**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
1999 Harrison Street, Suite 670
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

Javier Bleichmar
jbleichmar@bfalaw.com
Joseph Fonti
jfonti@bfalaw.com
Wilson Meeks
wmeeks@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960

*Counsel for Ontario Teachers' Pension Plan Board
and [Proposed] Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| AMRAM GALMI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, and EYAL DESHEH,<br><br>Defendants. | Case No. 2:16-cv-08259-TJH (ASx)<br><br>CLASS ACTION<br>**ONTARIO TEACHERS' PENSION PLAN BOARD'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COMPETING MOVANTS AND IN FURTHER SUPPORT OF ITS MOTION FOR LEAD PLAINTIFF**<br><br>DATE: February 6, 2017<br>TIME: UNDER SUBMISSION<br>JUDGE: Hon. Terry J. Hatter Jr. |

ANTHONY LEONE, Individually and on behalf of all others similarly situated,

Plaintiff,

vs.

TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, and KOBI ALTMAN,

Defendants.

Case No. 2:16-cv-9545 DSF (AFMx)

CLASS ACTION

# <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    THE TEVA INVESTOR GROUP IS NOT AN ADEQUATE OR
       TYPICAL LEAD PLAINTIFF........................................................... 4

       A.     The Teva Investor Group Is Inadequate And Atypical Because Its
              Own Counsel Asserts That One Of Its Members, Kleinerman, Is
              Unfit To Serve As Lead Plaintiff ....................................... 4

       B.     The Teva Investor Group Is Comprised Of Unaffiliated Investors
              That Appear To Have Been Improperly Cobbled Together By
              Counsel To Amass The Largest Loss................................. 7

              i.     The Teva Investor Group Has No Pre-existing Relationship ....8

              ii.    The Teva Investor Group Has No Adequate Explanation
                     For Its Formation ..................................................9

              iii.   The Teva Investor Group Has No Adequate Plan To Work
                     Together ..........................................................10

              iv.    There Is Additional Evidence That The Teva Investor
                     Group Is Controlled By Its Counsel ........................11

              v.     Kleinerman Has Not Provided Any Substantive Information
                     About Himself Casting Additional Doubt That He Is In
                     Control Of Counsel ...........................................12

III.   TIAA HAS OVERSTATED ITS FINANCIAL INTEREST IN THE
       LITIGATION ...........................................................................14

       A.     Five Of The Nine TIAA Entities Sold All Of Their Holdings In
              Teva Prior To Any Disclosure Of The Fraud; Those Losses Are
              "In-And-Out" And Must Be Excluded.............................. 14

B.    TIAA Also Improperly Included Losses From Shares Purchased After The Final Corrective Disclosure On November 3, 2016 Removed All Fraudulent Inflation From The Share Price ................ 19

C.    In The Four Remaining TIAA Entities That Have Losses That Are Not Completely In-and-Out, *Dura* Requires Removal Of All Pre-Disclosure Losses; TIAA's Financial Interest Is Reduced To $7.6 Million .................................................................................................. 21

IV.   ONTARIO TEACHERS' SHOULD BE APPOINTED LEAD PLAINTIFF ............................................................................................ 23

A.    Ontario Teachers' Has The Largest Financial Interest ..................... 23

B.    Ontario Teachers' Has Fully Demonstrated That It Satisfies Rule 23 .................................................................................................. 24

V.    CONCLUSION ........................................................................................... 25

1
## TABLE OF AUTHORITIES

2
**CASES**

3
*Armour v. Network Assocs., Inc.*, 171 F. Supp. 2d. 1044 (N.D. Cal. 2001) .......... 12

4
*Beckman v. Ener1, Inc.*, No. 11 CIV. 5794, 2012 WL 512651 (S.D.N.Y.

5
Feb. 15, 2012) ................................................................................................ 11

6
*Bensley v. Falconstor Software, Inc.*, 277 F.R.D. 231 (E.D.N.Y. 2011) ......... 15, 16

7
*Bodri v. Gopro, Inc.*, 16-CV-00232, 2016 WL 1718217 (N.D. Cal. Apr. 28,

8
2016) ................................................................................................................ 16

9
*Cholakyan v. Mercedez-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) .......... 5

10
*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................. 3, 14, 22, 23

11
*Eichenholtz v. Verifone Holdings, Inc.*, No. 07-CV-06140, 2008 WL

12
3925289 (N.D. Cal. Aug. 22, 2008) ................................................................ 10

13
*Ferrari v. Gisch,* 225 F.R.D. 599 (C.D. Cal. 2004) ............................................... 8

14
*Foster v. Maxwell Techs., Inc.*, No. 13-CV-00580, 2013 WL 5780424

15
(S.D. Cal. 2013) ............................................................................ 14, 15, 17, 22

16
*Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067 (W.D. Wash. 2011) ......... 9, 10, 12

17
*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ................... 20

18
*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) .................................................. 6, 7

19
*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ....................................... 7

20
*In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2007 WL 680779

21
(E.D.N.Y. Mar. 2, 2007) ................................................................................. 15

22
*In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729 (S.D. Ind. 2000) .................. 13

23
*In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427 (S.D. Tex. 2002) ...................... 9, 13

24
*In re MGM Mirage Sec. Litig.*, No. 09-cv-01558, 2010 WL 4316754

25
(D. Nev. Oct. 25, 2010) .................................................................................... 7

26
*In re Netflix, Inc. Sec. Litig.*, No. 12-CV-0225, 2012 WL 1496171

27
(N.D. Cal. Apr. 27, 2012) ................................................................................. 7

28
*In re Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017 (N.D. Cal. 1999) ............. 6

1  *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618 (S.D.N.Y. 2015) .............. 8, 9, 11

2  *In re Surebeam Corp. Sec. Litig.*, No. 03-CV-1721, 2004 WL 5159061

3      (S.D. Cal. Jan. 5, 2004) ...................................................................... 6

4  *In re Veeco Instruments, Inc. Sec. Litig.*, 233 F.R.D. 330 (S.D.N.Y. 2005) ......... 15

5  *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523 (S.D.N.Y. 2015) .. 16, 22

6  *Marjanian v. Allied Nevada Gold Corp.*, No. 14-CV-175, 2015 WL 128691

7      (D. Nev. Jan. 9, 2015) ...................................................................... 15

8  *Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499 (S.D. Fla. 2002)........................... 6

9  *Porzio v. Overseas Shipholding Grp.*, No. 12-CV-7948, 2013 WL 407678

10     (S.D.N.Y. Feb. 1, 2013) ...................................................................... 15

11 *Ross v. Abercrombie & Fitch Co.*, No. 2:05-CV-819, 2007 WL 895073

12     (S.D. Ohio Mar. 22, 2007) ...................................................................... 14

13 *Sallustro v. Cannavest Corp.*, 93 F. Supp. 3d 265 (S.D.N.Y. 2015)......... 17, 18, 22

14 *Schriver v. Impac Mortg. Holdings, Inc.*, No. SACV 06-31,

15     2006 WL 6886020 (C.D. Cal. May 2, 2006) ...................................... 11

16 *Schueneman v. Arena Pharms., Inc.*, No. 10-CV-1959, 2011 WL 3475380

17     (S.D. Cal. Aug. 8, 2011)...................................................................... 15

18 *Stocke v. Shuffle Master, Inc.*, No. 07-CV-715, 2007 WL 4262723

19     (D. Nev. Nov. 30, 2007)...................................................................... 13

20 *Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*, 95 F. Supp. 3d 607

21     (S.D.N.Y. 2015) ...................................................................... 18

22 *Tsirekidze v. Syntax-Brillian Corp.*, No. 07-CV-2204, 2008 WL 942273

23     (D. Ariz. Apr. 7, 2008) ...................................................................... 14

24 *W.R. Huff Asset Mgm't Co. v. Deloitte & Touche LLP*, 549 F.3d 100

25     (2d Cir. 2008) ...................................................................... 13, 15

26 **S**TATUTES

27 15 U.S.C. § 78u–4 ...................................................................... 6, 7, 10

28

1

**OTHER AUTHORITIES**

2

Fed. R. Civ. P. 23 ................................................................................... 6, 24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Ontario Teachers' Pension Plan Board ("Ontario Teachers'") respectfully submits this memorandum of points and authorities in opposition to the competing movants and in further support of its motion for (1) consolidation, (2) appointment as Lead Plaintiff, and (3) appointment of Lead Counsel.

## I.   PRELIMINARY STATEMENT

On January 5, 2017, the following five competing motions were filed seeking appointment as Lead Plaintiff:

(1)   The Teva Investor Group claiming a loss of $47,843,638, consisting of (i) the Oregon Public Employees' Retirement System ("Oregon"), (ii) the Public School Teachers' Pension And Retirement Fund of Chicago ("Chicago"), and (iii) Dan Kleinerman ("Kleinerman");

(2)   TIAA claiming a loss of $42,525,807;

(3)   Ontario Teachers' with a loss of $23,236,126;

(4)   Robert Brosnan ("Brosnan") with a loss of $2,303,773; and

(5)   A group with a loss of approximately $800,000, consisting of the (i) Wayne County Employees' Retirement System, (ii) City of Roseville Employees' Retirement System, and (iii) Waterford Township Police and Fire Retirement System (the "Wayne Group").

For the reasons set forth below, the Teva Investor Group's and TIAA's motions are fatally flawed and must be denied.  Accordingly, the Court should grant Ontario Teachers' motion because Ontario Teachers' has the next largest financial interest and is an adequate Lead Plaintiff.

The Teva Investor Group suffers from multiple infirmities.  First, its own counsel here, Pomerantz LLP ("Pomerantz"), is currently arguing in another securities class action also at the Lead Plaintiff stage that Kleinerman is inadequate because of his connection to an illicit insider trading scheme.  *See infra* II.A.  There could not be a more clear showing of Kleinerman's inadequacy than having his own counsel say so – either his counsel is right and Kleinerman is inadequate, or his counsel is wrong and Kleinerman is just as inadequate for his poor choice of counsel.  Further, the mere accusation of inadequacy by his own lawyers

disqualifies Kleinerman; Defendants will surely argue as much at class certification creating an unnecessary distraction and risk for the Class.  Tellingly, Kleinerman provides virtually no information to this Court to establish his adequacy aside from the fact that he lives in the Netherlands and is a businessman.  Accordingly, the motion before this Court claiming that Kleinerman is adequate rings hollow.  Kleinerman accounts for approximately $30 million of the Teva Investor Group's losses of approximately $47 million.  Without Kleinerman, Ontario Teachers' loss of $23.2 million is larger than the combined loss of approximately $17 million of the remaining group members, Oregon and Chicago.

Second, the Teva Investor Group is also inadequate because it appears to have been put together by its lawyers for the sole purpose of amassing the largest loss.  *See infra* II.B.  Lead plaintiff groups created by counsel have been repeatedly rejected by courts because they violate the express purpose of the Private Securities Litigation Reform Act ("PSLRA") to reject lawyer-driven litigation.  Indeed, the three members of this group have no pre-existing relationship, have not established an adequate mechanism to coordinate and efficiently litigate this case together, and have no credible explanation for the formation of the group other than increasing the size of their alleged loss.  The fact that they request the appointment of two law firms as lead counsel, including one that is conflicted, as opposed to a single firm, thereby duplicating work and creating inefficiency, also suggests that the group was established for the benefit of its lawyers.  Simply put, the Class must not be saddled with this lawyer-driven group whose largest participant, according to its own counsel, is an inadequate lead plaintiff.

With respect to TIAA, it did not suffer the loss it claims of $42.5 million.  It suffered a loss of no more than $7.6 million.  TIAA's loss calculation includes three major errors in the losses of the nine separate TIAA entities it grouped together.  First, five of the nine TIAA entities sold out their entire Teva position before the first corrective disclosure.  *See infra* III.A. These are commonly referred to as "in-

and-out" transactions because the entity was in-and-out of the security before the price dropped and the entity therefore suffered no losses caused by the fraud. It is a fundamental corollary of the element of proximate cause that there must be a causal connection between a securities plaintiff's loss and the defendant's fraudulent conduct. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46, 125 S. Ct. 1627, 1633 (2005).[1] If, however, "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* at 342, 125 S. Ct. at 1631. That is exactly what happened here in five of the TIAA entities. Eliminating the losses of these five TIAA entities reduces TIAA's total loss by approximately $19.9 million to a remaining loss of $22.6 million, which is already less than Ontario Teachers' loss of $23.2 million.

Second, in the four remaining TIAA entities, TIAA improperly included losses from purchases that occurred after the final corrective disclosure (in effect, after the end of the Class Period). *See infra* III.B. Once the fraud has been revealed, and the stock price has begun to drop and adjust by incorporating the new information, subsequent purchases cannot have incurred losses with a causal connection to the fraud. *See Dura*, 544 U.S. at 345-46, 125 S. Ct. at 1633. For this reason, TIAA's loss is reduced by another approximate $2.3 million that is not recoverable, bringing down TIAA's loss to $20.2 million.

Third, in three out of the four remaining TIAA entities that are not completely in-and-out, the vast majority of the losses are the result of pre-corrective disclosure sales. These purported losses again are not caused by the fraud and cannot be included in TIAA's loss calculation. *See infra* III.C. Applying *Dura* requires removing the losses arising from those pre-corrective disclosure sales (as well as the losses from the TIAA entities that sold out entirely before the first disclosure and the losses from post-corrective disclosure purchases). As a result, TIAA's

---

[1] All internal citations and quotations are omitted unless otherwise indicated.

financial interest is reduced to no more than $7.6 million.  *See infra* III.C.  In sum, TIAA does not have anywhere near the $42.5 million loss it claims.

Because the Teva Investor Group is not adequate, and because TIAA's recoverable losses are only $7.6 million, Ontario Teachers' has the largest financial interest with a $23.2 million loss.  The remaining movants, Brosnan and the Wayne Group, have far smaller losses and fail for this reason alone.  Accordingly, Ontario Teachers' is the presumptive most adequate Lead Plaintiff under the PSLRA and should be appointed Lead Plaintiff and BFA should be appointed Lead Counsel.

## II.   THE TEVA INVESTOR GROUP IS NOT AN ADEQUATE OR TYPICAL LEAD PLAINTIFF

### A.   The Teva Investor Group Is Inadequate And Atypical Because Its Own Counsel Asserts That One Of Its Members, Kleinerman, Is Unfit To Serve As Lead Plaintiff

In recent court filings in another securities class action styled *Roofers' Pension Fund v. Papa & Perrigo Co., plc*, 16-cv-02805 (D.N.J.) ("*Perrigo*"), the Teva Investor Group's own counsel, Pomerantz, argued that Kleinerman is inadequate and unfit to serve as Lead Plaintiff.[2]  *See* 2d Weaver Decl. Ex. A. Pomerantz' attack on Kleinerman in *Perrigo* is unequivocal: "Mr. Kleinerman Is Unfit To Serve As Lead Plaintiff."  *Id.* at 8.  According to Pomerantz, a company managed and owned by Kleinerman was implicated in an illicit insider trading scheme.  *Id.* at 8-9.  Pomerantz specifically argues that this subjects Kleinerman to unique defenses that will distract from the litigation and thus, regardless of whether the facts are true, Kleinerman is inadequate to serve as Lead Plaintiff.  *Id.* at 9-10. Pomerantz' brief opposing Kleinerman's motion in *Perrigo* states the following:

---

[2]  *Perrigo* is also at the Lead Plaintiff appointment stage and Pomerantz represents a group of investors that has moved for Lead Plaintiff.  Kleinerman has separately moved but is represented by Cohen Milstein Sellers & Toll LLP ("Cohen Milstein"). 2d Weaver Decl. Ex. B.  Thus, in *Perrigo*, Pomerantz is directly opposed to Kleinerman and is attacking Kleinerman because Pomerantz represents a competing group and would not be appointed lead counsel if Kleinerman is appointed.

4

- "[T]he Court should deny Mr. Kleinerman's motion on the independent grounds that his past conduct, which includes ownership and management of a company implicated in an illicit insider trading scheme, suggests that he will not fairly and adequately protect the interests of the Class." *Id.* at 8.

- "[T]here are serious concerns that Mr. Kleinerman will face a host of unique defenses, and that he is inadequate to serve as Lead Plaintiff." *Id.*

- "[C]ourts routinely reject movants seeking to serve as Lead Plaintiff or as class representatives when those movants appear to have engaged in misconduct that casts doubt on their ability to serve as a fiduciary." *Id.* at 8-9.

- "Mr. Kleinerman's ability to represent the Class is cast into doubt by his connection to fraudulent securities transactions, including involvement in unlawful insider trading." *Id.* at 9.

- "[T]he simple risk that a movant's unique defenses are likely to become a major focus of the litigation is enough to defeat class certification." *Id.* at 10.

- "[T]he mere fact that Defendants will challenge Mr. Kleinerman's adequacy to act as a class representative by litigating these questions before the Court means that the questions about Mr. Kleinerman will become a significant focus in discovery, will needlessly increase costs and delays, and will threaten to derail the litigation and shift the Court's attention and resources away from Defendants' misconduct." *Id.*

Pomerantz has not withdrawn, corrected, or retracted any of these arguments against Kleinerman in *Perrigo*, even though two of the lawyers who signed those papers are the same lawyers who signed the papers in this case saying exactly the opposite – that Kleinerman is adequate.

Pomerantz' contradictory assertions about Kleinerman's adequacy establish one thing for certain: Kleinerman is inadequate and unfit to serve as Lead Plaintiff. "[T]he typicality inquiry does not demand proof that a defense will ultimately defeat the class representative's claims.  Instead, it asks only whether plaintiff is likely to be preoccupied with litigating the defense to the detriment of the class as a whole." *Cholakyan v. Mercedez-Benz USA, LLC*, 281 F.R.D. 534, 557 (C.D. Cal. 2012).  As Pomerantz argues in Perrigo, it is "axiomatic that a movant cannot seek to represent

a class of investors asserting claims for securities fraud when that movant itself is tainted by allegations of similar fraudulent or deceptive behavior."[3]

Defendants will certainly raise Kleinerman's association with an insider trading scheme and his inability to act as a fiduciary to the Class. Defendants will also raise that Kleinerman's own counsel, Pomerantz, asserts that Kleinerman is inadequate. This will constitute a credible, yet unnecessary, distraction and risk at the class certification stage. And Defendants will also put the other members of the Teva Investor Group to the test of how, and why, they associated themselves with Kleinerman and Pomerantz.[4]

The entire Teva Investor Group is therefore unfit and inadequate. Either Chicago and Oregon were unaware of Pomerantz' arguments in *Perrigo* and associated themselves with both Kleinerman and Pomerantz without conducting the appropriate due diligence required of a fiduciary, or they were aware, but did not properly appreciate how Pomerantz' attacks on Kleinerman fatally undermine the entire group's credibility and adequacy. Certainly, the Cohen Milstein firm is aware, as it represents Kleinerman in *Perrigo* too. *See* 2d Weaver Decl. Ex. B. The fact remains that one of the firms that the Teva Investor Group has hired and proposed as co-lead counsel has explicitly argued that Kleinerman is unfit, which creates dangerous risks for the class here and bolsters the unique defense against Kleinerman.

---

[3] 2d Weaver Decl. Ex. A at 8-10 (*citing Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 504-05 (S.D. Fla. 2002); *In re Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999); and *In re Surebeam Corp. Sec. Litig.*, No. 03-CV-1721, 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004)).

[4] The failure to appreciate, disclose, explain or address the ethical conflict the Teva Investor Group created by hiring Pomerantz fatally undermines any claim that it can fairly and adequately protect the interests of the class, as required by the PSLRA and Fed. R. Civ. P. 23. *See In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002) (*citing* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

Kleinerman's response in *Perrigo* is that Pomerantz' accusations are baseless, old, and have been debunked. *Id.* at 7-8. But if that is the case, why did Kleinerman agree to be represented by Pomerantz in this action? Either Pomerantz' accusations are valid and Pomerantz is a zealous advocate, or Pomerantz is making meritless arguments that Kleinerman believes are frivolous. The latter renders Kleinerman just as inadequate here because Kleinerman has made a remarkably poor selection of counsel, opening the door to serious unique defenses, to the detriment of the Class.

> Though the selection of lead counsel is subject to the approval of the Court, courts generally do not reject the appointment of truly inadequate lead counsel, but, rather, reject the lead plaintiff if 'the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on the plaintiff's willingness or ability to perform the functions of lead plaintiff.'

*In re MGM Mirage Sec. Litig.*, No. 09-cv-01558, 2010 WL 4316754, at *3 (D. Nev. Oct. 25, 2010) (*citing In re Cavanaugh*, 306 F.3d at 733). *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001) ("[O]ne of a lead plaintiff's most important functions is to 'select and retain' lead counsel." (*quoting* 15 U.S.C. § 78u-4(a)(3)(B)(v))). Kleinerman has thus demonstrated that he is just not up to the task of acting as a fiduciary.

## B. The Teva Investor Group Is Comprised Of Unaffiliated Investors That Appear To Have Been Improperly Cobbled Together By Counsel To Amass The Largest Loss

Courts in the Ninth Circuit reject the aggregation of "losses of individual investors with no apparent connection to each other aside from their counsel" because such groups "fail to meet the adequacy prong of Rule 23" and are "contrary to the purposes of the PSLRA." *In re Netflix, Inc. Sec. Litig.*, No. 12-CV-0225, 2012 WL 1496171, at *4 (N.D. Cal. Apr. 27, 2012).[5]

---

[5] *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621 (S.D.N.Y. 2015) ("Although the PSLRA expressly permits the Court to appoint a 'group of persons'

Congress intended the PSLRA to "transfer primary control of private securities litigation from lawyers to investors." *Petrobras*, 104 F. Supp. 3d at 621. "Allowing unrelated plaintiffs to band together in order to manufacture a larger financial interest … ensures that the lawyers, who are invariably the matchmakers … are the true drivers of the litigation." *Id.* at 621-22. Such groups are further inadequate under Rule 23 because they "create[] problems of coordination, risk duplication of effort, and reduce[] the incentive of any individual group member to carry out its lead plaintiff duties to the fullest extent." *Id.* at 622.

Courts therefore demand that the members of any group applying for lead plaintiff affirmatively establish "their ability to function as a cohesive and independent unit to protect the interests of the class." *Id.* at 621; *see also Ferrari v. Gisch,* 225 F.R.D. 599, 608 (C.D. Cal. 2004). "[C]onsiderations include [1] whether the group's members have a pre-existing relationship, [2] whether they have cooperated effectively thus far, and [3] whether they have a coherent plan for dividing responsibilities, resolving conflicts, and managing the litigation." *Petrobras Sec. Litig.*, 104 F. Supp. 3d at 621. The Teva Investor Group fails each of these prongs.

### i. The Teva Investor Group Has No Pre-existing Relationship

The Teva Investor Group has failed to show that its members have any pre-existing relationship other than through their lawyers. Kleinerman is an individual residing in the Netherlands, while Oregon and Chicago are institutional investors that are neither geographically nor otherwise related, and all three are separated by nine different time-zones. There is no logical or natural connection between any of

to serve as lead plaintiff, many courts, including this one, are skeptical of such arrangements when they are the product of an artificial grouping designed merely to qualify as lead plaintiff under the PSLRA") (collecting cases). *Accord Kinney v. Capstone Turbine Corp.*, CV 15-8914, 2016 WL 5341948, at *3-4 (C.D. Cal. Feb. 29, 2016); *Fialkov v. Celladon Corp.*, No. 15-cv-1458, 2105 WL 11658717, at *4 (S.D. Cal. Dec. 9, 2015).

these investors to indicate any relationship prior to their motion in this case.  And they do not even claim to have one in their Joint Declaration.  *See* Joint Decl. of Oregon, Chicago, and Kleinerman in Support of Their Mot. For Appointment as Lead Pl. (ECF No. 17-8) (the "TIG Decl.").

This lack of a "pre-litigation relationship and that they were introduced by counsel … raises the specter of a group of unrelated individuals brought together by counsel solely for the purpose of aggregating losses in order to surpass the financial interests of any other applicant, and raises the concern that those in control of this litigation will in fact be the … lawyers and not the members…"  *Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1074 (W.D. Wash. 2011).

### ii.  The Teva Investor Group Has No Adequate Explanation For Its Formation

The Teva Investor Group also has not explained why it banded together other than generally to say that they "share a mutual belief that [their] combined knowledge, experience, sophistication and resources will enable [them] to vigorously represent the interests of the Proposed Class," and assert that the Class will somehow inexplicably benefit from the "combination of individual and institutional investors."  TIG Decl., 3-4.  Courts have rejected these kinds of generalized and empty explanations as insufficient to establish coherence, and have explicitly rejected claims that a class generally benefits from a combination of individuals and groups.  *See, e.g., In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002) (rejecting a group application without "clear or persuasive reason" why the members "joined together"); *Petrobras Sec. Litig.*, 104 F. Supp. 3d at 625 (rejecting application of an individual for co-lead plaintiff position because the individual did "not specify any particular interests that are not adequately represented" by an institutional investor).

9

### iii.  The Teva Investor Group Has No Adequate Plan To Work Together

The Teva Investor Group also has provided no indication that it has a cohesive plan to manage the litigation and cooperate effectively.  Instead, their Joint Declaration simply contains the kinds of conclusory statements and "generalities" that courts regularly hold "have little or no substance and do not further the position of [an] otherwise unrelated group of individuals as an adequate class representative." *Frias*, 835 F. Supp. 2d at 1074-1075 (rejecting group that proffered a conclusory joint declaration).[6]

The Group argues in its brief in support of its motion that they are a "small, cohesive group" (ECF No. 16 at 12), and asserts in its joint declaration that they "intend to work closely together," "fully expect[] to reach *unanimous* decisions regarding litigation matters," and have "agreed to utilize *consensus* decision making to maximize the recovery of the Class" (TIG Decl., 12-13) (emphasis supplied). These platitudes completely fail to address how the group can function effectively. It is easy to say – and self-evident – that the group will try to reach a "consensus," "unanimously."   But a cooperation plan requires a mechanism to resolve disagreements.  The question this Court, and the Class, needs answered is what happens if there is a disagreement.  Simply put, the Teva Investor Group has failed to present any workable or functional cooperation agreement, further suggesting that it is a lawyer driven group.[7]

---

[6] *Accord Eichenholtz v. Verifone Holdings, Inc.*, No. 07-CV-06140, 2008 WL 3925289, at *9 (N.D. Cal. Aug. 22, 2008) (same).

[7] The Teva Investor Group's lack of cohesiveness and inability to coordinate effectively is exemplified by their use of three different prices by each member for the 90-day average price of Teva's ADSs required under the PSLRA for calculating each member's financial interest.  15 U.S.C. § 78u-4(e).  *See* the estimated loss calculation charts of Oregon (ECF No. 17-5, at 1), Chicago (ECF No. 17-6, at 1) and Kleinerman (ECF No. 17-7, at 1).  If they cannot coordinate on such a simple,

10

#### iv.  There Is Additional Evidence That
#### The Teva Investor Group Is Controlled By Its Counsel

Additional evidence that the Teva Investor Group is not independent of its lawyers is its unexplained choice of two law firms, when one firm could aptly handle the litigation and two firms gives rise to duplication and inefficiency. *See Petrobras*, 104 F. Supp. 3d at 621 (finding unexplained choice of second counsel evidence of lawyer driven litigation); *Schriver v. Impac Mortg. Holdings, Inc.*, No. SACV 06-31, 2006 WL 6886020, at *8 (C.D. Cal. May 2, 2006) (same).

The unnecessary choice of two firms, and the choice of a conflicted firm whose presence exacerbates a unique defense against the group's members, strongly indicates that the Teva Investor Group is "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as lead plaintiff, which can then select the equally artificial grouping of [two law firms] as [co-]lead counsel." *Beckman v. Ener1, Inc.*, No. 11 CIV. 5794, 2012 WL 512651, at *3 (S.D.N.Y. Feb. 15, 2012).[8]

---

factual detail, how can they be expected to coordinate and agree upon complex litigation decisions and strategy?

[8]   There is yet another recent circumstance that supports the conclusion that the amalgamation of the Teva Investor Group and its losses is driven by the lawyers. On January 5, the day the lead plaintiff motions in this case were due, Pomerantz (representing another investor group) and Cohen Milstein (representing Kleinerman) were adverse to one another, competing for leadership in another securities class action. *Van Duppen v. Mylan N.V. et al.*, 16-cv-07926 (S.D.N.Y.) (JPO) ("*Mylan*"). The opposition brief in *Mylan* was due January 6.

Within hours of the filing of the instant lead plaintiff motions in this Action, however, Pomerantz and Cohen Milstein advised the *Mylan* court that they had struck a deal to join together Kleinerman with four other wholly unrelated entities, and sought appointment of both law firms as co-lead counsel. 2d Weaver Decl. Ex. C.  No substantive reason was provided for either the joinder of Kleinerman with the four other unrelated investors or the new decision to select two firms as co-lead counsel. *Id*.  The deal resolved all outstanding opposition.

### v. Kleinerman Has Not Provided Any Substantive Information About Himself Casting Additional Doubt That He Is In Control Of Counsel

Kleinerman has provided virtually no meaningful information to establish his qualifications as a fiduciary to the Class or that he can control counsel.  The only concrete information included in the Joint Declaration is that he lives in the Netherlands and is an "experienced businessman and investor."  TIG Decl. at ¶ 3. Neither the Court, nor the Class, knows his occupation, educational background, age, whether he is in good health, any details about his experience as a businessman and investor, or any of the most basic information necessary to determine whether this Class of thousands of investors, who lost billions of dollars in market capitalization, will be adequately represented.  *See Armour v. Network Assocs., Inc.*, 171 F. Supp. 2d. 1044, 1051 (N.D. Cal. 2001) (A movant "must show that it can discharge the fiduciary duties that a class representative owes to absent class members under Rule 23.").  The opacity of his submission to this Court therefore raises significant concerns, especially given his reported connection to an illicit insider trading scheme as Pomerantz set forth in *Perrigo*.

Kleinerman also does not explain the context of his claimed aggregate losses of approximately $80.4 million in the three cases in which he has moved for lead plaintiff, all within the past six months, *Perrigo*, *Mylan* and *Teva*.[9]  Each of these companies manufactures generic pharmaceuticals.  It is therefore fair to inquire whether Kleinerman has connections to the industry that may create a conflict.

---

This tangle of apparent deals and side deals crossing over various litigations for the benefit of the lawyers is anathema to Congress's very reason for enacting the PSLRA, and further reflects that the Teva Investor Group is inadequate.  "The PSLRA was enacted to prevent precisely this type of lawyer-drive litigation [through artificial aggregation]."  *Frias*, 835 F. Supp. 2d at 1074.  The Court should reject such machinations and deny their Teva Investor Group's motion.

[9] Kleinerman has claimed losses of (1) $30.4 million in this case, (2) losses of $28.6 million in *Perrigo* (a generic pharmaceuticals manufacturer), and (3) a $21.4 million loss in *Mylan* (also a generic drug manufacturer)

1    Kleinerman similarly provides no information about the legal entity (if any)

2    that he used to conduct the purchase of Teva's securities at issue here. Indeed, given

3    the substantial sums involved, particularly for an individual, and his self-professed

4    experience as a businessman, it is fair to ask whether these purchases were

5    conducted by trusts or legal entities, perhaps under his control, but technically not

6    under his name. The legal entity which has title to the shares is the only party with

7    standing. *W.R. Huff Asset Mgm't Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106

8    (2d Cir. 2008) ("the minimum requirement for an injury-in-fact is that the plaintiff

9    have legal title to, or a proprietary interest, in the claim").

10   Courts have made clear that a lead plaintiff motion as sparse as this one is

11   unacceptable. A lead plaintiff must demonstrate that it can adequately represent the

12   Class. *See Enron*, 206 F.R.D. at 441 ("[T]he Court must examine . . . the ability of

13   the representative[s] to take an active role in and control the litigation and to protect

14   the interests of the absentee" class members). Accordingly, courts regularly reject

15   lead plaintiff motions when the "quality of information submitted" provides "very

16   little basis to evaluate the ability of [the applicants] to prosecute th[e] case." *In re*

17   *Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 733 (S.D. Ind. 2000). "[W]hether the

18   class representative has the ability to prosecute the action vigorously" is a key focus

19   when considering adequacy. *Stocke v. Shuffle Master, Inc.*, No. 07-CV-715, 2007

20   WL 4262723, at *3 (D. Nev. Nov. 30, 2007).[10]

21                                    * * * *

22   In sum, the Teva Investor Group as a whole fails because Kleinerman is

23   inadequate and the group is nothing more than an artificial, lawyer–driven

24   amalgamation that has placed the Class in jeopardy by hiring counsel that

25   _____

26   [10] In *In re NovaGold Resources Inc. Sec. Litig.*, 08-cv-7041-DLC-JCF (S.D.N.Y

27   2008), the Court declined to appoint two individual investors because the Court did
     "not [know] enough [about them] to make a judgment" concerning their adequacy.

28   Oral Arg. Tr., (S.D.N.Y. Oct. 31, 2008), 2d Weaver Decl., Ex. D, 24:13-16.

13

undermines its adequacy.  Even if the Court simply removes Kleinerman from the group, the remaining losses of Oregon and Chicago are approximately $17.3 million, far less than the $23.2 million loss suffered by Ontario Teachers'.[11]  Thus, Ontario Teacher' has the largest financial interest in this case, and is the presumptive "most adequate lead" plaintiff.

## III.   TIAA HAS OVERSTATED ITS FINANCIAL INTEREST IN THE LITIGATION

### A.   Five Of The Nine TIAA Entities Sold All Of Their Holdings In Teva Prior To Any Disclosure Of The Fraud; Those Losses Are "In-And-Out" And Must Be Excluded

In determining the "most adequate plaintiff," courts in the Ninth Circuit "focus[] on the amount of potential recovery in the relief sought by the class," as required by the PSLRA.  *Foster v. Maxwell Techs., Inc.*, No. 13-CV-00580, 2013 WL 5780424, at *2-3 (S.D. Cal. 2013) (collecting cases).  This is logical as an investor's actual financial interest in the relief sought includes only losses potentially recoverable upon a judgment on the merits.

The U.S. Supreme Court has held that recoverable losses in securities fraud actions include only those proximately caused by a fraud.  *Dura*, 544 U.S. at 345-46.  Under *Dura*, there must be proof of a causal connection between a securities plaintiff's loss and the defendant's fraudulent conduct.  If, however, as the Supreme Court explained, "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* at 342.

---

[11] *See, e.g.*, *Tsirekidze v. Syntax-Brillian Corp.*, No. 07-CV-2204, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) ("[T]he group suggests that we pluck one of its top-two constituents to serve as lead plaintiff . . . . We decline to do so. The [] Group moved for lead plaintiff as a group and will be evaluated as such."); *Ross v. Abercrombie & Fitch Co.*, No. 2:05-CV-819, 2007 WL 895073, at *4 (S.D. Ohio Mar. 22, 2007) ("There is no requirement in the PLSRA that the Court realign a proposed group to cure a deficiency in adequacy of representation.").

Accordingly, "[t]he misrepresentation does not lead to a loss if the purchaser sells the shares before the truth is revealed." *Maxwell Techs.*, 2013 WL 5780424 at *3. Put differently, "[o]nly losses sustained after the misrepresentation[s] 'become generally known' are recoverable." *Marjanian v. Allied Nevada Gold Corp*., No. 14-CV-175, 2015 WL 128691, at *3 (D. Nev. Jan. 9, 2015). As a result, "for purposes of evaluating financial interest, it makes sense to disregard any gains or losses resulting from stock trades before the truth was disclosed." *Schueneman v. Arena Pharms., Inc*., No. 10-CV-1959, 2011 WL 3475380, at *3 (S.D. Cal. Aug. 8, 2011)). To wit:

> [i]t is clear that under [the Supreme Court decision in] *Dura* and its progeny, any losses that [movant] may have incurred before [defendant's] misconduct was ever disclosed to the public are not recoverable, because those losses cannot be proximately linked to the misconduct at issue in this litigation. While the *Dura* Court decided a motion to dismiss, and not a lead plaintiff motion, the legal outgrowth of that holding is that any such losses not be considered in the recoverable losses calculations that courts engage in when selecting lead plaintiff.

*In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2007 WL 680779, at *4 (E.D.N.Y. Mar. 2, 2007). More mechanically, "**losses resulting from in-and-out transactions**, which took place during the class period, but before the misconduct identified was ever revealed to the public, are not to be included in loss calculations" on a motion for lead plaintiff. *Bensley v. Falconstor Software, Inc.*, 277 F.R.D. 231, 238 (E.D.N.Y. 2011) (emphasis supplied).[12]

This requirement is rooted in a fundamental doctrine of Article III standing, injury-in-fact, because if all trades are in-and-out the entity has not sustained an injury and therefore has no standing. *Huff*, 549 F.3d at 106 (no standing if entity

---

[12] *See also Porzio v. Overseas Shipholding Grp.*, No. 12-CV-7948, 2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013) (denying lead plaintiff status to investor where stock purchased was sold before corrective disclosure); *In re Veeco Instruments, Inc. Sec. Litig.*, 233 F.R.D. 330, 333 (S.D.N.Y. 2005) (same).

cannot assert loss causation); *Bensley*, 277 F.R.D. at 240 (an in-and-out plaintiff "would lack standing").

Contrary to this case law, TIAA submits that its financial interest here is $42,525,807 on a first-in-first-out ("FIFO") basis.[13]  This represents the aggregate sum of nine separate entities reflected in the table below:

| UNCORRECTED TIAA LOSS CALCULATION (AS SUBMITTED BY TIAA) | |
|---|---|
| **TIAA Entity** | **Claimed FIFO (Loss) and Gain** |
| College Retirement Equities Fund - Growth Account | ($12,314,348) |
| College Retirement Equities Fund - Stock Account | ($11,268,921) |
| College Retirement Equities Fund - Global Equities Account | ($10,495,123) |
| TIAA-CREF Funds - Large-Cap Growth Fund | ($6,651,760) |
| TIAA-CREF Funds - Int'l Equity Index Fund | ($920,785) |
| TIAA-CREF Funds - Growth & Income Fund | ($824,146) |
| TIAA-CREF Life Funds - Life Growth Equity Fund | ($149,586) |
| TIAA-CREF Life Funds - Life Growth & Income Fund | ($25,878) |
| TIAA-CREF Funds - Enhanced Int'l Equity Index Fund | $124,740 |
| TOTAL | ($42,525,807) |

But this calculation as submitted by TIAA overstates losses.  Five of the nine entities sold out their entire positions in Teva before the first alleged corrective disclosure in this case, on August 4, 2016.[14]  (See next Table below).  The total

---

[13] TIAA has adopted FIFO.  We do not take issue with its FIFO analysis for the sole purposes of analyzing its losses, but note that FIFO is commonly known to "ignore[] sales during the class period and hence may exaggerate losses."  *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 531 (S.D.N.Y. 2015).  For this reason, "[t]he weight of authority puts the most emphasis on . . . a last in, first out ("LIFO") methodology."  *Bodri v. Gopro, Inc.*, 16-CV-00232, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016).  Ontario Teachers' calculated its loss under LIFO.

[14] There is no dispute that prior to August 4, 2016 there had been no disclosure that Teva had allegedly engaged in price-fixing.  The only two complaints on file, those in the above-captioned actions, as well as TIAA's own recitation of the facts in its

amount of losses that result from the in-and-out trades by those five TIAA entities is $19,965,718, and now must be excluded.

| CALCULATION OF UNRECOVERABLE LOSSES FROM IN-AND-OUT ENTITIES | | | |
|---|---|---|---|
| **TIAA Fund** | **Claimed FIFO (Loss)** | **Date Sold Out Entire Teva Position** | **FIFO (Loss) After 8/4/2016 Corrective Disclosure** |
| College Retirement Equities Fund - Growth Account | ($12,314,348) | 7/28/2016 | $0 |
| TIAA-CREF Funds - Large-Cap Growth Fund | ($6,651,760) | 7/15/2016 | $0 |
| TIAA-CREF Funds - Growth & Income Fund | ($824,146) | 10/7/2015 | $0 |
| TIAA-CREF Life Funds - Life Growth Equity Fund | ($149,586) | 7/15/2016 | $0 |
| TIAA-CREF Life Funds - Life Growth & Income Fund | ($25,878) | 10/7/2015 | $0 |
| **Total** | **($19,965,718)** | | **$0** |

In other words, none of these five TIAA entities – which claimed a total loss of $19,965,718 (based on the loss calculation submitted by TIAA (ECF No. 23-3))– have any potentially recoverable damages that can count towards TIAA's financial interest in the relief sought by the Class under the PSLRA. *See Maxwell Techs.*, 2013 WL 5780424, at *4-5 (excluding all but $178,994 of a claimed $907,930

---

Lead Plaintiff brief (at 2-3), state that August 4, 2016 is the first partial corrective disclosure. *Sallustro v. Cannavest Corp.*, 93 F. Supp. 3d 265, 27 (S.D.N.Y. 2015) (eliminating in-and-out losses in lead plaintiff motion and concluding that "*Dura* [and its progeny] … require a court to make pre-discovery loss causation determinations regarding asserted claims (or parts of asserted claims) that are based on the facts alleged in the complaint"); *Maxwell Techs.*, 2013 WL 5780424, at *4 ("The Court is limited to considering allegations in the pending complaints at [the lead plaintiff] stage of the litigation").

claimed loss because only those losses "resulted from the sale of stock that took place after the disclosure").[15]

Once these in-and-out losses of $19,965,718 are deducted, **the resulting total claimed losses by TIAA entities is $22,560,089 – this is less than the $23,236,126 FIFO/LIFO loss suffered by Ontario Teachers'**.

| TIAA LOSS CALCULATION CORRECTED TO EXCLUDE UNRECOGNIZED LOSSES FROM IN-AND-OUT ENTITIES | |
|---|---|
| **TIAA FUND** | **Claimed FIFO (Loss) or Gain** |
| College Retirement Equities Fund - Stock Account | ($11,268,921) |
| College Retirement Equities Fund - Global Equities Account | ($10,495,123) |
| TIAA-CREF Funds - Int'l Equity Index Fund | ($920,785) |
| TIAA-CREF Funds - Enhanced Int'l Equity Index Fund | $124,740 |
| **Total** | ($22,560,089) |

For clarity of presentation, Ontario Teachers' illustrates in two different ways the effect of eliminating TIAA's losses from entities that are completely in-and-out. First, we provide the Court with a copy of the loss calculation provided by TIAA as Exhibit C to the Myers Declaration (*see* ECF 23-3) now annotated by Ontario Teachers' counsel to show the specific losses that need to be eliminated because they are in-and-out. 2d Weaver Decl. Ex. E. Second, for each of the five TIAA entities that are in-and-out, we provide a stock price chart during the class period overlaid with the cumulative net holdings of Teva's ADSs for each TIAA entity. 2d Weaver Decl. Ex. G. These price charts graphically show that each of these five

---

[15] *Sallustro*, 93 F. Supp. 3d. at 273 (denying lead plaintiff motion after cutting in-and-out losses of about $10,000 and finding that movant no longer had largest loss); *Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*, 95 F. Supp. 3d 607, 618 (S.D.N.Y. 2015) ("Because Jayhawk did not own any shares of [] stock during or after the initial [] disclosure alleged in the original Complaint, [the competing movants] maintain that, for the purposes of the 'greatest financial interest' calculation, Jayhawk suffered no losses attributable to the [] fraud. The Court agrees.").

1  entities had sold out all of their Teva holdings prior to the first corrective disclosure

2  of August 4, 2016.

3
4    **B.    TIAA Also Improperly Included Losses From Shares Purchased
5            After The Final Corrective Disclosure On November 3, 2016
             Removed All Fraudulent Inflation From The Share Price**

6        Turning to each of the four TIAA funds that had not completely sold out of

7  Teva before the first disclosure, each one incorrectly includes shares that were

8  purchased **after** the final disclosure – in effect, after the end of the cognizable Class

9  Period.  This improperly inflates TIAA's claimed financial interest by an additional

10 $2,308,172 that now also needs to be subtracted from TIAA's alleged loss.

11 2d Weaver Decl. Ex. J.

12       Specifically, the final corrective disclosure alleged in this case occurred on

13 November 3, 2016, when *Bloomberg* published an article titled "U.S. Charges in

14 Generic-Drug Probe to be Filed by Year-End."  The article reported that criminal

15 indictments stemming from the DOJ's investigation into the generics industry might

16 issue by the end of 2016, named Teva, and added that "[c]harges could extend to

17 high-level executives." *Bloomberg* issued the article at exactly 2:10 p.m. EST. 2d

18 Weaver Decl. Ex. H.  After, and in response to, this article, the price of Teva's ADSs

19 immediately dropped as reflected in the intraday price chart from *Bloomberg* below:

20
21
22
23
24
25
26
27
28

19



From this chart, it is clear that Teva's ADSs traded roughly between $43 and $42 per share before *Bloomberg* published its article at 2:10 p.m. EST, and did not trade at $39.20 until **after** the corrective disclosure was issued.  The four TIAA entities that purchased Teva ADS on November 3 purchased at $39.20.  Accordingly, those purchases occurred after the *Bloomberg* article was published and investors had reacted to the corrective disclosure.  Indeed, Teva ADSs traded at $39.20 throughout the afternoon and after-market hours. TIAA could have purchased its ADSs hours after the disclosure. As a result, none of the losses from those after-the-fact purchases are recoverable, and they cannot count towards TIAA's aggregate "financial interest."[16]

---

[16] As a fundamental requirement of an injury-in-fact, "to recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must establish '….reliance upon the misrepresentation or omission; economic loss; and loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).

As reflected in the table below, removing the losses arising from post-final corrective disclosure purchases has a significant effect:

| TIAA FIFO LOSSES CORRECTED TO EXCLUDE POST-FINAL CORRECTIVE DISCLOSURE PURCHASES | | |
|---|---|---|
| **TIAA FUND** | **Claimed FIFO Loss/Gain Incl. Post-Class Purchases** | **Claimed FIFO Loss/Gain NOT Incl. Post-Class Purchases** |
| College Retirement Equities Fund - Stock Account | ($11,268,921) | ($9,872,810) |
| College Retirement Equities Fund - Global Equities Account | ($10,495,123) | ($10,352,724) |
| TIAA-CREF Funds - Int'l Equity Index Fund | ($920,785) | ($26,384) |
| TIAA-CREF Funds - Enhanced Int'l Equity Index Fund | $124,740 | $0 |
| **Total** | ($22,560,089) | ($20,251,917) |

TIAA's loss is reduced by another $2,308,172 that are not recoverable as a matter of law, for a total loss of $20,251,917, after also subtracting the losses from the TIAA entities that are completely in-and-out.  This is almost $3 million less than the $23,236,126, FIFO/LIFO loss suffered by Ontario Teachers'.

C.   **In The Four Remaining TIAA Entities That Have Losses That Are Not Completely In-and-Out,** *Dura* **Requires Removal Of All Pre-Disclosure Losses; TIAA's Financial Interest Is Reduced To $7.6 Million**

Ontario Teachers' already has a larger financial interest than TIAA because (i) TIAA has five entities that are completely in-and-out, which reduces TIAA's losses by $19,965,718 to $22,560,089 (less than Ontario Teachers' loss), and (ii) the remaining four TIAA entities also include losses from purchases after the truth was disclosed, which further reduces TIAA's loss by another $2,308,172 to $20,251,917.

21

Yet, under *Dura* and its progeny, there is even a third overstatement of TIAA's financial interest.  Within the remaining TIAA entities that suffered losses that are not entirely in-and-out, the vast majority of the remaining losses are the result of pre-corrective disclosure sales (pre-August 4, 2016).  When losses from those pre-corrective disclosure sales are removed from TIAA's financial interest calculation, TIAA's FIFO loss is reduced to a mere $7.6 million – after also deducting the losses from the TIAA entities that sold-out entirely before the first disclosure and the losses from post-class period purchases.  2d Weaver Decl. Ex. F.

Following *Dura*, courts regularly back-out losses from the sale of securities made before the first alleged disclosure from LIFO or FIFO loss calculations, even if the investor did not sell out of its position completely.  To provide a recent example, on contested lead plaintiff motions, the court in *Khunt v. Alibaba Grp. Holding* held that the movants could not include FIFO or LIFO losses from sales occurring before the first corrective disclosure as part of their financial interest:

> If a loss is not *Dura* eligible then it is not redressable through the putative class action the Zhangs seek to lead. If a lead plaintiff movant cannot recover a given loss in the action he seeks to lead, the loss cannot logically contribute to his financial stake in that action.

102 F. Supp. 3d at 531 (*citing Sallustro*, 93 F. Supp. 3d at 274–75 (rejecting a request to include losses realized from sales prior to a corrective disclosure)).  The court proceeded to compare the financial interest of each movant using a method it characterized as "Dura Recoverable Losses Using LIFO accounting." *Id.* at 532.

Similarly, the court in *Maxwell Techs.* held that "for purposes of evaluating financial interest, it makes sense to disregard any gains or losses resulting from stock trades before the truth was disclosed." 2013 WL 5780424, at *3 (*citing Arena Pharm.*, 2011 WL 3475380, at *3).  The court also then proceeded to compare the movants' financial interest counting only those "losses [that] resulted from the sale of stock that took place after the disclosure of the accounting fraud." *Id.* at *4-5 (excluding all but $178,994 of a claimed $907,930 claimed LIFO loss)

The result of applying this *Dura* method of calculating recognized financial interest to TIAA is reflected in the following chart and in the loss calculation attached to the 2d Weaver Decl. at Ex. F.

| TIAA FIFO LOSSES CORRECTED TO EXCLUDE ALL PRE-DISCLOSURE LOSSES AND POST-FINAL CORRECTIVE DISCLOSURE PURCHASES | |
|---|---|
| **TIAA Fund** | **Fully Corrected FIFO (Loss)/Gain** |
| College Retirement Equities Fund - Growth Account | $0 |
| College Retirement Equities Fund - Stock Account | ($2,634,745) |
| College Retirement Equities Fund - Global Equities Account | ($4,955,600) |
| TIAA-CREF Funds - Large-Cap Growth Fund | $0 |
| TIAA-CREF Funds - Int'l Equity Index Fund | ($26,255) |
| TIAA-CREF Funds - Growth & Income Fund | $0 |
| TIAA-CREF Life Funds - Life Growth Equity Fund | $0 |
| TIAA-CREF Life Funds - Life Growth & Income Fund | $0 |
| TIAA-CREF Funds - Enhanced Int'l Equity Index Fund | $0 |
| **TOTAL** | ($7,616,601) |

In contrast, whether FIFO, LIFO or a *Dura* FIFO/LIFO method of calculating losses is used, Ontario Teachers' financial interest in the outcome of the litigation remains materially the same. *See* 2d Weaver Decl. Ex. I (calculating Ontario Teachers' *Dura* FIFO loss as $23,896,559, and its *Dura* LIFO loss as $24,243,959).

## IV.   ONTARIO TEACHERS' SHOULD BE APPOINTED LEAD PLAINTIFF

### A.   Ontario Teachers' Has The Largest Financial Interest

For the reasons set forth above, Ontario Teachers' has a loss of $23.2 million which is the largest financial interest in the relief sought by the Class. It thus is the presumptive most adequate plaintiff and should be appointed Lead Plaintiff.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Ontario Teachers' Has Fully
Demonstrated That It Satisfies Rule 23**

Adequacy.  In support of its motion, Ontario Teachers' provided an extensive declaration explaining its status as one of the world's largest institutional investors; describing its long history of shareholder governance, including significant prior experience as lead plaintiff in securities fraud matters in which it has recovered well over one billion dollars for investors, and expressing its commitment to the Class and to the prosecution of it claims.  *See* Ex. C to Decl. of Lesley Weaver in Support of Ontario Teachers' Motion, ECF No. 26-3 ("Jang Decl.").  Furthermore, Ontario Teachers' also stated that it (i) is highly motivated to recover the losses incurred by the Class, (ii) maintains an in-house legal department with attorneys dedicated to the oversight of this action who will ensure that the action is litigated vigorously, efficiently, and in the best interest of the Class, and (iii) will supervise counsel and actively participate in the litigation, including, among other tasks, conferring with counsel regarding strategy, attending court proceedings, settlement negotiations and hearings as needed, and reviewing and authorizing important litigation documents. *Id*. at ¶¶ 7, 9, 10-12.  Finally, Ontario Teachers' has demonstrated its adequacy through the selection of one – and just one – highly experienced firm, BFA, as Lead Counsel to represent the Class, with the attorneys of which Ontario Teachers' has 15-year-plus relationship.

Typicality.  Typical of all members of the putative Class, Ontario Teachers' seeks recovery on losses incurred as result of declines in the price of Teva ADSs acquired in the United States caused by Defendants' fraudulent conduct.  Ontario Teachers' purchased a significant number of Teva's ADSs in both the open market as well as in the secondary offering and can therefore bring claims against Teva based on its own trading under both Sections 11 and 15 of the Securities Act and

under Sections 10(b) and 20(a) of the Exchange Act.[17]  Moreover, Ontario Teachers' is, unlike TIAA and the Teva Investor Group, not subject to unique defenses. Accordingly, Ontario Teachers' should be appointed Lead Plaintiff.

## V.  CONCLUSION

For the foregoing reasons, Ontario Teachers' respectfully requests that the Court: (1) consolidate all related actions; (2) appoint Ontario Teachers' as Lead Plaintiff; and (3) approve Ontario Teachers' selection of BFA as Lead Counsel.

---

[17] This is in contrast to Kleinerman, who did not purchase any shares in the December 3, 2015 offering.  *See* Kleinerman Loss Chart, ECF No. 17-7, at 11 (showing that Kleinerman purchased shares on the day of the offering, but at prices exceeding the $62.50 offering price).

1   Dated: January 13, 2017                    Respectfully submitted,

2                                              **BLEICHMAR FONTI & AULD LLP**

3                                              */s/ Lesley E. Weaver*

4                                              _____

                                               Lesley E. Weaver (Bar No. 191305)

5                                              lweaver@bfalaw.com

6                                              1999 Harrison Street, Suite 670
                                               Oakland, California 94612

7                                              Telephone:  (415) 445-4003

8                                              Facsimile:  (415) 445-4020

9
                                               Javier Bleichmar
10                                             jbleichmar@bfalaw.com
                                               Joseph Fonti
11                                             jfonti@bfalaw.com
                                               Wilson Meeks
12                                             wmeeks@bfalaw.com
                                               7 Times Square, 27th Floor
13                                             New York, New York 10036
                                               Telephone: (212) 789-1340
14                                             Facsimile:  (212) 205-3960
15

16

17                                             *Counsel for Ontario Teachers'*
                                               *Pension Plan Board, and*
18                                             *[Proposed] Lead Counsel for the Class*

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the registered participants. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 13, 2017.

*/s/ Lesley E. Weaver*
_____

Lesley E. Weaver (Bar No. 191305)
**BLEICHMAR FONTI & AULD LLP**
1999 Harrison Street, Suite 670
Oakland, California 94612
Telephone:  (415) 445-4003
Facsimile:  (415) 445-4020
lweaver@bfalaw.com