**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ONTARIO TEACHERS' PENSION PLAN BOARD, Individually and as Lead Plaintiff on behalf of all others similarly situated; and <br><br> ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Individually and as Named Plaintiff on behalf of all similarly-situated bond purchasers, <br><br>       Plaintiffs, <br><br>       v. <br><br> TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; YAACOV ALTMAN; ALLAN OBERMAN; SIGURDUR OLAFSSON; YITZHAK PETERBURG; DIPANKAR BHATTACHARJEE; DEBORAH GRIFFIN; TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.; ROGER ABRAVANEL; SOL J. BARER; ARIE S. BELLDEGRUN; ROSEMARY A. CRANE; AMIR ELSTEIN; JEAN-MICHEL HALFON; GERALD M. LIEBERMAN; GALIA MAOR; JOSEPH NITZANI; ORY SCHNEUR SLONIM; GABRIELLE GREENE SULZBURGER; ROBERT KOREMANS; GIANFRANCO NAZZI; JOHN NASON; DAVID VRHOVEC; BARCLAYS CAPITAL INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; HSBC SECURITIES (USA) INC.; MIZUHO SECURITIES USA LLC; MORGAN STANLEY & CO. LLC; RBC CAPITAL MARKETS, LLC; SMBC NIKKO SECURITIES AMERICA, INC.; BANK OF CHINA LIMITED LONDON BRANCH; BBVA SECURITIES INC.; COMMERZ MARKETS LLC; LLOYDS SECURITIES INC.; MUFG SECURITIES AMERICAS INC.; PNC CAPITAL MARKETS LLC; SCOTIA CAPITAL (USA) INC.; TD SECURITIES (USA) LLC; KESSELMAN & KESSELMAN d/b/a PWC ISRAEL, <br><br>       Defendants. | No. 3:17-cv-00558 (SRU) <br><br><br> **JURY TRIAL DEMANDED** <br><br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

I.     NATURE AND SUMMARY OF THE ACTION ........................................................2

II.    JURISDICTION AND VENUE ..............................................................................9

III.   CLASS ACTION ALLEGATIONS ........................................................................10

IV.    BACKGROUND ALLEGATIONS .........................................................................14

       A.     Overview Of The U.S. Generic Drug Market ..........................................14

       B.     Generic Drug Markets Share Characteristics That Make
              Them Susceptible To Collusion ................................................................16

       C.     Definitions Of Certain Metrics Used To Assess The U.S.
              Generic Drug Market ................................................................................19

V.     EXCHANGE ACT ALLEGATIONS ......................................................................20

       A.     Exchange Act Parties ...............................................................................20

              1.     Plaintiffs .........................................................................................20

                     a)     Lead Plaintiff ........................................................................20

                     b)     Named Plaintiff ....................................................................21

              2.     Exchange Act Defendants ...............................................................21

                     a)     The Company .........................................................................21

                     b)     The Officer Defendants.........................................................22

       B.     Teva Was Party To A Wide-Ranging Conspiracy To
              Manipulate The U.S. Generic Drug Market.............................................24

              1.     Government Investigations And Other Litigations....................26

                     a)     The Congressional Inquiry...................................................26

                     b)     The September 2016 GAO Report........................................27

                     c)     The DOJ And State AGs Investigations ...............................30

                     d)     Civil Antitrust Litigations ...................................................31

                     e)     The DOJ Investigation Yields Admissions Of A Wide-
                            Ranging Illegal Conspiracy Involving Teva .......................32

2.     Forty-Four State AGs Accuse Teva Of Participating In An Illegal Conspiracy Which Artificially Inflated The Value Of Teva Securities ................................................................33

3.     Trade Groups And Social Events Facilitated The Collusion ...................38

C.     Lead Counsel's Investigation Has Uncovered Eight Additional Drugs That Were The Subject Of Collusion ........................................40

1.     Lead Counsel's Research Has Identified Drugs With Large Collusive Price Increases ...............................................40

    a)     Pravastatin ......................................................................41

    b)     Enalapril Maleate ...........................................................45

    c)     Cephalexin Oral Suspension ..........................................48

    d)     Ketoconazole Tablets And 2% Cream ...........................52

    e)     Baclofen .........................................................................55

    f)     0.05% Fluocinonide .......................................................59

    g)     Carbamazepine Tablets And Chewable Tablets .............62

    h)     Estradiol Tablets ............................................................66

2.     Teva Increased Revenues By Over $1 Billion Through Collusion On These Eight Drugs ...............................................68

D.     Pre-Class Period Allegations – By 2013, Teva Was Facing Fundamental Market Pressures, Declining Profits, And Collapsing ADS Price ...................................................73

E.     The Class Period Begins On February 6, 2014 When Teva Announces 2013 Year-End Results ...............................................75

1.     During 2014, The Collusion Becomes The Centerpiece Of The Company's Profits, Fraudulently Inflating The ADS Price ...................75

    a)     Defendant Vigodman Arrives; Presides Over The Anticompetitive Collusion ...........................................77

    b)     In 2014, Teva's ADS Price Ascends As The Illegal Collusion Accelerates ....................................................79

    c)     The Exchange Act Defendants Mislead Investors By Concealing The True Basis Of Teva's Success .............80

d) Investors Were Misled By The Fraud ............................................84

2. In 2015, The Collusion Significantly Inflates Teva's ADS Price ............85

a) The Exchange Act Defendants Reaffirm The Fraudulent Narrative ........................................................................87

b) The Exchange Act Defendants Lay Plans For A Major Acquisition – Inflating The ADS To Use As "Currency" ............90

c) ADS Price Reaches All-Time High; Teva Announces $40 Billion Acquisition Of Actavis ......................................92

d) The Exchange Act Defendants Continue To Tout Teva's U.S. Generics Business In Anticipation Of The $6.75 Billion Offerings ..............................................................93

e) The Exchange Act Defendants Continue To Illegally Profit And Mislead Investors As They Prepare For The Equity Offerings ..............................................................96

f) Teva Issues $3.375 Billion In ADS And $3.375 Billion In Preferred Shares While The ADS Are Trading At A Highly Inflated Price ..............................................................98

3. In 2016, As The Collusion Comes Under Increasing Scrutiny, But The Exchange Act Defendants Categorically Deny That Price Increases Have Any Bearing On Teva's Results ......................................99

4. The Exchange Act Defendants Rush The Notes Offering Concealing That Teva Had Been Served Subpoenas By The DOJ And Connecticut AG Days Before ..........................................104

F. The Fraud Unravels Causing The Prices Of Teva Securities To Plummet ..............................................................107

1. The True Reason For Rushing The Notes Offering Is Revealed: Teva Was Subject To DOJ And State AGs Investigations ......................107

2. The Exchange Act Defendants Continue To Make False And Misleading Statements Regarding Second Quarter 2016 Results ............108

3. The Exchange Act Defendants Continue To Deceive At Teva's September 9, 2016 "Generics Day" Conference ......................................110

4. Only Two Months After The Bullish "Generics Day" Conference Teva Is Identified As A Target Of The DOJ And State AGs; Potentially Subject To Criminal And Civil Charges ..............................112

5.  Investors Are Surprised Again When Teva Announces Dismal Results For The Third Quarter 2016 ................................................116

6.  Defendant Olafsson Is Fired, With A False Explanation .........................119

7.  As 2017 Begins, Teva's Illicit Profits Further Dry Up ...........................123

8.  Defendant Vigodman Is Terminated ........................................................125

9.  Teva Falsely And Misleadingly Reaffirms Guidance .............................126

10. Defendant Desheh Is Forced Out Of The Company ...............................128

11. Teva Reaffirms Guidance In Desheh's Final Quarterly SEC Filing ........128

12. After Vigodman, Desheh, And Olafsson Are Terminated, Teva Reduces Guidance, Cuts Dividends, And Takes A $6.1 Billion Charge Against Earnings ....................................................................129

G.  Teva Improperly Recognized Revenue On Transactions Involving Price Fixing and Other Anticompetitive Conduct .............................133

H.  The Exchange Act Defendants Violated Item 5 Of Form 20-F ...........................................................................................138

I.  The Exchange Act Defendants' Retroactive Write Down Of Actavis Product Rights And Goodwill ...............................................140

J.  Actionable False And Misleading Statements And Omissions ...........................................................................................143

1.  The 2013 False And Misleading Statements And Omissions ..................144

2.  The 2014 False And Misleading Statements And Omissions ..................149

    a)  First Quarter 2014 Financial Results ...........................................149

    b)  Second Quarter 2014 Financial Results .......................................151

    c)  Third Quarter 2014 Investor Conference Calls ...........................152

    d)  Third Quarter 2014 Financial Results ..........................................153

    e)  Fourth Quarter 2014 Investor Conference Calls .........................155

    f)  Fourth Quarter 2014 And 2014 Full Year Financial Results .......156

3.  The 2015 False And Misleading Statements And Omissions ..................160

a) First Quarter 2015 Investor Conference Calls ............................160

b) First Quarter 2015 Financial Results ...........................................162

c) Second Quarter 2015 Investor Conference Calls......................164

d) Second Quarter 2015 Financial Results....................................165

e) Third Quarter 2015 Investor Conference Call ............................166

f) Third Quarter 2015 Financial Results.........................................168

g) Fourth Quarter 2015 Investor Conference Calls.........................170

h) Fourth Quarter 2015 And 2015 Full Year Financial Results.......171

4. The 2016 False And Misleading Statements And Omissions.................177

a) First Quarter 2016 Investor Conference Calls ............................177

b) First Quarter 2016 Financial Results ...........................................179

c) Second Quarter 2016 Investor Conference Calls......................184

d) Second Quarter 2016 Financial Results....................................185

e) Third Quarter 2016 Investor Conference Calls..........................188

f) Actavis Acquisition...................................................................191

g) Third Quarter 2016 Financial Results.........................................191

h) Departure Of Defendant Olafsson ..............................................194

i) Fourth Quarter 2016 And 2016 Full Year Financial Results.......194

5. The 2017 False And Misleading Statements And Omissions.................200

a) First Quarter 2017 Investor Conference Calls ............................200

b) First Quarter 2017 Financial Results ...........................................200

c) Second Quarter 2017 Investor Conference Calls......................202

6. The ADS, Preferred Shares, And Notes Offering Materials...................203

7. SOX Certifications.................................................................................205

K. Additional Allegations Of Scienter...................................................................209

1.     The Conspiracy Required Approval At The Highest Levels ..................210

2.     The Conspiracy Generated A Substantial Amount Of Illicit
       Revenues ...........................................................................................211

3.     The Officer Defendants And Investors Focused On U.S. Generics ........213

4.     The Officer Defendants Had A Duty To Investigate The
       Anticompetitive Conduct ....................................................................213

5.     The Pervasive Misstatements Diverged Sharply From The Truth..........215

6.     The Officer Defendants Staked Their Reputations  On The Actavis
       Transaction .........................................................................................216

7.     Defendants Olafsson, Vigodman, and Desheh  Left Under Unusual
       Circumstances .....................................................................................219

       a)     Olafsson – President And CEO, Global Generic Medicines
              Group ......................................................................................219

       b)     Vigodman – Teva's President And CEO .....................................220

       c)     Desheh – Teva's Group Executive Vice President, CFO ............220

8.     The Officer Defendants Executed SOX Certifications...........................221

9.     The Officer Defendants Were  Personally Motivated By
       Compensation .....................................................................................222

       a)     2014 Compensation .................................................................223

       b)     2015 Compensation .................................................................224

L.  Loss Causation ...............................................................................................225

1.     August 4-5, 2016................................................................................227

2.     November 3-6, 2016 ...........................................................................229

3.     November 15, 2016.............................................................................230

4.     December 5-6, 2016 ...........................................................................232

5.     December 14, 2016 .............................................................................233

6.     December 15-18, 2016.........................................................................235

7.     January 6-8, 2017 ...............................................................................237

8.      August 3-7, 2017..................................................................239

M.      Presumption Of Reliance And Fraud-On-The-Market
        Doctrine.................................................................................243

N.      Inapplicability Of The Statutory Safe Harbor Or Bespeaks
        Caution Doctrine ...................................................................244

VI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.......................245

      COUNT I ...........................................................................................245

      COUNT II ..........................................................................................247

VII.  SECURITIES ACT ALLEGATIONS .....................................................249

      A.      Securities Act Parties............................................................249

              1.      Plaintiffs......................................................................249

                      a)      Lead Plaintiff ....................................................249

                      b)      Named Plaintiff..................................................249

              2.      Securities Act Defendants...........................................250

                      a)      Teva Director Defendants...................................251

                      b)      Teva Finance Director Defendants ....................252

                      c)      Underwriter Defendants.....................................253

                      d)      Outside Auditor..................................................258

      B.      Additional Background Allegations ......................................259

              1.      Actavis Generics Acquisition .....................................259

              2.      The Relevant Offerings................................................259

                      a)      The ADS/Preferred Offerings.............................259

                      b)      The Notes Offering .............................................261

      C.      Actionable False And Misleading Statements In The
              Offering Materials.................................................................264

              1.      The ADS/Preferred Offering Materials .......................266

|  |  | a) | 2014 Full Year Financial Results | 267 |
|  |  | b) | First Quarter 2015 Financial Results | 271 |
|  |  | c) | Second Quarter 2015 Financial Results | 271 |
|  |  | d) | Third Quarter 2015 Financial Results | 272 |
|  |  | e) | Statements Made By PwC/Kesselman | 273 |
|  | 2. | | The Notes Offering Materials | 275 |
|  |  | a) | 2015 Full Year Financial Results | 275 |
|  |  | b) | First Quarter 2016 Financial Results | 279 |
|  |  | c) | The July 13, 2016 Form 6-K | 280 |
|  |  | d) | Statements Made By PwC/Kesselman | 281 |
|  | 3. | | Untruths And Omissions Have Come To Light | 283 |
|  | 4. | | The Offering Materials Did Not Comply With GAAP And Failed To Make Disclosures In Compliance With Item 5 Of Form F-20 | 285 |
| D. | | | Inapplicability Of The Statutory Safe Harbor Or Bespeaks Caution Doctrine | 285 |
| VIII. | | | CLAIMS FOR RELIEF UNDER THE SECURITIES ACT | 286 |
|  | | | COUNT III | 286 |
|  | | | COUNT IV | 288 |
|  | | | COUNT V | 290 |
|  | | | COUNT VI | 292 |
|  | | | COUNT VII | 294 |
|  | | | COUNT VIII | 296 |
| IX. | | | CLAIMS FOR RELIEF UNDER ISRAELI LAW | 299 |
|  | | | COUNT IX | 299 |
| X. | | | JURY DEMAND | 301 |
| XI. | | | PRAYER FOR RELIEF | 301 |

Court-appointed Lead Plaintiff Ontario Teachers' Pension Plan Board ("Lead Plaintiff," or "Ontario Teachers'") brings this securities class action individually and on behalf of a class of all persons and entities who purchased or otherwise acquired certain securities of Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company") between February 6, 2014 and August 3, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class," as further described below).  Anchorage Police & Fire Retirement System ("Anchorage") joins the action as a named plaintiff on behalf of those similarly situated who purchased Teva Notes (as defined below). (together, Lead Plaintiff and Anchorage are referred to herein as "Plaintiffs"). Lead Plaintiff's and Anchorage's allegations are based upon personal knowledge as to their own acts, and upon information and belief as to all other matters.  Lead Plaintiff's and Anchorage's information and belief as to allegations concerning matters other than their own acts is based upon, among other things, Lead Counsel's: (1) review and analysis of documents Teva and its subsidiaries filed publicly with the Securities and Exchange Commission (the "SEC"); (2) research reports by financial analysts; (3) transcripts of investor conference calls; (4) publicly available presentations by Teva; (5) press releases and media reports; (6) information concerning investigations conducted by Congress, the U.S. Department of Justice ("DOJ"), and the Attorneys General of at least 44 States and the District of Columbia (the "State AGs") into the generic drug industry; (7) publicly available filings in civil and criminal actions against Teva, its current and former employees, and its co-conspirators and competitors, arising out of alleged violations of federal and state antitrust laws; (8) reports by the U.S. Government Accountability Office ("GAO") into generic drug pricing; (9) news coverage of generic drug pricing and the pharmaceutical industry; and (10) Lead Counsel's investigation into, and analysis of, various generic drug markets, including through the use of private information sources regarding drug

pricing and sales metrics.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

## I.   NATURE AND SUMMARY OF THE ACTION

1.   In this Consolidated Class Action Complaint, Lead Plaintiff and Anchorage assert three sets of claims.  First, Lead Plaintiff and Anchorage assert fraud-based claims under Section 10(b) of the Securities Exchange Act of 1934 against Teva and seven current and former executives ("Exchange Act Defendants," defined below) who are alleged to have knowingly or recklessly made misstatements and omissions about Teva's financial results, operations, and internal controls throughout the Class Period, along with control person liability under Section 20(a) of the Exchange Act.

2.   Second, Lead Plaintiff and Anchorage assert strict liability, negligence, and claims which do not sound in fraud under Sections 11 and 12(a)(2) of the Securities Act of 1933.  These claims are asserted against defendants ("Securities Act Defendants," defined below) who are statutorily responsible for material misstatements of facts or omissions in the registration statements and prospectuses by which Teva offered to the public (i) American Depositary Shares ("ADS") and preferred shares in December 2015 and January 2016 in two separate offerings, and (ii) Teva's Notes (defined below) in July 2016 (collectively, the "Offerings").  As enumerated below, the Securities Act Defendants include Teva, Teva Finance (as defined below), Teva's Board of Directors (the "Board"), the underwriters of the Offerings (the "Underwriter Defendants," as defined below), and Teva's outside auditor Kesselman & Kesselman (also known as PwC Israel).  Lead Plaintiff and Anchorage also bring Section 15 claims against certain of the Securities Act Defendants for control person liability.  Lead Plaintiff and Anchorage expressly

disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are treated separately in this Complaint from the Exchange Act claims.

3.      Third, Lead Plaintiff asserts, against the Exchange Act Defendants, claims under Israeli law arising from the purchasers of Teva ADS and ordinary shares under the Israel Securities Law, 1968, which applies to Teva as an Israeli corporation.  Israeli law explicitly adopts and applies U.S. securities statutes, regulations, and rules, including the anti-fraud provisions of United States securities laws, and specifically the Exchange Act, to enforce disclosure obligations.

4.      These three sets of claims arise from a series of material misstatements and omissions about Teva's U.S. generic drugs business, its financial performance, and, in particular, its participation in an anticompetitive collusive scheme to manipulate the market for generic drugs. These material misstatements and omissions misled the market and caused the price of Teva's securities to be considerably inflated.  When the truth about Teva's financial condition and its role in the collusive scheme began to leak into the market, the price of Teva's securities fell significantly, causing damage to investors.

5.      Beginning in 2014, generic-drug pricing came under public scrutiny as consumers faced exorbitant price increases, often by 1000% or more.  In response, in October 2014, Congress initiated an inquiry, calling for testimony from Teva and other competitors to explain the egregious price spikes. Teva, however, refused to appear or to even produce documents.  In short order, Congress called on the GAO to conduct an audit of Medicare expenditures on generic drugs.  The Connecticut AG issued subpoenas and the U.S. Department of Justice launched a criminal investigation.  Those inquiries expanded from narrowly focused probes into specific drugs and manufacturers to an ongoing industry-wide investigation that has already produced guilty pleas from top executives who have admitted to colluding with Teva.

3

6.      Throughout, however, the Exchange Act Defendants issued financial reports and made public statements that misstated the Company's financial position and concealed Teva's participation in this vast collusion and involvement in a *per se* illegal price fixing, bid rigging, and market and customer allocation scheme.   They were drive to do it, the scheme was highly profitable, contributing billions of dollars to Teva's bottom line.

7.      The investigations began to bear fruit in the fall of 2016.   On September 12, 2016, the GAO publicly released its audit report, Generic Drugs Under Medicare ("GAO Report").   After the year-long review, the GAO's conclusions were stunning.   The Medicare data revealed hundreds of unexplained "extraordinary price increases," defined as a particular drug's price increasing over 100% within a 12-month period, including numerous price increases of more than 1000%.   Teva owned the rights to at least 40% of the drugs the GAO Report identified as having exhibited an extraordinary price increase between 2013 and 2015.

8.      On November 3, 2016, *Bloomberg* reported that Teva is implicated in the DOJ investigation, that criminal charges would be issued before year-end, and that the Connecticut AG could also soon file charges.   As predicted, on December 14, 2016, the DOJ unsealed allegations against the Chief Executive Officer ("CEO") and the President of Teva's competitor, Heritage Pharmaceuticals Inc. ("Heritage"), Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), respectively.   The charges included "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, … the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices…."   The charges pertained to two drugs, and both involved Teva.

9.      On December 15, 2016, twenty of the State AGs, led by the Connecticut AG, filed a civil complaint against Teva and several of its co-conspirators, following an investigation of well

over two years.  The State AGs' initial complaint accused Teva of allocating customers and market share and agreeing to collectively raise prices for two particular generic drugs along with other manufacturers.  As the Connecticut AG put it, this "fraud [was] on an almost unimaginable scale," and the allegations around these two drugs are just the "tip of the iceberg."  Since the filing of the State AGs' initial complaint, the Attorneys General of 24 additional states, and the District of Columbia, have sued Teva on substantially similar grounds.

10.     In January 2017, Glazer and Malek pled guilty to the DOJ's criminal charges in exchange for a grant of immunity as to a whole host of drugs, a list of which was filed under seal. They also admitted liability to the claims levied by the State AGs.  Most importantly, they admitted that they conspired with Teva.  Specifically, they admitted that in April 2014, for example, Heritage prepared a list of drugs and price increases for collusion.  According to the State AGs' allegations, "Malek himself was responsible for communicating with defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide."  Although the names and positions of all participants are redacted, they included the "executives at the highest levels of many of the Defendant companies."

11.     The guilty pleas and public disclosures have only identified a very small number of drugs so far and just scratch the surface of the underlying criminal conduct.  But as both the DOJ and State AGs have stated, more charges are to come.

12.     In the meantime, Lead Counsel has conducted an extensive investigation and uncovered evidence that Teva was engaged in this scheme, generating billions in profits from 2013 through mid-2017, and at least $1 billion from just a handful of drugs that Lead Counsel was able to identify and analyze.  For example, as set forth below, Teva's illicit profits from the conspiracy to hike the price of Pravastatin, one of Teva's better selling generics, amounted to at least $320

million after instituting price increases of up to 235%.  Similarly, the collusion with respect to

Carbamazepine, an epilepsy drug, yielded price increases of more than 1500% and nearly

$200 million in illicit profits.  Teva similarly gained over $160 million in such profits from

increases of up to 420% in its prices for Baclofen, a multiple sclerosis drug, and another

$160 million from increases of up to 500% in its prices for Fluocinonide, a high-potency topical

corticosteroid.  Importantly, Lead Counsel calculated these illicit profits from this limited sample

from the more than 250 generic drug products sold by Teva in the United States, dozens of which

were also subject to extraordinary price hikes according to the GAO.

13.     Throughout the Class Period, however, the Exchange Act Defendants vehemently

denied that Teva was engaging in, let alone benefiting from, any price increases.  In each of the

annual reports on Form 20-F filed with the SEC, the Exchange Act Defendants categorically, and

fraudulently, stated that: "In the United States, we are subject to intense competition in the generic

drug market from other domestic and foreign generic drug manufacturers…."

14.     With Teva's dramatically increased profitability beginning in 2014, analysts and

investors were focused on the reasons for Teva's improving fortunes.  In the face of probing

questions, the Exchange Act Defendants repeatedly and falsely asserted, with ever increasing force

and fraudulent conviction, that Teva was profiting from competition on the merits.  For instance,

Teva's CEO, Defendant Erez Vigodman ("Vigodman"), in response to a direct question on pricing

practices during an October 29, 2015 investor conference, retorted: "We're very … responsible in

everything that portends to prices on the Generics side and on the Specialty side."  He continued:

"And I would even put it another way, all the improvements you see in our – in *margins is not*

*driven by price*.  It is driven by quantities and by mix and by efficiency measures.  *Not by price,*

*2014, 2015, and that's a very important message*."  This was false.  Teva's success had been built

on revenue from the collusion, and once the conspiracy unraveled beginning in late 2016 and 2017, Teva's profits all but vanished.

15.     Likewise Defendant Eyal Desheh ("Desheh"), who during the Class Period served first as Teva's interim CEO and later as its Chief Financial Officer ("CFO"), went so far as to describe the success of the division as "nothing short of a revolution," bragging that Teva had steeply increased its margins in generics by simultaneously growing revenue through increasing quantities and new drugs, and cutting the sales and marketing costs needed to "drive the sale."  In a November 2015 investor conference, Desheh addressed pricing head on: "Now there's a lot of noise around pricing issues.  Some of it's coming from politicians who are driving agenda[s]…. *Our exposure to all these things is very minimal*….  I don't believe that there are many examples for competitive environment, *real competition*, like we see in generic market in the United States."

16.     Investors relied on these false statements.  For example, as analysts at Leerink echoed: Teva's management "provided some reassurance that the company is less exposed to the unwinding of generic price inflation … which was reassuring after competitor results stoked investor concerns about the groups' exposure to unwinding generic price inflation."

17.     With the number and magnitude of collusive price hikes, bid rigging, and market manipulations increasing, so did the prices of Teva's securities.  The price of Teva's ADS rose from $40 to a Class Period high of $72 in mid-2015.  The Exchange Act Defendants made millions in personal compensation from this supposed achievement.

18.     As the ADS prices soared, the Exchange Act Defendants turned to investors to fund a long-conceived acquisition binge.  Vigodman and Desheh had stated early in the Class Period that they wanted to convert ADS into "currency" to acquire a competitor, further consolidating Teva's market share.  They first tried making an offer for Mylan in April 2015.  This offer was

rebuffed.  Undeterred, the Exchange Act Defendants ratcheted up their bidding, and with the ADS price reaching an all-time high, on July 27, 2015, Defendants announced the purchase of Allergan's generics division, Actavis.

19.     The deal would cost Teva approximately $40 billion, most of which was funded by members of the Class through three offerings.  First, in December 2015, Teva undertook a secondary offering of $3.375 billion in ADS and an offering of $3.375 billion in preferred shares. Like their other public statements, the Offering Materials (as defined below) were materially false, claiming that Teva was facing "intense competition" and concealing the true source of the illicit profits.  The offerings were seemingly a success, and an additional debt offering was slated for later in 2016 once the Actavis transaction closed.

20.     As 2016 began, however, circumstances changed.   Increased scrutiny from investigators made it more difficult for co-conspirators to maintain their collusive price fixing, let alone agree to raise prices on additional drugs.  Unbeknown to investors, Teva's illicit profits were diminishing.   What is more, the Actavis acquisition was subject to routine Federal Trade Commission scrutiny, but given how large the two firms were, the review was running longer than expected.  Without warning, during a pre-arranged investor call on July 13, 2016, Defendant Vigodman announced that the debt offering would be launched that day (the "Notes Offering," as defined below).  The Notes Offering raised $15 billion from members of the Class, and was used to consummate the Actavis acquisition, which closed on August 2, 2016.

21.     What Vigodman concealed from the July 13 investor conference call and the Notes Offering Materials was that, on July 12, 2016, Teva had been served with a subpoena by the Connecticut AG, and three weeks earlier, on June 21, 2016, by the DOJ, indicating that Teva was now a focus of the investigations into illegal price fixing and collusive conduct.  These subpoenas

were not disclosed until Teva filed a Form 6-K with the SEC on August 3, 2016, once the Notes Offering and Actavis deal had closed.

22.    As the GAO Report, criminal charges, guilty pleas, and the State AGs' allegations mounted in the latter half of 2016, the prices of Teva Securities precipitously declined.  The wide-ranging scope of the investigation took its toll on Teva's ability to turn a profit from the unlawful conduct, and the Company's financial performance suffered.  In relatively short order, the key executives responsible for the U.S. generics business left or were fired.  Defendant Sigurdur "Siggi" Olafsson ("Olafsson"), President and CEO of Teva's Global Generic Medicines Group, was fired on December 5, 2016.  Vigodman was terminated on February 6, 2017, and on June 30, 2017, Desheh also left.

23.    On August 3, 2017, in the first financial report issued after Desheh, Vigodman, and Olafsson were gone, Teva announced a $6.1 billion write down of its entire U.S. generics business. The value of that business had been artificially inflated through collusion and deception.  As events leaked these facts to the market over time, , the price of Teva's ADS had collapsed from an all-time high of $72 to less than $20.   As a result, the market capitalization of the Company declined from approximately $72 billion to $19 billion, revealing that Teva's skyrocketing value during the Class Period, built on the supposed success of the U.S. generics business, had been a fraud based on collusive anti-competitive conduct.

## II.    JURISDICTION AND VENUE

24.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15(a) of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o(a), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

25. This Court has jurisdiction of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.  Pursuant to 28 U.S.C. § 1367(a) and/or decisional authority, this Court has supplemental subject matter jurisdiction and supplemental and/or pendent personal jurisdiction for the claims asserted in Count IX because they derive from a common nucleus of operative fact and are such that one would ordinary expect them to be tried in one judicial proceeding.

26. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1391.

27. In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate communications, and the facilities of a national securities exchange, namely the New York Stock Exchange ("NYSE").

## III.    CLASS ACTION ALLEGATIONS

28. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

- As to claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), on behalf of all persons and entities who purchased or otherwise acquired Teva's (i) ADS registered on the NYSE, (ii) Preferred Shares and/or (iii) Notes in domestic transactions, from February 6, 2014 through August 3, 2017, inclusive; and

- As to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of all persons and entities who purchased or otherwise acquired Teva's (i) ADS registered on the NYSE, (ii) Preferred Shares, and/or (iii) Notes, in domestic transactions, in, pursuant to, and/or traceable to the Offerings (defined below); and

- As to claims under the Israel Securities Law, 1968, which adopts and incorporates the Exchange Act, on behalf of all persons and entities who purchased or otherwise acquired ADS on the NYSE and/or Teva ordinary shares on the Tel Aviv Stock Exchange ("TASE") from February 6, 2014 through August 3, 2017, inclusive.

10

29.     The Teva securities at issue in this action are: (i) Teva's American Depositary Shares ("ADS"), including ADS issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "ADS Offering"); (ii) 7.00% mandatory convertible preferred shares issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "Preferred Shares" and the "Preferred Offering"); (iii) certain U.S.-dollar-denominated senior notes issued in the public offering on or about July 21, 2016, namely (a) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (b) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (c) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"), (d) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"), (e) 3.150% Senior Notes due October 1, 2026 ("2026 Notes"), and (f) 4.100% Senior Notes due October 1, 2046 ("2046 Notes") (collectively, referred to herein as the "Notes" and the "Notes Offering"); and (iv) Teva Ordinary Shares registered and traded on the TASE).  Teva's ADS, the Preferred Shares, and the Notes are sometimes referred to collectively as "Teva Securities," which are subject to the claims arising under the Exchange Act and/or the Securities Act.  The ADS Offering, the Preferred Offering, and the Notes Offering are sometimes referred to collectively as the "Offerings."

30.     The Class of persons and entities were damaged by violations of the relevant laws. Excluded from the Class are (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Teva, Teva USA, and Teva Finance, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) the legal representatives, heirs, agents, successors, or assigns of any excluded person or entity, and (vi) the Company's employee retirement and benefit plan(s).

31. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the hundreds or thousands. Throughout the Class Period, Teva ADS had an average daily volume of approximately 6.16 million ADS. As of August 3, 2017, Teva had 843,000,000 ADS outstanding. Teva issued 54 million ADS in the December 2015 ADS Secondary Offering, the ADS/Preferred Underwriters exercised their option to purchase an additional 5.4 million ADS to cover overallotments. Teva issued 3,375,000 Preferred Shares in the Preferred Offering, the ADS/Preferred Underwriters exercised their option to purchase an additional 337,500 Preferred Shares to cover overallotments. The Preferred Shares traded actively in the United States during the Class Period. Teva issued $15 billion of its U.S.-dollar-denominated Notes in the Notes Offering. The Notes traded actively in the United States during the Class Period.

32. Lead Plaintiff's claims are typical of the claims of Class members, and Anchorage's claims are typical of the claims of Class members who purchased or otherwise acquired Teva Notes in domestic transactions during the Class Period, including in or pursuant and/or traceable to the Notes Offering, as all Class members are similarly situated in that they sustained damages in violation of the federal securities laws, or under Israeli law, which applies U.S. federal securities law, as a result of conduct of the Company and the Officer Defendants complained of herein.

33. Lead Plaintiff will fairly and adequately protect the interests of the Class, and Anchorage will fairly and adequately protect the interests of Class members who purchased or otherwise acquired Teva Notes, including in or pursuant and/or traceable to the Notes Offering. Plaintiffs have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are antagonistic to or in conflict with those of the Class.

34.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.   The questions of law and fact common to the Class include, but are not limited to, the following:

      (a)     whether the federal securities laws were violated by Defendants, as alleged herein, and whether parallel provisions under Israeli law were violated;

      (b)     whether Defendants made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

      (c)     whether the Offering Materials contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

      (d)     whether the Exchange Act Defendants acted with scienter;

      (e)     whether certain of the Defendants were controlling persons;

      (f)     whether certain of the Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

      (g)     whether the prices of Teva's securities were artificially inflated and/or maintained during the Class Period; and

      (h)     whether and to what extent Class members have sustained damages and, if so, the proper measure of damages.

35.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  In addition, because the damages suffered by some Class members may be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to seek redress for the wrongful conduct alleged herein.  There will be no difficulty in the management of this action as a class action.

36.     Class members may be identified from records maintained by the Company or its transfer agent, or by other means, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

## IV.   BACKGROUND ALLEGATIONS

### A.   Overview Of The U.S. Generic Drug Market

37.   In 2015, sales of generic pharmaceuticals in the United States were an estimated $84 billion dollars, with the industry accounting for approximately 88% of all prescriptions written in the United States.  During the Class Period, Teva controlled as much as 16% of the U.S. market as of year-end 2016.

38.   Under U.S. law, newly-discovered drugs maintain patent protection.  But once expired, other companies may obtain government approval to manufacture and market "generic" drugs to compete.  According to the FDA's glossary, a generic drug shall be "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use." Once the FDA approves a generic as "'therapeutically equivalent'" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."  Thus, "[d]rug products classified as therapeutically equivalent [to a branded drug] can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."

39.   The regulatory filings necessary to market generic drugs are typically made before the patent expiration, so that generics manufacturers can maximize the amount of time they can sell the drug.  Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents.  21 U.S.C. § 355(a), (b).

40.   The Hatch-Waxman Act of 1984 simplified the regulatory hurdles for prospective generic manufacturers by allowing a manufacturer seeking approval to sell a generic version of a brand drug to file an Abbreviated New Drug Application ("ANDA"), a much simpler filing.  Once

the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the branded drug, an applicant may manufacture, market, and sell the generic drug product.  This approval process can be lengthy, with the median time to approval standing at 47 months as of September 2016, thus creating an effective barrier to entry into a market for new competitors.

41.     Because each generic must be identical, the only real means for the manufacturers to compete is by price.  As reported in a 2016 report by the GAO Report concerning generic drug prices, each of the five manufacturers interviewed by the GAO – including Defendant Teva – "reported that competition is the primary driver of generic drug prices."  (GAO-16-706, Generic Drugs Under Medicare Part D Generic Drug Prices Declined Overall, But Some Had Extraordinary Price Increases 11-12, 16 (Aug. 2016)).

42.     Ordinarily and consistent with established economic principles and common sense, once the first lower-priced generic enters the market, the brand drug rapidly loses sales, and sales continue to decrease. As new generic competitors enter the market, the price of the drug typically continues to decrease.  In a normally-functioning market for a generic drug, the market participants scramble to maintain market share, and if one manufacturer raises prices, the others will swoop in and steal its customers.

43.     Over the past decades, further increasing pressure on generic manufacturers, the purchasers of generic drugs (*i.e.*, pharmaceutical wholesalers, retail pharmacies, and institutional buyers like hospitals) have become highly consolidated through various mergers and acquisitions. By the start of the Class Period, in the U.S., there were four major wholesale distributors that control generic distribution to retailers: McKesson Corp., CVS Health Corp., through a partnership

with Cardinal Health, Inc., Walgreens Boots Alliance Inc., through a relationship with AmerisourceBergen Corp. and Wal-Mart Stores Inc.

44.    Likewise, the global market for generic pharmaceutical manufacturers has undergone substantial consolidation since at least 2005, which fueled the growth of a handful of large manufacturers, like Teva, who together dominate many of the generic drug markets.  Teva gained the status as the world's largest manufacturer of generic drugs, leading the U.S. generic market in total prescriptions and new prescriptions, through a series of acquisitions.  For example, Teva acquired Ivax Corp. for $7.4 billion in 2006, Barr Laboratories for $7.4 billion in 2008, Ratiopharm—Germany's second largest generic drug producer—for $5 billion in 2010, and Allergan Generics (also known as "Actavis") in 2016 for $40 billion.

45.    Teva's competitors also went on acquisition sprees.  By mid-2015, a handful of players controlled 50% of the market:  Teva (13%), Mylan (11%), Actavis (8%), the Sandoz division of Novartis AG ("Sandoz") (8%), Sun Pharmaceutical Industries, Inc. ("Sun") (4%), Endo International plc ("Endo") (3%), and  Par Pharmaceutical ("Par") (3%).  In 2016, the consolidation continued with Endo's acquisition of Par.

**B.    Generic Drug Markets Share Characteristics
That Make Them Susceptible To Collusion**

46.    The markets for the generic drug that were the subject of the anticompetitive and collusive conduct alleged herein were susceptible to collusion.  These factors include: (i) a high degree of industry concentration; (ii) significant barriers to entry; (iii) inelastic market demand, meaning that demand does not vary significantly as prices change; (iv) the lack of available substitutes for the goods involved; (v) a standardized product among collusion participants; and (vi) frequent intercompetitor contacts and communication.

47.   **Industry Concentration**.   In the markets for these drugs, market power is consolidated among only a few companies.

48.   **Significant Barriers to Entry**.  There are barriers to entry to the markets that make it difficult for new entrants to participate in a timely fashion, or at all.  Introducing generic pharmaceutical products is costly and lengthy due to drug development times and regulatory requirements, including approval by the FDA.

49.   Testimony before Congress on November 20, 2016 suggested that the financial cost of breaking into a generic drug has drastically increased in recent years.  According to the testimony before the Senate's HELP Committee, "[r]ecent data suggests that bringing a generic drug to the market can cost up to $5 million…" for one filing and "another $5-$15 million," for another filing, such that the anticipated sales must reach over the "$10 million figure" before it can be considered a profit or "attract[] robust generic competition."  The testimony suggested specifically that these barriers resulted in a lag time for entry of competition, something that contributed to higher generic drug prices.  Further, there is financial risk that the recoupment of any investment could be delayed or never happen.  The ANDA could be denied or delayed due to technical failures, delaying approval of an ANDA for months or even years, if ever.  According to the GAO and others, the FDA is significantly "backlogged," and thus potential entrants could have to wait for years for approval.  In 2015, it has been reported that ANDA approvals often took 40 months or more.

50.   In addition to ANDA costs and the long regulatory delays, a generic manufacturer must maintain production facilities that meet CGMP standards, which requires substantial investment.  A new manufacturer must secure a reliable and affordable source of materials for

production and be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability when compared to the branded drug.

51. **Inelastic Demand in the Market for Each Drug**.  Many generic drugs are important, if not absolutely critical, to the consumer as a medical necessity.  Thus, demand for them is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away from the market as prices rise.  Moreover, health insurance plans typically will pay for medications, so long as the drug is on the approved list.

52. **Lack of Ready Substitutes**.  In general, all drugs have distinguishing features, although some have more interchangeability than others.  Many of the drugs with price hikes by Teva are not readily substitutable with other drugs.  Regardless, doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class, and consequently they cannot simply substitute one product for another when price varies.

53. **Standardized Product**.  While a specific drug may not be readily substituted for another, any manufacturer's version of a particular generic drug is, by its very nature, interchangeable with another manufacturer's version of that drug.  The generic for one company is identical to the generic for another.  Generic drugs of the same chemical composition are therefore effectively commodity products because, as a result of this standardization, the primary mechanism through which they compete is price.  Because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's is through price.

### C.   Definitions Of Certain Metrics Used To
### Assess The U.S. Generic Drug Market

54.     The generic pharmaceutical supply chain generally flows as follows: manufacturers, such as Teva, sell drugs to wholesalers or large institutions (such as hospitals or prisons); wholesalers sell drugs to pharmacies; pharmacies dispense the drugs to consumers.

55.     Teva and other generic drug manufacturers generally do not publicly disclose their revenues on sales of generic drugs net of discounts and rebates on a drug-by-drug basis.  Teva did not disclose revenues specific to any particular generic drug during the Class Period, thus the scheme was imperceptible to investors.

56.     Nonetheless, several metrics, discussed below, allow insight into market size, market share, pricing levels, and trends in these measures over time.

57.     **WAC**.   Generic drug manufacturers typically report, via subscription-based industry publications and compendia such as MediSpan and First Data Bank, a drug-by-drug pricing metric known as Wholesale Acquisition Cost ("WAC").   WAC is, in effect, the manufacturers' list price for a given drug; it does not reflect discounts or rebates which are routinely applied to the transactions between manufacturers and wholesalers or other institutions.

58.     **NADAC**.   Market-wide pricing for a given drug, at the point in the supply chain between wholesalers and pharmacies, has been accumulated by the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies.

59.     NADAC is a monthly nationwide survey of retail community pharmacies, conducted pursuant to Section 1927(f) of the Social Security Act, "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire

prescription... drugs." (CMS, Methodology for Calculating NADAC for Medicaid Covered Outpatient Drugs at 5).

60. **Symphony Unit Data**. Symphony Health Solutions ("Symphony"), is a private research services firm that tracks the volume of prescription drug units sold, on a drug-by-drug basis, into the United States generic drug market. Symphony's volume data is via direct subscription from Symphony, and available to subscribers of the Bloomberg Terminal product distributed by Bloomberg Finance L.P.

## V.   EXCHANGE ACT ALLEGATIONS

### A.   Exchange Act Parties

#### 1.   Plaintiffs

##### a)  Lead Plaintiff

61. Court appointed Lead Plaintiff Ontario Teachers' Pension Plan Board ("Ontario Teachers'") is the largest single-professional pension plan in Canada, representing roughly 318,000 active and retired teachers in the Province of Ontario.

62. Ontario Teachers' purchased or otherwise acquired Teva ADS registered on the NYSE and Preferred Shares in domestic transactions during the Class Period, as set forth in the Certification attached hereto, and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Ontario Teachers' purchased Teva ADS (CUSIP: 881624209, SEDOL: 2883878) listed on the NYSE during the Class Period. In addition, Ontario Teachers' purchased (CUSIP: M8769Q136, SEDOL: BYWKW32) from Defendant Citigroup, a joint book-running manager and underwriter of the Preferred Offering, and from Goldman Sachs in the United States during the Class Period.

63.     On July 11, 2017, this Court appointed Ontario Teachers' as Lead Plaintiff for this Class Action.  ECF No. 124.  Ontario Teachers' brings claims on behalf of all Class Members under the Exchange Act, the Securities Act and the Israel Securities Law, 1968.

### b)  Named Plaintiff

64.     Plaintiff Anchorage Police & Fire Retirement System ("Anchorage") is a public pension fund in Anchorage, Alaska that provides pension, disability, and survivor benefits to more than 700 active and retired police officers and firefighters and their families.

65.     Anchorage purchased or otherwise acquired Teva Notes in domestic transactions during the Class Periods, as set forth in the Certification attached hereto, and suffered damages as a result of the violations of the federal securities laws alleged herein.

66.     Anchorage purchased Teva Notes, namely U.S.-dollar denominated 3.150% fixed rate senior notes maturing in 2026 (SEDOL: BD3GT31), from Defendant Citigroup, a joint book-running manager and underwriter of the Notes Offering, in the United States during the Class Period.

67.     Anchorage brings claims on behalf of Class Members who purchased or otherwise acquired Teva Notes under the Exchange Act, the Securities Act and the Israel Securities Law.

### 2.     Exchange Act Defendants

### a)  The Company

68.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva") is incorporated in Israel with its principal executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel. Teva's U.S. wholly-owned subsidiary Teva USA has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.

69.     Teva engages in interstate commerce within this District.  Teva ADS are listed and traded on the NYSE under the symbol "TEVA."  Teva Preferred Shares and Notes are traded in the United States.  Teva ordinary shares trade on the TASE under the symbol "TEVA."

### b)  The Officer Defendants

70.     Defendant Erez Vigodman ("Vigodman") served as Teva's President and Chief Executive Officer ("CEO") from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017.  Vigodman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as set forth herein.  Vigodman made false and misleading statements and omitted to disclose the truth during the course of numerous conference with investors and analysts, alleged specifically herein.

71.     Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President.  Desheh also served as Teva's Group Executive Vice President ("EVP") from 2012 to June 30, 2017.  Desheh signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as set forth herein.  Desheh made false and misleading statements and omitted to disclose the truth during the course of numerous conference with investors and analysts, alleged specifically herein.

72.     Defendant Yaacov "Kobi" Altman ("Altman") served as Teva's Acting CFO from October 31, 2013 to February 11, 2014.  Altman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as set forth herein.  Altman made false and misleading statements and omitted to disclose the truth during the course of numerous conference with investors and analysts, alleged specifically herein.

73.    Defendant Allan Oberman ("Oberman") served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014.  Further, Oberman possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business and was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Oberman made false and misleading statements and omitted to disclose the truth during the course of numerous conference with investors and analysts, alleged specifically herein.

74.    Defendant Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016.  Prior to joining Teva, Olafsson served in various roles, including senior leadership positions, within Actavis (also known as Actavis Pharma, Actavis plc, (Watson) and the Actavis Group) from 2003 to 2014.  Olafsson made false and misleading statements and omitted to disclose the truth during the course of numerous conference with investors and analysts, alleged specifically herein.  Further, Olafsson possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business and was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

75.    Defendant Yitzhak Peterburg ("Peterburg") has served as Teva's Interim President and CEO since February 6, 2017.  Prior to that date, he was Chairman of Teva's Board of Directors from January 1, 2015.  He also served as a Teva Director from June 2009 to July 2010 and after a brief departure he rejoined Teva's Board from 2012 until February 6, 2017.  Peterburg made false and misleading statements and omitted to disclose the truth during the course of numerous

conference with investors and analysts, alleged specifically herein.  Peterburg signed and certified

certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as set

forth herein.

76.     Defendant Dipankar Bhattacharjee ("Bhattacharjee") has served as Teva's

President and CEO, Global Generics Medicines Group since December 5, 2016; he previously

served from 2013 to 2016 as Teva's President and CEO, Generics Europe and, from 2009 to 2013,

as CEO, Teva UK Ltd. and later as SVP, Western Europe.  Bhattacharjee made false and

misleading statements and omitted to disclose the truth during the course of numerous conference

with investors and analysts, alleged specifically herein.  Bhattacharjee possessed the power and

authority to control the contents of the Company's reports to the SEC concerning Teva's U.S.

generics business and was provided with copies of the Company's reports and press releases

alleged herein to be misleading before, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.

77.     Defendants Vigodman, Desheh, Altman, Oberman, Olafsson, Peterburg, and

Bhattacharjee are sometimes referred to herein collectively as the "Officer Defendants."  Teva and

the Officer Defendants are sometimes referred to herein collectively, as pertaining solely to the

Class claims under the Exchange Act and the parallel provisions of the Israel Securities Law, 1968,

as the "Exchange Act Defendants."

### B.      Teva Was Party To A Wide-Ranging Conspiracy To Manipulate The U.S. Generic Drug Market

78.     The Exchange Act Defendants in or about mid-2013 entered into a wide-ranging

conspiracy over the course of numerous years to fix prices, rig bids and allocate market share with

their supposed competitors.  This conspiracy is the subject of, and corroborated by, investigations

by (i) Congress; (ii) at least 44 State AGs, who have brought claims for federal and state antitrust

violations; and (iii) the DOJ Antitrust, Criminal I Section, which has convened a grand jury and obtained guilty pleas from Teva's co-conspirators.  As the State AGs have alleged, this is "wide-ranging conduct implicating numerous different drugs and competitors."   (Compl. at 5, *Connecticut v. Aurobindo Pharma USA, Inc.*, 3:16-cv-02056 (VLB) (D. Conn. Mar. 1, 2017) ("*Aurobindo*") (ECF No. 168 ¶ 9)).  The Connecticut AG's office, which has been at the forefront of the investigation, has described the conspiracy as a "fraud on a broad[], nearly unimaginable scale."  (Mark Pazniokas, <u>How a small-state AG's office plays in the big leagues</u>, *The CT Mirror* (Jan. 27, 2017) ("Pazniokas")).

79.    As detailed herein, the existence of this scheme has been admitted by Teva's co-conspirators.  Glazer, the former chief executive officer of Heritage and Malek, the former president of Heritage, a company named as a co-conspirator of Teva in guilty pleas and the AGs Complaint, have admitted to participating in a conspiracy to suppress and eliminate competition by allocating customers, rigging bids, and fixing and maintaining prices with Teva and their competitors.  Malek and Glazer agreed to plead guilty on two counts, relating to two drugs, and promised the U.S. government complete and truthful cooperation against the co-conspirators in exchange for a grant of complete immunity as to a host of other related drugs (a list of which the DOJ filed under seal).  (*See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) ("*Glazer*") (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) ("*Malek*") (ECF No. 24)).  They have also admitted to state and federal antitrust violations in connection with the State AGs' suit, and are now also cooperating fully with the State AGs' action, which names Teva as a conspirator. Heritage has also expressly admitted to the conduct and said it was cooperating with the authorities.

### 1.   Government Investigations And Other Litigations

#### a)  The Congressional Inquiry

80.     Beginning in 2014, the price hikes by Teva and its co-conspirators in the generics market were sufficiently extensive that they had garnered some industry-wide attention.   In January 2014, the Chief Executive Officer of the National Community Pharmacists Association wrote Congress stating that "[o]ver the last six months … many of our members across the U.S. [] have seen huge upswings in generic drug prices," and requesting an investigation into the matter.

81.     Congress launched its investigation by October 2014, based on conclusions drawn from data accumulated on generic drug prices by the private Washington, D.C.-based Healthcare Supply Chain Association (the "HSCA").   The HSCA surveyed average prices paid by organizations that assist hospitals, nursing homes and home health agencies negotiate with pharmaceutical companies and other vendors for discounts.   The survey largely confirmed that there had been recent enormous price hikes for generics drugs that appeared to be unexplained by market conditions.   (Healthcare Supply Chain Assn., Surv. of Group Purchasing Org. (Oct. 2013 to Apr. 2014)).

82.     Congress sent letters to Teva and many of its peers, requesting information concerning the pricing for certain generic drugs.   The letter to Teva, dated October 2, 2014, was addressed personally to Defendant CEO Vigodman, and focused on "the underlying causes of recent increases in the price of [Teva's] drugs" that have increased by "as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin Sodium from October 2013 to April 2014. Over that time period, the average market price went up by as much as $735 for Divalproex Sodium and $426 for Pravastatin Sodium, depending on the formulation."   (Letter from Sen. Bernard Sanders and Rep. Elijah Cummings to Vigodman, President & CEO of Teva (Oct. 2, 2014)).

83.     Congress also requested that Teva provide a series of documents and information for the time period covering January 1, 2012, to the present by October 7, 2014.  (*Id*.).  Teva refused to provide these documents.

84.     The other generics manufacturers that received similar letters from Congress included:  (i) Actavis; (ii) Amphastar Pharmaceuticals; (iii) Apotex Corp.; (iv) Dr. Reddy's Laboratories Ltd. ("Dr. Reddy's"); (v) Endo; (vi) Global Pharmaceuticals; (vii) Heritage; (viii) Lannett Company, Inc. ("Lannett"); (ix) Marathon Pharmaceuticals, LLC; (x) Mylan; (xi) Par; (xii) Sun; (xiii) Turing Pharmaceuticals LLC; (xiv) Valeant Pharmaceutical International, Inc.; (xv) West-Ward Pharmaceutical Corp.; and (xvi) Zydus Pharmaceuticals USA Inc.  (Press Release, Sen. Bernard Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014)).

85.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw these huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted, and that is, in fact, what they did." (Why Are Some Generic Drugs Skyrocketing in Price?: Hrg. Before the Subcomm. on Primary Health and Aging of the S. Comm. of Health, Education, Labor, and Pensions, 113 Cong. 3 (2014)).  Although Teva was specifically invited to testify, it refused.  (*Id*. at 8).

### b)  The September 2016 GAO Report

86.     As a result of its own inquiry, Congress requested that the GAO, undertake an independent audit of the generic drugs that the federal government purchased by means of the Medicare Part D program.  The GAO performed its audit from June 2015 to August 2016 in accordance with generally accepted government auditing standards, requiring that the "evidence

obtained provide[d] a reasonable basis for [GAO's] findings and conclusions based on [its] audit objectives."

87.     Publicly released on September 12, 2016, the GAO's conclusions were significant. The GAO found hundreds of unexplained "extraordinary price increases," defined as a particular drug increasing over 100% within a 12-month period and that some drug prices increased more than 1000%. (*Id*. at 14). The GAO's analysis indicates that Teva was one of the largest offenders. (*See e.g.*, *id*. at 5, n.11).

88.     Over the study period of the first quarter of 2010 through the second quarter of 2015, the GAO found that as a general matter, generic drug prices had declined overall over time – as would be expected in a competitively functioning generics market. According to the GAO, consistent with expectations, "generic drug prices fell 59 percent from the first quarter of 2010 through the second quarter of 2015." (*Id*.). In other words, when looked at as a whole, the entire set of generic drugs, including new entrants to the market saw a price decline.

89.     However, over the same period, the GAO "analyzed an established basket of 1,441 generic drugs that were present during the entire period of analysis," and found price increases for a subset of drugs that was at odds with the trend for the overall generics market:

> ***More than 300 of the 1,441 established generic drugs analyzed had at least one extraordinary price increase of 100 percent*** or more between first quarter 2010 and first quarter 2015. GAO found that drugs with extraordinary price increases moderated the overall decline in generic drug prices. Additionally, the extraordinary price increases generally persisted for at least 1 year and most had ***no downward movement*** after the extraordinary price increase. Given the low cost of generic drugs relative to their brand counterparts, stakeholders indicated limited changes to benefit design, including drug coverage. (*Id*.).

(All emphasis in this Complaint has been added).

90.     The GAO Report concluded that these price increases had begun in earnest in 2012, and accelerated into 2015. Specifically, the GAO found that between the first quarter of 2010 and

the fourth quarter of 2012, the price for this established basket of generic drugs had decreased by 22%, or about 2.2% per quarter on average.  However, between the end of 2012 and the second quarter of 2015, the price of the GAO's "established generic drug basket increased by 10%, or about 0.9% per quarter on average, which was four times the overall rate of general inflation of approximately 2.3% over the same time period."  (*Id*. at 10).

91.     Of the 351 extraordinary price increases in the established basket of drugs, 183 of the increases were between 100% and 200%, 48 were 500% or higher, and 15 were 1,000% or higher.  (*Id*. at 14).  In all, the effect was that "the 315 drugs that experienced an extraordinary price increase during [GAO's] study period moderated the decline in generic drug prices for the basket of 1,441 established drugs, despite only representing slightly more than one in five established generic drugs."  (*Id*. at 16).

92.     Contemporaneously with the increases, manufacturers publicly blamed the price increases on external pressures such as ingredient supply disruption, market consolidation, or similar factors.  The GAO took issue with those assertions, concluding that the primary driver of prices in the generics industry is competition: "Manufacturers reported that competition, determined by the price and availability of the same drug from other manufacturers, is the primary driver of generic drug prices, as less competition could drive prices higher."  (*Id*.).

93.     Indeed, according to the manufacturers interviewed by the GAO, including Teva:

> ***The generic drug market operates like a commodities market***, and manufacturers told us they are asked to submit a proposal offering their best possible price to their customers—for example, companies that operate pharmacies or wholesalers.  If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.  (*Id*. at 23).

94.     As a matter of empirical fact, however, competition had not moderated the price hikes back to the historically normative price levels.  Instead, the GAO finds that "[o]f the 351

annual extraordinary price increases that occurred from first quarter 2010 to first quarter 2015, we were able to track 248 of these annual increases for 1 or more additional years, and found that nearly all persisted at 100 percent or more above the original price for at least 1 year." (*Id*. at 17). As a result, the benefit from each drug price increase to the bottom line of the manufacturers involved was cumulative over time, and did not just provide an immediate benefit to the drug manufacturers.

95.     Teva owned the rights to FDA-approved products associated with at least 40% of the drugs identified in the GAO Report as having exhibited an "extraordinary price increase" in the 2013 to 2014 or 2014 to 2015 timeframes (42 of 105 active ingredients, 90 of 191 ingredient/form/strength alignments), as determined by cross-referencing the GAO Report against the FDA's list of "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book").

### c)  The DOJ And State AGs Investigations

96.     On or around July 8, 2014, the State of Connecticut began an investigation into suspicious price increases of generic drugs.  The Connecticut AG quickly began issuing document subpoenas to Teva's peer generics manufacturers.   Specifically, the Connecticut AG issued subpoenas to Impax on July 14, 2014, to Lannett on July 15, 2014, and to Par on August 6, 2014, all relating to pricing of the generic drug Digoxin.  (Lannett, Current Report (Form 8-K) at 2 (July 16, 2014); Impax, Current Report (Form 8-K) at 2 (July 15, 2014); Par, Annual Report (Form 10-K) (Dec. 31, 2014)).

97.     According to reports, within days of the initial Connecticut AG subpoenas to drug manufacturers, the DOJ Antitrust Division, Criminal I Section contacted the Connecticut AG's office to inquire into the investigation.  (*See* Pazniokas, *supra* ¶ 79, at 2).

30

98.     By November 2014, the DOJ initiated an investigation and convened a grand jury in Philadelphia, Pennsylvania.  The grand jury began to issue document, testimony and information subpoenas.

99.     The DOJ's and the State AGs' investigation quickly accelerated with dozens of subpoenas being issued in 2014, 2015 and 2016.  Six companies have received subpoenas from the Connecticut AG:  Teva, Impax, Lannett, Par, Mylan, Mayne, and Dr. Reddy's.  Two have received subpoenas from the AG of California.  And one has been issued a subpoena from the AG of Texas.  Eleven generic drug manufacturers have received subpoenas for documents or testimony from the federal criminal grand jury:  Teva, Impax, Lannett, Par, Mylan, Mayne, Dr. Reddy's, Sun, Taro, Baxter and Allergan.  These subpoenas include those served directly on individuals, including high ranking executives.  The DOJ has also served search warrants on Mylan (Nov. 2016), Perrigo (May 2017), and Pfizer (July 2017).

100.     Tellingly, Teva was one of the last of the conspirators to receive a subpoena from the DOJ, which it did in July 2016, as it is the largest member of the conspiracy.

### d)  Civil Antitrust Litigations

101.     Teva and numerous peers are the subject of more than two dozen civil antitrust suits brought by market participants alleging per se illegal price fixing across numerous specific drugs.  Consistent with the AGs Complaint's allegations of a wide spread antitrust conspiracy, the DOJ Antitrust Division has intervened in these civil actions, seeking stays and also asserting that they overlap with the DOJ's criminal investigation.  This indicates that, at a minimum, the dozens of drugs in the civil suits – including the five against Teva – are the same drugs that are the subject of the ongoing criminal investigation.

### e)  The DOJ Investigation Yields Admissions
### Of A Wide-Ranging Illegal Conspiracy Involving Teva

102.    On December 14, 2016, the DOJ announced that it had charged Glazer, the former

CEO of Heritage, and Malek, the former president of Heritage, with violations of the federal

antitrust laws concerning a conspiracy relating to the prices of generic drugs.

103.    Glazer and Malek were charged with "knowingly enter[ing] into and engag[ing] in

a combination and conspiracy with other persons and entities engaged in the production and sale

of generic pharmaceutical products, … [with] the primary purpose of which was to allocate

customers, rig bids, and fix and maintain prices…."  (Information ¶ 6, *Glazer* (ECF No. 1);

Information ¶ 6, *Malek* (ECF No. 1)).

104.    The criminal informations related to these charges specified that these practices

included two specific drugs, Glyburide (used to treat type-2 diabetes) and Doxycycline Hyclate

(used to treat acne); they also indicated that the conspiracy involved numerous other unspecified

drugs and parties.  (*See Glazer supra* ¶ 106; *Malek, supra* ¶ 106).

105.    Teva was the dominant participant in the Glyburide market during the Class Period,

with approximately 70% to 75% of the market from 2012 to 2017.  The market for Glyburide was

an estimated $650 million in sales from 2012 to 2016.

106.    On December 9, 2016, Glazer and Malek both pled guilty to the federal charges.

In exchange for immunity as to a whole host of generic drugs, they each agreed to provide full

cooperation with the DOJ's ongoing investigation, specifically with "the current federal

investigation of violations of federal antitrust and related criminal laws involving the production

and sale of generic pharmaceutical products in the United States... ."  (Plea Agreement ¶18, *Glazer*

(ECF No. 18); Plea Agreement ¶17, *Malek* (ECF No. 17) (collectively "Pleas")).  The full list of

generic drugs on which Malek and Glazer conspired to raise prices, including those manufactured by Teva, has been filed under seal, and is the subject of the continued criminal grand jury inquiry.

107.    With respect to the Pleas, Malek and Glazer specifically admitted to participating in a conspiracy to allocate the market share, rig bids, and fix the prices of Doxycycline from at least April 2013 through at least December 2015.  They also admitted to participating in a conspiracy to allocate the market share, rig bids, allocate customers and fix the prices of Glyburide from April 2014 through at least December 2015.  Teva was a member of the conspiracy.  (Pleas, *Glazer supra* ¶ 106; *Malek supra* ¶ 106).

108.    Heritage, a New Jersey company owned by India-based manufacturer Emcure, fired Glazer and Malek in August 2016 and admitted to their conduct, stating:  "We are deeply disappointed by the misconduct and are committed to ensuring it does not happen again," and promising full cooperation with authorities.  (Nathan Vardi, The Man The Feds Are Using To First Crack Open Their Big Antitrust Case Against Generic Drug Makers, Forbes (Dec. 16, 2014)).

109.    The scope and breadth of the conspiracy, as well as these early guilty pleas, has led to comparisons to some of the largest antitrust conspiracies in DOJ history.  DOJ sources have reportedly compared it to the investigation into the auto parts industry's bid rigging, price fixing, market allocation, and other anticompetitive conduct which resulted in the prosecution of 48 corporations and 65 individuals, and more than $2.9 billion in criminal fines. (*See* Joshua Sisco, DoJ believes collusion over generic drug prices widespread—source, *Policy and Regulatory Report* (June 26, 2015) (the "PaRR Report")).

### 2.    Forty-Four State AGs Accuse Teva Of Participating In An Illegal Conspiracy Which Artificially Inflated The Value Of Teva Securities

110.    On December 15, 2016, Connecticut and nineteen other State AGs filed civil charges against Teva and five other generic drug manufacturers – Aurobindo Pharma USA, Inc.;

Citron Pharma, LLC; Heritage; Mayne Pharma (USA), Inc.; and Mylan.  The complaint was based on, and referenced, direct evidence of the conspiracy that was gathered by the Connecticut AG from its multiyear investigation.  Additional AGs joined the complaint as it expanded.

111.   The complaint alleges direct evidence, accumulated through years of investigation and discovery, of a massive horizontal conspiracy between Teva and other companies to illegally allocate the market for, rig bids for the sale of, and fix the prices of, generic drugs.  Such a conspiracy violates the well-established bedrock of U.S. antitrust law.

112.   According to the complaint, the scheme consisted of two types of anticompetitive practices:  First, to allocate customers and market share "either upon their entry into a given generic market or upon the entry of a new competitor into that market.  The co-conspirators communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to."  Teva and its co-conspirators would effectuate the agreement by either refusing to bid for particular customers (e.g., drug wholesalers) or by providing a cover bid that they knew would not be successful.  This conduct effectively reduced or eliminated competition for a particular drug, and allowed the Exchange Act Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

113.   Second, and often in conjunction with the first practice, competitors would simply communicate – typically either in person, by telephone, or by text message – and agree to collectively raise prices for a particular generic drug.  While maintaining a presence in the market for a particular drug, these agreements kept the appearance of competition though prices and markets were fixed.

114.   Glazer and Malek have also admitted liability to the claims levied by the State AGs and as part of their settlements have agreed to cooperate fully with the State AG investigation and

suit.  As the Connecticut AG George Jepsen has stated, Glazer and Malek's cooperation "will significantly strengthen [the State AG's] ability to prosecute the litigation and further [their] investigation."  (*Fierce Pharma*).

115.    The State AGs' complaint focuses on the same two drugs as the DOJ: Doxycycline and Glyburide.  Like the DOJ, however, the State AGs make clear that these are simply examples of the much greater continuum of illegal agreements, and only a small part of its tremendous scope. Specifically, the AGs' complaint, last amended on March 1, 2017, alleges that the still-ongoing investigation "uncovered evidence of a broad, well-coordinated and long running series of schemes to fix the prices and allocate the markets for a number of generic pharmaceuticals in the United States."

116.    According to the State AGs' allegations, although the names and positions of all participants are redacted, except for Glazer and Malek, "many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies."

117.    Teva was expressly implicated in the State AGs' allegations concerning the collusion over pricing and market share for Glyburide.  These allegations include direct communications and explicit agreements among Teva and its co-conspirators.  Specifically, on April 22, 2014, Malek identified "a large number of different drugs that Heritage targeted for price increases."  Malek "instructed members of the sales team to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to reach agreement on the price increases." "Malek himself was responsible for communicating with defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide."

118.    According to the complaint, "Malek had a direct relationship" with his contact at Teva who was capable of making binding decisions regarding price increases and "was able to

successfully communicate with her and reach an agreement to raise prices on Glyburide, among other drugs."  "After reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases.  By July 9, 2014, Heritage had been able to successfully increase prices for Glyburide to at least 17 different customers."

119.    Notably, as the AGs alleged, even before the Heritage conference call, Malek and his counterpart at Teva had been discussing the price increases, holding an 18 minute call on April 15, 2014.  The nature of these direct communications, and their frequency, indicates that Malek and his counterpart had been holding such communications for a much longer period of time.  Indeed, it is revealing of the depth and duration of the conspiracy that an agreement to conspire to fix the price of numerous drugs could not have taken place on a single phone call.

120.    Reflecting the discipline in carrying out the market conspiracy, Teva declined to take market share in the face of price increases by Heritage.  "[O]n July 9, 2014, Teva was contacted by a large national retail chain requesting a bid on Glyburide and another drug, due to the Heritage price increases."  Internally at Teva, the communication was forwarded on to a Teva official who wrote back reiterating that Heritage and Teva had an "agreement" "on the two drugs at issue," *i.e.*, Glyburide and an additional, unnamed drug concerning which Teva also had entered into a price fixing agreement with Heritage.

121.    The AGs also alleged that the efforts to conceal the conspiracy were deliberate and extensive.  "Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing."  In that regard, "all [defendants] made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made."  Indeed, "as [d]efendants became

more aware that they were under state and federal investigation, there was even more urgency to avoid detection." (Compl., *Aurobindo* supra ¶ 79).

122.    Moreover, the AGs have found that the explanations provided by the generic drug manufacturers for their price increases have been a mere pretext:  "[g]eneric drug manufacturers [have] argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.   What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister—collusion among generic drug competitors." (*Id*.).

123.    In addition to the specific claims already made in the State AG complaint, the AGs allege that "the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted on at the appropriate time." (*Id*.).   According to an article citing the Connecticut AG lawyers who prepared the Complaint, the full extent of the scheme involves "fraud on a broader, nearly unimaginable scale."  (Pazniokas, *supra* ¶ 79).

124.    Consistent with this, Connecticut's AG, Jepsen, in a December 2016 article published by *The New York Times*, noted that "this is just the tip of the iceberg.... I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."  (Katie Thomas, 20 State Accuse Generic Drug Companies of Price Fixing, *The New York Times* (Dec. 15, 2016)).   Jepsen "promised that more charges were coming."  (*Id*.).

125.    Similarly, in an interview with *Bloomberg*, that aired December 14, 2016, Jepsen described the breadth of the price fixing scheme: "we believe it is massive; we believe it is quite widespread.   This is only the first legal action that is being taken; we expect quite a bit more."

Asked to describe the mechanics of the scheme, Jepsen said "what we're finding, and what the evidence will show, is very explicit price fixing.  This isn't circumstantial evidence….  This is very explicit price fixing … in text messages, in emails, in conversations; we have cooperating witnesses.  The case is very strong."  Jepsen also explained that "the number of drugs that are being investigated goes well beyond the[] two drugs [Doxycycline and Glyburide]."

126.    Jepsen summarized, as reported in *The New York Times* that the investigation had uncovered "very damning" evidence, and "a culture of cronyism where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation."

### 3.    Trade Groups And Social Events Facilitated The Collusion

127.    According to the PaRR Report, both the DOJ and the State AGs focused in part on the participation of generic manufacturers in trade groups and other social industry events as a means to facilitate the conspiracy.  As the State AGs' alleged: "the [d]efendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), among others."

128.    The DOJ is reported to have stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

129.    At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including from Teva, had opportunities to interact with each other and discuss their respective businesses.

130.    As alleged by the State AGs, in addition to these frequent conferences and trade shows, sales representatives got together separately, in more limited groups, allowing high level executives to meet face-to-face with their competitors and discuss their business, gatherings that included "industry dinners."  For example, the AGs allege that "in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking male executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey."

131.    Further, "Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information."

132.    According to the State AGs' allegations, "Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving defendants Citron and Heritage, among others); (2) in Baltimore in May (involving defendants Citron, Heritage and Teva, among others); and (3) at the NACDS conference in August (involving defendants Citron and Heritage, among others)."

133.    Teva belonged to numerous additional trade organizations and attended numerous trade shows with its competitors over the relevant period of time, including: NACDS, HDMA (now the Healthcare Distribution Alliance), ECRM, and the GPhA.  Executives from Teva and its co-conspirators served on the GPhA Board of Directors, including: Allan Oberman, President & CEO of Teva Generics (2014); Debra Barrett, Teva Senior VP of Government and Public Affairs (2012-2013, 2015-2016); Jeffrey Glazer, President and CEO of Heritage Pharmaceuticals (2013-2016); Jeff Watson, President of Apotex Corp. (2013-2014, 2015-2017); and Joseph Renner,

President and CEO of Zydus Pharmaceuticals (2013-2017).  Trade meetings provided ample opportunity for collusion by high-level executives with authority over price setting.  For example, price hikes on Pravastatin tablets occurred soon after February and June, 2013, GPhA Conferences attended by representatives from Teva and its co-conspirators.

### C.  Lead Counsel's Investigation Has Uncovered Eight Additional Drugs That Were The Subject Of Collusion

#### 1.  Lead Counsel's Research Has Identified Drugs With Large Collusive Price Increases

134.    Lead Counsel's investigation has revealed that the market for numerous drugs sold by Teva have indicia of very large collusive price hikes by Teva.

135.    To be clear, these are simply examples, and it is undoubtable that discovery and continued analysis will reveal that numerous other drugs in which the market participants colluded to fix prices, set market share, allocate customers, and rig bids.  Specifically, these examples are Pravastatin, Enalapril Maleate, Cephalexin (oral suspension form), Ketoconazole (tablet and cream forms), Baclofen, Fluocinonide (cream, ointment, and gel forms), Carbamazepine (tablet and chewable tablet forms), and Estradiol (tablet form).

136.    For these drugs, Teva was among the peer group that undertook extraordinary price increases, and did so without the price hikes having any meaningful effect on its market share.  In other words, the market participants did not, as would be expected in a functioning, non-collusive market, try to undercut each other's prices to gain market share.  A price hike was in the competitors self-interests only if they all agreed to act in tandem.

137.    Moreover, these examples, and extraordinary price increases more generally, are not the only means by which Teva and its co-conspirators extended their collusion.  Teva and its co-conspirators also set market share, allocated customers, and rigged bids.  This behavior included removing Teva from certain markets in return for concessions by competitors with respect

to different drugs, collusively raising prices in certain markets in amounts and in ways that are not obvious, collusively maintaining prices in other markets, and rigging bids to stifle competition.

138.    Regardless, implementing and sustaining price increases for just the drugs that Lead Counsel identified, at minimum, added over $1 billion toward Teva's bottom line from 2013 through 2016.

### a) Pravastatin

139.    Lead Counsel's investigation indicates that price hikes in 2013 by Teva for its generic Pravastatin were the result of collusion among market participants.

140.    Pravastatin is among the class of lipid-lowering compounds known as statins, which reduce the biosynthesis of cholesterol.  It acts by inhibiting HMG-CoA reductase, an enzyme that catalyzes cholesterol biosynthesis, thereby reducing cholesterol in the bloodstream. Given cholesterol's link to heart disease, Pravastatin is indicated to reduce the risk of heart attack, stroke, and cardiovascular mortality.  Pravastatin was developed in the 1970s in Japan, and brought to the United States market in 1991 by Bristol-Myers Squibb under the brand name Pravachol. The first ANDA for generic Pravastatin was approved in 2006.

141.    Pravastatin comes in the form of a tablet, with strengths of 10, 20, 40, and 80 milligrams.  Teva's ANDAs to manufacture Pravastatin were approved April 24, 2006, for the 10, 20, and 40 milligram dosage forms, and January 15, 2008, for the 80 milligram dosage form.

142.    Pravastatin is critical to the health of patients with high cholesterol; it is considered a medical necessity that must be purchased at whatever the cost.  Other statins are not therapeutically equivalent: "While all statins have the same mechanism of action, they differ in terms of chemistry, pharmacokinetics, potency and approved indications."  (Darrell Hulisz, PharmD, Which Statin Is Right for My Patient, Medscape (Aug. 28, 2007)).  Pravastatin is unique among statins for its relatively low level of binding to blood plasma proteins, which is an important

consideration for patients whose other medications require binding to plasma proteins in order to be effective; the widely-used blood thinner warfarin is one such drug.  (*Id.*).

143.     According to Symphony data for July 2017, Pravastatin is among Teva's top-50 generic drugs, both in terms of revenues and units sold.

144.     During the relevant period, the main competitors in the market for generic Pravastatin were Teva, Glenmark Pharmaceuticals Inc. ("Glenmark"), and Apotex Corp. ("Apotex").  Manufacturers with lesser shares of the market included Zydus Pharmaceuticals (USA), Inc. ("Zydus"), and Lupin Pharmaceuticals, Inc. ("Lupin").  A repackager, International Laboratories, LLC ("International Labs") was responsible for selling a significant number of units as well.  Together, over the past four full years these entities were responsible for 99% (2013), 99% (2014), 97% (2015), and 94% (2016) of the generic Pravastatin sold in the United States (as measured in terms of Symphony Units).

145.     In mid-2013, just as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its competitors dramatically raised the list prices of their Pravastatin products.  Teva's WAC increases, which First Data Bank recorded as having taken effect on August 9, 2013, ranged for the 10, 20, and 40 milligram strengths from 152% (for a 90-count package of 20 milligram strength) to 235% (for a 1000-count package of 40 milligram strength); Teva's increases on the 80-milligram strength were of somewhat smaller but still significant magnitude, on the order of approximately 90%.  By way of example, Teva's list WAC for a 1000-count package of 10 milligram Pravastatin, previously $150, immediately increased to $482.

146.     As detailed in the graph below, the competitors' increases in the list prices of generic pravastatin were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings:



147.    Data from the NADAC survey, captured in the graph below, shows that the Pravastatin competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Pravastatin quickly grew by six times, jumping over the course of just four months from ten to nearly sixty cents for a typical (volume-weighted average strength) tablet, and that at least a portion of this increase continued to have material revenue impact from mid-2013 through at least the end of 2016.



148.   Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Pravastatin became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

149.   During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.   Each manufacturer retained substantially the same market share.

150.   Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.   There was no shortage of raw materials or supply (*see* FDA, Current and Resolved Shortages Reported to FDA) or unexpected increase in demand.

151.   As detailed at Section V.C.2 Teva generated an estimated $319.7 million from mid-2013 through the first quarter of 2016 as a result of collusive increases in its prices for Pravastatin.   The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### b)  Enalapril Maleate

152.    Lead Counsel's investigation has indicated that price hikes in 2013 and 2014 by Teva for its generic Enalapril Maleate were the result of collusion among market participants.

153.    Enalapril Maleate is among the class of antihypertensive compounds known as angiotensin-converting enzyme ("ACE") inhibitors, used to treat high blood pressure, and by extension heart and kidney disease.  It is on the World Health Organization's Model List of Essential Medicines, a list of the most effective and safe medicines necessary for a basic and functional healthcare system.  ACE inhibitors mitigate an enzyme involved in the biosynthesis of angiotensin II, a protein which acts to constrict blood vessels.  By inhibiting ACE, Enalapril Maleate causes levels of angiotensin II to drop, leading blood vessels to relax and, as a consequence, blood pressure to decrease.

154.    Merck developed Enalapril Maleate in the 1980s as a safer alternative to the existing ACE inhibitor.  The first ANDA for generic Enalapril Maleate was approved in the year 2000.

155.    Enalapril Maleate comes in the form of a tablet, with strengths of 2.5, 5, 10, and 20 milligrams.  Teva's ANDA to manufacture Enalapril Maleate tablets, in all four strengths, was approved August 22, 2000.

156.    During most of the relevant period, the main competitors in the market for generic Enalapril were Teva, Mylan, Taro, Legacy Pharmaceuticals International ("Legacy"), and Wockhardt.  Taro did not possess significant market share until 2014, and Teva substantially exited the market in 2016.  Together, over the past four full years these entities were responsible for 90% (2013), 100% (2014), 99% (2015), and 91% (2016) of the generic Enalapril Maleate sold in the United States (as measured in terms of Symphony Units).

157.    In mid-2013, just as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its main competitors raised the list prices of their Enalapril Maleate products.  Teva's WAC increases, effective July 19, 2013 per First Data Bank, ranged from 262% (applied to all package sizes of 10 milligram strength tablets) to 354% (for a 5000-count package of 5 milligram strength).  By way of example, Teva's list WAC for a 1000-count package of 20 milligram Enalapril Maleate, previously $54, immediately increased to $239.

158.    In 2014, Teva and its main competitors instituted an even larger increase in the list prices of their Enalapril Maleate products.  On August 28, 2014 Teva instituted a 230% across-the-board increase, over and above the increases implemented in 2014.  Continuing to use the 1000-count package of 20 mg Enalapril Maleate as an example, Teva's list WAC, $54 just over one year prior, now stood at $788, more than thirteen times higher than it was.

159.    As detailed in the graph below, the competitors' increases in the list prices of generic Enalapril Maleate were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.



160.    Data from the NADAC survey, captured in the graph below, shows that the Enalapril Maleate competitors' WAC increases were correlated with real market-pricing impact. The data also show that in 2013 the average cost of generic Enalapril Maleate quickly grew by five times, jumping over the course of just four months from three to fifteen cents for a typical (volume-weighted average strength) tablet; in 2014 this now-higher average itself tripled to 45 cents, resulting in a per-tablet cost roughly fifteen times more than the prices that had prevailed in early 2013.   At least a portion of these increases continued to have material revenue impact from mid-2013 through at least the end of 2016.



161.    Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Enalapril Maleate became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

162.    During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.   Each manufacturer retained substantially the same market share.

163.    Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

164.    As detailed at Section V.C.2, Teva has generated an estimated $104.4 million from mid-2013 through mid-2017 as a result of collusive increases in its prices for Enalapril Maleate. The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### c)  Cephalexin Oral Suspension

165.    Lead Counsel's investigation has indicated that price hikes in 2014 by Teva for the oral suspension form of its generic Cephalexin were the result of collusion among market participants.

166.    Cephalexin is a semisynthetic antibiotic that can treat a number of bacterial infections, including streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections.  It may be used to prevent bacterial endocarditis.  It is among the "Key Access Antibiotics" on the World Health Organization's Model List of Essential Medicines necessary for a basic and functional healthcare system.

167.    Cephalexin is an alternative to penicillins for patients with penicillin intolerance. For example, penicillin is the treatment of choice for respiratory tract infections caused by Streptococcus, but Cephalexin may be used as an alternative in penicillin-intolerant patients.

168.    Cephalexin was developed in 1967.  It was first marketed in 1969 and 1970 under the names Keflex and Ceporex, among others.  The first ANDA for an oral-suspension form of the drug (the form that was the subject of collusive price hikes) was approved prior to 1982.

169.    Teva's ANDA to manufacture 125 mg/5ml and 250 mg/5ml strength oral suspension Cephalexin was approved February 13, 1987.

170.     During the relevant period, the main competitors in the market for generic Cephalexin were Teva and Lupin Pharmaceuticals, Inc.  Together, over the past four full years Teva and Lupin were responsible for 94% (2013), 99% (2014), 96% (2015), and 89% (2016) of the generic Cephalexin oral suspension sold in the United States (as measured in terms of Symphony Units).  Karalex Pharma, LLC also sold Cephalexin before October 2013 and after July 2015, but not in between.  During the times that it sold the drug, Karalex was responsible for between 10% and 20% of the market share.

171.     In late 2013 and early 2014, respectively, Lupin and Teva – which already had established identical pricing structures – made identical increases in their prices for Cephalexin oral suspension.  The scale of the price increases ranged from 90% (for a small package of the stronger dose) to 185% (for a large package of the weaker dose).  In dollar terms, the latter package/strength configuration, which previously listed for $11, now was priced at $32.

172.     As detailed in the graph below, the competitors' increases in the list prices of generic Cephalexin oral suspension were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.



173.    Data from the NADAC survey, captured in the graph below, shows that the Cephalexin oral suspension competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Cephalexin oral suspension quickly grew by roughly three times, jumping over the course of just two months from five to fifteen cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from early 2014 through at least the end of 2016.



174.    Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Cephalexin oral suspension became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

175.    During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.  Indeed, when Karalex re-entered the market, it matched the price of Teva and Lupin rather than compete on price.

176.    Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

177.    As detailed at Section V.C.2, Teva has generated an estimated $33.9 million from the second quarter of 2014 through mid-2017 as a result of collusive increases in its prices for Cephalexin oral suspension.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### d)  Ketoconazole Tablets And 2% Cream

178.    Lead Counsel's investigation has indicated that price hikes in 2014 by Teva and its competitors for generic Ketoconazole tablets and 2% cream were the result of collusion among market participants.

179.    Ketoconazole is a synthetic imidazole antifungal drug primarily used to treat fungal infections.  It works by interfering with the synthesis of a constituent of fungal cell membranes, stopping the growth of the fungus.  The tablet form of Ketoconazole is used to treat a variety of fungal infections such as blastomycosis, histoplasmosis, coccidiomycosis, and candidiasis of the skin or mouth.  The cream form of the drug is used to treat external ailments such as athlete's foot, ringworm, and tinea versicolor.

180.    Ketoconazole was discovered in 1976 at Janssen Pharmaceutica, and introduced into the U.S. market in 1981.  Teva received the first ANDAs to sell generic Ketoconazole tablets (approved June 15, 1999) and to sell generic 2% Ketoconazole cream (approved Apr. 25, 2000).

181.    The markets for Ketoconazole tablets and 2% cream are highly concentrated with all three major manufacturers being previously identified together in other drug price fixing cases. During the relevant period, the main competitors in the market for both tablets and 2% cream were Teva and Taro; in each market, a third competitor – Mylan with respect to tablets and Fougera Pharmaceuticals Inc., a part of the Sandoz division of Novartis AG ("Fougera/Sandoz") with respect to 2% cream – held a smaller portion of the market.  In or around July 2015, Teva exited the market for Ketoconazole 2% cream.  Together, over the past four full years, in the markets for both forms of the drug at issue, the top-three competitors controlled the entire market (as measured in terms of Symphony Units).

182.    On April 4 and April 18, 2014, respectively, Teva and Taro dramatically raised the price of Ketoconazole tablets and 2% cream.  Before, that, the price had been essentially flat for

many years.  According to First Data Bank, both competitors instituted identical 110% price increases, to the same exact price points, across all package sizes of the 2% cream; with respect to the tablet form, price increases were on the order of 250% for Teva and 230% for Taro, again to identical price points.  By way of example, a 100-count package of tablets that had cost around $64 now cost $222, a mid-size container of 2% cream, previously $20, now cost $42.

183.    The remarkable similarity in timing and scale of Taro and Teva's price increases is evident in the graph below, which also shows that the Ketoconazole competitors' price increases occurred in close proximity to several industry gatherings:



184.    Data from the NADAC survey, captured in the graph below, shows that the Ketoconazole competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Ketoconazole cream quickly tripled, jumping over the course of just two months from twenty to sixty cents for a typical (volume-weighted average strength) dose, and rising to nearly one dollar per dose prior to Teva's exiting the market.  With respect to the tablet form, the average cost immediately tripled, and eventually settled at a price seven to eight times

the prevailing price prior to the WAC increases.  At least a portion of these increases continued to have material revenue impact from early 2014 through Teva's exiting the market with respect to the cream form, and through at least the end of 2016 with respect to the tablet form.



185.    Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Ketoconazole became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

186.    During the relevant period, despite the massive price hike, no competitor undercut the price-increasing competitors in order to seize market share.

187.    The price increase was maintained through at least July 2015, when Taro and Fougera/Sandoz again raised their prices.  Although Teva did not raise its WAC price at the time, it soon exited the market altogether.  The timing of Teva's exit coincides approximately with the FTC's review of Teva's purchase of Actavis.

188.    Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

189.    As detailed at Section V.C.2, Teva has generated an estimated $58.3 million from the second quarter of 2014 through mid-2017 as a result of collusive increases in its prices for Ketoconazole tablets and 2% cream.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### e)  Baclofen

190.    Lead Counsel's investigation has indicated that price hikes in 2014 by Teva for its generic Baclofen tablets were the result of collusion among market participants.

191.    Baclofen – a structural analog of the inhibitory neurotransmitter gamma-aminobutyric acid ("GABA") – acts as a muscle relaxant and an antispastic agent.  Baclofen is FDA-approved to treat spasticity (involuntary tightening or contracting of muscles) associated with multiple sclerosis ("MS"), particularly for the relief of repeated flexor spasms (spasms that cause limbs to bend toward the body) and accompanying pain and muscular rigidity.

192.    Baclofen was first developed by Ciba-Geigy (now Novartis) in 1962.  The FDA first approved Baclofen in its branded form, Lioresal, in November 1977.  The first ANDA for generic Baclofen was approved in 1988.

193.    Baclofen plays an important role in the treatment of MS patients suffering from often-debilitating muscle spasms, allowing them to greatly improve their quality of life.  Baclofen is one of two recognized first-line treatments for MS-induced spasticity (the other is gabapentin), and (with gabapentin) part of the second-line treatment as well.  (United Kingdom National Institute for Health and Care Excellence, *Multiple sclerosis in adults: management,* Oct. 2014, https://www.nice.org.uk/guidance/CG186/chapter/1-Recommendations).

194.    Thus, patients – particularly those who cannot tolerate gabapentin, or those for whom gabapentin is ineffective – have little-to-no viable choice but to purchase Baclofen at the price at which it is offered.  (Teva is also a major manufacturer of gabapentin, which is a top-10 generic drug for the Company, according to Symphony data).

195.    Baclofen is almost always administered orally, in tablets containing either 10 or 20 milligrams of active ingredient (the intrathecal-injectable form of the drug is not manufactured by Teva); Teva manufactures tablets in both the 10 and 20 milligram strengths under ANDAs, approved in 1988, that it acquired in its 2006 acquisition of Ivax Corp.  Baclofen is usually prescribed in a daily, divided dose of between up to 120 milligrams total.

196.    According to Symphony data for July 2017, Baclofen is one of Teva's top fifty generic drugs in the United States market, both in terms of revenue and in terms of quantity of units manufactured.

197.    During the relevant period, the main competitors in the market for generic Baclofen tablets were Teva, Qualitest Pharmaceuticals Co. (now part of Par), and Upsher-Smith Laboratories ("Upsher-Smith").  Together, over the past three full years these entities were responsible for 90% (2013), 90% (2014), 95% (2015), and 84% (2016) of the generic Baclofen tablets sold in the United States (as measured in terms of Symphony Units).

198.    In early 2014, Teva and Upsher-Smith increased their WAC list price, in equal or nearly equal amounts.  For example, Teva and Upsher-Smith increased their WAC prices for 100-unit packages of 10 milligram tablets by 350%, from $6.65 to $29.93 for 100 units, and for 20 milligram strength tablets by 420%, from $9.50 to $49.40.

199.   As detailed in the graph below, the competitors' increases in the list prices of generic Baclofen were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.



200.   Data from the NADAC survey, captured in the graph below, shows that the Baclofen competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Baclofen quickly grew by roughly five times, jumping over the course of just three months from five to twenty-five cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from early 2014 through at least the end of 2016.

57



201.    Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Baclofen became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

202.    During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.  Thus each manufacturer retained substantially the same market share.

203.    Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

204.    As detailed at Section V.C.2, Teva has generated an estimated $161.5 million from the second quarter of 2014 through mid-2017 as a result of collusive increases in its prices for Baclofen.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### f)   0.05% Fluocinonide

205.   Lead Counsel's investigation has indicated that price hikes in 2014 by Teva for its generic .05% Fluocinonide cream, ointment, and gel were the result of collusion among market participants.   For purposes of this Complaint, unless otherwise noted, references to ".05% Fluocinonide" encompass the cream, ointment, and gel forms of .05%-strength generic Fluocinonide.

206.   Fluocinonide is a high-potency topical corticosteroid widely used to reduce the swelling, itching, and redness associated with a variety of skin conditions such as  psoriasis, eczema, dermatitis, and vitiligo.   High potency (Group II) corticosteroids, of which .05% Fluocinonide is a prominent example, are "the mainstay of therapy for psoriasis." (Jonathan D. Ference, PharmD. and Allen R. Last, M.D., *Choosing Topical Corticosteroids*, 79 American Family Physician 2, at 135 (Jan. 15, 2009))

207.   Other classes of topical corticosteroids (Groups I, and III-VII) are of different potencies and safety levels – appropriate only to specific thicknesses of skin – making them unsuitable alternatives to .05% Fluocinonide.  (*See id.*).  "When prescribing topical steroids, it is important to consider the diagnosis as well as steroid potency, delivery vehicle, frequency of administration, duration of treatment, and side effects." (*Id.*).

208.   The FDA first approved Fluocinonide topical cream in the U.S. in 1971, under the brand name Lidex.  Beginning in 1987 and thereafter, the FDA approved generic Fluocinonide for sale and marketing.  During the relevant period, Teva sold .05% Fluocinonide under ANDAs approved in February 1989 (cream, gel) and December 1991 (ointment).

209.   During the relevant period, the main competitors in the combined market for generic .05% Fluocinonide were, as with Ketoconazole, Teva and Taro.  Actavis/Mayne, which manufactures only the cream form of .05% Fluocinonide, had a lesser share of the market, and did

not enter in any material way until June 2014.  Together, over the past four full years, these entities were responsible for 98% (2013), 99% (2014), 100% (2015), and 99% (2016) of the .05% Fluocinonide cream, ointment, and gel sold in the United States (as measured in terms of Symphony Units).

210.    In mid-2014, Taro and Teva made massive, and identical, increases in WAC list prices.  With respect to the cream and ointment forms, each manufacturer raised their WAC by 206% for a small package, and 337% for a mid-size package.  Both manufacturers raised prices for large packages of cream by 524%, and large packages of ointment by 483% (Taro also sold an extra-large package of cream, for which the price spiked by 754%).  Both manufacturers raised the price for a large package of gel by 255%.  These price increases meant that, a mid-sized package of .05% Fluocinonide ointment, previously listed at $26, now listed for $113.

211.    As detailed in the graph below, the competitors' increases in the list prices of generic Fluocinonide were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.



212.    Data from the NADAC survey, captured in the graph below, shows that the .05% Fluocinonide competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic 05% Fluocinonide quickly grew by three times, jumping over the course of just one month from roughly sixty-two cents to roughly $1.86 for a typical (volume-weighted average form/strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid 2014 through at least the end of 2016.



213.    Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Fluocinonide became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

214.    During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.  Thus each manufacturer retained substantially the same market share.

215.    Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

216.    As detailed at in Section V.C.2, Teva has generated an estimated $167.0 million from mid-2014 through mid-2017 as a result of collusive increases in its prices for .05% Fluocinonide.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### g)  Carbamazepine Tablets And Chewable Tablets

217.    Lead Counsel's investigation has indicated that price hikes during 2014 by Teva for its generic Carbamazepine tablets and chewable tablets (cf. sustained release tablets) were the result of collusion among market participants.

218.    Carbamazepine is an anticonvulsant, used primarily in the treatment of epilepsy and neuropathic pain.  It works by decreasing nerve impulses that cause seizures and pain.  It is FDA-approved medical to treat epilepsy (including partial, mixed, and grand mal seizures), trigeminal neuralgia (pain, often excruciating, of the face relating to the trigeminal nerve).  It is also used to treat manic and mixed episodes of bipolar I disorder, and claimed to be effective for the treatment of Attention Deficit and Hyperactivity Disorder.

219.    Carbamazepine was discovered in 1953 by J.R. Geigy AG (now a part of Novartis).  It was first brought to the U.S. market in 1968, under the brand name Tegretol.  It has been available as a generic medication in various forms since the 1980s.  It is on the World Health Organization's Model List of Essential Medicines necessary for a basic and functional healthcare system.

220.    Carbamazepine is chemically unrelated to other anticonvulsants or other drugs used to control the pain of trigeminal neuralgia.

221.    Teva manufactures 200 mg Carbamazepine tablets under an ANDA approved September 17, 1986, and 100 mg chewable tablets under an ANDA approved July 29, 1992.

222.    During the relevant period, the main competitors in the market for generic Carbamazepine tablets and chewable tablets were, as with Ketoconazole and .05% Fluocinonide, Teva and Taro.  Torrent Pharmaceuticals Ltd. ("Torrent") and Apotex held smaller shares of the market (Apotex did not compete in the chewables market).  Together, over the past four full years these entities were responsible for 100% (2013), 99% (2014), 99% (2015), and 100% (2016) of the combined market for generic Carbamazepine tablets and chewable tablets sold in the United States (as measured in terms of Symphony Units).

223.    In mid-2014, the four competitors in Carbamazepine tablets and three competitors in chewable tablets all increased WAC list prices for Carbamazepine tablets and chewable tablets. The competitors – whose price points generally varied prior to these increases – all established largely identical pricing structures, with identical WACs for 100-count packages, and only slight variations at larger package sizes.  Teva and Taro's new WAC for 1000-count tablets was identical, at $1241.  Relative to the former prices, the new prices for the tablets had massively more expensive list prices: more than 1000% higher in the case of Apotex, more than 1500% for Teva, and roughly 2300% higher for Taro and Torrent.  The increases for chewable tablets were also significant: in excess of 250% for Teva and Taro, and 778% for Torrent.  The practical effect of these changes was enormous: for example, a 100-count package of tablets, which Teva previously listed at $8, suddenly listed for $128, and with no cheaper alternative on the market; similarly, a 100-count package of chewable tablets, formerly listed by Teva for $14, now listed for $53, again with no cheaper alternative on the market.

224.    The remarkable similarity in timing and scale of the competitors' price increases is evident in the graph below, which also shows that the Carbamazepine competitors' price increases occurred in close proximity to several industry gatherings:



Again, the market participants went into 2014 at different price points, but the new WAC prices established in mid-2014 established largely identical pricing structures

225.    Data from the NADAC survey, captured in the graph below, shows that the Carbamazepine competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Carbamazepine tablets quickly grew by fifteen times, jumping over the course of just two months from roughly five to more than seventy-five cents for a typical (volume-weighted average form/strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid-2014 through at least the end of 2016.

64



226.   Lead Counsel's investigation reveals that manufacturers' relative shares of the market for generic Carbamazepine became more stable in the period after the price increases, a fact which is generally regarded as corroborative of collusion.

227.   During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.  Thus each manufacturer retained substantially the same market share.

228.   Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of raw materials or supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

229.   As detailed at Section V.C.2, Teva has generated an estimated $196.1 million from mid-2014 through mid-2017 as a result of collusive increases in its prices for Carbamazepine tablets.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

**h) Estradiol Tablets**

230.    Lead Counsel's investigation has indicated that price hikes in 2015 by Teva for its generic Estradiol tablets were the result of collusion among market participants.

231.    Estradiol, a naturally occurring steroid hormone, is a form of the primary female sex hormone estrogen.  Estradiol is used mainly in hormone replacement therapy (HRT) where the body does not naturally produce sufficient estrogen.  It is also used in hormonal contraception and sometimes in the treatment of hormone-sensitive cancers like prostate cancer.

232.    Estradiol was first isolated in 1935.  It first became available as a medication, in the form of estradiol benzoate, a prodrug of estradiol, in 1936.  Micronized estradiol, which allowed estradiol to be taken by mouth, was not introduced until 1975.

233.    Alternatives to Estradiol – synthetic estrogens and conjugated equine estrogens – have disproportionate effects on synthesis of proteins in the liver, which in turn creates a considerably higher risk of cardiovascular side effects relative to the risks of Estradiol.

234.    Teva sells .5 mg, 1 mg, and 2 mg tablets of Estradiol under and ANDA approved October 22, 1997, the rights to which Teva acquired via its 2008 acquisition of Barr Laboratories.  According to Symphony data for July 2017, Estradiol is among Teva's top-50 generic drugs in terms of units sold.

235.    From 2013 through the present, Teva has dominated the market for Estradiol with annual market shares ranging from 74% to 85%.  As of early 2015, Teva's largest competitor in the Estradiol tablets market was Actavis, which held approximately 10%t of the market until Teva and Actavis merged in August 2016.  Teva and Actavis together were responsible for 96% of units sold in 2014 and 95% in 2015.  In 2016, Teva and Actavis, now combined, controlled 87% of the market (as measured in terms of Symphony Units).  Before 2013, Mylan was a significant

competitor, but its market share dropped significantly in July 2013, before re-emerging in 2016 and 2017.

236.    In early 2015, Teva dramatically raised the list WAC of its Estradiol tablets by 90% across the board.  Thus, for example, a 500-count package of 1 mg strength tablets, previously listed at $81, now was listed at $154.  Actavis matched this new pricing structure, to the penny. The scale and timing of these price increases is evident in the graph below:



237.    Data from the NADAC survey, captured in the graph below, shows that the Estradiol tablets competitors' WAC increases were correlated with real market-pricing impact, that the average cost of generic Estradiol tablets quickly grew by a factor of roughly 1.6, jumping over the course of just one month from roughly eight to more than thirteen cents for a typical (volume-weighted average strength) dose, and that at least a portion of this increase continued to have material revenue impact from mid-2015 through at least the end of 2016.



238.   During the relevant period, despite the massive price hike, no competitor successfully undercut the price-increasing competitors in order to seize market share.  Thus each manufacturer retained substantially the same market share.

239.   Lead Counsel's investigation has found that there is no rational alternative explanation for these price hikes other than collusion.  There was no shortage of supply according to the FDA Drug Shortages List, and no unexpected increase in demand.

240.   As detailed at Section V.C.2, Teva has generated an estimated $58.7 million from early 2015 through mid-2017 as a result of collusive increases in its prices for Estradiol.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, fell straight to Teva's bottom line.

### 2.   Teva Increased Revenues By Over $1 Billion Through Collusion On These Eight Drugs

241.   Teva does not publicly disclose its revenues on sales of the specific generic drugs described above.  Despite this, Lead Counsel, through its investigation and analysis, estimated the

revenues that Teva derived from the collusive increase of the prices of certain drugs that Lead Counsel identified as the subject of collusion, enumerated above. Lead Counsel derived this estimated revenue using subscription-based data and publicly-available information.

242. In examining the revenues generated by the collusion for each drug, Lead Counsel examined: (i) the relationship between price and quantity; (ii) the relationship between price and cost of manufacturing; (iii) the prior price trends and volatility of price in the relevant drug; (iv) expected inflation / deflation; and (v) prices over the entire prescription market to calculate average prices. Lead Counsel applied a reasonable proxy for rebates and discounts provided to public purchasers based on publicly available Medicare rebates, as that information is not publicly disclosed.

243. Lead Counsel estimates that just for the drugs described above in subsection V.C.1, Teva generated over $1 billion in total revenue from the collusion. This is a small sample given that Teva generates revenue from hundreds of generic drugs at the time. This also does not include any revenue from other drugs with price hikes that were the result of collusion, or the revenues generated by other anticompetitive activities such as collusive price fixing, price maintenance, customer allocation, or market allocation.

244. Given the breadth of the conspiracy, as alleged herein and by both the DOJ and the State AGs, Teva also undoubtedly made additional price hikes, or agreed with its co-conspirators to allocate markets or decline to compete on price in other markets, thereby generating additional illicit revenues that contributed to Teva's reported 2013 Fourth Quarter success in U.S. generics. Thus, Lead Counsel's estimate for just the drugs listed below vastly understates the true impact of Teva's collusion in the generic drugs market.

245. **2013**. Lead Counsel, looking only to the drugs described above, estimates that in 2013, Teva generated approximately $126 million in revenue attributable to improper collusion with its competitors in 2013.  This improper collusion-derived revenue breaks down by drug and by quarter as follows:

| 2013 (USD Millions) | Q3 | Q4 | TOTAL |
|---|---|---|---|
| **Pravastatin Sodium** | $44.1 | $76.3 | $120.5 |
| **Enalapril Maleate** | $2.3 | $3.0 | $5.3 |
| **TOTAL** | $46.4 | 79.3 | $125.8 |

246. **2014**. Lead Counsel, looking only to the drugs described above, estimates that in 2014 Teva generated approximately $372 million in revenue attributable to improper collusion with its competitors.  This improper collusion-derived revenue breaks down by drug and by quarter as follows:

| 2014 (USD Millions) | Q1 | Q2 | Q3 | Q4 | TOTAL |
|---|---|---|---|---|---|
| **Pravastatin Sodium** | $52.1 | $41.1 | $30.9 | $25.6 | $149.7 |
| **Enalapril Maleate** | $5.7 | $6.3 | $13.8 | $21.9 | $47.7 |
| **Cephalexin** | -- | $4.8 | $5.1 | $4.1 | $14.0 |
| **Ketoconazole** | -- | $8.8 | $9.3 | $8.4 | $26.5 |
| **Baclofen** | -- | $15.7 | $20.6 | $19.9 | $56.1 |
| **Fluocinonide** | -- | -- | $19.7 | $21.7 | $41.4 |
| **Carbamazepine** | -- | -- | $10.6 | $26.0 | $36.6 |
| **TOTAL** | $57.8 | $76.7 | $110.0 | $127.6 | $372.0 |

247. **2015**. Lead Counsel estimates that in 2015, looking only to the drugs described above, Teva generated approximately $372 million in revenue attributable to improper collusion with its competitors.  This improper collusion-derived revenue breaks down by drug and by quarter as follows:

70

| 2015 (USD Millions) | Q1 | Q2 | Q3 | Q4 | TOTAL |
|---|---|---|---|---|---|
| Pravastatin Sodium | $16.6 | $14.5 | $12.2 | $4.6 | $47.9 |
| Enalapril Maleate | $19.1 | $10.4 | $8.4 | $6.2 | $44.1 |
| Cephalexin | $3.1 | $3.3 | $2.7 | $2.3 | $11.5 |
| Ketoconazole | $7.0 | $7.6 | $7.3 | $5.0 | $27.0 |
| Baclofen | $14.7 | $15.5 | $14.4 | $13.9 | $58.6 |
| Fluocinonide | $18.8 | $22.9 | $21.0 | $13.9 | $76.7 |
| Carbamazepine | $22.9 | $20.7 | $19.0 | $17.0 | $79.5 |
| Estradiol | $5.4 | $7.9 | $8.0 | $6.0 | $27.3 |
| TOTAL | $107.7 | $102.9 | $93.1 | $69.0 | $372.6 |

248.   **2016**.  Lead Counsel, looking only to the drugs described above, estimates that in 2016, Teva generated approximately $171 million in revenue attributable to improper collusion with its competitors.   This improper-collusion-derived revenue breaks down by drug and by quarter as follows:

| 2016 (USD Millions) | Q1 | Q2 | Q3 | Q4 | TOTAL |
|---|---|---|---|---|---|
| Pravastatin Sodium | $1.5 | -- | -- | -- | $1.5 |
| Enalapril Maleate | $2.8 | $1.7 | $1.0 | $0.8 | $6.2 |
| Cephalexin | $1.9 | $1.8 | $1.5 | $1.3 | $6.5 |
| Ketoconazole | $2.5 | $1.0 | $0.8 | $0.3 | $4.6 |
| Baclofen | $11.7 | $11.3 | $9.3 | $5.9 | $38.3 |
| Fluocinonide | $11.5 | $11.3 | $8.9 | $7.4 | $39.0 |
| Carbamazepine | $12.9 | $14.1 | $14.6 | $14.1 | $55.7 |
| Estradiol | $4.6 | $5.1 | $4.9 | $4.9 | $19.5 |
| TOTAL | $49.4 | $46.2 | $41.0 | $34.6 | $171.3 |

249.   **2017**.  Lead Counsel, looking only to the drugs described above, estimates that in the first two quarters of 2017, Teva generated approximately $57 million in revenue attributable

to improper collusion with its competitors.  This improper-collusion-derived revenue breaks down by drug and by quarter as follows:

| 2017 (USD Millions) | Q1 | Q2 | TOTAL |
|---|---|---|---|
| Pravastatin Sodium | -- | -- | -- |
| Enalapril Maleate | $0.6 | $0.5 | $1.1 |
| Cephalexin | $1.2 | $0.8 | $1.9 |
| Ketoconazole | $0.2 | $0.1 | $0.2 |
| Baclofen | $4.5 | $4.0 | $8.5 |
| Fluocinonide | $5.9 | $3.8 | $9.7 |
| Carbamazepine | $12.7 | $11.6 | $24.3 |
| Estradiol | $5.8 | $6.1 | $11.9 |
| TOTAL | $30.8 | $26.8 | $57.7 |

250.    In sum, the drugs Lead Counsel identified generated an estimated over $1 billion from 2013 through mid-2017 in revenue attributable to improper collusion with its competitors. This revenue breaks down by drug and by year as follows:

| (USD Millions) | 2013 | 2014 | 2015 | 2016 | 1H 2017 | TOTAL |
|---|---|---|---|---|---|---|
| Pravastatin Sodium | $120.5 | $149.7 | $47.9 | $1.5 | -- | $319.7 |
| Enalapril Maleate | $5.3 | $47.7 | $44.1 | $6.2 | $1.1 | $104.4 |
| Cephalexin | -- | $14.0 | $11.5 | $6.5 | $1.9 | $33.9 |
| Ketoconazole | -- | $26.5 | $27.0 | $4.6 | $0.2 | $58.3 |
| Baclofen | -- | $56.1 | $58.6 | $38.3 | $8.5 | $161.5 |
| Fluocinonide | -- | $41.4 | $76.7 | $39.0 | $9.7 | $167.0 |
| Carbamazepine | -- | $36.6 | $79.5 | $55.7 | $24.3 | $196.1 |
| Estradiol | -- | -- | $27.3 | $19.5 | $11.9 | $58.7 |
| TOTAL | $125.8 | $372.0 | $372.6 | $171.3 | $57.7 | $1,099.6 |

D.      **Pre-Class Period Allegations – By 2013, Teva Was Facing Fundamental Market Pressures, Declining Profits, And Collapsing ADS Price**

251.    By the beginning of 2012, Teva's ADS price had fallen from a high of over $60 in 2010, to the mid-$30s.  Teva's ADS price generally remained at this level throughout 2012 and heading into 2013, the Company faced major headwinds.

252.    In 2012 Teva had received subpoenas from the SEC relating to a Foreign Corrupt Practices Act ("FCPA")investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, certain Eastern European countries, and certain Latin American countries.  (Compl. at 1, *SEC v. Teva Pharm. Indus.*, No. 1:16-cv-25298 (KMM) (S.D. Fla. Dec. 22, 2016) (ECF No. 1 at ¶ 2)).  The SEC also alleged that Teva deliberately falsified its accounting.  Teva's generics revenues from the "Rest of World" markets ("ROW"), markets that were the subject of the FCPA investigation, fell approximately $280 million in 2013 and continued to fall after.  Ultimately, Teva paid a $519 million fine and entered into a deferred prosecution agreement.  The investigation obstructed the pipelines of revenue from these countries.

253.    The bribery scandal was not the only problem facing Teva's generics business.  As a Deutsche Bank analyst concluded in a report published on May 1, 2013, Teva's overall generics business had "seriously underperformed" as compared to its competitors.  Teva was the worst performing generics drug company compared to its peers despite being the largest.  By August 14, 2013 Teva's then-CEO Jeremy M. Levin acknowledged that "Generic growth in the United States [was] slowing ***fundamentally***."  Teva's U.S. generics business reported dramatically lower revues, year over year.

254.    Moreover, Teva would soon lose its patent protection on Copaxone, by far its biggest specialty drug, accounting for as much as 50% of Teva's profits over that time.  Due to

this impending loss of exclusivity, Teva knew it could face generic competition to Copaxone as early as mid-2014.

255.   Publically, Levin and Teva reacted to these headwinds and the decline of U.S. generics by touting an extensive "cost-cutting" program designed to make the company more efficient and purportedly save the company billions.  By mid-year 2013, the supposed cost-cutting produced few visible results as the revenues from Teva's generics segments continued to plummet.

256.   On October 30, 2013, Teva's Board of Directors forced CEO Levin to step down as President and Chief Executive Officer, less than 18 months into the job.  Given the sudden nature of Levin's termination, without a replacement identified, the Board named Defendant Eyal Desheh, Teva's Executive Vice President and Chief Financial Officer, to fill the role of President and Chief Executive Officer on an interim basis, effective immediately, and formed a committee to search for a permanent successor.  Defendant Altman took over as the acting Chief Financial Officer.

257.   In an October 30, 2013 investor call relating to Levin's firing, the then-chairman of Teva's board, Phillip Frost, and Defendant Desheh assured investors that they were focused on turning the Company around.  Desheh informed the market that Teva "ha[d] decided to accelerate" the cost reduction plan and promised "to create a much better, efficient generic machine."  Chairman Frost disclosed that "friends of [his] … have bought hundreds of millions of dollars - worth of stock during the last couple of weeks."

258.   In reality, Defendants desperation had already led them to enact a secret alternative and illegal business plan to boost Teva's profits.  Teva, mid-2013, enacted a series of collusive "extraordinary" price hikes of over 100%, coordinated with Teva's supposed competitors.  Unexplainable by any market forces, the price hikes propped up Teva's declining revenues in

advance of releasing year-end financial figures, mitigating the damage from the revenue losses in ROW.

259.     As detailed herein, Defendants' scheme allowed them to replace the revenue lost as a result of the FCPA investigation, and more, without incurring a penny more of research and development costs, hiring of additional sales force, or any other additional expenditures.  Instead, the Company slashed those line item costs as they unlawfully fixed market share and prices. Collectively, these collusive prices hikes in 2013 turned Teva's financial trajectory completely around in the Fourth Quarter.

**E.     The Class Period Begins On February 6, 2014 When Teva Announces 2013 Year-End Results**

**1.     During 2014, The Collusion Becomes The Centerpiece Of The Company's Profits, Fraudulently Inflating The ADS Price**

260.     The Class Period begins with Teva's publication of its financial results for the year 2013, including for the Fourth Quarter of 2013, on February 6, 2014.  Soon after, Teva filed its 2013 20-F, on February 10, 2014.

261.     In the 2013 20-F, the Exchange Act Defendants claimed that, far from colluding with peers, the participants in the generic drug markets were fierce competitors on price:

> Our revenues and profits from generic pharmaceutical products typically decline as a result of competition, both from other pharmaceutical companies and as a result of increased governmental pricing pressure.  ***Our generic drugs face intense competition.*** *P*rices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

262.     Even more specifically, the Exchange Act Defendants claimed that Teva's generics division faced "intense competition" on price in the United States markets:

Competitive Landscape. In the United States, we are subject to ***intense competition*** in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures.

263.    The Exchange Act Defendants made substantially the same false and misleading statements in each of their annual 20-F filings during the Class Period.  The reality was that, unbeknownst to investors, their strategy to collude with competitors to increase prices, had provided a massive lift to Teva's profits, essentially saving it from a destructively disastrous year.

264.    As revealed in the press release and Teva's 20-F for 2013, Teva's U.S. generics division, in the Fourth Quarter 2013, earned $1,178 million, as compared to $1,034 million the year before – an increase of approximately $144 million, or nearly 14%.  This was a striking turn around.  Relative to 2012, Teva's net revenues for the nine month period ending September 30 were down year-over-year.

265.    As evidenced by Lead Counsel's analysis (*see infra* V.C.), much of this gain was the result of a collusive price hike in a single drug, Pravastatin.  In August 2013, Teva and its competitors raised the price on Pravastatin, one of Teva's largest selling drugs significantly.  This price hike alone generated fraudulent revenue of $120 million for Teva, approximately $77 million of this in the Fourth Quarter of 2013, accounting for half of the supposed $144 million year-over-year Fourth Quarter improvement.

266.    Teva also made collusive price increases on Enalapril Maleate.  On July 19, 2013, Teva increased the price of Enalapril Maleate by 262%.

267.    The Exchange Act Defendants touted these financial results, while concealing anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.  On the investor earnings call related to the Fourth Quarter

and full year 2013 results, held on February 6, 2014, Defendant Desheh proclaimed "The U.S. generic business is highly profitable." Defendant Allan Oberman, President & Chief Executive Officer, Teva Americas Generics, Teva Pharmaceutical Industries Ltd. followed by "building on what Eyal said," to claim that Teva was "reporting a 14% top line growth on the U.S. generics business in the fourth quarter…. And at the gross profit levels that Eyal was talking about, it [the U.S. generics business] is a very valuable business to Teva, and we see it continuing to be on a go-forward basis." The Exchange Act Defendants did not mention the true source of the revenue: illegal collusion with their horizontal competitors.

268.    Because investors were not privy to the secret plan to conspire to fix prices, rig bids and allocate market share, analysts expressed the view that Teva's prospects were dim, including Morningstar in its February 6, 2014 report, stating that "Teva's internal growth prospects remain weak."

### a)  Defendant Vigodman Arrives; Presides Over The Anticompetitive Collusion

269.    In January 2014, Teva announced the appointment of Erez Vigodman as its President and Chief Executive Officer, effective February 11, 2014. As reported by Morningstar in a February 6, 2014 analyst report, Vigodman "has previous CEO experience a[t] agricultural and food companies" – not with generic drug companies – and "has been a member of Teva's board since 2009."

270.    Vigodman soon chose his right hand to execute the conspiracy. Teva announced on June 2, 2014 that Olafsson would join Teva as President and CEO of the newly-formed Global Generic Medicines Group, effective July 1, 2014. Olafsson's newly created position gave him responsibility over all global commercial activity relating to generics.

271.     Olafsson was a natural fit; he served as President of Actavis Pharma from 2012 to 2014, Executive Vice President, Global Generics, at Actavis plc (Watson) from 2010 to 2012 and CEO of the Actavis Group from 2008 to 2010.  While Teva's generics business had languished in 2012 and 2013, Actavis' generics had outpaced by far the growth of any competitors.

272.     Like Teva, Actavis is also a focus of the DOJ's price fixing investigation, and a defendant in numerous civil cases.  Olafsson is currently a defendant in the securities fraud case against Allergan, former parent company of Actavis based on allegations similar to those alleged herein.  (Compl. at 18, *In Re Allergan Generic Drug Pricing Sec. Litig.*, No. 2:16-cv-09449 (SDW) (LDW) (D.N.J. May 01, 2017) (ECF No. 36 ¶ 45)).   That case alleges Actavis's growth, shepherded by Olafsson, was also the result of the conspiracy to fix prices and allocate markets in generic drugs.

273.     Under the management team of Defendants Vigodman, Olafsson, Oberman and Desheh, in 2014, Teva increased the number of collusive price hikes.  As reported by the GAO, Teva made price hikes of over 100% on drugs at a pace nearly 50% greater than in 2013 - increasing the number of price hikes from 7 in 2013, to 10 in 2014.

274.     Soon after Vigodman took the helm, the price hikes accelerated.  To provide just a few examples of price hikes from Lead Counsel's research (Section V.C), the Company made at least the following collusive price hikes, which had a substantial effect on Teva's bottom line by contributing an estimated $372 million in revenues from the collusion in 2014:

- Ketoconazole: On April 4, 2014, Teva increased the price of Ketoconazole, by 110% for cream and 250% for tablets.   This collusive price increase generated an estimated $26 million in revenues from the collusion in 2014.

- Baclofen: On April 15, 2014, Teva increased the price of Baclofen, a major drug for the Company, by 350-420%, depending on strength and package size.   This collusive price increase generated an estimated $56 million in revenues from the collusion in 2014.

275.   Less than one month after Olafsson was hired, Teva increased the prices of numerous additional generic drugs to exorbitant levels, generating significant additional sums of illegal revenue, including at least:

- <u>Fluocinonide</u>: On July 1, 2014, Teva instituted price hikes of 200-500%, depending on the form, strength and package size.  These price hikes enabled the Company to generate an additional $41 million in 2014.

- <u>Enalapril Maleate</u>: On August 28, 2014, Teva instituted a price hike of 230%.  The price hike enabled the Company to generate an additional $48 million in 2014.

- <u>Carbamazepine</u>: On August 28, 2014, Teva raised the price of Carbamazepine tablets by 1500%.  This enabled the Company to generate an additional $37 million in 2014.

276.   All the while, the Exchange Act Defendants also continued to secure the benefits of previous collusive price hikes, as the collusive pricing was maintained by agreement of the co-conspirators.  For instance, the collusive increase on the price of Pravastatin alone generated an estimated $150 million in 2014 illicit revenue.

### b)  In 2014, Teva's ADS Price Ascends As The Illegal Collusion Accelerates

277.   The ill-gotten fruits from the collusive pricing, bid rigging and market allocation fueled a turn-around success story for Teva's U.S. generics business that was the focus of the Exchange Act Defendants and investors.  This supposed turn around propelled the Company's ADS price from around $37 in late October 2013, to $56 by the end of 2014 – a jump of nearly $20, or 54%.

278.   For the year 2014, Teva reported that overall its generics division earned $9.8 billion and a profit of $2.1 billion.  This reflected a reduction in overall revenue of 1% and an increase in profitability of 29%.  The increased profitability was driven by a surge in its U.S. generics revenues of approximately $250 million from 2013, up 6%.  This drove the profitability

of the segment and made up for significant decreases in revenue in the European and ROW generics markets of over $330 million.

279.    Remarkably, these astonishing year-over-year increases in U.S. generics revenues were accomplished in the face of 23 million *fewer* prescriptions than in 2013, and while the Exchange Act Defendants slashed Sales and Marketing expenses from $1,919 million in 2013 to $1,582 million in 2014 – a decrease of $337 million.

280.    Thus, Teva was making more money while selling fewer drugs, and claiming savings by slashing its sales and marketing force.  The reason that this was achievable was that the hundreds of millions in collusive revenue generated in the U.S. generics division did not require additional investment or expenditure.  The Exchange Act Defendants' supposed "cost savings" also resulted from its collusion, not from true, efficient reductions in production costs, i.e. Teva required fewer expenses to sell the same amount of generic drugs.

### c)   The Exchange Act Defendants Mislead Investors By Concealing The True Basis Of Teva's Success

281.    All the while, the Exchange Act Defendants actively or recklessly misled investors about the existence of their conspiracy, touting their supposed success based on the U.S. generics division's improvement, while providing investors misleading information about the source of Teva's financial turn-around, or even about the nature of generics pricing as it related to Teva.

282.    By April 7, 2014, National Alliance Securities analysts had taken note of Teva's new-found financial success.  Although its generics division had "dramatically underperformed in 2013" as compared to its peers, only a few months after the end of 2013, Teva's performance in generics was, remarkably, the "the Best YTD" among its peers.

283.    Yet, in the 20-F reporting Teva's supposedly glowing Fourth Quarter 2013 U.S. generics results, the company attributed the new revenue to "[l]aunches."  The Exchange Act

Defendants made the same or similar false and misleading attributions for the ever-increasing revenues in the U.S. generics division in their Forms 6-K, providing explanations for the revenue increases to anything but price hikes, let alone anticompetitive conduct and collusion, improper financial reporting and disclosures.

284.    On the February 6, 2014 investor conference call relating to Teva's Fourth Quarter 2013 and Full Year 2013 results, the Officer Defendants misleadingly indicated that primary plan to improve generics profitability was cost cutting, and that the improvement in Teva's 4Q 2013 had been the early results of those cuts.  Defendant Desheh, then acting CEO, said, "As to your question on the profitability of our generic, you see the profitability of the generic business in Q4, it's in line with what we have guided to 2014.  And we believe that we're going to deliver that, at least a lot of our cost reduction programs are going to hit the bottom line of the generic business as we said, it's not a one-sided picture.…  But we believe that the generic business of Teva is stable, is well-managed, is going to grow in emerging market.  We had a pretty good even excellent second half in the United States business."

285.    When the Officer Defendants were asked questions about drug pricing, they deflected in their answers.  After "spending time with Allan Oberman," the analysts at Barclay's in an April 15, 2014 report, described that Oberman had termed these and other "price increases" as "golden nuggets" that could occasionally "offset other declines for other products," even while Oberman "voic[ed] caution on how much [the price increases] will yield."  In reality, these price hikes were the result of systematic collusion to drive Teva's entire bottom line; with a conspiracy ripened so substantially that co-conspirator Glazer could simply pick up his phone and call his counterpart at Teva to agree in a single call to fold multiple new drugs into the conspiracy.

286.   During the July 31, 2014 investor earning call for Teva's second quarter 2014, Olafsson indicated his specific awareness of the importance of pricing to Teva, but painted an incomplete picture, speaking about "the need to capture pricing opportunities around the world," that "the company, due to the consolidation and due to the environment, company take pricing actions whenever they can," and that "this is a very important tool today to maximize the value of the business," while omitting the ongoing practice of collusive price hiking.

287.   The Exchange Act Defendants similarly touted the improved profitability of the U.S. generics segment, providing misleading reasons for its success such as cost cutting or a supposed improved "mix of products." For example, on the September 8, 2014 Morgan Stanley Global Healthcare Conference call, Defendant Desheh stated:

> [W]e are rebuilding our generic business with the strong focus on generic, with building the pipeline for the future, with enhancing the current portfolio, leveraging it and maximizing the return from existing portfolio with very, very smart and sophisticated legal move and intelligence and creative deal making. Combine that with cost reduction that is going to hit our generic business first and foremost, mostly will hit the generic business and you will see how the Teva generic business is leading the generic world.

288.   An October 16, 2014 analyst report from Cowen noted that Olafsson claimed that Teva could improve generic margins by 600 basis points with "roughly half the generic margin improvement will be due to improvements in gross margin, or a reduction in COGS [*i.e.* Cost of Goods Sold], and the other half will be an improvement in product mix." In their October 30, 2014 report, the Cowen analysts followed by noting that management "continues to indicate that the generic division operating margin should improve another 300-500 basis points" while attributing this solely to cost cutting: "[p]ut simply, management is quickly and effectively implementing the $2B cost reduction program."

289.   RBC also noted that management had been touting its ability to increase generics margins. Specifically, in its November 3, 2014 analyst report, RBC analysts reported that "[o]n

the 3Q earnings call, Teva talked about a generic operating margin in the 25% to 26% range," while simultaneously noting that the "generic margin 'fix'" was sourced to "targeted cost savings."

290.    As the public and regulatory scrutiny on the issue of generic drug price increases began to intensify, the Officer Defendants became increasingly more evasive in answering questions about price hikes, or even flatly denied their existence or import to Teva.

291.    By October 30, 2014, (i) certain of Teva's competitors had received subpoenas from the Connecticut AG and the DOJ relating to certain drugs, (ii) there had been news coverage of price hikes, such as *The Wall Street Journal's* August 14, 2014 article titled "How Much?  Some Generic Drug Prices Are Skyrocketing: Analysis," by Ed Silverman, and (iii) Congress on October 2, 2014 had sent a letter directly to Defendant Vigodman requesting testimony on price hikes, including relating to Pravastatin.

292.    Despite this, on a call that day with investors to discuss Third Quarter earnings, when UBS Securities LLC analyst asked Defendant Vigodman "how much revenue did you get from … the base of [generic drugs in the U.S.] and whether there were price increases in some of your base business and whether that impacted some of it," Vigodman misleadingly deflected:

> I've said it before, there's never a price increase on the base business as a whole.  Like any other business, if there's a pricing opportunity that comes in the market, we look for that.  But the base business itself has been eroding overall because of the consolidation of the customers.  When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business.  But overall, as I've said many times before, the base business itself is slowly eroding, the overall base of the business.

293.    Similarly, when, during Teva's 2015 Business Outlook Meeting investor call held on December 11, 2014, David R. Risinger, Analyst Morgan Stanley & Co. LLC, asked: "I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and ha[ve] been buying inventory ahead of tremendous price increases," Olafsson denied the very existence or importance of price hikes, asserting, "I have to disagree that they have experienced

tremendous price increase.  I think, overall, the pricing in the U.S. of generics has been flat to a slight down."

294.    By this point, the Exchange Act Defendants therefore were not only misleading investors about their participation in an illegal conspiracy to collude regarding the markets for generic drugs, but also concealing from investors that they were highly dependent on their ability generally to increase revenues through massive price hikes.

### d) Investors Were Misled By The Fraud

295.    This deflection effectively mislead investors and inflated Teva's ADS price. Industry analysts paid little attention to the effect of price hikes on Teva's bottom line, and instead focused on the purported alternative reasons that the Exchange Act Defendants gave for Teva's smashing success.

296.    For example, the Jefferies analysts, in their inaugural April 21, 2014 report initiating coverage, noted that Teva had a "U.S. generic drug business that will no longer be a growth driver," and that "we expect low single digit growth at best."  The Jefferies analysts highlighted Teva's plan to "Reshape" the company through cost-cutting.  In a May 2, 2014 report the Jefferies analysts relayed a conversation with Vigodman and his five point plan to improve Teva; a plan that, while including "reestablishing Teva's dominance in its core generics business," did not mention the role of price hikes.

297.    Similarly, the analysts at J.P Morgan, in a May 1 2014 report, discussed "Teva's current restructuring program ... targeting $2bln in savings by 2017," while asserting that Teva planned to "regain its generic leadership" by "shutting down or divesting 11 plants and putting another 16 under evaluation" or through "acquisitions."

298.    In an August 5, 2014 analyst report, the analysts at Sterne Agee opined that Teva's "Generics business headed in the right direction … Lead by industry veteran Siggi Olafsson," and

that "[a]lthough top-line growth is expected to be flat in the near term, profitability seems to be heading in the right direction with a renewed focus on profitability over volume," with no discussion of price increases as a mechanism to obtain profitability.

299.    A September 24, 2014 analyst report, by BMO Capital Management similarly reported on an in-person meetings with management, claiming their "focus is on delivering cost savings and gross margin improvements in generics via a combination of product mix and COGS savings."

300.    Barclays analysts in their October 31, 2014 report, noted Teva's vast improvement, writing that "[w]e heard some skepticism regarding TEVA's ability to extend margin gains further after taking them from 15.9% in 2013 to 21.2% in 2Q14 but that is exactly what the company did with generics profitability coming in at 22.9%.   Importantly, 3Q wasn't driven by any 'blockbuster' launches with exclusivity.  Instead, performance was driven by cost-saves as well as exits from unprofitable markets."

301.    By year-end, analysts were laser focused on Teva's vastly improved performance in regard to profitability, but without attribution to anticompetitive conduct and collusion. Investors had no inkling of the revenues generated through collusion.  The analysts at Barclays, for one, in a report published December 12, 2014, had a "bullish" take on Teva, considering past performance and Teva's rosy guidance for 2015.   The analysts were "impressed with the turnaround in TEVA's generics business," emphasizing "operational improvements" and "product launches."

## 2.    In 2015, The Collusion Significantly Inflates Teva's ADS Price

302.    In 2015, despite the growing focus on the issue by Congress, the Connecticut AG and DOJ investigations, and the added scrutiny from the FTC's review of the Actavis acquisition beginning in August 2015, the conspirators held firm on market share; Teva did not lose

meaningful market share in the drugs subject to collusion, or compete on price to gain market share.  Thus, Teva continued to reap the benefits of previous collusive price hikes, price maintenance, and market allocation, the benefits of which were still enormous.

303.    Teva also made a collusive price hike identified by Lead Counsel.  In early 2015, the Company spiked the price of Estradiol, generating an additional cumulative estimated $27 million in illicit revenues in 2015.

304.    The revenue from just the examples of price hikes that Lead Counsel identified as collusive in 2013 and 2014 alone, along with Estradiol, generated an estimated cumulative $373 million in revenue from the collusion in 2015 alone.

305.    Cumulatively, from 2013 through 2015, Teva earned at least an estimated approximate $870 million in revenue from these limited samples of collusive price hikes alone.

306.    The conspiracy led to a banner year in 2015 for Teva's U.S. generics division, which spearheaded the Company's growth story, fueling an unprecedented increase in the price of Teva ADS.  Once again, profit from the global generics division soared, to $2.7 billion.  Teva reported the 2015 gross profit from its overall generic medicines segment as $4.5 billion, an increase of $246 million, or 6%, compared to $4.3 billion in 2014, and a profit (with expenses removed) of $2.7 billion in 2015, compared to $2.2 billion in 2014, or a difference of almost 24%.

307.    Most of these glowing results were the result of the roaring U.S. generics division numbers.  U.S. revenues amounted to $4.8 billion, an increase of $375 million, or 8%, compared to 2014, which itself had been a banner year for U.S. generics.  In contrast, both Teva's European and ROW generics segments continued to crater.  The European segment earned $2.7 billion in 2015, as compared to $3.148 billion in 2014.  ROW dropped from $2.248 billion in 2014 revenue to $2.047 billion in revenue in 2015.

308.    Like in 2014, the U.S. generics segment again achieved these banner results while selling *fewer* products and spending less in total on sales and marketing.  In 2015, although Teva again led the U.S. generic market in total prescriptions and new prescriptions, with approximately 473 million total prescriptions, 13.1% of total U.S. generic prescriptions, the number of prescriptions was down approximately 27 million from 2014.

309.    Thus, the continued story of Teva's financial success hinged nearly entirely on a flood of illegally derived revenue from U.S. generics, without which the Company would have suffered losses.  Without the $375 million improvement from 2014 in U.S. generics revenues, the overall generics segment would have lost money, rather than gain approximately $250 million.  Moreover, as in 2014, the costless gains from the collusion allowed Teva to "save" additional sales and marketing expenses, without worry that the reduced sales force would translate to lost profit.

310.    These fraudulent results led directly to an inflated ADS price, rising from approximately $50 at the beginning of the year to approximately $72 in July 2015.

### a)  The Exchange Act Defendants Reaffirm The Fraudulent Narrative

311.    The Exchange Act Defendants in 2015 continued to mislead investors about the source of Teva's miraculous turnaround, and about Teva's dependence on price increases to inflate its bottom line.

312.    The Exchange Act Defendants once more included unequivocal statements in the 2014 20-F, filed on February 9, 2015, that Teva's "generic drugs face intense competition," that, particularly, "[i]n the United States, we are subject to intense competition in the generic drug market from other domestic and international generic drug manufacturers," and that "[p]rice competition from additional generic versions of the same product typically results in margin pressures."

313.     In each quarterly report, as in 2014, the Exchange Act Defendants provided explanations for the increased revenues in U.S. generics division as being attributed to "launch[es]," with no mention of price increases and price maintenance, let alone anticompetitive conduct and collusion and improper financial reporting and disclosures.

314.     Indeed, instead of divulging the truth to investors, the Exchange Act Defendants initiated an aggressive road show to tout their success and further inflate the share price by focusing investors on the supposed astounding success of Teva's generics business.  All the while, they attributed their success to cost cutting and innovation, concealing the true reasons.

315.     For instance, in a March 3, 2015 Cowen & Co. Health Care Conference, Olafsson attributed the Company's recent success to broad changes focused on cost cutting, geographic sales, and product offerings: "[Y]ou saw that last year we improved the bottom line by about 300 to 400 basis points.  We are going to do that again this year in the same amount but focusing on the cost of goods, focusing on where we are doing our business, and focusing on the portfolio."

316.     Similarly, at the March 12, 2015 Barclay's Capital Health Care Conference, Defendant Desheh was met by a question from Douglas Tao, Barclays Capital, Inc., who sought out answers to what appeared to be "great success in terms of improving the operating margins in the Generics business over the last 18 months," and seeking guidance as to "the continued growth and the next stages of operating margin improvement."

317.     Desheh misleadingly explained: "So there are a number of dimensions.  First, efficiency of production.…  The second thing is new product launches."  Indeed, although Desheh mentioned price increases, he diminished the true impact of the strategy as a marginal, yet uncertain, source of improvement, concealing their true extent and the illegal collusive behavior: "[t]he third one, price increases, we see price increases, we manage it right, you have to manage it

correctly, it can bounce back very, very easily, I believe we're managing very, very responsibly, but we see some price increases that are also contributing to improvement in margins and in absolute profit."   Of course, Desheh fraudulently omitted from his comments that the price increases were the result of price fixing.

318.   Investors were misled.   The analyst report for Piper Jaffray, published on February 11, 2016, noted that "profitability for the generics segment continues to grow," unaware of the price fixing conspiracy.

319.   On April 30, 2015, the Exchange Act Defendants published glowing financials, leading the analysts at J.P. Morgan to note that Teva had made a "Strong US Generics Beat and Guidance Raise," beating "consensus on stronger US generics revenues," notably an approximate "$300mm US generics beat," with "generic gross margins of 49%, with segment profitability of 30.5% … both significant improvements sequentially and vs. the prior year."   The analysts at UBS in an April 30, 2015 report claimed that Teva's "US generics beat" their estimate by nearly $200 million.   Neither mentioned the effect of price hikes, let alone a conspiracy to fix prices.

320.   Moreover, as noted by the analysts at Evercore ISI, in an April 30, 2015 report, Teva also raised guidance.

321.   On the related conference call on April 30, 2015, Olafsson touted Teva's "outstanding net quarter for generics this first quarter 2015.  All our returns showed a significant improvement over first quarter 2014 and, despite the FX impact, the profit for the generics increased 59% to $[7.99] million. The revenues were up 9% to $2.6 billion, and our operating profit in first quarter was 30.5%, which is a significant improvement over the 2014 operating profit of 21.9% and 16.7% operating profit in 2013."

322.    By the May 14, 2015 Bank of America Merrill Lynch Healthcare Conference, which focused on the success of Teva's generics business, Defendant Desheh went so far as to describe the success of the division as "nothing short of a revolution":

> So let's focus our business.  First the generic business.  This is ***nothing short of a revolution***.  In 2013 our gross margin of generic business was 41.3%.  And it's 46% in Q1 2015.  Our operating margin was 16.7%.  It is 27%, this is full 10 percentage point improvement.  And what you can read from this slide and really and easily calculate that the operating profit grew on profit margin, grew faster than the growth, which means that we are also reducing our expenses that are needed to drive the sale.  So the improvement is not just on the margin.  The improvement is also on the expense structure and how we're building the business.

323.    During the June 11, 2015 Goldman Sachs Global Healthcare Conference, Vigodman described the turnaround in the generics business from 2013, and its ever-intensifying profitability, without discussing price hikes, let alone their collusive nature:  "[W]e started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva.  You see the profound change in the generic business.  These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014.  We are committed to deliver 27% operating profit 2015."

324.    At the same conference, Olafsson touted that "We have improved the generic business by 1,000 basis point on a revenue of around $10 billion.  That is $1 billion improvement in 14 months, 16 months that we have done," indicating it was due to, among other things, a "full transformation of our operational network."

#### b)  The Exchange Act Defendants Lay Plans For A Major Acquisition – Inflating The ADS To Use As "Currency"

325.    The Exchange Act Defendants were, and had been, aggressively touting their purported success to pump up the price of Teva ADS in contemplation of an acquisition.

326.    From nearly the moment of the announcement of his hiring in January 2014, investors had understood that Vigodman, would "emphasize (potentially large) acquisitions more readily than his predecessor" according to a Morningstar report dated February 6, 2014.

327.    By April 16, 2014, the Exchange Act Defendants were "signaling [their] willingness to consider a 'transformational' deal."   According to a Sterne Agee analyst report published that day.   Jefferies, in a May 2, 2014 analyst report, divulged that Vigodman had discussed with its analysts, as part of Teva's "key initiatives" "M&A, including the possibility of a large transaction."   In a September 24, 2014 analyst report, BMO Capital Markets wrote that "Teva is back on the prowl for deals."   A March 10, 2015 analyst report by the analysts at Susquehanna noted that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A."

328.    The Exchange Act Defendants' statements confirmed their appetite for a huge deal using equity as "currency" as early as January 14, 2014.   On that date, at the Morgan Healthcare Conference, Chris T. Schott from J.P. Morgan Securities inquired, "can you give us a sense right now the kind of capacity to do transactions?  What type of capacity do you have with the current structure to play into transactions as we look out the next 12 to 24 months…?"   Defendant Desheh replied:  "Hopefully the stock price will go up and we'll be able to use our share as a currency. It's a circle which is feeding itself to grow your ability to fund transactions and I believe that we are starting now from a pretty good point to get there."

329.    By the March 4, 2014 Cowen & Co. Healthcare Conference, Desheh explained that they needed to keep Teva's stock price well-above $40 in order to land a large deal.   Desheh noted the "change over the past few months" allowing the Company was extracting "itself [from]… a corner that was difficult to come out of," that by then they were "encouraged a little bit by the

increase in the stock price" because with "the stock price under $40… we can't use [the stock as] currency" for an acquisition.

330.    By the end of the First Quarter 2015, Teva's ADS was trading much higher, at approximately $63.  Accordingly, as reported by the Barclays analysts in an April 7, 2015 analyst report, the Exchange Act Defendants had stated their "willingness" to perform a "transformational acquisition in the generics space."  The analysts at Leerink, in their April 16, 2015 report, noted that the "bigger picture still looks positive for Teva," and that Teva had an "urgency to diversify via M&A."

331.    With the stock price artificially inflated, the Exchange Act Defendants made their first effort to make an acquisition when, on April 21, 2015, in a 6-K filed with the SEC, Teva announced an offer to acquire all of the outstanding shares of Mylan in a transaction valued at $82.00 per Mylan share, with the consideration to be comprised of approximately 50% cash and 50% stock.  (April 21, 2014 Form 6-K).  By then Teva's ADS price was approximately $66.

332.    This acquisition was not fated to be consummated.  By April 27, 2015, according to an article in *Forbes*, Mylan's board rejected Teva's offer in a "strongly-worded letter that characterized Teva as a 'low quality' stock and further stated the proposed deal lacks industrial logic and carries significant antitrust risk."  (Antoine Gara, <u>Mylan Rejects $40 Billion Teva Takeover Offer, Calls Stock 'Low-Quality,</u>' *Forbes* (Apr. 27, 2015)).

### c)  ADS Price Reaches All-Time High;<br>Teva Announces $40 Billion Acquisition Of Actavis

333.    Fueled by the Exchange Act Defendants' misleading statements in SEC filings and on investor conference calls, Teva's ADS price by July 27, 2015, had reached a then all-time high of $72.  On that day, Teva announced in a July 27, 2015 Form 6-K that it had entered into a

definitive agreement with Allergan to acquire its worldwide generic pharmaceuticals business, Actavis, for $40.5 billion in cash and equity.

334.    Allergan would receive $6.75 billion in ADS, representing an approximate 10% stake in Teva, with the additional $33.75 billion in cash.  Teva would generate the cash "through a combination of new equity, debt financing and cash on hand."  As would later be revealed during a call with investors on October 29, 2015, Defendants planned to raise approximately $7 billion from a secondary public offering of ADS and an initial public offering of Preferred Shares, and approximately $27 billion from a debt issuance and term loans.

335.    The number of Teva shares issued to Allergan would be determined based on Teva's volume-weighted average trading prices during the 15 days prior to the announcement and five days following the announcement.  In other words, the number of shares to be issued would be determined within five days of the announcement, and it would not matter if Teva's stock price subsequently declined, as the number of shares to be issued had already by then been valued at $6.75 billion by Allergan.

336.    Teva announced the ADS and Preferred Offerings for early December 2015, with the debt issuance to follow, after the transaction received regulatory approval.  Completion of the equity offering, the critical raise of the $33.5 billion, was entirely dependent on maintaining the inflated share price, and concealing from investors that Teva's revenues and success hinged on an illicit conspiracy and price hikes.

### d)  The Exchange Act Defendants Continue To Tout Teva's U.S. Generics Business In Anticipation Of The $6.75 Billion Offerings

337.    Because the Exchange Act Defendants knew they had to keep Teva's ADS price inflated in order to consummate the deal, they continued to mislead investors about Teva's supposed revitalization and the success of Teva's U.S. generics division.  They specifically

continued to tout the future of the generics market in general, and of Teva's U.S. generics division in particular, describing a bright future, when in fact they had been inflated due to the sprawling conspiracy.

338.    In the conference call with investors held the morning of July 27, 2015, in which the Company announced the planned acquisition of Actavis and also discussed preliminary Second Quarter financial results that Teva had released that morning, Vigodman and Olafsson touted Teva's continued gains in U.S. generics, and the supposed synergies that the acquisition would bring.

339.    Vigodman further described Teva's earning success for the quarter: "Non-GAAP diluted earnings per share of $1.43 in the second quarter of 2015, up 15% compared to the second quarter of 2014.  Non-GAAP operating income of $1.6 billion, an increase of 16% compared to the second quarter of 2014.  Cash flow from operations of $1.5 billion, an increase of 41% compared to the second quarter of 2014.  Free cash flow of $1.3 billion, up 51% compared to the second quarter of 2014."

340.    He then announced that Teva was once again raising guidance: "We are raising our EPS guidance for the full year 2015, reflecting the positive momentum across the business. For the full year 2015, we expect EPS to be in the range of $5.15 to $5.40 as compared to the previously provided EPS range of $5.05 to $5.35."  As reflected in Teva's 6-K for the Second Quarter 2015, U.S. generics had generated $258 million more from the second quarter 2014, year over year, while Europe and ROW were down by hundreds of millions.

341.    Teva's ADS price reached its high water mark of $72 on July 27, 2015, the day that it announced the Allergan acquisition.

342.    Defendant Desheh, in Teva's investor conference call on July 30, 2015, to discuss the issued Second Quarter 2015 results, touted the results further, stating "a strong trend of improvement in operating margin for Teva over the past 18 months of almost 500 basis points in operating profit … built upon the impressive improvement in the profitability of our Generic business … stepped up for around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015."

343.    The Exchange Act Defendants also continued to falsely and misleadingly emphasize the supposed healthy competition in the generics industry, concealing their anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition

344.    In response to an analyst question concerning the effect of competition from a potential combination of Mylan and Perrigo (which was currently then proposed by Mylan), and despite the enormous revenues Teva was generating from the collusion and price hikes, Olafsson made another misleading statement emphasizing the supposed competitiveness of the U.S. generics market: "Remember, the U.S. generic market is very competitive. … So there's fierce competition on most of the portfolio, if not all the portfolio.  So it's difficult to say what the new company, if it happens, would be as a competitor."  Vigodman similarly chimed in to assert:  "[W]e promise to do everything in our power in order to basically take the company [Teva] to be able to continue the improvement that we have been witnessing here.  We believe in competition, and we'll do what is needed in order to win in all the markets we operate."

345.    Based on these results, analysts raised the price targets for Teva's ADS.  For example, the analyst at Jefferies, in a July 31, 2015 report, raised their price target to $80.  Morgan

Stanley changed their rating of Teva to overweight, and placed a price target at $85, as reported in a July 29, 2016 analyst report.

> **e)   The Exchange Act Defendants Continue To Illegally Profit And Mislead Investors As They Prepare For The Equity Offerings**

346.    On October 29, 2015, the Company issued third quarter results of "$1.35/share that was ahead of Street expectations, while also raising full-year guidance," as reported by J.P Morgan in their October 29, 2015 analyst report.  The analysts at J.P. Morgan explained in their report that "Teva raised its full year EPS range to $5.40-$5.45 … on higher revenues … [and] higher gross margin."  As summed up by the analysts at UBS in their October 29, 2015 report, "Our takeaway: Another good quarter."

347.    On the related earnings investor call, held October 29, 2015, Defendant Vigodman touted the results as the end product of his plan: "We thought that it's important nowadays to touch base face to face with you in order to discuss our Q3 results, first 9 months of 2015.  Also to show and share with you the way we are delivering on all the promises since the beginning of 2014 in a way which gains more and more momentum as we go along."  Vigodman did not reveal that the true nature of that plan was anticompetitive conduct and collusion and improper financial reporting and disclosures.  He continued by stating that in "Generics that's a totally entirely different business today."  Olafsson also confirmed that the positive results were driven by generics:  "As you've seen from the number, really the Generic business in third quarter continued to drive growth."

348.    On that same call, the Officer Defendants also faced direct questions about proposed legislation by Congress to quell the practice of extraordinary price hikes.  According to a May 18, 2015 press release titled "Sanders, Cummings File Bill on Rising Rx Prices," members of Congress had proposed legislation to curb extraordinary price hikes such that "drug

manufacturers must pay a rebate to Medicaid when prices shoot up at a rate steeper than inflation." (Press Release, House Comm. on Oversight and Gov't Reform, Sanders, Cummings File Bill on Rising Rx Prices (May 18, 2015)).

349.     In response to analyst questions about this proposed legislation, the Officer Defendants continued to dissemble and evade, concealing the truth that the collusion and price hikes had, and were, generating hundreds of millions for Teva in illicit profits.

350.     Olafsson, when prompted to discuss the potential legislation on the October 29, 2015 conference call, offered a well-crafted, yet false, narrative that price increases had not had any meaningful effect on Teva's bottom line:

> [W]e have told you that overall on our whole portfolio, we have a decline in price.  The talk about the inflation in generics when you have a big portfolio is really not there.  95% of our portfolio is declining due to the consolidation of the customers I talked about.  There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

351.     Vigodman went even further in response to a question on that same call by a Morgan Stanley analyst about whether Teva's success in generics was sustainable, denying that price increases existed or benefited Teva at all during 2014 and 2015:

> We're very … responsible in everything that portends to prices on the Generics side and on the Specialty side.  And I would even put it another way, ***all the improvements you see in our – in margins is not driven by price***.  It is driven by quantities and by mix and by efficiency measures.  ***Not by price, 2014, 2015, and that's a very important message***.

352.     At a November 19, 2015, at the Jefferies Autumn Global Healthcare Conference, analysts revisited the question of the impact of pricing trends on Teva's financial health and sustainability.  When asked by a Jefferies analyst: "Your particular products, where do you go on pricing?"  Defendant Desheh misleadingly replied that Teva was not exposed:

> Now there's a lot of noise around pricing issues.  Some of it's coming from politicians who are driving agenda, which is very, very legitimate.  ***Our exposure to all these things is very minimal***. … I don't believe that there are

97

many examples for competitive environment, real competition, like we see in generic market in the United States. … So it is a ***highly competitive environment*** with players coming from all over the world with a very fierce price competition.  The price of generic went down 50% over the past 10 years, price of specialty product went up by 200% over the past 10 years.

353.    Desheh misled investors.  The Exchange Act Defendants had generated billions of dollars by then through anticompetitive conduct and collusion, improper financial reporting and disclosures, and concealing Teva's true financial and business condition.  Teva's exposure was not "minimal":  to the contrary, it was incredibly significant, and would, eventually, cause a complete reversal and decline of Teva's financial condition, and cause investors who purchased Teva securities to incur billions in damages.

### f)    Teva Issues $3.375 Billion In ADS And $3.375 Billion In Preferred Shares While The ADS Are Trading At A Highly Inflated Price

354.    On December 8, 2015, Teva closed its Secondary Offering of ADS and its Initial Offering of Preferred Shares.

355.    Teva issued 54 million ADS at $62.50 per ADS in the secondary offering, raising approximately $3.375 billion from members of the Class.  These shares were offered publicly pursuant to a registration statement and prospectus.

356.    Teva also issued 3,375,000 Preferred Shares at $1,000.00 per share, raising another $3.375 billion from members of the Class.  Each Preferred Share pays a dividend of 7%, until converted automatically on the mandatory conversion date of December 15, 2018, into a number of ADS equal to the conversion rate set forth in the Preferred Prospectus, between 13.3333 and 16.0000, subject to anti-dilution adjustments.

357.    Following the December 8, 2015 issuances, on January 6, 2016, Teva sold an additional 5.4 million ADS and an additional 337,500 Preferred Shares pursuant to the exercise of the ADS/Preferred Underwriters' over-allotment option.

358.     In total, the net proceeds from the ADS Offering and the Preferred Offering were approximately $7.24 billion, after estimated underwriting discounts, commissions, and offering expenses payable by the Company.

### 3. In 2016, As The Collusion Comes Under Increasing Scrutiny, But The Exchange Act Defendants Categorically Deny That Price Increases Have Any Bearing On Teva's Results

359.     Teva's ADS price ended 2015 trading at approximately $65.  In order to facilitate the final execution of the Actavis deal through the necessary $20.4 billion bond offering, the Exchange Act Defendants continued their campaign of dissembling.

360.     By the first quarter 2016, the DOJ and State AGs investigations had fully transformed from inquiries into a handful of drugs by a few companies to a more sprawling investigation.  Although Teva remained months away from receiving subpoenas, investigative efforts mounted against co-conspirators like Allergan and Endo.  What's more, the FTC was reviewing the Actavis deal for antitrust compliance.  The increased scrutiny meant that the illicit revenues from the unlawful conduct were beginning to dissipate.

361.     Yet, at every opportunity, the Exchange Act Defendants denied that there was any change in market dynamics, let alone any rise in pricing pressure.  For example, on January 11, 2016, at a J.P. Morgan-hosted health care conference, Olafsson was asked to comment on a wholesaler's recent reference to increased pricing pressure in the marketplace.  Olafsson misleadingly responded that, despite the headlines, Teva was not seeing any increased pricing pressure, let alone was susceptible to it:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing.  But what we see is there's – ***overall on our total portfolio of 270 products, there is a slight decrease in pricing***.  It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline.  ***And then on 5%, we might be flat or a slight increase***.  So, overall, we see that in the business. ***There's a lot of headlines of examples of big price increases in generics***.

> But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – ***there is a decline***.

362.    Similarly, on a February 11, 2016 investor call addressing 2015 Annual and Fourth Quarter results, Olafsson continued to deny that pricing had anything to do with Teva's success, and that Teva was thus not susceptible to renewed pricing pressure:

> 2015 was a very good year for Teva Generics.  Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally.  We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue.  This is $1 billion improvement in operating profit over 24 months period.  So how did we do this?  ***Not by pricing but by portfolio mix, new products, and efficiency measures***.

363.    On that call, Olafsson was confronted by Louise Chen, an analyst with Guggenheim Securities LLC who asked, "some of your competitors have talked about pricing pressure in the generics business during the quarter.  Curious if you saw that, and if so what might be driving that."  Olafsson responded that pricing had always been the subject of intense competition:

> With regards to the region, just quickly, US has been stable over the year.  I mentioned the pricing before.  ***There is a lot of competition in the US***, there is no question about it. As you well know, there are over 200 generic competitors in the US market and the competition is fierce.

364.    The analysts at Morgan Stanley responded to these assertions by writing, in a report dated February 11, 2016, "No Major change in US pricing pressure; 4Q results solid."  J.P Morgan analysts similarly wrote, in their report also dated February 11, 2016, that Teva's "Generics business continues to perform well, Teva anticipates similar pricing environment in 2016."  Deutsche Bank analysts, in a report also on February 11, 2016, wrote that "on the generic pricing environment, TEVA does not anticipate significant changes for its business in 2016."

365.     In a February 12, 2016 report, analysts at Leerink echoed investor sentiment that their concerns over pricing pressure had been mollified by the Exchange Act Defendants, writing that "TEVA's 4Q results provided *some reassurance that the company is less exposed to the unwinding of generic price inflation*… which was reassuring *after competitor results stoked investor concerns about the groups' exposure to unwinding generic price inflation*."

366.     On the call, the Officer Defendants also told investors that the Actavis deal would not close until April 2016.  Then, on March 15, 2014, the Company disclosed that the deal could take until at least June 2016 to close, due to delays with FTC approval.  Soon after, it was again pushed to July.

367.     Despite their categorical denials, the Exchange Act Defendants were continuing to record hundreds of millions in illicit profits.  For instance, with regard to the limited sample of drugs that Lead Counsel has been able to assess without discovery, the estimated illicit revenue from, Carbamazepine amounted to $56 million in 2016, while Teva's price hikes for Baclofen generated $38 million in 2016.   The collusive price hike regarding Enalapril generated approximately $6 million in 2016; and price hike from Ketoconazole generated $5 million more in 2016.  Though still contributing to Teva's bottom line performance, these illicit profits were declining relative to the illicit profits on the same drugs in 2015, as illustrated above in Section V.C.2.  The Exchange Act Defendants' categorical denials surely concealed any change in pricing dynamics, let alone the marked decline in illicit profit.

368.     The Exchange Act Defendants continued to deny and mislead.  In its First Quarter 2016 6-K filed with the SEC on May 9, 2016, Teva reported that generic segment overall profits were down nearly $200 million.  The Exchange Act Defendants blamed the entirety of this decrease on the loss of exclusivity on just two drugs, namely generic Nexium and Esomeprazole.

369.    In an investor call the same day, Olafsson said that the loss of exclusivity "fully explained" any drop off in revenue and provided his most explicit denial that pricing had anything to do with the results, as Teva was highly distinguishable from its peers:

> As you know, in February, during the fourth-quarter reporting season, several industry participants referenced a tougher pricing environment than what they have experienced in previous years, as a reason for the softness in their respective generic businesses.  Now, we fast-forward to April and May, to a new reporting season, and we find the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate.  The referencing of generic drug price deflation has not been limited to the manufacturers, but is also being cited by those on the purchasing and distribution side, leaving many to wonder about what is the real opportunity in generics.
>
> As always, I will do my best to provide you with as much color as possible on what Teva is experiencing, in regards to pricing and volume; and more importantly, where we are headed.  Throughout the ongoing debate this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors.  ***Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year***.  Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.

370.    When inevitable questions from analysts came, concerning the market pressure on pricing reported by other firms, Olafsson again denied any impact and explained why Teva was unique in being immune to price competition: "It's basically due to our portfolio, because we are not operating – we have approximately 375 products on the US market.  We have a good understanding.  We also walk away when the competition is too fierce on a product.  We are not trying to grow our market share…."  Olafsson pegged price degradation for Teva's portfolio at 4%, despite larger reported declines from Teva's peer market participants.

371.    In view of the disappointing financial results, Vigodman went even further to bolster the market's perceptions of the Actavis acquisition.  In response to a question by Tim Chiang, an analyst from BTIG, about whether the deal was still at "a fair price in today's

environment" as there had been a "resetting of valuations" in "the generic space," Vigodman responded unequivocally that "the answer is absolutely yes."

372.    Investors took note of Teva's repeated denials and its contrast with other firms. Indeed, the analyst reports were replete with expressions of relief at management's reassuring comments that Teva did not see price degradation, and that in any event Teva was insulated from falling prices, as compared to its competitors.  The analysts at Jefferies, in a May 9, 2016 report, wrote that "Mgt Continues to See Mid-Single Price Digit [sic.] Erosion to Generic Base Business. Generic pharmaceutical *bellwether TEVA has not witnessed a deterioration in the pricing environment, according to mgt*.  *This directly contrasts with what has been stated by a number of competitors over the past few months*."  The Jefferies analysts continued to note Olafsson's comments that the pricing issues suffered by Teva's competitors were company specific, rather than market wide, and thus they would not reach Teva.

373.    The analysts at RBC noted specifically, in a May 9, 2016 report, that investors had been convinced by the Exchange Act Defendants' explanations regarding pricing trends and Teva's immunity to them, writing that management "effectively addressed on the call what had been building concern into the quarter.  While perhaps not completely assuaged, imminent investor fear around the generic outlook was clearly tempered."  The RBC analyst further concluded that Teva "should be able to handle" the margin risk on generics "better than most."  Analysts at Evercore ISI concurred in substance, writing in their May 9, 2016 report that "investors may likely *take relief in that Teva* is quite confident in its generics outlook."

374.    To drive his point home with the impending debt offering looming, the next day, at the May 10, 2016 Bank of America Merrill Lynch Healthcare Conference, Olafsson went so far as to claim that "there's *nothing* I have seen which shows a worsening pricing environment," and

that the "talk[] about a lot of pricing pressure, [] shouldn't be.  There is ***nothing that has happened over the last two quarters which has changed fundamental[ly] the market***.  And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio [like Teva], you have had the right investment in R&D, you really have a strong opportunity."

375.    What Olafsson and the Exchange Act Defendants concealed, however, was that Teva had been, and was, dependent on anticompetitive behavior and price hikes for its success, and that, by the first half of 2016, the revenues from those streams had already begun to dry up.

> **4.      The Exchange Act Defendants Rush The Notes Offering Concealing That Teva Had Been Served Subpoenas By The DOJ And Connecticut AG Days Before**

376.    On July 13, 2016, the Officer Defendants held a pre-arranged call to communicate preliminary non-GAAP financial results for the quarter ended June 30, 2016, and the preliminary non-GAAP financial outlook for the next three years, from 2016 - 2019, which would include results from the combined Teva/Actavis entity.

377.    Defendant Vigodman announced that Teva would accelerate the timing of the bond offering, purportedly based on some non-identified "terms" and "factors," even while simultaneously acknowledging the lack of full visibility into certain numbers and information that should have cautioned the acceleration of the bond offering.  According to Vigodman:

> [W]e are closely monitoring the corporate bond markets and given the various attractive terms currently prevailing there, we are considering accelerating our planned debt offering. With this in mind, and despite the fact that we will not yet have full visibility into the Actavis Generics number, and in particular, certain pipeline information, we have decided to provide you today with our best estimate of the financial outlook for Teva in 2016 to 2019, following the close of the deal.

378.    This was surprising because just a few weeks earlier, on a May 9, 2016 conference call, Desheh had told investors that the offering would not happen until ***after*** the Actavis deal

closed: "The plan is to close on the bridge [loan] and go to the market at September time frame or in Q4." The next day, May 10, 2016, at the America Merrill Lynch Healthcare Conference Olafsson was asked "Yesterday Erez said on the conference call that timing of the deal is being pushed out to September slash fourth quarter. So I just wanted to confirm that I heard it right. And also just trying to figure out the rationale behind that. So if the deal is closing in June, why is the issuance not, you know, why are you not coming to market until September?" Olafsson replied that: "So we want to do that after closing and then we get into a closed window and we are not issuing bonds in closed window. And usually August is not a good time for bond issuing, so that's why it comes into September before you issue the bonds."

379.    On the July 13, 2016 investor call, Vigodman revised Teva's guidance upward: "We delivered a solid first quarter in 2016, and today we are reaffirming and even slightly revising upwards the guidance we previously provided for the second quarter, as well as providing outlook for the remainder of 2016."

380.    When the analyst from Citigroup asked about the pricing assumptions that were "baked into [the] forecast" and for "comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace," Olafsson stuck closely to the false and misleading Company line that pricing erosion wouldn't really affect Teva's bottom line because other factors, not pricing, determine Teva's financial success: "That matters with the formula I gave you at the earnings call earlier this year -- are *we assuming the same pricing of minus 4% or is it minus 5%*? It really doesn't matter what we say. It is net-net when we have the new launches, minus the price erosion, minus any volume decline, we are seeing approximately 5% growth year on year." Olafsson was categorical: "In the second quarter, we have a stable pricing environment; there was no significant change in the pricing." (July 13, 2016 Prelim. Outlook Call).

381.     Investors were comforted by the Exchange Act Defendants' misleading statements. The analysts at Piper Jaffray, in a July 13, 2016 report, noted that "management stated that it did not see further pricing pressure on the overall generics business" which "may ease recent worries regarding the near-term trajectory of the business."  Morgan Stanley analysts, in a July 14, 2016 report, noted that "pricing and LT Guidance encouraging," explaining that "Mgmt sees US pricing environment as unchanged; anticipates 5% organic revenue growth for combined generics portfolio."  The analysts at Gabelli & Co., in their July 14, 2016 report, took note of the Exchange Act Defendants' claim that "both Allergan's and the company's generic drug businesses were performing in-line with expectations despite pricing pressure in the U.S."

382.     On July 31, 2016, Teva raised $20.3 billion, the net proceeds of a $20.4 billion bond issuance, to complete the Actavis acquisition, pricing $15 billion in dollar-denominated bonds on July 18, 4 billion Euros-denominated bonds on July 20, and 1 billion in Swiss Franc-denominated bonds on July 21.  The Actavis deal closed on August 2, 2016.  In the related August 2, 2016 press release, Vigodman falsely declared that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever—in both our generics and specialty businesses."  Olafsson further touted that "Teva now has some of the best assets, people and capabilities in the industry."

383.     In sum, of the $33.4 billion owed Allergan beyond the transfer of Teva stock (priced as of July 2015), $5 billion was funded by Teva borrowing from its loan facility, $8.1 billion from cash on hand that was previously raised in the ADS and Preferred Offerings, including from its December 2015 equity offerings and borrowings under its syndicated revolving credit.  The remaining $20.3 billion came from the proceeds of the Senior Notes offering.

384.     Teva's ADS, buoyed by false and misleading statements, was trading at about $54 when Teva issued the Notes on July 31, 2016.  If the Exchange Act Defendants had been unable

to secure financing for that debt, according to the terms of the deal's structure, Teva's agreement with Allergan would have required Teva to pay Allergan $2.5 billion.

385.    Only two days later, on August 3, 2016, the fraud would begin to unravel.

**F.    The Fraud Unravels Causing The Prices Of Teva Securities To Plummet**

**1.    The True Reason For Rushing The Notes Offering Is Revealed: Teva Was Subject To DOJ And State AGs Investigations**

386.    On August 4, 2016, two days following the closing of the Actavis transaction, the Exchange Act Defendants revealed for the first time to investors, in a previously scheduled announcement of second quarter 2016 financial results, that Teva now was subject to DOJ and State AG investigations.  In fact, the government had served Teva with the subpoenas before the bond issuance, although it did not disclose them at the time.

387.    While certain of Teva's peers had disclosed their receipt of DOJ and Connecticut AG subpoenas immediately upon receipt, (for example Impax and Lannett) the Exchange Act Defendants hurriedly raised the $20.3 billion in debt while waiting for the next scheduled SEC financial reporting event to disclose, thus concealing a highly material fact as the offering closed.

388.    A brief timeline below reflects the true chain of events:

- June 21, 2016: Teva USA received a subpoena from the Antitrust Division of the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products.

- July 12, 2016: Teva USA received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations.

- July 13, 2016: The Exchange Act Defendants announce they are taking the Notes Offering to market and file the amended registration statement.

- July 21, 2016: the $20.4 billion Notes Offering is closed.

- August 4, 2016: Teva publishes its Second Quarter 2016 results and finally discloses the two subpoenas.

389.    Teva's August 4, 2016 Form 6-K incorrectly and misleadingly identified the date Teva received the DOJ subpoena as June 21, 2015.  Teva later corrected this in a Form 6-K filed on November 15, 2016 to identify the date Teva received the subpoena as June 21, 2016).

390.    Upon disclosure of the subpoenas, the price of Teva's securities fell.

### 2.    The Exchange Act Defendants Continue To Make False And Misleading Statements Regarding Second Quarter 2016 Results

391.    Despite the revelation of law enforcement inquiries, and the continued unraveling of co-conspirators' ability to maintain elevated drug prices, the Exchange Act Defendants doubled down, expressly denying the impact of price hikes and reaffirming their inflated outlook for 2016.

392.    On August 4, 2016, the Exchange Act Defendants released Teva's Second Quarter 2016 financial results.  In the second quarter of 2016, revenues from Teva's generic medicines segment amounted to $2.3 billion, a decrease of $172 million, or 7%, compared to the second quarter of 2015.  Revenues of generic medicines in the United States, amounted to $892 million in the second quarter of 2016, a decrease of 33% compared to the second quarter of 2015, which had revenues of $1,326 million.  Thus, Teva had generated nearly $450 million less revenue from U.S. generics than in 2015.  The Exchange Act Defendants blamed this on the loss of exclusivity on a few drugs, and a decline in sales in others.  They did not mention the drastic effect from the weakening of the collusive prices, the inability to continue to allocate market share and customers, rig bids, and fix prices, or make price hikes, or Teva's resulting vulnerability to pricing trends.

393.    Consistent with this dissembling, on the related call with investors to discuss the Second Quarter results, held on August 4, 2016, Defendant Desheh reiterated guidance: "I would like to talk about our financial outlook.  So I'd like to reiterate the 2016 financial outlook which

we provided just a few weeks ago, of revenues of $22 billion to $22.5 billion and non-GAAP earnings per share at $5.20 to $5.40."

394.    Later in that call, the analyst from Citigroup specifically asked Olafsson whether the lower than expected revenues were attributable to pricing, and about Olafsson's "conviction in pricing stability."  Olafsson responded that Teva still saw only a 4% price erosion, the same erosion that was in Teva's model, and that any volatility that may be in the market was short term, and would have no effect on Teva's prospects: "I think, first of all, it's the old story in the generic business, and we have talked about it many times.  It's the short-term volatility, but a long-term profitability that we are seeing in the generic business.…  In terms of the pricing, the pricing is stable to the same degree as before.  We saw approximately in the U.S., 4% price erosion in the business, in a way very stable from the first quarter."

395.    When asked by the J.P Morgan analyst about "pricing opportunities on the combined generic portfolio," Olafsson again asserted that price hikes were due to "shortages" and other things, as competition would prevent Teva from making hikes simply to profit:  "On the pricing, as you know, and we know that, the size really doesn't affect the pricing.  And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing.  I think the pricing comes with shortages in the market."

396.    Investors took away from the Officer Defendants' comments that nothing had changed, *i.e.*, that pricing was stable, in part because Teva was not vulnerable to pricing pressure due to a normalization of competition in the markets, as whatever price hikes there had been, according to the Exchange Act Defendants, the result of natural market forces.

397.    Morgan Stanley analysts thus reported in an August 4, 2016 analyst report that "Mgmt maintained '16 guidance and LT outlook for mid-single-digit price erosion in generics."

J.P. Morgan analysts similarly concluded, in their August 4, 2016 report, that "US generics business modest below expectations but generics pricing environment remains stable."

398.    On the news disclosed on August 4, 2016, the price of Teva's securities fell.

### 3.    The Exchange Act Defendants Continue To Deceive At Teva's September 9, 2016 "Generics Day" Conference

399.    On September 9, 2016, the Exchange Act Defendants held an investor day conference to discuss Teva's generics business.  The presentation was geared towards providing information on the plan for an integrated Teva and Actavis to move forward as a massive generic drug conglomerate.  A substantial part of the Exchange Act Defendants' presentation was therefore geared towards disabusing investors and analysts that recent losses from adverse generics pricing reported by Teva's peers could also disrupt Teva.

400.    In the presentation, as reported by Deutsche Bank analysts in their September 9, 2016 analyst report, the Exchange Act Defendants proclaimed that they could increase "margin expansion for the generics business to [approximately] 35% over the next three years."  The analysts at J.P. Morgan similarly noted management's commitment to "driving 5% generics topline growth and margin expansion into the mid 30's as it realizes synergies from the [Actavis] deal."

401.    Consistent with this, Vigodman began his oral presentation by explaining: "In generics, it is obviously a very different Company from where we were.  The generic industry is one of the most attractive industries in the world.  In terms of growth rates, growth prospects, profitability 25% EBITDA on average.  Return to investors. … Teva is ideally positioned to realize the opportunities that the global and U.S. generic markets offer to us."  Vigodman did not discuss the Company's role in the industry-wide conspiracy, now subject to intensifying investigations, Teva's impaired ability to function in the collusion, now that it had received subpoenas from the

DOJ and Connecticut AG, Teva's inability to make price increases or their previous role in Teva's success story, Teva's vulnerability to pricing pressure, or the implications of these concealed facts on Teva's financial health, and the supposed benefits of the Actavis acquisition.

402.  Olafsson, while similarly positive, took the opportunity to once again disavow even the existence of price inflation in generics, let alone its effect on Teva, stating "people that say that … there's a big generic price inflation, are simply wrong."

403.  Olafsson again falsely claimed that any effect on Teva from price declines would simply be the result of a natural economic cycle, certainly not the result of the slow release of unnatural price inflation driven by market-wide collusion.  According to Olafsson:

> I think what I want to highlight is there will always be cycling of the pricing of generics.  I have in my career, 23 years, never seen a real inflation.  I mentioned to some of you before, I have been in the market where price declines was approximately 1% to 2%, probably 2%, and I've been in the market in 2006 and 2007 when the price decline was 7%, 8%.  And then it's everything in between.

404.  He added that there was no cause for concern that price deflation could continue, but that even if it did, the Exchange Act Defendants had managed their U.S. generics division such that Teva was "shielded" from any adverse pricing trends.  According to Olafsson:

> So far, what we saw in the end of [the] second quarter was approximately 4% in the US and 5% global.  So, there will be a fluctuation, and obviously, it will affect every generic Company.  ***But the message I want you to take from this slide is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down.***

405.  The analyst from Goldman Sachs pointedly sought to call the Exchange Act Defendants out on their claim that price hikes had not caused inflation of Teva's revenue:

> [B]ack on this whole pricing discussion, I think that there had been some speculation that during the whole FTC process, that you were on your very best behavior, not raising prices, that may have contributed to the deflation in generic drug pricing, and I think there is some expectation that now that this deal is done, we're going to get back to normal.  Whatever that means.  I

111

mean, I think normal is mid-single digit declines.  Can you comment on that, Siggi, if you expect the landscape in terms of pricing to change at all, now that this deal is closed.

406.    Olafsson falsely responded as follows:

So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases.  Simply, it doesn't work like that in generics.  When price increases are taken, there's some kind of abnormality in the business.  There are shortages. … So there's always somebody happy to take a little bit lower price.  So it's a very competitive business we're in.

407.    As a result of the Exchange Act Defendants' continued misstatements, investors were again mollified, and even had a bullish take on Teva's future.  The analysts from Guggenheim, in a September 9, 2016 report, wrote that "After Teva's… Generics Analyst Day, we continue to think that growth prospects for the company's generics business are underappreciated."  The analysts at BTIG wrote, in their September 9, 2016 report, that "Being at the Top of the Generic Industry Has Its Advantages," in that "Mgmt anticipates ongoing price erosion (4-5% on average)" as it "believes a broad portfolio mitigates some risk, as well as competitive cost position."  The analysts at Wells Fargo concluded, in a September 11, 2016 report, that "Teva's generics overview gave [them] more confidence in our estimates."

408.    The next day, September 12, 2016, the GAO Report was publicly released.  As detailed in Section V.B.1.b, Teva was specifically implicated in the extraordinary price increases.

### 4.    Only Two Months After The Bullish "Generics Day" Conference Teva Is Identified As A Target Of The DOJ And State AGs; Potentially Subject To Criminal And Civil Charges

409.    On November 3, 2016, on or about 2:10 p.m. ET, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End" revealing statements by DOJ prosecutors that the investigation had expanded to include a dozen or more drugs, that criminal charges could be handed down by the end of 2016, that the Connecticut AG was seeking to gather

a cadre of State AGs to bring a civil suit, and indicating that Teva was a potential target of the

criminal and civil investigations:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter.  The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd….
>
> While attention so far has been focused mainly on branded drugs, which are more expensive, the Justice Department probe is now bringing the generics industry into the fray.
>
> Although it isn't illegal for companies to raise prices at the same time, it's against the law for competitors to agree to set prices or coordinate on discounts, production quotas or fees that affect prices. The federal government can prosecute companies for collusion and seek penalties and potentially send executives to jail.  Charges could extend to high-level executives, according to the people [in the DOJ antitrust division]. …
>
> While the government may bring the first cases by the end of December, the situation is fluid and timing could slip, according to the people. The investigation is likely to continue after the first cases are filed, said the people, and has the potential to mirror the antitrust division's long-running probe into auto-parts cartels. That price-fixing investigation has resulted in $2.8 billion in penalties and charges against 46 companies and 65 individuals, of which 31 received prison sentences, according to the Justice Department.  Generic drug companies are also contending with a civil price-fixing investigation by Connecticut Attorney General George Jepsen. Jepsen is seeking to lead a

group of states to probe the industry, which could result in cases seeking damages, according to people familiar with the matter. …

The investigations initially focused on mid-sized U.S. companies and have since extended to the biggest manufacturers and U.S. subsidiaries of overseas companies. …(David McLaughlin & Caroline Chen, U.S. Charges in Generic-Drug Probe to Be Filed by Year End, *Bloomberg* (Nov. 3, 2016, 2:10 p.m. ET, updated Nov. 4, 2016, 12:14 a.m. ET)).

410.   The article put investors on notice, for the first time, that the investigations were uncovering conduct so severe that they would shortly culminate in criminal and civil charges, and that Teva was in the cross-hairs, rather than simply a witness or the subject of an inquiry.

411.   Upon disclosure of this information, the price of Teva's securities fell.

412.   The news quickly spread.  *The New York Times* reported on how the news in the *Bloomberg* article caused the price of the securities of the named pharmaceutical manufactures – including Teva – to drop in dramatic fashion:

The generic drug industry was jolted on Thursday as shares of many major companies tumbled after a news report said that a federal inquiry into drug price-fixing was wider than previously believed and could lead to charges by the end of the year. Shares in Teva Pharmaceuticals, the world's largest generic drug maker, fell more than 9 percent, and the stock of competitors like Mylan, Endo Pharmaceuticals and Impax Laboratories had similar declines." (Katie Thomas, News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling, *The New York Times* (Nov. 3, 2016)).

413.   Analysts were stunned by the new information.  The news caused analysts from S&P Capital IQ to go so far as to lower their rating of Teva ADS from "Buy" to "Hold," noting the increased risk to investors posed by regulatory escalation, explaining that "An unconfirmed report from *Bloomberg* indicates the Department of Justice is investigating generic drug firms over potential price collusion and by year-end may bring criminal charges against them, including TEVA.  The investigation is allegedly centered on whether these companies agreed with each other to raise prices."

414.    The analyst at BTIG directly linked the *Bloomberg* report with Teva's stock price in a report titled "Generic Drug Stocks 'Smoked' on Fears of DOJ Pricing Probe."  The BTIG analyst noted that the investigation was reportedly focusing on "more than a dozen" generic drug companies, and over two dozen drugs.  (Timothy Chiang, Generic Drug Stocks "Smoked" on Fears of DOJ Pricing Probe, BTIG Equity Research (BTIG LLC, New York, N.Y.), Nov. 3, 2016).

415.    An update to the *Bloomberg* article published November 4, similarly noted that Shares of all companies named in the investigation fell on the news [that *Bloomberg* released on November 3].  … Teva slipped 9.5% to $39.20."

416.    In an article by Eric Sagnowsky, published November 10, 2016 in *Fierce Pharma*, titled "DOJ's Price-fixing Investigation Could Lead to Sizable Liabilities, Analyst Says," the author reported that analysts believed that the investigation itself, through fines, would have a sizeable financial impact on Teva, as much as $700 million:

> While industry closely tracks developments on the Department of Justice price-fixing investigation into a host of generics companies, one influential analyst has run the numbers on potential liabilities. In an investigation that spans 12 companies and 24 drugs, Evercore ISI's Umer Raffat said he believes Teva could face a liability of $300 million to $700 million, while Mylan could face a $380 million to $770 million liability.  Those numbers are strictly based on the drugs "most likely" to be involved in the probe of which Raffat and company 'are aware.'"

417.    For their part, the Exchange Act Defendants immediately and unequivocally denied that there was any evidence that Teva could be liable for antitrust violations, stating in the *Bloomberg* update on November 4 that the company had not done nothing wrong: "Teva is not aware of any facts that would give rise to an exposure to the company with respect to these subpoenas." This flew in the face of the truth; and only a little over a month later, the Connecticut AG would file its complaint alleging direct evidence that Glazer, who has plead guilty to criminal antitrust conspiracy, conspired directly with Teva to fix prices on multiple drugs.

### 5.     Investors Are Surprised Again When Teva
##       Announces Dismal Results For The Third Quarter 2016

418.     The next quarterly earnings conference call and 6-K quarterly filing was set for November 15, 2016, to report on Third Quarter 2016 results.  According to the Exchange Act Defendants, the results were below investor expectations due to supposedly unexpected generic drug price decreases in the U.S generics industry.  Analysts were shocked and disappointed, especially because the Exchange Act Defendants had provided such positive guidance and statements concerning price trends, and bullish comments on Teva's generics business just two months earlier during Teva's generics day presentation.

419.     As summed up in an analyst report by Leerink, dated November 16, 2016, "Bottom Line: TEVA missed our 3Q sales forecast by 3% and lowered 2016 sales and EPS guidance range by 2% and 3%, respectively."  As the analysts at Gabelli & Co. wrote, in a November 16, 2016 analyst report, "On November 15, 2016, Teva reported disappointing Q3 results with revenue of $5.6B (+15%, -2% ex-Actavis) and adjusted EPS of $1.31 (vs. $1.35).

420.     On this news, the price of Teva's securities dropped.

421.     On the November 15, 2016 investor call concerning the Third Quarter earnings, despite their adamant stance on recent calls that pricing pressure was not impacting profits, the Exchange Act Defendants finally acknowledged the impact of unexpected price erosion, but they falsely blamed it on the one-time, FTC-imposed divestiture of products related to the Actavis acquisition, rather than any market wide trend.  As Olafsson stated on the November 15 investor call: "This quarter, the price erosion on our US-based business was approximately 7% versus a year ago.  This is slightly higher than our expectation going into the quarter, with a key driver being increased price pressure on select products as we divested some of the Teva/Actavis overlaps, and they transitioned to the new owners."  Olafsson further explained that the price

pressure was limited, it would not last beyond the quarter:  "Despite this, we are very confident that the price erosion we experienced in the US will continue to be in the mid-single-digits [*i.e.* 5% and not 7%] as we have guided throughout the year."  Olafsson had, as noted, previously provided 4-5% as the "mid single-digit" price erosion that Teva was and would experience in 2016.

422.   Olafsson was challenged on this false and misleading statement by the analyst at Credit Suisse, who asked, "just around your comments you made around generic drug pricing, you mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward.  So can you just maybe provide a little bit more insight, there's obviously an area that there's a lot of investor focus, just what gives you the confidence that what's going to happen in the coming quarters will be different than what you saw this quarter?"

423.   Olafsson's answer again denied the existence of a negative pricing trend for Teva, and he again blamed the quarterly price pressure again on the divestiture of products from the Actavis acquisition: "Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing.  And what we saw in the difference between the 5% or mid-single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product."

424.   These false statements mollified an otherwise skeptical analyst community that the erosion that had caused Teva's negative Third Quarter 2016 results was short lived.  As the analysts at Deutsche Bank wrote in a November 15, 2016 report, titled "Re-basing Generic Estimates," "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

425.   The analysts at Gabelli & Co., in their November 16, 2016 report despite being skeptical of management's conclusion that the pricing pressure was short-term, and would be limited to the third quarter, were swayed by management's vehement insistence to the contrary:

"While international generics ($1.6B, +38%) were strong in Q3, the focus remains on a US business ($1.3B, +25%) that would have declined without Actavis.  Price erosion of 7% (vs. 5% expected) was partially due to pressure from divested products, and the lack of meaningful new launches is expected to remain a headwind into 2017 and possibly 2018.  Teva continues to believe that long-term price erosion will be 5%, leading to net revenue growth of 5% for generics due to 10% volume increases from new launches."

426.    During the November 15, 2016 Third Quarter 2016 earnings conference call, the analyst at Morgan Stanley challenged the Officer Defendants hosting the call in view of what the analyst accurately described as a very bullish generics meeting in early September.  Pointedly, the Morgan Stanley analyst asked: "what you weren't aware of in early September, and how we should think about the prospects for the generics business going forward?"

427.    Olafsson falsely asserted that the decline in price was what he expected – although it was not, as he had asserted many times that he had expected a lower rate – and that a lack of new launches (rather than the divestiture excuse) somehow resulted in a price decline:

> So first of all, I'm as bullish on the generic business today as I was on September 9 for sure.  I think the volatility you see between months, between quarters, you -- I think we all recognize that, that the volatility of new launches between quarters and between years has a significant impact, especially on the US business. The price erosion in the US is similar to what we expected in September. The impact on the divested product was a little bit more.  I think the guidance on how we see the pricing environment is very similar as we guided to in our meeting, the difference being is basically the new launches.

428.    When analysts pushed back on Olafsson's explanations, he doubled-down.  For instance, on the call, the Wells Fargo analyst asked: "Just as a follow-up, Siggi.  So what you're saying is the acceleration in the price decreases that you've seen this past quarter aren't a result of increased competition on existing molecules, and it's not a result of having to tame previous price increases, or give back some of those?"  Olafsson falsely answered, "No," and again provided the

false explanation that the price issues were the result of "instability that happened in the market during the month of August, when the new owners [of products that Teva divested] were taking market share."

429.    Defendant Vigodman ended Teva's Third Quarter conference call with a false and misleading statement denying any involvement by Teva in anticompetitive behavior relating to the DOJ antitrust investigation: "Finally, I cannot conclude this part of my remarks without briefly addressing the US Department of Justice investigation into price collusion in the generic drug industry, which has been in the news this month.  I would like to emphasize that based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."

430.    As reported by the Wells Fargo analysts, in their November 22, 2016 report, the Exchange Act Defendants in the Third Quarter had "deferred answering whether the weaker-than-expected environment will impact 2017 guidance, and explained that it is presently conducting a bottom-up assessment of its business, including the opportunities and challenges, will provide an update to 2015 guidance when Teva reports Q4 2016 results in February."

**6.    Defendant Olafsson Is Fired, With A False Explanation**

431.    Less than three weeks later, on December 5, 2016, Teva unexpectedly announced the "retirement" of Olafsson, the 48-year-old head of generics.  His replacement, Dipankar Bhattacharjee, took over effective immediately as CEO, Global Generic Medicines Group.  In reality, Olafsson did not "retire."  He was fired.  He is currently the Chairman of Elucida Oncology, Inc., Chairman of Oculis, and a Director of Pfenex.

432.    Analyst reaction to the surprising and unexplained news was negative.  The analysts at Morningstar, in a December 6, 2017 report, noted that "Teva's announcement that Dipankar

Bhattacharjee will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence.   Recent pricing pressure in the generic drug market and anticipated generic competition on the 40mg version of Copaxone in 2017 remain significant near-term challenges for Teva, which makes the abrupt leadership change a concerning development at a critical time for the company."

433.   Moreover, analysts recognized that the loss was incongruent with the Exchange Act Defendants' reasoning and the realities on the ground.  Olafsson's termination called the future of Teva's U.S. pharmaceutical business into chaos.  Olafsson had worked at both Actavis and Teva, and he was expected to head the integration of the acquired business.  He was also the outspoken proponent of Teva's generics strategy from 2014 through his departure.

434.   The analysts at Credit Suisse, in a report dated December 5, 2016, titled "Management Change Raises More Questions," called the "transition timing very surprising" and noted that Teva told them that "after a challenging 2.5 years at TEVA, and in particular the many challenges seen in 2016, Olafsson decided it was time to move on."  The Credit Suisse analyst noted what numerous other analysts had observed, which was that "Olafsson's background and experience both at TEVA and the former ACT left him uniquely qualified to run the now combined generics businesses from those two firms," and that "Olafsson was a champion of the ACT generics business purchase, a deal investors continue to question given the price TEVA paid for that business.  To have Olafsson now leave TEVA just a few months after the deal closed and while the integration is in process, makes it more difficult for us to believe TEVA will obtain as much value from the deal as they have previously stated publicly."

435.   A BTIG analyst picked up on this in a report dated December 5, 2016, further noting that "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor

120

sentiment could worsen as the market has remained focused on price erosion for the [company's] base generics business."

436.    Some analysts questioned the true reason and linked it to the failures of the US generics business caused by softer drug pricing.   The Street's Sarah Pringle reported in a December 6, 2016 article called "Questions Mount at Teva as Generics Head Quits Without Explanation," that "less than two-and-a-half years following his appointment, Olafsson is stepping down as the CEO of the global generic medicines group at Teva Pharmaceutical Industries Ltd. (TEVA), raising more questions for investors amid continued worries around drug pricing."

437.    The analysts at Piper Jaffray, in their December 6, 2016 report, concluded that Olafsson had in fact been pushed out, and the reason was that the differences between the Exchange Act Defendants' false and misleading statements about the generics business and pricing finally caught up with them: "When a company issues what many view as bullish guidance and then walks that back within a quarter of issuing said guidance … it would only be natural to conclude that there would be repercussions at the top of the organization."   They also insisted that Olafsson should not be the only one held responsible: "we would not lay the responsibility for the missteps regarding the setting of expectations (and ultimately the decision to lever up and purchase Actavis at top-of-the market price) entirely at the feet of Siggi Olafsson."

438.    Olafsson's departure was also the focus of investors questions at the December 8, 2016 Citi Global Healthcare Conference.   Citi analyst Liav Abraham opened questioning by asking Vigodman to explain Olafsson's departure.   "I was hoping that, maybe just to start off, you could lay out for us the reasons for Siggi's departure, especially given the timing. You're in the important process of integrating one of your largest transactions, and this does potentially raise questions regarding what's going on internally in the generics business."

Vigodman's evasive answer raised more questions than it answered.  He replied, "we are fully aware and mindful of the uncertainties that are elevated in a way that is driven by Siggi's departure."

439.    After failing to answer directly the question about the internal workings in the generics division, Abraham pressed Vigodman, stating "that doesn't really address the questions of is there anything going on internally that we should be concerned about that caused Siggi to leave.  Is there any clarity that you can give on the reasons for Siggi's departure?  Was it his decision?  Was it your decision?"

440.    Vigodman again failed to answer directly, except to say that "Siggi decided that that's enough for him," and that there would be advantages to having a "new leader."  When asked what those advantages were, Vigodman replied "full responsibility.  He is going to stand up and basically commit to the set of numbers that relate to generics once guidance is provided in January, and also assuming responsibility and reducing the uncertainty period was also important."  This obfuscating answer revealed that Olafsson was not acting responsibly or providing accurate information to investors.

441.    Tellingly, when Liav Abraham asked about the generic pricing environment, Vigodman reversed Olafsson's repeated hard line that Teva was managing price erosion effectively, let alone able to.  Abraham asked: "what is it leaves you committed to, at least on your base business, pricing dynamics remaining stable….  I mean mid-single digit declines that are not deteriorating over and above that."  Vigodman responded:

> during the last number of quarters, the pressure on us on just trying to validate the 5%, and I found out that maybe that's a mistake to try to push back"; "at the end of the day, we don't manage price erosion. We manage the business, we manage the launches, we manage the base business, and we manage the profitability of the business. And *the strong focus on price erosion*, the way I see that, goes *out of context and proportion*.

442.     Ultimately, in response to Olafsson leaving Teva, the price of Teva's securities dropped.

### 7.     As 2017 Begins, Teva's Illicit Profits Further Dry Up

443.     With the DOJ's and State AGs' subpoenas in hand, GAO Report publicly released, and criminal charges against the co-conspirators unsealed, Teva's profit generating scheme further weakened.  Despite this, the Officer Defendants continued to deny the existence of this conspiracy, even as the reduced revenues flowed through Teva's financial statements, causing the price of Teva's securities to decline precipitously.  Indeed, although Olafsson had been fired, Vigodman and Desheh desperately continued to conceal this reality through false and misleading statements that obfuscated the true facts from investors.

444.     During the December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that, due to the uncertainty caused by Olafsson's departure, Teva would provide 2017 guidance early in January, rather than its previously scheduled February date.

445.     On January 6, 2017, Teva announced shocking news.  Vigodman for the first time admitted that Teva was not immune to the competitive pressures that the Exchange Act Defendants had been denying for almost a year: "It is no surprise to you that the entire healthcare sector has faced significant headwinds, and we have not been immune.  We also had some issues specific to Teva, which are not underestimated.  We continue to face challenges as a company and as an industry and we expect some of these challenges to continue in 2017."  To the contrary, this was a surprise.

446.     As explained by the analyst at Morningstar in a January 6, 2017 report called "Teva Previews Weak Year on Competitive Pressures and Currency Headwinds," "Teva's management lowered its 2017 outlook from its previous forecast released in July [2016, at the time of the Notes

Offering] as the firm succumbs to increased competitive pressure, especially in the U.S. generics market, and currency headwinds, partially tied to Venezuela."

447.    More than simply lowering guidance, Vigodman relayed the actual poor to-date results in Teva's U.S. generics business, which was eroding margins.  As Vigodman described in the January 6, 2017 conference call, Teva "ha[s] an EBITDA gap of $1.2 billion emanating from our US generics business."    The analysts at HSBC Global Research, in a report dated January 11, 2017, noted that "the magnitude of the difference in guidance over such a short period of time will have done the group's credibility no favors with investors," later noting as a downside risk "a significantly negative outcome for Teva from the DOJ price collusion investigation."

448.    The reality that the company was in shambles, and the previous positive statements that Teva was not immune to the competitive headwinds facing its peers, gave analysts to note that the Exchange Act Defendants had lost further credibility.  Further concealed from investors was the reality that Teva could no longer not count on revenues from collusive activity in the U.S. generics market.  As detailed in Section V.C, on just the drugs Lead Counsel has been able to assess without discovery, the drop off was dramatic.

449.    The revised guidance due to poor real-time performance, especially as contrasted with rosy guidance provided only months before in July 2016, just before the Notes Offering, elicited sharp reactions.  The analysts at Piper Jaffray, in a January 8, 2017 report titled "Guidance An Unmitigated disappointment A Major Overhaul Is Needed," colorfully and accurately summed up the unreliability of managements' previous statement, and questioned how it was even possible for a management team to have made them in good faith:

> Another disappointing guide.  To borrow from the annals of baseball, it was New York Mets manager Casey Stengel who famously said of its historically inept team in its inaugural season in 1962, "can't anybody here play this game?"  To paraphrase old Casey in the context of Teva, "can't anybody here

guide reliably?"  This is bearing in mind that management had originally guided… factoring in mid-single digit erosion in U.S. generics pricing… *The larger point here is this: how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management team in place?*

Further, though the departure of Global Generics head Siggi Olafsson is not lost on us, the formulation of expectations is simply not going to be the product of one person running one segment of the company (refer to our note on 12/6/16 for more details).

450.    As a result of the news, the price of Teva securities once again plummeted.

451.    Yet the Exchange Act Defendants still continued to mislead investors as to what was really happening.  On the January 6, 2017 investor conference call, Vigodman went so far as to tell investors that "[t]he majority of the $1.2 billion gap is attributable to not being able to realize new launches in our Teva legacy business in a way that is consistent with our past track-record," rather than pressure on generics drugs sales from competition, including drug pricing, as the collusion dissolved.

### 8.    Defendant Vigodman Is Terminated

452.    On February 6, 2017, in a Form 6-K filed with the SEC, Teva announced the termination of Defendant Vigodman, effective immediately and without announcing a permanent replacement.

453.    This departure was explained as a "mutual agreement between the Board of Teva and Erez Vigodman that Mr. Vigodman is stepping down," noting that "Mr. Vigodman's service on the Teva Board of Directors has also ended."

454.    The Company stated "that Dr. Yitzhak Peterburg, who has served as Chairman of the Teva Board of Directors since January 2015, has been appointed Interim President and Chief Executive Officer, effective immediately."  Peterburg promised "that we would conduct a total review of the business, and this process is already under way."

455.    Investors and news articles responded poorly to this abrupt and transparently unceremonious termination.  As with Olafsson, investors questioned the timing and abruptness of the departure, especially given that no replacement was named, or, apparently, was under consideration at the time.  Teva's securities dropped significantly.

456.    J.P Morgan analysts, in a report dated February 6, 2017, titled "CEO Transition Adds Further Uncertainty to Story," wrote that the sudden and unexplained departure contributed to the bad news at Teva, "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges."

457.    Wells Fargo analysts wrote in a February 6, 2017 report titled "Teva: CEO Erez Vigodman Stepping Down," that "While some investors might think a change was needed after such a challenging 2016, we believe that more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

458.    The stronger inference by far from these circumstances is that Vigodman was terminated as a result of his role in the anticompetitive behavior and price hikes.  He had touted Teva's success for years without being truthful to investors as to its source, and made serial false and misleading statements about the root of Teva's issues.  When the secret sources of revenue dried up, and generic pricing came under pressure as the collusion unraveled, and Teva was forced to disclose ever increasingly dire financial reports, Vigodman was fired.

### 9.    Teva Falsely And Misleadingly Reaffirms Guidance

459.    On February 13, 2017, Teva issued a press release with the Company's Fourth Quarter 2016 results and full year 2016 results.  As reported by J.P Morgan analysts in a February 13, 2017, report, the reported results were poor but in line with expectations:  "4Q CC Takeaways; No Major Changes to Underlying Outlook" as the Exchange Act Defendants "largely

maintain[ed] underlying 2017 guidance." The J.P Morgan analysts specifically noted that the Exchange Act Defendants still "expect[ed] base business erosion to be around 5% …"

460.    Indeed, on the February 13, 2017 investor conference call relating to Teva's Fourth Quarter 2016 results, the Officer Defendants reiterated Teva's 2017 guidance from January. New CEO Yitzhak Petersburg, stated "We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary."

461.    Given the circumstances, investors were still concerned about the pressures of renewed market competition on Teva, especially given Teva's massive debt load. After the 2016 ADS and Preferred Offerings, Teva held about $36 billion in total debt. A continued reduction in Teva's ADS price could trigger certain covenants in the bonds. Also, investors were concerned whether the Company was healthy enough to continue issuing substantial dividends. However, when they asked tough questions to management, they met only misleading reassurances.

462.    The Goldman Sachs analyst asked, "You don't have a ton of room under your covenants, and both Moody's and S&P both put Teva's credit rating on negative outlook. In this environment, where you don't have a ton of levers to pull, you have said you are not going to do M&A, you are not going to do buybacks. Not sure why I understand why you're still committed to the $1.6 billion dividend." Defendants Desheh assured him that "regarding dividend, our Board is approving dividends every quarter, and that's the policy." As stated by the analysts at Leerink in their February 13, 2017 report, the update and the plan to issue dividends "should provide investors with some relief that the street numbers don't need to come down further."

463.    This news was welcome to investors, but it was false and misleading as Teva's underlying business continued to crumble as the collusive pricing and market allocation dissolved. Teva would cut its dividend and suffer debt downgrades just a few months later.

### 10.    Defendant Desheh Is Forced Out Of The Company

464.    On April 25, 2017, numerous media reports surfaced that Defendant Desheh would be pushed out as CFO at Teva.

465.    These reports were confirmed next day when, in an April 26, 2017 6-K, Teva announced that Defendant Desheh would be stepping down as CFO and leaving the company in "the coming months" so that Desheh could move on to "the next phase of [his] career."

466.    The timing of this departure, especially after Olafsson and Vigodman were pushed out, and at a time when the Company was without a CEO, leads to an inference that it was Defendant Desheh's role in the fraud that led to his departure.

467.    As noted by the analysts at Gabelli & Co., this departure raised numerous questions about what was really going on inside Teva.  The Gabelli analysts noted that this was the "[t]hird major departure in past five months," and a troubling one as "[w]hile the latter two [Olafsson and Vigodman] joined Teva in 2014, Eyal has been with the company since 1989 and served as CFO since 2008." "Teva currently lacks leadership at a time of challenging dynamics in its core generics business, potential loss of exclusivity for its most profitable product (Copaxone), and a debt-laden balance sheet ($34.8B net debt) following several disappointing-to- disastrous acquisitions."

### 11.    Teva Reaffirms Guidance In Desheh's Final Quarterly SEC Filing

468.    On May 11, 2017, Teva released its positive First Quarter 2017 financial statements, again reaffirming guidance.  In connection with this disclosure, the Exchange Act Defendants also reported that they had revised their business operations, providing reassurances to investors that Teva had righted the ship, and that, despite the existence of pricing pressure, it

had no effect on Teva.  Many investors were reassured.  Analysts at Morningstar, in a May 11, 2017 report, wrote that "this quarter's results mostly track our expectations …."

469.   As described by interim CEO Peterburg on the related conference call "Q1 started off 2017 generally as expected and as we guided, which has been the lowest quarter of a back-end loaded year.  Revenues this quarter amounted to $5.6 billion, resulting in a non-GAAP net income of $1.1 billion and a non-GAAP EPS of $1.06."  Thus, Teva was, generally, reporting a good quarter, or at least one in line with its guidance.  Peterburg continued, "As we stated in our press release from this morning, we are reaffirming our 2017 outlook."

470.   Indeed, despite admitting that Teva's model of 5% price erosion in 2017 was incorrect, the Exchange Act Defendants explained that they would still meet their guidance.  Desheh affirmatively mollified investors, stating that the profitability of generic business was very stable, "our U.S. generic business was very stable this quarter," despite price erosion, as "the gross profit margin of our U.S. business or U.S. generic business remains exactly the same.  It's around 55% or a bit higher and did not suffer -- was not impacted by pricing pressure in generics in Q1."

471.   As reported by the analysts at Wells Fargo in a May 11 report, the Exchange Act Defendants tried to blame the new estimated price degradation on "buyer consolidation and a high number of FDA drug approvals" that negatively impacted price.  When Wells Fargo later had a call with management to discuss the issue, management "did not explain well how this was not fully anticipated," as consolidation had been taking place in the industry for years.

### 12.   After Vigodman, Desheh, And Olafsson Are Terminated, Teva Reduces Guidance, Cuts Dividends, And Takes A $6.1 Billion Charge Against Earnings

472.   On June 9, 2017, Teva announced four new directors to its Board, in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility.  By June 21, 2017, Defendant Desheh had left Teva for a new position.

129

473.    Two months later, with Defendants Desheh, Vigodman and Olafsson finally gone, and with new board members in place, Teva revised guidance down again, reduced its dividend, and took a $6.1 billion charge.  Management admitted that these actions were triggered largely by the same pricing and competitive market pressures that they, and especially former executives Vigodman, Olafsson and Desheh, had previously denied would have any effect on Teva.

474.    Trading in Teva securities was sent into a tailspin premarket, as reported by analysts at UBS, "trading down 8-10% pre-market.  Given the significant 2017 guidance cut, the dividend cut, the impairment charge of $1.6B along with the 2Q17 miss, it's understandable that the stock would trade down this significantly."

475.    A *Bloomberg* article called "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper," published August 3, 2017, noted that both Teva's equity and debt were significantly affected, as the disclosures put in question Teva's ability to comply with its debt covenants:  "The stock slumped the most in almost two decades and the yield on Teva's bonds jumped after the Israeli drugmaker also cautioned that it may breach some debt covenants this year if sales don't rise."

476.    On this news, the price of Teva securities dropped significantly, and continued to drop for days as a result of these disclosures.

477.    On August 3, 2017, Teva issued a press release in pre-market trading that included the earnings miss, lower guidance, and a $6.1 billion impairment charge.  Yitzhak Petersburg summed up the disclosure on the related August 3, 2017 investor call, these negative results were almost entirely the result of poor performance in U.S. generics:

> We are reporting today lower-than-expected Q2 results. Revenues in this quarter were $5.7 billion, resulting in a non-GAAP net income of $1.1 billion and non-GAAP EPS of $1.02. Cash flow from operations was soft, amounting to $741 million. We have also lowered our 2017 revenue outlook

to $22.8 billion to $23.2 billion, and our non-GAAP EPS outlook to $4.30 to $4.50. …. On a GAAP basis, we are reporting today a net EPS loss for the second quarter of $5.94. This loss is primarily the result of a $6.1 billion impairment charge to reduce goodwill associated with our U.S. Generics business unit which includes both the Teva legacy business and the Actavis Generics business. This impairment reflects our revised outlook for the business given the trends we are seeing in the market as I've just articulated.

478.    As Petersburg continued by explaining in the related investor conference call held that day that "In the last three months, our results were greatly impacted by the performance in the U.S. Generics business and continued deterioration in Venezuela.  In our U.S. Generics business, we experienced accelerated price erosion and decreased volume, mainly due to customer consolidation, greater competition as a result of an increase in generic drug approval by the FDA, and some new product launches that were either delayed this quarter or got subjected to more competition."

479.    Analysts were enraged by the Exchange Act Defendants' previous dissembling, and, in essence gave up on any credibility management might have had, or that the Company was nearly as viable as the Exchange Act Defendants had made it out to be.

480.    The Credit Suisse analysts titled their report that day, "Three Strikes and We're Out."  UBS analysts, in their August 3, 2017 report, proclaimed "Another bad day for Teva."  The Oppenheimer analysts, in a report dated August 3 2017, wrote that "Lower visibility On Turnaround Sends Us To the Sidelines; Downgrading to Perform."

481.    According to Deutsche Bank analysts on August 3, in a report called "Lowering estimates and target; not our best call," the key takeaways from Teva's investor call concerning the disastrous guidance centered largely on Teva's admission that price erosion was worse than they had previously discussed and would persist, and that, as a result of Teva's poor performance, it may have to renegotiate its debt covenants:

> In our view, some key takeaways were: 1) TEVA described increased
> pressures on its US generic business, which it believes could persist in 2018
> and potentially 2019; 2) the company expects price erosion for the US
> business to accelerate to the high single digits in 2H17 (from 6%+ in 2Q); 3)
> TEVA believes it can complete the divestitures of its global Women's Health
> and European pain businesses by year-end, and expects proceeds of $2bn or
> more from these and other asset sales; 4) management expects to remain in
> compliance with its debt covenants, but noted that lower cash flow in 2H17
> (eg, due to Copaxone generic competition, lower divestiture proceeds, etc.)
> could require the company to renegotiate the covenants with its lenders.

482.    The analysts at Cowen admitted "[u]nfortunately we have been horribly wrong on our call."  Cowen commented that it was rocked by the disclosure that Teva had hired outside consultants to help evaluate their generics business, a business in which they, as the market leaders, should presumably have been the experts: "We were [] disturbed by management's commentary about engaging in outside consulting firms to help analyze its generic business.  If the expertise to accomplish such a review isn't domiciled within the world leading generic manufacturer then there could be more duress than we had anticipated."

483.    As a result of the new disclosures, Moody's on August 3, 2017, issued a report in which it downgraded Teva's debt, including the senior secured debt issued in July 2016 as part of the Actavis acquisition:  "Ratings downgraded.  Issuer rating to Baa3 from Baa2.  Backed Senior unsecured rating to Baa3 from Baa2.  Senior unsecured shelf to (P)Baa3 from (P)Baa2.  Backed Senior unsecured shelf to (P)Baa3 from (P)Baa2.  Rating outlook is negative."  Morris Borenstein, a Moody's Assistant Vice President explained that "[t]he downgrade to Baa3 from Baa2 reflects slower deleveraging than we anticipated as Teva contends with weakness in its US generics business and the looming threat of generic competition on Copaxone 40mg."

484.    On August 4, 2017, Fitch Ratings downgraded Teva's Issuer Default Rating to BBB- from BBB, with a Negative Outlook reasoning: "Pricing pressure in the U.S. will weigh on operations in the near term, requiring the company to reduce debt both through FCF generation

and asset divestitures. Additional uncertainty stems from an ongoing search for a CEO and CFO and potential generic competition against Copaxone 40mg." As reported by *The Street* that day, "Teva Shares Are Getting Obliterated Again After Vicious Investment Bank Downgrades."

485. On August 7, 2017, as the price of Teva's securities continued to drop, Morgan Stanley analysts downgraded Teva's ADS. To "Underweight," noting specifically that they had "underappreciated the risk of generics pricing pressure to Teva's earnings and dividend, and we expect Teva to continue to underperform given overhangs." In other words, the analysts had not appreciated the risks to Teva on the very subject matter on which the Exchange Act Defendants had for so long mislead investors.

486. Teva's August 3, 2017 disclosure was the direct result of the fraud. The Exchange Act Defendants had concealed from investors that Teva had generated as least $1 billion in illicit revenues from anticompetitive conduct and collusion, price fixing, bid rigging, market allocation and price hikes. As those sources of revenue began to dry up, and competition seeped back into the generic drugs market.

487. The Exchange Act Defendants had even gone so far as to deny the very existence of adverse price trends, or Teva's vulnerability to them, in a last ditch attempt to maintain the illusion that Teva's success had been built on something other than illicit conduct and massive price increases. Once Desheh, Vigodman, Olafsson, and Oberman had left the Company, Teva finally revealed how unsustainable the success in U.S. generics was, and how hollow its rosy guidance had been.

### G.   Teva Improperly Recognized Revenue On Transactions Involving Price Fixing and Other Anticompetitive Conduct

488. The Exchange Act Defendants asserted that Teva's financial statements were in compliance with GAAP, as filed with the SEC, issued in press releases, or otherwise made public.

As alleged herein, the financial information the Exchange Act Defendants issued during the Class Period violated GAAP governing the recognition of revenue and disclosure requirements.

489.    GAAP does not allow revenue recognition before revenue is realized or realizable and earned.  Specifically, SEC Staff Accounting Bulletin No. 104 ("SAB 104"), the controlling GAAP pronouncement on revenue recognition, states: "revenue should not be recognized until it is realized or realizable and earned."  Furthermore, SAB 104 identifies four fundamental criteria that must be met before revenue is realized or realizable: (1) Persuasive evidence of an arrangement exists; (2) Delivery has occurred or services have been rendered; (3) The seller's price to the buyer is fixed or determinable; and (4) Collectability is reasonably assured.

490.    Teva stated that it applied these criteria.  *See, e.g.*, 2016 Form 20-F at 91.  In reality, the Exchange Act Defendants violated GAAP by recognizing revenues generated through their anticompetitive conduct and collusion alleged herein.   Specifically, the revenue from anticompetitive acts (i) was not the result of sales with fixed or determinable prices, and (ii) was not based on persuasive evidence of an arrangement, as the Exchange Act Defendants did not consider or reflect in their revenue recognition the uncertainty regarding the ultimate price caused by the illegal and unsustainable nature of their anticompetitive behavior.

491.    First, Teva violated GAAP revenue recognition requirements because the price of its products in such transactions was not fixed or determinable.  Specifically, Teva purportedly reported revenue net of estimated price adjustments to be provided to its customers if and when Teva reduced prices on drugs that had been previously acquired by a customer.  *See* Teva 2015 Form 20-F, at F-13 ("Revenues from product sales are recorded net of provisions for estimated chargebacks, rebates, returns, prompt pay discounts and other deductions, such as shelf stock adjustments, which can be reasonably estimated.").

492.     The most significant type of price adjustments were "shelf stock adjustments." Such adjustments were credits that Teva extended to its customers if Teva or a competitor reduced the price of products that had been purchased, but remained unsold (*i.e.*, customer inventory). Shelf stock adjustments significantly reduced the risk to Teva's customers that the price paid for existing inventory was inflated.  This is because a customer could obtain a refund if prices were later determined to be too high for sale.  To this end, Teva claimed to "regularly monitor the competitive factors that influence the pricing of our products and customer inventory levels and adjust these estimates where appropriate."  Teva 2015 Form 20-F at 85.  Of course, the factors that influenced the price of Teva's products included the collusive conduct.

493.     GAAP impose restrictions on revenue recognition when competitive conditions cause significant uncertainty about the vendor's ability to maintain its price.  ASC 985-605-25-36.d ("If a vendor is unable to reasonably estimate future price changes in light of competitive conditions, or if significant uncertainties exist about the vendor's ability to maintain its price, the arrangement fee is not fixed or determinable.   In such circumstances, revenue from the arrangement shall be deferred until the vendor is able to reasonably estimate the effects of future price changes and the other conditions in this Subtopic have been satisfied.").  Specifically, GAAP required Teva to estimate the amount of refunds or rebates that customers would claim.  If Teva was not able to reasonably estimate that amount, Teva was required to reduce revenue for the maximum amount of the price adjustment.  ASC 605-50-25-4 ("A vendor shall recognize a liability (or deferred revenue) for those sales incentives at the later of (a) and (b) in the preceding paragraph, based on the estimated amount of refunds or rebates that will be claimed by customers. However, if the amount of future rebates or refunds cannot be reasonably and reliably estimated, a liability

(or deferred revenue) shall be recognized for the maximum potential amount of the refund or rebate (that is, no reduction for breakage shall be made).").

494.     In fact, as a result of its price-fixing and anticompetitive scheme, Teva did not have a reasonable ability to estimate the extent to which it would have to forfeit its transaction price as a result of the detection of its illegal scheme.  SAB 104 ("The FASB ASC Master Glossary defines a 'fixed fee' as a 'fee required to be paid at a set amount that is not subject to refund or adjustment.'").  That is, when the price-fixing and anticompetitive scheme was detected, Teva knew that it would be forced to compensate customers with significant shelf stock adjustments for then-existing over-priced inventory on which Teva had previously reported inflated amounts of revenue.

495.     Indeed, Teva management has admitted that the Company is experiencing, and expects to continue to experience, price and volume erosion for its existing portfolio of drugs sold in the United States through 2020.  *See, e.g.*, Teva Form 6-K for the month of August, 2017 at 16 ("In determining the discounted cash flow of Teva's U.S. generics reporting unit, Teva used the following key assumptions: Teva expects revenue and operating profits to continue to decline in the next two years, as its ability to successfully launch new generic products is not expected to offset or exceed the price and volume erosion for its existing portfolio prior to 2020."); Teva, Aug. 3, 2017, 2Q2017 investor call (Bhattacharjee: "in quarter two, we saw the impact coming from finalization of Claris One which is an RFP that was from a combination of McKesson and Walmart.  We saw some impact of that due to price adjustment in the latter part of the quarter as well as some shelf stock adjustments that we had to do. It has negatively impacted our prices.").

496.     Second, and even more broadly, Teva did not have persuasive evidence of an arrangement for its revenue transactions impacted by price fixing or any of its other

anticompetitive acts because Teva entered into price-fixing and anticompetitive arrangements with its competitors in secret. These arrangements enabled Teva to transact with its distributor customers at artificially high prices.

497. As with all of the Exchange Act Defendants' anticompetitive behaviors, the anticompetitive arrangements constituted side agreements under GAAP. A side agreement is evidence that the original agreement between Teva and its customer(s) was not final and revenue recognition was not appropriate. SAB 104 ("The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate."). No revenue should have been recognized on these illegal side agreements.

498. The Exchange Act Defendants' accounting was particularly egregious because here the side arrangement was an unlawful conspiracy. Under SAB 104, the "use of the term 'arrangement' in… is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction." Because Teva's customers were never aware of the collusive conduct, the accounting never reflected the full circumstances of the arrangement. Thus, under GAAP, Teva was required to defer recognition of all revenue. *See, e.g.*, Teva 2015 Form 20-F at 84, ("When sales provisions are not considered reasonably estimable by Teva, the revenue is deferred to a future period when more information is available to evaluate the impact. These provisions primarily relate to sales of pharmaceutical products in the U.S.").

499. Teva thus violated GAAP because neither its accounting nor its disclosures included consideration of the collusive conduct as a component of the arrangement on which revenue was recognized. The absence of such consideration was a clear accounting error because the price-fixing and anticompetitive arrangement was integral to a final understanding of the specific nature and terms of such transactions.

500.    Ultimately, the Exchange Act Defendants concealed the actual nature of the anticompetitive arrangements.  In doing so they violated GAAP, which require that the accounting treatment for a transaction "represents faithfully the transaction."  (SAB 104, "The staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction.").  In this situation, Teva should have deferred revenue recognition, but failed to.

501.    Teva's historical revenue recognition on these transactions was an accounting error because such accounting misused the facts that existed at the time its financial statements were prepared.  ASC 250-10-20 (An error in previously issued financial statements is "An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.").  At a minimum, this accounting error amounted to the over $1 billion in illicit profit alleged herein from the limited number of drugs that Lead Counsel has analyzed without discovery.

**H.    The Exchange Act Defendants Violated Item 5 Of Form 20-F**

502.    The Exchange Act Defendants violated their obligations pursuant to Item 5 of Form 20-F and Item 303 of Regulation S-K by failing to disclose the reasons and factors contributing to the increase or decrease in revenues relating to the Exchange Act Defendants anticompetitive actions.

503.    More specifically, Item 5 of Form 20-F required Teva to disclose the source of material increases and decreases in revenues, including those resulting from the anticompetitive conduct.  The Exchange Act Defendants did not do so.  To the contrary, they made numerous affirmative misleading statements in the MD&A section of the 20-F to the effect that Teva's U.S. generics business was subject to "intense competition."

504.    Teva filed its annual financial statement with the SEC in a Form 20-F filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934.  The SEC explicitly requires disclosures detailing changes in price that impact reported revenues in a Form 20-F.  Item 5 of Form 20-F (Operating and Financial Review and Prospects) states:

> To the extent that the financial statements disclose material changes in net sales or revenues, provide a narrative discussion of the extent to which such changes are attributable to changes in prices or to changes in the volume or amount of products or services being sold or to the introduction of new products or services … discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

505.    Item 5 of Form 20-F is analogous to, and subject to the same rules and requirements as, the Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section of Form 10-K filed with the SEC.  SEC Release No. 33-8350, Note 1.

506.    As such, SAB 104 requires management to disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

507.    Indeed, SEC Release No. 33-8350 further provides the following MD&A disclosure guidance, requiring analysis and disclosure of volume and price changes affecting the Company's revenues in a situation analogous to the rise and decline in revenue from the Exchange Act Defendants' anticompetitive actions:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including

for example, if applicable, difficulties in the manufacturing process, a decline
in the quality of a product, loss in competitive position and market share, or
a combination of conditions.

508.    Additionally, SEC Release No. 33-8350 explicitly states "[o]ne of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance."

509.    SAB 104 further states that, "The Commission stated in FRR 36 that MD&A should 'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.'"

510.    The Exchange Act Defendants violated this requirement, especially given the Exchange Act Defendants' assertions that the U.S. generic drug markets were competitive, without disclosing the source and magnitude of revenues generated by their anticompetitive actions.

## I.    The Exchange Act Defendants' Retroactive Write Down Of Actavis Product Rights And Goodwill

511.    GAAP required Teva to allocate the $40 billion purchase price for the Actavis transaction based upon the estimated fair value of the assets acquired.  In its Q3 2016 financials, Teva initially attributed and recognized approximately $16.5 billion of the Actavis transaction to "product rights," $4 billion to in process research and development, and $20 billion to "goodwill." Teva further disclosed that "Goodwill recognized is largely attributable to synergies expected following the acquisition and was allocated to the generics segment."

512.    Because Teva's accounting for the Actavis transaction was initially incomplete, GAAP required Teva to retrospectively adjust the purchase price allocations "to reflect new information obtained about *facts and circumstances that existed as of the acquisition date that*,

if known, would have affected the measurement of the amounts" initially recognized in subsequent financial statements filed with the SEC.   Financial Accounting Standards Board Accounting Standards Codification 805-10-25, Business Combinations ("ASC 805") (Emphasis added).

513.    If such information resulted from events that occurred after the acquisition date, GAAP does not allow companies to adjust the purchase price allocations, but to account for the impact of this information in the current period – for example, by taking an asset or goodwill impairment charge. (ASC 805-10-30 and 35).

514.    In its 20-F filed with the SEC containing Teva's 2016 financial statements, the Exchange Act Defendants reduced the value of the "products rights" acquired from Actavis recorded in Teva's financial statements from $16.5 billion to $8.6 billion.   The nearly $8 billion reduction in value was treated as a measurement period adjustment under ASC 805 and not an impairment under ASC 360.   With the diminished value of the acquired product rights, the Actavis-related goodwill allocated by Teva to its generics business increased by nearly $4.6 billion to over $24 billion, though there was no immediate impact to Teva's earnings.

| Value of Assets Acquired from Actavis as of Acquisition Date (Aug. 2, 2016) (USD Millions) | Values Recorded at 3Q16 | Adjustments | Values Recorded at 4Q16 |
|---|---|---|---|
| Product Rights | $16,486 | ($7,846) | $8,640 |
| In-process Research and Development | $3,999 | $1,007 | $5,006 |
| Goodwill | $19,630 | $4,562 | $24,192 |

515.    The only explanation provided by the Exchange Act Defendants was that the "measurement period adjustments related to the identifiable intangible assets acquired represent the impact of updated cash flow projections on the fair value of the assets. *The updated projections incorporated additional information obtained subsequent to the closing of the transaction, which included updated product and market based assumptions*, as well as

consideration of duplicative products." (Emphasis added).  Further, Teva described the Actavis-related, and now $4.5 billion higher, goodwill as being "largely attributable to expected synergies following the acquisition, as well as future economic benefits arising from other assets acquired that could not be separately recognized at this time."

516.    In other words, Teva's accounting treatment and disclosure asserted, as implied by ASC 805-10-25-16 through 17, that the value of the "product rights" for generic drugs it acquired from Actavis were, as of August 2016, nearly $8 billion less than originally estimated because the markets that existed at the acquisition date in August 2016 for those drugs were weaker than originally expected.

517.    GAAP (ASC 350) also required Teva to perform a goodwill impairment analysis of its reporting units to determine whether or not the book values exceeded the implied fair values. In the 2016 20-F, the Exchange Act Defendants claimed to have applied an income approach using cash flow projections "based on management's estimates of revenue growth rates and operating margins, taking into consideration industry and market conditions."  Remarkably, Teva determined that its goodwill related to the U.S. generics business was not impaired as of December 31, 2016.

518.    Instead, Teva reported that its U.S. generics reporting unit barely passed the impairment test, even though it had been significantly increased by the Actavis-related goodwill – jumping by over $4.5 billion due to the $8 billion *decrease* to the Actavis generics product rights.

519.    On August 3, 2017, Teva announced a a $6.1 billion charge to the goodwill of its U.S. generics business – which consisted of both Teva legacy and Actavis generics business.  The reasons provided by the Exchange Act Defendants for taking the goodwill charge were, seemingly, the same as the basis for lowering the value of the Actavis-related "product rights" taken in Teva's 20-F for 2016:

During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business.   These developments included: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products. These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) expected price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the terminal growth rate of its U.S. generics reporting unit.

520.   Each of these factors existed throughout the Class Period, but were concealed through anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition, further evidencing the Exchange Act Defendants' fraudulent scienter.

## J.   Actionable False And Misleading Statements And Omissions

521.   The Exchange Act Defendants made false and misleading statements and material omissions throughout the Class Period.  The Exchange Act Defendants' representations were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the

anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.  Teva's financial results and performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the anticompetitive and collusive conduct.  Defendants disclosures in the Forms 20-F filed during the Class Period were misleading and in violation of SEC Item 5 requirements because they did not disclose known trends, specifically (1) the source of its inflated revenues caused by the collusive conduct, and (2) that Teva's revenues from its U.S. generics division were subject to Teva's ability to maintain the collusive prices under pressure from regulatory investigations and other scrutiny.

1. The 2013 False And Misleading Statements And Omissions

Fourth Quarter 2013 And 2013 Full Year Financial Results

522.    On February 6, 2014, Teva filed a press release on a Form 6-K with the SEC that reported the Company's fourth quarter 2013 and full year 2013 financial results.  Defendant Altman signed the 6-K.  Four days later, on February 10, 2014, Teva filed its Annual Report on Form 20-F with the SEC.  Defendant Desheh signed the 2013 Form 20-F on behalf of the Company.

523.    In the press release, Defendant Desheh stated: "Teva is reporting today strong results for the fourth quarter of 2013, bringing to close a year largely in-line with our expectations. During 2013, we had several key product launches, driven by a strong pipeline, which will continue to bear notable results in 2014.… We continue to focus our efforts on our core R&D programs and go-to-market activities while increasing organizational effectiveness through our cost-reduction program to ensure Teva's growth and its role as a leader in the ever-changing pharmaceutical industry.  2013 was an important year for Teva and its shareholders."

524.     In the press release, Teva reported (1) revenue of $5.4 billion; (2) gross profit of $2.9 billion; (3) net income of $377 million; (4) Generic Medicines segment revenues of $2.7 billion; (5) Generic Medicines gross profit of $1.1 billion; and (6) Generic Medicines segment profitability of $482 million for the quarter.

525.     In the press release, for the quarter Teva reported U.S. Generic Medicine "revenues of $1.2 billion, an increase of 14% compared to the fourth quarter of 2012.  The increase resulted mainly from the exclusive launches of niacin ER, the generic version of Niaspan®, and temozolomide, the generic version of Temodar®, in the third quarter of 2013, and launches of duloxetine, the generic version of Cymbalta®, and tobramycin, the generic version of Tobi®, in the fourth quarter of 2013, as well as higher sales of budesonide inhalation, the generic version of Pulmicort®."

526.     In the 2013 Form 20-F, Teva reported (1) revenue of $20.3 billion; (2) gross profit of $10.7 billion (3) net income of  $1.3 billion; (4) Generic Medicines segment revenues of $9.9 billion; (5) Generic Medicines gross profit of $4.1 billion; and (6) Generic Medicines segment profitability of $1.7 billion for the year.

527.     In the 2013 20-F, Teva also reported that 2013 U.S. Generic Medicines revenues "amounted to $4.2 billion, down 5% compared to $4.4 billion in 2012.  The decrease resulted mainly from a decline in sales of the generic version of Lexapro® (escitalopram oxalate) for which we had exclusive rights in the first half of 2012, the lack of royalties related to the sales of the generic equivalent of Lipitor® (atorvastatin) under our agreement with Ranbaxy, which we received in the first half of 2012, and a decline in sales of the generic version of Actos® (pioglitazone) and Actoplus met® (pioglitazone/metformin), which were launched in the third quarter of 2012.  These decreases were partially offset by higher sales of the generic version

of Pulmicort® (budesonide inhalation) and the generic version of Adderall IR® (amphetamine

salts IR), the exclusive launch of niacin ER, the generic equivalent of Niaspan®, as well as

products that were sold in 2013 that were not sold in 2012."

528.    In the 2013 20-F, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

> In 2013, we led the U.S. generic market in total prescriptions and new
> prescriptions, with total prescriptions of approximately 523 million,
> representing 15.3% of total U.S. generic prescriptions.  We intend to continue
> our U.S. market leadership based on our ability to introduce new generic
> equivalents for brand-name products on a timely basis, specifically, with a
> focus on complex generics and other high-barrier products that we believe
> will create more value for patients and customers, strong emphasis on
> customer service, the breadth of our product line, our commitment to quality
> and regulatory compliance and cost-effective production.

529.    In the 2013 20-F, Teva described the "intense competition" the Company faced in

the generic drug market in the United States and touted its strategic and "competitive advantages."

Specifically:

> Competitive Landscape. In the United States, we are subject to intense
> competition in the generic drug market from other domestic and foreign
> generic drug manufacturers, brand-name pharmaceutical companies through
> lifecycle management initiatives, authorized generics, existing brand
> equivalents and manufacturers of therapeutically similar drugs. Price
> competition from additional generic versions of the same product typically
> results in margin pressures. We believe that our primary competitive
> advantages are our ability to continually introduce new and complex generic
> equivalents for brand-name drug products on a timely basis, our quality and
> cost-effective production, our customer service and the breadth of our
> product line. We believe we have a focused and competitive pricing strategy.

530.    The Company also described in the 2013 20-F the challenges inherent to the

generics markets, including "intense competition," and the primary factors driving revenues and

growth in the Company's Generic Medicines segment:

> Sales of generic pharmaceuticals have benefitted from increasing awareness
> and acceptance on the part of healthcare insurers and institutions, consumers,
> physicians and pharmacists globally.… These conditions also result in

intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.

531.    Teva described the following Risk Factor in its 2013 20-F related to the impact of

competition in the generics market:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

532.    On February 6, 2014, Teva held its Fourth Quarter 2013 and Full Year 2013

Earnings Conference Call.  Participants from Teva included Defendants Desheh and Altman.

533.    On the call, Defendant Altman discussed the financial results:

> Turning next to profit margin and operating expenses. Non-GAAP gross profit in 2013 was $11.9 billion or 58.6% of revenues, a decrease of $0.2 billion or 0.8% compared to 2012. This decrease was mainly the result of lower revenues of Provigil, which lost its exclusivity, as well as the reduced revenue from additional exclusive generic products, mainly atorvastatin. These were partially offset by more profitable product mix, mainly in the U.S. generic business, and higher COPAXONE revenue as well as early contribution of our cost reduction program.

534.    An analyst from Goldman Sachs asked Defendant Desheh "how do we think about

the profitability of the generic business going forward?"  Desheh replied, "you see the profitability

of the generic business in Q4, it's in line with what we have guided to 2014.  And we believe that

we're going to deliver that, at least a lot of our cost reduction programs are going to hit the bottom

line of the generic business….  We are going to improve and get a lot of money into the bottom

line of our generic business in order to improve competitiveness....  [W]e believe that the generic

business of Teva is stable, is well-managed, is going to grow in emerging market.  We had a pretty

good even excellent second half in the United States business."

535.    When asked by an Analyst from Needham & Company, LLC about profitability of the U.S. generics versus the rest of the world, Defendant Desheh stated, "On the scale that we're seeing, our U.S. generic business is definitely the most profitable part, with gross margin at about 50%. … The U.S. generic business is highly profitable."

536.    Defendant Oberman added:

> Maybe just building on what Eyal [Desheh] said, we're reporting a 14% top line growth on the U.S. generics business in the fourth quarter. In the back half of the year, when we have an apples-to-apples comparison of six months versus six months, we reached double digit growth. And at the gross profit levels that Eyal was talking about, it is a very valuable business to Teva, and we see it continuing to be on a go-forward basis.

537.    The February 6, 2014 Form 6-K Press Release, the February 10, 2014 Form 20-F, and the February 6, 2014 earnings conference call each contained representations that were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.  In addition to these reasons, the statements concerning Teva's financial results were

false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the above-stated collusive and/or anticompetitive conduct.  In 2013 alone, Teva's financial results were materially inflated by at least $125.8 million in revenue.  Furthermore, Defendants disclosures in the Forms 20-F filed during the Class Period were misleading and in violation of SEC Item 5 requirements because they did not disclose known trends, specifically the source of both (1) its inflated revenues caused by the anticompetitive and collusive conduct, and (2) that the price degradation for its generic drugs was in substantial part caused by Teva's inability to maintain the collusive prices, under pressure from regulatory investigations and other scrutiny.

### 2.   The 2014 False And Misleading Statements And Omissions

#### a)  First Quarter 2014 Financial Results

538.    On May 1, 2014, Teva filed a press release on a Form 6-K with the SEC that reported the Company's first quarter 2014 financial results.  The next day, on May 2, 2014, Teva filed its Q1 2014 6-K with the SEC.  Defendant Desheh signed both Forms 6-K.

539.    In the press release, Defendant Vigodman stated: "Our global generics business delivered increased profitability and our U.S. generics revenues were up 17% year-over-year. We are intensely focused on solidifying the foundation of Teva … driving sustainable organic growth, and positioning Teva for long-term value creation.  During 2014, we will deliver significant savings as part of our cost reduction program, accelerate transformation of our operations network, strengthen our global leadership in generics and continue to increase confidence in Teva."

540.    In the Q1 2014 6-K, Teva reported (1) revenue of $5.0 billion; (2) gross profit of $2.7 billion; (3) net income of $740  million; (4) Generic Medicines segment revenues of $2.4 billion; (5) Generic Medicines gross profit of $1.0 billion; and (6) Generic Medicines segment profitability of $499 million for the quarter.

541.    In the Q1 2014 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.0 billion, an increase of 17% compared to $893 million in the first quarter of 2013.  The increase resulted mainly from the exclusive launch of capecitabine (the generic equivalent of Xeloda ®), the launch of tolterodine tartrate (the generic equivalent of Detrol ®), and higher sales of budesonide inhalation (the generic version of Pulmicort ®) as well as sales of products that were sold in the first quarter of 2014 but not sold in the first quarter of 2013, the most significant of which were niacin (the generic equivalent Niaspan®) and tobramycin (the generic equivalent of Tobi®).  These increases were partially offset by declines in other products due to loss of exclusivity or additional competition, the most significant of which were amphetamine salts (the generic equivalent of Adderall ®), fenofibrate (the generic equivalent of Tricor®) and clonidine patch (the generic equivalent of Catapres TTS ®)."

542.    In the Q1 2014 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 512 million, representing 15.0% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

543.    On May 1, 2014, Teva held its Q1 2014 Earnings Conference Call.  Participants from Teva included Defendants Vigodman and Desheh.

544.    Defendant Desheh stated, "[i]n generics, we experienced significant growth in the Unites States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."  Desheh added, "[t]he profitability of our major business segment was

driven by global generics, with 31% improvement resulting from the strong performance in the U.S. market and higher profitability in Europe. … 31% improvement in the profit of the global business[,] driven by the performance of the U.S. market[,] improved the total generics share to 30% of total profit."

### b) Second Quarter 2014 Financial Results

545.    On July 31, 2014, Teva reported its financial results on a press release on a Form 6-K.  Defendant Desheh signed the Form 6-K.  The same day, Teva filed its Q2 2014 6-K with the SEC.  Defendant Desheh signed both Forms 6-K.

546.    In the press release, Defendant Vigodman stated: "Our generic business delivered solid results with significantly improved profitability."

547.    In the Q2 2014 6-K, Teva reported (1) revenue of $5.0 billion; (2) gross profit of $2.7 billion (3) net income of $745 million; (4) Generic Medicines segment revenues of $ 2.5 billion; (5) Generic Medicines gross profit of $1.0 billion; and (6) Generic Medicines segment profitability of $532 million for the quarter.

548.    In the Q2 2014 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.1 billion, an increase of 10% compared to $1.0 billion in the second quarter of 2013.  The increase resulted mainly from a full quarter of sales of capecitabine (the generic equivalent of Xeloda®), which was launched exclusively in March of 2014, and the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we are first to market, as well as sales of products that were sold in the second quarter of 2014 but not sold in the second quarter of 2013, the most significant of which were raloxifene (the generic equivalent of Evista®) and tolterodine tartrate (the generic equivalent of Detrol®)."

549.    In the Q2 2014 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

151

In the second quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 508 million, representing 14.7% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

550. On July 31, 2014, Teva held its Second Quarter 2014 Earnings Conference Call. Participants from Teva included Defendants Vigodman, Desheh, and Olafsson.

551. Defendant Desheh discussed the quarterly financial results. In relevant part, he stated, "[t]he improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S. This increase resulted mainly from a full quarter of sales of capecitabine, generic Xeloda, which was launched exclusively in March 2014. And the launch of omerga-3, generic LOVAZA, for which we are first to market." Desheh added, "[t]he growth in generic sales made it 50% of our total sales."

552. In terms of profitability, Defendant Desheh stated, "the improvement of operating profit and profitability was driven by strong results in our global generic business, with profit improvement of 41% compared to last year. Launch of generic Xeloda in March and generic LOVAZA this quarter in the U.S. market … led to the better results." Desheh added, "profit contribution of the generic business increased from 24% last year to 32% of total this year."

### c) Third Quarter 2014 Investor Conference Calls

553. On September 8, 2014, Defendant Desheh participated in a Healthcare Conference call hosted by J.P. Morgan. On the call, Defendant Desheh discussed the reasons for the Company's turnaround.

[W]e've vigorously continued to drive in order to create more and more efficiency within our operations and our ability to deliver lower cost as a competitive advantage, competitive edge which is extremely important.

We are, and I think, the results are already seen and we'll more so, we are rebuilding our generic business with the strong focus on generic, with building the pipeline for the future, with enhancing the current portfolio, leveraging it and maximizing the return from existing portfolio with very, very smart and sophisticated legal move and intelligence and creative deal making. Combine that with cost reduction that is going to hit our generic business first and foremost, mostly will hit the generic business and you will see how the Teva generic business is leading the generic world.

### d)  Third Quarter 2014 Financial Results

554.    On October 30, 2014 Teva reported its financial results in a press release on a Form 6-K.  The same day Teva filed its Q3 2014 6-K.  Defendant Desheh signed both Forms 6-K.

555.    In the press release, Defendant Vigodman stated: "The effort we have put forth thus far in 2014 towards solidifying our foundation to drive organic growth is reflected in our strong third quarter results.  We delivered improvement in profitability in all businesses, particularly in global generics, which saw profitability increase by 40% year over year.  The quarter results are an important example of Teva's commitment to strengthen our global leadership position in generics, fully execute our cost reduction program, and focus on cash and cash flow generation."

556.    In the Q3 2014 6-K, Teva reported (1) revenue of $5.1 billion; (2) gross profit of $2.8 billion (3) net income of $863 million; (4) Generic Medicines segment revenues of $2.4 billion; (5) Generic Medicines gross profit of $1.1 billion; and (6) Generic Medicines segment profitability of $556 million for the quarter.

557.    In the Q3 2014 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.1 billion, a decrease of 1% compared the third quarter of 2013.  The decrease resulted mainly from a decline in sales of amphetamine salts (the generic equivalent of Adderall®) and the loss of exclusivity of niacin ER (the generic equivalent of Niaspan®).  This decrease was

largely offset by sales of products sold in the third quarter of 2014 which were not sold in the third quarter of 2013, the most significant of which were capecitabine (the generic equivalent of Xeloda®) and omega-3-acid ethyl esters (the generic equivalent of Lovaza®), as well as entecavir (the generic equivalent of Baraclude®), which was exclusively launched during the third quarter of 2014."

558.    In the Q3 2014 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the third quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 504 million, representing 14.4% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

559.    On October 30, 2014, Teva held its Q3 2014 Earnings Conference Call.  Defendants Vigodman, Desheh, and Olafsson participated in the call.

560.    On the call, Defendant Vigodman discussed the quarterly results.  Specifically, he stated, "Q3 was a solid quarter for Teva, significant improvement in all process margins. Generics profitability grew substantially."

561.    Vigodman further stated:

> We solidified the foundation of Teva, streamlining the organization, creating a sound, stronger, more equipped competitive base for the near future. We'll share with you today tangible outcomes through the five main pillars I specified shortly after taking charge, cementing our global leadership in Generics while improving profitability and driving organic growth. Fully executing our cost reduction program. Significantly improving our operational network to drive efficiency and optimize capacity. Strong focus on cash and cash flow generation. Quality as a competitive advantage.

562.     An analyst from UBS Securities asked whether price increases in "some of Teva's base business" impacted Teva's financial result for the quarter.  In response, Defendant Vigodman stated "there's never a price increase on the base business as whole.  Like any other business, if there's a pricing opportunity that comes in the market, we look for that.  But the base business itself has been eroding overall because of the consolidation of the customers.  When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business.  But overall … the base business itself is slowly eroding."

### e)  Fourth Quarter 2014 Investor Conference Calls

563.     On December 11, 2014, Teva convened a 2015 Business Outlook Meeting conference call.  Participants from Teva included Defendants Vigodman, Desheh, and Olafsson. On the call, Defendant Olafsson discussed the success of the generic medicines segment:

> So what did we do in 2014? There was a significant improvement in Teva performance in Generics.  And this comes basically focusing on the operating profit.  You will see it in the numbers …
>
> We will be roughly at 27% operating profit by looking at everything around the Generic business, the cost of goods sold, the product mix, but also the cost structure.…
>
> You can see Q4 2013, the operating profit of the Generic business was about 19.2% and this is growing to 27% in 2015. I think this speaks highly about the business. We are focusing on the bottom line. The team is executing on the portfolio, on the cost. But last but not least, this reflects the cost reduction program that Teva stepped into. By lowering the cost of goods, this affects the Generics business more than the Specialty business because we take more of the volume from the manufacturing plants. So the Generic business is benefiting hugely from the cost reduction program that was initiated in 2013. …
>
> Also the U.S. has done amazing job and over the last two years, the operating profit in the U.S. will increase by 10% and that's when you are the market leader like we are in the U.S. This is the fruit of the strategy we have in place.

564.    In response to a question from a Morgan Stanley analyst about "extraordinary price increases" experienced by wholesalers and the impact on their inventory purchases, Defendants Olafsson and Vigodman offered responses.

565.    First, Defendant Olafsson stated:

> So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the U.S. of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products. But, overall, if you think about it, all our major customers have consolidated.

566.    Defendant Vigodman added:

> [J]ust to underscore the point that was made by Siggi. What we see in terms of pricing, we see an erosion – still a net erosion in generic prices. It is lower than what we saw two years ago, but still, net -net, we see net erosion. And that's a message that shall be spelled out in a very clear way.

### f)   Fourth Quarter 2014 And 2014 Full Year Financial Results

567.    On February 5, 2015, Teva filed a press release on a Form 6-K with the SEC that reported the Company's fourth quarter 2014 and full year 2014 financial results.   Defendant Desheh signed the 6-K.   Four days later, on February 9, 2015, Teva filed its Annual Report on Form 20-F with the SEC.   Defendant Desheh signed the 2014 Form 20-F on behalf of the Company.

568.    In the press release, Defendant Vigodman stated: "2014 was that year for Teva, where we established a stable underlying base from which we will grow in the coming years."

569.    In the press release, Teva reported (1) revenue of $5.2 billion; (2) gross profit of $2.9 billion; (3) net income of $694 million; (4) Generic Medicines segment revenues of $2.5 billion; (5) Generic Medicines gross profit of $1.1 billion; and (6) Generic Medicines segment profitability of $561 million for the quarter.

570.    In the press release, Teva reported U.S. Generic Medicine quarterly "revenues of $1.2 billion, flat compared to the fourth quarter of 2013, as higher sales of omega-3-acid ethyl esters (the generic equivalent of Lovaza®), capecitabine (the generic equivalent of Xeloda®), celecoxib (the generic equivalent of Celebrex®), raloxifene (the generic equivalent of Evista®) and entecavir (the generic equivalent of Baraclude®) were offset by lower revenues of products launched during 2013, mainly niacin ER (the generic equivalent of Niaspan®), following the loss of exclusivity."

571.    In the 2014 Form 20-F, Teva reported (1) revenue of $20.3 billion; (2) gross profit of $11.1 billion; (3) net income of  $3.0 billion; (4) Generic Medicines segment revenues of $9.8 billion; (5) Generic Medicines gross profit of $4.2 billion; and (6) Generic Medicines segment profitability of $2.1 billion for the year.

572.    In the 2014 20-F, Teva reported that 2014 U.S. Generic Medicine revenues "amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013.  The increase resulted mainly from the 2014 exclusive launch of capecitabine (the generic equivalent of Xeloda), the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza ) for which we were first to market, and the launch of raloxifene (the generic equivalent of Evista ), as well as products that were sold in 2014 that were not sold in 2013.  These increases were partially offset by lower sales of the generic versions of Adderall IR (amphetamine salts IR), Pulmicort (budesonide inhalation) and Niaspan (niacin ER)."

573.    In the 2014 20-F, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 500 million, representing 14.2% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic

equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost effective production.

574.    In the 2014 20-F, Teva also described the "intense competition" the Company faced in the generic drug market in the United States and touted its strategic and "competitive advantages." Specifically:

In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

575.    The Company also described in the 2014 20-F the challenges inherent to the generics markets, including "intense competition," and the primary factors driving revenues and growth in the Company's Generic Medicines segment:

Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. … These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

576.    Teva described the following Risk Factor in its 2014 20-F related to the impact of competition in the generics market:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

577. On February 5, 2015, Teva held its Fourth Quarter 2014 and Full Year 2014 Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson were among the participants.

578. On the call, Defendant Desheh discussed the impact of the generics segment on Company revenue:

[R]evenue grew nicely in all our business activities..... The most notable contribution was generated by our Generic business, improving profitability by more than 500 basis points. The contribution of our Generic business to the growth of operating profit was nearly $500 million, increases its share of the total to 31%.

579. The May 1, 2014 Form 6-K Press Release, the May 2, 2014 Q1 2014 6-K, the May 1, 2014 earnings conference call, the July 31, 2014 Form 6-K Press Release, the July 31, 2014 Q2 2014 6-K, the July 31, 2014 earnings conference call, the September 8, 2014 J.P. Morgan Healthcare Conference call, the October 30, 2014 Form 6-K Press Release, the October 30, 2014 Q3 2014 6-K, the October 30, 2014 earnings conference call, the December 11, 2014 Business Outlook Meeting conference call, the February 5, 2015 Form 6-K Press Release, the February 9, 2015 Form 20-F, and the February 9, 2015 earnings conference call each contained each contained representations that were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive

159

market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.   In addition to these reasons, the statements concerning Teva's financial performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the above-stated collusive and/or anticompetitive conduct.   In 2014 alone, Teva's financial results were materially inflated by at least $372 million in revenue.   Furthermore, Defendants disclosures in the Forms 20-F filed during the Class Period were misleading and in violation of SEC Item 5 requirements because they did not disclose known trends, specifically the source of both (1) its inflated revenues caused by the anticompetitive and collusive conduct, and (2) that the price degradation for its generic drugs was in substantial part caused by Teva's inability to maintain the collusive prices, under pressure from regulatory investigations and other scrutiny.

### 3.    The 2015 False And Misleading Statements And Omissions

#### a)  First Quarter 2015 Investor Conference Calls

580.    On January 13, 2015, Defendant Vigodman participated in a Healthcare Conference call hosted by J.P. Morgan.   On the call Defendant Vigodman reiterated the role of the generics segment as a driver of Teva's growth:

> During 2014, we committed to improve our operating margin in generics against Q4 2013 by 600 basis points until the end of 2017. We delivered in 2014 an improvement of almost 300 basis points from 19.2% operating

margin Q4 2013 to a more than 22% operating margin in Q4 2014 and we're committed to deliver at least additional 400 basis points improvement in our operating profit during 2015, which means that Teva, by the end of 2015, will be exhausting the course of the improvement that was promised to the Street during 2014 and we'll – will do it earlier and bigger.

581.   When asked by the J.P. Morgan analyst about the ability of the generics segment to

continue margin expansion beyond 2015, Defendant Vigodman asserted that generics would drive

Teva well beyond 2015:

Yeah, so there is a strong focus today on bottom line, optimization of product and markets, decisions, product selection decisions and also basically the acceleration of FTS, strong focus on margin on profitability in a way which is manifested itself in a very clear manner.

582.   On March 3, 2015, Defendant Olafsson participated in a Healthcare Conference

hosted by Cowen & Co.   On the call, Defendant Olafsson touted Teva's improvements in the

generics segment:

So the focus when I came in was I changed the thinking.   We are running the Generics business now for the bottom line….
…
[Y]ou saw that last year we improved the bottom line by about 300 to 400 basis points.

583.   On March 12, 2015, Defendant Desheh participated in a Healthcare Conference

hosted by Barclays Capital.   On the call, the analyst from Barclays noted Teva's success in the

Generic Medicines segment and asked Desheh to discuss the "continued growth and the next stages

of operating margin improvement" and to "provide some context" as to the all of the moving parts.

In response, Desheh discussed how Teva had been able to find success in the generics market and

its efforts to continue that success:

There are a number of dimensions that makes it happen; it's not just the margin, it's also the absolute profit, which is growing and we're generating much more profit from our Generic business to the bottomline – not just about profitability, but profitability is one tool to get there. So there are a number of dimensions.

First, efficiency in production. And we are making a lot of moves and putting a lot of efforts, our cost reduction program is designed mainly to create better efficiencies in production….

The second thing is new product launches. We launched Nexium and we have a very highly profitable product. Our mix of products in generic is becoming more profitable. The third one, price increases, we see price increases, we manage it right, you have to manage it correctly, it can bounce back very, very easily, I believe that we're managing very, very responsibly, but we see some price increases that are also contributing to improvement in margins and in absolute profit.

### b) First Quarter 2015 Financial Results

584.    On April 30, 2015, Teva filed a press release on a Form 6-K with the SEC that reported the Company's first quarter 2014 financial results.  That same day, Teva filed its Q1 2015 6-K with the SEC.  Defendant Desheh signed both Forms 6-K.

585.    In the press release, Defendant Vigodman stated:

We are extremely pleased with our performance this quarter, which is truly the manifestation of our commitment to solidifying our foundation, driving organic growth and creating the most efficient operational network in the industry.  Our commitment to revitalizing our core generics business has resulted in increased revenues and profitability supported by the successful launch of generic Nexium® in the U.S.

586.    In the Q1 2015 6-K, Teva reported (1) revenue of $5.0 billion; (2) gross profit of $2.8 billion (3) net income of $444 million; (4) Generic Medicines segment revenues of $2.6 billion; (5) Generic Medicines gross profit of $1.3 billion; and (6) Generic Medicines segment profitability of $799 million for the quarter.

587.    In the Q1 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.4 billion, an increase of 37% compared to the first quarter of 2014. The increase resulted mainly from the launch of esomeprazole magnesium DR capsules (the generic equivalent of Nexium®) this quarter and from sales of other products that were not sold in the first quarter of 2014, the most significant of which was omega-3-acid ethyl esters (the generic equivalent of

Lovaza®). These increases were partially offset by declines in other products, the most significant of which was niacin ER (the generic equivalent of Niaspan®)."

588.    In the Q1 2015 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 488 million, representing 13.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

589.    On April 30, 2015, Teva held its First Quarter 2015 Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson participated in the call.

590.    During the call, an analyst from Bank of America Merrill Lynch asked "how much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?"  Olafsson responded:

> I think there's room for more, but it takes a little bit longer time.  What plays into your operating profit in generics are probably three or four things.  First of all, we have a significant improvement in our cost of goods.  I think the operation team in Teva has done an outstanding job in lowering the cost of goods, improving the quality of the supply, and really, it's my business that has benefited from that because a big portion of our volume comes straight to the generic business.  And really, we will continue that over time. …

> I think the next thing is the portfolio offering.  I think the more we have of exclusive complex generics of offering, we have a higher margin on these products.  It's simple.  So when we have more of the launches, it will drive up the market.

> The third thing is the cost infrastructure.  I think we have done a very good job in the cost infrastructure, you can see that from our gross margin versus our operating profit.…

> …[O]bviously, the big jumps of 1,000 basis points we have taken over the last 24 months, you wouldn't see that scale of improvement in the generics.

…
When you look at the top line growth, you see that already in first quarter we have improved our top line growth. That mainly comes from our new launches but also our emphasis on the branded generic markets.

### c) Second Quarter 2015 Investor Conference Calls

591.     On May 13, 2015, Defendant Desheh participated in a Healthcare Conference call hosted by Bank of America Merrill Lynch. On the call, Desheh touted the success of Teva's generics business by stating:

> First the generics business. This is nothing short of a revolution. In 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015. Our operating margin was 16.7%. It is 27%, this is full 10 percentage points improvement…. [T]he operating profit grew on profit margin, grew faster than the growth, which means that we are also reducing our expenses that are needed to drive the sale. So the improvement is not just on the margin. The improvement is also on the expense structure and how we're building the business.

592.     When asked by the Bank of America Merrill Lynch analyst "what opportunities do you have to further optimize" the generic business, Desheh responded:

> Well generic side of the house is doing very well. It has probably the best leader in the generic industry today under Siggi. Very strong management team both in Israel and Europe and in emerging markets. Production system or production network that is becoming more and more efficient all the time with a great program to reduce costs and reduce expenses. And you've seen the result. And the numbers don't lie. Where we are very successful in launching new product, in getting approval. We had our fair share, better than others over the past number of quarter.
>
> … The machine is working at a very, very high gear and high speed and is working very well.

593.     On June 11, 2015, Defendant Vigodman participated in a Goldman Sachs Global Healthcare Conference call. Vigodman kicked off the call by touting the success of the generics business:

> [W]e started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. You see the profound change in the generic business. These are things that are not confined to numbers, but

maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014.

### d)  Second Quarter 2015 Financial Results

594.    On July 30, 2015, Teva reported its financial results in a press release on a Form 6-K.  That same day, Teva filed its Q2 2015 6-K.  Defendant Desheh signed both Forms 6-K.

595.    In the press release, Defendant Vigodman stated: "Teva's second quarter solid performance was driven by important contributions from across our integrated portfolio of high-quality generic and specialty medicines…  We continue to deliver on our promise to take bold steps forward, both organic and inorganic, to position Teva for sustainable, profitable growth, execute on our strategic and operational initiatives, improve our profitability, strengthen our cash flow generation, and build the most competitive operating network in the industry."

596.    In the Q2 2015 6-K, Teva reported (1) revenue of $4.9 billion; (2) gross profit of $2.9 billion; (3) net income of $539 million; (4) Generic Medicines segment revenues of $2.5 billion; (5) Generic Medicines gross profit of $1.2 billion; and (6) Generic Medicines segment profitability of $729 million for the quarter.

597.    In the Q2 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.3 billion, an increase of 24% compared to the second quarter of 2014.  The increase resulted mainly from the at-risk launch of aripiprazole tablets (the generic equivalent of Abilify®) during the second quarter of 2015 and from sales of other products that were not sold in the second quarter of 2014, the most significant of which was esomeprazole magnesium DR capsules (the generic equivalent of Nexium®).  These increases were partially offset by declines in other products, the most significant of which was capecitabine (the generic equivalent of Xeloda®)."

598.     In the Q2 2015 6-K, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

> In the second quarter of 2015, we continued to lead the U.S. generic market
> in total prescriptions and new prescriptions, with total prescriptions of
> approximately 483 million, representing 13.5% of total U.S. generic
> prescriptions.  We seek to continue our U.S. market leadership by introducing
> new generic equivalents for brand-name products on a timely basis, with a
> focus on complex generics and other high-barrier products that we believe
> will create more value for patients and customers, our strong emphasis on
> customer service, our broad product line, our commitment to quality and
> regulatory compliance and our cost-effective production.

599.     On July 30, 2015, Teva held its Second Quarter 2015 Earnings Conference Call.

Defendants Vigodman, Desheh, and Olafsson participated in the call.  On the call, Desheh stated:

> When we look at our revenue breakdown by markets, the U.S. market is
> increasing in prominence reflecting our strong focus on U.S. Generics
> business and a record quarter for Copaxone sales in the United States.
> …
> The result of all this is a strong trend of improvement in operating margin for
> Teva over the past 18 months of almost 500 basis points in operating profit.
> And this was built upon the impressive improvement in the profitability of
> our Generic business as you can see, stepped up for around 20%, 21% a year
> ago to between 39.5% to 30% in the first half of 2015.
> …
> And for the full half, Q2 was a clear continuation of the momentum of Q1,
> resulting in a very strong first half for the year.

600.     Defendant Olafsson stated, "the Generic team at Teva, they have improved the

profitability of the Teva Generic business by approximately 1,100 basis points in two years."

### e)  Third Quarter 2015 Investor Conference Call

601.     On July 27, 2015, Teva held a call to discuss Teva's acquisition of Actavis.  On the

call, Vigodman also explained how Teva was able to achieve its acquisition of Actavis:

> Since the beginning of 2014, we have significantly solidified Teva's
> fundamentals, putting the company on a solid foot, laying the foundation for
> organic growth and also for a large transformative transaction like the one we
> announced today.  Hence, this acquisition comes at a time Teva is stronger
> than ever in both our generics and specialty businesses, and also on the
> important role our new Chairman of the Board with the entire Board of

166

Directors of Teva is playing in terms of governance alignment with the management in supported parameters to the management in the way which is manifested from the beginning of the cause we have been undergoing.

602.    Vigodman also stated that the deal with Actavis would "generate significant value for our stockholders."

603.    An analyst from Goldman Sachs asked about the view of the generic industry longer term and noted that other companies had gotten out of the business entirely or were actively looking to diversify.  Vigodman replied:

> Teva has developed during 2014 and the first half of 2015 a very strong standalone strategy, which basically is emanating from everything we have done in solidifying the foundation of the company in extending the life cycle of key specialty products in developing the [indiscernible] that we'll file for us on an organic basis – an organic move basis.  And the standalone strategy of Teva was a precondition for a transformative acquisition like the one that we have been announcing here.  It was a precondition filed there to put the company on a solid foot and as a precondition for such a transaction.  That's number one.
>
> Number two, [with the acquisition of Actavis] we see duplications, inefficiencies, overcapacity in the generic industry.  We are able to be the consolidator here.  We are able basically to eliminate inefficiencies and the overcapacity on a global scale. We are able to extract the benefits from it.

604.    An analyst from BMO Capital asked Olafsson and Vigodman about the generic market competitive landscape.  Defendant Olafsson replied, "the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio." Defendant Vigodman added, "we promise to do everything in our power to take the company to be able to continue the improvement that we have been witnessing here.  We believe in competition, and we'll do what is needed in order to win all the markets we operate."

**f) Third Quarter 2015 Financial Results**

605.    On October 29, 2015, Teva reported its financial results in a press release on a Form

6-K.  That same day, Teva filed a Q3 2015 6-K with the SEC.  Defendant Desheh signed both

Forms 6-K.

606.    In the press release, Defendant Vigodman stated:

> This was a transformative quarter for Teva as we continued to deliver on all
> financial, operational and strategic promises.  We continue to focus efforts
> on our pending acquisition of Actavis Generics … while continuing to bolster
> our specialty pipeline, especially our late-stage assets, and further evolving
> our business model to position Teva for long-term, sustainable growth …
> Through all this, we have taken great steps towards changing Teva
> profoundly, in a way that further highlights what makes us unique in this
> industry, allows us to better serve patients and enables us to provide
> significant value for all of our stakeholders.

607.    In the Q3 2015 6-K, Teva reported (1) revenue of $4.8 billion; (2) gross profit of

$2.8 billion; (3) net income of $116 million; (4) Generic Medicines segment revenues of

$2.2 billion; (5) Generic Medicines gross profit of $1.0 billion; and (6) Generic Medicines segment

profitability of $578 million for the quarter.

608.    In the Q3 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues

"amounted to $1.0 billion, a decrease of 8% compared to the third quarter of 2014.  The decrease

resulted mainly from a decline in sales of budesonide (the generic equivalent of Pulmicort®),

niacin ER (the generic equivalent of Niaspan®), capecitabine (the generic equivalent of Xeloda®)

and omega-3-acid ethyl esters (the generic equivalent of Lovaza®) due to price declines resulting

from increased competition.  These decreases were partially offset by sales of products sold in the

third quarter of 2015 that were not sold in the third quarter of 2014, the most significant of which

were esomeprazole (the generic equivalent of Nexium®), aspirin/extended-release dipyridamole

(the generic equivalent of Aggrenox®) and aripiprazole (the generic equivalent of Abilify®)."

609.    In the Q3 2015 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the third quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 481 million total prescriptions, representing 13.4% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

610.    On October 29, 2015, Teva held its Third Quarter 2015 Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson participated in the call.

611.    At the start of the call, Defendant Vigodman told investors "we are delivering on all the promises since the beginning of 2014 in a way which gains more and more momentum as we go along."

612.    Defendant Vigodman then explained how the results for the quarter show "continuous momentum that we have been building and accelerating since the beginning of 2014."

613.    Defendant Olafsson also touted the success of the Generic Medicines segment during the quarter:

> [T]he Generic business in third quarter continued to drive growth.  What wasn't in third quarter, which obviously happened first and second quarter, was there was hardly any exclusive products in the U.S., which clearly impacted our overall profitability of the Generic business, but that's to be expected. That's the nature of it….
>
> But clearly I think all the businesses are improving the profit margin….  So I'm really pleased with what we are seeing in third quarter and a very good indication for the fourth quarter.
>
> So where is the business? We really have been improving the profitability over time. You see it on the right-hand side, where we were at 16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%.

… U.S. is doing well. And it's down to the people in Teva, the employees of
Teva that have been executing extremely well on the strategy.

The second point here is about the successful launches. It's not easy in the
competition today on when we are investing in R&D like we do, we need to
have success on the other end in launching the product. 350 launches with
$1.4 billion in revenue. Some of them are very small in small markets. But
really the key launches we hit. We had a home run on the key launches.

614.   During the question and answer portion of the call, an analyst asked Olafsson for

his thoughts on potential government action to limit generic drug price increases.   Olafsson

responded:

[W]e have told you that overall on our whole portfolio, we have a decline in
price.  The talk about the inflation in generics when you have a big portfolio
is really not there. 95% of our portfolio is declining due to the consolidation
of the customers I talked about. There might be 5% of the portfolio that is
either flat or increasing in pricing due to some abnormalities in the market.

615.   The analyst asked Olafsson if he could "follow up … on what your pricing trends

are here in the U.S. for the Generics business."  In response, Olafsson stated:

So on the pricing, I think pricing is obviously based on the competition. We
have talked about that the overall pricing trend is down. What will change
that?  Obviously there is different things. I think the consolidation of the
customers affect pricing. I think the backlog when the FDA releases the
backlog of 3,000 NDA affect pricing.

616.   Defendant Vigodman also chimed in, denying that any of Teva's margin

improvements were attributable to price increases, stating:

We're very … responsible in everything that portends to prices on the
Generics side and on the Specialty side. And I would even put it another way,
all the improvements you see in our – in margins is not driven by price.  It is
driven by quantities and by mix and by efficiency measures. Not by price,
2014, 2015, and that's a very important message.

**g) Fourth Quarter 2015 Investor Conference Calls**

617.   On November 19, 2015, Defendant Desheh participated in a Global Healthcare

Conference call hosted by Jefferies LLC.

618.   On the call, the Jefferies analyst asked Defendant Desheh to "give us your 20,000 foot view on pricing" and asked "is it an issue … where do you go on pricing?"  In response Desheh provided a lengthy response:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate.
>
> Our exposure to all these things is very minimal….
>
> Generic prices.  There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States. …
>
> So it is a highly competitive environment with players coming from all over the world with a very fierce price competition.  The price of generic went down 50% over the past 10 years …
>
> So we're playing a competitive game.  We're playing it fairly.  We of course play by the book and by the rule.  And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have….
>
> But we also saw that there is a floor to this.  And the floor is a common economic and business model.  And wherever prices have come down to a level that it doesn't make sense, companies like us just pull out.  We refuse to participate in tenders that generate no profit.  And we just pull out, prices go up, because there is less supply over the demand.
>
> And we are in short playing in a very competitive market.

619.   Regarding the Actavis acquisition, Desheh stated:

> So when we look at the growth – and by the way, look at the value that is being created by generic companies over the past few years. And you see that there is a lot of business in generic. There's a lot of growth in generic. There's a lot of value to be created in generic.  And if you do it right, that's a great source for value creation.

### h)  Fourth Quarter 2015 And 2015 Full Year Financial Results

620.   On February 11, 2016, Teva filed a press release on a Form 6-K with the SEC that reported the Company's fourth quarter 2015 and full year 2015 financial results.  Defendant Desheh signed the 6-K.  On the same day, Teva filed its Annual Report on Form 20-F with the

SEC.  Defendant Desheh signed the 2015 Form 20-F on behalf of the Company and Defendants Vigodman and Desheh signed the consolidated balance sheet.

621.    In the press release, Defendant Vigodman stated: "2015 was a year of exceptional strategic, operational and financial performance for Teva.… Our strong focus on solidifying the foundation of Teva and improving the fundamentals of our business is manifesting itself in the consistent improvement of our operating and financial results."

622.    In the press release, Teva reported (1) revenue of $4.9 billion; (2) gross profit of $2.8 billion; (3) net income of $498 million; (4) Generic Medicines segment revenues of $2.3 billion; (5) Generic Medicines gross profit of $1.0 billion; and (6) Generic Medicines segment profitability of $576 million for the quarter.

623.    In the press release, Teva reported U.S. Generic Medicine quarterly "revenues of $1.0 billion a decrease of 15% compared to the fourth quarter of 2014.  The decrease resulted mainly from a decline in sales of omega-3-acid ethyl esters (Lovaza®), budesonide (Pulmicort®) and capecitabine (Xeloda®)."

624.    In the 2015 Form 20-F, Teva reported (1) revenue of $19.7 billion; (2) gross profit of $11.4 billion; (3) net income of  $1.6 billion; (4) Generic Medicines segment revenues of $9.5 billion; (5) Generic Medicines gross profit of $4.5 billion; and (6) Generic Medicines segment profitability of $2.7 billion for the year.

625.    In the 2015 20-F, Teva reported U.S. Generic Medicine 2015 revenues "amounted to $4.8 billion, up 8% compared to $4.4 billion in 2014.  The increase resulted mainly from the 2015 exclusive launch of esomeprazole (the generic equivalent of Nexium) and the launch of aripiprazole (the generic equivalent of Abilify), as well as products that were sold in 2015 that were not sold in 2014.  This increase was partially offset by lower sales of the generic versions of

Pulmicort (budesonide inhalation), Xeloda (capecitabine), Niaspan (niacin ER) and Lovaza (omega-3-acid ethyl esters)."

626.    In the 2015 20-F, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In 2015, we led the U.S. generic market in total prescriptions and new prescriptions, with approximately 473 million total prescriptions, representing 13.1% of total U.S. generic prescriptions according to IMS data. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

627.    In the 2015 20-F, Teva also described the "intense competition" the Company faced in the generic drug market in the United States and touted its strategic and "competitive advantages."  Specifically:

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

628.    The Company also described in the 2015 20-F the challenges inherent to the generics markets, including "intense competition," and the primary factors driving revenues and growth in the Company's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. … These conditions also result in intense competition in the generic market, with generic companies competing

173

for advantage based on pricing, time to market, reputation, customer service and breadth of product line. We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

629.    Teva described the following Risk Factor in its 2015 20-F related to the impact of competition in the generics market:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

630.    On February 11, 2016, Teva held its Fourth Quarter 2015 and Full Year 2015 Earnings Conference Call.  Defendants Vigodman, Desheh, and Olafsson participated in the call.

631.    Defendant Vigodman described 2015 as a "year of exceptional operational and strategic performance for Teva."  He stated that Teva delivered "record operating income, EPS and cash flow, while improving profitability margins," performance he attributed to "excellent execution in generics."

632.    Defendant Olafsson also lauded Teva's 2015 performance:

2015 was a very good year for Teva Generics. Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally. We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period.

So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

174

633.    Olafsson attempted to explain his position that pricing was not the catalyst for Teva's extraordinary 2015 results, stating:

> [W]e and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw mid-single-digit price decline for the overall business.
>
> In the U.S., our largest market, we saw approximately 4% price erosion. …
>
> Looking forward, the conjunction of price erosion with the mix changes, focus on cost structure, and the new product launches, we continue to drive our business growth, both top line and bottom line. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

634.    An analyst from Guggenheim Securities, LLC asked Olafsson to talk about pricing pressures discussed by Teva's competitors during the quarter.  Olafsson denied seeing any pricing pressure:

> [W]e didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.  Some of our competitors have seen more pressure. I think overall, it might have to do with some dosage form differences. But also I think we have been right in adjusting the business.

635.    An analyst from Susquehanna Financial Group asked Olafsson to talk about relationships with customers, specifically what impact the pending Actavis deal was having on pricing.  In response, Olafsson  stated:

> We will pride ourselves of the service level of the high quality of the product. But at the end of the day, there is a fierce competition in the market. Over 200 generic companies, and really there is no bundling or anything like that, that can go on in the market. So overall, same as without the deal. But we see the opportunity going forward based on the huge pipeline that we have.

636.    Olafsson also stated that the U.S. generics business had been "stable over the year" adding "[t]here is a lot of competition in the US, there is no question about it.  As you well know, there are over 200 generic competitors in the market and the competition is fierce."  Olafsson

claimed Teva's competitive advantage was having "the largest [drug] pipeline" and "an extremely good supply chain."

637.   The Investor Slides presented during the call contained the following statements attributed to Olafsson: "Do not see the inflationary pricing discussed in the media[.] Also do not see the sharp drop in prices other competitors have seen recently[.] Mid-single digit increases in 2014[.] Expect 2016 to maintain the current trend."

638.   The January 13, 2015 J.P. Morgan Healthcare Conference call, the March 3, 2015 Cowen & Co. Healthcare Conference call, the March 12, 2015 Barclays Healthcare Conference call, the April 30, 2015 Form 6-K Press Release, the April 30, 2015 Q1 2015 6-K, the April 30, 2015 earnings conference call, the May 13, 2015 Bank of America Merrill Lynch Healthcare Conference call, the June 11, 2015 Goldman Sachs Global Healthcare Conference call, the July 30, 2015 Form 6-K Press Release, the July 30, 2015 Q2 2015 6-K, the July 30, 2015 earnings conference call, the July 27, 2015 Acquisition of Allergan Generics [Actavis] by Teva Conference call, the October 29, 2015 Form 6-K Press Release, the October 29, 2015 Q3 2015 6-K, the October 29, 2015 earnings conference call, the November 19, 2015 Jefferies LLC Global Healthcare Conference call, the February 11, 2016 Form 6-K Press Release, the February 11, 2016 Form 20-F, and the February 11, 2016 earnings conference call and Investor Slides each contained representations that were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and

breadth of product line, but instead preserved Teva's market share volume and inflated pricing in

the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary

price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in

a lawful or sustainable business strategy; (v) were reporting financial results that were the result

of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the

anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from

the collusive anticompetitive behavior.  In addition to these reasons, the statements concerning

Teva's financial performance were false and misleading in that they purported to comply with

GAAP because they failed to properly recognize and record revenue that was subject to the above-

stated collusive and/or anticompetitive conduct.  In 2015 alone, Teva's financial results were

materially inflated by at least $372.6 million in revenue.  Furthermore, the Forms 20-F filed during

the Class Period were misleading and in violation of Item 5 requirements because they did not

disclose known trends, specifically the source of both (1) its inflated revenues caused by the

anticompetitive and collusive conduct, and (2) that the price degradation for its generic drugs was

in substantial part caused by Teva's inability to maintain the collusive prices, under pressure from

regulatory investigations and other scrutiny.

### 4.     The 2016 False And Misleading Statements And Omissions

#### a)  First Quarter 2016 Investor Conference Calls

639.    On January 11, 2016, Defendants Vigodman and Olafsson participated in a

Healthcare Conference call hosted by J.P. Morgan.  During the question and answer portion of the

call, the analyst from J.P. Morgan asked Olafsson to comment on generic pricing for 2016 and

beyond.  Olafsson answered:

> [T]here's a lot of talk about inflations in generic pricing. But what we see is
> there's -- overall on our total portfolio of 270 products, there is a slight
> decrease in pricing. It's low single digit, but year on year we see a low single-

digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase. So, overall, we see that in the business.

There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today -- as I said, 270 products for the whole of the portfolio -- there is a decline.

640.    Defendant Vigodman also stated:

So in 2013, basically the generic business, our operating profit before G&A of the generic business accounted for 25% of the combined operating profit of Teva, which was $1.6 billion. In 2015, it will be in the neighborhood of $2.7 billion, accounting for 35% of the combined higher operating profit versus 2013. In 2016, it will account for 55%, even more of the higher, including after the integration with Allergan generics.  And then just the generic business, which is basically -- which has been transformed profoundly.

641.    On March 8, 2016, Defendant Olafsson participated in a Healthcare Conference call hosted by Cowen & Co.

642.    On the call, Olafsson said the following about pricing.

So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015. …

I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing. But we never saw that. That was an individual molecule basis, they used example of products that really were not generic products, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business. And there has been a decline there.

…So as of today, I came out with 4% [price erosion] in 2015. As of today, I don't see any big changes in the pricing environment.  It's relatively stable. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014.  But overall, these are the three things that affect the price. And there's nothing on the horizon that should affect the pricing as of today.

643.    Defendant Olafsson also discussed profitability growth in the generic business:

[I]n terms of growth, how I think about growth is there are three buckets that come into growth. First of all it's the pricing. And we talked about in the US price erosion of approximately 4%.

The second thing is around the volumes. And usually in the generic space, especially for a big company like us, the movement in volume is usually not very much, maybe a decline approximately 1%, maybe 1.5%.  Because if you build into your model an increase in base business volume that will cost you on the pricing side.  So we keep that at 4% roughly on the pricing, 1% to 2% on the volume.  And how you grow your business is with new products.

And in terms of new products, with the pipeline that we have in place in the combined company …we are very comfortable on at least a 10% growth of new launches every year. So when you build that all together, that's why we have been guiding the generic business to grow mid-single digits, both top line and bottom line. …

In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue.  So it was a significant improvement over a 24-month period.  Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

### b)  First Quarter 2016 Financial Results

644.    On May 9, 2016, Teva filed a press release on a Form 6-K that reported the Company's First Quarter 2016 financial results.  That same day, Teva filed its Q1 2016 6-K with the SEC and held an Earnings Conference Call.  Defendant Desheh signed both Forms 6-K and Defendants Vigodman and Desheh signed the consolidate balance sheet in the Q1 2016 6-K.

645.    In the press release, Defendant Vigodman stated: "We start 2016 with solid performance across the business, strong financial results and the achievement of several key milestones.  Generics remains a core contributor to our performance despite no major launches in the U.S. this quarter as we had in the first quarter 2015 with continuous operational and financial improvement across the business."

646.    In the Q1 2016 6-K, Teva reported (1) revenue of $4.8 billion; (2) gross profit of $2.8 billion;  (3)  net  income  of  $633 million;  (4)  Generic  Medicines  segment  revenues  of

$2.2 billion; (5) Generic Medicines gross profit of $999 million; and (6) Generic Medicines segment profitability of $584 million for the quarter.

647.    In the Q1 2016 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $976 million, a decrease of 32% or of $463 million, compared to the first quarter of 2015. The decrease resulted mainly from a decline in sales of $427 million due to the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®) and budesonide (the generic equivalent of Pulmicort®) as well as a decline in sales of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) and capecitabine (the generic equivalent of Xeloda®) due to increased competition. These decreases were partially offset by sales of products sold in the first quarter of 2016 that were not sold in the first quarter of 2015, the most significant of which were aripiprazole (the generic equivalent of Abilify®) and aspirin/extended-release dipyridamole."

648.    In the Q1 2016 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 463 million total prescriptions, representing 12.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

649.    On May 9, 2016, Teva held its First Quarter 2016 Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson participated in the call.

650.    During the call, Defendant Vigodman discussed the generics business quarterly performance and the future:

> EPS for Q1 2016 is $1.20, at the top end of our quarterly guidance. We have improved our profitability, profit margin by 144 basis points, and operating

margin by 101 basis points. Cash flow from operations in the quarter was a robust $1.38 billion. Our solid performance was driven by continual improvement of our core business, with a strong focus on profitability, cost control, and portfolio optimization.

…

Our global generics business generated 26.9% operating margin in the quarter, without major new launches in the US and other key markets.…

651.    Defendant Desheh stated:  "Generic sales accounted for 45% of total sale, as a result of the loss of exclusivity in the US. Copaxone sales were 21% of total, 1% higher than in full-year 2015."

652.    Defendant Olafsson also discussed pricing on the call:

The global generic drug market has no shortage of manufacturers supplying vital medicines to patients in the US and around the world.… As you know, in February, during the fourth-quarter reporting season, several industry participants referenced a tougher pricing environment than what they have experienced in previous years, as a reason for the softness in their respective generic businesses. Now, we fast-forward to April and May, to a new reporting season, and we find the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate. The referencing of generic drug price deflation has not been limited to the manufacturers, but is also being cited by those on the purchasing and distribution side, leaving many to wonder about what is the real opportunity in generics.

As always, I will do my best to provide you with as much color as possible on what Teva is experiencing, in regards to pricing and volume; and more importantly, where we are headed. Throughout the ongoing debate this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.  Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same. In fact, Allergan, and Mylan, two other companies with broad and diversified portfolios and high quality products, have also reported similar trends. From where I sit today, there is nothing that changes my mind about that. Nothing has happened in the last two quarters that has changed the pricing environment. What this boils down to is each individual company's business model …

Additionally, we have heard from many of the companies in this sector that consolidation of the customers is having an impact on the pricing environment. Of course, this consolidation creates pressure on generic

manufacturers, but there has been no meaningful change in the last two quarters. We believe we have already reached a new status quo with the big customers; the fees and charges resulting from the customer consolidations are more or less already built into the pricing of the products when most of the consolidation took effect 24 months ago.

653.    At one point during the call, Olafsson rhetorically asked, "why is Teva different? Why is our performance better than most generic companies? Why are other companies continuing to say, there is pricing pressure greater than what we at Teva are seeing?" He then answered:

I see three reasons: first, the companies with older portfolio seemed to complain much more loudly. What I mean by that is, that if you look carefully at some companies with older portfolios, they will tell you that the pricing environment is worsening. But this is not an environment. This is purely a reflection of their portfolios, some of which are concentrated in one, or very few, therapeutic classes that are experiencing normal competition. This takes me to the second factor, new product launches. When companies don't have new product launches, and the business is declining, they tend to talk about the market more than anything else. This is not a reflection of the environment, but rather again, a reflection on a company's portfolio.

The third factor is companies that are trying to grow their market share. Some companies are aggressive in going after market share for a variety of reasons, including to utilize excess capacity with relatively cheap volume. But in order to do that, you'll have to drive down price. Buying new market share in price will cost you on the bottom line. We, on the other hand, are seeing our volumes go down, deliberately, net-net approximately 1% a year, because we think that is better for our business, and we would rather reduce capacity, than fill it with less profitable products. So if you look at this slide, you'll see that over the past few years, we discontinued 70 products. At the same time, we introduced 68 new ones in the US.

654.    Defendant Olafsson made additional statements on the call about pricing in the generics business, stating:

[I]t's difficult to comment on the long term pricing. But maybe we can think about, what are the factors that play into pricing. So it's obviously, it has to do with competition in the market. We know, if we look at the US market, there's 230 generic companies that are competing, so the competition is fierce.

Secondly, its impacted by the new approvals by the FDA. The FDA has been approving more products, and it's impacted obviously by consolidation of the customers.

655.    An analyst from Goldman Sachs noted that he was hearing about "worsening generic drug price deflation" from drug makers and asked "what is the attractive investment thesis for being the largest generic drug company in the world?"  Defendant Olafsson replied:

> So first of all … why we are saying the 4%.  It's basically due to our portfolio, because we are not operating -- we have approximately 375 products on the US market. We have a good understanding. We also walk away when the competition is too fierce on a product. We are not trying to grow our market share, which affects the 4% market share

656.    Olafsson then discussed what Teva's competitors were saying about pricing in the generic market:

> [O]ne investor asked me is, are you the only good house, in a really bad neighborhood? And I don't think that's it, because I think the other houses are blaming the neighborhood for their maintenance issues. They are working with leaking houses, and it has to do with renewal of the portfolio, of lack of investment in generic R&D. That keeps you growing the business, because that is the key at the end of the day. So I don't think you can look at companies, different companies, and say if company A is experiencing 7% price erosion, that should be the market norm. You have to look at it differently for a company that has a big portfolio, strong new product launches, a differentiated portfolio, and a high quality portfolio.

657.    An analyst from BTIG asked if Teva still thinks the purchase price for Actavis set in July 2015 is still a fair price, in light of the last 9-12 months in the generic market, including a "resetting of valuations."  Vigodman replied:

> The answer is absolutely yes. The strategic value of the deal … that was when we announced the deal. We have the opportunities in that US generic market, and in the global generic space are huge.  And we strongly believe, that with everything that we are witnessing now, our opportunities for Teva are even bigger, compared to basically where when we announced the deal. So for us, what we're creating in here, is a very unique platform, with the same at least the same strategic value that we alluded to when we announced the deal.  And at the end of the day, it is also about the economics. And from all of the messages that we are conveying in here, we strongly believe that we will be able to generate the economics that we promised.

658.    When asked by a Deutsche Bank analyst "what type of info are you getting from Allergan." Olafsson responded:

> [W]e are competitors in the market. We have to be very careful. We cannot exchange any information. We are competing very forcefully in the market until closing.

659.    The May 9, 2016 Investor Slides presented during the conference call contained the following statement, attributed to Olafsson: "What has changed in the US pricing environment since Q4 2015? The short answer is…nothing We still expect 4% price erosion on our portfolio." The Investor Slides also contained the statement: "There is no change in the pricing environment [.]  It all comes down to each company's business model[.]"

### c)  Second Quarter 2016 Investor Conference Calls

660.    On May 10, 2016, Olafsson participated in a Healthcare Conference call hosted by Bank of America Merrill Lynch.  On the call, Olafsson discussed the results from the first quarter and the pricing environment in the generics market:

> Teva obviously being a specialty company, offering both a branded pharmaceuticals and generics, I think puts us in the, right in between, in the ideal space where I think the most growth will be going forward.  We had our earnings call yesterday.  I think we have a very good first quarter, which was a sign of a good year.  I mentioned on that call, and want to reemphasize here, there's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%.  We guided the market that we would see the same pricing of approximately deflation of 4% in 2016.  And where I sit today, there is no change to that.
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity. And this doesn't only apply to the generic business, but also to the specialty business.

661.    Regarding pricing and competition, Olafsson stated:

> You have to keep in mind that in the US generic space there's approximately 230 competitors. Two hundred and thirty generic companies in the US that are offering products. So the competition is heavy. So if you show that you grow 3%, let's say 3% volume year-on-year, that will cost you on pricing.

There's no question about it. So that's why I'm highlighting that. In Teva world, we assume approximately 1% decline in the volume to maintain the pricing. So it's not that we are the only good house in the neighborhood, and I don't think this is a bad neighborhood, I think it's a good neighborhood. It's unique. To maintain your business you need to think about the future. And I think that's at the end of the day what differentiates us.

662.     On June 3, 2016, Defendant Vigodman participated in a Sanford C. Bernstein Strategic Decisions Conference.  On the call,  Defendant Vigodman also discussed pricing:

[W]e are very consistent. Our message was conveyed, and we will continue to convey.  What we see is a 4% to 5% erosion.  That's what we see.  That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that. And with basically our operating profits towards one of the (inaudible) in our history on kind of a naked basis, so generic business in the US without launches. So, in this respect, we are very continuing with our messages, and that's what we continue seeing.

663.     On June 8, 2016, Defendant Olafsson participated in a healthcare conference hosted by Goldman Sachs.  On the call, Olafsson discussed price erosion over time:

When we signed that [Actavis] deal in July, we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business. And we can talk about that later, how we look at it versus others.  But really the fundamental -- so what has changed in the market is that currently the multiples for generic companies, Mylan and us, has been dragged down, I think, due to other companies in the market partly, due to Valeant, due to Endo, due to comments that were made in Perrigo and Mallinckrodt about the generic business, which has affected the whole industry.

### d)  Second Quarter 2016 Financial Results

664.     On August 4, 2016, Teva announced its financial results in a press release on Form 6-K.  That day, Teva also filed its Q2 2016 6-K.  Defendant Desheh signed both Forms 6-K and Defendants Vigodman and Desheh signed the consolidated balance sheet in the Q2 2016 6-K.

665.     In the Q2 2016 6-K, Teva reported (1) revenue of $5.0 billion; (2) gross profit of $2.9 billion; (3) net income of $242 million; (4) Generic Medicines segment revenues of

$2.3 billion; (5) Generic Medicines gross profit of $1.1 billion; and (6) Generic Medicines segment profitability of $614 million for the quarter.

666.    In the Q2 2016 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.9 billion, a decrease of 32% compared to $2.8 billion in the first six months of 2015. The decrease resulted mainly from the loss of exclusivity on aripiprazole (the generic equivalent of Abilify®) and esomeprazole (the generic equivalent of Nexium®) as well as a decline in sales of budesonide (the generic equivalent of Pulmicort®)."

667.    In the Q2 2016 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the second quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 446 million total prescriptions, representing 12.1% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our recent acquisition of Actavis Generics, which will substantially expand our generics operations and pipeline.

668.    In the Q2 2016 6-K, Teva stated that:

> On June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. On July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations. Teva is cooperating fully with these requests.

669.    On August 4, 2016, Teva held its Second Quarter 2016 Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson participated in the call.

670.   On the call, Defendant Desheh began the call by discussing the quarterly performance, stating:

> Exchange rates reduced revenues by $141 million compared to Q2 2015. Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year. This was compensated by the performance of our global generic and OTC business, strong sales of Copaxone, and our specialty-product portfolio.

671.   An analyst from Citigroup asked Olafsson to talk about "pricing stability" in light of Teva's U.S. generic revenues coming in "a little lower than expectations."  Olafsson responded:

> I think, first of all, it's the old story in the generic business, and we have talked about it many times. It's the short-term volatility, but a long-term profitability that we are seeing in the generic business. I think on the US side, clearly the impact we highlighted, the impact of having a competition on Aripiprazole, Esomeprazole, and Budesonide was very, very significant. I think overall, the underlying business did well.
> …
> In terms of the pricing, the pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter.

672.   Regarding competition in the generics business, Olafsson stated "competition is fierce" in the United States and "[t]here's no question about it."

673.   An analyst from J.P. Morgan asked Olafsson about "price opportunities" on the combined [Teva-Actavis] generic portfolio.  Olafsson responded:

> On the pricing, as you know, and we know that, the size really doesn't affect the pricing.  And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing.  I think the pricing comes with shortages in the market.  If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out.  But overall, the size, and being a combined company doesn't play into that.  I feel quite strongly about that.

### e)  Third Quarter 2016 Investor Conference Calls

674.    On July 13, 2016, Teva held a Preliminary Outlook for 2016-2019 Investor Call.

Defendants Vigodman, Desheh, and Olafsson participated in the call.  Vigodman explained the

reason Teva decided to hold the Preliminary Outlook call.  He stated:

> [W]e are closely monitoring the corporate bond markets and given various
> attractive term currently prevailing there, we are considering accelerating our
> planned debt offering.

675.    On the call, Vigodman touted Teva's "solid first quarter in 2016."

676.    During the question and answer portion of the call, an analyst from Citigroup asked

Olafsson to "comment on the generics pricing assumptions that you have baked into your forecast"

and to "comment on the generics pricing environment."  Olafsson replied:

> Our assumption and what we assume is basically approximately 5% organic
> growth that we see year on year. That matters with the formula I gave you at
> the earnings call earlier this year -- are we assuming the same pricing of
> minus 4% or is it minus 5%? It really doesn't matter what we say. It is net-
> net when we have the new launches, minus the price erosion, minus any
> volume decline, we are seeing approximately 5% growth year on year.
>
> In terms of generic pricing in the second quarter, we saw no change in the
> pricing. We saw a stable environment, as we talked about, from first quarter
> into second quarter. Obviously, in second quarter, as we have highlighted to
> investors, there was no significant new launches that we saw in Teva, which
> obviously impacts the overall generic numbers. The pricing has remained
> stable.

677.    Later on the call, Olafsson reiterated:

> In the second quarter, we have a stable pricing environment; there was no
> significant change in the pricing. I think the opportunity, obviously, coming
> into 2017 … and this is what we want to speak to investors when we have
> closed the deal, is to give you a glimpse and a lifted look into the combined
> pipeline of Teva, and Actavis Generics in the new Teva.

678.    Further, with the above-quoted statements regarding pricing as a basis, as part of

the 2016-2019 Preliminary Financial Outlook investor presentation during the call, Teva provided

the following guidance for 2017: revenues of $25.2 - $26.2 billion; operating income of $8.9 - $9.5

billion; EBITDA of $9.5 - $10.3 billion; EPS of $6.00 - $6.50; and cash flow from operations of

$7.0 - $7.6 billion.

679.    On September 7, 2016, Defendant Desheh attended a Healthcare Conference call

hosted by Wells Fargo Securities.  On the call, Desheh discussed pricing, stating:

> Now, with talking about prices of the base business, product that we've been
> selling more than two years already, the prices are very stable there. Might
> even go up a little bit here and there, depending on demand and supply, and
> demand and availability of competing products in the market, but you don't
> see -- there you don't see the erosion. Where we see erosion is that you know,
> you have six months exclusivity, you start with the high price, and then
> obviously more competitors go into the market and the price goes down. But
> when we look at the base, there's no -- there's no pressure on prices.

680.    On September 9, 2016, Teva held a Generic Medicines Overview call with

Vigodman, Olafsson, and many high level employees in Teva's Generic Medicines segment

participating.  Vigodman kicked off the call by discussing the transition in generics:

> The generic industry is one of the most attractive industries in the world. In
> terms of growth rates, growth prospects, profitability 25% EBITDA on
> average. Return to investors.… Teva is ideally positioned to realize the
> opportunities that the global and US generic markets offer to us.

681.    On the call, Defendant Olafsson made multiple statements about pricing in the

generic markets.  First, he stated:

> There is no inflation in the generic pricing.
> …
> So what is the secret sauce? It's not very complex. This has been the same
> winning formula I have talked about many, many times. Really to be top
> three in the market is so important.
> …
> I think what I want to highlight is there will always be cycling of the pricing
> of generics. I have in my career, 23 years, never seen a real inflation. I
> mentioned to some of you before, I have been in the market where price
> declines was approximately 1% to 2%, probably 2%, and I've been in the
> market in 2006 and 2007 when the price decline was 7%, 8%. And then it's
> everything in between.
>
> So far, what we saw in the end of second quarter was approximately 4% in
> the US and 5% global. So, there will be a fluctuation, and obviously, it will

affect every generic Company. But the message I want you to take from this slide is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down.

682.    Regarding industry talk about price inflation, Olafsson stated, "people that say that the generic - there's a big generic price inflation, are simply wrong."

683.    During the question and answer portion of the call, an analyst from Goldman Sachs noted there had been speculation that Teva was not raising prices during the approval process for the Actavis deal.  He then asked Olafsson if he expected the "landscape in terms of pricing to change at all, now that the deal is closed."  In response, Olafsson stated:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.
>
> Remember that there's 208 generic companies out there that are offering product, and an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price.  So it's a very competitive business we're in. I think overall, obviously, we look at each opportunity, but we come back to what Andy said and he will say it better, is we have an opportunity to work with it. We have a broader portfolio now.

684.    The Investor Slides presented during the call contain statements related to pricing pressures in the Generics market attributed to Olafsson.  He stated: "Generic Price erosion varies year-to-year" and "Chasing market share will destroy value."  He then lists Teva's advantages: "Price challenges are product specific – a broad diverse portfolio mitigates risk[;] Strong understanding of the market[;] Offering differentiated products – lower competition, durability[;] Competitive cost position[;] Industry leading pipeline – customers want access to our new products which brings them value."

685.    The slides also contain the statement attributed to Olafsson that: "Price erosion is nothing new."  He then lists how Teva is positioned to succeed in the market: "Teva operations is

a competitive advantage and capable of creating additional value[;] Allows Reva to maximize the value of the best R&D engine in the industry[;] Diverse portfolio and competitive cost structure allows for long-term value creation."

### f)  Actavis Acquisition

686.    On August 2, 2016, Teva published a press release to announce to completion of the acquisition of Actavis.  In the press release, Vigodman declared that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever – in both our generics and specialty business."

### g)  Third Quarter 2016 Financial Results

687.    On November 15, 2016, Teva reported its financial results in a press release on Form 6-K.  That day, Teva filed its Q3 2016 6-K.  Defendant Desheh signed both Forms 6-K and Defendants Vigodman and Desheh signed the consolidate balance sheet in the Q3 2016 6-K.

688.    In the Q3 2016 6-K, Teva reported (1) revenue of $5.6 billion; (2) gross profit of $2.8 billion;  (3)  net  income  of  $410 million;  (4)  Generic  Medicines  segment  revenues  of $2.9 billion; (5) Generic Medicines gross profit of $1.5 billion; and (6) Generic Medicines segment profitability of $867 million for the quarter.

689.    In the Q3 2016 6-K, Teva reported U.S. Generic Medicine quarterly revenues of "$1.3 billion, an increase of $261 million, or 25%, compared to the third quarter of 2015.  The increase  resulted  mainly  from  the  inclusion  of  two  months  of  Actavis  Generics  revenues  of approximately  $538 million,  partially  offset  by  loss  of  revenues  following  our  divestment  of certain products in connection with the acquisition, a decline in sales of budesonide (the generic equivalent  of  Pulmicort®)  due  to  increased  competition  and  the  loss  of  exclusivity  on esomeprazole (the generic equivalent of Nexium®)."

191

690.    In the Q3 2016 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the third quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 634 million total prescriptions, representing 16.6% of total U.S. generic prescriptions, of which approximately 4% (net of divestiture impact) was from Actavis Generics.  We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our recent acquisition of Actavis Generics, which has substantially expanded our generics operations and pipeline.

691.    In the Q3 2016 6-K, regarding the subpoenas received from the DOJ and the Connecticut AG, Teva stated: "Teva is not aware of any facts that would give rise to an exposure to the company with respect to these subpoenas."

692.    On November 15, 2016, Teva held its Third Quarter Earnings Conference Call. Defendants Vigodman, Desheh, and Olafsson participated in the call.

693.    Defendant Vigodman discussed the news of the DOJ Investigation:

> Finally, I cannot conclude this part of my remarks without briefly addressing the US Department of Justice investigation into price collusion in the generic drug industry, which has been in the news this month.  I would like to emphasize that based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation.

694.    Defendant Olafsson then discussed the generics business results for the quarter

> This quarter was one of monumental change for Teva's global generic medicines business. On August 2, we completed the strategic acquisition of Actavis generics. The result is a much stronger, more competitive Teva that is best positioned to thrive in an evolving global generics marketplace.
> …
> This quarter, the price erosion on our US-based business was approximately 7% versus a year ago.  This is slightly higher than our expectation going into the quarter, with a key driver being increased price pressure on select

192

products as we divested some of the Teva/Actavis overlaps, and they transitioned to the new owners.

… Despite this, we are very confident that the price erosion we experienced in the US will continue to be in the mid single-digits as we have guided throughout the year.

As we have shared in the past, our broad portfolio, strong pipeline of new launches, and the durability of our more differentiated products continues to set Teva apart from many in the industry. Compared to third quarter 2015 and adjusted for divestiture, Teva standalone global generics business is down approximately $30 million in revenue.  With very few product launches in the quarter, that's a really good result, and shows the strength of our underlying business.

695.    An analyst from Credit Suisse asked:

[J]ust around your comments you made around generic drug pricing, you mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward. So can you just maybe provide a little bit more insight, there's obviously an area that there's a lot of investor focus, just what gives you the confidence that what's going to happen in the coming quarters will be different than what you saw this quarter?

Olafsson responded:

Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

696.    Then, an analyst from Morgan Stanley asked:

The Company hosted a very bullish generics meeting in early September, yet generics are disappointing, and the guidance is coming down. And so, could you just talk us through a little bit more detail on what you weren't aware of in early September, and how we should think about the prospects for the generics business going forward?

Olafsson answered:

So first of all, I'm as bullish on the generic business today as I was on September 9 for sure.  I think the volatility you see between months, between quarters, you -- I think we all recognize that, that the volatility of new launches between quarters and between years has a significant impact,

especially on the US business. The price erosion in the US is similar to what we expected in September. The impact on the divested product was a little bit more.

I think the guidance on how we see the pricing environment is very similar as we guided to in our meeting, the difference being is basically the new launches.
…
I think what we are saying here is, we didn't get the big approvals that we expected in third quarter. We don't foresee them in fourth quarter, and then we are building the plan for 2017. But I'm as bullish of seeing the mid single-digit growth as before.

697.    An analyst from RBC Capital Markets then pointedly asked, "[w]hat's changed since - from July, when you looked at the business, and provided that three year guidance…?" Olafsson replied, "[w]hat has brought the numbers lower than we thought in July 2016 are the revenue from the new launches.  That's very, very simple."

698.    An analyst from Wells Fargo asked Olafsson if he was saying that "the acceleration in the price decreases … this past quarter aren't a result of increased competition … and … not a result of having to tame previous price increases, or give back some of those?"  Olafsson answered:

No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio.  So there was an instability that happened in the market during the month of August, when the new owners were taking market share.

### h)  Departure Of Defendant Olafsson

699.    On December 5, 2016, Teva issued a press release on a Form 6-K filed with the SEC announcing that Defendant Olafsson was officially "retiring" from the Company.

### i)  Fourth Quarter 2016 And 2016 Full Year Financial Results

700.    On February 13, 2017, Teva filed a press release on a Form 6-K with the SEC that reported the Company's fourth quarter 2016 and full year 2016 financial results.  Defendant

Desheh signed the 6-K.  Two days later, on February 15, 2017, Teva filed its Annual Report on Form 20-F with the SEC.  Defendant Desheh signed the 2016 20-F on behalf of the Company, and Defendants Desheh and Peterburg signed the consolidated balance sheet.

701.    In the press release, Teva reported (1) revenue of $6.5 billion; (2) gross profit of $3.4 billion; (3) net income loss of ($974 million); (4) Generic Medicines segment revenues of $3.7 billion; (5) Generic Medicines gross profit of $1.8 billion; and (6) Generic Medicines segment profitability of $1.0 billion for the quarter.

702.    In the press release, Teva reported U.S. Generic Medicine quarterly "revenues of $1.4 billion, an increase of 40% compared to the fourth quarter of 2015, mainly due to the inclusion of Actavis Generics with revenues of $630 million."

703.    In the 2016 Form 20-F, Teva reported (1) revenue of $21.9 billion; (2) gross profit of $11.9 billion; (3) net income of  $311 million; (4) Generic Medicines segment revenues of $12.0 billion; (5) Generic Medicines gross profit of $5.7 billion; and (6) Generic Medicines segment profitability of $3.3 billion for the year.

704.    In 2016 20-F, Teva reported U.S. Generic Medicine revenues were $4.6 billion, a decrease of 5% compared to $4.8 billion in 2015.  The decrease resulted mainly from the loss of exclusivity on esomeprazole (the generic equivalent of Nexium) and aripiprazole (the generic equivalent of Abilify), a decline in the sales of budesonide (the generic equivalent of Pulmicort) due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine (the generic equivalent of Xeloda).  This decrease was partially offset by the inclusion of five months of Actavis Generics revenues of approximately $1.2 billion and revenues from products that were not sold in 2015."

705.   In the 2016 20-F, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

> In 2016, we led the U.S. generic market in total prescriptions and new
> prescriptions, with approximately 613 million total prescriptions,
> representing 16.0% of total U.S. generic prescriptions according to IMS data.
> We seek to continue our U.S. market leadership based on our ability to
> introduce new generic equivalents for brand-name products on a timely basis,
> with a focus on complex generics and other high-barrier products that we
> believe will create more value for patients and customers, our strong
> emphasis on customer service, the breadth of our product line, our
> commitment to quality and regulatory compliance and our cost-effective
> production, including through our recent acquisition of Actavis Generics,
> which has substantially expanded our generics operations and pipeline.

706.   In the 2016 20-F, Teva also described the "intense competition" the Company faced

in the generic drug market in the United States and touted its "strategic" and "competitive

advantages."  Specifically:

> In the United States, we are subject to intense competition in the generic drug
> market from domestic and international generic drug manufacturers, brand-
> name pharmaceutical companies through lifecycle management initiatives,
> authorized generics, existing brand equivalents and manufacturers of
> therapeutically similar drugs. Price competition from additional generic
> versions of the same product typically results in margin pressures. We believe
> that our primary competitive advantages are our ability to continually
> introduce new and complex generic equivalents for brand-name drug
> products on a timely basis, our quality, our customer service and the breadth
> of our product portfolio.

707.   The Company also described in the 2016 20-F the challenges inherent to the

generics markets, including "intense competition," and the primary factors driving revenues and

growth in the Company's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and
> acceptance on the part of healthcare insurers and institutions, consumers,
> physicians and pharmacists globally. … These conditions also result in
> intense competition in the generic market, with generic companies competing
> for advantage based on pricing, time to market, reputation, customer service
> and breadth of product line…. We believe that our robust product pipeline,
> which has been enhanced with the Actavis Generics business, and ability to

continuously launch new products are critical to our growth in the face of continuing price erosion expected in the generics market.

708.    Teva described the following Risk Factor in its 2016 20-F related to the impact of competition in the generics market:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

709.    On February 13, 2017, Teva held its Fourth Quarter 2016 and Full Year 2016 Earnings Conference Call.  Defendants Desheh, Peterburg, and Bhattacharjee participated in the call.

710.    Defendant Desheh discussed the quarterly results:  "On a GAAP basis, the quarter resulted in a loss of $973 million, due to a significant number of one-time charges."

711.    Defendant Bhattacharjee discussed the performance of the generics business, stating:

> So in terms of the performance of the generics business, as to how we look at it, the growth of generics business will be dependent on three factors, especially in relation to the US business. The first is the flow of new product launches. The second is the impact of transition products, which are products that have recently lost exclusivity, and the third is price erosion of our base business.
>
> As I have described in past discussions, in the US we expect net price erosion in our base business to be around 5%.

712.    The January 11, 2016 J.P. Morgan Healthcare Conference, the March 8, 2016 Cowen & Co. Healthcare Conference, the May 9, 2016 Form 6-K Press Release, the May 9, 2016 Q1 2016 6-K, the May 9, 2016 earnings conference call and associated Investor Slides, the May 10, 2016 Bank of America Merrill Lynch Healthcare Conference call, the June 3, 2016

Sanford C. Bernstein Strategic Decisions Conference call, the June 8, 2016 Goldman Sachs Healthcare Conference call, the August 2, 2016 Press Release "Teva Completes Acquisition of Actavis Generics," the August 4, 2016 Form 6-K Press Release, the August 4, 2016 Q2 2016 6-K, the August 4, 2016 earnings conference call, the July 13, 2016 Preliminary Outlook for 2016-2019 Investor call, the September 7, 2016 Wells Fargo Securities Healthcare Conference call, the September 9, 2016 Generic Medicines Overview call and associated Investor Slides, the November 15, 2016 Form 6-K Press Release, the November 15, 2016 Q3 2016 Form 6-K, the November 15, 2016 earnings conference call, the December 5, 2016 Form 6-K press release announcing the departure of Defendant Olafsson from Teva, the February 13, 2017 Form 6-K Press Release, the February 15, 2017 Form 20-F, and the February 13, 2017 earnings conference call each contained representations that were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.  In addition to these reasons, the statements concerning

Teva's financial performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the above-stated collusive and/or anticompetitive conduct.   In 2016 alone, Teva's financial results were materially inflated by at least $171.3 million in revenue.   Furthermore, the Forms 20-F filed during the Class Period were misleading and in violation of Item 5 requirements because they did not disclose known trends, specifically the source of both (1) its inflated revenues caused by the anticompetitive and collusive conduct, and (2) that the price degradation for its generic drugs was in substantial part caused by Teva's inability to maintain the collusive prices, under pressure from regulatory investigations and other scrutiny.

713.    In addition, statements made on the July 13, 2016 Preliminary Outlook for 2016-2019 Investor Call were also materially false and misleading because the Exchange Act Defendants omitted the material facts that: (1) on June 21, 2016 they received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain generic products as well as communications with competitors about those products and (2) just one day earlier, on July 12, 2016, they received a subpoena from the Connecticut AG seeking documents and information relating to potential state antitrust law violations.

714.    Finally, statements made in the August 4, 2016 Q2 2016 6-K, on the August 4, 2016 earnings conference call, the September 7, 2016 Wells Fargo Securities Healthcare Conference call, and the September 9, 2016 Generic Medicines Overview call were also false and misleading because the Exchange Act Defendants falsely stated that they received a subpoena from the DOJ on June 21, 2015 when, in fact, they received the subpoena on June 21, 2016.

### 5.    The 2017 False And Misleading Statements And Omissions

#### a)  First Quarter 2017 Investor Conference Calls

715.    On January 6, 2017, Teva held a Business Outlook conference call.  Defendants

Vigodman and Desheh participated in the call.  Defendant Vigodman stated:

> Since the start of 2014, one of our greatest priorities has been to increase the
> profitability of our generics business. In the first three years of this great
> effort, we have been able to improve significantly the margins of Teva's
> standalone generics business. This has been accomplished with a strong
> emphasis on the cost of goods sold, product mix, and the overall cost
> structure. We have also prioritized the most important markets. These efforts
> will now be taken to the next level as we integrate the Actavis Generics
> business. In 2017, we expect to see the operating margin increase to
> approximately 30%, generating $4.1 billion to $4.3 billion in operating
> profit.

#### b)  First Quarter 2017 Financial Results

716.    On May 11, 2017, Teva filed a press release on a Form 6-K with the SEC that

reported the Company's first quarter 2016 financial results.  The same day Teva filed its Q1 2017

6-K with the SEC and held an Earnings Conference Call.  Defendant Desheh signed both Forms

6-K and Defendants Peterburg and Desheh signed the consolidated balance sheet in the Q1 2017

6-K.

717.    In the Q1 2017 6-K, Teva reported (1) revenue of $5.6 billion; (2) gross profit of

$2.8 billion; (3) net income of $641 million; (4) Generic Medicines segment revenues of

$3.1 billion; (5) Generic Medicines gross profit of $1.4 billion; and (6) Generic Medicines segment

profitability of $779 million for the quarter.

718.    In the Q1 2017 6-K, Teva reported U.S. Generic Medicine quarterly revenues of

"$1.4 billion, an increase of 41%, compared to the first quarter of 2016. The increase resulted

mainly from the inclusion of Actavis Generics revenues and products sold in the first quarter of

2017 that were not sold in the first quarter of 2016, partially offset by a decline in sales due to

increased competition, mainly to aripiprazole (the generic equivalent of Abilify®) and budesonide (the generic equivalent of Pulmicort®) and loss of revenues following our divestment of certain products in connection with the acquisition."

719.    In the Q1 2017 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2017, we led the U.S. generic market in total prescriptions and new prescriptions, with approximately 597 million total prescriptions, representing 15.5% of total U.S. generic prescriptions according to IMS data. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

720.    On May 11, 2017, Teva held its Earnings Conference Call for the First Quarter of 2017.  Defendants Peterburg, Desheh, and Bhattacharjee participated in the call.

721.    On the call, Defendant Peterburg discussed the quarterly results.

> Q1 started off 2017 generally as expected and as we guided, which has been the lowest quarter of a back-end loaded year. Revenues this quarter amounted to $5.6 billion, resulting in a non-GAAP net income of $1.1 billion and a non-GAAP EPS of $1.06. …
>
> Compared to Q4 2016, which marks the first full quarter consolidation of Actavis into our overall group results, revenues declined 30% primarily due to impacts resulting from a devaluation of the Venezuelan currency, which totaled $400 million, losses of exclusivity in the specialty segment during Q1 and divestment in the U.K. related to the Actavis Generics acquisition.

722.    Peterburg also discussed the generic business more generally, stating:

> Our generic business is not immune to the challenges other companies in our industry are currently facing with increased competition and consolidation. This is reflected in the most recent analysis we completed that looks at net price erosion in our U.S. based business, which came in at 7% versus the approximately 5% that we communicated previously. The 2 biggest contributing factors to this change are the ongoing consolidation of our key

customers and the increase in generic drug approval by the FDA, which has created additional competition….

723.    Defendant Desheh added that, "[t]he profitability of generic business was very stable – of our U.S. generic business was very stable this quarter."

724.    During the question and answer portion of the call, an analyst from Goldman Sachs asked about the extent pricing pressure impacted gross margins.  Desheh replied, "It did not have an impact on our gross margin. … [T]he gross profit margin of our U.S. business or U.S. generic business remains exactly the same.  It's around 55% or a bit higher and did not suffer – was not impacted by pricing pressure in generics in Q1."

### c) Second Quarter 2017 Investor Conference Calls

725.    On June 7, 2017, Defendant Bhattacharjee participated in a Jefferies Healthcare Conference.  On the call, the analyst from Jefferies asked why the price erosion experience by Teva had increased.  Bhattacharjee responded:

> I think specifically around the questions of pricing in the US-based business, there are two elements that have contributed to the uptick that we have seen. The first is an increase in the number of approvals from the FDA.
> …
> The second element that contributes -- has contributed to an uptick of the price erosion -- and what we said was what our price erosion was or what we saw in the first quarter of 7% is that consolidation, the ongoing consolidation of the customers.

726.    The January 6, 2017 Business Outlook Conference call, the May 11, 2017 Form 6-K Press Release, the May 11, 2017  Q1 2017 6-K, the May 11, 2017 earnings conference call,  and the June 7, 2017 Jefferies Healthcare Conference, each contained representations that were untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic

202

drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior. In addition to these reasons, the statements concerning Teva's financial performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the above-stated collusive and/or anticompetitive conduct. In the first two quarters of 2017 alone, Teva's financial results were materially inflated by at least $57.7 million in revenue.

### 6.     The ADS, Preferred Shares, And Notes Offering Materials

727.    On November 30, 2015, Teva filed on Form 6-K a press release with the SEC, announcing that it was commencing concurrent public offerings, consisting of its ADS and its Preferred Shares pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 also filed with the SEC on November 30, 2015. On the same day, Teva filed with the SEC the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering.

728.    On December 3, 2015, Teva filed a Form 6-K with the SEC, announcing the pricing of the ADS Offering and the Preferred Offering; the final ADS Prospectus and final Preferred Prospectus; and a free writing prospectus and term sheet, all dated December 2, 2015.

729.     The ADS Registration Statement and the Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS Registration Statement and/or the Preferred Registration Statement, including the ADS Prospectus and the Preferred Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

730.     The ADS/Preferred Offering Materials expressly incorporate by reference the 2014 Form 20-F filed on February 9, 2015, the Q1 2015 6-K filed on April 30, 2015, the Q2 2015 6-K filed on July 30, 2015, the Q3 2015 6-K filed on October 29, 2015, and the false and misleading statements and omissions of material fact contained therein as alleged and explained above at ¶¶ 571-576, 586-588, 596-598, 607-609, and 638 respectively.

731.     On July 12, 2016, Teva filed a Form 6-K with the SEC and a free writing prospectus dated July 12, 2016.  The next day, on July 13, 2016, Teva filed its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3.

732.     On July 18, 2016, Teva filed a preliminary prospectus supplement for the Notes Offering with the SEC, dated July 18, 2016.

733.     On July 19, 2016, Teva filed its final Notes Prospectus and two free writing prospectuses, all dated July 18, 2016.

734.     The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration Statement, including the Notes Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials."

735.     The Notes Offering Materials expressly incorporate by reference the 2015 20-F filed on February 11, 2016 and the Q1 2016 6-K filed on May 9, 2016, and the false and misleading

statements and omissions of material fact contained therein as alleged and explained above at ¶¶ 624-629, 638, 646-648. and 712 respectively.   Furthermore, the statements made in the Notes Offering Materials were materially false and misleading because the Exchange Act Defendants omitted the material facts that: (1) on June 21, 2016 the Company received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of its generic products as well as communications with competitors about those products and (2) on July 12, 2016, the Company received a subpoena from the Connecticut AG seeking documents and information relating to potential state antitrust law violations.

### 7.    SOX Certifications

736.    Teva's CEO and CFO personally signed certifications pursuant to Section 302 and Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX Certification") in connection with the 2013 20-F, the 2014 20-F, the 2015 20-F, and the 2016 20-F.

737.    The 2013 20-F SOX Certifications were signed by Defendants Desheh and Altman.

738.    The 2014 20-F and the 2015 20-F SOX Certifications were signed by Defendants Vigodman and Desheh.

739.    The 2016 20-F SOX Certifications were signed by Defendants Peterburg and Desheh.

740.    These Certifications provided assurances that these Officer Defendants had evaluated the Company's internal controls and determined them to be effective as of December 31 of each year.   On the subject of internal controls, the 2013 Form 20-F stated the following (the 2014 20-F, 2015 20-F, and 2016 Forms 20-F contained substantively identical language).

> (a) *Disclosure Controls and Procedures*. Teva's chief executive officer and chief financial officer, after evaluating the effectiveness of Teva's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this annual report, have concluded that, as of such date, Teva's disclosure controls and procedures were effective to

ensure that the information required in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and such information is accumulated and communicated to its management, including its chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

(b) *Report of Teva Management on Internal Control over Financial Reporting*. Teva's board of directors and management are responsible for establishing and maintaining adequate internal control over financial reporting. Teva's internal control system was designed to provide reasonable assurance to Teva's management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of its published consolidated financial statements.

…

Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2013. In making this assessment, it used the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that, as of December 31, 2013, Teva's internal control over financial reporting is effective based on those criteria.

…

(d) *Changes in Internal Control over Financial Reporting*. There were no changes to Teva's internal control over financial reporting that occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, Teva's internal control over financial reporting.

741.  The SOX Certifications pursuant to Section 302 signed by Defendants Altman, Desheh, Vigodman, and Peterburg further represented that the Company's financial statements were accurate and in accordance with GAAP, and that the signatories had designed and implemented internal controls that provided reasonable assurance that Teva's financial reporting was reliable and complied with GAAP.  Specifically, the SOX Certifications pursuant to Section 302 in all Forms 20-F filed by Teva during the Class Period provided, stated, in relevant part:

1. I have reviewed this annual report on Form 20-F of Teva Pharmaceutical Industries Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

742.    The SOX Certifications pursuant to Section 906 signed by Defendants Altman, Desheh, Vigodman, and Peterburg in all of Teva's Forms 20-F filed during the Class Period certified, in relevant part: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

743.    The SOX Certifications signed by Defendants Altman, Desheh, Vigodman, and Peterburg were materially false and misleading when made in multiple respects.  Contrary to their representations that the Forms 20-F did "not contain any untrue statement of material fact or omit

to state a material fact necessary to make the statements made … not misleading" and "fairly present[ed], in all material respects, the financial condition and results of operations" of Teva, the Forms 20-F materially misstated Teva's key financial metrics.  As discussed further in Section V.C, the Forms 20-F and Teva's other financial statements issued during the Class Period reported more than $1 billion in revenue during the Class Period derived from the Company's illegal anticompetitive and collusive conduct at a minimum.  Further, contrary to the statement that Defendants Altman, Desheh, Vigodman, and Peterburg had implemented internal controls that "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," Teva's internal controls suffered deficiencies that caused the Company's financial results to be materially misstated in violation of GAAP.  These Officer Defendants did not design internal controls to provide reasonable assurance regarding the reliability of financial reporting.  Further, oversight and monitoring internal controls failed to detect the anticompetitive and collusive conduct.

744.   The SOX Certifications were also untrue statements of material fact and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, including that the Exchange Act Defendants: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in

a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.

### K.      Additional Allegations Of Scienter

745.    At all relevant times during the Class Period, the Officer Defendants acted with scienter in making the statements complained of herein, in that each had actual knowledge that the statements he made, approved, ratified, and/or disseminated to the investing public were materially untrue or misleading, or acted with reckless disregard for the truth or falsity of those statements.

746.    During their tenures as officers and/or directors, the Officer Defendants possessed the power and authority to control the contents of the Company's SEC filings alleged herein to contain untrue statements or omissions of material fact, and each had access to those filings before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

747.    Each of the Officer Defendants, at a minimum, was made aware of the facts alleged herein concerning the business, management, and operations of the Company and its core U.S. generics business and either (a) knew facts or had access to information suggesting that the statements complained of herein were materially untrue or misleading, or (b) repeatedly failed to review or check information that they had a duty to monitor, and certified that they did monitor, or otherwise ignored obvious signs of the anticompetitive conduct and collusion alleged herein.

748.    In addition to the allegations set forth above, each Officer Defendant's intent to deceive, manipulate, or defraud, or recklessness, is demonstrated by direct and circumstantial facts and evidence supporting a strong inference of scienter, as set forth below.

1.      **The Conspiracy Required Approval At The Highest Levels**

749.     The conspiracy has been admitted to by Glazer and Malek, who each pleaded guilty to charges under Section 1 of the Sherman Act in connection with two generic drugs and promised prosecutors full cooperation against their co-conspirators in exchange for complete immunity as to a host of other generic drugs.  As set forth in the State AGs' complaint, "many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies."  Indeed, "Malek himself was responsible for communicating with … Teva" and had a "direct relationship" at Teva who he "was able to successfully communicate with … and reach an agreement to raise prices on Glyburide, among other drugs."

750.     Lead Counsel's analysis shows that at least eight additional drugs are implicated in the wide-ranging conspiracy.  As reported by *Bloomberg*, the federal antitrust investigation includes more than a dozen companies and about two dozen drugs.  The DOJ has intervened in the multidistrict litigation governing the civil antitrust suits against Teva and its co-conspirators, which strongly suggests evidence of anticompetitive conduct and collusion with respect to at least those dozens of drugs.  The Connecticut AG has indicated that the charges brought against Teva and Heritage are "just the tip of the iceberg."  And the GAO has identified hundreds of drugs that were the subject of extraordinary price hikes.  Teva owned the rights to at least 40% of the drugs identified in the GAO Report

751.     Execution of a conspiracy and collusion on this scale required systematic coordination and top-down command and control, which could not have been accomplished without the knowledge and approval, or extreme reckless disregard, of the Officer Defendants and/or other senior corporate officials with the power to control, and ultimate authority over, the management and operations of the Company and its core U.S. generics business.  Indeed, the significance of the corporate action required to participate in any collusive behavior – particularly

such concerted and sustained price increases, at unprecedented levels, with multiple competitors –
makes it implausible that the scheme was been carried out by low-level employees acting alone.

### 2.    The Conspiracy Generated A Substantial Amount Of Illicit Revenues

752.    Teva is the largest generic drug maker in the world; it generates approximately half
of its annual revenues from generics and nearly half of its annual generics revenues in the United
States.  The increases in Teva's generic drug prices during the Class Period were so widespread
and central to the Company's core U.S. generics business, and impacted such a significant portion
of its products and financial results, that the Officer Defendants must have known or were reckless
in not knowing, that the Company was engaged in undisclosed anticompetitive conduct.  The
weaker inference by far would be - indeed it is implausible - that the Officer Defendants, who were
the most senior corporate officials of the Company and of its generics business, were unaware of
the unprecedented price increases and the reasons for those increases.

753.    Lead Counsel estimates that, from 2013 through the first half of 2017, Teva
generated more than $1 billion in illicit revenues as a result of collusive price increases and price
maintenance for just eight drugs.  This does not include any illicit revenues generated by other
anticompetitive conduct, such as customer and market allocation, or related to other drugs.

754.    The Company and the Officer Defendants repeatedly touted the success of the U.S.
generics business built on the more than $1 billion in illicit revenues during the height of the
anticompetitive and collusive conduct.  For example, during the May 1, 2014 Q1 2014 Earnings
Conference Call, Desheh stated "[i]n generics, we experienced significant growth in [the] United
States market, with 17% year-over-year growth."  Additionally, in the October 30, 2014 press
release announcing the Q3 2014 financial results, Defendant Vigodman noted that Teva "delivered
improvement in profitability in all businesses, particularly in global generics, which saw

profitability increase by 40% year over year."  For the year 2014, Teva reported U.S. Generic Medicine revenues of $4.4 billion, "up 6% compared to $4.2 billion in 2013."

755.    For Q1 2015 Teva reported U.S. Generic Medicine revenues of $1.4 billion, "an increase of 37% compared to the first quarter of 2014."  The next quarter, Teva reported U.S. Generic Medicine revenues of $1.3 billion, "an increase of 24% compared to the second quarter of 2014."  For the year 2015, Teva reported U.S. Generic Medicine revenues of $4.8 billion, "up 8% compared to $4.4 billion in 2014.  The Exchange Act Defendants made similar statements touting the success of Teva's U.S. generics business throughout most of the Class Period.

756.    Furthermore, each of these financial misstatements were issued in violation of long-standing GAAP and SEC regulations concerning the recognition of revenue.  In particular, SAB 104 requires that revenues secured from Teva's collusive scheme cannot be recognized.

757.    Further, GAAP requires that where, as here, the revenue is generated from anticompetitive acts and is (i) not the result of sales with fixed or determinable prices, and (ii) is not based on persuasive evidence of an arrangement, the revenue shall not be recognized. Furthermore, the Exchange Act's and SEC regulations imposed disclosure requirements under Item 5 of Form 20-F.  Under these provisions, the Officer Defendants were specifically required to disclose "material changes in net sales or revenues, [and] provide a narrative discussion of the extent to which such changes are attributable to changes in prices."

758.    The Exchange Act Defendants' were fully aware of these clear and long-standing GAAP and disclosure requirements.  Indeed, Defendants Vigodman and Desheh certified their compliance with these requirements under the Sarbanes Oxley Act.  Thus, the Exchange Act Defendants reporting of revenues recorded in violation of GAAP and their failure to make required disclosures further evidences their fraudulent scienter.

### 3.     The Officer Defendants And Investors Focused On U.S. Generics

759.     Prior to the start of the Class Period, Teva was a company in wide-ranging decline. In 2013, its generics revenues fell by approximately $480 million, more than 40% of which was attributed to the U.S. generics business.  At the same time, Teva was facing the loss of exclusivity for Copaxone, a specialty drug (not generic) that generated half of its profit.

760.     As announced on February 6, 2014, the first day of the Class Period, Teva barely met 2013 profit targets, and without the illicit profits from generic Pravastatin would have missed earnings estimates.  On the related fourth-quarter investor conference call, Defendants Desheh and Oberman touted this turnaround in the U.S. generics business and promised more to come.

761.     Due to a growing number of price increases, and other anticompetitive conduct, the financial results for Teva's generics business improved significantly.  By May 2015, Defendant Desheh went so far as to describe the turnaround as "nothing short of a revolution," bragging that Teva had steeply increased margins by somehow simultaneously growing revenues and cutting the sales and marketing costs needed to "drive the sale."  This purported success became the Exchange Act Defendants' primary storyline, and the illicit revenues drove the price of the Company's ADS to an all-time high of $72 in mid-2015.

762.     In reality, this success, which was the focus of the Exchange Act Defendants and investors, was due to extensive illegal anticompetitive conduct inside Teva.

### 4.     The Officer Defendants Had A Duty To Investigate The Anticompetitive Conduct

763.     Congressional scrutiny and widely-publicized investigations by the DOJ and State AGs of several of Teva's purported competitors in the U.S. generics market, which coincided with the sudden turnaround in Teva's own U.S. generics business, triggered the Officer Defendants'

duty to investigate whether, among other things, the Exchange Act Defendants' statements regarding pricing and competition were true in all, and not misleading in any, material respects.

764.    Moreover, Teva itself underwent significant scrutiny.  On October 2, 2014, Teva received a letter from Congress, addressed personally to Defendant Vigodman, and focused on "the underlying causes of recent increases in the price of [Teva's] drugs."  The letter requested that Teva provide documents and information from January 1, 2012 to the present.  Teva did not provide any documents or information to Congress in response to the letter.  Additionally, the Senate Subcommittee on Primary Health and Aging convened a hearing on November 20, 2014 to review the price increases.  Teva was invited to testify but refused.

765.    Numerous of Teva's peers were the subject of subpoenas starting in 2014 and continuing throughout the Class Period, and some were the subject of search warrants.  Moreover, the price hikes and the investigation were the subject of news reports.

766.    In the summer of 2016, Teva became aware that they were a subject of investigations by both the DOJ and the Connecticut AG.  On June 21, 2016, the DOJ served a subpoena on Teva that the Company described as, "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."  On July 12, 2016, the Connecticut AG served Teva with a subpoena "seeking documents and other information relating to potential state antitrust law violations."

767.    Further, the Exchange Act Defendants denied any knowledge of anticompetitive conduct or antitrust law violations.  For instance, after disclosing that Teva USA had received subpoenas from both the DOJ and the Connecticut AG, the Q3 2016 6-K, filed with the SEC on November 15, 2016, stated in relevant part, "***Teva is not aware of any facts that would give rise***

*to an exposure to the Company with respect to these subpoenas*."  During an investor conference call that day, Defendant Vigodman personally reiterated this statement:

> Finally, I cannot conclude this part of my remarks without briefly addressing the US Department of Justice investigation into price collusion in the generic drug industry, which has been in the news this month. I would like to emphasize that *based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation.*

768.    Given that they had access to information concerning the circumstances central to these matters, by virtue of their positions of control and authority over the Company, the Officer Defendants either had knowledge of and failed to disclose, or were reckless in not knowing, the true reasons for the purported success of the Company's U.S. generics business, and the false and misleading nature of their statements and omissions and Teva's reported financial results.

### 5.    The Pervasive Misstatements Diverged Sharply From The Truth

769.    In each of the Forms 20-F filed during the Class Period, the Exchange Act Defendants claimed that, far from collusion with peers, the Company and its generic drugs faced "intense competition," particularly in the U.S. market, and that "[p]rices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies … enter the market for a given product and competition intensifies."

770.    Indeed, throughout the Class Period, the Exchange Act Defendants falsely and misleadingly emphasized "intense competition" in the U.S. generics industry, repeatedly assuring investors that the Company's favorable results were due to legitimate strategies, and factors such as operational efficiency and organic growth, rather than price fixing, bid rigging, and allocation of customers and markets, and thereby concealing their anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

771.   The Exchange Act Defendants made serial false and misleading statements about pricing concerning Teva's products, even as the Officer Defendants knew that attention was acutely focused on Teva's generics business.  As analysts asked progressively pointed questions about pricing in the market, and Teva's exposure to that trend, the Officer Defendants made ever-more bold false and misleading statements disavowing any effect of price increases on Teva's bottom line.  For example, on an October 29, 2015 Earnings Conference call Vigodman touted the companies positive results and asserted they came about, "[n]ot by price, [in] 2014, 2015, and that's very important message.  Additionally, on a November 19, 2015 Healthcare Conference call hosted by Jefferies LLC, Defendant Desheh noted there was "a lot of noise around pricing issues" but claimed Teva's "exposure to all these things is very minimal."

772.   On the October 29, 2015 Earnings Conference Call, Vigodman asserted that Teva's "improvements … in margins is not driven by price.  It is driven by quantities and by mix and by efficiency measures."  Then, on the Company's February 11, 2016 Earnings Conference call, Defendant Olafsson lauded Teva's performance in 2014 and 2015, stating: "This is $1 billion improvement in operating profit over 24 month period.  So how did we do this?  Not by pricing but by portfolio mix, new products, and efficiency measures."

773.   In reality, Teva had made extraordinary price hikes on many drugs, as reflected by the GAO report, and in just the eight drugs that Lead Counsel has identified as being subject to collusion, Teva made over $1 billion in illicit revenue.  Teva was therefore highly exposed to and dependent on pricing, as pricing and collusion had driven its success.

### 6.    The Officer Defendants Staked Their Reputations On The Actavis Transaction

774.   Teva's growth prior to the Class Period was fueled by an acquisition binge that lasted for years.  For example, Teva acquired Ivax for $7.4 billion in 2006, Barr for $7.4 billion in

2008, and Ratiopharm for $5 billion in 2010.  By 2012, Teva's ADS price had cooled, dropping from a high of $64.54 in 2010 to around $38 by mid-2013.  As the ADS price stagnated, and investors sought growth through additional acquisitions, Teva's management acknowledged that a higher ADS price would be needed for them to use the ADS as currency to fund new transactions.

775.    For example, prior to the start of the Class Period, on January 14, 2014, during a J.P Morgan Healthcare Conference call, Defendant Desheh stated: "Hopefully the stock price will go up and we'll be able to use our share as a currency."  Shortly after Teva appointed Vigodman CEO, analysts understood that he would "emphasize (potentially large) acquisitions more readily than his predecessor."

776.    Then, on March 4, 2014, on a Cowen & Co. Healthcare Conference call, Desheh explained that Teva needed to keep the Company's stock price elevated in order to land a significant acquisition.  He noted that the Company was "encouraged a little bit by the increase in the stock price" because with the "price under $40 … we can't use [the stock as] currency" for an acquisition.

777.    Analysts continued to discuss Teva's appetite for acquisition.  An April 16, 2014 Sterne Agee analyst report noted that Teva "signal[ed] [their] willingness to consider a 'transformational' deal" and Jefferies, on May 2, 2014 reported that Vigodman had discussed with its analysts the possibility of a large transaction."

778.    As Teva's share price improved on the strength of Teva's anticompetitive and collusive conduct, financial analysts continued to focus on a potential acquisition.   On March 10, 2015, analysts at Susquehanna noted that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A" and analysts at Leerink, in an April 16, 2015 report, described an "urgency to diversify via M&A."

779.    Thus, the Officer Defendants were personally committed to and focused on making a major acquisition, and they had staked their reputations on it.  They were motivated to inflate and maintain Teva's ADS price to the point where a major acquisition was possible and then to execute that acquisition.  This required the Exchange Act Defendants to preserve the Company's investment-grade credit and debt ratings, specifically as a means to effectuate a transformative deal – namely, the $40 billion failed bid to acquire Mylan (proposed in April 2015 and withdrawn in July 2015) and ultimately the completed $40 billion acquisition of Actavis, as well as the equity and debt offerings needed to raise capital for that transaction.  To do so, the Exchange Act Defendants misled investors about the true value and nature of Teva's business.

780.    As an example of the lengths to which Officer Defendants would go to consummate the transaction, they rushed a $20 billion debt offering to hide Teva's receipt of subpoenas from the DOJ and Connecticut AG until *one day* after the deal was finally closed, providing investors baseless guidance to maintain investors interest.  Specifically, a debt offering had been planned for September 2016, following the FTC approval process and closing of the Actavis transaction.  However, after the Company received subpoenas from both the DOJ, on June 21, 2016, and the Connecticut AG, on July 12, 2016, the Exchange Act Defendants accelerated the timing of the debt offering, purportedly due to unspecified terms and factors in the bond market.

781.    The Notes Offering was announced the next day, July 13, 2016 – along with an increase in revenue guidance for the second quarter 2016 and a rosy financial outlook for Teva in 2016 to 2019 – and it closed just days before the Exchange Act Defendants revealed the subpoenas in their next quarterly filing on August 3, 2016.  When the subpoenas were disclosed, the prices of Teva Securities fell, including those of a number of the Notes issued just days before.

782.    In January 2017, when the Exchange Act Defendants lowered Teva's 2017 outlook from the previous release, at the time of the Notes Offering, analysts at Piper Jaffray asked rhetorically, "how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management team in place?"

### 7.    Defendants Olafsson, Vigodman, and Desheh Left Under Unusual Circumstances

783.    The timing and circumstances of certain of the Officer Defendants' departures from the Company, which occurred as the truth about the anticompetitive conduct and collusion began to emerge, adds further weight to the overall inference of scienter with respect to those Officer Defendants.  Between December 2016 and June 2017, Teva's CEO, CFO, and the head of its generics segment abruptly and unexpectedly left the Company, without planned replacements.

### a)  Olafsson – President And CEO, Global Generic Medicines Group

784.    On December 6, 2016, Defendant Olafsson unexpectedly left Teva.  He had been Teva's President and CEO, Global Generic Medicines Group since July 1, 2014 and, prior to joining Teva, he had served in various roles, including senior leadership positions, within Actavis from 2003 to 2014.  As reported by *TheStreet*, Olafsson's departure "rais[ed] more questions for investors amid continued worries around drug pricing."  The Company did not say why Olafsson was leaving, but referred to his departure as a retirement, even though he was only 48-years-old and works today as the director of another company.

785.    Olafsson's exit was particularly unexpected given that he had been the "champion" of the Actavis acquisition and was expected to shepherd its integration with Teva's generics business.  Analysts concluded that the timing and lack of explanation for his departure suggested there may be something "going on internally in the generics business" that had not been disclosed (Citi analyst question at Citi Global Healthcare Conference on December 8, 2016) or that the

Company may be trying to hold Olafsson responsible for the "missteps regarding the setting of expectations (and ultimately the decision to lever up and purchase Actavis at top-of-the market price)" (Piper Jaffray report on December 6, 2016).

786.    Within days of Olafsson's departure, news broke of both the criminal charges against Glazer and Malek (and the expectation that they would plead guilty in exchange for cooperation against their co-conspirators) and the State AGs' action against Teva.

### b)  Vigodman – Teva's President And CEO

787.    On February 6, 2017, Defendant Vigodman abruptly stepped down from his role as Teva's President and CEO.  He had served in that capacity since February 11, 2014, and also had served as a Teva Director since June 22, 2009.  He departed the Company immediately, without a permanent replacement identified.   Indeed, it was not until September 11, 2017 that Teva announced Vigodman's replacement.

788.    As analysts from Wells Fargo reported, Vigodman's unexpected departure came at an "inauspicious time - just about a week before Teva releases its 4Q results and presumably updates 2017 guidance."  Analysts from Morningstar also reported that, "Teva continues to see leadership changes as the firm struggles to adapt to competitive pressure in its generics segment and potential imminent generic competition on Copaxone."

### c)  Desheh – Teva's Group Executive Vice President, CFO

789.    On April 26, 2017, Teva confirmed that Defendant Desheh, its Group EVP and CFO since 2008, would depart the Company.  Desheh stepped down on June 30, 2017, leaving the Company without a permanent replacement.

790.    In the very next SEC filing, Teva took a $6.1 billion charge against earnings, and reduced guidance and cut its dividend

### 8.      The Officer Defendants Executed SOX Certifications

791.    During the Class Period, and their tenures as executive officers of Teva, Defendants Vigodman, Desheh, Altman, and Peterburg signed the Company's SEC filings, including Forms 20-F and 6-K, as well as certifications pursuant Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.   These Officer Defendants certified, based on their personal knowledge, that the Company's Forms 20-F (a) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, and (b) fairly presented, in all material respects, the financial condition and results of operations of the Company.

792.    These Officer Defendants further certified that they reviewed and evaluated Teva's compliance with GAAP and the adequacy and effectiveness of its disclosure controls and procedures and internal control over financial reporting.

793.    Their signatures and certifications are probative of scienter and further indicate that these Officer Defendants had knowledge of or access to information concerning the circumstances central to the anticompetitive conduct and collusion, and knew or should have known that the statements and omissions complained of herein were materially untrue or misleading.

794.    These Officer Defendants had a duty to monitor and investigate conduct that threatened to undermine the veracity of the Company's SEC filings, and the veracity of their SOX certifications, including perceived anticompetitive conduct in the generics industry, which raised serious red flags about the Company's generic drug pricing practices.   At minimum, they acted recklessly and in dereliction of this duty.

### 9.    The Officer Defendants Were
### Personally Motivated By Compensation

795.    The Officer Defendants made millions in personal compensation from the reported success of the Company's U.S. generics business during the Class Period.  They received cash bonuses of as much as 158% of their annual salaries based on performance metrics directly impacted by the illicit revenues derived from fixing and maintaining prices, rigging bids, and allocating customers and markets.  Teva also made substantial equity grants to Defendants Vigodman, Desheh, Oberman, Olafsson, and likely other senior officers, including options to purchase shares, awards of restricted shares, and awards of Performance Share Units ("PSUs").

796.    For the year 2014, Teva reported paying Defendant Oberman nearly $6.5 million in cash and nearly $1 million in equity compensation.  (He stepped down that year).  For the year 2015, Teva reported paying Defendant Desheh more than $1.8 million in cash and $1.7 million in equity compensation.  (His compensation as not disclosed for 2014 or 2016).  For the years 2015 and 2016, Teva reported paying Defendant Olafsson more than $4.8 million in cash and more than $3.5 million in equity compensation.  (His compensation was not disclosed for 2014).  For the years 2014 to 2016, Teva reported paying Defendant Vigodman more than $8.4 million in cash and more than $5 million in equity compensation.

797.    The Officer Defendants' compensation structure incentivized fraud.  The intent of the Company's Compensation Policy for Executive Officers and Directors (the "Compensation Policy"), is stated, as follows:

> Teva aims to incentivize its executive officers by creating a strong link between their compensation and performance.  Therefore, a significant portion of the total compensation package provided to Teva's executive officers is based on measures that reflect both Teva's short and long-term goals and performance, as well as the executive officer's individual performance and impact on shareholder value.

798.   A significant component of the Compensation Policy was the Company's annual cash bonus program.  Teva described the bonuses as "strictly pay-for-performance … as payout eligibility and levels are determined based on actual financial and operational results, as well as individual performance."  While the Compensation Policy laid out the general parameters of the bonus program, it gave Teva's Board and its Compensation Committee some flexibility to alter the measurements used to award cash bonuses year-to-year.

### a)  2014 Compensation

799.   In 2014, Defendants Vigodman, Desheh, Oberman, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenues generated from the anticompetitive conduct and collusion.

800.   According to the 2014 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for cash flow).  He was entitled to a bonus of 140% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 125% of the targets were met.

801.   Vigodman's total reported compensation was nearly $4.5 million; he received a salary of $1,183,888, a bonus of $1,868,477 (approximately 158% of salary), and a one-time bonus of $237,401 for "significant achievements and efforts" including Teva "strengthen[ing] its leading position in generics."  He also was awarded options to purchase 280,702 shares at $41.05; a grant of 15,660 restricted shares; and a grant of 30,869 PSUs based on targets of cumulative non-GAAP operating profit and cumulative non-GAAP net revenue from 2014 to 2016.

802.   According to the 2014 20-F, at least 50% of Oberman's cash bonus also was tied to such financial targets (specifically, 25% for non-GAAP operating profit, 15% for non-GAAP net revenue, and 10% for cash flow).  An additional 20% of his bonus was based on Teva's generics

business.  He was entitled to a bonus of 100% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 120% of the targets were met.

803.    Oberman's total reported compensation of $7,337,661 made him the highest-paid Teva executive for 2014, after being functionally replaced in July.  Oberman received a salary of $850,000, a cash bonus of $1,194,435 (approximately 140% of salary), and a cash severance of $4,464,171 based primarily on the amounts of his salary and average bonuses for 2012 to 2014.

804.    Because Olafsson and Desheh were not among Teva's five highest paid executives in 2014, their salaries and cash bonuses were not disclosed (Olafsson joined Teva in July 2014).  Olafsson was awarded options to purchase 88,238 shares at a price of $54.02; a grant of 18,229 PSUs; and an additional grant of 17,773 PSUs based on Teva's 2014 performance.  Desheh was awarded options to purchase 98,581 shares at a price of $48.76 and a grant of 20,066 PSUs.

### b)  2015 Compensation

805.    In 2015, Defendants Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenue generated from the anticompetitive conduct and collusion.

806.    According to the 2015 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for free cash flow).  He was entitled to a bonus of up to 200% of salary if 125% of the targets were met.

807.    Vigodman's total reported compensation was approximately $5.7 million; he received a salary of $1,363,682 and a bonus of $2,253,581 (approximately 165% of salary).  He also was awarded options to purchase 163,859 shares at a price of $57.35 and a grant of 30,869 PSUs based on Teva's 2014 to 2015 cumulative performance.

808.    According to the 2015 20-F, Desheh and Olafsson also were entitled to bonuses based on such financial targets (specifically, 25% for non-GAAP operating profit, 15% for net revenue, and 10% for free cash flow), in amounts of up to 200% of salary if 120% of the targets were met.

809.    Desheh's total reported compensation was approximately $4.3 million; he received a salary of $733,863 and a bonus of $1,110,824 (approximately 151% of salary).  He also was awarded options to purchase 89,376 shares at a price of $57.35 and a grant of 16,838 PSUs.

810.    Olafsson's total reported compensation was approximately $3.9 million; he received a salary of $954,955 and a bonus of $1,449,375 (approximately 151% of salary).  He also was awarded options to purchase 94,343 shares at a price of $57.35; options to purchase an additional 160,114 shares at a price of $59.19 "[i]n light of the increase in … scope of work and responsibilities as head of Global Generics Medicines Group in connection with the Actavis acquisition"; and a grant of 17,773 PSUs based on Teva's 2014 to 2015 cumulative performance.

811.    Teva's ADS price reached a high of $72 on July 27, 2015, making the potential value of the Officer Defendants' 2014 and 2015 options quite significant at the height of the alleged fraudulent scheme.  However, because Teva was a "foreign private issuer" during the Class Period, it was not required to report insider sales and, therefore, it is unknown whether these Officer Defendants, or any other insider, engaged in suspicious trading activity.  Evidence of insider trading, if any, could be obtained in discovery.

### L.    Loss Causation

812.    In addition to the allegations herein concerning the direct and proximate causal link between the Exchange Act Defendants' wrongful conduct and the economic harm suffered by investors, set forth below are Plaintiffs' additional allegations of loss causation.

813.    As alleged in Section V.M, Presumption Of Reliance And Fraud-On-The-Market Doctrine, the market for Teva Securities was open, well-developed, and efficient at all relevant times.   As a result of the Exchange Act Defendants' fraudulent scheme, the prices of Teva Securities were artificially inflated and/or maintained during the Class Period and, thus, investors who purchased or otherwise acquired those securities did so at artificially inflated prices.

814.    Between August 2016 and August 2017, as a series of negative events and disclosures began to reveal, on a piecemeal basis, the false and misleading nature of the Exchange Act Defendants' statements and omissions, the artificial inflation leaked out, at least in part, and the value of Teva Securities declined, causing economic harm to the Class.

815.    As a result of the Exchange Act Defendants' wrongful conduct, the ADS price, for example, which steadily increased from the start of the Class Period to an all-time high of $72 in July 2015, has fallen to less than $20, reducing market capitalization by nearly $42 billion as the truth leaked out.   The Company has experienced dislocation and uncertainty due to the abrupt departures of three top executives and ongoing disruption and fallout from numerous criminal and civil investigations and litigations.   Its credit ratings have been downgraded to one level above "junk," and it may be forced to sell assets to reduce debt.   In addition, Teva has cut its profit forecast for 2017, cut its dividend, and warned investors that it risks breaching debt covenants.

816.    These negative events and disclosures were directly related to the Exchange Act Defendants' fraudulent scheme.   Their material misstatements and omissions concealed from the market, among other things, the Company's true financial condition and results of operations.   The Exchange Act Defendants falsely and misleadingly reported more than $1 billion in illicit revenues generated from undisclosed artificially inflated and collusive pricing and market practices underlying the Company's core U.S. generic drug business, revenues which were unsustainable,

as well as illegal.  Throughout the Class Period, the Exchange Act Defendants denied their involvement in the alleged unlawful conduct in the generics market, and maintained the illusion that Teva faced "intense competition" and that the Company's positive results were based on other factors, such as cost-cutting and organic growth from new products.  As the anticompetitive conduct and collusion began to unravel, and government investigators began to close in on Teva and its co-conspirators, the Company lost the ability to fix and maintain artificially inflated prices for its generic drug products and maintain market share.  As a result, revenues deteriorated and Teva's true financial and business condition began to emerge.

817.    None of these negative events or disclosures was sufficient, on its own, to fully remove the inflation from the prices of Teva Securities because each only partially revealed the scope and consequence of the fraudulent scheme.  Despite the leakage of these partially corrective events and disclosures, Teva Securities prices remained artificially inflated, and were prevented from declining to their true value.  As Class members continued to hold Teva securities, and/or purchased or acquired those securities, the artificial inflation caused them further injury when additional information was revealed.  The corrective effect of each new piece of information was tempered by the Exchange Act Defendants' continuing efforts to conceal the true risks and conditions arising from Teva's involvement in anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

### 1.    August 4-5, 2016

818.    After trading on August 4, 2016, Teva filed the Q2 2016 6-K, reporting second quarter 2016 results, including a $434 million decline in revenue in the U.S. generics segment compared to second quarter 2015.  This marked the beginning of the leakage of corrective information to investors.  However, the Exchange Act Defendants misleadingly attributed Teva's disappointing financial results to the loss of exclusivity on certain drugs, and a decline in sales in

others; they did not fully reveal Teva's anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

819.    The Q2 2016 6-K disclosed for the first time that (i) "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and (ii) "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations."   The disclosure of the subpoenas was the first indication to the market that the Exchange Act Defendants were implicated in the federal and State AGs' antitrust investigations.

820.    The Q2 2016 6-K falsely and misleadingly stated that Teva had received its DOJ subpoena on June 21, **2015** (around the time other generic drug companies received and disclosed similar subpoenas, *e.g.*, Actavis received a DOJ subpoena on June 25, 2015), when Teva actually had received its DOJ subpoena on June 21, **2016** (as revealed in the Q3 2016 6-K filed with the SEC on November 15, 2016 without any explanation for the correction).

821.    As a result of this new negative information, the next trading day, the prices of Teva Securities declined.  The ADS price fell $1.24 or 2.24%, from a close of $55.45 on August 4, 2016 to a close of $54.21 on August 5, 2016, on high trading volume.  The Preferred Share price fell $12.00 or 1.32%, from a close of $907.00 on August 4, 2016 to a close of $895.00 on August 5, 2016.  The prices of the Notes also declined between $1.07 and $6.12 on August 5, 2016. Teva's market capitalization was reduced by approximately $1.13 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 8/4/2016 | 8/5/2016 | | |
| ADS | $55.45 | $54.21 | -$1.24 | -2.24% |
| Preferred Shares | $907.00 | $895.00 | -$12.00 | -1.32% |
| 2018 Note | $1,002.76 | $1,001.24 | -$1.52 | -0.15% |
| 2019 Note | $1,005.59 | $1,004.52 | -$1.07 | -0.11% |
| 2021 Note | $1,005.14 | $1,000.32 | -$4.82 | -0.48% |
| 2023 Note | $1,015.44 | $1,011.23 | -$4.21 | -0.41% |
| 2026 Note | $1,014.89 | $1,013.39 | -$1.50 | -0.15% |
| 2046 Note | $1,014.13 | $1,008.01 | -$6.12 | -0.60% |

2.    **November 3-6, 2016**

822.    During trading on the NYSE (after trading on the TASE) on November 3, 2016, new information was revealed to the market regarding the DOJ investigation into Teva's marketing and pricing of generic drugs.  At or around 2:10 p.m. ET (8:00 p.m. IT), *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," which described the DOJ's "sweeping" two-year investigation of suspected price collusion involving more than a dozen generic pharmaceutical companies, including Teva.  The article broke news of a grand jury probe, reporting that the first criminal charges against executives of those companies could emerge by the end of the year.  This indicated to the market that Teva and its executives were likely targets of the federal antitrust investigation, and that the investigation had found evidence of criminal conduct, despite the Exchange Act Defendants' repeated statements regarding "intense competition" in the generics market and an overall decline in price on the Company's generics portfolio.  The *Bloomberg* article also revealed that the Connecticut AG could file a civil complaint against Teva and other generics companies.

823.    Investors and analysts reacted to this new negative news.  For instance, analysts at S&P Capital IQ lowered their rating of Teva ADS from "buy" to "hold," and *Fierce Pharma* reported that analysts believed the investigation could have a sizeable financial impact on Teva, estimated to be as much as $700 million.

824.    As a result of this new negative information, the prices for Teva Securities declined. The ADS price fell $4.13 or 9.53%, from a close of $43.33 on November 2, 2016 to a close of $39.20 on November 3, 2016, on high trading volume.   The Preferred Share price fell $56.50 or 7.36%, from a close of $767.50 on November 2, 2016 to a close of $711.00 on November 3, 2016. The prices of certain of the Notes also declined between $5.37 and $27.94 on November 3, 2016. Teva's market capitalization was reduced by approximately $3.77 billion.

| Security | Closing Price | | Price Drop | Percentage |
| | 11/2/2016 | 11/3/2016 | | |
| --- | --- | --- | --- | --- |
| ADS | $43.33 | $39.20 | -$4.13 | -9.53% |
| Preferred Shares | $767.50 | $711.00 | -$56.50 | -7.36% |
| 2019 Note | $993.84 | $988.47 | -$5.37 | -0.54% |
| 2021 Note | $986.87 | $978.04 | -$8.83 | -0.89% |
| 2023 Note | $985.94 | $973.01 | -$12.93 | -1.31% |
| 2026 Note | $970.50 | $959.31 | -$11.19 | -1.15% |
| 2046 Note | $924.68 | $896.74 | -$27.94 | -3.02% |

825.    The next trading day on the TASE, the ordinary share, priced in Israeli New Shekel ("ILS") fell ILS7.10 or 4.43%. from a close of ILS160.40 on November 3, 2016 to a close of ILS153.30 on November 6, 2016.

| Security | Closing Price | | Price Drop | Percentage |
| | 11/3/2016 | 11/6/2016 | | |
| --- | --- | --- | --- | --- |
| Ordinary Shares | ILS160.40 | ILS153.30 | -ILS7.10 | -4.43% |

### 3.    November 15, 2016

826.    Before trading on the NYSE (during trading on the TASE) on November 15, 2016, Teva filed a press release on Form 6-K with the SEC, reporting third quarter 2016 revenues below consensus expectations.   During an investor conference call that day, Defendant Olafsson explained the poor financial reporting was a result of pricing pressures, stating that, despite his past denials that Teva was exposed to pricing pressure, or even observed such pressure, price

erosion in Teva's U.S. generics business in fact had been approximately 7%, as compared to the 5% that Olafsson had just recently stated. While the Exchange Act Defendants acknowledged that pricing pressure was impacting profits, they attributed these negative results to divestiture of certain generic products related to the Actavis acquisition, and continued to conceal Teva's anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

827.    During the same investor conference call, Defendant Vigodman directly addressed the DOJ investigation into price collusion in the generic drug industry that had been in the news that month, and emphasized that "based on all of our efforts to date, internal and external … we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." These denials tempered the impact of the corrective information and implied that the Exchange Act Defendants, and specifically Defendant Vigodman, had knowledge of and/or had made a meaningful inquiry into the underlying facts and had not ignored obvious signs of Teva's anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

828.    As a result of this new negative information, investors and analysts had negative reactions. For instance, analysts at Jefferies reported that their view of the company had changed and downgraded Teva ADS from "buy" to "hold."

829.    The prices of Teva Securities again declined. The ADS price fell $3.43 or 8.36%, from a close of $41.03 on November 14, 2016 to a close of $37.60 on November 15, 2016, on high trading volume. The Preferred Share price fell $38.01 or 5.22%, from a close of $728.00 on November 14, 2016 to a close price of $689.99 on November 15, 2016. The prices of the Notes also declined between $0.87 and $7.81 on November 15, 2016. The ordinary share price also

declined ILS7.20 or 4.58%, from a close of ILS157.10 on November 14, 2016 to a close of ILS149.90 on November 15, 2016.  Teva's market capitalization was reduced by approximately $3.13 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 11/14/2016 | 11/15/2016 | | |
| ADS | $41.03 | $37.60 | -$3.43 | -8.36% |
| Preferred Shares | $728.00 | $689.99 | -$38.01 | -5.22% |
| 2018 Note | $991.35 | $990.48 | -$0.87 | -0.09% |
| 2019 Note | $986.54 | $984.62 | -$1.92 | -0.19% |
| 2021 Note | $971.62 | $969.50 | -$2.12 | -0.22% |
| 2026 Note | $944.19 | $937.52 | -$6.67 | -0.71% |
| 2046 Note | $870.74 | $862.93 | -$7.81 | -0.90% |
| Ordinary Shares | ILS157.10 | ILS149.90 | -ILS7.20 | -4.58% |

### 4.    December 5-6, 2016

830.    After trading on December 5, 2016, Teva filed a 6-K, announcing that Defendant Olafsson would leave the Company and had been replaced, effective immediately, as President and CEO of Teva's Global Generic Medicines Group.  The 6-K did not offer any explanation for Olafsson's departure and said only that he was "retiring," even though he was only in his late 40s.

831.    Olafsson's abrupt exit, less than two-and-a-half years after his appointment to lead the newly formed Global Generic Medicines Group, surprised the market, and analysts tied Olafsson's termination to the apparent rise of pricing pressure.  For instance, the analysts at Morningstar in a December 6, 2017 report, noted that "Teva's announcement that Dipankar Bhattacharjee will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence.  *Recent pricing pressure* in the generic drug market and anticipated generic competition on the 40mg version of Copaxone in 2017 remain significant near-term challenges for Teva, which makes the abrupt leadership change a *concerning development at a critical time* for the company."  BTIG analysts, in a report dated December 5, 2016, further noted that "[w]ithout

Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained focused on price erosion for the [company's] base generics business." Other analysts, were concerned his departure suggested that there may be something "going on internally in the generics business" that had not been disclosed. (Citi analyst question at Citi Global Healthcare Conference; Piper Jaffray analyst report on December 6, 2016).

832.   As a result of this new negative information, on the next trading day, the prices of Teva Securities declined. The ADS price fell $2.01 or 5.43%, from a close of $37.04 on December 5, 2016 to a close of $35.03 on December 6, 2016, on high trading volume. The Preferred Share price fell $26.26 or 4.00%, from a close of $657.01 on December 5, 2016 to a close of $630.75 on December 6, 2016. The prices of certain of the Notes also declined between $1.33 and $17.01 on December 6, 2016. The ordinary share price also declined ILS6.90 or 4.91%, from a close of ILS140.50 on December 5, 2016 to a close of ILS133.60 on December 6, 2016. Teva's market capitalization was reduced by approximately $1.84 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 12/5/2016 | 12/6/2016 | | |
| ADS | $37.04 | $35.03 | -$2.01 | -5.43% |
| Preferred Shares | $657.01 | $630.75 | -$26.26 | -4.00% |
| 2018 Note | $993.25 | $990.20 | -$3.05 | -0.31% |
| 2021 Note | $961.11 | $959.00 | -$2.11 | -0.22% |
| 2023 Note | $946.43 | $945.10 | -$1.33 | -0.14% |
| 2026 Note | $931.76 | $923.86 | -$7.90 | -0.85% |
| 2046 Note | $873.98 | $856.97 | -$17.01 | -1.95% |
| Ordinary Shares | ILS140.50 | ILS133.60 | -ILS6.90 | -4.91% |

### 5.   December 14, 2016

833.   During trading on the NYSE on December 14, 2016, the DOJ announced in a press release that it had charged (by information) Glazer and Malek, the former CEO and former President of Heritage, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs, namely Doxycycline (as early as April 2013 until at least

December 2015) and Glyburide (as early as April 2014 until at least December 2015).  Teva was

the dominant market participant in the Glyburide market during the Class Period.

834.    The DOJ further stated that the charges resulted from an ongoing federal antitrust

investigation into price-fixing, bid-rigging and other anticompetitive conduct relating to generic

drugs and marked "an important step" in ensuring true competition among companies "at a price

set by the market, not by collusion."

835.    Two-count felony charges for violations of Section 1 of the Sherman Act against

Glazer and Malek also were unsealed that day, alleging the following in sum and substance:

(a)    various corporations and individuals participated as co-conspirators in the offenses and performed acts and made statements in furtherance thereof;

(b)    the defendants and co-conspirators knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic drugs, including Doxycycline and Glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of those drugs sold in the United States; and

(c)    for the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators, among other things, participated in meetings and communications to discuss the sale of and to allocate customers or rig bids for the drugs; agreed not to compete against each other for certain customers; submitted bids, withheld bids, and issued proposals in accordance with their agreements; and sold the drugs at collusive and noncompetitive prices.

836.    In a felony case, an information outlining probable cause may be filed where the

accused has waived indictment and has agreed, instead, to plead guilty.  Various news outlets,

including *Bloomberg*, confirmed that Glazer and Malek were preparing to plead guilty, and that

their cooperation could lead to charges against executives at other drug companies.

837.    As a result of this new negative information, the prices of Teva Securities declined.

The ADS price fell $0.66 or 1.75%, from a close of $37.66 on December 13, 2016 to a close of

$37.00 on December 14, 2016.  The Preferred Share price fell $13.00 or 1.93%, from a close of

$673.00 on December 13, 2016 to a close of $660.00 on December 14, 2016. The prices of certain

of the Notes also declined between $4.38 and $16.62 on December 14, 2016. Teva's market

capitalization was reduced by approximately $669.9 million.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 12/13/2016 | 12/14/2016 | | |
| ADS | $37.66 | $37.00 | -$0.66 | -1.75% |
| Preferred Shares | $673.00 | $660.00 | -$13.00 | -1.93% |
| 2021 Note | $956.85 | $952.31 | -$4.54 | -0.47% |
| 2023 Note | $943.28 | $938.90 | -$4.38 | -0.46% |
| 2026 Note | $923.22 | $916.96 | -$6.26 | -0.68% |
| 2046 Note | $855.80 | $839.18 | -$16.62 | -1.94% |

**6.     December 15-18, 2016**

838.    During trading on the NYSE (after trading on the TASE) on December 15, 2016,

the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for

violation of Section 1 of the Sherman Act against Teva USA and five other drug companies

(Heritage, Aurobindo, Citron, Mayne, and Mylan), alleging that they had entered into illegal

conspiracies to unreasonably restrain trade, artificially inflate and manipulate prices, and reduce

competition for Doxycycline Hyclate and Glyburide.

839.    The press release stated that portions of the complaint were redacted "to avoid

compromising the ongoing investigation" as to "a number of additional generic drugs."

> In July 2014, the state of Connecticut initiated [a non-public] investigation of
> the reasons behind suspicious price increases of certain generic
> pharmaceuticals. The investigation, which is still ongoing as to a number of
> additional generic drugs, uncovered evidence of a well-coordinated and long-
> running conspiracy to fix prices and allocate markets for doxycycline hyclate
> delayed release and glyburide. In today's lawsuit, the states allege that the
> misconduct was conceived and carried out by senior drug company
> executives and their subordinate marketing and sales executives.
>
> The complaint further alleges that the defendants routinely coordinated their
> schemes through direct interaction with their competitors at industry trade

shows, customer conferences and other events, as well as through direct email, phone and text message communications. The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation. The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.

840.     Connecticut led the multistate group of plaintiff states, which included Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington.

841.     As *Forbes* reported that day, the complaint revealed new information regarding Teva's potential exposure relating to two generic drugs, in that it "makes clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing" and that Glazer and Malek were cooperating; according to the publically available complaint, Malek had a direct relationship with an unnamed Teva employee and the two agreed to raise the prices of Glyburide.

842.     As a result of this new negative information, the prices of Teva Securities continued to decline.  The ADS price fell $0.27 or 0.73%, from a close of $37.00 on December 14, 2016 to a close of $36.73 on December 15, 2016.  The Preferred Share price fell $5.00 or 0.76%, from a close of $660.00 on December 14, 2016 to a close of $655.00 on December 15, 2016.  The prices of certain of the Notes also declined between $0.92 and $11.92 on December 15, 2016.  Teva's market capitalization was reduced by approximately $274 million.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 12/14/2016 | 12/15/2016 | | |
| ADS | $37.00 | $36.73 | -$0.27 | -0.73% |
| Preferred Shares | $660.00 | $655.00 | -$5.00 | -0.76% |
| 2018 Note | $991.99 | $990.51 | -$1.48 | -0.15% |
| 2019 Note | $990.23 | $978.31 | -$11.92 | -1.20% |
| 2023 Note | $938.90 | $934.94 | -$3.96 | -0.42% |
| 2026 Note | $916.96 | $908.55 | -$8.41 | -0.92% |
| 2046 Note | $839.18 | $838.26 | -$0.92 | -0.11% |

843.   The next trading day on the TASE, the ordinary share price fell ILS1.40 or 0.98%, from a close of ILS142.40 on December 15, 2016 to a close of ILS141.00 on December 18, 2016.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 12/15/2016 | 12/18/2016 | | |
| Ordinary Shares | ILS142.40 | ILS141.00 | -ILS1.40 | -0.98% |

**7.     January 6-8, 2017**

844.   Before trading on the NYSE (when the TASE was closed) on January 6, 2017, Teva filed a press release on Form 6-K, announcing a significant reduction in 2017 guidance, far below market expectations, due to previously-unannounced poor performance and increased competitive pricing pressures in the market.  The press release quoted Defendant Vigodman, who stated, "[t]he entire healthcare sector has faced significant headwinds, and we have not been immune."  The Exchange Act Defendants thus acknowledged for the first time that Teva had suffered greatly from competitive pressures such as pricing, a fact that they had denied vehemently until that point.  As explained by the analyst at Morningstar in a January 6, 2017 report, "Teva Previews Weak Year on Competitive Pressures and Currency Headwinds," the analyst concluded that "Teva's management lowered its 2017 outlook from its previous forecast released in July [2016, at the time of the Notes Offering] as the *firm succumbs to increased competitive pressure*, especially in the U.S. generics market."

237

845.    Indeed, analysts at Piper Jaffray wrote that the disclosure "further erod[ed] what in [their] view was already limited management credibility."  The analysts rhetorically questioned "how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management in place?"

846.    That day, certain of the Officer Defendants hosted a "business outlook" conference call, during which Defendant Vigodman stated that there was an EBITDA gap of $1.2 billion emanating from Teva's U.S. generics business.  He attributed the majority of that gap to delayed product launches; the Exchange Act Defendants continued to conceal, at least in part, the collusive practices in its U.S. generics business, including bid rigging, price fixing, and market and customer allocation, as well as pricing pressure due to weakening of the collusion.

847.    Investors and analysts reacted to the new negative news.  For instance, *TheStreet* reported that Teva's ADS prices "plummeted" due to lowered 2017 guidance.

848.    As a result of this new negative information, the prices of Teva Securities continued to decline.  That day, the ADS price fell $2.86 or 7.53%, from a close of $37.96 on January 5, 2017 to a close of $35.10 on January 6, 2017, on high trading volume.  The Preferred Share price fell $47.00 or 6.91%, from a close of $680.00 on January 5, 2017 to a close of $633.00 on January 6, 2017.  The prices of certain of the Notes also declined between $0.64 and $17.75 on January 6, 2017.  Teva's market capitalization was reduced by approximately $2.9 billion.

| Security | Closing Price | | Price Drop | Percentage |
| --- | --- | --- | --- | --- |
| | 1/5/2017 | 1/6/2017 | | |
| ADS | $37.96 | $35.10 | -$2.86 | -7.53% |
| Preferred Shares | $680.00 | $633.00 | -$47.00 | -6.91% |
| 2019 Note | $985.29 | $984.65 | -$0.64 | -0.06% |
| 2021 Note | $962.80 | $955.42 | -$7.38 | -0.77% |
| 2023 Note | $949.43 | $943.96 | -$5.47 | -0.58% |
| 2026 Note | $933.20 | $922.24 | -$10.96 | -1.17% |
| 2046 Note | $881.43 | $863.68 | -$17.75 | -2.01% |

849.     The next trading day on the TASE, the ordinary share price fell ILS7.90 or 5.49%, from a close of ILS143.90 on January 5, 2017 to a close of ILS136.00 on January 8, 2017.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 1/5/2017 | 1/8/2017 | | |
| Ordinary Shares | ILS143.90 | ILS136.00 | -ILS7.90 | -5.49% |

### 8.      August 3-7, 2017

850.     Before trading on the NYSE (during trading on the TASE) on Thursday, August 3, 2017, Teva filed a press release on Form 6-K, announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and "accelerated price erosion and decreased volume due mainly to customer consolidation, greater competition as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition."

851.     The Company also disclosed a net earnings loss primarily as a result of a $6.1 billion goodwill impairment charge related to its U.S. generics unit – which consisted of both Teva legacy and Actavis generics business, revealing the true value of the combined U.S. generic business.

852.     This disclosure revealed that Teva's business was facing significant and permanent pricing pressure.  As *Bloomberg* reported that day: "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper."  Deutsche Bank analysts reported in an August 3, 2017 report "TEVA described increased pressures on its US generic business, which it believes could persist in 2018 and potentially."  The Exchange Act Defendants until then had vehemently denied that Teva was susceptible to such pricing pressure.

853.     As a result of this disclosure, on August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above junk), with a negative outlook, reflecting slower-than-anticipated

deleveraging "as Teva contends with weakness in its US generics business and the looming threat of generic competition on Copaxone 40mg."

854.    As a result of the new negative information, the prices of Teva Securities again declined.  ADS price fell $7.50 or 24.00%, from a close of $31.25 on August 2, 2017 to a close of $23.75 on August 3, 2017, on high trading volume.  The Preferred Share price fell $95.45 or 17.03%, from a close of $560.50 on August 2, 2017 to a close of $465.05 on August 3, 2017.  The prices of the Notes also declined between $2.24 to $18.41 on August 3, 2017.  The ordinary share price also declined ILS19.80 or 17.79%, from a close of ILS111.30 on August 2, 2017 to a close of ILS91.50 on August 3, 2017.  Teva's market capitalization was reduced by approximately $7.6 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 8/2/2017 | 8/3/2017 | | |
| ADS | $31.25 | $23.75 | -$7.50 | -24.00% |
| Preferred Shares | $560.50 | $465.05 | -$95.45 | -17.03% |
| 2018 Note | $999.40 | $994.24 | -$5.16 | -0.52% |
| 2019 Note | $994.48 | $989.85 | -$4.63 | -0.47% |
| 2021 Note | $986.90 | $970.42 | -$16.48 | -1.67% |
| 2023 Note | $981.20 | $962.79 | -$18.41 | -1.88% |
| 2026 Note | $954.08 | $940.59 | -$13.49 | -1.41% |
| 2046 Note | $907.60 | $905.36 | -$2.24 | -0.25% |
| Ordinary Shares | ILS111.30 | ILS91.50 | -ILS19.80 | -17.79% |

855.    On Friday, August 4, Fitch Ratings also downgraded Teva to BBB- (one step above junk), with a negative outlook.  As a result of the news on August 3 and 4, the ADS price continued to fall, by an additional $3.15 or 13.26%, from a close of $23.75 on August 3, 2017 to a close of $20.60 on August 4, 2017, on high trading volume.  The Preferred Share price continued to fall, by an additional $56.05 or 12.05%, from a close of $465.05 on August 3, 2017 to a close of $409.00 on August 4, 2017.  The prices of certain of the Notes also continued to fall, by between $4.78 to

$51.57 on August 4, 2017.   Teva's market capitalization was reduced by approximately
$3.2 billion.

| Security | Closing Price | | Price Drop | Percentage |
| | 8/3/2017 | 8/4/2017 | | |
|---|---|---|---|---|
| ADS | $23.75 | $20.60 | -$3.15 | -13.26% |
| Preferred Shares | $465.05 | $409.00 | -$56.05 | -12.05% |
| 2019 Note | $989.85 | $985.07 | -$4.78 | -0.48% |
| 2021 Note | $970.42 | $957.52 | -$12.90 | -1.33% |
| 2023 Note | $962.79 | $948.87 | -$13.92 | -1.45% |
| 2026 Note | $940.59 | $919.42 | -$21.17 | -2.25% |
| 2046 Note | $905.36 | $853.79 | -$51.57 | -5.70% |

856.   The next trading day on the TASE, the ordinary share price continued to fall, by
ILS20.22 or 22.10%, from a close of ILS91.50 on Thursday, August 3, 2017 to a close of ILS71.28
on Sunday, August 6, 2017.

| Security | Closing Price | | Price Drop | Percentage |
| | 8/3/2017 | 8/6/2017 | | |
|---|---|---|---|---|
| Ordinary Shares | ILS91.50 | ILS71.28 | -ILS20.22 | -20.10% |

857.   The next trading day, Monday, August 7, 2017, as the prices of Teva Securities
continued to drop, Morgan Stanley analysts downgraded Teva's ADS to "Underweight," noting
specifically that they had "underappreciated the risk of generics pricing pressure to Teva's earnings
and dividend, and we expect Teva to continue to underperform given overhangs."  In other words,
the analysts had been led to believe through the Exchange Act Defendants' repeated and adamant
denials that Teva was not vulnerable to the pricing pressure.

858.   As a result of the news on August 3 and 4, the ADS price continued to fall, by an
additional $2.01 or 9.76%, from a close of $20.60 on August 4, 2017 to a close of $18.59 on
August 7, 2017, on high trading volume.  The Preferred Shares also continued to fall, by an
additional $33.00 or 8.07%, from a close of $409.00 on August 4, 2017 to a close of $376.00 on

August 7, 2017.  The prices of the Notes also continued to fall, by between $0.72 to $5.42 on August 7, 2017.  Teva's market capitalization was reduced by approximately $2.0 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 8/4/2017 | 8/7/2017 | | |
| ADS | $20.60 | $18.59 | -$2.01 | -9.76% |
| Preferred Shares | $409.00 | $376.00 | -$33.00 | -8.07% |
| 2018 Note | $995.00 | $991.64 | -$3.36 | -0.34% |
| 2019 Note | $985.07 | $982.03 | -$3.04 | -0.31% |
| 2021 Note | $957.52 | $956.80 | -$0.72 | -0.08% |
| 2023 Note | $948.87 | $942.48 | -$6.39 | -0.67% |
| 2026 Note | $919.42 | $914.00 | -$5.42 | -0.59% |
| 2046 Note | $853.79 | $850.09 | -$3.70 | -0.43% |

859.    The ordinary share price also continued to fall, by ILS0.18 or 0.25% from a close of ILS71.28 on Sunday, August 6, 2017 to a close of ILS71.10 on Monday, August 7, 2017.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 8/6/2017 | 8/7/2017 | | |
| Ordinary Shares | ILS71.28 | ILS71.10 | -ILS0.18 | -0.25% |

860.    In total, over these three trading days, the ADS price fell $12.66 or 40.51%.  The Preferred Share price fell $184.50 or 32.92%; and the prices of the Notes fell between $7.76 to $57.51; and the ordinary share price fell ILS40.20 or 36.12%.  Teva's market capitalization was reduced by approximately $12.85 billion.

| Security | Closing Price | | Price Drop | Percentage |
|---|---|---|---|---|
| | 8/2/2017 | 8/7/2017 | | |
| ADS | $31.25 | $18.59 | -$12.66 | -40.51% |
| Preferred Shares | $560.50 | $376.00 | -$184.50 | -32.92% |
| 2018 Note | $999.40 | $991.64 | -$7.76 | -0.78% |
| 2019 Note | $994.48 | $982.03 | -$12.45 | -1.25% |
| 2021 Note | $986.90 | $956.80 | -$30.10 | -3.05% |
| 2023 Note | $981.20 | $942.48 | -$38.72 | -3.95% |
| 2026 Note | $954.08 | $914.00 | -$40.08 | -4.20% |
| 2046 Note | $907.60 | $850.09 | -$57.51 | -6.34% |
| Ordinary Shares | ILS111.30 | ILS71.10 | -ILS40.20 | -36.12% |

## M.     Presumption Of Reliance And Fraud-On-The-Market Doctrine

861.    There is a presumption of reliance established pursuant to the fraud-on-the-market

doctrine because, among other things:

(a)     Defendants made misrepresentations or omissions that were public;

(b)     the misrepresentations or omissions were material;

(c)     the misrepresentations or omissions would tend to induce a reasonable
investor to misjudge the value of Teva Securities;

(d)     Teva Securities traded in an efficient market; and

(e)     Lead Plaintiff and others similarly situated traded in Teva Securities
between the time the misrepresentations or omissions were made and when
the truth was revealed.

862.    At all relevant times, the market for Teva Securities was efficient for the following

reasons, among others:

(a)     the ADS met the requirements for listing, and were listed and actively traded
on the NYSE, a highly efficient and automated market;

(b)     the average weekly trading volume of Teva Securities was significant;

(c)     as a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d)     Teva was eligible to file simplified SEC filings;

(e)     Teva regularly communicated with the public through established market
communication channels, including through the regular dissemination of
news releases on major newswire services and through other wide-ranging
public disclosures, such as communications with the financial press and
other similar reporting services; and

(f)     numerous securities and credit analysts followed Teva and wrote reports
that were published, distributed, and entered the public market.

863.    As a result of the foregoing, the market for Teva Securities promptly digested

current information regarding the Company from all publicly available sources and reflected such

information in their prices.  All purchasers of Teva Securities during the Class Period suffered

similar injury through their purchases of Teva Securities at artificially inflated prices, and a presumption of reliance therefore applies.

864.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Exchange Act Defendants had a duty to disclose.

### N.    Inapplicability Of The Statutory Safe Harbor Or Bespeaks Caution Doctrine

865.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.   First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made. Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.   Further, to the extent that any of the untrue or misleading statements alleged herein were identified as forward-looking, and can be construed as forward-looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those statements, and the generalized disclosures made by the Exchange Act Defendants were not sufficient to shield them from liability.

866.    In the alternative, to the extent the statutory safe harbor otherwise would apply, the Exchange Act Defendants are liable for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was false or misleading and/or each such statement was made or approved by an executive officer of the Company who knew that the statement was false or misleading.

## VI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Company and the Officer Defendants)

867.    Lead Plaintiff and Anchorage repeat and re-allege each and every allegation set forth above as if fully set forth herein.

868.    This Count is asserted against the Exchange Act Defendants (the Company and Officer Defendants) for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, individually and on behalf of all persons who purchased or otherwise acquired Teva Securities in domestic transactions during the Class Period.

869.    The Exchange Act Defendants disseminated or approved the false and misleading statements specified above during the Class Period, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

870.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff, Anchorage, and others similarly situated in connection with their purchases of Teva Securities during the Class Period.

871.    The Exchange Act Defendants, individually and in concert, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, and by the use

245

of the facilities of a national securities exchange with respect to the ADS, engaged in a continuous course of conduct that operated as a fraud and deceit, or otherwise used or employed manipulative or deceptive devices or contrivances, which were intended to and did: (i) deceive the investing public, including Lead Plaintiff, Anchorage, and others similarly situated, regarding, among other things, Teva's participation in illegal anticompetitive activities; (ii) artificially inflate and/or maintain the market price of Teva Securities; and (iii) cause Lead Plaintiff, Anchorage, and others similarly situated to purchase Teva Securities at artificially inflated prices, and thereby suffer losses when the truth was revealed.

872.    The Exchange Act Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

873.    As set forth above, the Exchange Act Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Teva Securities, were either known to the Exchange Act Defendants or were so obvious that the Exchange Act Defendants should have been aware of them.

874.    Lead Plaintiff, Anchorage, and others similarly situated suffered damages as a result of the Exchange Act Defendants' wrongful conduct in that, they purchased or otherwise acquired Teva Securities at artificially inflated prices in reliance on (i) the Exchange Act Defendants' untrue or misleading statements or omissions of material fact and/or (ii) in reliance on the integrity of the market.  Lead Plaintiff, Anchorage, and others similarly situated would not have purchased or otherwise acquired Teva Securities at the prices they paid, or at all, had they been aware that those prices were artificially inflated and/or maintained as a result of the wrongful conduct alleged herein.

875.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiff, Anchorage, and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Teva Securities during the Class Period.

## COUNT II
### Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

876.     Lead Plaintiff and Anchorage repeat and re-allege each and every allegation set forth above as if fully set forth herein.

877.     This Count is asserted against the Officer Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all persons who purchased or otherwise acquired Teva Securities in domestic transactions during the Class Period.

878.     During their tenures as officers and/or directors of Teva, the Officer Defendants were controlling persons of the Company, within the meaning of Section 20(a) of the Exchange Act, and were culpable participants in the alleged wrongful conduct that is the basis of Count I.

879.     The Officer Defendants, by virtue of their control and authority as officers and/or directors of Teva and their direct participation in and/or awareness of the Company's operations and finances, possessed the power and authority to, and did, direct or cause the direction of the management and policies of the Company and its employees, or otherwise cause the Company to engage in the alleged wrongful conduct that is the basis of Count I.

880.     The Officer Defendants were able to and did control, directly and indirectly, the content of the public statements made by Teva during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

881.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Officer Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   The Officer Defendants regularly spoke on behalf of the Company and had the power to, and did, control, directly or indirectly, the decision-making of the Company.   The Officer Defendants signed the Company's SEC filings during the Class Period, and/or were directly involved and responsible in providing false and misleading information and certifying and approving the false and misleading statements disseminated by Teva during the Class Period. The Officer Defendants were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false and misleading information and certifying and approving the false statements disseminated by Teva during the Class Period. As a result of the foregoing, the Officer Defendants, as a group and individually, were controlling persons of Teva within the meaning of Section 20(a) of the Exchange Act.

882.    As set forth above, Teva violated Section 10(b) of the Exchange Act and Rule 10b-5; as controlling persons of the Company, each of the Officer Defendants is liable jointly and severally for such violation, with and to the same extent as the Company. Moreover, as detailed above, during the respective times the Officer Defendants served as officers and/or directors of Teva, each of these Officer Defendants was culpable for the material misstatements and omissions made by Teva. As a direct and proximate result of these Officer Defendants' conduct, Lead Plaintiff, Anchorage, and the other members of the Class suffered damages in connection with their purchase or acquisition of Teva Securities.

## VII.    SECURITIES ACT ALLEGATIONS

### A.    Securities Act Parties

#### 1.    Plaintiffs

##### a)  Lead Plaintiff

883.    Lead Plaintiff Ontario Teachers' purchased or otherwise acquired Teva ADS and Preferred Shares in or pursuant and/or traceable to the ADS/Preferred Offerings, as set forth in the Certification attached hereto as Exhibit A.  For instance, on the December 3, 2015 offering date and at the $62.50 offering price, Ontario Teachers' purchased Teva ADS (SEDOL: 2883878), which are listed on the NYSE, in the ADS Offering and directly from Defendant BofA Merrill Lynch (defined below), a joint book-running manager and underwriter of the ADS/Preferred Offerings, in the United States, and these purchases settled on the December 8, 2015 settlement date.  In addition, on December 17, 2015, Ontario Teachers' purchased Teva Preferred Shares (SEDOL: BYWKW32) pursuant and/or traceable to the Preferred Offering and directly from Defendant Citigroup, a joint book-running manager and underwriter of the ADS/Preferred Offerings, in the United States and that purchase settled on December 22, 2015.

##### b)  Named Plaintiff

884.    Plaintiff Anchorage purchased or otherwise acquired Teva Notes in or pursuant and/or traceable to the Notes Offering, as set forth in the Certification attached hereto as Exhibit B.  For instance, on the July 18, 2016 offering date and at the offering price of 99.734% of the principal amount, Anchorage purchased, Teva Notes, namely 2026 Notes (SEDOL: BD3GT31), in the Notes Offering and directly from Defendant Barclays (defined below), a joint book-running manager and underwriter of the Notes Offering, in the United States, and that purchase settled on the July 21, 2016 settlement date.

## 2.      Securities Act Defendants

885.    Defendant Teva was the issuer of the ADS and the issuer of the Preferred Shares in the ADS/Preferred Offerings.  Teva caused its wholly-owned special purchase finance subsidiary Teva Finance to issue the Notes in the Notes Offering, and payment of all principal and interest payable on the Notes is unconditionally guaranteed by Teva.  As stated in the Notes Offering Materials, Teva intended for the net proceeds of the Notes Offering to be used to finance Teva's acquisition of Actavis, to pay related fees and expenses, and/or for general corporate purposes.

886.    Defendant Vigodman signed the Registration Statements and also signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC and incorporated by reference into the Offering Materials, as set forth herein.  Vigodman also was a Teva Director at the time of the Offerings.

887.    Defendant Desheh signed the Registration Statements and signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC and incorporated by reference into the Offering Materials, as set forth herein.

888.    Defendant Peterburg signed the Registration Statements and was a Teva Director and Chairman of Teva's Board of Directors at the time of the Offerings.

889.    Defendant Teva Pharmaceutical Finance Netherlands III B.V. ("Teva Finance"), a shell company that is a wholly-owned and controlled special purpose finance subsidiary of Teva, is a Dutch private limited liability company with its business address at Piet Heinkade 107, 1019 GM Amsterdam, Netherlands.

890.    Teva Finance does not have any independent operations and does not purport to engage in any activities other than issuing securities and investing the proceeds in Teva or its affiliates at the direction of Teva.

891.    Defendant Bhattacharjee signed the Notes Registration Statement in his capacity as a Managing Director of Teva Finance.

892.    Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance.  Griffin signed the Registration Statements.

### a)  Teva Director Defendants

893.    Defendant Roger Abravanel ("Abravanel") has been a Teva Director since January 2007; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

894.    Defendant Sol J. Barer ("Barer") has been Chairman of Teva's Board of Directors since February 6, 2017; he has been a Teva Director since January 2015, he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

895.    Defendant Arie S. Belldegrun ("Belldegrun") was a Teva Director from February 2013 to January 27, 2017, including at the time of the Offerings, and he signed the Registration Statements.

896.    Defendant Rosemary A. Crane ("Crane") has been a Teva Director since September 2015; she was a Teva Director at the time of the Offerings, and she signed the Registration Statements.

897.    Defendant Amir Elstein ("Elstein") has been a Teva Director since 1995; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

898.    Defendant Jean-Michel Halfon ("Halfon") has been a Teva Director since 2014; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

899.    Defendant Gerald M. Lieberman ("Lieberman") has been a Teva Director since September 2015; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

900.    Defendant Galia Maor ("Maor") has been a Teva Director since September 2012; she was a Teva Director at the time of the Offerings, and she signed the Registration Statements.

901.    Defendant Joseph Nitzani ("Nitzani") has been a Teva Director since September 2008; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

902.    Defendant Ory Schneur Slonim ("Slonim") has been a Teva Director since 1998; he was a Teva Director at the time of the Offerings, and he signed the Registration Statements.

903.    Defendant Gabrielle Greene Sulzburger ("Sulzburger") has been a Teva Director since September 2015; she was a Teva Director at the time of the Offerings, and she signed the Registration Statements.

904.    Defendants Vigodman, Abravanel, Barer, Belldegrun, Crane, Elstein, Halfon, Lieberman, Maor, Nitzani, Peterburg, Slonim, and Sulzburger are sometimes referred to herein collectively as the "Teva Director Defendants."

### b)  Teva Finance Director Defendants

905.    Defendant Dr. Robert Koremans ("Koremans") has served as Teva's President and CEO, Global Specialty Medicines Group since 2013, including at the time of the Notes Offering. From 2012 to 2013, Dr. Koremans served as President and CEO of Teva Pharmaceuticals Europe. Dr. Koremans signed the Notes Registration Statement in his capacity as a Managing Director of Teva Finance.

906.    Defendant Gianfranco Nazzi ("Nazzi") has served as Teva's President and CEO, Growth Markets since March 2017; at the time of the Notes Offering, he served as Teva's SVP,

Specialty Medicines Europe.  Nazzi signed the Notes Registration Statement in his capacity as a Managing Director of Teva Finance.

907.   Defendant John Nason ("Nason") has served as SVP of Teva Global Operations, Technical Operations Europe since March 2015, including at the time of the Notes Offering.  Nason signed the Notes Registration Statement in his capacity as a Managing Director of Teva Finance.

908.   Defendant David Vrhovec ("Vrhovec") has served as Teva's CFO Europe since May 2016, including at the time of the Notes Offering.  Vrhovec signed the Notes Registration Statement in his capacity as a Managing Director of Teva Finance.

909.   Defendants Koremans, Bhattacharjee, Nazzi, Nason, and Vrhovec are sometimes collectively referred to herein as the "Teva Finance Director Defendants."

### c)  Underwriter Defendants

910.   Defendant Barclays Capital Inc. ("Barclays") is an SEC-registered securities broker-dealer with investment banking and capital markets businesses in the United States; it is a Connecticut company with its principal place of business and mailing address at 745 7th Avenue, New York, New York, 10019.  Barclays acted as an underwriter and joint book-running manager with respect to the Offerings.

911.   Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("BofA Merrill Lynch") is an SEC-registered securities broker-dealer and wholly-owned indirect subsidiary of Bank of America Corporation that offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts and mergers and acquisitions; it is a Delaware company with its principal place of business at One Bryant Park, New York, New York, 10036, and mailing address at 222 Broadway, New York, New York,

10038.  BofA Merrill Lynch acted as an underwriter and joint book-running manager with respect to the Offerings.

912.    Defendant BNP Paribas Securities Corp. ("BNP") is an SEC-registered securities broker-dealer that operates in buying and selling securities such as stocks, bonds, and other investment products; it is a Delaware company with its principal place of business at 787 7th Avenue, New York, New York, 10019, and mailing address at 525 Washington Boulevard, Jersey City, New Jersey, 07310.  BNP acted as an underwriter and joint book-running manager with respect to the Offerings.

913.    Defendant Citigroup Global Markets Inc. ("Citigroup") is an SEC-registered securities broker-dealer and a large financial services institution that provides commercial and investment banking services, commercial loans, and underwriting services; it is a New York company with its principal place of business at 388 Greenwich Street, New York, New York, 10013, and mailing address at 540 Crosspoint Parkway, Getzville, New York, 14068.  Citigroup acted as an underwriter and joint book-running manager with respect to the Offerings.

914.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an SEC-registered securities broker-dealer that operates as an investment banking firm, offering services including strategic planning, consolidation, reorganization, merger and acquisition advice, capital raising, and valuation; it is a Delaware company with its principal place of business at Eleven Madison Avenue, New York, New York, 10010-3629, and mailing address at One Madison Avenue, 9th Floor, New York, New York, 10010.  Credit Suisse acted as an underwriter and joint book-running manager with respect to the Offerings.

915.    Defendant HSBC Securities (USA) Inc. ("HSBC") is an SEC-registered securities broker-dealer that engages in underwriting, dealing, and brokering a full range of debt and equity

securities; it is a Delaware company with its principal place of business at 452 5th Avenue, New York, New York, 10018, and mailing address at 1 West 39th Street, 12th Floor, New York, New York, 10018.  HSBC acted as an underwriter and joint book-running manager with respect to the Offerings.

916.    Defendant Mizuho Securities USA LLC, the entity at the time of the Offerings known as Mizuho Securities USA Inc. ("Mizuho"), is an SEC-registered securities broker-dealer that offers services involving asset management, equities, fixed income, foreign exchange, treasury, fund administration, research, and financial planning; it is a Delaware company with its principal place of business and mailing address at 320 Park Avenue, 12th Floor, New York, New York, 10022.  Mizuho acted as an underwriter and joint book-running manager with respect to the Offerings.

917.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an SEC-registered securities broker-dealer with businesses that include securities underwriting and distribution and financial advisory services; it is a Delaware company with its principal place of business at 1585 Broadway, New York, New York, 10036, and mailing address at 1300 Thames Street Wharf, 7th Floor, c/o North American Registration, Baltimore, Maryland, 21231.  Morgan Stanley acted as an underwriter and joint book-running manager with respect to the Offerings.

918.    Defendant RBC Capital Markets, LLC ("RBC") is an SEC-registered securities broker-dealer and investment adviser, which engages, among other endeavors, in full-service brokerage, investment banking, and asset management services to retail and institutional clients; it is a Minnesota company with its principal place of business and mailing address at 3 World Financial Center, 200 Vesey Street, New York, New York, 10281.  RBC acted as an underwriter and joint book-running manager with respect to the Offerings.

919.    Defendant SMBC Nikko Securities America, Inc. ("SMBC Nikko") is an SEC-registered securities broker-dealer that engages, among other endeavors, in securities trading, underwriting services of debt and equity securities, and services to assist in the sale of securities underwritten by other entities; it is a Delaware company with its principal place of business and mailing address at 277 Park Avenue, Fifth Floor, New York, New York, 10172.  SMBC Nikko acted as an underwriter and joint book-running manager with respect to the Offerings.

920.    Defendant Bank of China Limited London Branch ("Bank of China") provides banking and financial services including debt and equity underwriting and financial advisor; it is a major branch of a Chinese company and maintains its principal place of business at 1 Lothbury, London EC2R 7DB, United Kingdom.  Bank of China acted as an underwriter and co-manager with respect to the Notes Offering.

921.    Defendant BBVA Securities Inc. ("BBVA") is an SEC-registered securities broker-dealer, the institutional business of which consists of investment banking (including securities originations, loan syndications, project finance, and merger and acquisition advisory services), financing transactions, and institutional sales of fixed income securities; it is a New York company with its principal place of business at 1345 Avenue of the Americas, 44th Floor, New York, New York, 10105-0302, and its mailing address at 15 South 20th, 6th Floor, Birmingham, Alabama, 35233.  BBVA acted as an underwriter and co-manager with respect to the Notes Offering.

922.    Defendant Commerz Markets LLC ("Commerz") is an SEC-registered securities broker-dealer that engages, among other endeavors, in investment banking services in connection with corporate transactions; it is a Delaware company with its principal place of business and mailing address at 225 Liberty Street, New York, New York, 10281.  Commerz acted as an underwriter and co-manager with respect to the Notes Offering.

923.    Defendant Lloyds Securities Inc. ("Lloyds") is an SEC-registered securities broker-dealer that engages in business activities including investment banking and institutional sales with respect to debt securities and loans; it is a Delaware company with its principal place of business and mailing address at 1095 Avenue of the Americas, New York, New York, 10036.  Lloyds acted as an underwriter and co-manager with respect to the Notes Offering.

924.    Defendant MUFG Securities Americas Inc. ("MUFG") is an SEC-registered securities broker-dealer that engages in capital markets origination transactions, private placements, collateralized financing, securities borrowing and lending transactions, and debt transactions; it is a New York company with its principal place of business and mailing address at 1221 Avenue of the Americas, 6th Floor, New York, New York, 10020-1001.  MUFG acted as an underwriter and co-manager with respect to the Notes Offering.

925.    Defendant PNC Capital Markets LLC ("PNC") is an SEC-registered securities broker-dealer that underwrites, deals, and trades in corporate government and private debt and asset-backed securities, in addition to acting as an agent for its corporate affiliates in certain securities transactions; it is a Pennsylvania company with its principal place of business and mailing address at 300 5th Avenue, Fifth Floor, Pittsburgh, Pennsylvania, 15222.  PNC acted as an underwriter and co-manager with respect to the Notes Offering.

926.    Defendant Scotia Capital (USA) Inc. ("Scotia") is an SEC-registered securities broker-dealer that engages, among other endeavors, in corporate debt and equity underwriting; it is a New York company with its principal place of business and mailing address at 250 Vesey Street, New York, New York, 10006.  Scotia acted as an underwriter and co-manager with respect to the Notes Offering.

927.    Defendant TD Securities (USA) LLC ("TD") is an SEC-registered securities broker-dealer that engages, among other endeavors, in corporate debt and equity underwriting; it is a Delaware company with its principal place of business and mailing address at 31 West 52nd Street, New York, New York, 10019-6101.  TD acted as an underwriter and co-manager with respect to the Notes Offering.

928.    Defendants Barclays, BofA Merrill Lynch, BNP, Citigroup, Credit Suisse, HSBC, Mizuho, Morgan Stanley, RBC, SMBC Nikko, Bank of China, BBVA, Commerz, Lloyds, MUFG, PNC, Scotia, and TD are sometimes referred to herein collectively as the "Underwriter Defendants."  Defendants Barclays, BofA Merrill Lynch, BNP, Citigroup, Credit Suisse, HSBC, Mizuho, Morgan Stanley, RBC, and SMBC Nikko are sometimes referred to herein collectively as the "ADS/Preferred Underwriter Defendants."

### d)  Outside Auditor

929.    Defendant Kesselman & Kesselman ("PwC/Kesselman") is an independent registered public accounting firm in Israel and a member of PricewaterhouseCoopers International Ltd.  PwC/Kesselman also does business under the name PwC Israel and its main office is located at Trade Tower, 25 Hamered Street, Tel-Aviv 6812508, Israel.

930.    PwC/Kesselman issued the Audit Reports in regard to Teva's financial statements and internal control over financial reporting as set forth in the 2014 20-F and the 2015 20-F, which were incorporated by reference into the Registration Statements with the consent of PwC/Kesselman.

### B.    Additional Background Allegations

#### 1.    Actavis Generics Acquisition

931.    On July 27, 2015, Teva filed with the SEC a Form 6-K, announcing that it had entered into a definitive agreement with Allergan to acquire its worldwide generic pharmaceuticals business and certain other assets ("Actavis") in a transaction valued at $40.5 billion.

932.    On July 28, 2015, Teva filed with the SEC a Form 6-K, stating that it had entered into a master purchase agreement dated July 26, 2015, to purchase Actavis for a cash purchase price of $33.75 billion and $6.75 billion in unregistered restricted ordinary shares (or ADS with respect thereto) of Teva.

933.    On October 1, 2015, Teva filed a Form 6-K with the SEC, announcing a special meeting of shareholders to approve the creation of a new class of mandatory convertible preferred shares, which Teva intended to offer to finance a portion of the cash consideration for the acquisition of Actavis, or otherwise for general corporate purposes.   At the meeting held on November 5, 2015, the proposal was approved by the required majority of shareholders voting in person and by proxy.

934.    Teva received clearance from the FTC on or about July 27, 2016 and completed its acquisition of Actavis for $33.43 billion in cash and approximately 100 million Teva shares, valued at approximately $6.75 billion, on or about August 2, 2016.

#### 2.    The Relevant Offerings

##### a)    The ADS/Preferred Offerings

935.    On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing concurrent public offerings totaling approximately $6.75 billion.   These offerings consisted of approximately $3.375 billion of its ADS and approximately $3.375 billion of its Preferred Shares, and were pursuant to a prospectus and related prospectus

supplements constituting part of Teva's shelf registration statement on Form F-3 (Registration No. 333-208238) filed with the SEC on November 30, 2015.

936.    On November 30, 2015, Teva filed a registration statement on Form F-6 for the ADS evidenced by American Depositary Receipts, with JPMorgan Chase Bank, N.A., which has it principal offices at 4 New York Plaza, Floor 12, New York, New York 10004, as the depositary. Each ADS represents one ordinary share of Teva.

937.    On November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering, each dated November 30, 2015.

938.    On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings.  That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the final ADS Prospectus and final Preferred Prospectus, and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

939.    On December 8, 2015, Teva closed the ADS/Preferred Offerings and issued 54 million ADS at $62.50 per ADS and 3,375,000 Preferred Shares (7.00% mandatory convertible preferred shares, nominal (par) value NIS 0.10 per share) at $1,000.00 per share.  The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses payable by Teva, were approximately $3.29 billion from the ADS Offering and approximately $3.29 billion from the Preferred Offering.

940.    Defendants Barclays, Citigroup, BofA Merrill Lynch, and Morgan Stanley, as representatives of the ADS/Preferred Underwriters, and pursuant to certain underwriting agreements, exercised their options to purchase additional ADS and Preferred Shares to cover overallotments; Teva issued an additional 5.4 million ADS and an additional 337,500 Preferred

Shares at the time of such purchases, on January 6, 2016.  As a result, Teva received an additional $329 million in net proceeds for the ADS Offering and an additional $329 million in net proceeds for the Preferred Offering, for an aggregate of approximately $3.62 billion for the ADS Offering and an aggregate of approximately $3.62 billion for the Preferred Offering.

941.    Each Preferred Share will convert automatically on the mandatory conversion date of December 15, 2018, into a number of ADS equal to the conversion rate set forth in the Preferred Prospectus, between 13.3333 and 16.0000, subject to anti-dilution adjustments.

942.    The ADS Registration Statement and the Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS Registration Statement and/or the Preferred Registration Statement, including the ADS Prospectus and the Preferred Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

943.    The ADS/Preferred Offering Materials stated that Teva intended to use the net proceeds from the ADS/Preferred Offerings to finance the acquisition of Actavis, and related fees and expenses and/or otherwise for general corporate purposes.

### b)  The Notes Offering

944.    On July 12, 2016, Teva filed with the SEC a Form 6-K and, pursuant to Rule 433, a free writing prospectus dated July 12, 2016, each of which announced a conference call and webcast to provide preliminary outlook for 2016-2019 and stated, in part, as follows:

> On the conference call and webcast, the Company will communicate that it now expects revenues for the second quarter of 2016 to be $4.9 – $5.0 billion compared to its previous guidance of $4.8 – $4.9 billion, while non-GAAP EPS for the quarter is now expected to be $1.19 – $1.22 compared to the previous guided range of $1.16 – $1.20 based on a fully diluted weighted average number of shares of 980 million. Cash flow from operating activities is now expected to be $1.0 – $1.1 billion compared to $1.2 – $1.3 billion.

945.    On July 13, 2016, beginning at or around 8:00 a.m. ET, Defendants Vigodman, Desheh, and Olafsson hosted the conference call and webcast, along with 16 securities analyst participants, which was open to the investing public (live and as an audio recording) using toll-free telephone numbers and available on the Company's website (www.ir.tevapharm.com).

946.    During the conference call, Defendant Vigodman stated, in part, as follows:

> [W]e are closely monitoring the corporate bond markets and given the various attractive terms currently prevailing there, we are considering accelerating our planned debt offering.
>
> …
>
> We delivered a solid first quarter in 2016, and today we are reaffirming and even slightly revising upwards the guidance we previously provided for the second quarter, as well as providing outlook for the remainder of 2016. With everything we have accomplished as a Company since the beginning of 2014, and once we close the Actavis Generics deal, we are creating a new Teva, with a strong foundation of significantly enhanced financial profile, and more diversified revenue sources and profit streams, backed by strong product development engines in both generics and specialty. This is a platform that will generate multi-year top line and bottom line growth, as well as significant cash flow.

947.    During the conference call, Defendant Desheh stated, in part, as follows:

> … I would like to provide an update to our Q2 outlook. We believe that results for the second quarter of 2016 will be better than our original guidance. Revenues are expected to be between $4.9 billion to $5.0 billion, and non-GAAP earnings per share is expected to be between $1.19 to $1.22.

948.    Shortly thereafter, on July 13, 2016, Teva filed with the SEC its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3 (Registration Nos. 333-201984, 333-201984-09), superseding the original base prospectus dated February 9, 2015.

949.    Later that day, on July 13, 2016, Teva filed with the SEC, a Form 6-K, announcing a series of fixed income investor calls in the United States, on which Teva would be represented by Defendant Desheh and other senior executives of the Company, as follows:

Teva Pharmaceutical Industries Ltd. (NYSE and TASE: TEVA) announced a series of fixed income investor calls in the United States and in-person meetings in Europe, which are being arranged by Barclays, BofA Merrill Lynch, BNP Paribas, Credit Suisse, HSBC and Mizuho. The U.S. calls will be held on Wednesday, July 13 and Thursday, July 14. The meetings in Europe will be conducted on Monday, July 18 and Tuesday, July 19, with additional calls as requested. BofA Merrill Lynch is coordinating the U.S. calls, and Barclays and BNP Paribas are coordinating the European meetings. Senior, unsecured benchmark-sized offerings of USD, EUR and/or CHF-denominated multi-tranche debt securities are expected to follow, subject to market conditions.

U.S. Telephonic Schedule:
Wednesday, July 13: 12:00pm ET - 6:00pm ET
Thursday, July 14: 8:30am ET - 6:00pm ET

European Schedule:
Monday, July 18: London
Tuesday, July 19: Frankfurt, Munich & Paris

Teva will be represented by:
Erez Vigodman, Chief Executive Officer (Meetings only)
Eyal Desheh, Chief Financial Officer (Calls and Meetings)
Eran Ezra, SVP & Head of Global Treasury (Calls and Meetings)
Eyal Rubin, VP & Head of Corporate Treasury (Calls and Meetings)

950.    On July 13, 2016, Teva also filed with the SEC, pursuant to Rule 433, a free writing prospectus in the form of an investor presentation titled "2016-2019 Preliminary Financial Outlook" dated July 13, 2016.

951.    On July 15, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2106.

952.    On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final Notes Prospectus and, pursuant to Rule 433, two free writing prospectuses, all dated July 18, 2016.

953.    On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of an aggregate of $15 billion of debt securities comprised of (i) $1,500,000,000 of its 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of its 1.700% Senior Notes due 2019; (iii) $3,000,000,000 of its 2.200% Senior Notes due 2021; (iv) $3,000,000,000 of

263

its 2.800% Senior Notes due 2023; (v) $3,500,000,000 of its 3.150% Senior Notes due 2026; and (vi) $2,000,000,000 of its 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering"), payment of principal and interest unconditionally guaranteed by Teva.  The Company's net proceeds from the Notes Offering were approximately $14.9 billion, after underwriting discounts and estimated offering expenses payable by the Company.

954.    The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration Statement, including the Notes Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials."

955.    The Notes Offering Materials stated that Teva intended to use the net proceeds from the Notes Offering to finance its acquisition Actavis, to pay related fees and expenses, and/or otherwise for general corporate purposes.

### C.    Actionable False And Misleading Statements In The Offering Materials

956.    The statements set forth below contained untrue statements of material fact and omitted material facts necessary in order to make the statements therein, not misleading, including that the Company (by and through certain of its officials and other employees) (i) was colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the United States; (ii) was not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service, and breadth of product line, but instead preserved its market share volume and inflated pricing in the U.S. generics markets through anticompetitive conduct and collusion; (iii) was implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) was not engaged in a lawful or sustainable business strategy; (v) was reporting financial results that were the result of the anticompetitive conduct and collusion; (vi) was

reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the anticompetitive and collusive conduct.  In addition to these reasons, the statements concerning Teva's financial performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the above-stated anticompetitive conduct and collusion.

957.    Furthermore, the Forms 20-F was misleading and in violation of applicable SEC regulations, namely Item 5 of SEC Form F-3, because it did not disclose known trends, specifically (1) the source of the Company's inflated revenues, and (2) that the degradation in its generic drug business was in substantial part caused by Teva's inability to maintain collusive prices, under pressure from regulatory investigations and other scrutiny.

958.    Additionally, the 2014 20-F and 2015 20-F contain SOX Certifications signed by Vigodman and Desheh that were materially false and misleading when made in multiple respects. Contrary to their representations that the Forms 20-Fs did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made … not misleading" and "fairly present[ed], in all material respects, the financial condition and results of operations" of Teva, the Forms 20-F materially misstated Teva's key financial metrics.   Also, contrary to the statement in the 20-Fs that the signatories "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," Teva's internal controls suffered deficiencies that caused the Company's financial results to be materially misstated in violation of GAAP.  Defendants did not design internal controls to provide reasonable assurance regarding the reliability of financial reporting.  Further, oversight and monitoring internal controls failed to detect the anti-competitive and collusive conduct.

959.     Further, the statements made by Teva's outside auditor PwC/Kesselman were false because Teva's financial reporting did not fairly, in all material respects, represent the financial position of the Company, the reported results were not in compliance with GAAP as they violated GAAP revenue recognition rules, the Securities Act Defendants violated Item 303 of SEC Regulation S-K by failing to disclose the nature of the revenue from its anticompetitive conduct and collusion, and Teva's internal control over financial reporting were not effective or adequately designed to prevent the misstatements and omissions of material fact

### 1.     The ADS/Preferred Offering Materials

960.     The following documents filed with the SEC are expressly incorporated into the ADS/Preferred Offering Materials by reference:

(1) Our Annual Report on Form 20-F for the year ended December 31, 2014; and

(2) Our Reports of Foreign Private Issuer on Form 6-K, filed with the SEC on January 7, 2015, January 20, 2015, January 26, 2015, February 5, 2015 (report filed at 8:25:50 a.m. EST), February 12, 2015, February 17, 2015 (two reports), February 23, 2015, February 24, 2015, February 25, 2015, February 27, 2015, March 2, 2015, March 11, 2015, March 17, 2015, March 23, 2015 (two reports), March 24, 2015, March 30, 2015, March 31, 2015 (two reports), April 1, 2015, April 2, 2015, April 14, 2015, April 23, 2015 (two reports), April 28, 2015 (two reports), April 30, 2015 (report filed at 9:32:04 a.m. EDT), May 5, 2015 (report filed at 4:50:33 p.m. EDT), May 14, 2015, May 29, 2015, June 1, 2015, June 2, 2015, June 15, 2015, June 16, 2015, June 18, 2015 (two reports), June 25, 2015, July 1, 2015 (two reports), July 8, 2015, July 28, 2015 (two reports), July 30, 2015 (reports filed at 10:42:37 a.m. and 4:10:07 p.m. EDT), July 31, 2015, August 3, 2015 (two reports), August 12, 2015, September 1, 2015, September 3, 2015, September 10, 2015 (report filed at 10:43:22 a.m. EDT), September 25, 2015, September 28, 2015 (two reports), September 29, 2015, September 30, 2015, October 1, 2015 (two reports), October 8, 2015, October 13, 2015, October 29, 2015 (report filed at 11:18:49 a.m. EDT), November 5, 2015, November 9, 2015, November 18, 2015, November 19, 2015 (two reports), November 25, 2015 and November 30, 2015 (three reports).

961.     As set forth herein, certain of the above documents contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

**a)  2014 Full Year Financial Results**

962.    In the 2014 20-F, filed on February 9, 2015, Teva reported (1) revenue of

$20.3 billion; (2) gross profit of $11.1 billion; (3) net income of  $3.0 billion; (4) Generic

Medicines segment revenues of $9.8 billion; (5) Generic Medicines gross profit of $4.2 billion;

and (6) Generic Medicines segment profitability of $2.1 billion for the year.

963.    In the 2014 20-F, Teva reported that 2014 U.S. Generic Medicine revenues

> amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013.  The
> increase resulted mainly from the 2014 exclusive launch of capecitabine (the
> generic equivalent of Xeloda), the launch of omega-3-acid ethyl esters (the
> generic equivalent of Lovaza ) for which we were first to market, and the
> launch of raloxifene (the generic equivalent of Evista ), as well as products
> that were sold in 2014 that were not sold in 2013.  These increases were
> partially offset by lower sales of the generic versions of Adderall IR
> (amphetamine salts IR), Pulmicort (budesonide inhalation) and Niaspan
> (niacin ER).

964.    In the 2014 20-F, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

> In 2014, we led the U.S. generic market in total prescriptions and new
> prescriptions, with total prescriptions of approximately 500 million,
> representing 14.2% of total U.S. generic prescriptions. We intend to continue
> our U.S. market leadership based on our ability to introduce new generic
> equivalents for brand-name products on a timely basis, with a focus on
> complex generics and other high-barrier products that we believe will create
> more value for patients and customers, our strong emphasis on customer
> service, the breadth of our product line, our commitment to quality and
> regulatory compliance and our cost effective production.

965.    In the 2014 20-F, Teva also described the "intense competition" the Company faced

in the generic drug market in the United States and touted its strategic and "competitive

advantages."  Specifically:

> In the United States, we are subject to intense competition in the generic drug
> market from domestic and international generic drug manufacturers, brand-
> name pharmaceutical companies through lifecycle management initiatives,
> authorized  generics,  existing  brand  equivalents  and  manufacturers  of

therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

966.    The Company also described in the 2014 20-F the challenges inherent to the generics markets, including "intense competition," and the primary factors driving revenues and growth in the Company's Generic Medicines segment:

Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. … These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

967.    Teva described the following Risk Factor in its 2014 20-F related to the impact of competition in the generics market:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

968.    Defendants Vigodman and Desheh personally signed certifications pursuant to Section 302 and Section 906 of the Sarbanes-Oxley Act in connection with the 2014 20-F.

969.    The SOX Certifications provided assurances that these Officer Defendants had evaluated the Company's internal controls and determined them to be effective as of December 31, 2014.  On the subject of internal controls, the 2014 Form 20-F stated the following:

(a) Disclosure Controls and Procedures. Teva's chief executive officer and chief financial officer, after evaluating the effectiveness of Teva's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this annual report, have concluded that, as of such date, Teva's disclosure controls and procedures were effective to ensure that the information required in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and such information is accumulated and communicated to its management, including its chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

(b) Report of Teva Management on Internal Control over Financial Reporting. Teva's board of directors and management are responsible for establishing and maintaining adequate internal control over financial reporting. Teva's internal control system was designed to provide reasonable assurance to Teva's management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of its published consolidated financial statements.

…

Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014. In making this assessment, it used the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that, as of December 31, 2014, Teva's internal control over financial reporting is effective based on those criteria.

…

(d) Changes in Internal Control over Financial Reporting. There were no changes to Teva's internal control over financial reporting that occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, Teva's internal control over financial reporting.

970.   The SOX Certifications pursuant to Section 302 further represented that the Company's financial statements were accurate and in accordance with GAAP, and that the signatories had designed and implemented internal controls that provided reasonable assurance that Teva's financial reporting was reliable and complied with GAAP.  Specifically, the SOX Certifications pursuant to Section 302 in the 2014 Form 20-F stated, in relevant part:

1. I have reviewed this annual report on Form 20-F of Teva Pharmaceutical Industries Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    a.  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

971.   The SOX Certifications pursuant to Section 906 in the 2014 20-F certified, in relevant part: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

**b) First Quarter 2015 Financial Results**

972.    In the Q1 2015 6-K filed on April 30, 2015, Teva reported (1) revenue of $5.0 billion; (2) gross profit of $2.8 billion (3) net income of $444 million; (4) Generic Medicines segment revenues of $2.6 billion; (5) Generic Medicines gross profit of $1.3 billion; and (6) Generic Medicines segment profitability of $799 million for the quarter.

973.    In the Q1 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.4 billion, an increase of 37% compared to the first quarter of 2014. The increase resulted mainly from the launch of esomeprazole magnesium DR capsules (the generic equivalent of Nexium®) this quarter and from sales of other products that were not sold in the first quarter of 2014, the most significant of which was omega-3-acid ethyl esters (the generic equivalent of Lovaza®). These increases were partially offset by declines in other products, the most significant of which was niacin ER (the generic equivalent of Niaspan®)."

974.    In the Q1 2015 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 488 million, representing 13.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

**c) Second Quarter 2015 Financial Results**

975.    In the Q2 2015 6-K filed on July 30, 2015, Teva reported (1) revenue of $4.9 billion; (2) gross profit of $2.9 billion; (3) net income of $539 million; (4) Generic Medicines segment revenues of $2.5 billion; (5) Generic Medicines gross profit of $1.2 billion; and (6) Generic Medicines segment profitability of $729 million for the quarter.

976.    In the Q2 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.3 billion, an increase of 24% compared to the second quarter of 2014.  The increase resulted mainly from the at-risk launch of aripiprazole tablets (the generic equivalent of Abilify®) during the second quarter of 2015 and from sales of other products that were not sold in the second quarter of 2014, the most significant of which was esomeprazole magnesium DR capsules (the generic equivalent of Nexium®).  These increases were partially offset by declines in other products, the most significant of which was capecitabine (the generic equivalent of Xeloda®)."

977.    In the Q2 2015 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the second quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 483 million, representing 13.5% of total U.S. generic prescriptions.  We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

### d)  Third Quarter 2015 Financial Results

978.    In the Q3 2015 6-K filed on October 29, 2015, Teva reported (1) revenue of $4.8 billion; (2) gross profit of $2.8 billion; (3) net income of $116 million; (4) Generic Medicines segment revenues of $2.2 billion; (5) Generic Medicines gross profit of $1.0 billion; and (6) Generic Medicines segment profitability of $578 million for the quarter.

979.    In the Q3 2015 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $1.0 billion, a decrease of 8% compared to the third quarter of 2014.  The decrease resulted mainly from a decline in sales of budesonide (the generic equivalent of Pulmicort®),

niacin ER (the generic equivalent of Niaspan®), capecitabine (the generic equivalent of Xeloda®)

and omega-3-acid ethyl esters (the generic equivalent of Lovaza®) due to price declines resulting

from increased competition.  These decreases were partially offset by sales of products sold in the

third quarter of 2015 that were not sold in the third quarter of 2014, the most significant of which

were esomeprazole (the generic equivalent of Nexium®), aspirin/extended-release dipyridamole

(the generic equivalent of Aggrenox®) and aripiprazole (the generic equivalent of Abilify®)."

980.    In the Q3 2015 6-K, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

> In the third quarter of 2015, we continued to lead the U.S. generic market in
> total prescriptions and new prescriptions, with approximately 481 million
> total prescriptions, representing 13.4% of total U.S. generic prescriptions. We
> seek to continue our U.S. market leadership by introducing new generic
> equivalents for brand-name products on a timely basis, with a focus on
> complex generics and other high-barrier products that we believe will create
> more value for patients and customers, our strong emphasis on customer
> service, our broad product line, our commitment to quality and regulatory
> compliance and our cost-effective production.

### e)  Statements Made By PwC/Kesselman

981.    In addition, PwC/Kesselman consented to the incorporation by reference in the

ADS/Preferred Registration Statement its Audit Report dated February 9, 2015 (which also was

incorporated by reference and included in the 2014 20-F with consent) (the "2014 Audit Report"):

> We hereby consent to the incorporation by reference in this Registration
> Statement on Form F-3 of Teva Pharmaceutical Industries Limited of our
> reports dated February 9, 2015 relating to the consolidated financial
> statements, financial statement schedule and the effectiveness of internal
> control over financial reporting, which appears in Teva Pharmaceutical
> Industries Limited's Annual Report on Form 20-F for the year ended
> December 31, 2014. We also consent to the reference to us under the heading
> "Experts" in such Registration Statement.

982.    The 2014 Audit Report stated in substance the following:

> In our opinion, the accompanying consolidated balance sheets and the related
> consolidated statements of income, of comprehensive income, of changes in

equity and of cash flows present fairly, in all material respects, the financial position of Teva Pharmaceutical Industries Limited and its subsidiaries at December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014 , based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management and Board of Directors are responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in ''Report of Teva Management on Internal Control Over Financial Reporting'' appearing under Item 15(b). Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management and Board of Directors and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide

274

reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## 2.    The Notes Offering Materials

983.    The following documents filed with the SEC are expressly incorporated into the

Notes Offering Materials by reference:

(1) Our Annual Report on Form 20-F for the year ended December 31, 2015, including the description of Teva's ordinary shares, par value NIS 0.10 per share and the American Depositary Shares representing the ordinary shares, contained therein; and

(2) Our Reports of Foreign Private Issuer on Form 6-K, filed with the SEC on January 4, 2016 (two reports), January 5, 2016, January 6, 2016, January 7, 2016 (report filed at 8:24:25 a.m. EST), January 25, 2016, January 28, 2016 (report filed at 12:23:33 p.m. EST), February 2, 2016, February 24, 2016, February 29, 2016, March 3, 2016 (report filed at 9:22:03 a.m. EST), March 9, 2016, March 10, 2016, March 14, 2016, March 15, 2016, March 22, 2016, March 23, 2016, April 1, 2016 (report filed at 9:29:14 a.m. EDT), April 18, 2016 (report filed at 1:35:02 p.m. EDT), April 29, 2016, May 9, 2016 (report filed at 11:09:47 a.m. EDT), May 31, 2016 (report filed at 7:23:26 a.m. EDT), June 7, 2016 (report filed at 3:44:15 p.m. EDT), June 10, 2016, June 13, 2016, June 23, 2016, June 24, 2016, June 27, 2016, June 28, 2016, July 5, 2016 and July 13, 2016 (reports filed at 6:00:00 a.m. EST and 10:34:58 a.m. EST).

984.    As set forth herein, certain of the above documents contained untrue statements of

material fact and/or omitted to state material facts required to be stated therein or necessary to

make the statements therein not misleading.

## a)  2015 Full Year Financial Results

985.    In the 2015 Form 20-F filed on February 11, 2016, Teva reported (1) revenue of

$19.7 billion; (2) gross profit of $11.4 billion; (3) net income of   $1.6 billion; (4) Generic

Medicines segment revenues of $9.5 billion; (5) Generic Medicines gross profit of $4.5 billion;

and (6) Generic Medicines segment profitability of $2.7 billion for the year.

986.    In the 2015 20-F, Teva reported U.S. Generic Medicine 2015 revenues:

amounted to $4.8 billion, up 8% compared to $4.4 billion in 2014.   The
increase resulted mainly from the 2015 exclusive launch of esomeprazole (the
generic equivalent of Nexium) and the launch of aripiprazole (the generic
equivalent of Abilify), as well as products that were sold in 2015 that were
not sold in 2014.   This increase was partially offset by lower sales of the
generic   versions   of   Pulmicort   (budesonide   inhalation),   Xeloda
(capecitabine), Niaspan (niacin ER) and Lovaza (omega-3-acid ethyl esters).

987.    In the 2015 20-F, Teva touted its competitive position and discussed its plan for

success in the United States generic medicines market, stating:

In 2015, we led the U.S. generic market in total prescriptions and new
prescriptions,   with   approximately   473 million   total   prescriptions,
representing 13.1% of total U.S. generic prescriptions according to IMS data.
We seek to continue our U.S. market leadership based on our ability to
introduce new generic equivalents for brand-name products on a timely basis,
with a focus on complex generics and other high-barrier products that we
believe will create more value for patients and customers, our strong
emphasis on customer service, the breadth of our product line, our
commitment to quality and regulatory compliance and our cost-effective
production, including through our pending acquisition of Actavis Generics.

988.    In the 2015 20-F, Teva also described the "intense competition" the Company faced

in the generic drug market in the United States and touted its strategic and "competitive

advantages."  Specifically:

In the United States, we are subject to intense competition in the generic drug
market from domestic and international generic drug manufacturers, brand-
name pharmaceutical companies through lifecycle management initiatives,
authorized generics, existing brand equivalents and manufacturers of
therapeutically similar drugs. Price competition from additional generic
versions of the same product typically results in margin pressures. We believe
that our primary competitive advantages are our ability to continually
introduce new and complex generic equivalents for brand-name drug
products on a timely basis, our quality, our customer service and the breadth
of our product portfolio. We believe we have a focused and competitive
pricing strategy.

989.    The Company also described in the 2015 20-F the challenges inherent to the generics markets, including "intense competition," and the primary factors driving revenues and growth in the Company's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. … These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

990.    Teva described the following Risk Factor in its 2015 20-F related to the impact of competition in the generics market:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

991.    Defendants Vigodman and Desheh personally signed certifications pursuant to Section 302 and Section 906 of the Sarbanes-Oxley Act in connection with the 2015 20-F.

992.    The SOX Certifications provided assurances that these Officer Defendants had evaluated the Company's internal controls and determined them to be effective as of December 31, 2015.  On the subject of internal controls, the 2015 Form 20-F stated the following:

> (a) Disclosure Controls and Procedures. Teva's chief executive officer and chief financial officer, after evaluating the effectiveness of Teva's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this annual report, have concluded that, as of such date, Teva's disclosure controls and procedures were effective to ensure that the information required in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within

the time periods specified in the SEC's rules and forms, and such information is accumulated and communicated to its management, including its chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

(b) Report of Teva Management on Internal Control over Financial Reporting. Teva's board of directors and management are responsible for and maintaining adequate internal control over financial reporting. Teva's internal control system was designed to provide reasonable assurance to Teva's management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of its published consolidated financial statements.

…

Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015. In making this assessment, it used the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that, as of December 31, 2015, Teva's internal control over financial reporting is effective based on those criteria.

…

(d) Changes in Internal Control over Financial Reporting. There were no changes to Teva's internal control over financial reporting that occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, Teva's internal control over financial reporting.

993.    The SOX Certifications pursuant to Section 302 further represented that the Company's financial statements were accurate and in accordance with GAAP, and that the signatories had designed and implemented internal controls that provided reasonable assurance that Teva's financial reporting was reliable and complied with GAAP.  Specifically, the SOX Certifications pursuant to Section 302 in the 2015 Form 20-F stated, in relevant part:

1.  I have reviewed this annual report on Form 20-F of Teva Pharmaceutical Industries Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

278

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

994.    The SOX Certifications pursuant to Section 906 in the 2015 20-F certified, in relevant part: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

### b) First Quarter 2016 Financial Results

995.    In the Q1 2016 6-K filed on May 9, 2016, Teva reported (1) revenue of $4.8 billion; (2) gross profit of $2.8 billion; (3) net income of $633 million; (4) Generic Medicines segment revenues of $2.2 billion; (5) Generic Medicines gross profit of $999 million; and (6) Generic Medicines segment profitability of $584 million for the quarter.

996.    In the Q1 2016 6-K, Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $976 million, a decrease of 32% or of $463 million, compared to the first quarter of 2015. The decrease resulted mainly from a decline in sales of $427 million due to the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®) and budesonide (the generic equivalent of Pulmicort®) as well as a decline in sales of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) and capecitabine (the generic equivalent of Xeloda®) due to increased competition. These decreases were partially offset by sales of products sold in the first quarter of 2016 that were not sold in the first quarter of 2015, the most significant of which were aripiprazole (the generic equivalent of Abilify®) and aspirin/extended-release dipyridamole."

997.    In the Q1 2016 6-K, Teva touted its competitive position and discussed its plan for success in the United States generic medicines market, stating:

> In the first quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 463 million total prescriptions, representing 12.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

### c)  The July 13, 2016 Form 6-K

998.    The Notes Registration Statement also incorporates by reference "The special purpose combined financial statements and other information relating to Actavis Generics are included in a Report of Foreign Private Issuer on Form 6-K we filed with the SEC on July 13, 2016." The July 13, 2016 6-K, signed by Defendant Desheh, disclosed that Actavis had received a subpoena from the DOJ regarding its investigation into "the marketing and pricing of

certain of [Actavis's] generic products and communications with competitors about such products":

> Government Investigations, Government Litigation and Qui Tam Litigation
>
> Actavis. On June 25, 2015, the Business received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Business' generic products and communications with competitors about such products. The Business intends to cooperate fully with the DOJ's requests.

999.    In addition to the reasons stated above, the Notes Offering Materials were incomplete and misleading because they did not disclose that (i) on June 21, 2016, Teva USA had received a similar subpoena from the DOJ, seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and (ii) on July 12, 2016 (the day before the Securities Act Defendants filed the Notes Registration Statement, which incorporated by reference the July 13, 2016 6-K disclosing the DOJ subpoena received by Actavis) Teva USA had received a subpoena from the Connecticut AG "seeking documents and other information relating to potential state antitrust law violations."

### d)  Statements Made By PwC/Kesselman

1000.   In addition, PwC/Kesselman consented to the incorporation by reference in the Notes Offering Materials its Audit Report dated February 11, 2016 (which also was incorporated by reference and included in the 2015 20-F with consent) (the "2015 Audit Report"):

> We hereby consent to the incorporation by reference in this Registration Statement on Form F-3 of Teva Pharmaceutical Industries Limited of our reports dated February 11, 2016 relating to the consolidated financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appear in Teva Pharmaceutical Industries Limited's Annual Report on Form 20-F for the year ended December 31, 2015. We also consent to the reference to us under the heading "Experts" in such Registration Statement

1001.   The 2015 Audit Report stated in substance the following:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, of comprehensive income, of changes in equity and of cash flows present fairly, in all material respects, the financial position of Teva Pharmaceutical Industries Limited and its subsidiaries at December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management and Board of Directors are responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in ''Report of Teva Management on Internal Control Over Financial Reporting'' appearing under Item 15(b). Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management and Board of Directors and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are

recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### 3.     Untruths And Omissions Have Come To Light

1002.   On August 4, 2016, Teva filed the Q2 2016 6-K, which disclosed for the first time that the Company was implicated in the federal antitrust investigation on June 21, 2016 and the Connecticut AG's investigation on July 12, 2016.  Teva had concealed that information from the Notes Offering Materials.  The disclosure of the subpoenas in the August 2016 Form 6-K is an implicit admission that the omission of the same subpoenas in the Notes Offering Materials weeks earlier rendered those offering materials false and misleading.  If there was a duty to disclose the subpoenas in the Form 6-K, that same duty attached to the Notes Offering Materials.  There is no legally cognizable distinction for omitting the subpoenas in the Notes Offering Materials in July 2016 but including them in the Form 6-K in August 2016.

1003.   On November 3, 2016, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End" which discussed the DOJ's "sweeping" two-year investigation of suspected price collusion involving about two dozen drugs and more than a dozen drug companies, including Teva, which was expected to result in criminal charges against executives of some of those companies.

1004.   On November 15, 2016, Teva filed a press release on Form 6-K, announcing third quarter 2016 revenues below consensus expectations and disclosing that the poor results were due to pricing pressure in the U.S. generics market.

1005.   On December 5, 2016, Teva revealed that Defendant Olafsson, Teva's President and CEO, Global Generic Medicines Group, would abruptly "step down from his role" and depart the Company soon thereafter.

1006.   On December 14, 2016, the DOJ announced that it had charged (by information) two former executives of Heritage, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs, from as early as April 2013 until at least December 2015 – Teva was the dominant market participant for at least one of those drugs during the Class Period.

1007.   On December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for violation of Section 1 of the Sherman Act against Teva USA and five other drug companies, alleging that they had entered into illegal conspiracies to unreasonably restrain trade, artificially inflate and manipulate prices, and reduce competition for certain generic drugs.

1008.   On January 6, 2017, Teva announced a significant reduction in 2017 guidance, far below market expectations, due to previously-unannounced poor performance and "headwinds" in the sector.

1009.   On August 3 and 4, 2017, Teva announced lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and price erosion and, as a result of this and other new negative information that came to light, Teva's debt ratings were downgraded to just one level above "junk."

1010.   As Teva's true business and financial condition began to come to light, the values of Teva's ADS, Preferred Shares, and Notes declined and investors suffered economic harm.

### 4.   The Offering Materials Did Not Comply With GAAP And Failed To Make Disclosures In Compliance With Item 5 Of Form F-20

1011.   Teva's financial results and performance were false and misleading in that they purported to comply with GAAP because they failed to properly recognize and record revenue that was subject to the anticompetitive and collusive conduct.   Defendants disclosures in the Forms 20-F filed issued during the Class Period and incorporated in the Offering Materials were misleading for this reason.   Additionally, SEC Item 5 required that each Form 20-F incorporated by reference in the Offering Materials also disclose known trends, specifically (1) the source of its inflated revenues caused by the collusive conduct, and (2) that Teva's revenues from its U.S. generics division were subject to Teva's ability to maintain the collusive prices under pressure from regulatory investigations and other scrutiny.

### D.   Inapplicability Of The Statutory Safe Harbor Or Bespeaks Caution Doctrine

1012.   The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.   First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made. Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.   Further, to the extent that any of the untrue or misleading statements alleged herein were identified as forward-looking, and can be construed as forward-looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those

statements, and the generalized disclosures made by Defendants were not sufficient to shield them from liability.

## VIII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

**COUNT III**
**Section 11 of the Securities Act**
**On Behalf of Purchasers of ADS in the ADS Offering or Preferred Shares**
**(Against the Company, Vigodman, Desheh, Griffin, the Teva Director Defendants,**
**the ADS/Preferred Underwriter Defendants, and PwC/Kesselman)**

1013.   Lead Plaintiff repeats and re-alleges each and every allegation contained above in Sections I-IV, VII.

1014.   This claim does not sound in fraud and Lead Plaintiff expressly disclaims any allegation of fraud or intentional misconduct.  For the purposes of this Count, Lead Plaintiff does not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 11 of the Securities Act.  This Count is based solely on strict liability as to the Company, and negligence as to the other Defendants named in this Count.

1015.   This Count is asserted against the Company, Vigodman, Desheh, the Teva Director Defendants, the ADS/Preferred Underwriter Defendants, and PwC/Kesselman pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired Teva ADS and/or Preferred Shares in or pursuant and/or traceable to the ADS/Preferred Offerings.

1016.   The ADS/Preferred Offering Materials, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

1017.   The Defendants named in this Count issued, caused to be issued, or participated in the issuance of the actionable statements or omissions in the ADS/Preferred Offering Materials.

1018.   As the issuer of the ADS, and as the issuer of the Preferred Shares, the Company is strictly liable for the actionable statements and omissions in the ADS/Preferred Offering Materials.

1019.   The other Defendants named in this Count acted negligently in that none of them made a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the ADS/Preferred Registration Statement were true and there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.   These Defendants are liable, and certain of them are jointly and severally liable, for the actionable statements and omissions in the ADS/Preferred Offering Materials in that, among other things:

(a)   Vigodman, Desheh, and Griffin each signed the ADS/Preferred Registration Statement;

(b)   the Teva Director Defendants each signed the ADS/Preferred Registration Statement and each was a director of the Company at the time of the filing of the relevant parts of the ADS/Preferred Registration Statement with respect to which their liability is asserted;

(c)   PwC/Kesselman acted as an accountant and auditor, or otherwise in a professional capacity that gave authority to the statements it made and, with its consent, was named as having prepared or certified certain parts of the ADS/Preferred Registration Statement; and

(d)   the ADS/Preferred Underwriter Defendants each acted as an underwriter with respect to the ADS/Preferred Offerings.

1020.   When they acquired the ADS and/or Preferred Shares in or pursuant and/or traceable to the ADS/Preferred Offerings, Lead Plaintiff and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials.

1021.   Lead Plaintiff and others similarly situated suffered damages in connection with the purchase or acquisition of the ADS and/or Preferred Shares in or pursuant and/or traceable to the ADS/Preferred Offerings.

287

1022.   By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and others similarly situated for damages representing the difference between the amount paid for such ADS and/or Preferred Shares (not exceeding the price at which they were offered to the public) and (1) the value thereof as of the time the suit was brought, or (2) the price at which they were disposed of in the market before the suit, or (3) the price at which they shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid (not exceeding the price at which they were offered to the public) and the value thereof as of the time the suit was brought.

1023.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Lead Plaintiff and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the ADS and Preferred Shares were bona fide offered to the public and the time this claim was brought.

**COUNT IV**
**Section 12(a)(2) of the Securities Act**
**On Behalf of Purchasers of ADS in the ADS Offering or Preferred Shares**
**(Against the Company, Vigodman, Desheh,**
**and the ADS/Preferred Underwriter Defendants)**

1024.   Lead Plaintiff repeats and re-alleges each and every allegation contained above in Sections I-IV, VII.

1025.   This claim does not sound in fraud and Lead Plaintiff expressly disclaims any allegation of fraud or intentional misconduct.  For the purposes of this Count, Lead Plaintiff does not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 12(a)(2) of the Securities Act.  This Count is based solely on negligence.

1026.  This Count is asserted against the Company, Vigodman, Desheh, and the ADS/Preferred Underwriter Defendants pursuant to Section 12(a)(2) of the Securities Act, 15

U.S.C. § 77l(a)(2), on behalf of all persons who purchased Teva ADS and/or Preferred Shares directly from these Defendants.

1027.   The Defendants named in this Count offered, sold, and/or solicited the purchase of, (or assisted in the offer, sale, or solicitation of the purchase of) the ADS and/or Preferred Shares, within the meaning of the Securities Act, by means of a prospectus or oral communication.

1028.   The Defendants named in this Count assisted in the planning of the ADS/Preferred Offerings and actively participated in decisions regarding, among other things, the price at which the ADS and Preferred Shares would be sold and the language contained in the ADS/Preferred Offering Materials.  The ADS/Preferred Underwriter Defendants received $92,812,500 in fees for their work in connection with the ADS Offering (including the overallotment) and $92,812,500 in fees for their work in connection with the Preferred Offering (including the overallotment).

1029.   The ADS Prospectus and the Preferred Prospectus included (and/or incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

1030.   The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the ADS Prospectus and the Preferred Prospectus did not include untrue or misleading statements or omissions of material fact.  Had they exercised reasonable care, they would have known of such untruth or omission.

1031.  When they acquired Teva ADS and/or Preferred Shares directly from the Defendants named in this Count, Lead Plaintiff and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials.

1032.   Lead Plaintiff and others similarly situated suffered damages in connection with the purchase or acquisition of ADS and/or Preferred Shares in or pursuant and/or traceable to the ADS/Preferred Offerings.

1033.   By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and others similarly situated for either (a) the consideration paid for the ADS and/or Preferred Shares with interest thereon, less the amount of any income received thereon, upon tender of such ADS and/or Preferred Shares, or (b) damages as to the ADS and/or Preferred Shares no longer owned.

1034.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Lead Plaintiff and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the ADS and Preferred Shares at issue were sold and the time this claim was brought.

**COUNT V**
**Section 15 of the Securities Act**
**On Behalf of Purchasers of ADS in the ADS Offering or Preferred Shares**
**(Against Vigodman, Desheh, and the Teva Director Defendants)**

1035.   Lead Plaintiff repeats and re-alleges each and every allegation contained above in Sections I-IV, VII.

1036.   This claim does not sound in fraud.  For the purposes of this Count, Lead Plaintiff does not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 15 of the Securities Act.  This Count is based solely on negligence.

1037.  This Count is asserted against Vigodman, Desheh, and the Teva Director Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons

to whom the Company is liable under Section 11 and/or Section 12(a)(2) of the Securities Act, as alleged in Count III and Count IV.

1038.   During their tenures as officers and/or directors of Teva, the Defendants named in this Count were controlling persons of the Company, within the meaning of the Securities Act.

1039.   The Defendants named in this Count by virtue of their positions of control and authority as executive officers and directors of Teva and their direct participation in and/or awareness of the Company's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of the Company and its employees, or otherwise cause the Company to issue, or offer and/or sell securities pursuant to, the defective ADS/Preferred Offering Materials, which is the basis of Count III and Count IV.

1040.   The Defendants named in this Count had the power to, and did, control the decision-making of the Company, including the content and issuance of the statements contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials; they were provided with or had unlimited access to, copies of the ADS/Preferred Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the ADS Registration Statement and the Preferred Registration Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false information contained in the ADS/Preferred Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

1041.   The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the ADS/Preferred

Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

1042.   As set forth above, the Company is liable to Lead Plaintiff and others similarly situated pursuant to Section 11 and/or Section 12(a)(2) of the Securities Act; as controlling persons of the Company, Vigodman, Desheh, and each of the Teva Director Defendants is liable jointly and severally with and to the same extent as the Company.

1043.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Lead Plaintiff and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the ADS and Preferred Shares at issue were bona fide offered to the public and/or sold and the time this claim was brought.

**COUNT VI**
**Section 11 of the Securities Act**
**On Behalf of Purchasers of the Notes**
**(Against the Company, Vigodman, Desheh, Griffin, Teva Finance,**
**the Teva Director Defendants, the Teva Finance Director Defendants,**
**the Underwriter Defendants, and PwC/Kesselman)**

1044.   Lead Plaintiff and Anchorage repeat and re-allege each and every allegation contained above in Sections I-IV, VII.

1045.   This claim does not sound in fraud.  For the purposes of this Count, Lead Plaintiff and Anchorage do not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 11 of the Securities Act.  This Count is based solely on strict liability as to the Company, and negligence as to the other Defendants named in this Count.

1046.   This Count is asserted against the Company, Vigodman, Desheh, the Teva Director Defendants, the Underwriter Defendants, and PwC/Kesselman pursuant to Section 11 of the

Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired Teva Notes in or pursuant and/or traceable to the Notes Offerings.

1047.   The Notes Offering Materials, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

1048.   The Defendants named in this Count issued, caused to be issued, or participated in the issuance of the actionable statements or omissions in the Notes Offering Materials.

1049.   As the issuer of the Notes, the Company and Teva Finance are strictly liable for the actionable statements and omissions in the Notes Offering Materials.

1050.   The other Defendants named in this Count acted negligently in that none of them made a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the Notes Registration Statement were true and there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  These Defendants are liable, and certain of them are jointly and severally liable, for the actionable statements and omissions in the Notes Offering Materials in that, among other things:

(a)   Vigodman, Desheh, and Griffin each signed the Notes Registration Statement;

(b)   the Teva Director Defendants each signed the Notes Registration Statement and each was a director of the Company at the time of the filing of the relevant parts of the Notes Registration Statement with respect to which their liability is asserted;

(c)   the Teva Finance Director Defendants each signed the Notes Registration Statement and each was a director of Teva Finance at the time of the filing of the relevant parts of the Notes Registration Statement with respect to which their liability is asserted;

(d)     PwC/Kesselman acted as an accountant and auditor, or otherwise in a professional capacity that gave authority to the statements it made and, with its consent, was named as having prepared or certified certain parts of the Notes Registration Statement; and

(e)     the Underwriter Defendants each acted as an underwriter with respect to the Notes Offerings.

1051.   When they acquired the Notes in or pursuant and/or traceable to the Notes Offerings, Anchorage and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Notes Offering Materials.

1052.   Anchorage and others similarly situated suffered damages in connection with the purchase or acquisition of the Notes in or pursuant and/or traceable to the Notes Offerings.

1053.   By reason of the foregoing, the Defendants named in this Count are liable to Anchorage and others similarly situated for damages representing the difference between the amount paid for such Notes (not exceeding the price at which they were offered to the public) and (1) the value thereof as of the time the suit was brought, or (2) the price at which they were disposed of in the market before the suit, or (3) the price at which they shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid (not exceeding the price at which they were offered to the public) and the value thereof as of the time the suit was brought.

1054.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Anchorage and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the Notes were bona fide offered to the public and the time this claim was brought.

**COUNT VII**

**Section 12(a)(2) of the Securities Act**
**On Behalf of Purchasers of the Notes**
**(Against the Company, Vigodman, Desheh,**
**Teva Finance, and the Underwriter Defendants)**

1055.   Lead Plaintiff and Anchorage repeat and re-allege each and every allegation contained above in Sections I-IV, VII.

1056.   This claim does not sound in fraud.  For the purposes of this Count, Lead Plaintiff and Anchorage do not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 12(a)(2) of the Securities Act.  This Count is based solely on negligence.

1057.   This Count is asserted against the Company, Teva Finance, Vigodman, Desheh, and the Underwriter Defendants pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who purchased Teva Notes directly from these Defendants.

1058.   The Defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) the Notes, within the meaning of the Securities Act, by means of a prospectus or oral communication.

1059.   The Defendants named in this Count assisted in the planning of the Notes Offerings and actively participated in decisions regarding, among other things, the price at which the Notes would be sold and the language contained in the Notes Offering Materials.  The Underwriter Defendants received $64,125,000 in fees for their work in connection with the Notes Offering.

1060.  The Notes Prospectus included (and/or incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

1061.   The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the Notes Prospectus did not include untrue or misleading statements or omissions of material fact.  Had they exercised reasonable care, they should have known of such untruth or omission.

1062.   When they acquired Notes directly from the Defendants named in this Count, Anchorage and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Notes Offering Materials.

1063.   Anchorage and others similarly situated suffered damages in connection with the purchase or acquisition of Notes in or pursuant and/or traceable to the Notes Offerings.

1064.   By reason of the foregoing, the Defendants named in this Count are liable to Anchorage and others similarly situated for either (a) the consideration paid for the Notes with interest thereon, less the amount of any income received thereon, upon tender of such Notes, or (b) damages as to the Notes no longer owned.

1065.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Anchorage and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the Notes at issue were sold and the time this claim was brought.

## COUNT VIII
### Section 15 of the Securities Act
### On Behalf of Purchasers of the Notes
### (Against the Vigodman, Desheh, the Teva Director
### Defendants, and the Teva Finance Director Defendants)

1066.   Lead Plaintiff and Anchorage repeat and re-allege each and every allegation contained above in Sections I-IV, VII.

1067.   This claim does not sound in fraud.  For the purposes of this Count, Lead Plaintiff and Anchorage do not allege that any Defendant acted with scienter, or fraudulent intent, which is not an element of a claim under Section 12(a)(2) of the Securities Act.  This Count is based solely on negligence.

1068.   This Count is asserted against (i) Vigodman, Desheh, the Teva Director Defendants, and the Teva Finance Director Defendants (as controlling persons of Teva Finance), and (ii) Vigodman, Desheh, and the Teva Director Defendants (as controlling persons of the Company) pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons to whom Teva Finance and/or the Company are liable under Section 11 and/or Section 12(a)(2) of the Securities Act, as alleged in Count VI and Count VII.

1069.   At all relevant times, Teva was the whole owner, parent, and controller of Teva Finance, a special purpose finance subsidiary that does not have any independent operations and does not purport to engage in any activities other than issuing securities and investing the proceeds in Teva or its affiliates, at the direction of Teva.

1070.   During their tenures as officers and/or directors of Teva, the Defendants named in this Count were controlling persons of Teva Finance, within the meaning of the Securities Act, and Defendants Vigodman, Desheh, and the Teva Director Defendants were controlling persons of the Company, within the meaning of the Securities Act.

1071.   The Defendants named in this Count, by virtue of their positions of control and authority as executive officers and directors of Teva and their direct participation in and/or awareness of the Company's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Teva Finance and its employees, and Defendants Vigodman, Desheh, and the Teva Director Defendants possessed the power to, and

did, direct or cause the direction of the management and policies of the Company and its employees, or otherwise cause the Company and/or Teva Finance to issue, or offer and/or sell securities pursuant to, the defective Notes Offering Materials, which is the basis of Count VI and Count VII.

1072.   The Defendants named in this Count had the power to, and did, control the decision-making of Teva Finance, and Defendants Vigodman, Desheh, and the Teva Director Defendants did, control the decision-making of the Company, including the content and issuance of the statements contained (and/or incorporated by reference) in the Notes Offering Materials; they were provided with or had unlimited access to, copies of the Notes Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the Notes Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false information contained in the Notes Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

1073.   The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Notes Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

1074.   As set forth above, the Company and/or Teva Finance is liable to Anchorage and others similarly situated pursuant to Section 11 and/or Section 12(a)(2) of the Securities Act; as controlling persons of the Company and/or Teva Finance, each of the Defendants named in this

Count is liable jointly and severally with and to the same extent as the Company and/or Teva Finance.

1075.   This claim is brought within the applicable limitation periods.  Less than one year has elapsed between the time Anchorage and others similarly situated discovered, or reasonably could have discovered, the facts upon which this claim is based and the time this claim was brought.  Less than three years have elapsed between the time that the Notes at issue were bona fide offered to the public and/or sold and the time this claim was brought.

## IX.    CLAIMS FOR RELIEF UNDER ISRAELI LAW

### COUNT IX
### Violation of Israel Securities Law, 1968
### (Against the Company and the Officer Defendants)

1076.   Plaintiffs repeat and re-allege each and every allegation set forth in Sections I-VI.

1077.   This Count is asserted against the Company and the Officer Defendants for violation of the Israel Securities Law, 1968 and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, individually and on behalf of all persons who purchased or otherwise acquired Teva's ADS on the NYSE or Ordinary Shares on the TASE during the Class Period, and were damaged thereby.

1078.   Pursuant to 28 U.S.C. § 1367(a) and/or decisional authority, this Court has supplemental subject matter jurisdiction and supplemental and/or pendent personal jurisdiction for the claims asserted in this Count because they derive from a common nucleus of operative facts and are such that one would ordinary expect them to be tried in one judicial proceeding.  Venue is proper under 28 U.S.C. § 1391(b).

1079.   Throughout the Class Period, Teva's ADS and Ordinary Shares were considered "dual   listed"   on   both   the   NYSE   and   the   TASE   under   Israeli   law.   *See* http://www.tase.co.il/eng/marketdata/stocks/marketdata/pages/marketdata.aspx.   The   Israeli

Securities Law provides unique treatment for the securities of firms that are dual listed on both the TASE and a foreign exchange, such as the NYSE.

1080.   Section 1 of the Israel Securities Law defines a "body corporate abroad" as "a body corporate incorporated in Israel, the securities of which are listed for trading on a Stock Exchange abroad."  The NYSE is a "Stock Exchange abroad" under the Israel Securities Law.  Because Teva is incorporated in Israel and has its securities, such as the ADS, listed for trading on the NYSE, it is a "body corporate abroad" under the Israel Securities Law.  Therefore, the TASE correctly recognizes Teva as a dual listed company.

1081.   For "bodies corporate abroad" that are dual listed in the United States, Israeli law applies the reporting requirements (including the anti-fraud requirements) of the United States. *See* Israel Securities Law §§ 35T, 35EE.

1082.   Section 1 of the Israel Securities Law defines "the foreign Law" as "the Law that applies to a body corporate abroad because of the registration of its securities for trading on a Stock Exchange abroad, including the rules of that Stock Exchange abroad."  A "body corporate abroad" must agree to comply with the foreign Law as a matter of Israeli law.  *See* Israel Securities Law § 35T(a)(1).  Indeed, a body corporate abroad, like Teva, generally only needs to file its U.S. SEC filings in Israel (without further alteration or translation) in order to comply with Israeli reporting requirements.  As a matter of Israeli securities law, Teva agreed to comply with the U.S.  securities laws and the rules of the NYSE to fulfill its obligations under Israeli law.

1083.   Accordingly, in the case of Teva, Israeli law adopts and applies U.S. statutes, regulations, and rules, including the anti-fraud provisions of the United States securities laws, to enforce its disclosure obligations.  *See also Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-

08, decision rendered Aug. 25, 2011; Letter from Israel Securities Authority to the SEC (Feb. 18, 2011), available at https://www.sec.gov/comments/4-617/4617-45.pdf.   These sources make clear that Israeli law adopts and applies the standards, requirements, and liabilities of United States securities laws to all transactions of the "body corporate abroad," whether on the NYSE or the TASE.  Israeli law also prefers providing a United States forum for the consideration of such claims.

1084.   Accordingly, pursuant to Israeli case law, liability under Israeli law is pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, applies to the claims arising from trades made on the TASE.

1085.   This Count incorporates Counts I and II under the Exchange Act by reference.

## X.    JURY DEMAND

1086.   Lead Plaintiff hereby demands a trial by jury.

## XI.    PRAYER FOR RELIEF

1087.   WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies set forth in the Exchange Act and the Securities Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**DATED: SEPTEMBER 11, 2017**

**RESPECTFULLY SUBMITTED,**

Joseph Fonti (admitted *pro hac vice*)
Javier Bleichmar (admitted *pro hac vice*)
Wilson Meeks (admitted *pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
jbleichmar@bfalaw.com
wmeeks@bfalaw.com

*Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board,*
*and for Named Plaintiff Anchorage*
*Police & Fire Retirement System,*
*and Lead Counsel for the Class*

*/s/ Marc J. Kurzman*

Marc J. Kurzman (ct01545)
Christopher J. Rooney (ct04027)
John L. Cordani, Jr. (ct28833)
**CARMODY TORRANCE**
**SANDAK & HENNESSEY LLP**
707 Summer Street, Suite 300
Stamford, CT 06901
Telephone: (203) 252-2680
Facsimile: (203) 325-8608
mkurzman@carmodylaw.com
crooney@carmodylaw.com
jcordani@carmodylaw.com

*Local Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board,*
*and for Named Plaintiff Anchorage*
*Police & Fire Retirement System*

302

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2017, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties by operation of the court's electronic filing

system or by mail to anyone unable to accept electronic filing. Parties may access this filing

through the court's CM/ECF system.

_____
Joseph A. Fonti

## CERTIFICATION

I, Sharon Chilcott, Director & Associate General Counsel, Employment Law & Litigation of Ontario Teachers' Pension Plan Board ("Ontario Teachers'"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Ontario Teachers'. The securities subject to this litigation are or were held in title of and owned by Ontario Teachers'.

2.    I have reviewed the Consolidated Class Action Complaint, as provided for in the Court's Order entered July 27, 2017 (ECF No. 126), and have authorized its filing.

3.    Ontario Teachers' did not purchase or sell securities of Teva at the direction of counsel in order to participate in any private action under the federal securities laws.

4.    Ontario Teachers' is willing to serve as lead plaintiff in this matter, including by providing testimony at deposition and trial, if necessary.

5.    Ontario Teachers' transactions in Teva securities during the Class Period are reflected in Exhibit A, attached hereto.

6.    Ontario Teachers' has not sought to serve as lead plaintiff in a class action under the federal securities laws in the last three years, other than in this instant action.

7.    Beyond its *pro rata* share of any recovery, Ontario Teachers' will not accept payment for serving as lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

1

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 11th day of September 2017.

Sharon Chilcott
Director & Associate General Counsel,
Employment Law & Litigation
*Ontario Teachers' Pension Plan Board*

2

EXHIBIT A

TRANSACTIONS IN

TEVA PHARMACEUTICAL INDUSTRIES LIMITED

**Teva Pharmaceutical Industries Ltd. American Depository Receipts (Sedol: 2883878)**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 02/19/2014 | -10,000.00 | 46.95 | $469,544.00 |
| Sale | 02/19/2014 | -15,000.00 | 45.78 | $686,625.00 |
| Sale | 02/19/2014 | -15,000.00 | 46.75 | $701,263.50 |
| Sale | 02/19/2014 | -15,000.00 | 47.50 | $712,531.50 |
| Sale | 02/20/2014 | -15,000.00 | 47.87 | $718,042.50 |
| Sale | 02/20/2014 | -15,000.00 | 48.55 | $728,322.00 |
| Sale | 02/20/2014 | -15,000.00 | 48.81 | $732,154.50 |
| Sale | 03/06/2014 | -17,800.00 | 51.25 | $912,299.84 |
| Sale | 03/18/2014 | -17,200.00 | 50.01 | $860,166.84 |
| Sale | 03/31/2014 | -10,000.00 | 52.03 | $520,257.00 |
| Sale | 03/31/2014 | -10,000.00 | 51.01 | $510,145.00 |
| Sale | 03/31/2014 | -15,000.00 | 52.50 | $787,537.50 |
| Sale | 03/31/2014 | -15,000.00 | 52.75 | $791,269.50 |
| Sale | 04/02/2014 | -20,000.00 | 54.50 | $1,090,060.00 |
| Sale | 04/02/2014 | -20,000.00 | 53.52 | $1,070,462.00 |
| Purchase | 05/07/2015 | 23,600.00 | 59.95 | ($1,414,815.28) |
| Purchase | 05/26/2015 | 15,000.00 | 59.85 | ($897,748.50) |
| Purchase | 06/09/2015 | 1,400.00 | 59.75 | ($83,648.04) |
| Purchase | 06/10/2015 | 241,199.00 | 60.40 | ($14,568,709.04) |
| Purchase | 06/10/2015 | 78,691.00 | 60.59 | ($4,768,076.55) |
| Purchase | 06/11/2015 | 66,223.00 | 61.16 | ($4,049,907.30) |
| Purchase | 06/11/2015 | 13,887.00 | 60.96 | ($846,486.25) |
| Purchase | 06/18/2015 | 17,000.00 | 59.70 | ($1,014,962.90) |
| Purchase | 06/23/2015 | 18,000.00 | 59.47 | ($1,070,389.80) |
| Purchase | 06/25/2015 | 13,000.00 | 58.99 | ($766,914.20) |
| Sale | 07/27/2015 | -5,000.00 | 70.00 | $350,003.00 |
| Sale | 07/27/2015 | -5,000.00 | 71.50 | $357,506.00 |
| Sale | 07/27/2015 | -8,000.00 | 69.74 | $557,916.80 |
| Sale | 07/29/2015 | -55,000.00 | 71.71 | $3,944,055.50 |
| Purchase | 12/03/2015 | 145,000.00 | 62.50 | ($9,062,500.00) |
| Purchase | 12/03/2015 | 55,000.00 | 62.50 | ($3,437,500.00) |
| Sale | 12/17/2015 | -57,500.00 | 64.96 | $3,735,200.00 |
| Purchase | 12/23/2015 | 28,800.00 | 65.90 | ($1,897,920.00) |
| Purchase | 01/19/2016 | 15,000.00 | 61.88 | ($928,269.00) |
| Purchase | 01/19/2016 | 15,000.00 | 62.15 | ($932,313.00) |
| Purchase | 01/20/2016 | 15,000.00 | 61.00 | ($914,974.50) |
| Purchase | 01/20/2016 | 2,600.00 | 59.99 | ($155,969.58) |
| Purchase | 02/08/2016 | 12,361.00 | 56.24 | ($695,233.32) |
| Purchase | 02/11/2016 | 20,000.00 | 53.96 | ($1,079,126.00) |
| Purchase | 02/11/2016 | 15,039.00 | 55.21 | ($830,276.12) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/01/2016 | 25,000.00 | 53.18 | ($1,329,615.00) |
| Sale | 04/05/2016 | -29,375.00 | 54.66 | $1,605,637.50 |
| Purchase | 04/12/2016 | 150,000.00 | 54.90 | ($8,234,265.00) |
| Purchase | 04/13/2016 | 127,056.00 | 54.67 | ($6,945,884.70) |
| Purchase | 04/13/2016 | 18,044.00 | 54.75 | ($987,909.00) |
| Purchase | 04/13/2016 | 4,900.00 | 54.75 | ($268,275.00) |
| Purchase | 05/02/2016 | 20,000.00 | 53.85 | ($1,077,038.00) |
| Purchase | 05/02/2016 | 8,000.00 | 53.40 | ($427,198.40) |
| Purchase | 05/06/2016 | 100,000.00 | 51.03 | ($5,103,430.00) |
| Purchase | 05/06/2016 | 17,000.00 | 51.49 | ($875,392.90) |
| Purchase | 05/06/2016 | 10,000.00 | 50.18 | ($501,803.00) |
| Sale | 06/06/2016 | -3,025.00 | 54.50 | $164,862.50 |
| Sale | 07/08/2016 | -24,000.00 | 50.60 | $1,214,400.00 |
| Purchase | 08/04/2016 | 24,000.00 | 53.80 | ($1,291,200.00) |
| Purchase | 08/09/2016 | 24,000.00 | 53.72 | ($1,289,280.00) |
| Purchase | 08/16/2016 | 36,000.00 | 53.73 | ($1,934,280.00) |
| Purchase | 08/16/2016 | 1,100.00 | 53.80 | ($59,179.45) |
| Purchase | 09/29/2016 | 25,000.00 | 46.47 | ($1,161,867.50) |
| Sale | 07/11/2017 | -125,000.00 | 30.93 | $3,866,037.50 |
| Sale | 07/12/2017 | -35,000.00 | 32.07 | $1,122,481.50 |
| Sale | 07/13/2017 | -40,000.00 | 33.15 | $1,326,000.00 |
| Sale | 07/13/2017 | -20,000.00 | 33.42 | $668,324.00 |

**Teva Pharmaceutical Industries Ltd. 7% Mandatory Convertible Preferred Shares (Sedol: BYWKW32)**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 12/17/2015 | 5,000.00 | 1005.00 | ($5,025,000.00) |
| Sale | 12/23/2015 | -2,500.00 | 1024.46 | $2,561,137.50 |
| Purchase | 04/05/2016 | 2,500.00 | 891.00 | ($2,227,500.00) |
| Purchase | 07/08/2016 | 2,000.00 | 844.00 | ($1,688,000.00) |
| Sale | 08/04/2016 | -2,000.00 | 888.76 | $1,777,520.00 |
| Sale | 08/09/2016 | -2,000.00 | 889.00 | $1,778,000.00 |
| Sale | 08/16/2016 | -3,000.00 | 894.11 | $2,682,330.00 |

## CERTIFICATION

I, Edward A. Jarvis, as Director of Anchorage Police & Fire Retirement System ("Anchorage"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Anchorage. The securities subject to this litigation are or were held in title of and owned by Anchorage.

2.      I have reviewed the Consolidated Class Action Complaint, as provided for in the Court's Order entered July 27, 2017 (ECF No. 126), and have authorized its filing.

3.      Anchorage did not purchase or sell securities of Teva at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      Anchorage is willing to serve as a representative plaintiff on behalf of the Class in this matter, including   providing  testimony at deposition and trial, if necessary.

5.      Anchorage's transactions in Teva securities during the Class Period are reflected in Exhibit A, attached hereto.

6.      Anchorage has not sought to serve as a representative party in a class action under the federal securities laws during the last three years except in the following:

- *Hartsock v. Spectrum Pharmaceuticals, Inc.*, 16-cv-02279 (D. Nev.)
  (pending decision on lead plaintiff appointment)

7.      Anchorage has previous experience serving as Lead Plaintiff in *Freedman v. Weatherford International, Ltd.*, 12-cv-02121 (S.D.N.Y.) ("*Weatherford*"). Anchorage was appointed Co-Lead Plaintiff of *Weatherford* on July 10, 2012, and oversaw the prosecution of the case through the final approval of a $120 million settlement on November 4, 2015.  Anchorage also served as Lead Plaintiff and oversaw the litigation of *In re Conseco, Inc. Sec. Litig.*, 00-cv-

585 (S.D. Ind.) which also settled for $120 million.

8.      Beyond its *pro rata* share of any recovery, Anchorage will not accept payment for serving as a representative party on behalf of the class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.


I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ⏐8 day of September, 2017.

Edward A. Jarvis
*Director of Anchorage Police & Fire
Retirement System*

2

**EXHIBIT A**

<u>TRANSACTIONS IN</u>

<u>TEVA PHARMACEUTICAL INDUSTRIES LIMITED</u>

**Teva Pharmaceutical Finance Netherlands III BV 3.15% Note Due 10/01/26 (Sedol: BD3GT31)**

| Transaction Type | Trade Date | Quantity | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/18/2016 | 685,000.00 | 99.73 | ($683,177.90) |
| Purchase | 09/27/2016 | 75,000.00 | 100.77 | ($75,577.50) |