**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ONTARIO TEACHERS' PENSION PLAN BOARD, Individually and as Lead Plaintiff on behalf of all others similarly situated; and ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Individually and as Named Plaintiff on behalf of all similarly-situated bond purchasers,<br><br>      Plaintiffs,<br><br>v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD., *et al.*,<br><br>      Defendants. | Civ. A. No. 3:17-cv-00558 (SRU)<br>CONSOLIDATED with<br>Civ. A. No. 3:17-cv-00559 (SRU)<br><br><br><br><br><br><br><br>DECEMBER 1, 2017 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES LTD.,**
**VIGODMAN, DESHEH, ALTMAN, OBERMAN, OLAFSSON,**
**PETERBURG, AND BHATTACHARJEE'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 7

ARGUMENT ................................................................................................................. 11

I.      PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTION 10(B) OF THE EXCHANGE ACT ................................... 11

      A.      Plaintiffs' Allegations Are Not Pleaded
With The Particularity Required By The PSLRA And Rule 9(b) ...................... 11

      B.      Plaintiffs Fail To Identify Any
Actionable Statement Or Omission Of Material Fact ......................................... 14

            1.      Plaintiffs Fail To Identify Any
Misleading Statement of Material Fact .................................................. 15

                  a.      Accurate Statements Of Historical Fact Are Not Actionable ...... 16

                  b.      Defendants' Alleged Forward-Looking
Statements All Fall Within The PSLRA's Safe Harbor .............. 17

                  c.      Vague And Indefinite Statements Of
Optimism Are Immaterial As A Matter Of Law ......................... 21

                  d.      Teva's Sarbanes-Oxley Certifications Were Accurate ............... 23

            2.      Plaintiffs Fail To Identify Any
Actionable Omission Of Material Fact .................................................. 25

                  a.      Teva Had No Duty To Disclose
Alleged But Unadjudicated Wrongdoing .................................... 26

                  b.      Teva Had No Duty To Disclose
Its Receipt Of Government Subpoenas ........................................ 27

                  c.      Teva Complied With Its Statutory
And Regulatory Disclosure Requirements .................................. 28

                  d.      None Of The Challenged Statements
Were "So Incomplete As To Mislead." ....................................... 29

            3.      Plaintiffs Fail Adequately To Plead
Any Underlying Antitrust Violation ...................................................... 37

                  a.      Plaintiffs Plead No Direct
Evidence That An Agreement Was Made ................................... 38

                  b.      Plaintiffs Fail To Plead Circumstantial
Evidence That An Agreement Was Made ................................... 38

# TABLE OF CONTENTS
### (continued)

**Page**

i.   Government Investigations And Unadjudicated Lawsuits Are Insufficient To Establish A Claim of Price-Fixing .......... 39

ii.   Attending Social Gatherings And Industry Events Is Not Suggestive Of Conspiracy .......... 40

iii.   Unilateral Parallel Conduct Is Not Price-Fixing ............. 41

C.   Plaintiffs Fail Adequately To Plead Scienter ........................................................ 42

1.   Plaintiffs' Motive and Opportunity Allegations Do Not Support A Strong Inference Of Scienter ................. 43

2.   Plaintiffs Fail to Plead Specific Facts Establishing Strong Circumstantial Evidence of Scienter ...................... 45

3.   The Opposing Inferences Of Nonfraudulent Intent Are More Plausible Than Any Inference Of Fraud ...................... 48

D.   Plaintiffs Fail Adequately To Plead Loss Causation ........................................... 49

II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT ................................................ 53

III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT ............................ 53

IV.   THE ISRAELI LAW CLAIMS ALSO MUST BE DISMISSED .................................. 53

CONCLUSION...................................................................................................... 54

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................44

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)....................................................12, 13, 15

*In re Almost Family, Inc. Sec. Litig.*,
  No. 10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012).............................50

*In re Am. Express Co. Shareholder Litig.*,
  840 F. Supp. 260 (S.D.N.Y. 1993) .......................................................................27

*Athale v. SinoTech Energy Ltd.*,
  No. 11-cv-05831, 2015 WL 13145808 (S.D.N.Y. Jan. 23, 2015) ...........................6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd/*,
  493 F.3d 87 (2d Cir. 2007)..........................................................................43, 53

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).......................................................... *passim*

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013)...................................................................29

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988).............................................................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................37, 38, 41

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  No. 07-cv-10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .............................29

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ...........................................................................13

*Brophy v. Jiangbo Pharm., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) ...........................................................................46

*Caiafa v. Sea Containers Ltd.*,
  331 F. App'x 14 (2d Cir. 2009) ...........................................................................24

*In re Carter-Wallace, Inc. Sec. Litig.*,
   No. 94-cv-05704, 1999 WL 1029713 (S.D.N.Y. Nov. 10, 1999)............................................45

*Chan v. Orthologic Corp.*,
   No. 96-cv-01514, 1998 WL 1018624 (D. Ariz. Feb. 5, 1998) ................................................13

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.*,
   192 F. Supp. 3d 456 (S.D.N.Y. 2016)..................................................................................28

*In re Citigroup Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004)............................................................................ *passim*

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*,
   No. 10-cv-02835, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ..........................................25

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)................................................................................3, 26, 27

*City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*,
   No. 10 CV 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ....................................17, 21

*Coble v. Broadvision, Inc.*,
   No. 01-01969, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002)............................................23

*Cortina v. Anavex Life Scis. Corp.*,
   No. 15-cv-10162, 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ..........................................44

*In re Coty Inc. Sec. Litig.*,
   No. 14-cv-0919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)............................................16

*In re CRM Holdings, Ltd. Sec. Litig.*,
   No. 10-cv-00975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................43

*In re Cross Media Mktg. Corp. Sec. Litig.*,
   314 F. Supp. 2d 256 (S.D.N.Y. 2004)..................................................................................17

*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978)................................................................................................20

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   No. 16-cv-03495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..........................................14

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................................44

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)......................................................................................... *passim*

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)...................................................................44

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)...................................................................................41

*In re Elevator Antitrust Litig.*,
  No. 04-cv-1178, 2006 WL 1470994 (S.D.N.Y. May 30, 2006) ...........................40

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006)..............................................................22, 44

*In re Express Scripts Holding Co. Sec. Litig.*,
  No. 16-cv-03338, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)...........................47

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................................24

*Fant v. Perelman*,
  No. 97-cv-08435, 1999 WL 199078 (S.D.N.Y. Apr. 9, 1999) .............................46

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)........................................................27, 32, 36

*Frederick v. Mechel OAO*,
  475 F. App'x 353 (2d Cir. 2012) ..........................................................................44

*Gaines v. Guidant Corp.*,
  No. 03-cv-00892, 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) ...........................27

*Galati v. Commerce Bancorp, Inc.*,
  No. 04-3252, 2005 WL 3797764 (D.N.J. Nov. 7, 2005) ......................................27

*In re Galileo Corp. S'holders Litig.*,
  127 F. Supp. 2d 251 (D. Mass. 2001) ...................................................................24

*Gavish v. Revlon, Inc.*,
  No. 00-cv-07291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) .........................21

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)...................................................................46

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010)...................................................................18

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ................................................................................46

*Glazer v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992) ........................................................................................26, 30, 31

*In re GPC Biotech AG Sec. Litig.*,
No. 07-cv-06728, 2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009) ...........................................22

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999) .................................................................................................24

*Gusinsky v. Barclays PLC*,
944 F. Supp. 2d 279 (S.D.N.Y. 2013) ....................................................................................26

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ..................................................................................................17

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
No. 13-cv-07050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ...............................................23

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...............................................................................39, 40

*In re IAC/InterActiveCorp Sec. Litig.*,
695 F. Supp. 2d 109 (S.D.N.Y. 2010) ....................................................................................29

*Int'l Ass'n of Heat v. Int'l Bus. Mach. Corp.*,
205 F. Supp. 3d 527 (S.D.N.Y. 2016) ...............................................................................18, 48

*In re IPO Sec. Litig.*,
399 F. Supp. 2d 298 (S.D.N.Y. 2005) ....................................................................................49

*Janbay v. Canadian Solar, Inc.*,
No. 10-cv-04430, 2012 WL 1080306 (S.D.N.Y. March 30, 2012) ........................................25

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) .............................................................................................24, 30

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ..................................................................................................44

*LaFlamme v. Societe Air Fr.*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................................................40

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ...............................................................................................1, 49

*Leykin v. AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006) ....................................................................................49

- vi -

*In re Lions Gate Entm't Corp. Sec. Litig.*,
 165 F. Supp. 3d 1 (S.D.N.Y. 2016) ................................................................... *passim*

*Lipow v. Net1 UEPS Techs., Inc.*,
 131 F. Supp. 3d 144 (S.D.N.Y. 2015)................................................................46

*Lopez v. Ctpartners Exec. Search Inc.*,
 173 F. Supp. 3d 12 (S.D.N.Y. 2016)................................................................29

*Malin v. XL Capital Ltd.*,
 499 F. Supp. 2d 117 (D. Conn. 2007).........................................................47, 54

*In re Manulife Fin. Corp. Sec. Litig.*,
 276 F.R.D. 87 (S.D.N.Y. 2011) ....................................................................46

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
 709 F.3d 129 (2d Cir. 2013)...........................................................................37

*In re Mellanox Techs., Ltd. Sec. Litig.*,
 No. 13-cv-04909, 2014 WL 7204864 (N.D. Cal. Dec. 17, 2014)..........................54

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
 218 F.R.D. 76 (S.D.N.Y. 2003) ....................................................................40

*Meyer v. Greene*,
 710 F.3d 1189 (11th Cir. 2013) ....................................................................39

*In re Mirant Corp. Sec. Litig.*,
 No. 02-cv-01467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)..................................37

*In re Molycorp, Inc. Sec. Litig.*,
 No. 13-cv-5697, 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015)..........................48

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
 423 F. Supp. 2d 364 (S.D.N.Y. 2006).........................................................16, 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
 541 F. Supp. 2d 546 (S.D.N.Y. 2008).........................................................51, 52

*In re Peritus Software Servs. Inc. Sec. Litig.*,
 52 F. Supp. 2d 211 (D. Mass. 1999) ..............................................................21

*In re PetroChina*,
 120 F. Supp. 3d 340 (S.D.N.Y 2015).........................................................25, 45

*In re PETsMART, Inc. Sec. Litig.*,
 61 F. Supp. 2d 982 (D. Ariz. 1999) ..............................................................12

*Placide-Eugene v. Visiting Nurses Serv. of N.Y.*,
   No. 12-cv-02785, 2013 WL 2383310 (E.D.N.Y. May 30, 2013) ...........................................33

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   135 F. Supp. 3d 145 (S.D.N.Y. 2015).......................................................................................28

*Pollio v. MF Glob.*,
   608 F. Supp. 2d 564 (S.D.N.Y. 2009).......................................................................................23

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ..........................................................................................................7

*Roeder v. Alpha Indus.*,
   814 F.2d 22 (1st Cir. 1987)........................................................................................................27

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................................................17, 21

*RSM Prod. Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009)................................................................................38, 40

*Rudman v. CHC Grp. LTD*,
   217 F. Supp. 3d 718 (S.D.N.Y 2016)........................................................................................31

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996)...................................................................................................43, 45

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................................ *passim*

*Sapssov v. Health Mgmt. Assoc., Inc.*,
   608 F. App'x 855 (11th Cir. 2015) ...........................................................................................50

*In re Seachange Int'l*,
   No. 12-cv-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004) .................................................27

*In re Sec. Capital Assurance Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010).......................................................................................43

*Shemian v. Research in Motion Ltd.*,
   No. 11-cv-04068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013)............................................22

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00-cv-01041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)......................................35, 36

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ....................................................................................14

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
  09-cv-5064, 2010 WL 2473595 (S.D.N.Y. June 17, 2010) ....................................................45

*In re Stratasys Ltd.*,
  15-cv-00455, 2016 WL 3636992 (D. Minn. June 30, 2016) ..................................................48

*Superior Offshore Int'l Inc. v. Bristow Group, Inc.*,
  738 F. Supp. 2d 505 (D. Del. 2000)....................................................................................39

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).............................................................................50, 51

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................7, 43, 48

*Thesling v. Bioenvision, Inc.*,
  374 F. App'x 141 (2d Cir. 2010) .........................................................................................26

*Thor Power Tool Co. v. Comm'r*,
  439 U.S. 522 (1979)..............................................................................................................24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  No. 07-cv-06140 EMC, 2014 WL 12646027 (N.D. Cal. Feb. 18, 2014) ..............................54

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001).................................................................................................39

*Vtech Holdings Ltd. v. PriceWaterhouseCoopers, LLP*,
  No. 03-cv-01413, 2003 WL 21756623 (S.D.N.Y. July 30, 2003)..........................................14

*In re WEBMD Health Corp. Sec. Litig.*,
  No. 11-cv-05382, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...........................................17, 18

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................................................23

*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ...............................................................................................12

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007)..................................................................................................30

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
  474 F. Supp. 2d 505 (S.D.N.Y. 2007)..................................................................................47

*In re Yukos Oil Co. Secs. Litig.*,
  No. 04-cv-05243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)............................................37

## Statutes and Authorities

15 U.S.C. § 78u-4(b)(1) ...................................................................................................14

15 U.S.C. § 78u-5(c) ..................................................................................................17, 21

17 C.F.R. § 229.303(a)(3)(i)-(ii) ......................................................................................28

Fed. R. Civ. P. 9 ................................................................................................... *passim*

Fed. R. Civ. P. 10b-5 ............................................................................................ *passim*

Fed. R. Civ. P. 12 ......................................................................................................40, 42

## INTRODUCTION

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Teva Pharmaceutical Industries Ltd. ("Teva"), Erez Vigodman, Eyal Desheh, Yaacov "Kobi" Altman, Allan Oberman, Sigurdur Olafsson, Yitzhak Peterburg, and Dipankar Bhattacharjee (the "Individual Defendants," and with Teva, "Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint" or "Compl.") in its entirety, with prejudice.[1]

## PRELIMINARY STATEMENT

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) (citation and quotation omitted). This litigation is exactly the type of "baseless and extortionate" strike suit the PSLRA was designed to prevent. H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731.

On November 3, 2016, Bloomberg released an article reporting that the Department of Justice (the "DOJ") might file criminal antitrust charges by the end of 2016 against an unspecified number of unnamed generic drug companies. That article listed Teva as among the companies that had previously disclosed its receipt of a subpoena in connection with the DOJ's investigation. Notably, however, the article did not contain any allegation, let alone any

---

[1] Plaintiffs have asserted claims against Teva, Teva Pharmaceutical Finance Netherlands II B.V., and twenty-three current and former officers and directors of Teva, among others. Plaintiffs asserted claims under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and Israeli securities law against eight of those defendants, and this brief is filed on their behalf. Plaintiffs asserted claims only under the Securities Act of 1933 against seventeen other Teva-related defendants, who have filed a separate brief in support of their motion to dismiss.

evidence, that Teva had violated any antitrust law in connection with the pricing of any drug or otherwise.  Nonetheless, three days later, Plaintiffs filed this action, conclusorily alleging that Teva had engaged in misconduct supporting criminal antitrust claims, which also allegedly supported the assertion of federal securities fraud claims.  At the same time, other plaintiffs' class action lawyers brought virtually identical lawsuits against the other generic drug companies mentioned in the article, even though the article was equally devoid of any allegation that any of those companies had engaged in illegal price-fixing in connection with any drug.  To date, the DOJ has not filed criminal antitrust claims against Teva, or anyone affiliated with Teva.

As the record shows, this case began with a race to the courthouse and the assertion of knee-jerk securities fraud claims against Teva and its senior executives.  While the initial complaint was purportedly based on "the investigation conducted by and through [p]laintiff's attorneys," ECF No. 1 at 1,[2] no meaningful "investigation" could possibly have been conducted, by anyone, between the Bloomberg article's publication, on November 3, 2016, and the complaint's filing three days later, on November 6, 2016.  For this reason, it is hardly surprising that the initial complaint lacked a valid basis for piggybacking federal securities law claims on top of unproven price-fixing allegations, and Plaintiffs' 300-plus page amended complaint (the "Complaint") adds nothing of substance to the hastily-filed fraud charges that began this case. Volume cannot compensate for a failure to meet the strict pleading requirements applicable to federal securities law claims.  For numerous reasons discussed herein, the Complaint fails to satisfy those rigorous pleading standards.

First, Plaintiffs have failed to identify a single actionable misrepresentation or omission of material fact, which is fatal to the claims that they have asserted under the Exchange Act, the

---

[2] Except where otherwise noted, "ECF No." hereinafter refers to a document on the docket in this matter.

Securities Act, and Israeli securities law.  Try as they might, Plaintiffs cannot overcome that fatal flaw merely by burying it in lengthy quotations of virtually every financial disclosure that Teva made in the past three years. Nowhere do Plaintiffs identify a single material misrepresentation that any Defendant made, about any matter, let alone explain how any challenged statement was false when made.  In fact, the vast majority of the Complaint repeats accurate statements of historical fact, which Plaintiffs do not even allege to be false.  The remaining challenged statements are either forward-looking statements, which are immune from liability under the PSLRA's "safe harbor" provision, or vague and indefinite statements that cannot constitute material misrepresentations, as a matter of law.

The Complaint centers on one supposedly key omission.  Plaintiffs allege that Defendants violated federal securities law by failing to disclose Teva's alleged participation in a price-fixing scheme regarding less than 2 to 3 percent of the hundreds of generic drugs that it sold during the three-plus year putative class period (the "Class Period").[3]  However, even if Plaintiffs had pled with the requisite specificity that Teva had violated antitrust law in connection with any one drug—which Plaintiffs have failed to do—their Complaint would still fail to state a federal securities law claim, as a matter of law.

An omission is actionable under federal securities law only where there exists a duty to disclose the allegedly omitted information.  Under controlling Second Circuit law, there is no freestanding duty to disclose wrongdoing that has not been adjudicated or admitted, and there has been nothing of the sort here.[4]  Nor is there a freestanding duty to disclose that revenues

---

[3] *See infra* Part I.B.3. (showing that Plaintiffs' allegations relate to only nine of the hundreds of drugs Teva sold during the Class Period, only one of which is the subject of claims brought by several State Attorneys General).

[4] *See City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("As we have explained, '[d]isclosure is not a rite of confession,' and companies

were attributable to alleged wrongdoing.[5]

In addition, governing law makes clear that an otherwise true statement is rendered misleadingly incomplete through an omission only if the omitted information virtually contradicts the challenged statement made. *See infra* Part I.B.2.d. Here, where the vast majority of the challenged statements have literally nothing to do with the pricing of any generic drugs, let alone the pricing of the few drugs mentioned in the Complaint, those statements could thus not possibly have been rendered misleadingly incomplete by the allegedly omitted information.

The one challenged statement on which Plaintiffs place principal focus, *i.e.*, the warning that Teva regularly provided to investors in its SEC filings regarding the intense competition it faced in the generic drug market, also cannot support any actionable claim. Compl. ¶¶ 4, 13, 531, 576, 629, 708. Far from being false, Teva's assessment of the competition then generally prevalent in the generic drug market was consistent with similar assessments that the U.S. government contemporaneously made. For example, a 2016 U.S. Department of Commerce report described that generic drug sector of the drug market as "extremely competitive," and a 2016 U.S. Department of Health and Human Services report likewise acknowledged that "the generic drug market as a whole is quite competitive . . . ." *See infra* Part I.B.2.d.

Nor have Plaintiffs adequately alleged that Teva's warnings regarding competition were misleadingly incomplete by virtue of omissions about alleged antitrust law violations. As one court stressed in holding legally defective a similar claim: "Not every allegation of an antitrust

---

do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'") (footnotes and internal citations omitted).

[5] *See In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is . . . unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing.") (internal citations omitted), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

violation will render misleading generalized statements regarding a company's increased earnings or the competitive state of the marketplace." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 n.4 (S.D.N.Y. 2006). Here, Plaintiffs fail to plead the requisite connection between:  (1) Defendants' general statements about industry-wide competition; and (2) alleged antitrust violations implicating a minute percentage of the generic drugs that Teva sold during the Class Period.  In sum, Plaintiffs have failed adequately to allege that Teva's warnings to investors about industry-wide competition were false or misleadingly incomplete.

While the foregoing pleading deficiencies alone defeat all of Plaintiffs' claims, those claims also fail for several other legally dispositive reasons.  As noted above, Plaintiffs have failed to plead the required specific facts showing that Teva engaged in any violation of antitrust law.  They have also failed to plead specific facts supporting any inference—let alone the required strong inference—that any Defendant acted with scienter, which Plaintiffs are required to plead separately as to each Defendant (as opposed to relying on allegations made as to "all Defendants," as Plaintiffs impermissibly do here).  The Complaint also fails adequately to plead loss causation, control person liability, or violations of Israeli securities law, which tracks U.S. securities law.

Moreover, in amending the Class Period to extend to August 3, 2017, Plaintiffs have made even clearer the reasons why their claims lack any validity.  On August 3, 2017, the price of Teva securities dropped sharply[6] upon its announcement that it missed Wall Street financial expectations for the second quarter of 2017 ("Q2 2017"), it lowered its financial guidance for the year, and it took an impairment charge of $6.1 billion.  Compl. ¶ 477 (citing Ex. J (Aug. 3, 2017

---

[6] Compl. ¶ 854.

Earnings Call)).[7]  That impairment charge reduced the Company's goodwill associated with its generic drug business, both its legacy business and the Actavis Generics business that Teva acquired from Allergan Plc.  *Id.*  Teva attributed these negative results to "accelerated price erosion and decreased volume mainly due to customer consolidation, **greater competition** as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subjected to **more competition**."  Compl. ¶ 850 (citing Ex. I (2017 Q2 Form 6-K) (emphasis added)).

In other words, the price of Teva securities declined on August 3, 2017 because the very risks of competition about which Teva had previously warned investors—those same risks that Plaintiffs inconsistently attack in the Complaint as false—materialized, and they led to investor losses.  In addition, market conditions in the generic drug market declined in the aftermath of Teva's mid-2015 deal to acquire Actavis Generics for $40.5 billion, which is why stock analysts came to regard that purchase price as a "top-of-the-market price," after market conditions changed.  *See* Compl. ¶ 437.  As Teva explained on August 3, 2017, it was those worsening market conditions that led it to take a $6.1 billion impairment charge, partly related to the Actavis Generics business that it agreed to acquire two years earlier.  Compl. ¶ 477 (citing Ex. J (Aug. 3, 2017 Earnings Call)).

The losses that Teva reported on August 3, 2017 were disappointing, but the materialization of disclosed risks regarding competition, market conditions, and the Actavis acquisition does not constitute fraud.  Rather, Plaintiffs are asserting a charge of "fraud by hindsight," which cannot support an actionable federal securities law claim, as a matter of law.[8]

---

[7] Exhibits filed herewith contain complete copies of documents referenced herein as "Ex. __."

[8] *Athale v. SinoTech Energy Ltd.*, No. 11-cv-05831, 2015 WL 13145808, at *8 (S.D.N.Y. Jan. 23, 2015), *aff'd*, 636 F. App'x 582 (2d Cir. 2016) (recognizing that "it is not reckless to lack

In *Dura Pharmaceuticals Inc. v. Broudo*, the Supreme Court stressed that the federal securities laws make private securities fraud class actions available "not to provide investors with broad insurance against market losses, but to protect against those economic losses that misrepresentations actually cause." 544 U.S. 336, 345 (2005). As courts have long recognized: "The market has risks; the securities laws do not serve as investment insurance." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) (affirming dismissal of securities fraud claims). Investment insurance, to which Plaintiffs are not entitled, is plainly what they are seeking here. For these and other reasons discussed below, Plaintiffs' claims should be dismissed in their entirety, with prejudice.

## BACKGROUND[9]

### Teva Is A Leading Generic Drug Company That Sells Thousands Of Products.

Incorporated in Israel, Teva is a global pharmaceutical company working to increase access to high-quality healthcare by developing, producing, and marketing affordable generic medicines. Compl. ¶ 68; Ex. E (2016 Form 20-F at 22). Teva USA is a wholly-owned subsidiary of Teva with its headquarters in Pennsylvania. Compl. ¶ 68.

During the time period relevant to this litigation, Teva primarily operated its business in two segments: generic medicines and specialty medicines. Ex. D (2015 Form 20-F at 20). As the global leading generics manufacturer, its medicines treat millions of patients every day worldwide. *Id.* Still, from 2012 to 2016, only 48% to 55% of Teva's revenues came from its

---

clairvoyance" and that "the Second Circuit has long refused to allow plaintiffs to proceed with allegations of fraud by hindsight") (internal citations and quotation marks omitted).

[9] On a motion to dismiss a case governed by the PSLRA, this Court may consider documents referenced in the Complaint, matters of which the Court may take judicial notice, including public records, and documents integral to the complaint, without turning this motion into one for summary judgment. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference.").

generic business.[10]  These revenues were generated by a large portfolio of generic products, including hundreds in the United States alone:

| Year | Approximate Number of Generic Products Marketed in United States | Source |
|------|------------------------------------------------------------------|--------|
| 2012 | Over 400 | Ex. A (2012 Form 20-F at 23) |
| 2013 | 375 | Ex. B (2013 Form 20-F at 28) |
| 2014 | 375 | Ex. C (2014 Form 20-F at 20) |
| 2015 | 370 | Ex. D (2015 Form 20-F at 24) |
| 2016 | Over 500 | Ex. E (2016 Form 20-F at 27) |

**Governmental Investigators Examine Prices In The Generic Drug Industry.**

In 2014, Connecticut and the DOJ began investigating increases in the prices of generic drugs and issued subpoenas to several generic drug manufacturers, excluding Teva and Teva USA.  Compl. ¶¶ 96, 98.  It was not until June 21, 2016 that Teva USA received a DOJ subpoena "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."  *Id.* ¶ 819; Ex. G (2016 Q2 Form 6-K at 25).  Then, on July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General "seeking documents and other information relating to potential state antitrust law violations."  Compl. ¶ 819; Ex. G (2016 Q2 Form 6-K at 25).  Although Teva had no legal obligation to do so,[11] Teva promptly disclosed the receipt of both subpoenas in its next quarterly report, on August 4, 2016, stating that "Teva is cooperating fully

---

[10] 51% in 2012 (Ex. A (2012 Form 20-F at 18)); 50% in 2013 (Ex. B (2013 Form 20-F at 17)); 48% in 2014 (Ex. C (2014 Form 20-F at 18)); 49% in 2015 (Ex. D (2015 Form 20-F at 21)); and 55% in 2016 (Ex. E (2016 Form 20-F at 22)).

[11] *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (concluding, despite defendants' receipt of subpoenas and Wells Notices, that "defendants did not have a duty to disclose the SEC investigation and Wells Notices because the securities laws do not impose an obligation on a company to predict the outcome of investigations").

with these requests."  Ex. G (2016 Q2 Form 6-K at 25).[12]

On November 3, 2016, Bloomberg reported that U.S. prosecutors might file federal charges by the end of 2016 against several unnamed generic drug companies for alleged collusion to fix generic drug prices on unnamed drugs.  Compl. ¶ 409; Ex. M (David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe Said to Be Filed by Year-End, Bloomberg New Enterprise* (Nov. 3, 2016)).  The article stated that the antitrust investigation by the DOJ "spans more than a dozen companies and about two dozen drugs."  *Id.*  The article reported that Teva was one of the generic drug manufacturers that had received a subpoena.  *Id.*

On December 14, 2016, the DOJ announced that it had charged two executives of Heritage Pharmaceuticals ("Heritage") with antitrust violations related to the pricing of generic drugs.  Compl. ¶ 102.  The DOJ did not file any charges against Teva then or at any time since then.  On January 9 and 10, 2016, the Heritage executives pleaded guilty to charges related to two drugs:  Doxycyline and Glyburide.  *Id.* ¶¶ 106-07.[13]  Although Plaintiffs cite these guilty pleas to support the statement that "Teva was a member of the conspiracy," *id.* ¶ 107, the guilty pleas do not mention or in any other way implicate Teva or its officers.  *See* Ex. N (Glazer Plea Agreement, No. 16-00506, ECF No. 18 (E.D. Pa. Jan. 9, 2017)); Ex. O (Malek Plea Agreement, No. 16-00508, ECF No. 17 (E.D. Pa. Jan. 10, 2017)).

On December 15, 2016, Attorneys General from Connecticut and nineteen other States filed a civil lawsuit (the "State AG Lawsuit") in this District against six generic drug manufacturers—Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage, Mayne Pharma

---

[12] The 2016 Q2 6-K mistakenly stated that Teva USA received the DOJ subpoena on June 21, 2015, instead of the correct date of June 21, 2016.  Ex. G (2016 Q2 Form 6-K at 25).  Teva included the correct date in its 2016 Q3 From 6-K.  Ex. H (2016 Q3 Form 6-K at 33).

[13] Plaintiffs incorrectly allege the date of the guilty pleas as December 9, 2016.  Compl. ¶ 106.

(USA), Inc., Mylan Pharmaceuticals, Inc., and Teva.  Compl. ¶ 110.  Teva promptly disclosed

this litigation (*see, e.g.*, Ex. E (2016 Form 20-F at F-51)), and Plaintiffs do not allege that Teva

violated its disclosure requirements concerning the State AG Lawsuit.  As alleged in the

Complaint, the State AG Lawsuit involves the same two drugs at issue in the Heritage

executive's guilty pleas, Doxycycline and Glyburide, but as to Teva only pleads facts concerning

Glyburide.  Compl. ¶ 115.  Teva is vigorously contesting the civil claims asserted in the State

AG Lawsuit, which have not resulted in either a determination of liability or an admission of

guilt by anyone associated with Teva.  *See* No. 16-2056, ECF 284.[14]

**Plaintiffs File Their Consolidated Complaint After
Teva Reports Lower Than Expected Financial Performance.**

> On August 3, 2017, Teva announced:
>
> Second quarter results were lower than we had anticipated due to the performance
> of our U.S. Generics business and the continued deterioration in Venezuela.
> These factors also led to a lowering of our outlook for the remainder of the year.
> . . . In our U.S. Generics business, we experienced accelerated price erosion and
> decreased volume mainly due to customer consolidation, greater competition as a
> result of an increase in generic drug approvals by the U.S. FDA, and some new
> product launches that were either delayed or subjected to more competition.

Ex. I (2017 Q2 Form 6-K); Compl. ¶ 850.  In addition, Teva announced that it was recording a

goodwill impairment charge of $6.1 billion "related to the U.S. generics reporting unit in the

second quarter of 2017," which included both the legacy Teva and the newly acquired Actavis

Generics businesses.  Ex. I (2017 Q2 Form 6-K at Ex. 99.1, 3); Compl. ¶ 851.

> Plaintiffs filed the Complaint in this lawsuit on September 11, 2017, seeking to represent

---

[14] On October 31, 2017, the State AG plaintiffs moved for leave to file a consolidated amended
complaint, attaching a redacted version of the amended complaint on the public docket.  In re
Generic Drug Pharma. Pricing Antitrust Litig., No. 17-3768, ECF No. 3 (E.D. Penn. Oct. 31,
2017).  While none of the allegations set forth in that amended complaint are properly before this
Court for purposes of this Motion to Dismiss, nothing in that amended complaint supports the
denial of this motion.

a class of purchasers of Teva securities from February 6, 2014 to August 3, 2017.  Compl. at 1.

Although Teva sold between 375 and 500 different generic drug products during the Class Period

(depending on the year), the Complaint's allegations are limited to 2 to 3 percent of those drugs.

Compl. ¶¶ 10, 12.  Piggybacking on the governmental investigations and parroting allegations

made in the State AG Lawsuit—which, again, have not resulted in any determinations of liability

against Teva—Plaintiffs' core allegations relate to one drug, Glyburide.  *Id.* ¶ 104.  Plaintiffs

also make allegations concerning eight other generic drugs,[15] but these allegations are based

solely on "Lead Counsel's investigation," which counsel has not based upon any document or

any statement, whether testimonial or otherwise, from anyone, let alone anyone at Teva, but

rather only on supposedly parallel pricing for those drugs sold by different manufacturers.

Compl. ¶ 134, *et seq.*  As discussed below, parallel pricing, alone, does not support an antitrust

law claim.  *See infra* Part I.B.3.b.iii.  Even if it did, none of Plaintiffs' allegations would support

a federal securities law claim.

## ARGUMENT

### I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT.

#### A.     Plaintiffs' Allegations Are Not Pleaded With The Particularity Required By The PSLRA And Rule 9(b).

The PSLRA's pleading requirements are strict and rigorous.  They require Plaintiffs, *inter*

*alia*, to "specify each statement alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which the belief is

formed."  *In re Citigroup*, 330 F. Supp. 2d at 375 (quoting 15 U.S.C. § 78u-4(b)(1)).  Similarly,

---

[15] Pravastatin, Enalapril Maleate, Cephalexin (oral suspension form), Ketoconazole (tablet and cream forms), Baclofen, Fluocinonide (cream, ointment, and gel forms), Carbamazepine (tablet and chewable tablet forms), and Estradiol (tablet form).

Federal Rule of Civil Procedure 9(b) requires that a plaintiff state "with particularity" the circumstances constituting alleged fraud.

Instead of adhering to these exacting standards, the Complaint here appears designed to confuse and obscure.  At over 300 pages, it tries to make up for, in length, what it lacks in particularity.  But the PSLRA's "heightened pleading rules are designed to elicit clarity, not volume."  *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999) (dismissing "cumbersome and unhelpful" securities fraud complaint).  As the Fifth Circuit noted in rejecting a similar § 10(b) complaint, "[a] complaint can be long-winded, even prolix, without pleading with particularity."  *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).  "Indeed, such a garrulous style is not an uncommon mask for an absence of detail.  The amended complaint here, although long, states little with particularity."  *Id.*

The same is true here.  The Complaint's allegations concerning Defendants' statements and omissions span 223 paragraphs and over 65 pages.  Yet despite this length, Plaintiffs never state with particularity how **any** specific statement was false or misleading on its own or through the alleged omission of information.  Instead, Plaintiffs print hundreds of quotations in the complaint and then repeatedly cut and paste the same boilerplate accusation that "each contained representations that were untrue statements of material fact," along with a laundry list of seven omissions that supposedly made the statements misleading, asking the Court to figure out the rest.[16]  This is a textbook example of impermissible puzzle pleading.  *See In re Alcatel Sec.*

---

[16] The seven omissions, allegedly, are "that the Exchange Act Defendants (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with

*Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.").

Courts justifiably have little tolerance for this cut-and-paste approach to pleading securities fraud. As one court observed as it dismissed similarly repetitive claims:

> The Plaintiffs' decision to merely cut and paste identical allegations as to each charge of fraud or misrepresentation contributes to the deficiency of the complaint. **Such repeated lists of "specific" reasons make a mockery of Rule 9(b) and the [PSLRA].** Apparently, the Plaintiffs determined that placing identical assertions of falsehood under each of the complaint's allegations would suffice where lumping the allegations together, and following with the same assertions, would not. On this point, the Plaintiffs clearly confuse quantity and position with substance. . . . **Plaintiffs' attempt to meet the specificity requirements of Rule 9(b), through this repetitive method, is simply insufficient**.

*Chan v. Orthologic Corp.*, No. 96-cv-01514, 1998 WL 1018624, at *14 n.11 (D. Ariz. Feb. 5, 1998) (emphasis added). Here, the matching exercise that Plaintiffs improperly impose on the Court is even more difficult to undertake given the Complaint's length (over 300 pages).

In short, Plaintiffs' long block quotes and formulaic repetition "state[] very little with particularity," *In re Alcatel*, 382 F. Supp. 2d at 534, and their Complaint should be dismissed under the PSLRA and Rule 9(b) for this reason alone. *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (affirming dismissal of 280-page complaint that left the court "to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false

---

competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of the anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive and collusive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior." *See* Compl. ¶¶ 537, 579, 638, 712, 726.

and how other facts might show a strong inference of scienter"); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-cv-03495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (dismissing complaint that failed to demonstrate how "block quotations" were allegedly false, but instead repeatedly employed a "conclusory formula . . . to cover *all* of the allegedly material misrepresentations") (emphasis in original).[17]

### B. Plaintiffs Fail To Identify Any Actionable Statement Or Omission Of Material Fact.

The PSLRA obligates Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The Complaint fails to do so, which independently mandates its dismissal.

As discussed below, Plaintiffs have failed to show how any challenged statement was false when made.  Plaintiffs have also failed adequately to plead any actionable omission of material information.  As to the misrepresentations that Plaintiffs allege, the vast majority are accurate statements of historical fact that are not even alleged to be false.  The remainder are forward-looking statements, which are immune from liability under the PSLRA's safe harbor provision or vague and indefinite statements that cannot constitute actionable statements of material fact, as a matter of law.

As to omissions, at its core, Plaintiffs' case is grounded on one alleged omission, *i.e.*, the

---

[17] *See also Vtech Holdings Ltd. v. PriceWaterhouseCoopers, LLP*, No. 03-cv-01413, 2003 WL 21756623, at *1 (S.D.N.Y. July 30, 2003) (dismissing a 113-page pleading:  "[d]espite its enormous length and an overabundance of detail, it often is quite conclusory"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal. 2001) (dismissing with prejudice securities fraud claims contained in a 124-page "puzzle style pleading").

- 14 -

omission of the alleged fact that Teva supposedly participated in anticompetitive behavior that violated federal antitrust law.  However, even if Plaintiffs had adequately pleaded that Teva had engaged in an antitrust law violation—and they have not (*see infra* at I.B.3.)—the omission of that information would not support any valid federal securities law violation for two reasons discussed below.  First, it is black letter law that merely possessing material information does not give rise to a duty to disclose, and Plaintiffs cannot cite to any securities law giving rise to a freestanding duty to disclose that Teva allegedly violated federal antitrust law.  Second, Plaintiffs have failed to demonstrate how the omission of that alleged information rendered any challenged statement so incomplete as to mislead, within the meaning of the governing federal securities law on that point.  These pleading deficiencies, alone, are fatal to Plaintiffs' claims.  Moreover, even if the Complaint did implicate a cognizable duty to disclose, Plaintiffs have also failed to plead that Teva engaged in an antitrust violation.  All of these reasons, discussed below, support the grant of this motion.

> **1.     Plaintiffs Fail To Identify
> Any Misleading Statement of Material Fact.**

Plaintiffs rely on over 65 pages of alleged misrepresentations, largely comprised of long block quotes and a laundry list of accusations copied and pasted throughout the Complaint. Rather than trying to meet their burden of alleging fraud with particularity as to each statement, Plaintiffs impermissibly force Defendants to guess why each statement is allegedly misleading. *See, e.g.*, *In re Alcatel*, 382 F. Supp. 2d at 534.

Ultimately, the Complaint's 244 paragraphs of alleged misstatements can be categorized into four main groups: (1) accurate statements of historical fact; (2) vague and indefinite statements of optimism about a company's business or future prospects; (3) forward-looking statements accompanied by meaningful cautionary language; and (4) accurate Sarbanes-Oxley

certifications.  Longstanding principles of federal securities law establish that a plaintiff cannot predicate a securities fraud claim on these sorts of statements.

          a.        __Accurate Statements Of Historical Fact Are Not Actionable.__

True statements of historical fact simply are not actionable under §10(b).  In fact, "disclosure of accurate historical data does not become misleading even if [the company might predict] less favorable results . . . in the future."  *In re Coty Inc. Sec. Litig.*, No. 14-cv-00919, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016); *see, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") (internal citations and quotation marks omitted).

Plaintiffs nevertheless challenge as false or misleading factual statements of earnings and growth from every quarterly and annual announcement of financial results between the fourth quarter of 2013 to the second quarter of 2017.  To illustrate, Plaintiffs challenge the 2013 Form 20-F's disclosure of "(1) revenue of $20.3 billion; (2) gross profit of $10.7 billion; (3) net income of $1.3 billion; (4) Generics Medicines segment revenues of $9.9 billion; (5) Generic Medicines gross profit of $4.1 billion; and (6) Generic Medicines segment profitability of $1.7 billion for the year," and then claim that these financial results "were materially inflated by at least $125.8 million in revenue."  Compl. ¶¶ 526, 537.[18]  But "[a]bsent an allegation that [Defendants] reported income that [they] did not actually receive or sales growth that did not actually occur, . . . 'a violation of federal securities laws cannot be premised upon a company's

---

[18] *See also* Compl. ¶¶ 524, 540, 547, 556, 569, 571, 586, 596, 607, 622, 624, 646 665, 688, 701, 703, 717 (statements of earnings); *see also id.* ¶¶ 523, 524, 527, 533, 535, 541, 544, 548, 551, 552, 555, 557, 560, 563, 570, 572, 578, 585, 587, 597, 599, 600, 603, 606, 608, 613, 621, 623, 625, 631, 632, 640, 645, 647, 666, 670, 671, 689, 694, 697, 698, 702, 704, 710,718, 721 (statements of earnings and growth).

disclosure of accurate historical data.'" *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (citation omitted).   That is true even if the accurately reported income "is alleged to have been, in part, improperly obtained" and "inflated as a result of the alleged scheme." *Id.* at 403-04 (citations omitted).   Because there is no allegation that Teva restated its financial results from the Class Period or that the stated revenues or growth did not occur, these accurate reports of financial results are not actionable.

**b.    Defendants' Alleged Forward-Looking Statements All Fall Within The PSLRA's Safe Harbor.**

Next, Defendants' forward-looking statements fall within the PSLRA's safe harbor.   15 U.S.C. § 78u-5(c).   That safe harbor provides, inter alia, that: "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial." *City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10 CV 00967, 2011 WL 7158548, at *5 (S.D.N.Y. Sept. 6, 2011) (citation omitted) (emphasis in original); 15 U.S.C. § 78u-5(c).   As a consequence, "allegedly fraudulent forward-looking statements must be examined in the light of the cautionary language surrounding them"[19] so that companies may make projections without fear of liability should those projections not come to pass. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re WEBMD Health Corp. Sec. Litig.*, No. 11-cv-05382, 2013 WL 64511, at *9 (S.D.N.Y. Jan. 2, 2013) (dismissing claims where "[Defendant]'s prediction, while ultimately erroneous, could not have misled a reasonable investor into thinking that there was no risk").

Plaintiffs challenge many of Defendants' forward-looking statements,[20] including routine

---

[19] *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 267 (S.D.N.Y. 2004); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357-58 (2d Cir. 2002).

[20] Plaintiffs' puzzle-pleading style makes it difficult to identify *which* forward-looking statements Plaintiffs actually challenge.   For example, Plaintiffs include a section in the

financial projections.  *See, e.g.*, Compl. ¶ 678.   Courts in the Second Circuit, however, have consistently recognized that cautionary language shields a defendant company from liability for routine financial projections.  *See, e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010).[21]  The same conclusion applies for Teva's financial projections.

Plaintiffs also err in challenging other forward-looking statements by Defendants, including:

- "We are going to improve and get a lot of money into the bottom line of our generic business in order to improve competitiveness."  Compl. ¶ 534; *see also id.* ¶ 284.

- "During 2014, we will deliver significant savings as part of our cost reduction program, accelerate transformation of our operations network, strengthen our global leadership in generics and continue to increase confidence in Teva."  *Id.* ¶ 539.

- "Despite this, we are very confident that the price erosion we experienced in the US will continue to be in the mid single-digits as we have guided throughout the year."  *Id.* ¶ 694.

These statements squarely fall within the PSLRA safe harbor.  First, Teva's forward-looking statements were identified as such.  *See, e.g.*, Ex. E (2016 Form 20-F at 1).  Second, Teva's forward-looking statements were always accompanied by "meaningful cautionary language," either directly or through incorporation by reference.[22]  For example, each of Teva's Forms 20-F for the Class Period contained the following cautionary language:

---

Complaint titled, "Teva Falsely And Misleadingly Reaffirms Guidance," discussing statements made in February 2017 reaffirming earlier guidance, Compl. ¶¶ 459-63, but Plaintiffs do not include any of those February 2017 statements in the 244 paragraphs of alleged misrepresentations and omissions.  *See* Compl. ¶¶ 379, 468-71.  Even if Plaintiffs included the 2017 guidance in their catalog of alleged misrepresentations, those statements would not be actionable for the same reasons discussed herein.

[21] *See also Int'l Ass'n of Heat v. Int'l Bus. Mach. Corp.*, 205 F. Supp. 3d 527, 537-38 (S.D.N.Y. 2016); *In re WEBMD*, 2013 WL 64511, at *12 ("At its core, a forward-looking statement is one that contains a projection of income or earnings, or one of 'future economic performance.'").

[22] A corporation may incorporate by reference the risk factors set forth in its recent SEC filings. *See Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 192-93 (D. Conn. 2014) (earnings guidance press releases incorporating cautionary language by reference qualify for safe harbor).

- 18 -

> This annual report contains forward-looking statements, which express management's current beliefs or expectations with regard to future events. . . . The forward-looking statements contained herein involve a number of known and unknown risks and uncertainties that could cause our future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements.

Ex. E (2016 Form 20-F at 1), *see also* Ex. B (2013 Form 20-F at 1); Ex. C (2014 Form 20-F at 1); Ex. D (2015 Form 20-F at 1).

In addition, those reports also set forth in great detail numerous risks that could affect Teva's business and that could cause actual results to differ materially from expected results. Teva's extensive risk disclosures during the Class Period included detailed sections titled:

- "Our revenues and profits from generic pharmaceutical products typically decline as a result of competition, both from other pharmaceutical companies and as a result of increased governmental pricing pressure."

- "Our specialty pharmaceuticals business faces intense competition from companies that have greater resources and capabilities."

- "Decreas[ed/ing] opportunities to obtain U.S. market exclusivity for generic versions of significant products may adversely affect our revenues and profits."

- "Sales of our products may be adversely affected by the continuing consolidation of our customer base."

- "Governmental investigations into sales and marketing practices, particularly for our specialty pharmaceutical products, may result in substantial penalties."

*See* Ex. B (2013 Form 20-F at 5-14 ); Ex. C (2014 Form 20-F at 11-15); Ex. D (2015 Form 20-F at 11-13); Ex. E (2016 Form 20-F at 13-16)

It bears noting that virtually all of the statements that Plaintiffs challenge relating to Teva's securities price decline on August 3, 2017, are subject to dismissal under the PSLRA's safe harbor, alone. As noted above, on August 3, 2017, Teva announced that it missed its second quarter 2017 financial results, revised its financial guidance for 2017, and took an impairment charge of $6.1 billion relating to its generics business, including the Actavis Generics business

that it acquired from Allergan in a transaction struck two years before, in July 2015. *See supra* 10. Teva's prior financial projections and other forward-looking statements regarding its expected future prospects, which Teva ultimately did not achieve, are immune from liability under the PSLRA's safe harbor because they were accompanied by meaningful cautionary language.

Similarly, the various forward-looking statements that Teva and its management made regarding the Actavis acquisition and its prospects for success are also not actionable under the PSLRA's safe harbor provision for the same reason. Like the risks that Teva provided to its investors regarding the losses it could suffer in the future due to the competition it faced, Teva also warned investors regarding the many risks presented by its decision to purchase Actavis for $40.5 billion.[23] Plaintiffs purchased their Teva securities with their eyes wide open to these risks. Although it was disappointing to Teva, its management, and its shareholders, that these risks materialized, the losses that consequently resulted do not support any valid claim for violation of federal securities law. To the contrary, as the Second Circuit has long recognized, a lack of "clairvoyance" is not actionable, nor a charge of "fraud by hindsight," which is what Plaintiffs assert here. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of federal securities claims). In sum, because Teva's risk disclosures were sufficiently "meaningful" under Second Circuit law, Plaintiffs' claims based on forward-looking statements should be dismissed.[24]

---

[23] Ex. F (July 27, 2015 Form 6-K at Ex. 99.1) (press release announcing the Actavis acquisition, which lists many risks regarding the Actavis acquisition that Teva publicly disclosed, and which Teva continued to disclose in similar risk disclosures regarding that acquisition in subsequent SEC filings).

[24] Plaintiffs' claims based on forward-looking statements also should be dismissed for the separate and independent reason that the Complaint fails sufficiently to plead scienter under the second prong of the PSLRA's safe harbor provision: Even when a forward-looking statement is

c.       **Vague And Indefinite Statements Of**
**Optimism Are Immaterial As A Matter Of Law.**

Plaintiffs also err in challenging alleged vague and indefinite statements by Defendants.

Such statements, including "expressions of puffery and corporate optimism," cannot give rise to

liability under the federal securities laws because no reasonable investor would rely on them.

*Rombach*, 355 F.3d at 174.  "[C]ompanies must be permitted to operate with a hopeful outlook"

and management "can be expected to be confident about their stewardship and the prospects of

the business that they manage."  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1129-30 (2d Cir. 1994)).  For these reasons,

> Courts "have demonstrated a willingness to find immaterial as a matter of law a
> certain kind of rosy affirmation commonly heard from corporate managers and
> numbingly familiar to the marketplace—loosely optimistic statements that are so
> vague, so lacking in specificity, or so clearly constituting the opinions of the
> speaker, that no reasonable investor could find them important to the total mix of
> information available."

*Gavish v. Revlon, Inc.*, No. 00-cv-07291, 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004)

(citation omitted).  Such puffery includes "loose optimism about both an issuer's current state of

affairs and its future prospects."  *In re Peritus Software Servs. Inc. Sec. Litig.*, 52 F. Supp. 2d

211, 220 (D. Mass. 1999) (citation omitted).

Many of the statements Plaintiffs challenge fall into this category of inactionable

corporate puffery.  These include:

---

not accompanied by meaningful cautionary language—which is not the case here—it is
actionable only if made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(B); *see also
City of Roseville*, 2011 WL 7158548, at *5.  For this reason, the scienter pleading standard that
applies to forward-looking statements in a federal securities case is even higher than the one that
applies to statements of past or present fact.  Here, Plaintiffs have not pled a single specific
contemporaneous fact giving rise to any inference, let alone a strong inference, that any
Defendant had "actual knowledge" that any of the challenged forward-looking statements was
false or misleading.  *See infra* Part I.C. (discussing Plaintiffs' failure adequately to plead
scienter).

- "[The] acquisition of Actavis Generics comes at a time when Teva is stronger than ever—in both our generics and specialty businesses."  Compl. ¶¶ 382, 686.

- "[W]e believe that the generic business of Teva is stable, is well-managed, is going to grow in emerging market."  *Id.* ¶ 534.

- "We solidified the foundation of Teva, streamlining the organization, creating a sound, stronger, more equipped competitive base for the near future."  *Id.* ¶ 561.

- "We believe we have a focused and competitive pricing strategy."  *Id.* ¶ 574.

- "[The] generic side of the house is doing very well. . . . The machine is working at a very, very high gear and high speed and is working very well."  *Id.* ¶ 592.

- "[W]e have taken great steps towards changing Teva profoundly, in a way that further highlights what makes us unique in this industry, allows us to better serve patients and enables us to provide significant value for all of our stakeholders."  *Id.* ¶ 606.

- "Teva is ideally positioned to realize the opportunities that the global and US generic markets offer to us."  *Id.* ¶ 680.

- "Teva operations is a competitive advantage and capable of creating additional value."  *Id.* ¶ 685.

- "On August 2, we completed the strategic acquisition of Actavis generics.  The result is a much stronger, more competitive Teva that is best positioned to thrive in an evolving global generics marketplace."  *Id.* ¶ 694.

Courts regularly find such vague and indefinite statements of optimism to be immaterial puffery.

*See, e.g.*, *In re GPC Biotech AG Sec. Litig.*, No. 07-cv-06728, 2009 WL 5125130, at *6 (S.D.N.Y. Dec. 29, 2009) (statements conveying allegedly misleading impression that clinical trial "**was going well**" are immaterial puffery); *Shemian v. Research in Motion Ltd.*, No. 11-cv-04068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statement that "**I feel very, very good** about [the] U.S." held to be "non-actionable corporate puffery"), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 286 (S.D.N.Y. 2006) (statements that "**[w]e're excited** about the prospects.  So far, so good" and "**[e]verybody has been anxiously using it** and learning how to use the technology" "constitute mere puffery upon

which no investor could have reasonably relied") (emphasis added).[25]

### d. Teva's Sarbanes-Oxley Certifications Were Accurate.

Plaintiffs allege that Teva's Sarbanes-Oxley ("SOX") Certifications contained material misstatements and omissions because they failed to disclose that Teva was engaged in alleged price fixing, not operating in a competitive market, and reporting financial results that resulted from anticompetitive conduct.  Compl. ¶¶ 736-44.  A SOX certification requires the principal executive and financial officers of public companies to certify to the "general truthfulness of the company's quarterly and annual reports and to the establishment and adequacy of the company's internal controls."  *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-cv-07050, 2017 WL 1536223, at *19 (D.N.J. Apr. 27, 2017).  Plaintiffs fail adequately to allege that Defendants' SOX certifications were false or misleading, for at least two reasons.

First, Plaintiffs have not adequately alleged that Teva's financial reports were anything other than accurate statements of historical fact, which, as discussed above, are not actionable. *See supra* Part I.B.1.A.  At most, Plaintiffs claim that Teva's financial reporting was false and misleading because it failed to comply with GAAP.  *See* Compl. ¶¶ 488-501, 756-57, 1011. These conclusory assertions fail, however, because there has been no restatement of the financial results at issue, and Plaintiffs have failed to plead with the requisite specificity that Teva engaged in any material GAAP violation by setting forth such "basic details as the approximate amount by which revenues and earnings were overstated, . . . the dates of any of the transactions[,] or the

---

[25] *See also Pollio v. MF Glob.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statement that "the franchise is performing well" is merely optimistic puffery); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 956 (D. Ariz. 2007) (statement "[w]e are encouraged that strengthening customer forecasts may partially offset the [typical] seasonal weakness" is "indeed, puffery"); *Coble v. Broadvision, Inc.*, No. 01-01969, 2002 WL 31093589, at *1 (N.D. Cal. Sept. 11, 2002) (statement that company was "well positioned . . . to thrive and emerge an even a stronger player" not actionable).

identities of any of the customers or [Teva] employees involved in the transactions." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203-04 (1st Cir. 1999) (affirming dismissal where plaintiffs failed to plead specific facts indicating violation of FAS 48).[26] GAAP provisions are subject to a range of reasonable interpretations.[27] *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979).[28] For this reason, "[a]ccounting or business judgments, even negligent ones, are not actionable." *In re Fannie Mae*, 742 F. Supp. 2d at 408 (citing *Oleck v. Fischer*, 623 F.2d 791, 795 (2d Cir. 1980)). Furthermore, to the extent that Plaintiffs' GAAP allegations simply recast their allegations that Plaintiffs engaged in unlawful "anticompetitive and collusive conduct," Compl. ¶ 521, the allegations fail for the additional reason that Plaintiffs fail adequately to plead that Teva was engaged in the "anticompetitive and collusive conduct" underlying the GAAP claims. *See infra* Part I.B.3.

Second, Plaintiffs have not adequately alleged a defect in Teva's internal controls regarding financial reporting. Plaintiffs' conclusory statements about Teva's internal controls, without any further support, are insufficient. *See* Compl. ¶ 743 ("Teva's internal controls suffered deficiencies that caused the Company's financial results to be materially misstated in

---

[26] *See also Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009) (affirming dismissal where plaintiffs' "cursory" GAAP allegations "establish neither defendants' motive and opportunity nor strong circumstantial evidence of conscious behavior or recklessness"); *ECA*, 553 F.3d at 198-200 (affirming dismissal where allegations of GAAP violations were not coupled with sufficient evidence of fraudulent intent); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891-93 (8th Cir. 2002) (affirming dismissal where plaintiffs failed to plead specific facts indicating that defendants violated FAS 121 or FAS 5).

[27] Plaintiffs also devote several pages to allegations regarding Defendants' application of GAAP to goodwill received in the Actavis acquisition, but it is unclear how, if at all, Plaintiffs seek to allege any actionable misrepresentation through this GAAP discussion. *See* Compl. ¶¶ 511-20.

[28] *See also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (GAAP "allow[s] reasonable accountants to reach different conclusions"); *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 265-66 (D. Mass. 2001) (describing accounting decisions under GAAP as "fundamentally . . . subjective," a fluid "subjective concept," and a "matter of judgment" as to which "reasonable persons might disagree").

violation of GAAP.").  Courts routinely dismiss conclusory internal control allegations such as these.  *See, e.g.*, *PetroChina*, 120 F. Supp. 3d 340, 358-60 (S.D.N.Y. 2015) (dismissing complaint as "insufficiently plead[ed]" because, *inter alia*, the allegations had "not established that the Company's statements concerning its internal control over financial reporting were false"); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, No. 10-cv-02835, 2011 WL 4357368, at \*22 (S.D.N.Y. Sept. 19, 2011) (dismissing plaintiff's claim because plaintiff had "not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [it] lacked adequate internal controls"); *Janbay v. Canadian Solar, Inc.*, No. 10-cv-04430, 2012 WL 1080306, at \*9 (S.D.N.Y. March 30, 2012) (finding that the plaintiffs' allegations concerning internal and disclosure controls were insufficient because they "failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why").[29]

## 2.    Plaintiffs Fail To Identify
## Any Actionable Omission Of Material Fact.

Because they cannot identify any false or misleading statements by Defendants, Plaintiffs' theory of liability largely rests on the idea that Defendants were obligated to disclose that they had engaged in anticompetitive misconduct.  It is well established, however, that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  In fact, "it is by now axiomatic that 'a corporation is not required to disclose a fact merely because a reasonable investor would very much like to

---

[29] Moreover, even if Plaintiffs adequately pleaded that Teva's SOX certifications were false or misleading, Plaintiffs fail adequately to plead that the executives who signed the certifications had knowledge of their falsity.  *See In re Sanofi*, 155 F. Supp. 3d at 402 (concluding that SOX certifications were not actionable because, among other reasons, plaintiffs did "not plead any facts giving rise to a strong inference that [defendant] knew about the alleged illegal marketing and kickback scheme and therefore knew that the report misstated or omitted a material fact"); *infra* Part I.C. (discussing Plaintiffs' failure adequately to plead scienter).

know that fact.'"   *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (citation

omitted).   To prevent flooding investors with useless information, "an omission is actionable

under the securities laws **only when the corporation is subject to a duty to disclose the**

**omitted facts**."   *In re Lions Gate*, 165 F. Supp. 3d at 11 (emphasis added) (citation omitted).

Thus, even if the omission relates to material information, a duty to disclose arises only

when: (1) a statute or regulation requires disclosure; (2) there is contemporaneous insider

trading; or (3) a statement is voluntarily made that is rendered so incomplete as to mislead absent

the disclosure of the omitted information.   *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d

Cir. 1992).   Here, there are no allegations of insider trading, and Plaintiffs fail adequately to

allege either:  (a) any freestanding duty to have disclosed the allegedly omitted information; or

(b) any voluntary statement that was rendered so incomplete as to mislead due to the

nondisclosure of omitted information.

### a.   Teva Had No Duty To Disclose Alleged But Unadjudicated Wrongdoing.

Plaintiffs cannot circumvent the usual limitations on omission-based claims by alleging

that the undisclosed conduct was unlawful.  It is well recognized that the securities laws do not

require a company to "accuse itself of wrongdoing."   *In re Citigroup*, 330 F. Supp. at 377.   There

is no freestanding duty to disclose alleged wrongdoing that has been neither adjudicated nor

admitted.   *See City of Pontiac*, 752 F.3d at 184 ("As we have explained, '[d]isclosure is not a rite

of confession, and companies do not have a duty 'to disclose uncharged, unadjudicated

wrongdoing.").[30]   Nor is there a freestanding duty to disclose that revenues were attributable to

---

[30] *See also Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 290 (S.D.N.Y. 2013) (holding that
the failure to "disclose any potentially illegal conduct the instant it is committed" cannot form
the basis of liability under Rule 10b-5), *aff'd in part, vacated in part on other grounds sub nom.
Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014); *In re*

alleged wrongdoing.  *See In re Citigroup*, 330 F. Supp. 2d at 377 ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is . . . unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing.").

Courts routinely dismiss claims where the omitted information is alleged illegal conduct that the defendant was under no duty to disclose, even if investors might have found the information material.  *See In re Sanofi*, 155 F. Supp. 3d at 404-05 (no duty to disclose illegal marketing scheme); *In re Axis*, 456 F. Supp. 2d at 586 (no duty to disclose anticompetitive scheme); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (no duty to disclose alleged involvement in insider trading violations).[31]  Because Plaintiffs fail to plead that Defendants were under any duty to disclose the alleged antitrust violations, dismissal is likewise warranted here.

### b.      Teva Had No Duty To Disclose Its Receipt Of Government Subpoenas.

The same considerations preclude any claim based on Plaintiffs' allegation that Defendants failed to disclose Teva's receipt of two governmental subpoenas on the "July 13, 2016 Preliminary Outlook for 2016-2019 Investor Call."  Compl. ¶ 713.  Just as there is no duty "to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac*, 752 F.3d at 184, there is no general duty to disclose the existence of a governmental investigation—let alone an

---

*Am. Express Co. S'holder Litig.*, 840 F. Supp. 260, 269 (S.D.N.Y. 1993) (company not required to "accuse itself of antisocial or illegal policies") (citation omitted).

[31] *See also Roeder v. Alpha Indus.*, 814 F.2d 22, 28 (1st Cir. 1987) (no duty to disclose illegal payments); *In re Seachange Int'l*, No. 12-cv-12116, 2004 WL 240317, at *10 (D. Mass. Feb. 6, 2004) (no duty to disclose alleged patent infringement); *Galati v. Commerce Bancorp, Inc.*, No. 04-cv-3252, 2005 WL 3797764, at *1, 8 (D.N.J. Nov. 7, 2005) (no duty to disclose unlawful activities), *aff'd*, 220 F. App'x 97 (3d Cir. 2007); *Gaines v. Guidant Corp.*, No. 03-cv-00892, 2004 WL 2538374, at *7, 11 (S.D. Ind. Nov. 8, 2004) (no duty to disclose FDA compliance problems).

investigation, like the one in this case, that was already public knowledge.  *See In re Lions Gate*, 165 F. Supp. 3d at 12-13 ("The plaintiffs contend that the failure to disclose a government investigation is actionable.  But a government investigation, without more, does not trigger a generalized duty to disclose.").  Moreover, as noted above, while Teva had no duty to do so, it did disclose its receipt of those two subpoenas in its next quarterly report filed with the SEC on August 4, 2016.  *See supra* 8.  For these reasons, Defendants' failure to disclose the receipt of government subpoenas on the July 13, 2016 call cannot give rise to a § 10(b) claim.

c.      **Teva Complied With Its Statutory<br>And Regulatory Disclosure Requirements.**

Plaintiffs identify no statutory or regulatory duty that might require disclosure of the antitrust violations alleged here.  Plaintiffs assert that Item 5 of Form 20-F and Item 303 of Regulation S-K imposed a duty to disclose that Teva's revenues were being affected by the alleged anticompetitive misconduct.  *See* Compl. ¶¶ 502, 579, 712.  But there is no support for this assertion, which would contradict the well-established principle that the securities laws do not require a company to "accuse itself of wrongdoing."  *In re Citigroup*, 330 F. Supp. at 377.

Moreover, Item 303 requires a registrant only to disclose (1) "unusual or infrequent events . . . that materially affected the amount of reported income" and (2) "known trends or uncertainties" that can reasonably be expected to materially impact sales, revenue, or income.  17 C.F.R. § 229.303(a)(3)(i)-(ii).[32]  For both prongs, disclosure is required only if the event, trend, or uncertainty both is "known to management" and has a material impact on income.  *In re Ply*

---

[32] Although Item 303 of Reg. S-K does not apply to Teva as a foreign filer, the SEC and courts interpret Item 5 of Form 20-F as requiring the same disclosures.  *See Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 476 (S.D.N.Y. 2016).

*Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 149-50 (S.D.N.Y. 2015).[33]  The issuer must

not only "know" that an undisclosed event is happening, it must also "know" that the event is

going to unfold in a way that affects the issuer's bottom line.  *Lopez v. Ctpartners Exec. Search

Inc.*, 173 F. Supp. 3d 12, 36-37 (S.D.N.Y. 2016).  The event must be "known" with certainty.

*In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013), *aff'd*,

566 F. App'x 93 (2d Cir. 2014).

Here, Plaintiffs fail adequately to plead that the alleged anticompetitive misconduct,

which related to, at most, only nine out of Teva's between 370 and 500 generic drug products,

had or would have a material effect on the company's income.  *See infra* Part I.B.3.  Plaintiffs

also fail adequately to plead that the allegedly omitted information—Teva's supposed

involvement in anticompetitive conduct—was "known to management."  *See infra* Part I.C.

(discussing Plaintiffs' failure to plead scienter adequately).  Item 303, therefore, did not impose

an affirmative duty of disclosure on the Defendants here.

### d.     None Of The Challenged Statements Were "So Incomplete As To Mislead."

Unable to identify any statute or regulation requiring disclosure of the allegedly omitted

information, Plaintiffs are left to rely solely on the argument that the alleged omissions made

Defendants' statements "so incomplete as to mislead," which fails as well.  *See generally In re

Lions Gate*, 165 F. Supp. 3d at 15 (explaining that absent an affirmative duty to disclose, an

omission claim can only survive if the alleged omission rendered a statement "so incomplete as

---

[33] *See also In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) ("Defendants' actual knowledge of the trend is 'an essential allegation for purposes of a claim based on Item 303.'"); *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07-cv-10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend.").

to mislead").  As the First Circuit's seminal *en banc* decision in *Backman v. Polaroid Corp.* teaches, statements are misleadingly incomplete, within the meaning of federal securities law, only under very limited circumstances.  910 F.2d 10, 16 (1st Cir. 1990) (en banc) (followed and applied by the Second Circuit in *Glazer*, 964 F.2d at 156).[34]  *Polaroid* illustrates how very narrowly courts construe what it means for a statement to be "so incomplete as to mislead," stressing that "complete and accurate" disclosure does not require that a company publish every fact about every subject it voluntarily discloses.  *Polaroid*, 910 F.2d at 16 (citation omitted).

In *Polaroid*, the plaintiffs alleged, *inter alia*, that certain of Polaroid's disclosures concerning the sales price and number of sales of its Polavision instant movie camera (which proved to be a commercial disaster) were misleading in violation of the federal securities laws. *Id.* at 11, 15.  The First Circuit ordered that defendants were entitled to judgment as a matter of law, stressing that "complete and accurate" disclosure does not require that a company publish every fact about every subject it voluntarily discloses: "This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  *Id.* at 16.

The plaintiffs in *Polaroid* argued that, by featuring the Polavision camera on the cover of its third quarter report, by announcing record worldwide sales and earnings in both the third and fourth quarters, and by stating that Polaroid's worldwide manufacturing facilities continued "to operate at close to maximum capacity"—without disclosing that the company had instructed its European supplier to hold up production on 20,000 Polavision units—Polaroid had made misleadingly incomplete disclosures.  *Id.* at 15-16.  Rejecting that argument, the First Circuit

---

[34] *See also Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (applying *Polaroid* in affirming dismissal of securities fraud claims); *In re K-tel*, 300 F.3d at 897 (same).

- 30 -

applied a very literal rule.  It held that Polaroid's statement that its worldwide manufacturing operations were "close to maximum capacity," if "taken as a whole, was true; it expressly recognized an absence of totality."  *Id.* at 15.  In other words, even though Polaroid omitted information concerning a Polavision production slowdown during the relevant quarter, Polaroid's statement concerning manufacturing at "close to maximum capacity" was nevertheless literally true at that time and not misleadingly incomplete.  *Id.*  Similarly, "[d]isclosing that Polavision was being sold below cost was not misleading by reason of not saying how much below.  Nor was it misleading not to report the number of sales, or that they were below expectations."  *Id.*  Since *Polaroid*, courts have continued to adhere to a narrow construction of what it means for a statement to be misleadingly incomplete.  *See Glazer*, 964 F.2d at 156; *see also Rudman v. CHC Grp. LTD*, 217 F. Supp. 3d 718, 730 (S.D.N.Y. 2016) (holding that plaintiffs failed to identify statements that were misleading, "none of which are undermined or called into doubt by the omitted details of the Petrobras nonpayment").

Under Second Circuit case law in *Glazer*, which follows *Polaroid*, Plaintiffs' conclusory assertions fail to allege that any of Defendants' Class Period statements were so incomplete as to mislead.  Plaintiffs assert that two categories of statements were misleadingly incomplete because of Teva's alleged failure to disclose its violations of antitrust law:  (1) statements that Teva was subject to "intense competition" in the U.S. generic drug market;[35] and (2) statements discussing the pricing environment for Teva's generic drug portfolio.[36]  For the reasons discussed below, not one of the challenged statements in either category is actionable, as a matter of law.

To assert a nondisclosure claim arising from the failure to disclose illegal conduct, the

---

[35] *See, e.g.*, Compl. ¶¶ 531, 574, 576, 618, 629, 635, 654, 708.

[36] *See, e.g.*, Compl. ¶¶ 369, 380, 423, 565, 614, 633, 639, 642, 652, 677, 695.

alleged illegal conduct must be "specifically pled" *and* there must be a "direct nexus to the defendant's existing disclosures which rendered those statements misleading." *In re Axis*, 456 F. Supp. 2d at 589; *see In re Sanofi*, 155 F. Supp. 3d at 404-05 ("Assuming *arguendo* that plaintiffs sufficiently plead the existence of the scheme, whether defendants had a duty to disclose the scheme depends on the substance of the statements: whether 'alleged omissions . . . are sufficiently connected to defendants' existing disclosures.'") (citation omitted).  The connection "may not be too attenuated" and "must be pled with sufficient specificity." *In re Axis*, 456 F. Supp. 2d at 588.  In assessing nondisclosure claims, the alleged misstatements must be read "as a whole" both "together and in context." *Id.*; *In re FBR*, 544 F. Supp. 2d at 361 (citation omitted).

Here, even if the alleged antitrust violations were "specifically pled"—and they are not, *see infra* Part I.A.—Plaintiffs fail to plead the requisite connection between: (1) Defendants' general statements about industry-wide competition and about pricing across Teva's entire generics portfolio; and (2) alleged antitrust violations implicating a very small percentage of the generic drugs marketed by Teva during the Class Period.  Plaintiffs make the centerpiece of their case their allegation that the following warning Teva repeatedly gave to investors regarding the competition it faced in the generic drug market was supposedly fraudulent and false:

> Our generic drugs face intense competition.  Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

Compl. ¶¶ 531, 576, 629, 708.  The court in *Axis* rejected a similar claim as legally defective.  In that case, plaintiffs alleged that the defendant company's failure to disclose an alleged "scheme to drive competitors out of the marketplace" rendered misleading statements it made describing the insurance industry as "highly competitive."  456 F. Supp. 2d at 589.  Granting defendants'

- 32 -

motion to dismiss the case, the court stressed:  "Not every allegation of an antitrust violation will render misleading generalized statements regarding a company's increased earnings or the competitive state of the marketplace."   *Id.* at 589 n.4.   Accordingly, the court held the defendant's statements about industry-wide competition lacked a sufficient connection to the alleged antitrust violation and were thus too "innocuous" to support a federal securities law claim. *Id.* at 589.

The same rationale applies here. Teva's warning to investors about the competition it faced in the generic drug market generally lacks any connection to the alleged antitrust violation involving a minute percentage of the drugs it sold.  As in *Axis*, the challenged statement about industry-wide competition is too "innocuous" to support a misrepresentation claim; it was not rendered misleading through the omitted information.  *Id.*  After all, it cannot legitimately be disputed that the generic drug industry, as a whole, was extremely competitive during the Class Period.  A 2016 Department of Commerce report stated:

> Although generics make up only 22 percent of total prescription sales, its share of filled prescriptions has risen from 19 percent in 1984 to 88 percent in 2015.  The high volume and low value reflects an **extremely competitive sector** with low-cost imports adding increasing pressure on domestic generics producers.  It also points to high saturation in the U.S. generics market, underlining the need to expand abroad for future growth opportunities.

Ex. K (International Trade Commission, Department of Commerce, 2016 Top Markets Report Pharmaceuticals 4) (emphasis added).[37]  The Department of Health and Human Services voiced a similar assessment:

> Our review of evidence strongly supports the conclusion that generic drug prices are not an important part of the drug cost problem facing the nation.  In fact, about

---

[37] The Court may take judicial notice of government statistics.  *See Placide-Eugene v. Visiting Nurses Serv. of N.Y.*, No. 12-cv-02785, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013) (citing, *inter alia*, *City Bank Farmers' Tr. Co. v. United States*, 5 F. Supp. 871, 873 (S.D.N.Y. 1934) (taking judicial notice of statistics of Department of Commerce)).

> two-thirds of generic products appear to have experienced price declines in 2014. Although the **generic drug market as a whole is quite competitive**, some segments of the market have experienced large price increases. These spikes are on one hand troubling in that they disadvantage particular patient groups but also sufficiently limited so they exert no sizable influence on overall drug spending.

Ex. L (Department of Health and Human Services, ASPE Issue Brief, Understanding Recent Trends in Generic Drug Prices 1 (Jan. 27, 2016) (emphasis added)). The warnings that Teva gave to investors regarding the risks to its business posed by competition in the generic drug market during the Class Period were completely consistent with these government assessments.

Defendants' statements about industry-wide competition are also too innocuous to state an actionable omission claim. Plaintiffs do not make any allegations that the alleged illegal conduct was a "material source of [Teva's] success." *In re FBR*, 544 F. Supp. 2d at 357. Nor could Plaintiffs credibly do so—the allegations only implicate, at most, nine generic drugs marketed by Teva, while Teva marketed between 375 and 500 generic drugs per year in the United States during the Class Period. Ex. A (2012 Form 20-F at 23); Ex. B (2013 Form 20-F at 28); Ex. C (2014 Form 20-F at 20); Ex. D (2015 Form 20-F at 24); Ex. E (2016 Form 20-F at 27). Plaintiffs do not allege that the nine drugs at issue generated an outsized percentage of Teva's revenues. On the contrary, Plaintiffs allege that Copaxone, a drug not at issue in this lawsuit (or the State AG Lawsuit), accounted for "as much as 50% of Teva's profits" before the Class Period and was still its most profitable product in April 2017, just under three months before the end of the Class Period. Compl. ¶¶ 254, 467. Moreover, the Complaint's own allegations reveal that Teva's success between 2013 and 2015 was due not only to increased revenues but also to decreased costs. *Id.* ¶ 322 (noting that improvement in Teva's operating margin significantly exceeded improvement in its gross margin during the period between 2013 and 2015).

In addition, many of Teva's other challenged statements expressly recognized that there

were exceptions to "overall," industry-wide pricing trends:

- "I think, **overall**, the pricing in the U.S. of generics has been flat to a slight down.  There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.  But, **overall**, if you think about it, all our major customers have consolidated."  Compl. ¶ 565 (emphasis added).

- "[W]e and the generic industry **overall don't see price inflation of generics** as it sometimes is portrayed in the media.  On the contrary, for 2015, we saw mid-single-digit price decline **for the overall business**."  *Id.* ¶ 633 (emphasis added).

Plaintiffs do not attack as false any of the facts set forth above—all disclosed by Teva— respecting the overall pricing of its products.

*Polaroid* is again instructive.  There, the *en banc* court concluded that Polaroid's statements that it was manufacturing at "close to maximum capacity" were not misleading because it "expressly recognized an absence of totality."  *Polaroid*, 910 F.2d at 15.  Similarly, here, Teva's statements on industry-wide competition and pricing were not misleading given that they expressly recognized certain exceptions.

In these respects, the present case, like *Axis* before it, stands in stark contrast to the rare case in which courts have found a duty to disclose alleged wrongdoing on account of prior statements.  For instance, in *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00-cv-01041, 2000 WL 1234601, at *2, *4 (S.D.N.Y. Aug. 31, 2000), the court concluded that auctioneer Sotheby's had a duty to disclose its unlawful price-fixing agreement with its main competitor Christie's over the commissions charged by the two auction houses, who together controlled 95% of the market.  This duty to disclose only arose, however, because Sotheby's voluntarily made a statement that was directly contrary to the allegations regarding a price-fixing agreement **with its main competitor, Christie's**; Sotheby's voluntarily stated that it was under "'intense' competition **with its 'primary auction competitor,' Christie's**" and that they competed against each other on commissions.  *Id.* at *4.  Taken together, these statements "could have led

reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price," and the anticompetitive agreement to which Christie's itself had admitted directly contradicted the statements that Sotheby's made about that very subject. *Id.*

Here, just as in *Axis*, the required direct connection between the challenged statement and the omitted information is missing.  In *Sotheby's*, the omitted information, if true, rendered false the challenged statement regarding intense competition **between Sotheby's and Christie's** on commissions, in a market controlled 95% by those two companies.  *See In re Axis*, 456 F. Supp. 2d at 589.  Here, as in *Axis*, even if Plaintiffs' allegations regarding price-fixing involving 2-3% of Teva's generic drugs were adequately pled—and they are not—the warning that Teva gave to investors regarding the competition if faced generally in the generic drug market remained true and not misleading.

Aside from statements about competition and pricing, Plaintiffs also allege that statements during the July 13, 2016 investor call were so incomplete as to mislead because Defendants failed to disclose Teva's receipt of subpoenas from the DOJ and the Connecticut Attorney General.  Compl. ¶ 713.  These allegations also fail as a matter of law because the alleged statements do not relate to Teva's receipt of government subpoenas, *see id.* ¶¶ 674-78, and because Teva's receipt of two subpoenas does not contradict any statement allegedly made. *In re FBR*, 544 F. Supp. 2d at 357.  Instead, the statements allegedly made during that call simply concern first quarter 2016 results, general statements about assumptions and pricing in the generics market, and forward-looking guidance.

###   3.      Plaintiffs Fail Adequately
###          To Plead Any Underlying Antitrust Violation.

Even if Plaintiffs could show that Teva had a duty to disclose the alleged antitrust

violations, which they have failed to do, their claims still would not be actionable because they

have not adequately alleged that an antitrust violation actually occurred.  Moreover, because this

is a securities fraud case, not an antitrust case, Plaintiffs are subject to stricter pleading standards.

Where, as here, securities fraud allegations are premised on undisclosed antitrust violations, the

underlying facts alleging illegal price-fixing must be alleged with particularity.  *See, e.g.*, *In re

Sanofi*, 155 F. Supp. 3d at 400; *In re Yukos Oil Co. Secs. Litig.*, No. 04-cv-05243, 2006 WL

3026024, at *14 (S.D.N.Y. Oct. 25, 2006).   But Plaintiffs have not pleaded facts with

particularity demonstrating that Teva participated in an illegal conspiracy to fix prices in the

generic drug market, and so their Complaint should be dismissed for this reason as well.  *See In

re Axis*, 456 F. Supp. 2d at 585 ("[E]ach of plaintiffs' nondisclosure claims are entirely

dependent upon the predicate allegation that [defendant] participated in an anticompetitive

scheme . . . If the complaint fails to allege facts which would establish such an illegal scheme,

then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally

flawed.") (emphasis in original).[38]

Indeed, Plaintiffs' claims fail even under the lower pleading standard applicable to

antitrust actions.   A plaintiff alleging illegal price-fixing must plead "enough factual matter

(taken as true) to suggest that an agreement was made."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 556 (2007).  This requires a plaintiff to "allege enough facts to support the inference that a

conspiracy actually existed," either through direct or circumstantial evidence.  *Mayor & City*

---

[38] *See also In re Mirant Corp. Sec. Litig.*, No. 02-cv-01467, 2009 WL 48188, at *17 (N.D. Ga.
Jan. 7, 2009) ("In cases alleging securities fraud based on the failure to disclose the existence of
an underlying illegal scheme," the failure to allege such illegality "with particularity" is fatal).

*Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).   Under any pleading

standard, Plaintiffs fail to allege sufficient evidence of either kind.

a.      <b>Plaintiffs Plead No Direct<br>Evidence That An Agreement Was Made.</b>

Plaintiffs fail to plead *any* direct evidence that Defendants engaged in illegal price-fixing.

The 300-page Complaint does not identify any meetings, emails, or other communications in

which Defendants conspired with competitors of Teva to impermissibly set drug prices.[39]   The

Complaint does not include any allegations from witnesses, confidential or otherwise, suggesting

an illegal price-fixing agreement.   In short, the Complaint "furnishes no clue as to which of the

[Defendants] (or which of their employees) supposedly agreed, or when and where the illicit

agreement took place."   *Twombly*, 550 U.S. at 565 n.10.   Instead, Plaintiffs assert the type of

"conclusory allegations that an anticompetitive scheme existed" that are inadequate to survive a

motion even under notice pleading, let alone the heightened standard for securities fraud claims.

*See In re Axis*, 456 F. Supp. 2d at 585-86 ("[P]laintiffs' bald allegations of a scheme to drive

other insurance companies from the market are far too conclusory to satisfy the requirements of

Rule 9 and the PSLRA."); *see* Compl. ¶ 78 (alleging that Teva "entered into a wide-ranging

conspiracy over the course of numerous years to fix prices, rig bids and allocate market share

with their supposed competitors").

b.      <b>Plaintiffs Fail To Plead Circumstantial<br>Evidence That An Agreement Was Made.</b>

Without direct evidence of an illegal conspiracy, Plaintiffs must present "evidence that

---

[39] Plaintiffs cannot carry their pleading burden simply by relying on allegations from the State AG complaint.  *See* Compl. ¶¶ 115-23.  Allegations based wholly on unresolved complaints from separate actions are immaterial as a matter of law and should be ignored.  *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403-04 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

reasonably tends to prove that [Teva and its competitors] had a conscious commitment to a common scheme" to fix prices.  *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (citation omitted).  Courts have repeatedly rejected as insufficient Plaintiffs' patchwork of governmental investigations, Teva's receipt of subpoenas, unadjudicated claims in separate litigation, and Plaintiffs' own investigation into parallel price increases.  *See* Compl. ¶¶ 78-250.

### i.   Government Investigations And Unadjudicated Lawsuits Are <u>Insufficient To Establish A Claim of Price-Fixing.</u>

Plaintiffs fixate on the existence of governmental investigations into generic drug pricing, *see* Compl. ¶¶ 80-100, but none has resulted in an adjudication of wrongdoing by Teva.  The fact that the government launched an investigation does nothing to establish that Teva conspired to fix prices, and courts routinely dismiss both securities fraud and antitrust actions premised on similarly baseless claims.  *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("[C]itations to . . . investigations do not constitute factual averments of [an antitrust] claim that would allow such a claim to survive a motion to dismiss.").[40]  No federal charges have been brought against Teva.

The mere existence of the pending State AG Lawsuit against Teva and many other generic drug manufacturers, *see* Compl. ¶¶ 102, 110-26, is likewise no help to Plaintiffs.  That case is still in its preliminary stages and has not established any wrongdoing on Teva's part, and Plaintiff cannot satisfy its burden of pleading illegal price-fixing with particularity merely by

---

[40] *See also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("[T]he announcement of an investigation reveals just that—an investigation—and nothing more."); *Superior Offshore Int'l Inc. v. Bristow Group, Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2000), *aff'd*, 490 F. App'x 492 (3d Cir. 2012) ("the mere occurrence of [an] investigation is equally consistent with Defendants' innocence").

relying on the unsubstantiated allegations included in the State AG complaint.  *See* Compl. ¶¶ 111-26, 132.  Allegations based wholly on other unresolved proceedings are immaterial as a matter of law and routinely stricken from pleadings.  *See, e.g.*, *RSM*, 643 F. Supp. 2d at 403-04 ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)").[41]

Finally, the guilty pleas by Heritage executives do not support Plaintiffs' allegations against Teva.  *See* Compl. ¶¶ 102-09.  Those guilty pleas do not mention, let alone implicate, Teva or any of the Individual Defendants.  *See* Ex. N (Glazer Plea Agreement, No. 16-00506, ECF No. 18 (E.D. Pa. Jan. 9, 2017)); Ex. O (Malek Plea Agreement, No. 16-00508, ECF No. 17 (E.D. Pa. Jan. 10, 2017)).

### ii.    Attending Social Gatherings And Industry Events Is Not Suggestive Of Conspiracy.

Plaintiffs also err in attempting to rely on allegations that Defendants attended industry functions and belonged to trade associations.  *See* Compl. ¶¶ 127-33.  In the antitrust context, courts regularly reject efforts to base an antitrust claim on such allegations.  *See, e.g.*, *Hinds Cty.*, 620 F. Supp. at 513 ("[P]articipation in trade associations or conferences cannot support . . . allegations of a conspiracy"); *LaFlamme v. Societe Air Fr.*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("[M]embership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement."); *In re Elevator Antitrust Litig.*, No. 04-cv-01178, 2006

---

[41] *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 79 (S.D.N.Y. 2003) ("[T]he allegations of the present Amended Complaint . . . that refer to or rely on the SEC's complaints against Merrill Lynch and Henry Blodget, on the NASD's complaint against Phua Young, on the 309 complaints in the ongoing IPO Securities Litigation, on the complaint and appendices in the ongoing IPO Antitrust Litigation, and on the Dinallo Affidavit are hereby stricken under Rule 12(f) and may not be included in any amended pleadings hereafter[.]").

WL 1470994, at *11 (S.D.N.Y. May 30, 2006) *aff'd*, 502 F.3d 47 (2d Cir. 2007) ("allegation that elevator company executives attend trade, industry, or social functions together is clearly insufficient to state a claim").

### iii.    Unilateral Parallel Conduct Is Not Price-Fixing.

For eight of the nine drugs at issue in this litigation, Plaintiffs' only allegations of antitrust violations arise from Plaintiffs' own "investigations" purportedly showing that the drugs "were the subject of collusion."  *See* Compl. ¶¶ 134-240.  But the sum total of Plaintiffs' "investigations" is the mere allegation that manufacturers increased prices in parallel for these drugs, to varying degrees, "in close proximity to several industry gatherings."  *Id.*

In antitrust law, parallel behavior is insufficient to state a claim for price-fixing. *Twombly*, 550 U.S. at 556.  Parallel conduct may just be evidence of a "rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Id.* at 545.  In particular, "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007). "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'"  *Twombly*, 550 U.S. at 553-54 (brackets omitted).[42]

Plaintiffs' allegation that the price increases "occurred in close proximity to several industry gatherings" does not cure this pleading defect.  *See, e.g.*, Compl. ¶ 146.  The Complaint

---

[42] *See also, e.g.*, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("By engaging in conscious parallelism, firms in a concentrated market may lawfully recognize shared economic interests and, in effect, lawfully exercise their leverage to set prices at a profit maximizing—and even a supra-competitive—level.").

attests that these industry gathering occurred at least every few months,[43] and Plaintiffs' supposed "close proximity" is broad and vague enough that *any* generic drug price increases would necessarily be "in close proximity" to some such gathering.  Such allegations alone are legally insufficient to state a claim for an alleged antitrust law violation.

In sum, Plaintiffs have failed adequately to allege any actionable misrepresentation or omission of material fact.  They have failed to identify any statement that was false when made; they have failed to identify any omission of material fact that Defendants had a duty to disclose; and they have failed to identify any statement rendered misleading through any alleged omission.  For these reasons alone, Plaintiffs' claims are legally defective under Fed. R. Civ. P. 12(b)(6).  In addition, even if Plaintiffs had identified any duty to have disclosed an alleged antitrust law violation—which they have not—Plaintiffs have also failed adequately to allege that Teva engaged in any violation of federal antitrust law.  For that reason as well, the Complaint fails adequately to allege any actionable misrepresentation or omission of material fact, which independently mandates the grant of this motion.

### C.        Plaintiffs Fail Adequately To Plead Scienter.

Even if the Complaint adequately alleged any actionable misrepresentation or omission, and it does not, Plaintiffs' § 10(b) claims still would be subject to dismissal because the Complaint fails adequately to plead scienter.   The PSLRA's strict and rigorous pleading standards require Plaintiffs, among other things, to "state with particularity facts giving rise to a strong inference" of scienter.  *ECA & Local 134*, 553 F.3d at 196.  To plead the requisite "strong inference" of scienter, a plaintiff must allege detailed facts:  (1) showing that the defendants had

---

[43] *See* Compl. ¶¶ 146, 159, 172, 183, 199, 211, 224, 236 (alleging industry meetings in October 2012, February 2013, April 2013, June 2013, October 2013, February 2014, June 2014, October 2014, November 2014, and February 2015).

both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of scienter. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Any inference drawn from such facts must be "cogent and **at least as compelling** as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added).   A plaintiff must "allege facts supporting a strong inference with respect to **each** defendant." *In re Lions Gate*, 165 F. Supp. 3d at 22 (emphasis added).   For this reason, Plaintiffs cannot carry their pleading burden, as they attempt to do, by lumping all Defendants together. *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-00975, 2012 WL 1646888, at *29-30 (S.D.N.Y. May 10, 2012) (dismissing "lengthy and convoluted" complaint that "fail[ed] to allege facts that adequately address the scienter element with respect to each of the Individual Defendants—an element that cannot be satisfied through group pleading.").   Moreover, insofar as Plaintiffs rely on "allege[d] fraudulent omissions, rather than false statements, 'it is especially important to rigorously apply the standard for pleading intent.'"   *In re Lions Gate*, 165 F. Supp. 3d. at 23. Plaintiffs fail to satisfy this standard.

### 1.    Plaintiffs' Motive and Opportunity Allegations Do Not Support A Strong Inference Of Scienter.

Plaintiffs fail to plead motive as a basis for an inference of scienter.   To do so, a plaintiff must allege that defendants "benefitted in a concrete and personal way from the purported fraud." *ECA & Local 134*, 553 F.3d at 198.   Often that is shown through stock sales, and the fact that no such sales are alleged in this case undermines any inference of scienter. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *In re Sec. Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 594 (S.D.N.Y. 2010) (dismissing securities fraud claims for

failure to allege scienter where defendants did not sell stock during the class period).[44]

Without allegations of stock sales, Plaintiffs' litany of other motive-related allegations also all fail.  Plaintiffs assert that the alleged antitrust conspiracy "generated a substantial amount of illicit revenue."  Compl. ¶¶ 752-58.  But motives that are "generally possessed by most corporate directors and officers," like generating revenue, are "insufficient to withstand a motion to dismiss."  *Frederick v. Mechel OAO*, 475 F. App'x 353, 355 (2d Cir. 2012).  The same holds for Plaintiffs' scienter allegations based on the Individual Defendants' alleged motivation to increase their compensation.  Compl. ¶¶ 795-811.  Courts in the Second Circuit repeatedly reject such allegations as a basis for scienter.  *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (because incentive compensation is common to almost all corporate executives, it "can hardly be the basis on which an allegation of fraud is predicated").  Plaintiffs' contention that Defendants were motivated to complete the Actavis transaction likewise fails.  *See* Compl. ¶¶ 774-82.  Such conduct would inure to the benefit of all shareholders, and thus would not demonstrate intent to defraud Teva shareholders.  *See, e.g.*, *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243, 244 n.67 (S.D.N.Y. 2012) ("[W]hile an acquisition program funded by stock issuances in a certain sense might provide a 'motive' to inflate the stock price, it is not sufficient to allege scienter.").[45]

Even taken together, Plaintiffs' motive allegations do not give rise to a strong inference

---

[44] *See also In re eSpeed*, 457 F. Supp. 2d at 289; *see also Cortina v. Anavex Life Scis. Corp.*, No. 15-cv-10162, 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016) ("Notably, Plaintiffs make no allegation that any Defendant sold shares during the Class Period.").

[45] *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice [to plead scienter]; instead, plaintiffs must assert a concrete personal benefit to the individual defendants resulting from the fraud.") (citation omitted); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product. . . . These allegations do not support an inference of scienter.").

of scienter. *See In re Carter-Wallace, Inc. Sec. Litig.*, No. 94-cv-05704, 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999) (dismissing claims and stating: "Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives"), *aff'd*, 220 F.3d 36 (2d Cir. 2000).

### 2.    Plaintiffs Fail to Plead Specific Facts Establishing Strong Circumstantial Evidence of Scienter.

Plaintiffs also fail to cite any document, communication, conversation, or meeting indicating that any Defendant ever made a single statement that was knowingly false when made or intentionally omitted to disclose a material fact. Instead, they rely on impermissible "must have known" allegations [46] and assorted other theories that fail to allege scienter with the requisite particularity.

But "in order to establish an inference of scienter, Plaintiffs must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *In re PetroChina*, 120 F. Supp. 3d at 366. Dismissal is warranted when a securities fraud complaint, like Plaintiffs', fails to **specifically identify** documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made. *See San Leandro*, 75 F.3d at 812 (affirming dismissal of claim based on alleged existence of confidential company sales reports); *SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, 09-cv-05064, 2010 WL 2473595, at *10 (S.D.N.Y. June 17, 2010) (dismissing claim where plaintiff failed to "'specifically identif[y] any reports or statements' or any dates or time frame in which [d]efendants were put on notice of

---

[46] *See, e.g.*, Compl. ¶ 751 ("Execution of a conspiracy and collusion on this scale required systematic coordination and top-down command and control, which could not have been accomplished without the knowledge and approval, or extreme reckless disregard of the [Defendants] . . . .").

contradictory information") (citation omitted), *aff'd*, 448 F. App'x 116 (2d Cir. 2011). Without any documents to point to as circumstantial evidence, Plaintiffs advance four categories of scienter allegations, but none carries Plaintiffs' pleading burden.

First, Plaintiffs' scienter allegations based on the existence of governmental investigations fail as a matter of law. Compl. ¶¶ 763-68. As with falsity, governmental investigations alone prove nothing on their own and certainly "cannot bolster allegations of scienter that do not exist" because they "are just that, investigations." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015); *see Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1303-04 (11th Cir. 2015); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("Securities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter."). The same holds true for scienter allegations predicated on unproven allegations set forth in a complaint in another case, such as the AG Complaint here. *Cf. Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008) (holding settlement agreements with DOJ and SEC "were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter"). Nor does the "temporal proximity" of the 2016 Notes Offering and subsequent disclosure of subpoenas "raise a circumstantial inference of fraud" on its own. *Fant v. Perelman*, No. 97-cv-08435, 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 1999).

Second, Plaintiffs' scienter allegations based on the departure of three officer Defendants fail as a matter of law. Compl. ¶ 783. "Courts have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605-06 (S.D.N.Y. 2016) (collecting cases). Plaintiffs need to allege "other strong evidence of fraudulent behavior," "deliberate illegal behavior," or "conduct

which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 163, 165 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (collecting cases); *Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008).   Here, Plaintiffs attempt to imply a correlation between the timing of three of the Defendants' departures (spread over seven months between December 2016 and June 2017) and the timing of certain unrelated events, without pleading any facts showing how they are connected.  Compl. ¶¶ 786, 788, 790.  These allegations fail as a matter of law.  *See Malin*, 499 F. Supp. 2d at 162-63.

Third, Plaintiffs allege scienter based on a "core operations" theory, Compl. ¶ 751, but the Second Circuit has not decided whether a plaintiff may impute an inference of scienter to each defendant by virtue of the fact that the alleged fraud concerned "core" business operations. *See In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-03338, 2017 WL 3278930, at *18 n.11 (S.D.N.Y. Aug. 1, 2017).  Even if it did, that inference would not establish scienter here. During the Class Period, Teva generated only 48% and 55% of its revenues from its *entire* generics business,[47] Teva marketed between 370 and 500 generic drugs per year in the United States, and the Complaint implicates, at most, claims relating to nine generic drugs.  *See supra* Part I.B.3.  Allegations relating to a miniscule percentage of the generic drugs Teva sold, at a time when Teva's entire generic drug business only accounted for approximately 50% of Teva's revenues—do not constitute allegations that relate to Teva's "core operations."  Without more, Plaintiffs' "core operations" allegations fail as a matter of law.

---

[47] 51% in 2012 (Ex. A (2012 Form 20-F at 18)); 50% in 2013 (Ex. B (2013 Form 20-F at 17)); 48% in 2014 (Ex. C (2014 Form 20-F at 18)); 49% in 2015 (Ex. D (2015 Form 20-F at 21)); and 55% in 2016 (Ex. E (2016 Form 20-F at 22)).

Fourth, Plaintiffs allege scienter based on the Individual Defendants having signed SOX certifications in connection with the filing of SEC reports.  Compl. ¶¶ 791-94.  The mere allegation that corporate officers signed SOX certifications, however, does not give rise to any inference of scienter.  *See Int'l Ass'n of Heat*, 205 F. Supp. 3d at 536 (dismissing securities claims and noting that "[r]equired certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus"); *In re Molycorp, Inc. Sec. Litig.*, No. 13-cv-5697, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (dismissing securities claims and explaining that "in the absence of more particularized allegations of scienter, that certain Defendants signed or certified SEC disclosures is insufficient to support a finding of scienter").

### 3.     The Opposing Inferences Of Nonfraudulent Intent Are More Plausible Than Any Inference Of Fraud.

*Tellabs* requires courts to weigh competing inferences when assessing whether a securities complaint adequately alleges a strong inference of scienter.  551 U.S. at 314.  The Court must determine whether the Complaint contains specific facts that raise an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*  Here, the opposing inferences of non-fraudulent intent are far more compelling.  Investor losses resulted, not from any fraud, but from the price competition that incontrovertibly exists in the generics industry and other risks inherent in the market, which Teva disclosed, in great detail, throughout the Class Period.  *See supra* Parts I.B.1.b, I.B.2.d (detailing federal government's recognition of industry competition and Teva's Class Period risk disclosures related to the generic drug market).  In addition, Defendants' optimistic outlook throughout much of the Class Period was a sincere belief, not an inexplicable attempt to deceive investors.  *See, e.g.*, *In re Stratasys Ltd.*, 15-cv-00455, 2016 WL 3636992, at *11 (D. Minn. June 30, 2016), *aff'd sub nom.*, 864 F.3d 879 (8th Cir. 2017) ("The idea that defendants would increase guidance to mask

problems that would shortly have to be revealed is incredible, especially in the absence of any facts showing that any individual defendant had anything to gain from such a reckless act.").

### D. Plaintiffs Fail Adequately To Plead Loss Causation.

To plead loss causation adequately, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell*, 396 F.3d at 174 (2d Cir. 2005) (citation omitted). Plaintiffs must allege that a "concealed risk [led] to a decline in stock price either because a corrective disclosure reveal[ed] the falsity of the misrepresentations or omissions or because the risk which was concealed materializes and cause[d] the price decline."  *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006) (citations omitted), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).  Merely alleging a drop in stock price following the disclosure of bad news does not suffice.  *See id.*  Rather, Plaintiff must specifically allege how the alleged disclosure revealed the alleged fraud and caused Plaintiff's losses.  *See In re IPO Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005) ("*Lentell* imposes a heavy burden on plaintiffs to plead their losses specifically.").

To avoid dismissal, claims must be supported by allegations that the purported corrective disclosure or event actually revealed the alleged fraudulent scheme or prior misrepresentation. *See, e.g.*, *Lentell*, 396 F.3d at 175 & n.4 (holding that stock price drop following downgrade of stock did not amount to corrective disclosure because downgrades did not reveal the falsity of the prior recommendations); *In re IPO Sec. Litig.*, 399 F. Supp. 2d at 266 (holding that failure to meet earnings forecasts does not have a corrective effect because it does not "disclose the scheme" and therefore "cannot correct the artificial inflation caused by the scheme").

Here, Plaintiffs allege that, from August 2016 to August 2017, a "series of negative

events and disclosures began to reveal, on a piecemeal basis, the false and misleading nature" of Teva's statements on competition and pricing during the Class Period.  Compl. ¶ 814.  As a matter of law, none of the alleged eight "negative events and disclosures" are actionable corrective disclosures.

Except in limited circumstances inapplicable here, the announcement of a governmental investigation does not show actual wrongdoing on the part of the recipient and is insufficient to establish loss causation.  *See, e.g.*, *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the . . . investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure.").[48]  In limited circumstances, courts in the Second Circuit have allowed loss causation allegations based on a governmental investigation to survive dismissal, but only where the subject of the announced investigation is tightly tied to the subject of the alleged fraud and is not "tenuous."  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 (S.D.N.Y. 2008).

Here, the nexus between the alleged corrective disclosures and the alleged fraudulent statements is too tenuous to survive a motion to dismiss.  Teva's announcement of its receipt of subpoenas from the DOJ and the Connecticut Attorney General did not reveal the falsity of any prior statements.  Compl. ¶¶ 818-21.  First, the DOJ and State AG's investigations were industry-wide, and had been ongoing publicly since 2014, nearly two years before Teva received the subpoenas.  *Id.* ¶¶ 96-100.  Second, the alleged corrective disclosure revealed that the DOJ sought documents and information related to the "marketing and pricing" of certain generic products along with communications with competitors about such products, and that the

---

[48] *See also In re Almost Family, Inc. Sec. Litig.*, No. 10-cv-00520, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.").

Connecticut AG sought documents and information related to "potential state antitrust law violations." *Id.* ¶ 819. Moreover, like the subpoena in *Take Two*, the nexus between the broad nature of the subpoena requests, made in connection with an extenuated industry-wide investigation and Teva's alleged statements concerning competition across its entire suite of generic drugs, is "far too tenuous to permit the inference" that the disclosure revealed that Teva's prior statements were fraudulent. *In re Take-Two*, 551 F. Supp. 2d at 284.

The filing of the State AG complaint similarly fails adequately to plead loss causation. Compl. ¶¶ 838-42. The State AG Lawsuit, brought against numerous manufacturers of generic drugs, only implicated two drugs: Glyburide and Doxycycline. *Id.* ¶ 115. Of those, only Glyburide is the subject of allegations in Plaintiffs' Complaint. The announcement of an industry-wide lawsuit that only implicates a small portion of Teva's generic drug portfolio is far too removed from the challenged statements about competition generally in the generic drug business, which, as discussed above, was commonly known to have existed throughout the putative Class Period. *See supra* Part I.B.2.d.

Plaintiffs' allegations concerning the November 3, 2016 Bloomberg article also fail to plead loss causation adequately. Compl. ¶¶ 822-24. As to Teva, the article: (1) discloses information already known to the market (that Teva and others had received subpoenas), and (2) speculates about the nature and timing of potential charges that the DOJ could bring. Reiteration of information already known to the market and bare speculation are each insufficient to plead loss causation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."), *aff'd*, 597 F.3d 501(2d Cir. 2010).

Plaintiffs' other purported corrective disclosures also are inadequate to plead loss

causation.  The DOJ's announcement, on December 14, 2016, that it charged Heritage executives did not mention or disclose anything about Teva.  Compl. ¶¶ 833-37.  Plaintiffs' speculations concerning Teva's announcement of Mr. Olafsson's retirement and the subsequent analyst commentary likewise reveal nothing about any purported collusive conduct.  Compl. ¶¶ 830-32; *see In re Omnicom*, 597 F.3d at 514 (absent the disclosure of new facts, a director's resignation and resulting negative press, are insufficient to adequately allege loss causation).

The three remaining alleged partial corrective disclosures—6-Ks issued on November 15, 2016, January 6, 2017, and August 3, 2017 and accompanying investor conference calls— disclose nothing concerning alleged price fixing.  Plaintiffs' allegations concede that on the investor conference call on November 15, 2016, Mr. Olafsson explicitly attributed 7% price erosion to divestiture of certain generic products related to the Actavis acquisition and not to any purported price fixing or collusion.  Compl. ¶ 826.  Similarly, Mr. Vigodman's statement on January 6, 2017 that "[t]he entire healthcare sector has faced significant headwinds [in the quarter], and we have not been immune," *id.* ¶ 844, and Teva's statement on August 3, 2017 that lower than expected quarterly results were due to "accelerated price erosion and decreased volume due mainly to customer consolidation, greater competition, as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition," *id.* ¶ 850, disclose nothing concerning alleged collusion or price-fixing.  Neither does the goodwill impairment charge related to the U.S. Generics reporting unit.  *Id.* ¶ 851.  Indeed, Plaintiffs fail to allege that any of these alleged corrective disclosures revealed the supposed truth about the alleged price-fixing activity.  *See Dura*, 544 U.S. at 341-42.  For these reasons as well, Plaintiffs' claims fail as a matter of law.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM
##         UNDER SECTION 20(a) OF THE EXCHANGE ACT.

To plead "control person" liability under §20(a), Plaintiff must allege:  "(1) a primary violation by the controlled person; (2) control of the primary violator by the defendant, and (3) that the [controlling person] was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108.  Plaintiffs have failed to allege any of these elements and therefore have failed to state a claim for violation of §20(a), as a matter of law.  *Id.*

## III.    PLAINTIFFS FAIL TO STATE A CLAIM
##         UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT.

Plaintiffs have asserted claims against Teva and Individual Defendants Vigodman, Desheh, Peterburg, and Bhattacharjee under §§ 11, 12, and 15 of the Securities Act.  *See* Compl. ¶¶ 883-1075.  Those Defendants incorporate herein the arguments set forth in the Memorandum of Law in Support of the Teva Securities Act-Only Defendants' Motion to Dismiss, which arguments support the dismissal of the Securities Act claims asserted against them as well.

## IV.     THE ISRAELI LAW CLAIMS ALSO MUST BE DISMISSED.

Plaintiffs also assert claims under Israeli law based on Teva securities transactions on the Tel Aviv Stock Exchange.  Compl. ¶¶ 28, 1076-85.  Plaintiffs themselves allege, however, that Israeli law voluntarily adopts and applies U.S. law in these circumstances because Teva's stock is dual-listed on both the Tel Aviv Stock Exchange and the New York Stock Exchange.  *Id.* ¶¶ 1079-84.  Hence, on Plaintiffs' view, "liability under Israeli law is pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act."  *Id.* ¶ 1084.  Plaintiffs do not attempt to premise liability under Israeli law on any allegations beyond those that underlie the claims under §§ 10(b) and 20(a) of the Exchange Act.  *Id.* ¶ 1085.  In fact, they have stated that "the Israeli claims call for the direct application of securities fraud provisions of the U.S. Securities Exchange Act of 1934" and that "the same legal

claims are at issue under Israeli law as under Section 10(b)."  ECF No. 162, at 4 n.3.

Because the U.S. claims must be dismissed for the reasons offered above, under Plaintiffs' own account of Israeli law the Israeli law claims must be dismissed as well.  *See In re Mellanox Techs., Ltd. Sec. Litig.*, No. 13-cv-04909, 2014 WL 7204864, at *5 (N.D. Cal. Dec. 17, 2014) (dismissing Israeli securities claim because plaintiffs had failed to state a claim under §§ 10(b) and 20(a) and had "themselves allege[d] that liability under the Israel Securities Law is 'pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.'").[49]

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed, with prejudice.[50]

---

[49] Defendants agree that Israeli law mirrors U.S. law here.  The Israeli dual-listing regime was purposefully created in 2000 to make the Tel Aviv Stock Exchange more attractive to Israeli companies (like Teva) who otherwise might list their securities only on exchanges outside of Israel.  *See generally, e.g.*, Marcus Best & Jean-Luc Soulier, Israel § 21.1, *International Securities Law Handbook* (4th ed. 2014).  Because issuers find it unattractive to be subject to multiple and diverging regulatory regimes, Israel simply adopts the securities law requirements of the foreign jurisdiction—in this case, the United States—instead of enforcing "requirements that apply to Israeli companies listed solely on the TASE."  *Id.*  As Plaintiffs acknowledge, both Israeli case law and the Israel Securities Authority's public statements support the view that, as a matter of Israeli law, Israel voluntarily applies U.S. liability standards to dual-listed companies like Teva.  Compl. ¶ 1084; *see In re VeriFone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140 EMC, 2014 WL 12646027, at *1 (N.D. Cal. Feb. 18, 2014) (noting, in case involving securities fraud claims under Israeli law and a dual-listed company, that "the Israeli district court ruled twice that U.S. law, and not Israeli law, applies").

[50] *See Malin*, 312 F. App'x at 402-03 (affirming denial of leave to replead putative securities class action).

Respectfully submitted,

_/s/ Jordan D. Hershman_

Jordan D. Hershman (_pro hac vice_)
Jason D. Frank (_pro hac vice_)
Emily E. Renshaw (_pro hac vice_)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
Tel (617) 951-8455
Fax (617) 951-8736
jordan.hershman@morganlewis.com
jason.frank@morganlewis.com
emily.renshaw@morganlewis.com

 – and –

Michael D. Blanchard (ct25891)
**MORGAN, LEWIS & BOCKIUS LLP**
One State Street
Hartford, CT  06103
Tel: 860.240.2945
Fax: 860.240.2800
michael.blanchard@morganlewis.com

_Counsel for Defendants Teva
Pharmaceutical Industries Ltd., Erez
Vigodman, Eyal Desheh, Yaacov "Kobi"
Altman, Allan Oberman, Sigurdur Olafsson,
Yitzhak Peterburg, and Dipankar
Bhattacharjee_

 – and –

Jill M. O'Toole (ct27116)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
Email: jotoole@goodwin.com

_Counsel for Defendants Teva
Pharmaceutical Industries Limited, Erez
Vigodman, Eyal Desheh, and Yaacov
"Kobi" Altman_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of December, 2017, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jordan D. Hershman*

Jordan D. Hershman (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
Tel (617) 951-8455
Fax (617) 951-8736
jordan.hershman@morganlewis.com