## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ONTARIO TEACHERS' PENSION PLAN BOARD, Individually and as Lead Plaintiff on behalf of all others similarly situated; and<br><br>ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Individually and as Named Plaintiff on behalf of all similarly-situated bond purchasers,<br><br>       Plaintiffs,<br><br>       v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; YAACOV ALTMAN; ALLAN OBERMAN; SIGURDUR OLAFSSON; YITZHAK PETERBURG; DIPANKAR BHATTACHARJEE; DEBORAH GRIFFIN; TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.; ROGER ABRAVANEL; SOL J. BARER; ARIE S. BELLDEGRUN; ROSEMARY A. CRANE; AMIR ELSTEIN; JEAN-MICHEL HALFON; GERALD M. LIEBERMAN; GALIA MAOR; JOSEPH NITZANI; ORY SCHNEUR SLONIM; GABRIELLE GREENE SULZBURGER; ROBERT KOREMANS; GIANFRANCO NAZZI; JOHN NASON; DAVID VRHOVEC; BARCLAYS CAPITAL INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; HSBC SECURITIES (USA) INC.; MIZUHO SECURITIES USA LLC; MORGAN STANLEY & CO. LLC; RBC CAPITAL MARKETS, LLC; SMBC NIKKO SECURITIES AMERICA, INC.; BANK OF CHINA LIMITED LONDON BRANCH; BBVA SECURITIES INC.; COMMERZ MARKETS LLC; LLOYDS SECURITIES INC.; MUFG SECURITIES AMERICAS INC.; PNC CAPITAL MARKETS LLC; SCOTIA CAPITAL (USA) INC.; TD SECURITIES (USA) LLC; KESSELMAN & KESSELMAN d/b/a PWC ISRAEL,<br><br>       Defendants. | No. 3:17-cv-00558 (SRU)<br><br>CONSOLIDATED WITH<br><br>No. 3:17-cv-00559 (SRU)<br><br>January 10, 2018<br><br>**PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**<br><br><br><br>**Oral Argument Requested** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

I.      INTRODUCTION ................................................................................... 1

II.     SUMMARY OF ALLEGATIONS ............................................................ 4

III.    EXCHANGE ACT CLAIMS ................................................................. 20

        A.      The Complaint Adequately Alleges False And Misleading Statements In
                Violation Of The Exchange Act ................................................................ 20

                1.      Statements Concerning Competition And Pricing Were Materially
                        False And Misleading ................................................................ 23

                2.      Teva's Growth And GAAP Financial Reporting Were False And
                        Misleading When Issued.............................................................. 29

                3.      The False And Misleading Statements Are Material................................. 35

                4.      The 10(b) Defendants Had An Affirmative Duty  To Disclose
                        Material Trends And Uncertainties.............................................. 38

                5.      The PSLRA's Safe Harbor Does Not Apply ............................................. 40

                6.      The Statements That Defendants Cite Are Not Inactionable Puffery........ 45

                7.      Teva Had A Duty To Disclose The Subpoenas ......................................... 46

                8.      The SOX Certifications Are False And Misleading ................................. 48

        B.      The Complaint Adequately Alleges Securities Law Claims Regardless Of
                Whether Teva Actually Violated Antitrust Law....................................... 49

                1.      Teva Conspired To Fix The Prices Of Glyburide And Eight
                        Additional Generic Drugs .......................................................... 50

                2.      The State AGs' Actions, Governmental Investigations, And Plea
                        Agreements Support Plaintiffs' Allegations ............................... 51

                3.      Plaintiffs Make Additional Allegations Further Suggesting An
                        Antitrust Violation ..................................................................... 52

        C.      The Complaint's Allegations Taken Together Support A Strong Inference
                Of Scienter ............................................................................................... 55

                1.      The Complaint's Allegations of Motive And Opportunity Raise A
                        Strong Inference Of Scienter ..................................................... 57

i

2.     The Complaint Alleges A Strong Inference Of Conscious Misbehavior Or Recklessness ....................................................62

3.     There Is A Strong Inference Of Corporate Scienter ..................................76

D.     The Complaint Adequately Pleads Loss Causation................................78

E.     The Officer Defendants Are Liable As Control Persons .....................................83

IV.     THE SECURITIES ACT CLAIMS ............................................................84

A.     The Securities Act Claims Do Not Sound In Fraud................................84

B.     The Claims On The Notes Were Timely ................................................85

1.     The Securities Act Claims Were Timely Filed  Pursuant To The Discovery Rule Under *Merck* ....................................................85

2.     The Securities Act Claims Were Timely Filed Even Under The Inquiry Notice Standard ....................................................89

C.     Plaintiffs Have Standing To Assert All Claims ....................................90

1.     The SOL Did Not Lapse Until November 3, 2017,  Thus Defendants' Standing Argument Is Moot ....................................................90

2.     Even Absent Anchorage, Ontario Teachers' Has Class Standing With Respect To The Notes Under NECA ................................90

3.     Any Defect In Standing Was Cured By Anchorage .................................93

D.     Plaintiffs Adequately State A §11 Claim Against PwC......................93

V.     THE COMPLAINT STATES A CLAIM UNDER ISRAELI LAW...............................96

VI.     CONCLUSION.............................................................................96

## **TABLE OF AUTHORITIES**

### **CASES**

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ............................................. 93

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ............................ 50, 52

*Ansell v. Laikin*, 2011 WL 3274019 (C.D. Cal. 2011) ................................................................ 81

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) ........................................................... 28

*Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741 (S.D.N.Y. 2002) .......................... 57

*Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010) ........ 26, 27, 75

*Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506 (S.D.N.Y. 2010) ......................... 64

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................................... 57, 66, 77

*City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755 (S.D.N.Y. 2013) ............................ 40

*Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) .............................. 61, 64

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................................... 78

*ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................................................ 61

*Ellenburg v. JA Solar Holdings Co.*, 2010 WL 1983375 (S.D.N.Y. 2010) ................................. 83

*Emps. Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297 (2d Cir. 2015) ........................... 56, 57

*Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655 (D.S.C. 2016) ................................... 81

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ............................................................ 95

*FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017) ............................................... 85

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
    2017 WL 3261609 (S.D.N.Y. 2017) ............................................................................. passim

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ......................... 35, 79

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ................................................... 35, 83

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ................................................. 52, 53

*Gross v. GFI Grp.*, 162 F. Supp. 3d 263 (S.D.N.Y. 2016) .......................................... 78

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ...................................... 84

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015) .......................... 49

*In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................... 72

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) ........ 96

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .......................................................... 63, 74

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006).............. 28, 29

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) ......................................................... 39

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ......................................................... 85

*In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................... 47

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012)................................. 64

*In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822 (D.N.J. 2006).......................... 78, 79

*In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ............... 73, 78

*In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395 (S.D.N.Y. 2013)................................ 47

*In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ................. 56, 58, 59

*In re Coty Inc. Sec. Litig.*, 2016 WL 1271065 (S.D.N.Y. 2016) ................................. 32

*In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597 (S.D.N.Y. 2017)................................. 39

*In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450 (S.D.N.Y. 2017).................................. 46, 74, 76

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009)......................................................... 53, 54

*In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759 (E.D. Va. 2015) ..................... 49, 64, 74

*In re Interpublic Sec. Litig.*, 2003 WL 21250682 (S.D.N.Y. 2003) ............................. 57

*In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241 (S.D.N.Y. 2015)................... 93, 96

*In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011).................... 71, 72

*In re Lions Gate Entertainment Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................................... 48

*In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...... 20, 23, 44, 46

*In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468 (D. Idaho 2007) .................................... 26

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................ 23

*In re Nokia Oyj (Nokia Corp.) Securities. Litigation.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ....................................................................... 32

*In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) ......................... 44

*In re Omnicom Grp., Inc. Sec. Litig.*, 2005 WL 735937 (S.D.N.Y. 2005) ............................. 57, 59

*In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008) ............................. 83

*In re Optimal US Litig.*, 2011 WL 4908745 (S.D.N.Y. 2011) ..................................................... 71

*In re OSG Sec. Litig.*, 12 F. Supp. 3d 622 (S.D.N.Y. 2014) ....................................................... 75

*In re OSG Sec. Litig.*, 971 F. Supp. 2d 387 (S.D.N.Y. 2013) .......................................... 62, 84, 94

*In re Oxford Health Plans*, 187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................... 40

*In re Petrobras Sec. Litig.*, 2016 WL 1533553 (S.D.N.Y. 2016) .......................................... 95, 96

*In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) ........................... passim

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012) ................................................. 55

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................... 72, 84

*In re Salix Pharm., Ltd.*, 2016 WL 1629341 (S.D.N.Y. 2016) ............................................. passim

*In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................... 35

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .............................................. 69, 76

*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ............................... 75

*In re Sotheby's Holdings, Inc.*, 2000 WL 1234601 (S.D.N.Y. 2000) ........................................... 27

*In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878 (D. Minn. 2011) ............................... 35

*In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318 (9th Cir. 2007) ...................................... 30

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .............................................. 56, 57

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ....................................................... 30, 71, 72

*In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342 (S.D.N.Y. 2017) ............................ 30, 31, 75, 77

*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................. 41, 42

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ................................... passim

*In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007) .......................................... 93

*In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024 (S.D.N.Y. 2006) ........................... 51

*Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ................. 63, 70, 73, 78

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .............................................. 61

*Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015) ....... 30, 64, 74

*Lopez v. Ctpartners Exec. Search*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..................... 39

*Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC.*,
   797 F.3d 160 (2d Cir. 2015) .............................................................. 64, 76, 78

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008)................................ 71

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007)................................. 74

*Matrixx Initiatives v. Siracusano*, 563 U.S. 27 (2011) ......................................... 20, 21

*Mauss v. NuVasive, Inc.*, 2016 WL 3681831 (S.D. Cal. 2016) .................................. 81

*Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970 (D. Conn. 2005) ............................ 26

*Menkes v. Stolt-Nielsen S.A.*, 2006 WL 1699603 (D. Conn. 2006) ........................ 26, 66

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010) .......................................... 85, 86

*Meyer v. Jinkosolar Holdings*, 761 F.3d 245 (2d Cir. 2014) ................................... 21

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) .............................................................. 91, 92

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10 (2d Cir. 2011)........... 38, 70, 74

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir 2000) ............................................... passim

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)................................................................... 94, 95, 96

vi

*Patriot Expl., LLC v. SandRidge Energy, Inc.*,
   951 F. Supp. 2d 331 (D. Conn. 2013)..................................................... 41, 42, 44

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014).......... 79, 80, 81, 82

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014) ............................................... 68

*Retirement Board of Policemen's Annuity & Benefit Fund of Chicago v.
   Bank of N.Y. Mellon* ("BNYM"), 775 F.3d 154 (2d Cir. 2014)............................... 92

*Rolf v. Blyth*, 570 F.2d 38 (2d Cir. 1978).............................................. 63, 73

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)................................................ passim

*S.E.C. v. Gabelli*, 653 F.3d 49 (2d Cir. 2011)............................................... 21

*Shenk v. Karmazin*, 867 F. Supp. 2d 379 (S.D.N.Y 2011) ................................. 67, 68

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
   243 F. Supp. 3d 1109 (E.D. Cal. 2017) ............................................... 94, 96

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ................... 50, 53, 54, 55

*Steginsky v. Xcelera*, 658 F. App'x 5 (2d Cir. 2016) ....................................... 93

*Steginsky v. Xcelera, Inc.*, 2015 WL 1036985 (D. Conn. 2015)................................ 93

*Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032 (D. Minn. 2003) ................. 23

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015)........................... 39, 40

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ............................................................ 77

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................ passim

*Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............. 76

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)............................... 52

*Valeeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ......... 75

*Washtenaw County Employees Retirement System v. Avid Tech. Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ....................................................... 75

*Williams v. WMX Technologies*, 112 F.3d 175 (5th Cir. 1997)............................ 23

*Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635 (S.D.N.Y. 2017)................ 39

## <u>STATUTES</u>

15 U.S.C. § 78..................................................................................................................... 4, 24

17 C.F.R. § 210.4-01............................................................................................................. 17

17 C.F.R. §229.303............................................................................................................... 22

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| 10(b) Defendants | Teva; Officer Defendants |
| 2013 20-F | Teva's Annual Report on Form 20-F for the year ended Dec. 31, 2013 filed with the SEC on Feb. 10, 2014 |
| 2014 20-F | Teva's Annual Report on Form 20-F for the year ended Dec. 31, 2014 filed with the SEC on Feb. 9, 2015 |
| 2015 20-F | Teva's Annual Report on Form 20-F for the year ended Dec. 31, 2015 filed with the SEC on Feb. 11, 2016 |
| 2016 20-F | Teva's Annual Report on Form 20-F for the year ended Dec. 31, 2016 filed with the SEC on Feb. 15, 2017 |
| 20-F | SEC Form 20-F |
| 34 Act Br. | Memorandum Of Law In Support Of Defendants Teva Pharmaceutical Industries Ltd., Vigodman, Desheh, Altman, Oberman, Olafsson, Peterburg, And Bhattacharjee's Motion To Dismiss, ECF 189 |
| 6-K | SEC Form 6-K |
| Actavis | Allergan Generics; acquired by Teva on or about August 2, 2016 for $33.43 billion in cash and approximately 100 million Teva shares |
| ADS and ADS Offering | American Depositary Shares, including ADS issued in the public offering on or about Dec. 3, 2015 and Jan. 6, 2016 |
| ADS/Preferred Offering Materials | ADS Registration Statement and Preferred Registration Statement, along with base and preliminary prospectus and related prospectus supplements constituting part of ADS Registration Statement and/or Preferred Registration Statement, including ADS Prospectus and Preferred Prospectus, and documents incorporated by reference therein |
| ADS/Preferred Offerings | ADS Offering and Preferred Offering |
| AG or AGs | Attorney General or Attorneys General |
| Altman | Yaacov "Kobi" Altman; Acting CFO 10/31/13 – 2/11/14; Officer Defendant; 10(b) Defendant |
| Anchorage | Anchorage Police & Fire Retirement System; Named Plaintiff |
| Audit Reports | PwC's Audit Report dated Feb. 9, 2015 and incorporated by reference in the 2014 20-F and ADS/Preferred Registration Statement; PwC's Audit Report dated Feb. 11, 2016 and incorporated by reference in the 2015 20-F and Notes Offering Materials |
| Bank of China | Bank of China Limited London Branch; Underwriter Defendant; Securities Act Defendant |

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| Barclays | Barclays Capital Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| BBVA | BBVA Securities Inc.; Underwriter Defendant; Securities Act Defendant |
| Bhattacharjee | Dipankar Bhattacharjee; Teva's President and CEO, Global Generics Medicines Group 12/5/16 – Present; Teva's President and CEO, Generics Europe 2013 – 2016; CEO, Teva UK Ltd. 2009 – 2013; Officer Defendant; 10(b) Defendant; Teva Finance Director Defendant; Securities Act Defendant |
| BNP | BNP Paribas Securities Corp.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| BofA Merrill Lynch | Merrill Lynch, Pierce, Fenner & Smith Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Citigroup | Citigroup Global Markets Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Class Period | Feb. 6, 2014 through Aug. 3, 2017, inclusive |
| COGS | Cost of Goods Sold |
| Commerz | Commerz Markets LLC; Underwriter Defendant; Securities Act Defendant |
| Company | Teva Pharmaceutical Industries Ltd. |
| Complaint | Class Action Consolidated Complaint, ECF 141 |
| Credit Suisse | Credit Suisse Securities (USA) LLC; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Desheh | Eyal Desheh, Teva's CFO July 2008 – 6/30/17; Interim CEO and Interim President 10/30/13 – 2/11/14; Teva's Group EVP 2012 – 06/30/17; Officer Defendant; 10(b) Defendant; Securities Act Defendant |
| DOJ | U.S. Department of Justice |
| Exchange Act | Securities Exchange Act of 1934 |
| GAAP | Generally Accepted Accounting Principles |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report Generic Drugs Under Medicare (Sept. 12, 2016) |
| Generics Day | Sept. 9, 2016 investor day conference to discuss Teva's generics business |
| Glazer | Jeffrey Glazer, Heritage CEO |
| Heritage | Heritage Pharmaceuticals Inc., generic drug manufacturer |

| Glossary of Defined Terms | |
| --- | --- |
| **Term** | **Definition** |
| HSBC | HSBC Securities (USA) Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Lead Plaintiff | Ontario Teachers' Pension Plan Board |
| Levin | Jeremy M. Levin, former Teva CEO |
| Lloyds | Lloyds Securities Inc.; Underwriter Defendant; Securities Act Defendant |
| Malek | Jason Malek, Heritage President |
| Mizuho | Mizuho Securities USA Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Morgan Stanley | Morgan Stanley & Co. LLC; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| MUFG | MUFG Securities Americas Inc.; Underwriter Defendant; Securities Act Defendant |
| Notes and Notes Offering | Certain U.S.-dollar-denominated senior notes issued in the public offering on or about July 21, 2016, namely: (a) 1.400% Senior Notes due July 20, 2018, (b) 1.700% Senior Notes due July 19, 2019, (c) 2.200% Senior Notes due July 21, 2021, (d) 2.800% Senior Notes due July 21, 2023, (e) 3.150% Senior Notes due Oct. 1, 2026, and (f) 4.100% Senior Notes due Oct. 1, 2046 |
| Notes Offering Materials | Notes Registration Statement, along with base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including Notes Prospectus, and documents incorporated by inference therein |
| NYSE | New York Stock Exchange |
| Oberman | Allan Oberman; President and CEO of Teva Americas Generics 11/5/12 – 12/31/14; Officer Defendant; 10(b) Defendant |
| Offerings | ADS/Preferred Offerings; Notes Offering |
| Officer Defendants | Vigodman; Desheh; Altman; Oberman; Olafsson; Peterburg; Bhattacharjee |
| Olafsson | Sigurdur Olafsson, President and CEO of Teva's Global Generic Medicines Group 7/1/2014 – 12/5/2016; various roles, including senior leadership positions, within Actavis 2003 – 2014; Officer Defendant; 10(b) Defendant |
| Ontario Teachers' | Ontario Teachers' Pension Plan Board; Lead Plaintiff |

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| Peterburg | Yitzhak Peterburg; Teva's Interim President and CEO 2/6/17 – Sept. 2017; Teva Director 2012 – 2/6/17 (Chairman 1/1/15 – 2/6/17); Teva Director Defendant; Officer Defendant; 10(b) Defendant; Securities Act Defendant |
| Plaintiffs | Ontario Teachers' Pension Plan Board, Individually and as Lead Plaintiff on behalf of all others similarly situated; Anchorage Police & Fire Retirement System, Individually and as Named Plaintiff on behalf of all others similarly-situated bond purchasers |
| Pleas or Plea Agreements | Plea Agreement, *U.S. v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. filed Jan. 9, 2017, ECF 18; Plea Agreement, *U.S. v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. filed Jan. 10, 2017), ECF 17 |
| PNC | PNC Capital Markets LLC; Underwriter Defendant; Securities Act Defendant |
| Preferred Shares and Preferred Offering | 7.00% mandatory convertible preferred shares issued in the public offering on or about Dec. 3, 2015 and Jan. 6, 2016 |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| PwC | Kesselman & Kesselman (d.b.a. PwC Israel); Outside Auditor; Securities Act Defendant |
| PwC Br. | Memorandum Of Law In Support Of Defendant Kesselman & Kesselman d/b/a PwC Israel's Motion To Dismiss Plaintiffs' Consolidated Class Action Complaint, ECF 188 |
| RBC | RBC Capital Markets, LLC; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| Scotia | Scotia Capital (USA) Inc.; Underwriter Defendants; Securities Act Defendant |
| SEC | Securities and Exchange Commission |
| Securities Act | Securities Act of 1933 |
| Securities Act Defendants | Teva; Vigodman; Desheh; Peterburg; Teva Finance; Bhattacharjee; Griffin; Teva Director Defendants; Teva Finance Director Defendants; Underwriter Defendants; Outside Auditor |
| Sherman Act | Sherman Antitrust Act |
| SMBC Nikko | SMBC Nikko Securities America, Inc.; ADS/Preferred Underwriter Defendant; Underwriter Defendant; Securities Act Defendant |
| SOL | Statute of Limitations |

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| SOX Certifications | Certifications signed by Vigodman, Desheh, Altman, Peterburg pursuant to Section 302 and Section 906 of the Sarbanes-Oxley Act of 2002 |
| State AG or State AGs | State Attorney General or State Attorneys Generals |
| TASE | Tel Aviv Stock Exchange |
| TD | TD Securities (USA) LLC; Underwriter Defendant; Securities Act Defendant |
| Teva | Teva Pharmaceutical Industries Ltd.; 10(b) Defendant; Securities Act Defendant |
| Underwriter Defendants | Barclays Capital Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; HSBC Securities (USA) Inc.; Mizuho Securities USA LLC; Morgan Stanley & Co. LLC; RBC Capital Markets, LLC; SMBC Nikko Securities America, Inc.; Bank of China Limited London Branch; BBVA Securities Inc.; Commerz Markets LLC; Lloyds Securities Inc.; MUFG Securities Americas Inc.; PNC Capital Markets LLC; Scotia Capital (USA) Inc.; TD Securities (USA) LLC |
| UW Br. | Underwriter Defendants' Memorandum Of Law In Support Of Their Motion To Dismiss The Consolidated Class Action Complaint, ECF 187 |
| Vigodman | Erez Vigodman; Teva's President and CEO 2/11/14 – 2/6/17; Teva Director 2/22/09 – 2/6/17; Officer Defendant; 10(b) Defendant;  Teva Director Defendant; Securities Act Defendant |
| WAC | Wholesale Acquisition Cost, a drug-by-drug pricing metric |

# I.     INTRODUCTION

Plaintiffs in this consolidated securities class action allege (i) fraud based claims under Sections 10(b) and 20(a) of the Exchange Act of 1934, (ii) strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, and (iii) claims under Israeli law, which adopts and effectively applies U.S. securities law.  This omnibus brief (pursuant to ECF 195) opposes all four of Defendants' motions to dismiss in their entirety.[1]

The first consolidated action here was filed after the revelation on November 3, 2016, that the U.S. Department of Justice was considering criminal charges against Teva and its competitors in connection with a criminal antitrust conspiracy in the generics drug industry. Within weeks, on December 14, 2016, the CEO and President of one of Teva's smaller competitors, Heritage, pled guilty and admitted to criminally conspiring to fix prices and allocate market share with respect to Glyburide.  Teva controlled 75% of the Glyburide market.

The next day, the Connecticut Attorney General filed suit against Teva and five other companies alleging civil antitrust conspiracy with respect to Glyburide and other drugs. That lawsuit now has been joined by 44 other State Attorneys General.  Their complaint is the result of an ongoing two-year investigation that alleges in detail Teva's participation as an integral member of the conspiracy.  The Connecticut AG's remarks accompanying the filing of the complaint highlight the extent of the intentional wrongdoing: "what we are finding and what the evidence will show is very explicit price fixing … in text messages, in emails, in conversations; we have cooperating witnesses.  The case is very strong."  And, according to the State AGs complaint, the scheme was conceived and directed "by executives at the highest levels."

---

[1] All capitalized terms are defined in the Glossary of Terms included herein at pages __-__, and consistent with the definitions in the Class Action Consolidated Complaint, ECF 141.  All references to ¶ __ are to the Complaint.

Despite the PSLRA's mandatory discovery stay, Lead Counsel's investigation has uncovered that the meteoric financial success that Teva enjoyed over that Class Period was actually built on a rapid series of collusive price hikes. Almost to the dollar, the Complaint identifies $1 billion in illicit profits that the 10(b) Defendants falsely credited during the Class Period to a "revolutionary" turnaround unrelated to the fraud. Lead Counsel's analysis identified eight drugs whose price the 10(b) Defendants increased by more than 1500%, always in lockstep with peer firms that had been historic competitors. Significantly, there were no shortages or other market anomalies in play, and, once prices were raised, no manufacturer seized market share with lower prices. The 10(b) Defendants never disclosed any of these price hikes to investors, or even the revenues for any one of these generic drugs. Instead, the 10(b) Defendants falsely attributed their newfound success to cost savings and other benign programs.

Since these revelations, the 10(b) Defendants have been forced out of the Company. Olafsson, the 48-year old head of Teva's Generics segment and architect of its supposed (but illicit) success, was terminated on December 5, 2016. Teva then fired the CEO Vigodman, effective immediately and without announcing a replacement on February 6, 2017. On April 25, 2017, Teva forced out the CFO Desheh. As the DOJ criminal investigation and the States AGs' civil lawsuit have put an end to the wide ranging conspiracy, Teva's profits from generic drugs were decimated. With Vigodman, Olafsson, and Desheh out, Teva wrote down the U.S. generics business by $6.1 billion in August 2017. That is one measure of the destruction of value caused by the price fixing and anticompetitive conduct.

These criminal and civil antitrust charges by the authorities, as well as the particularized evidence they made public, provide some of the underlying facts, support, and context here. But this is a securities case, and Plaintiffs' claims are therefore rooted in Defendants' false

statements and omissions, and based on Lead Counsel's investigation and substantially more factual allegations discussed herein.

The false statements and omissions are comprised of four categories. First, Defendants repeatedly stated in Teva's SEC filings that the generics business was subject to "intense competition" or "price competition," and that "generic companies compet[e] for advantage based on pricing." This was false because Teva colluded against competition.

Second, Defendants concocted a false narrative to cover up that the financial success of the generics business was a result of price fixing and anticompetitive conduct. They falsely and misleadingly told investors that profitability was not based on price increases or pricing generally, but due to cost-cutting, operational efficiencies, innovation, and Teva's ability to execute. Those statements were false. In addition, because the revenues resulted from illicit conduct, booking those revenues in Teva's financial statements constituted a violation of Generally Accepted Accounting Principles ("GAAP").

Third, the 10(b) Defendants breached their affirmative statutory duty pursuant to Item 5 of Form 20-F, and Item 303 of Regulation S-K, to disclose the "trend" that unsustainable price increases resulting from collusion were driving Teva's financial success. And fourth, four of the Individual Defendants were required to certify that Teva's internal controls over financial reporting and disclosures were effective. Those certifications were false because the long-running misstatements and false financial reports demonstrate that the controls were ineffective.

As set forth below, all these false statements and half-truths are actionable pursuant to both the Exchange and Securities Acts under Second Circuit controlling law, little of which Defendants acknowledge. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (when a defendant "speaks on an issue or topic, there is a duty to tell the whole truth").

3

Further, for the Exchange Act claims, the "facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights,* 551 U.S. 308, 322-23 (2007).

Nevertheless, Defendants seek dismissal of the Complaint on seemingly every conceivable ground available.  They contend that this is the proverbial "strike suit" (notwithstanding the State AGs' lawsuit against Teva) seeking to recover losses for investors who purchased Teva's securities "eyes wide open" and who, Defendants argue, fail to plead "a single actionable misstatement or omission of material fact."  Defendants then ask the Court to weigh as more plausible a counter-narrative that the Teva Defendants simply maintained an "optimistic outlook, and sincere belief" throughout the Class Period, despite the particularized allegations of illegal price fixing, bid rigging, collusive conduct, improper financial reporting, and false certifications that Lead Counsel's investigation uncovered; let alone the criminal charges by the U.S. Department of Justice, the 45 State Attorneys General's civil antitrust complaint, and the resulting guilty pleas and admissions of collusion *with Teva*.

Setting aside Defendants' hyperbole, illogic, and counter-narratives, the issue now is whether, accepting the allegations as true, the Complaint satisfies the pleading requirements under the law.  Plaintiffs respectfully submit it does, the four motions should be denied, and the case should move into discovery.

## II.    SUMMARY OF ALLEGATIONS

<u>Teva And Industry Background</u> – Teva is the world's largest manufacturer of generic drugs.  ¶44.  By regulatory design, generic drugs must be "therapeutically equivalent" to the brand name drug, so that price is the only basis on which manufacturers like Teva can compete.  ¶¶38, 41, 53.  Cutthroat competition in the generic space had significantly hurt Teva's revenues immediately prior to the Class Period.  ¶253.  Wall Street recognized that Teva's generics business had "seriously underperformed" compared to its competitors, *id.*, hurting the price of

4

Teva's ADS, which fell from a high of over $60 in 2010, to the mid-$30s in 2013.  ¶251.

Desperate to reinvigorate the Company, Teva's Board removed then-CEO Levin in October

2013 and replaced him with Defendant Desheh as acting CEO.  ¶256.

    The Class Period Begins With A Sudden Turnaround – The Class Period begins on

February 6, 2014, with the 10(b) Defendants' announcement of surprisingly positive earnings for

year-end 2013.  ¶¶260, 264.  In stark contrast to the dim outlook under Levin, Desheh stated that

Teva "had a pretty good even excellent second half [of 2013] in the United States."  ¶¶284, 534.

He further told analysts that Teva's "U.S. generics business is definitely the most profitable part,

with gross margin at about 50%."  ¶535.  He falsely attributed the success to cost cutting and

good management, in what would become a consistent cover story for illegal profits.  ¶534.

    Motivation For A "Transformational" Deal – That same day, an analyst reported that

Defendant Vigodman, who had recently been announced as the new CEO, would "emphasize

(potentially large) acquisitions."  ¶326.  Desheh shared this desire for a large deal and was telling

analysts that such a deal could come in 12 to 24 months.  ¶328.  According to Desheh, Teva's

newfound success was "a circle which is feeding itself to grow []our ability to fund transactions

and I believe that we are starting now."  *Id*.  However, with the "the stock price under $40,"

Desheh conceded, "we can't use [it as] currency" for an acquisition.  ¶329.  He expressed

"[h]ope [that] the stock price will go up and we'll be able to use our share as a currency."  ¶328.

    The Scheme To Inflate Share Prices Had Already Begun – Far from leaving Teva's share

price to "hope," the surprise financial turnaround at the start of the Class Period was the result of

a wide-ranging scheme, already in place, to fix prices, allocate market share, and rig bids.

¶¶260-68.  Two of Teva's co-conspirators, the former CEO (Glazer) and President (Malek) of

Heritage, a generics manufacturer, have pled guilty to the DOJ's criminal charges of conspiring

with Teva, ¶¶102-07, and 44 State AGs civilly sued Teva for its illegal collusion.  ¶¶9, 110-20.

In July 2013, as part of the conspiracy, Teva, acting in parallel with its sole meaningful competitor, increased the price of Enalapril by as much as 354%.  ¶157.  By November 2013, Enalapril consumers were paying over five times what they had prior to May.  ¶160.  After a second round of even larger price increases on Enalapril in 2014, consumers paid 18 times more.  ¶¶158, 160.  After the initial 2013 price hike on Enalapril, Teva turned next to one of its leading drugs, Pravastatin.  On August 9, 2013, Teva, in concert with its competitors, raised prices by up to 235%.  ¶145.  The cost to consumers of Pravastatin jumped nearly six-fold.  ¶147.  Together, these two drugs generated illicit profits exceeding $125 million in 2013.  ¶245.  This accounted for more than half of the reported year-over-year profit gain in U.S. Generics during Q3 and Q4 2013 that Desheh had touted to investors on February 6, 2014.  ¶¶264-65.

The Conspiracy Was Well-Developed By Early 2014 – By early 2014, the conspiracy was so well-developed that by virtue of brief phone calls, admitted co-conspirators Malek and Glazer could agree with Teva to coordinate price-fixing on numerous specific drugs.  ¶¶117-19.  On April 22, 2014, Malek identified "a large number of different drugs … targeted for price increases."  ¶117.  "Malek himself was responsible for communicating with … Teva, which was a competitor on several of the drugs …on the list, including Glyburide."  *Id*.  Malek "was able to successfully communicate with [Teva] and reach an agreement to raise prices on Glyburide, a drug for which Teva had 70-75% of the market share, among other drugs."  ¶105, 118.

The market allocation and bid rigging continued unabated.  For example, on July 9, 2014, a large national retail chain contacted Teva, requesting a bid on Glyburide and another drug due to Heritage's price increases.  ¶120.  A Teva official wrote back, reiterating that Heritage and Teva had an "agreement" "on the two drugs at issue," and thus Teva would not submit a bid.  *Id*.

Teva's Collusive Price Hikes – The 10(b) Defendants picked up the pace and scope of the price fixing through 2014 and into 2015.  These increases –alleged in the Complaint based on Lead Counsel's investigation, and illustrated in Figure 1, below – persisted throughout the Class Period, involved collusion with as many as ten companies, resulting in over $1 billion in illicit profits.  ¶¶145-51, 157-64, 171-77, 182-89, 198-204, 201-16, 223-29, 236-40.

**Figure 1: Price Increases**

| Drug | Teva WAC Increase (%) | Date of Increase | Illicit Profit ($ millions) | Parallel Competitors |
|---|---|---|---|---|
| Enalapril Maleate (1st increase) | 262-354% | July 19, 2013 | $17.3 | Wockhardt |
| Pravastatin | 152-235% | Aug. 9, 2013 | $319.7 | Apotex, Glenmark, Zydus, Lupin |
| Cephalexin | 90-185% | Early 2014 | $33.9 | Lupin |
| Ketoconazole | 110-250% | April 4, 2014 | $58.3 | Taro |
| Baclofen | 350-420% | Early 2014 | $161.5 | Upsher-Smith, Par |
| Fluocinonide | 206-524% | Mid-2014 | $167.0 | Taro |
| Enalapril Maleate (2nd increase) | 230% | Aug. 28, 2014 | $87.1 | Wockhardt, Taro |
| Carbamazepine | 250-1500% | Mid-2014 | $196.1 | Apotex, Taro, Torrent |
| Estradiol | 90% | Early 2015 | $58.7 | Actavis |

Illicit Profits Catapult Teva's Financial Results – By April 2014, analysts took note that, while Teva had "dramatically underperformed in 2013," Teva was now "the Best YTD" performer among its peers.  ¶282.  For Q1 2014, Teva continued to surprise, reporting $1.0 billion in U.S. Generic Medicine revenues for Q1 2014, a 17% year-over-year increase.  ¶¶539-41.  The growth continued.  In Q2 2014, Teva reported $1.1 billion in U.S. Generic Medicine revenues, a 10% year-over-year increase.  ¶548.  Teva followed with a 40% year-over-year growth in global generics profit in Q3 2014.  ¶¶555-57.  Every dollar of revenue from illicit

price hikes translated into ***pure profit*** for Teva, as they came at no additional cost.  *E.g.* ¶151.

To conceal the true source of these increased profits, the 10(b) Defendants continued to credit cost cutting and product mix.  ¶288.  This narrative, though false, was well received by analysts.  One wrote, "[i]mportantly, … performance was driven by cost-saves as well as exits from unprofitable markets," ¶300, while another similarly stated "[o]n the 3Q earnings call, Teva talked about a generic operating margin in the 25% to 26% range," noting that the "generic margin 'fix'" was due to "targeted cost savings."  ¶289.

Increasing Questions On Pricing Are Met With Deception And Outright Denials – By late 2014, public scrutiny of generic pricing was increasing.  ¶¶80-85.  Investors were concerned that revenues from extraordinary price increases were vulnerable and unsustainable in functioning competitive markets, as any competing drug manufacturer could swoop in, undercut prices, and seize market share.  ¶¶42, 88.  Fearing this, analysts consistently probed whether Teva was benefitting from price hikes.  *See, e.g.*, ¶¶562, 564-66.

Defendants flatly and consistently denied the existence of any price increases at Teva. For instance, on October 2, 2014, Vigodman declared: "I've said it before, there's never a price increase on the base business as a whole.…  When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business."  ¶292.  Olafsson echoed these comments months later.  On December 11, 2014, in response to an analyst query about "wholesalers … seeing extraordinary price increases," he responded, "I have to disagree that they have experienced tremendous price increase."  ¶293.  Vigodman then added: "What we see in terms of pricing, we see an erosion ... And that's a message that shall be spelled out in a very clear way."  ¶566.  This "clear message" – the absence of price increases except in rare circumstances such as when there were shortages, and that price erosion was the norm –

8

remained a consistently false and misleading theme throughout the Class Period.

Analysts, and the investing public, took the 10(b) Defendants at their word.  On September 24, 2014, BMO remarked that Teva's "focus is on delivering cost savings and gross margin improvements in generics via a combination of product mix and COGS savings."  ¶299. The next month, Barclays similarly stated: "[w]e heard some skepticism regarding Teva's ability to extend margins further … but that is exactly what the company did …. performance was driven by cost-saves as well as exits from unprofitable markets."  ¶300.  And on December 12, 2014, Barclays proclaimed its "bullish" take on Teva, emphasizing "the turnaround in TEVA's generics business," "operational improvements," and "product launches."  ¶301.

Yet, unbeknown to investors, in 2014, the $372 million of increased profit margin directly attributable to the profits from anticompetitive conduct accounted for all of the touted 6% increase in U.S. generics revenue for 2014.  *See* ¶¶246, 572.  Without the illicit profits, the segment would have trended down more than $100 million versus the prior year.  *See* ¶572.

Teva's ADS Price Rose Above $60 In 2015, Raising M&A Possibilities – Barely a year into the Class Period, Teva's ADS price had soared from $40 to over $60.  ¶¶17, 330.  Analysts saw that it was now realistic for Teva to use its ADS as currency for a major acquisition: "TEVA is increasingly focusing attention on … M&A," said a Susquehanna report on March 10, 2015. ¶327.  A month later, Leerink noted Teva's "urgency to diversify via M&A."  ¶330.  Teva first targeted Mylan, with 11% of the generics market, offering $40 billion, 50% cash and 50% ADS. ¶¶45, 331, 779.  On April 27, 2015, however, the Mylan board publicly rejected the bid.  ¶332.

On April 30, 2015, the 10(b) Defendants announced another round of exceptional earnings for Q1 2015.  ¶¶585-88.  Teva reported U.S. generic revenues of "$1.4 billion, an increase of 37% compared to the first quarter of 2014," ¶587, prompting an analyst to ask: "how

much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?" ¶590. Olafsson reiterated the false and misleading theme about cost cutting, saying, "I think there's room for more, but it takes a little bit longer." ¶590.

On May 13, 2015, at the Bank of America Merrill Lynch Healthcare Conference, Desheh proclaimed the growth in Teva's generics business to be "nothing short of a revolution." ¶591. He touted a 27% operating margin, a "full 10 percentage point improvement" over 2013, attributing the "improvement … [to] the expense structure and how we're building the business." ¶¶322, 591. He then added: "[G]eneric side of the house is doing very well. … [Teva] is becoming more and more efficient all the time with a great program to reduce costs and reduce expenses. And you've seen the result. And the numbers don't lie." ¶592.

Echoing Desheh, on June 11, 2015, Vigodman emphasized Teva's results, falsely concealing their dependence on price fixing and antitrust violations: "[W]e started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. You see the profound change in the generic business. … maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014." ¶593. At the same conference, Olafsson exclaimed: "We have improved the generic business by 1,000 basis point on a revenue of around $10 billion. That is [a] $1 billion improvement in 14 months, 16 months that we have done." ¶324. In reality, the majority of that improvement derived from illicit profits generated by the anticompetitive scheme. *See* ¶¶246-47.

ADS Reach Record High As Actavis Deal Is Announced – On July 27, 2015, Teva announced a definitive agreement with Allergan to acquire its worldwide generic business, Actavis, for $40.5 billion. ¶333. That day, Teva's ADS price reached an all-time high of $72. ¶341. In making the announcement, Vigodman explained that the rapid success of the prior

18 months was the "precondition for a transformative acquisition."  ¶603.

Teva did not have sufficient cash to buy Actavis, so there was yet another "precondition": Teva would need to turn to investors to raise $33.5 billion, in addition to $6.75 billion in ADS they had on hand.  ¶¶334-36.  With the ADS/Preferred Offerings scheduled for early December 2015, ¶336, the 10(b) Defendants sought to keep the ADS price inflated despite facing pricing pressure as the conspiracy began to weaken.

The Tide Began To Turn, As Pricing Deteriorated – During Q2 2015, some cracks in the collusion appeared, in the form of pricing pressure reported by Teva's peers.  ¶365.  Teva, however, in Q3 2015, announced yet another successful quarter.  ¶606.  On the earnings call, Olafsson touted the profitability of the generics business: "[W]e were at 16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."  ¶613.  He elaborated, "really the Generic business in third quarter continued to drive growth."  ¶347.  An analyst's "takeaway: Another good quarter."  ¶346.

Pricing remained a concern for analysts, and their questions were met with increasingly blatant and false denials said, "We're very … responsible in everything that portends to prices on the Generics side and on the Specialty [branded] side … all the improvements you see in our – in margins is not driven by price.  It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message."  ¶¶351, 616.

On November 19, 2015, only weeks before the ADS/Preferred Offering, an analyst asked Desheh, "where do you go on pricing?"  Desheh falsely denied that Teva had any exposure at all:

> there's a lot of noise around pricing issues. … Our exposure to all these things
> is very minimal.… [W]e're playing a competitive game. We're playing it fairly.
> We of course play by the book and by the rule. … our exposure to any initiative
> on price reduction in the [U.S.] is as small as anybody can have.…  ¶618.

On December 8, 2015, Teva closed the ADS/Preferred Offerings, raising $7.254 billion

from Class members, including Lead Plaintiff.  ¶¶354-58.

Pricing Pressure Continued To Increase In 2016 – By Q1 2016, the DOJ and State AGs initial inquiries into a small number of drugs and a few companies had evolved into larger scale investigations, making it more difficult to maintain collusive price hikes, and resulting in pricing pressure.  ¶360.  As Teva's peers reported poor financial results from this, concerns over Teva's own exposure increased.  ¶¶363, 364-65, 370, 372-73.  The 10(b) Defendants persisted, however, in falsely denying the importance of pricing to Teva's profitability.

For example, during a February 11, 2016 investor conference call, Olafsson said: "2015 was a very good year for Teva Generics [with] … [a] $1 billion improvement in operating profit over 24 months period"; to avoid any doubts as to what was driving this, he answered his own question: "So how did we do this? *Not by pricing* but by portfolio mix, new products, and efficiency measures."  ¶¶362, 632.  Nevertheless, an analyst inquired about "pricing pressure" that "some of [Teva's] competitors ha[d] talked about during the quarter."  ¶363.  Olafsson issued a broad denial: the "US has been stable over the year.…  There is a lot of competition in the U.S."  *Id*.  Olafsson's false response served its purpose of deceiving the public.  One analyst wrote: "TEVA's 4Q results provided some reassurance that the company is less exposed to the unwinding of generic price inflation… which was reassuring after competitor results stoked investor concerns about the groups' exposure to unwinding generic price inflation."  ¶365.

Despite Teva's false denials, pricing pressure was taking a toll.  In its Q1 2016 earnings announcement, Teva was forced to disclose a $200 million year-over-year profit decline in generics.  ¶368.  Olafsson claimed that loss of exclusivity in just two drugs "fully explained" the decline, asserting "Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.…  Nothing

has happened in the last two quarters that has changed the pricing environment." ¶¶369, 652.

He then falsely boasted that, in view of "worsening generic drug price deflation" reported by

other manufacturers, Teva was the "only good house" among competitors with "leaking houses"

plagued by a "lack of investment in generic R&D." ¶¶655-56. Investors were deceived. As the

Jefferies analyst wrote, "Generic pharmaceutical bellwether TEVA has not witnessed a

deterioration in the pricing environment, according to mgt. This directly contrasts with what has

been stated by a number of competitors over the past few months." ¶372.

   The drumbeat of false denials, obfuscation, and deceit had grown louder in 2016 because

Teva was, indeed, seeing a decline in illicit profits. ¶¶247-48. As reflected in Figure 2, below,

each quarter beginning Q3 2015, Teva's illicit profits dropped, with this pattern accelerating

significantly into 2016 and 2017. ¶¶245-49.

**Figure 2: Collusion-Derived Revenue ($ Million)**



<u>Teva Receives DOJ And State AG Subpoenas, And Rushes Out The Notes Offering</u> – In

the first half of 2016, the timing of the $20.3 billion debt offering needed to finance the Actavis

deal remained uncertain. ¶¶378, 382. As late as May 2016, Desheh told investors that he

expected the offering not to take place until September or even Q4 2016.  ¶378.

All this changed with the receipt of the subpoenas.  On June 21, 2016, Teva received a subpoena from the Antitrust Division of the DOJ, and on July 12, 2016, a similar one from the Connecticut AG.  ¶388.  The *very next day* after receiving the State AG subpoena, Vigodman, during a prescheduled call with analysts, unexpectedly announced that Teva would accelerate the debt offering from September to July, based on unspecified market "factors" and "terms." ¶¶376-77.  He did not disclose the subpoenas.  ¶¶386-88.

On that call, Vigodman also raised Teva's financial forecasts.  ¶379.  Asked about assumptions in the guidance, Olafsson asserted: "In the second quarter, we have a stable pricing environment; there was *no significant change in the pricing*."  ¶¶380, 677.  Buoyed by these and similar false statements, Teva's ADS remained around $54.  ¶384.  On July 31, 2016, Teva closed the $20.3 billion debt offering, and on August 2, 2016 closed the Actavis deal.  ¶382.

Days After The Notes Offering, Teva Discloses The Subpoenas – On August 4, 2016, Teva finally disclosed the subpoenas as part of its Q2 2016 financials filed with the SEC.  ¶386. The filing also reported poor earnings results, with U.S. generics suffering a 33% revenue decline versus Q2 2015.  ¶¶392, 818.  Asked specifically whether this was attributable to pricing declines, Olafsson maintained his "conviction in pricing stability," and flatly denied any pricing decline: "In terms of the pricing, the pricing is stable to the same degree as before."  ¶394.  The truth was that the second quarter had brought a 55% decline in Teva's illicit profits versus Q2 2015.  *See* ¶¶247-48.  Investors gave credence to these assurances.  For instance, in an August 4, 2016 report, J.P. Morgan analysts concluded that Teva's "US generics business modest below expectations but generics pricing environment remains stable."  ¶397.

Generics Day: The Fraud's High Water Mark – On September 9, 2016, the 10(b)

14

Defendants held a so-called "Generics Day" conference for analysts to tout their post-acquisition generics business, forecasting "margin expansion for the generics business to [approximately] 35% over the next three years." ¶¶399-400. In a particularly remarkable moment of hubris, Olafsson falsely explained: "There is no inflation in the generic pricing," asking rhetorically, "So what is the secret sauce? It's not very complex…. [T]he message I want you to take from this [] is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down" than Teva's peers. ¶681. He persisted: "people that say that … there's a big generic price inflation, are simply wrong." ¶¶402, 682. And to round out the false statements, he added: "When price increases are taken, there's some kind of abnormality in the business. There are shortages. So there's always somebody happy to take a little bit lower price. So it's a very competitive business we're in." ¶¶406, 683.

Analysts were pleased. As one wrote after Generics Day, "we continue to think that growth prospects for the company's generics business are underappreciated." ¶407. Another wrote, "Teva's generics overview gave [them] more confidence in our estimates." *Id.*

The *Bloomberg* Article Implicates Charges Against Teva – Only weeks later, on November 3, 2016, *Bloomberg*, in an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," reported that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion." ¶409. The article revealed that the "investigation … begun about two years ago, now spans more than a dozen companies and about two dozen drugs … and the first charges could emerge by the end of the year." *Id.* "Though [until then] individual companies [had] made various disclosures about the inquiry, they … identified only a handful of drugs under scrutiny." *Id.* The article further

reported that "[c]harges could extend to high-level executives," and could mirror the DOJ's "long-running probe into auto-parts cartels," which "resulted in $2.8 billion in penalties, and charges against 46 companies and 65 individuals, of which 31 received prison sentences." *Id.* *Bloomberg* also reported that the State AG investigation "could result in cases seeking damages." *Id.* On the news, Teva's ADS price fell $4.13, or 9.53%, on high trading volume. ¶824.

Teva Reports Drastically Disappointing Results – On November 15, 2016, Teva reported disappointing results, for the first time attributing the results to pricing pressure. ¶418. However, it added a false caveat that the "key driver" was "increased price pressure on select products as we divested some of the Teva/Actavis overlaps." ¶421. For this reason, the 10(b) Defendants claimed pricing pressure would "not last beyond the quarter," as Olafsson remained "very confident that the price erosion we experienced in the US will continue to be in the mid-single-digits," as he had repeatedly claimed. *Id.* Vigodman then directly addressed the *Bloomberg* article, claiming that "based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." ¶¶429, 693.

Olafsson Is Terminated – On December 5, 2016, Teva unexpectedly announced Olafsson's "retirement" at age 48. ¶431. Skeptical analysts dismissed this as a pretext. For example, *The Street* ran an article, "Questions Mount at Teva as Generics Head Quits Without Explanation," noting the termination "less than two-and-a-half years following his appointment," was "raising more questions for investors amid continued worries around drug pricing." ¶436. Piper Jaffray attributed it to "repercussions at the top of the organization." ¶437.

DOJ And State AGs' Charges Against Teva Quickly Follow – On December 14, 2016, the DOJ unsealed its first charges, filing criminal informations against Malek and Glazer for

conspiring to "allocate customers, rig bids, and fix and maintain prices" of Glyburide, as well as other drugs, from April 2014 through at least December 2015.  ¶¶102-07.

On December 15, 2016, 20 State AGs filed civil charges against Teva for anticompetitive conduct and collusion to fix prices, rig bids, and allocate markets for Glyburide and other drugs with Malek, Glazer, and numerous other competitors.  ¶¶110-23.  The charges were based on direct evidence: "text messages … emails … conversations … [and] cooperating witnesses." ¶125.  The State AGs indicated that the collusive conspiracy was "fraud on a broad[], nearly unimaginable scale," and that their charges were "just the tip of the iceberg."  ¶¶123-24.  An additional 24 State AGs have since joined in the lawsuit against Teva.  ¶9.[2]

As Teva Enters 2017, Its Profits From Collusion Slow To A Trickle – On January 6, 2017, Vigodman for the first time conceded that "the entire healthcare sector has faced significant headwinds, and we have not been immune."  ¶445.  Vigodman described "an EBITDA gap" from the July 2016 guidance "of $1.2 billion emanating from our US generics business."  ¶447.  Analysts, surprised by this downward spiral, were intensely negative.  One saw an "Unmitigated Disappointment" in need of "A Major Overhaul" and asked "how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management team in place?"  ¶449.  The undisclosed truth was the revenues from the illicit price hikes were falling off a cliff in 2016.  ¶¶247-48; *see also* Figure 2.

Vigodman Is Terminated – On February 6, 2017, Teva announced that Vigodman was terminated, immediately and without a permanent replacement.  ¶¶452-53.  J.P Morgan analysts wrote that this added "[f]urther [u]ncertainty," "with arguably the two most important executives

---

[2] Though filed on October 31, 2017, and thus not pled in the Complaint here, the State AGs have entered a proposed Second Amended Complaint.  Pl. States' Proposed Consol. Am. Compl., *In re State Attorneys General Cases*, No. 16-AG-27240 (E.D. Pa. Oct. 31, 2017), ECF  3-1.

at Teva [Vigodman and Olafsson] stepping down within the last several months at a time of

significant fundamental challenges." ¶456.  Peterburg, Chairman of Teva's Board, took over as

interim CEO, promising that "a total review of the business [was] already under way." ¶454.

    <u>False Guidance Is Reaffirmed</u> – Among his first orders of business, on February 13,

Peterburg reaffirmed the fraudulent guidance, stating: "We are reiterating our guidance for 2017,

including our earnings per share of $4.90 to $5.30.  We are very committed to this EPS range,

and the management team, and I will do what it takes to protect it, including additional cost

reduction if necessary." ¶460.  J.P. Morgan analysts noted that Defendants still "expect[ed] base

business erosion to be around 5%." ¶459.  By that time the revenue from the collusive price

hikes had declined  even further.  ¶¶248-49; *see also* Figure 2.

    <u>Desheh Continues To Deny Pricing Pressure Even As He Exits Teva</u> – On April 25,

2017, numerous media outlets reported that Defendant Desheh would be pushed out as CFO.

¶464.  In what was Desheh's final earnings call on May 11, Teva released positive Q1 2017

financial results, again reaffirming its forecasts.  ¶¶464-68.  On the call, Desheh resumed his

disavowal of pricing pressure in 2017, claiming that "our U.S. generic business was very stable

this quarter … the gross profit margin … remains exactly the same.  It's around 55% … and did

not suffer – was not impacted by pricing pressure in generics in Q1." ¶¶470, 723-24.

Defendants went so far as to reaffirm the $1.6 billion dividend in the face of investor skepticism.

¶462.  Internally, however, Defendants knew that the dissolution of the collusive scheme

continued to drive Teva's prices down, along with illicit profit.  *See* ¶¶247-49.  In Q1 2017, illicit

profit from the eight price-fixed drugs identified in the Complaint was down 38% from Q1 2016,

and 71% as compared to Q1 2015.  *See id.*; Figure 2.

    <u>With Key Defendants Out, Teva Takes A $6.1 Billion Charge To Generics</u> – On June 9,

2017, Teva announced four new directors to its Board.  ¶472.  By June 21, Desheh was officially

out.  *Id*.  With Desheh, Vigodman, and Olafsson gone, on August 3, 2017 Teva reduced its

dividend, took a $6.1 billion charge to its generics business, and revised guidance down

dramatically.  ¶473.  Peterburg summed up the disclosure on the investor call: "This loss is

primarily the result of a $6.1 billion impairment charge to reduce goodwill associated with our

U.S. Generics business unit.…  This impairment reflects our revised outlook for the business

given the trends," including "accelerated price erosion and decreased volume."  ¶¶477-78.  He

blamed much of the pricing trend on "customer consolidation," and an increase in FDA

approvals, but this made no sense.  ¶479.  An analyst observed that management "did not explain

well how this was not fully anticipated," given headwinds in the industry for years.  ¶471.

Investors were infuriated.  ¶479.  UBS analysts wrote, "Three Strikes and We're Out";

another wrote, "Lowering estimates and target; not our best call."  ¶¶480-81.  Oppenheimer

analysts concluded, "Lower visibility On Turnaround Sends Us To the Sidelines; Downgrading."

¶480.  The analysts at Cowen admitted that "we have been horribly wrong on our call."  ¶482.

The price of Teva securities went into a tailspin, with UBS analysts reporting the ADS

price "trading down 8-10% pre-market.  Given the significant 2017 guidance cut, the dividend

cut, the impairment charge of [$6.1 billion] along with the Q2 2017 miss, it's understandable that

the stock would trade down this significantly."  ¶474.  *Bloomberg* reported "Pharma Giant

Teva's Stock Is Imploding As Generic Drugs Get Cheaper."  ¶475.  Teva's ADS price fell from

$31.25 to $23.75, on high trading volume; the Preferred Share price fell from $560.50 to

$465.05; the prices of Teva's Notes declined between $2.24 and $18.41.  ¶854.  Moody's issued

a report downgrading Teva's debt, ¶483, and on August 4, 2017, Fitch Ratings followed, ¶484.

This marked the end of the Class Period.  ¶28.  The $6.1 billion impairment charge

reflected the fact that the value of Teva's generic business had been grossly inflated based on false statements concealing price fixing and anticompetitive conduct.  *See* ¶¶851-52.  The real value of the Company was a fraction of what Class members paid for Teva's securities, with the stock price dropping from a Class Period high of $72 to about $20 where it trades today.  ¶815.

## III.   EXCHANGE ACT CLAIMS

### A.   The Complaint Adequately Alleges False And Misleading Statements In Violation Of The Exchange Act

To allege fraud under § 10(b), the PSLRA requires that Plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,… state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).[3]  Plaintiffs must allege the what, who, where, when, and why of each false statement.  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir 2000).  Importantly, the "goals embodied within Rule 8(a), Rule 9(b), and the PSLRA" are "to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 310 (S.D.N.Y. 2013).  Rule 9(b) and the PSLRA simply do not require the "extreme level of particularity" that Defendants apparently wish, as it "would serve no valid purpose."  *Id.*

Substantively, Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37 (2011).  Because "companies can control what they have to disclose

---

[3] As explained below, claims under the Securities Act do not have this heightened pleading requirement, and only require a short and concise statements of the claim pursuant to Rule 8.

under these provisions by controlling what they say to the market," *id*. at 45, when a defendant "speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings*, 761 F.3d 245, 250 (2d Cir. 2014). Accordingly, "the law is well settled ... that so-called 'half-truths'–literally true statements that create a materially misleading impression–will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011).

Consistent with these cases, analysis of alleged false statements must be contextual; "[t]he test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, ***taken together and in context***, would have misled a reasonable investor." *Vivendi*, 838 F.3d at 250 (emphasis in original); *accord Meyer*, 761 F.3d at 250 ("[T]he proper inquiry requires an examination of defendants' representations, taken together and in context."). Thus, "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *Vivendi*, 838 F.3d at 240.

Through various half-truths, false statements, and material omissions, the 10(b) Defendants concealed the truth. Specifically, the Complaint alleges four interrelated categories of materially false and misleading statements:

    i.    <u>Competition and Price</u> – In each of Teva's annual financial statements filed during the Class Period, the 10(b) Defendants repeated just how "intense" the competition was in the U.S. generics market on pricing; likewise, at conferences and on calls with analysts and investors, they repeatedly emphasized that Teva was excelling and profiting in a hotly competitive market. In doing so, they concealed the collusive price increases and anticompetitive conduct. *Infra* at Section III.A.1.

    ii.    <u>Growth, Earnings, and GAAP</u> – In each quarter of the Class Period, the 10(b) Defendants misled investors as to the sources of Teva's illicit profits and violated GAAP in recognizing over $1 billion in revenue derived from the collusion. *Infra* at Section III.A.2.

    iii.    <u>Known Trends and Uncertainties</u> – The 10(b) Defendants breached an affirmative statutory duty pursuant to Item 5 of Form 20-F and Item 303 of Regulation S-K to disclose the known trend that Teva's financial success from mid-2013 until at least

2015 was driven by unsustainable price hikes and collusion.   *Infra* at Section III.A.4.

iv.   <u>SOX Certifications</u> – Desheh, Altman, Vigodman, and Peterburg were required to certify the accuracy of the financial statements and the effectiveness of Teva's disclosure controls and internal control over financial reporting.  As the long-running misstatements and false financial statements demonstrate, those controls were ineffective and the certifications were false.  *Infra* at Section III.A.8.

Each category of misstatements is false and misleading for essentially the same fundamental reason:  they concealed the truth.  That is the 10(b) Defendants concealed that they: (i) were colluding with competitors to allocate customers and market share, rig bids, fix, inflate, and maintain prices, and manipulate the market for generic drugs in the U.S.; (ii) were not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line, but instead preserved Teva's market share volume and inflated pricing in the U.S. generics markets through anticompetitive means; (iii) were implementing extraordinary price increases, sometimes in close temporal proximity with competitors; (iv) were not engaged in a lawful or sustainable business strategy; (v) were reporting financial results that were the result of anticompetitive and collusive conduct; (vi) were reducing costs by virtue of the anticompetitive conduct; and (vii) concealed Teva's dependence on the benefits from the collusive anticompetitive behavior.  ¶¶521, 537, 579, 638, 712, 726.

As is common in securities fraud actions, the Complaint alleges this "unitary" theory of falsity through which the 10(b) Defendants "disseminat[ed] a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie."  *Vivendi*, 838 F.3d at 250.  As the Second Circuit recently recognized in affirming a plaintiff's similar "unitary" theory of falsity after trial, frauds often "manifest[] in many different ways and with respect to many different statements."  *Id.* at 241.  "Where a company seeks fraudulently to hide a particularly large problem with multiple contributing factors, it is quite

probable that the company will have to lie about a number of related topics in order successfully to conceal the larger issue." *Id*. at 250. "It would be perverse if companies could escape liability" under such circumstances. *Id.*

As an initial matter, Defendants' opening argument that Plaintiffs engaged in "puzzle pleading" rings hollow. *See* 34 Act Br. at 11-14 (Section I.A.). If the 96 pages spanning four "motions to dismiss are any indication," the Complaint "effectively alerted Defendants of the claims against them." *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003). Meritless "puzzle pleading" arguments like Defendants' are regularly rejected. *See MF Glob.*, 982 F. Supp. 2d at 309-10; *In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008). The cases Defendants cite are easily distinguishable. For example, in *Williams v. WMX Technologies*, plaintiffs made "[n]o attempt to isolate statements and particularize their falsity," did "not state a place or time that [alleged false oral] representations were made," contained "no analysis of [the] contents or falsity." 112 F.3d 175, 178-80 (5th Cir. 1997). The well-pled Complaint here bears no resemblance to those complaints.

### 1. Statements Concerning Competition And Pricing Were Materially False And Misleading

Throughout the Class Period, in Teva's annual reports, the 10(b) Defendants made repeated and vociferous statements concerning the supposed "intense" and "fierce" competitiveness in the U.S. generics market, and Teva's ability to profit and prosper in that environment. Under the heading "Competitive Landscape," the Forms 20-F stated:

> In the United States, we are subject to ***intense competition*** in the generic drug market from domestic and international generic drug manufacturers… We believe that our primary ***competitive advantages*** are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe ***we have a focused and competitive pricing strategy***. ¶574 (2014); s*ee also* ¶529 (2013); ¶627 (2015); ¶706 (2016).

Moreover, at investor conferences and on earnings conference calls, the 10(b) Defendants consistently stressed that the U.S. generics market was fiercely competitive, and claimed to "play by the book."  For instance, Desheh stated:

> I don't believe that there are many examples for competitive environment, ***real competition***, like we see in generic market in the United States. … So it is a ***highly competitive environment*** with players coming from all over the world…. So we're playing a competitive game. We're playing it fairly. ***We of course play by the book and by the rule.***  ¶618 (Nov. 19, 2015).

*See  e.g.*, ¶¶344, 604 ("U.S. generic market is ***very competitive***. … So there's ***fierce competition*** on most of the portfolio, if not all the portfolio.") (July 27, 2015 Olafsson); ¶¶344, 604 ("***We believe in competition***, and we'll do what is needed in order to win in all the markets we operate.") (July 27, 2015 Vigodman); ¶615 ("[P]ricing is obviously ***based on the competition***.") (Oct. 29, 2015 Olafsson); ¶¶363, 636 ("US has been stable over the year…. ***There is a lot of competition in the US***, there is no question about it.  As you well know, there are over 200 generic competitors in the US market and the ***competition is fierce***.") (Feb. 11, 2016 Olafsson); *see also* ¶¶ 654, 655, 661, 672, 673, 683, 722.

Defendants made further claims that any price increases were due to normal economic forces such as "shortages."  *See*, *e.g.*, ¶562 ("When there's an opportunity, ***when there is a shortage in the market***, we obviously look for pricing like any other business.") (Oct. 30, 2014 Vigodman); ¶406 ("When price increases are taken, ***there's some kind of abnormality in the business.  There are shortages***. …  So there's always somebody happy to take a little bit lower price.  So it's a ***very competitive business*** we're in.") (Sept. 9, 2016 Olafsson).

Often in the same breath, the 10(b) Defendants explained that Teva was not engaged in, nor benefiting from, extraordinary price increases.  They frequently implied or outright denied that price increases were occurring at all.  For example:

- "I have to disagree that [competitors] have experienced tremendous price increase. I think,

24

overall, the pricing in the U.S. of generics has been flat to a slight down." ¶565 (Dec. 11, 2014 Olafsson);

- "We're very … responsible in everything that portends to prices on the Generics side … all the improvements you see in our – in *margins is not driven by price*. It is driven by quantities and by mix and by efficiency measures. *Not by price*, 2014, 2015, and that's a very important message." ¶¶351, 614-16 (Oct. 29, 2015 Vigodman);

- "Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda…. *Our exposure to all these things is very minimal*…. I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States. … And we believe that *our exposure to any initiative on price reduction in the United States is as small as anybody can have*…." ¶¶352, 618 (Nov. 19, 2015 Desheh);

- "*$1 billion improvement* in operating profit over 24 months period" in U.S. generics was "*Not by pricing* but by portfolio mix, new products, and efficiency measures." ¶¶362, 632 (Feb. 11, 2016 Olafsson);

- "I think overall the *pricing hasn't changed that much*. There was a lot of talk about inflation in generic pricing. But we never saw that." ¶642 (Mar. 8, 2016 Olafsson);

- "*There is no inflation in the generic pricing*…. So what is the *secret sauce*? … This has been the same winning formula I have talked about many, many times.… [W]ith our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, *we are more shielded towards the prices up and down*." ¶681 (Sept. 9, 2016 Olafsson);

- "Let me start on the drug pricing, so overall, like previous quarters, there *hasn't been any fundamental change in the US drug pricing*." ¶¶423, 695 (Nov. 15, 2016 Olafsson).

Despite such statements, the 10(b) Defendants were implementing extraordinary price increases that were driving Teva's profitability, allocating customers and market share, rigging bids, fixing, inflating, and maintaining prices.  Teva was not operating in a competitive market or competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  Instead, Teva preserved market share volume and inflated pricing in the U.S. generics markets through anticompetitive means, whether illegal or not. ¶521.  As alleged, there were no "shortages" that caused the price increases for any of the drugs specified in the

25

Complaint; absent collusion, competitors would have entered the market to grab market share.[4]

In light of the widespread, yet concealed, anticompetitive activity, statements such as those enumerated above were false and misleading when made.  The complete and truthful picture, that Teva's success was built on the anticompetitive activity, whether illegal or not, was unknown to investors.  *See Vivendi*, 838 F.3d at 250.  In essence, the 10(b) Defendants "represented to the market throughout the [C]lass [P]eriod that [] performance was attributable to [Teva's] ability to effectively compete in the [] industry on price, quality and service when in fact [it] had entered into illegal market allocation agreements with [its] major competitors, … which ensured that [the Company was] impervious to the normal effects of competition." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 702 (E.D. Mich. 2010).

As Judge Squatrito similarly concluded in *Menkes v. Stolt-Nielsen S.A.*, statements such as these, "that there is 'intense' competition between [] business rivals … convey[] the false impression to investors that [the company] achieved success in a competitive pricing environment."  2005 WL 3050970, at *8 (D. Conn. 2005), *aff'd as to this issue*, 2006 WL 1699603, at *4 (D. Conn. 2006); *see also In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at *7 (D. Idaho 2007) ("sufficiently plead falsity because … officials explained [] pricing as a product of market factors rather than price-fixing" while "deliberately and knowingly engaged in a scheme to manipulate [] prices so that Micron could appear profitable to investors.").

Here, in reality, Teva was profiting from the deliberate lack of competition on price and market share.  Indeed, the 10(b) Defendants proclaimed, like in *Chamberlain*, "a highly competitive market as one of the main business challenges," and that Teva "faced many

---

[4] ¶150 (Pravastatin); ¶163 (Enalapril); ¶176 (Cephalexin); ¶188 (Ketoconazole); ¶203 (Baclofen); ¶215 (Fluocinonide); ¶228 (Carbamazepine); ¶239 (Estradiol).

competitors … and competed primarily on price." 757 F. Supp. 2d at 693-94. Far from

acknowledging that Teva was the beneficiary of anticompetitive conduct, the 10(b) Defendants

identified competition as among Teva's chief risks.

In re Sotheby's Holdings, Inc. is further instructive; like the 10(b) Defendants here,

Sotheby's made repeated public statements "relating to the existence of competition in the

industry and the source and growth of … revenue and earnings." 2000 WL 1234601, at *1

(S.D.N.Y. 2000). In reality, Sotheby's was in a scheme not to compete at all with its chief rival.

Because "when a corporation does make a disclosure–whether it be voluntary or required–there

is a duty to make it complete and accurate," otherwise that disclosure is actionable. Id. at *4.[5]

Importantly, the statements on competition and pricing are false and misleading whether

or not Teva formally agreed to fix pricing with peers. That the price increases occurred in lock-

step was necessarily dependent on a deliberate lack of competition between them. Teva, or its

peers, could have chosen to compete on price, and thereby taken market share. They did not.

This lack of competition belies Teva's claims to a "competitive pricing strategy."

Defendants' Challenges Fail – To the extent the 10(b) Defendants reference any specific

alleged pricing and competition misstatements, they merely cite them in two footnotes. See 34

Act Br. at 31, n.35, 36. With just one exception, their argument does not engage with the

substance of any statement, instead asserting generally that they all are not "so incomplete as to

---

[5] Defendants seek to distinguish Sotheby's on the basis that the statements at issue concerned
Sotheby's purported competition with Christie's, who together controlled 95% of the auction
market. 34 Act Br. at 35-36. This distinction is meaningless. The Sotheby's holding is not
rooted in the nature of the markets dynamic, but in the allegations that, like Teva, Sotheby's was
lying about the source of its success: "Sotheby's publicly touted the positive impact of the new []
structure and increased [] sales as the sources of improved revenues, when the real cause … was
the illegal collusion." 2000 WL 1234601, at *3. Moreover, Teva was most often among just a
handful of firms selling each of the price-fixed drugs. ¶¶144, 156, 170, 181, 197, 209, 222, 235.

mislead."  In support, the 10(b) Defendants discuss at length the First Circuit's "seminal" pre-PSLRA decision *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990), which purportedly "teaches [that] statements are misleadingly incomplete, within the meaning of federal securities law[] only under very limited circumstances," and, further, that the First Circuit "applied a very literal rule."  34 Act Br. at 30-31.

*Polaroid* is inapplicable on its facts.  While the decision lacks clarity in many respects, what is indisputable is that the plaintiffs there had not alleged actual false and misleading statements or half-truths under Rule 10b-5(b).  Instead, the case was rooted in pure omissions and scheme liability under Rule 10b-5(a) and (c).  Indeed, in "eight years of preparation and twelve days of trial, the words misrepresentation and misleading never crossed plaintiffs' lips … except to deny that they were claimed."  910 F.2d at 14.

The 10(b) Defendants' only specific reference to a price or competition statement is to challenge a single risk disclosure, which they submit is the "centerpiece" of Plaintiffs' case:

> ***Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically***, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

34 Act Br. at 32; ¶¶531, 596, 629, 708.  Defendants rely heavily on *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), for their conclusory argument that this and Plaintiffs' other alleged false and misleading statements are "too innocuous" to be actionable. They contend that the *Axis* court "stressed" that "[n]ot every allegation of an antitrust violation will render misleading generalized statements regarding a company's increased earnings or the competitive state of the marketplace," citing footnote 4 of the opinion.  34 Act Br. at 33.  *Axis* is factually the opposite of this case.  The thrust of the *Axis* decision was that the plaintiffs there "to

their credit as they apparently ha[d] no incriminating facts–do not allege that AXIS participated

in any bid-rigging conspiracy or, for that matter, any form of customer or market allocation," 456

F. Supp. 2d at 585, or "claim that the financial statements were inaccurate or violated GAAP,"

*id*. at 586.[6]  Here, instead, the above risk disclosure is actionable as it conceals Defendants'

efforts not to compete, whether or not the anticompetitive behavior was illegal.[7]

### 2. Teva's Growth And GAAP Financial Reporting Were False And Misleading When Issued

The anticompetitive scheme rendered materially false the 10(b) Defendants' statements

that: (i) through 2015, Teva's growth and success were the result of legitimate strategies and

activities; (ii) beginning in 2016, pricing pressure was not damaging the Company's revenues,

and (iii) during each quarter of the Class Period, Teva's financial statements and internal controls

complied with GAAP.  The 10(b) Defendants refer to over five dozen alleged false statements in

a single footnote, categorically, and without analysis, arguing that all such statements are

"accurate statements of historical fact."  34 Act Br. at 16, n.18.  They are wrong.

### a. Defendants' Statements Concerning The Source Of Earnings And Growth Were Materially False And Misleading

If, as here, a defendant "puts the topic of the cause of its financial success at issue, then it

is obligated to disclose information concerning the source of its success, since reasonable

investors would find that such information would significantly alter the mix of available

---

[6] Unlike Teva, AXIS was not named in the relevant complaint by a State AG, and the plaintiffs were never able to particularize what, if anything, AXIS had done that was illegal or improper.

[7] Defendants reference two reports for support that the generics market is competitive.  34 Act Br. at 33-34.  These reports are outside the pleadings as their subjective assertions are beyond the Court's consideration.  Defendants' argument further misses the point, as it is not whether the general market for generic drugs was competitive, it is that the 10(b) Defendants misled investors as to the fact that Teva's success depended on a lack of competition.  ¶¶102-26.

information." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401

(S.D.N.Y. 2005). Where an activity is a material driver of a company's financial performance,

*Van der Moolen* requires disclosure of the activity should the company choose (as Teva did) to

discuss the causes of its financial performance.[8] This principle applies whether the concealed

source of the company's financial success is illegal or not. *Vivendi*, 838 F.3d 239-40, 250.

Here, based on the statements alleged, there can be no dispute that the 10(b) Defendants

placed the source of Teva's financial performance squarely at issue, attributing the Company's

financial success to cost cutting, product selection, and excellent execution; not pricing. But the

truth was that Teva's profits from price increases were the foundation for Teva's dramatic

turnaround, and the express "precondition" for inflating Teva's ADS price as necessary to pursue

the Actavis deal. *See infra* Summary of Allegations II. Thus, "[u]nder the circumstances, the

alleged failure to disclose the true source of revenue could give rise to liability under Section

10(b)." *Van der Moolen*, 405 F. Supp. 2d at 401.

The 10(b) Defendants then argue that their statements were accurate representations of

historical fact, citing, without discussion, 63 paragraphs of the Complaint. 34 Act Br. at 16,

n.18. To the contrary, these statements, exemplified below, illustrate that the 10(b) Defendants

concealed the true drivers of Teva's purported success:

- "We delivered improvement in profitability in all businesses, ***particularly in global generics, which saw profitability increase by 40% year over year***. The quarter results are an important example of Teva's commitment to strengthen our global leadership position in generics, ***fully execute our cost reduction program***, and focus on cash and cash flow

---

[8] *See*, *e.g.*, *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (citing *Van der Moolen*, 405 F. Supp. 2d at 400-01) ("attributing [] success solely to legitimate practices … implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6 (S.D.N.Y. 2017) (sources of revenue growth included bribery of foreign leader's family member); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 599 (E.D. Va. 2015) (true source of "high margin growth and earnings" was not "legitimate 'sourcing initiatives,'").

generation." ¶555 (Oct. 30, 2014 Vigodman);

- "[T]he Generic business is *benefiting hugely from the cost reduction* program that was initiated in 2013.… Also the U.S. has done *amazing job and over the last two years*, the operating profit in the U.S. will increase by 10% and that's when you are the market leader like we are in the U.S." ¶563 (Dec. 11, 2014 Olafsson);

- Revenues from generic medicines in the United States during the first quarter of 2015 "amounted to $1.4 billion, an *increase of 37%* compared to the first quarter of 2014. *The increase resulted mainly from the launch of esomeprazole magnesium DR capsules* … this quarter and from sales of other products that were not sold in the first quarter of 2014." ¶587 (Apr. 30, 2015 Q1 2015 6-K);

- "U.S. market is increasing in prominence reflecting our *strong focus on U.S. Generics business*…. The result of all this is a *strong trend of improvement in operating margin* [] over the past *18 months of almost 500 basis points in operating profit*. And this was built upon the *impressive improvement in the profitability of our Generic business* as you can see, stepped up for around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015.… And for the full half, Q2 was a *clear continuation of the momentum of Q1*, resulting in a very strong first half for the year." ¶599 (July 30, 2015 Desheh).

As alleged specifically in the Complaint, and as illustrated in Figure 1 and Figure 2 it was the collusive behavior that was catapulting profits. Indeed, the trend in illicit profits moved in lockstep with Teva's reported U.S. generic revenues.[9] *See, e.g.*, *VEON*, 2017 WL 4162342, at *6 (attributing "increased … revenues" to "sales and marketing efforts," without disclosing that "this growth also was due to bribes" held actionable).

Beginning in the second half of 2015, the anticompetitive and collusive conduct came under increasing pressure. As the collusion unraveled and profits declined, the 10(b) Defendants likewise concealed the true cause. While the 10(b) Defendants were forced to disclose disappointing earnings beginning in Q1-2016, they attributed the negative trend entirely to anticipated factors, like the loss of exclusivity on certain drugs or loss of sales, but never to the

---

[9] *See* ¶541 (Q1 2014 6-K) (17% increase in U.S. generics revenues), ¶548 (Q2 2014 6-K) (10% increase); ¶557 (Q3 2014 6-K) (1% decrease); ¶572 (2014 20-F) (6% annual increase); ¶587 (Q1 2015 6-K) (37% increase); ¶597 (Q2 2015 6-K) (24% increase); ¶608 (Q3 2015 6-K) (8% decline); ¶625 (2015 20-F) (8% annual increase); ¶¶360, 647 (Q1 2016, 6-K) (32% decline); ¶666 (Q2 2016 6-K) (32% decline).

precipitous decline in U.S. generics prices.  For example:

- May 9, 2016 (Q1 2016 Form 6-K): Teva reported that U.S. Generic Medicine quarterly revenues "amounted to $976 million, a **decrease of 32% or of $463 million**, compared to the first quarter of 2015.  The decrease resulted mainly from a decline in sales of $427 million due to the loss of exclusivity on" specified drugs.  ¶647.

- Aug. 4, 2016, an analyst asked Olafsson about "pricing stability" in light of Teva's U.S. generics revenues falling short of expectations, Olafsson explained: "first of all, it's **the old story** in the generic business, and we have talked about it many times. It's the **short-term volatility**, but a long-term profitability that we are seeing in the generic business…. I think overall, the underlying business did well…. In terms of the pricing, **the pricing is stable to the same degree** as before. We saw approximately in the US, 4% price erosion in the business, in a way **very stable from the first quarter**."  ¶¶394, 671.

As alleged, in each of the first and second quarters of 2016, profits from the price increases fell by 54%, relative to 2015.  *See* Fig. 1; *compare* ¶247 *with* ¶248.  Yet the 10(b) Defendants denied that pricing trends had anything to do with these declines.  *Supra* III.A.1.

Accordingly, despite Defendants unsupported assertions, there is no accuracy, historical or otherwise, in the 10(b) Defendants' statements.  The cases Defendants cite are also off base.  In *In re Nokia Oyj Securities Litigation*, the complaint "[did] *not* challenge the accuracy of the historical statement,… or that th[e] growth [in market share] was, at the time, a legitimate and reasonable basis for an optimistic outlook."  423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006).  In *In re Coty Inc. Securities Litigation*, the complaint was a "grab bag of suspicion and speculation," that "[did] *not* assert that … the net revenues and operating income … were false."  2016 WL 1271065, at *12, *6 (S.D.N.Y. 2016).

b.      **Teva's Financial Reporting Violated GAAP**

While Defendants cite to the Complaint's paragraphs containing Teva's reported false financial statements in a footnote, 34 Act Br. at 16, n.18, nowhere in their 96 pages of briefing do they address any of the substance of the allegations that they violated GAAP.  They do not contest their erroneous recognition of revenue, or dispute the application of SAB 104.  Nor do

32

they dispute that Teva's historical revenue recognition, as alleged, was an accounting violation that amounted to at least $1 billion over the Class Period.  *See* ¶501.

"Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate…." 17 C.F.R. § 210.4-01(a)(1).  Teva throughout the Class Period, each quarter, recognized the following revenue from illegal conduct, in violation of GAAP, making its financial statements misleading.  ¶¶249-50, 496-501.

| $MM | Q1 | Q2 | Q3 | Q4 | Annual |
|------|---------|---------|---------|---------|---------|
| 2013 | – | – | $46.4 | $79.3 | $125.8 |
| 2014 | $57.8 | $76.7 | $110.0 | $127.6 | $372.0 |
| 2015 | $107.7 | $102.9 | $93.1 | $69.0 | $372.6 |
| 2016 | $49.4 | $46.2 | $41.0 | $34.6 | $171.3 |
| 2017 | $30.8 | $26.8 | – | – | – |

The 10(b) Defendants breached two requirements of SAB 104 (a provision of GAAP) as a result of their anticompetitive conduct and collusion.  First, SAB 104 requires "persuasive evidence of an arrangement" before revenue can be recognized.  ¶489.  The "use of the term 'arrangement' … is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction."  ¶498.  The 10(b) Defendants collusion with peers constituted illegal side agreements, apart from the agreements with Teva's customers; thus, the accounting never "represent[ed] faithfully the transaction," and the entirety of the related revenue should never have been recognized.  ¶¶498-500 (quoting SAB 104).

Second, SAB 104 prohibited the recognition of the illicit profits because the collusion prevented the determination of "fixed or determinable prices" between Teva and its customers.  ¶¶489, 491-95.  Under SAB 104, where a "vendor is unable to reasonably estimate future price changes *in light of competitive conditions*, or if *significant uncertainty exists* about the vendor's ability to *maintain its price*, the arrangement fee is not fixed or determinable."  ¶493.

Teva's stated revenue recognition policy was purportedly in accord with SAB 104. Teva claimed that SAB 104 required that it report revenue from generic sales net of any price adjustments to customers due to uncertainty. ¶¶489-91. Among the most common price adjustments Teva could owe customers was the shelf stock adjustment–a contractual term that obligated Teva to credit wholesalers if a drug's price declined after the wholesaler purchased the drug, but before the wholesaler sold to a third party. ¶492. Thus, under its own policy and GAAP, Teva was supposed to reserve a portion of its revenues from generics sales that could be subject to these uncertain shelf stock adjustments. ¶493. The size of this reserve was supposed to be contingent on the expected decline in price after sales to wholesalers. *Id.*

The risks associated with the collusion rendered future generic drug price changes not reasonably estimable, *e.g.*, if any of the competitors broke ranks (including if regulators intervened) then prices would collapse. ¶494. As a result, Teva could not reasonably estimate what shelf stock adjustments would be required. Thus, SAB 104 precluded the recognition of any related revenues, and all those revenues should have been reserved. Teva did not do so. The risk inherent in ignoring GAAP and booking the revenue from generics materialized; as investigative pressure increased on Teva's peers in late 2015 into 2016; prices began to plummet. On August 3, 2017, Teva was forced to take a $6.1 billion charge, which included a true-up of the shelf stock reserve.[10]

Defendants argue that because "there is no allegation that Teva restated its financial

---

[10] *See* ¶495 ("We saw some impact of that due to price adjustment in the latter part of the quarter as well as some shelf stock adjustments that we had to do. It has negatively impacted our prices.") (Aug. 3, 2017 Bhattacharjee); (Aug. 3, 2017 Form 6-K: "Teva expects revenue and operating profits to continue to decline in the next two years, as … price and volume erosion for its existing portfolio prior to 2020" will exceed profits from new launches.).

results…or that the stated revenues or growth did not occur" the statements are not actionable. 34 Act Br. at 16-17. Counter to Defendants' assertion, the absence of a restatement does not preclude a finding of falsity that is grounded in GAAP violations.[11] Although the revenue existed, Defendants do not address the Complaint's actual allegations; that booking the revenue violated GAAP, ¶¶488-501, because the proceeds were illicit and part of a vast conspiracy of "unimaginable" size. ¶¶9, 78, 123. Indeed, because of the detailed GAAP allegations here, Defendants' reliance on *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016), is inapt. In that case, Plaintiffs did not allege GAAP violations, and there was "no allegation that *Sanofi* failed to accurately report any of its financial figures."[12]

Finally, at least one District Court in this Circuit has found that accurate financial reporting may be an actionable misstatement if some of the revenue derived from illegal activity. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

### 3.    The False And Misleading Statements Are Material

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "Materiality is a mixed question of law and fact." *Id.* at 162. The Second Circuit has repeatedly "held that, when presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed … on the ground … [of] material[ity] unless they are so obviously unimportant to a

---

[11] *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 889 (D. Minn. 2011).

[12] The complaint in *Sanofi* was dismissed because it was based on implausible allegations from two whistleblower suits, brought by a former paralegal and a former contracts procurement coordinator, that alleged a scheme involving Sanofi funneling "tens, if not hundreds, of millions of dollars in disguised payments to consultants Accenture and Deloitte, which ... served as middlemen … to induce pharmaceutical retailers and hospitals to favor Sanofi's diabetes drugs over competing drugs." *Id.* at 392.

reasonable investor that reasonable minds could not differ on the question of their importance."

*Id.*; *see also SAIC*, 818 F.3d at 96.  "[T]he question of materiality ... is an objective one,

involving the significance of an omitted or misrepresented fact to a reasonable investor."  *Amgen*

*Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013).  The Complaint must only

"suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the

materiality requirement…."  *Matrixx*, 563 U.S. at 46.

Here, the alleged false statements are material by any measure.

- Price increases generated at least $1 billion in additional profits: The 10(b) Defendants touted the $1 billion in profits from Teva's generics segment from 2014 and 2015 as marking a revolutionary turnaround.  ¶250.[13]

- Teva's U.S. generics business was a key focus of analysts and investors: Throughout the Class Period, analysts and investors were highly focused on Teva's participation in generic drug price increases, which the 10(b) Defendants consistently denied.[14]  By 2016, analysts probed whether Teva's declining profits were resulting from widely reported pricing pressure.  They were again met with denials.[15]

- Anticompetitive conduct exposed Teva to significant legal actions and business disruption: The illegal nature of the 10(b) Defendants' conduct subjected them to a host of disruptive events, which have now come to pass.  Teva was accused of antitrust conspiracy by the State AGs, it is directly implicated in the DOJ criminal investigation, its senior management has been terminated, and for many months it went without a permanent CEO

---

[13] *See, e.g.*, ¶324 ("**$1 billion** improvement in 14 months, 16 months") (June 11, 2015 Olafsson); ¶¶362, 632 ("2015 was a very good year for Teva Generics. … we delivered … **$1 billion improvement** in operating profit over 24 months period.") (Feb. 11, 2016 Olafsson); ¶591 ("***First the generics business. This is nothing short of a revolution***.  In 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015.  Our operating margin was 16.7%. It is 27%, this is full 10 percentage points improvement.") (May 13, 2015 Desheh).

[14] *See, e.g.*, ¶562 (Oct. 30, 2014: UBS asked about price increases in "some of Teva's base business," Vigodman replied: "there's never been a price increase on the base business as a whole… the base business itself has been eroding."); ¶564-66 (Dec. 11, 2014: Morgan Stanley asked about "extraordinary price increases," Olafsson replied "I have to disagree that [wholesalers] have experienced tremendous price increase… [O]verall, the pricing in the U.S. of generics has been flat to slightly down" and Vigodman added "we see an erosion – still a net erosion in generic prices… And that's a message that shall be spelled out in a very clear way."); ¶618 (Nov. 19, 2015: Jefferies asked for a "20,000 foot view on pricing," Desheh responded "we're playing a competitive game.").

[15] *See, e.g.*, ¶¶634, 724, 698.

36

or CFO.  Analysts estimated that fines could reach $700 *million*.  ¶416.  This lawsuit is among many charging the 10(b) Defendants of wrongdoing.  *See, e.g.* ¶¶101-110.

Defendants scatter a number of arguments against materiality throughout their briefs.  For instance, they contend that "Plaintiffs do not make any allegations that the alleged illegal conduct was a 'material source of Teva's success.'"  34 Act Br. at 34.  This assertion ignores the plain allegations of the Complaint.  *See* ¶¶145-51, 157-64, 171-77, 182-89, 198-204, 210-16, 223-29, 236-40 (alleging a "material revenue impact" from "collusion" relating to eight specific drugs); ¶¶537, 579, 638, 712, 726 (alleging specific minimum amounts by which "Teva's financial results were materially inflated" for the years 2013 through 2017).

The 10(b) Defendants argue that the "alleged antitrust violations implicat[e] a very small percentage of the generic drugs marketed by Teva during the class period."  34 Act Br. at 32; *see also id.* at 29.  Remarkably, Defendants contend that materiality is lacking because "***only*** 48% to 55% of Teva's revenues came from its generic business."  34 Act Br. at 7-8.  In addition to ignoring the Complaint's allegations, these contentions ignore the law.  The Second Circuit has "consistently rejected a formulaic approach" toward assessing materiality.  *See Litwin v. Blackstone Grp.*, 634 F.3d 706, 717 (2d Cir. 2011).  Instead, "a court must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner."  *Id*.  In *Ganino*, the seminal case on qualitative assessment of materiality, the Second Circuit found materiality adequately pled as to false statements implicating 1.7% of revenue.  228 F.3d at 162.  Similarly, in *SAIC*, the Second Circuit sustained the materiality of false statements about misconduct regarding a contract even though "it was a single contract out of [] more than 10,000 ongoing contracts and … was worth a

fraction of [] yearly revenues ($635 million compared to $10 billion)."  818 F.3d at 95.[16]  Here,

the 10(b) Defendants acknowledge that the generics business generated roughly **half** of Teva's

revenues.  Indeed, that Teva was reliant on only eight drugs, out of hundreds, to drive $1 billion

of earnings is material in and of itself and would alter the "total mix" of information.  *See TSC*

*Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Moreover, as *SAIC* recognized, "possible exposure to significant civil and even criminal

liability arising from the submission of fraudulent" activity is also indicative of the materiality of

alleged false statements, as such liability would risk the "loss of revenue from future contracts …

and its ability to sell similar services … around the United States."  818 F.3d at 96.

### 4.    The 10(b) Defendants Had An Affirmative Duty To Disclose Material Trends And Uncertainties

The 10(b) Defendants violated their statutory duty to disclose material known trends and

uncertainties under Item 5 of Form 20-F, which is interpreted by the SEC and courts to require

the same disclosures as Item 303 of SEC Regulation S-K.[17]  Explicitly, the 10(b) Defendants

were to "[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations."  *SAIC*, 818 F.3d at 94 (quoting 17 C.F.R. §229.303).

"Even if Defendants were not certain about the likely effect of the [event or trend] on

---

[16] *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15-16 (2d Cir. 2011) (finding materiality adequately pled where fraud "resulted in an eventual $30 million writeoff of inventory … and an additional $60 to $80 million in restructuring charges, [that] were minuscule in comparison to Celestica's global assets and annual revenues.").

[17] Defendants do not dispute that the Item 303 standard applied to their disclosure obligations. 34 Act Br. at 28 n.32.  This duty attached to Teva's annual reports on Forms 20-F issued during the Class Period, ¶529 (2013); ¶574 (2014); ¶627 (2015); and ¶706 (2016), as well as Teva's Offering Materials, which incorporated by reference some of those same Forms 20-F.  ¶¶729-30 (ADS/Preferred Offering Materials); ¶734 (Notes Offering Materials).

38

their future revenues, Defendants were still required under Item 303 to disclose the manner in

which that then-known trend, event, or uncertainty *might reasonably be expected* to materially

impact [Teva's] future revenues." *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644

(S.D.N.Y. 2017). This "affirmative duty to disclose … can serve as the basis for a securities

fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir.

2015).[18] And "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a

question that should not be resolved at the motion to dismiss stage." *In re CPI Card Grp. Inc.*

*Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. 2017).

 Without mention of these established Second Circuit precedents, Defendants argue,

incorrectly, that to be liable under Item 303 the issuer must "'know' that the event is going to

unfold in a way that affects the issuer's bottom line" and that the event "must be 'known' with

certainty." 34 Act Br. at 29. This proposition directly contradicts the plain language of Item 303

and Second Circuit law, which apply an objective "reasonabl[e] expect[ation]" standard.[19]

 As alleged, the 10(b) Defendants were obligated to disclose: (1) the source of the inflated

revenues, and (2) that the degradation in its generic drug business was in substantial part caused

by Teva's inability to maintain collusive prices, and the manner in which these trends and

uncertainties might reasonably be expected to materially impact Teva's future revenues. ¶521.

---

[18] "[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is [also] actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." *Stratte-McClure*, 776 F.3d at 101.

[19] The cases the 10(b) Defendants cite do not actually support their proposition, as they cite the "reasonably expects" standard, and they are factually inapposite. *See Lopez v. Ctpartners Exec. Search*, 173 F. Supp. 3d 12, 33, 36-37 (S.D.N.Y. 2016) (no Item 303 duty to disclose "hostile work environment" or "coarse and unsavory work environment"); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (complaint "contain[ed] no allegation that the [allegedly known uncertainty] was ever presently known to [] management.").

Instead, Teva's Item 5 disclosures set forth only a list of wholly unrelated trends.[20]

The 10(b) Defendants additionally make, without analysis, two categorical arguments that (i) the trends and uncertainties were not known to them; and (ii) the conduct at issue was not material because it related to "at most" nine drugs.  34 Act Br. at 28-29.  Both arguments fail. As demonstrated in Figure 1, and as discussed in III.C, the pricing and revenue trends were known to the 10(b) Defendants.  As discussed in Section III.A.3, the trends resulting from the illicit revenues and eventual degradation in generic drug pricing were material.[21]  *See Litwin*, 634 F.3d 717 n.10 (applying *Ganino* to Item 303 disclosure claims).

## 5.  The PSLRA's Safe Harbor Does Not Apply

Plaintiffs do not allege any false statements that are protected by the PSLRA's safe harbor.  Under this statutory provision, a defendant will not be liable for a forward-looking statement if "(1) the statement is 'identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' (2) the statement is immaterial, or (3) if 'the plaintiff fails to prove that the forward-looking statement ... was ... made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading.'"  *City of Providence v. Aeropostale, Inc*., 2013 WL 1197755, at *9 (S.D.N.Y. 2013) (quoting 15 U.S.C. § 78u-5(c) (PSLRA safe harbor)).  But the safe harbor "do[es] not apply to [] omissions" of "historical and existing material facts."  *In re Oxford Health Plans*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999).  Nor does it "protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the

---

[20] *See*, 2015 20-F at 83; Defs Ex. D.

[21] Pleading knowledge of a material trend or uncertainty is not subject to the heightened standard for scienter under the PSLRA.  *See Stratte-McClure*, 776 F.3d at 106 .

time they are made, simply because the statements are couched as predictions of future events."

*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011).

Accordingly, the safe harbor does not apply here because Plaintiffs allege that the

projections were misleading because they "imply that the[y] … accurately reflect … problems

that Defendants were aware of at the time the statements were made, demonstrating that the

statements are not solely forward-looking, but instead incorporate a present fact whose accuracy

could be determined at the time." *Aeropostale*, 2013 WL 1197755, at *13; *see also Patriot*

*Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 358 (D. Conn. 2013) (allegedly false

"projected rates of return, cash flows and net present value" were actionable because they "were

based on historical performance data that failed to take into account plant shrink").

### a.      The Three Sentences Defendants Challenge Are Statements Of Then-Present Fact

The 10(b) Defendants argue that three specific sentences that are alleged to be false and

misleading are, in fact, forward looking and protected by the safe harbor.  34 Act Br. at 18.

Defendants take these three statements out of context.  Those sentences are actually parts of

lengthy statements alleged to be false for misstating then-present facts.  Thus, the PSLRA's safe

harbor is inapplicable.  *See Vivendi*, 838 F.3d at 246 (declining to apply safe harbor to statements

identified as forward-looking because they "contain present representations, and … these non-

forward-looking elements of those statements that Plaintiffs alleged were false or misleading.").

Reading of each of the complete alleged false statements reveals as much.  For example,

Defendants point to one sentence in ¶694, yet fail to acknowledge the seven other sentences in

that paragraph that speak to present facts.  ¶694 ("This quarter *was* one of monumental change.

On August 2, we *completed* the strategic acquisition of Actavis generics.  The result *is* a much

stronger, more competitive Teva that *is* best positioned.…  This quarter, the price erosion on our

41

US-based business **was** approximately 7% versus a year ago.  **Compared** to third quarter 2015…,

Teva standalone global generics business **is** down approximately $30 million in revenue… **that's**

a really good result, and **shows** the strength of our underlying business.").  The other two

sentences Defendants cherry pick are similar.  *See* ¶¶534, 539.  These statements are indisputably

related to present fact.  *Patriot Expl.*, 951 F. Supp. 2d at 357.

> **b.**   **The Forecasts Alleged As Misleading**
> **Are Not Subject To The Safe Harbor**

The 10(b) Defendants also argue, without reference to the Complaint, that "Teva's prior

financial projections and other forward-looking statements regarding its expected future

prospects … are immune from liability under the PSLRA's safe harbor."  34 Act Br. at 20.

Plaintiffs allege that two sets of Teva's forecasts were false and misleading, those made on July

13, 2016, ¶¶676-78, and February 13, 2017, ¶¶459-60.  However, both "are not entitled to the

protection of the PSLRA's safe harbor … because plaintiffs are not challenging the accuracy of

the forward-looking aspects of the statement."  *Vivendi*, 765 F. Supp. 2d at 568-69.  As in

*Vivendi*, here, Plaintiffs "never argued" that the projections were misleading "because the

company failed to achieve its target."  As the court reasoned, *see id.* at 569-70, like here:

> Under plaintiffs' theory of the case, whether [defendant] actually achieved its []
> target or not is **irrelevant**. According to plaintiffs, it is the announcement of the
> target itself that is misleading as *a matter of present fact* in that [defendant]
> **failed to disclose** that [an impropriety was] built into the projection …. That is,
> plaintiffs alleged that [defendant] **failed to disclose as a matter of present fact**
> that the company was not actually envisioning achieving anything close to [its
> goal] as a result of improved operations. Rather, the growth rate … was the result
> of [undisclosed improprieties]. ***In this sense, the misleading nature of the
> statement could be verified the moment it was made, and did not depend on
> any future events.***

Here, on the July 13, 2016 investor conference call,[22] in response to an analyst's question seeking "comment on the generics pricing assumptions that [] have [been] baked into [the] forecast," Olafsson provided a detailed factual response:

> ***Our assumption and what we assume is*** basically approximately 5% organic growth that we see year on year…. ***we are seeing approximately 5% growth year on year***. In terms of generic pricing in the second quarter, we ***saw no change in the pricing***. ***We saw a stable environment, as we talked about, from first quarter into second quarter***. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. ***The pricing has remained stable***.  ¶676; *see also* ¶677.

As Olafsson expressly stated, the forecast was predicated on the then-presently false basis that there had been "no change in the pricing … a stable environment … from first quarter into second quarter."  As alleged, pricing pressure increased dramatically in the first and second quarter and, as a result, the illicit profits plummeted by 54% and 55%, respectively, as compared to the prior year.  ¶¶247-48.

The same holds for the February 13, 2017 forecast.  Peterburg told investors "[w]e are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30," and would "do what it takes to protect it, including additional cost reduction if necessary."  ¶460.  On the call, Teva's new head of generics, Bhattacharjee, explained that the assumptions underlying generic segment growth included the false assumption that in the "US we expect net price erosion in our base business to be around 5%."  ¶711.  Reflecting on these statements, a J.P. Morgan analyst specifically noted that the 10(b) Defendants "expect[ed] base business erosion to be around 5%."  ¶459.  By this point, pricing pressure had caused even further decline of illicit

---

[22] The July 13, 2016 earnings projections were made during the same investor conference call when the 10(b) Defendants surprised investors by announcing the launch of the Notes Offering, ¶¶376-77, while concealing that Teva had been served with the Connecticut AG's subpoena the day before and the DOJ grand jury subpoena a few weeks earlier on June 21, 2016.  ¶388.

profits, which had collapsed 55% and 50% in Q3 2016 and Q4 2016, respectively.  ¶¶247-48.

**c.    The Cautionary Language Was
Not Meaningful And Defendants
Knew The Forecasts Were Misleading**

Even if some aspects of the forecasts were deemed forward looking, the PSLRA safe

harbor does not apply because the cautionary language to which the 10(b) Defendants refer, 34

Act Br. at 19, was inadequate.  "[D]efendants ... carry the burden of demonstrating that they are

protected by the meaningful cautionary language prong of the safe harbor."  *Patriot Expl.*, 951

F. Supp. 2d at 358.  For the safe harbor to apply, cautionary language "must be prominent and

specific, and must directly address exactly the risk that plaintiffs claim was not disclosed."  *MF*

*Glob.*, 982 F. Supp. 2d at 304.  "[D]efendants must demonstrate that their cautionary language

was not boilerplate and conveyed substantive information."  *Vivendi*, 838 F. 3d at 246.

Defendants have failed to meet their burden.  The events about which they should have

cautioned had already occurred; namely, that pricing pressure was already causing Teva to lose

substantial profits.  *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y.

2003) (cautionary language about "intense competition … [and] the highly volatile nature of the

technology sector" was not sufficient where the company "had been informed by major

customers … that their orders would be significantly reduced.").

The first four statements that Defendants identify as purportedly cautionary, 34 Act Br. at

19, do not "provide company-specific information or link specific risks to specific factors that

could cause results to differ materially from those projected in the forward-looking statements so

as to make the cautionary statements more than boilerplate warnings."  *Patriot Expl.*, 951

F. Supp. 2d at 358.  The "considerations mentioned in th[ese] disclaimer[s] … do not bear even

tangentially on" the concealed misconduct or the pricing pressure that Teva was under.  *Vivendi*,

838 F.3d at 247.  Statements such as "typically decline as a result of competition," "decreas[ing]

44

opportunities," and "continuing consolidation" (34 Act Br. at 19) are paradigmatic "garden-variety business concerns that could affect ***any*** company's financial well-being, [and] was not meaningful cautionary language." *Vivendi*, 838 F.3d at 247 (emphasis in original).  References to intense competition in Teva's ***specialty*** pharmaceuticals business is wholly irrelevant to the state of affairs in its U.S. generics business.  *See Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 2017 WL 3261609, at *13 (S.D.N.Y. 2017) ("risk factors plainly did not warn investors about the relevant risk that led to the restatement: misconduct.").

Additionally, the cautionary language that "[g]overnmental investigations into sales and marketing practices, particularly for our ***specialty*** pharmaceutical products, may result in substantial penalties" does not relate at all to the U.S. Generics segment.  It pertains to branded, on-patent drugs.  Teva's Forms 20-F (*see, e.g.*, Teva Ex. D at 14.).  Insofar as it concerns the risk of investigations generally, it is far too vague to provide an investor any insight into Teva.

As to actual knowledge, the 10(b) Defendants knew, contemporaneously, that the forecasts were false and misleading.  *See Vivendi*, 838 F.3d at 247.  As the Complaint alleges, the July 2016 guidance was issued in conjunction with the decision to accelerate the $20 billion debt issuance in light of Teva's recent receipt of the subpoenas from the DOJ and State AGs.  ¶¶376-77.  At that time, Defendants were aware the Company was earning approximately 50% less in illicit revenue from the collusive price increases.  ¶248; *see generally* Section III.C.  Even more so, by February 13, 2017, the 10(b) Defendants were aware that the factual basis of their forecasts had been vitiated.  *See id.*

### 6.    The Statements That Defendants Cite Are Not Inactionable Puffery

Defendants challenge nine of the alleged false and misleading statements as inactionable "puffery."  34 Act Br. at 21-23.  These statements are not puffery as they are "misrepresentations

45

of existing facts" made even though the speaker "knew that the contrary was true." *MF Glob.*,

982 F. Supp. 2d at 305.  Defendants cherry pick portions of statements, effectively deleting fact-

based content to try to create puffery where none exists.  *comScore*, 2017 WL 3261609, at *13.

Below is an example of a full paragraph of an alleged false statement that Defendants attempt to

pull out of context, with the portions Defendants cherry-picked <u>underscored</u> (34 Act Br. at 22):

> <u>The generic side of the house is doing very well.</u> It has probably the best leader
> in the generic industry today under Siggi [Olafsson]. Very strong management
> team both in Israel and Europe and in emerging markets. Production system or
> production network that is becoming more and more efficient all the time with
> a great program to reduce costs and reduce expenses. And you've seen the result.
> And the numbers don't lie. Where we are very successful in launching new
> product, in getting approval. We had our fair share, better than others over the
> past number of quarter.… <u>The machine is working at a very, very high gear and
> high speed and is working very well</u>. ¶592

Defendants failed to include Desheh's fraudulent misstatements that it was supposed cost

reductions and efficiency, and not price hikes, that led to the positive results.  ¶592.  There is "a

substantial likelihood that these statements, made to reassure investors, would be important to a

reasonable person in considering whether to buy or sell shares of [Teva's] securities."  *In re

Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463-64 (S.D.N.Y. 2017). *Vivendi*, 838 F.3d at 245

As a reading of the full context of the other eight statements Defendants challenge

reveals, they each follow this same pattern of cherry picking parts of a larger statement to

manufacture a puffery argument.  This tactic fails.  The cases Defendants reference in their brief

in support involve very different facts and circumstances that bear little resemblance to the

allegations and statements at issue.  It is telling that Defendants make no effort to describe how

those cases have any relation to the statements at issue.

### 7.    Teva Had A Duty To Disclose The Subpoenas

Defendants failed to disclose the DOJ subpoena and the State AGs' subpoena on two

occasions: first, during an investor call held on July 13, 2016, ***one day after*** Teva received the

Connecticut AG subpoena; and, second, in the Notes Offering Materials.  As alleged, the 10(b) Defendants had a duty to disclose the subpoenas in those statements.

On the July 13 call, Vigodman fraudulently asserted that Teva was accelerating the timing of the Notes Offering from September 2016 to launch it immediately, due to unspecified "various attractive terms currently prevailing" in "the corporate bond markets."  ¶674.  On the same call, the 10(b) Defendants, and Olafsson in particular, reiterated the sustainability of pricing.  ¶¶676-77.  In reality, revelation of the subpoenas, implicating the extent of Teva's role in the investigations, could have derailed the Notes Offering altogether.  Thus, with the looming August 4, 2016 deadline to file the Q2 2016 financial statements–which would be required to, and did, disclose the subpoenas–the 10(b) Defendants accelerated the Notes Offering.  ¶¶780-81.

The Notes Offering Materials are incorporated by reference Teva's 2015 and 2016 20-F, and the Q1 2016 6-K.  These SEC filings contained required litigation and risk disclosures.  They (i) disclosed a number of formal investigative demands and other government investigations, and (ii) included (or incorporated by reference) a risk disclosure warning of "governmental investigations" relating to "sales and marketing practices, particularly for our *specialty pharmaceutical* practices."[23]  34 Act Ex. D (2015 20-F) at 14; *Id.* at Ex. E (2016 20-F) at 17. Having chosen to disclose these similar investigations and formal investigative trends, the 10(b) Defendants had a duty to disclose the newly served subpoenas.  "[A] reasonable investor could have read [the Notes Offering Materials] to mean that [Teva] was not already in receipt of" subpoenas from the State AG and DOJ and thus they were actionable half-truths.  *See In re BioScrip, Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015)); *In re China Valves Tech.*, 979 F. Supp. 2d 395, 409 (S.D.N.Y. 2013) (duty to disclose investigation calling into question "future

---

[23] Beginning July 12, 2016, Teva filed the Notes Offering Materials.  ¶¶731-34.

earnings potential [] because earlier earnings may have resulted from corruption.").

Defendants' argument that "there is no general duty to disclose the governmental investigation," 34 Act Br. at 27, misses the mark. It was not the existence of the investigation, but that Teva was now involved that required disclosure. Further, Defendants' reliance on *In re Lions Gate Entertainment Corp. Sec. Litig.*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016), 34 Act Br. at 27-28, is misplaced. There, defendants disclosed they were the subject of an investigation, but did not disclose they had received a Wells Notice that the company reasonably considered immaterial. *Lions Gate*, 165 F. Supp. 3d at 16. The court reasoned that *Lions Gate* "is not a case where the [investigation, which led to a $7.5 million] penalty imperiled an important line of business or a significant revenue stream." *Id.* at 14. Here, Defendants concealed everything relating to Teva becoming the subject of extensive DOJ and State AG investigations concerning generics pricing, the driver of Teva's profits during the Class Period. ¶416.

### 8.    The SOX Certifications Are False And Misleading

The SOX certifications executed by Vigodman, Desheh, Altman, and Peterburg represented that Teva's financial statements were not misstated and complied with GAAP, and that its internal controls over financial reporting and disclosures were effective. ¶¶736-43. Defendants' objection to the allegations that the certifications were false is again that the allegations are conclusory and not sufficiently particularized. 34 Act Br. at 23-25. For the reasons set forth herein, the Complaint alleges material falsity, as well as scienter, as to misstatements in Teva's financial statements concerning (i) Teva's financial condition, (ii) its compliance with GAAP, (iii) its pricing and competitiveness; (iv) the sources of revenues, (iv) and known material trends and uncertainties. It also alleges dozens of actionable misstatements spoken to investors over the course of the Class Period. *See* ¶¶522-735.

Had Teva's internal controls been effective, neither the underlying unlawful collusive

conduct, nor the misstatements, could have occurred.  ¶¶736-44.  This suffices for pleading

falsity of the SOX certifications.  *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759,

782 (E.D. Va. 2015) (finding SOX certifications false because "[a]ccepting Plaintiffs' allegation

… then Defendants' internal controls could not have been effective").[24]

### B.    The Complaint Adequately Alleges Securities Law Claims Regardless Of Whether Teva Actually Violated Antitrust Law

Regardless of whether Teva ultimately is found guilty of, or liable for, ***antitrust*** law

violations, Plaintiffs adequately state ***securities*** law claims on behalf of investors arising from

the artificial inflation in Teva's securities due to misstatements and omissions.  Those

misstatements concealed from ***investors*** the true condition of Teva's financial condition, and

risks due to, among other things, price erosion and potential (whether or not actual) scrutiny and

liability.  Accordingly, Teva's technical violations of antitrust laws, or the failure of regulators or

private plaintiffs to prove those violations, is not at issue in the instant case.

The harm alleged here does not arise from the undisclosed risk that antitrust liability

***necessarily*** will materialize, but rather the undisclosed risk that it ***may***.  Thus, Plaintiffs need not

plead (or prove) an antitrust law violation.  This is consistent with the Second Circuit's decision

in *Vivendi*, where plaintiffs alleging securities claims arising from the undisclosed risks of a

liquidity crisis were not required to prove an actual liquidity crisis.  *Vivendi*, 838 F.3d at 261-62;

*see also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 240 (D. Conn. 2015) (plaintiffs

alleging antitrust claim arising from unjustified reverse-payment to patent holder not required to

---

[24] The 10(b) Defendants also argue that the allegations fail "because there has been no restatement of the financial results at issue."  34 Act Br. at 23-24.  In addition to the fact that the three cases they cite do not stand for this proposition; each was decided years, if not decades, before the Sarbanes Oxley Act of 2002 was enacted.

plead invalidity of the patent, but merely that payment sought to reduce risk of invalidity).[25]

Nevertheless, the Complaint sufficiently alleges antitrust violations, as set forth below.

### 1. Teva Conspired To Fix The Prices Of Glyburide And Eight Additional Generic Drugs

To state a claim under the Sherman Act, a plaintiff must "plausibly" allege "enough factual matter (taken as true) to suggest that an agreement was made." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012). This standard "***does not impose a probability requirement*** … it simply calls for enough fact to raise ***a reasonable expectation*** that ***discovery*** will reveal evidence of illegal agreement." *Id.* at 184 (emphasis in original). Thus, "at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Id.*[26]

Even assuming for argument that Plaintiffs must plead an antitrust law violation, they have discharged such burden by plausibly alleging a horizontal price fixing agreement involving Teva. The Complaint alleges specific instances in which Teva agreed to fix the prices of, and allocate the markets for, Glyburide and other drugs with Heritage and other competitors. ¶¶104-23. The Complaint also is replete with allegations of parallel action "in a context that raises a suggestion of a preceding agreement" to drastically increase the prices of eight additional drugs, from which Teva derived more than $1 billion in illicit profits during the Class Period. ¶¶127-250. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322-23 (2d Cir. 2010). Indeed, antitrust claims ***against*** *Teva* and its co-conspirators, arising from this conduct, have been

---

[25] The Court may find the lengthy hypothetical set forth in *Vivendi*, 838 F.3d at 262, instructive.

[26] Defendants argue the allegations relating to collusion must be pled with particularity. 34 Act Br. 37. While Rule 8 applies, as alleged and argued herein, the pleadings are more than sufficiently particularized to meet Rule 9.

*sustained* in regard to Propranolol.  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712,

715-16, 731 (S.D.N.Y. 2017) (denying motion to dismiss Sherman Act claim against Teva,

Actavis, Heritage, Mylan, Endo, Par, and others).[27]

> ### 2.  The State AGs' Actions, Governmental Investigations, And Plea Agreements Support Plaintiffs' Allegations

Defendants do not even attempt to refute the substance of the factual allegations in the

Complaint, which the Court must accept as true and consider in conjunction with documents

incorporated therein (*e.g.*, State AGs' Complaint, Plea Agreements) and facts of which a court

may take judicial notice (*e.g.*, government investigations).  *See Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Based on evidence collected over years of investigation, including from documents, text

messages, emails, conversations, and cooperating witnesses, 44 State AGs charged that Teva and

its competitors engaged in a horizontal conspiracy to allocate markets and fix prices for

Glyburide, in violation of state and federal antitrust laws.  ¶¶9, 110-23.  The State AGs allege

wide-ranging anticompetitive conduct, including unfair methods of competition, taking steps to

conceal their anticompetitive schemes, and conspiring to raise, fix, maintain, and/or stabilize

prices.  ¶¶111-23.  In addition, former executives of Heritage pleaded guilty to making an illegal

agreement with Teva to "allocate the market share, rig bids, allocate customers and fix the prices

of Glyburide" and at least one other drug.  ¶107.

As Judge Rakoff recognized in *Propranolol*, "[t]he presence of an ongoing investigation

into the same subject matter as alleged in the pleadings here raises an inference of conspiracy."

---

[27] The cases cited by Defendants are distinguishable, and any pleading defects identified therein are not present here.  *See, e.g.*, *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, *14-16 (S.D.N.Y. 2006) (defendants specifically disclosed risks attendant to Russian tax enforcement).

249 F. Supp. 3d at 723.  The Second Circuit regularly considers pending government investigations into anticompetitive conduct as context surrounding parallel action that plausibly suggests an illegal agreement.  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 766-67, 783 (2d Cir. 2016) (vacating dismissal of Sherman Act claim where "vast majority of allegations follow[ed] directly from evidence collected in government investigations").  *Starr*, 592 F.3d at 323-24 (same).

### 3.     Plaintiffs Make Additional Allegations Further Suggesting An Antitrust Violation

The Complaint also sets forth detailed factual allegations of suspicious parallel action taken by Teva and its purported competitors over the course of several years.  Specifically, that, after years of stable pricing in established drugs, they significantly increased their prices (some by more than 1,000%), in virtual lock-step, and sustained those prices at unreasonably high levels.  *E.g.* ¶¶157-59, 223-24.  And despite fundamental principles of competitive markets, no manufacturer sought to lower prices to seize market share.  ¶¶149, 162, 175, 186, 202, 214, 227, 238.  Tellingly, Defendants do not dispute that the allegations suggest parallel conduct (*see* 34 Act Br. 41), nor do they put forth any benign explanation for the coordinated price hikes or explain how such action was "unilateral."  *See* 34 Act Br. 41-42.  Even if it were plausible to infer that it was "rational and competitive," as Defendants baldly suggest, 34 Act Br. 41, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."  *Anderson*, 680 F.3d at 185.  Moreover, "[p]arallel conduct alone may support an inference of conspiracy" where, as here, "it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015).

Finally, it is well-established that an illegal agreement can be reasonably inferred from the circumstances surrounding parallel action and various "plus factors."  The following "plus factors" alleged in the Complaint – and found sufficient to state a Sherman Act claim against Teva with respect to Propranolol – raise a suggestion of a conspiracy involving Teva and its competitors.  *Propranolol*, 249 F. Supp. 3d at 718-19, 731; *see also Gelboim*, 823 F.3d at 781-82 (these types of allegations adequately state an antitrust claim); *Starr*, 592 F.3d at 323-24.

Common Motive – Plaintiffs allege in detail that the regulatory regime in which Teva operated was specifically designed to force manufacturers of "therapeutically equivalent" generic drugs to compete solely on price, so that, absent collusion or other aberrant circumstances, prices would fall to a stable minimum.  ¶¶38-44.  The Complaint sets forth charts showing that prices were low and stable prior to the alleged conspiracy, then abruptly increased by large amounts.  ¶¶146, 159, 172, 183, 199, 211, 224, 236.  The alleged facts support an inference that the natural price decline that took place in a competitive market caused the conspirators' profits to suffer, "giving them a common motive to conspire."  *Propranolol*, 249 F. Supp. 3d at 719-20; *see also Gelboim*, 823 F.3d at 781-82 (common motive includes desire to increase profits).[28]

Acts Against Apparent Self-Interest – Plaintiffs allege that the massive price increases cannot be explained by market forces, such as shortage of raw materials or unexpected increase in demand.  ¶¶150, 163, 176, 188, 203, 215, 228, 239.  Moreover, because Teva does not publicly disclose its drug prices, ¶241, there was "no clear mechanism through which the [conspirators] could legitimately and consistently monitor each other's pricing activity."  *See*

---

[28] Allegations that an industry is susceptible to collusion, as set forth in the Complaint, ¶¶46-53, are probative of motive.  *See Propranolol*, 249 F. Supp. 3d at 716; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009) ("The [relevant] market has many characteristics that would make illegal collusion feasible").

*Propranolol*, 249 F. Supp. 3d at 720.  Plaintiffs further allege that more than 300 of the 1,441 generic drugs analyzed by the GAO, or 21%, experienced price increases of at least 100% that were sustained for at least one year.  ¶89.  In addition, Teva had rights to manufacture at least 40% of those drugs. ¶95.  Yet, rather than attempt to seize market share through lower pricing, Teva exited some markets completely.  *See, e.g.*, ¶¶181-187 (Ketoconazole).

It is generally expected that inflated prices cannot be maintained in the generics markets because competitors will undercut each other on price to seize additional market share.  ¶¶38, 41-42.  Thus, failure to compete on price would be against each generic manufacturer's economic self-interest, in the absence of reciprocal behavior by its competitors – *i.e.*, collusion. *Propranolol*, 249 F. Supp. 3d at 720 ("A rational competitor [in a generics market] therefore should have kept its prices stable and vastly increased its market share."); *see also Starr*, 592 F.3d at 327 (allegations of competitors imposing very high "unpopular" prices in tandem suggests an illegal agreement).

Interfirm Communications – Plaintiffs allege numerous contacts between Teva and its co-conspirators at industry conferences and face-to-face meetings, such as "girls' nights out" and industry dinners attended by high-level employees.  ¶¶127-133.  Charts in the Complaint show the suspicious timing of price hikes following particular trade meetings.  ¶¶146, 159, 172, 183, 199, 211, 224.  Such allegations increase the plausibility of an alleged illegal agreement. *Propranolol*, 249 F. Supp. 3d at 722-23; *Ethylene Propylene*, 681 F. Supp. 2d at 173.

Government Investigations and Claims – In addition to the State AGs' allegations against Teva, and the charges filed by DOJ, ¶¶107-09, nearly all of Teva's major competitors have

received subpoenas from the DOJ and State AGs.[29]  The DOJ has intervened in the multidistrict generic drug antitrust litigation because the alleged conspiracy overlaps with its criminal investigation.  ¶101.  Teva is implicated in a number of those cases, including for three of the drugs alleged as the subject of collusion in the Complaint: Baclofen, Pravastatin, and Fluocinonide.  *Id.*; *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16-md-2724 (E.D. Pa.).  There is substantial overlap between participants in the drug markets alleged in the Complaint to have been infected with collusion, and companies subject to the DOJ's investigation.[30]

The State AGs further allege that Teva and its co-conspirators deliberately destroyed evidence of the conspiracy to avoid detection, accelerating those acts when regulatory scrutiny became more intense.  ¶121.  *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) ("[C]onceal[ment] from the government the true nature of … communications [is] behavior from which a jury could infer that [competitors] were aware that their … actions regarding [product] pricing violated the law.").

The plausibility of illegal conduct reasonably can be inferred from these circumstances.  *See Propranolol*, 249 F. Supp. 3d at 718-24; *see also Starr*, 592 F.3d at 323-25.

### C.  The Complaint's Allegations Taken Together Support A Strong Inference Of Scienter

The Complaint's allegations more than meet the pleading requirements for scienter under the Second Circuit's long-standing precedents and the PSLRA, which are satisfied by allegations (i) showing "that defendants had both motive and opportunity to commit the fraud," or (ii)

---

[29] Seven generic drug manufacturers have received subpoenas from the AGs: Teva, Impax, Lannett, Par, Mylan, Mayne, and Dr. Reddy's.  Eleven have received grand jury subpoenas: Teva, Impax, Lannett, Par, Mylan, Mayne, Dr. Reddy's, Sun, Taro, Baxter, and Allergan.  ¶99.
[30] For example, Teva, Taro, and Actavis were the three companies that sold Fluocinonide.  ¶209.  Teva and Taro also sold Enalapril Maleate, Ketoconazole, and Carbamazepine.  ¶¶156, 181, 222.

55

constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Allegations of motive are relevant to the scienter analysis in two ways. First, establishing motive may independently satisfy a strong inference of scienter. *Emps. Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305-06 (2d Cir. 2015); *Novak*, 216 F.3d at 307, 311. The Second Circuit "teaches that plaintiff's burden on a motion to dismiss is to state motive that, after taking all reasonable inferences in the plaintiff's favor, has a sufficient reasonable possibility ... of developing proof that a motive in fact existed." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993). The analysis is "extremely contextual." *Id.* Second, allegations of motive may further support a strong inference of intent to deceive or recklessness. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000).

Plaintiffs typically allege conscious or reckless misbehavior by pleading that defendants had "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Recklessness constitutes "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care ... to the extent that the danger [of misleading investors] was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

On a motion to dismiss, a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. The Court is to consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. The inference of "scienter need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.* at 324. "While robust, this pleading standard does

56

not involve applying the more probing test used at … [later] stage[s] of litigation, as the court is unaided by discovery"  *Blanford*, 794 F.3d at 306.

Importantly, the assessment of scienter is "inherently comparative."  *Tellabs*, 551 U.S. at 323.  A "strong inference" is pled "if a reasonable person would deem the inference of scienter cogent and ***at least as compelling*** as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

### 1.    The Complaint's Allegations of Motive And Opportunity Raise A Strong Inference Of Scienter

The Complaint alleges the 10(b) Defendants possessed motive through their explicit intention to increase Teva's ADS price in order to consummate a "transformational deal," which materialized in the Actavis acquisition.  ¶¶325-85.  "[A]rtificial inflation of stock price ***in the acquisition context*** may be sufficient for securities fraud scienter."  *Rothman*, 220 F.3d at 93. Indeed, such a transaction-based motive may be the sole basis for adequately pleading scienter. *See Time Warner*, 9 F.3d at 270.  Numerous District Court cases have followed.[31]  The allegation here that Teva's securities were used "as currency for acquisitions … is a sufficiently concrete motive to support a strong inference of scienter."  *Complete Mgmt.*, 153 F. Supp. 2d at

---

[31] *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 2005 WL 735937, at *13 (S.D.N.Y. 2005) (scienter adequately pled on acquisition-based motive, noting that circumstantial evidence of misbehavior or recklessness, though present, was "not necessary"); *In re Interpublic Sec. Litig.*, 2003 WL 21250682, at *11-14 (S.D.N.Y. 2003) (adequately pled scienter on basis of acquisition-as-motive theory; rejecting all other theories of scienter); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (allegations "that defendants were motivated to commit fraud so they could acquire and continue acquiring companies" supported scienter); *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. 2002) (holding acquisition-based motive alone "sufficiently concrete to support a strong inference of scienter.").

328.

First, as alleged, the 10(b) Defendants were motivated by a "transformational"

transaction that would be impossible without inflating Teva's securities prices:

- By January 2014, Desheh announced his motivation that within the coming 12 to 24 months "the stock price will go up and we'll be able to *use our share as a currency*. It's a circle which is feeding itself to grow your *ability to fund transactions*." ¶328.

- When Teva announced Vigodman as the new CEO in January 2014, it was clear that he would "emphasize (potentially large) acquisitions." ¶326. Upon his arrival, Teva accelerated its price increases, generating hundreds of a millions of dollars in illicit profits. ¶¶269-76; Fig. 2.

- On a March 4, 2014, investor conference call, Desheh explained that with "the stock price under $40 … we can't use [securities as] currency," but that with "*changes over the past few months*" Teva was extracting "itself [from] … a corner that was difficult to come out of." ¶329. He concealed that the so-called "changes" were the anticompetitive measures.

- By the end of Q1 2015, Teva's ADS was trading at approximately $63, and the 10(b) Defendants made clear to analysts their "willingness" to perform a "*transformational* acquisition in the generics space," as well as the "urgency to diversify via M&A." ¶330.

- On April 21, 2015, the 10(b) Defendants first attempt a purchase of Mylan, the second largest generics manufacturer in the U.S. ¶331. On April 27, 2015, Mylan issued a harsh, public rejection, criticizing Teva as "low quality" stock. ¶332.

- Stinging from the rejection, on April 30, 2015, the Olafsson proclaimed that Q1 2015 was an "outstanding net quarter for generics…. All our returns showed a significant improvement over first quarter 2014…profit for the generics increased 59%,… revenues were up 9% to $2.6 billion, and our operating profit in first quarter was 30.5%,… a significant improvement" over Q1 2014 (21.9%) and Q1 2013 (16.7%). ¶321. On May 14, 2015, Desheh went so far as to proclaim the turnaround in Teva's generics business was "*nothing short of a revolution*." ¶¶322, 591.

- On a June 11, 2015 investor call, Vigodman emphasized the "*profound change in the generic business*" and an improvement of "*$1 billion … in 14 months, 16 months*," attributed to a "full transformation of our operational network." ¶¶323-24, 593.

- Shortly thereafter, on July 27, 2015, Teva announced the $40 billion acquisition of Actavis from Allergan. The very same day that Teva's ADS reached an all-time high of $72. ¶333.

Remarkably, in announcing the deal, Vigodman tied all of the purported success since

2014 as the "*precondition*" for consummating this transformational deal, explaining:

58

> Teva has developed during 2014 and the first half of 2015 a very strong
> standalone strategy, which basically is emanating from everything we have done
> in solidifying the foundation of the company…. And the standalone strategy of
> Teva was a ***precondition for a transformative acquisition*** like the one that we
> have been announcing here. It was a precondition … to put the company on a
> solid foot and as a precondition for such a transaction.

¶603.  Of course, he attributed this "strategy" to things other than the collusion.  *Id.*

Where, as here, "defendants sought to maintain the artificially high stock price so that

[defendant] might use that stock as currency for acquisitions," "a sufficiently concrete motive to

support a strong inference of scienter" has been pled.  *Complete Mgmt.*, 153 F. Supp. 2d at 328.

The 10(b) Defendants "were motivated to inflate company stock prices as a means to effectuate a

specific acquisition that ***would not otherwise be possible*** without fraudulently inflating stock

prices."  *Vivendi*, 381 F. Supp. 2d at 185.[32]

Indeed, as a practical matter, the Actavis acquisition would have been impossible without

the stock price inflation.  The $6.75 billion in ADS equities issued to Allergan was essentially set

at the inflated $72 ADS price.  ¶¶334-35.  Teva raised $33 billion raised in public offerings,

including $7 billion from the ADS and Preferred Offerings and $20 billion from the debt offering

in which Class members participated.  ¶¶333-36, 354-58, 382.  Absent the inflated securities,

Teva did not have the cash; the $40 billion price tag was roughly ***twenty years*** of Teva's net

income (relative to the average of 2013-2015). ¶¶526, 571, 624.  The $6.75 billion ADS portion

alone cost more than three years' of Teva's earnings.  *See Rothman*, 220 F.3d at 86, 93-94

(motive supported by $12.6 million deal that cost roughly three quarters of earnings).

After Teva announced the Actavis deal in July, the 10(b) Defendants were motivated to

continue the fraud to maintain the inflated ADS price through the ADS and Preferred Offerings

---

[32] S*ee also Omnicom*, 2005 WL 735937, at *13 (finding scienter where complaint "allege[d] that
[company] depended on its stock price to make acquisitions").

and the Notes Offerings.  To do so, they made increasingly fraudulent statements:

- "We're very … responsible in everything that portends to prices on the Generics side and on the Specialty side … *all the* improvements *you see in our – in margins is __not__ driven by price*.  It is driven by quantities and by mix and by efficiency measures. ***Not by price, 2014, 2015, and that's a very important message*.**"  ¶616 (Oct. 29, 2015 Vigodman).

- "I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States.… So it is a ***highly competitive environment*** … with a very fierce price competition.… So we're playing a competitive game. We're playing it fairly.  ***We of course play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have*.**"  ¶618 (Nov. 19, 2015 Desheh).

- "[*T*]*here's a lot of headlines of examples of big price increases in generics*.  But when you are a company of the size of Teva and you have the portfolio that we have today – … for the whole of the portfolio – *there is a decline*."  ¶639 (Jan. 11, 2016 Olafsson).

The ADS and Preferred Shares were issued on December 8, 2016 and January 6, 2017, raising $7.24 billion from class members.  ¶¶354-58.  At this time, market wide pricing pressure was driving Teva's illicit revenues down.  ¶¶359-60.  The 10(b) Defendants had to conceal this to consummate the $20 billion note issuance that was critical to the Actavis acquisition.

- "Throughout the ongoing debate this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors.  ***Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year*.**"  ¶652 (May 9, 2016 Olafsson).

- "[*T*]here's ***nothing*** I have seen which shows a worsening pricing ***environment***," and that the "talk[] about a lot of pricing pressure, [] shouldn't be.  There is ***nothing that has happened over the last two quarters which has changed fundamental[ly] the market***.  And I feel that we are blaming the environment on individual company's business model."  ¶660 (May 10, 2016 Olafsson).

Finally, when Teva received the State AGs' subpoena on July 12, 2016, it immediately and unexpectedly accelerated the Notes Offering.  ¶¶376-89.  While publicly attributing the move to "market" conditions, Teva needed to close the deal before the next scheduled quarterly filing due August 4, 2016, at which point they would disclose the subpoenas.  *Id*.

Finally, the overall "timeline of events" helps to "plausibly establish[] a culpable motive

with respect to each individual 10(b) defendant that is more cogent and compelling than any alternative inference." *comScore*, 2017 WL 3261609, at *18.  Also, that the "acquisition occurred shortly after [management] defended their [] practices to analysts and the market," and the "scheme fell apart less than a month after the Merger was consummated," further supports a strong inference of their personal motive.  *Id*.

Defendants make three arguments regarding motive: that (i) completing a corporate transaction like the Actavis deal is a "generally possessed" motive; (ii) inflating a stock via fraud to fund an acquisition "would inure to the benefit of all shareholders"; and (iii) the absence of any allegations regarding executives' stock sales undermines motive.  34 Act Br. at 44. Defendants' reasoning is incorrect.

Their first argument is plain wrong.  The Second Circuit has already reasoned that "not every company has the desire to use its stock to acquire another company."  *Rothman v. Gregor*, 220 F.3d at 93.[33]  Their second argument–that all shareholders benefited from the fraud–is nonsensical.  Investors lost money ***because of*** the fraud; specifically, those who bought during the Class Period and did not sell prior to the first partial disclosure were damaged, *i.e.*, the Class. A scheme to inflate securities, no matter how Defendants may misconstrue it as beneficial, defrauds the purchasers of those inflated securities and is actionable.  That is true in the circumstances here in which Defendants' false statements have caused the Class significant

---

[33]  Where transaction-based motive has been rejected, it is due to allegations lacking in common sense, which is not the case here.  *See, e.g., ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 201 (2d Cir. 2009) ("that the alleged misstatements began ***eight years before*** the acquisition and ***ended years afterward*** renders any connection between the events dubious at best."); *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (motive allegations "nonsensical"), *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243 (S.D.N.Y. 2012) (rejecting a small acquisition over time without more as motive, but finding scienter on other grounds).

damage.  Defendants do not provide any explanation otherwise.

Finally, courts reject the premise that a lack of stock sales detracts from an inference of scienter.[34]  That is particularly the case here because Teva, as a foreign private issuer, was not required to, and did not, report insider sales.  ¶811.  Thus, absent discovery, the extent of executive transactions cannot be known.  To allow the absence of alleged insider sales to diminish the strong inference of scienter would reward Teva's lack of transparency.  No case reasons that the absence of stock sales affirmatively "undermines any inference" of scienter.

To the contrary, Vigodman, Desheh, and Olafsson all labored under an incentive program structured to reward improved revenue and/or efficiency.  ¶¶795-811.  Compensation-based allegations alone may not be sufficient, but in conjunction with other facts they can support an inference of motive.  *See comScore*, 2017 WL 3261609, at *19.  This is particularly so where, as here, the compensation is "tied to share price or company performance."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 404 and n.119 (S.D.N.Y. 2013) (collecting cases); *accord Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference.").

### 2.    The Complaint Alleges A Strong Inference Of Conscious Misbehavior Or Recklessness

The Complaint also alleges a strong inference of conscious misbehavior or recklessness.  As the Second Circuit has long recognized, in the context of determining conscious misbehavior or recklessness, "[i]t is the actual facts of [] securities fraud cases that provide the most concrete guidance as to the types of allegations required to meet the [] pleading standard in this circuit."  *Novak*, 216 F.3d at 308 (the PSLRA adopted the Circuit's then-existing pleading standard).

A variety of circumstantial allegations have been recognized as sufficient to satisfy the

---

[34] *See, e.g. Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not … infer from the fact that they did not sell … stock that they lacked motive.").

standard, including "when [plaintiffs] specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"; where "facts demonstrating [either] that defendants failed to review or check information that they had a duty to monitor," or where "[a]n egregious refusal to see the obvious, or to investigate the doubtful" is demonstrated. *Id*. at 308. Indeed, recklessness has long-been recognized to encompass situations where a defendant made "conclusory" representations "without investigation and with utter disregard for whether there was a basis for the assertions." *Rolf v. Blyth*, 570 F.2d 38, 47-8 (2d Cir. 1978). Defendants' argument that Plaintiffs must allege that Defendants "knew the statements in question were false when made," 34 Act Br. at 45, is simply not the law.

The Supreme Court and Second Circuit have also resoundingly rejected Defendants' contention that to plead scienter: (i) the Court should review each allegation in isolation, and that each standing "alone" is individually insufficient to support scienter, and (ii) that Plaintiffs were required, but failed, to "cite a[] [specific contemporaneous] document, communication, conversation, or meeting indicating" scienter." 34 Act Br. at 45. Instead, the analysis of conscious misbehavior or recklessness does not turn "on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009);[35] *Tellabs*, 551 U.S. at 322-23; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) ("a plaintiff is not required to plead internal reports to demonstrate that

---

[35] *Avaya* is instructive in that the Third Circuit sustained scienter allegations factually comparable to those here, and rejected the precise argument Defendants raise that Plaintiffs must allege a specific contemporaneous "particular document or conversation that would have informed" defendants of falsity "during the class period." 564 F.3d at 269.

contradictory facts were available to the defendants when they made certain statements in all cases where it is alleged the defendants were reckless.")).[36]

### a. Individual Defendants' Personal Knowledge Of The Subject Matter Of The Fraud Supports A Strong Inference Of Scienter

That the 10(b) Defendants repeatedly "claimed they had accurate knowledge … weighs in favor of scienter." *In re Salix Pharm., Ltd.,* 2016 WL 1629341, at *14 (S.D.N.Y. 2016). From their own "self-proclaimed personal involvement" in the business affairs at issue, the "Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of the ... business, and thus had knowledge that their representations were misleading." *Genworth*, 103 F. Supp. 3d at 785; *Dobina*, 909 F. Supp. 2d at 246 ("where a statement is made repeatedly regarding an issue of specific personal interest to the officers the allegations will more readily give rise to the requisite strong inference of scienter."); *comScore*, 2017 WL 3261609, at *16 ("[e]ach of the individual 10(b) defendants spoke extensively about [the] revenues" that were the result of the fraud "during the Class Period" supports scienter).[37]

More specifically, throughout the Class Period, the Individual 10(b) Defendants spoke at length about what was driving the U.S. generics "revolution" (*i.e.*, not pricing, but cost cutting, portfolio mix, new products, efficiency measures). Indeed, they emphasized that Teva thrived

---

[36] Bhattacharjee, Olafsson, and Oberman are liable for the Company's statements in its financial statements under the group pleading doctrine. *See Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC.*, 797 F.3d 160, 172 n.7 (2d Cir. 2015).

[37] *Citiline Holdings, Inc. v. iStar Fin. Inc.,* 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter pled where defendants "told the investing public that they monitored the value of their portfolio"); *Lumber Liquidators*, 155 F. Supp. 3d at 606-7 (allegations of "public statements about the importance of their Chinese operations and its singular impact on the company's overall growth … support the inference that Defendants were aware of the alleged regulatory violations"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 782-83 (S.D. Tex. 2012) (defendants repeated statements about safety weighed "strongly in favor of the inference that [the CEO] paid special attention to ... safety efforts").

despite "fierce competition," flatly denied any suggestion that pricing was driving profits, and

they claimed prices would only rise under market "abnormalities," like persistent shortages.   The

Complaint alleges a vast number of the 10(b) Defendants' statements, which include:

- Desheh proclaimed "*the numbers don't lie*," crediting the success of U.S. generics on Teva being "more efficient all the time with a great program to *reduce costs and reduce expenses*."   ¶¶592 (May 13, 2015).   He assured analysts that U.S. generics was a "highly competitive environment … with a very fierce price competition," and that Teva's pricing was "*by the book and by the rule*."   Thus, he claimed, Teva's *exposure to any initiative on price reduction in the United States is as small as anybody can have*."   ¶618 (Nov. 19, 2015).   *See also* ¶¶534 (Feb. 6, 2014); 583 (Mar. 12, 2015); 679 (Sept. 7, 2016).

- Vigodman similarly assured analysts that Teva only increased prices "[w]hen there's an opportunity, when there is a *shortage in the market*." ¶562 (Oct. 30, 2014). He emphasized "*We believe in competition*, and we'll do what it is needed in order to win all the markets we operate." ¶604 (July 27, 2015).   He said U.S. generics profits were "driven by quantities and by mix and by efficiency measures.   *Not by price*, 2014, 2015, and that's a very important message." ¶616 (Oct. 29, 2015).   Regarding the DOJ investigation, he stated, "*we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation*." ¶693 (Nov. 15, 2016).

- Olaffson claimed "There might be 5% of the portfolio that is either flat or *increasing in pricing due to some abnormalities in the market*.   ¶614 (Oct. 29, 2015).   He also told analysts that the "$1 billion improvement in operating profit over 24 months period" in U.S. generics was "*Not by pricing* but by portfolio mix, new products, and efficiency measures." ¶632 (Feb. 11, 2016). He also explained that "*When price increases are taken, there's some kind of abnormality in the business. There are shortages*. … So there's always somebody happy to take a little bit lower price. So it's a *very competitive* business we're in." ¶ 683 (Sept. 9, 2016). *See also* ¶¶633-34 (Feb. 11, 2016); 642 (Mar. 8, 2016).

- Altman, (interim CFO from Oct. 2013-Feb. 2014), claimed that declining margins in 2013 "were partially offset by more profitable product mix, mainly in the U.S. generic business," ¶533 (Feb. 6, 2014), while concealing that Teva generated $125.8 million in pure profit from price hikes.   ¶245.   In reality, it was the price hike on Pravastatin that drove most of the improved profit. *Id.*

- Oberman, (head of U.S. generics in 2013-2014), specifically discussed the "14% top line growth on the U.S. generics business in the fourth quarter" of 2013 (¶536 (Feb. 6, 2014)), which was in fact largely attributable to the illicit price hike of Pravastatin.   ¶245.

Equally, if not more, significant, as the collusion unwound, the 10(b) Defendants

concealed that the rapid decline in profits was directly related to the price erosion on the price-

fixed drugs.   ¶¶245-250, Figure 1.   The 10(b) Defendants declared authoritatively that these

declines were not due to the resurgence of pricing pressure, and certainly not the unwinding of

the fraud.  For instance:

- Vigodman was adamant that pricing was stable. "What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way we continue saying it in 2016."  ¶662 (June 3, 2016).

- Desheh ensured the market that "*prices are very stable*" in the generics business and specifically on Teva's base business he declared "there's no pressure on prices."  ¶679 (Sept. 7, 2016); *See also* ¶724 (May 11, 2017).

- Olafsson explained that while "*several industry participants referenced a tougher pricing environment* … Teva has been very consistent and clear with investors. *Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.*"  ¶¶652-53, 659 (May 9, 2016); *See also* ¶¶660 (May 10, 2016); 671 (Aug. 4, 2016); 696, 698 (Nov. 15, 2016).

- Peterburg (board member since 2012, chairman since January 2015, replaced Vigodman as CEO on February 6, 2017), after conducting "a total review of the business," ¶454, he falsely attributed the "2 biggest contributing factors" for the 40% increase in price erosion, from 5% to 7%, to benign causes of "*ongoing consolidation* of our key customers and increase[s] in [FDA] generic drug approvals."  ¶722 (May 11, 2017).

- Bhattacharjee, who took over for the terminated Olafsson on December 6, 2016, fraudulently repeated the same price erosion message as Olafsson: "As I have described in past discussions, in the US we *expect net price erosion in our base business to be around 5%.*"  ¶711 (Feb. 13, 2017).  Furthermore, he later attributed Teva's price erosion to "consolidation" and "FDA approvals."  ¶725 (June 7, 2017).

The "specificity of" the Individual Defendants' statements "is strong circumstantial

evidence that they were receiving some form of specific information."  *Lockheed*, 875

F. Supp. 2d at 372.

### b.    10(b) Defendants' Access To Information Supports A Strong Inference Of Scienter

The 10(b) Defendants do not dispute that they had access to the truthful internal

information pertinent to the fraud.  10(b) claims "typically have sufficed … when they have

specifically alleged defendants' knowledge of facts or access to information contradicting their

public statements."  *Menkes*, 2006 WL, at *4; *see Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387

(S.D.N.Y 2011) (a "number of courts have found that officers and directors recklessly disregarded the truth when their companies made, and they failed to correct, statements that contradicted reasonably available data and that concerned major transactions or touched upon the heart of their companies' businesses.").

Specifically, the Individual Defendants had contemporaneous access to information that included (i) Teva's pricing data (which showed extraordinary price increases for certain drugs), (ii) the growth, and eventual decline, of illicit profits Teva generated thereby, and (iii) internal evidence of the collusion. Teva did not disclose any of this information to investors.

Internal Pricing Data. There is no dispute that the drug pricing data in the Complaint is accurate, and that Teva was the source of the WAC data. ¶57. As illustrated in the Complaint, Teva engaged in extraordinary price increases for drugs that previously had stable pricing, numerous competitors, and those price increases were maintained over time. ¶¶139-250; Fig. 1. [38] Moreover, none of these drugs were subject to any shortages or other economically-rational reasons for price increases.[39]

Profitability of the collusive price hikes. All told, these price hikes are responsible for the "$1 billion improvement operating profit" that the 10(b) Defendants touted during the Class Period. ¶¶362, 632, 250. This fact is further illustrated in Fig 1 and Fig. 2.

Evidence of Collusion. The 10(b) Defendants also had readily available to them, the following information, which is strong evidence of illegal collusion by Teva with its competitors:

- Multiple instances of extraordinary price increases, conducted in parallel with competitors, without shortages or other reason. ¶¶150, 163 176, 188, 203, 215, 228, 239.

- That Teva's market share for these drugs was not undercut by its numerous competitors in

---

[38] Source: ¶¶145-46, 157-59, 171-72, 182-83, 198-99, 210-11, 223-24, 236.

[39] ¶150 (Pravastatin); ¶163 (Enalapril); ¶176 (Cephalexin); ¶188 (Ketoconazole); ¶203 (Baclofen); ¶215 (Fluocinonide); ¶228 (Carbamazepine); ¶239 (Estradiol).

each market, and that Teva itself also was not gaining market share.   ¶136.

- High-level Teva employees were coordinating widespread collusion with high-level involvement that left a trail of emails and text messages evidencing the fraud.   ¶¶127-29, 147, 159, 172, 183, 199, 211, 224, 236.

All this information was created and maintained at Teva.   Because 10(b) Defendants would "have easily uncovered the falsity of [the] claims … [and] these defendants had a duty to monitor the information that would have disproved the allegedly false and incredibly important claims, [the complaint] sufficiently alleged, at a minimum, that they consciously disregarded the truth."   *Shenk*, 867 F.Supp.2d at 387.   Any "inference that [the Defendants] did not have access to the [underlying truthful] data is directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]."   *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014).

### c.   The Importance Of The U.S. Generics Business And Magnitude And Duration Of The Allege Fraud Support A Strong Inference Of Scienter

U.S. generics was the crucial focus for the 10(b) Defendants, analysts, and investors, driving Teva's key metrics of profitability during the Class Period, as well as their eventual demise.   More particularly, "[t]he fact that revenues [from the fraud] and other related metrics were key to measuring [] financial performance and [were] a subject about which investors and analysts often inquired," supports a strong inference of scienter.   *comScore*, 2017 WL 3261609, at *17; *see Salix*, 2016 WL 1629341, at *16 (allegations that misstatements involved "crucial metrics" "provide additional support for finding that Defendants acted with scienter.").   Particularly, in the context of the "transformational" Actavis deal, the Individual Defendants "could have easily uncovered the falsity of [their] claims … [that] were the ***centerpiece of the companies'*** attempts to market [a] merger, the ***most important*** event in [the] corporation's history, to shareholders.   *Shenk*, 867 F. Supp. 2d at 387.

Here, the $1 billion in illicit profits was the Individual Defendants' biggest headline for

their success.  This is many multiples of measures of financial impact that courts have found

support a strong inference of scienter.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d

Cir. 2001) ($24 million fraud "undermines … the argument that the defendants were unaware" of

the truth); *comScore*, 2017 WL 3261609, at *17 ($43.2 million alleged fraud); *Salix*, 2016 WL

1629341, at *16 ($500 million impact of fraud was "startling by any measure.").[40]

In addition to the headline, the Individual Defendants consistently emphasized the

importance of profits and revenues from U.S. generics.  For instance:

- Later in 2014, Olafsson pointed to improved generic margins by 600 basis points (6%) with "roughly half … due to improvements in gross margin, or a reduction in COGS [Cost of Goods Sold], and the other half will be an improvement in product mix."  ¶288 (Oct. 16, 2014).  On Teva's Q32014 investor conference call, Vigodman attributed Teva's success to "cost reduction program" and improving efficiency.  ¶561 (Oct. 30, 2014).

- In 2015, Olafsson attributed the "higher margin" in U.S. generics and attributed "the big jumps of 1,000 basis points [*i.e.*, 10%] we have taken over the last 24 months…, [w]hen you look at the top line growth … [t]hat mainly comes from our new launches but also our emphasis on the branded generic markets."  ¶590 (Apr. 30, 2015).

- Only days after Mylan rejected Teva's bid, what Desheh described as "nothing short of a revolution," was the rapid turnaround from 2013: "Our operating margin was 16.7%.  It is [now] 27%, this is full 10 percentage point improvement…."  ¶¶ 322, 591.  (May 13, 2015).

- Announcing the Actavis deal, Vigodman declared improvements in U.S. generics revenues and profit margins were a "*precondition*."  ¶603 (July 27, 2015).  Desheh reaffirmed "a *strong trend of improvement* in operating margin for Teva over the past 18 months of almost 500 basis points in operating profit … built upon the *impressive improvement in the profitability of our Generic business* … stepped up for around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015."  ¶¶342, 599 (July 30, 2015).

- Once Teva's peers came under pricing pressure, the 10(b) Defendants denied any vulnerability.  (*E.g.*, ¶¶361, 660 (May 10, 2016, Olafsson "there's nothing I have seen which shows a worsening pricing environment," and that the "talk[] about a lot of pricing pressure, [] shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental[ly] the market.").

Wall Street analysts' focus on the revenues and profits from the fraud, as well as Teva's

---

[40] *See also Rothman*, 220 F.3d at 92 (deeming significant the "magnitude" of a $73 million dollar write off, as it made an innocent explanation implausible).

use of price increases and the competition for generics pricing, is further circumstantial evidence that Defendants "would have been alert to information concerning their statements." *Celestica*, 455 Fed. App'x. at 14, n.3.[41]  From late-2015 through the end of the Class period, analysts also asked repeatedly about whether Teva was suffering from the same pricing pressure as its competitors, and were met from Defendants' false denials. [42]

That Defendants made unequivocal, yet invariably false answers to analysts to these questions over the course of years is "powerful evidence of scienter." *Avaya*, 564 F.3d at 269. Defendants "did not simply make statements inconsistent with the existence of widespread and unusual [pricing]; [they] explicitly denied the existence of such discounting in response to repeated questions about pricing by analysts." *Id.*

For all the above reasons, the "inference of scienter is [] supported by the divergence between Defendants' internal conduct (increasing revenues and growth by engaging in anticompetitive behavior by dividing up the market…)… and their external statements (attributing increased revenues and growth to competition based on price, quality and service in a 'highly competitive' … industry and professing to comply with the antitrust laws and particularly to not agree with competitors to allocate customers or markets)." *Chamberlain*, 757 F. Supp.2d at 711.

> ### d.      Contemporaneous "Red Flags" Indicated That The Statements Were False Or Misleading

In addition to their personal knowledge and involvement in the underlying conduct and

---

[41] *See* Section III.A.3.  *See also, e.g.*, ¶¶ 299, 300, 301.

[42] *See, e.g.*, ¶698 (Nov. 15, 2016: Wells Fargo analyst asks whether the "acceleration in the price decreases… this past quarter aren't a result of increased competition… and… not a result of having to tame previous price increases," Olafsson replied "No."); ¶634 (Feb. 11, 2016 Guggenheim Securities); ¶724 (May 11, 2017 Goldman Sachs) *See supra* III.A.3.

statements, contemporaneous red flags alerted the 10(b) Defendants to the possibility that their

statements were false and misleading.  At a minimum, they recklessly "failed to review or check

information that they had a duty to monitor," and under these circumstances, the 10(b)

Defendants' "egregious refusal to see the obvious, or to investigate the doubtful" supports an

inference that they knew or recklessly ignored that their statements were incorrect.  *Novak*, 216

F.3d at 308.  Indeed, it is "sufficient to give rise to an inference of scienter … where [a plaintiff]

alleges that a corporate officer knew of or recklessly failed to learn of "red flags" indicating that

the officer's public statements were false or misleading."  *In re Lehman Bros. Sec. & Erisa

Litig.*, 799 F. Supp. 2d 258, 294 (S.D.N.Y. 2011).[43]  "[T]he *sine quanon* of red flags are facts

which come to a defendant's attention that would place a reasonable party in defendant's

position on notice that the audited company was engaged in wrongdoing to the detriment of its

investors."  *Van der Moolen*, 405 F. Supp. 2d 405-6.  As detailed herein, and in the Complaint,

the 10(b) Defendants were subject to various, consistent, and persistent red flags that have

sufficed to give rise to a strong inference of scienter in similar circumstances.

      <u>Congressional Inquiry</u> – "When the facts known to [an executive] place him on notice of

a risk, he cannot ignore the facts and plead ignorance of the risk."  *Makor Issues & Rights, Ltd. v.

Tellabs Inc*., 513 F.3d 702, 704 (7th Cir. 2008).  On October 2, 2014, Congress sent a personal

letter to Vigodman, seeking answers to "the underlying causes of recent increases in the price of

[Teva's] drugs."  ¶82.  Congress also invited Teva to testify at a November 20, 2014 hearing on

whether "there was a rational economic reason as to … huge price increases."  ¶85.  The letter,

---

[43] *Van der Moolen*., 405 F. Supp. 2d at 406 ("facts which [had] come to a defendant's attention
that would place a reasonable party in defendant's position on notice that the audited company
was engaged in wrongdoing to the detriment of its investors" support scienter); *In re Optimal US
Litig*., 2011 WL 4908745, at *8 (S.D.N.Y. 2011) (allegations of red flags support strong
inference of willful blindness).

and the subject matter of the testimony sought, "suggest[ed] the possibility that a significant portion of … revenue from principal transactions might be derived from" price hikes or collusion.  *Van der Moolen*, 405 F. Supp. 2d at 40406.

Aberrational Profits.  The "suspicious" "timing, recurrent nature, and obvious lack of" legitimate reasons for the price hikes, were red flags for "those who were or should have been aware of them."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 648-49 (S.D.N.Y. 2007).  The influx of hundreds of millions in profit from established drugs with previously flat pricing should have altered the 10(b) Defendants to investigate whether those profits were legitimate.  Even a cursory investigation would have revealed that the numerous price increases bore all the markings of collusion.  *Lehman Bros.*, 799 F. Supp. 2d at 294 (red flags allege scienter for those who "because of his or her corporate role" "knew or [were] reckless [to] not know" of suspicious transactions "lacking any business purposes other than to reduce net leverage.").

The Market Trend Of Pricing Pressure.  The clear market trend at the end of 2015 and throughout 2016 and 2017 of pricing pressure was an obvious indication for Defendants to investigate the veracity of their statements asserting that Teva was not affected by pricing pressure.  Despite their outward statements, internally Teva's own generic drug prices were deteriorating quickly.  *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268-269 (S.D.N.Y. 2010) (defendants claimed that they "just haven't seen … significant deterioration" in RMBS portfolio and that company was "very solid and very safe" and "very different than the rest of the market," in the face of adverse market trend, and contrary internal information).

The Receipt Of The Subpoenas.  Teva's receipt of subpoenas from the State AGs and the DOJ on July 12 and July 21, 2016, respectively, supports scienter.  ¶766.   Those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices.  Yet, the 10(b)

Defendants failed to disclose them in conjunction with the Notes Offering, and after made false statements relating to supposed pricing competition, including during Teva's September 9, 2016, Generics Day.  ¶¶681, 683. *See SAIC, Inc.*, 818 F. 3d at 93-94, 96 (grand jury subpoena for the production of documents was factor that "support[ed] the inference that SAIC acted with at least a reckless disregard"); *In re Bristol Myers Squib Co. Sec. Litig.*, 586 F. Supp. 2d 148, 167-68 (S.D.N.Y. 2008) (DOJ investigation into pay for delay agreement part of "holistic" analysis of scienter).[44]

Bloomberg Article.  The November 3, 2016 *Bloomberg* article indicated that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs would bring charges later in the year.  ¶409.  Despite this, Vigodman, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."  ¶693.  Less than a month later, the State AGs charged Teva with antitrust violations and the DOJ brought charges against Teva's coconspirators.  The "proximity of the [allegedly false] statements to the" charges "diminish[es] the plausibility of innocent explanations for [his] flat denials."  *See Avaya,* 564 F.3d at 272.  If Vigodman simply had no idea, making representations "conclusorily ... without investigation and with utter disregard for whether there was a basis for the assertions" supports a strong inference of scienter.  *Rolf*, 570 F.2d at 47.

### e.    Additional Allegations Support A Strong Inference Of Scienter

Courts within the Circuit have found a strong inference of scienter may be supported by a

---

[44] Defendants argue that "[a]s with falsity, governmental investigations alone prove nothing on their own… because they 'are just [] investigations.'"  34 Act Br. at 46.  But, the "investigations" here have ripened into criminal and civil charges against Teva and its co-conspirators, and contribute to the holistic evaluation of scienter.  *Tellabs*, 551 U.S. at 325.

variety of additional contextual allegations, including (i) that the conduct at issue pertains to a company's core operations, (ii) the misstatements result from GAAP violations, and (iii) that high-level executives were removed contemporaneously.  *Celestica*, 455 Fed. Appx. 10, 14, n.3.

Core Operations – That the 10(b) Defendants "statements concerned the core operations of the company supports the inference that [they] knew or should have known the statements were false when made.  Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them."  *Atlas*, 324 F. Supp. at 489 (S.D.N.Y. 2004); *see Eletrobras*, 245 F. Supp. 3d at 469.  The Defendants do not argue that this inference is unavailable as additional support to scienter.  Instead, they argue that the inference was not triggered here because the issues were not sufficiently critical.  34 Act Br. 47.  But "[r]egardless of whether [the drugs and the profits they generated] constitute 'core operations' in the technical sense, Defendants' repeated public discussion of" them indicated they were critical and core to Teva.  *Lumber Liquidators*, 155 F.Supp.3d at 593 at 606.  The presumption that the Defendants knew facts about Teva's core operations is "relevant to the Court's holistic analysis."  *Genworth*, 103 F.Supp.3d at 784; *see supra* III.A.3, III.A.2.

Executive Departures – "The timing and circumstances surrounding the [terminations] of [senior executives] also contribute to the inference of scienter with respect to those defendants."  *comScore*, 2017 WL 3261609, at *17.[45]

- Olafsson purportedly "retired" at the time he was most critically involved in the Actavis integration, only weeks after the *Bloomberg* article, and two weeks before charges and the

---

[45] In the cases Defendants cite, the terminations had tenuous or no links to the fraud.  *See, e.g.*, 34 Act Br. at 47 (*citing, e.g., Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 162 (D. Conn. 2007) (rejecting "Plaintiffs' only attempt to link" the defendants to the fraud because the allegations actually "support[ed] the more compelling inference that these individuals were terminated as a result of company mismanagement.").

State AGs' complaint were publically filed.  (¶¶784-86)  *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) (resignations "a few months" after disclosure for "pretextual reason," "suggest that [] defendants were terminated in relation to the" fraud).

- Vigodman was terminated without a replacement one month after withdrawing guidance, and issuing negative results (¶443-448), and weeks before the announcement of still further bad results.  ¶¶787-788.  *See Salix*, 2016 WL 1629341, at *15 (resignations close to restatement "provide[d] additional evidence of scienter").

- Desheh was terminated on June 21, 2017.  In the very next SEC filing – the first issued without any of the Individual Defendants – Teva booked a ***$6.1 billion charge***, announced terrible results, and again reducing guidance.  ¶¶789-790.  *See Vivendi*, 381 F. Supp. 2d at 176-177 ("large impairments taken immediately after the departure of key figures [supports] a reasonable inference … that [others] had reasonable grounds to believe the impairments had to be reported and that former management concluded not to do so.").

Illegal Conduct – That Teva engaged in "deliberately illegal behavior" by violating antitrust laws is supportive of a "strong inference of scienter."  *In re Veon*, 2017 WL 4162342 at *9.  It is a "piece of the puzzle, a series of circumstances that add up to a strong inference of scienter."  *Chamberlain*, 757 F. Supp. 2d at 695, 713-14 n.8.  As set forth in Section III.B, the Complaint adequately alleges Teva's participated in a vast antitrust conspiracy, with the DOJ criminal charges and the lawsuit filed by 45 State AGs further raising a strong inference of scienter against the 10(b) Defendants.  *Valeeuwen v. Keyuan Petrochemicals, Inc*., 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("Plaintiffs appropriately relied on the SEC complaint in pleading scienter and therefore state a claim under Section 10(b)"); *Washtenaw County Employees Retirement System v. Avid Tech. Inc*., 28 F. Supp. 3d 93, 114-115 (D. Mass. 2014) (compiling cases).

GAAP Violations – The size, frequency, and straightforward nature of the GAAP violations here, *see supra* III.A.2 support an inference of scienter.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (taking into account "a large, $112 million 'surprise' valuation" as evidence of scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) (more than $400 million charge and duration of the violations supported an

inference of scienter); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) (three year long violations of "relatively straightforward or basic" GAAP principles supports scienter). That Teva violated its express policy to follow and apply SAB 104 enhances this inference. ¶490. *See In re Scholastic Corp.*, 252 F.3d at 77 (actions contrary to expressed accounting policy "can form the basis for proof of recklessness.").

SOX Certifications – "[S]igned … SOX certifications indicating that [defendants] had designed, established, and maintained internal controls related to disclosure" supportive of an inference of scienter. *Eletrobras*, 245 F.Supp.3d at 468. Defendants Desheh, Altman, Vigodman and Peterburg each signed SOX certifications during the Class Period making it more likely they reviewed or had access to information contradicting their statements. *See supra* III.A.8. That is particularly true when, as here and in *comScore*, the alleged fraud is extensive, and involved "top-down" personnel. *See Comscore*, 2017 WL 3261609 at *16.

### 3.    There Is A Strong Inference Of Corporate Scienter

As set forth above, Teva's scienter is sufficiently pled by virtue of the Individual Defendants' scienter and their binding authority over the Company. In addition, Teva's corporate scienter is established by the State AGs' charges against it, as well as through the illegal and intentional conduct of other management-employees, though not identified by name, who are alleged to have bound Teva in *per se* illegal activities. ¶¶10, 117-20, 749, 841.

Within the Second Circuit, "it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Lorely*, 797 F.3d at 177. Indeed, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific

individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008). The Complaint need not allege the employee's identity or title with precision in order for the corporation's scienter to be sufficiently pled. *See Veon*, 2017 WL 4162342, at *10 and n.3 (corporate scienter on basis of an unspecified regional executive, who was engaged in the criminal activity underlying the fraud).

Here, the Complaint alleges, Malek and his management-level counterpart at Teva, with whom he "had a direct relationship," agreed to fix prices on Glyubride among other drugs in April 2014, ¶119, bid rigging agreement in July 2014. ¶120. Malek has admitted these facts and colluding with Teva. ¶79. The State AGs have stated that "[m]any of these schemes were conceived and directed by ***executives at the highest levels*** of many of the Defendant companies." ¶116. In view of the totality of the allegations, it is "reasonable to infer that [employees sufficient to bind Teva] either knew or recklessly ignored that [the Company's] public filings contained misrepresentations and omissions regarding the company's business." *Veon*, 2017 WL 4162342 at *10. *See also Lockheed*, 875 F. Supp. 2d at 375.

*       *       *

Taking the allegations as a whole, there is a strong inference that each of the 10(b) Defendant had "knowledge of facts or access to" truthful internal data at Teva and thus made their misstatements with scienter. *Novak*, 216 F.3d at 308. The 10(b) Defendants do not offer any cogent or compelling plausible competing inference, let alone one that is more compelling than the strong inference of scienter. What they offer alternative facts that "[i]nvestor losses resulted, not from any fraud, but from the price competition that incontrovertibly exists in the generics industry and other risks inherent in the market," and that Defendants numerous false and misleading statements were simply "sincere" "optimistic belief." Defs Br. at 48. Courts regularly dismiss such vacuous alternative explanations as "fail[ing] to posit any rational

77

inferences of benign intent." *Salix*, 2016 WL 1629341, at *16 (rejecting defendants' proposed inference that alleged fraud was a "mistake."); *SAIC, Inc.*, 818 F.3d 85 at 96-7. Instead, "[i]f [Defendants] simply had no idea whether [their repeated statements were true], and nonetheless [spoke], this would also have presented an obvious risk of misleading investors," establishing recklessness *Avaya*, 564 F.3d at 269 n. 43.

### D.     The Complaint Adequately Pleads Loss Causation

Loss causation is the "causal link" between the alleged misrepresentations and the economic harm suffered by the plaintiff. *Loreley*, 797 F.3d at 187.[46]   In pleading, a plaintiff need only "provide a defendant with *some indication* of the loss and the causal connection…." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).   Indeed, a plaintiff's "burden to plead loss causation is not a heavy one, and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, the chain of causation is ... not to be decided on a Rule 12(b)(6) motion to dismiss." *Gross v. GFI Grp.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016).   In the Second Circuit, "a plaintiff can establish loss causation either by showing a materialization of risk or by identifying a corrective disclosure that reveals the truth behind the alleged fraud." *Vivendi*, 838 F.3d at 262.   The "revelation of the truth … [need] not take the form of a single unitary disclosure, but [can] occur[] through a series of disclosing events." *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006).[47]   The Complaint pleads loss causation adequately with respect to the seven partially corrective disclosures.

---

[46] Loss causation is an element of § 10(b), but is not an element of a Securities Act claim. The 10(b) Defendants' arguments on loss causation are irrelevant to the Securities Act claims.

[47] *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008) (complaint is sufficient if it "allege[s] facts that support an inference that [] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.").

Aug. 4, 2016 (Connecticut AG And DOJ Subpoenas Disclosed) – Teva's Q2 2016 6-K disclosed for the first time that Teva had received subpoenas from the DOJ and Connecticut AG relating to their investigations into illegal collusion in the generic drugs market, ¶819; the price of Teva's securities dropped in response, ¶821.  Until then, there had been no public indication that Teva was implicated in the investigations.  "A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices" for showing loss causation.  *E*Trade*, 712 F. Supp. 2d at 202; *see also Bradley Pharm.*, 421 F. Supp. 2d at 827-30 (finding loss causation on announcement of SEC investigation involving defendant).[48]

Nov. 3, 2017 (*Bloomberg* Article) – Teva's securities prices dropped on the revelation that the DOJ investigation into Teva and other generics companies had gathered sufficient evidence of criminality, and that charges could be brought "by the end of the year" and "extend to high-level executives."  ¶409.  Sources affirmed that the "investigation is likely to continue after the first cases are filed … and has the potential to mirror the antitrust division's long-running probe into auto-parts cartels," which "resulted in $2.8 billion in penalties and charges against" dozens, including 31 who received prison sentences.  *Id.*  The article also revealed for the first time that the State AGs' probe could result in "cases seeking damages."  *Id.*  That same day, the price of Teva's ADS plummeted 9.5%, and the price of the Preferred Shares and Notes also declined precipitously.  ¶¶411, 415.

The direct link between the *Bloomberg* article and the reaction of the securities price was the subject of *New York Times* reports: "The generic drug industry was jolted on Thursday as shares of many major companies tumbled after a news report said that a federal inquiry into drug

---

[48] *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (finding loss causation based in part on the announcement of SEC and DOJ investigations).

price-fixing was wider than previously believed and could lead to charges by the end of the year." ¶412. The same day, S&P Capital IQ downgraded its rating of Teva ADS from "Buy" to "Hold," explaining that the *Bloomberg* article "indicates the [DOJ] is investigating generic drug firms over potential price collusion and by year-end may bring criminal charges against them, including TEVA." ¶413. While in August the market had learned that Teva was part of the investigation, now the market learned that Teva was involved in the investigation. *See Chamberlain*, 757 F. Supp. 2d at 717-18 (sustaining loss causation for article "exposing a nationwide market allocation agreement"); *see also Amedisys*, 769 F.3d at 324.

Dec. 5, 2016 (Olafsson's Termination) – Olafsson, as Teva's head of Generics and a former senior leader of Actavis, was a central figure in the alleged fraud and key lynchpin for the Actavis integration. ¶74. His termination, ¶431, was a "foreseeable result of the defendant's conduct" and the loss to Teva's securities that day was "caused by the materialization of the ... risk concealed by the defendant's alleged fraud." *Vivendi*, 838 F.3d at 260. Analysts viewed Olafsson's termination as "repercussions at the top" following failed "bullish guidance" that is alleged to have been fraudulent when made. ¶437. Analysts further connected Olafsson's firing to "drug pricing," a topic about which Olafsson had provided repeated false statements for years. ¶436. Moreover, while Teva's reason for his termination was that he was "retiring," analysts considered the reason pretextual, *id.* ("Questions Mount at Teva as Generics Head Quits Without Explanation"), and, indeed, it proved false as Olafsson is working elsewhere. ¶431. Within days of Olafsson's termination, the DOJ filed its criminal complaints against Malek and Glazer and the State AGs filed charges against Teva. ¶786. In this context, "[t]he announcement of Defendant['s] resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to the investigation." *See Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at

*11 (S.D. Cal. 2016); *see also Amedisys*, 769 F.3d at 318.[49]

Dec. 14, 2016 (DOJ Charges) – Defendants' argument that the DOJ charging documents did not "disclose anything about Teva," 34 Act Br. at 52, is directly refuted by the allegations. The filing of the DOJ charges was the first criminal prosecution; Malek and Glazer admitted guilt and agreed to cooperate.  ¶¶8-10, 79, 106.  Among the drugs described on DOJ criminal information was Glyburide, in which Teva held 75% of the market.  ¶¶105, 117-21.  Defendants do not dispute the alleged loss causation arising from the State AGs' complaint, which expressly named Teva as a defendant for the same illegal conduct charged in the DOJ information.  *Ansell v. Laikin*, 2011 WL 3274019, at *5 (C.D. Cal. 2011) (holding unsealing of criminal indictment and filing of SEC complaint constitute disclosures for loss causation).

Nov. 15, 2016, Jan. 6, 2017, and Aug. 3, 2017 Forms 6-K – Defendants' argue that there was no loss causation relating to the Forms 6-K issued on November 15, 2016, January 6, 2017, or August 3, 2017 because those filings disclosed "nothing concerning alleged collusion or price fixing."  34 Act Br. at 52.  They miss the mark, ignoring controlling precedent holding that "a plaintiff can establish loss causation … by showing a materialization of risk."  *Vivendi*, 838 F.3d at 261.  As Defendants acknowledge, on each of these dates they announced poor results due to "price erosion."  34 Act Br. at 52.  The allegations of fraud are that the 10(b) Defendants concealed that price hikes, bid rigging, GAAP violations, and other unlawful conduct inflated Teva's financial condition.  Further, as the collusive conduct unwound, the 10(b) Defendants concealed the severity of the price erosion Teva faced, and the related losses.  The fraud culminated in the $6.1 billion write down of the U.S. generics business.  ¶23.  Notably, on the

---

[49] *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 674-75 (D.S.C. 2016) ("resignation announcements in combination with the other alleged partial corrective disclosures … sufficiently pled to withstand a motion to dismiss.").

August 3, 2017 earnings call, Bhattacharjee tied the losses, in part, to the shelf-stock

adjustments.  ¶495.  *See* Section III.A.2.  Moreover, Defendants made numerous false statements

through to the end of the Class Period that Teva was not dependent on pricing for its profits, and

was immune from the pricing pressure in the market.  *See* Section III.A.1.

The Complaint's allegations are akin to the loss causation theory the Second Circuit

sustained in *Vivendi*, post-trial.  Here, as in *Vivendi*, "although no specific corrective disclosure

ever exposed the precise extent of [Defendants'] alleged fraud …. a series of events … made the

truth about [the concealed fraud] come to light."  838 F.3d at 262.[50]

Defendants' Arguments Fail – Defendants' central challenge to loss causation is that

"claims must be supported by allegations that the purported corrective disclosure or an event

actually revealed the alleged fraudulent scheme or prior misrepresentation."  34 Act Br. at 49.

The Second Circuit has soundly rejected this argument: "Whether the truth comes out by way of

a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or

through events **constructively disclosing** the fraud, does not alter the basic loss-causation

calculus."  *Vivendi*, 838 F.3d at 262.  Ultimately, "a plaintiff must show that the loss [was a]

foreseeable result of the defendant's conduct (*i.e.*, the fraud), and that the loss [was] caused by

the materialization of the ... risk concealed by the defendant's alleged fraud."  *Id.* at 261.

Defendants also make "truth on the market" arguments claiming the alleged loss causing

events are not viable because they were the "[r]eiteration of information already known to the

---

[50] The Fifth Circuit sustained similar allegations in *Amedisys*, 769 F.3d at 324 ("Once
[defendant] was placed under … government scrutiny … its earnings dropped significantly….
After each negative partial disclosure, Defendants attempted to mitigate the impact … by making
contemporaneous misstatements….  As a result, … Class members purchased [] securities at
artificially inflated prices and suffered economic loss when … the price of these securities
declined in response to the series of partial disclosures.").

market." 34 Act Br. at 51.  "A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Ganino*, 228 F.3d at 167.  However, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint." *Id*. Moreover, "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*; *see Ellenburg v. JA Solar Holdings Co*., 2010 WL 1983375, at *4 (S.D.N.Y. 2010).  Thus, the "truth on the market" defense "is appropriate only if defendants show that no rational jury could find that the market was misled." *Ganino*, 228 F.3d at 167.[51]

For example, Defendants argue that there is no loss causation for the August 3, 2016 disclosure because "the DOJ and State AG's investigations were industry-wide, and had been ongoing publicly since 2014, nearly two years before Teva received the subpoenas."  34 Act Br. at 50.  The existence of industry-wide investigations does not support a truth on the market defense; while the investigation was known, what was revealed was that Teva itself had become involved in both investigations.  Defendants' repeatedly denied over the Class Period that Teva was engaged in anticompetitive conduct, let alone involved in potentially criminal activity.

### E.     The Officer Defendants Are Liable As Control Persons

Plaintiffs adequately plead, ¶¶878-82, all three elements of a control person claim under § 20(a) of the Exchange Act: (i) a primary violation of the federal securities laws, (ii) control of the primary violator by the defendant, and (iii) that the controlling person was, in some meaningful sense, a culpable participant in the fraud.  *Ganino*, 228 F.3d at 170.

---

[51] Defendants' reliance on *In re Omnicom Group, Inc. Securities Litigation* is misplaced, as that decision addressed proof ascertained in discovery and presented on a motion for summary judgment, not an assessment of well-pled allegations taken as true.  541 F. Supp. 2d at 546.

## IV.    THE SECURITIES ACT CLAIMS

Separate and apart from claims for fraud under the Exchange Act, Plaintiffs bring claims under the Securities Act for strict liability and negligence for materially untrue or misleading statements and omissions made in the Offering Materials.  Though these claims are not based in fraud, the standards for falsity and materiality are the same under both Acts.  The statements and omissions in the Offering Materials, therefore, are materially untrue or misleading for the reasons set forth in the following sections.  *See* III.A.4, III.A.2, III.A.1, III.A.8, III.A.7, III.A.5.

### A.    The Securities Act Claims Do Not Sound In Fraud

Claims under §§11 and 12(a)(2) of the Securities Act must only meet Rule 8(a)'s notice pleading standard, under which liability is "virtually absolute," subject to certain good-faith affirmative defenses.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  The mere fact that a complaint also contains fraud allegations under §10(b) of the Exchange Act "does not take away plaintiffs' right to plead in the alternative" non-fraud claims under §§11 and 12(a)(2) in accordance with Rule 8(a).  *Refco*, 503 F. Supp. 2d at 632.

The Securities Act counts here expressly allege negligence and, thus, are subject to (and satisfy) the notice pleading standard under Rule 8, which requires only a "short and plain statement" of the claims.  *Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706, 715, 718 (2d Cir. 2011).  It is well settled that a heightened pleading burden should not be applied to Securities Act claims except "insofar as the claims are premised on allegations of fraud," *id.* at 715,  even when asserted along with Exchange Act claims in the same action.  *In re OSG Sec. Litig.*, 971 F. Supp. 2d at 396-97.  As Judge Scheindlin aptly recognized, *Rombach* should not be misread to mean that Securities Act allegations "sound in fraud" merely because they include phrases such as "materially false and misleading," which (as in the instant case) "simply track the language of the statute."  *OSG*, 971 F. Supp. 2d at 405.

84

Claims under §§11 and 12(a)(2) do not sound in fraud when, like here, Plaintiffs have crafted a "carefully structured" and separable two-part Complaint.  *See Refco*, 503 F. Supp. 2d at 632.  Plaintiffs also explicitly aver in the Complaint that each of the Securities Act claims – which are pleaded separately – disclaim any allegation of fraud or intentional misconduct.  *See comScore*, 2017 WL 3261609, at *22. Because the Complaint is "organized in a way that allows the court to determine which allegations support which claim," Plaintiffs properly plead fraud under §§ 10(b) and 20(a), and negligence under §§11 and 12(a).  *OSG*, 971 F. Supp. 2d at 406.

**B.      The Claims On The Notes Were Timely**

Defendants argue that the statute of limitations (or "SOL") with respect to claims relating to the Notes has lapsed.  UW Br. at 8-14; 33 Act Br. at 5.  To prevail on a SOL argument, it is Defendants' burden to "prove that a reasonable investor in [plaintiff's] shoes would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim for relief" such that the SOL had been triggered.  *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017).  To carry this burden, Defendants are required to muster "uncontroverted evidence [that] irrefutably demonstrates that [Plaintiffs] discovered or should have discovered facts sufficient to adequately plead a claim."  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.,* 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012).  Defendants do not acknowledge their burden; they do not point to any particular date that the limitations period began to run, let alone uncontroverted evidence.

**1.      The Securities Act Claims Were Timely Filed
Pursuant To The Discovery Rule Under *Merck***

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010) held that a securities fraud claim is subject to a "discovery" rule and "accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the

violation—whichever comes first." 559 U.S. at 637.  *Merck* abrogated the prior standard

commonly referred to as "inquiry notice."  *See id.* at 652-53.  Inquiry notice set the statute of

limitations based on "when a plaintiff possesses a quantum of information sufficiently suggestive

of wrongdoing that he should conduct a further inquiry."  *Id.* at 650.  So long as there were

"storm warnings," the plaintiff was on notice to investigate.  *Id.* at 653.  In contrast, under the

current discovery rule, a "securities-law violation is discovered when the plaintiff learns

sufficient information about the violation to plead it in a complaint with enough detail and

particularity to survive a 12(b)(6) motion to dismiss."  *Nomura*, 873 F.3d at 119.  To rule

otherwise would "precipitate groundless or premature suits by requiring plaintiffs to file suit

before they can discover with the exercise of reasonable diligence the necessary facts to support

their claims."  *Rothman*, 220 F.3d at 97.

      The Securities Act claims were timely filed on August 2, 2017.  ECF 129.  This was well

within one year from November 3, 2017, the earliest date that the SOL could have lapsed given

that November 3, 2016 is when Teva was first identified by *Bloomberg* as facing the risk of

criminal charges by the DOJ.  ¶1003.  Before that, press reports had only generally reported on

an investigation into certain generics manufacturers, but never identified Teva as a target.  It was

only on November 3, 2016 that investors could plausibly have pled a Securities Act violation for

false statements in the ADS/Preferred and Note Offerings, as required by *Merck*.

      Defendants argue that the SOL was triggered by the government investigations into

generic price hikes even absent any indication that Teva engaged in wrongdoing.  UW Br. at

11-12.  General reports about investigations are not sufficient to trigger the SOL under the

"discovery rule" set forth in the Supreme Court's *Merck* decision, or even under the prior

"inquiry notice" standard.  *Merck*, 559 U.S. at 653-54; *Nomura*, 873 F.3d at 120; *UBS*, 858

F. Supp. 2d at 321-22.  Defendants point to news that Congress asked the GAO to audit

Doxycycline in 2014, thereby triggering the SOL.  UW Br. at 14.  But the Complaint does not

allege that Teva sold Doxycycline during the Class Period, because it did not.  The earliest

conceivable date that Teva was associated with the government investigations was the August 4,

2016 disclosure of the subpoenas; but Defendants affirmatively argue that this disclosure "is not

a basis for a securities claim."  UW Br. at 13.[52]

Defendants affirmatively denied any improper conduct or that price hikes and price fixing

were the reason for their profitability.  ¶957.  Their repeated denials of wrongdoing and

affirmations to the contrary are sufficient to negate the triggering of the SOL.  *See Nomura,* 873

F.3d at 121.[53]  "Until such time they did, or with diligence should have, discovered otherwise,

the [investors are] entitled to rely on defendants' assertion[s]."  *FHFA v. UBS Ams., Inc.*, 858

F. Supp. 2d 306, 321 (S.D.N.Y. 2012).

The Merck Rule Applies – Defendants argue that the "discovery" rule under *Merck* does

not apply to the Securities Act.  UW Br. at 9.  They are wrong.  While *Merck* specifically

addressed the Exchange Act, the weight of authority has extended it to the Securities Act.  As the

Second Circuit has stated, the prior rule for the Securities Act SOL was the "inquiry notice" rule;

but the "Supreme Court's decision in *Merck* changed that rule" to the discovery rule.  *Nomura,*

---

[52] While Plaintiffs allege loss causation on the disclosure of the subpoenas on August 4, 2016, ¶821, loss causation and the SOL constitute different inquiries.  *See Vivendi*, 838 F.3d at 262.  A partial disclosure or materialization of the risk which is sufficient to trigger loss causation, is not necessarily sufficient to establish that all the elements of the claim had been discovered.  Moreover, loss causation is not an element of the claim under the Securities Act; instead negative causation is an affirmative defense.  Securities Act of 1933 §11(e), 15 U.S.C. §77k(e).

[53] The instant case stands in stark contrast to *Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013).  *Freidus* concluded that constructive discovery may occur if a defendant make corrective disclosure that includes "precisely the information [it] should have disclosed earlier" and which plaintiffs allege was absent from the offering materials.  *See id.* at 138.

873 F.3d at 119.[54]  The Third Circuit has likewise held that "the discovery standard … applies not only to the Exchange Act's statute of limitations, but also to the Securities Act's statute of limitations."  *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Trans., Inc.*, 730 F.3d 263, 273 (3d Cir. 2013).  No circuit court has held otherwise.

In *Merck*, the Supreme Court addressed the SOL for the Exchange Act, which provides that a claim may be brought not later than "2 years after the ***discovery*** of the facts constituting the violation."  *Merck*, 559 U.S. at 653-54 (quoting 28 U.S.C. § 1658(b)(1)).  "Because the word 'discovery' is often used as a term of art in connection with the 'discovery rule' in statutes of limitations, the [*Merck*] Court [] adopted [the] discovery standard."  *Mortg. Asset Sec. Trans.*, 730 F.3d at 273.  *Merck*, "rejected the inquiry notice standard," "explain[ing] that inquiry notice 'is not necessarily the point at which the plaintiff would already have discovered ... 'facts constituting the violation.'"  *Id.* at 273.

The Securities Act's SOL provision, also keys the SOL off "discovery": "No action shall be maintained to enforce any liability created under [the Securities Act] unless brought within one year after the ***discovery*** of the untrue statement or the omission, or after such ***discovery*** should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The difference between discovery "of the facts constituting the violation" in the Exchange Act and "of the untrue statement or omission" in the Securities Act is of no moment because an untrue statement suffices to violate the Securities Act.[55]  For this reason, the Third Circuit and

---

[54] As the issue was not disputed, the Court assumed that *Merck* applied to the Securities Act.  873 F.3d at 119 n.37.

[55] Defendants also argue, by analogy, that the Second Circuit declined to extend the *Merck* discovery rule to the RICO SOL.  UW Br. at 9-10 (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 149-50 (2d Cir. 2012)).  The RICO statute is far afield here.  Unlike the Securities Act,

numerous other courts have held that *Merck*'s discovery rule applies to the Securities Act.[56]

Defendants provide no argument to the contrary.

Finally, Defendants' argue that information sufficient to plead a claim arising from the Offerings could have been discovered long before the Offering documents even existed.  UW Br. at 11-14.  But as the Second Circuit has explained, a securities claim cannot accrue before the plaintiff purchases the relevant security.  *See City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175-76 (2d Cir. 2011) ("Since the purpose is to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim: A claim that has not yet accrued could never be considered stale.").

## 2.    The Securities Act Claims Were Timely<br>Filed Even Under The Inquiry Notice Standard

Defendants also fail to establish their statute of limitations defense even under the abrogated "inquiry notice" standard.  Prior to *Merck*, the Second Circuit held that the limitations period for a securities claim began to run when plaintiff had "notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge" of the violation.  *See Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006), *abrogated by Merck*, 559 U.S. 633.  "Inquiry notice [was] found as a matter of law only when uncontroverted evidence clearly demonstrate[d] when the plaintiff should have discovered the [actionable] conduct."  *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008).  So-called "storm warnings" triggered a duty to inquire only if they were (i) "relate[d] directly to the misrepresentations and omissions" and

---

RICO does not key the SOL off of "discovery" and is "silent on the issue" of when the SOL begins.  *Koch*, 699 F.3d at148.

[56] Multiple Second Circuit district courts apply the discovery rule under *Merck* to the Securities Act, "the weight of authority leans toward the courts which have applied the Merck statute of limitations standard to Securities Act cases …."  *Inovalon*, 2017 WL 3208042, at *5.

(ii) "specific enough to provide an ordinary investor with indications of the ***probability*** (not just the ***possibility***) of a violation."  *See Nomura*, 873 F.3d at 120 (emphasis in original).

As an initial matter, "Defendants adduced no evidence of how long it would take a reasonably diligent investor … to investigate the [] claims such that it could adequately plead them."  *Id.* at 122.  "Their failure to establish this indispensable piece of the statute of limitations defense dooms their argument."  *Id.*  Moreover, the Second Circuit has rejected the kind of evidence that Defendants claim comprise storm warnings.  In *Staehr*, the Second Circuit held that "generic articles" that do not name the defendant or reveal the scope of the misconduct alleged in the action failed to provide "uncontroverted evidence [that] clearly demonstrates when the plaintiff should have discovered the fraudulent conduct."  547 F.3d at 427-28.  Such reports "at most suggest the ***potential*** for [misconduct]."  *Id*. at 430 (emphasis in original).

### C.     Plaintiffs Have Standing To Assert All Claims

There is no dispute that Plaintiffs have standing with respect to Teva's (i) ADS purchased on the NYSE; (ii) ordinary shares purchased on the TASE; and (iii) securities issued in the ADS/Preferred Offerings.  Defendants only object to standing with respect to the Notes.  UW Br. at 14-18.  This too fails.

#### 1.     The SOL Did Not Lapse Until November 3, 2017, Thus Defendants' Standing Argument Is Moot

Defendants' objection to standing with respect to the Notes rests on the premise that the SOL lapsed before Anchorage (who purchased the Notes) was added as a named plaintiff on September 5, 2017.  UW. Br. at 15.  As set forth, supra IV.C.1, the SOL did not lapse until November 3, 2017, and therefore Defendants' argument on standing is moot.

#### 2.     Even Absent Anchorage, Ontario Teachers' Has Class Standing With Respect To The Notes Under NECA

Ontario Teachers' has "class standing" with respect to claims asserted on behalf of the

Noteholders because it meets the requirements set forth under the Second Circuit's decision in
*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012).
There, the lead plaintiff sought to bring claims on behalf of a putative class of persons who
acquired similar securities issued in 17 separate offerings involving the same issuer and the same
underwriter.  *See id.* at 149.  The District Court dismissed for lack of standing the claims arising
from 15 certificates that lead plaintiffs did not acquire directly.  *Id.* at 149, 154.  On appeal, the
Second Circuit reversed, holding that the lead plaintiff had "class standing" to assert claims on
behalf of purchasers of the other certificates "based on similar or identical misrepresentations."
*Id.* at 148-49.  The Second Circuit ruled that a plaintiff has class standing if it has plausibly
alleged (i) an actual injury "as a result of the putatively illegal conduct of the defendant," and
(ii) that "such conduct implicates the same set of concerns as the conduct alleged to have caused
injury to other members of the putative class by the same defendants."  *Id.* at 162.

Notably, *NECA* contemplated Ontario Teachers' situation here:

> [O]ne could imagine a series of corporate debt offerings, issued over the course
> of a year, all of which contained an identical misrepresentation about the issuing
> company's impending insolvency [here "intense competition" or "price
> competition"].  Sections 11 and 12(a)(2) claims brought by a purchaser of debt
> from one offering would raise a "***set of concerns" nearly identical*** to that of a
> purchaser from another offering: the misrepresentation would infect the debt
> issued from every offering in like manner, given that all of it is backed by the
> same company whose solvency has been called into question. ***In that case, the
> inappropriateness of denying class standing on the happenstance of the
> misrepresentation's location in one offering versus another seems patent***.

Here, substantially identical statements in the ADS/Preferred and the Notes Offering
Materials, that are false and misleading by virtue of the same conduct, and subject to the same
proof, caused the Class members' injuries.  *Compare* ¶963 (ADS/Preferred Offering) *with* ¶986
(Notes Offering); ¶964 *with* ¶987; ¶965 *with* ¶988; ¶966 *with* ¶989; ¶967 *with* ¶990; ¶969 *with*
¶992; ¶970 *with* ¶993; ¶972 *with* ¶ 995; ¶974 *with* ¶997.  *Compare more broadly* ¶¶960-82

(ADS/Preferred Offering) *with* ¶¶983-1001 (Notes Offering).  Teva's Offerings were around the same time and for the same stated purpose–financing the $40 billion acquisition of Actavis. ¶¶333, 382-83.  Thus, the alleged misrepresentations infected all of the Offering Materials in the same way.  *See NECA*, 693 F.3d at 163.  It is irrelevant that Teva's various securities were issued pursuant to separate shelf registration statements, *see* UW Br. at 17.  "The fact that those representations appeared in separate Offering Documents … does not by itself raise a number of fundamentally different concerns because the location of the representations has no effect on a given purchaser's assertion that the representation was misleading (the source of the injury)." *See NECA*, 693 F.3d at 162-63.  Thus the proof is nearly the same as to all Defendants.[57]

Defendants' contention that *NECA* should be read narrowly, based on *Retirement Board of Policemen's Annuity & Benefit Fund of Chicago v. Bank of N.Y. Mellon* ("BNYM"), 775 F.3d 154 (2d Cir. 2014), UW Br. at 16, is unavailing.  First, *BNYM* considered class standing in the context of breach of duty claims against a trustee rather than misrepresentation claims under the Securities Act.  *See id.* at 159, 162.  Under *BNYM*, claims are sufficiently similar "in all essential respects" where "the proof contemplated for all of the claims would be sufficiently similar."  *See id.* at 161.  *BNYM* reasoned that different evidence was required to prove and entity's breach of contract on a "loan-by-loan and trust-by-trust" basis.  *See id.* at 162.  Defendants fail to suggest

---

[57] All of the Underwriter Defendants are subject to the claims arising from the ADS/Preferred Offerings and the Notes Offering, except 8 of 18 that did not participate in the ADS/Preferred Offering, but are still subject to joint and several liability.  The overlapping Underwriter Defendants are: (1) Barclays, (2) BofA Merrill Lynch, (3) BNP, (4) Citigroup, (5) Credit Suisse, (6) HSBC, (7) Mizuho, (8) Morgan Stanley, (9) RBC, and (10) SMBC Nikko.  The following eight non-overlapping Underwriter Defendants participated only in the Notes Offering: (1) Bank of China, (2) BBVA, (3) Commerz, (4) Lloyds, (5) MUFG, (6) PNC, (7) Scotia, and (8) TD. Class standing with respect to all of the Underwriter Defendants is appropriate because Ontario Teachers' claims arising out of the ADS/Preferred Offerings are identical to those arising out of the Notes Offering, and based in many of the same misstatements.  *NECA*, 693 F.3d 163.

any "different proof," which might be required to prove liability as to the Notes Offering, but not the ADS/Preferred Offerings.  *See Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *11-12 (D. Conn. 2015), *aff'd*, 658 F. App'x 5 (2d Cir. 2016).  There is none.

### 3.    Any Defect In Standing Was Cured By Anchorage

Even assuming for argument that Ontario Teachers' lacked standing as to certain of the Defendants responsible for the Notes Offering, the claims alleged individually and on behalf of the Class by named plaintiff Anchorage in the September 5, 2017 Complaint were timely and cured any alleged defect in standing.  When a lead plaintiff is found to lack standing to bring certain claims, the SOL is tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), so that other putative class members with standing can step forward.  The commencement of a class action "suspends the applica[tion] [of a] statute of limitations as to all asserted members of the class."  *Id.* at 551, 554; *In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007).  Here, Lead Plaintiff has standing to assert all claims on behalf of the Class.  The SOL was tolled when Lead Plaintiff filed the claims on August 2, 2017, and any possible defect in standing was cured when named plaintiff Anchorage filed its complaint on September 5, 2017.

### D.    Plaintiffs Adequately State A §11 Claim Against PwC

An auditor is liable "both for its own audit opinions ***and*** for the false and materially misleading statements ***made by*** [***the issuer***] in its financial statements."  *See In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 259 (S.D.N.Y. 2015) (emphasis in original).  Plaintiffs allege both independent grounds of liability against PwC.  *See* ¶¶981-982, 1000-1001.  PwC, however, only moved to dismiss the claims arising from its audit opinions, and does not dispute its separate and distinct liability arising from its certification of Teva's false financial statements incorporated into the Offering Materials.  The §11 claim against PwC survives with respect to the latter; although as set forth below PwC's audit opinions are also actionable under *Omnicare,*

*Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).

PwC Is Liable For Certification Of Teva's False Financial Statements – "Under §11, accountants are liable for errors in any part of the registration statement that they prepared or certified." *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109 at 1115 (E.D. Cal. 2017). An "audit report constitutes a certification under §11" because "an auditor which consents to serve as an accounting expert in connection with a registration statement is liable." *Id.* at 1116.[58] To adequately plead a §11 claim against PwC, Plaintiffs need only allege that (i) the Registration Statements contained an untrue statement of material fact or omitted to state a material fact required to make them not misleading; and (ii) PwC prepared or certified any part of, or report used in connection with, the Registration Statements. *UBS*, 858 F. Supp. 2d at 329.

PwC is not shielded from liability merely by framing its audit reports as opinions because "the statutory language establish[es] strict liability for accountants based on the materials they have certified." *OSG*, 971 F. Supp. 2d at 399-400; *see also Special Situations*, 243 F. Supp. 3d at 1116 ("[N]o amount of couching an audit report as an opinion obviates the certification effect of those reports."). PwC's liability fits squarely within this framework. PwC issued audit reports which thus "certified" the accuracy of Teva's financial statements. PwC also explicitly consented to the incorporation by reference of its audit reports in the registration statements and to serve as an accounting expert. ¶¶981, 1000. Thus, PwC is liable because, as set forth above in Sections III.A.2, III.A.8, Teva's financial statements were false and misleading and failed to comply with GAAP and Item 5 of Form 20-F (Item 303). PwC does not dispute this point.

---

[58] Courts in this Circuit "consistently [find] that accountants bear Section 11 liability for the portions of a Registration Statement that they audited." *OSG*, 971 F. Supp. 2d at 400 n.87. *E.g.*, *Lehman*, 131 F. Supp. 3d at 260 (sustaining §11 claim against auditor).

*PwC Is Liable For Its False And Misleading Opinions* – PwC is also liable because its audit opinions were materially false and misleading in their own right.  *See, e.g.*, *Lehman*, 131 F. Supp. 3d at 255 (issue of fact as to whether audit opinions were materially misleading).  In *Omnicare*, the Supreme Court held that a statement of opinion can give rise to a securities claim where "(1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the stated opinion … omitted information whose omission made the stated opinion misleading to a reasonable investor."  *comScore*, 2017 WL 3261609, at *12.  Thus, *Omnicare* rejected PwC's argument that Plaintiffs necessarily are required to plead that PwC did not actually believe its allegedly false audit opinions.  *See Omincare*, 135 S. Ct. at 1331.[59]

Under the second prong of *Omnicare*, PwC is liable because the untrue facts of Teva's financial statements were embedded in PwC's Audit Reports and, thus, give rise to §11 liability. *See In re Petrobras Sec. Litig..*, 2016 WL 1533553, at *3-4 (S.D.N.Y. 2016).  The audit opinions at issue in *Petrobras*, also prepared by PwC, were adequately alleged as a basis for a §11 claim because PwC certified that the issuer's financial statements "present fairly, in all material respects, the financial position of Petrobras."  *See id.*  Here, like in *Petrobras*, PwC's Audit Reports certified that Teva's financial statements "present fairly, in all material respects, the financial position of Teva," ¶¶982, 1001, which Plaintiffs have adequately alleged was untrue.

Alternatively, PwC also is liable under the third prong of *Omnicare* because it "omit[ted] material facts about [its] inquiry into or knowledge concerning [its audit] opinion, and … those facts conflict with what a reasonable investor would take from [its audit opinion]."  *See* 135 S.

---

[59] PwC's argument that Plaintiffs have failed to allege subjective disbelief (see PwC Br. at 5-6), is irrelevant.  Plaintiffs do not – nor do they bear the burden to – allege liability under the first prong of *Omnicare*.  It also is irrelevant that Plaintiffs have disclaimed allegations of fraud with respect to the Securities Act claims because subjective disbelief and fraudulent intent are not one in the same.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 n.5 (2d Cir. 2011).

Ct. at 1329.  As the Supreme Court explained, an opinion carries with it an implied assertion that the speaker knows "facts which justify it," and this is especially so "where—as in a registration statement—a speaker holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff."  *Id.* at 1330-31; *see also Lehman*, 131 F. Supp. 3d at 259 (under *Omnicare* audit opinions can be materially misleading).  Like in *Special Situations*, PwC failed to (i) understand Teva's key contracts, which precluded the alleged improper revenue recognition; (ii) scrutinize a suspicious spike in revenue in a supposedly fiercely competitive market; and (iii) take into account Teva's internal control environment.  *Special Situations*, 243 F. Supp. 3d at 1121.  *Petrobras*, 2016 WL 1533553, at *4 (evidence relied on in audit opinion was untrue or insufficient "calls into question PwC's basis for offering the opinion" and states a §11 claim); *In re AOL Time Warner,* 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (allegations of an auditor ignoring red flags found sufficient to support a securities claim).[60]

## V.     THE COMPLAINT STATES A CLAIM UNDER ISRAELI LAW

The 10(b) Defendants do not dispute that "liability under Israeli law is pursuant to … the Exchange Act," 34 Act Br. 53 (quoting ¶1084), and therefore agree that Lead Plaintiffs' Israeli law claim (Count IX) should rise or fall in parallel with Lead Plaintiffs' claims under the Exchange Act (Counts I-II).  *See id.* at 53-54.  Because, as detailed above, the Complaint adequately states Lead Plaintiffs' Exchange Act claims, Count IX is likewise adequately pled.

## VI.    CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss.

---

[60] As set forth in Sections III.A.2 & III.A.8, Teva's financial statements did not present fairly, in all material respects and its controls were not effective.

96

DATED: January 10, 2018                     RESPECTFULLY SUBMITTED,


                                            /s/ Joseph A. Fonti

                                            Joseph Fonti (admitted *pro hac vice*)
                                            Javier Bleichmar (admitted *pro hac vice*)
                                            Wilson Meeks (admitted *pro hac vice*)
                                            **BLEICHMAR FONTI & AULD LLP**
                                            7 Times Square, 27th Floor
                                            New York, NY 10036
                                            Telephone: (212) 789-1340
                                            Facsimile: (212) 205-3960
                                            jfonti@bfalaw.com
                                            jbleichmar@bfalaw.com
                                            wmeeks@bfalaw.com

                                            *Counsel for Lead Plaintiff*
                                            *Ontario Teachers' Pension Plan Board,*
                                            *and for Named Plaintiff Anchorage*
                                            *Police & Fire Retirement System,*
                                            *and Lead Counsel for the Class*

                                            /s/ Marc J. Kurzman

                                            Marc J. Kurzman (ct01545)
                                            Christopher J. Rooney (ct04027)
                                            John L. Cordani, Jr. (ct28833)
                                            **CARMODY TORRANCE**
                                            **SANDAK & HENNESSEY LLP**
                                            707 Summer Street, Suite 300
                                            Stamford, CT 06901
                                            Telephone: (203) 252-2680
                                            Facsimile: (203) 325-8608
                                            mkurzman@carmodylaw.com
                                            crooney@carmodylaw.com
                                            jcordani@carmodylaw.com

                                            *Local Counsel for Lead Plaintiff*
                                            *Ontario Teachers' Pension Plan Board,*
                                            *and for Named Plaintiff Anchorage*
                                            *Police & Fire Retirement System*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2018, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties by operation of the court's electronic

filing system or by mail to anyone unable to accept electronic filing. Parties may access this

filing through the court's CM/ECF system.


   */s/ Joseph A. Fonti*
Joseph A. Fonti