**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ONTARIO TEACHERS' PENSION PLAN BOARD, Individually and as Lead Plaintiff on behalf of all others similarly situated; and | No. 3:17-cv-00558 (SRU) |
| ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Individually and as Named Plaintiff on behalf of all similarly-situated bond purchasers, | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | <u>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u> |
| TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; ALLAN OBERMAN; SIGURDUR OLAFSSON; DEBORAH GRIFFIN; MAUREEN CAVANAUGH AND TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.; | |
| Defendants. | |

# TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION .................................................................. 1

II.  JURISDICTION AND VENUE ................................................................ 7

III.  34 ACT ALLEGATIONS ..................................................................... 8

    A.  34 Act Parties ........................................................................... 8

        1.  Lead Plaintiff And Named Plaintiff .................................. 8

        2.  34 Act Defendants ........................................................... 9

    B.  Substantive Securities Fraud Allegations ............................... 11

        1.  Pre-Class Period Allegations ......................................... 12

        2.  Teva Adopted Undisclosed Price-Hike Strategy .............. 12

        3.  Teva Began To Implement The Price-Hike Strategy ........ 15

        4.  2014 - Class Period Begins; Fraudulent Attribution Of Profits; ADS Price Jumps; Law Enforcement Scrutiny ..................................... 16

        5.  Third And Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes ........................................................................ 20

        6.  The First Half Of 2015 – Teva ADS Price Soars To Become "Currency" For "Transformational" Actavis Acquisition ...................... 24

        7.  The Second Half Of 2015 -  Motivation Shifts; Paying For Actavis ................ 27

        8.  First Half 2016 – Price-Hike Strategy Screeches To A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering And Close Of Actavis Deal ...................................................... 31

        9.  Third Quarter 2016 – Disclosure Of Declining Performance And Subpoenas; Generics Day ............................................ 38

        10. Fourth Quarter 2016 – Teva Reported As Target Of Investigations; Disastrous Results; DOJ And State AG Charges; Executives Fired .................. 40

        11. January – August 3, 2017, The End Of The Class Period ................. 43

    C.  False And Misleading Statements And Omissions ................. 45

        1.  Defendants Violated Their Statutory Duty To Disclose Pricing Trends .......... 46

2. The 34 Act Defendants' False And Misleading Statements That Teva Operated In A Competitive Market With Respect To Price ............................. 49

3. False And Misleading Statements And Omissions Regarding Pricing.............. 52

4. False And Misleading Statements Concealing Teva's Receipt Of The DOJ And State AGs' Subpoenas................................................................. 85

D. Additional Allegations Of Scienter................................................................ 86

1. Former Employee Allegations ............................................................... 86

2. The 34 Act Defendants Were Motivated To Use Teva's ADS As "Currency" For A "Transformational" Acquisition.......................................... 89

3. Conscious Misbehavior Or Recklessness ........................................... 91

4. Corporate Scienter ........................................................................... 101

E. Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter ..................................... 102

1. Teva Colluded With Other Manufacturers To Fix Prices................................ 103

2. Evidence of Collusion Further Supports A Strong Inference Of Scienter....... 109

3. The Undisclosed Fact Of Teva's Collusion Constitutes An Independent Basis For Falsity ............................................................................... 111

F. Loss Causation ........................................................................................ 111

1. August 4-5, 2016................................................................................. 113

2. November 3, 2016, December 13-16, 2016..................................................... 113

3. November 15, 2016................................................................................ 115

4. December 5-6, 2016.............................................................................. 116

5. January 6, 2017 .................................................................................. 117

6. February 6-7, 2017............................................................................... 118

7. August 3-7, 2017.................................................................................. 119

G. Presumption Of Reliance And Fraud-On-The-Market Doctrine .......................... 121

IV. CLAIMS FOR RELIEF UNDER THE 34 ACT ........................................................... 122

COUNT I ................................................................................................. 122

COUNT II ............................................................................................... 123

V.      INFLATED PROFIT ANALYSIS ............................................................. 123

VI.     CLASS ACTION ALLEGATIONS .......................................................... 125

VII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ............................................................................ 127

VIII.  SECURITIES ACT ALLEGATIONS ..................................................... 129

     A.    Securities Act Parties .................................................................. 129

          1.   Securities Act Plaintiffs .................................................... 129

          2.   The Teva Securities Act Defendants................................. 130

     B.    The Relevant Offerings................................................................ 131

          1.   The ADS/Preferred Offerings .......................................... 131

          2.   The Notes Offering ........................................................... 133

     C.    Teva Filings Incorporated Into The Offering Materials ......................................... 134

     D.    The Offering Materials Contained Material Misstatements And Omissions......... 135

          1.   Material Misstatements And Omissions Concerning The Price-Hike Strategy And The Benefits And Risks Stemming Therefrom ........................ 135

          2.   Material Misstatements And Omissions Concerning Known Trends Required To Be Disclosed Pursuant To Item 5 Of Form 20-F ........................ 136

          3.   Material Misstatements And Omissions Concerning Competition In The U.S. Generics Market........................................................................ 137

          4.   Material Misstatements And Omissions Concerning The DOJ And State AGs' Subpoenas............................................................................... 137

          5.   Material Misstatements And Omissions Concerning Teva's Participation In A Price-Fixing Conspiracy ........................................................... 137

IX.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 138

     COUNT III.............................................................................................. 138

     COUNT IV.............................................................................................. 140

    COUNT V ....................................................................................................... 141

X.     JURY DEMAND ........................................................................................... 143

XI.    PRAYER FOR RELIEF ............................................................................... 143

    APPENDIX A ............................................................................................... A-1

    APPENDIX B ............................................................................................... A-2

    APPENDIX C ............................................................................................... A-4

    APPENDIX D ............................................................................................... A-6

# GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| 34 Act Defendants | Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Allan Oberman, Sigurdur Olafsson, Deborah Griffin, and Maureen Cavanaugh. References to the 34 Act Defendants include only those individuals then employed by Teva at the referenced time. |
| Actavis | Allergan Generics, acquired by Teva on or around August 2, 2016 |
| ADS | Teva's American Depository Shares |
| ADS Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:19 p.m. ET |
| ADS Offering | The public offering of ADS completed on or about December 3, 2015 and January 6, 2016 |
| ADS/Preferred Offering Materials | The ADS/Preferred Registration Statement, along with the base and preliminary prospectuses and related prospectus supplements constituting part of the ADS/Preferred Registration Statement including the ADS Final Prospectus and Preferred Final Prospectus, and the documents incorporated by reference therein |
| ADS/Preferred Offerings | The ADS Offering and the Preferred Offering |
| ADS/Preferred Registration Statement | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015. |
| ADS/Preferred and Notes Registration Statements | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015 (for the ADS/Preferred Offering), and the Post-Effective Amendment No. 1 to its shelf registration statement on the Form F-3 Teva filed with the SEC on July 13, 2016 (for the Notes Offering). |
| Anchorage | Anchorage Police & Fire Retirement System |
| ANDA | Abbreviated New Drug Application, an application submitted by a generic drug manufacturer to the U.S. Food and Drug Administration seeking approval for a drug the FDA has already approved |
| API | Active Pharmaceutical Ingredient use to make pharmaceutical products |
| Board | Teva's Board of Directors |
| Cavanaugh | Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics during the Class Period. |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| Class Period | February 6, 2014 through August 3, 2017, inclusive |
| COGS | Cost of Goods Sold |
| Desheh | Defendant Eyal Desheh, Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim President and CEO |

| Term | Definition |
|---|---|
| DOJ | U.S. Department of Justice |
| FE | Former Employees of Teva who are referenced herein and identified as FE- |
| Galownia | Kevin Galownia, Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017 |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report titled, "Generic Drugs Under Medicare" and publically released on September 12, 2016 |
| Generics Day | The September 9, 2016 investor day conference Teva hosted to discuss its generics business |
| Generics MDL | *In re Generic Pharmaceutical Pricing Antitrust Litigation*, Case No. 2:16-md-02724 (E.D. Pa.) |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals |
| Griffin | Defendant Deborah Griffin, Teva's SVP and CAO (Principal Accounting Officer) who also served as the Authorized U.S. Representative of Teva and Teva Finance during the Class Period. She was also VP and CFO of Teva USA during the Class Period. |
| Heritage | Heritage Pharmaceuticals Inc |
| Inflated Profits | The amount of profit Teva generated solely as a result of its price increases which was quantified through Lead Counsel's and Lead Counsel's expert's analysis |
| LBE | The Latest Best Estimate, a document produced quarterly with the involvement of Oberman (and later Olafsson), Griffin, and Cavanaugh, one that tracked whether financial forecasts were being met, and which was delivered to Teva's Israeli executives, including Vigodman and Desheh |
| Lead Plaintiff or Ontario Teachers' | Ontario Teachers' Pension Plan Board |
| Levin | Jeremy M. Levin, Teva's CEO from May 9, 2012 to October 30, 2014 |
| Malek | Jason Malek, Former President of Heritage |
| MD&A | The Management Discussion & Analysis section of SEC Form 20-F |
| NADAC | National Average Drug Acquisition Cost, the non-manufacturer specific average market-wide price paid by pharmacies for a specific drug, collected via a monthly survey of pharmacists, and provided to the public by the U.S. Department of Health and Human Services' Centers for Medicare & Medicaid Services |
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360)). |

| Term | Definition |
|------|-----------|
| Notes | Collectively certain U.S.-dollar-denominated senior notes issued by Teva Finance in a public offering on or about July 21, 2016, namely: (a) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (b) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (c) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"); (d) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"); (e) 3.150% Senior Notes due Oct. 1, 2026 ("2026 Notes"); and (f) 4.100% Senior Notes due Oct. 1, 2046 ("2046 Notes") |
| Notes Final Prospectus | The prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 |
| Notes Offering | The public offering of the Notes completed on or about July 21, 2016 |
| Notes Offering Materials | The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by inference therein |
| Notes Registration Statement | The Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 |
| NYSE | New York Stock Exchange |
| Oberman | Defendant Allan Oberman, President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 |
| Offerings | The ADS/Preferred Offerings and the Notes Offering |
| Offering Materials | The ADS/Preferred Offering Materials and the Notes Offering Materials |
| Officer Defendants | Defendants Erez Vigodman, Eyal Desheh, Allan Oberman, Sigurdur Olafsson, Deborah Griffin, and Maureen Cavanaugh. References to the Officer Defendants include only those individuals then employed by Teva at the referenced time. |
| Olafsson | Defendant Sigurdur ("Siggi") Olafsson, President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 |
| Oracle ERP System | The internal enterprise resource planning software system on which Teva digitally stores drug-by-drug pricing, sales, and revenue data |
| Patel | Nisha Patel, Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016 |
| Plaintiffs | Ontario Teachers' Pension Plan Board and Anchorage Police & Fire Retirement System |
| Preferred Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:26 p.m. ET |
| Preferred Offering | The public offering of Preferred Shares completed on or about December 3, 2015 and January 6, 2016 |
| Preferred Shares | 7.00% mandatory convertible preferred shares issued to the public on or about December 3, 2015 and January 6, 2016 |

| Term | Definition |
|---|---|
| Price-Hike Strategy | Teva's new and undisclosed corporate strategy, adopted in 2013, to systematically and broadly implement price increases across its generic drug portfolio |
| Pricing Group | A group of Teva employees, led by Galownia in the United States, whose day-to-day responsibilities included analysis of the pricing for Teva's generic drugs |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| R&D | Research and Development |
| RFP | Request for Proposal, a blind-bidding process intended to solicit a "best and final" offer where each firm that submits a response without knowing what competing firms are bidding |
| S&M | Sales and Marketing |
| SEC | Securities and Exchange Commission |
| Sherman Act | Sherman Antitrust Act |
| State AGs | The Attorneys General of 47 States, the District of Columbia, and Puerto Rico who filed a Consolidated Amended Complaint against Teva and others on June 18, 2018, in the Generics MDL |
| Teva or the Company | Defendant Teva Pharmaceutical Industries Ltd |
| Teva Finance | Defendant Teva Pharmaceutical Finance Netherlands III B.V. |
| Teva Securities | ADS, Preferred Shares, and Notes, collectively |
| Teva Securities Act Defendants | Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceutical Finance Netherlands III B.V., Erez Vigodman, Eyal Desheh, and Deborah Griffin |
| Vigodman | Defendant Erez Vigodman, Teva's President and CEO from February 11, 2014 to February 6, 2017 and one of its directors of the Board from June 22, 2009 to February 6, 2017 |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts |
| YOY | Year-Over-Year |

Lead Plaintiff Ontario Teachers' Pension Plan Board ("Ontario Teachers'") and Named Plaintiff Anchorage Police and Fire Retirement System ("Anchorage"), on behalf of themselves and the members of the Class, allege in this consolidated securities class action (i) fraud based claims under Sections 10(b) and 20(a) of the Exchange Act of 1934, and (ii) strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, against Teva and certain of its current and former employees and officers.[1]  The allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel.  Lead Counsel's investigation included, among other things, a review and analysis of Teva's SEC filings, transcripts of Teva's public conference calls, press releases issued by Teva, and interviews with former employees of Teva conducted by Lead Counsel and/or investigators retained by Lead Counsel.

## I.    SUMMARY OF THE ACTION

1.      This securities class action arises from the difference between what the Defendants told investors was driving Teva's financial success and the truth behind Teva's performance.  Defendants consistently attributed Teva's seemingly remarkable turnaround to fundamental business strategies, like cost cutting and good product management during the Class Period (February 6, 2014 to August 3, 2017, inclusive).  In truth, however, Teva's quarter-after-quarter financial growth was the result of Defendants' implementation of a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio (the "Price-Hike Strategy").  The strategy was initiated in early 2013, and rolled out with a first batch of price increases in July and August 2013.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms attached hereto.

2.     All told, Teva imposed price increases at least 76 times during the Class Period. Teva's senior officers considered and approved each increase, and then carefully tracked the profits generated on a daily, weekly, and quarterly basis. Over the Class Period, the financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to the price increases (the "Inflated Profit," as further explained at Section V below).

3.     Defendants were highly effective at concealing that the Price-Hike Strategy was driving Teva's rapid growth. They invariably attributed the improved profits to legitimate sources. Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases, except to ask Defendants.

4.     When analysts asked whether Teva's profits and performance were at all connected to price increases, the Officer Defendants answered with explicit denials, stating for example:

- "[A]ll the improvement you see in our … margins is **not driven by price**. It is driven by quantities and by mix and by efficiency measures. **Not by price, 2014, 2015, and that's a very important message**." (CEO Vigodman, Oct. 29, 2015)

- "So how did we" achieve $1 billion in increased profit margin?" **"Not by pricing** but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016)

- "Now there's a lot of **noise around pricing issues**….Our exposure to all these things is very minimal….**Teva was not associated with any of that**." (CFO Desheh, Nov. 19, 2015)

5.     Contrary to these false statements, as soon as the Price-Hike Strategy was implemented, it yielded hundreds of millions of dollars of Inflated Profit quarter-over-quarter through the second quarter of 2015, as illustrated in the chart below:

**Figure 1**



6.      The Defendants had to conceal that the Price-Hike Strategy was the primary contributor of this massive boost in profits. The strategy was inherently risky and unsustainable for a variety of reasons, including that two-thirds of the increases were done in tandem with other drug manufacturers. Wholesale purchasers of generic drugs routinely set pricing through competitive RFP bidding. Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share. Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. The Inflated Profits could vanish as quickly as they appeared.

7.      Defendants' motive was to inflate the share price in order to make a large acquisition that Teva otherwise could not afford. As Teva's CFO Desheh predicted in January 2014, within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency … to fund transactions" that could transform Teva into an even larger, more dominant force in generics. Newly-hired CEO Vigodman was reported to also want to undertake a significant acquisition as he took the helm in February 2014, at the start of the Class Period.

8.     Just as Desheh predicted, within 18 months, Teva's ADS price shot up along with the increasing profits.  Indeed, the share price hit an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion.  (Figure 2)  Of course, Teva did not have the cash; the price tag equaled roughly 20 years of Teva's recent average profits.  As Defendants intended all along, they would use Teva's securities as "currency" and raise $27 billion from investors, namely the members of the Class.

**<u>Figure 2</u>**



9.     In mid-2015, however, generic drug pricing had come under even more intense focus from law enforcement, and Congress was calling for legislation to regulate pricing. Analysts grew concerned, but CFO Desheh deflected: "there's a lot of ***noise around pricing*** issues. Some of it's coming from politicians…***Our exposure to all these things is very minimal***."

10.     As 2016 began, other pharmaceutical companies reported disappointing earnings, attributed to increased pressure to reduce prices.  This pricing pressure was a byproduct of heightened government scrutiny and public outcry.  When asked whether Teva faced the same risks, Olafsson falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment."  Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] … That's not something which is different from what we said during 2015."  In reality, the denied pricing pressure was eating into Teva's Inflated Profits; in the first quarter of 2016, Inflated Profits were 45% *lower* than they were a year earlier.

11.     On July 12, 2016, the Connecticut Attorney General served Teva with a subpoena concerning its pricing for generic drugs.  The receipt of the State AGs' subpoena marked the full-stop in Teva's ability to raise prices under the strategy; Teva did not make any price hikes past this point.  Though Teva had set a date in the fall of 2016 for the $20 billion debt offering, on July 13, 2016, Defendants announced that the debt offering was being immediately accelerated and they filed the Notes Registration Statement the same day.  Despite dozens of pages disclosing other investigations and legal matters, the filings were silent as to the State AGs' subpoena, and as to a similar one served by the DOJ.  Teva raised the cash, and closed the deal on August 2, 2016.  The next day, with Inflated Profits further declining since 2015, Teva reported disappointing earnings and disclosed the subpoenas.  Though the truth was beginning to surface, Defendants continued to deny that price increases ever occured:  "people that say that … there's a big generic price inflation, are simply wrong."  (Olafsson, Sept. 8, 2016)

12.     Reality, however, overtook the Defendants.  In November 2016, *Bloomberg* reported that Teva was a target of the DOJ and State AGs' investigations and looming charges. The end of the Price-Hike Strategy brought further declines in profits.  Olafsson, an architect of

the strategy and the driving force of the Actavis transaction, was fired on December 5, 2016. A week later, the State AGs sued Teva for violations of the Sherman Act. In short order, CEO Vigodman was terminated in February 2017, and CFO Desheh was also out by May 2017. On August 3, 2017, the very first investor call after their terminations, Teva announced it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."

13.     Without the Price-Hike Strategy driving Inflated Profits, Teva's ability to service its over $30 billion in debt also raised fears; the credit-rating agencies immediately downgraded the Company's debt to just above "junk." And after 30 years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the dividend by 75%. In reality, without the Price-Hike Strategy, Teva was a fundamentally weaker company than investors were led to believe. The share price plummeted in reaction to this news.

14.     Defendants carried out this securities fraud through four interrelated categories of misstatements and omissions, alleged particularly below. Section II.C. First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection. Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy. Second, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy was impacting Teva's profits, both as they dramatically increased, and later as they evaporated, a trend that Figure 1 illustrates. Third, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to sustain the Inflated Profits because of a lack of competition. Whether illegal or not, this was a precarious reality, which could be, and ultimately

was, undercut.  Finally, in connection with the Note Offering, Defendants were required to disclose the receipt of the State AGs' and DOJ subpoenas.

15.     Additionally, Defendants colluded with other manufacturers to fix prices for a subset of 16 drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion.  Section III.E.  Lead Counsel's investigation independently identified facts indicating this collusion.  These allegations are corroborated by the facts identified through the State AGs' allegations that Teva engaged in a vast industry-wide price-fixing conspiracy. Additionally, the allegations herein, on information and belief, identify the Teva employee who the State AGs allege was central in the price-fixing; this employee, however, was not in a position to agree to or approve any pricing changes.  Section III.3.E  Instead, Defendants Griffin, Chief Accounting Officer of Teva and CFO of Teva USA, and Cavanaugh, COO of Teva USA, made those decisions, approving all the price increases alleged herein.

16.     In addition to the Exchange Act securities fraud allegations, the Plaintiffs allege strict liability and negligence claims under the Securities Act against Teva, Teva Finance, and certain of the Officer Defendants who executed the Offering Materials.  The reasons why the Offering Materials are false and misleading are the same under the Exchange Act and the Securities Act.  For efficiency, the misstatements are pled in accordance with Fed. R. Civ. P. 9(b) in the Exchange Act section of the Complaint, and are incorporated by reference in the Securities Act section of the Complaint.  Section VIII.

## II.    JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 27 of the 34 Act (15 U.S.C. § 78aa); and, separately, (ii) Section 22 of the Securities Act (15 U.S.C. § 77v).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to: (i) Section 27 of the 34 Act

(15 U.S.C. § 78aa); and, separately, (ii) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)).

In addition, venue is proper pursuant to 28 U.S.C. § 1391.

19.     In connection with the acts alleged herein, Defendants directly or indirectly used

the means and instrumentalities of interstate commerce, including the United States mails,

interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.     34 ACT ALLEGATIONS

### A.     34 Act Parties

#### 1.     Lead Plaintiff And Named Plaintiff

20.     Lead Plaintiff Ontario Teachers' Pension Plan Board is the Court-appointed Lead

Plaintiff in this matter, and is the largest single-profession pension plan in Canada, representing

roughly 323,000 active and retired teachers in the Province of Ontario.  Ontario Teachers' brings

separate claims under the 34 Act and the Securities Act on behalf of all Class Members.

21.     Ontario Teachers' purchased or otherwise acquired Teva ADS registered on the

NYSE and Preferred Shares in domestic transactions during the Class Period, as set forth in its

Certification (Appendix D), and suffered damages as a result of the violations of the federal

securities laws alleged herein.  Ontario Teachers' purchased Teva ADS listed on the NYSE

during the Class Period.  In addition, Ontario Teachers' purchased Preferred Shares from

Defendant Citigroup, a joint book-running manager and underwriter of the Preferred Offering,

and from Goldman Sachs in the United States during the Class Period.

22.     Named Plaintiff Anchorage Police & Fire Retirement System is a public pension

fund in Anchorage, Alaska that provides pension, disability, and survivor benefits to active and

retired police officers and firefighters and their families.  Anchorage brings separate claims

under the 34 Act and the Securities Act on behalf of Class Members who purchased or otherwise acquired Teva Notes.

23.     Anchorage purchased or otherwise acquired Teva Notes in domestic transactions during the Class Period, as set forth in its Certification (Appendix D), and suffered damages as a result of the violations of the federal securities laws alleged herein.  Anchorage purchased Teva's U.S.-dollar denominated 3.150% fixed rate senior notes maturing in 2026, from Defendant Citigroup, a joint book-running manager and underwriter of the Notes Offering, in the United States during the Class Period.

**2.     34 Act Defendants**

24.     Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel.  Teva's wholly-owned subsidiary Teva USA has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.  Teva ADS trade on the NYSE under the symbol "TEVA."  Teva Preferred Shares and Notes are traded in the U.S.

25.     Teva has two reporting segments to its business, specialty medicines and generic medicines.  During the Class Period, Teva's generics segment contributed approximately one half of the Company's revenues.  Teva's U.S. generics business is the most important part of its generics segment comprising approximately 50% of overall generics revenues.

26.     Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017.  Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Class Period, as well as the ADS/Preferred and Notes Registration Statements.  Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically

herein. During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

27. Defendant Eyal Desheh served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President. Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as well as the ADS/Preferred and Notes Registration Statements filed with the SEC. Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

28. Defendant Allan Oberman served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014. Oberman made false and misleading statements as alleged herein. During his tenure at Teva, Oberman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

29. Defendant Sigurdur Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

30. Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S.

Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Class Period. She was also VP and CFO of Teva USA during the Class Period. Griffin signed the ADS/Preferred and Notes Registration Statements. While at Teva, Griffin possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

31.     Defendant Maureen Cavanaugh ("Cavanaugh") during the Class Period served as Teva USA's SVP and Chief Operating Officer, North America Generics. During her tenure at Teva, Cavanaugh possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

32.     Defendants Vigodman, Desheh, Oberman, Olafsson, Griffin, and Cavanaugh are referred to herein collectively as the "Officer Defendants." Teva and the Officer Defendants are referred to herein collectively, as to claims under the 34 Act, as the "34 Act Defendants."

**B.     Substantive Securities Fraud Allegations**

33.     The allegations herein are based on Lead Counsel's investigation, which included interviews with numerous former employees of Teva conducted by attorneys and/or investigators retained by Lead Counsel. Several former Teva employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the false or misleading nature of the statements. The former employees identified herein provided information on a confidential basis and are specifically described in Section III.D.1 by job description and responsibility, and duration of employment, thereby providing sufficient details to establish their reliability and personal

knowledge  (the "Former Employees" or "FEs")  Allegations attributed to a particular Former

Employee are designated as such by reference to their "FE-__" designation or job description.

1. **Pre-Class Period Allegations**

a) **ADS Price Suffers;**
   **Transaction Motivation Announced**

34.     Before the Class Period, Teva's generics segment was struggling and Teva's share

price had dropped from the $60s in 2010 into the $30s by 2013.  Then-CEO Levin acknowledged

that the U.S. generics business had been "slowing fundamentally" for years and had announced a

strategy to focus on Teva's other business segment, branded drugs.  Abruptly, Levin was fired on

October 30, 2013, after just 18 months as CEO, and was immediately replaced by CFO

Defendant Desheh.  As he stepped into the role of interim-CEO, Desheh was enthusiastic about

Teva's prospects, as was Chairman Peter Frost, who told analysts that his friends were buying

"hundreds of millions of dollars" of Teva shares.

35.     By the beginning of 2014, Desheh's optimism became more strident as he

announced Teva's motivation to make a major acquisition, predicting that within 12 to 24

months Teva's "stock price will go up and we'll be able to use our share as a currency … to fund

transactions."  As Defendant Vigodman took the helm as new CEO in February 2014, analysts

reported that he also supported engaging in a significant acquisition.

2. **Teva Adopted Undisclosed Price-Hike Strategy**

36.     Defendants actively concealed, however, that by early 2013 Teva had adopted a

non-public strategy to systematically increase prices across dozens of drugs in its generics drug

portfolio (the "Price-Hike Strategy").  Teva's decisions to increase prices came from the top

down.  Using an established review and approval procedure, price increases required the Chief

Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh to

undertake and document a careful cost-benefit-analysis to determine whether to make a price increase; they would personally approve the increases.  (FE-1, FE-2)  Griffin and Cavanaugh would then decide when the increases would become effective, often implementing them in batches.  (FE-1, FE-2)

37.     Members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were simply "told" via emails or in meetings to implement a price increase with little or no justification.  (FE-3)  While the directions often came from the head of Teva USA's Pricing Group, Kevin Galownia, he did not have the authority to make price-increase decisions himself; those decisions came from above.  (FE-3, FE-1, FE-2, FE-4)  Once implemented, Teva notified its customers via a letter, and would circulate a copy to employees whose work would be impacted by the increase (*e.g.*, customer service employees who would need to field consumer complaints following the hikes).  (FE-2, FE-4)  The expected profits from the price increases were then incorporated into the Company-wide Oracle database, (FE-2, FE-1, FE-3), to which Oberman, Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access.  (FE-1, FE-3)  Oracle generated daily or weekly "Scorecards" that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the Inflated Profit, and tracked whether Teva was on schedule to meet forecasts.  (FE-1, FE-2, FE-3)

38.     The Scorecards tracked profits against financial budgets and a long-term "Work Plan" which was prepared annually and contained forecasts for the coming three to five years. As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the Work Plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh.

(FE-2; FE-1)  During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, detailing whether forecasts were met, or whether there was a "hole" between the forecasted profits and reality.  (FE-1; FE-2)  The LBE reports were sent to Teva's executive committee in Israel (FE-1; FE-2).

39.     Throughout the Class Period, Defendants told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches.  At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, the 34 Defendants denied that Teva was engaged in price increases, let alone that those increases were driving profits.

40.     They concealed this because the Price-Hike Strategy was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution.  Specifically, the strategy was unsustainable and risky because the U.S. generic drug market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price.  Wholesale customers solicit pricing though a "blind" RFP bidding process.  Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share.  Moreover, generic drugs are an essential part of the lives of millions of Americans.  Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy.  Additionally, many of Teva's price increases occurred in tandem with competitors.  Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, come under intense civil and criminal law enforcement investigations.  Had Teva disclosed that its core business

strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a strategy driven by fundamental growth and cost cutting, as the 34 Act Defendants falsely proclaimed.

41.     Teva's Price-Hike Strategy was particularly well-suited for concealment.  The generics industry is highly opaque; Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug.  As explained in Section V, to determine that the Price-Hike Strategy was actually the driver of Teva's success, Lead Counsel and its experts undertook an econometric analysis of thousands of data points from various non-public, subscription-based data services, including multiple regression analyses, to identify and quantify Teva's very large price increases that greatly exceeded general pricing trends and inflation.  The analysis then isolated the amount of profit Teva generated solely as a result of the increases. This analysis yielded the Inflated Profits measure alleged herein.  *See* Section V.

### 3.     Teva Began To Implement The Price-Hike Strategy

42.     On July 3, 2013 and August 9, 2013, the 34 Act Defendants began to implement the Price-Hike Strategy by raising the prices of 18 drugs.  Fifteen of the increases were implemented together with Teva's competitors who also made price increases on the same drugs. The increases were as high as 812% of the original price.  *See* Appendix A.

43.     In just the last two quarters of 2013, these price increases generated as much as $250 million in Inflated Profit.  The profit from the increases fell directly to Teva's bottom line because they required no additional research and development ("R&D") or sales and marketing ("S&M") expenses.  These 2013 price-hiked drugs would contribute as much as $875 million in Inflated Profit to Teva's bottom line by the end of the Class Period.

44.     From the Scorecards, LBE reports, and Work Plan, executives closely tracked the impact of this Inflated Profit.  This reporting structure ensured that "everyone would have known" if there were significant price increases that generated large profits.  (FE-2)

### 4.     2014 - Class Period Begins; Fraudulent Attribution Of Profits; ADS Price Jumps; Law Enforcement Scrutiny

45.     Entering 2014, price increases by generic drug companies had caused public concern.  For example, on January 8, 2014, the National Community Pharmacists Association, based on a proprietary survey of its members, wrote to Congress stating that "[o]ver the last six months … many of our members across the U.S. [] have seen huge upswings in generic drug prices," and requested an investigation.  As the fact of large price increases on certain drugs trickled out to the public, the 34 Act Defendants made increasingly misleading statements to cover their tracks and falsely disassociate themselves from price increases by attributing profit to other sources.

46.     The Class Period begins on February 6, 2014, the date Teva announced its fourth quarter 2013 and full year 2013 financial results in a press release.  Those results improved as compared to performance prior to the Price-Hike Strategy.  The financial disclosures, however, made no mention of the fact  that this newfound success was driven by Inflated Profits.

47.     Specifically, Teva's financial disclosures touted a 14% increase in U.S. generics revenue for the fourth quarter, attributing it to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs.  While the attributed reasons for improvement may have had some minor influence on the profits, all of the YOY improvement was driven by the Inflated Profit from price increases. The omission of this fact when listing the causes for the YOY profit growth was misleading.  This pattern would repeat throughout the Class Period.

48.     During the February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, that the "U.S. generic business is highly profitable," and that "[w]e had a pretty good even ***excellent second half*** [of 2013] in the United States [generic] business."  Oberman, CEO of U.S. generics followed and explained that "at the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a ***very valuable business to Teva***, and we see it continuing to be on a go-forward basis"; a stark contrast from Levin's assessment just months earlier that the generics business was "slowing fundamentally."

49.     The improved financial results were well received by investors and analysts.  On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above … our expectations and consensus"; "we think 4Q results are a high-quality beat with revenue and EPS coupled with an improvement in margins year over year….  Teva shares should be bolstered by today's positive earnings announcement."

50.     The encouraging news triggered the beginning of a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015.  Figure 1.  By early March 2014, the ADS had risen from the $30s to trade at $48.  The increased price of the ADS was critical to achieving the 34 Act Defendants' stated motivation to use the ADS as "currency" to make a major acquisition.   Desheh, on a March 4 investor conference call, explained that with "the stock price under $40 … we can't use [Teva Securities as] currency," but that, with "change[s] over the past few months," Teva was extracting "itself [from] … a corner that was difficult to come out of," bringing Teva closer to a large acquisition.

51.     What investors and analysts did not, and could not, know was that Desheh, Oberman, and the Company's SEC filings had concealed the Price-Hike Strategy, and that, in the

fourth quarter of 2013, the 18 price increases made pursuant to the strategy generated ***the***
***entirety*** of Teva's year over year ("YOY") gain in U.S. generics revenue.

52.     <u>First Quarter 2014 Results; Analysts Take Note:</u>  By the beginning of April 2014,
Teva's ADS price had increased to $54.06, or 19%, since the Class Period began.  As a National
Alliance Securities analyst concluded, Teva's ADS had "the Best YTD" 2014 performance
relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

53.     The series of positive financial disclosures, fueled by undisclosed Inflated Profit
from the concealed Price-Hike Strategy, continued.  On May 1, 2014, Teva reported surprisingly
positive results driven by its generics segment, which reported a YOY increase of $117 million
from Q1 2013 profits.  The 34 Act Defendants falsely explained that lower expenses, a changed
composition of revenues, and "new product launches" were the cause of the increase in profits.
In reality, the Price-Hike Strategy had generated $120 million that quarter.

54.     The 2014 Work Plan, which was being reviewed by the executive committee in
August 2013, would have included the expected profits from the July and August 2013 price
increases.  Cavanaugh, Griffin, and Oberman were each provided on a daily or weekly basis
Scorecards that tracked whether Teva's actual results met or exceeded the Work Plan forecasts.
Vigodman and Desheh similarly were provided documents reflecting the impact of the Inflated
Profits as they compared actual revenues versus the Work Plan through the LBE reports
disseminated throughout the quarter.

55.     Analysts reacted positively to Teva's surprising and rapid turn-around.  Cowen
and Company analysts wrote, "The bottom line is that this story is reversing (for the positive)
much faster than previously anticipated, and the belief that 'growth' could reemerge is very
real."  J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking

several steps to regain its generic leadership including … focusing more heavily on portfolio selection and management."  Jefferies analysts noted that Vigodman "Impresses in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

56.     Second Quarter 2014 Results, Further Price Increases, and Law Enforcement Scrutiny:  In April 2014, Teva increased the prices of another 12 generic drugs pursuant to the Price-Hike Strategy; eight of the increases were carried out together with Teva's competitors. Following the established process for implementing price increases, Cavanaugh and Griffin would have approved these price increases, and would have tracked the Inflated Profits generated through the Scorecards.  By the end of the second quarter, these new price hikes alone would generate as much as $50 million in Inflated Profit; and as much as $395 million by the end of the Class Period.

57.     On July 1, 2014, Olafsson was hired from Actavis as President and CEO of Teva's Global Generic Medicines Group.

58.     By the Summer of 2014, public attention to generic pricing had increased.  On July 8, 2014, *The New York Times* published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug that Teva did not produce, had nearly doubled since late 2013.  Within days, and as a result of this article, the Connecticut Attorney General ("AG") began a non-public investigation into the companies that manufactured digoxin.  The Connecticut AG issued subpoenas to Teva's competitors Impax, on July 14, 2014, and Lannett, on July 15, 2014; each company disclosed its subpoena in an SEC filing the very next day.

59.     In this context, on July 31, 2014, Teva announced its Q2 2014 financial results, once again boasting an excellent outcome from its generics division.  Profitability of the generic segment increased by $156 million from 2013, again attributed to legitimate business strategies.  During the earnings call, Desheh stressed that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

60.     Analysts echoed Defendants' explanations.  Jefferies analysts observed: "we continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2."  Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for … [the] generics businesses," and the "[s]teady performance for U.S. generics."

61.     In truth, the Price-Hike Strategy had generated as much as $160 million in Inflated Profit, accounting for *all* of the YOY increase in profit reported for Teva's global generics division.

### 5.     Third And Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes

62.     Teva continued to report increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued.  The State AGs served Par Pharmaceuticals with a subpoena on August 6, 2014, which Par disclosed on August 11, 2014.  Then, on October 2, 2014, Congress sent letters to Teva and 16 of its peers.  The letter addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs."  Vigodman never responded.  Any truthful answer would have required him to reveal the Price-Hike Strategy.

63.     Griffin and Cavanaugh implemented another 20 price increases on July 1 and August 28, 2014, pursuant to the Price-Hike Strategy (Appendix A), 12 of which Teva made

together with other manufacturers. The increases would have been recorded in the Oracle database, and reflected in the daily Scorecards and LBE reports. These 12 price increases would generate as much as $50 million in Inflated Profit.

64. Significantly, the expected Inflated Profits from the July and August 2014 price hikes, along with all the earlier increases, would have made their way into the Oracle database and been reflected in the report to the Officer Defendants. The price hikes implemented through August 2014 generated as much as $193 million in Inflated Profits in the third quarter of 2014.

65. <u>Third Quarter Results</u> On October 30, 2014, Teva released positive third quarter results, driven by an increase in generic segments profits of $160 million, or 40%, as compared to the third quarter of 2013. As was routine by this point, the 34 Act Defendants fraudulently attributed this increase to a reduction in expenses.

66. With Congressional hearings looming, on the October 30, Q3 2014 earnings call, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? … *whether there were price increases in some of your base business and whether that impacted*" profit. Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there's an opportunity, **when there is a shortage in the market**, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

67. Increases in prices due to shortages is a normal market dynamic. Thus, Vigodman's statement misled investors as to the fact that Teva had, by this time, implemented the strategy by effectuating price increases on 46 drugs since July 2013 (some more than once), while not one of these 46 drugs were subject to shortages or other reported market anomalies. In total, the systematic Price-Hike Strategy had yielded as much as $193 million in Inflated Profit in

the third quarter of 2014.  The profits from all of these price increases would have been reflected in the Work Plan and LBEs that Vigodman and Desheh received.

68.     Unaware of the true facts, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to climb.  A Cowen and Company analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating."  Piper Jaffray wrote, "***Importantly, operating profit … for the generics segment during the quarter was up 40% versus the same period a year ago.***"  Morgan Stanley increased its price target for Teva from $57 to $61, stating, "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

69.     <u>December 11, 2014 Guidance Call</u>  By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania. The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014 to Lannett and Impax relating to a drug Teva did not make.  The companies disclosed these subpoenas days later in SEC filings, on November 6 and 7, respectively.

70.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted."  Teva was invited, but refused to testify.

71.     It was against this backdrop that, on December 11, 2014, the Company held a guidance call with analysts.  On the call, a Morgan Stanley analyst honed in on the issue of risky price increases, asking: for "generic manufacturers, ***I'm assuming that wholesalers have been seeing extraordinary price increases in recent years*** and has been buying inventory ahead of tremendous price increases.…  Are you able to control it?"

72.     In response, Olafsson flatly denied that prices had increased at all: "So first *let me correct*. *I have to disagree that they have experienced tremendous price increase*." Olafsson dismissed the matter further: "There has been a lot of press about price increases on individual molecules and this has been *a hot political issue selecting a few products*."

73.     These statements were flatly belied by the facts, to which Olafsson had direct access. Teva by then had implemented 50 price increases on 46 drugs, each from 50% to as much as 1,500%; each increase was part of a concealed internal strategy and implemented pursuant to Teva's established internal practices.

74.     <u>Year-End 2014 Results</u>: On February 5, 2015, Teva filed its fourth quarter and full year 2014 financial results with the SEC, once again announcing positive results driven by the generics segment. Fourth quarter 2014 profit for the generic segment increased $47 million, or 9%, as compared to 4Q 2013. For the full year 2014, profit from the generic segment increased $480 million from 2013.

75.     Though the 34 Act Defendants attributed success to cost savings and other benign factors, in Q4 2014 alone, Teva made as much as $219 million in Inflated Profit, or *four times* the fourth quarter increase in profits the 34 Act Defendants boasted; Teva made Inflated Profit of nearly $700 million for the full year 2014, or 144% of the reported YOY increase in generic profit for the whole Company. All of these results would have been reflected internally in the Work Plan, the Scorecards, and the LBE reports distributed to the 34 Act Defendants.

76.     The following table reflects Teva's overall Inflated Profit for 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

77.     Without mention of the Price-Hike Strategy, Desheh bragged about the profits from Teva's generic division.  On the February 5, 2015 earnings call, he claimed "the most notable contribution" to Teva's growth and profits "was generated by our Generic business, improving profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit.  Unaware that the profits came from the Price-Hike Strategy, analysts focused on this success.  Piper Jaffray wrote that "profitability of the generics business [is] continuing to improve."  Barclays focused on the trajectory of generics' success: "profitability for generics improved to 21.9% from 16.8% in 2013….  The company anticipates another 400 basis point improvement in 2015 … a key priority."

78.     Notably, and consistent with the Officer Defendants having misled investors by attributing Teva's improved profits to sources other than the Price-Hike Strategy, throughout 2014 the Officer Defendants had also claimed that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost cutting" program that had first been adopted in late 2012.  However, only a fraction of that cost cutting program actually fell to Teva's bottom line as profit.  As Defendants eventually disclosed on a December 2014 investor call, by then Teva had generated only $150 million in cumulative profit from the program since its inception.  After that call, the 34 Act Defendants stopped emphasizing cost cutting and mentioned it only rarely again.

**6.      The First Half Of 2015 – Teva ADS Price Soars To Become "Currency" For "Transformational" Actavis Acquisition**

79.     Teva implemented another 14 price increases in January 2015 (Appendix A), nine of which were increased together with other manufacturers.  Each of these was again subject to the same rigorous internal review and approval process that included the Officer Defendants.  The Inflated Profits were captured in the daily and weekly Scorecards and intra-quarter LBE

reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met. By the end of the first quarter of 2015, the 14 price increases undertaken in that quarter would generate as much as $48 million in Inflated Profit; the Price-Hike Strategy overall would generate as much as $228 million in the quarter.

80.     The Inflated Profits boosted the ADS price to nearly $60, and the 34 Act Defendants' motivation to use the ADS as "currency" for a "transformational" transaction was coalescing into reality. As J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, Susquehanna took note that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A." By April 16, Barclays reported on Teva's "willingness" to perform a "'transformational' acquisition in the generics space." That day, Leerink wrote that Teva had an "urgency to diversify via M&A."

81.     Though not disclosed at the time, by late 2014 the 34 Act Defendants had actually approached Allergan, although Allergen was not ready to make a deal then. Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition. Indeed, Olafsson told employees assembled at an August 2014 meeting soon after arriving at Teva (from Actavis), that he had never joined a company that did not eventually acquire his previous employer. (FE-1) His prescience would prove true soon enough.

82.     With Allergan rejecting Teva's advances, the 34 Act Defendants planned a hostile offer for Mylan, Teva's long-standing rival. On April 21, 2015, the 34 Act Defendants filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of the outstanding shares of Mylan. Mylan's board quickly rejected the offer, criticizing Teva as a "low quality stock." This rejection intensified the 34 Act Defendants' motive to improve the ADS price.

83.     First Quarter 2015 Results:  In the face of Mylan's rebuff, on April 30, 2015, Defendants again announced excellent results stemming from Teva's generic segment, pointing to a profit increase of $296 million, or 59%, compared to the first quarter of 2014.  The 34 Act Defendants again misleadingly attributed this increase in profits to a reduction in expenses, as well as a new product launch and higher profitability in Europe.  The 34 Act Defendants concealed that as much as $228 million in Inflated Profit accounted for 77% of the reported generic profit increase.

84.     On the earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment."  He attributed this to "a significant improvement in our cost of goods…. portfolio offering … [including] when we have more of the launches … [and] the cost infrastructure."

85.     In the absence of the truthful and complete reasons for Teva's improved profit, analysts credited the 34 Act Defendants' false statements.  J.P. Morgan noted, "Teva continues to make progress on generics profitability … we remain encouraged by the recovery in Teva's generic business."  Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."  Buoyed by the fraud, Teva ADSs closed at $60.42 that day, an increase of 33% since the start of Class Period.

86.     As the weeks passed, the 34 Act Defendants continued to laud the vast success in Teva's generic segment in a series of statements:

- On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "***nothing short of a revolution***," explaining that "[i]n 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015.  Our operating margin was 16.7%.  It is 27%, this is full 10 percentage points," *i.e.*, a $1 billion improvement.

- During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva.  ***You see the profound change in the generic business.  These are things that are***

*not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014.*" He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

87.    $40 Billion Acquisition of Actavis Announced: As Olafsson had foretold on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva would announce the transformational acquisition it had been seeking: it had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity.

88.    In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since the start of the Class Period was the "precondition" for making the deal. Of course, he concealed that the true "precondition" underlying that turnaround was Teva's implementation of the Price-Hike Strategy.

### 7.    The Second Half Of 2015 - Motivation Shifts; Paying For Actavis

89.    Following the announcement of the Actavis deal, the 34 Act Defendants needed to raise over $30 billion in cash to pay for it. Teva did not have the money, and the price tag would amount to roughly **20 years** of Teva's recent annual earnings. To pay for the deal, Teva would give Allergan $7 billion in ADS, and raise cash from the Class through a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from an offering of bonds set for 2017.

90.    On July 30, 2015, following the announcement of the Actavis deal, Teva issued more glowing Q2 2015 results driven by generics; specifically, an increase in generics profit of $193 million, or 36%, compared to 2Q 2014, attributed primarily, and misleadingly, to reduced expenses and new product launches. That day, Desheh, boasted about "the impressive improvement in the profitability of our Generic business … up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and specifically the "strong focus on

U.S. Generics business." The 34 Act Defendants concealed that the Price-Hike Strategy contributed as much as $236 million in Inflated Profit in the second quarter alone. Without the Price-Hike Strategy, generic profit would have declined.

91. <u>Third Quarter 2015 Results:</u> In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases, following Cavanaugh's and Griffin's review and approval and as would be reflected in the Scorecards, LBEs, and Work Plan circulated to the 34 Act Defendants. By the end of the quarter, these seven price increases, together with earlier hikes, would generate as much as $218 million in Inflated Profits. Furthermore, given the timing of the increases, the expected profits would be incorporated into the 2016 Work Plan that Olafsson, Cavanaugh, and Griffin would be finalizing for presentation to Vigodman and Desheh later in the summer, following the routine schedule.

92. Following these increases, on October 29, 2015, the 34 Act Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, again misleadingly attributing this increase mainly to lower expenses. In reality, the Price-Hike Strategy contributed as much as $218 million, ***ten times*** the reported improvement in profit.

93. On the earnings call, Vigodman was exuberant about the "huge opportunities in the United States" for generics. Likewise, Olafsson emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

94.     Analysts, unaware of the truth, continue to adopt the 34 Act Defendants'
misleading narrative.  Piper Jaffray wrote, "Margins for the generics business continue to
improve….  Though top-line growth for the generics segment has been anemic, margins have
continued to expand."  Jefferies' analysts highlighted that, "Generic Drug Margins Continue to
Improve," noting that "on the live Q3 presentation, management highlighted the significant
improvement in profitability from its core generics business."

95.     Increased Public Scrutiny On Pricing: By the fall of 2015, however,
Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in
drug pricing had taken hold.  Legislation was introduced in Congress that would penalize generic
manufacturers for increasing prices at a rate higher than inflation.  The State AGs and DOJ were
continuing their investigations.  And, Allergan had received a DOJ subpoena concerning generic
pricing on June 25, 2015, which it disclosed in an SEC filing on August 6, 2015.

96.     Given this landscape, during the 3Q 2015 earnings call held on October 29, 2015,
analysts posed direct questions to the 34 Act Defendants aimed at getting a clear answer as to
whether Teva was exposed to the potential legislation.  The 34 Act Defendants met these specific
questions with equally specific denials.

97.     On the call, after a series of questions on the sustainability of Teva's generics
success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from
sustainable, ordinary business practices, and not price:

> We're very … responsible in everything that portends to prices on
> the Generics side…. And I would even put it another way, ***all the
> improvement you see in our – in margins is not driven by price. It
> is driven by quantities and by mix and by efficiency measures. Not
> by price, 2014, 2015, and that's a very important message***.

Then, when a Barclays analyst asked for management's thoughts on the proposed legislation's
"potential limit to generic drug price increases," Olafsson denied that Teva was exposed:

> In terms of the proposed legislation on pricing control on generics, … we have told you that overall on our whole portfolio, we have a decline in price. ***The talk about the inflation in generics when you have a big portfolio is really not there.***

The only price increases he acknowledged were those "due to some ***abnormalities*** in the market," like supply shortages.

98.     Misled, analysts took explicit note.  That day, UBS repeated the 34 Act Defendants' fraudulent denials: "[Management] highlighted that the [generic business] improvement was ***not driven by price***, but by volume, mix, and efficiency."  The truth was that the fraudulent denials concealed the Price-Hike Strategy, and that Teva had by that point made 71 price increases, none of which were caused by market abnormalities like shortages.  Moreover, a huge portion, if not all, of the margin improvement Vigodman touted was driven by as much as $1.6 billion in Inflated Profit reported since the start of the Class Period, including, over $690 million in 2014, and over $680 million in the first three quarter of 2015.  All of this information was reflected in the Scorecards, LBEs, Work Plan and other reports regularly sent to Olafsson and Vigodman.

99.     Importantly, by this time, the 34 Act Defendants misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were concealing an ever increasing risk.  Public, regulatory, and law enforcement scrutiny of the industry had begun to undermine Teva's ability to execute and sustain the Price-Hike Strategy.  Teva was finding it increasingly difficult to increase prices.  In 2014, Teva made 32 increases.  In 2015, Teva made a total of only 21 hikes; 14 in January, and seven in July, the final round of significant price increases implemented in a systematic fashion prior to the close of the Class Period.  By the end of 2015, Inflated Profits had diminished quarter over quarter for the first time since Q1 2014.

100. With this context, and with the offering of $7 billion in ADS and Preferred Shares weeks away, Teva attended a November 19, 2015, Jefferies conference. The moderator pressed Desheh about "everyone's favorite topic the last 2 months … ***pricing, is it an issue***? …. ***where do you go on pricing***?" Desheh acknowledged the swirl of concern over pricing and legislative actions, but claimed that "***Teva was not associated with any of that***," and specifically, with respect to legislative initiatives to cap price increases, Teva's exposure "is as a small as anybody can have." The opposite was true.

101. <u>Teva's False And Misleading Registration Documents For Its Secondary ADS And Preferred Share Offerings</u> On November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's Secondary ADS and Preferred Share Offerings, and on December 3 filed two prospectus supplements and issued the Secondary ADS and Preferred Shares. The Offering Documents included numerous false misleading statements attributing Teva's profits to sources other than the Price-Hike Strategy. The ADS/Preferred Offerings raised approximately $7.2 billion.

**8. First Half 2016 – Price-Hike Strategy Screeches To A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering And Close Of Actavis Deal**

102. As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices came to the fore as a number of industry participants reported a new trend of downward pricing pressure. On, January 11, 2016, McKesson, one of Teva's major wholesaler customers, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

103. The same day, J.P. Morgan held a healthcare conference. With McKesson's announcement in mind, J.P. Morgan asked Olafsson to comment "on how you see generic

pricing as we look out not just this year but in the future and how Teva is able to navigate the

current environment?" Olafsson responded by fraudulently claiming that Teva was not involved

in "big price increases":

> There's *a lot of headlines of examples of big price increases* in
> generics. But when you are a company of the size of Teva and you
> have the portfolio that we have today – as I said, 270 products for
> the whole of the portfolio – *there is a decline*.

He later fraudulently explained that, because Teva had not taken "big price increases," its

generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind *there's a lot of talk
> about inflations in generic pricing*. But what we see is there's –
> overall on our total portfolio of 270 products, *there is a slight
> decrease in pricing*. … on 95% of our portfolio, we experience price
> decline. And then on 5%, we might be *flat or a slight increase*….

104.    These false statements belied the truth. Teva had raised prices on 60 drugs, or

22% of the portfolio Olafsson cited, generating by that point as much as $1.7 billion. This would

have been reflected on the daily Scorecards and intra-quarter LBE reports the Officer Defendants

received. More to the point, the drugs that were driving Teva's profits were massively inflated,

making Teva particularly vulnerable to the pricing pressure that other industry players reported.

105.    <u>Fourth Quarter and Full Year 2015 Results</u>  On February 11, 2016, Teva issued its

fourth quarter and full year 2015 financial results. The full year disclosures reported Teva's

profit in generics in 2015 were up $500 million YOY, concealing over $848 million in Inflated

Profit for the year.

106.    On the earnings call that day, Olafsson again touted a "$1 billion improvement in

operating profit over 24 months period," pointing to generics profits going from "$1.68 billion

operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of

revenue.  He explained rhetorically: "So how did we do this? ***Not by pricing*** but by portfolio mix, new products, and efficiency measures."

107.     Olafsson denied even the mere existence of price inflation, let alone having engaged in 71 price hikes: "on pricing…. [W]e and the generic industry overall ***don't see price inflation of generics*** as it sometimes is portrayed in the media."

108.     In truth, the concealed Price-Hike Strategy had generated as much as $1.5 billion in Inflated Profits over the 24 months period Olafsson cited.

109.     But additional price hikes had become more difficult, if not impossible to implement.  Accordingly, Teva reported that fourth quarter 2015 profit in generics increased only 1% compared to the fourth quarter of 2014.  Analysts, thus, grew more concerned as more firms reported pricing pressure in the fourth quarter.  Guggenheim asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that."  Olafsson fraudulently responded:

> let me start on the pricing. ***As I mentioned in the beginning, we didn't see anything change in fourth quarter***. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

110.     Misled, Guggenheim expressed relief in its report, stating: "[u]nlike its generic competitors, ***TEVA did not experience any increase in pricing pressure this quarter***, which highlights the ***strength of the company's platform***, in our view."  Jefferies' analysts also believed Olafsson's false distinction between Teva and other companies reporting pricing pressure: "Mgt noted that smaller generics players may have realized outsized gains from price increases on individual drugs – and are thus now exposed to faster price erosion – and stressed that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid profitability."

111.    Based on these false statements, the 34 Act Defendants had concealed from investors the true reason for the flattening of the YOY profit growth from generics: Teva's Price-Hike Strategy had begun to falter.  The 60 drugs on which Teva had increased price were facing renewed pricing pressure.  As such, the quarterly change in Inflated Profit had begun to decrease, rather than increase by as much as $70 million since the second quarter of 2015, or by 30%. This trend would continue throughout the Class Period.

112.    The following table reflects Teva's overall Inflated Profit for 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

113.    <u>Pricing Concerns Increase, Defendants Go On The Offense</u>  As investors became increasingly concerned about the pricing environment, the 34 Act Defendants continued to affirmatively deny any vulnerability to pricing pressure.  At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing."  Olafsson said that "[Teva] *never* saw" price increases and that "inflation *never* really happened in the generics business."  He added, "overall the pricing hasn't changed that much," and was "*stable*," and there had been no "big changes in the pricing environment" since 2015.  In reality, Teva's Inflated Profit had fallen 24% in the fourth quarter 2015, from $218 million to $166 million, compared to the prior quarter.

114.    <u>First Quarter 2016 Results</u>  As the public and law enforcement scrutiny intensified, the Price-Hike Strategy faltered and Inflated Profits declined from pricing pressure. Teva was unable to make significant additional price hikes, implementing only five during the entire course of 2016, all on April 6 of that year, and all on drugs that Teva had hiked before and in markets where Teva possessed a monopoly.  See Appendix A.

115.    Because of declining profits, the 34 Act Defendants were under significant stress to finance the Actavis acquisition.  They needed to raise the $20 billion in additional cash required to close the Actavis deal through a bond offering.  On May 9, 2016, on the Q1 2016 earnings call, the 34 Act Defendants set a new date for the $20 billion offering, September 2017.

116.    That day, Teva also announced its first quarter 2016 financial results, reporting profit from generics $215 million *less than* in the first quarter of 2015.  Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches.  As pricing pressure sapped the impact of the Price-Hike Strategy in 1Q 2016, Teva generated $104 million *less* in Inflated Profits compared to the first quarter of 2015, accounting for half of the generics division's reported profit decline.  The "hole" created by the drop in Inflated Profit would have been reflected in the Scorecards, LBEs and Work Plan.  (FE-1, FE-2)

117.    Similarly, even as additional generic drug manufacturers accurately reported poor results due to pricing pressure, the 34 Act Defendants continued to deny that pricing pressure had any impact on Teva.  On the May 9, 2016 earnings call, Olafsson noted "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' woes on those firms' business models:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. ***Teva has not seen any fundamental change or worsening in the pricing environment***… What this boils down to is each individual company's business model.… ***Nothing has happened in the last two quarters that has changed the pricing environment.***

Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, most prominently, the lack of new product launches.  He misleadingly asserted that Teva's prior

success had come from sustainable sources such as "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products … and sales force effectiveness."

118.    The empirical facts internal to Teva and available to Olafsson through the Scorecards, LBE reports, Work Plans, and the Oracle database would have shown otherwise. Like its competitors, price deflation was substantially damaging Teva's profits.  Since the fall of 2015, Teva's Inflated Profit plummeted from as much as $236 million in 2Q 2015, to $218 million in 3Q 2015, to a mere $124 million in the first quarter of 2016.  Figure 1.

119.    Deceived analysts credited Olafsson's false denials.  J.P. Morgan wrote, "Reassuring Generics Outlook Ahead of [Actavis] Deal Close … *Teva does not see any major changes in the price environment*."  Jefferies wrote "Generic pharmaceutical bellwether TEVA has *not witnessed a deterioration* in the pricing environment, according to mgt.  *This directly contrasts* with what has been stated by a number of competitors over the past few months."

120.    With Teva's debt offering scheduled to occur in the fall, and thus needing to keep investors optimistic about Teva's prospects, the 34 Act Defendants continued their unrelenting flow of fraudulent statements and denials that Teva was seeing any increase in pricing pressure:

- May 10, 2016 (Olafsson)  "I know many of the competitors in the generic space … are *talking about a lot of pricing pressure*, but it shouldn't be. There is *nothing that has happened* over the last two quarters which has changed fundamental the market."

- June 3, 2016 (Vigodman)  "So we are very consistent.  Our message was conveyed, and we will continue to convey.  What we see is a 4% to 5% erosion.  That's what we see.  That's *not something which is different from what we said during 2015*.  By the way, we continue saying it in 2016."

- June 8, 2016 (Olafsson)  "[R]eally, the *environment hasn't changed*. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business.  And we are *still talking about the same number*, what we see in the base business."

121.    The undisclosed truth was that the rapid deterioration of the Price-Hike Strategy continued into the second quarter of 2016.  Inflated Profits would decline 52% YOY.

122.     Only days after Olafsson's June 8 statements, undisclosed to shareholders, on June 21, 2016, Teva received a subpoena from the DOJ seeking information relating to generics pricing.  And on July 12, 2016, Teva received a subpoena from the Connecticut AG.  Teva did not make any further price increases for the duration of the Class Period.

123.     <u>Subpoenas Concealed; Notes Offering Is Accelerated:</u>  The day immediately after receiving the subpoena from the Connecticut AG, on July 13, 2016, the 34 Act Defendants announced that Teva was accelerating its $20 billion debt offering from the September timeframe it had announced just weeks earlier.  Defendants filed the Registration Statement with the SEC that very day.  To support this surprise announcement, Olafsson, Vigodman, and Desheh gave bullish guidance to investors for the end of 2016 through 2019.  Again, with industry reports of pricing pressure in mind, a Citigroup analyst asked Olafsson on an investor call that day: "can you comment on the generics pricing assumptions that you have **baked into your forecast?**"  Olafsson responded: "we are assuming and now forecasting for the guidance for the remainder of the year **same pricing assumption** as we have had for the first half of the year," because "**we saw no change in the pricing**.  We saw a stable environment … from first quarter into second quarter."

124.     But far from being "stable," the pricing environment for Teva's own generics portfolio had been deteriorating.  Inflated Profit was down $122 million, or 52%, for the second quarter as compared to the same period in 2015.  Teva was unable to offset this price deterioration with additional price increases.  The pricing assumption Teva "baked into" the guidance was contemporaneously false and disprovable.

125.     Moreover, Teva's Price-Hike Strategy faced a brand new, and concealed, challenge.  The 34 Act Defendants made no mention of this or the DOJ subpoenas until after the Notes Offering was complete and the Actavis deal was closed.

126.     Without the true facts, investors were falsely reassured that Teva had somehow immunized itself from the downward industry trend.  Piper Jaffray noted, "management stated that it did not see further pricing pressure on the overall generics business," which "may *ease recent worries* regarding the near-term trajectory of the business."  Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging … [m]gmt sees *US pricing environment as unchanged*."

127.     The $20 Billion Debt Offering On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction, approximately $15 billion of which were U.S. dollar denominated and sold directly to the Class.  The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures.  Despite dozens of pages of disclosures about other investigations and litigations, neither the Notes Offering Materials, nor the documents incorporated by reference therein, disclosed the DOJ and Connecticut AG subpoenas.

> **9.     Third Quarter 2016 – Disclosure Of Declining
> Performance And Subpoenas; Generics Day**

128.     Second Quarter 2016 Results On August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of the DOJ and State AG subpoenas.  The financial disclosures reported $115 million *less* in generic profit in 2Q 2016, than in the second quarter of 2015, a decrease attributed mostly to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases.  This misleading attribution concealed that Teva earned as much as $122 million *less*

in Inflated Profit for 2Q 2016 YOY.  On the disclosure of the poor results and the subpoenas, the price of Teva Securities declined.

129.    The 34 Act Defendants scrambled to mitigate the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure. On the earnings call, the Citigroup analyst again asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability.  Likewise, Olafsson once again falsely claimed that "the pricing is stable to the same degree as before … *very stable* from the first quarter." This was belied by facts that Olafsson was presented with on the daily Scorecards, and in the LBEs and Work Plan, that he shared with the other Officer Defendants, which would have revealed dramatically decreasing Inflated Profit.

130.    When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson fraudulently implied that Teva had never increased prices to drive profits, and that opportunities to do so were ephemeral and limited to times of shortage, stating, "***pricing comes with shortages in the market*** … if there's some kind of dysfunction in the market, there might be a ***small pricing opportunity that usually comes in and comes out***." The concealed truth was that Teva had made 76 price increases on 60 drugs, and none had anything to do with shortages.  And now, with those inflated prices under pressure, the Inflated Profit was declining.

131.    The false statements mollified unaware analysts.  J.P. Morgan wrote, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable."  Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

132.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in Inflated Profits for the same period:

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported YOY Change in Generics Profit | -$215 | -$115 | -$330 |
| (Unreported) YOY Change in Inflated Profit | -$104 | -$122 | -$227 |

133.    <u>Teva's Generics Day</u>  On September 9, 2016, Teva held its "Generics Day" for investors, during which the 34 Act Defendants touted the supposed opportunities of the combined Teva/Actavis business.  Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "people that say that … there's a big generic price inflation, ***are simply wrong***."  He falsely reiterated that price increases occurred only with market abnormalities like shortages: "When price increases are taken, there's some kind of abnormality in the business.  There are shortages."

134.    Olafsson then falsely explained that Teva had a purported "secret sauce" that immunized the Company from pricing pressure.  In reality, Teva had no "secret sauce"; it was suffering from pricing pressure on its drug portfolio which in reality had "big generic price inflation" from years of large price hikes made pursuant to the Price-Hike Strategy.  The pricing pressure on that portfolio would have been reflected in the Scorecards, LBEs and Work Plan.

**10.    Fourth Quarter 2016 – Teva Reported As Target Of Investigations; Disastrous Results; DOJ And State AG Charges; Executives Fired**

135.    <u>Bloomberg Article; DOJ Charges & State AGs Loom</u>  On November 3, 2016, *Bloomberg*, the leading real-time news source for Wall Street and investors, published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," revealing for the first time that "according to people familiar with the matter," "U.S. prosecutors are bearing down on

generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year." Moreover, "Connecticut Attorney General George Jepsen … is seeking to lead a group of states … seeking damages." The article specifically mentioned Teva as one of the companies.

136.    Accordingly, Teva was now for the first time reported as a potential target of criminal and civil liability. The price of Teva securities fell immediately upon release of this article, with its ADS price plummeting 9%.

137.    <u>Disastrous Third Quarter Results; Continued Denials</u>  On November 15, 2016, Teva reported its third quarter 2016 results, its first post-Actavis financial report, disclosing disappointing numbers, particularly from Teva's legacy generics business. With revenues from Actavis removed, Teva's U.S. generics revenues declined $277 million YOY from the third quarter of 2015. Defendants fraudulently attributed the decline to causes such as divestments and lost sales from certain drugs. In truth, as much as $121 million, or 44%, of the overall YOY decline, was attributable to a YOY decline in Inflated Profit as the Price-Hike Strategy collapsed. This decline would, again, have been reflected in the Scorecards, and the "hole" between forecasts and actual revenues long ago captured in the LBEs, and circulated to Olafsson, Desheh, and Vigodman.

138.    Olafsson, however, falsely insisted that "like previous quarters, there ***hasn't been any fundamental change in the US drug pricing***." Indeed, Olafsson doubled down when a Wells Fargo analyst expressly asked whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?" Olafsson flatly,

and fraudulently, stated "No." He instead claimed the number increased because of divested drugs, and thus that it was an anomaly limited to the quarter. In reality, the increase in erosion was causing a dramatic decline in Inflated Profit. Figure 1. A puzzled J.P. Morgan analyst pressed him, observing that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Olafsson adamantly insisted "there hasn't again been any fundamental change" in pricing.

139.     The false statements comforted analysts otherwise troubled by the poor U.S. generic results. Deutsche Bank wrote: "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

140.     <u>Olafsson Is Fired</u> Less than three weeks later, on December 5, 2016, Teva unexpectedly announced Olafsson's "retirement." His replacement, Bhattacharjee, immediately took over as CEO, Global Generic Medicines Group. In reality, Olafsson, only 48 years old, was fired. He is now the CEO of Hikma Pharmaceuticals PLC, and a director of other companies.

141.     Analysts readily saw through the implausible reason for Olafsson's departure, concluding that he had been terminated due to the poor performance of Teva's generics division. In truth, the sudden change in performance was the materialization of the risks associated with the Price-Hike Strategy; Inflated Profit suddenly dropped; law enforcement was now pursuing Teva; a price-inflated generics portfolio was increasingly susceptible to pricing pressure; and Teva could not plug the hole in its financial results with price increases.

142.     <u>DOJ Criminal Charges; State AGs Sue Teva</u> On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from

2013 through the end of 2015.  The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the Class Period.

143.    The next day, December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide.  The State AGs' complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer.

144.    The State AGs' complaint has been amended to include 13 additional drugs, seven of which implicate Teva, and 47 State AGs, and the AGs from the District of Columbia and Puerto Rico.  That complaint is based in part on the cooperation of Glazer and Malek, who have settled with the State AGs in exchange for cooperation.  The State AGs are now investigating conspiracies regarding upwards of 200 drugs, and will file additional complaints in the future.  Malek and Glazer have also pleaded guilty to Federal criminal charges, admitting that they participated in "a conspiracy to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide, from in or about April 2014 and continuing until at least December 2015," in violation of the Sherman Act.

**11.    January – August 3, 2017, The End Of The Class Period**

145.    In view of Olafsson's departure, on January 6, 2017, Teva provided 2017 guidance a month early, announcing a significant reduction, and surprising analysts.  Vigodman attributed the reduction to previously-unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business."  Teva's legacy generics business "explain[ed] the majority of the gap."  On this news, the price of Teva Securities plummeted.

146.    Vigodman concealed that the EBITDA "gap" was actually attributable largely to the collapse of Teva's Price-Hike Strategy, and the resulting steep decline in Inflated Profit.  In

2016, Teva had generated only as much as $420 million in Inflated Profit, compared to $848 million in 2015. In each quarter of 2016, Inflated Profit declined at least 45% YOY. In 2016, Teva made only five modest (~25%) price increases, on drugs that had already been hiked.

147. The following chart reflects the YOY reduction in Inflated Profit on a quarterly basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

148. Vigodman, for his part, continued to fraudulently claim that Teva's profitability since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price."

149. <u>Vigodman Is Terminated:</u> On February 6, 2017, Teva announced Vigodman's termination, effective immediately. Without a permanent replacement, Teva appointed Peterburg, its Chairman of its Board since January 2015, as Interim President and CEO. Investors reacted negatively on this news, and the price of Teva Securities dropped significantly. Once again, the reality was that Vigodman was fired; the Price-Hike Strategy had collapsed, along with all the success that Vigodman had boasted about for years.

150. On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016 results. The 34 Act Defendants disclosed that, without the Actavis revenue, Teva would have reported a $233 million YOY decline in quarterly U.S. generics revenues, but concealed that as much as $80 million of that YOY decline resulted from the decline in Inflated Profit.

151. As to the full year 2016, without Actavis, Teva would have reported a YOY U.S. generic revenue ***decline*** of $1.4 billion for the full year 2016, attributed to a loss of exclusivity,

lower sales of certain drugs, and the loss of revenues from divested product, when in fact as much as $427 million of the yearly decline resulted from the decline in Inflated Profit.

152.    <u>Desheh Finally Out, $6.1 Billion Charge Announced</u>  Weeks later, on June 8, 2017, Teva announced the nomination of four new directors to its Board, in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility.  By June 21, 2017, Desheh was also out, leaving Teva for another job.

153.    On August 3, 2017, with Desheh, Vigodman, and Olafsson – the principal architects of Teva's Price-Hike Strategy – finally gone, and with new Board members in place, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line.  In addition, after at least thirty years of maintaining its shareholder dividend, Teva announced a 75% reduction in its payout.  In reporting a dismal loss of $5.94 per share, Teva also drastically revised the guidance issued in January (which already revised the July 2016 guidance); this guidance reduction was a direct result of the complete collapse of the Price-Hike Strategy, and evaporation of the Inflated Profits, which by this point amounted to just $53 million per quarter, with no reason to believe that the erosion would abate.

154.    On this news, the credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded Teva to just one notch above "Junk" rated debt.  Investors fled Teva Securities, and the price of Teva's ADS fell dramatically.

## C.    False And Misleading Statements And Omissions

155.    During the Class Period, the 34 Act Defendants made four types of false and misleading statements or omissions on conference calls with investors and in SEC filings:

- <u>Item 5</u>  The 34 Act Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F.  Defendants failed to disclose the material trend of generating profit as part of the concealed Price-Hike

Strategy. They also concealed the trend of declining Inflated Profit, and that they could no longer make price increases as the strategy unraveled.

- <u>False Statements Regarding Competition</u>  These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs.  To the contrary, Teva made dozens of price increases in tandem with its competitors.  Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Pricing Statements</u>  These statements concealed Teva's Price-Hike Strategy and the profits it generated.  Later, the statements concealed that the Price-Hike Strategy fell apart as Teva was unable to make more price increases or sustain Inflated Profit.  These statements were particularly misleading as the 34 Act Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success.

- <u>Concealed Receipt Of Subpoenas</u>  The 34 Act Defendants failed to disclose in the Notes Offering Materials Teva's receipt of subpoenas from the DOJ and the State AGs in connection with their antitrust investigations into the generics industry.

156.    The alleged false and misleading statements and omissions below that were made in Teva's financial disclosures filed with the SEC, and were attributable to the 34 Act Defendants as follows.  Desheh was responsible for and signed each Form 20-F and 6-K. Vigodman was responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO. Olafsson was responsible for the reporting for Teva's generics segment in each Form 20-F and 6-K from the third quarter of 2014 through the third quarter of 2016.  Oberman was responsible for the financial reporting for Teva's U.S. generics segment in Teva's Form 20-F for 2013, and Teva's 6-Ks for the first three quarters of 2014.

### 1.    Defendants Violated Their Statutory Duty To Disclose Pricing Trends

157.    During the Class Period, Defendants were under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same disclosures as Item 303 of Regulation S-K ("Item 303").  Item 303 (and Item 5) require that a foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section

of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues or income from continuing operations.   The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

158.    According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.  Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.

159.    SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

160.    During the Class Period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs.  First, Defendants failed to disclose the trend that Teva's financial success was driven in a material way by the Price-Hike Strategy. These prices increases, as discussed, generated as much as $2.3 billion in Inflated Profit for Teva over the Class Period.  Yet, the Price-Hike Strategy and the Inflated Profits it generated were risky and unsustainable as the Price-Hike Strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

161.    Second, starting no later than the beginning of 2016, Defendants failed to disclose

the by-then known trend that the Price-Hike Strategy was beginning to fail.  Teva could not

maintain the Inflated Profits as industry-wide pricing pressure, which Defendants consistently

denied, was reducing the inflated prices on Teva's generic drug portfolio.  Teva was also finding

it increasingly difficult, if not impossible, to make additional price increases because of the

scrutiny from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva

effectively could not make any price increases after the DOJ subpoena was served on June 21,

2016.

162.    SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly

perfect analogy to the facts here, requiring that:

> if a company's financial statements reflect materially lower
> revenues resulting from a decline in the volume of products sold
> when compared to a prior period, MD&A should not only identify
> the decline in sales volume, but also should analyze the reasons
> underlying the decline in sales when the reasons are also material
> and determinable. The analysis should reveal underlying material
> causes of the matters described, including for example, if applicable,
> difficulties in the manufacturing process, a decline in the quality of
> a product, loss in competitive position and market share, or a
> combination of conditions.

163.    Instead, in violation of its duties under Item 303, Teva only disclosed trends that

did not bear on the issue of price inflation (through price increases), or price erosion.  Teva's

failure to disclose the pricing trends was particularly misleading given that (i) price increases

were a core but concealed business strategy; (ii) management concurrently denied that pricing

had impacted Teva's bottom line and that the Company made price increases simply for profit,

(iii) management consistently minimized the positive impact of price increases on Teva's profits,

(iv) management consistently denied that price increases had resulted in price inflation, and

(v) management denied that price deflation was materially affecting Teva, even as its revenues from the former price increases cratered.

2. **The 34 Act Defendants' False And Misleading Statements That Teva Operated In A Competitive Market With Respect To Price**

164.    Throughout the Class Period, on conference calls and in Teva's SEC filings, the 34 Act Defendants made materially false and misleading statements concerning purported "intense" or "fierce" competition on price in the U.S. market for generic drugs. These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening access for patients to life-saving medicines.

165.    The 34 Act Defendants' statements about supposed competition on price by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on at least 48 occasions, raised their prices in tandem, often in very large amounts of well over 100%, rather than use lower prices to increase market share. Teva would also raise the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally choose not to.

#### a)       False Statements On Conference Calls

166.     <u>July 27, 2015 Conference Call</u>   On Teva's investor call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating:

> the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio.

167.     On that same conference call, Vigodman added:

> we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. We believe in competition, and we'll do what is needed in order to win in all the markets we operate.

168.     <u>October 29, 2015 Earnings Call</u>   On the earnings call relating to Teva's Q3 2015 financial results, Olafsson similarly falsely stated:

> So on the pricing, I think pricing is obviously based on the competition.  We have talked about that the overall pricing trend is down.

169.     <u>November 19, 2015 Conference Call</u>   Desheh, on an additional investor conference call, again falsely stressed that Teva was fiercely competing in generics markets:

> Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States … So it is a highly competitive environment with players coming from all over the world with a very fierce price competition. The price of generic went down 50% over the past 10 years .… So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule … And we are in short playing in a very competitive market.

170.     These statements were false and misleading.  Contrary to Olafsson's July 27, 2015 statement, by that time there was not "fierce competition on most of … if not all of" Teva's generic drug portfolio.  Since July 2013, Teva had made, pursuant to the Price-Hike Strategy, 61 price increases without any competitor competing on price.  At least 48 of those price increases

were made in tandem with Teva's supposed competitors.  Vigodman's July 27, 2015 statement

that "we believe in competition" was also false as a result, and the fact that the Officer

Defendants had adopted and participated in the Price-Hike Strategy, the success of which

depended on a lack of competition.  Olafsson's October 29, 2015 declaration that "pricing is

obviously based on competition" was false because, by then, the opposite was true:  pricing for

the drugs subject to the Price-Hike strategy was based on a distinct lack of competition.

Desheh's November 19, 2015 statements that Teva was "playing a competitive game…by the

rule" in the generics markets was false and misleading for all the reasons that the other

statements were.  Each of these statements was particularly misleading given the importance of

the concealed price increases to Teva's bottom line, and because the profits from this concealed

source were in fact the centerpiece of Teva's supposed turn-around and its success.

### b) False Statements In Teva's SEC Filings

171.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015, the

34 Act Defendants made substantively identical false and misleading statements (adopted by

reference in each quarterly filing) that (i) warned investors that "intense" competition was a

primary risk Teva faced in the U.S. generic drug market, and that competition would force the

price of generic drugs down, as would be expected; and (ii) described how Teva's competitive

advantage was a "competitive pricing strategy" and the ability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs
> typically decline, often dramatically, especially as additional
> generic pharmaceutical companies (including low-cost generic
> producers based in China and India) receive approvals and enter the
> market for a given product and competition intensifies.
> Consequently, our ability to sustain our sales and profitability on
> any given product over time is affected by the number of new
> companies selling such product and the timing of their approvals.
>
> In the United States, we are subject to intense competition in the
> generic drug market from other domestic and foreign generic drug

manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

Each of these statements was materially false and misleading because, while the 34 Act Defendants represented that the U.S. generic drug market was working effectively as designed by forcing rival generic drug manufacturers to compete for market share by underbidding each other on price, the opposite was true. Teva had made dozens of price increases over this time, including dozens in tandem with competitors. The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and a "competitive pricing strategy," were false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the Price-Hike Strategy and undertook, respectively, 18, 31, and 18 systematic increases of generic drug prices to generate billions in Inflated Profits, by deliberately taking advantage of markets that lacked competition.

### 3. False And Misleading Statements And Omissions Regarding Pricing

172. The 34 Act Defendants made numerous statements to conceal their Price-Hike Strategy and its effects. Those false and misleading statements fall into four general categories:

(1) Statements in SEC filings that attribute the YOY changes in Teva's generic segment profit and U.S. generic revenues to sources other than the YOY changes in Inflated Profit from price hikes, which are misleading half-truths. Once the 34 Act Defendants spoke on these subjects, they had a duty to fully and accurately describe the source of Teva's profits.

(2) Flat denials that Teva had engaged in and derived material financial benefit from price increases.

(3) False claims of limited price hikes asserting that Teva only raised prices on a select few generic drugs when there was a shortage or other abnormality in the market of that drug, when in fact none of the dozens of price increases the Company made were accompanied by a shortage.

(4) Denials of pricing pressure even as Teva could not maintain the Inflated Profit from price increases or implement new price increases.

### a) Fourth Quarter And Full Year 2013 False And Misleading Financial Disclosures

173.    On February 6, 2014, Teva filed a press release disclosing its fourth quarter 2013 ("Q4 2013") financial results (the "Q4 2013 Press Release") and held an investor earnings conference call (the "Feb. 6, 2014 Earnings Call").  On February 10, 2013, the 34 Act Defendants filed Teva's annual report with the SEC on Form 20-F (the "2013 20-F"), reporting Teva's full-year 2013 financial results.

174.    Q4 2013 Press Release  The Q4 2013 Press Release announced U.S. generics revenues of $1.2 billion for the fourth quarter, a YOY increase of $144 million, or 14%, with the attribution that the increase:

> [r]esulted mainly from the exclusive launches of [niacin ER and temozolomide] … in the third quarter of 2013, and launches of [duloxetine and tobramycin] … in the fourth quarter of 2013, as well as higher sales of budesonide inhalation.

The statements were false and misleading because, having attributed the source of the revenue increase, the 34 Act Defendants had a duty to disclose, but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results.  These price increases generated as much as $147 million in Inflated Profit in Q4 2013, comprising the entire YOY increase in U.S. generic revenues.

175.　2013 20-F　The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to:

> "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

176.　The statements were false and misleading because, while the 34 Act Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results.  These price increases generated as much as $250 million in Inflated Profit in 2013 and, without that Inflated Profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F.  The contribution of the Inflated Profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.

**b)　First Quarter 2014
False And Misleading Financial Disclosures**

177.　On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call").  On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial statements on Form 6-K with the SEC (the "Q1 2014 6-K").

178.　The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches":

> Teva's generics division "experienced significant growth in the United States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."

The statements were false and misleading because, having attributed the sources of the increases, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes implemented in July and August 2013, contributed materially to the results. The price increases generated as much as $120 million in Inflated Profit in Q1 2014 that accounted for all of the increase in generic profit, and nearly all of YOY growth in U.S. generic revenues. The Inflated Profit amounted to nearly three times the $42 million YOY reduction in S&M expenses.

c) **Second Quarter 2014**
**False And Misleading Financial Disclosures**

179. On July 31, 2014, Teva filed its second quarter 2014 ("Q2 2014") financial statements on Form 6-K with the SEC ("Q2 2014 6-K), and held an investor earnings conference call ("July 31, 2014 Earnings Call").

180. The Q2 2014 6-K disclosed a YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> "[A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit," which was attributed to "higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe."

On the July 31, 2014 Earnings Call, Desheh similarly attributed the "better results" in Teva's generic segment to:

> The launches of "generic Xeloda in March and generic LOVAZA
> this quarter in the U.S. market."

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 30 systematic price hikes since July 2013, 12 of which were made in April 2014, contributed materially to the results. These price increases generated as much as $160 million in Inflated Profit in Q2 2014 that comprised all of the YOY increase in generic profit, and amounted to more than one and a half times the $101 million YOY reduction in S&M expenses to the 34 Act Defendants attributed the generic profit increase.

### d) Third Quarter 2014
### False And Misleading Financial Disclosures

181.    On October 30, 2014, Teva filed its third quarter 2014 ("Q3 2014") financial statements on Form 6-K with the SEC (the "Q3 2014 6-K"), and held an investor earnings conference call (the "Oct. 30, 2014 Earnings Call").

182.    The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, which was purportedly "primarily" from:

> "[H]igher gross profit and a significant reduction in selling and
> marketing expenses," with higher gross profit attributed to "lower
> expenses related to production, higher revenues from our API
> business as well as higher gross profit due to the change in the
> composition of revenues."

During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products:

> "I think overall, we have a good revenue of the new launches this
> year – capecitabine, the generic Lovaza, Omega-3 and entecavir.
> Entecavir was a new launch for us in the quarter.  I think all these
> three products have been very significant contributors to the year."

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-

Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 20 of which were made in Q3 2014, contributed materially to the results. These price increases generated as much as $193 million in Inflated Profit in Q3 2014, a YOY increase of $90 million. That YOY increase of as much as $90 million accounted for over half of the YOY increase in generic profit, and was more than the entire $81 million YOY reduction in S&M expenses to which the 34 Act Defendants attributed the generic profit increase.

183. <u>Oct. 30, 2014 Earnings Call</u>  By this time, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the Oct. 30, 2014 earnings call, the UBS analyst asked "could you talk about Generics a little bit in the U.S. … whether there were price increases in some of your base business and whether that impacted some of" Teva's financial performance?

184. Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in Inflated Profit:

> I think that pricing – I've said it before, there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers.

Vigodman then explained that the market was functioning under normal conditions, *i.e.*, that prices increase only where there are shortages or market dynamics:

> When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

Vigodman's statements were false and misleading because, far from price increases only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price-Hike Strategy. Vigodman concealed that Teva had increased prices on 50 drugs and that those concealed increases—the very subject of the UBS analyst's question—resulted in as much as $720 million in Inflated Profit reported since the start of the Class Period, and as much as $193 million in Q3 2014 alone, on drugs for which there were no shortages.

e)  **December 11, 2014 False And Misleading Statements**

185.   On December 11, 2014, Teva held a guidance call to discuss Teva's 2015 business outlook (the "Dec. 11, 2014 Guidance Call"). On the call, and in light of increased reports of price hikes on generic drugs, the Morgan Stanley analyst asked: "with respect to generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases?"

186.   Olafsson flatly denied even the existence of price increases, and minimized the possibility that Teva had engaged in large price increases:

> So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the U.S. of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

The statements were false and misleading because, in responding to a direct question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, with 32 in 2014, contributed materially to the results. Far from a limited issue involving "a few products," by Q3 2014, Teva's dozens of increases generated a total of as much as $720 million in pure profit,

which would increase to as much as $943 million by the end of 2014. Olafsson's statement that pricing had been "flat to a slight down" across the U.S. generics market concealed the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit from drastic price increases on generics drugs.

     **f)**  **Fourth Quarter and Full Year 2014**
         **False And Misleading Financial Disclosures**

  187. On February 5, 2015, Teva filed a press release with the SEC that reported the Company's fourth quarter 2014 ("Q4 2014") and full year 2014 ("FY 2014") financial results (the "Q4 2014 Press Release"). Also that day, Teva filed its 2014 20-F with the SEC (the "2014 20-F") reporting the Company's FY 2014 financial results, and held an investor earnings conference call (the "Feb. 5, 2015 Earnings Call"). The false statements in the 2014 20-F are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus, and the Preferred Final Prospectus.

  188. Q4 2014 Press Release  The Q4 2014 Press Release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and lower R&D expenses." The statement was false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $219 million in Inflated Profit in Q4 2014, a YOY increase of as much as $72 million. That $72 million YOY increase accounted for the entire YOY increase in generic profit. In contrast, 34 Act Defendants attributed the increased generic profit to a $113 million YOY reduction in S&M expenses, and an $8 million YOY reduction in R&D expenses.

189.    2014 20-F  The 2014 20-F disclosed a YOY increase in generic profit of

$480 million, or 29%, attributed to:

> "lower S&M expenses and higher gross profit," which was
> purportedly "mainly a result of higher revenues in the United States,
> specifically of products launched during 2014 and in the second half
> of 2013, and higher revenues in Canada, which led to higher gross
> profits, as well as higher gross profit from API sales to third parties."

The statements were false and misleading because, having attributed the source of the profit

increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-

Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of

which were made in 2014, contributed materially to the results.  These price increases generated

as much as $693 million in Inflated Profit in 2014, a YOY increase of as much as $443 million,

which increase accounted for nearly the entire YOY increase in generic profit, and was more

than the entire $337 million reduction in S&M expenses to which the 34 Act Defendants

attributed the increase in generic profit.

190.    The table below reflects Teva's improved profits as reported in 2014, as well as

the YOY change in Inflated Profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |

### g)    First Quarter 2015
### False And Misleading Financial Disclosures

191.    On April 30, 2015, Teva filed its first quarter 2015 ("Q1 2015") financial

statements on a Form 6-K with the SEC (the "Q1 2015 6-K"), and held an investor earnings

conference call (the "April 30, 2015 Earnings Call").  The false statements in the Q1 2015 6-K

are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

192.    The Q1 2015 6-K disclosed a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to:

> "higher gross profit and lower selling and marketing expenses as well as lower research and development expenses," with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business."

On the April 30, 2015 Earnings Call, Olafsson similarly concealed the impact of the Price-Hike Strategy when discussing the sources of the improvements in generic profitability since the beginning of 2014.  On the call, the Bank of America analyst asked, "[H]ow much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?"  Olafsson claimed that the "1,000 basis points improvement over a two years period" in "operating profit in the generic segment" was attributable to:

> [P]robably three or four things.  First of all, … significant improvement in our cost of goods… the next thing is the portfolio offering … [including] exclusive complex generics of offering … [as] when we have more of the launches, it will drive up the market. The third thing is the cost infrastructure.

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, 14 of which were made in January 2015, contributed materially to the results.  These price increases generated as much as $228 million in Inflated Profit in Q1 2015, a YOY increase of as much as $108 million, which increase accounted for over a third of the YOY increase in generic profit. The Inflated Profit increase also amounted to more than double the $43 million YOY reduction in S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which the

34 Act Defendants attributed the increased generic profit. Olafsson's statements on the call were also misleading because they concealed that the Price-Hike Strategy was a fundamental part of Teva's improvement. By the end of Q1 2015, Teva had generated as much as $1.1 billion in Inflated Profit on the price increases since July 2013.

### h) June 11, 2015 False And Misleading Statements

193.     As investors, analysts, and the 34 Act Defendants were focused on Teva's outstanding offer to acquire Mylan, during a June 11, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to "[t]he execution of the cost reduction program: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement.… So everything that was done during 2014 was based on organic … moves only."

The statements were false and misleading because, having attributed the source of the profit increase, Vigodman had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, which generated over $1.1 billion in Inflated Profit by the close of Q1 2015, contributed materially to the results. Strikingly, the excess profit of as much as $1.1 billion generated by the price increases accounted for all of the improved operating profit that Vigodman touted.

### i) Second Quarter 2015 False And Misleading Financial Disclosures

194.     On July 30, 2015, Teva filed its second quarter 2015 ("Q2 2015") financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K"), and held an investor earnings call regarding the financial results and the Actavis transaction (the "July 30, 2015 Earnings Call").

The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

195.    The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> "[H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, contributed materially to the results.  These price increases generated $236 million in Inflated Profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which 34 Act Defendants attributed the increased generic profit.

### j)    Third Quarter 2015
### False And Misleading Financial Disclosures

196.    On October 29, 2015, Teva filed its third quarter 2015 ("Q3 2015") financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K"), and held an investor earnings call (the "Oct. 29, 2015 Earnings Call").  The false statements in the Q3 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

197.    The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to:

> "[L]ower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 71 systematic price hikes since July 2013, seven of which had been implemented in July 2015, contributed materially to the results. These price increases generated as much as $218 million in Inflated Profit in Q3 2015, a YOY increase of $25 million, which accounted for all the YOY increase in generic profit.

198. During the Oct. 29, 2015 Earnings Call, Vigodman disavowed that any of the improvement in Teva's results over the previous years were driven by generic pricing:

> We're very – and are very responsible in everything that portends to prices on the Generics side and on the Specialty side. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

The statements were false and misleading because, by this time, Teva had increased prices on at least 71 drugs since July 2013 as part of its Price-Hike Strategy, often by well over 100%, generating over $1.6 billion in Inflated Profit over that time, including as much as $690 million in 2014 and as much as $680 million in the first three quarter of 2015 alone. Thus, the Inflated Profit contributed significantly to improving Teva's generic profit margin, as that Inflated Profit was devoid of any material corresponding costs, directly contradicting Vigodman's statements.

199. In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent

and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

The statements were false and misleading because, by this time, Teva had made at least 71 systematic price hikes, seven of which Teva implemented on July 29, 2015, and many of which were increased by more than 100%. The 60 drugs subject to these price increases made up 22% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like a shortage or an increase in demand. By the end of Q3 2015, 34 Act Defendants' Price-Hike Strategy had generated over $1.6 billion in Inflated Profit.

### k) November 19, 2015 False And Misleading Statements

200. On November 19, 2015, Jefferies held a conference, at which Desheh was pressed by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2 months, pricing and specialty pharmacy. Could you just give us your 20,000 foot view on pricing, is it an issue? Your particular products, where do you go on pricing?"

201. Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. Our exposure to all these things is very minimal …. And Teva was not associated with any of that. So we're playing a competitive game. We're playing it fairly. We of course play by the

> book and by the rule. And we believe that our exposure to any
> initiative on price reduction in the United States is as a small as
> anybody can have.

This statement was false and misleading because Teva was critically dependent on Inflated Profit from price increases, and the ability to make additional price increases to increase profits, to fill any holes in its financial projections. Thus, 34 Act Defendants' Price-Hike Strategy was greatly exposed to any initiative that addressed generic drug pricing, such as those which would grant Medicare the ability to negotiate prices, which could lead to price deflation. Without the benefit of the Price-Hike Strategy, Teva could not generate additional Inflated Profit or fill financial holes, while Teva's past practice of generating massive profits through inflated prices left it very exposed to any efforts that would cause price deflation of those already-increased drugs. Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue.

**l)      Teva's Registration Documents For Its
Secondary ADS And Preferred Share Offerings
Contained False And Misleading Statements**

202.    On November 30, 2015, Teva filed a Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin, with the SEC (the "ADS/Preferred Registration Statement"), as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public. On December 3, 2015, Teva filed two prospectus supplements with the SEC (referred to hereafter as the "ADS Final Prospectus" and the "Preferred Final Prospectus," respectively).

203.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015

6-K, and Q3 2015 6-K. The incorporated 2014 20-F and Q1, Q2, and Q3 2015 6-Ks contained

false and misleading financial disclosures, as discussed above.

**m)   January 11, 2016 False and Misleading
Statements**

204.    At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked

Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics

side or an expectation of that going forward. Could you just comment a little bit on how you see

generic pricing as we look out not just this year but in the future and how Teva is able to

navigate the current environment?"

205.    In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk
> about inflations in generic pricing. But what we see is there's –
> overall on our total portfolio of 270 products, there is a slight
> decrease in pricing. It's low single digit, but year on year we see a
> low single-digit decrease because on 95% of our portfolio, we
> experience price decline. And then on 5%, we might be flat or a
> slight increase. So, overall, we see that in the business. There's a lot
> of headlines of examples of big price increases in generics. But
> when you are a company of the size of Teva and you have the
> portfolio that we have today – as I said, 270 products for the whole
> of the portfolio – there is a decline.

The statements were false and misleading because they minimized the impact of price increases

– which by the end of Q3 2015 had generated as much as $1.7 billion in Inflated Profit – on

Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its

competitors and wholesalers were already reporting. By this time, Teva had increased the prices

of 60 of its generic drugs, three of which Teva had recently increased the prices on July 29,

2015, and many of which were increased by more than 100%. These drugs made up 22% of

Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic

portfolio "might be flat or a slight increase." The context is particularly important because

McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva.

**n)      Fourth Quarter And Full Year 2015
False And Misleading Financial Disclosures**

206.      On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release").  The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F") reporting the Company's FY 2015 financial results, and held an investor earnings conference call (the "Feb. 11, 2016 Earnings Call")  The false statements in the 2015 20-F are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

207.      Q4 2015 Press Release  The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to:

> "[T]he reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

The statements were false and misleading because the 34 Act Defendants explained that profits were offset by reduced sales, while they had a duty to disclose but concealed the full truth that Inflated Profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24%.  This decline occurred because the Price-Hike Strategy was unsustainable and under increasing investigation by governmental agents and, thus, Teva's ability to make further increases was reduced.

208.      2015 20-F  The 2015 20-F disclosed a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to:

> "[L]ower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues from new products

68

> launched in the United States during 2015, lower other production
> expenses and higher gross profit from API sales to third parties."

The statements were false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 71 systematic price hikes since July 2013, contributed materially to the results. The price increases generated as much as $848 million in Inflated Profit in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generic profit.

209. The table below reflects Teva's improved profits as reported in 2015, as well as the YOY change in Inflated Profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

210. <u>Feb. 11, 2016 Earnings Call</u>  In his opening statements, Olafsson touted "2015 was a very good year for Teva Generics," while explicitly denying that pricing had played *any* role in that supposed success, stating:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period.  So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

The statements are false and misleading because they are directly contradicted by the empirical data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in Inflated Profit from price increases – more than the $1 billion improvement touted by Olafsson.

211.    Later in the call, and repeated in his slide presentation, Olafsson minimized

Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid-single-digit price decline for the overall business.

The statements are false and misleading because Teva had taken at least 71 price increases since

July 2013, many for over 100% or more.  The Inflated Profit from the increases implemented as

part of 34 Act Defendants' Price-Hike Strategy was a necessary foundation of Teva's purported

financial success over that time.

212.    Olafsson denied that Teva was seeing any change in its pricing environment:

> In the US, our largest market, we saw approximately 4% price erosion…. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

A Guggenheim Securities analyst asked:  "some of your competitors have talked about pricing

pressure in the generics business during the quarter.  Curious if you saw that, and if so what

might be driving that."  Olafsson responded:

> As I mentioned in the beginning, we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

The slides Olafsson presented during the call echoed these statements:

> Also do not see the sharp drop in prices other competitors have seen recently[;] Mid-single digit decrease in 2015[.]

The statements were false and misleading because, while 34 Act Defendants claimed not to have

seen any changes in the pricing environment, (i) internally, Teva's profits from price increases

had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3

2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (ii)

Teva was increasingly unable to implement further price increases, as it had in the past.

**o)       March 8, 2016 False And Misleading Statements**

213.     During a March 8, 2016 Cowen conference, Olafsson touted the increased

profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew
> the operating profit of the generic business from 17% in 2013, and
> we exited for the full year of 2015 we were at 28.1%. So it's about
> 1,100 basis points we improved the profitability on approximately
> $10 billion in revenue. So it was a significant improvement over a
> 24-month period. Part of that was due to the improvement in our
> cost of goods sold, very important in consolidation of plants and
> looking for the money there. But also part of it was due to portfolio
> selection and the cost infrastructure.

The statements were false and misleading because, once Olafsson chose to speak on this subject

and having attributed the source of the profit increase, Olafsson had a duty to disclose but

concealed the full truth that Teva had by then generated over $1.7 billion in profit from price

increases on dozens of generic drugs from 2013 through 2015, pursuant to the Price-Hike

Strategy; far more than the $1.1 billion in improved generic profit touted by Olafsson.

214.     Later on the call, a Cowen analyst asked Olafsson:  "Can you discuss what you're

seeing," in generics pricing, "what you're observing, and then maybe in the context of what

you're hearing from others, both US and ex-US?"  In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market that
> we had seen approximately 4% price decline in the US market in
> 2015…. I think overall the pricing hasn't changed that much. There
> was a lot of talk about inflation in generic pricing. But we never saw
> that…. [I]nflation never really happened in the generic business….
> I don't see any big changes in the pricing environment. It's relatively
> stable. 4% is worse than maybe two years ago. But it's similar to
> what we saw in 2014.

The statements were false and misleading because the truth was that the Price-Hike Strategy,

whereby Teva had inflated the prices on 60 base-business generic drugs from July 2013 through

Q1 2016, had generated well over $1.7 billion in Inflated Profit from the beginning of the Class

Period through the end of 2015.  The Inflated Profit generated by the Price-Hike Strategy, however, had drastically fallen.  Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 32 price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

<b>p)  First Quarter 2016<br>False And Misleading Financial Disclosures</b>

215. On May 9, 2016, Teva filed its first quarter 2016 ("Q1 2016") financial statements on Form 6-K with the SEC (the "Q1 2016 6-K"), and held an investor earnings call (the "May 9, 2016 Earnings Call") (collectively, May 9, 2016 Statements").  The false statements in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

216. <u>Q1 2016 6-K</u>  The Q1 2016 6-K disclosed a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while lower gross profit was purportedly "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets.

The statements were false and misleading because, having attributed the source of the profit decline, the 34 Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%.  That YOY decline in Inflated Profit comprised as much as 48% of the YOY decline in generic segment profit, and was more than four times the $25 million YOY increase in R&D expenses to which the 34 Act Defendants attributed the results.  It further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to make more hikes.

217.    <u>May 9, 2016 Earnings Call</u>  In his opening remarks, Olafsson explained away the

decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined
> by 360 basis points, fully explained by the exclusive launch of
> generic Nexium, esomeprazole, in the first quarter 201[5].
> Excluding the exclusivity period of esomeprazole in first quarter,
> the profit margin of the generic segment was 24.4%.

The statements were false and misleading because they excluded entirely the decline in Teva's

Inflated Profit from the unsustainable Price-Hike Strategy, including the steep decline of

$42 million in Inflated Profit from Q4 2015 to Q1 2016, and the $104 million YOY decline

compared to Q1 2015.  That YOY decline comprised 48% of the decline in YOY generic profit

that Olafsson attributed to a decline in sales of generic Nexium, reflecting that 34 Act

Defendants could no longer maintain the Inflated Profit generated by the increases implemented

since July 2013, nor could they make further price increases.

218.    Also on that call, Olafsson, while asserting he would "do my best to provide you

with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the
> pricing environment – something we have been consistent about
> telling investors all year. Teva experienced approximately 4% price
> erosion in the United States last year, and our guidance for this year
> is that it will remain the same.… From where I sit today, there is
> nothing that changes my mind about that. Nothing has happened in
> the last two quarters that has changed the pricing environment. What
> this boils down to is each individual company's business model…

The slides presented by Olafsson during the conference call echoed Olafsson's statements:

> "What has changed in the US pricing environment since Q4 2015?
> The short answer is…nothing[.]… There is no change in the pricing
> environment[.]   It all comes down to each company's business
> model…. Why is Teva generics performance better than most Gx
> companies? Portfolio optimization …. [and] [n]ew products…."

The statements were false and misleading because, far from not seeing "any fundamental change or worsening in the pricing environment," Teva's Price-Hike Strategy of generating billions in profits from price increases was collapsing. In Q3 2015 Teva earned as much as $218 million in Inflated Profit from price increases, while in Q1 2016 it earned $124 million; and while, in 2015, Teva made 21 price increases on generic drugs, in 2016 it would implement only five, all of which were on prices of drugs which had previously been increased.

219. During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

The statements were false and misleading because, while attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated as much as $1.9 billion in Inflated Profit from price hikes reported since the start of the Class Period. The Inflated Profit, however, had begun to dry up due to the unsustainability of the Price-Hike Strategy, and the materialization of the risks concealed by 34 Act Defendants – recently reported by Teva's competitors – namely the risk of increased pricing pressure due to increased public, Congressional, and regulatory scrutiny of generic drug price increases, which would result in increased competition and the inability to take further price increases.

**q)    False And Misleading Statements On Conference Calls In The Build Up To The $20 Billion Debt Offering**

220.    On May 10, 2016, Olafsson participated in a Bank of America conference, and

claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing
> environment. We saw a price erosion in the US last year of
> approximately 4%. …
>
> I know many of the competitors in the generic space, and in the
> specialty space, are talking about a lot of pricing pressure, but it
> shouldn't be. There is nothing that has happened over the last two
> quarters which has changed fundamental the market. And I feel that
> we are blaming the environment on individual company's business
> model more than anything else because as long as you have the right
> portfolio, you have had the right investment in R&D, you really
> have a strong opportunity.

During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst question

regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent. Our message was conveyed, and we will
> continue to convey. What we see is a 4% to 5% erosion. That's what
> we see. That's not something which is different from what we said
> during 2015. By the way, we continue saying it in 2016. I think our
> results in Q1 demonstrated that.

Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a

similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed. When we signed that
> deal in July, we talked about 4% price erosion in the US generic
> business. And we are still talking about the same number, what we
> see in the base business.

The statements were false and misleading because Teva was experiencing a drastic decline in

Inflated Profit from price increases, the inability to make additional price increases, and, in the

past two quarters, the acceleration of the deterioration of the pricing environment. Thus, the

Price-Hike Strategy was proving to be unsustainable, with Inflated Profit declining by $104

million in Q1 2016 as compared to Q1 2015, as the risks concealed by 34 Act Defendants'

strategy began to materialize, namely increased pricing pressure and the inability to take further

price increases due to increased public, legislative, and regulatory scrutiny of generic drug price

increases, which resulted in increased competition.

### r) False July 13, 2016 Guidance Assumption

221.     In a July 13, 2016 call held by the 34 Act Defendants to announce the acceleration

of Teva's debt offering, including the Notes Offering, to the end of July, which, on the May 9,

2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup

analyst asked about pricing: "[C]an you comment on the generics pricing assumptions that you

have baked into your forecast?  Following on that, Siggi, maybe you could just comment on the

generics pricing environment, more broadly, that you are currently seeing in the marketplace."

222.     In response Olafsson indicated that Teva had still not seen any change in the

pricing environment, and that this stable pricing was baked into the assumptions underlying

Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5%
> organic growth that we see year on year.… In terms of generic
> pricing in the second quarter, we saw no change in the pricing. We
> saw a stable environment, as we talked about, from first quarter into
> second quarter. Obviously, in second quarter, as we have
> highlighted to investors, there was no significant new launches that
> we saw in Teva, which obviously impacts the overall generic
> numbers. The pricing has remained stable.… Our assumption for the
> rest of the year is basically assuming the same pricing erosion. It is
> difficult to say; but as I'm sitting here today, with the information I
> have in hand, we are assuming and now forecasting for the guidance
> for the remainder of the year same pricing assumption as we have
> had for the first half of the year.

These statements were false and misleading at the time because Teva's price erosion assumption

was not based on "stable" pricing in which there was "no change" in the second quarter or the

"first half of the year."  In truth, Teva was at that time experiencing a drastic decline in Inflated

Profit from price increases, the inability to make additional price increases, and, over the past year, the acceleration of the deterioration of the pricing environment. Teva generated $10 million less in Inflated Profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less Inflated Profit in the second quarter 2016 than it had in the second quarter of 2015. In the first two quarters of 2015, Teva made as much as $464 million in Inflated Profit. In the first two quarters of 2016, Teva made $238 million. In the first half of 2015, Teva had made 14 price increases. In the first half of 2016, Teva only made five, generating less than $12 million by the end of the Class Period.

### s) The False And Misleading Registration Statement and Prospectus

223. On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to Form F-3, which was signed by Vigodman, Desheh, and Griffin, (the "Notes Registration Statement"). On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus for the Notes Offering (the "Notes Final Prospectus). The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The incorporated 2015 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as described above (2015 20-F ¶¶_; Q1 2016 6-K ¶¶_ ).

### t) Second Quarter 2016 False And Misleading Financial Disclosures

224. On August 4, 2016, Teva filed its second quarter 2016 ("Q2 2016") financial statements on Form 6-K with the SEC (the "Q2 2016 6-K"), and held an investor earnings conference call (the "Aug. 4, 2016 Earnings Call").

225. The Q2 2016 6-K disclosed a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was purportedly "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses…"

During the Aug. 4, 2016 Earnings Call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in Inflated Profit:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

The statements were false and misleading because, having attributed the source of the profit decline, the 34 Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decline of $122 million or 52%. That YOY decline in Inflated Profit comprised nearly all of the YOY decline in generic profit. The statements further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

226.    Also during that call, and in response to a Citigroup analyst's inquiry regarding pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.

Olafsson then reiterated the same false and misleading sentiment later in the call:

> So overall, the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US.

The statements were false and misleading because, in Q2 2016, Teva suffered a $122 million YOY reduction in Inflated Profit from price increases compared to Q2 2015, and Teva was

increasingly unable to implement further price hikes, implementing only five, immaterial increases during 2016, compared to 21 in 2015, and 32 in 2014, during the height of the strategy.

227.     In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that.

These statements were false and misleading because they minimized Teva's Price-Hike Strategy when, in reality, Teva took 76 price increases on 60 drugs, most of which were for 100% or more, that were not associated with any such shortage or dysfunction.  This left Teva very exposed to the pricing pressure facing the industry at the time.

**u)     In the Third Quarter 2016, 34 Act Defendants Continue To Deny Price Inflation And Increased Pricing Pressure In Statements To Investors**

228.     On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.… [Y]ou don't see -- there you don't see the erosion. Where we see erosion is … [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – there's no pressure on prices.

On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure:

> Price erosion is nothing new[.]… Diverse portfolio and competitive
> cost structure allows for long-term value creation.

The statements were false and misleading because, while Desheh claimed that Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in Inflated Profit and the inability to implement further hikes due to increased pricing pressure that was itself the materialization of the risks concealed by the 34 Act Defendants. Most recently, in Q2 2016, Teva suffered a massive $122 million YOY reduction in Inflated Profit from price increases compared to Q2 2015, and Teva implemented only five immaterial hikes in 2016, compared to 21 in 2015, and 32 in 2014, demonstrating the unsustainability of the Price-Hike Strategy.

229.     During the September 9, 2016 call, Olafsson categorically denied Teva had increased prices on its generic drugs:

> There is no inflation in the generic pricing, which I will talk about.

Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:

> [S]o first of all, we need to differentiate generics from branded
> pricing. And people that say that the generic – there's a big generic
> price inflation, are simply wrong.

Olafsson even claimed that Teva had a "*secret sauce*" that immunized the Company from price fluctuations. These statements were false and misleading because each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on 60 drugs or 22% of its portfolio; (ii) the importance of the Inflated Profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing

a dramatic drop in Inflated Profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by the 34 Act Defendants.

230.    During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

The statements were false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation.  The truth was that Teva had raised the prices of 60 drugs, or 22% of its portfolio, via 76 price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

### v)    Third Quarter 2016 False And Misleading Financial Disclosures

231.    On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K"), and held an investor earnings conference call (the "Nov. 15, 2016, Earnings Call").

232.    The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis.  But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%.  In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

The statements were false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, the 34 Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%. That YOY decline in Inflated Profit comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. It further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

233. During the Nov. 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen throughout the market. Olafsson reiterated:

> [W]here I sit here today, experiencing the market, there hasn't again been any fundamental change.

The statements were materially false and misleading because Teva was in fact experiencing a sustained and material decline in the pricing environment, particularly with regard to the drugs whose price Teva had previously raised pursuant to the Price-Hike Strategy, in direct contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on

the matter, in the face of contrary empirical evidence that Teva had inflated prices on 60 drugs, profited by as much as over $2.1 billion since the start of the Class Period, and was now suffering from drastic YOY reductions in Inflated Profit generated from those price hikes and an inability to implement more, were particularly misleading.

234. During the same Nov. 15, 2016 Earnings Call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

The statements were false and misleading because the Inflated Profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%. The sharp decline in Inflated Profit was a result of the materialization of the risks that the 34 Act Defendants concealed as they implemented their Price-Hike Strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes. Those were not single-quarter issues related to divested products, as suggested by Olafsson, but a long-term trend with no end in sight.

### w) The January 6, 2017 Guidance Call

235. During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017. During the call, Vigodman claimed Teva's past success was not due to Inflated Profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

The statement was false and misleading because, having attributed the source of the profitability increases, Vigodman had a duty to disclose but concealed that the Price-Hike Strategy, whereby Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the Class Period through the end of 2016.

### x) Fourth Quarter and Full Year 2016 False And Misleading Financial Disclosures

236. On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY 2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017 Earnings Call"). Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial results (collectively, the "Q4 and FY 2016 Statements").

237. <u>2016 20-F</u>  The 2016 20-F disclosed a YOY decline in U.S. generic revenues of $200 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole …
> and aripiprazole …, a decline in the sales of budesonide … due to
> increased competition, loss of revenues following our divestment of
> certain products in connection with the Actavis Generics acquisition
> and the decline in sales of capecitabine."

The statements were false and misleading because, having attributed the source of the increased revenues, the 34 Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $848 million in 2015 to $421 million in 2016, a decline of $427 million or 50%. That YOY decline in Inflated Profit comprised 31% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. Even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more than double the $200 million YOY decline in U.S. generic revenues. It further concealed that the Price-Hike Strategy was unsustainable, as Inflated Profit was drastically declining, and Teva was unable to implement more hikes.

### 4. False And Misleading Statements Concealing Teva's Receipt Of The DOJ And State AGs' Subpoenas

238. The 34 Act Defendants concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016, each pursuant to their respective investigations into potential antitrust violations regarding pricing practices by generics manufacturers (collectively, the "Subpoenas"). Specifically, the 34 Act Defendants failed to disclose these subpoenas in the Notes Offering Materials. This was actionably false and misleading because the subpoenas called into question Teva's future earnings potential. They rendered uncertain the Company's ability to maintain its earnings from the undisclosed Price-Hike Strategy. Indeed, after Teva received the DOJ subpoena, it was unable to make any additional price increase pursuant to the Price-Hike Strategy. Consistent with this, the Note Issuance Documents listed "governmental investigations into sales and marketing practices" as

among the "[i]mportant factors" that could cause Teva's future financial performance to "differ significantly from [anticipated] results, performance or achievements."

239.    Additionally, the Notes Offering Materials incorporated by reference the 2015 20-F and the Q1 2016 6-K, which included extensive risk disclosures but did not did not disclose the subpoenas.  Among these is a section titled "Government Investigations and Litigation Relating to Pricing and Marketing," that  include an extensive description of litigation related to "marketing and promotion of [Teva's] specialty pharmaceutical products," and to litigation by "[a] number of state attorneys general … relating to reimbursements or drug price reporting under Medicaid or other programs."  The detailed and extensive nature of this section falsely and misleadingly indicated that the disclosures were complete, while omitting the highly material DOJ and State AGs subpoenas.

### D.    Additional Allegations Of Scienter

240.    Together with the above-alleged facts, the 34 Act Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### 1.    Former Employee Allegations

241.    Several former Teva employees provided information on a confidential basis supporting the strong inference that the 34 Act Defendants acted with scienter in making the alleged material false and misleading statements and omissions.  The former employees' accounts corroborate one another and the additional facts alleged herein.

242.    Senior Product Operations Manager [or FE-1] started at Teva in 2005 and, until 2011, FE-1 worked in new generic drug forecasting.  From 2011 to July 2014, FE-1 was a manager, responsible for forecasting and analysis of a product group, and from July 2014 through April 2016 was a Product Manager and then Senior Product Manager responsible for

supply chain and inventory management of Teva's base-line generics business. In FE-1's most recent role, FE-1 reported to Bryan Bart who, in turn, reported to Galownia, Senior Director of Marketing. According to FE-1, based on personal knowledge:

> (i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "Work Plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "Scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to Work Plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii) that compensation structure for Teva's national account managers was not tied to individual performance.

243.    Senior Director of Trade Relations [or FE-2] worked at Teva from 2006 until August 2012. During his tenure, FE-2 was in charge of sales for the branded, generics, and injectables groups. FE-2 later, and until leaving Teva, oversaw the branded drug national account managers, reporting to the Head of U.S. Brands. FE-2 also remained involved and knowledgeable about Teva's U.S. generics. According to FE-2, based on personal knowledge:

> (i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives, including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug-by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," *i.e.*, competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large

price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter;

244.    Associate Manager of Customer Marketing [or FE-3] worked at Teva from September 2014 until May 2016 and was a member of the pricing team. FE-3 reported to a person who reported to Galownia, who reported to Baeder and, for a time, to Cavanaugh.  FE-3 was responsible for evaluating requests for proposals and assessing market pricing for generic drugs.  According to FE-3, based on personal knowledge:

> (i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

245.    Manager of Customer Operations [or FE-4] was employed at Teva from April 2008 to April 2014 and was responsible for metrics for the phone system and managing the process for customer calls to Teva regarding generic drugs.  FE-4 reported directly to Baeder until 2012, and later to Michelle Osmian.  According to FE-4, based on personal knowledge:

> (i) in the early part of 2013, at a quarterly marketing group "all-hands" meeting that FE-4 attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that

Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of FE-4's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

2. **The 34 Act Defendants Were Motivated To Use Teva's ADS As "Currency" For A "Transformational" Acquisition**

246.    The 34 Act Defendants were motivated to make false statements to inflate the price of Teva Securities in order to complete a "transformational" acquisition.  By January 2014, once the Price-Hike Strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation in setting out that "the stock price will go up and we'll be able to *use our share as a currency … to fund transactions*."  Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

247.    Unbeknown to investors, Teva was already focused on acquiring Actavis by as early as the middle of 2014.  Soon after joining Teva from Actavis in August 2014, Olafsson announced at an "all-hands" quarterly meeting at the North Wales U.S. headquarters that he had never joined a new company that did not subsequently purchase his former employer.  (FE-1) By the end of 2014, with the strategy resulting in numerous batches of systematic price hikes, involving 46 drugs, and generating as much as $943 million in Inflated Profit, the ADS was trading in the mid-$50s.  By then, as Vigodman would later acknowledge on July 27, 2015, the 34 Act Defendants had developed a list of acquisition targets and Actavis was at the top. Concealed from investors at this time, Teva had already approached Actavis, but was rejected.

248.   By the end of the first quarter 2015, the Price-Hike Strategy resulted in another batch of hikes, involving 11 drugs.  All told, over $1.1 billion in Inflated Profit had been generated, and Teva's ADS was trading near $63.  The 34 Act Defendants' "willingness" to perform a "'***transformational***' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively.  On April 21, 2015, the 34 Act Defendants attempted to purchase Mylan.  Mylan's Board dismissed the offer on April 27, 2015.

249.   Undeterred, during a June 10, 2015 Goldman Sachs conference, Teva again announced glowing results, with Vigodman emphasizing to investors the "***profound change in the generic business***" and Olafsson noting the improvement of "***$1 billion … in 14 months, 16 months***," while concealing that the Price-Hike Strategy had generated over $1.1 billion in profits for the generics unit over that time.  Fueled by profits from the fraud, by July 27, 2015, the price of Teva's ADS reached an all-time high of $72.

250.   That day, Teva announced the $40 billion acquisition of Actavis from Allergan.  Vigodman explained that the improvement in generics was a "***precondition***" for accomplishing their motivation for a deal.  Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly ***twenty years*** of Teva's average annual income from 2013 to 2015.  They raised the cash from the Class.

251.   By the second quarter 2015, however, the Price-Hike Strategy had peaked.  Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases.  Inflated Profits began to deteriorate, even as the 34 Act Defendants needed to raise the capital necessary to pay Actavis's $40 billion price tag.  As questions were raised regarding the deteriorating pricing environment and Teva's weakening

financials, the 34 Act Defendants flatly denied Teva was making profits from price increases, or that Teva was facing pricing pressure. It was not until the 34 Act Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the deal on August 2, 2016, that they disclosed that their generics business was now the subject of government subpoenas. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### 3. Conscious Misbehavior Or Recklessness

#### a) Implementation Of The Price-Hike Strategy

252. In early 2013, Teva expressly adopted the Price-Hike Strategy as a means to turn the Company around by revitalizing its dwindling generics business. This deliberate strategy was announced by Kevin Galownia, then-Senior Director of Marketing, at a quarterly "all-hands" meetings at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups. (FE-4) At that meeting, Galownia, a frequent presenter at these quarterly meetings, explained that Teva would raise prices on its generic drugs in a systematic manner. (FE-4) This marked a sharp break from the Company's prior strategy of focusing on branded drugs, set by then-CEO Levin in 2012. This significant change in direction necessarily came only from Teva's highest executives, (FE-4) and could not have been decided by Galownia alone. (FE-4, FE-3, FE-2, FE-1)

253. Indeed, carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters. The Inflated Profits would be captured by the daily and weekly reports circulated to Cavanaugh, Griffin, Oberman and later Olafsson. (FE-1) They were also reflected in the intra-quarter reports that these Officer Defendants assembled and sent to Teva's senior executives in Israel. (FE-1, FE-2) Consistent with this, according to FE-2, "everyone would have known" of large price increases that had a significant financial impact, including Oberman, especially if it was used to fill a "hole" between revenues and forecasts.

b)     **Only Senior Executives**
       **Could Make Price Increases**

254.    The 34 Act Defendants' scienter is also supported by the fact that the execution of

the Price-Hike Strategy required that senior executives personally analyzed and approved each

price increase, pursuant to an established and formalized process that was in place by 2012 when

FE-2 was employed at Teva.  (FE-2)  Galownia and the Pricing Group would initiate the process.

(FE-2, FE-4)  Galownia would analyze Teva's portfolio of established generic drugs on a

"constant and ongoing basis," and would produce a "list of opportunities" and recommendations

of potential price increases to Teva USA COO Maureen Cavanaugh and Deborah Griffin, who

was Chief Accounting Officer of Teva and the CFO of Teva USA.  (FE-2)

255.    However, Galownia was "just the guy doing the evaluation," (FE-2), as his

superiors made the actual decision to increase the price of a generic drug.  (FE-2, FE-3, FE-1)

Accordingly, Cavanaugh and Griffin would each separately evaluate whether Teva would make

a price increase, and if so, when.  (FE-2)  Cavanaugh would review the price increases from the

operational perspective, while Griffin would undertake a financial cost-benefit analysis that

would evaluate both whether and when to implement the price increases.  (FE-2)  In particular,

Griffin would have to factor in specific contract terms and costs associated with increasing

pricing, and determine the right timing for the increase.  (FE-2)  Sometimes, Griffin's decision

was to raise a price, but wait until the next quarter when the contractual implications would be

more favorable.  (FE-2)  This recommendation and evaluation process could be quick, but could

also span weeks, with the implemented price hike following as many as 60 days after Galownia's

initial recommendation.  (FE-2)

256.    The members of the Pricing Group would routinely engage in a bottom-up

analysis in deciding to lower prices.  This required them to conduct and provide senior

executives with detailed analysis and documentation justifying their decisions to reduce prices. (FE-3) Price increases, in contrast, came from the top down. When prices were increased, the Pricing Group was simply "told," by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. (FE-3) Members of the Pricing Group did not have authority to implement price increases. (FE-3) Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward. (FE-4) Empirical evidence confirms this observation. Appendix A.

257. As was the case during the Class Period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day. (FE-2) Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. (FE-2, FE-4) Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases. (FE-4)

258. Given this formalized process involving the Griffin and Cavanaugh, there is a strong inference that 34 Act Defendants were aware of, or at least recklessly disregarded, the 76 price increases, ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in Inflated Profit.

c) **Continuous Access To Documents And Information Tracking Profits From Price Increases**

259. The 34 Act Defendants were given documents that tracked the financial impact of the Price-Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis. (FE-1) They also had access to Company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis. (FE-1, FE-3) Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that the 34 Act Defendants knew

or recklessly ignored that billions of dollars in Inflated Profit were generated through the Price-Hike Strategy, and its collapse caused the later short-falls in profits.

260.     Long Range Work Plan  Among the documents the 34 Act Defendants created and received was a long-range Work Plan, generated annually, that included generic revenue forecasts for three to five years, and that contained granular pricing details down to the NDC level.  (FE-1)  The employees preparing the Work Plan would receive feedback from executives over the course of a pre-established schedule.  (FE-1)  The process began around March each year, with the U.S.-based executives, including Oberman and Olafsson reviewing and approving the Work Plan over the late summer.  (FE-1)  The U.S.-based executives would then present the Work Plan to Teva's executives in Israel, including Vigodman and Desheh, each year.  (FE-1)

261.     Daily Scorecards  Weekly or daily Scorecards were circulated among Teva's top executives, including Olafsson and Oberman.  (FE-1, FE-2)  These Scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs.  (FE-1)  The Scorecards also compared Teva's actual revenue figures to longer-term revenue goals.  (FE-1)  The executives used the Scorecards to track "holes" between the actual revenues and forecasts, including the Work Plan.  (FE-1, FE-2)  The price increases were used to "fill" the holes.  (FE-2)

262.     Latest Best Estimates  Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs which showed how a current financial quarter compared to long term forecasts.  (FE-1)  The LBEs would also be circulated to the executives in Israel.  (FE-1)

263.     Oracle ERP System  Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a Company-wide database.  (FE-1, FE-3)  Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at

the granular level, "down to the NDC code." (FE-3) Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to Oracle. (FE-1, FE-3) Oracle was the source for the data used for the Scorecards, Work Plan and the LBEs. (FE-1)

> **d)** **The 34 Act Defendants Spoke Repeatedly About The Pricing Of Generic Drugs**

264. The 34 Act Defendants repeatedly claimed that they had accurate knowledge of the sources of Teva's generics profitability.

265. The 34 Act Defendants claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement … in our … margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

266. The 34 Act Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014 Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increases prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

267. The 34 Act Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion.…

That's not something which is different from what we said during 2015."  Earlier, on  May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment….  What this boils down to is each individual company's business model.… Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

268.    The 34 Act Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market.  For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio."  During that same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to win all the markets we operate."  On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game …. playing it fairly …. by the book and by the rule."

269.    This self-proclaimed personal involvement by the 34 Act Defendants' supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

<strong>e)      34 Act Defendants' And<br>Analysts' Focus On Generics</strong>

270.    The fact that the 34 Act Defendants recurrently publicized that Teva's generics segment, fueled by its U.S. division, was driving the Company's turnaround during the Class Period supports a strong inference of scienter.  For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution."  On June 10, 2015, Olafsson touted improvement of the "generic business by … $1 billion [] in 14 months, 16 months."  That

same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

271.     Analysts accordingly focused on Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter.  For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve."  On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability … we remain encouraged by the recovery in Teva's generic business."  The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

272.     Similarly, when industry pricing pressure damaged Teva's competitors, analysts peppered the 34 Act Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers:  For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that  "on the pricing … we didn't see anything change in fourth quarter."  On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business … the prices are very stable there."

### f)      The Magnitude, Importance And Duration Of The Fraud

273.     The fact that the Price-Hike Strategy generated as much as $2.3 billion in Inflated Profit supports a strong inference of scienter.  Indeed, the Inflated Profit drove Teva's reported financial turnaround throughout the Class Period.  In 2014 and 2015, Inflated Profits comprised an increasingly large portion of Teva's overall net income.  As to the generic segment's profits, the Inflated Profits accounted for 15% of segment profits in 2013; 32% in 2014; and 32% in

2015.  The Inflated Profits accounted for an even larger portion of the Company's overall net income: in 2013, Inflated Profits accounted for 20% of net income; in 2014, 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit.  The stronger inferences that the 34 Act Defendants knew of the source of these profits.

274.    Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result Teva's generic drug profits plummeted.  Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, forced the Company to take a staggering $6.1 billion impairment charge to its generics business, and reduce its dividend.  The stronger inference by far is that the 34 Act Defendants were aware of the source of this decline, or were reckless in not knowing.

> **g)     Contemporaneous Red Flags Indicated
> That The 34 Act Defendants' Statements
> Were False Or Misleading**

275.    Contemporaneous red flags alerted the 34 Act Defendants to the possibility that their statements were false and misleading.  At a minimum, the 34 Act Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

276.    <u>Congressional Inquiry</u>: On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs."  This should have placed the 34 Act Defendants on alert to discover whether Teva had taken price increases and to what extent.  Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases.  Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to … huge price increases."  Again, this should have sparked an internal inquiry from Teva's executives.  Yet, on December 11, 2014, when

faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

277. <u>The State AG And DOJ Investigations:</u>  The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter.  The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.

278. <u>GAO Report:</u> On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016.  The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%.  Teva had numerous drugs that showed extraordinary price increases in the GAO report.  The facts of the GAO report support the inference that the 34 Act Defendants spoke the alleged false statements with scienter.

**h)    Officer Terminations Support Scienter**

279. That three of the Officer Defendants – Olafsson, Vigodman, and Desheh – resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter.  There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed.  The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later.  There is a similarly strong inference regarding Vigodman's termination.  He was

fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016. Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these 34 Act Defendants who were blocking the true financial state of the Company from coming to light.

### i) Other Facts Supporting Scienter

280. <u>The Receipt Of The Subpoenas</u> Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of the 34 Act Defendants' scienter. Particularly, the 34 Act Defendants failed to disclose them in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the Offering. The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the very next SEC disclosure. Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices. Yet, the 34 Act Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016, Generics Day.

281. <u>Bloomberg Article</u> The November 3, 2016 *Bloomberg* article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an

exposure to Teva with respect to the investigation." The State AGs suit and the DOJ charges against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from the 34 Act Defendants.

### 4.    Corporate Scienter

282.    Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above had binding authority over the Company.  In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

283.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.  For instance, in 2013, Galownia, Teva's Senior Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups.  Given the nature of this strategy, that it required the involvement of numerous divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and that it had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

284.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature.  As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis.   From this, it can  be inferred that someone at Teva approved of the false and misleading statements in Teva's

financial statements concerning the source of its generics profits, while knowing that the true source of the profits were Inflated Profits from the Price-Hike Strategy. Indeed, according to FE-2, "everyone" would have known of price increases that had a material impact on Teva's financial reporting for the U.S. It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition.

**E.  Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter**

285.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs. Plaintiffs make this allegation based on information identified in: (i) Plaintiffs' Counsel's own investigation; and (ii) the State AGs allegations in their Consolidated Amended Complaint against Teva and others ("CAC"), filed June 18, 2018.

286.    Lead Counsel's investigation included, among other things, interviews with former employees and econometric analysis of data accessible only through subscription based data services.

287.    The States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the State AGs and pled guilty to federal antitrust violations. That investigation remains ongoing. Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the States filed their proposed CAC, Jepsen emphasized that the CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages,

and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

### 1. Teva Colluded With Other Manufacturers To Fix Prices

288.     <u>Parallel Price Increases</u>  Lead Counsel's investigation has identified 17 sudden and aberrational price increases undertaken by Teva

289.     that show strong indicia of collusion.  These price increases, the details of which are reflected in Appendix B, relate to 16 drugs (the "Collusive Drugs"), collectively generated as much as $1.23 billion dollars in Inflated Profit for Teva.

290.     In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level.  For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead.  Lead Counsel's investigation identified, in addition to these lock-step price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) interfirm communications.

291.     <u>Motive and Opportunity</u>  Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products.  In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity.  Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production.  Each of the

Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

292.    In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- <u>High Concentration</u>  The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- <u>High Barriers to Entry</u>  Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- <u>Demand Inelasticity</u>  The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list. Lead Counsel undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- <u>Lack of Alternative Products</u>  Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs. For instance, Pravastatin is one of several generic statins, but unique for its relatively low level of binding to blood plasma proteins, which may have life-altering implications for certain patients.

- <u>Inherent Fungibility of Generic Drugs</u>  Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

293.     Price Increases Against Self-Interest   There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs.  In no case was a shortage reported during the Class Period for any of the Collusive Drugs, nor any sudden significant increase in demand.  Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price.  As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly-smaller price increase.  Without a deliberate strategy, such price increases would have been against Teva's self-interest, further supporting the 34 Act Defendants' scienter.

294.     The "risk" Teva would have undertaken without collusion was particularly acute with respect to the six Collusive Drugs for which Teva was the first to increase the price, namely Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol.  Appendix B.  The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly supports that, in reality, there was no risk at all; Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

295.     Inter-Firm Communications   The State AGs' CAC describes evidence showing Teva engaged in extensive direct communication with other manufacturers.  For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior

sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

296.     Furthermore, Lead Counsel's investigation identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the relevant period, many of which occurred in close proximity to price increases that Teva and/or another manufacturers implemented on the Collusive Drugs.  A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Galownia and Patel is attached hereto as Appendix C.  In all instances identified in Appendix C, representatives of at least one other manufacturer – and typically many more – also attended.

297.     Trade shows and conferences provided opportunities for one-on-one meetings with between Teva personnel, including several of the 34 Act Defendants, and those of other manufacturers.  For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners."  In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

298.     <u>Government Investigations Corroborate An Inference Of Collusion</u> Corroborating the inferences drawn from Lead Counsel's investigation, the State AGs' CAC alleges, based on specifically-described communications, seven drug markets where Teva conspired to fix prices and/or allocate markets, namely the markets for: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.   Nystatin and Theophylline – two drugs where the States uncovered evidence that Teva, in coordination with

Heritage, agreed to "take the lead" on price increases, overlap with the set of drugs where Lead Counsel's investigation found strong indicia of collusive price-fixing.

299. The State AGs focus many of their drug-specific collusion allegations on the communications of Malek, Heritage's President. In dealing with Teva, Malek coordinated market allocation and price increases with a particular Teva employee, with whom he had a preexisting relationship. This employee joined Teva in April 2013, and was on maternity leave from August through December 2013. On information and belief, this employee is Nisha Patel ("Patel"), Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016. Patel was on maternity leave from August through the end of 2013, (FE-1), and her tenure at Teva, based on publicly available social media sites, aligns with that of Malek's Teva contact. Patel had responsibilities relating to pricing prior to her shift to National Accounts. (FE-1, FE-3) The following is a brief timeline of those interactions, and their anticompetitive outcomes:

- July 2013  After three calls between Malek and Patel spanning more than 43 minutes, Nystatin appeared on an internal Teva list of "potential" price increases, despite a Nystatin price increase having met internal resistance the prior month, when Teva first considered the prospect. Patel went on maternity leave soon afterwards.

- February 7, 2014  After several contacts between Patel and Malek, Nystatin again appeared on an internal Teva spreadsheet as a candidate for a price increase.

- April 4, 2014  Teva increased WAC for Nystatin and Theophylline.

- April 15, 2014  Malek and Patel had a 17 minute conversation, during which they discussed price increases and/or market allocation as to at least the seven drugs referenced above. Patel and Malek determined that, as Teva had raised WAC on Nystatin and Theophylline days earlier, Teva would "take the lead" on implementing price increases for those drugs, and other competitors would follow. Heritage would lead on the other five.

- April 16-17, 2014  Multiple Teva employees communicated with Zydus, a competitor in the market for Acetazolamide.

- <u>May 1-6, 19-22, 2014</u>  Patel had at least three calls and exchanged at least 30 text messages with the Actavis pricing manager responsible for Glyburide-Metformin.

- <u>May 9, 2014</u>  A Teva employee responsible for pricing spoke with their counterpart a Mylan, a competitor in the market for Glipizide-Metformin; these employees remained in close communication through 2014.

- <u>July 8, 2014</u>  Teva refused to bid when a large Heritage customer requested a quote on Nystatin from Teva, in response to Heritage's price increase on the drug.

- <u>By July 9, 2014</u>  Teva had increased prices on Nystatin, Theophylline, Glyburide, and Glyburide-Metformin, and Heritage had increased prices on all seven drugs Malek and Patel had discussed on April 15.  If Teva did not increase prices, it furthered the agreement by refraining from bidding competitively, lowering prices, or, in the case of Leflunomide, leaving the market entirely.

- <u>July 25, 2014</u>   After a large wholesaler solicited bids from Teva and Aurobindo on Glyburide, Teva spoke with Heritage (and Heritage with Aurobindo) "to ensure uniformity and compliance with the scheme," and resolved that Teva and Aurobindo would decline to provide a bid.

300.    These seven examples of Teva's reaching anticompetitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry.  The State AGs have indicated that the CAC's common thread is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage.  The States are investigating collusive conduct relating to nearly 200 additional drugs.

301.    The DOJ also continues to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation."  The S.D.N.Y., in sustaining the *Propranolol Antitrust* allegations over Teva's motion to dismiss, reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy."  DOJ intervened similarly in the *Generic Pharmaceuticals* MDL, seeking stays and asserting that the drugs at issue – including the Collusive Drugs Baclofen, Fluocinonide, Pravastatin, and Propranolol – overlap with the DOJ's

criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

**2.      Evidence of Collusion Further Supports A Strong Inference Of Scienter**

302.    Teva's collusion additionally supports a strong inference of scienter.  Given all the information available to them, the 34 Act Defendants knew, or recklessly disregarded, that in order for the Price-Hike Strategy to generate the high level of Inflated Profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

303.    As alleged, Teva's price increase approval processes necessarily involved senior management.  Indeed, Patel, or any person in her position, did not have the authority or ability to raise prices or to determine which drugs Teva would bid on, including the ones that Malek and Patel had discussed.  (FE-2, FE-1, FE-3)  Teva's senior management and executives, including Griffin and Cavanaugh, approved all price increases.

304.    Moreover, many of the Collusive Drugs were major drugs for Teva and the profits from the price hikes were substantial.  In all, the Collusive Drugs generated $1.2 billion over the Class Period.  The financial implications of the price increases would have been reflected in the analysis that Griffin and Cavanaugh undertook in deciding whether to take the price increase, and when.  (FE-1, FE-2)  That financial impact would also be reflected in the financial reporting for which they and Oberman and Olafsson were responsible, and which was presented to Vigodman and Desheh.  (FE-2, FE-1)  These included regularly updated forecasts and scorecards.  The information was also available on the Oracle ERP system.

305.    With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA

(Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

306.    Moreover, the State AGs have alleged that for years Teva adhered to a "widespread" "code of conduct," among generic drug manufacturers that allowed them to "fix prices and allocate markets to suppress competition." The "code's" objective was to attain a price equilibrium where manufacturers had no incentive to compete for additional market share by lowering price. Under that code, "competitors" would agree collectively to raise or maintain drug prices, dictating that a competitor should not "punish" another for price increases by underbidding the competitor who raised prices, as that would be "irresponsible." Manufacturers also would enter into collusive "fair share" market allocation agreements by making knowingly uncompetitive bids, refusing to bid, or readjusting market share by walking away from customers.

307.    The State AGs have stated that evidence they have secured shows that executives at the highest levels in many of the defendant companies conceived and directed many of the schemes. This assertion corroborates the allegations arising from Lead Counsel's investigation, including that Cavanaugh and Griffin were involved in pricing decisions, and Olafsson and Oberman would have received and reviewed reports and forecasts reflecting the Inflated Profit generated thereby.

308.    Furthermore, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the relevant period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers (Appendix C).

### 3. The Undisclosed Fact Of Teva's Collusion Constitutes An Independent Basis For Falsity

309. The false and misleading statements regarding the source of Teva's profits as described in its SEC disclosures identified above in Section III.C.3, and the false and misleading statements regarding competition in Teva's SEC disclosures as identified above in Section III.C.2, were false and misleading, in addition to the reasons enumerated above, because Teva conspired with other manufacturers to fix prices for certain generic drugs. Statements regarding the supposed source of Teva's revenues were false because they omitted the fact that Teva's revenues were partly generated by collusive means. Statements describing the supposed competitiveness of the U.S. generic drug market were false because Teva was in reality participating in series of anticompetitive conspiracies that distorted competitiveness.

### F. Loss Causation

310. In addition to the allegations herein, the 34 Act Defendants' fraudulent conduct directly and proximately caused the Class to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Class Period.

311. The 34 Act Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Class Period. By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, and that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, the 34 Act Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the Inflated Profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in Inflated Profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, Teva's Inflated Profits declined, and Teva was prevented from making additional price increases, those trends would continue.

The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt payable to members of the Class.

312.     Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the 34 Act Defendants' Class Period statements and omissions.  Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by the 34 Act Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud.  As the relevant truth leaked out into the market from August 2016 to August 2017, the Class suffered losses, which were foreseeable and caused by the materialization of the risks that the 34 Act Defendants' fraudulent conduct concealed from investors, as set forth below.

### 1. August 4-5, 2016

313.     After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced (i) poor generics segment earnings, including a $115 million YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

314.     On this news, the prices of Teva Securities declined.  Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21; the Preferred Share price fell $12.00 or 1.32% to close at $895.00.

315.     This marked the beginning of the relevant truth leaking out, as Teva's Price-Hike Strategy had begun to collapse, as Teva lost its ability to profit from the 76 historic price hikes, or to implement new increases in 2016.  The disclosure of the subpoenas was a materialization of the risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

### 2. November 3, 2016, December 13-16, 2016

316.     On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs.  The article broke the news that the

first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

317. On this news, the prices of Teva Securities declined once again. Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20; the Preferred Share price fell $56.50 or 7.36% to close at $711.00; and the prices of Teva's 2023, 2026, and 2046 Notes fell $12.93 or 1.31%, $11.19 or 1.15%, and $27.94 or 3.02%, respectively.

318. In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities. On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares." HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

319. Within weeks the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at

Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

320.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

321.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51, and the Preferred Share price fell $28.00 or 4% to close at $645.00; the price of the Company's 2046 Notes also declined $17.54, a drop of 2.5%.

### 3.    November 15, 2016

322.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although

115

Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

323.    On this news, the prices of Teva Securities continued to decline.  Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60; the Preferred Share price fell $38.01 or 5.22% to close at $689.99.

324.    Analysts responded negatively to the new information concerning the Company's disappointing financial results.  That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," PiperJaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value."  Also that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales … the company saw higher than expected price erosion in 3Q …" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics."  Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

### 4.    December 5-6, 2016

325.    After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee.  Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

326. On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03; the Preferred Share price fell $26.26 or 4.00% to close at $630.75; the price of Teva's 2046 Notes fell $17.01 or 1.95%.

327. Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. ***Recent pricing pressure*** in the generic drug market … remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a ***concerning development at a critical time*** for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained ***focused on price erosion for the [company's] base generic business***" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

### 5. January 6, 2017

328. On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of the 34 Act Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants

assumed a pricing environment that was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters—when, in fact, pricing pressure was causing a more rapid decline.

329.     As a result of this new negative information, the prices of Teva Securities continued to decline.  Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10; the Preferred Share price fell $47.00 or 6.91% to a close at $633.00; and the prices of Teva's 2026 and 2046 Notes declined $10.96 or 1.17% and $17.75 or 2.01%, respectively.

330.     Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion.  In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated***."  Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic … business are becoming bigger issues."  In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already ***limited management credibility***."

### 6.     February 6-7, 2017

331.     On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

332.     On this news, the prices of Teva Securities continued to decline.  Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to

close at $32.19; the Preferred Share price fell $29.00 or 4.57% to close at $605.00; Teva's 2026 Notes fell $13.69 (1.51%); the 2046 Notes fell $32.33 (3.76%).

333.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead.  For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges.  With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business … we continue to believe a near-term recovery in the company's business is unlikely."  Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

### 7.    August 3-7, 2017

334.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's long-standing dividend.  The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow.  On the Company's earnings conference call held that day, McClennan, Teva's interim CFO, explained that the poor results and reduced

guidance were partly the result of increased price erosion and price pressure. Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Class Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar.

335. Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance … and cut its dividend by 75%.... U.S. *generic weakness appears to be at the heart of these reductions*." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 … If mgt's ever-shrinking EBITDA guidance … erodes much further, *it is possible Teva may not meet the [debt] obligation*." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise. There was no realistic prospect that the strategy could be revived, or that it could again generate the same Inflated Profits. The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

336.     With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades.  On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

337.     As investors digested the news, the prices of Teva Securities dropped.  Between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59; the Preferred Share price fell $184.50 or 32.92% to close at $376.00; the price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $7.76 (.78%), $12.45 (1.25%), $30.10 (3.05%), $38.72 (3.95%), $40.88 (4.20%), and $57.51 (6.34%), respectively.

### G.     Presumption Of Reliance And Fraud-On-The-Market Doctrine

338.     Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Teva's ADS, Preferred Shares, and Notes was efficient for the following reasons, among others:

(a) Teva's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) The average weekly trading volume of Teva Securities was significant;

(c) As a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d) Teva was eligible to file simplified SEC filings;

(e) Teva regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and

(f) Numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public domain.

339. Accordingly, the markets for Teva Securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Teva Securities. Under these circumstances all purchasers of Teva Securities during the Class Period suffered similar injury through their purchases at artificially inflated prices. A presumption of reliance therefore applies.

340. In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the 34 Act Defendants had a duty to disclose.

## IV. CLAIMS FOR RELIEF UNDER THE 34 ACT

### COUNT I
### For Violation Of Section 10(b) Of The 34 Act And Rule 10b-5
### (Against The 34 Act Defendants)

341. Plaintiffs incorporate ¶¶1-340 by reference as if fully set forth herein.

342. During the Class Period, the 34 Act Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

343. The 34 Act Defendants violated § 10(b) of the 34 Act and Rule 10b-5 in that they:

(a) Employed devices, schemed, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     (c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Teva Securities during the Class Period.

344.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teva Securities. Plaintiffs and the Class would not have purchased Teva Securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and falsely inflated by the 34 Act Defendants' misleading statements.

345.    As a direct and proximate result of the 34 Act Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Teva Securities during the Class Period.

**COUNT II**
**For Violation Of Section 20(a) Of The 34 Act**
**(Against The 34 Act Defendants)**

346.    Plaintiffs incorporate ¶¶1-340 by reference as if fully set forth herein.

347.    During the Class Period, the 34 Act Defendants acted as controlling persons of Teva within the meaning of § 20(a) of the 34 Act. By virtue of their positions and their power to control public statements about Teva, the Officer Defendants had the power and ability to control the actions of Teva and its employees. Teva controlled the Officer Defendants and its other officers and employees. By reason of such conduct, the 34 Act Defendants are liable pursuant to § 20(a) of the 34 Act.

## V.    INFLATED PROFIT ANALYSIS

348.    Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public. Lead Counsel therefore undertook an investigation and engaged econometric experts, working at Lead Counsel's direction, to calculate and isolate the profit that Teva earned from its Price-Hike Strategy. The investigation comprised multiple

distinct econometric analyses, including regression analyses, that ultimately took into account thousands of data points.

349.     The analysis screened Teva's entire generic drug portfolio during the relevant period to identify Wholesale Acquisition Cost ("WAC") increases of at least 50%.  The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually.  Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

350.     To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase.  To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the relevant period had prevailing drug-specific pricing trends continued.  The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

351.     Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Teva's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

352.     Sales volumes were derived by reference to figures reported in a subscription database.  Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

353.     Teva's discounts and rebates are unavailable by any means of which Lead

Counsel is aware.  Thus, the level of discounts and rebates was determined by analyzing, on a

month-by-month basis over the relevant period, multiple data points from a number of

subscription and other industry datasets that reflected average pricing and sales volume data.

This analysis was unique for each drug and captured fluctuations over time.

## VI.    CLASS ACTION ALLEGATIONS

354.     The Teva securities at issue in this action are:

- American Depositary Shares registered on the NYSE ("ADS"), including ADS issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "ADS Offering");

- 7.00% mandatory convertible preferred shares issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "Preferred Shares" and "Preferred Offering"); and

- certain U.S.-dollar-denominated senior notes issued in the public offering on or about July 21, 2016, namely (i) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (ii) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (iii) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"), (iv) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"), (v) 3.150% Senior Notes due October 1, 2026 ("2026 Notes"), and (vi) 4.100% Senior Notes due October 1, 2046 ("2046 Notes") (collectively, referred to herein as the "Notes" and the "Notes Offering").

355.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure, on behalf of the following proposed Class:

- As to claims under the 34 Act, all persons and entities who, in domestic transactions, purchased or otherwise acquired ADS, Preferred Shares, and Notes from February 6, 2014 through August 2, 2017, inclusive, and were damaged thereby; and

- As to claims under the Securities Act, all persons and entities who, in domestic transactions, purchased or otherwise acquired ADS, Preferred Shares, and Notes pursuant or traceable to the Offerings, and were damaged thereby.

356.     Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries

thereof; (ii) present and former officers and directors of Teva, Teva USA, and Teva Finance, and

their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R.

§ 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Teva's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

357.    The Class is so numerous that joinder of all members is impracticable.  Plaintiffs believe that Class members number at least in the thousands.  Throughout the Class Period, Teva ADS had an average daily volume on the NYSE of approximately 6.16 million.  As of August 2, 2017, Teva had 843,000,000 ADS outstanding.  Teva issued over 59 million ADS in the ADS Offering, over 3.6 million Preferred Shares in the Preferred Offering, and $15 billion of Notes in the Notes Offering.  The ADS, Preferred Shares, and Notes traded actively in the United States during the Class Period.

358.    Lead Plaintiff's claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages by acquiring Teva Securities at prices artificially inflated by the wrongful conduct complained of herein.

359.    Lead Plaintiff will fairly and adequately protect the interests of the Class, and Anchorage will fairly and adequately protect the interests of Class members who purchased or otherwise acquired Teva Notes.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

360.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

> (a) Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

(b) Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

(c) Whether the Offering Materials contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

(d) Whether the 34 Act Defendants acted with scienter as to Plaintiffs' claims for relief under Section 10(b) of the 34 Act;

(e) Whether the Officer Defendants were controlling persons as to Plaintiffs' claims for relief under Section 20(a) of the 34 Act and Section 15 of the Securities Act;

(f) Whether any of the Securities Act Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

(g) Whether and to what extent the prices of the Teva Securities were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

(h) Whether, with respect to Plaintiffs' claims under the 34 Act, reliance may be presumed under the fraud-on-the-market doctrine; and

(i) Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

361. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

362. There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

363. The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading

statements alleged herein.  The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

364.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements; the generalized risk disclosures Teva or other Defendants made were not sufficient to shield Defendants from liability.

365.    To the extent the statutory safe harbor otherwise would apply, the Defendants are liable under the 34 Act and/or the Securities Act for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was untrue or misleading when made, or because each such statement was approved by an executive officer who knew that the statement was untrue or misleading when made.

366.    Specifically as to the alleged false and misleading guidance issued on July 13, 2016, and January 6, 2017, that guidance incorporated an assumption grounded on historically-inaccurate data.  Namely, the assumption was that pricing was declining at the same rate as it had during 2015 and the first half of 2016 because, as Olafsson puts it on Teva's July 13, 2016 Preliminary Outlook call, Teva was "assuming … [the] same pricing assumption as we have had for the first half of the year," because Teva "saw no change in the pricing.  We saw a stable environment … from first quarter into second quarter." Teva's pricing erosion was not, however, "stable."  Teva's Inflated Profits had declined by $10 million from Q1 2016 to Q2 2016, and had declined over $100 on YOY basis from Q1 2015 due to an increasingly adverse pricing

environment.  Moreover, because Teva had received the DOJ and State AG subpoenas, it would be unable to mitigate these declines, as it had in the past, by taking additional price increases.

## VIII. SECURITIES ACT ALLEGATIONS

367.    In this section of the Complaint, Ontario Teachers' and Anchorage (collectively, "Securities Act Plaintiffs") assert strict liability and negligence claims based on Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons and entities who purchased or otherwise acquired Teva's (i) ADS registered on the NYSE, (ii) Preferred Shares, and/or (iii) Notes, in domestic transactions, and in, pursuant to, and/or traceable to the Offerings (defined below), and who were damaged thereby.  Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' 34 Act claims.

### A.    Securities Act Parties

#### 1.    Securities Act Plaintiffs

368.    Ontario Teachers' purchased or otherwise acquired Teva ADS and Preferred Shares in or pursuant to and/or traceable to the ADS/Preferred Offerings (defined below) as set forth in the Certification attached hereto as Exhibit A.  For instance, on the December 3, 2015 offering date and at the $62.50 offering price, Ontario Teachers' purchased Teva ADS (SEDOL: 2883878), which are listed on the NYSE, in the ADS Offering (defined below), and directly from Merrill Lynch, Pierce, Fenner & Smith Incorporated, a joint book-running manager and underwriter of the ADS/Preferred Offerings, in the United States., and these purchases settled on the December 8, 2015 settlement date. In addition, on December 17, 2015, Ontario Teachers' purchased Teva Preferred Shares pursuant, and/or traceable, to the Preferred Offering (defined below) and directly from Citibank Securities, a joint book-running manager and underwriter of the ADS/Preferred Offerings.

369.	Anchorage purchased or otherwise acquired Teva Notes in, pursuant to, and/or traceable to the Notes Offering (defined below), as set forth in the Certification attached hereto as Exhibit B. For instance, on the July 18, 2016 offering date and at the offering price of 99.734% of the principal amount, Anchorage purchased, Teva Notes, namely 2026 Notes (SEDOL: BD3GT31), in the Notes Offering and directly from Barclays Capital Inc., a joint book-running manager and underwriter of the Notes Offering, in the United States. That purchase settled on the July 21, 2016 settlement date.

370.	As a result of material misstatements and omissions made by the Securities Act Defendants (defined below), Securities Act Plaintiffs purchased or otherwise acquired Teva Securities at artificially inflated prices. When the relevant truth concerning the Securities Act Defendants' misstatements and omissions of material fact leaked out into the market from August 2016 to August 2017, the prices of Teva Securities fell, causing Securities Act Plaintiffs and the Class to suffer losses.

## 2.	The Teva Securities Act Defendants

371.	Each of the following Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the material misstatements and omissions contained in and incorporated (and thereby made anew) in the Offering Materials (defined below).

372.	Teva was the issuer of the ADS, the Preferred Shares, and the Notes. Teva caused its wholly-owned special purchase finance subsidiary Teva Finance (defined below) to issue the Notes in the Notes Offering (defined below), and unconditionally guaranteed the payment of all principal and interest payable on the Notes.

373.	Defendant Teva Pharmaceutical Finance Netherlands III B.V. ("Teva Finance") also issued the Notes in the Notes Offering. Teva Finance, a shell company that is a wholly-owned and controlled special purpose finance subsidiary of Teva, is a Dutch private limited

liability company with its business address at Piet Heinkade 107, 1019 GM Amsterdam, Netherlands.  Teva Finance does not have any independent operations and does not purport to engage in any activities other than issuing securities and investing the proceeds in Teva or its affiliates at the direction of Teva.

374.    Defendant Vigodman signed the Registration Statements (defined below).  He also signed and certified Teva's 2014 and 2015 Forms 20-F and signed Teva's Q1 2016 6-K that were incorporated by reference into the Offering Materials.  He also was, at all relevant times, a member of Teva's Board at the time of the Offerings.

375.    Defendant Desheh signed the Registration Statements (defined below), and signed and certified Teva's 2014 and 2015 Forms 20-F, and signed Teva's Q1 2015, Q2 2015, Q3 2015, and Q1 2016 6-Ks filed with the SEC and incorporated by reference into the Offering Materials.

376.    Defendant Griffin signed the Registration Statements and was at all relevant times Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance.

377.    Teva, Teva Finance, Vigodman, Desheh, and Griffin are collectively referred to herein as the "Teva Securities Act Defendants."

**B.    The Relevant Offerings**

**1.    The ADS/Preferred Offerings**

378.    On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion.  These offerings consisted of approximately $3.375 billion of its ADS and approximately $3.375 billion of its Preferred Shares, and were announced pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 filed with the SEC on November 30, 2015 (the "ADS/Preferred

Registration Statement"). Each ADS represents one ordinary share of Teva, and each Preferred Share will automatically convert on December 15, 2018 into 13.3333 to 16 ADS, subject to anti-dilution adjustments. Likewise, on November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering, each dated November 30, 2015.

379. On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings. That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the final ADS Prospectus (the "ADS Final Prospectus") and final Preferred Prospectus (the "Preferred Final Prospectus"), and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

380. The ADS Offering and the Preferred Offering are referred to collectively as the "ADS/Preferred Offerings." The ADS/Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred Registration Statement, including the ADS Final Prospectus and the Preferred Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

381. On December 8, 2015, Teva closed the ADS/Preferred Offerings and issued 54 million ADS at $62.50 per ADS and 3,375,000 Preferred Shares (7.00% mandatory convertible preferred shares, nominal (par) value NIS 0.10 per share) at $1,000.00 per share. The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses by Teva, were approximately $3.29 billion from the ADS Offering and approximately $3.29 billion from the Preferred Offering, for a total of approximately $6.58 billion.

382.     Certain underwriters of the ADS/Preferred Offerings exercised their options to purchase additional ADS and Preferred Shares to cover overallotments; Teva issued an additional 5.4 million ADS and an additional 337,500 Preferred Shares at the time of such purchases, on January 6, 2016.  As a result, Teva received an additional $329 million in net proceeds for the ADS Offering and an additional $329 million in net proceeds for the Preferred Offering, for an aggregate of approximately $3.62 billion for the ADS Offering and an aggregate of approximately $3.62 billion for the Preferred Offering. As a result of the ADS Offering and the Preferred Offering, Teva raised a total of approximately $7.24 billion.

### 2.     The Notes Offering

383.     On July 12, 2016, Teva filed with the SEC a Form 6-K and, under Rule 433, a free writing prospectus dated July 12, 2016, each of which announced a conference call and webcast to provide a preliminary outlook for 2016-2019.  On July 13, 2016, Teva filed with the SEC its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3 (Registration Nos. 333-201984, 333-201984-09), superseding the original base prospectus dated February 9, 2015 (the "Notes Registration Statement") and, under Rule 433, a free writing prospectus in the form of an investor presentation titled "2016-2019 Preliminary Financial Outlook" dated July 13, 2016.

384.     On July 15, 2016, Teva filed with the SEC, under Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2016. Then, on July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final Notes Prospectus (the "Notes Final Prospectus") and, under Rule 433, two free writing prospectuses, all dated July 18, 2016.

385.     The ADS/Preferred Offerings and the Notes Offering are referred to collectively as the "Offerings." The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration

Statement, including the Notes Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials," and, collectively with the ADS/Preferred Offering Materials, the "Offering Materials."

386.    On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of an aggregate of $15 billion of debt securities comprised of (i) $1,500,000,000 of 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of 1.700% Senior Notes due 2019; (iii) $3,000,000,000 of 2.200% Senior Notes due 2021; (iv) $3,000,000,000 of 2.800% Senior Notes due 2023; (v) $3,500,000,000 of 3.150% Senior Notes due 2026; and (vi) $2,000,000,000 of 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering"). The payment of principal and interest was unconditionally guaranteed by Teva. After underwriting discounts and estimated offering expenses payable by the Company, Teva's net proceeds from the Notes Offering were approximately $14.9 billion.

### C.    Teva Filings Incorporated Into The Offering Materials

387.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference various documents that Teva had previously been filed with the SEC.  Specifically, each of those Final Prospectuses incorporated by reference Teva's 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K.  The incorporated 2014 20-F and Q1, Q2, and Q3 2015 Forms 6-K contained material misstatements and omissions concerning (i) the Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) material trends that were not disclosed under Item 5 of Form 20-F; and (iii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market, as well as other topics discussed below.  The statements and omissions in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are set forth in Section III.C.

388.     The Notes Final Prospectus incorporated by reference various documents that had previously been filed with the SEC.  Specifically, the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K.  The incorporated 2015 20-F and Q1 2016 6-K contained material misstatements and omissions concerning (i) the Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market; (iii) material trends that were not disclosed under Item 5 of Form 20-F; and (iv) misstatements and omissions concerning subpoenas issued to the Company by the DOJ and the State AGs, as well as other topics discussed below in Section VIII.E.  The statements and omissions contained in the 2015 20-F and the Q1 2016 6-K and the reasons why they are materially misleading are described above in Section III.C.

**D.     The Offering Materials Contained Material Misstatements And Omissions**

389.     The Offering Materials incorporated Teva's 2014 and 2015 20-Fs, as well as the Company's Q1, Q2, and Q3 2015 6-Ks, and the Company's Q1 2016 6-K.  Accordingly, the Offering Materials contained material misstatements and omissions.

**1.     Material Misstatements And Omissions Concerning The Price-Hike Strategy And The Benefits And Risks Stemming Therefrom**

390.     The Offering Materials contained material misstatements and omissions concerning the attribution of the sources of Teva's generic segment's revenues and profit during the Class Period.  The statements and omissions contained in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are described in Section III.C.3.

391.     In sum, the various financial disclosures regarding the sources of Teva's generic revenues and profits contained within the incorporated filings were materially misstated because they failed to disclose the Price-Hike Strategy, pursuant to which Teva implemented price hikes

on a number of Teva's generic drugs, generating a significant amount of Inflated Profit as a result of those price hikes that was unsustainable, while attributing the source of those profits to other sources and failing to disclose that they were caused by concealed price hikes.

392.    Moreover, as to the incorporated 2015 20-F and the Q1 2016 6-K, those filings also failed to disclose that, starting in the latter part of 2015, Teva was increasingly unable to successfully execute the Price-Hike Strategy. Specifically, the Company could no longer maintain the profits from the price increases as a result of the materialization of the risks concealed by the failure to disclose the Price-Hike Strategy.  Those materialized risks included: (i) increased public, legislative, and regulatory scrutiny of generic drug increases that undermined Teva's ability to sustain Inflated Profit from price increases and/or implement further price increases; (ii) increased legislative and law enforcement scrutiny that resulted in legal actions being taken against Teva; (iii)  increased competition from other generic manufacturers who undercut Teva's raised prices as they themselves faced increased scrutiny; and (iv) significant disruption caused by the termination of the senior management who was responsible for the strategy, and the attendant resources required to locate and hire suitably qualified replacements.

**2.    Material Misstatements And Omissions Concerning Known Trends Required To Be Disclosed Pursuant To Item 5 Of Form 20-F**

393.    Incorporating Teva's 2014 and 2015 20-Fs, the Offering Materials contained material misstatements and omissions in that they violated SEC Item 5 of Form F-20 by failing to disclose two known trends. (*See* Section III.C.1)  The Securities Act Defendants failed to disclose the trend that Teva's financial success was materially dependent on the Price-Hike Strategy and the attendant price increases on generic drugs that generated significant amounts of Inflated Profit.  These prices increases generated as much as $2.3 billion in profit for Teva over

the Class Period. Yet, the existence of this trend and the related risks and uncertainties surrounding its source and sustainability were concealed. Moreover, beginning in February 2016, Defendants failed to disclose the known trend that increased pricing pressure was causing Teva's Inflated Profit generated from the price increases to decrease precipitously, from $218 million in Q3 2015, to $166 million in Q4 2015, to $124 million in Q1 2016, with all then-known financial information indicating future profit deterioration and price erosion.

### 3. Material Misstatements And Omissions Concerning Competition In The U.S. Generics Market

394. Incorporating Teva's 2014 and 2015 20-Fs, the Offering Materials contained material misstatements and omissions in that they, among other things, purportedly (i) warned investors that one of the primary risks that Teva faced was the "intense" competition in the U.S. generic drug market, and that this competition would force the price of generic drugs down; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics. These statements and omissions were materially misstated for all of the reasons described above in Section III.C.2.

### 4. Material Misstatements And Omissions Concerning The DOJ And State AGs' Subpoenas.

395. The Notes Offering contained material misstatements and omissions of material fact and omissions in that it failed to disclose Teva's receipt of subpoenas from the DOJ and Connecticut AG, including by incorporation of the 2015 20-F as set forth in Section III.C.4.

### 5. Material Misstatements And Omissions Concerning Teva's Participation In A Price-Fixing Conspiracy

396. The Offering Materials that incorporated the statements referenced in Section III.E.1 and 3, above, contained material misstatements and omissions in that they failed to

disclose that Teva conspired with other generic manufacturers to fix prices, rig bids, and allocate the market for generic drugs.

## IX.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III
### Section 11 of the Securities Act
### In Connection With the Offerings
### (Against Teva, Teva Finance, Vigodman, Desheh, and Griffin)

397.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  Defendants' liability under this Count is predicated on the participation of each Defendant in the Offerings pursuant to the Offering Materials, which contained untrue statements and omissions of material fact. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

398.    **ADS/Preferred Offerings**. This Count is brought pursuant to Section 11 of the Securities Act against Teva, Vigodman, Desheh, and Griffin on behalf of Plaintiffs and members of the Class who purchased or otherwise acquired Teva ADS or Preferred Shares pursuant and/or traceable to the ADS/Preferred Offerings and were damaged by the acts alleged herein. This count is based solely in strict liability and negligence. Teva was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the ADS/Preferred Offering Materials.

399.    **Notes Offering.** This Count is brought pursuant to Section 11 of the Securities Act against Teva, Teva Finance, Vigodman, Desheh, and Griffin on behalf of Plaintiffs and

members of the Class who purchased or otherwise acquired Notes pursuant and/or traceable to the Notes Offering and were damaged by the acts alleged herein. This count is based solely on strict liability and negligence. Teva and Teva Finance were the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Notes Offering Materials.

400. The Offering Materials, at the time when the relevant parts became effective, contained (and/or by incorporation by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state material facts) required to be stated therein or necessary to make the statements therein not misleading.

401. Defendants named in this Count issued or disseminated, caused to be issued or disseminated, or participated in the issuance or dissemination of the Offering Materials.

402. As the issuers of the Offerings, Teva and Teva Finance are strictly liable for the actionable statements and omissions in the Offering Materials.

403. The other Defendants named in this Count acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the ADS/Preferred and Notes Registration Statements were true and there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading. These Defendants are liable for the actionable statements and omissions in the ADS/Preferred and Notes Registration Statements in that, among other things:

   (a) Vigodman, Desheh, and Griffin each signed the ADS/Preferred and Notes Registration Statements as a senior officer and/or director of Teva;

   (b) Vigodman was a director of the Company at the time of the filing of the relevant parts of the ADS/Preferred and Notes Registration Statements with respect to which their liability is asserted;

   (c) Griffin is the Authorized U.S. Representative of Teva Finance.

404.     When they acquired the securities in, pursuant to, and/or traceable to the Offerings, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or by incorporation by reference) in the Offering Materials.

405.     Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the Offerings.

**COUNT IV**
**Section 12(a)(2) of the Securities Act**
**In Connection With the Offerings**
**(Against Teva, Teva Finance, Vigodman, Desheh, and Griffin)**

406.     Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. For the purposes of this Count, Plaintiffs assert only negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

407.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act against Teva, Teva Finance, Vigodman, Desheh, and Griffin on behalf of all persons who purchased securities in, pursuant to, and/or traceable to the Offerings.

408.     The Defendants named in this Count offered, sold, and/or solicited the purchase of, (or assisted in the offer, sale, or solicitation of the purchase of) the securities, within the meaning of the Securities Act, by means of a prospectus or oral communication.

409.     The Defendants named in this Count assisted in the planning of the Offerings and actively participated in decisions regarding, among other things, the price of sale of the securities and the information contained in the respective prospectuses.

410. The prospectuses included (and/or by incorporation by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

411. The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the prospectuses did not include untrue or misleading statements or omissions of material fact.

412. When they acquired the securities directly from the Defendants named in this Count, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Offering Materials.

413. Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the Offerings.

414. By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs and others similarly situated for either (i) the consideration paid for the securities with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the securities no longer owned.

**COUNT V**
**Section 15 of the Securities Act**
**In Connection With The Offerings**
**(Against Teva, Vigodman, Desheh, and Griffin)**

415. Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct. This Count is based solely on negligence.

416.     This Count is brought pursuant to Section 15 of the Securities Act against Defendants (i) Vigodman, Desheh, and Griffin in connection with the ADS and Preferred Offerings and (ii) Teva, Vigodman, Desheh and Griffin in connection with the Notes Offering, on behalf of members of the Class who purchased or otherwise acquired the securities pursuant and/or traceable to the Offering Materials and were damaged thereby. For purposes of this Count, Plaintiffs assert only negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offering.

417.     At all relevant times, Teva was the whole owner, parent, and controller of Teva Finance, a special purpose finance subsidiary that does not have any independent operations and does not purport to engage in any activities other than issuing securities and investing the proceeds in Teva or its affiliates, at the direction of Teva, and thereby a controlling person within the meaning of the Securities Act.

418.     During their tenures as officers and/or directors of the Company, Vigodman, Desheh and Griffin were controlling persons of Teva and Teva Finance, within the meaning of the Securities Act.

419.     The Defendants named in this Count, by virtue of their positions of control and authority and their direct participation in and/or awareness of Teva's and Teva Finance's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Teva and Teva Finance and its employees, or cause Teva and Teva Finance to issue, offer, and/or sell securities pursuant to the defective Offering Materials.

420.    The Defendants named in this Count had the power to, and did, control the decision-making of Teva and Teva Finance, including the content and issuance of the statements contained (and/or incorporated by reference) in the Offering Materials; they were provided with or had unlimited access to copies of the Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the ADS/Preferred Registration Statements and Notes Registration Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false or misleading information contained in the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

421.    The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

422.    Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the Offerings.

## X.    JURY DEMAND

423.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## XI.    PRAYER FOR RELIEF

424.    WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding Plaintiffs and the Class damages, including interest;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(d) Granting such other and further relief as the Court may deem just and proper.

**DATED: JUNE 22, 2018**                    **RESPECTFULLY SUBMITTED,**

 /s/ Marc J. Kurzman                          /s/ Joseph A. Fonti

Marc J. Kurzman (ct01545)                  Joseph Fonti (admitted *pro hac vice*)
Christopher J. Rooney (ct04027)            Javier Bleichmar (admitted *pro hac vice*)
**CARMODY TORRANCE**                       Wilson Meeks (admitted *pro hac vice*)
**SANDAK & HENNESSEY LLP**                 **BLEICHMAR FONTI & AULD LLP**
707 Summer Street, Suite 300               7 Times Square, 27th Floor
Stamford, CT 06901                         New York, NY 10036
Telephone: (203) 252-2680                  Telephone: (212) 789-1340
Facsimile: (203) 325-8608                  Facsimile: (212) 205-3960
mkurzman@carmodylaw.com                    jfonti@bfalaw.com
crooney@carmodylaw.com                     jbleichmar@bfalaw.com
                                           wmeeks@bfalaw.com

*Local Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board,*     *Counsel for Lead Plaintiff*
*and for Named Plaintiff Anchorage*         *Ontario Teachers' Pension Plan Board,*
*Police & Fire Retirement System*           *and for Named Plaintiff Anchorage*
                                            *Police & Fire Retirement System,*
                                            *and Lead Counsel for the Class*

Parallel Price Increases Indicated In **Orange**

| Drug Name / Form | Wtd. Avg. Increase |
| --- | --- |
| **April 4, 2014** | |
| Ketoconazole Tablets | 250% |
| Bumetanide Tablets | 249% |
| Cephalexin Oral Suspension | 111% |
| Nystatin Tablets | 110% |
| Ketoconazole Cream | 108% |
| Hydroxyzine Pamoate Capsules | 94% |
| Cyproheptadine HCL Tablets | 93% |
| Dicloxacillin Tablets (1st of 2) | 91% |
| Theophylline Anhydrous SR Tabs | 75% |
| Anagrelide HCL Capsules (1st of 2) | 58% |
| Estazolam Tablets (1st of 2) | 37% |
| **April 15, 2014** | |
| Baclofen Tablets | 381% |
| **July 1, 2014** | |
| Fluocinonide .05% Cream | 435% |
| Fluocinonide .05% Ointment | 415% |
| Fluocinonide .05% Gel | 255% |
| **August 28, 2014** | |
| Carbamazepine Tablets | 1543% |
| Carbamazepine Chewable Tablets | 270% |
| Enalapril Maleate Tablets (2nd of 2) | 230% |
| Clotrimazole Topical Solution (1st of 2) | 164% |
| Flutamide Capsules | 140% |
| Meperidine HCL Tablets | 110% |
| Penicillin V Potass. Tablets | 100% |
| Nefazodone Tablets (1 of 2) | 90% |
| Mexiletine Capsules | 90% |
| Cromolyn Sodium Inhalant (1st of 2) | 90% |
| Desmopressin Acetate Tablets | 75% |
| Fosinopril Tablets | 70% |
| Megestrol Acetate Tablets | 55% |
| Diclofenac Potass. Tablets (2nd of 2) | 50% |
| Cimetidine Tablets (2nd of 3) | 29% |
| Tolmetin Sodium Capsules (2nd of 3) | 25% |
| Loperamide HCL Capsules (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
| --- | --- |
| **July 3, 2013** | |
| Oxybutynin Chloride Tablets | 812% |
| Nadolol Tablets | 786% |
| Fluconazole Tablets | 218% |
| Methotrexate Sodium Tablets | 163% |
| Cimetidine Tablets (1st of 3) | 151% |
| Prazosin Capsules | 118% |
| Ranitidine HCL Tablets | 115% |
| **July 19, 2013** | |
| Enalapril Maleate Tablets (1st of 2) | 316% |
| **August 9, 2013** | |
| Doxazosin Mesylate Tablets | 305% |
| Etodolac Tablets | 282% |
| Pravastatin Sodium Tablets | 175% |
| Ketoprofen Capsules (1st of 3) | 168% |
| Etodolac SR Tablets | 96% |
| Tolmetin Sodium Capsules (1st of 3) | 91% |
| Clemastine Fumarate | 90% |
| Diltiazem HCL Tablets | 71% |
| Ketorolac Trometh. Tablets (1st of 2) | 34% |
| Diclofenac Potass. Tablets (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
| --- | --- |
| **January 28, 2015** | |
| Fluoxetine HCL Tablets | 608% |
| Propranolol Tablets | 447% |
| Glimepiride Tablets | 312% |
| Ciprofloxacin HCL Tablets | 194% |
| Penicillin v Potass. Oral Sol. (1st of 2) | 91% |
| Nortriptyline HCL Capsules | 91% |
| Estradiol Tablets | 90% |
| Ketoprofen Capsules (2nd of 2) | 90% |
| Danazol Capsules | 90% |
| Ketorolac Trometh. Tablets (2nd of 2) | 90% |
| Methyldopa Tablets | 90% |
| Diltiazem HCL Tablets | 90% |
| Carbidopa/ Levodopa Tablets | 50% |
| Griseofulvin Oral Suspension | 50% |
| **July 29, 2015** | |
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

| Drug Name / Form | Wtd. Avg. Increase |
| --- | --- |
| **April 6, 2016** | |
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

**2013 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[2] |
|---|---|---|---|
| **Enalapril Maleate** (1st Increase) | Mylan *Teva* Wockhardt | July 2 *July 19* August 1 | $25.15 (92%) *$25.15 (341%)* $21.38 (275%) |
| **Pravastatin Sodium** | Glenmark Apotex Zydus *Teva* Lupin | May 16 May 31 June 14 *August 9* August 28 | $75.51 (202%) $75.51 (119%) $64.73 (201%) *$64.73 (201%)* $64.80 (201%) |

**2014 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Cephalexin** | Lupin *Teva* | Nov. 1, 2013 *April 4* | $41.00 (128%) *$41.00 (128%)* |
| **Ketoconazole** Cream | *Teva* Taro | *April 4* April 18 | *$63.30 (110%)* $63.30 (110%) |
| **Ketoconazole** Tablets | *Teva* Taro | *April 4* April 18 | *$221.55 (250%)* $221.55 (250%) |
| **Nystatin** | *Teva* Heritage | *April 4* July 1 | *$100.30 (110%)* $100.30 (110%) |
| **Theophylline SR** | *Teva* Heritage | *April 4* July 1 | *$54.53 (80%)* $54.53 (80%) |
| **Baclofen** | Upsher-Smith *Teva* | February 21 *April 15* | $29.93 (350%) *$29.93 (350%)* |

---

[2] Because drugs are often available in multiple strengths and package sizes, "New WAC per Pkg." refers to the pricing for the most-common package size of the most-widely-used strength.

## 2014 Collusive Drug Price Increases (continued)

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Fluocinonide** 5% Ointment | Taro *Teva* | June 3 *July 1* | $226.40 (483%) *$226.40 (483%)* |
| **Fluocinonide** 5% Cream | Taro *Teva* | June 3 *July 1* | $145.75 (524%) *$145.75 (524%)* |
| **Fluocinonide** 5% Gel | Taro *Teva* | June 3 *July 1* | $190.57 (255%) *$190.57 (255%)* |
| **Enalapril Maleate** (2nd Increase) | Mylan *Teva* Taro Wockhardt | April 17 *August 28* October 15 December 15 | $82.98 (230%) *$83.00 (230%)* $83.00 (230%) $70.53 (230%) |
| **Carbamazepine** Tablets | Taro Apotex *Teva* Torrent | June 3 July 11 *August 28* September 12 | $127.93 (2517%) $127.93 (1030%) *$127.93 (1538%)* $127.93 (2517%) |
| **Carbamazepine** Chewable Tablets | Taro *Teva* Torrent | June 3 *August 28* September 12 | $52.68 (290%) *$52.68 (270%)* $52.68 (778%) |
| **Diclofenac Potassium** | *Teva* Sandoz Mylan | *August 28* October 10 Mar. 4, 2015 | *$104.58 (50%)* $104.58 (82%) $104.58 (50%) |

## 2015 Collusive Drug Price Increases

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Propranolol** | *Teva* Actavis Mylan Heritage | *January 28* February 17 July 10 August 17 | *$34.40 (632%)* $34.39 (632%) $35.67 (659%) $34.39 (632%) |
| **Estradiol** | *Teva* Actavis | *January 28* May 21 | *$30.74 (90%)* $30.74 (109%) |

**2013 Trade Shows and Conferences**

| Date | Organization[3] / Event | Teva Attendees |
|------|------------------------|----------------|
| February 20-22 | GPhA Annual Meeting | Oberman<br>Olafsson (with Actavis) |
| April 20-23 | NACDS Annual Meeting | Oberman<br>Cavanaugh |
| August 10-13 | NACDS Total Store Expo | Cavanaugh<br>Galownia<br>Oberman |
| December 3 | NACDS Annual Dinner | Cavanaugh |

**2014 Trade Shows and Conferences**

| Date | Organization[1] / Event | Teva Attendees |
|------|------------------------|----------------|
| February 19-21 | GPhA Annual Meeting | Oberman |
| February 26 | GPhA BOD Quarterly Meeting | Oberman |
| April 1 | HDMA Roundtable Fundraiser | Cavanaugh |
| April 26-29 | NACDS Annual Meeting | Cavanaugh<br>Oberman |
| June 1-4 | HDMA Leadership Conference | Patel |
| August 23-26 | NACDS Total Store Expo | Cavanaugh<br>Galownia<br>Patel |
| Sept. 27 - Oct. 1 | HDMA Annual Board Membership Meeting | Cavanaugh<br>Baeder |
| November 19-21 | IGPA Annual Conference | Oberman |
| December 3 | NACDS Annual Dinner | Cavanaugh |

---

[3] GPhA = Generic Pharmaceutical Association;
HDMA = Healthcare Distribution Management Alliance;
IGPA = International Generic Pharmaceutical Alliance;
NACDS = National Association of Chain Drug Stores.

**2015 Trade Shows and Conferences**

| Date | Organization[1] / Event | Teva Attendees |
|------|------------------------|----------------|
| February 9-11 | GPhA Annual Meeting | Olafsson |
| June 7-10 | HDMA Leadership Conference | Patel |

**APPENDIX D**
**CLIENT CERTIFICATIONS**

## CERTIFICATION

I, Sharon Chilcott, Director & Associate General Counsel, Employment Law & Litigation of Ontario Teachers' Pension Plan Board ("Ontario Teachers'"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Ontario Teachers'. The securities subject to this litigation are or were held in title of and owned by Ontario Teachers'.

2.    I have reviewed the Consolidated Class Action Complaint, as provided for in the Court's Order entered July 27, 2017 (ECF No. 126), and have authorized its filing.

3.    Ontario Teachers' did not purchase or sell securities of Teva at the direction of counsel in order to participate in any private action under the federal securities laws.

4.    Ontario Teachers' is willing to serve as lead plaintiff in this matter, including by providing testimony at deposition and trial, if necessary.

5.    Ontario Teachers' transactions in Teva securities during the Class Period are reflected in Exhibit A, attached hereto.

6.    Ontario Teachers' has not sought to serve as lead plaintiff in a class action under the federal securities laws in the last three years, other than in this instant action.

7.    Beyond its *pro rata* share of any recovery, Ontario Teachers' will not accept payment for serving as lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

1

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 11ᵗʰ day of September 2017.

Sharon Chilcott
Director & Associate General Counsel,
Employment Law & Litigation
*Ontario Teachers' Pension Plan Board*

## EXHIBIT A

### TRANSACTIONS IN

### TEVA PHARMACEUTICAL INDUSTRIES LIMITED

**Teva Pharmaceutical Industries Ltd. American Depository Receipts (Sedol: 2883878)**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 02/19/2014 | -10,000.00 | 46.95 | $469,544.00 |
| Sale | 02/19/2014 | -15,000.00 | 45.78 | $686,625.00 |
| Sale | 02/19/2014 | -15,000.00 | 46.75 | $701,263.50 |
| Sale | 02/19/2014 | -15,000.00 | 47.50 | $712,531.50 |
| Sale | 02/20/2014 | -15,000.00 | 47.87 | $718,042.50 |
| Sale | 02/20/2014 | -15,000.00 | 48.55 | $728,322.00 |
| Sale | 02/20/2014 | -15,000.00 | 48.81 | $732,154.50 |
| Sale | 03/06/2014 | -17,800.00 | 51.25 | $912,299.84 |
| Sale | 03/18/2014 | -17,200.00 | 50.01 | $860,166.84 |
| Sale | 03/31/2014 | -10,000.00 | 52.03 | $520,257.00 |
| Sale | 03/31/2014 | -10,000.00 | 51.01 | $510,145.00 |
| Sale | 03/31/2014 | -15,000.00 | 52.50 | $787,537.50 |
| Sale | 03/31/2014 | -15,000.00 | 52.75 | $791,269.50 |
| Sale | 04/02/2014 | -20,000.00 | 54.50 | $1,090,060.00 |
| Sale | 04/02/2014 | -20,000.00 | 53.52 | $1,070,462.00 |
| Purchase | 05/07/2015 | 23,600.00 | 59.95 | ($1,414,815.28) |
| Purchase | 05/26/2015 | 15,000.00 | 59.85 | ($897,748.50) |
| Purchase | 06/09/2015 | 1,400.00 | 59.75 | ($83,648.04) |
| Purchase | 06/10/2015 | 241,199.00 | 60.40 | ($14,568,709.04) |
| Purchase | 06/10/2015 | 78,691.00 | 60.59 | ($4,768,076.55) |
| Purchase | 06/11/2015 | 66,223.00 | 61.16 | ($4,049,907.30) |
| Purchase | 06/11/2015 | 13,887.00 | 60.96 | ($846,486.25) |
| Purchase | 06/18/2015 | 17,000.00 | 59.70 | ($1,014,962.90) |
| Purchase | 06/23/2015 | 18,000.00 | 59.47 | ($1,070,389.80) |
| Purchase | 06/25/2015 | 13,000.00 | 58.99 | ($766,914.20) |
| Sale | 07/27/2015 | -5,000.00 | 70.00 | $350,003.00 |
| Sale | 07/27/2015 | -5,000.00 | 71.50 | $357,506.00 |
| Sale | 07/27/2015 | -8,000.00 | 69.74 | $557,916.80 |
| Sale | 07/29/2015 | -55,000.00 | 71.71 | $3,944,055.50 |
| Purchase | 12/03/2015 | 145,000.00 | 62.50 | ($9,062,500.00) |
| Purchase | 12/03/2015 | 55,000.00 | 62.50 | ($3,437,500.00) |
| Sale | 12/17/2015 | -57,500.00 | 64.96 | $3,735,200.00 |
| Purchase | 12/23/2015 | 28,800.00 | 65.90 | ($1,897,920.00) |
| Purchase | 01/19/2016 | 15,000.00 | 61.88 | ($928,269.00) |
| Purchase | 01/19/2016 | 15,000.00 | 62.15 | ($932,313.00) |
| Purchase | 01/20/2016 | 15,000.00 | 61.00 | ($914,974.50) |
| Purchase | 01/20/2016 | 2,600.00 | 59.99 | ($155,969.58) |
| Purchase | 02/08/2016 | 12,361.00 | 56.24 | ($695,233.32) |
| Purchase | 02/11/2016 | 20,000.00 | 53.96 | ($1,079,126.00) |
| Purchase | 02/11/2016 | 15,039.00 | 55.21 | ($830,276.12) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/01/2016 | 25,000.00 | 53.18 | ($1,329,615.00) |
| Sale | 04/05/2016 | -29,375.00 | 54.66 | $1,605,637.50 |
| Purchase | 04/12/2016 | 150,000.00 | 54.90 | ($8,234,265.00) |
| Purchase | 04/13/2016 | 127,056.00 | 54.67 | ($6,945,884.70) |
| Purchase | 04/13/2016 | 18,044.00 | 54.75 | ($987,909.00) |
| Purchase | 04/13/2016 | 4,900.00 | 54.75 | ($268,275.00) |
| Purchase | 05/02/2016 | 20,000.00 | 53.85 | ($1,077,038.00) |
| Purchase | 05/02/2016 | 8,000.00 | 53.40 | ($427,198.40) |
| Purchase | 05/06/2016 | 100,000.00 | 51.03 | ($5,103,430.00) |
| Purchase | 05/06/2016 | 17,000.00 | 51.49 | ($875,392.90) |
| Purchase | 05/06/2016 | 10,000.00 | 50.18 | ($501,803.00) |
| Sale | 06/06/2016 | -3,025.00 | 54.50 | $164,862.50 |
| Sale | 07/08/2016 | -24,000.00 | 50.60 | $1,214,400.00 |
| Purchase | 08/04/2016 | 24,000.00 | 53.80 | ($1,291,200.00) |
| Purchase | 08/09/2016 | 24,000.00 | 53.72 | ($1,289,280.00) |
| Purchase | 08/16/2016 | 36,000.00 | 53.73 | ($1,934,280.00) |
| Purchase | 08/16/2016 | 1,100.00 | 53.80 | ($59,179.45) |
| Purchase | 09/29/2016 | 25,000.00 | 46.47 | ($1,161,867.50) |
| Sale | 07/11/2017 | -125,000.00 | 30.93 | $3,866,037.50 |
| Sale | 07/12/2017 | -35,000.00 | 32.07 | $1,122,481.50 |
| Sale | 07/13/2017 | -40,000.00 | 33.15 | $1,326,000.00 |
| Sale | 07/13/2017 | -20,000.00 | 33.42 | $668,324.00 |

## Teva Pharmaceutical Industries Ltd. 7% Mandatory Convertible Preferred Shares (Sedol: BYWKW32)

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 12/17/2015 | 5,000.00 | 1005.00 | ($5,025,000.00) |
| Sale | 12/23/2015 | -2,500.00 | 1024.46 | $2,561,137.50 |
| Purchase | 04/05/2016 | 2,500.00 | 891.00 | ($2,227,500.00) |
| Purchase | 07/08/2016 | 2,000.00 | 844.00 | ($1,688,000.00) |
| Sale | 08/04/2016 | -2,000.00 | 888.76 | $1,777,520.00 |
| Sale | 08/09/2016 | -2,000.00 | 889.00 | $1,778,000.00 |
| Sale | 08/16/2016 | -3,000.00 | 894.11 | $2,682,330.00 |

## CERTIFICATION

I, Edward A. Jarvis, as Director of Anchorage Police & Fire Retirement System ("Anchorage"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Anchorage. The securities subject to this litigation are or were held in title of and owned by Anchorage.

2.      I have reviewed the Consolidated Class Action Complaint, as provided for in the Court's Order entered July 27, 2017 (ECF No. 126), and have authorized its filing.

3.      Anchorage did not purchase or sell securities of Teva at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      Anchorage is willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.      Anchorage's transactions in Teva securities during the Class Period are reflected in Exhibit A, attached hereto.

6.      Anchorage has not sought to serve as a representative party in a class action under the federal securities laws during the last three years except in the following:

> • *Hartsock v. Spectrum Pharmaceuticals, Inc.*, 16-cv-02279 (D. Nev.) (pending decision on lead plaintiff appointment)

7.      Anchorage has previous experience serving as Lead Plaintiff in *Freedman v. Weatherford International, Ltd.*, 12-cv-02121 (S.D.N.Y.) ("*Weatherford*"). Anchorage was appointed Co-Lead Plaintiff of *Weatherford* on July 10, 2012, and oversaw the prosecution of the case through the final approval of a $120 million settlement on November 4, 2015. Anchorage also served as Lead Plaintiff and oversaw the litigation of *In re Conseco, Inc. Sec. Litig.*, 00-cv-

1

585 (S.D. Ind.) which also settled for $120 million.

8.      Beyond its *pro rata* share of any recovery, Anchorage will not accept payment for serving as a representative party on behalf of the class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this $\underline{8}$ day of September, 2017.

Edward A. Jarvis
*Director of Anchorage Police & Fire*
*Retirement System*

2

**EXHIBIT A**

TRANSACTIONS IN

TEVA PHARMACEUTICAL INDUSTRIES LIMITED

**Teva Pharmaceutical Finance Netherlands III BV 3.15% Note Due 10/01/26 (Sedol: BD3GT31)**

| Transaction Type | Trade Date | Quantity | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/18/2016 | 685,000.00 | 99.73 | ($683,177.90) |
| Purchase | 09/27/2016 | 75,000.00 | 100.77 | ($75,577.50) |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

_____/s/ Joseph A. Fonti_____
Joseph A. Fonti