# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

<table>
<tr>
<td>
ONTARIO TEACHERS' PENSION PLAN<br>
BOARD, Individually and as Lead Plaintiff on<br>
behalf of all others similarly situated; and<br>
ANCHORAGE POLICE & FIRE RETIREMENT<br>
SYSTEM, Individually and as Named Plaintiff on<br>
behalf of all similarly-situated bond purchasers,<br><br>
       Plaintiffs,<br><br>
v.<br><br>
TEVA PHARMACEUTICAL INDUSTRIES<br>
LTD., <em>et al.</em>,<br><br>
       Defendants.
</td>
<td>
Civ. A. No. 3:17-cv-00558 (SRU)<br>
CONSOLIDATED with<br>
Civ. A. No. 3:17-cv-00559 (SRU)<br><br><br><br><br><br>
September 14, 2018
</td>
</tr>
</table>

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES LTD., EREZ VIGODMAN, EYAL DESHEH, DEBORAH GRIFFIN, AND SIGURDUR OLAFSSON's MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ............................................................................................... 8

ARGUMENT .................................................................................................... 12

I.      PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTION 10(B) OF THE EXCHANGE ACT ................................ 12

     A.    Plaintiffs' Allegations Are Not Pleaded With
The Particularity Required By The PSLRA And Rule 9(b). ............... 12

     B.    Plaintiffs Fail To Identify Any
Actionable Statement Or Omission Of Material Fact. ........................ 14

          1.    Plaintiffs Fail To Identify Any
Misleading Statement of Material Fact. ................................... 16

               a.    Accurate Statements Of
Historical Fact Are Not Actionable. ............................ 16

               b.    The Challenged Forward-Looking
Statements All Fall Within The PSLRA's Safe Harbor .............. 18

               c.    Vague And Indefinite Statements Of
Optimism Are Immaterial As A Matter Of Law ........................ 20

          2.    Plaintiffs Fail To Identify Any
Actionable Omission Of Material Fact. .................................... 22

               a.    Teva Had No Duty To Disclose
The Details Of Its Pricing Strategies. .......................... 23

               b.    None Of The Challenged Statements
Were "So Incomplete As To Mislead." ...................................... 26

                    i.    Defendants Made No Misleadingly
Incomplete Statements About Teva's Pricing
Strategy Or Susceptibility To Pricing Pressure. .............. 28

                    ii.    Defendants Made No Misleadingly
Incomplete Statements About The Degree
Of Competition In The Generic Drugs Market. ............... 33

                    iii.    Defendants Made No Misleadingly
Incomplete Statements About Ongoing Investigations.... 36

               c.    Teva Had No Duty To Disclose Its
Receipt Of Government Subpoenas. ........................................... 36

# TABLE OF CONTENTS
(continued)

Page

       d.    Plaintiffs Fail Adequately To Plead A
Strategy Of Systematic Price Increases. ...................................... 37

C.    Plaintiffs Fail Adequately To Plead Scienter. ....................................................... 39

    1.    Plaintiffs' Motive and Opportunity Allegations
Do Not Support A Strong Inference Of Scienter. .................................... 39

    2.    Plaintiffs Fail to Plead Specific Facts
Establishing Strong Circumstantial Evidence of Scienter. ...................... 41

       a.    Plaintiffs' Status And Access Allegations
Do Not Support A Strong Inference of Scienter. ......................... 42

       b.    Plaintiffs' Allegation That Teva's
Generics Business Was Widely Discussed
Does Not Raise An Inference Of Scienter. ................................... 44

       c.    Plaintiffs' "Magnitude Of The Fraud"
Allegations Fail Adequately To Plead Scienter. .......................... 45

       d.    The Existence Of Governmental Investigations
Does Not Give Rise To A Strong Inference of Scienter. ............. 45

       e.    The Individual Defendants' Departures
Do Not Support Any Inference Of Scienter. ................................ 46

       f.    Plaintiffs' Confidential Witness Allegations
Do Not Give Rise to Any Inference of Scienter. ......................... 47

    3.    Plaintiffs' Recycled Antitrust
Allegations Do Not Raise Any Inference Of Scienter. ............................ 49

       a.    Plaintiffs Fail Adequately To
Plead An Underlying Antitrust Violation. ................................... 49

       b.    Plaintiffs Antitrust Allegations
Do Not Support A Strong Inference of Scienter. ......................... 53

    4.    The Opposing Inferences Of Nonfraudulent
Intent Are More Plausible Than Any Inference Of Fraud. ...................... 54

D.    Plaintiffs Fail Adequately To Plead Loss Causation. ........................................... 55

II.    PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTION 20(A) OF THE EXCHANGE ACT. ............................................... 58

III.    PLAINTIFFS FAIL TO STATE A CLAIM
UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT. ............................ 59

CONCLUSION ................................................................................................................... 59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ......................................................................... 19

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ....................................................................................... 37

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ...................................................................... 14

*In re Am. Express Co. Sec. Litig.*,
  No. 02-cv-5533, 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ............................ 48

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) .................................................................................... 43

*Athale v. SinoTech Energy Ltd.*,
  No. 11-cv-05831, 2015 WL 13145808 (S.D.N.Y. Jan. 23, 2015), *aff'd sub
  nom Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582 (2d
  Cir. 2016) ................................................................................................................... 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................... 39, 59

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............................................................ *passim*

*Backman v. Polaroid Corp.*
  910 F.2d 10 (1st Cir. 1990) ........................................................................ 26, 27, 31

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................ 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 50, 51, 52

*Brophy v. Jiangbo Pharm., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) .............................................................................. 46

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ............................................................................ 47

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd,* 371 F. App'x 212 (2d Cir. 2010) ..... 14

DB1/ 99493668

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996).................................................................. *passim*

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)................................................................12, 37

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)...........................................................................35, 36

*City of Roseville Emps' Ret. Sys. v. Nokia Corp.*,
    No. 10-cv-00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ......................18, 20

*Coble v. Broadvision, Inc.*,
    No. 01-cv-01969, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002)........................22

*Cortina v. Anavex Life Scis. Corp.*,
    No. 15-cv-10162, 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016)...........................40

*In re Coty Inc. Sec. Litig.*,
    No. 14-cv-00919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)......................17, 28

*In re CRM Holdings, Ltd. Sec. Litig.*,
    No. 10-cv-00975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012)...........................39

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)...................................................................18

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)................................................................................20

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16-cv-03495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017),
    *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
    729 F. App'x 55 (2d Cir. 2018) ...........................................................................14

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)..............................................................40, 41

*Dura Pharmaceuticals, Inc. v. Broudo*
    544 U.S. 336 (2005).......................................................................................8, 58

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)............................................................................ *passim*

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)...................................................................40

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...................................................................................52

*In re Elevator Antitrust Litig.*,
   No. 04-cv-01178, 2006 WL 1470994 (S.D.N.Y. May 30, 2006),
   *aff'd*, 502 F.3d 47 (2d Cir. 2007) ......................................................................52

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................................................21

*In re Express Scripts Holding Co. Sec. Litig.*,
   No. 16-cv-03338, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) .............................44

*Fant v. Perelman*,
   No. 97-cv-08435, 1999 WL 199078 (S.D.N.Y. Apr. 9, 1999) ...............................46

*In re FBR Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..................................................................33

*In re Ferro Corp. Sec. Litig.*,
   No. 04-cv-1440, 2007 WL 1691358 (N.D. Ohio June 11, 2007) ...........................47

*Frederick v. Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) .........................................................................40

*Friedman v. Endo Int'l PLC*,
   No. 16-cv-3912, 2018 WL 446189 (S.D.N.Y. 2018) ............................................31

*Gammel v. Hewlett-Packard Co.*,
   905 F. Supp. 2d 1052 (C.D. Cal. 2012) ...............................................................47

*Gavish v. Revlon, Inc.*,
   No. 00-cv-07291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ..........................21

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................46

*Gissin v. Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010) ..................................................................19

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................................47

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ...............................................................................46

*Glazer v. Formica Corp.*,
   964 F.2d 149 (2d Cir. 1992) ....................................................................... *passim*

*In re GPC Biotech AG Sec. Litig.*,
    No. 07-cv-06728, 2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009) ...........................................21

*Grillo v. Tempur-Pedic Int'l Inc.*,
    553 F. Supp. 2d 809 (E.D. Ky. 2008) ....................................................................................44

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)....................................................................................................18

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................................................51, 52

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ..................................................................................................47

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)....................................................................................................59

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) *cert. granted sub nom. Leidos, Inc. v. Indiana Pub.*
    *Ret. Sys.,* 137 S. Ct. 1395 (2017), *voluntarily dismissed* 138 S. Ct. 2670 ..............................23

*Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*,
    205 F. Supp. 3d 527 (S.D.N.Y. 2016)....................................................................................19

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005).....................................................................................56

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005).....................................................................................56

*Johnson v. Sequans Commc'ns S.A.*,
    No. 11-cv-6341, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ................................................23

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ..................................................................................................26

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)....................................................................................................40

*LaFlamme v. Société Air Fr.*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................................................52

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................................1, 55, 56

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).......................56

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016)................................................................. *passim*

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)........................................................46

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ...............47, 59

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) ....................................................................46

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013).........................................................................50

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ....................................................................51

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ....................................................................51

*In re Mirant Corp. Sec. Litig.*,
   No. 02-cv-01467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)..................................50

*Missere v. Gross*,
   826 F. Supp. 2d 542 (S.D.N.Y. 2011)........................................................13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010).....................................................................26, 28

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006).......................................................17

*In re NVIDIA Corp. Secs. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ......................................................................23

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010).....................57, 58

*Perez v. Higher One Holdings, Inc.*,
   No. 14-cv-00755, 2016 WL 6997160 (D. Conn. Sept. 13, 2016)...........................36

*In re Peritus Software Servs. Inc. Sec. Litig.*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ............................................................21

*In re PetroChina Co. Ltd. Sec. Litig*,
   120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015),
   *aff'd,* No. 15-cv-02528 (2d Cir. Mar. 21, 2016) ...........................................43

*Placide-Eugene v. Visiting Nurses Serv. of N.Y.*,
  No. 12-cv-02785, 2013 WL 2383310 (E.D.N.Y. May 30, 2013) ............................................35

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
  No. 15-cv-05999, 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ..........................................28

*Pollio v. MF Glob.*,
  608 F. Supp. 2d 564 (S.D.N.Y. 2009) ....................................................................................22

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) .......................................................................................................8

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...........................................................................................18, 20

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) .................50, 51

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996) ............................................................................................ *passim*

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................................ *passim*

*Sapssov v. Health Mgmt. Assoc., Inc.*,
  608 F. App'x 855 (11th Cir. 2015) .........................................................................................57

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013) ....................................................................................45

*Schwab v. E*Trade Fin. Corp.*,
  285 F. Supp. 3d 745 (S.D.N.Y. 2018) ....................................................................................43

*Shemian v. Research in Motion Ltd.*,
  No. 11-cv-04068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013),
  *aff'd*, 570 F. App'x 32 (2d Cir. 2014) ...................................................................................21

*In re ShengdaTech, Inc. Sec. Litig.*,
  No. 11-cv-01918, 2014 WL 3928606 (S.D.N.Y Aug. 12, 2014) ...........................................45

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..................................................................................................43

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014) ......................................................................................45

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
  09-cv-05064, 2010 WL 2473595 (S.D.N.Y. June 17, 2010),
  *aff'd*, 448 F. App'x 116 (2d Cir. 2011) ............................................................41, 44

*In re Stratasys Ltd.*,
  15-cv-00455, 2016 WL 3636992 (D. Minn. June 30, 2016), *aff'd sub nom. In
  re Stratasys Ltd. S'holder Sec. Litig.,* 864 F.3d 879 (8th Cir. 2017) ......................55

*Superior Offshore Int'l Inc. v. Bristow Group, Inc.*,
  738 F. Supp. 2d 505 (D. Del. 2010), *aff'd*, 490 F. App'x 492 (3d Cir. 2012) ........51

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................................57

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................2, 39, 54

*Thesling v. Bioenvision, Inc.*,
  374 F. App'x 141 (2d Cir. 2010) .........................................................................22

*Thornton v. Micrografx, Inc.*,
  878 F. Supp. 931 (N.D. Tex. 1995) ......................................................................55

*Utesch v. Lannett Co.*,
  316 F. Supp. 3d 895 (E.D. Pa. 2018) ...........................................................*passim*

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ................................................................................51

*In re WEBMD Health Corp. Sec. Litig.*,
  No. 11-cv-05382, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ............................18, 19

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................................22

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ................................................................................28

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ................................................................................26

*In re Yukos Oil Co. Secs. Litig.*,
  No. 04-cv-05243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ............................49

*Yung v. Lee*,
   160 F. App'x 37 (2d Cir. 2005) ..................................................................2

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y 2016) .........................................................52

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ....................................................................47

**Statutes and Other Authorities**

15 U.S.C. § 78u-4(b)(1)(B) ...............................................................................14

15 U.S.C. § 78u-5(c) .............................................................................18, 19, 20

17 C.F.R. § 229.303(a)(3) (2012) .....................................................................23

Denise Voigt Crawford & Dean Galaro,
   *A Rule 10b-5 Private Right of Action for MD&A Violations?*,
   43 Sec. Reg. L.J. 1, 1 (2015) ...................................................................23

Fed. R. Civ. P. 12(f) ..........................................................................................51

*Gross Profit Margin*, BLACK'S LAW DICTIONARY (10th ed. 2014) ...............32

H.R. Rep. No. 104-369 (1995) ............................................................................1

## INTRODUCTION

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Teva Pharmaceutical Industries Ltd. ("Teva"), Erez Vigodman, Eyal Desheh, Deborah Griffin, and Sigurdur Olafsson (the "Individual Defendants," and with Teva, "Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Class Action Complaint (the "2018 Complaint" or "C") in its entirety, with prejudice.[1]

## PRELIMINARY STATEMENT

Taking their third bite at the apple, Plaintiffs do nothing in their latest Complaint to cure the defects that led this Court to dismiss their last Complaint from the bench. To the contrary, the manner in which they have repackaged their prior defective allegations serves only to highlight the reasons that this case should never have been filed.

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005) (citation and quotation omitted). This litigation is exactly the type of "baseless and extortionate" strike suit the PSLRA was designed to prevent. H.R. Rep. No. 104-369, at 32 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731.

This case began with a race to the courthouse and the assertion of knee-jerk securities fraud claims against Teva and its senior executives following a November 3, 2016, *Bloomberg* article reporting that the Department of Justice (the "DOJ") might file criminal antitrust charges by the

---

[1] Plaintiffs have asserted claims against Teva, Teva Pharmaceutical Finance Netherlands II B.V. ("Teva Finance") and six current and former officers and directors of Teva under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Separate motions are being filed on behalf of: (1) Teva Finance, against whom Plaintiffs assert claims only under the Securities Act; and (2) Defendants Allan Oberman and Maureen Cavanaugh, two officers who are not alleged to have made a statement on which any claim is based.

end of 2016 against an unspecified number of unnamed generic drug companies.  That article listed

Teva as among the companies that had previously disclosed its receipt of a subpoena in connection

with the DOJ's investigation.  Three days later, Plaintiffs filed this action, conclusorily alleging

that Teva had engaged in misconduct supporting criminal antitrust claims, which also allegedly

supported the assertion of federal securities fraud claims.

While the initial complaint was purportedly based on "the investigation conducted by and

through [p]laintiff's attorneys," ECF No. 1 at 1, no meaningful "investigation" could possibly have

been conducted, by anyone, between the Bloomberg article's publication, on November 3, 2016,

and the complaint's filing three days later, on November 6, 2016.  For this reason, it is hardly

surprising that the initial complaint lacked a valid basis for piggybacking federal securities law

claims on top of unproven antitrust price-fixing allegations.

On September 11, 2017, Plaintiffs filed a Consolidated Class Action Complaint, ECF. No.

141 (the "2017 Complaint"), which despite spanning more than 300 pages, added nothing of

substance to the hastily-filed fraud charges that began this case.  On April 3, 2018, the Court

dismissed the 2017 Complaint from the bench.  ECF No. 215.  Granting leave to replead, the Court

cautioned: "[M]y reading of the complaint was everything was hinging on price-fixing, which I

thought was extremely thin."  Ex. 1 (ECF No. 218 (Apr. 3, 2018 Oral Arg. Tr.) ("April 3 Tr.")

51)[2].

On June 22, 2018, Plaintiffs filed the 2018 Complaint, which spans 145 pages and includes

---

[2] On a motion to dismiss a case governed by the PSLRA, this Court may consider documents referenced in the Complaint, matters of which the Court may take judicial notice, including public records, and documents integral to the complaint, without turning this motion into one for summary judgment.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference."); *Yung v. Lee*, 160 F. App'x 37, 41 (2d Cir. 2005) ("We also consider any statements or documents incorporated in the complaint by reference, as well as any documents not so incorporated but nevertheless integral to the complaint.") (quotations omitted).  Exhibits attached hereto contain copies of documents referenced herein as "Ex. __."

a purportedly new theory of the case.  To begin, and to state the obvious, the notion that Plaintiffs have now concocted a whole new theory of wrongdoing, different from the one that ostensibly supported these same fraud claims when they filed them, itself undermines the legitimacy of the 2018 Complaint.  Gone are the allegations that Teva engaged in an undisclosed price-fixing scheme that supposedly rendered all of the challenged statements false and misleading.[3]  Instead, those allegations have been replaced with the equally invalid claim that that Teva engaged in an undisclosed "strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio" – what Plaintiffs' call the "Price-Hike Strategy," and which supposedly rendered all of the challenged statements false and misleading.  *See* C ¶ 1.

If this sounds somewhat familiar to the Court, that is understandable.  All that Plaintiffs have done is masquerade in a new costume the very same claims that this Court previously dismissed.  Plaintiffs continue to base their case on the same challenged statements.  They continue to be "conclusory about critical facts" necessary to state a securities fraud claim under the PSLRA, which is a defect that this Court previously identified in their 2017 Complaint.  Ex. 1 (April 3 Tr. 17).  Plaintiffs continue to assert claims that suffer from the same legal infirmities that beset those in their 2017 Complaint.  Worse still, however, the 2018 Complaint also contains an additional flaw, which goes to the heart of their new Complaint, *i.e.*, to their new "Price Hike Strategy" allegations.

Simply put, there is nothing improper, let alone illegal, about a company having a strategy, as virtually all companies do, to raise prices on products when a market opportunity arises.  Thus, despite the number of times that the 2018 Complaint refers to Teva's allegedly "Inflated Profit,"

---

[3] Plaintiffs now resort only to half-hearted allegations regarding supposed antitrust violations solely in support of their scienter arguments, which Defendants address below.  Those antitrust allegations are less detailed than those in the prior Complaint that this Court found legally inadequate.

and despite Plaintiffs' attempt to contrast profit allegedly generated from higher prices with "legitimate sources" of profit, this rhetoric cannot substitute for the pleading of specific facts regarding actual illegal activity.  Plaintiffs do not, because they cannot, identify anything illegal about Teva raising prices on some of its many products when the opportunity arose.  For a number of reasons discussed in detail below, Plaintiffs' new "Price Hike Strategy" allegations do not support any actionable claim.

First, Plaintiffs have failed to identify a single actionable misrepresentation or omission of material fact, which is fatal to the claims that they have asserted under the Exchange Act and the Securities Act.  As with the 2017 Complaint, Plaintiffs attempt to overcome this fatal flaw by sheer breadth – quoting every quarterly and annual financial disclosure Teva made from the fourth quarter of 2013 to the fourth quarter of 2016.  Volume cannot replace substance.  These statements of earnings and growth are non-actionable accurate statements of historical fact, which Plaintiffs do not even allege to be false.  The remaining challenged statements are either forward-looking statements, which are immune from liability under the PSLRA's "safe harbor" provision, or vague and indefinite statements that cannot constitute material misrepresentations, as a matter of law.

Plaintiffs' omission allegations fare no better.  Plaintiffs allege that Defendants violated federal securities law by failing to disclose an alleged "strategy" to raise prices on certain generic products Teva marketed over the course of the three-plus year putative class period (the "Class Period").  However, even if Plaintiffs had pled with the requisite specificity that Teva engaged in an undisclosed "Price Hike Strategy" – which Plaintiffs have failed to do – the 2018 Complaint would still fail to state a federal securities law claim, as a matter of law.

An omission is actionable under federal securities law only where there exists a duty to disclose the allegedly omitted information.  There is no freestanding duty to disclose a company's

pricing strategy.[4]  To the contrary, as the Second Circuit has explained, it would be improper to "interpret[] the securities laws to force companies to give their competitors advance notice of sensitive pricing information."  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996).  Moreover, disclosing anticipated pricing decisions without any business justification "could be considered price signaling" to competitors and therefore raise "antitrust concerns."  *Id.*  For these reasons, it would be "**inherently absurd to impose on companies in highly competitive, consumer-based industries an affirmative duty to disclose to competitors sensitive pricing and marketing decisions.**"  *Canandaigua*, 944 F. Supp. at 1211 (emphasis added).

While Teva had no duty to disclose its internal pricing strategy, Teva, in fact, *did* disclose its overarching approach to pricing and also issued repeated warnings about the difficulties of sustaining high prices on generic products.  Those disclosures include, *inter alia*, that Teva will raise prices "[w]hen there's an opportunity,"[5] and that a certain percentage of Teva's portfolio would experience price increases.[6]  Those disclosures undermine Plaintiffs' claims, because no omissions claim can be brought for failure to disclose information that was, in fact, disclosed.  Those candid disclosures are inconsistent with any inference that anyone at Teva intended to mislead any investor in connection with the Company's pricing strategy.  *See infra* Parts I.B.1, I.B.2.

---

[4] *See, e.g.*, *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1210 (S.D.N.Y. 1996) ("[I]nformation concerning management decisions such as pricing plans properly falls outside of [Reg.] S-K [Item] 303 [disclosure].").

[5] C ¶ 184.

[6] C ¶¶ 199, 227; *see also* Ex. 2 (Dec. 11, 2014 Tr. at 18) (acknowledging "price increases on individual molecules"); Ex. 6 ( June 8, 2016 Tr. at 11) (noting price increases due to "a lot of shortages in the market" around 2014); Ex. 9 (Sept. 7, 2016 Tr. at 2) (acknowledging prices "might even go up a little bit here and there, depending on demand and supply"); Ex. 10 (Sept. 9, 2016 Tr. at 28) ("[W]e will maximize the value of our assets, and if that indicates that there's been a change in marketplace dynamics due to supply chain or someone leaving the market, we will evaluate that and price our products accordingly.").

Plaintiffs also get nowhere with their allegations challenging as false Defendants' statements regarding the impact that Teva's cost savings had on its reported financial results. At the prior motion to dismiss hearing, Plaintiffs' counsel conceded that Plaintiffs lack any basis for contending that Teva did not, in fact, achieve the cost savings that it described to the market:

> THE COURT: By the way, is the cost savings false?
>
> [PLAINTIFFS' COUNSEL]: It is false in that it conceals -- it's not the whole story. We don't --
>
> THE COURT: **Well, they undertook a $2 billion cost savings program.**
>
> [PLAINTIFFS' COUNSEL]: **Yes.** To the extent there was cost savings, absent the profits, the illicit profits, they would not have had a net addition of a billion dollars. **We're not alleging that the cost savings didn't exist and they didn't get a benefit from that**, but the additional margin of profit that we're talking about is on the order of magnitude of the illicit profit that we were able to identify.

Ex. 1 (April 3 Tr. 29) (emphasis added).

It is also worth noting that, in the exchange with the Court quoted above, Plaintiffs' counsel used the phrase "illicit profits" to refer to profits that Teva supposedly generated from alleged price-fixing with respect to, at most, nine specific generic drugs that Plaintiffs had identified by name in their prior Complaint, and the exact amount of which Plaintiffs purported to calculate for the Court. 2017 Complaint ¶¶ 134-240. Now, in their newest Complaint, Plaintiffs contend that the very same Teva profits were supposedly "illicit" for *an entirely different reason*, *i.e.*, because they allegedly resulted from the supposedly illegal "Price Hike Strategy." This merely highlights the extent to which the 2018 Complaint contains nothing but a rehash of the same claims that this Court previously found wanting.

While the foregoing pleading deficiencies alone defeat all of Plaintiffs' claims, those claims also fail for several other legally dispositive reasons. Plaintiffs have failed to plead specific facts supporting the required strong inference that any Defendant acted with scienter, which

Plaintiffs are required to plead separately as to each Defendant (as opposed to relying on allegations made as to "all Defendants," as Plaintiffs impermissibly do here).  *See infra* Part I.C. Plaintiffs also fail adequately to plead loss causation because they never allege any disclosure that revealed the alleged pricing strategy fraud to investors and thereby caused Plaintiffs' alleged loss. *See infra* Part I.D.  The 2018 Complaint also fails to adequately plead control person liability.  *See infra* Part II.

The invalidity of Plaintiffs' claims is made clearer by Plaintiffs continued assertion of August 3, 2017 as the end of the Class Period.  On August 3, 2017, the price of Teva securities dropped sharply upon its announcement that it missed Wall Street financial expectations for the second quarter of 2017 ("Q2 2017"), it lowered its financial guidance for the year, and it took an impairment charge of $6.1 billion.  C ¶¶ 23, 153, 334 (citing Ex. 13 (Aug. 3, 2017 Tr.)).  That impairment charge reduced the Company's goodwill associated with its generic drug business, including both its legacy business and the Actavis Generics business that Teva acquired from Allergan Plc.  Ex. 13 (Aug. 3, 2017 Tr.).  Teva attributed these negative results to "accelerated **price erosion and decreased volume** mainly due to customer consolidation, **greater competition** as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subjected to **more competition**."  C ¶ 334 (quoting Ex. 22 (2017 Q2 Form 6-K at Ex. 99.1) (emphasis added)).

In other words, the price of Teva securities declined on August 3, 2017 because the very risks of competition and pricing about which Teva had previously warned investors – those same risks that Plaintiffs inconsistently attack in the 2018 Complaint as false – materialized and led to investor losses.  In addition, market conditions in the generic drug market declined in the aftermath of Teva's mid-2015 deal to acquire Actavis Generics for $40.5 billion.  As Teva explained on

August 3, 2017, it was those worsening market conditions that led it to take a $6.1 billion impairment charge, partly related to the Actavis Generics business that it agreed to acquire two years earlier.  Ex. 13 (Aug. 3, 2017 Tr.).

The losses that Teva reported on August 3, 2017 were disappointing, but the materialization of disclosed risks regarding competition, market conditions, and the Actavis acquisition does not constitute fraud.  Rather, Plaintiffs are asserting a charge of "fraud by hindsight," which cannot support an actionable federal securities law claim, as a matter of law.[7]

In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court stressed that the federal securities laws make private securities fraud class actions available "not to provide investors with broad insurance against market losses, but to protect against those economic losses that misrepresentations actually cause."  544 U.S. 336, 345 (2005).  As courts have long recognized: "The market has risks; the securities laws do not serve as investment insurance."  *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) (affirming dismissal of securities fraud claims).  Investment insurance, to which Plaintiffs are not entitled, is plainly what they are seeking here.  For these and other reasons discussed below, Plaintiffs' claims should be dismissed in their entirety, with prejudice.

## **BACKGROUND**

### **Teva Is A Leading Generic Drug Company That Sells Thousands Of Products.**

Incorporated in Israel, Teva is a global pharmaceutical company working to increase access to high-quality healthcare by developing, producing, and marketing affordable generic medicines.  C ¶ 24; Ex. 18 (2016 Form 20-F at 22).  Teva USA is a wholly-owned subsidiary of Teva with its

---

[7] *Athale v. SinoTech Energy Ltd.*, No. 11-cv-05831, 2015 WL 13145808, at *8 (S.D.N.Y. Jan. 23, 2015) (recognizing that "it is not reckless to lack clairvoyance" and that "the Second Circuit has long refused to allow plaintiffs to proceed with allegations of fraud by hindsight") (internal citations and quotation marks omitted), *aff'd sub nom Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582 (2d Cir. 2016).

headquarters in Pennsylvania.  C ¶ 24.

During the time period relevant to this litigation, Teva primarily operated its business in two segments:  generic medicines and specialty medicines.  Ex. 17 (2015 Form 20-F at 20).  As the global leading generics manufacturer, Teva's medicines treat millions of patients every day worldwide.  *Id.*  Still, from 2012 to 2016, only 48% to 55% of Teva's revenues came from its generics business.[8]  These revenues were generated by a large portfolio of generic products, including hundreds in the United States alone:

| Year | Approximate Number of Generic Products Marketed in United States | Source |
|---|---|---|
| 2012 | Over 400 | Ex. 14 (2012 Form 20-F at 28) |
| 2013 | 375 | Ex. 15 (2013 Form 20-F at 28) |
| 2014 | 375 | Ex. 16 (2014 Form 20-F at 20) |
| 2015 | 370 | Ex. 17 (2015 Form 20-F at 24) |
| 2016 | Over 500 | Ex. 18 (2016 Form 20-F at 27) |

**Governmental Investigators Examine Prices In The Generic Drug Industry.**

In 2014, Connecticut and the DOJ began investigating increases in the prices of generic drugs and issued subpoenas to several generic drug manufacturers.  2017 Complaint ¶¶ 96, 98.  On June 21, 2016 Teva USA received a DOJ subpoena "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."  C ¶ 122; Ex. 20 (2016 Q2 Form 6-K at 25).  Then, on July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General "seeking documents and other information relating to potential state antitrust law violations."  *Id.*  Although Teva had no legal obligation to do so,[9] Teva promptly disclosed the

---

[8] 51% in 2012 (Ex. 14 (2012 Form 20-F at 17)); 50% in 2013 (Ex. 15 (2013 Form 20-F at 18)); 48% in 2014 (Ex. 16 (2014 Form 20-F at 18)); 49% in 2015 (Ex. 17 (2015 Form 20-F at 21)); and 55% in 2016 (Ex. 18 (2016 Form 20-F at 22)).

[9] *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (concluding, despite defendants' receipt of subpoenas and Wells Notices, that "defendants did not have a duty to disclose the SEC investigation and Wells Notices because the securities laws do not impose an obligation on a company to predict the outcome of investigations").

receipt of both subpoenas in its next quarterly report, on August 4, 2016, stating that "Teva is cooperating fully with these requests."  Ex. 20 (2016 Q2 Form 6-K at 25).[10]

On November 3, 2016, Bloomberg reported that U.S. prosecutors might file federal charges by the end of 2016 against several unnamed generic drug companies for alleged collusion to fix generic drug prices on unnamed drugs.  C ¶ 135; Ex. 25 (David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe Said to Be Filed by Year-End*, Bloomberg New Enterprise (Nov. 3, 2016)).  The article stated that the antitrust investigation by the DOJ "spans more than a dozen companies and about two dozen drugs."  *Id.*  The article reported that Teva was one of the generic drug manufacturers that had received a subpoena.  *Id.*

On December 14, 2016, the DOJ announced that it had charged two executives of Heritage Pharmaceuticals ("Heritage") with antitrust violations related to the pricing of generic drugs. C ¶ 142.  On January 9 and 10, 2016, the Heritage executives pleaded guilty to charges related to two drugs:  Doxycyline and Glyburide.  *Id.* ¶ 144.  The guilty pleas do not even mention, let alone implicate, Teva or its officers.  *See* Exs. 26 (Glazer Plea Agreement, No. 16-00506, ECF No. 18 (E.D. Pa. Jan. 9, 2017)); 27 (Malek Plea Agreement, No. 16-00508, ECF No. 17 (E.D. Pa. Jan. 10, 2017)).  The DOJ did not file any charges against Teva then or at any time since then, nearly two years after the Bloomberg article.

On December 15, 2016, Attorneys General from Connecticut and nineteen other States filed a civil lawsuit (the "State AG Lawsuit") in this District against six generic drug manufacturers – Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage, Mayne Pharma (USA), Inc., Mylan Pharmaceuticals, Inc., and Teva.  C ¶ 143.  Teva promptly disclosed this litigation (*see,*

---

[10] The Q2 2016 Form 6-K mistakenly stated that Teva USA received the DOJ subpoena on June 21, 2015, instead of the correct date of June 21, 2016.  Ex. 20 (2016 Q2 Form 6-K at 25).  Teva included the correct date the next quarter. Ex. 21 (2016 Q3 Form 6-K at 33).

*e.g.*, Ex. 18 (2016 Form 20-F at F-51)).  As alleged in the 2018 Complaint, the State AG Lawsuit

originally only pled facts as to Teva concerning the drug Glyburide.  C ¶ 143.  The State AG later

amended its suit to add 13 additional drugs, additional defendants, and additional State Attorneys

General.  C ¶ 144.  Teva is vigorously contesting the civil claims asserted in the State AG Lawsuit,

which have not resulted in either a determination of liability nor an admission of guilt by anyone

associated with Teva.  *See* No. 16-2056, ECF No. 284.

**Plaintiffs Filed The 2017 Complaint After**
**Teva Reported Lower Than Expected Financial Performance.**

> On August 3, 2017, Teva announced:
>
> Second quarter results were lower than we had anticipated due to the performance
> of our U.S. Generics business and the continued deterioration in Venezuela.  These
> factors also led to a lowering of our outlook for the remainder of the year. . . . In
> our U.S. Generics business, we experienced accelerated price erosion and decreased
> volume mainly due to customer consolidation, greater competition as a result of an
> increase in generic drug approvals by the U.S. FDA, and some new product
> launches that were either delayed or subjected to more competition.

Ex. 22 (2017 Q2 Form 6-K at Ex. 99.1); C ¶ 334.  In addition, Teva announced that it was recording

a goodwill impairment charge of $6.1 billion "related to the U.S. generics reporting unit in the

second quarter of 2017," which included both the legacy Teva and the newly acquired Actavis

Generics businesses.  *Id*.

On September 11, 2017, Plaintiffs filed the 2017 Complaint, seeking to represent a class

of purchasers of Teva securities from February 6, 2014 to August 3, 2017.  ECF No. 141 at 1.

Piggybacking on the governmental investigations and parroting allegations made in the State AG

Lawsuit – which have still not resulted in any determinations of liability against Teva – Plaintiffs

alleged that the Defendants violated federal securities laws by failing to disclose Teva's alleged

participation in a price-fixing scheme regarding less than 2 to 3 percent of the hundreds of generic

drugs that Teva marketed during the Class Period.[11]

On December 1, 2017, Teva and certain individual defendants moved to dismiss the 2017 Complaint.  ECF No. 189.  On April 3, 2018, the Court dismissed the 2017 Complaint from the bench.  ECF No. 215.  Granting leave to replead, the Court cautioned:  "[M]y reading of the complaint was everything was hinging on price-fixing, which I thought was extremely thin."  Ex. 1 (April 3 Tr. 51).

**In The 2018 Complaint, Plaintiffs Repackage Their Defectively Pled**
**Antitrust Allegations As A Failure To Disclose "The Price Hike Strategy."**

On June 22, 2018, Plaintiffs filed the 2018 Complaint.  ECF No. 226.  It does not remedy the pleading weaknesses that the Court previously identified.  Rather, the 2018 Complaint abandons the bulk of Plaintiffs' prior price-fixing allegations and seeks to repackage those same defectively pled claims as relating to an allegedly undisclosed "Price Hike Strategy."  C ¶ 1.  For numerous reasons discussed below, the 2018 Complaint fails to state any claim against any Defendant, as a matter of law.

## ARGUMENT

**I.     PLAINTIFFS FAIL TO STATE A CLAIM**
       **UNDER SECTION 10(b) OF THE EXCHANGE ACT.**

**A.     Plaintiffs' Allegations Are Not Pleaded With The**
        **Particularity Required By The PSLRA And Rule 9(b).**

The PSLRA's pleading requirements are strict and rigorous.  They require Plaintiffs, *inter alia*, to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  *In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367, 374-75 (S.D.N.Y. 2004) (quoting

---

[11] As in the 2017 Complaint, Plaintiffs propose a class period of February 6, 2014 to August 3, 2017.

15 U.S.C. § 78u-4(b)(1) (1998)), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.,* 165 F. App'x 928 (2d Cir. 2006).  Similarly, Federal Rule of Civil Procedure 9(b) requires that plaintiff state "with particularity" the circumstances constituting alleged fraud.  "[U]nwarranted inferences and unsupported conclusions cast in the form of factual allegations" do not count in the plaintiff's favor.  *Missere v. Gross*, 826 F. Supp. 2d 542, 565 (S.D.N.Y. 2011).

Like the 2017 Complaint, the 2018 Complaint fails to adhere to these exacting standards. At over 150 pages, the 2018 Complaint tries to make up for in length what it lacks in particularity. Plaintiffs' core allegation is that Teva should have disclosed its alleged "strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio," which Plaintiffs call the "Price-Hike Strategy."  C ¶ 1.  But Plaintiffs fail to plead with particularity facts demonstrating that Teva engaged in such a "strategy" or that Teva's *overall* pricing increased if one includes drugs for which there were price declines.  While the 2018 Complaint repeatedly asserts that Teva employed a "Price Hike Strategy" that yielded billions in revenue, such "unwarranted inferences and unsupported conclusions" do not constitute well-pleaded facts for purposes of a motion to dismiss under Rule 12(b)(6), and they fall far short of providing the "particularity" Rule 9(b) and the PSLRA require.  *Missere*, 826 F. Supp. 2d at 565.

Moreover, Plaintiffs concede that Teva and other drug companies do not disclose individualized product pricing information, yet claim that their unspecified analysis of data from unidentified sources (C ¶ 41) allows them to determine, to the dollar, Teva's Class Period price increases on individual drugs, including the magnitude of the price increases.  If Plaintiffs were actually able to allege price increases with the requisite particularity – which they cannot – competitors and other market observers could undertake this same analysis.  The implication of Plaintiffs' position defeats their core allegation that such pricing information was not publicly

available.  *See infra* Part I.B.2.d.

Similarly, despite its length, the 2018 Complaint never states with particularity how **<u>any</u>** specific statement was false or misleading on its own or through the alleged omission of information.  Instead, Plaintiffs print quotations from every quarterly and annual financial release and then conclusorily allege that the financial disclosures were misleading based on Plaintiffs' speculation about supposed price increases.  While Plaintiffs challenge Defendants' statements attributing good results to cost savings and product mix, Plaintiffs already conceded in open Court that they have no ground for contending that Teva did not, in fact, benefit from those actions.  *See supra* p. 6.  Consistent with that concession, the 2018 Complaint fails to plead any facts demonstrating the falsity of any challenged statement regarding the contribution that cost savings and product mix made to Teva's financial results for any period.  In short, Plaintiffs' block quotes and formulaic repetition "state[] very little with particularity," *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005), and their Complaint should be dismissed under the PSLRA and Rule 9(b) for this reason alone.[12]

### B.    Plaintiffs Fail To Identify Any Actionable Statement Or Omission Of Material Fact.

The PSLRA obligates Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see ECA, Local*

---

[12] *See, e.g.*, *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]"), *aff'd*, 371 F. App'x 212 (2d Cir. 2010); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-cv-03495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (dismissing securities complaint that failed to demonstrate how "block quotations" were allegedly false, but instead repeatedly employed a "conclusory formula . . . to cover *all* of the allegedly material misrepresentations") (emphasis in original), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).

*134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The 2018 Complaint must be dismissed because Plaintiffs have failed to identify any challenged statement that was false when made or any actionable omission of material information.

As to the alleged misrepresentations, the vast majority are accurate statements of historical fact that are not even alleged to be false. The remainder are forward-looking statements, which are immune from liability under the PSLRA's safe harbor provision, or vague and indefinite statements that cannot constitute actionable statements of material fact, as a matter of law.

As to omissions, Plaintiffs try to repackage the defective omission at the core of their 2017 Complaint, *i.e.*, that Teva failed to disclose an illegal price-fixing scheme in violation of federal antitrust law. As repackaged, Teva failed to disclose an alleged "strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio" – the so-called "Price-Hike Strategy." C ¶ 1.[13] It is not surprising that Plaintiffs would de-emphasize their antitrust price-fixing allegations, given this Court's statement in dismissing the 2017 Complaint from the bench: "everything was hinging on the price-fixing, which I thought was extremely thin." Ex. 1 (April 3 Tr. 51). At its core, however, Plaintiffs' newly-conceived "Price Hike Strategy" is nothing more than a rehash of their failed price-fixing allegations. *See, e.g.*, C ¶ 6 (alleging that "two-thirds of the increases were done in tandem with other drug manufacturers").

Of course, Plaintiffs cannot save their price-fixing allegations by including *far less* in their Complaint to support a contention that illegal price-fixing occurred. They also cannot predicate claims on the allegation that Teva supposedly raised prices on certain products consistent with

---

[13] Plaintiffs have not completely abandoned the omission allegation at the core of the 2017 Complaint. Buried deep in their 2018 Complaint is Plaintiffs' allegation that Teva's Class Period statements about competitiveness and pricing were rendered misleading by the failure to disclose Teva's alleged (but unadjudicated) violation of the antitrust laws. C ¶ 309. For the reasons set forth below, and the reasons that dictated the dismissal of the 2017 Complaint, this recycled allegation fails to state a claim under the federal securities laws. *See infra* Part I.B.2.b.ii.

market opportunities to do so, which is entirely legal, which is what virtually all companies do, and which Teva never denied doing.  *See infra* Part I.B.2.a.

Plaintiffs cannot adequately allege a misrepresentation regarding Teva's pricing, when: (1) they do not attack as false or misleading any statement regarding Teva's pricing for any particular generic drug, because no Defendant made any statement about the price of any specific drug; and (2) Plaintiffs do not plead any facts demonstrating the falsity of any challenged statement any Defendant made regarding the pricing for *the entirety* of Teva's generic drug business. Furthermore, Plaintiffs have also failed to allege an actionable omission regarding Teva's pricing because: (1) they cannot cite any securities law giving rise to a freestanding duty to disclose a company's pricing strategy; and (2) Teva *did* disclose that it sought to raise prices when market opportunities to do so arose, and it also repeatedly warned investors regarding the difficulties of sustaining high prices on generic drugs.

Having failed to plead an actionable statement or omission of material fact, Plaintiffs' claims should be dismissed.

### 1.      Plaintiffs Fail To Identify Any Misleading Statement of Material Fact.

Plaintiffs rely on 40 pages of alleged misstatements (C ¶¶ 155-239), which can be categorized into three main points: (1) accurate statements of historical fact that are not challenged as false for what they state; (2) forward-looking statements accompanied by meaningful cautionary language; and (3) vague and indefinite statements of optimism about Teva's business or future prospects.   Longstanding principles of federal securities law establish that a plaintiff cannot predicate a securities fraud claim on these sorts of statements.

### a.      Accurate Statements Of Historical Fact Are Not Actionable.

True statements of historical fact simply are not actionable under Section 10(b).  In fact,

"disclosure of accurate historical data does not become misleading even if [the company might predict] less favorable results . . . in the future." *In re Coty Inc. Sec. Litig.*, No. 14-cv-00919, 2016 WL 1271065, at \*6 (S.D.N.Y. Mar. 29, 2016); *see, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") (internal citations and quotation marks omitted).

Plaintiffs nevertheless base their claims on factual statements of earnings and growth drawn from every quarterly and annual announcement of financial results between the fourth quarter of 2013 to the fourth quarter of 2016.  To illustrate, Plaintiffs challenge the Company's announcement of U.S. generics revenues of $1.2 billion for Q4 2013, amounting to a year-over-year increase of $144 million, which the Company stated "[r]esulted mainly from the exclusive launches" of two products in each of Q3 and Q4, as well as "higher sales" of a fifth product.  C ¶ 174 (quoting Ex. 19 (2013 Q4 Form 6-K at Ex. 99.1)).[14]  Plaintiffs claim that this statement of historical revenues and growth was false or misleading because the Company did not disclose 18 alleged price hikes in Q3 2013.  But "[a]bsent an allegation that [the company] reported income that it did not actually receive or sales growth that did not actually occur, . . . 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'"  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (citation omitted).  That is true even if the accurately reported income "is alleged to have been, in part, improperly obtained" and "inflated as a result of the alleged scheme."  *Id.* at 403-04 (citations omitted).

Plaintiffs have not alleged that the financial results Teva reported were inaccurate.  They have not identified any duty to disclose price increases by product, as none exists.  They have not

---

[14] *See also* C ¶¶ 175-76, 178, 180, 182, 188-89, 192, 195, 197, 207, 208, 213, 217, 225, 232, 237.

shown how the omission of alleged price increases on any particular products rendered misleading the accurate historical results that Teva reported.  Plaintiffs have not adequately alleged that any of Teva's revenues resulted from any type of illegal activity and, even if they had, such allegations would not render actionable Teva's accurately reported historical financial results.  For all of these reasons, the accurate reports of Teva's financial results that Plaintiffs challenge are not actionable.

### b.    The Challenged Forward-Looking Statements All Fall Within The PSLRA's Safe Harbor.

Defendants' forward-looking statements cannot give rise to liability under the PSLRA's safe harbor provision. 15 U.S.C. § 78u-5(c).  That safe harbor provides, *inter alia*, that a defendant is not liable if "the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial . . . ."  *City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10-cv-00967, 2011 WL 7158548, at \*5 (S.D.N.Y. Sept. 6, 2011) (citation omitted) (emphasis in original); 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).  As a consequence, "allegedly fraudulent forward-looking statements must be examined in the light of the cautionary language surrounding them"[15] so that companies may make projections without fear of liability should those projections not come to pass.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re WEBMD Health Corp. Sec. Litig.*, No. 11-cv-05382, 2013 WL 64511, at \*9 (S.D.N.Y. Jan. 2, 2013) (dismissing claims where "[Defendant]'s prediction, while ultimately erroneous, could not have misled a reasonable investor into thinking that there was no risk").

Plaintiffs challenge financial guidance provided on investor calls held on July 13, 2016 and January 6, 2017.  *See* C ¶¶ 222, 235, 366.  Financial projections, however, are the prototypical forward-looking statement entitled to safe harbor protection.  *See, e.g.*, *WEBMD*, 2013 WL 64511,

---

[15] *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 267 (S.D.N.Y. 2004); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357-58 (2d Cir. 2002).

at *5 ("At its core, a forward-looking statement is one that contains a projection of income or earnings, or one of 'future economic performance.'").  Courts in the Second Circuit consistently recognize that cautionary language shields a company from liability for routine projections.  *See, e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010).[16]  Teva's guidance is likewise shielded from liability because these investor calls and accompanying presentations included "meaningful cautionary language," both directly and through incorporation by reference.  Exs. 7 & 8 (July 13, 2016 Tr. and Presentation); Exs. 11 & 12 (Jan. 6, 2017 Tr. and Presentation).[17]  Teva's Form 20-F for 2015, incorporated by reference in both presentations, includes similar cautionary language. Ex. 17 (2015 Form 20-F at 1).  In short, these calls and presentations both identified that forward-looking statements were being made and incorporated by reference literally pages of risks that could cause actual results to differ from the forward-looking projections.

To the extent Plaintiffs are not challenging the accuracy of the projections themselves, but rather the basis for those projections, Plaintiffs' claims still fail.  *See* C ¶ 366.  Any allegation that a projection accompanied by meaningful cautionary language could be actionable conflicts with the language of the PSLRA and the controlling Second Circuit law cited above.  Putting the legal infirmities aside, these allegations also fail because Plaintiffs have failed adequately to plead the facts underlying their contention that Defendants allegedly misled investors regarding the basis for Teva's projections.  *See infra* Part I.B.2.[18]

---

[16] *See also Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 537-38 (S.D.N.Y. 2016); *WEBMD*, 2013 WL 64511, at *9.

[17] A corporation may incorporate by reference the risk factors set forth in its recent SEC filings. *See Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 192-93 (D. Conn. 2014) (earnings guidance press releases incorporating cautionary language by reference qualify for safe harbor); 15 U.S.C. § 78u-5(c).

[18] To the extent Plaintiffs challenge those portions of the July 2016 and January 2017 guidance regarding the Actavis acquisition and its prospects for success, they are also not actionable under the PSLRA's safe harbor provision because, as noted above, they were accompanied by meaningful cautionary language, including the many risks presented by Teva's decision to purchase Actavis.  Exs. 8 (July 13, 2016 Presentation at 2); 12 (Jan. 6, 2017 Presentation at 2) (listing many risks regarding the Actavis acquisition).

Plaintiffs purchased their Teva securities with their eyes wide open to the risks Teva disclosed. Although it was disappointing to Teva, its management, and its shareholders that certain risks materialized, the losses that consequently resulted do not support any valid claim for violation of federal securities law. To the contrary, as the Second Circuit has long recognized, a lack of "clairvoyance" is not actionable, nor a charge of "fraud by hindsight," which is what Plaintiffs assert here. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of federal securities claims). Because Teva's risk disclosures were sufficiently "meaningful" under Second Circuit law, Defendants' forward-looking statements are immune from liability.[19]

### c.   Vague And Indefinite Statements Of Optimism Are Immaterial As A Matter Of Law.

Plaintiffs also err in challenging vague and indefinite statements allegedly made by Defendants. Such statements, including "expressions of puffery and corporate optimism," cannot give rise to liability under the federal securities laws because no reasonable investor would rely on them. *Rombach*, 355 F.3d at 174; 15 U.S.C. § 78u-5(c)(1)(A)(ii) ("immaterial" forward-looking statements not actionable). "[C]ompanies must be permitted to operate with a hopeful outlook" and management "can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach*, 355 F.3d at 174 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)). For these reasons:

> [Courts] have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the

---

[19] Plaintiffs' claims based on forward-looking statements also should be dismissed for the independent reason that the Complaint fails sufficiently to plead scienter under the second prong of the PSLRA's safe harbor provision. Even when a forward-looking statement is not accompanied by meaningful cautionary language—which is not the case here—it is actionable only if made with "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(B)(i); *see also City of Roseville*, 2011 WL 7158548, at *5. For this reason, the scienter pleading standard is higher for forward-looking statements than statements of historical fact. Here, Plaintiffs have not pled a single specific contemporaneous fact giving rise to a strong inference that any Defendant had "actual knowledge" that any forward-looking statement was false or misleading. *See infra* Part I.C (discussing Plaintiffs' failure adequately to plead scienter).

speaker, that no reasonable investor could find them important to the total mix of information available.

*Gavish v. Revlon, Inc.*, No. 00-cv-07291, 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004)

(citation omitted).  Such puffery includes "loose optimism about both an issuer's current state of

affairs and its future prospects."  *In re Peritus Software Servs. Inc. Sec. Litig.*, 52 F. Supp. 2d 211,

220 (D. Mass. 1999) (citation omitted).

Many of the statements Plaintiffs challenge as false or misleading fall into this category of

inactionable corporate puffery.  These include:

- "We believe in competition, and we'll do what is needed in order to win in all the markets we operate."  C ¶ 167.

- "We believe we have a focused and competitive pricing strategy."  C ¶ 171.

- "We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space."  C ¶ 219.

- "Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business.  In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business."  C ¶ 235.

Courts regularly find such vague and indefinite statements of optimism to be immaterial puffery.

*See, e.g.*, *In re GPC Biotech AG Sec. Litig.*, No. 07-cv-06728, 2009 WL 5125130, at *6 (S.D.N.Y.

Dec. 29, 2009) (statements conveying allegedly misleading impression that clinical trial "**was**

**going well**" are immaterial puffery) (emphasis added); *Shemian v. Research in Motion Ltd.*, No.

11-cv-04068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (statement that "**I feel very,**

**very good** about [the] U.S." held to be "non-actionable corporate puffery"), *aff'd*, 570 F. App'x

32 (2d Cir. 2014) (emphasis added); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 286

(S.D.N.Y. 2006) (statements that "**[w]e're excited** about the prospects" and "**[e]verybody has**

**been anxiously using it** and learning how to use the technology" "constitute mere puffery upon

which no investor could have reasonably relied") (emphasis added).[20]  Defendants' vague and indefinite statements of optimism are immaterial, as a matter of law.

### 2.    Plaintiffs Fail To Identify Any Actionable Omission Of Material Fact.

As Plaintiffs do not adequately allege that any statement they challenge was false, their case largely rests on the contention that Defendants were obligated to disclose Teva's supposed strategy to increase prices on certain generic drug products.  It is well established, however, that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  In fact, "it is by now axiomatic that 'a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.'" *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (citation omitted).  To prevent flooding investors with useless information, "an omission is actionable under the securities laws *only when the corporation is subject to a duty to disclose the omitted facts.*"  *Lions Gate*, 165 F. Supp. 3d at 11 (emphasis added) (citation omitted).

Even where undisclosed information is material, a duty to disclose arises only when: (1) a statute or regulation requires disclosure; (2) there is contemporaneous insider trading; or (3) a voluntary statement is rendered so incomplete as to mislead absent the disclosure of the undisclosed information.  *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992).  Here, there are no allegations of insider trading, and Plaintiffs fail adequately to allege either a freestanding duty to disclose the allegedly omitted information or a voluntary statement that was rendered so incomplete as to mislead due to the nondisclosure of omitted information.

---

[20] *See also Pollio v. MF Glob.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statement that "the franchise is performing well" is merely optimistic puffery); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 956 (D. Ariz. 2007) (statement "[w]e are encouraged that strengthening customer forecasts may partially offset the [typical] seasonal weakness" is "indeed, puffery"); *Coble v. Broadvision, Inc.*, No. 01-cv-01969, 2002 WL 31093589, at *1 (N.D. Cal. Sept. 11, 2002) (statement that company was "well positioned . . . to thrive and emerge even a stronger player" not actionable).

### a.     Teva Had No Duty To Disclose
### The Details Of Its Pricing Strategies.

Plaintiffs incorrectly contend that Teva had a "statutory" obligation to disclose: (1) that its success supposedly was driven by raising prices on certain of its generic products; and (2) that pricing pressure beginning in 2016 was preventing it from increasing generic drug prices.  C ¶¶ 160-61.  To support this contention, Plaintiffs invoke Item 303 of Regulation S-K and Item 5 of Form 20-F, which require a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3) (2012); *see* C ¶¶ 157-58.[21]  Plaintiffs' reliance on these regulatory provisions is misplaced.  It is well-settled that "information concerning management decisions such as pricing plans properly falls outside of [Reg.] S-K [Item] 303 disclosure."  *Canandaigua*, 944 F. Supp. at 1210.[22]

As the Second Circuit has explained, it would be improper to "interpret[] the securities laws to force companies to give their competitors advance notice of sensitive pricing information." *San Leandro*, 75 F.3d at 809 (affirming dismissal of claim based on alleged failure to disclose alternative marketing strategy).  The *Canandaigua* court's application of this controlling Second Circuit law is instructive.

There, the plaintiffs attempted to premise securities fraud claims on the company's

---

[21] Although Item 303 of Reg. S-K does not apply to Teva as a foreign filer, the SEC and courts interpret Item 5 of Form 20-F as requiring the same disclosures.  *See, e.g.*, *Johnson v. Sequans Commc'ns S.A.*, No. 11-cv-6341, 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013).

[22] Whether Item 303 of Reg S-K can give rise to a duty to disclose that is privately enforceable under the federal securities laws is the subject of a Circuit split.  *Compare Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016) *cert. granted sub nom. Leidos, Inc. v. Indiana Pub. Ret. Sys.*, 137 S. Ct. 1395 (2017), *voluntarily dismissed* 138 S. Ct. 2670, *with In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046 (9th Cir. 2014).  Although the issue is settled law for the moment in the Second Circuit, there is a substantial likelihood that the Supreme Court will hold that Item 303 cannot give rise to such a duty to disclose, given that the contours of required disclosure under Item 303 have never been clear.  *See* Denise Voigt Crawford & Dean Galaro, *A Rule 10b-5 Private Right of Action for MD&A Violations?*, 43 Sec. Reg. L.J. 1, 1 (2015) ("[T]he test set out by the Commission for assessing MD&A disclosures  has  been poorly  worded  and  incongruous  for  twenty-six  years.").

undisclosed strategy to increase market share by introducing new, lower priced products. *Canandaigua,* 75 F.3d at 1205.  The plaintiffs claimed that this pricing strategy caused a price war and "gambl[ed] short-term profits and earnings to gain longer-term benefits" and that Item 303 of Reg. S-K imposed a duty on the company to disclose the new strategy sooner than it did.  *Id.* at 1207, 1209 (internal quotation marks omitted).  Rejecting that argument, the court held that "[t]here is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans."  *Id.* at 1210-11.  "The former are information concerning the extrinsic operational situation that management faces, and needs to be disclosed, while the latter are competitive business judgments that management makes to improve the business, and need not be disclosed."  *Id.* at 1211.[23]

Courts are rightly "sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information" like pricing strategy.  *Id.*  For this reason, a company has no duty to disclose pricing information in the absence of an explicit "promise to maintain a current [pricing] strategy, even if [the strategy was] previously detailed" to investors – a promise the plaintiffs have not alleged Teva made.  *Canandaigua*, 944 F. Supp. at 1208.  In fact, disclosing anticipated pricing decisions without any business justification "could be considered price signaling" to competitors and therefore raise "antitrust concerns."  *San Leandro*, 75 F.3d at 809.  Thus, in *Canandaigua*, the court reasonably concluded that it would be "inherently absurd to impose on companies in highly competitive, consumer-based industries an affirmative duty to disclose to competitors sensitive pricing and marketing decisions."  *Canandaigua*, 944 F.

---

[23] This distinction explains why, contrary to Plaintiffs' contention, disclosing a decline in the volume of products sold – which reflects market conditions and hence the company's extrinsic operational situation – is not at all analogous to disclosing business judgments about optimal pricing strategy.  *See* C ¶ 162 (discussing SEC Release No. 33-8350).

- 24 -

Supp. at 1211.  Accordingly, Item "303's mandate to disclose material 'trends and uncertainties' does not contemplate furnishing competitors with an analytical blueprint of a company's business strategies." *Id.*

Furthermore, while Teva had no duty to disclose its pricing strategy, it made no secret that it would, and did, raise prices of certain of its products as market opportunities to do so arose.  It also issued constant warnings about the difficulties of sustaining high prices on generic products. Defendants disclosed that Teva would raise prices "[w]hen there's an opportunity." C ¶ 184.  They also recognized that a certain percentage of the portfolio would experience price increases.  C ¶¶ 199, 227; *see also* Ex. 2 (Dec. 11, 2014 Tr. at 18) (acknowledging "price increases on individual molecules"); Ex. 6 (June 8, 2016 Tr. at 11) (noting price increases due to "a lot of shortages in the market" around 2014); Ex. 9 (Sept. 7, 2016 Tr. at 3) (acknowledging prices "might even go up a little bit here and there depending on demand and supply"); Ex. 10 (Sept. 9, 2016 Tr. at 28) ("[W]e will maximize the value of our assets, and if that indicates that there's been a change in marketplace dynamics due to supply chain or someone leaving the market, we will evaluate that and price our products accordingly.").

Overall, however, Teva warned investors, repeatedly, that "[p]rices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies . . . receive approvals and enter the market for a given product and competition intensifies." C ¶ 171.  Teva made clear to investors that its products were subject to price erosion.  *See, e.g.*, C ¶ 199 ("95% of our portfolio is declining[.]"); Ex. 2 (Dec. 11, 2014 Tr. 18) ("[W]e see net erosion, and that's the message that should be spelled out in a very clear way."); Ex. 6 (June 8, 2016 Tr. at 10-11) (explaining that price decreases on newly launched product can quickly reach "40%, 50%").

For all of these reasons, Plaintiffs have failed to allege any actionable omission respecting Teva's pricing or any other matter.

### b. None Of The Challenged Statements Were "So Incomplete As To Mislead."

Unable to identify any statute or regulation requiring disclosure of the allegedly omitted information, Plaintiffs are left to rely solely on the argument that the alleged omissions made Defendants' statements "so incomplete as to mislead." *See, e.g.*, *Lions Gate*, 165 F. Supp. 3d at 15 (explaining that absent an affirmative duty to disclose, an omission claim can only survive if the alleged omission rendered a statement "so incomplete as to mislead"). This argument fails as well, for Plaintiffs fundamentally misunderstand the scope of this doctrine.

The First Circuit's seminal *en banc* decision in *Backman v. Polaroid Corp.* teaches that statements are misleadingly incomplete, within the meaning of federal securities law, only under very limited circumstances, and the Second Circuit has followed *Polaroid* on this issue. 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (followed and applied in *Glazer*, 964 F.2d at 156).[24] *Polaroid* illustrates how very narrowly courts construe what it means for a statement to be "so incomplete as to mislead," stressing that "complete and accurate" disclosure does not require that a company publish every fact about every subject it voluntarily discloses. *Polaroid*, 910 F.2d at 16 (citation omitted); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (affirming dismissal because "disclosures did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding [the subject]").

In *Polaroid*, the plaintiffs alleged, among other things, that Polaroid violated the federal securities laws because certain disclosures concerning its Polavision instant movie camera (which

---

[24] *See also Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (applying *Polaroid* in affirming dismissal of securities fraud claims); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (same).

proved to be a commercial disaster) were misleading.  *Id.*, 910 F.2d at 11-12, 15.  The First Circuit ordered that defendants were entitled to judgment as a matter of law, stressing that "complete and accurate" disclosure does not require that a company publish every fact about every subject it discloses:  "This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  *Id.* at 16.

The *Polaroid* plaintiffs argued that Polaroid had made misleadingly incomplete disclosures by featuring the Polavision camera on the cover of a quarterly report, announcing record sales and earnings, and stating that Polaroid's worldwide manufacturing facilities continued "to operate at close to maximum capacity" – without disclosing that the company had instructed its European supplier to hold up production on 20,000 Polavision units.  *Id.* at 15.  Rejecting that argument, the First Circuit applied a very literal rule.  It held that Polaroid's statement that its worldwide manufacturing operations were "close to maximum capacity," if "taken as a whole, was true; it expressly recognized an absence of totality."  *Id.*  In other words, even though Polaroid omitted information concerning a Polavision production slowdown during the relevant quarter, Polaroid's statement concerning manufacturing at "close to maximum capacity" was nevertheless literally true at that time and not misleadingly incomplete.  *Id.*  Similarly, "[d]isclosing that Polavision was being sold below cost was not misleading by reason of not saying how much below.  Nor was it misleading not to report the number of sales, or that they were below expectations."  *Id.* at 16.

Since *Glazer*'s adoption of *Polaroid*, courts in the Second Circuit have adhered to this narrow construction of what it means for a statement to be misleadingly incomplete.  *See Glazer*, 964 F.2d at 156.  In particular, courts zero in on the language that the defendants *actually used* – not a plaintiff's characterization or edited version of the defendants' statements – when

determining whether an alleged omission renders misleading a challenged statement. *See, e.g.*, *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-cv-05999, 2017 WL 4403314, at \*13 (S.D.N.Y. Sept. 30, 2017) ("[I]n arguing that Amex's disclosures were misleading, Plaintiff ignores the language Amex used."); *Sanofi*, 155 F. Supp. 3d at 403 ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether 'the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading.'") (citation omitted). Courts also review the defendant's disclosures "holistically," taking them "together and in context," *Morgan Stanley*, 592 F.3d at 366.   Thus, there is no liability when what the defendant actually said is consistent with the omitted alleged facts.   *See, e.g.*, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 133 (2d Cir. 2011) ("Merrill's statement that it 'may routinely' place support bids is not inconsistent with the possibility that it would place such bids in every Merrill ARS auction that took place over a particular period."); *Coty*, 2016 WL 1271065, at \*9 ("Plaintiffs still fail to explain how the termination of a single product line sold in the United States demonstrates that Defendants' statements that the OPI brand was expanding globally was false or misleading.") (emphasis omitted).

Plaintiffs challenge as misleadingly incomplete statements on three subjects: (1) statements about Teva's pricing strategy and exposure to pricing pressure; (2) statements about competition in the generics market; and (3) statements about ongoing government investigations.   None of these alleged statements were so incomplete as to mislead, under applicable law.

### i. Defendants Made No Misleadingly Incomplete Statements About Teva's Pricing Strategy Or Susceptibility To Pricing Pressure.

Plaintiffs rely most heavily on Defendants' statements about generic drug pricing.   These statements address the pricing across its entire generic drug portfolio **overall**, and none are about

the price of any one specific drug.[25]  Plaintiffs additionally point to statements that Teva was relatively well positioned to withstand pricing pressure, while Plaintiffs ignore the warnings Teva gave about the risk nonetheless presented by potential declines in pricing.  Plaintiffs also challenge statements various Defendants made that attributed Teva's improved profit margins to cost reductions, portfolio diversity, and new product launches, without alleging one fact suggesting that Teva did not, in fact, have the improvements in those areas that it publicly described.[26]  In Plaintiffs' view, these statements were rendered misleading through omission of information about alleged price increases on approximately 60 generic drugs over a three-year period.  C ¶¶ 227, 230.  Devoid from the Complaint, however, are any facts indicating that Teva's pricing, across its *entire* generic drug portfolio of hundreds of products, contributed more to its profit margin improvement than had been represented.  Furthermore, even if the alleged omissions were adequately pled – and they are not (*see infra* Part I.B) – they would not be actionable because they do not render the challenged statements false or misleading, as the Second Circuit's *San Leandro* decision illustrates.

In *San Leandro*, the plaintiffs argued that the defendant company, cigarette manufacturer Philip Morris, "had stated that it would continue its historic strategy of raising the price of Marlboro in order to sustain profits, but had already test marketed Marlboro at reduced prices, and therefore was under an obligation to disclose its consideration of an alternative and opposite strategy that would focus on increasing market share through a price cut."  75 F.3d at 809.  Refusing to interpret the securities laws to "force companies to give their competitors advance notice of sensitive pricing information," the Court concluded that the plaintiffs had not identified

---

[25] *See, e.g.*, C ¶¶ 184, 186, 198, 199, 205, 211, 212, 214, 227, 229, 230.

[26] *See, e.g.*, C ¶¶ 198, 201, 210, 213, 218, 219, 220 222, 225, 226, 228, 233, 234, 235.

any actionable, misleadingly incomplete statement under the approach required by *Glazer*.  *Id.* at 809-10 (citing *Glazer*, 964 F.2d at 156-57).  The allegedly misleading statements, when read in context, were not misleading at all because, even though Philip Morris had said its "main focus . . . would be on profits and not on market share," it had nonetheless "indicated that market share was an important consideration in its overall business strategy."  *Id.* at 810.

Plaintiffs' arguments based on Teva's supposedly undisclosed pricing strategy fail for the same reason:  Teva's statements were not misleading as they were consistent with the alleged omission.  Even if Plaintiffs had plausibly alleged that Teva engaged in a deliberate strategy to raise prices on several dozen occasions over a period of nearly three years – which they have not, *see* infra Part I.B.2.d –  that allegation is in no way inconsistent with the alleged affirmative statements about Teva's generics pricing overall.  The challenged statements relate to pricing trends across Teva's entire generic drug portfolio (of hundreds of drugs), which Plaintiffs do not show – or even claim – were false.  For example:

- "I think, **overall**, the pricing in the U.S. of generics has been flat to a slight down.  There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products."  C ¶ 186 (emphasis added).

- "[W]e and the generic industry **overall don't see price inflation of generics** as it sometimes is portrayed in the media.  On the contrary, for 2015, we saw mid-single-digit price decline **for the overall business**."  *Id.* ¶ 211 (emphasis added).

Absent from the 2018 Complaint are any well-pled allegations showing that the challenged statements about pricing across the entirety of Teva's generic drug business overall were false.

Even more importantly, as already described, Defendants expressly disclosed that Teva did, and would, raise prices on individual drug products when market opportunities to do so arose.  Teva repeatedly acknowledged, for example, that it, "[l]ike any other business," is on the lookout for any "pricing opportunity that comes in the market."  C ¶ 184.  Although Defendants sometimes opined that such opportunities commonly arise "when there is a shortage in the market," *id.*,

Plaintiffs do not point to any statement or implication by any Defendant that Teva would *only* take advantage of pricing opportunities if they were caused by shortages, which of course would be an odd commitment for a company to make.

Given the actual language of Teva's disclosures, Plaintiffs cannot succeed with a claim that any were misleadingly incomplete. As in *Polaroid*, where the *en banc* court stressed that the defendants' statement about manufacturing at "close to maximum capacity" was not misleading because it "expressly recognized an absence of totality," 910 F.2d at 15, here Teva's statements on industry-wide competition and pricing were not misleading given that they expressly recognized certain exceptions. Further, as in *San Leandro*, where the defendants said they were focusing on pricing instead of market share, but nevertheless disclosed that increasing market share was part of their business strategy, 75 F.3d at 810, Defendants here acknowledged that Teva would, and did, capitalize on opportunities to raise prices.[27]

Nor can Plaintiffs get any traction from two out-of-context statements suggesting that "price" and "pricing" did not explain the "improvements" in Teva's profit margins, from 17% in 2013 to 28% in 2015. *See* C ¶¶ 4, 198, 210. As noted above, counsel for Plaintiffs conceded at oral argument that Teva benefited from the implementation of a multi-billion-dollar cost reduction program, and Plaintiffs have no basis for alleging otherwise. Ex. 1 (April 3 Tr. 29). Absent from the Complaint are any facts to show that cost saving, improved efficiency, and product mix were not the principal drivers of Teva's improved margins. Nor does the 2018 Complaint contain any facts that undercut Teva's representations regarding that contribution that pricing **overall**, across

---

[27] *See also Friedman v. Endo Int'l PLC*, No. 16-cv-3912, 2018 WL 446189, at *6 (S.D.N.Y. 2018) ("[A] company has no such duty to disclose changes to its business plans – unless the company had hyped a specific plan, thereby inducing investors to believe that alternative plans were excluded. To qualify for that exception, a plaintiff must allege facts plausibly establishing that a company had stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors.") (quotation marks and citations omitted).

its entire business, made to its profit margin improvement. Instead, Plaintiffs offer only speculation based on their own purported analysis of Teva's pricing, based on undisclosed analysis of unidentified data, relating solely to a small subset of the hundreds of generic drug products that Teva sold during the Class Period. Missing from Plaintiffs' homemade analysis is any consideration of the pricing on the Teva products that Plaintiffs do not claim to have analyzed, *i.e.*, approximately 80% of the products that Teva sold during the Class Period. C ¶ 230. Price declines on merely some of those products could easily have offset the alleged price increases Plaintiffs vaguely allege on others. In sum, Plaintiffs fail adequately to allege that the challenged statements regarding the main drivers for Teva's profit margin improvements were misleadingly incomplete.[28]

*San Leandro* also bars Plaintiffs' claims based on the statement that Teva's "exposure," given "politicians[']" noise on pricing issues, "is very minimal," C ¶¶ 4, 9, 201, by making clear that challenged statements must be analyzed in context. 75 F.3d at 810. Teva explained that its exposure to such political initiatives was minimal because the Company "has one of the smallest exposure[s] to Medicaid and Medicare, or basically being paid by the US government budget." Ex. 5 (Nov. 19, 2015 Tr. at 4). For that reason, Teva, unlike some of its competitors, faced comparatively low exposure to "price being pushed down by governments that want to see that as a source to balance their budget." *Id.* In context, this challenged statement is not misleading.

---

[28] Notably, cost reductions have a mathematically outsized effect on profit margins as compared to revenue. Calculated as a percentage of revenue, gross profit margin equals the total revenue less costs divided by total revenue. *See Gross Profit Margin*, BLACK'S LAW DICTIONARY (10th ed. 2014). Thus, if a seller with revenues of 100 and costs of 50 decreases costs by 10, its gross profit margin increases from 50% to 60% (*i.e.*, 60/100). If the same seller keeps costs constant but increases revenues by 10, its gross profit margin only increases from 50% to 54.5% (*i.e.*, 60/110).

> ### ii.   Defendants Made No Misleadingly Incomplete Statements About The Degree Of Competition In The Generic Drugs Market.

Plaintiffs allege that a few statements about the competitive nature of the U.S. generic drug market were misleading because Defendants failed to disclose that Teva was raising prices on drugs that featured a "lack of competition." C ¶ 170; *see also id.* ¶¶ 166, 167, 168, 169, 171. None of these statements was misleadingly incomplete.

First, to the extent that Plaintiffs are implying these statements were misleadingly incomplete because Teva had allegedly engaged in anticompetitive price-fixing – the central theory of the 2017 Complaint – Plaintiffs cannot overcome the many cases holding that, to assert a nondisclosure claim arising from the failure to disclose illegal conduct, the alleged illegal conduct must be "specifically pled" *and* there must be a "direct nexus to the defendant's existing disclosures which rendered those statements misleading." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006); *see Sanofi*, 155 F. Supp. 3d at 404-05 ("Assuming *arguendo* that plaintiffs sufficiently plead the existence of the scheme, whether defendants had a duty to disclose the scheme depends on the substance of the statements: whether 'alleged omissions . . . are sufficiently connected to defendants' existing disclosures.'") (citation omitted).   The connection "may not be too attenuated" and "must be pled with sufficient specificity." *Axis*, 456 F. Supp. 2d at 588.   In assessing nondisclosure claims, the alleged misstatements must be read "as a whole" both "together and in context." *Id.*; *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 361 (S.D.N.Y. 2008) (citation omitted).

Here, Plaintiffs do not even attempt to "specifically" plead any anticompetitive price-fixing, and so these claims fail for that reason alone.   *See infra* Part I.B.2.b.ii; *see also Axis*, 456 F. Supp. 2d at 589.   Indeed, Plaintiffs have cut the bulk of the price-fixing allegations from their 2017 Complaint, which this Court considered "extremely thin."   Ex. 1 (April 3 Tr. 51).

DB1/ 99493668

Although that failure is independently dispositive of this claim, it also fails for the separate

reason that, even if price-fixing were adequately pled, and it is not, the alleged omission does not

render misleading the challenged statements about competition in the generic drug industry

generally.  The context surrounding the statements that Plaintiffs highlight reveals just how little

connection they had with any alleged anticompetitive conduct.  For example, Mr. Olafsson's

statement on the July 27, 2015 conference call that "the U.S. generic market is very competitive,"

*see* C ¶ 166, was in response to a targeted question asking for his view about whether a

combination between two of Teva's competitors would result in "tougher competition for Teva"

than the one competitor on its own.  Ex. 3 (July 27, 2015 Tr. 14).  Mr. Olafsson thought it was

"difficult . . . to speculate how [the combined companies would] be as a competitor," but observed

that the market was already "very competitive" with "over 200 generic companies" that compete

over "most of [Teva's] portfolio."  *Id.*  None of these statements was false or misleading under

governing precedent.  *See Axis*, 456 F. Supp. 2d at 589 & n.4 (holding that "[n]ot every allegation

of an antitrust violation will render misleading generalized statements regarding a company's

increased earnings or the competitive state of the marketplace" and ruling that statements

"referencing [Axis's] 'competitive strengths or stating that the insurance and reinsurance industries

were 'highly competitive'" were too "innocuous" to be misleadingly incomplete).

It is indisputably true that the U.S. generics industry, as a whole, was extremely

competitive during the Class Period.  A 2016 Department of Commerce report stated:

> Although generics make up only 22 percent of total prescription sales, its share of
> filled prescriptions has risen from 19 percent in 1984 to 88 percent in 2015.  The
> high volume and low value reflects an **extremely competitive sector** with low-cost
> imports adding increasing pressure on domestic generics producers.  It also points
> to high saturation in the U.S. generics market, underlining the need to expand
> abroad for future growth opportunities.

Ex. 23 (International Trade Commission, Department of Commerce, 2016 Top Markets Report

Pharmaceuticals 4) (emphasis added).[29]  The Department of Health and Human Services voiced a similar assessment:

> Our review of evidence strongly supports the conclusion that generic drug prices are not an important part of the drug cost problem facing the nation.  In fact, about two-thirds of generic products appear to have experienced price declines in 2014. Although the **generic drug market as a whole is quite competitive**, some segments of the market have experienced large price increases.  These spikes are on one hand troubling in that they disadvantage particular patient groups but also sufficiently limited so they exert no sizable influence on overall drug spending.

Ex. 24 (Department of Health and Human Services, ASPE Issue Brief, Understanding Recent Trends in Generic Drug Prices 1 (Jan. 27, 2016) (emphasis added)).  Teva's warnings about the risks posed by competition in the generic drug market were completely consistent with these government assessments.

No other statement on this topic was misleading either.  Although Plaintiffs isolate Mr. Olafsson's generalized statement that "pricing is obviously based on the competition," C ¶ 168, they neglect to include his comment that "the pricing environment has been quite favorable for generics versus 6 years ago" or his observation that the FDA's rate of approval of new drug applications could "affect pricing" going forward.  Ex. 4 (Oct. 29, 2015 Tr. 17).  Thus, far from promising investors a continuation of a relatively favorable pricing environment, Mr. Olafsson in fact made clear that the favorable environment could change for the worse.

Similarly, under settled law, Plaintiffs cannot premise a claim on Mr. Desheh's statement that Teva "play[s] by the book and by the rule."  C ¶ 169.  As the Second Circuit explained in *City of Pontiac*: "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to

---

[29] The Court may take judicial notice of government statistics.  *See Placide-Eugene v. Visiting Nurses Serv. of N.Y.*, No. 12-cv-02785, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013) (citing, *inter alia*, *City Bank Farmers' Tr. Co. v. United States*, 5 F. Supp. 871, 873 (S.D.N.Y. 1934) (taking judicial notice of statistics of Department of Commerce)).

cause a reasonable investor to rely upon them.'"  752 F.3d at 183; *see also Perez v. Higher One Holdings, Inc.*, No. 14-cv-00755, 2016 WL 6997160, at *13 (D. Conn. Sept. 13, 2016) ("[G]eneral statements proclaiming compliance with ethical and legal standards [are] non-material.").  Here, where the 2018 Complaint lacks any well-pled allegations regarding any illegal activity, no valid claim respecting Mr. Desheh's statement lies for that reason as well.

### iii. Defendants Made No Misleadingly Incomplete Statements About Ongoing Investigations.

Aside from statements about pricing strategy and competition, Plaintiffs allege that statements in Teva's 2015 Form 20-F and Q1 2016 6-K were misleadingly incomplete as incorporated into the Notes Offering Materials because they discussed several ongoing investigations but not subpoenas that Teva had received in June and July 2016. C ¶¶ 238-39.  But the 20-F and 6-K forms were filed on Feb. 11, 2016 and May 9, 2016, respectively, and they could not have implied anything to a reasonable investor about what developments might have arisen in *subsequent* months.  As discussed next, the law is settled that defendants do not need to predict future investigations or immediately disclose the receipt of subpoenas.

### c. Teva Had No Duty To Disclose Its Receipt Of Government Subpoenas.

Plaintiffs get nowhere alleging that Teva had to disclose its receipt of two government subpoenas more quickly than it actually did – *i.e.*, in its very next quarterly SEC filing.  C ¶¶ 238-39.  "[A] government investigation, without more, does not trigger a generalized duty to disclose." *Lions Gate*, 165 F. Supp. 3d at 12.  In *Lions Gate*, the defendants had for several years declined to disclose that they were under SEC investigation – and had received several subpoenas and Wells Notices informing them that civil enforcement charges against the company might be recommended – and only made those disclosures *after* they reached a settlement agreeing to pay the SEC a $7.5 million penalty.  *Id.* at 8-10.  The court nonetheless rejected the plaintiffs' argument

that failing to disclose the ongoing SEC investigation for several years was misleading.  As the court observed, "the securities laws do not impose an obligation on a company to predict the outcome of investigations" or the possibility of future "litigation that is not 'substantially certain to occur.'"  *Id.* at 12 (citations omitted); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52-53 (2d Cir. 1995) (rejecting argument that defendants were obligated to disclose government regulatory inspections); *Citigroup*, 330 F. Supp. 2d at 377-78 ("Defendants' failure to disclose all possible future litigation is not actionable under section 10(b).").[30]

Plaintiffs concede that Teva did disclose both subpoenas when it made its next quarterly announcement, on August 4, 2016.  C ¶¶ 122, 128.  There is no merit to Plaintiffs' assertion that this prompt disclosure was somehow not prompt enough.   At such an early stage of an investigation, Teva had no duty to disclose at all, let alone a duty of *instant* disclosure.  *See Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

### d.   Plaintiffs Fail Adequately To Plead A Strategy Of Systematic Price Increases.

Even if Teva had a duty to disclose any strategy it had to systematically raise prices on generic drugs, which it did not, Plaintiffs' claims on that topic would still fail, because they have not adequately alleged that Teva had any such strategy.  In fact, the 2018 Complaint acknowledges that Plaintiffs could not possibly identify systematic price increases:

> Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases . . . .

---

[30] *Lions Gate* specifically rejected the plaintiffs' argument that Item 303 of Reg. S-K required disclosure on the ground that the investigation could not fairly "be characterized as a 'known trend' or 'uncertainty.'"  165 F. Supp. 3d at 20.

C ¶ 3.   Although Plaintiffs claim to be able to figure out this same information through Lead Counsel's "investigation" and "econometric analyses," they further concede that this investigation is based on Wholesale Acquisition Cost, which does not take into account "Teva's discounts and rebates," which are not publicly available.  *Id.* ¶¶ 348, 353.   Despite this concession, however, Plaintiffs purport to be able to identify quarter-by-quarter figures of the amount of supposedly "inflated profit" attributable to price increases.  *Id.* ¶ 5.   Apparently, the secret to figuring out the amount Teva actually charged its purchasers was "analyzing, on a month-by-month basis over the relevant period, multiple data points from a number of subscription and other industry datasets." *Id.* ¶ 353.   Yet Plaintiffs never identify the subscription or industry datasets that supposedly allowed them to discover what analysts allegedly could not discover.

Plaintiffs cannot have it both ways.   Either the relevant information was indeed ascertainable by the market, or it was secret and beyond the reach of Wall Street analysts and class-action lawyers alike – in which case Plaintiffs' vague references to unnamed "subscription and industry datasets" are smoke and mirrors.   Given the lack of adequate support for their largely unexplained "price-hike" and "inflated profit" allegations, Plaintiffs' claims premised on the nondisclosure of those price hikes or inflated profits necessarily fail.  *Cf. Axis*, 456 F. Supp. 2d at 585 ("[E]ach of plaintiffs' nondisclosure claims are entirely dependent upon the predicate allegation that [defendant] participated in an anticompetitive scheme . . . . If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.").   Here, the "Price Hike Strategy" is not adequately pled and, even if it were, it is not an illegal scheme, despite Plaintiffs' conclusory allegations regarding supposedly "inflated profits."   C at vi.   Plaintiffs' "Price Hike Strategy" claims fail for this reason as well.

### C.      **Plaintiffs Fail Adequately To Plead Scienter.**

Even if the 2018 Complaint adequately alleged an actionable misrepresentation or omission, and it does not, Plaintiffs' Section 10(b) claims still would be subject to dismissal because the Complaint fails adequately to plead scienter.  The PSLRA's strict and rigorous pleading standards require Plaintiffs, among other things, to "state with particularity facts giving rise to a strong inference" of scienter.  *ECA*, 553 F.3d at 196.  To plead the requisite "strong inference" of scienter, a plaintiff must allege detailed facts: (1) showing that the defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of scienter.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Any inference drawn from such facts must be "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324 (emphasis added).  A plaintiff must "allege facts supporting a strong inference with respect to *each* defendant."  *Lions Gate*, 165 F. Supp. 3d at 22 (emphasis added).  For this reason, Plaintiffs cannot carry their pleading burden, as they attempt to do, by lumping all Defendants together.  *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-00975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (dismissing "lengthy and convoluted" complaint that "fail[ed] to allege facts that adequately address the scienter element with respect to each of the Individual Defendants—an element that cannot be satisfied through group pleading").  Moreover, insofar as Plaintiffs rely on "allege[d] fraudulent omissions, rather than false statements, 'it is especially important to rigorously apply the standard for pleading intent.'"  *Lions Gate*, 165 F. Supp. 3d. at 23.  Plaintiffs fail to satisfy this standard.

### 1.      **Plaintiffs' Motive and Opportunity**
**Allegations Do Not Support A Strong Inference Of Scienter.**

Plaintiffs fail to plead motive as a basis for an inference of scienter.  To do so, a plaintiff must allege that defendants "benefitted in a concrete and personal way from the purported fraud."

*ECA*, 553 F.3d at 199.  Often that is shown through stock sales, but Plaintiffs allege no stock sales here.[31]  Their only motive allegations are (1) that the "Price-Hike Strategy generated as much as $2.3 billion in Inflated Profit" (C ¶¶ 273-74); and (2) that Defendants wanted to consummate the Actavis transaction.  *Id.* ¶¶ 246-51.  Neither supports a strong inference of scienter.

As to the alleged "$2.3 billion in Inflated Profit," motives that are "generally possessed by most corporate directors and officers," like generating revenue, are "insufficient to withstand a motion to dismiss."  *Frederick v. Mechel OAO*, 475 F. App'x 353, 355 (2d Cir. 2012).

Plaintiffs' contention that Defendants were motivated to complete the Actavis transaction likewise fails.  *See* C ¶¶ 246-251.  Such conduct would inure to the benefit of all shareholders, and thus would not demonstrate intent to defraud Teva shareholders.  *ECA*, 553 F.3d at 198; *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243, 244 n.67 (S.D.N.Y. 2012).  "[T]he 'desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another' and therefore generally is insufficient."  *Dobina*, 909 F. Supp. 2d at 242-43 (quoting *ECA*, 553 F.3d at 201) (stock-based acquisition program "not sufficient to allege scienter").[32]

In rare circumstances not present here, scienter may be inferred from allegations regarding an acquisition.  "Whether an interest in acquisitions is sufficient is an 'extremely contextual' inquiry" and "demands more than alleging simply that the Company acquired companies during

---

[31] *See San Leandro*, 75 F.3d at 814 ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *see also Cortina v. Anavex Life Scis. Corp.*, No. 15-cv-10162, 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016) ("Notably, Plaintiffs make no allegation that any Defendant sold shares during the Class Period.").

[32] *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice [to plead scienter]; instead, plaintiffs must assert a concrete personal benefit to the individual defendants resulting from the fraud.") (citation omitted); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product. . . . These allegations do not support an inference of scienter.").

the class period with the use of stock." *Dobina*, 909 F. Supp. 2d at 242-43 (citation omitted).

Rather, it requires "an allegation of a '**unique connection between the fraud and the acquisition**.'" *Id.* at 243 (quoting *ECA*, 553 F.3d at 201 n.6) (emphasis added); *see also ECA*, 553 F.3d at 201 (holding requisite unique connection existed where the "misstatements directly relat[ed] to the acquisition"). Plaintiffs cannot allege a unique connection between the alleged fraud and the Actavis transaction. In sum, their motive allegations do not give rise to a strong inference of scienter.

## 2. Plaintiffs Fail to Plead Specific Facts Establishing Strong Circumstantial Evidence of Scienter.

Plaintiffs alternatively seek to establish a strong inference of scienter by alleging "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Where, as here, Plaintiffs fail to plead motive and opportunity, the weight of the factual allegations of scienter "must be correspondingly greater." *Id.* at 198-99. To avoid dismissal, Plaintiffs must **specifically identify** documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made. *See San Leandro*, 75 F.3d at 812-13 (affirming dismissal of claim based on alleged existence of confidential company sales reports); *SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, 09-cv-05064, 2010 WL 2473595, at *10 (S.D.N.Y. June 17, 2010) (dismissing claim where plaintiff failed to "'specifically identif[y] any reports or statements' or any dates or time frame in which [d]efendants were put on notice of contradictory information") (citation omitted), *aff'd*, 448 F. App'x 116 (2d Cir. 2011).

Plaintiffs recycle many of their scienter allegations from the 2017 Complaint. But here, instead of alleging that Defendants knew or recklessly disregarded alleged antitrust violations, Plaintiffs allege that Defendants knew or recklessly disregarded the fact that Teva increased prices on certain generic drugs during the Class Period, which had an alleged "significant financial

impact." *See, e.g.*, C ¶ 253.  Just as Plaintiffs cannot shoehorn a new allegation of falsity into this lawsuit, they likewise cannot shoehorn recycled scienter allegations into the 2018 Complaint. Knowledge of price increases on certain drugs is **not** knowledge regarding anything remotely improper, let alone knowledge that any challenged statement was false when made.  That fact alone renders these scienter allegations senseless.

Regardless, Plaintiffs fail to allege any specific facts regarding any specific document or report indicating that any Defendant ever made a single statement that was knowingly false when made or intentionally omitted a material fact.  Instead, the 2018 Complaint contains, *inter alia*, conclusory allegations regarding what the Individual Defendants "must have known": (a) by virtue of their positions in the company and access to certain categories of internal reports; (b) based on the generics business being widely discussed; (c) based on the alleged "magnitude of the fraud"; (d) based on governmental investigations; (e) based on the departures of Individual Defendants; and (f) based on statements attributed to four confidential witnesses.  None of these "must have known" allegations give rise to any inference of scienter, let alone the requisite strong inference.[33]

### a.   Plaintiffs' Status And Access Allegations Do Not Support A Strong Inference of Scienter.

Plaintiffs allege that Defendants' status as executives and access to certain categories of internal reports give rise to a strong inference that the Defendants knew or recklessly ignored the fact that the alleged "Price-Hike Strategy" resulted in billions of dollars in "Inflated Profits." C ¶¶ 253-54, 259.  As an initial matter, even if Teva raised prices on the drugs on which Plaintiffs

---

[33] Plaintiffs' allegations of corporate scienter against Teva also fail.  C ¶¶ 282-84.  As set forth below, Plaintiffs have not pled facts creating "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  While the Second Circuit has recognized that "[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *id.*, Plaintiffs' corporate scienter allegations as to "unknown executives" and "yet unidentified employees" assert nothing more than the same "must have known" allegations Plaintiffs allege against the Individual Defendants, and which should therefore be dismissed for the same reasons set forth below.  C ¶¶ 283-84.

focus, and even if Teva's profits increased as a consequence, that would not have been improper, and it would not have rendered its profits "inflated." *Id.* For a number of additional reasons, Plaintiffs' allegations fail to give rise to a strong inference of scienter.

"[T]o establish an inference of scienter, Plaintiffs must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." *In re PetroChina Co. Ltd. Sec. Litig*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015), *aff'd,* No. 15-cv-02528 (2d Cir. Mar. 21, 2016); *see also Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y. 2018) (determining that "conclusory allegations that, because of their corporate positions," defendants "must have known" of the alleged fraud do not "add any allegations that raise a cogent inference that either [defendant] acted with scienter"). Plaintiffs' conclusory status allegations therefore cannot give rise to an inference of scienter.

Plaintiffs' allegation that Defendants "would have known" about the alleged fraud because of their access to daily, weekly, and intra-quarter internal reports likewise fails to raise an inference of scienter. C ¶ 253. Courts routinely dismiss complaints when a plaintiff fails to specifically identify documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made. *See San Leandro*, 75 F.3d at 812-13 (affirming dismissal of claim based on alleged existence of confidential company sales reports); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (plaintiffs' description of contents of three named reports regularly generated by defendants held insufficient for lack of specific description of content of particular reports); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) (holding insufficient to support allegations of fraud "scanty descriptions" of internal documents not augmented by facts showing "who sent the memo, when it was received, or whether it reflected a

final determination").[34]

Here, Plaintiffs fail to allege any specific facts regarding any specific document or report – let alone the contents of any such document or report – that any Defendant reviewed during the Class Period, much less any document or report that actually contradicted a challenged statement. While Plaintiffs list categories of documents, *see* C ¶¶ 260-63, they fail specifically to identify any specific document, the exact information in the document, the date of such document, and who received or reviewed it.  Plaintiffs fail to allege how Defendants' external statements about price increases diverged from specific information in a particular document allegedly known to the Defendants at the time the statements were issued.  Plaintiffs' access allegations therefore cannot give rise to an inference of scienter.

### b.  Plaintiffs' Allegation That Teva's Generics Business Was Widely Discussed Does Not Raise An Inference Of Scienter.

Plaintiffs' allegations that Defendants "spoke repeatedly" about and were "focused" on generic drugs do not raise any inference of scienter.  C ¶¶ 264-72.  At most, these allegations seek to allege scienter based on a "core operations" theory, which is another form of a "must have known" allegation.  The Second Circuit has not decided whether a plaintiff may impute an inference of scienter to each defendant by virtue of the fact that the alleged fraud concerned the company's "core" business operations.  *See In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-03338, 2017 WL 3278930, at *18 n.11 (S.D.N.Y. Aug. 1, 2017).  Even if it did, that inference would not establish scienter here.  During the Class Period, Teva marketed between 370 and 500 generic drugs per year in the United States, but the 2018 Complaint only implicates alleged price

---

[34] *See also SRM*, 2010 WL 2473595, at *10 (dismissing claim where plaintiff failed to "'specifically identif[y] any reports or statements' or any dates or time frame in which [d]efendants were put on notice of contradictory information") (citation omitted); *Grillo v. Tempur-Pedic Int'l Inc.*, 553 F. Supp. 2d 809, 819 (E.D. Ky. 2008) ("Merely stating that the Defendants had access to and receipt of internal financial reports without any proof of the adverse content of those reports is not a basis for a strong inference of scienter.").

- 44 -

increases on a fraction of those drugs.  *See supra* Part I.B.2.b.i.  Without more, Plaintiffs' "core

operations" allegations fail as a matter of law.

### c.       Plaintiffs' "Magnitude Of The Fraud" Allegations Fail Adequately To Plead Scienter.

Plaintiffs assert that the "importance" of Teva's generics business and the "magnitude and

duration of the alleged fraud" support a strong inference of scienter.  C ¶¶ 273-74.  Courts in the

Second Circuit have consistently held that "allegations regarding the magnitude of the fraud" are

not an "independent basis for scienter."  *See, e.g.*, *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-cv-

01918, 2014 WL 3928606, at \*9 (S.D.N.Y Aug. 12, 2014) (collecting cases); see also *Utesch v.

Lannett Co.*, 316 F. Supp. 3d 895, 905-06 (E.D. Pa. 2018) (dismissing claims and disregarding

scienter allegations based on the "Importance of Generics Drug Pricing," holding that even if the

individual defendants were aware of price increases, inferring that they "had 'knowledge of illegal

activities' crosses a bridge too far.").[35]  Moreover, Plaintiffs base their "magnitude of the fraud"

allegation on an alleged $2.3 billion in "Inflated Profits," which, as discussed above, is based on

Plaintiffs' rank speculation.  *See supra* Part I.C.1.

### d.       The Existence Of Governmental Investigations Does Not Give Rise To A Strong Inference of Scienter.

Plaintiffs' scienter allegations based on the existence of governmental investigations also

fail as a matter of law.  C ¶¶ 275-78, 280, 295, 298-301.  As an initial matter, the governmental

investigations cited by Plaintiffs concern alleged antitrust violations and were the basis of

Plaintiffs' 2017 Complaint, which was dismissed.  Merely copying those allegations into the 2018

Complaint to allege knowledge of a supposedly *different* alleged fraud cannot meet Plaintiffs'

---

[35] *See also Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 428 (S.D.N.Y. 2014) ("[O]n its own, the magnitude of an alleged fraud fails to establish scienter."); *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013) ("[T]he magnitude of a fraud, standing alone, cannot support a strong inference of scienter").

burden of pleading a strong inference of scienter.  Aside from this incongruity, the governmental inquiries cannot give rise to any inference of scienter.  *Lannett Co.*, 316 F. Supp. 3d at 904 (dismissing securities claims and holding that "governmental inquiries into Lannett's purported antitrust violations are unpersuasive in raising any inference that [Defendants] knew about the potential price-fixing.").  Governmental investigations alone prove nothing on their own and certainly "cannot bolster allegations of scienter that do not exist" because they "are just that, investigations." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015); *see Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1303-04 (11th Cir. 2015); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("Securities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter.").  The same holds for scienter allegations predicated on unproven assertions in a complaint in another case, such as the AG Complaint here.  *Cf. Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008) (holding settlement agreements with DOJ and SEC "were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter").  Nor does the "temporal proximity" of the 2016 Notes Offering and subsequent disclosure of subpoenas "raise a circumstantial inference of fraud" on its own. *Fant v. Perelman*, No. 97-cv-08435, 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 1999).

### e.   The Individual Defendants' Departures Do Not Support Any Inference Of Scienter.

Plaintiffs' scienter allegations based on the departure of three officer Defendants also fail. C ¶ 279.  As with the governmental investigations, Plaintiffs recycle these scienter allegations from the 2017 Complaint despite the fact that Plaintiffs supposedly allege a different fraud. Nonetheless, "[c]ourts have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d

557, 605-06 (S.D.N.Y. 2016) (collecting cases).  Plaintiffs need to allege "other strong evidence

of fraudulent behavior," "deliberate illegal behavior," or "conduct which is highly unreasonable

and which represents an extreme departure from the standards of ordinary care." *Malin v. XL*

*Capital Ltd.*, 499 F. Supp. 2d 117, 163, 165 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir.

2009) (collecting cases).  Here, Plaintiffs attempt to imply a correlation between the timing of

three departures (spread over seven months between December 2016 and June 2017) and certain

unrelated events, without pleading any facts showing how they are connected.  C ¶ 279.  These

allegations fail as a matter of law.  *See Malin*, 499 F. Supp. 2d at 162-63.

### f.   Plaintiffs' Confidential Witness Allegations Do Not Give Rise to Any Inference of Scienter.

Nor can Plaintiffs raise an inference of scienter through allegations from four confidential

witnesses.  *See* C ¶¶ 241-45.  For a court to credit information obtained from a confidential source,

the source must be "described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information

alleged." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011).  Courts give no credence

to "water-cooler gossip" unconnected to personal knowledge.  *In re Ferro Corp. Sec. Litig.*, No.

04-cv-1440, 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007).[36]  Here, none of the

confidential witnesses is alleged to have been in a position to testify competently about any

particular Defendant's state of mind – let alone about the fictional "Price Hike Strategy" on which

they focus.  As discussed below, one of the confidential witnesses was not even employed by Teva

---

[36] *See also Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (discounting confidential witness allegations where witness lacked personal knowledge);  *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) (PSLRA requires rejection of confidential witness statement that "does not provide the sources' basis of knowledge"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 (9th Cir. 2009) (PSLRA precludes consideration of "confidential witnesses [who] base their knowledge on vague hearsay"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) (under the PSLRA and Rule 9(b), "the Court may disregard confidential witness statements that . . . are not based on personal knowledge").

at any point during the Class Period (FE-2).  None of the other three is alleged to have spoken to any Defendant, let alone have personal knowledge of any fraud.

The 2018 Complaint relies heavily on allegations allegedly supplied by a former Senior Director of Trade Relations at Teva, "FE-2," who left the Company six months before the Class Period began.  C ¶ 243.  None of the allegations related to FE-2 can give rise to an inference that any Defendant acted with scienter during the Class Period, as there are no allegations in the 2018 Complaint imputing to FE-2 actual personal knowledge of the happenings at the Company during the Class Period, six months after FE-2's departure.

Allegations supposedly tied to the three other confidential witnesses fare no better.  As an initial matter, "FE-4," allegedly a former Manager of Customer Operations, was employed by Teva for only the first two months of the Class Period.  More importantly, the 2018 Complaint fails to allege that FE-4 or any of the other confidential witnesses who were employed by Teva during the Class Period (FE-1 and FE-3) had any contact at all with any Individual Defendant, let alone has personal knowledge regarding the state of mind of any Individual Defendant.  *In re Am. Express Co. Sec. Litig.*, No. 02-cv-5533, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period.").  These confidential witnesses do not support any inference that any Defendant acted with scienter.

Further, the allegations attributed to these alleged witnesses are not based on personal knowledge, but rather rumor and hearsay.  Allegations of this type are not credited by the courts.  *See supra* C.2.f; *see also Lannett*, 316 F. Supp. 3d at 904-05 (dismissing claims and holding that allegation that individual defendants were involved in the pricing process is "unavailing in

showing scienter.").  Even taken at face value, the former Teva employees' comments do not suggest that anyone at Teva, let alone any Individual Defendant, knew anything contrary to any challenged statement in this case.  None of the allegations that the Complaint attributes to these confidential sources support any inference, let alone a strong inference, of scienter.

### 3.   Plaintiffs' Recycled Antitrust Allegations Do Not Raise Any Inference Of Scienter.

Deep in the 2018 Complaint, this Court will find the remnants of Plaintiffs' antitrust claim. C ¶¶ 302-08.  These allegations also do not support any inference of scienter as to any of their claims.  This Court found the far more extensive allegations regarding alleged antitrust violations in the 2017 Complaint "extremely thin."  *See supra* Part I.B.2.b.ii.  The few allegations relating to alleged antitrust violations that Plaintiffs have retained do not come close to meeting the PSLRA and Rule 9(b)'s strict standards for pleading adequately an alleged antitrust law violation in a securities action.  Furthermore, even if Plaintiffs had adequately pled any antitrust violation, and they have not, they have not come close to pleading scienter sufficiently against any named Defendant as to any alleged antitrust violation.  As discussed below, the recent ruling in the *Lannett* case is instructive on both of these points.  316 F. Supp. 3d 895.

### a.   Plaintiffs Fail Adequately To Plead An Underlying Antitrust Violation.

Recycling some of the same allegations from the 2017 Complaint, Plaintiffs again fail adequately to allege that an antitrust violation actually occurred.  Because this is a securities fraud case, not an antitrust case, Plaintiffs are subject to stricter pleading standards – *i.e.*, the underlying facts alleging illegal price-fixing must be alleged with particularity.  *See, e.g.*, *Sanofi*, 155 F. Supp. 3d at 400; *In re Yukos Oil Co. Secs. Litig.*, No. 04-cv-05243, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006).  Plaintiffs have failed to meet this standard, and Plaintiffs' claims based on an

alleged antitrust violation – both as an alternative basis for falsity (C ¶ 309) and as evidence of scienter (C ¶¶ 302-08) – should be dismissed.  *See Axis*, 456 F. Supp. 2d at 585 ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original).[37] Moreover, Plaintiffs have failed even to meet the lower pleading standard applicable to antitrust actions, which requires a plaintiff to "allege enough facts to support the inference that a conspiracy actually existed," either through direct or circumstantial evidence.[38]

Plaintiffs fail to plead *any* direct evidence that Defendants engaged in illegal price-fixing. As in the recent *Lannett* decision, which is on all fours with this case, the 2018 Complaint "doesn't speak of any 'direct evidence of an agreement,' such as 'document or conversation explicitly manifesting the existence of an agreement in question' by [Defendants] to price-fix the Generic Drugs."  316 F. Supp. 3d at 903.[39]  Plaintiffs' alleged "Inter-Firm Communications," C ¶¶ 295, 299-300, are nothing more than allegations pulled directly from the State AG lawsuit.  As this Court already stated in dismissing the 2017 Complaint: "just because somebody else alleged it in their case and you allege that they alleged it, doesn't mean I assume it's true in this case. . . . Otherwise, for $400 anybody can allege anything."  Ex. 1 (April 3 Tr. 25).  As with the 2017 Complaint, the 2018 Complaint "furnishes no clue as to which of the [Defendants] (or which of their employees) supposedly agreed, or when and where the illicit agreement took place."

---

[37] *See also In re Mirant Corp. Sec. Litig.*, No. 02-cv-01467, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009) ("In cases alleging securities fraud based on the failure to disclose the existence of an underlying illegal scheme," the failure to allege such illegality "with particularity" is fatal).

[38] *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[39] Plaintiffs cannot carry their pleading burden simply by relying on allegations from the State AG complaint.  *See* C ¶¶ 285, 287, 295, 298-300, 306-07.  Allegations based wholly on unresolved complaints from separate actions are immaterial as a matter of law and should be ignored.  *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403-04 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

*Twombly*, 550 U.S. at 565 n.10.  Instead, the 2018 Complaint repeats the error the Court previously drew attention to:  "it's very conclusory about critical facts."  Ex. 1 (April 3 Tr. 17).

Without direct evidence of an illegal conspiracy, Plaintiffs must present "evidence that reasonably tend[s] to prove that [Teva and its competitors] were consciously commitment to a common scheme" to fix prices.  *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (citation omitted).  The 2018 Complaint asserts a similar patchwork of allegations as in the 2017 Complaint, and again those allegations fail.  *See* C ¶¶ 285-301; 2017 Complaint ¶¶ 78-250.

Governmental investigations that have not resulted in an adjudication of wrongdoing by Teva do not establish that Teva conspired to fix prices.  *See* C ¶¶ 298-301; *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("[C]itations to . . . investigations do not constitute factual averments of [an antitrust] claim that would allow such a claim to survive a motion to dismiss.").[40]  Nor does the mere existence of the pending State AG Lawsuit against Teva and many other generic drug manufacturers.  *See* C ¶¶ 299-300.  Plaintiffs cannot meet their burden by repeating unsubstantiated allegations included in the State AG complaint.  *See* Ex. 1 (April 3 Tr. 25) ("[J]ust because somebody else alleged it in their case and you allege that they alleged it, doesn't mean I assume it's true in this case."); *RSM*, 643 F. Supp. 2d at 403 ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)").[41]

---

[40] *See also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("The announcement of an investigation reveals just that—an investigation—and nothing more."); *Superior Offshore Int'l Inc. v. Bristow Group, Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010), *aff'd*, 490 F. App'x 492 (3d Cir. 2012) ("the mere occurrence of [an] investigation is equally consistent with Defendants' innocence").

[41] *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 79 (S.D.N.Y. 2003) ("[T]he allegations of the present Amended Complaint . . . that refer to or rely on the SEC's complaints against Merrill Lynch

Plaintiffs' own "investigation" of 17 alleged parallel price increases does not show "strong indicia of collusion." *See* C ¶¶ 288-90.  Parallel behavior is insufficient to state a claim for price-fixing because it may just be evidence of a "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 545, 556.  In particular, "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).  "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-54 (brackets omitted).[42]

Plaintiffs' allegation that the price increases "occurred in close proximity" to "trade shows and conferences" does not cure this pleading defect.  *See* C ¶¶ 296-97.  Courts regularly reject efforts to base an antitrust claim on such allegations.  *See, e.g.*, *Hinds Cnty.*, 620 F. Supp. 2d at 513 ("[P]articipation in trade associations or conferences cannot support . . . allegations of a conspiracy").[43]  Given the frequency of the industry trade shows and conferences cited in the 2018 Complaint, Plaintiffs' supposed "close proximity" is broad and vague enough that *any* generic drug price increases would necessarily be "in close proximity" to some such gathering.  Such allegations alone do not state a claim for an alleged antitrust law violation.

---

and Henry Blodget, on the NASD's complaint against Phua Young, on the 309 complaints in the ongoing IPO Securities Litigation, on the complaint and appendices in the ongoing IPO Antitrust Litigation, and on the Dinallo Affidavit are hereby stricken under Rule 12(f) and may not be included in any amended pleadings hereafter[.]").

[42] *See also, e.g.*, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("By engaging in conscious parallelism, firms in a concentrated market may lawfully recognize shared economic interests and, in effect, lawfully exercise their leverage to set prices at a profit maximizing—and even a supra-competitive—level.").

[43] *See also* *LaFlamme v. Société Air Fr.*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("[M]embership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement."); *In re Elevator Antitrust Litig.*, No. 04-cv-01178, 2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006) *aff'd*, 502 F.3d 47 (2d Cir. 2007) ("allegation that elevator company executives attend trade, industry, or social functions together is clearly insufficient to state a claim").

### b.      Plaintiffs Antitrust Allegations
###      <u>Do Not Support A Strong Inference of Scienter.</u>

Having failed to plead any antitrust violation, Plaintiffs also fail to plead that any Defendant had knowledge of any such violation. Indeed, Plaintiffs merely repeat the same "must have known" allegations they assert in support of their scienter allegations related to the alleged Price Hike Strategy, only now they assert them in support of Defendants' alleged knowledge or disregard of collusion. C ¶ 302. These repeated allegations – including "all the information available" to Defendants, the assertion that pricing decisions "necessarily involved senior management," and that Defendants had access to reports (C ¶¶ 302-305) – are "must have known" allegations based on "status and access" that do not raise a strong inference of scienter. *See supra* Part I.C.2.a. Likewise, Plaintiffs' scienter allegation based on the "major" nature of the drugs and the "substantial" alleged profits of the alleged collusion merely repeat Plaintiffs' "magnitude of the fraud" and "core operations" allegations that do not raise a strong inference of scienter. C ¶ 304; *see supra* Parts I.C.2.b, I.C.2.c. Finally, Plaintiffs' scienter allegations based on allegations in the State AG suit do not raise a strong inference of scienter. C ¶¶ 306-07; *see supra* Part I.C.2.d.

The district court in *Lannett* recently dismissed Exchange Act claims, holding that nearly identical scienter allegations to those alleged here fail to give rise to a strong inference of scienter. 316 F. Supp. 3d 895. As here, the plaintiff asserted Exchange Act claims against a generics drug company, Lannett, on the heels of the very same Bloomberg article that led Plaintiffs here to race to the courthouse. The *Lannett* plaintiff attempted to predicate securities claims on alleged antitrust violations and derived many of those allegations from the same State AG Complaint to which Plaintiffs cite here. *Id.* at 898. In *Lannett*, as here, the plaintiffs alleged that the defendant company misleadingly asserted that "drug pricing was competitive." *Id.* at 900.

The court held that those antitrust allegations did not give rise to an inference of scienter

because, as here, plaintiffs did not allege "direct evidence" of an agreement, and allegations that "price hikes . . . can only be explained by competitive agreements" were not "tether[ed]" to any Defendant.  *Id.* at 903.  The court also held that "governmental inquiries into Lannett's purported antitrust violations are unpersuasive in raising the inference that [the defendants] knew about the potential price-fixing."  *Id.*  Finally, the *Lannett* court held that allegations that individual defendants were involved in the pricing process is "unavailing in showing scienter."  *Id.* at 905 ("Alleging that [defendant] had authority to raise prices is not the equivalent of alleging that [defendant] illegally price-fixed with peer companies.").  Plaintiffs' antitrust allegations fail to give rise to any inference of scienter for the same reasons.  C ¶¶ 302-03, 306-07.

The *Lannett* court also disregarded scienter allegations based on the "Importance of Generics Drug Pricing," holding that even if the individual defendants were aware of price increases, inferring that they "had 'knowledge of illegal activities' crosses a bridge too far."  316 F. Supp. 3d at 905-06.  The same holds for Plaintiffs' scienter allegations about the "major" nature of the drugs at issue.  C ¶ 304.  In sum, the *Lannett* court dismissed every scienter allegation based on alleged antitrust violation asserted by Plaintiffs here, for reasons directly applicable here.

### 4. The Opposing Inferences Of Nonfraudulent Intent Are More Plausible Than Any Inference Of Fraud.

*Tellabs* requires courts to weigh competing inferences when assessing whether a securities complaint adequately alleges a strong inference of scienter.  551 U.S. at 314.  The Court must determine whether the specific facts alleged raise an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.*  Here, the opposing inference of non-fraudulent intent is far more compelling.  Investor losses resulted, not from any fraud, but from the price competition that incontrovertibly exists in the generics industry and other risks inherent in the market, which Teva disclosed, in great detail, throughout the Class Period.  *See*

*supra* Parts I.B.2.a, I.B.2.b.ii (detailing federal government's recognition of industry competition and Teva's Class Period risk disclosures related to the generic drug market).   In addition, Defendants' optimistic outlook throughout much of the Class Period reflected sincere beliefs, not an inexplicable attempt to deceive investors.  *See, e.g.*, *In re Stratasys Ltd.*, 15-cv-00455, 2016 WL 3636992, at *11 (D. Minn. June 30, 2016), *aff'd sub nom. In re Stratasys Ltd. S'holder Sec. Litig.,* 864 F.3d 879 (8th Cir. 2017) ("The idea that defendants would increase guidance to mask problems that would shortly have to be revealed is incredible, especially in the absence of any facts showing that any individual defendant had anything to gain from such a reckless act.").

Indeed, Plaintiffs' new fraud scheme is particularly implausible.  According to Plaintiffs, Teva legally raised prices on certain of its products in order to maximize profits for shareholders. That approach, Plaintiffs claim, was enormously successful, leading to billions of dollars of profit. But rather than just reap the rewards of a successful business strategy, the Defendants – according to Plaintiffs – decided to lie about the cause of the Company's success, risking their careers and reputations and exposing the Company and themselves to liability.  This Court does not need to leave logic at the courthouse door, and it should reject these illogical scienter allegations.  *See Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The Court refuses to leave its common sense at the courthouse steps, and concludes that the Plaintiffs have failed to make the requisite showing of scienter to support their securities fraud claims.").

### D.      Plaintiffs Fail Adequately To Plead Loss Causation.

To plead loss causation adequately, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (citation omitted).  Plaintiffs must allege that a "concealed risk [led] to a decline in stock price either because a corrective disclosure

reveal[ed] the falsity of the misrepresentations or omissions or because the risk which was concealed materialize[d] and cause[d] the price decline." *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006) (citations omitted), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).   Merely alleging a drop in stock price following the disclosure of bad news does not suffice. *See id.* Plaintiffs must allege that the purported corrective disclosure or event actually revealed the alleged fraudulent scheme or prior misrepresentation. *See, e.g.*, *Lentell*, 396 F.3d at 175 & n.4 (holding that stock price drop following downgrade of stock did not amount to corrective disclosure because downgrades did not reveal the falsity of the prior recommendations); *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (holding that failure to meet earnings forecasts does not have a corrective effect because it does not "disclose the scheme" and therefore "cannot correct the artificial inflation caused by the scheme").  For plaintiffs, this is a "heavy burden." *In re IPO Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005).

Here, in an effort to plead loss causation, Plaintiffs allege that, from August 2016 to August 2017, a "series of negative events and disclosures … reveal[ed], on a piecemeal basis, the false and misleading nature" of Teva's statements on competition and pricing during the Class Period. C ¶ 312.  Notably, the "negative events and disclosures" are almost all recycled from the 2017 Complaint, where Plaintiffs alleged a different basis for falsity – alleged antitrust violations.  Thus, the same "corrective events and disclosures" previously alleged to have revealed the alleged antitrust violations are now alleged to have revealed a different alleged fraud – the alleged "Price Hike Strategy."  Alleging the same "corrective events and disclosures" for a different fraud highlights Plaintiffs' inability to identify any corrective disclosure revealing a "Price Hike Strategy," let alone to satisfy the Second Circuit's requirement that the "corrective events and disclosures" be closely tied to the alleged fraud. *See Lentell*, 396 F.3d at 174.  For this reason and

those discussed below, as a matter of law, Plaintiffs have failed to plead loss causation.

Except in limited circumstances inapplicable here, the announcement of a governmental investigation does not show actual wrongdoing on the part of the recipient and is insufficient to establish loss causation. *See, e.g.*, *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the . . . investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."). For loss causation allegations based on a governmental investigation to survive dismissal, the subject of the announced investigation must be tightly tied to the subject of the alleged fraud and not "tenuous." *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 284 (S.D.N.Y. 2008).

Here, the nexus between the alleged corrective disclosures and the alleged fraudulent statements is too tenuous to survive a motion to dismiss. Teva's announcement of its receipt of subpoenas from the DOJ and the Connecticut Attorney General did not reveal the falsity of any prior statements. C ¶¶ 313-15. Nor did the filing of the State AG complaint. C ¶¶ 319-21. These subpoenas and lawsuits concerned alleged (but unproven) antitrust violations. They did not somehow reveal the existence of Plaintiffs' so-called Price Hike Strategy. The same applies to Plaintiffs' allegations concerning the November 3, 2016 Bloomberg article. C ¶¶ 316-17. Moreover, as to Teva, the article: (1) discloses information already known to the market (that Teva and others had received subpoenas), and (2) speculates about the nature and timing of potential antitrust charges that the DOJ could bring. Reiteration of publicly available information and bare speculation are each insufficient to plead loss causation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."), *aff'd*, 597 F.3d 501 (2d Cir. 2010). Plaintiffs' speculation concerning Teva's announcements of Mr. Olafsson's and Mr. Vigodman's departures

and the subsequent analyst commentary also reveal nothings about an alleged "Price Hike Strategy."  C ¶¶ 325-27, 331-33; *see Omnicom*, 597 F.3d at 514 (holding director's resignation and resulting negative press insufficient to allege loss causation).

The three remaining alleged partial corrective disclosures – Forms 6-K issued on November 15, 2016, January 6, 2017, and August 3, 2017 and accompanying investor conference calls – likewise disclose nothing concerning the alleged "Price Hike Strategy."  Plaintiffs concede that on November 15, 2016, Mr. Olafsson explicitly attributed 7% price erosion to divestiture of certain generic products related to the Actavis acquisition and not to any purported "Price Hike Strategy."  C ¶ 322.  Similarly, Mr. Vigodman's statement on January 6, 2017 that "[t]he entire health care sector was facing significant headwinds [in the quarter] and we have not been immune," *id.* ¶ 328, quoting Ex. 11 (Jan. 6, 2017 Tr. at 3), and Teva's statement on August 3, 2017 that lower than expected quarterly results were due to "accelerated price erosion and decreased volume due mainly to customer consolidation, greater competition, as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition," *id.* ¶ 334, quoting Ex. 13 (Aug. 3, 2017 Tr. at 3), disclose nothing concerning the alleged "Price Hike Strategy."  Neither does the goodwill impairment charge related to the U.S. Generics reporting unit.  *Id.* ¶ 394.  Indeed, Plaintiffs fail to allege that any of these alleged "corrective events and disclosures" revealed the supposed "Price Hike Strategy."  *See Dura*, 544 U.S. at 341-42.  For this reason as well, Plaintiffs' claims fail as a matter of law.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT.

To plead "control person" liability under Section 20(a), Plaintiff must allege: "(1) a primary violation by the controlled person; (2) control of the primary violator by the defendant, and (3) that the [controlling person] was, in some meaningful sense, a culpable participant in the

controlled person's fraud." *ATSI*, 493 F.3d at 108.  As set forth in the Memorandum of Law in Support of Maureen Cavanaugh and Allan Oberman's Motion to Dismiss, Plaintiffs have failed to allege any of these elements and therefore have failed to state a claim for violation of Section 20(a), as a matter of law.  *Id.*

## III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT.

Plaintiffs have asserted claims against Teva and Individual Defendants Vigodman, Griffin, and Desheh, under Sections 11, 12, and 15 of the Securities Act.  *See* C ¶¶ 367-424.  Those Defendants incorporate herein the arguments set forth in the Memorandum of Law in Support of Teva Finance's Motion to Dismiss, which arguments support the dismissal of the Section 11 and Section 12 Securities Act claims asserted against them as well.

As to "control person" liability under Section 15, "a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (citation omitted).  Because Plaintiffs have failed sufficiently to allege required elements of their Sections 11 and 12 claims, their Section 15 claims necessarily fail.  In addition, those claims fail because, as set forth in the Memorandum of Law in Support of Maureen Cavanaugh and Allan Oberman's Motion to Dismiss, Plaintiffs have failed to sufficiently allege that any Defendant controlled any primary violator.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed, with prejudice.[44]

---

[44] *See Malin*, 312 F. App'x at 402-03 (affirming denial of leave to replead putative securities class action).

Respectfully submitted,

/s/ Jordan D. Hershman

Jordan D. Hershman (*pro hac vice*)
Jason D. Frank (*pro hac vice*)
Emily E. Renshaw (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
Tel (617) 951-8455
Fax (617) 951-8736
jordan.hershman@morganlewis.com
jason.frank@morganlewis.com
emily.renshaw@morganlewis.com

– and –

Michael D. Blanchard (ct25891)
**MORGAN, LEWIS & BOCKIUS LLP**
One State Street
Hartford, CT  06103
Tel: 860.240.2945
Fax: 860.240.2800
michael.blanchard@morganlewis.com

*Counsel for Defendants Teva*
*Pharmaceutical Industries Ltd., Erez*
*Vigodman, Eyal Desheh, and Sigurdur*
*Olafsson*

– and –

Jill M. O'Toole (ct27116)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
Email: jotoole@goodwin.com

*Counsel for Defendants Teva*
*Pharmaceutical Industries Limited, Erez*
*Vigodman and Eyal Desheh*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of September, 2018, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jordan D. Hershman*

Jordan D. Hershman (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
Tel (617) 951-8455
Fax (617) 951-8736
jordan.hershman@morganlewis.com