## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ONTARIO TEACHERS' PENSION PLAN BOARD, Individually and as Lead Plaintiff on behalf of all others similarly situated; and ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Individually and as Named Plaintiff on behalf of all similarly-situated bond purchasers, <br>  Plaintiffs, <br><br>  v. <br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD., et al., <br>  Defendants. | No. 3:17-cv-558 (SRU) |

## I. INTRODUCTION

  Lead Plaintiff, Ontario Teachers' Pension Plan Board ("Ontario Teachers'"), and Named

Plaintiff Anchorage Police & Fire Retirement System ("Anchorage") (together, "the plaintiffs"),

individually and on behalf of all others similarly situated ("the Class"), filed this Second

Amended Consolidated Class Action Complaint ("the complaint") on June 22, 2018, Doc. No.

226.  Their first set of allegations, called "'34 Act Allegations", "34 Act Allegations", or alleged

Exchange Act violations, are asserted against the following defendants (together "'34 Act

Defendants"): Teva Pharmaceutical Industries, Ltd. ("Teva"); Former Teva President and CEO

Erez Vigodman ("Vigodman"); Former Teva CFO Eyal Desheh ("Desheh"); Former Teva

America Generics President and CEO Allan Oberman ("Oberman"); Former Teva Global

Generics President and CEO Sigurdur Olafsson ("Olafsson"); Former Teva SVP and CAO

Deborah Griffin ("Griffin"); Former Teva SVP and COO Maureen Cavanaugh ("Cavanaugh").

Compl., Doc. No. 226 at ¶¶ 24-32.  Plaintiffs also allege "Securities Act Allegations" against the

following defendants (together "Securities Act Defendants"): Teva; Teva Pharmaceuticals Finance Netherlands III B.V. ("Teva Finance"); Vigodman; Desheh; and Griffin. *Id*. at ¶¶ 371-77.

The Defendants moved to dismiss all counts of the Complaint (*see* Doc. Nos. 238, 239, 240), and the parties have fully briefed the motions. Upon a review of the defendants' numerous motions in light of the plaintiffs' account of facts, which I accept as true, I conclude that some of the defendants' arguments have merit. Thus, for the reasons stated below, the Motion to Dismiss filed by Teva, Vigodman, Desheh, Griffin, and Olafsson (doc. no. 238) and the Motion to Dismiss filed by Teva Finance (doc. no. 239) are **denied in substantial part** but **granted** with respect to the plaintiffs' allegations stemming from the defendants' failure to disclose subpoenas from the Department of Justice and Connecticut Attorney General. Further, the Motion to Dismiss filed by Cavanaugh and Oberman (doc. no. 240) is **granted.**

## II.     BACKGROUND

Plaintiff's securities class action claims "arise[] from the difference between what the Defendants told investors was driving Teva's financial success and the truth behind Teva's performance." Compl, Doc. No. 226 at ¶ 1. Plaintiffs basically allege that the defendants implemented "a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio," which the plaintiffs refer to as the "Price-Hike Strategy." *Id*. According to the plaintiffs, however, the defendants failed to reveal the actual reason for the company's financial success, and attributed the growth to "fundamental business strategies" such as cost-cutting and "good product management." *Id*. The plaintiffs allege that the reported profits made Teva look more successful than it was, compelling plaintiffs, and others, to invest.

A.  The Parties

1.  *Plaintiffs and the Class*

Ontario Teachers' "is the largest single-profession pension plan in Canada, representing roughly 323,000 active and retired teachers in the Province of Canada." Compl., Doc. No. 226 at ¶ 20. Ontario Teachers' alleges that it purchased and acquired Teva American Depository Shares ("ADS") registered on the New York Stock Exchange ("NYSE") and Preferred Shares in domestic transactions during the class period (February 6, 2015 through August 3, 2017). *Id*. at ¶ 21. Anchorage "is a public pension fund in Anchorage, Alaska that provides pension, disability, and survivor benefits to active and retired police officers and firefighters and their families." *Id*. at ¶ 22. Anchorage alleges that it purchased and acquired Teva Notes during the class period. *Id*. at ¶ 23. The plaintiffs alleged that they "suffered damages as a result of the violations of the federal securities laws alleged herein." *Id*. at ¶ 21, 23. Ontario Teachers' "brings separate claims under the 34 Act and the Securities Act on behalf of all Class Members." *Id*. at ¶ 20. Anchorage "brings separate claims under the 34 Act and the Securities Act on behalf of Class members who purchased or otherwise acquired Teva Notes." *Id*. at ¶ 22.

2.  *Defendants*

Teva, "the world's largest generic drug manufacturer", is incorporated in Israel, and has a wholly-owned subsidiary, Teva USA. *Id*. at ¶ 24. Teva is named in both the '34 Act Allegations and the Securities Act Allegations.

Vigodman was Teva's President and Chief Executive Officer ("CEO") from January 11, 2014 to February 6, 2017 and a Teva Director from June 22, 2009 to February 6, 2017. *Id*. at ¶ 26. The plaintiffs allege that Vigodman's liability stems from his signing and certifying certain forms, including Securities and Exchange Commission ("SEC") forms 20-F and 6-K, that

3

included false and misleading statements, and making false statements on conference calls and in notes documents. *Id*. Vigodman is named in both the '34 Act Allegations and the Securities Act Allegations.

Desheh was Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014 when he served as Teva's interim CEO and Interim President. *Id*. at ¶ 27. The plaintiffs allege that Desheh's liability stems from his signing and certifying certain forms, including SEC forms 20-F and 6-K, that included false and misleading statements, and making false statements on conference calls and in notes documents. *Id*. Desheh is named in both the '34 Act Allegations and the Securities Act Allegations.

Oberman was Teva Americas Generics' President and CEO from November 5, 2012 to December 13, 2014. *Id*. at ¶ 28. The plaintiffs allege that Oberman's liability stems from his false and misleading statements, as well as his approval and control of the false and misleading SEC filings. *Id*. Oberman is named in both the '34 Act Allegations and the Securities Act Allegations.

Olafsson was Teva's Global Generic Medicine Group's President and CEO from July 1, 2014 to December 5, 2016. *Id*. at ¶ 29. The plaintiffs allege that Olafsson's liability stems from his false and misleading statements, as well as his approval and control of the false and misleading SEC filings. *Id*. Olafsson is named in the '34 Act Allegations only.

Griffin is the current Teva Senior Vice President ("SVP") and Chief Accounting Officer ("CAO"), and was an authorized representative of both Teva and Teva Finance, who served as Vice President and CFO of Teva USA. *Id*. at ¶ 30. The plaintiffs allege that Griffin's liability stems from signing the notes and shares statements as well as her approval and control of the

false and misleading SEC filings. *Id.* Griffin is named in both the '34 Act Allegations and the Securities Act Allegations.

Cavanaugh was Teva USA's SVP and Chief Operating Officer ("COO") for North American Generics. *Id.* at ¶ 31. The plaintiffs allege that Cavanaugh's liability stems from her approval and control of the false and misleading SEC filings. *Id.* Cavanaugh is named in the '34 Act Allegations only.

Teva Finance is Dutch company that is "a shell company that is wholly-owned and controlled special purpose finance subsidiary of Teva." *Id.* at ¶ 373.

B. Procedural History

The original complaint was filed on November 6, 2016 in the Central District of California. Compl., Doc. No. 1. It was transferred to the District of Connecticut on April 4, 2017.[1] Doc. No. 75. On July 11, 2017, Ontario Teachers' Pension Plan Board was appointed as lead plaintiff. Order, Doc. No. 124. The plaintiffs filed a Class Action Complaint for Violation of the Securities Act of 1933 on August 2, 2017, Compl., Doc. No. 129; and an Amended Class

---

[1] *Leone v. Teva Pharmaceutical Industries Ltd. et al.*, 3:17-cv-559 (SRU), was consolidated into this lead case on April 27, 2017. *See* Consol. Orders, Doc. No. 120, 122. Further, the following related cases are currently pending in this court, but have been stayed pending the resolution of the Motions to Dismiss in this case: *OZ ELS Master Fund Ltd., et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:17-cv-1314 (SRU); *Huellemeier v. Teva Pharmaceutical Industries Ltd. et al.*, 3:17-cv-1938 (SRU); *Baker v. Teva Pharmaceutical Industries Ltd. et al.*, 18-cv-789 (SRU); *Grodko v. Teva Pharmaceutical Industries Ltd. et al.*, 18-cv-800 (SRU); *Nordea Investment Management AB v. Teva Pharmaceutical Industries Ltd. et al.*, 18-cv-1681 (SRU); *Department of Revenue, et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:18-cv-1721 (SRU); *Pacific Funds Series Trust, et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:18-cv-1956 (SRU); *Public School Teachers Pension Fund and Retirement Fund of Chicago v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-175 (SRU); *Schwab Capital Trust, et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-192 (SRU); *Phoenix Insurance Company Ltd. et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-449 (SRU); *Mivtachim The Workers Social Insurance Fund Ltd., et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-513 (SRU); *Clal Insurance Company Ltd., et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-543 (SRU); *Highfields Capital I LP, et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-603 (SRU); *Migdal Insurance Company LTD et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-655 (SRU); *Harel Pension and Provident Ltd. et al. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-656 (SRU); *Oregon v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-657 (SRU); *Migdal Mutual Funds, Ltd. v. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-923 (SRU); *Psagot Mutual Funds, Ltd. et al. Teva Pharmaceutical Industries Ltd. et al.*, 3:19-cv-1167 (SRU); *Stichting PGGM Depositary v. Teva Pharmaceutical Indus. Ltd., et al.*, 3:19-cv-1173 (SRU).

Action Complaint for Violation of the Securities Act of 1933 on September 5, 2017. Compl., Doc. No. 138. Plaintiffs filed an Amended Consolidated Class Action Complaint on September 11, 2017. Compl., Doc. No. 141. The defendants filed multiple Motions to Dismiss, which I granted without prejudice to repleading on April 3, 2018. *See* Motions to Dismiss, Doc. Nos. 187, 188, 189, 190, and 198; Order, Doc. No. 215. Thereafter, the plaintiffs filed the operative Second Amended Consolidated Class Action Complaint on June 22, 2018. Compl., Doc. No. 226.

Teva, Vigodman, Desheh, Griffin, and Olafsson filed a Motion to Dismiss on September 14, 2018 (*see* '34 Act Mot. to Dism., doc. no. 238), which the plaintiffs opposed (*see* Opp. to '34 Act Mot. to Dism., doc. no. 244), and the Teva defendants filed a reply (*see* Reply to '34 Act Mot. to Dism., doc. no. 254). Teva Finance also filed a Motion to Dismiss on September 14, 2018 (*see* Teva Fin. Mot. to Dism., doc. no. 239), which the plaintiffs opposed (*see* Opp. to Teva Fin. Mot., doc. no. 246), and Teva Finance filed a reply (*see* Reply to Teva Fin. Mot., doc. no. 255). Lastly, Cavanaugh and Oberman filed a Motion to Dismiss on September 14, 2018 (*see* C/O Mot. to Dism., doc. no. 240), which the plaintiffs opposed (*see* Opp. to C/O Mot., doc. no. 247), and Cavanaugh/Oberman filed a reply (*see* Reply to C/O Mot., doc. no. 256).

C. Factual Allegations

The allegations in the Second Amended Consolidated Class Action Complaint stem mostly from three categories of alleged misrepresentations/omissions by Teva relative to: (1) the source of its profit success; (2) the competitive nature of the generics market; and (3) the investigations in which Teva was involved. *See generally*, Compl, Doc. No. 226. The plaintiffs allege that those misrepresentations/omissions were perpetuated by Teva officials in order to inflate profits to make Teva appear more successful and attractive in the market and, therefore,

attract more investors to raise money to acquire a competitor company. *Id*. The plaintiffs allege generally that the defendants consistently misrepresented to investors and the market that their financial success was due to good business decisions, and not because of pricing, when, in fact, they were consistently raising prices of many of their generic drugs and were concealing information from investors, analysts, and the public. *Id*. Further, the plaintiffs allege generally that the defendants consistently misrepresented that the generics market was highly competitive when, in fact, the defendants and its competitors were engaged in a collusive agreement to raise prices, further inflating Teva's profits. *Id*. The plaintiffs refer to that as the price-fixing conspiracy. The plaintiffs also allege that Teva was the subject of numerous investigations into its pricing and profits but concealed that information from the public and investors. *Id*. The plaintiffs base their allegations "on Lead Counsel's investigation, which included interviews with numerous former employees of Teva[.]" *Id*. at ¶ 33.

The plaintiffs allege that the class period began on February 6, 2014 when Teva "announced its fourth quarter 2013 and full year 2013 financial results in a press release", because those reported profits resulted from the undisclosed price-hike strategy. *Id*. at ¶ 46. The plaintiffs allege that before the class period began, "Teva's generics segment was struggling and [its] share price had dropped from the $60s in 2010 into the $30s by 2013." *Id*. at ¶ 34. Teva's then-CEO planned to focus on branded drugs but was abruptly fired and Desheh, then CFO, became the interim-CEO in November 2013. *Id*. Desheh and then-CEO Vigodman announced that Teva would make a "major acquisition." *Id*. at ¶ 35. Plaintiffs allege, though, that in early 2013 Teva adopted the price-hike strategy, which was "a non-public strategy to systematically increase prices across dozens of drugs in its generic drug portfolio." *Id*. at ¶ 36. The plaintiffs allege that, as part of this strategy, Teva raised the prices of 18 of its generic drugs on July 3,

2013 and August 9, 2013, some as much as an 812% increase, which led to $875 million in price-related profit. *Id*. at ¶ 42-43. Further, the plaintiffs allege that fifteen of those increases were "implemented together with Teva's competitors who also made price increases on the same drugs." *Id*.

Plaintiffs allege that Teva's financial results announcement on February 6, 2014, which started the class period, revealed a 14% increase in generics revenue for 2013 fourth quarter, and attributed that increase to "'higher sales' volume, reduced expenses, and 'exclusive launches' of new generic drugs." *Id*. at ¶ 47. The plaintiffs allege that the defendants omitted that, although those reasons may have had *some* influence, the real reason for the increase was the price-hike strategy. *Id*. The plaintiffs allege that the defendants perpetuated this misrepresentation/omission in calls with investors and analysts. *Id*. at ¶ 48. The news of Teva's financial success in 2013 led to increased share prices on the stock market, and by March 2014, it was trading at $48. *Id*. at ¶ 50. By April 2014, the share price had increased to $54.06. *Id*. at ¶ 52. The plaintiffs allege that in April 2014, as part of the price-hike strategy, Teva increased the prices of another twelve generic drugs, eight of which were done in collaboration with competitors. *Id*. at ¶ 56. On May 1, 2014, Teva announced that its continued financial success was due to "lower expenses, a changed composition of revenues, and 'new product launches.'" *Id*. at ¶ 53. The plaintiffs allege, though, that the price-hike strategy had generated $120 million that quarter, making it the actual cause of the financial success. *Id*. The success gained Teva more positive press. *Id*. at ¶ 55.

On July 31, 2014, Teva announced that it was seeing continued financial success due to "the growth of [its] global generic business, primarily in the U.S." *Id*. at ¶ 59. The plaintiffs allege that the price-hike strategy was the actual reason for the financial success, generating as

much as $160 million in profit. *Id*. at ¶ 61. On July 1 and August 28, 2014, Teva increased the prices of another 20 drugs, twelve of which were done in collaboration with competitors. *Id*. at ¶ 63. The plaintiffs allege that those increases generated as much as $50 million in profit. *Id*.

The generic drug market came under scrutiny in summer of 2014 and the Connecticut Attorney General began a "non-public investigation into the companies that manufactured digoxin" and issued subpoenas to many of Teva's competitors. *Id*. at ¶ 58, 62. Congress also started looking into the generic drug market and sent Teva a letter in October 2014 seeking information on its recent price increases, to which Teva never responded. *Id*. at ¶ 62. Teva also refused to testify in a November 20, 2014 Senate Subcommittee of Primary Health and Aging hearing. *Id*. at ¶ 70.

On October 30, 2014, Teva again reported financial success, with a $160 million increase in generic drug profits. *Id*. at ¶ 65. The plaintiffs allege that defendants again misrepresented and omitted the truth about the profits in both written statements and on calls with investors and analysts. *Id*. at ¶ 66-67, 72. Teva continued to receive positive press on the basis of those financial results. *Id*. at ¶ 68. Amidst public scrutiny of the generic market as a whole, Teva again announced positive financial results on February 5, 2015, including a $480 million generic segment profit increase from 2013 to 2014. *Id*. at ¶ 74. The plaintiffs allege that Teva reported $693 million of profit for the year 2014. *Id*. at ¶ 76. The plaintiffs allege that the defendants again misrepresented and/or omitted the real reason for the financial success in written statements and on calls with investors and analysts, which gained Teva positive press. *Id*. at ¶ 76-77.

In January 2015, Teva increased the prices of another 14 drugs, nine of which were done in collaboration with competitors. *Id*. at ¶ 79. The plaintiffs allege that this generated as much as

$48 million in profits, and the overall price-hike strategy generating as much as $228 million in the first quarter of 2015. *Id*. The plaintiffs allege that the defendants continued to misrepresent/omit the real reason for their financial success in written statements and on calls with investors and analysts, gaining Teva more positive press. *Id*. at ¶ 83-86. Teva shares started trading at almost $60 per share, which led the media to speculate about a possible acquisition. *Id*. at ¶ 80. Teva unsuccessfully tried to acquire Allergan and Mylan. *Id*. at ¶ 81-82. Teva's shares then increased to $72 per share. *Id*. at ¶ 87.

With high stock prices, on July 27, 2015, Teva announced that it would acquire Actavis, Allergan's worldwide generics business, for $40.5 billion in cash and equity. *Id*. Plaintiffs allege that the defendants now needed to raise $30 billion to complete the deal and, therefore, Teva's motivation for raising capital shifted from acquisition to payment. *Id*. at ¶ 89. Plaintiffs allege that Teva, on July 30, 2015, again reported financial success due to "reduced expenses and new product launches" in the generics segment, and continued to perpetuate that misrepresentation/omission in calls with media and investors. *Id*. at ¶ 90. In July 2015, Teva implemented a price increase of another seven drugs, four of which were done in collaboration with competitors. *Id*. at ¶ 91. The plaintiffs allege that Teva again, on October 29, 2015, reported financial success and misrepresented/omitted that the real reason was the price-hike strategy, and falsely stated that it was due to lower expenses, again gaining Teva continued positive press. *Id*. at ¶ 92-94. Amidst growing public and political scrutiny of the generics market, Teva denied any exposure to legislation that would penalize manufacturers who increased prices more than inflation and concealed the price-hike strategy, gaining more positive press for Teva. *Id*. at ¶ 95-98.

The plaintiffs allege that the cash to complete the Actavis deal would come from three offerings: (1) a $7 billion secondary public offering of depository shares in December 2015; (2) an initial public offering of Preferred Shares in December 2015; and (3) a $15 billion offering of bonds in 2017. *Id*. at ¶ 89. In November and December 2015, Teva filed a registration statement with the SEC and two prospectus supplements for the two share offerings, all of which "included numerous false [and] misleading statements attributing Teva's profits to sources other than the price-hike strategy." *Id*. at ¶ 101. The two shares offerings were issued and raised roughly $7.2 billion. *Id*.

Amidst even more public scrutiny in the generics sector, Teva continued to misrepresent and omit the real reasons for its increased financial success. *Id*. at ¶ 103. On February 11, 2016, Teva again reported financial success, in which the plaintiffs allege they concealed $848 million in profits from the price-hike strategy. *Id*. at ¶ 105. The plaintiffs allege that Teva continued to perpetuate the misrepresentation/omission about the reasons for their financial success, which led to continued positive press for Teva. *Id*. at ¶ 106-10. In the face of even more public scrutiny of the sector, Teva continued to "deny any vulnerability to pricing pressure." *Id*. at ¶ 113. The plaintiffs allege that the price-hike strategy began to falter and Teva, on April 6, 2016, increased the prices on only five generic drugs, all of which Teva had increased before. *Id*. at ¶ 114. Teva also, on May 9, 2016, reported negative financial results—$215 million less in first quarter 2016 than in first quarter 2015—which it attributed to "higher expenses, lower sales, lower European profit, and fewer product launches." *Id*. at ¶ 116. Teva continued to report that pricing pressure had nothing to do with their financial results. *Id*. at ¶ 117. The plaintiffs allege that, contrary to its public statements, Teva was indeed being substantially damaged by price deflation, and its price increase related profit had "plummeted." *Id*. at ¶ 118. Teva continued to issue statements

perpetuating the omission/misrepresentation that it was not subject to pricing pressure, and the media therefore continued to report as such. *Id*. at ¶ 119-20.

In June and July 2016, Teva received subpoenas from both the Department of Justice ("DOJ") and the Connecticut Attorney General, seeking information about its generics pricing. *Id*. at ¶ 122. One day after receiving the Attorney General's subpoena, on July 13, 2016, Teva announced that its $20 billion debt offering, scheduled for September, would be accelerated, and filed a Registration Statement with the SEC that day. *Id*. at ¶ 123. In conjunction with the offering, Teva continued to report that it had "stable" pricing and "saw no change" in generics pricing, which the media reported, and Teva did not report the receipt of the subpoenas. *Id*. at 124-26. Teva launched its $20 billion bond offering on July 18, 2016 pursuant to the Notes Offering Materials, "which incorporated several of the false and misleading quarterly and full year financial disclosures", and did not disclose the subpoenas from the DOJ or Connecticut Attorney General. *Id*. at ¶ 127.

On August 4, 2016, Teva disclosed the subpoenas and reported negative financial results from the second quarter of 2016—$115 million less in profits than in the second quarter of 2015—which Teva attributed to "increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases." *Id*. at ¶ 128. The plaintiffs allege that the defendants concealed that Teva had earned $122 million less in price-based profit. *Id*. With the negative financial results and disclosure of the subpoenas, the price of securities declined. *Id*. The plaintiffs allege that the defendants continued to perpetuate the misrepresentations and omissions about their pricing practices to investors, analysts, and the media. *Id*. at ¶ 129-34.

On November 3, 2016, Bloomberg released an article about the DOJ and Connecticut Attorney General probes into generic drug manufacturers, and specifically stated that Teva was being investigated, which led to Teva securities immediately dropping 9%. *Id*. at ¶ 135-36. On November 15, Teva reported negative financial results from the third quarter of 2016—a $277 million decline from the third quarter of 2015—which Teva attributed to "causes such as divestments and lost sales from certain drugs." *Id*. at ¶ 137. The plaintiffs allege, though, that the decline was "attributable to a … decline in inflated profit as the price-hike strategy collapsed" but that Teva repeatedly and fraudulently disclaimed that was the reason. *Id*. at ¶ 137-38. CEO Olafsson abruptly "retired" shortly thereafter, but the plaintiffs allege that he was actually fired. *Id*. at ¶ 140. Soon after that, the DOJ announced that it charged, via an information, two executives of a Teva competitor, Heritage, with conspiring to fix prices, rig bids, and manipulate the market for Glyburide, for which, the plaintiffs allege, Teva controlled 75% of the market. *Id*. at ¶ 142. On December 15, the Connecticut Attorney General announced that it, and other Attorneys General, were charging Teva and others with antitrust violations regarding Glyburide (more drugs have since been added, *id*. at ¶ 144). *Id*. at ¶ 143. The plaintiffs allege that the AG complaint "cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals" who had been criminally charged. *Id*.

On January 6, 2017, Teva again reported negative financial results and continued to falsely attribute the reasons. *Id*. at ¶ 145-48. One month later, Vigodman was terminated as President and CEO, and that news, in tandem with the negative financial reports, caused Teva securities to drop. *Id*. at ¶ 145, 149. Shortly thereafter, Teva reported its financial results for 2016 and reported that without Actavis, it would have had a $1.4 billion decline, which Teva attributed to "loss of exclusivity, lower sales of certain drugs, and then loss of revenues from

divested product." *Id*. at ¶ 151.  On August 3, 2017, Teva "took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to [its] bottom line." *Id*. at ¶ 153.  The plaintiffs allege that this was a "direct result of the complete collapse of the price-hike strategy, and evaporation of the inflated profits." *Id*. Credit rating agencies downgraded Teva's debt rate to just above "junk" and the price of Teva securities "fell dramatically." *Id*. at ¶ 154.

From the above allegations, the plaintiffs assert that the defendants "made four types of false and misleading statements or omissions on conference calls with investors and in SEC filings":  (1) Item 5 non-disclosure—the plaintiffs allege that the defendants "violated their statutory duty to disclose material trends under Item 5 of Form 20-F" when they "failed to disclose the material trend of generating profit as part of the concealed price-hike strategy" and they also "concealed the trend of declining inflated profit, and that they could no longer make price increases as the strategy unraveled"; (2) False statements regarding competition—the plaintiffs allege that the defendants' statements "falsely indicated that Teva was participating in competitive and functioning markets for generic drugs" when, actually, "[t]o the contrary, Teva made dozens of price increases in tandem with its competitors" and Teva and the cooperating companies "deliberately did not compete on price"; (3) False and misleading pricing statements—the plaintiffs allege that the defendants' statements "concealed Teva's price-hike strategy and the profits it generated" and then later "concealed that the price-hike strategy fell apart as Teva was unable to make more price increases or sustain inflated profit" and the statements "were particularly misleading as the 34 Act Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success"; and (4) Concealed receipt of subpoenas—the plaintiffs allege that the defendants "failed to disclose in the Notes

Offering Materials Teva's receipt of subpoenas from the DOJ and the State Attorneys General in connection with their antitrust investigations into the generics industry." *Id*. at ¶ 155. The plaintiffs lay out the alleged false and misleading statements and omissions in more detail, along with their allegations about why each statement was fraudulent. *Id*. at ¶ 155-239.

D. Legal Claims

1. *'34 Act (Exchange Act) Allegations*[2]

Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by the '34 Act Defendants. Compl., Doc. No. 226 at ¶ 342. Plaintiffs assert, inter alia, that the '34 Act Defendants "made, disseminated, or approved the false and misleading statements … which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id*. Plaintiffs allege that they, and the class, "suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teva Securities." *Id*. at ¶ 344.

Count Two alleges a violation of Section 20(a) of the Exchange Act by the '34 Act Defendants. *Id*. at ¶ 347. Plaintiffs assert that the defendants "had the power and ability to control the actions of Teva and its employees" and are therefore liable under Section 20(a). *Id*.

2. *Securities Act Allegations*[3]

Count Three alleges a violation of Section 11 of the Securities Act by the Securities Act Defendants. *Id*. at ¶ 397. Plaintiffs assert that this count "does not sound in fraud" and liability

---

[2] The '34 Act Defendants are: Teva, Vigodman, Desheh, Oberman, Olafsson, Griffin, and Cavanaugh.
[3] The Securities Act Defendants are: Teva, Teva Finance, Vigodman, Desheh, and Griffin.

is "predicated on the participation of each defendant in the … Offering Materials, which contained untrue statements and omissions of material fact." *Id*. Count Three is brought against all Securities Act Defendants with respect to the ADS/Preferred Offerings "on behalf of the class who purchased or otherwise acquired Teva ADS or Preferred Shares pursuant and/or traceable to the ADS/Preferred Offerings[.]" *Id*. at ¶ 398. Count Three is brought against all Securities Act Defendants, except Teva Finance, with respect to the Notes Offerings "on behalf of members of the class who purchased or otherwise acquired Notes pursuant and/or traceable to the Notes Offering[.]" *Id*. at ¶ 399. Plaintiffs allege that the ADS/Preferred and Notes Offerings "contained … untrue statements of material fact or omitted to state [material facts] … required to be stated therein or necessary to make the statements therein not misleading." *Id*. at ¶ 400.

Count Four alleges a violation of Section 12(a)(2) of the Securities Act by the Securities Act Defendants. *Id*. at ¶ 406. Plaintiffs assert that Count Four is solely based in negligence and not fraud. *Id*. Count Four is brought "on behalf of all persons who purchased securities in/ pursuant to, and/or traceable to the Offerings", offered by means of prospectus or oral communications which "included … untrue statements of material fact and/or omitted to state … material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." *Id*. at ¶¶ 407, 410.

Count Five alleges a violation of Section 15(a) of the Securities Act by Teva, Vigodman, Desheh, and Griffin; all in connection with the Notes Offering, and against all but Teva in connection with the ADS and Preferred Offerings. *Id*. at ¶¶ 415-16. Plaintiffs assert that Count Five is solely based in negligence and not fraud. *Id*. Plaintiffs assert that the defendants "acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Offering Materials were true and not misleading as to all material facts and

did not omit to state any material fact required to be stated therein or necessary to make … the statements therein not misleading." *Id.* at ¶ 421.

## III. DISCUSSION

### A. Pleading Standards: Rule 12(b)(6), Rule 8(a), Rule 9(b), and the PLSRA

Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 6 79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is

nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted). Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Further, plaintiffs claiming securities fraud under the Exchange Act are "subject to heightened pleading requirements that [they] must meet to survive a motion to dismiss. First, a complaint alleging securities fraud must satisfy Rule 9(b) … which requires that 'the circumstances constituting fraud … shall be stated with particularity.'" *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting Fed. R. Civ. P. 9(b)). "Securities Acts claims that 'are premised on allegations of fraud' also must satisfy Rule 9(b)'s particularity requirement." *In re MF Global Holdings Limited Securities Litigation*, 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013) (*quoting Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). The heightened pleading standard set by Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard [its] reputation from improvident charges of wrongdoing, and protect [a defendant] against strike suits." *ATSI Communications*, 493 F.3d at 99; *Rombach*, 335 F.3d at 171.

In addition to the heightened requirements under Rule 9(b), Exchange Act complaints must also meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See ATSI Communications*, 492 F.3d at 99; *In re MF Global Holdings*, 982 F. Supp. 2d at 302. "The PSLRA requires that a complaint 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed.'" *In re MF Global Holdings*, 982 F.

Supp. 2d at 302 (*quoting* 15 U.S.C. § 78u-4(b)(1)).

1. *Exchange Act Claims – Counts One and Two*

The '34 Act Defendants argue that the plaintiffs failed "to adhere to the[] exacting

standards" under the PSLRA and Rule 9(b). '34 Act Mot. to Dism., Doc. No. 238-1 at 12-13.

They argue that the complaint "tries to make up for in length what it lacks in particularity" and

the plaintiffs "fail to plead with particularity facts demonstrating that Teva engaged in … a

'[price-hike] strategy' or that Teva's *overall* pricing increased if one includes drugs for which

there were price declines." *Id.* at 13. The defendants argue that the plaintiffs asserted only

"unwarranted inferences and unsupported conclusions [that] do not constitute well-pleaded facts

for purposes of a motion to dismiss under Rule 12(b)(6), and they fall far short of providing the

particularity Rule 9(b) and the PSLRA require." *Id.* (internal quotation marks omitted). Further,

the '34 Act Defendants argue that the complaint "never states with particularity how **<u>any</u>** specific

statement was false or misleading on its own or through the alleged omission of information."

*Id.* at 14 (emphasis in original). They argue that the plaintiffs instead just "print quotations from

every quarterly and annual financial release and then conclusorily allege that the financial

disclosures were misleading based on Plaintiffs' speculation about supposed price increases." *Id.*

The plaintiffs argue that they met the required standard for pleading with specificity to survive

this threshold argument. Opp. to '34 Act Mot. to Dism., Doc. No 244 at 12. I agree with the

plaintiffs.

Courts in this Circuit have held that the length of a complaint does not, alone, satisfy the

requirement that it be sufficiently particular, nor is it enough for a plaintiff to assert generic

and/or identical allegations after each quotation or section, setting forth the reasons why the

statement is allegedly false. *See In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. Feb. 28, 2005); *Endovasc Ltd., Inc. v. J.P. Turner & Co.*, 2004 WL 634171, at *6, *9 (S.D.N.Y. Mar. 30, 2004) (dismissing a plaintiff's complaint where the plaintiff "provided a laundry list of alleged false statements," but supported the alleged misstatements "only by sweeping conclusory allegations that lack[ed] particularity as to how the statements were untrue"), *aff'd*, 169 F. App'x 655 (2d Cir. 2006). It is not up to the courts to play "connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim." *In re Alcatel*, 382 F. Supp. 2d at 534 (citing *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999)).

In *Alcatel*, the plaintiffs asserted claims similar to those in Count One here, violations of Section 10(b) and Rule 10b-5, in a 250-paragraph, 102-page complaint. *Id.* The court dismissed those claims because the complaint, although long, stated "very little with particularity." *Id.* In addition, the court highlighted the fact that the plaintiffs, in making allegations under those sections, set forth lengthy quotations made by the defendants and followed each quotation "with a similar (in most cases identical) laundry list of 'specific' reasons why the statements were allegedly false." *Id.* The court held that the plaintiffs neglected to "make it clear what portion of each quotation constitut[ed] a false representation or which statements link up with which issues in the laundry list." *Id.* The court held that was deficient under the pleading standards for all those reasons and because it "plac[ed] the burden on the Court to sort out the alleged misrepresentations and match them with the corresponding adverse facts." *Id.* Courts have found, however, that a complaint meets the particularity requirement when it "specifically identif[ies] the date, publication, and speaker of each of the alleged misstatements or omissions and contain[s] facts supporting the existence and materiality of these problems" and highlights in

some way the "particular aspects of the statements alleged to be misleading." *In re MF Global Holdings*, 982 F. Supp. 2d at 309 (internal quotation marks omitted); *see also In re NTL, Inc. Securities Litigation*, 347 F. Supp. 2d 15, 22-23 (S.D.N.Y. 2004).

Here, the plaintiffs separated into four categories the alleged misleading statements and omissions by the defendants: (1) pricing trends; (2) competition; (3) pricing; and (4) subpoenas. Compl., Doc. No. 226 at pp. 45-86. With respect to the section regarding the alleged misleading statements that Teva operated in a competitive market regarding price, the complaint is further separated into subsections, detailing the false statements made on conference calls, and those made in SEC filings. *See id*. at ¶¶ 164-71. With respect to the section regarding the alleged false and misleading statements and omissions regarding pricing, the complaint is further separated into subsections, detailing the alleged false and misleading financial disclosures for each quarter and full year throughout the class period. *See id.* at ¶¶ 172-237. In each subsection, the plaintiffs identify the allegedly misleading statement or omission, the date it was made, the forum/publication in which it was made, and the speaker of the alleged misstatements or omissions. As an example, in the subsection regarding Third Quarter 2014 Financial Results, the plaintiffs cite to an October 30, 2014 statement by Vigodman on a conference call in which he stated that Teva's revenue was because of "the new launches this year" which have "been very significant contributors to the year." *Id*. at ¶ 182. The plaintiffs allege that the statements were "false and misleading because, having attributed the source of the profit increase, the 34 Act Defendants had a duty to disclose but concealed the full truth that the price-hike strategy … contributed materially to the results." *Id*. The plaintiffs used this layout and format throughout all of its allegations of misleading statements and omissions, and after each statement or

omission, the plaintiffs allege why it was false or misleading. Here, the plaintiffs provide the required particularity for the heightened standard under Rule 9(b) and the PSLRA.[4]

Here, the complaint is not "so '[v]ague and disorganized' as to fail to satisfy Rule 9(b) and the PSLRA." *In re MF Global Holdings*, 982 F. Supp. 2d at 309 (*quoting In re ITT Educ. Servs., Inc. Sec. & Shareholder Derivatives Litig.*, 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012)). The purpose of the heightened pleading requirements under Rule 9(b) and the PSLRA is "to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Communications*, 493 F.3d at 99. The complaint here sufficiently achieves those purposes. If nothing else, the defendants' briefs, in which the defendants thoroughly and directly rebut the allegations in the Complaint, prove that the defendants were on notice of the claims against them. *See In re MF Global Holdings*, 982 F. Supp. 2d at 310 (relying on defendants' motions to dismiss to find that the complaint put the defendants on notice of the claims against them).

---

[4] I do note, though, that within those sections, the plaintiffs put forth a number of block quotes but do not highlight the particular parts of the statement they allege to be inadequate. Courts have routinely focused on a plaintiff's doing so as indicia of sufficient particularity. *See In re Alcatel*, 382 F. Supp. 2d at 534 (faulting complaint for failing to "make it clear what portion of each quotation constitutes a false representation"); *In re MF Global Holdings*, 982 F. Supp. 2d at 309 (finding that the plaintiff's "use of bold text to highlight particular aspects of the statements alleged to be misleading further supports a finding of sufficient particularity"). The failure for the plaintiffs to do so here, though, is not fatal to the Complaint.

    First, the inquiry does not rise and fall on this factor alone; there are other factors to consider in determining a complaint's particularity. Second, by addressing the allegedly false and misleading nature of the statement after each statement, the plaintiffs highlight further with which portion of the statement they take issue. Further, the plaintiffs recite many of the same allegedly false statements in other sections of the Complaint and there do highlight the relevant portions in bold text. For instance, paragraph 72 asserts December 11, 2014 statements by Olafsson on an analyst call in which he stated, in response to a question about wholesaler price increases: "So first *let me correct. I have to disagree that they have experienced tremendous price increase*." *Id.* at ¶ 72 (emphasis in original). The following paragraph alleges that his statement was "flatly belied by the facts [about the price-hike strategy], to which Olafsson had direct access." *Id.* at ¶ 73. That same statement by Olafsson is re-asserted in the subsection alleging the false and misleading statements. *Id.* at ¶ 186. There, the plaintiffs allege further that the statements were "false and misleading because, in responding to a direct question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that the price-hike strategy … contributed materially to the results." *Id.* Although the statement in the latter portion of the complaint is not highlighted, it is clear from the earlier paragraph with which portion of the statement the plaintiffs take issue. That system is routinely used by the plaintiffs throughout the complaint.

Although Rule 9(b) and the PSLRA place heavy requirements on plaintiffs who bring fraud allegations, they "do not require such an extreme level of particularity" and, in especially complex cases, allow for some flexibility. *In re MF Global Holdings*, 982 F. Supp. 2d at 311. Accordingly, the complaint satisfies the particularity requirements of Rule 9(b) and the PSLRA with respect to the pricing claims brought under the Exchange Act claims in Counts One and Two.

2. *Securities Act Claims – Counts Three, Four, and Five*

"While Exchange Act claims require proof of fraud and must always be pled with particularity, Securities Act claims must be pled with particularity only where 'the gravamen of the complaint is plainly fraud.'" *In re MF Global Holdings*, 982 F. Supp. 2d at 310 (*quoting Rombach*, 355 F.3d at 172)). Here, the plaintiffs distinguish their Securities Act claims, which they allege *do not* sound in fraud but only negligence, from their Exchange Act claims, which they allege *do* sound in fraud. As such, the Complaint states, in each count brought under the Securities Act, that the count does not sound in fraud and/or that any allegations of fraud are expressly excluded from the count. *See* Compl., ¶ 397 (Count Three: "This count does not sound in fraud."); ¶ 406 (Count Four: "Plaintiffs … expressly exclude from this count any allegations of fraud or reckless or intentional misconduct"); ¶ 415 (Count Five: "Plaintiffs … expressly exclude from this count any allegations of fraud or intentional misconduct.").

Many of the defendants allege that the plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act actually do sound in fraud, though, and should therefore be subjected to the heightened pleading requirements of Rule 9(b) and the PSLRA. Teva Finance Mot. to Dism., Doc. No. 239-1 at 15. They argue that the plaintiffs claim, either in the express allegations of the counts or through reference to other sections of the complaint, that the defendants made "false

and misleading statements", and also use words like "fraud" and "untrue", and, therefore the claims actually sound in fraud. *Id.* at 17. Further, they argue that the plaintiffs' "Securities Act claims are based on the very same alleged conduct and the very same statements as the Exchange Act claims" and the complaint tries to "obscure the similarity" by separating the two claims. *Id.* at 17.

It is true that when "the sole allegations supporting the falsity element of the Section 11 and Section 12(a)(2) claims are inextricably intertwined with the allegations underlying plaintiffs' fraud claims," the Section 11 and Section 12(a)(2) claims sound in fraud. *In re Axis Capital Holdings Ltd. Securities Litigation*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) (citation omitted). Further, "[i]t is well-established that … a boilerplate disclaimer is not enough to make out a claim for negligence." *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *11 n.10 (S.D.N.Y. Sept. 30, 2008) (internal quotation marks omitted); *In re Ultrafem Inc. Securities Litigation*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) ("boilerplate disclaimer is not enough to make out a claim for negligence, and, therefore Rule 9(b) applies to the Section 11, 12(a)(2), and Section 15 claims[.]").

Here, it seems that the plaintiffs have attempted to use boilerplate language to remove their Section 11, 12(a)(2), and 15 claims from Rule 9(b)'s heightened pleading standards. Accordingly, Counts Three through Five should be subjected to the same standard as Counts One and Two. If the plaintiffs' Securities Act claims sound in fraud, because they are identical to the Exchange Act claims, Plaintiffs have met the Rule 9(b) and PSLRA particularity standard for the reasons stated above. Even if not, however, the plaintiffs, by virtue of meeting the higher standard, have also met any lower standard applicable to the Securities Act claims that sound in negligence. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145,

157 (2d Cir. 2012) (the provisions of sections 11 and 12(a) "place[] a relatively minimal burden on a plaintiff" (internal quotation marks omitted)).  Accordingly, whether these counts sound in fraud or negligence, the plaintiffs have complied with the pleading standards applicable to their Securities Act claims.

    B.  <u>Sufficiency of the '34 Act (Exchange Act) Allegations</u>

       1.  *Count One: Section 10(b) and Rule 10b-5*

The plaintiffs bring Count One of the Complaint against the '34 Act Defendants for violations of Section 10(b) and Rule 10b-5 for various alleged misrepresentations and omissions made during the class period.  Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), states, in pertinent part:

> It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d. Cir. 1999).  Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange [in connection with the purchase or sale of any security], (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. "Section 10b-5 operates as a broad prohibition against manipulation, whether in the form of false statements or market manipulation." *In re MF Global Holdings*, 982 F. Supp. 2d at 303. "To state a claim for misrepresentations or omissions, a plaintiff must allege that the defendant '(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" *Id.* (*quoting ATSI Communications*, 492 F.3d at 105).

The '34 Act Defendants move to dismiss Count One on multiple grounds: (1) the plaintiffs failed to plead their allegations with particularity, as required by the PSLRA and Rule 9(b)[5]; (2) the plaintiffs failed to identify any actionable statement or omission of material fact; (3) the plaintiffs failed to adequately plead scienter; and (4) the plaintiffs failed to adequately plead loss causation. '34 Act Def. Mot. to Dism., Doc. No. 238-1.

   a.   Did the plaintiffs fail to identify any actionable statement or omission of material fact?

The plaintiffs allege that the complaint sets out a deviation between what was said and what was done "in particularized detail, as Defendants' outright untrue statements unfolded in a variety of different yet wholly consistent falsehoods" and the complaint "alleges two independently sufficient bases for violations of the Exchange Act's antifraud provisions." Opp. to '34 Act Mot. to Dism., Doc. No. 244 at 1 (internal quotation marks omitted). First, the plaintiffs allege that the defendants "made categorically false statements that Teva's rapid turnaround and $1 billion improvement in generic profit margin was not driven by price increases" when, in fact, the defendants "implemented 76 price increases on 60 different drugs

---

[5] The Rule 9(b) issue has been addressed above.

from July 2013 to April 2016" which led to "over $2.3 billion in [i]nflated [p]rofits." *Id.*

(internal quotation marks omitted). The plaintiffs argue that "SEC regulations required [the

d]efendants to disclose the impact of th[o]se price increases, [but] they instead denied any price

hikes existed." *Id.* at 2. Second, the plaintiffs allege that the complaint "independently

establishes through Lead Counsel's investigation that Defendants were engaged in an industry-

wide conspiracy to fix prices and allocate markets with respect to a subset of 16 Teva drugs"

which is "more than parallel pricing." *Id.* The '34 Act Defendants allege that the plaintiffs

failed to identify any misleading statements or omission of material fact and, therefore, the

complaint should be dismissed in its entirety with prejudice.

The PSLRA requires that a complaint "specify each statement alleged to have been

misleading, the reason or reasons why a statement is misleading, and, in an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Rule 10b-5

requires an actual *statement*, one that is either untrue outright or misleading by virtue of what it

omits to state. Absent an actual statement, a complete failure to make a statement—in other

words, a pure omission—is actionable under the securities laws only when the corporation is

subject to a duty to disclose the omitted facts." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d

223, 239 (2d Cir. 2016) (emphasis in original) (internal citations and quotation marks omitted).

"And in and of themselves, [section] 10(b) and Rule 10b-5 do not create an affirmative duty to

disclose any and all material information…. No such duty arises merely because a reasonable

investor would very much like to know that information." *Id.* (internal citations and quotation

marks omitted). Half-truths, "statements that are misleading by omission", are actionable in

securities law. *Id.* at 239-40.

"To determine whether a misstatement or omission is material is an inherently fact-specific inquiry." *Hutchison v. Deutshe Bank Securities Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (internal quotation marks omitted). "A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]…. That is to say there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal citations and quotation marks omitted). Materiality is a mixed question of fact and law and, therefore, "a complaint may not properly be dismissed … on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted). However, "materiality allegations in securities fraud complaints must nevertheless comply with the particularity requirements of [Rule 9(b)] and the PSLRA; the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion." *In re Axis*, 456 F. Supp. 2d at 585 (internal quotations omitted).

As aforementioned, there are three types of statements, or lack thereof, that the plaintiffs allege are actionable: (1) defendants' statements that Teva's success was not because of pricing and price increases, which were themselves misleading and, also, half-truths because the defendants failed to disclose that they were involved in price-hiking; (2) defendants' statements that Teva was engaged in stiff competition in the generics market, which were themselves misleading and, also, half-truths because the defendants failed to disclose that they were involved in a collusive agreement with its competitors to raise prices in tandem; and (3)

defendants' failure to disclose the receipt of the DOJ and state Attorney General subpoenas, which relate, at least in part, to both of the other alleged categories of misstatements/omissions.

The '34 Act Defendants allege that the plaintiffs failed to identify any misleading statement of material fact because all of the statements identified by the plaintiffs fall into one of the following three exceptions: (1) they were accurate statements of historical fact; (2) they were forward-looking statements that fall within PSLRA's safe harbor; and/or (3) they were vague and indefinite statements of optimism and, therefore, immaterial. Further, the '34 Act Defendants allege that the plaintiffs failed to identify any actionable omissions of material fact because all of the omissions identified by the plaintiffs fall into one of the following exceptions: (1) Teva had no duty to disclose the details of its pricing strategies; (2) none of the statements was so incomplete as to mislead; (3) Teva had no duty to disclose its receipt of government subpoenas; and (4) the plaintiffs failed to plead a strategy of systematic price increases. *See* Mem. in Supp. '34 Act Mot. to Dism., Doc. No. 238-1.

### i. Statements and Omissions about Competition

In the complaint, the plaintiffs allege that the defendants "made materially false and misleading statements concerning purported 'intense' or 'fierce' competition on price in the U.S. market for generic drugs" on conference calls and in SEC filings. Compl., Doc. No. 226 at ¶ 164; *see also id.* at ¶¶ 164-71. The plaintiffs allege that the defendants' statements about competition were "materially false and misleading because Teva was not in fact competing on price" but was, instead, raising the prices of its generic drugs "in tandem" with its competitors. *Id*. at ¶ 165. The defendants allege that the plaintiffs' competition claims fail because the plaintiffs "do not even attempt to 'specifically' plead any anticompetitive price-fixing[.]" '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 33. Further, the defendants allege that even if the anti-

competition allegation were adequately pled, "the alleged omission does not render misleading the challenged statements about competition in the generic drug industry generally." *Id*. at 34.

The plaintiffs in *In re Sotheby's* sued for violations of Section 10(b), Rule 10b-5, and Section 20(a) alleging that Sotheby's and its main competitor, Christie's, were colluding in an illegal price-fixing scheme, for which both were investigated by the Department of Justice. 2000 WL 1234601, at *2 (S.D.N.Y. Aug. 31, 2000). The plaintiffs alleged that the defendants "made a number of false or misleading affirmative statements in public filings and in press releases—as to the level of competition in the industry and the reasons for Sotheby's growth in revenues and earnings—that triggered the requirement to disclose the illegal conduct." *Id*., at *4. The court agreed and denied the motions to dismiss stating:

> The Complaint alleges that defendants' statements in Sotheby's Annual Reports on Form 10-K that there was 'intense' competition with its 'primary auction competitor,' Christie's, and that the amount of commission proposed by auction houses was a factor in the decision made by a seller of Auction items, were false and misleading because the price-fixing agreement between Sotheby's and Christie's had eliminated price competition between the two houses. A jury could conclude that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price.

*Id*. The court held that Sotheby's was under a duty to disclose because it had made a disclosure and, therefore, had a "duty to make it complete and accurate." *Id*. (internal quotation marks omitted).

The strength of *In re Sotheby's* was diminished by *In re Axis*, 456 F. Supp. 2d 576, in which the court held that the statements made by defendants "referencing its 'competitive strengths' or stating that the insurance and reinsurance industries were 'highly competitive' [were] far more innocuous than Sotheby's disclosures which were directly contradicted by specific allegations of a price-fixing conspiracy between companies that accounted for 95% of the market." *Id.* at 589. "If the complaint fails to allege facts which would establish such an

illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed." *Id.* at 585 (emphasis in original). The court in *In re Axis* dismissed the complaint, in part, because the plaintiffs were

> unable to allege in other than conclusory terms *how* AXIS's statements were rendered false because they are unable to allege *how* AXIS engaged in the alleged scheme to drive other insurance companies from the market. Plaintiffs cannot parrot allegations made in the AG complaint against [defendant] and other insurance companies … to establish a factual predicate for AXIS's misuse of contingent commission agreements, and then allege that AXIS's statement as to its 'competitive strengths' should be read as a misrepresentation of some unspecified anticompetitive conduct.

*Id.* (emphasis in original).

The Southern District of New York recently held that allegations about a price-fixing conspiracy in the generic drug industry, similar to the allegations here, were sufficiently pled. *Speakes v. Taro Pharmaceutical Industries, Ltd.*, 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018). The complaint alleged that various officials from the defendant company, "who had the authority to, and did, cause pricing changes", attended trade association meetings and, shortly thereafter, the prices of their drugs increased, and the prices of their competitors' drugs similarly increased after that. *Id.* at *2. The allegations about price increases were also corroborated by confidential witnesses. *Id.* "Generally, [d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing…. However, the failure to disclose uncharged criminal conduct may be actionable where the failure to do so would make other disclosures materially misleading." *Taro Pharmaceuticals*, 2018 WL 4572987, at *4 (internal citations and quotation marks omitted). "Where a complaint concerns allegations of anti-competitive conduct, mere evidence of parallel price movements does not suffice to make out a claim…. Rather, 'a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve

to allow a fact-finder to infer a conspiracy.'" *Id.* (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)). Plus factors can be shown through direct or circumstantial evidence, *id.*, and circumstantial evidence includes "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communication." *Apple, Inc.*, 791 F.3d at 315.

Here, the plaintiffs do not allege direct evidence of a price-fixing conspiracy, but premise their allegations "upon parallel price movements for the drugs at issue over a short period of time, combined with certain factors that tend to indicate price-fixing." *Taro Pharmaceuticals*, 2018 WL 4572987, at *4. The plaintiffs allege that the defendants engaged in parallel price increases with their competitors 48 times. *See* Compl., Doc. No. 226 at ¶¶ 15, 165, 288. The plaintiffs further allege that high-level officials attended various industry meetings and trade shows "that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts" and occurred "in close proximity to price increases that Teva and/or another manufacturer implemented on the Collusive Drugs." *Id.* at ¶ 296. The plaintiffs allege that "representatives of at least one other manufacturer – and typically many more – also attended the conferences. *Id.*; *see also* App. C to Compl. Further, the plaintiffs allege that at the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores, "Teva reserved a 'strategic exchange' bungalow" which offered "'opportunities to meet and discuss strategic issues with key trading partners.'" *Id.* at ¶ 297. The plaintiffs allege that Teva "paid for a secluded area where its personnel could meet privately with others, including other manufacturers." *Id.*

Courts in this Circuit have determined that similar allegations were sufficient to survive a motion to dismiss, even under the heightened Rule 9(b) and PSLRA standards. *See Taro Pharmaceuticals*, 2018 WL 4572987 (price-fixing scheme adequately plead with respect to seven of the defendants' drugs where plaintiffs alleged parallel pricing and attendance at market conferences); *In re Mylan N.V. Securities Litigation*, 2018 WL 1595985 (S.D.N.Y. 2018) (price-fixing scheme was adequately pled where complaint referenced anti-competitive agreements as well as DOJ and Attorney General investigations). Viewing the allegations in the light most favorable to the plaintiffs, the complaint has adequately pled a price-fixing scheme. The plaintiffs allege that there were dozens of parallel price increases, which certainly satisfies the first portion of the test. They also allege that Teva representatives, who had control over pricing, attended industry conferences and met with other pharmaceutical company representatives and, shortly thereafter, both Teva and its competitors raised prices.

"To the extent that [Teva] engaged in a price-fixing conspiracy with their competitors, statements that the industry was, for example, 'intensely competitive[,]' are 'misleading in the absence of a disclosure of that anticompetitive conduct.'" *Taro Pharmaceuticals*, 2018 WL 4572987, at *6 (quoting *In re Mylan*, 2018 WL 1595985, at *7). Teva representatives made statements about competition on conference calls, such as: "the generic market is very competitive", Compl., at ¶ 166; "[w]e believe in competition, and we'll do what is needed in order to win in all the markets we operate", *id.* at ¶ 167; "pricing is obviously based on competition", *id*. at ¶ 168; "there are [not] many examples for competitive environment, real competition, like we see in generic market in the United States", *id.* at ¶ 169; "it is a highly competitive environment … [and] we're playing a competitive game [and w]e're playing it fairly. We of course play by the book and by the rule", *id*.; "we are in short playing in a very

competitive market." *Id*. Further, in its SEC filings, Teva stated that its "generic drugs face[d] intense competition" and that it "ha[d] a focused and competition pricing strategy." *Id*. at ¶ 171. The plaintiffs allege those statements are all misleading and false because Teva was, in fact, not engaged in competition with other firms in the industry.

The plaintiffs have adequately pled that Teva's statements regarding competition, and lack thereof, are actionable misleading statements and/or omissions. "A duty to disclose arises whenever secret information renders prior public statements materially misleading[.]" *In re Time Warner Securities Litigation*, 9 F.3d 259, 268 (2d Cir. 1993). "[E]ven though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Securities Litigation*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990); *see also In re Mylan*, 2018 WL 1595985, at *7; *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005) (comments that pricing market was "tight" and subject to "pressure", where defendant was engaged in anti-competitive conduct, gave rise to a duty to disclose).

In sum, the material differences between what Teva was doing regarding competition and what it was saying about competition were misleading and "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," and, therefore, those statements and omissions are actionable at the motion to dismiss stage. *In re Int'l Bus. Machines Corporate Securities Litigation*, 163 F.3d 102, 106-07 (2d Cir. 1998) (internal quotation marks omitted). At the very least, the misstatements and omissions about competition are not "so obviously unimportant to a reasonable investor that reasonable minds

could not differ on the question of their importance." *Menkes*, 2005 WL 3050970, at *6 (internal quotation marks omitted).

ii. <u>Statements and Omissions about Pricing</u>

In the complaint, the plaintiffs allege a number of different types of statements and omissions that related to Teva's pricing structure. First, the plaintiffs allege that the defendants were under a duty to disclose, pursuant to Item 5 of SEC Form 20-F, the price-hike strategy and its ultimate failure. Compl., Doc. No. 226, ¶¶ 157-63. Second, the plaintiffs allege that the defendants "made numerous statements to conceal their Price-Hike Strategy and its effects" on conference calls with investors, analysts, and the media and in various financial disclosures. *Id.* at ¶ 172; *see also id.* at ¶¶ 172-237. With respect to Item 5, the plaintiffs allege that the '34 Act defendants were under a statutory duty to disclose the pricing trends, namely the price-hike strategy and its ultimate failure, in its filing of Form 20-F. Compl., Doc. No. 226 at ¶ 157. The plaintiffs allege that, contrary to their duty to disclose, the '34 Act defendants "only disclosed trends that did not bear on the issue of price inflation (through price increases), or price erosion." *Id.* at ¶ 163. During the relevant time period, from 2012 to 2016, Teva yearly filed Form 20-F. *See* Ex. 14-18 to '34 Act Def. Mot to Dism., Doc. No. 238-16-238-20.

In addition to Item 5, the plaintiffs allege that the '34 Act defendants "made numerous statements to conceal their Price-Hike Strategy and its effects" in SEC filings and on conference calls. Compl., Doc. No. 226 at ¶ 172. In various press releases, conference calls, and financial disclosures, the defendants attributed positive financial results primarily to reasons other than the price-hike strategy: "exclusive launches" and "higher sales" of drugs, *id.* at ¶ 174; "change in composition of revenues in the [U.S.] and Europe" from product launches, *id.* at ¶ 178; "significant reduction in selling and marketing expenses", *id.* at ¶¶ 178, 179, 182; "new product

launches", *id*.; "lower … expenses", *id*. at ¶ 188, 189, 192, 195; "portfolio mix, new products, and efficiency measures", *id*. at ¶ 210; "improvement in cost of goods sold", "consolidation of plants", and "portfolio selection and cost infrastructure", *id*. at ¶ 213; and "portfolio optimization", *id*. at ¶ 218, 219.

Further, Teva officials routinely expressly denied that pricing had much of an effect on profits, even when asked by investors and analysts. *See id.* at ¶ 184 ("there's never a price increase on the base business as a whole"); *id*. at ¶ 186 ("I have to disagree that [generics has] experienced tremendous price increase[s] … the pricing in the U.S. of generics has been flat to a slight down"); *id*. at ¶ 198 ("the improvement … is not driven by price[; i]t is driven by quantities and by mix and efficiency measures[, n]ot by price … and that's a very important message"); *id*. at ¶ 199 ("overall on our whole portfolio, we have a decline in price … 95% of our portfolio is declining"); *id*. at ¶ 201 ("[Teva's] exposure to [pricing pressure] is very minimal … and Teva was not associated with any of that … we believe that our exposure to any initiative on price reduction in the United States is as small as anybody could have"); *id*. at ¶ 205 ("there is a slight decrease in [generics] pricing … because on 95% of our portfolio, we experience price decline"); *id*. at ¶ 210 ($1 billion improvement "[n]ot [achieved] by profit"); *id*. at ¶ 211 ("we and the generic industry overall don't see price inflation of generics … we saw a mid-single-digit price decline"); *id*. at ¶ 214 ("the pricing hasn't changed that much … [i]nflation never really happened in the generic business").

When profits started to decline, Teva officials continued to disclaim that pricing was the reason, even though the plaintiffs allege that the decline in profits was due to the failing of the price-hike strategy. Instead, Teva attributed the decline to other factors: "higher … expenses", *id*. at ¶ 216, 225; "exclusive launch" of different drugs, *id*. at ¶ 217; "loss of exclusivity" on

certain products, *id*. at ¶ 225, 232; "increased competition", *id*.; and "instability in the market", *id*. at ¶ 234. As with profit increases, Teva officials routinely and expressly denied that pricing had anything to do with the decline in profits. *See id*. at ¶ 218 ("Teva has not seen any fundamental change or worsening in the pricing environment"); *id*. ("[t]here is no change in the pricing environment"); *id*. at ¶ 220 ("[t]here's nothing I have seen which shows a worsening pricing environment"); *id*. at ¶ 222 ("[t]he pricing has remained stable"); *id*. at ¶ 226 ("the pricing is stable"); *id*. at ¶ 228 ("there's no pressure on prices"); *id*. at ¶ 233 ("there hasn't been any fundamental change in the US drug pricing"). The plaintiffs allege that all of those statements were misleading, false, and/or half-truths because the real reason, or at least a substantial reason, for the increase, and ultimate decrease, in profits was because of the concealed price-hike strategy, and its ultimate failure.

The '34 Act defendants argue that they were not under a duty to disclose pricing information on Item 5 because pricing plans falls outside of Item 5 disclosure. '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 23. With respect to the other alleged misleading statements and omissions about pricing, the defendants allege that the statements were not incomplete, and are not actionable because they were all accurate, optimistic, and/or puffery. The plaintiffs adequately alleged a price-hike strategy that strongly impacted Teva's profits and, therefore, Teva's comments on its revenue in which it neglected to include pricing as a factor, or expressly denied it as a factor, were misleading and, therefore, actionable.

Statements or omissions are actionable under securities laws if the statement is "untrue outright", *In re Vivendi*, 838 F.3d at 239; when there is a duty to disclose pursuant to a statute or regulation, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015), or when there is no statutory or regulatory duty to disclose, but where a company has a "duty to tell the whole

truth", *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014), because it spoke on an issue or topic and have made omissions that lead to a "material misleading impression", *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011).

(i) Item 5

The plaintiffs allege that defendants were under a statutory and regulatory duty to disclose the pricing information on Item 5 of Form 20-F. Item 5 requires disclosure of "trends already known and existing" at the time of a public offering. *Johnson v. Sequans Communications S.A.*, 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013) (internal quotation marks omitted). Although Item 303 of Regulation S-K does not apply to Teva, the SEC and courts have interpreted Item 303 and Item 5 to require the same disclosures. *See Johnson*, 2013 WL 214297, at *11; Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8350, Exchange Act Release No. 48960, 81 S.E.C. Docket 2905, 2003 WL 22996757, at *1 n.1 (Dec. 19, 2003) (Item 5 of Form 20-F requires "the same disclosures as Item 303 of Regulation S-K").

Item 303 requires a company to "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and to "describe any other significant components of revenues or expenses that … should be described in order to understand the … results of operations." 20 C.F.R. § 229.303(a)(3)(i). In addition, it requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Further, if financial statements "disclose material increases in net

sales or revenues," the company must "provide a narrative discussion of the extent to which such increases are attributable to increases in prices[.]" 17 C.F.R. § 229.303(a)(3)(iii). The regulations require that registrants reveal the impact of "changing prices" and "known … price increases" on sales. 17 C.F.R. §§ 229.303(a)(3)(iv), (ii).

Although price increases are required disclosures, "management decisions such as pricing plans properly fall outside of [Item 303] disclosure." *In re Canandaigua Securities Litigation*, 944 F. Supp. 1202, 1210 (S.D.N.Y. 1996). "There is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans…. [T]he latter are competitive business judgments that management makes to improve the business, and need not be disclosed." *Id.* at 1210-11. The Second Circuit has expressed "concern[] … about interpreting the securities laws to force companies to give their competitors advance notice of sensitive pricing information." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 810 (2d Cir. 1996); *see also In re Canandaigua*, 944 F. Supp. at 1211 ("[C]ourts have been sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information.").

In a case similar to this one, the Southern District of New York found that the defendants "failed to disclose the sources of their price changes and revenue" pursuant to Item 5, when they were engaged in a price-fixing conspiracy. *Taro Pharmaceutical*, 2018 WL 4572987, at *7. There, the court found that many of the challenged statements were "nothing more than a narrative restatement of accurate financial reporting", but "certain other of the [defendants'] statements sufficiently place[d] the reasons for sources of [the defendants'] growth at issue to make further disclosure necessary." *Id.* With respect to Item 5, the court found that the

"underlying price-fixing conspiracy [was] sufficiently alleged to have been 'known to management' at the time, and 'reasonably likely to have material effects on [the defendant's] financial conditions or results of operations." *Id*. The court held, therefore, that the alleged misrepresentations and omissions relating to Item 5 were actionable. *Id*. at *8.

The plaintiffs allege that the price-based profits were "often the entire reason for growth; and the price increases often comprised the entirety of the change in generic segment profits throughout 2014 and 2015." Opp. to '34 Act Def. Mot. to Dism., Doc. No. 244 at 32. Accepting the plaintiffs' allegations as true, the priced-based profits are subject to disclosure pursuant to the regulations, which require that registrants reveal the impact of "changing prices" and "known … price increases" on sales. 17 C.F.R. §§ 229.303(a)(3)(iv), (ii). Moreover, the defendants' statements that their profits were not connected to pricing of the generic drugs but lower expenses, were misleading and, therefore, actionable. Thus, the plaintiffs have adequately pled that the defendants were under a regulatory duty to disclose in Item 5 the pricing trends, and failed to do so.

### (ii) Other Statements/Omissions

With respect to the other alleged misstatements and omissions, on conference calls and in financial disclosures and press releases, the plaintiffs allege that the statements were either untrue outright, or the defendants were under a duty to tell the whole truth about the pricing landscape. It is possible for statements to be actionable even if each one does not "repeat the precise same refrain." *In re Vivendi*, 838 F.3d at 250. "It would be perverse if companies could escape liability for securities fraud claims by disseminating a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie." *Id*. The plaintiffs allege that Teva officers adopted and implemented the price-hike strategy

"to systematically increase prices across dozens of drugs in its generics drugs" in order to increase revenue, but they kept it concealed because it was "inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution." Compl., Doc. No. 226 at ¶ 40. The strategy was unsustainable and risky because "the U.S. generic drug market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable, and identical in every respect, except for price." *Id*. The plaintiffs allege that this strategy to raise prices was consistently the main, if not sole, reason for Teva's quarter-to-quarter, and year-to-year, profit increase. As mentioned, the plaintiffs have adequately alleged a price-hike strategy that would require the defendants to disclose the source of its profits. The misstatements and omissions attributing the profit increases and decreases to things other than pricing were half-truths, ones that gave rise to a duty to disclose the whole truth. There were material differences between what Teva was doing regarding pricing and what it was saying about pricing, making the statements misleading; those statements "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," and, therefore, are actionable. *In re Int'l Bus. Machines*, 163 F.3d at 106-07 (internal quotation marks omitted). At the very least, the misstatements and omissions about competition are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Menkes*, 2005 WL 3050970, at *6 (internal quotation marks omitted).

The '34 Act Defendants' argument that the statements about their profit increases and decreases were "statements of historical fact" and therefore not actionable is unavailing. *See* '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 16. They argue that the plaintiffs "base their claims on factual statements of earnings and growth drawn from every quarterly and annual

announcement of financial results[.]" *Id.* at 28. Although it is true that "[d]efendants may not be held liable under the securities laws for accurate reports of past successes", *In re Nokia Oyj (Nokia Corp.) Securities Litigation*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006), a defendant is still under a duty to disclose additional information in order to complete statements that would otherwise be "misleading by omission." *In re Vivendi*, 838 F.3d at 239-40. The defendants may well be right that some of their profit increases and decreases were a result of the factors that they addressed in their statements, such as portfolio optimization and decreased costs, and, therefore, those are indeed accurate statements of historical fact. The plaintiffs allege, however, that the defendants' statements were not entirely accurate because they neglected to include another significant factor, the pricing of the drugs, generally, and the price-hike strategy, more specifically. The plaintiffs have adequately alleged that the statements were only partially accurate because of what was omitted, and the defendants cannot avoid potential liability on the basis of the technically correct portion of a half-truth.

Further, the defendants' argument that the statements fall within PSLRA's safe harbor is also unavailing. *See* '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 18. The defendants argue that their financial guidance to investors on July 13, 2016 and January 6, 2017, in which representatives stated that they assume similar profit growth in the future, is not actionable pursuant to the safe harbor. *See id.*; *see also* Compl., Doc. No. 226 at ¶¶ 222, 235. "[A] defendant is not liable [for misstatements or omissions] if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial[.]" *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). "[A] forward-looking statement is one that contains a projection of income or earnings, or one of future economic performance." *In re WEBMD Health Corp. Securities Litigation*, 2013 WL 64511, at *5 (S.D.N.Y. 2013) (internal

quotation marks omitted). In the challenged statements, however, the defendants not only discussed future projections but also past performance, which did not include pricing as a factor. *See, e.g.*, Compl., Doc. No. 226 at ¶ 222 ("we saw no change in the pricing [in the second quarter] … the pricing has remained stable"). The plaintiffs challenge the statements because, at the time the statements were made, Teva was "experiencing a drastic decline in inflated profit" that affected their revenue for the quarter. *Id.* "[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." *In re Vivendi*, 838 F.3d 223 at 246 (internal quotation marks omitted). The fact that the defendants also made forward-looking statements does not change the fact that their statements about the past were misleading. Accordingly, the non-forward-looking elements of those statements, as already mentioned, are actionable on the basis of the failure to include pricing as a factor in Teva's financial results.

Lastly, the defendants' argument that the challenged statements and omissions are "vague and indefinite statements of optimism" and "puffery" is also unavailing. *See* '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 20. The defendants allege that the following types of statements are inactionable puffery: "we believe in competition, and we'll do what is needed in order to win in all the markets we operate"; "we believe we have a focused and competitive pricing strategy"; "we have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space"; and "one of our greatest priorities has been to increase the profitability of our generics business [and] … we have been able to improve significantly the margins of Teva's standalone generics business." *Id.* at 21. "Puffery encompasses statements [that] are too general to cause a reasonable investor to rely upon them … and thus cannot have misled a reasonable investor." *In re Vivendi*, 838 F.3d at 245 (internal citations and quotation

marks omitted). "They are statements that lack the sort of definite positive projections that might require later correction." *Id.* (internal quotation marks omitted). Puffery, however, depends on the context of the statement. *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443 (S.D.N.Y. 2018). With respect to the statements about "believ[ing] in competition", the defendants also stated at the same time that they were facing "fierce competition", which, as aforementioned, was actionable given the lack of competition in the market. *See* Compl., Doc. No. 226 at ¶¶ 167, 171. Accordingly, in context with the defendants' other actionable statements and omissions, those challenged statements are not those which were "too general" to mislead a reasonable investor. *In re Vivendi*, 838 F.3d at 245.

In sum, the plaintiffs adequately allege that the defendants participated in a price-hike strategy which had a substantial effect, both positive and negative, on Teva's financial picture. Teva's statements in which it completely attributed its financial success, or lack thereof, to other factors and/or expressly discounted that price played a part, were misleading because they omitted information that was necessary to make the statement complete.

### iii. Failure to Disclose Subpoenas

In the complaint, the plaintiffs allege that the defendants "concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State [Attorney General] on July 12, 2016" and allege that Teva should have disclosed those facts in the Notes Offering Materials because "the subpoenas called into question Teva's future earnings potential." Compl., Doc. No. 226 at ¶¶ 238-39. The defendants argue that they had no duty to disclose the two subpoenas and, even so, they disclosed the two subpoenas when it made its next quarterly statement and, therefore, the plaintiffs cannot assert that Teva's "prompt disclosure was somehow not prompt enough." '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 36-37.

Teva received a subpoena from the DOJ on June 21, 2016 and received a second one on July 12, 2016 from the Connecticut Attorney General.  Compl., Doc. No. 226 at ¶ 122.  On July 18, 2016, Teva launched its bond offering and did not disclose the subpoenas in the Notes Offering Materials.  *Id*. at ¶ 127.  Teva disclosed the subpoenas on August 4, 2016 when it announced its financial results from the second quarter of 2016.  *Id*. at ¶ 128.

The defendants are correct that they were not under a duty to disclose the subpoenas and, therefore, any claims arising from their alleged concealment fail.  The duty to disclose is not a "rite of confession," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 183 (2d Cir. 2014), and "[t]he federal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc*., 165 F. App'x 928 (2d Cir. 2006); *see also In re Am. Express Co Shareholder Litig*., 840 F. Supp. 260, 269-70 (S.D.N.Y. 1993) (company not required to "accuse itself of antisocial or illegal policies" (*quoting GAF Corp. v. Heyman*, 724 F. 2d. 727, 740 (2d Cir. 1983)); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement.").

Additionally, "securities laws do not impose an obligation on a company to predict the outcome of investigations."  *In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (finding that Wells Notices and SEC subpoenas did not give rise to a duty to disclose because "[t]here is no duty to disclose litigation that is not 'substantially certain to occur'").  "[A] government investigation, without more, does not trigger a generalized duty to disclose."  *Id.*; *see also In re UBS Securities Litigation*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or

mismanagement" (internal quotation marks omitted)), *aff'd sub nom, City of Pontiac*, 752 F.3d 173.  Further, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).  The receipt of the subpoenas, in and of themselves, did not trigger the defendants' duty to disclose.  Even so, the defendants disclosed the subpoenas in their next filing, a mere two months after their receipt.  Accordingly, the plaintiffs have not adequately pled that the defendants had a duty to disclose the subpoenas.

       b.   Did the plaintiffs fail to plead scienter?

The defendants allege that the plaintiffs fail to adequately plead scienter for purposes of section 10(b) because: (1) plaintiffs' motive and opportunity allegations do not support a strong inference of scienter; (2) plaintiffs failed to plead specific facts establishing strong circumstantial evidence of scienter; (3) plaintiffs' recycled antitrust allegations do not raise an inference of scienter; and (4) the opposing inferences of nonfraudulent intent are more plausible than any inference of fraud.  '34 Act Def. Mot. to Dism., Doc. No. 238-1 at ii.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  "When pleading scienter, with respect to each act or omission alleged to violate the securities law, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Sotheby's*, 2000 WL 1234601, at * 6.  "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate, or defraud." *Taro Pharmaceuticals*, 2018 WL 4572987, at *8 (internal quotation marks omitted).  In order to satisfy that scienter requirement, a plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness." *ATSI Communications*, 492 F.3d at 99; *see also In re Sotheby's*, 2000 WL 1234601, at * 6. "In evaluating whether either of [those] showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Taro Pharmaceuticals*, 2018 WL 4572987, at * 8 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

Additionally, "in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *ATSI*, 492 F.3d at 99 (citing *Tellabs, Inc.,* 551 U.S. 308) (internal quotation marks omitted). For an inference of scienter to be "strong," "a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis in original) (internal quotation marks omitted). "[A]t a motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). "The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322-23 (emphasis in original).

i.  Motive and Opportunity Scienter

The defendants argue first that the plaintiffs did not adequately plead motive and opportunity scienter. The plaintiffs argue that the $40 billion acquisition was motive to commit the fraud, the price-hiking strategy and the price-fixing conspiracy. Opp. to 34 Def. Mot. to Dism., Doc. No. 244 at 29.

"To plead facts supporting a strong inference of the requisite scienter by showing motive and opportunity, a plaintiff must allege facts showing concrete benefits that could be realized by one or more false statements and wrongful disclosures alleged, and the means and likely prospect of achieving the concrete benefits by the means alleged." *In re Sotheby's*, 2000 WL 1234601, at * 6 (internal quotation marks omitted). "A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant 'benefitted in some concrete and personal way from the purported fraud.'" *In re MF Global Holdings*, 982 F. Supp. 2d at 304-05 (*quoting Novak*, 216 F.3d at 207-08)). In pleading *opportunity*, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'" *In re Take-Two Interactive Securities Litigation*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. Apr. 16, 2008) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). "The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." *In re MF Global Holdings*, 982 F. Supp. 2d at 306. Here, the defendants are Teva and its corporate officers. Accordingly, opportunity is presumed to have been met. The question in this prong of scienter, then, is whether *motive* has been met.

In pleading *motive*, a plaintiff must plead something more than just a motive that is common to most corporate officers, because that is insufficient to constitute motive for the purposes of scienter. *In re MF Global Holdings*, 982 F. Supp. 2d at 304-05; *ECA & Local 134*, 552 F.3d at 198. "Examples of general motives which fail to support a strong inference of scienter include '(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation.'" *In re MF Global Holdings*, 982 F. Supp. 2d at 306 (*quoting Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). It is not enough for a

plaintiff to plead a compilation of general motives in order to give rise to a strong inference of scienter. *In re Carter-Wallace, Inc. Securities Litigation*, 199 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one … specific motive"), *aff'd*, 220 F.3d 36 (2d Cir. 2000).

"[I]n some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). Courts have diverged on whether "inflated stock price may at times be sufficiently specific support for an allegation of scienter … and the analysis is a highly fact-intensive one." *In re Complete Management Inc. Securities Litigation*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001). "The question turns … on the concreteness of the allegations; a generalized desire to maintain a higher stock price will not rise to the level of motive for these purposes. However, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." *Id.* at 328 (finding that inflating stock price to use as currency was "sufficiently concrete motive"); *see also In re Omnicom Group, Inc. Secs. Litig.*, 2005 WL 735937, at *13 (S.D.N.Y. Mar. 30, 2005) (complaint sufficiently alleged motive where it alleged that Omnicom "acquired hundreds of companies, which it paid for, in large part, through the issuance of common stock" (internal quotation marks omitted)); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. Nov. 3, 2003) (complaint sufficiently alleged motive where it alleged that the defendants "were motivated to commit fraud so they could acquire and continue acquiring [three] companies … by using its artificially inflated stock and ADSs as currency"). Here, the plaintiffs more than adequately pled that the defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency to acquire Actavis. The plaintiffs support their allegations with the representations by

Desheh, and later Vigodman, that Teva stock price would increase in such a way to allow for its use as currency to fund transactions, Compl., Doc. No. 226 at ¶¶ 7, 35, 50, which is likely enough to sustain an allegation of motive and opportunity scienter. In any event, as discussed below, the plaintiffs have also adequately pled circumstantial evidence of conscious misbehavior or recklessness.

ii. Circumstantial Evidence of Conscious Misbehavior or Recklessness

The second way a plaintiff can adequately plead scienter is by pleading facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications*, 492 F.3d at 99. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant[s], though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). "A plaintiff may sufficiently plead conscious misbehavior through allegations of deliberate illegal conduct." *In re Sotheby's*, 2000 WL 1234601, at * 6. "A plaintiff pleading the conscious misbehavior or recklessness theory of scienter must allege conduct which is 'highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re MF Global Holdings*, 982 F. Supp. 2d at 306 (*quoting Kalnit*, 264 F.3d at 142). "[A] complaint sufficiently pleads scienter where it alleges defendants had 'knowledge of facts or access to information contradicting their public statements.'" *Id.* (*quoting Kalnit*, 264 F.3d at 142). "Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or

(2) failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id*. (internal quotation marks omitted).

"Where plaintiffs contend [a] defendant[] had access to contrary facts, they must specifically identify the reports or statements containing this information." *In re Sotheby's*, 2000 WL 1234601, at * 6 (internal quotation marks omitted). The court in *In re Sotheby's* held that the complaint sufficiently pled a strong inference of fraudulent intent of two of the defendants because the complaint alleged that they were "directly involved in arranging the illegal price-fixing agreement, and that each of them signed 10-Ks that, in light of the illegal agreement, they knew were false and misleading. Allegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter." *In re Sotheby's*, 2000 WL 1234601, at * 8.

Here, the plaintiffs have adequately pled strong circumstantial evidence of conscious misbehavior or recklessness by Vigodman, Desheh, Olafsson, and Griffin, all of whom made statements about the price-hike strategy and the price-fixing conspiracy. The complaint is replete with examples of those defendants making public statements about the financial status and competitive nature of Teva, all while "possess[ing] knowledge of facts, or [having] access to information [that] contradict[ed] their public statements" or, at the very least, "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *In re MF Global Holdings*, 982 F. Supp. 2d at 306; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").

The plaintiffs allege that Vigodman, Desheh, Olafsson, and Griffin made public statements and/or signed financial disclosures contrary to the known, concealed information. By way of example, the plaintiffs allege that Vigodman publicly stated that the improvement in Teva's generics market was due to factors other than price. Compl., Doc. No. ¶ 198. In reality, however, the plaintiffs allege that at the time of that statement, Vigodman was aware of, and approved, work plans that included 71 price increases, generating over $1.6 billion in price-based profit. *Id*. at ¶ 98. Similarly, the plaintiffs allege that Olafsson publicly stated that Teva had not "seen any fundamental change or worsening in the pricing environment", *id*. at ¶ 218, but at the time of the statement, Olafsson was aware of, and approved, work plans that indicated that Teva's pricing environment had drastically declined, decreasing profits by $94 million. *Id*. The plaintiffs allege that Griffin and Olafsson, among others, circulated reports regarding the price increases and the resulting profits, which were sent to Desheh and Vigodman for approval. *Id*. at ¶ 253. Specifically, Griffin and Cavanagh would review a list of potential price increases, undertake a cost-benefit analysis, and then determine which drugs' prices would be increased. *Id*. at ¶ 255. The plaintiffs allege that those defendants were all aware of the price-hike strategy, and its impact on Teva's revenue goals. *Id*. at ¶ 259. Throughout that time, with knowledge of the price-hike strategy, those defendants repeatedly spoke publicly in ways that contradicted the concealed knowledge. *See id.* ¶¶ 264-69 (for instance, Desheh claimed that pricing was "very stable" and there was "no pressure on prices", *id*. at ¶ 267; Olafsson asserting that there was "fierce competition" in generics, *id*. at ¶ 268).

The complaint contains detailed allegations regarding "what defendants knew on a daily, weekly[,] and monthly basis about the [pricing and competitive environment], while at the same time making public statements that painted a different picture." *In re Scholastic*, 252 F.3d at 76;

*see* Compl., Doc. No. 226 at ¶¶ 240-309.  Vigodman, Desheh, Olafsson, and Griffin publicly represented, in conference calls and in SEC filings, that generic drug pricing was not a factor in Teva's profit growth and that they were actively involved in a competitive environment, despite their knowledge of both the price-hike strategy and price-fixing conspiracy.  Those alleged actions are consistent with recklessness and suffice, at least at this early stage, to establish scienter.  *See In re Scholastic*, 252 F.3d at 76.

With respect to Cavanaugh and Oberman, though, the plaintiffs do not argue that they made any public statements, nor signed any documents with the alleged misstatements/omissions about drug pricing.  The plaintiffs allege only that Cavanaugh and Oberman, among others, circulated reports regarding the price increases and the resulting profits, which were sent to Desheh and Vigodman for approval.  *Id*. at ¶ 253.  Further, the plaintiffs allege that Cavanagh would review a list of potential price increases, undertake a cost-benefit analysis, and then determine which drugs' prices would be increased.  *Id*. at ¶ 255.  The plaintiffs allege that Cavanaugh and Oberman, by virtue of their positions of authority in the company, must have known about the strategy to increase prices in lockstep with competitors and, therefore, they were complicit by allowing SEC forms to include misstatements/omissions, and allowing the other defendants to make public statements.  *See id.* at ¶ 28, 31 (Cavanaugh and Oberman had the "power and authority to … approve and control the contents of [Teva's] SEC filings alleged … to be false and misleading").  Those allegations are insufficient to give rise to "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Communications*, 492 F.3d at 99.  The plaintiffs do not allege that Cavanaugh or Oberman "had knowledge of facts or access to information contradicting their public statements."  *In re MF Global Holdings*, 982 F. Supp. 2d at 306 (internal quotation marks omitted).  Accordingly, the plaintiffs have not

sufficiently pled that Cavanagh and Oberman are primarily liable and, therefore, their motion to dismiss (doc. no. 240) is **granted** with respect to Count One.

> c.   Did the plaintiffs fail to plead loss causation?

The defendants argue that the plaintiffs failed to adequately plead loss causation.  '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 55.  "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) (quoting *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  The PSLRA codified that requirement: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiffs seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).

"[T]o establish loss causation, a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual lost suffered, … *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  Otherwise, the loss in question was not foreseeable."  *Lentell*, 396 F.3d at 174.  Further, "a plaintiff must show that 'the loss [was a] foreseeable' result of the defendant's conduct (*i.e.*, the fraud), '*and* that the loss [was] caused by the materialization of the … risk' concealed by the defendant's alleged fraud."  *In re Vivendi*, 838 F.3d at 261 (emphasis in original) (quoting *Lentell*, 396 F.3d at 173).  "[L]oss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant…. If that relationship is sufficiently direct, loss causation is established … but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the

content of the alleged misstatements or omissions and the harm actually suffered, … a fraud claim will not lie…. That is because the loss-causation requirement—as with the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Lentell*, 396 F.3d at 174 (internal citations and quotation marks omitted).

In order to adequately plead loss causation, "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharm v. Broudo*, 544 U.S. 336, 347 (2005)). Plaintiffs need not plead that concealed risk actually "materialized into a more significant problem" in order to show loss causation. *In re Vivendi*, 838 F.3d at 261. "[I]t is enough that the loss caused by the alleged fraud results from the 'relevant truth … leak[ing] out.'" *Id.* (quoting *Dura Pharm*, 544 U.S. at 342). The materialization of the risk principle requires a showing that a "misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security…. Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* (internal citations and quotation marks omitted) (emphasis in original). "Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by the circumstances." *Lentell*, 396 F.3d at 174.

The "burden to plead loss causation is not a heavy one, and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, the chain of causation is … not to be decided on a Rule 12(b)(6) motion to dismiss." *Gross v. GFI Grp.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016). Further, "there is a split among the circuits as to whether

the loss causation element is subject to the heightened pleading requirements of Rule 9(b) or the ordinary pleading standard of Rule 8(a). The Second Circuit … has yet to weigh in on this debate…. Under either standard, however, the securities fraud plaintiff's burden is not a heavy one. She must only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Taro Pharmaceuticals*, 2018 WL 4572987, at \*10 (quoting *Dura Pharm*, 544 U.S. at 347).

In the complaint, the plaintiffs allege that the '34 Act Defendants' "fraudulent conduct directly and proximately caused the Class to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Class Period." Compl., Doc. No. 226 at ¶ 310. They allege that Teva concealed the price-hike strategy, the price-fixing conspiracy, and the risks associated with both including that the price-hike strategy "was highly risky and not sustainable and as the strategy failed, Teva's profits would collapse[.]" *Id*. at ¶ 311. Further, the plaintiffs allege that those "concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over \$30 billion in debt payable to members of the Class." *Id*. With respect to materialization of the risk, the plaintiffs allege that the risks "began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the 34 Act Defendants' Class Period statements and omissions." *Id*. at ¶ 312.

As the relevant truth about the price-based profits and the price-hike strategy's failure "leaked out into the market from August 2016 to August 2017, the Class suffered losses, which were foreseeable and caused by the materialization of the risks that the 34 Act Defendants' fraudulent conduct concealed from the investors[.]" *Id*. The plaintiffs allege a number of specific examples that, taken together, led to the materialization of the risk. *See id*. at ¶¶ 313-37. For

instance, on November 3, 2016, Bloomberg published an article that Teva was under suspicion of colluding on the prices of generic drugs, and by the end of that day, the prices of Teva Securities declined. *Id*. at ¶ 316-17. Analysts and media commented on the fact that the disclosure of the subpoenas and the investigation into Teva's pricing caused its stock prices to fall. *Id*. at ¶ 318. After the Connecticut Attorney General filed a lawsuit against Teva, among others, for antitrust violations, the price of Teva Securities continued to decline. *Id*. at ¶ 320-21. The price of securities continued to fall after Teva revealed disappointing financial numbers, high-level executives were fired or quit, and the media reported that pricing pressure was creating uncertainty for Teva's future. *Id*. at ¶¶ 322-37. The plaintiffs allege that the sequence of events between early August 2016 and early August 2017 constructively disclosed the frauds (the price-hike strategy and the price-fixing collusion) that Teva had been concealing.

The plaintiffs have certainly pled that the defendants concealed *something* from the market, whether the price-hike strategy, the price-fixing collusion, or both. *See In re Vivendi*, 838 F.3d at 261. Further, the plaintiffs have adequately pled that the value of Teva securities was negatively affected and that, if found to be sufficiently disclosed, that there was a "plausible causal link between that loss and the alleged misrepresentations." *Loreley Financing,* 797 F.3d at 187. The question, then, is whether the above-listed events constructively disclosed the concealed frauds, and the plaintiffs adequately pled the constructive disclosure of the price-fixing collusion with its competitors. The government investigation, the articles written in the aftermath, and the case initiated by the Attorney General relate to the alleged anti-trust violations regarding the price-fixing. Although those do not seem to explicitly relate to the other alleged concealed fraud, the internal price-hike strategy, it is hard to imagine that the price-fixing conspiracy could be constructively disclosed without the price-hike strategy also necessarily

being disclosed. They are both part of a "network of interrelated lies … all collectively aimed at perpetuating a broader, material lie." *In re Vivendi*, 838 F.3d at 250. The plaintiffs' general allegations are that the defendants systematically raised the prices on many of its generic drugs (price-hike) in collaboration with its competitors (price-fixing). The price-hike strategy, then, cannot be viewed in a vacuum. The lawsuit and bad press, in revealing that Teva conspired with its competitors, also necessarily revealed that Teva was increasing the prices of its generic drugs. Investors and analysts, then, were on notice that Teva was internally raising its prices, in lockstep with its competitors.

The plaintiffs' allegations regarding the investigations, the bad press, and the various departures of executives, and the resultant dip in stock prices, "suffice at the pleading stage for the purposes of loss causation." *Taro Pharmaceuticals*, 2018 WL 4572987, at * 11 (concluding that the disclosure of DOJ subpoena and the Bloomberg article, and stock prices falling contemporaneously was sufficient to allege loss causation on motion to dismiss).

The plaintiffs have adequately alleged that the defendants were engaged in an internal price-hike strategy and a price-fixing conspiracy, that the defendants made material misrepresentations and omissions about whether competition and their pricing scheme affected their profits, and did so with conscious misbehavior or recklessness. Further, the plaintiffs adequately alleged loss causation.

Accordingly, the defendants' motions to dismiss count one are **denied** in substantial part. The plaintiffs' allegations regarding the defendants' failure to timely disclose the receipt of government subpoenas, however, are not actionable and the defendants' motions to dismiss are **granted** with respect to those allegations. Furthermore, Cavanagh and Oberman's motion to dismiss (doc. no. 240) is **granted** with respect to Count One.

## 2. *Count Two: Section 20(a)*

The plaintiffs bring Count Two of the Complaint against the '34 Act Defendants and

allege a violation of Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), which

states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must

show (1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud." *ATSI Communications*, 493 F.3d at 108; *see also S.E.C. v. First

Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

The defendants move to dismiss Count Two on the basis that the plaintiffs have failed to

satisfy all three prongs of Section 20(a) control person liability against each of them. C/O Mot.

to Dism., Doc. No. 240 at 8; '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 59.

### a. First Element: Primary Violation

The defendants argue first that the plaintiffs failed to satisfy the first prong of control

person liability, arguing that the complaint "does not state a claim for primary liability under

Section 10(b) of the Exchange Act." C/O Mot. to Dism., Doc. No. 240-1 at 9. In order to satisfy

the first prong of the standard, liability for Section 20(a) violations is "derivative of liability for

Section 10(b) violations." *In re MF Global Holdings*, 982 F. Supp. 2d at 307. Accordingly, as

aforementioned, the plaintiffs have adequately pled Section 10(b) violations and, therefore, the

first prong is satisfied. *See In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *20

(S.D.N.Y. Mar. 30, 2018) (dismissing Section 20(a) claim because primary violation claim dismissed).

### b. Second Element: Control

Cavanaugh and Oberman argue that the plaintiffs failed to satisfy the second prong of control person liability, arguing that the plaintiffs' control person claims "teeter on the generalized allegation that [Cavanaugh and Oberman] controlled the decision making of the company [b]y virtue of their positions and their power to control," which are insufficient allegations. C/O Mot. to Dism., Doc. No. 240 at 9-10.

In order to satisfy the second prong of the standard, control of the primary violator by the defendant "may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey*, 101 F.3d at 1473 (*quoting* 17 C.F.R. § 240.12b-2). "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." *In re Global Crossing*, 2005 WL 1881514, at *12 (S.D.N.Y. Aug. 5, 2005) (internal quotation marks omitted). "Moreover, a Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question." *In re MF Global Holdings*, 982 F. Supp. 2d at 307 (emphasis in original) (internal quotations omitted). "[O]fficer or director status alone does not constitute control." *In re Sotheby's*, 2000 WL 1234601, at * 8. That said, however, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry and generally should not be resolved on a motion to dismiss." *In re MF Global Holdings*, 982 F. Supp. 2d at 307.

With respect to this element, courts in the Second Circuit only require the plaintiff to satisfy the pleading requirements of Rule 8(a), rather than the heightened Rule 9(b) standard. *See Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 334-35 (D. Conn. 2011) (collecting cases). "[A]n allegation of control is not an averment[] of fraud or mistake …, it is unrelated to whether any misleading statement was made by the controlled person …, and has nothing to do with the state of mind." *Id*. (internal quotation marks omitted). "Because a plaintiff's allegations regarding the control element need only comply with the requirements of Rule 8(a), the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage." *Id*. at 335.

A plaintiff can establish control by showing that the defendants were "members of the core management team." *In re Hi-Crush Partners L.P. Sec. Litig*., 2013 WL 6233561, at *27 (S.D.N.Y. Dec. 2, 2013). For purposes of Section 20(a), control means generally "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise…. Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons." *Poptech*, 792 F. Supp. 2d at 336 (internal citations and quotation marks omitted). The plaintiffs allege in the complaint that Cavanaugh served as Teva USA's Senior Vice President and Chief Operating Officer of North America Generics during the Class Period, and that she "possessed the power and authority to, and in fact did, approve and control the contents of [Teva's] SEC filings alleged … to be false and misleading, as they pertained to Teva USA's financial reporting." Compl., Doc. No. 226 at ¶ 31. The plaintiffs allege in the complaint that Oberman served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 and that he

"made false and misleading statements [and] possessed the power and authority to, and in fact did approve and control the contents of [Teva's] SEC filings alleged … to be false and misleading." *Id*. at ¶ 28. Given the low standard in proving control liability for purposes of Section 20(a), and given that this factual issue "is ordinarily not resolved summarily at the pleading stage", *Poptech*, 792 F. Supp. 2d at 335, the plaintiffs have sufficiently alleged the second prong of control liability with respect to Cavanaugh and Oberman.

###### c. Third Element: Culpability

In order to satisfy the third prong of the standard, that the defendant was a culpable participant in the control person's fraud, the plaintiff must plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind, i.e., scienter." *Id*. The heightened pleading standards of Rule 9(b) and the PSLRA apply to the third prong of a Section 20(a) claim. *See In re MF Global Holdings*, 982 F. Supp. 2d at 307. The plaintiff must allege with particularity that the defendants "knew or should have known" about the fraudulent conduct. *In re Global Crossing*, 2005 WL 1881514, at *12. "In order to withstand a motion to dismiss, a Section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." *In re MF Global Holdings*, 982 F. Supp. 2d at 307. As discussed above, however, the plaintiffs have not sufficiently pled scienter with respect to Cavanagh and Oberman and, therefore, their Motion to Dismiss (doc. no. 240) is **granted** with respect to Count Two.

###### d. Vigodman, Desheh, Olafsson, and Griffin

The remaining '34 Act Defendants (Vigodman, Desheh, Olafsson, and Griffin) do not substantively address this issue in their brief but, instead, rely on Cavanagh and Oberman's arguments in arguing that the plaintiffs "have failed to allege any of th[e] elements and therefore

have failed to state a claim for violation of Section 20(a), as a matter of law." '34 Act Def. Mot. to Dism., Doc. No. 238-1 at 59. Cavanaugh and Oberman's motion, however, argues only that the plaintiffs have failed to allege control liability against the two of them and does not argue that the plaintiffs failed to prove control person liability with respect to any of the remaining '34 Act Defendants. *See* C/O Mot. to Dism. Doc. No. 240-1 at 8-11. Control person liability "requires an individualized determination of a defendant's control of the primary violator and well as the defendant's culpability." *Burstyn v. Worldwide Xceed Group*, 2002 WL 31191741, at *8 (S.D.N.Y. 2002). Regardless, though, as discussed above, the plaintiffs have adequately pled that there was a primary violation, and that the defendants were control persons, and, further, the requisite scienter and culpability with respect to Vigodman, Desheh, Olafsson, and Griffin. Accordingly, those defendants' motions to dismiss Count Two are **denied.**

C. Sufficiency of the Securities Act Allegations

1. *Timeliness*

The defendants argue, as a threshold matter, that plaintiffs' Section 11 and 12 allegations are time-barred for two reasons: (1) the plaintiffs were on notice of the alleged securities violations more than a year before they brought the claims; and (2) no plaintiff had standing to sue on the Senior Notes until after the one-year statute of limitations passed. Teva Finance Mot. to Dism., Doc. No. 239 at 8-9.

a. Notice of Claims

The plaintiffs first alleged Securities Act violations in their first amended complaint, on August 2, 2017. Doc. No. 129. Teva Finance argues that "[t]he information and events relied upon by [the plaintiffs] in the [first amended complaint] as well as the [current] complaint were publicly known and available well over a year earlier and would have permitted Plaintiffs to

plead the same … claims they are now attempting to bring."  Teva Finance Mot. to Dism., Doc.

No. 239 at 8.

"The lapse of a limitations period is an affirmative defense that a defendant must plead

and prove.  [Fed. R. Civ. P.] 8(c)(1).  However, a defendant may raise an affirmative defense in a

pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v.*

*Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).  Dismissal under Rule 12(b)(6) is

"appropriate when a defendant raises … [a statutory bar] as an affirmative defense and it is clear

from the face of the complaint, and matters of which the court may take judicial notice, that the

plaintiff's claims are barred as a matter of law."  *Id.* (internal quotation marks omitted).  Any

action pursuant to Section 11 and/or Section 12(a)(2) of the Securities Act must be brought

"within one year after the discovery of the untrue statement or the omission, or after such

discovery should have been made by the exercise of reasonable diligence[.]" 15 U.S.C. § 77m.

The defendants argue that this standard requires only "inquiry notice" for the statute of

limitations to begin running.  Teva Finance Mot. to Dism., Doc. No. 238 at 10.  The plaintiffs

argue that the standard is much higher than that and, even if it were not, the inquiry notice was

triggered within a year of the filing of the amended complaint.  Opp. to Teva Finance Mot. to

Dism., Doc. No. 246 at 13-14.

"[I]nquiry notice means only '*notice of the facts, which in the exercise of reasonable*

*diligence, would have led to actual knowledge*' ….  In other words, inquiry notice means notice

of facts that 'would suggest to an investor of ordinary intelligence the probability that she has

been defrauded.'"  *Shah v. Stanley*, 2004 WL 2346716, at *11 (S.D.N.Y. Oct. 19, 2004)

(emphasis in original) (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d

148, 154 (2d Cir. 2003)).  "Such circumstances are often analogized to storm warnings."  *LC*

*Capital*, 318 F.3d at 154 (internal quotation marks omitted). "A storm warning 'need not detail every aspect of the alleged' securities-law violation… Information triggers the duty to inquire if it 'relates directly to the misrepresentations and omissions the [p]laintiff[] … allege[s] in [its] action against the defendants … and is, in the totality of the circumstances, 'specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of' a violation." *Federal Housing Finance Agency for Federal National Mortgage Association v. Nomura Holding America, Inc.*, 873 F.3d 85, 120 (2d Cir. 2017) (emphasis in original) (quoting *Staehr*, 547 F.3d at 427, 430).

For purposes of the Exchange Act, the Supreme Court did away with inquiry notice and "adopted a standard whereby the statute of limitations begins to run when 'the plaintiff … discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 268 F. Supp. 3d 515, 519 (S.D.N.Y. 2017) (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010)); *see also City of Pontiac*, 637 F.3d at 174 (applying *Merck* standard to Exchange Act claims). The defendants argue that it is still an open question in the Second Circuit whether the *Merck* standard applies to Securities Act claims. Teva Finance Mot. to Dism., Doc. No. 239-1 at 10. However, in *Nomura*, the Second Circuit held:

> A securities-law violation is discovered when the plaintiff learns sufficient information about [the violation] to … plead it in a complaint with enough detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss…. A plaintiff is charged with knowledge of any fact that a reasonably diligent plaintiff would have discovered…. [W]hen the circumstances would suggest … the probability that a violation of the securities laws has occurred—a situation sometimes called storm warnings—we deem the plaintiff on inquiry notice and assume that a reasonable person in his or her shoes would conduct further investigation into the potential violation…. Under prior Circuit law, the Section 13 limitations period could begin to run as early as the moment a plaintiff knew or should have known of storm warnings that placed it on inquiry notice…. *The Supreme Court's decision in* Merck *changed that rule*…. After *Merck*, we still assume a reasonable plaintiff on inquiry notice would conduct further

investigation, but the limitations period begins to run only when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately.

873 F.3d at 119 (internal citations and quotation marks omitted) (emphasis added).

The defendants argue that "prominent news articles, numerous industry analyses, and well-publicized public hearings before Congress in 2014 and 2015 constitute 'storm warnings' that put reasonable investors on inquiry notice, before August 2016, of claims relating to Teva allegedly having a strategy to raise prices on certain drugs it sold." Teva Finance Mot. to Dism. Doc. No. 239-1 at 12. However, of the articles relied on by the defendants to show that investors should have been on notice of Teva's alleged wrongdoing, Teva is rarely mentioned. *See* Exs. A-L to Teva Finance Mot. to Dism., Doc. No. 239-3-239-14. Exhibit A is a transcript of a hearing before the Subcommittee on Primary Health and Aging, which Teva did not attend, but was mentioned as having been invited. *See* Ex. A to Teva Finance Mot. to Dismiss, Doc. No. 239-3. Teva is next mentioned in a press release by Senator Bernie Sanders and Representative Elijah Cummings in which they state that they are launching an investigation into generic drug prices, and sent a letter to Teva, in addition to 13 other pharmaceutical companies. *See* Ex. E to Teva Finance Mot. to Dism., Doc. No. 239-2. In a Pharmalot blog post, Teva is reported to have received a letter from Congress. *See* Ex. D to Teva Finance Mot. to Dism., Doc. No. 239-6. In a blog post titled "Is the Antitrust Division Starting a Broad Investigation of Price Fixing in the Generic Pharmaceuticals Market?", Teva is mentioned only in a footnote as one of "the top five U.S. corporations" for generic drugs. Ex. H to Teva Finance Mot. to Dism., Doc. No. 239-10. Lastly, Teva is mentioned in a blog post on "Fierce Pharma" titled "Actavis gets subpoena as DOJ probe of generic pricing moves up the food chain" but only has having recently acquired Actavis. Ex. L to Teva Finance Mot. to Dism., Doc. No. 239-14.

The statute of limitations begins to run when the reasonable plaintiff would have "discovered sufficient information [in an investigation] to plead a securities- law violation." *Nomura*, 873 F.3d at 119. The defendants have not shown that the plaintiffs could have pled their claims earlier. The articles they cite merely discuss the generics market in general, some of which mention Teva in very non-specific ways. Further, even if the standard was "inquiry notice," the aggregate of those articles would be insufficient. When "nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute 'storm warnings' is far from compelling." *Staehr*, 547 F.3d at 428. The Second Circuit acknowledged that it has "expressly declined to limit a finding of inquiry notice to company-specific storm warnings" but went on to state that "the fact remains that the specificity of storm warnings bears directly on the determination of whether, under the totality of the circumstances, a plaintiff should be charged with a duty to inquire." *Id*. Further, though, the Second Circuit stated that it had "never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence." *Id*. at 432. Those reports, then, were not enough to start the statute of limitations period. Furthermore, Teva's receipt of subpoenas, which Teva disclosed on August 4, 2016, does not necessarily "suggest to an investor of ordinary intelligence the probability that she ha[d] been defrauded." *Shah*, 2004 WL 2346716, at *11. Even if the disclosure of the receipt of the subpoenas did give rise to a duty to investigate and that started the one-year statute of limitations, the plaintiffs have satisfied the requirement, because the second amended complaint was filed on August 2, 2017.

Bloomberg did publish an article on November 3, 2016, specifically naming Teva as one of the companies being investigated for possible criminal and civil penalties because of its

pricing and collusion.  In conjunction with the disclosure of the subpoenas, that was likely sufficient to give a reasonable investor enough of a warning that they should have investigated further, which, under the inquiry notice standard, would mean the statute of limitations would have run on November 3, 2017.  Under the discovery rule standard, though, the statute of limitations would not start running until the plaintiffs could have plausibly pled their claims. The receipt of the subpoenas and the Bloomberg article still were not enough to plead material misrepresentations and omissions and, therefore, even the Bloomberg article would not have started the limitations period.  Accordingly, the defendants' argument fails.

b.   Parties with Standing

The defendants argue next that although the second amended complaint was filed on August 2, 2017, the securities act claim was not asserted by any plaintiff with standing until Anchorage was added on September 5, 2017.  Teva Finance Mot. to Dism., Doc. No. 239-1 at 14.  As a threshold matter, even if the defendants are correct that Anchorage was the first plaintiff with standing to assert the claims, under the discovery rule, the statute of limitations did not start running until, at the *earliest*, November 3, 2016 when the Bloomberg article was published.  Therefore, Anchorage's complaint was timely filed on September 5, 2017.  If not, though, the defendants argue that "Ontario Teachers plainly lacked standing to sue [with respect to] the Senior Notes because it does not allege that it purchased them."  Teva Finance Mot. to Dism., Doc. No. 239-1 at 14.  The plaintiffs argue that Ontario Teachers did have "standing to bring claims on behalf of purchasers of the Notes" against the securities act defendants and, therefore, "the August 2, 2017 complaint … tolled the [statute of limitations] for the members of the Class that purchased the Notes."  Opp. to Teva Finance Mot. to Dism., Doc. No. 246 at 23.

"The Second Circuit has held that a plaintiff may pursue claims on behalf of a putative class of investors for securities that he did not purchase if he alleges both Article III standing and class standing." *Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 510 (S.D.N.Y. 2016) (emphasis in original) (referencing *NECA-IBEW*, 693 F.3d at 162). "In the context of class actions, Article III standing requires that 'for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant.'" *Id.* (quoting *NECA-IBEW*, 693 F.3d at 159. "If that requirement is satisfied, the inquiry shifts to a class standing analysis." *Id.* It seems to be undisputed that Ontario Teachers' has Article III standing. *See* Opp. to Teva Finance Mot. to Dism., Doc. No. 246 at 23 ("It is undisputed that Ontario Teachers' … has Article III standing to sue each of the 33 Act Defendants"); Reply to Teva Finance Mot. to Dism., Doc. No. 255 at 5-6 (taking issue only with plaintiffs' class standing argument).

Plaintiffs are conferred class standing to assert claims of other plaintiffs where the claims "implicate 'the same set of concerns' as plaintiff's claims." *NECA-IBEW*, 693 F.3d at 148-49 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)). "[I]n the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement. Whether that conduct implicates the same set of concerns for distinct sets of plaintiffs, however, will depend on the nature and content of the specific misrepresentation alleged." *Id.* at 162. The Second Circuit, in *NECA-IBEW*, opined that it is sufficient for class standing to allege multiple "corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation[.]" *Id.* at 163. "Sections 11 and 12(a)(2) claims brought by a purchaser of debt from one offering would raise a 'set of concerns' nearly identical to that of a purchaser from another offering…. In that case, the

inappropriateness of denying class standing on the happenstance of the misrepresentation's location in one offering versus another seems patent." *Id.* Where "alleged injuries … could turn on very different proof", the claims do not "share the same set of concerns." *Youngers*, 195 F. Supp. 3d at 510 (internal quotation marks omitted); *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *11 (D. Conn. Mar. 10, 2015) ("[w]hether a false or misleading statement implicates the same set of concerns for distinct sets of plaintiffs depends on the nature and content of the specific misrepresentation alleged" and whether the claims "could turn on very different proof" (internal quotation marks omitted)). Where the subject of the claims are "structured the same way" and "are all substantially similar", and the plaintiffs have "substantially similar" relationships with the defendants, if the defendants' "systematic conduct is tortious with respect to one fund, it is also tortious with respect to another fund, and does not depend on the individualized circumstances of each fund." *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 373 (S.D.N.Y. 2016).

Here, the plaintiffs allege in their complaint that the claims brought under the Exchange Act, for which Ontario Teachers' indisputably has standing, are based on the same set of misrepresentations and omissions as the Securities Act claims. The claims turn on the same proof, and, therefore, implicate the same set of concerns for each set of plaintiffs. Accordingly, Ontario Teachers' had the class standing to assert the Securities Act claims and, therefore, the allegations were timely raised in the August 2, 2017 complaint.

### 2. *Count Three: Section 11; and Count Four: Section 12(a)(2)*

The plaintiffs allege violations of Section 11 in Count Three by Teva, Teva Finance, Vigodman, Desheh, and Griffin. Compl., Doc. No. 226 at ¶ 397. They allege that Teva, Vigodman, Desheh, and Griffin are liable for their actions related to the ADS/Preferred

Offerings, and Teva, Teva Finance, Vigodman, Desheh, and Griffin are liable for their actions related to the Notes Offerings. *Id*. at ¶¶ 398-99. The plaintiffs allege violations of Section 12(a)(2) in Count Four by Teva, Teva Finance, Vigodman, Desheh, and Griffin. *Id*. at ¶ 406.

Section 11 of the Securities Act, codified at 15 U.S.C. § 77k, "imposes liability on issuers, directors of issuers, and other signers of a registration statement that contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading." *In re MF Global Holdings*, 982 F. Supp. 2d at 308; *see* 15 U.S.C. § 77k(a). Section 12(a)(2) of the Securities Act, codified at 15 U.S.C. § 77*l*(a)(2), "imposes liability for selling or offering a security by means of prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading." *Id*.; *see* 15 U.S.C. § 77*l* (a)(2).

"[T]he language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 360 (2d Cir. 2010). When pleading either a violation of Section 11 or of Section 12(a)(2), "a plaintiff must show that the relevant communication either misstated or omitted a material fact." *Iowa Public Employees' Retirement System v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *In re MF Global Holdings*, 982 F. Supp. 2d. at 308. Because the two have "roughly parallel elements," *Fait v. Regions Financial Corp.*, 655 F.3d 105, 109 (2d Cir. 2011), "[a] plaintiff who fails to plead a [Section 11] claim necessarily fails to plead a [Section] 12(a)(2) claim as well." *In re*

*MF Global Holdings*, 982 F. Supp. 2d. at 308; *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. Nov. 30, 2009).

The legal standard for misstatements or omissions of material facts in a claim brought under the Exchange Act is substantially similar to the legal standard with respect to the same in a claim brought under the Securities Act. *See In re Morgan Stanley*, 592 F.3d at 360; *In re MF Global Holdings*, 982 F. Supp. 2d. at 308. The only difference, however, is that "Securities Act claims do not need to be pled with particularity unless they sound in fraud … and do not require allegations of scienter, reliance, or loss causation."[6] *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (internal quotation marks omitted); *see also Rombach*, 355 F.3d at 171; *Fait*, 655 F.3d at 109. "Instead, Section 11 imposes virtually absolute liability on issuers, and Section 11 and Section 12(a)(2) impose liability on other parties for mere negligence." *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (internal quotation marks omitted). The plaintiffs here rely on the same alleged misrepresentations and omissions for Sections 11 and 12(a)(2) liability as they did with Section 10(b) liability in Count One, regarding pricing and competition, and the parties make the same arguments here as they did with Count One. Accordingly, the same analysis with respect to misstatements and omissions, as discussed above, applies to Counts Three and Four and, therefore, the defendants' motions to dismiss are **denied**.

3. *Count Five: Section 15(a)*

The plaintiffs allege violations of Section 15(a) in Count Five against Teva, Vigodman, Desheh, and Griffin. Compl., Doc. No. 226 at ¶ 415.

---

[6] As aforementioned in the "Pleading Standards" Section, however, the Securities Act claims here are subjected to the same heightened standard because they resort to "boilerplate disclaimers" that the counts do not sound in fraud. *Ladmen Partners,* 2008 WL 4449280, at *11 n.10.

Section 15(a) of the Securities Act, codified at 15 U.S.C. § 77o(a), provides that a person who controls a person liable under Section 11 or Section 12:

> [S]hall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a). Similar to Section 20(a) of the Exchange Act, Section 15(a) of the Securities Act "requires proof of a primary violation of the statute and control of the primary violator by defendants." *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (internal quotation marks omitted). Additionally, "control" under Section 20(b) of the Exchange Act is the same as "control" under Section 15(a) of the Securities Act. *See id*.; *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011); *First Jersey*, 101 F.3d at 1472-73. As with Section 20(a), the first two prongs are met here as well.

The third prong of the analysis under Section 20(a), the "culpable participant" requirement, has not yet been imputed into an analysis under Section 15(a). The Second Circuit declined to decide that issue even though it has "divided district courts in this District." *In re Lehman Bros.*, 650 F.3d at 186. It appears, though, that a "majority of judges" in this Circuit have held that a plaintiff need not prove the "culpable participant" requirement in a Section 15(a) claim. *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. Mar. 30, 2012) (collecting cases). Neither the plaintiff nor any of the defendants argue that a claim under Section 15(a) requires a showing of "culpable participant" and, therefore, I will join my colleagues in finding that the additional element of culpable participant is not present here. Accordingly, for the reasons analyzed with respect to Count Two, the defendants' motions to dismiss Count Five are **denied.**

**IV.     Conclusion**

For the foregoing reasons, the Motion to Dismiss filed by Teva, Vigodman, Desheh, Griffin, and Olafsson (doc. no. 238) and the Motion to Dismiss filed by Teva Finance (doc. no. 239) are **denied in substantial part**.  The motions are **granted**, however, with respect to the plaintiffs' allegations stemming from the defendants' failure to disclose subpoenas from the DOJ and Connecticut Attorney General.  Further, the Motion to Dismiss filed by Cavanaugh and Oberman (doc. no. 240) is **granted.**  The Clerk is directed to terminate Cavanaugh and Oberman as defendants to this case.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge