# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ONTARIO TEACHERS' PENSION PLAN
BOARD, et al.,
      Plaintiffs,

    v.

TEVA PHARMACEUTICAL
INDUSTRIES LTD., et al.,
      Defendants.

No. 3:17-cv-558 (SRU)

## **ORDER**

    This order addresses the parties'[1] joint motion to consolidate this case and nineteen other

similar cases pending before me (the "Related Actions").  *See* Joint Mot. to Consolidate Cases,

Doc. No. 311.  Of those cases, four are putative class actions (the "Putative Class Actions"),[2] and

sixteen are individual actions in which the plaintiffs have indicated they will opt out of any

potential class (the "Direct Actions").[3]  The parties' joint motion—"joint" in that the Plaintiffs

---

[1] The "parties" refers to the Plaintiffs—Lead Plaintiff Ontario Teachers' Pension Plan Board and Named Plaintiff Anchorage Police & Fire Retirement System—and the Defendants—Teva Pharmaceutical Indus., Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Schultz, Michael McClellan, Yitzhak Peterburg, and Teva Pharmaceutical Finance Netherlands III B.V.—in this action.  The Defendants include the two defendants added to this action in the Second Amended Complaint (Schultz and McClellan).

[2] The Putative Class Actions are: (1) *Ontario Teachers' Pension Plan Board, et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:17-cv-558; (2) *Huellemeier v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-1938; (3) *Grodko v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-800; (4) *Emps.' Ret. Sys. of the City of St. Petersburg, Florida v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1768.

[3] The Direct Actions are: (1) *OZ ELS Master Fund, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-1314; (2) *Nordea Investment Mgmt. AB v. Teva Pharm. Industries Ltd., et al.*, No. 3:18-cv-1681; (3) *Revenue, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-1721; (4) *Pacific Funds Series Trust, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-1956; (5) *Public School Teachers Pension and Ret. Sys. of Chicago v. Teva Pharm. Indus., Ltd*, No. 3:19-cv-175; (6) *Schwab Capital Trust, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-192; (7) *Phoenix Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-449; (8) *Mivtachim The Workers Social Ins. Fund Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-513; (9) *Clal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-543; (10) *Highfields Capital I LP, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-603; (11) *Migdal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-655; (12) *Harel Pension and Provident Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-656; (13) *Oregon v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-657; (14) *Migdal Mutual Funds, Ltd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-923; (15) *Psagot Mutual Funds, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1167; (16) *Stiching PGGM Depositary, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1173.

and Defendants in *this* action filed the motion jointly—was filed in nineteen of the twenty

Related Actions.[4]  Since the time that the parties fully briefed this consolidation issue, another

similar case has been transferred to me.[5]

This order also addresses a party's related motion to intervene in this case.  *See* Mot. to

Intervene, Doc. No. 312.  The party seeking to intervene is HMG Global Initiative, Inc.

("HMG").  HMG is one of two possible lead plaintiffs in *Emps.' Ret. Sys. of the City of St.*

*Petersburg, Florida v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1768 ("*St. Petersburg*").

For the reasons that follow, the parties' joint motion to consolidate, doc. no. 311, is

**granted** and HMG's motion to intervene, doc. no. 312, is **denied**.  The Putative Class Actions

shall be consolidated for all purposes and the Direct Actions shall be consolidated for all pre-trial

purposes.[6]  That consolidation is subject to alteration at any time for good cause shown, or if the

structure established proves detrimental, in any way, to the best interest of the plaintiffs.  *See In*

*re Facebook, Inc., IPO Securities and Derivative Litigation*, 288 F.R.D. 26, 31 (S.D.N.Y. 2012).

## I.     Relevant Background

This case (*Ontario Teachers'*) was filed on November 6, 2016 in the Central District of

California.  *See* Compl., Doc. No. 1.  It was transferred to the District of Connecticut on April 3,

2017.  *See* Order, Doc. No. 74.  On July 11, 2017, pursuant to the procedure outlined in the

Private Securities Litigation Reform Act ("PSLRA"), I appointed Ontario Teachers' Pension

Plan Board ("Ontario Teachers'") as lead plaintiff of this purported class action.  *See* Order, Doc.

---

[4] Even though the parties' joint motion did not *technically* encompass *OZ ELS*, No. 3:17-cv-1314, the same joint motion was filed in *OZ ELS*.  As the parties note in their submission on the *OZ ELS* docket, the reason for treating *OZ ELS* differently from the other nineteen Related Actions is that lead counsel for the defendants in this action and in *OZ ELS* are not the same.  *See* Defs.' Mot. to Consolidate, *OZ ELS*, Doc. No. 53, at 2 n.1.  The defendants in *OZ ELS* seek consolidation, too.  *See id.*
[5] On January 31, 2020, the following case was transferred to me: *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-83.
[6] I will issue a subsequent Order that details the logistics of consolidation.

No. 124, at 27; 15 U.S.C. § 78u-4(a)(3)(B)(i) (requiring a court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . .").  Shortly thereafter, Anchorage Police & Fire Retirement System ("Anchorage Police") was added to this case as a Named Plaintiff.  *See* Am. Order, Doc. No. 137.  Together, Ontario Teachers' and Anchorage Police are the "Plaintiffs."

The Plaintiffs have amended the complaint on numerous occasions.  *See* Am. Compls., Doc. Nos. 129, 138, 141, 226, and 310.  On April 3, 2018, I granted several motions to dismiss the then-operative consolidated class action complaint.  *See* Order, Doc. No. 215.  On June 22, 2018, the Plaintiffs re-filed an amended consolidated class action complaint.  *See* Am. Compl., Doc. No. 226 (the "First Amended Consolidated Class Action Complaint" or "FAC").  The FAC alleged that over the class period—from February 6, 2014 to August 3, 2017—the Defendants had artificially inflated Teva's stock price by falsely attributing Teva's strong financial results to fundamental business strategies rather than sharp increases in generic drug prices.  *See* FAC, Doc. No. 226, at ¶ 1.  In addition, the Plaintiffs alleged that the Defendants colluded with other generic drug manufacturers to fix prices for some subset of drugs.  *See id.* at ¶ 15.  Based on that behavior, the Plaintiffs alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a)(2), and 77o(a).  *See id.* at ¶¶ 341–47, 397–422.

Defendants made motions to dismiss the FAC soon after it had been filed.  On September 25, 2019, I denied in substantial part and granted in part various motions to dismiss the FAC.

*See* Order, Doc. No. 283.  At that point, the remaining six defendants in this case were: Teva

Pharm. Indus., Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, and

Teva Pharm. Finance Netherlands III B.V.  Since 2017, numerous cases related to this case have

been transferred to me from other districts and from other judges within this district.

On November 13, 2019, I held a Rule 16 pretrial conference in this case.  *See* Min. Entry,

Doc. No. 297.  On November 18, 2019, I filed a Case Management Order that governs the

schedule for the remainder of this litigation.  *See* Order, Doc. No. 298.  In that Order, I instructed

the parties to "make submissions regarding the consolidation of this case and the 19 other related

actions pending before me no later than December 13, 2019."  *See id.* at 1.

On December 13, 2019, the parties filed a joint motion to consolidate all twenty Related

Actions.  The parties propose consolidating the Putative Class Actions for all purposes and the

Direct Actions for all pre-trial purposes.  *See* Joint Mot. to Consolidate, Doc. No. 311, at 4.  Also

on December 13, 2019, the Plaintiffs filed an amended consolidated class action complaint (the

"Second Amended Consolidated Class Action Complaint" or "SAC") with the Defendants'

consent, pursuant to Federal Rule of Civil Procedure 15(a)(2), which allows a party to amend its

pleading "with the opposing party's written consent."  *See* SAC, Doc. No. 310; Notice, Doc. No.

309.  In general, the SAC expands the class period and adds claims and parties to erase

differences between this case and the other three Putative Class Actions.  Whether the SAC is an

appropriate pleading is a subject of contention and is addressed below.

As noted on the docket in each Related Action, the defendants in all the Related

Actions—who are largely the same as in this action but sometimes include or omit certain Teva

officers—consent to the parties' joint motion to consolidate.  On December 20, 2019, the

Plaintiffs in all the Direct Actions filed a joint opposition to the parties' joint motion to

consolidate.  That joint opposition appears on the docket in all but one Direct Action.[7]  The joint

opposition essentially argues that the Direct Actions should be coordinated—not consolidated—

with this action.  On January 3, putative lead plaintiffs in two of the Putative Class Actions—*St.

Petersburg* and *Huellemeier v. Teva Pharmaceutical Indus., Ltd., et al.*, No. 3:17-cv-1938

("*Huellemeier*")—filed oppositions to the parties' joint motion to consolidate.  On January 17,

the parties in this action filed a joint omnibus reply in all but one[8] of the Related Actions in

further support of consolidation.  On January 23, the plaintiffs in thirteen of the sixteen Direct

Actions filed a joint supplemental opposition to the parties' joint omnibus reply in favor of

consolidation.[9]  On January 29, the parties in this action filed a joint response to the Direct

Action plaintiffs' joint supplemental reply.  *See* Reply, Doc. No. 334.

With respect to the pending motion to intervene, HMG filed the motion in this action on

December 20, 2019.  *See* Mot. to Intervene, Doc. No. 312.  The Defendants and Plaintiffs filed

separate oppositions on January 17, 2020.  *See* Mems. in Opp'n, Doc. Nos. 324 and 325.  On

January 31, 2020, HMG filed a reply.  *See* Reply, Doc. No. 335.

## II.   Discussion

### A.   The Law on Consolidation of Class Actions

"If actions before the court involve a common question of law or fact, the court may . . .

consolidate the actions."  Fed. R. Civ. P. 42(a).  Whether to consolidate pending actions is a

---

[7] The exception, again, is *OZ ELS*, in which the plaintiffs filed a response "join[ing] in, and expressly adopt[ing] and incorporat[ing] the argument set forth" in the Direct Action Plaintiffs' joint opposition.  *See* Response, *OZ ELS*, Doc. No. 56, at 1.

[8] The parties did not file the reply in *Grodko*, No. 3:18-cv-800, because no opposition was filed in *Grodko*.

[9] The joint supplemental opposition was not filed in (1) *Public School Teachers Pension and Ret. Sys. of Chicago v. Teva Pharm. Indus., Ltd*, No. 3:19-cv-175 ("*Chicago*"), (2) *Oregon v. Teva Pharm. Indus., Ltd, et al.*, No. 3:19-cv-657 ("*Oregon*"), and (3) *OZ ELS*.  It was likely a simple oversight that the joint supplemental opposition was not filed in *Chicago* and *Oregon*.  Plaintiffs' counsel in both cases is the same, and the joint supplemental opposition includes both cases in its case caption.

question within the discretion of the court.  *See Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d

265, 269 (S.D.N.Y. 2015) (internal citations omitted).  In exercising its discretion, a court should

consider

> whether the specific risks of prejudice and possible confusion [are]
> overborne by the risk of inconsistent adjudications of common factual and
> legal issues, the burden on the parties, witnesses, and available judicial
> resources posed by multiple lawsuits, the length of time required to
> conclude multiple suits as against a single one, and the relative expense to
> all concerned of the single-trial, multiple-trial alternatives.

*Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990).  Of course, "efficiency cannot be

permitted to prevail at the expense of justice."  *Devlin v. Transportation Comm'ns Intern. Union*,

175 F.3d 121, 130 (2d Cir. 1999).

Consolidation of "stockholders' suits often benefits both the courts and the parties by

expediting pretrial proceedings, avoiding duplication of discovery, and minimizing costs."

*Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 205 (E.D.N.Y. 2019) (quoting *In re Olsten Corp. Sec.*

*Litig.*, 3 F. Supp. 2d 286, 294 (E.D.N.Y. 1998) (internal quotation marks omitted)).  "In

securities actions where the complaints are based on the same 'public statements and reports'

consolidation is appropriate if there are common questions of law and fact and the defendants

will not be prejudiced."  *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1211

(S.D.N.Y. 1992) (quoting *Lloyd v. Industrial Bio-Test Laboratories, Inc.*, 454 F. Supp. 807, 812

(S.D.N.Y. 1978)).

The requirement that separate actions involve a common question of law or fact does not

mean that the actions must be identical.  *See Rauch*, 378 F. Supp. 3d at 204 (citing *Reitan v.*

*China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390, 394 (S.D.N.Y. 2014)).  Indeed,

"[d]ifferences in causes of action, defendants, or the class period do not render consolidation

inappropriate if the cases present sufficiently common questions of fact and law, and the

differences do not outweigh the interests of judicial economy served by consolidation." *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007) (citing *Pinkowitz v. Elan Corp.*, 2002 WL 1822118, at * 3–4 (S.D.N.Y. July 29, 2002)); *see also In re Facebook,* 288 F.R.D. at 35.

      B.  <u>Consolidation of the Putative Class Actions for all purposes is appropriate.</u>

         1.  *Grodko v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-800 ("*Grodko*")

*Grodko* was filed in the Eastern District of Pennsylvania on August 21, 2017.  The *Grodko* complaint alleged—on behalf of a putative class of those who had acquired Teva ADS or Teva common stock through the Tel Aviv Stock Exchange between November 15, 2016 and August 2, 2017—violations of the Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and the Israeli Securities Law of 1968.  *See* Compl., *Grodko*, Doc. No. 1, at ¶ 1.  The *Grodko* complaint listed as defendants Teva, Erez Vigodman, Eyal Desheh, and Yitzhak Peterburg.  *See id.* at ¶¶ 10–13.

      *Grodko* itself is a consolidated class action.  *Baker v. Teva Pharmaceutical Indus., Ltd.*, et al., No. 3:18-cv-798 ("*Baker*"), was filed in the Eastern District of Pennsylvania on August 30, 2017.  The *Baker* complaint asserted the same class, the same class period, and the same violations of federal securities law against the same defendants as in *Grodko* (but it did not allege violations of Israeli law).  *See* Compl., *Baker*, Doc. No. 1, at ¶¶ 1, 10–13.  *Baker* was consolidated into *Grodko* on November 1, 2017.  *See* Order, *Grodko*, Doc. No. 16.  However, on October 23, 2017, Grodko had voluntarily dismissed his complaint because, in part, "a case filed in the United States District Court for the District of Connecticut was expanded to include the claims filed by Plaintiff in this matter."  *See* Notice, *Grodko*, Doc. No. 11.  Grodko was referring to this action.  Other parties moved to be lead plaintiff in *Grodko*, but District Judge Paul

Diamond did not rule on those motions and, instead, transferred *Grodko* to this court on April 10, 2018.  *See* Order, *Grodko*, Doc. No. 37.

In transferring the consolidated *Grodko* action to this court, Judge Diamond noted that "[a]lthough the Connecticut action is broader than *Grodko* and *Baker*, it encompasses the class members, defendants, and allegations present in" *Grodko* and *Baker*.  *See id.* at 9.  *Grodko* and *Baker* were transferred to this court on two separate dockets.[10]  Since the cases have been in this court, there has been no activity on either docket: neither case has a lead plaintiff, operative complaint, or even a plaintiff pursuing a claim.  Further, no party in either case has objected to the parties' joint motion to consolidate *Grodko* and *Baker* into this action.

I will consolidate *Grodko* and *Baker* into this action.[11]  Those cases and this action clearly involve common questions of law and fact.  The FAC in this action subsumed the class period, federal securities law claims, and defendants in both *Grodko* and *Baker*.  *Grodko* and *Baker* focus on Teva's misrepresentations with respect to its acquisition and integration of Actavis Generics; the FAC also included numerous allegations about that acquisition.  *See* FAC, Doc. No. 226, at ¶¶ 79–127.  The parties also report that the SAC "eliminates any areas in which the *Grodko/Baker* Complaint and the [FAC] previously lacked complete overlap."  Joint Mot. to Consolidate, Doc. No. 311, at 10.

However, the *Grodko* complaint does assert a claim based on violation of the Israeli Securities Law of 1968.  *See* Compl., *Grodko*, Doc. No. 1, at ¶¶ 60–63.  Neither the FAC nor SAC asserts such a claim.  The Plaintiffs in this action have explained that they declined to add

---

[10] *Grokdo*'s docket is No. 3:18-cv-800, and *Baker*'s docket is No. 3:18-cv-798.

[11] As described, *Baker* was already consolidated into *Grodko* in the Eastern District of Pennsylvania, so consolidating *Grodko* into this action should also consolidate *Baker* into this action.  However, because *Grodko* and *Baker* were transferred to this District on two different dockets, for the sake of clarity, I formally consolidate both *Grodko* and *Baker* into this action.

any claims based on violations of Israeli law to the SAC because, first, they expect that such claims will be dismissed. *See* Joint Mot. to Consolidate, Doc. No. 311, at 6 n.5 (citing *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*18–20 (S.D.N.Y. Mar. 28, 2018), in which the court declined to exercise supplemental jurisdiction over Israeli law claims). In addition, even if those claims are not dismissed, the Plaintiffs say, they are based on common question of law and fact to the federal securities law claims alleged in this action.

I find that the SAC's omission of claims based on violations of Israeli law does not defeat consolidation. Recall that separate actions need not be identical to consolidate them: rather, they must involve common questions of law and fact. There is no question that the claims in *Grodko* and *Baker* and this action are substantially similar and involve numerous common questions of law and fact. Indeed, the *Grodko* complaint's claim for a violation of the Israeli Securities Law, 1968 premises liability on violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *See* Compl., *Grodko*, Doc. No. 1, at ¶ 62–63. Thus, consolidation will not prejudice the *Grodko/Baker* plaintiffs because the facts and law undergirding their claim based on violation of Israeli law are, in their own view, almost identical to the facts and law undergirding their claims based on violations of federal securities law. Thus, discovery would be nearly identical for both types of claims.

2. *Huellemeier*

*Huellemeier* was filed in the Southern District of Ohio on July 17, 2017. The original *Huellemeier* complaint alleged—on behalf of "all persons who purchased or otherwise acquired" Teva ADS "between February 9, 2015 and November 3, 2016 . . . in the ESPP"—that the defendants violated Section 11 of the Securities Act and state common law by making misrepresentations in the 2010 Registration Statement and documents it incorporated by

reference.  *See* Compl., *Huellemeier*, Doc. No. 1, at ¶¶ 1, 109–36.  Huellemeier explains that

only Teva employees could purchase ADS pursuant to Teva's Employee Stock Purchase Plan

("ESPP").  When an employee wished to do so, the ADS were "held in the ESPP via payroll

deductions . . . and were not purchased on the open market."  Huellemeier's Opp'n, Doc. No. 47,

at 9.  The defendants in *Huellemeier* moved to transfer, and the court granted transfer on

November 17, 2017.

In doing so, District Judge Susan Dlott noted numerous similarities between *Huellemeier*

and this action.  First, three of the four defendants in *Huellemeier* were defendants in this action.

*See* Order, *Huellemeier*, Doc. No. 17, at 9.  (And Hullemeier's counsel has agreed to voluntarily

dismiss the fourth, Shlomo Yanai, because Yanai stopped working for Teva before the class

period in either *Huellemeier* or this action began.[12])  Second, the class period in *Huellemeier* was

subsumed by the class period in this action.  *Id.*  Judge Dlott even noted: "It would appear that

Huellemeier himself falls within the class defined in the *Ontario Teachers*['] action as a person

who purchased or acquired Teva shares between February 6, 2014 and August 3, 2017."  *Id.*

That was because the complaint in this action "does not explicitly limit the proposed class to

those who purchased shares on the open market."  *Id.* at 8.  Third, both actions involved a claim

for violation of Section 11 of the Securities Act, allegations that Teva engaged in price-fixing,

and alleged misrepresentations and omissions in Teva's 2014 and 2015 20-F Forms.  *Id.* at 9.

Judge Dlott concluded: "Based on these similarities, it is highly likely that there will be a

substantial overlap in discovery and briefing in the two cases."  *Id.*

On December 29, 2017, the parties in *Huellemeier* made a joint motion to stay the case,

which I granted on February 12, 2018.  In their joint motion to stay, the parties noted that

---

[12] *See* Joint Omnibus Reply, Doc. No. 326, at 17 n.8.

"[t]here is an overlap between the facts and circumstances alleged in the Teva ESPP Litigation and the Teva Securities Litigation, including the relevance of many of the same documents and witnesses." *See* Joint Mot., *Huellemeier*, Doc. No. 26, at ¶ 3. On November 1, 2019, Huellemeier filed an amended complaint. *See* Am. Compl., *Huellemeier*, Doc. No. 40. That complaint is extremely similar to the FAC in this action,[13] and, clearly, copied large portions of the FAC. The Plaintiffs in this action claim that "*Huellemeier*'s current pleading is a nearly verbatim copy of *Ontario*'s prior Amended Complaint." Joint Omnibus Reply, Doc. No. 326, at 18.

There are three differences between the *Huellemeier* amended complaint and the FAC, and none counsels against consolidation. The first (apparent) difference regards the putative classes in the two actions. The FAC in this action asserts claims on behalf of a putative class of "all persons and entities who, in domestic transactions, purchased or otherwise acquired ADS . . . and were damaged thereby." FAC, Doc. No. 226, at ¶ 355. The amended (and original) complaint in *Huellemeier* asserts claims on behalf of a putative class of "all individuals who purchased or otherwise acquired Teva ADSs pursuant to the Company's ESPP." Am. Compl., *Huellemeier*, Doc. No. 40, at ¶ 437. Although Huellemeier believes that those who acquired Teva ADS through the ESPP are excluded from the proposed class in this action, he is incorrect because—even if employees did not purchase Teva ADS through the ESPP on the open market—employees "otherwise acquired" Teva ADS through the ESPP. Thus, as Judge Dlott recognized, and as the parties here note, the putative class asserted in the FAC includes Huellemeier and the class he seeks to represent. *See* Joint Omnibus Reply, Doc. No. 326, at 21; *see also* Transfer Order, *Huellemeier*, Doc. No. 17, at 9. The SAC makes it explicitly clear—if

---

[13] Indeed, Huellemeier admits that his amended complaint "relies heavily" on the FAC. *See* Am. Compl., *Huellemeier*, Doc. No. 40, at ¶ 2.

there were any doubt—that those who acquired Teva ADS through the ESPP during the Class Period are putative class members.  *See* SAC, Doc. No. 311, at ¶ 394.

The second difference between the *Huellemeier* amended complaint and the FAC regards the state common law claims asserted in *Huellemeier*.  The *Huellemeier* complaint alleges three state common law claims for breach of fiduciary duty, misrepresentation and non-disclosure, and breach of contract.  *See* Am. Compl., *Huellemeier*, Doc. No. 40, at ¶¶ 451–71.  The FAC did not allege any of those claims, but the SAC adds them.  *See* SAC, Doc. No. 310, at ¶¶ 465–85.  I explain below why the Plaintiffs may properly assert those claims in the SAC.  In addition, I note here that the facts necessary to prove the state common law claims asserted in the *Huellemeier* complaint will be nearly identical to the facts necessary to prove the federal securities law claims asserted in the FAC in this action: both kinds of claims are premised on Teva and certain of its officers and directors' false and misleading statements regarding the reasons behind Teva's financial success during the same period of time.  *Compare* FAC, Doc. No. 226, at ¶ 1 *with* Am. Compl., *Huellemeier*, Doc. No. 40, at ¶ 4 (both explaining that "[t]his action arises from the difference between what the Defendants told investors was driving Teva's financial success and the truth behind Teva's performance").  Indeed, Huellemeier's nearly wholesale copying of the FAC into his amended complaint—the sentence in the *compare* citation above is an example of that—shows the extent of the factual overlap between the two kinds of claims.

The third difference between the *Huellemeier* amended complaint and the FAC regards the nature of the Section 11 claim in each case.  Plaintiffs' Section 11 claim in this action concerns misstatements made in connection with the ADS/Preferred Registration Statement filed with the SEC on November 30, 2015.  *See* SAC, Doc. No. 310, at 6 (glossary), ¶ 439.  Huellemeier's Section 11 claim concerns misstatements made in connection with the 2010

Registration Statement, filed with the SEC on July 27, 2010.  *See* Compl., *Huellemeier*, Doc. No.

1, at ¶ 38.  The 2010 Registration Statement incorporates by reference "all documents filed by

the Registrant with the [SEC] pursuant to Sections 13(a), 13(c), 14 and 15(d) of the [Exchange

Act] . . . subsequent to the date of this Registration Statement."  *See id.*  Those later-filed

documents, including a 2014 Form 20-F, and three 2015 Forms 6-K, also are incorporated by

reference into the ADS/Preferred Registration Statement and form the basis for the Plaintiffs'

Section 11 claim in this action.  *See* SAC, Doc. No. 310, at ¶ 428; Joint Omnibus Reply, Doc.

No. 326, at 21 & n.12.  Thus, "every alleged misstatement underlying Ontario Teachers' claim

also supports ESPP purchasers' Section 11 claim."  Joint Omnibus Reply, Doc. No. 326, at 21.

### 3.  *St. Petersburg*

*St. Petersburg* was filed in the Eastern District of Pennsylvania on June 21, 2019.  The

plaintiff alleges—on behalf of all persons or entities who acquired Teva ADS between August 4,

2017 and May 10, 2019—that Teva, Kåre Schultz, and Michael McClellan violated Sections

10(b) and 20(a) of the Exchange Act and Rule 10b-5 through their "consistent denials during the

Class period of having engaged in any anticompetitive practices."  Compl., *St. Petersburg*, Doc.

No. 1, at ¶¶ 1–2.  On August 23, 2019, four groups of movants made motions to be appointed

lead plaintiff in *St. Petersburg*.  Two groups of those movants withdrew their motions and

supported HMG's motion.  *See* Response, *St. Petersburg*, Doc. No. 20; Notice, *St. Petersburg*,

Doc. No. 22.  Thus, only two movants remained: HMG and the Employees' Retirement System

of the City of St. Petersburg, Florida ("SPERS").  On October 8, 2019, Judge Diamond granted

the defendants' motion to transfer[14] *St. Petersburg* to the District of Connecticut, and he did not

---

[14]       During the briefing period regarding *St. Petersburg*'s transfer, HMG and Ontario Teachers' took positions
that are in significant tension with the positions they take now.  For instance, Ontario Teachers' filed an unsolicited
submission opposing transfer because the cases were "not sufficiently related to warrant transfer."  *See* Response, *St.
Petersburg*, Doc. No. 33, at 1.  Ontario Teachers' continued to explain that *St. Petersburg* "involves entirely

rule on the pending motions for appointment as lead plaintiff.  *See* Order, *St. Petersburg*, Doc. No. 37.

The similarities between the FAC in this action and the complaint in *St. Petersburg* were many.  In granting the defendants' motion to transfer *St. Petersburg* to this court, Judge Diamond noted that "the factual background and subject matter" of the two cases are "substantially similar" because "the subject matter of both actions is premised on Teva's alleged involvement in an industry-wide price-fixing scheme."  Order, *St. Petersburg*, Doc. No. 37, at 9–10.  The *St. Petersburg* complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  In this action, the Plaintiffs bring claims for violations of the same provisions (in addition to other claims).  The putative class in *St. Petersburg* includes "all persons who purchased or otherwise acquired Teva ADS" between August 4, 2017 and May 10, 2019.  *See* Compl., *St. Petersburg*, Doc. No. 1, at ¶ 59.  The proposed class in the FAC in this action covered all who "purchased or otherwise acquired" the same security—Teva ADS—between February 6, 2014 and August 2, 2017.  *See* FAC, Doc. No. 226, at ¶ 355.  Thus, the two actions seek to represent a class of holders of the same security.  Perhaps because of those clear

---

different alleged false statements and a different theory of falsity" than *Ontario Teachers'*, and so "while discovery and proof in [*Ontario Teachers'*] will focus on the subject matter of the misstatements at issue there, the instant action will instead focus on the separate and distinct question of whether Teva committed securities fraud by affirmatively denying its own antitrust liability in the context of certain lawsuits and proceedings."  *Id.* at 1–2. Ontario Teachers' did note that it "expressly reserves all rights and arguments with regard to Defendants' and HMG's arguments about the potential effect of transfer on [*Ontario Teachers'*] and the claims asserted here."  *Id.* at 3 n.1.  Ontario Teachers' explains that its prior opposition was "based on concerns that amending its then-operative pleading without Defendants' consent would prompt further motion practice and a renewed discovery stay," but that that concern is no longer present because of the SAC.  *See* Ontario Teachers' Opp'n to Mot. to Intervene, Doc. No. 324, at 8.

Similarly, HMG supported transferring *St. Petersburg* to this district because, among other reasons, *Ontario Teachers'* was a "substantially similar consolidated securities litigation" with "substantially similar claims."  Mot. to Transfer, *St. Petersburg*, Doc. No. 14-1, at 3, 13.

Throughout their briefing, the HMG and Ontario Teachers' both point repeatedly to each others' statements in those prior submissions to suggest that their positions now are disingenuous or weak.  But I accord those prior submissions very little weight because they were made in a different posture and at a very different stage of litigation.

similarities, SPERS—one of the two movants for lead plaintiff in *St. Petersburg*—does not oppose consolidation so long as the Plaintiffs here assert the class claims advanced in *St. Petersburg*.  *See* Notice, *St. Petersburg*, Doc. No. 70, at 2–3.  And, in the SAC, the Plaintiffs have done exactly that.

To be sure, the *St. Petersburg* complaint is not identical to the FAC in this action.  First, the theory of liability in *St. Petersburg* concerns the Defendants' misstatements regarding Teva's anticompetitive activity.[15]  That is, the claims in *St. Petersburg* "arise[] from Teva's consistent denials during the Class Period of having engaged in any anticompetitive practices."  Compl., *St. Petersburg*, Doc. No. 1, at ¶ 2.  To that end, the *St. Petersburg* complaint identifies public filings—Forms 6-K, 10-K, and 10-Q—and a few company-issued statements during the Class Period in which Teva denied any involvement in anticompetitive conduct.  *See* Compl., *St. Petersburg*, Doc. No. 1, at ¶¶ 30–37.  In contrast, although the FAC in this action alleges that Teva engaged "in a series of anticompetitive conspiracies" to raise the prices of generic drugs, that is not the sole focus of the FAC.  *See* FAC, Doc. No. 226, at ¶¶ 285–309.

However, the conduct alleged in the *St. Petersburg* complaint is a clear continuation of the conduct alleged in the FAC in this action.  The success of the *St. Petersburg* complaint will depend on many of the same facts that the Plaintiffs in this action must prove to sustain their claims as asserted in the FAC.  For instance, the theory in *St. Petersburg* relies heavily on the May 2019 complaint against Teva released by 44 State Attorneys General (the "May 2019 State AGs' Complaint").  *See* Compl., *St. Petersburg*, Doc. No. 1, at ¶¶ 9–11 (noting that "[t]he full

---

[15] Although the focus of the *St. Petersburg* complaint is on Teva's denials of anticompetitive behavior, that is merely the theory of liability: it is a securities case, not an antitrust case.  As a case in point, *St. Petersburg* was initially classified as "related" to the anti-trust MDL in the Eastern District of Pennsylvania; but District Judge Cynthia Rufe, presiding over that MDL, filed an order removing the "related" designation from *St. Petersburg* because it alleges violation of securities laws, not antitrust laws.  *See* Order, *St. Petersburg*, Doc. No. 2.

extent of Teva's years-long lies and extensive involvement in the price-fixing conspiracy was not

fully revealed" until the May 2019 State AGs' Complaint).  But the May 2019 State AGs'

Complaint was a continuation of investigations into Teva and other generic drug companies that

had begun years earlier and on which the FAC in this action relied.  For instance, the FAC noted

that the United States Department of Justice had criminally charged officers of one of Teva's

competitors in December 2016 for "manipulating the market" for a particular generic drug for

which "Teva controlled over 75% of the market" during the class period.  *See* FAC, Doc. No.

226, at ¶ 142.  The FAC similarly relied on a December 2016 federal lawsuit against Teva USA

by 20 State AGs alleging antitrust violations with respect to that same generic drug.  *See id.* at ¶

143.  The FAC also contained a section titled, in part, "Teva Engaged In Collusion," that

discussed a consolidated class action complaint filed in June 2018 by over 40 State AGs (the

clear predecessor to the May 2019 State AGs' Complaint).  *See id.* at ¶¶ 285–300.  The FAC

even anticipated further antitrust investigations and noted: "State AGs are now investigating

conspiracies regarding upwards of 200 drugs, and will file additional complaints in the future."

*See id.* at ¶ 144.  Thus, even though the May 2019 State AGs' Complaint is different in scope

from the investigations and complaints that preceded it, its thrust is the same: Teva was colluding

with its competitors in an anticompetitive manner.

Additionally, although the FAC could not, of course, have alleged false statements that

would be made in the future, it did allege false statements from the then-Teva CEO and CFO that

share the same substance as the later false statements on which the plaintiffs in *St. Petersburg*

rely.  For instance, the FAC quotes then-CFO Desheh as saying in November 2015 that Teva was

"playing a competitive game" with respect to pricing.  *See id.* at ¶ 201.  The FAC also quoted

then-CEO Vigodman as saying in November 2016 that he "was not aware of any fact that would

give rise to an exposure to Teva with respect to" the State AGs' and DOJ investigations into Teva at that time.  *See id.* at ¶ 281.

The further differences between *St. Petersburg* and this action also do not counsel against consolidation.  First, although two of the three defendants in *St. Petersburg* were not named in the FAC, those two defendants are Teva's current CEO (Kåre Schultz), who has been in the job since September 2017, and its CFO between November 2017 and 2019 (Michael McLellan).  Both of their predecessors (Erez Vigodman and Eyal Desheh, respectively) were named in the FAC in this action.  In addition, the *St. Petersburg* complaint alleges involvement of Schultz and McClellan only insofar as they signed the Forms 10-Q and 10-K filed with the SEC throughout the class period.  *See* Compl., *St. Petersburg*, Doc. No. 1, at ¶ 32.  Second, the class periods alleged in the FAC and in the *St. Petersburg* complaint do not overlap; they are consecutive.  However, the above discussion highlights how many facts are common to both actions; the proof in each action will be substantially the same.  That is because the Defendants' misrepresentations regarding Teva's financial results and denials of anticompetitive behavior before *and* after August 3, 2017 were part of the same course of conduct.  Losses on Teva ADS from 2017 to 2019 implicate the same set of concerns as the losses on Teva ADS from 2014 to 2017.

Finally, in this discussion I have noted the similarities between the FAC in this action and the complaint in *St. Petersburg*.  Those similarities are important because they show the overlap in the two actions even before the SAC was filed in this action.  However, the SAC, which I hold is the operative complaint in this action (discussion below), eliminates the differences that existed between the claims in this action and in *St. Petersburg*.  *See* SAC, Doc. No. 310, at ¶¶ 31–32 (adding Schultz and McClellan as defendants), 250–55 (Forms 6-K, 10-K, and 10-Q

between August 3, 2017 and February 19, 2019), 372–76 (December 2018 *Washington Post* article and May 2019 State AGs' Complaint).

      4.  The SAC

As the above discussion indicates, consolidation of the Putative Class Actions would likely have been warranted even had the Plaintiffs in this action not filed the SAC.  However, on December 13, 2019, the Plaintiffs in this action filed the SAC with the consent of the Defendants.  The SAC is different in several respects from the FAC.  First, the SAC extends the class period's end point by nearly two years, from August 3, 2017 to May 10, 2019.  *See* SAC, Doc. No. 310, at ¶ 1.  Second, although the SAC still alleges all the same federal securities claims as the FAC, it also alleges additional claims and theories that were alleged in the other three Putative Class Actions.  In particular, the SAC incorporates the allegations underlying the anticompetitive theory in *St. Petersburg*, adds the relevant defendants from *St. Petersburg*, absorbs the three state common law claims alleged in *Huellemeier*, and integrates the Section 11 claim based on the Registration Statement alleged in *Huellemeier*.  *See* SAC, Doc. No. 310, at ¶¶ 31–32, 41, 250–55, 372–76, 465–85.  In all, the FAC was 424 paragraphs, and the SAC is 487 paragraphs.

In addition, the parties report that, as part of the Defendants' consent to the SAC, the

> Defendants have agreed that they will not advance at any stage of the case the arguments that Lead Plaintiff or Named Plaintiff . . . do not have standing to advance the claims that are the subject of the amendments, or that Plaintiffs are not adequate or typical representatives for purposes of representing the class, and Defendants shall not use the fact of the amendment itself to challenge class certification . . . .  Subject to the exceptions set forth in this paragraph, Defendants do not waive and expressly reserve all arguments and defenses, and Defendants may advance any argument or defense at a later stage of the case, including in support of any motion for summary judgment.  Defendants shall not move under Fed. R. Civ. P. 12 with respect to the amended complaint.

Doc. No. 311, at 15–16; *see also* Proposed Order, Doc. No. 311-1, at ¶¶ 7–10.  The Defendants explain that their interest in "avoiding the expense and burden associated with litigating multiple class actions lawsuits asserting essentially the same claims" informed their decision to consent to the SAC in this case.  *See* Defs.' Mem. in Opp'n to Mot. to Intervene, Doc. No. 325, at 9.  I hold that the SAC is a proper pleading and is the operative complaint in this action.

        a.   The SAC does not require republication under the PSLRA.

Under the PSLRA, a plaintiff who files a putative class action complaint "shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class" about the case, thus enabling "any member of the purported class . . . to move the court to serve as lead plaintiff of the purported class."  15 U.S.C. § 78u-4(a)(3)(A).  When a complaint is amended, courts must determine whether republication of such a notice—and relitigation of an appropriate lead plaintiff—is warranted under the PSLRA.  "Courts typically disfavor republication when a complaint is amended unless the amended complaint substantially alters the claims or class members."  *Rauch*, 378 F. Supp. 3d at 207 (citing *Waldman v. Wachovia Corp.*, 2009 WL 2950362, at *1 (S.D.N.Y. Sept. 14, 2009) (internal quotation marks omitted)); *see also Dube v. Signet Jewelers Limited*, 2017 WL 1379385, at *1 (S.D.N.Y. Apr. 14, 2017).  "In cases encompassing the same claims and securities, but somewhat different class periods, courts have generally found that the efficiency cost of republication outweighs the marginal fairness gains of notifying class members" because "most potential lead plaintiffs are probably eligible under either class period."  *Id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 1322721, at *2 (E.D.N.Y. June 1, 2005)).  In sum, when "the legal claims are the same and the

factual allegations are substantially similar between the original and amended Complaints," no republication is necessary under the PSLRA.  *Id.*

The purpose of the PSLRA is a related and relevant concern: the PSLRA's purpose was "to prevent lawyer-driven litigation, and to ensure that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel."  *In re Flight Safety Technologies, Inc. Securities Litig.*, 231 F.R.D. 124, 129 (D. Conn. 2005) (citing *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (internal quotation marks omitted)).  The role of a lead plaintiff "is to empower investors so that they—not their lawyers—exercise primary control over private securities litigation."  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004).

HMG apparently[16] challenges the SAC as an improper pleading under the PSLRA because the SAC "substantially alters the claims and class members" alleged in the FAC by extending the class period by nearly two years, alleging different false statements and corrective disclosures, and by naming new individual defendants.  *See* Mem. in Supp. of Mot. to Intervene, Doc. No. 313, at 11–16.  I have catalogued those differences in detail above in discussing why the *St. Petersburg* action will be consolidated into this action.  Put simply, the conduct alleged in the *St. Petersburg* complaint is a clear continuation of the conduct alleged in the FAC, and the success of the *St. Petersburg* complaint would depend on many of the facts that the Plaintiffs in this action must prove to sustain their claims as asserted in the FAC.

---

[16] HMG seemingly argues that the SAC is improper without republication of notice under the PSLRA, but then explains that "an order for republication of a PSLRA early notice is unnecessary," and, instead, "the more prudent action would be for the Court to strike the new claims and allegations in the SAC."  Mem. in Supp. of Mot. to Intervene, Doc. No. 313, at 18–19.

Two cases that HMG cites in its favor actually indicate that republication of notice under the PSLRA is not warranted here. The first is *In re Leapfrog Enter., Inc. Sec. Litig.* In *Leapfrog*, the court held that republication was warranted when a lead plaintiff in a consolidated class action amended its complaint to "vastly expand[] their original complaint." *Leapfrog*, 2005 WL 5327775, at *3 (N.D. Cal. July 5, 2005). Indeed, the *Leapfrog* lead plaintiff's original complaint was 21 pages and focused on the defendants' statements about LeapFrog's general financial outlook. *See id.* The lead plaintiff's amended complaint was 135 pages, included far more detailed allegations about, for instance, the defendant's "distribution and supply chain," and expanded the class period by a factor of two-and-a-half. *Id.*

The second is *Signet Jewelers*. In *Signet Jewelers*, the court granted a party's motion to intervene for the purpose of seeking an order requiring the lead plaintiff to republish notice pursuant to the PSLRA. *See Signet Jewelers*, 2017 WL 1379385, at *1. The court held that republication was necessary for two reasons. The first regarded the class period expansion: the original class period ran about six months, but the amended complaint's class period ran three-and-a-half *years* (a six-fold increase). *See id.* The second—"more significant[]"—reason was that the amended complaint "dramatically" altered the gravamen of the claims alleged against the defendants. In the original complaint, the allegations all regarded the poor performance of simple, core business activities that made the defendants' "positive statements about [their] business, operations, and prospects . . . false and misleading"; in the amended complaint, the lead plaintiffs alleged two "categorically different theories of securities fraud": (a) that the defendants' failed to disclose "blatant sexual harassment of female employees," which was "a pervasive feature of its corporate culture," and (b) that the defendants "omitted material facts about the quality of its credit portfolio." *Id.* at *2.

21

This case is unlike *Leapfrog* and *Signet Jewelers* because the differences between the prior and amended complaints in those two actions were much more substantial than the differences between the FAC and the SAC here.  In this action, the class period expanded from the FAC to the SAC by, about, a factor of one-and-a-half.  That expansion is substantially less than the expansions in both *Leapfrog* and *Signet Jewelers*.  In addition, the *Signet Jewelers* court itself explained that the PSLRA republication inquiry is "more qualitative" than quantitative; thus, a class period multiplication exercise is a less important consideration than a qualitative comparison of the two complaints.

That qualitative comparison leaves little doubt that the SAC is not a "substantially altered" version of the FAC.  The court in *Leapfrog* noted that the lead plaintiff's original complaint was 21 pages and its amended complaint was 135 pages.  In contrast, the FAC in this action was 424 paragraphs, and the SAC is 487 paragraphs.  The court in both *Leapfrog* and *Signet Jewelers* noted the substantial differences in the factual underpinnings between the claims and theories advanced in the prior and amended complaints in those actions.  In this action, though, the factual underpinnings of the FAC and SAC are substantially the same.  To encompass *Huellemeier*, the SAC added paragraphs alleging state common law claims and referring to the 2010 Registration Statement.  As explained above, those additions are not "substantial alterations" because the state common law claims in *Huellemeier* and the federal securities claims in this action depend on the same facts, and the 2010 Registration Statement incorporates by reference public filings already mentioned in the FAC.  To encompass *St. Petersburg*, the SAC added paragraphs regarding public filings from the *St. Petersburg* class period, further denials of anticompetitive conduct, and adds two new defendants.  Those additions do not "substantially alter" the FAC because the Defendants' anticompetitive conduct

and their *previous*, *related* denials were already part of the theory of liability in the FAC.

Indeed, the FAC explicitly anticipated further developments with respect to the State AGs'

investigation into Teva's anticompetitive conduct.  For those reasons, I hold that the SAC does

not "substantially alter" the FAC and so republication of notice under the PSLRA is not

warranted.

> b.  The Plaintiffs have class standing to assert all the claims in the SAC.

In the Second Circuit, a lead plaintiff in a putative class action has "class standing" to

assert claims on behalf of other putative class members

> if he plausibly alleges (1) that he "personally has suffered some actual . . .
> injury as a result of the putatively illegal conduct of the defendant," and (2)
> that such conduct implicates "the same set of concerns" as the conduct
> alleged to have caused injury to other members of the putative class by the
> same defendants.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir.

2012).  There is no dispute that the Plaintiffs have plausibly alleged that they have suffered an

actual injury as a result of the putatively illegal conduct of the Defendants.  *See* Order, Doc. No.

283, at 69.  Whether a defendant's illegal conduct implicates the "the same set of concerns" as

the conduct alleged to have caused injury to other members of the putative class depends on

whether the Plaintiffs have "a sufficiently personal and concrete stake in proving [those] other,

related claims."  *Retirement Bd. of the Policemen's Annuity and Ben. Fund of the City of*

*Chicago v. Bank of New York Mellon*, 775 F.3d 154, 163 (2014).  The Plaintiffs have such an

interest if "the proof contemplated for all of the claims [will] be sufficiently similar."  *Id.* at 161.

In *NECA*, the plaintiff sued under the Securities Act on behalf of a putative class

consisting of all persons who acquired certain mortgage-backed certificates underwritten by the

defendants there.  693 F.3d at 149.  The certificates were sold in seventeen separate offerings

which were all based on common shelf registration statements but which also all had unique

offering documents. *Id.* at 162–63. The court held that the plaintiff—which had bought

certificates from only two of the offerings—could assert claims on behalf of certificate-holders

from other offerings that "were backed by loans originated by originators common to those

backing the" two offerings in which the plaintiff itself had purchased certificates. *Id.* at 164–65.

In contrast, in *Policemen's Annuity*, the named plaintiff sought to assert absent class members'

breach of duty claims against the trustee of a trust in which the named plaintiff did not invest; the

court held that the named plaintiff did not have class standing because "[i]n contrast to *NECA*,

where the defendants' alleged Securities Act violations inhered in making the *same*

misstatements across multiple offerings, [the defendant's] alleged misconduct must be proved

loan-by-loan and trust-by-trust." 775 F.3d at 162.

　　This case is more like *NECA* than like *Policemen's Annuity* because the facts required to

prove the Plaintiffs' "own" claims will be substantially similar to—not "very different" from—

the facts required to prove the "other, related claims" against the Defendants. *See id.* at 163.

That is plainly true in *Grodko*, which asserts the same federal securities claims against a subset

of the same defendants during a subset of the same class period as in this action. Even though

*Grodko* assert a claim based on Israeli law, Grodko himself noted that that claim was premised

on violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *See* Compl.,

*Grodko*, Doc. No. 1, at ¶ 62–63.

　　The same is true in *Huellemeier*. As explained above, the first difference that

Huellemeier identifies between *Huellemeier* and this action is illusory: those who acquired Teva

ADS through the ESPP have always been a part of the putative class in this action. *See* Joint

Omnibus Reply, Doc. No. 326, at 21; *see also* Transfer Order, *Huellemeier*, Doc. No. 17, at 9

("It would appear that Huellemeier himself falls within the class defined in the *Ontario Teachers*['] action as a person who purchased or acquired Teva shares between February 6, 2014 and August 3, 2017.").

The second difference that Huellemeier identifies—that the *Huellemeier* complaint asserts state common law claims, *see* SAC, Doc. No. 310, at ¶¶ 465–85, and a Section 11 claim in connection with the 2010 Registration Statement based on Teva ADS acquired through the ESPP, *see id.* at ¶ 441—also does not defeat the Plaintiffs' class standing in this action because the claims implicate the same set of concerns. As explained above, the 2010 Registration Statement and the ADS/Preferred Registration Statement incorporated by reference the same crucial filings: a 2014 Form 20-F, and three 2015 Forms 6-K. Thus, the misstatements underlying Ontario Teachers' Section 11 claim also support the Section 11 claim in *Huellemeier*.

Regarding the *Huellemeier* complaint's state common law claims, it is undeniable that essentially the same facts undergird those claims and the federal securities law claims in this action. Indeed, Huellemeier amended his complaint to conform to the FAC in this action. Although *Huellemeier*'s state common law claims regard the Defendants' duties with respect to those putative class members who acquired Teva ADS through the ESPP, the claims "implicate the same set of concerns" as the federal securities law claims in this action because both types of claims rely on many of the same alleged misrepresentations. *See, e.g.*, Huellemeier's Opp'n, *Huellemeier*, Doc. No. 47, at 29 (explaining that to prove breach of fiduciary duty, Huellemeier will show that the Defendants made "misleading statements of material fact in the [2010] Registration Statement and in SEC filings subsequently incorporated into the Registration Statement"). For the above reasons, the facts required to prove Huellemeier's Section 11 and

state common law claims will be substantially similar to the proof required to prove the Plaintiffs' federal securities law claims.

In addition, the Plaintiffs have class standing to pursue the Exchange Act claims asserted in *St. Petersburg* on behalf of those who acquired Teva ADS between August 4, 2017 and May 10, 2019.  Ontario Teachers' last purchased Teva ADS on September 29, 2016, and, since then, has sold some if its ADS.  *See* App. D to SAC, Doc. No. 310.  However, the Plaintiffs have class standing to assert claims regarding the losses alleged on Teva ADS purchased or otherwise acquired between August 4, 2017 and May 10, 2019 because those losses resulted from the Defendants' sustained course of conduct originating at the beginning of the class period.  *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) ("With respect to class representative standing, it is well established that where, as here, plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period.") (citing *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 187 (S.D.N.Y. 1992)).  As described above, the Defendants' misrepresentations regarding Teva's financial results and its denials of anti-competitive behavior between August 4, 2017 and May 10, 2019 were part of the same course of conduct described in the FAC.  Thus, the Defendants' conduct that caused losses on Teva ADS from August 4, 2017 to May 10, 2019 implicates the "same set of concerns" as their conduct that caused losses on Teva ADS from February 6, 2014 through August 3, 2017.

Finally, there is every indication that the Plaintiffs will adequately pursue all the claims in the SAC.  In *In re Central European Distribution Corp. Securities Litig.* ("*CEDC*"), the court de-consolidated two actions when the lead plaintiffs in the first action "indicated that they

[would] not prosecute" claims arising from the second action because keeping the cases consolidated would "prejudice" the claimants in the second action "by subjecting them to a lead plaintiff that would neglect their claims."  2012 WL 5465799, at *9 (D.N.J. Nov. 8, 2012).  In *CEDC*, the claims raised by lead plaintiffs in the first action and the claimants in the second action were extremely different: the first action regarded "CEDC's management of its vodka portfolio," and the second action regarded "the accounting actions of a CEDC subsidiary in Russia."  *Id.*

This case is different.  The Plaintiffs in this action have indicated that they will prosecute all claims in the SAC.[17]  Indeed, the Plaintiffs report that even before filing the SAC, they had "already vigorously pursued claims for the post-August 3, 2017 period, including by serving extensive discovery requests concerning that period."  *See* Joint Omnibus Reply, Doc. No. 326, at 22; Ontario Teachers' Opp'n to HMG's Mot. to Intervene, Doc. No. 324, at 16 ("[O]n October 3, 2019, days after the Court ruled on Defendants' motions to dismiss, Ontario Teachers' propounded requests for documents concerning the entire period following August 17, including seeking discovery concerning the February 2018 writedown; the December 2018 article in *The Washington Post*; the State AGs' May 2019 amended complaint; and Teva's various denials of collusion.").

5.  Consolidation rather than coordination

HMG and Huellemeier seek to coordinate—rather than consolidate—*St. Petersburg* and *Huellemeier* with this action.  In the alternative, each seeks to be appointed lead plaintiff for a sub-class of Teva ADS purchasers.  I find that consolidation is much the better option.

---

[17] As noted above in n.14, I accord hardly any weight to Ontario Teachers' statements in their motion opposing transfer of the *St. Petersburg* action.  *See* Response, *St. Petersburg*, Doc. No. 33, at 1.

Were I to coordinate *St. Petersburg* and *Huellemeier* with this action, *St. Petersburg* and *Huellemeier* would be far behind this action in the litigation timeline. In neither case has a lead plaintiff been properly appointed. After I appointed a lead plaintiff, the defendants in both actions would certainly file motions to dismiss. Those motions to dismiss would trigger a mandatory discovery stay under the PSLRA. *See* 15 U.S.C. § 78u-4(b)(3)(B) ("[A]ll discovery and other proceedings shall be stayed during the pendency of any motion to dismiss . . . ."). Meanwhile, pursuant to my Case Management Order, this action is currently on schedule to conclude fact discovery by February 26, 2021. *See* Order, Doc. No. 298, at 2.

Allowing *St. Petersburg* and *Huellemeier* to proceed on that delayed timeline would be extremely inefficient precisely because those actions are so similar to this action. *See In re Facebook, Inc.,* 2013 WL 4399215, at *1 (holding that, despite some difference between putative class actions, "there was no reason to allow two separate class action[s] to proceed under different leadership structures" and that "[t]o reject consolidation would unnecessarily create two distinct and parallel securities litigation cases with different plaintiffs and different leadership"). If these actions were coordinated, rather than consolidated, Plaintiffs in this action would be litigating on behalf of those who acquired Teva ADS from February 6, 2014 through August 3, 2017; lead plaintiffs in *St. Petersburg* would be litigating on behalf of those who acquired the *same securities* between August 4, 2017 and May 10, 2019; and lead plaintiffs in *Huellemeier* would be litigating on behalf of those who acquired the *same securities*—only through the ESPP—during the class period in this action. That fracturing would be highly inefficient.

It might also be prejudicial to the putative class members in *St. Petersburg* and *Huellemeier*. In parallel class actions, "[a] judgment in either class action would preclude further litigation of the other," and the plaintiffs in each parallel action would thus "necessarily be in

destabilizing competition to race to an early resolution." *Id.* at *5 (citing *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 110 (2d Cir. 2000)).  Thus, coordinating *St. Petersburg* and *Huellemeier* with this action would be inefficient and potentially prejudicial to potential class members in those actions.  It would also negate the purpose of the PSLRA: to "empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole." *Hevesi*, 366 F.3d at 82, n.13.

I also decline to create a sub-class in this action.  I have explained above why the Plaintiffs in this action have class standing to pursue all the claims asserted in the SAC and why there is no reason to doubt that they will do so zealously.  It is not necessary that "a different lead plaintiff be appointed to bring every single available claim, as such a requirement would contravene the main purpose of having a lead plaintiff." *Police and Fire Retirement Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013) (quoting *Hevesi*, 366 F.3d at 82 n.13) (internal quotation marks omitted).  However, "there must be a named plaintiff sufficient to establish jurisdiction over each claim advanced." *See id.*

C.  <u>Consolidation of the Direct Actions for all pre-trial purposes is appropriate.</u>

The parties in this action urge that the Direct Actions should be consolidated with this action for many of the same reasons that the Putative Class Actions should be consolidated.  The parties point to the "common questions of fact and law" in the Direct Actions and this action: all allege claims under the Exchange Act; all assert those claims against four of the defendants in this action; all arise out of alleged misstatements concerning Teva's "pricing" and "competition"; and all involve claims during the class period alleged in the SAC.  *See* Joint Mot. to Consolidate Cases, Doc. No. 311, at 17.  During the pendency of the motions to dismiss in this action, the parties in all the Direct Actions made submissions in which they noted the substantial overlap

between this action and that particular Direct Action. *See id.* at n.10 (collecting cites in all Direct Actions except *OZ ELS*); *see also* Joint Mot. for Ext. of Time, *OZ ELS*, Doc. No. 18, at ¶ 1 (referring to this action as "the related class action").

Further, courts frequently consolidate class actions and related direct actions for pre-trial purposes. *See, e.g.*, *In re Worldcom, Inc. Securities Litig.*, 2003 WL 21219037 (S.D.N.Y. May 22, 2003); *Crowe v. JPMorgan Chase & Co.*, 2009 WL 3852381 (S.D.N.Y. Nov. 18, 2009); *In re Enron Corp. Securities Litig.*, 206 F.R.D. 427 (S.D. Tex. 2002). The *Worldcom* court explained that an important consideration in consolidating those actions for pre-trial purposes was "the preservation of assets for distribution to plaintiffs" should a recovery occur. *In re Worldcom*, 2003 WL 21219037, at *3. In particular, the *Worldcom* court noted that inflated attorneys' fees might reduce recovery unnecessarily and that, even if they did not, defendants who had spent heavily on their defense would be inflexible in settlement discussions. *See id.* Another important consideration was making sure that parties in the Direct Actions had "a full and fair opportunity for discovery," so that the Direct Actions are trial-ready when an individual plaintiff opts out of any class that is certified. *See id.* Finally, the Direct Action parties must "hav[e] access to any information learned during the course of discovery" and "have an opportunity to ensure that the discovery conducted is sufficient to meet the needs of their action" so that the Direct Actions can be in "a position to participate effectively in settlement discussions." *Id.* In this case, consolidating the Related Actions would achieve all three goals because it would appropriately conserve the Defendants' resources and allow the Direct Actions to proceed to discovery now, without motions to dismiss being filed in those cases (which would, again, trigger mandatory discovery stays under the PSLRA).

Still, the Direct Action plaintiffs (except in *OZ ELS*) request that the Direct Actions be coordinated—rather than consolidated—with this action.  The Direct Action plaintiffs' main argument is that numerous Direct Actions assert claims under Israeli law or state law.  *See* Joint Opp'n to Mot. to Consolidate, *Nordea*,[18] Doc. No. 34, at 7–8 n.1 (citing eight Direct Actions with state law claims and nine Direct Actions with Israeli law claims).  The Direct Action plaintiffs claim in particular that consolidating the Direct Actions with this action would be tantamount to dismissing their state law claims because it would subject those claims to preclusion under the Securities Litigation Uniform Standards Act ("SLUSA").  SLUSA directs that "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1).  SLUSA defines a "covered class action," in part, as "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which . . . the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose."  15 U.S.C. § 78bb(f)(5)(B)(ii).  The Direct Action plaintiffs argue that if the Direct Actions are "consolidated" with this action, they will become "covered class actions" within the meaning of SLUSA, and so the Direct Actions' state law claims would be subject to dismissal.

As the parties in this action point out, though, coordination would have the same effect as consolidation on the Direct Actions' state law claims because the Related Actions, even if simply coordinated, would be "otherwise proceed[ing] as a single action."  *See, e.g.*, *Amorosa v. Ernst &*

---

[18] I cite to the *Nordea* docket, but the same joint opposition could be found on the docket of any of the Direct Actions (except *OZ ELS*).

*Young LLP*, 672 F. Supp. 2d 493, 514–18 (S.D.N.Y. 2009); *Kuwait Inv. Office v. American Intern. Grp., Inc.*, 128 F. Supp. 3d 792, 813 (S.D.N.Y. 2015) ("SLUSA sweeps broadly and applies to individual cases that are 'coordinated or consolidated' for pre-trial purposes with a class action"); *In re American Realty Capital Properties, Inc., Litig.*, 2019 WL 2082508, at *4 (S.D.N.Y. May 10, 2019).  Further, as described above, the claims and issues in the Direct Actions are substantially the same as the claims and issues in this action. Courts commonly consolidate direct actions asserting state law claims with putative class actions in situations similar to this.  *See, e.g.*, *In re Worldcom*, 2003 WL 21219037, at *4.  Nor do the Israeli law claims included in some of the Direct Actions counsel against consolidation.  Again, as discussed above with respect to *Huellemeier*, the facts and law undergirding the Israeli law claims in the Direct Actions are substantially the same (if not exactly the same) as those undergirding the federal securities law claims in this action.  Thus, the Direct Actions and the Putative Class Actions should be consolidated for pre-trial purposes.

    D.  HMG's Motion to Intervene

        On December 20, 2019, HMG made a motion to intervene in this action "to obtain an order striking" the SAC.  *See* Mot. to Intervene, Doc. No. 312.  HMG's arguments in this posture largely mirror its arguments in its opposition to the parties' joint motion to consolidate the Related Actions.  In particular, HMG claims that the SAC was an improper pleading under the PSLRA because it "substantially alters the claims and class members" in this action, and there was no republication of notice issued to class members as required by the PSLRA.  *See* 15 U.S.C. § 78u-4(a)(3)(A); Mem. in Supp. of Mot. to Intervene, Doc. No. 313, at 6.  Further, HMG suggests that the Defendants' consenting to the SAC and agreeing to waive further Rule 12

motions and challenges to the Plaintiffs' adequacy and typicality indicate "collusion" between the parties in this action.  *See id.* at 7–8.

On timely motion, a court *must* permit a party to intervene as of right when that party:

> (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  On timely motion, a court *may* permit a party to intervene who "(A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b).  However, courts equate mandatory and permissive intervention and require that "[t]o be granted intervention as of right *or* by permission, an applicant must" satisfy the requirements of intervention as of right.  *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014).  Failure to satisfy any one of the requirements of mandatory intervention is sufficient grounds to deny a motion to intervene.  *See In re Bank of New York Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003) (internal citation and quotation marks omitted).  When a putative intervenor and a named party "have the same ultimate objective," a presumption of adequate representation attaches that can be rebutted by evidence of "collusion, adversity of interest, nonfeasance, or incompetence." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001).

The only relevant question is whether Ontario Teachers' adequately represents HMG's interests.  Ontario Teachers' and HMG plainly do have the same ultimate objective: they want to recover for Teva ADS holders.  Thus, a presumption of adequate representation attaches to Ontario Teachers' that HMG must rebut.  HMG first alleges that Ontario Teachers' does not have a personal stake in recovering for losses on Teva ADS in the *St. Petersburg* class period

because Ontario Teachers' stopped buying Teva ADS in September 2016 and, since then, has sold some of its Teva ADS holdings.  *See* App. D to SAC, Doc. No. 310.  But, again, a lead plaintiff in a consolidated securities class action need not have purchased shares all the way until the end of the class period.  *See Vivendi Universal*, 242 F.R.D. at 87; *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 477–79 (D.N.J. 1998) (rejecting an argument that lead plaintiffs would have a "disincentive" to prove the claims of putative class members who purchased common stock after lead plaintiff stopped purchasing common stock because accepting that argument would "injure the purpose of the PSLRA by fragmenting the plaintiff class and decreasing client control"); *In re Synergy Pharm. Inc. Sec. Litig.*, 2019 WL 6150713, at *5–6 (E.D.N.Y. Nov. 20, 2019).

HMG also suggests that the SAC—and the concessions that the Defendants have made—are evidence of "collusion" between the parties in this action.  That assertion is speculation and runs counter to the evidence.  There is no reason to believe that the SAC was the product of anything other than an arms-length bargain.  As the Plaintiffs point out, the filing of the SAC and subsequent consolidation of all the Related Actions will confer benefits on the purported class members in *St. Petersburg*: their claims, filed in 2019, will not be subject to a motion to dismiss and will begin discovery at the same time as this action, which has already been in litigation for years.  *See* Ontario Teachers' Opp'n to HMG's Mot. to Intervene, Doc. No. 324, at 18.  The Defendants emphasize that consenting to the SAC benefitted them by streamlining the litigation against them, which they have been trying to do for years as evidenced by their proactively seeking to transfer all the Related Actions to this district.  *See* Defs.' Mem. in Opp'n to Mot. to Intervene, Doc. No. 325, at 9–10.  For the foregoing reasons, HMG's motion to intervene, doc. no. 312, is **denied**.

### III.    Conclusion

For the foregoing reasons, the parties' joint motion to consolidate, doc. no. 311, is **granted**.  The clerk is directed to consolidate into this action all the cases listed above in footnotes 2 and 3.  The *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus., Ltd., et al.* case, No. 3:20-cv-83, which was transferred to me on January 31, 2020—after the consolidation briefing had concluded—shall also be consolidated into this action for all pre-trial purposes.


So ordered.

Dated at Bridgeport, Connecticut, this 10th day of March 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge