# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-CV-558 (SRU) |
| THIS DOCUMENT RELATES TO: | |
| NORDEA INVESTMENT MANAGEMENT AB, | No. 3:18-cv-01681 (SRU) |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; YAACOV ALTMAN; SIGURDUR OLAFSSON; KÅRE SCHULTZ; AND MICHAEL MCCLELLAN, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................................... 9

III.  PARTIES AND RELEVANT THIRD-PARTIES ..................................................... 9

    A.    Plaintiff ............................................................................................................ 9

    B.    Defendants ...................................................................................................... 16

    C.    Relevant Third Parties ................................................................................... 18

IV.   FACTUAL ALLEGATIONS .................................................................................. 18

    A.    The Regulation of Generic Drugs in the U.S. Is Structured to Create a Competitive Market for the Benefit of Consumers ........................................ 18

    B.    In 2010-2014, a Backlog of ANDA Approvals at the FDA Created a Window of Reduced Competition in the Generic Drug Market .......................... 20

    C.    By 2013, Teva Was Performing Poorly and Facing a Collapsing ADS Price ....... 21

    D.    By 2014, Defendants Were Fully Aware that Price Hikes for Generic Drugs Could Not Be Maintained for an Extended Period ................................. 23

    E.    Vigodman Becomes CEO and Teva Announces Its Strategy to Use Its Stock as Currency for a Major Acquisition ....................................................... 27

    F.    Teva Substantially Increases Prices on a Multitude of Drugs to Prop Up Its Declining Revenues and Increase Its Share Price ....................................... 28

        1.    Teva's Price Increases Were Approved by the Company's Senior Executives ....................................................................................... 28

        2.    Teva Unilaterally Increased Prices on Dozens of Drugs ........................... 30

        3.    Teva Increased Prices in Parallel with Other Manufacturers for a Number of Drugs ................................................................................. 31

        4.    Teva Actively Colluded with Other Generic Drug Manufacturers to Fix Prices ......................................................................................... 32

            a)    Direct Evidence of Price-Fixing: Nystatin and Theophylline ER ..... 33

            b)    Direct Evidence of Price-Fixing: Glipizide-Metformin .............. 35

            c)    Other Indicia of Price Collusion ............................................ 36

        5.    As a Result of the Price Increases, Teva Increased Its Revenues and Profits by Billions of Dollars ............................................................ 39

    G.    Recognizing that Its Price Increase Scheme Was Unsustainable for More than a Short Period, Teva Misleads Investors Regarding the Basis for Its Improved Financial Performance ......................................................... 40

H.      Propelled by Price Increases, Teva's ADS Price Ascends .....................................41

I.      Defendants Lay Plans for a Major Acquisition—Inflating the ADS Price to Use as "Currency" .....................................................................................................42

J.      The Company Announces a $40 Billion Acquisition of Actavis Fueled By Its Inflated Share Price and a Proposed Bond Offering.............................................42

    1.      Teva Issues $3.375 Billion in ADS and $3.375 Billion in Preferred Shares While the ADS Trade at an Inflated Price .......................................43

    2.      Defendants Rush the Notes Offering and Conceal the Fact that Teva Had Been Served Subpoenas by the DOJ and the Connecticut AG ..........43

K.      The Fraud Unravels, Causing the Prices of Teva Securities to Fall .....................44

    1.      Days After the Close of the Actavis Transaction, Teva Belatedly Announces It Is the Subject of Government Antitrust Investigations .......44

    2.      The Market Is Surprised When Teva Announces Dismal Results for the Third Quarter of 2016 and Olafsson Is Fired.........................................46

    3.      Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company..........................46

    4.      After Vigodman, Desheh and Olafsson Are Terminated, Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings .......................................................................................................47

    5.      The Market Learns Additional Details Regarding Defendants' Price-Fixing Scheme .......................................................................................48

V.      DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS............49

A.      Defendants' Materially False and Misleading Statements and Omissions During the Relevant Period .....................................................................................50

    1.      February 6, 2014.........................................................................................50

    2.      February 10, 2014.......................................................................................51

    3.      May 1, 2014................................................................................................53

    4.      July 31, 2014..............................................................................................54

    5.      October 30, 2014 .......................................................................................55

    6.      December 11, 2014.....................................................................................56

    7.      February 5 and February 9, 2015...............................................................57

    8.      April 30, 2015 ............................................................................................60

    9.      June 10, 2015 .............................................................................................62

    10.     July 27, 2015..............................................................................................63

    11.     July 30, 2015..............................................................................................63

    12.     October 29, 2015 .......................................................................................64

|       | 13. | November 19, 2015 ........................................................... 66 |
|       | 14. | January 11, 2016 ............................................................... 68 |
|       | 15. | February 11, 2016 ............................................................. 69 |
|       | 16. | March 8, 2016 ................................................................... 73 |
|       | 17. | May 9, 2016 ..................................................................... 74 |
|       | 18. | May 10, 2016 ................................................................... 78 |
|       | 19. | June 3 and 8, 2016 ........................................................... 79 |
|       | 20. | July 13, 2016 .................................................................... 80 |
|       | 21. | August 4, 2016 ................................................................. 82 |
|       | 22. | September 7 and 9, 2016 ................................................. 84 |
|       | 23. | November 15, 2016 .......................................................... 87 |
|       | 24. | January 6, 2017 ................................................................ 90 |
|       | 25. | February 15, 2017 ............................................................ 91 |
|       | 26. | August 3, 2017 ................................................................. 93 |
|       | 27. | October 31, 2017 .............................................................. 94 |
|       | 28. | December 19, 2018, January 18, 2019 and February 19, 2019 ................. 95 |
|       | B.  | Defendants Violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F ........................................................................ 95 |
| VI.   | ADDITIONAL ALLEGATIONS OF SCIENTER ................................. 97 |
| VII.  | THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION ...................... 113 |
|       | A.  | August 4-5, 2016 ............................................................. 113 |
|       | B.  | November 3 and November 6, 2016 ................................. 114 |
|       | C.  | November 15, 2016 .......................................................... 115 |
|       | D.  | December 5-6, 2016 ......................................................... 116 |
|       | E.  | December 14, 2016 .......................................................... 117 |
|       | F.  | December 15-18, 2016 ..................................................... 118 |
|       | G.  | January 6-8, 2017 ............................................................ 119 |
|       | H.  | February 6-7, 2017 .......................................................... 120 |
|       | I.  | August 3-7, 2017 ............................................................. 120 |
|       | J.  | November 2, 2017 ............................................................ 122 |
|       | K.  | February 8, 2018 .............................................................. 122 |
|       | L.  | December 7-10, 2018 ....................................................... 123 |
|       | M.  | May 10-13, 2019 .............................................................. 124 |
| VIII. | PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE ...................... 126 |

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ............................................................................... 128

X.    CAUSES OF ACTION ........................................................................... 129

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Teva and the Individual Defendants ............................................. 129

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ....................................................................................................................... 130

XI.    PRAYER FOR RELIEF ........................................................................ 131

XII.    JURY TRIAL DEMANDED .................................................................. 132

Funds under the management of Plaintiff Nordea Investment Management AB ("NIM" or "Plaintiff") purchased or otherwise acquired Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company") securities on behalf of NIM's investors (including NIM's funds and institutional clients) between February 6, 2014 and May 10, 2019, inclusive (the "Relevant Period") and were damaged thereby.

Plaintiff, by and through its counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through its attorneys which included, among other things, a review of Defendants' public documents, conference calls and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teva, analysts' reports about the Company, pricing data for various generic drugs obtained from a nationally recognized database, various civil complaints alleging violations of federal and state antitrust and unfair competition laws by Teva and its subsidiaries, the amended consolidated class action complaint filed in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, No. 3:17-cv-00558 (SRU) (D. Conn. June 22, 2018) ("*Ontario Teachers* Complaint"), the second amended consolidated class action complaint filed in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, No. 3:17-cv-00558 (SRU) (D. Conn. Dec. 13, 2019) ("*Ontario Teachers* Amended Complaint"), and information obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      Plaintiff brings this action to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2.      Teva is a pharmaceutical company based in Israel that develops, produces, and markets generic pharmaceutical products worldwide, with a significant presence in the United States, Europe, and other markets.  Teva is the leading generic drug company in the United States.

3.      This action arises out of Teva's plan to engage in massive price increases for many of its U.S. generic drugs to fuel an increase in short-term (2 to 3 year) profitability.  Teva believed that through this strategy, the short-term profitability from price increases would allow the Company to use its stock as currency to make a major acquisition that (it hoped) would secure its long-term future.  However, such a price increase strategy is not sustainable over the long-term in the generic drug business—due to relative low barriers to entry to the market and other reasons explained below—and Teva knew it.

4.      Given Teva's unsustainable business model, Defendants lied to investors for three years—from February 2014 through February 2017—by falsely claiming that Teva was ***not*** increasing prices and that the Company's increased profitability was in fact due to other, more sustainable factors including aggressive cost-cutting and improved operational efficiency. Teva's fraudulent statements permitted the Company to mislead the market and to complete a $40 billion acquisition of the Actavis generic drug division from Allergan plc in 2015.  However, Teva's price increases could not be sustained.  By mid-2016, the Company succumbed to the pricing pressures of the generics market, and its stock price declined, costing investors tens of billions of dollars.

5.      Prior to the Relevant Period, Teva faced major headwinds.  In 2012, Teva received a subpoena from the SEC for alleged violations of the Federal Corrupt Practices Act ("FCPA").  The SEC alleged that Teva bribed Russian, Eastern European, and Latin American countries to gain market share of generic drugs and falsified its accounting. Teva later paid a $519 million fine to the SEC and the U.S. Department of Justice ("DOJ") and entered into a deferred prosecution agreement.  No longer able to rely on bribes to foreign officials, these pipelines dried up.

6.      Teva's U.S. pipeline was equally bleak.  The Company's U.S. generics business reported dramatically lower revenues, year over year.  A May 3, 2013 Deutsche Bank report concluded that Teva's overall generics business had "significantly underperformed."  By August 14, 2013, Teva's then-Chief Executive Officer ("CEO") and President Jeremy M. Levin ("Levin") acknowledged that "Generic growth in the United States [was] slowing *fundamentally*."  Moreover, Teva would soon lose its patent protection on Copaxone, by far its largest specialty drug, accounting for as much as 50% of Teva's profits at that time.  On October 30, 2013, Teva's Board of Directors forced Levin to step down, less than 18 months into the job.

7.      In sum, Teva needed to reinvent itself.  In January 2014, Teva announced the appointment of Defendant Erez Vigodman ("Vigodman") as its President and CEO, effective February 11, 2014.  He replaced Defendant Eyal Desheh ("Desheh"), Teva's Chief Financial Officer ("CFO") from July 2008 through June 30, 2017 (except from October 30, 2013 to February 11, 2014, during which he served as Teva's Interim CEO and President).  From the time Vigodman took over in January 2014, it immediately became clear that Teva's plan was to acquire new businesses potentially using Teva's American Depositary Shares ("ADS") as currency.  As Desheh explained on a Q4 2013 earnings call (February 6, 2014), Teva was, on

potential "business opportunities," "open for business."   During the March 4, 2014 Cowen
Healthcare Conference, Desheh made plain Teva's intentions (and need to boost its stock price
by any means) when he noted that, with "the [stock] price under $40, … we can't use [Teva
Securities as] currency" for the large acquisition he had touted two months earlier.

8.     To achieve its growth-through-acquisition strategy, Teva had to improve its
profits and its share price.   Although Teva was touting, as early as October 30, 2013, a
turnaround plan based upon an "accelerate[d]" cost reduction plan and "a much better, efficient
generic machine[,]" in reality, Teva was improving its profitability through enormous price
increases for drugs for which the Company had (i) some degree of independent market power,
(ii) the ability to engage in parallel price increases with other drug companies (because of limited
competition), or (iii) the ability to engage in outright price collusion in violation of the antitrust
laws.  Pursuant to its price increase scheme, Teva increased the prices on as many as 55 drugs by
as much as 1700%.  While Teva had begun price increases in July and August 2013, such price
increases continued into 2014 and 2015, and involved at least 55 separate drugs.  Many of these
price increases exceeded 500% and some exceeded 1000% and even 1500%.

9.     As a result of these huge price increases, Teva's U.S. generic segment revenues
increased by nearly 15% from $4.18 billion in 2013, to $4.79 billion in 2015, and then decreased
to $4.56 billion in 2016, as the inevitable pricing pressure took its toll on the price increase
strategy.

10.     For a time, Teva's plan worked—its share price increased from just over $37 per
share in September 2013 to more than $70 per share by July 2015.  However, Teva well knew
that a strategy for increasing profitability based upon increasing drug prices could not be
sustained because the U.S. Food & Drug Administration ("FDA") was devoting increasing

resources to approving Accelerated New Drug Applications ("ANDA") through which generic manufacturers could bring generic drugs to market on a fast-tracked basis. Thus, critical to Teva's strategy was masquerading the true basis for its increased profits and revenues. Avoiding the taint of price increases became particularly important because of the public scrutiny afforded price increases in formerly inexpensive generic drugs. As a result of the initial Teva price increases in July and August 2013 and similar price increases by other generics manufacturers, in January 2014, the National Community Pharmacists Association ("NCPA") wrote to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee and the U.S. House Energy and Commerce Committee requesting hearings on the significant spike in generic pharmaceutical pricing. On July 8, 2014, The New York Times addressed pricing issues in an article titled, "*Rapid Price Increases for Some Generic Drugs Catch Users by Surprise*," highlighting a 100% price increase for digoxin, a longtime generic drug.

11.    As a result of the N.Y. Times article, the Connecticut Attorney General ("CT AG") began an investigation on pricing issues with a focus on digoxin. Other state attorneys general ("AGs") followed suit. On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings sent letters to Teva and thirteen other generic drug companies asking for detailed information on various generic drug price hikes. Teva never responded to these letters.

12.    In November 2014, the U.S. Department of Justice ("DOJ"), which had also opened an investigation into price fixing of generic drugs, convened a grand jury in the U.S. District Court for the Eastern District of Pennsylvania, pursuant to which subpoenas were issued to Teva and ten other generic drug makers.

13.     In response to this increasing drum beat regarding ever-accelerating increases in generic drug prices, Teva sought at all costs to avoid any suggestion that price increases were the cause of its seemingly miraculous turnaround.  Accordingly, at the beginning of the Relevant Period (February 6, 2014), Teva attributed its increase in revenues to higher sales volumes and launches of new generic drugs.  Nothing was said about the eighteen drug price increases from the summer of 2013.  In May 2014, trumpeting its first quarter 2014 results, Teva again relied upon "new product launches" and a changed composition of revenues to explain its increased profitability.  On October 30, 2014, during the third quarter 2014 earnings call, Teva was specifically asked about the impact of price increases, but Defendant Sigurdur "Siggi" Olafsson ("Olafsson") deflected, suggesting that there were no significant increases since "the base business itself is slowly eroding . . . ."  And at the end of 2014, Defendant Olafsson, President and CEO of Teva's Global Generic Medicines Group (since July 1, 2014), rejected the premise of the question, stating: "*[L]et me correct*.  *I have to disagree that they have experienced tremendous price increase[s]*."[1]

14.     Throughout the remainder of 2015 and into 2016, Defendants flatly denied that Teva's improved performance was the result of price increases.  For example, on February 11, 2016, Olafsson falsely insisted that Teva achieved $1 billion in increased profits "[n]ot by pricing but by portfolio mix, new products and efficiency measures."  Vigodman made a similar pronouncement on October 29, 2015:

> [A]ll the improvements you see in margins is *not driven by price*.  It is driven by quantities, and by mix, and by efficiency measures *not by price, 2014, 2015.  And that's a very important message*.

These statements were demonstrably false—by mid-July 2015, Teva had raised prices on more than 61 drugs, including many by more than 250%.

---

[1]     Unless otherwise stated, all emphasis is added.

15.     On July 27, 2015, when Teva's stock was trading at an all-time high, Teva's master plan came to fruition when it announced the purchase of Allergan's generics division, Actavis.  The deal, which was expected to close in mid-2016, would cost Teva approximately $40 billion, most of which was to be funded through a massive debt offering (as well as a smaller ADS and preferred stock offering).  While the debt offering initially was scheduled to take place after the close of the transaction, in July 2016, recognizing that the price-increase scheme could no longer be maintained, Teva announced that the debt offering would be accelerated to the end of the month.  The deal closed on August 2, 2016.

16.     Just two days after the closing of the Actavis transaction, on August 4, 2016, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of 2015.  Teva also revealed for the first time that it was the subject of DOJ and state AG investigations into price collusion.

17.     Shortly thereafter, on September 12, 2016, the U.S. Government Accountability Office ("GAO") issued an audit report ("GAO Report") that generic drug manufacturers had engaged in hundreds of unexplained "extraordinary price increases," including price increases of more than 1,000%.  Teva owned the rights to many of the drugs identified in the GAO Report as having exhibited an extraordinary price increase between 2013 and 2015.

18.     Then, on November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Teva and others for unlawfully colluding to fix generic drug prices.  On November 15, 2016, Teva reported third quarter 2016 revenues below consensus expectations, which Olafsson stated were a result of pricing pressures in Teva's U.S. generics business.

19.     On December 15, 2016, the CT AG and nineteen other AGs filed a civil complaint in the U.S. District Court for the District of Connecticut against various generic pharmaceutical manufacturers, including Teva Pharmaceuticals USA, Inc. ("Teva USA"), for alleged anticompetitive activity.

20.     As Teva's financial condition deteriorated and the scrutiny surrounding the AGs' allegations and the GAO Report mounted in the latter half of 2016, Teva's stock price precipitously declined.  In relatively short order, the key executives responsible for the U.S. generics business left the Company or were fired, including Olafsson who was fired on December 5, 2016; Vigodman who was terminated on February 6, 2017; and Desheh who left on June 30, 2017.  The "inauspicious tim[ing]" of these departures was not lost on market watchers like TheStreet which reported that Olafsson's departure "rais[ed] more questions for investors amid continued worries around drug pricing."

21.     On August 3, 2017, in the first financial report issued after Desheh, Vigodman and Olafsson departed the Company, Teva announced a $6.1 billion write down of its entire U.S. generics business, which had been artificially inflated as the result of its ultimately unsustainable price increase scheme.  However, Defendants continued to repeatedly—and falsely—deny that Teva was involved in any collusive conduct, further misleading investors during the Relevant Period.

22.     In May 2019, the State AGs filed an expanded complaint alleging that Teva significantly raised prices on approximately 112 generic drugs, and fixed prices and/or allocated markets for at least 107 drugs.

23.     From July 2015 through the end of the Relevant Period, the price of Teva's ADS collapsed from an all-time high of $72 per share to just over $12, causing Teva's market

capitalization to decline significantly.  As a result of Defendants' acts and omissions, and the substantial decline in the market value of Teva's securities, several of Plaintiff's funds and assignors suffered significant damages.

## II.    JURISDICTION AND VENUE

24.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

25.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

26.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

27.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange, namely the New York Stock Exchange ("NYSE").

## III.    PARTIES AND RELEVANT THIRD-PARTIES

### A.    Plaintiff

28.    Plaintiff **Nordea Investment Management AB** ("NIM") is a Swedish limited liability company and licensed investment firm.  NIM ultimately is a fully-owned subsidiary of Nordea Bank Abp, which is a publicly listed, full-service universal bank headquartered in Finland, and the third largest corporation in the Nordic region and one of the top 10 financial services companies in Europe based on market capitalization.  NIM, as an active investment manager, has a global business model and manages asset classes across the full investment

spectrum. NIM's client base is equally split between Nordea-branded UCITS and AIF funds and Institutional Clients (such as pension funds, banks, governmental organizations, large industrial corporations, etc.). NIM and associated Nordea asset management entities have a total of close to 700 employees, of which one-third are dedicated investment specialists within three investment centers in Bergen, Copenhagen and Stockholm. With more than EUR 220bn in assets under management, NIM is the largest investment manager in the Nordic Region but has also developed a large global business servicing clients across continents (Europe, Americas and Asia). NIM asserts claims on behalf of its **NLP Stabile Aktier Fund**, for which it serves as the management company, and for which it has authority, under Swedish law, to assert such claims. The NLP Stabile Aktier Fund is not a legal entity under Swedish law; has no Boards of Directors, management, or employees and, thus, has no independent capacity to sue or take legal or other action in its own right, or in connection with the assets within it. The fund's unit holders cannot direct that investments be made on the fund's behalf, exercise voting rights for the securities the fund holds, initiate legal action for the fund, or assign claims in connection with investments made on the fund's behalf. When NIM acts on behalf of this fund, Swedish law requires NIM to act in its own name.

29.     NIM also asserts claims on behalf of **Nordea Investment Funds S.A.** ("NIF SA") and on behalf of **Nordea Funds Ltd.** ("NF LTD."), which have assigned their claims to NIM. NIF SA is a Luxembourgish *Société Anonyme* (limited liability company) management company established and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 562, rue de Neudorf, L-2220 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (RCS Luxembourg) under number B 31619. As such, NIF SA is an independent legal entity under Luxembourgish law, with authority

to assert claims in its own name.  NF LTD. is a Finnish management company which also has authority to assert claims in its own name under Finnish law.  NIF SA and NF LTD. are – similar to NIM – ultimately fully-owned by Nordea Bank Abp, and both have appointed NIM as the investment manager of all the funds managed by NIF SA and NF LTD.

30.    NIF SA served as the management company for the **Nordea Asset Allocation Fund**, a Luxembourgish *Fond Commun de Placement* ("FCP"), in connection with the Nordea Asset Allocation Fund's purchases of Teva ADS on the NYSE during the Relevant Period, through its Futura, Optima and Spara Trean sub-funds.  NIF SA is the legal owner of and has authority to assert and assign claims on behalf of the Nordea Asset Allocation Fund because, under Luxembourgish law, an FCP does not have its own legal personality and, thus, cannot act in its own name; instead, a designated management company—in this case, NIF SA—acts on behalf of an FCP.

31.    NIF SA is also the assignee of all claims in this action held by:  (i) **Nordea 1, SICAV**; (ii) **Nordea 2, SICAV**; (iii) **Nordea Dedicated Investment Fund, SICAV-FIS**; and (iv) **Nordea Institutional Investment Fund, SICAV-FIS**, for which NIF SA served as the management company during the Relevant Period.  These SICAVs are all Luxembourgish *Sociétés d'Investissement à Capital Variable* or open-ended collective investment companies, with their own legal personalities.

32.    Nordea 1, SICAV is an investment company with variable capital (*société d'investissement à capital variable*) established and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 562, rue de Neudorf, L-2220 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (RCS Luxembourg) under number B 31442.  Nordea 1, SICAV consisted of the following sub-

funds in connection with their purchases of Teva ADS on the NYSE during the Relevant Period: (i) Alpha 10 MA Fund; (ii) Alpha 15 MA Fund; (iii) GBP Diversified Return Fund; (iv) Global Stable Equity Fund; (v) Global Stable Equity Fund – Euro Hedged; (vi) Stable Equity Long/Short Fund – Euro Hedged; (vii) Stable Return Fund; and (viii) US Bond Opportunities Fund. These sub-funds are not separate legal entities under Luxembourgish law, have no officers or employees and cannot act in their own name; instead, they are investment compartments, or pools of assets, and Nordea 1, SICAV is the legal entity empowered to take action on their behalf.

33.     Nordea 2, SICAV is an investment company with variable capital (*société d'investissement à capital variable*) established and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 562, rue de Neudorf, L-2220 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (RCS Luxembourg) under number B 205880. Nordea 2, SICAV consisted of the Balanced Growth Target Date Fund and the US Constrained Corporate Bond Fund in connection with their purchases of Teva ADS on the NYSE during the Relevant Period. These sub-funds are not separate legal entities under Luxembourgish law, have no officers or employees and cannot act in their own name; instead, they are investment compartments, or separate pools of assets, and Nordea 2, SICAV is the legal entity empowered to take action on their behalf.

34.     Nordea Dedicated Investment Fund, SICAV-FIS is an investment company with variable capital (*société d'investissement à capital variable*) established and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 562, rue de Neudorf, L-2220 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (RCS Luxembourg) under number B 150516. Nordea Dedicated Investment

Fund, SICAV-FIS consisted of the Diversified Growth Fund in connection with its purchases of Teva ADS on the NYSE during the Relevant Period.  This sub-fund is not a separate legal entity under Luxembourgish law, has no officers or employees and cannot act in its own name; instead, it is an investment compartment, or separate pool of assets, and Nordea Dedicated Investment Fund, SICAV-FIS is the legal entity empowered to take action on its behalf.

35.    Nordea Institutional Investment Fund, SICAV-FIS is an investment company with variable capital (*société d'investissement à capital variable*) established and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 562, rue de Neudorf, L-2220 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (RCS Luxembourg) under number B 143334.   Nordea Institutional Investment Fund, SICAV-FIS consisted of the Corporate Bond Fund and the Global Equity Fund in connection with their purchases of Teva ADS on the NYSE during the Relevant Period. These sub-funds are not separate legal entities under Luxembourgish law, have no officers or employees and cannot act in their own name; instead, they are investment compartments, or separate pools of assets, and Nordea Institutional Investment Fund, SICAV-FIS is the legal entity empowered to take action on their behalf.

36.    NF LTD. served as the management company for the following Finnish contractual funds, in connection with their purchases of Teva ADS on the NYSE during the Relevant Period:  (i) **Nordea World Fund**; (ii) **Nordea Emerging Market Equities Fund**; (iii) **Nordea Stable Return Fund**; (iv) **Nordea Pro Stable Return Fund**; (v) **Nordea Global Frontier Markets Fund**; (vi) **Nordea Stable Equities UCITS ETF**; (vii) **Nordea Global Emerging Markets Equities UCITS ETF**; (viii) **Nordea Equity Core Fund**; and (ix**) Nordea Discretionary Global Equity Fund**.  NF LTD. is the legal owner of and has authority to assert

and assign claims on behalf of these funds because, under Finnish law, a fund does not have its own legal personality and, thus, cannot act in its own name; instead, a designated management company, in this case, NF LTD., acts on behalf of a fund.

37.     NF LTD. served as the management company for the following Norwegian contractual funds, in connection with their purchases of Teva ADS on the NYSE during the Relevant Period: (i) **Nordea Global Fund**; (ii) **Nordea Internasjonale Aksjer III**; (iii) **Nordea Stabile Aksjer Global Etisk**; and (iv) **Nordea Stabile Aksjer Global**.  NF LTD. is the legal owner of and has authority to assert and assign claims on behalf of these funds because, under Norwegian law, a fund does not have its own legal personality and, thus, cannot act in its own name; instead, a designated management company, in this case, NF LTD., acts on behalf of a fund.

38.     NF LTD. served as the management company for the following Swedish contractual funds, in connection with their purchases of Teva ADS on the NYSE during the Relevant Period: (i) **Nordea Avtalspensionsfond Midi**; (ii) **Nordea Donationsmedelsfond**; (iii) **Institutionella Aktiefonden Varlden**; (iv) **Institutionalla Aktiefonden Stabil**; (v) **Nordea Generationsfond 40-tal**; (vi) **Nordea Generationsfond 50-tal**; (vii) **Nordea Generationsfond 60-tal**; (viii) **Nordea Generationsfond 70-tal**; (ix) **Nordea Generationsfond 80-tal** (x) **Nordea Stabil**; (xi) **Nordea Stratega 100**; (xii) **Nordea Stratega 10**; (xiii) **Nordea Stratega 30**; (xiv) **Nordea Stratega 50**; and (xv) **Nordea Stratega 70**.  NF LTD. is the legal owner of and has authority to assert and assign claims on behalf of these funds because, under Swedish law, a fund does not have its own legal personality and, thus, cannot act in its own name; instead, a designated management company, in this case, NF LTD., acts on behalf of a fund.

39.     NF LTD. is also the assignee of all claims in this action held by the following umbrella funds in connection with their transactions in Teva securities, on behalf of the sub-funds described below: (i) **Investeringsforeningen Nordea Invest**; (ii) **Investeringsforeningen Nordea Invest Engros**; and (iii) **Investeringsforeningen Nordea Invest Portefølje**, each of which has assigned its respective claims in this action to NF LTD.

40.     **Investeringsforeningen Nordea Invest** is a Danish umbrella fund that operated the following sub-funds during the Relevant Period, in connection with their transactions in Teva securities:   **Aktier; Aktier II; Basis 1; Basis 2; Basis 3; Emerging Markets; Stabil Balanceret; Stabile Aktier; and Stabile Aktier Akkumulerende**.   These sub-funds are not separate legal entities under Danish law, have no officers or employees, and only Investeringsforeningen Nordea Invest is authorized to assert and assign claims relating to securities held in these sub-funds.

41.     **Investeringsforeningen Nordea Invest Engros** is a Danish umbrella fund that operated the following sub-funds during the Relevant Period, in connection with their transactions in Teva securities:   (i) **Absolute Return Equities**; (ii) **Absolute Return Equities II**; (iii) **Absolute Return Equities II – Etisk tilvalg**; (iv) **Internationale aktier**; and (v) **Internationale aktier – Etisk tilvalg**.   These sub-funds are not separate legal entities under Danish law, have no officers or employees, and only Investeringsforeningen Nordea Invest Engros is authorized to assert and assign claims relating to securities held in these sub-funds.

42.     **Investeringsforeningen Nordea Invest Portefølje** is a Danish umbrella fund that operated the **Aktier** and **Aktier Strategi** sub-funds during the Relevant Period, in connection with their transactions in Teva securities.   These sub-funds are not separate legal entities under

15

Danish law, have no officers or employees, and only Investeringsforeningen Nordea Invest Portefølje is authorized to assert or assign claims relating to securities held in these sub-funds.

43.    The funds under NIM's management discussed above purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated by the materially false and misleading statements and omissions of material fact complained of herein, in violation of federal securities laws, and suffered damages as a result.

**B.    Defendants**

44.    Defendant Teva is incorporated in Israel with its principal executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel.   Teva's U.S. wholly-owned subsidiary Teva USA has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.   Teva engages in interstate commerce within this District and regularly transacts business within the State of Connecticut.  Teva ADS are listed and traded on the NYSE under the symbol "TEVA."   Teva ADS are traded in the United States.   Teva ordinary shares trade on the Tel Aviv Stock Exchange ("TASE") under the symbol "TEVA."

45.    Defendant Vigodman was Teva's President and CEO from February 11, 2014 through February 6, 2017 and a Director from June 22, 2009 through February 6, 2017. Vigodman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.

46.    Defendant Desheh was Teva's CFO from July 2008 through June 30, 2017, except from October 30, 2013 to February 11, 2014, during which he served as Teva's Interim CEO and President.   Desheh also was Teva's Group Executive Vice President ("EVP") from 2012 to June 30, 2017.  Desheh signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.

47.     Defendant Yaacov "Kobi" Altman ("Altman") was Teva's Acting CFO from October 31, 2013 through February 11, 2014.  Altman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.

48.     Defendant Olafsson was President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 until December 5, 2016.  Prior to joining Teva, Olafsson held senior leadership and other positions, within Actavis between 2003 and 2014.  As President and CEO of Teva's Global Generics Medicines Group, Olafsson possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business and was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

49.     Defendant Kåre Schultz ("Schultz") has served as the President and CEO of Teva since November 1, 2017.  In addition, Schultz has served on the Company's Board of Directors since November 1, 2017.  Schultz signed and certified certain of Teva's periodic reports filed with the SEC during the Relevant Period, as set forth herein.

50.     Defendant Michael McClellan ("McClellan") was Teva's Executive Vice President and CFO from November 2017 until November 8, 2019.  Prior to serving in that role, McClellan was Teva's Interim Group CFO from July 2017 to November 2017 and Senior Vice President and CFO, Global Specialty Medicines from 2015 to November 2017.  McClellan signed and certified certain of Teva's periodic reports filed with the SEC during the Relevant Period, as set forth herein.

51.     Defendants Vigodman, Desheh, Altman, Olafsson, Schultz, and McClellan are sometimes referred to herein collectively as the "Individual Defendants."

**C.     Relevant Third Parties**

52.     Former Employee No. 1 ("FE-1") served in the Trade relations group at Teva during the Relevant Period.

53.     Former Employee No. 2 ("FE-2'') served in various positions in supply chain management, including at the associate director level, during the Relevant Period.

**IV.     FACTUAL ALLEGATIONS**

**A.     The Regulation of Generic Drugs in the U.S. Is Structured to Create a Competitive Market for the Benefit of Consumers**

54.     Since the implementation of the Drug Price Competition and Patent Term Restoration Act (known as the "Hatch-Waxman Act") in 1984, generic drugs have had a significant impact on healthcare in the U.S., resulting in tens of billions of dollars in annual savings for consumers and the overall healthcare system.  The Hatch-Waxman Act was initially enacted to simplify the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain FDA approval.  The Hatch-Waxman Act is designed to get less expensive generic drugs into the hands of consumers expeditiously.  Under the revised process, generic drug companies can instead file an ANDA.  A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the company can "piggy-back" on the safety and efficacy data supplied by the original NDA holder for a given drug.

55.     Generic drugs must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the

brand-name drug.  To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the original brand-name version approved by the FDA through an NDA.  The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile.  According to the FDA: "[p]roducts classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[2]  The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating.

56.     The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug.  This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs.  When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company.  The first generic drug will generally be priced 15% to 20% below the brand-name drug.  Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow.  The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug.  This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.  As Stephen W. Schondelmeyer, Professor of Management &

---

[2]       *See* Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book"), 37th Ed., 2017, U.S. Department of Health and Human Services – Food and Drug Administration, at vii.

Economics at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

57.     The Maximum Allowable Cost ("MAC") pricing regime also serves to control drug prices.  Under this regime, individual states or pharmacy benefits managers ("PBMs")—third party administrators of prescription drug programs—establish an MAC for drug products using a variety of inputs.  If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.  Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion.

**B.     In 2010-2014, a Backlog of ANDA Approvals at the FDA Created a Window of Reduced Competition in the Generic Drug Market**

58.     One of the keys to reducing drug prices is ensuring that there is substantial competition in generic drug markets.  Given that generic drug makers bear none of the large research and development expenses borne by brand-name manufacturers, the primary impediment to entry into the generic market is obtaining ANDA approval from the FDA. Accordingly, the overall cost of prescription drugs for the public is reduced by faster generic drug approval times.  Historically, the average time between generic drug application submission and approval ranges from six months to several years, depending on the complexity of the drug.

That approval time had varied over time, however, based upon the number of generic drugs seeking approval and the review resources available to the FDA.

59.     By 2012, FDA resource problems similar to those plaguing the new drug market in the late 1980s had become a significant limitation on the approval of ANDA for generic drugs. In 2012, the FDA was facing a backlog of over 2,800 unexamined ANDA. This overload was driven by the relative ease with which manufacturers could obtain generic drug approvals as a result of Hatch-Waxman, and the lack of a respective increase in FDA reviewers to process the applications. By 2012, the average waiting period for an ANDA approval had increased to 31 months.

60.     The backlog of unapproved drugs, which limited generic competition, created a window in which generic companies had the ability to increase prices. For example, the September 2016 GAO Report found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "extraordinary price increases"—i.e., "periods of prices at least doubling" between the first quarter of 2010 and the first quarter of 2015. In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases. For 48 of these 100 drugs, the price increases were 500% or higher.

### C.     By 2013, Teva Was Performing Poorly and Facing a Collapsing ADS Price

61.     Heading into 2013, Teva faced a number of significant issues. First, by 2012, Teva's ADS price had fallen from a high of over $60 in 2010, to the upper-$30s.

62.     Second, in 2012, Teva received subpoenas from the SEC relating to a Foreign Corrupt Practices Act investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, Ukraine and Mexico (SEC v. Teva Pharm. Indus., No. 1:16-cv-25298 (KMM) (S.D. Fla. Dec. 22, 2016) (ECF No. 1 (Complaint) at ¶ 2)). The SEC also alleged that Teva deliberately falsified its accounting. Teva's generics revenues from "Rest of World"

markets ("ROW") (including those subject to the FCPA investigation) fell approximately $280 million in 2013. Ultimately, Teva paid a $519 million fine and entered into a deferred prosecution agreement. The investigation put pressure on the revenue pipelines from these countries.

63.    Third, Teva's U.S. generics business reported dramatically lower revenues, year over year. In fact, Teva was the worst performing generic drug company compared to its peers, despite being the largest. As a Deutsche Bank analyst concluded in a May 3, 2013 report, Teva's overall generics business had "significantly underperformed."

64.    Fourth, Teva would soon lose its patent protection on Copaxone, which was far and away its most important drug, accounting for as much as 40% of Teva's operating profits at that time. Due to this impending loss of exclusivity, Teva knew it could face generic competition to Copaxone as early as mid-2014.

65.    On October 30, 2013, Teva's Board of Directors forced CEO Levin to step down less than 18 months after he had taken the job. Given the sudden nature of Levin's termination, the Board named Defendant Desheh, Teva's Executive Vice President and CFO, to fill the role of President and CEO on an interim basis, effective immediately, and formed a committee to search for a permanent successor.

66.    In an October 30, 2013 investor call relating to Levin's firing, then-Chairman Phillip Frost and Desheh assured investors that they were focused on turning the Company around. Desheh informed the market that Teva "ha[d] decided to accelerate" the cost reduction plan and promised "to create a much better, efficient generic machine." Chairman Frost disclosed that "friends of [his] . . . have bought hundreds of millions of dollars of stock during the last couple of weeks. . . ."

67.     In reality, just months earlier, recognizing that the backlog in ANDA approvals at the FDA discussed above had, at least temporarily, restricted competition for some generic drugs, Teva had undertaken a risky gamble to improve its results – substantial price increases for certain of its drugs.  In July and August 2013, Teva increased prices on a number of drugs:

> Oxybutynin Chloride Tablets; Nadolol Tablets; Fluconazole Tablets; Methotrexate Sodium Tablets; Cimetidine Tablets; Prazosin Capsules; Ranitidine HCL Tablets; Enalapril Maleate Tablets; Doxazosin Mesylate Tablets; Etodolac Tablets; Pravastatin Sodium Tablets; Ketoprofen Capsules; Etodolac SR Tablets; Tolmetin Sodium-Capsules; Clemastine Fumarate; Diltiazem HCL Tablets; Ketorolac Trometh Tablets; Diclofenac Potassium Tablets.[3]

68.     By October 2013, this desperate gamble had not yet fully borne fruit – costing CEO Levin his job.

### D.     By 2014, Defendants Were Fully Aware that Price Hikes for Generic Drugs Could Not Be Maintained for an Extended Period

69.     Recognizing the enormous backlog the FDA was experiencing in its ANDA approval process, and the attendant negative impacts on competition in the provision of generic drugs, Congress enacted the Generic Drug User Fee Amendments ("GDUFA") to provide the FDA with a supplemental revenue source to spur the approval process.  GDUFA went into effect in October of 2012, and instituted user fees on ANDA and other facility fees to generate $1.5 billion over the life of the five-year program.  The goal of GDUFA was to eliminate the ANDA backlog and reduce the average review time to ten months or less.  The expectation was that, once the fees flowed into the system and new FDA reviewers were hired and trained, backlogs would decrease and competition would increase, severely curtailing generic drug makers' ability to increase prices.  Thus, by late 2012/early 2013, generic manufacturers knew that within the

---

[3]     The specific timing and price increases for these drugs are set forth in charts in Sections IV.F.2-4 and in Appendix A hereto.

next 1-2 years, ANDA approvals would be on the rise and any ability they had to raise prices would be severely curtailed.

70.    With the additional funds provided by GDUFA came an FDA commitment to reach a variety of goals, including accelerating the review process and eliminating the mounting backlog of ANDA.  One such commitment the FDA took was to act on 90% of all backlogged ANDA by the end of fiscal year ("FY") 2017.  In a keynote address at the Generic Pharmaceutical Association annual meeting in the spring of early 2015, the Director of the FDA's Office of Generic Drugs, Kathleen Uhl, M.D., pledged accelerated action.  The FDA delivered on Director Uhl's promise, hiring nearly 1,200 new employees in 2015—more than the preceding two years combined.

71.    As the graph below depicts[4], the number of full approvals and tentative approvals of generic drugs began to reach record heights in or around April 2015:

## Chart 7. Approvals and Tentative Approvals



---

[4]       Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA), Testimony of Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration, Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Feb. 4, 2016, at 7.

72.     On November 9, 2015, InsiderHealthPolicy reported in an article entitled, *FDA, Pressed to Clear Generic Drug Backlog, Says It Is Ahead of Schedule*, that the FDA had taken action on **82% of the backlog** "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press the agency to clear the backlog to help counter rising pharmaceutical prices." All told, in 2015, more than 700 generic drugs were approved or tentatively approved by the FDA—***the highest figure in the FDA's history***.

73.     In addition to the increase in generic competition that would result from the adoption of GDUFA and subsequent increase in the FDA's ANDA review capabilities, Teva had other reasons to believe that its ability to increase prices would be a short term phenomenon that would not extend beyond 2015 or 2016—at the latest.

74.     As a result of the initial price increases by Teva and others in 2013, in January 2014, the NCPA wrote to the U.S. Senate HELP Committee and the U.S. House Energy and Commerce Committee regarding generic pharmaceutical pricing. The letter stated that "many of our members across the U.S. … have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate." It further noted that "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." It asked that the Senate "schedule an oversight hearing to examine what factors may have led to these unmanageable spikes in generic drugs"

75.     On July 8, 2014, *The New York Times* addressed pricing issues with generic drugs in an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting a nearly 100% price increase for digoxin, a longtime generic drug that Teva did not produce. The article stated:

> Though generic medicines are far cheaper to bring to market than brand-name drugs because they involve little research and development, they also are priced

lower because generics typically face intense competition. But Dr. Aaron Kesselheim, a professor of health economics at the Harvard School of Public Health, noted, "Studies show it is not until you have four or five generics in the market that the prices really are down."

76.     As a result of the *New York Times* article, the CT AG began an investigation on pricing issues with a focus on digoxin.  Other AGs quickly followed suit.

77.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings sent letters to Teva and thirteen other generic drug companies asking for detailed information on various generic drug price hikes.  The letter stated:  "We are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  It specifically noted that

> We are writing to your company to request information about the escalating prices it has been charging for two drugs: Divalproex Sodium ER, which is used to prevent migraines and treat certain types of seizures, and Pravastatin Sodium, which is used to treat high cholesterol. According to data provided by the Healthcare Supply Chain Association (HSCA), the average prices charged for these drugs have increased by as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin Sodium from October 2013 to April 2014.

Teva never responded to this letter.

78.     On November 10, 2014, *The Wall Street Journal* reported that the DOJ was investigating generic drug manufacturers for violations of the antitrust laws.  Later that month, the DOJ convened a grand jury in the Eastern District of Pennsylvania, pursuant to which subpoenas were issued to Teva and at least ten other generic drug manufacturers.

79.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?"  In his opening remarks, Senator Sanders noted that

> According to Medicare and Medicaid data, between July 2013 and July 2014, half of all generic drugs went up in price. During this same time period, over 1,200 generic drugs, nearly 10 percent of all generic drugs, more than doubled in price.

> More than doubled in price. In fact, these drugs went up in price by an average of 448 percent. Dozens of drugs went up by 500, 600, 1,000 percent.

Other Senators noted the need to reduce the FDA backlog in ANDA approvals to spur generic competition—a process that was then ongoing.

80.     As a result of the adoption of GDUFA in 2012, and the intense scrutiny by Congress, regulators and the press in generic drug pricing (spurred largely by drug price increases in 2013 and 2014), Teva knew that its ability to obtain additional revenues by raising prices was a short term phenomenon that would not persist for more than a relatively short (1-2 year) period of time.  Investors were also aware that the flood of new generics to the market would lead to increased competition and lower prices.  Teva therefore knew that acknowledging price increases could alert investors that any success the Company was experiencing would be short term.

### E.     Vigodman Becomes CEO and Teva Announces Its Strategy to Use Its Stock as Currency for a Major Acquisition

81.     In January 2014, Teva announced the appointment of Vigodman as its President and CEO, effective February 11, 2014.  From the time Vigodman was hired, it immediately became clear that Teva's plan was to solve its long-term issues through a major acquisition by using its stock to facilitate a deal.  This strategy was the direct result of Teva's planning for the end of its patent for Copaxone in 2017.  Copaxone is used to treat multiple sclerosis and was a huge success for Teva, providing as much as 40% of Teva's operating profit in some years.  Teva's management anticipated the patent and pricing issues well in advance, and decided that the company should buy its way out of the problem through major acquisitions.[5]

---

[5]     David Segal and Isabel Kershner, "Nobody Thought It Would Come To This': Drug Maker Teva Faces A Crisis," N.Y. Times (Dec. 27, 2017), at B1.

82.     Thus, at a January 14, 2014 J.P. Morgan Healthcare Conference, Defendant Desheh explained that Teva was in a position to make "more than a small acquisition or in-licensing transaction." He specifically noted that this "major commitment" was supported by the recent recruitment of Vigodman who would "emphasize (potentially large) acquisitions more readily than his predecessor," ideally using Teva's ADS as "currency."

83.     On March 4, 2014, at a Cowen Health Care Conference, Desheh noted that, with "the stock price under $40, … we can't use [Teva Securities as] currency" for the large acquisition he had touted two months earlier.

### F.     Teva Substantially Increases Prices on a Multitude of Drugs to Prop Up Its Declining Revenues and Increase Its Share Price

84.     The arrival of Vigodman caused Teva to substantially intensify its undisclosed plan to increase the prices it charged for an array of its generic drug offerings. Including the multiple drugs where it had raised prices in 2013, beginning in April 2014 and extending through July 2015, Teva raised prices on additional drugs and, in total, raised prices on at least 55 drugs. These undisclosed price increases fit into one of three categories: (1) 28 drugs where Teva was the only (or only major manufacturer) increasing the price of the generic drug; (2) 24 drugs where Teva's price increase occurred in parallel with increases by other manufacturers; and (3) three drugs where governmental investigations have indicated there may have been active collusion between Teva and other manufacturers. In total, the price increases swelled Teva's revenue by billions of dollars.

#### 1.     Teva's Price Increases Were Approved by the Company's Senior Executives

85.     Teva's decisions to increase prices came from the top down. FE-1 explained that Teva had an internal Pricing Group that was tasked with providing detailed reviews and documentation of price reductions. FE-1 further explained that the head of Teva USA's Pricing

28

Group, Kevin Galownia, was "the gatekeeper" for generic pricing. While Galownia was often the conduit for price increase orders, he did not make such decisions, which came from executives more senior than him.[6]

86.     Teva established review and approval procedures, pursuant to which price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Deborah Griffin ("Griffin"), and Teva USA Chief Operating Officer ("COO"), Maureen Cavanaugh ("Cavanaugh"), to determine whether to make a price increase and to personally approve the increases. Griffin and Cavanaugh would then decide when the increases would become effective.

87.     According to FE-2, Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System. FE-2 states that the Company stored pricing and revenue data "down to the NDC code" on the Oracle System and executives, including Cavanaugh, Allan Oberman ("Oberman"), President and CEO of Teva Americas Generics from November 5, 2012 until December 31, 2014, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers. The database was used to generate daily or weekly "Scorecards" that senior executives would receive that reported generic drug revenues and profits.

88.     FE-2 explains that the Company annually, on a predetermined schedule, prepared a long-range "Work Plan" that forecasts 3-5 years of revenue on a granular level. FE-2 further states that the Work Plan was reviewed and approved by Teva's U.S. and Israeli executives. Vigodman and Desheh were executives in Israel who reviewed the Work Plan. Further, during each quarter, a document called a Latest Best Estimate ("LBE") was prepared, detailing whether

---

[6]     Allegations in this subsection not specifically attributed to an "FE" are taken from the allegations set forth in the *Ontario Teachers* Amended Complaint at ¶¶ 40-42. Before relying on the information set forth in the *Ontario Teachers* Amended Complaint, counsel for Plaintiff herein independently confirmed that information.

forecasts were met.  The LBE reports were sent to Teva's executive committee in Israel, which included Vigodman and Desheh.

### 2.    Teva Unilaterally Increased Prices on Dozens of Drugs

89.    Beginning in 2013 and extending through early 2016, Teva recognized that the FDA's ANDA backlog had bestowed it with significant market power with respect to a number of drugs.  In response, Teva unilaterally increased prices on at least **28 generic drugs** by significant amounts.  The drugs and the dates and amounts of increases are set forth below:

| Generic Drug | Period of Increase[7] | Percentage Increase[8] | Increased Revenue[9] |
|---|---|---|---|
| Anagrelide HCL | 3/14-12/15 | 243% | $17,134,558 |
| Cimetidine | 6/13-6/18 | 869% | $12,797,442 |
| Ciprofloxacin HCL | 12/14-1/17 | 1111% | $102,373,807 |
| Clemastin Fum | 7/13-12/16 | 223% | $3,410,833 |
| Clotrimazole | 8/14-12/17 | 500% | $3,193,627 |
| Cromolyn Sodium | 7/14-6/18 | 392% | $6,029,503 |
| Cyrpoheptadine HCL | 3/14-11/17 | 110% | $7,460,259 |
| Diclofenac | 1/13-8/15 | 310% | $21,783,410 |
| Dicloxacillin Sodium | 3/14-8/17 | 98% | $13,326,041 |
| Diltiazem HCL | 7/13-1/16 | 205% | $38,020,901 |
| Etodolac SR | 7/13-1/14 | 200% | $49,403,608 |
| Fluoxetine HCL | 1/15-6/18 | 769% | $29,043,960 |
| Flutamide | 11/15-7/16 | 55% | $88,170 |
| Fosinipril Sodium | 2/15-9/15 | 60% | $3,928,025 |
| Griseofulvin | 2/15-3/16 | 276% | $16,148,357 |
| Hydroxyzine Pam | 3/14-1/18 | 173% | $11,019,351 |

---

[7]    A nationally recognized database was used to calculate prices per unit.  The data reflect prices at wholesale, but do not reflect off-invoice discounts and rebates.  The data show sales prices reflecting the inventory in any given month.  Even though price increase may be set at a particular point in time, because the data tracks actual market pricing, these prices increases can take time to work through the system as older stocks with lower prices are sold and replaced by newer stocks with higher prices.  The period of increase is calculated with respect to the beginning of the price increase and the month of the peak price after the price increase.

[8]    This represents the percentage increase for the most commonly prescribed dosage level for the period in the prior column.  All dosages and relevant periods are set forth in Appendix A hereto.

[9]    To determine increased revenue, the month prior to the price increase was identified.  Then it was assumed that this "but-for" price would have continued from that point onward had the price increase not occurred.  The increased revenue is the difference between the actual monthly prices and the pre-increase price, multiplied by total quantity.  Increased revenue is only calculated for months where the actual price is greater than the pre-increase price.  This calculation is performed separately for each formulation of a given product.

| Generic Drug | Period of Increase[7] | Percentage Increase[8] | Increased Revenue[9] |
|---|---|---|---|
| Ketoprofen | 7/13-5/18 | 746% | $6,131,456 |
| Ketorolac Trometh | 7/13-5/16 | 409% | $36,732,068 |
| Loperamide HCL | 8/14-2/16 | 119% | $15,651,417 |
| Megestrol Ace | 2/15-6/15 | 35% | $762,856 |
| Methotrexate Sodium | 6/13-1/15 | 579% | $138,314,084 |
| Methydolpa | 1/15-2/17 | 216% | $645,886 |
| Mexiletine HCL | 8/14-4/17 | 124% | $23,345,258 |
| Nefazodone HCL | 8/14-11/16 | 120% | $23,479,496 |
| Nortriptyline HCL | 1/15-9/16 | 158% | $20,967,422 |
| Prazosin HCL | 11/12-11/15 | 243% | $43,272,877 |
| Ranitidine HCL | 6/13-1/17 | 611% | $41,038,333 |
| Tolmetin Sodium | 7/13-6/17 | 265% | $2,652,049 |

90.     In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $688.1 million.

### 3.     Teva Increased Prices in Parallel with Other Manufacturers for a Number of Drugs

91.     Beginning in 2013 and extending through early 2016, Teva, acting in response to or in parallel with other manufacturers, increased prices on at least **24 generic drugs**.  The drugs and the dates and amounts of increases are set forth below:

| Generic Drug | Period of Increase | Percentage Increase[10] | Increased Revenue | Average Increase of Competitors[11] |
|---|---|---|---|---|
| Baclofen | 3/14-2/15 | 306% | $143,490,678 | 716% |
| Bumetanide | 3/14-7/16 | 652% | $86,977,165 | 258% |
| Cabidopa-Levodopa | 6/16-12/16 | 51% | $94,699 | 79% |
| Carpamazepine | 8/14-12/16 | 909% | $81,660,368 | 792% |
| Cephalexin | 3/14-7/14 | 171% | $52,800,891 | 320% |
| Danazol | 1/15-3/16 | 169% | $3,588,552 | 76% |
| Dipyridamole | 6/15-12/17 | 413% | $1,486,507 | 245% |
| Divalproex Sodium | 3/13-6/18 | 444% | $8,765,463 | 166% |
| Doxazosin Mesy | 7/13-10/15 | 666% | $45,742,141 | 908% |
| Enalapril | 6/13-12/16 | 1728% | $55,084,975 | 1222% |
| Estazolam | 3/14-6/18 | 132% | $20,790,429 | 277% |
| Estradiol | 7/12-1/16 | 198% | 61,704,439 | 273% |
| Etotolac | 3/13-12/15 | 501% | $49,403,608 | 333% |
| Fluconazole | 5/13-8/13 | 487% | $98,589,022 | 643% |
| Fluocinonide | 5/14-12/14 | 182% | $110,899,192 | 358% |
| Glimepiride | 1/15-8/15 | 199% | $19,091,825 | 214% |
| Ketoconazole | 3/14-9/16 | 590% | $54,025,729 | 945% |
| Meperdine HCL | 7/14-5/16 | 439% | $9,463,723 | 389% |
| Nadolol | 6/13-10/16 | 1143% | $70,875,535 | 131% |
| Oxybutynin CL | 5/13-1/16 | 869% | $97,355,732 | 535% |
| Penicillin V Potassium | 10/16-3/17 | 440% | $27,574,780 | 412% |
| Pravastatin Sod | 7/13-11/13 | 437% | $373,633,425 | 394% |
| Propranolol HCL | 5/13-5/14 | 298% | $256,345,498 | 900% |
| Trazodone HCL | 6/15-2/16 | 112% | $100,168,909 | 130% |

92.     In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $1.83 billion.

### 4.     Teva Actively Colluded with Other Generic Drug Manufacturers to Fix Prices

93.     With respect to three drugs as to which Teva made significant price increases—Nystatin, Theophylline ER, and Glipizide-Metformin—there is direct evidence that the price

---

[10]     This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

[11]     Competitor price increases are included here if the data showed a price increase generally within a month or two of Teva's price increase for the same drug and formulation.  The data in this chart represent the average percentage increase for all competitors that increased the price on at least one dosage of the drug.  All competitors, dosages and relevant periods are set forth in Appendix A hereto.

increases were the result of collusion with other manufacturers. Teva increased prices for and revenues from these drugs as follows:

| Generic Drug | Period of Increase | Percentage Increase[12] | Increased Revenue |
|---|---|---|---|
| Glipizide Metform | 2/13-2/16 | 142% | $14,683,227 |
| Nystatin | 3/14-11/15 | 52% | $4,334,575 |
| Theophylline | 3/14-7/14 | 172% | $25,624,945 |

### a)   Direct Evidence of Price-Fixing: Nystatin and Theophylline ER

94.     Nystatin is a medication used to fight fungal infections. The generic Nystatin sold by Teva is AB-rated to the brand name drug Mycostatin®. During the Relevant Period, Teva's two main competitors for Nystatin were Heritage Pharmaceuticals Inc. ("Heritage") and Sun Pharmaceuticals (through its division Mutual Pharmaceuticals ("Mutual")).

95.     Theophylline ER is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema. The generic Theophylline ER sold by Teva is AB-rated to the brand name drug Theodur®. Theophylline ER is an extended release medication, which means that it is released into the body throughout the day. During the Relevant Period, Teva's primary competitor for Theophylline ER was Heritage.

96.     As evidenced by facts and documents detailed in the CT AG's Amended Complaint against Teva and others dated June 18, 2018, Teva, Heritage and Mutual exchanged numerous e-mails and text messages regarding the prices of generic Nystatin and Theophylline ER during the Relevant Period. Many of these communications were, on information and belief, between Nisha Patel ("Patel"), Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to

---

[12]      This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

December 2016, and Jason Malek ("Malek"), the former President of Heritage who pled guilty to Sherman Act antitrust violations for price-fixing in January 2017.[13] For example,

a) In July 2013, Patel had a series of phone calls with Malek. The three calls spanned 43 minutes, including an initial call on July 7 that lasted for 21 minutes.

b) On July 30, 2013 Patel and Malek spoke twice, with the second of those two calls lasting more than twelve minutes. In between these two calls, another Heritage representative spoke with a Mutual representative for nearly eleven minutes.

c) After these calls, Nystatin was identified on an internal Teva document listing "potential" price increases, notwithstanding that Teva management had declined to raise prices a month earlier. Patel then left for maternity leave in August 2013 until the end of 2013.

d) On February 5, 2014, Patel and Malek spoke for more than one hour. Two days later, on February 7, Nystatin was again identified on an internal Teva document listing drugs for potential price increases. Patel and Malek had several additional calls in February and March 2014.

e) On April 4, 2014, Teva increased the weighted average cost ("WAC") price for Nystatin and Theophylline ER.

f) On April 15, 2014, Patel and Malek spoke for 17 minutes and discussed price increases for Nystatin, Theophylline, and several other generic drugs.

g) On June 23, 2014, Heritage employees internally discussed strategies to implement its own price increases of Nystatin, which it had slated for a 95% increase, and Theophylline ER, which it has slated for a 150% increase. In her notes about the call, a Heritage representative indicated that Heritage had to increase its WAC pricing for Nystatin, because Teva had. On June 25, 2014, the Heritage representative exchanged text messages with her contact at Sun/Mutual to let her know the details of Heritage's anticipated price increase for Nystatin.

---

[13]     Based on publicly available social media sites, Patel's tenure at Teva aligns with the tenure of Malek's contact at Teva.

h) On June 25, 2014, Malek also spoke with Patel for nearly fourteen minutes, during which Malek reported that Heritage would increase its prices for Theophylline shortly.

i) On June 30, 2014, Patel emailed her colleagues, acknowledging the agreement with Heritage.

j) By July 9, 2014, Heritage had increased Nystatin prices for at least fourteen of its customers nationwide, and by at least August of 2014, Sun began increasing its price for Nystatin as well. In addition to leading the price increases for Nystatin, Teva also refused to bid or challenge Heritage's price increases when requested by Heritage customers. Indeed, on July 8, 2014, a large retail customer emailed a Teva representative requesting a quote for Nystatin, but Teva refused to bid or challenge the Heritage price increase for this customer.

k) Also by July 9, 2014, Heritage had increased prices for Theophylline ER for at least twenty different customers nationwide, much as Teva had done three months earlier.

97.    As discussed herein, in May 2019, the State AGs filed a significantly expanded complaint against Teva and several other drug companies. The agreements between Teva and the other drug companies to increase prices for Theophylline and Nystatin and various other drugs, as alleged by the State AGs, were part of a scheme to manipulate prices for these drugs.

**b)    Direct Evidence of Price-Fixing: Glipizide-Metformin**

98.    Glipizide-Metformin is a medicine indicated for the treatment of high blood sugar levels caused by Type-2 diabetes. The generic Glipizide-Metformin manufactured by Teva is AB-rated to the brand name drug Metaglip®. Prior to and during the Relevant Period, Teva's only two competitors for Glipizide-Metformin were Heritage and Mylan. In 2016, Zydus entered the market with less than 2% market share.

99.   Beginning in April 2014, representatives from Teva, Heritage, Zydus, Mylan, Aurobindo, and/or Citron participated in numerous phone calls, and exchanged numerous e-mails and text messages regarding the prices of generic Glipizide-Metformin.

100.   On April 15, 2014, Heritage's Malek spoke with Patel for more than seventeen minutes, during which they discussed Heritage's intention to raise the price of Glipizide-Metformin and other drugs, and Teva agreed that if Heritage raised the price of these drugs, Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid Heritage and take its accounts.   Malek and Patel spoke several more times over the next several months, during which Malek and his contact confirmed the agreement to raise Glipizide-Metformin, prices, and Malek updated Patel on the progress of Heritage's price increases.

101.   By May 9, 2014, a Teva representative had spoken with a Mylan representative multiple times regarding Glipizide-Metformin, including one call that lasted more than seven minutes, and the two continued to stay in close contact throughout the rest of 2014.

### c)   Other Indicia of Price Collusion

102.   In addition to the direct evidence of price collusion between Teva and its rival drug maker in the form of inter-company communications, there are other indicia of collusion. For example, there was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortages were reported during the Relevant Period. In addition, there was no significant increase in the demand for these drugs or in the drugs' production costs that would explain the enormous price increase.   In addition, price increases of this magnitude would have been contrary to Teva's and each of the co-conspirators' economic interest absent the price-fixing scheme.   Without the certainty that all of the co-

conspirators would raise and maintain the prices for the relevant drugs, each co-conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the co-conspirators' agreement to raise and maintain their prices for the relevant drugs.

103.   In addition, Teva and the Individual Defendants had a palpable motive to fix prices with Teva's competitors which derives from the nature of the U.S. generic drug market itself.  As discussed above (¶¶ 54-57), because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drug makers' marginal production costs.  This stabilization of prices in turn caused Teva's profits and revenues to level off, thus giving Teva and its co-conspirators a common motive to conspire to raise prices.

104.   With the backdrop of this common motive in mind, the markets for Nystatin, Theophylline ER, and Glipizide-Metformin were all susceptible to anti-competitive conduct for the following economic reasons:

a) The market for each of the three drugs referenced above was **highly concentrated** and controlled by a handful of companies.  A more concentrated market is more susceptible to anti-competitive behavior, due in part to the relative ease with which co-conspirators can monitor each other's pricing behavior to ensure adherence to the price-fixing agreement.  Moreover, in a highly concentrated market, there is a lower probability that each company has different production costs, which facilitates the maintenance of a price-fixing scheme.

b) **Barriers to entry** into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power—i.e., the ability to set prices above market costs—of existing participants.  Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and

difficulties buyers may have in changing suppliers. If there is no significant threat that new firms will enter a market, a single firm with a dominant market share— or a combination of firms with a significant percentage of the market—is able to engage in anticompetitive conduct, such as restricting output and raising prices to the detriment of consumers. Barriers to entry in the markets for generic drugs include, among other things, high manufacturing costs and regulatory and intellectual property requirements. For example, the requirement that companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

c) The presence of alternative products that can easily be substituted for a given product serves to undermine anti-competitive behavior. Conversely, the **absence of available substitutes** increases the susceptibility of a market to anti-competitive behavior because consumers have no alternative but to purchase the product, notwithstanding any price increases. In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic and brand-name versions of a drug are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

d) A standardized, commodity-like product with a **high degree of interchangeability** between the goods of the participants in an anti-competitive conspiracy also increases the susceptibility of a given market to anti-competitive conduct. By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original, brand-name drug.

105. In addition to the economic characteristics of these markets which indicate a susceptibility to anti-competitive conduct, representatives from Teva and its co-conspirators had substantial opportunities to meet up, socialize and engage in collusive conduct. Teva and its co-conspirators routinely attended conferences, meetings, and trade shows sponsored by various

pharmaceutical trade associations, interacted with each other and discussed their respective businesses and customers, and to discuss, devise, and implement the price-fixing schemes set forth herein.  Social events and other recreational activities—including golf outings, lunches, cocktail parties, and dinners—were also organized in conjunction with the trade association events and provided further opportunities for these representatives to meet outside of the traditional business setting and engage in the collusive activities alleged herein.  Teva even reserved a "strategic exchange" bungalow at the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS") which NACDS marketed as an "opportunit[y] to meet and discuss strategic issues with key trading partners."  Such bungalows provided Teva and its competitors with a secluded place to privately conduct business.  A list of these industry events and the attendees from Teva and its co-conspirators is attached as Appendix B hereto.

### 5. As a Result of the Price Increases, Teva Increased Its Revenues and Profits by Billions of Dollars

106.    As a result of the price increases described above, between 2014 and 2016, the total additional revenues obtained from these price increases was **$2.5 billion**.  Further, because price increases impose minimal additional costs on Teva, these revenue increases were, effectively, increases in Teva's profitability resulting from the price increase strategy.

107.    On an annual basis, the increased revenues began to impact Teva's bottom line beginning in 2013, peaked in 2015, and by 2017, had substantially declined as increased price competition negatively impacted Teva's ability to successfully implement its price increase strategy.  The additional revenues earned by Teva from its price increase strategy for 2013 through November 2014 is set forth in the chart below:

**Total Additional Revenues Earned From Price Increases**

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| $222,115,831 | $656,024,837 | $747,045,795 | $541,772,741 | $273,812,033 | $74,887,541 | $2,515,686,778 |

**G.    Recognizing that Its Price Increase Scheme Was Unsustainable for More than a Short Period, Teva Misleads Investors Regarding the Basis for Its Improved Financial Performance**

108.    In connection with its price increase strategy, Teva sought at all costs to avoid any suggestion that price increases were the cause of its seemingly miraculous turnaround. Accordingly, at the beginning of the Relevant Period of February 6, 2014, Teva attributed its increase in revenues for the end of 2014 to higher sales volumes and launches of new generic drugs. Nothing was said about the multiple drug price increases from the summer of 2013.

109.    In May 2014, touting its first quarter results, Teva again relied upon "new product launches" and a changed composition of revenues to explain its increased profitability.

110.    On October 30, 2014, during the third quarter earnings call, Teva was specifically asked about the impact of price increases, but Defendant Olafsson deflected, suggesting that there were no significant increases since "the base business itself is slowly eroding . . . ."

111.    And during a conference call in December 2014, Defendant Olafsson was asked a question that was based upon an assumption that wholesalers of generic drugs were experiencing "extraordinary price increases." Defendant Olafsson rejected the premise of the question, stating: "let me correct. I have to disagree that they have experienced tremendous price increase[s]."

112.    Throughout 2015 and early 2016, Vigodman, Desheh and Olafsson flatly denied that Teva's improved performance was the result of price increases:

- October 29, 2015 (Vigodman): "[A]ll the improvements you see in margins is ***not driven by price***. It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015. And that's a very important message."

40

- November 19, 2015 (Desheh): "There is a lot of noise around pricing issues. Some of it is coming from politicians [who are] driving agenda[s] . . . . Our exposure to all these things is very minimal . . . . I believe there are many examples for competitive environment, real competition, like we see in the generic market in the United States . . . . ***Teva was not associated with any of that***."

- February 11, 2016 (Olafsson): "So how did we do this [increase our profit margin by $1 billion over 24 months]? ***Not by pricing but by portfolio mix, new products, and efficiency measures***."

All of the above statements were false because by July 2015, Teva had raised prices on more than 61 drugs, including many by more than 250%.

### H.      Propelled by Price Increases, Teva's ADS Price Ascends

113.   In 2014, despite the storm clouds raised by press stories, government investigations and the increasing pace of the FDA's ANDA approval process, Teva's price increases fueled a turn-around success story for Teva's U.S. generics business, which reported approximately a $250 million (or 6%) increase in revenues over the prior year.  Teva's ADS price soared as a result, jumping more than 50% from around $37 in late October 2013, to approximately $56 by the end of 2014.  These astonishing year-over-year increases in U.S. generics revenues were accomplished in the face of 23 million fewer prescriptions than in 2013.

114.   The price increases also led to a banner year in 2015 for Teva's U.S. generics division, which spearheaded the Company's growth story, fueling an unprecedented increase in the price of Teva ADS.  Teva reported the 2015 gross profit from its overall generic medicines segment as $4.5 billion, an increase of $246 million, or 6%, compared to $4.3 billion in 2014, and a profit (with expenses removed) of $2.7 billion in 2015, compared to $2.2 billion in 2014, or a difference of almost 24%.  Most of these glowing results stemmed from Teva's U.S. generics division, which reported revenues of $4.8 billion, an increase of $375 million, or 8%, over 2014, which itself had been a flagship year for U.S. generics.  Teva's inflated ADS price

rocketed from approximately $55 at the beginning of the year to more than $70 by late July 2015.

**I.**      **Defendants Lay Plans for a Major Acquisition—Inflating the ADS Price to Use as "Currency"**

115.    Undeterred by the public outcry regarding the price increases and the government investigations into generic price-fixing, as well as Teva's knowledge that price increases could not be maintained over the long-term as generic competition increased, Defendants continued to pursue plans—contemplated from the time Vigodman was hired as CEO in January 2014—to engage in large acquisitions to position the company for the end of its Copoxone patent rights.

116.    On April 21, 2015, with the ADS shares trading at an artificially inflated price of approximately $66 per share, Defendants announced an offer to acquire all of the outstanding shares of Mylan in a transaction valued at $82.00 per Mylan share, with the consideration to be comprised of approximately 50% cash and 50% stock.   The acquisition fell through; yet Defendants continued to pursue other acquisition options, all the while continuing to misrepresent and omit material facts regarding the Teva's ongoing price-fixing conspiracy and source of its financial success.

**J.**      **The Company Announces a $40 Billion Acquisition of Actavis Fueled By Its Inflated Share Price and a Proposed Bond Offering**

117.    Fueled by Defendants' misleading statements, Teva's ADS price reached a then all-time high of $72 on July 27, 2015.  On that day, Teva announced it had entered into a definitive agreement with Allergan plc to acquire its worldwide generic pharmaceuticals business, Actavis, for $40.5 billion in cash and equity.

118.    As would later be revealed during a call with investors on October 29, 2015, Defendants planned to raise approximately $6.75 billion from a secondary public offering of

ADS and an initial public offering of Preferred Shares, and approximately $27 billion from a debt issuance and term loans, to finance the acquisition.

119.    On the same day, Teva issued its third quarter 2015 results, which were ahead of the street's expectations, and again raised its full year guidance. As summarized by the analysts at UBS in their October 29, 2015 report, "Our takeaway: Another good quarter."

### 1. Teva Issues $3.375 Billion in ADS and $3.375 Billion in Preferred Shares While the ADS Trade at an Inflated Price

120.    On December 8, 2015, Teva closed its Secondary Offering of ADS and its Initial Offering of Preferred Shares. Teva issued 54 million ADS at $62.50 per ADS in the secondary offering, raising approximately $3.375 billion from investors. These shares were offered publicly pursuant to a registration statement and prospectus. Teva also issued 3,375,000 Preferred Shares at $1,000.00 per share, raising another $3.375 billion from investors. Each Preferred Share was to be converted into a number of ADS equal to the conversion rate set forth in the Preferred Prospectus, between 13.3333 and 16.0000.

121.    On January 6, 2016, Teva sold an additional 5.4 million ADS and an additional 337,500 Preferred Shares pursuant to the exercise of the ADS/Preferred Underwriters' over-allotment option. In total, Teva generated net proceeds from the ADS Offering and the Preferred Offering of approximately $7.24 billion.

### 2. Defendants Rush the Notes Offering and Conceal the Fact that Teva Had Been Served Subpoenas by the DOJ and the Connecticut AG

122.    On July 13, 2016, Vigodman announced that Teva would accelerate the timing of the bond offering related to the Actavis deal, despite the fact that it "lacked full visibility into the Actavis Generics number." According to Vigodman:

> [W]e are closely monitoring the corporate bond markets and given the various attractive terms currently prevailing there, we are considering accelerating our planned debt offering. With this in mind, and despite the fact that we will not yet

43

have full visibility into the Actavis Generics number, and in particular, certain pipeline information, we have decided to provide you today with our best estimate of the financial outlook for Teva in 2016 to 2019, following the close of the deal.

123.   This was surprising because just a few weeks earlier, on a May 9, 2016 conference call, Desheh had told investors that the offering would not happen until **after** the Actavis deal closed.

124.   As of July 31, 2016, Teva had raised $20.3 billion from the Senior Notes Offering to complete the Actavis acquisition.  The Actavis deal closed on August 2, 2016.  In the related August 2, 2016 press release, Vigodman falsely declared that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever—in both our generics and specialty businesses."

125.   In sum, of the $33.4 billion owed Allergan beyond the transfer of Teva stock (priced as of July 2015), $5 billion was funded by Teva borrowing from its loan facility, and $8.1 billion from cash on hand that was previously raised in the ADS and Preferred Offerings, including from its December 2015 equity offerings and borrowings under its syndicated revolving credit.  The remaining $20.3 billion came from the proceeds of the Senior Notes Offering.  If Defendants had been unable to secure financing for that debt, according to the terms of the deal's structure, Teva's agreement with Allergan would have required Teva to pay Allergan $2.5 billion.

**K.    The Fraud Unravels, Causing the Prices of Teva Securities to Fall**

**1.    Days After the Close of the Actavis Transaction, Teva Belatedly Announces It Is the Subject of Government Antitrust Investigations**

126.   On August 4, 2016, three days after the Notes Offering, and two days after the Actavis transaction closed, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of

2015.  The end of its ability to maintain growth through price increases was due to the massive increase in competition as the result of the FDA's vastly accelerated pace of ANDA approvals. Defendants also revealed for the first time to investors that Teva was now the subject of DOJ and State AG investigations into generic drug price collusion.  In fact, the DOJ had served Teva with a subpoena on June 21, 2016, and the CT AG on July 12, 2016—just before Teva announced the $20 billion Notes Offering on July 13, 2016, although Defendants did not disclose the subpoenas at the time.  Upon this news, the price of Teva's securities fell.

127.    Despite the revelation of government inquiries and the continued unraveling of Teva's ability to maintain elevated drug prices, Defendants doubled down, expressly denying the impact of price hikes and reaffirming their inflated outlook for 2016.

128.    Defendants' denials were deeply undermined when, on September 12, 2016, the GAO Report was issued.  This report, based upon a review of Medicare data, concluded that generic drug manufacturers including Teva had made hundreds of unexplained "extraordinary price increases"—defined as a particular drug's price increasing over 100% within a 12-month period—including numerous price increases of more than 1,000% in some cases.  Teva owned the rights to at least *40%* of the drugs identified in the GAO Report as having exhibited an extraordinary price increase between 2013 and 2015.

129.    Further, after *Bloomberg* and other media outlets reported between November 3 and November 10, 2016, that U.S. prosecutors could hand down criminal charges related to its price-fixing investigation by year-end, resulting in sizeable liabilities for Teva and other generic drug manufacturers, Defendants denied any wrongdoing, stating, "Teva is not aware of any facts that would give rise to an exposure to the company with respect to these subpoenas."

130.   This denial was false.  Only a month later, the CT AG would file its complaint alleging direct evidence that Teva had engaged in a conspiracy to fix prices on multiple drugs.

### 2.   The Market Is Surprised When Teva Announces Dismal Results for the Third Quarter of 2016 and Olafsson Is Fired

131.   On November 15, 2016, Teva reported third quarter 2016 revenues below consensus expectations, which Defendant Olafsson stated were a result of pricing pressures in Teva's U.S. generics business.  This news was a shock and a disappointment, given Defendants' bullish comments on Teva's generics business and statements concerning price trends.  On this news, the price of Teva's securities dropped.

132.   Less than three weeks later, on December 5, 2016, amid Teva's deteriorating financial condition, the Company unexpectedly announced the "retirement" of Olafsson, the 48-year-old head of generics.   His replacement, Dipankar Bhattacharjee, took over effective immediately.  In reality, Olafsson did not "retire."  He was fired.  The price of Teva's securities dropped in response.

### 3.   Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company

133.   On January 6, 2017, Teva reduced its 2017 guidance, far below market expectations, which Vigodman attributed "to not being able to realize new launches in . . . Teva['s] legacy business," rather than pricing pressure as generic competition increased.  With this report of reduced revenues, the price of Teva securities declined precipitously.

134.   Shortly thereafter, on February 6, 2017, Teva announced the termination of Vigodman, effective immediately and without a permanent replacement.   The press release further noted that Vigodman's service on Teva's Board had also ended.  As with Olafsson, investors questioned the timing and abruptness of Vigodman's departure, especially given that no replacement was named, or, apparently, was under consideration at the time.  For example,

J.P Morgan, in a report dated February 6, 2017, titled "CEO Transition Adds Further Uncertainty to Story," wrote that "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges."

135.   On April 25, 2017, numerous media reports surfaced that Desheh would be pushed out as CFO at Teva.  These reports were confirmed the next day when, in an April 26, 2017 6-K, Teva announced that Desheh would be stepping down as CFO in "the coming months" so that he could move on to "the next phase of [his] career."

### 4.   After Vigodman, Desheh and Olafsson Are Terminated, Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings

136.   On June 8, 2017, Teva announced four new directors to its Board in an attempt to regain lost credibility.  By June 21, 2017, Desheh had also left Teva.  Two months later, with Defendants Desheh, Vigodman and Olafsson finally gone and new board members in place, Teva revised guidance down again, reduced its dividend, and took a $6.1 billion charge. Management admitted that these actions were triggered largely by the same pricing and competitive market pressures that the Company—and especially former executives Vigodman, Olafsson and Desheh—had previously denied would have any impact on Teva.

137.   On August 3, 2017, Teva announced lower-than-expected second quarter 2017 results, including a net EPS loss for the quarter of $5.94, reduced guidance, and a $6.1 billion goodwill impairment charge.  As Dr. Yitzhak Peterburg, Vigodman's temporary replacement, revealed during the Company's earnings call that day, the EPS loss was primarily the result of the $6.1 billion impairment charge, which was taken to reduce goodwill associated with Teva's U.S. generics business. Fitch downgraded Teva's Issuer Default Rating to BBB- as a result, with a Negative Outlook, reasoning that, "Pricing pressure in the U.S. will weigh on operations in the

near term, requiring the company to reduce debt both through FCF generation and asset divestitures." As reported by The Street that day, "Teva Shares Are Getting Obliterated Again After Vicious Investment Bank Downgrades."

138. Teva's August 3, 2017 disclosure was the direct result of Defendants' fraud. Defendants had concealed from investors that Teva had generated revenues from price increases that simply could not be maintained over the long-term. As those sources of revenue began to dry up, and competition seeped back into the generic drugs market, revenue substantially declined, necessitating the massive write down.

### 5. The Market Learns Additional Details Regarding Defendants' Price-Fixing Scheme

139. The truth about Teva's collusion with other generic drug manufacturers further emerged with the publication of a December 9, 2018 article in *The Washington Post*, which quoted Connecticut Assistant AG Joseph Nielsen as stating that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." The article also noted Teva's continued denials that it engaged in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

140. On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy alleged herein. The May 2019 State AG complaint alleges that Teva implemented significant price increases for approximately 112 generic drugs, including astonishing price hikes of over 1,000%, and describes Teva's price-fixing with respect to at least 86 of those generic drugs—significantly more drugs than the 7 Teva-related drugs at issue in the State AGs' previously filed action. The action details Teva's role as a "consistent participant"

and a central player in the conspiracy.  Further, the civil enforcement action names four Teva

employees as defendants: Cavanaugh, Patel, Kevin Green ("Green"), Teva's former Director of

National Accounts, and David Rekenthaler ("Rekenthaler"), Teva's former Vice President, Sales

U.S. Generics.

## V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

141.    During the Relevant Period, Defendants made a series of materially false or

misleading statements and omissions of material fact.  These statements can be summarized as

follows:

> *First*, Defendants made materially false and misleading statements and omissions regarding the reasons for the Company's success in the generic drug market (including improved revenues, growth, profitability, costs, and margins). Specifically, Defendants falsely attribute the year-over-year ("YOY") changes in Teva's generic segment profit and U.S. generic revenues to sources other than Teva's price increases.  Once Defendants spoke on these subjects, they had a duty to fully and accurately disclose the true source of Teva's revenues and profits.

> *Second*, Defendants flatly and falsely denied that Teva had engaged in price increases or received material benefit from price increases.  Instead, Defendants falsely claimed that Teva only raised prices on a select few generic drugs due to market shortages.

> *Third*, Defendants falsely stated that the Company was immune to pricing pressures when, in fact, it was unable to sustain its undisclosed strategy of taking substantial price increases.

> *Fourth*, Defendants falsely represented the level of completion that the Company faced in the generic drug market.  In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.

> *Fifth*, Defendants failed to disclose their receipt of subpoenas from the U.S. Department of Justice and the Connecticut Attorney General in connection with those agencies' investigations into price collusion in the generic pharmaceutical markets and the impact of such investigations on the Company.

> *Sixth*, Defendants falsely denied that Teva had engaged in collusive conduct, while in reality Teva was the central actor in an industry-wide price-fixing and market-allocation scheme, and four Teva executives were so extensively involved in

the unlawful conspiracy that they were personally named as defendants in the State AGs' May 2019 complaint.

142.    Defendants also violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F by failing to disclose the true reasons and factors contributing to the increases and decreases in the Company's revenues, i.e., the Company's undisclosed strategy and implementation of massive price increases for generic drugs.  These increases were unsustainable given, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.

### A.    Defendants' Materially False and Misleading Statements and Omissions During the Relevant Period

#### 1.    February 6, 2014

143.    On February 6, 2014, in a press release filed with the SEC on Form 6-K that was signed by Defendant Altman, Teva reported the Company's 4Q13 and FY 2013 financial results. In the same press release, Teva disclosed 4Q13 U.S. Generic Medicine "revenues of $1.2 billion, an increase of 14% compared to the fourth quarter of 2012."  The press release reported that:

> The increase resulted mainly from the exclusive launches of niacin ER, the generic version of Niaspan®, and temozolomide, the generic version of Temodar®, in the third quarter of 2013, and launches of duloxetine, the generic version of Cymbalta®, and tobramycin, the generic version of Tobi®, in the fourth quarter of 2013, as well as higher sales of budesonide inhalation, the generic version of Pulmicort®.

144.    The statements set forth in ¶ 143 above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly

competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone.   This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 2.   February 10, 2014

145.   On February 10, 2014, Teva filed its 2013 Annual Report with the SEC on Form 20-F, which was signed by Defendant Desheh. The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

146.   The statements set forth in ¶ 145 above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results in the generic drug market were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone. Without this inflated revenue, Teva would have experienced a YOY decline in generic profit of $622 million, or 55% more than what it reported.   This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.   Having put into play the issue of the source of

Teva's revenue growth and the subject of competition in the generic drug markets, Defendants

had a duty to disclose Teva's price increase strategy and the true source of its revenues.

147.    The Company's February 10, 2014 Form 20-F also described the "intense

competition," Teva faced in the U.S. generic market and its "competitive pricing strategy," and

again touted its "competitive advantages":

> Competitive Landscape. In the United States, we are subject to intense
> competition in the generic drug market from other domestic and foreign generic
> drug manufacturers, brand-name pharmaceutical companies through lifecycle
> management initiatives, authorized generics, existing brand equivalents and
> manufacturers of therapeutically similar drugs. Price competition from additional
> generic versions of the same product typically results in margin pressures.  We
> believe that our primary competitive advantages are our ability to continually
> introduce new and complex generic equivalents for brand-name drug products on
> a timely basis, our quality and cost-effective production, our customer service and
> the breadth of our product line. We believe we have a focused and competitive
> pricing strategy.

148.    In the same Form 20-F, Teva discussed the primary factors driving growth in the

Company's Generic Medicines segment, and reported "intense competition in the generic

market":

> Sales of generic pharmaceuticals have benefitted from increasing awareness and
> acceptance on the part of healthcare insurers and institutions, consumers,
> physicians and pharmacists globally. . . .  These conditions also result in intense
> competition in the generic market, with generic companies competing for
> advantage based on pricing, time to market, reputation, customer service and
> breadth of product line.

149.    The statements set forth in ¶¶ 147-48 above were materially false and misleading

and/or omitted material facts because Teva was not facing "intense competition" or operating in

a competitive environment. Nor was Teva working to combat the purported effects of

competition, which resulted in "margin pressures," through a "competitive pricing strategy."  In

truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price

increases depended in large part on a *lack* of competition. In fact, during the Relevant Period,

Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 3.     May 1, 2014

150.    On May 1, 2014, Teva filed a press release on a Form 6-K with the SEC, signed by Defendant Desheh, reporting the Company's 1Q14 financial results. The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was "primarily" due to: "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

151.    That same day, Teva held its 1Q14 earnings conference call, in which Defendants Vigodman and Desheh participated.  During that call, Desheh stated:

> In generics, we experienced significant growth in the Unites States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches.
>
> * * *
>
> The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market and higher profitability in Europe. . . .  31% improvement in the profit of the global generic business, driven by the performance of the US market, improved the total generic share to 30% of total profit.

152.    The statements set forth in ¶¶ 150-51 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact,

during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by May 2014. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 4.   July 31, 2014

153.   On July 31, 2014, Teva filed its 2Q14 Form 6-K with the SEC, which was signed by Desheh. The 2Q14 Form 6-K reported that YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> [A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit, [which was attributed to] . . . . higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe.

154.   On July 31, 2014, Teva held its 2Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated. During the call, Desheh stated:

> [T]he improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year. Launch of generic Xeloda in March and generic Lovaza this quarter in the US market . . . led to the better results.

155.   The statements set forth in ¶¶ 153-54 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved

revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by July 2014. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 5.        October 30, 2014

156.    On October 30, 2014, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva reported its 3Q14 financial results. The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, "primarily" from:

> [H]igher gross profit and a significant reduction in selling and marketing expenses, [with higher gross profit attributed to] . . . lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues.

157.    On October 30, 2014, Teva held its 3Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated. During the call, Olafsson stated:

> I think overall, we have a good revenue off the new launches this year. [Capasida] the generic Lovaza omega 3 [and] Entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year.

> (First alteration in original.)

158.    On the same call, a UBS Securities analyst asked whether price increases in "some of [Teva's] base business" impacted Teva's 3Q14 financial results. Olafsson responded:

"there's never a price increase on the base business as whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers."

159.    The statements set forth in ¶¶ 156-58 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by October 2014. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 6.    December 11, 2014

160.    On December 11, 2014, Vigodman, Desheh, and Olafsson participated in the Company's 2015 Business Outlook Meeting conference call. During the call, a Morgan Stanley analyst asked "with respect to Generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases." Defendant Olafsson "disagree[ed]" stating:

So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the US of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

161.    The statements set forth in ¶ 160 above were materially false and misleading and/or omitted material facts. Defendants' statements that "overall, the pricing in the US of generics has been flat to a slight down" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY 13 and FY14 Teva generated more than $878 million through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 7.    February 5 and February 9, 2015

162.    On February 5, 2015, Teva filed a press release with the SEC on Form 6-K, signed by Defendant Desheh, reporting the Company's 4Q14 and FY2014 financial results. The Q4 2014 Press Release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and lower R&D expenses."

163.    On February 9, 2015, Teva filed its 2014 Annual Report with the SEC on Form 20-F, signed by Desheh.   The 2014 20-F stated that Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31,

2014, and concluded that its internal controls were effective, and that Defendants Vigodman and

Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of

December 31, 2014, and concluded that its disclosure controls and procedures were effective.

The 2014 20-F disclosed a YOY increase in generic profit of $480 million, or 29%, attributed

"mainly" to:

> "lower S&M expenses and higher gross profit . . . . [which was] mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties.

164.     The Company's 2014 20-F also reported that FY2014 U.S. Generic Medicine

revenues "amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013," explaining that:

> The increase resulted mainly from the 2014 exclusive launch of capecitabine (the generic equivalent of Xeloda®), the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we were first to market, and the launch of raloxifene (the generic equivalent of Evista®), as well as products that were sold in 2014 that were not sold in 2013.  These increases were partially offset by lower sales of the generic versions of Adderall IR (amphetamine salts IR), Pulmicort (budesonide inhalation) and Niaspan® (niacin ER).

165.     The table below reflects Teva's improved profits as reported in 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |

166.     The statements set forth in ¶¶ 162-65 above were materially false and misleading

and/or omitted material facts. Defendants' statements touting the purported success of their

generics business had the effect of concealing, and/or failed to disclose, that, in truth, the

Company's reported financial results and success in the generic drug market, including improved

revenues, were driven primarily by its undisclosed strategy to take massive price increases, either

on its own or in tandem with other manufacturers whom it purportedly competed with. In fact,

during FY14 Teva generated more than $656 million through price increases alone, representing a YOY increase in inflated revenues of more than $434 million, or nearly all of the reported YOY change in generics profit. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

167.    The Company's February 9, 2015 Form 20-F also described the "intense competition" Teva faced in the U.S. generic drug market and its "competitive pricing strategy," and again touted its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

168.    In the 2014 Form 20-F, Teva also described the "intense competition in the generic market," and the primary factors driving growth in its Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to

continued expansion in the global generic market, as well as increased competition in this market.

169.    In the same Form 20-F, the Company also described the following Risk Factor:

Our generic drugs face intense competition.  Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

170.    The statements set forth in ¶¶ 167-69 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy."  In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 8.    April 30, 2015

171.    On April 30, 2015, Teva filed its 1Q15 Form 6-K with the SEC, also signed by Defendant Desheh. The Company's 1Q15 Form 6-K reported a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to:

[H]igher gross profit and lower selling and marketing expenses as well as lower research and development expenses. . . . [with] higher gross profit . . .mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business.

172.    On April 30, 2015, Teva held its 1Q15 earnings conference call, on which Vigodman, Desheh, and Olafsson participated.  During the call, a Bank of America Merrill

Lynch analyst asked "how much more potential exists to increase generic segment margins purely from organic gains in operational efficiency?"  In response, Olafsson stated:

> I think there is room for more, but it takes a little longer time.  What plays into the operating profit in generics are probably three or four things.

> First of all, we have a significant improvement in our cost of goods.  I think the operation team in Teva has done an outstanding job in lowering the cost of goods, improving the quality of the supply.

> And really, it's my business that has benefited from that because a big portion of our volume comes straight to the generic business.  And really, we will continue that over time. . . .

> I think the next thing is the portfolio offering.  I think the more we have of exclusive complex generics on offering, we have a higher margin on these products. It's simple. So when we have more of the launches, it will drive up the margin.

> The third thing is the cost infrastructure.  I think we have done a very good job in the cost infrastructure.   You can see that from our gross margin versus our operating profit. . . .

> [O]bviously, the big jumps of 1,000 basis points we have taken over the last 24 months, you wouldn't see that skill of improvement in the generics. . . .

> When you look at the top line growth, you see that already in first-quarter, we have improved our top line growth.  That mainly comes from our new launches but also our emphasis on the branded generic markets.

173.   The statements set forth in ¶¶ 171-72 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business, including the "three or four things" that play into Teva's operating profit, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in

FY15 generated an additional $747 million through price increases, much of which had been realized by April 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 9.   June 10, 2015

174.   During a June 10, 2015 Goldman Sachs conference, Vigodman spoke of "the profound change in the generic business" since 2014, stating:

> These "are things [that] are not confined to numbers, but maybe [numbers tell the story:] 16.7% operating profit in 2013; 21.9% operating profit 2014," and attributing this success solely to "[t]he execution of the cost reduction program[:] $600 million dollars of net savings, 2014; $500 million dollar, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months, we centralized procurement.... So everything that was done during 2014 was based on organic moves only. . . ."

175.   The statements set forth in ¶ 174 above were materially false and misleading and/or omitted material facts. Vigodman's statements touting the purported success of their generics business, including the "cost reduction program" and "full transformation of our operational network," had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by June 2015. This strategy was inherently unsustainable in light of, among other

things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 10.   July 27, 2015

176.   On July 27, 2015, Teva held a call to discuss the Company's Actavis acquisition. On the July 27, 2015 call, a BMO Capital analyst asked Olafsson and Vigodman about the competitive landscape in the generic market.  In response, Olafsson stated, "the U.S. generic market is very competitive. . . .  [There's] a fierce competition on most of the portfolio, if not all of the portfolio."  Vigodman added, "we promise to do everything in our power to take the Company to be able to continue the improvement that we have been witnessing here.  We believe in competition, and we'll do what is needed in order to win all the markets we operate."

177.   The statements set forth in ¶ 176 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce competition" or operating in a competitive environment. Nor was "the U.S. generic market [] very competitive." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 11.   July 30, 2015

178.   On July 30, 2015, Teva filed its 2Q15 Form 6-K, which was signed by Defendant Desheh.  Teva's 2Q15 6-K reported a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

"[H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

179.    The statements set forth in ¶ 178 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by July 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 12.    October 29, 2015

180.    On October 29, 2015, Teva filed its 3Q15 Form 6-K with the SEC, signed by Desheh. In the 3Q15 Form 6-K, Teva reported YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to:

"[L]ower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

181.   On October 29, 2015, Vigodman, Desheh, and Olafsson participated in the Company's 3Q15 earnings conference call. During the call, Vigodman denied that any of Teva's margin improvements were attributable to price increases:

> We are very responsible . . . in everything that pertains to prices on the generic side and on the specialty side.  And I would even put it another way, ***all the improvements you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures.  Not by price, 2014, 2015. And that's a very important message***.

182.   In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit:

> In terms of the proposed legislation on pricing control on generics, first of all, we don't really know what it's going to be. But let me give you examples. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price.
>
> ***The talk about the inflation in generics when you have a big portfolio is really not there***. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

183.   The statements set forth in ¶¶ 180-82 above were materially false and misleading and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by October 2015.  This strategy was inherently

unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

184.    On the same October 29, 2015 call, Olafsson was asked if he could "follow up . . . on what your pricing trends are here in the US for the generic business." Olafsson responded:

> So on the pricing, I think pricing is obviously based on the competition. We have talked about that the overall pricing trend is down.  What will change that obviously, there is different things.  I think the consolidation of the customers affect pricing.  I think the backlog, when the FDA releases the backlog of 3,000 NDA affect pricing.

185.    The statements set forth in ¶ 184 above were materially false and misleading and/or omitted material facts because Teva's pricing was not "obviously based on the competition" and the Company was not operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 13.    November 19, 2015

186.    On November 19, 2015, during a Global Healthcare Conference call hosted by Jefferies LLC, in response to a question asking Desheh to "give us your 20,000 foot view on pricing" and asked "[i]s it an issue. . . . where do you go on price," he stated:

> There is a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. ***Our exposure to all these things is very minimal. . . .***

Generic prices? There are no – I believe that there are many examples for competitive environment, real competition, like we see in the generic market in the United States. . . .

So it's a highly competitive environment with players coming from all over the world, with a very fierce price competition. The price of generic went down 50% over the past 10 years. . . .

**And Teva was not associated with any of that.** So we're playing a competitive game. We're playing it fairly. We, of course, play by the book and by the rule. **And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have. . . .**

But we also saw that there is a floor to this. And the floor is a common economic and business model. And wherever prices have come down to a level that it doesn't make sense, companies like us just pull out. We refuse to participate in tenders that generate no profit. And we just pull out . . . . prices go up, because there is less supply over the demand.

187.    The statements set forth in ¶ 186 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce price competition" or operating in a "highly competitive environment." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

188.    Similarly, Desheh's statements set forth in ¶ 186 above – including that Teva's "exposure to all these things is very minimal," "we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have," and "Teva was not associated with any of that" – were false and misleading because Teva was highly dependent on its strategy to implement massive short term price hikes. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. Thus, any political initiative, such as permitting Medicare to negotiate drug prices, could lead to drastic price decreases.

### 14.    January 11, 2016

189.    At a January 11, 2016 J.P. Morgan Conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because *on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase*. So, overall, we see that in the business.

> There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

190.    The statements set forth in ¶ 189 above were materially false and misleading and/or omitted material facts. Olafsson's statement that "on 95% of our portfolio, we experience price decline" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the

subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 15.   February 11, 2016

191.   On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to: "[T]he reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

192.   Also on February 11, 2016, Teva filed its Annual Report with the SEC on Form 20-F, signed by Desheh.   The 2015 20-F stated that Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, and concluded that its internal controls were effective, and that Defendants Vigodman and Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014, and concluded that its disclosure controls and procedures were effective. Vigodman and Desheh also signed the consolidated balance sheet.  The 2015 Form 20-F reported a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses and higher gross profit," which was "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

193.   The table below reflects Teva's improved profits as reported in 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |

194.     On February 11, 2016, Vigodman, Desheh, and Olafsson participated in Teva's

4Q15 and FY2015 earnings call.  On the same call, Olafsson stated:

> 2015 was a very good year for Teva Generics. Thanks to our strong performance
> of the base business and good new products launches, we delivered great results
> in the US and in major markets globally. We continued improving the operating
> profit of the generic business, coming from $1.68 billion operating profit in 2013,
> or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue.
> This is $1 billion improvement in operating profit over 24 months period.
>
> So how did we do this? Not by pricing but by portfolio mix, new products, and
> efficiency measures.

195.     During the February 11, 2016 earnings conference call, Olafsson made the

following statements regarding pricing in the generic segment:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall
> don't see price inflation of generics as it sometimes is portrayed in the media. On
> the contrary, for 2015, we saw mid-single-digit price decline for the overall
> business.
>
> In the U.S., our largest market, we saw approximately 4% price erosion. . . .
>
> Looking forward, the conjunction of price erosion with the mix changes, focus on
> cost structure, and the new product launches, we continue to drive our business
> growth, both top line and bottom line.  We expect to see the same in 2016.
> Nothing today points to a significant change in the generic pricing environment.

196.     On the same call, a Guggenheim Securities, LLC analyst asked Olafsson about

pricing pressures discussed by Teva's competitors during the quarter.  In response, Olafsson

denied that there was any pricing pressure:

> As I mentioned in the beginning, we didn't see anything change in fourth quarter.
> We saw approximately 4% pricing pressure or price decline in the US business
> over 2015 flat over the year. Some of our competitors have seen more pressure.  I
> think overall, it might have to do with some dosage form differences.  But also I
> think we have been right in adjusting the business.

197.     The Investor Slides presented during the February 11, 2016 earnings conference

call  contained  the  following  statements  attributed  to  Olafsson:  "Do  not  see  the  inflationary

pricing discussed in the media[.]  Also do not see the sharp drop in prices other competitors have

seen recently[.]   Mid-single digit increases in 2015[.]   Expect 2016 to maintain the current trend."

198.    The statements set forth in ¶¶ 191-97 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) touting the purported success of their generics business and (ii) denying any knowledge of price inflation, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. Moreover, during FY15 Teva generated more than $747 million through price increases alone, representing a YOY increase in inflated revenues of more than $91 million, or nearly 20% of the reported YOY change in generics profit.   This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

199.    In the 2015 20-F filed on February 11, 2016, Teva described the "intense competition" the Company faced in the U.S. generic market and its "competitive pricing strategy," as well as its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar

drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

200.    The 2015 Form 20-F also described the "intense competition in the generic market" and the primary factors driving growth in Teva's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . .  These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

201.    The same Form 20-F also described the following Risk Factor:

> Our generic drugs face intense competition.  Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

202.    During the February 11, 2016 earnings conference call, a Susquehanna Financial Group analyst also asked Olafsson about the Company's relationships with customers and what impact the Actavis deal was having on pricing.  Olafsson responded:

> We will pride ourselves of the service level of the high quality of the product.  But at the end of the day, there is a fierce competition in the market.  Over 200 generic companies, and really there is no bundling or anything like that, that can go on in the market.  So overall, same as without the deal.  But we see the opportunity going forward based on the huge pipeline that we have.

203.    During the same call, Olafsson also stated that the U.S. generics business had been "stable over the year" and "[t]here is a lot of competition in the US, there is no question about it.  As you well know, there are over 200 generic competitors in the market and the competition is fierce."  Olafsson claimed Teva's competitive advantage was having "the largest [drug] pipeline" and "an extremely good supply chain."

204.    The statements set forth in ¶¶ 199-203 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition," "a lot of competition in the US," or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy."   In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 16.    March 8, 2016

205.    On March 8, 2016, during a Cowen & Company Healthcare Conference call, Olafsson stated:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015. . . .
>
> I think **overall the pricing hasn't changed that much**.  There was a lot of talk about inflation in generic pricing.  But we never saw that.  That was an individual molecule basis, they used example of products that really were not generic products, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business.  And there has been a decline there. . . .
>
> So as of today, I came out with 4% [price erosion] in 2015.  As of today, I don't see any big changes in the pricing environment.  It's relatively stable. 4% is worse than maybe two years ago.  But it's similar to what we saw in 2014. But overall, these are the three things that affect the price.  And there's nothing on the horizon that should affect the pricing as of today.

206.   During the same conference, Olafsson also discussed Teva's profitability in its generic segment:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%.  So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue.  So it was a significant improvement over a 24-month period.  Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there.  But also part of it was due to portfolio selection and the cost infrastructure.

207.   The statements set forth in ¶¶ 205-06 above were materially false and misleading and/or omitted material facts.  Olafsson's statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 17.   May 9, 2016

208.   On May 9, 2016, Teva filed its 1Q16 Form 6-K with the SEC, which was signed by Desheh.  Vigodman and Desheh both signed the consolidated balance sheet in the 1Q16 Form

6-K. In the 1Q16 Form 6-K, Teva reported a YOY decline in generic profit of $215 million, or

27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while lower gross profit
> was "mainly a result of lower sales of high gross profit products in the United
> States, higher production expenses and lower gross profit in our European
> markets.

209.   On May 9, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 1Q16

earnings conference call.  During the call, Olafsson explained away the decline in generic profit

margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis
> points, fully explained by the exclusive launch of generic Nexium, esomeprazole,
> in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in
> first quarter, the profit margin of the generic segment was 24.4%.

210.   During the call, Olafsson also discussed pricing on the May 9, 2016 earnings call:

> The global generic drug market has no shortage of manufacturers supplying vital
> medicines to patients in the US and around the world. . . .  As you know, in
> February, during the fourth-quarter reporting season, several industry participants
> referenced a tougher pricing environment than what they have experienced in
> previous years, as a reason for the softness in their respective generic businesses.
> Now, we fast-forward to April and May, to a new reporting season, and we find
> the number of companies citing a tougher pricing environment or price deflation
> seems to have grown at an almost incredible rate.  The referencing of generic drug
> price deflation has not been limited to the manufacturers, but is also being cited
> by those on the purchasing and distribution side, leaving many to wonder about
> what is the real opportunity in generics.
>
> As always, I will do my best to provide you with as much color as possible on
> what Teva is experiencing, in regards to pricing and volume; and more
> importantly, where we are headed.  Throughout the ongoing debate this year
> about the level of generic price erosion in the United States, Teva has been very
> consistent and clear with investors.  Teva has not seen any fundamental change or
> worsening in the pricing environment – something we have been consistent about
> telling investors all year.  Teva experienced approximately 4% price erosion in
> the United States last year, and our guidance for this year is that it will remain the
> same.  In fact, Allergan, and Mylan, two other companies with broad and
> diversified portfolios and high quality products, have also reported similar trends.
> From where I sit today, there is nothing that changes my mind about that.
> Nothing has happened in the last two quarters that has changed the pricing

environment. What this boils down to is each individual company's business model. . . .

211. During the same call, Olafsson stated:

[W]hy is Teva different? Why is our performance better than most generic companies? Why are other companies continuing to say, there is pricing pressure greater than what we at Teva are seeing?

I see three reasons: first, the companies with older portfolio seemed to complain much more loudly. What I mean by that is, that if you look carefully at some companies with older portfolios, they will tell you that the pricing environment is worsening. But this is not an environment. This is purely a reflection of their portfolios, some of which are concentrated in one, or very few, therapeutic classes that are experiencing normal competition. This takes me to the second factor, new product launches. When companies don't have new product launches, and the business is declining, they tend to talk about the market more than anything else. This is not a reflection of the environment, but rather again, a reflection on a company's portfolio.

The third factor is companies that are trying to grow their market share. Some companies are aggressive in going after market share for a variety of reasons, including to utilize excess capacity with relatively cheap volume. But in order to do that, you'll have to drive down price. Buying new market share in price will cost you on the bottom line. We, on the other hand, are seeing our volumes go down, deliberately, net-net approximately 1% a year, because we think that is better for our business, and we would rather reduce capacity, than fill it with less profitable products. So if you look at this slide, you'll see that over the past few years, we discontinued 70 products. At the same time, we introduced 68 new ones in the US.

212. During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

213.    The Investor Slides that the Company presented during the May 9, 2016 earnings conference call contained the following statement, attributed to Olafsson:  "What has changed in the US pricing environment since Q4 2015?  The short answer is…nothing.  We still expect 4% price erosion on our portfolio."  The Investor Slides also contained the statement:  "There is no change in the pricing environment [.]  It all comes down to each company's business model . . . Why is Teva generics performance better than most Gx companies? Portfolio optimization …. [and] [n]ew product[]."

214.    The statements set forth in ¶¶ 208-13 above were materially false and misleading and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by the unsustainability of Teva's undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.  Much of this decline would have been known to Teva by May 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the source of its revenue.

18.    **May 10, 2016**

215.    On May 10, 2016, on a Bank of America Merrill Lynch Healthcare Conference call, Olafsson discussed the Company's 1Q16 financial results and the pricing environment in the generics market:

> I mentioned on that call, and want to reemphasize here, there's nothing I have seen which shows a worsening pricing environment.  We saw a price erosion in the US last year of approximately 4%.  We guided the market that we would see the same pricing of approximately deflation of 4% in 2016.  And where I sit today, there is no change to that.
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be.  There is nothing that has happened over the last two quarters which has changed fundamental the market.  And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

216.    During the call, Olafsson also stated:

> You have to keep in mind that in the US generic space there's approximately 230 competitors.  Two hundred and thirty generic companies in the US that are offering products.  So the competition is heavy.  So if you show that you grow 3%, let's say 3% volume year-on-year, that will cost you on pricing.  There's no question about it.  So that's why I'm highlighting that, in Teva world, we assume approximately 1% decline in the volume to maintain the pricing. So it's not that we are the only good house in the neighborhood, and I don't think this is a bad neighborhood, I think it's a good neighborhood.  It's unique.  To maintain your business you need to think about the future.  And I think that's at the end of the day what differentiates us.

217.    The statements set forth in ¶¶ 215-16 above were materially false and misleading and/or omitted material facts. Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of,

among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by May 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 19.   June 3 and 8, 2016

218.   On June 3, 2016, during a Sanford C. Bernstein Strategic Decisions Conference call, Vigodman made the following statement regarding pricing:

> [W]e are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that. And with basically our operating profits towards one of the (inaudible) in our history on kind of a naked basis, so generic business in the US without launches. So, in this respect, we are very continuing with our messages, and that's what we continue seeing.

219.   During a June 8, 2016 Goldman Sachs Healthcare Conference call, Olafsson again discussed pricing:

> When we signed that [Actavis] deal in July, we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business. And we can talk about that later, how we look at it versus others. But really the fundamental -- so what has changed in the market is that currently the multiples for generic companies, Mylan and us, has been dragged down, I think, due to other companies in the market partly, due to Valeant, due to Endo, due to comments that were made in Perrigo and Mallinckrodt about the generic business, which has affected the whole industry.

220.    The statements set forth in ¶¶ 218-19 above were materially false and misleading and/or omitted material facts. Defendants' statements that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.  Much of this decline would have been known to Teva by June 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

**20.    July 13, 2016**

221.    In a July 13, 2016 call to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, a Citigroup analyst asked: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace." In response, Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

Our assumption and what we assume is basically approximately 5% organic growth that we see year on year....

In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable....

\*\*\*

Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

222.    The statements set forth in ¶ 221 above were materially false and misleading and/or omitted material facts. Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by July 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

21.     **August 4, 2016**

223.     On August 4, 2016, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva announced its 2Q16 financial results.  That same day, Teva also filed with the SEC its 2Q16 Form 6-K, signed by Desheh.  Vigodman and Desheh both signed the consolidated balance sheet in the 2Q16 Form 6-K. The Company's 2Q16 6-K reported a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses…"

224.     On August 4, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 2Q16 earnings conference call. On the call, Desheh  attributed the poor performance of the Company's generic segment to factors other than its inability to maintain its long undisclosed price increases:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

225.     On the same call, in response to a question about "pricing stability" in light of Teva's U.S. generic revenues coming in "a little lower than expectations," Olafsson stated:

> I think, first of all, it's the old story in the generic business, and we have talked about it many times. It's the short-term volatility, but a long-term profitability that we are seeing in the generic business.  I think on the US side, clearly the impact we highlighted, the impact of having a competition on Aripiprazole, Esomeprazole, and Budesonide was very, very significant. I think overall, the underlying business did well. . . .
>
> In terms of the pricing, the pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter.

226.    Later in the call, Olafsson reiterated that "overall the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US."

227.    On the same call, a J.P. Morgan analyst asked about "price opportunities" on the combined Teva-Actavis generic portfolio. In response, Olafsson stated:

> On the pricing, as you know, and we know that, the size really doesn't affect the pricing. And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing. I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that. I feel quite strongly about that.

228.    The statements set forth in ¶¶ 223-27 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by August 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose

Teva's price increase strategy and the true source of its revenues.   Moreover, Olafsson's suggestion that pricing decisions were driven by organic market factors – including that "pricing comes with shortages in the market" – was false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue.

229.   During the August 4, 2016 earnings conference call, Olafsson also stated that "competition is fierce" in the U.S. generics market and "[t]here's no question about it."

230.   The statements set forth in ¶ 229 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce" competition, or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 22.   September 7 and 9, 2016

231.   On September 7, 2016, during a Wells Fargo Securities Healthcare Conference call, Desheh stated:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.  Might even go up a little bit here and there, depending on demand and supply, and demand and availability of competing products in the market, but you don't see -- there you don't see the erosion.  Where we see erosion is that you know, you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down.  But when we look at the base, there's no -- there's no pressure on prices.

232.   On September 9, 2016, during the Generic Medicines Business Overview call, Olafsson stated:

> ***There is no inflation in the generic pricing***. . . .

So what is the secret sauce? It's not very complex. This has been the same winning formula I have talked about many, many times. Really to be top three in the market is so important.

***

I think what I want to highlight is there will always be cycling of the pricing of generics. I have in my career, 23 years, never seen a real inflation. I mentioned to some of you before, I have been in the market where price declines was approximately 1% to 2%, probably 2%, and I've been in the market in 2006 and 2007 when the price decline was 7%, 8%. And then it's everything in between.

So far, what we saw in the end of second quarter was approximately 4% in the US and 5% global. So, there will be a fluctuation, and obviously, it will affect every generic Company. But the message I want you to take from this slide is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down.

233.    On the same call, Olafsson made the following statement regarding industry talk about price inflation: "so first of all, we need to differentiate generics from branded pricing. And people that say that the generic—there's a big generic price inflation, are simply wrong."

234.    Also during the September 9, 2016 call, a Goldman Sachs analyst noted there had been speculation that Teva was not raising prices during the approval process for the Actavis deal and asked if the Company expected the "landscape in terms of pricing to change at all, now that the deal is closed." Olafsson responded:

So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. *When price increases are taken, there's some kind of abnormality in the business*. There are shortages.

Remember that there's 208 generic companies out there that are offering product, and an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price. *So it's a very competitive business we're in*. I think overall, obviously, we look at each opportunity, but we come back to what Andy said and he will say it better, is we have an opportunity to work with it. We have a broader portfolio now.

235.   During the September 9, 2016 conference call, the Company presented Investor Slides related to pricing pressures in the Generics market.  The slides contain the following statements attributed to Olafsson:

- "Generic Price erosion varies year-to-year" and "Chasing market share will destroy value."

- Listing Teva's advantages as: "Price challenges are product specific – a broad diverse portfolio mitigates risk[;] Strong understanding of the market[;] Offering differentiated products – lower competition, durability[;] Competitive cost position[;] Industry leading pipeline – customers want access to our new products which brings them value."

- "Price erosion is nothing new."

- Listing how Teva is positioned to succeed in the market as:  "Teva operations is a competitive advantage and capable of creating additional value[;] Allows Teva to maximize the value of the best R&D engine in the industry[;] Diverse portfolio and competitive cost structure allows for long-term value creation."

236.   The statements set forth in ¶¶ 231-35 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, (ii) that nothing had changed in the pricing environment in which Teva operated, and (iii) denying price inflation in the generic business, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this

decline would have been known to Teva by September 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues. Moreover, Desheh's and Olafsson's suggestions that pricing decisions were driven by organic market factors – including that "prices are very stable there . . . depending on demand and supply" and "When price increases are taken, there's some kind of abnormality in the business" – was false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue.

237. The statements set forth in ¶ 234 above were also materially false and misleading and/or omitted material facts because Teva was not operating in a "very competitive business." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 23.    November 15, 2016

238. On November 15, 2016, in a press release filed with the SEC on Form 6-K, and signed by Desheh, Teva reported its 3Q16 financial results. That same day, Teva filed its 3Q16 Form 6-K with the SEC, signed by Desheh. Vigodman and Desheh both signed the consolidated balance sheet in the 3Q16 Form 6-K. The Company's 3Q16 Form 6-K also reported a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. However, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

[P]artially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide ... due to increased competition and the loss of exclusivity on esomeprazole.

239.    Teva's 3Q16 Form 6-K also contained the following statement regarding the subpoenas the Company had received from the DOJ and the Connecticut AG: "Teva is not aware of any facts that would give rise to an exposure to the Company with respect to these subpoenas."

240.    On November 15, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 3Q16 earnings conference call. During the call, a Credit Suisse analyst asked:

[J]ust around your comments you made around generic drug pricing, you mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward. So can you just maybe provide a little bit more insight, there's obviously an area that there's a lot of investor focus, just what gives you the confidence that what's going to happen in the coming quarters will be different than what you saw this quarter?

In response, Olafsson stated:

Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

241.    When pressed on his explanation by a J.P. Morgan analyst, Olafsson reiterated: "where I sit here today, experiencing the market, there hasn't again been any fundamental change."

242.    A Wells Fargo analyst also asked Olafsson on the same call if he was saying that "the acceleration in the price decreases . . . this past quarter aren't a result of increased competition . . . and . . . not a result of having to tame previous price increases, or give back some of those?" In response, Olafsson stated:

No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took

over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio.  So there was an instability that happened in the market during the month of August, when the new owners were taking market share. . . . It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

243.   The statements set forth in ¶¶ 238-42 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.  Much of this decline would have been known to Teva by November 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.  Moreover, Olafsson's suggestions that price decreases were driven by organic market factors – including because Teva "had to divest a very good portfolio of products that had limited competition" – was false and

misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue, which, by this time, was no longer sustainable.

### 24.    January 6, 2017

244.    During a January 6, 2017 Business Outlook Conference Call, Vigodman announced that Teva would provide 2017 guidance early in January 2017. During the call, Vigodman claimed Teva's past success was not due to price increases, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

245.    The statements set forth in ¶ 244 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. Indeed, from FY13 through FY16 Teva generated more than $2.1 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in

the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 25.     February 15, 2017

246.     On February 15, 2017, Teva filed its 2016 Annual Report with the SEC on Form 20-F, signed by Desheh.  Desheh signed the consolidated balance sheet.  The Company's 2016 Form 20-F also reported a YOY decline in U.S. generic revenues of $39 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. The Form 20-F explained that the decline:

> "resulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine."

247.     The statements set forth in ¶ 246 above were materially false and misleading and/or omitted material facts. Defendants' statements citing non-price factors for the decline in generic revenue had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the past success and current YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having

put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

248.   In the same February 15, 2017 Form 20-F, Teva described the "intense competition" the Company faced in the U.S. generic market and its "strategic" and "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.

249.   The Company also described in the Form 20-F the "intense competition in the generic market" and the primary factors driving growth in the Teva's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. . . . We believe that our robust product pipeline, which has been enhanced with the Actavis Generics business, and ability to continuously launch new products are critical to our growth in the face of continuing price erosion expected in the generics market.

250.   Teva's 2016 Form 20-F also described the following Risk Factor:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

251.    The statements set forth in ¶¶ 248-50 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* ¶¶ 84-107.

### 26.    August 3, 2017

252.    In Teva's August 3, 2017 Form 6-K filed with the SEC, the Company included a description of the antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and misleadingly stated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

253.    Teva made materially identical false and misleading statements in each of its periodic reports filed with the SEC between August 3, 2017, and May 10, 2019, including Teva's Form 6-K filed on November 2, 2017; Teva's Form 10-K for the year ended December 31, 2017, filed on February 12, 2018; Teva's Form 10-Q for the three-month period ended March 31, 2018, filed on May 3, 2018; Teva's Form 10-Q for the three-month period ended June 30, 2018, filed on August 2, 2018; Teva's Form 10-Q for the three-month period ended September 30, 2018, filed on November 1, 2018; and Teva's Form 10-K for the year ended December 31, 2018, filed on February 19, 2019.

254.    Each of these reports, as well as the other reports that Teva filed with the SEC on Forms 10-Q and 10-K throughout the Class Period, contained certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Schultz and McClellan, stating that the "report does not contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." In addition, Desheh was responsible for and signed each Form 20-F and 6-K. Vigodman was responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO, and Olafsson was responsible for the reporting for Teva's generics segment in each Form 20-F and 6-K from the third quarter of 2014 through the third quarter of 2016.

255. The statements set forth in ¶¶ 252-54 were materially false and misleading because, contrary to Teva's denials that it engaged in the conduct alleged by the AGs and its representations that its filings with the SEC did not contain any untrue statements or material fact or omissions necessary to make the statements therein not misleading, Defendants had colluded with other generic drug manufacturers to fix the prices of generic drugs and were therefore subject to civil liability with respect to this conduct. *See* ¶¶ 84-107.

### 27. October 31, 2017

256. On October 31, 2017, in response to media reports issued in the wake of the State AGs proposed amendment, which expanded their first antitrust complaint, a Teva spokeswoman told Courthouse News that "Teva denies these allegations and will continue to defend itself vigorously in court." The Company further stated: "In accordance with our values, Teva is committed to complying with all applicable competition laws and regulations. To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by them."

257. The statements set forth in ¶ 256 were materially false and misleading because, contrary to Teva's denial of the AGs' allegations and its related statements, Defendants had colluded with other generic drug manufacturers to fix the prices of generic drugs. *See* ¶¶ 84-107.

Accordingly, Teva was not "committed to complying all applicable competition laws and regulations." *See id.*

### 28.    December 19, 2018, January 18, 2019 and February 19, 2019

258.    In a December 19, 2018 statement to *Business Insider*, Teva again denied the State AGs' allegations, representing that it "will continue to vigorously defend itself."   On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to shareholders."   Teva further stated that it is "committed to complying with all applicable laws and regulations and is dedicated to conducting business with integrity and fairness.  Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories."   On February 19, 2019, in response to media reports discussing the recent release of an unredacted version of the first State AG complaint, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

259.    These statements were false and misleading because, as alleged herein, Teva had colluded with other generic drug manufacturers to fix the prices of generic drugs, as alleged by the AGs.  *See* ¶¶ 84-107, 140.  Indeed, Teva was one of the central actors in an industry-wide price-fixing and market allocation scheme, and four Teva executives are personally named as defendants in the May 2019 State AGs complaint.  *See* ¶ 140.

### B.    Defendants Violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F

260.    Defendants violated their obligations pursuant to Item 5 of Form 20-F and Item 303 of SEC Regulation S-K by failing to disclose the reasons and factors contributing to the increase or decrease in revenues relating to Defendants' undisclosed and inherently unsustainable price increases.

261.    More specifically, Item 5 of Form 20-F required Teva to disclose the source of material increases and decreases in revenues, including those resulting from Defendants' undisclosed and inherently unsustainable price increases.  Defendants did not do so.  Instead, they made numerous affirmative misleading statements in the MD&A section of the 20-F which suggested Teva's U.S. generics business was subject to "intense competition."

262.    Teva filed its annual financial statement with the SEC in a Form 20-F filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934.  The SEC explicitly requires disclosures detailing changes in price that impact reported revenues in a Form 20-F. Item 5 of Form 20-F (Operating and Financial Review and Prospects) states:

> To the extent that the financial statements disclose material changes in net sales or revenues, provide a narrative discussion of the extent to which such changes are attributable to changes in prices or to changes in the volume or amount of products or services being sold or to the introduction of new products or services .
> . . discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

263.    Item 5 of Form 20-F is analogous to, and subject to the same rules and requirements as, the Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) section of Form 10-K filed with the SEC.  SEC Release No. 33-8350, Note 1.

264.    As such, SAB 104 requires management to disclose in the MD&A section the impact of artificial or collusive price increases:  "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

265.   SEC Release No. 33-8350 further provides the following MD&A disclosure guidance, requiring analysis and disclosure of volume and price changes affecting the Company's revenues in a situation analogous to the rise and decline in revenue from the Defendants' undisclosed and inherently unsustainable price increases:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable.   The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

266.   Additionally, SEC Release No. 33-8350 explicitly states that "[o]ne of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance."

267.   SAB 104 further states:  "The Commission stated in FRR 36 that MD&A should 'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.'"

268.   Defendants violated this requirement, especially given their assertions that the U.S. generic drug markets were competitive, without disclosing the source and magnitude of revenues generated by Teva's undisclosed and inherently unsustainable price increases.

**VI.   ADDITIONAL ALLEGATIONS OF SCIENTER**

269.   Numerous facts give rise to a strong inference that, throughout the Relevant Period, Teva and the Individual Defendants knew or recklessly disregarded that the statements identified in Section V above were materially false and misleading and/or omitted material facts

when made.  In addition to the specific facts enumerated above, the following facts also support

a strong inference of scienter:

Evidence from former employees demonstrates that all price increases implemented by

Teva were approved by the company's most senior executives.[14]  Teva's decisions to increase

prices came from the top down.  Former employees of Teva explained that Teva had an internal

Pricing Group that was tasked with providing detailed reviews and documentation of price

reductions.  Teva established review and approval procedures, pursuant to which price increases

required the Chief Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA

COO, Cavanaugh, to determine whether to make a price increase and to personally approve the

increases.   Griffin and Cavanaugh would then decide when the increases would become

effective.

270.    Teva stored drug-by-drug pricing, sales, and revenue data on the Company's

Oracle ERP System.  The Company stored pricing and revenue data "down to the NDC code"

and executives, including Cavanaugh, Oberman, and Olafsson, had access to the system, and

were routinely filled in on sales numbers.  The database was used to generate daily or weekly

"Scorecards" that senior executives would receive that reported generic drug revenues and a

long-term "Work Plan," which was presented to Teva's executive committee in Israel—

including Vigodman and Desheh.   Other reports with pricing information were also sent to

Teva's executive committee.

271.    ***The sheer magnitude of Teva's price hikes supports an inference of scienter***.

During the Relevant Period, Teva made astronomical increases in the prices of its generic drugs,

including multiple price hikes of more than 800%, and some more than 1700%.  Such massive

---

[14]       As noted previously (¶¶ 85-88), these allegations were taken from certain former employees contacted by
Plaintiff's counsel or the *Ontario Teachers* Amended Complaint, where the allegations were verified by Plaintiff's
counsel.

price increases impacted more than 55 separate drugs, over a four year period. Given the intense focus on pricing in the generic drug industry, and the fact that Teva's senior executives, including the Individual Defendants, were asked questions regarding Teva's pricing and pricing trends during every earnings conference call and at many industry meetings, it is implausible that the Defendants—the most senior executives of the Company—were not aware of price increases on this scale in Teva's core business unit.

272.   These massive price increases also contributed billions of dollars to Teva's bottom line. Indeed, from 2013 through mid-2017, Defendants' fraud generated more than $2 billion in additional revenues. Further, given that the costs of implementing price increases are effectively zero, these massive increases in revenue flowed directly into Teva's profits—which increased by similar amounts. For example, Teva's profits from Pravastatin, one of Teva's better selling generics, amounted to at least $370 million after instituting price increases of up to 437%. Similarly, Teva increased the price of Propranolol HCL by nearly 300% and obtained nearly $256 million in profits. Teva also gained over $143 million in such profits from increases of up to 306% in its prices for Baclofen, $110 million from increases of up to 182% in its prices for Fluocinonide; $138 million from increases of up to 579% in its prices for Methotrexate Sodium; and $102 million from increases of up to 1111% in its prices for Ciprofloxacin HCL.

273.   The intense national focus on price increases in the generic drug business from the beginning of the Relevant Period demonstrates that Defendants must have been aware of what was going on with respect to pricing at Teva. Even assuming that the Individual Defendants—Teva's top executives—were not put on notice by massive and unexplained price spikes in the Company's core generics division, the historic rise in generic drug prices immediately before and during the Relevant Period was well-publicized. Indeed, the gargantuan

prices increases by Teva and other generic manufacturers led Congress to commence an industry-wide investigation beginning in 2014.   On October 2, 2014, Defendant Vigodman received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings, putting Teva on notice of an investigation and requesting pricing data and other information regarding the Company's generics business.   In particular, Congress asked the Defendants to provide it with information regarding massive increases in the price of Teva's generic drugs that coincided with similar increases by other generic drug manufacturers.   For example, the letter requested information regarding "the underlying causes of recent increases in the price of [Teva's] drugs" that have increased by "as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin Sodium from October 2013 to April 2014.   Over that time period, the average market price went up by as much as $735 for Divalproex Sodium and $426 for Pravastatin Sodium," depending on the formulation.

274.   As noted above, Teva refused to appear to testify or to produce documents in response to the Congressional inquiry.   This Congressional investigation, the subsequent DOJ subpoena to the Company, and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price increases at Teva and a duty to monitor changes in the Company's generic drug pricing.   At a minimum, Teva's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty to investigate and monitor changes in the pricing of the Company's core products.

275.   ***The fraud concerns the core of Teva's operations.***  Teva's production of generic drugs was the Company's core operation during the Relevant Period.   In fact, during the Relevant Period, Teva was the largest manufacturer of generic drugs in the world, controlling

13% of the generic drug market by mid-2015.  Generic drug sales accounted for a substantial portion of Teva's revenues and operations during the Relevant Period.  For example, in 2014, Teva's revenues from the segment including generics accounted for 42.13% of the Company's total revenues.  In 2015, the percentage of the Company's revenues from the segment including generics jumped to roughly 50%.  It is implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases being implemented by the Company—particularly given the significant positive impact those price increases were having on Teva's financial performance.  As the Company's most senior executives, the Individual Defendants had access to information concerning these price increases.   At a minimum, they were reckless in misleadingly telling investors that the Company's improved financial outlook was due to cost-cutting, product mix and other factors without investigating whether changes in prices for the Company's products were not a factor in that turnaround.

276.   *Defendants' turn around narrative was the result of massive price increases.* By the end of 2013, Teva's U.S. generics business suddenly began reporting significant growth. For example, in 4Q13, its U.S. generics division reported earnings of $1,178 million, as compared to $1,034 million the year before—an increase of approximately $144 million, or nearly 14%.  This was a striking turn around.  Relative to 2012, Teva's net revenues for the nine month period ending September 30, 2013, were down year-over-year.

277.   By April 7, 2014, National Alliance Securities analysts had taken note of Teva's new-found financial success:  although its generics division had "dramatically underperformed in 2013" as compared to its peers, only a few months after the end of 2013, Teva's performance in generics was, remarkably, "the Best YTD" among its peers.

278.   By the end of 2014, Defendants' remarkable "turnaround" story for the Company's generics business had propelled the Company's ADS price from around $37 in late October 2013, to $56 by the end of 2014.

279.   Defendants' financial success continued into 2015, and by the end of July 2015, its stock price exceeded $70 per share.

280.   It is implausible that Vigodman, Desheh, Olafsson, Schultz, and McClellan, who directly oversaw, and spoke publicly at length about, the "turnaround" in Teva's generics business, were unaware of the true source of the Company's changed fortunes.  The far more compelling inference is that these executives, whose ascension and arrival coincided with massive price increases, and whose departures coincided with expanding governmental probes into those same price increases, were well aware that the price increases were the true driving force behind the Company's newfound success.

281.   ***The evidence produced in the government investigations supports an inference of scienter.***  As detailed above, the AG investigation has been ongoing for three and one half years and has involved the collection of documentary, electronic, and testimonial evidence from Teva and others.   As a result of the information and evidence developed through this investigation, the Attorneys General of 46 separate U.S. States brought suit against Teva and other generic drug manufacturers, documenting their "numerous contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the generic pharmaceutical industry throughout the United States."  The CT AG stated during a December 14, 2016 interview with *Bloomberg* that its investigation has uncovered "very explicit price fixing" between Teva and others: "This isn't circumstantial evidence . . .  This is very explicit price fixing . . . in text messages, in

emails, in conversations; we have cooperating witnesses. The case is very strong." As reported by *The New York Times*, the CT AG further summarized the evidence as "very damning." Nor were these conspiracies limited to lower-level employees. Rather, the AG investigation uncovered evidence revealing that "many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies."

282. Moreover, the fact that the DOJ has intervened in at least five civil antitrust actions against Teva, now consolidated in the Multi-District Litigation in the U.S. District Court for the Eastern District of Pennsylvania—*after* subpoenaing and receiving documents from Teva—strongly suggests that federal prosecutors have also determined that there is evidence of a criminal conspiracy to fix prices in an anti-competitive manner.

283. The significance of the corporate action required to participate in any collusive behavior—particularly such sustained price increases, with multiple competitors—makes it implausible that the scheme was carried out solely by low-level employees.

284. ***The Individual Defendants were motivated to commit fraud in order to raise capital for a major acquisition.*** The Individual Defendants were motivated to pump up the price of Teva's securities in order to consummate a major corporate acquisition. Indeed, Vigodman and Desheh had stated early in the Relevant Period that they wanted to convert ADS into "currency" to acquire a competitor, further consolidating Teva's market share.

285. By 2015, with the price of Teva's stock artificially inflated to over $60 per share by Defendants' price increase plan, they decided to make their move. In April 2015, Defendants first tried making an offer for Mylan, but their overtures were swiftly rebuffed. Undeterred, the Individual Defendants ratcheted up their bidding, and with the ADS price reaching an all-time high, on July 27, 2015, Defendants announced the purchase of Allergan's generics division,

Actavis.  The deal would cost Teva approximately $40 billion, most of which was funded by members of the Class through three offerings.

286.    To execute the Actavis deal, however, Defendants still needed to undertake a massive bond offering to raise tens of billions of dollars in additional capital.  Without warning, during a pre-arranged investor call on July 13, 2016, Vigodman announced that the debt offering would be launched that very day.  On the same call, Vigodman also revised Teva's guidance upward and confirmed that the Company was not seeing further pricing pressure in its generics business, thereby continuing to artificially inflate the price of Teva's securities.  Ultimately, the Company's July 2016 bond offerings raised over $20 billion from unsuspecting investors.  The Actavis deal closed on August 2, 2016.

287.    ***The temporal proximity of the false statements to the corrective disclosures supports an inference of scienter***.  On August 4, 2016, three days after the Notes Offering, and two days after the Actavis transaction closed, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of 2015. Teva also disclosed for the first time that it was subject to DOJ and State AG price-fixing investigations.  In fact, on July 12, 2016—the day before Teva suddenly decided to rush its bond offering to market—Teva had been served with a subpoena by the Connecticut AG; and three weeks earlier, on June 21, 2016, Teva had been served a subpoena by the DOJ, indicating that Teva was now a focus of the investigations into illegal price collusion.  The timing of these events, with Defendants rushing an offering to market and increasing the Company's guidance immediately after receiving government subpoenas regarding their pricing policies, strongly supports an inference of scienter.

288.    On January 6, 2017, less than six months after raising its guidance on the same day it announced the surprise bond offering, Teva significantly lowered its guidance, admitting that its generics business was underperforming as a result of the pricing pressures it had claimed immunity from.  As Vigodman described in the January 6, 2017 conference call, Teva "ha[s] an EBITDA gap of $1.2 billion emanating from our US generics business."

289.    Market reaction to Defendants' disclosures was fast and furious.  Commentators noted:  "The larger point here is this: how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management team in place?"  The temporal proximity of Defendants' disclosures that pricing pressures were impacting Teva's generics business, less than six months after they raised guidance and assured investors that there would be no such effect, further supports an inference of scienter.

290.    ***Defendants' Further Denials of Liability Despite Investigations***.  As set forth above, Defendants repeatedly denied any involvement in collusive conduct during the Relevant Period, and continue to do so.  For example, Defendant Schultz stated during an investor earnings conference call on November 7, 2019: "We have, of course, shared more than 1 million documents with [the DOJ]. We have not found any evidence that we were in any way part of any structured collusion or price fixing."  These statements underscore that Defendants knew Teva was a central actor in collusive conduct or, at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

291.    The Individual Defendants' high-level positions, access to information about the Company's generics business, and control of the contents of the Company's public statements.  As the Company's top executives, Vigodman, Desheh, Altman, Schultz, McClellan, and Olafsson—the Presidents, CEOs, and CFOs of Teva, and President and CEO of Teva's Global

Generics Medicines Group (the divisions where the heart of the misconduct alleged herein took place), respectively—controlled the Company's day-to-day operations and were informed of and responsible for monitoring Teva's generics business. The Individual Defendants had access to various sources of information concerning Teva's U.S. generics business, including pricing. These sources gave Defendants access to information that was adverse to their public statements during the Relevant Period. Because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors were materially false, misleading, and incomplete. As a result, the Individual Defendants were responsible for the accuracy of Teva's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

292. Defendant Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017. Vigodman signed and certified certain of Teva's reports on Forms 20-F (including the 2014 and 2015 Form 20-F SOX Certifications) and 6-K, including consolidated balance sheets, filed with the SEC during the Relevant Period, as set forth herein. Vigodman had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the conduct alleged herein. Vigodman had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Vigodman and his access to pricing data, Vigodman knowingly or

recklessly failed to disclose the overwhelming significance of the price increase plan to the financial resurgence of Teva.

293.    Vigodman also, in response to a direct question on pricing practices during an October 29, 2015 investor conference, falsely assured investors that: "We are very responsible . . . in everything that pertains to prices on the generic side and on the specialty side." He continued: "And I will even put it another way, all the improvements you see in margins is not driven by price. It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015. And that's a very important message."

294.    Defendant Desheh served as Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim CEO and Interim President. Desheh also served as Teva's Group EVP from 2012 to June 30, 2017. Desheh signed and certified certain of Teva's reports on Forms 20-F (including the 2013, 2014, 2015, and 2016 Form 20-F SOX Certifications) and 6-K filed with the SEC during the Relevant Period, including consolidated balance sheets, as set forth herein. Desheh had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the conduct alleged herein. Desheh had access to pricing data for the Company's generic drugs. Notwithstanding the certifications signed by Desheh and his access to pricing data, Desheh knowingly or recklessly failed to disclose the overwhelming significance of the price increase plan to the financial resurgence of Teva.

295.    During the Relevant Period, Desheh made additional false and misleading statements regarding the Company's pricing. For example, during a November 2015 investor conference, Desheh addressed pricing head on: "There is a lot of noise around pricing issues. Some of it is coming from politicians [who are] driving agenda[s]. . . . Our exposure to all these

things is very minimal. . . . I believe there are many examples for competitive environment, real competition, like we see in generic market in the United States. . . . So it's a highly competitive environment with players coming from all over the world with a very fierce price competition." Even in the face of this direct question, Desheh never disclosed the price increase plan.

296.   Defendant Altman served as Teva's Acting CFO from October 31, 2013 to February 11, 2014.  Altman signed and certified certain of Teva's reports on Forms 20-F (including the 2013 Form 20-F SOX Certification) and 6-K filed with the SEC during the Relevant Period, as set forth herein.  Altman had a duty to monitor conduct that threatened to undermine the veracity of these filings, including the conduct alleged herein.  Altman had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications Altman signed, and his access to pricing data, Altman knowingly or recklessly failed to disclose the overwhelming significance of the price increase plan to the financial resurgence of Teva.

297.   Defendant Olafsson served as President and CEO of Teva's Global Generics Medicines Group from July 1, 2014 to December 5, 2016.  In that role, Olafsson had access to pricing data for the Company's generic drugs.  Olafsson also possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business and was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Olafsson also would have received reports showing the amount of profit earned from price increases on Teva's generic drugs.

298.   Olafsson assured investors during the Relevant Period that Teva's strong performance in its generics business was not the result of pricing changes: "This is $1 billion improvement in operating profit over 24 months period.  So how did we do this? Not by pricing

but by portfolio mix, new products, and efficiency measures." In response to an analyst request regarding the source of price increases, Olafsson falsely responded as follows: "So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages. . . . So there's always somebody happy to take a little bit lower price. So it's a very competitive business we're in." Even in the face of this direct question, Olafsson never disclosed the price increase plan.

299. ***The Individual Defendants were motivated to commit fraud for their own personal gain***. Teva aims to incentivize its executive officers by creating a strong link between their compensation and performance. Therefore, a significant portion of the total compensation package provided to Teva's executive officers is based on measures that reflect both Teva's short and long-term goals and performance, as well as the executive officer's individual performance and impact on shareholder value. For example, the Individual Defendants received cash bonuses of as much as 158% of their annual salaries based on performance metrics directly impacted by the price increase plan. As described by the Company's Compensation Policy for Executive Officers and Directors (the "Compensation Policy"), "A significant component of the Compensation Policy was the Company's annual cash bonus program." Teva described the bonuses as "strictly pay-for-performance . . . as payout eligibility and levels are determined based on actual financial and operational results, as well as individual performance." Teva also made substantial equity grants to Defendants Vigodman, Desheh, Olafsson, and likely other senior officers, including options to purchase shares, awards of restricted shares, and awards of Performance Share Units ("PSUs"), the value of which were likewise tied to Teva's performance.

300.    As a result of the number and magnitude of Teva's price hikes, the prices of Teva's securities soared.  The price of Teva's ADS rose from just below $45 to a Relevant Period high of $72 in mid-2015.  The Individual Defendants made millions in personal compensation from this supposed achievement.  For example, for the year 2015, Teva reported paying Desheh more than $1.8 million in cash and $1.7 million in equity compensation.  (His compensation was not disclosed for 2014 or 2016).  For the years 2015 and 2016, Teva reported paying Olafsson more than $4.8 million in cash and more than $3.5 million in equity compensation.  (His compensation was not disclosed for 2014).  For the years 2014 to 2016, Teva reported paying Vigodman more than $8.4 million in cash and more than $5 million in equity compensation.

301.    In **2014**, Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenues generated from the price increase plan.

302.    According to the 2014 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for cash flow).  He was entitled to a bonus of 140% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 125% of the targets were met.  His total reported compensation was nearly $4.5 million, comprised of:  (i) a salary of $1,183,888, a bonus of $1,868,477 (roughly 158% of salary); (ii) a one-time bonus of $237,401 for "significant achievements and efforts" including Teva "strengthen[ing] its leading position in generics"; (iii) options to purchase 280,702 shares at $41.05; (iv) a grant of 15,660 restricted shares; and (v) a grant of 30,869 PSUs based on targets of cumulative non-GAAP operating profit and cumulative non-GAAP net revenue from 2014 to 2016.

303.    Because Olafsson and Desheh were not among Teva's five highest paid executives in 2014, their salaries and cash bonuses were not disclosed (Olafsson joined Teva in July 2014).  Olafsson's other compensation included options to purchase 88,238 shares at $54.02 per share, a grant of 18,229 PSUs, and an additional grant of 17,773 PSUs based on Teva's 2014 performance.  Desheh's other compensation included options to purchase 98,581 shares at $48.76 per share and a grant of 20,066 PSUs.

304.    In **2015**, Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenue generated from the price increase plan.

305.    According to the 2015 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for free cash flow).  He was entitled to a bonus of up to 200% of salary if 125% of the targets were met.  Vigodman's total reported compensation was approximately $5.7 million, comprised of a salary of $1,363,692, a bonus of $2,253,581 (roughly 165% of salary), options to purchase 163,859 shares at $57.35 per share, and a grant of 30,869 PSUs based on Teva's 2014 to 2015 cumulative performance.

306.    According to the 2015 20-F, Desheh and Olafsson also were entitled to bonuses based on such financial targets (specifically, 25% for non-GAAP operating profit, 15% for net revenue, and 10% for free cash flow), in amounts of up to 200% of salary if 120% of the targets were met.  Desheh's total reported compensation was approximately $4.3 million, comprised of a salary of $733,863, a bonus of $1,110,824 (roughly 151% of salary), options to purchase 89,376 shares at a price of $57.35, and a grant of 16,838 PSUs.

307. Olafsson's total reported compensation was approximately $3.9 million; he received a salary of $954,955 and a bonus of $1,449,375 (roughly 151% of salary). He also was awarded options to purchase 94,343 shares at $57.35 per share, and an additional 160,114 shares at $59.19 per share "[i]n light of the increase in . . . scope of work and responsibilities as head of Global Generics Medicines Group in connection with the Actavis acquisition," as well as a grant of 17,773 PSUs based on Teva's 2014 to 2015 cumulative performance.

308. Teva's ADS price reached a high of $72 on July 27, 2015, making the potential value of the Individual Defendants' 2014 and 2015 options quite significant at the height of the alleged fraudulent scheme. However, because Teva was a "foreign private issuer" during the Relevant Period, it was not required to report insider sales and, therefore, it is unknown whether these Individual Defendants, or any other insider, engaged in suspicious trading activity. Evidence of insider trading, if any, could be obtained in discovery.

309. ***Suspiciously-timed executive departures support an inference of scienter***. In late 2016, as the price increase plan was in tatters as a result of the inevitable increase in generic competition resulting from FDA generic drug approvals and basic market forces, and the GAO Report, criminal charges, guilty pleas, and State AGs' allegations mounted, the key executives responsible for Teva's U.S. generics business departed or were fired in relatively short order. First, on December 5, 2016, Teva unexpectedly announced the "retirement" of Olafsson, the 48-year-old head of generics (Olafsson did not, in fact "retire" but instead found employment elsewhere in the industry). As reported by *TheStreet*, Olafsson's departure "rais[ed] more questions for investors amid continued worries around drug pricing."

310. Just two months later, on February 6, 2017, as Teva's finances continued to sag and the governmental investigations continued to gather steam, Teva unexpectedly announced

the termination of Defendant Vigodman, effective immediately and without announcing a permanent replacement.   Then, on April 25, 2017, numerous media reports surfaced that Defendant Desheh would be pushed out as CFO at Teva.  These reports were confirmed the next day when, in an April 26, 2017 6-K, Teva announced that Defendant Desheh would be stepping down as CFO and leaving the company in "the coming months" so that Desheh could move on to "the next phase of [his] career."  In its first financial report issued after these architects of the fraud were removed, Teva announced a $6.1 billion write down of its entire U.S. generics business.

## VII.    THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION

311.    Defendants' false statements and material omissions concealed the truth about, and risks presented by, their business practice of improving business results through massive price increases.  The truth and risks that were concealed and/or affirmatively misstated include the fact that the price increase plan was not sustainable over the long-term because of the FDA's approval of new drugs, natural competitive pressures, public approbation and governmental investigations and that once the plan became non-viable, and Teva's participation in an industry-wide conspiracy was revealed, the Company's revenues and profits would fall, negatively impacting its stock price.  These risks became apparent to the investing public through a number of revelations that negatively impacted prices for Teva's securities.

### A.    August 4-5, 2016

312.    After the close of trading on August 4, 2016—two days after the Actavis transaction closed—Teva filed the 2Q16 Form 6-K, reporting its second quarter 2016 financial results, including a $434 million decline in revenue in the U.S. generics segment compared to the second quarter of 2015.  The 2Q16 Form 6-K revealed for the first time that Teva was implicated in the federal and State AGs' antitrust investigations, stating: (i) "[o]n June 21, 201[6], Teva

USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and (ii) "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut [AG] seeking documents and other information relating to potential state antitrust law violations."

313.    While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations and omissions, Defendants misleadingly attributed Teva's disappointing results to the loss of exclusivity on certain drugs, and a decline in sales in others, expressly denied the impact of price hikes, and reaffirmed Teva's inflated outlook for 2016.

314.    In response to this information, the price of Teva's ADS declined $1.24 per share, or approximately 2.24%, from its closing price of $55.45 on August 4, 2016, to a close of $54.21 on August 5, 2016, on high trading volume, wiping out $1.13 billion in market capitalization.

**B.    November 3 and November 6, 2016**

315.    On Thursday, November 3, 2016, before the U.S. markets closed, and after the close of trading on the TASE, Bloomberg reported on the government's "sweeping criminal investigation into suspected price collusion," spanning more than a dozen companies, including Teva, and about two dozen drugs, and that charges could emerge by year-end.

316.    On this news, the price of Teva ADS fell $4.13 per share, or approximately 9.53%, from its closing price of $43.33 on November 2, 2016 to close at $39.20 on November 3, 2016, on high trading volume, reducing Teva's market capitalization by another $3.77 billion.

317.    Analysts from S&P Capital IQ lowered their rating of Teva ADS in response, from "buy" to "hold," and Fierce Pharma reported that analysts believed the investigation could have a sizeable financial impact on Teva, estimated to be as much as $700 million.  The New York Times similarly reported that: "The generic drug industry was jolted on Thursday as shares

of many major companies tumbled after a news report said that a federal inquiry into drug price-fixing was wider than previously believed and could lead to charges by the end of the year. Shares in Teva Pharmaceuticals, the world's largest generic drug maker, fell more than 9 percent, and the stock of competitors like Mylan, Endo Pharmaceuticals and Impax Laboratories had similar declines." (Katie Thomas, *News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling*, N.Y. Times (Nov. 3, 2016), at B5).

### C.     November 15, 2016

318.     On November 15, 2016, before the U.S. markets opened (and during trading on the TASE), Teva filed a press release on Form 6-K with the SEC, reporting third quarter 2016 revenues below consensus expectations.  During an investor conference call that day, Olafsson explained that the disappointing results were a result of pricing pressures, stating that, despite his past denials that Teva was exposed to or had observed pricing pressure, price erosion in Teva's U.S. generics business in fact had been approximately 7% (as compared to the 5% Olafsson had recently stated on September 9, 2016).

319.     While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations and omissions, Defendants insisted that the pricing pressure was limited and would not last beyond the quarter, continued to attribute the Company's disappointing results to divestiture of certain generic products related to the Actavis acquisition, and continued to conceal Teva's anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.   Moreover, Defendant Vigodman stated that, "we are not aware of any fact that would give rise to an exposure to Teva with respect to the [DOJ] investigation."

320.     The prices of Teva ADS fell again in response to this news, declining $3.43 per share, or 8.36%, from its closing price of $41.03 per share on November 14, 2016 to close at

$37.60 on November 15, 2016, on high trading volume, erasing another $3.3 billion in market capitalization.  Teva's ordinary share price similarly declined ILS7.20, or 4.58%, from its closing price of ILS157.10 on November 14, 2016 to close at ILS149.90 on November 15, 2016.

321.    Market participants similarly responded, with analysts at Jefferies downgrading Teva ADS from "buy" to "hold."

**D.    December 5-6, 2016**

322.    After the markets closed on December 5, 2016, Teva filed a Form 6-K, announcing Olafsson's immediate "retirement," even though he was only in his late 40's. Analysts at Piper Jaffray quickly concluded that Olafsson had in fact been pushed out, stating in a December 6, 2016 report: "When a company issues what many view as bullish guidance and then walks that back within a quarter of issuing said guidance . . . it would only be natural to conclude that there would be repercussions at the top of the organization."

323.    Other analysts tied Olafsson's abrupt departure to the apparent rise in generic pricing pressure.  For example, analyst Morningstar commented in a December 6, 2016 report, that "Teva's announcement that Dipankar Bhattacharjee will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence.  Recent pricing pressure in the generic drug market and anticipated generic competition on the 40mg version of Copaxone in 2017 remain significant near-term challenges for Teva, which makes the abrupt leadership change a concerning development at a critical time for the company."  BTIG similarly stated, in a report dated December 5, 2016, that "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained focused on price erosion for the [company's] base generics business."  Citi (at the Citi Global Healthcare Conference) and Piper Jaffray (in a December 6, 2016 report) expressed concern that Olafsson's

departure suggested that there may be something "going on internally in the generics business" that had not been disclosed.

324.    In response to this news the price of Teva ADS fell $2.01 per share, or 5.43%, the next trading day, from its closing price of $37.04 per share on December 5, 2016, to close at $35.03 per share on December 6, 2016, on high trading volume, and reducing Teva's market capitalization by $1.96 billion.

**E.    December 14, 2016**

325.    As had been previewed on November 3, 2016, on December 14, 2016, the DOJ announced the anticipated criminal investigation and disclosed that it had charged Glazer and Malek, the former CEO and President of Heritage, respectively, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs, namely Doxycycline (as early as April 2013 until at least December 2015) and Glyburide (as early as April 2014 until at least December 2015), the latter for which Teva was a dominant market participant during the Relevant Period.   The DOJ further stated that the charges stemmed from its ongoing federal antitrust investigation into price-fixing, bid-rigging and other anticompetitive conduct relating to generic drugs and marked "an important step" in ensuring true competition among companies "at a price set by the market, not by collusion."   Two-count felony charges for violations of Section 1 of the Sherman Act against Glazer and Malek also were unsealed that day, alleging the following in sum and substance:

- various corporations and individuals participated as co-conspirators in the offenses and performed acts and made statements in furtherance thereof;

- the defendants and co-conspirators knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic drugs, including Doxycycline and Glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of those drugs sold in the United States; and

117

- for the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators, among other things, participated in meetings and communications to discuss the sale of and to allocate customers or rig bids for the drugs; agreed not to compete against each other for certain customers; submitted bids, withheld bids, and issued proposals in accordance with their agreements; and sold the drugs at collusive and noncompetitive prices.

326.   In response to this news, the price of Teva ADS price fell $0.66 per share, or approximately 1.75%, from its closing price of $37.66 on December 13, 2016 to close at $37.00 per share on December 14, 2016, erasing $711.7 million in market capitalization.

**F.     December 15-18, 2016**

327.   On December 15, 2016 (after the TASE closed), the CT AG announced that he and 19 other State AGs had filed a federal antitrust lawsuit against Teva USA and five other drug companies (Heritage, Aurobindo, Citron, Mayne, and Mylan), alleging that they had "entered into illegal conspiracies . . . to unreasonably restrain trade, artificially inflate and manipulate prices, and reduce competition" for Doxycycline and Glyburide.

328.   The December 15, 2016 press release stated that portions of the complaint were redacted "to avoid compromising the ongoing investigation[]" as to "a number of additional generic drugs," but revealed that:

> In July 2014, the state of Connecticut initiated [a non-public] investigation of the reasons behind suspicious price increases of certain generic pharmaceuticals. The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a well-coordinated and long-running conspiracy to fix prices and allocate markets for doxycycline hyclate delayed release and glyburide. In today's lawsuit, the states allege that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives.
>
> The complaint further alleges that the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone and text message communications. The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation. The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.

329.    As Forbes reported that day, the complaint revealed new information regarding Teva's potential exposure relating to two generic drugs, in that it "makes clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," including Teva. It further noted that, according to the state AGs, Malek had a direct relationship with a Teva employee and the two agreed to raise the prices of Glyburide.

330.    On this news, the price of Teva ADS fell $0.27, or 0.73%, from its closing price of $37.00 on December 14, 2016 to close at $36.73 on December 15, 2016, reducing Teva's market capitalization by another $291 million.

**G.    January 6-8, 2017**

331.    Before the NYSE opened (and when the TASE was closed) on January 6, 2017, Teva filed a press release on Form 6-K, announcing a significant reduction in 2017 guidance, far below market expectations, due to previously-unannounced poor performance and increased competitive pricing pressures in the market. The press release quoted Defendant Vigodman, who stated, "[t]he entire healthcare sector has faced significant headwinds, and we have not been immune." As explained by Morningstar in a January 6, 2017 report, "Teva's management lowered its 2017 outlook from its previous forecast released in July [2016, at the time of the Notes Offering] as the *firm succumbs to increased competitive pressure*, especially in the U.S. generics market."

332.    While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations, during a conference call that day Vigodman falsely attributed

Teva's poor results "to not being able to realize new launches in our Teva legacy business . . . consistent with our past track-record," rather than pricing pressure as the collusion dissolved.

333.   As TheStreet reported, Teva's ADS price "plummeted" in response to the lowered 2017 guidance.   Specifically, the price of Teva ADS fell $2.86 per share, or approximately 7.53%, from its closing price of $37.96 on January 5, 2017 to close at $35.10 on January 6, 2017, on high trading volume, erasing nearly $3.1 billion in market capitalization.

**H.   February 6-7, 2017**

334.   On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and his removal from the Board of Directors.

335.   While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations, additional information continued to be concealed by the Company.

336.   On this news, between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19; and the Preferred Share price fell $29.00 or 4.57% to close at $605.00.

**I.   August 3-7, 2017**

337.   Before the NYSE opening (and during trading on the TASE) on Thursday, August 3, 2017, Teva filed a press release on Form 6-K, announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and "accelerated price erosion and decreased volume mainly due to customer consolidation, greater competition as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition."

338.    Teva also disclosed a net earnings loss primarily due to a $6.1 billion goodwill impairment charge in its U.S. generics unit—which consisted of both Teva legacy and Actavis generics business—revealing the true value of the combined U.S. generic business.

339.    These disclosures revealed that Teva was facing significant and permanent generic pricing pressure—which pressures Defendants had, until then, vehemently denied and the price of Teva securities declined significantly in response.  As Bloomberg reported: "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper."  Moody's also downgraded Teva's debt rating to Baa3 (one step above junk), with a negative outlook, citing "weakness in its US generics business" among other things.  Specifically, Teva ADS prices fell $7.50, or 24.00%, from its closing price of $31.25 on August 2, 2017 to close at $23.75 per share on August 3, 2017, on high trading volume—wiping out $8.08 billion in market capitalization.  Teva's ordinary share price also declined ILS19.80, or 17.79%, from its closing price of ILS111.30 on August 2, 2017 to a close of ILS91.50 on August 3, 2017.

340.    On Friday, August 4, 2017, Fitch Ratings downgraded Teva to BBB- (one step above junk), with a negative outlook.  Teva's ADS price continued to fall, an additional $3.15, or 13.26%, from its closing price of $23.75 on August 3, 2017 to close at $20.60 on August 4, 2017, on high trading volume—removing another $3.2 billion in market capitalization.

341.    The next trading day, Monday, August 7, 2017, Morgan Stanley downgraded Teva's ADS to "Underweight," noting that it had "underappreciated the risk of generics pricing pressure to Teva's earnings and dividend, and we expect Teva to continue to underperform given overhangs."

342.    The prices of Teva Securities continued to drop, with Teva's ADS prices declining an additional $2.01, or 9.76%, from its closing price of $20.60 on August 4, 2017 to

close at $18.59 on August 7, 2017, on high trading volume, wiping out another $2.0 billion in market capitalization.

343.    In total, over these three trading days, Teva's ADS price fell $12.66, or 40.51%.

**J.    November 2, 2017**

344.    On November 2, 2017, Teva filed a press release with the SEC on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quarterly revenues compared to Q3 2016.  The Company attributed the decrease in generic revenues to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

345.    In response to this news, the prices of Teva Securities continued to decline.  From the close of trading on November 1, 2017, to the close of trading on November 2, 2017, Teva's ADS price fell $2.79 or 19.90% to close at $11.23.

346.    Commenting on this news, RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising."  Wells Fargo stated that Teva's results were "especially disappointing."

**K.    February 8, 2018**

347.    On February 8, 2018, Teva filed a press release with the SEC on a Form 8-K announcing its Q4 2017 and FY 2017 financial results, including a significant $17.1 billion goodwill impairment, of which $10.4 billion related to Teva's U.S. generics business.  Teva stated that the $10.4 billion impairment was based in part on "further deterioration in the U.S.

generics market"—including "[p]ricing challenges due to government regulation"—and the Company's resulting expectation of "larger pricing declines" than previously anticipated.

348.    On this news, the prices of Teva Securities continued to decline.  From the close of trading on February 7, 2018, to the close of trading on February 8, 2018, Teva's ADS price fell $2.21 or 10.6% to close at $18.64.

349.    In response to this news, Wells Fargo observed that Teva had missed consensus expectations "by a significant margin," pointed to "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is."   IBI Brokerage stated that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below market expectations."

**L.      December 7-10, 2018**

350.    On December 9, 2018, an article in *The Washington Post* quoted the Connecticut Assistant AG Joseph Nielsen as stating that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." While the article cited Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts," the price of Teva Securities dropped significantly with the disclosure of the State AGs' expanded investigation.

351.    From the close of trading on December 7, 2018 (the last trading day before the announcement), to the close of trading on December 10, 2018, Teva's ADS price fell $0.97 or 5% to close at $18.44.

**M.      May 10-13, 2019**

352.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the industry-wide generic drug price-fixing conspiracy.  The May 2019 complaint details Teva's price-fixing with respect to at least 86 different generic drugs, compared to the 7 drugs in the previously-filed action.  The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including astonishing price hikes of over 1,000% for some drugs, and details Teva's role as a "consistent participant" and a central player in the conspiracy.  Further, the May 2019 complaint names four Teva employees as defendants: Cavanaugh, Patel, Green, and Rekenthaler.

353.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019.

354.    Analysts expressed surprise in response to the revelations in the State AGs' May 10, 2019 complaint.  For example, Bernstein stated that "the price-fixing lawsuit is worse than we expected" and "there seem to be specific cases in the lawsuit that are going to be hard to explain away."  J.P. Morgan stated:  "We were open to the majority of price spikes being 'explainable' by way of shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law.  So we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the expanded complaint."

355.    Plaintiff suffered actual economic loss and was damaged by Defendants' misrepresentations and omissions when the truth concealed by such misrepresentations and omissions was revealed through the disclosures on August 4-5, 2016, November 3-6, 2016, November 15, 2016, December 5-6, 2016, December 14, 2016, December 15-18, 2016, January 6-8, 2016, August 3-7, 2017, November 2, 2017, February 8, 2018, December 7-10, 2018, and

May 10-13, 2019.  Each disclosure served to remove some of the artificial inflation in the price of Teva securities.

356.   The negative events and disclosures on these dates were directly related to Defendants' fraudulent scheme.  Defendants' material misstatements and omissions concealed from the market, among other things, the fact that the Company's financial condition had been the result of its price increase plan, rather than the factors cited by Defendants.  Defendants falsely and misleadingly reported more than $1 billion in revenues generated from undisclosed price increases in the Company's core U.S. generic drug business, revenues which were unsustainable.

357.   None of these events or disclosures was sufficient, on its own, to fully remove the inflation from the prices of Teva securities because each only partially revealed the scope and consequence of Defendants' fraudulent scheme.  The corrective effect of each new piece of information was tempered also by Defendants' continuing efforts to conceal the true risks and conditions arising from Teva's involvement in the undisclosed price increase plan, which prevented the price of Teva securities from declining to their true value.  As a result, the price of Teva securities remained artificially inflated until the end of the Relevant Period.  As Plaintiff continued to hold Teva securities, and/or purchased or acquired those securities, the artificial inflation caused them further injury when additional information was revealed.

358.   Defendants' conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff.  As a result of Defendants' wrongful conduct slowly being revealed on the above dates, the price of Teva ADS, which had steadily increased from the start of the Relevant Period to an all-time high of $72 in July 2015, had fallen to less than $12, reducing market capitalization significantly as the truth leaked out.  The Company has

experienced dislocation and uncertainty due to the abrupt departures of three top executives and ongoing disruption and fallout from numerous criminal and civil investigations and litigations. Its credit ratings were downgraded to one level above "junk."  In addition, Teva cut its profit forecast for 2017, cut its dividend, and warned investors that it risks breaching debt covenants.

359.   It was entirely foreseeable that concealing the Company's concealment of its price increase plan, which was unsustainable over more than a short period, would, among other things, inflate the revenues from its generics business and artificially inflate the price of its securities.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Teva's misconduct, would cause the price of Teva's securities to decline as the inflation caused by Teva's earlier misrepresentations and omissions was removed from the price of Teva's securities.  Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses for Plaintiff, which purchased Teva securities during the Relevant Period.

## VIII.   PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

360.   At all relevant times, the market for Teva ADS was open and efficient for the following reasons, among others:  (i) Teva ADS met the requirements for listing, and were listed and actively traded on the NYSE under the ticker symbol "TEVA";  (ii) as a registered and regulated issuer of securities, Teva filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Teva regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) Teva was followed by numerous securities analysts employed by major brokerage firms, including Citigroup, Goldman Sachs,

Needham & Company, UBS, Barclays Capital, Bank of America Merrill Lynch, BMO Capital, Susquehanna Financial Group, J.P. Morgan, and Wells Fargo, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; (v) the material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Teva's ADS; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiff purchased or otherwise acquired Teva ADS between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which period the price of Teva's ADS was artificially inflated by Defendants' misrepresentations and omissions.

361.    As a result of the foregoing, the market for Teva ADS promptly digested current information regarding Teva from all publicly available sources and the prices of Teva's ADS reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, Teva ADS traded at prices in excess of the true value of such shares during the Relevant Period.  Plaintiff purchased or otherwise acquired Teva ADS relying upon the integrity of the market price and other market information relating to Teva.

362.    Under these circumstances, Plaintiff, as a purchaser or acquirer of Teva ADS at artificially inflated prices during the Relevant Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

363.    Further, at all relevant times, Plaintiff relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiff would not have purchased or otherwise acquired Teva ADS at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or

improperly failed to disclose material facts with regard to the Company and its business, Plaintiff is entitled to a presumption of reliance.

## IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

364.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

365.    None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

366.    To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements or omissions.

367.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading forward-looking statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Teva who knew that the forward-looking statement was false or misleading.

## X.   CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Teva and the Individual Defendants

368.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

369.   This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b 5 promulgated thereunder, against Teva and the Individual Defendants.

370.   As alleged herein, throughout the Relevant Period, Teva and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.  Teva and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff; (ii) artificially inflate and maintain the prices of Teva's ADS; and (iii) cause funds under Plaintiff's management to purchase the Company's ADS at artificially inflated prices.

371.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

372.     As set forth above, Teva and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff, whose funds purchased the Company's ADS during the Relevant Period.

373.     In ignorance of the materially false and misleading nature of Teva's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Teva's ADS, Plaintiff's funds purchased the Company's ADS at artificially inflated prices during the Relevant Period.  But for the fraud, Plaintiff's funds would not have purchased the Company's ADS at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Teva's ADS declined precipitously, and Plaintiff's funds were harmed and damaged as a direct and proximate result of their purchases of the Company's ADS at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

374.     By virtue of the foregoing, Teva and the Individual Defendants are liable to Plaintiff for violations of Section 10(b) of the Exchange Act and Rule 10b 5.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

375.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

376.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

377.     As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder by making materially false and misleading statements and

omissions in connection with the purchase or sale of Teva's ADS, and by participating in a fraudulent scheme and course of business or conduct throughout the Relevant Period. This fraudulent conduct was undertaken with scienter, and Teva is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Relevant Period.

378.   As set forth above, the Individual Defendants were controlling persons of the Company during the Relevant Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

379.   By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

380.   The Individual Defendants were culpable participants in Teva's fraud alleged herein, by acting acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff's funds who purchased the Company's ADS during the Relevant Period.

381.   By reason of the foregoing, the Individual Defendants are liable to Plaintiff as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

382.   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

383.   Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

384.   Awarding Plaintiff their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

385.   Granting such other and further relief as the Court deems just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 28, 2020

Respectfully submitted,

By: _William H. Clendenen, Jr._

William H. Clendenen, Jr.
**CLENDENEN & SHEA, LLC**
400 Orange Street
New Haven, CT 06511
Telephone:  (203) 787-1183
Facsimile:  (203) 787-2847
office@clenlaw.com

Matthew L. Mustokoff
Geoffrey C. Jarvis
Margaret E. Mazzeo (*pro hac forthcoming*)
Joshua A. Materese (*pro hac forthcoming*)
Jonathan F. Neumann
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
gjarvis@ktmc.com
mmazzeo@ktmc.com
jmaterese@ktmc.com
jneumann@ktmc.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2020, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/William H. Clendenen, Jr.*
William H. Clendenen, Jr.