# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-558 (SRU) |
| THIS DOCUMENT RELATES TO: | |
| HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP, and HIGHFIELDS CAPITAL III L.P., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICAL INDUSTRIES, LTD., EREZ VIGODMAN, EYAL DESHEH, SIGURDUR OLAFSSON, DEBORAH GRIFFIN, KÅRE SCHULTZ, MICHAEL MCCLELLAN, and YITZHAK PETERBURG, <br><br> Defendants. | No. 3:19-cv-603 (SRU) <br><br> **JURY TRIAL DEMANDED** <br><br><br> **<u>AMENDED COMPLAINT AND JURY DEMAND</u>** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ................................................................7

III.  PARTIES ...................................................................................................8

IV.   FACTUAL ALLEGATIONS ....................................................................11

      A.    Regulation of the Pharmaceutical Industry ...................................11

      B.    Teva's Business Struggles ...............................................................12

      C.    2013 – Teva Adopts Its Undisclosed Price-Hike Strategy ...................13

      D.    2014 – Teva Expands the Price-Hike Strategy ................................20

      E.    Beginning of 2015 – Teva ADS Price Soars, Providing Teva with the Necessary
            "Currency" to Pursue the Actavis Acquisition ....................................31

      F.    End of 2015 – the Price-Hiking Strategy Fizzles...................................34

      G.    Beginning of 2016 – the Price-Hike Strategy Ends but Teva Denies It is Facing
            Pricing Pressure ..............................................................................39

      H.    The Truth Begins to Emerge...........................................................46

V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS...............................53

      A.    Defendants Violated Their Statutory Duty to Disclose Pricing Trends.................54

      B.    Defendants' False and Misleading Statements that Teva Operated in a
            Competitive Market with Respect to Price ..........................................56

      C.    False and Misleading Statements and Omissions Regarding Pricing ...................60

      D.    False and Misleading Denials of Teva's Participation in Collusive Conduct........92

      E.    False and Misleading Statements Regarding Actavis Acquisition........................94

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER............................................99

VII.  TEVA ENGAGED IN COLLUSION, RENDERING THE STATEMENTS FALSE AND
      MISLEADING AND FURTHER SUPPORTING A STRONG INFERENCE OF
      SCIENTER ....................................................................................116

VIII. PRESUMPTION OF RELIANCE ..................................................................123

IX.     PLAINTIFFS' ACTUAL RELIANCE ............................................................................124

X.      LOSS CAUSATION....................................................................................................127

XI.     NO SAFE HARBOR ...................................................................................................139

XII.    CLAIMS FOR RELIEF ..............................................................................................140

PRAYER FOR RELIEF .............................................................................................................146

JURY DEMAND........................................................................................................................147

Plaintiffs Highfields Capital I LP, Highfields Capital II LP, and Highfields Capital III L.P. (collectively, "Plaintiffs") are purchasers of the publicly traded securities of Teva Pharmaceutical Industries Limited ("Teva," or the "Company").  Plaintiffs, through their undersigned attorneys, by way of this Amended Complaint and Jury Demand, for their federal securities and common law claims against Teva and its present or former executive officers and directors Erez Vigodman ("Vigodman"), Eyal Desheh ("Desheh"), Sigurdur Olafsson ("Olafsson"), Deborah Griffin ("Griffin"), Kåre Schultz ("Schultz"), Michael McClellan ("McClellan"), and Yitzhak Peterburg ("Peterberg") (collectively, the "Individual Defendants," and, together with Teva, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of:  Teva's filings with the United States Securities and Exchange Commission ("SEC"); public documents and media reports concerning Teva; analyst reports concerning Teva; transcripts of Teva conference calls and earnings calls; pleadings and documents filed in the matter *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Indus. Ltd., et al.*, No. 3:17-cv-558 (D. Conn.) (the "Class Action"); and pleadings and documents filed in the matter *State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19-cv-2407 (E.D. Pa.) (the "State AGs Action").  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Amended Complaint after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.     This is an action to recover significant investment losses suffered as a result of a massive fraud that led Plaintiffs to believe that Teva – the world's largest generic drug

manufacturer – was experiencing strong financial growth over a number of years based on fundamentally sound business practices when, in fact, Teva's performance was being driven by an illegal practice of colluding with other drug manufacturers to systematically increase the price of scores of generic drugs (the "Price-Hike Strategy").  Although competition in the generics market is meant to drive the price of those drugs down to just a fraction of the price of their brand-name equivalents, in this case, Teva and its "competitors" manipulated the system to ***exponentially increase*** the price of generic drugs.  Over a two-year period, Teva raised the prices on over 100 generic drugs.  Some of the price increases that Teva implemented ***were as high as 1500%***.  This conduct not only defrauded investors like Plaintiffs who relied on Defendants' public representations that Teva's growth was not driven by price increases and that Teva was engaged in a competitive market, but also harmed patients who needed lifesaving medications that were subject to the price gouging.

2.      The Price-Hike Strategy was devised by Teva's senior executives, including the Individual Defendants.  The Teva sales and marketing personnel who carried out the executives' orders could only do so with the express approval and knowledge of Teva's senior executives.  The State of Connecticut and forty-eight additional states and U.S. territories have filed a complaint against Teva detailing the collusive conduct in which Defendants engaged.  The State AGs Action is based on a four-year, non-public investigation, during which the government agencies had access to millions of documents and obtained evidence from numerous cooperating witnesses.  The results of the investigation are indisputable.  According to the State AGs Action, Teva engaged in "***one of the most egregious and damaging price-fixing conspiracies in the history of the United States***," and did so "[t]hrough its senior-most executives."[1]

---

[1] Bold and italic emphasis has been added to quotations throughout this complaint unless otherwise noted.

3.      Defendants defrauded Plaintiffs by concealing that the Price-Hike Strategy was driving Teva's rapid growth.  When analysts inquired whether Teva's profits and performance were at all connected to price increases, the Individual Defendants answered with explicit denials, stating for example:

- [A]ll the improvement you see in our . . . margins is **not driven by price**. It is driven by quantities and by mix and by efficiency measures.  **Not by price, 2014, 2015, and that's a very important message**." (CEO Vigodman, Oct. 29, 2015)

- "So how did we achieve $1 billion in increased profit margin?" **"Not by pricing** but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016)

- "Now there's a lot of **noise around pricing issues**. . . .  Our exposure to all these things is very minimal. . . . .  **Teva was not associated with any of that**." (CFO Desheh, Nov. 19, 2015)

4.      Contrary to these false statements, as soon as the Price-Hike Strategy was implemented, it yielded at least hundreds of millions of dollars of inflated profits for Teva, quarter-over-quarter between the third quarter of 2013 and through the second quarter of 2015.  As illustrated in the chart below based on study conducted by the Class Action:



5.     The numbers in the above chart are likely understated because they are based on fewer price increases than Teva actually imposed because the Class Action study was conducted prior to the filing of the State AGs Action, which publicly disclosed scores of new price increases. For example, the chart assumes only 18 price increases in 2013 when, in fact, there were at least 34 price increases, according to the State AGs Action.  Internal Teva documents obtained by the states attorneys general show that Teva estimated that just a portion of the 2013 price increases increased the Company's bottom line by almost ***$1 billion per quarter***.

6.     Defendants had to conceal that the Price-Hike Strategy was the primary contributor of this massive boost in profits.  The strategy was inherently risky and unsustainable for a variety of reasons, including that a significant majority of the increases were done in tandem with other drug manufacturers.  Indeed, according to the State AGs Action, 77% of the price increases were imposed by Teva in collusion with its so-called "competitors."  The appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. The inflated profits could vanish as quickly as they appeared.

7.     Defendants' motive was to inflate the share price in order to make a large acquisition that Teva otherwise could not afford – the purchase of Actavis from Allergan.  As Teva's CFO Desheh predicted in January 2014, within twelve to twenty-four months, Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions" that could transform Teva into an even larger, more dominant force in generics.  Then-newly hired CEO Vigodman was reported to also want to undertake a significant acquisition when he took the helm in February 2014.

8.     Teva's ADS price shot up along with the increasing profits, reaching an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion.

Teva did not have the cash to consummate such a significant transaction.  Instead, Defendants used Teva's securities as "currency" and raised an additional $27 billion through debt-financing.

9.      In mid-2015, generic drug pricing practices became the subject of intense focus from government regulators.  When Congress called for legislation to regulate pricing, analysts grew concerned.  However, CFO Desheh attempted to dispel those concerns by denying that Teva's business model was built on price increases:  "[T[here's a lot of *noise around pricing* issues.  Some of it's coming from politicians . . . .  *Our exposure to all these things is very minimal*."

10.     As 2016 began, however, other pharmaceutical companies began to report disappointing earnings based on pricing pressure caused by heightened government scrutiny and public outcry.  When asked whether Teva faced the same exposure as these other drug companies, Defendant Olafsson falsely claimed that Teva was not subject to pricing pressure: "Teva has not seen any fundamental change or worsening in the pricing environment."  Defendant Vigodman similarly claimed that "[w]hat we see is a 4% to 5% erosion [in pricing] . . . .  That's not something which is different from what we said during 2015."  In reality, but unbeknownst to investors, pricing pressure was eating into Teva's inflated profits.  According to a study conducted in the Class Action, in the first quarter of 2016, inflated profits were 45% *lower* than they were a year earlier.

11.     On August 3, 2016, with inflated profits further declining since 2015, Teva reported disappointing earnings.  Though the truth was beginning to unravel, Defendants continued to deny that price increases ever occurred:  "People that say that . . . there's a big generic price inflation, are simply wrong." (Head of Global Generics, Olafsson, Sept. 8, 2016)

12.     However, Defendants were unable to prevent the truth from continuing to leak out into the market.  In November 2016, *Bloomberg* reported that Teva was the target of government investigations and looming charges.  The end of the Price-Hike Strategy brought further declines in profits.  Defendant Olafsson, an architect of the strategy and the driving force of the Actavis transaction, was fired on December 5, 2016.  A week later, the states attorneys general sued Teva and other companies for antitrust violations.  Soon thereafter, Defendant Vigodman was terminated, and Defendant Desheh was also out by May 2017.  Thus, within the span of a few weeks, Teva's CEO, CFO and Head of Global Generics all left the Company.

13.     But the fallout from the Price-Hiking Strategy did not end there.  On August 3, 2017, Teva announced it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."  The announcement of this impairment charge caused the price of Teva ADS to plummet in value by almost 25%.

14.     The credit-rating agencies immediately downgraded the Company's debt to just above "junk."  Moreover, after thirty years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the Company's dividend by 75%.  Without the Price-Hike Strategy, Teva was a fundamentally weaker company than investors were led to believe.

15.     Defendants carried out their securities fraud through five categories of misstatements and omissions.  *First*, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy was impacting Teva's profits, both as they dramatically increased, and later as they evaporated.  *Second*, Defendants repeatedly stated that Teva was excelling in a highly competitive environment.  That was far from the truth, as Teva was only able to sustain the inflated profits because of a lack of competition.  *Third*, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost

cutting and product selection.  Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy.  *Fourth*, Defendants falsely denied that Teva had participated in collusive conduct, when in reality Teva was the central actor in an industry-wide scheme to fix prices and allocate customers, and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs Action.  *Finally*, Defendants failed to disclose and actively concealed the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects.

16.     Plaintiffs are investment funds that purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, between February 28, 2014, and May 10, 2019, during the time when, unbeknownst to them, Defendants were making materially false and misleading statements, and failing to disclose material information, which caused the price of these securities to be artificially inflated.  As the truth was gradually release, Plaintiffs suffered significant investment losses.

17.     The revelation of this fraud has caused Plaintiffs significant economic harm. Plaintiffs therefore bring this action under the federal securities laws and under the common law to recover the losses they suffered as a result of Defendants' securities fraud.

## II.     <u>JURISDICTION AND VENUE</u>

18.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.

21.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.     PARTIES

### A.     Plaintiffs

22.     Plaintiff Highfields Capital I LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.  Highfields Capital I LP purchased Teva American Depositary Shares ("ADS"), Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, in the United States between February 28, 2014, and May 10, 2019, inclusive.

23.     Plaintiff Highfields Capital II LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.  Highfields Capital II LP purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, in the United States between February 28, 2014, and May 10, 2019, inclusive.

24.     Plaintiff Highfields Capital III L.P. is a Cayman Islands exempted limited partnership with its main office location in Grand Cayman, Cayman Islands.  Highfields Capital III L.P. purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, in the United States between February 28, 2014, and May 10, 2019, inclusive.

25.     Each of the Plaintiffs is managed by, and acts via, a common investment manager, Highfields Capital Management LP ("Highfields"), located in Boston, Massachusetts At all relevant times, Highfields acted as investment adviser to Highfields Capital I LP, Highfields

Capital II LP, and Highfields Capital III L.P. in connection with their purchases and acquisitions of Teva securities.

### B.   Defendants

26.     Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel.   Teva's wholly-owned subsidiary Teva USA has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.  Teva ADS trade on the NYSE under the symbol "TEVA."

27.     Teva has two reporting segments to its business, specialty medicines and generic medicines.  During the relevant period, Teva's generics segment contributed approximately one-half of the Company's revenues.  Teva's U.S. generics business is the most important part of its generics segment, comprising approximately 50% of overall generics revenues.

28.     Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017, and as a Director of Teva from June 22, 2009, to February 6, 2017. Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the relevant period, as well as the ADS/Preferred and Notes Registration Statements.  Vigodman also made false and misleading statements on numerous conference calls with investors and analysts.  During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

29.     Defendant Eyal Desheh served as Teva's Chief Financial Officer ("CFO") from July 2008, to June 30, 2017, except from October 30, 2013, to February 11, 2014, a period when he served as Teva's Interim CEO and Interim President.  Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the relevant

period, as well as the ADS/Preferred and Notes Registration Statements filed with the SEC. Desheh also made false and misleading statements on numerous conference calls with investors and analysts.

30.     Defendant Sigurdur Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014, to December 5, 2016.  Olafsson made false and misleading statements on numerous conference calls with investors and analysts.  During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

31.     Defendant Deborah Griffin serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva during the relevant period.  She was also VP and CFO of Teva USA during the relevant period.  Griffin signed the ADS/Preferred and Notes Registration Statements.  While at Teva, Griffin possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

32.     Defendant Kåre Schultz has served as the President and Chief Executive Officer of Teva since November 1, 2017.  Schultz has also served on the Company's Board of Directors since November 1, 2017.

33.     Defendant Michael McClellan served as Executive Vice President and Chief Financial Officer of Teva from November 2017 until November 8, 2019.  Prior to serving in that role, McClellan served as Teva's Interim Group CFO from July 2017 to November 2017, and as Senior Vice President and CFO, Global Specialty Medicines from 2015 to November 2017.

34.     Defendant Yitzhak Peterburg served as Teva's Interim President and CEO from February 6, 2017, to October 31, 2017.  He also served as a Teva Director from June 2009 to July 2010, and from 2012 until December 12, 2017, and as Chairman of Teva's Board of Directors from January 1, 2015 to February 6, 2017.

IV.     **FACTUAL ALLEGATIONS**

        A.     **Regulation of the Pharmaceutical Industry**

35.     The manufacture and commercial sale of pharmaceutical drugs in the United States is regulated by the Food and Drug Administration ("FDA") under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq.  Prescription drugs marketed in the United States must be approved by the FDA.  To obtain such approval, the manufacturer of a new drug must submit a new drug application ("NDA") that demonstrates, among other things, a drug's safety, clinically proven effectiveness, composition, and patent coverage.  Thus, the NDA must contain extensive data gathered from animal studies and human clinical trials.

36.     Branded drugs approved under an NDA enjoy a period of market exclusivity that can be tremendously profitable for the drug manufacturer because there is no generic competition for the drug.  This exclusivity period typically lasts for seven years.  Once the exclusivity period ends, generic drugs can enter the market, creating pricing competition for the branded drug.

37.     To speed the entry of generic drugs and to facilitate price competition with branded drugs, Congress passed the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act").  Under the Hatch-Waxman Act, generic drug manufacturers may receive FDA approval for generic drugs without replicating the costly and time-consuming clinical trials involved in an NDA.  Instead, the proponent of the generic drug need only demonstrate that it performs in the same way as the branded drug.  Accordingly, instead of submitting an NDA, a

generic drug manufacturer may submit an abbreviated new drug application ("ANDA") and incorporate data, such as clinical studies, that the NDA filer submitted to the FDA.

38.     To be approved, an ANDA must demonstrate that the generic drug:  (a) has the same active ingredients as; (b) is pharmaceutically equivalent to (same dosage form and strength); and (c) is bioequivalent to (exhibiting the same drug absorption characteristics) the previously approved drug.

39.     The FDA publishes a list of all approved drugs and therapeutic equivalents in the Approved Drug Products with Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book").

40.     As generic drugs become available, lower-priced generic competitors are rapidly substituted for their brand-name counterparts because the Hatch-Waxman Act and most state drug product selection laws permit (or require) pharmacists to substitute a generic drug for the branded version unless the prescription is specifically designated otherwise.

41.     Manufacturers of brand-name drugs typically lose 80% or more of their sales to generic competition soon after a generic competitor enters the market.  Until a generic becomes FDA approved, however, a branded manufacturer may continue to charge supra-competitive prices.

42.     Simply put, the entrance of generic drugs into the market should – in theory – result in patients paying the lowest price for the drug that a competitive market can bear to produce the drug.

### B.     Teva's Business Struggles

43.     Prior to 2014, Teva's generics segment was struggling.  Teva's share price had lost approximately 50% of its value between 2010 and 2013.

44.     Teva faced headwinds.  In August 2013, then-CEO Levin acknowledged that the U.S. generics business had been "slowing fundamentally" for years.  To offset the slowdown in the generics segment, Levin announced a strategy to focus on Teva's other business segment, branded drugs.

45.     However, Levin was fired as CEO on October 30, 2013, after just eighteen months as CEO, and was immediately replaced by CFO Defendant Desheh.  Stepping into the role of interim-CEO, Desheh was enthusiastic about Teva's prospects, as was Chairman Phillip Frost, who told analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

46.     By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within one-to-two years Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions."  When Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

## C.     2013 – Teva Adopts Its Undisclosed Price-Hike Strategy

47.     Unbeknownst to investors, however, Defendants actively concealed that by early 2013 Teva had adopted a non-public strategy to systematically increase prices across dozens of drugs in its generics drug portfolio (the "Price-Hike Strategy").  Teva's decisions to increase prices came from the top levels of the Company.  According to former Teva employees interviewed in the Class Action, using an established review and approval procedure, price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Defendant Griffin, and Teva USA COO, Maureen Cavanaugh ("Cavanaugh") to undertake and document a careful cost-benefit-analysis to determine whether to make a price increase; they would personally approve the increases.  Griffin and Cavanaugh would then decide when the increases would become effective, often implementing them in batches.

48.     This process is documented in great detail in the now-unsealed complaints filed in the State AGs Action against Teva, which is being prosecuted by forty-nine U.S. states and territories, as well as the District of Columbia.  The State AGs' investigation was led by the Attorney General of the State of Connecticut, whose office conducted a four-year investigation that involved the review of thousands of documents, millions of phone records, and interviews of scores of individuals presently or formerly associated with Teva or other generic drug manufacturers.

49.     The allegations that follow are based on the information provided by the former Teva employees interviewed in the Class Action, the detailed information provided in the State AGs Action as a result of the State of Connecticut's four-year investigation, or both.  Discovery in this matter is expected to provide substantial evidentiary support for these allegations.

50.     A group of Teva employees, led by Kevin Galownia (Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017) ("Galowina"), had the day-to-day responsibility of analyzing the pricing for Teva's generic drugs (the "Pricing Group").  Teva tracked its drug prices, sales and revenue data on an internal software system called "Oracle."

51.     Members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were simply "told" via emails or in meetings to implement a price increase with little or no justification.  While the directions often came from Galownia, he did not have the authority to make price-increase decisions himself – those decisions came from above.

52.     Once implemented, Teva notified its customers, and would circulate a copy to employees whose work would be impacted by the increase (*e.g.*, customer service employees who would need to field consumer complaints following the hikes).  The expected profits from the price increases were then incorporated into the Oracle database, to which Allan Oberman (President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014) ("Oberman"), Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access.  Oracle generated daily or weekly "scorecards" that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the inflated profits generated by price hikes, and tracked whether Teva was on schedule to meet forecasts.

53.     The scorecards tracked profits against financial budgets and a long-term "work plan," which was prepared annually and contained forecasts for the coming three to five years.  As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the work plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh.  During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, detailing whether forecasts were met, or whether there was a "hole" between the forecasted profits and reality.  The LBE reports were sent to Teva's executive committee in Israel.

54.     Throughout the relevant period, Defendants told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches.  At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, Defendants denied that Teva was engaged in price increases, let alone disclose that those increases were driving profits.

55.     Defendants concealed this because the Price-Hike Strategy was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, and even potential criminal penalties.  Specifically, the strategy was unsustainable and risky because the U.S. generic drug market was designed to be extremely competitive.  Generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price.  Wholesale customers solicit pricing though a "blind" bidding process.  Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share.  Moreover, generic drugs are an essential part of the lives of millions of Americans. Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy.  Additionally, many of Teva's price increases occurred in tandem with competitors.  Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could – and ultimately did – come under intense civil and criminal law enforcement investigations.  Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a strategy driven by fundamental growth and cost cutting, as Defendants falsely proclaimed.

56.     Teva's Price-Hike Strategy was particularly well-suited for concealment.  The generics industry is highly opaque.  Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes, or amounts of revenues per drug, let alone the profits from any particular drug.

57.     In April 2013, Teva hired Nisha Patel ("Patel") as its Director of Strategic Customer Marketing.  Patel was part of Teva's Pricing Group, which implemented the Price-Hiking strategy at the direction of senior management.

58.    On July 3, 2013, Defendants began to implement the Price-Hike Strategy by raising the prices of twenty-one different drugs.

59.    Patel scheduled a conference call for the day before the price increases to discuss those increases with a number of Teva's sales and pricing departments:

| | Price Increase -- Agenda | | | | |
|---|---|---|---|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office | | | | |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ██████████████████████████████ | | | | |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 | | | | |

1)  Price increase effective Wednesday, 7/3/2013

2)  List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

60.    On July 16, 2013, after receiving approval from COO Cavanaugh, Patel scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams to discuss an increase in the price of Enalapril Maleate:



61.    On August 9, 2013, Defendants commenced "Round 2" of the Price-Hiking strategy, raising prices on twelve different drugs.  Two days prior, Patel sent an email to Galownia

attaching a spreadsheet summarizing the August 9 increases, which Patel had prepared for COO Cavanaugh:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase |
|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% |
| CLEMASTINE FUMARATE TABLETS | 76% |
| DICLOFENAC TABLETS | 302% |
| DILTIAZEM HCL TABLETS | 90% |
| DOXAZOSIN MESYLATE TABLETS | 1031% |
| ETODOLAC ER TABLETS | 198% |
| ETODOLAC TABLETS | 414% |
| KETOPROFEN CAPSULES | 146% |
| KETOROLAC TABLETS | 268% |
| PRAVASTATIN TABLETS | 653% |
| TOLMETIN SODIUM CAPSULES | 80% |

62.    These price increases had a material impact on Teva's financials.  In an estimate prepared by Patel for her bosses, titled "Total Net Upside after Credits," Patel presented the impact of the July 3, 2013 price increases plus one price increase from August 9, 2013 (and one other drug) on Teva's quarterly revenue, and found that they added almost *$1 billion per quarter* to Teva's bottom line:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

63.    Many of the price increases in July and August were implemented together with Teva's competitors, who also made price increases on the same drugs.  Some increases represented an increase of *over 1000%* of the original price.

-19-

64.     According to an analysis conducted by the Class Action, in just the last two quarters of 2013, these price increases generated as much as $250 million in inflated profit.  This amount is likely understated given that the Class Action alleges only eighteen price increases during this period, and not thirty-four, as documents the Connecticut AGs' investigation.

65.     The profit from the increases fell directly to Teva's bottom line because they required no additional research and development ("R&D") or sales and marketing ("S&M") expenses.  According to the Class Action, these 2013 price-hiked drugs would contribute as much as $875 million in inflated profit to Teva's bottom line by the end of the relevant period.  In fact, Teva itself calculated that number as much higher.  According to Teva's internal documents uncovered by the State AGs, these price increases were designed to add almost one billion dollars of "net upside after credits" for *each quarter* that they were in effect.

66.     From the scorecards, LBE reports, and work plan, executives closely tracked the impact of this inflated profit.  According to a former Teva employee interviewed in the Class Action, this reporting structure ensured that "everyone would have known" if there were significant price increases that generated large profits.  Indeed, all of these price increases had to be approved by COO Cavanaugh.

### D.     2014 – Teva Expands the Price-Hike Strategy

67.     Heading into 2014, price increases by generic drug companies had caused public concern.  For example, on January 8, 2014, the National Community Pharmacists Association, based on a proprietary survey of its members, wrote to Congress requested an investigation and stating that "[o]ver the last six months . . . many of our members across the U.S. [] have seen huge upswings in generic drug prices."  As the fact of large price increases on certain drugs trickled out to the public, Defendants made increasingly misleading statements to cover their tracks and falsely disassociate themselves from price increases by attributing profit to other sources.

-20-

68.     On February 10, 2014, Teva filed its 2013 annual report with the SEC on Form 20-F, showing improved results.  However, Teva's financial disclosures made no mention of the fact that this newfound success was driven by inflated profits.

69.     The encouraging news triggered the beginning of a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015.  By early March 2014, the ADS had risen from the $30s to trade at $48.  The increased price of the ADS was critical to achieving Defendants' stated motivation to use the ADS as "currency" to make a major acquisition.  On a March 4 investor conference call, Desheh explained that with "the stock price under $40 . . . we can't use [Teva securities as] currency," but that, with "change[s] over the past few months," Teva was extracting "itself [from] … a corner that was difficult to come out of," bringing Teva closer to a large acquisition.

70.     What investors and analysts did not, and could not, know was that Desheh and the Company's SEC filings had concealed the Price-Hike Strategy, and that, in the fourth quarter of 2013, the thirty-four price increases made pursuant to the strategy generated *the entirety* of Teva's year-over-year gain in U.S. generics revenue.

71.     By the beginning of April 2014, Teva's ADS price had increased to $54.06, or 19%, since the relevant period began.  As a National Alliance Securities analyst concluded, Teva's ADS had "the Best YTD" 2014 performance relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

72.     The series of positive financial disclosures, fueled by undisclosed inflated profit from the concealed Price-Hike Strategy, continued.  On May 1, 2014, Teva reported surprisingly positive results driven by its generics segment, which reported a year-over-year increase of $117 million from Q1 2013 profits.  Defendants falsely explained that lower expenses, a changed

composition of revenues, and "new product launches" were the cause of the increase in profits.  In reality, the Price-Hike Strategy had generated at least $120 million that quarter.

73.     The 2014 work plan, which was being reviewed by the executive committee in August 2013, would have included the expected profits from the July and August 2013 price increases.  Cavanaugh, Griffin, and Oberman were each provided on a daily or weekly basis scorecards that tracked whether Teva's actual results met or exceeded the work plan forecasts.  Vigodman and Desheh similarly were provided documents reflecting the impact of the inflated profits as they compared actual revenues versus the work plan through the LBE reports disseminated throughout the quarter.

74.     Analysts reacted positively to Teva's surprising and rapid turn-around.  Cowen analysts wrote, "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including . . . focusing more heavily on portfolio selection and management." Jefferies analysts noted that Vigodman "Impresses in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

75.     In January of 2014, Patel memorialized in writing Teva's strategy for continuing to increase generic drug prices in 2014.  This strategy was well-known, understood, and authorized by individuals at Teva at much higher levels than Patel, including executives such as Cavanaugh.  In a document titled "2014 Pricing Strategy Brainstorm," Patel outlined Teva's plan for implementing more price increases:

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
    - Exclusive items
    - Number of competitors; Target 2-4 total players, where quality of competitor is high
    - Teva has majority share and quality of competitors is high - lead
    - Competitors with long term supply issues
    - Competitors exiting market
    - Low or limited financial exposure
    - Adjust  pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
    - Delayed reactions erode pricing
    - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

76.     In accordance with this strategy, in April 2014 Teva increased the prices of another twenty generic drugs.  All of these increases were carried out together with Teva's competitors. Following the established process for implementing price increases, Cavanaugh and Griffin would have approved these price increases, and would have tracked the inflated profits generated through the scorecards.  According to an analysis conducted by the Class Action, by the end of the second quarter, these new price hikes alone would generate as much as $50 million in inflated profit; and as much as $395 million by the end of the relevant period.  Again, however, these figures are likely understated, as the Class Action alleges increases on only twelve drugs, when in fact Teva increased the price on twenty drugs on April 4, 2014.  Those drugs were as follows:

| Product Description |
| --- |
| AZITHROMYCIN ORAL SUSPENSION |
| AZITHROMYCIN SUSPENSION |
| BUMETANIDE TABLETS |
| CEPHALEXIN SUSPENSION |
| CLARITHROMYCIN ER TABLETS |
| CYPROHEPTADINE HCL TABLETS 4MG 100 |
| DICLOXACILLIN SODIUM CAPSULES |
| DIFLUNISAL TABLETS |
| ESTAZOLAM TABLETS |
| ETHOSUXIMIDE CAPSULES |
| ETHOSUXIMIDE ORAL SOLUTION |
| HYDROXYZINE PAMOATE CAPSULES |
| KETOCONAZOLE CREAM 2% |
| KETOCONAZOLE TABLETS |
| MEDROXYPROGESTERONE TABLETS |
| MIMVEY (ESTRADIOL/NORETH) TAB |
| NYSTATIN ORAL TABLETS |
| PENTOXIFYLLINE TABLETS |
| TAMOXIFEN CITRATE TABLETS |
| THEOPHYLLINE ER TABLETS 100MG 100 |

77.    The price increases on these drugs ranged from 90% to 528%.

78.    On July 1, 2014, Olafsson was hired from Actavis as President and CEO of Teva's Global Generic Medicines Group.

79.    By the summer of 2014, public attention to generic pricing had increased.  On July 8, 2014, *The New York Times* published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug that Teva did not produce, had nearly doubled since late 2013.  Within days, and as a result of this article, the Attorney General of the State of Connecticut (the "Connecticut AG") began a non-public investigation into the companies that manufactured digoxin.  The Connecticut AG issued subpoenas to Teva's competitors Impax, on July 14, 2014, and Lannett, on July 15, 2014.

80.     On July 31, 2014, Teva announced its second quarter 2014 financial results.  Teva once again touted an excellent outcome from its generics division.  Profitability of the generic segment increased by $156 million from 2013, which Teva attributed to legitimate business strategies.  During the earnings call, Desheh stressed that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

81.     Analysts echoed Defendants' explanations.  Jefferies analysts observed: "[W]e continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2."  Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for . . . [the] generics businesses," and the "[s]teady performance for U.S. generics."

82.     In truth, the Price-Hike Strategy had generated at least $160 million in inflated profit, accounting for ***all*** of the year-over-year increase in profit reported for Teva's global generics division.

83.     Teva continued to report increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued.  The attorneys general of several states served Par Pharmaceuticals with a subpoena on August 6, 2014.  Then, on October 2, 2014, Congress sent letters to Teva and sixteen of its peers.  The letter, addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs."  Vigodman never responded.  Any truthful answer would have required him to reveal the Price-Hike Strategy.

84.     Griffin and Cavanaugh implemented another twenty-four price increases on July 1 and August 28, 2014, pursuant to the Price-Hike Strategy, all of which Teva were coordinated with other manufacturers.  The increases would have been recorded in the Oracle database, and reflected

in the daily scorecards and LBE reports. These twenty-four price increases would generate at least $50 million in inflated profit.

85.     The July 1, 2014 price increase related to various formulations of the drug Fluoncide. Teva's price increases largely followed the June 3, 2014 price increase on these drugs by its purported "competitor," Taro, which were as follows:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

86.     The August 28, 2014 increases included a wider array of drugs. They also required Teva to collude with more of its purported "competitors." These other drug companies and several representatives of Teva – including Cavanaugh and Patel – had attended a conference in Boston between August 23-26, 2014. On August 28, Teva raised the wholesale acquisition cost ("WAC"), i.e., the price, on several drugs as follows:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

87.     Significantly, the expected inflated profits from the July and August 2014 price hikes, along with all the earlier increases, would have made their way into the Oracle database and been reflected in the report to the Individual Defendants.  The price hikes implemented through August 2014 generated at least $193 million in inflated profits in the third quarter of 2014.

88.     On October 30, 2014, Teva released positive third quarter results, driven by an increase in generic segments profits of $160 million, or 40%, as compared to the third quarter of 2013.  As was routine by this point, Defendants fraudulently attributed this increase to a reduction in expenses.

89.     With Congressional hearings looming, on the October 30, Q3 2014 earnings call, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? . . . *whether there were price increases in some of your base business and whether that impacted*" profit.

Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there's an opportunity, **when there is a shortage in the market**, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

90.     Increases in prices due to shortages is a normal market dynamic.  Thus, Vigodman's statement misled investors as to the fact that Teva had, by this time, implemented the strategy by effectuating 78 price increases on drugs since July 2013, while not one of the drugs on which Teva raised the price were subject to shortages or other reported market anomalies.  In total, the systematic Price-Hike Strategy had yielded at least $193 million in inflated profit in the third quarter of 2014.  The profits from all of these price increases would have been reflected in the work plan and LBEs that Vigodman and Desheh received.

91.     Unaware of the true facts, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to climb.  A Cowen analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating."  Piper Jaffray wrote:  "***Importantly, operating profit . . . for the generics segment during the quarter was up 40% versus the same period a year ago.***"  Morgan Stanley increased its price target for Teva from $57 to $61, stating:  "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

92.     By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania.  The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014, to Lannett and Impax, relating to a drug Teva did not make.

93.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge

price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted."  Teva was invited, but refused to testify.

94.     It was against this backdrop that, on December 11, 2014, Teva held a guidance call with analysts.  On the call, a Morgan Stanley analyst homed in on the issue of risky price increases, asking:  for "generic manufacturers, *I'm assuming that wholesalers have been seeing extraordinary price increases in recent years* and has been buying inventory ahead of tremendous price increases. . . .  Are you able to control it?"

95.     In response, Olafsson flatly denied that prices had increased at all:  "So first *let me correct*.  *I have to disagree that they have experienced tremendous price increase*."  Olafsson dismissed the matter further:  "There has been a lot of press about price increases on individual molecules and this has been *a hot political issue selecting a few products*."

96.     These statements were flatly belied by the facts, to which Olafsson had direct access.  Teva by then had implemented 78 price increases, *ranging as high as 1538%*.  Each increase was part of a concealed internal strategy and implemented pursuant to Teva's established internal practices.

97.     On February 5, 2015, Teva filed its fourth quarter and year-end 2014 financial results with the SEC, once again announcing positive numbers driven by the generics segment.  Fourth quarter 2014 profit for the generic segment increased $47 million, or 9%, as compared to 4Q 2013.  For 2014, profit from the generic segment increased $480 million from 2013.

98.     Though Defendants attributed success to cost savings and other benign factors, in the fourth quarter of 2014 alone, Teva made at least $219 million in inflated profit, or *four times* the fourth quarter increase in profits Defendants disclosed.  Teva made inflated profit of at least $700 million for the full year 2014, or 144% of the reported year-over-year increase in generic

profit for the whole Company.  All of these results would have been reflected internally in the work plan, the scorecards, and the LBE reports distributed to Defendants.

99.     The following table reflects Teva's overall inflated profit for 2014, as calculated by the Class Action, which does not take into account all of Teva's price increases set forth in the State AGs Action:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

100.    Without mention of the Price-Hike Strategy, Desheh bragged about the profits from Teva's generic division.  On the February 5, 2015 earnings call, Desheh claimed "the most notable contribution" to Teva's growth and profits "was generated by our Generic business, improving profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit.  Unaware that the profits came from the Price- Hike Strategy, analysts focused on this success.  Piper Jaffray wrote that "profitability of the generics business [is] continuing to improve."  Barclays focused on the trajectory of generics' success: "profitability for generics improved to 21.9% from 16.8% in 2013. . . . .  The company anticipates another 400 basis point improvement in 2015 . . . a key priority."

101.    Notably, and consistent with the Individual Defendants having misled investors by attributing Teva's improved profits to sources other than the Price-Hike Strategy, throughout 2014 the Individual Defendants had also claimed that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost cutting" program that had first been adopted in late 2012.  However, only a fraction of that cost-cutting program actually fell to Teva's bottom line as profit.  As Defendants eventually disclosed on a December 2014 investor call, Teva

had generated only $150 million in cumulative profit from the program since its inception.  After that call, Defendants stopped emphasizing cost cutting and mentioned it only rarely again.

102.    The 2014 20-F further stated that Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, and concluded that its internal controls were effective, and that Defendants Vigodman and Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014, and concluded that its disclosure controls and procedures were effective.  Teva made substantially similar statements in its 2015 20-F.

<b>E.      Beginning of 2015 – Teva ADS Price Soars, Providing Teva with the Necessary "Currency" to Pursue the Actavis Acquisition</b>

103.    Teva implemented another sixteen price increases in January 2015, at least nine of which were increased together with other manufacturers.  Each of these was again subject to the same rigorous internal review and approval process that included the Individual Defendants, Oberman, and Cavanaugh.  The inflated profits were captured in the daily and weekly scorecards and intra-quarter LBE reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met.  By the end of the first quarter of 2015, the sixteen price increases undertaken in that quarter would generate at least $48 million in inflated profit; the Price-Hike Strategy overall would generate at least $228 million in the quarter.

104.    Twelve of the price increases in January 2015 were reflected in Teva's price increase spreadsheet, which at that time was maintained by Galownia.  The spreadsheet identified the following drugs, among others, along with the price increase and the reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor- DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor- Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

105.    The other four drugs on which Teva increased the price in January 2015, identified by the Class Action, were Penicillin v Potass. Oral Sol. (91% WAC increase), Danazol Capsules (90% WAC increase), Methyldopa Tablets (90% WAC increase), and Carbidopa/Levodopa Tablets (50% WAC increase).

106.    The inflated profits boosted the ADS price to nearly $60, and Defendants' motivation to use the ADS as "currency" for a "transformational" transaction was coalescing into reality.  As J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, 2015, Susquehanna took note that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A."   By April 16, Barclays reported on Teva's "willingness" to perform a "'transformational' acquisition in the generics space." That day, Leerink wrote that Teva had an "urgency to diversify via M&A."

107.    Though not disclosed at the time, by late 2014 Defendants had actually approached Allergan about a potential deal (Actavis was Allergan's generics business).  Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition. Indeed, according to the Class Action, Olafsson told employees assembled at an August 2014

meeting soon after arriving at Teva (from Actavis), that he had never joined a company that did not eventually acquire his previous employer. His prescience would prove true soon enough.

108.    With Allergan rejecting Teva's advances, Defendants planned a hostile offer for Mylan, Teva's long-standing rival. On April 21, 2015, Defendants filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of the outstanding shares of Mylan. Mylan's Board quickly rejected the offer, criticizing Teva as a "low quality stock." This rejection intensified Defendants' motive to improve the ADS price.

109.    On April 30, 2015, Defendants again announced excellent results stemming from Teva's generic segment, pointing to a profit increase of $296 million, or 59%, compared to the first quarter of 2014. Defendants again misleadingly attributed this increase in profits to a reduction in expenses, as well as a new product launch and higher profitability in Europe. Defendants concealed that as much as $228 million in inflated profit accounted for 77% of the reported generic profit increase.

110.    On the earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment." He attributed this to "a significant improvement in our cost of goods . . . portfolio offering . . . [including] when we have more of the launches . . . [and] the cost infrastructure."

111.    In the absence of the truthful and complete reasons for Teva's improved profit, analysts credited Defendants' false statements. J.P. Morgan noted: "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." Cowen noted that Teva's "outperformance was a result of better than expected U.S. generic sales." Buoyed by the fraud, Teva ADSs closed at $60.42 that day, an increase of 33% since the start of relevant period.

112.    As the weeks passed, Defendants continued to laud the vast success in Teva's generic segment in a series of statements:

- On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "***nothing short of a revolution***," explaining that "[i]n 2013 our gross margin of generic business was 41.3%.  And it's 46% in Q1 2015.  Our operating margin was 16.7%.  It is 27%, this is full 10 percentage points," *i.e.*, a $1 billion improvement.

- June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva.  ***You see the profound change in the generic business.  These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014***." He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

113.    As Olafsson had foretold on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva would announce the transformational acquisition it had been seeking – it had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity.

114.    In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since the start of the relevant period was the "precondition" for making the deal.  Of course, he concealed that the true "precondition" underlying that turnaround was Teva's implementation of the Price-Hike Strategy.

### F.    End of 2015 – the Price-Hiking Strategy Fizzles

115.    Following the announcement of the Actavis deal, Defendants needed to raise over $30 billion in cash to pay for it.  Teva did not have the money, and the price tag would amount to roughly ***20 years*** of Teva's recent annual earnings.  To pay for the deal, Teva would give Allergan $7 billion in ADS, and raise cash from investors and lenders through a $7 billion secondary public offering of ADS and an initial public offering of preferred shares in early December 2015, and a $15 billion offering of bonds set for 2017.

116.    On July 30, 2015, following the announcement of the Actavis deal, Teva issued glowing second quarter 2015 results driven by generics; specifically, an increase in generics profit of $193 million, or 36%, compared to the second quarter of 2014.  Teva attributed the increase primarily, and misleadingly, to reduced expenses and new product launches.  That day, Desheh, boasted about "the impressive improvement in the profitability of our Generic business . . . up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and specifically the "strong focus on U.S. Generics business."  Defendants concealed that the Price-Hike Strategy contributed at least $236 million in inflated profit in the second quarter alone.  Without the Price-Hike Strategy, generic profit would have declined.

117.    In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases, following Cavanaugh's and Griffin's review and approval and as would be reflected in the scorecards, LBEs, and work plan circulated to Defendants.

118.    As set forth in the Class Action, these price increases were as follows:

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **July 29, 2015** | |
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

119.    By the end of the quarter, these seven price increases, together with earlier hikes, would generate as much as $218 million in inflated profits.  Furthermore, given the timing of the increases, the expected profits would be incorporated into the 2016 work plan that Olafsson,

Cavanaugh, and Griffin would be finalizing for presentation to Vigodman and Desheh later in the summer, following the routine schedule.

120.    Following these increases, on October 29, 2015, Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, again misleadingly attributing this increase mainly to lower expenses.  In reality, the Price-Hike Strategy contributed as much as $218 million, **ten times** the reported improvement in profit.

121.    On the earnings call, Vigodman was exuberant about the "huge opportunities in the United States" for generics.  Likewise, Olafsson emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

122.    Analysts, unaware of the truth, continued to adopt Defendants' misleading narrative.  Piper Jaffray wrote, "Margins for the generics business continue to improve. . . .  Though top-line growth for the generics segment has been anemic, margins have continued to expand."  Jefferies' analysts highlighted that, "Generic Drug Margins Continue to Improve," noting that "on the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

123.    By the fall of 2015, however, Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in drug pricing had taken hold.  Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at a rate higher than inflation.  The attorneys general of several states and Department of Justice ("DOJ")

were continuing their investigations.   Furthermore, Allergan had received a DOJ subpoena concerning generic pricing on June 25, 2015.

124.     Given this landscape, during the third quarter 2015 earnings call held on October 29, 2015, analysts posed direct questions to Defendants that were aimed at getting a clear answer as to whether Teva was exposed to the potential legislation.   Defendants met these specific questions with equally specific denials.

125.     On the call, after a series of questions on the sustainability of Teva's generics success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from sustainable, ordinary business practices, and not price:

> We're very . . . responsible in everything that portends to prices on the Generics side . . . .  And I would even put it another way, *all the improvement you see in our – in margins is not driven by price.  It is driven by quantities and by mix and by efficiency measures.  Not by price, 2014, 2015, and that's a very important message.*

Then, when a Barclays analyst asked for management's thoughts on the proposed legislation's "potential limit to generic drug price increases," Olafsson denied that Teva was exposed:

> In terms of the proposed legislation on pricing control on generics, . . . we have told you that overall on our whole portfolio, we have a decline in price*.  The talk about the inflation in generics when you have a big portfolio is really not there.*

The only price increases he acknowledged were those "due to some *abnormalities* in the market," like supply shortages.

126.     Later that day, UBS repeated Defendants' fraudulent denials: "[Management] highlighted that the [generic business] improvement was *not driven by price*, but by volume, mix, and efficiency."

127.     Defendants' fraudulent denials concealed the Price-Hike Strategy, and that Teva had by that point made 101 price increases, none of which were caused by market abnormalities

like shortages.  Moreover, a huge portion, if not all, of the margin improvement Vigodman touted was driven by as much as $1.6 billion in inflated profit reported since the start of the relevant period, including, over $690 million in 2014, and over $680 million in the first three quarters of 2015.  All of this information was reflected in the scorecards, LBEs, work plan and other reports regularly sent to Olafsson and Vigodman.

128.    Importantly, by this time, Defendants' misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were concealing an ever increasing risk.  Public, regulatory, and law enforcement scrutiny of the industry had begun to undermine Teva's ability to execute and sustain the Price-Hike Strategy.  Teva was finding it increasingly difficult to increase prices.  In 2014, Teva made 36 increases.  In 2015, Teva made a total of only 23 hikes; 16 in January, and 7 in July.  By the end of 2015, inflated profits had diminished quarter over quarter for the first time since Q1 2014.

129.    With this context, and with the offering of $7 billion in ADS and preferred shares weeks away, Teva attended a November 19, 2015, Jefferies conference.  The moderator pressed Desheh about "everyone's favorite topic the last 2 months . . . ***pricing, is it an issue***? . . . ***where do you go on pricing***?"  Desheh acknowledged the swirl of concern over pricing and legislative actions, but claimed that "***Teva was not associated with any of that***," and specifically, with respect to legislative initiatives to cap price increases, Teva's exposure "is as a small as anybody can have."  The opposite was true.

130.    On November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's secondary ADS and preferred share offerings, and on December 3, 2015, filed two prospectus supplements and issued the securities.  The offering documents included numerous

false and misleading statements attributing Teva's profits to sources other than the Price-Hike Strategy.  These securities offerings raised approximately $7.2 billion in capital for Teva.

G.   **Beginning of 2016 – the Price-Hike Strategy Ends but Teva Denies It is Facing Pricing Pressure**

131.   As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices came to the fore as a number of industry participants reported a new trend of downward pricing pressure.  On, January 11, 2016, McKesson, one of Teva's major wholesaler customers, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

132.   The same day, J.P. Morgan held a healthcare conference.   With McKesson's announcement in mind, J.P. Morgan asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"  Olafsson responded by fraudulently claiming that Teva was not involved in "big price increases":

> There's ***a lot of headlines of examples of big price increases*** in generics.  But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – ***there is a decline***.

He later fraudulently explained that, because Teva had not taken "big price increases," its generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind ***there's a lot of talk about inflations in generic pricing***.  But what we see is there's – overall on our total portfolio of 270 products, ***there is a slight decrease in pricing***. . . .   [O]n 95% of our portfolio, we experience price decline.  And then on 5%, we might be ***flat or a slight increase*** . . . .

133.    These statements were false.  Teva had raised prices on at least 60 drugs, or 22%

of the portfolio Olafsson cited, generating by that point as much as $1.7 billion.  This would have

been reflected on the daily scorecards and intra-quarter LBE reports the Individual Defendants

received.  More to the point, the drugs that were driving Teva's profits were massively inflated,

making Teva particularly vulnerable to the pricing pressure that other industry players reported.

134.    On February 11, 2016, Teva issued its fourth quarter and full year 2015 financial

results.  The full year disclosures reported Teva's profit in generics in 2015 were up $500 million

year-over-year, concealing over $848 million in inflated profit for the year.

135.    On the earnings call that day, Olafsson again touted a "$1 billion improvement in

operating profit over 24 months period," pointing to generics profits going from "$1.68 billion

operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of

revenue.  He explained rhetorically: "So how did we do this? *Not by pricing* but by portfolio mix,

new products, and efficiency measures."

136.    Olafsson denied even the mere existence of price inflation, let alone having engaged

in 71 price hikes: "on pricing . . . we and the generic industry overall *don't see price inflation of*

*generics* as it sometimes is portrayed in the media."

137.    In truth, the concealed Price-Hike Strategy had generated as much as $1.5 billion

in inflated profits over the 24 months period Olafsson cited.

138.    But additional price hikes had become more difficult, if not impossible to

implement.  Accordingly, Teva reported that fourth quarter 2015 profit in generics increased only

1% compared to the fourth quarter of 2014.  Analysts, thus, grew more concerned as more firms

reported pricing pressure in the fourth quarter.  Guggenheim asked:  "[S]ome of your competitors

have talked about pricing pressure in the generics business during the quarter. Curious if you saw

that, and if so what might be driving that." Olafsson fraudulently responded:

> [L]et me start on the pricing. *As I mentioned in the beginning, we didn't see anything change in fourth quarter*. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

139.    In response, Guggenheim expressed relief in its report, stating that "[u]nlike its

generic competitors, *TEVA did not experience any increase in pricing pressure this quarter*,

which highlights the *strength of the company's platform*, in our view." Jefferies' analysts also

believed Olafsson's false distinction between Teva and other companies reporting pricing

pressure: "Mgt noted that smaller generics players may have realized outsized gains from price

increases on individual drugs – and are thus now exposed to faster price erosion – and stressed that

its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid

profitability."

140.    Based on these false statements, Defendants had concealed from investors the true

reason for the flattening of the year-over-year profit growth from generics – Teva's Price- Hike

Strategy had begun to falter. The at-least 60 drugs on which Teva had increased price were facing

renewed pricing pressure. As such, the quarterly change in inflated profit had begun to decrease,

rather than increase by as much as $70 million since the second quarter of 2015, or by 30%. This

trend would continue throughout the relevant period.

141.    The following table reflects Teva's overall inflated profit for 2015, according to an

analysis by the Class Action:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

142.     As investors became increasingly concerned about the pricing environment, Defendants continued to affirmatively deny any vulnerability to pricing pressure.  At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing."  Olafsson responded that "[Teva] *never* saw" price increases and that "inflation *never* really happened in the generics business."  He added, "overall the pricing hasn't changed that much," and was "*stable*," and there had been no "big changes in the pricing environment" since 2015.  In reality, Teva's inflated profit had fallen 24% in the fourth quarter of 2015, from $218 million to $166 million, compared to the prior quarter.

143.     As the public and regulatory scrutiny intensified, the Price-Hike Strategy faltered and inflated profits declined from pricing pressure.  Teva was unable to make significant additional price hikes, implementing only five during the entire course of 2016, all on April 6 of that year, and all on drugs that Teva had hiked before and in markets where Teva possessed a monopoly.

144.     According to the Class Action, those price increases were as follows:

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **April 6, 2016** | |
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

145.     Teva's declining profits created significant pressure on Defendants to finance the Actavis acquisition.  They needed to raise the $20 billion in additional cash required to close the Actavis deal through a bond offering.  On May 9, 2016, on the first quarter 2016 earnings call, Defendants set a new date for the $20 billion offering:  September 2017.

146.    That day, Teva also announced its first quarter 2016 financial results, reporting profit from generics of $215 million, ***less than*** in the first quarter of 2015.   Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches.   As pricing pressure sapped the impact of the Price-Hike Strategy in the first quarter of 2016, Teva generated $104 million ***less*** in inflated profits compared to the first quarter of 2015, accounting for half of the generics division's reported profit decline.   The "hole" created by the drop in inflated profit would have been reflected in the scorecards, LBEs and work plan.

147.    Similarly, even as additional generic drug manufacturers accurately reported poor results due to pricing pressure, Defendants continued to deny that pricing pressure had any impact on Teva.   On the May 9, 2016 earnings call, Olafsson noted "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' woes on those firms' business models:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors.   ***Teva has not seen any fundamental change or worsening in the pricing environment***… What this boils down to is each individual company's business model.… ***Nothing has happened in the last two quarters that has changed the pricing environment.***

Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, most prominently, the lack of new product launches.   He misleadingly asserted that Teva's prior success had come from sustainable sources such as "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products . . . and sales force effectiveness."

148.    The empirical facts internal to Teva and available to Olafsson through the scorecards, LBE reports, work plans, and the Oracle database would have shown otherwise.   Like

its competitors, price deflation was substantially damaging Teva's profits.  According to an analysis conducted by the Class Action, since the fall of 2015, Teva's inflated profit plummeted from as much as $236 million in second quarter of 2015, to $218 million in the third quarter of 2015, to a mere $124 million in the first quarter of 2016.

149.    Deceived analysts credited Olafsson's false denials.   J.P. Morgan wrote: "Reassuring Generics Outlook Ahead of [Actavis] Deal Close . . . ***Teva does not see any major changes in the price environment***."  Jefferies wrote:  "Generic pharmaceutical bellwether TEVA has ***not witnessed a deterioration*** in the pricing environment, according to mgt.  ***This directly contrasts*** with what has been stated by a number of competitors over the past few months."

150.    With Teva's debt offering scheduled to occur in the fall, and thus needing to keep investors optimistic about Teva's prospects, Defendants continued to mislead investors and deny that Teva was seeing any increase in pricing pressure:

- May 10, 2016 (Olafsson) "I know many of the competitors in the generic space . . . are ***talking about a lot of pricing pressure***, but it shouldn't be.  There is ***nothing that has happened*** over the last two quarters which has changed fundamental the market."

- June 3, 2016 (Vigodman) "So we are very consistent.  Our message was conveyed, and we will continue to convey.  What we see is a 4% to 5% erosion.  That's what we see.  That's ***not something which is different from what we said during 2015***.  By the way, we continue saying it in 2016."

- June 8, 2016 (Olafsson) "[R]eally, the ***environment hasn't changed***.  When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business.  And we are ***still talking about the same number***, what we see in the base business."

151.    The undisclosed truth was that the rapid deterioration of the Price-Hike Strategy continued into the second quarter of 2016.  According to the Class Action analysis, inflated profits would decline 52% year-over-year.

152.    Only days after Olafsson's June 8 statements, undisclosed to shareholders, on June 21, 2016, Teva received a subpoena from the DOJ seeking information relating to generics pricing. And on July 12, 2016, Teva received a subpoena from the Connecticut AG.  Teva did not make any further price increases for the duration of the relevant period.

153.    The day immediately after receiving the subpoena from the Connecticut AG, on July 13, 2016, Defendants announced that Teva was moving up its $20 billion debt offering from the September timeframe it had announced just weeks earlier.  Defendants filed the Registration Statement with the SEC that very day.  To support this surprise announcement, Olafsson, Vigodman, and Desheh provided bullish guidance to investors for the end of 2016 through 2019. Again, with industry reports of pricing pressure in mind, a Citigroup analyst asked Olafsson on an investor call that day:  "[C]an you comment on the generics pricing assumptions that you have **baked into your forecast?**"  Olafsson responded:  "[W]e are assuming and now forecasting for the guidance for the remainder of the year **same pricing assumption** as we have had for the first half of the year," because "**we saw no change in the pricing**.  We saw a stable environment . . . from first quarter into second quarter."

154.    But far from being "stable," the pricing environment for Teva's own generics portfolio had been deteriorating.  According to the Class Action analysis, inflated profit was down $122 million, or 52%, for the second quarter, as compared to the same period in 2015.  Teva was unable to offset this price deterioration with additional price increases.  The pricing assumption Teva "baked into" the guidance was contemporaneously false and disprovable.

155.    Without the true facts, investors were falsely reassured that Teva had somehow immunized itself from the downward industry trend.  Piper Jaffray noted, "management stated that it did not see further pricing pressure on the overall generics business," which "may **ease recent**

*worries* regarding the near-term trajectory of the business."  Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging . . . [m]gmt sees *US pricing environment as unchanged*."

156.   On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction.

### H.   The Truth Begins to Emerge

157.   On August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of the DOJ and Connecticut AG subpoenas.  The financial disclosures reported $115 million *less* in generic profit in the second quarter of 2016 than in the second quarter of 2015, a decrease attributed mostly to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases. This misleading attribution concealed that Teva earned as much as $122 million *less* in inflated profit for the second quarter 2016 year-over-year.  On the disclosure of the poor results and the subpoenas, the price of Teva securities declined.

158.   Defendants scrambled to downplay the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure.  On the earnings call, the Citigroup analyst again asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability.  Likewise, Olafsson once again falsely claimed that "the pricing is stable to the same degree as before . . . *very stable* from the first quarter." This was belied by facts that Olafsson was presented with on the daily scorecards, and in the LBEs and work plan, that he shared with the other Individual Defendants, which would have revealed dramatically decreasing inflated profit.

159.   When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson fraudulently implied that Teva had never increased prices to drive profits, and that opportunities to do so were ephemeral and limited to times of shortage,

stating, "***pricing comes with shortages in the market*** . . . if there's some kind of dysfunction in the market, there might be a ***small pricing opportunity that usually comes in and comes out***." The concealed truth was that Teva had made 101 price increases on over scores of drugs, and none had anything to do with shortages.  And now, with those inflated prices under pressure, the inflated profit was declining.

160.    The false statements mollified analysts.  J.P. Morgan wrote:  "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "[m]anagement also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

161.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in inflated profits for the same period based on an analysis done in the Class Action:

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported year-over-year change in generics profit | -$215 | -$115 | -$330 |
| (Unreported) year-over-year change in inflated profit | -$104 | -$122 | -$227 |

162.    On September 9, 2016, Teva held its "Generics Day" for investors, during which Defendants touted the supposed opportunities of the combined Teva/Actavis business.  Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "people that say that . . . there's a big generic price inflation, ***are simply wrong***."  He falsely reiterated that price increases occurred only with market abnormalities like shortages:  "When price increases are taken, there's some kind of abnormality in the business.  There are shortages."

163.    Olafsson then falsely explained that Teva had a purported "secret sauce" that immunized the Company from pricing pressure.  In reality, Teva had no "secret sauce"; it was suffering from pricing pressure on its drug portfolio, which in reality had "big generic price inflation" from years of large price hikes made pursuant to the Price-Hike Strategy.  The pricing pressure on that portfolio would have been reflected in the scorecards, LBEs and work plan.

164.    On November 3, 2016, *Bloomberg* published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End."  This article revealed – for the first time – that, "according to people familiar with the matter," "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion." The article further explained that the "antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year."  Moreover, "Connecticut Attorney General George Jepsen . . . is seeking to lead a group of states . . . seeking damages."  The article specifically mentioned Teva as one of the companies.

165.    Accordingly, Teva was now – for the first time – reported as a potential target of criminal and civil liability.  The price of Teva securities fell immediately upon release of this article, with its ADS price plummeting 9%.

166.    The bad news did not end there.  On November 15, 2016, Teva reported its third quarter 2016 results, its first post-Actavis financial report, disclosing disappointing numbers, particularly from Teva's legacy generics business.  With revenues from Actavis removed, Teva's U.S. generics revenues declined $277 million year-over-year from the third quarter of 2015. Defendants fraudulently attributed the decline to causes such as divestments and lost sales from certain drugs.  In truth, as much as $121 million, or 44%, of the overall year-over-year decline,

was attributable to a year-over-year decline in inflated profit as the Price-Hike Strategy collapsed. This decline would, again, have been reflected in the scorecards, and the "hole" between forecasts and actual revenues long ago captured in the LBEs, and circulated to Olafsson, Desheh, and Vigodman.

167.    Olafsson, however, falsely insisted that "like previous quarters, there ***hasn't been any fundamental change in the US drug pricing***." Indeed, Olafsson doubled down when a Wells Fargo analyst expressly asked whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?" Olafsson flatly, and fraudulently, responded:  "No."  He instead claimed the number increased because of divested drugs, and thus that it was an anomaly limited to the quarter.  In reality, the increase in erosion was causing a dramatic decline in inflated profit.  A puzzled J.P. Morgan analyst pressed him, observing that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Olafsson adamantly insisted that "there hasn't again been any fundamental change" in pricing.

168.    The false statements comforted analysts otherwise troubled by the poor U.S. generic results.  Deutsche Bank reported that "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

169.    Less than three weeks later, on December 5, 2016, Teva unexpectedly announced Olafsson's "retirement." His replacement, Bhattacharjee, immediately took over as CEO, Global Generic Medicines Group.  In reality, Olafsson, only 48 years old, was fired.

170.    Analysts readily saw through the implausible reason for Olafsson's departure, concluding that he had been terminated due to the poor performance of Teva's generics division. The sudden change in performance was the materialization of the risks associated with the Price-

Hike Strategy; inflated profit suddenly dropped; law enforcement was now pursuing Teva; a price-inflated generics portfolio was increasingly susceptible to pricing pressure; and Teva could not plug the hole in its financial results with price increases.

171.    On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through the end of 2015.  The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the relevant period.

172.    The next day, December 15, 2016, the Connecticut AG announced that he and nineteen other state attorneys general had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide.

173.    In view of Olafsson's departure, on January 6, 2017, Teva provided 2017 guidance a month early, announcing a significant reduction, and surprising analysts.  Vigodman attributed the reduction to previously unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business."  Teva's legacy generics business "explain[ed] the majority of the gap."  On this news, the price of Teva securities plummeted.

174.    Vigodman concealed that the EBITDA "gap" was actually attributable largely to the collapse of Teva's Price-Hike Strategy, and the resulting steep decline in inflated profit.  In 2016, Teva had generated only as much as $420 million in inflated profit, compared to $848 million in 2015.  In each quarter of 2016, inflated profit declined at least 45% year-over-year.  In 2016, Teva made only five modest (~25%) price increases, on drugs that had already been hiked.

175.    The following chart based on the Class Action analysis reflects the year-over-year reduction in inflated profit on a quarterly basis from 2015 to 2016:

| Inflated Profits ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

176.    Vigodman, for his part, continued to fraudulently claim that Teva's profitability since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price."

177.    On February 6, 2017, Teva announced Vigodman's termination, effective immediately.   Without a permanent replacement, Teva appointed Defendant Peterburg, its Chairman of its Board since January 2015, as Interim President and CEO.  Investors reacted negatively on this news, and the price of Teva securities dropped significantly.  Once again, the reality was that Vigodman was fired – the Price-Hike Strategy had collapsed, along with all the success that Vigodman had boasted about for years.

178.    On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016 results.  Defendants disclosed that, without the Actavis revenue, Teva would have reported a $233 million year-over-year decline in quarterly U.S. generics revenues, but concealed that as much as $80 million of that year-over-year decline resulted from the decline in inflated profit.

179.    As to the full year 2016, without Actavis, Teva would have reported a year-over-year U.S. generic revenue *decline* of $1.4 billion for the full year 2016, attributed to a loss of exclusivity, lower sales of certain drugs, and the loss of revenues from divested product, when in fact as much as $427 million of the yearly decline resulted from the decline in inflated profit.

180.    Weeks later, on June 8, 2017, Teva announced the nomination of four new directors to its Board in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility.  However, by June 21, 2017, Desheh had left Teva for another job.

181.    On August 3, 2017, with Desheh, Vigodman, and Olafsson – the principal architects of Teva's Price-Hike Strategy – finally gone, and with new Board members in place, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line.

182.    In addition, after at least thirty years of maintaining its shareholder dividend, Teva announced a 75% reduction in its payout.  In reporting a dismal loss of $5.94 per share, Teva also drastically revised the guidance issued in January (which already revised the July 2016 guidance). This guidance reduction was a direct result of the complete collapse of the Price-Hike Strategy, and evaporation of the inflated profits, which by this point amounted to just $53 million per quarter, with no reason to believe that the erosion would abate.

183.    On this news, the credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded Teva to just one notch above "junk" rated debt.  The price of Teva's ADS fell dramatically.

184.    However, as the multiple government investigations and state attorneys general lawsuits intensified, Teva repeatedly made false and misleading statements and/or failed to disclose material adverse facts regarding Teva's anticompetitive practices and involvement in the collusive scheme.  For example, on August 3, 2017, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and denied "having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

185.    The truth about Teva's collusion further emerged with the publication of an article on December 9, 2018 in *The Washington Post*, which quoted statements from Connecticut Assistant AG Joseph Nielsen that the Connecticut AG's investigation had expanded to at least sixteen companies and 300 drugs.  Nielsen stated that the investigation had exposed "the largest cartel in the history of the United States." The article also noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

186.    On May 10, 2019, after the market closed, the State AGs Action was filed.  The 524-page complaint revealed previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The complaint alleged that Teva implemented over 101 significant price increases, including extraordinary price hikes of over 1,000%.  The State AGs Action disclosed details Teva's price-fixing with regards to a significant portion of those generic drugs.  The State AGs Action detailed Teva's role as a "consistent participant" and a central player in the conspiracy.  Further, the civil enforcement action named four Teva employees personally as defendants:  Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

187.    During the relevant period, Defendants made six types of false and misleading statements or omissions on conference calls with investors and in SEC filings:

- <u>Failure to Disclosure Material Tread under Item 5 of Form 20-F</u>. Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F.  Defendants failed to disclose the material trend of generating profit as part of the concealed Price-Hike Strategy.  They also concealed the trend of declining inflated profit, and that they could no longer make price increases as the strategy unraveled.

- <u>False Statements Regarding Competition</u>. These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs.  To the contrary, Teva made dozens of price increases in tandem with its competitors.  Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Pricing Statements</u>  These statements concealed Teva's Price-Hike Strategy and the profits it generated.  Later, the statements concealed that the Price-Hike Strategy fell apart as Teva was unable to make more price increases or sustain inflated profit.  These statements were particularly misleading as Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success.

- <u>False Denials Of Teva's Participation in Collusive Conduct</u>.  These statements falsely denied that Teva had participated in collusive conduct, when in reality Teva was the central actor in an industry-wide scheme to fix prices and allocate customers, and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs Action.

- <u>False Statements Regarding Actavis Acquisition</u>  These statements failed to disclose and actively concealed the negative impact resulting from the acquisition and integration of Actavis on Teva's financial results and business prospects.

## A. **Defendants Violated Their Statutory Duty to Disclose Pricing Trends**

188.    During the relevant period, Defendants were under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same disclosures as Item 303 of Regulation S-K ("Item 303").  Item 303 (and Item 5) require that a foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues or income from continuing operations.  The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

189.     According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.  Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.

190.     SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

191.     During the relevant period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs.  First, Defendants failed to disclose the trend that Teva's financial success was driven in a material way by the Price-Hike Strategy.  These price increases, as discussed, generated as much as $2.3 billion in inflated profit for Teva over the relevant period.  Yet, the Price-Hike Strategy and the inflated profits it generated were risky and unsustainable as the Price-Hike Strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

192.     Second, starting no later than the beginning of 2016, Defendants failed to disclose the by-then known trend that the Price-Hike Strategy was beginning to fail.  Teva could not maintain the inflated profits as industry-wide pricing pressure, which Defendants consistently denied, was reducing the inflated prices on Teva's generic drug portfolio.  Teva was also finding

it increasingly difficult, if not impossible, to make additional price increases because of the

scrutiny from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva

effectively could not make any price increases after the DOJ subpoena was served on June 21,

2016.

193.    SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly

perfect analogy to the facts here, requiring that:

> if a company's financial statements reflect materially lower
> revenues resulting from a decline in the volume of products sold
> when compared to a prior period, MD&A should not only identify
> the decline in sales volume, but also should analyze the reasons
> underlying the decline in sales when the reasons are also material
> and determinable.  The analysis should reveal underlying material
> causes of the matters described, including for example, if applicable,
> difficulties in the manufacturing process, a decline in the quality of
> a product, loss in competitive position and market share, or a
> combination of conditions.

194.    Instead, in violation of its duties under Item 303, Teva only disclosed trends that

did not bear on the issue of price inflation (through price increases), or price erosion.  Teva's

failure to disclose the pricing trends was particularly misleading given that (i) price increases were

a core but concealed business strategy; (ii) management concurrently denied that pricing had

impacted Teva's bottom line and that the Company made price increases simply for profit, (iii)

management consistently minimized the positive impact of price increases on Teva's profits, (iv)

management consistently denied that price increases had resulted in price inflation, and (v)

management denied that price deflation was materially affecting Teva, even as its revenues from

the former price increases cratered.

### B.    Defendants' False and Misleading Statements that Teva Operated in a Competitive Market with Respect to Price

195.    Throughout the relevant period, on conference calls and in Teva's SEC filings,

Defendants made materially false and misleading statements concerning purported "intense" or

"fierce" competition on price in the U.S. market for generic drugs. These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening access for patients to life-saving medicines.

196. Defendants' statements about supposed competition on price by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on at least 48 occasions, raised their prices in tandem, often in very large amounts of well over 100%, rather than use lower prices to increase market share. Teva would also raise the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally choose not to.

### 1.    **False Statements on Conference Calls**

197. <u>July 27, 2015 Conference Call</u>. On Teva's investor call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating:

> the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio.

198. On that same conference call, Vigodman added:

> we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. We believe in competition, and we'll do what is needed in order to win in all the markets we operate.

199.   <u>October 29, 2015 Earnings Call</u>.  On the earnings call relating to Teva's Q3 2015 financial results, Olafsson similarly falsely stated:

> So on the pricing, I think pricing is obviously based on the competition.  We have talked about that the overall pricing trend is down.

200.   <u>November 19, 2015 Conference Call</u>.  Desheh, on an additional investor conference call, again falsely stressed that Teva was fiercely competing in generics markets:

> Generic prices.  There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States … So it is a highly competitive environment with players coming from all over the world with a very fierce price competition.  The price of generic went down 50% over the past 10 years .… So we're playing a competitive game.  We're playing it fairly.  We of course play by the book and by the rule … And we are in short playing in a very competitive market.

201.   These statements were false and misleading.  Contrary to Olafsson's July 27, 2015 statement, by that time there was not "fierce competition on most of … if not all of" Teva's generic drug portfolio.  Since July 2013, Teva had made, pursuant to the Price-Hike Strategy, 94 price increases without any competitor competing on price.  Most of those price increases were made in tandem with Teva's supposed competitors.  Vigodman's July 27, 2015 statement that "we believe in competition" was also false as a result, and the fact that the Individual Defendants had adopted and participated in the Price-Hike Strategy, the success of which depended on a lack of competition.  Olafsson's October 29, 2015 declaration that "pricing is obviously based on competition" was false because, by then, the opposite was true: pricing for the drugs subject to the Price-Hike Strategy was based on a distinct lack of competition.  Desheh's November 19, 2015 statements that Teva was "playing a competitive game . . . by the rule" in the generics markets was false and misleading for all the reasons that the other statements were.  Each of these statements was particularly misleading given the importance of the concealed price increases to Teva's bottom

line, and because the profits from this concealed source were in fact the centerpiece of Teva's

supposed turn-around and its success.

### 2.    False Statements in Teva's SEC Filings

202.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015,

Defendants made substantively identical false and misleading statements (adopted by reference in

each quarterly filing) that (i) warned investors that "intense" competition was a primary risk Teva

faced in the U.S. generic drug market, and that competition would force the price of generic drugs

down, as would be expected; and (ii) described how Teva's competitive advantage was a

"competitive pricing strategy" and the ability to launch new generics:

> Our generic drugs face intense competition.  Prices of generic drugs
> typically decline, often dramatically, especially as additional
> generic pharmaceutical companies (including low-cost generic
> producers based in China and India) receive approvals and enter the
> market for a given product and competition intensifies.
> Consequently, our ability to sustain our sales and profitability on
> any given product over time is affected by the number of new
> companies selling such product and the timing of their approvals.
>
> In the United States, we are subject to intense competition in the
> generic drug market from other domestic and foreign generic drug
> manufacturers, brand-name pharmaceutical companies through
> lifecycle management initiatives, authorized generics, existing
> brand equivalents and manufacturers of therapeutically similar
> drugs.  Price competition from additional generic versions of the
> same product typically results in margin pressures.  We believe that
> our primary competitive advantages are our ability to continually
> introduce new and complex generic equivalents for brand-name
> drug products on a timely basis, our quality, our customer service
> and the breadth of our product portfolio.  We believe we have a
> focused and competitive pricing strategy.

Each of these statements was materially false and misleading because, while Defendants

represented that the U.S. generic drug market was working effectively as designed by forcing rival

generic drug manufacturers to compete for market share by underbidding each other on price, the

opposite was true.  Teva had made dozens of price increases over this time, including dozens in

tandem with competitors.  The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and a "competitive pricing strategy," were false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the Price-Hike Strategy and undertook, respectively, 34, 54, and 23 systematic increases of generic drug prices to generate billions in inflated profits, by deliberately taking advantage of markets that lacked competition.

## C.   False and Misleading Statements and Omissions Regarding Pricing

203.   Defendants made numerous statements to conceal their Price-Hike Strategy and its effects.  Those false and misleading statements fall into four general categories:

> (1)   Statements in SEC filings that attribute the year-over-year changes in Teva's generic segment profit and U.S. generic revenues to sources other than the year-over-year changes in inflated profit from price hikes, which are misleading half- truths.  Once Defendants spoke on these subjects, they had a duty to fully and accurately describe the source of Teva's profits.

> (2)   Flat denials that Teva had engaged in and derived material financial benefit from price increases.

> (3)   False claims of limited price hikes asserting that Teva only raised prices on a select few generic drugs when there was a shortage or other abnormality in the market of that drug, when in fact none of the dozens of price increases the Company made were accompanied by a shortage.

> (4)   Denials of pricing pressure even as Teva could not maintain the inflated profit from price increases or implement new price increases.

### 1.   Full Year 2013 False and Misleading Financial Disclosures

204.   On February 10, 2013, Defendants filed Teva's annual report with the SEC on Form 20-F (the "2013 20-F"), reporting Teva's full-year 2013 financial results.

205.     The 2013 20-F disclosed a year-over-year decline in generic profit of $400 million, or 20%, "primarily" attributed to:

> "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

206.     The statements were false and misleading because, while Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 34 systematic price hikes in July and August 2013, contributed materially to the results.   These price increases generated at least $250 million in inflated profit in 2013 and, without that inflated profit, Teva would have reported a $650 million year-over-year decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F.   The contribution of the inflated profit was significant, particularly in comparison to the attributed reduced sales and marketing ("S&M") expenses, which declined only $26 million compared to 2012.

## 2.     First Quarter 2014 False and Misleading Financial Disclosures

207.     On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call").   On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial statements on Form 6-K with the SEC (the "Q1 2014 6-K").

208.     The Q1 2014 6-K disclosed a year-over-year increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches":

> Teva's generics division "experienced significant growth in the
> United States market, with 17% year-over-year growth, to a total of
> $1 billion with a number of new product launches."

The statements were false and misleading because, having attributed the sources of the increases,

Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby

Teva made at least 34 systematic price hikes implemented in July and August 2013, contributed

materially to the results. The price increases generated at least $120 million in inflated profit in

Q1 2014 that accounted for all of the increase in generic profit, and nearly all of year-over-year

growth in U.S. generic revenues. The inflated profit amounted to nearly three times the $42 million

year-over-year reduction in S&M expenses.

### 3.  Second Quarter 2014 False and Misleading Financial Disclosures

209.    On July 31, 2014, Teva filed its second quarter 2014 ("Q2 2014") financial

statements on Form 6-K with the SEC ("Q2 2014 6-K), and held an investor earnings conference

call ("July 31, 2014 Earnings Call").

210.    The Q2 2014 6-K disclosed a year-over-year increase in generic segment profit of

$156 million, or 41%, "primarily" attributed to:

> "[A] significant reduction in selling and marketing expenses, higher
> revenues and higher gross profit," which was attributed to "higher
> revenues in the United States, specifically of products launched
> during the first half of 2014 and in the second half of 2013, and
> higher revenues in Canada as well as … the change in the
> composition of revenues in Europe."

On the July 31, 2014 Earnings Call, Desheh similarly attributed the "better results" in Teva's

generic segment to:

> The launches of "generic Xeloda in March and generic LOVAZA
> this quarter in the U.S. market."

The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike Strategy, whereby Teva made at least 54 systematic price hikes since July 2013, 20 of which were made in April 2014, contributed materially to the results.  These price increases generated at least $160 million in inflated profit in Q2 2014 that comprised all of the year-over-year increase in generic profit, and amounted to more than one and a half times the $101 million year-over-year reduction in S&M expenses to which Defendants attributed the generic profit increase.

**4.      Third Quarter 2014 False and Misleading Financial Disclosures**

211.     On October 30, 2014, Teva filed its third quarter 2014 ("Q3 2014") financial statements on Form 6-K with the SEC (the "Q3 2014 6-K"), and held an investor earnings conference call (the "Oct. 30, 2014 Earnings Call").

212.     The Q3 2014 6-K disclosed a year-over-year increase in generic profit of $160 million, or 40%, which was purportedly "primarily" from:

> "[H]igher gross profit and a significant reduction in selling and marketing expenses," with higher gross profit attributed to "lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues."

During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products:

> "I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir.
>
> Entecavir was a new launch for us in the quarter.  I think all these three products have been very significant contributors to the year."

The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike Strategy, whereby Teva made at least 78 systematic price hikes since July 2013, 24 of which were made in Q3 2014, contributed materially to the results.  These price increases generated at least

$193 million in inflated profit in Q3 2014, a year-over-year increase of $90 million. That year-over-year increase of as much as $90 million accounted for over half of the year-over-year increase in generic profit, and was more than the entire $81 million year-over-year reduction in S&M expenses to which Defendants attributed the generic profit increase.

213.   Oct. 30, 2014 Earnings Call.  By this time, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the Oct. 30, 2014 earnings call, the UBS analyst asked "could you talk about Generics a little bit in the U.S. … whether there were price increases in some of your base business and whether that impacted some of" Teva's financial performance?

214.   Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in inflated profit:

> I think that pricing – I've said it before, there's never a price increase on the base business as a whole.  Like any other business, if there's a pricing opportunity that comes in the market, we look for that.  But the base business itself has been eroding overall because of the consolidation of the customers.

Vigodman then explained that the market was functioning under normal conditions, *i.e.*, that prices increase only where there are shortages or market dynamics:

> When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business.  But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

Vigodman's statements were false and misleading because, far from price increases only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price- Hike Strategy. Vigodman concealed that Teva had increased prices on 78 drugs and that those concealed increases – the very subject of the UBS analyst's question – resulted in at least $720 million in inflated profit

reported since the start of the relevant period, and as much as $193 million in Q3 2014 alone, on drugs for which there were no shortages.

### 5.   December 11, 2014 False and Misleading Statements

215.   On December 11, 2014, Teva held a guidance call to discuss Teva's 2015 business outlook (the "Dec. 11, 2014 Guidance Call").  On the call, and in light of increased reports of price hikes on generic drugs, the Morgan Stanley analyst asked: "with respect to generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases?"

216.   Olafsson flatly denied even the existence of price increases, and minimized the possibility that Teva had engaged in large price increases:

> So first let me correct.  I have to disagree that they have experienced tremendous price increase.  I think, overall, the pricing in the U.S. of generics has been flat to a slight down.  There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

The statements were false and misleading because, in responding to a direct question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 78 systematic price hikes since July 2013, with 44 in 2014, contributed materially to the results.  Far from a limited issue involving "a few products," by Q3 2014, Teva's dozens of increases generated a total of at least $720 million in pure profit, which would increase to as much as $943 million by the end of 2014.  Olafsson's statement that pricing had been "flat to a slight down" across the U.S. generics market concealed the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit from drastic price increases on generics drugs.

**6.    Fourth Quarter and Full Year 2014 False and Misleading Financial Disclosures**

217.    On February 5, 2015, Teva filed a press release with the SEC that reported the Company's fourth quarter 2014 ("Q4 2014") and full year 2014 ("FY 2014") financial results (the "Q4 2014 Press Release").  Also that day, Teva filed its 2014 20-F with the SEC (the "2014 20-F") reporting the Company's FY 2014 financial results, and held an investor earnings conference call (the "Feb. 5, 2015 Earnings Call").  The false statements in the 2014 20-F were also incorporated by reference into the shelf registration statement on Form F-3 that Teva filed with the SEC on November 30, 2015 and the Post-Effective Amendment No. 1 to its shelf registration statement on the Form F-3 that Teva filed with the SEC on July 13, 2016 (the "ADS/Preferred Registration Statement") that Vigodman, Desheh, and Griffin signed, the final prospectus supplement relating to ADSs filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 (the "ADS Final Prospectus"), and the final prospectus supplement relating to preferred shares filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 (the "Preferred Final Prospectus").

218.    *Q4 2014 Press Release*.  The Q4 2014 Press Release disclosed a year-over-year increase in generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and lower R&D expenses." The statement was false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 78 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results.  These price increases generated at least $219 million in inflated profit in Q4 2014, a year-over-year increase of as much as $72 million.  That $72 million year-over-year increase accounted for the entire year-over-year increase in generic profit.  In contrast, Defendants attributed the increased generic profit to a $113

million year-over-year reduction in S&M expenses, and an $8 million year-over-year reduction in R&D expenses.

219.   2014 20-F.  The 2014 20-F disclosed a year-over-year increase in generic profit of $480 million, or 29%, attributed to:

> "lower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties."

The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 78 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results.  These price increases generated at least $693 million in inflated profit in 2014, a year-over-year increase of as much as $443 million, which increase accounted for nearly the entire year-over-year increase in generic profit, and was more than the entire $337 million reduction in S&M expenses to which Defendants attributed the increase in generic profit.

220.   The table below reflects Teva's improved profits as reported in 2014, as well as the year-over-year change in inflated profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported year-over-year change in generics profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) year-over-year change in inflated profit | $120 | $160 | $90 | $72 | $443 |

**7.      First Quarter 2015 False and Misleading Financial Disclosures**

221.     On April 30, 2015, Teva filed its first quarter 2015 ("Q1 2015") financial statements on a Form 6-K with the SEC (the "Q1 2015 6-K"), and held an investor earnings conference call (the "April 30, 2015 Earnings Call").   The false statements in the Q1 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

222.     The Q1 2015 6-K disclosed a year-over-year increase in generic profit of $296 million, or 59%, attributed "primarily" to:

> "higher gross profit and lower selling and marketing expenses as well as lower research and development expenses," with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business."

On the April 30, 2015 Earnings Call, Olafsson similarly concealed the impact of the Price-Hike Strategy when discussing the sources of the improvements in generic profitability since the beginning of 2014.  On the call, the Bank of America analyst asked, "[H]ow much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?" Olafsson claimed that the "1,000 basis points improvement over a two years period" in "operating profit in the generic segment" was attributable to:

> [P]robably three or four things.   First of all, … significant improvement in our cost of goods… the next thing is the portfolio offering … [including] exclusive complex generics of offering … [as] when we have more of the launches, it will drive up the market. The third thing is the cost infrastructure.

The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike Strategy, whereby Teva made at least 94 systematic price hikes since July 2013, 16 of which were

made in January 2015, contributed materially to the results. These price increases generated as much as $228 million in inflated profit in Q1 2015, a year-over-year increase of as much as $108 million, which increase accounted for over a third of the year-over-year increase in generic profit. The inflated profit increase also amounted to more than double the $43 million year-over-year reduction in S&M expenses, and nine times the $12 million year-over-year reduction in R&D expenses, to which Defendants attributed the increased generic profit. Olafsson's statements on the call were also misleading because they concealed that the Price-Hike Strategy was a fundamental part of Teva's improvement. By the end of Q1 2015, Teva had generated as much as $1.1 billion in inflated profit on the price increases since July 2013.

### 8.   June 11, 2015 False and Misleading Statements

223.   As investors, analysts, and Defendants were focused on Teva's outstanding offer to acquire Mylan, during a June 11, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to "[t]he execution of the cost reduction program: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement.… So everything that was done during 2014 was based on organic … moves only."

The statements were false and misleading because, having attributed the source of the profit increase, Vigodman had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 94 systematic price hikes since July 2013, which generated over $1.1 billion in inflated profit by the close of Q1 2015, contributed materially to the results. Strikingly, the excess profit of as much as $1.1 billion generated by the price increases accounted for all of the improved operating profit that Vigodman touted.

9.     **Second Quarter 2015 False and Misleading Financial Disclosures**

224.     On July 30, 2015, Teva filed its second quarter 2015 ("Q2 2015") financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K"), and held an investor earnings call regarding the financial results and the Actavis transaction (the "July 30, 2015 Earnings Call"). The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

225.     The Q2 2015 6-K disclosed a year-over-year increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> "[H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike Strategy, whereby Teva made at least 94 systematic price hikes since July 2013, contributed materially to the results. These price increases generated $236 million in inflated profit in Q2 2015, a year-over-year increase of $76 million, which increase accounted for 39% of the year-over-year increase in generic profit, and amounted to over one and a half times the $53 million year-over-year reduction in S&M expenses to which Defendants attributed the increased generic profit.

10.     **Third Quarter 2015 False and Misleading Financial Disclosures**

226.     On October 29, 2015, Teva filed its third quarter 2015 ("Q3 2015") financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K"), and held its October 29, 2015

Earnings Call.  The false statements in the Q3 2015 6-K are also incorporated by reference into the

ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final

Prospectus and the Preferred Final Prospectus.

227.    The Q3 2015 6-K disclosed a year-over-year increase in generic profit of $20

million, or 4%, attributed "primarily" to:

> "[L]ower selling and marketing expenses, partially offset by lower
> gross profit," which in turn was partially offset "by higher gross
> profit of our API business."

The statements were false and misleading because, having attributed the source of the profit

increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike

Strategy, whereby Teva made at least 101 systematic price hikes since July 2013, seven of which

had been implemented in July 2015, contributed materially to the results.  These price increases

generated as much as $218 million in inflated profit in Q3 2015, a year-over-year increase of $25

million, which accounted for all the year-over-year increase in generic profit.

228.    During the Oct. 29, 2015 Earnings Call, Vigodman disavowed that any of the

improvement in Teva's results over the previous years were driven by generic pricing:

> We're very – and are very responsible in everything that portends to
> prices on the Generics side and on the Specialty side.  And I would
> even put it another way, all the improvement you see in our – in
> margins is not driven by price.  It is driven by quantities and by mix
> and by efficiency measures.  Not by price, 2014, 2015, and that's a
> very important message.

The statements were false and misleading because, by this time, Teva had increased prices on at

least 101 drugs since July 2013 as part of its Price-Hike Strategy, often by well over 100%,

generating over $1.6 billion in inflated profit over that time, including as much as $690 million in

2014 and as much as $680 million in the first three quarter of 2015 alone.  Thus, the inflated profit

contributed significantly to improving Teva's generic profit margin, as that inflated profit was

devoid of any material corresponding costs, directly contradicting Vigodman's statements.

229.    In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

The statements were false and misleading because, by this time, Teva had made at least 101 systematic price hikes, seven of which Teva implemented on July 29, 2015, and many of which were increased by more than 100%. The more-than 60 drugs subject to these price increases made up more than 22% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like a shortage or an increase in demand. By the end of Q3 2015, Defendants' Price-Hike Strategy had generated over $1.6 billion in inflated profit.

### 11.    November 19, 2015 False and Misleading Statements

230.    On November 19, 2015, Jefferies held a conference, at which Desheh was pressed by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2 months, pricing and specialty pharmacy. Could you just give us your 20,000 foot view on pricing, is it an issue? Your particular products, where do you go on pricing?"

231.     Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues.  Some of it's coming from politicians who are driving agenda, which is very, very legitimate.  Our exposure to all these things is very minimal ....  And Teva was not associated with any of that.  So we're playing a competitive game.  We're playing it fairly.  We of course play by the book and by the rule.  And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have.

This statement was false and misleading because Teva was critically dependent on inflated profit from price increases, and the ability to make additional price increases to increase profits, to fill any holes in its financial projections.  Thus, Defendants' Price-Hike Strategy was greatly exposed to any initiative that addressed generic drug pricing, such as those which would grant Medicare the ability to negotiate prices, which could lead to price deflation.  Without the benefit of the Price-Hike Strategy, Teva could not generate additional inflated profit or fill financial holes, while Teva's past practice of generating massive profits through inflated prices left it very exposed to any efforts that would cause price deflation of those already-increased drugs.  Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue.

### 12.     Teva's Registration Documents for Its Secondary ADS and Preferred Share Offerings Contained False and Misleading Statements

232.     On November 30, 2015, Teva filed the ADS/Preferred Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin, with the SEC as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred

Shares ("Preferred Shares") to the public.  On December 3, 2015, Teva filed the ADS Final

Prospectus and the Preferred Final Prospectus.

233.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the

Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015

6-K, and Q3 2015 6-K.  The incorporated 2014 20-F and Q1, Q2, and Q3 2015 6-Ks contained

false and misleading financial disclosures, as discussed above.

### 13.    January 11, 2016 False and Misleading Statements

234.    At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked

Olafsson:  "McKesson this morning announced some maybe challenging pricing on the generics

side or an expectation of that going forward.  Could you just comment a little bit on how you see

generic pricing as we look out not just this year but in the future and how Teva is able to navigate

the current environment?"

235.    In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk
> about inflations in generic pricing.  But what we see is there's –
> overall on our total portfolio of 270 products, there is a slight
> decrease in pricing.  It's low single digit, but year on year we see a
> low single-digit decrease because on 95% of our portfolio, we
> experience price decline.  And then on 5%, we might be flat or a
> slight increase.  So, overall, we see that in the business.  There's a
> lot of headlines of examples of big price increases in generics.  But
> when you are a company of the size of Teva and you have the
> portfolio that we have today – as I said, 270 products for the whole
> of the portfolio – there is a decline.

The statements were false and misleading because they minimized the impact of price increases –

which by the end of Q3 2015 had generated as much as $1.7 billion in inflated profit – on Teva's

bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its

competitors and wholesalers were already reporting.  By this time, Teva had increased the prices

of at least 60 of its generic drugs, many of which were increased by more than 100%.  These drugs

made up at least 22% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase." The context is particularly important because McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva.

### 14. Fourth Quarter and Full Year 2015 False and Misleading Financial Disclosures

236.   On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release").  The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F") reporting the Company's FY 2015 financial results, and held an investor earnings conference call (the "Feb. 11, 2016 Earnings Call") The false statements in the 2015 20-F are also incorporated by reference into the Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 (the "Notes Registration Statement") that Vigodman, Desheh, and Griffin signed, and the prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 (the "Notes Final Prospectus").

237.   Q4 2015 Press Release.  The Q4 2015 Press Release disclosed a year-over-year increase in generic profit of $7 million, or 1%, attributed "primarily" to:

> "[T]he reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

238.   The statements were false and misleading because Defendants explained that profits were offset by reduced sales, while they had a duty to disclose but concealed the full truth that inflated profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24%.  This decline occurred because the Price-Hike Strategy was

unsustainable and under increasing investigation by governmental agents and, thus, Teva's ability

to make further increases was reduced.

239.   <u>2015 20-F</u>.  The 2015 20-F disclosed a year-over-year increase in generic profit of

$500 million, or 24%, attributed "primarily" to:

> "[L]ower S&M expenses and higher gross profit," which was
> purportedly "mainly a result of higher revenues from new products
> launched in the United States during 2015, lower other production
> expenses and higher gross profit from API sales to third parties."

The statements were false and misleading because, having attributed the source of the profit

increase, Defendants had a duty to disclose but concealed the full truth that the Price- Hike

Strategy, whereby Teva made at least 101 systematic price hikes since July 2013, contributed

materially to the results.  The price increases generated as much as $848 million in inflated profit

in 2015, a year-over-year increase of $155 million that amounted to 31% of the year-over-year

increase in generic profit.

240.   The table below reflects Teva's improved profits as reported in 2015, as well as the

year-over-year change in inflated profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported year-over-year change in generics profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) year-over-year change in inflated profit | $108 | $76 | $25 | -$53 | $155 |

241.   <u>Feb. 11, 2016 Earnings Call</u>.  In his opening statements, Olafsson touted "2015 was

a very good year for Teva Generics," while explicitly denying that pricing had played ***any*** role in

that supposed success, stating:

> We continued improving the operating profit of the generic
> business, coming from $1.68 billion operating profit in 2013, or
> 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of

> revenue.  This is $1 billion improvement in operating profit over 24
> months period.  So how did we do this? Not by pricing but by
> portfolio mix, new products, and efficiency measures.

The statements are false and misleading because they are directly contradicted by the empirical

data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in inflated profit

from price increases – more than the $1 billion improvement touted by Olafsson.

242.     Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's

participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing.  As I've previously stated, we and the generic
> industry overall don't see price inflation of generics as it sometimes
> is portrayed in the media.  On the contrary, for 2015, we saw a mid-
> single-digit price decline for the overall business.

The statements are false and misleading because Teva had taken at least 101 price increases since

July 2013, many for over 100% or more.  The inflated profit from the increases implemented as

part of Defendants' Price-Hike Strategy was a necessary foundation of Teva's purported financial

success over that time.

243.     Olafsson denied that Teva was seeing any change in its pricing environment:

> In the US, our largest market, we saw approximately 4%  price
> erosion…. We expect to see the same in 2016.  Nothing today points
> to a significant change in the generic pricing environment.

A Guggenheim Securities analyst asked: "some of your competitors have talked about pricing

pressure in the generics business during the quarter.  Curious if you saw that, and if so what might

be driving that." Olafsson responded:

> As I mentioned in the beginning, we didn't see anything change in
> fourth quarter.  We saw approximately 4% pricing pressure or price
> decline in the US business over 2015 flat over the year.

The slides Olafsson presented during the call echoed these statements:

> Also do not see the sharp drop in prices other competitors have seen
> recently[;] Mid-single digit decrease in 2015[.]

The statements were false and misleading because, while Defendants claimed not to have seen any changes in the pricing environment, (i) internally, Teva's profits from price increases had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (ii) Teva was increasingly unable to implement further price increases, as it had in the past.

### 15.    March 8, 2016 False and Misleading Statements

244.    During a March 8, 2016 Cowen conference, Olafsson touted the increased profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period. Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

The statements were false and misleading because, once Olafsson chose to speak on this subject and having attributed the source of the profit increase, Olafsson had a duty to disclose but concealed the full truth that Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic drugs from 2013 through 2015, pursuant to the Price-Hike Strategy; far more than the $1.1 billion in improved generic profit touted by Olafsson.

245.    Later on the call, a Cowen analyst asked Olafsson: "Can you discuss what you're seeing," in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?" In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015.… I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing. But we never saw that…. [I]nflation never really happened in the generic business.…

> I don't see any big changes in the pricing environment. It's relatively
> stable. 4% is worse than maybe two years ago. But it's similar to
> what we saw in 2014.

The statements were false and misleading because the truth was that the Price-Hike Strategy, whereby Teva had inflated the prices on at least 60 base-business generic drugs from July 2013 through Q1 2016, had generated well over $1.7 billion in inflated profit from the beginning of the relevant period through the end of 2015. The inflated profit generated by the Price-Hike Strategy, however, had drastically fallen. Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 54 price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

### 16.    First Quarter 2016 False and Misleading Financial Disclosures

246.    On May 9, 2016, Teva filed its first quarter 2016 ("Q1 2016") financial statements on Form 6-K with the SEC (the "Q1 2016 6-K"), and held an investor earnings call (the "May 9, 2016 Earnings Call") (collectively, May 9, 2016 Statements"). The false statements in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

247.    Q1 2016 6-K. The Q1 2016 6-K disclosed a year-over-year decline in generic profit of $215 million, or 27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while lower
> gross profit was purportedly "mainly a result of lower sales of high
> gross profit products in the United States, higher production
> expenses and lower gross profit in our European markets.

The statements were false and misleading because, having attributed the source of the profit decline, Defendants had a duty to disclose but concealed the full truth that inflated profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%. That year-over-year decline in inflated profit comprised as much as 48% of the year-over-

year decline in generic segment profit, and was more than four times the $25 million year-over-year increase in R&D expenses to which Defendants attributed the results.  It further concealed that the Price-Hike Strategy was unsustainable, as the inflated profit was drastically declining, and Teva was increasingly unable to make more hikes.

248.   May 9, 2016 Earnings Call.  In his opening remarks, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

The statements were false and misleading because they excluded entirely the decline in Teva's inflated profit from the unsustainable Price-Hike Strategy, including the steep decline of $42 million in inflated profit from Q4 2015 to Q1 2016, and the $104 million year-over-year decline compared to Q1 2015.  That year-over-year decline comprised 48% of the decline in year-over-year generic profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that Defendants could no longer maintain the inflated profit generated by the increases implemented since July 2013, nor could they make further price increases.

249.   Also on that call, Olafsson, while asserting he would "do my best to provide you with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.  Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.… From where I sit today, there is nothing that changes my mind about that.  Nothing has happened in the last two quarters that has changed the pricing environment.  What this boils down to is each individual company's business model…

The slides presented by Olafsson during the conference call echoed Olafsson's statements:

> "What has changed in the US pricing environment since Q4 2015?
> The short answer is…nothing[.]… There is no change in the pricing
> environment[.] It all comes down to each company's business
> model…. Why is Teva generics performance better than most Gx
> companies? Portfolio optimization …. [and] [n]ew products…."

The statements were false and misleading because, far from not seeing "any fundamental change
or worsening in the pricing environment," Teva's Price-Hike Strategy of generating billions in
profits from price increases was collapsing. In Q3 2015 Teva earned as much as $218 million in
inflated profit from price increases, while in Q1 2016 it earned $124 million; and while, in 2015,
Teva made 23 price increases on generic drugs, in 2016 it would implement only five, all of which
were on prices of drugs which had previously been increased.

250.    During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons
why Teva's generics division had achieved success over several years, and thus was differently
positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business,
> solidify our foundation, increase our profitability, and to better
> position us to generate sustainable long-term growth. These many
> steps have included portfolio optimization, strengthening our
> capabilities in R&D, and manufacturing of complex products,
> regaining a leading position in submission on first-to-files,
> enhancing our go-to-market, and sales force effectiveness
> capabilities, and much, much more. These are the very capabilities
> that companies must possess in order to thrive at the global level.
> We have created a unique and differentiated platform, positioned to
> extract significant value in the global growing generic space.

The statements were false and misleading because, while attributing Teva's supposed past success
to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated
as much as $1.9 billion in inflated profit from price hikes reported since the start of the relevant
period. The inflated profit, however, had begun to dry up due to the unsustainability of the Price-
Hike Strategy, and the materialization of the risks concealed by Defendants – recently reported by
Teva's competitors – namely the risk of increased pricing pressure due to increased public,

Congressional, and regulatory scrutiny of generic drug price increases, which would result in

increased competition and the inability to take further price increases.

> **17.** **False and Misleading Statements on Conference Calls in the Build-Up to the $20 Billion Debt Offering**

251.    On May 10, 2016, Olafsson participated in a Bank of America conference, and

claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing environment.  We saw a price erosion in the US last year of approximately 4%. …
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be.  There is nothing that has happened over the last two quarters which has changed fundamental the market.  And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst question

regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent.  Our message was conveyed, and we will continue to convey.  What we see is a 4% to 5% erosion.  That's what we see.  That's not something which is different from what we said during 2015.  By the way, we continue saying it in 2016.  I think our results in Q1 demonstrated that.

Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a

similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed.  When we signed that deal in July, we talked about 4% price erosion in the US generic business.  And we are still talking about the same number, what we see in the base business.

The statements were false and misleading because Teva was experiencing a drastic decline in

inflated profit from price increases, the inability to make additional price increases, and, in the past

two quarters, the acceleration of the deterioration of the pricing environment. Thus, the Price-Hike Strategy was proving to be unsustainable, with inflated profit declining by $104 million in Q1 2016 as compared to Q1 2015, as the risks concealed by Defendants' strategy began to materialize, namely increased pricing pressure and the inability to take further price increases due to increased public, legislative, and regulatory scrutiny of generic drug price increases, which resulted in increased competition.

### 18.    False July 13, 2016 Guidance Assumption

252.    In a July 13, 2016 call held by Defendants to announce the acceleration of Teva's debt offering (the "Notes Offering"), to the end of July, which, on the May 9, 2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup analyst asked about pricing: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace."

253.    In response Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.… In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.… Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

These statements were false and misleading at the time because Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year." In truth, Teva was at that time experiencing a drastic decline in inflated profit from price increases, the inability to make additional price increases, and, over the past year, the acceleration of the deterioration of the pricing environment. Teva generated $10 million less in inflated profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less inflated profit in the second quarter 2016 than it had in the second quarter of 2015. In the first two quarters of 2015, Teva made as much as $464 million in inflated profit. In the first two quarters of 2016, Teva made $238 million. In the first half of 2015, Teva had made 16 price increases. In the first half of 2016, Teva only made five, generating less than $12 million by the end of the relevant period.

## 19.   The False and Misleading Registration Statement and Prospectus

254.    On July 13, 2016, Teva filed with the SEC the Notes Registration Statement, which was signed by Vigodman, Desheh, and Griffin. On July 19, 2016, Teva filed with the SEC the Notes Final Prospectus. The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The incorporated 2015 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as described above.

## 20.   Second Quarter 2016 False and Misleading Financial Disclosures

255.    On August 4, 2016, Teva filed its second quarter 2016 ("Q2 2016") financial statements on Form 6-K with the SEC (the "Q2 2016 6-K"), and held an investor earnings conference call (the "Aug. 4, 2016 Earnings Call").

256.    The Q2 2016 6-K disclosed a year-over-year decline in generic profit of $115 million, or 16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was purportedly "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses…"

During the Aug. 4, 2016 Earnings Call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in inflated profit:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

The statements were false and misleading because, having attributed the source of the profit decline, Defendants had a duty to disclose but concealed the full truth that inflated profit declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decline of $122 million or 52%. That year-over-year decline in inflated profit comprised nearly all of the year-over-year decline in generic profit. The statements further concealed that the Price-Hike Strategy was unsustainable, as the inflated profit was drastically declining, and Teva was increasingly unable to implement further hikes.

257. Also during that call, and in response to a Citigroup analyst's inquiry regarding pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.

Olafsson then reiterated the same false and misleading sentiment later in the call:

> So overall, the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US.

The statements were false and misleading because, in Q2 2016, Teva suffered a $122 million year-over-year reduction in inflated profit from price increases compared to Q2 2015, and Teva was

increasingly unable to implement further price hikes, implementing only five, immaterial increases during 2016, compared to 21 in 2015, and 32 in 2014, during the height of the strategy.

258.    In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market.  If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out.  But overall, the size, and being a combined company doesn't play into that.

These statements were false and misleading because they minimized Teva's Price-Hike Strategy when, in reality, Teva took 101 price increases on over 60 drugs, most of which were for 100% or more, that were not associated with any such shortage or dysfunction.  This left Teva very exposed to the pricing pressure facing the industry at the time.

### 21.    In the Third Quarter 2016, Defendants Continue to Deny Price Inflation and Increased Pricing Pressure in Statements to Investors

259.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?" Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there…. [Y]ou don't see -- there you don't see the erosion. Where we see erosion is … [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down.  But when we look at the base, there's no – there's no pressure on prices.

On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure:

> Price erosion is nothing new[.]… Diverse portfolio and competitive
> cost structure allows for long-term value creation.

The statements were false and misleading because, while Desheh claimed that Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in inflated profit and the inability to implement further hikes due to increased pricing pressure that was itself the materialization of the risks concealed by Defendants. Most recently, in Q2 2016, Teva suffered a massive $122 million year-over-year reduction in inflated profit from price increases compared to Q2 2015, and Teva implemented only five immaterial hikes in 2016, compared to 23 in 2015, and 54 in 2014, demonstrating the unsustainability of the Price-Hike Strategy.

260.    During the September 9, 2016 call, Olafsson categorically denied Teva had increased prices on its generic drugs:  "There is no inflation in the generic pricing, which I will talk about."  Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:

> [S]o first of all, we need to differentiate generics from branded
> pricing.  And people that say that the generic – there's a big generic
> price inflation, are simply wrong.

Olafsson even claimed that Teva had a "*secret sauce*" that immunized the Company from price fluctuations.  These statements were false and misleading because each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on over 60 drugs or 22% of its portfolio; (ii) the importance of the inflated profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a

dramatic drop in inflated profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by Defendants.

261.    During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases.  Simply, it doesn't work like that in generics.  When price increases are taken, there's some kind of abnormality in the business.  There are shortages.

The statements were false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation.  The truth was that Teva had raised the prices of over 60 drugs, or 22% of its portfolio, via 101 price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

## 22.    Third Quarter 2016 False and Misleading Financial Disclosures

262.    On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K"), and held an investor earnings conference call (the "Nov. 15, 2016 Earnings Call").

263.    The Q3 2016 6-K disclosed a year-over-year increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis.  But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a year-over-year decline of $277 million, or 27%.  In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

The statements were false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, Defendants had a duty to disclose but concealed the full truth that inflated profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%. That year-over-year decline in inflated profit comprised as much as 44% of the year-over-year decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. It further concealed that the Price-Hike Strategy was unsustainable, as the inflated profit was drastically declining, and Teva was increasingly unable to implement further hikes.

264.    During the Nov. 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen throughout the market. Olafsson reiterated:

> [W]here I sit here today, experiencing the market, there hasn't again been any fundamental change.

The statements were materially false and misleading because Teva was in fact experiencing a sustained and material decline in the pricing environment, particularly with regard to the drugs whose price Teva had previously raised pursuant to the Price-Hike Strategy, in direct contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on the matter, in

the face of contrary empirical evidence that Teva had inflated prices on over 60 drugs, profited by as much as over $2.1 billion since the start of the relevant period, and was now suffering from drastic year-over-year reductions in inflated profit generated from those price hikes and an inability to implement more, were particularly misleading.

265.    During the same Nov. 15, 2016 Earnings Call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it.  What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio.  So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market.  It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

The statements were false and misleading because the inflated profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a year-over-year reduction of $121 million, or 56%.  The sharp decline in inflated profit was a result of the materialization of the risks that Defendants concealed as they implemented their Price-Hike Strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes.  Those were not single-quarter issues related to divested products, as suggested by Olafsson, but a long-term trend with no end in sight.

### 23.      The 2017 Guidance Call

266.     During a December 8, 2016 Citi Global Healthcare Conference, Vigodman

announced that Teva would provide 2017 guidance early in January 2017.   During the call,

Vigodman claimed Teva's past success was not due to inflated profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to
> increase the profitability of our generics business.  In the first three
> years of this great effort, we have been able to improve significantly
> the margins of Teva's standalone generics business.  This has been
> accomplished with a strong emphasis on the cost of goods sold,
> product mix, and the overall cost structure.

The statement was false and misleading because, having attributed the source of the profitability

increases, Vigodman had a duty to disclose but concealed that the Price-Hike Strategy, whereby

Teva made at least 106 systematic price hikes since July 2013, many of which were in excess of

100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the relevant

period through the end of 2016.

### 24.      Fourth Quarter and Full Year 2016 False and Misleading Financial Disclosures

267.     On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press

Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY

2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017 Earnings

Call").   Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended

December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial

results (collectively, the "Q4 and FY 2016 Statements").

268.     2016 20-F.   The 2016 20-F disclosed a year-over-year decline in U.S. generic

revenues of $200 million, or 5%.   When removing the impact of Actavis' $1.168 billion in U.S.

generic revenues, Teva's U.S. generic revenues from its legacy business suffered a year-over-year

decline of $1.4 billion, or 29%.   Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole …
> and aripiprazole …, a decline in the sales of budesonide … due to
> increased competition, loss of revenues following our divestment of
> certain products in connection with the Actavis Generics acquisition
> and the decline in sales of capecitabine."

The statements were false and misleading because, having attributed the source of the increased

revenues, Defendants had a duty to disclose but concealed the full truth that inflated profit declined

from as much as $848 million in 2015 to $421 million in 2016, a decline of $427 million or 50%.

That year-over-year decline in inflated profit comprised 31% of the year-over-year decline in U.S.

generic revenue from Teva's legacy business, excluding the impact of Actavis.  Even giving Teva

the benefit of Actavis' 2016 revenues, the year-over-year decline in inflated profit was more than

double the $200 million year-over-year decline in U.S. generic revenues.  It further concealed that

the Price-Hike Strategy was unsustainable, as inflated profit was drastically declining, and Teva

was unable to implement more hikes.

> **D.** **False and Misleading Denials of Teva's Participation in Collusive Conduct**

269.    Teva repeatedly, and falsely, denied its participation in collusive conduct.

270.    In Teva's August 3, 2017 Form 6-K filed with the SEC ("Q2 2017 6-K"), Teva

described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas,

and the antitrust action filed by many state attorneys general against Teva and other generics

manufacturers, and fraudulently stated that "Teva denies having engaged in any conduct that

would give rise to liability with respect to the above-mentioned subpoenas and civil suits."  Teva

made materially identical false and misleading statements in each of its periodic reports filed with

the SEC between August 3, 2017, and May 10, 2019, including:  Teva's Form 6-K filed on

November 2, 2017 ("3Q 2017 6-K"); Teva's Form 10-K for the year ended December 31, 2017,

filed on February 12, 2018 ("2017 10-K"); Teva's Form 10-Q for the period ended March 31,

2018, filed on May 3, 2018 ("1Q 2018 10-Q"); Teva's Form 10-Q for the period ended June 30, 2018, filed on August 2, 2018 ("2Q 2018 10-Q"); Teva's Form 10-Q for the period ended September 30, 2018, filed on November 1, 2018 ("3Q 2018 10-Q"); and Teva's Form 10-K for the year ended December 31, 2018, filed on February 19, 2019 ("2018 10-K").

271.    Further, on October 31, 2017, in response to media reports issued after the State AGs filed a proposed amendment expanding their first antitrust complaint, a Teva spokeswoman stated to Courthouse News that "Teva denies these allegations and will continue to defend itself vigorously in court." The Company further stated that "[i]n accordance with our values, Teva is committed to complying with all applicable competition laws and regulations.  To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by them."

272.    Teva issued further denials in a December 19, 2018 statement to *Business Insider*, in which Teva denied the State AGs' allegations and said it "will continue to vigorously defend itself." On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to shareholders." Teva added that it is "committed to complying with all applicable laws and regulations and is dedicated to conducting business with integrity and fairness.  Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories." On February 19, 2019, in response to media reports discussing an unredacted version of the first State AG complaint that had recently been made public, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

273.    In addition, each of the reports Teva filed with the SEC on Forms 10-Q and 10-K throughout the relevant period contained certifications pursuant to Section 302 of the Sarbanes-

Oxley Act of 2002 ("SOX Certifications") signed by Defendants Schultz and McClellan, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

274.    These statements were false and misleading because, as alleged specifically and independently herein, Teva had in fact engaged in the collusive conduct alleged by the states attorneys general.  Teva was not merely a participant, but the central actor in an industry-wide scheme to fix prices and allocate customers; and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs Action.

### E.    False and Misleading Statements Regarding Actavis Acquisition

275.    Teva's Q3 2016 6-K asserted that the Actavis acquisition "had a significant impact on our generic medicines segment, expanding our product portfolio, R&D capabilities, product pipeline, and global operational network."

276.    In the press release announcing the Q3 2016 results, Defendant Vigodman stated:

> This has been a year of transition for Teva, underscored this quarter by the close of our strategic acquisition of Actavis Generics, which had significant contribution to our results.  Actavis will continue to contribute in a meaningful way to the future growth of our generics business through the strengthened R&D capabilities and complementary pipeline and portfolio, and enhance our leadership in an increasingly evolving industry.

277.    During the Nov. 15, 2016, earnings call the same day, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Vigodman:] The completion of the Actavis acquisition strengthens and broadens our R&D capabilities, and highly complements our product pipeline, product portfolio, geographical footprint and operational network.  It enhances Teva's leadership in an evolving competitive landscape and massive consolidation across our

customer base.  In addition, our integration plans with the Actavis generics business are on track.

\*      \*      \*

[Olafsson:] On August 2, we completed the strategic acquisition of Actavis generics.  The result is a much stronger, more competitive Teva that is best positioned to thrive in an evolving global generics marketplace.

278.    In response to a question about the Actavis transaction, Defendant Olafsson stated:

The closing of the Actavis transaction has gone very smoothly since day one with no operational disrupter.  While we were disappointed at the delays with antitrust review, the time allows the integration teams at Teva and Actavis Generics to work diligently to plan for integration of the two companies in order to ensure that combined company would be fully operational immediately as on closing of the transaction.  As a result, Teva was able to begin capitalizing immediately on the benefits offered by the acquisition of Actavis Generics.  This included optimizing our R&D activities, harmonizing our customer contracts and relationships, and realizing economies of scale with our purchase.

279.    On December 5, 2016, Teva filed a report on Form 6-K with the SEC, which appended a press release containing the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

Erez Vigodman, Teva's President and [CEO stated:] . . .  "As we continue to focus on integrating and realizing the value of the Actavis Generics transaction, which is progressing according to plan, Dipankar and his team will focus on generating organic growth through new launches and replenishing the pipe line through our industry-leading R&D, and drive efficiencies across the generics organization . . . ."

. . . [Dipankar] Bhattacharjee[, Teva's President and CEO, Global Generic Medicines Group stated:] "With the integration of Actavis proceeding on schedule and the complementary U.S. distribution capabilities provided by our recent acquisition of Anda, we have a matchless opportunity to add value in the U.S. healthcare system, and in the fast-changing global generics marketplace."

280.     On February 13, 2017, Teva filed with the SEC the Q4 2016 Press Release.  In the

Feb. 13, 2017 Earnings Call held the same day, Defendants Peterburg and Desheh made the

following false and misleading statements concerning the financial impact of the Actavis

acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] The Company's priorities continue to be extracting all
> synergies related to the Actavis generic acquisition, successfully
> launching the key generic and specialty products we have planned
> for 2017, and generating significant cash flow to rapidly pay down
> our existing debt to maintain a strong balance sheet.
>
> We are reiterating our guidance for 2017, including our earnings per
> share of $4.90 to $5.30.  We are very committed to this EPS range,
> and the management team and I will do what it takes to protect it,
> including additional cost reduction if necessary.
>
> *        *        *
>
> [Desheh :] The increase in our operating profit was driven mainly
> by our generic business, following the closing of the Actavis
> transaction.
>
> *        *        *
>
> Total sales were $93 billion, with significant growth in goodwill and
> intangible assets, resulting from the progress made on the Actavis
> acquisition versus price allocation.

281.     On February 15, 2017, Teva filed the 2016 20-F.  In the 2016 20-F, Teva made the

following false and misleading statements concerning the financial impact of the Actavis

acquisition and integration on the Company's business prospects and reported financials:

> In August 2016, we completed the Actavis Generics acquisition.
> Our strong legacy generics business, combined with the Actavis
> Generics business, has a world-leading product portfolio,
> comprehensive R&D capabilities, robust product pipeline and an
> efficient global operational network.   The combined generic
> business has a wide-reaching commercial presence, as the market
> leader in the United States and a top three leadership position in over
> 40 countries, including some of our key European markets.   The
> combined business benefits from a leading and diverse pipeline of
> products, which will help us continue executing key generic

launches and further expand our product pipeline, focusing on both large and small opportunities.  We expect that a larger number of smaller but more durable launches will help offset expected price erosion while diversifying our revenue stream.

\*          \*          \*

In August 2016, we completed our acquisition of Allergan plc's worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, we paid Allergan consideration of approximately \$33.4 billion in cash and approximately 100.3 million Teva shares.  The acquisition significantly expanded our generics product portfolio and pipeline, R&D capabilities and global operational network.

\*          \*          \*

Significant highlights of 2016 included:

- In August 2016, we completed our acquisition of Actavis Generics.  The acquisition had a significant impact on our generic medicines segment, expanding our product portfolio and pipeline, R&D capabilities and global operational network.

282.    The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Peterburg and Desheh, stating that the financial information contained in the 2016 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

283.    On May 11, 2017, Teva filed a report on Form 6-K with the SEC reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 6-K").

284.    In the Q1 2017 6-K, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

On August 2, 2016, Teva consummated its acquisition of Allergan plc's ("Allergan") worldwide generic pharmaceuticals business ("Actavis Generics").  At closing, Teva transferred to Allergan consideration of approximately \$33.4 billion in cash and

approximately 100.3 million Teva shares.   The acquisition significantly expanded Teva's generics product portfolio and pipeline, R&D capabilities and global operational network.

285.   In a conference call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] As it relates to our first priority, I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017.
>
> *        *        *
>
> Turning to generics.  It has been 2 full quarters since the completion of our acquisition of Actavis Generics.  The acquisition has provided us with many benefits, especially much stronger and broader R&D capabilities, which we believe are the engine for any substantial generic business.  This is essential in today's world when we are operating across such an evolving competitive landscape and ongoing consolidation across our customer base.  We are very confident that the global business we have built will allow Teva to thrive in the long-term future as a leader in the generics industry.
>
> [Desheh:] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

286.   The statements referenced above were materially false and misleading.  Viewed holistically, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financial results, and operations by failing to disclose and actively concealing the negative impact resulting from the acquisition and integration of Actavis on the Company's financial results and business prospects, which (among other things) exacerbated the risky and unsustainable nature of the Price-Hike Strategy that collapsed shortly after the closing of the Actavis acquisition in August 2016.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

287.   Together with the above-alleged facts, Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### A.   The Results of a Four-Year Government Investigation Demonstrate Scienter

288.   In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  Over time, the investigation expanded, and the Connecticut AG was joined in its efforts by forty-eight additional states and U.S. territories.

289.   In May 2019, these governmental entities filed a complaint against, among others, Teva and four of its former employees.  The complaint was over 500 pages in length.  It set forth, in great detail, how – during a 19-month period beginning in July 2013 and continuing through January 2015 – Teva significantly raised prices on more than 100 generic drugs as the Company and other generic drug manufacturers "embarked on one of the most egregious and damaging price-fixing conspiracies in the history of the United States."

290.   In advance of the filing of the State AGs Action, the Connecticut AG's investigatory powers allowed it to obtain thousands of documents, millions of phone records, and to interview an untold number of cooperating witnesses in order to bring its antitrust suit against Teva and others in connection with the U.S. generic drug market.

291.   Based on internal Teva documents and insider testimony, the State AGs Action compiled a tome that is replete with allegations conclusively establishing that the Price-Hike Strategy was conducted with the knowledge, and at the behest, of Teva's "senior-most executives."

292.    Although many of the allegations focus on Nisha Patel, the Price-Hike Strategy "was *well known, understood, and authorized by individuals at much higher levels at Teva*" than Patel, including Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics.

293.    Indeed, according to the State AGs Action, "*high-level executives at Teva were aware that [antitrust] laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors*." This knowledge of wrongdoing, intentional conduct, and willful blindness is imputable to Teva.

294.    Furthermore, Teva's senior-most executives instructed their employees to avoid creating a paper trail documenting Teva's collusion with its "competitors." On one occasion, Cavanaugh even smiled and pretended to put her hands over her ears when her subordinates were discussing communications with other companies about coordinating price increases.

295.    The State AGs Action also provides details of how several high-ranking Teva employees deleted their text messages and attempted to coordinate with each other in response to government search warrants and subpoenas, establishing further conscious misbehavior and recklessness that is imputable to Teva.

## B.    Former Employee Allegations

296.    Several former Teva employees interviewed in the Class Action buttress the allegations in the State AGs Action that the Price-Hike Strategy came from the very top of Teva. The information provided by these former Teva employees was summarized in the Class Action as follows.

297.    According to a Senior Product Operations Manager:

(i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "work plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to work plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii) that compensation structure for Teva's national account managers was not tied to individual performance.

298.    According to a Senior Director of Trade Relations:

(i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives, including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug-by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," *i.e.*, competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter;

299.    According to an Associate Manager of Customer Marketing:

(i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

300.    According to a Manager of Customer Operations:

(i) in the early part of 2013, at a quarterly marketing group "all-hands" meeting that the employee attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of the employee's departure in April 2014;  and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

C.    **Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition**

301.    Defendants were motivated to make false statements to inflate the price of Teva securities in order to complete a "transformational" acquisition.  By January 2014, once the Price-Hike Strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation in setting out that "the stock price will go up and

we'll be able to *use our share as a currency* . . . *to fund transactions*."  Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

302.    Unbeknown to investors, Teva was already focused on acquiring Actavis by as early as the middle of 2014.  Soon after joining Teva from Actavis in August 2014, Olafsson announced at an "all-hands" quarterly meeting at the North Wales U.S. headquarters that he had never joined a new company that did not subsequently purchase his former employer.  By the end of 2014, with the strategy resulting in numerous batches of systematic price hikes, involving 78 price increase, and generating at least $943 million in inflated profit, the ADS was trading in the mid-$50s.  By then, as Vigodman would later acknowledge on July 27, 2015, Defendants had developed a list of acquisition targets and Actavis was at the top.  Concealed from investors at this time, Teva had already approached Actavis, but was rejected.

303.    By the end of the first quarter 2015, the Price-Hike Strategy resulted in another batch of hikes, involving 16 drugs.  All told, over $1.1 billion in inflated profit had been generated, and Teva's ADS was trading near $63.    Defendants' "willingness" to perform a "'*transformational*' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively.  On April 21, 2015, Defendants attempted to purchase Mylan.  Mylan's Board dismissed the offer on April 27, 2015.

304.    Undeterred, during a June 10, 2015 Goldman Sachs conference, Teva again announced glowing results, with Vigodman emphasizing to investors the "*profound change in the generic business*" and Olafsson noting the improvement of *"$1 billion . . . in 14 months, 16 months*," while concealing that the Price-Hike Strategy had generated over $1.1 billion in profits

for the generics unit over that time.  Fueled by profits from the fraud, by July 27, 2015, the price of Teva's ADS reached an all-time high of $72.

305.    That day, Teva announced the $40 billion acquisition of Actavis from Allergan.  Vigodman explained that the improvement in generics was a "*precondition*" for accomplishing their motivation for a deal.  Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly *twenty years* of Teva's average annual income from 2013 to 2015.  They raised the cash from investors such as Plaintiffs.

306.    By the second quarter 2015, however, the Price-Hike Strategy had peaked.  Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases.  Inflated profits began to deteriorate, even as Defendants needed to raise the capital necessary to pay Actavis's $40 billion price tag.  As questions were raised regarding the deteriorating pricing environment and Teva's weakening financials, Defendants flatly denied Teva was making profits from price increases, or that Teva was facing pricing pressure.  It was not until Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the deal on August 2, 2016, that they disclosed that their generics business was now the subject of government subpoenas.  Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### D.    Conscious Misbehavior or Recklessness

#### 1.    Implementation of the Price-Hike Strategy

307.    In early 2013, Teva expressly adopted the Price-Hike Strategy as a means to turn the Company around by revitalizing its dwindling generics business.  This deliberate strategy was announced by Kevin Galownia, then-Senior Director of Marketing, at a quarterly "all-hands" meetings at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups.  At that meeting, Galownia, a frequent presenter at these quarterly

meetings, explained that Teva would raise prices on its generic drugs in a systematic manner. This marked a sharp break from the Company's prior strategy of focusing on branded drugs, set by then-CEO Levin in 2012. This significant change in direction necessarily came only from Teva's highest executives, and could not have been decided by Galownia alone.

308.    Indeed, carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters. The inflated profits would be captured by the daily and weekly reports circulated to Cavanaugh, Griffin, Oberman and later Olafsson. They were also reflected in the intra-quarter reports that Olafsson, Oberman, Griffin, and Cavanaugh assembled and sent to Teva's senior executives in Israel. Consistent with this, according to a former Teva employee interviewed in the Class Action, "everyone would have known" of large price increases that had a significant financial impact, including Oberman, especially if it was used to fill a "hole" between revenues and forecasts.

### 2.    Only Senior Executives Could Make Price Increases

309.    Defendants' scienter is also supported by the fact that the execution of the Price-Hike Strategy required that senior executives personally analyzed and approved each price increase, pursuant to an established and formalized process that was in place by 2012. Galownia and the Pricing Group would initiate the process. Galownia would analyze Teva's portfolio of established generic drugs on a "constant and ongoing basis," and would produce a "list of opportunities" and recommendations of potential price increases to Maureen Cavanaugh and Deborah Griffin, who was Chief Accounting Officer of Teva and the CFO of Teva USA.

310.    However, Galownia was "just the guy doing the evaluation," according to a former Teva employee interviewed in the Class Action, as his superiors made the actual decision to increase the price of a generic drug. Accordingly, Cavanaugh and Griffin would each separately evaluate whether Teva would make a price increase, and if so, when. Cavanaugh would review

the price increases from the operational perspective, while Griffin would undertake a financial cost-benefit analysis that would evaluate both whether and when to implement the price increases. In particular, Griffin would have to factor in specific contract terms and costs associated with increasing pricing, and determine the right timing for the increase. Sometimes, Griffin's decision was to raise a price, but wait until the next quarter when the contractual implications would be more favorable. This recommendation and evaluation process could be quick, but could also span weeks, with the implemented price hike following as many as 60 days after Galownia's initial recommendation.

311. The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices. This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices. Price increases, in contrast, came from the top down. When prices were increased, the Pricing Group was simply told by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. Members of the Pricing Group did not have authority to implement price increases. According to a former Teva employee interviewed in the Class Action, Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward. The empirical evidence, described above, confirms this observation.

312. As was the case during the relevant period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day. Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases.

313.     Given this formalized process involving Griffin and Cavanaugh, there is a strong

inference that Defendants were aware of, or at least recklessly disregarded, the 106 price increases,

ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in

inflated profit.

### 3.     Continuous Access to Documents and Information Tracking Profits from Price Increases

314.     Defendants were given documents that tracked the financial impact of the Price-

Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on

a daily basis.  They also had access to Company-wide databases with detailed drug-by-drug

information about the price, sales, and profits of each drug on a real-time basis.  Given the close

attention paid to revenue and its sources, and the readily available information concerning these

topics, there is a strong inference that Defendants knew or recklessly ignored that billions of dollars

in inflated profit were generated through the Price- Hike Strategy, and its collapse caused the later

short-falls in profits.

315.     Among the documents Defendants created and received was a long-range work

plan, generated annually, that included generic revenue forecasts for three to five years, and that

contained granular pricing details down to the NDC level.  The employees preparing the work plan

would receive feedback from executives over the course of a pre-established schedule.  The

process began around March each year, with the U.S.-based executives, including Oberman and

Olafsson reviewing and approving the work plan over the late summer.  The U.S.-based executives

would then present the work plan to Teva's executives in Israel, including Vigodman and Desheh,

each year.

316.     Weekly or daily scorecards were circulated among Teva's top executives, including

Olafsson and Oberman.  These scorecards provided these executives with regular access to U.S.

sales and revenue data for generic drugs.  The scorecards also compared Teva's actual revenue figures to longer-term revenue goals.  The executives used the scorecards to track "holes" between the actual revenues and forecasts, including the work plan.  The price increases were used to "fill" the holes.

317.    Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs which showed how a current financial quarter compared to long term forecasts.  The LBEs would also be circulated to the executives in Israel.

318.    Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a Company-wide database.  Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code."  Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to Oracle.  Oracle was the source for the data used for the scorecards, work plan and the LBEs.

### 4.    Defendants Spoke Repeatedly about the Pricing of Generic Drugs

319.    Defendants repeatedly claimed that they had accurate knowledge of the sources of Teva's generics profitability.

320.    Defendants claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division.  For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement . . . in our . . . margins is not driven by price.  It is driven by quantities and by mix and by efficiency measures.  Not by price, 2014, 2015."  Similarly, on February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was

achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures."  On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

321.    Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages.  For example, on October 30, 2014, Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increases prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

322.    Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years.  For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion. . . .  That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment….  What this boils down to is each individual company's business model.… Nothing has happened in the last two quarters that has changed the pricing environment."  Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

323.    Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market.  For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to

win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game . . . playing it fairly . . . by the book and by the rule."

324.     This self-proclaimed personal involvement by Defendants' supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

### 5.     Defendants' and Analysts' Focus on Generics

325.     The fact that Defendants recurrently publicized that Teva's generics segment, fueled by its U.S. division, was driving the Company's turnaround during the relevant period supports a strong inference of scienter. For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution." On June 10, 2015, Olafsson highlighted improvement of the "generic business by . . . $1 billion [] in 14 months, 16 months." That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

326.     Analysts accordingly focused on Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." The same day Cowen noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

327.     Similarly, when industry pricing pressure damaged Teva's competitors, analysts peppered Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers. For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that

"on the pricing . . . we didn't see anything change in fourth quarter."  On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there."

### 6.      The Magnitude, Importance and Duration of the Fraud

328.      The fact that the Price-Hike Strategy generated as much as $2.3 billion in inflated profit supports a strong inference of scienter.  Indeed, the inflated profit drove Teva's reported financial turnaround throughout the relevant period.  According to internal Teva documents, a portion of the 2013 price hikes boosted Teva's revenue by almost *$1 billion per quarter*.

329.      In 2014 and 2015, inflated profits comprised an increasingly large portion of Teva's overall net income.  As to the generic segment's profits, the inflated profits accounted for at least 15% of segment profits in 2013; at least 32% in 2014; and 32% in 2015.  The inflated profits accounted for an even larger portion of the Company's overall net income.  In 2013, inflated profits accounted for at least 20% of net income; in 2014, at least 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit.  The stronger inferences that Defendants knew of the source of these profits.

330.      Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result Teva's generic drug profits plummeted.  Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, forced the Company to take a staggering $6.1 billion impairment charge to its generics business, and reduce its dividend.  The stronger inference by far is that Defendants were aware of the source of this decline, or were reckless in not knowing.

### 7.   Contemporaneous Red Flags Indicated that Defendants' Statements Were False or Misleading

331.   Contemporaneous red flags alerted Defendants to the possibility that their statements were false and misleading.  At a minimum, Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

332.   On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants on alert to discover whether Teva had taken price increases and to what extent.  Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases.  Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases."  Again, this should have sparked an internal inquiry from Teva's executives.  Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

333.   The fact that the DOJ and the Connecticut AG began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter.  The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.  Teva has produced over one million documents to the DOJ.

334.   On September 12, 2016, the U.S. Government Accountability Office (the "GAO"), which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016.  The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a twelve-month period, and that some drug

prices increased more than 1,000%.  Teva had numerous drugs that showed extraordinary price increases in the GAO report.  The facts of the GAO report support the inference that Defendants spoke the alleged false statements with scienter.

### 8.      Officer Terminations Support Scienter

335.    That three of the Individual Defendants – Olafsson, Vigodman, and Desheh – resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter.  There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed.  The explanation for his termination as "retirement" was false, and the first charges from the DOJ and Connecticut AG regarding their pricing investigations were released only days later.

336.    There is a similarly strong inference regarding Vigodman's termination.  He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016.

337.    Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these Defendants who were blocking the true financial state of the Company from coming to light.

### 9.      Other Facts Supporting Scienter

338.    Receipt of Subpoenas.  Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of

Defendants' scienter.  Particularly, Defendants failed to disclose them in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the offering.  The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the very next SEC disclosure.  Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices.  Yet, Defendants thereafter made materially false and misleading statements about their exposure to price erosion and validity of the investigations.

339.  _Bloomberg_ Article.  The November 3, 2016 _Bloomberg_ article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and Connecticut AG could likely bring charges later in the year.  Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."  A civil suit brought by the Connecticut AG and others, and the DOJ charges against Glazer and Malek, soon followed and, subsequently, those investigations have expanded massively.  The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from Defendants.

340.  Teva's Further Denials of Liability Despite Its Purported Investigation of the Facts As set forth above, Teva repeatedly denied any involvement in collusive conduct during the relevant period, and continues to do so.  For example, on November 7, 2019, Defendant Schultz stated during an investor earnings conference call:  "We have, of course, shared more than 1 million documents with [the DOJ].  We have not found any evidence that we were in any way part of any structured collusion or price fixing."  Such statements underscore that Defendants knew

Teva was a central actor in collusive conduct, or at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

### E.      Corporate Scienter

341.    Teva possessed scienter by virtue of the fact that the Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company.  In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

342.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.  For instance, in 2013, Galownia, Teva's Senior Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups.  Given the nature of this strategy, that it required the involvement of numerous divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and that it had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

343.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature.  As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis.  From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source of the profits were inflated profits from the Price-Hike Strategy.  Indeed, according to a former Teva employee

interviewed in the Class Action, "everyone" would have known of price increases that had a material impact on Teva's financial reporting for the U.S.  It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition.

## VII.   TEVA ENGAGED IN COLLUSION, RENDERING THE STATEMENTS FALSE AND MISLEADING AND FURTHER SUPPORTING A STRONG INFERENCE OF SCIENTER

344.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs.

345.    The in their first action against Teva, the states attorneys general identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the states and pled guilty to federal antitrust violations.  That investigation remains ongoing.  Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the the allegations have a strong basis in direct evidence.  In an October 31, 2017 interview with CNBC, Jepsen emphasized that the states' now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

### A.    Teva Colluded with other Manufacturers to Fix Prices

346.    Parallel Price Increases.  The Class Action has identified at least 14 sudden and aberrational price increases undertaken by Teva that show strong indicia of collusion.  These price increases, the details of which are reflected in Appendix A, relate to at 15 drugs (the "Collusive Drugs"), collectively generated almost $1.23 billion dollars in inflated profit for Teva.

347.    These example garnered by the Class Action are just the tip of the iceberg.  As set forth above and in the relevant pleadings, there is even more evidence of parallel price increases disclosed in the State AGs Action.

348.    In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level.  For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead.  The Class Action's investigation identified, in addition to these lock-step price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) inter-firm communications.

349.    <u>Motive and Opportunity</u>.  Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products.  In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity.  Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium.  The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

350.    In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- <u>High Concentration</u>.  The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- <u>High Barriers to Entry</u>.  Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval.  The cost is significant; the process of obtaining regulatory approval alone can cost millions.  Further, there is financial risk that the recoupment of any investment could be delayed or never happen.  Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors.  According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval.  It has been reported that in 2015 ANDA approvals often took 40 months or more.

- <u>Demand Inelasticity</u>.  The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being.  As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise.  Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list.  The Class Action undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- <u>Lack of Alternative Products</u>.  Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies.  This is true of the Collusive Drugs.

- <u>Inherent Fungibility of Generic Drugs</u>.  Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's.  By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

351.  <u>Price Increases against Self-Interest</u>.  There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs.  In no case was a shortage reported during the relevant period for any of the Collusive Drugs, nor any sudden significant increase in demand.  Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price.  As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly-smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest, further supporting Defendants' scienter.

352.  The "risk" Teva would have undertaken without collusion was particularly acute with respect to the six Collusive Drugs for which Teva was the first to increase the price, namely Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol. The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly supports that, in reality, there was no risk at all – Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

353.  <u>Inter-Firm Communications</u>.  The Connecticut AGs' pleadings describe evidence showing Teva engaged in extensive direct communication with other manufacturers.  For example, the Connecticut AG alleges that over 1,500 communications occurred between certain of Teva's

"senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

354. Furthermore, the Class Action's investigation identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the relevant period, many of which occurred in close proximity to price increases that Teva and/or another manufacturers implemented on the Collusive Drugs. A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Galownia and Patel is attached hereto as Appendix B. In all instances identified in Appendix B, representatives of at least one other manufacturer – and typically many more – also attended.

355. Trade shows and conferences provided opportunities for one-on-one meetings with between Teva personnel, including several of Defendants, and those of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

356. <u>Government Investigations Corroborate an Inference of Collusion</u>. The Connecticut AGs' pleadings allege, among other things, based on specifically-described communications, seven drug markets where Teva conspired to fix prices and/or allocate markets, namely the markets for: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. Nystatin and Theophylline – two drugs where the states uncovered evidence that Teva, in coordination with Heritage, agreed to "take the lead" on price

increases, overlap with the set of drugs where the Class Action's investigation found strong indicia of collusive price-fixing.

357.    The DOJ also continues to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation." The United Stated District Court for the Southern District of New York, in sustaining the *Propranolol Antitrust* allegations over Teva's motion to dismiss, reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy."  The DOJ intervened similarly in the *Generic Pharmaceuticals* MDL, seeking stays and asserting that the drugs at issue – including the Collusive Drugs Baclofen, Fluocinonide, and Propranolol – overlap with the DOJ's criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

### B.    Evidence of Collusion Further Supports a Strong Inference of Scienter

358.    Teva's collusion additionally supports a strong inference of scienter.  Given all the information available to them, Defendants knew, or recklessly disregarded, that in order for the Price-Hike Strategy to generate the high level of inflated profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

359.    Teva's price increase approval processes necessarily involved senior management. Indeed, Patel, or any person in her position, did not have the authority or ability to raise prices or to determine which drugs Teva would bid on.  Teva's senior management and executives, including Griffin and Cavanaugh, approved all price increases.  Indeed, the State AGs Action confirms that the Price-Hike Strategy was carried out at the direction of Teva's top executives, and that Patel was acting at their behest.

360.     Moreover, many of the Collusive Drugs were major drugs for Teva and the profits from the price hikes were substantial.  In all, the Collusive Drugs generated at least $1.2 billion over the relevant period.  The financial implications of the price increases would have been reflected in the analysis that Griffin and Cavanaugh undertook in deciding whether to take the price increase, and when.  That financial impact would also be reflected in the financial reporting for which they and Oberman and Olafsson were responsible, and which was presented to Vigodman and Desheh.  These included regularly updated forecasts and scorecards.  The information was also available on the Oracle ERP system.

361.     With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA (Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

362.     Furthermore, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the relevant period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers (Appendix B).

### C.     The Undisclosed Fact of Teva's Collusion Constitutes an Independent Basis For Falsity

363.     The false and misleading statements regarding the source of Teva's profits as described in its SEC disclosures identified above, and the false and misleading statements regarding competition in Teva's SEC disclosures as identified above, were false and misleading, in addition to the reasons enumerated above, because Teva conspired with other manufacturers to fix prices for certain generic drugs.  Statements regarding the supposed source of Teva's revenues

were false because they omitted the fact that Teva's revenues were partly generated by collusive means. Statements describing the supposed competitiveness of the U.S. generic drug market were false because Teva was in reality participating in a series of anticompetitive conspiracies that distorted competitiveness.

## VIII.   PRESUMPTION OF RELIANCE

364.    Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Teva ADS traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Teva ADS; and (e) Plaintiffs purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

365.    The market for Teva ADS was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, Teva securities traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations and omissions.

366.    At all relevant times, the market for Teva ADS was efficient for the following reasons, among others:  (a) Teva filed periodic reports with the SEC; (b) Teva ADS was listed and actively traded on the NYSE; (c) numerous analysts followed Teva; and (d) Teva regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and

through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

367.   Plaintiffs purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, in reliance on the market price of Teva ADS, which reflected all the information in the market, including Defendants' misstatements.

368.   In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## IX.   PLAINTIFFS' ACTUAL RELIANCE

369.   During the relevant period, Highfields Capital I LP's, Highfields Capital II LP's, and Highfields Capital III L.P.'s investments in Teva securities were managed by Highfields. Highfields made the investment decisions with respect to Plaintiffs' purchases and acquisitions of Teva securities.  Factors considered by Highfields in making such decisions included, among other things, Teva's purported financial information and a review of the Company's strengths, weaknesses and opportunities.

370.   Prior to Highfields making the decision to purchase or acquire Teva securities on behalf of Plaintiffs, a Highfields investment analyst actually and justifiably read, reviewed, listed to and/or relied upon (as applicable, and to the extent the referenced documents had been published or the referenced conferences conducted at the time) the 2013 20-F, the May 1, 2014 Earnings Call, the Q1 2014 6-K, the Q2 2014 6-K, the July 31, 2014 Earnings Call, the Q3 2014 6-K, the October 30, 2014 Earnings Call, the December 11, 2014 Guidance Call, the Q4 2014 Press Release, the 2014 20-F, the February 5, 2015 Earnings Call, the Q1 2015 6-K, the April 30, 2015 Earnings Call, the June 11, 2015 Goldman Sachs Conference, the July 27, 2015 Conference Call, the Q2

2015 6-K, the July 30, the 2015 Earnings Call, the Q3 2015 6-K, the October 29, 2015 Earnings

Call, the November 19, 2015 Conference Call, the ADS/Preferred Registration Statement, the ADS

Final Prospectus, the Preferred Final Prospectus, the January 11, 2016 J.P. Morgan Conference,

the Q4 2015 Press Release, the 2015 20-F, the February 11, 2016 Earnings Call, the March 8, 2016

Cowen Conference, the Q1 2016 6-K, the May 9, 2016 Earnings Call, the May 10, 2016 Bank of

America Conference Call, the June 3, 2016 Sanford C. Bernstein Conference Call, June 8, 2016

Goldman Sachs Global Healthcare Conference, July 13, 2016 Conference Call, the Notes

Registration Statement, the Notes Final Prospectus, the Q2 2016 6-K, the August 4, 2016 Earnings

Call, the September 7, 2016 Wells Fargo Conference, the September 9, 2016 Generic Medicines

Business Overview, the Q3 2016 6-K, the November 15, 2016 Earnings Call, the December 5,

2016 Press Release, the December 8, 2016 Citi Global Healthcare Conference, the Q4 2016 Press

Release, the February 13, 2017 Earnings Call, the 2016 20-F, the Q1 2017 6-K, the May 11, 2017

Conference Call, the Q2 2017 6-K, the 3Q 2017 6-K, the 1Q 2018 10-Q, the 2Q 2018 10-Q, the

October 31, 2017 Courthouse News Article, the 3Q 2018 10-Q, the December 19, 2018 Business

Insider Article, the February 19, 2019 Bloomberg Article, and the 2018 10-K, including (as

applicable) statements concerning pricing trends for generic drugs, the competitiveness of the U.S.

generics market, the source of Teva's revenues and profits, Defendants' denials that Teva was

deriving material financial benefits from price increases, Defendants' claims of limited price hikes,

Defendants' denials of pricing pressure, Defendants' denials of participation in collusive conduct,

and statements regarding the Actavis acquisition.

371.   Defendants' statements concerning pricing trends for generic drugs, the

competitiveness of the U.S. generics market, the source of Teva's revenues and profits,

Defendants' denials that Teva was deriving material financial benefits from price increases,

Defendants' claims of limited price hikes, Defendants' denials of pricing pressure, Defendants' denials of participation in collusive conduct, and Defendants' statements regarding the Actavis acquisition were material to Highfields' decision to purchase or acquire Teva securities on behalf of Plaintiffs.

372.  Highfields actually and justifiably relied upon information contained in (and/or statements made during, as applicable) the 2013 20-F, the May 1, 2014 Earnings Call, the Q1 2014 6-K, the Q2 2014 6-K, the July 31, 2014 Earnings Call, the Q3 2014 6-K, the October 30, 2014 Earnings Call, the December 11, 2014 Guidance Call, the Q4 2014 Press Release, the 2014 20-F, the February 5, 2015 Earnings Call, the Q1 2015 6-K, the April 30, 2015 Earnings Call, the June 11, 2015 Goldman Sachs Conference, the July 27, 2015 Conference Call, the Q2 2015 6-K, the July 30, the 2015 Earnings Call, the Q3 2015 6-K, the October 29, 2015 Earnings Call, the November 19, 2015 Conference Call, the ADS/Preferred Registration Statement, the ADS Final Prospectus, the Preferred Final Prospectus, the January 11, 2016 J.P. Morgan Conference, the Q4 2015 Press Release, the 2015 20-F, the February 11, 2016 Earnings Call, the March 8, 2016 Cowen Conference, the Q1 2016 6-K, the May 9, 2016 Earnings Call, the May 10, 2016 Bank of America Conference Call, the June 3, 2016 Sanford C. Bernstein Conference Call, June 8, 2016 Goldman Sachs Global Healthcare Conference, July 13, 2016 Conference Call, the Notes Registration Statement, the Notes Final Prospectus, the Q2 2016 6-K, the August 4, 2016 Earnings Call, the September 7, 2016 Wells Fargo Conference, the September 9, 2016 Generic Medicines Business Overview, the Q3 2016 6-K, the November 15, 2016 Earnings Call, the December 5, 2016 Press Release, the December 8, 2016 Citi Global Healthcare Conference, the Q4 2016 Press Release, the February 13, 2017 Earnings Call, the 2016 20-F, the Q1 2017 6-K, the May 11, 2017 Conference Call, the Q2 2017 6-K, the 3Q 2017 6-K, the 1Q 2018 10-Q, the 2Q 2018 10-Q, the October 31,

2017 Courthouse News Article, the 3Q 2018 10-Q, the December 19, 2018 Business Insider Article, the February 19, 2019 Bloomberg Article, and the 2018 10-K (to the extent each such document was on file with the SEC, or the referenced statements had been made, as applicable, at the time) in making each purchase and acquisition of Teva securities on behalf of Plaintiffs.

## X.   **LOSS CAUSATION**

373.     In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Teva securities at artificially inflated prices during the relevant period.

374.     Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the relevant period, as well as Teva's collusive conduct.  By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, that Teva was in fact engaged in collusion and the central actor in an industry-wide conspiracy, and the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects, Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the inflated profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in inflated profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, Teva's inflated profits declined, and Teva was prevented from making additional price increases, those trends would continue.

The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt.

375.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of Defendants' relevant period statements and omissions.  Despite these partially corrective events and disclosures, the price of Teva's securities remained artificially inflated and were prevented from declining to their true value by Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud.  As the relevant truth leaked out into the market from August 2016 to May 2019, Plaintiffs suffered losses, which were foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors, as set forth below.  When the price of Teva ADS dropped, the value of Teva equity swaps and call options declined, and the value of Teva put options increased, causing Plaintiffs economic harm.

### A.   August 4-5, 2016

376.   After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced (i) poor generics segment earnings, including a $115 million year-over-year decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

377.   On this news, the prices of Teva securities declined.  Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21.

378.   This marked the beginning of the relevant truth leaking out, as Teva's Price-Hike Strategy had begun to collapse, as Teva lost its ability to profit from the 106 historic price hikes, or to implement new increases in 2016.  The disclosure of the subpoenas was a materialization of the risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

### B.   November 3, 2016, December 13-16, 2016

379.   On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs.  The article broke the news that the first

criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

380.    On this news, the prices of Teva securities declined once again.  Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20.

381.    In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva securities.  On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares."  HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors.  In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

382.    Within weeks the expected governmental actions materialized.  On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

383.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy.  *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

384.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva securities continued to decline.  Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51.

### C.    November 15, 2016

385.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations largely due to poor sales in Teva's generics divisions, including a $277 million year-over-year decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business).  In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

386.    On this news, the prices of Teva securities continued to decline.  Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60.

387.    Analysts responded negatively to the new information concerning the Company's disappointing financial results.  That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," PiperJaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank wrote that "TEVA reported 3Q revenue that was below our estimate on lower generic sales . . . the company saw higher than expected price erosion in 3Q" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

### D.    <u>December 5-6, 2016</u>

388.    After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee.  Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

389.    On this news, on December 6, 2016, the prices of Teva securities continued to decline.  Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03.

390.    Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure.  On December 6, Morningstar reported: "Teva's

announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. ***Recent pricing pressure*** in the generic drug market … remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a ***concerning development at a critical time*** for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained ***focused on price erosion for the [company's] base generic business***" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

### E.   January 6, 2017

391.   On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that was "stable" – *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters – when, in fact, pricing pressure was causing a more rapid decline.

392.   As a result of this new negative information, the prices of Teva securities continued to decline. Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10.

393.   Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI

conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated***."  Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic … business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already ***limited management credibility***."

### F.   February 6-7, 2017

394.   On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

395.   On this news, the prices of Teva securities continued to decline.  Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19.

396.   Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead.  For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges.  With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business . . . we continue to believe a near-term recovery in the company's business is unlikely."  Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

G.      **August 3-7, 2017**

397.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results.  The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's long- standing dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow.  On the Company's earnings conference call held that day, Defendant McClellan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure.  Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook.  Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline.  It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the relevant period.  Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for- dollar.  During the August 3, 2017, earnings call, Defendant Peterburg stated that the $6.1 billion charge was "to reduce goodwill associated with our U.S. Generics business unit, which includes both the Teva legacy business and the Actavis Generics business."

398.    Analysts reacted harshly.  That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance . . . and cut its dividend by 75%. . . . . U.S. ***generic weakness appears to be at the heart of these reductions***."

Jefferies wrote: "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern."  Oppenheimer noted:  "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled.  Analysts were further concerned about Teva's ability to sustain its debt and debt rating.  Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 . . . .  If mgt's ever-shrinking EBITDA guidance . . . erodes much further, *it is possible Teva may not meet the [debt] obligation*."  The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise.  There was no realistic prospect that the strategy could be revived, or that it could again generate the same inflated profits.  The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

399.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades.  On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business."  Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

400.    As investors digested the news, the prices of Teva securities dropped.  Between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59.

### H.      November 2, 2017

401.    On November 2, 2017, Teva filed a press release on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quarterly revenues compared to Q3 2016.  The Company attributed the decrease to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

402.    As a result of this new negative information, the prices of Teva securities continued to decline.  Between the close of trading on November 1 and on November 2, 2017, the ADS price fell $2.79 or 19.90% to close at $11.23.

403.    Analysts reacted negatively.  For example, RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo found Teva's results "especially disappointing."

### I.      February 8, 2018

404.    On February 8, 2018, Teva filed a press release on a Form 8-K announcing Q4 2017 and FY 2017 financial results, including a staggering $17.1 billion goodwill impairment, of which $10.4 billion related to Teva's U.S. generics business.  Teva stated that the $10.4 billion write-down was based in part on "further deterioration in the U.S. generics market" – including "[p]ricing challenges due to government regulation" – and Teva's resulting expectation of "larger pricing declines" than previously anticipated.

405.    As a result of this new negative information, the prices of Teva securities continued to decline.  Between the close of trading on February 7, 2018 and the close of trading on February 8, 2018, the price of Teva's ADS fell $2.21 or 10.6% to close at $18.64.

406.    Analysts reacted negatively.  Wells Fargo noted that Teva had missed consensus expectations "by a significant margin," pointed to "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is."  IBI Brokerage noted that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below market expectations."

### J.    December 7-10, 2018

407.    On December 9, 2018, an article in *The Washington Post* quoted statements from Connecticut Assistant Attorney General Joseph Nielsen that Connecticut's investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." While the article noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts," the price of Teva securities dropped substantially with the disclosure of the expanded investigation.

408.    Between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 or 5% to close at $18.44.

### K.    May 10-13, 2019

409.    On May 10, 2019, after the market closed, the State AGs Action was filed, revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The May 2019 complaint details Teva's price-fixing with regards to over 80 different generic drugs, compared to just 7 drugs in the previously filed action.  The complaint further asserts that Teva implemented significant price increases for approximately over 100 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's role as a "consistent

participant" and a central player in the conspiracy.  Further, the May 2019 complaint names four

Teva employees personally as defendants:  Cavanaugh, Patel, Kevin Green (Teva's former

Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S.

Generics).

410.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of

$14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019.

411.    Analysts were surprised by the revelations in the State AGs Action.  For example,

Bernstein warned that "the price-fixing lawsuit is worse than we expected" and "there seem to be

specific cases in the lawsuit that are going to be hard to explain away."  J.P. Morgan stated that

"[w]e were open to the majority of price spikes being 'explainable' by way of shortages, limited

competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law.  So

we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the

expanded complaint."

## XI.    <u>NO SAFE HARBOR</u>

412.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Amened

Complaint.  The specific statements pleaded herein were not "forward-looking statements" nor

were they identified as "forward-looking statements" when made.  Nor was it stated with respect

to any of the statements forming the basis of this Amended Complaint that actual results "could

differ materially from those projected."  To the extent there were any forward-looking statements,

there were no meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Teva who knew that those statements were false when made.

413.     Specifically as to the alleged false and misleading guidance issued on July 13, 2016, and January 6, 2017, that guidance incorporated an assumption grounded on historically inaccurate data.  Namely, the assumption was that pricing was declining at the same rate as it had during 2015 and the first half of 2016 because, as stated by Olafsson, Teva was "assuming . . . [the] same pricing assumption as we have had for the first half of the year," because Teva "saw no change in the pricing.  We saw a stable environment . . . from first quarter into second quarter."  Teva's pricing erosion was not, however, "stable."  Teva's inflated profits had declined by $10 million from Q1 2016 to Q2 2016, and had declined over $100 on year-over-year basis from Q1 2015 due to an increasingly adverse pricing environment.  Moreover, because Teva had received the DOJ and Connecticut AG subpoenas, it would be unable to mitigate these declines, as it had in the past, by taking additional price increases.

## XII.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5
### (Against All Defendants)

414.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

415.     During the relevant period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

416.    Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in that they:

(a)    Employed devices, schemed, and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Teva securities during the relevant period.

417.    Plaintiffs have suffered damages in that, relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, they paid artificially inflated prices for Teva securities.  Plaintiffs would not have purchased Teva securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and falsely inflated by Defendants' misleading statements.

418.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva securities during the relevant period.

419.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

420.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

421.    During the relevant period, the Individual Defendants acted as controlling persons of Teva within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

422.    Each of the Individual Defendants was a controlling person of Teva within the meaning of Section 20(a) of the Exchange Act.

423.    By virtue of their positions and their power to control public statements about Teva, the Individual Defendants had the power and ability to influence and control the actions of Teva and its employees, and did in fact influence and control, directly or indirectly, the decision-making of the Company.  Teva controlled the Individual Defendants and its other officers and employees.

424.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements of cause the statements to be corrected.  In particular, the Individual Defendants each had direct and/or supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

425.    The Individual Defendants culpably participated in Teva's violations of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

426.    By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

427. Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### COUNT III
**For Violations of Section 18 of the Exchange Act**
**(Against Defendants Teva, Desheh, McClellan, Schultz, and**
**Griffin)**

428. Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

429. As alleged herein, Defendants Teva and Desheh caused statements to be made in Teva's 2014 20-F, 2015 20-F, and 2016 20-F that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

430. As alleged herein, Defendants Teva, McClellan, Schultz, and Griffin caused statements to be made in Teva's 2017 10-K and 2018 10-K that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts,.

431. In purchasing Teva securities, Plaintiffs' investment team actually and justifiably read, and had direct eyeball reliance on, Teva's 2014 20-F, 2015 20-F, 2016 20-F, 2017 10-K and 2018 10-K (to the extent published at the time of purchase).

432. Specifically, an investment analyst at Highfields read and actually relied upon information contained in Teva's 2014 20-F, 2015 20-F, 2016 20-F, 2017 10-K and 2018 10-K (to the extent each such document was on file with the SEC at the time) in making each purchase of Teva securities on behalf of Plaintiffs during the relevant period.

433.     In ignorance of the falsity of Defendants Teva, Desheh, McClellan, Schultz, and Griffin's statements, or of the true facts, Plaintiffs purchased Teva securities in actual, justifiable, eyeball reliance upon Defendants Teva, Desheh, McClellan, Schultz, and Griffin's representations.

434.     Defendants Teva, Desheh, McClellan, Schultz, and Griffin's materially false and misleading statements and omissions of material fact artificially inflated the price of Teva securities.

435.     Had they known the true facts, Plaintiffs would not have purchased Teva securities and/or would not have paid the inflated prices they paid.

436.     Upon disclosure of the true facts, the price of Teva securities dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

437.     By reason of the foregoing, Defendants Teva, Desheh, McClellan, Schultz, and Griffin are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

438.     Taking into account, inter alia, tolling of the limitations period by the filing of the class action complaint against Defendants in the class action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**COUNT IV**
**Common Law Fraud**
**(Against All Defendants)**

439.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

440.     Defendants made material misrepresentations of material fact and/or omitted material facts as set forth above.

441.     These misrepresentations and/or omissions were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to invest in Teva securities.

442.     These misrepresentations and/or omissions constitute fraud and deceit under the common law.

443.     Plaintiffs actually and reasonably relied upon the representations and/or omissions when making decisions to purchase Teva securities and did not know of any of the misrepresentations or omissions.

444.     As a direct and proximate result of the fraud and deceit by Defendants, Plaintiffs suffered damages in connection with their investment in Teva securities.

445.     Defendants' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public.  Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

### COUNT V
### Negligent Misrepresenation
### (Against All Defendants)

446.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.  As to this Cause of Action, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct.

447.     Defendants authorized or caused the representations and/or omissions set forth above.

448.     Defendants supplied false information for use by Plaintiffs in making an investment decision.

449.     Defendants made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Teva securities.

450.     Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

451.     Moreover, Defendants had a duty to disclose certain information to Plaintiffs, as alleged above.  Defendants breached that duty by failing to disclose such information.

452.     Plaintiffs reasonably relied on the information Defendants provided and were damaged as a result of these misrepresentations and omissions.

453.     Plaintiffs would not have purchased Valeant securities at all, or at the inflated prices they paid, had they known the true facts.

454.     By reason of the foregoing, Defendants are liable to Plaintiffs for negligent misrepresentation.

455.     As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding punitive damages against Defendants;

(c)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(c)     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

The Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  May 28, 2020

By*: /s/ David A. Ball*
David A. Ball (ct10154)
Ari J. Hoffman (ct22516)
COHEN and WOLF, P.C**.**
1115 Broad St. P.O. Box 1821
Bridgeport, CT 06604
Tel: (203) 368-0211
Fax: (203) 337-5534
dball@cohenandwolf.com
ahoffman@cohenandwolf.com

Lawrence M. Rolnick *(pro hac vice)*
Michael J. Hampson *(pro hac vice)*
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 262-6700
Fax: (973) 597-2469
lrolnick@lowenstein.com
mhampson@lowenstein.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date herein, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ David A. Ball
David A. Ball, Esq.

## APPENDIX A
## Collusive Drug Price Increases

**2013 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Enalapril Maleate (1st Increase)** | Mylan<br>*Teva*<br>Wockhardt | July 2<br>*July 19*<br>August 1 | $25.15 (92%)<br>*$25.15 (341%)*<br>$21.38 (275%) |

**2014 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Ketoconazole Cream** | *Teva*<br>Taro | *April 4*<br>April 18 | *$63.30 (110%)*<br>$63.30 (110%) |
| **Ketoconazole Tablets** | *Teva*<br>Taro | *April 4*<br>April 18 | *$221.55 (250%)*<br>$221.55 (250%) |
| **Nystatin** | *Teva*<br>Heritage | *April 4*<br>July 1 | *$100.30 (110%)*<br>$100.30 (110%) |
| **Theophylline SR** | *Teva*<br>Heritage | *April 4*<br>July 1 | *$54.53 (80%)*<br>$54.53 (80%) |
| **Baclofen** | Upsher-Smith<br>*Teva* | February 21<br>*April 15* | $29.93 (350%)<br>*$29.93 (350%)* |

**2014 Collusive Drug Price Increases (continued)**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| ***Fluocinonide* 5% Ointment** | Taro<br>*Teva* | June 3<br>*July 1* | $226.40 (483%)<br>*$226.40 (483%)* |
| ***Fluocinonide* 5% Cream** | Taro<br>*Teva* | June 3<br>*July 1* | $145.75 (524%)<br>*$145.75 (524%)* |

---

[1] Because drugs are often available in multiple strengths and package sizes, "New WAC per Pkg." refers to the pricing for the most-common package size of the most-widely-used strength.

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| | | | |
| *Fluocinonide* 5% Gel | Taro *Teva* | June 3 *July 1* | $190.57 (255%) *$190.57 (255%)* |
| *Enalapril Maleate* (2nd Increase) | Mylan *Teva* Taro Wockhardt | April 17 *August 28* October 15 December 15 | $82.98 (230%) *$83.00 (230%)* $83.00 (230%) $70.53 (230%) |
| *Carbamazepine* Tablets | Taro Apotex *Teva* Torrent | June 3 July 11 *August 28* September 12 | $127.93 (2517%) $127.93 (1030%) *$127.93 (1538%)* $127.93 (2517%) |
| *Carbamazepine* Chewable Tablets | Taro *Teva* Torrent | June 3 *August 28* September 12 | $52.68 (290%) *$52.68 (270%)* $52.68 (778%) |
| Diclofenac Potassium | Teva Sandoz Mylan | *August 28* October 10 Mar. 4, 2015 | *$104.58 (50%)* $104.58 (82%) $104.58 (50%) |

**2015 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| Propranolol | *Teva* Actavis Mylan Heritage | *January 28* February 17 July 10 August 17 | *$34.40 (632%)* $34.39 (632%) $35.67 (659%) $34.39 (632%) |
| Estradiol | *Teva* Actavis | *January 28* May 21 | *$30.74 (90%)* $30.74 (109%) |

**APPENDIX B**
**Trade Shows and Conferences**

## 2013 Trade Shows and Conferences

| Date | Organization[1] / Event | Teva Attendees |
|------|-------------------------|----------------|
| February 20-22 | GPhA Annual Meeting | Oberman Olafsson (with Actavis) |
| April 20-23 | NACDS Annual Meeting | Oberman Cavanaugh |
| August 10-13 | NACDS Total Store Expo | Cavanaugh Galownia Oberman |
| December 3 | NACDS Annual Dinner | Cavanaugh |

## 2014 Trade Shows and Conferences

| Date | Organization[1] / Event | Teva Attendees |
|------|-------------------------|----------------|
| February 19-21 | GPhA Annual Meeting | Oberman |
| February 26 | GPhA BOD Quarterly Meeting | Oberman |
| April 1 | HDMA Roundtable Fundraiser | Cavanaugh |
| April 26-29 | NACDS Annual Meeting | Cavanaugh Oberman |
| June 1-4 | HDMA Leadership Conference | Patel |
| August 23-26 | NACDS Total Store Expo | Cavanaugh Galownia Patel |
| Sept. 27 - Oct. 1 | HDMA Annual Board Membership Meeting | Cavanaugh Baeder |
| November 19-21 | IGPA Annual Conference | Oberman |

---

[1] GPhA = Generic Pharmaceutical Association;
HDMA = Healthcare Distribution Management Alliance
IGPA = International Generic Pharmaceutical Alliance
NACDS = National Association of Chain Drug Stores

| Date | Organization[1] / Event | Teva Attendees |
|------|------------------------|----------------|
| December 3 | NACDS Annual Dinner | Cavanaugh |