UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re TEVA SECURITIES LITIGATION | ) | No. 3:17-cv-00558-SRU |
| | ) | |
| | ) | CLASS ACTION |
| This Document Relates To: | ) | |
| | ) | AMENDED COMPLAINT FOR |
| No. 3:19-cv-00449-SRU | ) | VIOLATIONS OF FEDERAL SECURITIES |
| | ) | LAW, THE PENNSYLVANIA SECURITIES |
| THE PHOENIX INSURANCE COMPANY | ) | ACT AND THE ISRAEL SECURITIES |
| LTD., THE PHOENIX PENSION LTD., | ) | LAWS |
| EXCELLENCE GEMEL & HISHTALMUT | ) | |
| LTD., EXCELLENCE KESEM ETNS and | ) | |
| EXCELLENCE MUTUAL FUNDS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TEVA PHARMACEUTICAL INDUSTRIES | ) | |
| LTD., TEVA PHARMACEUTICALS USA, | ) | |
| INC., EREZ VIGODMAN, EYAL DESHEH, | ) | |
| SIGURDUR OLAFSSON, YAACOV | ) | |
| ALTMAN, YITZHAK PETERBURG, | ) | |
| DIPANKAR BHATTACHARJEE, MICHAEL | ) | |
| McCLELLAN, DEBORAH GRIFFIN, KÅRE | ) | |
| SCHULTZ and TEVA PHARMACEUTICAL | ) | |
| FINANCE NETHERLANDS III B.V., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

4828-1671-4429.v2

# TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ...............................................................1

II.     JURISDICTION AND VENUE ......................................................................................17

III.    EXCHANGE ACT, PSA AND ISRAEL SECURITIES LAW ALLEGATIONS ...........18

     A.     Parties.................................................................................................................18

           1.      Plaintiffs ................................................................................................18

           2.      Defendants .............................................................................................18

                  a.     The Company..............................................................................18

                  b.     The Officer Defendants...............................................................19

     B.     A Brief Overview of the U.S. Generic Drug Market ...........................................21

     C.     Teva Suffered a Series of Setbacks Before the Relevant Period Began ...............24

     D.     Collusive Price Hikes Drove Teva's Rebound ....................................................27

     E.     The Actavis Acquisition .....................................................................................36

     F.     Defendants Falsely Denied Price Inflation and the Resulting Erosion and
            Provided Misleading Projections Using Artificially Inflated Metrics ..................39

     G.    Multiple Governmental Investigations Uncovered Evidence of Teva's
            Illegal Price Fixing, Bid Rigging and Market Allocation.....................................47

           1.      The Congressional Inquiry......................................................................47

           2.      The September 2016 GAO Report...........................................................49

           3.      The DOJ and State AG Investigations.....................................................52

           4.      Civil Antitrust Litigations ......................................................................53

           5.      The DOJ Investigation Yields Admissions of a Wide-Ranging
                Illegal Conspiracy Involving Teva..........................................................54

           6.      Forty-Seven State AGs, the District of Columbia and the
                Commonwealth of Puerto Rico Accuse Teva of Participating in an
                Illegal Conspiracy Which Artificially Inflated the Value of Teva
                Securities................................................................................................56

a.      Trade Groups and Social Events Facilitated the Collusion ...........59

b.      The State AGs Expand Their Allegations Against Teva to Eight Drugs .................................................................................61

(1)      Nystatin ................................................................67

(2)      Theophylline ........................................................72

(3)      Glyburide .............................................................75

(4)      Acetazolamide ER ...............................................81

(5)      Glipizide-Metformin ............................................83

(6)      Glyburide-Metformin ...........................................85

(7)      Leflunomide ........................................................88

(8)      Verapamil ............................................................90

H.      Plaintiffs' Investigation Has Uncovered 17 Additional Drugs that Were the Subject of Collusion ................................................................94

1.      Plaintiffs' Research Has Identified Drugs with Large Collusive Price Increases ..................................................................94

a.      Pravastatin Sodium ........................................................98

b.      Enalapril Maleate ..........................................................100

c.      Cephalexin Oral Suspension ........................................101

d.      Ketoconazole Tablets and 2% Cream ...........................103

e.      Baclofen Tablets ...........................................................104

f.      0.05% Fluocinonide ......................................................106

g.      Carbamazepine Tablets and Chewable Tablets ............107

h.      Estradiol Tablets ...........................................................109

i.      Clobetasol Propionate Topical Cream .........................111

j.      Diclofenac Potassium Tablets .......................................113

k.      Glyburide Micronized ...................................................114

- ii -

l. Propranolol Tablets ..................................................116

m. Desonide Topical Lotion and External Cream............................117

n. Doxycycline Hyclate Capsules .................................................119

o. Propranolol Hydrochloride ........................................121

p. Tretinoin External Cream ...........................................123

q. Ursodiol Capsules ....................................................124

2. The Structure of the Markets for the 25 Alleged Drugs Facilitated Teva's Collusion .......................................................126

a. High Level of Market Concentration ...........................................126

b. Inelastic Demand ....................................................127

c. Commodity-Like Product ..........................................128

d. No Viable Substitute ................................................129

e. Barriers to Entry.......................................................130

f. Information Sharing ................................................131

3. Teva Increased Revenues by Approximately $1.57 Billion Through Collusion on the Eight Drugs Identified by the State AGs and the Seventeen Additional Drugs Uncovered by Plaintiffs .............................135

I. Forty-Four State AGs Filed a Second Complaint Against Teva and Nineteen Co-Conspirators for Participating in an Illegal Conspiracy Which Artificially Inflated the Value of Teva Securities.............................140

1. Collusive Price-Hike Drugs in the November 2019 AG Complaint........140

a. July 2012 Price-Fixing on Eight Drugs ......................................141

b. July 3, 2013 Price-Fixing of 21 Generic Drugs ..........................143

(1) Agreement with Mylan ....................................146

(2) Agreement with Glenmark..............................147

(3) Agreement with Greenstone ...........................149

(4) Agreement with Taro ......................................149

4828-1671-4429.v2

(5)  Agreement with Sandoz ....................................................150

(6)  Agreement with Upsher-Smith .......................................151

(7)  Agreement with Lupin ....................................................152

    (i)  The July 2013 Collusive Price Hikes
      Generated Nearly $1 Billion of Revenue per
      Quarter for Teva ....................................................152

c.  Enalapril Maleate Price-Fixing and Market Allocation –
Teva, Taro, Mylan, Wockhardt (July 2013) ...............................153

d.  August 9, 2013 Price-Fixing of 12 Generic Drugs .....................155

(1)  Amiloride, Diclofenac, Diltiazem, Doxazosin,
Ketoprofen, Ketorolac, and Tolmetin Price-Fixing ........156

(2)  Pravastatin Price-Fixing....................................................157

(3)  Etodolac Price-Fixing ......................................................159

e.  April 4, 2014 Price-Fixing of 20 Drugs .....................................160

(1)  Cephalexin Oral Suspension – Teva, Lupin ...................163

(2)  Azithromycin Oral Suspension, Azithromycin
Suspension, and Medroxyprogesterone Tablets –
Teva, Greenstone ..............................................................164

(3)  Clarithromycin ER Tablets, Tamoxifen Citrate and
Estazolam – Teva, Actavis................................................165

(4)  Ketoconazole Cream (Teva, Taro, Sandoz) and
Tablets (Teva, Taro, Mylan, Apotex) ..............................166

(5)  Estradiol/Norethindrone Acetate Tablets
("Mimvey") and Cyproheptadine HCL Tablets –
Teva, Breckenridge ..........................................................167

(6)  Diflunisal and Hydroxyzine Pamoate – Teva, Rising......168

(7)  Ethosuximide Capsule and Oral Solution – Teva,
Versapharm .......................................................................169

(8)  Pentoxifylline Price Fixing – Teva, Apotex ...................170

f. April 15, 2014 Baclofen Price-Fixing and Market Allocation – Teva, Upsher-Smith, Lannett ...................................171

  (1) Baclofen Price-Fixing .......................................171

  (2) Baclofen Market Allocation..............................172

g. July 1, 2014 Fluocinonide Price-Fixing – Teva, Sandoz, Taro, Actavis.............................................................172

h. August 28, 2014 Price-Fixing on 22 Drugs .................175

  (1) Amiloride HCL/HCTZ Tablets, Cimetidine Tablets, Diclofenac Potassium Tablets, Enalapril Maleate Tablets, Flurbiprofen Tablets, Fluvastatin Sodium Capsules, Loperamide HCL Capsules, Prazosin HCL Capsules, Prochlorperazine Tablets, and Sotalol Hydrochloride Tablets Price Fixing – Teva, Mylan ......................................................................176

  (2) Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets –Teva, Taro, Zydus ...............177

  (3) Topiramate Sprinkle Capsules – Teva, Zydus, Actavis ...........................................................178

  (4) Amoxicillin/Potassium Clavulanate Chewable Tablets, Diclofenac Potassium Tablets, Penicillin V Potassium Tablets, Desmopressin Acetate Tablets – Co-Conspirators Followed Teva's Price Hikes...............179

i. January 28, 2015 Price-Fixing of 12 Drugs ................180

  (1) Propranolol – Teva, Actavis, Mylan ................181

  (2) Ciprofloxacin HCL (Teva, Dr. Reddy's, Actavis) and Glimepiride (Teva, Dr. Reddy's) .............................182

  (3) Isoniazid – Teva, Sandoz .................................182

  (4) Griseofulvin Microsize Oral Suspension – Teva, Actavis ...........................................................183

2. Market Allocation and Price-Fixed Drugs in the November 2019 AG Complaint..........................................................183

a.     Allocation of Irbesartan, Generic Combivir, Portia and Jolessa, and MAS XR Markets to Fix Prices in 2012 ................ 183

b.     Allocation of Budesonide Inhalation, Clonidine-TTS Patch, Generic Ocella, Fenofibrate, Nortriptyline Hydrochloride, Oxyprozin, Temezolomide, and Tolterodine ER Markets to Fix Prices in 2013 ................... 185

c.     Allocation of Amphetamine/Dextroamphetamine IR, generic Balziva, Budesonide Inhalation, generic Cambivir, Cabergoline, Capecitabine, Clonidine-TTS, Dexmethylphenidate HCL ER, Dextroamphetamine Sulfate ER, Entecavir, Etodolac, Fenofibrate, Gabapentin, Labetalol, Niacin ER, Norethindrone Acetate, Omega-3-Acid Ethyl Esters, Paricalcitol, Prioxicam, Raloxifene, Tobramycin, and Tolterodine Tartrate Markets to Fix Prices in 2014 and 1Q2015 ................... 188

J.     Teva Overstated Goodwill and Failed to Make Timely Impairments ................ 195

    1.     Goodwill False Statements ................ 195

        a.     Teva's Discounted Cash Flow Models Were Inflated ................ 196

        b.     Teva's Discount Rate and Terminal Growth Rates Were Improperly Inflated ................ 199

    2.     GAAP Provisions Concerning Goodwill and Goodwill Impairment ...... 201

    3.     Defendants Failed to Properly Perform the Goodwill Impairment Tests Required by GAAP ................ 206

K.     Actionable False and Misleading Statements and Omissions ................ 212

    1.     False and Misleading Statements Regarding Competition ................ 213

    2.     False and Misleading Statements Regarding Teva's Price-Hike Strategy and Collusive Activities ................ 224

    3.     False and Misleading Statements Concerning Subpoenas ................ 281

    4.     False and Misleading Statements Relating to the Actavis Acquisition ................ 285

    5.     False and Misleading Statements Relating to Goodwill ................ 289

    6.     False and Misleading Statements Relating to Financial Results ............ 299

4828-1671-4429.v2

7.     False and Misleading Statements Regarding Legal Compliance .............329

8.     False and Misleading Statements Relating to the Bribery Schemes ........335

L.     Teva Violated Its Statutory Duty to Disclose Pricing Trends .............................343

M.     Additional Allegations of Scienter ........................................................................346

1.     The Officer Defendants Knew of and Controlled the Price Hikes ..........346

2.     Former Employee Allegations ................................................................350

3.     Defendants Were Motivated to Use Teva's Stock as "Currency" for a "Transformational" Acquisition ......................................................354

4.     Only Senior Executives Could Make Price Increases ............................356

5.     Defendants Had Continuous Access to Documents and Information Tracking Profits from Price Increases ....................................................358

6.     Defendants' and Analysts' Focus on Generics ......................................360

7.     The Magnitude, Importance and Duration of the Fraud .........................361

8.     Contemporaneous Red Flags Indicated that Defendants' Statements Were False or Misleading ......................................................361

9.     Officer Terminations Support Scienter ..................................................363

10.     Other Facts Supporting Scienter ............................................................363

11.     Corporate Scienter .................................................................................364

12.     The Officer Defendants Were Personally Motivated by Compensation ........................................................................................366

a.     2014 Compensation ...................................................................367

b.     2015 Compensation ...................................................................368

N.     Loss Causation ......................................................................................................369

1.     August 4-5, 2016 ...................................................................................372

2.     November 3-6, 2016 ..............................................................................373

3.     November 15, 2016 ...............................................................................374

4.      December 5-6, 2016 ................................................................376

5.      December 14, 2016 ................................................................377

6.      December 15-18, 2016 ...........................................................378

7.      January 6-8, 2017 .................................................................380

8.      August 3-7, 2017 ..................................................................381

9.      November 2, 2017 .................................................................383

10.     February 8, 2018 ..................................................................384

11.     December 9-10, 2018 ............................................................385

12.     May 10, 2019 .......................................................................386

O.      Presumption of Reliance and Fraud-on-the-Market Doctrine ...........387

P.      Inapplicability of the Statutory Safe Harbor or Bespeaks Caution Doctrine .......388

IV.     INFLATED PROFIT METHODOLOGY ........................................................389

V.      CLAIMS FOR RELIEF ................................................................................391

VI.     SECURITIES ACT ALLEGATIONS ............................................................398

A.      Securities Act Parties ..............................................................398

1.      Securities Act Plaintiffs ................................................398

2.      The Securities Act Defendants.......................................399

B.      The Relevant Offerings .............................................................400

C.      Teva Filings Incorporated into the Offering Materials ......................403

D.      The Offering Materials Contained Material Misstatements and Omissions........404

1.      Material Misstatements and Omissions Concerning Collusive Activities and the Price-Hike Strategy and the Benefits and Risks Stemming Therefrom ...............................................404

2.      Material Misstatements and Omissions Concerning Known Trends Required to Be Disclosed Pursuant to Item 5 of Form 20-F...................405

4828-1671-4429.v2

3.    Material Misstatements and Omissions Concerning Competition in the U.S. Generics Market ........................................................................ 405

4.    Material Misstatements and Omissions Concerning the DOJ and State AGs' Subpoenas ............................................................................. 406

5.    Material Misstatements and Omissions Concerning Legal Compliance ..................................................................................................... 406

6.    Material Misstatements and Omissions Relating to the Bribery Schemes ..................................................................................................... 406

VII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 407

PRAYER FOR RELIEF ..................................................................................................... 412

JURY DEMAND .................................................................................................................. 413

4828-1671-4429.v2

| DEFINED TERMS | DEFINITION |
|---|---|
| 2Q2013 Form 6-K | Form 6-K, filed on August 1, 2013, signed by defendant Desheh, with second quarter 2013 financial results |
| 3Q2013 Form 6-K | Form 6-K, filed on October 31, 2013, signed by defendant Desheh, with third quarter 2013 financial results |
| 4Q2013 Form 6-K Press Release | Form 6-K, filed on February 6, 2014, signed by defendant Altman, with fourth quarter and full year 2013 financial results press release |
| 2013 Form 20-F | Form 20-F, filed on February 10, 2014, signed by defendant Desheh |
| 1Q2014 Form 6-K | Form 6-K, filed on May 1, 2014, signed by defendant Desheh, with first quarter 2014 financial results |
| 2Q2014 Form 6-K | Form 6-K, filed on July 31, 2014, signed by defendant Desheh, with second quarter 2014 financial results |
| 3Q2014 Form 6-K | Form 6-K, filed on October 30, 2014, signed by defendant Desheh, with third quarter 2014 financial results |
| 4Q2014 Form 6-K Press Release | Form 6-K, filed on February 5, 2015, signed by defendant Desheh, with fourth quarter and full year 2014 financial results press release |
| 2014 Form 20-F | Form 20-F, filed on February 9, 2015, signed and certified by defendants Desheh and Vigodman |
| 1Q2015 Form 6-K | Form 6-K, filed on April 30, 2015, signed by defendant Desheh, with first quarter 2015 financial results |
| 2Q2015 Form 6-K | Form 6-K, filed on July 30, 2015, signed by defendant Desheh, with second quarter 2015 financial results |
| 3Q2015 Form 6-K | Form 6-K, filed on October 29, 2015, signed by defendant Desheh, with third quarter 2015 financial results |
| 4Q2015 Form 6-K Press Release | Form 6-K, filed on February 11, 2016, signed by defendant Desheh, with fourth quarter 2015 financial results press release |
| 2015 Form 20-F | Form 20-F, filed on February 11, 2016, signed by defendant Desheh; defendants Vigodman and Desheh signed the consolidated balance sheet. |
| 1Q2016 Form 6-K | Form 6-K, filed on May 9, 2016, signed by defendant Desheh, with first quarter 2016 financial results; defendants Vigodman and Desheh signed the consolidated balance sheet |
| 2Q2016 Form 6-K | Form 6-K, filed on August 2, 2016, signed by defendant Desheh, with second quarter 2016 financial results; defendants Vigodman and Desheh signed the consolidated balance sheet |
| 3Q2016 Form 6-K | Form 6-K, filed on November 15, 2016, signed by defendant Desheh, with third quarter 2016 financial results; defendants Vigodman and Desheh signed the consolidated balance sheet |
| 3Q2016 Form 6-K Press Release | Form 6 K, filed on November 15, 2016, with third quarter 2016 financial results press release |
| 4Q2016 Form 6-K Press Release | Form 6-K, filed on February 13, 2017, signed by defendant Desheh, with fourth quarter 2016 financial results press release |
| 2016 Form 20-F | Form 20-F, filed on February 15, 2017, signed by defendant Desheh; defendants Peterburg and Desheh signed the consolidated balance sheet |
| 1Q2017 Form 6-K | Form 6-K, filed on May 11, 2017, signed by defendant Desheh, with first quarter 2017 financial results; defendants Peterburg and Desheh signed the consolidated balance sheet |

4828-1671-4429.v2

| DEFINED TERMS | DEFINITION |
|---|---|
| 2Q2017 Form 6-K | Form 6-K, filed on August 3, 2017, signed by defendant McClellan, with second quarter 2017 financial results; defendants McClellan and Peterburg also signed the consolidated balance sheet |
| 3Q2017 Form 6-K | Form 6-K, filed on November 2, 2017, signed by defendant McClellan, with third quarter 2017 financial results |
| 4Q2017 Form 8-K | Form 8-K, filed on February 8, 2018, signed by defendant McClellan with fourth quarter 2017 financial results |
| 2017 Form 10-K | Form 10-K, filed on February 12, 2018, signed by defendants Schultz and McClellan |
| 1Q2018 Form 8-K | Form 8-K, filed on May 3, 2018, signed by defendant McClellan, with first quarter 2018 financial results |
| 1Q2018 Form 10-Q | Form 10-Q, filed on May 3, 2018, signed by defendants Schultz and McClellan, with first quarter 2018 financial results |
| 2Q2018 Form 8-K | Form 8-K, filed on August 2, 2018, signed by defendant McClellan, with second quarter 2018 financial results |
| 2Q2018 Form 10-Q | Form 10-Q, filed on August 2, 2018, signed by defendants Schultz and McClellan, with second quarter 2018 financial results |
| 3Q2018 Form 8-K | Form 8-K, filed on November 1, 2018, signed by defendant McClellan, with third quarter 2018 financial results |
| 3Q2018 Form 10-Q | Form 10-Q, filed on November 1, 2018, signed by defendants Schultz and McClellan, with third quarter 2018 financial results |
| 4Q2018 Form 8-K | Form 8-K, filed on February 13, 2019, signed by defendant McClellan, with fourth quarter 2018 financial results |
| 2018 Form 10-K | Form 10-K, filed on February 19, 2019, signed by defendants Schultz and McClellan |
| 1Q2019 Form 8-K | Form 8-K, filed on May 2, 2019, signed by defendant McClellan, with first quarter 2019 financial results |
| 1Q2019 Form 10-Q | Form 10-Q, filed on May 2, 2019, signed by defendants Schultz and McClellan, with first quarter 2019 financial results |
| ADS Offering | $3.375 billion offering of 54 million American Depository Shares to finance the Actavis acquisition |
| ADS/Preferred Offering Materials | The ADS/Preferred Registration Statement, the ADS Underwriting Agreement, the Preferred Underwriting Agreement, the Rule 424(b)(5) prospectus supplements for the ADS Offering and the Preferred Offering, each dated and filed on November 30, 2015, the ADS Prospectus Supplement, the Preferred Prospectus Supplement, and the SEC filings incorporated therein, including the 2014 Form 20-F, the 1Q2015 Form 6-K, the 2Q2015 Form 6-K, the 3Q2015 Form 6-K, and the July 28, 2015 Form 6-K with the Master Purchase Agreement |
| ADS Prospectus Supplement | Prospectus supplement for the ADSs, dated December 2, 2015, filed on December 3, 2015, with Registration No. 333-208238 |
| ADS Underwriting Agreement | Form 6-K, filed on December 8, 2015, signed by defendant Desheh, with an underwriting agreement relating to the ADS Offering, dated December 2, 2015, and signed by defendants Teva and Desheh |
| ADS/Preferred | Form F-3 registration statement and the prospectus that formed a part of |

| DEFINED TERMS | DEFINITION |
|---|---|
| Registration Statement | the registration statement, dated and filed on November 30, 2015, with Registration No. 333-208238, signed by, among others, defendants Peterburg, Vigodman, Desheh and Griffin |
| Collusive Profit | The amount of profit generated by Teva as a result of its collusive price increases as quantified by counsel and industry experts |
| ILS | Israel New Shekels |
| Inflated Profit | The amount of profit generated by Teva as a result of its price increases as quantified by counsel and industry experts |
| Master Purchase Agreement | Master Purchase Agreement, dated as of July 26, 2015, by and between Allergan plc and Teva Pharmaceutical Industries Limited, signed by defendants Vigodman, Desheh and Olafsson, filed as a Form 6-K on July 28, 2015, signed by defendant Desheh |
| Notes | The $3.5 billion 3.150% Senior Notes due October 1, 2026 (the "2026 Notes") and the $2 billion 4.100% Senior Notes due October 1, 2046 (the "2046 Notes") |
| Notes Offering Materials | The Notes Registration Statement, Notes Registration Statement Amendment No. 1, Notes Prospectus Supplements and the SEC filings incorporated therein, including the 2015 Form 20-F, the January 25, 2016 Form 6-K, the 1Q2016 Form 6-K, and the Notes Underwriting Agreement |
| Notes Offering | The $3.5 billion 3.150% Senior Notes due 2026 and the $2 billion 4.100% Senior Notes due 2046 to finance the Actavis acquisition |
| Notes Prospectus Supplements | (1) Preliminary Prospectus Supplement for the Notes Offering, dated July 18, 2016, filed on July 18, 2016, with Registration No. 333-201984, and (2) Prospectus Supplement for the Notes Offering, dated July 18, 2016, filed on July 19, 2016, with Registration No. 333-201984 |
| Notes Registration Statement | (1) Form F-3 registration statement and the prospectus that formed part of the registration statement, dated and filed on February 9, 2015, with Registration No. 333-201984, signed by, among others, defendants Peterburg, Vigodman, Desheh and Griffin, and (2) the Notes Registration Statement Amendment No. 1 |
| Notes Registration Statement Amendment No. 1 | Post-Effective Amendment No. 1 to the Notes Registration Agreement and the accompanying prospectus, dated and filed on July 13, 2016, with Registration No. 333-201984, signed by defendants Vigodman, Peterburg, Desheh and Griffin |
| Notes Underwriting Agreement | Form 6-K , filed on July 21, 2016, signed by defendant Desheh, with an underwriting agreement relating to the Notes Offering, dated July 18, 2016, and signed by defendants Teva and Desheh |
| Offerings | The ADS Offering, the Preferred Offering and the Notes Offering |
| Preferred Offering | $3.375 billion offering of 3.375 million mandatory convertible Preferred Shares to finance the Actavis acquisition |
| Preferred Prospectus Supplement | Prospectus supplement for the Preferred Shares, dated December 2, 2015, filed on December 3, 2015, with Registration No. 333-208238 |
| Preferred Shares | 7.00% mandatory convertible preferred shares |

| DEFINED TERMS | DEFINITION |
|---|---|
| Preferred Underwriting Agreement | Form 6-K, filed on December 8, 2015, signed by defendant Desheh, with an underwriting agreement relating to the Preferred Offering, dated December 2, 2015, and signed by defendants Teva and Desheh |

4828-1671-4429.v2

The Phoenix Insurance Company Ltd., The Phoenix Pension Ltd., Excellence Gemel & Hishtalmut Ltd., Excellence Kesem ETNS and Excellence Mutual Funds (collectively, "Plaintiffs"), by the undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings made by Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company"), wire and press releases published by and regarding Teva, analysts' reports and advisories about Teva, government investigations and reports related to the generic drug industry, information obtainable on the Internet, civil and regulatory complaints and court filings, drug pricing and market share information from proprietary databases, and consultation with industry experts.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs bring this action under the Securities Exchange Act of 1934 (the "Exchange Act"), the Securities Act of 1933 (the "Securities Act"), the Pennsylvania Securities Act of 1972 (the "PSA"), and Israel Securities Law, 1968, against Teva, Teva Pharmaceuticals USA, Inc. ("Teva USA"), Teva Pharmaceutical Finance Netherlands III B.V. ("Teva Finance"), and certain of Teva's former and current officers and directors to recover damages for losses Plaintiffs have suffered in connection with their acquisition of Teva securities between October 30, 2013 and May 10, 2019, inclusive (the "Relevant Period").  Plaintiffs purchased or otherwise acquired Teva American Depositary Shares ("ADSs"), ordinary shares, Preferred Shares, and Notes at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein.

- 1 -

2.      Plaintiffs assert claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and §§1-402(c) and 1-501(c) of the PSA, and Israel Securities Law, 1968, against Teva, Teva USA, and nine of Teva's current and former executives (collectively, "Defendants").

3.      Plaintiffs also assert strict liability and negligence claims, which do not sound in fraud, under §§11 and 12(a)(2) of the Securities Act.  These claims are asserted against the Securities Act Defendants (defined below) who are statutorily responsible for material misstatements of fact or omissions in the registration statements and prospectuses by which Teva offered securities to the public.  Plaintiffs also bring §15 claims against certain of the Securities Act Defendants for control person liability.  Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are treated separately in this Complaint from the Exchange Act, PSA and Israel Securities Law claims.

4.      These claims arise from a series of material misstatements and omissions about: (i) Teva's U.S. generic drugs business, including its financial performance and projections, its participation in an anti-competitive collusive scheme to manipulate the market for generic drugs, the source and sustainability of Teva's revenues, profits and growth, the rate of price erosion on Teva's generic drugs, and Teva's acquisition of Actavis Generics; (ii) Teva's overstatement of its goodwill valuation for its generics business and inflation of its balance sheet and operating results by billions of dollars, and (iii) Teva's engagement in an international bribery scheme centered around its key drug Copaxone that ultimately led to a $519 million fine, the imposition of a deferred prosecution agreement, and significant loss of revenues from the "Rest of World" markets.  These material misstatements and omissions misled the market and caused the prices of Teva securities to be inflated.  When the truth about Teva's financial condition and operations began to leak into the market, the prices of these securities fell significantly, causing damage to Plaintiffs.

- 2 -

5.      Teva develops, manufactures and markets generic medicines and a portfolio of specialty medicines worldwide.  Teva is the largest generic drug manufacturer and one of the 15 largest pharmaceutical companies in the world.  Prior to the Relevant Period, Teva was under siege on all fronts – its top selling generic drug was suffering from new competition, its top revenue driver (the specialty drug Copaxone) was about to lose exclusivity, and its stock price was flat.  Under pressure to turn the Company around, Defendants resorted to fraud.

6.      Beginning in mid-2013, Teva began to collude with its competitors to increase generic drug prices in order to decrease competition and artificially inflate revenues.  In particular, throughout the Relevant Period, Teva entered into agreements to fix the prices of or allocate the market for hundreds of generic drugs.  Throughout the Relevant Period, Defendants issued financial reports and made public statements that misstated the Company's financial position and concealed Teva's and Teva USA's participation in this vast collusion and involvement in an illegal price fixing, bid rigging, and market and customer allocation scheme.  The scheme was highly profitable, contributing at least $1.57 billion to Teva's bottom line.

7.      In addition to collusive price hikes, Teva systematically raised prices across a large swath of its generic drug portfolio, often in tandem with other drug manufacturers (together with collusive price hikes, the "Price-Hike Strategy").  The impact of the Price-Hike Strategy was staggering, totaling more than $2.75 billion in profits attributable solely to the price increases (the "Inflated Profit"):

4828-1671-4429.v2



8.      Teva's Price-Hike Strategy, including collusive price hikes, immediately drove the Company's rebound.  During the third quarter of 2013, U.S. generics revenues turned around and rose over $1 billion, with a 6% increase year-over-year.  U.S. generics ended the year as the most profitable part of Teva's business, with 14% top-line revenue growth and 50% gross margins.  In turn, Teva's stock price ended its year-long flat streak, and by the first quarter of 2014, the stock posted its biggest quarterly rally since 2005 at 32%.

9.      Defendants were highly effective at concealing that the Price-Hike Strategy was driving Teva's rapid growth.  They invariably attributed the improved profits to legitimate sources. Neither Teva, nor any of its peers, regularly disclosed to the investing public information concerning individual drug prices, changes in price, or revenues per drug, let alone profits.  Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases, except to ask Defendants.  When analysts asked whether Teva's profits and performance were at all connected to price increases, the Officer Defendants (as defined below) answered with explicit and false denials – repeatedly representing that: (1) Teva was not engaged in any collusive activity; (2) Teva's Relevant Period growth, revenues and profits were not

the product of generic drug price increases; and (3) because Teva's success was not reliant on generic drug price increases, the Company was not susceptible to, and had not experienced, substantial price erosion.  In fact, Maureen Cavanaugh ("Cavanaugh") blatantly told investors that Teva brought "'cost savings to patients each year and also reduce[d its] costs on an ongoing basis.'"

10.     Defendants had to conceal that the massive generic drug price increases were the primary contributor to Teva's massive boost in Relevant Period profits.  The strategy was inherently risky and unsustainable for a variety of reasons, including that a significant number of the increases were done in tandem with other drug manufacturers.  Wholesale purchasers of generic drugs routinely set pricing through a competitive RFP bidding process.  Thus, assuming no collusion, when Teva raised prices any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share.  Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability.  Had Teva disclosed the true facts behind its core business strategy, investors would have valued Teva very differently from a company with a strategy driven by fundamental growth and cost cutting, as the Defendants falsely proclaimed.

11.     Substantial facts support the allegations that Teva did in fact collude to fix the prices of over 100 drugs.  In addition to evidence uncovered by the State AGs and cited in the AGs' complaints, Plaintiffs' investigation also revealed that for at least two dozen drugs, prices moved in near-perfect unison and increased suddenly and simultaneously at each drug company.  The price increases were exponential.  And there is a clear pattern of an industry conference attendance by Teva and its competitors, followed by an abrupt and unprecedented spike in Teva's prices closely timed with spikes in Teva's competitors' prices.

12.     There is no non-collusive explanation for Teva's sudden, synchronized price increases – there were no supply shortages, production problems, or sudden increases in demand for

- 5 -

these drugs during this period, and no major competitor left the market.  Moreover, the markets for these drugs are highly susceptible to collusion – they are dominated by only a few companies, and this market concentration makes collusion easy.  The market for the price-fixed drugs featured several other characteristics that facilitated collusion:  demand was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; they were commodity-like products – generic drugs for which the only distinguishing factor for purchasers was price; there was no viable substitute; the drugs had high barriers to entry; and information sharing and price discovery were common.  Finally, the drug prices did not decrease following the initial price increases as one would expect if the sudden price increases reflected temporary supply shortages, cost increases or other benign market explanations.

13.     Teva's extraordinary and historic price increases would have been against Teva's economic self-interest absent the existence of a price-fixing scheme.  Generic drugs are commodity products.  Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices.  Indeed, under the "maximum allowable cost" ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher priced drug will cease.  Thus, it would not be in any drug manufacturer's interest to increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

14.     The suspicious price increases by Teva and other drug manufacturers have spawned investigations by Congress, the U.S. Department of Justice ("DOJ"), and 49 state Attorneys General ("AGs").  In October 2014, Congress initiated an inquiry, calling for testimony from Teva and other

- 6 -

competitors to explain the egregious price spikes.  Teva, however, refused to appear or to even

produce documents.  As the State AGs' evidence revealed, instead of responding to Congressional

inquiries with testimony and document production, Teva was coordinating with co-conspirators to

generate a "polite f-u" letter response:



15.     In short order, Congress called on the U.S. Government Accountability Office

("GAO") to conduct an audit of Medicare expenditures on generic drugs, the Connecticut AG issued

subpoenas, and the DOJ launched a criminal investigation.  Those inquiries expanded from narrowly

focused probes into specific drugs and manufacturers to an ongoing industry-wide investigation that

has already produced guilty pleas from top executives who have ***admitted*** to colluding with Teva.

16.     As the price hikes gained attention, Teva went on the offensive, repeatedly and falsely

denying any wrongdoing and that Teva's success was price-driven.  Defendants insisted that price

increases were only taken "due to some abnormalities in the market," emphasized that the Company

was "very responsible in everything that pertains to prices," and assured investors that margin

improvements were "driven by quantities, and by mix, and by efficiency measures, not by price, [in]

2014, 2015."  In reality, there were no "abnormalities in the market" associated with the generic

drugs subject to the price hikes, and Teva's outsized profits were driven by collusion and other

massive, but unsustainable, price increases.

17.     The investigations began to bear fruit in the fall of 2016.  On September 12, 2016, the GAO publicly released its audit report, *Generic Drugs Under Medicare Part D* ("GAO Report"). After the year-long review, the GAO's conclusions were stunning.  The Medicare data revealed hundreds of unexplained "extraordinary price increases," defined as a particular drug's price increasing over 100% within a 12-month period, including numerous price increases of more than 1,000%.  Teva owned the rights to at least 40% of the drugs the GAO Report identified as having exhibited extraordinary price increases between 2013 and 2015.  Following the GAO Report, Defendants continued to falsely deny that Teva had driven performance through price hikes and was susceptible to erosion from "giv[ing] back" prior price increases.

18.     On November 3, 2016, *Bloomberg* reported that the DOJ investigation had implicated Teva in the price-fixing scheme, that criminal charges would be issued before year-end, and that the Connecticut AG could also soon file charges.  As predicted, on December 14, 2016, the DOJ unsealed allegations against the Chief Executive Officer ("CEO") and the President of Teva's competitor Heritage Pharmaceuticals Inc. ("Heritage"), Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), respectively.  The charges included "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, . . . the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices."  The charges pertained to two drugs, Glyburide and Doxycycline Hyclate, both also sold by Teva.

19.     On December 15, 2016, the AGs of 20 states, led by the Connecticut AG, filed a civil complaint against Teva and several of its co-conspirators ("December 2016 AG Complaint").  The state AGs' initial complaint accused Teva of allocating customers and market share and agreeing to collectively raise prices of generic drugs along with other manufacturers.  The allegations expressly implicated Teva in colluding to fix the pricing and market share for Glyburide – a generic drug for

- 8 -

which Teva had dominated 75% of sales from 2012 to 2017.  As the Connecticut AG put it, this "fraud [was] on an almost unimaginable scale," and the allegations around these two drugs are just the "***tip of the iceberg***."[1]  In March 2017, the AGs amended their complaint and added the claims of AGs of 24 additional states, the Commonwealth of Puerto Rico and the District of Columbia ("State AGs") against Teva and its co-conspirators ("March 2017 AG Complaint").

20.     In January 2017, Glazer and Malek pleaded guilty to the DOJ's criminal charges in exchange for a grant of immunity as to a host of additional drugs, a list of which was filed under seal.  They also admitted liability to the claims levied by the State AGs.  Most importantly, they admitted that they conspired with Teva.  Specifically, they admitted that in April 2014, for example, Heritage prepared a list of drugs and price increases for collusion.  According to the State AGs' allegations, "***Malek himself was responsible for communicating with defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide***."  Although the names and positions of the participants are redacted, they included the "executives at the highest levels of many of the Defendant companies."

21.     On October 31, 2017, the State AGs filed a motion for leave to file a Consolidated Amended Complaint (the "October 2017 AG Complaint") in *Connecticut v. Aurobindo Pharma USA, Inc.*, Civ. A. No. 17-3768 (E.D. Pa.) (ECF No. 3).  The October 2017 AG Complaint contains additional detailed allegations regarding Teva's collusive activities.  In total, Teva was implicated in the misconduct surrounding eight of the 15 generic drugs alleged by the State AGs in their amended complaint: (i) Glyburide; (ii) Acetazolamide ER; (iii) Glipizide-Metformin; (iv) Glyburide-Metformin; (v) Leflunomide; (vi) Nystatin; (vii) Theophylline ER; and (viii) Verapamil.

---

[1]     All emphasis has been added unless otherwise noted.

22.     On June 18, 2018, after the court granted the State AGs' motion for leave to file an amended complaint, 49 AGs filed a Consolidated Amended Complaint (the "June 2018 AG Complaint") (collectively with the December 2016 AG Complaint, the March 2017 AG Complaint and October 2017 AG Complaint, the "AG Complaints") in *Connecticut v. Aurobindo Pharma USA, Inc.*, Civ. A. No. 17-3768 (E.D. Pa.) (ECF No. 15).  As both the DOJ and State AGs have stated, the investigations are ongoing and more charges are to come.

23.     On May 10, 2019, the State AGs filed an expanded complaint (the "May 2019 AG Complaint") alleging that Teva significantly raised prices on approximately 112 generic drugs, and fixed prices and/or allocated markets for at least 107 drugs with 19 manufacturer co-conspirators. On November 1, 2019, the State AGs amended the May 2019 AG Complaint to include additional defendants (the "November 2019 AG Complaint").

24.     In the meantime, Plaintiffs have conducted an extensive investigation and uncovered additional evidence that Teva's misconduct applies to at least three times as many drugs as alleged by the State AGs in the AG Complaints.  Through this scheme, Teva was able to generate approximately $1.57 billion in profits from 2013 through the first half of 2019 from more than two dozen drugs that Plaintiffs were able to identify and analyze.  For example, as set forth in more detail below, Teva's illicit profits during the Relevant Period from the conspiracy to hike the price of Pravastatin, one of Teva's better selling generics, amounted to nearly $320 million.  Similarly, the collusion with respect to Carbamazepine, an epilepsy drug, yielded price increases of more than 1,500% and over $230 million in illicit profits.  Teva similarly gained close to $168 million in such profits from increases of up to 430% in its prices for Baclofen, a multiple sclerosis drug, and over $160 million from increases of up to 434% in its prices for Fluocinonide, a high-potency topical corticosteroid.  Teva, through its purchase of Actavis Generics, also gained more than $23 million in illicit profits from price increases of up to 2,500% for Doxycycline Hyclate, an acne medication.

Importantly, Plaintiffs calculated these illicit profits from a limited subset of the more than 250 generic drug products sold by Teva in the United States, dozens of which were also subject to extraordinary price hikes according to the GAO.

25.     Teva's illicit profits led to increased revenues beginning in mid-2013; however, Teva kept the source of its revenues hidden from investors.  With Teva's dramatically increased profitability beginning in 2014, analysts and investors were focused on the reasons for Teva's improving fortunes.  In the face of probing questions, Defendants repeatedly omitted the true source of Teva's increased revenues, instead falsely asserting that Teva was profiting from competition on the merits.  For instance, Teva's former CEO, defendant Erez Vigodman ("Vigodman"), in response to a direct question on pricing practices during an October 29, 2015 investor conference, stated: "We are very responsible . . . in everything that pertains to prices, on the generic side and on the specialty side. . . .  I will even put [it] another way, all the improvement you see in *margins is not driven by price*.  It is driven by quantities, and by mix, and by efficiency measures, *not by price, 2014, 2015. And that's a very important message*."

26.     Likewise defendant Eyal Desheh ("Desheh"), who during the Relevant Period served first as Teva's Interim CEO and later as its Chief Financial Officer ("CFO"), went so far as to describe the success of the division as "nothing short of a revolution," bragging that Teva had steeply increased its margins in generics by simultaneously growing revenue through increasing quantities and new drugs, and cutting the sales and marketing costs needed to "drive the sale."  In a November 2015 investor conference, Desheh addressed pricing head on:

> There is a lot of noise around pricing issues.  Some of it's coming from politicians driving agenda[s] . . . .  *Our exposure to all these things is very minimal*. . . .  I believe there are many examples for competitive environment, *real competition*, like we see in the generic market in the United States.

27.     Defendants and senior executives repeated their false denials throughout the Relevant

Period:

- On November 19, 2015, defendant Desheh eased investor concerns by attesting that Teva played "by the book and by the rule[s]," and as such, its "exposure to any initiative on price reduction in the United States is as small as anybody can have."

- On January 5, 2016, Cavanaugh told investors that "'[a]s the largest supplier of generics in the U.S. market, we bring cost savings to patients each year and also reduce our costs on an ongoing basis.  We are continuously working to make products more accessible, especially when there are drug shortages in the market.'"

- During a February 11, 2016 earnings call, defendant Sigurdur Olafsson ("Olafsson"), the former President and CEO of Teva's Global Generic Medicines Group, conveyed that competition was fierce.  In both the United States and Europe, Teva fought "on a molecule by molecule basis" and there was "fierce competition between Actavis Generics and Teva."   In addition, Olafsson told investors that Teva's record performance was achieved "not by pricing."

- On August 4, 2016, defendant Olafsson stated that competition from Emcure/Heritage resulted in "significant volume impact, but very little impact on profitability or the top line," and Teva regularly competed with Actavis.  In addition, opportunities to raise prices only came with shortages or "some kind of dysfunction in the market," and "the small pricing opportunity . . . usually comes in and comes out."

- During a November 15, 2016 earnings call, defendant Vigodman professed that, with respect to the DOJ's "investigation into price collusion in the generic drug industry, which has been in the news this month[,] I would like to emphasize that based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."

- On the same conference call, when an analyst asked whether the accelerated price decreases during the 2016 third quarter were due to increased competition or "having to tame previous price increases, or give back some of those," defendant Olafsson emphatically answered "no" and falsely explained that the increased price erosion was due to a one-time event of the Federal Trade Commission ("FTC") requiring divestiture of products relating to the Actavis Generics acquisition.

- In a November 2, 2017 filing with the SEC disclosing the receipt of subpoenas from prosecutors concerning price collusion activities in the U.S. generic drug market, Teva denied "having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

- In all of its filings disclosing the receipt of subpoenas from prosecutors concerning price collusion activities in the U.S. generic drug market, Teva told investors that it

- 12 -

was "not aware of any facts that would give rise to an exposure to [the Company] with respect to these subpoenas."

28.     Investors relied on these false statements.  For example, as analysts at Leerink echoed: Teva's management "provided some reassurance that the company is less exposed to the unwinding of generic price inflation . . . which was reassuring after competitor results stoked investor concerns about the groups' exposure to unwinding generic price inflation."

29.     And, as Teva's price hikes increased, the price of Teva's ADSs rose from $40 to a Relevant Period high of $72 in mid-2015, and the price of ordinary shares rose from ILS 13,000 to a high of ILS 27,120.  Defendants made millions in personal compensation from the scheme.

30.     Defendants also used Teva's soaring stock price to fund a long-conceived acquisition binge.  Vigodman and Desheh stated early in the Relevant Period that they wanted to convert Teva securities into "currency" to acquire a competitor, further consolidating Teva's market share.  They first tried making an offer for Mylan N.V. ("Mylan") in April 2015.  This offer was rejected. Undeterred, Defendants ratcheted up their bidding, and with Teva's ADS and ordinary share prices reaching all-time highs, on July 27, 2015, Defendants announced the purchase of Allergan plc's ("Allergan") generics division, Actavis.

31.     The deal would cost Teva approximately $40 billion, most of which was funded through three offerings.  First, in December 2015, Teva undertook a secondary offering of $3.375 billion in ADSs and an offering of $3.375 billion in Preferred Shares.  Like their other public statements, the ADS/Preferred Offering Materials were materially false, claiming that Teva had achieved its outstanding results notwithstanding "intense competition," and concealing the true source of Teva's profits.  These offerings were a success, and an additional debt offering was slated for later in 2016 once the Actavis transaction closed.

- 13 -

32.     In 2016, however, Teva's scheme began to unravel.  Increased scrutiny from investigators made it more difficult for Teva to maintain its high prices, let alone raise prices on additional drugs.  Unbeknownst to Plaintiffs, under pressure from the investigations, Teva's Inflated Profits were diminishing.   Other pharmaceutical companies reported disappointing earnings, attributed to increased pressure to reduce prices.  This pricing pressure was a by-product of heightened government scrutiny and public outcry.  But when asked whether Teva faced the same risks, Olafsson falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment."  Vigodman claimed that "[w]hat we see is a 4% to 5% erosion [in pricing] . . . .  That's not something which is different from what we said during 2015."  In reality, the denied pricing pressure was eating into Teva's Inflated Profits; in the first quarter of 2016, Inflated Profits were 46% lower than they were a year earlier.

33.     Adding to the pressure, the FTC's approval of the Actavis acquisition took longer than expected.  With the investigations mounting, Teva urgently sought to close the Actavis acquisition before the fraud became public.  Without warning, during a pre-arranged investor call on July 13, 2016, defendant Vigodman announced that the notes offering, which was used to consummate the Actavis acquisition, would be launched that day.  The notes offering, which raised $15 billion for the acquisition, was closed on August 2, 2016.

34.     What Vigodman failed to disclose in the July 13, 2016 investor conference call and the Notes Offering Materials was that Teva had been served with subpoenas on July 12, 2016 by the Connecticut AG, and three weeks earlier, on June 21, 2016, by the DOJ, indicating that Teva was now a focus of the investigations into illegal price-fixing and collusive conduct.  These subpoenas were not disclosed until Teva filed a Form 6-K with the SEC on August 4, 2016, after the Notes Offering and Actavis deal had closed.

35.     As criminal charges, guilty pleas, and the State AGs' allegations mounted in the latter half of 2016, the prices of Teva securities precipitously declined.  The wide- ranging scope of the investigation took its toll on Teva's ability to continue with its Price-Hike Strategy, and the Company's financial performance suffered.  Over the course of 2016, Inflated Profits plunged 50%.  Nevertheless, Teva continued to push back against charges of generic price inflation, and misled investors about the Company's exposure to the concommitant price erosion.

36.     As Teva's troubles mounted, key executives resigned or were fired.  Defendant Olafsson, President and CEO of Teva's Global Generic Medicines Group, was fired on December 5, 2016.  Vigodman was terminated on February 6, 2017, and on June 30, 2017, Desheh also left.

37.     On August 3, 2017, in the first financial report issued after Desheh, Vigodman and Olafsson were gone, Teva announced disappointing results due to the poor performance of its U.S. generics business and wrote down more than $6.1 billion of goodwill related to the Actavis Generics acquisition.  Teva attributed the poor performance of its U.S. generics business to "accelerated price erosion," a natural result of increased scrutiny of increased pricing.

38.     Without the Price-Hike Strategy driving Inflated Profits, Teva's ability to service its over $30 billion in debt also raised fears; the credit-rating agencies immediately downgraded the Company's debt to just above "junk."  And after 30 years of maintaining or increasing its dividend, the new Board of Directors and management of Teva were forced to cut the dividend by 75%.  In reality, without the Price-Hike Strategy and collusive activities, Teva was a fundamentally weaker company than investors were led to believe.  Teva's share price plummeted in reaction to this news.

39.     On October 31, 2017, the State AGs, now numbering more than 40, published the proposed amended complaint that expanded on the states' allegations against Teva.  The expanded allegations, developed by evidence uncovered through the ongoing investigation, specifically

implicated Teva in conspiring with its competitors to fix the prices and allocate market share for eight generic drugs.

40.     On February 8, 2018, Teva announced another staggering $10.4 billion goodwill impairment related to its generics business for the fourth quarter of 2017.  The February 8, 2018 Form 6-K stated that "[d]uring the fourth quarter of 2017, we noted further deterioration in the U.S. generics market and economic environment, further limitations on our ability to influence generic medicines pricing in the long term and a decrease in value from future launches."  These developments included "additional pricing pressure in the U.S. generics market as a result of customer consolidation into larger buying groups capable of extracting greater price reductions" and "pricing challenges due to government regulation."  As such, another goodwill impairment was recorded for the generics segment.

41.     On December 9, 2018, *The Washington Post* published an interview with Connecticut Assistant AG Joseph Nielsen, where he stated that the State AGs' investigation had expanded to at least 16 companies and 300 drugs, and exposed "'the largest cartel in the history of the United States.'"

42.     On May 10, 2019, after the market closed, the State AGs filed a 467-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The May 2019 AG Complaint alleges that Teva implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's price-fixing with regard to at least 86 of those generic drugs compared to just 7 Teva-related drugs in the State AGs' previously filed action. The action details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the civil enforcement action names four Teva employees personally as defendants: Cavanaugh, Nisha Patel, Kevin Green (Teva's

former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

43.     As these revelations came to light over time, the price of Teva's ADSs collapsed from an all-time high of $72 to less than $11.30, and Teva's ordinary shares fell from an all-time high of ILS 27,120 to ILS 4,026.  As a result, Teva's market capitalization declined from approximately $61 billion to $12 billion, revealing that Teva's skyrocketing value during the Relevant Period, built on the supposed success of its U.S. generics business, had been a fraud.

## II.    JURISDICTION AND VENUE

44.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5; §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §77k, 77l(a)(2) and 77o; §§1-402(c) and 1-501(c) of the PSA, 70 Pa. Stat. §§1-402(c) & 1-501(c); and the Israel Securities Law, 1968.

45.     This Court has jurisdiction over the subject matter of Counts I, II, V, VI and VII pursuant to §27(a) of the Exchange Act, 15 U.S.C. §78aa(a), §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §§1331 and 1337.  This Court has supplemental jurisdiction over Counts III and IV pursuant to 28 U.S.C. §1367(c).

46.     Venue is proper in this District pursuant to §27(a) of the Exchange Act, 15 U.S.C. §78aa(a), §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1391.

47.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate communications, and the facilities of a national securities exchange, namely the New York Stock Exchange ("NYSE").

III.    **EXCHANGE ACT, PSA AND ISRAEL SECURITIES LAW ALLEGATIONS**

A.    **Parties**

1.    **Plaintiffs**

48.    Plaintiffs are subsidiaries of The Phoenix Insurance Company Ltd ("Phoenix"), an insurance and financial services conglomerate headquartered in Israel, which provide insurance products and services, including life insurance, long-term savings, pension and provident funds, general insurance, healthcare insurance, ETNS indexes and mutual funds.

2.    **Defendants**

a.    **The Company**

49.    Defendant Teva Pharmaceutical Industries Ltd. is incorporated in Israel with its principal executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel.

50.    Defendant Teva Pharmaceuticals USA, Inc. is defendant Teva's wholly-owned subsidiary and during the Relevant Period had its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.  Teva conducted much of its global operations through the Teva USA North Wales offices, including investor relations and sales and marketing for the North American generics business.  In addition, during the Relevant Period, all sales, marketing and finance executives with responsibility for U.S. generics pricing were based in Pennsylvania, and Teva's Relevant Period SEC filings were drafted, prepared and/or controlled by individuals located in Teva USA's North Wales, Pennsylvania headquarters, in conjunction with individuals at Teva's headquarters in Israel.

51.    Teva engages in interstate commerce within this District.  Teva's ADSs are listed and traded on the NYSE under the symbol "TEVA."  Teva's ordinary shares trade on the Tel Aviv Stock Exchange ("TASE") under the symbol "TEVA."

### b.      The Officer Defendants

52.      Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva director from June 22, 2009 to February 6, 2017.  Vigodman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.  Vigodman made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

53.      Defendant Eyal Desheh served as Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President.  Desheh also served as Teva's Group Executive Vice President ("EVP") from 2012 to June 30, 2017.  Desheh signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.  Desheh made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

54.      Defendant Yaacov Altman ("Altman") served as Teva's Acting CFO from October 31, 2013 to February 11, 2014.  Altman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein.  Altman made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

55.      Defendant Sigurdur Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 and was CEO of Teva USA.  Prior to joining Teva, Olafsson served in various roles, including senior leadership positions, within Actavis (also known as Actavis Pharma, Actavis plc, (Watson) and the Actavis Group) from 2003 to 2014.

Olafsson made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

56.     Defendant Yitzhak Peterburg ("Peterburg") served as Teva's Interim President and CEO from February 6, 2017 to October 31, 2017. Prior to that date, he was Chairman of Teva's Board from January 1, 2015. He also served as a Teva director from June 2009 to July 2010 and after a brief departure he rejoined Teva's Board from 2012 until February 6, 2017. Peterburg signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. Peterburg made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

57.     Defendant Dipankar Bhattacharjee ("Bhattacharjee") served as the President and CEO of Teva's Global Generic Medicines Group from December 5, 2016 to December 31, 2017. He previously served as President and CEO of Teva's Generics Europe from 2013 and 2016 and as CEO of Teva UK Ltd. and later as Senior Vice President ("SVP") of Teva Western Europe from 2009 to 2013. Bhattacharjee made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

58.     Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Relevant Period. She was also Vice President ("VP") and CFO of Teva USA during the Relevant Period. Griffin signed the ADS/Preferred Registration Statement and the Notes Registration Statement. While at Teva, Griffin possessed the power and authority to approve, and in fact did approve, and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

59.     Defendant Kåre Schultz ("Schultz") has served as the President and CEO of Teva since November 1, 2017. Schultz has also served on the Company's Board of Directors since November 1, 2017. Schultz signed and certified certain of Teva's reports on Forms 10-K and 10-Q filed with the SEC during the Relevant Period, as set forth herein. Schultz made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

60.     Defendant Michael McClellan ("McClellan") has served as Executive Vice President ("EVP") and CFO of Teva since November 2017. Prior to becoming CFO, he was Teva's SVP and Interim CFO from July 2017 to November 2017, and SVP and CFO of the Global Specialty Medicines division from July 2015 to July 2017. McClellan signed and certified certain of Teva's reports on Forms 10-K, 10-Q, and 6-K filed with the SEC during the Relevant Period, as set forth herein. McClellan made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

61.     Defendants Vigodman, Desheh, Altman, Olafsson, Peterburg, Bhattacharjee, Schultz, McClellan, and Griffin are sometimes referred to herein collectively as the "Officer Defendants." Teva, Teva USA and the Officer Defendants are sometimes referred to herein collectively, as pertaining solely to the claims under the PSA, the Exchange Act, and the parallel provisions of the Israel Securities Law, 1968, as the "Defendants."

**B.     A Brief Overview of the U.S. Generic Drug Market**

62.     In 2015, sales of generic pharmaceuticals in the United States were an estimated $84 billion, with the industry accounting for approximately 88% of all prescriptions written in the United States. Teva controlled as much as 16% of the U.S. market as of year-end 2016.

63.     Under U.S. law, newly discovered drugs maintain patent protection. But once expired, other companies may obtain government approval to manufacture and market "generic"

drugs to compete.  According to the U.S. Food and Drug Administration's ("FDA") glossary, a generic drug shall be "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."  Once the FDA approves a generic as "'therapeutically equivalent'" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."  Thus, "[d]rug products classified as therapeutically equivalent [to a branded drug] can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."

64.     The regulatory filings necessary to market generic drugs are typically made before the patent expiration, so that generics manufacturers can maximize the amount of time they can sell the drug.  Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents.  21 U.S.C. §355(a), (b).

65.     The Hatch-Waxman Act of 1984 simplified the regulatory hurdles for prospective generics manufacturers by allowing a manufacturer seeking approval to sell a generic version of a brand-name drug to file an Abbreviated New Drug Application ("ANDA"), a much simpler filing. Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the branded drug, an applicant may manufacture, market, and sell the generic drug product.  This approval process can be lengthy, with the median time to approval standing at 47 months as of September 2016, thus creating an effective barrier to entry into a market for new competitors.

66.     Because each generic must be identical, the only real means for the manufacturers to compete is by price.  As reported in the August 2016 GAO Report concerning generic drug prices,

each of the five manufacturers interviewed by the GAO – including Teva – "reported that competition is the primary driver of generic drug prices." U.S. Gov't Accountability Off., GAO-16-706, *Generic Drugs Under Medicare Part D* 11-12, 16 (Aug. 2016).

67.     Ordinarily and consistent with established economic principles and common sense, once the first lower-priced generic enters the market, the brand-name drug rapidly loses sales, and sales continue to decrease.  As new generic competitors enter the market, the price of the drug typically continues to decrease.  In a normally functioning market for a generic drug, the market participants compete to maintain market share, and if one manufacturer raises prices, the others will lower prices and steal its customers.

68.     Over the past decades, further increasing pressure on generic manufacturers, the purchasers of generic drugs (*i.e.*, pharmaceutical wholesalers, retail pharmacies, Group Purchasing Organizations ("GPOs") and institutional buyers like hospitals) have become highly consolidated through various mergers and acquisitions.  Likewise, the global market for generic pharmaceutical manufacturers has undergone substantial consolidation since at least 2005, which fueled the growth of a handful of large manufacturers, like Teva, who together dominate many of the generic drug markets.  Teva gained the status as the world's largest manufacturer of generic drugs, leading the U.S. generic market in total prescriptions and new prescriptions, through a series of acquisitions. For example, Teva acquired Ivax Corp. for $7.4 billion in 2006, Barr Laboratories for $7.4 billion in 2008, Ratiopharm – Germany's second largest generic drug producer – for $5 billion in 2010, and Allergan Generics (also known as "Actavis") in 2016 for $40 billion.

69.     Teva's competitors also went on acquisition sprees.  By mid-2015, a handful of players controlled 50% of the market: Teva (13%), Mylan (11%), Actavis (8%), the Sandoz division of Novartis AG ("Sandoz") (8%), Sun Pharmaceutical Industries, Inc. ("Sun") (4%), Endo

International plc ("Endo") (3%), and Par Pharmaceutical ("Par") (3%). In 2016, the consolidation continued with Endo's acquisition of Par.

### C.   Teva Suffered a Series of Setbacks Before the Relevant Period Began

70.   During the first half of 2013, Teva was a company under siege on all fronts. Teva's specialty drug segment, which represented close to 40% of its company-wide revenue, was dominated by one drug – Copaxone. Copaxone made up two-thirds of the Company's profits in the specialty segment and faced looming generic competition from Mylan and Sandoz. Analysts characterized the drug as Teva's "white elephant in the room," and defendant Desheh called it a "large product towards the autumn of its life." Compounding the problem, in 2012, Teva received subpoenas from the SEC and the DOJ relating to a Foreign Corrupt Practices Act ("FCPA") investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, certain Eastern European countries, and certain Latin American countries.[2] Upon receiving the subpoenas, Teva proceeded to conduct an internal investigation. However, unbeknownst to investors, Teva's worldwide bribery scheme actually centered around its key drug Copaxone.

71.   At the same time, Teva's generics segment, which represented close to 50% of company-wide revenues, was also marred by problems. The segment's profitability was likewise dominated by one drug – budesonide, also known as generic Pulmicort – which was facing the heightened risk of losing exclusivity with a generic entrant from Actavis. Excluding profits from generic Pulmicort, Teva's generics segment was close to break-even. As a Deutsche Bank analyst

---

[2]   Complaint at 1, *SEC v. Teva Pharm. Indus.*, No. 1:16-cv-25298 (KMM) (S.D. Fla. Dec. 22, 2016) (ECF No. 1, ¶2) (the "SEC FCPA Complaint"). Teva LLC entered into a plea agreement with the DOJ on December 22, 2016, pleading guilty to conspiracy to violate the FCPA in connection with the bribery of a Russian government official. *See* Plea Agreement at 1, *United States of America v. Teva LLC (Russia)*, No. 1:16-cr-20967 (KMW) (S.D. Fla. Dec. 22, 2016) (ECF No. 2, ¶1) (the "FCPA Plea Agreement"); Information, *United States of America v. Teva LLC (Russia)*, No. 1:16-cr-20967 (KMW) (S.D. Fla. Dec. 22, 2016) (ECF No. 1) (the "FCPA Information"). The SEC FCPA Complaint, FCPA Plea Agreement, and FCPA Information are incorporated herein in their entirety.

concluded in a report published on May 3, 2013, Teva's overall generics business had "significantly underperformed" as compared to its competitors.  Teva was the worst performing generics drug company compared to its peers despite being the largest.  By August 14, 2013, Teva's then-CEO Jeremy M. Levin acknowledged that "Generic growth in the United States [was] slowing *fundamentally*."

72.    In addition to product problems, the Company was in the midst of sweeping management and board changes, with a new CEO who had only been in his position for a year.

73.    Publicly, Levin and Teva reacted to these headwinds and the decline of U.S. generics by touting an extensive "cost-cutting" program designed to make the Company more efficient and purportedly save the Company billions.  By mid-year 2013, the supposed cost-cutting had produced few visible results as the revenues from Teva's generics segments continued to plummet.

74.    On October 30, 2013, Teva's Board of Directors forced CEO Levin to step down as President and CEO, less than 18 months into the job.  Given the sudden nature of Levin's termination, without a replacement identified, the Board named defendant Desheh, Teva's EVP and CFO, to fill the role of President and CEO on an interim basis, effective immediately, and formed a committee to search for a permanent successor.  Defendant Altman took over as the acting CFO.

75.    In an October 30, 2013 investor call about Levin's firing, the then-chairman of Teva's Board, Phillip Frost, and defendant Desheh assured investors that they were focused on turning the Company around.  Desheh informed the market that Teva "ha[d] decided to accelerate" the cost reduction plan and promised "to create a much better, efficient generic machine."  Chairman Frost disclosed that "friends of [his] . . . have bought hundreds of millions of dollars [worth] of stock during the last couple of weeks."

76.    Teva's only means of delivering immediate value to investors was implementing a stock buyback program of 10 to 15 million shares on average purchased annually.  The buyback

program temporarily propped up the stock price, which was close to flat and traded around the average of $39 throughout 2013.

77.     But flat stock performance was not enough for investors or the Company.  Frustrated investors urged Teva to divest assets, break up the Company or position Teva to become an acquisition target.  These options were vehemently opposed by Board members and management, with Chairman Frost stating that Teva "was not seeking to be bought."  Instead, Teva hired Paul Sekhri as the Head of Business Development to look for acquisition opportunities.  However, with the stock price below $40, Teva's CFO concluded that "[i]t's just too expensive.  There's no deal in the world that will justify using our stocks."

78.     With limited options to deliver a quick boost to profitability, Teva resorted to massive collusive activities by the third quarter of 2013 and kicked off a long series of price hikes with at least three drugs: Pravastatin – one of the Company's more prominent generic drugs – along with Enalapril Maleate and Diclofenac.  According to the June 2018 AG Complaint, by at least June 2013, Teva had begun to select generic drugs for price increases – resulting in the creation of a "Price Increase Candidates" list put together by Nisha Patel.  *See* June 2018 AG Complaint, ¶¶394-397.  Patel was hired by Teva in April 2013 "to run the pricing team," and shortly after starting her role, she and others began to choose generic drugs for price increases.  For certain drugs, Patel noted on the list "Heritage Involved; follow Mutual" after her extensive phone consultations with Heritage's President Malek (who pleaded guilty to conspiracy).  *See id.*  Around the same time, between July and August 2013, Teva hiked prices on Pravastatin, Enalapril Maleate and Diclofenac on a similar scale and timing as its co-conspirators.  *See* §III.H, *infra*.  With respect to Pravastatin, for which Teva had close to 50% market share, the Company increased prices from 90% to 200% for different dosage forms.  Similarly, for Enalapril Maleate, Teva initially hiked prices by 260% for the

- 26 -

10 milligram strength tablets and over 340% for the 5 milligram strength tablets.  For Diclofenac, the initial round of price hikes was 22%.

79.     The collusive price hikes relating to Pravastatin, Enalapril Maleate and Diclofenac marked the beginning of years of massive anti-competitive activities involving over 100 generic drugs.  Unexplainable by any market forces, the price hikes propped up Teva's declining revenues, without incurring a penny more in research and development costs, the hiring of additional sales force, or any other additional expenditures.  Instead, the Company slashed those line item costs as it unlawfully fixed market share and prices.  Collectively, these collusive prices hikes in 2013 turned Teva's financial trajectory completely around.

### D.     Collusive Price Hikes Drove Teva's Rebound

80.     The effects of Teva's collusive price hikes were immediate and significant.  During the third quarter of 2013, U.S. generics revenues turned around and rose over $1 billion with a 6% increase year-over-year.  U.S. generics ended the year as the most profitable part of Teva's business, with top-line revenue growth of 14% and gross margins of 50% – far exceeding other regions such as Europe (gross margins of 40%) and Japan (gross margins of 35%).

| Millions | 1Q2013 | 2Q2013 | 3Q2013 | 4Q2013 |
|---|---|---|---|---|
| U.S. Generics Revenues | $895 | $970 | $1,138 | $1,178 |
| Year-Over-Year Change | -27% | -8% | 6% | 14% |

81.     On October 31, 2013 (the first day of the Relevant Period), Allan Oberman ("Oberman") falsely told investors that the improvements were the result of Teva's product-by-product "margin enhancement strategy" and its ability "to take pricing on a number of products this year."  On December 10, 2013, Defendant Desheh agreed and predicted price erosion would slow down in the United States.  He assured investors that "it wouldn't take long, where all the improvement will go to the bottom line of the generic business."  What Defendants failed to disclose, however, was that Teva had engaged in collusive activity to raise the prices.

82.     Analysts reacted positively to Teva's surprising and rapid turn-around.  Cowen and Company analysts wrote: "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real."  J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including . . . focusing more heavily on portfolio selection and management."

83.     In turn, Teva's stock price ended its year-long flat streak, and in the first quarter of 2014 posted the biggest quarterly rally since 2005 at 32%.

84.     When defendant Vigodman was named as President and CEO of Teva in February 2014, he immediately told investors that improving profitability was a "must win[ ]" for 2014 and "Teva will do everything which is needed in order to win.  Everything that is needed in order to win."  Jefferies analysts noted that Vigodman "Impresse[d] in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."  In fact, Teva did do everything and anything to drive profits in 2014.  Unbeknownst to investors, this included implementing collusive price-fixing activities on dozens of additional generic drugs.  Consequently, for each quarter during 2014, Teva's revenues and/or profitability growth were attributed to the U.S. generics business:

- First quarter 2014 earnings call – Desheh:  "In generics, we experienced significant growth in the United States market, with 17% year-over-year growth to a total of $1 billion. . . .  The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market and higher profitability in Europe."

- Second quarter 2014 earnings call – Desheh:  "Revenues. The improvement in sales this quarter was driven by the growth of our global generic business, primarily in the US. . . .  Looking at what impacted profitability this quarter, the improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year.  Launch of generic Xeloda in March and generic Lovaza this quarter in the US market."

- Third quarter 2014 earnings call – Vigodman:  "Q3 was a solid quarter for Teva. Significant improvement in all profit margins.  Generic profitability improved substantially."

- Fourth quarter 2014 earnings call – Desheh:  "When we look at the profit distribution, we see the improvement in the generic profit and a lower dependency on Copaxone profit, which we are developing.  We will see the same impacts for the entire year."

85.     During 2014, the prices of Teva's ADSs and ordinary shares rallied 43% and 59%, respectively, on the Company's improved financial performance, largely driven by its collusive activities.

86.     As heightened generic drug pricing drew Congressional attention in late 2014, Defendants falsely assured investors that Teva only sought out price hike opportunities on specific products – such as drugs that encountered shortages in the market.  Defendant Olafsson emphatically stated during the October 30, 2014 earnings call that:

> [T]here's never a price increase on the base business as whole.  Like any other business, if there's a pricing opportunity that comes in the market, we look for that. . . .  When there is an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business.

87.     On the same call, a UBS analyst asked Vigodman: "[C]ould you talk about generics a little bit in the US? . . . [whether there were] price increases in some of your base business.  And whether that impacted" profit.  Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there is an opportunity, ***when there is a shortage in the market***, we obviously look for pricing like any other business.  But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

88.     Again, analysts, unaware of the true facts, reacted positively to Teva's financial results, and the Company's ordinary share and ADS prices continued to climb.  For example, a Cowen and Company analyst noted that Teva's "Operations Are Improving, [and] Cash Flows Are Accelerating."  Piper Jaffray wrote: "Importantly, operating profit . . . for the generics segment

during the quarter was up 40% versus the same period a year ago."  Morgan Stanley increased its price target for Teva from $57 to $61, stating: "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

89.    In truth, the generic drugs subject to the highly profitable price hikes represented a substantial portion of Teva's generic drugs portfolio and no shortages had in fact occurred. Plaintiffs' investigation revealed that, in 2013 and 2014 alone, Teva implemented at least 50 massive price jumps across its portfolio as part of the Price-Hike Strategy.  At least 35 of the price increases were executed in tandem with other drug manufacturers, with at least 15 collusive price hikes.  The price hikes mitigated price declines in other Teva products.

90.    Still, despite at least $942 million of Inflated Profits driving Teva's turnaround in 2014, analysts continued to press management to break up the Company.  Desheh flatly responded "[a]bsolutely not," while Vigodman unequivocally stated: "On the scenario of breaking up the businesses, this scenario is not on the table."

91.    In lieu of breaking up the business, Vigodman set out to create "a new Teva."  He considered 2015 an important year for the Company: "Once we put Teva on a solid footing . . . we moved to the next phase in the grand plan of Teva."  While the Company sought out acquisition candidates to transform itself in 2015, the Price-Hike Strategy continued in an effort to continue to drive profitability and keep stock prices on their upward trajectory.  Teva needed a more valuable currency to pay for a transformative acquisition.

92.    Once again, revenues and profits skyrocketed with more than 14 additional massive price hikes during the first quarter of 2015 – U.S. generics revenues increased 37% year-over-year, gross profit jumped 23% and gross margins reached 50% of revenues.  Throughout the first half of the year, Defendants continued to laud the success of Teva's generics segment in a series of misleading statements, while concealing the true source and unsustainability of the results:

- On an April 30, 2015, earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment." He attributed this to "a significant improvement in our *cost of goods* . . . portfolio offering . . . [including] when we have *more of the launches* . . . [and] the *cost infrastructure*.

- On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generics business was "*nothing short of a revolution*," explaining that "[i]n 2013 our gross margin of generic business was 41.3%, it was 46% in Q1 2015. Our operating margin was 16.7%, it is 27%, this is full 10 percentage points," *i.e.*, a $1 billion improvement.

- During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "[W]e started 2014 with a clear message, clear focus getting the [house in order] first, solidifying the foundation of Teva. *You see the profound change in the generic business. . . . [These are] things [that] are not confined to numbers, [inaudible]: 16.7% operating profit in 2013, 21.9% operating profit in 2014*." He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

93.     By the time Teva announced its $40.5 billion acquisition of Actavis, its ADS and ordinary share prices had rallied another 25% and 18%, respectively, since the end of 2014 – reaching their all-time highs.

94.     Teva's illicit anti-competitive activities and concealed Price-Hike Strategy enabled the Company to achieve a stellar year in 2015 and facilitated its issuance of securities to finance the acquisition.  The U.S. generics business finished 2015 with $4.8 billion in revenues, an increase of 8% from 2014.  Gross profit from the generics segment increased 6%, driven by the U.S. business. Vigodman attributed the performance to the generics segment: "We delivered in 2015 record operating income, EPS and cash flow, while improving profitability margins across the board.  Our financial performance was based on *excellent execution* in generics, with significant improvement in profitability."

95.     Analysts, unaware of the truth, continued to adopt the Defendants' misleading narrative.  Piper Jaffray wrote, "Margins for the generics business continue to improve. . . . Though top-line growth for the generics segment has been anemic, margins have continued to expand."

- 31 -

Jefferies' analysts highlighted that, "Generic Drug Margins Continue to Improve," noting that "on the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

96.     Specifically, the generic segment drove Teva's profit margin and EBITDA growth between 2013 to 2015.  During the third quarter 2015 earnings call on October 29, 2015, defendant Olafsson touted the generics business's contribution to Teva's profitability, stating that, "overall, we will be in the range of 28% operating profits from generics, which really is first class with the countries we're operating in today."

97.     On the same call, after a series of questions on the sustainability of Teva's generics success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from sustainable, ordinary business practices, and not price hikes:

> We are very responsible . . . in everything that pertains to prices, on the generics side . . . .  And I will even put [it] another way, ***all the improvement you see in margins is not driven by price***.  It is driven by ***quantities***, and by ***mix***, and by ***efficiency*** measures, ***not by price***, 2014, 2015.  And that's a ***very important*** message.

98.     Then, when a Barclays analyst asked for management's thoughts on the proposed legislation with the "potential limit to generic [drug] price increases," Olafsson denied that Teva was exposed, and acknowledged the only price increases were those "due to some abnormalities in the market," like supply shortages: "In terms of the proposed legislation on pricing control on generics, . . . we have told you that overall on our whole portfolio, we have a decline in price. . . . The talk about the inflation in generics, when you have a big portfolio . . . is really not there."

99.     Misled, analysts took explicit note.  That day, UBS repeated the Defendants' fraudulent denials: "[Management] highlighted that the [generic business] improvement was not driven by price, but by volume, mix, and efficiency."

- 32 -

100.    When the full year 2015 results came in, Desheh recognized the increasing

importance of the generics business as a percentage of the Company's annual operating profit:

> Looking at EBITDA, this important measurement will continue to drive very strong
> EBITDA growth, with 7.8% [compound annual growth rate ("CAGR")] over the past
> three years.  The improved generic business generated 37% of annual operating
> profit without G&A while Copaxone's share of this profit was down from 46% to
> 42%.





101.    Defendants continued to conceal the impact of Teva's collusive activities and Price-

Hike Strategy on the Company's profitability, instead falsely attributing the increased profits to

Teva's operations.  During the September 2016 "Generic Medicine Business Overview," Olafsson summed it up, claiming that Teva's financial outperformance was all bottom line as top-line revenue growth was stagnant: "I think over the last two and-a-half years, there has been double-digit growth on the bottom line.  There hasn't been a growth on the top line.  We needed to do that just to clean up the organization, to clean up what we were doing."

102.   On January 6, 2017, Vigodman, again, attributed the improvement of Teva's profitability since 2014 to everything except collusive activities and the Price-Hike Strategy: "Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. . . .  This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure."  Indeed, at every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, Defendants denied that Teva was engaged in price increases, let alone that those increases were driving profits.  Defendants told investors that the Company's increased profits came from ordinary business strategies, like cost cutting and new product launches.

103.   In truth, without the Price-Hike Strategy and its associated collusive activities, revenues for the U.S. generics segment would have suffered negative growth in 2014 and endured dismal growth in 2015.  As such, the Price-Hike Strategy and collusive activities drove both top- and bottom-line growth.  The associated increase in revenues went straight to the bottom line with no incremental increase in cost, generating significant profit margin improvement and substantial Inflated Profit and Collusive Profit:

| million | 2015 | 2014 | 2013 |
|---|---|---|---|
| U.S. Generics Revenues | $4,793 | $4,418 | $4,172 |
| Year-Over-Year Increase | +$375 | +$246 | |
| Year-Over-Year Change | +8.5% | +5.9% | |
| | | | |
| U.S. Price-Hike Strategy Inflated Profit | $848 | $692 | $250 |
| Year-Over-Year Increase | +$156 | +$445 | |
| Year-Over-Year Change | +22.5% | +176.8% | |
| | | | |
| Global Generic Segment Gross Profit | $2,682 | $2,148 | $1,668 |
| Year-Over-Year Increase | +$534 | +$480 | |
| Year-Over-Year Change | +24.9% | +28.8% | |

104.    Defendants concealed the Price-Hike Strategy because it was inherently risky and unsustainable and could subject Teva to governmental and law enforcement scrutiny, if not prosecution.  Specifically, the strategy was unsustainable and risky because the U.S. generic drug market was designed to be extremely competitive; generic drugs are a commodity, fully interchangeable and identical in every respect, except for price. Wholesale customers solicit pricing though a "blind" RFP bidding process. Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share.  Moreover, generic drugs are an essential part of the lives of millions of Americans.  Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy. Additionally, many of Teva's price increases occurred in tandem with competitors.  As described herein, there is significant and compelling evidence that Teva colluded to fix the prices of generic drugs and allocate markets.  But whether illegal or not, Teva's pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, come under intense civil and criminal law enforcement scrutiny.  Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from a company with a strategy driven by fundamental growth and cost cutting, as the Defendants falsely proclaimed.

E.     **The Actavis Acquisition**

105.     In late 2014, Teva urgently sought to announce an acquisition and enter into a merger agreement.  At the end of 2014, Teva reached out to Allergan but was rebuffed.  After Mylan likewise rebuffed Teva's offer in the first half of 2015, Teva tapped Allergan again and speedily executed the transaction "in the course of . . . two weeks."

106.     After implementing two years of collusive schemes and the Price-Hike Strategy, which drove up profitability and Teva's stock price, Defendants upped their ante by acquiring Actavis to drive up their own paychecks.  According to Defendants' numbers, the Actavis acquisition was projected to take Teva's net revenues from $19.7 billion in pre-closing 2015 to a projected $22 billion in 2016 and $25-$26 billion in 2017; EBITDA from $6 billion in 2015 to a projected $7.5-$7.9 billion in 2016 and close to $10 billion in 2017; and free cash flow from $4.9 billion in 2015 to a projected $7.6-$8.1 billion in 2016 and close to $6.5 billion in 2017.  These numbers translated to giant paydays for defendants Vigodman, Olafsson and Desheh, as their cash bonus objectives were based on the following performance indicators: 35% non-GAAP operating profit (EBITDA), 20% net revenue, 15% free cash flow.

107.     Defendants also portrayed the deal as good for employees.  Olafsson emphasized:

[T]o me, for this to be a successful company, we need to have the best teams. . . . [B]ecause, yes, we are buying [tablet presses] and files and things like that, but at the end of the day, the success of this position and of this integration is the human capital.

People are the essence of the company going forward.

Less than 18 months after closing, Teva cut 14,000 jobs or 25% of its employees.

108.     The Actavis acquisition was represented as a cure-all for the new Teva, with benefits such as:

- The creation of a platform to grow the top and bottom line and "help the Street to assign a higher multiple on higher EPS to Teva."

- 36 -

- The "incredible value [of] the pipeline of new products . . . as a part of this acquisition."

- Although originally pitched as "not driven by any necessity that pertains to Copaxone," Vigodman later admitted that the acquisition was part of "everything that we have been doing the last 20 months is in a quest to be fully prepared for . . . generic competition to 40 milligram [Copaxone]," and "in the story, the narrative, that we have been building, the new one for Teva, Copaxone will become less and less prominent and important in that story."

- A solution to customer consolidation: "[T]here has been such a transformation on our customers side, I think this move will change the generic space, in terms of product supply, in terms of pipeline, in terms of offering what our customers are looking for" because "they basically reduce over time and limit the number of suppliers that basically they work with. So in general, you need to be big. You need to be able to apply economy of scale in order to compete successfully and to translate, then transform the challenge here into an opportunity."

- After closing, it was again emphasized that: "Yes, there has been [customer] consolidation, but we are strategically aligned and already communicating with these companies as we bring the two organizations together . . . big to big provides a value to all of these companies. Less transactions. It's a lot easier to do business with Teva."

109.   Defendants pitched the deal to investors as risk-mitigated based on Olafsson's credentials. During the second quarter 2015 earnings call, an analyst mentioned Olafsson's long tenure at Actavis and that it "eliminated the biggest risk to any major M&A . . . in that you know what you're buying." Olafsson agreed and stated that "on the integration, yes, it's true. We're in a special situation of knowing both companies very well."

110.   Olafsson also used his credentials as the former President of Actavis to ease investors' concerns about Actavis's revenues and strategic value. During a May 10, 2016 industry conference, an analyst confronted Olafsson with concerns about Actavis's first quarter results, stating that "revenues were down 26% year-over-year, and the operating income was down like 30%." Olafsson responded that, "as we sit here today, and me understanding what has happened in the in and out of the business, there's nothing alarming in the numbers that we are seeing this morning." In fact, he blamed Actavis's dismal performance on one product, Lidoderm, as the

"single biggest issue," and warned investors that it was "very dangerous to compare discontinued operation number[s] with a real reporting a year ago."  On June 8, 2016, two months prior to closing, in addressing the market's perception that Teva overpaid for Actavis, Olafsson assured investors that "the [strategic] value of the deal is exactly the same, and even better . . . than it was in July.  If you look at the performance of the Actavis business . . . I was running that for 11 years up until July 2014."  Again, during the July 13, 2016 outlook conference call, less than a month before closing, he affirmed that

> overall, the revenue hasn't changed in the Actavis business.  We understand, it is in good shape.  We are pleased with the business as is.
>
> The underlying business of what we're acquiring is in very, very good shape, and in the same shape as we were hoping when we did the transaction a year ago.

111.   After closing, during the November 15, 2016 earnings call, Olafsson continued to justify the Actavis acquisition, stating: "We are very pleased with . . . the Actavis asset when it comes in," but the overall underperformance of the generics business was blamed on delays in new launches.  He assured investors that "the good news on this bad news is they will come later . . . it doesn't undermine at all the fundamental of the generic business, because these are not lost opportunities.  These are opportunities that we are moving into next year and the year after."

112.   In reality, however, Olafsson knew that the combined companies' performance was not due to delayed launches, but was the foreseeable consequence of the companies' unsustainable collusive practices and Price-Hike Strategy.  During the same investor conference call, defendant Vigodman directly addressed the DOJ investigation into price collusion in the generic drug industry that had been in the news that month, emphasizing that, "based on all of our efforts to date, internal and external . . . we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."  When Olafsson announced that pricing erosion had jumped to 7%, a Wells Fargo analyst immediately questioned whether "it's not a result of having to tame previous

price increases or give back some of those?"  Olafsson pushed back against such claim and emphatically stated:

> No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition . . . .  So, there was an instability that happened in the market during the month of August . . . .
>
> It didn't change the fundamental of the market.  It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

113.    Thus, while Defendants acknowledged that pricing pressure was impacting profits, they falsely attributed these negative results to divestiture of certain generic products related to the Actavis acquisition and continued to conceal Teva's anti-competitive conduct and Price-Hike Strategy, improper financial reporting and disclosures, and Teva's true financial and business condition.

114.    Less than 20 days later, Teva fired Olafsson and immediately started the process of revising guidance.  While shocking Wall Street with the announcement of Olafsson's departure, Vigodman told investors that:

> [W]e are fully aware and mindful of the uncertainties that are elevated in a way that is driven by [Olafsson's] departure.  So, that's why we decided to just to move the guidance we provide to the Street on 2017 from February to January.  So, we are accelerat[ing] . . . the internal processes, and in the course of January [you will be] provide[d] the guidance.

**F.    Defendants Falsely Denied Price Inflation and the Resulting Erosion and Provided Misleading Projections Using Artificially Inflated Metrics**

115.    On July 27, 2015, when the Actavis acquisition was announced, Defendants provided false and misleading projections to investors on the expected benefits of the acquisition.  During the acquisition announcement conference call, defendant Vigodman stated "[d]uring [the] 2016 to 2018 timeframe, we expect to grow pro forma net revenues by CAGR of 5%, pro forma EBITDA by 10.1%, pro forma cash flow from operations by 12.5%, and pro forma free cash flow by 14.4%."

During the February 11, 2016 earnings call, defendant Vigodman reaffirmed the projections, "using 2015 as the base year."

116.    On July 13, 2016, three weeks before the completion of the acquisition, defendant Vigodman provided a new set of projections:



| 2016-2019 financial highlights | | | | |
|---|---|---|---|---|
| | **2016E** | **2017E** | **2018E** | **2019E** |
| **Revenues** $ billions | 22.0-22.5 | 25.2-26.2 | 25.8-26.9 | 26.7-27.8 |
| **Operating income** $ billions | 6.9-7.3 | 8.9-9.5 | 9.3-10.1 | 10.0-10.8 |
| **EBITDA** $ billions | 7.5-7.9 | 9.5-10.3 | 10.0-10.8 | 10.7-11.5 |
| **EPS** $ | 5.20-5.40 | 6.00-6.50 | 6.30-6.90 | 6.90-7.40 |
| Weighted average number of shares, in millions | 1,021 | 1,085 | 1,092 | 1,099 |
| **Cash flow from operations** $ billions | 5.7-6.1 | 7.0-7.6 | 7.6-8.3 | 8.0-8.8 |
| **Free cash flow** $ billions | 7.6-8.1 | 6.0-6.6 | 6.7-7.3 | 7.2-7.8 |

Operating Income, EBITDA and EPS presented on a non-GAAP basis.                                                                19

117.    Using 2015 as a base year, revenues were projected to grow at midpoint CAGR of 9% from $19.5 billion in 2015 to $26.7 billion to $27.8 billion in 2019; EBITDA was projected to grow at midpoint CAGR of 14% from $6.6 billion in 2015 to $10.7 billion to $11.5 billion in 2019. Similarly, free cash flow was projected to grow at midpoint CAGR of 11% from 2015.

118.    Defendants Vigodman, Desheh and Olafsson – all of whom participated in each of the conference calls providing false and misleading projections to investors – knew that the projections lacked a reasonable basis, as 2015, the base year, was a record year for U.S. generics revenues, operating income, EBITDA, earnings per share ("EPS"), cash flow and profitability margin. These metrics were driven by the generics segment and were artificially and unsustainably inflated by the Price-Hike Strategy and collusive price-fixing and market allocation activities.

119.    As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices had come to the fore as a number of

4828-1671-4429.v2

industry participants reported a new trend of downward pricing pressure. In the first half of 2016, Teva's customers and industry peers began announcing increased pricing erosion or expectations of heightened generic drug price deflation. For example, during the January 11, 2016 industry conference, a JPMorgan analyst raised the concern that "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward." Olafsson flatly rejected the claim and stated that Teva did not take part in generics price inflation, stating that:

> [W]e need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit.
>
> There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today . . . there is a decline.

Again, during the May 9, 2016 earnings call, analysts flagged that AmerisourceBergen, Endo and Perrigo Company plc ("Perrigo") were seeing worsening price deflation. Olafsson derided these companies as "leaking houses" that were "blaming the neighborhood for their maintenance issues. . . . You have to look at it differently for a company that has a big portfolio, strong new product launches, a differentiated portfolio, and a high quality portfolio."

120. Along the same lines, throughout 2016, Olafsson repeatedly denied ever having participated in generics pricing inflation, and accordingly, that Teva had encountered the concomitant pricing erosion:

- January 11, 2016 – Olafsson: "[W]e need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase. So, overall, we see that in the business."

- February 11, 2016 – Olafsson: "As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid-single-digit price decline for the

overall business.  In the US, our largest market, we saw approximately 4% price erosion."

- March 8, 2016 – Olafsson: "I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing.  But we never saw that. That was an individual molecule basis, they used example of products that really were not generic products, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business.  And there has been a decline there."

- June 8, 2016 – Olafsson: "When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business.  And we are still talking about the same number, what we see in the base business."

- September 9, 2016 – Olafsson: "Government is struggling with increased healthcare costs, and really the generics are the key to the solution.  They are really not the problem.  There is no inflation in the generic pricing. . . .  So far, what we saw in the end of second quarter was approximately 4% in the US and 5% global."

- November 15, 2016 – Olafsson: "[T]he overall prices in the US of generics always go down.  I've been in the business for 23 years, and the prices, even though there are examples giving of a product going up significantly, maybe a single molecule, even one SKU, but overall, when you look at the 300 to 400 products we have on the market, our price erosion on average is about 5% per year."

121.    In truth, Teva had raised prices on dozens of drugs, generating more than $2.2 billion in Inflated Profit by the end of 2016.

122.    Furthermore, as Olafsson made the above false statements and denials, Teva's Inflated Profit from collusive activities and the Price-Hike Strategy was on a rapid downward trajectory:



123.    Contrary to Olafsson's representations, Teva's portfolio experienced heightened pricing erosion throughout 2016 – much higher than the 4% conveyed to investors.  During Teva's January 6, 2017 business outlook conference call, Vigodman announced that "the entire healthcare sector has faced significant headwinds, and we have not been immune," resulting in a $1.2 billion EBITDA gap.  Vigodman stated that "[t]he guidance we provided today is significantly below what we provided in the July [13, 2016] preliminary outlook . . . [and] we have an EBITDA gap of $1.2 billion emanating from our generic business."  He falsely claimed that:

> [T]he majority of the $1.2 billion gap is attributable to not being able to realize new launches in our Teva legacy business in a way that is consistent with our past track-record.  As we communicated in November, this impacted the second half of 2016 and will have an impact on 2017 as well.
>
> In addition, the long waiting period for the closing of the transaction had an adverse impact on our ability to fully exploit all opportunities from the business during this long transition period.

124.    Defendants' explanations for the $1.2 billion gap were marred by inconsistencies. The July 2016 projection was provided a mere three weeks prior to the Actavis closing, which was originally scheduled to occur in the first quarter of 2016.  Thus, the long waiting period for the closing had already occurred at that point and would have been accounted for in the projections.

- 43 -

Vigodman provided a further explanation for the $1.2 billion gap at the J.P. Morgan Healthcare Conference a few days later, stating that:

> [T]he assumption was that we launch $600 million, which is very reasonable, given the numbers . . . .  In retrospect that was a tough year for us for a number of reasons and we were able eventually to launch only $140 million in 2016 for new products . . . and it created a new run rate for 2017.

In essence, Vigodman asserted a $460 million new launch delay – which Olafsson previously had characterized as "the good news" because these delayed products were "opportunities" that Teva could move "into next year and the year after" – that generated a $1.2 billion earnings gap.

125.    In addition, Vigodman emphasized that "we use basically very reasonable assumptions in the model, we modeled, based on past performance in the US and pipeline assets of Teva."   But the "past performance in the US" was inflated by collusive activities and the unsustainable Price-Hike Strategy, which Defendants concealed from investors.   In reality, the Inflated Profit declined by 40%, dropping from $848 million in 2015 to $513 million in 2016, which significantly contributed to the EBITDA gap.

126.    Nevertheless, Defendants continued to mislead investors with false and misleading projections that lacked a reasonable basis and were tainted by artificially and unsustainably inflated assumptions.  Although Defendants adjusted the EBITDA guidance downwards by $1.2 billion, the revised 2017 projections were still artificially inflated by unreasonable pricing assumptions:

## Non-GAAP financial highlights

| | 2016 Guidance* | 2017 Business Outlook |
|---|---|---|
| Revenues<br>$ billions | 21.6-21.9 | 23.8-24.5 |
| Operating income<br>$ billions | 6.8-7.0 | 7.4-7.8 |
| EBITDA<br>$ billions | 7.3-7.5 | 8.0-8.4 |
| Net income<br>$ billions | 5.2-5.3 | 5.3-5.7 |
| EPS<br>$ | 5.10-5.20 | 4.90-5.30 |
| Weighted average number of shares,<br>in millions | 1,020 | 1,076 |
| Cash flow from Operations<br>$ billions | 4.8-5.0 | 5.7-6.1 |
| Free cash flow<br>$ billions | 5.9-6.0 | 6.3-6.7 |

* Provided November 15th 2016

5

127.    After Vigodman's unexpected termination, during Teva's first quarter 2017 earnings conference call on May 11, 2017, defendant Peterburg affirmed the false and misleading projections even though pricing erosion had reached 7%.  He attributed the heightened pricing pressure to "the ongoing consolidation of our key customers and the increase in generic drug approval by the FDA, which has created additional competition" – without disclosing that dramatic price hikes from collusive activities and the Price-Hike Strategy had led to the FDA's initiative to speed up and increase generic drug approval and had attracted additional competitors, which had resulted in customer renegotiation of contracts as competition increased.  Inflated Profit for the first quarter of 2017 dwindled to $103 million, a 17% drop year-over-year and 19% decline from the fourth quarter of 2016.

128.    On August 3, 2017, Peterburg announced that Teva would have to lower its 2017 projections again due to U.S. generics pricing erosion and customers negotiating lower prices:

### 2017 non-GAAP P&L outlook

| billions, except EPS | 2017 Business Outlook January 2017 | Updated Business Outlook August 2017 |
|---|---|---|
| Net revenues | 23.8 - 24.5 | 22.8 - 23.2 |
| Gross profit (%) | 57% - 58% | 56% - 57% |
| R&D | 1.75 - 1.85 | 1.6 - 1.7 |
| S&M | 3.4 - 3.55 | 3.45 - 3.55 |
| G&A | 1.0 - 1.1 | 1.1 - 1.2 |
| Operating income ($B) | 7.4 - 7.8 | 6.6 - 6.8 |
| EBITDA | 8.0 - 8.4 | 7.2 - 7.4 |
| Finance expenses | 0.8 - 0.85 | 0.8 - 0.9 |
| Tax (%) | 17% - 18% | 16.5% - 17.5% |
| Number of shares (M) | 1,076 | 1,076* |
| EPS | 4.90 - 5.30 | 4.30 - 4.50 |
| Cash flow from operations | 5.7 - 6.1 | 4.4 - 4.6 |

\* If annual EPS is below $4.37, the mandatory convertible preferred shares will be anti-dilutive and the number of shares will be 1,017 with no impact on guided EPS of $4.30-$4.50. See slide 29 for additional information.

20

129.    Interim CFO McClellan revealed that Teva had been lying about the true level of pricing erosion all along.  He stated that pricing erosion for the base business was 8% on the 12-month moving average measurement "we have used in the past," but 6% on a year-over-year basis:

> Regarding the key topic of price erosion, as mentioned by Yitzhak, if we look at Q2 '17 compared to Q2 '16, rather than a 12-month moving average that we have used in the past, price erosion of our base products was slightly over 6%. We believe this methodology better captures the rapid changes in the market, which we've been seeing recently. Had we used the previous MAT methodology, Q2 erosion would have been near 8%.

130.    In order for a trailing 12-month moving average to be 8% between the second quarter of 2016 and the second quarter of 2017, when year-over-year change was only 6%, Teva had to experience substantially higher than 8% pricing erosion during the 12-month period.  However, except for the third quarter of 2016 and the first quarter of 2017 – in which Olafsson and Peterburg announced pricing erosion of 7% – Defendants had represented to investors that Teva's pricing erosion was 4% or 5% each quarter since 2015.  In fact, during the September 2016 generics outlook conference call, Olafsson reiterated that, because of the size of Teva's portfolio, "we are more shield

[sic] towards the prices up and down." A stable portfolio with pricing erosion between 4% to 7% could not have reached 8% pricing erosion on an average basis.

131.     Finally, on February 8, 2018, Teva provided 2018 guidance, with revenues down 30% from the projections at the time of the Actavis acquisition closing:

### 2018 Non-GAAP Financial Outlook

| | 2018 Outlook |
|---|---|
| Revenues ($ billions) | 18.3-18.8 |
| Non-GAAP Operating income ($ billions) | 4.0-4.3 |
| Non-GAAP EBITDA ($ billions) | 4.7-5.0 |
| Weighted average number of shares (in millions) | 1,030 |
| Non-GAAP EPS ($) | 2.25-2.50 |
| Free cash flow ($ billions) | 2.6-2.8 |

\* Free Cash Flow includes cash flow generated from operating activities, net of cash used for capital investments

**G.     Multiple Governmental Investigations Uncovered Evidence of Teva's Illegal Price Fixing, Bid Rigging and Market Allocation**

**1.     The Congressional Inquiry**

132.     Beginning in 2014, the price hikes by Teva and its co-conspirators in the generics market were sufficiently extensive that they had garnered some attention within the industry. In January 2014, the CEO of the National Community Pharmacists Association wrote Congress stating that "[o]ver the last six months . . . many of our members across the U.S. . . . have seen huge upswings in generic drug prices," and requesting an investigation into the matter. The State of Connecticut also found that:

> Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers, and consumers across the country whose costs have doubled, tripled, or in some cases, increased up to 1,000% or more. The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to

- 47 -

commence an investigation in July of 2014, which was followed shortly by . . . the United States Department of Justice Antitrust Division.

133.    Congress launched its investigation by October 2014, based on conclusions drawn from data accumulated on generic drug prices by the private Washington, D.C.-based Healthcare Supply Chain Association (the "HSCA").  The HSCA surveyed average prices paid by organizations that assist hospitals, nursing homes and home health agencies in negotiating with pharmaceutical companies and other vendors for discounts.  The survey largely confirmed that there had been recent enormous price hikes for generics drugs that appeared to be unexplained by market conditions. (Healthcare Supply Chain Assn., Surv. of Group Purchasing Org. (Oct. 2013 to Apr. 2014)).

134.    Congress sent letters to Teva and many of its peers, requesting documents and information concerning "the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life threatening illnesses" and requesting that Teva provide a series of documents and information for the time period covering January 1, 2012 to October 7, 2014.  Teva refused to provide these documents.  Instead, the Company coordinated with co-conspirators to draft a "polite f-u" letter to Congress.

135.    The other generics manufacturers that received similar letters from Congress included:  (i) Actavis;  (ii) Amphastar  Pharmaceuticals;  (iii) Apotex  Corp.  ("Apotex"); (iv) Dr. Reddy's  Laboratories  Ltd.  ("Dr. Reddy's");  (v) Endo;  (vi) Global  Pharmaceuticals; (vii) Heritage;  (viii) Lannett Company, Inc. ("Lannett");  (ix) Marathon Pharmaceuticals, LLC; (x) Mylan;  (xi) Par;  (xii) Sun;  (xiii) Turing Pharmaceuticals LLC;  (xiv) Valeant Pharmaceutical International,  Inc.  ("Valeant");  (xv) West-Ward Pharmaceutical Corp.  ("West-Ward");  and (xvi) Zydus Pharmaceuticals USA Inc. ("Zydus").  Press Release, Sen. Bernard Sanders, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014).

136.    On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw these huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted, and that is, in fact, what they did." *Why Are Some Generic Drugs Skyrocketing in Price?: Hrg. Before the Subcomm. on Primary Health and Aging of the S. Comm. of Health, Education, Labor, and Pensions*, 113 Cong. 3 (2014).  Although Teva was specifically invited to testify, it refused.  *Id.* at 8.

## 2.    The September 2016 GAO Report

137.    As a result of its inquiry, Congress requested that the GAO undertake an independent audit of the generic drugs that the federal government purchased by means of the Medicare Part D program.  The GAO performed its audit from June 2015 to August 2016 in accordance with generally accepted government auditing standards, requiring that the "evidence obtained provide[d] a reasonable basis for [the GAO's] findings and conclusions based on [its] audit objectives."  U.S. Gov't Accountability Off., GAO-16-706, *Generic Drugs Under Medicare Part D* 5 (Aug. 2016).

138.    Publicly released on September 12, 2016, the GAO's conclusions were significant.  The GAO found hundreds of unexplained "extraordinary price increases," defined as a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1000%.  *Id.* at 14.  The GAO's analysis indicates that Teva was one of the largest offenders.  *See, e.g.*, *id.* at 5 n.11.

139.    Over the study period of the first quarter of 2010 through the second quarter of 2015, the GAO found that as a general matter, overall generic drug prices had declined over time – as would be expected in a competitively functioning generics market.  According to the GAO, consistent with expectations, "generic drug prices fell 59 percent from the first quarter of 2010

- 49 -

through the second quarter of 2015." *Id.* at "What GAO Found."  In other words, when looked at as a whole, the entire set of generic drugs, including new entrants to the market, saw a price decline.

140.    However, over the same period, the GAO "analyzed an established basket of 1,441 generic drugs that were present during the entire period of analysis," and found price increases for a subset of drugs that was at odds with the trend for the overall generics market:

> ***More than 300 of the 1,441 established generic drugs analyzed had at least one extraordinary price increase of 100 percent*** or more between first quarter 2010 and first quarter 2015.  GAO found that drugs with extraordinary price increases moderated the overall decline in generic drug prices.  Additionally, the extraordinary price increases generally persisted for at least 1 year and most had ***no downward movement*** after the extraordinary price increase.  Given the low cost of generic drugs relative to their brand counterparts, stakeholders indicated limited changes to benefit design, including drug coverage.

*Id*.

141.    The GAO Report concluded that these price increases had begun in earnest in 2012, and accelerated into 2015.  Specifically, the GAO found that between the first quarter of 2010 and the fourth quarter of 2012, the price for this established basket of generic drugs had decreased by 22%, or about 2.2% per quarter on average.  However, between the end of 2012 and the second quarter of 2015, the price of the GAO's "established generic drug basket increased by 10%, or about 0.9% per quarter on average, which was four times the overall rate of general inflation of approximately 2.3% over the same time period."  *Id*. at 10.

142.    In all, "[t]he 315 drugs that experienced an extraordinary price increase during [the GAO's] study period have moderated the decline in generic drug prices for [the] basket of 1,441 established drugs, despite only representing slightly more than one in five established generic drugs."  *Id*. at 16.

143.    Contemporaneously with the increases, manufacturers publicly blamed the price increases on external pressures such as ingredient supply disruption, market consolidation, or similar

factors.  The GAO took issue with those assertions, concluding that the primary driver of prices in the generics industry is competition: "Manufacturers reported that competition, determined by the price and availability of the same drug from other manufacturers, is the primary driver of generic drug prices, as less competition could drive prices higher."  *Id*. at "What GAO Found."

144.    Indeed, according to the manufacturers interviewed by the GAO, including Teva:

> ***The generic drug market operates like a commodities market***, and manufacturers told us they are asked to submit a proposal offering their best possible price to their customers – for example, companies that operate pharmacies or wholesalers.  If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.

*Id*. at 23.

145.    As a matter of empirical fact, however, competition had not moderated the price hikes back to the historically normative price levels.  Instead, the GAO Report states that, "[o]f the 351 annual extraordinary price increases that occurred from first quarter 2010 to first quarter 2015, we were able to track 248 of these annual increases for 1 or more additional years, and found that nearly all persisted at 100 percent or more above the original price for at least 1 year."  *Id*. at 17.  As a result, the benefit from each drug price increase to the bottom line of the manufacturers involved was cumulative over time, and did not just provide an immediate benefit to the drug manufacturers.

146.    Teva owned the rights to FDA-approved products associated with at least 40% of the drugs identified in the GAO Report as having exhibited an "extraordinary price increase" in the 2013 to 2014 or 2014 to 2015 timeframes (42 of 105 active ingredients, 90 of 191 ingredient/form/strength alignments), as determined by cross-referencing the GAO Report against the FDA's list of "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book").

147.    The drugs identified by the GAO Report specifically included Acetazolamide, Baclofen, Carbamazepine, Cephalexin, Clobetasol Propionate, Desonide, Doxycycline Hyclate, Enalapril Maleate, Fluocinonide, Ketoconazole, Nystatin, Pravastatin Sodium, Theophylline and Tretinoin.  All of these drugs, which are discussed in more detail below, have also either been implicated in the State AGs' investigation and/or have been identified by Plaintiffs as having collusive price increases.

### 3.    The DOJ and State AG Investigations

148.    On or around July 8, 2014, the State of Connecticut began a non-public investigation into suspicious price increases of generic drugs.  The Connecticut AG quickly began issuing document subpoenas to Teva's peer generics manufacturers.  Specifically, the Connecticut AG issued subpoenas to Impax on July 14, 2014, to Lannett on July 15, 2014, and to Par on August 6, 2014, all relating to pricing of the generic drug Digoxin.  Lannett, Current Report (Form 8-K) at 2 (July 16, 2014); Impax, Current Report (Form 8-K) at 2 (July 15, 2014); Par, Annual Report (Form 10-K) (Dec. 31, 2014).

149.    According to reports, within days of the initial Connecticut AG subpoenas being issued to drug manufacturers, the DOJ Antitrust Division, Criminal I Section, contacted the Connecticut AG's office to inquire into the investigation.  *See* Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, C.T. Mirror, Jan. 27, 2017.

150.    By November 2014, the DOJ reportedly initiated an investigation and convened a grand jury in Philadelphia, Pennsylvania.  The grand jury began to issue document, testimony and information subpoenas.

151.    The DOJ's and the State AGs' investigations quickly accelerated with dozens of subpoenas being issued in 2014, 2015 and 2016.  To date, the Connecticut AG alone has issued hundreds of subpoenas to various  manufacturers, individuals and other entities in the generic drug

industry, including Actavis, Teva, Impax, Heritage, Lannett, Par, Mylan, Mayne Pharma (USA) ("Mayne"), and Dr. Reddy's.  Plaintiff State of New York has issued a total of 30 investigative subpoenas to telephone carriers regarding current and former employees of targets of the investigation, including to AT&T on February 6, 2018 and to 29 additional carriers between February 15, 2018 and March 27, 2018.  The AGs of California and Texas have also issued subpoenas.  Generic drug manufacturers have received subpoenas for documents or testimony from the federal criminal grand jury, including Teva, Impax, Lannett, Par, Mylan, Mayne, Dr. Reddy's, Sun, Taro Pharmaceuticals USA, Inc. ("Taro"), Baxter International and Allergan.  These include subpoenas served directly on individuals, including high ranking executives.  The DOJ has also served search warrants on Citron Pharma LLC ("Citron") (June 2016), Mylan (November 2016), Perrigo (May 2017), and Pfizer Inc. (July 2017).

152.    Teva was one of the last of the conspirators to receive a subpoena from the DOJ, which it did in June 2016, as it is the largest member of the conspiracy.

### 4.    Civil Antitrust Litigations

153.    Teva and numerous peers are the subject of more than two dozen civil antitrust suits brought by market participants alleging per se illegal price fixing across numerous specific drugs. Consistent with the AG Complaints' allegations of a wide-spread antitrust conspiracy, the DOJ Antitrust Division has intervened in these civil actions, seeking stays and also asserting that they overlap with the DOJ's criminal investigation.  This indicates that, at a minimum, the dozens of drugs in the civil suits – including several suits against Teva and Actavis – are the same drugs that are the subject of the ongoing criminal investigation.

5.    **The DOJ Investigation Yields Admissions of a Wide-Ranging
      Illegal Conspiracy Involving Teva**

154.    On December 14, 2016, the DOJ announced that it had charged Glazer, the former

CEO of Heritage, and Malek, the former President of Heritage, with violations of the federal

antitrust laws concerning a conspiracy relating to the prices of generic drugs.

155.    Glazer and Malek were charged with "knowingly enter[ing] into and engag[ing] in a

combination and conspiracy with other persons and entities engaged in the production and sale of

generic pharmaceutical products, . . . the primary purpose of which was to allocate customers, rig

bids, and fix and maintain prices."  Information, ¶6, *USA v. Glazer*, No. 16-cr-00506-RBS (E.D. Pa.

Dec. 12, 2016) (ECF No. 1) ("*Glazer* Information"); Information, ¶6, *USA v. Malek*, No. 16-cr-

00508 (E.D. Pa. Dec. 13, 2016) (ECF No. 1) ("*Malek* Information").

156.    The criminal information related to these charges specified that these products

included two specific drugs, Glyburide (used to treat type-2 diabetes) and Doxycycline Hyclate

(used to treat acne); they also indicated that the conspiracy involved numerous other unspecified

drugs and parties.  *See Glazer* Information, ¶106; *Malek* Information, ¶106.

157.    Teva was the dominant participant in the Glyburide market during the Relevant

Period, with approximately 70% to 75% of the market from 2012 to 2017.  The market for Glyburide

was an estimated $650 million in sales from 2012 to 2016.  Teva was also a major player in the

Doxycycline Hyclate market through its acquisition of Actavis, with an estimated $708 million in

sales in 2015 for Doxycycline Hyclate capsules alone.

158.    On December 9, 2016, Glazer and Malek both pled guilty to the federal charges.  In

exchange for immunity as to a whole host of generic drugs, they each agreed to provide full

cooperation with the DOJ's ongoing investigation, specifically with "the current federal

investigation of violations of federal antitrust and related criminal laws involving the production and

sale of generic pharmaceutical products in the United States."  Plea Agreement, ¶18, *USA v. Glazer*, No. 16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 18) ("*Glazer* Plea"); Plea Agreement, ¶17, *USA v. Malek*, No. 16-cr-00508-RBS (E.D. Pa. Jan. 1, 2017) (ECF No. 17) ("*Malek* Plea") (collectively, the "Pleas").  The full list of generic drugs on which Malek and Glazer conspired to raise prices, including those manufactured by Teva, has been filed under seal, and is the subject of the continued criminal grand jury inquiry.

159.    With respect to the Pleas, Malek and Glazer specifically admitted to participating in a conspiracy to allocate the market share, rig bids, and fix the prices of Doxycycline from at least April 2013 through at least December 2015.  They also admitted to participating in a conspiracy to allocate the market share, rig bids, allocate customers and fix the prices of Glyburide from April 2014 through at least December 2015.  Teva was a member of the conspiracy.  *Glazer* Plea, ¶106; *Malek* Plea, ¶106.

160.    Heritage, a New Jersey company owned by India-based manufacturer Emcure Pharmaceuticals, Ltd., fired Glazer and Malek in August 2016 and admitted to their conduct, stating: "'We are deeply disappointed by the misconduct and are committed to ensuring it does not happen again,'" promising full cooperation with authorities.  Nathan Vardi, *The Man The Feds Are Using To First Crack Open Their Big Antitrust Case Against Generic Drug Makers*, Forbes (Dec. 16, 2014).

161.    Further confirming the wide-ranging conspiracy at issue, co-conspirators Apotex, Heritage, Sandoz, and Rising have all entered into deferred prosecution agreements with the DOJ and agreed to cooperate in the investigations.  Sandoz's Armando Kellum and Taro's Ara Aprahamian are facing criminal charges for their roles in the conspiracy, with Kellum pleading guilty to the charges on February 14, 2020.

6. **Forty-Seven State AGs, the District of Columbia and the Commonwealth of Puerto Rico Accuse Teva of Participating in an Illegal Conspiracy Which Artificially Inflated the Value of Teva Securities**

162. On December 15, 2016, Connecticut and 19 other states' AGs filed civil charges against Teva and five other generic drug manufacturers – Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron; Heritage; Mayne; and Mylan. *See* December 2016 AG Complaint. The December 2016 AG Complaint was based on, and referenced, direct evidence of the conspiracy that was gathered in the State AGs' multi-year investigation. Additional states have since joined the action, which currently totals 47 State AGs, the District of Columbia and the Commonwealth of Puerto Rico.

163. The December 2016 AG Complaint alleged direct evidence, accumulated through years of investigation and discovery, of a massive horizontal conspiracy between Teva and other companies to illegally allocate the market for, rig bids for the sale of, and fix the prices of, generic drugs.

164. According to the December 2016 AG Complaint, the scheme consisted of two types of anti-competitive practices: First, to allocate customers and market share "either upon their entry into a given generic market or upon the entry of a new competitor into that market." The co-conspirators "communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to." Teva and its co-conspirators would effectuate the agreement either by refusing to bid for particular customers (*e.g.*, drug wholesalers or GPOs) or by providing a cover bid that they knew would not be successful. This conduct effectively reduced or eliminated competition for a particular drug and allowed Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

165.     Second, and often in conjunction with the first practice, competitors would simply communicate – typically either in person, by telephone, or by text message – and agree to collectively raise prices for a particular generic drug.  While maintaining a presence in the market for a particular drug, these agreements kept the appearance of competition, though prices and markets were fixed.

166.     Glazer and Malek have also admitted liability to the claims levied by the State AGs and, as part of their settlements, have agreed to cooperate fully with the State AGs' investigation and suit.  As the Connecticut AG George Jepsen has stated, Glazer and Malek's cooperation "'will significantly strengthen [the State AG's] ability to prosecute the litigation and further [their] investigation.'"  Eric Sagonowsky, *Ex-Heritage execs turn state's evidence in far-reaching generic pricing probe*, FiercePharma, May 25, 2017.

167.     The December 2016 AG Complaint focused on the same two drugs as the DOJ: Doxycycline and Glyburide.  However, like the DOJ, the State AGs made clear that these were simply examples of the much greater continuum of illegal agreements, and only a small part of its tremendous scope.  Specifically, the State AGs' complaint, amended on March 1, 2017, alleged that the still-ongoing investigation "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate the markets for a number of generic pharmaceuticals in the United States."  *See* March 2017 AG Complaint.

168.     According to the State AGs' allegations, "many of these schemes were conceived and directed by executives at the highest levels of many of the Defendant companies."

169.     As discussed in more detail below, Teva was expressly implicated in the December 2016 AG Complaint concerning the collusion over pricing and market share for Glyburide.  These allegations included direct communications and explicit agreements among Teva and its co-conspirators.  Specifically, on April 22, 2014, Malek identified "a large number of

different drugs that Heritage targeted for price increases."  Malek "instructed members of the sales team to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to reach agreement on the price increases."  However, Malek had a "direct relationship" with Nisha Patel at Teva, whom he spoke to regarding "rais[ing] prices on Glyburide, among other drugs."

170.    The State AGs also alleged that the efforts to conceal the conspiracy were deliberate and extensive.  "Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing."  In that regard, "all [defendants] made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made."  Indeed, "as [d]efendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection."  March 2017 AG Complaint, ¶¶125-126, 131.

171.    Moreover, the State AGs have found that the explanations provided by the generic drug manufacturers for their price increases were a mere pretext:

> Generic drug manufacturers [have] argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors.

*Id.*, ¶6.

172.    In addition to the specific claims already made in the State AG complaint, the AGs allege that "the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  *Id.*, ¶9.  According to an article citing the Connecticut AG lawyers who prepared the complaint, the full extent of the scheme involves "fraud on a broader, nearly unimaginable scale."  Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, C.T. Mirror, Jan. 27, 2017.

173.    Consistent with this, Connecticut's AG, Jepsen, in a December 2016 article published by *The New York Times*, noted that "'this is just the tip of the iceberg . . . .  I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit.'"  Katie Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, N.Y. Times, Dec. 15, 2016.  Jepsen "promised that more charges were coming." *Id.*

174.    Similarly, in an interview with *Bloomberg* that aired December 14, 2016, Jepsen described the breadth of the price-fixing scheme: "'[W]e believe it is massive, we believe it is quite widespread.  This is only the first legal action that is being taken; we expect quite a bit more.'"  Asked to describe the mechanics of the scheme, Jepsen said "what we're finding, and what the evidence will show, is very explicit price fixing.  This isn't circumstantial evidence . . . .  This is very explicit price fixing . . . in text messages, in emails, in conversations; we have cooperating witnesses.  The case is very strong."  Jepsen also explained that "the number of drugs that are being investigated goes well beyond the[] two drugs [Doxycycline and Glyburide]."

175.    Jepsen summarized, as reported in *The New York Times*, that the investigation had uncovered "'very damning'" evidence, and "'a culture of cronyism where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation.'"

> **a.    Trade Groups and Social Events Facilitated the Collusion**

176.    Both the DOJ and the State AGs focused in part on the participation of generic manufacturers in trade groups and other social industry events as a means to facilitate the conspiracy.  The State AGs alleged that "the [d]efendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ('NACDS'), Healthcare Distribution Management Association

('HDMA') (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ('GPhA') and Efficient Collaborative Retail Marketing ('ECRM')," among others.

177.    The DOJ is reported to have stated that "prosecutors are taking a close look at trade associations as part of its investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

178.    At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including from Teva, had the opportunity to interact with each other and discuss their respective businesses.

179.    As alleged by the State AGs, in addition to these frequent conferences and trade shows, sales representatives got together separately, in more limited groups, allowing high level executives to meet face-to-face with their competitors and discuss their business, gatherings that included "industry dinners."  For example, the State AGs allege that "in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking [male] executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey."

180.    Further, "[f]emale generic pharmaceutical sales representatives also get together regularly for what they refer to as a 'Girls Night Out' ('GNO'), or alternatively 'Women in the Industry' meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information."

181.    According to the State AGs' allegations:

> Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving defendants Citron and Heritage, among others); (2) in Baltimore in May (involving defendants Citron, Heritage and Teva, among others); and (3) at the NACDS conference in August (involving defendants Citron and Heritage, among others).

182.     Teva belonged to numerous additional trade organizations and attended numerous trade shows with its competitors over the Relevant Period, including: NACDS, HDMA (now the Healthcare Distribution Alliance), ECRM, and the GPhA.   Executives from Teva and its co-conspirators served on the GPhA Board of Directors, including Oberman, President and CEO of Teva Generics (2014); Debra Barrett, Teva SVP of Government and Public Affairs (2012-2013, 2015-2016); Glazer, President and CEO of Heritage (2013- 2016); Jeff Watson, President of Apotex (2013-2014, 2015-2017); and Joseph Renner President and CEO of Zydus (2013-2017).   Trade meetings provided ample opportunity for collusion by high-level executives with authority over price setting.   For example, price hikes on Pravastatin tablets occurred soon after February and June 2013 GPhA conferences attended by representatives from Teva and its co-conspirators.[3]

### b.     The State AGs Expand Their Allegations Against Teva to Eight Drugs

183.     On October 31, 2017, the State AGs filed a motion for leave to file a Consolidated Amended Complaint in *Connecticut v. Aurobindo Pharma USA, Inc*., Civ. A. No. 17-3768 (E.D. Pa.), ECF No. 3.   The October 2017 AG Complaint, which was filed as Exhibit A to the motion, alleged an extensive industry-wide overarching conspiracy and increased the number of generic drug manufacturer defendants from 6 to 18 and the number of drugs at issue in the litigation from 2 to 15. Several of the new drugs implicated in the conspiracy are manufactured by Teva.   The motion for leave to amend was granted on June 5, 2018.[4]

184.     Specifically, the October 2017 AG Complaint provided additional detailed allegations about Teva's expansive organizational involvement in the illegal price-fixing conspiracy related to

---

[3]    *See* Appendix B for a non-exhaustive list of corporate and individual attendees at various industry meetings and conferences attended by Defendants.

[4]    The October 2017 AG Complaint was originally filed with certain details and allegations under seal.   On February 27, 2019, the complaint was filed in unredacted form.

eight drugs: (i) Acetazolamide; (ii) Glipizide-Metformin; (iii) Glyburide; (iv) Glyburide-Metformin; (v) Leflunomide; (vi) Nystatin; (vii) Theophylline; and (viii) Verapamil.  The allegations included internal Teva communications announcing collusive price increases with instructions to not to compete against co-conspirators or decrease pricing and to track the agreements through Teva's Delphi system.  The allegations also included organized efforts by Teva personnel to communicate externally with co-conspirators to reach agreements on pricing increases.

185.    Through their investigations, the State AGs found that the conspiratorial conduct by Teva and its co-conspirators in the generic drug market was "pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition."   October 2017 AG Complaint, ¶11.  The overarching understanding applied whether the scheme involved allocation of market share or an agreement to fix prices.  *Id.*, ¶¶8, 14.  According to the October 2017 AG Complaint, "[t]his overarching agreement is widespread across the generic drug industry and is broader than the [d]efendants named in this Complaint."  *Id.*, ¶92.

186.    The overarching conspiracy rested on "general rules of the road" that were put in place over a decade ago – that each competitor was entitled to a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  *Id.*, ¶¶90-91.  In general, the earlier entrant was entitled to additional market share.  *Id.*  In practice, a generic manufacturer with more than its fair share of the market would walk away from a customer by instigating a price increase to allow its competitor seeking to obtain its fair share to bid slightly below the increased pricing.  *Id.*, ¶99.  After the market reached an equilibrium, the manufacturers then agreed on not competing on prices or on significantly raising prices in coordination.  *Id.*  At the equilibrium state, manufacturers did not take advantage of another

competitor's price increase by bidding lower prices, as doing so would be "viewed as 'punishing' a competitor for raising prices – which [was] against the rules." *Id.*, ¶106.

187.    Adherence to the "general rules of the road" by all competitors was crucial to maintaining high prices, because even a single deviant could lead to competition and lower prices. *Id.*, ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing manufacturers to determine "a generally agreed-upon standard of 'fair share' in order to avoid competing and keep prices high." *Id.*, ¶¶14, 100.

188.    The October 2017 AG Complaint also provided additional detailed information about how high-level executives, including CEOs, Presidents and SVPs at many generic drug manufacturers, including Teva, regularly discussed competitively sensitive information at industry events, in private meetings and via phone, text and email conversations. *Id.*, ¶¶88-91.  As a result of these communications, sales and marketing executives in the generic pharmaceutical drug industry are aware of their competitors' current and future business plans.  This familiarity and opportunity led to agreements among competitors to allocate markets to avoid price competition.  *Id.*

189.    For example, senior sales executives and other individuals responsible for the pricing, marketing and sale of generic drugs at Teva frequently spoke by phone and/or exchanged text messages with representatives of every other U.S.-based corporate defendant named in the October 2017 AG Complaint between July 1, 2013 and July 30, 2014, as represented in the following Table 2, which is based on phone and text message records from some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between Teva and the other defendants named by the State AGs during that period:

- 63 -

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**July 1, 2013 – July 30, 2014**

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| Apotex | 3 | 4 | | | | | | | | | | | | 7 |
| Ascend | | 3 | | | | | | | | | | | | 3 |
| Aurobindo | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| Citron | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| DRL | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| Glenmark | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| Heritage | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| Lannett | | | | | | | | | 16 | 13 | | 1 | 13 | 43 |
| Mayne | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| Mylan | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| Par | 0 | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| Sandoz | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| Sun | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| Zydus | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1501 |

*Id.*, ¶¶93-95.

190.     According to the October 2017 AG Complaint, these close communications led to price increases for several drugs in 2014, including those manufactured by Teva.  For instance, in April 2014, as part of his "pricing strategy," Heritage's Malek identified 18 different drugs targeted for price increases, of which Teva was a competitor on 8 of the drugs.  *Id.*, ¶269.  Malek had a direct relationship with Teva's National Accounts Manager, Nisha Patel, whom he called on April 15, 2014 and spoke to for 17 minutes.  *Id.*, ¶271.  During the call, Malek and Patel agreed that if Heritage increased prices for the drugs on the list, Teva would follow or, at a minimum, would not challenge Heritage's price increases by underbidding Heritage.  *Id.*

191.     For two of the drugs – Nystatin and Theophylline ER – Teva had already been planning a price increase and Malek and Patel agreed that Teva would take the lead on those increases.  *Id.*, ¶272.

192.     After her April 15, 2014 agreement with Malek, Patel and her Teva colleagues reached out extensively to other co-conspirators in an effort to reach similar agreements.  For example, on April 16, 2014, the day after her agreement with Malek, Patel called co-conspirator Zydus's Kevin Green, a Senior Director of National Accounts, and spoke for close to 20 minutes.

- 64 -

*Id.*, ¶298.  They spoke again the next day for another 12 minutes and continued to talk frequently over the course the next several months.  *Id.*  Patel's colleague Jessica Peters – an Associate Director of National Accounts – also communicated closely with Kristy Ronco, Zydus's Vice President of Sales, through numerous text messages in May 2014.  *Id.*  David Rekenthaler – Teva's National Accounts Director – communicated with Actavis's Marc Falkin (Vice President of Marketing, Pricing, and Contracts) by phone frequently throughout May 2014 and the subsequent months and exchanged 30 text messages between May 19 and May 22, 2014.  *Id.*, ¶¶370, 375.  Rekenthaler was also in constant communication with Mylan's Vice President of Sales, Jim Nesta.  Rekenthaler and Nesta communicated by phone multiple times on May 9, 2014, speaking for more than seven minutes, and continuously stayed in contact throughout 2014.

193.    While Teva reached out to co-conspirators, Teva and Heritage continued to keep each other updated about the "pricing strategy."  Malek spoke to Patel several more times after their April 15 conversation and kept her informed with more details about when Heritage would be increasing prices for those drugs so Patel could track them and instruct Teva not to decrease prices and to avoid competing when customers ask for bid requests.  In addition, from May 12 to May 15, 2014, representatives from Teva, Heritage and other co-conspirators met at the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") conference to discuss pricing.  Heritage's Anne Sather summarized in an email to Malek her success in achieving "'like minding'" with the co-conspirators on the "'pricing strategies'":

> "Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed.  Overall, spoke with Aurobindo['s representative], and Sandoz['s Christopher Bihari], Perrigo['s Pam Hoffman] (Colistimethate), Xgen ([B.P.]), (Colistimethate), and Lannett['s Tracy Sullivan]. . . .  I will try to meet with the Teva [representative], today.  Supposedly, Midlothian is here too – but I have not seen G. S. yet. . . ."

*Id.*, ¶287.

194.    After rounding up agreements from co-conspirators, on June 23, 2014, Heritage employees had an internal call to discuss the specific percentages by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors) to increase the prices, including Teva, and the strategies for doing so. *Id.*, ¶289.  Included on the list of drugs slated for increases were four drugs manufactured by Teva: Acetazolamide (75% increase); Glyburide (200% increase); Theophylline (150% increase); and Nystatin (95% increase). *Id.*

195.    After the Heritage internal call, Malek and Patel spoke on June 25, 2014 for approximately 14 minutes. *Id.*, ¶290.  During that conversation, Malek told Patel that Heritage would increase prices for a number of drugs that were also sold by Teva. *Id.*

196.    After her conversation with Malek, Patel informed her Teva colleagues of Heritage's price increases and requested that the drugs be entered into the "Delphi" system for tracking purposes to ensure Teva would not provide competing bids or decrease prices.  On June 30, 2014, Patel sent an email to Teva employees announcing Heritage's price increase on Theophylline and instructed that Teva "should not be considering decreases," even when opportunities arose to capture market share, as Heritage's price-hike "will likely trigger some bid requests/activity." *Id.*, ¶441. Similarly, when bid requests came in on July 9, 2014 for Glyburide and Nystatin after Heritage's price increases, Patel told her colleagues that "'we will not be bidding'" and affirmed Teva's agreement with Heritage, under which Heritage would "'follow[] Teva on . . . Nystatin'" and Heritage would be "'leading Glyburide Micronase.'" *Id.*, ¶¶353-354.  She further instructed: "'Per our conversation, please enter in Delphi for tracking purposes . . . .'" *Id.*

197.    According to the October 2017 AG Complaint, Teva's Government Affairs Department was alerted to the price-gouging activities and requested Patel's assistance in coming up with a rational excuse to provide to the Senate. *Id.*, ¶433.  After receiving a request on April 24,

- 66 -

2014 from a consultant working for the U.S. Senate Special Committee on pharmaceutical price gouging for an explanation of Teva's 200% price hike on Theophylline, Teva's Government Affairs Department stated in an internal email:  "'I'm hoping someone increased the price and we had to follow it up.  Or, API or something I can give the senate.'"  *Id.*, ¶434.  And specifically directed to Patel, the email asked: "'Anything positive I can say?'"  *Id.*  Patel responded: "'I don't have a great story.  I'll take a closer look.'"  *Id.*

198.    As is evident from the internal communications, Teva's collusive activities were well-known within the organization and not bidding against co-conspirators and not competing on pricing were the usual modus operandi tracked through the Delphi system.  And through experience, the Government Affairs Department knew to provide common excuses such as "'API [shortage] or something'" to external inquiries about Teva's dramatic price hikes.  *Id.*

199.    As discussed, Teva was implicated in the misconduct alleged by the State AGs in their amended complaint for eight of the 15 generic drugs.  Additional detailed allegations regarding these Teva-manufactured drugs subject to collusive price increases are laid out below.

### (1)    Nystatin

200.    The State AGs' investigation has indicated that price hikes in 2014 by Teva for Nystatin Oral Tablets ("Nystatin") were the result of collusion among market participants.

201.    Nystatin is a medication used to fight fungal infections, also known by the brand name Mycostatin®, among others.

202.    Nystatin comes in the form of a tablet in a strength of 500,000 units.  Teva's ANDA to manufacture Nystatin was approved in 1984.

203.    In 2013 and 2014, Teva's two main competitors for Nystatin were Heritage and Sun, through its division Mutual Pharmaceuticals ("Mutual").

204.     Price increases on Nystatin were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*) and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Nystatin, representatives from Teva, Heritage and Sun communicated via phone and text at least 34 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Nystatin.

205.     Sun, through Mutual, had increased Nystatin prices on April 15, 2013.

206.     According to the October 2017 AG Complaint, Teva began to consider raising its price of Nystatin around June 2013, and the drug appeared on a "'Price Increase Candidates'" list created by Teva's Patel by late July 2013 after a series of phone conversation between her and Malek.  October 2017 AG Complaint, ¶¶394-395.  Patel spoke to Heritage's Malek on July 9, 2013 for more than 21 minutes.  *Id.*  They spoke again on July 23, 2013 for nearly 10 minutes, and twice on July 30, 2013 with the second of those 2 calls lasting more than 12 minutes.  *Id.*  While Patel was initially reluctant to increase prices on Nystatin when it was suggested to her in June 2013, she ultimately put it on Teva's list of "'Price Increase Candidates'" after her discussions with Malek.  *Id.*, ¶397.  She included a note of "'Heritage Involved; follow Mutual'" on the list.  *Id.*

207.     The State AGs also alleged that Heritage and Mutual/Sun were in close contact, both before and after Mutual took the Nystatin price increase in April 2013.  *Id.*, ¶396.  In fact, the day after Mutual increased its price for Nystatin – April 16, 2013 – Mutual/Sun's Susan Knoblauch called Heritage's Anne Sather and they spoke for nearly 40 minutes, and continued to communicate

regularly throughout the summer of 2013.  *Id.*  In the time between Malek's two July 30, 2013 calls

with Patel, Sather and Knoblauch also spoke for nearly 11 minutes.  *Id.*, ¶395.

208.    After these conversations with Teva and Mutual/Sun, Heritage also began exploring a

price increase for Nystatin.  *Id.*, ¶398.  On August 20, 2013, Malek sent an email, with a copy to

Glazer, providing a list of four drugs, one of which was Nystatin.  *Id.*

209.    Patel left for maternity leave in August 2013, and both Teva and Heritage put the

Nystatin price increase plan on hold until her return.  *Id.*, ¶399.

210.    Shortly after her return, Patel reached out to Malek and resumed communication on

Teva and Heritage's price increase plan for Nystatin and other generic drugs.  *Id.*  On February 4,

2014, Patel left a message for Malek.  *Id.*  The next day, Malek returned her call and spoke for more

than an hour.  *Id.*

211.    After their conversation, on February 7, 2014, Patel created a "PI Candidates"

spreadsheet that included Nystatin and Theophylline as price increase candidates.  *Id.*, ¶400.  For

Nystatin, Patel noted on the spreadsheet: "'Shared with Heritage and Mutual/Caraco'" and "'WAC

increase likely.'"  *Id.*[5]

212.    According to the October 2017 AG Complaint, after Patel and Malek's follow-up

calls in February and March 2014, in April 2014, Patel and Malek "***agreed that Teva would take the***

***lead on [Nystatin and Theophylline] increases***."  *Id.*, ¶272.  Once Heritage had its agreement with

Teva in place, "***Teva began implementing the price increases for Nystatin with an effective date of***

***April 4, 2014, doubling the WAC price from $47.06 to $100.30***."  *Id.*, ¶402.

---

[5]    Generic drug manufacturers typically report, via subscription-based industry publications and compendia such as MediSpan and First Data Bank, a drug-by-drug pricing metric known as Wholesale Acquisition Cost ("WAC").  WAC is, in effect, the manufacturers' list price for a given drug; it does not reflect discounts or rebates applied to transactions between manufacturers and wholesalers or other institutions.

213.    After Teva's price increase, Heritage continued to communicate with Sun, with Heritage's Sather responsible for reaching out to her counterpart Knoblauch at Sun. *Id.*, ¶404. After Heritage's internal "Price Increase Discussion" conference call on April 22, 2014, Sather spoke with Knoblauch for 45 minutes. *Id.* After her call, Sather reported her agreement with Knoblauch in an email to Glazer and Malek entitled "'Conference call follow up.'" *Id.*, ¶405. She stated: "'Caraco notified and on board'" – to which Glazer replied: "'No emails please.'" *Id.*

214.    After reaching agreement with Sun, Heritage conducted a series of internal meetings to determine the extent of its price increase. On May 9, 2014, Heritage employees held another call regarding raising prices for Nystatin, and on June 23, 2014, discussed the specific percentage amounts by which they would seek to increase the pricing of certain drugs, and the strategies for doing so. *Id.*, ¶¶406-407. Nystatin was slated for a 95% increase. *Id.* Heritage's Associate Director of International Sales recorded in her notes that "***Heritage had to increase its WAC pricing for Nystatin, because Teva had***." *Id.* On June 25, 2014, Heritage held a "Product Price Changes" internal conference call regarding the planned price increase for Nystatin. *Id.*, ¶408.

215.    During Heritage's June 25, 2014 internal call, Sather texted Knoblauch to update her about the upcoming Nystatin price increase:

Sather:  "'Work news: we are raising price on Nystatin. Just letting you know. :)'"

Knoblauch:  "'How much[?]'"

Sather:  "'Double the price[.]'"

Sather:  "'On conf call – will call you back[.]'"

Knoblauch:  "'Yes[.]'"

*Id.*, ¶409.

216.    Similarly, on the same day, Malek updated Teva about Heritage's upcoming price increases. *Id.*, ¶410. During Malek's 14-minute call with Patel, he reported that Heritage would be

sending out Price Increase Notices the next day for Nystatin and several of the other drugs that Heritage and Teva had agreed to raise prices on. *Id.*

217.    Indeed, Heritage began to send out Price Increase Notices on June 26, 2014, and by July 9, 2014, Heritage had successfully increased prices for at least 14 different customers nationwide. *Id.*, ¶411.

218.    In addition to leading the price increases, the State AGs alleged that Teva also refused to bid or challenge the Heritage price increases when requested by Heritage's customers. *Id.*, ¶412. For example, on July 8, 2014, a large retail customer sent an email to a Teva representative requesting a quote for Nystatin, given the price increase of its current supplier. *Id.* The Teva representative forwarded that email to Patel, to which Patel "responded that she was aware," and that Heritage would be "following Teva on . . . Nystatin" and "leading Glyburide." Patel instructed that "we will not be bidding. Thanks." *Id.*

219.    Although Plaintiffs do not have the benefit of discovery at this stage, Plaintiffs' investigation has uncovered nearly identical information confirming that Teva doubled the WAC price in April 2014. Teva's WAC price for Nystatin tablets increased 110% for a 100-count bottle, from $47.76 to $100.03.

220.    Moreover, this price increase occurred in concert with Teva's competitors' increases, which were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings. *See* ¶¶327, 465, *infra*; App. B.

221.    As detailed in §III.H.3, Teva generated close to $9.5 million from the second quarter of 2014 through the second quarter of 2019 as a result of collusive increases in its prices for Nystatin: $2.6 million in 2014, $2.7 million in 2015, $2.4 million in 2016, $1.8 million in 2017, and less than $0.1 million in 2018 to the second quarter of 2019. The price hikes came at no additional expense to Teva. This increased revenue, therefore, went straight to Teva's bottom line.

## (2)    Theophylline

222.    The State AGs' investigation indicates that price hikes in 2014 by Teva for generic Theophylline, manufactured through its wholly-owned subsidiary Pliva, were the result of collusion among market participants.

223.    Theophylline, also known by the brand name Theo-Dur®, among others, is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema.

224.    Teva manufactures Theophylline in tablet form, with strengths of 100, 200, 300 and 450 milligrams.  Teva's ANDAs to manufacture the 100, 200 and 300 milligram strengths of Theophylline were approved in 1990, and the 450 milligram strength was approved in 1992.

225.    In 2014, Teva's primary competitor for Theophylline was Heritage.

226.    Price increases on Theophylline were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*) and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Theophylline, representatives from Teva and Heritage communicated via phone and text at least 22 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Theophylline.

227.    According to the October 2017 AG Complaint, Teva began to consider raising the price of Theophylline in early 2014.  October 2017 AG Complaint, ¶429.  On February 4, 2014, Patel and Malek spoke for more than an hour, and three days later Theophylline was identified as a

candidate for price increases in a "PI Candidates" spreadsheet created by Patel. *Id.*, ¶430. Follow-up calls ensued in February and March 2014. *Id.*, ¶431.

228.    As alleged by the State AGs, "[b]y April 2014, Teva had decided to increase prices for Theophylline, and Heritage had planned to follow the price increases to match Teva." *Id.*

229.    In fact, as alleged by the State AGs, in April 2014, Patel and Malek "***agreed that Teva would take the lead on those increases***." *Id.*, ¶272.  In the ensuing months, Patel and Malek spoke several times and Malek gave Teva detailed information "about when Heritage would be increasing prices for those drugs." *Id.*, ¶273.

230.    Effective April 4, 2014, Teva implemented price increases across the board for Theophylline. *Id.*, ¶432.

231.    According to the October 2017 AG Complaint, shortly after Teva hiked its Theophylline prices, on April 24, 2014, a consultant for the U.S. Senate Special Committee sent an email to Teva with the subject line "'PLIVA.com [Info] Price Gouging.'" *Id.*, ¶433.  The email stated:

> "I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was institute sometime earlier this year (2014).  Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative."

*Id.*

232.    The email was forwarded to a member of the Government Affairs Department at Teva, who asked: "'Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up.  Or, API or something I can give the

senate.'" *Id.*, ¶434.  Ultimately, the request was forwarded to Patel – who had directed and agreed to the price increases – with the question: "'Please let me know the specifics of the price increase. Anything positive I can say?'" *Id.*  Patel responded:  "'I don't have a great story.  I'll take a closer look.'" *Id.*  The real story was that Teva conspired with Heritage to raise market prices.  *Id.*

233.    Meanwhile, Heritage held a series of internal meetings to determine the extent of its Theophylline price increase.  During an April 22, 2014 Heritage "Price Increase Discussion" meeting, "Malek specifically instructed the Heritage sales team during that meeting that Heritage would be following the Teva price increase on Theophylline." *Id.*, ¶435.  In May and June 2014, Heritage continued to discuss internally its planned price increase on Theophylline. *Id.*, ¶¶436-438.  On June 23, 2014, Heritage employees discussed the specific percentage amounts by which they would seek to increase the prices of certain drugs, and the strategies for doing so. *Id.*  As alleged by the State AGs, Theophylline "was slated for a 150% increase." *Id.*, ¶437.  On June 25, 2014, Heritage conducted a final "Product Price Changes" internal call before implementing its Theophylline price increase. *Id.*, ¶438.

234.    According to the October 2017 AG Complaint, on June 25, 2014, Patel and Malek spoke for 14 minutes and Malek informed Patel "that Heritage would be sending out Price Increase Notices shortly for Theophylline and several of the other drugs for which Heritage and Teva had agreed to raise prices." *Id.*, ¶439.  The next day Heritage began sending out Price Increase Notices to its customers. *Id.*, ¶440.  By July 9, 2014, Heritage had followed Teva's lead and raised prices for at least 20 different customers nationwide. *Id.*

235.    After her call with Malek, on June 30, 2014, Patel emailed Teva employees, reporting "'[i]t appears that Heritage took an increase [on Theophylline] to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs.'" *Id.*, ¶441.  Patel noted to her

Teva colleagues that this activity "'will likely trigger some bid requests/activity,'" but stated that Teva "'should not be considering decreases.'" *Id.*

236.   Although Plaintiffs do not have the benefit of discovery at this stage, Plaintiffs' investigation has uncovered nearly identical information confirming that Teva increased the WAC price of Theophylline in April 2014.  Teva's WAC price for Theophylline 300 milligram tablets increased 82% for a 100-count bottle, from $30 to $54.  Parallel price increases occurred in the 100, 200 and 450 milligram tablets during April 2014, rising abruptly by 78%, 70% and 28%, respectively.

237.   Moreover, these price increases occurred in concert with Teva's competitors' increases, which were remarkably similar in terms of scale and timing, and occurred in close proximity to industry gatherings.  *See* ¶¶327, 465, *infra*; App. B.

238.   As detailed in §III.H.3, Teva has generated an estimated $19.2 million from the second quarter of 2014 through 2017 as a result of collusive increases in its prices for all strengths of Theophylline: $8.1 million in 2014, $8.4 million in 2015, and $2.7 million in 2016-2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### (3)   Glyburide

239.   The State AGs' investigation indicates that price hikes in 2014 by Teva for generic Glyburide were the result of collusion among market participants.

240.   Glyburide is an oral diabetes medication used to treat Type 2 diabetes.  Over time, people who have diabetes and high blood sugar can develop serious or life-threatening complications, including heart disease, stroke, kidney problems, nerve damage, and eye problems.

241.   Glyburide comes in the form of a tablet, with strengths of 1.25, 2.5 and 5 milligrams. Teva's ANDA for generic Glyburide was approved in 1995.

242.    As of April 2014, Teva's main competitors for Glyburide were Heritage and Aurobindo.  Between 2012 and 2017, Teva dominated the market for Glyburide with 75% of the $650 million market.

243.    Price increases on Glyburide were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Glyburide, representatives from Teva, Aurobindo, Citron, and Heritage communicated via phone and text at least 114 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Glyburide.

244.    On April 22, 2014, Heritage held a conference call during which Malek identified a large number of different drugs targeted for price increases, including Glyburide.  October 2017 AG Complaint, ¶269.  As alleged by the State AGs, "Malek instructed members of the sales team to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to reach agreement on the price increases." *Id.*  In response to Malek's directive, the sales team immediately began contacting their competition, including Teva.  *Id.*, ¶275.

245.    On June 23, 2014, Heritage employees discussed "the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so." *Id.*, ¶346.  Among those discussed was Glyburide, "which was slated for a 200% increase." *Id.*

246.    According to the State AGs, "Malek himself was responsible for communicating with [d]efendant Teva, which was a competitor on several of the drugs on the list, including Glyburide." March 2017 AG Complaint, ¶108.  Malek "had a direct relationship" with his contact at Teva who

- 76 -

was capable of making binding decisions regarding price increases. *Id.* Malek "was able to successfully communicate with her and reach an agreement to raise prices on Glyburide, among other drugs." *Id.*

247.   As alleged by the State AGs, "[a]fter reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases." October 2014 AG Complaint, ¶352.  By July 9, 2014, "Heritage had been able to successfully increase prices for Glyburide to at least seventeen (17) different customers." *Id.*

248.   The State AGs further alleged that Patel and Malek had been discussing the price increases as early as April 15, 2014, when they spoke for approximately 17 minutes. *Id.*, ¶341. During the call, they "discussed Heritage's intention to raise the price of Glyburide and other drugs" and Patel "agreed that if Heritage did raise the price of Glyburide (and/or the other drugs), ***Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts***." *Id.* Patel and Malek "spoke several more times over the next several months and confirmed the agreement to raise prices." *Id.*

249.   According to the October 2017 AG Complaint, after reaching agreement with Teva in April, Heritage began to communicate with Aurobindo and Citron to reach agreements to increase Glyburide prices. *Id.*, ¶342.  Representatives from Heritage and Aurobindo spoke for 16 minutes on May 8, 2014. *Id.*, ¶343.  Less than a week later, at the MMCAP conference, Heritage's Sather emailed Glazer and Malek and reported her success after her May 14, 2014 meeting with Aurobindo at the conference.  She stated that Aurobindo expressed "'similar like minding on the pricing strategies we discussed'" for Glyburide and other drugs. *Id.*, ¶345.  A month later, on June 25, 2014, Sather texted her friend at Citron to tout Heritage's success at reaching agreements with Teva and Aurobindo and inquired about Citron's plan at launching Glyburide:

Sather: "'Work question: is Citron launching Glyburide anytime soon?'"

- 77 -

K.A.:      "'Yes we currently have the product in our warehouse.'"

Sather:   "'We are raising the price right now – just letting you know.  Teva says they will follow.'"

Sather:   "'Aurobindo agrees too.'"

K.A.:      "'?'"

K.A.:      "'You have micronaise brand equivalent.'"

K.A.:      "'And are you also raising your wacs?'"

Sather:   "'Sorry – was on conference call.  Ours is Micronase?  Is yours Micro or Diabeta?'"

K.A.:      "'Micro.'"

Sather:   "'I don't think we changing WAC – verifying now[.]'"

K.A.:      "'Okay i talked to [Karen Strelau, Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing . . . are doing this immediately, i know she was mentioning teva can take a while to raise prices[.]'"

Sather:   "'Teva is slow but conversations have been good.'"

Sather:   "'No change to WAC for us[.]'"

Sather:   "'We are raising our customers 200% over current market price[.]'"

K.A.:      "'Okay will make sure the appropriate people find out[.]'"

Sather:   "'Teva has 66% of mkt- great target for share!  By [sic] [t]hey should play fair.  Aurobindo and us each have about 18% share.  Good luck!'"

K.A.:      "'Thanks!  Is this something you will be doing like this week?'"

Sather:   "'Letters going out this week!  A lot of customers have 30 day notices and price protection so real price will be felt in 30+ days[.]'"

K.A.:      "'Perfect makes sense . . .  Your not doing anything with glyb/met pricing right?'"

Sather:   "'Not yet – but is on a short list!'"

Sather:   "'Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too[.]'"

K.A.:   "'Okay yeah we have that too. . . .  Thanks for the info!'"

*Id.*, ¶347.

250.     After the text exchange, Sather sent an email entitled "Citron: Glyburide" to the Heritage sales team, which stated that "'Citron is launching soon – product is in their warehouse now. They have our version- rated to Micronase.  They are on board – communication is good.'"  *Id.*, ¶348. In a reply the next day, Neal O'Mara cautioned that "'[t]hey will still need to get some market share. May keep away initially, but we need to be prepared to lose some.'"  *Id.*

251.     After a series of internal meetings to determine the extent of its Glyburide price increase, Heritage decided on June 23, 2014 that Glyburide was slated for a 200% price hike.  *Id.*, ¶346.

252.     Having reached agreements with Teva, Aurobindo, and Citron, Heritage began sending Price Increase Notices to its customers on June 26, 2014.  *Id.*, ¶352.  That day, Sather informed a customer that Heritage would be increasing its price for Glyburide by 200% market-wide effective July 1, 2014.  *Id.*, ¶349.  By July 9, 2014, Heritage successfully increased Glyburide prices for at least 17 customers.  *Id.*, ¶352.

253.     Teva also began to evaluate its own price increases on Glyburide, and by July 9, 2014, "***Teva had also increased its WAC pricing on Glyburide***."  *Id.*, ¶355.  On July 15, 2014, Citron also increased its WAC and average wholesale price, or AWP, pricing for Glyburide to be in line with the price increases adopted by Heritage.  *Id.*

254.     Indeed, the March and October 2017 AG Complaints alleged that "[t]he unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide."  *Id.*, ¶353.  The price increases on Glyburide prompted a large national retail chain to contact Teva on July 9, 2014, requesting a bid.  *Id.*  The request was forwarded to Patel with "'[a]re you aware of the below?  Should we engage?'"  *Id.*  Patel reiterated that Heritage and Teva had an

- 79 -

"agreement" regarding "the two drugs at issue" and stated in her response: "'I am aware.  Heritage is likely following Teva on the Nystatin.  They are likely leading Glyburide Micronase.  Per our conversation, please enter in Delphi for tracking purposes, but we will not be bidding.  Thanks.'" *Id.*, ¶354.

255.    After Heritage raised its prices in July 2014, another large wholesaler solicited bids from both Teva and Aurobindo in an effort to obtain lower pricing.  *Id.*, ¶356.  On July 25, 2014, that wholesaler sent an email to Patel requesting a bid for Glyburide and certain other drugs.  *Id.*  The same day, the wholesaler sent an identical email to Aurobindo.  *Id.*

256.    According to the October 2017 AG Complaint, the bid requests "sparked immediate communication between the competitors as they tried to ensure uniformity and compliance with the scheme."  *Id.*, ¶357.  On July 25, 2014, Malek sent directions via text message, then had a 13-minute call to convey "the direction that Aurobindo should not provide a bid to the wholesaler."  *Id.*

257.    Malek also called Patel on the same day and spoke for more than 15 minutes.  *Id.*, ¶358.  After speaking with Heritage, both Teva and Aurobindo declined to provide a bid to the wholesaler.  *Id.*, ¶359.  These communications indicate that Teva coordinated with its competitors and declined to take market share in the face of price increases by Heritage.

258.    The October 2017 AG Complaint alleged that the anti-competitive agreement between Heritage, Teva, Aurobindo and Citron "to avoid competition and unlawfully increase prices for Glyburide continued until at least December 2015, and the effects continue to this day."  *Id.*, ¶363.

259.    Indeed, as described in §III.G.5, *supra*, in December 2016 both the former CEO and the former President of Heritage, Glazer and Malek, respectively, were charged with and pled guilty to federal charges of "knowingly enter[ing] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical

- 80 -

products, . . . the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices." As part of their pleas, Glazer and Malek admitted to participating in a conspiracy to allocate the market share, rig bids, allocate customers and fix the prices of Glyburide from April 2014 through at least December 2015. As described above, Teva was a member of this conspiracy.

### (4)   Acetazolamide ER

260.    The State AGs' investigation indicates that Teva colluded with its competitors in 2014 to increase prices for generic Acetazolamide ER ("Acetazolamide").

261.    Acetazolamide, also known by the brand name Diamox®, among others, is an extended-release version of a medication used to treat glaucoma (a condition in which increased pressure in the eye can lead to gradual loss of vision), epilepsy, altitude sickness, periodic paralysis, and heart failure.

262.    Acetazolamide comes in the form of a capsule in a strength of 500 milligrams. Teva's first NDA for Acetazolamide, under the brand name Diamox®, was approved in 1962.

263.    Teva's main competitors for Acetazolamide were Heritage and Zydus. As of April 2014, Heritage and Teva combined for approximately 78% of the market.

264.    Price increases on Acetazolamide were the result of collusive agreements to increase pricing and restrain competition. These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B). For instance, in the months preceding the April 2014 price increases for Acetazolamide, representatives from Teva, Heritage and Zydus communicated via phone and text at least 593 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April of 2014. These frequent meetings and communications

culminated in an agreement among competitors to fix prices and restrain competition for Acetazolamide.

265.   According to the AG Complaints, Heritage's Malek was responsible for obtaining Teva's agreement to raise prices.  On April 15, 2014, Patel and Malek spoke for more than 17 minutes during which time they discussed Heritage's intention to raise the price of Acetazolamide and other drugs.  October 2017 AG Complaint, ¶297.  The State AGs alleged that, during the call, Patel agreed that if Heritage did raise the price of Acetazolamide, "Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts."  *Id.*  Over the next several months, Patel and Malek spoke several more times to confirm their agreement to raise prices, and to provide updates regarding the Heritage increases.  *Id.*

266.   After reaching agreement with Heritage, Teva engaged in communications with employees at Zydus.  *Id.*, ¶298.  According to the October 2017 AG Complaint, on April 16, 2014, Patel spoke with Zydus's Senior Director of National Accounts, Kevin Green, for close to 20 minutes.  *Id.*  They spoke again on April 17, 2014 for another 12 minutes.  *Id.*  Over the next few months, Patel and Green continued to communicate frequently.  *Id.*  Patel's colleague, Jessica Peters – Teva's Associate Director of National Accounts – also exchanged numerous text messages with Zydus's Vice President of Sales, Kristy Ronco, on May 14, 2014.  *Id.*

267.   According to the October 2017 AG Complaint, Malek also reached out to Zydus's Ronco via LinkedIn, with Ronco responding on April 24, 2014 with "Hi Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."  *Id.*, ¶299.

268.   On May 7, 2014, Malek confirmed to his colleague Sather that he got "'buy in from all to go up'" on the price of Acetazolamide.  *Id.*, ¶300.  Sather expressed an intention to hike prices within the next week on Acetazolamine, "'one of our strategic items.'"  *Id.*

269.    The State AGs alleged that during this time period Heritage avoided bidding on any potential Acetazolamide customers already being supplied by Zydus in order to maintain market share among the competitors.  *Id.*, ¶301.  Then, on June 23, 2014, Malek and members of the Heritage sales team discussed an intention to raise prices for Acetazolamide by 75%.  *Id.*, ¶302.

270.    Indeed, three days later, on June 26, 2014, Heritage began sending out price increases to its customers, notifying them that Acetazolamide prices would be increasing by 75%.  *Id.*, ¶303.  As alleged by the State AGs, Heritage raised Acetazolamide prices to at least 17 different customers nationwide by July 9, 2014.  *Id.*, ¶304.

### (5)    Glipizide-Metformin

271.    The State AGs' investigation indicates that Teva colluded with its competitors in 2014 to increase prices for generic Glipizide-Metformin ("Glip-Met").

272.    Glip-Met, also known by the brand name Metaglip®, is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called Type 2 diabetes.  Over time, people who have diabetes and high blood sugar can develop serious or life-threatening complications, including heart disease, stroke, kidney problems, nerve damage, and eye problems.

273.    Glip-Met comes in the form of a tablet in strengths of 2.5 mg/250 mg, 2.5 mg/500 mg, and 5 mg/500 mg.  Teva's ANDA to manufacture Glip-Met was approved in 2005.

274.    As of April 2014, Teva's main competitors for Glip-Met were Heritage and Mylan.

275.    Price increases on Glip-Met were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Glip-Met,

- 83 -

representatives from Teva, Heritage and Mylan communicated via phone and text at least 110 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April of 2014. These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Glip-Met.

276. As alleged in the October 2017 AG Complaint, Heritage's Malek took responsibility for communicating with Teva about Glip-Met price increases and spoke with Patel on April 15, 2014 for more than 17 minutes. October 2017 AG Complaint, ¶341. During the call they discussed Heritage's intention to raise the price of Glip-Met and other drugs. *Id.* The State AGs alleged that Patel agreed that if Heritage raised the price of Glip-Met, "Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts." *Id.* Over the next several months, Patel and Malek spoke several more times to confirm their agreement to raise prices and to provide updates regarding the Heritage price increases. *Id.*

277. According to the State AGs, Mylan also agreed to raise prices for Glip-Met and two other drugs on April 23, 2014. *Id.*, ¶276. Heritage's Neal O'Mara confirmed in an internal email to Malek and Sather on April 23, 2014 that: "'Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products.'" *Id.*

278. Teva employees were in close communication with employees at Mylan during this time period. According to the October 2017 AG Complaint, Teva's National Accounts Director, David Rekenthaler, spoke with Mylan's Vice President of Sales, Jim Nesta, multiple times on May 9, 2014, including one call that lasted more than seven minutes. *Id.*, ¶333. The two continued to stay in close contact throughout the rest of 2014. *Id.*

279.    The agreed price increases went into effect shortly thereafter.  On May 9, 2014, Heritage held another internal call regarding increasing the price of Glip-Met.  *Id.*, ¶334.  Then, on June 26, 2014, Heritage's Sather informed a customer, a large wholesaler, that a 100% market-wide price increase for Glip-Met would be going into effect as of July 1, 2014.  *Id.*, ¶335.  Heritage began sending out Price Increase Notices to its customers for Glip-Met the same day.  By July 9, 2014, Heritage had increase prices nationwide to at least 27 different customers for Glip-Met.  *Id.*, ¶336.

280.    Teva and Mylan went along with Heritage on its price increases, and "Teva, in fact, increased its bid prices to potential customers."  *Id.*, ¶337.  In November 2014, Malek received confirmation from Heritage's Keith Fleming that "'a majority'" of Heritage price increases for Glip-Met "'had stuck up to [that] point.'"  *Id.*

### (6)    Glyburide-Metformin

281.    The State AGs' investigation indicates that Teva colluded with its competitors in 2014 to increase prices for generic Glyburide-Metformin.

282.    Glyburide-Metformin, also known by the brand name Glucovance®, is an oral medication used to treat Type 2 diabetes, a condition in which the body does not use insulin normally and therefore cannot control the amount of sugar in the blood.

283.    Glyburide-Metformin comes in the form of tablet, in strengths of 1.25 mg/250 mg, 2.5 mg/500 mg, and 5 mg/500 mg.  Teva's ANDA to manufacture Glyburide-Metformin was approved in 2005.

284.    As of April 2014, Teva's competitors in the market for Glyburide-Metformin were Heritage, Aurobindo and Actavis.  Heritage had only 5% market share at that time, but nonetheless wanted to raise prices.

285.    Price increases on Glyburide-Metformin were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part,

- 85 -

through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Glyburide-Metformin, representatives from Teva, Actavis, Aurobindo and Heritage communicated via phone and text at least 320 times, and corporate representatives at Teva, Actavis, Aurobindo and Heritage, including Oberman, met in person at numerous industry events, including events held in February and April of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Glyburide-Metformin.

286.   According to the October 2017 AG Complaint, "Malek was responsible for communicating with Teva regarding Glyburide-Metformin price increases," and on April 15, 2014 Malek and Patel spoke for more than 17 minutes.  October 2017 AG Complaint, ¶367.  During the call they discussed Heritage's intention to raise the price of Glyburide-Metformin and agreed that if Heritage did raise the price of Glyburide-Metformin, "Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts."  *Id.*  Over the next several months, Malek and Patel spoke several more times to confirm their agreement to raise prices and to provide updates regarding the Heritage price increases.  *Id.*

287.   After reaching an agreement with Teva, Heritage contacted Actavis, which also agreed to increase the price of Glyburide-Metformin.  *Id.*, ¶368.  The State AGs allege that on April 22, 2014, after Heritage's internal "Price Increase Discussion" call, Heritage's Sather called Actavis's National Accounts Director Michael Dorsey to discuss price hikes for Glyburide-Metformin and Verapamil.  *Id.*  Sather and Dorsey spoke for nine minutes and, according to the October 2017 AG Complaint, Actavis and Heritage reached an agreement to raise the prices of both

- 86 -

drugs.  *Id.*  Dorsey conveyed the message internally to the Actavis sales and pricing team that Heritage was planning a price increase on Glyburide-Metformin and Verapamil.  *Id.*, ¶369.

288.    On April 28, 2014, an Actavis pricing manager circulated an email with a list of potential price increases for different drugs.  *Id.*  The email noted "'[Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR.'"  *Id.*

289.    As alleged by the State AGs, after receiving the April 28, 2014 email with a list of potential price increase candidates, Mark Falkin, Actavis's Vice President of Marketing, Pricing and Contracts, called Teva's Rekenthaler and spoke for five minutes on May 1, 2014.  *Id.*, ¶370.  They communicated frequently over the next several months and spoke three more times on May 6, 2014, with one of the calls lasting 15 minutes.  *Id.*  Between May 19 and May 22, 2014, Falkin and Rekenthaler exchanged 30 text messages.  *Id.*, ¶375.

290.    With agreements from Teva in hand, Heritage and Actavis reached out to Aurobindo to obtain an agreement on price increases for Glyburide-Metformin.  *Id.*, ¶371.  Heritage's Dan Lukasiewicz spoke with Aurobindo's Paul McMahon for 16 minutes on May 8, 2014.  *Id.*, ¶372.  Less than a week later, on May 14, 2014, Heritage's Sather met in person with an Aurobindo representative at the MMCAP conference.  *Id.*, ¶311.  After the meeting, she emailed Malek to report on Aurobindo's "'similar like minding on the pricing strategies we discussed.'"  *Id.*  Around the same time, Actavis's Falkin communicated twice with Aurobindo's CEO, Robert Cunard, on May 12, 2014.  *Id.*, ¶375.

291.    Sather touted Heritage's success at reaching agreements on Glyburide-Metformin and other drugs in her communications with other co-conspirators – even though they were not actively selling Glyburide-Metformin.  *Id.*, ¶¶376-377.  In her text messages to Sun's Knoblauch on August 20, 2014, Sather discussed Heritage's agreements with Actavis:

Sather:   "'I heard they were on board with it.  What item specifically?'"

Knoblauch: "'I don't know.  I am just hearing about an increase but no details. What product have you heard about[?]'"

Sather:   "'We were communicating on Glyburide/Metformin and Verapamil[.]'"

*Id.*, ¶378.

292.    With Citron, after reaching agreements on Glyburide on June 22, 2014, in response to her co-conspirator inquiry on Glyburide-Metformin's price increase, Sather stated:  "'Not yet – but is on a short list!'" *Id.*, ¶376.

293.    Several weeks later, Teva's and Heritage's WAC pricing increases on Glyburide-Metformin and two other drugs were noted by Citron's Karen Strelau in an internal email dated July 9, 2014. *Id.*, ¶377.  In reply, a member of the pricing team stated Citron's intention to "'match their price increases.'" *Id.*

294.    Price increases resulted from these numerous communications.  As alleged by the State AGs, on July 2014, Heritage increased its WAC prices for Glyburide-Metformin.  An internal Citron email dated July 9, 2014 noted that "Heritage and Teva had increased their WAC pricing on 3 different drugs, including Glyburide-Metformin." *Id.*

### (7)    Leflunomide

295.    The State AGs' investigation indicates that Teva colluded with its competitors in 2014 to raise the price of generic Leflunomide.

296.    Leflunomide, also known by the brand name Arava®, is an immunosuppressant drug used to treat active, moderate-to-severe rheumatoid arthritis and psoriatic arthritis (conditions in which the body attacks its own joints, causing pain, swelling, and loss of function).

297.    Leflunomide comes in the form of a tablet in strengths of 10 and 20 milligrams. Teva's ANDA to manufacture Leflunomide was approved in 2005.

298.    As of April 2014, Teva's main competitors in the market for Leflunomide were Heritage and Apotex.  Heritage was the dominant player, holding a 61% share.

299.    Price increases on Leflunomide were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*) and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Leflunomide, representatives from Teva, Apotex and Heritage communicated via phone and text at least 37 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in February and April of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Leflunomide.

300.    According to the October 2017 AG Complaint, "Malek was responsible for communicating with Teva about Leflunomide price increases," and he spoke with Patel on April 15, 2014 for more than 17 minutes.  October 2017 AG Complaint, ¶382.  During the call they discussed Heritage's intention to raise the price of Leflunomide and other drugs.  The State AGs alleged that Patel agreed that if Heritage did raise the price of Leflunomide, "Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts."  *Id.*  Over the next several months, Malek and Patel spoke several more times to confirm their agreement to raise prices and to provide updates regarding the Heritage price increases.  *Id.*

301.    Armed with an agreement from Teva, Heritage proceeded to rope in Apotex.  As alleged by the State AGs, Heritage's Matt Edelson took responsibility for contacting Apotex on Leflunomide.  *Id.*, ¶383.  On May 2, 2014, he spoke with Apotex's Sales Manager Debbie Veira for over 13 minutes.  *Id.*  On May 6, 2014, Heritage's Sather emailed Malek about Teva's potential exit from the market, stating that "'the Teva discontinuation of Leflunomide has everyone in a fuss!

Wow – can we take more share???'" *Id.*, ¶384. Malek responded with "'we may give some to [A]potex and follow our strategy we discussed. Will have clarity by tomorrow.'" *Id.* At the same time, Edelson intensified his efforts to contact Apotex and had two more conversations with Veira. *Id.*, ¶385. Apotex's Vice President of Sales, Beth Hamilton, also spoke twice with Edelson for more than 17 minutes. *Id.* They had two more conversations the next day. *Id.* According to the October 2017 AG Complaint, upon information and belief, Heritage and Apotex agreed to increase prices and avoid competition on Leflunomide during these conversations. *Id.*

302.    On May 9, 2014, Heritage discussed internally the planned price increase for Leflunomide, and in late June began sending out Price Increase Notices to its customers. *Id.*, ¶¶387-388. By July 9, 2014, Heritage had raised prices for at least 15 different customers nationwide. *Id.*

303.    Despite Teva's initial agreement to follow Heritage's price increase, Teva began to exit the market for Leflunomide in or around July 2014. *Id.*, ¶389.

### (8)    Verapamil

304.    The State AGs' investigation indicates that price hikes in early 2015 by Actavis for its generic Verapamil was the result of collusion among market participants. The collusion and collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

305.    Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina and certain heart rhythm disorders.

306.    On October 29, 2013, Actavis hosted a conference call to discuss the Company's third quarter 2013 financial results. During this call, defendant Olafsson acknowledged that "***there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity***." A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014. At the conference,

Olafsson indicated that, despite increased pricing pressure, "*when you are in this top four range –*
*Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win*."

307.    In April 2014, Actavis's main competitors for Verapamil were Mylan and Heritage.
Together, over the prior five full years, these entities were responsible for over 90% of the generic
Verapamil capsules sold in the United States.

308.    Price increases on Verapamil were the result of collusive agreements to increase
pricing and restrain competition.  These collusive agreements were furthered, in part, through phone
and text communications (as identified in ¶189, *supra*) and in-person discussions conducted at
meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*;
App. B).  For instance, in the months preceding the March 2015 price increases for Verapamil,
representatives from Actavis communicated with Heritage on at least two occasions, communicated
frequently with Mylan, and their corporate representatives met in person at numerous industry
events, including events held from February 2014 through February 2015.  These frequent meetings
and communications culminated in an agreement among competitors to fix prices and restrain
competition for Verapamil.

309.    In phone calls that took place on April 22 and April 23, 2014, senior sales executives
at Actavis, Mylan and Heritage reached an agreement to raise prices for Verapamil.

310.    On April 22, 2014, Actavis's Dorsey and Heritage's Sather spoke for more than nine
minutes within hours after Heritage's internal "Price Increase Discussion."  October 2017 AG
Complaint, ¶446.  The State AGs alleged, upon information and belief, that during that call Heritage
and Actavis reached an agreement to raise the price of Verapamil and another drug, Glyburide-
Metformin.  *Id.*

311.    Dorsey then conveyed the message internally to the sales and pricing team at Actavis
that Heritage was looking to take a price increase on Verapamil.  *Id.*, ¶447.  Two different Senior

Pricing Managers at Actavis were involved.  As alleged by the State AGs, "*[t]he information spread quickly throughout the sales and pricing teams at Actavis*."  *Id.*

312.     On April 28, 2014, an Actavis pricing manager circulated an email with a list of drugs that were potential price increase candidates.  The email noted "'[Michael Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil JR.'"  *Id.*

313.     Just over a week later, on May 6, 2014, Actavis's Falkin, who had also received the April 28, 2014 email with a list of price increase candidates, called Mylan's Nesta and left a message.  *Id.*, ¶448.  Nesta returned the call on May 9, 2014 and the two spoke for just over three minutes.  They spoke again on May 19, 2014 for almost seven minutes, and continued to communicate frequently over the next several months.  *Id.*

314.     On May 8, 2014, Malek emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with the price increases discussed during the April 22, 2014 "Price Increase Discussion" call.  *Id.*, ¶449.  Sather, who reached an agreement with Dorsey on Verapamil and Glyburide-Metformin, confirmed in an email to Malek: "'Jason, I made contact with all my take aways – with positive results.  I can resend those notes or talk with you on any details.'"  *Id.*

315.     Likewise, Heritage's Neal O'Mara had similar success with Mylan.  *Id.*, ¶276.  He spoke with Mylan's Mike Aiger on April 23, 2014 and reached an agreement to hike prices for Verapamil and two other drugs.  *Id.*  Immediately after his call, he sent an email entitled "'Mylan'" to Malek and Sather and confirmed: "'Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone.  They are looking at price increases as well on a number of products.'"  *Id.*

316.     On May 9, 2014, Heritage held another conference call, and Verapamil was again on the list of drugs targeted for a price increase.  *Id.*, ¶450.

317.    Although Heritage did not increase prices for Verapamil market-wide in July 2014, like it did for many other drugs, it did raise the price of Verapamil for at least one customer as part of its price increase initiative.  *Id.*, ¶451.

318.    As alleged by the State AGs, on August 20, 2014, Heritage's Sather and Sun's Knoblauch exchanged text messages, which "***described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil***":

> Knoblauch: "'Have you heard anything about an Actavis price increase[?]'"
>
> Sather:  "'I heard they were on board with it.  What item specifically?'"
>
> Knoblauch: "'I don't know.  I am just hearing about an increase but no details.  What product have you heard about[?]'"
>
> Sather:  "'We were communicating on Glyburide/Metformin and Verapamil[.]'"
>
> Sather:  "'We haven't touched verapamil yet[.]'"

*Id.*, ¶452.

319.    Although Plaintiffs do not have the benefit of discovery at this stage, Plaintiffs' investigation has uncovered information confirming that Actavis increased the WAC price of Verapamil around March 2015.  Teva's WAC price for the highest strength Verapamil capsules increased by 95% for a 100-count bottle, from $155 to $303.  The unprecedented price increases for Verapamil by the colluding manufacturers were highly correlated, meaning that there is a 99% chance that the probability of "no correlation" can be rejected, and that a relationship exists.

320.    As detailed in §III.H.3, Actavis and Teva have generated an estimated $127 million from the first quarter of 2015 through the second quarter of 2019 as a result of collusive increases in prices for Verapamil, approximately $96 million of which was generated after Teva acquired Actavis in August 2016: $15.8 million in 2016, $37.4 million in 2017, and $43.1 million from 2018 to the second quarter of 2019.  The price hikes came at no additional expense to Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

- 93 -

321.    These eight examples of Teva reaching anti-competitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry.  The State AGs have indicated that the AG Complaints' common thread is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage.  The State AGs are investigating collusive conduct relating to nearly 300 additional drugs.

**H.    Plaintiffs' Investigation Has Uncovered 17 Additional Drugs that Were the Subject of Collusion**

**1.    Plaintiffs' Research Has Identified Drugs with Large Collusive Price Increases**

322.    Plaintiffs' investigation has revealed that the markets for numerous additional drugs sold by Teva have indicia of large collusive price hikes by Teva.

323.    These are examples that Plaintiffs have been able to uncover without the benefit of discovery.  Plaintiffs believe discovery will reveal numerous other drugs in which the market participants colluded to fix prices, set market share, allocate customers, and rig bids.  Specifically, these examples are:

| Additional Collusive Drugs | Teva Drug | Actavis Drug | Medical Indications |
|---|---|---|---|
| Baclofen | X | | Treats spasticity associated with multiple sclerosis, particularly for the relief of repeated flexor spasms and accompanying pain and muscular rigidity |
| Carbamazepine (tablet and chewable tablet forms) | X | | Treats epilepsy, trigeminal neuralgia, manic and mixed episodes of bipolar I disorder, and attention deficit and hyperactivity disorder |
| Cephalexin (oral suspension form) | X | | Treats bacterial infections, including streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections |
| Clobetasol (topical cream) | | X | Reduces swelling, redness, and itching |
| Desonide (topical lotion and external cream) | | X | Treats redness, swelling, itching, and discomfort of skin conditions such as eczema, seborrheic dermatitis, contact dermatitis and psoriasis |
| Diclofenac Potassium | X | | Reduces pain, fever, and inflammation |
| Doxycycline | | X | Treats infections caused by bacteria, such as pneumonia; infections of the skin, eye, and the lymphatic, intestinal, genital, and urinary systems |
| Enalapril Maleate | | | Treats high blood pressure, heart and kidney disease |
| Estradiol (tablet form) | X | X | A hormone replacement therapy for insufficient estrogen production |
| Fluocinonide (cream, ointment, and gel forms) | X | | Reduces swelling, itching, and redness associated with conditions such as psoriasis, eczema, dermatitis, and vitiligo. |
| Glyburide (micronized) | X | | Reduces blood glucose to improve glycemic control in adults with type 2 diabetes |
| Ketoconazole (tablet and cream forms) | X | | Treats fungal infections |
| Pravastatin Sodium | X | | Reduces the risk of heart attack, stroke, and cardiovascular mortality |
| Propranolol (capsule) | | X | Treats high blood pressure, irregular heart rhythms, pheochromocytoma, and certain types of tremor, and hypertrophic subaortic stenosis; prevents angina and migraine headaches; and improves survival after a heart attack |

| Additional Collusive Drugs | Teva Drug | Actavis Drug | Medical Indications |
|---|---|---|---|
| Propranolol (tablet) | X | | Treats high blood pressure, irregular heart rhythms, pheochromocytoma, and certain types of tremor, and hypertrophic subaortic stenosis; prevents angina and migraine headaches; and improves survival after a heart attack |
| Tretinoin | | X | Treats acne |
| Ursodiol | | X | Treats gallstone |

324. For the Teva collusive drugs, Teva implemented extraordinary price increases, and did so without the price hikes having any meaningful effect on Teva's market share. In other words, the market participants did not, as would be expected in a functioning, non-collusive market, try to undercut each other's prices to gain market share. The price hikes were in the competitors' self-interests only if they all agreed to act in tandem.

325. For the Actavis collusive drugs, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain prices of the generic drugs. The collusion and its effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

326. Plaintiffs' investigation has found that there is no rational alternative explanation for these price hikes other than collusion. There was no shortage of supply or unexpected increase in demand.[6] Moreover, as the graphs below depict (Appendix C), prices generally did not decrease following the initial price increases to their pre-increase equilibrium price points as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

327. Anti-competitive behavior by Teva and its co-conspirators left behind a series of collusive markers in the market, as evidenced by uniform price hikes within close timeframes marked by high correlations, low volatility of drug prices post-collusion, and the high stability of market share. These characteristics were inconsistent with competitive markets. For each drug, the

---

[6] *See* FDA, Current and Resolved Shortages and Discontinuations Reported to FDA, https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm.

correlation of the manufacturers' price moves was so high and statistically significant that the probability of obtaining such heightened correlation by chance is less than 1%. After the price hikes, the volatility of pricing and market share substantially declined – indicating stability that was uncharacteristic of a competitive market where manufacturers would compete on pricing to gain market share:

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Unit. (% increase) | Correlation of Price Hikes During Relevant Period | Volatility of Prices after Price Hike | Volatility of Market Share After Price Hike |
|---|---|---|---|---|---|---|
| **Enalapril Maleate** (1st Increase) | Mylan | Jul, 2013 | $0.20 (81%) | 73% | 0.3%-12.8% | 3.3% |
| | *Teva* | *Jul, 2013* | *$0.20 (312%)* | 100% | 0.4%-11.7% | 1.0% |
| | Wockhardt | Jul, 2013 | $0.17 (247%) | 91% | 0.3%-9.2% | 4.2% |
| **Pravastatin Sodium** | Glenmark | May, 2013 | $0.76 (191%) | 63% | 0.1%-1.8% | 2.1% |
| | Apotex | May, 2013 | $0.75 (118%) | 66% | 0.3%-6.2% | 2.4% |
| | Zydus | Jun, 2013 | $0.64 (187%) | 86% | 0.3%-3.3% | 1.3% |
| | *Teva* | *Aug, 2013* | *$0.64 (175%)* | 100% | 0.1%-1.6% | 2.7% |
| | Lupin | Aug, 2013 | $0.64 (160%) | 99% | 0.2%-1.5% | 0.4% |
| **Cephalexin** | Lupin | Nov, 2013 | $0.21 (109%) | 85% | 0.0% | 0.6% |
| | *Teva* | *Apr, 2014* | *$0.21 (111%)* | 100% | 0.0% | 2.3% |
| **Ketoconazole** Cream / Tablets | *Teva* | *Apr, 2014* | *$1.23 (113%)* *$2.22 (250%)* | 100% | 0.4%-1.7% | 7.8% |
| | Taro | Apr, 2014 | $1.23 (112%) $2.20 (242%) | 40% | 0.1%-3.5% | 5.8% |
| **Nystatin** | *Teva* | *Apr, 2014* | *$1.00 (110%)* | 100% | 0.0% | 2.9% |
| | Heritage | Jun, 2014 | $1.00 (110%) | 92% | 0.0% | 4.8% |
| **Theophylline SR** **100mg** **200mg** **300mg** **450mg** | *Teva* | *Apr, 2014* | *$0.35 (78%)* | 100% | 0.0% | 8.5% |
| | Major | Jul, 2014 | $0.48 (237%) | 73% | 0.0% | 21.5% |
| | Teva | Apr, 2014 | *$0.42 (70%)* | | | |
| | Major | Jul, 2014 | $0.56 (197%) | | | |
| | Teva | *Apr, 2014* | *$0.54 (82%)* | | | |
| | Heritage | *Jun, 2014* | $0.55 (80%) | | | |
| | Teva | Apr, 2014 | *$0.76 (32%)* | | | |
| | Heritage | *Jun, 2014* | $0.76 (32%) | | | |
| **Baclofen** | Upsher-Smith | Feb, 2014 | $0.35 (374%) | 94% | 0.3%-0.6% | 2.3% |
| | *Teva* | *Apr, 2014* | *$0.35 (380%)* | 100% | 0.1%-0.4% | 6.3% |
| **Fluocinonide** 5% Ointment / 5% Cream / 5% Gel | Taro | May, 2014 | $3.77 (400%) $2.43 (437%) $3.18 (181%) | 92% | 0.0% | 3.9% |
| | *Teva* | *Jun, 2014* | *$3.77 (415%)* *$2.43 (434%)* *$3.18 (255%)* | 100% | 0.0% | 3.9% |

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Unit. (% increase) | Correlation of Price Hikes During Relevant Period | Volatility of Prices after Price Hike | Volatility of Market Share After Price Hike |
|---|---|---|---|---|---|---|
| **Enalapril Maleate** (2nd Increase) | Mylan | Apr, 2014 | $0.66 (230%) | 73% | 0.3%-5.9% | 3.6% |
| | ***Teva*** | ***Aug, 2014*** | ***$0.67 (230%)*** | 100% | 0.4%-2.3% | 1.1% |
| | Taro | Oct, 2014 | $0.67 (244%) | 94% | 0.7%-3.9% | 1.0% |
| | Wockhardt | Nov, 2014 | $0.55 (231%) | 91% | 0.3%-2.1% | 0.6% |
| **Carbamazepine** Tablets / Chewable Tablets | Taro | May, 2014 | $1.25 (2282%) / $0.53 (307%) | 70% | 0.0%-11.3% | 3.5% |
| | Apotex | Jul, 2014 | $1.28 (1041%) | 90% | 0.0%-3.7% | 3.8% |
| | ***Teva*** | ***Aug, 2014*** | ***$1.28 (1543%) / $0.53 (270%)*** | 100% | 0.0%-3.8% | 2.8% |
| | Torrent | Sep, 2014 | $1.28 (2336%) / $0.53 (967%) | 98% | 0.0%-3.7% | 1.8% |
| **Diclofenac Potassium** | ***Teva*** | ***Aug, 2014*** | ***$1.05 (50%)*** | 100% | 0.0%-4.3% | 3.5% |
| | Sandoz | Oct, 2014 | $1.05 (82%) | 94% | 0.0%-4.3% | 2.9% |
| | Mylan | Mar, 2015 | $1.05 (49%) | 81% | 0.0%-8.6% | 3.0% |
| **Propranolol Tablets** | ***Teva*** | ***Jan, 2015*** | ***$0.43 (482%)*** | 100% | 0.3%-2.0% | 8.1% |
| | Actavis | Jan, 2015 | $0.37 (681%) | 92% | 0.4%-0.5% | 3.9% |
| | Mylan | Jul, 2015 | $0.41 (454%) | 61% | 0.2%-1.6% | 4.9% |
| | Heritage | Aug, 2015 | $0.42 (305%) | 59% | 0.2%-0.6% | 6.2% |
| **Estradiol** | ***Teva*** | ***Jan, 2015*** | ***$0.32 (90%)*** | 100% | 0.1%-0.2% | 0.9% |
| | Actavis | Apr, 2015 | $0.32 (112%) | 92% | 0.1%-0.2% | 2.8% |
| **Glyburide Micronized** | ***Teva*** | ***Sep, 2015*** | ***$0.15 (185%)*** | 100% | 0.4% | 3.6% |
| | Mylan | Sep, 2015 | $0.21 (191%) | 99% | 0.6% | 1.0% |
| | Westward | Sep, 2015 | $0.16 (182%) | 98% | 0.3% | 1.2% |
| **Desonide Topical Lotion** | Actavis | Aug, 2013 | $3.39 (98%) | 100% | 0.6%-1.0% | 6.4% |
| | Sandoz | Dec, 2012 | $3.42 (99%) | 78% | 1.0%-2.3% | 6.8% |
| **Doxycycline** | Actavis | Feb, 2013 | $2.61 (2547%) | 100% | 0.8% | 6.2% |
| | Sun | Dec, 2012 | $4.35 (4819%) | 90% | 2.8% | 9.7% |
| | Westward | Jan, 2013 | $4.10 (4093%) | 99% | 2.9% | 5.4% |
| **Tretinoin** | Actavis | Apr, 2014 | $3.67 (218%) | 100% | 0.4%-1.9% | 0.6% |
| | Perrigo | Mar, 2014 | $4.08 (196%) | 75% | 0.5%-3.9% | 10.6% |
| | Spear | Apr, 2014 | $4.16 (10%) | 82% | 0.3%-2.1% | 1.1% |
| **Ursodiol** | Epic | May, 2014 | $5.10 (1034%) | 94% | 0.0% | 5.8% |
| | Actavis | May, 2014 | $5.11 (562%) | 100% | 0.0% | 6.8% |
| | Lannett | Jun, 2014 | $5.11 (138%) | 97% | 0.0% | 9.7% |
| **Verapamil** | Actavis | Feb, 2015 | $2.25 (113%) | 100% | 7.5%-8.5% | 2.9% |
| | Mylan | Apr, 2016 | $1.66 (74%) | 72% | 7.5%-8.5% | 1.6% |
| **Clobetasol** | Actavis | Mar, 2015 | $6.66 (670%) | 100% | 1.3% | 1.8% |
| | Akorn | Jul, 2014 | $6.42 (2014%) | 59% | 0.5% | 4.5% |
| | Taro | May, 2014 | $6.47 (1886%) | 50% | 0.2% | 2.0% |
| | Sandoz | Jul, 2014 | $6.37 (1116%) | 59% | 1.0% | 2.2% |
| **Propranolol Capsules** | Actavis | Jan, 2014 | $2.03 (91%) | 100% | 0.5%-1.3% | 3.2% |
| | Breckenidge | Nov, 2013 | $2.11 (85%) | 88% | 0.3%-1.4% | 2.0% |
| | Ani/Rouse | Jan, 2014 | $2.17 (90%) | 98% | 0.7%-2.4% | 3.6% |
| | Upsher-Smith | Dec, 2013 | $2.18 (81%) | 94% | 0.9%-3.8% | 2.0% |

328.     These examples, and extraordinary price increases more generally, are not the only means by which Teva and its co-conspirators extended their collusion.  Teva and its co-conspirators also set market share, allocated customers, and rigged bids.  This behavior included removing Teva from certain markets in return for concessions by competitors with respect to different drugs, collusively raising prices in certain markets in amounts and in ways that are not obvious, collusively maintaining prices in other markets, and rigging bids to stifle competition.

329.     At a minimum, implementing and sustaining price increases for just the drugs that Plaintiffs have identified added approximately $1.47 billion to Teva's bottom line from 2013 through the second quarter of 2019.

### a.     Pravastatin Sodium

330.     In 2013, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Pravastatin Sodium ("Pravastatin").

331.     Pravastatin comes in the form of a tablet, with strengths of 10, 20, 40, and 80 milligrams.  Teva's ANDAs to manufacture Pravastatin were approved April 24, 2006, for the 10, 20, and 40 milligram dosage forms, and January 15, 2008, for the 80 milligram dosage form.

332.     During the Relevant Period, the main competitors in the market for generic Pravastatin were Teva, Glenmark Pharmaceuticals Inc. ("Glenmark"), and Apotex.  Manufacturers with smaller shares of the market included Zydus and Lupin Pharmaceuticals, Inc. ("Lupin").  A repackager, International Laboratories, LLC ("International Labs") was responsible for selling a significant number of units as well.  Together, over the past five full years, these entities were responsible for 99% (2013), 99% (2014), 97% (2015), 94% (2016) and 94% (2017) of the generic Pravastatin sold in the United States.

333.     In mid-2013, as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its competitors dramatically raised the list prices of their Pravastatin products.

- 98 -

Teva's WAC increases, which took effect in August 2013, ranged from over 150% (for a 90-count package of 20 milligram strength) to over 200% (for a 1,000-count package of 40 milligram strength); Teva's increases on the 80-milligram strength were somewhat smaller but still significant, on the order of approximately 90%.  By way of example, Teva's list WAC for a 1,000-count package of 10 milligram Pravastatin, previously $165, immediately increased to $482.

334.    Price increases on Pravastatin were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the August 2013 price increases for Pravastatin, representatives from Teva, Apotex, Glenmark and Zydus communicated via phone and text at least 126 times, and corporate representatives from Teva, Apotex, Glenmark, Lupin and Zydus, including Oberman, met in person at industry events, including events held in February and June of 2013. These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Pravastatin.  The competitors' increases in the list prices of generic Pravastatin were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; App. B.

335.    As detailed in §III.H.3, Teva generated an estimated $320 million from mid-2013 through the first quarter of 2016 as a result of collusive increases in its prices for Pravastatin: $120.5 million in 2013, $149.7 million in 2014, $47.9 million in 2015, and $1.5 million in 2016. The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### b.    Enalapril Maleate

336.    In 2013 and 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Enalapril Maleate ("Enalapril").

337.    Enalapril comes in the form of a tablet, with strengths of 2.5, 5, 10, and 20 milligrams.  Teva's ANDA to manufacture Enalapril tablets, in all four strengths, was approved August 22, 2000.

338.    During most of the Relevant Period, the primary competitors in the market for generic Enalapril were Teva, Mylan, Taro, Legacy Pharmaceuticals International ("Legacy"), and Wockhardt USA ("Wockhardt").  Together, over the past five full years, these entities were responsible for 90% (2013), 100% (2014), 99% (2015), 91% (2016), and 88% (2017) of the generic Enalapril sold in the United States.

339.    In mid-2013, as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its primary competitors raised the list prices of their Enalapril products.  Teva's WAC increases, which took effect around July 2013, ranged from over 260% (applied to all package sizes of 10 milligram tablets) to over 340% (applied to all package sizes of 5 milligram tablets).  By way of example, Teva's list WAC for a 1,000-count package of 20 milligram Enalapril, previously around $50, immediately increased to over $230.

340.    In 2014, Teva and its primary competitors instituted an even larger increase in the list prices of their Enalapril products.  Around August 2014, Teva instituted a 230% across-the-board increase, over and above the increases implemented in 2013.  Continuing to use the 1,000-count package of 20 milligram Enalapril as an example, Teva's list WAC, around $50 just over one year prior, now stood at $788, more than 13 times higher than it was.

341.    Price increases on Enalapril were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone

and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the July 2013 and August 2014 price increases for Enalapril, representatives from Teva and Mylan communicated via phone and text at least 88 times, and corporate representatives from Teva, Mylan, Taro and Wockhardt, including Oberman, met in person at numerous industry events, including events held in April and June of 2013 and April through August of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Enalapril.  The competitors' increases in the list prices of generic Enalapril were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

342.    As detailed in §III.H.3, Teva has generated an estimated $105 million from mid-2013 through 2017 as a result of collusive increases in its prices for Enalapril: $5.3 million in 2013, $47.7 million in 2014, $44.1 million in 2015, $6.2 million in 2016, and $1.8 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### c.    Cephalexin Oral Suspension

343.    In 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Cephalexin.

344.    Teva's ANDA to manufacture 125 mg/5 mL and 250 mg/5 mL strength oral suspension Cephalexin was approved February 13, 1987.

345.    During the Relevant Period, the main competitors in the market for generic Cephalexin were Teva and Lupin.  Together, over the past five full years Teva and Lupin were responsible for 94% (2013), 99% (2014), 96% (2015), 89% (2016) and 88% (2017) of the generic

Cephalexin oral suspension sold in the United States.  Karalex Pharma, LLC also held a lesser share of the market for Cephalexin, between 1% and 12% from 2013 to 2017.

346.    In late 2013 and early 2014, respectively, Lupin and Teva – which already had established identical pricing structures – made identical increases in their prices for Cephalexin oral suspension.  Teva's April 2014 price increases ranged from 109% (for the stronger dose) to 165% (for the weaker dose).  In dollar terms, a large package of the weaker strength configuration, which previously listed for $13, now was priced at $35.

347.    Price increases on Cephalexin were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Cephalexin, corporate representatives of Teva and Lupin, including Oberman, met in person at numerous industry events, including events held in October 2013 and February 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Cephalexin.  The competitors' increases in the list prices of generic Cephalexin were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

348.    As detailed in §III.H.3, Teva has generated an estimated $35 million from the second quarter of 2014 through 2017 as a result of collusive increases in its prices for Cephalexin oral suspension: $14 million in 2014, $11.5 million in 2015, $6.5 million in 2016, and $3.1 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

#### d.      Ketoconazole Tablets and 2% Cream

349.      In 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Ketoconazole tablets and 2% cream.

350.      Teva received the first ANDAs to sell generic Ketoconazole tablets (approved June 15, 1999) and generic 2% Ketoconazole cream (approved April 25, 2000).

351.      The markets for Ketoconazole tablets and 2% cream are highly concentrated with all three major manufacturers being previously identified together in other drug price-fixing cases. During the Relevant Period, the main competitors in the market for both tablets and 2% cream were Teva and Taro; in each market, a third competitor – Mylan with respect to tablets and Fougera Pharmaceuticals Inc. ("Fougera"), a part of Sandoz, with respect to 2% cream – held a smaller portion of the market.  In or around July 2015, Teva began exiting the market for Ketoconazole 2% cream.  Together, over the past five full years, in the markets for both forms of the drug, the top three competitors controlled the entire market.

352.      In April 2014, Teva and Taro dramatically raised the price of Ketoconazole tablets and 2% cream.  Before that the price had been essentially flat for many years.  Both competitors instituted identical 110% price increases, to the same exact price points, across all package sizes of the 2% cream; with respect to the tablet form, price increases were on the order of 250% for Teva and 230% for Taro, again to identical price points.  By way of example, a 100-count package of tablets that had cost around $64, increased to $222, and a mid-size container of 2% cream, previously $20, increased to $42.

353.      Price increases on Ketoconazole were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App.

B).  For instance, in the months preceding the April 2014 price increases for Ketoconazole, representatives from Teva, Mylan and Sandoz communicated via phone and text at least 103 times, and corporate representatives at Teva, Fougera, Mylan, Sandoz and Taro, including Oberman, met in person at numerous industry events, including events held in February and April of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Ketoconazole.  The Ketoconazole competitors' price increases occurred in close proximity to several industry gatherings, with remarkable similarity in timing and scale.  *See* ¶¶327, 465; Apps. B-C.

354.    The price increase was maintained through at least July 2015, when Taro and Fougera/Sandoz again raised their prices.  Although Teva did not raise its WAC price at the time, it soon exited the market altogether.  The timing of Teva's exit coincides approximately with the FTC's review of Teva's purchase of Actavis.

355.    As detailed in §III.H.3, Teva has generated an estimated $58 million from the second quarter of 2014 through the third quarter of 2016 as a result of collusive increases in its prices for Ketoconazole tablets and 2% cream: $26.5 million in 2014, $26.8 million in 2015, $4.4 million in 2016, and $.2 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### e.    Baclofen Tablets

356.    In 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Baclofen tablets.

357.    Baclofen is almost always administered orally, in tablets containing either 10 or 20 milligrams of active ingredient; Teva manufactures tablets in both the 10 and 20 milligram strengths under ANDAs, approved in 1988, that it acquired in its 2006 acquisition of Ivax Corp.

358.     For July 2017, Baclofen was one of Teva's top 50 generic drugs in the U.S. market, both in terms of revenue and in terms of quantity of units manufactured.

359.     During the Relevant Period, the main competitors in the market for generic Baclofen tablets were Teva, Qualitest Pharmaceuticals Co. ("Qualitest") (now part of Par), and Upsher-Smith Laboratories ("Upsher-Smith").  Manufacturers that held a smaller share of the market included Lannett and Northstar Rx LLC.  Together, between 2013 and 2017 these entities were responsible for 100% of the generic Baclofen tablets sold in the United States.

360.     Around April 2014, Teva and Upsher-Smith increased their WAC list price, in equal or nearly equal amounts.  Teva increased its WAC prices for 100-unit packages of 10 milligram tablets by 359%, from $6.52 to $29.93, and for 20 milligram tablets by 430%, from $9.32 to $49.40.

361.     Price increases on Baclofen were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Baclofen, representatives from Teva, Lannett and Qualitest/Par communicated via phone and text at least 90 times, and corporate representatives of Teva, Lannett, Qualitest/Par and Upsher-Smith, including Oberman, met in person at numerous industry events, including events held in February and April 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Baclofen.  The competitors' increases in the list prices of generic Baclofen were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

362.     As detailed in §III.H.3, Teva has generated an estimated $168 million from the second quarter of 2014 through the second quarter of 2019 as a result of collusive increases in its

prices for Baclofen: $56.1 million in 2014, $58.6 million in 2015, $38.3 million in 2016, $10.1 million in 2017, and $4.5 million from 2018 to the second quarter of 2019. The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### f.    0.05% Fluocinonide

363.    In 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic .05% Fluocinonide cream, ointment, and gel. For purposes of this Complaint, unless otherwise noted, references to ".05% Fluocinonide" encompass the cream, ointment, and gel forms of .05% generic Fluocinonide.

364.    During the Relevant Period, Teva sold .05% Fluocinonide under ANDAs approved in February 1989 (cream, gel) and December 1991 (ointment).

365.    During the Relevant Period, the main competitors in the combined market for generic .05% Fluocinonide were Teva and Taro. Actavis/Mayne, which manufactures only the cream form of .05% Fluocinonide, had a lesser share of the market, and did not enter in any material way until June 2014. Fougera/Sandoz held a small share of the .05% Fluocinonide topical gel market before exiting in mid-2014. Together, over the past several years, these entities were responsible for 98% (2013), 99% (2014), 100% (2015), and 96% (2016) of the .05% Fluocinonide sold in the United States.

366.    .05% Fluocinonide is among Teva's top-50 generic drugs in terms of sales.

367.    In mid-2014, Taro and Teva made massive, and identical, increases in WAC list prices. Around June 2014, both manufacturers raised the average prices for .05% Fluocinonide cream by 434% and ointment by 415%. In July 2014, both manufacturers raised the price for .05% Fluocinonide gel by 255%. These price increases meant that a mid-sized package of .05% Fluocinonide ointment, previously listed at $22, now listed for $113.

- 106 -

368.     Price increases on .05% Fluocinonide were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the June and July 2014 price increases for .05% Fluocinonide, representatives from Teva, Actavis and Mayne communicated via phone and text at least 358 times, and corporate representatives from Teva, Actavis and Taro, including Oberman, met in person at numerous industry events, including events held from February through June 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for .05% Fluocinonide.  The competitors' increases in the list prices of generic .05% Fluocinonide were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

369.     As detailed in at in §III.H.3, Teva has generated an estimated $168 million from mid-2014 through 2017 as a result of collusive increases in its prices for the cream, gel and ointment forms of .05% Fluocinonide: $41 million in 2014, $75.6 million in 2015, $38 million in 2016, and $13.3 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### g.     Carbamazepine Tablets and Chewable Tablets

370.     During 2014, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the prices of generic Carbamazepine tablets and chewable tablets (cf. sustained release tablets).

371.     Teva manufactures 200 milligram Carbamazepine tablets under an ANDA approved September 17, 1986, and 100 milligram chewable tablets under an ANDA approved July 29, 1992.

372.    During the Relevant Period, the main competitors in the market for generic Carbamazepine tablets and chewable tablets were Teva and Taro.  Torrent Pharmaceuticals Ltd. ("Torrent"), Novartis AG and Apotex held smaller shares of the market (Novartis and Apotex did not compete in the chewables market).  Together, over the past several years these entities were responsible for 100% (2013), 99% (2014), 99% (2015), 100% (2016) and 99.5% (2017) of the combined market for generic Carbamazepine tablets and chewable tablets sold in the United States.

373.    Around August 2014, the five competitors in Carbamazepine tablets and three competitors in chewable tablets all increased WAC list prices for Carbamazepine tablets and chewable tablets.  The competitors – whose price points generally varied prior to these increases – all established largely identical pricing structures, with identical WACs for 100-count packages, and only slight variations at larger package sizes.  Teva's new WAC for 1,000-count tablets was $1,276, which was nearly identical to Taro's price increase.  Teva's new list price for the tablets had been massively inflated by more than 1,500%.  Teva's increase for chewable tablets was also significant: nearly 270%.  The practical effect of these changes was enormous: for example, a 100-count package of tablets, which Teva previously listed at $8, suddenly listed for $128, and with no cheaper alternative on the market; similarly, a 100-count package of chewable tablets, formerly listed by Teva for $14, now listed for $53, again with no cheaper alternative on the market.

374.    Price increases on Carbamazepine were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the August 2014 price increases for Carbamazepine, representatives from Teva and Apotex communicated via phone and text at least 7 times, and corporate representatives of Teva, Apotex and Taro, including Oberman, met in person at numerous

- 108 -

industry events, including events held in February and June of 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Carbamazepine.  The Carbamazepine competitors' price increases occurred in close proximity to several industry gatherings, with remarkable similarity in timing and scale.  *See* ¶¶327, 465; Apps. B-C.

375.    Again, the market participants went into 2014 at different price points, but the new WAC prices established in mid-2014 established largely identical pricing structures.

376.    As detailed in §III.H.3, Teva has generated a combined estimated $234 million from mid-2014 through the second quarter of 2019 as a result of collusive increases in its prices for Carbamazepine tablets and chewable tablets: $38 million in 2014, $81.3 million in 2015, $56.9 million in 2016, $40.6 million in 2017, $16.6 million in 2018, and close to $1 million in the first half of 2019.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### h.    Estradiol Tablets

377.    In 2015, Teva and Actavis engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Estradiol tablets.

378.    Teva sells .5, 1, and 2 milligram tablets of Estradiol under an ANDA approved October 22, 1997, the rights to which Teva acquired via its 2008 acquisition of Barr Laboratories.  Estradiol is among Teva's top-20 generic drugs in terms of sales.

379.    From 2013 through 2017, Teva dominated the market for Estradiol with annual market shares ranging from 74% to 85%.  As of early 2015, Teva's largest competitor in the Estradiol market was Actavis, which held approximately 10% of the market until Teva and Actavis merged in August 2016.  Teva and Actavis together were responsible for 96% of units sold in 2014 and 95% in 2015.  In 2016, Teva and Actavis, now combined, controlled 87% of the market.  Before

2013, Mylan was a significant competitor, but its market share dropped significantly in July 2013, before increasing in 2016 and 2017.

380.   Prior to the Estradiol price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results.   During this call, defendant Olafsson acknowledged that "***there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity***."   A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014.   At the conference, Olafsson indicated that, despite increased pricing pressure, "***when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win***."

381.   In early 2015, Teva and Actavis dramatically raised the list WAC of Estradiol tablets. In February 2015, Teva raised prices by 90% across the board.   Thus, for example, a 500-count package of 1 milligram tablets, previously listed at $81, now was listed at $154.   In May 2015, a few months later, Actavis matched Teva's pricing structure to the penny.   *See* ¶327, *supra*; App. C.

382.   Price increases on Estradiol were the result of collusive agreements to increase pricing and restrain competition.   These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).   For instance, in the months preceding the February and May 2015 price increases for Estradiol, corporate representatives from Teva, Actavis and Mylan communicated via phone and text at least 422 times and met in person at numerous industry events, including events held in November and December of 2014, and in February and April of 2015.   Defendant Olafsson attended the annual GPhA meeting in February 2013 while President of Actavis.   Concurrent with the February 2015 price spike, defendant Olafsson attended the annual GPhA meeting while President of Teva.   These

frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Estradiol.

383.    As detailed in §III.H.3, Teva has generated an estimated $88 million from early 2015 through the second quarter of 2019 as a result of collusive increases in its prices for Estradiol: $27.3 million in 2015, $19.5 million in 2016, $24.6 million in 2017, $14.2 million in 2018, and $2.4 million in the first half of 2019.  Additionally, Actavis generated an estimated $7 million in collusive profit from mid-2015 through mid-2017 ($1.2 million of which was generated post-acquisition).  Actavis's collusive profits were a fact that Teva was aware of when it announced it would acquire Actavis in July 2015.  These price hikes came at no additional expense to Teva or Actavis; this increased revenue, therefore, went straight to Teva's bottom line.

### i.    Clobetasol Propionate Topical Cream

384.    In 2015, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Clobetasol Propionate ("Clobetasol").  The collusion and collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

385.    Clobetasol comes in the form of a topical cream, lotion, spray and topical solution.  The topical cream form comes in a strength of 0.05%.  Teva's ANDA for generic Clobetasol topical cream, also known under the brand name Temovate®, was approved in 1994.

386.    Clobetasol is among Teva's top-40 generic drugs, both in terms of revenues and units sold.

387.    During the Relevant Period, both before and after Teva's acquisition of Actavis, Actavis's main competitors in the market for generic Clobetasol were Akorn, Inc. ("Akorn")/Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), Taro, and Fougera/Sandoz.  Together, over the past five full

years these entities were responsible for 100% of the generic Clobetasol topical cream sold in the United States.

388.    Prior to the Clobetasol price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results.  During this call, defendant Olafsson acknowledged that "*there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity*."  A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014.  At the conference, Olafsson indicated that, despite increased pricing pressure, "*when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win*."

389.    In early-2015, Actavis and its competitors dramatically raised the list price of Clobetasol topical cream.  Actavis's WAC increase, which took effect around February 2015, was 587%.  By way of example, Actavis's list WAC for a large tube of Clobetasol, previously $58, immediately increased to $400.

390.    Price increases on Clobetasol were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the February 2015 price increases for Clobetasol, corporate representatives from Actavis, Akorn, Fougera, Hi-Tech, Taro and Sandoz met in person at numerous industry events, including events held from February 2013 through February 2015.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Clobetasol.  The competitors' increases in the list prices of generic

Clobetasol were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

391.    As detailed in §III.H.3, Teva and Actavis generated an estimated $93.1 million from 2015 through 2017 as a result of collusive increases in prices for Clobetasol, approximately $33 million of which was generated after Teva acquired Actavis in August 2016: $19.8 million in 2016, and $12.9 million in 2017.  The price hikes came at no additional expense to Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### j.    Diclofenac Potassium Tablets

392.    In 2013, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Diclofenac Potassium ("Diclofenac") tablets.

393.    Diclofenac is the most widely prescribed NSAID worldwide, with more than 10 million Diclofenac drug product prescriptions dispensed in the United States in 2012.

394.    Teva manufactures Diclofenac in the form of a tablet, with a strength of 50 milligrams available in quantities of 100 or 500.  Teva's ANDAs to manufacture Diclofenac were approved in 1998.

395.    During the Relevant Period, the main competitors in the market for generic Diclofenac were Teva, Mylan and Sandoz.  Together, over a five year time span (2013-2017) these entities were responsible for 100% of the generic Diclofenac tablets sold in the United States.

396.    In mid-2013, as Teva was experiencing a sharp downward trend in its U.S. generics business, Teva and its competitors dramatically raised the list prices of their Diclofenac products. Teva's WAC increase, which took effect around August 2013, increased 22%.  By way of example, Teva's list WAC for a 100-count bottle of 50 milligram Diclofenac, previously $57.07, immediately increased to $69.72.  A second WAC price hike, of an additional 50%, occurred around

August 2014.  A 100-count bottle of 50 milligram Diclofenac, previously $69.72, increased again to $104.58.

397.    Price increases on Diclofenac were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the August 2013 and August 2014 price increases for Diclofenac, representatives from Teva, Mylan and Sandoz communicated via phone and text at least 112 times, and their corporate representatives, including Oberman, met in person at numerous industry events, including events held in August 2013 and August 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Diclofenac.  The competitors' increases in the list prices of generic Diclofenac were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

398.    As detailed in §III.H.3, Teva generated an estimated $12.8 million from mid-2013 through the second quarter of 2017 as a result of collusive increases in its prices for Diclofenac: $0.4 million in 2013, $3.0 million in 2014, $5.9 million in 2015, $3.05 million in 2016, and $0.5 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### k.    Glyburide Micronized

399.    In 2015, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of the generic micronized form of Glyburide ("Glyburide Micronized").

400.     Teva's first ANDA for generic Glyburide Micronized was approved in 1999. Glyburide Micronized comes in the form of a tablet, with strengths of 1.5, 3 and 6 milligrams.

401.     During the Relevant Period, the main competitors in the market for generic Glyburide Micronized were Teva, West-Ward Inc. and Mylan.  Manufacturers with lesser shares of the market included Dava Pharma.  Together, from 2013 to 2017, these entities were responsible for 99% of the generic Glyburide Micronized sold in the United States.

402.     Around August 2015, Teva and its competitors reduced the discounts offered to wholesalers, thereby increasing their net prices on Glyburide Micronized.  The effect on prices by reducing these discounts can be seen in the following chart:



403.     Price increases on Glyburide Micronized were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the August 2015 price increases for Glyburide Micronized, representatives from Teva and Mylan communicated via phone and text at least 88 times, and corporate representatives from Teva, Mylan and West-Ward, including defendant Olafsson, met in person at numerous industry events, including events held from February through

August of 2015.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Glyburide Micronized.  The competitors' increases in the list prices of generic Glyburide Micronized were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

404.    As detailed in §III.H.3, Teva generated an estimated $0.5 million from mid-2015 through 2017 as a result of collusive increases in its prices for Glyburide Micronized: $.2 million in 2015, $.3 million in 2016, and $.1 million in 2017.  The price hikes came at no additional expense to Teva; this increased revenue, therefore, went straight to Teva's bottom line.

### l.    Propranolol Tablets

405.    In 2015, Teva and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Propranolol tablets ("Propranolol Tablets").

406.    Teva's main competitors in the market for generic Propranolol Tablets were Actavis, Mylan and Heritage.  Between early to mid-2015, Teva and its competitors dramatically raised the list prices of their Propranolol Tablets.  Teva's WAC increase, which took effect around January 2015, was over 630%.

407.    Price increases on Propranolol Tablets were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by NACDS, IGPA, GPhA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the January 2015 price increase, corporate representatives from Actavis, Mylan and Heritage met in person at numerous industry events, including events held between October and December of 2014.  In November 2014, Oberman attended the IGPA annual conference with counterparts from Actavis and Mylan.  In

December 2014, Cavanaugh attended the NACDS dinner with representatives from Actavis and Mylan. These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Propranolol Tablets. The competitors' increases in the list prices of generic Propranolol Tablets were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings. *See* ¶¶327, 465; Apps. B-C.

408.    As detailed in §III.H.3, Teva generated an estimated $98 million from 2015 through 2017 as a result of collusive increases in prices for Propranolol Tablets: approximately $41 million in 2015, $47 million in 2016, and $11 million in 2017. The price hikes came at no additional expense to Teva and went straight to Teva's bottom line.

### m.    Desonide Topical Lotion and External Cream

409.    In 2013, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Desonide Topical Lotion and External Cream ("Desonide"). The collusion and its effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

410.    Actavis marketed generic Desonide under an ANDA approved in 1992.

411.    During the Relevant Period, both before and after Teva's acquisition of Actavis, Actavis's main competitors in the market for generic Desonide were Taro and Fougera/Sandoz. Together, over the past five full years these entities were responsible for 100% (2013), 100% (2014), 99% (2015), 99% (2016) and 100% (2017) of the generic Desonide sold in the United States.

412.    In 2013, Actavis and its competitors dramatically raised the list prices of their Desonide products. Actavis's WAC increase, which took effect around August 2013, was 96%. By way of example, Actavis's list WAC for a 2-ounce bottle of Desonide Topical Lotion, previously $3.45, immediately increased to $6.77. This followed an approximately eight-fold increase by

Actavis's competitors for Desonide External Cream in March 2013, from approximately $0.50 per ounce to $4.25 per ounce. Instead of competing on price, Actavis entered the collusive arrangement in August 2013 by setting its price at elevated levels exactly in line with competitors, as depicted in the following chart:



413. After the Desonide price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results. During this call, defendant Olafsson acknowledged that "*there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity.*" A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014. At the conference, Olafsson indicated that, despite increased pricing pressure, "*when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win.*"

414. Price increases on Desonide were the result of collusive agreements to increase pricing and restrain competition. These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B). For instance, in the months preceding the August 2013 price increases for Desonide, corporate

representatives from Actavis, Taro and Fougera/Sandoz met in person at numerous industry events, including events held in February and June of 2013.  Mere months before the price spike, defendant Olafsson attended the annual GPhA meeting in February 2013 while President of Actavis.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Desonide.  The competitors' increases in the list prices of generic Desonide were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

415.    As detailed in §III.H.3, Teva and Actavis generated an estimated $60 million from mid-2013 through 2017 as a result of collusive increases in prices for Desonide topical lotion and external cream, approximately $6.3 million of which was generated after Teva acquired Actavis in August 2016: $4 million in 2016 and $2.3 million in 2017.  The price hikes came at no additional expense to Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### n.    Doxycycline Hyclate Capsules

416.    In 2013, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Doxycycline Hyclate Capsules ("Doxycycline").  Doxycycline was also implicated in the investigations conducted by the DOJ and the State AGs.  The collusion and the collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

417.    Actavis's first ANDA for generic Doxycycline was approved in 1982.  Actavis manufactures Doxycycline in the form of a capsule, with strengths of 50 and 100 milligrams.

418.    Following the acquisition of Actavis, Doxycycline became one of Teva's top-50 generic drugs, both in terms of revenues and units sold.

419.    During the Relevant Period, both before and after Teva's acquisition, Actavis's main competitors in the market for generic Doxycycline were Sun and West-Ward.  Other competitors entered the market in 2014, but held a lesser share of the market, including Citron and Mylan. Together, from 2013 to 2016, these entities were responsible for 100% (2013), 100% (2014), 97% (2015), and 89% (2016) of the generic Doxycycline sold in the United States.  Even as new competitors entered the market in 2017, the entities above maintained control of 59% of the market.

420.    In early 2013, Actavis and its competitors dramatically raised the list prices of their Doxycycline products.  Actavis's WAC increases, which took effect around February 2013, ranged from 1,711% (for the 50 milligram strength) to 2,558% (for the 100 milligram strength).  By way of example, Actavis's list WAC for a 500-count bottle of 100 milligram Doxycycline capsules, previously $49.58, immediately increased to $1,317.89.

421.    After the Doxycycline price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results.  During this call, defendant Olafsson acknowledged that "***there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity***."  A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014.  At the conference, Olafsson indicated that, despite increased pricing pressure, "***when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win***."

422.    Price increases on Doxycycline were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the February 2013 price increases for Doxycycline, corporate representatives from Actavis, Mylan, and Sun met in person at

- 120 -

industry events, including events held in October 2012 and February 2013.  Concurrent with the price spike, defendant Olafsson attended the annual GPhA meeting in February 2013 while President of Actavis.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Doxycycline.  The competitors' increases in the list prices of generic Doxycycline were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

423.    As detailed in §III.H.3, Actavis and Teva generated an estimated $581 million from 2013 through 2017 as a result of collusive increases in prices for Doxycycline, approximately $24 million of which was generated after Teva acquired Actavis in August 2016: $17.5 million in 2016 and $6.3 million in 2017.  The price hikes came at no additional expense to either Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### o.    Propranolol Hydrochloride

424.    In 2014, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Propranolol Hydrochloride ("Propranolol").  The collusion and collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

425.    Actavis's first ANDA for generic Propranolol extended release was approved in 2007.  Propranolol extended release capsules come in strengths of 60, 80, 120, and 160 milligrams.

426.    During the Relevant Period, both before and after Teva's acquisition, Actavis's main competitors in the market for generic Propranolol extended release capsules were Breckenridge and Ani/Rouses.  Manufacturers with lesser shares of the market included Upsher-Smith and Mylan.  Together, from 2013 to 2017 these entities were responsible for 100% of the generic Propranolol extended release capsules sold in the United States.

427.    Following the acquisition of Actavis, Propranolol became one of Teva's top-50 generic drugs in terms of sales.

428.    In early 2014, Actavis and its competitors dramatically raised the list prices of their Propranolol extended release capsules.   Actavis's WAC increase, which took effect around January 2014, was 91% across the board for all four strengths.  By way of example, Actavis's list WAC for a 100-count package of 160 milligram Propranolol, previously $167, immediately increased to $319.

429.    Shortly after the Propranolol price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results.  During this call, defendant Olafsson acknowledged that "***there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity***."  A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014.  At the conference, Olafsson indicated that, despite increased pricing pressure, "***when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win***."

430.    Price increases on Propranolol were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the January 2014 price increases for Propranolol, corporate representatives from Actavis, Breckenridge, Mylan and Upsher-Smith met in person at numerous industry events, including events held in October and December of 2013.  Months before the price spike, defendant Olafsson attended the annual GPhA meeting in February 2013 while President of Actavis.  These frequent meetings and communications culminated in an agreement

- 122 -

among competitors to fix prices and restrain competition for Propranolol. The competitors' increases in the list prices of generic Propranolol extended release capsules were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings. *See* ¶¶327, 465; Apps. B-C.

431.     As detailed in §III.H.3, Actavis and Teva generated an estimated $92 million from 2014 through 2017 as a result of collusive increases in prices for Propranolol, approximately $6.5 million of which was generated after Teva acquired Actavis in August 2016: $5.5 million in 2016 and $.9 million in 2017. The price hikes came at no additional expense to either Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### p.     Tretinoin External Cream

432.     In 2014, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Tretinoin External Cream ("Tretinoin"). The collusion and collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

433.     Actavis marketed generic Tretinoin under an NDA approved in 1997. Tretinoin comes in a strength of 0.025%, in 20 or 45 gram tubes.

434.     During the Relevant Period, both before and after Teva's acquisition, Actavis's main competitors in the market for generic Tretinoin were Perrigo, Ani/Rouses and Spear Derm Prod ("Spear"). Manufacturers, with a lesser share of the market going to Valeant. Together, from 2013 to 2017 these entities were responsible for 100% of the generic Tretinoin sold in the United States.

435.     In early 2014, Actavis and its competitors dramatically raised the list prices of their Tretinoin products. Actavis's WAC increase, which took effect around April 2014, was 218%. By

way of example, Actavis's list WAC for a small tube of Tretinoin, previously $23, immediately increased to $73.

436.    Price increases on Tretinoin were the result of collusive agreements to increase pricing and restrain competition.  These collusive agreements were furthered, in part, through in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B).  For instance, in the months preceding the April 2014 price increases for Tretinoin, corporate representatives from Actavis and Perrigo met in person at numerous industry events, including events held in October 2013 and February 2014.  Months before the price spike, defendant Olafsson attended the annual GPhA meeting in February 2013 while President of Actavis.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Tretinoin.  The competitors' increases in the list prices of generic Tretinoin were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

437.    As detailed in §III.H.3, Teva generated close to $39 million of Collusive Profit from Tretinoin after acquiring Actavis in August 2016.  The price hikes came at no additional expense to either Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### q.    Ursodiol Capsules

438.    In 2014, Actavis and its competitors engaged in anti-competitive conduct by colluding to improperly raise and maintain the price of generic Ursodiol Capsules ("Ursodiol").  The collusion and collusive effect on overall sales continued after Teva's acquisition of Actavis on August 2, 2016.

439.    Actavis marketed generic Ursodiol under an NDA approved in 1987.  Ursodiol comes in capsules with a strength of 300 milligrams.

- 124 -

440.    Following the acquisition of Actavis, Ursodiol became one of Teva's top-30 generic drugs, in terms of sales.

441.    During the Relevant Period, both before and after Teva's acquisition, Actavis's main competitors in the market for generic Ursodiol were Lannett and Epic Pharma LLC ("Epic"). Together, over the past five full years these entities were responsible for 96% (2013), 98% (2014), 98% (2015), 96% (2016) and 94% (2017) of the generic Ursodiol sold in the United States.

442.    In mid-2014, Actavis and its competitors dramatically raised the list prices of their Ursodiol products. Actavis's WAC increase, which took effect around May 2014, was 562%. By way of example, Actavis's list WAC for a 100-count bottle of Ursodiol, previously $77, immediately increased to $511.

443.    Shortly before the Ursodiol price increases, Actavis hosted a conference call on October 29, 2013 to discuss its third quarter 2013 financial results. During this call, defendant Olafsson acknowledged that "***there's [sic] opportunities to take pricing increases [in the U.S. generics market], and that is what has changed since maybe 5 years ago when there wasn't an opportunity***." A few months later, Actavis participated in the Citi Global Healthcare Conference on February 25, 2014. At the conference, Olafsson indicated that, despite increased pricing pressure, "***when you are in this top four range – Teva, Mylan, Actavis, and Sandoz – I think you can make this a win-win***."

444.    Price increases on Ursodiol were the result of collusive agreements to increase pricing and restrain competition. These collusive agreements were furthered, in part, through phone and text communications (as identified in ¶189, *supra*), and in-person discussions conducted at meetings and industry events hosted by GPhA, HDMA and others (as identified in ¶465, *infra*; App. B). For instance, in the months preceding the May 2014 price increases for Ursodiol, corporate representatives from Actavis, Lannett and Epic met in person at numerous industry events, including

- 125 -

events held in October 2013 and February 2014.  These frequent meetings and communications culminated in an agreement among competitors to fix prices and restrain competition for Ursodiol. The competitors' increases in the list prices of generic Ursodiol were remarkably similar in terms of scale and timing, and occurred in close proximity to several industry gatherings.  *See* ¶¶327, 465; Apps. B-C.

445.    As detailed in §III.H.3, Teva generated approximately $46.8 million of Collusive Profit from Ursodiol after acquiring Actavis in August 2016.  The price hikes came at no additional expense to either Actavis or Teva; following the Actavis acquisition, this increased revenue, therefore, went straight to Teva's bottom line.

### 2.    The Structure of the Markets for the 25 Alleged Drugs Facilitated Teva's Collusion

446.    The markets for the 25 drugs that are the subject of the State AGs' ongoing investigation as alleged in the June 2018 AG Complaint and Plaintiffs' investigation were highly conducive to price fixing.  Characteristics that facilitated collusion include: (i) a high level of market concentration; (ii) near perfectly inelastic demand; (iii) the commoditized-nature of generic drugs; (iv) significant barriers to entry; and (v) the ease of information sharing.

### a.    High Level of Market Concentration

447.    The Herfindahl-Hirschman Index ("HHI") is a widely accepted market concentration measurement and is used by antitrust enforcement agencies, such as the FTC and the DOJ, for assessing market competitiveness.  An HHI score of 0 is indicative of perfect competition and an HHI score of 10,000 is indicative of a monopoly.  The DOJ and FTC's Horizontal Merger Guidelines classify a market as unconcentrated when HHI is below 1,500, moderately concentrated when HHI is between 1,500 and 2,500, and highly concentrated when HHI exceeds 2,500.

448.    The HHI score is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, in a market consisting of three companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

449.    As indicated in the chart below, HHI scores for the drugs that have so far been implicated in the State AGs' investigation and by Plaintiffs' investigation well exceeded 1,500, with most exceeding 2,500, and were thus all considered moderately to highly concentrated.

| Teva & Actavis's Generic Drugs HHI | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Acetazolamide SR Capsules HHI | 3555 | 3204 | 3428 | 4381 | 4438 |
| Baclofen Tablets HHI | 3521 | 3679 | 3653 | 3108 | 2275 |
| Carbamazepine Tablets HHI | 3775 | 3683 | 3127 | 2572 | 2627 |
| Cephalexin Oral Suspension HHI | 4328 | 4969 | 4614 | 4115 | 4002 |
| Clobetasol External Cream HHI | 4333 | 4286 | 3371 | 2693 | 2771 |
| Desonide Topical Lotion HHI | 8738 | 5551 | 4006 | 3513 | 3574 |
| Diclofenac Potassium Tablets HHI | 3998 | 3689 | 3517 | 3622 | 3842 |
| Doxycycline Hyclate Capsules HHI | 2550 | 2495 | 2047 | 2064 | 1823 |
| Enalapril Tablets HHI | 2888 | 2795 | 2446 | 2407 | 2276 |
| Estradiol Tablets HHI | 5137 | 6416 | 6756 | 6390 | 6463 |
| Fluocinonide External Ointment HHI | 4572 | 4796 | 5977 | 5228 | 3908 |
| Glipizide Metformin Tablet HHI | 2668 | 4609 | 3550 | 3731 | 3481 |
| Glyburide Metformin HCL Tablets HHI | 4945 | 5111 | 5104 | 3738 | 4333 |
| Glyburide Micronized Tablets HHI | 4208 | 5227 | 5612 | 4838 | 4399 |
| Glyburide Tablet HHI | 5007 | 5382 | 6065 | 5838 | 5730 |
| Ketoconazole Cream HHI | 4092 | 3698 | 3169 | 2985 | 3353 |
| Leflunomide Tablet HHI | 5284 | 4757 | 2284 | 2494 | 2618 |
| Nystatin Tablet HHI | 3378 | 4499 | 3835 | 4075 | 3973 |
| Pravastatin Sodium Tablets HHI | 3318 | 2419 | 2280 | 2177 | 2065 |
| Propranolol HCL Sustained Release Capsules HHI | 3726 | 4446 | 3569 | 3372 | 4016 |
| Theophylline Anhydrous SR Tablets 100MG HHI | 9738 | 9595 | 9537 | 9256 | 8843 |
| Theophylline Anhydrous SR Tablets 200MG HHI | 9958 | 9897 | 9862 | 9631 | 9302 |
| Theophylline Anhydrous SR Tablets 300MG HHI | 7320 | 6675 | 5381 | 6183 | 9711 |
| Theophylline Anhydrous SR Tablets 450MG HHI | 6842 | 6594 | 5553 | 7174 | 9907 |
| Tretinoin External Cream HHI | 4284 | 3977 | 3912 | 3770 | 3109 |
| Ursodiol Capsules HHI | 5494 | 3579 | 3257 | 3061 | 2965 |
| Verapamil SR Capsules HHI | 3602 | 3652 | 3886 | 3994 | 4200 |

450.    During the Relevant Period each of the 25 combined drugs were in highly concentrated markets with only a handful of competitors.  A highly concentrated market is vulnerable to coordinated activities because fewer firms are involved in the negotiation, collusive profits are high for each firm, and the cartel tends to be stable with the absence of cheating.

**b.    Inelastic Demand**

451.    Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly inelastic as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel

behavior, as a significant increase in price has minimal effect on quantity demanded by consumers.

As such, the cartel can maximize profit because price increases will directly translate into revenues.

452.    At the time of the collusive price-fixing, the markets for the drugs were characterized

by nearly perfect inelastic demand with Ed measured at close to zero:

| PRICE ELASTICITY OF DEMAND | | | | |
|---|---|---|---|---|
| Collusive Drugs | Elasticity of Demand | % Change in Price | % Change in Quantity Demanded | Elasticity |
| Baclofen | 0.019 | 197% | 4% | Highly inelastic |
| Carbamazepine | -0.002 | 621% | -1% | Highly inelastic |
| Cephalexin | -0.078 | 48% | -4% | Highly inelastic |
| Clobetasol | 0.008 | 1812% | 15% | Highly inelastic |
| Desonide | -0.197 | 63% | -12% | Highly inelastic |
| Diclofenac Potassium | 0.255 | 32% | 8% | Highly inelastic |
| Doxycycline | -0.001 | 3240% | -3% | Highly inelastic |
| Enalapril Maleate | -0.038 | 106% | -4% | Highly inelastic |
| Estradiol | -0.028 | 71% | -2% | Highly inelastic |
| Fluocinonide | -0.016 | 395% | -6% | Highly inelastic |
| Glyburide | -0.137 | 96% | -13% | Highly inelastic |
| Ketoconazole | 0.155 | 85% | 13% | Highly inelastic |
| Nystatin | 0.040 | 88% | 3% | Highly inelastic |
| Pravastatin | 0.026 | 172% | 4% | Highly inelastic |
| Propranolol | 0.024 | 68% | 2% | Highly inelastic |
| Theophyline – SR 100 mg | 0.023 | 78% | 2% | Highly inelastic |
| Theophyline – SR 200 mg | -0.074 | 70% | -5% | Highly inelastic |
| Theophyline – SR 300 mg | -0.086 | 82% | -7% | Highly inelastic |
| Theophyline – SR 450 mg | -0.208 | 32% | -7% | Highly inelastic |
| Tretinoin | 0.006 | 109% | 1% | Highly inelastic |
| Ursodiol | -0.003 | 294% | -1% | Highly inelastic |
| Verapamil | -0.126 | 31% | 4% | Highly inelastic |

For example, for Baclofen, the market was so inelastic that a 197% price increase had no negative

effect on sales whatsoever and quantities sold actually increased by 4%.  As a result, the coordinated

price hikes translated immediately and directly into collusive profits shared by the co-conspirators.

### c.    Commodity-Like Product

453.    A commodity-like product is a standardized product where price is the only

distinguishing factor for purchasers.  During the Relevant Period, each of the 25 combined drugs was

AB-rated by the FDA, which indicates each drug is bioequivalent to its respective branded version.

In addition, the FDA's Orange Book shows that Teva's versions are therapeutically equivalent to

other manufacturers' generic versions of the same drugs.  As stated in its Orange Book, the "FDA

believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."  As such, pharmacists are able to substitute one manufacturer's version of a drug for another.

454.    For commodity-like products such as these, all of the manufacturers must raise prices for the collusion to be viable.  Price hikes by Teva without the co-conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Teva's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation and agreement among the co-conspirators.

### d.    No Viable Substitute

455.    The lack of a viable substitute encourages cartel behavior because consumers cannot replace the product with a cheaper alternative after significant price hikes.  For example:

- Carbamazepine, Cephalexin and Enalapril are listed prominently on the World Health Organization's "essential medicine" list and are considered crucial to the priority health care needs of the population.

- Baclofen is one of two recognized first-line treatments for spasticity induced by multiple sclerosis, according to the U.K. National Institute of Health and Care Excellence.  Patients who cannot tolerate gabapentin – the alternative first-line treatment – or those for whom gabapentin proves ineffective have little to no viable choice.

- Estradiol alternatives – synthetic estrogens and conjugated equine estrogens – have disproportionate effects on synthesis of proteins in the liver, which in turn creates a considerably higher risk of cardiovascular side effects relative to the risks of Estradiol.

- .05% Fluocinonide is a prominent high potency (Group II) corticosteroids and is one of "the mainstay[s] of therapy for psoriasis."  Jonathan D. Ference, PharmD. and Allen R. Last, M.D., *Choosing Topical Corticosteroids*, 79 American Family Physician 2, at 135 (Jan. 15, 2009).

- Pravastatin is critical to the health of patients with high cholesterol and is considered a medical necessity that must be purchased at whatever the cost.  Pravastatin is unique among statins for its relatively low level of binding to blood plasma proteins, which is an important consideration for patients whose other medications require

- 129 -

binding to plasma proteins in order to be effective, such as the widely used blood thinner warfarin.

- Propranolol's creation is considered to be one of the most important contributions to clinical medicine and pharmacology of the 20th century. The drug was invented in the 1960s by James Black.

- Ursodiol is the principal non-invasive non-surgical medical treatment for cholesterol gallstones. Ursodiol is usually taken two or three times a day to treat gallstones, and must be taken for months, or even years, to have an effect. Up to 50% of patients who dissolve their stones on bile acid therapy have a recurrence of stones within five years. Gallstone disease is one of the most common and costly of all digestive diseases when factoring in the cost of surgeries and hospital admissions.

456.    In addition to the fact that few or no effective substitutes exist for patients on many of the collusive drugs, various barriers in the medical field also serve to promote the resistance to prescription changes. These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

457.    The lack of a viable substitute enabled the collusive price fixing to be sustained over an extended period.

### e.    Barriers to Entry

458.    Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.

459.    A competitor attempting to enter the generic drug market faces the barrier of both time and costs. The generic drug approval process created a significant barrier to entry in the markets for each of the 25 combined drugs alleged above. An ANDA approval by the FDA takes an average of 36 months. Upon approval, the manufacturing facility is subject to regulatory oversight and compliance expenses.

460.    A high barrier to entry to the markets for each of the 25 drugs enabled the collusive price fixing to be sustained over an extended period.

**f.    Information Sharing**

461.    Information sharing is important in a conspiracy to enable the cartel to come to an agreement and monitor pricing decisions and compliance.

462.    Teva and its co-conspirators were in constant contact prior to the collusive price hikes through industry conferences and trade association meetings.  The State AGs stated that "[t]hese trade shows and customer conferences provide generic drug manufacturers, including but not limited to the [d]efendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."  As such, the DOJ is scrutinizing "trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

463.    According to the GPhA's website, GPhA is "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA provides a forum for frequent in-person meetings and opportunities to collude.

464.    In addition, Teva has always occupied a leadership role at the GPhA.  Executives from Teva and its co-conspirators served on the GPhA Board of Directors, including: Oberman, President and CEO of Teva Generics (2014); Debra Barrett, Teva SVP of Government and Public Affairs (2012-2013, 2015-2016); Glazer, President and CEO of Heritage (2013- 2016); Jeff Watson, President of Apotex (2013-2014, 2015-2017); and Joseph Renner, President and CEO of Zydus (2013-2017).

465.    In addition to the GPhA, Teva also belonged to numerous additional trade organizations and attended numerous trade shows with its competitors over the Relevant Period. Teva and other drug manufacturers had opportunities to meet and collude at association meetings hosted by: NACDS, HDMA (now the Healthcare Distribution Alliance), and ECRM:

| Meeting / Conference | Location | Corporate Attendees |
|---|---|---|
| GPhA 2012 Technical Conference October 1-3, 2012 | Bethesda North Marriott Hotel & Conference Center, Bethesda, MD | • **Teva:** ‣ Debbie Jaskot, Vice President, US Generic Regulatory Affairs & North American Policy ‣ Jonathan Kafer, VP Sales & Marketing • Other Corporate Attendees: ‣ Actavis ‣ Heritage ‣ Sun / ‣ Akorn ‣ Impax ‣ Taro / ‣ Apotex ‣ Lannett ‣ UDL (Mylan / ‣ Aurobindo ‣ Lupin   Institutional) / ‣ Breckenridge ‣ Mylan ‣ Upsher-Smith / ‣ Dr. Reddy's ‣ Par ‣ Wockhardt / ‣ Fougera ‣ Perrigo ‣ Zydus / ‣ Glenmark ‣ Sandoz |
| GPhA 2013 Annual Meeting February 20-22, 2013 | JW Marriott Orlando Grande Lakes, Orlando, FL | • **Teva:** ‣ **Allan Oberman, President & CEO** • Actavis ‣ **Sigurdur Olafsson, President** • Other Corporate Attendees: ‣ Akorn ‣ Heritage ‣ Sandoz / ‣ Apotex ‣ Impax ‣ Taro / ‣ Aurobindo ‣ Lupin ‣ Teligent (IGI / ‣ Breckenridge ‣ Mylan   Laboratories) / ‣ Dr. Reddy's ‣ Par ‣ Wockhardt / ‣ Glenmark ‣ Perrigo ‣ Zydus |
| 2013 NACDS Annual Meeting April 20-23, 2013 | Palm Beach, FL | • **Teva:** ‣ Jeremy Levin, President and CEO ‣ **Allan Oberman, President and CEO of Teva Americas Generics** ‣ **Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics** ‣ Teri Coward, Sr. Director Sales and Trade Relations ‣ Michael Sine, Director, Corporate Account Group ‣ Jonathan Kafer, Executive VP, Sales and Marketing ‣ David Marshall, VP of Operations ‣ Dave Rekenthaler, VP of Sales • Other Corporate Attendees: ‣ Actavis ‣ Par / ‣ Mylan ‣ Upsher-Smith |
| GPhA 2013 CMC Conference June 4-5, 2013 | Bethesda North Marriott Hotel & Conference Center, Bethesda, MD | • **Teva** • Other Corporate Attendees: ‣ Actavis ‣ Hi-Tech ‣ Sandoz / ‣ Apotex ‣ Impax ‣ Sun / ‣Breckenridge ‣ Lannett ‣ Taro / ‣ Dr. Reddy's ‣ Morton Grove ‣ UDL (Mylan / ‣ Fougera ‣ Mylan   Institutional) / ‣ Glenmark ‣ Par ‣ Upsher-Smith / ‣ Heritage ‣ Perrigo ‣ Zydus |
| 2013 NACDS Total Store Expo August 10-13, 2013 | Sands Expo Convention Center, Las Vegas, NV | • **Teva:** ‣ Theresa Coward, Senior Director of Sales ‣ David Rekenthaler, Vice President, Sales ‣ **Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics** ‣ Kevin Galowina, Head of Marketing Operations ‣ Jessica Peters, Manager of Corporate Accounts ‣ **Allan Oberman, President and CEO Teva Americas Generics** • Other Corporate Attendees: ‣ Actavis ‣ Heritage ‣ Par / ‣ Breckenridge ‣ Mylan ‣ Upsher-Smith |

| Meeting / Conference | Location | Corporate Attendees |
|---|---|---|
| GPhA 2013 Fall Technical Conference<br>October 28-30, 2013 | Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | • **Teva**<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Hi-Tech    ‣ Taro<br> ‣ Akorn    ‣ Impax    ‣ Teligent (IGI<br> ‣ Apotex    ‣ Lannett     Laboratories)<br> ‣ Aurobindo    ‣ Lupin    ‣ UDL (Mylan<br> ‣ Breckenridge    ‣ Mylan     Institutional)<br> ‣ Dr. Reddy's    ‣ Par    ‣ Upsher-Smith<br> ‣ Fougera    ‣ Perrigo    ‣ Wockhardt<br> ‣ Glenmark    ‣ Sandoz    ‣ Zydus<br> ‣ Heritage    ‣ Sun |
| 2013 NACDS NYC Week Annual Foundation Dinner<br>December 3, 2013 | New York City | • **Teva:**<br> ‣ Theresa Coward, Senior Director of Sales<br> ‣ David Rekenthaler, Vice President, Sales<br> ‣ **Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics**<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Mylan    ‣ Upsher-Smith |
| GPhA 2014 Annual Meeting<br>February 19-21, 2014 | JW Marriott Orlando Grande Lakes, Orlando, FL | • **Teva:**<br> ‣ Allan Oberman, President & CEO<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Hi-Tech    ‣ Sun<br> ‣ Apotex    ‣ Impax    ‣ Taro<br> ‣ Aurobindo    ‣ Lupin    ‣ Teligent (IGI<br> ‣ Breckenridge    ‣ Mylan     Laboratories)<br> ‣ Dr. Reddy's    ‣ Par    ‣ Upsher-Smith<br> ‣ Epic    ‣ Perrigo    ‣ Wockhardt<br> ‣ Heritage    ‣ Sandoz    ‣ Zydus |
| 2014 NACDS Annual Meeting<br>April 26–29, 2014 | The Phoenician Resort, Scottsdale, Arizona | • **Teva:**<br> ‣ Theresa Coward, Senior Director of Sales<br> ‣ David Rekenthaler,  Vice  President,  Sales<br> ‣ **Maureen  Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics**<br> ‣ **Allan Oberman, President and CEO Teva Americas Generics**<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Heritage    ‣ Par<br> ‣ Breckenridge    ‣ Mylan    ‣ Upsher-Smith |
| 2014 MMCAP National Member Conference<br>May 12-15, 2014 | Bloomington, MN | • **Teva:**<br> ‣ Nick Gerebi, National Account Manager<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Heritage    ‣ Upsher-Smith<br> ‣ Breckenridge    ‣ Mylan |
| 2014 HDMA Business and Leadership Conference<br>June 1-4, 2014 | JW Marriott Desert Ridge, Phoenix, AZ | ‣ Actavis    ‣ Mylan    ‣ Upsher-Smith |
| GPhA 2014 CMC Conference<br>June 3-4, 2014 | Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | • **Teva:**<br> ‣ Scott Tomsky, Generic Regulatory Affairs, North America<br> ‣ Siva Vaithiyalingam, Director, Regulatory Affairs<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Impax    ‣ Sandoz<br> ‣ Apotex    ‣ Lannett    ‣ Sun<br> ‣ Dr. Reddy's    ‣ Lupin    ‣ Taro<br> ‣ Fougera    ‣ Morton Grove    ‣ Teligent (IGI<br> ‣ Glenmark    ‣ Mylan     Laboratories)<br> ‣ Heritage    ‣ Par    ‣ Upsher-Smith<br> ‣ Hi-Tech    ‣ Perrigo    ‣ Zydus |
| 2014 NACDS Total Store Expo<br>August 23-26, 2014 | Boston Convention Center, Boston, MA | • **Teva:**<br> ‣ David Rekenthaler, Vice President, Sales<br> ‣ **Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics**<br> ‣ Kevin Galowina, Head of Marketing Operations<br> ‣ Jessica Peters, Manager of Corporate Accounts<br> ‣ **Nisha Patel, Director of National Accounts**<br>• Other Corporate Attendees:<br> ‣ Actavis    ‣ Heritage    ‣ Par<br> ‣ Breckenridge    ‣ Mylan    ‣ Upsher-Smith |
| 2014 HCSCA LogiPharma Supply Chain Conference<br>September 16-18, 2014 | Princeton, NJ | • **Teva**<br>• Other Corporate Attendee:<br> ‣ Actavis |

| Meeting / Conference | Location | Corporate Attendees |
|---|---|---|
| GPhA 2014 Fall Technical Conference<br>October 27-29, 2014 | Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | • **Teva:**<br>  ➢ Scott Tomsky, Generic Regulatory Affairs, North America<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Impax  ➢ Teligent (IGI Laboratories)<br>➢ Apotex  ➢ Lannett  ➢ Upsher-Smith<br>➢ Aurobindo  ➢ Lupin<br>➢ Breckenridge  ➢ Mylan  ➢ UDL (Mylan Institutional)<br>➢ Citron  ➢ Par<br>➢ Dr. Reddy's  ➢ Perrigo  ➢ West-Ward<br>➢ Fougera  ➢ Sandoz  ➢ Wockhardt<br>➢ Glenmark  ➢ Sun  ➢ Zydus<br>➢ Heritage  ➢ Taro |
| 2014 IGPA Annual Conference<br>November 19-21, 2014 | Ritz-Carlton, Key Biscayne, Miami, FL | • **Teva:**<br>  ➢ **Allan Oberman, President & CEO, Teva Americas Generics**<br>  ➢ Yehudah Livneh, Ph.D., Vice President, Global Public Policy, Asia and EMIA<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Dr. Reddy's  ➢ Sandoz<br>➢ Apotex  ➢ Mylan |
| 2014 NACDS NYC Week Annual Foundation Dinner<br>December 3, 2014 | New York City | • **Teva:**<br>  ➢ Theresa Coward, Senior Director of Sales<br>  ➢ David Rekenthaler, Vice President, Sales<br>  ➢ **Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics**<br>  ➢ Jessica Peters, Director National Accounts<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Mylan |
| GPhA 2015 Annual Meeting<br>February 9-11, 2015 | Fontainebleau Miami Beach, Miami, FL | • **Teva:**<br>  ➢ **Sigurdur Olafsson, President & Chief Executive Officer, Global Generic Medicines Group**<br>  ➢ Brian Rubenstein, Executive Counsel<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Heritage  ➢ Taro<br>➢ Akorn  ➢ Impax  ➢ Teligent (IGI Laboratories)<br>➢ Apotex  ➢ Lupin<br>➢ Aurobindo  ➢ Mylan  ➢ Upsher-Smith<br>➢ Breckenridge  ➢ Par  ➢ West-Ward<br>➢ Dr. Reddy's  ➢ Perrigo  ➢ Wockhardt<br>➢ Epic  ➢ Sandoz  ➢ Zydus<br>➢ Glenmark |
| 2015 HCSCA National Pharmacy Forum<br>February 16-18, 2015 | Tampa, FL | • **Teva:**<br>  ➢ Nick Gerebi, Director of National Accounts<br>  ➢ Jeff McClard, Sr. Director of National Accounts<br>  ➢ Cam Bivens, Director of National Accounts<br>  ➢ Brad Bradford, Director of National Accounts<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Breckenridge  ➢ Mylan |
| 2015 NACDS Annual Meeting<br>April 25-28, 2015 | The Breakers Resort, Palm Beach, FL | • **Teva**<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Mylan  ➢ Upsher-Smith<br>➢ Breckenridge  ➢ Par |
| 2015 HDMA Business & Leadership Conference<br>June 7-10, 2015 | JW Marriott San Antonio Hill Country, San Antonio, TX | • **Teva:**<br>  ➢ Christine Bader, Vice President, Commercial Operations<br>  ➢ Brad Bradford, Director National Accounts<br>  ➢ Theresa (Teri) Coward, Senior Director of National Sales<br>  ➢ Christopher (Chris) Doerr, Senior Director, Trade Operations<br>  ➢ Cassie Dunrud, Associate Director<br>  ➢ Nick Gerebi, Director National Accounts<br>  ➢ Jeff Herberholt, Senior Manager, Regional Accounts<br>  ➢ Jeff McClard, Senior Director National Accounts<br>  ➢ Jason Nagel, Associate Director, Trade Relations<br>  ➢ Michelle Osmian, Director, Customer Operations<br>  ➢ **Nisha Patel, Director, National Accounts**<br>  ➢ Jessica Peters, Director, National Accounts<br>• Other Corporate Attendees:<br>➢ Actavis  ➢ Heritage  ➢ Sandoz<br>➢ Apotex  ➢ Impax  ➢ Sun<br>➢ Aurobindo  ➢ Lannett  ➢ Upsher-Smith<br>➢ Breckenridge  ➢ Lupin  ➢ Wockhardt<br>➢ Citron  ➢ Mylan  ➢ Zydus<br>➢ Dr. Reddy's  ➢ Par |

- 134 -

| Meeting / Conference | Location | Corporate Attendees |
|---|---|---|
| GPhA 2015 CMC Conference<br>June 9-10, 2015 | Bethesda North<br>Marriot Hotel &<br>Conference Center,<br>Bethesda, MD | • **Teva:**<br>  ➢ Scott Tomsky, Generic Regulatory Affairs, North America<br>  ➢ Siva Vaithiyalingam, Director, Regulatory Affairs<br>• Other Corporate Attendees:<br>  ➢ Actavis   ➢ Impax   ➢ Sun<br>  ➢ Apotex   ➢ Lannett   ➢ Taro<br>  ➢ Citron   ➢ Lupin   ➢ UDL (Mylan<br>  ➢ Dr. Reddy's   ➢ Mylan     Institutional)<br>  ➢ Fougera   ➢ Par   ➢ Upsher-Smith<br>  ➢ Glenmark   ➢ Perrigo   ➢ West-Ward<br>  ➢ Heritage   ➢ Sandoz   ➢ Wockhardt<br>      ➢ Zydus |
| 2015 NACDS Total Store<br>Expo<br>August 22-25, 2015 | Colorado Convention<br>Center, Denver, CO | • **Teva**<br>• Other Corporate Attendees:<br>  ➢ Actavis   ➢ Heritage   ➢ Par<br>  ➢ Breckenridge   ➢ Mylan   ➢ Upsher-Smith |

466.   Often within weeks after these industry meetings took place, Teva and its competitors implemented unprecedented massive price hikes in lock-step.  *See* ¶¶327, 465; Apps. B-C.

467.   Besides in-person meetings, pricing and market information were communicated through investor conference calls.

468.   In addition to issuing directives through investor calls, pricing and market information was shared through subscription-based databases.  The availability of market-sensitive information facilitates the coordination and collusion between manufacturers.  Teva and other manufacturers have the ability to share pricing, market share, quantities and sales information on a weekly basis through subscription-based data providers such as Symphony Health Solutions, IMS, and First Data Bank

### 3. Teva Increased Revenues by Approximately $1.57 Billion Through Collusion on the Eight Drugs Identified by the State AGs and the Seventeen Additional Drugs Uncovered by Plaintiffs

469.   Teva does not publicly disclose its revenues on sales of the specific generic drugs described above.  Despite this, Plaintiffs, through their investigation and analysis, have estimated the revenues that Teva derived from the collusive increase of the prices of certain drugs identified through Plaintiffs' investigation and by the State AGs as the subject of collusion, enumerated above.  Plaintiffs derived this estimated revenue using subscription-based data and publicly available information.

- 135 -

470.    In examining the revenues generated by the collusion for each drug, Plaintiffs examined: (i) the relationship between price and quantity; (ii) the relationship between price and cost of manufacturing; (iii) the prior price trends and volatility of price in the relevant drug; (iv) expected inflation/deflation; and (v) prices over the entire prescription market to calculate average prices. Plaintiffs applied a reasonable proxy for rebates and discounts provided to public purchasers based on publicly available Medicare rebates, as that information is not publicly disclosed.

471.    Plaintiffs estimate that just for the drugs described above in §§III.G, H.1, Teva generated approximately $1.57 billion in total revenue from the collusion.  This is a small sample given that Teva generated revenue from hundreds of generic drugs at the time.  This also does not include any revenue from other drugs with price hikes that were the result of collusion, or the revenues generated by other anti-competitive activities such as collusive price fixing, price maintenance, customer allocation, or market allocation.

472.    Given the breadth of the conspiracy, Teva also undoubtedly made additional price hikes, or agreed with its co-conspirators to allocate markets or decline to compete on price in other markets, thereby generating additional illicit revenues that contributed to Teva's reported 2013 fourth quarter success in U.S. generics.  Thus, Plaintiffs' estimate for just the drugs listed below vastly understates the true impact of Teva's collusion in the generic drugs market.

473.    2013.  Plaintiffs, looking only to the drugs described above, estimate that in 2013 Teva generated approximately $126 million in revenue attributable to improper collusion with its competitors.  This improper collusion-derived revenue breaks down by drug and by quarter as follows[7]:

---

[7]    Collusive profits are calculated as the average of three methodologies: (1) a time series regression of pre-collusion prices to determine "but for" prices based on prior trend and volatility; (2) a time series regression of pre-collusion prices to determine but for prices based on prior trend and volatility plus accounting for inflation; and (3) an analysis of prices over the entire prescription

| Collusive Profits ($mm) | Q3 2013 | Q4 2013 | Total |
|---|---|---|---|
| Diclofenac Potassium Tablets | 0.12 | 0.24 | **0.36** |
| Enalapril Tablets | 2.32 | 3.01 | **5.33** |
| Pravastatin Sodium Tablets | 44.11 | 76.34 | **120.45** |
| **Total** | 46.55 | 79.59 | **126.14** |

474. <u>2014-2015</u>. Plaintiffs, looking only to the drugs described above, estimate that between 2014 and 2015 Teva generated approximately $818 million in revenue attributable to improper collusion with its competitors. This improper collusion-derived revenue breaks down by drug and by quarter as follows:

| Collusive Profits ($mm) | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Baclofen Tablets | 0.00 | 15.66 | 20.59 | 19.88 | 14.72 | 15.53 | 14.43 | 13.94 | **114.74** |
| Carbamazepine Chewable Tablets | 0.00 | 0.00 | 0.40 | 1.00 | 0.74 | 0.44 | 0.33 | 0.27 | **3.19** |
| Carbamazepine Tablets | 0.00 | 0.00 | 10.58 | 26.03 | 22.91 | 20.68 | 18.97 | 16.96 | **116.13** |
| Cephalexin Oral Suspension | 0.00 | 4.85 | 5.08 | 4.06 | 3.11 | 3.32 | 2.73 | 2.33 | **25.47** |
| Diclofenac Potassium Tablets | 0.18 | 0.17 | 0.77 | 1.89 | 1.59 | 1.43 | 1.42 | 1.40 | **8.86** |
| Enalapril Tablets | 5.70 | 6.26 | 13.80 | 21.95 | 19.13 | 10.38 | 8.38 | 6.25 | **91.84** |
| Estradiol Tablets (Teva) | 0.00 | 0.00 | 0.00 | 0.00 | 5.43 | 7.92 | 7.96 | 6.02 | **27.33** |
| Fluocinonide External Cream | 0.00 | 0.02 | 6.09 | 6.92 | 4.80 | 9.89 | 8.91 | 5.28 | **41.90** |
| Fluocinonide External Gel | 0.00 | 0.00 | 0.88 | 0.75 | 0.43 | 0.26 | 0.17 | 0.09 | **2.58** |
| Fluocinonide External Ointment | 0.00 | 0.10 | 12.48 | 13.80 | 13.36 | 12.50 | 11.69 | 8.27 | **72.20** |
| Glyburide Micronized Tablet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.16 | **0.17** |
| Ketoconazole Cream | 0.00 | 6.48 | 6.77 | 6.19 | 5.14 | 5.78 | 5.68 | 3.90 | **39.94** |
| Ketoconazole Tablets | 0.00 | 2.33 | 2.52 | 2.19 | 1.84 | 1.85 | 1.65 | 0.98 | **13.35** |
| Nystatin Tablets | 0.00 | 0.92 | 0.92 | 0.80 | 0.66 | 0.65 | 0.63 | 0.71 | **5.29** |
| Pravastatin Sodium Tablets | 52.14 | 41.11 | 30.92 | 25.57 | 16.60 | 14.53 | 12.16 | 4.64 | **197.67** |
| Propranolol Tablets | 0.00 | 0.00 | 0.00 | 0.00 | 6.87 | 12.06 | 11.87 | 10.18 | **40.98** |
| Theophylline SR Tablets 100mg | 0.00 | 0.31 | 0.33 | 0.32 | 0.30 | 0.30 | 0.30 | 0.30 | **2.17** |
| Theophylline SR Tablets 200mg | 0.00 | 1.16 | 1.15 | 1.10 | 1.00 | 0.96 | 0.92 | 0.88 | **7.17** |
| Theophylline SR Tablets 300mg | 0.00 | 1.37 | 1.24 | 1.14 | 1.01 | 0.90 | 0.78 | 0.74 | **7.18** |
| Theophylline SR Tablets 450mg | 0.00 | 0.02 | 0.02 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | **0.08** |
| **Total** | 58.02 | 80.75 | 114.55 | 133.60 | 119.67 | 119.40 | 108.98 | 83.30 | **818.26** |

475. <u>2016-2017</u>. Plaintiffs, looking only to the drugs described above, estimate that between 2016 and 2017, Teva generated approximately $531 million in revenue attributable to

drug market (7,128 drugs, excluding alleged drugs) to calculate the average price changes post-collusion. These average prices were then used to determine but for prices.

improper collusion with its competitors.  This improper collusion-derived revenue breaks down by drug and by quarter as follows:

| Collusive Profits ($m) | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Baclofen Tablets | 11.74 | 11.26 | 9.35 | 5.93 | 4.47 | 3.00 | 1.36 | 1.27 | **48.38** |
| Carbamazepine Chewable Tablets | 0.29 | 0.33 | 0.33 | 0.32 | 0.29 | 0.30 | 0.27 | 0.25 | **2.38** |
| Carbamazepine Tablets | 12.90 | 14.14 | 14.59 | 14.07 | 12.70 | 11.62 | 8.67 | 6.46 | **95.15** |
| Cephalexin Oral Suspension | 1.92 | 1.80 | 1.52 | 1.28 | 1.15 | 0.78 | 0.78 | 0.40 | **9.63** |
| Clobetasol External Cream | 0.00 | 0.00 | 11.52 | 8.28 | 5.44 | 3.68 | 2.58 | 1.22 | **32.72** |
| Desonide External Cream | 0.00 | 0.00 | 1.78 | 1.35 | 0.79 | 0.41 | 0.00 | 0.00 | **4.33** |
| Desonide Topical Lotion | 0.00 | 0.00 | 0.35 | 0.53 | 0.38 | 0.23 | 0.31 | 0.13 | **1.95** |
| Diclofenac Potassium Tablets | 0.72 | 0.63 | 0.64 | 1.06 | 0.31 | 0.17 | 0.00 | 0.00 | **3.53** |
| Doxycycline Hyclate Capsules | 0.00 | 0.00 | 10.34 | 7.15 | 4.96 | 1.23 | 0.06 | 0.00 | **23.74** |
| Enalapril Tablets | 2.76 | 1.67 | 0.96 | 0.78 | 0.62 | 0.49 | 0.46 | 0.25 | **7.97** |
| Estradiol Tablets (Teva) | 4.58 | 5.09 | 4.92 | 4.87 | 5.82 | 6.08 | 6.15 | 6.56 | **44.07** |
| Estradiol Tablets (Actavis) | 0.00 | 0.00 | 0.68 | 0.25 | 0.11 | 0.07 | 0.05 | 0.04 | **1.20** |
| Fluocinonide External Cream | 4.71 | 4.91 | 4.16 | 3.63 | 2.66 | 1.72 | 1.90 | 1.87 | **25.55** |
| Fluocinonide External Gel | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | **0.02** |
| Fluocinonide External Ointment | 6.55 | 6.13 | 4.45 | 3.51 | 3.08 | 1.86 | 0.21 | 0.00 | **25.80** |
| Glyburide Micronized Tablet | 0.09 | 0.09 | 0.06 | 0.01 | 0.05 | 0.05 | 0.01 | 0.01 | **0.37** |
| Ketoconazole Cream | 1.54 | 0.18 | 0.16 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | **1.90** |
| Ketoconazole Tablets | 0.88 | 0.72 | 0.59 | 0.31 | 0.11 | 0.02 | 0.01 | 0.01 | **2.65** |
| Nystatin Tablets | 0.57 | 0.63 | 0.61 | 0.57 | 0.55 | 0.56 | 0.46 | 0.19 | **4.14** |
| Pravastatin Sodium Tablets | 1.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | **1.53** |
| Propranolol HCL SR Capsules | 0.00 | 0.00 | 3.55 | 1.97 | 0.81 | 0.12 | 0.00 | 0.00 | **6.45** |
| Propranolol Tablets | 12.16 | 13.73 | 11.08 | 9.91 | 6.84 | 2.35 | 0.90 | 0.49 | **57.46** |
| Theophylline SR Tablets 100mg | 0.23 | 0.07 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | **0.33** |
| Theophylline SR Tablets 200mg | 0.49 | 0.19 | 0.07 | 0.03 | 0.02 | 0.01 | 0.01 | 0.01 | **0.82** |
| Theophylline SR Tablets 300mg | 0.67 | 0.47 | 0.20 | 0.06 | 0.04 | 0.02 | 0.01 | 0.01 | **1.47** |
| Theophylline SR Tablets 450mg | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | **0.01** |
| Tretinoin External Cream | 0.00 | 0.00 | 5.42 | 5.41 | 4.56 | 3.89 | 4.51 | 4.26 | **28.04** |
| Ursodiol Tablets | 0.00 | 0.00 | 10.90 | 9.63 | 8.07 | 6.67 | 6.98 | 4.52 | **46.78** |
| Verapamil SR Capsules | 0.00 | 0.00 | 7.87 | 7.95 | 7.98 | 8.78 | 10.38 | 10.21 | **53.18** |
| **Total** | 64.36 | 62.05 | 106.09 | 88.88 | 71.80 | 54.10 | 46.09 | 38.16 | **531.53** |

476.  <u>2018-1H2019</u>.  Plaintiffs, looking only to the drugs described above, estimate that between 2018 and the first half of 2019, Teva generated close to $95 million in revenue attributable to improper collusion with its competitors.  This improper collusion-derived revenue breaks down by drug and by quarter as follows:

| Collusive Profits ($m) | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Total |
|---|---|---|---|---|---|---|---|
| Baclofen Tablets | 1.64 | 1.08 | 1.05 | 0.49 | 0.04 | 0.20 | **4.50** |
| Carbamazepine Chewable Tablets | 0.18 | 0.18 | 0.14 | 0.13 | 0.05 | 0.03 | **0.70** |
| Carbamazepine Tablets | 5.61 | 4.51 | 4.19 | 1.67 | 0.29 | 0.43 | **16.70** |
| Estradiol Tablets | 2.65 | 4.34 | 4.03 | 3.18 | 1.28 | 1.12 | **16.60** |
| Tretinoin External Cream | 3.01 | 1.86 | 1.46 | 1.81 | 1.56 | 1.22 | **10.92** |

| Collusive Profits ($m) | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Total |
|---|---|---|---|---|---|---|---|
| Ursodiol Tablets | 1.52 | 0.70 | 0.04 | 0.00 | 0.00 | 0.00 | **2.26** |
| Verapamil SR Capsules | 8.63 | 7.62 | 7.21 | 7.10 | 6.43 | 6.13 | **43.12** |
| **Total** | 23.23 | 20.29 | 18.12 | 14.38 | 9.65 | 9.13 | **94.81** |

477.    In sum, the drugs Plaintiffs identified generated approximately $1.57 billion from mid-2013 through the first half of 2019 in revenue attributable to improper collusion with Teva's competitors.  This revenue breaks down by drug and by year as follows:

| Collusive Profits ($mm) | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | 1H 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| Baclofen Tablets | 0.00 | 56.12 | 58.61 | 38.28 | 10.11 | 4.26 | 0.24 | **167.62** |
| Carbamazepine Chewable Tablets | 0.00 | 1.41 | 1.78 | 1.26 | 1.11 | 0.62 | 0.08 | **6.26** |
| Carbamazepine Tablets | 0.00 | 36.61 | 79.53 | 55.70 | 39.45 | 15.98 | 0.73 | **228.00** |
| Cephalexin Oral Suspension | 0.00 | 13.99 | 11.48 | 6.51 | 3.11 | 0.00 | 0.00 | **35.09** |
| Clobetasol External Cream | 0.00 | 0.00 | 0.00 | 19.80 | 12.92 | 0.00 | 0.00 | **32.72** |
| Desonide External Cream | 0.00 | 0.00 | 0.00 | 3.13 | 1.20 | 0.00 | 0.00 | **4.33** |
| Desonide Topical Lotion | 0.00 | 0.00 | 0.00 | 0.88 | 1.06 | 0.01 | 0.06 | **2.01** |
| Diclofenac Potassium Tablets | 0.36 | 3.02 | 5.85 | 3.05 | 0.48 | 0.05 | 0.00 | **12.81** |
| Doxycycline Hyclate Capsules | 0.00 | 0.00 | 0.00 | 17.49 | 6.25 | 0.00 | 0.00 | **23.74** |
| Enalapril Tablets | 5.33 | 47.70 | 44.14 | 6.17 | 1.81 | 0.00 | 0.00 | **105.15** |
| Estradiol Tablets (Teva) | 0.00 | 0.00 | 27.33 | 19.47 | 24.61 | 14.20 | 2.40 | **88.01** |
| Estradiol Tablets (Actavis) | 0.00 | 0.00 | 0.00 | 0.93 | 0.27 | 0.00 | 0.00 | **1.20** |
| Fluocinonide External Cream | 0.00 | 13.03 | 28.88 | 17.40 | 8.15 | 0.02 | 0.00 | **67.48** |
| Fluocinonide External Gel | 0.00 | 1.63 | 0.95 | 0.02 | 0.00 | 0.00 | 0.00 | **2.60** |
| Fluocinonide External Ointment | 0.00 | 26.38 | 45.82 | 20.64 | 5.16 | 0.01 | 0.00 | **98.01** |
| Glyburide Micronized Tablet | 0.00 | 0.00 | 0.17 | 0.25 | 0.12 | 0.00 | 0.00 | **0.54** |
| Ketoconazole Cream | 0.00 | 19.44 | 20.50 | 1.89 | 0.00 | 0.00 | 0.00 | **41.83** |
| Ketoconazole Tablets | 0.00 | 7.04 | 6.32 | 2.50 | 0.15 | 0.01 | 0.01 | **16.03** |
| Nystatin Tablets | 0.00 | 2.64 | 2.65 | 2.38 | 1.76 | 0.01 | 0.00 | **9.44** |
| Pravastatin Sodium Tablets | 120.45 | 149.75 | 47.92 | 1.53 | 0.00 | 0.00 | 0.00 | **319.65** |
| Propranolol HCL SR Capsules | 0.00 | 0.00 | 0.00 | 5.52 | 0.93 | 0.00 | 0.00 | **6.45** |
| Propranolol Tablets | 0.00 | 0.00 | 40.98 | 46.89 | 10.58 | 0.00 | 0.00 | **98.45** |
| Theophylline SR Tablets 100mg | 0.00 | 0.95 | 1.21 | 0.32 | 0.01 | 0.00 | 0.00 | **2.49** |
| Theophylline SR Tablets 200mg | 0.00 | 3.41 | 3.76 | 0.78 | 0.04 | 0.00 | 0.00 | **7.99** |
| Theophylline SR Tablets 300mg | 0.00 | 3.75 | 3.43 | 1.40 | 0.07 | 0.00 | 0.00 | **8.65** |
| Theophylline SR Tablets 450mg | 0.00 | 0.05 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | **0.09** |
| Tretinoin External Cream | 0.00 | 0.00 | 0.00 | 10.83 | 17.22 | 8.14 | 2.78 | **38.97** |
| Ursodiol Tablets | 0.00 | 0.00 | 0.00 | 20.53 | 26.24 | 2.26 | 0.00 | **49.03** |
| Verapamil SR Capsules | 0.00 | 0.00 | 0.00 | 15.82 | 37.35 | 30.56 | 12.56 | **96.29** |
| **Total** | 126.14 | 386.91 | 431.35 | 321.38 | 210.15 | 76.13 | 18.85 | **1,570.93** |

I.      **Forty-Four State AGs Filed a Second Complaint Against Teva and Nineteen Co-Conspirators for Participating in an Illegal Conspiracy Which Artificially Inflated the Value of Teva Securities**

478.    On May 10, 2019, Connecticut and 43 additional states filed a second complaint against Teva, alleging a massive industry-wide conspiracy that now includes over 100 generic drugs. In a June 24, 2019 press release, Connecticut Attorney General William Tong suggested more to come against Teva and its co-conspirators:

> "The evidence is undeniable and the conspiracy is unconscionable.  Our lawsuit alleges that generic drug manufacturers engaged in a brazen, industrywide conspiracy to fix prices and allocate market share for drugs that we rely on every day.  The evidence demonstrates that they knew what they were doing was illegal, and that's why they sought to mislead Congress, destroyed evidence, and cautioned each other to keep their collusive conversations offline.  Our investigation is ongoing and expanding and the evidence released today reinforces the allegations in the complaint."

479.    Similarly, after filing the November 2019 AG Complaint to include additional defendants, Joseph Nielsen from the State of Connecticut Attorney General's Office indicated in a December 13, 2019 court hearing that a third complaint is expected to be filed with a similar set of defendants.

1.      **Collusive Price-Hike Drugs in the November 2019 AG Complaint**

480.    Evidence uncovered by the State AGs and cited in the November 2019 AG Complaint shows that Teva and its co-conspirators engaged in collusive price hikes for over 100 drugs that generated collusive profits during the Relevant Period:

### a.      July 2012 Price-Fixing on Eight Drugs

481.     On July 31, 2012, Teva collusively increased prices for at least eight generic drugs after extensive coordination with co-conspirators Alvogen, Breckenridge, Mylan, Sandoz, and Watson[8]:

| Drug | Medical Indications |
|------|---------------------|
| Buspirone Hydrochloride Tablets | An anti-anxiety drug for prevention of depression and bioequivalent to the branded drug BuSpar |
| Estadiol Tablets | An estrogen for alleviation of menopause symptoms and bioequivalent to the branded drug Estrace |
| Labetalol HCL Tablets | A beta blocker for the treatment of high blood pressure and bioequivalent to the branded drug Normodyne |
| Loperamide HCL Capsules | An anti-diarrhea drug used to treat inflammatory bowel disease and the generic version of the branded drug Imodium |
| Estradiol/Norethindrone Acetate Tablets ("Mimvey") | An estrogen used for the alleviation of menopause symptoms and the generic version of the branded drug Activella |
| Nadolol Tablets | A beta blocker for the treatment of chest pain and high blood pressure and a generic version of the branded drug Corgard |
| Nitrofurantoin MAC Capsules | Use for the treatment of urinary tract infections and bioequivalent to the branded drug Macrodantin |
| Tamoxifen Citrate Tablets | Use for the treatment of breast cancer and bioequivalent to the branded drug Nolvadex |

November 2019 AG Complaint, ¶¶540-559.

482.     For this batch of price increases, Teva's Green was responsible for coordinating with Mylan, Sandoz, and Alvogen; and Rekenthaler was responsible for Watson and Breckenridge.  *Id.*, ¶540.  The co-conspirators communicated extensively in July 2012, immediately prior to Teva's July 31 price increases:

- Mylan for Buspirone Hydrochloride, Estradiol, Loperamide HCL, Nadolol, Nitrofurantoin MAC, Tamoxifen Citrate: Green communicated with Mylan's Vice President of Sales James Nesta by phone on July 23, 2012 (7 minutes), July 24 (2 calls totaling 12 minutes), July 25 (4 minutes), July 26 (4 minutes), July 30 (2 calls over 8 minutes), and July 31 (5 calls totaling 21 minutes).

- Alvogen for Nitrofurantoin MAC: After Teva's Green and Mylan's Nesta spoke on July 31, 2012, Nesta called his counterpart B.H., a senior sales and marketing executive at Alvogen.

---

[8]    In October 2012, Watson acquired Actavis and the entities became Actavis, Inc. in January 2013. *See* November 2019 AG Complaint, ¶540 n.3.

- Watson for Buspirone Hydrochloride, Estradiol, Labetalol, Tamoxifen Citrate: On July 11, 2012, Rekenthaler communicated with Watson's senior sales executive Allan Slavsky twice by phone for total of 10 minutes.

- Sandoz for Labetalol and Nadolol: Green communicated with the State AG CW-2[9] on July 29, 2012 (2 calls totaling 6 minutes) and July 31 (6 minutes).

- Breckenridge for Mimvey: On July 17, 2012, Rekenthaler communicated with Breckenridge's senior sales executive Dave Neilson by phone for 4 minutes.

*Id.*

483. After Teva's July 31, 2012 price hikes, the co-conspirators continued to communicate with each other to maintain prices or implement additional price hikes:

- Labetalol:   After Teva, Allergan, and Sandoz implemented coordinated price increases in June and July 2012, on October 16, 2012, Teva's Green spoke with State AG CW-2 from Sandoz by phone twice.  *Id.*, ¶555.  After his conversation with State AG CW-2 of Sandoz, Green emailed his Teva colleagues Jared Levinson and Theresa Coward and stated that Sandoz was "holding firm with their prices" and that Teva must "[s]tay the course and maintain our higher price."  *Id.*, ¶¶554-555.  Coward concurred with "[w]e need to stay the TEVA course."  *Id.*, ¶555.  On October 18, 2012, Teva's Rekenthaler and Allergan's Slavsky spoke by phone four times to also re-affirm their commitment to maintain elevated pricing.  *Id.*, ¶556.

- Mimvey:   In preparation for Breckenridge's price hikes on November 14, 2013, Teva's Rekenthaler and Breckenridge's Nielson spoke twice on October 14, 2013 and once on October 24, 2013 for 26 minutes.  *Id.*, ¶799.  On November 14, 2013, Breckenridge raised Mimvey's WAC by 20%-27%.  *Id.*, ¶798.

- Nadolol:  On August 21, 2012, State AG CW-2 at Sandoz spoke to Teva's Green while Sandoz's pricing committee was approving Sandoz's price hike. *Id.*, ¶547.  On August 26, the day before Sandoz's price increases Sandoz's Senior Director of Pricing and Contracts Armando Kellum called Green.  *Id.*  On August 27, 2012, Sandoz followed Teva's price increase with 746%-2,762% hikes varying by dosage.  *Id.*  Teva's Green acted as an information conduit between Sandoz and Mylan and spoke to Mylan's Nesta twice on August 28, 2012.  *Id.*

- Nadolol:  On January 3, 2013, the day before Mylan's price hike, Teva's Green spoke to Mylan's Nesta four times.  *Id.*, ¶548.  Green again acted as conduit of information and conveyed Mylan's information to Sandoz's Kellum at 9:43 a.m. on January 4, 2013, the day of Mylan's price hike.  *Id.*  Kellum immediately passed the

---

[9]   State AG CW-2 is one of the State AGs' cooperating witnesses.  November 2019 AG Complaint, ¶68.  State AG CW-2 was a sales and marketing executive at Sandoz until 2013, when he/she left Sandoz to join Rising Pharmaceuticals, Inc.  *Id.*, ¶959.

information to his Sandoz colleagues at 11:28 a.m. that same morning and confirmed that Teva, Mylan, and Sandoz had coordinated Nadolol prices to the same level. *Id.* In his email, Kellum warned his Sandoz colleagues to be "cautious" on Nadolol, which, according to the State AGs, meant not to "steal business away" from Teva and Mylan "by offering a lower price and taking their market share." *Id.* After Kellum sent out his 11:28 a.m. email, State AG CW-2 at Sandoz spoke with Teva's Green at 11:50am for 15 minutes. *Id.*, ¶549.

- <u>Nitrofurantoin MAC</u>: On October 10, 2012, more than two months after Teva's 90%-95% price hike on different dosages and formulations of Nitrofurantoin MAC, Teva's Galownia emailed his sales team at 9:49 a.m. about a customer request for price reduction on the drug and asked the team to gather intellligence about current market pricing. *Id.*, ¶¶558-559. Instantly after receiving Galownia's email, Green called Mylan's Nesta at 10:01 a.m. and spoke for ten minutes. *Id.*, ¶559. Immediately after the call with Mylan, Teva's Green called his counterpart B.H. at Alvogen at 10:11 a.m., followed by two more calls that day, and spoke for more than ten minutes. *Id.* After Green's calls with Mylan and Alvogen, Teva refused to reduce its pricing. *Id.*

### b.    July 3, 2013 Price-Fixing of 21 Generic Drugs

484.    On July 3, 2013, Teva implemented collusive price hikes on at least 21 generic drugs. *Id.*, ¶626.    On July 2, 2013, the day before the price hikes, Teva's Patel sent out an agenda for a conference call with personnel from Teva's sales and pricing departments. *Id.* The agenda showed the 21 drugs affected and the percentage of Average Sales Price increases as reported to Medicare:

| Price Increase -- Agenda | |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

*Id.*

485.    In the process of putting together the July 3, 2013 collusive price hike list, Teva began coordinating with co-conspirators in May 2013.  The price increase list initially included only 15 generic drugs, compiled after conversations that Patel, Rekenthaler, and Green had with the highest-quality co-conspirators that included at least Actavis, Amneal, Glenmark, Lupin, Sandoz, and Taro:

4828-1671-4429.v2



*Id.*, ¶¶602-604.

486.    After a month of constant communication with co-conspirators, Teva's Patel put together a spreadsheet entitled "Immediate PI File" for senior executive's approval. *Id.*, ¶602. On May 24, 2013, she emailed the spreadsheet to Galownia, who forwarded the list to Cavanaugh for approval on May 27, 2013. *Id.*, ¶¶602, 605. Cavanaugh approved the price increases on May 28, 2013. *Id.*, ¶605.

487.    After Cavanaugh approved the initial collusive price hikes list, Teva continued to coordinate extensively with co-conspirators via phone calls and text messages and the price increase list grew to 21 drugs:



*Id.*, ¶¶626-627.

488.    Details of Teva's agreements with co-conspirators are outlined below.

### (1)    Agreement with Mylan

489.    For Teva's July 3, 2013 price hikes, Teva's Green and Mylan's Nesta agreed to collusively increase prices on Nadolol, Cimetidine, Prazosin, and Methotrexate (*id.*, ¶¶636-645):

- As discussed above, Nadolol was previously subjected to collusive price hikes by Teva, Mylan, and Sandoz between mid-2012 to early 2013. §III.I.1.a.

- On May 6, 2013 Patel emailed to Green a spreadsheet entitled "Price Increase Candidate Competitive Landscape," with instruction to "gather as much market intelligence as possible" for at least nine Mylan drugs: (i) Amiloride HCL/HCTZ Tablets, (ii) Cimetidine Tablets, (iii) Diltiazem HCL Tablets, (iv) Estradiol Tablets, (v) Flurbiprofen Tablets, (vi) Methotrexate Tablets, (vii) Nadolol, (viii) Prazosin HCL Capsules, and (ix) Tolmetin Sodium Capsules. November 2019 AG Complaint, ¶636.  Over the next 4 days, between May 7 and May 10, Green spoke to Nesta at least 8 times, totaling more than 30 minutes. *Id.*, ¶637.  Green reported information obtained from his conversations with Nesta to Patel by phone. *Id.*

- On May 14, Patel emailed Green and other Teva national account managers to obtain "price points" from Mylan on additional drugs including Nadolol and Cimetidine in

preparation for potential price hikes. *Id.*, ¶638.  Three days later, on May 17, Green spoke to Nesta 6 times totaling at least 35 minutes.  *Id.*  While Green was reaching out to Mylan, Patel told another colleague to expect "additional Mylan intel" and Mylan "to take an additional increase" on Nadolol and Cimetidine.  *Id.*

- After Green's conversations with Mylan, on May 29, 2013, Patel asked for Cavanaugh's approval on Nadolol, Cimetidine, Prazosin, and Methotrexate – on top of her May 28, 2013 approval of the 15 drugs on the preliminary list in the "Immediate PI File." *Id.*, ¶¶605, 639.

- During the week before Mylan and Teva's price hikes, from June 24 to June 28, Green and Mylan's Nesta spoke at least ten times, totaling over 80 minutes. *Id.*, ¶640.

- On June 28, 2013, after Green's call with Mylan's Nesta, Patel circulated an email about Mylan's upcoming price increases – before Mylan publicly announced its price increases – demonstrating that Teva had advanced non-public information about Mylan's price hikes. *Id.*, ¶643.

- On July 2, 2013, the day before Teva's price hikes, a colleague emailed Patel to inquire about Mylan's pricing on Methotrexate in preparation for Teva's own increase on the drug. *Id.*, ¶645.  Patel responded that Teva was comfortable taking price increase on the drug on July 3 because, even though Mylan's pricing was a bit low, "we are hearing rumors of them taking another increase." *Id.*  According to the State AGs, the purported "rumors" were based on conversations between Green and Nestor at the request of Patel on May 6 to gather "market intelligence" relating to Methotrexate and eight other Mylan drugs. *Id.*, ¶¶636-637, 645.

### (2)    Agreement with Glenmark

490.    For Teva's July 3, 2013 round of price hikes, Patel reached collusive agreement with State AG CW-5[10] of Glenmark to implement coordinated price hikes on Adapalene Gel, Fluconazole, Nabumetone, Moexipril HCL, Moexipril HCTZ, and Ranitidine (November 2019 AG Complaint, ¶¶607-614):

- As early as 6:49 a.m. on May 2, 2013, Patel emailed her colleague about having some "high priority items" to add to Teva's price increase list shortly. *Id.*, ¶607. Within 15 minutes after sending her email, Patel spoke to State AG CW-5 from Glenmark for over 5 minutes. *Id.*  That day, Patel spoke to State AG CW-5 4 times for more than 24 minutes. *Id.*  After speaking with State AG CW-5, at 7:44 a.m.,

---

[10]    State AG CW-5 is one of the State AGs' cooperating witnesses.  November 2019 AG Complaint, ¶68.  State AG CW-5 was a "senior-most" executive at Glenmark until s/he resigned in March 2014. *Id.*, ¶¶483, 596.

Patel emailed the same Teva colleague again about adding six Glenmark drugs to Teva's price increase list: Adapalene Gel, Nabumetone, Moexipril, Moexipril HCTZ, Pravastatin, and Ranitidine. *Id.*

- Patel continued to coordinate the upcoming price increases with Glenmark as the price increase list grew to include eight Glenmark drugs. *Id.* On May 3, 2013, Patel communicated with State AG CW-5 via two phone calls and a text message. *Id.* Patel also had series of calls with Glenmark's sales and marketing executive Jessica Cangemi on May 3, May 6, and May 7 totaling over 45 minutes. *Id.* On May 16, 2013, the day of Glenmark's price hikes, Patel spoke with State AG CW-5 for almost 6 minutes. *Id.*, ¶609. The day after the price hikes, she spoke again with State AG CW-5 and also with Cangemi. *Id.*

- On May 16, 2013, Glenmark hiked prices on at least eight drugs that were also manufactured by co-conspirator Teva: (i) Adapalene Gel; (ii) Fluconazole tablets; (iii) Moexipril; (iv) Moexipril HCTZ; (v) Nabumetone; (vi) Ondansetron; (vii) Pravastatin; and (viii) Ranitidine. *Id.*, ¶609. All of these drugs were on Teva's price increase list – with Pravastatin slated for the August 9, 2013 round of price increases instead of the July 3, 2013 hike. *Id.*, ¶609.

- Patel also that ensured that Teva did not violate the "fair share" rule of the road. According to the State AGs, on May 15, the day prior to Glenmark's price hikes and before its price increases were made public, Patel directed her colleagues that she "would like to be made aware of any requests (including in-house RFPs)" on the eight Glenmark drugs to ensure that Teva did not take market share away from Glenmark as a result of Glenmark's price increases. *Id*, ¶608.

- Indeed, after Glenmark's price hikes, Teva conformed to its agreement to not undermine its co-conspirator's efforts by either refusing to bid or providing high bids to Glenmark customers that approached Teva for lower pricing. *Id.*, ¶610. As Patel instructed a colleague in responding to a large wholesaler's request, "IF we bid, we need to bid high, or we will disturb the market." *Id.* Similarly, Teva's Green told colleagues on May 29, 2013 that he would not want to steal Glenmark's Fluconazole business "on an increase" even though Teva had plenty of inventory to meet a large retail client's bid. *Id.*, ¶137. Teva ultimately decided not to bid for the business. *Id.*

- On August 5, 2013, after receiving news of Glenmark's attempt to poach Teva's largest customer AmerisourceBergen, Patel called and spoke to State AG CW-5 at Glenmark three times. *Id.*, ¶¶484-486. On August 6, 2013, Patel also spoke to Glenmark's Vice President of Sales Jim Brown twice for 13 and 15 minutes. *Id.*, ¶486. According to the State AGs, during these conversations, she "reminded Brown and [State AG] CW-5 of their prior agreement not to poach each other's customers after a price increase." *Id.* After these conversations, on August 6, 2013, Glenmark withdrew its AmerisourceBergen bid and honored the agreement it had reached with Teva not to compete on Moexipril. *Id.*, ¶487. Teva's Theresa Coward emailed her colleagues to inform them of Glenmark's bid withdrawal: "[t]oday is a new day and today . . . . ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark." *Id.*

### (3)     Agreement with Greenstone

491.    For Teva's July 3, 2013 round of price hikes, in addition to reaching agreement with

Glenmark on Fluconazole and other drugs, Patel also reached collusive agreement with Greenstone's

Robin Hatosy to implement coordinated price hikes on Fluconazole (*id.*, ¶¶611-613, 950-953):

- Even though Teva had entered into agreement to coordinate with Glenmark on its price hike, Teva's Patel was initially ambivalent about adding the Fluconazole to Teva's price increase list because Greenstone, a not-so-high-quality competitor, was also a manufacturer for the drug. *Id.*, ¶¶611-612. Patel had given Greenstone a mediocre co-conspirator quality score of "0." *Id.*, ¶950.

- Her views about Greenstone changed on May 28, 2013, after a 21-minute phone conversation with Greenstone's National Account Executive Robin Hatosy, who was Patel's former colleague at AmerisourceBergen. *Id.*, ¶¶612, 951. According to the State AGs, after the call with Hatosy, on May 29, "Patel promptly added Fluconazole to the Teva price increase list." *Id.*, ¶612.

- On July 3, 2013, when Teva hiked prices for different dosages of Fluconazole by 875%-1,570%, Patel spoke to Greenstone's Hatosy and Glenmark's CW-5 for 16 minutes and 5 minutes, respectively. *Id.*, ¶613. As agreed, Greenstone followed Teva and hiked Fluconazole prices on August 16, 2013. *Id.*

### (4)     Agreement with Taro

492.    For Teva's July 3, 2013 round of price hikes, Patel reached collusive agreements with

Taro's Ara Aprahamian[11] to implement coordinated price hikes on Adapalene Gel and Fluocinonide

0.05% cream, gel, ointment and emollient-based cream ("Fluocinonide"):

- <u>Fluocinonide:</u>  Patel had planned for Teva's price increases even before April 11, 2013 – his last day at former employer AmerisourceBergen. *Id.*, ¶¶569-570, 602, 830. On April 2, 2013, after his conversation with Patel, Taro's Aprahamian emailed his Chief Operating Officer about Patel. *Id.*, ¶571. Taro's Chief Operating Officer viewed Patel "as someone who would change" the Teva mindset, which the State AGs described as "being slow to follow price increases." *Id.*, ¶571. Taro predicted that "[m]aybe the industry will be better for it. Teva can only improve." *Id.* Patel reached out to her former colleague Aprahamian and identified Fluocinonide as a coordinated price increase candidate. *Id.*

---

[11]   Ara Aprahamian, a Vice President of Sales and Marketing at Taro, is named as a defendant in the November 2019 AG Complaint.

- <u>Adapalene Gel:</u> Patel's conversations with Taro's Aprahamian continued after she joined Teva and they also reached agreement to follow Glenmark's price hike for Adapalene Gel. *Id.*, ¶623. On May 22, 2013, during their first phone call after Patel joined Teva, Patel and Aprahamian agreed to follow Glenmark's May 16, 2013 price hike for the drug. *Id.* After the call, Aprahamian instructed his Taro colleague to implement a price increase on the drug on May 23, 2013, which took effect on May 29, 2013. *Id.*, ¶¶623-624. At the same time, Patel made a note in her May 24, 2013 "Immediate PI File" price increase spreadsheet about following Glenmark's Adapalene Gel price hikes. *Id.*, ¶¶623, 643.

- Teva increased its price for Adapalene Gel on July 3, 2013. *Id.*, ¶625. At the same time, it also hiked the prices of the four formulations of Fluocinonide by 10%-17%. *Id.*, ¶831.

### (5)   Agreement with Sandoz

493.   For Teva's July 3, 2013 round of price hikes, Patel reached collusive agreements with State AG CW-1[12] of Sandoz to implement coordinated price hikes on Nabumetone, Cefdinir Oral Suspension, Cefprozil, Cefdinir Capsules, Fluocinonide, Nadolol[13], and Ranitidine:

- Before Patel started her employment at Teva on April 22, 2013, she and State AG CW-1 at Sandoz already began communication. November 2019 AG Complaint, ¶572. The two co-conspirators exchanged phone calls on April 12, 2013 and April 18, 2013. *Id.*

- On May 1, 2013, Patel started to create a spreadsheet with "Price Increase Candidates," and one of the first calls she made was to State AG CW-1 at Sandoz. The two co-conspirators spoke for almost 16 minutes on May 2, 2013. *Id.*, ¶¶573, 575, 577. According to the State AGs, "Patel told [State AG] CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked [State AG] CW-1 how Sandoz handled price increases. [State AG] CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased." *Id.*, ¶575.

- On May 15, 2013 and May 20, 2013, Patel spoke to State AG CW-1 from Sandoz again for 25 minutes and more than 18 minutes, respectively. *Id.*, ¶615. According to the State AGs, during these conversations, Patel received assurance from Sandoz that it would be "bidding high" on Nabumetone – meaning it "would provide cover

---

[12]   State AG CW-1 is one of the StateAGs' cooperating witnesses. November 2019 AG Complaint, ¶68. State AG CW-2 was a pricing executive at Sandoz. *Id.*

[13]   For Nadolol, Teva and Sandoz already had a successful experience coordinating a year before and hiked prices by 746% to 2,762% for different formulations of the drug following Teva's price hike in July 31, 2012. *See* §III.I.1.a.

bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase." *Id*. Sandoz's May 22, 2013 internal email revealed such an agreement. *Id.*, ¶616.

- After these conversations with Sandoz, Patel's "Immediate PI File" spreadsheet included Sandoz drugs Nabumetone, Cefdinir Oral Suspension, Cefprozil, Cefdinir Capsules, Fluocinonide, and Ranitidine as initial price increase candidates. *Id.*, ¶602.

- On May 30, Patel called State AG CW-1 at Sandoz after her 8:15 a.m. call with State AG CW-5 at Glenmark to discuss with State AG CW-1 "Glenmark's increase on the drug Ranitidine and Teva's plans to follow that increase." *Id.*, ¶617. At 10:02 a.m., after speaking with Patel, State AG CW-1 emailed his Sandoz colleague Kellum and recommended that Sandoz triple its Ranitidine pricing "from $1.77 to $5" as he believed "there might be some price increases in the pipeline." *Id.*, ¶618.

- After Teva's July 3, 2013 price hikes, on July 15, 2013, State AG CW-2 at Sandoz called Teva's Rekenthaler and asked for "a full comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz" so as to be sure not to compete with Teva for market shares on the drugs. *Id.*, ¶¶646-648. According to the State AGs, the purpose of request was to ensure that Sandoz "could live up to its end of the bargain." *Id.*, ¶646. Rekenthaler complied with the request but, knowing the impropriety of sharing such commercially sensitive information, sent the price increase list from his Teva email to his personal email before forwarding to State AG CW-2's personal icloud email account. *Id.*, ¶648.

### (6)    Agreement with Upsher-Smith

494.    For Teva's July 3, 2013 round of price hikes, Patel reached an agreement with

Upsher-Smith's Brad Leonard to implement coordinated price hikes on Oxybutynin Chloride:

- Patel reached a general agreement with Leonard to implement coordinated price hikes. On April 18, 2013, the week before starting her new job at Teva, Patel and Upsher-Smith's senior national account executive Brad Leonard began exchanging text messages. *Id.*, ¶633. On April 29, 2013, Patel and Leonard again spoke for close to 20 minutes. *Id.* According to the State AGs, "[d]uring these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases." *Id.*

- On June 13, 2013, Patel's boss Galownia emailed several Teva colleagues, including Patel, to "share any competitive intelligence you may have or receive" on the drug in order to assess whether to exit the Oxybutynin market. *Id.*, ¶631. On Saturday, June 15, 2013, Patel communicated with Upsher-Smith's Leonard six times via text messages. *Id.*, ¶632.

- Within half a month, Teva hiked the Oxybutynin Chloride prices by 1,100%-1,500% on July 3, 2013, depending on dosages. *Id.*, ¶635. Plaintiffs' investigation reveals

- 151 -

that Upsher-Smith also hiked Oxybutynin prices by the same amount around the same time as Teva's price hikes.  *See* App. C.

### (7)  Agreement with Lupin

495.  For Teva's July 3, 2013 round of price hikes, Patel reached an agreement with Lupin's David Berthold to implement coordinated price hikes on Cefdinir Oral Suspension, Cefdinir Capsules, and Cefprozil Tablets:

- Patel had a series of phone conversations with Lupin's Berthold during the process of putting together her "Immediate PI File" spreadsheet.  In the week prior to her May 24, 2013 email to her supervisor Galownia with a preliminary list of price hike candidates, Patel spoke to Lupin's Berthold almost on a daily basis: 6 times on May 16 for close to 12 minutes, twice on May 17 for over 11.5 minutes, on May 20 for close to a minute, on May 21 for more than 11.5 minutes, and 3 times on May 23 for over 2 minutes.  November 2019 AG Complaint, ¶¶604-605.

- According to the State AGs, during these calls, "Teva and Lupin conspired to fix and raise prices" on Cefdinir Oral Suspension, Cefdinir Capsules, and Cefprozil Tablets.  *Id.*, ¶¶603-604, 940.  Indeed, after these calls, in her "Immediate PI Files" spreadsheet, Patel noted next to these three drugs Teva's agreement to "follow Lupin" as the "[r]eason for increase."  *Id.*, ¶602.

### (i)  The July 2013 Collusive Price Hikes Generated Nearly $1 Billion of Revenue per Quarter for Teva

496.  As alleged in the November 2019 AG Complaint, Teva benefited from "a staggering $937,079,079 (nearly $1 billion) per quarter" as a result of its July 3, 2013 price hikes on 21 drugs, Pravastatin price hike in August 2013, and price hike on an additional drug:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

*Id.*, ¶722.

497.    As a reward for her efforts, within a mere 11 months after Patel began her employment at Teva, the Company awarded Patel 9,500 stock options and a $37,735 cash bonus in March 2014.  *Id.*, ¶¶572, 723.

c.    **Enalapril Maleate Price-Fixing and Market Allocation –
Teva, Taro, Mylan, Wockhardt (July 2013)**

498.    Enalapril is an ace inhibitor used to treat congestive heart failure and high blood pressure and is the generic version of Vasotec®.  *Id.*, ¶¶391, 651.  Teva's Green and Patel coordinated with Wockhardt and Mylan for Teva and Wockhardt's July 19, 2013 price hike:

- On July 10, 2013, Teva's Galownia emailed his colleagues about a customer's erroneous claim that Wockhardt was having supply issues for Enalapril.  *Id.*, ¶653. He conveyed that, in reality, the drug "was on the Mylan increase communicated last week.  They took a ~75% increase to WAC."  *Id.*  Teva's Green sought to figure out the Enalapril market situation and immediately called Mylan's Nesta that same day and spoke for 16 minutes.  *Id.*, ¶654.  They spoke again twice on July 11 and Nesta explained that Mylan and Wockhardt had actually reached an agreement such that Wockhardt would follow Mylan's price increase on Enalapril.  *Id.*  Green quickly emailed the information from Nesta to his Teva colleagues.  *Id.*

- On July 12, 2013, Patel spoke with Mylan's Nesta three times while Green attended the July 12-14, 2013 PBA Health Conference in Overland Park, Kansas.  *Id.*, ¶656. Teva's Jessica Peters emailed Patel and asked if Teva was "planning on increasing [its price for Enalapril]."  *Id.*, ¶655.  Patel indicated: "I hope to increase, but we're gathering all the facts before making a determination" and "[w]e're exploring the possibility of an increase just on this item . . . in the near future.  Maybe next week." *Id.*

- According to the November 2019 AG Complaint, based on information and belief, Green likely spoke with Wockhardt's Kevin Knarr during the PBA conference's golf outing on July 12 or at the trade show that night, resulting in Knarr adding Green's cell number to his cell phone contact list at 12:40 a.m. on July 13.  *Id.*, ¶656. Immediately after the conference, Green and Patel spoke 3 times on July 14 for 21 minutes and, according to the State AGs, "Green conveyed to Defendant Patel what he had learned from [Kevin Knarr]: Wockhardt planned to follow the Mylan price increase."  *Id.*, ¶657.  Patel immediately announced the information via email to a Teva executive early in the morning on the next day: "new developments . . . heard that Wockhardt is taking an increase today or tomorrow."  *Id.*, ¶658.

- During the early morning of July 15, 2013, Green and Wockhardt's Knarr exchanged Enalapril price points over two phone calls.  *Id.*  By 9:57 a.m., Knarr had obtained Teva's price points from Green and sent the information to his colleagues for the upcoming price increase.  *Id.*  On July 16, 2013, after she received a voice mail from

Green, Patel emailed her plan for the Enalapril price increase to Galownia, who forwarded it to Cavanaugh. *Id.*, ¶¶659-660. According to the State AGs, "Cavanaugh . . . promptly approved the price increase," and Patel immediately scheduled a sales and pricing team meeting for an Enalapril "Price Increase Discussion." *Id.*, ¶660.

499. On the same day that Teva was preparing for the coordinated Enalapril price hikes, Patel called Taro's Aprahamian and kicked off the market allocation process to maintain elevated pricing for the drug:

- On July 17, 2013, Patel and Aprahamian spoke for 14 minutes. *Id.*, ¶396. On July 19, 2013, the day of Teva and Wockhardt's price hikes, Aprahamian called Wockhardt's Vice President of Sales and Marketing Michael Craney's office and cell phones and spoke for almost 11 minutes. *Id.* After speaking with Teva's Patel and Wockhardt's Craney, Taro's Aprahamian decided to re-launch Enalapril to go beyond the governmental sales and started negotiating with Teva, Mylan and Wockhardt for its "fair share." *Id.*, ¶¶395-398.

- According to the State AGs, "both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market." *Id.*, ¶398. After speaking with Taro's Aprahamian for 11 minutes on July 30, 2013 and 4 minutes on July 31, 2013, Patel circulated her analysis to her colleagues and provided instructions on how Teva should respond to customers' bid requests in light of its ""fair share" targets." *Id.*, ¶399. According to the State AGs, "[b]ased on the agreement between the two companies, and in accordance with the industry's 'fair share' code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market." *Id.*

- When Taro reached out to potential customers with bid proposals, Aprahamian would call each co-conspirator beforehand to seek its input. *Id.*, ¶¶402-403. For example, Aprahamian reached out to Patel on December 5, 2013 and spoke with her before submitting a bid proposal to Teva's customer on December 6. *Id.*, ¶¶403, 405. At the same time and throughout December 2013, Aprahamian also consulted the market leader Mylan by communicating with its senior account executive Mike Aiger. *Id.*, ¶¶401, 405-407. With Aiger's consent, Taro increased its targeted "fair share" from 15% to 20%. *Id.*, ¶407. On December 31, 2013, Wockhardt's Craney also reached agreement with Taro's Aprahamian to concede Morris & Dickson's Enalapril business to Taro. *Id.*, ¶408.

- With customer allocation agreements in place and without the need to compete on pricing to obtain market share, Taro's Enalapril fact sheet generated on December 5 – the day of Aprahamian's consultation with Patel – showed that Taro's pricing was set at the same level as Teva's pricing for the drug and close to Wockhardt and Mylan's levels. *Id.*, ¶404.

- On May 14, 2014, Teva's Patel communicated with Taro's Aprahamian once by phone and eight times by text messages after receiving a request for proposal from a wholesale customer. *Id.*, ¶409. On the same day, she also emailed her colleagues to caution them not to disrupt the Enalapril market agreement: "no bid due to potential market/customer disruption, aka strategic reasons." *Id.*

- With the "fair share" market allocation in place, the co-conspirators implemented another round of price hikes on Enalapril in August 2014. *See* §III.I.1.h.

### d.   August 9, 2013 Price-Fixing of 12 Generic Drugs

500.   Teva's August 9, 2013 price hikes included at least 12 drugs – 7 of which involved co-conspirator Mylan, and also included other co-conspirators such as Actavis, Aurobindo, Apotex, Glenmark, Heritage, Lupin, Sandoz, Taro, and Zydus:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 96.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 102% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1032% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 138% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 20.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 268% | Follow Mylan | Mylan, 61.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 23.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 4.3% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

November 2019 AG Complaint, ¶¶663, 668. The price hike list above was sent to Cavanaugh for approval on August 7, 2013 – two days before the price increases became effective. *Id.*, ¶668.

501.   Teva coordinated extensively with co-conspirators in the process of putting together the August 9, 2013 price hike list and agreeing to price hikes:

- Between July 8-11, 2013, Teva's Patel communicated extensively with at least 6 conspirators: (i) Actavis (July 8 with Rogerson), (ii) Aurobindo (July 8 with Grauso for over 8 minutes), (iii) Glenmark (July 8 for over 11 minutes, July 10 by phone and text, July 11 for 7.5 minutes – all with State AG CW-5) , (iv) Heritage (July 9 with Malek for over 21 minutes), (v) Lupin (July 8 for over 8 minutes, July 9 for over 4 minutes, July 11 – all with Berthold), and (vi) Sandoz (July 9 for 16.5 minutes, July 10 for 16 minutes – all with State AG CW-1). *Id.*, ¶665.

- Teva's Green acted as the conduit of information between Patel and Mylan: On June 26, 2013, Green and Mylan's Nesta had an hour-long conversation, followed by

Teva personnel emailing around a list of drugs for potential price increase, which included Mylan drugs Ketorolac Tablets and Ketoprofen Capsules. *Id.*, ¶641. Galownia and Patel responded positively, with Galownia commenting that "Ketoprofen would have a high likelihood of success." *Id.* Teva slated the two drugs for price increases on August 9, 2013. *Id.*, ¶642. On July 10, 2013, Green spoke to Mylan's Nesta again twice for approximately 17.9 minutes. *Id.*, ¶666. Within ten minutes after his last call with Mylan that day, Green called Patel to talk about his conversation with Nesta. *Id.* Green and Nesta spoke again on July 11, 2013 for over six minutes. *Id.*

- On July 11, 2013, Patel distributed a preliminary list by email and stated "it will be put through the review process." *Id.*, ¶664.

### (1) Amiloride, Diclofenac, Diltiazem, Doxazosin, Ketoprofen, Ketorolac, and Tolmetin Price-Fixing

502.   After Patel distributed the preliminary list, Green continued communication with Mylan's Nestor to coordinate the August 2013 price hikes:

- On July 22, 2013, Patel emailed Green that she was "seeking intel" on drugs targeted for price hikes and attached a spreadsheet with mostly Mylan drugs, including Amiloride, Diclofenac, Diltiazem, Doxazosin, Ketoprofen, Ketorolac, and Tolmetin. *Id.*, ¶674. The next day, Green called Mylan's Nesta and spoke for over six minutes. *Id.*, ¶675. Immediately after the call, Green called Patel and conveyed the intel from Mylan. *Id.*

- A week later, on July 30, 2013 Patel emailed another spreadsheet to Green requesting for more "market intel" on the seven Mylan drugs. *Id.*, ¶677. On July 31, Green spoke to Mylan's Nesta 5 times for close to 18 minutes. On August 1, they spoke again twice for close to seven minutes. *Id.*, ¶678. Within seven minutes of Green's last conversation with Mylan, he called Patel to convey the intel gathered. *Id.*

- According to the State AGs, "[b]ased on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013." *Id.*, ¶680.

503.   Patel also communicated with Apotex to coordinate price hikes for Doxazosin. A week after Apotex's Beth Hamilton's phone conversation with Patel, on July 23, 2013, Apotex implemented its price hike for the drug. *Id.*, ¶922. On August 1, 2013, the two co-conspirators spoke again to coordinate Teva's price hike. *Id.* On August 3, 2013, Teva hiked Doxazosin price by 1,053% to match the price levels set by Apotex and Mylan. *Id.*

- 156 -

## (2)    Pravastatin Price-Fixing

504.    Although five generic manufacturers – Teva, Apotex, Glenmark, Lupin, and Zydus – split the market for the cholesterol drug Pravastatin, it was one of the most profitable drugs for Teva. *Id.*, ¶¶681, 683, 704.

505.    Teva began coordinating with co-conspirators on Pravastatin price hikes as early as May 2013:

- Glenmark: Patel began with Glenmark and exchanged four calls with State AG CW-5 of Glenmark on May 2, 2013 – speaking for over 24 minutes. *Id.*, ¶¶577, 682. After one of her calls with State AG CW-5, Patel directed her colleague to add Pravastatin to the price increase list. *Id.*, ¶682. Patel continued communicating with Glenmark and spoke with its National Account Executive Jessica Cangemi for more than 36 minutes on May 6 and 9 minutes on May 7. *Id.*, ¶686. According to the State AGs, during Patel's conversations with State AG CW-5 and Cangemi, she was able to obtain "specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet." *Id.* By May 8, 2013, Teva and Glenmark decided that Glenmark would lead the price hikes as a Teva executive emailed Patel and expressed the expectation to hike Pravastatin price "if/when Glenmark does." *Id.*, ¶687. On May 16, 2013, Glenmark hiked Pravastatin prices. *Id.*, ¶689.

- Apotex: Beginning May 20, 2013, Patel reached out to Apotex – the only remaining Pravastatin competitor that Teva had not reached out to – and reached agreement to a coordinated price hike on the drug. According to the November 2019 AG Complaint, Patel exchanged 5 phone calls between May 20-24 for more than 52 minutes with Apotex's senior sales executive Beth Hamilton – "during which Apotex agreed to raise its price for Pravastatin." *Id.*, ¶695. Apotex hiked its Pravastatin price by more than 100% on May 28, 2013 – taking its price to approximately the same level as Glenmark after its May 16, 2013 price hike. *Id.*, ¶919.

- Immediately after Apotex's May 28 price hike, Patel spoke to Teva's executive Cavanaugh and added Pravastatin to the price increase list. *Id.*, ¶697.

- Zydus: Green was responsible for coordinating with Zydus. Beginning May 3, 2013, Green coordinated the Pravastatin price hikes with Zydus senior executive Michael Keenley – speaking twice on that day with one call lasting at least four minutes. *Id.*, ¶685. Patel indicated to her colleagues that "[t]he only threat was Zydus." *Id.*, ¶691. Green reached out to Zydus to gain assurance and spoke to Maria Falcone (for 5 minutes on May 15), Michael Keenley (for 3 minutes on May 15 and 4 minutes on May 16), and Kristy Ronco (for 16 minutes on May 15). *Id.*, ¶690. After his conversations with Zydus executives, on May 16, Green reported the conversations to his colleagues Rekenthaler and Patel. *Id.*, ¶692.

- Green continued to coordinate with Zydus until Zydus's price increase on June 14, 2013. *Id.*, ¶698. On May 28, the day of Apotex's Pravastatin price hike, Green and Zydus's Ronco exchanged six text messages. *Id.*, ¶697. On May 29, the two co-conspirators spoke twice and exchanged four text messages. *Id.*, ¶698. During the week before Zydus's price hike, Green communicated extensively with Zydus's Michael Keenley (June 10 call for 2 minutes, June 11 calls for 29 minutes), Maria Falcone (June 9 call for 12 minutes, June 13 call for 16 minutes), and Kristy Ronco (June 11 with one call and three text messages, June 12 calls for 37 minutes, June 13 call for over seven minutes). *Id.*, ¶¶699, 933. On June 14, 2013, Zydus hiked its Pravastatin price by more than 150%. *Id.*, ¶933.

- <u>Lupin:</u> Patel began coordinating the Pravastatin price hikes with Lupin's Berthold on May 6, 2013 and spoke with Berthold for more than 22 minutes on May 6 and 10 minutes on May 7. *Id.*, ¶686. On May 16, 2013, Patel called Lupin's Berthold again to gather supply and pricing intelligence and exchanged seven phone calls with him that day. *Id.*, ¶¶690, 693. Lupin increased its Pravastatin price on August 28, 2013. *Id.*, ¶703.

506.    In the week prior to Teva's own August 9, 2013 Pravastatin price hike, Green and Patel communicated with Apotex, Glenmark, Lupin and Zydus by phone to coordinate the price increase:

|  | Teva Executive | Co-Conspirator | Phone Call |
|---|---|---|---|
| 7/31/2013 | Nisha Patel | Lupin (David Berthold) | 2.5 minutes |
| 8/1/2013 | Nisha Patel | Apotex (Beth Hamilton) | 14.6 minutes |
| 8/1/2013 | Kevin Green | Lupin (David Berthold) | 2 minutes |
| 8/2/2013 | Kevin Green | Lupin (David Berthold) | over 13 minutes |
| 8/4/2013 | Kevin Green | Zydus (Kristy Ronco) | 2 times |
| 8/5/2013 | Kevin Green | Zydus (Kristy Ronco) | once |
| 8/5/2013 | Kevin Green | Lupin (David Berthold) | 1 minute |
| 8/5/2013 | Nisha Patel | Glenmark (CW-5) | 3 times for more than 21 minutes |
| 8/6/2013 | Nisha Patel | Glenmark (Jim Brown) | 2 times for more than 28 minutes |
| 8/8/2013 | Nisha Patel | Lupin (David Berthold) | 0.6 minute |
| 8/9/2013 | Nisha Patel | Glenmark (Jim Brown) | 2.1 minutes |

*Id.*, ¶¶670, 699-700, 921.

507.    Several days after Teva's August 9, 2013 price hike, Patel summed up the co-conspirators' Pravastatin price increases in an internal email, noting that Kevin Green was responsible for coordinating with Zydus and that Zydus's price hike occurred around the time of the HDMA conference:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

*Id.*, ¶702.

508.   Patel touted the lucrativeness of Teva's Pravastatin price hike.  According to the State AGs, Teva's monumental effort in coordinating with four other co-conspirators on the price hikes was well worth it as "[o]n August 8, 2013 – the day before the Teva increase – Patel sent her supervisor K[evin] G[alownia] an estimate of the 'net upside' to Teva as a result of certain price increases.  She estimated that, for Pravastatin alone, the 'net upside after credits' to Teva was $674,670,548 per quarter." *Id.*, ¶704.

### (3)   Etodolac Price-Fixing

509.   Sandoz kicked off the collusive coordination with Teva and Taro for the arthritis drugs Etodolac Immediate Release ("Etodolac" or "Etodolac IR") and Etodolac Extended Release ("Etodolac ER"):

- In July 2013, Sandoz had identified a list of drugs targeted for price hikes at the end of July, and State AG CW-3[14] at Sandoz reached out to Taro's Aprahamian.  *Id.*, ¶¶708-709.  The two co-conspirators spoke for 16 minutes on July 16 and 8 minutes on July 17.  *Id.*, ¶709.  Immediately after his July 17 phone call with Sandoz, Taro's Aprahamian exchanged calls with Teva's Patel and spoke for close to 14 minutes that day.  *Id.*  The next day, Teva's Patel reached out to State AG CW-1 at Sandoz, who was responsible for generic drugs pricing, and spoke for over ten minutes.  *Id.*, ¶¶68, 709.  According to the State AGs, "[d]uring this flurry of phone calls, . . . Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER." *Id.*, ¶710.

- On July 22, 2013, Patel included Etodolac IR and Etodolac ER to Teva's price increase spreadsheet, before any of the co-conspirators made public announcement of price hikes for the drugs.  *Id.*, ¶711.  Patel's spreadsheet noted details from her conversations with State AG CW-1 at Sandoz and Taro's Aprahamian – which included the agreement that Sandoz would lead the price increase on Etodolac IR, Taro would follow by increasing prices for both Etodolac IR and Etodolac ER, and Teva would follow Taro on both drugs.  *Id.*

---

[14]   State AG CW-3 is one of the State AGs' cooperating witnesses.  November 2019 AG Complaint, ¶68.  State AG CW-3 was a senior sales executive at Sandoz.  *Id.*, ¶¶68, 709.

- According to the State AGs, on July 23, 2013, three days before Sandoz's price hikes, State AG CW-1 spoke to Teva's Patel for 14 minutes and "confirmed the details of the Sandoz price increase on Etodolac." *Id.*, ¶712. At the same time, State AG CW-3 at Sandoz reached out to Taro's Aprahamian. *Id.*

- Patel continued communicating with Sandoz and Taro after Sandoz's July 26, 2013 in preparation to follow Teva own price increases. *Id.*, ¶¶713-716. On July 29, Patel spoke with State AG CW-1 at Sandoz for over nine minutes. *Id.*, ¶716. On July 30 and July 31, she spoke with Taro's Aprahamian for 11 minutes and 3.5 minutes, respectively. *Id.* On August 1, she spoke with Aprahamian twice for close to 12.5 minutes and with State AG CW-1 at Sandoz for over 14.5 minutes. *Id.* On August 2, she spoke with State AG CW-1 at Sandoz 3 times for over 14 minutes, followed by 4 conversations with Aprahamian for over 6.5 minutes. *Id.* After speaking with Teva's Patel on August 1, Taro's Aprahamian directed his colleagues to start preparing for price hikes on Etodolac and Etodolac ER. *Id.*, ¶717.

- According to November 2019 AG Complaint, "Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%." *Id.*, ¶720.

### e.    April 4, 2014 Price-Fixing of 20 Drugs

510.    According to the State AGs, "[b]y early 2014, the generic drug industry was in the midst of a price increase explosion." *Id.*, ¶795. Teva's own internal presentation, entitled "2014 US Pricing Strategy," recognized the same and noted that the generic drug "[c]ompetitive landscape is supportive of price increases." *Id.* Teva further commented in the presentation that "[m]ature competitors participate in price appreciation; immature competitors are starting to follow." *Id.* According to the State AGs, this price-hike strategy presentation "document[ed] in many respects the successful strategy that [Patel] had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors." *Id.*, ¶741. "This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Defendants Cavanaugh and Rekenthaler, and Patel's direct supervisor Kevin Galownia." *Id.* For 2014, Teva's collusive price hike strategy included "[l]ead more increases." *Id.*

511.     Consistent with the strategy laid out in the "2014 US Pricing Strategy" document, after extensive coordination with co-conspirators such as Actavis, Apotex, Breckenridge, Greenstone, Heritage, Lupin, Mylan, Rising, Sandoz, Taro, Versapharm, and Zydus, Teva implemented collusive price hikes on 20 generic drugs[15] in the April 4, 2014 round of price increases.  Teva itself initiated price hikes on 11 of the collusive drugs, leading price hikes on more than half of the collusive drugs:



November 2019 AG Complaint, ¶749.

512.     Teva began strategizing for future collusive price hikes and developing price increase candidates in December 2013:

---

[15]  Nystatin Tablet and Theophylline Tablet are part of the October 2017 AG Complaint, and Teva's collusive activities relating to the two drugs are discussed in §III.G.6.b.(1) and §III.G.6.b.(2) above, respectively.

- On January 14, 2014 Patel emailed her boss Galownia the preliminary list of "Increase Potential Q1 2014" and stated "[a]ttached is my list of potential items. Note that they still need to go through the review process." *Id.*, ¶742. The list was developed after communications with co-conspirators in December 2013 to early January 2014. *Id.*, ¶743.

- On February 26, 2014, Patel sent out another "PI Candidates" list to her Teva colleague after talking to Actavis, Breckenridge, Glenmark, Greenstone, Heritage, Lupin, Sandoz, and Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

*Id.*, ¶¶744-745.

- In preparation for Galownia's review and approval of the "PI Candidates" collusive price hikes list, Patel and Rekenthaler coordinated extensively with co-conspirators between March 10-17, 2014. Some of their communiciations with co-conspirators are captured by the phone log below, which included calls and text messages with Actavis, Greenstone, Heritage, Lupin, Rising, Taro, and Zydus:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

*Id.*, ¶746.

- In addition to the communications above, Rekenthaler also called Versapharm's senior national accounts executive James Josway on January 22, 2014 and March 7, 2014 to secure his agreement to follow Teva's Ethosuximide Capsule and Ethosuximide Oral Solution price hikes. *Id.*

- On March 17, 2014, Patel emailed a close-to-final spreadsheet of the "PI Candidates" to Galownia, stating: "Once you verify these are acceptable, we can finalize for the increase." *Id.*

### (1)   Cephalexin Oral Suspension – Teva, Lupin

513.   Six months before Teva's April 2014 price hikes, Teva was already coordinating with co-conspirator Lupin to increase prices of Cephalexin Oral Suspension (*id.*, ¶¶751-760):

- On October 14, 2013, Teva's Rekenthaler and Lupin's Berthold spoke for 16 minutes to coordinate Lupin's November 1, 2013 Cephalexin price increase. *Id.*, ¶754. On October 31, 2013, one day before Lupin's price hike, Teva's Teri Sherman and Lupin's Berthold spoke for five minutes at 9:57 a.m. *Id.*, ¶755. Immediately after hanging up the phone, Teva's Sherman emailed her colleagues about Lupin's plan to hike Cephalexin prices to "4-6x's current price." *Id.*, ¶756.

- Teva agreed not to compete for Lupin's Cephalexin Oral Suspension business after Lupin's November 1, 2013 price hike. On November 22, 2013, when a customer requested Teva's bid on the medication, Teva's Sherman emailed her colleagues to suggest not submitting a bid as Teva already had majority market share. *Id.*, ¶758. Galownia agreed and forwarded Sherman's email to Patel to include Cephalexin Oral Suspension to Teva's collusive price increase list, stating "Nisha, let's add this to our list to discuss." *Id.* Patel immediately called and left a message for Lupin's Berthold that day. *Id.* Patel continued to coordinate with Lupin's Berthold after Galownia's instruction, and Cephalexin Oral Suspension was on the collusive price hikes list when she forwarded it to Galownia in January 2014. *See id.*, ¶759; §III.I.1.e.

- On April 4, 2014, Teva hiked Cephalexin Oral Suspension's WAC price to the identical level set by Lupin on November 1, 2013, with 90%-185% increases depending on formulation. November 2019 AG Complaint, ¶760.

### (2)   Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets – Teva, Greenstone

514.   Teva and Greenstone began coordinating price hikes for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets in November 2013:

- On November 16, 2013, Teva's Patel and Greenstone's Hatosy exchanged six text messages – followed by a a phone call on November 23. *Id.*, ¶761. According to the State AGs, "[b]ecause Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase." *Id.*

- Teva agreed to refrain from bidding for Greenstone's customers after Greenstone's December 2013 announcement of its price increases. On November 23, 2013, the day after Greenstone's parent company Pfizer approved Greenstone's Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets price hikes, Teva's Patel spoke with Greenstone's Hatosy. *Id.*, ¶762. The two co-conspirators spoke for more than 7.5 minutes on December 2, 2013, when Greenstone sent out price increase notices to its customers. *Id.*, ¶763. Immediately following these calls, at 2:23 p.m., Teva's Patel emailed her colleagues and instructed them to take Greenstone's price hikes "into consideration for bid requests we may receive." *Id.*, ¶764.

- On December 5, 2013, the two co-conspirators communicated again about coordinating responses to customers' bid requests, with Teva's Patel emailing her supervisor Galownia afterwards recommending a "'decline to bid at this time' approach." *Id.*, ¶765. Galownia agreed with the strategy and it was implemented multiple customers. *Id.*, ¶¶765-766.

- On January 27, 2014, when a wholesaler requested for bids on Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets, Teva's Patel called Greenstone's Hatosy. *Id.*, ¶766. After the call, she declined to bid for the business. *Id.*

- On April 4, 2014, three months after Greenstone's price hikes became effective, Teva hiked prices for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets. *Id.*, ¶768. As part of the process of coordinating the price hikes with Greenstone, Teva's Patel and Greenstone's Hatosy spoke two times that day. *See id.*; §III.I.1.e.

### (3) Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam – Teva, Actavis

515.  Teva and Actavis began coordinating price hikes on Clarithromycin ER Tablets in

January 2014, when Zydus was planning its exit from the market:

- On December 30, 2013, in preparation for Zydus's exit, Cardinal, a wholesaler, approached Teva for a bid on Clarithromycin ER Tablets. November 2019 AG Complaint, ¶770. On January 2, 2014 at 9:37 a.m., Teva's customer marketing manager Liz Ricketts recommended that Teva compete for Cardinal's business and price Clarithromycin ER "10% under market intel pricing for [the] Watson/Actavis product." *Id.*, ¶771. Instead of competing, within three minutes of receiving the email, Teva's Patel called Actavis's Rogerson at 9:40 a.m. to coordinate pricing. *Id.*, ¶772. After speaking with Rogerson for 17 minutes, Patel replied to Ricketts' email at 10:12 a.m. with a recommendation to price Clarithromycin ER higher, suggesting: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback." *Id.* A week later, on January 9, Patel spoke with Rogerson again for over six minutes at 9:19 a.m. *Id.*, ¶773. At 9:45 a.m., she announced to her colleagues that Teva had an opportunity to take a price increase on the drug: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases." *Id.*

- On January 14, 2014, Patel emailed Galownia a collusive price hike list entitled "Increase Potentials Q1 2014," which included Clarithromycin ER as a price hike candidate. *Id.*, ¶¶742, 774.

- In March 2014, when Actavis implemented price hikes on basket of drugs, Teva's Patel and Actavis's Rogerson communicated again to coordinate price increases on drugs that overlapped with Teva. *Id.*, ¶775. According to the State AGs, "[c]onsistent with the ongoing understanding between these high-quality

- 165 -

competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase." *Id.* At 10:31 a.m. on March 14, 2014, Patel and Rogerson spoke on the phone for over 12 minutes. *Id.*, ¶776. Immediately after hanging up the phone, Patel emailed Teva's team of National Account Managers ("NAMs") at 10:47 a.m. to announce Actavis's price hikes and quickly followed up with a second email instructing her colleagues to add Tamoxifen and Estazolam to Teva's price hike list. *Id.*, ¶¶777-778. Within two hours after sending her emails, Patel called Actavis's Rogerson again at 12:37 p.m. and spoke for over five minutes. *Id.*, ¶778. At 12:51 p.m., she emailed her colleagues and stated affirmatively that "Actavis took an increase. We will follow." *Id.*

- On Monday, March 17, Patel sent a collusive price increases list entitled "PI Candidates" to her boss Galownia and included Tamoxifen Citrate and Estsazolam on the list. *Id.*, ¶779. After sending the list, she called Actavis's Rogerson and spoke for 19 minutes. *Id.* On the same day, her colleague Rekenthaler spoke to Actavis's Falkin for over six minutes and communicated by text messages four times. *Id.*

- On April 4, 2014, when Teva took its price hikes, Teva's Patel coordinated with Actavis's Rogerson, and Teva's Rekenthaler coordinated with Actavis's Falkin. For Tamoxifen Citrate and Estazolam, Teva's price hikes took effect even before Actavis's price hikes took effect on April 15, 2014. *Id.*, ¶¶776, 780.

- After the price hikes, in May 2014, Teva avoided competing against Actavis for additional Tamoxifen Citrate and Estazolam businesses. On May 14, Teva declined to bid for wholesaler AmerisourceBergen's business for "strategic reasons." *Id.*, ¶781. According to the State AGs, "strategic" reason was a code "for the fact that there was an understanding in place with a competitor." *Id.* Again, on May 21, Teva declined to bid for a large customer's Tamoxifen Citrate business. *Id.*, ¶782.

### (4) Ketoconazole Cream (Teva, Taro, Sandoz) and Tablets (Teva, Taro, Mylan, Apotex)

516.    Teva led the collusive price increases for Ketoconazole Cream and Tablets and was the first of the co-conspirators to hike prices in April 4, 2014. *Id.*, ¶785. Teva's Patel added Ketoconazole to its collusive price increase list in February 2014, entitled "Increase Potentials." *Id.*, ¶783. After adding the medications to the list and prior to its price hikes, Teva coordinated with Taro and Sandoz on the cream, and Taro, Mylan and Apotex on the tablets (*id.*, ¶¶783-785):

- On March 20 and 25, Teva's Rekenthaler reached out to Apotex's Jeffrey Hampton to coordinate the upcoming price hikes for Ketoconazole. *Id.*, ¶785. On April 4, 2014, Rekenthaler spoke to Mylan's Nesta. *Id.* On the same day, Patel spoke to Aprahamian of Taro and State AG CW-1 of Sandoz. *Id.* Indeed, after Patel and Aprahamian's conversation, Sandoz's April 4 internal email revealed that Taro had

agreed to follow Teva's price hikes. *Id.*, ¶786. According to the State AGs, State AG "CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on 'strict allocation' until Sandoz determined how to proceed." *Id.*

- Aprahamian also instructed his Taro colleagues not to bid for business in the face of Teva's April 4 price hikes and promptly followed Teva's price hikes on both the cream and tablet formulations. *Id.*, ¶¶787-789. On April 7, 2014, when the Minnesota Multistate Contracting Alliance for Pharmacy requested a bid, a Taro sales executive announced in an internal email that "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." *Id.*, ¶788. According to the State AGs, Taro's Director of Corporate Accounts Elizabeth Guerrero further directed her colleagues to "lie about the reason" why Taro was not bidding by stating in her email response: "Yes, we are declining, but we need to advise is [sic] due to supply." *Id.* The next day, Aprahamian spoke to Teva's Patel for over 19 minutes and began the process of hiking Ketoconazole Cream and Tablets prices for all Taro's customers by instructing that price increase notices be sent out on April 16, 2014 with new prices taking effect the next day. *Id.*, ¶789.

- Sandoz was not able to follow Teva and Taro's Ketoconazole cream price hikes until October 10, 2014 due to price protection provisions in its customer contracts. *Id.*, ¶¶790, 793. On October 10, when Sandoz implemented its price hike, State AG CW-1 from Sandoz coordinated with Teva's Patel by phone and spoke for over three minutes. *Id.*, ¶793.

- Teva, Taro and Sandoz's WAC increased by close to 110% for Ketoconazole cream. *Id.*, ¶794. Teva increased its WAC for Ketoconazole tablets by almost 250%, and its customer pricing soared by an average of 528%. *Id.*

- After Teva and Taro's Ketoconazole price hikes, the co-conspirators avoided competing for each other's customers as agreed. *Id.*, ¶791. On May 14, 2014, Teva's Patel communicated extensively with Taro's Aprahamian – exchanging one phone call and eight text messages. *Id.* In the same day, she instructed her colleagues to decline to bid for wholesaler Cardinal's business after conferring with co-conspirator Aprahamian at Taro, citing "strategic" reasons – the code for having "an understanding in place with a competitor." *Id.*, ¶¶781, 791. Later in the day, Patel also instructed her colleagues to not bid for wholesaler AmerisourceBergen's Ketoconazole business for the same reason. *Id.*, ¶792.

### (5) Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets – Teva, Breckenridge

517. Teva had coordinated successfully with Breckenridge for its Mimvey price hike in July 2012. *See* §III.I.1.a. The collusive relationship continued as Teva and Breckenridge engaged in extensive coordination to implement Breckenridge's Mimvey and Cyproheptadine HCL price hikes

in November 2013, followed by Teva's price hikes for the same drugs in April 2014 (November 2019 AG Complaint, ¶¶797-803):

- Teva and Breckenridge began coordinating in October 2013 in preparation for Breckenridge's Mimvey and Cyproheptadine HCL price hikes. Teva's Rekenthaler and Breckenridge's Nielson spoke twice on October 14, 2013. *Id.*, ¶799. On October 24, 2013, they spoke again for 26 minutes. *Id.* On November 14, 2013, Breckenridge raised Cyproheptadine HCL's WAC by 150% and customer pricing by 400%. *Id.*, ¶798. It also increased Mimvey's WAC by 20%-27%. *Id.*

- The co-conspirators resumed communication in January 2014 as Teva prepared for its April 4, 2014 Mimvey and Cyproheptadine HCL price hikes. After Teva's Patel released a list of potential price increase candidates on January 14, 2014 – entitled "Increase Potential Q1 2014" – Teva's Rekenthaler spoke to Breckenridge's Nielson for 19 minutes on January 15 to coordinate Teva's upcoming price increase. *Id.*, ¶968. On February 7, 2014, while she was creating a more formalized price increase list entitled "PI Candidates," Patel reached out to Breckenridge's Cohon and spoke twice lasting six minutes. *Id.*, ¶744. On February 26, 2014, Patel's "PI Candidates" list showed Mimvey and Cyproheptadine HCL as targeted for a price increase, with notations next to each drug indicating "Follow Breckenridge." *Id.*, ¶745.

- Prior to its April 2014 price hikes, Teva avoided poaching Breckenridge's Cyproheptadine HCL customers as Teva already had its fair share of 54% of the market. *Id.*, ¶801. For example, on February 7, Patel reached out to Breckenridge's Cohon and spoke twice by phone. *Id.* After their conversations, Teva declined to compete for Breckenridge's customer's Cyproheptadine HCL business by refusing to provide a bid. *Id.*

- For Mimvey, where Teva did not have its fair share, Teva's five-months delay in following Breckenridge's price hike enabled the co-conspirators to "level the playing field" by allowing Teva to take some of Breckenridge's Mimvey business. *Id.*, ¶802.

- On April 4, 2014, Teva implemented WAC increases of 26% on Mimvey and 95% on Cyproheptadine HCL, which took pricings on the drugs to the same levels set by Breckenridge in November 2013. *Id.*, ¶803.

### (6)   Diflunisal and Hydroxyzine Pamoate – Teva, Rising

518.   In August 2013, State AG CW-2 left Sandoz, joined Rising, and brought his collusive relationships and activities with him to his new employer. *Id.*, ¶¶804, 959. Rising immediately became a more appealing co-conspirator for Teva as Teva's Rekenthaler had a long-standing

relationship with State AG CW-2, dating back to State AG CW-2 tenure at Teva years ago prior to

his employment at Sandoz. *Id.*

519.   State AG CW-2 of Rising began coordinating with Teva's Rekenthaler as early as

December 2013 to facilitate Teva's 182% contract price hike on Diflunisal and 165% contract price

hike on Hydroxyzine Pamoate on April 4, 2014 (*id.*, ¶¶806, 961):

- In December 2013, the Hydroxyzine Pamoate market was already rife with collusive activities because Rising had entered the market in October 2013 and engaged in market allocation activities with Teva. *Id.*, ¶960.  After State AG CW-2 reached out to Teva's Rekenthaler and Green, Teva ceded a large customer to Rising to facilitate its entry. *Id.*  According to the State AGs, to reciprocate the favor, State AG CW-2 and Teva's Rekenthaler spoke by phone for 14 minutes on December 5, 2013 to assist Teva in putting together an "initial list of 'Increase Potentials,'" which was sent to Teva's Galownia to review on January 14, 2014. *Id.*, ¶806.

- In March 2014, State AG CW-2 and Rekenthaler spoke by phone three times to coordinate Teva's price hikes – two times on March 17 and one time on March 31. *Id.*, ¶961.  According to the State AGs, "[i]n effort to 'play nice in the sandbox,' and to further the ongoing understanding between the two competitors," on March 17, State AG CW-2 gave Rekenthaler advance notice that Rising was planning to temporarily leave the Diflunisal market. *Id.*, ¶960.  Teva, by hiking prices on the drug, would enable Rising to re-enter the market at heightened pricing. *Id.*, ¶809.  Four days before Teva's price hikes, on March 31, State AG CW-2 and Rekenthaler again spoke to each other by phone. *Id.*, ¶808.  Teva hiked its Diflunisal WAC price by 30%. *Id.*

- Rising temporarily exited the Diflunisal market in mid-July 2014 – four months after State AG CW-2's advance notice to Teva and more than three months after Teva's price hikes. *Id.*, ¶809.  State AG CW-2 called Rekenthaler when Rising was exiting the market. *Id.*  According to the State AGs, "[c]onsistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, [State AG] CW-2 and . . . Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014." *Id.*  Indeed, when Rising returned to the market on December 3, 2014, its Diflunisal WAC was set at the identical level established by Teva on April 4, 2014. *Id.*

**(7)    Ethosuximide Capsule and Oral Solution – Teva, Versapharm**

520.   In May 2013, when Patel created Teva's co-conspirator ranking, Versapharm had a

score of -2, which signified its status as a low-quality co-conspirator. *Id.*, ¶812.  As such, when Patel

added Ethosuximide capsule and oral solution to Teva's list of "PI Candidate" after Rekenthaler call with Versapharm's Senior Account Executive James Josway on January 22, 2014, she noted that Versapharm's quality as a co-conspirator needed to be tested:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
|---|---|
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

*Id.* Prior to Rekenthaler's January 22 conversation with Versapharm, Ethosuximide Capsule and Oral Solution were not on Teva's list of price increase candidates as the drugs were not in the mid-January 2014 version of the list sent to Patel's boss Galownia. *Id.*, ¶811.

521.   In March 2014, Teva and Versapharm continued to coordinate their price hikes on the drugs. Rekenthaler and Josway spoke again on March 7, and less than a month later, Teva increased Ethosuximide capsule and oral solution WAC prices by 87% and 20%, respectively, and contract prices by close to 322% and 81%, respectively. *Id.*, ¶813. Five days after Teva's April 4 price hikes, Versapharm followed and raised prices on both drugs to close to the identical levels set by Teva. *Id.*, ¶814.

522.   After the price hikes, Rekenthaler and Josway never spoke again by phone. *Id.*, ¶815.

### (8)   Pentoxifylline Price Fixing – Teva, Apotex

523.   When Senior Executive Jeffrey Hampton joined Apotex in 2013, it was one of Teva's lowest-ranked co-conspirator with a score of -3. *Id.*, ¶¶917, 923. A year after he joined, in May 2014, Apotex became a high-quality co-conspirator with a score of +2. *Id.*

524.   Teva's Rekenthaler communicated with Hampton regularly after he joined Apotex – the two had never communicated before that – and Apotex proved to be a high-quality co-conspirator by coordinating on Teva's April 2014 Pentoxifylline price increase. *Id.*, ¶923. During the month prior to Teva's Pentoxifylline price hikes, Rekenthaler and Hampton spoke frequently, including two phone calls on March 7, one phone call on March 20, and another phone call on

March 25.  *Id.*, ¶924.  According to the State AGs, "during these calls, . . . Rekenthaler gathered

Apotex's pricing plans and conveyed them to . . . Patel."  *Id.*  Teva hiked its Pentoxifylline price by

close to 69% on April 4, 2014.  *Id.*

### f. April 15, 2014 Baclofen Price-Fixing and Market Allocation – Teva, Upsher-Smith, Lannett

#### (1) Baclofen Price-Fixing

525.    Teva had assigned a high co-conspirator score of +2 to Upsher-Smith in 2013 based

on Patel's relationship with Upsher-Smith's National Account Executive Brad Leonard.  *Id.*, ¶823.

Patel communicated with Leonard even before she started at Teva – during the week prior to her

employment at Teva – and followed by a 20-minutes call during her first week at Teva on April 29,

2013.  *Id.*  According to the State AGs, "[d]uring these initial communications, . . . Patel and [Brad

Leonard] reached an understanding that Teva and Upsher-Smith would follow each other's price

increases, and not compete for each other[']s customers after a price increase."  *Id.*

526.    This understanding drove the collusive price hikes on Baclofen, with Teva and

Upsher-Smith increasing prices to the same level and avoiding competing for customers:

- On February 21, 2014, Upsher-Smith hiked Baclofen WAC by 350%-420% on different formulations of the drug.  *Id.*, ¶¶818, 825.

- With an agreement in place with Upsher-Smith, during the two months between Upsher-Smith and Teva's price hikes, Teva did not pursue Upsher-Smith's customers in accordance to their agreement.  *Id.*, ¶826.

- On April 15, 2014, Teva followed with 350%-447% WAC and SWP price hikes and took its Baclofen prices to the identical levels set by Upsher-Smith.  *Id.*, ¶¶818, 825. After Teva's price hikes, Upsher-Smith's Senior Director of Sales and Marketing Jim Maahs touted Baclofen's new status as a very profitable product in an internal email and stated that "Teva matched our pricing."  *Id.*, ¶827.

- After its price hikes, Teva continued to avoid competing against Upsher-Smith to allow its co-conspirator to pick up its fair share from a low 6.8% market share as competitor Qualitest exited the market.  *Id.*, ¶¶819, 826.  For example, in a June 11, 2014 email to Galownia, Patel suggested: "Dynamics have changed, but I think we need to see if Upsher wants to pick up share.  We have an unreasonably high share."

*Id.*, ¶826.  Galownia replied: "I think this is the right thing to do. . . .  we should just give [a former Qualitest customer] a high bid."  *Id.*

### (2)  Baclofen Market Allocation

527.  Within two months after Teva's Baclofen price hikes, Lannett entered the market for the drug, and, according to the State AGs, "Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market" (*id.*, ¶828):

- On or before June 12, 2014, in preparation for its Baclofen launch, Lannett's senior sales executive Kevin Smith sent an email to his colleagues, stating: "Baclofen launch in four weeks, need market intelligence.  We can only take a 10% market share."  *Id.*, ¶497.  Lannett's National Accounts Director Tracy Sullivan immediately reached out to Teva's Patel via Facebook Messenger at 11:16 a.m. on June 12, 2014.  *Id.*, ¶498.

- Within less than 15 minutes, Patel reached out to Lannett's Sullivan for the first time since joining Teva and had a 7-minute phone conversation.  *Id.*  During the call, Sullivan told Patel about Lannett's plan to enter the Baclofen market and confirmed their conversation through another Facebook Messenger message that same day and agreed to "touch base" again before the launch that was coming "[d]efinitely Mid July."  *Id.*

- Indeed, in July 2014, Teva and Lannett touched base to coordinate Lannett's Baclofen market entry and price maintenance.  On July 1, Patel and Sullivan had another 7-minute phone call.  *Id.*, ¶499.  On July 11, Patel and Sullivan exchanged text messages and a phone call.  *Id.*, ¶500.  On July 22, Teva conceded a customer's Baclofen business to Lannett by refusing to exercise its right of first refusal.  *Id.*, ¶501.  Teva decided not to compete even though the pricing was only slightly below Teva's own pricing.  *Id.*  Patel stated in an internal email that she agreed with the decision to concede because "I believe this is Lannett," and Teva's tracking database showed that the Baclofen concession was due to a "Strategic New Market Entrant."  *Id.*

- In accordance with its agreement with Teva, when Lannett entered the Baclofen market, it set the WAC price for the drug at the identical level set by Teva in its April 15, 2014 price hikes.  *Id.*, ¶502.

### g.  July 1, 2014 Fluocinonide Price-Fixing – Teva, Sandoz, Taro, Actavis

528.  Because Fluocinonide is one of the most widely used dermatological drugs for the treatment of psoriasis, dermatitis, and eczema, Teva decided to take a second bite at the apple by implementing a second round of price increases on the drug.  *Id.*, ¶829.  Similar to the first round of

price hikes, Teva's collusive activities in the second round also involved the 0.05% cream, 0.05% emollient-based cream, 0.05% gel, and 0.05% ointment formulations (collectively, "Fluocinonide"). *Id.*, ¶830; § III.I.1.b. But this time around, instead of the 10%-17% price increases in July 2013, the co-conspirators hiked prices by multiples (*see, e.g.*, November 2019 AG Complaint, ¶¶831-832, 845):

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

529.   Teva began coordinating for the second round of Fluocinonide massive price increases with co-conspirators as early as May 2014:

- On May 14, 2014, Patel and Taro's Aprahamian communicated via a phone call and eight text messages. *Id.*, ¶834. During these communications, Aprahamian conveyed to Patel about Taro's plan to hike Fluocinonide prices. *Id.* After her communications with Taro, Patel provided data to a colleague to create a spreadsheet with price hike candidates, which included Fluocinonide. *Id.*, ¶¶835-836. The spreadsheet contained a notation of "Follow/Urgent" next to each Fluocinonide formulations. *Id.*

- On June 3, 2014, Taro implemented its Fluocinonide price hike for all four formulations. *Id.*, ¶832.

- After Taro's price hikes, Patel repeatedly stressed the need to act responsibly as Taro was a high-quality co-conspirator. For example, when CVS requested bids for Fluocinonide on June 3, the day of Taro's price hikes, Patel promptly communicated with Taro's Aprahamian five times by text. *Id.*, ¶¶836, 838. In the afternoon, she emailed her colleagues that she was "still working on intel" on the Taro price hikes, noting that Taro was a "high quality competitor" and she would provide "guidance" tomorrow. *Id.*, ¶838. After her email, she spoke with Aprahamian for close to seven minutes. *Id.*

- On the morning of June 4, she communicated with Aprahamian again – twice by text and once by phone for over 25 minutes. *Id.*, ¶839. At 10:44 a.m., she emailed her boss Galownia – emphasizing her preference to discuss verbally the "intel" and again stressing that "Taro is a high quality competitor – I think we need to be responsible where we have adequate market share." *Id.*

- 173 -

- When Walmart requested Fluocinonide bids that day, she again emphasized the quality of Taro as a co-conspirator and the need to be responsible. *Id.*, ¶840. Ultimately, Teva refused to provide bids to Walmart. *Id.*

- In the middle of June 2014, Teva began to prepare for its July 1, 2014 price increase. On June 17 and June 19, Patel and Taro's Aprahamian spoke for approximately 15 and 14 minutes, respectively, where she obtained additional "intel" from Aprahamian. *Id.*, ¶841. Her "intel" was recorded in a spreadsheet, which, according to the State AGs, "contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO)." *Id.* These customer contract price points were not public information. *Id.*

- Around the same time, Taro's Aprahamian also spoke to State AG CW-3 at Sandoz seven times by phone between June 17 to 20. *Id.*, ¶842. According to the State AGs, on June 20, 2014, "Aprahamian dictated to [State AG] CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to . . . Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information . . . ." *Id.*

- On June 26, 2014, Teva's sales and pricing employees held a conference call at 3:00 p.m. to "discuss the upcoming price increase for all Fluocinonide products" targeted for effective date July 1. *Id.*, ¶843. Patel and Rekenthaler were among the attendees. *Id.* The next day, Patel and Aprahamian communicated by phone for close to 13 minutes. *Id.*

- On July 1, 2014, Teva hiked Fluocinonide WAC prices to the same levels set by Taro during its June 3, 2014 price hikes. *Id.*, ¶844.

- On the same day, Patel and State AG CW-1 at Sandoz exchanged 7 phone calls, totaling almost 31 minutes. *Id.*, ¶844. According to the State AGs, "[d]uring those calls, . . . Patel informed [State AG] CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase." *Id.*

- On October 10, 2014, Sandoz hiked Fluocinonide gel WAC prices by 491%. *Id.*, ¶845. On the same day, Patel and State AG CW-1 spoke for over three minutes. *Id.*

- Around the same time, Actavis entered the Fluocinonide 0.05% cream market. *Id.*, ¶846. Between December 3-18, 2014, Teva's Rekenthaler and Actavis's Marc Falkin exchanged at least 14 phone calls, totaling close to half an hour: 5 calls on December 3, 3 calls on December 9, 3 calls on December 10, 2 calls on December 17, and 1 call on December 18. *Id.*

- On December 19, Actavis hiked its Fluocinonide cream prices to the same levels set by Teva and Taro, even though it did not have much market share at the time. *Id.*

### h.  August 28, 2014 Price-Fixing on 22 Drugs

530.    Teva hiked prices on 22 drugs during the August 28, 2014 round of price-fixing – co-conspirators included at least Actavis, Amneal, Apotex, Aurobindo, Greenstone, Mylan, Par, Sandoz, Taro, and Zydus (*id.*, ¶847):



531.    Shortly before Teva's August 28, 2014 price hikes, the co-conspirators met at the August 23-26, 2014 NACDS annual event.  Teva's Cavanaugh, Patel and Rekenthaler attended the conference along with Taro's Aprahamian, Actavis's Rogerson and Falkin, Zydus's Green, and Mylan's Nesta, among others.  *See* App. B.

532.    Evidence uncovered and cited in the November 2019 AG Complaint shows Teva's extensive coordination with co-conspirators prior to and after the price hikes.

(1) **Amiloride HCL/HCTZ Tablets, Cimetidine Tablets, Diclofenac Potassium Tablets, Enalapril Maleate Tablets, Flurbiprofen Tablets, Fluvastatin Sodium Capsules, Loperamide HCL Capsules, Prazosin HCL Capsules, Prochlorperazine Tablets, and Sotalol Hydrochloride Tablets Price Fixing – Teva, Mylan**

533.    Teva began coordinating with Mylan in April 2014 for its August 28, 2014 price hikes:

- Beginning April 17, 2014, Mylan implemented price hikes on numerous drugs for effective date in mid-May. November 2019 AG Complaint, ¶854. According to the State AGs, "[p]ursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases." *Id.*, ¶855. Indeed, on April 21, 2014, Patel forwarded two Mylan-created spreadsheets with Mylan's WAC and AWP pricing levels for the price-hiked drugs to other Teva colleagues and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan." *Id.*, ¶¶855-856.

- Patel's list included Amiloride HCL/HCTZ Tablets, Cimetidine Tablets, Enalapril Maleate Tablets, Fluvastatin Sodium Capsules, Loperamide HCL Capsules, Prazosin HCL Capsules, and Sotalol Hydrochloride Tablets. *Id.*, ¶856.

- On May 9, 2014, Patel emailed Teva's team of National Account Managers to gather "Mylan price increase intelligence" in advance of Teva's own price hikes. *Id.*, ¶859. After receiving Patel's 9:55 a.m. email, Rekenthaler reached out to Mylan's Nesta at 11:23 a.m. and spoke for close to eight minutes. *Id.* On May 13, Teva's Teri Sherman emailed a Mylan-created spreadsheet entitled "Mylan-Price List A" to Patel. *Id.*, ¶861. On May 20, Rekenthaler spoke to Nesta again. With such Mylan "intel," Patel asked a colleague to create a price hike list with the Mylan drugs and price points in a spreadsheet tab labeled as "follow." *Id.*, ¶862.

- On May 27, 2014, Rekenthaler spoke to Mylan's Nesta again twice for at least four minutes. *Id.*, ¶863. On May 28, Teva's comprehensive list of price hike drugs included seven drugs for which Teva will follow Mylan's price hikes: Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets. *Id.* Next to each drug, Teva included comments "Follow/Urgent" and "Follow Mylan Increase." *Id.* For three Mylan drugs – Diclofenac Potassium, Flurbiprofen, and Prochlorperazine Tablets – Teva would lead the price hikes. *Id.*

- Between August 4-21, 2014, Rekenthaler spoke to Mylan's Nesta at least 8 times for over 49 minutes to coordinate Teva's August 24 price hikes: twice on August 4 for

- 176 -

7 minutes, August 7 for 14 minutes, twice on August 11 for 8 minutes, twice on August 18 for 14 minutes, and August 21 for at least 6 minutes. *Id.*, ¶864.

- After speaking with Rekenthaler on August 7 and 11, on both days, Mylan's Nesta promptly reached out to Mark Dudick of Cardista Pharmaceuticals – another manufacturer of Prochloporazine – to coordinate the price hikes for the drug. *Id.*, ¶852.

- On March 4, 2015, Mylan followed Teva's August 28, 2014 Diclofenac Potassium Tablets price hikes after Mylan's Nesta coordinated with Rekenthaler on February 18-19, 2015 through three phone calls. *Id.*, ¶887.

### (2) Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets –Teva, Taro, Zydus

534.    Teva began coordinating its August 28, 2014 Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets price hikes with Taro as early as May 2014 and began coordinating with Zydus on Warfarin in June 2014:

- After Patel communicated with Taro's Aprahamiuan by text eight times and by phone for over four minutes on May 14, 2014, she provided the data obtained from Taro to Teri Sherman to include in a price hike spreadsheet. *Id.*, ¶¶834-835, 867. On May 28, 2014, Sherman provided a spreadsheet entitled "Future Price Increase Candidate Analysis" to Patel, which included Taro drugs Carbamazepine Tablets and Clotrimazole Topical Solution with a notation "Follow/Urgent." *Id.*, ¶¶835, 867.

- On June 3, 2014, after Taro hiked the prices of Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, Warfarin Sodium Tablets, and other drugs, Patel texted Taro's Aprahamian five times. *Id.*, ¶¶835, 868. She followed up with a 7-minute call with Aprahamian that evening, and two text messages and a 26-minute call the next morning. *Id.*, ¶¶868-869. After her communications with Aprahamian, she emailed her boss Galownia and stated that she had additional "intel" to verbally discuss with him about the Taro price hikes. *Id.*, ¶869.

- In addition to communicating with Taro, Teva also reached out to co-conspirator Zydus to coordinate Zydus's June 13, 2014 Warfarin price hike. *Id.*, ¶¶872-873. On June 2, 2014, both Rekenthaler and Patel reached out to Zydus's Kevin Green and spoke to him for two minutes and close to six minutes, respectively. *Id.*, ¶880. On June 11, 2014, Rekenthaler and Patel again reached out to Zydus's Green and spoke to him for 8 minutes and over 14.5 minutes, respectively. *Id.*, ¶¶872, 880. Patel then reached out to Taro's Aprahamian the next day and spoke for more than nine minutes. *Id.*, ¶872. After speaking with Taro, Patel called Zydus's Green on June 13 and spoke for over 16.5 minutes. *Id.*

- On June 13, 2014, after Zydus's Warfarin price hike, Patel responded to a colleague's email about a customer's bid request for the drug with: "we intend to follow [the] Taro and Zydus increase price." *Id.*, ¶873. Later that day, she emailed her colleagues a Teva price-hikes list – which included Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets with comment "Follow/Urgent - Taro" – and instructed "we should not provide any decreases on these products" to avoid competing for Taro's or Zydus's customers. *Id.*

- On June 17, 2014, Patel spoke with Taro's Aprahamian for over 15 minutes. *Id.*, ¶874. The next day, she re-distributed the Teva price-hikes list to the sales team on to inform them that "we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." *Id.* She further stated that Teva's decision took into consideration the "quality of competitors" among other things. *Id.*

- After her email to the Teva sales team, Patel communicated diligently with Taro's Aprahamian and Zydus's Green simultaneously in advance of Teva's price hikes:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

*Id.*, ¶875.

- The day before Teva's August 28, 2014 price increases, Patel reached out to Taro's Aprahamian and Zydus's Green and spoke for 2.5 minutes and 39 minutes, respectively, to discuss the price hikes. *Id.*, ¶848.

### (3)   Topiramate Sprinkle Capsules – Teva, Zydus, Actavis

535.   Teva began coordinating with co-conspirators on price hikes relating to the seizure and migraine drug Topiramate Sprinkle as early as June 2014 (*id.*, ¶¶878, 927-930):

- Four days before Zydus's June 13, 2014 Topiramate Sprinkle price hike, on June 9, Patel and Zydus's Green spoke four times. *Id.*, ¶¶928-929. On June 11, both Rekenthaler and Patel communicated with Zydus's Green by phone, for 8 minutes and over 14.5 minutes, respectively. *Id.*, ¶¶880, 930. On the same day, Rekenthaler also called Actavis's Marc Falkin twice – Actavis was the third manufacturer of the drug. *Id.*, ¶¶878, 881.

- 178 -

- On the day of Zydus's price hike, Patel spoke with Green for over 16.5 minutes. *Id*., ¶880. After Patel's June 13, 2014 conversion with Zydus's Green, she included Topiramate Sprinkle to Teva's price hike list, noting "Follow/Urgent – Zydus." *Id*., ¶881.

- Approximately a week before Teva's August 28, 2014 Topiramate Sprinkle price hike, Teva communicated extensively with co-conspirators Zydus and Actavis. On August 18, Rekenthaler spoke to Actavis's Falkin twice. *Id*., ¶848. On August 20, Rekenthaler spoke to Zydus's Green twice. *Id*., ¶930. On August 24 and 26, Rekenthaler spoke to Actavis's Falkin once and four times, respective. *Id*., ¶848. On the day before Teva's price hike, Patel spoke to Zydus's Green for three minutes and exchanged three calls with Actavis's Rogerson. *Id*., ¶¶848, 929. On the day of the price hike, Rekenthaler coordinated with Actavis's Falkin. *Id*., ¶848.

<div align="center">

**(4)**   **Amoxicillin/Potassium Clavulanate Chewable Tablets, Diclofenac Potassium Tablets, Penicillin V Potassium Tablets, Desmopressin Acetate Tablets – Co-Conspirators Followed Teva's Price Hikes**

</div>

536.     While Teva communicated extensively with co-conspirators prior to the August 28, 2014 price hikes, the Company continued these communications after its price hikes to coordinate the co-conspirators' price hikes:

- Sandoz: For Amoxicillin/Potassium Clavulanate Chewable Tablets, Diclofenac Potassium Tablets, and Penicillin V Potassium Tablets, Teva coordinated its August 28, 2014 price hikes with Sandoz – with Patel reaching out to State AG CW-1 on August 11, 26, 27 (twice), and 28. *Id*., ¶848. When Sandoz followed Teva's price hikes on October 10, 2014, Patel again communicated with State AG CW-1 to discuss Sandoz's price increases for more than three minutes. *Id*., ¶884.

- Actavis: For Desmopressin Acetate Tablets, Disopyramide Phosphate Capsules, Flutamide Capsules, Teva coordinated its August 28, 2014 price hikes with Actavis – with Patel reaching out to Actavis's Rogerson three times by phone on August 27 and Rekethaler speaking to Actavis's Falkin twice on August 18, once on August 24, four times on August 26, and once on August 28. *Id*., ¶848.

- On October 15, 2014, when a customer contacted Teva on Desmopressin Acetate, Patel lamented to her colleagues about the difficulty in tracking Teva's collusive arrangements and stating "I can't quite recall if Actavis followed us or we followed them." *Id*., ¶886.

- When Actavis followed Teva's price hikes for Desmopressin Acetate in December 2014, Rekenthaler spoke to Actavis's Falkin on November 18, 21, and 25 to discuss the price increases. *Id*., ¶885. On December 19, 2014, Actavis hiked its

<div align="center">- 179 -</div>

Desmopressin Acetate price to the same level set by Teva on August 28, 2014.  *Id.*; App. C.

### i.      January 28, 2015 Price-Fixing of 12 Drugs

537.    For the January 28, 2015 round of price-fixing, Teva coordinated with at least Actavis, Amneal, Dr. Reddy's, Mylan, Par, Sandoz, and Taro to hike prices on 12 generic drugs (November 2019 AG Complaint, ¶¶890-891):



538.    According to the State AGs, upon information and belief, Patel met with the co-conspirators in trade conferences, including the August 23-26, 2014 NACDS annual event, the September 17-19, 2014 Econdisc Bidders Meeting, the October 13-14, 2014 PCMA Annual Meeting, the October 26-29, 2014 Anda Strategy Meeting, and the January 8, 2015 HDMA Round Table.  *Id.*, ¶892.

539.    Evidence uncovered and cited in the November 2019 AG Complaint shows the extent of the price hikes were massive – reaching as high as 612% increase (November 2019 AG Complaint, ¶890):

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor- DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor- Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi -Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

## (1)    Propranolol – Teva, Actavis, Mylan

540.    In early January 2015, Teva, Actavis, and Mylan began coordinating price hikes for the blood pressure drug Propranolol (November 2019 AG Complaint, ¶¶894-901:

- During the week before Actavis's January 15, 2015 notifications to its customers of a significant Propranolol price hike, Teva's Rekenthaler and Actavis's Falkin spoke 4 times for a total of 15 minutes: once on January 8, once on January 13, and twice on January 14. *Id.*, ¶¶895-896. On January 14, the day before Actavis's notifications, Rekenthaler reached out to both Actavis and Mylan:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

    *Id.*, ¶897.

- Actavis hiked both WAC and Suggested Wholesale Prices, and the increases became effective on February 17, 2015. *Id.*, ¶895.

- On January 16, 2015, Rekenthaler emailed a price hike list to Patel, which included different dosages of Propranolol. *Id.*, ¶898. Next to each Propranolol product, a notation showed "Follow Competitor – Actavis." *Id.*

- After Teva's January 28, 2015 price hikes, the co-conspirators continued coordination on pricing. On February 16, 2015, the day before Actavis's increases effective date, Rekenthaler spoke to Actavis's Falkin twice for more than 23 minutes.

*Id.*, ¶900.  On February 18-19, 2015, Rekenthaler and Mylan's Nesta spoke three times over the phone.  *Id.*

- On July 10, 2015, Mylan followed Teva and Actavis's Propranolol price hikes.  *Id.*, ¶901.

### (2) Ciprofloxacin HCL (Teva, Dr. Reddy's, Actavis) and Glimepiride (Teva, Dr. Reddy's)

541.   Teva began coordinating with co-conspirators on price hikes for antibiotic drug Ciprofloxacin HCL and diabetic drug Glimepiride as early as July 2014 (*id.*, ¶¶902-910):

- Dr. Reddy's Price Hikes:  Between July 10-24, 2014, Patel spoke to Dr. Reddy's Victor Borelli 6 times for more 25 minutes – once on July 10, 18, 21, and 22, and twice on July 26 – regarding Dr. Reddy's upcoming Ciprofloxacin and Glimepiride price hikes.  *Id.*, ¶905.  On August 18, 2014, Dr. Reddy's hiked Ciprofloxacin WAC by 201%-533% for different dosages and Glimepiride WAC by close to 300% for all dosages.  *Id.*, ¶904.

- Dr. Reddy's Borelli texted Patel four times on August 25, 2014 in hope that Teva would hike prices for the two drugs in its August 28, 2014 round of price increases.  *Id.*, ¶906.  Even though Teva did not include the two drugs in the August 2014 round, the two co-conspirators communicated by text four times on October 10, 2014 to coordinate pricing.  *Id.*, ¶908.

- Actavis's Price Hikes:  In December 2014, Rekenthaler spoke to Actavis's Falkin at least three times to coordinate Actavis's price hikes on Ciprofloxacin – two times on December 17 and once on December 18, 2014.  *Id.*, ¶909.  On December 19, 2014, Actavis's hiked its Ciprofloxacin prices to the levels set by Dr. Reddy's on August 18, 2014.  *Id.*

- Teva's Price Hikes: On January 13, 14, and 16 of 2015 Rekenthaler spoke to Actavis's Falkin again to coordinate Teva's own price hike this time.  *Id.*, ¶891.  On January 28, 2015, Teva hiked Ciprofloxacin prices to the same levels set by Dr. Reddy's and Actavis.  Similarly, Teva's Glimepiride prices were raised to identically match Dr. Reddy's pricing.  *Id.*, ¶910.

### (3) Isoniazid – Teva, Sandoz

542.   During Teva's July 2013 round of price hikes, Patel was already collecting Isoniazid pricing information from Sandoz.  According to the State AGs, Patel reached out to State AG CW-1 of Sandoz in June 2013 "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market" in light of Sandoz's Isoniazid price hikes in January 2013.  *Id.*, ¶619.  On

June 12, 2013, Patel reached out to and spoke with State AG CW-1 of Sandoz at least 5 times, totaling over 35 minutes. *Id.*, ¶620. She passed on the market information received from State AG CW-1, noting that Teva's WACs for the drug were very low. *Id.*, ¶¶620-621.

543.    Although Teva did not hike Isoniazid prices in the early round of price increases, it did on January 28, 2015 – after coordinating with State AG CW-1 at Sandoz and speaking with him for more than 16 minutes on January 22, 2015. *Id.*, ¶622.

### (4)    Griseofulvin Microsize Oral Suspension – Teva, Actavis

544.    Teva began coordinating with co-conspirator Actavis on raising prices of anti-fungal medication Griseofulvin Microsize Oral Suspension as early as September 2014 (*id.*, ¶¶911-914):

- In the week prior to Actavis notifying its Griseofulvin customers of a price hike, Rekenthaler and Patel communicated with Actavis extensively to coordinate the price increase. *Id.*, ¶912. Between September 3-9, 2014, Rekenthaler spoke to Actavis's Falkin 9 times, totaling 49 minutes. *Id.* On September 9, 2014, the day of Actavis's notifications, Patel also spoke to Actavis's Rogerson for over 4.5 minutes. *Id.* Actavis's price hikes took effect on October 6, 2014. *Id.*

- Immediately after Actavis's price hike, Teva included Griseofulvin to its price hike list with comment "Follow Competitor – Actavis." *Id.*, ¶913.

- On January 28, 2015, Teva hiked Griseofulvin prices to match Actavis's pricing. *Id.*, ¶914. Prior to Teva's price hikes, Rekenthaler coordinated with Actavis's Falkin and spoke with him four times during January 13-16, 2015. *Id.*

### 2.    Market Allocation and Price-Fixed Drugs in the November 2019 AG Complaint

#### a.    Allocation of Irbesartan, Generic Combivir, Portia and Jolessa, and MAS XR Markets to Fix Prices in 2012

545.    During 2012, Teva and its co-conspirators divided the markets on four generic drugs: Irbesartan, Lamivudine/Zidovudine ("generic Combivir"), Ethinyl Estradiol and Levonorgestrel ("Portia and Jolessa"), and (Amphetamine/Dextroamphetamine Extended Release ("MAS XR"). These four essential drugs were manufactured by Teva, Actavis, Aurobindo, Lupin, and Sandoz:

- <u>March 2012, Irbesartan (November 2019 AG Complaint, ¶¶270-275)</u>: Teva and Lupin began dividing the market for the hypertension drug Irbesartan in March 2012, when the FDA granted approval for Teva to manufacture the drug. *Id.*, ¶¶270, 275. Teva's Green reached out to Lupin's David Berthold on March 6 and confirmed that Lupin sought a 15% fair share. *Id.*, ¶273. According to the State AGs, on March 7, after Green and Berthold's conversation, Teva's Galownia announced that "Teva was in a position to take up to a 40% market share when it launched Irbesartan on March 30, 2012." *Id.*, ¶275.

- <u>May 2012, generic Combivir (*id.*, ¶¶257-269)</u>: Teva, Lupin, and Aurobindo began the market allocation process for the HIV drug generic Combivir in April 2014, in anticipation of Lupin and Aurobindo receiving FDA approvals for the drug in May 2012. *Id.*, ¶¶257-261. On April 24 and 25, Green spoke to Lupin's Berthold and obtained Lupin's launch plan. *Id.*, ¶¶261-262. On April 24, Green also reached out to Aurobindo's Jim Grauso and obtained Aurobindo's launch plan. *Id.* Green and negotiated market share with Lupin's Berthold and Aurobindo's Grauso on May 8 and 9. *Id.*, ¶263. On May 10, Teva's Galownia announced the customer accounts Teva will retain and the specific accounts to concede to Aurobindo and Lupin. *Id.*, ¶265. He further stated that Teva would obtain its fair share as the first entrant with "40-45% market share in a three player market." *Id.*, ¶268. Shortly thereafter, Lupin entered the market and received more than 30% fair share without significantly eroding the price of generic Combivir as a result of the agreement. *Id.*, ¶269.

- <u>May 2012, Portia and Jolessa (*id.*, ¶¶219-224)</u>: Teva and Sandoz coordinated to allocate customers for birth control drugs Portia and Jolessa (also known as Ethinyl estradiol and levonorgestrel) beginning May 2012, when Walmart reached out to Teva with a right of first refusal after receiving Sandoz's competing offer. *Id.*, ¶¶219, 221. On May 22, 2012, Green spoke with State AG CW-2 at Sandoz by phone and came to an agreement to withdraw Teva's offers to Walmart to enable Sandoz to achieve a more equal share for Portia and Jolessa. *Id.*, ¶222. The next day, Teva withdrew the Walmart offers. *Id.* The market allocation process continued over a year later, after a series of phone conversations between Teva and Sandoz on July 10, 2013 – Patel with State AG CW-1 of Sandoz and Rekenthaler with State AG CW-2 – Teva submitted an intentionally inflated bid to cede a customer's business to Sandoz. *Id.*, ¶¶223-224.

- <u>June 2012, MAS XR (*id.*, ¶¶329-335)</u>: Teva and Actavis began the process of allocating the attention deficit drug MAS XR (also known as Amphetamine/Dextroamphetamine Extended Release) market on June 22, 2012, when Actavis received FDA approval for the drug. *Id.*, ¶¶329, 333. On June 23, Teva's Teri Sherman emailed Rekenthaler about her conversation with Actavis's Michael Perfetto and conveyed Actavis's plan to obtain 15% fair share for the drug. *Id.*, ¶333. She stated that Actavis wanted "either McKesson or Cardinal" and maybe "Econdisc," but "NOT Walgreen and CVS." *Id.* Afterwards, Teva conceded customers to Actavis and the market allocation scheme was completed by May 7, 2013. *Id.*, ¶335.

- 184 -

b.     **Allocation of Budesonide Inhalation, Clonidine-TTS Patch, Generic Ocella, Fenofibrate, Nortriptyline Hydrochloride, Oxyprozin, Temezolomide, and Tolterodine ER Markets to Fix Prices in 2013**

546.     During 2013, in response to the entry and/or re-entry of Actavis, Dr. Reddy's, Greenstone, Lupin, Mylan, Taro, and Sandoz to the market for various generic drugs, Teva again engaged in market allocation activities with the co-conspirators to avoid price competition. Teva's market allocation efforts involved at least eight drugs – Budesonide Inhalation (§III.I.2.c), Clonidine-TTS Patch, Drospirenone and ethinyl estradiol ("generic Ocella"), Fenofibrate, Nortriptyline Hydrochloride, Oxyprozin, Temezolomide, and Tolterodine ER:

- February-April 2013, Clonidine-TTS Patch (*id.*, ¶¶178-192): Teva and Mylan began colluding in the blood pressure medication Clonidine-TTS Patch market as early as July 2012, when Teva's Green spoke to Mylan's Nesta on July 17-18, 2012 and September 28, 2012 to discuss Mylan temporarily exiting the market for the drug. *Id.*, ¶¶178, 184-187. On October 1, 2012, when CVS asked for Teva's pricing, Green again spoke to Mylan's Nesta while Rekenthaler spoke to Mylan's Bob Potter. *Id.*, ¶¶186-187. On October 4, after Green's conversation with Mylan's Nesta, Teva submitted bids at over three times higher than CVS's then-current prices. *Id.* Between February and March 2013, Teva and Mylan logged 33 calls, totaling close to 2 hours and 45 minutes to discuss Mylan's re-entry into the Clonidine-TTS Patch market. *Id.*, ¶191. As a result of these conversations, Teva ceded Econdisc back to Mylan in March and ceded McKesson, Rite Aid, and Omnicare to Mylan in April 2013. *Id.*, ¶¶189, 192. On April 8-9, 2013, Green and Mylan's Nesta spoke twice and confirmed that Mylan would follow a Teva price increase on Clonidine-TTS. *Id.*, ¶192.

- May 2013, Fenofibrate (*id.*, ¶¶168-177): Teva, Mylan, and Lupin began allocating the market for cholesterol drug Fenofibrate in February 2013 in advance of Mylan's launch of the drug. *Id.*, ¶¶168, 171. On May 6-9, 2013, Green spoke to Mylan's Nesta eight times and spoke to Lupin's Berthold three times while Patel also spoke to Lupin's Berthold three times. *Id.*, ¶172. At the same time, Mylan's Nesta spoke to Lupin's Berthold – often after speaking to Teva. *Id.*, ¶¶172-173. After these conversations, on May 10, Teva's Galownia announced that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers" even though Mylan had not posted a price challenge and Econdisc did not request a bid. *Id.*, ¶174. Galownia announcement triggered a series of calls among the co-conspirators:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

*Id.*, ¶175.  On May 15, 2013, after Econodisc's request for bids due to a competing offer for Fenofibrate from a new market entrant, the three co-conspirators reaffirmed their agreement – with Teva's Patel exchanging seven calls with Lupin's Berthold on May 16 and three calls on May 17, and Teva's Green exchanging one text message and six calls with Mylan's Nesta on May 17 and one call with Lupin's Berthold.  *Id.*, ¶177.  Mylan's Nesta and Lupin's Berthold also communicated by phone on May 17.  *Id.*  Teva ultimately conceded Econdisc to Mylan.  *Id.*, ¶176.

- <u>March-July 2013, Oxaprozin</u> (*id.*, ¶¶299-307, 506-517):  In March 2013, Teva and Greenstone began allocating customers for the anti-inflammatory drug Oxaprozin in advance of Greenstone's market entry.  *Id.*, ¶¶299-300.  Between March 6-27, Green logged 13 phone calls and 1 text message with Greenstone's Robin Hatosy, and agreed to concede CVS and Cardinal's Oxaprozin business to Greenstone.  *Id.*  When Greenstone violated the fair share agreement by going after Walmart, Teva was "pissed" and Green logged six calls to Hatosy on March 28.  *Id.*, ¶¶300-305.  Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.  *Id.*, ¶¶305-306.

  On June 27, 2013, Dr. Reddy's re-launched Oxaprozin at the same WAC as Teva and Greenstone, and sought a fair share of 20% of the market.  *Id.*, ¶¶507, 509.  On July 23, Dr. Reddy's Jake Austin called Green to see if Teva would concede Walgreen's business.  *Id.*, ¶512.  On July 29, 2013, Teva decided to concede Econdisc to Dr. Reddy's and keep Walgreens, and Rekenthaler promptly called Dr. Reddy's Tricia Wetzel.  *Id.*, ¶¶514-516.  By September 10, 2013, Dr. Reddy's achieved its 20% fair share with customers such as Econdisc, Keysource, and Premier.  *Id.*, ¶517.

- <u>April 2013, generic Ocella</u> (*id.*, ¶¶276-292):  Teva, Lupin, and Actavis began the market allocation process for the birth control medication generic Ocella (also known as Drospirenone and Ethinyl Estradiol) in April 2013, in advance of Lupin's entry into the market planned for the summer of 2013.  *Id.*, ¶¶276, 279-280.  On April 24-25, Lupin's Berthold called Teva's Green three times to begin negotiation.  *Id.*, ¶279.  A series of calls took place between Lupin's Berthold and Teva's Patel and Green between May 6-10.  *Id.*, ¶¶282-283.  Finally, on July 10, 2013, Teva's Green and Patel reached an agreement to divide customers with Lupin's Berthold, and the process took place over the next three montha before its completion in October 2013.  *Id.*, ¶¶286-292.

Actavis also took the opportunity to negotiate for its fair share in light of Teva's dominating 70%-75% market share. *Id.*, ¶280. On April 30, Actavis's Andrew Boyer spoke to Rekenthaler twice. *Id.*, ¶281. Patel also called Boyer on the same day and texted him four times on May 1. *Id.* On May 8, after learning about Actavis's bid for Teva's customer, Patel immediately called Actavis's Richard Rogerson and spoke to him again on May 10. *Id.*, ¶¶283-284. On May 14, 2013, Galownia recommended conceding two significant generic Ocella customers to Actavis. *Id.*, ¶¶284-285.

- Julybold 2013, Temozolomide (*id.*, ¶¶225-238): In July 2013, Teva and Sandoz began planning for their August entry into the market for brain cancer drug Temozolomide and coordinated to allocate customers. *Id.*, ¶¶225-226. After a large pharmacy requested bids, Teva's Patel called the State AG CW-1 at Sandoz and began discussion of dividing customers for Temozolomide on July 18 and 23. *Id.*, ¶¶227, 229. On July 22, Sandoz's Steven Greenstein reached out to the pharmacy for Teva's plans, and the pharmacy replied that Teva will launch on August 11 and "looking to play nice in 2 player market." *Id.*, ¶¶228-230. Sandoz cheered "[g]reat news…!" and indicated that "Teva is seeking ~45-50% share." *Id.*, ¶231. Between July 29-31, Teva's Patel, Green and Sherman had a series of calls with Sandoz's State AG CW-1, State AG CW-2 and Greenstein, respectively. *Id.*, ¶¶232-234. On July 31, 2013, after Sherman's call with Sandoz's Greenstein, Sandoz ceded the pharmacy's business to Teva. *Id.*, ¶233. On August 12, 2013, at the NACDS Total Store Expo Conference in Las Vegas, Rekenthaler met State AG CW-2 at the Grand Lux Café and an agreement was reached that CVS's business on the 250mg Temozolomide would go to Teva initially. *Id.*, ¶¶236-237.

- Novemberbold 2013, Nortriptyline Hydrochloride (*id.*, ¶¶411-428): In November 2013, Teva, Taro, and Actavis began dividing the market for anti-depression drug Nortriptyline Hydrochloride in preparation for Taro re-launching the drug. *Id.*, ¶¶411, 414. Rekenthaler spoke to Actavis's Falkin on November 10, 14-15 and 18 to determine how to, as the State AGs stated, "make room for Taro." *Id.*, ¶¶417, 419. Falkin also texted Cavanaugh twice on November 18-19. *Id.*, ¶419. Taro's Aprahamian reached out to Patel on November 17 and agreed not to pursue Teva's customers, such McKesson and HD Smith. *Id.*, ¶¶418, 420. In exchange, on November 21, Teva agreed to cede Cardinal's Nortriptyline business to Taro. *Id.*, ¶422. In addition, Taro's Aprahamian spoke to Actavis's Michael Dorsey on November 20 and December 6, and Actavis agreed to cede HEB's Nortriptyline business to Taro. *Id.*, ¶¶421, 423-424. Between March 4-10, 2014, the three co-conspirators communicated by phone and text extensively to coordinate Taro's re-entry. *Id.*, ¶427. After Patel spoke to Taro's Aprahamian on March 10, she decided to postpone hiking prices for the drug during Taro's entry. *Id.*, ¶428. The collusive price hike was postponed until January 28, 2015 after coordinating with Actavis and Teva. *Id.*; §III.1.1.i.

- Decemberbold 2013, Tolterodine Extended Release (November 2019 AG Complaint, ¶¶193-204): Teva and Mylan began dividing the market for overactive bladder drug Tolterodine ER in December 2013 in preparation for both companies' launch of the

drug in early 2014. *Id.*, ¶¶193, 197.  On December 20, Cardinal told Teva's Coward that Mylan was "looking for a 40% market share," and that Teva "can figure the rest out." *Id.*  On December 23, Rekenthaler reached out to Mylan's Nesta and agreed to the 60-40 market share. *Id.*, ¶¶199-200.  After the Mylan call, Galownia distributed a target customers list which gave Teva 60% market share:

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

*Id.*, ¶201.  In addition, comparison of Teva's Tolterodine ER pricing plan before and after reaching agreement with Mylan showed substantially higher prices set for Cigna, Humana, Kaiser, Optum RX Prime Therapeutics, and Walgreens – all of which were customers allocated to Mylan.  *Id.*, ¶202.  Teva and Mylan then proceeded to submit inflated cover bids or refused to bid in order to avoid competing for each others' customers. *Id.*, ¶¶202-203.  On December 24, 2013, Rekenthaler and Nesta spoke twice to confirm the market allocation agreement. *Id.*, ¶204.

> **c.  Allocation of Amphetamine/Dextroamphetamine IR, generic Balziva, Budesonide Inhalation, generic Cambivir, Cabergoline, Capecitabine, Clonidine-TTS, Dexmethylphenidate HCL ER, Dextroamphetamine Sulfate ER, Entecavir, Etodolac, Fenofibrate, Gabapentin, Labetalol, Niacin ER, Norethindrone Acetate, Omega-3-Acid Ethyl Esters, Paricalcitol, Prioxicam, Raloxifene, Tobramycin, and Tolterodine Tartrate Markets to Fix Prices in 2014 and 1Q2015**

547.    During 2014 and the first quarter of 2015, Teva's collusive activities picked up speed

and the Company entered into market allocation agreements constantly throughout the year.  Teva's

collusive activities were industry-wide and included co-conspirators such as Actavis, Amneal,

Apotex, Aurobindo, Camber, Celecoxib, Dr. Reddy's, Glenmark, Greenstone, Lupin, Mylan, Par,

Sandoz,   Taro,   and   Zydus   and   involved   essential   medicines   such   as

Amphetamine/Dextroamphetamine IR, generic Balziva, Budesonide Inhalation, generic Cambivir,

Cabergoline, Capecitabine, Clonidine-TTS, Dexmethylphenidate HCL ER, Dextroamphetamine

Sulfate ER, Entecavir, Etodolac, Fenofibrate, Gabapentin, Labetalol, Niacin ER, Norethindrone

Acetate, Omega-3-Acid Ethyl Esters, Paricalcitol, Prioxicam, Raloxifene, Tobramycin, and

Tolterodine Tartrate:

- <u>January 2014, generic Balziva (*id.*, ¶¶293-298)</u>:  Teva and Lupin began allocating customers for the birth control drug generic Balziva (also known as Norethindrone/Ethinyl Estradiol) in January 2014, after Teva heard from its customer that a manufacturer was entering the generic Balziva market.  *Id.*, ¶¶293-294.  Suspecting that it was Lupin, Patel reach out to Lupin's Berthold and spoke with him twice on January 24.  *Id.*, ¶296.  After her conversation, she recommended to Rekenthaler: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."  *Id.*, ¶297.  On February 4, Patel analyzed concession of business to Lupin and spoke to him twice later that day to coordinate Lupin's entry into the generic Balziva market.  *Id.*, ¶298.

- <u>January 2014, Tolterodine Tartrate (*id.*, ¶¶308-313)</u>:  Teva and Greenstone began allocating customers for the overactive bladder drug Tolterodine Tartrate in January 2014, when Greenstone entered the market for the drug. *Id.*, ¶¶308-309.  On January 21-22, Patel exchanged five phone calls and six text messages with Greenstone's Jill Nailor, and one phone call and one text message with Greenstone's Robin Hatosy.  *Id.*, ¶309.  Rekenthaler also exchanged two phone calls and a text message with Greenstone's Jill Nailor.  *Id.*  During these conversations, Teva agreed to concede customers to Greenstone.  *Id.*  In exchange, on the next day, Greenstone entered the Tolterodine Tartrate market at the same pricing set by Teva. *Id.*, ¶310.  On January 24, Patel emailed Teva's national account managers and notified them of Greenstone's entry and stated "I'm sure we will have to concede somewhere." *Id.*  On January 28, CVS notified Teva of a pricing challenge on the drug. *Id.*, ¶311.  After speaking with Greenstone's Hatosy twice on January 29, Patel told her colleagues to concede the account to Greenstone on February 3 despite protest by Teva's CVS coverage person.  *Id.*, ¶¶311-312.  On February 4, Patel called Hatosy again to discuss the concession.  *Id.*, ¶312.

- <u>February 2014, Dexmethylphenidate HCL Extended Release (*id.*, ¶¶248-256)</u>:  In February 2014, Teva and Sandoz began allocating customers for the attention deficit drug Dexmethylphenidate HCL Extended Release ("Dexmeth ER") in advance of Sandoz entering the market for the drug. *Id.*, ¶¶248-249.  On February 10, State AG CW-1 at Sandoz called Patel after he made preparation to go after Rite Aid's Dexmeth ER business.  *Id.*, ¶249.  He called Patel on February 18 again, and Teva conceded Rite Aid's Dexmeth ER business to Sandoz on the same day.  *Id.*  Similarly, on February 12, after Sandoz submitted a bid for ABC's business, State AG CW-1 spoke to Patel.  *Id.*, ¶250.  After the call, Patel emailed her team that "Sandoz is being responsible with their pricing.  We should be responsible with our share" and it "makes more sense to hold onto Walgeens than ABC."  *Id.*  On February 14, Teva also conceded Anda's Dexmeth ER business to Sandoz. *Id.*, ¶251.  On February 24, Teva had an internal meeting about "Post Launch Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market."  *Id.*, ¶253.  After the meeting, Patel spoke with State AG CW-1 on February 27.  *Id.*  According to the

State AG, "Sandoz abided by fair share principles and its ongoing understanding with Teva" and the scheme continued until 2015.  *Id.*, ¶¶254-255.

- February 2014, Labetalol (*id.*, ¶¶946-948):  Teva and Par began the market allocation process for blood pressure drug Labetalol in February 2014, after a customer emailed Teva about a pricing challenge from Par.  *Id.*, ¶¶553, 946.  On February 7, 2014, after Patel forwarded Sherman the customer's email with "???," Sherman immediately called Par's Renee Kenney and told Patel "left message."  *Id.*, ¶946.  Sherman spoke with Par's Kenney that day.  *Id.*  Rekenthaler also called Par's Michael Burton within one minute after receiving Patel's email.  *Id.*, ¶947.  After Rekenthaler and Sherman's conversations with Par executives, Teva conceded the customer's business.  *Id.*, ¶948.  As plaintiffs' investigation shows, Labetalol pricing was maintained at elevated levels for years after Teva and co-conspirators' price hikes.  *See* App. C.

- February 2014, Fenofibrate (November 2019 AG Complaint, ¶¶431-447):  After a successful round of allocating Fenofibrate customers in May 2013 (§III.I.2.b), Teva, Lupin, and Mylan began dividing the customers and fixing prices for the cholesterol drug again in February 2014 with Zydus in preparation for Zydus's entry into the market on March 7, 2014.  November 2019 AG Complaint, ¶¶431, 433-435.  Patel and Zydus's Green exchanged 17 phone calls between February 19-24.  *Id.*, ¶435.  On March 3-4, both Patel and Rekenthaler spoke to Green.  *Id.*, ¶436.  Rekenthaler also coordinated with Mylan's Nesta on March 3, while Patel reached out to Lupin's Berthold on March 6.  *Id.*  After no less than 26 calls exchanged among the parties, Zydus entered the market on March 7 at the same WAC pricing as set by Teva, Lupin, and Mylan.  *Id.*

    Over the next couple of months, Teva "strategically" conceded some customers to Zydus, such as OptiSource, Humana, Ahold, Walgreen, and Anda.  *Id.*, ¶¶439-447.  These concessions were documented in Teva's internal emails – with each concession, Patel and Rekenthaler communicated with Green at Zydus or other co-conspirators.  *Id.*

- March-April 2014, MAS-IR (*id.*, ¶¶336-339):  Teva, Aurobindo, and Actavis began dividing the market for the attention deficit disorder drug Amphetamine/Dextroamphetamine Immediate Release in March 2014 in advance of Aurobindo and Actavis's launches.  *Id.*, ¶¶336-337.  On March 17-18, and 20, Patel and Rekenthaler spoke to Actavis's Rogerson and Falkin, respectively.  At the same time, Rekenthaler also coordinated with Aurobindo.  *Id.*, ¶338.  Aurobindo targeted a 10% market share for the drug.  *Id.*, ¶337.  On April 16, 2014, Patel told her colleague to concede a MAS-IR customer to Actavis.  *Id.*, ¶339.  Within less than 15 minutes, she called Rogerson to discuss Teva's concession.  *Id.*  Plaintiffs' investigation revealed that both Actavis and Aurobindo entered the MAS-IR market at the same WAC as set by Teva.

- March-June 2014, Niacin ER (*id.*, ¶¶461-472, 729-739):  Teva, Lupin, and Zydus began dividing the market for cholesterol drug Niacin Extended Release in March 2014, when Lupin entered the market for the drug.  *Id.*, ¶¶461, 729, 731.  In

anticipation of Lupin's entrance, on February 28, 2014, Cavanaugh instructed Galownia to hike Niacin ER price as Lupin was a quality co-conspirator. *Id.*, ¶732. Patel immediately called Lupin's Berthold, and Teva hiked the Niacin ER price by 10% on March 7. *Id.*, ¶¶732-733. Between March 17-20, Patel spoke to Lupin's Berthold every day, resulting in Lupin entering the Niacin market at the same WAC set by Teva. *Id.*, ¶¶735-736. On March 24, Patel and Lupin's Berthold exchanged three calls. *Id.*, ¶¶738-739. After the calls, on March 25, Galownia confirmed to Patel and Cavanaugh that Teva agreed to cede Cardinal, CVS, Humana, and Optum's Niacin ER business to Lupin, giving it 40% of the market. *Id.*

Prior to Teva's March 7 price hike, Patel and Rekenthaler also looped in Zydus's Kevin Green on March 3, each spoke with Green for close to 20 minutes separately. *Id.*, ¶464. Zydus planned to enter the market in June 2014. *Id.*, ¶469. Between May 6-9, Green exchanged numerous calls with Teva's Patel and Rekenthaler, and Lupin's Berthold. *Id.*, ¶¶466-467. On May 29, Green spoke to Patel and Rekenthaler again. *Id.*, ¶469. On June 5, Teva's Jessica Peter sent an internal email with subject "McKesson Niacin" and confirming "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." *Id.*, ¶471. On June 28, Zydus launched Niacin ER at the same WAC set by Teva and Lupin. *Id.*, ¶472.

- <u>March-July 2014, Paricalcitol (*id.*, ¶¶448-460, 518-535)</u>: Between March to June 2014, Teva, Zydus, and Dr. Reddy's began dividing customer for the kidney disease drug Paricalcitol, in preparation for Zydus and Dr. Reddy's entering the market on March 29 and June 24, respectively. *Id.*, ¶¶448, 450, 527. Patel and Rekenthaler exchanged a series of calls with Zydus's Green on February 28 and March 3-4, 14, and 17. *Id.*, ¶¶452-455. Within 30 minutes after the second call in March 17, Patel proposed to Galownia that Teva should "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare" on Paricalcitol. *Id.*, ¶455. After the email, Patel spoke to Zydus's Green again. *Id.* After Patel and Zydus Green spoke on March 27, Teva conceded OptiSource on March 28 and Publix on April 1. *Id.*, ¶¶457-458. After Patel and Green spoke on April 1-2, Teva conceded NC Mutual. *Id.*, ¶459.

  On May 1, 2014 Dr. Reddy's Tricia Wetzel reached out to Teva's Rekenthaler in advance of Dr. Reddy's entrance into the Paricalcitol market. *Id.*, ¶521. After Patel spoke to Dr. Reddy's Borelli on June 10 and July 10, 18, and 22, Teva ceded Omnicare, Cardinal, Winn-Dixie, Giant Eagle, and McKesson to Dr. Reddy's. *Id.*, ¶¶521-527. On June 26, Galownia confirmed to Patel that Teva was willing to cede to Dr. Reddy's 10%-15% of Paricalcitol's market share. *Id.*, ¶527.

- <u>May 2014, Clonidine-TTS (*id.*, ¶¶343-351)</u>: After successfully dividing the Clonidine-TTS market with Mylan in February-April 2013 (§III.I.2.b), Teva conducted a second round of market allocation with Actavis in May 2014, when Actavis entered the market for the blood pressure medication. November 2019 AG Complaint, ¶¶343, 345. As soon as Actavis received the FDA's approval, Rekentheler spoke to Actavis's Falkin immediately on the same day. *Id.*, ¶345. On the next day, Galownia asked Patel to draw up a list of customers to concede to Actavis. *Id.*, ¶346. On May 8, Rekenthaler and Patel spoke to Actavis's Falkin and

- 191 -

Rogerson, respectively, and agreed to concede Ahold and HEB's Clonidine business. *Id.*, ¶347.  On May 9, Rogerson told Patel that Actavis wanted 25% of the Clonidine market and agreed to change "their offer letters at pricing that is higher than our [Teva's] current."  *Id.*, ¶348.  In exchange, between May 14-23, Teva conceded a wholesaler, a retailer, and two other customers' Clonidine business to Actavis.  *Id.*, ¶¶350-351.

- May 2014, Etodolac ER (*id.*, ¶¶473-481):  After a successful round of Etodolac ER price hikes in August 2013, Teva and Taro began dividing customers with Zydus for the anti-inflammatory drug in May 2014 in preparation for Zydus's launch of the drug.  *Id.*, ¶¶473, 475.  On May 6-8 and 11, Patel acted as conduit of information by exchanging ten calls with Zydus's Green, and three calls and six text messages with Taro's Aprahamian.  *Id.*, ¶475.  As a result of the agreement to allocate customers to Zydus, Zydus entered the Etodolac ER market on May 12, 2014 at the same collusive WAC pricing as set by Teva and Taro in August 2013.  *Id.*

  In May and July 2014, Teva ceded customers to Zydus.  After Patel spoke to Taro's Aprahamian on May 14 and Zydus's Green on May 14 and 20-21, and Cavanaugh's call and text messages to Zydus's Ronco on May 20-21, Teva ceded Anda's Etodolac business to Zydus on May 22.  *Id.*, ¶¶476-478.  Similarly, after communicating with Taro's Aprahamian and Zydus's Green on June 27 and July 2, respectively, Patel told colleagues to cede Econodisc's business to Zydus.  *Id.*, ¶¶479-481.

- June 2014, Dex Sulfate XR (*id.*, ¶¶340-342):  Teva and Actavis began the market allocation process for the impulse control medication Dextroamphetamine Sulfate Extended Release in June 2014, when Actavis launched the drug.  *Id.*, ¶¶340-341.  Rekenthaler spoke to Actavis's Falkin twice on June 19 when Actavis entered the market and confirmed that Actavis wanted 20%-25% of the Dex Sulfate XR market.  *Id.*, ¶341.  On June 24, Teva decided to give up a large customer and cede close to 14% market share to Actavis.  *Id.*, ¶342.

- June 2014-April 2015, Omega-3-Acid Ethyl Esters (*id.*, ¶¶363-373):  Teva began to work with co-conspirators to allocate the market for lipid regulating agent Omega-3-Acid Ethyl Esters in June 2014, when Par received approval for the drug.  *Id.*, ¶¶363, 365.  On June 26, Patel reached out to Par's Trey Propst via LinkedIn and spoke to him on June 26-27 to gather Par's pricing and bidding plan.  *Id.*, ¶¶365-367.  After Par entered the market on June 30, Teva began ceding Omega-3-Acid Ethyl Esters market shares to Par in July and continued the process until February 2015 to maintain elevated pricing.  *Id.*, ¶¶368-369, 371-372.  During this period, Patel texted Par's Propst five times in November 2014, and Rekenthaler spoke frequently with Par's Michael Burton in February 2015.  *Id.*, ¶¶371-372.

  When Apotex entered the Omega-3-Acid Ethyl Esters market in April 2015, Rekenthaler spoke extensively with Apotex's Jeffrey Hampton and ceded market shares to Apotex.  *Id.*, ¶373.

- July 2014, Tobramycin (*id.*, ¶¶239-247):  Teva and Sandoz began dividing customers for the antibacterial eye drop Tobramycin in July 2014 as Sandoz was entering the

- 192 -

market for the medication. *Id.*, ¶¶239, 241.  On July 2, after Patel exchanged seven phone calls with State AG CW-1 at Sandoz the day before, Teva decided to cede two accounts to Sandoz. *Id.*, ¶241.  On July 7, Teva and Sandoz agreed on a list of customers after Patel spoke to State AG CW-1 five times as Patel stated in an email that Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. *Id.*, ¶242.  Cardinal would also go to Sandoz. *Id.*  As Teva was conceding Tobramycin businesses to Sandoz, State AG CW-1 told Patel that Sandoz wanted 50% market share. *Id.*, ¶¶243-246.  Patel told him "a 25% share was reasonable" after consulting with Rekenthaler. *Id.*, ¶246.

- <u>August 2014, Capecitabine</u> (*id.*, ¶¶205-218):  Teva and Mylan began dividing the market for the chemotherapy drug Capecitabine in August 2014 in advance of Mylan's launch of the drug. *Id.*, ¶¶205, 210.  Teva's Rekethaler spoke with Mylan's Nesta on August 4, 7, 11, and 18 and agreed on ceding 35% market share of the drug to Mylan. *Id.*, ¶¶211-218.  Teva ultimately ceded, among others, ABC, McKesson, Econdisc, and Cigna's Capecitabine business to Mylan. *Id.*

- <u>August 2014, Entecavir</u> (*id.*, ¶¶374-383):  Teva and Par began the market allocation process for Hepatitis B drug Entecavir in August 2014 to pave the way for their entry into the market for the drug. *Id.*, ¶¶374-375.  After Teva received approval to market the drug on August 28, Rekenthaler immediately called Par's Michael Burton three times that day and twice on the next day. *Id.*, ¶¶376-377.  After their conversation, Par abandoned its plan to price lower than Teva and allowed Teva to win ABC and other customers' Entecavir business. *Id.*, ¶¶378-379.  Several weeks after both companies launched on September 4, 2014, Teva captured close to 47% of the Entecavir market and continued to maintain that market share through January 2015. *Id.*, ¶¶380-383.

- <u>September 2014, Raloxifene and generic Cambivir</u> (*id.*, ¶¶1085-1106):  Teva began coordinating with Camber to allocate markets for the osteoporosis drug Raloxifene and HIV drug generic Combivir in September 2014, when Camber was entering the market for both drugs. *Id.*, ¶¶1088-1090.  On September 17-19, Rekenthaler played golf and socialized with Camber's Kon Ostaficiuk at an industry outing in Kentucky. *Id.*, ¶1094.  After the event, the two co-conspirators continued to speak by phone on September 21-22 and 24. *Id.*, ¶¶1095-1096.  During these conversations, Camber modified its Raloxifene pricing and indicated to Teva that it wanted Econdisc and a small retailer's business. *Id.*  On September 25, Teva agreed to cede the small retailer's business, and later, also conceded Econdisc's Raloxifene business to Camber. *Id.*, ¶¶1099, 1103.  Rekenthaler and Ostaficiuk spoke again on September 25-26, when Camber officially launched Raloxifene, and told Camber to stop seeking anymore of Teva's customers for both drugs as Teva had already ceded customers to Camber for Raloxifene. *Id.*, ¶¶1099-1102.  On September 29, Ostaficiuk instructed his colleagues to stop making offers to Teva's customers as "[w]e do not want to upset them more!" *Id.*, ¶1102.

- <u>September 2014, Norethindrone Acetate</u> (*id.*, ¶¶503-505):  In September 2014, Teva, Amneal, and Glenmark began fixing prices and maintaining market share for the

hormonal therapy drug Norethindrone Acetate. *Id.*, ¶¶503-504. The three co-conspirators evenly shared the market for the drug when a customer reached out to Teva for lower pricing on September 9. *Id.*, ¶¶504-505. Patel immediately called Amneal's Stephen Rutledge and another Amneal sales and finance executive, who in turn, contacted Glenmark's Jim Brown. *Id.*, ¶504. During these conversations, Amneal executives told Patel that Norethindrone Acetate "would be an increase candidate for Amneal." *Id.*, ¶505. After the call, according to the State AGs, Teva "reinforced the fair share understanding" by giving the customer "only a nominal [price] reduction so as not to disrupt the market" and avoid stealing Amneal's business. *Id.* Amneal implemented a price increase shortly thereafter. *Id.*

- <u>October 2014, Gabapentin (*id.*, ¶¶492-495)</u>: In October 2014, Teva and Glenmark allocated the market for epilepsy drug Gabapentin while Glenmark took a price increase on the drug. *Id.*, ¶¶492, 494. After returning from the October 13-14 Pharmaceutical Care Management Association Annual Meeting in California, Patel texted Glenmark's Jim Brown twice on October 15 and announced to her colleague that Glenmark was planning to hike Gabapentin prices. *Id.*, ¶¶493-494. The co-conspirators agreed that Teva would take the opportunity to get its fair share, and Teva did so cautiously in the next several weeks so as not to "disrupt Glenmark's business too much." *Id.*, ¶¶494-495.

- <u>November-December 2014, Celecoxib (*id.*, ¶¶356-362)</u>: Both Actavis and Teva were in preparation for the launch of anti-inflammatory medication Celecoxib in November 2014, and when the two companies began targeting the same customers, market allocation discussions began – initially with a customer as the intermediary. *Id.*, ¶¶356-358. On November 20, a customer told Teva that Allergan was in preparation for launch and wanted to get its fair share given that Teva had captured more than 30% of the market. *Id.*, ¶358. According to the State AGs, Teva's Rekenthaler "took a cooperative – rather than competitive – stance" and responded "'[t]hat's all pretty accurate and hard to argue with.'" *Id.*, ¶359. In preparation for Teva's December 10 launch, Rekenthaler spoke with Actavis's Falkin on November 25, December 3, 9, and 10. *Id.*, ¶362. Similarly, Patel connected with Actavis's Boyer on December 5 and 8. *Id.*

- <u>December 2014, Cabergoline (*id.*, ¶¶324-328)</u>: In December 2014, Teva and Greenstone allocated customers for the hormone therapy drug Cabergoline as Greenstone launched the drug. *Id.*, ¶¶324-325. On December 9, Teva's wholesaler customer intermediated and approached Teva's Theresa Coward on behalf of Greenstone – stating that Greenstone wanted the wholesaler's business along with those of two other grocery store chains. *Id.*, ¶325. On December 10, after internal discussions, Coward replied: "Tell Greenstone we are playing nice in the sandbox and we will let them have [The Wholesaler]." *Id.*, ¶¶326-327.

- <u>February 2015, Budesonide Inhalation (*id.*, ¶¶352-355, 560-564)</u>: Teva and Actavis began coordinating Actavis's entry into the asthma medication Budesonide Inhalation market as early as April 2013. *Id.*, ¶¶560, 562. After Rekenthaler spoke with Actavis's Boyer on April 1 and 2, Actavis launched the medication at the exact same price set by Teva. *Id.*, ¶¶562-563. Actavis then temporarily exited the market

due to legal action by the brand manufacturer and re-entered in February 13, 2015. *Id.*, ¶¶354, 564. Teva continued with the agreement and ceded customers to Actavis after Rekenthaler spoke with Actavis's Falkin on February 10 and 16. *Id.*, ¶¶354-355. On February 17, 2015, Teva's Coward sent out an email to announce the immediate concession of two major accounts to Actavis due to Actavis's urgent need to put out products before further litigations by the brand manufacturer. *Id.* In addition, she had been working on an "exit strategy" with the customers to eliminate Teva's Budesonide from the supply channel to facilitate Actavis's entry. *Id.*

**J.     Teva Overstated Goodwill and Failed to Make Timely Impairments**

     **1.     Goodwill False Statements**

548.    As of December 31, 2016, Teva materially overstated the value of its goodwill, which inflated its balance sheet and understated its goodwill impairment charge. This, in turn, inflated Teva's operating income and net earnings by billions of dollars. Teva continued to conceal its inflated goodwill and overstated operating income, net income and EPS through February 8, 2018 – when it reported its fourth quarter 2017 financial results. In total, Defendants inflated the goodwill for their U.S. generics reporting unit by at least $8.0 billion or 52% of Teva's $15.5 billion goodwill amount reported as of September 30, 2017. Defendants accomplished this scheme by using bogus inputs for the discounted cash flow ("DCF") model used to calculate the fair value and goodwill of Teva's U.S. generics unit. By inflating goodwill, Defendants avoided recording impairment charges necessary to properly account for the true value of the reporting unit. More specifically, Defendants, in violation of generally accepted accounting principles ("GAAP"),[16] used inflated future cash flow projections, abnormally low discount rates, and abnormally high terminal growth rates to improperly

---

[16]   GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation SX, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

inflate goodwill. Teva's disclosures regarding its goodwill valuations and testing was also false and misleading in the 2016 Form 20-F, filed on February 15, 2017 (*see* §III.K.5).

549.    Teva reported goodwill impairment and goodwill balances as of the end of December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017 as shown in the following chart:

**Teva's Reported Goodwill Impairment and Goodwill Amounts as of the End of Each Quarter**
**(in millions of dollars)**

|  | Quarters | | | | |
|---|---|---|---|---|---|
|  | 31-Dec-16 | 31-Mar-17 | 30-Jun-17 | 30-Sep-17 | 31-Dec-17 |
| Goodwill Impairment Recognized By Teva | $    - | $    - | $    (6,100) | $    - | $    (10,400) |
| Goodwill Amount Reported By Teva | $    23,100 | $    23,100 | $    15,500 | $    15,500 | $    5,500 |

As described herein, Teva's goodwill and corresponding goodwill impairment charges were materially false and misleading for each quarter from the fourth quarter of 2016 through the third quarter of 2017.  Teva ultimately took a late catch-up impairment charge of $10.4 billion in the fourth quarter of 2017.

### a.    Teva's Discounted Cash Flow Models Were Inflated

550.    In the 2016 Form 20-F filed on February 15, 2017, Teva assured investors that only the Rimsa reporting unit's goodwill was impaired (by $900 million) and stated that "[t]here was no impairment for our remaining reporting units [including the U.S. generics reporting unit]."  But Defendants' DCF model for the fourth quarter of 2016 was inflated because they applied improper inputs to their DCF model.  Defendants, in violation of GAAP,  used  inflated projected cash flows, applied an abnormally low discount rate and applied an abnormally high terminal growth rate that they knew market participants would not use to value the reporting unit. Therefore, the goodwill for the U.S. generics reporting unit was also inflated by at least $7.6 billion or 33% of Teva's reported $23.1 billion goodwill as of the fourth quarter of 2016.

551.    One of the critical inputs for goodwill impairment testing is the projected future cash flow and the implicit compounded annual growth rate ("CAGR").  For Defendants' fourth quarter

2016 goodwill impairment test, Teva's DCF model effectively applied an aggressive, biased CAGR of 20%.  But in Teva's own July 2015 plan, Defendants used a "Pro Forma Free Cash Flow" CAGR of 14.4% and Defendants themselves characterized the expected 14.4% cash flow CAGR as representing "*[s]trong free cash flow*."[17]  Defendants had no credible basis to arbitrarily boost their expected 14.4% CAGR to 20%, an increase of 39% in the CAGR in the fourth quarter of 2016.  And in July 2016, Teva used a CAGR of 11% for their projected cash flows (*see* §III.F, *supra*).  Defendants had no basis to increase the cash flow CAGR to 20% just five months later as of December 31, 2016.  Therefore, the maximum CAGR that Defendants should have applied for their fourth quarter 2016 DCF model was their own 14.4% CAGR that was disclosed to investors, and that Defendants themselves used to support the existence of Teva's original $23.1 billion goodwill for the U.S. generics reporting unit when Teva acquired Actavis in 2016.

552.   In the 1Q2017 Form 6-K filed on May 11, 2017, Teva assured investors of its continuous monitoring of "events or changes in circumstances that may impact the valuation of our goodwill" and concluded that nothing affected its conclusion that the fair value estimates were greater than the carrying amounts of the goodwill.  In fact, not only did Teva fail to recognize any impairment of its overvalued goodwill, it actually increased the amount of goodwill relating to its Actavis acquisition and its generics segment.  Teva increased the goodwill of its generics segment by $590 million from $32.863 billion to $33.453 billion as of March 31, 2017. Since Teva's goodwill was still impaired at the first quarter of 2017, the reported goodwill was overstated by at least $7.6 billion or 33% of Teva's reported $23.1 billion goodwill as of the first quarter of 2017.

553.   In the 2Q2017 Form 6-K filed on August 3, 2017, Defendants reported "a goodwill impairment charge of $6.1 billion related to [Teva's] U.S. generics reporting unit."  Defendants

---

[17]   *See* Teva, Current Report (Form 6-K), *Enhancing Teva's Growth Profile* (July 27, 2015).

however, knew that GAAP required a much larger goodwill impairment charge of at least $8.9 billion – $2.8 billion more than they recorded for the second quarter of 2017. In their DCF model for the second quarter of 2017, Defendants again purposefully inflated the fair value of the U.S. generics reporting unit by applying an abnormally low discount rate and an abnormally high terminal growth rate that they knew market participants would not use to value the reporting unit.

554. For the second quarter of 2017, Defendants stated in their November 2, 2017 3Q2017 Form 6-K that Teva applied the following expected future cash flow assumptions:

> Teva expects revenue and operating profits to continue to decline in the next two years, as its ability to successfully launch new generic products is not expected to offset or exceed the price and volume erosion for its existing portfolio prior to 2020, following which time, in 2020 and 2021, Teva expects to return to moderate growth.

Defendants' however, applied an effective CAGR of 7.4% for the second quarter of 2017, which did not comport with a "cash flow decline in the next two years," followed by a "return to ***moderate*** growth." A 7.4% cash flow CAGR is mathematically equivalent to a small decline in the first two years, followed by consecutive 16.6% increases in cash flows for future years 2020 and 2021. Defendants' effective 16.6% CAGR for future years 2020 and 2021 does not comport with "moderate growth," since Defendants themselves have characterized a 14.4% CAGR as "strong free cash flow" growth.

555. Furthermore, Defendants also admitted in the 3Q2017 Form 6-K to

> certain developments in the U.S. market [during the second quarter of 2017], which negatively impacted Teva's outlook for its U.S. generics business [including the following]: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products.

Nonetheless, to give Defendants the benefit of the doubt, Plaintiffs have made no changes to Defendants' aggressive, biased 7.4% implicit cash flow CAGR assumption for the second quarter of

2017.  And even though such an aggressive, biased assumption cuts against Teva's own recognized $6.1 billion goodwill impairment at the second quarter of 2017, which was greatly understated, Plaintiffs' analysis assumes no adjustments to Defendants' cash flow assumptions for the second quarter of 2017.[18]

556.    For the third quarter of 2017, Teva did not take any impairment for goodwill.  In the 3Q2017 Form 6-K, filed on November 2, 2017, Teva falsely assured investors that the Company conducted impairment testing of goodwill for the third quarter of 2017 and that the goodwill fair value was actually higher than carrying value even though the Company claimed that it had lowered future cash flow projections.  Defendants falsely stated that the amount of goodwill was $29.2 billion for the generics segment and $39.4 billion for all reporting units as of September 30, 2017. Defendants stated in the 3Q2017 Form 6-K: "As of September 30, 2017, Teva adjusted the projections for its U.S. generics reporting unit to reflect favorable events, partially offset by further increased pressure in the U.S. generics market."  Since Teva's goodwill was still impaired at the third quarter of 2017, the reported goodwill was overstated by at least $8.0 billion, or 52% of Teva's reported $15.5 billion goodwill as of the third quarter of 2017.

### b.    Teva's Discount Rate and Terminal Growth Rates Were Improperly Inflated

557.    Two other critical inputs for goodwill in the DCF model are the discount rate and terminal growth rate.[19]  The discount rate is "a rate of return used to convert a future monetary sum into [a] present value."  AICPA, Statements on Standards for Valuation Services, VS Section 100, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset* (June 2007).

---

[18]  Had a more appropriate CAGR rate of 6.4% been used, Teva's impairment charge would have been understated by $3.1 billion.

[19]  These two inputs have a greater impact on the goodwill measurement than projected cash flow because relatively small decreases in the discount rate and/or relatively small increases in the terminal growth rate can dramatically inflate the goodwill fair value measurement.

The discount rate reflects macroeconomic risk, such as interest rate risk and the risk of recession, as well as industry risks.  "***The discount rate is a market-driven rate.  It represents the expected yield rate – or rate of return – necessary to induce investors to commit available funds to the subject investment, given its level of risk***."  Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 182 (2008) (emphasis in original).  The terminal growth rate measures the perpetual cash flow growth rate after the end of the discrete period and is used to measure the terminal or residual value of the business.  "If [the] company is in an industry subject to vigorous competitive pressure, with little prospect for real growth without large capital expenditures, then perpetual growth at the rate of expected long-term inflation may be reasonable (i.e., zero real growth)."  *Id.* at 248.

558.    Defendants used a 6.8% discount rate and a 2.0% terminal growth rate for the fourth quarter of 2016, first quarter of 2017, second quarter of 2017, and third quarter of 2017.  For the fourth quarter of 2017, Defendants increased the discount rate to 7.3% and continued to apply a 2.0% terminal growth rate.  Defendants knew that a 6.8% discount rate for the fourth quarter of 2016, first quarter of 2017, second quarter of 2017, and third quarter of 2017 was abnormally low and a 2.0% terminal growth rate for those quarters was abnormally high.  The discount rate and the terminal growth rate that Defendants used did not reflect rates that market participants would use in a DCF model of the U.S. generics reporting unit, as required by GAAP.  As discussed below, GAAP also required that Defendants use observable inputs to the extent possible.  And Defendants had no empirical or verifiable basis to support their inputs, which inflated the U.S. generics reporting unit's fair value in violation of GAAP.

559.    For the fourth quarter of 2017, Defendants belatedly wrote down $10.4 billion for goodwill impairment for the U.S. generics reporting unit, wiping out a total of $16.5 billion of

goodwill in fiscal 2017, representing more than 71% of the reporting unit goodwill balance that was originally reported in fiscal 2016.

560.    When the cash flow projections discount rate and the terminal growth rate for the fourth quarter of 2016 through the third quarter of 2017 are adjusted to rates that market participants would use in accordance with GAAP, the U.S. generics reporting unit's goodwill was actually impaired by $8.5 billion in the fourth quarter of 2016, $7.6 billion in the first quarter of 2017, $7.6 billion in the second quarter of 2017, and $8.9 million in the third quarter of 2017.  As a result of improperly accounting for goodwill, Teva's operating income, net income and EPS were materially overstated as depicted in the chart below.

Corrected Income Statement Line Items for Teva Pharmaceuticals Limited
(in millions of dollars, except shareholder earnings and percentages)

| | YE 2016 Reported | Corrected YE 2016 | 1Q 2017 Reported | Corrected 1Q 2017 | 2Q 2017 Reported | Corrected 2Q 2017 | 3Q 2017 Reported | Corrected 3Q 2017 |
|---|---|---|---|---|---|---|---|---|
| Goodwill Impairment charges | 900 | 8,500 | | 7,600 | 6,100 | 8,900 | - | 8,000 |
| Net income (loss) attributable to ordinary shareholders | $    68 | $  (2,727) | $   580 | $  (6,423) | $  (6,035) | $  (8,825) | $   530 | $ (40,680) |
| Earnings Per Share - Basic | $  0.07 | $   (2.86) | $  0.57 | $  (6.32) | $  (5.94) | $  (8.68) | $  0.52 | $  (40.00) |
| Overstatement of Earnings per share | | 102% | | 109% | | 32% | | 101% |

### 2.    GAAP Provisions Concerning Goodwill and Goodwill Impairment

561.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying . . . the acquisition method." ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 350-20-35-16 states that "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill."

- 201 -

562.    "A reporting unit is an operating segment [of a company] or one level below an operating segment (also known as a component)."  ASC 350-20-20 Glossary.  Although Teva classified generics as a separate segment, for goodwill reporting purposes, Defendants treated the U.S. generic part of the generics segment as a separate reporting unit for measuring applicable goodwill impairment.

563.    ASC 350-20-35-2 states that "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20.  ASC 350-20-35-28 requires goodwill to be tested annually and, as is at issue here, for any quarter when certain circumstances are present.

564.    ASC 350-20-35-3A requires that a company test goodwill for any quarter when an assessment of "qualitative factors" determines that "more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill."  This qualitative assessment is sometimes referred to as "step zero," since the goodwill impairment test itself involves GAAP procedures referred to as "step one," followed by "step two," if required, as discussed in detail below.[20]

565.    GAAP requires goodwill impairment analysis testing for any quarter when certain triggering events are present "that would more likely than not reduce the fair value of a reporting

---

[20]    Instead of performing step zero, "[a]n entity has an unconditional option to bypass the qualitative assessment . . . and proceed directly to performing the first step of the goodwill impairment test. An entity may resume performing the qualitative assessment in any subsequent period." ASC 350-20-35-3B.

unit below its carrying amount." ASC 350-20-35-30.[21]  As noted in ASC 350- 20-35-3C, examples

of such triggering events include, but are not limited to, the following:

- Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets

- Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development

- Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows

- Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods

- Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation

- Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit

- If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

566.    ASC 350-20-35-3E required Defendants to test for goodwill impairment if any

triggering events, including but not limited to any of the examples given above, alone or in

combination, made it more likely than not the fair value of the reporting unit is less than the book

value or carrying amount.  ASC 350-20-35-3E also provides that the triggering events must be

considered holistically.  In other words, even if no individual triggering event is sufficient, on its

---

[21]  "Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC-350-20-35-30.

own, to make it more likely than not the fair value of the reporting unit is less than the book value, if the "totality" of the events and circumstances described above, as applied to Teva's U.S. generics reporting unit, made it more likely than not that the fair value of a reporting unit at each quarter was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.

567.    Moreover, factors that were based on observable inputs are entitled to greater weight than those based on inputs (such as forecasts) in the step zero analysis because observable inputs reflect the assumptions market participants would use.  ASC 820-10-05-1C requires that:

> When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs.  Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk.

*Cf.* FASB Statement of Accounting Concepts No. 8 ("SFAC No. 8") at 18 (accounting must strictly avoid bias, slanting and manipulation undertaken "to increase the probability that financial information will be received favorably").

568.    During the first three quarters of 2017, by Defendants' own admissions and/or objective facts, Teva's U.S. generics reporting unit met at least three of the specific triggering circumstances set forth in ASC 350-20-35-3C, as well as other factors that they were required to consider under ASC 350-20-35-3F.  These circumstances and factors indicated that this reporting unit's goodwill was more likely than not impaired, requiring testing of goodwill.

569.    ***Decline in overall financial performance***.  The generic segment's continuous poor overall financial performance indicated that the U.S. generics reporting unit's goodwill was more likely than not impaired. ASC 350-20-35-3C(d).   Because the decline in overall financial

performance was an observable input available to market participants, it was entitled to substantial weight in the step zero analysis. ASC 820-10-05-1C.

570.   ***Increased competition and changes in industry conditions and the market for generic drugs***.  Defendants repeatedly represented that the generics segment and the U.S. generics reporting unit in particular faced increased competition and changed industry conditions.  Pursuant to ASC 350-20-35-3C(b), the existence of increased competition and changed industry and/or market conditions added to the requirement that the Company test for goodwill impairment each quarter. Because increased competition, the change in industry conditions, and the market for Teva's generic drug products were observable inputs available to market participants, they were entitled to substantial weight in the step zero analysis.  ASC 820-10-05-1C.

571.   ***A sustained decrease in share price (and corresponding decline in market capitalization)***.  ASC 350-20-35-3C(g) also indicates that "a sustained decrease in share price (consider[ed] in both absolute terms and relative to peers)," can be a triggering event that requires testing for goodwill impairment.  In fact, when Defendants belatedly reported that the U.S. generics reporting unit's goodwill was impaired as of the second quarter of 2017 and the fourth quarter of 2017, they themselves ascribed the decrease in the Company's market capitalization as indicators of goodwill impairment.  Because Teva's stock price decline and its corresponding decline in market capitalization were observable inputs available to market participants, they were entitled to substantial weight in the step zero analysis.  ASC 820-10-05-1C.

572.   Importantly, Teva did not need to perform step two to comply with GAAP. Completing step one of the goodwill impairment test was sufficient.  Defendants acknowledged this as follows:

> In January 2017, the Financial Accounting Standards Board ("FASB") issued guidance on goodwill impairment testing. The new guidance reduces the complexity of goodwill impairment tests by no longer requiring entities to determine goodwill

impairment by calculating the implied fair value of goodwill by assigning the fair value of a reporting unit to all of its assets and liabilities as if that reporting unit had been acquired in a business combination. Teva adopted the provisions of this update in the first quarter of 2017. The amount of goodwill impairment charge was determined in accordance with this new guidance.

2Q2017 Form 6-K, filed August 3, 2017.

### 3. Defendants Failed to Properly Perform the Goodwill Impairment Tests Required by GAAP

573.   The Defendants well understood goodwill and the proper procedures and calculations for determining goodwill impairment under GAAP as described above.  "Goodwill is largely attributable to expected synergies following the acquisitions, as well as future economic benefits arising from other assets acquired that could not be separately recognized at this time."  3Q2017 Form 6-K.  The Defendants recognized that when applying the DCF income valuation method that "Cash flow projections are based on management's estimates of revenue growth rates and operating margins, *taking into consideration industry and market conditions*."  2016 Form 20-F.  The Defendants also knew that in the DCF model the discount rate used is based on the "weighted-average cost of capital *adjusted for the relevant risk associated with business-specific characteristics*."  *Id.*

574.   Teva ultimately disclosed information about those inputs and assumptions.  When Teva took its $10.4 billion write-down in February 2018, it also disclosed information that revealed the inputs and assumptions used to compute the fair values and the carrying values (book values) of the U.S. generics reporting unit during the fourth quarter of 2016 through the third quarter of 2017.

575.   Defendants' DCF models used during the pertinent period relied entirely on unsupported and unreasonable inputs and assumptions that Defendants knew did not comport with GAAP.  Defendants knew, for example, that:

> *Estimates of future cash flows* used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and *shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections.*

ASC 360-10-35-30.[22]   In particular, GAAP states that, "[i]n developing unobservable inputs, *a reporting entity may begin with its own data, but it shall adjust those data if reasonably available information indicates that other market participants would use different data*." ASC 820-10-35-54A.

576.     According to GAAP, a "reporting entity shall measure the fair value of an asset or a liability using the assumptions that market participants would use in pricing the asset or liability, assuming that market participants act in their economic best interest." ASC 820-10-35-9.  GAAP defines market participants as:

> Buyers and sellers in the principal (or most advantageous) market for the asset or liability that [among other things] are independent of each other, that is, they are not related parties [and] are knowledgeable, having a reasonable understanding about the asset or liability and the transaction using all available information, including information that might be obtained through due diligence efforts that are usual and customary.

ASC 820-10-20, Glossary.

577.     For Defendants' discount rates and terminal growth rates, they also deliberately failed to apply reasonable, supportable, and verifiable inputs in accordance with GAAP.  For example, ASC 820-10-05-1C requires that:

> *When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of*

---

[22]   Although ASC 360 applies to long-lived assets, specifically property, plant and equipment, this guidance similarly applies to the ASC 350 income approach's use of future cash flows in the DCF model.  "If the guidance for a transaction or event is not specified within a source of authoritative GAAP for that entity, an entity shall first consider accounting principles for similar transactions or events within a source of authoritative GAAP for that entity and then consider nonauthoritative guidance from other sources."  ASC 105-10-05-2.

*relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk.*

Cf. SFAC No. 8 at 18 (accounting must strictly avoid bias, slanting and manipulation undertaken "to increase the probability that financial information will be received favorably"). "The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (**Level 1 inputs**) and the lowest priority to unobservable inputs (**Level 3 inputs**)." ASC 820-10-35-37 (emphasis in original). "**Level 2 inputs** are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly." ASC 820-10-35-47 (emphasis in original). "Level 2 inputs include . . . **market-corroborated inputs**." ASC 820-10-35-48 (emphasis in original).

578. Defendants' failure to recognize and book the goodwill impairment charge at the fourth quarter of 2016 for the U.S. generics reporting unit, when GAAP required the goodwill impairment charge, is a common fraud scheme. In an academic study, Kevin K. Li and Richard G. Sloan concluded that the implementation of what was previously referred to as SFAS 142 (currently ASC 350) has resulted in "relatively inflated goodwill balances and untimely impairments." They also concluded, precisely as Defendants did here, that "managers . . . [exploit] the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."[23]

---

[23] Kevin K. Li & Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (Jan. 23, 2015), http://ssrn.com/abstract=1466271 (last visited Apr. 26, 2019). Professor Sloan is the Emile R. Nimela Chair in Accounting and International Business at the Hass School of Business, University of California, Berkeley, and serves as an editor, associate editor, or on the editorial board of *Review of Accounting Studies*, *Accounting Review*, *Accounting and Finance*, *Journal of Accounting and Economics*, and *Journal of Finance Economics*.

579.    Timely recognition of goodwill impairments is critical to investors because, when a goodwill impairment is announced, investors revise their company performance expectation downward.  An academic study by Zining Li, Pervin Shroff, Ramgopal Venkataraman, and Ivy Zhang confirms this is the case:

> Our results show that on average the market revises its expectations downward on the announcement of a goodwill impairment loss and the downward revision is related to the magnitude of the impairment loss.
>
> *        *        *
>
> We further examine how the market reacts . . . when a firm with potentially impaired goodwill does not announce a goodwill impairment loss . . . .
>
> *        *        *
>
> [W]e find no evidence that market participants revise their expectations at the time of revelation [reporting] of a zero impairment loss.[24]

"We further show that the impairment loss serves as a leading indicator of a decline in future profitability due to a slow-down in sales and/or higher operating costs."  *Id.* at Abstract.  In other words, when a company announces a goodwill impairment, investors revise their future cash flow expectations downward and the stock price falls in relation to the magnitude of the reported impairment loss.  On the other hand, if investors are aware of factors that could potentially result in goodwill impairment (called "triggers" in accounting), but the company concludes that goodwill is not impaired, then investors do not revise their expectations downward even though they are aware of goodwill impairment indicators.

580.    When Defendants belatedly recognized $6.1 billion and $10.4 billion goodwill impairments as of the second quarter of 2017 and the fourth quarter of 2017, respectively, financial analysts provided commentary about the adverse consequences of the goodwill announcements to

---

[24]    Zining Li, Pervin K. Shroff, Ramgopal Venkataraman & Ivy Zhang, *Causes and Consequences of Goodwill Impairment Losses*, Social Science Research Network (May 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=590908 (last visited Apr. 26, 2019).

the future of the Company.  The "$14 billion in additional goodwill and other impairments taken this quarter [fourth quarter 2017] foreshadows further deterioration in the business."  Morningstar Equity Research, *Teva's Operational and Debt Problems Result in Disappointing 2018 Outlook* (Feb. 8, 2018).  "We expect these challenges to continue for the next several quarters and the company took a large goodwill impairment charge in 4Q (~$11Bn) mainly due to these challenges."  Credit Suisse, *We Expect TEVA's US Generics Business to See Some Stability Starting in 2017* (Feb. 11, 2018). "Teva reported goodwill [and other] impairments of $17.1B in 2017, mainly due to headwinds in its U.S. generics unit.  Therefore, it is not clear if U.S. generic drug pricing has stabilized yet."  Cantor Fitzgerald Equity Research, *Prescribing Big Change, But Return to Growth Could Take Time* (Feb. 8, 2018).  "Teva took a $17.1 billion goodwill [and other] impairment[s], which investors should see as reflective of how challenging the situation is."  Wells Fargo Equity Research, *TEVA: 4Q17 First Look – Trends Look Poor* (Feb. 8, 2018).

581.    The consensus total Company terminal growth rate that financial analysts used for the second quarter of 2017, however, was 0.0%.  Consequently, Teva's 2% terminal growth rate that it used for the second quarter of 2017 was not "in line with [the] recent general outlook for [the] U.S. generics [market]."  For the data used to be "neutral" and to have "verifiability" in accordance with the requirements of SFAC No. 8, Teva should have used a 0.0% terminal growth rate assumption for the U.S. generics reporting unit as of the second quarter of 2017.  Similarly, using the consensus terminal growth rates based on the corresponding financial analyst reports for each quarter, the consensus terminal growth rates that market participants would use was 0.8% for the fourth quarter of 2016, 0.0% for the second quarter of 2017 and 0.3% for the third quarter of 2017.

582.    Teva should also have relied on the consensus financial analyst terminal growth rates because that data was verifiable and supported, whereas Teva's 2.0% terminal growth rate assumption lacked the verifiability required by GAAP.  "Verifiability helps assure users that

information faithfully represents the economic phenomena it purports to represent.  Verifiability means that different knowledgeable and independent observers could reach consensus, although not necessarily complete agreement, that a particular depiction is a faithful representation."  SFAC No. 8.

583.     When Plaintiffs applied the inputs and assumptions that market participants would use, as required by GAAP,  and even incorporated some of Defendants' overoptimistic (biased) cash flow growth assumptions, Defendants should have recognized the following goodwill impairments:

Corrected U.S. Generic Reporting Unit DCF Models Based on Market Participants' Inputs and Assumptions
(in millions of dollars, except percentages)

| | Quarters | | | |
|---|---|---|---|---|
| | 31-Dec-16 | 31-Mar-17 | 30-Jun-17 | 30-Sep-17 |
| Market Participant Discount Rate | 7.8% | 7.8% | 8.1% | 8.0% |
| Market Participant Terminal Growth Rate | 0.8% | 0.8% | 0.0% | 0.3% |
| Cash Flows | $950 | $950 | $900 | $950 |
| Cash Flow Growth Rate | 14.4% | 14.4% | 7.4% | 6.2% |
| | | | | |
| Corrected Fair Value | $   22,500 | $   22,500 | $   15,100 | $   16,000 |
| Carrying (Book) Value at Start of Quarter | $   30,100 | $   30,100 | $   30,100 | $   24,000 |
| Corrected Quarterly Goodwill Impairment | $   (7,600) | $   (7,600) | $   (15,000) | $   (8,000) |
| Goodwill Impairment Recognized By Teva | $   - | $   - | $   (6,100) | $   - |
| Additional Goodwill Impairment Teva Should Have Recognized | $   (7,600) | $   (7,600) | $   (8,900) | $   (8,000) |

584.     And when the corrected goodwill impairments to the U.S. generics reporting unit were made to Teva's financial statements, Teva's operating income, net income, and EPS were materially overstated for each quarter in the fourth quarter of 2016 through the third quarter of 2017, as follows:

Corrected Income Statement Line Items for Teva Pharmaceuticals Limited
(in millions of dollars, except shareholder earnings and percentages)

| | YE 2016 Reported | Corrected YE 2016 | 1Q 2017 Reported | Corrected 1Q 2017 | 2Q 2017 Reported | Corrected 2Q 2017 | 3Q 2017 Reported | Corrected 3Q 2017 |
|---|---|---|---|---|---|---|---|---|
| Goodwill Impairment charges | 900 | 8,500 | | 7,600 | 6,100 | 8,900 | - | 8,000 |
| Net income (loss) attributable to ordinary shareholders | $   68 | $   (2,727) | $   580 | $   (6,423) | $   (6,035) | $   (8,825) | $   530 | $   (40,680) |
| Earnings Per Share - Basic | $   0.07 | $   (2.86) | $   0.57 | $   (6.32) | $   (5.94) | $   (8.68) | $   0.52 | $   (40.00) |
| | | | | | | | | |
| Overstatement of Earnings per share | | 102% | | 109% | | 32% | | 101% |

### K.    Actionable False and Misleading Statements and Omissions

585.    During the Relevant Period, Defendants made eight types of false and misleading statements or omissions on conference calls with investors, in SEC filings, and in Company reports and documents:

- <u>False Statements Regarding Competition.</u>  These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs. To the contrary, Teva made dozens of price increases in tandem with its competitors. Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Pricing Statements.</u>  These statements concealed Teva's Price-Hike Strategy and the profits it generated. Later, the statements concealed that the Price-Hike Strategy fell apart as Teva was unable to make more price increases or sustain the Inflated Profit, including the Collusive Profit. These statements were particularly misleading, as Defendants touted, and investors were highly attuned to, the sources of the generics segment's purported success.

- <u>Concealed Receipt of Subpoenas and Subsequent Denials.</u>  Defendants failed to disclose in the Notes Offering Materials Teva's receipt of subpoenas from the DOJ and the State AGs in connection with their antitrust investigations into the generics industry.  Even after the disclosures of the subpoenas, Teva continued to deny having participated in any collusive conduct.

- <u>False and Misleading Statements Relating to the Actavis Acquisition.</u>  These statements concealed the negative impact of the Actavis acquisition and integration on Teva's financial results and business prospects.

- <u>False and Misleading Statements Relating to Goodwill.</u>  Beginning in the fourth quarter of 2016, and through the end of the Relevant Period, Teva materially overstated the value of its goodwill and inflated its balance sheet and operating results by billions of dollars.  In particular, Defendants, in violation of GAAP, used bogus inputs for Teva's DCF model which included inflated future cash flow projections, based on abnormally low discount rates and abnormally high terminal growth rates.  In addition, Defendants made false and misleading disclosures about Teva's goodwill valuations and testing.

- <u>False and Misleading Statements Explaining Financial Results.</u>  These statements explained the sources and drivers of Teva's financial results but failed to disclose that the Company's financial performance was positively impacted or mitigated by the Inflated Profit, including the Collusive Profit.

- <u>False and Misleading Statements Concerning Legal Compliance.</u>  These statements falsely and unequivocally represented that Teva was in compliance with laws and regulations and covenanted to the Company's continual compliance.  In truth, Teva was engaged in illegal anti-competitive activities that constituted violations of

- 212 -

antitrust laws and exposed the Company to significant risk of prosecution, along with the attendant financial and reputational harm.

- <u>False and Misleading Statements Relating to the Bribery Schemes.</u>  These statements concealed that Teva was involved in worldwide bribery schemes centered around its key drug Copaxone and touted Teva's long history of supposedly ethical business practices globally.

### 1.    False and Misleading Statements Regarding Competition

586.    Throughout the Relevant Period, on conference calls, in Teva's SEC filings, and in the Company's reports and publications, Defendants made materially false and misleading statements concerning the purported:  (i) "intense" competition on price in the U.S. market for generic drugs, and (ii) "fierce" competition against "strong competitors" such as Mylan, Perrigo, Actavis, Sandoz and Heritage.  These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, providing access for patients to life-saving medicines.

587.    Defendants' statements about supposed competition on price by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on at least 48 occasions, raised their prices in tandem, often by very large amounts of well over 100%, rather than using lower prices to increase market share.  Of the 48 occasions, at least 17 price increases were conducted collusively.  Teva would also raise the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally choose not to.

588.    In each of the 2013 Form 20-F (filed February 10, 2014), 2014 Form 20-F (filed February 9, 2015), 2015 Form 20-F (filed February 11, 2016), 2016 Form 20-F (filed February 15, 2017), 2017 Form 10-K (filed February 12, 2018), and 2018 Form 10-K (filed February 19, 2019), Defendants made substantially similar false and misleading statements with slight insignificant variations (incorporated by reference in each quarterly filing and the ADS/Preferred Registration Statement) that: (i) warned investors that "intense" competition was a primary risk Teva faced in the U.S. generic drug market, and that competition would force the price of generic drugs down as competitors "compet[ed] for advantage based on pricing," as would be expected; and (ii) described how the Company's competitive advantages included its "competitive pricing strategy," its product portfolio, and the ability to launch new generics:

> *Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals*.

<div align="center">*      *      *</div>

> Sales of generic pharmaceuticals have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . .  *These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line*.

<div align="center">*      *      *</div>

> *In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers*, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. *Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-*

<div align="center">- 214 -</div>

*effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy*.

589.    Each of the 2013 Form 20-F, 2014 Form 20-F, 2015 Form 20-F, 2016 Form 20-F, 2017 Form 10-K, and 2018 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Desheh (2013 Form 20-F, 2014 Form 20-F, 2015 Form 20-F, and 2016 Form 20-F), Altman (2013 Form 20-F), Vigodman (2014 Form 20-F and 2015 Form 20-F), Peterburg (2016 Form 20-F), McClellan (2017 Form 10-K and 2018 Form 10-K), and Schultz (2017 Form 10-K and 2018 Form 10-K) stating that the financial information contained in the Forms 20-F and Forms 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.   In addition, Desheh, Altman, Vigodman, Peterburg, Schultz, and McClellan certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures ensured that "information required to be disclosed in reports that [Teva] files or submits under the Exchange Act [was] recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms, and that such information is accumulated and communicated to its management, including the chief executive office and chief financial officer, as appropriate to allow timely decisions regarding required disclosure."

590.    The statements in ¶¶588-589 were materially false and misleading or omitted material facts.  In particular:

(i)        Defendants' statements above concerning Teva's "primary competitive advantages" and "competitive pricing strategy," that the Company "compet[ed] for advantage based on pricing" and "face[d] intense competition," and that "[p]rices of generic drugs typically decline, often dramatically" when new competitors entered the market were materially false and misleading when made because: (a) Teva had gained its competitive advantage through illegal price fixing and

market allocation schemes and the anti-competitive Price-Hike Strategy; (b) Teva's pricing strategy was not competitive and the Company conducted at least 76 price increases on selected generic drugs between 2013 to 2016 without competitors competing on price, with at least 48 increases made in tandem with purported competitors and at least 17 increases made collusively; and (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs; and

(ii)    Defendants' statements above concerning "margin pressures" from "[p]rice competition" were materially false and misleading when made because Teva's profit margin improved significantly between 2013 to 2019 with over $2.75 billion of Inflated Profit, of which at least $1.57 billion was Collusive Profit – all of which was generated with insignificant price competition.

591.    In addition to Forms 20-F and filings that incorporated them by reference, in each of its Form 6-K quarterly financial results filings, Teva touted its competitive position and pledged to increase its U.S. leadership position through its commitment to regulatory compliance:

> **We expect that our U.S. market leadership position will continue to increase as a result of** the enhancement of our specialty business, our ability to introduce new generic equivalents for brand-name products on a timely basis, our emphasis on customer service, the breadth of our product line, **our commitment to regulatory compliance and quality and our cost-effective production**.

592.    On July 27, 2015, Teva filed a Form 6-K signed by Desheh that described the Company's "strong generics portfolio" as a competitive advantage that drove the delivery of generic drugs at "competitive prices":

> **When combined with Teva's strong generics portfolio**, Allergan Generics' world-class generics pipeline, which holds a leading position in first-to-file opportunities in the U.S., will further enhance **Teva's goals of delivering the highest quality generic medicines at the most competitive prices** and cultivating the best development pipeline in the industry.

593.     On the same day, Teva hosted a conference call in which Olafsson emphasized the competitiveness of the U.S. generics market and characterized Teva's co-conspirators as "strong competitors in the market."  In turn, Vigodman claimed that "[w]e believe in competition" while discussing the Company's improved performance:

> [Olafsson:]  ***I think both Mylan and Perrigo individually are strong competitors in the market.  Remember, the US generic market is very competitive***.  There are over 200 generic companies.  ***So it's a fierce competition on most of the portfolio if not all of the portfolio***.
>
>         *   *   *
>
> [Vigodman:]  [W]e promise to do everything in our power to basically take the Company to be able to continue the improvement that we have been witnessing here. ***We believe in competition***, and will do what is needed in order to win in all the markets we operate.

594.     During Teva's third quarter 2015 earnings call on October 29, 2015, Olafsson boasted about the Company's stellar performance in the generics business despite competition in the market, including from Actavis, and emphatically stated that "pricing is obviously based on the competition":

> But overall, we will be in the range of 28% operating profit from the generics, which really is first class with the countries we're operating in today. . . .
>
>     . . . ***It is not easy in the competition today*** . . . .
>
>         *   *   *
>
> So what has happened with the Actavis generics?
>
>     . . . ***We're competing with them in the market on a day-to-day business***.
>
>         *   *   *
>
>     So on the pricing, ***I think pricing is obviously based on the competition.  We have talked about that the overall pricing trend is down***.

595.     During a Jefferies LLC Global Healthcare Conference on November 19, 2015, Desheh highlighted the competitiveness of the U.S. generic drug market and falsely represented that Teva played the competitive game fairly, "by the book and by the rule":

- 217 -

*Generic prices?  There are no – I believe there are many examples for competitive environment, real competition, like we see in the generic market in the United [S]tates*.

\*     \*     \*

*So we are playing the competitive game.  We are playing it fairly.  We, of course, play by the book and by the rule.  And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have*. . . .

But we also saw that there is a floor to this.  And the floor is an economic and business model.  And wherever prices have come down to a level that it doesn't make sense, companies like us just pull out.  We refuse to participate in tenders that generate no profit and we just pull out. *You pull out, prices go up because there is less supply over the demand.  And we are, in short, playing in a very competitive market. And that's a global phenomenon, not just limited to the US*.

596.    The statements in ¶¶591-595 were materially false and misleading or omitted material facts.  In particular:

(i)    Defendants' statements above concerning Teva operating in a "competitive environment" and a "very competitive market," facing "fierce competition on most . . . if not all of the portfolio," playing "the competitive game . . . fairly," believing in competition and delivering "generic medicines at the most competitive prices," with pricing "based on the competition," and that "the overall pricing trend is down" were materially false and misleading when made because: (a) Teva did not operate in a competitive market, as the marketplace for many of its key generic drugs was tainted by illegal price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy; (b) pricing for Teva's generic drugs was not competitive or trending down, as the Company implemented at least 71 massive price increases on selected generic drugs between 2013 to 2015 without competitors competing on price, with at least 48 increases made in tandem with purported competitors and at least 17 increases made collusively; and (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs; and

(ii)     Defendants' statements above that "Mylan and Perrigo individually are strong competitors in the market" and that Teva was competing with Actavis on a "day-to-day" basis were materially false and misleading when made because Teva had engaged in collusive anti-competitive activities with Mylan, Perrigo and Actavis and implemented price hikes in tandem with these purported competitors.

597.    On January 5, 2016, Teva published its 2014 Global Citizenship Report, signed by Vigodman.  In the report, the Company emphasized its "operational efficiencies" as a competitive advantage in maintaining "competitive market pricing positions":

> **Much of our core business drives access to affordable healthcare** through our ongoing investment in new generic products and their registration in national markets for the benefit of local patients.  **Our continued focus on operational efficiencies enables us to maintain competitive market pricing positions**.

598.    On February 11, 2016, during the fourth quarter 2015 earnings call, Olafsson again stressed to investors the intense competitiveness of the U.S. generics drug market for every generic drug, with Teva "fighting on a molecule by molecule basis" after product launches and engaging in "fierce competition" with Actavis in particular:

> **There is a lot of competition in the US, there is no question about it.  As you well know, there are over 200 generic competitors in the US market and the competition is fierce**.

*          *          *

> **There is a [sic] still a very fierce competition between Actavis Generics and Teva in the market today, there's no question about that.  We basically launched the product.  We compete on pricing**.  And you have to keep in mind that especially in the – in the bigger market, **both in the US and Europe, you are really fighting on a molecule by molecule basis.  If there is a lowering of the prices, you either have to walk away from the business and that's that.  And that is the fact of the US business**, and that doesn't change anything around the combination of the two companies.

599.    On May 9, 2016, Teva held its first quarter 2016 earnings call, in which Olafsson discussed the U.S. generics market competition.  Again, he reiterated there was fierce competition in

- 219 -

the market and that Teva was competing "forcefully" against Actavis.  He further represented that

Teva "walk[ed] away when competition [was] too fierce" and discussed competition in the topical

space with pricing pressures faced by co-conspirators such as Perrigo and Sandoz:

> **We know, if we look at the US market, there's 230 generic companies that are competing, so the competition is fierce**. . . .

> . . . I think overall, the consolidation of the customers hasn't changed that much in the last 24 months, as I said in my prepared remarks on, **the change in the competition hasn't been that much.  So at this point in time, I don't see [sic] foresee any big changes in the pricing environment in the US or globally.  There's nothing on the horizon that changes my mind**.

> \*       \*       \*

> **We also walk away when the competition is too fierce on a product.  We are not trying to grow our market share, which affects the 4% market share**.

> \*       \*       \*

> [A]round the information we get from **Allergan**.  First of all, we have – **we are competitors in the market**. . . .  **We are competing very forcefully in the market until closing**.

> \*       \*       \*

> So on topicals now, I think there is some pricing pressure.  You've seen that maybe in the companies that are more exposed to topicals like Per[r]igo and Sando[z], to some extent they have been talking about more pricing pressure than we have been talking about, or Mylan or Allergan, so that could be a reason.

> **Overall, in topicals, the competition is a little bit less.  We are talking about usually maybe three to five competitors in the market, where you have on commodities maybe 18, 19 – up to 18, 19 competitors.  But currently, we are not that exposed to topicals ourselves**.

600.   On August 2, 2016, Teva filed a Form 6-K signed by Desheh that touted the

acquisition of Actavis, which enhanced Teva's competitive position in delivering generic medicines

"at the most competitive prices":

> This strategic acquisition brings together two leading generics businesses with complementary strengths, R&D capabilities, product pipelines and portfolios, geographical footprints, operational networks and cultures. **The result is a stronger, more competitive Teva**, well positioned to thrive in an evolving global marketplace,

- 220 -

to realize the opportunities the very attractive global and U.S. generics markets offer, and to *deliver the highest-quality generic medicines at the most competitive prices, unlocking value to patients, healthcare systems and investors around the world*.

601.    Two days later, during the second quarter 2016 earnings call, Olafsson again emphasized the fierce competition in the generic drug market – in particular, competition against Actavis and Emcure/Heritage, with Heritage having a significant impact on Teva's volume, but "very little impact on our profitability or the top line."  And when questioned about the opportunity to raise prices on selected products, he responded that market competition kept pricing in check, even for a sizeable company like Teva:

> But we also have versus previous years, *there's an impact from a third-party manufacturer in India, Emcure [Heritage] which has a significant volume impact, but very little impact on our profitability or the top line*.
>
> \*    \*    \*
>
> *[T]here has been a regular competition between Actavis and Teva*, but Teva always has used Anda in the past.
>
> \*    \*    \*
>
> *[W]ith the 208 generic companies in the US market, the competition is fierce. There's no question about it*. . . .
>
> . . . I think most companies have started to understand how the market functions.  *But it is a fierce competition in the market*.  There's no question in my mind, that with 208 companies with an – on average now from the FDA, approximately 55 to 60 approvals every month, we need to be on top of our game.
>
> \*    \*    \*
>
> [Chris Schott – JPMorgan – Analyst:]  As you kind of review the pro forma business, do you see the opportunity to raise price on select products here? . . .
>
> . . . [Olafsson:]  On the pricing, as you know, and we know that, the size really doesn't affect the pricing.  *And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing*.

602.    On September 9, 2016, Teva held a Generic Medicines Business Overview conference call during which Olafsson insisted that, because of the intense competition for each molecule, competitors were always willing "to take a little bit lower price":

- 221 -

*Remember that there's 208 generic companies out there that are offering product, and an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price. So it's a very competitive business we're in.*

603.    The statements in ¶¶597-602 were materially false and misleading or omitted material facts.  In particular:

(i)    Defendants' statements above concerning Teva maintaining its "competitive market pricing positions" through operational efficiencies were materially false and misleading when made because Teva had gained its competitive positions through illegal price fixing and market allocation schemes and the anti-competitive Price-Hike Strategy;

(ii)    Defendants' statements above concerning Teva driving "access to affordable healthcare," facing "a lot of competition" and fierce competition in the U.S. generics market, delivering "generic medicines at the most competitive prices" through "R&D capabilities, product pipelines and portfolios," and "always" encountering "somebody happy to take a little bit lower price" were materially false and misleading when made because: (a) Teva did not operate in a competitive market, as the marketplace for many of its key generic drugs was tainted by illegal price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy; (b) pricing for Teva's generic drugs was not competitive, as the Company implemented at least 76 instances of massive price increases on selected generic drugs between 2013 to 2016 without competitors competing on price, with at least 48 increases made in tandem with purported competitors and at least 17 increases made collusively; and (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs;

(iii)    Defendants' statements above concerning the "very fierce competition" between Actavis and Teva on pricing and competition with Perrigo and Sandoz in the topical market were materially false and misleading when made because Teva had engaged in collusive anti-

- 222 -

competitive activities with Actavis, Perrigo and Sandoz and implemented price hikes in tandem with these purported competitors;

(iv)    Defendants' statements above that there had been no significant change in the competitive and pricing environment in the United States were materially false and misleading when made because the anti-competitive practices in the generics industry that contributed substantially to the Company's financial results were drawing increased scrutiny, which made it difficult for Teva and other manufacturers to continue to implement price hikes; and

(v)    Defendants' statements above that Teva experienced "significant volume impact, but very little impact" on profitability from Heritage and that it walks away "when the competition is too fierce on a product" were materially false and misleading when made because Teva was engaged in an anti-competitive market allocation scheme by agreeing with Heritage and other manufacturers to not compete with each other by walking away from selected customers in certain markets to maintain heightened pricing.

604.    On May 11, 2017, during the first quarter 2017 earnings call, Peterburg claimed that Teva faced increased competition caused by the FDA, which led to pricing erosion:

> Our generic business is not immune to the challenges other companies in our industry are *currently facing with increased competition* and consolidation. ***This is reflected in the most recent analysis we completed that looks at net price erosion in our U.S.-based business, which came in at 7% versus the approximately 5% that we communicated previously. The 2 biggest contributing factors to this change are the ongoing consolidation of our key customers and the increase in generic drug approval by the FDA, which has created additional competition***.

605.    The statement above was materially false and misleading or omitted material facts because the anti-competitive practices in the generics industry that contributed substantially to the Company's financial results were drawing increased scrutiny, which made it difficult for Teva and other manufacturers to continue to conduct price hikes and led to pricing erosion and additional

- 223 -

competition.  In addition, Peterburg understated the rate of pricing erosion which was much higher than 7%.

### 2. False and Misleading Statements Regarding Teva's Price-Hike Strategy and Collusive Activities

606.    On October 31, 2013, Teva held its third quarter 2013 earnings call.  Participants from Teva included Desheh and Oberman.

607.    During the call, Oberman again reassured investors of Teva's efforts in improving profit margins, with a focus on tweaking "product by product" in a "margin enhancement strategy," but concealed that such strategy was driven by the Price-Hike Strategy, including collusive price hikes, to quickly increase profit margins with no incremental increase in cost:

> The word rationalizing leads you to believe there is a massive effort going on, and ***really what we are focused on is product by product. Individual products where we want to improve our margins in working together with Carlo and his team in reducing our costs . . . . It's a tweaking here and there of products that we are working very consciously on to improve our margin.*** Have we discontinued some products? Yes, but they are very few and very far between. ***I think you should view it more of a margin enhancement strategy*** than really a massive rationalization strategy.

608.    On December 10, 2013, Teva hosted its 2014 Business Outlook Conference Call. Oberman stated that the Company had increased prices on a number of generic products in 2013, and defendant Desheh affirmed that such price hikes will go directly to the bottom line – without disclosing that the price increases were part of widespread collusive activities:

> [Oberman:] ***We have been able to take pricing on a number of products this year and are forecasting next year to recoup some of that price erosion***.

<p align="center">*       *       *</p>

> [Desheh:] ***We do estimate, we do see price erosion trends of slowdown in Europe and in the United States***.  You heard it both from Allan and from Dipankar Bhattacharjee.  So I believe that at one point in time, ***it wouldn't take long, where all the improvement will go to the bottom line of the generic business***.

<p align="center">- 224 -</p>

609.    At least as early as the end of 2013, Teva published its 2012 Corporate Social Responsibility Report, signed by Desheh, which emphasized the Company's business as a provider of affordable generic medicines and unequivocally assured investors that its "sales and marketing efforts follow the laws and regulations of markets where we operate."  The report stated, in part:

Letter from the CEO

As one of the world's largest medicine companies, ***Teva has a tremendous responsibility to our patients, as well as to our customers, shareholders and employees and to the communities in which we live and work.  We consider this responsibility a foundation of doing business***, and are guided by our values – integrity, respect, collaboration, excellence and leadership – in everything we do.

\*       \*       \*

***We are also the world's leading provider of*** affordable ***generic medicines*** . . . .

\*       \*       \*

***Teva boasts more than 100 years of ethical and responsible business practices***.

\*       \*       \*

***Teva aims to build a culture of integrity and ethical behavior in every country where we do business.  We uphold the highest ethical standards for our Board of Directors, executives and employees***.

\*       \*       \*

***We offer a wide range of products, including many generic alternatives to innovative pharmaceuticals, that provide millions of people with sometimes life-saving access to affordable medicines***.

610.    On February 6, 2014, Teva held its fourth quarter 2013 and full year 2013 earnings call.  Participants from Teva included Desheh, Oberman and Altman.

611.    On the call, Defendants discussed the performance of the generics business in the United States.  Although Teva's U.S. generics business turned in 14% revenue growth in the fourth quarter and double-digit growth in last six months of 2014, Defendants attributed the improved

profitability to cost reduction and concealed the impact of the Price-Hike Strategy, including the

collusive activities, on profitability growth:

> [Altman:] ***Non-GAAP gross profit in 2013 was $11.9 billion or 58.6% of revenue, a decrease of $0.2 billion or 0.8% compared to 2012. This decrease was mainly the result of*** lower revenues of PROVIGIL, which lost its exclusivity, as well as the reduced revenue from additional exclusive generic products, mainly atorvastatin.

> ***These were partially offset by more profitable product mix mainly in the US generic business***, and higher COPAXONE revenue, as well as early contribution of our cost reduction program.

> \*          \*          \*

> [Desheh:] As to your question on the profitability our generic. ***You see the profitability of the generic business in Q4***. It's in line with what we have guided to 2014 and we believe that we're going to deliver that, at least. ***A lot of our cost reduction programs are going to hit the bottom line of the generic business, as we said. It's not a one-sided picture***.

> ***We are going to improve and get a lot of money into the bottom line over our generic business in order to improve competitiveness***.

> \*          \*          \*

> ***On the scale that we're seeing, our US generic business is definitely the most profitable part, with gross margin at about the 50%***. It's a little over 40% in Europe. It's around 35%, but improving next year, in Japan. It's close to 50% in emerging markets.

> \*          \*          \*

> [Oberman:] Building on what Eyal said, ***we are reporting a 14% top-line growth on the US generics business in the fourth quarter. In the back half of the year when we have an apples to apples comparison of six months versus six months, we reached double-digit growth. At the gross profit levels that Eyal was talking about, it is a very valuable business to Teva. And we see it continuing to be on a go-forward basis***.

612.    The statements in ¶¶601-611 were materially false and misleading or omitted material

facts. In particular:

> (i)      Defendants' statements above that Teva was a "leading provider of affordable

generic medicines" that upheld the "highest ethical standards" were materially false and misleading

when made because: (a) Teva was engaged in illegal price-fixing and market allocation schemes that caused generic drug prices to skyrocket; (b) Teva implemented at least 18 massive price increases on selected generic drugs during 2013, with at least 15 increases made in tandem with purported competitors; and (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 40 generic drugs; and

(ii)    Defendants' statements above concerning improving profitability through cost reduction and "profitable product mix" in the U.S. generic business mitigating profitability decline were materially false and misleading when made because: (a) Teva's financial results were inflated in part by collusive activities and the Price-Hike Strategy; and (b) the Company generated at least $250 million in Collusive Profit and Inflated Profit in 2013, which contributed significantly to the financial results.

613.    On May 1, 2014, Teva held its first quarter 2014 earnings call.  Participants from Teva included Vigodman and Desheh.

614.    During the call, Desheh recognized that Teva's significant revenue growth in the first quarter was driven by the U.S. generics business, and Vigodman targeted 600 basis points in profitability improvement in the generics business.  Vigodman asserted that Teva planned to achieve the profitability target by re-evaluating its generics business by product and by market through portfolio selection and management – without disclosing that such revenue and profitability growth would be driven by the Price-Hike Strategy and anti-competitive collusive activities:

> [Desheh:]  The improvement of our sales this quarter was nicely split between the generic and the specialty businesses.  ***In generics, we experienced significant growth in the United States market, with 17% year-over-year growth to a total of $1 billion, with a number of new product launches***.

<p style="text-align:center">*       *       *</p>

*The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market* and higher profitability in Europe.

\*        \*        \*

[Vigodman:] *We have been assessing markets and products, in order to terminate products and markets, which will not meet a minimum threshold of profitability.*

*I strongly believe that there is significant strategic and economic value in global generics leadership. Teva must regain focus on its generic business, with strong emphasis on portfolio selection and management, on R&D and innovation, on markets and product profitability, with the target to improve our profitability by the end of 2017 by at least 600 basis points.*

615.    On July 31, 2014, Teva held its second quarter 2014 earnings call. Participants from Teva included Vigodman, Desheh and Olafsson.

616.    During the call, Desheh attributed the generic segment's revenue and profitability growth to new launches in the United States, without disclosing the significant impact of the Company's Price-Hike Strategy and illegal collusive activities to the segment's improved performance:

[Desheh:] As you can see from the results highlight, this was another good quarter, which followed a solid Q1. We delivered 2% increase in revenues, we drove an 8% year-over-year improvement in our operating profit, 4% increase in net income, and 3% increase in earnings per share. Cash flow generation for the quarter was also very strong.

\*        \*        \*

*The improvement in sales this quarter was driven by the growth of our global generic business, primarily in the US. This increase resulted mainly from a full quarter of sales of Capecitabine, generic Xeloda, which was launched exclusively in March 2014, and the launch of Omega-3, generic Lovaza, for which we are first to market.*

\*        \*        \*

Looking at what impacted profitability this quarter, *the improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year. Launch of generic Xeloda in March and generic Lovaza this quarter in the US market*, together with improvements in profitability in Europe, led to the better results. . . .

- 228 -

So when we look at profitability by segment this quarter, profit contribution of the generic business increased from 24% last year to 32% of total this year.

617.    On October 30, 2014, Teva held its third quarter 2014 earnings call.  Vigodman, Desheh and Olafsson participated on the call.

618.    During the call, Desheh and Olafsson attributed the generics business's profitability and revenues performance to lower expenses and new launches.  In addition, in response to an analyst's question on price increases, Olafsson assured investors that price increases were only taken when opportunities like shortages existed in the market:

> [Desheh:]  Profitability, which is our measure for segment operating income without G&A allocation, improved through all segments.  ***Mostly for the generic segment, with 40% improvement year over year . . . .  The improvement is due to better gross margins, lower sales and marketing expenses*** and Copaxone revenue, which grew year over year.
>
> \*        \*        \*
>
> ***We can see the gross profit margin over the full year improved from 39.5% to 44.3%.  Total profitability operating profit from 15.9% to almost 23%, an improvement of 7 full points***.
>
> \*        \*        \*
>
> [Olafsson:]  Let me talk a little bit about the US business.  ***I think overall we have a good revenue off the new launches this year***.
>
> [Capecitabine] being the generic Lovaz[a,] omega 3[, and] Entecavir.  Entecavir was a new launch for us in the quarter.  ***I think all these three products have been very significant contributors through the year***.
>
> \*        \*        \*
>
> I think the pricing, I've said it before, ***there's never a price increase on the base business as a whole.  Like any other business, if there's a pricing opportunity that comes in the market, we look for that***.
>
> But the base business itself has been eroding overall because of the consolidation of the customers.  ***When there is an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business***.  But overall, as I've said many times before, the base business itself is slowly eroding the overall of the base business.

- 229 -

619.    On December 11, 2014, Teva hosted its 2015 Business Outlook conference call. Participants from Teva included Vigodman, Desheh, and Olafsson.  During the call, Vigodman and Olafsson attributed the generic segment's profitability to cost reduction, insisted that media coverage of dramatic price increases in the U.S. generic drug market was simply a "hot political issue," and emphasized that Teva's generic drugs actually experienced net pricing erosion in the past two years – while failing to disclose the significant impact of the Price-Hike Strategy and anti-competitive price-fixing activities on Teva's U.S. generic drug pricing and profitability:

> [Vigodman:] *Our cost reduction program will yield $650 million of net savings that flow directly to the bottom line in 2014.  It supports the very important profitability of our new established Global Generic Medicine group, which will deliver 400 basis points in profitability in 2014*.

<div align="center">*      *      *</div>

> [Olafsson:] *Also the US has done [an] amazing job and over the last two years, the operating profit in the US will increase by 10%.*  And that's when you are the market leader like we are in the US.  *This is the fruit of the strategy we have in place.  We are not growing the top line at the same rate, but the bottom line is very important to us*.

<div align="center">*      *      *</div>

> *I have to disagree that [wholesalers] have experienced tremendous price increase. I think overall the pricing in the US of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules, and this has been a hot political issue, selecting a few products*.

<div align="center">*      *      *</div>

> [Vigodman:] First, maybe on – just to underscore the point that was made by Siggi.  *What we see in terms of pricing, we see an erosion, still a net erosion, generic prices.  It is lower than what we saw two years ago, but still net/net we see net erosion.  That's a message that shall be spelled out in a very clear way*.

620.    On December 15, 2014, the Company issued its 2013 Corporate Social Responsibility Report, signed by Vigodman, which misleadingly represented that the Company adhered to ethical guidelines in all countries, even if doing so put it in a competitive disadvantage:

A Letter from Erez Vigodman, Teva's President & CEO

<div align="center">- 230 -</div>

\*       \*       \*

Teva is shifting its focus and reorienting its business model in order to stay ahead of the changes and deliver on our promise to our patients.  These are transformative and exciting times for us.  As such, they underscore not only what we need to change, but what must remain constant: *our unwavering commitment to conducting our business responsibly and ethically*. . . .

. . . As one of the top 12 global pharmaceutical companies and a world leader in Generics, *we are committed to increasing access to high-quality, affordable healthcare*.

\*       \*       \*

Going forward, we aim at targeting a unique space in the industry, at the intersection between innovative and off-patent drugs, in a way that will enable us to meet more and more unmet needs of patients along their journey, *with affordable and integrated solutions that improve their adherence and compliance and enhance treatment effectiveness*.

\*       \*       \*

As we quest towards the differentiated leadership space we wish to claim and make our own, *our strategic decisions and actions are guided by our deep-seated sense of social responsibility*.

\*       \*       \*

*We bring safe, effective, innovative and affordable medications to patients worldwide, while delivering results for our customers, shareholders and employees*. . . .

*Our corporate culture and our focus on broadening the access to affordable medicines is what drives our success*.

\*       \*       \*

As the world's largest generic drug manufacturer, Teva plays a key role in providing patients with access to affordable medicines.  *Our broad portfolio of generic drugs helps us bring the latest advances in medicine to millions of patients, while keeping costs down throughout national healthcare systems.  Our generic drugs offer affordable medicines that address pressing health issues in the developed world*.

\*       \*       \*

Teva plays an important role in generating value to the healthcare systems and wider economies in which we operate.  *The scale of production and the*

- 231 -

*accessible price of our products help to limit rising healthcare costs and improve patient health outcomes*.

\*       \*       \*

While marketing regulations may differ by region, *we adhere to the ethical marketing guidelines in our Code of Business Conduct in all countries, even if this puts us at a competitive disadvantage*.

\*       \*       \*

Each action Teva takes, each action our employees take, shapes the ethical character of our company.  That character is at the heart of how we operate and is what sets us apart in the marketplace.  *It drives our deep commitment to expanding the availability and affordability of medicines for patients worldwide*.

*From the Board of Directors and CEO to each individual employee in each unit, we are unwavering in our commitment to doing what is right while striving to reach our financial and business goals.  Although we face complex challenges as we transform our business, no objective is worth compromising our values or ethical standards*.

621.    On January 6, 2015 and January 13, 2015, Vigodman participated in the Goldman Sachs CEOs Unscripted Healthcare Conference and the JPMorgan Healthcare Conference, respectively.  During the conferences, in answering analysts' questions about when Teva would begin to focus on topline revenue growth for the generics segment and what would drive such growth, Vigodman reiterated that Teva's market and product optimization and selection processes would drive revenue growth – without disclosing that such processes had already driven the Company's U.S. generics revenue and profitability growth by selecting numerous drugs for participation in illegal market allocation and price-fixing activities and the Price-Hike Strategy:

- Goldman Sachs January 6, 2015 conference:

[Jami Rubin – Goldman Sachs – Analyst:]  The focus for generics has been on growing profitability, not the top line.  And as you have remarked, the improvement in profitability has been very impressive.  But when do you start to focus on topline growth, and what will drive that growth beginning in 2017? . . .

. . . [Vigodman:]  *First, look at the measures that we are conducting now. The decisions, the optimization of markets and product, that's something that in most of the cases reduces the top line.  Number one*.

- 232 -

*Number two, decisions on product selection.  Over time it will basically enable us to drive our top line*.

- JPMorgan January 13, 2015 conference:

[Chris Schott – JPMorgan Securities – Analyst:]  You're driving very, very impressive operating margin expansion as we look through 2015.  Can we just talk a little bit about once that's complete, is there further opportunity for margin expansion within that generic business or is that largely going to be taken care of in 2015?  I'm just trying to think about how we think about growth in that business over time beyond the step-up we're expecting this year?

[Vigodman:]  *So, there is this strong focus today on bottom line; optimization of products and markets, product selection decisions and also basically the acceleration of FTFs, strong focus on margins and profitability in a way which has manifested itself in a very clear manner.  All of the time, the generic business will drive up also the topline.  So we believe that in 2017 onward, we start to see the generic business driving up also the topline without derogating from the efforts to continue excess high pressure on margins and bottom line*.

622.   The statements in ¶¶614-621 were materially false and misleading or omitted material facts.  In particular:

(i)   Defendants' statements above concerning Teva as a provider of affordable generic medicines, experiencing net erosion of generic drug prices, making "strategic decisions and actions" that were "guided by our deep-sense of social responsibility," and adhering to ethical guidelines "even if this puts us at a competitive disadvantage," were materially false and misleading when made because: (a) Teva was engaged in illegal price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy that caused generic drug prices to skyrocket; (b) Teva implemented at least 50 massive price increases on selected generic drugs during 2013 and 2014, with at least 35 increases made in tandem with purported competitors; and (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs;

(ii)   Defendants' statements above concerning improving sales and profitability through new product launches, lower expenses, cost reduction and the optimization of markets and

products in the generic business driving profitability were materially false and misleading when made because: (a) Teva's financial results were inflated in part by illegal collusive activities and the Price-Hike Strategy; and (b) the Company generated at least $942 million in Collusive Profit and Inflated Profit during 2013 and 2014, which contributed significantly to its financial results; and

(iii)    Defendants' statements above concerning price increases occurring only during periods of drug shortages were materially false and misleading when made because the Price-Hike Strategy was implemented on drugs for which no shortages had in fact occurred.

623.    On April 30, 2015, Teva held its first quarter 2015 earnings call.  Vigodman, Desheh and Olafsson participated in the call.

624.    During the call, Desheh and Olafsson emphasized the significant profitability and revenue growth of the generics segment and the increased contribution from the U.S. market, but attributed the results to new launches without disclosing the impact of the Price-Hike Strategy and anti-competitive activities to the top and bottom line:

> [Olafsson:]  We have done [an] outstanding quarter for generics this first-quarter 2015.  All of our regions shows the significant improvement over first-quarter 2014.  And despite the FX impact, *the profit for the generics increased 59% to $799 million.  The revenues were up 9% to $2.6 billion.  And our operating profit in [the] first-quarter was 30.5%, which is a significant improvement over the 2014 operating profit of 21.9% and 16.7% in operating profit in 2013.  We successfully launched generic Nexium, esomeprazole, on February 17*.

> *            *            *

> [Desheh:]  We are tracking the turnaround in our generic business closely.  As you heard from Siggi, this is doing very well.  *This quarter, gross margins reached nearly 50% for our generic business.  Segment profitability was 30.5%, above our plan for the year, which I have to remind you was 27%.  This is a 10 [point] percentage point improvement from last year, driven primarily by the launch of esomeprazole in the US and other new generic products*.

> *US market [increasing in prominence] is reflecting our strong focus on the US generic business*.  FX impact also had a contribution to that and other markets.  In total, that [will grow our] business in the United States to 59% of our total sales worldwide.

- 234 -

*       *       *

[Olafsson:] *What plays into the operating profit in the generics are probably three or four things*.

*First of all, we have a significant improvement in our cost of goods*.

*       *       *

*I think the next thing is the portfolio offering*.  I think the more we have of exclusive complex generics on offering, we have a higher margin on these products . . . .

*The third thing is the cost infrastructure*.

*       *       *

*When you look at the top line growth, you see that already in first-quarter, we have improved our top-line growth.  That mainly comes from our new launches but also our emphasis on the branded generic markets*.

625.    On May 13, 2015, Desheh participated in the Bank of America Merrill Lynch

Healthcare Conference.  During the conference, Desheh touted the profitability of Teva's generics

business and attributed the improved profitability to numerous factors while concealing the Price-

Hike Strategy and collusive activities:

*First, the generic business.  This is nothing short of a revolution.  In 2013 our gross margin of generic business was 41.3%, it was 46% in Q1 2015.  Our operating margin was 16.7%, it is 27%, this is full 10 percentage points improvement. . . . [T]he operating profit grew – profit margin grew faster than the gross, which means that we're also reducing our expenses that are needed to drive the sale.  So the improvement is not just on the margins improvement, it is also on the expense structure and how we are building the business*.

*       *       *

Generic side of the house is doing very well.  It has probably the best leader in the generic industry today under Siggi, very strong management team, both in Israel and Europe and in emerging market[s], *production system or production network that is becoming more and more efficient all the time with a great program to reduce costs and reduced expenses, and you've seen the results in our numbers online.  We're very successful in launching new products, and getting approval.  We had our fair share, better than others over the past number of quarter*.

- 235 -

626.    On June 10, 2015, Vigodman and Olafsson participated in the Goldman Sachs Global Healthcare Conference.   During the conference, both defendants touted the 1,000 basis point profitability improvement in the generics business since 2013 and attributed the financial performance to cost reductions – without disclosing that the Price-Hike Strategy and illegal collusive activities also significantly impacted profitability:

> [Vigodman:] *[W]e started 2014 with a clear message, clear focus getting the house [in order] first, solidifying the foundation of Teva.  You see the profound change in the generic business, you know these are things that are not confined to numbers, but [inaudible] 16.7% operating profit in 2013, 21.9% operating profit 2014*.  We are committed to deliver 27% operating profit 2015.  *The execution of the cost reduction program $600 million dollars of net savings 2014*, $500 million dollar 2015 . . . .  Full transformation of our operational network.  We closed or divested 11 plants during the last 12 months, we centralized procurement . . . .
>
> So everything that was done during 2014 was based on organic moves only . . . .
>
> *       *       *
>
> [Olafsson:]  Erez mentioned the profitability 2013 and the challenge.  *We have improved the generic business by 1,000 basis point[s] on a revenue of around $10 billion, that is $1 billion improvement in 14 months, 16 months that we have done*.

627.    On July 27, 2015, Teva filed a Form 6-K, signed by Desheh, attaching a press release announcing "Teva to Acquire Allergan Generics for $40.5 billion Creating a Transformative Generics and Specialty Company Well Positioned to Win in Global Healthcare."  The Form 6-K described Teva as a provider of affordable generic medicines at "the most competitive prices" and quantified the "substantial financial benefits" of the acquisition.  The Form 6-K, however, failed to state that Teva was engaging in anti-competitive activities with substantial price hikes, and the Company's projections were based on artificially inflated and unsustainable historical performance impacted by collusive activities:

> *This strategic acquisition brings together two leading generics businesses with  complementary strengths, brands and cultures, providing patients with more affordable access to quality medicines, and creating significant financial benefits*

- 236 -

*for Teva stockholders*. . . .  The new Teva will further transform the global generics space through its best-in-class generics pipeline, R&D capabilities, operational network, supply chain, global commercial deployment and infrastructure to achieve greater efficiencies across the healthcare system and *provide patients and consumers across the globe with better access to high quality affordable medicines*.

When combined with Teva's strong generics portfolio, Allergan Generics' world-class generics pipeline, which holds a leading position in first-to-file opportunities in the U.S., will further enhance *Teva's goals of delivering the highest quality generic medicines at the most competitive prices* and cultivating the best development pipeline in the industry.

<div align="center">*     *     *</div>

**Substantial Financial Benefits**

The transaction is expected to provide substantial financial benefits for Teva including highly diversified revenues and profits, and substantial cost synergies and tax savings.  Teva expects Allergan Generics to contribute approximately $2.7 billion in EBITDA in 2016, excluding synergies.  *Following the completion of the acquisition, Teva is expected to have pro forma sales of approximately $26 billion and EBITDA of approximately $9.5 billion in 2016*, including an estimated $11 billion in sales outside of the United States.  *Teva also believes the acquisition will be significantly accretive to non-GAAP EPS, including expected double digit non-GAAP EPS accretion in 2016 and more than 20% accretion in year two and year three following the close of the transaction*.

<div align="center">*     *     *</div>

*This acquisition furthers Teva's promising future in generics with a focus on patient needs, improving compliance, convenience, efficacy and safety, and providing affordable generic products to patients and society worldwide*.

628.    On the same day, Teva held a conference call with a slide presentation to discuss Teva's acquisition of Actavis, attended by Vigodman, Olafsson, Peterburg and Desheh.  On the call, Vigodman informed investors that the Actavis acquisition would generate 5% CAGR for revenues, over 10% growth for EBITDA, and 12.5% growth for cash flow from operations:

[Vigodman:]  *During [the] 2016 to 2018 timeframe, we expect to grow pro forma net revenues by a CAGR of 5%, pro forma EBITDA by 10.1%, pro forma cash flow from operations by 12.5%, and pro forma free cash flow by 14.4%*.  The combined Company free cash flow would allow for rapid de-leveraging and the ability to continue to pursue future acquisitions to expand our portfolio in both specialty pharmaceuticals and generics.

<div align="center">- 237 -</div>





\*        \*        \*

*I said it and I'm just going to hit it now again, that is not the acquisition which focuses on cost savings only, a look at the growth profile that we will be portraying between 2016, 2018 top-line growth of 5% now we're on organic moves only basis.  EBITDA and profits more than 10% CAGR, cash flow more than 12% and 14% CAGR . . . .*

629.   On July 30, 2015, Vigodman, Desheh, and Olafsson hosted the Company's second quarter 2015 earnings call, boasting about the significant outperformance of the U.S. generic drug business – with outsized profitability growth of close to 1,100 basis point in the past two years – with no mention of the impact of the Price-Hike Strategy and collusive price-fixing and market allocation schemes on the Company's performance:

> [Desheh:]  **When we look at our revenue breakdown by market, the US market is increasing in prominen[ce], reflecting our strong focus on US generics business** and a record quarter for Copaxone sales in the United States. . . .
>
> . . . When we look at the bridge of our quarterly revenues, **strong results of our generics driven by the successful launch of aripiprazole, ABILIFY, this quarter, and esomeprazole, NEXIUM, which was launched in Q1, increased it significantly**.
>
> \*      \*      \*
>
> **The result of all this is a strong trend of improvement in operating margin for Teva over the past 18 months of almost 500 basis points in operating profit. This was built upon the impressive improvement in the profitability of our generic business**.
>
> \*      \*      \*
>
> [Olafsson:]  Teva has an outstanding team.  **If you think about the generic team at Teva, they have improved the profitability of the Teva generic business by approximately 1,100 basis points in two years**.

630.   On October 29, 2015, Teva held its third quarter 2015 earnings call.  Vigodman, Desheh and Olafsson participated in the call.

631.   During the call, Olafsson unleashed a diatribe against proposed governmental efforts to rein in generic prices, criticizing the proposal's review of pricing on an individual drug basis, and claimed Teva took price increases only due to "some abnormalities in the market" – all without disclosing that Teva was engaged in the Price-Hike Strategy and collusive price-fixing and market allocation schemes to artificially inflate generic drug prices.  Vigodman, in turn, falsely assured

investors that Teva was "very responsible" with respect to its pricing and its profitability was not driven by price:

> [Olafsson:] *The talk about the inflation in generics, when you have a big portfolio it is really not there*. 95% of our portfolio is declining, due to the consolidation of the customers I talked about. *There might be [5]% of the portfolio that is either flat or increasing in pricing, due to some abnormalities in the market.* The proposal on the table now, is that you cannot increase prices for more than inflation of generics. *But it doesn't take into account that I am declining on 95% of my portfolio, because they want to look at it molecule by molecule*. That's number one.

> And then secondly, from what time point will you look at the price? Will you look at the price from when the generic launched, which would be fair. *Or do you looked [sic] at the low point, after four or five quarters, when you have a fierce competition in the market*? I think this could easily lead to shortages in the market, because there is product out there, if you cannot take a price increase, you simply go off the market.

> Secondly, it doesn't take into account that API increases are not according to inflation. So not that you don't notice, but I'm quite excited about this. *And really I think it's [a]n unfair proposal. And I think the government is shooting their self in the foot, in terms of shortages in the market. And how unfair this will be – I think to the patients at the end of the day, because when the patients don't get their drugs*, I think that will really be when people speak up.

> \*      \*      \*

> *I still think the pricing environment has been quite favorable for generics versus six years ago*.

> \*      \*      \*

> [Vigodman:] *We are very responsible to in [sic] everything that pertains to prices, on the generic side and on the specialty side*. And I will even put in another way, *all the improvement you see in margins is not driven by price. It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015. And that's a very important message*.

632.  On November 19, 2015, Desheh participated in the Jefferies Autumn Global Healthcare Conference and assured investors that Teva played the competitive game fairly, "by the book and by the rule."  Hence, Teva's exposure to potential government efforts to rein in generic prices "is as small as anybody can have":

*There is a lot of noise around pricing issues*. Some of it is coming from politicians or a driving agenda, which is very, very legitimate. **Our exposure to all these things is very minimal**.

<div align="center">*       *       *</div>

**And Teva was not associated with any of that.  So we are playing the competitive game.  We are playing it fairly.  We, of course, play by the book and by the rule.  And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have**.

633.    Teva filed its (i) ADS/Preferred Registration Statement on November 30, 2015, (ii) Preferred Prospectus Supplement on December 3, 2015, and (iii) ADS Prospectus Supplement on December 3, 2015 – all of which incorporated by reference the materially false and misleading statements in the 2014 Form 20-F (§§III.K.1, 6, 8), and the 1Q2015 Form 6-K, 2Q2015 Form 6-K, and 3Q2015 Form 6-K (§III.K.6).

634.    In addition, the Preferred Prospectus Supplement and ADS Prospectus Supplement contained materially false and misleading statements concerning Teva and the combined entities' revenues – with no disclosure that the revenues were artificially and unsustainably inflated by collusive activities:

**For the nine months ended September 30, 2015, our generics segment represented approximately 46% of our revenues.  Following the consummation of the Actavis Generics acquisition, generics will comprise a significantly larger component of our business, expected to be approximately 60% of our revenues.  Accordingly, we will be increasingly subject to the risks associated with that business**.

<div align="center">*       *       *</div>

| | For the nine months ended September 30, | | | For the year ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2015 | 2014 | Pro forma 2014 | 2014 | 2013 | 2012 | 2011 | 2010 |
| | Pro forma | (unaudited) | | | | | | | |
| | | U.S. dollars in millions (except per share and share amounts) | | | | | | | |
| Net revenues | 19,051 | 14,771 | 15,104 | 26,160 | 20,272 | 20,314 | 20,317 | 18,312 | 16,121 |
| Cost of sales | 9,700 | 6,262 | 6,937 | 13,865 | 9,216 | 9,607 | 9,665 | 8,797 | 7,056 |
| Gross profit | 9,351 | 8,509 | 8,167 | 12,295 | 11,056 | 10,707 | 10,652 | 9,515 | 9,065 |

<div align="center">- 241 -</div>

635.    On January 5, 2016, Teva issued its 2014 Global Citizenship Report, which, again, repeatedly touted Teva as the leading provider of affordable generic medicines with generic drugs pricing reductions of 8.4% in the United States in 2013.  Further, Cavanaugh falsely claimed that Teva brought "'cost savings to patients each year'" and worked "'to make products more accessible'" – without disclosing that Teva's Price-Hike Strategy and collusive activities had made generic medicines unaffordable to millions since 2013:

> We changed the game in healthcare by shaping the U.S. generics market and other markets around the world, ***making medicines affordable for millions of patients, and saving healthcare systems many billions of dollars each year***.
>
> \*        \*        \*
>
> Message from Teva's President and CEO, Erez Vigodman
>
> \*        \*        \*
>
> ***We also reduced the price on gold-standard therapies and medicines in key markets***, helping healthcare services, payers and patients save billions of dollars.
>
> \*        \*        \*
>
> ***Our passion – as great today as it was when Teva was founded as a single pharmacy in Jerusalem – is the fundamental aim to save money for healthcare systems***, allowing for efficient use of resources and ultimately achieve better outcomes for patients.  I am proud of what the people of Teva have accomplished.  ***Guided by our unwavering commitment to conducting our business responsibly and ethically***, we continue to influence healthcare decisions for billions of people around the world.
>
> \*        \*        \*
>
> ***Teva's generic drug prices were reduced by 8.4% in the U.S. in 2013*** – double the average price reduction of the 280 top generic drugs sold in the U.S. market.
>
> \*        \*        \*
>
> Affordable healthcare
>
> ***We believe that affordable healthcare should be available to all and as a global pharmaceutical company, we make a constant effort to make this possible.***

Affordable healthcare affects not only emerging economies and those living in extreme poverty.  It also affects the quality of life for populations of the developed world.   National economies are strengthened when their populations enjoy good health.  *By helping to increase access to affordable healthcare, we make a positive contribution to the global economy*.

\*         \*         \*

"*As the largest supplier of generics in the U.S. market, we bring cost savings to patients each year and also reduce our costs on an ongoing basis.  We are continuously working to make products more accessible, especially when there are drug shortages in the market*."

Maureen Cavanaugh, SVP, U.S. Generics Sales & Marketing

\*         \*         \*

*Conscious of the need to ensure generic medicines remain affordable for older Americans as well as other patients, we reduced the price of four most frequently prescribed generic drugs by 7-21%.  Overall, our generic drug prices reduced by 8.4% – double the average price reduction of 280 generic prescription drugs examined by AARP.  At the same time, the general inflation rate rose by 1.5%.*

636.    On January 11, 2016, Vigodman and Olafsson participated in the J.P. Morgan Healthcare Conference.   During the conference, Vigodman reiterated the materially false and misleading projections and emphasized that, with the Actavis acquisition, Teva would generate $20 billion to $25 billion of free cash flow between 2016 to 2018.  At the same time, in response to analysts' concerns that McKesson had warned "some may be [sic] challenging pricing on the generics side or an expectation of that going forward," Olafsson assured investors that Teva would be insulated from any potential generic drug pricing erosion because the Company had made only a "flat or slight increase" to 5% of its portfolio and experienced price declines on the remaining 95%:

[Vigodman:]  So basically during 2016 – *during 2016 to 2018 time frame, we will grow the bottom line of Teva by more than 10%, including the effect of the acquisition.  We'll grow the EBITDA, the cash flow for operation and free cash flow, by 20% CAGR during 2016 to 2018 time frame, including the effect of the acquisitions*.

*Now, on an organic basis, during 2016 to 2018 time frame we will grow top line on organic basis, without – excluding – the effect of the acquisition, by 4% to*

- 243 -

*5% CAGR top line, EBITDA by 8% to 10% CAGR, cash from operations by 10% to 12% CAGR and free cash flow by 12% to 14% CAGR.*

\*      \*      \*

*Teva will generate during 2016 to 2018 time frame between $20 billion to $25 billion of free cash flow.  Teva will generate on a run rate basis from 2018 onward between $8 billion to $9 billion of free cash flow*.  It will enable us to not just to relever swiftly but also to direct resources towards unique assets *that will enable us or help the Street to assign a higher multiple on higher EPS to Teva*.

\*      \*      \*

[Olafsson:]  The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing.  But what we see is there's – *overall on our total portfolio of 270 products, there is a slight decrease in pricing.  It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline.  And then on 5%, we might be flat or a slight increase*.  So, overall, we see that in the business.

There's a lot of headlines of examples of big price increases in generics. *But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline*.

\*      \*      \*

But if at some point in time the FDA would start to catch up and they would start to approve some of these 3,000 applications, there could be an impact on pricing of the generic industry.  How we think about it is the combined Company at closing will have over 300 ANDAs. *So if the FDA starts to approve products faster, we will have a net benefit from that versus the pricing pressure that we experience*.

637.    On January 25, 2016, Teva filed a Form 6-K, signed by Desheh, to announce the release of its Corporate Social Responsibility Highlights.  Despite the Company's Price-Hike Strategy and collusive activities, in the Form 6-K, Vigodman touted Teva's effort in decreasing generic drug prices in the United States and making healthcare accessible:

Teva President and CEO Erez Vigodman [stated:]  "*The highlights released today demonstrate our evolution over the last few years as we make healthcare accessible for billions of people around the world and seek to reduce the burden on national economies* and investing in development to bring new therapeutic options to patients."

*Teva's work in decreasing generic prescription drug prices in the U.S.*, saving billions for the UK National Health Service, lowering greenhouse gas emissions and other recent insights into the company's social responsibility and innovation efforts can be found in "Innovating for Better Health: Teva Global Corporate Social Responsibility Highlights."

638.    Furthermore, in the publication, Teva and Vigodman falsely represented that the

Company had reduced medicine prices to save patients billions of dollars and tackled challenges of

affordability through its business, as opposed to philanthropy:

In this report, we share with you the stories of how we are meeting this commitment: how we innovate and collaborate with our stakeholders to address unmet patient needs, develop new therapies, *expand the availability and affordability of our medicines and respond to the needs of our local communities*.

. . . *We also reduced the price on gold-standard therapies and medicines in key markets, helping healthcare services, payers and patients save billions of dollars*.

\*      \*      \*

*Guided by our unwavering commitment to conducting our business responsibly and ethically, we continue to influence healthcare decisions for billions of people around the world*.

\*      \*      \*

As a leading global healthcare company, *we are deeply engaged with the issues relevant to our stakeholders and our business, such as accessibility and affordability of medicines*; patient safety and patient support services; *strengthening healthcare systems and acting ethically and responsibly*.

\*      \*      \*

*To find new ways to make healthcare available to and affordable for all, in 2014 Teva spent nearly $1.4 billion on research and development.  In generics alone, we invested $517 million, an increase of five percent from 2013, to enhance the most affordable and accessible drugs in our product line*.

\*      \*      \*

*We aim to expand sustainably and tackle challenges of access and affordability through our business, not philanthropy*.

639.    On February 11, 2016, Teva held its fourth quarter and full year 2015 earnings call.

Vigodman, Desheh and Olafsson participated in the call.

- 245 -

640.    During the conference call, all three defendants touted Teva's performance in 2015 as a record year for operating income, EBITDA, EPS, cash flow and profitability margin driven by the generics segment – without disclosing that all of these metrics were inflated by the Company's Price-Hike Strategy and illegal price-fixing and market allocation activities.  In fact, Olafsson falsely assured investors that the record performance was achieved "[n]ot by pricing," and refuted news of generic drug price inflation by asserting that Teva and its competitors all experienced pricing pressure and declines – albeit Teva experienced less of a decline because "we ha[d] been right in adjusting the business."  On the basis of these misleading claims, Vigodman re-affirmed the growth projections made during the Actavis acquisition announcement "[u]sing 2015 as the base year" for top-line, EBITDA, cash flow from operations, and free cash flow growth:

> [Vigodman:]  2015 was a year of exceptional operational and strategic performance for Teva. **We delivered in 2015 record operating income, EPS and cash flow, while improving profitability margins across the board.  Our financial performance was based on excellent execution in generics, with significant improvement in profitability**, strong execution of specialty life-cycle management initiatives, continued transformation of our global operations and network, and strong focus on cash flow generation.
>
> *       *       *
>
> **EBITDA grew by 6% to $6.6 billion, cash flow for operations grew by 8% to $5.5 billion, and free cash flow grew by 15% to $4.9 billion**. . . .
>
> **In 2015, we continued the operating profit improvement of our generic business**, while maintaining the operating profit of our specialty business, in a year when we face for the first time generic competition to Copaxone and invested in building the future of our specialty franchises.
>
> *       *       *
>
> **Our strong focus on solidifying the foundation of Teva and improving our business fundamentals is manifesting itself in the operational step-up since the beginning of 2014 and the continuous improvement on all relevant financial matters**.
>
> *       *       *

*Today we are reaffirming our 2018 target, first presented last year when we announced the proposed Actavis Generics acquisition.  Using 2015 as the base year, we project a CAGR for top-line growth of 12.5% and 20% CAGR growth in EBITDA, cash flow from operations, and free cash flow.*

\*       \*       \*

*Last but not least, we expect to generate $20 billion to $25 billion of free cash flow during the 2016 to 2018 timeframe.*

\*       \*       \*

[Olafsson:]  2015 was a very good year for Teva Generics.  Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally.  *We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue.  This is $1 billion improvement in operating profit over 24 months period.*

*So how did we do this?  Not by pricing but by portfolio mix, new products, and efficiency measures.*

\*       \*       \*

As I've previously stated, *we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media.  On the contrary, for 2015, we saw a mid-single-digit price decline for the overall business.*

*In the US, our largest market, we saw approximately 4% price erosion.* . . .

*Looking forward, the conjunction of price erosion with the mix changes, focus on cost structure, and the new product launches, we continue to drive our business growth, both top line and bottom line.  We expect to see the same in 2016.  Nothing today points to a significant change in the generic pricing environment.*



*       *       *

As I mentioned in the beginning, ***we didn't see anything change in [the] fourth quarter.  We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.  Some of our competitors have seen more pressure.  I think overall, it might have to do with some dosage form differences.  But also I think we have been right in adjusting the business***.

*       *       *

***But keep in mind that from fourth-quarter 2014 to fourth-quarter 2015, there is a 200-basis-point improvement [in] the operating profit***.  So there were no exclusive launches in either quarters.  ***So the base business, overall base business improvement from the 12-month period was 200 basis point from fourth quarter to fourth quarter.  So I think the overall business is improving***.

641.    The statements in ¶¶624-640 were materially false and misleading or omitted material facts.  In particular:

(i)    Defendants' statements above concerning Teva providing affordable generic medicines at the "most competitive prices," working continuously "'to make products more accessible,'" experiencing price declines on 95% of the portfolio and a "mid-single-digit price decline" for 2015 with price erosion of 4% in the United States contributing to a more favorable pricing environment for generic drugs versus six years ago, having "minimal exposure" to price reduction initiatives in the United States, reducing generic drug prices by 8.4% in the United States in 2013 and "the price of [the] four most frequently prescribed generic drugs by 7-21%,"

"strengthening healthcare systems and acting ethically and responsibly," and "tackl[ing] challenges of access and affordability through our business" were materially false and misleading when made because: (a) Teva was engaged in collusive price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy that caused generic drug prices to skyrocket; (b) Teva made at least 71 massive price increases on selected generic drugs during 2013 to 2015, with at least 48 increases made in tandem with purported competitors; (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs; and (d) in 2013, Teva implemented price hikes in the range of 22% to 812% for at least 18 generic drugs in United States;

(ii)     Defendants' statements above that improving sales, revenues and profitability were achieved through new product launches, lower expenses, cost reduction, operating efficiency, and an outstanding generics team at Teva and "[n]ot by pricing" were materially false and misleading when made because: (a) Teva's financial results were inflated in part by illegal collusive activities and the Price-Hike Strategy; and (b) the Company generated at least $1.79 billion in Collusive Profit and Inflated Profit during 2013 to 2015, which contributed significantly to the financial results;

(iii)     Defendants' statements above concerning pro forma sales and growth "using 2015 as the base year" were materially false and misleading when made because both measures were based on and included sales and growth derived from the unsustainable Price-Hike Strategy and collusive anti-competitive activities;

(iv)     Defendants' statements above that price increases occurred only during periods of "abnormalit[y] in the market," such as drug shortages or an increase in demand, were materially false and misleading when made because the Price-Hike Strategy was implemented on drugs for which no such abnormality had in fact occurred; and

(v)     Defendants' statement that "[n]othing today points to a significant change in the generic pricing environment" was materially false and misleading when made because: (a) Teva's Inflated Profit began to decline by close to 8% and 24% quarter-over-quarter in the third quarter and fourth quarter of 2015, respectively; and (b) the anti-competitive practices in the generics industry that contributed substantially to the Company's financial results were drawing increased scrutiny, which made it increasingly difficult for Teva and other manufacturers to continue to hike prices.

642.     On March 8, 2016, Olafsson attended the Cowen Health Care Conference during which he discussed pricing erosion and drivers of Teva's profitability growth between 2013 and 2015. He reiterated that Teva saw less than 4% pricing erosion in 2013, 4% in 2014, and 4%-5% in 2015 – even though less than three months before, in its 2014 Global Citizenship Report, the Company represented to investors that "[c]onscious of the need to ensure generic medicines remain affordable for older Americans . . . our generic drug prices [were] reduced by 8.4%." In addition, Olafsson falsely assured investors that Teva's 1,100 basis point profitability growth between 2013 to 2015 was driven by improvements in cost of goods sold, portfolio selection, and cost infrastructure – without disclosing the impact of Teva's Price-Hike Strategy and collusive activities:

> *So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015. And overall for Teva generics, we saw approximately 5% price decline in the market in 2015.* And anyway, when I came out, we were one of the first to come out, I thought I was bringing some negative news. But now suddenly *I look like the good guy in a bad neighborhood. Because some of the other companies saw worse price pressure than we saw*.
>
> *I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing. But we never saw that. That was an individual molecule basis, they used example of products that really were not generic products*, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business. And there has been a decline there.

\*      \*      \*

*So as of today, I came out with 4% in 2015.  As of today, I don't see any big changes in the pricing environment.  It's relatively stable.  4% is worse than maybe two years ago.  But it's similar to what we saw in 2014.*

\*      \*      \*

*[F]rom 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%.  So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue.*  So it was a significant improvement over a 24-month period.  *Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there.  But also part of it was due to portfolio selection and the cost infrastructure.*

643.    On May 9, 2016, Teva held its first quarter 2016 earnings call.  Vigodman, Desheh and Olafsson participated in the call.

644.    During the conference call, Vigodman and Desheh assured investors that – even though sales declined in the U.S. generics segment – EBITDA, operating income, cash flows from operations, net income and EPS were unchanged due to improved profitability and "portfolio optimization," without disclosing that Teva's sales from its Price-Hike Strategy and collusive activities in the generic drug markets flowed directly to the bottom line and inflated each one of these metrics:

[Vigodman:]  EPS for Q1 2016 is $1.20, at the top end of our quarterly guidance.  *We have improved our profitability, profit margin by 144 basis points, and operating margin by 101 basis points.  Cash flow from operations in the quarter was a robust $1.38 billion.  Our solid performance was driven by continual improvement of our core business, with a strong focus on profitability, cost control, and portfolio optimization.*

\*      \*      \*

Our global generics business generated 26.9% operating margin in the quarter, without major new launches in the US and other key markets.

\*      \*      \*

[Desheh:]  As you can see from the highlights presented here, this was another strong quarter for Teva.  Sales declined by 3%, mostly due to exchange rates impact.

- 251 -

However, *operating income, EBITDA, net income, and earning per share were at the same level of last year, due to improved efficiency, and profitability* – and Q1 last year was a very strong quarter as well.

645.   In turn, Olafsson assured investors that customer consolidation had already taken effect two years ago, and during that period, Teva's generics business's operating profit actually increased by 140 basis points, and emphasized that Mylan and Allergan were seeing a similar level of price erosion as Teva.  However, throughout his discourse, Olafsson failed to disclose that the Company's Price-Hike Strategy and widespread collusive pricing-fixing and market allocation schemes had inflated Teva's operating profits and mitigated the effects of price erosion for Teva and its co-conspirators, such as Mylan and Allergan:

> Now, we fast-forward to April and May, to a new reporting season, and we find the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate. . . .
>
> . . . *Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year. Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.  In fact, Allergan, and Mylan, two other companies with broad and diversified portfolios and high quality products, have also reported similar trends.  From where I sit today, there is nothing that changes my mind about that.  Nothing has happened in the last two quarters that has changed the pricing environment.  What this boils down to is each individual company's business model* . . . .



Additionally, we have heard from many of the companies in this sector that consolidation of the customers is having an impact on the pricing environment.  Of course, this consolidation creates pressure on generic manufacturers, but there has been no meaningful change in the last two quarters.  *We believe we have already reached a new status quo with the big customers; the fees and charges resulting from the customer consolidations are more or less already built into the pricing of the products when most of the consolidation took effect 24 months ago*.

*Overall, Teva's generic business in the first quarter 2016 performed extremely well.  The operating profit improved compared to last quarter by 140 basis points from 25.5% in the fourth quarter 2015, to 26.9% in the first quarter 2016*.  When compared to first quarter 2015, the operating profit declined by 360 basis points, *fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 2016*.  Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

*So why is Teva different? Why is our performance better than most generic companies? Why are other companies continuing to say, there is a pricing pressure greater than what we at Teva are seeing?* . . .

. . . Some companies are aggressive in going after market share for a variety of reasons, including to utilize excess capacity with relatively cheap volume.  But in order to do that, you'll have to drive down price.  Buying new market share in price will cost you on the bottom line.  *We, on the other hand, are seeing our volumes go down, deliberately, net-net approximately 1% a year, because we think that is better for our business, and we would rather reduce capacity, than fill it with less profitable products*.

\*       \*       \*

*We have taken a significant step to* transform our generic business, solidify our foundation, *increase our profitability*, and to better position us to generate sustainable long-term growth.  *These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more*.  These are the very capabilities that companies must possess in order to thrive at the global level.  We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

\*       \*       \*

I can't obviously comment on why ABC [AmerisouceBergen] is seeing a high single-digit price erosion when we are talking about 4%.  *But I would remind you both Cardinal and McKesson are seeing the similar numbers that we are quoting, that Mylan is talking about, and also what Allergan is talking about.  So it's not all that bad*.  That's number one. Number two, in terms of the – not all companies are created equal, and one investor asked me is, are you the only good house, in a really bad neighborhood?

And I don't think that's it, because I think the other houses are blaming the neighborhood for their maintenance issues. They are working with leaking houses, and it has to do with renewal of the portfolio, of lack of investment in generic R&D. That keeps you growing the business, because that is the key at the end of the day. So I don't think you can look at companies, different companies, and say if company A is experiencing 7% price erosion, that should be the market norm. You have to look

- 253 -

at it differently for a company that has a big portfolio, strong new product launches, a differentiated portfolio, and a high quality portfolio.

646.     In the same conference call, in response to an analyst's question concerning whether the announced Actavis acquisition price was still considered fair given the environment, Vigodman answer with an unequivocal "absolutely yes," because, "from all of the messages that we are conveying in here, we strongly believe that we will be able to generate the economics that we promised."  Later in the call, he re-affirmed his projection of generating $20 to $25 billion of free cash flow in the first three years:

> [Tim Chiang – BTIG – Analyst:]  Now, I know that you guys announced this deal back in July of last year.  What can you comment about, in terms of the price you're putting on the table for Allergan? You think that's still a fair price in today's environment?
>
> [Vigodman:] Hi, Tim. ***The answer is absolutely yes***.  The strategic value of the deal, is at least the one that it was when we announced the deal. We have the opportunities in that US generic market, and in the global generic space are huge. ***And we strongly believe, that with everything that we are witnessing now, our opportunities for Teva are even bigger, compared to basically where [sic] when we announced the deal***.  So for us, what we're creating in here, is a very unique platform, with the same at least the same strategic value that we alluded to when we announced the deal.  And at the end of the day, it is also about the economics.  ***And from all of the messages that we are conveying in here, we strongly believe that we will be able to generate the economics that we promised***.
>
> \*       \*       \*
>
> ***Furthermore, the combined Company of Teva and Allergan generics will generate significant amounts of cash.  We mentioned numbers like $20 billion to $25 billion during the first three years following the closing***.

647.     On June 3, 2016, Vigodman participated in the Sanford C. Bernstein Strategic Decisions Conference.  During the conference, Vigodman attributed Teva's substantial operating profit growth between 2013 to 2015 to its business in emerging markets and touted the Company's generics business as generating over $240 billion in savings in the United States during the past decade, while concealing that Teva's Price-Hike Strategy and illegal collusive activities in the

- 254 -

United States directly contributed to its bottom line and offset savings to the U.S. consumers of generic medicines:

> [Vigodman:]   *We generated $1.6 billion of operating profit, which basically represented 17% operating profit – by our entire generic global generic business in 2013. 2015, we generated 28% margin, $2.7 billion of operating profit*. . . . *We are improving significantly also the business in emerging markets.  In emerging markets, this is a very profitable business*.

> \*       \*       \*

> [T]he generic industry saved $1.6 trillion during the last decade they were in the United States.  *The contribution of Teva is $240 billion to $260 billion during the last 10 years in the United States*.

> \*       \*       \*

> So we are very consistent. Our message was conveyed, and we will continue to convey. *What we see is a 4% to 5% erosion. That's what we see.  That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that*.

648.    On June 8, 2016, Olafsson participated in the Goldman Sachs Global Healthcare Conference and misleadingly reassured investors about the pricing environment by affirming that: (i) the pricing environment had not changed since the Actavis deal was signed; (ii) Teva, Actavis and Mylan had experienced a similar magnitude of price erosion; (iii) the cream and ointment space had experienced greater price erosion as the opportunities to hike prices, which had occurred two years ago, were no longer in existence; (iv) products with five or more players in the market were so competitive that prices were "so low anyway"; (v) price increases taken two years ago were due to shortages created by the FDA with its import ban; and (vi) customer consolidation would have "little or very insignificant" impact on pricing.  Throughout the conference, he failed to disclose that Teva was engaged in the Price-Hike Strategy and widespread anti-competitive activities to artificially inflate pricing – including in the cream and ointment space – and that such conduct mitigated the price erosion experienced by the Company and its co-conspirators, such as Mylan and Actavis:

- 255 -

But really, the environment hasn't changed. ***When we signed that [Actavis] deal in July, we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business***.

\*       \*       \*

***So when you are in a niche industry, like if you are in creams and ointments now, where there is pricing pressure that is not a big portion of our business***. But we need to be wide. I think the challenge has been that the companies, the medium-sized companies which don't have a big enough portfolio, don't have a differentiated enough portfolio, ***companies that have really gained significantly from raising prices in the previous years on maybe one or two molecules, and have shown growth year on year based on two molecules; those days are gone***.

***Because the opportunity of raising prices are not exactly the same as they were before***. . . .

But I challenge the competition as saying it's not the environment that is bad in pricing. ***You can blame the environment all you want. But it's the business model itself that is failing when you cannot take the same pricing action you could do two years ago***.

\*       \*       \*

***So Mylan, Actavis, Teva, Capital Health and McKesson; we all are seeing the same or similar things. So two of the big three customers, and three of the big four generic companies are seeing the same or similar numbers in terms of price erosion***.

\*       \*       \*

So, you know, I've been running a US generic business for about 10 years, so the last 10 years. And the swings have been from about minus 1% to about minus 7%. Those have been the extremes. So minus 1%, ***about two years ago when they started the price increases. There was a lot of shortages in the market. This is when the FDA went very strongly and had the import bans and things like that, which led to shortages***, which meant that the overall business was doing much better.

\*       \*       \*

But overall these are the swings. ***You will see 3% to 5% every year. I don't expect it to be much worse than 7% to say on a big portfolio***. What plays into it is I don't think there could be more consolidation of the customers. For Walmart to go to McKesson really doesn't move things. Walmart already has very good pricing. So ***I think the impact on pricing is very little or very insignificant***.

\*       \*       \*

- 256 -

*And when a product has five or more competitors in the market, the pricing doesn't get much worse. Because it's so low anyway. Where we are hit on pricing is when you're exclusive or semi-exclusive in the market, and there's a third and a fourth player. That's really when it hurts in our business.*

649.     On July 13, 2016, Vigodman, Desheh and Olafsson hosted a conference call to provide a preliminary outlook for 2016-2019 in advance of the consummation of the Actavis acquisition.  During the call, they provided investors with misleading projections for the combined companies' financial metrics, including net revenues, EBITDA, free cash flow, and EPS, while concealing that the assumed generic drug pricing erosion was artificially and unsustainably inflated by the Price-Hike Strategy and widespread collusive and anti-competitive activities.  In addition, Vigodman represented that Teva had made "huge improvement during the last two years in cash flow" generation that was "very strongly driven by the improvement of margin in generics," but failed to disclosed that the Company's cash flow and margin improvements were driven by profits from the Price-Hike Strategy and illegal conduct and were not sustainable:

> [Vigodman:] *Financially, the [Actavis] transaction yields very competitive economics.  It is highly synergetic, with $1.4 billion in operational and tax synergies achievable by the end of 2019.  It is significantly accretive to non-GAAP EPS, with approximately 14% accretion in 2017, and approximately 19% accretion in 2019, and is expected to generate 9.3% ROIC by the end of 2019.  The combined Company will generate more than $25 billion of free cash flow from deal close until the end of 2019, including the proceeds from the expected divestiture.*

> *       *       *

> It is also important to note that our 2016 outlook includes five months contribution from Actavis Generics.  *We estimate that we will grow the net revenues of the Company from $19.7 billion in 2015 to a range of between $26.7 billion and $27.8 billion in 2019, representing midpoint CAGR growth of approximately 9% on 2015 through 2019.  As for the EBITDA of the Company, we estimate that we will grow it from $6.6 billion in 2015 to a range of between $10.7 billion to $11.5 billion in 2019, representing midpoint CAGR growth of approximately 14% from 2015 to 2019.*

> *Turning next to net income and non-GAAP EPS, we estimate that we will grow net income from $4.7 billion in 2015 to a range of between $7.5 billion and $8.1 billion in 2019, representing midpoint CAGR growth of approximately 14% from 2015 to 2019.  This in turn will generate an EPS growth from $5.42 in 2015,*

*based on a share count of 867 million, to a range between $6.90 to $7.40 in 2019 based on our increased share count of approximately 1.1 billion*.

*And finally, free cash flow.  We estimate we will grow our free cash flow from $4.9 billion in 2015 to a range of between $7.2 billion and $7.8 billion in 2019, representing midpoint CAGR growth of approximately 11% from 2015 to 2019.  Including the $2.9 billion of proceeds from product divestitures, in 2016, we expect to generate over $25 billion of cumulative free cash flow between the close of the Actavis Generics deal and the end of 2019*.

### 2016-2019 financial highlights

| | 2016E | 2017E | 2018E | 2019E |
|---|---|---|---|---|
| **Revenues** $ billions | 22.0-22.5 | 25.2-26.2 | 25.8-26.9 | 26.7-27.8 |
| **Operating income** $ billions | 6.9-7.3 | 8.9-9.5 | 9.3-10.1 | 10.0-10.8 |
| **EBITDA** $ billions | 7.5-7.9 | 9.5-10.3 | 10.0-10.8 | 10.7-11.5 |
| **EPS** $ | 5.20-5.40 | 6.00-6.50 | 6.30-6.90 | 6.90-7.40 |
| Weighted average number of shares, in millions | 1,021 | 1,085 | 1,092 | 1,099 |
| **Cash flow from operations** $ billions | 5.7-6.1 | 7.0-7.6 | 7.6-8.3 | 8.0-8.8 |
| **Free cash flow** $ billions | 7.6-8.1 | 6.0-6.6 | 6.7-7.3 | 7.2-7.8 |

Operating Income, EBITDA and EPS presented on a non-GAAP basis.

19

\*        \*        \*

[Olafsson:]  *Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.  That matters with the formula I gave you at the earnings call earlier this year – are we assuming the same pricing of minus 4% or is it minus 5%? It really doesn't matter what we say.  It is net-net when we have the new launches, minus the price erosion, minus any volume decline, we are seeing approximately 5% growth year on year*.

*In terms of generic pricing in the second quarter, we saw no change in the pricing.  We saw a stable environment, as we talked about, from first quarter into second quarter*.  Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. *The pricing has remained stable*.

\*        \*        \*

Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but *as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year*.

4828-1671-4429.v2

\*   \*   \*

**[Vigodman:] *Especially looking at the huge improvement during the last two years in cash flow. Now we are able to drive up our cash flow generation, cash flow from operations and free cash flow in a way that was very strongly driven by the improvement of margin in generics. That is the main driving force in basically our ability to uplift and step up the cash flow generation from the Business*.**

650.     On July 13, 2016 and July 19, 2016, Teva filed its Notes Registration Statement Amendment No. 1 and its Notes Prospectus Supplements, respectively, which incorporated by reference the materially false and misleading statements in the 2015 Form 20-F, filed February 11, 2016 (§§III.K.1, 3, 5, 6, 8); the January 25, 2016 Form 6-K containing the Teva Corporate Social Responsibility Highlights (¶¶639-640); and the 1Q2016 Form 6-K, filed May 9, 2016 (§§III.K.3, 6).

651.     In addition, the Notes Prospectus Supplements contained materially false and misleading statements concerning revenues for Teva and the combined entity – with no disclosure that the revenues were artificially and unsustainably inflated by the Price-Hike Strategy and collusive activities:

> *For the year ended December 31, 2015, our generics segment represented approximately 49% of our revenues. Following the completion of the Actavis Generics acquisition, the percentage of our revenues and profits attributable to sales of generics is expected to increase substantially. . . . [I]t is unlikely that the proportion of revenues attributable to generic pharmaceuticals, which will move from less than half before the acquisition to nearly two-thirds afterward, will change significantly over the next few years. Accordingly, we will be more dependent on our generics business and increasingly subject to market and regulatory factors affecting generic pharmaceuticals worldwide*.

\*   \*   \*

| | For the three months ended March 31, | | | For the year ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pro forma 2016 | 2016 | 2015 | Pro forma 2015 | 2015 | 2014 | 2013 | 2012 | 2011 |
| | (unaudited) | | | (unaudited) | | | | | |
| | | | | U.S. dollars in millions (except per share and share amounts) | | | | | |
| Net revenues | 5,803 | 4,810 | 4,982 | 24,708 | 19,652 | 20,272 | 20,314 | 20,317 | 18,312 |
| Cost of sales | 3,029 | 2,019 | 2,146 | 12,560 | 8,296 | 9,216 | 9,607 | 9,665 | 8,797 |
| Gross profit | 2,774 | 2,791 | 2,836 | 12,148 | 11,356 | 11,056 | 10,707 | 10,652 | 9,515 |

652.     On July 27, 2016, Teva filed a Form 6-K, signed by Desheh, announcing it had received clearance from the FTC for the Actavis acquisition. In the press release, the Company

touted itself as the provider of affordable generic medicines and repeated the false and misleading projections provided to investors two weeks before:

>Acquisition Strongly Reinforces Teva's Strategy and Opens New Possibilities in Generics and Specialty
>
>Added Capabilities, Assets and Talent Advance Teva's Focus on Patient Needs and ***Providing Affordable Generic Products to Patients at Every Stage of Life Worldwide***
>
>\*       \*       \*
>
>***Highly Synergistic Transaction Generating Double-Digit Accretion During 2017 Through 2019 with 9.3% ROIC in 2019***
>
>***Strong Combined Company Free Cash Flow ($25 billion from deal close to the end of 2019) will enable rapid deleveraging and continued capital allocation to fuel future growth and generate shareholder value***.

653.    Less than a week later, on August 2, 2016, the Company filed a Form 6-K, signed by Desheh, announcing "Teva Completes Acquisition of Actavis Generics."  In the Form 6-K, Teva again touted the Company's generation of more than $200 billion of savings to the U.S. healthcare system in the past ten years.  In addition, Vigodman repeated the combined companies' ability to generate "'significant cash flow'" and top- and bottom-line growth.  However, Desheh and Vigodman failed to disclose that Teva engaged in the Price-Hike Strategy and anti-competitive price-fixing and market allocation activities that worked to artificially inflate generic drug pricing and offset any savings to U.S. consumers of generic medicines.  Furthermore, Teva's projections of significant cash flow generation and top- and bottom-line growth lacked a reasonable basis and were based on unsustainable pricing levels and revenues due to the Price-Hike Strategy and collusive activities:

>Erez Vigodman, President and CEO, Teva [stated:] "Through our acquisition of Actavis Generics, we are creating a new Teva with a strong foundation, significantly enhanced financial profile and more diversified revenue sources and profit streams backed by strong product development engines in both generics and specialty. ***This is a platform that is expected to generate multi-year top-line and bottom-line growth as well as significant cash flow***."

\*     \*     \*

*Teva's products generated approximately $215 billion in savings in the last decade to the U.S. healthcare system; this number will continue to increase and even accelerate as a result of the acquisition*.

654.    On August 4, 2016, Teva held its second quarter 2016 earnings call.  Vigodman, Desheh and Olafsson participated in the call.

655.    During the call, Vigodman and Olafsson discussed financial projections, pricing and competition – while concealing Teva's participation in the Price-Hike Strategy and anti-competitive activities and the conduct's impact on pricing and financial projections.  Vigodman repeated the misleading projections, again highlighting the significant accretion and cash flow generation capabilities of $25 billion free cash flow for the upcoming three years.  Olafsson, in turn, reassured investors of the pricing stability in the market.  And when questioned about the opportunity to raise prices on selected product, Olafsson falsely stated that such opportunities only arose with exclusive products or when some kind of dysfunction occurred in the market:

> [Vigodman:] *Financially, the [Actavis] transaction yields very compelling economics.  It is highly synergistic with $1.4 billion in operational and tax synergies achievable by the end of 2019.  It is significantly accretive to non-GAAP EPS with 14% accretion in 2017, and 19% accretion in 2019, and is expected to generate 9.3% ROIC by the end of 2019.  The combined Company will generate more than $25 billion of free cash flow from the beginning of August 2016 until the end of 2019*.

\*     \*     \*

> [Olafsson:]  So overall, the business itself is fairly stable. As I mentioned in the beginning*, we are seeing exactly the 4% price erosion*. There is such [sic] not much movement in the other volumes. If you take away these two exceptions, the rest of the volume seems to be intact. And then some of the product there has been a small volume increase. *So overall, a stable business, 4% price erosion in the US*, and I think a great base to build on now, when we combine the two businesses for the future.

\*     \*     \*

- 261 -

[Chris Schott – J.P. Morgan – Analyst:]   As you kind of review the pro forma business, do you see the opportunity to raise price on select products here? . . .

. . . [Olafsson:]   On the pricing, as you know, and we know that, the size really doesn't affect the pricing.  And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing.  *I think the pricing comes with shortages in the market.  If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out*.  But overall, the size, and being a combined company doesn't play into that.  I feel quite strongly about that.

656.   On September 7, 2016, Desheh attended a Healthcare Conference hosted by Wells Fargo Securities.  During the conference, Desheh not only maintained that Teva experienced only 4% pricing erosion, but also suggested that for products that Teva had been selling for two years or more, the Company did not see any pricing erosion at all, and pricing "might even go up a little bit here and there" – without disclosing that Teva's pricing was artificially and unsustainably inflated by the Price-Hike Strategy and collusive activities:

*Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.  Might even go up a little bit here and there, depending on demand and supply, and demand and availability of competing products in the market, but you don't see – there you don't see the erosion.  Where we see erosion is that you know, you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down.  But when we look at the base, there's no – there's no pressure on prices*.

\*       \*       \*

Regarding your second question, you know**, *our role – and that's how we see it, and we truly believe in it – is to bring to the markets, not just the US market but global markets, affordable medicines and provide access to billions of people, to medicine***.

657.   On September 9, 2016, Vigodman and Olafsson hosted Teva's Generic Medicines Overview conference call.  During the call, Olafsson again reiterated the lack of pricing inflation for generic medicines and 4% pricing erosion for Teva's U.S. generics segment and assured investors that its sizeable portfolio shielded the Company from pricing fluctuation – but failed to disclose that

- 262 -

the Price-Hike Strategy and collusive price increases mitigated Teva's pricing erosion.  Furthermore,

Olafsson misrepresented that price increases were only taken when drug shortages occurred:

> Government is struggling with increased healthcare costs, and really the generics are the key to the solution.  They are really not the problem.
>
> **There is no inflation in the generic pricing**, which I will talk about.
>
> <p style="text-align:center">*     *     *</p>
>
> **So I couldn't conclude the presentation without talking about pricing.  So first of all, nothing big has changed**.  We can all breathe in and breathe out.
>
> <p style="text-align:center">*     *     *</p>
>
> **So far, what we saw in the end of second quarter was approximately 4% in the US and 5% global.**  So, there will be a fluctuation, and obviously, it will affect every generic Company.  But the message I want you to take from this slide is **with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down**.
>
> <p style="text-align:center">*     *     *</p>
>
> **And people that say that the generic – there's a big generic price inflation, are simply wrong**.
>
> You've seen it throughout the years.  **Every year for the last 10 years, the price erosion we have seen this between 2% and 7%.**
>
> <p style="text-align:center">*     *     *</p>
>
> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases.  Simply, it doesn't work like that in generics.  **When price increases are taken, there's some kind of abnormality in the business.  There are shortages**.

658.     On November 15, 2016, Teva held its third quarter 2016 earnings call.  Vigodman,

Desheh and Olafsson participated in the call.  During the call, Olafsson reviewed the performance of

the U.S. generics business and falsely attributed its profitability to cost control and business mix –

while concealing the profitability boost from the Price-Hike Strategy and collusive activities:

> Turning to the performance of our global generics business in the third quarter.  Total revenues were $2.9 billion, an increase of 32% compared to third

<p style="text-align:center">- 263 -</p>

quarter of 2015, reflecting the results of operation of the Actavis generics business from August 2, 2016 or approximately two months contribution. . . .

*In the US, there was a small decline in the Teva legacy generics business, which mainly resulted from a loss of exclusivity, and intensified competition for generic versions of Pulmicort, Nexium and Xeloda.*

\*      \*      \*

*Turning to our profit margins, the generic business came in at 29.9%. By exercising strong focus on cost control, and driving the right business mix, we compensated for challenges on the top line.*

\*      \*      \*

*So I really didn't expect us to get to 29.9% at this point in time. I think, that highlighted with, I think, early synergies, a good work around those synergies, but also a very good cost control. But I'm still of the opinion that we can be in the 30%s in 2017 with the right mix of product launches.*

659.    Furthermore, on pricing, Olafsson emphasized that price erosion was and will be 5% per year as guided by Teva.  In response to an analyst's question on whether the recent 7% price erosion had to do with increased competition or reversal of previous price increases, he explained that the increased price erosion was a one-time event associated with the FTC's required divestiture relating to the Actavis acquisition.  In addition, Olafsson confirmed that the bullish growth guidance from the September 9, 2016 conference call remained unchanged, and the recent underperformance in the legacy Teva generic segment was a temporary event due to a lag in product launches:

Let me start on the drug pricing, so overall, *like previous quarters, there hasn't been any fundamental change in the US drug pricing.  And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.* As we mentioned, to close the transaction and to fulfill the requirement of the FTC, we had to divest 79 products in the US.

\*      \*      \*

*I'm as bullish on the generic business today as I was on September 9 for sure. . . . The price erosion in the US is similar to what we expected in September.  The impact on the divested product was a little bit more.*

- 264 -

*I think the guidance on how we see the pricing environment is very similar as we guided to in our meeting, the difference being is basically the new launches*. . . .

. . . *But I'm as bullish of seeing the mid single-digit growth as before*.

\*       \*       \*

*What has brought the numbers lower than we thought in July for 2016 are the revenue from new launches*.   That's very, very simple.   We estimated a significantly higher – there were about three or four key launches that we expected to get by the end of this year, which are not coming in, that would deliver the hundreds of millions in revenue which are not coming in.   *The good news, on this bad news is, they will come later*.

*They will come in 2017 and maybe into 2018.   So they're not lost at all*.

\*       \*       \*

I think maybe to add to the price increases, keep in mind, and we talk a lot about that, *the overall prices in the US of generics always go down*.   I've been in the business for 23 years, and *the prices, even though there are examples giv[en] of a product going up significantly, maybe a single molecule, even one SKU, but overall, when you look at the 300 to 400 products we have on the market, our price erosion on average is about 5% per year*.

\*       \*       \*

[David Maris – Wells Fargo Securities – Analyst:]  Just as a follow-up, Siggi. So what you're saying is the acceleration in the price decreases that you've seen this past quarter aren't a result of increased competition on existing molecules, and it's not a result of having to tame previous price increases, or give back some of those?

[Olafsson:]  *No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it*.   What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of – and these were one of our top – the top molecules we had in our portfolio.   *So there was an instability that happened in the market during the month of August, when the new owners were taking market share*.

*It didn't change the fundamental of the market*.   It didn't change the structure of the market, or the chemistry of the market, but *we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter*.

- 265 -

660.    Less than one month later, Olafsson was fired.  A month after that, on January 6, 2017, Teva held a business outlook conference call.  Vigodman, Desheh and Bhattacharjee participated in the call.

661.    During the call, defendant Vigodman discussed the drivers of increased profitability in the generics business since 2014 and attributed the increase to everything but the Price-Hike Strategy and collusive activities:

> *Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business.  In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure*.

662.    In addition, during the call, Defendants lowered guidance provided to investors during the July 13, 2016 conference call – blaming the delay on the Actavis acquisition closing and new launches, even though the July 2016 guidance was provided a mere three weeks prior to the completion of the Actavis acquisition.  Vigodman falsely assured investors that "very reasonable assumptions" based on past performances were used in the projections, without disclosing that Teva's past performance was unsustainably and artificially inflated by the Price-Hike Strategy and collusive activities.  Furthermore, Bhattacharjee maintained that price erosion expectations would remain the same, in the mid-single digits, unless threatened by "unique market events," such as losing exclusivity due to additional competition.  In sum, Defendants continued to provide misleading projections, with Vigodman stating:

> *For 2017, we estimated that Teva's total revenues will be between $23.8 billion and $24.5 billion. For non-GAAP EPS, we estimate a range of between $4.90 and $5.30 per share.  EBITDA for 2017 is expected to be in a range of $8 billion to $8.4 billion.  Our cash flow from operations is expected to be between $5.7 billion and $6.1 billion*.

<center>*     *     *</center>

The 2017 guidance we provided today is significantly below what we provided in the July [2016] preliminary outlook.  Besides FX headwinds ex-US, we have an EBITDA gap of $1.2 billion emanating from our US generics business.

. . . ***The majority of the $1.2 billion gap is attributable to not being able to realize new launches in our Teva legacy business in a way that is consistent with our past track-record***.  As we communicated in November, this impacted the second half of 2016 and will have an impact on 2017 as well.

***In addition, the long waiting period for the closing of the transaction had an adverse impact on our ability to fully exploit all opportunities from the business during this long transition period***.

## Non-GAAP financial highlights

|  | 2016 Guidance* | 2017 Business Outlook |
|---|---|---|
| **Revenues** $ billions | 21.6-21.9 | 23.8-24.5 |
| **Operating income** $ billions | 6.8-7.0 | 7.4-7.8 |
| **EBITDA** $ billions | 7.3-7.5 | 8.0-8.4 |
| **Net income** $ billions | 5.2-5.3 | 5.3-5.7 |
| **EPS** $ | 5.10-5.20 | 4.90-5.30 |
| Weighted average number of shares, in millions | 1,020 | 1,076 |
| **Cash flow from Operations** $ billions | 4.8-5.0 | 5.7-6.1 |
| **Free cash flow** $ billions | 5.9-6.0 | 6.3-6.7 |

* Provided November 15th 2016

*          *          *

***We use basically very reasonable assumptions in the model, we modeled, based on past performance in the US and pipeline assets of Teva.  In retrospect a number of potential launches were not realized in the second half of 2016 as we indicated already would carry over, affect 2017, and we decided to lower expectations that pertain to the Teva's legacy business in 2017, and that explains the majority of the gap***.

*          *          *

663.   Further, Desheh and Bhattacharjee stated:

[Desheh:]  ***In 2017 we will deliver 11% top line growth . . . 11% growth in EBITDA, and strong cash flow from operations of $5.7 billion to $6.1 billion***.

*          *          *

- 267 -

*EBITDA grows by approximately 11% to a range of $8 billion to $8.4 billion*.

\*       \*       \*

*Our cash flow from operations is expected to be approximately $5.9 billion of leverage, and free cash flow which includes the divestment of Actavis European business and other non-core assets will reach $6.3 billion to $6.7 billion*.

\*       \*       \*

[Bhattacharjee:]  On price erosion, as you know price erosion depends on the mix of products in the portfolio of a company and differs from company to company. *We expect to see mid single digit price erosion to continue in our base business in the United States. However, if we include products that have unique market events, such as moving from an exclusive or semi-exclusive position, to seeing additional competition, this erosion could be higher*.

664.   On January 9, 2017, Vigodman participated in the JPMorgan Healthcare Conference. During the conference, he elaborated on the $1.2 billion EBITDA gap announced in the business outlook conference call three days earlier and misleadingly blamed the massive earnings gap on $460 million in new launch delays:

*So, [we] used very reasonable assumptions when we modeled the outlook for 2017 in July 2016.  And the assumption was that we launch $600 million, which is very reasonable, given the numbers that I've just indicated.  In retrospect, that was a tough year for us for a number of reasons and we were able eventually to launch only $140 million in 2016 for new products.  It created – it had an impact on 2016 and created a new run rate for 2017.  We reduced the expectations also for 2017 in that regard.  And that is the main reason that explains the gap between the guidance – the outlook and 2017 guidance*.

665.   In addition, during the conference, Vigodman touted Teva as a provider of affordable generic medicines that saved U.S. consumers $215 billion in the last decade – with no mention that the Company's Price-Hike Strategy and collusive activities during the past four years had caused dramatic price increases on essential drugs that were detrimental to patients and offset purported savings to consumers:

I think maybe this is an opportunity to maybe take three minutes through the generic industry . . . .   A space that is critical for healthcare systems across the globe. It enables access for billions of people to high quality, affordable drugs. The space

- 268 -

saved, here in the United States, $1.6 trillion during the last decade. ***The direct contribution of Teva to that number is $215 billion during the last decade***.

666.   On February 13, 2017, a week after Vigodman's unexpected termination, Teva filed its 4Q2016 Form 6-K Press Release reaffirming the materially false and misleading projections provided during the January 6, 2017 business outlook conference call:

> ***Teva reaffirms its 2017 full year non-GAAP guidance, including the items below:***
>
> - ***We expect revenues for full year 2017 to be $23.8 - 24.5 billion***.
>
> - ***Non-GAAP EPS for 2017 is expected to be $4.90 - 5.30, based on a weighted average number of shares of 1,076 million***.

667.   On the same day, Teva held its fourth quarter 2016 and full year 2016 earnings call. Desheh, Peterburg and Bhattacharjee participated in the call.

668.   During the call, Peterburg again reaffirmed the misleading projections provided during the January 6, 2017 conference call and Bhattacharjee stated that the projections assumed 5% price erosion in the base business:

> [Peterburg:]  ***We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary***.
>
> \*      \*      \*
>
> [Bhattacharjee:]  ***As I have described in past discussions, in the US we expect net price erosion in our base business to be around 5%***; however, there are additional price erosion factors at work, which will depend upon the amount of transition products in our portfolio for that specific year.

669.   The statements in ¶¶642-668 were materially false and misleading or omitted material facts.  In particular:

(i)      Defendants' statements above that Teva was a provider of affordable generic medicines, contributed over $200 billion of savings to the U.S. healthcare system in the past decade, experienced a 5% price decline for 2015 with price erosion of 4% in the United States similar to

2014, had never seen inflation in generic pricing, and saw "no change in the pricing" with 4% pricing erosion during the second quarter of 2016 were materially false and misleading when made because: (a) Teva was engaged in collusive price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy that caused generic drug prices to skyrocket; (b) Teva made at least 76 massive price increases on selected generic drugs during 2013 to 2016, with at least 48 increases made in tandem with purported competitors; (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs; (d) in 2014, Teva implemented price hikes ranging from 22% to 1,543% for at least 28 generic drugs in the United States; (e) in 2015, Teva implemented price hikes ranging from 50% to 632% for at least 15 generic drugs in the United States; and (f) Teva's rate of pricing erosion was much higher than reported or disclosed.

(ii)    Defendants' statements above concerning improving profitability driven by cost control, cost of goods sold, portfolio selection and cost infrastructure were materially false and misleading when made because: (a) Teva's financial results were inflated in part by collusive activities and the Price-Hike Strategy; and (b) the Company generated at least $1.79 billion in Collusive Profit and Inflated Profit during 2013 to 2015 and at least $2.3 billion during 2013 to 2016, which contributed significantly to the financial results;

(iii)    Defendants' statements above that "we strongly believe that we will be able to generate the economics we promised" and that Teva grew net revenues and EBITDA from 2015 levels were materially false and misleading when made because both measures were based on and included sales and growth derived from the unsustainable Price-Hike Strategy and collusive anti-competitive activities;

(iv)     Defendants' statements above concerning price increases taken due to shortages in the market were materially false and misleading when made because the Price-Hike Strategy was implemented on drugs for which no shortages had in fact occurred; and

(v)     Defendants' statements that Teva's portfolio shielded the Company from pricing variation, that it was not seeing any fundamental change or worsening in the pricing environment and saw a stable environment during the second quarter of 2016, that the heightened pricing erosion of 7% in the third quarter of 2016 was due to divested products, that expectation of price erosion continued to be 5%, and that the $1.2 billion EBITDA gap was caused by a lag in new product launches and a delay in the closing of the Actavis acquisition were materially false and misleading when made because: (a) Teva's Inflated Profit began to decline by close to 50% year-over-year in 2016; (b) Defendants knew that the anti-competitive practices in the generics industry that contributed substantially to Teva's financial results were drawing increased scrutiny, which made it increasingly difficult for Teva and other manufacturers to continue to implement price hikes; and (c) Teva's rate of pricing erosion had accelerated as the Inflated Profit declined substantially.

670.     On March 31, 2017, Teva issued its Communication on Progress for 2015, proclaiming that it upheld "ethical conduct at all times" and saved $215 billion in the past ten years for various U.S. generic drug market participants – while disguising its involvement in widespread unethical and collusive anti-competitive activities in the U.S. generic drug market and its implementation of the Price-Hike Strategy that offset savings to families, insurers and the government:

Message from our President and CEO

*       *       *

To continue to positively impact the lives of our patients and other stakeholders, we must operate according to the principles and standards of corporate responsibility. ***This means upholding ethical conduct at all times***, protecting the

- 271 -

planet, caring for our communities and providing our employees with a challenging, rewarding and meaningful work environment.

<div align="center">*       *       *</div>

Dr. Yitzhak Peterburg
Teva Interim President & CEO

<div align="center">*       *       *</div>

**_Teva saved $215 billion for U.S. families, insurers and government over 10 years_**.

<div align="center">*       *       *</div>

**_We account for almost 13% of savings generated from generics prescriptions in the U.S. equating to approximately $215 billion over the last ten years_**.

671.    On May 11, 2017, Teva held its earnings call for the first quarter of 2017.  Peterburg, Desheh and Bhattacharjee participated in the call.

672.    On the call, the three defendants reaffirmed the misleading projections provided during the January 6, 2017 conference call and told investors that pricing erosion – which now stood at a higher 7% – was embedded into the January forecast.  Defendants attributed the heightened pricing erosion to an increase in FDA generic drug approval and customer consolidation, without disclosing that dramatic price hikes from collusive price fixing and the Price-Hike Strategy attracted additional competitors and caused customer renegotiation of contracts as competition increased:

> [Peterburg:]  Our generic business is not immune to the challenges other companies in our industry are currently facing with increased competition and consolidation.  **_This is reflected in the most recent analysis we completed that looks at net price erosion in our U.S.-based business, which came in at 7% versus the approximately 5% that we communicated previously.  The 2 biggest contributing factors to this change are the ongoing consolidation of our key customers and the increase in generic drug approval by the FDA, which has created additional competition_**.

<div align="center">*       *       *</div>

> As we stated in our press release from this morning, **_we are reaffirming our 2017 outlook.  We are committing to being transparent.  And therefore, we wanted to provide more clarity into our business and the moving parts of our projections_**,

<div align="center">- 272 -</div>

specifically regarding the challenges in the U.S. generic market and Venezuela.  We will continue to keep you informed throughout the year as our team works extremely hard to execute on all of our promises and priorities for 2017.

\*         \*         \*

[Bhattacharjee:]  As regarding – in terms of what we would expect and how we will track for the rest of the year, *we would expect the current levels of price erosion that we have spoken about will remain for the rest of the year.  It is embedded in our forecast*.

673.    On August 3, 2017, Teva held its second quarter 2017 earnings call.  Peterburg, Bhattacharjee and McClellan participated in the call.

674.    During the call, Defendants announced that profitability had declined for the first half of 2017 and lowered guidance for 2017.  Defendants attributed the negative results to the 8% price erosion during the second quarter and volume decline – both caused by heightened competition from increased FDA ANDA approvals and customers' renegotiation of contract prices.  Nevertheless, Defendants failed to disclose that the increased pricing erosion, competition and renegotiation of contracts were the direct result of Teva's substantial and collusive price hikes and the Price-Hike Strategy, which lured additional competitors to seek approval to manufacture and supply the drugs and triggered contract renegotiation:

[Peterburg:]  We reported today lower-than-expected Q2 results.  Revenues in this quarter were $5.7 billion, resulting in a non-GAAP net income of $1.1 billion and non-GAAP EPS of $1.02.  Cash flow from operation was soft, amounting to $741 million.  *We have also lowered our 2017 revenue outlook to $22.8 billion to $23.2 billion and our non-GAAP EPS outlook to $4.30 to $4.50*.

All of us at Teva understand the frustration and disappointment our shareholders are feeling.  This morning we are going to outline what has changed over in the last 3 months, the actions we are taking and some of the positive development this quarter.

*In the last 3 months, our results were greatly impacted by the performance in the U.S. Generics business and continued deterioration in Venezuela.  In our U.S. Generics business, we experienced accelerated price erosion and decreased volume, mainly due to customer consolidation, greater competition as a result of an increase in generic drug approval by the FDA and some new product launches that were either delayed this quarter or got subjected to more competition*.

- 273 -

*  *  *

[McClellan:] Quarterly revenues. *Looking at our quarterly revenues. They're up 13% from Q2 of 2016.  U.S. Generics is up by $410 million, while the other generic markets have grown by $316 million.  Most of the growth in the generics business is due to the integration of the Actavis business globally, offset by price erosion and volume loss in the U.S.* . . .

. . . *We do not – or we do expect price erosion to accelerate in the remainder of the year*, and we will be using the quarterly comparison going forward as it better reflects the dynamic nature of our business.

*  *  *

*The reduction in profitability we see in this slide in the first half of 2017 is the result of factors previously mentioned, mainly the price erosion and relatively low launches in our U.S. Generics business in 2017 as well as the Venezuela currency impact*.

*  *  *

*Now we'll move to the financial outlook for the year.  Our updated expectations for the annual revenues is down approximately 5% from our previous expectations, reflecting both the challenging environment in the U.S. Generics and the Venezuela devaluation*.  All of our other businesses are on track to deliver their forecasted targets. *The same elements and specifically the U.S. price erosion and lower number of product launches also drove the majority of the reduction in our gross profit margin that you see here*.

### 2017 non-GAAP P&L outlook

| billions, except EPS | 2017 Business Outlook January 2017 | Updated Business Outlook August 2017 |
|---|---|---|
| Net revenues | 23.8 - 24.5 | 22.8 - 23.2 |
| Gross profit (%) | 57% - 58% | 56% - 57% |
| R&D | 1.75 - 1.85 | 1.6 - 1.7 |
| S&M | 3.4 - 3.55 | 3.45 - 3.55 |
| G&A | 1.0 - 1.1 | 1.1 - 1.2 |
| Operating income ($B) | 7.4 - 7.8 | 6.6 - 6.8 |
| EBITDA | 8.0 - 8.4 | 7.2 - 7.4 |
| Finance expenses | 0.8 - 0.85 | 0.8 - 0.9 |
| Tax (%) | 17% - 18% | 16.5% - 17.5% |
| Number of shares (M) | 1,076 | 1,076* |
| EPS | 4.90 - 5.30 | 4.30 - 4.50 |
| Cash flow from operations | 5.7 - 6.1 | 4.4 - 4.6 |

\* If annual EPS is below $4.37, the mandatory convertible preferred shares will be anti-dilutive and the number of shares will be 1,017 with no impact on guided EPS of $4.30-$4.50. See slide 29 for additional information.

*  *  *

- 274 -

[Bhattacharjee:]   First, let me address the question that you have around the consolidation of the buyers.   As you know that, now at this point in time, approximately 80% or a little higher than that, of generics purchases are concentrated in 4 GPOs.  *Specifically in quarter 2, we saw the impact coming from finalization of ClarusONE, which is the RFP that was from a combination of McKesson and Walmart*.  We saw some impact of that due to price adjustment in the latter part of the quarter as well as some shelf stock adjustments that we had to do.  It has negatively impacted our prices.  And we also largely secured most of the volumes that we have seen.  *Earlier in the year, we had a similar RFP from another GPO, which is ECONDISC*.  And at this point in time, we have no further news as to whether there will be further RFPs or not.  *In terms of the effect of these RFPs on the remainder of the year, it will lead to a higher price erosion and that is built into our forecast*.

675.   On September 14, 2017, Teva published its 2016 Social Impact Report, which, again, repeatedly touted the Company as a leading provider of affordable generic medicines and its ethical business practices and stated, in part:

Increasingly, people suffer from more than one chronic condition, and *too many face barriers to accessing the affordable treatments they need.  We are committed to doing our part to address these challenges and demonstrate social value, knowing the way we act – and the way we conduct our business – matters*.

\*      \*      \*

**Everything we do**.

In an ever-changing world, we strive to constantly evolve and improve, recognizing there is always more to learn – even from missteps.  *We are dedicated to acting with integrity and transparency*.

\*      \*      \*

A letter to our stakeholders

From Dr. Yitzhak Peterburg, Teva's Interim President & CEO

. . . As a global medicines company, we have a tremendous opportunity to improve lives and make a positive social impact.  To realize this potential good, *we foster a culture of accountability, responsibility, and ethical business practices throughout Teva*.

\*      \*      \*

**—  Increasing access to affordable, high-quality generic medicines**.
Unfortunately, many individuals around the world are living without access to much-

- 275 -

needed therapies.   Last year, we launched nearly 1,000 generic medicines, *enabling millions of patients to access and afford safe and reliable treatments*.

\*       \*       \*

**Teva at a glance: 2016**

\*       \*       \*

*We specialize in developing, manufacturing, and delivering affordable generic medicines*, as well as innovative and specialty pharmaceuticals, over-the-counter healthcare products and Active Pharmaceutical Ingredients (APIs).

\*       \*       \*

**Enabling Better Days**

*Making medicines affordable*

\*       \*       \*

**Doing Business Ethically and Responsibly**

\*       \*       \*

*Maintaining ethical business standards*

*Strengthening compliance*

\*       \*       \*

*We advance good health and well-being through our core business of making medicines affordable* and developing specialty treatments to address unmet needs.

*We promote ethical and responsible business behavior*, advancing diversity, gender equality, and inclusion throughout our business.

\*       \*       \*

Our promise is simple: enable better days.  Making this promise real for the 200 million people we serve each day is a central focus of every decision we make, every product we develop, and every therapy we bring to market – *yet, we can only have an impact when medicines are accessible and affordable*. . . .

**In Progress**

*Our vast portfolio of generic medicines helps people live their best lives – with increased access to affordable treatments*.

4828-1671-4429.v2

<p align="center">*      *      *</p>

**A unique ability to increase access to affordable medicines**

As a large generics manufacturer with a global footprint, we have proven our dedication to making vital treatments accessible. *We consistently introduce affordable, high-quality medications*, while tailoring treatments to patient needs.

<p align="center">*      *      *</p>

Worldwide, our patients, their caregivers, and the communities in which they live trust us to engage in ethical conduct. *Since our company was founded 116 years ago, we have made a commitment to act responsibly, maintain integrity, and ensure transparency in every part of our business*.

676.    On November 2, 2017, Teva held its third quarter 2017 earnings call. Peterburg, Bhattacharjee and McClellan participated in the call.

677.    During the call, Defendants announced declines in the revenues and profitability of the U.S. generics business due to heightened price erosion driven by increased competition from FDA approvals and customer consolidation:

[McClellan:] *The profitability of the company was down to 26.2% from 32.2% in 2016 Q3. This reflects a lower gross profit of 53% in the quarter compared to 61% in the same quarter of the previous year. This is driven by several factors. The inclusion of ANDA distribution business as well as lower margins in the generics, specifically, in our U.S. generic market. . . . U.S. generics revenues were down $102 million, despite the increase of an additional month of the Actavis generics compared to the same quarter in 2016. The U.S. business was impacted from continued price erosion, which was 10% in Q3 2017 on the base business as compared to the same quarter of last year as well as accelerated FDA approvals of additional generic versions of competitors in our base business as well as lower volumes of the Concerta-authorized generic following additional competition.*

<p align="center">*      *      *</p>

[Bhattacharjee:] *So in the second quarter, we reported a price erosion of a little over 6% for our base business compared to the comparable quarter of the prior year. Since then, in our third quarter, we have seen an increase in price erosion. And as Mike explained that we have now seen, in the third quarter, the price erosion to be 10% This is primarily driven by 2 factors. The first is that the increasing FDA approvals that are happening for products, for which, already generics players exist in the market. So the new players try and drive some gains in market share based on volumes – based on lower prices. And the second is that the consolidation of the 3 – of the customers into 3 GPOs, which now account for*

<p align="center">- 277 -</p>

*more than 85% of generics, which is in the U. S. market has also, while their RFPs have created additional pricing pressure. In terms of the rest of the year, we expect that these price erosions will remain at these elevated levels.*

\*      \*      \*

*Now in terms of the generics business, it is not a recent development. It has been there for a while, which is, that the base business erodes as new and additional competitors come into the market. And this, in recent times, has been exacerbated by the increase in the FDA approvals.*

\*      \*      \*

[McClellan:] *So the overall gross margin, the net margin on generics has been declining. We do – it's driven by a couple of things. One is the level of price erosion we've seen in the U.S. generic business. We've seen lower contribution from our business in Venezuela over the quarters and compared to last year. We've also seen some unfavorable FX and other variance in our costs of goods sold. So all of those things have been pressuring margins, especially, in our U.S. generic business.*

678.    On December 14, 2017, Teva hosted a conference call to discuss its restructuring plan and the additional measures it was taking to improve its financial and business performance. During the call, Schultz told investors that generic drug price competition in the past several years had led to a race to the bottom for Teva and other drug manufacturers. However, he concealed from investors that Teva's anti-competitive, collusive activities had contributed significantly to the Company's profitability:

Now let me talk a bit about the global generics portfolio. *There's been a lot of pricing dynamics on generic products in United States and elsewhere in the last couple of years. If you have a very dynamic situation, sometimes you have the risk that some of your products will not really meet a sustainable profitability benchmark.*

*In order to secure that we have a long-term sustainable portfolio, we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary.*

\*      \*      \*

*Then, of course, it's good to have price competition. . . . The total dynamics have just led to that – my guess is that not only Teva, but other manufacturers have ended up competing to the bottom where it's not really sustainable or profitable.*

- 278 -

679.     On January 8, 2018, Schultz participated at the JPMorgan Healthcare Conference, where he represented to investors that Teva historically had focused on maximizing revenues through volume growth – in direct contradiction to Oberman's, Vigodman's, Olafsson's and Desheh's repeated representations that Teva's profitability was not driven by volume or market share.  Schultz failed to disclose that Teva was actually maximizing revenues through unsustainable collusive price increases:

> We're also optimizing our portfolio and there's been some misunderstandings about what is it we're doing with this optimization of the portfolio.  Why am I talking about some prices will have to go up, because they're not sustainable.  It's basically a change where you can say, *Teva used to focus on maximizing revenue in the generics business, believing that if you just maximize revenue, everything will fall in place and you'll get great profitability and so on.  That doesn't really work from my point of view.  You always need to maximize operating profit.  So when you think about it, if you maximize revenue, you're taking really any deal you can get, just to get the volume, but you don't really stay super focused on what is the per product, per SKU profitability*.

680.     The statements in ¶¶670-679 were materially false and misleading or omitted material facts.  In particular:

(i)     Defendants' statements above that "it's good to have price competition . . . manufacturers . . . have ended up competing to the bottom," and that Teva experienced higher pricing erosion due to RFPs from GPOs, "saved $215 billion for U.S. families, insurers and [the] government" during the past decade, upheld "ethical conduct at all times," was "commit[ted] to being transparent," "dedicated to acting with integrity and transparency" with "a culture of . . . ethical business practices throughout Teva," and specialized in "delivering affordable generic medicines" and "making medicines affordable" were materially false and misleading when made because: (a) Teva was engaged in collusive price-fixing and market allocation schemes and the anti-competitive Price-Hike Strategy that caused generic drug prices to skyrocket; (b) Teva made at least 76 massive price increases on selected generic drugs during 2013 to 2016, with at least 48 increases

made in tandem with purported competitors; (c) Teva engaged in collusive and anti-competitive price-fixing and market allocation schemes on over 100 generic drugs; and (d) Teva's rate of pricing erosion was much higher than reported or disclosed;

(ii)     Defendants' statements above that the generics business's growth and profitability was attributable to the Actavis integration, but was reduced by volume loss and price erosion in the U.S. and Teva's past effort at maximizing revenue "to get the volume" without getting the profitability were materially false and misleading when made because: (a) Teva's financial results were inflated in part by collusive activities and the Price-Hike Strategy; and (b) the Company generated at least $2.6 billion in Collusive Profit and Inflated Profit during 2013 to 2017, which contributed significantly to revenues, profitability and growth;

(iii)     Defendants' statements above "reaffirming [the] 2017 outlook," lowering Teva's 2017 revenues and EPS outlook, and "expect[ing] the current levels of price erosion" to "remain for the rest of the year" were materially false and misleading when made because these measures were based on and impacted by the unsustainable Price-Hike Strategy and collusive anti-competitive activities; and

(iv)     Defendants' statements that Teva "experienced accelerated price erosion and decreased volume" and pricing erosion of 7% due to customer consolidation and additional competition created by the FDA's increased generic drug approvals were materially false and misleading when made because: (a) Defendants knew that the anti-competitive practices in the generics industry that contributed substantially to Teva's financial results and mitigated Teva's rate of pricing erosion were drawing increased scrutiny, which made it increasingly difficult for Teva and other manufacturers to continue to implement price hikes; (b) Teva's rate of pricing erosion had accelerated as the Inflated Profit declined substantially; and (c) Teva and other manufacturers' dramatic price hikes from collusive activities and its Price-Hike Strategy had led to the FDA's

initiative to speed up and increase generic drug approval and had attracted additional competitors, which resulted in customer renegotiation of contracts as competition increased.

### 3. False and Misleading Statements Concerning Subpoenas

681.    Defendants concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016, each pursuant to their respective investigations into potential antitrust violations regarding pricing practices by generics manufacturers (collectively, the "Subpoenas").  Even when Teva ultimately disclosed the Subpoenas, Defendants persistently denied "having engaged in any conduct that would give rise to liability."

682.    Specifically, Defendants failed to disclose the Subpoenas in the Notes Offering Materials. This was actionably false and misleading because the Subpoenas called into question Teva's future earnings potential. They rendered uncertain the Company's ability to maintain its earnings from the undisclosed Price-Hike Strategy. Indeed, after Teva received the DOJ subpoena, it was unable to make any additional price increases pursuant to the Price-Hike Strategy. Consistent with this, the Notes Prospectus Supplements listed "governmental investigations into sales and marketing practices" as among the "[i]mportant factors" that could cause Teva's future financial performance to "differ significantly from [anticipated] results, performance or achievements."

683.    Additionally, the Notes Offering Materials incorporated by reference the 2015 Form 20-F and the 1Q2016 Form 6-K, which included extensive risk disclosures but did not disclose the Subpoenas.  Among these is a section titled "Government Investigations and Litigation Relating to Pricing and Marketing," which included an extensive description of litigation related to "marketing and promotion of [Teva's] specialty pharmaceutical products," and to litigation by "[a] number of state attorneys general . . . relating to reimbursements or drug price reporting under Medicaid or other programs."  The detailed and extensive nature of this section falsely and misleadingly indicated

that the disclosures were complete, while omitting the highly material DOJ and State AGs Subpoenas.

684.    On August 2, 2016, in its 2Q2016 Form 6-K, Teva made the first disclosure of the Subpoenas:

> On June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products.  On July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations.  Teva is cooperating fully with these requests.

685.    On November 15, 2016, Teva made substantially similar disclosures concerning the Subpoenas in its 3Q2016 Form 6-K, discussed Actavis's receipt of "a similar subpoena in June 2015," and issued the following denial:

> ***Teva is not aware of any facts that would give rise to an exposure to the Company with respect to these subpoenas***.

686.    On the same day, Teva held its third quarter 2016 earnings call hosted by Vigodman, Desheh and Olafsson.  Vigodman opened the call with reassurances to investors about Teva's culture of compliance with the law and that such culture underpinned "every single business decision that Teva makes."  In the same breath, he affirmed that – based on "all of our efforts to date, internal and external" – there were no facts from which exposure would accrue to Teva with respect to the investigations on its generic drug collusive activities:

> [Vigodman:]    ***Since becoming Teva's CEO in 2014, I have made compliance a top priority in everything we do***.  The compliance program that Teva has in place is serious, rigorous and comprehensive, and is designed to protect the Company and its subsidiaries against future violations. ***Today, Teva has a compliance culture that begins with a strong tone at the top, including our executive regional and local management, a culture of compliance that underpins every single business decision that Teva makes***.

<p style="text-align:center">*       *       *</p>

Finally, I cannot conclude this part of my remarks without briefly addressing the US Department of Justice investigation into price collusion in the generic drug industry, which has been in the news this month. ***I would like to emphasize that based on all of our efforts to date, internal and external, we disclosed, and I'm reiterating it here today, that we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation***.

687.    In the 2016 Form 20-F, filed on February 15, 2017, Teva repeated the disclosures above concerning the Subpoenas and the Actavis subpoena, announced the filing of the civil lawsuit by the State AGs, and assured investors that no evidence existed that "would give rise to liability with respect to" the Subpoenas and the State AGs' lawsuit:

> On December 15, 2016, a civil action was brought by the attorneys general of twenty states (Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington) against Teva USA and several other companies. The states seek a finding that the defendants' actions violated federal antitrust law (Sherman Act § 1), as well as injunctive relief, disgorgement, and costs.
>
> *            *            *
>
> ***To date, Teva has not identified any evidence that would give rise to liability with respect to the above-mentioned subpoenas and civil suits***.

688.    On May 11, 2017, August 3, 2017, and November 2, 2017, February 12, 2018, May 3, 2018, August 2, 2018, November 1, 2018, February 19, 2019, and May 2, 2019 Teva filed its 1Q2017 Form 6-K, 2Q2017 Form 6-K, 3Q2017 Form 6-K, 2017 Form 10-K, 1Q2018 Form 10-Q, 2Q2018 Form 10-Q, 3Q2018 Form 10-Q, 2018 Form 10-K, and 1Q2019 Form 10-Q, respectively, which repeated substantially similar disclosures to those above concerning the Subpoenas, the Actavis subpoena, and the State AGs' lawsuit and denied engaging in "any conduct" that would expose the Company to liabilities pursuant to the Subpoenas or civil lawsuits:

> ***Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits***.

689.    Starting on October 31, 2017, in response to media reports issued after the State AGs filed a proposed amendment expanding their first antitrust complaint, Teva continuously issued denials:

- On October 31, 2017, a Teva spokeswoman told *Courthouse News* that "Teva denies these allegations and will continue to defend itself vigorously in court."   The Company further stated that "[i]n accordance with our values, Teva is committed to complying with all applicable competition laws and regulations.  To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by them."

- In a December 19, 2018 statement to *Business Insider*, Teva denied the State AGs' allegations and said it "will continue to vigorously defend itself."

- On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to shareholders." Teva added that it is "committed to complying with all applicable laws and regulations" and "is dedicated to conducting business with integrity and fairness.  Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories."

- On February 19, 2019, in response to media reports discussing an unredacted version of the first State AG complaint that had recently been made public, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

690.    The statements in ¶¶681-689 concerning the government investigations into generic price fixing misled investors by denying any wrongdoing and representing that no anti-competitive collusive activities had taken place, when in fact, Teva's engagement in price-fixing and market allocation schemes constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm.  As the State AGs alleged, Teva was not merely a participant, but the central actor in an industry-wide scheme to fix prices and allocate customers; and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the May 2019 AG Complaint.

### 4.      False and Misleading Statements Relating to the Actavis Acquisition

691.     Beginning the the third quarter of 2016, Teva failed to disclose and concealed the negative impact resulting from the acquisition and integration of Actavis on Teva's financial results and business prospects.

692.     In the 3Q2016 Form 6-K, filed on November 15, 2016, Teva asserted that the Actavis acquisition "had a significant impact on our generic medicines segment, expanding our product portfolio, R&D capabilities, product pipeline, and global operational network."

693.     In the 3Q2016 Form 6-K Press Release, defendant Vigodman stated:

> "This has been a year of transition for Teva, underscored this quarter by the close of our strategic acquisition of Actavis Generics, which had significant contribution to our results.  Actavis will continue to contribute in a meaningful way to the future growth of our generics business through the strengthened R&D capabilities and complementary pipeline and portfolio, and enhance our leadership in an increasingly evolving industry."

694.     On the same day, Teva held its third quarter 2016 earnings call and made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Vigodman:] The completion of the Actavis acquisition strengthens and broadens our R&D capabilities, and highly complements our product pipeline, product portfolio, geographical footprint and operational network.  It enhances Teva's leadership in an evolving competitive landscape and massive consolidation across our customer base. In addition, our integration plans with the Actavis generics business are on track.

> *          *          *

> [Olafsson:] On August 2, we completed the strategic acquisition of Actavis generics.  The result is a much stronger, more competitive Teva that is best positioned to thrive in an evolving global generics marketplace.

> *          *          *

> The closing of the Actavis transaction has gone very smoothly since day one with no operational disrupter.  While we were disappointed at the delay with the anti-trust review, the time allowed the integration teams at Teva and Actavis generics

- 285 -

to work diligently to plan for integration of the two companies, in order to ensure that combined Company would be fully operational immediately upon closing of the transaction.

As a result, Teva was able to begin capitalizing immediately on the benefits offered by the acquisition of Actavis generics. This included optimizing our R&D activities, harmonizing our customer contracts and relationships, and realizing economies of scale with our purchasing.

695. On December 5, 2016, Teva filed a Form 6-K, which included the following false and

misleading statements concerning the financial impact of the Actavis acquisition and integration on

the Company's business prospects and reported financials:

- <u>Vigodman</u>: "As we continue to focus on integrating and realizing the value of the Actavis Generics transaction, which is progressing according to plan, Dipankar and his team will focus on generating organic growth through new launches and replenishing the pipe line through our industry-leading R&D, and drive efficiencies across the generics organization."

- <u>Bhattacharjee</u>: "With the integration of Actavis proceeding on schedule and the complementary U.S. distribution capabilities provided by our recent acquisition of Anda, we have a matchless opportunity to add value in the U.S. healthcare system, and in the fast-changing global generics marketplace."

696. On February 13, 2017, Teva hosted its 4Q2016 earnings call, where Peterburg and

Desheh made the following false and misleading statements concerning the financial impact of the

Actavis acquisition and integration on the Company's business prospects and reported financials:

[Peterburg:] The Company's priorities continue to be extracting all synergies related to the Actavis generic acquisition, successfully launching the key generic and specialty products we have planned for 2017, and generating significant cash flow to rapidly pay down our existing debt to maintain a strong balance sheet.

We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary.

\*      \*      \*

[Desheh:] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

\*      \*      \*

- 286 -

Total sales were $93 billion, with significant growth in goodwill and intangible assets, resulting from the progress made on the Actavis acquisition versus price allocation.

697.     In the 2016 Form 20-F, filed on February 15, 2017, Teva made the following false

and misleading statements concerning the financial impact of the Actavis acquisition and integration

on the Company's business prospects and reported financials:

In August 2016, we completed our acquisition of Allergan plc's worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, we paid Allergan consideration of approximately $33.4 billion in cash and approximately 100.3 million Teva shares. The acquisition significantly expanded our generics product portfolio and pipeline, R&D capabilities and global operational network.

*     *     *

In August 2016, we completed the Actavis Generics acquisition. Our strong legacy generics business, combined with the Actavis Generics business, has a world-leading product portfolio, comprehensive R&D capabilities, robust product pipeline and an efficient global operational network. The combined generic business has a wide-reaching commercial presence, as the market leader in the United States and a top three leadership position in over 40 countries, including some of our key European markets. The combined business benefits from a leading and diverse pipeline of products, which will help us continue executing key generic launches and further expand our product pipeline, focusing on both large and small opportunities. We expect that a larger number of smaller but more durable launches will help offset expected price erosion while diversifying our revenue stream.

*     *     *

Significant highlights of 2016 included:

•     In August 2016, we completed our acquisition of Actavis Generics. The acquisition had a significant impact on our generic medicines segment, expanding our product portfolio and pipeline, R&D capabilities and global operational network.

698.     In the 1Q2017 Form 6-K, filed on May 11, 2017, Teva made the following false and

misleading statements concerning the financial impact of the Actavis acquisition and integration on

the Company's business prospects and reported financials:

On August 2, 2016, Teva consummated its acquisition of Allergan plc's ("Allergan") worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, Teva transferred to Allergan consideration of approximately $33.4 billion in

cash and approximately 100.3 million Teva shares.  The acquisition significantly expanded Teva's generics product portfolio and pipeline, R&D capabilities and global operational network.

699.    On the same day, Teva hosted its 1Q2017 earnings call, where Peterburg and Desheh stated:

> [Peterburg:]  As it relates to our first priority, I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017.
>
> *        *        *
>
> Turning to generics.  It has been 2 full quarters since the completion of our acquisition of Actavis Generics.  The acquisition has provided us with many benefits, especially much stronger and broader R&D capabilities, which we believe are the engine for any substantial generic business.  This is essential in today's world when we are operating across such an evolving competitive landscape and ongoing consolidation across our customer base.  We are very confident that the global business we have built will allow Teva to thrive in the long-term future as a leader in the generics industry.
>
> *        *        *
>
> [Desheh:]  The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

700.    The statements in ¶¶692-699 concerning the Actavis acquisition and integration were materially false and misleading.  Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financial results and operations by, in addition to the reasons set forth in §§III.K.1-2, III.L (False and Misleading Statements Regarding Competition; False and Misleading Statements Regarding Teva's Price-Hike Strategy and Collusive Activities; Teva Violated Its Statutory Duty to Disclose Pricing Trends) and §III.M (Allegations of Scienter), failing to disclose and actively concealing the negative impact resulting from the acquisition and integration of Actavis on the Company's financial results and business prospects, which (among other things) exacerbated the risky and unsustainable nature of the

Price-Hike Strategy, which collapsed shortly after the closing of the Actavis acquisition in August 2016.

### 5.      False and Misleading Statements Relating to Goodwill

701.    Beginning in the fourth quarter of 2016, Teva overstated the value of its goodwill and inflated its balance sheet and operating results by billions of dollars.

702.    In the 2015 Form 20-F filed on February 11, 2016, Teva disclosed the goodwill policy that Teva failed to follow:

> ***We regularly review our long-lived assets, including*** identifiable intangible assets, ***goodwill*** and property, plant and equipment, for impairment.  ***Goodwill*** and acquired indefinite life intangible assets ***are subject to impairment review on an annual basis and whenever potential impairment indicators are present*** . . . .  The amount of goodwill, identifiable intangible assets and property, plant and equipment on our consolidated balance sheet . . . is expected to significantly increase further following consummation of the Actavis Generics and other future acquisitions.

<div align="center">*      *      *</div>

> (a)      Long-lived assets:
>
> Teva's long-lived, non-current assets are comprised mainly of goodwill, identifiable intangible assets and property, plant and equipment.  Teva reviews its long-lived assets and performs detailed testing whenever potential impairment indicators are present.  In addition, the Company performs impairment testing as of October 1 of each year for goodwill and identifiable indefinite life intangible assets.
>
> *Goodwill*
>
> Goodwill reflects the excess of the consideration paid or transferred plus the fair value of contingent consideration and any non-controlling interest in the acquiree at the acquisition date over the fair values of the identifiable net assets acquired.  The goodwill impairment test is performed according to the following principles:
>
> - An initial qualitative assessment of the likelihood of impairment may be performed.  If this step does not result in a more likely than not indication of impairment, no further impairment testing is required.  If it does result in a more likely than not indication of impairment, the impairment test is performed.
>
> - In step one of the impairment test, Teva compares the fair value of the reporting units to the carrying value of net assets allocated to the reporting units.  If the fair value of the reporting unit exceeds the carrying value of the net assets allocated to that unit, goodwill is not impaired, and no further

<div align="center">- 289 -</div>

testing is required.  Otherwise, Teva must perform the second step of the impairment test to measure the amount of the impairment.

- In the second step, the reporting unit's fair value is allocated to all the assets and liabilities of the reporting unit, including any unrecognized intangible assets, in a hypothetical analysis that simulates the business combination principles to derive an implied goodwill value.  If the implied fair value of the reporting unit's goodwill is less than its carrying value, the difference is recorded as an impairment.

\*       \*       \*

In September 2015, the FASB issued guidance on current accounting for measurement-period adjustments.  The new guidance requires entities to recognize adjustments to provisional amounts that are identified during the measurement period in the reporting period in which the adjustment amounts are determined. Measurement period adjustments were previously required to be retrospectively adjusted as of the acquisition date.  The provisions of this update are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015 (early adoption is permitted), and should be applied prospectively.  Teva does not expect this guidance to have a material effect on its consolidated financial statements at the time of adoption of this standard.

703.    On November 15, 2016, Teva disclosed its overstated balance sheet with inflated

goodwill valuations:

The table below summarizes the preliminary estimates of the fair value of the assets acquired and liabilities assumed and resulting goodwill.  These values are not yet finalized and are subject to change, which could be significant.  The amounts recognized and associated amortization periods will be finalized as the information necessary to complete the analyses is obtained, but no later than one year from the acquisition date.

\*       \*       \*

|  | U.S.$ in millions |
|---|---|
| Goodwill | 19,630 |

\*       \*       \*

Total balance sheet assets amounted to $98.7 billion as of September 30, 2016, compared to $57.9 billion as of June 30, 2016.  ***The increase was mainly due to an increase of $40.0 billion of goodwill and other intangible assets mainly related to the Actavis Generics acquisition***.

\*       \*       \*

- 290 -

| CONSOLIDATED BALANCE SHEETS - USD ($)<br>$ in Millions | September 30,<br>2016 | December 31,<br>2015 |
|---|---|---|
| Goodwill | 40,296 | 19,025 |
| Total assets | $ 98,747 | $ 54,233 |

704.    Teva's 2016 Form 20-F, filed on February 15, 2017, included the Company's goodwill impairment testing policy – which it failed to follow – and disclosed false and misleading goodwill valuations relating to its generics segment:

> ***We regularly review our long-lived assets, including identifiable intangible assets, goodwill and property, plant and equipment, for impairment. Goodwill and acquired indefinite life intangible assets are subject to impairment review on an annual basis and whenever potential impairment indicators are present***.

> \*        \*        \*

> We review goodwill and purchased intangible assets with indefinite lives for impairment annually and whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable.  The provisions of the accounting standard for goodwill and other intangibles allow us to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test.

> For our annual goodwill impairment test in 2016, we performed a quantitative test for all of our reporting units.  We determine the fair value of our reporting units using a weighting of fair values derived from the income approach.

> The income approach is a forward-looking approach to estimating fair value and relies primarily on internal forecasts.  Within the income approach, the method that we use is the discounted cash flow method.  We start with a forecast of all the expected net cash flows associated with the reporting unit, which includes the application of a terminal value, and then we apply a discount rate to arrive at a net present value amount.

> Cash flow projections are based on management's estimates of revenue growth rates and operating margins, taking into consideration industry and market conditions.  The discount rate used is based on the weighted-average cost of capital adjusted for the relevant risk associated with business-specific characteristics.

> Our annual goodwill impairment analysis, performed during the fourth quarter of 2016, resulted in a goodwill impairment charge of approximately $900 million related to the Rimsa acquisition. . . .

> There was no impairment for our remaining reporting units, whose fair value was estimated based on future cash flows discounted at a market participant rate.  We adjust the discount rate in certain circumstances based on specific additional country

- 291 -

level risk or business risk.  Other events or circumstances that could impact the estimated fair value of a reporting unit include changes in our key assumptions relating to operating results and anticipated future cash flows.

Our U.S. generics reporting unit has the narrowest percentage difference between estimated fair value and estimated carrying value, with approximately $23.1 billion of allocated goodwill.  The estimated fair value and the carrying value, including goodwill, of this reporting unit increased significantly compared to the prior year, due to our acquisition of Actavis Generics, reducing the relative difference between estimated fair value and carrying value. . . .

A hypothetical decrease in the fair value of our U.S. generics reporting unit of approximately 21% could trigger a potential impairment of its goodwill.   In determining the fair value of our U.S. generics reporting unit we used a discounted cash flow analysis and applied the following key assumptions: expected revenue growth, which reflects our ability to successfully launch new generic products, operating profit margins including an estimate for price erosion in the U.S. generics market and discount rate, amongst others.  If any of these were to vary materially from our plans, we could face impairment of goodwill allocated to this reporting unit in the future.

<div align="center">*        *        *</div>

We will continue to evaluate goodwill on an annual basis as of the beginning of the fourth quarter each year or whenever events or changes in circumstances indicate that there may be a potential trigger of impairment.

<div align="center">*        *        *</div>

**_The table below summarizes the preliminary estimates of the fair value of the assets acquired and liabilities assumed and resulting goodwill.  These values are not yet finalized and are subject to change, which could be significant.  The amounts recognized and associated amortization periods will be finalized as the information necessary to complete the analyses is obtained, but no later than one year from the acquisition date ("the measurement period")._**

Recognized amounts of identifiable assets acquired and liabilities assumed [from the Actavis acquisition]:

<div align="center">*        *        *</div>

| U.S.$ in millions | Preliminary values at September 30, 2016 | Measurement period adjustments, and impact of Anda acquisition | Preliminary values at December 31, 2016 |
|---|---|---|---|
| Goodwill | 19,630 | 4,562 | 24,192 |

<div align="center">*        *        *</div>

<div align="center">- 292 -</div>

The changes in the carrying amount of goodwill for the years ended December 31, 2016 and 2015 were as follows:

\*       \*       \*

| | Generics | Specialty | Other | Total |
|---|---|---|---|---|
| | | (U.S. $ in millions) | | |
| Balance as of December 31, 2015 | $    8,465 | $    9,420 | $    1,140 | $   19,025 |
| Changes during year: | | | | |
| Goodwill acquired and adjustments[(2)] | 25,767 | (29) | 1,091 | 26,829 |
| Goodwill disposed[(3)] | (99) | | | (99) |
| Goodwill impairment[(4)] | (900) | | | (900) |
| Translation differences and other | (370) | (68) | (8) | (446) |
| Balance as of December 31, 2016 | $   32,863 | $    9,323 | $    2,223 | $   44,409 |

\*       \*       \*

(2)  Goodwill recognized as part of the Actavis Generics, Anda, Takeda and Rimsa acquisitions.  Goodwill acquired in the specialty segment represents measurement period adjustments on goodwill acquired in 2015 (mainly Auspex).

705.    In the 1Q2017 Form 6-K, filed on May 11, 2017, Teva assured investors of its continuous monitoring of "events or changes in circumstances that may impact the valuation of [its] goodwill" and concluded that nothing affected its conclusion that the fair value estimates were greater than the carrying amounts of the goodwill.  In fact, not only did Teva fail to impair its overvalued goodwill, it also increased the amount of goodwill relating to its Actavis acquisition and its generics segment:

> *We continuously monitor for events or changes in circumstances that may impact the valuation of our goodwill.*  Notwithstanding the recent performance of our shares on the market, the February 2017 departure of our President and Chief Executive Officer and the announcement of the impending departure of our Chief Financial Officer, *we have determined that our business has not changed in a manner that affects our conclusion that the fair value estimates of our reporting units are greater than their respective carrying amounts*.

\*       \*       \*

The table below summarizes the preliminary estimates of the fair value of the assets acquired and liabilities assumed and resulting goodwill [from the Actavis acquisition].  These values are not yet finalized and are subject to change, which could be significant.  The amounts recognized and associated amortization periods

will be finalized as the information necessary to complete the analyses is obtained, but no later than one year from the acquisition date ("the measurement period").

Recognized amounts of identifiable assets acquired and liabilities assumed:

**U.S.$ in millions**

| | | | Preliminary values at December 31, 2016 | Measurement period adjustments | Preliminary values at March 31, 2017 |
|---|---|---|---|---|---|
| | * | * | * | | |
| Goodwill | | | 24,192 | 390 | 24,582 |
| | * | * | * | | |

The changes in the carrying amount of goodwill for the period ended March 31, 2017 were as follows:

| | Generics | Specialty | Other | Total |
|---|---|---|---|---|
| | | (U.S. $ in millions) | | |
| Balance as of January 1, 2017 | $ 32,863 | $ 9,323 | $ 2,223 | $ 44,409 |
| Changes during the period: | | | | |
| Goodwill adjustments (1) | 355 | — | — | 355 |
| Translation differences | 235 | 22 | 5 | 262 |
| Balance as of March 31, 2017 | $ 33,453 | $ 9,345 | $ 2,228 | $ 45,026 |

(1)     Due to Actavis Generics and Rimsa measurement period adjustments.

As a result of the acquisition of Actavis Generics, Teva conducted an analysis of its business segments, which led to a change to Teva's segment reporting and goodwill assignment in the fourth quarter of 2016. Teva reallocated goodwill to its adjusted reporting units using a relative fair value approach.

706.    On August 3, 2017, Teva filed its 2Q2017 Form 6-K and reported "a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting unit." The Form 6-K further stated:

The table below summarizes the fair value estimates of the assets acquired, liabilities assumed and resulting goodwill. As the measurement period is now closed, the amounts were finalized during the second quarter of 2017.

| | | | |
|---|---|---|---|
| | * | * | * |

| | Preliminary values at December 31, 2016 | Measurement period adjustments | Values at June 30, 2017 |
|---|---|---|---|
| Goodwill | 24,192 | 961 | 25,153 |

- 294 -

\*     \*     \*

The changes in the carrying amount of goodwill for the period ended June 30, 2017 were as follows:

| | Generics | Specialty | Other | Total |
|---|---|---|---|---|
| | (U.S. $ in millions) | | | |
| Balance as of January, 1 2017 | $    32,863 | $    9,323 | $    2,223 | $    44,409 |
| | | | | |
| Changes during the period | | | | |
|    Goodwill impairment | (6,100) | —— | —— | (6,100) |
|    Goodwill adjustments[1] | 1,490 | —— | (560) | 930 |
|    Goodwill disposed | (7) | (24) | —— | (31) |
|    Translation differences | 713 | 92 | 22 | 827 |
| | | | | |
| Balance as of June 30, 2017 | $    28,959 | $    9,391 | $    1,685 | $    40,035 |

[1]Due to Actavis Generics and Rimsa measurement period adjustments.  See note 3.

\*     \*     \*

*During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business.  These developments included: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products. These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) expected price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the terminal growth rate of its U.S. generics reporting unit*.

Teva determined the fair value of the reporting units using a weighting of fair values derived from the income approach.  The income approach is a forward-looking approach to estimating fair value and utilizes the 2017 remaining year forecast, projections for growth off that base with an associated price erosion as well as terminal growth rate.  Within the income approach, the method that was used is the discounted cash flow method.  Teva started with a forecast of all the expected net cash flows associated with the reporting unit, which includes the application of a terminal value, and then applied a discount rate to arrive at a net present value amount.  Cash flow projections are based on Teva's estimates of revenue growth rates and operating margins, taking into consideration industry and market conditions.  The discount rate used is based on the weighted-average cost of capital adjusted for the relevant risk associated with country-specific characteristics.

*Based on the revised discounted cash flows analysis, Teva recorded a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting*

*unit in the second quarter of 2017.  The remaining goodwill allocated to this reporting unit amounts to $15.5 billion as of June 30, 2017*.

707.    On the same day, Teva hosted its second quarter 2017 earnings call and attributed the belated $6.1 billion goodwill write-down to factors that Teva had encountered for the past year.  The write-down was inadequate and the Company continued to overstate its goodwill:

> [Peterburg:]  *In the last 3 months, our results were greatly impacted by the performance in the U.S. Generics business and continued deterioration in Venezuela.  In our U.S. Generics business, we experienced accelerated price erosion and decreased volume, mainly due to customer consolidation, greater competition as a result of an increase in generic drug approval by the FDA and some new product launches that were either delayed this quarter or got subjected to more competition*.
>
> *            *            *
>
> On a GAAP basis, we are reporting today an EPS loss for the second quarter of $5.94.  *This loss is primarily the result of a $6.1 billion impairment charge to reduce goodwill associated with our U.S. Generics business unit, which includes both the Teva legacy business and the Actavis Generics business.  This impairment reflects our revised outlook for the business given the trends we are seeing in the market, as I have just articulated*.
>
> *            *            *
>
> [McClellan :]  *As mentioned by Yitzhak, during the second quarter of 2017, management identified certain developments in the U. S. market, which we feel negatively impact Teva's outlook for the U. S. Generics business.  And this has led us to review the value of this business at the half year, though we have typically done our goodwill impairment analysis at the end of the year*.
>
> *First in Q2, we renegotiated both prices and volumes of our in-line products with some of our largest customers.  These developments had a much greater impact than expected, negatively impacting not only our Q2 results, but our results through the rest of the year and our outlook going forward in the near term.  This manifests itself as an accelerated rate of price erosion on our base generic portfolio as well as some reduced volumes sold into the marketplace*.
>
> *In addition, since the end of the year, we have seen an increase in generics drug approvals by the FDA.  This has resulted in additional competition on our existing portfolio, which is further accelerating price and volume erosion and negatively impacting our overall business and performance outlook*.
>
> *Finally, we had some launches for the year in the U.S. that experienced delays and some did not materialize*.

*All of this led management to revisit its long-term forecast for the U.S. Generics unit, as we see these pressures persisting into the near future, leading to lower revenue and profit most likely in the U.S. Generics in 2018 and potentially 2019. All of these factors, which became strongly evident during Q2, triggered us to review and impair our goodwill to align our revised expectations for the performance of this business in our balance sheet.*

The goodwill impairment was the main driver of the changes in our balance sheet, and you can see the goodwill went down by $5 billion. This is the $6.1 billion impairment, offset by $1 billion, which was reallocated to goodwill in the final Actavis purchase price allocation, as we closed the purchase price allocation as of June 30. There was also a corresponding reduction in our shareholders' equity for the charge of the goodwill impairment.

## Balance Sheet

| $ billions | Jun 30, 2017 | Mar 31, 2017 | Diff |
|---|---|---|---|
| Cash and Cash Equivalents | 0.6 | 0.9 | -0.3 |
| Other Financial assets | 0.3 | 0.3 | 0.0 |
| AR Trade | 7.4 | 7.3 | 0.1 |
| Pre-paid Expenses and Other Current Assets | 1.5 | 1.7 | -0.1 |
| Inventory | 5.1 | 5.0 | 0.1 |
| Fixed Assets | 8.1 | 8.2 | -0.1 |
| Goodwill | 40.0 | 45.0 | -5.0 |
| Intangible Assets | 21.7 | 21.2 | 0.5 |
| Other Long Term Assets | 1.7 | 1.7 | 0.0 |
| **Total Assets** | **86.4** | **91.3** | **-4.9** |
| | | | |
| AP Trade | 2.2 | 2.3 | -0.1 |
| SR&A | 7.6 | 7.5 | 0.1 |
| AP Other | 4.4 | 4.1 | 0.3 |
| Total Debt (ST+LT) | 35.1 | 34.6 | 0.4 |
| Other Long Term liabilities | 7.5 | 6.9 | 0.6 |
| Minority | 1.6 | 1.7 | -0.1 |
| Teva Shareholders' Equity | 28.0 | 34.0 | -6.0 |
| **Total Liabilities & Equity** | **86.4** | **91.3** | **-4.9** |

708.    In the 3Q2017 Form 6-K filed on November 2, 2017, Teva falsely assured investors that the Company had conducted impairment testing of goodwill for the third quarter of 2017 and that the goodwill fair value was actually higher than carrying value, even though the Company had lowered projections for 2017:

| | Preliminary values at December 31, 2016 | Measurement period adjustments | Values at June 30, 2017 |
|---|---|---|---|
| Goodwill | 24,192 | 961 | 25,153 |

*          *          *

The changes in the carrying amount of goodwill for the period ended September 30, 2017 were as follows:

- 297 -

| | Generics | Specialty | Other | Total |
|---|---|---|---|---|
| | | (U.S. $ in millions) | | |
| Balance as of January 1, 2017 | $   32,863 | $   9,323 | $   2,223 | $   44,409 |
| | | | | |
| Changes during the period: | | | | |
| Goodwill impairment | (6,100) | — | — | (6,100) |
| Goodwill adjustments[1] | 1,482 | — | (560) | 922 |
| Goodwill reclassified to assets held for sale | — | (905) | — | (905) |
| Goodwill disposed | (7) | (24) | — | (31) |
| Translation differences | 968 | 106 | 23 | 1,097 |
| | | | | |
| Balance as of September 30, 2017 | $   29,206 | $   8,500 | $   1,686 | $   39,392 |

[1]Due to Actavis Generics and Rimsa measurement period adjustments.  See note 3.

\*        \*        \*

*Given certain developments in its businesses and especially the significant decline of its share price during the third quarter of 2017, Teva reassessed its cash flow projections for its reporting units as of September 30, 2017, focusing on its specialty reporting unit and its U.S. generics reporting unit.  As part of this assessment, Teva considered the sensitivity of estimates and assumptions used in the latest projections and the sensitivity of changes to the prior projections on its June 30, 2017 impairment testing.*

\*        \*        \*

During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business. These developments included: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products.  These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) expected price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the terminal growth rate of its U.S. generics reporting unit.

\*        \*        \*

*Based on the revised discounted cash flows analysis, Teva recorded a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting unit in the second quarter of 2017.  The remaining goodwill allocated to this reporting unit amounted to $15.5 billion as of June 30, 2017, and remained unchanged as of September 30, 2017.*

*As of September 30, 2017, Teva adjusted the projections for its U.S. generics reporting unit to reflect favorable events, partially offset by further increased*

*pressure in the U.S. generics market. Teva believes that risks are appropriately reflected in the cash flow projections and therefore no risk premium is required to the discount rate of 6.8%. The adjustments to the projections resulted in a slight increase of the fair value over carrying value with a percentage difference of 1%. Goodwill allocated to this reporting unit remained unchanged as of September 30, 2017*.

709.    The foregoing statements concerning Teva's goodwill are false and misleading because, as described in §III.J, Teva materially overstated the value of its goodwill, which inflated the Company's balance sheet and understated its goodwill impairment charge. This, in turn, inflated Teva's operating income and net earnings by billions of dollars.

### 6.    False and Misleading Statements Relating to Financial Results

710.    The sales and profit figures Teva announced during the Relevant Period, listed in the charts in ¶¶711-744 below, were false and misleading, as were Teva's reasons for the increases in sales and profits. Teva certified that its financial information was fairly presented in all material respects as to the financial condition, results of operations, and cash flows of the Company without disclosing that revenues and profitability were impacted by the illicit anti-competitive schemes and the Price-Hike Strategy in its U.S. generics business. Teva's undisclosed inflation of its sales through collusive price fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm. In addition, Teva's failure to make required disclosures regarding the impact of artificial price increases from the unsustainable Price-Hike Strategy on its reported financial results was a violation of SEC disclosure rules.

711.    On October 31, 2013, Teva reported its third quarter 2013 financial results in its 3Q2013 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Total Revenues | $5,059 | $4,972 | $14,884 | $15,068 |
| Gross Profit | $2,630 | $2,601 | $7,813 | $7,867 |
| Generic Medicines Segment Revenues | $2,483 | $2,492 | $7,209 | $7,723 |

- 299 -

| | | | | |
|---|---|---|---|---|
| U.S. Revenues | $1,138 | $1,074 | $3,003 | $3,347 |
| EBITDA (Non-GAAP Operating Income) | $1,330 | $1,400 | $3,840 | $4,369 |
| Cash Flow from Operations | $444 | $1,000 | | |
| Free Cash Flow | ($34) | $577 | | |

**3Q2013 Form 6-K:**

Highlights

- Our revenues amounted to $5.1 billion, an increase of 2% compared to the third quarter of 2012. In local currency terms, revenues also increased 2%. The increase in local currency terms was primarily attributable to higher sales of generic medicines in the United States, higher revenues from global sales of our specialty and OTC medicines and higher revenues from generic medicines (exclusive of APIs) in our ROW markets. This increase was partially offset by a decrease in global API sales to third parties and lower revenues from generic medicines in Europe.

<div align="center">*     *     *</div>

Revenues from generic medicines in the United States during the third quarter of 2013 amounted to $1.1 billion, an increase of 6% compared to the third quarter of 2012. The increase resulted mainly from the exclusive launches of niacin ER, the generic equivalent of Niaspan® and temozolomide, the generic equivalent of Temodar®, as well as higher sales of amphetamine salts IR, and products that were sold in the third quarter of 2013 that were not sold in the third quarter of 2012, the largest of which was fenofibrate, the generic equivalent of Tricor®. The increase was partially offset by a decline in sales of escitalopram oxalate, for which we had exclusive rights in the third quarter of 2012, and a decline in sales of pioglitazone and pioglitazone/metformin, which were launched in the third quarter of 2012.

<div align="center">*     *     *</div>

Revenues from generic medicines in the United States in the nine months ended September 30, 2013 amounted to $3.0 billion, a decrease of 10%, compared to $3.3 billion in the same period of 2012.

Among the most significant generic medicines sold in the United States during the nine months ended September 30, 2013 were generic versions of Pulmicort® (budesonide inhalation), Adderall IR® (amphetamine salts IR), Niaspan® (niacin ER), Tricor® (fenofibrate), Adderall XR® (mixed amphetamine salts ER), Provigil® (modafinil) and Accutane® (isotretinoin, which we market as Claravis™).

**3Q2013 Earnings Conference Call:**

Teva's non-GAAP operating profit this quarter was approximately $1.3 billion, down 5% compared to the third quarter of 2012 mainly as a result of higher R&D and sales and marketing spending. The over split of operating profits before G&A expenses between our main lines of business for the quarter is as follows, global generics 25%, multiple sclerosis, 49%, other specialty brands 22%, OTC and other businesses at 4%. Our non-GAAP financial expenses in the quarter were slightly down to $71 million.

712.    On February 6, 2014, Teva reported its fourth quarter 2013 financial results in the 4Q2013 Form 6-K Press Release and hosted an earnings call announcing its quarterly and annual results:

| | Three Months Ended Dec. 31, | | Year Ended Dec. 31, | |
|---|---|---|---|---|
| million | 2013 | 2012 | 2013 | 2012 |
| Total Revenues | $5,430 | $5,249 | $20,314 | $20,317 |
| Gross Profit | $2,894 | $2,785 | $10,707 | $10,652 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,697 | $2,662 | $9,906 | $10,385 |
| U.S. Revenues | $1,178 | $1,034 | $4,181 | $4,381 |
| Gross Profit | $1,149 | $1,153 | $4,095 | $4,518 |
| Segment Profit | $482 | $505 | $1,656 | $2,062 |

<div align="center">- 300 -</div>

4828-1671-4429.v2

| | | | | |
|---|---|---|---|---|
| EBITDA (Non-GAAP Operating Income) | $1,358 | $1,346 | $5,198 | $5,175 |
| Cash Flow from Operations | $816 | $1,577 | | |
| Free Cash Flow | $236 | $1,000 | | |

**4Q2013 Form 6-K Press Release:**

Revenues for the three months ended December 31, 2013, were $5.4 billion, an increase of 3% compared to the fourth quarter of 2012. In local currency terms, revenues increased 4%. The increase was primarily attributable to higher sales of generic medicines in the U.S. and higher revenues from our global specialty medicines business, as well as higher sales of OTC products. This increase was partially offset by a decrease in generics sales outside the U.S., mostly in Japan, due to the weaker yen, and API sales to third parties.

\*        \*        \*

Generic medicines net revenues in the fourth quarter were $2.7 billion (including API sales to third parties of $163 million), an increase of 1% compared to the fourth quarter of 2012. In local currency terms, revenues increased 3%. Generic revenues consisted of:

- U.S. revenues of $1.2 billion, an increase of 14% compared to the fourth quarter of 2012. The increase resulted mainly from the exclusive launches of niacin ER, the generic version of Niaspan®, and temozolomide, the generic version of Temodar®, in the third quarter of 2013, and launches of duloxetine, the generic version of Cymbalta®, and tobramycin, the generic version of Tobi®, in the fourth quarter of 2013, as well as higher sales of budesonide inhalation, the generic version of Pulmicort®.

\*        \*        \*

Generic medicines net revenues in 2013 were $9.9 billion (including API sales to third parties of $692 million), a decrease of 5% compared to $10.4 billion in 2012. Generic revenues consisted of:

- U.S. revenues of $4.2 billion, a decrease of 5% compared to 2012. The decrease mainly reflected the absence of royalties related to sales of atorvastatin, the generic equivalent of Lipitor® under our agreement with Ranbaxy, which we received in the first half of 2012, a decline in sales of escitalopram oxalate, the generic version of Lexapro®, to which we had exclusive rights in the first half of 2012, and a decline in sales of generic versions of Actos® (pioglitazone) and Actoplus Met® (pioglitazone/ metformin), which were launched in the third quarter of 2012.

**4Q2013 Earnings Conference Call:**

Non-GAAP gross profit in 2013 was $11.9 billion or 58.6% of revenue, a decrease of $0.2 billion or 0.8% compared to 2012. This decrease was mainly the result of lower revenues of PROVIGIL, which lost its exclusivity, as well as the reduced revenue from additional exclusive generic products, mainly atorvastatin.

These were partially offset by [a] more profitable product mix mainly in the US generic business, and higher COPAXONE revenue, as well as early contribution of our cost reduction program.

\*        \*        \*

Our non-GAAP operating profit in 2013 was $5.2 billion compared to $5.7 billion in 2012. This 9% decline is mainly the result of slower sales of exclusive generic and specialty products mainly PROVIGIL, coupled with higher R&D and sales and marketing expenses. For the fourth quarter operating profit totaled $1.36 billion, an increase of 1% compared to last year. For the full-year 2013 the overall split of operating profit before G&A expenses between our main lines of business is global generics 29%, MS 50%, other specialty brands 19%, [and] OTC and other businesses 2%.

713.    On February 10, 2014, Teva filed its 2013 Form 20-F:

| million | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| Total Revenues | $20,314 | $20,317 | $18,312 | $16,121 | $13,899 |
| Gross Profit | $10,707 | $10,652 | $9,515 | $9,065 | $7,367 |
| Generic Medicines Segment: | | | | | |
| Revenues | $9,906 | $10,385 | $10,196 | | |
| U.S. Revenues | $4,181 | $4,381 | $3,957 | | |
| Gross Profit | $4,095 | $4,518 | $4,605 | | |

| | | | | | |
|---|---|---|---|---|---|
| Segment Profit | $1,656 | $2,062 | $2,059 | | |
| EBITDA (Non-GAAP Operating Income) | $5,198 | $5,715 | $5,253 | | |
| Cash Flow from Operations | $3,200 | $4,500 | | | |
| Free Cash Flow | $1,220 | $2,738 | | | |

Significant highlights of 2013 included:

        *   *   *

- Our generic medicines segment generated revenues of $9.9 billion and profitability of $1.7 billion, down 5% and 20%, respectively. The decline in revenues was mainly due to lower sales in the United States and ROW markets. Profitability was affected by product mix and increasing costs.

        *   *   *

  Revenues from generic medicines in the United States during 2013 amounted to $4.2 billion, down 5% compared to $4.4 billion in 2012. The decrease resulted mainly from a decline in sales of the generic version of Lexapro® (escitalopram oxalate) for which we had exclusive rights in the first half of 2012, the lack of royalties related to the sales of the generic equivalent of Lipitor® (atorvastatin) under our agreement with Ranbaxy, which we received in the first half of 2012, and a decline in sales of the generic version of Actos® (pioglitazone) and Actoplus met® (pioglitazone/metformin), which were launched in the third quarter of 2012. These decreases were partially offset by higher sales of the generic version of Pulmicort® (budesonide inhalation) and the generic version of Adderall IR® (amphetamine salts IR), the exclusive launch of niacin ER, the generic equivalent of Niaspan®, as well as products that were sold in 2013 that were not sold in 2012.

        *   *   *

  In 2013 gross profit from our generic medicines segment amounted to $4.1 billion, a decrease of $423 million, or 9%, compared to $4.5 billion in 2012. The lower gross profit was mainly a result of a change in the composition of revenues in the United States and Canada, mainly royalties related to sales in the United States of the generic equivalent of Lipitor® (atorvastatin) under the agreement with Ranbaxy, higher charges related to inventories, a decrease in profits from API sales to third parties, as well as lower sales of other generic medicines, partially offset by sales of higher profitability products in the United States.

  714. The financial figures and the reasons given for the figures in ¶¶711-713 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were inflated by the Price-Hike Strategy and included sales from collusive price-fixing and market allocation schemes. Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $250 million in 2013 – with contribution of at least $103 million in the third quarter of 2013 and $147 million in the fourth quarter of 2013.

  715. On May 1, 2014, Teva hosted its first quarter 2014 earnings call and reported its quarterly financial results in the 1Q2014 Form 6-K:

| | Three Months Ended Mar. 31, | |
|---|---|---|
| million | 2014 | 2013 |
| Total Revenues | $5,001 | $4,901 |
| Gross Profit | $2,697 | $2,590 |
| Generic Medicines Segment: | | |

| | | |
|---|---|---|
| Revenues | $2,398 | $2,328 |
| U.S. Revenues | $1,048 | $893 |
| Gross Profit | $1,042 | $951 |
| Segment Profit | $499 | $382 |
| EBITDA (Non-GAAP Operating Income) | $1,365 | $1,250 |
| Cash Flow from Operations | $898 | $1,102 |
| Free Cash Flow | $382 | $640 |

**1Q2014 Form 6-K:**

Significant highlights of the first quarter of 2014 included:

- Our revenues amounted to $5.0 billion, an increase of 2% compared to the first quarter of 2013. In local currency terms, revenues increased 3%. The increase is due to higher revenues from our generic and specialty medicines, partially offset by lower sales of OTC products.

- Our generic medicines segment generated revenues of $2.4 billion and profitability of $0.5 billion in the first quarter of 2014, up 3% and 31%, respectively, from the first quarter of 2013. The increase in revenues and profitability was driven by improved results in the United States, partially offset by generic medicines' lower performance in our ROW and European markets.

\*         \*         \*

Revenues from generic medicines in the United States during the first quarter of 2014 amounted to $1.0 billion, an increase of 17% compared to $893 million in the first quarter of 2013. The increase resulted mainly from the exclusive launch of capecitabine (the generic equivalent of Xeloda ®), the launch of tolterodine tartrate (the generic equivalent of Detrol ®), and higher sales of budesonide inhalation (the generic version of Pulmicort ®) as well as sales of products that were sold in the first quarter of 2014 but not sold in the first quarter of 2013, the most significant of which were niacin (the generic equivalent of Niaspan ®) and tobramycin (the generic equivalent of Tobi®). These increases were partially offset by declines in other products due to loss of exclusivity or additional competition, the most significant of which were amphetamine salts (the generic equivalent of Adderall ®), fenofibrate (the generic equivalent of Tricor®) and clonidine patch (the generic equivalent of Catapres TTS ®).

Among the most significant generic products we sold in the United States in the first quarter of 2014 were generic versions of Pulmicort ® (budesonide inhalation), Niaspan® (niacin ER), Xeloda® (capecitabine), Detrol® (tolterodine tartrate), Tobi® (tobramycin), Pravachol® (pravastatin), Adderall IR® (mixed amphetamine salts IR) and Evista ® (raloxifene).

\*         \*         \*

In the first quarter of 2014, gross profit from our generic medicine segment amounted to $1,042 million, an increase of $91 million, or 10%, compared to $951 million in the first quarter of 2013. The higher gross profit was mainly a result of higher revenues and of the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013. These increases were partially offset by lower revenues from our ROW markets, as well as a decrease in profit from API sales to third parties.

\*         \*         \*

Profitability of our generic medicine segment amounted to $499 million in the first quarter of 2014, compared to $382 million in the first quarter of 2013. The increase was due to the factors previously discussed, primarily higher revenues, higher gross profit and a reduction in selling and marketing expenses, which were partially offset by an increase in research and development expenses.

**1Q2014 Earnings Conference Call:**

The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market and higher profitability in Europe.

716.    On July 31, 2014, Teva reported its second quarter 2014 financial results in its

2Q2014 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Jun. 30, | | Six Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $5,045 | $4,924 | $10,046 | $9,825 |
| Gross Profit | $2,661 | $2,593 | $5,358 | $5,183 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,515 | $2,405 | $4,913 | $4,733 |
| U.S. Revenues | $1,068 | $967 | $2,116 | $1,860 |
| Gross Profit | $1,046 | $989 | $2,088 | $1,940 |
| Segment Profit | $532 | $376 | $1,031 | $758 |
| EBITDA (Non-GAAP Operating Income) | $1,367 | $1,260 | $2,732 | $2,510 |
| Cash Flow from Operations | $1,100 | $900 | | |
| Free Cash Flow | $583 | $378 | | |

**2Q2014 Form 6-K:**

Significant highlights of the second quarter of 2014 included:

- Our revenues amounted to $5.0 billion, an increase of 2% in both U.S. dollar and local currency terms, compared to the second quarter of 2013. The increase is due to higher revenues from our generic medicines, partially offset by lower sales of specialty medicines.

- Our generic medicines segment generated revenues of $2.5 billion and profitability of $532 million in the second quarter of 2014, up 5% and 41%, respectively, from the second quarter of 2013. The increase in revenues was driven by higher sales in the United States. Profitability increased as a result of higher profitability in the United States and in Europe.

\*       \*       \*

Revenues from generic medicines in the United States during the second quarter of 2014 amounted to $1.1 billion, an increase of 10% compared to $1.0 billion in the second quarter of 2013. The increase resulted mainly from a full quarter of sales of capecitabine (the generic equivalent of Xeloda®), which was launched exclusively in March of 2014, and the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we are first to market, as well as sales of products that were sold in the second quarter of 2014 but not sold in the second quarter of 2013, the most significant of which were raloxifene (the generic equivalent of Evista®) and tolterodine tartrate (the generic equivalent of Detrol®). These increases were partially offset by declines in other products, the most significant of which was amphetamine salts (the generic equivalent of Adderall®).

Among the most significant generic products we sold in the United States in the second quarter of 2014 were generic versions of Pulmicort® (budesonide inhalation), Xeloda® (capecitabine), Lovaza® (omega-3-acid ethyl esters), Adderall XR® (mixed amphetamine salts ER), Pravachol® (pravastatin), Evista® (raloxifene), Accutane® (isotretinoin, which we market as Claravis™) and Adderall IR® (mixed amphetamine salts IR).

\*       \*       \*

In the second quarter of 2014, gross profit from our generic medicine segment amounted to $1.0 billion, an increase of $57 million, or 6%, compared to the second quarter of 2013. The higher gross profit was mainly a result of higher revenues in the United States, specifically of products launched during the first half of 2014 and in the first half of 2013, and higher revenues in Canada as well as the higher gross profit due to the change in the composition of revenues in Europe. These increases were partially offset by lower revenues and a change in the composition of revenues in certain ROW markets, mainly Japan and Russia.

\*       \*       \*

Revenues in the second quarter of 2014 amounted to $5.0 billion, an increase of 2% in both U.S. dollar and local currency terms compared to the second quarter of 2013. Our revenues were positively affected by higher revenues of our generic medicines, partially offset by lower revenues of our specialty medicines. See "Generic Medicine Revenues" and "Specialty Medicine Revenues" above. Exchange rate movements during the second quarter of 2014 in comparison with the second quarter of 2013 positively impacted overall revenues by approximately $16 million.

\*       \*       \*

Revenues from generic medicines in the United States during the first six months of 2014

- 304 -

amounted to $2.1 billion, an increase of 14% compared to $1.9 billion in the first half of 2013.

Among the most significant generic products we sold in the United States in the first six months of 2014 were generic versions of Pulmicort® (budesonide inhalation), Xeloda® (capecitabine), Detrol® (tolterodine tartrate), Pravachol® (pravastatin), Lovaza® (omega-3-acid ethyl esters), Evista® (raloxifene), Niaspan® (niacin ER) and Adderall XR® (mixed amphetamine salts ER).

**2Q2014 Earnings Conference Call:**

Looking at what impacted profitability this quarter, the improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year.  Launch of generic Xeloda in March and generic Lovaza this quarter in the US market, together with improvements in profitability in Europe, led to the better results.  Copaxone profit contribution was down following the decline in sales, and our other specialty products, especially Azilect, Treanda, [and] ProAir, showed good improvement contributing to $57 million to the improvement in operating profit.

So when we look at profitability by segment this quarter, profit contribution of the generic business increased from 24% last year to 32% of total this year.  While Copaxone contribution was down from 51%, it was more than half of our profit last year, to 42% this year.

717.    On October 30, 2014, Teva reported its third quarter 2014 financial results in its

3Q2014 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $5,058 | $5,059 | $15,104 | $14,884 |
| Gross Profit | $2,809 | $2,630 | $8,167 | $7,813 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,432 | $2,489 | $7,345 | $7,222 |
| U.S. Revenues | $1,124 | $1,137 | $3,240 | $2,997 |
| Gross Profit | $1,078 | $984 | $3,166 | $2,924 |
| Segment Profit | $556 | $396 | $1,587 | $1,154 |
| EBITDA (Non-GAAP Operating Income) | $1,504 | $1,330 | $4,236 | $3,840 |
| Cash Flow from Operations | $1,400 | $400 | | |
| Free Cash Flow | $924 | ($34) | | |

**3Q2014 Form 6-K:**

Significant highlights of the third quarter of 2014 included:

\*        \*        \*

- Our generic medicines segment generated revenues of $2.4 billion and profitability of $556 million.  Revenues decreased 2% compared to the third quarter of 2013, but profitability increased 40%.  The increase in profitability was mainly due to higher profitability in the United States and Europe.

\*        \*        \*

Revenues from generic medicines in the United States during the third quarter of 2014 amounted to $1.1 billion, a decrease of 1% compared to the third quarter of 2013.  The decrease resulted mainly from a decline in sales of amphetamine salts (the generic equivalent of Adderall®) and the loss of exclusivity of niacin ER (the generic equivalent of Niaspan®).  This decrease was largely offset by sales of products sold in the third quarter of 2014 which were not sold in the third quarter of 2013, the most significant of which were capecitabine (the generic equivalent of Xeloda®) and omega-3-acid ethyl esters (the generic equivalent of Lovaza®), as well as entecavir (the generic equivalent of Baraclude®), which was exclusively launched during the third quarter of 2014.

\*        \*        \*

In the third quarter of 2014, gross profit from our generic medicine segment amounted to

4828-1671-4429.v2

$1.1 billion, an increase of $94 million, or 10%, compared to the third quarter of 2013.  The higher gross profit was mainly a result of lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues.  These increases were partially offset by lower revenues in certain ROW markets and a change in the composition of revenues in these markets, as well as a slight decrease in revenues in the United States.

Gross profit margin for our generic medicine segment in the third quarter of 2014 increased to 44.3%, from 39.5% in the third quarter of 2013.  This increase of 4.8 points in gross margin was mainly a result of lower expenses related to production and higher revenues from our API business as well as the change in composition of revenues in Europe and in the United States, partially offset by lower gross profit from our ROW markets, as mentioned above.

\*         \*         \*

Profitability of our generic medicine segment amounted to $556 million in the third quarter of 2014, compared to $396 million in the third quarter of 2013.  The increase was due to the factors previously discussed, primarily higher gross profit and a significant reduction in selling and marketing expenses, partially offset by higher research and development expenses.

\*         \*         \*

In the third quarter of 2014, gross profit amounted to $2.8 billion, an increase of 7% compared to the third quarter of 2013.

The higher gross profit is primarily the result of the higher gross profit of our generic segment and our specialty medicines' segment.  See "Generic Medicine Gross Profit" and "Specialty Medicine Gross Profit" above.

\*         \*         \*

Revenues from generic medicines in the United States during the first nine months of 2014 amounted to $3.2 billion, an increase of 8% compared to $3.0 billion in the first nine months of 2013.

Among the most significant generic products we sold in the United States in the first nine months of 2014 were generic versions of Pulmicort® (budesonide inhalation), Xeloda® (capecitabine), Lovaza® (omega-3-acid ethyl esters), Niaspan® (niacin ER), Adderall XR® (mixed amphetamine salts ER), Evista® (raloxifene), Pravachol® (pravastatin), Tobi® (tobramycin sulfate) and Adderall IR® (mixed amphetamine salts IR).

**3Q2014 Earnings Conference Call:**

Profitability, which is our measure for segment operating income without G&A allocation, improved through all segments.  Mostly for the generic segment, with 40% improvement year over year, as you have heard from Siggi.  The improvement is due to better gross margins, lower sales and marketing expenses and Copaxone revenue, which grew year over year.

718.     On February 5, 2015, Teva reported its fourth quarter 2014 financial results in the 4Q2014 Form 6-K Press Release and hosted an earnings call announcing its quarterly and annual results:

| million | Three Months Ended Dec. 31, | | Year Ended Dec. 31, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $5,168 | $5,430 | $20,272 | $20,314 |
| Gross Profit | 2,889 | $2,894 | $11,056 | $10,707 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,469 | $2,680 | $9,814 | $9,902 |
| U.S. Revenues | $1,178 | $1,175 | $4,418 | $4,172 |
| Gross Profit | $1,081 | $1,155 | $4,247 | $4,079 |
| Segment Profit | $561 | $514 | $2,148 | $1,668 |
| EBITDA (Non-GAAP Operating Income) | $1,496 | $1,358 | $5,732 | $5,198 |
| Cash Flow from | $1,800 | $800 | $5,100 | $3,200 |

| Operations | | | | |
|---|---|---|---|---|
| Free Cash Flow | $1,500 | $500 | $4,300 | $2,300 |

**4Q2014 Form 6-K Press Release:**

Eyal Desheh, Chief Financial Officer of Teva, stated "Throughout the year, Teva placed great emphasis on the optimization of our global portfolio and the ongoing cost containment efforts, which resulted in an overall improvement in our non-GAAP operating margin of approximately 400 basis points. These efforts contributed to the strong financial results in 2014, which included achieving or exceeding the key metrics of our financial guidance.

\*         \*         \*

Generic revenues consisted of:

- U.S. revenues of $1.2 billion, flat compared to the fourth quarter of 2013, as higher sales of omega-3-acid ethyl esters (the generic equivalent of Lovaza®), capecitabine (the generic equivalent of Xeloda®), celecoxib (the generic equivalent of Celebrex®), raloxifene (the generic equivalent of Evista®) and entecavir (the generic equivalent of Baraclude®) were offset by lower revenues of products launched during 2013, mainly niacin ER (the generic equivalent of Niaspan®), following the loss of exclusivity.

\*         \*         \*

Gross profit from our generic medicines segment in the fourth quarter of 2014 amounted to $1.1 billion, a decrease of 6%, compared to the fourth quarter of 2013. The lower gross profit was mainly the result of lower revenues . . . partially offset by higher profitability of products launched in 2014 and of our European portfolio, improved pricing and higher gross profit of our APIs. Gross profit margin for our generic medicines segment in the fourth quarter of 2014 increased to 43.8%, from 43.1% in the fourth quarter of 2013.

Profit from our generic medicines segment amounted to $561 million in the fourth quarter of 2014, an increase of 9% compared to $514 million in the fourth quarter of 2013. The increase was primarily due to our lower S&M expenses and lower R&D expenses, partially offset by lower gross profit. Generic medicines profit as a percentage of generic medicines revenues was 22.7% in the fourth quarter of 2014, up from 19.2% in the fourth quarter of 2013.

**4Q2014 Earnings Conference Call:**

The most notable contribution was generated by our generic business, improving profitability by more than 500 basis points. The contribution of our generic business to the growth of other operating profit was nearly $500 million, increas[ing] its share of the total to 31%.

719.     On February 9, 2015, Teva filed its 2014 Form 20-F:

| million | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|
| Total Revenues | $20,272 | $20,314 | $20,317 | $18,312 | $16,121 |
| Gross Profit | $11,056 | $10,707 | $10,652 | $9,515 | $9,065 |
| Generic Medicines Segment: | | | | | |
| Revenues | $9,814 | $9,902 | $10,385 | | |
| U.S. Revenues | $4,418 | $4,172 | $4,381 | | |
| Gross Profit | $4,247 | $4,079 | $4,518 | | |
| Segment Profit | $2,148 | $1,668 | $2,062 | | |
| EBITDA (Non-GAAP Operating Income) | $5,732 | $5,198 | $5,715 | | |
| Cash Flow from Operations | $5,100 | $3,200 | | | |
| Free Cash Flow | $4,300 | $2,300 | | | |

Significant highlights of 2014 included:

\*         \*         \*

- Our generic medicines segment generated revenues of $9.8 billion and profit of $2.1 billion, down 1% and up 29%, respectively. The decline in revenues was due to lower sales in the European and ROW markets, largely offset by higher sales in the United States. The increase in profit resulted from lower S&M expenses and higher gross profit.

> \*     \*     \*
>
>      Revenues from generic medicines in the United States in 2014 amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013.  The increase resulted mainly from the 2014 exclusive launch of capecitabine (the generic equivalent of Xeloda®), the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we were first to market, and the launch of raloxifene (the generic equivalent of Evista®), as well as products that were sold in 2014 that were not sold in 2013.  These increases were partially offset by lower sales of the generic versions of Adderall IR® (amphetamine salts IR), Pulmicort® (budesonide inhalation) and Niaspan® (niacin ER).
>
>       \*     \*     \*
>
>      In 2014, gross profit from our generic medicines segment amounted to $4.2 billion, an increase of $168 million, or 4%, compared to $4.1 billion in 2013.  The higher gross profit was mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties.  These increases were partially offset by lower revenues in Europe and certain ROW markets, which led to lower gross profits.

720.    The financial figures and the reasons given for the figures in ¶¶715-719 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were inflated by the Price-Hike Strategy and included sales from price-fixing and market allocation schemes.  Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $693 million in 2014 – with contribution of at least $120 million in the first quarter of 2014, $160 million in the second quarter of 2014, $193 million in the third quarter of 2014, and $219 million in the fourth quarter of 2014.

721.    On April 30, 2015, Teva reported its first quarter 2015 financial results in its 1Q2015 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Mar. 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Total Revenues | $4,982 | $5,001 |
| Gross Profit | $2,836 | $2,697 |
| Generic Medicines Segment: | | |
|   Revenues | $2,621 | $2,398 |
|     U.S. Revenues | $1,439 | $1,048 |
|   Gross Profit | $1,284 | $1,043 |
|   Segment Profit | $799 | $503 |
| EBITDA (Non-GAAP Operating Income) | $1,533 | $1,381 |
| Cash Flow from Operations | $1,400 | $900 |
| Free Cash Flow | $1,200 | $540 |

**1Q2015 Form 6-K:**

Significant highlights of the first quarter of 2015 included:

- Our revenues amounted to $5.0 billion, consistent with the first quarter of 2014, and up 7% in local currency terms.

- Our generic medicines segment generated revenues of $2.6 billion and profit of $799 million. As compared to the first quarter of 2014, revenues increased 9% as a result of higher U.S. sales

and profit increased 59%.  The increase in profit was mainly due to higher profit in the United States and Europe.

\*         \*         \*

Revenues from generic medicines in the United States during the first quarter of 2015 amounted to $1.4 billion, an increase of 37% compared to the first quarter of 2014.  The increase resulted mainly from the launch of esomeprazole magnesium DR capsules (the generic equivalent of Nexium®) this quarter and from sales of other products that were not sold in the first quarter of 2014, the most significant of which was omega-3-acid ethyl esters (the generic equivalent of Lovaza®).  These increases were partially offset by declines in other products, the most significant of which was niacin ER (the generic equivalent of Niaspan®).

\*         \*         \*

In the first quarter of 2015, gross profit from our generic medicines segment amounted to $1.3 billion, an increase of $241 million, or 23%, compared to the first quarter of 2014.  The higher gross profit was mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business.

**1Q2015 Earnings Conference Call:**

[Olafsson:] And despite the FX impact, the profit for the generics increased 59% to $799 million.  The revenues were up 9% to $2.6 billion.  And our operating profit in [the] first-quarter was 30.5%, which is a significant improvement over the 2014 operating profit of 21.9% and 16.7% in operating profit in 2013.  We successfully launched generic Nexium, esomeprazole, on February 17.  We are still exclusive on the market.  But pending at the FDA are 10 other ANDA filers waiting for approval.

722.    On July 30, 2015, Teva reported its second quarter 2015 financial results in its 2Q2015 Form 6-K and hosted its quarterly earnings call.

| million | Three Months Ended Jun. 30, | | Six Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $4,966 | $5,045 | $9,948 | $10,046 |
| Gross Profit | $2,902 | $2,661 | $5,738 | $5,358 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,466 | $2,515 | $5,087 | $4,913 |
| U.S. Revenues | $1,326 | $1,068 | $2,765 | $2,116 |
| Gross Profit | $1,198 | $1,049 | $2,482 | $2,092 |
| Segment Profit | $729 | $536 | $1,528 | $1,039 |
| EBITDA (Non-GAAP Operating Income) | $1,610 | $1,387 | $3,143 | $2,768 |
| Cash Flow from Operations | $1,500 | $1,100 | | |
| Free Cash Flow | $1,336 | $882 | $2,549 | $1,555 |

**2Q2015 Form 6-K:**

Significant highlights of the second quarter of 2015 included:

- Our revenues amounted to $5.0 billion, consistent with the second quarter of 2014, but up 5% in local currency terms.

- Our generic medicines segment generated revenues of $2.5 billion and profit of $729 million.  Revenues decreased 2% (but increased 6% in local currency terms), while profit increased 36%, compared to the second quarter of 2014.  The increase in profit was mainly due to higher profit in the United States.

\*         \*         \*

Revenues from generic medicines in the United States during the second quarter of 2015 amounted to $1.3 billion, an increase of 24% compared to the second quarter of 2014.  The increase resulted mainly from the at-risk launch of aripiprazole tablets (the generic equivalent of Abilify®) during the second quarter of 2015 and from sales of other products that were not sold in the second quarter of 2014, the most significant of which was esomeprazole magnesium DR capsules (the generic equivalent of Nexium®).  These increases were partially offset by declines in other products, the most

significant of which was capecitabine (the generic equivalent of Xeloda®).

\*          \*          \*

In the second quarter of 2015, gross profit from our generic medicines segment amounted to $1.2 billion, an increase of $149 million, or 14%, compared to the second quarter of 2014. The higher gross profit was mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses, partially offset by lower gross profit of our ROW markets and our European business due to our focus on profitable business and lower gross profit of our API business.

**2Q2015 Earnings Conference Call:**

The result of all this is a strong trend of improvement in operating margin for Teva over the past 18 months of almost 500 basis points in operating profit. This was built upon the impressive improvement in the profitability of our generic business.

723.    On October 29, 2015, Teva reported its third quarter 2015 financial results in its 3Q2015 Form 6-K:

| million | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $4,823 | $5,058 | $14,771 | $15,104 |
| Gross Profit | $2,771 | $2,809 | $8,509 | $8,167 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,202 | $2,432 | $7,289 | $7,345 |
| U.S. Revenues | $1,032 | $1,124 | $3,797 | $3,240 |
| Gross Profit | $1,005 | $1,078 | $3,487 | $3,170 |
| Segment Profit | $578 | $558 | $2,106 | $1,597 |
| EBITDA (Non-GAAP Operating Income) | $1,550 | $1,522 | $4,693 | $4,290 |
| Cash Flow from Operations | $1,100 | $1,400 | | |
| Free Cash Flow | $1,000 | | | |

**3Q2015 Form 6-K:**

Significant highlights of the third quarter of 2015 included:

- Our revenues amounted to $4.8 billion, compared to $5.1 billion in the third quarter of 2014, down 5%, but up 3% in local currency terms.

- Our generic medicines segment generated revenues of $2.2 billion and profit of $578 million. Revenues decreased 9%, or 1% in local currency terms. Profit increased 4% compared to the third quarter of 2014. The increase in profit was mainly due to lower selling and marketing expenses.

\*          \*          \*

Revenues from generic medicines in the United States during the third quarter of 2015 amounted to $1.0 billion, a decrease of 8% compared to the third quarter of 2014. The decrease resulted mainly from a decline in sales of budesonide (the generic equivalent of Pulmicort®), niacin ER (the generic equivalent of Niaspan®), capecitabine (the generic equivalent of Xeloda®) and omega-3-acid ethyl esters (the generic equivalent of Lovaza®) due to price declines resulting from increased competition. These decreases were partially offset by sales of products sold in the third quarter of 2015 that were not sold in the third quarter of 2014, the most significant of which were esomeprazole (the generic equivalent of Nexium®), aspirin/extended-release dipyridamole (the generic equivalent of Aggrenox®) and aripiprazole (the generic equivalent of Abilify®).

\*          \*          \*

In the third quarter of 2015, gross profit from our generic medicines segment amounted to $1.0 billion, a decrease of $73 million, or 7%, compared to the third quarter of 2014. The lower gross profit was mainly a result of lower sales of budesonide (the generic equivalent of Pulmicort®) and niacin ER (the generic equivalent of Niaspan®) in the United States, which are both high gross profit products. In addition, exchange rate movements in our ROW and European markets further decreased gross profit. This decrease was partially offset by higher gross profit of our API business. In local

- 310 -

> currency terms, gross profit increased 1%
>
>         *        *        *
>
>        Revenues from generic medicines in the United States in the first nine months of 2015 amounted to $3.8 billion, an increase of 17% compared to $3.2 billion in the first nine months of 2014.
>
>        Among the most significant generic products we sold in the United States in the first nine months of 2015 were generic versions of Nexium® (esomeprazole), Pulmicort® (budesonide inhalation), Abilify® (aripiprazole), Xeloda® (capecitabine), Lovaza® (omega-3-acid ethyl esters), Adderall XR® (mixed amphetamine salts ER), Detrol® (tolterodine ER), Accutane® (isotretinoin), Pravachol® (pravastatin), Evista® (raloxifene), and Celebrex® (celecoxib).

      724.    On February 11, 2016, Teva reported its fourth quarter 2015 financial results in the 4Q2015 Form 6-K Press Release and hosted an earnings call announcing its quarterly and annual results:

| million | Three Months Ended Dec. 31, | | Year Ended Dec. 31, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $4,881 | $5,168 | $19,652 | $20,272 |
| Gross Profit | $2,847 | $2,889 | $11,356 | $11,056 |
| Generic Medicines Segment: | | | | |
|   Revenues | $2,257 | $2,469 | $9,546 | $9,814 |
|     U.S. Revenues | $996 | $1,178 | $4,793 | $4,418 |
|   Gross Profit | $1,012 | $1,083 | $4,499 | $4,253 |
|   Segment Profit | $576 | $569 | $2,682 | $2,166 |
| EBITDA (Non-GAAP Operating Income) | $1,481 | $1,520 | $6,174 | $5,810 |
| Cash Flow from Operations | $1,600 | $1,800 | $5,500 | $5,100 |
| Free Cash Flow | $1,400 | $1,500 | $4,900 | $4,300 |

**4Q2015 Form 6-K Press Release:**

Generic revenues consisted of:

- U.S. revenues of $1.0 billion, a decrease of 15% compared to the fourth quarter of 2014. The decrease resulted mainly from a decline in sales of omega-3-acid ethyl esters (Lovaza®), budesonide (Pulmicort®) and capecitabine (Xeloda®).

            *        *        *

       Gross profit from our generic medicines segment in the fourth quarter of 2015 amounted to $1.0 billion, a decrease of 7% compared to the fourth quarter of 2014. The lower gross profit was mainly a result of lower sales of budesonide (Pulmicort®) in the United States. In addition, exchange rate movements in our ROW and European markets had a negative impact on our gross profit. This decrease was partially offset by higher gross profit of our API business.

            *        *        *

       Our generic medicines segment generated profit of $576 million in the fourth quarter of 2015, an increase of 1% compared to the fourth quarter of 2014. Generic medicines profitability as a percentage of generic medicines revenues was 25.5% in the fourth quarter of 2015, up from 23.0% in the fourth quarter of 2014. The increase was primarily due to the reduction in S&M expenses, partially offset by lower gross profit.

**4Q2015 Earnings Conference Call:**

       2015 was a very good year for Teva Generics. Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally. We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is [a] $1 billion improvement in operating profit over 24 months [sic] period.

       So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency

measures.

        \*        \*        \*

        Looking at EBITDA, this important measurement will continue to drive very strong EBITDA growth, with 7.8% CAGR over the past three years. The improved generic business generated 37% of annual operating profit without G&A, while Copaxone's share of this profit was down from 46% to 42%. And these two major pieces of our business are coming close in contribution.

        \*        \*        \*

[O]n the profitability, the overall business coming in at 28% versus what we – for the full year was 25.5% for fourth quarter. I think how you need to think about it is, obviously, when you have an exclusive opportunity, especially in the US, you traditionally have a higher profitability. And we saw that in the first two quarters of the year, where we didn't have any exclusive product in third and fourth quarter, there was a lower profitability.

        . . . But keep in mind that from fourth-quarter 2014 to fourth-quarter 2015, there is a 200-basis-point improvement the operating profit. So there were no exclusive launches in either quarters. So the base business, overall base business improvement from the 12-month period was 200 basis point from fourth quarter to fourth quarter. So I think the overall business is improving.

725.    On February 11, 2016, Teva filed its 2015 Form 20-F:

| million | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Total Revenues | $19,652 | $20,272 | $20,314 | $20,317 | $18,312 |
| Gross Profit | $8,296 | $9,216 | $9,607 | $9,665 | $8,797 |
| Generic Medicines Segment: | | | | | |
|   Revenues | $9,546 | $9,814 | $9,902 | | |
|     U.S. Revenues | $4,793 | $4,418 | $4,172 | | |
|   Gross Profit | $4,499 | $4,253 | $4,083 | | |
|   Segment Profit | $2,682 | $2,166 | $1,680 | | |
| EBITDA (Non-GAAP Operating Income) | $6,174 | $5,810 | $5,252 | | |
| Cash Flow from Operations | $5,500 | $5,100 | | | |

        Revenues from generic medicines in the United States in 2015 amounted to $4.8 billion, up 8% compared to $4.4 billion in 2014. The increase resulted mainly from the 2015 exclusive launch of esomeprazole (the generic equivalent of Nexium®) and the launch of aripiprazole (the generic equivalent of Abilify®), as well as products that were sold in 2015 that were not sold in 2014. This increase was partially offset by lower sales of the generic versions of Pulmicort® (budesonide inhalation), Xeloda® (capecitabine), Niaspan® (niacin ER) and Lovaza® (omega-3-acid ethyl esters).

        \*        \*        \*

        In 2015, gross profit from our generic medicines segment amounted to $4.5 billion, an increase of $246 million, or 6%, compared to $4.3 billion in 2014. The higher gross profit was mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties. These increases were partially offset by lower gross profit in our ROW markets and lower gross profit in Europe.

726.    The financial figures and the reasons given for the figures in ¶¶721-725 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were inflated by the Price-Hike Strategy and included sales from collusive price-fixing and market allocation schemes. Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $848 million in 2015 – with contribution of at least

- 312 -

$228 million in the first quarter of 2015, $236 million in the second quarter of 2015, $218 million in

the third quarter of 2015, and $166 million in the fourth quarter of 2015.

727.     On May 9, 2016, Teva reported its first quarter 2016 financial results in its 1Q2016

Form 6-K and hosted its quarterly earnings call:

| | Three Months Ended Mar. 31, | |
| million | 2016 | 2015 |
| --- | --- | --- |
| Total Revenues | $4,810 | $4,982 |
| Gross Profit | $2,791 | $2,146 |
| Generic Medicines Segment: | | |
| Revenues | $2,170 | $2,621 |
| U.S. Revenues | $976 | $1,439 |
| Gross Profit | $999 | $1,284 |
| Segment Profit | $584 | $799 |
| EBITDA (Non-GAAP Operating Income) | $1,526 | $1,533 |
| Cash Flow from Operations | $1,376 | $1,354 |
| Free Cash Flow | $1,200 | |

**1Q2016 Form 6-K:**

Significant highlights of the first quarter of 2016 included:

<p style="text-align:center">*          *          *</p>

- Our generic medicines segment generated revenues of $2.2 billion and profit of $584 million. Revenues decreased 17%, or 15% in local currency terms, mainly due to lower U.S. sales. Profit decreased 27% compared to the first quarter of 2015. Our higher revenues and profit in the first quarter of 2015 were both due to significant launches in the U.S.

Revenues from generic medicines in the United States during the first quarter of 2016 amounted to $976 million, a decrease of 32% or of $463 million, compared to the first quarter of 2015. The decrease resulted mainly from a decline in sales of $427 million due to the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®) and budesonide (the generic equivalent of Pulmicort®) as well as a decline in sales of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) and capecitabine (the generic equivalent of Xeloda®) due to increased competition. These decreases were partially offset by sales of products sold in the first quarter of 2016 that were not sold in the first quarter of 2015, the most significant of which were aripiprazole (the generic equivalent of Abilify®) and aspirin/extended-release dipyridamole.

<p style="text-align:center">*          *          *</p>

In the first quarter of 2016, gross profit from our generic medicines segment amounted to $999 million, a decrease of $285 million, or 22%, compared to the first quarter of 2015. In local currency terms, gross profit decreased 20%. The lower gross profit was mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets. This decrease was partially offset by higher gross profit of our ROW markets and our API business.

**1Q2016 Earnings Conference Call:**

We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more.

<p style="text-align:center">*          *          *</p>

Sales declined by 3%, mostly due to exchange rates impact. However, operating income, EBITDA, net income, and earning per share were at the same level of last year, due to improved efficiency, and profitability . . . .

4828-1671-4429.v2

728.    On August 4, 2016, Teva reported its second quarter 2016 financial results in its 2Q2016 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Jun. 30, | | Six Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Total Revenues | $5,038 | $4,966 | $9,848 | $9,948 |
| Gross Profit | $2,877 | $2,902 | $5,668 | $5,738 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,294 | $2,466 | $4,464 | $5,087 |
| U.S. Revenues | $892 | $1,326 | $1,868 | $2,765 |
| Gross Profit | $1,072 | $1,198 | $2,071 | $2,482 |
| Segment Profit | $614 | $729 | $1,198 | $1,528 |
| EBITDA (Non-GAAP Operating Income) | $1,583 | $1,610 | $3,109 | $3,143 |
| Cash Flow from Operations | $963 | $1,500 | | |
| Free Cash Flow | $800 | $1,300 | | |

**2Q2016 Form 6-K:**

Significant highlights of the second quarter of 2016 included:

        *      *      *

- Our generic medicines segment generated revenues of $2.3 billion and profit of $614 million. Revenues decreased 7%, or 4% in local currency terms. Profit decreased 16% compared to the second quarter of 2015. Our lower revenues and profit in the second quarter of 2016 were mainly due to loss of exclusivity on certain products as well as increased competition on other product.

        *      *      *

Revenues from generic medicines in the United States during the second quarter of 2016 amounted to $892 million, a decrease of $434 million, or 33%, compared to the second quarter of 2015. The decrease resulted mainly from the loss of exclusivity on aripiprazole (the generic equivalent of Abilify®) and esomeprazole (the generic equivalent of Nexium®) as well as a decline in sales of budesonide (the generic equivalent of Pulmicort®), capecitabine (the generic equivalent of Xeloda®) and omega-3-acid ethyl esters (the generic equivalent of Lovaza®), due to increased competition.

        *      *      *

In the second quarter of 2016, gross profit from our generic medicines segment amounted to $1.1 billion, a decrease of $126 million, or 11%, compared to the second quarter of 2015. In local currency terms, gross profit decreased 7%. The lower gross profit was mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States (as described above) and higher production expenses, partially offset by higher gross profit of our ROW markets, higher gross profit of our API business and higher gross profit of our European markets.

        *      *      *

Revenues from generic medicines in the United States in the first six months of 2016 amounted to $1.9 billion, a decrease of 32% compared to $2.8 billion in the first six months of 2015. The decrease resulted mainly from the loss of exclusivity on aripiprazole (the generic equivalent of Abilify®) and esomeprazole (the generic equivalent of Nexium®) as well as a decline in sales of budesonide (the generic equivalent of Pulmicort®).

        *      *      *

In the first six months of 2016, gross profit amounted to $5.7 billion, a decrease of 1% compared to the first six months of 2015.

The lower gross profit was mainly a result of the lower gross profit of our generic medicines segment as well as inventory step-up charges and higher costs related to regulatory actions taken in facilities, partially offset by higher gross profit of our specialty medicines segment, lower amortization of purchased intangible assets and higher gross profit of our OTC activity.

**2Q2016 Earnings Conference Call:**

- 314 -

> Operating profit for the quarter, which was similar to last year were influenced by the decline of our Aripiprazole, Esomeprazole, and Budesonide due to competition.
>
> *        *        *
>
> On the profitability of our generic pieces, obviously, we are not breaking this down, but what you've seen is that the level of profitability was similar to Q1, 26.8%.  The difference from last year, mostly due to the three major products that saw a much more intensive competition in the US market.

729.    On November 15, 2016, Teva reported its third quarter 2016 financial results in its

3Q2016 Form 6-K and hosted its quarterly earnings call:

| million | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Total Revenues | $5,563 | $4,823 | $15,411 | $14,771 |
| Gross Profit | $2,801 | $2,771 | $8,469 | $8,509 |
| Generic Medicines Segment: | | | | |
| Revenues | $2,904 | $2,202 | $7,368 | $7,289 |
| U.S. Revenues | $1,293 | $1,032 | $3,161 | $3,797 |
| Gross Profit | $1,466 | $1,005 | $3,537 | $3,487 |
| Segment Profit | $867 | $578 | $2,065 | $2,106 |
| EBITDA (Non-GAAP Operating Income) | $1,794 | $1,550 | $4,903 | $4,693 |
| Cash Flow from Operations | $1,500 | $1,100 | | |
| Free Cash Flow | $1,200 | $1,000 | | |

**3Q2016 Form 6-K:**

Significant highlights of the third quarter of 2016 included:

- On August 2, 2016, we consummated the Actavis Generics acquisition.  The acquisition had a significant impact on our generic medicines segment, expanding our product portfolio, R&D capabilities, product pipeline, and global operational network.  Our results of operations for the third quarter of 2016 include two months of Actavis Generics results, with $887 million included in our consolidated revenues.

*        *        *

- Our generic medicines segment generated revenues of $2.9 billion and profit of $867 million. Revenues increased 32%, or 35% in local currency terms.  Profit increased 50% compared to the third quarter of 2015.  Our higher revenues and profit in the third quarter of 2016 were mainly due to the inclusion of two months of Actavis Generics revenues in this quarter.

*        *        *

Revenues from generic medicines in the United States during the third quarter of 2016 were $1.3 billion, an increase of $261 million, or 25%, compared to the third quarter of 2015.  The increase resulted mainly from the inclusion of two months of Actavis Generics revenues of approximately $538 million, partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide (the generic equivalent of Pulmicort®) due to increased competition and the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®).

*        *        *

In the third quarter of 2016, gross profit from our generic medicines segment was $1.5 billion, an increase of $461 million, or 46%, compared to the third quarter of 2015.  The higher gross profit was mainly due to the first time inclusion of Actavis Generics and our business venture with Takeda in Japan, commencing with the second quarter of 2016, and higher gross profit of our API business as well as lower expenses related to production.

*        *        *

Revenues in the third quarter of 2016 were $5.6 billion, an increase of 15% compared to the third quarter of 2015, primarily due to higher revenues of our generic medicines due to the first time inclusion of the Actavis Generics, as well as higher revenues of other activities, partially offset by lower

- 315 -

revenues of our specialty medicines.  See "Generic Medicines Revenues," . . . .

\* \* \*

In the third quarter of 2016, gross profit amounted to $2.8 billion, an increase of 1% compared to the third quarter of 2015.

The higher gross profit was mainly the result of higher gross profit of our generics medicines due to the first time inclusion of Actavis Generics and higher gross profit of our OTC activity, partially offset by higher amortization of purchased intangible assets, inventory step-up charges in the third quarter of 2016, lower gross profit of our specialty medicines segment, higher costs related to regulatory actions taken in facilities and other activities.  See "Generic Medicines Gross Profit," . . . .

\* \* \*

Revenues from generic medicines in the United States in the first nine months of 2016 amounted to $3.2 billion, a decrease of 17% compared to $3.8 billion in the first nine months of 2015.  The decrease resulted mainly from the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®), a decline in sales of budesonide (the generic equivalent of Pulmicort®) and the loss of exclusivity on aripiprazole (the generic equivalent of Abilify®), partially offset by the inclusion of two months of Actavis Generics revenues.

\* \* \*

Cash flow generated from operating activities during the third quarter of 2016 amounted to $1.5 billion, compared to $1.1 billion in the third quarter of 2015.  The increase was mainly due to lower payments for legal settlements, partially offset by an increase in accounts receivable, net of SR&A, and an increase in inventories.  Cash flow was affected by the inclusion of two months of Actavis Generics.

**3Q2016 Earnings Conference Call:**

Turning to our profit margins, the generic business came in at 29.9%.  By exercising strong focus on cost control, and driving the right business mix, we compensated for challenges on the top line.

\* \* \*

Our non-GAAP operating profit, this measure excludes G&A, was up 16% year-over-year.  Generics including Actavis contributed additional operating profit of more than $300 million to our operating profit, and our operating profit from our specialty business was down by $120 million year-over-year, all in all, a 16% increase.

730.   On February 13, 2017, Teva reported its fourth quarter 2016 financial results in its 4Q2016 Form 6-K Press Release and hosted an earnings call announcing its quarterly and annual results:

| million | Three Months Ended Dec. 31, | | Year Ended Dec. 31, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Total Revenues | $6,492 | $4,881 | $21,903 | $19,652 |
| Gross Profit | $3,390 | $2,847 | $11,859 | $11,356 |
| Generic Medicines Segment: | | | | |
| Revenues | $3,716 | $2,573 | $11,990 | $10,540 |
| U.S. Revenues | $1,395 | $998 | $4,556 | $4,795 |
| Gross Profit | $1,835 | $1,169 | $5,696 | $4,903 |
| Segment Profit | $1,075 | $693 | $3,310 | $2,925 |
| EBITDA (Non-GAAP Operating Income) | $1,944 | $1,481 | $6,847 | $6,174 |
| Cash Flow from Operations | $1,400 | | $5,200 | $5,500 |
| Free Cash Flow | $1,100 | | $4,400 | $4,900 |

**4Q2016 Form 6-K Press Release:**

**Revenues** in 2016 were $21.9 billion, an increase of 11% compared to 2015, primarily due to the inclusion, following the closing on August 2, of the results of the Actavis Generics business.

\*     \*     \*

**Revenues** in the fourth quarter of 2016 were $6.5 billion, up 33% compared to the fourth quarter of 2015, primarily due to the inclusion, following the closing on August 2, of the results of the Actavis Generics business.

\*     \*     \*

Generic medicines revenues in the fourth quarter of 2016 were $3.7 billion, an increase of 44% compared to the fourth quarter of 2015, reflecting the results of the Actavis Generics business from August 2, 2016.

Generic revenues consisted of:

- U.S. revenues of $1.4 billion, an increase of 40% compared to the fourth quarter of 2015, mainly due to the inclusion of Actavis Generics with revenues of $630 million.

**4Q2016 Earnings Conference Call:**

As you can see, on a non-GAAP basis, our profit and EBITDA were up about 30% compared to Q4 last year, all driven by inorganic growth, related mostly to the Actavis acquisition, and also to the joint venture with Takeda in Japan.

\*     \*     \*

The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

731.    On February 15, 2017, Teva filed its 2016 Form 20-F:

| million | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| Total Revenues | $21,903 | $19,652 | $20,272 | $20,314 | $20,317 |
| Gross Profit | $11,859 | $11,356 | $11,056 | $10,707 | $10,652 |
| Generic Medicines Segment: | | | | | |
|    Revenues | $11,990 | $10,540 | $10,810 | | |
|     U.S. Revenues | $4,556 | $4,795 | $4,516 | | |
|    Gross Profit | $5,696 | $4,903 | $4,601 | | |
|    Segment Profit | $3,310 | $2,925 | $2,346 | | |
| EBITDA (Non-GAAP Operating Income) | $6,847 | $6,174 | $5,810 | | |
| Cash Flow from Operations | $5,200 | $5,500 | | | |

Significant highlights of 2016 included:

\*     \*     \*

- Revenues of our generic medicines segment were $12.0 billion, up 14%, and profit was $3.3 billion, up 13%. Our higher revenues and profit in 2016 were mainly due to the inclusion of five months of Actavis Generics revenues in 2016 and our new business venture with Takeda, which commenced operations in April 2016, partially offset by losses of exclusivity and increased competition on certain products in the U.S.

\*     \*     \*

Revenues from generic medicines in the United States in 2016 were $4.6 billion, a decrease of 5% compared to $4.8 billion in 2015. The decrease resulted mainly from the loss of exclusivity on esomeprazole (the generic equivalent of Nexium®) and aripiprazole (the generic equivalent of Abilify®), a decline in the sales of budesonide (the generic equivalent of Pulmicort®) due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine (the generic equivalent of Xeloda®). This decrease was partially offset by the inclusion of five months of Actavis Generics revenues of approximately $1.2 billion and revenues from products that were not sold in 2015.

\*     \*     \*

In 2016, gross profit from our generic medicines segment was $5.7 billion, an increase of $793 million, or 16%, compared to $4.9 billion in 2015. The higher gross profit was mainly a result of higher gross profit in our ROW markets and in Europe as well as higher gross profit from API sales to

- 317 -

> third parties, partially offset by lower gross profit in the United States as well as higher other production expenses.
>
>      *    *    *
>
>   Revenues in 2016 were $21.9 billion, an increase of 11% compared to 2015, mainly due to higher revenues of our generic medicines and of our specialty medicines.  See "Generic Medicines Revenues," . . . .

732.  The financial figures and the reasons given for the figures in ¶¶727-731 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were inflated by the Price-Hike Strategy and illegal price-fixing and market allocation schemes.  Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $513 million in 2016 – with contribution of at least $124 million in the first quarter of 2016, $114 million in the second quarter of 2016, $149 million in the third quarter of 2016, and $127 million in the fourth quarter of 2016.

733.  On May 11, 2017, Teva reported its first quarter 2017 financial results in its 1Q2017 Form 6-K and hosted its quarterly earnings call:

| | Three Months Ended Mar. 31, | |
|---|---|---|
| million | 2017 | 2016 |
| Total Revenues | $5,630 | $4,810 |
| Gross Profit | $2,819 | $2,791 |
| Generic Medicines Segment: | | |
|  Revenues | $3,058 | $2,458 |
|   U.S. Revenues | $1,381 | $976 |
|  Gross Profit | $1,370 | $1,123 |
|  Segment Profit | $779 | $649 |
| EBITDA (Non-GAAP Operating Income) | $1,621 | $1,526 |
| Cash Flow from Operations | $470 | $1,400 |
| Free Cash Flow | $300 | $1,200 |

**1Q2017 Form 6-K:**

Significant highlights of the first quarter of 2017 included:

     *    *    *

- Our generic medicines segment generated revenues of $3.1 billion and profit of $779 million. Revenues increased 24%, or 34% in local currency terms.  Profit increased 20% compared to the first quarter of 2016.  The increase in revenues and profit in the first quarter of 2017 was mainly due to the inclusion of Actavis Generics revenues.

     *    *    *

  Revenues from generic medicines in the United States during the first quarter of 2017 were $1.4 billion, an increase of 41%, compared to the first quarter of 2016.  The increase resulted mainly from the inclusion of Actavis Generics revenues and products sold in the first quarter of 2017 that were not sold in the first quarter of 2016, partially offset by a decline in sales due to increased competition, mainly to aripiprazole (the generic equivalent of Abilify®) and budesonide (the generic equivalent of Pulmicort®) and loss of revenues following our divestment of certain products in connection with the

acquisition.

<div align="center">*        *        *</div>

In the first quarter of 2017, gross profit from our generic medicines segment was $1.4 billion, an increase of $247 million, or 22%, compared to the first quarter of 2016.  The higher gross profit was mainly due to the inclusion of Actavis Generics and our business venture with Takeda in Japan.

<div align="center">*        *        *</div>

Revenues in the first quarter of 2017 were $5.6 billion, an increase of 17% compared to the first quarter of 2016, primarily due to higher revenues of our generic medicines and other activities, which were mainly related to the acquisitions of Actavis Generics and Anda as well as the business venture with Takeda in Japan, partially offset by lower revenues of our specialty medicines.

**1Q2017 Earnings Conference Call:**

Our operating income from Q4 to Q1 declined by 17%.  While gross profit margin of our U.S. generic business remained stable, overall gross profit and gross margin was impacted by the Venezuela devaluation, our business in Japan and the divestment in the U.K.  Lower NINLARO income was also a contributor to lower profit and profitability.  On the other hand, you could see our efficiency initiatives, which reduced our operating expenses across the board and mitigated some of the decline in the gross profit.  And we expect this trend to continue throughout the year. On our balance sheet compared to December 31, 2016, our balance sheet amounted to total assets of $91.3 billion and total equity of $34 billion.

734.    On August 3, 2017, Teva reported its second quarter 2017 financial results in its 2Q2017 Form 6-K:

| million | Three Months Ended Jun. 30, | | Six Months Ended Jun. 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Total Revenues | $5,686 | $5,038 | $11,316 | $9,848 |
| Gross Profit | $2,821 | $2,161 | $5,676 | $4,180 |
| Generic Medicines Segment: | | | | |
| Revenues | $3,078 | $2,557 | $6,136 | $5,015 |
| U.S. Revenues | $1,290 | $892 | $2,671 | $1,868 |
| Gross Profit | $1,316 | $1,148 | $2,686 | $2,271 |
| Segment Profit | $691 | $604 | $1,470 | $1,253 |
| EBITDA (Non-GAAP Operating Income) | $1,597 | $1,583 | $3,218 | $3,109 |
| Cash Flow from Operations | $741 | $963 | | |
| Free Cash Flow | $567 | $796 | | |

**2Q2017 Form 6-K:**

Significant highlights of the second quarter of 2017 included:

- Our revenues were $5.7 billion, up 13%, or 17% in local currency terms, compared to the second quarter of 2016.

- Our generic medicines segment generated revenues of $3.1 billion and profit of $691 million.  Revenues increased 20%, or 28% in local currency terms.  Profit increased 14% compared to the second quarter of 2016.  The increase in revenues and profit in the second quarter of 2017 was mainly due to the inclusion of Actavis Generics.

<div align="center">*        *        *</div>

Revenues from generic medicines in the United States during the second quarter of 2017 were $1.3 billion, an increase of 45%, compared to the second quarter of 2016.  The increase resulted mainly from the inclusion of Actavis Generics revenues and products sold in the second quarter of 2017 that were not sold in the second quarter of 2016, partially offset by a decline in sales due to increased competition, mainly to budesonide (the generic equivalent of Pulmicort®) and aripiprazole (the generic equivalent of Abilify®) and loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition.

<div align="center">*        *        *</div>

In the second quarter of 2017, gross profit from our generic medicines segment was $1.3 billion, an increase of $168 million, or 15%, compared to the second quarter of 2016. The higher gross profit was mainly due to higher sales following the inclusion of Actavis Generics.

\* \* \*

Revenues from generic medicines in the United States in the first six months of 2017 amounted to $2.7 billion, an increase of 43% compared to $1.9 billion in the first six months of 2016. The increase resulted mainly from the inclusion of Actavis Generics revenues and products sold in the first half of 2017 that were not sold in the first half of 2016, partially offset by a decline in sales due to increased competition, mainly to budesonide (the generic equivalent of Pulmicort®) and aripiprazole (the generic equivalent of Abilify®) and loss of revenues following our divestment of certain products in connection with the acquisition.

**2Q2017 Earnings Conference Call:**

In terms of profit, we are up 1%, compared to . . . – Q2 2016, sorry. Our generics segment has generated $136 million of additional profits, driven mainly by the higher sales as a result of the Actavis acquisition.

735.    On November 2, 2017, Teva reported its third quarter 2017 financial results in its

3Q2017 Form 6-K and hosted its quarterly earnings call:

| (in millions) | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Total Revenues | $5,610 | $5,563 | $16,926 | $15,411 |
| Gross Profit | $2,643 | $2,801 | $8,283 | $8,469 |
| Generic Medicines Segment: | | | | |
| Revenues | $3,007 | $3,259 | $9,143 | $8,274 |
| U.S. Revenues | $1,179 | $1,293 | $3,850 | $3,161 |
| Gross Profit | $1,158 | $1,590 | $3,844 | $3,861 |
| Segment Profit | $619 | $982 | $2,089 | $2,235 |
| EBITDA (Non-GAAP Operating Income) | $1,470 | $1,794 | $4,688 | $4,903 |
| Cash Flow from Operations | $1,100 | $1,500 | | |
| Free Cash Flow | $900 | $1,200 | | |

**3Q2017 Form 6-K:**

Significant highlights of the third quarter of 2017 included:

\* \* \*

- Our generic medicines segment generated revenues of $3.0 billion and profit of $619 million. Revenues decreased 8%, or 2% in local currency terms. Profit decreased 37% compared to the third quarter of 2016. The decrease in revenues and profit in the third quarter of 2017 was mainly due to market dynamics in the United States.

\* \* \*

Revenues from generic medicines in the United States during the third quarter of 2017 were $1.2 billion, a decrease of 9%, compared to the third quarter of 2016. The decrease was mainly due to pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product, partially offset by the inclusion of three months of Actavis Generics revenues in this quarter, compared to two months in the third quarter of 2016.

\* \* \*

In the third quarter of 2017, gross profit from our generic medicines segment was $1.2 billion, a decrease of $432 million, or 27%, compared to the third quarter of 2016. The lower gross profit was mainly due to higher production expenses, market dynamics in the United States and lower revenues in Venezuela following the currency devaluation.

*        *        *

Revenues from generic medicines in the United States in the first nine months of 2017 were $3.9 billion, an increase of 22% compared to $3.2 billion in the first nine months of 2016. The increase resulted mainly from the inclusion of Actavis Generics revenues and products sold in the first nine months of 2017 that were not sold in the comparable period of 2016, partially offset by a decline in sales due to increased competition, mainly to budesonide (the generic equivalent of Pulmicort®) and aripiprazole (the generic equivalent of Abilify®) and loss of revenues following our divestment of certain products in connection with the acquisition.

**3Q2017 Earnings Conference Call:**

The profitability of the company was down to 26.2% from 32.2% in 2016 Q3. This reflects a lower gross profit of 53% in the quarter compared to 61% in the same quarter of the previous year. This is driven by several factors. The inclusion of ANDA distribution business as well as lower margins in the generics, specifically, in our U.S. generic market. This was partially offset by reductions in expenses, mainly in our R&D and sales and marketing. . . . For the quarterly non-GAAP operating profit, we are down overall 18%. The largest decrease was in the profit of our generics business, mainly due to lower revenues and margins in the U.S. COPAXONE revenues and profit were down slightly based on the discussion I just had.

736.   On February 8, 2018, Teva reported its fourth quarter and full year 2017 financial results in its 4Q2017 Form 8-K[25]:

|  | Three Months Ended Dec. 31, | | Full Year Ended Dec. 31, | |
| --- | --- | --- | --- | --- |
| (in millions) | 2017 | 2016 | 2017 | 2016 |
| Total Revenues | $5,459 | $6,492 | $22,385 | $21,903 |
| Gross Profit | $2,542 | $3,390 | $10,825 | $11,859 |
| Generic Medicines Segment: |  |  |  |  |
| Revenues | $3,114 | $3,716 | $12.257 | $11,990 |
| U.S. Revenues | $1,186 | $1,395 | $5,036 | $4,556 |
| Gross Profit | $1,271 | $1,835 | $5,115 | $5,696 |
| Segment Profit | $740 | $1,075 | $2,829 | $3,310 |
| EBITDA (Non-GAAP Operating Income) | $1,385 | $1,944 | $6,073 | $6,847 |
| Cash Flow from Operations | $1,200 |  | $3,500 | $5,200 |
| Free Cash Flow | $900 |  | $2,700 | $4,400 |

**2017 Annual Results**

Revenues in 2017 were $22.4 billion, an increase of 2%, or 6% in local currency terms, compared to 2016, primarily due to: (i) an increase in our generic medicines segment from the inclusion of Actavis Generics revenues for the full year of 2017 as compared to five month in 2016, partially offset by the adverse market dynamics in the United States; (ii) the acquisition of Anda in the fourth quarter of 2016 . . . .

GAAP gross profit was $10.8 billion in 2017, down 9% compared to 2016. GAAP gross profit margin for the year was 48.4%, compared to 54.1% in 2016. Non-GAAP gross profit was $12.2 billion in 2017, down 9% compared to 2016. Non-GAAP gross profit margin was 54.7% in 2017, compared to 61.3% in 2016. The decrease in GAAP gross profit as a percentage of revenues primarily reflects lower profitability of our generic medicines segment, higher amortization of purchased intangible assets, lower profitability of our specialty medicines segment and the inclusion of Anda . . . .

*        *        *

**Fourth Quarter 2017 Results**

---

[25]   Due to Teva's acquisition of Actavis, the SEC re-classified Teva as a U.S. domestic issuer and the Company lost its foreign private issuer status. As a result, Teva had to comply with the SEC's filing requirements for U.S. reporting companies effective January 1, 2018.

> Revenues in the fourth quarter of 2017 were $5.5 billion, down 16% compared to the fourth quarter of 2016, primarily due to . . . the challenging market dynamics in the U.S. generics market.
>
> \*       \*       \*
>
> ### Generic Medicines Revenues
>
> Generic medicines revenues in the fourth quarter of 2017 were $3.1 billion, a decrease of 16% compared to the fourth quarter of 2016.
>
> Generic revenues consisted of:
>
> • U.S. revenues of $1.2 billion, a decrease of 15% compared to the fourth quarter of 2016, mainly due to challenging market dynamics including pricing declines resulting from customer consolidation into large buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines . . . .
>
> ### Generic Medicines Gross Profit
>
> Gross profit of our generic medicines segment in the fourth quarter of 2017 was $1.3 billion, a decrease of 31% compared to $1.8 billion in the fourth quarter of 2016. The lower gross profit was mainly due to higher production expenses, market dynamics in the United States . . . .
>
> \*       \*       \*
>
> ### Generic Medicines Profit
>
> Our generic medicines segment generated profit of $740 million in the fourth quarter of 2017, a decrease of 31% compared to the fourth quarter of 2016. Generic medicines profitability as a percentage of generic medicines revenues was 23.8% in the fourth quarter of 2017, down from 28.9% in the fourth quarter of 2016.

737.    On February 12, 2018, Teva filed its 2017 Form 10-K:

| million | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| Total Revenues | $22,385 | $21,903 | $19,652 | $20,272 | $20,314 |
| Gross Profit | $10,825 | $11,859 | $11,356 | $11,056 | $10,707 |
| Generic Medicines Segment: | | | | | |
|   Revenues | $12,257 | $11,990 | $10,540 | | |
|    U.S. Revenues | $5,036 | $4,556 | $4,795 | | |
|    Gross Profit | $5,115 | $5,696 | $4,903 | | |
|    Segment Profit | $2,829 | $3,310 | $2,925 | | |
| EBITDA (Non-GAAP Operating Income) | $6,073 | $6,847 | $6,174 | | |
| Cash Flow from Operations | $3,500 | $5,200 | | | |

Significant highlights of 2017 included:

\*       \*       \*

- Our generic medicines segment generated revenues of $12.3 billion and profit of $2.8 billion. Revenues increased 2%, or 10% in local currency terms compared to 2016. Profit decreased 15% compared to 2016. Our higher revenues in 2017 were mainly due to the inclusion of Actavis Generics revenues for the full year of 2017 compared to five months in 2016, partially offset by the adverse market dynamics in the United States. Our lower profit in 2017 was mainly due to price erosion in the U.S. generics market.

\*       \*       \*

Revenues from generic medicines in the United States in 2017 were $5.0 billion, an increase of 11% compared to $4.6 billion in 2016. The increase resulted mainly from the inclusion of Actavis Generics revenues for the full year of 2017 compared to five months in 2016 and products sold in 2017 that were not sold in 2016, partially offset by:

- decline in sales of budesonide (the generic equivalent of Pulmicort®) and methylphenidate extended-release tablets (Concerta® authorized generic) due to increased competition;

> • price erosion resulting from the following factors:
>
> > • customer consolidation into larger buying groups; and
> >
> > • accelerated FDA approvals for additional generic versions of competing off-patent medicines . . . .
>
> <div align="center">*       *       *</div>
>
> In 2017, gross profit from our generic medicines segment was $5.1 billion, a decrease of $581 million, or 10%, compared to $5.7 billion in 2016. The lower gross profit was mainly a result of higher other production expenses, lower gross profit in the United States due to price erosion . . . .

738.    The financial figures and the reasons given for the figures in ¶¶733-737 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were impacted by the Price-Hike Strategy and illegal price-fixing and market allocation schemes. Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $309 million in 2017 – with contribution of at least $103 million in the first quarter of 2017, $79 million in the second quarter of 2017, $69 million in the third quarter of 2017, and $58 million in the fourth quarter of 2017.

739.    On May 3, 2018, Teva reported its first quarter 2018 financial results in its 1Q2018 Form 8-K and 1Q2018 Form 10-Q[26]:

| million | Three Months Ended Mar. 31, | |
|---|---|---|
| | 2018 | 2017 |
| Total Revenues | $5,065 | $5,650 |
| Gross Profit | $2,348 | $2,839 |
| North America Segment: | | |
|    Revenues | $2,531 | $3,240 |
|     Generic Products Revenues | $1,088 | $1,415 |
|    Gross Profit | $1,432 | $2,080 |
|    Segment Profit | $915 | $1,306 |
| EBITDA (Non-GAAP Operating Income) | $1,600 | $1,800 |
| Cash Flow from Operations | $1,500 | $100 |
| Free Cash Flow | $1,900 | $300 |

> **1Q2018 Form 8-K:**
>
> The decrease in gross profit margin, on both a GAAP and a non-GAAP basis, was mainly the result of lower profitability in our North America segment due to lower COPAXONE sales and adverse market dynamics in the U.S. generics market.

---

[26] Beginning with the 1Q2018 financial reporting, Teva stopped reporting generic medicines segment results and changed segment reporting to North America, Europe, and Growth Markets segments.

4828-1671-4429.v2

* * *

Generic products revenues in our North America segment in the first quarter of 2018 decreased by 23% to $1.1 billion, compared to the first quarter of 2017, mainly due to lower volumes and price erosion.

* * *

Gross profit margin for our North America segment in the first quarter of 2018 decreased to 56.6%, compared to 64.2% in the first quarter of 2017.  This decrease was mainly due to lower COPAXONE revenues and continued price erosion of generic products.

* * *

Profit from our North America segment in the first quarter of 2018 was $915 million, a decrease of 30% compared to $1.3 billion in the first quarter of 2017.  The decrease was mainly due to lower revenues due to generic competition for COPAXONE and continued price erosion in the U.S. generics market, partially offset by cost reduction and higher other income.

**1Q2018 Form 10-Q:**

Generic products revenues in our North America segment in the first quarter of 2018 decreased by 23% to $1.1 billion, compared to the first quarter of 2017, mainly due to lower volumes and continued price erosion.

* * *

Revenues in the first quarter of 2018 were $5.1 billion, a decrease of 10%, or 15% in local currency terms, compared to the first quarter of 2017, mainly due to adverse market dynamics in the U.S. generics market . . . .

740.  On August 2, 2018, Teva reported its second quarter 2018 financial results in its

2Q2018 Form 8-K and 2Q2018 Form 10-Q:

| | Three Months Ended Jun. 30, | | Six Months Ended Jun. 30, | |
|---|---|---|---|---|
| million | 2018 | 2017 | 2018 | 2017 |
| Total Revenues | $4,701 | $5,720 | $9,766 | $11,370 |
| Gross Profit | $2,061 | $2,855 | $4,409 | $5,694 |
| North America Segment: | | | | |
| Revenues | $2,263 | $3,169 | $4,794 | $6,409 |
| Generic Products Revenues | $947 | $1,331 | $2,035 | $2,746 |
| Gross Profit | $1,203 | $2,058 | $2,635 | $4,138 |
| Segment Profit | $722 | $1,250 | $1,637 | $2,556 |
| EBITDA (Non-GAAP Operating Income) | $1,400 | $1,700 | | |
| Cash Flow from Operations | $162 | $435 | | |
| Free Cash Flow | $600 | $600 | | |

**2Q2018 Form 8-K:**

**Second Quarter 2018 Consolidated Results**

Revenues in the second quarter of 2018 were $4.7 billion, a decrease of 18%, or 19% in local currency terms, compared to the second quarter of 2017, mainly due to continued price erosion in our U.S. generics business . . . .

* * *

The decrease in gross profit margin, on both a GAAP and a non-GAAP basis, resulted primarily from price erosion in our U.S. generics business . . . .

* * *

Gross profit from our North America segment in the second quarter of 2018 was $1.2 billion, a decrease of 42% compared to $2.1 billion in the second quarter of 2017.  The decrease was mainly due to lower revenues from COPAXONE and generic products . . . .

* * *

Profit from our North America segment in the second quarter of 2018 was $722 million, a decrease of 42% compared to $1.3 billion in the second quarter of 2017. The decrease was mainly due to lower revenues from COPAXONE and generic products.

**2Q2018 Form 10-Q:**

Significant highlights of the second quarter of 2018 included:

* * *

- Our North America segment generated revenues of $2.3 billion and profit of $722 million in the second quarter of 2018.  Revenues decreased by 29% compared to the second quarter of 2017, mainly due to a decline in revenues of COPAXONE® as well as an equally significant decline in revenues in our U.S. generics business . . . .

* * *

Generic products revenues in our North America segment in the second quarter of 2018 decreased by 29% to $947 million, compared to the second quarter of 2017, mainly due to continued price erosion in our U.S. generics business, additional competition to methylphenidate extended-release tablets (Concerta® authorized generic) and portfolio optimization, primarily as part of the restructuring plan.

741.    On November 1, 2018, Teva reported its third quarter 2018 financial results in its

3Q2018 Form 8-K and 3Q2018 Form 10-Q:

| (in millions) | Three Months Ended Sep. 30, | | Nine Months Ended Sep. 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Total Revenues | $4,529 | $5,617 | $14,295 | $16,987 |
| Gross Profit | $2,021 | $2,650 | $6,430 | $8,344 |
| North America Segment: | | | | |
| Revenues | $2,265 | $3,043 | $7,059 | $9,452 |
| Generic Products Revenues | $922 | $1,233 | $2,957 | $3,979 |
| Gross Profit | $1,232 | $1,833 | $3,867 | $5,971 |
| Segment Profit | $649 | $1,130 | $2,286 | $3,686 |
| EBITDA (Non-GAAP Operating Income) | $1,253 | $1,618 | | |
| Cash Flow from Operations | $421 | $795 | | |
| Free Cash Flow | $704 | $920 | | |

**3Q2018 Form 8-K:**

**Third Quarter 2018 Consolidated Results**

Revenues in the third quarter of 2018 were $4,529 million, a decrease of 19%, or 18% in local currency terms, compared to the third quarter of 2017, mainly due to generic competition to COPAXONE, price erosion in our U.S. generics business . . . .

* * *

The decrease in gross profit margin, on both a GAAP and a non-GAAP basis, resulted primarily from a decline in COPAXONE revenues due to generic competition, price erosion in our U.S. generics business . . . .

**3Q2018 Form 10-Q:**

Significant highlights of the third quarter of 2018 included:

* * *

- Our North America segment generated revenues of $2,265 million and profit of $649 million in the third quarter of 2018.  Revenues decreased by 26% compared to the third quarter of 2017, mainly due to a decline in revenues of COPAXONE®, as well as a decline in revenues in our U.S. generics business . . . .

> \* \* \*
>
> Generic products revenues in our North America segment in the third quarter of 2018 decreased by 25% to $922 million, compared to the third quarter of 2017, mainly due to price erosion in our U.S. generics business, additional competition to methylphenidate extended-release tablets (Concerta® authorized generic) and portfolio optimization, primarily as part of the restructuring plan.
>
> \* \* \*
>
> Gross profit from our North America segment in the third quarter of 2018 was $1,232 million, a decrease of 33% compared to $1,833 million in the third quarter of 2017.  The decrease was mainly due to lower revenues from COPAXONE and generic products . . . .
>
> \* \* \*
>
> Profit from our North America segment in the third quarter of 2018 was $649 million, a decrease of 43% compared to $1,130 million in the third quarter of 2017.  The decrease was mainly due to lower revenues from COPAXONE and generic products . . . .

742.    On February 13, 2019, Teva reported its fourth quarter and full year 2018 financial results in its 4Q2018 Form 8-K:

| | Three Months Ended Dec. 31, | | Full Year Ended Dec. 31, | |
|---|---|---|---|---|
| (in millions) | 2018 | 2017 | 2018 | 2017 |
| Total Revenues | $4,559 | $5,398 | $18,854 | $22,385 |
| Gross Profit | $1,971 | $2,444 | $8,296 | $10,615 |
| North America Segment: | | | | |
| Revenues | $2,238 | $2,689 | $9,297 | $12,141 |
| Generic Products Revenues | $1,099 | $1,224 | $4,056 | $5,203 |
| Gross Profit | $1,201 | $1,506 | $4,979 | $7,322 |
| Segment Profit | $551 | $938 | $2,837 | $4,624 |
| EBITDA (Non-GAAP Operating Income) | $1,091 | $1,534 | | |
| Cash Flow from Operations | $367 | $859 | $2,446 | |
| Free Cash Flow | $522 | $934 | $3,679 | $2,693 |

**2018 Annual Consolidated Results**

Revenues in 2018 were $18,854 million, a decrease of 16% in both U.S. dollar and local currency terms, compared to 2017, mainly due to generic competition to COPAXONE®, a decline in revenues in our U.S. generics business . . . .

\* \* \*

The decrease in both GAAP and non-GAAP gross profit was mainly due to lower profitability in North America resulting from a decline in COPAXONE revenues due to generic competition and a decline in revenues in our U.S. generics business, partially offset by higher profitability in Europe.

\* \* \*

**Fourth Quarter 2018 Consolidated Results**

Revenues in the fourth quarter of 2018 were $4,559 million, a decrease of 16%, or 14% in local currency terms, compared to the fourth quarter of 2017, mainly due to generic competition to COPAXONE, a decline in revenues in our U.S. generics business . . . .

\* \* \*

Revenues from our North America segment in the fourth quarter of 2018 were $2,238 million, a decrease of $451 million, or 17%, compared to the fourth quarter of 2017, mainly due to a decline in revenues of COPAXONE, our U.S. generics business . . . .

\* \* \*

Generic products revenues in our North America segment in the fourth quarter of 2018 decreased by 10% to $1,099 million, compared to the fourth quarter of 2017, mainly due to additional competition to methylphenidate extended-release tablets (Concerta® authorized generic), portfolio

optimization primarily as part of the restructuring plan as well as market dynamics and price erosion in our U.S. generics business, partially offset by new generic product launches.

\*       \*       \*

Gross profit from our North America segment in the fourth quarter of 2018 was $1,201 million, a decrease of 20% compared to $1,506 million in the fourth quarter of 2017.  The decrease was mainly due to lower revenues from COPAXONE and generic products.

\*       \*       \*

Profit from our North America segment in the fourth quarter of 2018 was $551 million, a decrease of 41% compared to $938 million in the fourth quarter of 2017.  The decrease was mainly due to lower revenues from COPAXONE and generic products as well as investment in the launch of AJOVY.

743.    On February 19, 2019, Teva filed its 2018 Form 10-K:

| million | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Total Revenues | $18,854 | $22,385 | $21,903 | $19,652 | $20,272 |
| Gross Profit | $8,296 | $10,615 | $11,653 | $11,120 | $10,628 |
| North America Segment: | | | | | |
| Revenues | $9,297 | $12,141 | $11,778 | | |
| Generic Products Revenues | $4,056 | $5,203 | $4,654 | | |
| Gross Profit | $4,979 | $7,322 | $8,404 | | |
| Segment Profit | $2,837 | $4,624 | $5,536 | | |

Significant highlights of 2018 included:

\*       \*       \*

- Our revenues in 2018 were $18,854 million, a decrease of 16% in both U.S. dollar and local currency terms compared to 2017, mainly due to generic competition to COPAXONE, a decline in revenues in our U.S. generics business . . . .

\*       \*       \*

Revenues from our North America segment in 2018 were $9,297 million, a decrease of $2,844 million, or 23%, compared to 2017, mainly due to a decline in revenues of COPAXONE, our U.S. generics business . . . .

\*       \*       \*

Generic products revenues in our North America segment in 2018 decreased by 22% to $4,056 million, compared to 2017, mainly due to additional competition to methylphenidate extended-release tablets (Concerta® authorized generic), portfolio optimization primarily as part of the restructuring plan, as well as market dynamics and price erosion in our U.S. generics business, partially offset by new generic product launches.

\*       \*       \*

Gross profit from our North America segment in 2018 was $4,979 million, a decrease of 32% compared to $7,322 million in 2017.  The decrease was mainly due to lower revenues from COPAXONE and a decline in sales of generic and other specialty products.

\*       \*       \*

Profit from our North America segment in 2018 was $2,837 million, a decrease of 39% compared to $4,624 million in 2017.  The decrease was mainly due to lower revenues from COPAXONE and a decline in sales of generic and other specialty products, partially offset by cost reductions and efficiency measures as part of the restructuring plan.

744.    On May 2, 2019, Teva reported its first quarter 2019 financial results in its 1Q2019 Form 8-K and 1Q2019 Form 10-Q:

|  | Three Months Ended Mar. 31, | |
| million | 2019 | 2018 |
| Total Revenues | $4,295 | $5,065 |
| Gross Profit | $1,856 | $2,315 |
| North America Segment: | | |
| Revenues | $2,047 | $2,531 |
| Generic Products Revenues | $966 | $1,088 |
| Gross Profit | $1,039 | $1,403 |
| Segment Profit | $498 | $915 |
| EBITDA (Non-GAAP Operating Income) | $1,154 | $1,587 |
| Cash Flow from Operations | $112 | $1,496 |
| Free Cash Flow | $360 | $1,894 |

## 1Q2019 Form 8-K:

The decrease in gross profit margin was mainly due to lower profitability in North America resulting mainly from a decline in COPAXONE revenues due to generic competition and lower revenues of certain other specialty prodeucts.

\*       \*       \*

Generic products revenues in our North America segment in the first quarter of 2019 decreased by 11% to $966 million, compared to the first quarter of 2018, mainly due to market dynamics, price erosion in our U.S. generics business . . . .

\*       \*       \*

Gross profit margin for our North America segment in the first quarter of 2019 decreased to 50.8%, compared to 55.5% in the first quarter of 2018.  This decrease was mainly due to lower COPAXONE revenues . . . .

\*       \*       \*

Profit from our North America segment in the first quarter of 2019 was $498 million, a decrease of 46% compared to $915 million in the first quarter of 2018.  The decrease was mainly due to lower revenues from COPAXONE . . . .

## 1Q2019 Form 10-Q:

Significant highlights in the first quarter of 2019 included:

- Revenues in the first quarter of 2019 were $4,295 million, a decrease of 15%, or 12% in local currency terms, compared to the first quarter of 2018, mainly due to generic competition to COPAXONE, as well as declines in revenues from our respiratory products and U.S. generics business.

- Our North America segment generated revenues of $2,047 million and profit of $498 million in the first quarter of 2019.  Revenues decreased by 19% compared to the first quarter of 2018, mainly due to a decline in revenues from COPAXONE, our U.S. generics business, as well as certain other specialty products.  Profit decreased by 46%, mainly due to lower revenues from COPAXONE, a decline in sales of certain other specialty products and generic products, as well as lower other income.

\*       \*       \*

### North America Revenues

Our North America segment includes the United States and Canada.  Revenues from our North America segment in the first quarter of 2019 were $2,047 million, a decrease of $484 million, or 19%, compared to the first quarter of 2018, mainly due to a decline in revenues of COPAXONE, our U.S. generics business . . . .

\*       \*       \*

Generic products revenues in our North America segment in the first quarter of 2019 decreased by 11% to $966 million, compared to the first quarter of 2018, mainly due to market dynamics, price erosion in our U.S. generics business and portfolio optimization, partially offset by new generic product launches.

- 328 -

*      *      *

Gross profit from our North America segment in the first quarter of 2019 was $1,039 million, a decrease of 26% compared to $1,403 million in the first quarter of 2018. The decrease was mainly due to lower revenues from COPAXONE, as well as a decline in sales of certain other specialty products and generic products . . . .

*      *      *

Profit from our North America segment in the first quarter of 2019 was $498 million, a decrease of 46% compared to $915 million in the first quarter of 2018. The decrease was mainly due to lower revenues from COPAXONE, as well as a decline in sales of certain other specialty products and generic products and lower other income . . . .

745.    The financial figures and the reasons given for the figures in ¶¶739-744 were materially false and misleading or omitted material facts because Teva failed to disclose that its revenues and profits were impacted by the Price-Hike Strategy and illegal price-fixing and market allocation schemes. Significantly, Inflated Profit and Collusive Profit increased Teva's profitability by at least $126 million from 2018 to the first quarter of 2019 – with contribution of at least $34 million in the first quarter of 2018, $30 million in the second quarter of 2018, $26 million in the third quarter of 2018, $21 million in the fourth quarter of 2018, and $14 million in the first quarter of 2019.

## 7.    False and Misleading Statements Regarding Legal Compliance

746.    During the Relevant Period, Teva filed: (i) a Form 6-K on December 24, 2013, signed by Altman, the Acting CFO, with a Credit Agreement dated December 17, 2013, by and among Teva, as Guarantor, Teva Holdings K.K., as Borrower, Mizuho Bank, Ltd., Sumitomo Mitsui Banking Corporation and The Bank Of Tokyo-Mitsubishi UFJ, Ltd.; (ii) the 2013 Form 20-F, with a Credit Agreement dated January 8, 2014 by and among Teva and Teva USA, as borrower, Citibank N.A., as administrative agent and the lenders party thereto; (iii) a Form 6-K on September 28, 2015, signed by Desheh, with a Credit Agreement dated September 25, 2015 by and among Teva, Teva USA, Teva Finance, Teva Capital Services Switzerland GmbH, Citibank, N.A., and the lenders thereto; (iv) a Form 6-K on November 18, 2015, signed by Desheh, with two Credit Agreements, both dated November 16, 2015, by and among Teva, Teva USA, Teva Capital Services Switzerland

GmbH, Teva Finance Services B.V., Teva Finance Services II B.V., Teva Finance, Citibank N.A. and the lenders thereto; and (v) the May 11, 2017 1Q2017 Form 6-K, with a Credit Agreement dated March 22, 2017 by and among Teva, Teva Holdings KKK, the lenders thereto and Sumitomo Mitsui Banking Corporation.

747.    All of the filings above contained materially false and misleading statements that the Company and its subsidiaries complied with laws and regulations.  In addition, Teva and Teva USA covenanted that they will continue to comply with law:

<div align="center">REPRESENTATIONS AND WARRANTIES</div>

<div align="center">*      *      *</div>

***Such Loan Party [Teva, Teva USA, Teva Holdings K.K.] is in compliance with all laws, regulations, orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its property*** and all indentures, agreements and other instruments binding upon it or its property, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

<div align="center">*      *      *</div>

<div align="center">AFFIRMATIVE COVENANTS</div>

<div align="center">*      *      *</div>

***Each Loan Party [Teva, Teva USA, Teva Holdings K.K.] will, and will cause each of its Subsidiaries to, comply with all requirements of law applicable to it or its property***, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

<div align="center">*      *      *</div>

"Material Adverse Effect" means any event or circumstance which:

(a) is materially adverse to:

(i) the business, operations or financial condition of the Loan Parties [Teva, Teva Pharmaceuticals USA, Inc., Teva Holdings K.K.] and their Subsidiaries, taken as a whole; or

(ii) the ability of the Loan Parties to perform their financial obligations (including both payment obligations and compliance with financial covenants) under any Loan Document; or

<div align="center">- 330 -</div>

(b) affects the validity or the enforceability against any Loan Party of any Loan Document.

748.    On October 30, 2013, Teva hosted an investor conference call to announce management succession.  Defendant Desheh spoke as Teva's Acting President and CEO and assured investors that Teva continued to be in compliance with all legal requirements:

> Eyal Desheh – Teva Pharmaceutical Industries Ltd – EVP, CFO
>
> Under Jeremy's leadership, we significantly improved the transparency and accountability to our shareholders, and I intend to continue that.  We remain fully committed to running this company with high ethics and ***compliance in accordance with*** our core value, code of conduct as well as ***all legal requirements***.

749.    By at least the end of 2013, Teva published its 2012 Corporate Social Responsibility Report, signed by Desheh, which unequivocally assured investors that its "sales and marketing efforts follow the laws and regulations of markets where we operate":

> OUR APPROACH TO SUPPORTING PATIENTS
>
> *             *             *
>
> • We work to promote access to high quality, affordable medicines around the world.
>
> *             *             *
>
> • ***Our sales and marketing efforts follow the laws and regulations of markets where we operate***.

750.    On December 15, 2014, the Company issued its 2013 Corporate Social Responsibility Report, signed by Vigodman, which falsely stated that "Teva does not tolerate behavior that is unethical, illegal or dishonest":

> ***Our leadership enforces high standards of conduct for our employees. Teva does not tolerate behavior that is unethical, illegal or dishonest.  All our employees are required to comply with the laws of the countries in which we operate and with the regulatory rules that affect our business***.  Failure to do so can result in severe penalties, including termination and potential criminal or civil actions.

751.    On July 27, 2015, Teva filed a Form 6-K, signed by defendant Desheh, with a press release announcing "Teva to Acquire Allergan Generics for $40.5 billion Creating a Transformative Generics and Specialty Company Well Positioned to Win in Global Healthcare."  In the filing, Teva falsely stated that the Company and Actavis "boasted the highest industry standards" and complied with all regulations:

> **Teva and Allergan Generics are committed to adherence to all applicable regulatory requirements and boast the highest industry standards**, dedicated to defining and implementing patient safety policies and systems, **as well as ensuring compliance with all relevant global and local regulations**.

752.    On July 28, 2015, the Company filed a Form 6-K, signed by Desheh, with the Master Purchase Agreement, dated July 26, 2015, between Allergan and Teva, signed by Vigodman, Desheh and Olafsson, that stated:

REPRESENTATIONS AND WARRANTIES OF BUYER PARENT

*      *      *

5.6   <u>Compliance with Law.</u>  **Buyer Parent [Teva] and each of Buyer Parent's Subsidiaries are in compliance with and are not in default under or in violation of any Laws, applicable to Buyer Parent [Teva], such Subsidiaries or any of their respective properties or assets**, except where such non-compliance, default or violation would not reasonably be expected to prevent or materially delay the consummation of the Transactions or to have, individually or in the aggregate, a Buyer Material Adverse Effect.

*      *      *

"Buyer Material Adverse Effect" means any Effect that is, or would reasonably be expected to be, materially adverse to the business of the Buyer Group [Teva and its affiliates] or the financial condition, liabilities, business or results of operations of the business of the Buyer Group [Teva and its affiliates], taken as a whole . . . .

753.    Teva filed its (i) ADS/Preferred Registration Statement on November 30, 2015; (ii) Preferred Prospectus Supplement on December 3, 2015; and (iii) ADS Prospectus Supplement on December 3, 2015 – all of which incorporated by reference the materially false and misleading statements in the Master Purchase Agreement (¶752).  In addition, with respect to the Master

Purchase Agreement, the Preferred Prospectus Supplement and the ADS Prospectus Supplement

affirmed that:

> The purchase agreement for the Actavis Generics acquisition contains a ***number of conditions that must be fulfilled to complete the acquisition. Those conditions primarily consist of*** U.S. and European Union antitrust approvals and other customary conditions, including, among others, ***(i) the accuracy of representations and warranties and compliance with covenants and (ii) the absence of any material adverse effect with respect to Actavis Generics or Teva***.

754. Moreover, during the Relevant Period, Teva filed: (i) the ADS Underwriting

Agreement on December 8, 2015; (ii) the Preferred Underwriting Agreement on December 8, 2015;

and (iii) the Notes Underwriting Agreement on July 21, 2016, which falsely represented:

> Representations, Warranties and Agreements of the Company and/or the Guarantor [Teva]

> \*       \*       \*

> ***The Incorporated Documents as amended or supplemented at the date hereof, when they were filed with the Commission, conformed in all material respects to the requirements of the Securities Act and the Exchange Act.  None of the Incorporated Documents as amended or supplemented at the date hereof, when such documents were filed with the Commission, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  Any further documents so filed and incorporated by reference in the Prospectus, when such documents are filed with the Commission, will conform in all material respects to the requirements of the Exchange Act and will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading***.

> \*       \*       \*

> ***[The Company or the Guarantor [Teva]] is not . . . (iii) in violation of any law, ordinance, governmental rule, regulation or court decree to which it or its properties or assets may be subject*** or has failed to obtain any license, permit, certificate, franchise or other governmental authorization or permit necessary to the ownership of its properties or to the conduct of its business, except to the extent that any such default, event or violation described in the foregoing clauses (ii) and (iii) would not have a Material Adverse Effect.

> \*       \*       \*

- 333 -

[Material Adverse Effect was defined as] material adverse effect on the business, properties, financial condition, results of operations or prospects of the Company and its subsidiaries, taken as a whole . . . .

755.    On November 30, 2015 and July 13, 2016, Teva filed: (i) the ADS/Preferred Registration Statement and exhibits that formed part of the registration statement; and (ii) the Notes Registration Statement Amendment No. 1 and exhibits that formed part of the registration statement, respectively.   The ADS/Preferred Registration Statement and the Notes Registration Statement repeated all of the materially false and misleading statements in the Master Purchase Agreement, the ADS Underwriting Agreement, the Preferred Underwriting Agreement and Notes Underwriting Agreement that formed part of the applicable registration statement.  *See* ¶¶752-754.

756.    On January 5, 2016, Teva issued its 2014 Global Citizenship Report and falsely represented that the Company went "beyond minimal compliance with legislation" and operated ethically:

> ***We aim to go beyond minimal compliance with legislation to create a culture of compliance that proactively assesses all forms of risk and ensures frameworks are in place to protect our business, our patients, our employees and all the stakeholders we impact***.  Within this approach, transparency is the key to ensuring our stakeholders know that we take their interests seriously and operate ethically.

757.    In the 2016 Social Impact Report published by Teva on September 14, 2017 and signed by Peterburg, the Company touted its compliance to "applicable laws, regulations, policies, and process" at "every level and every location" and affirmed the accuracy and transparency of its books and records:

> ***We obey our Code of Conduct, applicable laws, regulations, policies, and processes***
>
> ***We are accurate and transparent in our books and records***
>
> <div align="center">*       *       *</div>
>
> ***Ensuring compliance at every level and every location***
>
> <div align="center">*       *       *</div>

> *Our commitment to compliance, ethical standards, and responsible supply chain practices relies on vigilance and transparency. We strive to conduct our business – and ourselves – in ways that reflect well on the people we employ, the patients we serve, and the communities in which we live. We are dedicated to fostering a culture of responsibility, integrity, and respect as we endeavor to enable people to live better days.*

758. The statements set forth in ¶¶746-757 above were materially false and misleading or omitted material facts because Teva was not in compliance with the laws and regulations governing the Company. Teva's undisclosed inflation of its sales through collusive price-fixing and market allocation schemes was a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm.

### 8. False and Misleading Statements Relating to the Bribery Schemes

759. Throughout the Relevant Period, Teva discussed the drivers of financial results relating to Copaxone sales in Russia, Ukraine and Mexico – while concealing that the results were at least in part a result of the Company's illegal payments worldwide to influence the governmental approvals of and prescriptive and purchase decisions concerning its key drug Copaxone:

- 2013 Form 20-F filed on February 10, 2014: "Our Copaxone® revenues outside the United States amounted to $1.1 billion during the year, 2% higher than 2012. The increase mostly reflects higher revenues in Europe driven by volume growth, which were partially offset by lower revenues in our ROW markets, mostly due to the timing of tenders in Russia. . . . As part of a government tender procedure in Mexico, a local manufacturer was allowed to bid to provide a purported generic glatiramer acetate and was awarded a substantial part of the tender in 2013 and 2014. We are pursuing legal action seeking to revoke the local manufacturer approval. The award did not materially affect our global sales of Copaxone®."

- 1Q2014 Form 6-K/A filed on May 1, 2014: "Copaxone® . . . [s]ales outside the United States amounted to $254 million during the first quarter of 2014, a decrease of 2% in both U.S. dollar and local currency terms, compared to the first quarter of 2013. The decrease reflects the timing of tenders in Russia, which took place in the first quarter of 2013 but not in the first quarter of 2014, partially offset by higher revenues in Europe."

- 3Q2014 Form 6-K filed on October 30, 2014:  "Copaxone® revenues outside the United States amounted to $307 million during the third quarter of 2014, an increase of 21%, or 24% in local currency terms, compared to the third quarter of 2013.  The increase is a result of the timing of a tender in Russia, partially offset by lower revenues in other markets."

- 4Q2014 Form 6-K Press Release filed on February 5, 2015:  "Sales [of Copaxone] outside the United States amounted to $286 million, a decrease of 15%, but flat in local currency terms, compared to the fourth quarter of 2013, as higher sales in Russia, due to the timing of a tender in Russia, were offset by lower revenues in other markets."

- 2014 Form 20-F filed on February 9, 2015:  "Our Copaxone® revenues outside the United States amounted to $1.1 billion during the year, 2% higher than 2013.  In local currency terms, revenues grew 7%, primarily due to the timing of tenders in Russia."

- 2Q2015 Earnings Call on July 30, 2015, Desheh stated:  "First of all, the ex-US Copaxone was strongly influenced by exchange rate.  We sell in Russia, we sell in Europe.  Rubel and euro are down year-over-year significantly against the dollar so that has the biggest impact.  In Russia, we have to remember also, there are tenders, and this quarter there was no tenders, so basically we have a bump each time we have a tender in Russia. . . .  Gross margin of Copaxone is just under 90%, pretty high and stable.  And then we have a few hundreds of millions of sales and marketing expenses supporting our sales effort in the US and in the international markets, which, of course, are a judgment call based on launches effort and driving sales in the geographies."

- 3Q2015 Form 6-K filed on October 29, 2015:  "Our Copaxone® revenues outside the United States were $207 million in the third quarter of 2015, a decrease of 33%, or 15% in local currency terms, compared to the third quarter of 2014.  The decrease in local currency terms is mainly due to increased competition in our European markets resulting in lower volumes and lower tender volumes in Russia."

- 2015 Form 20-F filed on February 11, 2016:  "Our Copaxone® revenues outside the United States amounted to $783 million during 2015, 30% lower than in 2014.  In local currency terms, revenues decreased 16%, primarily due to lower tender orders in Russia, as well as lower volumes sold in Europe."

760.    In addition to failing to disclose in its filings that the Company's improper practices were centered around its key drug Copaxone, by at least the end of 2013, Teva published its 2012 Corporate Social Responsibility Report touting its "100 years of ethical and responsible business practice," its anti-corruption policies, its ethical dealings with all healthcare professionals, and its compliance of laws and regulations:

4828-1671-4429.v2

**Letter from the CEO**

As one of the world's largest medicine companies, Teva has a tremendous responsibility to our patients, as well as to our customers, shareholders and employees and to the communities in which we live and work. *We consider this responsibility a foundation of doing business, and are guided by our values – integrity, respect, collaboration, excellence and leadership – in everything we do*.

In 2012, we began the process of integrating our existing Corporate Social Responsibility (CSR) activities around the world. *Although Teva is a global organization, we view CSR as a local endeavor*.

\*        \*        \*

*Teva boasts more than 100 years of ethical and responsible business practices*.

\*        \*        \*

*Teva aims to build a culture of integrity and ethical behavior in every country where we do business. We uphold the highest ethical standards for our Board of Directors, executives and employees*.

\*        \*        \*

*Our Anti-Corruption Policy facilitates meaningful and fully compliant collaboration with healthcare professionals and government officials in the development of products*, and in our training and education procedures for the safe and effective use of those products.

\*        \*        \*

**OUR APPROACH TO SUPPORTING PATIENTS**

\*        \*        \*

- We collaborate with healthcare professionals to enhance our understanding of patient needs and *ensure that our financial support is impactful and ethical* . . . .

- Our sales and marketing efforts follow the laws and regulations of markets where we operate. . . .

\*        \*        \*

Healthcare professionals (HCPs) provide the frontline in patient care around the world. . . .

. . . *In all dealings with HCPs, we maintain high ethical standards*.

- 337 -

\*   \*   \*

We target our work with healthcare professionals on areas that advance our healthcare mission, following all codes and regulations governing interaction with HCPs. *When applicable we compensate HCPs, taking care to ensure that such payments are not perceived as inducements or rewards for prescribing our products.*

In some countries, certain HCPs can qualify as government officials for the purposes of anti-corruption laws.

761.    In addition, in the Forms 20-F, Teva discussed obtaining marketing approvals for Copaxone in Russia and other global markets and the measures it was taking in response to the Russian government's 2020 pharmaceutical strategy requirements, but failed to disclose these initiatives included making illegal payments to authorities as part of the Company's worldwide bribery scheme:

The key elements of our strategy consist of the following:

\*   \*   \*

*In Russia, which is primarily a branded generic market, we market a diverse portfolio of branded generic products, as well as OTC pharmaceutical products and specialty products. We have a portfolio of approximately 130 products sold to both retail and hospital channels. We are currently one of the largest pharmaceutical companies in Russia.*

*The Russian government seeks to encourage the use of generic products in order to reduce the cost of pharmaceuticals. Russian pharmaceutical law is currently under review and undergoing continual changes, with the goal of increasing access and controlling pricing of products. The government is further seeking to encourage local production of pharmaceuticals by providing incentives for domestic or localized foreign producers.*

*Competitive Landscape. The Russian market includes large local manufacturers as well as international pharmaceutical companies, both generic and innovative. As part of Russia's 2020 pharmaceutical strategy, companies with a local manufacturing presence will receive favorable treatment. We are building a manufacturing facility in Yaroslavl, Russia, which is expected to be operational by 2015.*

762.    On May 1, 2014, Teva hosted its 1Q2014 earnings call, with participation from Defendants Vigodman and Desheh. During the call, Desheh discussed the importance of the Russian

- 338 -

market to the specialty segment and Copaxone-related performance and Russia's drag on the Company's performance with its political instability and unmaterialized Copaxone tender – without disclosing that the Company drove its Copaxone and specialty revenues and Russian tender results through illegal payments to Russian authorities:

**Eyal Desheh** – *Teva Pharmaceutical Industries Ltd – CFO*

\*     \*     \*

The improvement of our sales this quarter was nicely split between the generic and the specialty businesses.  In generics, we experienced significant growth in the United States market, with 17% year-over-year growth to a total of $1 billion, with a number of new product launches.

*However, part of the growth was offset by weaker sales in Eastern Europe due to an exceptionally warm winter and political instability in Russia and Ukraine* . . . .

*The specialty business continued to grow with Copaxone, which delivered another good quarter, even without a tender in Russia, which we believe will materialize in Q2*.

Maybe I will add a few data points about Russia and the neighboring countries. . . .  *The other thing, that everybody is of course aware of is political issues in Russia, transforming a little bit due to economic uncertainties, which is never good of business*, but it wasn't terrible.

. . . *Also, the Copaxone tender, which can move from one quarter to another, it didn't happen this quarter in Q1 in Russia.  We expect this to materialize in the second quarter, so the Copaxone results were without Russia, which is not an insignificant piece*.

763.    On June 10, 2014, Defendant Desheh participated in the Goldman Sachs Healthcare Conference, where he discussed Teva's presence in the Russian and Mexican markets.  In particular, Desheh discussed the Russian government's imposition of duty on foreign products but failed to disclose that the prospect of paying such duty prompted Teva to enter into illegal arrangements with a local distributor owned by a prominent Russian official:

**Eyal Desheh** – *Teva Pharmaceutical Industries Ltd – CFO*

\*     \*     \*

- 339 -

>        *Mexico is another country where we have a pretty nice presence in Mexico, but the market there is much, much bigger than where we are.  And we can do more*.

>        In Eastern Europe there's room for growth.  A lot of this is organic growth.  *Building a plant in Russia today that will help us reduce our costs over there, because there are for foreign product there's duty in Russia.  Local manufacturing has an advantage so we're building a plant there.  Russia is a very large market for us and a fast growing.  Russia and its neighboring countries*.

764.    On October 30, 2014, Defendants Vigodman, Desheh and Olafsson participated in Teva's 3Q2014 earnings call.  During the call, defendants discussed the Russian tender's significant contribution to Copaxone sales – without disclosing that Teva made illicit payments to Russian officials to influence the drug's tender and approval processes:

**Erez Vigodman** – *Teva Pharmaceutical Industries Ltd – President and CEO*

>                    *            *            *

>        . . . Copaxone 40 milligram has gained already 10% market share in the MS space, and it accounts for 57.4% of the entire family based on mostly [CTIMS] data updated to October 2014.  *Copaxone 40 milligram was launched also in Argentina and Israel, approved in Chile, pending in Russia, Brazil, and EMEA*.

**Eyal Desheh** – *Teva Pharmaceutical Industries Ltd – CFO*

>                    *            *            *

>        Copaxone sales.  *We delivered a very good quarter in Copaxone sales*.  Results show an improvement in the US, resulting from some inventory buildup following a weak Q2, as we all remember.  *And the impact of the tender in Russia, which was delivered in Q3*.

>                    *            *            *

**Siggi Olafsson** – *Teva Pharmaceutical Industries Ltd – President and CEO of Global Generics Medicines Group*

>                    *            *            *

>        If we look at the rest of the world, we have very significant generic business in Russia.  It's a good business.  We are improving the pipeline in Russia, we are building it up.

*Obviously we also have a good Russian business due to the Copaxone tender that Eyal mentioned in his presentation.  We see that business growing going forward*.

765.    On December 15, 2014, Teva published its 2013 Corporate Social Responsibility Report and assured investors that its dealing with healthcare providers were "not perceived as inducements or rewards for prescribing our products" and that the Company adhered to its Code of Conduct in its activities in all countries "even if this put[ ] us at a competitive disadvantage":

**A Letter from Erez Vigodman, Teva's President & CEO**

*    *    *

*We target our work with healthcare professionals on areas that advance our healthcare mission, following our Code of Business Conduct and regulations governing interaction with HCPs.  When applicable we compensate HCPs, taking care to ensure that such payments are not perceived as inducements or rewards for prescribing our products*.  We are developing local, regional and global policies and standard operating procedures in parallel with existing local and regional reporting requirements governing specific interactions with HCPs.

In some countries, certain HCPs can qualify as government officials for the purposes of anticorruption laws.

*    *    *

*We carefully monitor compliance with the Foreign Corrupt Practices Act* . . . .

*    *    *

While marketing regulations may differ by region, *we adhere to the ethical marketing guidelines in our Code of Business Conduct in all countries, even if this puts us at a competitive disadvantage*.

*    *    *

*Our leadership enforces high standards of conduct for our employees. Teva does not tolerate behavior that is unethical, illegal or dishonest*.  All our employees are required to comply with the laws of the countries in which we operate and with the regulatory rules that affect our business.  Failure to do so can result in severe penalties, including termination and potential criminal or civil actions.

*    *    *

- 341 -

> *From the Board of Directors and CEO to each individual employee in each unit, we are unwavering in our commitment to doing what is right while striving to reach our financial and business goals.  Although we face complex challenges as we transform our business, no objective is worth compromising our values or ethical standards.*

766.    On February 5, 2015, Teva conducted it 4Q2014 earnings call hosted by Defendants Vigodman, Desheh and Olafsson.  During the call, Olafsson touted Teva's Russia management team and the volume growth and price adjustments made in the Russian market – without disclosing that the Russian team had engaged in a bribery scheme and Teva's presence in the Russian market was built on illicit payments made to Russian authorities for Copaxone.  In fact, when an analyst inquired about the Russian marketing practice investigation, Vigodman suggested that he had nothing to add beyond what was disclosed in the SEC filings:

**Siggi Olafsson** – *Teva Pharmaceutical Industries Ltd – Global Generic Medicines*

> *I think, David, on Russia, per se, we are fully aligned that this is still an opportunity.  This is still a very fast-growing market for us.  We are number five in Russia today.*
>
> *Our volume growth in the market and any price adjustment we have made, we are still being very close to keep up with the currency.  We feel that we are well positioned on expanding our business in Russia.  We have amazing management team in the country.*
>
> So we are not gun shy, maybe for the reason of the currency per se, but we need to be careful.  *There is risk in the Russian market, but there is also risk in other emerging markets on the growth markets we are looking to.*

<div align="center">*     *     *</div>

**Ronny Gal** – *Sanford C. Bernstein & Company, Inc. – Analyst*

<div align="center">*     *     *</div>

> Second on the content . . . the marketing practice investigation in Russia.  If you'd mentioned to us the risk there.

<div align="center">*     *     *</div>

**Erez Vigodman** – *Teva Pharmaceutical Industries Ltd. – President and CEO*

On the second one, ***we have nothing to add beyond the note to the financial statements***.

767.     The statements referenced above in ¶¶759-766 were materially false and misleading or omitted material facts.  Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Teva made illegal payments worldwide to influence the governmental approvals of and prescriptive and purchase decisions concerning its key drug Copaxone.  Teva's pattern of illegal activities included, *inter alia*: (i) bribing government officials in Russia to improperly influence the results of government tenders for Copaxone and speed up drug registrations to increase market shares and access; (ii) bribing government officials to improperly influence the registrations and promotion of Copaxone and other drugs in Ukraine; and (iii) bribing health care providers at state-owned hospitals in Mexico to improperly influence their prescription decisions for Copaxone.  These bribery schemes were unethical and lacked integrity, transparency and legality, and the resulting Copaxone sales and contracts awarded were not based on fair dealing, bidding and competition.

### L.     Teva Violated Its Statutory Duty to Disclose Pricing Trends

768.     During the Relevant Period, Defendants Vigodman, Peterburg, and Desheh were under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same disclosures as Item 303 of Regulation S-K ("Item 303"). Item 303 (and Item 5) require that a foreign issuer like Teva must, in the Management's Discussion and Analysis ("MD&A") section of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

769.     According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations. Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.  Specifically, Item 303 states:

> To the extent that the financial statements disclose material increases in net sales or revenues, ***provide a narrative discussion of the extent to which such increases are attributable to increases in prices*** or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

770.     SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that:

> MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, ***known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income*** and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.  The Commission stated in FRR 36 that MD&A should "***give investors an opportunity to look at the registrant through the eyes of management***" by providing a historical and prospective analysis of the registrant's financial condition and results of operations, ***with a particular emphasis on the registrant's prospects for the future***."

771.     During the Relevant Period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs.  First, Defendants failed to disclose the trend that Teva's financial success was driven in a material way by the Price-Hike Strategy.  These price increases, as discussed, generated over $2.75 billion in Inflated Profit, including at least $1.57 billion

of Collusive Profit for Teva over the Relevant Period.  Yet, the Price-Hike Strategy and the Inflated

Profit and Collusive Profit it generated were risky and unsustainable as the Price-Hike Strategy was

susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators

and criminal investigators.

772.    Second, starting no later than the beginning of 2016, Defendants failed to disclose the

by-then known trend that the Price-Hike Strategy was beginning to fail. Teva could not maintain the

Inflated Profit, as industry-wide pricing pressure, which Defendants consistently denied, was

reducing the inflated prices on Teva's generic drug portfolio. Teva was also finding it increasingly

difficult, if not impossible, to make additional price increases because of the scrutiny from the

public, Congress, and the DOJ and State AGs investigations; and indeed, Teva effectively could not

make any price increases after the DOJ subpoena was served on June 21, 2016.

773.    SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly

perfect analogy to the facts here, stating:

> One of the most important elements necessary to an understanding of a
> company's performance, and ***the extent to which reported financial information is
> indicative of future results***, is the discussion and analysis of known trends, demands,
> commitments, events and uncertainties.  Disclosure decisions concerning trends,
> demands, commitments, events, and uncertainties generally should involve the:
>
> - consideration of financial, operational and other information known
>   to the company;
>
> - identification, based on this information, of ***known trends*** and
>   uncertainties; and
>
> - assessment of whether these trends and uncertainties will have, or are
>   reasonably likely to have, a material impact on the company's
>   liquidity, capital resources or results of operations.
>
> As we have explained in prior guidance, disclosure of a trend, demand,
> commitment, event or uncertainty is required unless a company is able to conclude
> either that it is not reasonably likely that the trend, uncertainty or other event will
> occur or come to fruition, or that a material effect on the company's liquidity, capital
> resources or results of operations is not reasonably likely to occur.

\*     \*     \*

One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain *the likelihood that past performance is indicative of future performance.  Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A*.

774.    Teva, in violation of its duties under Item 303, only disclosed trends that did not bear on the issue of price inflation (through price increases), or price erosion. Teva's failure to disclose the pricing trends was particularly misleading given that: (i) price increases were a core but concealed business strategy; (ii) management concurrently denied that pricing had impacted Teva's bottom line and that the Company made price increases simply for profit; (iii) management consistently minimized the positive impact of price increases on Teva's profits; (iv) management consistently denied that price increases had resulted in price inflation; and (v) management denied that price deflation was materially affecting Teva, even as its revenues from the former price increases cratered.

## M.    Additional Allegations of Scienter

775.    Together with the above-alleged facts, Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### 1.    The Officer Defendants Knew of and Controlled the Price Hikes

776.    Throughout the Relevant Period, Defendants closely monitored product-by-product pricing and deliberately chose which products to target for price hikes.  Between 2013 and 2015, when Teva was actively hiking prices and entering into collusive agreements to drive profits, Teva's generic pricing was one of the first topics Defendants addressed in virtually all of the earnings

conference calls throughout the Relevant Period, and Defendants and senior executives frequently

discussed targeted price increases and margin enhancement:

- On October 31, 2013, Oberman revealed a "margin enhancement strategy" that involved focusing on "product by product. Individual products where we want to improve our margins . . . . It's a tweaking here and there of products that *we are working very consciously* on to improve our margin."

- On December 10, 2013, Oberman further explained that, in a year with few new product launches, Teva increased "pricing on a number of products" as part of a "value creation based strategy" and forecasted "next year to recoup some of that price erosion."

- On May 1, 2014, Vigodman told investors that "we have been assessing markets and products, in order to terminate products and markets, which will not meet a minimum threshold of profitability. I strongly believe that there is significant strategic and economic value in global generics leadership. Teva must regain focus on its generic business, with strong emphasis on portfolio selection and management . . . ."

- On July 31, 2014, Olafsson represented to investors that "[w]e have taken the decision that in some of our markets, we look at the portfolio and we take a pricing decision, and see if we stay for this molecule or not."



- On October 30, 2014, Olafsson suggested to investors that "there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, *we look for that*. . . . When there is an opportunity, when there is a shortage in the market, *we obviously look* for pricing like any other business."

- On December 11, 2014, Olafsson told investors that "*[w]e are looking through our portfolio*, what are the most profitable products we have. *We work hand in hand* with the manufacturing and the operation, if we need to cut the portfolio to reduce our cost; but we still want to retain our leadership in the US market."

- 347 -

- On January 13, 2015, Vigodman explained to analysts that opportunity for margin expansion in the generics business involved strong focus on "optimization of products and markets, product selection decisions."

- On March 12, 2015, Desheh told analysts that to drive "the absolute profit" and not just the profit margins, price increases must be managed correctly, stating that "*[w]e see price increases, we manage it right*.  You have to manage [it] correctly, it can bounce back very, very easily."

777.    After the government scrutiny on generic drug price increases heightened, Defendants

addressed the issues directly with investors and falsely denied the price hikes and collusive

activities:

- On November 29, 2015, Desheh reviewed Teva's potential exposure from past conduct and represented to investors that "our exposure to all these things is very minimal."  He further emphasized that Teva played the competitive game "by the book and by the rule."

- On January 11, 2016, Olafsson discussed his generics portfolio and conveyed that "on 5%, we might be flat or a slight increase" and the remaining 95% experienced a "slight decrease in pricing."

- On February 11, 2016, in answering an analyst's question about contracting with large customers in the United States, Olafsson stated that "you are really fighting on a molecule by molecule basis.  If there is a lowering of the prices, you either have to walk away from the business and that's that."  In addition, "[w]e basically launched the product.  We compete on pricing."

- On February 11, 2016, while touting Teva's $1 billion improvement in operating profit over a 24-month period, Olafsson offered "how did we do this?  Not by pricing."  Further, speaking on behalf of the industry, he stated "we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media."

- On May 9, 2016, Olafsson suggested that Teva did not buy market share, but instead, "[w]e . . . are seeing our volumes go down, deliberately."  Furthermore "we also walk away when the competition is too fierce on a product."

- On June 8, 2016, Olafsson stated that, "about two years ago when they started the price increases[,] [t]here was a lot of shortages in the market.  This is when the FDA went very strongly and had the import bans and things like that, which led to shortages, which meant that the overall business was doing much better."

- On September 9, 2016, Olafsson indicated that "pricing and pharmaceuticals are always a hot topic in an election year" and, with 208 generic companies, "an average of every molecule we have, there is more than five competitors.  So there's always

- 348 -

somebody happy to take a little bit lower price. So it's a very competitive business we're in. I think overall, obviously, we look at each opportunity . . . we have an opportunity to work with it." In turn, Andy Boyer, Head of North America Generics after the Actavis acquisition, affirmed that "if . . . there's been a change in marketplace dynamics due to supply chain or someone leaving the market, we will evaluate that and price our products accordingly."

- On December 14, 2017, Schultz stated that "[i]n order to secure that we have a long term sustainable portfolio, we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary."

778. This self-proclaimed personal involvement by the Defendants supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

779. In the absence of collusion, moreover, Teva's generic drug price hikes during 2013 to 2015 would have been against its self-interest and unsustainable. The rational response to the massive price increases would be for "someone happy to take a little bit lower price" and Teva would either fight "on a molecule by molecule basis" or "walk away from the business and that's that." In a commoditized business with multiple competitors, price increases would indeed "be a small pricing opportunity that usually comes in and comes out" as companies could only gain market share by competing on price. Yet, as explained herein, Teva and its co-conspirators substantially maintained market share on the 25 collusive drugs subject to collusion with negligible pricing competition.

780. Furthermore, contrary to Olafsson's justifications for Teva's price hikes that occurred in 2014, none of the 25 drugs subject to collusive price increases and none of the Price-Hike Strategy drugs experienced supply shortages in the market around that time. Manufacturers were required by federal law to report any potential drug shortages to the FDA, and no shortage report existed for any of the 25 drugs and Price-Hike Strategy drugs around the time of their respective price hikes.

2.      **Former Employee Allegations**

781.    Former Teva employees provided information on a confidential basis supporting the strong inference that the Defendants acted with scienter in making the alleged materially false and misleading statements and omissions.  The former employees' accounts corroborate one another, Defendants' admissions, and the additional facts alleged herein.

782.    Confidential Witness 1 ("CW1") was a Senior Financial Analyst, Financial Planning and Analysis at Teva from 2010 to 2018.  CW1 reported that one of his primary responsibilities was collecting quality of revenue data, and then calculating the "effective price" that Teva experienced in selling individual products in Latin America.  CW1 also was responsible for calculating variances between forecasts and actual results, using Teva's Hyperion Planning system, part of a company-wide Oracle ERP system.  CW1 stated that Teva's Hyperion database system was used throughout the Company for financial forecasting, planning and analysis.  CW1 stated that throughout the Company, pricing was done on Excel spreadsheets, all ultimately controlled by the Global Pricing Group in North Wales, Pennsylvania.  CW1 also worked on a "Price Quarterly Analysis" that he prepared in Hyperion, which showed the effective price of sales for each drug.  He believed this analysis was done each quarter by each region including the United States.  CW1 stated that from 2011 to early 2013, he reported to William Marsh, Teva's President and CEO of the Americas.  Plaintiffs' investigation indicates that Marsh is currently the President and CEO for North American and Europe at Heritage.

783.    Confidential Witness 2 ("CW2") was employed at Teva in Fraser, Pennsylvania, from January 2003 through the end of the Relevant Period.  From 2003 to 2014, CW2 was first a Regional Sales Manager for Specialty Products, and from 2013 to 2014, a Senior Regional Sales Manager for Specialty Products.  From January 2015 through the end of the Relevant Period, CW2 was a Senior Regional Sales Manager for a generic product category, reporting to Vice President of Institutional

Sales, John Fallon, who in turn reported to the SVP of Generic Sales for the United States, Mark Falkin. CW2 stated that the product pricing in Teva's generics contracts was all handled by a pricing group at Teva's U.S. headquarters in North Wales, Pennsylvania. This group was headed up by Kevin Galownia ("Galownia"), who CW2 recalled was the Director or Vice President of Pricing. According to CW2, there were approximately six "National Account Managers" who negotiated contracts with the GPOs in connection with the pricing work performed at North Wales. CW2 identified Nisha Patel as one of Teva's U.S. National Account Managers.

784.    Confidential Witness 3 ("CW3") was a Manager of Revenue Accounting at Teva. CW3 was first an Actavis employee starting in 2004, and remained with Allergan/Actavis through the time Actavis was acquired by Teva in 2016. He was the Manager of Revenue for Allergan/Actavis at the time of the acquisition, and continued as a Manager of Revenue Accounting with Teva until he left in August 2017. CW3's central function for Actavis and then Teva was to calculate "gross to net revenue" for monthly reporting from sales information on spreadsheets he accessed in the Teva accounting system. The sales information was generated by the sales group for the generics market and the accounting system he used was "Oracle and Hyperion based." CW3 indicated that Teva's Sales and Marketing Group and the Contracts Group of Teva's Generics Division were involved with negotiating and implementing prices before contract execution and sale He also confirmed that the pricing group in North Wales established prices for generic sales in the United States and was headed by Galownia.

785.    The following information from former employees, which was cited in the amended consolidated complaint filed in *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-00558-SRU (D. Conn.), on June 22, 2018 (the "Class Complaint") corroborates the confidential witness accounts, Defendants' admissions, and other facts alleged herein:

(i)    Senior Product Operations Manager, or FE-1, started at Teva in 2005 and, until 2011, FE-1 worked in new generic drug forecasting.  From 2011 to July 2014, FE-1 was a manager responsible for forecasting and analysis of a product group, and from July 2014 through April 2016, FE-1 was a Product Manager and then Senior Product Manager responsible for supply chain and inventory management of Teva's base-line generics business.  In FE-1's most recent role, FE-1 reported to Bryan Bart who, in turn, reported to Galownia, Senior Director of Marketing. According to FE-1, based on personal knowledge:

> (i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "Work Plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S. and Israeli executives; (iii) daily or weekly "Scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to Work Plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii) that compensation structure for Teva's national account managers was not tied to individual performance.

Class Complaint, ¶242.

(ii)    Senior Director of Trade Relations, or FE-2, worked at Teva from 2006 until August 2012.  During his tenure, FE-2 was in charge of sales for the branded, generics, and injectables groups.  FE-2 later, and until leaving Teva, oversaw the branded drug national account managers, reporting to the Head of U.S. Brands.  FE-2 also remained involved and knowledgeable about Teva's U.S. generics.  According to FE-2, based on personal knowledge:

> (i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives,

including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug-by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," *i.e.*, competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter.

Class Complaint, ¶243.

(iii)   Associate Manager of Customer Marketing, or FE-3, worked at Teva from September 2014 until May 2016 and was a member of the pricing team.  FE-3 reported to a person who reported to Galownia, who reported to Christine Baeder and, for a time, to Cavanaugh.  FE-3 was responsible for evaluating requests for proposals and assessing market pricing for generic drugs.

According to FE-3, based on personal knowledge:

(i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

Class Complaint, ¶244.

(iv)   Manager of Customer Operations, or FE-4, was employed at Teva from April 2008 to April 2014 and was responsible for metrics for the phone system and managing the

process for customer calls to Teva regarding generic drugs.  FE-4 reported directly to Baeder until

2012, and later to Michelle Osmian.  According to FE-4, based on personal knowledge:

> (i) in the early part of 2013, at a quarterly marketing group "all- hands" meeting that FE-4 attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of FE-4's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

Class Complaint, ¶245.

### 3.     Defendants Were Motivated to Use Teva's Stock as "Currency" for a "Transformational" Acquisition

786.     The Defendants were motivated to make false statements to inflate the price of Teva

securities in order to complete a "transformational" acquisition.  By January 2014, once the Price-

Hike Strategy was fully implemented and had generated material profits toward fourth quarter 2013

results, Desheh announced this motivation, setting out that "the stock price will go up and we'll be

able to *use our share as a currency* . . . *to fund transactions*."  Upon his hiring in February 2014,

Vigodman was reported to also favor significant M&A activity.

787.     Unbeknownst to investors, Teva was already focused on acquiring Actavis by as early

as the middle of 2014.  Soon after joining Teva from Actavis in August 2014, Olafsson announced at

an "all-hands" quarterly meeting at the North Wales headquarters that he had never joined a new

company that did not subsequently purchase his former employer.  (FE-1.)  By the end of 2014, with

the strategy resulting in numerous batches of systematic price hikes, involving 46 drugs, and

generating as much as $943 million in Inflated Profit, Teva's ADSs were trading in the mid-$50s,

and the ordinary shares were trading at ILS 22,200.  By then, as Vigodman would later acknowledge

on July 27, 2015, Defendants had developed a list of acquisition targets and Actavis was at the top. Concealed from investors at this time, Teva had already approached Actavis, but was rejected.

788.     By the end of the first quarter of 2015, the Price-Hike Strategy resulted in another batch of hikes, involving 12 drugs.  All told, over $1.1 billion in Inflated Profit had been generated, and Teva's ADSs were trading near $63 per share, with the ordinary shares trading at ILS 24,960. Defendants' "willingness" to perform a "*transformational*" acquisition in the generics space was well known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively.  On April 21, 2015, Defendants attempted to purchase Mylan. Mylan's board dismissed the offer on April 27, 2015.

789.     Undeterred, during a June 10, 2015 Goldman Sachs conference, Teva again announced glowing results, with Vigodman emphasizing to investors the "*profound change in the generic business*" and Olafsson noting the improvement of "*$1 billion . . . in 14 months, 16 months*," while concealing that the Price-Hike Strategy and collusive activities had generated over $1.1 billion in profits for the generics unit over that time.  Fueled by profits from the fraud, by July 27, 2015, the price of Teva's ADSs had reached an all-time high of $72 per share, and the ordinary shares were near an all-time high of ILS 26,040.

790.     That day, Teva announced the $40 billion acquisition of Actavis from Allergan. Vigodman explained that the improvement in generics was a "*precondition*" for accomplishing their motivation for a deal.  Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly *20 years* of Teva's average annual income from 2013 to 2015.  They raised the cash from investors.

791.     By the second quarter of 2015, however, the Price-Hike Strategy had peaked.  Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases.  The Inflated Profit began to deteriorate, even as Defendants needed

to raise the capital necessary to pay Actavis's $40 billion price tag.  As questions were raised regarding the deteriorating pricing environment and Teva's weakening financials, Defendants flatly denied Teva was making profits from price increases or that Teva was facing pricing pressure.  It was not until Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the Actavis deal on August 2, 2016, that they disclosed that their generics business was now the subject of government subpoenas.  Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### 4.      Only Senior Executives Could Make Price Increases

792.    All sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania, and carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters.  (*See* Kim Declaration; CW1, CW2, FE-2.)[27]  The Inflated Profit would be captured by the daily and weekly reports circulated to Oberman, Cavanaugh, and defendants Griffin and Olafsson.  (CW1, CW2, FE-1.)  They were also reflected in the intra-quarter reports that these Officer Defendants assembled and sent to Teva's senior executives in Israel.  (FE-1, FE-2.)  Consistent with this, according to FE-2, "everyone would have known" of large price increases that had a significant financial impact, including Oberman, especially if they were used to fill a "hole" between revenues and forecasts.

793.    Defendants' scienter is also supported by the fact that the execution of the Price-Hike Strategy required that senior executives personally analyzed and approved each price increase pursuant to an established and formalized process that was in place by 2012 when FE-2 was employed at Teva.  Galownia and the Pricing Group would initiate the process.  (FE-2, FE-4.)  Galownia would analyze Teva's portfolio of established generic drugs on a "constant and ongoing

---

[27]   "Kim Declaration" refers to the Declaration of Austin D. Kim filed in *Galmi v. Teva Pharm. Indus. Ltd.*, No. 16-cv-08259 (C.D. Cal.) ("*Galmi*") (ECF No. 37-2).

basis" and produce a "list of opportunities" and recommendations of potential price increases to Teva USA's COO, Cavanaugh, and defendant Griffin, who was Chief Accounting Officer of Teva and the CFO of Teva USA.  (FE-2.)

794.    However, Galownia was "just the guy doing the evaluation" (FE-2), as his superiors made the actual decision to increase the price of a generic drug.  (FE-2, FE-3, FE-1.)  Accordingly, Cavanaugh and Griffin would each separately evaluate whether Teva would make a price increase, and if so, when.  (FE-2.)  Cavanaugh would review the price increases from the operational perspective, while Griffin would undertake a financial cost-benefit analysis that would evaluate both whether and when to implement the price increases.  (FE-2.)  In particular, Griffin would have to factor in specific contract terms and costs associated with increasing pricing and determine the right timing for the increase.  (FE-2.)  Sometimes Griffin's decision was to raise a price, but wait until the next quarter when the contractual implications would be more favorable.  (FE-2.)  This recommendation and evaluation process could be quick, but could also span weeks, with the implemented price hike following as many as 60 days after Galownia's initial recommendation. (FE-2.)

795.    The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices.  This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices.  (FE-3.)  Price increases, in contrast, came from the top down.  When prices were increased, the Pricing Group was simply "told," by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase.  (FE-3.)  Members of the Pricing Group did not have authority to implement price increases.  (FE-3.)  Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward.  (FE-4.)  Empirical evidence confirms this observation.  *See* App. A.

796.    As was the case during the Relevant Period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day.  (FE-2.)  Once a price increase was made, Teva would send letters to affected customers informing them of the price increase.  (FE-2, FE-4.)  Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases.  (FE-4.)

797.    Given this formalized process involving Griffin and Cavanaugh, there is a strong inference that Defendants were aware of, or at least recklessly disregarded, the 76 price increases, ranging from 22% to 1,500%, over the course of over three years, that generated over $2.6 billion in Inflated Profit.

### 5.    Defendants Had Continuous Access to Documents and Information Tracking Profits from Price Increases

798.    Defendants were given documents that tracked the financial impact of the Price-Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis.  (CW1, CW3, FE-1.)  They also had access to company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis.  (CW1, CW3, FE-1, FE-3.)  Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that Defendants knew or recklessly ignored that billions of dollars in Inflated Profit and Collusive Profit were generated through the Price-Hike Strategy, and its collapse caused the later short-falls in profits.

799.    Long-Range Work Plan:  Among the documents Defendants created and received was a long-range Work Plan, generated annually, that included generic revenue forecasts for three to five years and contained granular pricing details down to the National Drug Code, or NDC, level. (FE-1.)  The employees preparing the Work Plan would receive feedback from executives over the course of a pre-established schedule.  (FE-1.)  The process began around March each year, with the

U.S.-based executives, including Oberman and Olafsson, reviewing and approving the Work Plan over the late summer.  (FE-1.)  The U.S.-based executives would then present the Work Plan to Teva's executives in Israel, including Vigodman and Desheh, each year.  (FE-1.)

800.  <u>Daily Scorecards</u>:  Weekly or daily Scorecards were circulated among Teva's top executives, including Olafsson and Oberman.  (FE-1, FE-2.)  These Scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs.  (FE-1.)  The Scorecards also compared Teva's actual revenue figures to longer term revenue goals.  (FE-1.)  The executives used the Scorecards to track "holes" between the actual revenues and forecasts, including the Work Plan.  (FE-1, FE-2.)  The price increases were used to "fill" the holes.  (FE-2.)

801.  <u>Latest Best Estimates ("LBEs")</u>:  Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs, which showed how a current financial quarter compared to long-term forecasts.  (FE-1.)  The LBEs would also be circulated to the executives in Israel.  (FE-1.)

802.  <u>Price Quarterly Analysis</u>:  Teva financial analysts created Price Quarterly analyses each quarter that showed the effective price of sales for each drug in each region.  (CW1.)

803.  <u>Oracle ERP System</u>:  Teva housed the pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a company-wide database.  (CW1, CW3, FE-1, FE-3.)  Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code."  (FE-3.)  Teva executives, including Oberman, Cavanaugh, and defendants Griffin and Olafsson, all had access to the Oracle ERP system.  (FE-1, FE-3.)  The Oracle ERP system was the source for the data used for the Scorecards, Work Plan and LBEs.  (CW1, CW3, FE-1.)

### 6.     Defendants' and Analysts' Focus on Generics

804.    The fact that Defendants recurrently publicized that Teva's generics segment, fueled by its U.S. division, was driving the Company's turnaround during the Relevant Period supports a strong inference of scienter.  For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution."  On June 10, 2015, Olafsson touted improvement of the "generic business by . . . $1 billion . . . in 14 months, 16 months."  That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

805.    Analysts accordingly focused on Teva's generics business, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter.  For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve."  On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

806.    Similarly, when industry pricing pressure damaged Teva's competitors, analysts peppered Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers.  For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing . . . we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that in "the base [generics] business . . . the prices are very stable there."

### 7.     The Magnitude, Importance and Duration of the Fraud

807.     The fact that Teva's collusive activities and Price-Hike Strategy generated as much as $2.6 billion in Inflated Profit supports a strong inference of scienter.  Indeed, the Inflated Profit drove Teva's reported financial turnaround throughout the Relevant Period.  In 2014 and 2015, the Inflated Profit comprised an increasingly large portion of Teva's overall net income.  As to the generics segment's profits, the Inflated Profit accounted for 15% of segment profits in 2013 – of which 50% was Collusive Profit; 32% in 2014 – of which 56% was Collusive Profit; and 32% in 2015 – of which 51% was Collusive Profit.  The Inflated Profit accounted for an even larger portion of the Company's overall net income: in 2013, the Inflated Profit accounted for 20% of net income; in 2014, 23%; in 2015, 54%; and in 2016, more than all of Teva's overall profit.  The stronger inference is that Defendants knew of the source of these profits.

808.     Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion and was no longer able to implement additional price hikes.  As a result, Teva's generic drug profits plummeted.  Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt and forced the Company to take a staggering $6.1 billion impairment charge to its generics business and reduce its dividend.  The stronger inference by far is that Defendants were aware of the source of this decline, or were reckless in not knowing.

### 8.     Contemporaneous Red Flags Indicated that Defendants' Statements Were False or Misleading

809.     Contemporaneous red flags alerted Defendants to the possibility that their statements were false and misleading.  At a minimum, Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

810.  <u>Congressional Inquiry</u>:  On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants on alert to discover whether Teva had taken price increases and to what extent.  Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases.  Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases."  Again, this should have sparked an internal inquiry from Teva's executives.  Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

811.  <u>The State AG and DOJ Investigations</u>:  The fact that the DOJ and State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter.  The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.

812.  <u>GAO Report</u>:  On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016.  The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%.  Teva had numerous drugs that showed extraordinary price increases in the GAO Report. The facts of the GAO Report support the inference that Defendants spoke the alleged false statements with scienter.

### 9. Officer Terminations Support Scienter

813.    That three of the Officer Defendants – Olafsson, Vigodman, and Desheh – resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter. There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed. The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later.  There is a similarly strong inference regarding Vigodman's termination.  He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for the fourth quarter of 2016.  Finally, less than two months after Desheh left Teva, and in the very first reporting period after all of these defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders.  This supports an inference that it was these defendants who were blocking the true financial state of the Company from coming to light.

### 10. Other Facts Supporting Scienter

814.    The Receipt of the Subpoenas:  Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of Defendants' scienter.  Particularly, Defendants failed to disclose the Subpoenas in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering Materials, but then disclosed them approximately two weeks after completing the Notes Offering.  The failure to disclose receipt of the Subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the

very next SEC disclosure.  Moreover, the Subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices.  Yet, Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016 Generics Day.

815.  <u>Bloomberg Article</u>:  The November 3, 2016 *Bloomberg* article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year.  Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs suit and the DOJ charges against Glazer and Malek soon followed and, subsequently, those investigations have expanded massively.  The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from the Defendants.

816.  <u>Teva's Further Denials of Liability Despite Its Purported Investigation of the Facts</u>: As set forth above, Teva repeatedly denied any involvement in collusive conduct during the Relevant Period, and continues to do so.  For example, on November 7, 2019, defendant Schultz stated during an investor earnings conference call: "We have, of course, shared more than 1 million documents with [the DOJ].  We've not found any evidence that we were in any way part of any structured collusion or price fixing."  Such statements underscore that Defendants knew Teva was a central actor in collusive conduct, or at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

### 11.    Corporate Scienter

817.  Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above had binding authority over the Company.  In addition, certain allegations herein establish Teva's corporate scienter based on: (i) the state of mind of employees

whose intent can be imputed to the Company; and/or (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

818.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.  For instance, in 2013, Galownia, Teva's Senior Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups.  Given the nature of this strategy, that it required the involvement of numerous divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and that it had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

819.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature.  As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis.  From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source of the profits were the Inflated Profit from the Price-Hike Strategy.  Indeed, according to FE-2, "everyone" would have known of price increases that had a material impact on Teva's financial reporting for the U.S. generics business.  It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition.

### 12. The Officer Defendants Were Personally Motivated by Compensation

820.    The Officer Defendants made millions of dollars in personal compensation from the reported success of the Company's U.S. generics business during the Relevant Period.  They received cash bonuses of as much as 158% of their annual salaries based on performance metrics directly impacted by the illicit revenues derived from fixing and maintaining prices, rigging bids, and allocating customers and markets.  Teva also made substantial equity grants to Oberman and defendants Vigodman, Desheh, Olafsson, and likely other senior officers, including options to purchase shares, awards of restricted shares, and awards of Performance Share Units ("PSUs").

821.    For 2014, Teva reported paying Oberman nearly $6.5 million in cash and nearly $1 million in equity compensation.  (He stepped down that year.)  For 2015, Teva reported paying defendant Desheh more than $1.8 million in cash and $1.7 million in equity compensation.  (His compensation was not disclosed for 2014 or 2016.)  For 2015 and 2016, Teva reported paying defendant Olafsson more than $4.8 million in cash and more than $3.5 million in equity compensation.  (His compensation was not disclosed for 2014.)  For 2014 to 2016, Teva reported paying defendant Vigodman more than $8.4 million in cash and more than $5 million in equity compensation.

822.    The Officer Defendants' compensation structure incentivized fraud.  The intent of the Company's Compensation Policy for Executive Officers and Directors (the "Compensation Policy") is stated, as follows:

> Teva aims to incentivize its executive officers by creating a strong link between their performance and compensation.  Therefore, a significant portion of the total compensation package provided to Teva's executive officers is based on measures that reflect both Teva's short- and long-term goals and performance, as well as the executive officer's individual performance and impact on shareholder value.

823.    A significant component of the Compensation Policy was the Company's annual cash bonus program.  Teva described the bonuses as "strictly pay-for-performance . . . as payout eligibility and levels are determined based on actual financial and operational results, as well as individual performance."  While the Compensation Policy laid out the general parameters of the bonus program, it gave Teva's Board and its Compensation Committee some flexibility to alter the measurements used to award cash bonuses year-to-year.

### a.    2014 Compensation

824.    In 2014, Vigodman, Desheh, Oberman, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenues generated from the anti-competitive conduct and collusion.

825.    According to the 2014 Form 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for cash flow).  He was entitled to a bonus of 140% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 125% of the targets were met.

826.    Vigodman's total reported compensation was nearly $4.5 million; he received a salary of $1,183,888, a bonus of $1,868,477 (approximately 158% of salary), and a one-time bonus of $237,401 for "significant achievements and efforts," including Teva "strengthen[ing] its leading position in generics."  He also was awarded options to purchase 280,702 shares at $41.05; a grant of 15,660 restricted shares; and a grant of 30,869 PSUs based on targets of cumulative non-GAAP operating profit and cumulative non-GAAP net revenue from 2014 to 2016.

827.    According to the 2014 Form 20-F, at least 50% of Oberman's cash bonus also was tied to such financial targets (specifically, 25% for non-GAAP operating profit, 15% for non-GAAP net revenue, and 10% for cash flow).  An additional 20% of his bonus was based on Teva's generics

business.  He was entitled to a bonus of 100% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 120% of the targets were met.

828.    Oberman's total reported compensation of $7,337,661 made him the highest-paid Teva executive for 2014, after being functionally replaced in July.  Oberman received a salary of $850,000, a cash bonus of $1,194,435 (approximately 140% of salary), and a cash severance of $4,464,171 based primarily on the amounts of his salary and average bonuses for 2012 to 2014.

829.    Because Olafsson and Desheh were not among Teva's five highest paid executives in 2014, their salaries and cash bonuses were not disclosed (Olafsson joined Teva in July 2014). Olafsson was awarded options to purchase 88,238 shares at a price of $54.02; a grant of 18,229 PSUs; and an additional grant of 17,773 PSUs based on Teva's 2014 performance.  Desheh was awarded options to purchase 98,581 shares at a price of $48.76 and a grant of 20,066 PSUs.

### b.    2015 Compensation

830.    In 2015, defendants Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenue generated from the anti-competitive conduct and collusion.

831.    According to the 2015 Form 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for free cash flow).  He was entitled to a bonus of up to 200% of salary if 125% of the targets were met.

832.    Vigodman's total reported compensation was approximately $5.7 million; he received a salary of $1,363,682 and a bonus of $2,253,581 (approximately 165% of salary).  He also was awarded options to purchase 163,859 shares at a price of $57.35 and a grant of 30,869 PSUs based on Teva's 2014 to 2015 cumulative performance.

833.     According to the 2015 Form 20-F, Desheh and Olafsson also were entitled to bonuses based on such financial targets (specifically, 25% for non-GAAP operating profit, 15% for net revenue, and 10% for free cash flow), in amounts of up to 200% of salary if 120% of the targets were met.

834.     Desheh's total reported compensation was approximately $4.3 million; he received a salary of $733,863 and a bonus of $1,110,824 (approximately 151% of salary).  He also was awarded options to purchase 89,376 shares at a price of $57.35 and a grant of 16,838 PSUs.

835.     Olafsson's total reported compensation was approximately $3.9 million; he received a salary of $954,955 and a bonus of $1,449,375 (approximately 151% of salary).  He also was awarded options to purchase 94,343 shares at a price of $57.35; options to purchase an additional 160,114 shares at a price of $59.19 "[i]n light of the increase in . . . scope of work and responsibilities as head of . . . Global Generics Medicines Group in connection with the Actavis acquisition"; and a grant of 17,773 PSUs based on Teva's 2014 to 2015 cumulative performance.

836.     Teva's ADS price reached a high of $72 on July 27, 2015, making the potential value of the Officer Defendants' 2014 and 2015 options quite significant at the height of the alleged fraudulent scheme.  However, because Teva was a "foreign private issuer" during the Relevant Period, it was not required to report insider sales and, therefore, it is unknown whether these Officer Defendants, or any other insider, engaged in suspicious trading activity.  Evidence of insider trading, if any, could be obtained in discovery.

### N.     Loss Causation

837.     In addition to the allegations herein concerning the direct and proximate causal link between Defendants' wrongful conduct and the economic harm suffered by Plaintiffs, set forth below are Plaintiffs' additional allegations of loss causation.

838.    As alleged in §III.O, Presumption of Reliance and Fraud-on-the-Market Doctrine, the market for Teva's ADSs, ordinary shares, Preferred Shares, and Notes was open, well developed, and efficient at all relevant times.  As a result of Defendants' fraudulent scheme, the prices of Teva securities were artificially inflated and/or maintained during the Relevant Period and, thus, investors who purchased or otherwise acquired those securities did so at artificially inflated prices.

839.    Between August 2016 and May 2019, as a series of negative events and disclosures began to reveal, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions, the artificial inflation leaked out, at least in part, and the value of Teva securities declined, causing economic harm to investors.

840.    As a result of Defendants' wrongful conduct, Teva's ADS price, for example, which steadily increased from the start of the Relevant Period to an all-time high of $72 per ADS in July 2015, fell to less than $11.30 per ADS, reducing Teva's market capitalization by close to $50 billion as the truth leaked out.  Similarly, the ordinary shares dropped from an all-time high of ILS 27,120 to ILS 4,026.  The Company has experienced dislocation and uncertainty due to the abrupt departures of three top executives and ongoing disruption and fallout from numerous criminal and civil investigations and litigations.  Teva's credit ratings have been downgraded to one level above "junk," and it may be forced to sell assets to reduce debt.  In addition, Teva cut its profit forecast for 2017, cut its dividend, and warned investors that it risks breaching debt covenants.

841.    These negative events and disclosures were directly related to Defendants' fraudulent scheme.  As detailed herein, during the Relevant Period, Defendants made false and misleading statements and engaged in a scheme that artificially inflated the price of Teva securities.  Defendants misled investors about Teva's financial health and performance and its prospects for future financial success by concealing the details of its collusive conduct and Price-Hike Strategy, maintaining that Teva was not subject to the pricing pressures that finally came to bear on the U.S. generic drug

market, and overstating goodwill and failing to make timely impairments.  Throughout the Relevant

Period, Defendants denied their involvement in the alleged unlawful conduct in the generics market,

denied that Teva's results were driven by generic drug price increases, and maintained the illusion

that Teva faced "intense competition" and that the Company's positive results were based on other

factors, such as cost-cutting and organic growth from new products.

842.     By concealing, among other things, the collusive conduct, the Price-Hike Strategy,

that the strategy was driving known material trends, and that as the strategy failed and pricing

competition increased Teva's financial condition was deteriorating, Defendants also concealed the

numerous and related risks associated with their false statements and omissions, including but not

limited to:

- The strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- By their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- Should the collusive activity or the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the Inflated Profit and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generics segment's profit;

- If pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in the Inflated Profit, resulting in poor financial results and undercutting reported and forecasted profits;

- Upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy and by any increased difficulty in hiring qualified replacements;

- As the Price-Hike Strategy in fact failed over time and Teva was prevented from making additional price increases, Teva's Inflated Profit declined; and

- Teva's goodwill was overstated by billions of dollars.

843.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the Defendants' Relevant Period statements and omissions.  None of these negative events or disclosures was sufficient, on its own, to fully remove the inflation from the prices of Teva securities because each only partially revealed the scope and consequence of the fraudulent scheme. Despite the leakage of these partially corrective events and disclosures, the prices of Teva securities remained artificially inflated, and were prevented from declining to their true value.  As Plaintiffs continued to hold Teva securities, and/or purchased or acquired those securities, the artificial inflation caused them further injury when additional information was revealed.  The corrective effect of each new piece of information was tempered by Defendants' continuing efforts to conceal the true risks and conditions arising from Teva's involvement in anti-competitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

### 1.    August 4-5, 2016

844.    After trading on August 4, 2016, Teva filed the 2Q2016 Form 6-K, reporting second quarter 2016 results, including a $434 million decline in revenue in the U.S. generics segment compared to the second quarter of 2015.  This marked the beginning of the leakage of corrective information to investors.  However, Defendants misleadingly attributed Teva's disappointing financial results to the loss of exclusivity on certain drugs and a decline in sales in others; they did not fully reveal Teva's anti-competitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

845.    The 2Q2016 Form 6-K disclosed for the first time that: (i) "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products"; and (ii) "[o]n

July 12, 2016, Teva USA received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations."   The disclosure of the Subpoenas was the first indication to the market that Defendants were implicated in the DOJ's and State AGs' antitrust investigations.

846.    The 2Q2016 Form 6-K falsely and misleadingly stated that Teva had received its DOJ subpoena on June 21, *2015* (around the time other generic drug companies received and disclosed similar subpoenas, *e.g.*, Actavis received a DOJ subpoena on June 25, 2015), when Teva had actually received its DOJ subpoena on June 21, *2016* (as revealed in the 3Q2016 Form 6-K filed with the SEC on November 15, 2016 without any explanation for the correction).

847.    As a result of this new negative information, the next trading day, the prices of Teva securities declined.  The ADS price fell $1.24 per share, or 2.24%, from a close of $55.45 on August 4, 2016 to a close of $54.21 on August 5, 2016, on high trading volume.  Teva's market capitalization was reduced by approximately $1.13 billion.  Similarly, the Preferred Shares price fell $12 per share, or 1.32% from a close of $907 on August 4, 2016 to a close of $895 on August 5, 2016.

## 2.    November 3-6, 2016

848.    During trading on the NYSE on November 3, 2016, new information was revealed to the market regarding the DOJ investigation into Teva's marketing and pricing of generic drugs.  On that day, *Bloomberg* published an article, titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," which described the DOJ's "sweeping" two-year investigation of suspected price collusion involving more than a dozen generic pharmaceutical companies, including Teva.  The article broke news of a grand jury probe, reporting that the first criminal charges against executives of those companies could emerge by the end of the year.  This indicated to the market that Teva and its executives were likely targets of the federal antitrust investigation, and that the investigation had

found evidence of criminal conduct, despite Defendants' repeated statements regarding "intense competition" in the generics market and an overall decline in price on the Company's generics portfolio.  The *Bloomberg* article also revealed that the Connecticut AG might file a civil complaint against Teva and other generics companies.

849.    Investors and analysts reacted to this new negative news.  For instance, analysts at S&P Capital IQ lowered their rating of Teva's ADSs from "buy" to "hold," and *Fierce Pharma* reported that analysts believed the investigation could have a sizeable financial impact on Teva, estimated to be as much as $700 million.

850.    As a result of this new negative information, Teva's ADS price fell $4.13 per share, or 9.53%, from $43.33 on November 2, 2016 to $39.20 on November 3, 2016, on high trading volume.  Teva's market capitalization was reduced by approximately $4 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $767.50 to $711.00 (7.36% decline), $97.03 to $95.68 (1.39% decline), and $92.34 to $88.97 (1.0% decline), respectively, from November 2, 2016 to November 3, 2016.

851.    The next trading day on the TASE, Teva ordinary shares fell ILS 710, or 4.5%, from ILS 16,040 on November 3, 2016 to ILS 15,330 on November 6, 2016.

### 3.    November 15, 2016

852.    Before the open of trading on the NYSE on November 15, 2016, Teva filed a press release on Form 6-K with the SEC, reporting third quarter 2016 revenues below consensus expectations.  During an investor conference call that day, defendant Olafsson explained the poor financial reporting was a result of pricing pressures, stating that, despite his past denials that Teva was exposed to pricing pressure, or even observed such pressure, price erosion in Teva's U.S. generics business had, in fact, been approximately 7%, as compared to the 5% that Olafsson had just recently stated.  While Defendants acknowledged that pricing pressure was impacting profits, they

- 374 -

attributed these negative results to the divestiture of certain generic products related to the Actavis acquisition, and continued to conceal Teva's anti-competitive conduct and collusion, unsustainable Price-Hike Strategy, improper financial reporting and disclosures, and Teva's true financial and business condition.

853.    During the same conference call, defendant Vigodman announced that Teva had set aside $500 million in provisions as it was in settlement discussions with the DOJ and the SEC to resolve their FCPA investigations relating to conduct involving Russia, Mexico and Ukraine.

854.    In addition, defendant Vigodman directly addressed the DOJ investigation into price collusion in the generic drug industry that had been in the news that month, emphasizing that, "based on all of our efforts to date, internal and external . . . we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." These denials tempered the impact of the corrective information and implied that Defendants, and specifically defendant Vigodman, had knowledge of and/or had made a meaningful inquiry into the underlying facts and had not ignored obvious signs of Teva's anti-competitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.

855.    As a result of this new negative information, investors and analysts reacted negatively. For instance, analysts at Jefferies reported that their view of the Company had changed and downgraded Teva's ADSs from "buy" to "hold."

856.    The price of Teva's ADSs fell $3.43 per share, or 8.36%, from $41.03 on November 14, 2016 to $37.60 on November 15, 2016, on high trading volume. The ordinary share price also declined ILS 720, or 4.6%, from a close of ILS 15,710 on November 14, 2016 to a close of ILS 14,990 on November 15, 2016. Teva's market capitalization was reduced by approximately $3 billion. Similarly, the Preferred Shares price fell from $728.00 to $689.99, a 5.22% decline, from November 14, 2016 to November 15, 2016.

4.    **December 5-6, 2016**

857.    After trading on December 5, 2016, Teva filed a Form 6-K, announcing that defendant Olafsson would leave the Company and had been replaced, effective immediately, as President and CEO of Teva's Global Generic Medicines Group.  The Form 6-K did not offer any explanation for Olafsson's departure and said only that he was "retiring," even though he was only in his late 40s.

858.    Olafsson's abrupt exit, less than two-and-a-half years after his appointment to lead the newly formed Global Generic Medicines Group, surprised the market, and analysts tied Olafsson's termination to the apparent rise of pricing pressure.  For instance, *TheStreet.com* reported that Olafsson's resignation "rais[ed] more questions for investors" about the drug pricing allegations against Teva.  Analysts at Morningstar, in a December 6, 2016 report, noted that:

> Teva's announcement that Dipankar Bhattacharjee will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence.  Recent pricing pressure in the generic drug market and anticipated generic competition on the 40mg version of Copaxone in 2017 remain significant near-term challenges for Teva, which makes the abrupt leadership change a concerning development at a critical time for the company.

BTIG analysts, in a report dated December 5, 2016, further noted that "[w]ithout Siggi [Olafsson] at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained focused on price erosion for the [Company's] base generics business."  Other analysts were concerned his departure suggested that there may be something "going on internally in the generics business" that had not been disclosed.  (Citi analyst question at December 8, 2016 Citi Global Healthcare Conference; Piper Jaffray analyst report on December 6, 2016).

859.    As a result of this new negative information, on the next trading day, Teva's ADS price fell $2.01 per share, or 5.43%, from a close of $37.04 on December 5, 2016 to a close of $35.03 on December 6, 2016, on high trading volume.  The ordinary share price also declined

- 376 -

ILS 690, or 4.91%, from a close of ILS 14,050 on December 5, 2016 to a close of ILS 13,360 on December 6, 2016.  Teva's market capitalization was reduced by approximately $1.84 billion. Similarly, the Preferred Shares and 2046 Notes prices fell from $657.01 to $630.75 (4.00% decline) and $86.94 to $85.76 (1.36% decline), respectively, from December 5, 2016 to December 6, 2016.

### 5.   December 14, 2016

860.   During trading on the NYSE on December 14, 2016, the DOJ announced in a press release that it had charged (by information) Glazer and Malek, the former CEO and former President of Heritage, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs, namely Doxycycline (as early as April 2013 until at least December 2015) and Glyburide (as early as April 2014 until at least December 2015).  Teva was the dominant market participant in the Glyburide market and a major player in the market for Doxycycline through its acquisition of Actavis during the Relevant Period.

861.   The DOJ further stated that the charges resulted from an ongoing federal antitrust investigation into price fixing, bid rigging and other anti-competitive conduct relating to generic drugs and marked "an important step" in ensuring true competition among companies "at a price set by the market, not by collusion."

862.   Two-count felony charges for violations of §1 of the Sherman Antitrust Act against Glazer and Malek also were unsealed that day, alleging the following in sum and substance:

- Various corporations and individuals participated as co-conspirators in the offenses and performed acts and made statements in furtherance thereof;

- The defendants and co-conspirators knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic drugs, including Doxycycline and Glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of those drugs sold in the United States; and

- For the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators, among other things, participated in

meetings and communications to discuss the sale of and to allocate customers or rig bids for the drugs; agreed not to compete against each other for certain customers; submitted bids, withheld bids, and issued proposals in accordance with their agreements; and sold the drugs at collusive and noncompetitive prices.

863.    In a felony case, an information outlining probable cause may be filed where the accused has waived indictment and has agreed, instead, to plead guilty.  Various news outlets, including *Bloomberg*, confirmed that Glazer and Malek were preparing to plead guilty and that their cooperation could lead to charges against executives at other drug companies.

864.    As a result of this new negative information, Teva's ADS price fell $0.66 per share, or 1.75%, from a close of $37.66 on December 13, 2016 to a close of $37.00 on December 14, 2016.  Teva's market capitalization was reduced by approximately $710 million.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $673.00 to $660.00 (1.93% decline), $91.99 to $91.10 (0.97% decline), and $85.13 to $83.81 (1.55% decline), respectively, from December 13, 2016 to December 14, 2016.

### 6.    December 15-18, 2016

865.    During trading on the NYSE on December 15, 2016, Connecticut AG Jepsen announced that he and 19 other State AGs had filed a federal lawsuit for violation of §1 of the Sherman Antitrust Act against Teva USA and five other drug companies (Heritage, Aurobindo, Citron, Mayne, and Mylan), alleging that they had entered into illegal conspiracies to unreasonably restrain trade, artificially inflate and manipulate prices, and reduce competition for Doxycycline Hyclate and Glyburide.

866.    The press release stated that portions of the complaint were redacted "to avoid compromising the ongoing investigation" as to "a number of additional generic drugs":

> In July 2014, the state of Connecticut initiated [a non-public] investigation of the reasons behind suspicious price increases of certain generic pharmaceuticals. The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a well-coordinated and long- running conspiracy to fix prices

and allocate markets for doxycycline hyclate delayed release and glyburide. In today's lawsuit, the states allege that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives.

The complaint further alleges that the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone and text message communications. The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation. The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.

867. Connecticut led the multistate group of plaintiff states, which included Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington.

868. As *Forbes* reported that day, the complaint revealed new information regarding Teva's potential exposure relating to two generic drugs, in that it "makes clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing" and that Glazer and Malek were cooperating; according to the publicly available complaint, Malek had a direct relationship with an unnamed Teva employee and the two agreed to raise the prices of Glyburide.

869. As a result of this new negative information, the prices of Teva securities continued to decline. Teva's ADS price fell $0.27 per share, or 0.73%, from a close of $37.00 on December 14, 2016 to a close of $36.73 on December 15, 2016. Teva's market capitalization was reduced by approximately $274 million. Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $660.00 to $655.00 (0.76% decline), $91.10 to $90.81 (0.32% decline), and $83.81 to $83.69 (0.15% decline), respectively, from December 14, 2016 to December 15, 2016.

- 379 -

870.     The next trading day on the TASE, the ordinary share price fell ILS 140, or 0.98%, from a close of ILS 14,240 on December 15, 2016 to a close of ILS 14,100 on December 18, 2016.

### 7.     January 6-8, 2017

871.     Before the open of trading on the NYSE on January 6, 2017, Teva filed a press release on Form 6-K announcing a significant reduction in 2017 guidance, far below market expectations, due to previously unannounced poor performance and increased competitive pricing pressures in the market.  The press release quoted defendant Vigodman, who stated that "[t]he entire healthcare sector has faced significant headwinds, and we have not been immune."  Defendants thus acknowledged for the first time that Teva had suffered greatly from competitive pressures such as pricing, a fact that they had denied vehemently until that point.  As explained by an analyst at Morningstar in a January 6, 2017 report, entitled "Teva Previews Weak Year on Competitive Pressures and Currency Headwinds," "Teva's management lowered its 2017 outlook from its previous forecast released in July [2016, at the time of the Notes Offering] as the firm succumbs to increased competitive pressure, especially in the U.S. generics market."

872.     Indeed, analysts at Piper Jaffray wrote that the disclosure "further erod[ed] what in [their] view was already limited management credibility."  The analysts rhetorically questioned "how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management in place?"

873.     That day, certain of the Officer Defendants hosted a "business outlook" conference call, during which defendant Vigodman stated that there was an EBITDA gap of $1.2 billion emanating from Teva's U.S. generics business.  He attributed the majority of that gap to delayed product launches.  Defendants continued to conceal, at least in part, the collusive practices in Teva's U.S. generics business, including bid rigging, price fixing, and market and customer allocation, as well as pricing pressure due to the weakening of the collusion.

- 380 -

874.   Investors and analysts reacted to the new negative news.  For instance, *TheStreet* reported that Teva's ADS prices "plummeted" due to the lowered 2017 guidance.

875.   As a result of this new negative information, the prices of Teva securities continued to decline.  That day, Teva's ADS price fell $2.86 per share, or 7.53%, from a close of $37.96 on January 5, 2017 to a close of $35.10 on January 6, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $680.00 to $633.00 (6.91% decline), $93.33 to $92.30 (1.10% decline), and $87.96 to $86.11 (2.11% decline), respectively, from January 5, 2017 to January 6, 2017.

876.   The next trading day on the TASE, the ordinary share price fell ILS 790, or 5.49%, from a close of ILS 14,390 on January 5, 2017 to a close of ILS 13,600 on January 8, 2017.

### 8.   August 3-7, 2017

877.   Before the open of trading on the NYSE on Thursday, August 3, 2017, Teva filed a press release on Form 6-K announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and "accelerated price erosion and decreased volume due mainly to customer consolidation, greater competition as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition."

878.   The Company also disclosed a net earnings loss primarily as a result of a $6.1 billion goodwill impairment charge related to its U.S. generics unit – which consisted of both Teva legacy and Actavis generics business.

879.   This disclosure revealed that Teva's business was facing significant and permanent pricing pressure.  As *Bloomberg* reported that day, "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper."  Deutsche Bank analysts reported in an August 3, 2017 report that

"TEVA described increased pressures on its US generic business, which it believes could persist in 2018 and potentially 2019."  Defendants until then had vehemently denied that Teva was susceptible to such pricing pressure.

880.    As a result of this new negative information, Teva's ADS price fell $7.50 per share, or 24%, from a close of $31.25 on August 2, 2017 to a close of $23.75 on August 3, 2017, on high trading volume.  The ordinary share price also declined ILS 1,980, or 17.79%, from a close of ILS 11,130 on August 2, 2017 to a close of ILS 9,150 on August 3, 2017.  Teva's market capitalization was reduced by approximately $8 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $560.50 to $465.05 (17.03% decline), $95.27 to $93.76 (1.58% decline), and $90.73 to $88.91 (2.00% decline), respectively, from August 2, 2017 to August 3, 2017.

881.    On Friday, August 4, 2017, Fitch Ratings also downgraded Teva to BBB- (one step above junk), with a negative outlook.  As a result of the news on August 3 and 4, Teva's ADS price continued to fall by an additional $3.15 per share, or 13.26%, from a close of $23.75 on August 3, 2017 to a close of $20.60 on August 4, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3.3 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $465.05 to $409.00 (12.05% decline), $93.76 to $92.03 (1.85% decline), and $88.91 to $85.86 (3.43% decline), respectively, from August 3, 2017 to August 4, 2017.

882.    The next trading day on the TASE, the ordinary share price continued to fall by ILS 2,022, or 22.10%, from a close of ILS 9,150 on Thursday, August 3, 2017 to a close of ILS 7,128 on Sunday, August 6, 2017.

883.    The next trading day, Monday, August 7, 2017, as the prices of Teva securities continued to drop, Morgan Stanley analysts downgraded Teva's ADSs to "Underweight," noting specifically that they had "underappreciated the risk of generics pricing pressure to Teva's earnings

and dividend, and we expect Teva to continue to underperform given overhangs." In other words, the analysts had been led to believe through Defendants' repeated and adamant denials that Teva was not vulnerable to the pricing pressure.

884.    As a result of the news on August 7, 2017, Teva's ADS price continued to fall by an additional $2.01 per share, or 9.76%, from a close of $20.60 on August 4, 2017 to a close of $18.59 on August 7, 2017, on high trading volume.   Teva's market capitalization was reduced by approximately $2.2 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $409.00 to $376.00 (8.07% decline), $92.03 to $91.40 (0.68% decline), and $85.86 to $84.97 (1.04% decline), respectively, from August 4, 2017 to August 7, 2017.

885.    The ordinary share price also continued to fall by ILS 18, or 0.25%, from a close of ILS 7,128 on Sunday, August 6, 2017 to a close of ILS 7,110 on Monday, August 7, 2017.

886.    In total, over these three trading days, Teva's ADS price fell $12.66 per share, or 40.6%; its ordinary share price fell ILS 4,020, or 36.2%; Preferred Shares price fell $184.50, or 32.9%; 2026 Notes price fell $3.86, or 4.1%; and 2046 Notes price fell $5.76, or 5.4%.  Teva's market capitalization was reduced by approximately $13 billion.

### 9.    November 2, 2017

887.    On November 2, 2017, Teva filed its 3Q2017 Form 6-K, reporting the Company's third quarter 2017 financial results, including a 9% decline in U.S. Generic Medicine quarterly revenues compared to the third quarter of 2016.  The decrease was misleadingly attributed to "pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

888.    Investors and analysts reacted negatively to this news.  Analysts at Cowen and Company called the Company's full year guidance "unfavorable" and stated that, with a "difficult generic pricing environment and competitive pressures – which are not being properly offset by new product launches – the Teva business model is now upside down."  Analysts at RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising."  Wells Fargo Securities analysts found Teva's results to be "especially disappointing."

889.    As a result of this new negative information, the prices of Teva securities declined. The ADS price fell $2.79 per share, or nearly 20%, from a close of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $288.01 to $239.57 (16.82% decline), $88.54 to $85.47 (3.47% decline), and $80.03 to $77.22 (3.51% decline), respectively, from November 1, 2017 to November 2, 2017.

890.    The next trading day on the TASE, Teva's ordinary shares fell ILS 670, or 13.65%, from a close of ILS 4,908 on Wednesday, November 1, 2017 to a close of ILS 4,238 on Thursday, November 2, 2017.

### 10.    February 8, 2018

891.    On February 8, 2018, Teva issued a press release announcing its fourth quarter and full year financial results, including a staggering $17.1 billion goodwill impairment mainly related to its generics business for 2017.  On the conference call with investors held later that day, Teva explained that $11 billion of the impairment "related to our U.S. generics business as well as additional impairments of other long-lived assets of $3.2 billion, mainly related to a revaluation of generic products acquired from Actavis."

- 384 -

892.    Investors and analysts reacted negatively to this news.  Analysts at Wells Fargo Securities stated that the Company missed consensus expectations "by a significant margin," but noted that:

> [W]e believe it will be the lower than consensus 2018 outlook that investors will be focused on, especially the commentary about generic pricing worsening in 4Q and the overall environment worsening for the value of future launches.  Teva took a $17.1 billion goodwill impairment, which investors should see as reflective of how challenging the situation is.

BTIG analysts noted "another major write-down following last year's $6B goodwill impairment." Similarly, IBI Brokerage stated that the $11 billion "impairment charge [was] almost entirely for the generics business in the US" and that guidance for fiscal year 2018 was "way below market expectations."

893.    As a result of this new negative information, the prices for Teva securities declined. Teva's ADS price fell $2.21 per share, or over 10.5%, from a close of $20.85 on February 7, 2018 to a close of $18.64 on February 8, 2018, on high trading volume.  Teva's market capitalization was reduced by approximately $2.3 billion.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $360.25 to $352.00 (2.29% decline), $82.36 to $81.28 (1.30% decline), and $74.99 to $74.06 (1.24% decline), respectively, from February 7, 2018 to February 8, 2018.

894.    The next trading day on the TASE, the ordinary share price fell ILS 500, or 6.9%, from a close of ILS 7,200 on February 7, 2018 to a close of ILS 6,700 on February 8, 2018.

**11.    December 9-10, 2018**

895.    On December 9, 2018, an article in *The Washington Post* quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "'the largest cartel in the history of the United States.'" While the article noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of price-fixing conspiracy "'are entirely conclusory and

devoid of any facts,'" the price of Teva securities dropped substantially with the disclosure of the State AGs' expanded investigation.

896.    Between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 per share or 5% to close at $18.44 and the price of the 2026 Notes fell $1.29, or 1.6%, to close at $79.92.  Similarly, the Preferred Shares, 2026 Notes, and 2046 Notes prices fell from $369.80 to $353.40 (4.43% decline), $81.21 to $79.92 (1.59% decline), and $70.30 to $68.65 (2.35% decline), respectively, from December 7, 2018 to December 10, 2018.

897.    The next trading day on the TASE, the ordinary share price fell ILS 390, or 5.3% from a close of ILS 7,300 on December 9, 2018 to a close of ILS 6,910 on December 10, 2018.

### 12.    May 10, 2019

898.    On May 10, 2019, after the market closed, the State AGs filed a 467-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The May 2019 AG Complaint details Teva's price-fixing with regards to at least 86 different generic drugs, compared to just 7 drugs in the previously filed action.  The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's role as a "consistent participant" and a central player in the conspiracy.  Further, the May 2019 AG Complaint names four Teva employees personally as defendants: Cavanaugh, Patel, Green (Teva's former Director of National Accounts), and Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

899.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019.  Similarly, the 2026 Notes

and 2046 Notes prices fell from $82.57 to $80.71 (2.25% decline) and $70.35 to $69.65 (1.0%

decline), respectively, from May 10, 2019 to May 13, 2019.

900.    The next trading day on the TASE, the ordinary share price fell ILS 559, or 10.7%

from a close of ILS 5,225 on May 7, 2019 to a close of ILS 4,666 on May 12, 2019.

901.    Analysts were surprised by the revelations in the State AGs' May 10, 2019 complaint.

For example, Bernstein warned that "[t]he price-fixing lawsuit is worse than we expected" and

"there seem to be specific cases in the lawsuit that are going to be hard to explain away." J.P.

Morgan stated that "[w]e were open to the majority of price spikes being 'explainable' by way of

shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of

antitrust law.  So we were sorely disappointed by the nature of the direct quotes attributed to Teva

employees in the expanded complaint."

### O.    Presumption of Reliance and Fraud-on-the-Market Doctrine

902.    There is a presumption of reliance established pursuant to the fraud-on-the-market

doctrine because, among other things:

(a)    Defendants made misrepresentations or omissions that were public;

(b)    the misrepresentations or omissions were material;

(c)    the misrepresentations or omissions would tend to induce a reasonable

investor to misjudge the value of Teva securities;

(d)    Teva securities traded in an efficient market; and

(e)    Plaintiffs traded in Teva securities between the time the misrepresentations or

omissions were made and the time when the truth was revealed.

903.    At all relevant times, the market for Teva securities was efficient for the following

reasons, among others:

(a)     Teva's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     the average weekly trading volume of Teva securities was significant;

(c)     as a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d)     Teva was eligible to file simplified SEC filings;

(e)     Teva regularly communicated with the public through established market communication channels, including through regular dissemination of news releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public market.

904.    As a result of the foregoing, the market for Teva securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in their prices.  All purchasers of Teva securities during the Relevant Period suffered similar injury through their purchases of Teva securities at artificially inflated prices, and a presumption of reliance therefore applies.

905.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

**P.      Inapplicability of the Statutory Safe Harbor or Bespeaks Caution Doctrine**

906.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading

statements alleged herein.  First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made.  Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.  Further, to the extent that any of the untrue or misleading statements alleged herein were identified as forward looking, and can be construed as forward looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those statements, and the generalized disclosures made by Defendants were not sufficient to shield them from liability.

907.    In the alternative, to the extent the statutory safe harbor otherwise would apply, Defendants are liable for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was false or misleading and/or each such statement was made or approved by an executive officer of the Company who knew that the statement was false or misleading.

## IV.    INFLATED PROFIT METHODOLOGY

908.    Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public.  Counsel therefore undertook an investigation and engaged econometric experts, working at counsel's direction, to calculate and isolate the profit that Teva earned from its Price-Hike Strategy.  The investigation comprised multiple distinct econometric analyses, including regression analyses, that ultimately took into account thousands of data points.

909.    The analysis screened Teva's entire generic drug portfolio during the Relevant Period to identify significant WAC increases.  The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually.  Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

910.    To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase.  To do so, the drug's specific pricing history was analyzed using a regression analysis to determine the price through the Relevant Period had prevailing drug-specific pricing trends continued.   The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

911.    Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for: (i) Teva's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

912.    Sales volumes were derived by reference to figures reported in a subscription database.  Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

913.    Teva's discounts and rebates are unavailable by any means of which counsel is aware. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the Relevant Period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data.  This analysis was unique for each drug and captured fluctuations over time.

## V.      CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Teva and the Officer Defendants for ADS, Preferred Shares, and Notes Purchases

914.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

915.    This Count is asserted against Teva and the Officer Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

916.    The defendants named in the Count disseminated or approved the false and misleading statements specified above during the Relevant Period, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

917.    Teva and the Officer Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Teva securities during the Relevant Period.

918.    Teva and the Officer Defendants, individually and in concert, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, and by the use of the facilities of a national securities exchange with respect to Teva securities, engaged in a continuous course of conduct that operated as a fraud and deceit, or otherwise used or employed manipulative or deceptive devices or contrivances, which were intended to and did: (i) deceive the

- 391 -

investing public, including Plaintiffs, regarding, among other things, Teva's participation in illegal anti-competitive activities; (ii) artificially inflate and/or maintain the market price of Teva securities; and (iii) cause Plaintiffs to purchase Teva securities at artificially inflated prices, and thereby suffer losses when the truth was revealed.

919.    Teva and the Officer Defendants are liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

920.    As set forth above, Teva and the Officer Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Teva securities, were either known to these defendants or were so obvious that these defendants should have been aware of them.

921.    Plaintiffs suffered damages as a result of Teva's and the Officer Defendants' wrongful conduct in that they purchased or otherwise acquired Teva securities at artificially inflated prices in reliance on (i) these defendants' untrue or misleading statements or omissions of material fact and/or (ii) the integrity of the market.  Plaintiffs would not have purchased or otherwise acquired Teva securities at the prices they paid, or at all, had they been aware that those prices were artificially inflated and/or maintained as a result of the wrongful conduct alleged herein.

922.    As a direct and proximate result of Teva's and the Officer Defendants' wrongful conduct, Plaintiffs suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Teva securities during the Relevant Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Officer Defendants for ADS, Preferred Shares, and Notes Purchases

923.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

924.    This Count is asserted against the Officer Defendants pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

925.    During their tenures as officers and/or directors of Teva, the Officer Defendants were controlling persons of the Company, within the meaning of §20(a) of the Exchange Act, and were culpable participants in the alleged wrongful conduct that is the basis of Count I.

926.    The Officer Defendants, by virtue of their control and authority as officers and/or directors of Teva and their direct participation in and/or awareness of the Company's operations and finances, possessed the power and authority to, and did, direct or cause the direction of the management and policies of the Company and its employees, or otherwise cause the Company to engage in the alleged wrongful conduct that is the basis of Count I.

927.    The Officer Defendants were able to and did control, directly and indirectly, the content of the public statements made by Teva during the Relevant Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

928.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Officer Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  The Officer Defendants regularly spoke on behalf of the Company and had the power to, and did, control, directly or indirectly, the decision-making of the Company.  The Officer

Defendants signed the Company's SEC filings during the Relevant Period, and/or were directly involved and responsible in providing false and misleading information and certifying and approving the false and misleading statements disseminated by Teva during the Relevant Period. The Officer Defendants were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false and misleading information and certifying and approving the false statements disseminated by Teva during the Relevant Period. As a result of the foregoing, the Officer Defendants, as a group and individually, were controlling persons of Teva within the meaning of §20(a) of the Exchange Act.

929.    As set forth above, Teva violated §10(b) of the Exchange Act and Rule 10b- 5; as controlling persons of the Company, each of the Officer Defendants is liable jointly and severally for such violation, with and to the same extent as the Company. Moreover, as detailed above, during the respective times the Officer Defendants served as officers and/or directors of Teva, each of these Officer Defendants was culpable for the material misstatements and omissions made by Teva. As a direct and proximate result of these Officer Defendants' conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of Teva securities.

### COUNT III

**For Violation of §§1-402(c) and 1-501(c) of the PSA**
**Against All Defendants for All Teva Securities Purchases**

930.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

931.    This Count is asserted against Defendants (Teva, Teva USA, and the Officer Defendants) for violations of §§1-402(c) and 1-501(c) of the PSA, 70 Pa. Stat. §§1-402(c) & 1-501(c).

932.     Defendants directly and/or indirectly, for the purpose of inducing the purchase of Teva securities by others, participated in the circulation and/or dissemination of misrepresentations and omissions of material facts to the effect that the price of the security would or was likely to rise. During the Relevant Period, Defendants sold or offered to sell Teva securities, or received consideration, directly or indirectly, from a person who sold or offered to sell Teva securities.

933.     Pennsylvania is "the factual center" of this action. *Galmi*, ECF No. 37-1, at 6.  In two separate securities cases, Teva moved to transfer venue to the Eastern District of Pennsylvania from the Central District of California. *See, e.g.*, *Galmi*, ECF No. 37-1.  In support of its motion, Teva submitted a sworn declaration from Austin D. Kim ("Kim"), its Vice President and Deputy General Counsel, Corporate/M&A, who detailed the substantial connections between this District and the events giving rise to this lawsuit.  *Galmi*, ECF No. 37-2 ("Kim Declaration").  The false statements "were prepared in Pennsylvania and Israel."  *See Galmi*, ECF No. 37-1, at 6; *see also* Kim Declaration, ¶5 ("Individuals, myself included, who participated in drafting and preparing [the relevant SEC] filings, or who otherwise controlled the drafting process, are located in or around Petach Tikva, Israel and North Wales, Pennsylvania.").  And "[s]everal departments, including investor relations and sales and marketing for the North American generic medicines business, are based at the Pennsylvania offices.  In addition, all sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania."  Kim Declaration, ¶4. Documents related to this case – "*e.g.*, materials related to Teva USA, drug pricing and U.S. Competitors . . . are located in Pennsylvania, or, if not there, [in] Israel."  *Id.*, ¶3.  Furthermore, Teva's Vice President and Deputy General Counsel, Corporate/M&A, Kim, "also live[s] and work[s] in Pennsylvania," and Teva USA's headquarters and principal executive offices are located at 1090 Horsham Road, North Wales, Pennsylvania, 19454."  *Id.*, ¶¶1, 3-4.

- 395 -

934.   Defendants willfully participated in the acts and transactions that caused the circulation and/or dissemination of misrepresentations and omissions of material facts.

935.   Defendants are liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

936.   Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The misrepresentations and omissions of material fact set forth herein were either known to Defendants or were so obvious that Defendants should have been aware of them.

937.   Plaintiffs suffered damages as a result of Defendants' wrongful conduct in that they purchased or otherwise acquired Teva securities at artificially inflated prices in reliance on Defendants' untrue or misleading statements or omissions of material fact and/or the integrity of the market.

938.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages.

## COUNT IV

### For Violation of the Israel Securities Law, 1968, Against All Defendants for Ordinary Share Purchases Made on the TASE

939.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

940.   Throughout the Relevant Period, Teva's ADSs and ordinary shares were "dual listed" on both the NYSE and the TASE under Israeli law.[28]

941.   Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets.  For

---

[28]   *See* http://www.tase.co.il/eng/marketdata/stocks/marketdata/pages/marketdata.aspx (last visited Apr. 26, 2019).

dual-listed firms incorporated in Israel, Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing.  *See* Israel Securities Law, 1968 ("Securities Law"), §§1, 35T, 35DD, 35EEE.

942.   Section 1 of the Securities Law defines a "foreign corporation" as "a corporation incorporated in Israel whose securities are listed for trade on a foreign stock exchange."  The NYSE is a "foreign stock exchange" under the Securities Law.  Because Teva is incorporated in Israel and has its securities, such as the ADSs, listed for trading on the NYSE, it is a "foreign corporation" under the Securities Law.  Therefore, the TASE correctly recognizes Teva as a dual-listed company.

943.   For "foreign corporations" that are dual listed in the United States, Israeli law applies the reporting requirements (including the anti-fraud requirements) of the United States.  *See* Securities Law §§35T, 35EE.

944.   Section 1 of the Securities Law defines "the foreign law" as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."  A "foreign corporation" must agree to comply with the foreign law as a matter of Israeli law.  *See* Securities Law §35T(a)(1).  Indeed, a foreign corporation, like Teva, generally only needs to file its U.S. SEC filings in Israel (without further alteration or translation) in order to comply with Israeli reporting requirements.  As a matter of Israeli securities law, Teva agreed to comply with the U.S. securities laws and the rules of the NYSE to fulfill its obligations under Israeli law.

945.   Accordingly, to construe the propriety of Teva's disclosures to investors, Israel applies U.S. laws and regulations, including the anti-fraud provisions of the U.S. securities laws, to enforce disclosure obligations for dual-listed stocks.  *See* Securities Law, §§35T, 35DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011 (subsequent to

- 397 -

and in light of *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)); Letter from Israel Securities

Authority to the SEC (Feb. 18, 2011), https://www.sec.gov/comments/4-617/4617-45.pdf (last

visited Apr. 26, 2019).

946.    In a Motion to Dismiss the Class Action Complaint filed on December 1, 2017, in

*Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-00558-SRU

(D. Conn.), Teva, Vigodman, Desheh, Altman, Oberman, Olafsson, Peterburg, and Bhattacharjee

> agree[d] that Israeli law mirrors U.S. law here. The Israeli dual-listing regime was purposefully created in 2000 to make the Tel Aviv Stock Exchange more attractive to Israeli companies (like Teva) who otherwise might list their securities only on exchanges outside of Israel. *See generally, e.g.*, Marcus Best & Jean-Luc Soulier, Israel §21.1, *International Securities Law Handbook* (4th ed. 2014). Because issuers find it unattractive to be subject to multiple and diverging regulatory regimes, Israel simply adopts the securities law requirements of the foreign jurisdiction – in this case, the United States – instead of enforcing "requirements that apply to Israeli companies listed solely on the TASE." *Id.* As Plaintiffs acknowledge, both Israeli case law and the Israel Securities Authority's public statements support the view that, as a matter of Israeli law, Israel voluntarily applies U.S. liability standards to dual-listed companies like Teva. Compl., ¶1084; *see In re VeriFone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140 EMC, 2014 WL 12646027, at *1 (N.D. Cal. Feb. 18, 2014) (noting, in case involving securities fraud claims under Israeli law and a dual-listed company, that "the Israeli district court ruled twice that U.S. law, and not Israeli law, applies").

947.    This Count incorporates Counts I and II under the Exchange Act by reference

## VI.    SECURITIES ACT ALLEGATIONS

### A.    Securities Act Parties

#### 1.    Securities Act Plaintiffs

948.    Plaintiffs purchased or otherwise acquired Teva's ADSs, Preferred Shares, and Notes

in or pursuant to and/or traceable to the Offerings. For instance, on and/or around the December 3,

2015 offering date and at the $62.50 offering price, Plaintiffs purchased Teva's ADS (SEDOL:

2883878), which are listed on the NYSE, in the ADS Offering.

949.    As a result of material misstatements and omissions made by the Securities Act

Defendants (defined below), Plaintiffs purchased or otherwise acquired Teva securities at artificially

inflated prices.  When the relevant truth concerning the Securities Act Defendants' misstatements and omissions of material fact leaked out into the market from August 2016 to May 2019, the price of Teva securities fell, causing Plaintiffs to suffer losses.

### 2.    The Securities Act Defendants

950.    Each of the following defendants is statutorily liable under §§11, 12(a)(2) and/or 15 of the Securities Act for the material misstatements and omissions contained in and incorporated (and thereby made anew) in the Offering Materials.

951.    Defendant Teva was the issuer of the ADSs, Preferred Shares, and Notes.  Teva also caused its wholly-owned special purpose finance subsidiary Teva Finance to issue the Notes in the Notes Offering and unconditionally guaranteed the payment of all principal and interest payable on the Notes.

952.    Defendant Teva Finance also issued the Notes in the Notes Offering.  Teva Finance, a shell company that is a wholly-owned and controlled special purpose finance subsidiary of Teva, is a Dutch private limited liability company with its business address at Piet Heinkade 107, 1019 GM Amsterdam, Netherlands.  Teva Finance does not have any independent operations and does not purport to engage in any activities other than issuing securities and investing the proceeds in Teva or its affiliates at the direction of Teva.

953.    Defendant Vigodman signed the ADS/Preferred Registration Statement, Notes Registration Statement, the Notes Registration Amendment No. 1, the Master Purchase Agreement, and the 1Q2016 Form 6-K.  He also signed and certified the 2014 Form 20-F and 2015 Form 20-F. He also was, at all relevant times, a member of Teva's Board at the time of the Offerings.

954.    Defendant Desheh signed the ADS/Preferred Registration Statement, Notes Registration Statement, the Notes Registration Amendment No. 1, the ADS Underwriting Agreement, the Preferred Underwriting Agreement, the Notes Underwriting Agreement, the 2014

Form 20-F, the 2015 Form 20-F, the 1Q2015 Form 6-K, the 2Q2015 Form 6-K, the 3Q2015 Form 6-K, the July 28, 2015 Form 6-K with the Master Purchase Agreement, the January 25, 2016 Form 6-K, and the 1Q2016 Form 6-K – documents filed with the SEC and incorporated by reference into the ADS/Preferred Registration Statement and Notes Registration Statement.

955.    Defendant Griffin signed the ADS/Preferred Registration Statement, Notes Registration Statement, and Notes Registration Statement Amendment No. 1, and was at all relevant times Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance.

956.    Defendant Peterburg signed the ADS/Preferred Registration Statement, Notes Registration Statement, and Notes Registration Statement Amendment No. 1, and was at all relevant times Chairman of Teva's Board.

957.    Defendants Teva, Teva Finance, Vigodman, Desheh, Peterburg, and Griffin are collectively referred to herein as the "Securities Act Defendants."

## B.    The Relevant Offerings

958.    On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion.  These offerings consisted of approximately $3.375 billion worth of ADSs and approximately $3.375 billion worth of Preferred Shares, and were announced pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 filed with the SEC on November 30, 2015 (the "ADS/Preferred Registration Statement").  Each ADS represents one ordinary share of Teva.  Likewise, on November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering, each dated November 30, 2015.

959.    On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings.  That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the ADS Prospectus Supplement and the Preferred Prospectus Supplement and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

960.    The ADS/Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred Registration Statement, including the ADS Prospectus Supplement and the Preferred Prospectus Supplement, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

961.    On December 8, 2015, Teva closed the ADS Offering and issued 54 million ADSs at $62.50 per ADS and 3,375,000 Preferred Shares (7.00% mandatory convertible preferred shares, nominal (par) value NIS 0.10 per share) at $1,000.00 per share.  The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses by Teva, were approximately $3.29 billion from the ADS Offering and approximately $3.29 billion from the Preferred Offering, for a total of approximately $6.58 billion.

962.    Certain underwriters of the ADS Offerings exercised their options to purchase additional ADSs and Preferred Shares to cover overallotments.  Teva issued an additional 5.4 million ADSs and an additional 337,500 Preferred Shares at the time of such purchases, on January 6, 2016. As a result, Teva received an additional $329 million in net proceeds for the ADS Offering and an additional $329 million in net proceeds for the Preferred Offering, for an aggregate of approximately $3.62 billion for the ADS Offering and an aggregate of approximately $3.62 billion for the Preferred Offering.  As a result of the ADS Offering and the Preferred Offering, Teva raised a total of approximately $7.24 billion.

963.    On July 12, 2016, Teva filed with the SEC a Form 6-K and, under Rule 433, a free writing prospectus dated July 12, 2016, each of which announced a conference call and webcast to provide a preliminary outlook for 2016-2019.  On July 13, 2016, Teva filed with the SEC its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3 (Registration Nos. 333-201984, 333-201984-09), superseding the original base prospectus dated February 9, 2015 (the "Notes Registration Statement") and, under Rule 433, a free writing prospectus in the form of an investor presentation titled "2016-2019 Preliminary Financial Outlook" dated July 13, 2016.

964.    On July 18, 2016, Teva filed with the SEC, under Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2016.  Then, on July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus supplement (together with the preliminary prospectus supplement, the "Notes Prospectus Supplements") and, under Rule 433, two free writing prospectuses, all dated July 18, 2016.

965.    The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration Statement, including the Notes Prospectus Supplements, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials."

966.    On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of $3.5 billion in 3.150% Senior Notes due 2026 and $2 billion of 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering").  The payment of principal and interest was unconditionally guaranteed by Teva.  After underwriting discounts and estimated offering expenses payable by the Company, Teva's net proceeds from the Notes Offering were approximately $5.44 billion.

### C.     Teva Filings Incorporated into the Offering Materials

967.    The ADS/Preferred Registration Statement, the ADS Prospectus Supplement, and the Preferred Prospectus Supplement incorporated by reference various documents that Teva had previously filed with the SEC and all §§13(a), 13(c), 14 or 15(d) reports or documents filed by Teva subsequent to the dates of the ADS/Preferred Registration Statement, the ADS Prospectus Supplement, and the Preferred Prospectus Supplement until the ADS Offering and the Preferred Offering was complete.  Specifically, the ADS/Preferred Registration Statement and the ADS Prospectus Supplement incorporated by reference Teva's 2014 Form 20-F, 1Q2015 Form 6-K, 2Q2015 Form 6-K, 3Q2015 Form 6-K, the July 28, 2015 Form 6-K with the Master Purchase Agreement, the ADS Underwriting Agreement, and the Preferred Underwriting Agreement.

968.    The Notes Registration Statement and the Notes Prospectus Supplements incorporated by reference various documents that Teva had previously filed with the SEC and all §§13(a), 13(c), 14 or 15(d) reports or documents filed by Teva subsequent to the dates of the Notes Registration Statement and the Notes Prospectus Supplements, until the Notes Offering was completed.  Specifically, the Notes Prospectus Supplements incorporated by reference the 2015 Form 20-F, the January 25, 2016 Form 6-K containing the Teva Corporate Social Responsibility Highlights, the 1Q2016 Form 6-K, and the Notes Underwriting Agreement.

969.    The ADS/Preferred Offering Materials and the Notes Offering Materials contained material misstatements and omissions concerning: (i) the collusive activities and Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market; (iii) material trends that were not disclosed under Item 5 of Form 20-F; (iv) the subpoenas issued to the Company by the DOJ and the State AGs; (v) legal compliance; and (vi) the international bribery scheme that centered around Teva's key drug Copaxone, as well as other topics discussed below.  The statements and omissions contained

in the ADS/Preferred Offering Materials and the Notes Offering Materials and the reasons why they are materially misleading are described above in §III.K.

**D.**   **The Offering Materials Contained Material Misstatements and Omissions**

**1.**   **Material Misstatements and Omissions Concerning Collusive Activities and the Price-Hike Strategy and the Benefits and Risks Stemming Therefrom**

970.   The ADS/Preferred Offering Materials and Notes Offering Materials contained material misstatements and omissions concerning the attribution of the sources of Teva's generics segment's revenues and profit during the Relevant Period.  The statements and omissions contained in the ADS/Preferred Offering Materials and Notes Offering Materials, and the reasons why they are materially misleading, are described in §§III.K.2 and III.K.6.

971.   In sum, the various financial disclosures regarding the sources of Teva's generics revenues and profits contained within the incorporated filings were materially misstated because they failed to disclose collusive activities and the Price-Hike Strategy, pursuant to which Teva implemented price hikes on a number of Teva's generic drugs, generating a significant amount of the Inflated Profit, including the Collusive Profit, as a result of those price hikes that was unsustainable, while attributing the source of those profits to other sources and failing to disclose that they were caused by concealed price hikes.

972.   Teva failed to disclose the material risks associated with collusive activities and the Price-Hike Strategy.  Those material risks included: (i) increased public, legislative, and regulatory scrutiny of generic drug price increases that undermined Teva's ability to sustain the Inflated Profit and Collusive Profit from price increases and/or implement further price increases; (ii) increased legislative and law enforcement scrutiny that resulted in legal actions being taken against Teva; (iii) increased competition from other generic manufacturers who undercut Teva's raised prices as

they themselves faced increased scrutiny; and (iv) significant disruption caused by the termination of members of senior management who were responsible for the strategy, and the attendant resources required to locate and hire suitably qualified replacements.

### 2. Material Misstatements and Omissions Concerning Known Trends Required to Be Disclosed Pursuant to Item 5 of Form 20-F

973.   The ADS/Preferred Offering Materials and the Notes Offering Materials, by incorporating Teva's 2014 Form 20-F and 2015 Form 20-F, respectively, contained material misstatements and omissions in that they violated SEC Item 5 of Form F-20 by failing to disclose two known trends.  *See* §III.L, *supra*.  The Securities Act Defendants failed to disclose the trend that Teva's financial success was materially dependent on collusive activities and the Price-Hike Strategy and the attendant price increases on generic drugs that generated significant amounts of Collusive Profit and Inflated Profit.  These prices increases generated as much as $2.75 billion in profit for Teva over the Relevant Period.  Yet the existence of this trend and the related risks and uncertainties surrounding its source and sustainability were concealed.

### 3. Material Misstatements and Omissions Concerning Competition in the U.S. Generics Market

974.   The ADS/Preferred Offering Materials (by incorporating the 2014 Form 20-F, the 1Q2015 Form 6-K, the 2Q2015 Form 6-K, and the 3Q2015 Form 6-K) and the Notes Offering Materials (by incorporating the 2015 Form 20-F and 1Q2016 Form 6-K) contained material misstatements and omissions in that they, among other things, purportedly: (i) warned investors that one of the primary risks that Teva faced was "intense" competition in the U.S. generics drug market, and that this competition would force the price of generic drugs down; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics.

- 405 -

These statements and omissions were materially misstated for all of the reasons described above in §III.K.1.

### 4. Material Misstatements and Omissions Concerning the DOJ and State AGs' Subpoenas

975.   The Notes Offering Materials, including by incorporation of the 2015 Form 20-F, contained material misstatements and omissions of material fact in that they failed to disclose Teva's receipt of subpoenas from the DOJ and Connecticut AG as set forth in §III.K.3.

### 5. Material Misstatements and Omissions Concerning Legal Compliance

976.   The ADS/Preferred Offering Materials and Notes Offering Materials contained material misstatements and omissions of material fact in that Teva and its subsidiary Teva USA were not in compliance with laws and regulations.  Teva's undisclosed inflation of sales through collusive price-fixing and market allocation were violations of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant financial and reputational harm as set forth in §III.K.7.

### 6. Material Misstatements and Omissions Relating to the Bribery Schemes

977.   The ADS/Preferred Offering Materials and Notes Offering Materials contained material misstatements and omissions of material fact in that Teva failed to disclose that the financial results were impacted at least in part by the Company's illegal scheme worldwide to influence the governmental approvals of and prescriptive and purchase decisions concerning its key drug Copaxone.  These statements and omissions were materially misstated for all of the reasons described above in §III.K.8.

## VII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT V

**For Violation of §11 of the Securities Act in Connection with the Offerings**
**Against Defendants Teva, Teva Finance, Vigodman, Desheh, Peterburg and Griffin**

978.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

979.    Defendants' liability under this Count is predicated on the participation of each of the Securities Act Defendants in the Offerings pursuant to the ADS/Preferred Offering Materials and Notes Offering Materials, which contained untrue statements and omissions of material fact.

980.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of Offerings.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

981.    This Count is brought pursuant to §11 of the Securities Act against defendants Teva, Teva Finance, Vigodman, Desheh, Peterburg, and Griffin and arises out of Plaintiffs' purchase or acquisition of the securities pursuant and/or traceable to the Offerings.  This Count is based solely in strict liability and negligence.  Teva was the issuer, within the meaning of §11 of the Securities Act, pursuant to the ADS/Preferred Offering Materials and Notes Offering Materials.

982.    The ADS/Preferred Offering Materials and Notes Offering Materials, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

983.     The defendants named in this Count issued or disseminated, caused to be issued or disseminated, or participated in the issuance or dissemination of the ADS/Preferred Offering Materials and Notes Offering Materials.

984.     As the issuer of the Offerings, Teva is strictly liable for the actionable statements and omissions in the ADS/Preferred Offering Materials and Notes Offering Materials.

985.     As the issuer of the Notes Offering, Teva Finance is strictly liable for the actionable statements and omissions in the Notes Offering Materials.

986.     The other defendants named in this Count acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the ADS/Preferred Registration Statement and the Notes Registration Statement were true and there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading.  These defendants are liable for the actionable statements and omissions in the ADS/Preferred Registration Statements and the Notes Registration Statement in that, among other things:

- Vigodman, Desheh, Peturburg, and Griffin each signed the ADS/Preferred Registration Statement and the Notes Registration Statement as a senior officer and/or director of Teva; and

- Vigodman and Peturburg were directors of the Company at the time of the filing of the relevant parts of the ADS/Preferred Registration Statement and the Notes Registration Statement with respect to which their liability is asserted.

987.     When they acquired the securities in, pursuant, and/or traceable to the Offerings, Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials and Notes Offering Materials.

988.     Plaintiffs suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the Offerings.

- 408 -

**COUNT VI**

**For Violation of §12(a)(2) of the Securities Act in Connection with the Offerings
Against Defendants Teva, Teva Finance, Vigodman, Desheh, Peterburg and Griffin**

989.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

990.    For the purposes of this Count, Plaintiffs assert only negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

991.    This claim is brought pursuant to §12(a)(2) of the Securities Act against Teva, Teva Finance, Vigodman, Desheh, Peterburg, and Griffin on behalf of Plaintiffs who purchased securities in, pursuant to, and/or traceable to the Offerings.

992.    The defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) the securities, within the meaning of the Securities Act, by means of a prospectus or oral communication.

993.    The defendants named in this Count assisted in the planning of the Offerings and actively participated in decisions regarding, among other things, the price of the securities and the information contained in the ADS Prospectus Supplement, Preferred Prospectus Supplement, and Notes Prospectus Supplements.

994.    The ADS Prospectus Supplement, Preferred Prospectus Supplement, and Notes Prospectus Supplements included (and/or incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state)

material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

995.     The defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the ADS Prospectus Supplement, Preferred Prospectus Supplement, and Notes Prospectus Supplements did not include untrue or misleading statements or omissions of material fact.

996.     When they acquired the securities directly in, pursuant to, and/or traceable to the Offerings, Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS Prospectus Supplement, Preferred Prospectus Supplement, and Notes Prospectus Supplements.

997.     Plaintiffs suffered damages in connection with their purchases or acquisitions of the securities in, pursuant to, and/or traceable to the Offerings.

998.     By reason of the foregoing, the defendants named in this Count are liable to Plaintiffs for either: (i) the consideration paid for the securities with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the securities no longer owned.

## COUNT VII

### For Violation of §15 of the Securities Act in Connection with the Offerings
### Against Defendants Vigodman, Desheh, Peterburg and Griffin

999.     Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.  This Count is based solely on negligence.

1000.  This Count is brought pursuant to §15 of the Securities Act against defendants Vigodman, Desheh, Peterburg, and Griffin in connection with the Offerings on behalf of Plaintiffs

who purchased or otherwise acquired the securities pursuant and/or traceable to the ADS/Preferred Offering Materials and Notes Offering Materials and were damaged thereby.  For purposes of this Count, Plaintiffs assert only negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

1001.   During their tenures as officers and/or directors of the Company, Vigodman, Desheh, Peterburg, and Griffin were controlling persons of Teva and Teva Finance, within the meaning of the Securities Act.

1002.   The defendants named in this Count, by virtue of their positions of control and authority and their direct participation in and/or awareness of Teva's and Teva Finance's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Teva, Teva Finance and their employees, or cause Teva and Teva Finance to issue, offer, and/or sell securities pursuant to the defective ADS/Preferred Offering Materials and Notes Offering Materials.

1003.   The defendants named in this Count had the power to, and did, control the decision-making of Teva and Teva Finance, including the content and issuance of the statements contained (and/or incorporated by reference) in the ADS/Preferred Offering Materials and Notes Offering Materials.  They were provided with or had unlimited access to copies of the ADS/Preferred Offering Materials and Notes Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected.  These defendants signed the ADS/Preferred Registration Statement and the Notes Registration Statement (and/or certain of the Company's SEC filings incorporated by

reference therein) and were directly involved in or responsible for providing the false or misleading information contained in the ADS/Preferred Offering Materials and Notes Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

1004.   The defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the ADS/Preferred Offering Materials and Notes Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

1005.   Plaintiffs suffered damages in connection with the purchase or acquisition of the securities in, pursuant to, and/or traceable to the Offerings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

A.      Declaring and determining that Defendants violated the Exchange Act, Securities Act, PSA and Israel Securities Law, 1968 by reason of the acts and omissions alleged herein;

B.      Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

C.      Awarding Plaintiffs reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 28, 2020
                  ROBBINS GELLER RUDMAN
                    & DOWD LLP
                  CHAD JOHNSON


                          s/ Chad Johnson
                        CHAD JOHNSON

                  125 Park Avenue, 25th Floor
                  New York, NY  10017
                  Telephone:  212/791-0567
                  chadj@rgrdlaw.com

                  ROBBINS GELLER RUDMAN
                    & DOWD LLP
                  SPENCER A. BURKHOLZ
                  LUKE O. BROOKS
                  RYAN A. LLORENS
                  ERIC I. NIEHAUS
                  ANGEL P. LAU
                  SARA B. POLYCHRON
                  JEFFREY J. STEIN
                  ERIKA OLIVER
                  TING H. LIU
                  655 West Broadway, Suite 1900
                  San Diego, CA  92101
                  Telephone:  619/231-1058
                  619/231-7423 (fax)
                  spenceb@rgrdlaw.com
                  lukeb@rgrdlaw.com
                  ryanl@rgrdlaw.com
                  eniehaus@rgrdlaw.com
                  alau@rgrdlaw.com
                  spolychron@rgrdlaw.com
                  jstein@rgrdlaw.com
                  eoliver@rgrdlaw.com
                  tliu@rgrdlaw.com

4828-1671-4429.v2

MOTLEY RICE LLC
WILLIAM H. NARWOLD
MATTHEW P. JASINSKI
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/882-1676
860/882-1682 (fax)
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Attorneys for Plaintiffs Harel Pension and
Provident Ltd., et al. and Phoenix Insurance
Company Ltd., et al.

4828-1671-4429.v2

# APPENDIX A
## Teva WAC Increases

Parallel Price Increases Indicated in **Orange**

**April 4, 2014**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Ketoconazole Tablets | 250% |
| Bumetanide Tablets | 249% |
| Cephalexin Oral Suspension | 111% |
| Nystatin Tablets | 110% |
| Ketoconazole Cream | 108% |
| Hydroxyzine Pamoate Capsules | 94% |
| Cyproheptadine HCL Tablets | 93% |
| Dicloxacillin Tablets (1st of 2) | 91% |
| Theophylline Anhydrous SR Tabs | 75% |
| Anagrelide HCL Capsules (1st of 2) | 58% |
| Estazolam Tablets (1st of 2) | 37% |

**April 15, 2014**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Baclofen Tablets | 381% |

**July 1, 2014**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Fluocinonide .05% Cream | 435% |
| Fluocinonide .05% Ointment | 415% |
| Fluocinonide .05% Gel | 255% |

**August 28, 2014**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Carbamazepine Tablets | 1543% |
| Carbamazepine Chewable Tablets | 270% |
| Enalapril Maleate Tablets (2nd of 2) | 230% |
| Clotrimazole Topical Solution (1st of 2) | 164% |
| Flutamide Capsules | 140% |
| Meperidine HCL Tablets | 110% |
| Penicillin V Potass. Tablets | 100% |
| Nefazodone Tablets (1 of 2) | 90% |
| Mexiletine Capsules | 90% |
| Cromolyn Sodium Inhalant (1st of 2) | 90% |
| Desmopressin Acetate Tablets | 75% |
| Fosinopril Tablets | 70% |
| Megestrol Acetate Tablets | 55% |
| Diclofenac Potass. Tablets (2nd of 2) | 50% |
| Cimetidine Tablets (2nd of 2) | 29% |
| Tolmetin Sodium Capsules (2nd of 3) | 25% |
| Loperamide HCL Capsules (1st of 2) | 22% |

**July 3, 2013**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Oxybutynin Chloride Tablets | 812% |
| Nadolol Tablets | 786% |
| Fluconazole Tablets | 218% |
| Methotrexate Sodium Tablets | 163% |
| Cimetidine Tablets (1st of 3) | 151% |
| Prazosin Capsules | 118% |
| Ranitidine HCL Tablets | 115% |

**July 19, 2013**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Enalapril Maleate Tablets (1st of 2) | 316% |

**August 9, 2013**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Doxazosin Mesylate Tablets | 305% |
| Etodolac Tablets | 282% |
| Pravastatin Sodium Tablets | 175% |
| Ketoprofen Capsules (1st of 3) | 168% |
| Etodolac SR Tablets | 96% |
| Tolmetin Sodium Capsules (1st of 3) | 91% |
| Clemastine Fumarate | 90% |
| Diltiazem HCL Tablets | 71% |
| Ketorolac Trometh. Tablets (1st of 2) | 34% |
| Diclofenac Potass. Tablets (1st of 2) | 22% |

**January 28, 2015**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Fluoxetine HCL Tablets | 608% |
| Propranolol Tablets | 447% |
| Glimepiride Tablets | 312% |
| Ciprofloxacin HCL Tablets | 194% |
| Penicillin v Potass. Oral Sol. (1st of 2) | 91% |
| Nortryptyline HCL Capsules | 91% |
| Estradiol Tablets | 90% |
| Ketoprofen Capsules (2nd of 3) | 90% |
| Danazol Capsules | 90% |
| Ketorolac Trometh. Tablets (2nd of 2) | 90% |
| Methyldopa Tablets | 90% |
| Diltiazem HCL Tablets | 90% |
| Carbidopa/ Levodopa Tablets | 50% |
| Griseofulvin Oral Suspension | 50% |

**July 29, 2015**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

**April 6, 2016**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

A-1

**APPENDIX B**
**Trade Shows and Conferences**

## Trade Shows and Conferences

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| NACDS Annual Meeting<br>April 30-May 3, 2011<br>Scottsdale, AZ | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Impax<br>○ Mylan<br>○ Sun<br>○ Zydus | **Teva**<br>  ○ Theresa Coward, Senior Director of National Sales & Trade Relations<br>  ○ Maureen Cavanaugh, Chief Operating Officer, North America Generics<br>  ○ Jonathan Kafer, VP Sales and Marketing<br>  ○ Robert Cunard, VP, Sales<br>Allergan<br>  ○ Andrew Boyer, EVP, Commercial Operations<br>  ○ Sigurdur Olafsson, President<br>  ○ Michael Baker, Executive VP, Trade Sales and Development<br>  ○ Paul Bisaro, President and Chief Executive Officer<br>  ○ Michael Reed, Executive Director, Trade Relations<br>  ○ Paul Reed, Senior Director, Trade Sales and Operations<br>  ○ John Shane, Director, Trade Relations<br>  ○ Allan Slavsky, Sales Consultant<br>Par<br>  ○ Paul Campanelli, President & CEO (Endo)<br>  ○ Michael Altamuro, Commercial Operations & Marketing<br>  ○ Renee Kenney, Senior Advisor, Generic Sales<br>Perrigo<br>  ○ Sharon Kochan, Executive VP & GM, Perrigo Pharmaceuticals<br>  ○ Richard McWilliams, Senior VP & General Manager<br>  ○ Jim Tomshack, Senior VP, Sales<br>  ○ John Wesolowski, Executive VP, President, RX<br>Sandoz<br>  ○ Don DeGolyer, Chief Executive Officer and Board Director<br>  ○ Jeff George, Division Head and CEO<br>  ○ Steven Greenstein, Director, Key Customers<br>  ○ Armando Kellum, VP, Sales & Marketing<br>  ○ Paul Krauthauser, Senior VP, Commercial Operations<br>  ○ Della Lubke, Director, National Accounts<br>Taro<br>  ○ Jim Kedrowski, Interim CEO<br>  ○ Jim Josway, VP, RX Sales<br>  ○ Bill Seiden, Senior VP, U.S. Sales & Marketing |

B-1

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| HDMA 2011 Business and Leadership Conference<br>June 6-7, 2011<br>Phoenix, AZ | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Sandoz<br>○ Apotex<br>○ Dr. Reddy's<br>○ Fougera<br>○ Lannett<br>○ Mylan<br>○ Sun<br>○ Zydus | **Teva**<br>  ○ Theresa Coward, Senior Director of National Sales<br>  ○ Jonathan Kafer, VP Sales & Marketing<br>  ○ Robert Cunard, VP, Sales<br>  ○ Andrew Boyer, Senior VP, Generic Sales and Marketing<br>  ○ Kevin Green, National Account Manager<br>  ○ Jessica Peters, National Account Manager<br>  ○ Allan Slavsky, VP Sales<br>**Allergan**<br>  ○ Michael Baker, EVP, Trade Sales and Development<br>  ○ John Shane, Director, Trade Relations<br>**Par**<br>  ○ Michael Altamuro, Commercial Operations & Marketing<br>  ○ Renee Kenney, Senior Advisor, Generic Sales<br>  ○ Sandra Bayer, National Accounts Manager<br>**Sandoz**<br>  ○ Steven Greenstein, Director, National Accounts<br>  ○ Armando Kellum, Director, Contracts & Pricing<br>  ○ Paul Krauthauser, Director, National Accounts<br>  ○ Della Lubke, Director, National Accounts<br>  ○ Rich Tremonte, VP, Sales & Marketing |
| NACDS 2011 Pharmacy & Technology Meeting<br>August 27-30, 2011<br>Boston, MA | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ G&W Laboratories<br>○ Heritage<br>○ Lannett<br>○ Mylan<br>○ Sun<br>○ West-Ward<br>○ Zydus | **Teva**<br>  ○ Theresa Coward, Senior Director Sales & Trade Relations<br>  ○ Maureen Cavanaugh, Chief Operating Officer, North American Generics<br>  ○ Robert Cunard, VP, Sales<br>  ○ Christine Baeder, SVP, Customer and Marketing Operations<br>  ○ Kevin Green, Associate VP, National Accounts<br>  ○ Teri Mauro Sherman, Director, National Accounts<br>  ○ Jessica Peters, Director, Trade Operations<br>  ○ David Rekenthaler, VP, Sales<br>**Allergan**<br>  ○ Andrew Boyer, EVP, Commercial Operations<br>  ○ Sigurdur Olafsson, Chief Executive Officer<br>  ○ Allan Slavsky, Sales Consultant<br>  ○ Napoleon Clark, VP Marketing<br>  ○ Anthony Giannone, Executive Director, Sales<br>  ○ Ara Aprahamian, VP, Sales & Marketing<br>  ○ Michael Dorsey, Director, National Accounts<br>  ○ Michael Perfetto, Chief Commercial Officer, Generic RX/OTC, US and Canada<br>**Par**<br>  ○ Paul Campanelli, President & CEO (Endo)<br>  ○ Michael Altamuro, Commercial Operations & Marketing |

B-2

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Jon Holden, VP, Sales<br>○ Renee Kenney, Senior Advisor, Generic Sales<br>○ Karen O'Connor, VP, National Accounts<br>○ Sandra Bayer, Sr. Director, National Accounts<br>Perrigo<br>○ Sharon Kochan<br>○ John Wesolowski<br>○ Andrea Felix<br>○ Tony Polman<br>○ Anthony Schott<br>Sandoz<br>○ Don DeGolyer, Chief Executive Officer and Board Director<br>○ Jeff George, Division Head and CEO<br>○ Steven Greenstein, Director, Key Customers<br>○ Armando Kellum, VP, Sales & Marketing<br>○ Paul Krauthauser, Senior VP, Commercial Operations<br>○ Della Lubke, Director, National Accounts<br>Taro<br>○ Jim Josway, VP, RX Sales<br>○ Bill Seiden, Senior VP, U.S. Sales & Marketing<br>○ Scott Brick, Manager, National Accounts |
| NACDS Annual Meeting<br>April 24-27, 2012<br>Palm Beach, FL | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Sandoz<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ G&W Laboratories<br>○ Impax<br>○ Mylan/UDL<br>○ Perrigo<br>○ Sun<br>○ Taro<br>○ Zydus | **Teva**<br>○ Theresa Coward, Senior Director Sales & Trade Relations<br>○ Maureen Cavanaugh, Chief Operating Officer, North America Generics<br>○ Christine Baeder, SVP, Customer and Marketing Operations<br>○ Jonathan Kafer, EVP, Sales & Marketing<br>○ Jeremy Levin, President & CEO<br>Allergan<br>○ Andrew Boyer, EVP, Commercial Operations<br>○ Sigurdur Olafsson, Chief Executive Officer<br>○ Michael Reed, Executive Director, Trade Relations<br>○ Paul Reed, Senior Director, Trade Sales and Operations<br>○ John Shane, Director, Trade Relations<br>○ Allan Slavsky, Sales Consultant<br>○ Michael Perfetto, Chief Commercial Officer, Generic RX/OTC, US and Canada<br>○ Paul Bisaro, President and Chief Executive Officer<br>○ Robert Stewart, EVP, Global Operations<br>Par<br>○ Paul Campanelli, President & CEO (Endo)<br>○ Michael Altamuro, Commercial Operations & Marketing<br>○ Renee Kenney, Senior Advisor, Generic Sales<br>○ Thomas Haughey, President<br>Sandoz<br>○ Don DeGolyer, Chief Executive Officer |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | and Board Director<br>○ Jeff George, Division Head and CEO<br>○ Armando Kellum, VP, Sales & Marketing |
| HDMA 2012 Business and Leadership Conference<br>June 13, 2012<br>San Antonio, TX | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Sandoz<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ Fougera<br>○ Heritage<br>○ Lannett<br>○ Mylan/UDL<br>○ Sun<br>○ Valeant<br>○ West-Ward<br>○ Zydus | **Teva**<br>○ Theresa Coward, Senior Director of National Sales<br>○ Kevin Green, National Account Manager<br>○ Jessica Peters, National Account Manager<br>○ David Rekenthaler, Director, National Accounts<br>○ Teri Mauro Sherman, Director, National Accounts<br>Allergan<br>○ Andrew Boyer, EVP, Commercial Operations<br>○ Richard Rogerson, Director, Pricing<br>○ Allan Slavsky, VP, Sales<br>○ Michael Baker, Executive VP, Trade Sales and Development<br>○ John Shane, Director, Trade Relations<br>○ Jack Ericsson, Senior Regional Manager<br>○ Michael Reed, Director, National Trade Accounts<br>○ Paul Reed, Senior Director, Trade Sales<br>○ Carrie Wetzel, National Account Manager<br>Par<br>○ Sandra Bayer, National Accounts Manager<br>Sandoz<br>○ Steven Greenstein, Director, National Accounts<br>○ Paul Krauthauser, Director, National Accounts<br>○ Della Lubke, Director, National Accounts<br>○ Christopher Neurohr, Director, National Accounts |
| NACDS 2012 Pharmacy and Technology Conference<br>August 25-28, 2012<br>Denver, CO | ○ **Teva**<br>○ Allergan<br>○ Par<br>○ Sandoz<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Mylan<br>○ Perrigo<br>○ Sun<br>○ Taro<br>○ West-Ward<br>○ Zydus | **Teva**<br>○ Theresa Coward, Senior Director Sales & Trade Relations<br>○ Maureen Cavanaugh, Chief Operating Officer, North America Generics<br>○ Christine Baeder, SVP, Customer and Marketing Operations<br>○ Kevin Galownia, Senior Director, Pricing<br>○ Scott Goldy, National Accounts<br>○ Kevin Green, Associate VP, National Accounts<br>○ Teri Moura Sherman, Director, National Accounts<br>○ Jessica Peters, Director, Trade Operations<br>○ Dave Rekenthaler, VP Sales<br>Allergan<br>○ Andrew Boyer, EVP, Commercial Operations<br>○ Allan Slavsky, VP, Sales<br>○ Michael Perfetto, Chief Commercial Officer, Generic RX/OTC, US and Canada<br>○ Napoleon Clark, VP, Marketing<br>○ Anthony Giannone, Executive Director, Sales<br>○ David Schmidt, Director, National |

B-4

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | Accounts<br>○ Michael Baker, Executive VP, Trade Sales and Development<br>○ Ara Aprahamian, VP, Sales & Marketing<br>○ Steve Cohen, VP, National Accounts<br>○ Michael Dorsey, Director, National Accounts<br>○ Jinping McCormick, VP, Rx Sales & Marketing, US Generics<br>Par<br>○ Paul Campanelli, President & CEO<br>○ Michael Altamuro, Commercial Operations & Marketing<br>○ Renee Kenney, Senior Advisor, Generic Sales<br>○ Jon Holden, VP, Sales<br>○ Karen O'Connor, VP, National Accounts<br>Sandoz<br>○ Armando Kellum, VP, Sales & Marketing<br>○ Steven Greenstein, Director, Key Customers<br>○ Della Lubke, Director, National Accounts<br>○ Chris Neurohr, Director, National Accounts |
| GPhA 2012 Technical Conference<br>October 1-3, 2012<br>Bethesda North Marriott Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Allan Oberman, President<br>○ Debbie Jaskot, VP, US Generic Regulatory Affairs & North American Policy<br>○ Jonathan Kafer, VP Sales & Marketing<br>Allergan<br>○ Joyce DelGaudio, Executive Director, Regulatory Affairs<br>Apotex<br>○ Bruce Clark, Senior VP, Scientific & Regulatory Affairs<br>Dr. Reddy's<br>○ Nick Cappuccino, Vice President and Head of Global Quality<br>Impax<br>○ Marcy Macdonald, VP, Regulatory Affairs<br>Mylan<br>○ Marcie McClintic, VP & General Counsel<br>Perrigo<br>○ Richard Stec, VP, Global Regulatory Affairs<br>Sandoz<br>○ Don DeGolyer, President |
| NACDS 2013 Regional Chain Conference<br>February 3-5, 2013<br>Harbor Beach Marriott Resort & Spa, Fort Lauderdale, FL | ○ **Teva**<br>○ Allergan | **Teva**<br>○ Theresa Coward, Senior Director Sales and Trade Relations<br>Allergan<br>○ Michael Baker, Executive VP, Trade and Sales Department<br>○ Paul Reed, Senior Director, Trade Sales and Development |
| GPhA 2013 Annual Meeting<br>February 20-22, 2013<br>JW Marriott Orlando Grande Lakes, Orlando, FL | ○ **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Aurobindo | **Teva**<br>○ Allan Oberman, President & CEO<br>Allergan<br>○ Sigurdur Olafsson, President<br>Mylan<br>○ Tony Mauro, President |

B-5

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Breckenridge<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Wockhardt<br>○ Zydus | Sandoz<br>   ○ Donald DeGolyer, President |
| ECRM Annual Retail Pharmacy<br>Efficient Program Planning Session<br>February 24-27, 2013<br>Sheraton Dallas Hotel, Dallas, TX | **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Ascend<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Epic<br>○ Fougera<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lupin<br>○ Par/Endo<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | |
| 2013 NACDS Annual Meeting<br>April 20-23, 2013<br>Palm Beach, FL | **Teva**<br>○ Allergan<br>○ Mylan<br>○ Par<br>○ Taro<br>○ Upsher-Smith<br>○ Apotex<br>○ Aurobindo<br>○ Dr. Reddy's<br>○ G&W Laboratories<br>○ Glenmark<br>○ Impax<br>○ Lupin<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Valeant<br>○ Wockhardt<br>○ Zydus | **Teva**<br>   ○ Jeremy Levin, President and CEO<br>   ○ Allan Oberman, President and CEO, Teva Americas Generics<br>   ○ Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics<br>   ○ Theresa Coward, Sr. Director Sales and Trade Relations<br>   ○ Michael Sine, Director, Corporate Account Group<br>   ○ Jonathan Kafer, Executive VP, Sales and Marketing<br>   ○ David Marshall, VP of Operations<br>   ○ Dave Rekenthaler, VP of Sales<br>Allergan<br>   ○ Paul Bisaro, Board Member<br>   ○ Sigurdur Olafsson, President, Global Generics<br>   ○ Andrew Boyer, President and CEO of North America Generics<br>   ○ Michael Reed, Executive Director of Trade Relations |

B-6

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Michael Baker, Executive VP of Trade Sales and Development<br>○ Paul Reed, Sr. Director of Trade Sales and Development<br>○ Robert Stewart, Chief Operating Officer<br>○ John Shane, Director, Trade Relations<br>○ Alan Slavsky, Sales Consultant<br>Lupin<br>○ Dave Berthold, SVP, Generics<br>○ Vinita Gupta, CEO<br>○ Robert Hoffman, EVP, U.S. Generics<br>○ Paul McGarty, President<br>Mylan<br>○ Joe Duda, President<br>○ Tony Mauro, Chief Commercial Officer<br>○ Robert Potter, Sr. VP of North America National Accounts and Channel Development<br>○ Jeffrey May, VP of North America Product Strategy<br>○ Jim Nesta, VP of Sales<br>Par<br>○ Paul Campanelli, President<br>○ Jon Holden, VP of Sales<br>○ Michael Altamuro, VP of Marketing and Business Analytics<br>○ Renee Kenney, Sr. Advisor for Generic Sales<br>Taro<br>○ Jim Kedrowski, Interim CEO<br>○ Ara Aprahamian, VP Sales and Marketing<br>○ Michael Perfetto, Chief Commercial Officer, Generic RX/OTC, US and Canada<br>○ Carlton Holmes, VP Marketing<br>○ Elizabeth Ivey, VP, Sales and Marketing<br>Upsher-Smith<br>○ Mark Evenstad, CEO<br>○ Thomas Burke, Chief Operating Officer<br>○ Brad Leonard, Sr. Director of National Accounts<br>○ Scott Hussey, Sr. VP of Sales<br>○ Jim Maahs, VP of Commercial Portfolio Management<br>○ Mike McBride, VP of Partner Relations |
| HDMA 2013 Business and Leadership Conference<br>June 2-5, 2013<br>Orlando, FL | ○ **Teva**<br>○ Allergan<br>○ Akron/Hi-Tech<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Sandoz | Teva<br>○ Theresa Coward, Senior Director, National Sales<br>○ Jessica Peters, National Accounts Manager<br>○ Teri Sherman, National Accounts Director<br>○ Christine Baeder, Senior Director, Customer Operations<br>Allergan<br>○ Andrew Boyer, President and CEO of North America Generics<br>○ Marc Falkin, VP of Purchasing<br>○ Maureen Barrett, Director of National Accounts<br>○ Anthony Giannone, National Accounts Director |

B-7

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Sun<br>○ Valeant<br>○ West-Ward<br>○ Zydus | Lupin<br>  ○ Dave Berthold, VP, Sales, U.S. Generics<br>  ○ David Shirkey, National Accounts Manager<br>  ○ Lauren Walten, National Account Manager |
| GPhA 2013 CMC Conference<br>June 4-5, 2013<br>Bethesda North Marriott Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Morton Grove<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Zydus | Apotex<br>  ○ Kiran Krishnan, VP, Regulatory Affairs<br>Dr. Reddy's<br>  ○ Nick Cappuccino, Vice President and Head of Global Quality<br>Impax<br>  ○ Marcy Macdonald, VP, Regulatory Affairs<br>Perrigo<br>  ○ Richard Stec, VP, Global Regulatory Affairs<br>Sandoz<br>  ○ Alison Sherwood, Associate Director, Regulatory Affairs |
| 2013 NACDS Total Store Expo<br>August 10-13, 2013<br>Sands Expo Convention Center, Las Vegas, NV | ○ **Teva**<br>○ Allergan<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith<br>○ Akorn/High-Tech<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ Fougera<br>○ G&W Laboratories<br>○ Glenmark<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Valeant<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>  ○ Theresa Coward, Senior Director of Sales<br>  ○ David Rekenthaler, VP, Sales<br>  ○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, N.A. Generics<br>  ○ Kevin Galownia, Head of Marketing Operations<br>  ○ Jessica Peters, Manager of Corporate Accounts<br>  ○ Allan Oberman, President and CEO, Teva Americas Generics<br>  ○ Scott Goldy, Director, National Accounts<br>  ○ Christine Baeder, Senior VP, Customer and Marketing Operations<br>  ○ Kevin Green, Associate VP, National Accounts<br>  ○ Jonathan Kafer, Executive VP, Sales and Marketing<br>  ○ Teri Sherman, Director, National Accounts<br>Allergan<br>  ○ Andrew Boyer, Senior VP (Generic Sales, Marketing, National Accounts)<br>  ○ Marc Falkin, VP (Marketing, Pricing and Contracts)<br>  ○ Michael Baker, Executive VP, Trade and Sales Department<br>  ○ Napoleon Clark, VP of Marketing<br>  ○ Michael Dorsey, Director of National Accounts<br>  ○ Anthony Giannone, National Accounts Director<br>  ○ Richard Rogerson, Senior Director, New Products<br>  ○ Allan Slavsky, Sales Consultant |

B-8

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | Breckenridge<br> ○ Larry Lapila, President<br>Heritage<br> ○ Matthew Edelson, Senior Director of Sales<br> ○ Jeffrey A. Glazer (then CEO and Chairman)<br> ○ Jason T. Malek (then Senior VP, Commercial Operations, and subsequently President)<br> ○ Gina Gramuglia, Commercial Operations<br> ○ Neal O'Mara, Senior Director, National Accounts<br> ○ Anne Sather, Senior Director, National Accounts<br>Lupin<br> ○ Dave Berthold, SVP, Generics<br> ○ Robert Hoffman, EVP, U.S. Generics<br> ○ Paul McGarty, President<br> ○ Steve Randazzo, SVP<br> ○ David Shirkey, National Account Manager<br> ○ Lauren Walten, National Account Manager<br>Mylan<br> ○ Mike Aigner, Director, National Accounts<br> ○ Kevin McElfresh, Executive Director, National Accounts<br> ○ Joe Duda, President<br> ○ Robert Potter, Senior VP North America National Accounts<br> ○ Rob O'Neill, Head of Sales<br> ○ Lance Wyatt, Director, National Accounts<br> ○ James Nesta, VP of Sales<br>Par<br> ○ Jon Holden, VP of Sales<br> ○ Renee Kenney, Senior Advisor Generic Sales<br> ○ Karen O'Connor, VP National Accounts<br> ○ Lori Minnihan, Manager, Pricing & Analytics<br> ○ Warren Pefley, Director, National Accounts<br> ○ Charles "Trey" Propst, VP, National Accounts<br> ○ Michael Reiney, VP, Sales<br> ○ Jeremy Tatum, Demand Manager<br>Taro<br> ○ Ara Aprahamian, Vice President, Sales and Marketing<br> ○ Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic Rx Business<br> ○ Howard Marcus, Vice President Sales and Marketing<br> ○ Doug Statler, Senior Director, Head of Sales<br> ○ Elizabeth Guerrero, Director, Corporate Accounts, Managed Care<br> ○ Carlton Holmes, Vice President, Marketing<br>Upsher-Smith<br> ○ Scott Hussey, Senior VP, Sales |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Brad Leonard, Senior Director, National Accounts<br>○ Michael Muzetras, Sr. National Accounts Manager<br>○ Beth Pannier, Senior National Accounts Manager<br>○ Mary Rotunno, National Accounts Manager |
| GPhA 2013 Fall Technical Conference<br>October 28-30, 2013<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | Apotex<br>  ○ Kiran Krishnan VP, Regulatory Affairs<br>Dr. Reddy's<br>  ○ Nick Cappuccino, Vice President and Head of Global Quality<br>Impax<br>  ○ Marcy Macdonald, VP, Regulatory Affairs<br>Mylan<br>  ○ Dan Snider, VP, Morgantown RD<br>  ○ Marcie McClintic, VP & Chief of Staff<br>  ○ Carmen Shepard, Senior VP, Global Policy & Regulatory<br>Perrigo<br>  ○ Richard Stec, VP, Global Regulatory Affairs |
| 2013 NACDS NYC Week Annual Foundation Dinner<br>December 1-3, 2013<br>New York, NY | ○ **Teva**<br>○ Allergan<br>○ Mylan<br>○ Upsher-Smith<br>○ Apotex<br>○ Perrigo<br>○ Sandoz | **Teva**<br>  ○ Theresa Coward, Senior Director of Sales<br>  ○ David Rekenthaler, VP, Sales<br>  ○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, N.A. Generics<br>  ○ David Marshall, VP of Operations<br>Allergan<br>  ○ Andrew Boyer, Senior VP (Generic Sales, Marketing, National Accounts)<br>  ○ Marc Falkin, VP (Marketing, Pricing and Contracts)<br>  ○ Anthony Giannone, Executive Director, Sales<br>  ○ Paul Reed, Senior Director, Trade Sales and Development<br>  ○ Michael Reed, Executive Director, Trade Relations<br>  ○ John Shane, Director, Trade Relations<br>Mylan<br>  ○ Joe Duda, President<br>  ○ Tony Mauro, COO<br>  ○ Robert Potter, Senior VP, North America National Accounts<br>  ○ Rob O'Neill, Head of Sales<br>Upsher-Smith<br>  ○ Scott Hussey, Senior VP, Sales |

B-10

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Jim Maahs, VP, Commercial Portfolio Management<br>○ Mike McBride, VP, Partner Relations |
| GPhA 2014 Annual Meeting<br>February 19-21, 2014<br>JW Marriott Orlando Grande Lakes, Orlando, FL | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Epic<br>○ Heritage<br>○ Akron/Hi-Tech<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Allan Oberman, President & CEO<br>Apotex<br>○ Jeff Watson, President<br>Mylan<br>○ Marcie McClintic Coates, VP & Head of Global Regulatory Affairs<br>○ Andrea Miller, Senior VP, Head of Global Complex Products Operations<br>○ Tony Mauro, President<br>Sandoz<br>○ Carlos Sattler, M.D., VP, Clinical Development & Medical Affairs |
| HDMA Sixth Annual CEO Roundtable Fundraiser<br>April 1, 2014<br>New York, NY | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Upsher-Smith | **Teva**<br>○ Maureen Cavanaugh, Senior VP, Sales and Marketing<br>○ Christopher Doerr, Director, Trade Operations<br>○ David Rekenthaler, Generic Sales<br>Allergan<br>○ Andrew Boyer, Senior VP, US Generics Sales and Marketing<br>○ Napoleon Clark, Executive Director, US Generics Marketing<br>○ Marc Falkin, VP, Marketing, Pricing, and Contracts<br>○ Anthony Giannone, Executive Director, Sales<br>○ Rick Rogerson, Director, Pricing<br>Mylan<br>○ Anthony Mauro, Senior Vice President, and President of North America<br>○ James Nesta, Vice President of Sales<br>○ Robert Potter, Senior Vice President, North America National Accounts and Channel Development<br>Aurobindo<br>○ Robert Cunard, CEO<br>○ Paul McMahon, Senior Director Commercial Operations |
| 2014 NACDS Annual Meeting<br>April 26-29, 2014<br>The Phoenician Resort, Scottsdale, AZ | ○ **Teva**<br>○ Allergan<br>○ Aurobindo<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Sandoz | **Teva**<br>○ Theresa Coward, Senior Director of Sales<br>○ David Rekenthaler, Vice President, Sales<br>○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, N.A. Generics<br>○ Allan Oberman, President and CEO, Teva Americas Generics<br>○ Christine Baeder, Senior Director, |

4828-1671-4429.v2

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Taro<br>○ Upsher-Smith<br>○ Apotex<br>○ Citron<br>○ Dr. Reddy's<br>○ G&W Laboratories<br>○ Glenmark<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Perrigo<br>○ Sun<br>○ Valeant<br>○ Wockhardt<br>○ Zydus | Customer Operations<br>Allergan<br>  ○ Andrew Boyer, Senior VP (Generic Sales, Marketing, National Accounts)<br>  ○ Marc Falkin, VP (Marketing, Pricing and Contracts)<br>  ○ Sigurdur Olafsson, President<br>  ○ Robert Stewart, Chief Operating Officer<br>  ○ Paul Bisaro, Board Member<br>Aurobindo<br>  ○ Robert Cunard, CEO<br>  ○ Paul McMahon, Senior Director, Commercial Operations<br>Breckenridge<br>  ○ Larry Lapila, President<br>  ○ Brian Guy, VP, Business Development<br>  ○ Martin Schatz, Senior VP, Sales<br>Heritage<br>  ○ Jeffrey Glazer (then CEO and Chairman)<br>Mylan<br>  ○ Joe Duda, President<br>  ○ Tony Mauro, President<br>  ○ James Nesta, Vice President of Sales<br>  ○ Hal Korman, Executive Vice President and Chief Operating Officer<br>  ○ Robert Potter, Senior VP, North America National Accounts and Channel Development<br>  ○ Rob O'Neill, Head of Sales<br>Par<br>  ○ Jon Holden, VP of Sales<br>  ○ Paul Campanelli, President<br>  ○ Renee Kenney, Senior Advisor, Generic Sales<br>Sandoz<br>  ○ Peter Goldschmidt, President Sandoz, US and Head, North America<br>  ○ Steven Greenstein, Director, Key Customers<br>  ○ Anuj Hasija, Executive Director, Key Customers<br>  ○ Armando Kellum, VP, Sales and Marketing<br>Taro<br>  ○ Ara Aprahamian, VP, Sales and Marketing<br>  ○ Michael Perfetto, Chief Commercial Officer, Generic RX, OTC, US and Canada<br>  ○ Alex Likvornik, Senior Director, Strategic Pricing and Marketing<br>  ○ Elizabeth Ivey, VP, Sales and Marketing<br>Upsher-Smith<br>  ○ Scott Hussey, Senior VP, Sales<br>  ○ Brad Leonard, Senior Director, National Accounts<br>  ○ Jim Maahs, VP, Commercial Portfolio Management<br>  ○ Mark Evenstad, CEO<br>  ○ Rusty Field, President |

B-12

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| 2014 MMCAP National Member Conference<br>May 12-15, 2014<br>Bloomington, MN | ○ **Teva**<br>○ Allergan<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Upsher-Smith<br>○ Apotex<br>○ Aurobindo<br>○ Lannett<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ West-Ward | **Teva**<br>  ○ Nick Gerebi, National Account Manager<br>Allergan<br>  ○ Mark Blitman, Executive Director of Sales for Government Markets<br>Breckenridge<br>  ○ Scott Cohon, National Accounts Director<br>Heritage<br>  ○ Anne Sather, Director, National Accounts<br>Mylan<br>  ○ Jan Bell, Director, National Accounts<br>Upsher-Smith<br>  ○ Michelle Brassington, Regional Account Manager |
| 2014 HDMA Business and Leadership Conference<br>June 1-4, 2014<br>JW Marriott Desert Ridge, Phoenix, AZ | ○ **Teva**<br>○ Allergan<br>○ Heritage<br>○ Sandoz<br>○ Taro<br>○ Mylan<br>○ Upsher-Smith<br>○ Akorn/Hi-Tech<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Par<br>○ Sun<br>○ Valeant<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>  ○ Theresa Coward, Senior Director, National Sales<br>  ○ Jessica Peters, Director, National Accounts<br>  ○ Teri Sherman, National Accounts Director<br>  ○ Cassie Dunrud, Associate Director<br>  ○ David Rekenthaler, VP, Sales, US Generics<br>  ○ Nisha Patel, Director<br>  ○ Nick Gerebi, Director, National Accounts<br>Allergan<br>  ○ Marc Falkin, VP of Purchasing<br>  ○ Anthony Giannone, National Accounts Director<br>  ○ Andrew Boyer, Senior VP, Generic Sales and Marketing<br>  ○ Richard Rogerson, Executive Director Pricing and Business Analytics<br>Heritage<br>  ○ Anne Sather, National Accounts Manager<br>  ○ Neal O'Mara, National Accounts Manager<br>  ○ Jeffrey Glazer, Chairman and CEO<br>  ○ Jason Malek, Senior VP, Commercial Operations<br>  ○ Matthew Edelson, Associate Director, National Accounts<br>Sandoz<br>  ○ Lisa Badura, Director, National Accounts Sales<br>  ○ Anuj Hasija, Key Account Executive Director<br>  ○ Della Lubke, Director, National Accounts<br>  ○ David Picard, VP, Generic Sales<br>  ○ Christopher Bihari, Director, National Sales<br>  ○ Steve Greenstein, Director, National Accounts<br>Taro<br>  ○ Anand Shah, Associate Director, Sales Operations<br>Mylan<br>  ○ Lance Wyatt, Director, National Accounts<br>  ○ Richard Isaac, Senior Manager, Strategic Accounts<br>  ○ James Nesta, VP of Sales<br>  ○ Michael Aigner, Director, National |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | Accounts<br><br>Upsher-Smith<br>○ JoAnn Gaio, Sr. National Account Manager, Trade<br>○ Scott Hussey, Senior VP, Global Sales<br>○ Jim Maahs, Sr. Director<br>○ Michael McBride, Associate VP, Partner Relations<br>○ Mike Muzetras, Senior National Accounts Manager<br>○ Doug Zitnak, National Accounts Senior Director – Trade |
| GPhA 2014 CMC Conference<br>June 3-4, 2014<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Akorn/Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Morton Grove<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ Zydus | **Teva**<br>○ Scott Tomsky, Generic Regulatory Affairs, North America<br>○ Siva Vaithiyalingam, Director, Regulatory Affairs<br><br>Apotex<br>○ Pradeep Sanghvi, Executive VP, Global R&D<br>○ Kiran Krishnan, VP, Regulatory Affairs<br>○ Chetan Doshi, Director of Formulation Development – Solid Dose<br><br>Impax<br>○ Marcy Macdonald, VP, Regulatory Affairs<br><br>Mylan<br>○ Dan Snider, VP, Morgantown RD<br><br>Perrigo<br>○ Richard Stec, VP, Global Regulatory Affairs |
| 2014 NACDS Total Store Expo<br>August 23-26, 2014<br>Boston Convention Center, Boston, MA | ○ **Teva**<br>○ Allergan<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith<br>○ Akorn/Hi-Tech<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Epic<br>○ G&W Laboratories<br>○ Glenmark<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mayne<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Valeant<br>○ West-Ward | **Teva**<br>○ David Rekenthaler, VP, Sales<br>○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, N.A. Generics<br>○ Kevin Galownia, Head of Marketing Operations<br>○ Jessica Peters, Manager of Corporate Accounts<br>○ Nisha Patel, Director of National Accounts<br>○ Theresa Coward, Senior Director Sales and Trade Relations<br>○ Cassie Dunrud, Associate Director, National Accounts<br>○ Christine Baeder, Senior VP, Customer and Marketing Operations<br><br>Allergan<br>○ Andrew Boyer, Senior VP (Generic Sales, Marketing, National Accounts)<br>○ Marc Falkin, VP (Marketing, Pricing and Contracts)<br>○ Richard Rogerson, Executive Director (Pricing & Business Analytics)<br>○ David Buchen, Executive VP, Commercial, North America Generics and International<br>○ Napoleon Clark, VP of Marketing<br>○ Michael Dorsey, Director of National |

B-14

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Wockhardt<br>○ Zydus |     Accounts<br>○ Paul Reed, Senior Director, Trade Sales and Development<br>○ Anthony Giannone, Executive Director, Sales<br>○ Michael Reed, Executive Director, Trade Relations<br>○ Allan Slavsky, Sales Consultant<br>Akorn/Hi-Tech<br>○ Ed Berrios, VP, Sales and Marketing – Hi-Tech Pharmacal Co., Inc.<br>○ Michael Corley, VP, National Accounts<br>○ Thomas Kronovich, VP, National Accounts<br>○ Bruce Kutinsky, Chief Operating Officer<br>○ Mick McCanna, Executive Director of National Accounts<br>○ Raj Rai, Chief Executive Officer<br>○ John Sabat, Senior VP of National Accounts<br>○ M. Tranter, National Accounts Manager, Sales & Marketing<br>Breckenridge<br>○ Larry Lapila, President<br>○ Martin Schatz, Senior VP, Sales<br>Dr. Reddy's<br>○ Victor Borelli, VP and Head, National Accounts, North America Generics<br>○ Jinping McCormick, VP, Rx Marketing, US Generics<br>○ Nimish Muzumdar, Director of Marketing<br>○ Jake Austin, Director, National Accounts<br>Heritage<br>○ Heather Beem, National Account Manager, Institutional<br>○ Katie Brodowski, Associate Director, Institutional Sales<br>○ Matthew Edelson, Senior Director of Sales<br>○ Jeffrey A. Glazer (then CEO and Chairman)<br>○ Jason T. Malek, SVP (then Senior VP, Commercial Operations, and subsequently President)<br>○ Gina Gramuglia, Commercial Operations<br>○ Neal O'Mara, Senior Director, National Accounts<br>○ Anne Sather, Senior Director, National Accounts<br>Mylan<br>○ Joe Duda, President<br>○ Robert Potter, Senior VP, North America National Accounts and Channel Manager<br>○ Kevin McElfresh, Executive Director, National Accounts<br>○ Michael Aigner, Director, National Accounts<br>○ Gary Tighe, National Accounts Director<br>○ Lance Wyatt, National Accounts Director<br>○ James Nesta, VP, Sales<br>Par |

<div align="center">B-15</div>

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Jon Holden, VP of Sales <br> ○ Renee Kenney, Senior Advisor, Generic Sales <br> ○ Lori Minnihan, Manager, Pricing & Analytics <br> ○ Warren Pefley, Director, National Accounts <br> ○ Charles "Trey" Propst, VP, National Accounts <br> ○ Michael Reiney, VP, Sales <br> ○ Jeremy Tatum, Demand Manager <br> Sandoz <br> ○ Lisa Badura, Director, Key Customers <br> ○ Christopher Bihari, Director, Key Customers <br> ○ Steven Greenstein, Director, Key Customers <br> ○ Anuj Hasija, Executive Director, Key Customers <br> ○ Armando Kellum, VP, Sales and Marketing <br> ○ Della Lubke, National Account Executive <br> ○ Scott Smith, VP, Sales and Marketing <br> ○ Arunesh Verma, Executive Director, Marketing <br> ○ Sean Walsh, Director, Key Customers <br> Taro <br> ○ Ara Aprahamian, VP, Sales and Marketing <br> ○ Scott Brick, Manager, National Accounts <br> ○ Kevin Kriel, Executive Director, Marketing and Business Development, US and Canada <br> ○ Christopher Urbanski, Director, Corporate Accounts <br> ○ Alex Likvornik, Senior Director, Strategic Pricing and Marketing <br> ○ Michael Perfetto, Chief Commercial Officer, Generic RX/OTC <br> Upsher-Smith <br> ○ Scott Hussey, Senior VP, Sales <br> ○ Brad Leonard, Senior Director, National Accounts <br> ○ Jim Maahs, VP, Commercial Portfolio Management <br> Zydus <br> ○ Scott Goldy, Director, National Accounts <br> ○ Kevin Green, Associate VP, National Accounts <br> ○ Michael Keenley, President <br> ○ Ganesh Nayak, Chief Operating Officer and Executive Director <br> ○ Elizabeth Purcell, Senior Director, Marketing and Portfolio Management <br> ○ Kristy Ronco, VP, Sales |
| 2014 HCSCA LogiPharma Supply Chain Conference <br> September 16-18, 2014 <br> Princeton, NJ | ○ **Teva** <br> ○ Allergan | |

B-16

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| HDMA 2014 Annual Board and Membership Meeting<br>September 27, 2014-October 1, 2014<br>Laguna Beach, CA | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Mylan<br>○ Zydus | **Teva**<br>  ○ Maureen Cavanaugh, Chief Operating Officer, Teva US Generics<br>  ○ Christopher Doerr, Director, Trade Operations<br>  ○ David Rekenthaler, VP Sales, US Generics<br>○ Christine Baeder, Senior Director, Customer Operations<br>Allergan<br>  ○ Marc Falkin, VP, Marketing, Pricing and Contracts<br>  ○ Andrew Boyer, Senior VP, Generic Sales and Marketing |
| GPhA 2014 Fall Technical Conference<br>October 27-29, 2014<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ UDL (Mylan Institutional)<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>  ○ Scott Tomsky, Generic Regulatory Affairs, North America<br>Allergan<br>  ○ Michael Kimball, Executive Director, Transdermal Development<br>Apotex<br>  ○ Kiran Krishnan, VP, Regulatory Affairs<br>Impax<br>  ○ Marcy Macdonald, VP, Regulatory Affairs<br>Mylan<br>  ○ Marcie McClintic Coates, VP & Head of Global Regulatory Affairs<br>Perrigo<br>  ○ Richard Stec, VP, Global Regulatory Affairs |
| 2014 IGPA Annual Conference<br>November 19-21, 2014<br>Ritz-Carlton, Key Biscayne, Miami, FL | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Dr. Reddy's<br>○ Mylan<br>○ Sandoz | Teva<br>  ○ Allan Oberman, President and CEO, Teva Americas Generics<br>  ○ Yehudah Livneh, Ph.D., VP, Global Public Policy, Asia and EMIA<br>Allergan<br>  ○ David Buchen, Executive VP, Commercial North American Generics and International<br>  ○ Shawn Brown, Esq., VP, International Government Affairs<br>Apotex<br>  ○ Jeremy Desai, Ph.D., President & CEO<br>Dr. Reddy's<br>  ○ Nicholas Cappuccino, Jr., Ph.D., Vice President and Head of Global Quality<br>Mylan<br>  ○ Rajiv Malik, President<br>  ○ Nawel Bailey Rojkjaer, Senior Director, International Affairs, Office of Global Policy<br>Sandoz |

B-17

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Peter Goldschmidt, President of Sandoz US and Head of North America<br>○ Nick Haggar, Head of Western Europe, Middle East & Africa |
| 2014 NACDS NYC Week Annual Foundation Dinner<br>December 3, 2014<br>New York, NY | ○ **Teva**<br>○ Allergan<br>○ Mylan<br>○ Apotex<br>○ Perrigo<br>○ Sandoz<br>○ Valeant<br>○ Upsher-Smith | **Teva**<br>○ Theresa Coward, Senior Director of Sales<br>○ David Rekenthaler, VP, Sales<br>○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, N.A. Generics<br>○ Jessica Peters, Director, National Accounts<br>○ Christine Baeder, Senior Director, Customer Operations<br>Allergan<br>○ Andrew Boyer, Senior VP (Generic Sales, Marketing, National Accounts)<br>○ Marc Falkin, VP (Marketing, Pricing and Contracts)<br>○ Brent Saunders, President, CEO and Chairman<br>Mylan<br>○ Mike Aigner, Director, National Accounts<br>○ Robert Potter, Senior VP, North America National Accounts and Channel Development<br>○ Tony Mauro, COO |
| GPhA 2015 Annual Meeting<br>February 9-11, 2015<br>Fontainebleau Miami Beach, Miami, FL | ○ **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Epic<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Sigurdur Olafsson, President & Chief Executive Officer, Global Generic Medicines Group<br>○ Brian Rubenstein, Executive Counsel<br>Apotex<br>○ Jeff Watson, President<br>Mylan<br>○ Rajiv Malik, President<br>○ Deborah Autor, Senior VP, Strategic Global Quality & Regulatory Policy<br>Perrigo<br>○ Joseph Papa, President, Chief Executive Officer & Chairman |
| 2015 HCSCA National Pharmacy Forum<br>February 16-18, 2015<br>Tampa, FL | ○ **Teva**<br>○ Allergan<br>○ Breckenridge<br>○ Mylan<br>○ Taro<br>○ West-Ward | **Teva**<br>○ Nick Gerebi, Director of National Accounts<br>○ Jeff McClard, Sr. Director of National Accounts<br>○ Cam Bivens, Director of National Accounts<br>○ Brad Bradford, Director of National Accounts<br>Allergan<br>○ John Fallon, Executive Director of Sales<br>Breckenridge<br>○ David Giering, Marketing and Trade Relations Manager |

B-18

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | Mylan<br> ○ Lee Rosencrance, District Manager<br> ○ Martin Wingerter, Director of National Accounts<br> ○ Jan Bell, Director of National Accounts<br> ○ Heather Paton, VP of Institutional Sales<br> ○ Mark Pittenger, Sr. Director of National Accounts |
| ECRM's Annual Retail Pharmacy Efficient Program Planning Session<br>February 22-25, 2015 | ○ **Teva**<br>○ Allergan<br>○ Akorn<br>○ Apotex<br>○ Ascend<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ Epic<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mayne<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Teligent<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | |
| HDMA 2015 Annual CEO Roundtable Fundraiser<br>April 14, 2015<br>New York, NY | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Dr. Reddy's<br>○ Mylan<br>○ Par<br>○ Sandoz<br>○ Sun<br>○ Zydus | **Teva**<br> ○ Christine Baeder, VP, Customer Operations<br> ○ Maureen Cavanaugh, Chief Operating Officer<br>Allergan<br> ○ Andrew Boyer, Senior VP, Generic Sales, Marketing, National Accounts<br> ○ Marc Falkin, VP, Marketing, Pricing and Contracts<br> ○ Anthony Giannone, Executive Director, Sales |
| 2015 NACDS Annual Meeting<br>April 25-28, 2015<br>The Breakers Resort, Palm Beach, FL | ○ **Allergan**<br>○ Teva<br>○ Breckenridge<br>○ Mylan<br>○ Par<br>○ Upsher-Smith<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ G&W Laboratories<br>○ Glenmark<br>○ Impax<br>○ Perrigo<br>○ Sandoz<br>○ Sun | **Teva**<br> ○ Christine Baeder, Senior VP, Customer and Marketing Operations<br> ○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, North America Generics<br> ○ Theresa Coward, Senior Director Sales and Trade Relations<br>Allergan<br> ○ Andrew Boyer, Senior VP, Generic Sales, Marketing, National Accounts<br> ○ Marc Falkin, VP, Marketing, Pricing and Contracts<br> ○ Robert Stewart, Chief Operating Officer<br> ○ Paul Bisaro, Board Member<br>Mylan<br> ○ Robert Potter, Senior VP, National Accounts and Channel Development |

B-19

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Taro<br>○ Valeant<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | ○ Rob O'Neill, Head of Sales<br>○ Anthony Mauro, Chief Commercial Officer<br>○ Robert Tighe, National Accounts Director<br>○ James Nesta, VP, Sales |
| 2015 HDMA Business & Leadership Conference<br>June 7-10, 2015<br>JW Marriott San Antonio Hill Country, San Antonio, TX | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Sandoz<br>○ Sun<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Christine Bader, VP, Commercial Operations<br>○ Brad Bradford, Director, National Accounts<br>○ Theresa Coward, Senior Director of National Sales<br>○ Christopher Doerr, Senior Director, Trade Operations<br>○ Cassie Dunrud, Associate Director<br>○ Nick Gerebi, Director, National Accounts<br>○ Jeff Herberholt, Senior Manager, Regional Accounts<br>○ Jeff McClard, Senior Director, National Accounts<br>○ Jason Nagel, Associate Director, Trade Relations<br>○ Michelle Osmian, Director, Customer Operations<br>○ Nisha Patel, Director, National Accounts<br>○ Jessica Peters, Director, National Accounts<br>Allergan<br>○ Andrew Boyer, Sr. VP Generic Sales & Marketing<br>○ Marc Falkin, VP Marketing, Pricing & Contracts<br>○ Anthony Giannone, Executive Director, Sales<br>○ Brandon Miller, Executive Director, Trade Relations<br>○ Michael Reed, Director, National Trade Accounts<br>Apotex<br>○ Sam Boulton, Director, National Account<br>○ John Crawford, Director, National Account<br>○ Beth Hamilton, VP, Sales & Marketing<br>○ Jeff Hampton, Sr. VP, Commercial Operations<br>○ Tina Kaus, Director, National Account<br>○ Erin Organ, Director, Commercial Operations<br>○ Jim Van Lieshout, VP, Market Access & Pharmacy Strategy<br>○ Debbie Veira, Manager, National Accounts<br>Aurobindo<br>○ Julia Faria, Sr. Manager, Sales Operations & Contract Administration<br>○ Charles Rath, National Trade Relations Manager<br>Breckenridge<br>○ Scott Cohon, Director of Sales<br>○ David Giering, Manager, Marketing & Trade Relations<br>○ Philip Goldstein, Director of National |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | Accounts<br>Citron<br> ○ Susan Knoblauch, Director, National Accounts<br> ○ Laura Short, VP of Sales<br> ○ Karen Strelau, EVP of Sales & Marketing<br>Dr. Reddy's<br> ○ Jake Austin, Director, National Accounts Rx Generics<br> ○ Victor Borelli, Sr. Director, Head of National Accounts Rx Generics<br> ○ Sherice Koonce, Director, Rx Pricing<br> ○ Katherine Neely, Director, National Accounts<br> ○ Patricia Wetzel, Sr. Director, National Accounts<br>Heritage<br> ○ Matthew Edelson, Associate Director, National Accounts<br> ○ Jeff Glazer, CEO & Vice Chairman<br> ○ Jason Malek, Senior VP, Commercial Operations<br> ○ Neal O'Mara, Director, National Accounts<br> ○ Anne Sather, Director, National Accounts<br>Impax<br> ○ William Ball, Senior National Sales Manager<br> ○ Danny Darnell, Senior National Accounts Manager<br> ○ Todd Engle, VP, Sales & Marketing<br> ○ Michael Grigsby, Senior National Accounts Manager<br> ○ Italo Pennella, Trade Account Manager<br> ○ Thomas Sammler, Director, Sales Operations<br> ○ Gary Skalski, Senior Director, Sales<br>Lannett<br> ○ Kevin Smith, Sr. VP of Sales & Marketing<br> ○ Breanna Stillman, Sales Analyst<br> ○ Tracy Sullivan, Director of National Accounts<br> ○ Grace Wilks, Director of National Accounts<br>Lupin<br> ○ David Berthold, VP of Sales, US Generics<br> ○ William Chase, Director, Managed Markets & Trade (Brand)<br> ○ Jason Gensburger, Director, Financial Services<br> ○ Kevin Walker, National Account Manager<br> ○ Lauren Walten, Regional Sales Associate<br>Mylan<br> ○ Todd Bebout, VP of Sales, VP – NA Supply Chain Management<br> ○ Janet Bell, Director, National Accounts<br> ○ Richard Isaac, Senior Manager, Strategic Accounts<br> ○ Stephen Krinke, National Account Manager |

B-21

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Rob O'Neill, Head of Sales, Generic, NA<br>○ Sean Reilly, National Account Manager<br>○ Erik Williams, VP, NA Pricing<br>○ Lance Wyatt, Director, National Accounts<br>**Par**<br>○ Karen O'Connor, VP, National Accounts<br>**Sandoz**<br>○ Ken Baker, Director, Managed Markets<br>○ Christopher Bihari, Director of National Accounts (Sales)<br>○ Seth Coombs, Executive Director, Oncology Injectables<br>○ Steven Greenstein, Director of National Accounts (Sales)<br>○ Anuj Hasija, Executive Director, Key Customers<br>○ Jason Jones, Director of Key Customers<br>○ Kirko Kirkov, Executive Director, Key Customers<br>○ Marco Polizzi, Head, Institutional Sales & Marketing<br>○ Arun Varma, Executive Director, Marketing<br>○ Sean Walsh, Key Account Manager<br>**Sun**<br>○ Daniel Schober, VP, Trade Sales<br>○ Steve Smith, Sr. Director, Sales<br>**Upsher-Smith**<br>○ JoAnn Gaio, Senior National Account Manager, Trade<br>○ Scott Hussey, Senior VP, Global Sales<br>○ Brad Leonard, Senior Director, National Accounts<br>○ Michael McBride, Associate VP, Partner Relations<br>○ Mike Muzetras, Senior National Accounts Manager<br>○ David Zitnak, National Accounts Senior Director – Trade<br>○ Doug Zitnak, National Accounts Senior Director – Trade<br>**Wockhardt**<br>○ Karen Andrus, Director of Sales<br>○ Scott Koenig, VP, Retail Generics<br>**Zydus**<br>○ Maria Bianco-Falcone, Director of Offer Development & Trade Operations<br>○ Scott Goldy, Sales Director<br>○ Kevin Green, Senior Director of Sales<br>○ Maria McManus, Corporate Account Manager<br>○ Louis Pastor, Senior Director, Trade Operations<br>○ Kristy Ronco, VP, Sales<br>○ Jodi Weber, Corporate Account Manager |
| GPhA 2015 CMC Conference<br>June 9-10, 2015<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Citron | **Teva**<br>○ Scott Tomsky, Generic Regulatory Affairs, North America<br>○ Siva Vaithiyalingam, Director, Regulatory |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | ○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | Affairs<br>Allergan<br>○ Joyce Anne DelGaudio Executive Director, Regulatory Affairs<br>Apotex<br>○ Kiran Krishnan, VP, Regulatory Affairs<br>Impax<br>○ Marcy Macdonald, VP, Regulatory Affairs<br>Mylan<br>○ Bryan Winship, Senior Director, Quality Management, Strategic Global Quality & Regulatory Policy<br>○ Daniel Snider, VP, Research & Development<br>○ Timothy Ames, VP, Global Strategic Regulatory Affairs<br>○ Dawn Culp, VP, Global Regulatory Affairs Policy<br>Perrigo<br>○ Richard Stec, VP, Global Regulatory Affairs<br>Sandoz<br>○ Nicholas Tantillo, Head, Policy & Regulatory Strategy |
| 2015 NACDS Total Store Expo<br>August 22-25, 2015<br>Colorado Convention Center, Denver, CO | ○ **Teva**<br>○ Allergan<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith<br>○ Akorn<br>○ Apotex<br>○ Citron<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Lannett<br>○ Mayne<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Valeant<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, North America Generics<br>○ Kevin Galownia, Head of Marketing Operations<br>○ Jessica Peters, Manager of Corporate Accounts<br>○ Nisha Patel, Director of National Accounts<br>○ Theresa Coward, Senior Director, Sales and Trade Relations<br>○ Cassie Dunrud, Associate Director, National Accounts<br>○ Christine Baeder, Senior VP, Customer and Marketing Operations<br>Allergan<br>○ Andrew Boyer, President and CEO, North America Generics<br>○ Napoleon Clark, VP of Marketing<br>○ Michael Dorsey, Director of National Accounts<br>○ Marc Falkin, VP of Purchasing<br>○ Richard Rogerson, Senior Director, New Products, Business Analytics and Systems<br>○ Anthony Giannone, Executive Director, Sales<br>○ Allan Slavsky, Sales Consultant<br>Heritage<br>○ Jeffrey Glazer, CEO<br>○ Jason Malek, Senior VP<br>○ Gina Gramuglia, Commercial Operations<br>○ Neal O'Mara, National Accounts Manager<br>○ Anne Sather, National Accounts Manager<br>○ Ashley O'Rourke, Sales Director<br>Mylan<br>○ Anthony Mauro, President |

B-23

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES, INCLUDING: |
|---|---|---|
| | | ○ Kevin McElfresh, Executive Director, National Accounts<br>○ Robert Potter, Senior VP, National Accounts and Channel Development<br>○ Michael Aigner, Director, National Accounts<br>○ James Nesta, VP, Sales |
| GPhA 2015 Fall Technical Conference<br>November 2-4, 2015<br>Bethesda, MD | ○ **Teva**<br>○ Allergan<br>○ Apotex<br>○ Aurobindo<br>○ Citron<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Heritage<br>○ Lannett<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Westward<br>○ Zydus | |
| NACDS 2016 Annual Meeting<br>April 16-19, 2016<br>Palm Beach, FL | ○ **Teva**<br>○ Allergan<br>○ Akorn/Hi-Tech<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Christine Baeder, Senior VP, Customer and Marketing Operations<br>○ Maureen Cavanaugh, Senior VP and Chief Operating Officer, North America Generics<br>○ Sigurdur Olafsson, President<br>Allergan<br>○ Marc Falkin, Senior VP, Sales<br>○ Andrew Boyer, President North American Generics |

## APPENDIX C
## Graphs of Collusive Price Increases

a.      **Pravastatin Sodium**



b.      **Enalapril Maleate**



4828-1671-4429.v2

**c.**     **Cephalexin Oral Suspension**



**d.**     **Ketoconazole Tablets and 2% Cream**



4828-1671-4429.v2

### e.   Baclofen Tablets



*Source: Symphony Health Solutions*

### f.   0.05% Fluocinonide



*Source: Symphony Health Solutions*

### g.   Carbamazepine Tablets and Chewable Tablets



*Source: Symphony Health Solutions*

4828-1671-4429.v2

h.      **Estradiol Tablets**



i.      **Clobetasol Propionate Topical Cream**



j.      **Diclofenac Potassium Tablets**



C-4

**k.   Glyburide Micronized**



Source: Symphony Health Solutions

**l.   Desonide Topical Lotion and External Cream**




Source: Symphony Health Solutions

**m.   Doxycycline Hyclate Capsules**



Source: Symphony Health Solutions

4828-1671-4429.v2

n.    **Propranolol Hydrochloride**



o.    **Tretinoin External Cream**



p.    **Ursodiol Capsules**



**q.** **Nystatin**



**r.** **Theophylline ER**



**s.** **Propranolol Tablets**



4828-1671-4429.v2

**t.     Oxybutynin Chloride**



**u.     Desmopressin Acetate**



4828-1671-4429.v2

**v.    Labetalol**



<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of May, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

s/ Chad Johnson
CHAD JOHNSON

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  chadj@rgrdlaw.com