# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | Case No.:       3:17-CV-558 (SRU) |

| | |
|---|---|
| THIS DOCUMENT RELATES TO:<br><br>PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO,<br><br>       Plaintiff,<br><br>   v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD.; EZRA VIGODMAN, EYAL DESHEH; SIGURDUR OLAFSSON; DEBORAH GRIFFEN; KÅRE SCHULTZ; MICHAEL MCCLELLEN; YITZHAK PETERBURG; AND TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.,<br><br>      Defendants. | Case No.:       3:19-CV-175 (SRU)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.      OVERVIEW OF THE ACTION……………………………………………………...1
II.     JURISDICTION AND VENUE……………………………………………………11
III.    EXCHANGE ACT ALLEGATIONS………………………………………………12
        A.      Exchange Act Parties……………………………………………………...12
                1.      Plaintiff……………………………………………………………12
                2.      Exchange Act Defendants………………………………………….12
        B.      FACTUAL ALLEGATIONS……………………………………………15
                1.      The Regulation of Generic Drugs in the U.S. Is Structure to Create
                        Competitive Market for the Benefit of Consumers……………………15
                2.      In 2010-2014, a Backlog of ANDA Approvals at the FDA Created
                        a Window of Reduced Competition in the Generic Drug Market……...17
                3.      By 2013, Teva Was Performing Poorly and Facing a Collapsing
                        ADS Price…………………………………………………………18
                4.      By 2014, Defendants Were Fully Aware that Price Hikes for
                        GenericDrugs Could Not Be Maintained for an Extended Period……...20
                5.      Vigodman Becomes CEO and Teva Announces Its Strategy to Use Its
                        Stock as Currency for a Major Acquisition……………………………24
                6.      Teva Substantially Increases Prices on a Multitude of Drugs to Prop
                        Up Its Declining Revenues and Increase Its Share Price………………25
                7.      Teva Unilaterally Increased Prices on Dozens of Drugs………………26
                8.      Teva Increased Prices in Parallel with Other Manufacturers for a
                        Number of Drugs…………………………………………………28
                9.      Teva Actively Colluded with Other Generic Drug Manufacturers to
                        Fix Prices……………………………………………….………………29
                        1)      Direct Evidence of Price-Fixing: Nystatin and Theophylline
                                ER……………………………………………………………29
                        2)      Direct Evidence of Price-Fixing: Glipizide-Metformin..……..32
                        3)      Other Indicia of Price Collusion………………….…………33
                        4)      As a Result of the Price Increases, Teva Increased Its Revenues
                                and Profits by Billions of Dollars…..………………………… .35
                        5)      Recognizing that Its Price Increase Scheme Was
                                Unsustainable for More than a Short Period, Teva Misleads
                                Investors Regarding the Basis for Its Improved Financial
                                Performance……………………………………….…………...36
                        6)      Driven by Price Increases, Teva's ADS Price Soars…………37
                        7)      Defendants Lay Plans for a Major Acquisition—Inflating the
                                ADS Price to Use as "Currency"……………………………...38
                        8)      The Company Announces a $40 Billion Acquisition of Actavis
                                Fueled By Its Inflated Share Price and a Proposed Bond
                                Offering……………………………………………………...38
                                1.      Teva Issues $3.375 Billion in ADS and $3.375 Billion
                                        in Preferred Shares While the ADS Trade at an Inflated

Price…..…………………………………………………39

2.  Defendants Rush the Notes Offering and Conceal the Fact that Teva Had Been Served Subpoenas by the DOJ and the Connecticut AG…..…………………………………..40

9)  The Fraud Unravels, Causing the Prices of Teva Securities to Fall…………………………………………….………41

1.  Days After the Close of the Actavis Transaction, Teva Belatedly Announces It Is the Subject of Government Antitrust Investigations…………………………………41

2.  The Market Is Surprised When Teva Announces Dismal Results for the Third Quarter of 2016 and Olafsson Is Fired……………………………………………….42

3.  DOJ Criminal Charges and State AG Lawsuits place Teva Under Further Market Scrutiny………………….…..43

4.  Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company……………………………….…………...44

5.  After Vigodman, Desheh and Olafsson Are Terminated, Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings..………………..45

C.  DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS………………………………………………………..46

1.  Defendants' Materially False and Misleading Statements and Omissions During the Relevant Period aa.    February 15, 2017……..47

1.  February 6, 2014……………………………………47
2.  February 10, 2014…………………………………..48
3.  May 1, 2014……………………………………….50
4.  July 31, 2014………………………………………52
5.  October 30, 2014…………………………………..53
6.  December 11, 2014…………………………………54
7.  February 5 and 9, 2015……………………………55
8.  April 30, 2015…………………………………….58
9.  June 11, 2015……………………………..............60
10.  July 27, 2015………………………………………61
11.  July 30, 2015………………………………………62
12.  October 29, 2015…………………………………..62
13.  November 19, 2015………………………………..65
14.  November 30, and December 3, 2015……………………66
15.  January 11, 2016…………………………………..67
16.  February 11, 2016…………………………………68
17.  March 8, 2016……………………………………..73
18.  May 9, 2016……………………………………….74
19.  May 10, 2016……………………………………..78

|       | 20. | June 3 and 8, 2016…………………………………………………79 |
|       | 21. | June 21 and July 12, 2016………………………………………81 |
|       | 22. | July 13 and 19, 2016……………………………………………81 |
|       | 23. | August 4, 2016…………………………………………………83 |
|       | 24. | September 7 and 9, 2016………………………………………...86 |
|       | 25. | November 15, 2016……………………………………………89 |
|       | 26. | January 6, 2017…………………………………………………92 |
|       | aa. | February 15, 2017………………………………………………93 |

| bb. | Additional False and Misleading Denials of Teva's Participation in Collusive Conduct………………….95 |
|     | cc. | False and Misleading Statements Regarding Actavis Acquisition…………………………………97 |

2.   Defendants Violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F………………………………………………...102

D.   ADDITIONAL ALLEGATIONS OF SCIENTER…………………………104

1.   Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition……………………….……104
2.   Conscious Misbehavior or Recklessness……………………………105
a.   Implementation and Concealment of the Price-Hike Strategy……………………………………………………...105
     b.   Continuous Access to Documents and Information Tracking Profits from Price Increases…………………………………107
     c.   Defendants Spoke Repeatedly About the Pricing of Generic Drugs……………………………………………………...107
     d.   Defendants' and Analysts' Focus on Generics……………...109
     e.   The Magnitude, Importance, and Duration of the Fraud……110
     f.   Contemporaneous Red Flags…………………………………111
     g,   Officer Terminations Support Scienter………………………112
     h.   Evidence of Collusion Supports a Strong Inference of Scienter……………………………………………………113
     i.   Other Facts Supporting Scienter……………………………114
3.   Corporate Scienter…………………………………………………...116

E.   THE TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION……116

1.   August 4-5, 2016……………………………………………….……116
2.   November 3, 2016, December 13-16, 2016………………………….……117
3.   November 15, 2016…………………………………………………….……119
4.   December 5-6, 2016…………………………………………………….……120
5.   January 6, 2017……………………………………………………….……121
6.   February 6-7, 2017……………………………………………………….....122
7.   August 3-7, 2017……………………………………………………….……123
8.   November 2, 2017……………………………………………………….……125

9.      February 8, 2018………………………………………….………125
10.     December 7-10, 2018…………………………………….…………126
11.     May 10-13, 2019.……………………………..…………………127

F.      PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE…..129

G.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
        DOCTRINE ARE INAPPLICABLE……………………………….....131

IV.     CAUSES OF ACTION……………………………………………..…….132

        COUNT I - For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
        Promulgated Thereunder Against The Exchange Act Defendants……………..…132

        COUNT II - For Violations of Section 20(a) of the Exchange Act Against the
        Individual Defendants ..……………………………………………………135

V.      PRAYER FOR RELIEF…………………………………………………135

VI.     JURY TRIAL DEMANDED…………………………………………..…….…135

| Term | Definition |
|---|---|
| Exchange Act Defendants | Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Schultz, Michael McClellan, and Yitzhak Peterburg. References to the Exchange Act Defendants include only those individuals then employed by Teva at the referenced time. |
| Actavis | Allergan Generics, acquired by Teva on or around August 2, 2016 |
| ADS | Teva's American Depository Shares |
| ADS Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:19 p.m. ET |
| ADS Offering | The public offering of ADS completed on or about December 3, 2015 and January 6, 2016 |
| ADS Offering Materials | The ADS Registration Statement, along with the base and preliminary prospectuses and related prospectus supplements constituting part of the ADS Registration Statement including the ADS Final Prospectus and the documents incorporated by reference therein |
| ADS Registration Statement | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015. |
| ADS and Notes Registration Statements | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015 (for the ADS Offering), and the Post- Effective Amendment No. 1 to its shelf registration statement on the Form F-3 Teva filed with the SEC on July 13, 2016 (for the Notes Offering). |
| ANDA | Abbreviated New Drug Application, an application submitted by a generic drug manufacturer to the U.S. Food and Drug Administration seeking approval for a drug the FDA has already approved |
| API | Active Pharmaceutical Ingredient use to make pharmaceutical products |
| Board | Teva's Board of Directors |
| Cavanaugh | Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics during the Class Period. |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| Desheh | Defendant Eyal Desheh, Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim President and CEO |
| DOJ | U.S. Department of Justice |

| Term | Definition |
|---|---|
| Galownia | Kevin Galownia, Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017 |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report titled, "Generic Drugs Under Medicare" and publically released on September 12, 2016 |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals |
| Griffin | Defendant Deborah Griffin, Teva's SVP and CAO (Principal Accounting Officer) who also served as the Authorized U.S. Representative of Teva and Teva Finance during the Class Period. She was also VP and CFO of Teva USA during the Class Period. |
| Heritage | Heritage Pharmaceuticals Inc |
| Individual Defendants | Defendants Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Schultz, Michael McClellan, and Yitzhak Peterburg. References to the Officer Defendants include only those individuals then employed by Teva at the referenced time. |
| Levin | Jeremy M. Levin, Teva's CEO from May 9, 2012 to October 30, 2014 |
| Malek | Jason Malek, Former President of Heritage |
| McClellan | Defendant Michael McClellan, Teva's Executive Vice President and CFO from November 2017 until November 8, 2019, Interim Group CFO from July 2017 to November 2017, and Senior Vice President and CFO, Global Specialty Medicines from 2015 to November 2017 |
| MD&A | The Management Discussion & Analysis section of SEC Form 20-F |
| Notes | Collectively certain U.S.-dollar-denominated senior notes issued by Teva Finance in a public offering on or about July 21, 2016, namely:<br>(a) 1.400% Senior Notes due July 20, 2018 ("2018 Notes");<br>(b) 1.700% Senior Notes due July 19, 2019 ("2019 Notes");<br>(c) 2.200% Senior Notes due July 21, 2021 ("2021 Notes");<br>(d) 2.800% Senior Notes due July 21, 2023 ("2023 Notes");<br>(e) 3.150% Senior Notes due Oct. 1, 2026 ("2026 Notes"); and<br>(f) 4.100% Senior Notes due Oct. 1, 2046 ("2046 Notes") |
| Notes Final Prospectus | The prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 |
| Notes Offering | The public offering of the Notes completed on or about July 21, 2016 |
| Notes Offering Materials | The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by inference therein |
| Notes Registration Statement | The Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 |
| NYSE | New York Stock Exchange |
| Oberman | Allan Oberman, President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 |

| Term | Definition |
|---|---|
| Offerings | The ADS Offering and the Notes Offering |
| Offering Materials | The ADS Offering Materials and the Notes Offering Materials |
| Olafsson | Defendant Sigurdur ("Siggi") Olafsson, President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 |
| Patel | Nisha Patel, Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016 |
| Peterburg | Defendant Yitzhak Peterburg, Teva's Interim President and CEO from February 6, 2017 to October 31, 2017, a Teva Director from June 2009 to July 2010, and from 2012 until December 12, 2017, and Chairman of Teva's Board of Directors from January 2, 2015 to February 6, 2017 |
| Plaintiff | Public School Teachers' Pension and Retirement Fund of Chicago |
| Price-Hike Strategy | Teva's new and undisclosed corporate strategy, adopted in 2013, to systematically and broadly implement price increases across its generic drug portfolio |
| Pricing Group | A group of Teva employees, led by Galownia in the United States, whose day-to-day responsibilities included analysis of the pricing for Teva's generic drugs |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| R&D | Research and Development |
| Relevant Period | February 6, 2014 through May 10, 2019, inclusive |
| RFP | Request for Proposal, a blind-bidding process intended to solicit a "best and final" offer where each firm that submits a response without knowing what competing firms are bidding |
| S&M | Sales and Marketing |
| Schultz | Defendant Kåre Schultz, Teva's President and Chief Executive Officer since November 1, 2017 and one of its directors of the Board since November 1, 2017 |
| SEC | Securities and Exchange Commission |
| Sherman Act | Sherman Antitrust Act |
| State AGs | The Attorneys General of 47 States, the District of Columbia, and Puerto Rico who filed a Consolidated Amended Complaint against Teva and others on June 18, 2018, in the Generics MDL |
| Teva or the Company | Defendant Teva Pharmaceutical Industries Ltd |
| Teva Finance | Defendant Teva Pharmaceutical Finance Netherlands III B.V. |
| Teva Securities | ADS and Notes, collectively |

| Term | Definition |
|---|---|
| Vigodman | Defendant Erez Vigodman, Teva's President and CEO from February 11, 2014 to February 6, 2017 and one of its directors of the Board from June 22, 2009 to February 6, 2017 |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts |
| YOY | Year-Over-Year |

Plaintiff, Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF" or "Plaintiff"), brings this action to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and SEC Rule 10b-5, 17 C.F.R.§ 240.10b-5. CTPF purchased or otherwise acquired Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company") securities between February 6, 2014 and May 10, 2019, inclusive (the "Relevant Period") and was damaged thereby.

Plaintiff alleges the following based upon personal knowledge as to its own acts and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys.  This investigation included, among other things, a review of Teva's filings with the United States Securities and Exchange Commission ("SEC"), transcripts of Teva's conference calls and announcements, wire and press releases published by and regarding Teva, analysts' reports, various civil complaints alleging violations of federal and state antitrust and unfair competition laws by Teva and its subsidiaries, generic drug pricing data from a nationally-recognized source, and the Second Amended Consolidated Class Action Complaint filed in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd*., No. 3:17-cv-00558 (SRU) (D. Conn. December 13, 2019) ("*Ontario Teachers* Complaint").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW OF THE ACTION

1.    Teva, a pharmaceutical company based in Israel, develops, produces and markets generic pharmaceutical products worldwide and is the leading generic drug company

in the United States. This action arises from misrepresentations by Defendants to investors regarding Teva's purported financial success and performance during the period from February 6, 2014 to May 10, 2019, inclusive.  Defendants consistently attributed Teva's success to fundamental business strategies, such as cost cutting and good product management.  In reality, however Teva's reported financial growth during the Relevant Period was the result of Defendants' strategy to raise systematically generic drug prices across a large portion of Teva's generic drug portfolio (the "Price-Hike Strategy").  Teva initiated the strategy in early 2013, with a first batch of price increases taking place in July and August 2013.

2.      In fact, during the Relevant Period, Teva imposed price increases at least 76 times.  These price increases were considered and approved by Teva's senior officers, who tracked the profits generated on a daily, weekly and quarterly basis.  The price increases had the desired effect, generating billions of dollars of additional revenue and profit attributable solely to the price increases.

3.      Defendants however concealed from investors that Teva's rapid growth was driven by its Price-Hike Strategy, falsely claiming that it was ***not*** increasing prices and that the Company's increased profitability was in fact due to other, more sustainable factors including aggressive cost-cutting and improved operational efficiency.

4.      Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Even Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way of knowing whether Teva was profiting from systematic price

increases, other than asking Defendants, who denied that Teva's profits and performance were connected to price increases

5.      For example, when asked whether Teva's profits and performance were connected, the Individual Defendants stated:

> •      "(A]11 the improvement you see in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message." (Defendant Vigodman, Oct. 29, 2015)
>
> •      "So how did we" achieve $1 billion in increased profit margin?" "Not by pricing but by portfolio mix, new products, and efficiency measures." (Defendant Olafsson, Feb. 11, 2016)
>
> •      "Now there's a lot of noise around pricing issues. . . . Our exposure to all these things is very minimal . . . . Teva was not associated with any of that." (Defendant Desheh, Nov. 19, 2015)

6.      Contrary to these false statements, the Price-Hike Strategy yielded hundreds of millions of dollars of additional revenue and profit quarter over quarter through the second quarter of 2015.[1]   Defendants concealed however that the Price-Hike Strategy was the primary contributor of this massive boost in profits.

7.      Moreover, the strategy was inherently risky and unsustainable for several reasons, including that two-thirds of Teva's increases were affected in tandem with other drug manufacturers. Wholesale purchasers of generic drugs routinely set pricing through competitive Request for Proposal ("RFP") bidding. Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share. Moreover, the appearance of price gouging or collusion could draw public outrage,

---

[1] The Complaint may at times refer to quarterly and annual accounting periods in this manner. Thus, 2Q15 refers to the second quarter of 2015, and FY15 refers to the fiscal year ending 2015.

law enforcement scrutiny, and civil and criminal liability.

8.      Defendants' fraudulent statements permitted the Company to mislead the market and to complete a $40 billion acquisition of the Actavis generic drug division from Allergan plc in 2015. However, Teva could not sustain the price increases. By mid-2016, the Company succumbed to the pricing pressures of the generics market, and its stock price declined, costing investors tens of billions of dollars.

9.      Prior to the Relevant Period, Teva had faced major headwinds. In 2012, Teva received a subpoena from the SEC for alleged violations of the Federal Corrupt Practices Act ("FCPA"). The SEC alleged that Teva bribed Russian, Eastern European, and Latin American countries to gain market share of generic drugs and falsified its accounting. Teva later paid a $519 million fine to the SEC and the U.S. Department of Justice ("DOJ"). No longer able to rely on bribes to foreign officials, these pipelines dried up.

10.      Teva's U.S. pipeline was equally bleak at that time. The Company's U.S. generics business reported dramatically lower revenues, year over year. A May 3, 2013 Deutsche Bank report concluded that Teva's overall generics business had "significantly underperformed." By August 14, 2013, Teva's then-Chief Executive Officer ("CEO") and President Jeremy M. Levin ("Levin") acknowledged that "Generic growth in the United States [was] slowing ***fundamentally***." Moreover, Teva would soon lose its patent protection on Copaxone, by far its largest specialty drug, accounting for as much as 50% of Teva's profits at that time. On October 30, 2013, Teva's Board of Directors forced Levin to step down, less than 18 months into the job.

11.      In sum, Teva needed to reinvent itself. In January 2014, Teva announced the appointment of Defendant Erez Vigodman ("Vigodman") as its President and CEO, effective

February 11, 2014. He replaced Defendant Eyal Desheh ("Desheh"), Teva's Chief Financial Officer ("CFO") from July 2008 through June 30, 2017 (except from October 30, 2013 to February 11, 2014, during which he served as Teva's Interim CEO and President).  From the time Vigodman took over in January 2014, it immediately became clear that Teva's plan was to acquire new businesses potentially using Teva's American Depositary Shares ("ADS") as currency.  As Desheh explained on a Q4 2013 earnings call (February 6, 2014), Teva was, with respect to potential "business opportunities," "open for business." During the March 4, 2014 Cowen Healthcare Conference, Desheh made plain Teva's intentions (and need to boost its stock price by any means) when he noted that, with "the [stock] price under $40, … we can't use [Teva Securities as] currency" for the large acquisition he had touted two months earlier.

12.     To achieve its growth-through-acquisition strategy, Teva had to improve its profits and its share price. Although Teva was touting, as early as October 30, 2013, a turnaround plan based upon an "accelerate[d]" cost reduction plan and "a much better, efficient generic machine[,]" in reality, Teva was improving its profitability through enormous price increases for drugs for which the Company had (i) some degree of independent market power, (ii) the ability to engage in parallel price increases with other drug companies (because of limited competition), or (iii) the ability to engage in outright price collusion in violation of the antitrust laws. Pursuant to its price increase scheme, Teva increased the prices on as many as 55 drugs by as much as 1700%. While Teva had begun price increases in July and August 2013, such price increases continued into 2014 and 2015, and involved at least 55 separate drugs.  Many of these price increases exceeded 500% and some exceeded 1000% and even 1500%.

13.     As a result of these huge price increases, Teva's U.S. generic segment revenues increased by nearly 15% from $4.18 billion in 2013, to $4.79 billion in 2015, and then decreased to $4.56 billion in 2016, as the inevitable pricing pressure took its toll on the price increase strategy.

14.     For a time, Teva's plan worked—its share price increased from just over $37 per share in September 2013 to more than $70 per share by July 2015. However, Teva well knew that a strategy for increasing profitability based upon increasing drug prices could not be sustained for several reasons, including, that the U.S. Food & Drug Administration ("FDA") was devoting increasing resources to approving Accelerated New Drug Applications ("ANDA") through which generic manufacturers could bring generic drugs to market on a fast-tracked basis. Thus, avoiding the taint of price increases became particularly important because of the public scrutiny afforded price increases in formerly inexpensive generic drugs. Indeed, as a result of the initial Teva price increases in July and August 2013 and similar price increases by other generics manufacturers, in January 2014, the National Community Pharmacists Association ("NCPA") wrote to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee and the U.S. House Energy and Commerce Committee requesting hearings on the significant spike in generic pharmaceutical pricing.  On July 8, 2014, The New York Times addressed pricing issues in an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting a 100% price increase for digoxin, a longtime generic drug.

15.     As a result of the N.Y. Times article, the Connecticut Attorney General ("CT AG") began an investigation on pricing issues with a focus on digoxin. Other state attorneys general ("AGs") followed suit. On October 2, 2014, U.S. Senator Bernie Sanders and U.S.

Representative Elijah E. Cummings sent letters to Teva and thirteen other generic drug companies asking for detailed information on various generic drug price hikes. Teva never responded to these letters.

16.     In November 2014, the U.S. Department of Justice ("DOJ"), which had also opened an investigation into price fixing of generic drugs, convened a grand jury in the U.S. District Court for the Eastern District of Pennsylvania, pursuant to which subpoenas were issued to Teva and ten other generic drug makers.

17.     In response to this increasing outside focus on its ever-accelerating increases in generic drug prices, Teva sought at all costs to avoid any suggestion that price increases were the cause of its seemingly miraculous turnaround.  Accordingly, at the beginning of the Relevant Period (February 6, 2014), Teva touted its increase in revenues, attributing them to higher sales volumes and launches of new generic drugs.  Teva did not disclose the eighteen drug price increases since the summer of 2013.  In May 2014, Teva again touted its first quarter 2014 results, similarly relying on "new product launches" and a changed composition of revenues to explain its increased profitability. On October 30, 2014, during the third quarter 2014 earnings call, Teva was specifically asked about the impact of price increases, but Defendant Sigurdur "Siggi" Olafsson ("Olafsson") deflected, suggesting that there were no significant increases since "the base business itself is slowly eroding . . . ." And at the end of 2014, Defendant Olafsson, President and CEO of Teva's Global Generic Medicines Group (since July 1, 2014), rejected the premise of the question, stating: "*[L]et me correct*. *I have to disagree that they have experienced tremendous price increase[s]*."[2]

---

[2] Unless otherwise stated, all emphasis is added.

18.     Throughout the remainder of 2015 and into 2016, Defendants flatly denied that Teva's improved performance was the result of price increases. For example, on February 11, 2016, Olafsson falsely insisted that Teva achieved $1 billion in increased profits "[n]ot by pricing but by portfolio mix, new products and efficiency measures." Vigodman made a similar pronouncement on October 29, 2015:

> [A]ll the improvements you see in margins is ***not driven by price***. It is driven by quantities, and by mix, and by efficiency measures ***not by price, 2014, 2015. And that's a very important message***.

These statements were demonstrably false—by mid-July 2015, Teva had raised prices on more than 61 drugs, including many by more than 250%.

19.     On July 27, 2015, when Teva's stock was trading at an all-time high, Teva's growth through acquisition plan came to fruition when it announced the purchase of Allergan's generics division, Actavis.  The deal, which was expected to close in mid-2016, would cost Teva approximately $40 billion, most of which was to be funded through a massive debt offering (as well as a smaller ADS and preferred stock offering).  While the debt offering initially was scheduled to take place after the close of the transaction, in July 2016, recognizing that the price increase scheme could no longer be maintained, Teva announced that the debt offering would be accelerated to the end of the month.  The deal closed on August 2, 2016.  Notably, neither the Registration Statement nor the Offering Documents filed with the SEC made any reference to the investigations or Teva's receipt of subpoenas.

20.     Just two days after the closing of the Actavis transaction, on August 4, 2016, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of 2015.

21.     Shortly thereafter, on September 12, 2016, the U.S. Government

8

Accountability Office ("GAO") issued an audit report ("GAO Report") that generic drug manufacturers had engaged in hundreds of unexplained "extraordinary price increases," including price increases of more than 1,000%. Teva owned the rights to many of the drugs identified in the GAO Report as having had an extraordinary price increase between 2013 and 2015.

22.     Then, on November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges against Teva and others for unlawfully colluding to fix generic drug prices. On November 15, 2016, Teva reported third quarter 2016 revenues below consensus expectations, which Olafsson stated were a result of pricing pressures in Teva's U.S. generics business.

23.     On December 15, 2016, the CT AG and nineteen other AGs filed a civil complaint in the U.S. District Court for the District of Connecticut against various generic pharmaceutical manufacturers, including Teva Pharmaceuticals USA, Inc. ("Teva USA"), for alleged anticompetitive activity.

24.     As Teva's financial condition deteriorated and the scrutiny surrounding the AGs' allegations and the GAO Report mounted in the latter half of 2016, Teva's stock price precipitously declined. In relatively short order, the key executives responsible for the U.S. generics business left the Company or were fired, including Olafsson who was fired on December 5, 2016; Vigodman who was terminated on February 6, 2017; and Desheh who left by June 30, 2017. The "inauspicious tim[ing]" of these departures was not lost on market watchers like The Street which reported that Olafsson's departure "rais[ed] more questions for investors amid continued worries around drug pricing."

25.     On August 3, 2017, in the first financial report issued after Desheh, Vigodman

and Olafsson departed the Company, Teva announced a $6.1 billion write down of its entire U.S. generics business, which had been artificially inflated as the result of its ultimately unsustainable price increase scheme. Teva also announced, for the first time in 30 years, a 75% reduction in its shareholder dividend payout. Teva simultaneously announced drastically reduced guidance which was a direct result of the complete collapse of the Price-Hike Strategy and evaporation of its grossly inflated profits.

26.     Credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded its status to just above a "junk" rating. Teva's share price plunged in response to this news.

27.     Plaintiff's claims arise from several interrelated categories of misstatements and omissions, alleged particularly below. First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection. Having identified the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy. Second, Defendants falsely denied that Teva had engaged in price increases or received material benefit therefrom. Rather, Defendants claimed that Teva only raised prices on a few generic drugs when a market shortage occurred. Third, Defendants falsely claimed that Teva was immune to pricing pressures, though in reality, it was unable to sustain the undisclosed Price-Hike Strategy. Fourth, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to adopt and pursue the Price-Hike Strategy because of a lack of competition. Fifth, Defendants failed to disclose the receipt of the State AGs' and DOJ subpoenas relating to investigations into price collusion in the generic pharmaceuticals

industry and the impact of such investigations on Teva, and were required to do so in connection with the Note Offering.

28.     Moreover, under Item 303 of SEC Regulation S-K and Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy was impacting Teva's profits, both as they dramatically increased, and later as they evaporated.

29.     Additionally, Teva, and certain other Defendants, colluded with other generic pharmaceutical manufacturers to fix prices for numerous generic drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion. These allegations are corroborated by Plaintiff's counsel's investigation and by the facts identified through the State AGs' allegations that Teva engaged in a vast industry-wide price-fixing conspiracy.

30.     Defendants' fraud also extended to related matters, such as failing to disclose and actively concealing the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial and business prospects.  Moreover, since August 4, 2017, Teva repeatedly – and falsely – denied any involvement in collusive conduct, further misleading investors during the Relevant Period.

## II.     JURISDICTION AND VENUE

31.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

32.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

34.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange, namely the New York Stock Exchange ("NYSE").

## III.     EXCHANGE ACT ALLEGATIONS

### A.     Parties

#### 1.     Plaintiff

35.     Plaintiff, CTPF, was established in 1895 by the Illinois legislature and is the administrator of a defined benefit pension fund, providing retirement, survivor and disability benefits for certain certified teachers and employees of, *inter alia*, the Chicago Public Schools. CTPF brings claims under the Exchange Act pursuant to its purchase of acquisition of Teva securities, during the Relevant Period, on the New York Stock Exchange at prices that were artificially inflated by the materially false and misleading statements and omissions of material fact complained of herein, in violation of federal securities laws, and suffered damages thereby. In addition, CTPF purchased U.S.-dollar-denominated senior notes maturing in 2018. 2019. 2021, 2023, 2026 and 2046 issued by Teva Finance, in the United States during the Relevant Period.

#### 2.     Exchange Act Defendants

36.     Defendant Teva is incorporated in Israel with its principal executive offices at

12

5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel. Teva's U.S. wholly-owned subsidiary Teva USA has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454. Teva engages in interstate commerce within this District and regularly transacts business within the State of Connecticut. Teva ADS are listed and traded on the NYSE under the symbol "TEVA." Teva ADS are traded in the United States.

37.      Defendant Vigodman was Teva's President and CEO from February 11, 2014, through February 6, 2017, and a Director from June 22, 2009, through February 6, 2017. Vigodman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein. During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged to be false and misleading.

38.      Defendant Desheh was Teva's CFO from July 2008, through June 30, 2017, except from October 30, 2013, to February 11, 2014, during which he served as Teva's Interim CEO and Interim President.  Desheh also was Teva's Group Executive Vice President ("EVP") from 2012 to June 30, 2017. Desheh signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

39.      Defendant Olafsson was President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 until December 5, 2016. Prior to joining Teva, Olafsson held senior leadership and other positions, within Actavis between 2003 and 2014. As

13

President and CEO of Teva's Global Generics Medicines Group, Olafsson possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business.  Olafsson was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

40.     Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Class Period.  She was also VP and CFO of Teva USA during the Class Period.  Griffin signed the ADS and Notes Registration Statements.  While at Teva, Griffin possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva's USA's financial reporting.

41.     Defendant Kare Schultz ("Schultz") has served as President and Chief Executive Officer of Teva since November 1, 2017.  Schultz has also served on the Company's Board of Directors since November 1, 2017.

42.     Defendant Michael McClellan ("McClellan") served as Executive Vice President and Chief Financial officer of Teva from November 2017 until November 8, 2019.  Prior to serving in that role, McClellan served as Teva's Interim Group CFO form July 2017 to November 2017 and Senior Vice President and CFO, Global Specialty Medicines from 2015 to November 2017.

43.     Defendant Yitzhak Peterburg ("Peterburg") served as Teva's Interim President and CEO from February 6, 2017, to October 31, 2017.  He also served as a Teva director from

14

June 2009 to July 2010, and from 2012 until December 12, 2017, and as Chairman of Teva's Board of Directors from January 1, 2015, to February 6, 2017.

44.    Defendants Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellan, and Peterburg are sometimes referred to herein collectively as the "Individual Defendants." Teva and the Individual Defendants are referred to herein collectively, as to claims under the 34 Act, as the "Exchange Act Defendants."

### B.    FACTUAL ALLEGATIONS

#### 1.    The Regulation of Generic Drugs in the U.S. Is Structure to Create a Competitive Market for the Benefit of Consumers

45.    Since the implementation of the Drug Price Competition and Patent Term Restoration Act (known as the "Hatch-Waxman Act") in 1984, generic drugs have had a significant impact on healthcare in the U.S., resulting in tens of billions of dollars in annual savings for consumers and the overall healthcare system. The Hatch-Waxman Act was initially enacted to simplify the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain FDA approval. The Hatch-Waxman Act is designed to get less expensive generic drugs into the hands of consumers expeditiously. Under the revised process, generic drug companies can instead file an ANDA. A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug. Instead, the company can "piggy-back" on the safety and efficacy data supplied by the original NDA holder for a given drug.

46.    Generic drugs must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the

brand-name drug. To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the original brand-name version approved by the FDA through an NDA. The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile. According to the FDA: "[p]roducts classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[3]  The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating.

47.    The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug. This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs.  When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company. The first generic drug will generally be priced 15% to 20% below the brand-name drug. Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow. The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand- name drug. This competition

---

[3] *See* Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book"), 37th Ed., 2017, Department of Health and Human Services – Food and Drug Administration, at vii.

allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices. As Stephen W. Schondelmeyer, Professor of Management & Economics at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

48.     The Maximum Allowable Cost ("MAC") pricing regime also serves to control drug prices. Under this regime, individual states or pharmacy benefits managers ("PBMs") - third party administrators of prescription drug programs - establish a MAC for drug products using a variety of inputs. If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient. This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits. Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion.

### 2.     In 2010-2014, a Backlog of ANDA Approvals at the FDA Created a Window of Reduced Competition in the Generic Drug Market

49.     One of the keys to reducing drug prices is ensuring that there is substantial competition in generic drug markets. Given that generic drug makers bear none of the large research and development expenses borne by brand-name manufacturers, the primary impediment to entry into the generic market is obtaining ANDA approval from the FDA. Accordingly, the overall cost of prescription drugs for the public is reduced by faster generic drug approval times. Historically, the average time between generic drug application submission and approval ranges from six months to several years, depending on the complexity of the drug. That approval time

had varied over time, however, based upon the number of generic drugs seeking approval and the review resources available to the FDA.

50.     By 2012, FDA resource problems similar to those plaguing the new drug market in the late 1980s had become a significant limitation on the approval of ANDA for generic drugs. In 2012, the FDA was facing a backlog of over 2,800 unexamined ANDA. This overload was driven by the relative ease with which manufacturers could obtain generic drug approvals as a result of Hatch-Waxman, and the lack of a respective increase in FDA reviewers to process the applications. By 2012, the average waiting period for an ANDA approval had increased to 31 months.

51.     The backlog of unapproved drugs, which limited generic competition, created a window in which generic companies had the ability to increase prices. For example, the September 2016 GAO Report found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "extraordinary price increases"—i.e., "periods of prices at least doubling" between the first quarter of 2010 and the first quarter of 2015. In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases. For 48 of these 100 drugs, the price increases were 500% or higher.

### 3.     By 2013, Teva Was Performing Poorly and Facing a Collapsing ADS Price

52.     Heading into 2013, Teva faced a number of significant issues. <u>First</u>, by 2012, Teva's ADS price had fallen from a high of over $60 in 2010, to the upper-$30s.

53.     <u>Second</u>, in 2012, Teva received subpoenas from the SEC relating to a Foreign Corrupt Practices Act investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, Ukraine and Mexico (Complaint at ¶2, *SEC v. Teva Pharm.*

18

*Indus.*, No. 1:16-cv- 25298 (KMM) (S.D. Fla. Dec. 22, 2016), ECF No. 1). The SEC also alleged that Teva deliberately falsified its accounting. Teva's generics revenues from "Rest of World" markets ("ROW") (including those subject to the FCPA investigation) fell approximately $280 million in 2013. Ultimately, Teva paid a $519 million fine and entered into a deferred prosecution agreement. The investigation put pressure on the revenue pipelines from these countries.

54.     Third, Teva's U.S. generics business reported dramatically lower revenues, year over year. In fact, Teva was the worst performing generic drug company compared to its peers, despite being the largest. As a Deutsche Bank analyst concluded in a May 3, 2013 report, Teva's overall generics business had "significantly underperformed."

> Fourth, Teva would soon lose its patent protection on Copaxone, which was far and away its most important drug, accounting for as much as 40% of Teva's operating profits at that time. Due to this impending loss of exclusivity, Teva knew it could face generic competition to Copaxone as early as mid-2014.

55.     On October 30, 2013, Teva's Board of Directors forced CEO Levin to step down less than 18 months after he had taken the job. Given the sudden nature of Levin's termination, the Board named Defendant Desheh, Teva's Executive Vice President and CFO, to fill the role of President and CEO on an interim basis, effective immediately, and formed a committee to search for a permanent successor.

56.     In an October 30, 2013 investor call relating to Levin's firing, then-Chairman Phillip Frost and Desheh assured investors that they were focused on turning the Company around. Desheh informed the market that Teva "ha[d] decided to accelerate" the cost reduction plan and promised "to create a much better, efficient generic machine." Chairman Frost disclosed that "friends of [his] . . . have bought hundreds of millions of dollars of stock during the last couple of weeks. . . ."

19

57.     In reality, just months earlier, recognizing that the backlog in ANDA approvals at the FDA discussed above had, at least temporarily, restricted competition for some generic drugs, Teva had undertaken a risky gamble to improve its results – substantial price increases for certain of its drugs. In July and August 2013, Teva increased prices on a number of drugs:

> Oxybutynin Chloride Tablets; Nadolol Tablets; Fluconazole Tablets; Methotrexate Sodium Tablets; Cimetidine Tablets; Prazosin Capsules; Ranitidine HCL Tablets; Enalapril Maleate Tablets; Doxazosin Mesylate Tablets; Etodolac Tablets; Pravastatin Sodium Tablets; Ketoprofen Capsules; Etodolac SR Tablets; Tolmetin Sodium-Capsules; Clemastine Fumarate; Diltiazem HCL Tablets; Ketorolac Trometh Tablets; Diclofenac Potassium Tablets.[4]

58.     By October 2013, this desperate gamble had not yet fully borne fruit – costing CEO Levin his job.

### 4.   By 2014, Defendants Were Fully Aware that Price Hikes for GenericDrugs Could Not Be Maintained for an Extended Period

59.     Recognizing the enormous backlog the FDA was experiencing in its ANDA approval process, and the attendant negative impacts on competition in the provision of generic drugs, Congress enacted the Generic Drug User Fee Amendments ("GDUFA") to provide the FDA with a supplemental revenue source to spur the approval process. GDUFA went into effect in October of 2012, and instituted user fees on ANDA and other facility fees to generate $1.5 billion over the life of the five-year program. The goal of GDUFA was to eliminate the ANDA backlog and reduce the average review time to ten months or less. The expectation was that, once the fees flowed into the system and new FDA reviewers were hired and trained, backlogs would decrease and competition would increase, severely curtailing generic drug makers' ability to increase prices. Thus, by late 2012/early 2013, generic manufacturers knew that within the next 1-2 years, ANDA

---

[4]   The specific timing and price increases for these drugs are set forth in charts herein and in Appendix A hereto.

approvals would be on the rise and any ability they had to raise prices would be severely curtailed.

60.     With the additional funds provided by GDUFA came an FDA commitment to reach a variety of goals, including accelerating the review process and eliminating the mounting backlog of ANDA. One such commitment the FDA took was to act on 90% of all backlogged ANDA by the end of fiscal year ("FY") 2017. In a keynote address at the Generic Pharmaceutical Association annual meeting in the spring of early 2015, the Director of the FDA's Office of Generic Drugs, Kathleen Uhl, M.D., pledged accelerated action. The FDA delivered on Director Uhl's promise, hiring nearly 1,200 new employees in 2015—more than the preceding two years combined.

61.     As the graph below depicts[5], the number of full approvals and tentative approvals of generic drugs began to reach record heights in or around April 2015:



_____

[5]   Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA), Testimony of Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration, Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Feb. 4, 2016, at 7.

62.     On November 9, 2015, InsideHealthPolicy reported in an article entitled, "FDA, Pressed to Clear Generic Drug Backlog, Says It Is Ahead of Schedule," that the FDA had taken action on **82% of the backlog** "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press the agency to clear the backlog to help counter rising pharmaceutical  prices." All told, in 2015, more than 700 generic drugs were approved or tentatively approved by the FDA—***the highest figure in the FDA's history***.

63.     In addition to the increase in generic competition that would result from the adoption of GDUFA and subsequent increase in the FDA's ANDA review capabilities, Teva had other reasons to believe that its ability to increase prices would be a short-term phenomenon that would not extend beyond 2015 or 2016—at the latest.

64.     As a result of the initial price increases by Teva and others in 2013, in January 2014, the NCPA wrote to the U.S. Senate HELP Committee and the U.S. House Energy and Commerce Committee regarding generic pharmaceutical pricing. The letter stated "many of our members across the U.S. … have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate." It further noted "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." It asked that the Senate "schedule an oversight hearing to examine what factors may have led to these unmanageable spikes in generic drugs."

65.     On July 8, 2014, The New York Times addressed pricing issues with generic drugs in an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users  by Surprise," highlighting a nearly 100% price increase for digoxin, a longtime generic drug that Teva did not produce. The article stated:

> Though generic medicines are far cheaper to bring to market than brand-name drugs because they involve little research and development, they also are priced lower because generics typically face intense competition. But Dr. Aaron Kesselheim, a professor of health economics at the Harvard School of Public Health, noted, "Studies show it is not until you have four or five generics in the market that the prices really are down."

66.    As a result of the New York Times article, the CT AG began an investigation on pricing issues with a focus on digoxin. Other AGs quickly followed suit.

67.    On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings sent letters to Teva and thirteen other generic drug companies asking for detailed information on various generic drug price hikes. The letter stated: "We are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." It specifically noted that:

> We are writing to your company to request information about the escalating prices it has been charging for two drugs: Divalproex Sodium ER, which is used to prevent migraines and treat certain types of seizures, and Pravastatin Sodium, which is used to treat high cholesterol. According to data provided by the Healthcare Supply Chain Association (HSCA), the average prices charged for these drugs have increased by as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin Sodium from October 2013 to April 2014.

Teva never responded to this letter.

68.    On November 10, 2014, The Wall Street Journal reported that the DOJ was investigating generic drug manufacturers for violations of the antitrust laws. Later that month, the DOJ convened a grand jury in the Eastern District of Pennsylvania, pursuant to which subpoenas were issued to Teva and at least ten other generic drug manufacturers.

69.    On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" In his

opening remarks, Senator Sanders noted that

> According to Medicare and Medicaid data, between July 2013 and July 2014, half of all generic drugs went up in price. During this same time period, over 1,200 generic drugs, nearly 10 percent of all generic drugs, more than doubled in price. More than doubled in price. In fact, these drugs went up in price by an average of 448 percent. Dozens of drugs went up by 500, 600, 1,000 percent.

Other Senators noted the need to reduce the FDA backlog in ANDA approvals to spur generic competition—a process that was then ongoing.

70.     As a result of the adoption of GDUFA in 2012, and the intense scrutiny by Congress, regulators and the press of generic drug pricing (spurred largely by drug price increases in 2013 and 2014), Teva knew that its ability to obtain additional revenues by raising prices was a short-term phenomenon that would not persist for more than a relatively short (1-2 year) period of time. Investors were also aware that the flood of new generics to the market would lead to increased competition and lower prices. Teva therefore knew that acknowledging price increases could alert investors that any success the Company was experiencing would be short term.

### 5.     Vigodman Becomes CEO and Teva Announces Its Strategy to Use Its Stock as Currency for a Major Acquisition

71.     In January 2014, Teva announced the appointment of Vigodman as its President and CEO, effective February 11, 2014. From the time Vigodman was hired, it immediately became clear that Teva's plan was to solve its long-term issues through a major acquisition by using its stock to facilitate a deal. This strategy was the direct result of Teva's planning for the end of its patent for Copaxone in 2017. Copaxone is used to treat multiple sclerosis and was a huge success for Teva, providing as much as 40% of Teva's operating profit in some years. "Teva's management

anticipated the patent and pricing issues well in advance, and decided that the company should buy

its way out of the problem through major acquisitions."[6]

72.     Thus, at a January 14, 2014 J.P. Morgan Healthcare Conference, Defendant Desheh

explained that Teva was in a position to make "more than a small acquisition or in- licensing

transaction." He specifically noted that this "major commitment" was supported by the recent

recruitment of Vigodman who would "emphasize (potentially large) acquisitions more readily than

his predecessor," ideally using Teva's ADS as "currency."

73.     On March 4, 2014, at a Cowen Health Care Conference, Desheh noted that, with

"the stock price under $40, … we can't use [Teva Securities as] currency" for the large acquisition

he had touted two months earlier.

> ### 6.     Teva Substantially Increases Prices on a Multitude of Drugs to Prop Up Its Declining Revenues and Increase Its Share Price

74.     The arrival of Vigodman caused Teva to substantially intensify its undisclosed plan

to increase the prices it charged for an array of its generic drug offerings. Including the multiple

drugs where it had raised prices in 2013, beginning in April 2014 and extending through July 2015,

Teva raised prices on additional drugs and, in total, raised prices on at least 55 drugs. These

undisclosed price increases fit into one of three categories: (1) 28 drugs where Teva was the only

(or only major manufacturer) increasing the price of the generic drug; (2) 24 drugs where Teva's

price increase occurred in parallel with increases by other manufacturers; and (3) three drugs where

governmental-investigations had indicated there may have been active collusion between Teva and

other manufacturers. In total, the price increases swelled Teva's revenue by billions of dollars.

---

[6] David Segal and Isabel Kershner, "'Nobody Thought It Would Come To This': Drug Maker Teva Faces A Crisis," N.Y. Times (Dec. 27, 2017), at B1.

7.   **Teva Unilaterally Increased Prices on Dozens of Drugs**

75.   Beginning in 2013 and extending through early 2016, Teva recognized that the FDA's ANDA backlog had bestowed it with significant market power with respect to a number of drugs. In response, Teva unilaterally increased prices on at least **28 generic drugs** by significant amounts. The drugs and the dates and amounts of increases are set forth below:

26

| **Generic Drug** | **Period of Increase**[7] | **Percentage Increase**[8] | **Increased Revenue**[9] |
|---|---|---|---|
| Anagrelide HCL | 3/14-12/15 | 243% | $17,134,558 |
| Cimetidine | 6/13-6/18 | 869% | $12,797,442 |
| Ciprofloxacin HCL | 12/14-1/17 | 1111% | $102,373,807 |
| Clemastin Fum | 7/13-12/16 | 223% | $3,410,833 |
| Clotrimazole | 8/14-12/17 | 500% | $3,193,627 |
| Cromolyn Sodium | 7/14-6/18 | 392% | $6,029,503 |
| Cyrpoheptadine HCL | 3/14-11/17 | 110% | $7,460,259 |
| Diclofenac | 1/13-8/15 | 310% | $21,783,410 |
| Dicloxacillin Sodium | 3/14-8/17 | 98% | $13,326,041 |
| Diltiazem HCL | 7/13-1/16 | 205% | $38,020,901 |
| Etodolac SR | 7/13-1/14 | 200% | $49,403,608 |
| Fluoxetine HCL | 1/15-6/18 | 769% | $29,043,960 |
| Flutamide | 11/15-7/16 | 55% | $88,170 |
| Fosinipril Sodium | 2/15-9/15 | 60% | $3,928,025 |
| Griseofulvin | 2/15-3/16 | 276% | $16,148,357 |
| Hydroxyzine Pam | 3/14-1/18 | 173% | $11,019,351 |
| Ketoprofen | 7/13-5/18 | 746% | $6,131,456 |
| Ketorolac Trometh | 7/13-5/16 | 409% | $36,732,068 |
| Loperamide HCL | 8/14-2/16 | 119% | $15,651,417 |
| Megestrol Ace | 2/15-6/15 | 35% | $762,856 |
| Methotrexate Sodium | 6/13-1/15 | 579% | $138,314,084 |
| Methydolpa | 1/15-2/17 | 216% | $645,886 |
| Mexiletine HCL | 8/14-4/17 | 124% | $23,345,258 |
| Nefazodone HCL | 8/14-11/16 | 120% | $23,479,496 |
| Nortriptyline HCL | 1/15-9/16 | 158% | $20,967,422 |
| | | | |

---

[7] A nationally recognized database was used to calculate prices per unit. The data reflect prices at wholesale, but do not reflect off-invoice discounts and rebates. The data show sales prices reflecting the inventory in any given month. Even though price increases may be set at a particular point in time, because the data tracks actual market pricing, these prices increases can take time to work through the system as older stocks with lower prices are sold and replaced by newer stocks with higher prices. The period of increase is calculated with respect to the beginning of the price increase and the month of the peak price after the price increase.

[8] This represents the percentage increase for the most commonly prescribed dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

[9] To determine increased revenue, the month prior to the price increase was identified. Then it was assumed that this "but-for" price would have continued from that point onward had the price increase not occurred. The increased revenue is the difference between the actual monthly prices and the pre-increase price, multiplied by total quantity. Increased revenue is only calculated for months where the actual price is greater than the pre-increase price. This calculation is performed separately for each formulation of a given product.

| Generic Drug | Period of Increase | Percentage Increase | Increased Revenue |
|---|---|---|---|
| Prazosin HCL | 11/12-11/15 | 243% | $43,272,877 |
| Ranitidine HCL | 6/13-1/17 | 611% | $41,038,333 |
| Tolmetin Sodium | 7/13-6/17 | 265% | $2,652,049 |

76.    In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $688.1 million.

8.    **Teva Increased Prices in Parallel with Other Manufacturers for a Number of Drugs**

77.    Beginning in 2013 and extending through early 2016, Teva, acting in response to or in parallel with other manufacturers, increased prices on at least **24 generic drugs**. The drugs and the dates and amounts of increases are set forth below:

| Generic Drug | Period of Increase | Percentage Increase[10] | Increased Revenue | Average Increase of Competitors[11] |
|---|---|---|---|---|
| Baclofen | 3/14-2/15 | 306% | $143,490,678 | 716% |
| Bumetanide | 3/14-7/16 | 652% | $86,977,165 | 258% |
| Cabidopa-Levodopa | 6/16-12/16 | 51% | $94,699 | 79% |
| Carbamazepine | 8/14-12/16 | 909% | $81,660,368 | 792% |
| Cephalexin | 3/14-7/14 | 171% | $52,800,891 | 320% |
| Danazol | 1/15-3/16 | 169% | $3,588,552 | 76% |
| Dipyridamole | 6/15-12/17 | 413% | $1,486,507 | 245% |
| Divalproex Sodium | 3/13-6/18 | 444% | $8,765,463 | 166% |
| Doxazosin Mesy | 7/13-10/15 | 666% | $45,742,141 | 908% |
| Enalapril | 6/13-12/16 | 1728% | $55,084,975 | 1222% |
| Estazolam | 3/14-6/18 | 132% | $20,790,429 | 277% |
| Estradiol | 7/12-1/16 | 198% | 61,704,439 | 273% |
| Etotolac | 3/13-12/15 | 501% | $49,403,608 | 333% |

[10] This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

[11] Competitor price increases are included here if the data showed a price increase generally within a month or two of Teva's price increase for the same drug and formulation. The data in this chart represent the average percentage increase for all competitors that increased the price on at least one dosage of the drug. All competitors, dosages and relevant periods are set forth in Appendix A hereto.

28

| Fluconazole | 5/13-8/13 | 487% | $98,589,022 | 643% |
|---|---|---|---|---|
| Fluocinonide | 5/14-12/14 | 182% | $110,899,192 | 358% |
| Glimepiride | 1/15-8/15 | 199% | $19,091,825 | 214% |
| Ketoconazole | 3/14-9/16 | 590% | $54,025,729 | 945% |
| Meperdine HCL | 7/14-5/16 | 439% | $9,463,723 | 389% |
| Nadolol | 6/13-10/16 | 1143% | $70,875,535 | 131% |
| Oxybutynin CL | 5/13-1/16 | 869% | $97,355,732 | 535% |
| Penicillin V Potassium | 10/16-3/17 | 440% | $27,574,780 | 412% |
| Pravastatin Sod | 7/13-11/13 | 437% | $373,633,425 | 394% |
| Propranolol HCL | 5/13-5/14 | 298% | $256,345,498 | 900% |
| Trazodone HCL | 6/15-2/16 | 112% | $100,168,909 | 130% |

78.     In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $1.83 billion.

9.     **Teva Actively Colluded with Other Generic Drug Manufacturers to Fix Prices**

79.     With respect to three drugs as to which Teva made significant price increases—Nystatin, Theophylline ER, and Glipizide-Metformin—there is direct evidence that the price increases were the result of collusion with other manufacturers. Teva increased prices for and revenues from these drugs as follows:

| **Generic Drug** | **Period of Increase** | **Percentage Increase[12]** | **Increased Revenue** |
|---|---|---|---|
| Glipizide Metformin | 2/13-2/16 | 142% | $14,683,227 |
| Nystatin | 3/14-11/15 | 52% | $4,334,575 |
| Theophylline | 3/14-7/14 | 172% | $25,624,945 |

1)  **Direct Evidence of Price-Fixing: Nystatin and Theophylline ER**

80.     Nystatin is a medication used to fight fungal infections. The generic Nystatin sold by Teva is AB-rated to the brand name drug Mycostatin®. During the Relevant Period, Teva's

---

[12] This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

two main competitors for Nystatin were Heritage Pharmaceuticals Inc. ("Heritage") and Sun Pharmaceuticals (through its division Mutual Pharmaceuticals ("Mutual")).

81.     Theophylline ER is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema. The generic Theophylline ER sold by Teva is AB-rated to the brand name drug Theodur®. Theophylline ER is an extended release medication, which means that it is released into the body throughout the day. During the Relevant Period, Teva's primary competitor for Theophylline ER was Heritage.

82.     As evidenced by facts and documents detailed in the CT AG's Amended Complaint against Teva and others dated June 18, 2018, Teva, Heritage and Mutual exchanged numerous e-mails and text messages regarding the prices of generic Nystatin and Theophylline ER during the Relevant Period. Many of these communications were, on information and belief, between Nisha Patel ("Patel"), Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016, and Jason Malek ("Malek"), the former President of Heritage who pled guilty to Sherman Act antitrust violations for price-fixing in January 2017.[13]  For example,

> (a)     In July 2013, Patel had a series of phone calls with Malek. The three calls spanned 43 minutes, including an initial call on July 7 that lasted for 21 minutes.

> (b)     On July 30, 2013 Patel and Malek spoke twice, with the second of those two calls lasting more than twelve minutes. In between these two calls, another Heritage representative spoke with a Mutual representative for nearly eleven minutes.

---

[13] Based on publicly available social media sites, Patel's tenure at Teva aligns with the tenure of Malek's employment at Heritage and contact with Teva.

(c)     After these calls, Nystatin was identified on an internal Teva document listing "potential" price increases, notwithstanding that Teva management had declined to raise prices a month earlier. Patel then left for maternity leave in August 2013 until the end of 2013.

(d)     On February 5, 2014, Patel and Malek spoke for more than one hour. Two days later, on February 7, Nystatin was again identified on an internal Teva document listing drugs for potential price increases. Patel and Malek had several additional calls in February and March 2014.

(e)     On April 4, 2014, Teva increased the weighted average cost ("WAC") price for Nystatin and Theophylline ER.

(f)     On April 15, 2014, Patel and Malek spoke for 17 minutes and discussed price increases for Nystatin, Theophylline, and several other generic drugs.

(g)     On June 23, 2014, Heritage employees internally discussed strategies to implement its own price increases of Nystatin, which it had slated for a 95% increase, and Theophylline ER, which it has slated for a 150% increase. In her notes about the call, a Heritage representative indicated that Heritage had to increase its WAC pricing for Nystatin, because Teva had. On June 25, 2014, the Heritage representative exchanged text messages with her contact at Sun/Mutual to let her know the details of Heritage's anticipated price increase for Nystatin.

(h)     On June 25, 2014, Malek also spoke with Patel for nearly fourteen minutes, during which Malek reported that Heritage would increase its prices for Theophylline shortly.

(i)     On June 30, 2014, Patel emailed her colleagues, acknowledging the agreement with Heritage.

(j)     By July 9, 2014, Heritage had increased Nystatin prices for at least fourteen of its customers nationwide, and by at least August of 2014, Sun began increasing its price for Nystatin as well. In addition to leading the price increases for Nystatin, Teva also refused to bid or challenge Heritage's price increases when requested by Heritage customers. Indeed, on July 8, 2014, a large retail customer emailed a Teva representative requesting a quote for Nystatin, but Teva refused to bid or challenge the Heritage price increase for this customer.

(k)     Also, by July 9, 2014, Heritage had increased prices for Theophylline ER for at least twenty different customers nationwide, much as Teva had done three months earlier.

83.     The agreements between Teva and these other drug companies to increase prices for Theophylline and Nystatin were part of a scheme to manipulate prices for these drugs.

### 2)  Direct Evidence of Price-Fixing: Glipizide-Metformin

84.     Glipizide-Metformin is a medicine indicated for the treatment of high blood sugar levels caused by Type-2 diabetes. The generic Glipizide-Metformin manufactured by Teva is AB-rated to the brand name drug Metaglip®. Prior to and during the Relevant Period, Teva's only two competitors for Glipizide-Metformin were Heritage and Mylan. In 2016, Zydus entered the market with less than 2% market share.

85.     Beginning in April 2014, representatives from Teva, Heritage, Zydus, Mylan, Aurobindo, and/or Citron participated in numerous phone calls, and exchanged numerous e- mails and text messages regarding the prices of generic Glipizide-Metformin.

86.     On April 15, 2014, Heritage's Malek spoke with Patel for more than seventeen minutes, during which they discussed Heritage's intention to raise the price of Glipizide- Metformin and other drugs. Teva agreed that if Heritage raised the price of these drugs, Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid Heritage and take its accounts. Malek and Patel spoke several more times over the next several months, during which Malek and his contact confirmed the agreement to raise Glipizide-Metformin, prices, and Malek updated Patel on the progress of Heritage's price increases.

87.     By May 9, 2014, a Teva representative had spoken with a Mylan representative multiple times regarding Glipizide-Metformin, including one call that lasted more than seven minutes, and the two continued to stay in close contact throughout the rest of 2014.

### 3)   Other Indicia of Price Collusion

88.     In addition to the direct evidence of price collusion between Teva and its rival drug maker in the form of inter-company communications, there are other indicia of collusion. For example, there was no reasonable justification for the price hikes discussed above. While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortages were reported during the Relevant Period. In addition, there was no significant increase in the demand for these drugs or in the drugs' production costs that would explain the enormous price increase. In addition, price increases of this magnitude would have been contrary to Teva's and each of the co-conspirators' economic interest absent the price-fixing scheme. Without the certainty that all of the co-conspirators would raise and maintain the prices for the relevant drugs, each co-conspirator risked being undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the co-conspirators' agreement to raise and maintain their prices for the relevant drugs.

89.     In addition, Teva and the Individual Defendants had a palpable motive to fix prices with Teva's competitors, which derives from the nature of the U.S. generic drug market itself. As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drug makers' marginal production costs. This stabilization of prices in turn caused Teva's profits and revenues to level off, thus giving Teva and its co- conspirators a common motive to conspire to raise prices.

90.     With the backdrop of this common motive in mind, the markets for Nystatin, Theophylline ER, and Glipizide-Metformin were all susceptible to anti-competitive conduct for

33

the following economic reasons:

(a)     The market for each of the three drugs referenced above was **highly concentrated** and controlled by a handful of companies. A more concentrated market is more susceptible to anti-competitive behavior, due in part to the relative ease with which co-conspirators can monitor each other's pricing behavior to ensure adherence to the price-fixing agreement. Moreover, in a highly concentrated market, there is a lower probability that each company has different production costs, which facilitates the maintenance of a price-fixing scheme.

(b)     **Barriers to entry** into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power—i.e., the ability to set prices above market costs—of existing participants. Entry barriers include things such as: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and difficulties buyers may have in changing suppliers. If there is no significant threat that new firms will enter a market, a single firm with a dominant market share—or a combination of firms with a significant percentage of the market—is able to engage in anticompetitive conduct, such as restricting output and raising prices to the detriment of consumers. Barriers to entry in the markets for generic drugs include, among other things, high manufacturing costs and regulatory and intellectual property requirements. For example, the requirement that companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

(c)     The presence of alternative products that can easily be substituted for a given product serves to undermine anti-competitive behavior. Conversely, the **absence of available substitutes** increases the susceptibility of a market to anti-competitive behavior because consumers have no alternative but to purchase the product, notwithstanding any price increases. In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic and brand-name versions of a drug are AB-rated to one another. Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

(d)     A standardized, commodity-like product with a **high degree of interchangeability** between the goods of the participants in an anti-competitive conspiracy also increases the susceptibility of a given market to anti-competitive conduct. By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original, brand-name drug.

91.     In addition to the economic characteristics of these markets, which indicate a

susceptibility to anti-competitive conduct, representatives from Teva and its co-conspirators had substantial opportunities to meet up, socialize and engage in collusive conduct. Teva and its co-conspirators routinely attended conferences, meetings, and trade shows sponsored by various pharmaceutical trade associations, interacted with each other and discussed their respective businesses and customers, and to discuss, devise, and implement the price-fixing schemes set forth herein. Social events and other recreational activities—including golf outings, lunches, cocktail parties, and dinners—were also organized in conjunction with the trade association events and provided further opportunities for these representatives to meet outside of the traditional business setting and engage in the collusive activities alleged herein. Teva even reserved a "strategic exchange" bungalow at the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS") which NACDS marketed as an "opportunit[y] to meet and discuss strategic issues with key trading partners." Such bungalows provided Teva and its competitors with a secluded place to privately conduct business. A list of these industry events and the attendees from Teva and its co-conspirators is attached as Appendix B hereto.

10.   **As a Result of the Price Increases, Teva Increased Its Revenues and Profits by Billions of Dollars**

92.   As a result of the price increases described above, between 2014 and 2016, the total additional revenues obtained from these price increases was **$2.5 billion**. Further, because price increases impose minimal additional costs on Teva, these revenue increases were, effectively, increases in Teva's profitability resulting from the price increase strategy.

93.   On an annual basis, the increased revenues began to impact Teva's bottom line beginning in 2013, peaked in 2015, and by 2017, had substantially declined as increased price

competition negatively impacted Teva's ability to successfully implement its price increase strategy. The additional revenues earned by Teva from its price increase strategy for 2013 through November 2014 is set forth in the chart below:

**Total Additional Revenues Earned From Price Increases**

| 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|------|------|------|------|------|------|-------|
| $222,115,831 | $656,024,837 | $747,045,795 | $541,772,741 | $273,812,033 | $74,887,541 | $2,515,686,778 |

7. **Recognizing that Its Price Increase Scheme Was Unsustainable for More than a Short Period, Teva Misleads Investors Regarding the Basis for Its Improved Financial Performance**

94.     In connection with its price increase strategy, Teva sought at all costs to avoid any suggestion that price increases were the cause of its seemingly miraculous turnaround. Accordingly, at the beginning of the Relevant Period of February 6, 2014, Teva falsely attributed its increase in revenues for the end of 2014 to higher sales volumes and launches of new generic drugs.

95.     In May 2014, touting its first quarter results, Teva again relied upon "new product launches" and a changed composition of revenues to explain its increased profitability.

96.     On October 30, 2014, during the third quarter earnings call, Teva was specifically asked about the impact of price increases, but Defendant Olafsson deflected, suggesting that there were no significant increases since "the base business itself is slowly eroding . . . ."

97.     And, during a conference call in December 2014, Defendant Olafsson was asked a question that was based upon an assumption that wholesalers of generic drugs were experiencing "extraordinary price increases." Defendant Olafsson rejected the premise of the question, stating: "let me correct. I have to disagree that they have experienced tremendous price increase[s]."

36

98.     Throughout 2015 and early 2016, Vigodman, Desheh and Olafsson flatly

denied that Teva's improved performance was the result of price increases:

- October 29, 2015 (Vigodman): "[A]ll the improvements you see in margins is ***not driven by price***. It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015. And that's a very important message."

- November 19, 2015 (Desheh): "There is a lot of noise around pricing issues. Some of it is coming from politicians [who are] driving agenda[s] . . . . Our exposure to all these things is very minimal . . . . I believe there are many examples for competitive environment, real competition, like we see in the generic market in the United States- .. . . . Teva was not associated with any of that*."*

- February 11, 2016 (Olafsson): "So how did we do this [increase our profit margin by
$1 billion over 24 months]? ***Not by pricing but by portfolio mix, new products, and efficiency measures***."

All of the above statements were false because by July 2015, Teva had raised prices on

more than 61 drugs, including many by more than 250%.

### 8.     Driven by Price Increases, Teva's ADS Price Soars

99.     In 2014, despite the storm clouds raised by press stories, government investigations,

and the increasing pace of the FDA's ANDA approval process, Teva's price increases fueled a

turn-around success story for Teva's U.S. generics business, which reported approximately a $250

million (or 6%) increase in revenues over the prior year. Teva's ADS price soared as a result,

jumping more than 50% from around $37 in late October 2013, to approximately $56 by the end

of 2014. These astonishing year-over-year increases in U.S. generics revenues were accomplished

in the face of 23 million fewer prescriptions than in 2013.

100.     The price increases also led to a banner year in 2015 for Teva's U.S. generics

division, which spearheaded the Company's growth story, fueling an unprecedented increase in

the price of Teva ADS. Teva reported the 2015 gross profit from its overall generic medicines segment as $4.5 billion, an increase of $246 million, or 6%, compared to $4.3 billion in 2014, and a profit (with expenses removed) of $2.7 billion in 2015, compared to $2.2 billion in 2014, or a difference of almost 24%. Most of these glowing results stemmed from Teva's U.S. generics division, which reported revenues of $4.8 billion, an increase of $375 million, or 8%, over 2014, which itself had been a flagship year for U.S. generics. Teva's inflated ADS price rocketed from approximately $55 at the beginning of the year to more than $70 by late July 2015.

**9.      Defendants Lay Plans for a Major Acquisition—Inflating the ADS Price to Use as "Currency"**

101.    Teva was undeterred by the public outcry regarding the price increases and the government investigations into generic price-fixing, as well as Teva's knowledge that price increases could not be maintained over the long-term as generic competition increased. Defendants continued to pursue plans—contemplated from the time Vigodman was hired as CEO in January 2014—to engage in large acquisitions to position the company for the end of its Copoxone patent rights.

102.    On April 21, 2015, with the ADS shares trading at an artificially inflated price of approximately $66 per share, Defendants announced an offer to acquire all of the outstanding shares of Mylan in a transaction valued at $82.00 per Mylan share, with the consideration to be comprised of approximately 50% cash and 50% stock. The acquisition fell through; yet Defendants continued to pursue other acquisition options, all the while continuing to misrepresent and omit material facts regarding the Teva's ongoing price-fixing conspiracy and source of its financial success.

**10.      The Company Announces a $40 Billion Acquisition of Actavis Fueled By Its Inflated Share Price and a Proposed Bond Offering**

103.     Fueled by Defendants' misleading statements, Teva's ADS price reached a then all-time high of $72 on July 27, 2015. On that day, Teva announced it had entered into a definitive agreement with Allergan plc to acquire its worldwide generic pharmaceuticals business, Actavis, for $40.5 billion in cash and equity.

104.     As would later be revealed during a call with investors on October 29, 2015, Defendants planned to raise approximately $6.75 billion from a secondary public offering of ADS and an initial public offering of Preferred Shares, and approximately $27 billion from a debt issuance and term loans, to finance the acquisition.

105.     On the same day, Teva issued its third quarter 2015 results, which were ahead of the street's expectations, and again raised its full year guidance. As summarized by the analysts at UBS in their October 29, 2015 report, "Our takeaway: Another good quarter."

1.     **Teva Issues $3.375 Billion in ADS and $3.375 Billion in Preferred Shares While the ADS Trade at an Inflated Price**

106.     On December 8, 2015, Teva closed its Secondary Offering of ADS and its Initial Offering of Preferred Shares. Teva issued 54 million ADS at $62.50 per ADS in the secondary offering, raising approximately $3.375 billion from investors. These shares were offered publicly pursuant to a registration statement and prospectus. Teva also issued 3,375,000 Preferred Shares at $1,000.00 per share, raising another $3.375 billion from investors. Each Preferred Share was to be converted into a number of ADS equal to the conversion rate set forth in the Preferred Prospectus, between 13.3333 and 16.0000.

107.     On January 6, 2016, Teva sold an additional 5.4 million ADS and an additional 337,500 Preferred Shares pursuant to the exercise of the ADS/Preferred Underwriters' over-allotment option. In total, Teva generated net proceeds from the ADS Offering and the

Preferred Offering of approximately $7.24 billion.

2.  **Defendants Rush the Notes Offering and Conceal the Fact that Teva Had Been Served Subpoenas by the DOJ and the Connecticut AG**

108.    On July 13, 2016, Vigodman announced that Teva would accelerate the timing of the bond offering related to the Actavis deal, despite the fact that it "lacked full visibility into the Actavis Generics number." According to Vigodman:

> [W]e are closely monitoring the corporate bond markets and given the various attractive terms currently prevailing there, we are considering accelerating our planned debt offering. With this in mind, and despite the fact that we will not yet have full visibility into the Actavis Generics number, and in particular, certain pipeline information, we have decided to provide you today with our best estimate of the financial outlook for Teva in 2016 to 2019, following the close of the deal.

109.    This was surprising because just a few weeks earlier, on a May 9, 2016 conference call, Desheh had told investors that the offering would not happen until *after* the Actavis deal closed.

110.    On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction.  The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures. Despite dozens of pages of disclosures about other investigations and litigations, neither the Notes Offering Materials, nor the documents incorporated by reference therein, disclosed the DOJ and Connecticut AG subpoenas.

111.    As of July 31, 2016, Teva had raised $20.3 billion from the Senior Notes Offering to complete the Actavis acquisition. The Actavis deal closed on August 2, 2016. In the related August 2, 2016 press release, Vigodman falsely declared that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever—in both our generics and

specialty businesses."

112.     In sum, of the $33.4 billion owed Allergan beyond the transfer of Teva stock (priced as of July 2015), $5 billion was funded by Teva borrowing from its loan facility, and $8.1 billion was funded from cash on hand that was previously raised in the ADS and Preferred Offerings, including from its December 2015 equity offerings and borrowings under its syndicated revolving credit. The remaining $20.3 billion came from the proceeds of the Senior Notes Offering. If the deal failed because Defendants had been unable to secure financing for that debt, according to the terms of the deal's structure, Teva's agreement with Allergan would have required Teva to pay Allergan $2.5 billion.

### 11.     The Fraud Unravels, Causing the Prices of Teva Securities to Fall

#### 1.     Days After the Close of the Actavis Transaction, Teva Belatedly Announces It Is the Subject of Government Antitrust Investigations

113.     On August 4, 2016, three days after the Notes Offering, and two days after the Actavis transaction closed, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of 2015. The end of its ability to maintain growth through price increases was due to the massive increase in competition as the result of the FDA's vastly accelerated pace of ANDA approvals. Defendants also revealed for the first time to investors that Teva was now the subject of DOJ and State AG investigations into generic drug price collusion. In fact, the DOJ had served Teva with a subpoena on June 21, 2016, and the CT AG on July 12, 2016—just before Teva announced the $20 billion Notes Offering on July 13, 2016, although Defendants did not disclose the subpoenas at the time. Upon this news, the price of Teva's securities fell.

114.     Despite the revelation of government inquiries and the continued unraveling of

Teva's ability to maintain elevated drug prices, Defendants doubled down, expressly denying the impact of price hikes and reaffirming their inflated outlook for 2016.

115.    Defendants' denials were deeply undermined when, on September 12, 2016, the GAO Report was issued. This report, based upon a review of Medicare data, concluded that generic drug manufacturers, including Teva, had made hundreds of unexplained "extraordinary price increases"—defined as a particular drug's price increasing over 100% within a 12-month period—including numerous price increases of more than 1,000% in some cases. Teva owned the rights to at least *40%* of the drugs identified in the GAO Report as having exhibited an extraordinary price increase between 2013 and 2015.

116.    Further, after *Bloomberg* and other media outlets reported between November 3 and November 10, 2016, that U.S. prosecutors could hand down criminal charges related to its price-fixing investigation by year-end, Defendants denied any wrongdoing, stating, "Teva is not aware of any facts that would give rise to an exposure to the company with respect to these subpoenas."

117.    This denial was false. Only a month later, the CT AG would file its complaint alleging direct evidence that Teva had engaged in a conspiracy to fix prices on multiple drugs.

2.    **The Market Is Surprised When Teva Announces Dismal Results for the Third Quarter of 2016 and Olafsson Is Fired**

118.    On November 15, 2016, Teva reported third quarter 2016 revenues below consensus expectations, which Defendant Olafsson stated were a result of pricing pressures in Teva's U.S. generics business. This news was a shock and a disappointment, given Defendants' bullish comments on Teva's generics business and statements concerning price trends. On this news, the price of Teva's securities dropped.

119.    Less than three weeks later, on December 5, 2016, amid Teva's deteriorating financial condition, the Company unexpectedly announced the "retirement" of Olafsson, the 48-year-old head of generics. His replacement, Dipankar Bhattacharjee, took over effective immediately. In reality, Olafsson did not "retire." He was fired. The price of Teva's securities dropped in response.

3.    **DOJ Criminal Charges and State AG Lawsuits place Teva Under Further Market Scrutiny**

120.    On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through 2015.  The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the Class Period.

121.    The next day, December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide.  The State AG's complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer.

122.    The State AGs' complaint was amended to include 13 additional drugs, seven of which implicate Teva, and 47 State AGs, as well as the AG from the District of Columbia and the AG from Puerto Rico.  That complaint is based in part on the cooperation of Glazer and Malek, who have settled with the State AGs in exchange for cooperation.  The State AGs are now investigating conspiracies regarding upwards of 200 drugs, filed a significantly expanded

43

complaint in May 2019, as set forth below, and have indicated their intent to file additional complaints in the future. Malek and Glazer have also pleaded guilty to Federal criminal charges, admitting that they participated in "a conspiracy to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide, from in or about April 2014 and continuing until at least December 2015," in violation of the Sherman Act.

4.  **Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company**

123.   On January 6, 2017, Teva reduced its 2017 guidance, far below market expectations, which Vigodman attributed "to not being able to realize new launches in . . . Teva['s] legacy business," rather than pricing pressure as generic competition increased. With this report of reduced revenues, the price of Teva securities declined precipitously.

124.   Shortly thereafter, on February 6, 2017, Teva announced the termination of Vigodman, effective immediately and without a permanent replacement. The press release further noted that Vigodman's service on Teva's Board had also ended. As with Olafsson, investors questioned the timing and abruptness of Vigodman's departure, especially given that no replacement was named, or, apparently, was under consideration at the time. For example, J.P Morgan, in a report dated February 6, 2017, titled "CEO Transition Adds Further Uncertainty to Story," wrote that "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges."

125.   On April 25, 2017, numerous media reports surfaced that Desheh would be pushed out as CFO at Teva. These reports were confirmed the next day when, in an April 26, 2017 6-K, Teva announced that Desheh would be stepping down as CFO in "the coming months" so that he

44

could move on to "the next phase of [his] career."

5. **After Vigodman, Desheh and Olafsson Are Terminated, Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings**

126.    On June 8, 2017, Teva announced four new directors to its Board in an attempt to regain lost credibility. By June 21, 2017, Desheh had also left Teva. Two months later, with Defendants Desheh, Vigodman and Olafsson finally gone and new board members in place, Teva revised guidance down again, reduced its dividend, and took a $6.1 billion charge. Management admitted that these actions were triggered largely by the same pricing and competitive market pressures that the Company—and especially former executives Vigodman, Olafsson and Desheh—had previously denied would have any impact on Teva.

127.    On August 3, 2017, Teva announced lower-than-expected second quarter 2017 results, including a net EPS loss for the quarter of $5.94, reduced guidance, and a $6.1 billion goodwill impairment charge. As Dr. Yitzhak Peterburg, Vigodman's temporary replacement, revealed during the Company's earnings call that day, the EPS loss was primarily the result of the $6.1 billion impairment charge, which was taken to reduce goodwill associated with Teva'

128.    U.S. generics business. Fitch downgraded Teva's Issuer Default Rating to BBB- as a result, with a Negative Outlook, reasoning that, "Pricing pressure in the U.S. will weigh on operations in the near term, requiring the company to reduce debt both through FCF generation and asset divestitures." As reported by The Street that day, "Teva Shares Are Getting Obliterated Again After Vicious Investment Bank Downgrades."

129.    Additionally, as the government investigations continued and the State AG lawsuits intensified, Teva repeatedly made false and misleading statements and/or failed to disclose material adverse facts regarding its anticompetitive practices and involvement in the collusive

45

scheme.  Specifically, on August 3,2017 Teva denied "having engaged in any conduct that would give rise to liability with respect to" the subpoenas and civil suits.

130.    The truth regarding Teva's collusion further emerged in an article published in *The Washington Post* on December 9, 2018 regarding the expansion of the State AG investigation.  The article also made note of Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

131.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The May 2019 complaint alleges that Teva implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's price-fixing with regards to at least 86 of those generic drugs compared to just 7 Teva-related drugs in the State AGs' previously filed action.  The action details Teva's role as a "consistent participant" and a central player in the conspiracy.  Further, the civil enforcement action names four Teva employees personally as defendants:  Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

C.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

132.    During the Relevant Period, Defendants made a series of materially false or misleading statements and omissions of material fact. These statements can be summarized as follows:

> *First*, Defendants made materially false and misleading statements and omissions regarding the reasons for the Company's success in the generic

drug market (including improved revenues, growth, profitability, costs, and margins). Specifically, Defendants falsely attribute the year-over-year ("YOY") changes in Teva's generic segment profit and U.S. generic revenues to sources other than Teva's price increases. Once Defendants spoke on these subjects, they had a duty to fully and accurately disclose the true source of Teva's revenues and profits.

*Second*, Defendants flatly and falsely denied that Teva had engaged in price increases or received material benefit from price increases. Instead, Defendants falsely claimed that Teva only raised prices on a select few generic drugs due to market shortages.

*Third*, Defendants falsely stated that the Company was immune to pricing pressures when, in fact, it was unable to sustain its undisclosed strategy of taking substantial price increases.

*Fourth*, Defendants falsely represented the level of completion that the Company faced in the generic drug market. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.

*Fifth*, Defendants failed to disclose in the Notes Offering Materials their receipt of subpoenas from the DOJ and the State AGs in connection with those agencies' investigations into price collusion in the generic pharmaceutical markets.

133.   Defendants also violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F by failing to disclose the true reasons and factors contributing to the increases and decreases in the Company's revenues, i.e., the Company's undisclosed strategy and implementation of massive price increases for generic drugs. These increases were unsustainable given, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.

      1.       **Defendants' Materially False and Misleading Statements and Omissions During the Relevant Period**

           1.      **February 6, 2014**

134.    On February 6, 2014, in a press release filed with the SEC on Form 6-K, Teva reported the Company's 4Q13 and FY 2013 financial results. In the same press release, Teva disclosed 4Q13 U.S. Generic Medicine "revenues of $1.2 billion, an increase of 14% compared to the fourth quarter of 2012." The press release reported that:

> The increase resulted mainly from the exclusive launches of niacin ER, the generic version of Niaspan®, and temozolomide, the generic version of Temodar®, in the third quarter of 2013, and launches of duloxetine, the generic version of Cymbalta®, and tobramycin, the generic version of Tobi®, in the fourth quarter of 2013, as well as higher sales of budesonide inhalation, the generic version of Pulmicort®.

135.    The statements set forth in ¶ 134 above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

2.    **February 10, 2014**

136.    On February 10, 2014, Teva filed its 2013 Annual Report with the SEC on Form 20-F, which was signed by Defendant Desheh. The 2013 20-F disclosed a YOY decline in generic

48

profit of $400 million, or 20%, "primarily" attributed to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

137.    The statements set forth in ¶ 136 above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results in the generic drug market were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone. Without this inflated revenue, Teva would have experienced a YOY decline in generic profit of $622 million, or 55% more than what it reported.  This strategy was inherently unsustainable in light of, among other   things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

138.    The Company's February 10, 2014 Form 20-F also described the "intense competition," Teva faced in the U.S. generic market and its "competitive pricing strategy," and again touted its "competitive advantages":

> Competitive Landscape. In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary

competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy.

139.    In the same Form 20-F, Teva discussed the primary factors driving growth in the Company's Generic Medicines segment, and reported "intense competition in the generic market":

Sales of generic pharmaceuticals have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.

140.    The statements set forth in ¶¶ 138-139 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

3.    **May 1, 2014**

141.    On May 1, 2014, Teva filed a press release on a Form 6-K with the SEC, signed by Defendant Desheh, reporting the Company's 1Q14 financial results. The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was "primarily" due to: "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014

and in the United States in the second half of 2013."

142.    That same day, Teva held its 1Q14 earnings conference call, in which Defendants Vigodman and Desheh participated. During that call, Desheh stated:

> In generics, we experienced significant growth in the Unites States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches.

> \* \* \*

> The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market and higher profitability in Europe. . . . 31% improvement in the profit of the global generic business, driven by the performance of the US market, improved the total generic share to 30% of total profit.

143.    The statements set forth in ¶¶ 141-42 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by May 2014. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition

in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

4. **July 31, 2014**

144.    On July 31, 2014, Teva filed its 2Q14 Form 6-K with the SEC, which was signed by Desheh. The 2Q14 Form 6-K reported that YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> [A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit, [which was attributed to] . . . . higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe.

145.    On July 31, 2014, Teva held its 2Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated. During the call, Desheh stated:

> [T]he improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year. Launch of generic Xeloda in March and generic Lovaza this quarter in the US market . . . led to the better results.

146.    The statements set forth in ¶¶ 144-45 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by July 2014. This strategy was inherently unsustainable in light of, among other things, industry,

52

regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

5.   <b>October 30, 2014</b>

147.   On October 30, 2014, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva reported its 3Q14 financial results. The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, "primarily" from:

> [H]igher gross profit and a significant reduction in selling and marketing expenses, [with higher gross profit attributed to] . . . lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues.

148.   On October 30, 2014, Teva held its 3Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated. During the call, Olafsson stated:

> I think overall, we have a good revenue off the new launches this year. [Capasida] the generic Lovaza omega 3 [and] Entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year.
>
> (First alteration in original.)

149.   On the same call, a UBS Securities analyst asked whether price increases in "some of [Teva's] base business" impacted Teva's 3Q14 financial results. Olafsson responded: "there's never a price increase on the base business as whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers."

53

150.    The statements set forth in ¶¶ 147-49 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by October 2014. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

6.    **December 11, 2014**

151.    On December 11, 2014, Vigodman, Desheh, and Olafsson participated in the Company's 2015 Business Outlook Meeting conference call. During the call, a Morgan Stanley analyst asked "with respect to Generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases." Defendant Olafsson "disagree[ed]" stating:

> So first let me correct. I have to disagree that they have experienced
> tremendous price increase. I think, overall, the pricing in the US of

54

generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

152.     The statements set forth in ¶ 152 above were materially false and misleading and/or omitted material facts. Defendants' statements that "overall, the pricing in the U.S. of generics has been flat to a slight down" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY 13 and FY14 Teva generated more than $878 million through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 7.     **February 5 and 9, 2015**

153.     On February 5, 2015, Teva filed a press release with the SEC on Form 6-K, signed by Defendant Desheh, reporting the Company's 4Q14 and FY2014 financial results. The Q4 2014 Press Release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and lower R&D expenses."

154.     On February 9, 2015, Teva filed its 2014 Annual Report with the SEC on Form 20-F, signed by Desheh. The 2014 20-F disclosed a YOY increase in generic profit of $480 million,

or 29%, attributed "mainly" to:

> lower S&M expenses and higher gross profit . . . . [which was] mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties.

155. The Company's 2014 20-F also reported that FY2014 U.S. Generic Medicine revenues "amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013," explaining that:

> The increase resulted mainly from the 2014 exclusive launch of capecitabine (the generic equivalent of Xeloda®), the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we were first to market, and the launch of raloxifene (the generic equivalent of Evista®), as well as products that were sold in 2014 that were not sold in 2013. These increases were partially offset by lower sales of the generic versions of Adderall IR (amphetamine salts IR), Pulmicort (budesonide inhalation) and Niaspan® (niacin ER).

156. The table below reflects Teva's improved profits as reported in 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |

157. The statements set forth in ¶¶ 153-56 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY14 Teva generated more than $656 million through price increases alone, representing

a YOY increase in inflated revenues of more than $434 million, or nearly all of the reported YOY change in generics profit. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

158.   The Company's February 9, 2015 Form 20-F also described the "intense competition" Teva faced in the U.S. generic drug market and its "competitive pricing strategy," and again touted its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand- name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

159.   In the 2014 Form 20-F, Teva also described the "intense competition in the generics market," and the primary factors driving growth in its Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less

expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

160.    In the same Form 20-F, the Company also described the following Risk Factor:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

161.    The statements set forth in ¶¶ 158-60 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

8.    **April 30, 2015**

162.    On April 30, 2015, Teva filed its 1Q15 Form 6-K with the SEC, also signed by Defendant Desheh. The Company's 1Q15 Form 6-K reported a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to:

Higher gross profit and lower selling and marketing expenses as well as lower research and development expenses . . . . [with] higher gross profit . . . mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business.

163.    On April 30, 2015, Teva held its 1Q15 earnings conference call, on which Vigodman, Desheh, and Olafsson participated. During the call, a Bank of America Merrill Lynch analyst asked "how much more potential exists to increase generic segment margins purely from organic gains in operational efficiency?" In response, Olafsson stated:

> I think there is room for more, but it takes a little longer time. What plays into the operating profit in generics are probably three or four things.
>
> First of all, we have a significant improvement in our cost of goods. I think the operation team in Teva has done an outstanding job in lowering the cost of goods, improving the quality of the supply.
>
> And really, it's my business that has benefited from that because a big portion of our volume comes straight to the generic business. And really, we will continue that over time. . . .
>
> I think the next thing is the portfolio offering. I think the more we have of exclusive complex generics on offering, we have a higher margin on these products. It's simple. So when we have more of the launches, it will drive up the margin.
>
> The third thing is the cost infrastructure. I think we have done a very good job in the cost infrastructure. You can see that from our gross margin versus our operating profit. . . .
>
> [O]bviously, the big jumps of 1,000 basis points we have taken over the last 24 months, you wouldn't see that skill of improvement in the generics. . . .
>
> When you look at the top line growth, you see that already in first quarter we have improved our top line growth. That mainly comes from our new launches but also our emphasis on the branded generic markets.

164.    The statements set forth in ¶¶ 162-3 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business, including the "three or four things" that play into Teva's operating profit, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily

by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by April 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

9.   **June 11, 2015**

165.   During a June 11, 2015 Goldman Sachs conference, Vigodman spoke of "the profound change in the generic business" since 2014, stating:

> These are "things [that] are not confined to numbers, but maybe [numbers tell the story]: 16.7% operating profit in 2013; 21.9% operating profit 2014," and attributing this success solely to "[t]he execution of the cost reduction program[:]
> $600 million net savings 2014; $500 million 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months, we centralized procurement.… So everything that was done during 2014 was based on organic moves only."

166.   The statements set forth in ¶ 165 above were materially false and misleading and/or omitted material facts. Vigodman's statements touting the purported success of their generics business, including the "cost reduction program" and "full transformation of our operational network," had the effect of concealing, and/or failed to disclose, that, in truth, the Company's

60

reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by June 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 10.  July 27, 2015

167.  On July 27, 2015, Teva held a call to discuss the Company's Actavis acquisition. On the July 27, 2015 call, a BMO Capital analyst asked Olafsson and Vigodman about the competitive landscape in the generic market. In response, Olafsson stated, "the US generic market is very competitive. . . . [There's] a fierce competition on most of the portfolio, if not all of the portfolio." Vigodman added, "we promise to do everything in our power to take the Company to be able to continue the improvement that we have been witnessing here.  We believe in competition, and we'll do what is needed in order to win all the markets we operate."

168.  The statements set forth in ¶ 167 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce competition" or operating in a competitive environment. Nor was "the US generic market [] very competitive." In truth, Teva's

undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

11.   **July 30, 2015**

169.   On July 30, 2015, Teva filed its 2Q15 Form 6-K, which was signed by Defendant Desheh. Teva's 2Q15 6-K reported a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> "[H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

170.   The statements set forth in ¶ 169 above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth,  the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by July 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth

62

and the subject of competition in the generic drug markets, Defendants had a duty to disclose

Teva's price increase strategy and the true source of its revenues.

12.   <strong>October 29, 2015</strong>

171.   On October 29, 2015, Teva filed its 3Q15 Form 6-K with the SEC, signed by

Desheh. In the 3Q15 Form 6-K, Teva reported YOY increase in generic profit of $20 million, or

4%, attributed "primarily" to:

> "[L]ower selling and marketing expenses, partially offset by lower gross
> profit," which in turn was partially offset "by higher gross profit of our
> API business."

172.   On October 29, 2015, Vigodman, Desheh, and Olafsson participated in the

Company's 3Q15 earnings conference call. During the call, Vigodman denied that any of Teva's

margin improvements were attributable to price increases:

> We are very responsible . . . in everything that pertains to prices on the
> generic side and on the specialty side. And I would even put it
> another way, ***all the*** improvements you see in our – in margins is not
> driven by price. It is driven by quantities and by mix and by efficiency
> measures. Not by price, 2014, 2015. And that's a very important
> message.

173.   In light of recent legislative proposals that would penalize generic manufacturers

for raising prices above the rate of inflation, an analyst asked for management's thoughts on "the

potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's

practice of increasing prices and implied that Teva was not dependent on such profit:

> In terms of the proposed legislation on pricing control on generics, first of
> all, we don't really know what it's going to be. But let me give you
> examples. So Teva has the largest portfolio on the U.S. market. We are
> offering approximately 275 products. And we have told you that overall
> on our whole portfolio, we have a decline in price. ***The talk about the
> inflation in generics when you have a big portfolio is really not there***.
> 95% of our portfolio is declining due to the consolidation of the customers

63

> I talked about. There might be 5% of the portfolio that is either flat or
> increasing in pricing due to some abnormalities in the market.

174.    The statements set forth in ¶¶ 171-73 above were materially false and misleading

and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to

disclose, that, in truth, the Company's reported financial results and success in the generic drug

market, including improved revenues, were driven primarily by its undisclosed strategy to take

massive price increases, either on its own or in tandem with other manufacturers whom it

purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878

million through price increases alone, and in FY15 generated an additional $747 million through

price increases, much of which had been realized by October 2015. This strategy was inherently

unsustainable in light of, among other things, industry, regulatory and governmental scrutiny

surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the

FDA, which would have the effect of introducing new competitors in the market. Having put into

play the issue of the source of Teva's revenue growth and the subject of competition in the

generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true

source of its revenues.

175.    On the same October 29, 2015 call, Olafsson was asked if he could "follow up . . .

on what your pricing trends are here in the US for the generic business." Olafsson responded:

> So on the pricing, I think pricing is obviously based on the competition.
> We have talked about that the overall pricing trend is down. What will
> change that obviously, there is different things. I think the consolidation
> of the customers affect pricing. I think the backlog, when the FDA
> releases the backlog of 3,000 NDA affect pricing.

176.    The statements set forth in ¶ 175 above were materially false and misleading and/or

omitted material facts because Teva's pricing was not "obviously based on the competition" and

the Company was not operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

13.   <b>November 19, 2015</b>

177.    On November 19, 2015, during a Global Healthcare Conference call hosted by Jefferies LLC, in response to a question asking Desheh to "give us your 20,000 foot view on pricing" and asked "[i]s it an issue . . . where do you go on price," he stated:

> There is a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate.
>
> **Our exposure to all these things is very minimal. . . .**
>
> Generic prices? There are no – I believe that there are many examples for competitive environment, real competition, like we see in the generic market in the United States. . . .
>
> So it's a highly competitive environment with players coming from all over the world, with a very fierce price competition. The price of generic went down 50% over the past 10 years. . . .
>
> ***And Teva was not associated with any of that.*** So we're playing a competitive game. We're playing it fairly. We, of course, play by the book and by the rule. ***And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have. . . .***
>
> But we also saw that there is a floor to this. And the floor is a common economic and business model. And wherever prices have come down to a level that it doesn't make sense, companies like us just pull out. We refuse to participate in tenders that generate no profit. And we just pull out . . . . prices go up, because there is less supply over the demand.

178.    The statements set forth in ¶ 177 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce price competition" or operating in a

65

"highly competitive environment." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

179.    Similarly, Desheh's statements set forth in ¶ 177 above – including that Teva's "exposure to all these things is very minimal," "we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have," and "Teva was not associated with any of that" – were false and misleading because Teva was highly dependent on its strategy to implement massive short term price hikes. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. Thus, any political initiative, such as permitting Medicare to negotiate drug prices, could lead to drastic price decreases.

### 14.    **November 30, and December 3, 2015**

180.    On November 30, 2015, Teva filed a Registration Statement on Form F-3, signed by Vigdoman, Desheh, and Griffin, with the SEC (the "ADS Registration Statement"), as well as a preliminary prospectus supplement, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS to the public.  The ADS Registration Statement incorporated by reference the 2014 20-F, Q1 2015 6-K, Q22015 6-K, and Q3 2015 6-K which all contained false and misleading financial disclosures.

181.    On December 3, 2015, Teva filed a prospectus supplement, referred to herein as "the ADS Final Prospectus," with the SEC.  The ADS Final Prospectus incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K.

182.    The statements set forth in ¶¶180-81 above were materially false and misleading

and/or omitted material facts. Defendants' statements touting the purported success of their generics business, including the "three or four things" that play into Teva's operating profit, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by April 2015. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 15.  January 11, 2016

183.    At a January 11, 2016 J.P. Morgan Conference, a J.P. Morgan a.nalyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease

because **on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase**. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

184.    The statements set forth in ¶ 183 above were materially false and misleading and/or omitted material facts. Olafsson's statement that "on 95% of our portfolio, we experience price decline" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

16.    **February 11, 2016**

185.    On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to: "[T]he reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

186.     Also on February 11, 2016, Teva filed its Annual Report with the SEC on Form 20-F, signed by Desheh. Vigodman and Desheh also signed the consolidated balance sheet. The 2015 Form 20-F a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses and higher gross profit," which was "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

187.     The table below reflects Teva's improved profits as reported in 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |

188.     On February 11, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 4Q15 and FY2015 earnings call. On the same call, Olafsson stated:

> 2015 was a very good year for Teva Generics. Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally. We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period.
>
> So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

189.     During the February 11, 2016 earnings conference call, Olafsson made the following statements regarding pricing in the generic segment:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw mid-single-digit price decline for the overall business.

In the U.S., our largest market, we saw approximately 4% price erosion. . . .

Looking forward, the conjunction of price erosion with the mix changes, focus on cost structure, and the new product launches, we continue to drive our business growth, both top line and bottom line. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

190.    On the same call, a Guggenheim Securities, LLC analyst asked Olafsson about pricing pressures discussed by Teva's competitors during the quarter. In response, Olafsson denied that there was any pricing pressure:

As I mentioned in the beginning, we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year. Some of our competitors have seen more pressure. I think overall, it might have to do with some dosage form differences. But also, I think we have been right in adjusting the business.

191.    The Investor Slides presented during the February 11, 2016 earnings conference call contained the following statements attributed to Olafsson: "Do not see the inflationary pricing discussed in the media[.] Also do not see the sharp drop in prices other competitors have seen recently[.] Mid-single digit increases in 2015[.] Expect 2016 to maintain the current trend."

192.    The statements set forth in ¶¶ 185-91 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) touting the purported success of their generics business and (ii) denying any knowledge of price inflation, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than

$1.6 billion through price increases alone. Moreover, during FY15 Teva generated more than $747 million through price increases alone, representing a YOY increase in inflated revenues of more than $91 million, or nearly 20% of the reported YOY change in generics profit. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

193.   In the 2015 20-F filed on February 11, 2016, Teva described the "intense competition" the Company faced in the U.S. generic market and its "competitive pricing strategy," as well as its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand- name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

194.   The 2015 Form 20-F also described the "intense competition in the generic market" and the primary factors driving growth in Teva's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies

71

competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

195.    The same Form 20-F also described the following Risk Factor:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

196.    During the February 11, 2016 earnings conference call, a Susquehanna Financial Group analyst also asked Olafsson about the Company's relationships with customers and what impact the Actavis deal was having on pricing. Olafsson responded:

We will pride ourselves of the service level of the high quality of the product.   But at the end of the day, there is a fierce competition in the market. Over 200 generic companies, and really there is no bundling or anything like that, that can go on in the market. So overall, same as without the deal. But we see the opportunity going forward based on the huge pipeline that we have.

197.    During the same call, Olafsson also stated that the U.S. generics business had been "stable over the year" and "[t]here is a lot of competition in the US, there is no question about it. As you well know, there are over 200 generic competitors in the market and the competition is fierce." Olafsson claimed Teva's competitive advantage was having "the largest [drug] pipeline" and "an extremely good supply chain."

198.    The statements set forth in ¶¶ 193-97 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition," "a lot of competition in the US," or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

17.    **March 8, 2016**

199.    On March 8, 2016, during a Cowen & Company Healthcare Conference call, Olafsson stated:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015. . . .
>
> I think ***overall the pricing hasn't changed that much***. There was a lot of talk about inflation in generic pricing. But we never saw that. That was an individual molecule basis, they used example of products that really were not generic products, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business. And there has been a decline there. . . .
>
> So as of today, I came out with 4% [price erosion] in 2015. As of today, I don't see any big changes in the pricing environment. It's relatively stable. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014. But overall, these are the three things that affect the price. And there's nothing on the horizon that should affect the pricing as of today.

200.    During the same conference, Olafsson also discussed Teva's profitability in its generic segment:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited

73

for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period. Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

201.   The statements set forth in ¶¶ 199-200 above were materially false and misleading and/or omitted material facts. Olafsson's statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

18.   **May 9, 2016**

202.   On May 9, 2016, Teva filed its 1Q16 Form 6-K with the SEC, which was signed by Desheh. Vigodman and Desheh both signed the consolidated balance sheet in the 1Q16 Form 6-K. In the 1Q16 Form 6-K, Teva reported a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while lower gross profit was "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in

74

our European markets.

203.   On May 9, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 1Q16 earnings conference call. During the call, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

204.   During the call, Olafsson also discussed pricing on the May 9, 2016 earnings call:

> The global generic drug market has no shortage of manufacturers supplying vital medicines to patients in the US and around the world. . . . As you know, in February, during the fourth-quarter reporting season, several industry participants referenced a tougher pricing environment than what they have experienced in previous years, as a reason for the softness in their respective generic businesses. Now, we fast-forward to April and May, to a new reporting season, and we find the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate. The referencing of generic drug price deflation has not been limited to the manufacturers, but is also being cited by those on the purchasing and distribution side, leaving many to wonder about what is the real opportunity in generics.
>
> As always, I will do my best to provide you with as much color as possible on what Teva is experiencing, in regards to pricing and volume; and more importantly, where we are headed. Throughout the ongoing debate this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.  Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same. In fact, Allergan, and Mylan, two other companies with broad and diversified portfolios and high quality products, have also reported similar trends. From where I sit today, there is nothing that changes my mind about that.  Nothing has happened in the last two quarters that has changed the pricing

environment. What this boils down to is each individual company's business model. . . .

205.    During the same call, Olafsson stated:

[W]hy is Teva different? Why is our performance better than most generic companies? Why are other companies continuing to say, there is pricing pressure greater than what we at Teva are seeing?

I see three reasons: first, the companies with older portfolio seemed to complain much more loudly. What I mean by that is, that if you look carefully at some companies with older portfolios, they will tell you that the pricing environment is worsening. But this is not an environment. This is purely a reflection of their portfolios, some of which are concentrated in one, or very few, therapeutic classes that are experiencing normal competition. This takes me to the second factor, new product launches. When companies don't have new product launches, and the business is declining, they tend to talk about the market more than anything else. This is not a reflection of the environment, but rather again, a reflection on a company's portfolio.

The third factor is companies that are trying to grow their market share. Some companies are aggressive in going after market share for a variety of reasons, including to utilize excess capacity with relatively cheap volume. But in order to do that, you'll have to drive down price. Buying new market share in price will cost you on the bottom line. We, on the other hand, are seeing our volumes go down, deliberately, net-net approximately 1% a year, because we think that is better for our business, and we would rather reduce capacity, than fill it with less profitable products. So if you look at this slide, you'll see that over the past few years, we discontinued 70 products. At the same time, we introduced 68 new ones in the US.

206.    During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position

76

in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

207.    The Investor Slides that the Company presented during the May 9, 2016 earnings conference call contained the following statement, attributed to Olafsson: "What has changed in the US pricing environment since Q4 2015? The short answer is…nothing. We still expect 4% price erosion on our portfolio." The Investor Slides also contained the statement: "There is no change in the pricing environment [.] It all comes down to each company's business model . . . Why is Teva generics performance better than most Gx companies? Portfolio optimization …. [and] [n]ew product[]."

208.    The statements set forth in ¶¶ 202-07 above were materially false and misleading and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by the unsustainability of Teva's undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by May 2016.

77

Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the source of its revenue.

19. **May 10, 2016**

209. On May 10, 2016, on a Bank of America Merrill Lynch Healthcare Conference call, Olafsson discussed the Company's 1Q16 financial results and the pricing environment in the generics market:

> I mentioned on that call, and want to reemphasize here, there's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%. We guided the market that we would see the same pricing of approximately deflation of 4% in 2016. And where I sit today, there is no change to that.
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

210. During the call, Olafsson also stated:

> You have to keep in mind that in the US generic space there's approximately 230 competitors. Two hundred and thirty generic companies in the US that are offering products. So the competition is heavy. So, if you show that you grow 3%, let's say 3% volume year-on-year, that will cost you on pricing.
>
> There's no question about it. So that's why I'm highlighting that in Teva world, we assume approximately 1% decline in the volume to maintain the pricing. So, it's not that we are the only good house in the neighborhood, and I don't think this is a bad neighborhood, I think it's a good neighborhood. It's unique. To maintain your business, you need to think about the future. And I think that's at the end of the day what differentiates us.

211. The statements set forth in ¶209-10 above were materially false and misleading and/or omitted material facts. Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by May 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 20.  June 3 and 8, 2016

212. On June 3, 2016, during a Sanford C. Bernstein Strategic Decisions Conference call, Vigodman made the following statement regarding pricing:

> [W]e are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that. And with basically our operating profits towards one of the (inaudible) in our history on kind of a naked basis, so generic business in the US without launches. So, in this

79

respect, we are very continuing with our messages, and that's what we
continue seeing.

213.   During a June 8, 2016 Goldman Sachs Healthcare Conference call, Olafsson again
discussed pricing:

> When we signed that [Actavis] deal in July, we talked about 4% price
> erosion in the US generic business. And we are still talking about the
> same number, what we see in the base business. And we can talk about
> that later, how we look at it versus others. But really the fundamental -
> - so what has changed in the market is that currently the multiples for
> generic companies, Mylan and us, has been dragged down, I think, due
> to other companies in the market partly, due to Valeant, due to Endo,
> due to comments that were made in Perrigo and Mallinckrodt about the
> generic business, which has affected the whole industry.

214.   The statements set forth in ¶¶ 212-13 above were materially false and misleading
and/or omitted material facts. Defendants' statements that nothing had changed in the pricing
environment in which Teva operated had the effect of concealing, and/or failed to disclose, that,
in truth, the Company's reported financial results were driven primarily by its undisclosed strategy
to take massive price increases, either on its own or in tandem with other manufacturers whom it
purportedly competed with. This strategy was inherently unsustainable in light of, among other
things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs,
and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of
introducing new competitors in the market. In fact, by this time, the risk from Defendants'
undisclosed strategy had begun to materialize. While Teva generated more than $541 million
through price increases during FY16, that figure represented a decline of more than $200 million,
or nearly 30%, from FY15. Much of this decline would have been known to Teva by June 2016.
Having put into play the issue of the source of Teva's revenue growth and the subject of
competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase

strategy and the true source of its revenues.

21. **June 21 and July 12, 2016**

215.    The Exchange Act Defendants concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016, each pursuant to their respective investigations into potential antitrust violations regarding pricing practices by generics manufacturers.    Specifically, these Defendants failed to disclose the subpoena in the Notes Offering Materials.

216.    This was false and misleading because the subpoenas called into question Teva's future earnings potential.    They rendered uncertain the Company's ability to maintain its earnings form the undisclosed Price-Hike Strategy.    Importantly, the issuance documents listed "governmental investigations into sales and marketing practices" as among "[i]mportant factors" that could cause Teva's future financial performance to "differ significantly from [anticipated] results, performance or achievements."    Additionally, the Notes Offering Materials incorporated by reference the 2015 20-F and the Q1 2016 6-K, which included extensive risk disclosures but did not disclose the subpoenas.    Among these is a section titled, "Government Investigations and Litigation Relating to Pricing and Marketing," that include an extensive description of litigation related to "marketing and promotion of [Teva's] specialty pharmaceutical products," and to litigation by "[a] number of state attorneys general . . . relating to reimbursements or drug price reporting under Medicaid or other programs."    The detailed and extensive nature of this section falsely and misleadingly indicated that the disclosures were complete, while omitting the highly material DOJ and State AGs subpoenas.

22. **July 13 and 19, 2016**

217.    On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to Form F-3, which was signed by Vigodman, Desheh, and Griffin, (the "Notes Registration Statement"). The Notes Registration Statement incorporated by reference the 2015 20-F and the Q1 2016 6-K.

218.    In a July 13, 2016 call to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, a Citigroup analyst asked: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace." In response, Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.…
>
> In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.…
>
> ***
>
> Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

219.    On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus for the Notes Offering (the "Notes Final Prospectus"). The Notes Final Prospectus also incorporated by

reference the 2015 20-F and the Q1 2016 6-K.

220.     The statements set forth in ¶ 218 above were materially false and misleading and/or omitted material facts. Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by July 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### 23.     **August 4, 2016**

221.     On August 4, 2016, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva announced its 2Q16 financial results. That same day, Teva also filed with the SEC its 2Q16 Form 6-K, signed by Desheh. Vigodman and Desheh both signed the consolidated balance sheet in the 2Q16 Form 6-K. The Company's 2Q16 6-K reported a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to:

"[L]ower gross profit," which in turn was "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses…"

222. On August 4, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 2Q16 earnings conference call. On the call, Desheh attributed the poor performance of the Company's generic segment to factors other than its inability to maintain its long undisclosed price increases:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

223. On the same call, in response to a question about "pricing stability" in light of Teva's U.S. generic revenues coming in "a little lower than expectations," Olafsson stated:

> I think, first of all, it's the old story in the generic business, and we have talked about it many times. It's the short-term volatility, but a long-term profitability that we are seeing in the generic business. I think on the US side, clearly the impact we highlighted, the impact of having a competition on Aripiprazole, Esomeprazole, and Budesonide was very, very significant. I think overall, the underlying business did well. . . .
>
> In terms of the pricing, the pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter.

224. Later in the call, Olafsson reiterated that "overall the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US."

225. On the same call, a J.P. Morgan analyst asked about "price opportunities" on the combined Teva-Actavis generic portfolio. In response, Olafsson stated:

> On the pricing, as you know, and we know that, the size really doesn't

affect the pricing. And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing. I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that. I feel quite strongly about that.

226.    The statements set forth in ¶¶ 221-25 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by August 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues. Moreover, Olafsson's suggestion that pricing decisions were driven by organic market factors – including that "pricing comes with shortages in the market" – was false and misleading in light of the Company's undisclosed practice of

implementing massive short term price increases to boost revenue.

227.    During the August 4, 2016 earnings conference call, Olafsson also stated that "competition is fierce" in the U.S. generics market and "[t]here's no question about it."

228.    The statements set forth in ¶ 227 above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce" competition, or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

### 24.    **September 7 and 9, 2016**

229.    On September 7, 2016, during a Wells Fargo Securities Healthcare Conference call, Desheh stated:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there. Might even go up a little bit here and there, depending on demand and supply, and demand and availability of competing products in the market, but you don't see -- there you don't see the erosion. Where we see erosion is that you know, you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no -- there's no pressure on prices.

230.    On September 9, 2016, during the Generic Medicines Business Overview call, Olafsson stated:

> *There is no inflation in the generic pricing. . . .*
>
> So what is the secret sauce? It's not very complex. This has been the same winning formula I have talked about many, many times. Really to be top three in the market is so important.

*** 

I think what I want to highlight is there will always be cycling of the pricing of generics. I have in my career, 23 years, never seen a real inflation. I mentioned to some of you before, I have been in the market where price declines was approximately 1% to 2%, probably 2%, and I've been in the market in 2006 and 2007 when the price decline was 7%, 8%. And then it's everything in between.

So far, what we saw in the end of second quarter was approximately 4% in the US and 5% global. So, there will be a fluctuation, and obviously, it will affect every generic Company. But the message I want you to take from this slide is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down.

231.     On the same call, Olafsson made the following statement regarding industry talk about price inflation: "so first of all, we need to differentiate generics from branded pricing. And people that say that the generic—there's a big generic price inflation, are simply wrong."

232.     Also during the September 9, 2016 call, a Goldman Sachs analyst noted there had been speculation that Teva was not raising prices during the approval process for the Actavis deal and asked if the Company expected the "landscape in terms of pricing to change at all, now that the deal is closed." Olafsson responded:

So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. *When price increases are taken, there's some kind of abnormality in the business*. There are shortages.

Remember that there's 208 generic companies out there that are offering product, and an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price. *So it's a very competitive business we're in*. I think overall, obviously, we look at each opportunity, but we come back to what Andy said and he will say it better, is we have an

87

opportunity to work with it. We have a broader portfolio now.

233.    During the September 9, 2016 conference call, the Company presented Investor Slides related to pricing pressures in the Generics market. The slides contain the following statements attributed to Olafsson:

- "Generic Price erosion varies year-to-year" and "Chasing market share will destroy value."

- Listing Teva's advantages as: "Price challenges are product specific – a broad diverse portfolio mitigates risk[;] Strong understanding of the market[;] Offering differentiated products – lower competition, durability[;] Competitive cost position[;] Industry leading pipeline – customers want access to our new products which brings them value."

- "Price erosion is nothing new.

- Listing how Teva is positioned to succeed in the market as: "Teva operations is a competitive advantage and capable of creating additional value[;] Allows Teva to maximize the value of the best R&D engine in the industry[;] Diverse portfolio and competitive cost structure allows for long-term value creation."

234.    The statements set forth in ¶¶ 229-33 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, (ii) that nothing had changed in the pricing environment in which Teva operated, and (iii) denying price inflation in the generic business, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk

from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by September 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues. Moreover, Desheh's and Olafsson's suggestions that pricing decisions were driven by organic market factors – including that "prices are very stable there . . . depending on demand and supply" and "When price increases are taken, there's some kind of abnormality in the business" – was false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue.

235.    The statements set forth in ¶ 232 above were also materially false and misleading and/or omitted material facts because Teva was not operating in a "very competitive business." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short-term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

### 25.    **November 15, 2016**

236.    On November 15, 2016, in a press release filed with the SEC on Form 6-K, and signed by Desheh, Teva reported its 3Q16 financial results. That same day, Teva filed its 3Q16 Form 6-K with the SEC, signed by Desheh. Vigodman and Desheh both signed the  consolidated balance sheet in the 3Q16 Form 6-K. The Company's 3Q16 Form 6-K also reported a YOY

increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. However, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> [P]artially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

237.    Teva's 3Q16 Form 6-K also contained the following statement regarding the subpoenas the Company had received from the DOJ and the Connecticut AG: "Teva is not aware of any facts that would give rise to an exposure to the Company with respect to these subpoenas."

238.    On November 15, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 3Q16 earnings conference call. During the call, a Credit Suisse analyst asked:

> [J]ust around your comments you made around generic drug pricing, you mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward. So can you just maybe provide a little bit more insight, there's obviously an area that there's a lot of investor focus, just what gives you the confidence that what's going to happen in the coming quarters will be different than what you saw this quarter?

In response, Olafsson stated:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

239.    When pressed on his explanation by a J.P. Morgan analyst, Olafsson reiterated: "where I sit here today, experiencing the market, there hasn't again been any fundamental change."

240.    A Wells Fargo analyst also asked Olafsson on the same call if he was saying that "the acceleration in the price decreases . . . this past quarter aren't a result of increased competition . . . and . . . not a result of having to tame previous price increases, or give back some of those?" In response, Olafsson stated:

> No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. . . . It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

241.    The statements set forth in ¶¶ 236-40 above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than

$200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva

by November 2016.  Having put into play the issue of the source of Teva's revenue growth and

the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's

price increase strategy and the true source of its revenues. Moreover, Olafsson's suggestions that

price decreases were driven by organic market factors – including because Teva "had to divest a

very good portfolio of products that had limited competition" – was false and misleading in light

of the Company's undisclosed practice of implementing massive short term price increases to

boost revenue, which, by this time, was no longer sustainable.

26.    <strong>January 6, 2017</strong>

242.    During a January 6, 2017 Business Outlook Conference Call, Vigodman announced

that Teva would provide 2017 guidance early in January 2017. During the call, Vigodman claimed

Teva's past success was not due to price increases, stating:

> Since the start of 2014, one of our greatest priorities has been to
> increase the profitability of our generics business. In the first three
> years of this great effort, we have been able to improve significantly the
> margins of Teva's standalone generics business. This has been
> accomplished with a strong emphasis on the cost of goods sold, product
> mix, and the overall cost structure.

243.    The statements set forth in ¶ 242 above were materially false and misleading and/or

omitted material facts. Defendants' statements touting the purported success of their generics

business had the effect of concealing, and/or failed to disclose, that, in truth,  the Company's

reported financial results and success in the generic drug market were driven primarily by its

undisclosed strategy to take massive price increases, either on its own or in tandem with other

manufacturers whom it purportedly competed with. Indeed, from FY13 through FY16 Teva

generated more than $2.1 billion through price increases alone. This strategy was inherently

92

unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

**aa.    February 15, 2017**

244.    On February 15, 2017, Teva filed its 2016 Annual Report with the SEC on Form 20-F, signed by Desheh. Desheh signed the consolidated balance sheet. The Company's 2016 Form 20-F also reported a YOY decline in U.S. generic revenues of $39 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. The Form 20-F explained that the decline:

> "resulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine.

245.    The statements set forth in ¶ 244 above were materially false and misleading and/or omitted material facts. Defendants' statements citing non-price factors for the decline in generic revenue had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the past success and current YOY decline in generic profits,

were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

246.    In the same February 15, 2017 Form 20-F, Teva described the "intense competition" the Company faced in the U.S. generic market and its "strategic" and "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand- name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.

247.    The Company also described in the Form 20-F the "intense competition in the generic market" and the primary factors driving growth in the Teva's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions,

94

consumers, physicians and pharmacists globally. . . . These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. . . . We believe that our robust product pipeline, which has been enhanced with the Actavis Generics business, and ability to continuously launch new products are critical to our growth in the face of continuing price erosion expected in the generics market.

248.    Teva's 2016 Form 20-F also described the following Risk Factor:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

249.    The statements set forth in ¶¶ 246-48 above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors.

**bb.    Additional False and Misleading Denials of Teva's Participation in Collusive Conduct**

250.    Teva repeatedly, and falsely, denied its participation in collusive conduct.

251.    In Teva's August 3, 2017 Form 6-K filed with the SEC, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and fraudulently stated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and

civil suits." Teva made materially identical false and misleading statements in each of its periodic reports filed with the SEC between August 3, 2017, and May 10, 2019, including Teva's Form 6-K filed on November 2, 2017; Teva's Form 10-K for the year ended December 31, 2017, filed on February 12, 2018; Teva's Form 10-Q for the period ended March 31, 2018, filed on May 3, 2018; Teva's Form 10-Q for the period ended June 30, 2018, filed on August 2, 2018; Teva's Form 10-Q for the period ended September 30, 2018, filed on November 1, 2018; and Teva's Form 10-K for the year ended December 31, 2018, filed on February 29, 2019.

252.    Further, on October 31, 2017, in response to media reports issued after the State AGs filed a proposed amendment expanding their first antitrust complaint, a Teva spokeswoman stated to Courthouse News that "Teva denies these allegations and will continue to defend itself vigorously in court." The Company further stated that "[i]n accordance with our values, Teva is committed to complying with all applicable competition laws and regulations. To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by them."

253.    Teva issued further denials in a December 19, 2018 statement to *Business Insider*, in which Teva denied the State AGs' allegations and said it "will continue to vigorously defend itself." On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to shareholders." Teva added that it is "committed to complying with all applicable laws and regulations and is dedicated to conducting business with integrity and fairness. Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories." On February 19, 2019, in response to media reports discussing an

unredacted version of the first State AG complaint that had recently been made public, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

254.    In addition, each of the reports Teva filed with the SEC on Forms 10-Q and 10-K throughout the Class Period contained certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Schultz and McClellan, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

255.    These statements were false and misleading because, as alleged specifically and independently herein and at Section III.E (Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter), Teva had in fact engaged in the collusive conduct the State AGs alleged; Teva was not merely a participant, but the central actor in an industry-wide scheme to fix prices and allocate customers; and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs' May 2019 complaint.

cc.    **False and Misleading Statements Regarding Actavis Acquisition**

256.    256. Teva's Q3 2016 6-K asserted that the Actavis acquisition "had a significant impact on our generic medicines segment, expanding our product portfolio, R&D capabilities, product pipeline, and global operational network."

257.    In the press release announcing the Q3 2016 results, Defendant Vigodman stated:

This has been a year of transition for Teva, underscored this quarter by the close of our strategic acquisition of Actavis Generics, which had

97

significant contribution to our results. Actavis will continue to contribute
in a meaningful way to the future growth of our generics business through
the strengthened R&D capabilities and complementary pipeline and
portfolio, and enhance our leadership in an increasingly evolving industry.

258.    During the Nov. 15, 2016, earnings call the same day, Teva made the following false and

misleading statements concerning the financial impact of the Actavis acquisition and integration on the

Company's business prospects and reported financials:

[Vigodman:] The completion of the Actavis acquisition strengthens and broadens
our R&D capabilities, and highly complements our product pipeline, product
portfolio, geographical footprint and operational network. It enhances Teva's
leadership in an evolving competitive landscape and massive consolidation across
our customer base. In addition, our integration plans with the Actavis generics
business are on track.

*    *    *

[Olafsson:] On August 2, we completed the strategic acquisition of Actavis
generics. The result is a much stronger, more competitive Teva that is best
positioned to thrive in an evolving global generics marketplace.

259.    In response to a question about the Actavis transaction, Defendant Olafsson

stated:

The closing of the Actavis transaction has gone very smoothly since day one
with no operational disrupter. While we were disappointed at the delays with
antitrust review, the time allows the integration teams at Teva and Actavis
Generics to work diligently to plan for integration of the two companies in order
to ensure that combined company would be fully operational immediately as on
closing of the transaction. As a result, Teva was able to begin capitalizing
immediately on the benefits offered by the acquisition of Actavis Generics. This
included optimizing our R&D activities, harmonizing our customer contracts and
relationships, and realizing economies of scale with our purchase.

260.    On December 5, 2016, Teva filed a report on Form 6-K with the SEC, which

included the following false and misleading statements concerning the financial impact of the

Actavis acquisition and integration on the Company's business prospects and reported financials:

Erez Vigodman, Teva's President and [CEO stated:] ... "As we continue to focus
on integrating and realizing the value of the Actavis Generics transaction, which
is progressing according to plan, Dipankar and his team will focus on generating

organic growth through new launches and replenishing the pipe line through our industry-leading R&D, and drive efficiencies across the generics organization . . . ."

. . . [Dipankar] Bhattacharjee[, Teva's President and CEO, Global Generic Medicines Group stated:] "With the integration of Actavis proceeding on schedule and the
complementary U.S. distribution capabilities provided by our recent acquisition of Anda, we have a matchless opportunity to add value in the U.S. healthcare system, and in the
fast-changing global generics marketplace."

261.    On February 13, 2017, Teva filed with the SEC the Q4 2016 Press Release. In the Feb. 13, 2017 earnings call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

[Peterburg:] The Company's priorities continue to be extracting all synergies related to the Actavis generic acquisition, successfully launching the key generic and specialty products we have planned for 2017, and generating significant cash flow to rapidly pay down our existing debt to maintain a strong balance sheet.

We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary.

* * *

[Desheh :] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

* * *

Total sales were $93 billion, with significant growth in goodwill and intangible assets, resulting from the progress made on the Actavis acquisition versus price allocation.

262.    On February 15, 2017, Teva filed the 2016 20-F. In the 2016 20-F, Teva made the

following false and misleading statements concerning the financial impact of the Actavis

acquisition and integration on the Company's business prospects and reported financials:

> In August 2016, we completed the Actavis Generics acquisition. Our strong legacy generics business, combined with the Actavis Generics business, has a world-leading product portfolio, comprehensive R&D capabilities, robust product pipeline and an efficient global operational network. The combined generic business has a wide-reaching commercial presence, as the market leader in the United States and a top three leadership position in over 40 countries, including some of our key European markets. The combined business benefits from a leading and diverse pipeline of products, which will help us continue executing key generic launches and further expand our product pipeline, focusing on both large and small opportunities. We expect that a larger number of smaller but more durable launches will help offset expected price erosion while diversifying our revenue stream.
>
>       *    *    *
>
> In August 2016, we completed our acquisition of Allergan plc's worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, we paid Allergan consideration of approximately $33.4 billion in cash and approximately 100.3 million Teva shares. The acquisition significantly expanded our generics product portfolio and pipeline, R&D capabilities and global operational network.
>
>       *    *    *
>
> Significant highlights of 2016 included:
>
> •  In August 2016, we completed our acquisition of Actavis Generics. The acquisition had a significant impact on our generic medicines segment, expanding our product portfolio and pipeline, R&D capabilities and global operational network.

263.    The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act

of 2002 by Defendants Peterburg and Desheh, stating that the financial information contained in

the 2016 20-F was accurate and disclosed any material changes to the Company's internal control

over financial reporting.

264.    On May 11, 2017, Teva filed a report on Form 6-K with the SEC reporting the

Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 6-K").

265.   In the Q1 2017 6-K, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> On August 2, 2016, Teva consummated its acquisition of Allergan plc's ("Allergan") worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, Teva transferred to Allergan consideration of approximately $33.4 billion in cash and approximately 100.3 million Teva shares. The acquisition significantly expanded Teva's generics product portfolio and pipeline, R&D capabilities and global operational network.

266.   In a conference call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] As it relates to our first priority, I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017.
>
> \*   \*   \*
>
> Turning to generics. It has been 2 full quarters since the completion of our acquisition of Actavis Generics. The acquisition has provided us with many benefits, especially much stronger and broader R&D capabilities, which we believe are the engine for any substantial generic business. This is essential in today's world when we are operating across such an evolving competitive landscape and ongoing consolidation across our customer base. We are very confident that the global business we have built will allow Teva to thrive in the long-term future as a leader in the generics industry.
>
> [Desheh:] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

267.   The statements referenced above were materially false and misleading.  Considered

as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financial results and operations by, in addition to the reasons set forth in Sections III.C.1-3 (Defendants Violated Their Statutory Duty To Disclose Pricing Trends; The Exchange Act Defendants' False And Misleading Statements That Teva Operated In A Competitive Market With Respect To Price; False And Misleading Statements And Omissions Regarding Pricing) and III.E (Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter), failing to disclose and actively concealing the negative impact resulting from the acquisition and integration of Actavis on the Company's financial results and business prospects, which (among other things) exacerbated the risky and unsustainable nature of the Price-Hike Strategy, which collapsed shortly after the closing of the Actavis acquisition in August 2016.

### 2. Defendants Violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F

268.   Defendants violated their obligations pursuant to Item 5 of Form 20-F and Item 303 of SEC Regulation S-K by failing to disclose the reasons and factors contributing to the increase or decrease in revenues relating to Defendants' undisclosed and inherently unsustainable price increases.

269.   More specifically, Item 5 of Form 20-F required Teva to disclose the source of material increases and decreases in revenues, including those resulting from Defendants' undisclosed and inherently unsustainable price increases. Defendants did not do so.  Instead, they made numerous affirmative misleading statements in the MD&A section of the 20-F which suggested Teva's U.S. generics business was subject to "intense competition."

270.    Teva filed its annual financial statement with the SEC in a Form 20-F filed under

section 13(a) or 15(d) of the Securities Exchange Act of 1934. The SEC explicitly requires

disclosures detailing changes in price that impact reported revenues in a Form 20-F. Item 5 of

Form 20-F (Operating and Financial Review and Prospects) states:

> To the extent that the financial statements disclose material changes in
> net sales or revenues, provide a narrative discussion of the extent to
> which such changes are attributable to changes in prices or to changes
> in the volume or amount of products or services being sold or to the
> introduction of new products or services.. . discuss, for at least the
> current financial year, any known trends, uncertainties, demands,
> commitments or events that are reasonably likely to have a material
> effect on the company's net sales or revenues, income from continuing
> operations, profitability, liquidity or capital resources, or that would
> cause reported financial information not necessarily to be indicative of
> future operating results or financial condition.

271.    Item 5 of Form 20-F is analogous to, and subject to the same rules and requirements

as, the Management's Discussion and Analysis of Financial Condition and Results of Operations

(MD&A) section of Form 10-K filed with the SEC. SEC Release No. 33-8350, Note 1.

272.    As such, SAB 104 requires management to disclose in the MD&A section the

impact of artificial or collusive price increases: "Changes in revenue should not be evaluated solely

in terms of volume and price changes, but should also include an analysis of the reasons and factors

contributing to the increase or decrease."

273.    SEC Release No. 33-8350 further provides the following MD&A disclosure

guidance, requiring analysis and disclosure of volume and price changes affecting the Company's

revenues in a situation analogous to the rise and decline in revenue from the Defendants'

undisclosed and inherently unsustainable price increases:

> For example, if a company's financial statements reflect materially lower
> revenues resulting from a decline in the volume of products sold when

compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

274.     Additionally, SEC Release No. 33-8350 explicitly states that "[o]ne of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance."

275.     SAB 104 further states: "The Commission stated in FRR 36 that MD&A should 'give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.'"

276.     Defendants violated this requirement, especially given their assertions that the

U.S. generic drug markets were competitive, without disclosing the source and magnitude of revenues generated by Teva's undisclosed and inherently unsustainable price increases.

### D.     ADDITIONAL ALLEGATIONS OF SCIENTER

Together with the above-alleged facts, the Exchange Act Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein

#### 1.   Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition

277.     As alleged above, Defendants were motivated to make false statements to inflate

the price of Teva Securities in order to complete a "transformational" acquisition. By January 2014, once the price-hike strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation, stating that, "the stock price will go up and we'll be able to use our share as a currency . . . to fund transactions." Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

278.    When Teva announced the $40 billion acquisition of Actavis on July 27, 2015, Vigodman explained that the improvement in generics was a "precondition" for accomplishing the deal. Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly twenty years of Teva's average annual income from 2013 to 2015. They raised the cash from investors, such as Plaintiff.

279.    By the second quarter 2015, however, the price-hike strategy had peaked. Teva began to experience pricing pressure on its generic drugs, and was unable to make additional large price increases. As analysts questioned the deteriorating pricing environment and Teva's weakening financials, Defendants flatly denied Teva was making profits from price increases, or that Teva was facing pricing pressure.

280.    It was not until Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the deal on August 2, 2016, that they disclosed negative results in the generic business, and that it was the subject of government subpoenas. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### 2.    Conscious Misbehavior or Recklessness

#### a.    Implementation and Concealment of the Price-Hike Strategy

281.    Teva's systematic implementation of a strategy to hike prices on generic drugs,

while publicly denying that price increases played any role in the Company's reported results, supports a strong inference of scienter. As discussed above, allegations in both the TSCA Complaint and the 2019 AG Complaint—which corroborate one another—detail how Teva adopted a strategy of systematically raising prices on generic drugs just before the Relevant Period, how the strategy was adopted with the full knowledge of senior executives, and how senior executives reviewed and approved price increases. TSCA Complaint, ¶¶ 269-273; 2019 AG Complaint ¶¶ 1111-1114. The TSCA Complaint attributes these allegations to former Teva employees, and the State AGs draw their allegations from a long-running investigation as well as party discovery in the Generics MDL, including Teva's full custodial file for Nisha Patel, a central player in Teva's collusion.

282.    The fact that senior executives reviewed and signed off on price increases supports an inference of scienter. The TSCA Complaint includes allegations that Teva employees would provide a list of potential price increases to Maureen Cavanaugh and Deborah Griffin, who approved the timing and amounts of the price increases. TSCA Complaint ¶ 282.

283.    The 2019 AG Complaint corroborates these allegations with detailed descriptions of the systematic approach taken to price increases. For example, the 2019 AG Complaint describes how, shortly after joining Teva, Patel began to rank competitors on their "quality"— meaning their willingness to collude—and, with approval from her supervisor "K.G." (Kevin Galownia, on information and belief, who was the Senior Director of Marketing at the time of the relevant conduct), she used this list to identify price-hike candidates. K.G. forwarded the list of price increases, which was based on information obtained from competitors, to Cavanaugh, who approved them, and allegedly understood the source of the information. 2019 AG Complaint ¶¶

1111-1114. The 2019 AG Complaint walks through numerous other examples where Patel and other Teva employees would follow this process for subsequent price increases—identifying candidates in collusion with competitors, and then forwarding to senior executives for approval.

284.    Given this formalized process involving Griffin and Cavanaugh, there is a strong inference that Defendants were aware of, or at least recklessly disregarded, the more than 76 price increases, ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in Inflated Profit.

> **b.  Continuous Access to Documents and Information Tracking Profits from Price Increases**

285.    According to the TSCA Complaint, Defendants were provided reports that tracked the financial impact of the price-hike strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis, and had access to a database that tracked pricing at a granular level. TSCA Complaint ¶¶ 288-291. Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that Defendants knew or recklessly ignored that billions of dollars in Inflated Profit were generated through the price-hike strategy, and that its collapse caused the later short-falls in profits.

> **c.  Defendants Spoke Repeatedly About the Pricing of Generic Drugs**

286.    Defendants repeatedly claimed that they had accurate knowledge of the sources of Teva's generics profitability. Defendants claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement . . . in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on

February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

287.    Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014, Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increase prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

288.    Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion.… That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment . . . . What this boils down to is each individual company's business model. . . . Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

289.    Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market. For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that

same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game . . . . playing it fairly . . . . by the book and by the rule."

290.   This self-proclaimed personal involvement by Defendants supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

### d.   Defendants' and Analysts' Focus on Generics

291.   The fact that Defendants touted Teva's generics segment, fueled by its U.S. division, as driving the Company's turnaround during the Relevant Period supports a strong inference of scienter. For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution." On June 10, 2015, Olafsson touted improvement of the "generic business by … $1 billion [] in 14 months, 16 months." That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013

to 2014.

292.   Analysts accordingly focused on Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

293.   Similarly, when industry pricing pressure damaged Teva's competitors, analysts

peppered Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers: For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing … we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there."

### e.   The Magnitude, Importance, and Duration of the Fraud

294.   The fact that the price-hike strategy generated as much as $2.3 billion in Inflated Profit supports a strong inference of scienter. Indeed, the Inflated Profits drove Teva's reported financial turnaround throughout the Relevant Period. In 2014 and 2015, Inflated Profits comprised an increasingly large portion of Teva's overall net income. As to the generic segment's profits, the Inflated Profits accounted for 15% of segment profits in 2013; 32% in 2014; and 32% in 2015. The Inflated Profits accounted for an even larger portion of the Company's overall net income: in 2013, Inflated Profits accounted for 20% of net income; in 2014, 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit. The strong inference is that Defendants knew of the source of these profits.

295.   Likewise, in 2016, the price-hike strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result, Teva's generic drug profits plummeted. Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, and forced the Company to take a $6.1 billion impairment charge to its generics

business, and reduce its dividend. The stronger inference by far is that Defendants were aware of the source of this decline, or were reckless in not knowing.

        **f.  Contemporaneous Red Flags**

296.   Contemporaneous red flags alerted Defendants to the possibility that their statements were false and misleading. At a minimum, Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

297.   <u>Congressional Inquiry</u>: On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants on alert to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases.  Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases." Again, this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

298.   <u>The State AG and DOJ Investigations</u>: The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter. The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors. Indeed, as set forth below, Teva has produced over one million documents to the DOJ.

111

299.   <u>GAO Report</u>: On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that Defendants spoke the alleged false statements with scienter.

### g.   Officer Terminations Support Scienter

300.   That three of the Officer Defendants—Olafsson, Vigodman, and Desheh—resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's price-hike strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter. There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the price-hike strategy and the subsequent decline in Teva's profits as the strategy collapsed. The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later. There is a similarly strong inference regarding Vigodman's termination. He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016. Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these

Defendants who were blocking the true financial state of the Company from coming to light.

### h. Evidence of Collusion Supports a Strong Inference of Scienter

301.   Teva's collusion supports a strong inference of scienter. Given the information available to them, each Defendant knew, or recklessly disregarded, that in order for the price- hike strategy to generate the high level of Inflated Profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

302.   As discussed above, the 2019 AG Complaint provides detailed allegations about Teva's collusion with other drug manufacturers to raise prices and/or allocate market share for over 100 drugs just before and during the Relevant Period. Moreover, the State AGs have alleged that, before and during the Relevant Period, Teva adhered to a widespread code of conduct among generic drug manufacturers that allowed them to fix prices and allocate markets to suppress competition. According to the State AGs, the code's objective was to attain a price equilibrium where manufacturers had no incentive to compete for additional market share by lowering price. Under that code, competitors would agree collectively to raise or maintain drug prices, dictating that a competitor should not underbid the competitor who raised prices.   Manufacturers also entered into collusive fair share market allocation agreements by making knowingly uncompetitive bids, refusing to bid, or readjusting market share by walking away from customers. 2019 AG Complaint ¶¶ 18, 132-133.

303.   The State AGs have stated that evidence they have secured shows that executives at the highest levels of Teva conceived and directed many of the schemes. This and other allegations corroborate the allegations in the TSCA Complaint, including that Cavanaugh and

Griffin were involved in pricing decisions, and Olafsson and Oberman would have received and reviewed reports and forecasts reflecting the Inflated Profit generated thereby.

304.    Teva's price increase approval processes necessarily involved senior management. As discussed above, Teva's senior management and executives, including Griffin and Cavanaugh, approved price increases and were aware of the impact of the increases on Teva's financial results, which was over $1 billion just for the drugs discussed in the TSCA Complaint.

305.    With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA (Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

306.    Finally, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the relevant period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers. *See* TSCA Complaint, Appendix C.

### i.    Other Facts Supporting Scienter

307.    <u>The Receipt of the Subpoenas</u>: Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, and the Defendants' actions in response, support a strong inference of Defendants' scienter. Particularly, after receiving the subpoena from the Connecticut AG, Defendants abruptly announced the next day that they would be moving forward the Notes Offering. Defendants failed to disclose them in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then

disclosed them approximately two weeks after completing the Offering. The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter. Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices. Yet, Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016 Generics Day.

308.     Further, Defendants did not take any further collusive price increases after receiving the subpoenas. The fact that the Company implemented dozens of price increases each year prior to receiving the subpoenas, suggests that Teva made a conscious decision not take any further price increases in light of the subpoenas.

309.     Bloomberg Article: The November 3, 2016 Bloomberg article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs' suit and the DOJ charges against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from Defendants.

310.     Teva's Further Denials of Liability: Despite its purported investigation of the facts, Teva repeatedly denied any involvement in collusive conduct during the Relevant Period, and continues to do so. For example, on November 7, 2019, Defendant Schultz stated during an investor earnings conference call: "We have, of course, shared more than 1 million documents with [the DOJ]. We have not found any evidence that we were in any way part of any structured

collusion or price fixing." Such statements underscore that Defendants knew Teva was a central actor in collusive conduct, or at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

### 3. Corporate Scienter

311.    Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter, as set forth above, had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can also be inferred from the above allegations that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.

### E.    THE TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION

312.    Defendants' false statements and material omissions concealed the truth about, and risks presented by, their business practice of improving business results through massive price increases. The truth and risks that were concealed and/or affirmatively misstated include the fact that the price increase plan was not sustainable over the long-term because of the FDA's approval of new drugs, natural competitive pressures, public approbation and governmental investigations and that once the plan became non-viable, Teva's revenues and profits would fall, negatively impacting its stock price. These risks became apparent to the investing public through a number of revelations that negatively impacted prices for Teva's securities.

### 1.    August 4-5, 2016

313.    After the close of trading on August 4, 2016—two days after the Actavis transaction

closed—Teva filed the 2Q16 Form 6-K, reporting its second quarter 2016 financial results, including a $434 million decline in revenue in the U.S. generics segment compared to the second quarter of 2015. The 2Q16 Form 6-K revealed for the first time that Teva was implicated in the federal and State AGs' antitrust investigations, stating: (i) "[o]n June 21, 201[6], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and (ii) "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut [AG] seeking documents and other information relating to potential state antitrust law violations."

314.    While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations and omissions, Defendants misleadingly attributed Teva's disappointing results to the loss of exclusivity on certain drugs, and a decline in sales in others, expressly denied the impact of price hikes, and reaffirmed Teva's inflated outlook for 2016.

315.    In response to this information, the price of Teva's ADS declined $1.24 per share, or approximately 2.24%, from its closing price of $55.45 on August 4, 2016, to a close of $54.21 on August 5, 2016, on high trading volume, wiping out $1.13 billion in market capitalization.

316.    This marked the beginning of the relevant truth leaking out, as Teva's Price-Hike Strategy had begun to collapse, as Teva lost its ability to profit from the 76 historic price hikes, or to implement new increases in 2016.  The disclosure of the subpoenas was a materialization of the risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

2.    **November 3, 2016, December 13-16, 2016**

117

317.     On Thursday, November 3, 2016, before the U.S. markets closed, and after the close of trading on the TASE, Bloomberg reported on the government's "sweeping criminal investigation into suspected price collusion," spanning more than a dozen companies, including Teva, and about two dozen drugs, and that charges could emerge by year-end.

318.     On this news, the price of Teva ADS fell $4.13 per share, or approximately 9.53%, from its closing price of $43.33 on November 2, 2016 to close at $39.20 on November 3, 2016, on high trading volume, reducing Teva's market capitalization by another $3.77 billion. The prices of Teva's 2023, 2026 and 2046 Notes also fell $12.93 or 1.31%, $11.19 or 1.15%, and $27.94 or 3.02%, respectively.

319.     Analysts from S&P Capital IQ lowered their rating of Teva ADS in response, from "buy" to "hold," and Fierce Pharma reported that analysts believed the investigation could have a sizeable financial impact on Teva, estimated to be as much as $700 million. The New York Times similarly reported that: "The generic drug industry was jolted on Thursday as shares of many major companies tumbled after a news report said that a federal inquiry into drug price-fixing was wider than previously believed and could lead to charges by the end of the year. Shares in Teva Pharmaceuticals, the world's largest generic drug maker, fell more than 9 percent, and the stock of competitors like Mylan, Endo Pharmaceuticals and Impax Laboratories had similar declines." (Katie Thomas, *News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling*, N.Y. Times (Nov. 3, 2016), at B5).

320.     Within weeks the expected governmental actions materialized.  On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the

price of Glyburide, a drug for which Teva held 75% of the market.

321.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

322.    On the news of the DOJ charges and the filing of the State AG's complaint, the prices of Teva Securities continued to decline.  Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51, and the price of the Company's 2046 Notes also declined $17.54, a drop of 2.5%.

### 3.    November 15, 2016

323.    On November 15, 2016, before the U.S. markets opened (and during trading on the TASE), Teva filed a press release on Form 6-K with the SEC, reporting third quarter 2016 revenues below consensus expectations. During an investor conference call that day, Olafsson explained that the disappointing results were a result of pricing pressures, stating that, despite his past denials that Teva was exposed to or had observed pricing pressure, price erosion in Teva's generics business in fact had been approximately 7% (as compared to the 5% Olafsson had recently stated on September 9, 2016).

324.    While these disclosures partially revealed the relevant truth concealed by

Defendants' misrepresentations and omissions, Defendants insisted that the pricing pressure was limited and would not last beyond the quarter, continued to attribute the Company's disappointing results to divestiture of certain generic products related to the Actavis acquisition, and continued to conceal Teva's anticompetitive conduct and collusion, improper financial reporting and disclosures, and Teva's true financial and business condition.  Moreover, Defendant Vigodman stated that, "we are not aware of any fact that would give rise to an exposure to Teva with respect to the [DOJ] investigation."

325.    The prices of Teva ADS fell again in response to this news, declining $3.43 per share, or 8.36%, from its closing price of $41.03 per share on November 14, 2016 to close at $37.60 on November 15, 2016, on high trading volume, erasing another $3.3 billion in market capitalization. Teva's ordinary share price similarly declined ILS7.20, or 4.58%, from its closing price of ILS157.10 on November 14, 2016 to close at ILS149.90 on November 15, 2016.

326.    Market participants similarly responded, with analysts at Jefferies downgrading Teva ADS from "buy" to "hold."

### 4.    December 5-6, 2016

327.    After the markets closed on December 5, 2016, Teva filed a Form 6-K, announcing Olafsson's immediate "retirement," even though he was only in his late 40's. Analysts at Piper Jaffray quickly concluded that Olafsson had in fact been pushed out, stating in a December 6, 2016 report: "When a company issues what many view as bullish guidance and then walks that back within a quarter of issuing said guidance . . . it would only be natural to conclude that there would be repercussions at the top of the organization."

328.    Other analysts tied Olafsson's abrupt departure to the apparent rise in generic

pricing pressure. For example, analyst Morningstar commented in a December 6, 2016 report, that "Teva's announcement that Dipankar Bhattacharjee will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. Recent pricing pressure in the generic drug market and anticipated generic competition on the 40mg version of Copaxone in 2017 remain significant near-term challenges for Teva, which makes the abrupt leadership change a concerning development at a critical time for the company." BTIG similarly stated, in a report dated December 5, 2016, that "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained focused on price erosion for the [company's] base generics business." Citi (at the Citi Global Healthcare Conference) and Piper Jaffray (in a December 6, 2016 report) expressed concern that Olafsson's departure suggested that there may be something "going on internally in the generics business" that had not been disclosed.

329.    In response to this news the price of Teva ADS fell $2.01 per share, or 5.43%, the next trading day, from its closing price of $37.04 per share on December 5, 2016, to close at $35.03 per share on December 6, 2016, on high trading volume, and reducing Teva's market capitalization by $1.96 billion.  Additionally, the price of Teva's 2046 Notes fell $17.01 or 1.95%.

**5.    January 6, 2017**

330.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016.  In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business."   In

addition to the materialization of the concealed risks described herein, this was the materialization of the risk of the Exchange Act Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that was "stable" – *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters – when, in fact, pricing pressure was causing a more rapid decline.

331.    Asma result of this new negative information, the prices of Teva Securities continued to decline.  Between the close of trading on January 5 and January 6, 2017, the price of Teva ADS fell $2.86 per share, or approximately 7.53%, from its closing price of $37.96 on January 5, 2017 to close at $35.10 on January 6, 2017, on high trading volume, erasing nearly $3.1 billion in market capitalization.  Additionally, the prices of Teva's 2026 and 2046 Notes declined $10.96 or 1.17% and $17.75 or 2.01%, respectively.

332.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion.  In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated.***"  Similarly, the same day, Maxim Group downgraded its rating of the Company form "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic . . . business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already ***limited management credibility.***"

### 6.    February 6-7, 2017

333.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed

with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and his removal from the Board of Directors.

334.    While these disclosures partially revealed the relevant truth concealed by Defendants' misrepresentations, additional information continued to be concealed by the Company.

335.    On this news, between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19. Teva's 2026 Notes also fell $13.69 or 1.51% and the 2046 Notes fell $32.33 or 3.76%.

**7.    August 3-7, 2017**

336.    Before the NYSE opening (and during trading on the TASE) on Thursday, August 3, 2017, Teva filed a press release on Form 6-K, announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and "accelerated price erosion and decreased volume mainly due to customer consolidation, greater competition as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition."

337.    Teva also disclosed a net earnings loss primarily due to a $6.1 billion goodwill impairment charge in its U.S. generics unit—which consisted of both Teva legacy and Actavis generics business—revealing the true value of the combined U.S. generic business.

338.    These disclosures revealed that Teva was facing significant and permanent generic pricing pressure—which pressures Defendants had, until then, vehemently denied and the price of Teva securities declined significantly in response. As Bloomberg reported: "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper." Moody's also downgraded Teva's debt rating

to Baa3 (one step above junk), with a negative outlook, citing "weakness in its US generics business" among other things. Specifically, Teva ADS prices fell $7.50, or 24.00%, from its closing price of $31.25 on August 2, 2017 to close at $23.75 per share on August 3, 2017, on high trading volume—wiping out $8.08 billion in market capitalization. Teva's ordinary share price also declined ILS19.80, or 17.79%, from its closing price of ILS111.30 on August 2, 2017 to a close of ILS91.50 on August 3, 2017.

339.    On Friday, August 4, 2017, Fitch Ratings downgraded Teva to BBB- (one step above junk), with a negative outlook. Teva's ADS price continued to fall, an additional $3.15, or 13.26%, from its closing price of $23.75 on August 3, 2017 to close at $20.60 on August 4, 2017, on high trading volume—removing another $3.2 billion in market capitalization.

340.    The next trading day, Monday, August 7, 2017, Morgan Stanley downgraded Teva's ADS to "Underweight," noting that it had "underappreciated the risk of generics pricing pressure to Teva's earnings and dividend, and we expect Teva to continue to underperform given overhangs."

341.    The prices of Teva Securities continued to drop, with Teva's ADS prices declining an additional $2.01, or 9.76%, from its closing price of $20.60 on August 4, 2017 to close at $18.59 on August 7, 2017, on high trading volume, wiping out another $2.0 billion in market capitalization.

342.    In total, over these three trading days, Teva's ADS price fell $12.66, or 40.51% to close at $18.59.  The price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $7.76 (.78%), $12.45 (1.25%), $30.10 (3.05%), $38.72 (3.95%), $40.88 (4.20%), and $57.51 (6.34%), respectively.

### 8.   November 2, 2017

343.    On November 2, 2017 Teva filed a press release on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quartery revenues compared to Q3 2016.  The Company attributed the decrease to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

344.    Analysts reacted negatively, including RBC Capital Markets stating the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising."  Wells Fargo noted that Teva's results were "especially disappointing."

345.    As a result of this new negative information, the prices of Teva Securities continued to decline.  Between the close of trading on November 1 and on November 2, 2017, the ADS price fell $2.79 of 19.90% to close at $11.23.  The price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $0.16 (.16%), $1.05 (1.07%), $2.61 (2.76%), $2.32 (2.52%), $4.62 (5.13%), and $1.85 (2.3%), respectively.

### 9.   February 8, 2018

346.    On February 8, 2018, Teva filed a press release on Form 8-K announcing Q4 2017 and FY 2017 financial results, including a staggering $17.1 billion goodwill impairment, of which $10.4 billion related to Teva's U.S. generics business.  Teva stated that the $10.4 billion writedown was based in part on "further deterioration in the U.S. generics market" – including "[p]ricing challenges due to government regulation" – and Teva's resulting expectation of "larger pricing

declines" than previously anticipated.

347.     Analysts again reacted negatively.   Wells Fargo noted that Teva had missed consensus expectations "by a significant margin," pointed to a "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is."   IBI Brokerage also noted that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below market expectations."

348.     As a result of this new negative information, the prices of Teva Securities continued to decline.  Specifically, the price of Teva's ADS fell $2.21 or 10.6% to close at $18.64; and the price of the 2023, 2026, and 2046 Notes fell $0.75 (0.85%), $0.86 (1.07%), and $1.75 (2.33%), respectively.

### 10.     December 7-10, 2018

349.     On December 9, 2018, an article in *The Washington Post* quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States."  While the article noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts," the price of Teva Securities dropped substantially with the disclosure of the State AGs' expanded investigation.

350.     Between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 or 5% to close at $18.44.  Additionally, the price of the 2019, 2023, 2026, and 2046 Notes fell $0.11 (0.11%), $0.38 (0.44%), $1.13 (1.39%), and $1.70 (2.43%), respectively.

126

### 11. May 10-13, 2019

351.     On May 10, 2019, after the markets closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy.  The May 2019 complaint details Teva's price-fixing with regards to at least 86 different generic drugs, compared to just 7 drugs in the previously filed action.  The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes over 1.000%, and details Teva's role as a "consistent participant" and a central player in the conspiracy.  Further, the May 2019 complaint names four Teva employees personally as defendants:  Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

352.     Analysts were surprised by the revelations in the new complaint.  For example, Bernstein warned that "the price-fixing lawsuit is worse than we expected" and "there seem to be specific cases in the lawsuit that are going to be hard to explain away."  J.P. Morgan stated that "[w]e were open to the majority of price spikes being 'explainable' by way of shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law.  So we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the expanded complaint."

353.     On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019. The price of the 2019, 2021, 2023, and 2046 Notes fell $0.99 (0.09%), $0.65 (0.68%), $1.37 (1.51%), $1.78 (2.14%), and $2.16 (3.00%), respectively.344.     Plaintiff suffered actual economic loss and were damaged by

Defendants' misrepresentations and omissions when the truth concealed by such misrepresentations and omissions was revealed through the disclosures discussed above. Each disclosure served to remove some of the artificial inflation in the price of Teva securities.

354.     The negative events and disclosures on these dates were directly related to Defendants' fraudulent scheme. Defendants' material misstatements and omissions concealed from the market, among other things, the fact that the Company's financial condition had been the result of its price increase plan, rather than the factors cited by Defendants. Defendants falsely and misleadingly reported more than $1 billion in revenues generated from undisclosed price increases in the Company's core U.S. generic drug business, revenues which were unsustainable.

None of these events or disclosures was sufficient, on its own, to fully remove the inflation from the prices of Teva securities because each only partially revealed the scope and consequence of Defendants' fraudulent scheme. The corrective effect of each new piece of information was tempered also by Defendants' continuing efforts to conceal the true risks and conditions arising from Teva's involvement in the undisclosed price increase plan, which prevented the price of Teva securities from declining to their true value. As a result, the price of Teva securities remained artificially inflated until the end of the Relevant Period. As Plaintiff continued to hold Teva securities, and/or purchased or acquired those securities, the artificial inflation caused them further injury when additional information was revealed.

355.     Defendants' conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff. As a result of Defendants' wrongful conduct slowly being revealed on the above dates, the price of Teva ADS, which had steadily increased from the start of the Relevant Period to an all-time high of $72 in July 2015, had fallen to less than $20, reducing market

capitalization by nearly $42 billion as the truth leaked out. The Company experienced dislocation and uncertainty due to the abrupt departures of three top executives and ongoing disruption and fallout from numerous criminal and civil investigations and litigations. Its credit ratings were downgraded to one level above "junk." In addition, Teva cut its profit forecast for 2017, cut its dividend, and warned investors that it risks breaching debt covenants.

356.    It was entirely foreseeable that concealing the Company's concealment of its price increase plan, which was unsustainable over more than a short period, would, among other things, inflate the revenues from its generics business and artificially inflate the price of its securities. It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Teva's misconduct, would cause the price of Teva's securities to decline as the inflation caused by Teva's earlier misrepresentations and omissions was removed from the price of Teva's securities. Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses for Plaintiff, who purchased Teva securities during the Relevant Period.

### F.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

357.    At all relevant times, the market for Teva ADS was open and efficient for the following reasons, among others: (i) Teva ADS met the requirements for listing, and were listed and actively traded on the NYSE under the ticker symbol "TEVA"; (ii) as a registered and regulated issuer of securities, Teva filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Teva regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities

129

analysts, and other similar reporting services; (iv) Teva was followed by numerous securities analysts employed by major brokerage firms, including Citigroup, Goldman Sachs, Needham & Company, UBS, Barclays Capital, Bank of America Merrill Lynch, BMO Capital, Susquehanna Financial Group, J.P. Morgan, and Wells Fargo, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; (v) the material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Teva's ADS; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiff purchased or otherwise acquired Teva ADS between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which period the price of Teva's ADS was artificially inflated by Defendants' misrepresentations and omissions.

358.    As a result of the foregoing, the market for Teva ADS promptly digested current information regarding Teva from all publicly available sources and the prices of Teva's ADS reflected such information. Based upon the materially false or misleading statements and omissions of material fact alleged herein, Teva ADS traded at prices in excess of the true value of such shares during the Relevant Period. Plaintiff purchased or otherwise acquired Teva ADS relying upon the integrity of the market price and other market information relating to Teva. Under these circumstances, Plaintiff, as purchaser or acquirer of Teva ADS at artificially inflated prices during the Relevant Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

359.    Further, at all relevant times, Plaintiff relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff would not have

purchased or otherwise acquired Teva ADS at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff is entitled to a presumption of reliance.

### G. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

360. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

361. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements or omissions.

362. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading forward-looking statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Teva who knew that the forward-looking statement was false or misleading.

131

## IV.   CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against The Exchange Act Defendants**

363.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

364.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b- 5 promulgated thereunder, against Teva and the Individual Defendants.

365.    As alleged herein, throughout the Relevant Period, Teva and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Teva and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff; (ii) artificially inflate and maintain the prices of Teva's ADS; and (iii) caused Plaintiff to purchase the Company's ADS at artificially inflated prices.

366.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that

contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

367.    As set forth above, Teva and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff, who purchased the Company's ADS during the Relevant Period.

368.    In ignorance of the materially false and misleading nature of Teva's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Teva's ADS, Plaintiff purchased the Company's ADS at artificially inflated prices during the Relevant Period. But for the fraud, Plaintiff would not have purchased the Company's ADS at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Teva's ADS declined precipitously, and Plaintiff was harmed and damaged as a direct and proximate result of their purchases of the Company's ADS at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

369.    By virtue of the foregoing, Teva and the Individual Defendants are liable to Plaintiff for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

### COUNT II

**For Violations of Section 20(a) of the
Exchange Act Against the Individual
Defendants**

370.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

371.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.  As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Teva's ADS, and by participating in a fraudulent scheme and course of business or conduct throughout the Relevant Period. This fraudulent conduct was undertaken with scienter, and Teva is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Relevant Period.

372.    As set forth above, the Individual Defendants were controlling persons of the Company during the Relevant Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

373.    The Individual Defendants were culpable participants in Teva's fraud alleged herein, by acting acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff, who purchased the Company's ADS during the Relevant Period.

By reason of the foregoing, the Individual Defendants are liable to Plaintiff as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## V.      PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

B.  Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

C.  Awarding Plaintiff its reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.  Granting such other and further relief as the Court deems just and proper.

## VI.     JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 28, 2020

Respectfully submitted,

/s/ *David A. Slossberg*

HURWITZ, SAGARIN, SLOSSBERG &
KNUFF, LLC
David A. Slossberg (CT13116)
Jeffrey P. Nichols (CT29547)
147 Broad St.
Milford, CT 06450
Telephone: (203) 877-8000
Facsimile: (203) 878-9800
dslossberg@hssklaw.com
jnichols@hssklaw.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
(312) 357-0370
(312) 357-0369
cgilden@cohenmilstein.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Julie G. Reiser
1100 New York Avenue, NW
Suite 500 East Tower
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
jresier@cohenmilstein.com

*Counsel for Plaintiff*