**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| IN RE TEVA SECURITIES LITIGATION | : | No. 3:17-cv-00558 (SRU) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | All Class Actions |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT**
**OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

ARGUMENT ......................................................................................................................... 7

   A.   Class Certification Standards .................................................................................... 7

   B.   This Action Meets the Requirements of Rule 23(a) ................................................ 8

      1.  Numerosity Is Established ................................................................................... 8

      2.  There Are Questions of Law and Fact Common to the Class .......................... 9

      3.  Plaintiffs' Claims Are Typical of the Class .................................................. 10

      4.  Plaintiffs, Class Counsel, and Class Liaison Counsel Will
         Fairly and Adequately Protect the Interests of the Class ............................... 12

      5.  Plaintiffs Are Not Subject to Any Unique Defenses ..................................... 15

      6.  The Class Is Ascertainable ............................................................................. 15

   C.   The Requirements of Rule 23(b) Are Satisfied .................................................... 16

      1.  Common Questions of Law and Fact Predominate ....................................... 16

          a.  Securities Act Claims ............................................................................ 17

          b.  Exchange Act Claims ........................................................................... 18

             (1) Plaintiffs and the Class Are Entitled to a Presumption of Reliance for the
                ADS and Preferred Shares Because They Traded in Efficient Markets .............. 19

             (2) Plaintiffs and the Class Are Entitled to a Presumption of Reliance for
                Teva Notes Because They Traded in Efficient Markets ...................................... 28

             (3) Plaintiffs and the Class Are Also Entitled to a Presumption of Reliance
                under *Affiliated Ute* ............................................................................ 34

          c.  Individual Damages Calculations Will Not Defeat Predominance .......................... 35

      2.  A Class Action Is Superior ............................................................................ 36

   CONCLUSION ................................................................................................................ 37

## TABLE OF AUTHORITIES

## CASES

*AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005)............................ 29

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ................................. 34, 35

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................. 16

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ............................. 8, 16, 18

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*,
955 F.3d 254 (2d Cir. 2020) ........................................ 8, 19

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000)................... 12, 15

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)...................................................... 4, 19, 20

*Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498 (D. Kan. 2014) ........................................ 28, 32

*Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150 (S.D.N.Y. 2012) ............................ 21, 27

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ............................................ *passim*

*Carpenters Pension Trust Fund v. Barclays*, 310 F.R.D. 69 (S.D.N.Y. 2015) ......................... 25

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003) ................................. 28

*City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173 (S.D.N.Y. 2012).......................... 21

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ........................................ 8

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ........................................ 12

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................... 18

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).................................... 8, 16, 18

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ............................................. 17

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014)........................................ 17

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ........................................ 15

*Gruber v. Gilbertson*,
No. 16-cv-9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ............................. 34

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) .................................. 19, 20, 24

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) ...................................... 30

*In re Am. Realty Capital Properties, Inc. Litig.*,
No. 15-MC-40 (AKH), 2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017) .................................... 28

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................................... 8

*In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009) ........................ 27, 31

*In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71 (S.D.N.Y. 2018) ........................ 10, 11, 13, 15

*In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992) .................................... 11

*In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008) .............................................. 29, 30

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009) .......................... 29, 30, 32

*In re JPMorgan Chase & Co. Sec. Litig.*,
No. 12 Civ. 3852, 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ........................................ 36

*In re MF Global Holdings Limited Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................... 17

*In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230 (S.D.N.Y. 2015) .......................... 17

*In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401 (E.D. Va. 2015) .................................. 32, 33

*In re Parmalat Sec. Litig.*,
No. 04MD1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) .................................. 15

*In re PE Corp. Sec. Litig.*, 228 F.R.D. 102 (D. Conn. 2005) .............................................. 1, 13, 37

*In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) .............................................. *passim*

*In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017) ............................................. 15, 20, 21, 26

*In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38 (S.D.N.Y. 2012) .............................................. 18

*In re Priceline.com Inc.*, 236 F.R.D. 89 (D. Conn. 2006) ...................................................... 9, 16

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013) .......................... 7, 35

*In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124 (S.D.N.Y. 2019) .................................. 12, 18, 36

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) .......................... 7

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ............................ 12

*Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373 (S.D.N.Y. 2015) ................................. 35

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ............................................. 20, 26, 27, 33

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ......................................................... 22, 25, 30

*McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044 (2d Cir. 1995) ........................................ 36

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86 (S.D.N.Y. 2018) .................... 22, 25

*N.J. Carpenters Health Fund v. Rali Series 2006-QO1*,
    477 F. App'x 809 (2d Cir. 2012) .............................................................................. 36

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011) .............................................................................. 36

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ...................................................................................... 11

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019) ............................................................ 11, 12, 13

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    No. 3:17-CV-558 (SRU), 2020 WL 1181366 (D. Conn. Mar. 10, 2020).............. 10, 11, 13, 34

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ..................................................................... *passim*

*Plumbers & Pipefitters, Nat'l Pension Fund v. Burns*,
    967 F. Supp. 2d 1143 (N.D. Ohio 2013) .................................................................. 30

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ........................................................ 35

*Strougo v. Barclays PLC*, 312 F.R.D. 307 (S.D.N.Y. 2016) ...................................................... 35

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05 CIV. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ................................. 24

*Teamsters Local 445 Freight Div. Pension, Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ...................................................................................... 20

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ..................................................................... *passim*

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).............................................. *passim*

*Wilson v. LSB Indus., Inc.*,
  No. 15CIV7614RAGWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)......................*passim*

*Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013) ........................................*passim*

## **STATUTES**

15 U.S.C. § 77................................................................................................................... 36

## **OTHER AUTHORITIES**

H.R. Rep. No. 104- 369 (1995) (Conf. Rep.)................................................................. 13

## **RULES**

Fed. R. Civ. P. 23 ..............................................................................................*passim*

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiff Ontario Teachers' Pension Plan Board and Named Plaintiff Anchorage Police & Fire Retirement System (together, "Plaintiffs") respectfully request that the Court:  (1) certify the Class; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Bleichmar Fonti & Auld LLP ("BFA") as Class Counsel, with Carmody Torrance Sandak & Hennessey LLP ("Carmody") as Class Liaison Counsel.[1]

## PRELIMINARY STATEMENT

"It is well recognized that class actions are a particularly appropriate means for resolving securities fraud actions." *In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 107 (D. Conn. 2005).  This case is no exception.  In asserting claims under the Securities Exchange Act of 1934 and the Securities Act of 1933, Plaintiffs allege that Teva—the largest generic drug manufacturer in the world—and its top executives repeatedly misrepresented and concealed the true source of Teva's financial performance, defrauding Class members out of billions of dollars.

Specifically, Defendants consistently attributed Teva's improvements in revenues and profits to sustainable business strategies, like cost cutting and good product management during the Class Period (February 6, 2014 to May 10, 2019, inclusive).  In truth, however, Teva's growth was the result of Defendants' implementation of a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio, generating billions in profits during the Class Period.  Defendants explicitly denied that price increases were the source of their profits. This conduct was also directly contrary to Defendants' claims that Teva's generic drugs faced "intense" and "fierce" competition.  These statements were also false because Teva colluded with other manufacturers to fix prices and allocate markets—conduct that has now led to DOJ deferred

---

[1] Capitalized terms not defined herein have the meanings stated in the operative Complaint (ECF 310).  All "¶__" references are to the Complaint.  Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

prosecution agreements with Teva's admitted co-conspirators, multiple government investigations, and a multi-district antitrust litigation against Teva and other generics manufacturers in the Eastern District of Pennsylvania. Defendants' fraud was unsustainable, and beginning in August 2016, the concealed risks of Defendants' scheme began to materialize with a series of corrective events.

Pursuant to Rule 23(b)(3), Plaintiffs now seek certification of the following Class:

- As to claims under the Securities Exchange Act of 1934 (the "Exchange Act"), all persons and entities who, in domestic transactions, purchased or otherwise acquired the following securities during the period from February 6, 2014 through May 10, 2019, inclusive (the "Class Period"), and were damaged thereby:

  o Teva American Depositary Shares ("ADS");

  o Teva 7.00% mandatory convertible preferred shares issued on or about December 3, 2015 and January 6, 2016 ("Preferred Shares");

  o The following Teva Finance U.S.-dollar-denominated senior notes issued on or about July 21, 2016:

    ▪ 1.400% Senior Notes due July 20, 2018 ("2018 Notes");

    ▪ 1.700% Senior Notes due July 19, 2019 ("2019 Notes");

    ▪ 2.200% Senior Notes due July 21, 2021 ("2021 Notes");

    ▪ 2.800% Senior Notes due July 21, 2023 ("2023 Notes");

    ▪ 3.150% Senior Notes due October 1, 2026 ("2026 Notes"); and

    ▪ 4.100% Senior Notes due October 1, 2046 ("2046 Notes") (collectively, the "Notes"); and

- As to claims under the Securities Act of 1933 (the "Securities Act"), all persons and entities who, in domestic transactions, purchased or otherwise acquired ADS, Preferred Shares, and Notes pursuant or traceable to the offerings of ADS and Preferred Shares completed on or about December 3, 2015, and January 6, 2016, or the offering of the Notes completed on or about July 21, 2016; and as to the alleged additional state-law claims, all persons and entities who purchased or otherwise acquired ADS pursuant to Teva's Employee Stock Purchase Plan for U.S. Employees ("ESPP") during the Class Period, and were damaged thereby.

Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Teva, Teva USA, and Teva Finance, and their

immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant has or has had a controlling interest; (v) Teva's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories. For the avoidance of doubt, Teva's employee retirement and benefit plan(s) do not include the ESPP.[2]

Rule 23's requirements are amply satisfied.

*First*, there is no question that Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy are satisfied. As is true in most class actions, numerosity and commonality plainly exist here, as joinder of the many thousands of members of the proposed Class would be wholly impracticable, and this securities fraud action raises numerous common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, and damages.

Further, Defendants have agreed, and the Court has ordered, that Plaintiffs' adequacy and typicality cannot be challenged at any stage of this action. (ECF 311-1 ¶7; ECF 352 ¶7.) Nonetheless, Ontario Teachers' and Anchorage are the quintessential institutional investor plaintiffs contemplated under the PSLRA and have recovered over $2.1 billion as lead plaintiffs in nine securities class actions. Proposed Class Counsel are also highly experienced, have vigorously pursued Class members' claims for over three years, and are fully committed to maximizing Class members' recovery, including by taking this action to trial.

---

[2] The plaintiffs in the Direct Actions have filed independent lawsuits, and must formally opt out of the Class once certified.

*Second*, Rule 23(b)(3)'s predominance and superiority requirements are readily satisfied. Questions common to all Class members predominate over any questions affecting only individual Class members.  In a securities class action, the predominance requirement is synonymous with the element of reliance.  Plaintiffs' claims under Section 11 of the Securities Act do not require reliance; thus, no further analysis is needed to find that common questions predominate as to these claims.  For Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, where securities trade in an efficient market, as alleged here, the fraud-on-the-market doctrine establishes class-wide reliance.  ¶¶377-38; *see Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

As explained below, overwhelming evidence, including as summarized in the accompanying expert report of David I. Tabak, Ph.D., of NERA Economic Consulting (the "Tabak Report"), confirms that the ADS, Preferred Shares, and Notes (together, the "Teva Securities") traded in efficient markets during the Class Period.  (*See* Fonti Declaration Ex. 1.)[3]  Indeed, Defendants have no basis to dispute market efficiency:  Teva ADS were traded on the New York Stock Exchange (the "NYSE"), a paradigmatic efficient market, and Teva Preferred Shares and Notes were actively traded and highly liquid.  Proceeding as a class action is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.

### STATEMENT OF FACTS

Class members' claims arise from a fraudulent scheme that will be demonstrated with Class-wide, common proof of Defendants' conduct.  As the Complaint alleges, Defendants engaged in a systematic strategy to raise prices on Teva's generic drugs, and colluded with other manufacturers to fix prices and allocate markets to suppress competition.  Neither the scheme nor

---

[3] Declaration of Joseph A. Fonti in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed herewith.

the underlying conduct was disclosed; to the contrary, Defendants repeatedly made fraudulent statements about Teva's sources of revenue, generic drug pricing, and competition.

Notably, in response to analyst questions about the sources of Teva's performance, Defendants explicitly denied that price increases played any part. For example (¶4):

- "[A]ll the improvement you see in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message." (CEO Vigodman, Oct. 29, 2015.)

- "So how did we" achieve $1 billion in increased profit margin? "Not by pricing but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016.)

- "Now there's a lot of noise around pricing issues . . . . Our exposure to all these things is very minimal . . . . Teva was not associated with any of that." (CFO Desheh, Nov. 19, 2015.)

Initially, Teva's price increases generated hundreds of millions of dollars in profits. By Q4 2015, as Teva's profits peaked, the fraudulent scheme faced pressure from Congressional inquiries and government investigations, including Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016. (¶11.) In reaction, Defendants immediately accelerated the massive Notes Offering (originally scheduled to close in fall 2016) and filed the Notes Registration Statement on July 13, 2016 in order to raise nearly $15 billion in cash and fund its acquisition of Actavis before the subpoenas were disclosed. (*Id.*) The Offering Materials for the Notes Offering (and Teva's prior ADS and Preferred Offerings) misstated and omitted the impact of Defendants' Price-Hike Strategy and non-competitive pricing in the U.S. generics market on Teva's profits, which was required to be disclosed under the SEC's Item 5. (¶¶167-73, 434.)

On August 2, 2016, with the cash raised from the Notes Offering and ADS and Preferred Offerings, Teva closed its $40 billion acquisition of Actavis. (¶11.) The next day, Teva reported

5

disappointing earnings, though Defendants concealed that it was due to the collapse of the unsustainable price increases.  (*Id.*)  The truth was beginning to leak out.

Teva's financial performance continued to decline, and in November 2016, *Bloomberg* reported that Teva was a target of the DOJ and State AGs' investigations and potentially exposed to charges.  (¶12.)  Defendant Olafsson, an architect of the Price-Hike Strategy and the driving force of the Actavis transaction, was fired on December 5, 2016.  (*Id.*)  A week later, the State AGs sued Teva for violations of the Sherman Act.  (*Id.*)  In short order, Defendant Vigodman was terminated as CEO in February 2017, and Defendant Desheh was also out as CFO by May 2017.  (*Id.*)  And on August 3, 2017, Teva announced it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."  (*Id.*)  The prices of Teva Securities plummeted, and the credit-rating agencies immediately downgraded the Company's debt to just above "junk."  (¶13.)

In February 2018, Teva disclosed another $10.4 billion generics impairment.  (¶369.)  And a December 2018 article in *The Washington Post* revealed that the State AG investigation had expanded to expose "the largest cartel in the history of the United States," followed by the State AGs' May 2019 filing of a 524-page amended antitrust complaint.  (¶¶372, 374.)  The State AGs' complaint details Teva's price-fixing with regard to at least 86 different generic drugs and includes the contents of numerous documents that were discovered as part of their ongoing investigation, which began in 2016.  (¶¶341, 374.)

Nonetheless, Teva and its executives have steadfastly continued to deny any participation in collusive conduct, even as the State AGs' and DOJ investigations and lawsuits picked up steam. For example, on November 7, 2019, Defendant CEO Schultz declared:  "We have, of course,

shared more than 1 million documents with [the DOJ].  We have not found any evidence that we were in any way part of any structured collusion or price fixing."  (¶310.)

While discovery in this case commenced over eight months ago, Defendants have yet to produce key documents—including complete materials from Teva's Board of Directors and documents from most of the Individual Defendants (*see* ECF 375).  However, the limited discovery to date has fully confirmed many of Plaintiffs' key allegations, including as to the existence and contents of Teva's Scorecards, Latest Best Estimates and Work Plans (*see, e.g.*, ECF 310 ¶¶41-42); the tracking and reporting of price increases and resulting profits to Teva's most senior executives (*id.* ¶¶287-91); the generation of billions in profits (*id.* ¶¶2, 5); and the trend of worsening price erosion (*id.* ¶¶10, 138, 302, 434).

## ARGUMENT

### A.    <u>Class Certification Standards</u>

An action may be certified as a class action if the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) are met, and the action qualifies under one of Rule 23(b)'s subdivisions (here, Rule 23(b)(3)).  Actions "alleging violations of Section[ ] 10(b) . . . of the Exchange Act are especially amenable to class certification," and "[i]n light of the importance of the class action device in securities fraud suits," the Rule 23 "factors are to be construed liberally." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013).

Rule 23 must be satisfied by a preponderance of the evidence.  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).  As the Supreme Court has cautioned, however, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 955 F.3d 254, 268 (2d Cir. 2020) ("*ATRS II*") (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*") (securities fraud plaintiff need not prove loss causation to obtain class certification).

### B.    This Action Meets the Requirements of Rule 23(a)

#### 1.    Numerosity Is Established

Rule 23(a)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity "is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012).

Here, the proposed Class consists of at least thousands of members. Teva had well over 700 million ADS outstanding throughout the Class Period (*see* Tabak Report Ex. 3-a), and issued over 59 million ADS in the ADS Offering, over 3.6 million Preferred Shares in the Preferred Offering, and $15 billion of Notes in the Notes Offering (ECF 310 ¶396). Teva ADS are actively traded on the NYSE, and all of the Teva Securities traded actively in the United States during the Class Period. For example, throughout the Class Period, Teva ADS had an average weekly volume on the NYSE of approximately 40.36 million. (Tabak Report Ex. 3-a.) Accordingly, the joinder of this vast number of investors would be impractical, and the "numerosity" requirement is satisfied. *See, e.g., Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (numerosity satisfied where defendant corporation "had an average of 22.7 million shares outstanding during the Class Period, an average daily trading volume of

193,013 shares, and an average weekly trading volume of 965,064 shares"); *In re Priceline.com Inc.*, 236 F.R.D. 89, 95 (D. Conn. 2006) (numerosity satisfied where defendant corporation "had at least 160 million shares of stock outstanding," and "daily trading volume regularly exceeded 3 million shares").  Defendants have no basis for disputing numerosity.

### 2.    There Are Questions of Law and Fact Common to the Class

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality "does not mean that all issues must be identical as to each member," but rather requires "that plaintiffs identify some unifying thread among the members' claims that warrants class treatment."  *Wilson*, 2018 WL 3913115, at *4.  Securities fraud claims involve numerous common questions of law and fact, including misrepresentations, materiality, and scienter, which are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff."  *Id.*

Defendants have no basis to dispute commonality.  Plaintiffs' and proposed Class members' Exchange Act and Securities Act claims arise out of similar misstatements and omissions in Defendants' SEC filings and other public statements, raising a host of common questions, such as:

- Whether Defendants' alleged acts and omissions violated the federal securities laws;

- Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

- Whether the Offering Materials contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

- Whether the 34 Act Defendants acted with scienter as to Plaintiffs' claims for relief under Section 10(b) of the 34 Act;

- Whether the Officer Defendants were controlling persons as to Plaintiffs' claims for relief under Section 20(a) of the 34 Act and Section 15 of the Securities Act;

- Whether any of the Securities Act Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

- Whether and to what extent the prices of the Teva Securities were artificially inflated or maintained during the Class Period due to the alleged false and misleading statements or omissions;

- Whether, with respect to Plaintiffs' claims under the 34 Act, reliance may be presumed under the fraud-on-the-market doctrine; and

- Whether Plaintiffs and other members of the Class suffered damages, as well as the appropriate measure thereof.

Courts have repeatedly held that these exact types of common questions satisfy Rule 23(a)(2)'s requirement of common issues. *See, e.g.*, *Wilson*, 2018 WL 3913115, at *4 (common questions included falsity, materiality and control person status); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018), *leave to appeal denied*, No. 18-3036, 2019 WL 1612904 (2d Cir. Feb. 20, 2019) (common questions for Securities Act claims included "(1) whether DB made an unlawful omission and (2) whether that omission was material").[4]

### 3.    Plaintiffs' Claims Are Typical of the Class

Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

---

[4] Plaintiffs' state-law claims on behalf of ESPP purchasers (for breach of fiduciary duty, misrepresentation and non-disclosure, and breach of contract) also raise common questions, including whether Teva, Vigodman, and Desheh (1) breached their fiduciary duties to the ESPP; (2) made material misrepresentations and nondisclosures; and (3) breached their agreement to properly monitor and manage the ESPP and offer Teva ADS to the ESPP at their correct and appropriate price. As this Court has noted, "essentially the same facts undergird [the state-law] claims and the federal securities law claims in this action." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 3:17-CV-558 (SRU), 2020 WL 1181366, at *13 (D. Conn. Mar. 10, 2020).

As is true for commonality, "typicality does not require the representative party's claims to be identical to those of all class members." *Wilson*, 2018 WL 3913115, at *4.  Rather, typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id.* (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).  In securities actions, typicality is "not demanding." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 80.

As the Court ordered (ECF 352), Defendants expressly agreed that they cannot challenge Plaintiffs' typicality.  Their agreement is for good reason; Plaintiffs' typicality is unequivocally established here.  Plaintiffs, like all other members of the proposed Class, purchased Teva Securities.[5]  Under the Exchange Act, they all assert the same Section 10(b) claims, based on the same misstatements and omissions, and the same Section 20(a) claim of "control person" liability.  Likewise, under the Securities Act, they all assert the same Section 11 and 12(a)(2) claims, based on the same misstatements and omissions, and the same Section 15 claim of "control person" liability.  The additional state-law claims arise from the same misstatements and omissions.

Thus, all of Plaintiffs' claims "are based entirely on alleged misrepresentations that [Defendants] made to the investing public during the Class Period, as well as the individual defendants' control of [Teva]," and "will rely on the same course of events." *Wilson*, 2018 WL 3913115, at *5.  Underscoring Plaintiffs' typicality, the Court has confirmed that all the claims in the Complaint rest on "Defendants' sustained course of conduct." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 3:17-CV-558 (SRU), 2020 WL 1181366, at *13 (D.

[5] Ontario Teachers' purchased Teva ADS and Preferred Shares, and Anchorage purchased 2026 Notes.  (ECF 310 at App'x D.)  Because all Notes were issued pursuant to the same registration statement, the claims for all Notes rest on the same misstatements and omissions and "implicate the same set of concerns." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 148-49, 162 (2d Cir. 2012); *see also Ontario Teachers'*, 432 F. Supp. 3d at 181.

Conn. Mar. 10, 2020); *see also Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 181 (D. Conn. 2019).  Plaintiffs' legal and factual arguments are the same ones that other Class members would advance in support of their claims, and Plaintiffs satisfy the "typicality" requirement.

### 4.    Plaintiffs, Class Counsel, and Class Liaison Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)'s "adequacy" prong requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The Court's inquiry focuses on "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  The adequacy requirement is meant to "ensure that the named representatives will have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members," *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  Only a "fundamental" conflict of interest will defeat adequacy under Rule 23(a)(4).  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001).

As with typicality, the Court has ordered that Defendants, by virtue of their agreement, cannot challenge Plaintiffs' adequacy.  (ECF 352.)  Likewise, Plaintiffs are unquestionably adequate, having vigorously pursued the proposed Class's claims since the inception of the case, through two rounds of motions to dismiss, consolidation, and securing substantial discovery from Defendants and numerous non-parties.  *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 141–42 (S.D.N.Y. 2019) (finding adequacy where lead plaintiff and counsel "advanced the case through a contentious discovery process" and "vigorously pursued claims on behalf of the class").

Moreover, based on their purchases of Teva Securities during the Class Period, Plaintiffs' interests are "directly aligned" with the interests of other Class members, all of whom were injured by the same materially untrue statements and omissions. *PE Corp.*, 228 F.R.D. at 109. Underscoring that alignment, Defendants also agreed not to challenge Plaintiffs' standing to assert the claims added in the December 2019 amendment. (ECF 352.) Moreover, this Court has confirmed that both Plaintiffs have class standing to assert claims on behalf of all purchasers of Teva Securities. *Ontario Teachers'*, 432 F. Supp. 2d at 181; *Ontario Teachers'*, 2020 WL 1181366, at *13; *see also In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 82 (class standing supported adequacy by showing lead plaintiffs' alignment of interests with other class members).

Plaintiffs have further demonstrated their commitment to monitor and supervise the prosecution of this action on behalf of the Class.[6] Plaintiffs have retained experienced counsel, BFA and Carmody, and have vigorously prosecuted this action, kept abreast of developments and engaged in the prosecution of the action, and will continue to do so. *See PE Corp.*, 228 F.R.D. at 109 (class representatives' counsel were "qualified, experienced and able to conduct complex securities litigation").

Indeed, the PSLRA was intended to "increase the likelihood that institutional investors will serve as lead plaintiffs," such as those here. *See* H.R. Rep. No. 104- 369, at 34 (1995) (Conf. Rep.). Both Plaintiffs are the type of institutional investors that the PSLRA envisioned as class representatives. Ontario Teachers' manages more than CAD$200 billion for over 327,000 beneficiaries (Chilcott Declaration ¶2), and is a highly experienced lead plaintiff, having recovered over $1.9 billion in seven securities class actions since 2002, and has been found an adequate and

---

[6] *See* Declaration of Sharon Chilcott in Support of the Motion of Ontario Teachers' Pension Plan Board for Class Certification and Declaration of Edward A. Jarvis in Support of the Motion of Anchorage Police & Retirement System for Class Certification, concurrently filed herewith.

typical class representative in each.[7]  As the Court noted in its lead plaintiff decision, Ontario Teachers' has an "in-house legal department with attorneys dedicated to the oversight of this action," which has "supervise[d] retained counsel and actively participate[d] in the litigation with its client and the class's best interests in mind."  (ECF 124 at 27.)  Ontario Teachers' has suffered over $47 million in losses on its investments in Teva securities during the Class Period.  (*See* ECF 310 at App'x D.)  Anchorage manages over $350 million for over 700 beneficiaries (Jarvis Declaration ¶2) and is also highly experienced, having served as co-lead plaintiff in *Freedman v. Weatherford International, Ltd.*, 12-cv-02121 (S.D.N.Y.), and overseen the prosecution of the case to a $120 million settlement, and as lead plaintiff in *In re Conseco, Inc. Sec. Litig.*, No. 00-cv-585 (S.D. Ind.), which also settled for $120 million.

Finally, Plaintiffs have protected the interests of the Class by retaining and overseeing BFA as Lead Counsel.  BFA is highly experienced in litigating securities class actions and will vigorously prosecute the claims of the proposed Class.  Lead Counsel has a proven track record in prosecuting complex securities class actions like this one, establishing their adequacy for appointment as Class Counsel; proposed Class Liaison Counsel Carmody is also highly experienced with securities and other complex litigation.  (*See* Fonti Declaration Exs. 2-3 (Class Counsel resumes).)  Lead Counsel's adequacy also is demonstrated by the substantial work in

---

[7] *See In re Computer Sciences Corp. Sec. Litig.*, No. 1:11-cv-00610 (E.D. Va.) ($97.5 million settlement); *In re Washington Mutual Sec. Litig.*, No. 2:08-cv-00387 (W.D. Wash.) ($208.5 million settlement); *In re Bristol-Myers Squibb Co. Sec. Litig.*, No. 1:07-cv-05867 (S.D.N.Y.) ($125 million settlement); *In re Williams Companies, Inc. Sec. Litig.*, No. 4:02-cv-00072 (N.D. Okla.) ($311 million settlement); *In re Nortel Networks Corp. Sec. Litig.*, No. 1:04-cv-02115 (S.D.N.Y.) ($1.07 billion settlement); *In re Biovail Corp. Sec. Litig.*, No. 1:03-cv-08917 (S.D.N.Y.) ($138 million settlement); *In re Cable & Wireless, PLC Sec. Litig.*, No. 1:02-cv-01860 ($7 million settlement).

investigating and prosecuting this action thus far.  Accordingly, Plaintiffs respectfully submit that proposed Class Counsel satisfy the adequacy requirement of Rule 23(a)(4).

### 5.    Plaintiffs Are Not Subject to Any Unique Defenses

Moreover, Plaintiffs are not subject to any "unique defenses which threaten to become the focus of the litigation" and could therefore undermine adequacy or typicality.  *Baffa*, 222 F.3d at 59 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).  The unique defense rule "is not rigidly applied in this Circuit," and "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit."  *In re Parmalat Sec. Litig.*, No. 04MD1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008).  Plaintiffs are not subject to any unique defenses, and Defendants, recognizing as much, have waived all challenges to Plaintiffs' typicality and adequacy.

### 6.    The Class Is Ascertainable

The Second Circuit has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable," often characterized as an "ascertainability" requirement.  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017). A "class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries."  *Id.* at 257.  Here, the "ascertainability" requirement is readily met because the proposed Class is defined by objective criteria—those who purchased or acquired Teva Securities within the Class Period, or (for the Securities Act claims) pursuant or traceable to the Offerings—and Class members are readily identifiable.  *See, e.g.*, *Wilson*, 2018 WL 3913115, at *7 (purchasers of securities during specified period could be "identified from the books and records maintained by [the defendant] and its agents"); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 85 (class membership "easily ascertained by objective documentation" where class

consisted of those who purchased or otherwise acquired securities "pursuant or traceable to" defendants' public offerings).

**C.**     **The Requirements of Rule 23(b) Are Satisfied**

Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts in this District have explained that securities fraud class actions typically meet the Rule 23(b)(3) requirement because an "enormous group" of class members seek damages, and the "focus of [the] litigation is upon the propriety [of] defendants' conduct, and any issues pertaining to individual class members only pale in comparison to the importance of defendants' potential liability." *Priceline.com Inc.*, 236 F.R.D. at 101-02. This case is no different.

**1.**     **Common Questions of Law and Fact Predominate**

The Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Halliburton I*, 563 U.S. at 809. A plaintiff seeking class certification does not need to prove that "each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568 U.S. at 469. Rather, "a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class, taking into

16

account both affirmative claims and potential defenses." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 136 (S.D.N.Y. 2014).

Here, common issues plainly predominate, and are far "more substantial than [any] issues subject only to individualized proof." *Waggoner*, 875 F.3d at 93.  Plaintiffs' Securities Act and Exchange Act claims are addressed separately below.

### a.    Securities Act Claims

Plaintiffs' Securities Act claims "do not require . . . scienter, reliance, or loss causation." *In re MF Global Holdings Limited Sec. Litig.*, 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013).  Instead, to prevail on their claims under Sections 11 and 12(a)(2) of the Securities Act, Plaintiffs must only prove the Class-wide issues of (1) materially false statements and omissions in Teva's 2010 Registration Statement and Offering Materials, and (2) negligence by Vigodman, Desheh, and Griffin (Teva and Teva Finance, as issuers, are strictly liable for violations).  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011).  Plaintiffs' "control person" claim under Section 15 also requires common proof that the defendant controlled the primary violator.  Resolution of all of these legal and factual questions can plainly "be achieved through generalized proof." *Waggoner,* 875 F.3d at 93.  As a result, no further analysis is required to find that common issues predominate as to Plaintiffs' Securities Act claims.  *See, e.g.*, *In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 233 (S.D.N.Y. 2015) (certifying Securities Act class of noteholders).[8]

---

[8] The same is true for Plaintiffs' state-law claims on behalf of ESPP purchasers, which also require proof of common issues, including Defendants' breach of fiduciary duties, material misrepresentations and nondisclosures, and breach of contract.  Moreover, Defendants have waived any argument that the state-law claims raise individualized questions, since in consenting to the addition of those claims, Defendants agreed (and the Court later ordered) that Defendants cannot use "the fact of the amendment itself to challenge class certification."  (ECF 352.)

#### b.      Exchange Act Claims

To prevail under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must prove (1) a material omission or misrepresentation; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[9]  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  The Supreme Court has held that materiality and loss causation are common merits issues in a securities fraud class action, and thus proof of those elements is not a prerequisite to class certification.  *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 812-13 (loss causation).  Scienter is another common issue.  *See, e.g.*, *SunEdison*, 329 F.R.D. at 147 (certifying class given predominance of common questions, including falsity, materiality, and scienter).  And while Plaintiffs are not required to prove that the element of economic loss is susceptible to Class-wide proof, economic loss is nonetheless measurable on a Class-wide basis, as discussed below.

Thus, whether common questions predominate for Plaintiffs' Section 10(b) claims "turns on the element of reliance."  *Halliburton I*, 563 U.S. at 810; *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("All of these [10(b)] elements, other than reliance . . . are subject to class wide proof in securities litigation").

The Complaint alleges Class-wide reliance through the fraud-on-the-market presumption (¶¶377-38), which dispenses with the requirement that each Class member prove direct, individual reliance upon Defendants' alleged misstatements and/or omissions.  The fraud-on-the-market presumption recognizes that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business,"

---

[9] In addition, Plaintiffs' "control person" claim under Section 20(a) of the Exchange Act requires proof that the defendant controlled the primary violator, another common issue subject to Class-wide proof.  *See, e.g.*, *Wilson*, 2018 WL 3913115, at *4.

and thus, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241–42.  Under *Basic* and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), Plaintiffs may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84.

As explained below, all of the Teva Securities—the ADS, Preferred Shares, and Notes— traded in efficient markets, such that the fraud-on-the-market presumption applies.  And efficiency aside, Plaintiffs are entitled to the separate presumption of reliance under *Affiliated Ute* because Plaintiffs' claims involve Defendants' material omissions in violation of a statutory duty.  For both reasons, there is Class-wide reliance, and common issues predominate.

<blockquote>(1)  <b>Plaintiffs and the Class Are Entitled to a Presumption of Reliance for the ADS and Preferred Shares Because They Traded in Efficient Markets</b></blockquote>

To invoke the fraud-on-the-market presumption, Plaintiffs must show "that [the] defendants' misstatements were publicly known, their shares traded in an efficient market, and [the] plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed."  *ATRS II*, 955 F.3d at 260.

Plaintiffs amply demonstrate these requirements.  All of the alleged misstatements were publicly available; indeed, many were made in Teva's SEC filings.  Additionally, the Teva Securities traded in efficient markets, as explained below, and Class members purchased Teva Securities at market prices after the misstatements were made and before the truth was revealed. (*See, e.g.*, ECF 310 App'x D.)  As a result, the fraud-on-the-market presumption applies.

An efficient market is "one in which the prices of the [stock] incorporate most public information rapidly." *Teamsters Local 445 Freight Div. Pension, Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008). Importantly, the Supreme Court has confirmed that the fraud-on-the-market presumption "does not rest on a 'binary' view of market efficiency," but instead is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton II*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247 n.24). Plaintiffs need only show that the stock traded in a "generally efficient market" at the class certification stage, *Halliburton II*, 573 U.S. at 279, a burden that is not "onerous," *Petrobras*, 862 F.3d at 278.[10]

Although the Second Circuit has not definitively established any test for determining market efficiency, "district courts in this and other Circuits regularly consider five factors first set forth" in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). *Waggoner*, 875 F.3d at 94. The five *Cammer* factors are: (1) the weekly trading volume; (2) the amount of securities analyst coverage, (3) the existence of market makers and arbitrageurs; (4) the eligibility of the company to file a Form S-3 registration statement, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security's prices. *Bombardier*, 546 F.3d at 200. Courts in this Circuit also consider the three factors noted in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001), including "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')." *Waggoner*, 875 F.3d at 94-95.

---

[10] Importantly, *Halliburton II* also held that "plaintiffs need not directly prove price impact to invoke the *Basic* presumption," 573 U.S. at 279; rather, "it is incumbent upon the defendant to show the absence of price impact." *Id.* at 284 (Ginsburg, Breyer, and Sotomayor, JJ., concurring).

The first four *Cammer* factors "examine indirect indicia of market efficiency for a particular security," while the fifth ("*Cammer* 5") looks to direct evidence. *Id.* at 94. As explained below, all five *Cammer* factors (and the *Krogman* factors) confirm that Teva Securities traded on efficient markets. However, the Second Circuit has emphasized that no one factor is dispositive, and courts should conduct "a holistic analysis based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 277.

<blockquote>(a)    **Teva's ADS Were Listed and Traded on the NYSE, a Presumptively Efficient Market**</blockquote>

At all relevant times, Teva ADS were listed and actively traded on the NYSE. (Tabak Report ¶52.) Courts consistently find that the NYSE "is a paradigmatic efficient market." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (fact that defendant's "ADS traded on the New York Stock Exchange . . . by itself is a strong indication of efficiency"); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 181-82 (S.D.N.Y. 2012) (NYSE is a "presumptively efficient market"); *Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) ("If . . . a security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient."). The Class is therefore entitled to invoke the presumption of reliance as to the ADS.

<blockquote>(b)    ***Cammer* 1:  Teva's ADS and Preferred Shares Traded at a Large Average Weekly Volume**</blockquote>

*Cammer* noted that an average weekly turnover "of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." 711 F. Supp. at 1286. Teva's ADS and Preferred Shares easily meet this standard, as their average weekly trading volumes during the Class Period were respectively 4.87% and 4.96%—well over

*Cammer*'s 2% threshold.  (Tabak Report ¶¶19-20.)  *See, e.g.*, *Pirnik*, 327 F.R.D. at 44 (2.5% average weekly trading volume justified "strong presumption of efficiency").

<div align="right">

(c)   ***Cammer* 2:  A Significant Number of Analysts Followed and Reported on Teva's ADS and Preferred Shares**

</div>

Teva ADS and Preferred Shares were the subject of broad analyst coverage during the Class Period.[11]   On average, 20 analysts each month provided quarterly earnings estimates included in the Institutional Brokers' Estimate System consensus earnings estimate for Teva. (Tabak Report ¶24 & Ex. 4.)  In addition, at least 14 analysts issued one or more reports each month regarding Teva, for a total of over two thousand reports during the Class Period.  (*Id.* ¶25.) This factor strongly supports market efficiency.  *See, e.g.*, *Villella*, 333 F.R.D. at 54 (*Cammer* 2 satisfied where "fifteen firms provided analyst coverage for the ADS, surpassing the three analysts found sufficient in *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014)"); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 97 (S.D.N.Y. 2018) (*Cammer* 2 satisfied based on "400 analyst reports during the class period and routine coverage in the financial press").

<div align="right">

(d)   ***Cammer* 3:  Existence of Market Makers, Institutional Investors, and Arbitrageurs**

</div>

*Cammer* noted that the "existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and

---

[11] As *Cammer* explained, "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.  In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [auditor] reports, as interpreted by the securities analysts."  711 F. Supp. at 1286.

reported financial results by buying or selling stock and driving it to a changed price level." 711 F. Supp. at 1286–87. This factor also strongly supports market efficiency.

As stated above, Teva ADS traded on the NYSE, which is widely regarded as one of the most open, developed, and efficient exchanges in the world. The NYSE maintains a system where there is a "designated market maker" in charge of ensuring that there is a well-functioning market (Tabak Report ¶26), which supports efficiency. *See, e.g.*, *Villella*, 333 F.R.D. at 54 ("There is a designated market maker that executes ADS transactions, satisfying *Cammer* 3."); *Pirnik*, 327 F.R.D. at 44 ("trading in FCA stock was facilitated by a designated market maker on the NYSE").

Additionally, institutional investors (defined as all SEC Form 13-F filers) held significant positions in Teva ADS and Preferred Shares during the Class Period. Institutions held over 457 million shares of Teva ADS, or 64.3% of the ADS outstanding, as of December 31, 2013; on average, institutional holdings were 69.5% of the outstanding ADS during the Class Period. (Tabak Report ¶28 & Ex. 5-a.) Likewise, institutions held on average 42.48% of Teva's outstanding Preferred Shares during the Class Period. (Tabak Report ¶32 & Ex. 5-b.) This supports a finding of market efficiency because the participation of sophisticated investors facilitates the incorporation of material information into securities prices. *See Pirnik*, 327 F.R.D. at 44 ("institutional ownership . . . ranged from 61% to 68% of the FCA shares available"); *Wilson*, 2018 WL 3913115, at *12 (noting "large number of institutional investors"). Additionally, these institutions actively modified their holdings in Teva ADS and Preferred Shares throughout the Class Period, evidencing that these investors followed the Company closely and "were able to, and did, take and change positions" in Teva ADS and Preferred Shares to reflect their views, creating a highly liquid and efficient market. (Tabak Report ¶¶31-32.)

(e)     *Cammer* 4:  **Eligibility to File SEC Form S-3**

During the Class Period, Teva was eligible to file simplified SEC filings on Form F-3 (the foreign-issuer equivalent of Form S-3), filed a registration statement on Form F-3 used for the ADS/Preferred and Notes Offerings (ECF 310 ¶¶417, 422), and after becoming a U.S. domestic issuer at the beginning of 2018, filed a Form S-3 in January 2018.  (Tabak Report ¶¶34-35.)  *See Villella*, 333 F.R.D. at 54 ("SQM was eligible to file a Form F-3, the foreign equivalent of the Form S-3 cited in *Cammer* 4."); *Pirnik*, 327 F.R.D. at 44-45 ("FCA was eligible to file, and did file, simplified filings with the Securities and Exchange Commission").  This factor supports market efficiency because companies are only permitted to make such simplified filings if the SEC believes "that the market operates efficiently for these companies."  *Cammer*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6331 (Aug. 13, 1981)); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 CIV. 1898 (SAS), 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) (the "SEC permits an S-3 Registration Statement only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.").

(f)     *Cammer* 5:  **The Relationship Between News Events and Security Price Changes**

The relationship between news events and security price changes is typically analyzed through a statistical regression analysis, commonly referred to as an "event study," which seeks "to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *Halliburton II*, 573 U.S. at 280.  The Second Circuit has concluded that an event study or "direct evidence of price impact under *Cammer* 5 is not always necessary to establish market efficiency and invoke the *Basic* presumption."  *Waggoner*, 875 F.3d at 96-98 (district court's "decision not to rely on direct evidence of price impact under *Cammer* 5 . . . fell

24

comfortably within the range of permissible decisions" where remaining *Cammer* and *Krogman* factors "weighed so clearly in favor of concluding that the market for Barclays' ADS was efficient that the Defendants did not even challenge them").[12]   Nonetheless, Plaintiffs provide Dr. Tabak's event study to further substantiate market efficiency, which, though unnecessary, more than satisfies *Cammer* 5.   Indeed, it would be puzzling for Teva, the world's largest generics manufacturer with hundreds of millions of ADS outstanding, to challenge the efficiency of the market for its securities.

Dr. Tabak conducted a series of event studies using a widely accepted methodology and concluded that there is "very strong evidence" of efficiency for Teva ADS and Preferred Shares. (Tabak Report ¶¶49-50.)   Specifically, Dr. Tabak's first event study compared the price reactions of Teva ADS and Preferred Shares on "news" days, defined as days during the Class Period in which earnings were announced, and "non-news" days.   This analysis revealed that Teva ADS and Preferred Shares reacted with statistical significance at the 5% significance level (sometimes called the 95% confidence level) on 77.3% and 66.7% of the "news" days, respectively.[13]   This result

---

[12] *See also Menaldi*, 328 F.R.D. at 97 ("if [*Cammer* 1-4 and *Krogman* factors] point to market efficiency, a court can dispose with *Cammer* 5 completely"); *Pirnik*, 327 F.R.D. at 45 n.3 (finding market efficiency and noting that because "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact.").

[13] As Dr. Tabak noted, there is "no meaningful benchmark for the percent of news days that should be associated with a statistically significant return," and "no reason to expect any particular percentage."   (Tabak Report at 22 n.31.)   Courts have also rejected the argument that price reactions on any particular percentage of news days are required.   *See Carpenters Pension Trust Fund v. Barclays*, 310 F.R.D. 69, 82-86 (S.D.N.Y. 2015) (finding market efficiency based on event study demonstrating price reaction on 5 of 15 event days, but noting that court would have found efficiency regardless of *Cammer* 5); *China MediaExpress*, 38 F. Supp. 3d at 430 ("[t]o require a stock to change on at least 50 percent of potentially material news days ignores that, in many circumstances, the absence of a price change on a potentially material news day is not inconsistent with an efficient market").

compares favorably to the days in which no earnings announcement was made, only 12.3% (ADS) and 20.9% (Preferred) of which resulted in statistically significant price movement.  (Tabak Report ¶¶45, 50, Exs. 8a-a, 8a-b.)  Dr. Tabak also performed additional event studies that analyzed broader sets of "news" days consisting of days with stories about Teva published by the *Dow Jones Newswires* (and the subsets of those days with larger numbers of stories).  (Tabak Report ¶42.) *All* of the differences between "news" days and "non-news" days, including when looking at earnings dates and broader sets of news days, were statistically significant at the 5% significance level.  (*Id.* ¶¶45-47, 50.)  "In other words, there were more likely to be big price movements on days when important [Teva] events occurred," showing that the "markets in [these] securities were responsive to new information."  *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 367-68 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).[14]

        (g)    **Additional *Krogman* Factors Further Establish Market Efficiency with Respect to the Teva ADS and Preferred Shares**

Each of the three *Krogman* factors also strongly supports efficiency:

*First*, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Krogman*, 202 F.R.D. at 478.  During the Class Period, the market capitalization of Teva ADS was always over $9 billion, and the market capitalization of Teva Preferred Shares was always at least $880 million.  (Tabak Report ¶¶54-56 & Exs. 7-a, 7-b.)  Teva's market capitalization of $14 billion on the last day of the

---

[14] To forestall any arguments Defendants may assert, the Second Circuit has made clear that Plaintiffs are not required to show directionality—that the prices of Teva Securities increased with positive information and decreased with negative information.  *See Petrobras*, 862 F.3d at 278-79 ("[There is no] blanket rule requiring district courts to, at the class certification stage, rely on directional event studies and directional event studies alone.").

Class Period exceeded the market capitalization of more than 85% of the members of the Russell 3000 Index.  (*Id.* ¶54.)  Numerous courts have found similar or far lower market capitalization levels to support market efficiency.  *See, e.g.*, *Villella*, 333 F.R.D. at 54 (efficiency found where market capitalization was $1 billion); *Billhofer*, 281 F.R.D. at 154 (market capitalization ranged from $288 to $717 million).

*Second*, when evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders," known as the float.  *Krogman*, 202 F.R.D. at 478.  A larger float indicates greater liquidity, making it easier to purchase and sell shares in the market, and increasing investors' incentives to examine a company's stock price and news about a company to maximize their potential profits from trading.  (Tabak Report ¶61.)  During the Class Period, the float for Teva ADS averaged over 98% of the ADS outstanding, and the float of the Preferred Shares was 100%.  (*Id.* ¶¶61-62.)  The large percentage of Teva ADS and Preferred Shares in the float supports market efficiency.  *See, e.g.*, *Villella*, 333 F.R.D. at 54 (market float of between 65% and 95%); *Wilson*, 2018 WL 3913115, at *15 (average public float of 82.41% of outstanding shares "exceeds amounts other courts have deemed sufficient to suggest a finding of market efficiency").

*Third*, the relatively narrow bid-ask spreads for Teva ADS and Preferred Shares also support efficiency.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.  During the Class Period, the average daily bid-ask spread on Teva ADS was about 0.035% of the closing prices for the day.  (Tabak Report ¶58.)  These narrow bid-ask spreads compare favorably to the spreads in other cases finding market efficiency.  *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 619 (C.D. Cal. 2009) (bid-ask spread of 0.51%).  For the Preferred Shares, the average daily bid-ask was 2.66% of the closing prices for the day, while the median was 1.99%

(Tabak Report ¶59), also near or below the level in other cases finding market efficiency.  *See*

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (bid-ask spread of 2.44%).

> (h)     **A Lack of Consistent Autocorrelation Also
>         Demonstrates Efficiency as to the Teva ADS and
>         Preferred Shares**

One additional factor, autocorrelation, considers whether changes in a security's prices can

be statistically predicted based on past price movements:  for example, whether price increases on

Mondays make it more likely that on Tuesdays, prices will increase (positive autocorrelation) or

decrease (negative autocorrelation).  (Tabak Report ¶64.)  Persistent autocorrelation beyond

transaction costs would represent a potential failure of investors to exploit profit opportunities in

the security, suggesting that investors may not be properly analyzing the company's stock price

movements.  Dr. Tabak found no consistent autocorrelation in Teva's ADS and Preferred Share

prices during the Class Period, again supporting a finding of market efficiency.  (*Id.* ¶¶68-69.)

> (2)     **Plaintiffs and the Class Are Entitled to a Presumption
>         of Reliance for Teva Notes Because They Traded in
>         Efficient Markets**

The Teva Notes also traded in efficient markets during the Class Period.  In evaluating

market efficiency for a company's bonds, "courts [also] generally apply [the *Cammer*] factors to

the efficiency question."  *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 507-508 (D. Kan. 2014);

*see also In re Am. Realty Capital Properties, Inc. Litig.*, No. 15-MC-40 (AKH), 2017 WL

3835881, at *1 (S.D.N.Y. Aug. 31, 2017) (market efficiency for common stock "also extends to

ARCP's preferred stock and debt securities, which also satisfy many of the aforementioned factors,

including S-3 registration eligibility, existence of market makers and arbitrageurs, narrow bid-ask

spread, and a high float"); *Petrobras*, 312 F.R.D. at 366 ("modified *Cammer* factors" provided

"useful rubric to evaluate debt markets").

Courts, however, are sensitive to differences between stocks and bonds, cautioning that "bond investors cannot be categorically denied an opportunity to utilize the fraud-on-the-market theory simply because of a structural difference in the way that debt securities are marketed and traded vis-a-vis equity securities." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 633 (N.D. Ala. 2009). In this regard, courts have stressed in certifying classes of bondholders that, to establish market efficiency, the plaintiff "is not required to show the existence of each of [the relevant] factors." *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005); *cf. Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) ("Because the *Cammer* factors were created in the context of the stock markets, courts adjust them for the realities of the over the counter bond market."). Nevertheless, the relevant factors overwhelmingly demonstrate that the markets for the Teva Notes also were efficient during the Class Period.

(a)     ***Cammer* 1:  Teva's Notes Traded at a Large Average Weekly Volume**

The trading activity for Teva Notes supports a finding of market efficiency. For bonds, weekly trading volume of two percent or more creates a "strong" presumption of efficiency, and above one percent creates a "substantial" presumption of efficiency. *See Petrobras*, 312 F.R.D. at 366 (noting that all bonds were "over *Cammer*'s 1% threshold for a substantial presumption of efficiency, even though the *Cammer* thresholds are designed for common stock, which trades more frequently than bonds"); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 214 (E.D. Pa. 2008) ("substantial presumption" of efficiency where "Senior Notes had an average weekly trading volume during the class period of 1.25%"). Courts have applied the fraud-on-the-market presumption, "notwithstanding that on some days the trading volume was low and on others, there was no trading at all." *AAL High Yield*, 229 F.R.D. at 685.

Here, average weekly trading for the Notes ranged from 1.31% to 4.21% during the Class

Period, creating "substantial" or "strong" presumptions of efficiency (Tabak Report ¶21, Ex. 3-c):

| Note | Average Traded Weekly |
|------|----------------------|
| **2018 Notes** | 1.46% |
| **2019 Notes** | 1.31% |
| **2021 Notes** | 2.07% |
| **2023 Notes** | 2.49% |
| **2026 Notes** | 4.21% |
| **2046 Notes** | 3.98% |

(b)    *Cammer* **2:  A Significant Number of Analysts**
**Followed and Reported on Teva's Notes**

The *Cammer* analyst-coverage factor "is commonly met where multiple large brokerage

firms produce and disseminate analyst reports on the financial condition of a company for the

entirety of a Class Period." *China MediaExpress*, 38 F. Supp. 3d at 31 (citing *In re Alstom SA Sec.*

*Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008)).

Here, the extensive analyst coverage regarding Teva, noted above, contributes to the

conclusion that the market was efficient.  "The coverage by analysts of [defendant's] equities also

provided information of interest to the bond market when concerned with the overall financial

health of the issuing firm." *HealthSouth*, 261 F.R.D. at 635; *see also Plumbers & Pipefitters, Nat'l*

*Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1162 (N.D. Ohio 2013) ("Although the majority of

these reports covered Dana's stock, the information helped investors evaluate the riskiness of

Dana's debt securities."); *DVI Inc.*, 249 F.R.D. at 215, *aff'd*, 639 F.3d 623 (3d Cir. 2011) (same);

*Winstar*, 290 F.R.D. at 446 ("number of analysts following the company as a whole is instructive"

because company's "overall financial health impacted the price of both . . . stock and bonds").

In addition, throughout the Class Period the major credit rating agencies—Moody's,

Standard & Poor's, and Fitch—actively issued credit reports concerning Teva's debt.  (Tabak

Report ¶24.)  This level of focus on the credit ratings of Teva's debt specifically contributes to a finding of market efficiency.  *See Countrywide*, 273 F.R.D. at 615 ("Coverage by the major credit rating agencies also provides information to the market and is relevant to a determination of a debt security's efficiency.").

The continuous analyst and rating agency coverage of Teva supports the conclusion that Teva Notes traded in an open, well-developed, and efficient market.  *See, e.g.*, *Petrobras*, 312 F.R.D. at 366 (noting coverage by analysts and ratings agencies); *Winstar*, 290 F.R.D. at 446 (noting coverage by debt and equity analysts, company press releases, and "cover[age] by mainstream financial news services" of company as a whole, "giving both stock and fixed income investors recommendations on securities and opinions regarding the company's outlook").

<div align="center">

(c)      ***Cammer* 3:  Existence of Market Makers,
Institutional Investors, and Arbitrageurs**

</div>

Further supporting market efficiency, Teva Notes were underwritten by 18 investment banks, and (based on the underwriters' records) each Note was allocated to at least one hundred institutional investors in the Offering.  (Tabak Report ¶33.)  *See Petrobras*, 312 F.R.D. at 366 (involvement of "at least 20 underwriters of the Petrobras Bonds, including large and prominent investment banks," and ownership by "214 different mutual funds," supported efficiency).

<div align="center">

(d)      ***Cammer* 4:  Eligibility to File SEC Form S-3**

</div>

As with the ADS and Preferred Shares, Teva's eligibility to file simplified SEC filings on Form F-3 (the foreign-issuer equivalent of Form S-3), noted above, also supports a finding of efficiency for the Notes.  *See supra* at 24; *Petrobras*, 312 F.R.D. at 366 (eligibility to file Form F-3 supported efficiency for bonds).  Moreover, each of the Notes individually had an issuance of at least $1.5 billion, far in excess of the $75 million requirement for Form S-3 eligibility.  (Tabak Report ¶36 & Exs. 7-c1, 7-c2.)

<div align="center">31</div>

(e)     *Cammer* **5**:  The Relationship Between News
Events and Security Price Changes

Dr. Tabak conducted a series of event studies for each of the Teva Notes and determined that the "Notes respond to relevant news, but that the set of news events that are relevant for the Notes is more restrictive than the sets of news relevant for the ADS or the Preferred Shares." (Tabak Report ¶51.)

Because the bond and stock markets are different, the event studies and *Cammer* 5 analysis must be placed in context.  These differences have long been recognized:  "The price of bonds reacts differently to unexpected new information than does the price of stocks."  *HealthSouth*, 261 F.R.D. at 635; *see also In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 411-12 (E.D. Va. 2015) (recognizing difference between news relevant to stocks and bonds).  The critical difference is that bond prices do not necessarily react to company news unless it affects the risk of default, *i.e.*, credit risk.  *See* Tabak Report ¶51; *Petrobras*, 312 F.R.D. at 367 (certifying bondholder class and approvingly citing plaintiffs' expert for proposition that "unless bonds are close to default they are insensitive to earnings announcements").  For this reason, sometimes "information that affects the price of stocks, such as the announcement of a dividend or earning statements, would not be expected to affect the price of bonds."  *HealthSouth*, 261 F.R.D. at 631-32.[15]

---

[15] *See also HealthSouth*, 261 F.R.D. at 631 ("The changes in market price of corporate bonds most frequently reflect changes in risk-free interest rates (Treasury Bonds) [not company specific news] and changes in the company's likelihood of default on its obligations, i.e., a company's credit risk"); *Bennett*, 298 F.R.D. at 509 ("[W]hen examining this factor in the context of debt securities, the [c]ourt should recognize that material new unexpected information concerning the creditworthiness of the issuer or the prospect of default on bond obligations would be of interest to bondholders and affect price."); *id.* at 512 ("unless the statement disclosed information that altered Sprint's likelihood of default, the price of the Sprint Bonds would not be expected to change in any meaningful way.").

As Dr. Tabak explained, the key result is that, for days with the most extensive news coverage of Teva,[16] all of the Notes' prices are more likely to move in a statistically significant manner than on non-news days, with the difference between the two groups being statistically significant at both the standard five-percent significance level and the more stringent one-percent significance level.  (Tabak Report ¶51 & Ex. 8a-c.)  "This is strong evidence of price response to news."  (*Id.*)[17]

        (f)      **Additional *Krogman* Factors Further Establish Market Efficiency for the Teva Notes**

Courts also consider the factors discussed in *Krogman*, discussed above, relevant to the efficiency analysis for bonds.  Just as a large market capitalization supports a finding of market efficiency for a stock, the large size of an issuance supports efficiency for bonds.  *See* Tabak Report ¶56; *Winstar*, 290 F.R.D. at 449.  Here, the Notes issuances, six in all, were each between $1.5 billion and $3.5 billion, for an aggregate principal amount of $15 billion.  (Tabak Report Ex. 7-c1.)  All of the Notes were issued in a single offering on the same day.  (ECF 310 ¶425.)  Courts find that these facts support efficiency for bond markets.  *See NII*, 311 F.R.D. at 412 (bond

---

[16] For this analysis, Dr. Tabak identified the days with stories about Teva published by *Dow Jones Newswires*, sorted the days by the number of news stories on each day, and considered the top 10% as news days.  (Tabak Report ¶42.)

[17] While Dr. Tabak's alternative tests (with earnings dates as news days, and broader sets of news days based on *Dow Jones Newswire* coverage) yielded more mixed results, under each of those tests, the fraction of news days with statistically significant price movements always exceeds the fraction of non-news days with statistically significant price movements, although the difference between those two fractions is not always statistically significant.  (Tabak Report ¶51.)  As Dr. Tabak explains, it is not surprising that the results of this test are weaker for the broader categories of news days; not all earnings news will be material for the Notes, as small earnings surprises and/or small changes in guidance may not be particularly relevant for the values, and hence the prices, of the Notes.  (*Id.*)

market capitalization of $1.45 billion "supports the conclusion that their market was efficient"); *Winstar*, 290 F.R.D. at 449 (market for $1.88 billion of bonds "likely to be efficient").

> (a)   **Autocorrelation Does Not Bear on Efficiency as to the Teva Notes**

Based on two tests, Dr. Tabak found minimal evidence of autocorrelation for two of the Notes (the 2019 and the 2026 Notes), mixed to weak evidence for two of the Notes (the 2021 and 2023 Notes), and moderate evidence for the remaining two Notes (the 2018 and 2046 Notes). (*See* Tabak Report ¶70.)  Overall, he concluded that this small amount does not meaningfully add to or detract from finding efficient markets for the Notes.  (*Id.*)

In sum, the above factors, viewed both individually and collectively, show that the market for Teva Notes was efficient during the Class Period, and the presumption of reliance applies.

> (3)   **Plaintiffs and the Class Are Also Entitled to a Presumption of Reliance under *Affiliated Ute***

In addition to the fraud-on-the-market presumption, the reliance element of Plaintiffs' Section 10(b) claims is also presumed because Plaintiffs' claims involve Defendants' omission of material information in violation of a statutory duty to disclose.  ECF 310 ¶379; *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).  Thus, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material[.]"  *Id.* at 153.

Here, Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F by failing to disclose at least two material trends:  that Teva was generating material portions of profits from the concealed Price-Hike Strategy, and that after 2015, those profits began to decline, and Defendants were no longer able to make price increases as the scheme unraveled. ECF 310 ¶¶167-73, 434; *see also Ontario Teachers'*, 2020 WL 1181366, at *18 (sustaining Item 5 allegations).  These omissions of statutorily required disclosures support a presumption of reliance.  *See, e.g.*, *Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4439415, at *6 (S.D.N.Y.

Sept. 17, 2019) (*Affiliated Ute* presumption applied where defendants omitted individuals' "ownership of more than 5% of the Company in violation of their duty to disclose that information"); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015) (*Affiliated Ute* presumption applied where defendant had duty to disclose nonpublic information used for insider trading); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. at 48 ("class-wide reliance is presumed" under *Affiliated Ute* where defendants' omissions of transfer agent scheme "involve[d] primarily a failure to disclose").

### c.   Individual Damages Calculations Will Not Defeat Predominance

It is "'well-established' in [the Second Circuit] that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

Thus, while Dr. Tabak does not provide a full damages model at this time, his report demonstrates that per-share damages can be determined on a Class-wide basis under a widely accepted model in securities class actions that will (1) use an event study to isolate the price movements specific to Teva Securities when Defendants' fraud was revealed; (2) determine the amount of artificial inflation in the price of Teva Securities for each day during the Class Period; and (3) mechanically calculate each Class member's individual damages by analyzing their actual

transactions as part of the claims process.[18]   (Tabak Report ¶¶74-79.)   Courts in this Circuit "have found that this three-step model suffices at the class certification stage to show that the issue of damages does not preclude a finding that common issues of law and fact predominate over individual damages issues."  *Wilson*, 2018 WL 3913115, at *16 (citing *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 3852, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015)); *see also Waggoner*, 875 F.3d at 106; *Pirnik*, 327 F.R.D. at 47-48.

### 2.  A Class Action Is Superior

Finally, Rule 23's "superiority" requirement is met when a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides four factors to guide this determination:  (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

"Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake."  *SunEdison*, 329 F.R.D. at 144.  The same is true here:  the Class consists of a large number of investors who are geographically dispersed and whose individual damages are likely small enough to render

---

[18] Section 11 and 12 damages will be calculated under the respective statutory formulas.  15 U.S.C. § 77k(e); 15 U.S.C. § 77l(a)(2); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 167 (S.D.N.Y. 2011) (The "'plain language of section 11(e) prescribes the method of calculating damages . . . and the statutory scheme requires courts to apply the prescribed formula in every section 11 case.'") (quoting *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995)), *aff'd sub nom. N.J. Carpenters Health Fund v. Rali Series 2006-QO1*, 477 F. App'x 809 (2d Cir. 2012).

individual litigation prohibitively expensive.  "Given the complexities of a securities litigation case, the interest of individual stockholders in controlling the prosecution of separate actions is low."  *PE Corp.*, 228 F.R.D. at 111.  Concentrating the litigation in this Court also has a number of benefits, including efficiency and eliminating the risk of inconsistent adjudication.  Lastly, federal securities class actions are routinely certified and raise no unusual manageability issues. *See id.*  Superiority is satisfied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this Action as a class action pursuant to Rule 23(a) and (b)(3); (2) appoint Plaintiffs as Class Representatives pursuant to Rules 23(a) and 23(b)(3); and (3) pursuant to Rule 23(g), appoint BFA as Class Counsel, with Carmody as Class Liaison Counsel.

Dated:  New York, New York
      June 19, 2020

<div style="margin-left:40%">

Respectfully submitted,

/s/ *Joseph A. Fonti*
Joseph A. Fonti (admitted *pro hac vice*)
Javier Bleichmar (admitted *pro hac vice*)
Evan A. Kubota (admitted *pro hac vice*)
Benjamin F. Burry (admitted *pro hac vice*)
Thayne Stoddard (admitted *pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
jbleichmar@bfalaw.com
ekubota@bfalaw.com
bburry@bfalaw.com
tstoddard@bfalaw.com

*Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board, and*
*for Named Plaintiff Anchorage Police & Fire*

</div>

*Retirement System, and Lead Counsel for the Class*

Marc J. Kurzman (ct01545)
Christopher J. Rooney (ct04027)
**CARMODY TORRANCE SANDAK & HENNESSEY LLP**
707 Summer Street, Suite 300
Stamford, CT 06901
Telephone: (203) 252-2680
Facsimile: (203) 325-8608
mkurzman@carmodylaw.com
crooney@carmodylaw.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board, and for Named Plaintiff Anchorage Police & Fire Retirement System*