


Joseph A. Fonti
212 789 1342 direct
212 205 3962 fax
jfonti@bfalaw.com

July 9, 2020

**VIA ELECTRONIC MAIL**

Hon. Stefan R. Underhill
United States Courthouse
915 Lafayette Boulevard, Suite 411
Bridgeport, Connecticut 06604

Re: *In re Teva Securities Litigation*, No. 3:17-cv-00558-SRU

Dear Judge Underhill:

Plaintiffs[1] write further to the June 23, 2020 conference and their July 2 letter (ECF 443) concerning Defendants' production of monthly data sufficient to show pricing, sales, revenues, and profits for Teva's full portfolio of generic drugs. Until this afternoon, Plaintiffs understood that Defendants would produce monthly data showing pricing, sales, and revenues, and were hopeful that an agreement would be reached on what were then the only remaining issues: (i) whether profits would be provided on a monthly versus quarterly basis, and (ii) whether the time period for the data would include 2017 and 2018.

Only hours ago, however, Defendants abruptly changed course. After six meet and confers since the June 23 conference, Defendants issued an ultimatum and refused to provide ***any*** data at all. This issue has dragged on long enough; the data Plaintiffs seek exists, is highly relevant, and must be produced. Plaintiffs respectfully request that the Court resolve the parties' impasse.

**A. Defendants Must Produce Monthly Data on Prices, Sales, Revenues and Profits**

Since last year, Plaintiffs have sought discovery sufficient to show Teva's generic drug price increases, sales, revenues, and profits that are at the heart of this action (*see, e.g.*, RFP 13). Defendants have refused to provide any data beyond a subset of drugs for the 2013-2016 period.

At the June 23 hearing, the Court rejected Defendants' position, including counsel's assertion that it would "take over six months" to produce additional data (ECF 414-1 ¶8), and advised that Defendants should produce the requested data on a monthly basis for the entire Teva

[1] Capitalized terms not defined herein have the meanings specified in the Complaint (ECF 310) and Plaintiffs' motion to compel (ECF 411-1).






portfolio. Yesterday, Defendants confirmed that they can produce average sale price ("ASP"), unit sales, and net sales (*i.e.*, net of rebates and discounts) on a monthly basis by August 7, 2020.

**Monthly vs. Quarterly Profits:** Thus, as of this afternoon, all that remained in dispute was production of data reflecting Defendants' monthly profits, not just quarterly profit data. It is puzzling that this dispute persists because Defendants concede that monthly profit data exists and can be produced. That is unsurprising for a consumer product organization, in which product managers "ha[ve] to know on, if not a daily or weekly basis, certainly a monthly basis what the price of the product has been, what the sales of the product have been, what the profits have been, what the margins [have been], so that they can make business decisions about what to be doing." (June 23, 2020 Tr. at 6:18-24.)

Defendants' only apparent objection to producing monthly data is that quarterly data is supposedly more "accurate" because it reflects royalties that were reconciled on a quarterly basis. Setting aside the questionable nature of this unsupported assertion, Defendants' opinion about "accuracy" does not define the scope of discovery. The issue is readily resolved simply by providing both quarterly and monthly profit data, leaving the issue of "accuracy" to be resolved by the facts.[2] Nonetheless, without agreement on this issue, Defendants refuse to produce ***any*** data whatsoever.

**Gross vs. Net/Operating Profits:** This afternoon, Defendants revealed for the first time that they are willing to provide only gross profit data, but not the net or operating profits Defendants also reported to investors.

Providing only gross profits is insufficient because this figure only removes direct costs involved in production. There is no question that net and operating profit figures are maintained. Indeed, Teva tracks both net income (synonymous with net profit) and operating profit (which removes operating expenses like overhead) and discloses both metrics in its public earnings results.[3] Defendants should provide monthly data for all three profit metrics.

---

[2] At the end of the parties' July 9 call, Defendants' counsel also vaguely suggested that producing monthly data could be burdensome, but admitted he "didn't know" the extent of any burden. That is far from the "affidavit" that the Court contemplated to support a claimed inability to produce monthly data. (June 23, 2020 Tr. at 9:10.)

[3] *See, e.g.*, ¶112 ("On the earnings call [on Feb. 11, 2016], Olafsson again touted a '$1 billion improvement in operating profit over 24 months period,' pointing to generics profits going from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. He explained rhetorically: 'So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.'").





**B. The Data Should Be Produced Through December 31, 2018**

Defendants refuse to produce any post-2016 data, contending that 2017 and 2018 data is not relevant because all of the alleged price increases had occurred by December 2016. That argument fails for three separate reasons, and the Court should order Defendants to produce this highly relevant data through December 31, 2018 (a compromise from Plaintiffs' original request through May 31, 2019). Defendants do not argue burden.

First, Teva sustained certain price increases well after 2016, allegedly earning more than $120 million in additional profits in 2017 (¶5), and for certain drugs sustained price increases through at least 2018, and inflated profits into 2019.[4] Plaintiffs are entitled to explore the full extent to which such sustained price increases contributed to Teva's financial performance during the Class Period, which extends to May 10, 2019.

Second, post-2016 data bears directly on the decline in Teva's financial performance due to the collapse of the price increase strategy and plummeting profits. Specifically, "[a]s with profit increases, Teva officials routinely and expressly denied that pricing had anything to do with the decline in profits." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 162-63 (D. Conn. 2019).

Ultimately, the price erosion that continued after 2016 led directly to two massive impairment charges that permanently wrote down the value of Teva's generics business: a $6.1 billion impairment on August 3, 2017 and a $10.4 billion impairment on February 8, 2018. (¶¶160, 362, 369, 405.) Generic drug pricing, sales, revenue and profit data from 2017 and 2018 are directly relevant to the reasons for the permanent impairments. Indeed, Teva expressly attributed the February 2018 impairment in part to "further deterioration in the U.S. generics market"—including "[p]ricing challenges due to government regulation"—and Teva's resulting expectation of "larger pricing declines" than previously anticipated. (¶369.) Both of the impairments are loss causation events—corresponding to significant declines in the prices of Teva securities—and require Defendants to produce post-2016 data.

Third, post-2016 data will show that Defendants' concerted price increase strategy collapsed once Defendants were unable to implement further increases. This is relevant to (among other things) rebut one of Defendants' main defenses: that Teva's price increases from 2013 to 2016 simply reflected ordinary pricing practices and "business as usual." Plaintiffs allege that in reality, with government investigations closing in, Teva could no longer make new, widespread increases. By showing the ***absence*** of further increases and Teva's correspondingly reduced

---

[4] *See, e.g.*, ECF 393, App'x A (increases sustained into 2018 for cimetidine, cromolyn sodium, cyproheptadine HCL, dipyridamole, divalproex sodium, hydroxyzine pam, and ketoprofen); ECF 397, ¶¶743-45 & App'x C (increases sustained through at least December 2017 for pravastatin sodium, enalapril maleate, cephalexin, ketoconazole, baclofen, fluocinonide, and other drugs).





revenue and profit, post-2016 data is directly relevant to these allegations and will confirm that the price increase strategy was not "business as usual," but a deliberate scheme. Indeed, courts routinely order discovery both "before" and "after" an alleged antitrust conspiracy to show its effect. *See Kleen Prod. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (compelling the production of pricing data five years before the alleged conspiracy began and two years after the conspiracy ended "to demonstrate the 'before' and 'after' effect of the alleged conspiracy upon price" and "provide an accurate economic picture").

* * *

In conclusion, Plaintiffs respectfully submit that Defendants should be ordered to produce, for each NDC Code in Teva's full portfolio of generic drugs, data sufficient to show, on a monthly basis from January 1, 2013 to December 31, 2018: (1) average sales price, (2) total units of sales, (3) total net sales, and (4) gross, net, and operating profits. Defendants should also be ordered to produce for each drug quarterly gross, net, and operating profits.

Alternatively, Defendants should simply produce Teva's full database as maintained in the usual course of business from January 1, 2013 to December 31, 2018, with the existing tools and applications necessary to run management-level reports. This practical solution will minimize future disputes of this type and place all parties on equal factual footing.

Respectfully submitted,

Joseph A. Fonti

cc: Jordan Hershman, Esq.
Jill O'Toole, Esq.
Christopher Rooney, Esq.
Matthew Mustokoff, Esq.