## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | No. 3:17-cv-00558 (SRU) |
| | July 31, 2020 |

### DEFENDANTS' THIRD NOTICE REGARDING PENDING
### MOTIONS TO COMPEL RESPONSES TO DISCOVERY REQUESTS

Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Shultz, Michael McClellen, Yitzhak Peterburg, and Teva Pharmaceutical Finance Netherlands III B.V. ("Defendants") respectfully submit this third notice updating the Court regarding ongoing negotiations to resolve Plaintiffs' Motion to Compel (ECF 411) (the "Motion") and to further supplement the information Defendants provided in their July 2, 2020 Notice (ECF 442) and July 9, 2020 Notice (ECF 457).

### REPORT ON ITEMS DISCUSSED DURING MEET AND CONFER PROCESS

The parties had a number of disputes, many of which Defendants believe to be resolved, in whole or in part. The original disputes relate to the following subjects: (1) the production of profit and sales data; (2) Defendants' privilege log; (3) redacted Board Materials; (4) Plaintiffs' Second Request for Production of Documents; (5) Plaintiffs' request for additional search terms and nine additional custodians; and (6) Plaintiffs' subpoenas to non-party, Maureen Cavanaugh. The parties have exchanged correspondence on all of these issues, and they have had a number of meet and confer calls regarding these issues. As discussed below, several of these matters have been resolved in their entirety by agreement, and the parties have narrowed their disputes on the remaining matters.

As this Court will recall, on July 2, 2020, in conjunction with Plaintiffs' then-pending motion to compel, Plaintiffs submitted to the Court a three-page letter updating the Court on the disputes ripe for the Court's consideration, and further submitted a 5-page single-spaced Appendix A detailing a number of discovery disputes between the Parties, on which the Parties had not yet reached impasse. (ECF 443).  Defendants responded to several of those matters in a submission dated July 9.  (ECF 453).  On the July 16 status conference, the Court heard argument from both parties regarding Plaintiffs' then-pending motion to compel, and further entertained some discussion of matters raised by Plaintiffs in their Appendix A.  (ECF 475 "Transcript").  The principal focus of that conference was the issue of what data relating to sales and profits Defendants were going to produce.  Defendants had offered to produce data relating to various categories of monthly and quarterly data, but Plaintiffs rejected that offer, principally because Defendants did not agree to produce monthly profit data.

The Court resolved the Parties' dispute regarding profit data in an Order that issued shortly after the conference.  Following that status conference, the Court issued a Memorandum and Order in which the Court ordered Defendants to "produce profit reports as kept in the ordinary course of business" for the "time period through February 2018." (ECF 473 at 3).  This Order was consistent with the Court's comments at the conference that it was not asking Defendants to create new reports, but rather to identify existing reports.  (Transcript at 14:14-15:1).  The Court further scheduled a follow-up call for Monday, August 3 at 2:00 pm, and permitted the Parties to submit simultaneous briefs in advance of that call.

Following that conference and related Court Order, the Parties have met and conferred on July 21, July 27, and July 31 and had numerous written exchanges regarding their disputes, including the many disputes set forth in Plaintiffs' Appendix A.   Defendants have worked

diligently to identify pre-existing profit reports that the Court directed Defendants to identify. Likewise, Defendants have worked diligently to attempt to reach resolution with respect to Plaintiffs' many other complaints.  Defendants believe they resolved the vast majority of the Parties' disputes in a series of communications to Plaintiffs on Wednesday, July 29, 2020, as discussed further below.

## I.    PROFIT AND SALES DATA

Profit and sales-related data formed the basis of Plaintiffs' initial Motion to Compel.  (ECF 411).  Therein, Plaintiffs sought transactional sales and profit data for the entirety of Teva's generic drug portfolio for the years 2013 through 2019.  This sought-after data was to be, according to Plaintiffs, identical to the data already produced by Defendants for the specific drugs named in the Complaint.  Following a conference with the Court, wherein the Court suggested summary reports may resolve the Parties' dispute, Defendants offered to produce monthly and quarterly NDC-level data relating to pricing, sales, and revenue – and quarterly reports relating to profit.  Plaintiffs rejected that offer.  Plaintiffs' basis for rejecting the offer was that they found the offer of gross profit data on a quarterly basis only to be unacceptable.  While Defendants explained that monthly profit numbers are incomplete and therefore subject to distortion, Plaintiffs nevertheless insisted that these reports be produced.

The Parties thereafter submitted papers to the Court (ECF 442, 443, 453, 457, 459), argued the issue before the Court on July 16 (ECF 475), and received an Order from the Court that same day (ECF 472).  The Court did not order that Defendants create new reports based on available data.  Rather, the Court required the production of pre-existing reports reflecting profits.  As it stated:  "Defendants must produce profit reports as kept in the ordinary course of business … [and] that the Defendants' production must cover the time period through the end of February 2018." (ECF 472 at 3).

Defendants understood that the Court, in fact, addressed the Parties' dispute over the accuracy of profit-related monthly data by ordering the production of pre-existing profit reports as kept in the ordinary course of business instead of the creation of new reports based on data.  In the intervening two weeks, Defendants have searched for profit reports kept in the ordinary course of business at the Company from January 1, 2013 through at least the end of February 2018 (the "Time Period").  Defendants have identified five existing reports that were kept and circulated in the ordinary course that include some form of profit metric, at the product and business unit levels, many of which have already have been produced to Plaintiffs, and any remaining reports will be identified, collected, and produced promptly to Plaintiffs.

First, a US Generics Daily Scorecard was circulated on a daily basis (with some exceptions).  This Scorecard reported both revenue and profit metrics, which over time.  These metrics include a profit metric called "Con A" or "Contribution A" (which we understand was merely net sales less material costs) and subsequently the metric "Product Profit" (which we understand was net sales less material costs, labor and overhead allocated at standard costing, and an estimated royalties amount) for Teva's top 25 generic products, and at the US Generics business unit level.  Second, Teva USA West similarly had a Daily Scorecard, which reported revenue and similar profit information for a subset of Teva's product offerings.

Third, a "Product Profit" or "Con A" report (the naming convention was contingent upon which profit metric was utilized at the time, as described above) was issued daily, and also reported revenue and profit metrics at the product level.  Fourth and Fifth, the Company's Latest Best Estimates and Annual Operating Plans typically included what was titled a "Consolidated Report" or simply "Actuals" (or "Act") for the following categories on a quarterly basis at the US Generic business unit level: Sales (revenue); Cost of Goods Sold ("COGs") excluding royalties, Royalties,

Total COGs, Gross Profit, Legal R&D, Other R&D, Sales and Marketing ("S&M") General and Administrative expenses ("G&A"), Operating Profit, and Gross Margin Percentage. The categories in these reports also changed over the years for which the Court has ordered production.

Many of the reports described above are already in Plaintiffs' possession as a result of Defendants' ongoing document productions. *See, e.g.*, Daily Scorecards at TEVA_SL_00037480 through TEVA_SL_00044419 (also contains some Product Profit reports within families); Product Profit Reports at TEVA_SL_00113008 through TEVA_SL_00113188; and LBEs and AOPs at TEVA_SL_00150511 through TEVA_SL_00151277.

Defendants have been working diligently to understand where these reports have been stored in the ordinary course of business over the five-plus-year period, beyond those circulated in email, and to forensically collect these documents for production. Defendants' understanding, at this time, is that Defendants have produced the majority of these reports in custodial email productions.

With respect to the data that Plaintiffs and Defendants had previously been discussing, Defendants understood that this Order did not require them to produce NDC-level data that had previously been offered to Plaintiffs, and rejected. Nor had Plaintiffs and Defendants reached an agreement on the production of that data. Again, so as to avoid further disputes regarding pricing and profit reports, Defendants will <u>also</u> produce monthly reporting on the NDC-level for each month from January 2013 through February 2018, which includes the following data: sales (revenue) and sales (units). In addition, Defendants will produce quarterly reporting on the NDC-level that includes the following data: sales (revenue), sales (units), average sales price, and operating profits.[1] Further, Defendants will also provide a quarterly US Generics P&L report

---

[1] Defendants had previously understood that the most accurate term for the NDC-level profit data was "gross profits," and represented as much to the Court. Defendants have come to learn that this profit number calculated as net sales,

extracted from the Company's database for each quarter from the first quarter of 2013 through the first quarter of 2018.  While Defendants had not offered to produce that P&L data previously, it will hopefully avoid future disputes, given the changes in the Company's reporting over the years.

Defendants expect that Plaintiffs will have two complaints about this data.  First, Defendants expect Plaintiffs to complain that Defendants are not offering to provide data regarding gross profits on a monthly level.  Defendants did not previously offer to provide that information, and it is Defendants' understanding that this Court's order resolved the dispute between the parties on that matter, requiring the production of existing reports and not the production of the disputed data.

Second, Defendants expect Plaintiffs to complain that Defendants are not providing the average sales price per month that Defendants previously believed they could provide.  We have come to learn that as part of Teva's quarterly closing process there were often sales reserves adjustments recorded in the third month of the quarter that were not just related to that monthly period.   For that reason, an accurate average sales price cannot be calculated on a monthly basis.  Defendants will provide Operating Profit on a quarterly basis by NDC.  While Plaintiffs may criticize Defendants for learning more information and sharing it with Plaintiffs, that criticism does not support any request for relief.

In view of the foregoing, Defendants do not believe that there is any need for judicial intervention in favor of Plaintiffs.  Defendants will produce the profit reports described above, to the extent not already produced, and they will produce the data described above as well.

---

less COGS at standard costing, less estimated royalty expenses.  Therefore, while the Parties may dispute the appropriate terminology for this figure, and Plaintiffs have accused Defendants of a "fraud" because these figures were previously labeled "gross profit" and not "operating profit," the fact remains that Plaintiffs are in possession of sufficient information to understand the basis for the figures, and to depose appropriate fact witnesses regarding these figures once produced.

## II.   OTHER DISPUTES

Defendants address below the remaining matters set forth in Plaintiffs' Appendix A.  The Parties have had an opportunity to meet and confer about the majority of these issues, but there are several where the Parties have not finished the meet and confer process.  While Defendants provided to Plaintiffs their final positions on various issues, as set forth below, on Wednesday, July 29, 2020, the Parties did not ultimately meet and confer on all remaining issues prior to the filing of papers on July 31.  See Exhibit A.  While the Parties did have a meet and confer call at 11:00 a.m. on Friday, July 31, Plaintiffs stated that they were unable to meet and confer on other issues, and they were unwilling to ask the Court for more time to complete the process.  Ultimately, Plaintiffs declared the Parties were at an impasse.  See Exhibit G.  Nonetheless, Defendants believe that it is obvious where the Parties have reached agreement or an impasse, and Defendants note below those few occasions where it may be that further discussion may resolve remaining disputes.

### A.   Defendants' Privilege Logs

On July 13, 2020, Defendants produced a privilege log related to the first production milestone that was comprised of over 7,700 entries, following the production of nearly 200,000 documents to Plaintiffs.  The volume of the privilege log is attributable in large part to entries reflecting narrowly tailored redactions applied to thousands of voluminous, detailed, highly sensitive spreadsheets and presentations.  The Company's business is influenced by legal developments, including litigation, intellectual property, regulatory approval, and policy developments.  For that reason, a substantial number of its business records contain privileged attorney-client communications and work product concerning various legal matters related to the Company's products and business functions.

Defendants undertook the substantial burden of carefully redacting these documents to ensure that any relevant, non-privileged, responsive information was produced to the greatest

extent possible, and described those redactions, as well as the basis for withholding certain completely privileged documents, in an industry-standard privilege log.  On the evening of Friday, July 24, Plaintiffs sent a 6-page single spaced letter concerning the alleged deficiencies with Defendants' log.  Plaintiffs' primary concerns were that Defendants had not denoted on the face of the log the identity of each lawyer associated with the entries, and that Defendants consolidated privileged emails and attachment(s) into a single descriptive log entry (noting that both the cover email and attachment(s) had been withheld and describing the basis for the assertion of privilege).  Plaintiffs claimed that these purported deficiencies rendered it impossible for them to assess the privilege claims asserted in the log.  These log entries showed the sender and recipients of the privileged parent email, which in most cases enabled Plaintiffs to see that the withheld documents had been sent to or received from legal counsel, either indicating an outside counsel domain or Teva in-house counsel.  This information, in conjunction with the subject matter described in the subject lines of the parent email, the file names of non-email documents, and the narrative description asserting and describing the privilege basis, were more than sufficient to enable Plaintiffs' counsel to assess Defendants' privilege claims.

Notably, the log contained sufficient detail such that Plaintiffs were able to opine on various entries in the log and identify subject matter Plaintiffs challenged as non-privileged.  The fact that Plaintiffs were able to assert these challenges undermines their position that Defendants' log is insufficient to assess the claims of privilege asserted by Defendants.  To be clear, Defendants privilege log was fully sufficient under the governing rules and industry standards for privilege logs produced in connection with large-scale electronic document productions.  The log contained all the necessary information required under Local Rule 26(e), describing "(1) The type of document or electronically stored information; (2) The general subject matter of the document or

electronically stored information; (3) The date of the document or electronically stored information; (4) The author of the document or electronically stored information; and (5) Each recipient of the document or electronically stored information."

To generate their privilege log, Defendants used a document-by-document review process enhanced by the use of document metadata and document coding. As required, Defendants populated any available data from the original metadata of a document showing information about the document's date, author, sender, recipients, and subject/file name information (which typically indicates the file type). In many cases, subject/file name information adequately describes the subject matter of the document and is sufficient on its own or in conjunction with the sender/recipient metadata to identify the subject matter and privilege basis. Nevertheless, Defendants supplemented this automated information using a document-by-document review of privileged documents families, during which attorneys identified the type of legal subject matter contained in the document and coded the document, which code was then used to populate narrative descriptions. Examples of these categories include privileged communications concerning assessment of launch risks, information concerning litigation status, and legal advice concerning regulatory or intellectual property strategy, among others evident in Defendants' log. Combined with the subject-matter specific information in the metadata and the other metadata information, each log entry gave a complete picture of the general subject matter addressed and the specific categories of legal communications or advice being withheld.

As to the Plaintiffs' complaint regarding missing author information, this most likely reflects a logistical reality: for certain types of document, a document is created by one "author" but information is contributed to the document on an ongoing basis by many different individuals within the company. For example, for redacted spreadsheets, the author information sometimes

reflects the person who created the template, but the information within has been contributed by many different people who may be feeding information received from many different business and legal functions concerning certain product launches or other topics.  In these cases, it is often clear from the face of the redacted document that the information has been contributed by IP counsel or litigation counsel.  Even where no specific attorney is identifiable, these redacted documents, viewed on their face and in conjunction with the privilege log entries, provide a sufficient basis to assess whether the redacted information is privileged.  Defendants are under no obligation to conduct an independent investigation to determine which individual legal personnel contributed a privileged legal communication to each cell of a redacted spreadsheet.  Further, even in instances where *no* legal personnel can be identified on a communication, internal non-legal personnel are entitled to share privilege legal advice without waiving the company's privilege and such documents may be properly withheld.  *See MacDermid, Inc. v. Raymond Selle & Cookson Grp. plc*, No. 3:07 CV 1566 (JBA), 2009 WL 10689349, at *2–3 (D. Conn. Jan. 14, 2009) ("[J]ust because the legal advice is shared with other executives, or is the subject of discussion amongst other executives, does not mean it loses its privilege.").  Further still, even the absence of *any* identifiable author or recipient, legal or otherwise, is not necessarily a bar to asserting privilege. *See Gen. Elec. Co. v. United States*, No 3:14-cv-190 (JAM), 2015 WL 5443479, at *2-3 9D. Conn. Sept. 15, 2015) (acknowledging that documents may still be privileged although a document's author and recipient may not be identifiable, if it is possible to ascertain from the content of a document that it reflects legal advice).

Defendants' privilege log adequately describes the author, sender, and recipient information and gives Plaintiffs sufficient information to identify counsel copied on communications, as well as identify cases where counsel is not copied.  As to the latter cases,

where no attorney was included, Defendants' descriptions stated the reasons why such communications were nevertheless privileged, noting for example that the communication "forwarded" or "reflected" legal advice.  Often it is clear from the surrounding emails in the log or from unredacted portions of an email thread which attorney gave the original advice being discussed.  Plaintiffs have more than enough information to determine the relevant attorneys involved as to the vast majority of the entries on the log.

To the extent no such author or recipient is identifiable from the log or the context, it is likely a rare instance in which the specific author or recipient is simply not identifiable at all, to either party, from the document or its metadata.  As discussed above, this does not bar the assertion of privilege and Defendants have described in their log the reasons why they believe a given document is in fact privileged, including that it clearly reflects legal advice from some legal personnel within Teva as to specific legal topics disclosed in the log.  In sum, none of the alleged deficiencies Plaintiffs raise with respect to the format or level of detail in Defendants' log is actually a deficiency under the discovery rules.

Nevertheless, in an effort to resolve the dispute, in a meet and confer call on July 27, 2020, Defendants have agreed to re-review and re-log documents identified in the privilege log to include the additional information sought by Plaintiffs.  Defendants agreed to, among other things: (1) identify, where reasonably practicable, associated attorney(s); (2) individually log each privileged document within a family, including providing a parent, child, or standalone column; and (3) provide for every document a parent beginning Bates number column.  In a letter on July 29, Defendants further offered to revise the specific narratives for each entry to provide individualized narratives as opposed to using the more efficient, industry-standard coding process, in yet another effort to avoid burdening this Court with discovery disputes over voluminous, and

in many cases irrelevant, documents.   A copy of Defendants' letter setting forth this offer is attached as Exhibit B.

Given Defendants' offer, Defendants believe that the only remaining dispute with regard to Defendants' privilege log is the timing of the production of the revised log and the forthcoming second milestone log (which will also require re-review to comply with the new protocol we have proposed).   On Monday, July 27, following a meet and confer wherein Defendants outlined this offer, Plaintiffs demanded that Defendants revise and reproduce a fully re-reviewed 7,700+ entry log within three days, by Thursday, July 30.   In their July 29 letter, Defendants informed Plaintiffs that, given all of the ongoing review efforts to finalize the second milestone log, in addition to the ongoing efforts to produce relevant, responsive, documents by the August 7 date in the Stipulation, Plaintiffs' demand could not be met, despite the extraordinary amount of resources Defendants have marshaled to complete the task.   Defendants instead proposed the following realistic and achievable privilege log schedule:

- August 24, 2020 – Second Milestone Log
- September 1, 2020 – Revised Previous Logs (produced before July 29, 2020)
- September 8, 2020 – Third Milestone Log (existing deadline)

Defendants believe this is a reasonable timeline given the original 30-day window for privilege log creation from the date of production, as contained in the Parties' Stipulation.   This time is necessary to allow Defendants to follow through on their offer to re-review and re-code thousands of documents to meet Plaintiffs' request.   Defendants request that the Court permit the Defendants to have the additional time sought above to revise its privilege log.

### B.   **Board Materials**

The Parties have reached agreement that Defendants will remove all relevance redactions from the Board materials, except for those contained in the Board Minutes.   Plaintiffs are willing

to accept this compromise, without prejudice to challenging Defendants' redactions to the minutes at a later date in the event there is a basis to do so.

C.     **Plaintiffs' Second Request for Documents**

On June 17, 2020, Defendants proposed to Plaintiffs a narrowing of certain of Plaintiffs' Second Requests for Production of Documents ("Second Requests").  Rather than providing a counterproposal, such that resolution could be reached on these requests, Plaintiffs filed with the Court their Appendix A on July 2, 2020.  In that submission, Plaintiffs argued that Defendants waived their objections to Plaintiffs' Second Requests in a colloquy with the Court on May 13. During that conference, counsel for Defendants represented to the Court that Defendants' objections to document requests were resolved.  Notably, that representation was expressly based on the fact that the Parties had agreed that Defendants' document review was limited by the search parameters the Parties had agreed upon on January 25, 2020.  (May 13, 2020 Tr. at 11:8-22 ("we view the parameters that the Parties have agreed upon as resolving our objections"); *id.* at 12:10-14 ("this document would then need to say something along the lines of based on the search parameters on which the Parties have agreed, we'll be producing, from within those non-privileged and responsive documents").

Plaintiffs seek to use this representation to argue that Defendants waived all of their objections to Plaintiffs' Second Requests.  Plaintiffs' effort to use that representation in that manner is unfair.  It is clear from the context that Defendants' counsel was referring to the objections to Plaintiffs' First Request for Production of Documents, where the burden and overbreadth objections were resolved by the Parties' reaching agreement on ESI search parameters.

Plaintiffs' effort to use that representation to suggest a waiver of objections to the Second Request also makes no sense.  The Parties' January 25, 2020 agreement on ESI search parameters

could not have preemptively resolved Defendants' objections, which had not then been served. In fact, Plaintiffs' Second Request was served a month after that search parameter agreement, and objected to two months after that search parameter agreement. Plaintiffs cannot seriously contend that the Parties' ESI search term agreement resolved Defendants' objections to Plaintiffs' Second Requests. Further, Plaintiffs position makes no sense because, if the ESI search parameter agreement did resolve those objections, then Plaintiffs will not be entitled to the documents they seek. By Plaintiffs' own argument, then, Defendants would only be obligated to review and produce relevant, responsive documents hitting on the agreed-upon January 25 search parameters in response to Plaintiffs' Second Requests. If that were the case, Plaintiffs would get very few, if any, of the documents they seek from nearly all of their Second Requests.

Despite Plaintiffs' waiver assertion, Defendants nevertheless continued to try to meet and confer with Plaintiffs regarding the substance of the Second Requests. Following a meet and confer conference on July 27, Plaintiffs finally, on July 28, provided a counterproposal to Defendants' June 17 proposal to narrow the categories of documents sought by the Second Request. On July 29, Defendants responded to Plaintiffs' counterproposal, making proposals with respect to a final three issues and agreeing to Plaintiffs' position on the remainder of issues. As Defendants explained in their communication to Plaintiffs (attached as Exhibit C), all of the Parties' disputes are resolved with three exceptions:

### Trading Records

In their Second Request for Production of Documents ("RFP") No. 1, Plaintiffs requested the securities trading information for the Individual Defendants from January 1, 2013 to present. That period of time is not only greater than the Class Period in the case, but also it extends far beyond the dates of employment for many of the individuals. Plaintiffs do not have any allegations

relating to continued access to sensitive Company information following these Defendants' departures, and there is ample case law supporting the proposition that an individual's trading in a company's stock following that individual's departure from the company does not support a finding of scienter. Indeed, even the sales of departing employees do not give rise to any inference of scienter. *See*, *e.g.*, *Greebel v. FTP Software, Inc*., 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company … to sell shares."). Accordingly, Plaintiffs have no need for trading information relating to periods when the Individual Defendants were not employees or directors of the Company.

Defendants noted in their letter that there was no dispute as to Messrs. McClellan and Desheh and Ms. Griffin. As to the remaining four Individual defendants, Defendants offered to produce documents sufficient to show their trading in Teva securities to the extent not duplicative of information produced by Teva, for the entire period during which they were employed by Teva and/or served on Teva's Board of Directors, and further offered to provide official terms of employment for each Individual Defendant.

### **Communications with Financial Consultants**

Plaintiffs also have requested communications between the Individual Defendants and any financial consultants. Specifically, they have requested:

> All Documents and Communications concerning the Individual Defendants as they relate to any Financial Consultant concerning Teva Securities, including, but not limited to, all Documents and Communications:
>
> a. between (i) the Individual Defendants and (ii) any Financial Consultant concerning Teva Securities;
>
> b. considered or prepared by the Individual Defendants or any Financial Consultant concerning Teva Securities or any actual or considered investment or trade in Teva Securities;
>
> c. relating to the Individual Defendants' evaluation of any Financial Consultant identified in response to Request No. 2(b);

> d. concerning any brokerage account maintained by any Individual Defendant, in which any Individual Defendant had an interest; or over which any Individual Defendant had discretion and control, in which Teva Securities were held, including, but not limited to, with respect to all such accounts: (i) margin agreements; (ii) option agreements; (iii) account statements for each such brokerage account; and (iv) Documents concerning the account holder's investment objectives and/or strategies.

Defendants objected on the grounds of overbreadth, undue burden, relevance, and that this Request is duplicative of other of Plaintiffs' Requests.  In an effort to resolve the dispute, Individual Defendants offered to produce responsive, relevant communications, if any, with Financial Consultants concerning trading in Teva Securities for the entire period during which they were employed by Teva and/or served on Teva's Board of Directors.  Plaintiffs rejected this offer, solely on the basis of the limitation to the time frame.

Defendants' offer is a more than a sufficient response to Plaintiffs' document request.  The Individual Defendants trading in Teva securities is relevant solely to their state of mind at the time of alleged misstatements or omissions.  All documents that relate in any way to a financial consultant of an Individual Defendant, without regard to the facts of this case, is overbroad and simply unreasonable.  Further, communications during periods beyond employment dates are not relevant to Plaintiffs' claims, nor proportional to the needs of this case.

### Transcripts of Testimony In Unrelated Cases

Plaintiffs' also have requested all transcripts of testimony and accompanying exhibits for a broad range of cases over a ten year period.  Specifically, Plaintiffs have requested:

> All testimony, deposition or otherwise, by or concerning the Individual Defendants, and exhibits thereto, generated in any other litigation in which Defendants are (or were within the last ten years) a defendant.

This request calls for testimony that is wholly irrelevant, overly broad, and could encompass not only irrelevant but even personal litigation.  By its terms, this request potentially calls for transcripts in employment litigation, litigation with Company counterparties, and even perhaps

divorce proceedings.   Defendants initially proposed to limit this request to testimony by an
Individual Defendant in their capacity as an officer, director, or employee of Teva, where some
portion of that testimony relates to the allegations in the operative Complaint.   Plaintiffs rejected
that proposal.   More recently, Defendants proposed as follows:   "Defendants will agree to produce
all testimony, deposition or otherwise, by or concerning the Individual Defendants and exhibits
thereto, generated in any other litigation in which Defendants are (or were within the last ten years)
a defendant in their capacity as an officer, director, or employee of Teva, where that testimony is
relevant to any party's claim or defense in this Action or any of the consolidated actions."
Plaintiffs rejected this proposal too.

Defendants' proposal to limit this request using the relevance language taken directly from
Rule 26 is reasonable.   Of course, Defendants will be producing any relevant testimony that is
taken in the pending MDL antitrust action.   But Defendants should not have to search for and
produce testimony and exhibits from cases that are wholly unrelated to the issues in this case.
*Devonshire Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12-CV-2199-B-BK, 2013 WL
12124309, at *2 (N.D. Tex. Aug. 30, 2013) (limiting an interrogatory request for the identification
of "all testimony" to include only testimony provided "in cases involving claims similar to those
present in" the case at bar because the "request would [otherwise] include irrelevant personal
matters such as bankruptcy, divorces and child custody disputes."). Discovery is not a fishing
expedition, and Plaintiffs need to tailor their requests to the subject matter of this action.

Given the reasonable proposal Defendants have made, there is no need for any judicial
intervention on this issue.

### D.        **Additional Search Terms and Custodians**

As the Court knows, Plaintiffs and Defendants previously agreed to ESI search parameters.
After substantial negotiation, on January 25, 2020, the parties agreed to a total of 19 custodians

and thousands of search terms[2].  The agreed-upon January 25 search terms, when put into a Word document occupy seven and a half single spaced pages.  These terms are incredibly overbroad, and the Parties agreed upon these terms in advance of substantial document discovery.

More recently, Plaintiffs requested that an additional nine custodians be added to Defendants' review of documents, identifying topics about which Plaintiffs contend these custodians have relevant information.  Plaintiffs, however, asked that all of the January 25 search terms be applied to each new custodian, regardless of topic.  Plaintiffs have failed to meet their burden to show that the discovery they seek is relevant – they have provided no argumentation that

---

[2] Plaintiffs often characterize this agreement as "only" including 175 search terms.  This is a misleading characterization.  Many of the agreed terms are conjunctive "or" searches, which when broken into their individual components are actually tens or even hundreds of searches. For example, Plaintiffs consider the following to be a "single" search term, which could be several hundred terms if broken into its component parts: (@akorn.com   OR  @amneal.com   OR  @apotex.com   OR  @ascendlaboratories.com   OR @ascendlabs.com OR @aurobindo.com OR @aurobindousa.com OR @barrlabs.com OR @bpirx.com OR  @citronpharma.com  OR  @davapharma.com   OR  @drreddys.com   OR  @emcure.com  OR @emcureusa.com  OR  @endo.com   OR  @Epic-Pharma.com  OR  @fougera.com  OR  @glenmark-generics.com   OR   @glenmarkpharma.com   OR   @greenstone.com   OR   @gwlabs.com   OR @heritagepharma.com  OR  @hitechpharm.com  OR  @igilabs.com   OR  @impaxlabs.com   OR @impaxpharma.com OR @lannett.com OR @libertaspharma.com OR @lupin.com OR @lupinusa.com OR @maynepharma.com   OR   @mgp-online.com   OR   @midlothianlabs.com OR @mylan.com OR @mylanbertek.com    OR   @mylanlabs.com  OR  @oceansidepharma.com  OR  @parpharm.com  OR @perrigo.com    OR  @pfizer.com  OR  @pliva.hr   OR  @plivainc.com   OR  @sandoz.com   OR @sunpharma.com    OR    @sunpharmausa.com    OR    @taro.com    OR    @teligent.com    OR @thepharmanetwork.com  OR  @torrentpharma.com    OR  @udl.com.pk  OR  @udlpharma.com  OR @upsher-smith.com  OR  @valeant.com OR @west-ward.com OR @west-ward.net  OR @wockhardt.com OR @zydususa.com) AND (Oxybut* OR Nadol* OR Fluco* OR Methotrex* OR Cimet* OR Prazo* OR Ranit* OR Enala* OR Doxa* OR Etodo* OR Prava* OR Ketop* OR Tolme* OR Clema* OR Dilti* OR Ketoro* OR Diclofen* OR Ketoc* OR Bumet* OR Cephalex* OR Nysta* OR Hydroxy* OR Cypro* OR Dicloxa* OR Theop* OR Anagr* OR Estaz* OR Baclo* OR Fluocino* OR Carbamaz* OR Clotrim* OR Fluta* OR Meper* OR Penicill* OR Nefaz* OR Mexil* OR Cromo* OR Desmo* OR Fosin* OR Megest* OR Loper* OR Fluox* OR Propran* OR Glime* OR Cipro* OR Nortry* OR Nortri* OR Estra* OR Danaz* OR Ketorola* OR Methyldop* OR Carbido* OR Griseo* OR Dipyr* OR Trazo* OR adapale* OR amilorid* OR amoxici* OR (ampheta* w/10 (dextro* OR mixed)) OR azithro* OR bethane* OR budeson* OR buspiro* OR cabergol* OR capecita* OR cefdin* OR cefproz* OR celecox* OR clarith* OR clonidine* OR desogest* OR kariva OR dexmethyl* OR dextroamp* OR diflun* OR disopyr* OR ocella OR drospir* OR entecav* OR epitol* OR portia OR jolessa OR levonor* OR ethosux* OR fenofibr* OR flurbi* OR fluvas* OR gabap* OR hydroxyu* OR isonia* OR labeta* OR lamivu* OR combivir OR medroxy* OR mimvey OR moexi* OR nabume* OR niacin OR nitrofur* OR norethin* OR "omega 3 acid" OR "omega-3-acid" OR (omega w/4 ethyl) OR oxapro* OR parical* OR pentoxif* OR piroxi* OR prochlor* OR raloxif* OR tamoxi* OR temozol* OR tobram* OR toltero* OR topiram* OR warfarin*).

can demonstrate that, as run against the newly requested custodians, the search terms will return relevant documents. *AM Gen. LLC v. Activision Blizzard, Inc.*, No. 17-cv-8644GBDJLC, 2019 WL 1085470, at *3 (S.D.N.Y. Mar. 7, 2019) ("The party seeking discovery bears the initial burden of proving the discovery is relevant ....") (quotation omitted). Plaintiffs also proposed that Defendants apply additional search terms to the 19 previously agreed upon custodians. Plaintiffs' proposal calls for the production of irrelevant information and places a great and undue burden on Defendants.

Nonetheless, Defendants' counterproposal satisfies the majority of Plaintiffs' demands. A copy of Defendants' most recent proposal on the subject is attached hereto as Exhibit D. Defendants have agreed to seven of the eight custodians Plaintiffs continued to demand,[3] on the condition that these custodial files only be searched for search terms that are relevant to the topics for which Plaintiffs seek these custodians. While these searches are focused on the purportedly relevant issues for each custodian, they are primarily a subset of search terms from the January 25 agreed-upon list, and are in themselves extraordinarily broad. Plaintiffs refused to make a counterproposal, and instead insisted that each custodian's documents be subject to the entire universe of search terms, without any explanation as to the relevance of those terms, and in complete disregard for the burden of doing so. Defendants discuss both the Parties' disputes on search terms and a final remaining custodian, below.

**Search Terms**

Defendants have declined to run all of Plaintiffs' requested search terms based on two primary objections: relevance and burden. To date, Defendants have produced over 250,000

---

[3] During the meet and confer process, Plaintiffs were willing to drop one custodian, Jan Gustavsen, who has no relevant information that Defendants have not otherwise agreed to produce, as she is sought only in relation to Teva's Employee Stock Purchase Plan, and Defendants indicated that they were willing to add a total of seven custodians of the remaining eight, as set forth above.

documents (including over a million pages and 100,000 native documents) from 19 custodians over a six-and-a-half-year period.  At this time, Plaintiffs possess more than enough information to determine the topics for which their proposed custodians are relevant to avoid the burden and expense of Defendants reviewing large swaths of plainly irrelevant documents, simply to satisfy Plaintiffs' uncompromising position.  Indeed, in Plaintiffs' initial letter seeking the nine additional custodians and additional search terms, Plaintiffs were able to fully articulate the topics for which they sought each custodians' documents, including citations and quotations from documents previously produced by Defendants in this case.  It is Plaintiffs' burden to demonstrate why the discovery sought is relevant, and they have set forth no argumentation as to why any of the additional search terms to which Defendants will not agree are relevant, as applied to the particular custodians at issue.  Given that the Parties are equipped to identify relevant topics and related search terms, there is simply no justification for demanding that Defendants run thousands of search terms relating to irrelevant topics against these custodians' documents.

Despite Plaintiffs' failure to articulate the relevance of their requested search terms, at Plaintiffs' request, Defendants ran Plaintiffs proposed search terms against the seven custodians referenced above.  More specifically, Defendants provided Plaintiffs with: (1) a hit reports for all search terms at issue, both the January 25 agreed-upon terms and Plaintiffs newly requested terms, for the 19 previously agreed-upon custodians and the 7 additional custodians, with unique hit counts for each custodian by term; (2) a revised proposal of search terms for the seven additional custodians; and (3) a hit report corresponding to Defendants' revised proposal of search terms for the seven additional custodians.

These hit reports reveal the great and unnecessary burden imposed by Plaintiffs' unwillingness to compromise.  Plaintiffs' proposed search terms yielded approximately 250,000

documents, family inclusive. Defendants' proposed narrowed terms returned approximately 180,000 documents.  This 70,000 difference represents approximately 1,500 hours of attorney and vendor time reviewing, quality-checking, redacting, logging, and producing those documents. Such a burden is significant, particularly where, as here, abundant information is readily accessible to assist in narrowing these documents to just those most likely to be relevant to the claims and defenses in this case.

With respect to the additional search terms, Defendants' proposed compromise includes the application of Plaintiffs' proposed additional search terms on the original nineteen custodians, but not as to the additional custodians for the reasons detailed above.  Given the reasonable proposal Defendants have made (see Exhibit E), there is no need for any judicial intervention on this issue.

### Additional Custodians

Plaintiffs proposed the addition of nine custodians.  That request would have added approximately 50% to the already large group of 19 agreed-upon custodians.  Although Plaintiffs reduced their demand to eight custodians, even that slightly narrowed demand includes at least one extraneous person, Brendan O'Grady.  Mr. O'Grady's work at the Company throughout his tenure of employ has primarily focused on specialty medicine.  Plaintiffs, in their May 21 letter seeking additional custodians, identified Mr. O'Grady as one of four additional custodians sought in connection with the company's internal forecasting reports (the others being Boyd, Mitrany, and Shadur).  Defendants have already agreed to three of those custodians, plus additional related search terms targeted at these issues for the Parties' previously agreed-upon 19 custodians.  Mr. O'Grady is simply a superfluous custodian on the topics for which Plaintiffs claim to seek his documents, much less the thousands of search terms Plaintiffs demand be run against their

additional custodians' documents.  As noted above, during the meet and confer process, Plaintiffs were willing to drop one custodian, Jan Gustavsen, who has no relevant information that Defendants have not otherwise agreed to produce, as she is sought only in relation to Teva's Employee Stock Purchase Plan.

In sum, Defendants are amenable to additional search terms and custodians, but such requests must be measured and utilize information both Parties currently possess to target relevant documents and information.  Given the reasonable proposal Defendants have made (see Exhibit E), there is no need for any judicial intervention on this issue.

Defendants note that, regardless of what combination of new custodians and search terms Defendants apply, Defendants will need time to review, produce, redact, and log these additional documents.  The Parties have not yet discussed a revised timeline and structure for this review and production, but given the volume of documents at issue, and despite resources Defendants already have devoted to this work, additional time is necessary and likely will require a revised schedule for the events in this case.

## III.   RULE 45 SUBPOENA TO NON-PARTY, MAUREEN CAVANAUGH

In the Appendix to their July 2 submission, Plaintiffs identified three areas of disputes relating to their Rule 45 subpoena to non-party, Maureen Cavanaugh.  Those areas of dispute were briefly addressed during the July 16 hearing with the Court.  Ms. Cavanaugh believes that those three disputes have been resolved.  We address those issues below in the order presented in Plaintiffs' July 2 submission.

First, putting aside Plaintiffs' inflammatory mischaracterizations respecting the Parties' meet and confer efforts over many months, Plaintiffs inquired about the mobile phone Ms. Cavanaugh used during her employment at Teva, which ended in 2018.  Counsel has confirmed no fewer than **four times** – on meet and confer calls, in letters to Plaintiffs dated May 19 and June

25, and again during the July 16 Court conference – that Ms. Cavanaugh no longer has any device in her possession that she used during her tenure at Teva.  Furthermore, as Plaintiffs are aware, the image of the mobile device that Ms. Cavanaugh used during her tenure at Teva was searched in accordance with the Plaintiffs' and Defendants' January 25 custodial search parameter agreement, and Teva produced responsive, relevant documents.  Defendants have identified those documents for Plaintiffs by Bates number, at their request.  Therefore, this dispute (to the extent one remained after counsel first informed Plaintiffs of this information) is resolved.

Second, pursuant to and in accordance with the Court's July 16 Order, Ms. Cavanaugh produced to Plaintiffs on July 30, 2020 the document containing Ms. Cavanaugh's personal and business contacts.  Thus, that dispute has been resolved.

Last, Plaintiffs' July 2 submission asserted, without providing the Court with any context, that Ms. Cavanaugh has produced no communications "with Teva's purported competitors."  In their Rule 45 subpoena to Ms. Cavanaugh, Plaintiffs' made two very broad requests for, among other things, communications with individuals at Teva and any employee of more than two dozen other companies without limitation as to individual or subject matter, for more than a six-year period.  Ms. Cavanaugh objected to those requests on numerous grounds including relevance, undue burden, and overbreadth.

Counsel for Ms. Cavanaugh and Plaintiffs' counsel had numerous meet and confer calls following Ms. Cavanaugh's timely service of her responses and objections, including about Plaintiffs' requests for those communications.  Plaintiffs proposed on June 26 that Ms. Cavanaugh conduct a search for all communications for the six-and-a-half-year period January 2013 through May 2019 with eleven individuals, some of whom Plaintiffs identified only by initials.  Despite the overbreadth of Plaintiffs' proposed time period (which post-dated her employment at Teva by

more than a year), to resolve the outstanding dispute, Ms. Cavanaugh agreed to Plaintiffs' proposal and conducted those searches.  Ms. Cavanaugh confirmed in a July 29 letter, *see* Exhibit F, to Plaintiffs that no responsive, relevant emails were identified.  Thus, this dispute has been resolved, no disputes remain, and Ms. Cavanaugh's response to Plaintiffs' subpoena is now complete.

## **REQUEST FOR RELIEF**

As the above discussion and the attached communications evidence, Defendants have met and conferred with Plaintiffs in good faith in an effort to resolve Plaintiffs' various discovery demands.  Defendants respectfully request that this Court decline to grant Plaintiffs any relief on their various demands, in favor of allowing Defendants to provide the documents and data they have offered.

Respectfully submitted,

DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES LTD., EREZ VIGODMAN, EYAL DESHEH, SIGURDUR OLAFSSON, DEBORAH GRIFFIN, KÅRE SCHULTZ, MICHAEL MCCLELLAN; YITZHAK PETERBURG, and TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.

/s/ *Jordan D. Hershman*
Jordan D. Hershman (admitted *pro hac vice*)
Jason D. Frank (admitted *pro hac vice*)
Emily E. Renshaw (admitted *pro hac vice*)
Elizabeth G. Hays (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
Tel: (617) 951-8455
Fax: (617) 951-8736
jordan.hershman@morganlewis.com
jason.frank@morganlewis.com
emily.renshaw@morganlewis.com

liza.hays@morganlewis.com

*Counsel for Defendants*

– and –

Jill M. O'Toole (ct27116)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, CT 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
jotoole@goodwin.com

*Counsel for Defendants except Kåre Schultz*