UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE TEVA SECURITIES LITIGATION | : | No. 3:17-cv-00558 (SRU) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | No. 3:17-cv-00558 (SRU) |
| | : | |

**PLAINTIFFS' SUBMISSION FOR AUGUST 3, 2020 DISCOVERY CONFERENCE**

**FILED UNDER SEAL**

**ORAL ARGUMENT REQUESTED**

**I.      INTRODUCTION**

Since March, Plaintiffs have engaged with the Court to secure its direction and intervention in order to ensure that this securities class action remains on track.  At the outset, Defendants wanted to complete their document production in September.  But the Court rejected that as "really [not] acceptable," (April 28, 2020 Tr. at 29:21), reasoning that it cannot be that "we're going to be stuck where it's not until August … that there's any confidence that [Plaintiffs] have the documents that they've sought."  (May 13, 2020 at 10:21-11:2.)  In May, the parties then stipulated to a discovery schedule that set specific production milestones by custodian and related deadlines for privilege logs with the goal of commencing depositions in the late summer.  (ECF 375.)

Now, over two months later, despite the parties' stipulation, the Court's extensive instructions and guidance, and even express Court orders, Defendants have failed to live up to their commitments.  Defendants' track record is clear:  it is not until the very last minute before a Court deadline that they make or respond to a proposal, often contradicting their prior representations or positions, but refuse to engage in fact-based, transparent discussion of their positions.

Most recently, Defendants abruptly reversed course after the July 16 hearing, suddenly claiming they had no obligation to produce the NDC-level pricing data at the heart of this action, despite their prior representations to Plaintiffs and the Court.  After countless meet and confer conferences over the last two months, including as recently as 11 a.m. today, their positions continue to shift without any commitment to making an actual production.

In a similar vein, after producing a non-compliant privilege log for the June 4 custodians on July 13 (a week after the stipulated deadline), we learned on July 29 that Defendants do not intend to provide a compliant privilege log for these custodians until September, nearly two months after the stipulated July 6 deadline.

1

Through these and other discovery failures, Defendants are attempting to effectuate the same unacceptable schedule they originally sought, and their voluntary compliance with any future agreed-upon deadline cannot be relied upon. They are also subverting the essential need to establish a common set of fundamental facts from which both sides may fairly work. As set forth specifically below, the Court's entry of Plaintiffs' Proposed Order providing explicit relief is required to accomplish the goals of keeping this case on track, establishing an orderly structure to prepare for depositions, and establishing a common evidentiary base.

## II.     ARGUMENT

### A.     Defendants Have Yet to Produce Any NDC-Level Pricing, Sales, Revenue Data, and Profit Reports; The Court Should Order Such Production by August 7

Unfortunately, the Court has been through this issue several times and patiently provided clear guidance on multiple occasions. To be sure, Defendants have expressly represented to the Court and to Plaintiffs that they would produce Teva's pricing and profit data. But the fact is that Defendants still have ***not*** produced (i) the monthly drug-by-drug (NDC-level) pricing, sales, revenue, and profit data for each generic drug in Teva's portfolio or (ii) the centralized profit reports. Indeed, as to the NDC-level data, Defendants have claimed that because the Court's July 16 Order (ECF 472) did not expressly require Defendants to make this production, they do not have to produce any of it. This position is simply unjustifiable; the Court should now order Defendants to produce the specified data by August 7.[1]

Critically, as to the NDC-level data, Defendants' July 9 submission acknowledged that they would produce ***by August 7*** monthly and quarterly "reporting, on an NDC-level, of: total unit

---

[1] Although the Court observed that "we're [not] at the database point yet" (July 16, 2020 Tr. at 12:11-12), it is becoming increasingly apparent that production of the full database may be the only practical resolution that will eliminate further disputes of this type.

sales, total net sales (dollars), and ASP," plus "quarterly reporting, on an NDC-level, of . . . gross profit," to resolve Plaintiffs' motion.  (ECF 457 at 3-4, 6.)  During the July 16 conference, Defendants' counsel reiterated what was ***not*** in dispute, explaining that:  "We're comfortable producing the summary data that's readily available to us -- sales volumes, net sales, average sales price on a monthly basis, gross profits on a quarterly basis.[2]  That makes sense to us.  That we have and we can produce in a relatively ***short time period***."  (July 16, 2020 Tr. at 10:24-11:4.)  Strikingly, in the meet and confers that followed, Defendants claimed the Court gave no such guidance, and the NDC-level data need not be produced.

Moreover, even where the Court's Order expressly required Defendants to "produce profit reports as kept in the ordinary course of business," (ECF 472 at 3)—"without respect to whether they're gross or net or operating" profits (July 16, 2020 Tr. at 19:18-19), they have not done so, let alone provided a date certain to complete production.[3]

Just this morning (July 31), Defendants proposed for the first time to produce only a subset of profit reports and NDC-level data, as well as an "exemplar" of the data and a quarterly "P&L report."  As to the NDC-level data, however, Defendants have backtracked again.  They now refuse to produce ***any monthly pricing or profit*** information, but merely offer to disclose sales and revenue (with pricing and operating profit on a quarterly basis only).  There is no dispute that Defendants possess monthly NDC-level pricing and profit data; it is central to this case, and must be produced by August 7.

---

[2] Moreover, Defendants concededly possess and can produce NDC-level gross profit data on a monthly basis (*see* ECF 459 at 2; July 16, 2020 Tr. at 13:25).

[3] As the Court correctly reasoned, Defendants' mere production of some of the specified reports that may be attached to emails is no substitute for production of comprehensive and centralized profit reports. (July 16, 2020 Tr. at 16:19-17:16; *id.* at 17:14-16 ("In other words, you can't bring a dump truck and say somewhere in there is a lump of gold.").)

3

Also troubling is that Defendants' counsel refuse to answer questions about, among other things, how the proposed reports are being generated, the source of the data for the reports, and whether the reports reflect the same data that was rolled up into Teva's public financial statements. Instead, Defendants' counsel have insisted that Plaintiffs may only get these answers through a Rule 30(b)(6) deposition. Defendants know the answers, but seek to impose a complete lack of transparency to create further uncertainty and delay about these fundamental facts.

To resolve these long-pending issues, Defendants should be ordered to produce by August 7, 2020 the following, for the time period from January 1, 2013 to February 28, 2018:

1. Data sufficient to show, on a monthly basis for each NDC Code in Teva's full portfolio of generic drugs: (1) average sales price; (2) total units of sales; (3) total net sales; and (4) gross and operating profits.

2. Reports from Teva's centralized files, as maintained in the ordinary course of business, showing Teva's profits from its full generic drug portfolio (including without limitation gross profits, operating profits, and net profits). The production shall include reports on at least a monthly basis, as well as weekly (if available). The production shall also include the most granular reports available (*e.g.*, if operating profit and/or net profit information is available by product family, if not NDC Code, such reports should be produced).

**B.   Defendants' Wholly Inadequate "Privilege Log" Effectively
      Pushes Completion of the June 4 Custodians into September**

At the Court's direction, the parties agreed that Defendants would have until July 6 to produce the privilege log for the June 4 custodians. As the Court observed, this would ensure that by July 6, Plaintiffs would, for example, "know what documents were withheld on the basis of privilege from the production of Kevin Galownia's files. You're going to know. And then you can tee that up, you can see whether you can test that, you can come to court, I'll try to rule promptly, and you'll be ready to take his deposition late August, early September. And it'll be on a rolling basis." (May 13, 2020 Tr. at 20:5-12.) Solely as a result of Defendants' failures, this timing cannot be met.

4

What Defendants have labeled a "privilege log" in no way complies with Local Rule 26(e). Setting aside that its initial format was completely unusable and illegible (sample pages at Exhibit 1), and that it was provided to Plaintiffs a week after the July 6 deadline, Defendants' "log" does nothing to identify the attorneys who purportedly rendered legal advice, and in several instances, it does not even identify a human being who authored the purportedly privileged document. Moreover, its over 7,700 entries admittedly are only a small fraction of the documents actually withheld because attachments to emails are *not* logged separately, violating the parties' agreement (and the rules' requirement) for a document-by-document privilege log.

In addition to these defects, Defendants have admittedly withheld hundreds, if not thousands, of non-privileged documents from the June 4 custodians that must now come off the "log"—including those exchanged with third parties, such as Teva's auditors, consultants, ***and competitors***—because Defendants concede that no privilege exists for such communications.

All of these deficiencies effectively amount to having no log at all. Now that these defects are exposed, Defendants concede they must redo their log and produce additional, indisputably non-privileged documents from the June 4 custodians. But Defendants now claim they cannot do so until September 1, 2020, wholly defeating the very purpose of the tiered discovery milestones and subverting the orderly, sequenced preparation for depositions to start in the late summer, as Plaintiffs intended and the Court instructed:

> I do think it's important that we have a sequence set up that allows the plaintiffs to know that they've gotten literally just about everything, that allows them to see what's on the privilege log so that they can appropriately meet and confer and/or raise with the Court problems that they have with claims of privilege, and ***only at that point*** then prepare and take depositions. (May 13, 2020 Tr. at 16:8-15.)

5

As the table below illustrates, Defendants are attempting to effectively push "that point" well into September, if not beyond:

| Privilege Log | Stipulated Date (ECF 375) | Defendants' Proposal | Delay |
|---|---|---|---|
| Documents produced by May 8, 2020 | June 15, 2020 | Sept. 1, 2020 | 11 weeks |
| June 4 custodians | July 6, 2020 | Sept. 1, 2020 | 8 weeks |
| Board materials and Cavanaugh | July 24, 2020 | Sept. 1, 2020 | 5 weeks |
| July 9 custodians and centralized sources | August 10, 2020 | August 24, 2020 | 2 weeks |

We are now well beyond the Court's initial concern that it will not be "until August that there's any confidence that [Plaintiffs] have the documents that they've sought," (May 13, 2020 Tr. at 10:21-11:2). As Plaintiffs feared, left to Defendants' devices, we "could be talking about October before we have a sense of the full scope of what's been withheld and what's been produced." (*Id.* at 19:9-11.)

Defendants cannot be allowed to dictate their own schedule and circumvent their agreements and the Court's clear mandate. Nor, given the track record here, do Plaintiffs have any confidence that Defendants' latest proposed schedule will be met, let alone satisfy the requirements of the Federal and Local Rules. Accordingly, Plaintiffs' Proposed Order provides for firm deadlines for the remaining document productions and privilege logs, and requires a showing of good cause for any relief from those deadlines:

1. By August 7, Defendants shall produce all non-privileged documents from their existing privilege logs (including the examples Plaintiffs have identified to Defendants);

2. By August 14, Defendants shall provide complete, revised versions of their existing privilege logs;

3. Defendants shall provide all subsequent privilege logs on the current schedule; and

4. Defendants' privilege logs shall fully comply with the Federal and Local Rules, including by describing each allegedly privileged or protected document separately (*e.g.*, listing emails and their attachments separately), and identifying all counsel and the specific grounds for withholding.

C. **Telephone Records the State AGs Produced to Teva Must be Produced in the Form Teva Received It**

Plaintiffs have long sought telephone records between Teva personnel and their counterparts at competitors and distributors, including all of the telephone records Teva obtained from the State AGs in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-md-2724 (E.D. Pa.). The phone records are particularly relevant to the June 4 custodians, many of whom were extensively engaged in collusive communications. On June 25, Defendants finally agreed to produce these telephone records, but refuse to do so earlier than August 7. This is inexplicable given that the records were handed to Teva in their entirety some time ago and can be produced by just handing over a copy.

More problematic, however, is Defendants' lack of transparency. They refuse to confirm that they are producing this highly relevant discovery in the form Teva received it from the State AGs. Rather, Defendants have only made vague statements, such as that Plaintiffs likely "will be satisfied" with the forthcoming production. Whether Defendants will produce all of the telephone records as the State AGs produced them to Teva—and as Plaintiffs requested—is a simple question whose answer can lay to rest this dispute.

As set out in Plaintiffs' Proposed Order, Defendants should produce the complete records as received from the State AGs, without any withholding or redaction, by August 7.

7

>   D.  **While the Parties Have Reached Agreement on Seven Custodians, Defendants Must Add Teva's North America Generics CEO as a Custodian; Defendants Must Apply All Agreed-Upon Search Terms for All Custodians**

As is routine in all cases, as discovery proceeds, additional relevant custodial documents must be produced absent a "specific explanation" of how the "proposed email custodians are duplicative." *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07CV929 (WWE), 2014 WL 6474285, at *2, 4 (D. Conn. Nov. 19, 2014) (ordering production from 12 additional custodians and noting that Rule 26(e) imposes "a continuing duty to supplement by providing documents that are responsive to the discovery propounded").

>   1.  **Discovery Confirms That Defendants Must Produce Documents From Brendan O'Grady (Teva's President and CEO, North America Generics from April 2015 to August 2016)**

The only custodian Defendants refuse to produce is **Brendan O'Grady**, who was Teva's President and CEO, North America Generics from April 2015 to August 2016. Mr. O'Grady's relevance is beyond dispute; during his tenure as President and CEO, North America Generics, Teva implemented at least 12 price increases at the heart of this case and completed the Notes Offering and Actavis acquisition, and the State AGs and DOJ commenced their investigations into Teva's U.S. generics business.

Nor was he a passive observer; discovery has shown that Mr. O'Grady was *centrally* involved in Teva's pricing decisions and risk analyses. For example, Teva's documents show that Mr. O'Grady personally ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] Plaintiffs will submit copies of the cited document at the Court's request.

████████████████████████████████████

██████. Defendants have nonetheless flatly refused to produce Mr. O'Grady's custodial files, without any support.

### 2. All of the Agreed-Upon Search Terms Should Be Applied to the Seven Additional Agreed-Upon Custodians and O'Grady

Setting aside Mr. O'Grady, Defendants have accepted seven additional custodians, and for good reason, as Defendants identified five of the seven in their revised initial disclosures (June 12, 2020) and amended interrogatory responses (May 27, 2020) as having relevant information.[5]

However, for these seven custodians, Defendants attempt to depart from the agreed-upon parameters and refuse to apply (i) the January 25, 2020 agreed-upon search terms, (ii) the additional terms agreed to on July 29, and (iii) the time period (January 1, 2013 through May 31, 2019) that have all been applied for all other custodial discovery.[6]  Instead, Defendants unjustifiably insist that only narrow subsets of search terms be used for these additional custodians.

To date, there is no factual basis for Defendants refusing to apply all of the agreed-upon search terms to the seven additional custodians and Mr. O'Grady.  All eight are high-level Teva

---

[5] As previously noted (ECF 443 at A-4-A-5), the seven custodians are:  Gilad Shadur (Interim CFO and other senior finance roles since 2010); Eti Mitrany (Senior Vice President and CFO, Head of Business Planning & Analysis); Todd Branning (Senior Vice President and CFO, Global Generics Medicines); Brandon Boyd (Strategic Associate to Allan Oberman (President - Americas Generics)); Andrew Boyer (President and CEO, North America Generics); Mayra Avila (Director and Senior Director of Finance); and Sean Silver (Associate Director of Pricing and Customer Analytics, among other positions).  Given Defendants' shifting positions, if they attempt to retract on accepting the seven custodians, Plaintiffs can supplement the record if needed.

[6] On July 29, Defendants agreed to run the additional nine search terms that Plaintiffs proposed on *only the original 19 custodians* (QBU; QBR; "Long Term Plan" OR LRP; "Operating Plan" OR AOP; Q*V*; "Life Cycle Management" OR LCM; "Life Cycle Extension" OR LCE; "pric*" w/3 comm*; and "Boston Consulting" OR BCG OR @bcg.com).  Plaintiffs maintain that these nine additional terms should be added to the January 25, 2020 agreed-upon search terms for *all custodians*, including Mr. O'Grady and the seven additional agreed-upon custodians.

personnel with direct personal involvement in the price increases and related financial analysis at the heart of this action.

Critically, Defendants have not substantiated their refusal to conduct full searches. For months, Plaintiffs requested "hit reports" for the additional custodians using the January 25, 2020 agreed-upon terms in order to assess the number of *unique documents* for each added custodian in light of Defendants' claims of burden. Defendants first provided a search proposal and hit report on Wednesday, July 29, and claimed that applying the full set of searches could double the volume of documents.

But this is groundless; Defendants' report does not fully account for *duplicate* documents, either across the additional custodians or against the original 19 custodians whose documents are already being reviewed. Thus, Defendants have not meet their burden to substantiate how many additional unique documents would actually need to be reviewed, the only relevant metric.

Finally, that these individuals were not custodians months ago is the result of Defendants' own strategic choices. Defendants could have—and, indeed should have—disclosed these centrally involved eight individuals and included them among the initial custodians agreed to in January. Instead, Defendants revealed their identities in their May and June supplemental Initial Disclosures and Amended Interrogatory Responses. This dispute has gone on long enough; the Defendants should apply all the *agreed-upon search terms* to these additional custodians.

### E.   Former Teva Executive Cavanaugh Must Produce Responsive Documents

Numerous questions remain regarding Plaintiffs' January 27, 2020 subpoena to Maureen Cavanaugh (former SVP and Chief Operating Officer, North America Generics, of Teva USA).

First, Ms. Cavanaugh has not produced *any* (i) communications with Teva's competitors; (ii) employment-related files; or (iii) documents concerning her transactions or holdings in Teva Securities. It was not until late Wednesday night that counsel for Ms. Cavanaugh and

Defendants sent a letter narrowly claiming that no "responsive, relevant *emails* were identified" by a search. The fact that Ms. Cavanaugh has not produced, and apparently could not locate, *any* text messages with Teva's competitors—while hundreds of such communications are known to have occurred[7]—raises serious questions about preservation and spoliation. Counsel have nonetheless refused to answer any questions on this important topic and are wholly unwilling to explain this discrepancy.

Moreover, while counsel recently indicated that Teva has produced 22 documents from an image of Ms. Cavanaugh's mobile phone—another long-running dispute—the scant volume is questionable given the agreed time period (nearly 6.5 years) and Ms. Cavanaugh's role as the former COO of Teva's U.S. generics business. The documents produced are also largely unintelligible, potentially indicating a lack of adequate forensic steps to reconstruct, search, and produce the available data from the phone. Examples are attached as Exhibit 2.

The Proposed Order requires that Defendants produce intelligible documents from Ms. Cavanaugh's mobile phone and that defense counsel explain in writing the steps undertaken to retrieve data from Ms. Cavanaugh's devices and files and the lack of any responsive documents in Ms. Cavanaugh's possession, custody, or control.

### F.   Third-Party Discovery from Teva's Admitted Co-Conspirator

Finally, Plaintiffs have been engaged in a long-standing dispute with admitted Teva co-conspirator Sandoz, Inc. regarding a subpoena served on December 5, 2019 and as to which Plaintiffs have received no documents whatsoever. Plaintiffs filed a motion to compel in the Southern District of New York, which is the court of compliance. Judge Caproni transferred the

---

[7] For example, Ms. Cavanaugh called or texted Marc Falkin of Actavis over 400 times between August 2013 and May 2016 (State AG May 2019 Complaint ¶588), including while allocating the market for Nortriptyline (*id.* ¶418). Ms. Cavanaugh also exchanged numerous text messages with executives at Zydus, Amneal, Sandoz, Glenmark, and Greenstone (*id.* ¶¶476, 1064).

motion to this Court to ensure that all discovery motions could be heard by the Court. Earlier today, this miscellaneous matter (Case Number 3:20-mc-00050) was assigned to Judge Chatigny. Resolution of the Sandoz dispute will expedite the resolution of disputes with other third parties that have raised objections on the same or similar grounds. We are prepared to address these issues at the Court's earliest availability.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the Proposed Order submitted herewith.

Date: July 31, 2020

    Respectfully submitted,

    PLAINTIFFS ONTARIO TEACHERS'
    PENSION PLAN BOARD, and
    ANCHORAGE POLICE & FIRE
    RETIREMENT SYSTEM

    /s/ *Joseph A. Fonti*
    Joseph A. Fonti (admitted *pro hac vice*)
    Evan A. Kubota (admitted *pro hac vice*)
    Benjamin F. Burry (admitted *pro hac vice*)
    Thayne Stoddard (admitted *pro hac vice*)
    **BLEICHMAR FONTI & AULD LLP**
    7 Times Square, 27th Floor
    New York, NY 10036
    Telephone: (212) 789-1340
    Facsimile: (212) 205-3960
    jfonti@bfalaw.com
    ekubota@bfalaw.com
    bburry@bfalaw.com
    tstoddard@bfalaw.com

    *Counsel for Lead Plaintiff*
    *Ontario Teachers' Pension Plan Board, and*
    *for Named Plaintiff Anchorage Police & Fire*
    *Retirement System, and Lead Counsel for the*
    *Class*

    Marc J. Kurzman (ct01545)

Christopher J. Rooney (ct04027)
**CARMODY TORRANCE SANDAK & HENNESSEY LLP**
707 Summer Street, Suite 300
Stamford, CT 06901
Telephone: (203) 252-2680
Facsimile: (203) 325-8608
mkurzman@carmodylaw.com
crooney@carmodylaw.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board, and for Named Plaintiff Anchorage Police & Fire Retirement System*

13