# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE TEVA SECURITIES LITIGATION | : | No. 3:17-cv-00558 (SRU) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | No. 3:17-cv-00558 (SRU) |
| | : | |

**PLAINTIFFS' AUGUST 7, 2020 SUBMISSION
IN FURTHER SUPPORT OF PROPOSED ORDER**

**ORAL ARGUMENT REQUESTED**

## I.     INTRODUCTION

On June 2, Plaintiffs moved to compel discovery of the core facts about Teva's price increases on its generic drugs and its related sales, revenues, and profits.[1]  (ECF 411-1.)  The parties have since filed extensive submissions and made good progress in narrowing the issues, and Plaintiffs believe the path forward is now largely undisputed.

This submission provides brief background and explains why Plaintiffs' proposed order (the "Proposed Order"), submitted herewith, should be entered.  Defendants admittedly possess a complete repository of drug-by-drug data, which is the same data that was rolled up into Teva's public financial statements and available in real time to Teva executives making pricing decisions. Indeed, Teva's counsel is "comfortable producing . . . sales volumes, net sales, average sales price on a monthly basis, gross profits on a quarterly basis" because that "makes sense."  (Ex. 2, July 16, 2020 Tr. at 10:24-11:4.)  At this point, the only truly disputed item is whether *monthly* (versus quarterly) drug-by-drug pricing and profit data must be produced.

All of this data is fundamental to proving when the price increases occurred and how they drove Teva's profits.  Plaintiffs therefore seek a clear, comprehensive order to establish the common set of facts about Teva's generic drug pricing, sales, revenues, and profits so that "there can't be a dispute about what happened."  (Ex. 1, June 23, 2020 Tr. at 12:10.)

## II.    RELEVANT BACKGROUND

**Teva Has Complete Drug-by-Drug Data:**  Teva's electronic books and records (referred to broadly in this dispute as Teva's "databases") contain drug-by-drug (NDC-level) pricing, sales, revenue, and profit data for each generic drug in Teva's portfolio.  As alleged in the Complaint, the records exist on databases that include Oracle (*see, e.g.*, ECF 310 ¶37).  While the records are

---

[1] Capitalized terms not defined herein have the meanings specified in the Complaint (ECF 310) or Plaintiffs' June 2, 2020 motion to compel (ECF 411-1).

stored electronically, rather than on paper, they are the documents and electronically stored

business records of Teva, and are squarely within the scope of Rule 34(a)(1)(A) ("documents or

electronically stored information ["ESI"]—including … data or data compilations").

Since last October, Plaintiffs have expressly sought this data in discovery.  (*See* ECF 411-3

(Plaintiffs' First Document Requests).)  For example:

- RFP 13 seeks documents and ESI "sufficient to reflect all prices for, and all changes in prices for, Your Generic Drugs on an individual, NDC-Code-level basis";

- RFPs 21 and 22 seek documents and ESI concerning "price changes" and "profit margins, profits, and revenues from Your Generic Drugs that were generated by or maintained in any electronic database, including, but not limited to, the Oracle database referenced in ¶37 of the Complaint or any similar database"; and

- RFP 12 seeks (among other things) "reports concerning Your Generic Drugs that were . . . generated by any electronic database, including, but not limited to, the Oracle database referenced in ¶37 of the Complaint or any similar database."

Defendants have yet to produce complete data showing these fundamental facts, much less

in usable form.  In January, Teva produced raw transaction-level data (*i.e.*, showing every sale to

customers like CVS) for a subset of only 60 drugs and a truncated time period (2013-2016).

However, this production was insufficient because (among other things) the 60 drugs represented

only a fraction of Teva's full generic drug portfolio (comprised of over 350 drugs).  Moreover, the

raw data did not clearly show Teva's ***actual price changes*** to each drug or the resulting profits.

After months of Defendants' intransigence, on June 2, Plaintiffs moved to compel a

complete data production, and an interrogatory response identifying price increases and profits,

for Teva's full generic drug portfolio and a longer time period.  (ECF 411.)

**The June 23 Conference:**  On June 23, the Court heard argument on Plaintiffs' motion to

compel.  In an effort to streamline the discovery, the Court directed Defendants to provide data

showing on a monthly basis—rather than for every transaction with each customer—the pricing,

sales, revenue, and profit for each drug in Teva's portfolio.[2]   (The transcript is attached as Exhibit 1.)   In doing so, the Court emphasized the ultimate goal of identifying the common set of facts about Teva's generic drug pricing, sales, revenues, and profits so that "there can't be a dispute about what happened."   (Ex. 1, June 23, 2020 Tr. at 12:10.)

**The July 16 Conference and Order:**   By July 9, Defendants had agreed to produce monthly NDC-level pricing, sales, and revenue data, and quarterly NDC-level gross profit. (ECF 457 at 4.)   On July 16, Defendants' counsel reiterated the point to the Court:   "We're comfortable ***producing the summary data that's readily available to us—sales volumes, net sales, average sales price on a monthly basis, gross profits on a quarterly basis.***   That makes sense to us. That we have and we can produce in a relatively short time period."   (Ex. 2, July 16, 2020 Tr. at 10:24-11:2.)   The Court also resolved a dispute over the time period, ordering that "Defendants' production must cover the time period through the end of February 2018."   (ECF 472 at 3.)

What remained was a narrow dispute over ***NDC-level profit data***, the sole category where the parties had not reached agreement as of July 16.   During the hearing, Defendants insisted that gross profit data should only be produced quarterly, rather than monthly, and that net and operating profit data are not available at the NDC level.   Based on those representations, the Court ordered Defendants to "produce profit reports as kept in the ordinary course of business," (ECF 472 at 3), "without respect to whether they're gross or net or operating."   (Ex. 2, July 16, 2020 Tr. at 19:18-19.)   However, Defendants have since corrected those July 16 representations, and have admitted that NDC-level operating profit data exists.

---

[2] *See, e.g.*, Ex. 1, June 23, 2020 Tr. at 5:11-17 ("[M]y strong belief is that Teva has to have a database that contains historical records of price, sales and profits. And assuming that they do, producing that information, that database or those spreadsheets or whatever, ought to be sufficient for the plaintiff to have, in effect, a marker against which they can run their economic analysis."); *id.* at 7:6-7 ("[I]t's sufficient to produce monthly pricing sales and profit data that I think you already have.").

**Current Status:**  Defendants have yet to produce any data or documents in response to the Court's guidance and July 16 order.  However, it appears that the parties are close to resolution. On July 31, Defendants proposed to produce:

> (1) Five types of periodic reports from centralized files, which had been previously produced in part from custodial files and emails, and some centralized files;
>
> (2) Quarterly "P&L Reports," first offered on the morning of July 31; and
>
> (3) Six undisputed categories of NDC-level data:
>
> - Monthly:
>   - Sales (Units)
>   - Revenue
> - Quarterly:
>   - Average Sales Price ("ASP")
>   - Sales (Units)
>   - Revenue
>   - Operating Profit

Plaintiffs agree that all of this material should be produced.  What still remains to be resolved is the NDC-level pricing and profit data.  As set forth more fully below, that pricing and profit data should be produced on both a monthly and quarterly basis.

## III.    ARGUMENT

### A.    NDC-Level Data Should Be Beyond Dispute; It Is Relevant, Discoverable, and Admissible

To begin, the relevance of the NDC-level data should be undisputed; Plaintiffs view the issue as settled.  On August 3, the Court likewise expressed some level of frustration that Defendants had not yet produced the undisputed data.  To the extent Defendants may now attempt to dispute whether this data is relevant, discoverable, admissible, and/or necessary to produce, such arguments fail.

**The Data Is Directly Relevant to the Misstatements and Omissions, As Well As Teva's**

**Defenses:** NDC-level data is fundamental to demonstrate the falsity of Defendants' material false

and misleading statements about pricing, profit, and competition, such as:

- "[A]ll the improvement you see in our – in margins is ***not driven by price***" (Defendant Vigodman), and "95% of our portfolio is declining" and "***[t]here might be 5% of the portfolio that is either flat or increasing pricing*** due to some abnormalities in the market" (Defendant Olafsson).  (Compl. ¶208.)

- Teva's improvement in operating profit was achieved "***[n]ot by pricing*** but by portfolio mix, new products, and efficiency measures" (Defendant Vigodman).  (*Id.* ¶220.)

- "Our generic drugs face ***intense competition***."  (*Id.* ¶181.)

Teva's NDC-level data relates directly to the core bases for falsity summarized in

Paragraph 165 of the Complaint.  Specifically, NDC-level data is essential to show:

- How Teva in fact made money and improved margins, and whether any of the improvement was "driven by price" (Compl. ¶208);

- The actual percentages of Teva's generics portfolio that were "declining," "flat," or "increasing pricing" (*id.*);

- The parallel price increases and market allocation that contradict Defendants' statements about "intense competition" (*id.* ¶181), and

- The collusion that constitutes an additional ground for falsity (*id.* ¶337).

Moreover, in violation of their statutory duty of disclosure pursuant to Item 5 of Form 20-F

and Item 303 of Regulation S-K, Defendants omitted (i) the ***material impact*** of both the pricing

increases and the price erosion on Teva's revenue, sales, and profits, and (ii) the ***known trends***

that risky and unsustainable price increases were materially driving Teva's financial performance,

and that by early 2016, Teva was experiencing increased pricing pressure and erosion.  (*Id.* ¶¶170-

71.)  In the words of the SEC regulation, the discovery sought is highly relevant to (i) the "material

favorable or unfavorable impact on net sales or revenues or income"; (ii) the extent to which

5

increases in net sales or revenues "are attributable to increases in prices"; and (iii) the "impact of . . . changing prices" on Teva's net sales, revenues, and income.  17 C.F.R. § 229.303(a)(3).

And significantly, Defendants have acknowledged they will have to rely upon the same NDC-level data to defend this case.  (Ex. 2, July 16, 2020 Tr. at 26:2-9.)  Defendants explicitly argue that their statements were truthful because any price increases were "offset" by price decreases on other drugs:

> [Our defense is that] price declines during the heart of plaintiffs' case, plaintiffs' original class period, the 2014, 2015, 2016 period, that the pricing that rose and pricing declines during that period *offset* any of the price increases that plaintiffs are talking about, and that is why the defendants were justified in saying that improved results weren't the result of pricing.

(Ex. 2, July 16, 2020 Tr. at 26:2-9.)  Defendants' "offset" theory necessarily requires the production of NDC-level data so both sides (and their experts) can analyze the actual "price increases" and "pricing declines" on each drug in Teva's portfolio.  Indeed, Defendants' counsel undoubtedly have used information extracted from Teva's databases to formulate this defense, and will use it again to prepare their fact witnesses and experts.  We await Defendants' formal position statement on August 17 as to their reliance on the database, but in all events, at a minimum NDC-level data is necessary to rebut the "offset" defense on the facts.

**The Data Is Explicitly Discoverable under Rule 34:**  The NDC-level data Plaintiffs seek is squarely within the scope of Rule 34, which has long expressly provided for discovery of such "data" and "data compilations."  Fed. R. Civ. P. 34(a)(1).  It is a "realit[y] of modern business litigation" that "many business records are kept in databases, and parties query these databases in order to provide responses to discovery requests."  *Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007), *aff'd*, 294 F. App'x 680 (2d Cir. 2008).  "[P]roducing limited data from a larger database is more akin to reviewing a set of documents in response to a discovery request and producing only responsive documents, than it is [to] creating a new data

compilation or document for the purposes of litigation." *Id.*; *see also N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 51 (E.D.N.Y. 2018) (parties may be required "to query an existing dynamic database for relevant information").

It is a routine matter to query the database to extract and produce the NDC-level data. That is what Plaintiffs seek here. The Federal Rules regard databases, data compilations, and extracted data as fully subject to discovery.

**The Data Is Admissible as a Business Record:** While information need not be admissible to be discoverable, Fed. R. Civ. P. 26(b)(1), and it is premature to address admissibility at this time, courts have routinely admitted data and databases into evidence. Indeed, the law is clear that where an "underlying database [was] maintained through the ordinary course of business," the "smaller subset of data provided as evidence from the database" is "subject to the business records exception to the hearsay rule." *Health All. Network*, 245 F.R.D. at 129. The NDC-level data is squarely admissible because Teva's databases were prepared in the course of Teva's regularly conducted business activity, as a regular practice, and at or near the time of the acts and events. Fed. R. Evid. Rule 803(6).

**The Data Is Necessary, and the Static Periodic Reports Are No Substitute:** Finally, Defendants have suggested that the Court's July 16 order to produce periodic "profit reports" somehow displaced the need for Defendants to produce NDC-level data. That is simply wrong. The July 16 order was premised on Defendants' explicit representations that Teva ***did not have*** NDC-level net or operating profit data. (*See* Ex. 2, July 16, 2020 Tr. at 13:25-14:2 ("But net profits and operating profits at an NDC level, ***I don't have them***. ***We don't have them at the NDC level***.").) Those representations were admittedly incorrect; as discussed above, Defendants

confirmed on July 31 that they possess and are willing to produce NDC-level operating profit (as well as pricing, sales, and revenues).  (*See* ECF 480 at 5-6.)  They should be ordered to do so.

On July 31, Defendants "identified" five types of periodic reports.  These are not new to discovery, nor are they an adequate substitute for NDC-level data.  Specifically, these are Annual Operating Plans (a.k.a. Work Plans), Long Range Plans, Latest Best Estimates, and two forms of daily Scorecards circulated to Teva's senior management.  These reports were specifically alleged in the Complaint, and have been the target of discovery since inception.

While the periodic reports are plainly relevant to scienter—and therefore discoverable— they do not fully address the falsity of Defendants' misstatements and omissions.  Among other limitations, these reports ***do not include pricing information***, typically are ***not NDC-level***, and only address small subsets of Teva's portfolio.  For example, Exhibit 3, ███████████████ ██████ produced in PDF format, is difficult to read, █████████████████████████ ███████████████████.[3]

Thus, of the discovery at issue, ***only*** NDC-level data conveys the specific drug-by-drug facts about price increases and resulting profit at the heart of this action.  Indeed, this is the data used to create Teva's publicly issued financial statements.  It is therefore essential and cannot be replaced by static, incomplete periodic reports.

## B.    The Disputed NDC-Level Monthly Pricing and Profit Data Is Highly Relevant and Must Be Produced

The only remaining issue is narrow:  whether Defendants must produce NDC-level monthly data for both pricing ***and*** profit, which Defendants resist on the ground that monthly data is purportedly less "accurate" than quarterly data.  Their argument fails.

---

[3] Defendants' proffered "P&L Reports" suffer from the same flaw, as they do not contain any drug-by-drug information.

### 1. Defendants Already Agreed to Produce Monthly Pricing Data, and Should Not Be Allowed to Backtrack

As explained above, Defendants expressly agreed to produce monthly pricing data on July 9 and July 16.  On July 31, Defendants backtracked by offering only quarterly pricing data, arguing "that as part of Teva's quarterly closing process there were often sales reserves adjustments recorded in the third month of the quarter that were not just related to that monthly period.  For that reason, an accurate average sales price cannot be calculated on a monthly basis."  (ECF 480 at 6.)  Defendants' self-serving argument that quarterly pricing is more "accurate" cannot avoid production of the monthly pricing data.  *See MultiPlan, Inc.*, 325 F.R.D. at 52 (rejecting defendant's argument "founded on the purported unreliability and incompleteness of [its] data").

Prejudicially, quarterly pricing data alone would obscure the impact of the "sales reserves adjustments" that Defendants have cited as the source of the claimed inaccuracy (ECF 480 at 6).  Monthly and quarterly pricing data is necessary to assess the propriety of these purported quarter-end "adjustments," and to understand the facts as they stood at the time of many of Defendants' false statements, which did not always coincide with the quarter end.  (*See, e.g.*, Compl. ¶¶196, 215, 224, 230, 232, 238-40.)

Quarterly pricing data alone would also obscure when the price increases actually happened, and that many of the increases were made in close proximity with Teva's purported competitors.  For example, Plaintiffs allege that Teva increased prices on Enalapril Maleate on July 19, 2013, sandwiched between increases by Mylan (July 2, 2013) and Wockhardt (August 1, 2013).  (Compl. at A-2.)  Quarterly data would merely show an increase in "Q3 2013," concealing the fact that Teva raised the price just 17 days after Mylan and 13 days before Wockhardt.

The Proposed Order specifies a simple and practical solution:  Defendants can produce monthly *and* quarterly pricing data so all parties can evaluate the price increases and "sales reserves adjustments" with equal access to the full facts.

### 2. Monthly Profit Data Admittedly Exists and Must Now Be Produced

Similarly, while Defendants have agreed to produce quarterly profits only, it is undisputed that Teva also has NDC-level monthly profit information.  (*See* ECF 459 at 2; July 16, 2020 Tr. at 13:25.)  Defendants' protestation that monthly profit data is also less "accurate" fails for the reasons above.  In addition to scienter, monthly profit data bears directly on falsity and materiality because it will show the impact of price increases and price erosion from specific drugs on Teva's financial performance; quarterly profit information alone will present a less detailed picture of these fundamental facts.  Both quarterly and monthly profit data can and should be produced.

In addition, Defendants previously labeled the available NDC-level profit metric as "gross profit," and now describe it as "operating profit."  (ECF 480 at 5.)  Whatever the terminology, monthly NDC-level profit data must be produced, and Plaintiffs' Proposed Order thus provides for the production of gross, net, and/or operating profits.

### C. The Court's Order Must Also Direct Defendants to Produce the Undisputed NDC-Level Data and Agreed-Upon Periodic Reports

Although these categories are agreed, to achieve a timely, complete resolution, it is critical that the Court enter an explicit order directing their production by a concrete deadline.

As to the NDC-level data, based on Defendants' representations, Defendants must produce the following by August 14:  (1) monthly sales (units); (2) monthly revenue; (3) quarterly ASP; (4) quarterly sales (units); (5) quarterly revenue; and (6) quarterly profit.

As noted above, Defendants expressed their willingness to produce all of these items on July 9, July 16, and July 31.  Plaintiffs have never "rejected" that proposal.  Rather, Plaintiffs'

counsel **_confirmed_** it on July 16, stating "we know what's going to be coming out of the database in report form." (Ex. 2, July 16, 2020 Tr. at 21:7-8.) Entry of a Court order is necessary.

As for the periodic reports, Plaintiffs' Proposed Order clarifies that Defendants must produce by August 14 a comprehensive set of all periodic reports from centralized files (whether or not already produced). To be clear, Defendants were already obligated to produce these reports in full by the established August 7 production deadline (ECF 375). Nonetheless, since Defendants have now acknowledged that their production of these reports is incomplete, the Proposed Order calls for prompt and complete production from centralized files.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the Proposed Order submitted herewith.

Date:  August 7, 2020

Respectfully submitted,

PLAINTIFFS ONTARIO TEACHERS'
PENSION PLAN BOARD, and
ANCHORAGE POLICE & FIRE
RETIREMENT SYSTEM

/s/ _Joseph A. Fonti_
Joseph A. Fonti (admitted _pro hac vice_)
Evan A. Kubota (admitted _pro hac vice_)
Benjamin F. Burry (admitted _pro hac vice_)
Thayne Stoddard (admitted _pro hac vice_)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
ekubota@bfalaw.com
bburry@bfalaw.com
tstoddard@bfalaw.com

_Counsel for Lead Plaintiff_

*Ontario Teachers' Pension Plan Board, and for Named Plaintiff Anchorage Police & Fire Retirement System, and Lead Counsel for the Class*

Marc J. Kurzman (ct01545)
Christopher J. Rooney (ct04027)
**CARMODY TORRANCE
SANDAK & HENNESSEY LLP**
707 Summer Street, Suite 300
Stamford, CT 06901
Telephone: (203) 252-2680
Facsimile: (203) 325-8608
mkurzman@carmodylaw.com
crooney@carmodylaw.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board, and for Named Plaintiff Anchorage Police & Fire Retirement System*