# Exhibit 2

Filed Under Seal

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION. | ) ) ) ) ) No. 3:17-cv-00558 (SRU) ) ) ) All Class Actions |
| THIS DOCUMENT RELATES TO: | ) ) |

**EXPERT REPORT OF MUKESH BAJAJ, PH.D.**

**August 7, 2020**

Table of Contents

**I. Qualifications** ............................................................................ **4**

**II. Background and Scope of Assignment** .......................................... **5**

**III. Summary of Opinions** ................................................................ **7**

**IV. The Tabak Report does not establish market efficiency for the Teva Securities at Issue over the Class Period** .................................... **12**

A. Economic background ............................................................ 12

B. As his own writings state ███████████████████ , Dr. Tabak's analysis of the "indirect," structural *Cammer* and *Krogman* factors are insufficient to support his efficiency opinion ........................ 18

C. Dr. Tabak admits that his own "weak form" autocorrelation tests fail to support his conclusion that the Teva Securities at Issue traded in a weak-form efficient market, and thus, as a matter of basic economic logic, Dr. Tabak's entire efficiency opinion has no basis. ..................... 20

D. Dr. Tabak's purported "direct" tests ("Tabak Z-test" and "Tabak KS-test") cannot and do not support a finding of semistrong-form market efficiency by their very design. ............................................... 25

   1. Description of the Tabak z-test ........................................... 25

   2. The Tabak z-test is not a methodology generally accepted by economists to establish market efficiency and the only support Dr. Tabak offers for it as a test for market efficiency is a single citation to his own co-authored 2004 law review paper. .................. 32

   3. By its very design, the Tabak z-test does not assess market efficiency. ...................................................................... 33

   4. The Tabak Z-test ignores the directionality of price movement, in contradiction of the economic definition of market efficiency, which Dr. Tabak explicitly notes in his report. ............................... 37

   5. The Tabak KS tests suffer from the same fundamental flaws as the Tabak z-tests and thus are unreliable and cannot establish market efficiency. ...................................................................... 42

E. The Tabak z-Tests and KS Tests are also unreliable because they are biased, lack robustness, and are premised on assumptions contrary to his own writings, including in his report in this matter. ..................... 44

   1. Flawed identification of "news" days ................................... 44

   2. Dr. Tabak's purported tests of cause and effect are plagued by reverse causality: his data reflects stock returns generating press coverage rather than news causing excess returns ........................... 49

   3. Deviation from FDT 1: failure to exclude alleged disclosure days .... 64

4. Deviation from FDT 2: use of pooled instead of unpooled variance for the z-test ...................................................................................... 69

5. Lack of robustness: Tabak DJNW z-tests and KS tests fail for the almost three-year period prior the Actavis acquisition and for most individual years of the Class Period......................................... 72

6. The Tabak z-test either fails to detect cause and effect or shows the markets for Teva Securities were inefficient, by Dr. Tabak's own logic in his writings................................................................. 74

F. Dr. Tabak either disregards or fails to discuss numerous "indirect," structural *Cammer* and *Krogman* factors that do not support his efficiency opinion. ...................................................................................76

# I. Qualifications

1. I am a Senior Consultant in the Finance Practice of Charles River Associates ["CRA"]. CRA is a leading global consulting firm that offers economic, financial, and strategic expertise to major law firms, corporations, accounting firms, and governments around the world.  My curriculum vitae is attached as Appendix 1.

2. In 1988, I graduated from the University of California at Berkeley earning a Ph.D. in Business Administration with a specialty in finance. I was awarded an M.B.A. from the University of Texas at Austin in 1987. I was awarded a Bachelor of Technology degree in 1981 from the Indian Institute of Technology in Delhi, India.

3. As a financial economist, I specialize in the study of capital markets, including the valuation of stocks, bonds, warrants, restricted stock and other complex contingent securities, intellectual property, intangible assets, corporate hedging practices (through derivatives and other methods), conducting event studies to determine the significance of stock price reactions to particular events, and analyzing market efficiency, materiality and loss causation issues related to securities class action claims.

4. Since 1996, I have been engaged as an expert in financial economics on numerous matters involving allegations of securities fraud, valuation of firms and their securities, intangible assets and intellectual property and transfer pricing by multinational corporations.  I have testified as an expert either in court or at deposition in over 60 matters, including almost 30 matters concerning liability and/or damages issues in securities fraud cases.  In such securities fraud cases, I have testified on behalf of the U.S. Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office in a criminal matter, as well as on behalf of both plaintiffs and defendants in civil and criminal matters.

5. In addition to my consulting work and business activities, I also have taught graduate-

4

level courses in corporate finance, investments and financial engineering as a visiting lecturer with the Haas School of Business ("Haas") at the University of California at Berkeley. At Haas, I served as a Graduate Student Instructor while earning my Ph.D. between 1983 and 1988. From 1988 to 1995, I was an Assistant Professor of Finance and Business Economics at the University of Southern California.

6. I have authored or co-authored more than 25 publications and working papers in the field of financial economics. My research has been published in *The Journal of Finance, The Journal of Financial Economics, The Journal of Financial Research, The Journal of Applied Finance, International Economic Review, Research in Finance, The Journal of Corporation Law, The Journal of Derivatives,* and *Research in Law and Economics.*

7. I am a member of the American Finance Association, the Western Finance Association and the European Finance Association, and I have lectured widely on a variety of issues in financial economics. CRA is being compensated for my work on these matters at my regular hourly rate of $1,200 per hour. That compensation is not in any way dependent on the opinions I express on issues in these cases. I am independent of the Plaintiffs and the Defendants in this matter. I have been assisted in my work on this case by my colleagues at CRA, for whose work CRA is being paid at their regular hourly rates, which range from $375 per hour to $785 per hour.

8. The documents I have considered are cited throughout the report and/or listed in Appendix 2. If additional information becomes available, I reserve the right to supplement or modify the opinions set forth in this report.

## II. Background and Scope of Assignment

9. In their Second Amended Complaint filed December 13, 2019 ("Complaint"), Plaintiffs bring claims against Teva and "certain of its current and former employees and officers"

(collectively, "Defendants").[1]  The Plaintiffs seek to represent a class of investors who purchased Teva "Securities at Issue"[2] from February 6, 2014 to May 10, 2019, inclusive (the "Proposed Class Period" or the "Class Period").[3]

10. Plaintiffs bring claims under the Securities Act of 1933 and the Securities Exchange Act of 1934, among other things.  Plaintiffs allege that "Defendants consistently attributed Teva's seemingly remarkable turnaround to fundamental business strategies, like cost cutting and good product management" but "[i]n truth, however, Teva's quarter-after-quarter financial growth was the result of Defendants' implementation of a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio (the 'Price-Hike Strategy')."  Plaintiffs group these alleged misrepresentations into several different categories.[4]

11. The Complaint further alleges that (1) in seeking damages related to the alleged misrepresentations, Plaintiffs are entitled to a "presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine;" (2) "[a]t all relevant times, the market for Teva's ADS, Preferred Shares, and Notes was efficient;"[5] and (3) that "[u]nder these circumstances all purchasers of Teva Securities during the Class Period suffered

---

[1]    Complaint, page 1.

[2]    According to the Complaint, the Teva "Securities at Issue" are: "American Depositary Shares registered on the NYSE ("ADS"), including ADS (i) registered pursuant to Teva's July 27, 2010 Registration Statement, and (ii) issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "ADS Offering"); 7.00% mandatory convertible preferred shares issued in the public offering on or about December 3, 2015 and January 6, 2016 (the "Preferred Shares" and "Preferred Offering"); and certain U.S.-dollar-denominated senior notes issued in the public offering on or about July 21, 2016, namely (i) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (ii) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (iii) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"), (iv) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"), (v) 3.150% Senior Notes due October 1, 2026 ("2026 Notes"), and (vi) 4.100% Senior Notes due October 1, 2046 ("2046 Notes")" [Complaint, ¶393].

[3]    Complaint, ¶1.

[4]    Complaint, ¶ 165.

[5]    Complaint, ¶377.

similar injury through their purchases at artificially inflated prices."[6]

12. On June 19, 2020, in conjunction with Plaintiffs' Motion for Class Certification, Dr. David Tabak filed an expert report ("Tabak Report").[7] Dr. Tabak's **primary** opinion is that "relevant analyses demonstrate that Teva's ["Securities at Issue"] traded in efficient markets."[8] Dr. Tabak does not specify what time period these securities "traded in efficient markets," but presumably he means over the entire Proposed Class Period.

13. I have been asked by Teva's counsel to review and comment on the opinions in the Tabak Report and his deposition in this matter dated July 28, 2020 and, in particular, to offer an opinion as to whether Dr. Tabak has demonstrated that the markets for Teva's ADS, Preferred Shares, and Notes were efficient.[9]

## III. Summary of Opinions

14. Based on my expertise and experience as a financial economist and my analyses described in this report, I have reached the opinion that Dr. Tabak has not established that the markets for the Teva Securities at Issue over the Class Period were efficient.

15. While the Tabak Report presents various complex calculations and uses statistical and scientific terminology, basic economic logic and common sense alone are sufficient to conclude that his report fails to establish that the Teva Securities at Issue traded in an efficient market over the Class Period. His conclusion is based on his self-invented methodology that has no basis in extant economic literature on market efficiency and he deviates even from his own past writings in ways that improperly support his ultimate conclusions.

16. According to economic literature and Dr. Tabak's own writings and prior expert

---

6   Complaint, ¶378.
7   Expert Report of David I. Tabak, Ph.D., *In Re Teva Securities Litigation*, No. 3:17-cv-00558 (SRU), June 18, 2020. ("Tabak Report").
8   Tabak Report, ¶3.
9   Deposition of Dr. David I. Tabak, *In Re Teva Securities Litigation*, No. 3:17-cv-00558 (SRU), July 28, 2020. ("Tabak Dep.")

testimony:

> a. The FOTM presumption requires that the market be "semistrong-form" efficient, which means that security prices consistently react to "material, new, unexpected information."[10] "[W]e expect that the price of a stock will increase in response to unexpectedly positive news and fall in response to unexpectedly negative news."[11]
>
> b. If a security does not trade in even a weak-form efficient market (a weaker standard than semistrong-form market efficiency), then it cannot possibly trade in a semistrong-form efficient market.[12]

17. Dr. Tabak's own report presents significant evidence consistent with the conclusion that the Teva Securities at Issue did not even exhibit weak-form market efficiency. Thus, there would be no basis for him to conclude that these securities trade in a semistrong-form efficient market. Yet, Dr. Tabak dismisses his own evidence and concludes, on the basis of his purported "direct" tests,[13] that the securities at issue traded in a semistrong-form efficient market.

18. According to extant economic literature, the Tabak Report, his past writings, as well as guidance from case law, the direct test of the semistrong-form of market efficiency is to examine

---

[10]  See, e.g., Tabak Report, ¶11and ¶37.
[11]  Tabak Report, ¶38.
[12]  See Tabak Expert Report in *In Re Netbank Securities Litigation*, ¶10 and ¶14 ("As noted by a recent working paper, "a market that is not weak-form efficient cannot be semi-strong-form efficient;"" "Because a stock that is not weak-form efficient is not efficient in any sense, one could end the analysis of market efficiency here.")
[13]  Tabak Report, ¶12, ¶37, and ¶49. As discussed in detail below, Dr. Tabak purports to analyze the fifth "cause and effect" *Cammer* factor through two analyses: (1) the "Tabak z-test," a series of statistical z-tests comparing the proportion of statistically significant "excess return" days on different sets of purported "news" days and remaining "non-news" days; and (2) the "Tabak KS test," a similar analysis, based on a statistical test called the Kolomgorov-Smirnov (or "KS") test, that instead of comparing the two proportions, compares the distributions of the absolute value of excess returns on the same groups of "news" days to "non-news" days.

if, upon receiving "material, new, unexpected information"[14] (i.e., upon occurrence of an "event"), the security exhibits a statistically significant excess return.[15] This basic approach is called an event study. Yet, in his "direct" tests (the Tabak z-test and Tabak KS-test), Dr. Tabak does not identify even a single "event" during a more than five-year Class Period with over 1,300 trading days. He refuses to identify "events," claiming that to do so would require him to use his "subjective" judgment[16]                                          [17] and will require the Court to evaluate the credibility of his expert judgment.[18]

19. Instead, for his purported direct test of semistrong-form of market efficiency, Dr. Tabak has focused on a tautology that on trading days when there was a statistically significant excess return, it is more likely that there would be mention of Teva in one or more business publications (what he calls "news").[19] He does not even check whether the news that purportedly caused the price change arrived before or after the price change occurred or whether the direction of the price change he observes is consistent or inconsistent with what he considers news before concluding that news must have been responsible for the price change as would be expected in a semistrong-

---

[14] Tabak Report, ¶37.

[15] As I explain in more detail below an "excess" change in the security price is the change after controlling for market-wide and other factors using a statistical model. A "statistically significant" excess change is one that large enough compared to standard excess changes such that it is considered highly unlikely to have occurred by chance alone.

[16] Tabak Report, ¶41 and footnote 24.

[17] Tabak Dep., page 193                                                                     .").

[18] See Tabak Report, footnote 24 quoting *In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 618 (C.D. Cal. 2009): "It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility."

[19] In one of his analyses, Dr. Tabak performs his z-test and KS test on a group of Teva's earnings announcement dates. These tests are equally flawed and do not establish market efficiency as I explain later in this report.

form efficient market.

20. I demonstrate by examining Dr. Tabak's own data that, as expected, a business reporter is more likely to publish an article mentioning Teva upon observing a relatively large price change in the Teva securities. Dr. Tabak's "news" often follows rather than precedes the price changes he has documented. Obviously, such "news" that follows a price change could not have caused that price change. When I rearrange Dr. Tabak's own data so I associate returns over one period with his "news" in the subsequent period, Dr. Tabak's z-test would still conclude that news caused significant return and the market is efficient. I also show through statistical simulations based on his own data that even if the market is not efficient by design, his purported tests would spuriously conclude the opposite (i.e., efficiency) most of the time. Specifically, his KS test would show spurious significance from 79.1% to 90.6% of the times and his z test would provide spurious significance from 89.9% to 98.9% of the time.

21. Dr. Tabak's "direct" tests are also illogical in other ways. They are simply not designed to test market efficiency, and they have no basis in extant economic literature on market efficiency. In addition, the Tabak Report is replete with various methodological and logical shortcomings and erroneous conclusions, as I will explain and document in this report.

22. Overall, Dr. Tabak's own economic evidence provides greater support for the conclusion that the Teva Securities at Issue failed to even trade in a weak-form efficient market than his conclusion that Teva securities traded in a semistrong-form efficient market, a tougher standard of efficiency that cannot be met without meeting the weaker standard. I explain the bases for my opinion below.

23. Attached to this report are Appendices that include information referenced herein and analyses that further support my opinions. These Appendices are as follows:

- Appendix 1: Curriculum Vitae of Mukesh Bajaj

- Appendix 2: Documents Considered

- Appendix 3: Exact % of significant Tabak "news" needed to produce a statistically significant z-test result

- Appendix 4: Dr. Tabak z-test results with excess return signs reversed

- Appendix 5: Tabak z-test and KS test results for ADS NYSE open to close and close to open periods

- Appendix 6: Analysis of 4:00 pm NYSE close to 7:00 am Teva stock returns and 7:00 to 9:30 am DJNW articles

- Appendix 7: Methodology for simulations that demonstrate reverse causality in Dr. Tabak's data

- Appendices 8a and 8b: Simulation results detail

- Appendix 9: Tabak Dow Jones Newswire ("DJNW") KS test for ADS, Preferred Shares and Notes corrected to remove alleged disclosures

- Appendix 10: Tabak KS test for Notes corrected to remove alleged disclosures

- Appendix 11: Tabak DJNW z-test for Notes corrected for deviations from FDT[20]

- Appendix 12: Tabak DJNW z-test for ADS and Preferred Shares corrected for deviations from FDT and applied to pre/post Actavis acquisition and years of the Class Period

---

[20]  "FDT" is an abbreviation used in this report to refer to a paper coauthored by Dr. Tabak: Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's Law Review 81, 119-22 (2004).

## IV. The Tabak Report does not establish market efficiency for the Teva Securities at Issue over the Class Period.

### A. Economic background

24. The efficient market hypothesis ("EMH") is an economic theory about how security prices adjust to information.[21]  The EMH dates back to the 1960s and is one of the most widely tested theories in financial economics.  Economic literature defines three forms of the EMH:  weak-form, semistrong-form and strong-form.  In a weak-form efficient market, current security prices reflect the information contained or present in "just historical prices."[22]  If the market is weak-form efficient, past trends in prices provide no reliable basis to predict future prices.  In a semistrong-form efficient market, security prices reflect the information in historical prices as well as "other information that is obviously publicly available (*e.g.*, announcements of annual earnings, stock splits, etc.)."[23]  Finally, in a strong-form efficient market, security prices reflect "any information relevant for price formation" (*i.e.*, either public or non-public information).[24] Financial economists agree that the strong-form of efficient markets hypothesis is simply a theoretical benchmark and is not a realistic description of how markets actually function.

25. Because in a semistrong-form efficient market security prices at all times reflect all material, publicly available information, stock prices consistently react promptly to "material, new, unexpected information"[25] ("Material News") regarding security value.  That is, in a semistrong-form efficient market, the stock price should promptly increase following positive Material News

---

[21]  See, e.g., Fama, Eugene F. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," Journal of Finance, 25(2), pages 383-417. ("Fama (1970)")
[22]  Fama (1970), page 383.
[23]  Fama (1970), page 383.
[24]  Fama (1970), page 383.
[25]  Tabak Report, ¶37.

and promptly decrease following negative Material News.  If not, stock prices could not reflect all value-relevant information that was then publicly available. As Dr. Tabak acknowledges,[26] in a semistrong-form efficient market "the price of a stock rapidly incorporates <u>all</u> publicly available information"[27] and "if the market learns of material new, unexpected positive (negative) information about an issuer, then the price of the issuer's common stock will rise (fall) if the market is efficient.[28]

26. It is well-established that each form of market efficiency rests on the prior form because each successive information set contains the previous one.   As a standard finance textbook explains:[29]

> *The information sets that pertain to the weak, semistrong, and strong form of the EMH can be described by the following illustration:*



> *The weak-form information set includes only the history of prices and volumes. The semistrong-form set includes the weak form set plus all publicly available information. In turn, the strong-form set includes the semistrong set plus insiders' information. … The direction of valid implication is*

---

[26]  Dr. Tabak also discusses the "standard taxonomy" of market efficiency forms and he agrees that the semistrong-form is the standard and definition appropriate for this Class Action proceeding [See Tabak Report, ¶10 and footnote 6.]

[27]  Tabak Report, ¶10. [underline added]

[28]  Tabak Report, ¶11. See also Tabak Report, ¶38, noting that in an efficient market "we expect that the price of a stock will increase in response to unexpectedly positive news and fall in response to unexpectedly negative news."

[29]  Bodie, Kane, and Marcus, *Investments*, Irwin McGraw-Hill, 4th Ed., page 368.

> *Strong form EMH => Semistrong-form EMH => Weak-form EMH*
>
> *The reverse direction implication is not valid. For example, stock prices may reflect all past price data (weak-form efficiency) but may not reflect relevant fundamental data (semistrong-from efficiency).")*

This means, as Dr. Tabak has noted in other expert reports,[30] that if the market is not weak-form efficient, it cannot be semistrong-form efficient. Dr. Tabak, in his deposition in this matter,

███████████████████████████████████████████████████████"[31]

27. The U.S. Supreme Court in *Basic* linked market efficiency and securities class actions when it allowed plaintiffs to prove class-wide reliance by endorsing the FOTM doctrine, which allowed plaintiffs to "invoke a rebuttable presumption of reliance on public, material misrepresentations regarding securities traded in an efficient market."[32] It is well-established that FOTM is premised on "semistrong-form" market efficiency where security prices reflect all publicly available information.[33]   As I and my coauthors note in our 2014 paper[34] (quoting *Polymedica*[35]):

> *After Basic, courts have viewed the link between the market efficiency hypothesis and fraud-on-the-market theory as a "syllogism: (a) an investor buys or sells stock*

---

[30]   See Tabak Expert Report in *In Re Netbank Securities Litigation*, ¶10 and ¶14 ("As noted by a recent working paper, "a market that is not weak-form efficient cannot be semi-strong-form efficient;"" "Because a stock that is not weak-form efficient is not efficient in any sense, one could end the analysis of market efficiency here.")

[31]   Tabak Dep. 33:5-9

[32]   See *Basic Inc. et. al. v. Levinson et al.* (1988), No. 86-279 Supreme Court of United States ("*Basic*") and *Amgen v. Connecticut Ret. Plan & Trust Funds*, 133 S. Ct. 1184, 1188 (2013) (citing *Basic*, 485 U.S., at 241-249).

[33]   *Basic*, echoing Fama's notion of semi-strong market efficiency, states that in an efficient market "the market price of shares traded on well developed markets reflects all publicly available information." 247.

[34]   Bajaj, et al. (2014), "Assessing Market Efficiency For Reliance On The Fraud-on-the-Market Doctrine After Wal-Mart and Amgen," *Research in Law and Economics*, Vol. 26, 161-207. ("Bajaj, et al. (2014)"), pages 165-166 (citing *PolyMedica I*, 432 F.3d, at 8.)

[35]   *PolyMedica I*, 432 F.3d, at 8.

> *in reliance on the integrity of the market price; (b) publicly available information, including material misrepresentations, is reflected in the market price; and therefore, (c) the investor buys or sells stock in reliance on material misrepresentations. This syllogism breaks down, of course, when a market lacks efficiency, and the market does not necessarily reflect the alleged material misrepresentation."*

Dr. Tabak agrees that the relevant definition of market efficiency and the standard applicable for this matter is "semistrong form" of market efficiency where "the price of a stock rapidly incorporates all publicly available information."[36]

28. In the context of securities cases, courts have also drawn a distinction between "fundamental" and "informational" (semistrong-form of) market efficiency.[37] According to the notion of fundamental efficiency, if a security price always reflects all public information at all times, the stock price will always be equal to its fundamental (i.e., true) economic value. However, for purposes of FOTM theory, courts have explained that even if a stock happens to be incorrectly valued from a fundamental perspective, if the stock price reflects value of new, unexpected, and material news correctly, the logic of the Fraud on the Market Doctrine will still apply. This more limited version of a semistrong-form efficient market has been labelled as "informational efficiency." In other words, informational efficiency is sufficient (as well as necessary) for the FOTM presumption because, in such a market, any material disclosure defect can be presumed to have distorted the stock price regardless of whether an individual member of the class relied

---

[36] Tabak Report, ¶10.

[37] The District Court in *Polymedica I* noted that "by requiring that stock price in an efficient market fully reflect all publicly available information in order to establish the fraud-on-the-market presumption, we do not suggest that stock price must accurately reflect the fundamental value of the stock" and that "[t]his distinction is well-supported by the legal and economic commentary." [*Polymedica I*, p. 13.]

specifically on the disclosure defect.[38]

29. The standard test that economists use to test for semistrong-form market efficiency is an "event study."[39] An event study is a technique, used widely in the finance literature on market efficiency for over 50 years.[40] Event studies use statistical models to examine whether Material News causes security prices to reflect the economic value of the news. I will describe an event study in greater detail later. An event study is a test for informational efficiency, not fundamental efficiency.[41]

---

[38] In his deposition, Dr. Tabak



[39] See, e.g., Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, No. 5 (Dec. 1991), pp. 1575-1617, pages 1599-1602.

[40] Fama (1991), at page 1599, describes his 1969 paper (coauthored with Fisher, Jensen, and Roll) as the "original event study (of stock splits)." See Eugene Fama, Lawrence Fisher, Michael C. Jensen, and Richard Roll, 1969, "The adjustment of stock prices to new information," *International Economic Review* 10, 1-21.

[41] The following hypothetical illustrates the distinction between fundamental and informational market efficiency in the context of event study analysis. Suppose a stock traded at $10 per share, whereas its true "fundamental" value was $15, i.e., its price was inconsistent with fundamental efficiency. Suppose further that material negative information is released to the public which should lead to a decline in stock price by $1 a share. An event study would test whether, upon receipt of this material negative information, the stock price declined from $10 to $9 per share. If an event study were designed to test for fundamental efficiency, one would expect the price to rise to $14, i.e., a 40% increase rather than a 10% decline in response to this material negative news.

30. In the context of securities class actions, various courts have also considered certain "indirect,"[42] structural market factors (known as *"Cammer"* and *"Krogman"* factors), which would facilitate a securities market becoming efficient.  As I discuss below (███████████████████

███████████████████[43]), these "indirect" factors are at best necessary, but not sufficient to establish semistrong-form market efficiency.

31. A fundamental and necessary element of using an event study to establish cause and effect and semistrong-form market efficiency is to examine "directionality."  That is, positive Material News must result in a positive price impact (and vice-versa).  Indeed, as noted above, Dr. Tabak defines an efficient stock market as one where, "if the market learns of material new, unexpected positive (negative) information about an issuer, then the price of the issuer's common stock will rise (fall)."[44]  This must be the case in the context of FOTM theory because according to this theory, if a disclosure defect provides materially false positive information to the market, it is assumed that such a defective disclosure inflated the stock price and thus misled every class member who bought the security at an inflated price relying on integrity of the market. If the market is deemed to be efficient, the inflation is measured as the amount by which the stock price increased upon receiving such false information (or failed to decline due to actionable omission of bad news).  Similarly, if a corrective disclosure revealed a previously concealed truth to the market, the FOTM will assume that such a disclosure caused a change in stock price that that similarly affected every member of the class. Therefore, there is simply no logical basis to test for market

---

[42]   As discussed below, Dr. Tabak identifies four of the five *Cammer* factors and the three *Krogman* factors as "indirect" factors and the "cause and effect" fifth *Cammer* factor (which he agrees should be based on "event study analysis") as "direct." [Tabak Report, ¶12, "These tests can broadly be divided into direct tests of whether a market violates the conditions of market efficiency (e.g., whether the price of a security actually responds to material new unexpected information) and indirect tests of the conditions that one expects would be present in an efficient market (e.g., substantial analyst coverage of the issuer, which suggests that market participants are interested in understanding and responding to news)." See also ¶37, ¶49.] Dr. Tabak ███████████████████████████████████████████████

███ [Tabak Dep. 77-78].
[43]   Tabak Dep. 77-78.
[44]   Tabak Report ¶11, ¶38.

efficiency without confirming that positive Material News results in a significant increase in stock price and negative Material News causes stock price to decline by a significant amount.

32.   Price reactions to Material News in an efficient market must also be consistently observed. This means prices should react to Material News every (or, within the degree of noise in statistical tests, almost every) time.  This consistency is particularly necessary in the context of the FOTM theory. This is because, if a class is certified, then plaintiffs would rely on the assumption of market efficiency to be entitled to relief from every material disclosure defect they allege and establish.[45] If the stock price reacts only sometime to material news, there would be no logical basis to invoke common, class-wide reliance. For example, if one could only establish that the market reacted to material news 20% of the time, it would be impossible to tell which alleged material disclosure defects distorted the stock price.  Even if one could establish that the market reacted to material news 50% of the time, it would still be impossible to assume that each material disclosure defect distorted the stock price.

**B. As his own writings state ████████████████████████, Dr. Tabak's analysis of the "indirect," structural *Cammer* and *Krogman* factors are insufficient to support his efficiency opinion.**

33. In support of his opinion that the Teva Securities at Issue traded in efficient markets over the proposed Class Period, Dr. Tabak cites eight factors drawn from the judicial decisions in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) (hereafter, *Cammer* and *Krogman*).[46]

---

[45]   Henceforth, every time I mention market efficiency, I mean informationally efficient semistrong-form efficient market unless I state otherwise.

[46]   Tabak Report, ¶¶14 and 15. These eight factors are: (1) the average weekly trading volume expressed as a percentage of total outstanding shares;  (2) the number of securities analysts following and reporting on the

34. Dr. Tabak divides these factors into two types: "indirect" and "direct."[47] Dr. Tabak opines that *Cammer* Factor 5, the existence of "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock [or "security"] price,"[48] is the direct test of market efficiency. Dr. Tabak notes, that this factor "is often considered the most direct and important factor."[49] As the *Cammer* court itself explained in referring to this cause and effect relationship: "[t]his, after all, is the essence of an efficient market and the foundation for the fraud on the market theory."[50] He refers to the other factors as "indirect" factors that may facilitate market efficiency.

35. A recent study examined whether the indirect "*Cammer and Krogman* factors are sufficient for reliance" and found that the factors had "little relation" even to weak-form efficiency, a standard lower than what I understand is required to establish a claim of presumption of reliance

---

securities; (3) the extent to which market makers and arbitrageurs trade in the securities; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock [or "security"] price"; (6) the company's equity market capitalization; (7) the bid-ask spread for security sales; and (8) float, the security's trading volume without counting insider-owned securities.

[47] See Tabak Report, ¶12 ("To assess whether a market is efficient, financial economists and the courts have developed various tests. These tests can broadly be divided into direct tests of whether a market violates the conditions of market efficiency (e.g., whether the price of a security actually responds to material new unexpected information) and indirect tests of the conditions that one expects would be present in an efficient market (e.g., substantial analyst coverage of the issuer, which suggests that market participants are interested in understanding and responding to news).")

[48] *Cammer* at 1287 quoted in the Tabak Report, ¶15.

[49] See Tabak Report, ¶37 ("Whether a stock price responds to material, new, unexpected information is often considered the most direct and important of the Cammer factors." Also noting that the Cammer decision "noted on page 1291 that "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.") Tabak does note, however, at footnote 19 that "that courts have often held that this factor is not a necessary factor when the other Cammer factors weigh in favor of market efficiency and that particular forms of proof of this factor are not necessary." I offer no legal opinion in this regard. I only note that as a financial economist, the "indirect" Cammer and Krogman factors do not provide the necessary basis to support a conclusion of market efficiency. As I discuss below, and in Bajaj et al. (2014), these factors are insufficient.

[50] *Cammer* at 1287.

under the fraud-on-the-market theory, *viz.,* semistrong-form efficiency.[51]  In addition to his own

writings in FDT, ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████.[52]

36. Thus, even assuming Dr. Tabak's analysis of these factors is correct and complete for

all of the Teva Securities at Issue (which it is not as I discuss below in Section IV.F), this evidence

does not demonstrate that the markets for the Teva Securities at Issue were efficient during the

Class Period. This evidence at most points to the possibility that the market could be efficient.

Interestingly, Dr. Tabak does not even provide evidence on some of these structural factors for the

Notes at issue in this case.

### C. Dr. Tabak admits that his own "weak form" autocorrelation tests fail to support his conclusion that the Teva Securities at Issue traded in a weak-form efficient market, and thus, as a matter of basic economic logic, Dr. Tabak's entire efficiency opinion has no basis.

37. Dr. Tabak also performs certain "weak-form" tests of market efficiency, although he

does not acknowledge them as such.[53] These tests – autocorrelation and "runs" tests – unlike the

Tabak z-test and KS tests, do have a basis in the academic literature, as Dr. Tabak acknowledges.[54]

---

[51]    Erenburg, Grigori, Janet Kiholm Smith and Richard L. Smith (2011), "The Paradox of 'Fraud-on-the-Market Theory': Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies*, Volume 8, Issue 2, June 2011, pp. 260-303. Pg. 266.

[52]    Tabak Dep., 77-78.

[53]    Tabak Report, ¶¶64-70.

[54]    At ¶64 when presenting these tests, Dr. Tabak cites to Fama (1970), noting that "[a]utocorrelation, also known as serial correlation, is discussed as a test of potential market efficiency in Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970. Dr. Tabak cites to

I agree that these tests are valid tests of weak-form market efficiency which, as noted above, is a prerequisite for semi-strong form efficiency. As Dr. Tabak has noted in other expert reports,[55] unless the market is weak-form efficient (i.e., one cannot predict future prices from past prices), by definition, it cannot be semi-strong form efficient. ████████████████████████████████ ████████████████[56] As I discuss below, Dr. Tabak's own tests fail to support his conclusion that the Teva Securities at Issue traded in a weak-form efficient market. Indeed, they establish the opposite. The null hypothesis was that the market was weak form efficient, and his results indicate a rejection of that hypothesis. Rather than conclude that the market was not weak form efficient, Dr. Tabak finds a way to equivocate. He instead concludes that these tests "do not provide strong evidence in any direction and thus do not meaningfully add to or detract from a finding of efficiency based on the other tests discussed above." As matter of basic economic logic (which Dr. Tabak agrees with), if he cannot conclude the market for Teva Securities is even weak-form efficient, then his entire opinion of semistrong-form efficiency simply has no basis.

38. Dr. Tabak's first test, "autocorrelation," as he describes it, tests ██████████████ ████████████████████████████████████████████████.[57] He notes that "[e]vidence of autocorrelation would be an indicator counter to market efficiency and would invite the question of how severe that violation of market efficiency would be."[58] I agree that "[e]vidence of autocorrelation would be an indicator counter to market efficiency."

39. Dr. Tabak runs separate autocorrelation tests for the ADS, Preferred Shares, and the six Notes.[59] His "null" hypothesis for this test (consistent with the finance literature) is that the

---

page 391 of Fama (1970) which is part of the section of the paper titled "Weak Form Tests of the Efficiency Markets Model."

55    See Tabak Expert Report in *In Re Netbank Securities Litigation*, ¶10 and ¶14 ("As noted by a recent working paper, "a market that is not weak-form efficient cannot be semi-strong-form efficient;" "Because a stock that is not weak-form efficient is not efficient in any sense, one could end the analysis of market efficiency here.")

56    Tabak Dep. 33:5-9
57    Tabak Report, ¶64.
58    Tabak Report, ¶64.
59    Tabak Report, Exhibits 10a-a, 10a-b, and 10a-c.

market is "efficient" (i.e., no autocorrelation) and a statistically significant result (rejecting the "null") he claims is "[e]vidence of autocorrelation" which "would be an indicator counter to market efficiency." His results show the following:

- ADS (Analysis period: February 6, 2014 to May 10, 2019)

    o For the entire Class Period he finds positive statistically significant autocorrelation at the 5% level.

    o For 2016 he finds negative statistically significant autocorrelation over the Class Period at the 10% level.

    o For 2017 he finds positive statistically significant autocorrelation over the Class Period at the 5% level.

- Preferred Shares (Analysis period: December 7, 2015 to December 14, 2018)

    o For 2016 he finds negative statistically significant autocorrelation at the 5% level.[60]

    o For 2017 he finds positive statistically significant autocorrelation at the 5% level.

    o For 2018 he finds negative statistically significant autocorrelation at the 5% level.

- Notes (Analysis period: July 22, 2016 to May 10, 2019):

    o For four of the six Notes, he finds statistically significant autocorrelation at the 5% level over the entire Analysis Period (negative for 2018 and 2046 Notes and positive for 2021 and 2023 Notes).

40. Overall, Dr. Tabak's weak-form tests establish that the market for these securities was not even weak form efficient during specified periods. As Dr. Tabak has admitted, where a market is not weak form efficient, it cannot be semi-strong form efficient. In short, his weak form test

---

[60]    The Preferred Shares traded from December 7, 2015 to December 14, 2018.

establishes inefficiency over the entire class period, and Dr. Tabak merely tries to explain away these inconvenient test results as "mixed" and inconclusive.   To the contrary, they are evidence of inefficiency.

41. For the Preferred Shares, Dr. Tabak agrees that while "there is no statistically significant autocorrelation" "over the portion of the Class Period in which the Preferred Shares traded," "there is in three of the four relevant years."[61] Thus, while Dr. Tabak tries to minimize this evidence, he cannot deny that his own evidence shows inefficiency.

42. For the Notes, again Dr. Tabak states that "[o]verall, there is minimal evidence of autocorrelation for two of the Notes (the 2019 and the 2026 Notes) across the two tests, mixed to weak evidence for two of the Notes (the 2021 and 2023 Notes), and moderate evidence for the remaining two Notes (the 2018 and 2046 Notes)."[62]  Finally, in summarizing the overall "weak-form" test findings, Dr. Tabak concludes that "[o]verall, the autocorrelation tests do not provide strong evidence in any direction and thus do not meaningfully add to or detract from a finding of efficiency based on the other tests discussed above."[63] As noted above, according to basic economic logic (which Dr. Tabak agrees with), if he cannot conclude the market for Teva Securities is even weak-form efficient, then his entire opinion of semistrong-form efficiency simply has no basis.

43. As a matter of basic economic logic, and as Dr. Tabak has stated in prior expert reports, semi-strong form market efficiency is only possible if the market for stock is at least weak-form efficient.[64]  Thus, it follows as a logical matter that an event study (such as the ones Dr. Tabak claims to have conducted in this matter) cannot reliably gauge the impact of the studied events on the stock's price if the stock is not at least weak-form efficient. It also follows as a practical matter.

---

[61]  Tabak Report, ¶69.
[62]  Tabak Report, ¶70.
[63]  Tabak Report, ¶70.
[64]  Tabak Expert Report in *In Re Netbank Securities Litigation*, ¶10 and ¶14.

23

There are numerous instances when well-known stocks did not trade efficiently for extended periods according to several academic studies, even though such stocks appear to satisfy *Cammer* factor 5, *i.e.*, their prices seemed to react quickly and significantly to news about unexpected corporate events.[65]

44. Dr. Tabak 

"[66]

But this makes no economic sense and seems to be his own made up definition of market efficiency. Either the market is efficient, or it is not. There is no "mild" form of inefficiency and Dr. Tabak does not cite any economic literature to support his baseless claims. And.

.[67]

45. When the market is weak-form *inefficient*, it has not even fully reflected historical stock price information. Consequently, its price change (current and future) is attributable in part to past price changes, not necessarily to the contemporaneous events analyzed in an event study. This means that the market's reaction to new material information cannot be either quick or correct, the predicates of semistrong-form efficiency. It cannot be quick, because today's price change may be dependent on what happened yesterday, what happened the day before, or the day before that, and so on.

---

[65] See Bajaj et al. (2014), pages 183-190.
[66] Tabak Dep., pages 34-35.
[67] Tabak Dep., 33: 5-9.
[68] Tabak Dep., pages 140-142.

### D. Dr. Tabak's purported "direct" tests ("Tabak Z-test" and "Tabak KS-test") cannot and do not support a finding of semistrong-form market efficiency by their very design.

46. Dr. Tabak purports to analyze the fifth *Cammer* factor for the Teva Securities at Issue through two analyses: (1) the "Tabak z-test," a series of statistical z-tests comparing the proportion of statistically significant "excess return" days[69] on different sets of purported "news" days and remaining "non-news" days; and (2) the "Tabak KS test," a very similar test that instead of comparing the two proportions, compares the distribution of excess returns on "news" days to "non-news" days.[70] As I explain below, both of these tests are fatally and fundamentally flawed and do not establish the market efficiency of the Securities at Issue.

#### 1. Description of the Tabak z-test

47. The z-test of two proportions is used when one wants to test whether two populations or groups differ significantly on some single, categorical characteristic.[71] Generally speaking, the z-test of two proportions is used when one wants to test whether two populations or groups differ significantly on some single, categorical characteristic. A simple example is a survey of 100 men and 100 women (randomly sampled), asking whether they like to watch baseball, and then comparing the proportions of men and women who said "yes," to test whether the proportions are different. The idea behind the Tabak z-test in this case is to compare two categories of trading days

---

[69]  "Excess" returns (also called "abnormal" or "residual" returns) in an event study context are the returns of the security being analyzed (in this case Teva ADS, Preferred, or one of the six Notes) net of the returns predicted using a statistical "market" model. The statistical "market model," based on a regression analysis, is typically designed to capture market- and industry-wide factors to reasonably isolate the firm-specific component of the stock's return.

[70]  Tabak Report, ¶¶37-51. I describe these Tabak KS tests in more detail below.

[71]  See, for example, Bhattacharyya and Johnson, Statistical Concepts and Methods, Wiley, 1977 ("Bhattacharyya and Johnson"), pp. 308-312.

during the Class Period, "news days" and "non-news days" (both as defined by Dr. Tabak[72]) for each of the Teva Securities at Issue, ostensibly, to test whether these securities experienced a greater incidence of "excess returns" on the news days, which he contends "shows clear evidence of efficiency" for the fifth "cause and effect" Cammer factor[73] and provide "strong" or "very strong" evidence that the ADS and Preferred Shares "responded to material information."[74] For the Notes he concludes that his z-tests (along with the KS-tests) "support the conclusion that the Notes respond to relevant news, but that the set of news events that are relevant for the Notes is more restrictive than the sets of news relevant for the ADS or the Preferred Shares" and that "[t]his supports a finding of market efficiency for the Notes."[75]  He does not claim that the evidence is "strong" or "very strong" as he does for the ADS and Preferred Shares.

48.   .

49. The Tabak z-test proceeds in three stages. First, he created the two populations being tested – *i.e.*, purported "news days" versus "non-news days."  Notably, unlike using a z-test to assess whether there is a statistically significant difference in the proportion of men compared to women who like to watch baseball games, which involves objectively observable criteria (male or female) – whether a particular trading day in the Class Period is a "news day" or a "non-news day" is subjective (despite Dr. Tabak's claims to the contrary[76]).  In other words, in a typical application of the z-test to determine if two proportions are statistically significantly different, the proportions for each group are exogenously identified.  They are objectively determined, not subjectively determined by the researcher performing the test.

50. For each of the Teva Securities at Issue, Dr. Tabak created four different sets of "news" and "non-news" days: (1) "news" days based on Teva quarterly earnings announcements which is

---

[72]   As I explain below, Dr. Tabak uses four different sets of purported "news" and "non-news" days.
[73]   Tabak Report, ¶71.
[74]   Tabak Report, ¶49-50.
[75]   Tabak Report, ¶51.
[76]   Tabak Report, ¶41, ¶47, ¶49.

his "standard procedure" ["Earnings Days"]; (2) "news" days defined as days with stories published by *Dow Jones Newswires* that "have references to "Teva Pharmaceuticals Industries Ltd" as a company ["Tabak DJNW Days"] (which he did not describe as part of his "standard procedure");[77] (3) "news" days, per his "protocol in recent cases," based on "sorting the [DJNW] news days by the number of stories about Teva on each day" and then looking at "the top half of this group (i.e., those days with more news stories than the bottom half)"[78] (which was effectively any "Tabak DJNW Day" with a story count greater than 2; ["Tabak DJNW Top 50%"] (4) "news" days, based on the "Top 10%" of the sorted Tabak DJNW Days by story count (which was effectively any "Tabak DJNW Day" with a story count greater than 7) ["Tabak DJNW Top 10%"].[79] Dr. Tabak also removed 19 DJNW articles that were "merely commenting on Teva's stock price or volume,"[80] which left him with 2,332 remaining DJNW articles during the Proposed Class Period.[81]

51. I note that in other cases Dr. Tabak has used different "news" identification methods. In some cases he only used two categories: "Earnings" dates and "news" days defined as days with stories published by some source (e.g., *Dow Jones Newswires* or *Associated Press*) that references the defendant company in the title or the first paragraph of the article while in other cases he uses the above four "news" definitions, plus an additional identification method where he did a search based on some source and then excluded articles "as they contained only news stories reporting stock price movements or volume, news stories that appeared to be duplicates of previously

---

[77] Tabak Report, ¶¶41-42.
[78] Tabak Report, ¶42
[79] These "news" and "non-news" day counts for each of the Teva Securities at Issue are summarized in the Tabak Report, Exhibits 8-a (ADS), 8a-b (Preferred Shares), and 8a-c (Notes).
[80] Tabak Report, footnote 26 and Exhibit 8d.
[81] See Tabak Electronic Workpapers.

reported news, and news stories deemed to be non-material because they reported data irrelevant to the value of the Company."[82]  He did not use that exclusionary rule here. ███████████████████████████████████████████████████████████████.[83]  As I note later, had he done so here there would be only six "non-news" days and 1,318 "non-news" days and he could not have performed his test.

52. Dr. Tabak claims that the categories of "news" he used in this matter were "objective"[84] and that "[o]ne generally wishes to use an objective measure of news, or at least one where any subjective decisions have been made by others who are not part of the analysis of market efficiency."[85] It is not clear as to how these "news" selection criteria are "objective" or consistent with his past writings or testimony. For example, while the FDT paper does not describe the method used to produce the "news" days in their numerical example of an FDT z-test,[86] I used Dr. Tabak's DJNW method for the company and time period used in the FDT example and found only 5 news dates, far fewer than the 204 reported.  While Dr. Tabak ███████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.

Also, a 2016 Tabak paper posted on his company website analyzed "Earnings Announcements" but only considered "Earnings Surprises" where the announced earnings were different from the expected analyst consensus. Dr. Tabak made no such adjustment in this case.  Finally, as noted above, in other cases Dr. Tabak added a "news" identification method where he looked at the articles he found using some source in Factiva and then excluded articles "as they contained only

---

[82]    See Tabak Expert Report in Forsta AP-fonden using *Associated Press* and Expert Report in Rayonier and Merck removing "news stories reporting stock price movements, news stories reporting previously announced events and institutional holdings, and news stories deemed to be non-material because they reported data irrelevant to the value of the Company."

[83]    See Tabak Dep. 318:7-318:18 and Tabak Expert Report ¶42.

[84]    Tabak Report, ¶41, ¶47, ¶49.

[85]    Tabak Report, ¶41.

[86]    ████████████████████████████████████████████████████████████
       [Tabak Dep. 184:13-185:11].

news stories reporting stock price movements or volume, news stories that appeared to be duplicates of previously reported news, and news stories deemed to be non-material because they reported data irrelevant to the value of the Company." He did not use this method here.

53. Next, in the second stage of his z-test, Dr. Tabak used a market model regression analyses to determine which of the trading days had statistically significant "excess" returns. "Excess returns" are effectively a security price fluctuation that exceeds what would be expected based solely on random day-to-day movements in the stock and the market, exclusive of company-specific news and to determine whether that excess return was unusually large (i.e., statistically significant).

54. In the third stage of the Tabak z-test he compares the proportion of the statistically significant excess return days for the "news" and "non-news" groups of days. For each of the eight Teva Securities at Issue, Dr. Tabak compared four sets of so-called "news" and "non-news" day proportions: (1) "news" days based on Earnings Days; (2) "news" days based on DJNW days; (3) "news" days based on DJNW Top 50% days; and (4) "news" days based on DJNW Top 10% days. Dr. Tabak then computes a "z-statistic" – a number that purports to measure the extent to which the proportion of statistically significant abnormal returns on "news" days exceeded the proportion on "non-news" days using a statistical benchmark. Dr. Tabak chooses a critical z-statistic level of 1.96, which is the threshold for statistical significance at the 95% level in a "two tailed" z-test.[87]

55. As I explain below, a z-test conducted in this manner simply has nothing to do with market efficiency for five very simple, but critically important reasons.

- First, Dr. Tabak's z-test does not test for market efficiency, but rather seeks to test that the market never reacts to any news. But, in an efficient market, there should be consistent security price reaction to all unexpected Material News. Dr. Tabak's test does not even try to determine whether the price of a stock

---

[87] See, e.g., Tabak Report, Exhibit 8a-a, footnote 4.

rapidly incorporates all publicly available information. ████████████
████████████ ."[88] In other words, he is trying to test whether there is no
difference between how often security price excess returns are statistically
significant on his chosen "news" days versus the remaining "non-news" days.
Thus, even putting aside the many other flaws with his tests that I discuss below,
Dr. Tabak's tests do not by design, and his own acknowledgement, test market
efficiency.  It is for this reason ████████████████████████████
████████████████████████████████.[89]

- Second, market efficiency is defined in terms of Material News causing a
  statistically significant price response consistent with the news.  Having defined
  market efficiency in terms of unexpected Material News, Dr. Tabak switches to
  analyzing something else, his purported "news."  An analysis of the relationship
  between "news" – regardless of whether it is new information or stale, and
  regardless of whether it is material or not – and return is simply not probative
  of market efficiency.

- Third, the Tabak z-test does not even test whether the market price increases
  significantly with positive news and declines significantly with negative news.
  All it examines is whether prices are more volatile on "news" days versus "non-
  news" days.   In the Tabak z-test whether price increases or declines
  significantly on positive or negative news days is totally irrelevant.  This is not
  a test of cause and effect as Dr. Tabak claims, but simply whether or not stock
  price volatility (i.e., a large swing in stock price independent of the direction of
  the change) is higher on news days.  Whether it is so or not says nothing about

---

[88]   Tabak Dep. 95:2-4
[89]   Tabak Dep. 134:22-135:8

market efficiency at all.

- Fourth, in an efficient market, Material News will (almost) always lead to a significant price reaction. The fact that a price change is significant more often on days that Dr. Tabak selects as "news" days (16.8% of the time in his DJNW z-test) than on those selected as "non-news" days (9.8%) does not say the market is efficient. If Dr. Tabak's test of proportions has any validity at all, and it does not, the fact that 16.8% is statistically significantly below 100% would imply that you would reject the null hypothesis that the market is efficient and thus conclude that the market is not efficient.

- Fifth, in an efficient market ███████████████████ causality runs from material, unexpected news to the price reaction, not the other way around. What Dr. Tabak observes is that larger stock return days are associated with greater likelihood of it being a day with one or more articles from his selected news source (DJNW). The underlying causality could, at least in part, be the reverse of what market efficiency dictates. For example, if Teva's ADS experiences a change in price by a large amount, say 20%, within a short interval at the start of trading on NYSE, is it not more likely that financial journalists would cover Teva on that day, compared to a day when the price change over that interval was negligible?  Thus, the association that Dr. Tabak claims is evidence of causality from news to price reaction is not necessarily so. It could, in significant part, be the reverse: returns prompting financial coverage. In

---

[90]  Tabak Dep. 194-195.

carefully constructed event studies, it is possible to disentangle causality from reverse causality, but that is not possible to do in Dr. Tabak's purported "direct" tests of "cause and effect."[91]. I will present evidence in the following sections showing that in his data, when there is larger price return over part of a day it leads to more financial coverage in the next part of the day. Obviously, a preceding return was not in any way caused by "news" that had not even been released. I will also establish with statistical simulations that given the extent of this reverse causality, his methods will falsely conclude market efficiency almost all the time.

56. Finally, even if Dr. Tabak's z-tests could in the abstract be considered an appropriate framework for examining market efficiency, which they are not, Dr. Tabak's design and implementation of the test is unreliable, as it is premised on numerous statistical errors and unsupported assumptions that depart from and contradict his prior writings and bias his test in favor of a finding of efficiency.

### 2. The Tabak z-test is not a methodology generally accepted by economists to establish market efficiency and the only support Dr. Tabak offers for it as a test for market efficiency is a single citation to his own co-authored 2004 law review paper.

57. The Tabak z-test is not a methodology generally accepted by economists to establish market efficiency. Dr. Tabak's sole support for the use of his z-test to establish market efficiency is his own co-authored FDT article.[92] Dr. Tabak's z-test is simply his own self-invented and made-

---

[91]   Tabak Report, ¶37-51.
[92]   Tabak Report, footnote 22. And even here, he deviates from this methodology in at least two key ways that bias his conclusions in favor of finding market efficiency (discussed in detail below).

for-litigation methodology that makes no economic sense.

58. Dr. Tabak's own writings in a 2010 unpublished paper posted on his company website note that "the FDT methodology may not be able to fully distinguish an efficient market from an inefficient one."[93] This paper also notes that there are "conceptual questions relating to whether a market can exhibit some form of inefficiency but still pass the FDT test" and that there are "clear examples" where that could be the case. One example is where the market is inefficient because only some, but not all, material news is absorbed into the price of a security.[94] As I will demonstrate below, even if we construct an inefficient market by design, one in which news days have no correlation with Dr. Tabak's returns, his z-tests will incorrectly conclude otherwise more than 89.9% to 98.9% of the time. I also show that his KS test has a false positive error rate of 79.1% to 90.6%.

### 3. By its very design, the Tabak z-test does not assess market efficiency.

59. The Tabak z-test is incapable of demonstrating a "cause and effect" relationship between material, new unexpected news and the Teva Security prices, and thus cannot establish market efficiency. *Basic v. Levinson*, echoing Fama's notion of informational market efficiency discussed above, states that in an efficient market "*the market price of shares traded on well developed markets reflects all publicly available information*."[95]  As noted above, markets that are

---

[93]    Tabak, David I., (2010). "Use and Misuse of Event Studies to Examine Market Efficiency," *NERA Economic Consulting,* ("Tabak (2010)"), page 7.

[94]    Tabak (2010), p. 7.

[95]    *485 U.S. 224, BASIC INC. ET AL. v. LEVINSON ET AL.  (1988), No. 86-279. Supreme Court of United States, 246 (emphasis added). Elsewhere, the Court notes in Basic that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations,*

33

semistrong-form efficient have security prices that "rapidly incorporate[] all publicly available information"[96] and respond to all "material, new, unexpected information"[97] which is the standard and definition Dr. Tabak has established for market efficiency in the Tabak Report. Thus, the definition of efficient markets, the logic of *Basic*, and Dr. Tabak's own definition require that price impact be observed in response to all public "material, new, unexpected information" [*i.e.*, Material News], all the time. Of course, as is the case with all statistical tests, even if we fail to observe such price impact all the time, it should be close enough so the observed proportion of the time when we find price impact is not statistically different for 100%.

60. In contrast, however, the Tabak z-test simply tests whether, proportionally, more abnormal returns are observed on what he calls "news" days than so-called "non-news" days. As FDT notes, "if seven percent of the days with news have statistically significant price movements and four percent of the days without news have statistically significant price movements, then the analyst would test whether the difference between the seven percent and the four percent is statistically significant."[98] Accordingly, even assuming Material News days were correctly identified, which they were not, the Tabak z-test could yield a conclusion of market efficiency according to Dr. Tabak even if it only showed abnormal returns *some of the time*. Even "seven percent" of the time according to his own article.

61. It is well established as a matter of economics that when price reactions occur only "some of the time" when there is material news, that is not enough to establish market efficiency.

---

*therefore, may be presumed for purposes of a Rule 10b-5 action. 485 U.S. 224, BASIC INC. ET AL. v. LEVINSON ET AL. (1988), No. 86-279. Supreme Court of United States, 247 (1988) (emphasis added).*

[96]  Tabak Report, ¶10. References to "market efficiency" hereafter mean "semistrong-form" unless stated otherwise. [underline added]

[97]  Tabak Report, ¶37.

[98]  FDT, page 120.

Indeed, as Judge Cedarbaum explained in the Freddie Mac class action litigation, in the context of FOTM, demonstrating a semistrong-form efficient market requires more than simply proving that "news probably had some effect on price" but rather "that the market price responds to most new, material news."[99,100]

62. In contrast, the Tabak z-test in this case is designed to ask only whether, on different sets of purported "news" dates chosen with purported "objective" criteria, the stock price moved by a statistically significant amount more than some percentage on "non-news" dates (ranging from 9.8% to 12.3% for the ADS, 17.5% to 20.9% for the Preferred Shares, and 1.1% to 5.95% for the Notes[101]). In other words, depending on sample size and Teva Security, the Tabak z-test implies that if the stock price were to move statistically significantly on less than 8% of "news" dates compared to moving significantly on only 5% of "non-news" dates, the market still should be deemed to be informationally efficient according to Dr. Tabak.[102]

63. To illustrate this fatal flaw in the z-test approach, suppose there were 50 days with "material, new, unexpected information" for publicly traded "Company A," over a class period of 500 days in total (i.e., 50 days with Material News). The logic of *Basic* and efficient markets

---

[99]    Opinion, In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation, United States District Court, Southern District of New York, No. 09 Civ. 832 (MGC), March 27, 2012, page 18.

[100]   Dr. Tabak's own z-test results illustrate the inadequacy of his evidence. For his DJNW day analysis of the ADS, to generate a "z-statistic" of greater than 1.96 and conclude the market was efficient, he would only need 90 out of 678 statistically significant days, or 13.3% compared to the "non-news" proportion of 9.8% (63/646). A conclusion that a stock reacts to news only 13.3% of the time is a far cry from concluding that the stock "always" reacts to "material, new, unexpected information," or even that it does so most of the time. It is therefore insufficient to conclude market efficiency. Appendix 3 shows the number of exact statistically significant news days needed to get a z-statistic of 1.96 for each of Dr. Tabak's four scenarios for each of the 8 Teva Securities at Issue.

[101]   Tabak Report, Exhibits 8a-a, 8a-b, and 8a-c.

[102]   For example, if we assume 600 news dates and 600 non-news dates and that 5%, or 30, of the non-news dates are statistically significant, then the Tabak z-test would only require 47 of the news days (or 7.8%) to be statistically significant, to conclude there was a statistically significant difference and therefore that the market was efficient according to his z-test. If we assume 22 news dates and 1,000 non-news dates and that 5%, or 50, of the non-news dates are statistically significant, then the Tabak z-test would only require 4 of the news days (or 18.2%) to be statistically significant, to conclude there was a statistically significant difference.

35

dictates that all or most of those 50 Material News days should result in statistically significant abnormal returns for Company A. But that is not what the Tabak z-test measures. Rather, the Tabak z-test measures whether the proportion of statistically significant abnormal returns on those 50 true Material News days was larger (to a degree of statistical significance, i.e., beyond the statistical threshold of random chance according to his z-test of two proportions) than the proportion of statistically significant abnormal returns on the 450 non-Material News days. The Tabak z-test is thus incapable of demonstrating that the Teva Securities at Issue reacted to all "material, new, unexpected information" (i.e., Material News), as it simply does not test that hypothesis.

64. To further illustrate the inapplicability of the Tabak z-test to establishing cause and effect and semistrong-form market efficiency, it is helpful to understand how the test plays out in light of the assumptions used regarding the extent to which random chance, as opposed to Material News, will cause the Teva Securities at Issue to experience excess returns. Dr. Tabak's z-test assumes that abnormal returns resulting from random chance (as opposed to material news) will occur about 5% of the time.[103] Continuing the illustration with the example of Company A discussed above, assume that on non-Material News days, abnormal returns were observed (as a matter of random chance) on only 5% of the non-Material News days, or about 22 out of the 450 non-Material News days in the example above [22/450 = 4.89%]. The Tabak z-test simply asks whether the proportion of abnormal returns among the 50 Material News days was significantly larger than 5% such that, when compared to the 5% random chance of non-Material News days, the difference is statistically significant. Applying the Tabak z-test in these circumstances would

---

[103] Due to "noise," i.e., random changes, in stock prices, when applying an event study market model some proportion of dates will show a statistically significant abnormal price movement in the absence of material news. In other words, if the test of statistical significance is calibrated at a 5% level of significance, it would mean that about 5% of days would be expected to show a statistically significant price change due to no specific cause, just random noise. Dr. Tabak's various market models find different proportions of statistically significant non-news days, typically greater than 5% for the ADS and Preferred Shares, and lower for the Notes. See Tabak Report, Exhibits 8a-a, 8a-b, and 8a-c.

require only 6 of the 50 news days, or 12%, to have statistically significant abnormal returns to conclude that this proportion was significantly greater than 5%, and hence conclude that the market was efficient. According to Dr. Tabak's definition of a semistrong efficient market that rapidly incorporates all publicly available information, when a stock price reacts to Material News only 12% of the time, it can hardly be considered to be trading in an efficient market as *Basic* contemplates.[104]

### 4. The Tabak Z-test ignores the directionality of price movement, in contradiction of the economic definition of market efficiency, which Dr. Tabak explicitly notes in his report.[105]

65. There is another fundamental reason that the Tabak z-test, as a general proposition and as applied by Dr. Tabak, is insufficient to demonstrate market efficiency. Dr. Tabak defines an efficient market as one where, "if the market learns of material new, unexpected positive (negative) information about an issuer, then the price of the issuer's common stock will rise (fall)."[106] Put another way, "we expect that the price of a stock will increase in response to unexpectedly positive news and fall in response to unexpectedly negative news."[107] For shorthand, I refer to this as "directionality." Yet, despite this fundamental element of market efficiency, the Tabak z-test does

---

[104] Dr. Tabak's z-test results are demonstrative. For his DJNW day analysis of the ADS, to generate a "z-statistic" of greater than 1.96 and conclude the market was efficient, he would only need 90 out of 678 statistically significant days, or 13.3% compared to the "non-news" proportion of 9.8% (63/646). A conclusion that a stock reacts to news only 13.3% of the time is a far cry from concluding that the stock "always" reacts to "material, new, unexpected information," or even that it does so most of the time. It is therefore insufficient to conclude market efficiency. Appendices 3a and 3b show the number of exact statistically significant news days needed to get a z-statistic of 1.96 for each of Dr. Tabak's four scenarios for each of the 8 Teva Securities at Issue.

[105] See Tabak Report ¶11 ("One of the implications of the Efficient Market Hypothesis is that the market begins to incorporate unexpected news quickly into security prices. Therefore, if the market learns of material new, unexpected positive (negative) information about an issuer, then the price of the issuer's common stock will rise (fall) if the market is efficient.") and ¶38 ("… I performed statistical analyses, based on tests known as "event studies," the standard means of quantifying stock price responses to news, to examine this [Fifth *Cammer*] factor. … In general, we expect that the price of a stock will increase in response to unexpectedly positive news and fall in response to unexpectedly negative news.").

[106] Tabak Report ¶11.

[107] Tabak Report ¶38.

not account for the directionality of the price movement.  To demonstrate this basic mathematical property of Dr. Tabak's z-test, I reversed the sign of all of Dr. Tabak's ADS excess returns for his z-tests and recomputed his z-statistics.  As shown in Appendix 4, his z-statistics are unchanged.

66. I agree with Dr. Tabak that directionality is a key element of market efficiency, and thus of the cause and effect demonstration that is the *sine qua non* of market efficiency. If a market is to be considered efficient in incorporating new value relevant information, price movements must correspond to the direction indicated by the nature of the information – i.e., all other things being equal, as Dr. Tabak states, negative Material News would result in a lower stock price, while positive Material News would result in a higher stock price.

67. Using the Tabak z-test, which does not account for directionality, to establish market efficiency is like testing a medicine for efficacy and ignoring whether it kills people or cures them, and testing instead only whether the proportion of total extreme outcomes in the group taking the medicine is different than the proportion of extreme outcomes in the placebo group, even if the difference was being driven by every patient dying, rather than recovering. In the Tabak z-test (in contrast to his definition of market efficiency), every single statistically significant "news" day could exhibit an excess return in the opposite direction indicated by the "news," and he would still conclude that the test "proved" market efficiency.  This is not a matter of the z-test not being a perfect test of market efficiency – it does not test market efficiency at all.

68. To further illustrate this issue, I briefly discuss examples of days that Dr. Tabak counted as statistically significant "news" days, where the price movement was in the opposite direction to the direction implied by the "news" he identified.  For example, on August 15, 2017, Dr. Tabak calculates a statistically significant positive excess return for Teva ADS (0.04385, t-statistic 3.51) and Preferred Shares (0.0258, t-statistic 2.4832), and reports three news articles released after trading hours on August 14, 2017.  Accordingly, Dr. Tabak counts August 15, 2017 as one of his statistically significant DJNW "news" and DJNW Top 50% "news" dates (because the article

count was greater than 2) for both ADS and Preferred Shares.[108] Dr. Tabak reports three "news" articles titled (1) "Perrigo: Still A Hard Pill To Swallow -- Barron's Blog," (2) "John Paulson Turns From Pharmaceutical Bets After Rough Run," and (3) "John Paulson Turns From Pharmaceutical Bets."[109] The first article, with a timestamp of 16:12 was a verbatim repeat of an earlier article posted before the close of trading (at 15:58) and was entirely about another company, Perrigo. The article only once mentioned Teva in passing, noting Teva's earnings results posted "earlier this month." Hence, this article does not contain any "material, new, unexpected information" for Teva's securities that could explain the positive, statistically significant movement for the ADS and the Preferred Shares that Dr. Tabak calculates. The second and the third articles timestamped 17:46 and 17:50 (which appear to be verbatim repeats of each other except for six words) state that "Paulson & Co. slashed stakes in Teva Pharmaceutical Industries Ltd" and other companies.[110] If anything, this is negative news for Teva, but both the ADS and Preferred shares exhibited statistically significant positive excess returns, i.e., in the *wrong* direction, according to Dr. Tabak's analysis.

69. Another example is May 3, 2018 where Dr. Tabak calculates statistically significant <u>negative</u> excess returns for Teva ADS and statistically significant <u>positive</u> excess returns for three of the five Teva Notes trading at that time.[111] For the ADS, Dr. Tabak calculates an excess return of -0.0369 (t-statistic 2.96) and for three of the Notes (2019, 2021, and 2023) he calculates excess returns of 0.0038, 0.0079, and 0.017 (t-statistics 4.45, 3.68, and 4.80).[112] On this day, Dr. Tabak

---

[108]  Tabak Electronic Work Files.
[109]  Tabak Electronic Work Files; Tabak Report, Exhibit 2.
[110]  Tabak Electronic Work Files; Tabak Report, Exhibit 2.
[111]  Teva 2019 Notes, Teva 2021 Notes and Teva 2023 Notes. The 2018 notes were no longer trading.
[112]  Tabak Electronic Work files.

reports six news articles.[113]  Five of these articles are time stamped from 07:26 to 11:46 and comment on Teva's Q1 2018 results which were announced earlier that day before market open at 07:00.[114]  The sixth article is time stamped 15:22 and reports the transcript of the Teva earnings conference call which occurred during the trading day.[115]  My review of Dr. Tabak's articles indicates that the overall earning results were seen to be a positive for Teva's Securities. For instance, an article in Dow Jones Institutional News titled "Teva Shares Surge 6.5% On Q1 Beats, Higher 2018 Guidance – MarketWatch" timestamped 11:46 states that "Teva Pharmaceutical Industries Ltd. (TEVA) shares rose 6.5% in premarket trade Thursday after the company reported first-quarter profit and revenue beats and raised its 2018 guidance … Teva Chief Executive Kåre Schultz said the company is on track to meet cost reduction targets in 2018 and 2019 … Teva also raised its 2018 revenue guidance from $18.3 billion to $18.8 billion to $18.5 billion to $19.0 billion and raised its 2018 adjusted EPS guidance from $2.25 to $2.50 to $2.40 to $2.65." Another article in Dow Jones Institutional News titled "Teva Pharmaceutical's 1Q May Have Been Its Best Quarter of Year: BTIG -- Market Talk" timestamped 09:04 states that "Teva Pharmaceutical's 1Q results benefited from Chief Executive Kare Schultz's restructuring plans and better-than-expected sales of multiple-sclerosis drug Copaxone."[116] The Tabak articles indicate positive news for Teva (and price increases at or near the open) but the ADS by the end of the trading day was statistically significantly negative, i.e., in the *wrong* direction given the news identified by Dr. Tabak.

---

[113]   See Tabak Report, Exhibit 2 and Electronic Work Files. This day is included in Dr. Tabak's DJNW Top 50% because of the number of news articles exceeds 2, but not the "Top 10%" as Dr. Tabak's cut-off value was 7. Dr. Tabak found a seventh news article but excluded it as it was a story "that Solely Reported Teva's ADS Price Movements or Volume." See Tabak Report, Exhibit 8d.

[114]   See Tabak Report, Exhibit 8e.

[115]   "Teva Pharmaceutical Industries Q1 2018 Results -- Earnings Call Transcript >TEVA," Dow Jones Institutional News, May 3, 2018 ET 15:22.

[116]   Tabak Electronic Work Files; Tabak Report, Exhibit 2.

70. On the same day, and given the same purported "news," Dr. Tabak also finds that three of the five Teva Notes had statistically significant negative excess returns, i.e., were in the opposite direction of the stock. Curiously, Dr. Tabak counts both the ADS and the 3 Notes (2019, 2021, and 2023 Notes) -- that move significantly in opposite directions on the same day ostensibly in response to the same "news"[117] --, as evidence of market efficiency for both ADS and the Notes.

71. Dr. Tabak's z-test and KS test for his earnings dates further illustrates the bias in his results because of his failure to consider directionality of the purported news. In an unpublished paper Dr. Tabak uses "consensus" estimates from I/B/E/S for classifying earnings announcements as "surprises" when the announced earnings are above or below the consensus.[118] Had Dr. Tabak used the consensus forecast in this matter as an estimate of investors' expectations, he would have determined that in 5 of the 17 instances in which he concludes that Teva's ADS price moved by a statistically significant amount in response to an earnings announcement, the actual earnings announcement by Teva would have been classified as good news but the change in Teva's ADS price was significantly negative.

72. Table 1 below lists, among other things, the 22 Tabak earnings dates, the earnings "surprise," and the Teva ADS excess returns. On 17 (out of 22) of these earnings dates Dr. Tabak finds that Teva's ADS return was statistically significantly different from zero. Based on the consensus forecast, the 5 dates on which the earnings "surprise" was positive and the ADS price response was significantly negative are highlighted in bold print. When those five days are removed from Dr. Tabak's sample, the instances in which Teva's ADS price moved significantly and in the correct direction based on the "surprise" drops from 17 out of 22 to 12 out of 22, just barely above half the time.

---

[117] According to Dr. Tabak's analysis, the Preferred Share excess return was negative (-0.0165) but statistically insignificant at the 5% level (two-tailed) with a t-statistic of -1.58.

[118] Tabak, David I., "What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Economic Consulting*, August 2016, https://www.nera.com/content/dam/nera/publications/2016/PUB_Testing_For_Price_Response_0816.pdf

**Table 1: Tabak ADS excess returns and earnings surprises**

| # | Date | Teva ADS Price | Teva ADS Raw Return | TEVA ADS Excess Return | | Estimate Mean EPS | Actual EPS | EPS Surprise |
|---|---|---|---|---|---|---|---|---|
| | | | Teva ADS Excess Return | | | I/B/E/S Earnings Surprise | | |
| 1. | 2/6/2014 | $44.69 | -1.55% | -1.48% | | 1.40 | 1.42 | 1.14% |
| 2. | 5/1/2014 | $50.97 | 4.23% | 4.10% | * | 1.22 | 1.22 | 0.37% |
| 3. | 7/31/2014 | $53.50 | -2.55% | -1.64% | | 1.22 | 1.23 | 0.60% |
| 4. | 10/30/2014 | $56.47 | 3.57% | 2.74% | * | 1.24 | 1.32 | 6.49% |
| 5. | 2/5/2015 | $57.54 | 1.88% | 0.45% | | 1.31 | 1.31 | 0.15% |
| 6. | 4/30/2015 | $60.42 | -2.71% | -1.34% | | 1.25 | 1.36 | 8.90% |
| 7. | 7/27/2015 | $72.00 | 15.20% | 15.46% | * | 1.31 | 1.43 | 8.86% |
| **8.** | **10/29/2015** | **$60.24** | **-3.44%** | **-3.21%** | * | **1.28** | **1.35** | **5.26%** |
| 9. | 2/11/2016 | $54.08 | -5.10% | -4.34% | * | 1.29 | 1.28 | -0.74% |
| 10. | 5/9/2016 | $52.81 | 4.93% | 3.84% | * | 1.17 | 1.2 | 2.89% |
| 11. | 8/4/2016 | $55.45 | 3.45% | 3.27% | * | 1.20 | 1.25 | 3.95% |
| **12.** | **11/15/2016** | **$37.60** | **-8.73%** | **-8.68%** | * | **1.28** | **1.31** | **2.40%** |
| 13. | 2/13/2017 | $34.00 | 5.47% | 5.33% | * | 1.35 | 1.38 | 2.52% |
| 14. | 5/11/2017 | $32.00 | 2.02% | 1.53% | | 1.03 | 1.06 | 2.81% |
| 15. | 8/3/2017 | $23.75 | -27.44% | -26.95% | * | 1.06 | 1.02 | -3.53% |
| 16. | 11/2/2017 | $11.23 | -22.19% | -21.75% | * | 1.04 | 1 | -3.96% |
| **17.** | **2/8/2018** | **$18.64** | **-11.20%** | **-9.87%** | * | **0.76** | **0.93** | **21.66%** |
| **18.** | **5/3/2018** | **$17.78** | **-4.51%** | **-3.69%** | * | **0.67** | **0.94** | **41.21%** |
| **19.** | **8/2/2018** | **$21.61** | **-9.95%** | **-10.22%** | * | **0.64** | **0.78** | **21.20%** |
| 20. | 11/1/2018 | $23.00 | 14.08% | 12.76% | * | 0.54 | 0.68 | 25.84% |
| 21. | 2/13/2019 | $17.63 | -8.11% | -8.10% | * | 0.54 | 0.53 | -2.63% |
| 22. | 5/3/2019 | $15.18 | 1.86% | 1.23% | | 0.58 | 0.6 | 3.42% |

**Notes and Sources**

[1] * denotes significance at 5% level

[2] Teva ADS excess return data is from Dr. Tabak's electronic workfiles.

[3] I/B/E/S earnings surprise data is from Thomson Eikon.

[4] Alleged disclosure dates: 8/4/2016; 11/15/2016; 8/3/2017; 11/2/2017; 2/8/2018. (See: Teva Second Amended Complaint filed 12/13/2019)

## 5. The Tabak KS tests suffer from the same fundamental flaws as the Tabak z-tests and thus are unreliable and cannot establish market efficiency.

73. As noted above, the Tabak "KS tests" compare the same groups of purported "news"

and "non-news" dates Dr. Tabak used for his z-tests, but instead of using a z-test to compare the proportions of significant days, they compare the "distribution of the excess returns" for the two groups using a statistical test called a "Kolmogorov-Smirnov test of the equality of two distributions" ("Tabak KS test").[119]  The Tabak KS test fails as a test of market efficiency for many of the same reasons as the Tabak z-test.  The Tabak KS tests are based on the same flawed groups of "news" and "non-news" days as his z-tests and thus suffer from the same fundamental problems discussed above and explored further later in this report.  Like the Tabak z-tests, the Tabak KS-tests also ignore the directionality element of market efficiency which Dr. Tabak has himself posited as a key part of the definition.[120]

74. The Tabak KS test, like the Tabak z-test, also appears not to test the "cause and effect" relationship required to establish market efficiency.  The Tabak KS test simply compares two distributions of excess returns on purported groups of "news" and "non-news" days and tests for their statistical difference. But, like the Tabak z-test, this test has nothing to do with "cause and effect" for market efficiency where all publicly available information is impounded quickly -- all of the time -- and prices always respond to Material News.  Like the Tabak z-test, just because the distribution of the "average absolute value of the excess returns" may be statistically different on purported "news" days when compared to purported "non-news" days, this does not and cannot establish "cause and effect" between "material new, unexpected" information (i.e., Material News days) and security prices in the correct direction.  Moreover, Dr. Tabak identifies no literature (let alone peer reviewed finance or economic literature) as support for this test as a test of market efficiency.[121]  This is perhaps not surprising as this test does not test market efficiency.

75. In addition, the KS test is subject to the criticism that it may not be able to "fully

---

[119]  Tabak Report, ¶48, ¶50, and ¶51; and Exhibits 8c-a, 8c-b, and 8c-c.
[120]  The Tabak KS test looks at the distribution of the "absolute value" of excess returns for the two groups and like the z-test does not tie the identified news in any way to the excess returns.
[121]  See Tabak Report, ¶48, ¶50, and ¶51; and Exhibits 8c-a, 8c-b, and 8c-c citing no literature as support.

distinguish an efficient market from an inefficient one" noted by Dr. Tabak himself in his writings published on his company website. In a section titled "Where this [FDT] method falls short", Tabak (2010) notes that:

> *There are several ways that versions of the FDT methodology may not be able to fully distinguish an efficient market from an inefficient one. ... Different forms of the FDT test[122] are more susceptible to different types of inefficiency. For example, suppose that a stock was generally unresponsive to news but did respond to the most extreme news events, such as news that the company was nearly worthless. In that case, the stock movement on most of the news days would be indistinguishable from the stock movement on non-news days, which would mean that the stock was inefficient, because it did not incorporate all news.[123]*

As I show below, the Tabak KS test appears to suffer from just this flaw as his results reverse for several of his "test" scenarios when I remove the alleged disclosure dates from Dr. Tabak's analysis (which the FDT paper claims is necessary to avoid "bias"[124] because Plaintiffs would choose these dates because of high returns).

### E. The Tabak z-Tests and KS Tests are also unreliable because they are biased, lack robustness, and are premised on assumptions contrary to his own writings, including in his report in this matter.

#### 1. Flawed identification of "news" days

76. Another fundamental flaw in Dr. Tabak's z-tests and KS-tests is that Dr. Tabak's

---

[122]  Dr. Tabak notes earlier in this paper that he considers his KS test to be a variant of the FDT test, noting that "the FDT methodology can be altered to compare the average absolute value of the market-adjusted returns for the news days and the non-news days, and not just the percent of days that have statistically significant returns." [Tabak (2010), page 7].

[123]  Tabak (2010), pages 7-8.

[124]  Dr. Tabak has warned against such a "selection bias" as well in other expert reports. See Tabak Expert Report in KB Partners, ¶68 ("A proper sample must be chosen in a way that is not designed to include days that either favor or disfavor a particular result.")

identification of "news" and "non-news" days for his z-Test and KS tests does not make economic sense and does not follow his own definition of "news" for an Event Study which he notes should examine the price impact of "material, new, unexpected information."[125]  As noted above, for three of his four groups of "news" and "non-news" days Dr. Tabak creates purported "news" days based on a search for articles referencing Teva in the "Factiva" database, which covers over 15,000 sources,[126] from which he selected only articles published by *Dow Jones Newswires*.  He simply assumes all articles meeting this criteria are "news" and creates the "news" groups with no regard for "stale"[127] or potentially immaterial news, despite his claim that he is using an event study to examine the cause and effect price impact of Material News or "material, new, unexpected information" as he defines it.[128]  Indeed, in prior reports, he used as a news selection criterion the fact that the name of the Company appeared in the title of the article or the first paragraph.  Here, he did not even do that, allowing any reference to the Company, no matter how immaterial, to qualify an article for "news" status.  Whether this rule was by accident or design, it cannot possibly be considered a rule that accurately identifies "material, new, unexpected information."  That is a serious defect, because he claims that his "direct" z-tests and KS-tests examine "whether a market violates the conditions of market efficiency (e.g., whether the price of a security actually responds to material new unexpected information)."[129]  But in examining clearly stale and immaterial

---

[125]  Tabak Report, ¶37.

[126]  Factiva.com ("Factiva.com provides access to a global news archive, a collection of over 15,000 sources in 28 languages from 199 countries.")

[127]  Dr. Tabak, acknowledges that stale news cannot be expected to affect security prices in an efficient market and notes, "[i]deally, one wants to define news as material, new, unexpected information" and that "[o]ther news may be consistent with prior expectations and should not be expected to cause a change in a stock's price." [Tabak Report, Footnote 21]

[128]  Tabak Report, ¶37. I note that in at least one other matter he did remove "stale" articles and other articles he considered "non-material." (see, e.g., Tabak Expert Report in Rayonier, noting an information identification method for a Tabak z-test where he did an article search based on some source criteria and then excluded articles "as they contained only news stories reporting stock price movements, news stories reporting previously announced events and institutional holdings, and news stories deemed to be non-material because they reported data irrelevant to the value of the Company.")

[129]  Tabak Report, ¶12.

"news," and "news" implying the wrong direction compared to the observed price movement, Dr. Tabak simply did not examine the Material News he claimed was the basis of his "direct" tests. He did not identify the "events" in his so-called "event study."

77. Hence, the data inputs forming the basis of his z-tests and KS tests are flawed. Indeed, if I expand Dr. Tabak's "news" search to <u>all</u> sources in Factiva (not just DJNW) mentioning "Teva," then I find 19,156 articles covering every trading day of the 1,324-day Class Period except 6. This renders Dr. Tabak's z-test meaningless. Table 2 below summarizes the results of this search compared to Dr. Tabak's DJNW search.

**Table 2: Dr. Tabak's DJNW search results for Teva articles compared to a search using all Factiva sources[130]**

| Description | Number of Articles | Number of "News" Days | Number of "Non-News" Days | Total Days in Class Period |
|---|---|---|---|---|
| Tabak DJNW Tests | 2,332 | 678 | 646 | 1,324 |
| All Sources (Unrestricted Search on Factiva) | 19,156 | 1,318 | 6 | 1,324 |

78. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███"[131] Overall, Dr. Tabak has made no rigorous attempt to identify Material News ("material, new, unexpected information") which he himself stated should be the basis for a cause and effect test of market efficiency.

79. Dr. Tabak's failure to identify the Material News that he claimed should be the basis

---

[130] Factiva.
[131] Tabak Dep. 192 ████████████████████████████████████████████
████████████████████████████ [Tabak Dep. 185].

of his "direct" tests produces numerous instances in his analyses that do not make economic sense. For example, on October 22, 2015 Dr. Tabak reports "news" from a "Dow Jones Top Energy Stories" article titled "Valeant: What Bottom Fishers Might Reel In," the article only mentions "Teva's forward free-cash-flow multiple" in order to estimate the value of Valeant's stock.[132] The article is about Valeant and does not contain any "material, new, unexpected information" for Teva's securities, even according to Dr. Tabak's own definition of "news." Dr. Tabak calculates a statistically significant negative excess return for Teva ADS on that day, and it is included among the data that supposedly supports his opinion that Teva's ADS traded in an efficient market. But there was no "material, new, unexpected information" about Teva on that day, and it should not be considered as a statistically significant "news" day for Dr. Tabak's z-test analyses or for his KS tests.[133]

80. There are other examples of how Dr. Tabak's flawed selection criteria infect his results. On December 1, 2015 Dr. Tabak calculates a statistically significant positive excess return for Teva ADS, and reports "news" from a GlobeNewswire article titled "MediWound Appoints Aharon Yaari to Its Board of Directors." This article mentions only that Mr. Yaari had served in various positions at Teva until 2012.[134] The article is about MediWound and does not contain any "material, new, unexpected information" for Teva's securities. Hence, this day also should not be considered as a statistically significant "news" day for Dr. Tabak's z-test analyses or for his KS tests.

81. On November 7, 2016, Dr. Tabak calculates a statistically significant negative excess return for two of the six Notes at Issue, but insignificant excess returns for the ADS and the Preferred Shares. He reports three "news" articles and thus counts this as a statistically significant "news" day for his DJNW and DJNW Top 50% tests for the Notes. One of the articles reports

---

[132]   Tabak Electronic Work Files; Tabak Report, Exhibit 2.
[133]   Tabak Electronic Work Files; Tabak Report, Exhibit 2.
[134]   Tabak Electronic Work Files; Tabak Report, Exhibit 2.

stale information about a class action law suit, and the other two represent positive news about Teva highlighting a "Growing Respiratory Portfolio" at a scientific meeting and an announcement of approval of generic Tribenzor in the US.  In an efficient market, this so-called "news" cannot have caused the statistically significant negative price movement for the Notes and thus this day should not be considered as a Material News event day for Dr. Tabak's z-test analyses or for his KS tests.

82. Consider also November 10, 2017, where Dr. Tabak reports a statistically significant negative excess return for four of the six Teva Notes[135] and reports a single news article from GlobeNewswire, titled "Kamada Announces Nomination of Three New Members to its Board of Directors," an article about another company, Kamada Ltd. The article only mentions Teva when noting that one of the nominated directors for this company had "held multiple management-level positions at Teva Pharmaceuticals over a 12 year-period."[136] This article does not contain any "material, new, unexpected information" for Teva's securities, and thus this day should not be considered as a Material News event day for Dr. Tabak's z-tests and KS tests.

83. These selected examples demonstrate that Dr. Tabak simply did not examine the impact of Material News that he claimed was the basis of his "direct" cause and effect tests and he claimed should be the "events" for his purported z-test "event study" of market efficiency.

84. 

---

[135]   Teva 2018 Notes, Teva 2021 Notes, Teva 2023 Notes, and Teva 2026 Notes.
[136]   Tabak Electronic Work Files; Tabak Report, Exhibit 2.



### 2. Dr. Tabak's purported tests of cause and effect are plagued by reverse causality: his data reflects stock returns generating press coverage rather than news causing excess returns

85. A carefully constructed event study can determine whether Material News (i.e., an event) causes a security's price to move significantly in response to the event. To conduct an event study, an economist first identifies an event (new information that is material and unexpected). After an event is observed and there is a statistically significant price reaction in the *following* period, cause and effect may be established for that event. However, it would not be sensible if the cause and effect were reversed. For example, if an event were observed at 3:00 pm EST, 60 minutes from the close of trading on the NYSE,[140] it would not be sensible to claim that the event caused a stock price change that occurred almost entirely *prior to* the event, from the close of

---

[137]  Tabak Dep. 198-199.
[138]  Tabak Dep. 221-223.
[139]  The same logic would apply to his KS test.
[140]  The NYSE trades between 9:30 am and 4:00 pm Eastern Standard Time ("EST"). All times noted in this report are EST, unless noted otherwise.

trading on the previous day to the close of trading that day.  Dr. Tabak, in his previous writing agreed with this basic approach.[141]

86. In any scientific study, one must start with a refutable hypothesis.  In a study that purports to examine whether market is efficient, the hypothesis is that material unexpected news should be promptly reflected in market prices. In an efficient market, there is no expected connection between an event that is stale, or otherwise immaterial, and the expected price change it should produce.  It is also obvious that if the observed price reaction is positive for negative material information, or vice versa, that would be evidence against the efficient market hypothesis, not in favor of it.

87. In his "direct" z-test tests for cause and effect, Dr. Tabak compares relative proportions of DJNW purported "news" days where there is a significant security price reaction (excess return) versus the proportion on his "non-news days" (and two additional variants of this experiment using subsets of the DJNW purported "news" days).  First, he examines how often, among all the days that there is at least one article on Teva in the financial press sources he selected (his "news days"), the excess market price change was statistically significantly positive or negative. For Teva's ADS, he finds that out of 1,324 trading days in the class period, there were 678 days on which there was DJNW "news" and on 114 of those days there was a statistically significant excess return, while out of 646 "non-news" days, a statistically significant return was observed on 63 days.[142]  Thus while 16.8% of his DJNW "news" days (114/678 = 16.8%) experienced a significant return, 9.8% (63/646 = 9.8%) of his "non-news" days experienced a significant return. He concludes that since a ratio of 16.8% is statistically larger than 9.8%, his test establishes cause and effect and thus

---

[141]  See Tabak (2010), page 4: "the relevant academic literature is clear: first one identifies news and then measures price movements associated with that news. The reasoning for this is rooted in the basics of scientific methodology: first a hypothesis is proposed and then a test is made to see if that hypothesis can be rejected. The statistics of an event study apply only if the statistical test is made after the hypothesis is created, so that there is a chance that the price movement is statistically significant and a chance that it is not." [footnotes omitted]

[142]  Tabak Report, Exhibit 8a-a.

market for Teva ADS was efficient during the class period.

88. In identifying his DJNW purported "news," days, Dr. Tabak does not identify which days represented unexpected Material News and he does not even identify whether such news was positive or negative in his opinion. As noted in Dr. Tabak's prior writings, the academic literature clearly states that "[t]he first step in the conduct of an event study is to identify the event of interest."[143] Yet, in his "direct" tests, Dr. Tabak does not even identify a single "event" during a more than five-year Class Period with over 1,300 trading days. He refuses to identify "events," claiming that to do so would require him to use his "subjective" judgment,[144] ███████████████ ██████████"[145] and will burden the Court to evaluate the credibility of his expert judgment.[146]

89. Instead of conducting a carefully constructed event study, Dr. Tabak simply lines up press articles over a 24-hour period (and longer, when there is a trading holiday) beginning just after the 4:00 pm NYSE market close on the previous trading day to the close on the trading day being studied. He then simply **assumes** that the news articles he considers must have caused the stock return over the same period. This assumption is illogical, as it results in concluding that

---

[143]  See Tabak (2010) footnote 12 citing Robert G. Bowman, "Understanding and Conducting Event Studies," Journal of Business Finance & Accounting, 1983. See also Tabak (2010), page 4.

[144]  Tabak Report, ¶41 and footnote 24.

[145]  Tabak Dep., page 193: ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[146]  See Tabak Report, footnote 24 quoting *In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 618 (C.D. Cal. 2009): "It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility."

news published at the end of the trading day caused the stock price movement that occurred earlier that day.  If news is published at a certain time, e.g., 1:00 pm EST, it could not have caused stock return between the market close on the previous day and 1:00 pm.  Nonetheless, Dr. Tabak still attributes such returns for that day to such news. As I show below, it turns out that Dr. Tabak's lack of attention to the time stamp of articles and the time period over which he measures return on a security that he attributes to that news is quite consequential.

90. This reversal of cause and effect is what is known as an "endogeneity" problem in econometrics where the proposed explanatory variable (the Tabak "news" count in this case) is potentially caused by the variable to be explained (price reaction in this case). This is the equivalent of first looking at the price reaction and then determining what is and is not a "news" day, a backwards approach that Dr. Tabak himself has criticized in his own writings.[147]

91. It is helpful to look at an example in Dr. Tabak's data, the inputs for his purported "cause and effect" tests.  On February 1, 2017, one of Dr. Tabak's statistically significant ADS DJNW "news" days, the first "news" article that Dr. Tabak identifies was time stamped 1:45 pm and titled "Teva Pharmaceutical: Not Going Down Without a Fight – Barron's Blog."[148] As Figure 1 below shows, 86% of the day's total 3.77% return,[149] on which Dr. Tabak's statistically significant excess return is based, occurred before 1:45 pm when his first identified news article

---

[147]  See Tabak (2010), page 4: "the relevant academic literature is clear: first one identifies news and then measures price movements associated with that news. The reasoning for this is rooted in the basics of scientific methodology: first a hypothesis is proposed and then a test is made to see if that hypothesis can be rejected. The statistics of an event study apply only if the statistical test is made after the hypothesis is created, so that there is a chance that the price movement is statistically significant and a chance that it is not."

[148]  Tabak Electronic Work Files, Tabak Report, Exhibit 2. Dr. Tabak identifies one other "news" article time stamped 3:01 PM titled "Press Release: Teva to Report Fourth Quarter 2016 Financial Results on February 13, 2017" which reported that Teva would "release its fourth quarter 2016 financial results on Monday, February 13, 2017 at 7:00 a m. ET."

[149]  The price at the close of the prior day was $33.43 and had increased to $34.52 by the time the news on February 1, 2017 had come out (1:45 pm), resulting in a pre-news return of 3.25% [34.52/33.43 -1]. The total return (close to close) for the day was 3.77%.  Hence, the return before the news article was published accounts for 86.2% of the day's total return [3.25/3.77]. Note: minute by minute intraday prices were obtained from Refinitiv Eikon.

was published.  This day's excess return (the "effect" Dr. Tabak purports to measure to test market

efficiency), therefore, could not have been "caused" by this "news."

**Figure 1: Example of Reverse Causality for Tabak Statistically Significant ADS "News" Day**



Sources: TickData, Tabak Electronic Work Files.

92. Again, it is apparent from the 1:45 PM DJNW article that it follows the price movement

on that day while commenting on the price movement that has already occurred, and thus appears

to exist only <u>because</u> the price moved.  The article reported commentary in Barron's blog and

noted that "[s]hares of Teva Pharmaceutical Industries (TEVA), which tumbled 3.2% yesterday

after losing a patent case, are bouncing back in a big way today."  The article commented on Teva's

intention "to appeal the district court decision" from the day before where Teva lost a patent case

regarding its Copaxone drug which was seen to bring "generic competition another step closer for

53

Teva's largest product." But this intention to appeal was announced after market close two days earlier, and thus the reported information was stale.[150] The article noted that analyst Kevin Kedra saw a launch of generic drugs competing with Copaxone as "unlikely prior to an appeals court decision given the threat of treble damages if the ruling is reversed on appeal" and concluded stating that "Shares of Teva Pharmaceutical Industries have gained 3.1% to $34.45 at 1:40 p.m. today" (i.e., the price as of five minutes before the time stamp of the article). In sum, this date is not properly evidence of any market efficiency. Moreover, these articles should be excluded according to the methodology described in Dr. Tabak's own FDT paper which states that in performing the "news search" one must "be careful" to remove any stories "that exist because they report on a price movement."[151]

93. To examine this issue, I took the 2,332 DJNW "news" articles over the 1,324 trading days of the Class Period that Dr. Tabak provided and that underlie his "direct" analyses, and divided the stories for each trading period[152] into two sub-period "buckets," based on the publication time stamp in Dr. Tabak's underlying data. All stories that were published between close of trading on NYSE (at 4:00 pm) and the next trading day's NYSE opening (at 9:30 am) (i.e., "pre-open") were placed in the first sub-period bucket ("pre-open stories"), and the remaining stories, published during the time NYSE was trading ("open to close") were placed in the second sub-period bucket.

94. Surely, stories that are published between 9:30 am EST and 4:00 pm EST ("open to close") on a trading day could not cause the return on ADS during the preceding period, from close of trading the previous day to 9:30 am ("close to open"). Similarly, stories that were published

---

[150] See Tabak Electronic work files and articles dated January 30 and 31, 2017.

[151] FDT, page 120.

[152] These trading periods correspond to the "close to close" excess returns that Dr. Tabak uses as the basis for his z-test and KS tests. Each trading day in Dr. Tabak's analysis over which he calculates the "excess" returns, corresponds to the close of trading on one day to the close of trading on the next trading day (i.e., "close to close").

from 4:00 pm EST to 9:30 am EST on the next trading day could not have caused the return observed between preceding 9:30 am EST and 4:00 pm EST time period.  If the return during a preceding subperiod is correlated with number of stories in the subsequent sub-period, then the only logical conclusion is that when financial journalists see a large return on stock, they are more likely to publish an article mentioning the stock.

95. After placing each article into one of the two sub-period buckets on each trading day, I also divided Dr. Tabak's close to close ADS returns into two parts using the same sub-periods. The total return during both subperiods put together is exactly the return Dr. Tabak reports.[153]  I created five categories for each sub-period by ranking the absolute value of the ADS excess returns.  The highest excess return category of pre-open returns contains the largest 20% of the absolute value of excess returns and the lowest category contains the smallest 20% of absolute excess returns over this trading day sub-period.

96. Figure 2 below shows the relationship between the preceding sub-period return and the number of news stories in the subsequent sub-period. The pattern is clear. The larger the absolute value of the excess return during one period, the larger the average number of stories in the subsequent subperiod there are.

---

[153]     Since Dr. Tabak's z and KS tests are based on excess returns, I compute excess returns for each half day period using Dr. Tabak's market model and return of S&P Pharmaceuticals Select Industry Index over each of the two sub-periods.

**Figure 2: Association between absolute value of ADS excess returns and Tabak DJNW article counts in the subsequent sub-period[154]**



Five Quantiles Based on Mean Absolute Return (4pm NYSE close to 9:30 am NYSE open and 9:30am to 4pm)

97. When I perform the Tabak z-test and KS test in which returns over a preceding period are matched against stories in the subsequent period, I find that both tests produce statistically significant results. Appendix 5 provides these results. Since stories could not possibly "cause" preceding returns, my evidence shows that Dr. Tabak would illogically conclude market efficiency

---

154    Sources: All Teva ADS data obtained from Refinitiv Eikon. DJNW article data obtained from Tabak Electronic Work Files.

even when there is no cause and effect.  These results are entirely driven by the reverse causation present in Dr. Tabak's data.  Thus, he cannot disentangle causation from reverse causation in his z-test and KS-test. His results are simply spurious in which he interprets correlation as causation, including reverse causation.[155]

98. Dr. Tabak's selection criteria suffer from yet other flaws.  Dr. Tabak conducts his purported cause and effect tests based on his data dump of DJNW articles in three ways. In addition to categorizing news days and non-news days based on whether or not there was one of more DJNW article published on that day, Dr. Tabak also defines "Top 50%" and "Top 10%" days based on the DJNW news story count.  As indicated in Dr. Tabak's electronic work files, the "Top 50%" category are days with more than 2 DJNW stories and the "Top 10%" category are days with more than 7 DJNW stories.  As noted above, the reason Dr. Tabak offers for this approach is that the number of news articles on a day is a more "objective" substitute for him having read the news articles and making a judgment as to whether the article represented unexpected and material information. As I demonstrate, it appears this purported "objective" measure is not a sound substitute for an economist's reasoned judgment.

99. Notably, this news selection method is not described in the FDT paper. Dr. Tabak claims he has used this "protocol in recent cases," as if his own use of this methodology in recent cases is sufficient instead of any scientifically established methodology.[156] He claims that "[t]he theory here is that the more material a news item is, the more likely it is to either be repeated or updated during the same trading day."[157] But this "theory" has no basis in economics and assumes

---

[155] While examining the pattern of publication time in Dr. Tabak's DJNW data, I noticed that there tended to be a relatively larger number of articles between 7:00 am and the NYSE open at 9:30 am.  In Appendix 6, I demonstrate, using the Teva stock price on the Tel Aviv Stock Exchange ("TASE") at 7:00 am that the average number of articles during this period prior to NYSE is larger on days with larger average absolute returns over the period from the 4:00 pm NYSE close the prior trading day to 7:00 am. Thus, even articles published prior to NYSE open exhibit strong reverse causality.

[156] Tabak Report, ¶42.

[157] Tabak Report, ¶42.

a causality that his own data suggests could just as likely run in the other direction. More specifically, Dr. Tabak assumes, citing no supporting logic or literature, that the more "material" a story is the more likely it may be repeated and in turn will be more likely to cause a price reaction. But, as I demonstrate below, this premise is simply false.

100. This is exactly the kind of analysis Dr. Tabak says the "relevant academic literature" warns one should not do.[158] He correctly wrote in an earlier article that "[o]ne should identify news and then measure price movements."[159] But, if the causal direction is backwards and price movements are causing the appearance or frequency of the so-called "news" he uses as the basis for his "direct" tests, then he is violating the "basics of scientific methodology" that he himself has previously espoused.

101. I also note that Dr. Tabak, in an expert report in another matter, criticized the opposing expert for associating the news article "count" with market efficiency. Dr. Tabak claimed that the opposing expert should not "merely count the number of "news" stories, including company press releases, as if those were useful information for the purposes of assessing market efficiency" and that "[p]ut simply, the existence of news coverage, including company issued press releases, provides no information on whether a stock price actually responded to that news." He further noted that "[i]n fact, according to the academic literature, the raw amount of coverage may be associated with less efficient markets."[160] He also noted that "the count of "over 800 news articles" mentioned" in the opposing expert's report "is potentially misleading in that it appears to count repetitions of the same news story as separate entries in its counts."[161] As noted above, Dr. Tabak

---

[158] Tabak (2010), page 4.
[159] Tabak (2010), page 4.
[160] Tabak Expert Report, KB Partners, ¶29. [footnotes omitted]
[161] Tabak Expert Report, KB Partners, footnote 23.

did not exclude repetitions in his counts of so-called "news" articles for the Tabak z-test and KS tests.

102. Dr. Tabak also claims that because his z-test results "become stronger" as he moves from DJNW to DJNW Top 50 to DJNW Top 10, that this "supports the view that more material news stories generated larger price movements on average."[162]  But again, Dr. Tabak appears to have erroneously assumed a causal direction when this direction could just as likely be the opposite. As I demonstrate, Dr. Tabak's results may "become stronger" not because the news count increased as stories were "more material," but rather the news count increased because the price movement was larger.

103. To ascertain the error rate of false positives this bias from reverse causality may produce, I utilize simulation analysis, which is a standard technique used in financial economics.[163] The details of my simulation analysis are described in detail in Appendix 7.

104. First, I take Dr. Tabak's data on return and excess return on each of 1,324 trading days during the class period. Then using a methodology called bootstrapping, I randomly generate 1,000 samples of those returns and excess returns in a way that the statistical distribution of returns, excess returns and statistical significance in each sample is the same as Dr. Tabak's sample. Next, for each such sample of 1,324 return and excess return days, I randomly pick the same proportion of days to be "news days" as in Dr. Tabak's sample with one crucial difference. The distribution of news days was statistically unrelated (i.e., uncorrelated in statistical jargon) to the distribution of returns and excess returns. Given that the samples were constructed so there is no statistical relationship between returns on a day and whether or not it was a news day, the proportion of statistically significant days on news and non-news days is expected to be the same and the z-test for difference in proportions is expected to show insignificant difference between these two

---

[162] Tabak Report, ¶47.
[163] Brown, Stephen and Jerold B. Warner (1985), "Using Daily Stock Returns: The Case of Event Studies," Journal of Financial Economics 14, pages 3-31.

proportions most of the time. (The same holds for the Tabak KS test.)  As Figure 3 below shows, the values of 1,000 z-tests, based on each of 1,000 samples, are on average equal to zero.  Only about 5% of the times will z-test show statistical significance at the 5% level, just as one would expect to happen due to chance alone based on how the samples in the simulation exercise were constructed.

**Figure 3: Simulation of inefficient market by design[164]**



105. Next, on each day that was randomly picked as a "news" day in each of the 1,000 simulated samples of 1,324 returns, I randomly assign a certain number of stories. In this second step, I assign a larger number of stories on average on those days which had a larger return. Thus,

---

[164] Sources and Notes: See Appendix 7 and 8a for details.

in my sample, which simulates an inefficient market by design according to Dr. Tabak's own test (i.e., there is no higher likelihood of a news day being statistically significant than a non-news day), I introduce a statistical correlation between the number of stories and magnitude of the observed return and I do so in a way that mimics this correlation in Dr. Tabak's original data based on his DJNW article selection. In other words, my sample simply reflects a world in which when there is a large return, not just one, but multiple articles are written about the company on that day, purely reflecting reverse causation.

106. The next two Figures 4 and 5 below show that the Tabak z-test corresponding to his Top 50% category will find that z-statistic is significant at 5% level of statistical significance 89.9% of the time. In other words, the false positive error rate of his Top 50% test is 89.9% when I introduce reverse causality based on Dr. Tabak's own data. For Dr. Tabak's Top 10% test, the rate of false positives is 98.9%. In other words, even if the market was simply (and "completely") inefficient by design according to his own z-test, the reverse causality problem alone could lead one to falsely conclude the market is efficient 89.9% of the time for Dr. Tabak's Top 50% z-test and 98.9% of the time for his Top 10% z-test. Similarly, when I perform Dr. Tabak's KS test on this simulated data, I find that KS test will falsely identify market efficiency, as Dr. Tabak interprets this test 79.1% of the times for his Top 50% sample and 90.6% of the times for his Top 10% sample.[165]

---

[165]   See Appendices 7 and 8b for details.

**Figure 4: Simulation of DJNW "Top 50%" Tabak z-test results with reverse causation[166]**



**Figure 5: Simulation of DJNW "Top 10%" Tabak z-test results with reverse causation** [167]



107. Dr. Tabak appears to take comfort in claiming that his z-test results get "stronger" as he moves from his DJNW z-test to his Top 50% version and even "stronger" in his top 10% version. The Plaintiffs' Class Certification motion claims that, as Dr. Tabak explains, the DJNW Top 10 % scenario is the "key result" because these are "days with the most extensive news coverage of Teva."[168]  This is claimed to be a "key" result because the news coverage is "more

---

[167] Sources and Notes: See Appendices 7 and 8a for details.
[168] Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, June 19, 2020, p 33.

extensive" based on Dr. Tabak's news article count methodology. But the above analyses of Dr. Tabak's news articles and simulations show that this claim that coverage is "more extensive" has no basis due to the presence and effect of reverse causality. In fact, the source of bias in Dr. Tabak's test gets stronger in each version of his test.[169]

108. The inescapable conclusion of the various analyses I have presented above is that Dr. Tabak's claim that he has established cause and effect is inextricably affected by his lack of attention to what his data reflect and the reverse causality bias that arises from his flawed methodology. He has simply provided no economic evidence to support his conclusion that Teva Securities at Issue traded in a semistrong-form efficient market.

### 3. Deviation from FDT 1: failure to exclude alleged disclosure days

109. The Tabak z-tests are also flawed and biased because they deviate from Dr. Tabak's only cited source for his test, his own FDT paper, in ways that bias the results toward a finding of efficiency. FDT states that the "sample of days in a class period" for the FDT z-test should be "exclusive of those days alleged to be corrective disclosure(s)" because this could bias the results.[170] Dr. Tabak has also discussed this selection bias problem in other expert reports on market efficiency, noting that "[i]t would be improper to include this [alleged disclosure] day in the analysis, because one would then start with a sample that nearly always automatically includes one day essentially selected because it shows an apparent correspondence of news and a stock

---

[169]  As Appendix 8b shows, Dr. Tabak's KS test is similarly biased.

[170]  FDT, page 119 and footnote 155 ("The examination would exclude those days in which a corrective disclosure was made because plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results.") I also note that Dr. Tabak excluded these alleged disclosure days from the estimation period for his bond regression.

price movement. A proper sample must be chosen in a way that is not designed to include days that either favor or disfavor a particular result."[171]  He also notes that "[f]ormally, this is known as a problem of "selection bias.""[172]  Yet here Dr. Tabak failed to follow his own advice and exclude 13 alleged disclosure dates from his z-test "news" dates.[173]

110.  To illustrate this bias, I removed the 13 alleged disclosure dates in the Complaint from Dr. Tabak's z-tests and KS-tests.[174]  For Dr. Tabak's ADS KS test for the DJNW scenario, simply removing these dates (as Dr. Tabak's own FDT paper requires) changes his results from statistically significant to insignificant with the p-value increasing from 3.77% (i.e., meeting the 5% significance threshold set by Dr. Tabak) to 13.48%.[175]  Table 3 below shows the results of this correction on Dr. Tabak's DJNW KS test for all of the Teva Securities at Issue.

---

[171]  Tabak Expert Report in KB Partners, ¶68.
[172]  Tabak Expert Report in KB Partners, footnote 60.
[173]

Tabak Dep., page 152]

[174]  Although Dr. Tabak does not acknowledge this in his report, based on my review of his electronic work files I found that Dr. Tabak, when running his six market models for the six Notes removed 12 of the 13 alleged disclosure dates from his estimation windows. I used this same list of alleged corrective disclosure impact dates except that I added August 4, 2017 which is also mentioned in the Complaint as an alleged disclosure date (See Complaint, ¶¶362-365).
[175]  See Appendix 9 and Table 3.

**Table 3: Tabak DJNW KS test, corrected to remove alleged disclosure days**

| | Average Absolute Value of Excess Returns on Tabak Purported "News" Days (In Percentages) | Average Absolute Value of Excess Returns on Tabak Purported "Non-News" Days (In Percentages) | Tabak KS test | |
| --- | --- | --- | --- | --- |
| | | | p-value | Different in Distribution at 5% Significance Level? |
| ADS | 1.46 % | 1.14 % | 13.48 % | No |
| Preferred | 1.59 % | 1.24 % | 3.61 % | Yes |
| 2018 Notes | 0.00 % | 0.03 % | 23.11 % | No |
| 2019 Notes | 0.00 % | 0.05 % | 70.74 % | No |
| 2021 Notes | 0.00 % | 0.15 % | 31.88 % | No |
| 2023 Notes | 0.00 % | 0.22 % | 12.92 % | No |
| 2026 Notes | 0.00 % | 0.31 % | 56.54 % | No |
| 2046 Notes | 0.01 % | 0.52 % | 14.72 % | No |

**Notes and Sources:**
[1] All data sourced from Tabak Electronic Workfiles. Alleged corrective disclosure days are the days Dr. Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364). Tabak KS tests were recomputed using Dr. Tabak's electronic files. Appendix 9 provides further calculation details supporting this table.

As the Table shows, after correcting Dr. Tabak's analysis for the bias noted by FDT of including alleged disclosure days, his DJNW KS test fails for the ADS and all six of the Notes ████████ ████████████████████████████████████████████████████████"[176] In other words, these securities traded in a market that was completely inefficient

111. Similarly, as Table 4 below also shows, for the Notes, while Dr. Tabak found five out of the six "Earnings Date" KS tests to be statistically significant, after removing the alleged disclosure dates, the result is reversed and five out six become statistically insignificant. For the DJNW Top10%, Dr. Tabak finds all six Notes to be statistically significant, but after removing the alleged disclosure dates, only 4 out of six are significant. Overall, after removing the alleged disclosure dates, only 5 out of the 24 Tabak KS tests for the Notes are significant.[177] These results clearly cannot support a finding of efficiency, even if the test was valid for analyzing cause and

---

[176] Tabak Dep. 95:2-4
[177] See Appendix 10 and Table 4.

effect and market efficiency (which it is not).

**Table 4: Tabak KS Test for the Notes, corrected to exclude alleged disclosure dates.**

| Count | Note | Analysis Period | Kolmogorov-Smirnov Distance | p-value | Different in Distribution at 5% Significance Level? |
|---|---|---|---|---|---|
| | | | **Tabak KS Test (corrected)[1]** | | |
| | | | **Distributions of Tabak Purported "News" Days and "Non-News" Days** | | |
| ***Earnings Dates*** | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 0.330 | 0.902 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 0.435 | 0.100 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 0.324 | 0.379 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 0.365 | 0.244 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 0.340 | 0.321 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 0.501 | 0.037 | Yes |
| ***Dow Jones Newswires*** | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 0.104 | 0.231 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 0.054 | 0.707 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 0.073 | 0.319 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 0.089 | 0.129 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 0.060 | 0.565 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 0.087 | 0.147 | No |
| ***Dow Jones Newswires - Top 50%*** | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 0.101 | 0.460 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 0.105 | 0.215 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 0.061 | 0.854 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 0.063 | 0.824 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 0.088 | 0.421 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 0.092 | 0.360 | No |
| ***Dow Jones Newswires - Top 10%*** | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 0.378 | 0.032 | Yes |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 0.402 | 0.003 | Yes |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 0.305 | 0.045 | Yes |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 0.249 | 0.160 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 0.245 | 0.174 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 0.377 | 0.006 | Yes |

[1]  All data sourced from Tabak Electronic Workfiles. Alleged corrective disclosure days are the days Dr. Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364). Tabak KS tests were recomputed using Dr. Tabak's electronic files, but removing alleged disclosure dates. Appendix 10 provides further calculation details supporting this table.

### 4. Deviation from FDT 2: use of pooled instead of unpooled variance for the z-test

112. Standard statistical textbooks on the z-test of two proportions (the statistical basis of Dr. Tabak's z-test) describe two methods of calculating the z-statistic using "pooled" or "unpooled" variance.[178] Where the variances of the two samples are not assumed to be equal, it is appropriate to use the unpooled variance in the requisite calculation. That is the way the test was constructed in the FDT paper on which Dr. Tabak relies. As Dr. Tabak acknowledges, for his analysis in his report Dr. Tabak deviated from his own FDT paper and used the "pooled" method, assuming the variance of the two samples are equal.[179] For small samples (generally at or below 30 observations) which Dr. Tabak finds for many of the z-test "news" groups in his report,[180] this will strongly bias the results toward a finding of market efficiency. Moreover, because Dr. Tabak

---

[178] See, e.g., Anderson, David R. et. al. (1984), Statistics for Business and Economics, 2nd edition, West Publishing, pg. 309. With respect to the two samples being compared in the Tabak z- test – "news" vs. non- "news" days – each sample has a standard error estimate that measures the variability in the sample. Standard error estimates can vary considerably based upon the sample size, among other factors. When sample sizes are similar or are assumed to be similar, statisticians can employ a "pooled" estimate of the standard deviation of the test statistic (or "standard error") based on both populations. This "pooled" estimate combines, or "pools," the standard errors of the two samples and effectively assumes that both sets of data have common variability. As noted above, the z-statistic in this test is the difference in the proportions of the two groups divided by the "standard error" which is the square root of the sample variance (pooled or unpooled).

See also SAS Institute, SAS STAT manual, version 9.2 at pg. 1755 and Bhattacharyya and Johnson at pp. 309-310. The formula for the test statistic used by FDT in the FDT z-test with an unpooled measure of the standard deviations is given below.

$$Z = \frac{p_1 - p_2}{\sqrt{p_1(1-p_1)(\frac{1}{n_1}) + p_2(1-p_2)(\frac{1}{n_2})}} = \frac{p_1 - p_2}{SE\ (unpooled)}$$

[179] See Tabak Report, footnote 29: ("A test of proportions implicitly assumes equal variances under the null hypothesis, an update in methodology that I have used in prior cases relative to that used in" FDT).

[180] See Tabak Report, Exhibits 8a-a, 8a-b, and 8a-c.

clearly applies a null hypothesis that is not the equality of the two proportions (as he claims in his footnote 29), but rather, that the "news" proportion <u>is less than or equal to</u> the "non-news" proportion,[181] he must use the unpooled variance. Hence, all of his computed z-statistics are incorrect and biased towards a finding of efficiency, in addition to being inconsistent with the methodology in his own FDT paper.

113. When the two deviations from Dr. Tabak's FDT z-test method are corrected, Dr. Tabak's analysis of the Notes almost completely reverses. Table 5 below summarizes these results, showing 17 out 24 of the Tabak z-test scenarios for the Notes are statistically insignificant.[182]

---

[181] Dr. Tabak clearly would not reject the null (indicating market efficiency according to his analysis) if the news proportion were statistically less than the non-news proportion.

[182] See Appendix 11 and Table 5.

**Table 5: Dr. Tabak z-test results for the Notes after correcting deviations from FDT z-test method: removing alleged disclosure dates and using "unpooled variance"[1]**

| | Percent of Tabak Purported "News" Days with Significant Excess Returns | Percent of Tabak Purported "Non-News" Days with Significant Excess Returns | Difference and z-statistics | | | |
| | | | Difference in Percentages | z-statistic[2] | p-value (1-sided) | Significant?[3] |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Earnings Days** | | | | | | |
| 2018 Notes | 0.0% | 4.0% | -4.0% | -4.08 | 100.00% | No |
| 2019 Notes | 25.0% | 4.6% | 20.4% | 1.33 | 9.12% | No |
| 2021 Notes | 12.5% | 5.1% | 7.4% | 0.63 | 26.53% | No |
| 2023 Notes | 37.5% | 5.1% | 32.4% | 1.89 | 2.95% | Yes |
| 2026 Notes | 37.5% | 5.0% | 32.5% | 1.90 | 2.89% | Yes |
| 2046 Notes | 0.0% | 5.4% | -5.4% | -6.26 | 100.00% | No |
| **Dow Jones Newswires** | | | | | | |
| 2018 Notes | 6.2% | 1.1% | 5.1% | 2.85 | 0.22% | Yes |
| 2019 Notes | 6.1% | 3.5% | 2.6% | 1.59 | 5.56% | No |
| 2021 Notes | 6.1% | 4.4% | 1.7% | 1.01 | 15.61% | No |
| 2023 Notes | 6.1% | 5.0% | 1.1% | 0.65 | 25.80% | No |
| 2026 Notes | 5.8% | 5.0% | 0.8% | 0.49 | 31.24% | No |
| 2046 Notes | 5.8% | 5.0% | 0.8% | 0.49 | 31.24% | No |
| **Dow Jones Newswsires — Top 50%** | | | | | | |
| 2018 Notes | 7.6% | 2.9% | 4.7% | 1.62 | 5.22% | No |
| 2019 Notes | 9.0% | 3.9% | 5.1% | 1.89 | 2.95% | Yes |
| 2021 Notes | 6.6% | 4.9% | 1.6% | 0.67 | 25.28% | No |
| 2023 Notes | 8.2% | 4.9% | 3.2% | 1.23 | 10.96% | No |
| 2026 Notes | 6.6% | 5.1% | 1.4% | 0.59 | 27.72% | No |
| 2046 Notes | 4.9% | 5.5% | -0.6% | -0.26 | 60.12% | No |
| **Dow Jones Newswires — Top 10%** | | | | | | |
| 2018 Notes | 20.0% | 3.3% | 16.7% | 1.61 | 5.39% | No |
| 2019 Notes | 19.0% | 4.3% | 14.7% | 1.71 | 4.38% | Yes |
| 2021 Notes | 19.0% | 4.8% | 14.3% | 1.66 | 4.89% | Yes |
| 2023 Notes | 14.3% | 5.2% | 9.0% | 1.18 | 11.98% | No |
| 2026 Notes | 23.8% | 4.8% | 19.0% | 2.04 | 2.08% | Yes |
| 2046 Notes | 19.0% | 4.9% | 14.1% | 1.64 | 5.07% | No |

|  | | | | Count of "No" | 17 |
|  | | | | Total Tabak Tests | 24 |
|  | | | | % of Total | 71% |

**Notes and Sources:**

[1] All data sourced from Tabak Electronic Workfiles. Alleged corrective disclosure days are the days Dr. Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364). Appendix 9 provides further calculation details supporting this table.

[2] Z-statistic is computed using the "unpooled variance" as per FDT.

[3] Statistical significance is determined using a threshold of 1.65, the 5% level in a one-tailed test.

### 5. Lack of robustness: Tabak DJNW z-tests and KS tests fail for the almost three-year period prior the Actavis acquisition and for most individual years of the Class Period.

114. Dr. Tabak applies his z-test for the entire class period, but did not apply it to each partial or full year within the class period. This is notable because for Dr. Tabak's weak-form tests of autocorrelation (discussed in more detail below), Dr. Tabak finds that the ADS fail the test over the Class Period, but "per [his] standard practice" he also examines "each partial or full year within the Class Period"[183] and concludes, overall, "a mixed finding that does not point strongly to either market efficiency or inefficiency."[184] Dr. Tabak does not explain his failure to apply this same logic to his z-test. He also fails to acknowledge that if he were to run the test on the ADS (using all DJNW dates) for each year of the Class Period (as he did for autocorrelation tests) he would have found statistically insignificant results for all years except 2017. In an earlier expert report, Dr. Tabak explains the converse of this logic (which he applies in his autocorrelation test in this matter): "Though perhaps it may be somewhat counterintuitive that a set of statistically insignificant results combine to a statistically significant aggregated result, the reason for this difference is that as we increase the number of days examined, the more likely that any pattern will be measured precisely enough to be considered statistically different (i.e., distinguishable from the lack of any pattern)."[185] As I show below, the converse holds true here for Dr. Tabak's DJNW z-tests and KS tests. When his Class Period results are subdivided into annual periods, or even into multi-year periods pre- and post-Actavis acquisition, his statistically significant results disappear.

115. To illustrate this point, I split Dr. Tabak's DJNW ADS z-test into pre- and post-

---

[183] Tabak Report, ¶65.

[184] See Tabak Report ¶65 and Exhibit 10a-a ("there is a statistically significant degree of autocorrelation at the standard 5% level in the ADS over the full Class Period. However, when examining the years within the Class Period, three show positive autocorrelation and three show negative autocorrelation (though in only one year is the result statistically significant at the five-percent level). Thus, the autocorrelation over the Class Period is not stable.").

[185] Tabak Expert Report, In Re Merck II, ¶56.

Actavis acquisition completion time periods (Feb. 6 ,2014 to August 2, 2016 and August 3, 2016 to May 10, 2019).  Table 6 below shows that the ADS z-test fails (for all DJNW) for the earlier period (Appendix 12 also details these results).  I also note that in another Expert Report Dr. Tabak concluded the market was inefficient for part of the alleged Class Period, but here did not analyze parts of the Class Period for his z-test and KS tests.[186]  As Table 6 also shows, the Preferred Shares follow a similar pattern.

### Table 6: Tabak DJNW z-test corrected for deviations from FDT and for pre/post Actavis acquisition and years of the Class Period

| | Percent of Tabak Purported "News" Days with Significant Excess Returns | Percent of Tabak Purported "Non-News" Days with Significant Excess Returns | Difference in Percentages | z-statistic[2] | p-value (1-sided) | Significant[3] |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Panel A: ADS** | | | | | | |
| **Pre-Acquisition (2/6/2014 to 8/1/2016)** | 7.1% | 5.0% | 2.1% | 1.10 | 13.48% | No |
| **Post-Acquisition (8/2/2016 to 5/10/2019)** | 23.8% | 14.0% | 9.8% | 3.30 | 0.05% | Yes |
| **2014** | 4.7% | 5.0% | -0.3% | -0.10 | 45.99% | No |
| **2015** | 8.0% | 4.9% | 3.1% | 1.01 | 15.71% | No |
| **2016** | 8.1% | 4.9% | 3.3% | 1.04 | 15.00% | No |
| **2017** | 25.9% | 12.6% | 13.3% | 2.71 | 0.34% | Yes |
| **2018** | 28.4% | 18.6% | 9.9% | 1.82 | 3.45% | Yes |
| **2019** | 26.2% | 12.5% | 13.7% | 1.65 | 4.94% | Yes |
| **Panel B: Preferred Shares** | | | | | | |
| **Pre-Acquisition (12/4/2015 to 8/1/2016)** | 10.5% | 4.5% | 6.0% | 1.45 | 7.30% | No |
| **Post-Acquisition (8/2/2016-5/10/2019)** | 27.6% | 21.6% | 6.1% | 1.71 | 4.38% | Yes |
| **2016** | 9.8% | 4.9% | 4.9% | 1.48 | 7.00% | No |
| **2017** | 28.1% | 15.3% | 12.8% | 2.49 | 0.65% | Yes |
| **2018** | 37.9% | 32.4% | 5.5% | 0.88 | 18.86% | No |

**Notes and Sources:**
[1]  All data sourced from Tabak Electronic Workfiles. Alleged corrective disclosure days are the days Dr. Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364).
[2]  Z-statistic is computed using the "unpooled variance" as per FDT.
[3]  Statistical significance is determined using a threshold of 1.65, the 5% level in a one-tailed test.

116. These results further indicate the lack of robustness of Dr. Tabak's z-tests and failure

---

[186]  See Tabak Expert Report in KB Partners, ¶¶96-97.

to establish market efficiency over the entire Proposed Class Period, especially for the more than two-year period from February 6, 2014 to August 1, 2016 and for most individual years of the period. I note also that the only individual year where Dr. Tabak's Preferred z-test finds statistical significance in his DJNW groups, 2017, is a year where his Autocorrelation test finds statistically significant autocorrelation, indicating a lack of weak-form efficiency.[187]

### 6. The Tabak z-test either fails to detect cause and effect or shows the markets for Teva Securities were inefficient, by Dr. Tabak's own logic in his writings.

117. To further demonstrate the flaws in Dr. Tabak's z-test I used Dr. Tabak's data to analyze the 288 Tabak "news" days that are immediately followed by a Tabak "non-news" day. If the market is efficient, according to Dr. Tabak, the market should not incorporate "news slowly" and it should generally not take more than one day to impound the information. As Tabak writes, "[a] response on the day after news sounds like a potential effect of an inefficient market that incorporates news slowly."[188]

118. Table 7 below shows that for the each of the Teva Securities at Issue for the sets of Tabak "news" days followed by Tabak "non-news" days, according to Dr. Tabak's own z-test, the proportions of significant returns are statistically indistinguishable.

---

[187] Tabak Report, Exhibit 10a-a.
[188] Tabak (2010), page 9.

**Table 7: Tabak z-test for 288 DJNW "news" days followed by "non-news" days in Dr. Tabak's analysis.**

| Security | Analysis Period | Tabak Purported "News" Days | | | Following Tabak Purported "Non-News" Days | | | z-statistic | p value | Different from Zero at 5% Significance Level? |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | | | |
| ADS | 2/6/2014-5/10/2019 | 288 | 37 | 12.8% | 288 | 29 | 10.1% | 1.05 | 29.53% | No |
| Preferred | 12/4/2015-12/14/2018 | 157 | 30 | 19.1% | 157 | 24 | 15.3% | 0.90 | 36.96% | No |
| 2018 Notes | 7/21/2016-3/22/2018 | 86 | 4 | 4.7% | 86 | 1 | 1.2% | 1.36 | 17.33% | No |
| 2019 Notes | 7/21/2016-5/10/2019 | 144 | 8 | 5.6% | 144 | 7 | 4.9% | 0.27 | 79.09% | No |
| 2021 Notes | 7/21/2016-5/10/2019 | 144 | 5 | 3.5% | 144 | 8 | 5.6% | -0.85 | 39.45% | No |
| 2023 Notes | 7/21/2016-5/10/2019 | 144 | 7 | 4.9% | 144 | 8 | 5.6% | -0.27 | 79.09% | No |
| 2026 Notes | 7/21/2016-5/10/2019 | 144 | 7 | 4.9% | 144 | 8 | 5.6% | -0.27 | 79.09% | No |
| 2046 Notes | 7/21/2016-5/10/2019 | 144 | 9 | 6.3% | 144 | 11 | 7.6% | -0.46 | 64.29% | No |

119. For example, the tables show that for the ADS there were 288 (of the 678) Tabak DJNW "news" days immediately followed by a Tabak DJNW "non-news" day and that the proportions of significant days were 12.8% and 10.1%, respectively. The z-statistic according to Dr. Tabak's z-test is 1.05, which is below the 1.96 threshold used by Dr. Tabak, indicating that proportions for these two samples are statistically indistinguishable.

120. Because the excess return proportions on "news" days and the next day with no "news" are not statistically distinguishable this means that according to Dr. Tabak's own z-test, there are two possibilities: either, (1) the markets for Teva Securities were inefficient over these periods (according to Dr. Tabak's own logic) or (2) if the market is efficient, his own test fails to detect cause and effect for these days representing a large subsample of his chosen "news" days. Hence, if (2) is true, Dr. Tabak's own direct test is incapable of identifying efficiency, or, if (1) is true the test does not support his opinion that the markets for the Teva Securities at Issue were efficient over these days.

## F. Dr. Tabak either disregards or fails to discuss numerous "indirect," structural *Cammer* and *Krogman* factors that do not support his efficiency opinion.

121. Dr. Tabak's market efficiency analysis is also problematic because he either disregards or fails to discuss numerous "indirect," structural *Cammer* and *Krogman* factors when they do not support his efficiency opinion for all of the Teva Securities at Issue. There are multiple instances of these securities failing to satisfy Dr. Tabak's stated thresholds and standards for market efficiency based on these "indirect" factors. In some cases, like "Trading on a Major Securities Market," Dr. Tabak acknowledges that some of the securities fail to meet these standards, but in other cases he is silent.  It appears that he is silent on these matters because they do not support his client's desired outcome, i.e., that the market for all Teva securities were efficient.

122. <u>Analyst Coverage</u>: Dr. Tabak discusses analyst coverage and notes that one of the factors the *Cammer* court discussed that "support(s)" efficiency was that "a significant number of securities analysts followed and reported on a company's stock during the class period."[189]  He also notes that the *Cammer* court stated on page 1286 that "[t]he existence of such analysts would imply, for example, the [auditor] reports [on the issuer] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (Closing footnote omitted.)[190]  But, while Dr. Tabak discusses the ADS analyst coverage in some detail, he offers no evidence that analyst reports were written specifically covering the Preferred Shares or Notes. For the Notes, Dr. Tabak mentions three ratings agencies who provided and changed ratings, but no professional analyst reports.[191]  In an earlier expert report Dr. Tabak noted that "[e]ven analyst coverage of securities other than the one that was the subject of the suit in question

---

[189]  Tabak Report, ¶14.
[190]  Tabak Report, ¶22.
[191]  Tabak Report, ¶24.

was given reduced weight as were rating agency reports which, while more specific to the security in question than news reports, were still "less thorough than analyst reports and should be given less weight.""[192]

123. Dr. Tabak does not acknowledge that, by his own stated standards, this lack of coverage does not support his efficiency opinion for the Preferred Shares and the Notes.

124. <u>Market Makers and Arbitrageurs</u>: Dr. Tabak notes that one of the factors the *Cammer* court discussed that "support(s)" efficiency was that the "stock had numerous market makers" and that the court noted that [t]he existence of market makers and arbitrageurs" would aid in market efficiency."[193] Dr. Tabak notes that one type of arbitrageurs are those who take "short" positions in securities and discusses in detail data on "short interest" for the ADS.[194] But, for the Preferred Shares he acknowledges that "data on short interest are not readily available."[195] Similarly for the Notes he acknowledges that "[d]ata for short interest for the Teva Notes are not readily available" and he concludes that "this portion of the test provides no information either in support of or against a finding of market efficiency for the Teva Notes." Again, Dr. Tabak does not acknowledge that, by his own stated standards, the inability to locate short interest data does not support his efficiency opinion for the Preferred Shares and the Notes.

125. <u>Trading on a Major Securities Market:</u> Dr. Tabak notes that "[t]he court in DVI II" stated that "the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."[196] He further acknowledges that, unlike the ADS, the

---

[192]   Tabak Report, KB Partners, footnote 24, [citations omitted].
[193]   Tabak Report, ¶14.
[194]   Tabak Report, ¶¶26-33.
[195]   Tabak Report, ¶32.
[196]   Tabak Report, ¶52.

Preferred Shares and Notes did not trade on a major securities market and instead traded "over the counter."[197] Dr. Tabak concludes that "[t]hus, this criterion does not support a finding of efficiency for these securities."[198]

126. <u>Bid-Ask Spread</u>: Dr. Tabak notes that "[a] narrow bid-ask spread is a potential indicator of market efficiency because the spread provides information about the cost of arbitrage, with a narrow spread meaning that those costs are lower."[199]  He acknowledges that the bid-ask spread for the Preferred shares was "2.66% of the same-day's closing price while the median was 1.99%," figures which were "higher than those of the ADS."[200] Dr. Tabak concludes that while this "would suggest efficiency [for the Preferred Shares] with respect to the allegations being made in this case," "it would not suggest that there was necessarily a strong mechanism for market efficiency for some smaller degrees of potential mispricing."[201]  Dr. Tabak does not quantify or specify what he means by "with respect to the allegations in this case" but he does acknowledge for the Preferred Shares that the relatively high bid-ask spread could indicate lack of a "strong mechanism" to correct "potential mispricing."

Respectfully submitted,

Mukesh Bajaj, Ph.D.

_Mukesh Bajaj_

_____

August 7, 2020

---

[197]  Tabak Report, ¶53.
[198]  Tabak Report, ¶53.
[199]  Tabak Report, ¶57.
[200]  Tabak Report, ¶59.
[201]  Tabak Report, ¶59.

Appendix 1: CV of Mukesh Bajaj



## Mukesh Bajaj
Senior Consultant

PhD, Business Administration,
Finance,
University of California, Berkeley

MBA, Business Administration,
University of Texas at Austin

Bachelor of Technology,
Indian Institute of Technology,
Delhi, India

Dr. Mukesh Bajaj is a Senior Consultant in CRA's Finance Practice. He has managed hundreds of consulting assignments involving economic and financial issues. His areas of expertise include: securities fraud, valuation of complex derivatives and intellectual property, insider trading, financial market microstructure, intangible assets, transfer pricing, interests in closely-held firms, warrants, restricted stock and other complex contingent securities, and purchase price allocation studies. He was previously Managing Director and Global Head of the Securities & Finance Practice at Navigant. Prior to that, Dr. Bajaj founded AFE Consulting and served as its President. Dr. Bajaj has also consulted on financial strategy and acquisition analysis.

Dr. Bajaj has testified in various Federal and State Courts, the Superior Court of California, the State Board of Equalization in California, the U.S. Tax Court, arbitrations, mediations and in IRS Appeals proceedings. He has also testified in Canadian and Australian courts, testified in JAMS arbitration and filed an expert report in the International Center for Settlement of Investment Disputes.

In addition to his consulting work, Dr. Bajaj has taught corporate finance, investments, and financial engineering courses in the MBA and Masters in Financial Engineering programs at the Haas School of Business at the University of California at Berkeley. Prior to his consulting practice, He was an assistant professor of finance and business economics at the University of Southern California where he taught undergraduate and graduate courses in finance. Dr. Bajaj is the recipient of several teaching awards and scholastic honors and has published several articles in leading academic and applied journals, such as *The Journal of Finance*, *The Journal of Financial Economics*, *The Journal of Financial Research*, *The Journal of Applied Finance*, *International Economic Review*, *Research in Finance*, and *Research in Law and Economics*.

### Expert Testimony on Record

*Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001, v. Peter J. Wellin, et al.* and related cases, Civil Action Nos. 2:13-cv-01831-DCN, 2:13-cv-03595-DCN, and 2:13-cv-04067-DCN in the United States District Court for the District of South Carolina. Testified in depositions regarding the equivalent value of limited partnership units. Depositions in August 2018 and November 2018.

*The Tulalip Tribes, et al., v. The State of Washington, et al.*, Case No. 2:15-cv-00940 in the United States District Court for the District of Washington. Testified in deposition and at trial regarding the economic and governmental activities of the Tulalip tribe and the State of Washington and Snohomish County, respectively, and the relationship of such activities to sales and other taxes assessed by the State of Washington and Snohomish County. Deposition in July 2017. Trial in May 2018.

*Ohio Public Employees Retirement System, On Behalf of Itself and all Others Similarly Situated, v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, Richard F. Syron, Patricia L. Cook, Anthony S. Pizel, and Eugene M. McQuade*, Civil Action No. 4:08-cv-160 in the United States District Court for the Northern District of Ohio, Eastern Division (Youngstown). Testified in depositions and a hearing concerning the efficiency of the market for Freddie Mac's common stock and the economic evidence as it related to the Plaintiff's allegations that alleged misrepresentations and omissions had an impact on the price of Freddie's Mac's stock. Hearing in April 2018. Depositions in January 2013 and September 2017.

*In re Allergan, Inc. Proxy Violation Securities Litigation,* C.A. 14-cv-02004 (N.D. Cal 2014). Testified in deposition on whether the common stock of Allergan Inc. traded in an efficient market during the Class Period and whether damages in the action are subject to a common formula that can be applied Class-wide (December 2016). Also testified in deposition on the economic materiality of alleged non-public information and damages allegedly caused by insider trading on this information (July 2017). Depositions in December 2016 and July 2017.

*OpenGate Capital, LLC, et al., v. Thermo Fisher Scientific Inc.*, Civil No. 13-475-GMS in the United States District Court for the District of Delaware. Testified in deposition regarding damages allegedly caused by claims of fraudulent misrepresentation in connection with the purchase of a division of Thermo Fisher by OpenGate. Deposition in November 2015.

*Continental Industries Group, Inc. v. FTS International Services, LLC, et al.*, Case Nos. 12-CV-05599 and 12-CV-06966 in the United States District Court, Southern District of New York. Testified in deposition and trial on economic damages resulting from the alleged breaches of two supply agreements between the Plaintiff and Defendants. Deposition in October 2014. Trial in October 2015.

*In re: UBS Financial Services, Inc. of Puerto Rico Securities Litigation*, Civil Case No.: 3:12-cv-01663-CCC, United States District Court for the District of Puerto Rico. Testified in deposition on economic issues related to certain Puerto Rico closed-end funds for class certification purposes. Deposition in September 2015.

*In the Matter of the Arbitration between Offshore Exploration and Production LLC, Claimant/Seller, v. Korea National Oil Corporation and Ecopetrol, S.A., Respondents/Purchasers*, ICDR Case No. 50 198 T 00825 1 in the International Centre for Dispute Resolution. Testified in arbitration proceedings on the calculation of prejudgment interest related to payments Claimant/Seller asserted should have been made pursuant to an escrow agreement between Claimant/Seller and Respondents/Purchasers. Arbitration in February 2014.

*Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard and Mary Louise Trudel-Hart*, Case No. 12-CIV-03479 in the United States District Court, Southern District of New York. Testified in deposition on damages in an action alleging breach of contract arising out of the sale of a medical diagnostics company. Deposition in September 2013.

*Securities and Exchange Commission v. Manouchehr Moshayedi*, Case No. 12CV-01179-JVS-JPR in the United States District Court for the Central District of California. Testified in deposition regarding allegations by the SEC of insider trading against the founder and former CEO of STEC, a maker of custom memory solutions. Deposition in August 2013.

*In re American International Group, Inc. 2008 Securities Litigation*, Master File No. 08-CV-4772-LTS in the United States District Court, Southern District of New York. Testified in depositions and in an evidentiary hearing on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent to which AIG had accumulated exposure to the subprime mortgage market through its securities lending program and its credit default swap ("CDS") portfolio. Depositions in November 2011 and March 2012. Evidentiary Hearing in April 2013.

*Securities and Exchange Commission v. Fabrice Tourre*, Case No. 10-CV-3229 (KBF) in the United States District Court, Southern District of New York. Testified in deposition on the economic materiality of the nondisclosure of certain hedge fund positions with respect to a particular synthetic ABS CDO. Deposition in February 2013.

*Cora E. Bennett v. Sprint Nextel Corporation, Gary D. Forsee, Paul N. Saleh and William G. Arendt*, Case No. 09-CV-2122 EFM/KMH in the United States District Court for the District of Kansas. In the class-certification stage of a securities fraud class action, testified in deposition regarding the economic evidence supporting the claim that Sprint bonds traded in efficient markets throughout the Class Period. Deposition in June 2012.

*State of New Jersey, Department of Treasury, Division of Investment, on behalf of Common Pension Fund A. v. Merrill Lynch & Co. and Bank of America Corp.*, Case No. L-3855-09 in the Superior Court of New Jersey. Testified in deposition on the materiality of accounting allegations, loss causation and damages calculations in connection with transactions involving the purchase and subsequent conversion of a convertible preferred security to common stock. Deposition in May 2012.

*In re Richard Kirby v Centro Properties Ltd & Ors* (VID 326 of 2008), *Richard Kirby v Centro Retail Ltd & Ors* (VID 327 of 2008), and *Nicholas Stott v Pricewaterhouse Securities Ltd* (VID 1028 of 2010), in the Federal Court of Australia. In a pair of securities class action disputes in Australia, testified at trial on alleged disclosure deficiencies of two Australian REITs in connection with certain short-term and long-term debts and the effect of those disclosures on the prices of the REITs' two stapled securities, as well as on the condition of the global credit market during the class period. Trial in May 2012.

Charles River Associates

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD-2017 (LAK) in United States District Court, Southern District of New York. Testified in deposition on the market for structured products and the market's general awareness of credit risks associated with structured finance products in the class-certification stage of a securities fraud class action alleging materially false and misleading statements and omissions in the offering documents of principal-protected notes. Deposition in April 2012.

*In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 in the Court of Common Pleas for the State of South Carolina, County of Greenville. Testified in deposition on damages and loss causation for class action and derivatives suits arising from a merger. Deposition in April 2012.

*Bank of America National Association, and Banc of America Securities LLC v. Bear Stearns Asset Management Inc., Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal*, Case No. 1:08-cv-0265-AJN in the United States District Court, Southern District of New York. Testified in deposition on damages related to a securitization transaction and the Defendants' alleged failure to disclose the financial condition of their hedge funds. Deposition in March 2012.

*Between: Howard Green and Anne Bell, and Canadian Imperial Bank of Commerce, Gerald McCaughey, Tom Woods, Brian G. Shaw, And Ken Kilgour*, No. CV-08-00359335-0000, Ontario Superior Court of Justice. Testified in deposition on loss causation in proceedings under the Class Proceedings Act, 1992 alleging that Defendants made various misrepresentations regarding CIBC's CDO exposure and the extent of impairment of CIBC's CDO positions. Deposition in December 2011.

*In re Tronox Inc. Securities Litigation*, No. 09 Civ. 06220 (SAS), United States District Court, Southern District of New York. Testified in deposition on market efficiency at class certification stage in a securities fraud class action alleging that Defendants materially misstated the extent of legacy environmental liabilities. Deposition in December 2011.

*In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, Case No. 1:09-MD-2072 in the United States District Court, Southern District of New York. (Appeal denied by United States Court of Appeals for the Second Circuit, May 31, 2012.) Testified in deposition and hearing before the Court on market efficiency at class certification stage in a securities fraud class action alleging misrepresentations concerning Freddie Mac's capitalization and credit risk exposure. Depositions in August 2011 and November 2011. Court hearing in November and December 2011.

*Estate of John F. Koons, III v. Commissioner of Internal Revenue*, Docket Nos. 19771-09 and 19772-09, in the United States Tax Court. Testified at trial regarding the valuation of certain membership interests in a limited corporation. March 2011.

*In Re Altria Group, Inc. v. United States of America*, Case No. 1:06-cv-09430-RJH in the United States District Court, Southern District of New York. Testified in deposition and at trial regarding economic issues affecting tax treatment of certain leveraged lease transactions. Deposition in December 2007. Trial in June-July 2009.

*Madison Tyler Holdings, LLC, et al., Claimants v. Financial Asset Trading & Technology of California, LLC, et al., Respondents*; *Financial Asset Trading & Technology of California, et al., Cross-Claimants, v. Madison Tyler Holdings, LLC, et al., Cross-Respondents*; and related arbitration *Madison Tyler Holdings, a Delaware Limited Liability Company, et al., Counter-Claimants and Respondents v. Rajashree Karwa, an individual, Counter-Respondent and Claimant*. Arbitration Before JAMS, JAMS Ref. No. 1220038462. Testified in deposition on economic analysis of source of value creation in algorithmic trading strategies. June 2009.

*Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated, v. Household International, Inc., et al.*, Case No. 02-C-5893 in the United States District Court, Northern District of Illinois, Eastern Division. Testified in deposition and at trial on loss causation and damages in a securities class action alleging securities fraud arising from purported accounting irregularities and predatory lending practices to subprime borrowers. Deposition in March 2008. Trial in May 2009.

*Guerrero Family Trust, Carmen De Leon Guerrero, Jose T. Tenorio Trust, Estate of Santiago C. Tenorio, Juan T. Guerrero, Jesus T. Guerrero, and AJT Trust, v. Kinki Nippon Tourist Co. LTD, Saipan Hotel Corporation, Pacific Development Inc., Pedro J.L. Igitol, in his official capacity of Secretary of Saipan Hotel Corporation, Morgan Stanley Japan Limited, Marianas Holdings, LLC, and K.K. ING Karuizawa Training Institute*, Civil Action No. 04-0574D in the Superior Court of the Commonwealth of the Northern Mariana Islands. Testified in deposition on damages arising from alleged abuse of fiduciary duty and dilution of minority shareholders' stock holding. July 2008.

*In the Matter of David A. Finnerty, et al., Administrative Proceeding*, File No. 3-11893, Before the Securities and Exchange Commission. Testified in trial regarding the trading patterns of certain NYSE specialists in connection with alleged violations of priority rules and securities laws. February and March 2008.

*In Re NYSE Specialists Securities Litigation*, Master File No. 03 Civ. 8264 (RWS) in the United States District Court, Southern District of New York. Testified in deposition on class certification issues relating to alleged trading-rule violations by New York Stock Exchange specialist firms. November 2007.

*Theo Bullmore and Phillip S. Stenger, as Joint Official Liquidators of Beacon Hill Master Ltd. (In Official Liquidation), Plaintiffs v. Ernst & Young Cayman Islands, Ernst & Young LLP, Beacon Hill, Asset Management, LLC, John D. Barry, Thomas Daniels, John Irwin, Mark Miszkiewicz, and ATC Fund Services (Cayman) Limited f/k/a ATC Fund Administrators (Cayman) Limited, Defendants*, Index No.: 104314/05 in the Supreme Court of the State of New York, County of New York. Testified in deposition on the causation and alleged damages experienced by the Beacon Hill Master Fund caused by an alleged improper audit by Ernst & Young Cayman Islands. September 2007.

*Sterling Savings Association and Sterling Financial Corporation v. United States of America, Defendant*, Case No. 95-829C in the United States Court of Federal Claims. Testified in deposition and at trial on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Depositions in June 2002 and May 2004. Trial in July 2007.

*Adelphia Communications Corp., Plaintiff v. Deloitte & Touche LLP, (Defendant) v. John Rigas, Timothy Rigas, Michael Rigas and James Rigas (Additional Defendants)*, in the Court of Common Pleas, Philadelphia County. Testified in deposition on loss causation and damages issues related to alleged improper conduct by auditor. May 2007.

*David S. and Malia A. Litman v. United States of America*, Case No. 05-956T; *Robert B. and Michelle S. Diener v. United States of America*, Case No. 05-971T; *Hotels.com Inc. and Subsidiaries (f/k/a Hotel Reservations Network, Inc.) v. United States of America*, Case No. 06-285T. Judge Christine O.C. Miller in the United States Court of Federal Claims. Testified in deposition and at trial on valuation of 9.9 million shares of stock issued to certain former officers of Hotels.com for tax purposes. Deposition in July 2006. Trial in May 2007

*Jane Z. Astleford, Donor, Petitioner v. Commissioner of the Internal Revenue, Respondent*, Docket No 4342-06 in the U.S. Tax Court. Testified at trial on value of certain interests in a limited partnership. March 2007.

*United States of America v. Sanjay Kumar and Stephen Richards*, 04-CR-0846 (ILG), in the United States District Court, Eastern District of New York. Testified at trial on loss causation and damages issues in criminal securities fraud matter in which defendants pleaded guilty to improper revenue recognition related accounting irregularities. October 2006.

*The Procter and Gamble Company and Subsidiaries & Proctor and Gamble FSC (Barbados) vs. The United States of America*, Case number 1:05cv355 in United States District Court for the Southern District of Ohio, Western Division. Testified in deposition on fair market value of certain technologies donated by Proctor and Gamble to various entities in connection with a tax dispute. September 2006.

*United States of America v. Richard Volpe*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. August 2006.

*United States of America v. Robert Scavone*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*United States of America v. Michael Hayward and Michael Stern*, Indictment S1 05 Cr. 390 (SHS) in the United States District Court, Southern District of New York. Testified at trial on liability issues in criminal securities fraud matter alleging illegal trading by certain New York Stock Exchange specialists. July 2006.

*Commonwealth Holdings, Inc., Profit Sharing Plan & Trust, James T. Waddill, IV et al. v. Salomon Smith Barney, Inc. and John Henry Spatz*, in a hearing before NASD. Testified on loss causation and damages aspects of Plaintiffs' claims arising from alleged securities fraud. September 2005.

*Messrs. Robert, Charles and John Switzer et al. v. Deutsche Bank et al.*, in a hearing before NASD. Testified on liability and damages aspects of Plaintiffs' damage claims arising from alleged unsuitable investments in certain leveraged debt obligations. June 2005.

*IDT Corp. v Telfonica S.A. et al.*, Case No. 01 CV 471 in the United States District Court for New Jersey. Testified in deposition on liability and loss causation aspects in a claim of alleged securities fraud. April 2005.

*Sherewin I. Ray et al. v. Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup, Inc. and John Henry Spatz*, Case No. 03C3157 in the United States District Court for the Northern District of Illinois, Eastern Division. Testified in deposition on liability and loss causation in a claim of alleged securities fraud. March 2005.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. Allmerica Financial Life Insurance and Annuity Company.* Testified in deposition on certain liability aspects in a breach of contracts claim involving certain mutual fund trading strategies. January 2005.

*In re WorldCom, Inc. ERISA Litigation*, Master File No. 02 Civ. 4816 (DLC) in the United States District Court, Southern District of New York. Testified in deposition on liability aspects of Plaintiffs' damage claims in an ERISA class action. January 2005.

*Xilinx Inc. and Subsidiaries v. Commissioner of Internal Revenue Service*, Docket Nos. 004142-01 and 00702-03. Testified in U.S. Tax Court on whether grant date value, or certain spread upon exercise, of employee stock options should be considered part of cost sharing pool in a cost sharing arrangement between Xilinx, Inc. and its Irish affiliate. Trial in July 2004. Submitted affidavit in connection with motion to dismiss in June 2002.

*Maxtor Corporation v. Koninklijke Philips Electronics N.V., Philips Semiconductors B.V., Philips Semiconductor International B.V., Philips Electronics North America Corporation, Philips Semiconductors, Inc., Philips Semiconductor Manufacturing, Inc., Philips France, Philips Japan, Ltd., and Does 1 through 25*, Case No. CV 808650 in the Superior Court of the State of California, County of Santa Clara. Testified in deposition on damages analysis in connection with alleged design failure of a chip used in manufacturing computer hard drives. March 2004.

*Mid-Continent Federal Savings Bank v. United States of America, Defendant*, Case No. 95-472C in the United States Court of Federal Claims. Testified in deposition and at trial in Court of Federal Claims on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. Deposition in April 2002. Trial in July 2003.

*Robert F. Flood v. Bessemer Trust Company, N.A.*; *Robert G. Vanneman; and Does 1-25 and Stephen Gorosh v. same defendants.* Testified in deposition on alleged damages due to failure to diversify. November 2002.

*Christine P. Rales, Plaintiff v. Steven M. Rales, Defendant*, Civil Action No. 02DR166-D in the Superior Court of District of Columbia. Testified in deposition on the fair market value of a block of 19.67 million shares of common stock of Danaher Corporation held by Stephen M. Rales. February 2002.

*American National Bank and Trust Company of Chicago, as Trustee f/b/o Emerald Investments LP, and Emerald Investments LP, an Illinois Partnership v. AXA Client Solutions, LLC, The Equitable Life Assurance Society of the United States, and AXA Financial, Inc.*, Case No. 00 C 6786. Testified in deposition on damages due to alleged breach of contract involving certain mutual fund trading strategies. May 2002.

*Statewide Savings Bank, S.L.A., Plaintiff v. United States of America, Defendant*, Case No. 95-779C in the United States Court of Federal Claims. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. February 2002.

*Charles T. McCord and Mary S. McCord, Donors, Petitioners v. Commissioner of Internal Revenue, Respondent*, Docket No 7048-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*Estate of Elma Middleton Dailey, Deceased, K. Robert Dailey, II, Executor, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket Nos 6251-00 and 6262-00 in the U.S. Tax Court. Testified at trial on value of several interests in a limited partnership. May 2001.

*John G. Balletto v. Xoom.com, Inc.*, Case No. 306798 in the Superior Court of California, San Francisco County. Testified in deposition and at trial relating to damages due to alleged breach of contract. January 2001. Deposition in January 2001. Trial in March 2001.

*Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267) v. California Franchise Tax Board.* Testified before the State Board of Equalization on whether Mission First Financial and its parent company SCEcorp formed a unitary business for tax purposes during 1988 to 1990. December 2000.

*Framatome Connectors USA Holdings, Inc. and Subsidiaries, et al. v. Commissioner of Internal Revenue Service*, Docket No. 5030-98, 9160-99, 118 T.C. 32 (2002), aff'd, 108 Fed. Appx. 683, (2004). Testified in trial on whether Burndy Japan was a controlled foreign corporation of the petitioner for the years 1988, 1989 and 1992 under section 957(a) (2) of the Internal Revenue Code. October 2000.

*Barry G. Hittner, Receiver of American Universal Insurance Company v. Sequa Corporation, et al.*, M.D.L. No. 972, C.A. No. 1:92-512. Testified in deposition on the value of a $50 million note backed by certain real estate. June 2000.

*Estate of Richie C. Heck, Deceased, Gary Heck, Special Administrator, Plaintiff v. Commissioner of Internal Revenue Service, Defendant.* Docket No. 11619-99 in the U.S. Tax Court. Testified at trial on the valuation of a minority interest in F. Korbel & Bros., Inc. June 2000.

*American Heritage Bancorp, Plaintiff v. United States of America, Defendant*; *Federal Deposit Insurance Corporation, as successor to the rights of Home Federal Savings Bank, Plaintiff Intervenor v. United States of America, Defendant.* Case No. 90-3982C. Testified in deposition on damages due to alleged breach of contract as a result of Financial Institutions Reform and Recovery Act of 1989. May 2000.

*Estate of Robert H. Lurie, deceased, Ann Lurie, Executor v. Commissioner of Internal Revenue*, Docket No. 22639-94 in the U.S. Tax Court. Testified at trial on whether certain trusts accumulated assets from investments without transfers for inadequate consideration by the deceased. February 1999.

*Joseph K. Mitchell, et al., v. Central Investment Corporation*, Case No. A9700035, Special Proceedings in the Court of Common Pleas, Hamilton County, Ohio. Testified in deposition regarding fair cash value of a minority position in stock of a Pepsi-Cola bottling company in connection with a freeze-out merger. March 1998.

*Walter L. Gross, Jr. & Barbara H. Gross, Petitioners v. Commissioner of Internal Revenue Service, Respondent*, No. 4460-97; Calvin C. Linnemann & Patricia G. Linnemann, Petitioners v. Commissioner of Internal Revenue Service, Respondent, No. 4469-97. Testified at trial regarding the fair market value of a minority interest in a Pepsi-Cola bottling company, which Petitioners had claimed as a gift-tax liability. November 1997.

*R. J. R. Nabisco Inc. and Subsidiaries v. Commissioner*, Docket No. 3796-95 in the U.S. Tax Court. Testified at trial regarding the nature and useful economic life of cigarette package design for federal income taxation purposes. February 1997.

*Clinton, Inc. & Subsidiaries, Petitioner v. Commissioner of Internal Revenue, Respondent*, Docket No. 9885-95 in the U.S. Tax Court. Testified in deposition regarding reasonable executive compensation pursuant to Internal Revenue Code Section 162 (a) (1). August 1996.

*Fullers Jewelry, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Case No. 94-09169-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a retail jewelry chain for purposes of ad valorem taxation. July 1996.

*American Marazzi, Inc., Plaintiff v. Dallas Central Appraisal District, Defendant*, Cause number 95-07028-B, District Court, Dallas County, Texas, 44th Judicial District. Testified in deposition regarding the value of merchandise inventory of a manufacturer and distributor of ceramic tiles for purposes of ad valorem taxation. June 1996.

*Terence Dean, et al. v. Dean Security, Inc. et al.* Testified in binding arbitration regarding damages due to breach of contract for the sale of a security company. March 1996.

*Advertiser's Dynamic Services, Co., Inc., Plaintiff v. United States of America, Defendant*, Case No. 3-94-CV-2079-G, District Court, North Dallas, Texas. Testified at trial regarding the nature of contracts between a publisher and salespersons for payroll tax purposes. February 1996.

## Publications

"Economic Consequences: The Real Cost of U.S. Securities Class Action Litigation," 2014, with Nikolai Caswell, Anand Goel, Sumon C. Mazumdar and Rahul Surana, issued by Institute for Legal Reform, U.S. Chamber of Commerce.

"Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after Wal-Mart and Amgen," with Sumon C. Mazumdar and Daniel A. McLaughlin, 2014, in James Langenfeld Ed., Research in Law and Economics, Volume 26, 161-207.

"The NUA Benefit and Optimal Investment in Company Stock in 401(K) Accounts," with Sumon C. Mazumdar, Vikram Nanda and Rahul Surana, 2009, in A. H. Chen Ed., Research in Finance, Volume 25, 203–227.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen and Sumon C. Mazumdar, 2008, in A. H. Chen Ed., Research in Finance, Volume 24, 1–25.

"A Matrix-Based Lattice Model to Value Employee Stock Options," with Sumon C. Mazumdar, Rahul Surana and Sanjay Unni, 2006, Journal of Derivatives 14, 9–26.

"Mean Reversion in Earnings and the Use of E/P Multiples in Corporate Valuation," with David Denis and Atulya Sarin, 2004, Journal of Applied Finance 14, 4–10.

"Securities Class Action Settlements: An Empirical Analysis," with Sumon C. Mazumdar and Atulya Sarin, 2003, Santa Clara Law Review 43, 1001–1033.

"Ownership Structure, Agency Costs and Dividend Policy," with Anand M. Vijh and Randolph W. Westerfield, 2002, in A. H. Chen Ed., Research in Finance, Volume 19, 1–28.

"The Cost of Raising Preferred Equity Capital," with Sumon C. Mazumdar and Atulya Sarin, 2002, Journal of Financial Research 25, 577–592.

"Firm Value and Marketability Discounts," with David J. Denis, Stephen P. Ferris and Atulya Sarin, 2001, Journal of Corporation Law 27, 89–115.

"Transfer Pricing and Foreign Exchange Risk," with Brian Becker and Jonathan Neuberger, Transfer Pricing Report, July 1999.

"Dividend Omissions and Forecasts of Future Earnings: Some Positive Evidence on Information Content of Dividends," 1999, in A. H. Chen Ed., Research in Finance, Volume 17, 13–39.

"The Relationship Between Ownership, Financing Decisions and Firm Performance: A Signaling Model," with Sudipto Dasgupta and Yuk-She Chan, 1998, International Economic Review 39, 723–744.

"Valuation for Smaller Capitalization Companies," with Scott D. Hakala, 1998, in Financial Valuation: Business and Business Interests – 1998 update, Warren, Gorham & Lamant.

"Trading Behavior and the Unbiasedness of the Market Reaction to Dividend Announcements," with Anand M. Vijh, 1995, Journal of Finance 50. (Abstract reprinted in Financial Management Collection, 1996.)

"Beyond Mere Compliance," with Anita S. Agarwal, Mortgage Banking, April 1993, 57–61.

"Dividend Clienteles and the Information Content of Dividend Changes," with Anand M. Vijh, 1990, Journal of Financial Economics 26, 193–219.

"The Efficient and Inefficient Media for Political Campaign Advertising," with Roland T. Rust and George T. Haley, 1984, Journal of Advertising 13, 45–49.

"Modeling of Non-Ideal Residence Time Distribution in a Continuous Flow Stirred Tank Reactor at Zero RPM," with D. Prasanna Rao, 1983, Indian Chemical Engineer, 24–27.

"Alternate Criteria for the Comparison of Regression Models," with Roland T. Rust, presented in Proceedings of the Southwestern Marketing Association, Spring 1983.

## Working Papers

"ESO Expensing Under the Revised FAS 123: A Practitioner's Guide," with Sumon C. Mazumdar, Sanjay Unni, and Anand Vijh, September 2005.

"Investment in Company Stock in 401(k) Accounts," with Sumon C. Mazumdar, May 2005.

"The New Accounting Rules for ESO Expensing: Not Quite As Easy As 123," with Sumon C. Mazumdar and Sanjay Unni, March 2005.

"Competition in IPO Underwriting: Time Series Evidence," with Andrew H. Chen, Sumon C. Mazumdar and Atulya Sarin, March 2003.

"Auditor Compensation and Audit Failure: An Empirical Analysis," February 2003.

"The Offer Yield of Preferred Stock," with Sumon C. Mazumdar and Atulya Sarin, March 2002.

"Signaling, Agency Costs and Ownership Structure: Theory and Empirical Implications," with Sudipto Dasgupta and Yuk–Shee Chan, mimeo, Hong Kong University of Science and Technology, 1997.

"Is it Appropriate to Use a Higher Discount Rate to Value Small Firms?" with Martin Hanan, Rick Knoll, and Mark Mitchell.

"Turnover in Equity Ownership, Risk and Return," September 1995.

## Professional History

| | |
|---|---|
| 2019 – present | Charles River Associates<br>    Senior Consultant |
| 2012 – 2019 | Navigant Consulting<br>    Managing Director and Global Head of the Securities & Finance Practice |
| 1997 – 2014 | Haas School of Business, University of California, Berkeley<br>    Lecturer |
| 2011 – 2012 | AFE Consulting<br>    Founder and President |
| 1997 – 2011 | LECG<br>    Senior Managing Director and Practice Leader (2007 – 2011)<br>    Member – Executive Management Committee (2007 – 2011)<br>    Member – Management Advisory Committee (2003 – 2007)<br>    Member – Board of Directors (2001 – 2003)<br>    Managing Director (1999 – 2007)<br>    Director (1999)<br>    Affiliate (1998)<br>    Principal (1998)<br>    Senior Economist (1997) |

| 1995 – 1997 | BVS |
|---|---|
| | Senior Associate |

| 1988 – 1995 | University of Southern California |
|---|---|
| | Assistant Professor – Finance and Business Economics |
| | Award from Faculty Research & Innovation Fund, University of Southern California, 1990 |

1983 – 1988    University of California, Berkeley
               Instructor
               Graduate Student Instructor

- Graduate Fellowship, University of California, Berkeley (1988)
- Earl F. Cheit Award for Outstanding Teaching, Graduate School of Business, University of California, Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California, Berkeley (1986–1987)
- Outstanding Graduate Student Instructor Award, University of California, Berkeley (1985–1986)
- Award for Best Technical Paper published in Indian Chemical Engineer (1983)

**Appendix 2: Documents Considered**

**Legal Documents**

Second Amended Consolidated Class Action Complaint, United States District Court, District of Connecticut, Civil Action No. 3:17-cv-00558 (SRU), filed December 13, 2019.

Expert Report of Dr. David I. Tabak, Ph.D., June 18, 2020.

Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, June 19, 2020.

Deposition Transcript of Dr. David I. Tabak, Ph.D., July 28, 2020.

**Articles**

Anderson, David R., Dennis J. Sweeney, Thomas A. Williams, Jeffrey D. Camm, and James J. Cochran, (2016). *Statistics for Business & Economics*, 2nd edition, West Publishing.

Bajaj, Mukesh, Sumon C. Mazumdar, and Daniel A. McLaughlin, (2014). "Assessing Market Efficiency for Reliance on the Fraud-on-the-Market Doctrine after Wal-Mart and Amgen," *Research in Law and Economics,* 26:161-207.

Bhattacharya, Gouri K. and Richard A. Johnson, (1977). *Statistical Concepts and Methods*, Wiley.

Bodie, Zvi, Alex Kane, and Alan J. Marcus, (2011). *Investments*, McGraw-Hill Irwin.

Brown, Stephen J., and Jerold B. Warner, (1985). "Using Daily Stock Returns: The Case of Event Studies," *Journal of Financial Economics,* 14(1):3-31.

Efron, Bradley and Robert J. Tibshirani, (1993). *An Introduction to the Bootstrap*. Springer-Science+Business Media B.V.

Erenburg, Grigori, Janet K. Smith, and Richard L. Smith, (2011). "The Paradox of "Fraud-on-the-Market Theory": Who Relies on the Efficiency of Market Prices?" *Journal of Empirical Legal Studies* 8(2):260-303.

Fama, Eugene F., (1970). "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25(2):383-417.

Fama, Eugene F., (1991). "Efficient Capital Markets: II," *The Journal of Finance,* 46(5):1575-1617.

Fama, Eugene F., Lawrence Fisher, Michael C. Jensen, and Richard W. Roll, (1969). "The Adjustment of Stock Prices to New Information," *International Economic Review,* 10(1):1-21.

Ferrillo, Paul A., Frederick C. Dunbar, and David I. Tabak, (2004). "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 81:119-22.

Grossman, Sanford J. and Joseph E. Stiglitz, (1980). "On the Impossibility of Informationally Efficient Markets," *The American Economic Review,* 70(3):393-408.

Tabak, David I., (2010). "Use and Misuse of Event Studies to Examine Market Efficiency," *NERA Economic Consulting.*

Tabak, David I., (2016). "What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Economic Consulting.*

## Case Literature and Expert Reports

*Amgen v. Connecticut Ret. Plan & Trust Funds*, 568 U.S. 455, 133 S. Ct. 1184 (2013).

*Basic Inc. et al. v. Levinson et al.* 485 U.S. 224 No. 86-279 (1988).

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

Expert Report of David Tabak, *Forsta AP-Fonden v. St. Jude Medical, Inc.*, United States District Court for the District of Minnesota. Civil No. 12-3070 (JNE/HB), January 15th, 2015.

Expert Report of David Tabak, *In Re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, United States District Court, District of New Jersey, Civil Action No. 05-2367 (SRC), August 28th, 2015.

Expert Report of David Tabak, *In Re Netbank Securities Litigation*, United States District Court, Northern District of Georgia, Atlanta Division, 1:07-cv-2298, May 29th, 2009.

Expert Report of David Tabak, *In Re Rayonier Inc. Securities Litigation*, United States District Court, Middle District of Florida, Jacksonville Division, 3:14-cv-1395-J-32JBT, December 15th, 2016.

Expert Report of David Tabak, *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, United States District Court, Western District of Texas, No 1-11-CV-01034 (SS), March 21st, 2013.

*In re PolyMedica Corp. Securities Litigation*, (1st Cir. 12/13/2005), 1st Cir., 05-1220.

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

Opinion, *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, United States District Court, Southern District of New York, No. 09 Civ. 832 (MGC), March 27, 2012.

**Miscellaneous Sources**

"Investor FAQs," Teva Investor Relations, http://ir.tevapharm.com/investor-resources/investor-faqs/default.aspx.

SAS Institute, SAS STAT manual, version 9.2.

**Data Sources**

Factiva.

Tabak Electronic Work Files.

Refinitiv Eikon.

All other data, documents and sources cited/mentioned in the report and appendices.

APPENDIX 3a

**Mimiumum Number of Tabak Purported "News" Days with Statistically Significant Excess Returns for Tabak z-test to Be Significant at 5% Level [1]**

**ADS and Preferred Shares**

| | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Difference and z-statistic | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Significant Number Needed for z-statisitc > 1.96[1] | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Difference in Percentages | Tabak z-statistic | p-value | Different from Zero at 5% Significance Level? |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | (2) / (1) | | | (5) / (4) | (3) - (6) | | | |
| **Panel A: ADS** | | | | | | | | | | |
| Tabak Earnings Dates | 22 | 6 | 27 3% | 1,302 | 160 | 12 3% | 15 0% | 2 10 | 3 53% | Yes |
| DJNW | 678 | 90 | 13 3% | 646 | 63 | 9 8% | 3 5% | 2 00 | 4 51% | Yes |
| DJNW Top 50% | 263 | 39 | 14 8% | 1,061 | 111 | 10 5% | 4 4% | 2 00 | 4 55% | Yes |
| DJNW Top 10% | 63 | 13 | 20 6% | 1,261 | 150 | 11 9% | 8 7% | 2 06 | 3 94% | Yes |
| **Panel B: Preferred Shares** | | | | | | | | | | |
| Tabak Earnings Dates | 12 | 6 | 50 0% | 751 | 157 | 20 9% | 29 1% | 2 44 | 1 47% | Yes |
| DJNW | 381 | 89 | 23 4% | 382 | 67 | 17 5% | 5 8% | 1 99 | 4 62% | Yes |
| DJNW Top 50% | 154 | 40 | 26 0% | 609 | 114 | 18 7% | 7 3% | 2 00 | 4 51% | Yes |
| DJNW Top 10% | 30 | 11 | 36 7% | 733 | 146 | 19 9% | 16 7% | 2 22 | 2 61% | Yes |

[1]  All data sourced from Tabak Electronic Workfiles and Tabak Report Exhibits 8a-a and 8a-b  Z-statisics were calculated using the Tabak z-test method (which included alleged disclosure dates and used a pooled standard error)  To arrive at the z-statistics shown, the number of statistically significant Tabak Purported "news" Days reported in Dr  Tabak's workfiles was redudced (or increased) to the minimum number of days needed to achieve a z-statistic of greater than 1 96 (holding other things fixed)

APPENDIX 3b

**Mimimum Number of Tabak Purported "News" Days with Statistically Significant Excess Returns for Tabak z-test to Be Significant at 5% Level[1]**

**Teva Notes**

| | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Difference and z-statistic | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Minimum Significant Number Needed for z-statisitc > 1.96[1] | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Difference in Percentages | Tabak z-statistic | p-value | Different from Zero at 5% Significance Level? |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| | | | (2) / (1) | | | (5) / (4) | (3) - (6) | | | |
| **Tabak Earnings Dates** | | | | | | | | | | |
| 2018 Notes | 7 | 2 | 28 57 % | 411 | 17 | 4 14 % | 24 44 % | 3 08 | 0 21 % | Yes |
| 2019 Notes | 12 | 3 | 25 00 | 689 | 34 | 4 93 | 20 07 | 3 08 | 0 21 | Yes |
| 2021 Notes | 12 | 3 | 25 00 | 689 | 40 | 5 81 | 19 19 | 2 75 | 0 60 | Yes |
| 2023 Notes | 12 | 3 | 25 00 | 689 | 39 | 5 66 | 19 34 | 2 80 | 0 51 | Yes |
| 2026 Notes | 12 | 3 | 25 00 | 689 | 37 | 5 37 | 19 63 | 2 91 | 0 37 | Yes |
| 2046 Notes | 12 | 3 | 25 00 | 689 | 41 | 5 95 | 19 05 | 2 70 | 0 70 | Yes |
| **DJNW** | | | | | | | | | | |
| 2018 Notes | 237 | 11 | 4 64 % | 181 | 2 | 1 10 % | 3 54 % | 2 06 | 3 90 % | Yes |
| 2019 Notes | 357 | 25 | 7 00 | 344 | 12 | 3 49 | 3 51 | 2 08 | 3 75 | Yes |
| 2021 Notes | 357 | 30 | 8 40 | 344 | 16 | 4 65 | 3 75 | 2 01 | 4 49 | Yes |
| 2023 Notes | 357 | 31 | 8 68 | 344 | 17 | 4 94 | 3 74 | 1 96 | 4 99 | Yes |
| 2026 Notes | 357 | 31 | 8 68 | 344 | 17 | 4 94 | 3 74 | 1 96 | 4 99 | Yes |
| 2046 Notes | 357 | 31 | 8 68 | 344 | 17 | 4 94 | 3 74 | 1 96 | 4 99 | Yes |
| **DJNW Top 50%** | | | | | | | | | | |
| 2018 Notes | 102 | 8 | 7 84 % | 316 | 9 | 2 85 % | 5 00 % | 2 22 | 2 64 % | Yes |
| 2019 Notes | 133 | 11 | 8 27 | 568 | 22 | 3 87 | 4 40 | 2 16 | 3 11 | Yes |
| 2021 Notes | 133 | 14 | 10 53 | 568 | 30 | 5 28 | 5 24 | 2 24 | 2 48 | Yes |
| 2023 Notes | 133 | 13 | 9 77 | 568 | 29 | 5 11 | 4 67 | 2 04 | 4 11 | Yes |
| 2026 Notes | 133 | 13 | 9 77 | 568 | 29 | 5 11 | 4 67 | 2 04 | 4 11 | Yes |
| 2046 Notes | 133 | 14 | 10 53 | 568 | 32 | 5 63 | 4 89 | 2 05 | 4 03 | Yes |
| **DJNW Top 10%** | | | | | | | | | | |
| 2018 Notes | 21 | 3 | 14 29 % | 397 | 14 | 3 53 % | 10 76 % | 2 43 | 1 50 % | Yes |
| 2019 Notes | 27 | 4 | 14 81 | 674 | 31 | 4 60 | 10 22 | 2 39 | 1 69 | Yes |
| 2021 Notes | 27 | 4 | 14 81 | 674 | 36 | 5 34 | 9 47 | 2 08 | 3 74 | Yes |
| 2023 Notes | 27 | 4 | 14 81 | 674 | 38 | 5 64 | 9 18 | 1 97 | 4 88 | Yes |
| 2026 Notes | 27 | 4 | 14 81 | 674 | 34 | 5 04 | 9 77 | 2 20 | 2 79 | Yes |
| 2046 Notes | 27 | 4 | 14 81 | 674 | 36 | 5 34 | 9 47 | 2 08 | 3 74 | Yes |

**Notes and Sources:**

[1] All data sourced from Tabak Electronic Workfiles and Tabak Report Exhibit 8a-c  Z-statisics were calculated using the Tabak z-test method (which included alleged disclosure dates and used a pooled standard error)  To arrive at the z-statistics shown, the number of statistically significant Tabak Purported "news" Days reported in Dr  Tabak's workfiles was redudeed (or increased) to the minimum number of days needed to achieve a z-statistic of greater than 1 96 (holding other things fixed)

**APPENDIX 4**

**Tabak ADS z-test Exhibit 8a-a Analysis with Signs of Excess Returns Reversed[1]**

| | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Difference and z-statistics | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Difference in Percentages | z-statistic | p-value | Different from Zero at 5% Significance Level? |
| | (1) | (2) | (3) (2) / (1) | (4) | (5) | (6) (5) / (4) | (7) (3) - (6) | (8) | (9) | (10) |
| Tabak Earnings Dates | 22 | 17 | 77 3% | 1,302 | 160 | 12 3% | 65 0% | 8 88 | 0 00 % | Yes |
| DJNW | 678 | 114 | 16 8% | 646 | 63 | 9 8% | 7 1% | 3 77 | 0 02 | Yes |
| DJNW - Top 10% | 263 | 66 | 25 1% | 1,061 | 111 | 10 5% | 14 6% | 6 24 | 0 00 | Yes |
| DJNW - Top 50% | 63 | 27 | 42 9% | 1,261 | 150 | 11 9% | 31 0% | 7 05 | 0 00 | Yes |

**Notes and Sources:**

[1] All data sourced from Tabak Electronic Workfiles

APPENDIX 5a

**Percent of Open-Close and Close-Open Periods with Statistically Significant Abnormal Returns on Tabak Purported "News Days" as Compared to "Non-News" Days[1]**
**for American Depository Shares**
**February 6, 2014 to May 10, 2019**

| | Tabak Purported "News" Periods | | | Tabak Purported "News" Periods | | | Difference between Tabak Purported "News" Days and "Non-News" Periods | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns in Prior Period | Percent of Days with Significant Excess Returns in Prior Period | Total Number | Number with Significant Excess Returns in Prior Period | Percent of Days with Significant Excess Returns in Prior Period | Difference in Percentages | z-statistic[2] | p-value | Different from Zero at 5% Significance Level? |
| | (1) | (2) | (3) (2) / (1) | (4) | (5) | (6) (5) / (4) | (7) (3) - (6) | | (9) | (10) |
| Dow Jones Information Day | 861 | 179 | 20 8% | 1786 | 179 | 10 0% | 10 8% | 7 59 | 0 00% | Yes |
| Dow Jones Top 50% Information Day | 267 | 71 | 26 6% | 2380 | 287 | 12 1% | 14 5% | 6 58 | 0 00% | Yes |
| Dow Jones Top 10% Information Day | 76 | 20 | 26 3% | 2571 | 338 | 13 1% | 13 2% | 3 31 | 0 05% | Yes |

**Notes and Sources:**

[1] Data from Tabak Electronic Workfiles and Refinitiv Eikon  Number of news articles are calculated for each period  In order to calculate excess return I perform a regression using Tabak's market model for ADS but with two sets of returns for each day: one for the close/open return between 4pm the previous trading day and 930am period, and one for the open/close return during trading hours from the 930am to 4pm period  The regression is estimated over the same period (February 6, 2013 to February 5, 2014) and using the same index (S&P Pharmaceuticals Select Index)  Abnormal Returns are compared to the news count for the following open-close/close-open period

[2] Z-statistic is computed using the "pooled variance" and a two sided p-value as in Tabak Report

**APPENDIX 5b**

**Percent of Open-Close and Close-Open Periods with Statistically Significant Returns on Tabak Purported "News" as Compared to "Non-News" Periods[1]**
**for American Depository Shares**
**Febrary 6, 2014 to May 10, 2020**

| | Tabak Purported "News" Periods | | | Tabak Purported "Non-News" Periods | | | KS Test of the Equality of Distribution of Tabak Purported "News" and "Non-News" Periods | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Average Absolute Value of Excess Returns (In Logs) of Previous Period | Average Absolute Value of Excess Returns (In Percentages) of Previous Period | Total Number | Average Absolute Value of Excess Returns (In Logs) of Previous Period | Average Absolute Value of Excess Returns (In Percentages) of Previous Period | Kolmogorov-Smirnov Distance | p-value | Different in Distribution at 5% Significance Level? |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| *Dow Jones Newswires* | 861 | 0 013 | 1 34 % | 1786 | 0 008 | 0 82 % | 0 187 | 0 000 % | Yes |
| *Dow Jones Newswires - Top 10%* | 267 | 0 018 | 1 81 | 2380 | 0 009 | 0 90 | 0 213 | 0 000 | Yes |
| *Dow Jones Newswires - Top 50%* | 76 | 0 022 | 2 20 | 2571 | 0 009 | 0 95 | 0 191 | 0 927 | Yes |

**Notes and Sources:**

[1] Data from Tabak Electronic Workfiles and Eikon  Number of news articles are calculated for each period  In order to calculate excess return I perform a regression using Tabak's market model for ADS but with two sets of returns for each day: one for the close/open return between 4pm the previous trading day and 930am period, and one for the open/close return during trading hours from the 930am to 4pm period  The regression is estimated over the same period (February 6, 2013 to February 5, 2014) and using the same index (S&P Pharmaceuticals Select Index) Abnormal Returns are compared to the news count for the following open-close/close-open period

# APPENDIX 6

## Analysis of 4:00 pm NYSE close to 7:00 am Teva stock returns and 7:00 to 9:30 am DJNW articles

1. To further examine the two NYSE trading day sub-periods (close to open and open to close) with more granularity, I examined the time stamps of the 2,332 Tabak DJNW articles indicating when the articles were published.  I find that they do not arrive at a uniform rate throughout the trading day.  Figure 6.1 below shows that the most intense period for publication of these articles is between 7:00 am EST and 9:30 pm EST.  It would be interesting to examine if even this cluster of "pre-open" articles could also be subject to reverse causation. While the NYSE does not start trade between 4:00 pm close on the preceding until 9:30 am, we can examine degree of reverse causation for such pre-open articles because Teva stock also trades on the Tel Aviv Stock Exchange ("TASE").[1]  The TASE opens at 2:45 am EST.[2] Therefore, we can see if the return on Teva stock between the previous day's NYSE close at 4:00 pm and next morning at 7:00 am explains the number of articles in Dr. Tabak's sample between 7:00 am and 9:30 am, which would evidence reverse causality for these pre-open articles as well. In order to do so, I use stock price on Tel Aviv's stock exchange at 7:00 am EST in order to compute return between previous day's closing price on NYSE and the 7:00 am EST price the next morning.

---

[1]    Teva's common stock traded on TASE and the ADS trade at a 1:1 ratio. According to the company website "Teva stock has traded on the Tel Aviv Stock Exchange since 1951," and Teva's ADS traded on the NASDAQ from 1982 until 2012 at which time the listing was switched to the NYSE." [http://ir.tevapharm.com/investor-resources/investor-faqs/default.aspx]

[2]    Note that the Tel Aviv exchange opens around 2:45 am EST and closes at around 10:30 am EST most days in the year, except for some days when the changes from standard to daylight saving time in the US and Israel happen at different times.  Note also that TASE does not trade on Fridays so the analysis is not performed on Fridays.  [Source: Refinitiv Eikon].

**Figure 6.1: Number and frequency of Dr. Tabak's DJNW Articles by time interval**



Source: Tabak Report Electronic Work Files

2. For each of the 1,324 trading days in Dr. Tabak's data set,[3] I then compute the return from the 4:00 pm close of NYSE trading the previous trading day to 7:00 am the next trading day. Note that this return is a sub-part of the daily close to close return underlying Dr. Tabak's z-tests and KS tests. I also count the number of DJNW articles in Dr. Tabak's data between 7:00 am to 9:30 am during each of the days in his sample. Similar to the analysis shown in Figure 2 in the main body of this report, I then create 5 quintile categories of returns from market close to 7:00 am based on the magnitude of their absolute value. As Figure 6.2 below shows, if the return from market close to 7:00 am was large, it is more likely that there would be one or more stories between 7:00 am and 9:30 am and the average number of stories on such story days is also larger. Clearly the stock return between the previous day's close and 7:00 am could not have been due to stories

---

[3] Excluding Fridays as noted above.

that were published after 7:00 am. This chart shows that when the stock had a large price change based on trading on TASE as financial press is beginning to get active before trading starts on NYSE, there is likely to be a larger number of stories in the press. In other words, there is significant evidence that, despite the fact that Dr. Tabak interpreted his data to conclude news stories were causing returns, the opposite appears to be true: stock price returns were causing news stories.

**Figure 6.2: The association between ADS returns (4:00 pm NYSE Close to next trading day 7:00 am) and Tabak DJNW article counts in the subsequent sub-period (7:00 am to 9:30 am NYSE Open)[4]**



4    Sources and Notes: Refinitiv Eikon. Because 7:00am TASE prices are quoted in New Israeli Shekels (NIS), prices are converted to USD to calculate returns. Currency conversion from New Israeli Shekel to USD from daily open spot exchange rate from Eikon.

**Appendix 7: Technical details for reverse causality simulations**

       1. The simulation analysis takes 3 steps, each of which is executed 1,000 times.

    a) Step 1: Simulation of an inefficient market structure, i.e. uncorrelated "story dates" and excess returns.

    b) Step 2: Simulation of story counts on "story dates"

    c) Step 3: Statistical testing using Dr. Tabak's z-test and KS-tests

       <u>Step 1: Simulation of an inefficient market structure</u>

       2. To simulate an inefficient market I first sample 1,324 observations (the length of the proposed class period) for 3 variables from Dr. Tabak's dataset. The variables I sample from are the ADS raw return, ADS excess return, and Dr. Tabak's statistical significance indicator.[1]

       3. The sampling, with replacement, from a known population of data is a frequently used procedure in statistics known as "bootstrap."[2] The bootstrap simulation allows a researcher to study the distributions of various statistics, in this case Dr. Tabak's z-statistic and KS-distance statistic, drawn from a particular distribution. Moreover, by sampling from Dr. Tabak's dataset, my analysis utilizes Dr. Tabak's market model and statistical significance tests.

       4. Next, I randomly assign each of the 1,324 days in the proposed class period a label of "story date" or "no-story date." The random assignment of the "story date" label was performed by drawing from a Bernoulli distribution with probability of success equal to the fraction of dates that Dr. Tabak labels as news days, i.e. 51% (= 678 / 1,324). Thus, the "story date" indicator is independent of the Teva ADS excess returns or their statistical significance indicator as computed by Dr. Tabak.

---

[1] I use file "TEVA ADS Market Efficiency Tests.xlsx," which was provided as backup to the Tabak Report.
[2] See, for example, Efron, Bradley and Robert Tibshirani, (1993). "An Introduction to the Bootstrap," Springer Science+Business Media, B.V.

Step 2: Simulation of the story counts

5. I simulate the number of stories released on each day which I label as "story date" in Step 1. For dates labeled as "no-story dates," I assign a zero count for the number of stories.

6. The number of stories is simulated by bootstrap conditional on the level of the ADS absolute value of raw return.[3] For that purpose I first assign the Teva ADS raw returns into deciles by their absolute raw returns. Each decile contains 132 or 133 dates, labeled as "story dates" or "no-story dates." Within each decile I keep only the distribution of the number of stories on the "story dates." I use these ten distributions to simulate the number of stories on the "story dates" generated in my simulations.

7. Next, I split all simulated "story dates" into deciles using the same decile cut-offs as those used with the actual data. Then for each simulated "story date", I randomly sample, with replacement, from the distribution of actual story counts in the same decile. Thus, the number of stories on the "story dates" mirrors the actual distribution of story counts and its correlation with the ADS raw returns in Dr. Tabak's data.

8. Lastly, I use the same process as Dr. Tabak to assign each story date into the Top 50% or Top 10% of the set of the days in each simulation. Namely, I assign to dates into "Top 50%" if they contain more stories than the median number of stories. All other dates, including the "no-story dates" are assigned to the complement set of the "Top 50%" story dates. Similarly, I assign to dates into "Top 10%" if they contain more stories than the 10th percentile of the number of stories. All other dates, including the "no-story dates" are assigned to the complement set of the "Top 10%" story dates.

Step 3: Statistical testing using Dr. Tabak's z-test and KS-tests

---

[3] I condition the number of stories on the size of the ADS raw return because it is far more likely that financial journalists react to large raw returns rather than large excess returns. Conditioning my analysis on the Teva ADS excess returns, however, produces the same qualitative conclusion as the analysis I use in this report.

9. To perform Dr. Tabak's z-test, I need as inputs the indicators of statistical significance of each day in the proposed class period (from Step 1) the indicator whether the date is a "story date" (from Step 1), "Top 50% story date" (from Step 2) or "Top 10% story date" (from Step 2). Then I use Dr. Tabak's z-test as described in the Tabak Report.

10. More specifically, for each of the 1,000 simulation runs, I compute the z-statistic as the ratio of the difference in proportions of significant excess returns on "story dates" and "no-story dates" and the pooled standard error of that difference.[4] The histograms of the z-statistics I compute is shown in Figure 3, Figure 4 and Figure 5. The figures also show the fraction of z-statistics that are larger than the critical value of 1.9695 in absolute value, for which Dr. Tabak's z-test would reject the null hypothesis that the two proportions are the same. More details of the computation are shown in Appendix 8a.

11. For the KS-tests, for each of the 1,000 simulation runs, I compute the KS distance measure and the p-value (probability of the KS distance being larger than the computed value) using standard statistical software in Matlab.[5] The KS distance is the maximum difference between the cumulative distribution functions (CDF) of the absolute ADS excess returns in "story dates" and "non-story dates." The p-value of the KS distance is the probability under, the null hypothesis, that The KS distance is as large as, or larger, than the computed value. More details of the computation are shown in Appendix 8b.

---

[4] This is computed for all "story dates," "Top 50% story dates," and "Top 10% story dates."

[5] The distribution of the KS distance measure and the corresponding p-values need to be computed numerically and are provided by the statistical software.

**APPENDIX 8a**
**ADS Simulation Analysis Using Dr. Tabak's Data**
**Percent of Days with Statistically Significant Returns on Story Dates as Compared to No-Story Dates**

| | Story Dates | | | No-story Dates | | | Difference between Story Dates and No-Story Dates | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Average Total Number[1] | Average Number with Significant Excess Returns[2] | Average Percent of Days with Significant Excess Returns[3] | Average Total Number[4] | Average Number with Significant Excess Returns[5] | Average Percent of Days with Significant Excess Returns[6] | Average Difference in Percentages[7] | Average z-statistic[8] | Average p-value[9] | Percent of Simulations with p-values <0.05%[10] |
| **Simulated Story Dates** | 678 | 91 | 13 4% | 646 | 86 | 13 4% | 0 0% | -0 01 | 50 3% | 4 1% |
| **Simulated Story Dates - Top 50%** | 259 | 50 | 19 2% | 1,065 | 127 | 11 9% | 7 3% | 3 10 | 1 8% | 89 9% |
| **Simulated Story Dates - Top 10%** | 59 | 20 | 33 6% | 1,265 | 157 | 12 4% | 21 2% | 4 68 | 0 3% | 98 9% |

**Notes and Sources:**
[1]    Average (over 1,000 simulations) of the total number of simulated story dates
[2]    Average (over 1,000 simulations) of the number of story dates with significant excess return
[3]    = [1] / [2]
[4]    Average (over 1,000 simulations) of the total number of simulated no-story dates
[5]    Average (over 1,000 simulations) of the number of no-story dates with significant excess return
[6]    = [5] / [6]
[7]    Average (over 1,000 simulations) of the difference between the values in [3] and [6]
[8]    = Average of z-statistic  Z-statistic = ([3][i] - [6][i]) / sqrt(p[i]*(1-p[i])*(1/[1][i] + 1/[4][i]), where p[i] = ([2][i]+[5][i])/([1][i]+[4][i]) and [i] stands for the individual simulation run
[9]    = Number of p-values of z-test less than or equal to 5%  / 1000

**APPENDIX 8b**
**Teva Pharmaceutical Industries Ltd.**
**Absolute Value of Excess Returns on "Story" as Compared to "No-Story" Days**
**for American Depositary Shares**
**February 6, 2014 to May 10, 2019**
*Simulation Exercise Based on Dr. Tabak's Data*

| | Story Dates | | | No-story Dates | | | Kolmogorov-Smirnov Test of the Equality of Distributions of Story Dates and No-Story Dates | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Average Total Number[1] | Average of Average Absolute Value of Excess Returns (In Logs)[2] | Average of Average Absolute Value of Excess Returns (In Percentages)[3] | Average Total Number[4] | Average of Average Absolute Value of Excess Returns (In Logs)[5] | Average of Average Absolute Value of Excess Returns (In Percentages)[6] | Average Kolmogorov-Smirnov Distance[7] | Average p-value[8] | Fraction of p-value lower than 5%[9] |
| **Simulated Story Dates** | 679 | 0 0137 | 1 38 | 645 | 0 0137 | 1 38 | 0 047 | 0 508 | 5 00% |
| **Simulated Story Dates - Top 50%** | 258 | 0 0165 | 1 66 | 1,066 | 0 0130 | 1 31 | 0 118 | 0 047 | 79 10% |
| **Simulated Story Dates - Top 10%** | 59 | 0 0229 | 2 31 | 1,265 | 0 0133 | 1 33 | 0 259 | 0 022 | 90 60% |

**Notes and Sources:**

[1]  Average (over 1,000 simulations) of the total number of simulated story dates

[2]  Average (over 1,000 simulations) of the average Teva ADS absolute excess return

[3]   = (exp([2]) - 1)*100

[4]  Average (over 1,000 simulations) of the total number of simulated no-story dates

[5]  Average (over 1,000 simulations) of the average Teva ADS absolute excess return of simulated no-story dates

[6]   = (exp([5]) - 1)*100

[7]  Average (over 1,000 simulations) of the Kolmogorov-Smirnov (KS) Distance  The KS Distance (computed via Matlab function kstest2)  Represents the maximum distance between the distributions of the absolute excess returns on story dates and no-story dates

[8]  Average (over 1,000 simulations) of the p-value of the KS Distance (computed via Matlab function kstest2)

[9]   = Number of p-values of KS Distance less than or equal to 5%  / 1000

**APPENDIX 9**
**Tabak DJNW KS tests with Alleged Disclosure Dates Removed**

| | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Tabak KS Test (corrected)[1] Distributions of Tabak Purported "News" and "Non-News" Days | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Average Absolute Value of Excess Returns (In Logs) | Average Absolute Value of Excess Returns (In Percentages) | Total Number | Average Absolute Value of Excess Returns (In Logs) | Average Absolute Value of Excess Returns (In Percentages) | Kolmogorov-Smirnov Distance | p-value | Different in Distribution at 5% Significance Level? |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| ADS | 666 | 0 0145 | 1 46 % | 645 | 0 0113 | 1 14 % | 0 0641 | 13 48 % | No |
| Preferred | 369 | 0 0158 | 1 59 % | 381 | 0 0123 | 1 24 % | 0 1035 | 3 61 % | Yes |
| 2018 | 226 | 0 000 | 0 04 % | 180 | 0 0003 | 0 03 % | 0 1037 | 23 11 % | No |
| 2019 | 345 | 0 001 | 0 06 % | 343 | 0 0005 | 0 05 % | 0 0536 | 70 74 % | No |
| 2021 | 345 | 0 002 | 0 15 % | 343 | 0 0015 | 0 15 % | 0 0730 | 31 88 % | No |
| 2023 | 345 | 0 003 | 0 25 % | 343 | 0 0022 | 0 22 % | 0 0892 | 12 92 % | No |
| 2026 | 345 | 0 003 | 0 33 % | 343 | 0 0030 | 0 31 % | 0 0600 | 56 54 % | No |
| 2046 | 345 | 0 006 | 0 57 % | 343 | 0 0052 | 0 52 % | 0 0871 | 14 72 % | No |

**Notes and Sources:**

[1] All data sourced from Tabak Electronic Workfiles  Alleged corrective disclosure days are the days Dr  Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364)  Tabak KS tests were recomputed using Dr  Tabak's electronic files

**APPENDIX 10**

**Tabak KS Test for the Notes, Corrected to Exclude Alleged Disclosure Dates.**

| | Note | Analysis Period | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Tabak KS Test (corrected)[1] Distributions of Tabak Purported "News" and "Non-News" Days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total Number | Average Absolute Value of Excess Returns (In Logs) | Average Absolute Value of Excess Returns (In Percentages) | Total Number | Average Absolute Value of Excess Returns (In Logs) | Average Absolute Value of Excess Returns (In Percentages) | Kolmogorov-Smirnov Distance | p-value | Different in Distribution at 5% Significance Level? |
| *Earnings Dates* | | | | | | | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 3 | 0.000 | 0.03 % | 403 | 0.000 | 0.04 % | 0.330 | 0.902 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 8 | 0.001 | 0.13 | 680 | 0.001 | 0.06 | 0.435 | 0.100 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 8 | 0.003 | 0.25 | 680 | 0.001 | 0.15 | 0.324 | 0.379 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 8 | 0.006 | 0.65 | 680 | 0.002 | 0.23 | 0.365 | 0.244 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 8 | 0.007 | 0.71 | 680 | 0.003 | 0.31 | 0.340 | 0.321 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 8 | 0.008 | 0.84 | 680 | 0.005 | 0.54 | 0.501 | 0.037 | Yes |
| *Dow Jones Newswires* | | | | | | | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 226 | 0.000 | 0.04 % | 180 | 0.000 | 0.03 % | 0.104 | 0.231 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 345 | 0.001 | 0.06 | 343 | 0.001 | 0.05 | 0.054 | 0.707 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 345 | 0.002 | 0.15 | 343 | 0.001 | 0.15 | 0.073 | 0.319 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 345 | 0.003 | 0.25 | 343 | 0.002 | 0.22 | 0.089 | 0.129 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 345 | 0.003 | 0.33 | 343 | 0.003 | 0.31 | 0.060 | 0.565 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 345 | 0.006 | 0.57 | 343 | 0.005 | 0.52 | 0.087 | 0.147 | No |
| *Dow Jones Newswires - Top 50%* | | | | | | | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 92 | 0.000 | 0.05 % | 314 | 0.000 | 0.03 % | 0.101 | 0.460 | No |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 122 | 0.001 | 0.07 | 566 | 0.001 | 0.05 | 0.105 | 0.215 | No |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 122 | 0.002 | 0.16 | 566 | 0.001 | 0.15 | 0.061 | 0.854 | No |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 122 | 0.003 | 0.27 | 566 | 0.002 | 0.23 | 0.063 | 0.824 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 122 | 0.003 | 0.33 | 566 | 0.003 | 0.32 | 0.088 | 0.421 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 122 | 0.006 | 0.59 | 566 | 0.005 | 0.53 | 0.092 | 0.360 | No |
| *Dow Jones Newswires - Top 10%* | | | | | | | | | | | |
| 1 | Teva 2018 Notes | 7/21/2016 - 3/22/2018 | 15 | 0.001 | 0.08 % | 391 | 0.000 | 0.03 % | 0.378 | 0.032 | Yes |
| 2 | Teva 2019 Notes | 7/21/2016 - 5/10/2019 | 21 | 0.001 | 0.10 | 667 | 0.001 | 0.06 | 0.402 | 0.003 | Yes |
| 3 | Teva 2021 Notes | 7/21/2016 - 5/10/2019 | 21 | 0.003 | 0.28 | 667 | 0.001 | 0.15 | 0.305 | 0.045 | Yes |
| 4 | Teva 2023 Notes | 7/21/2016 - 5/10/2019 | 21 | 0.004 | 0.43 | 667 | 0.002 | 0.23 | 0.249 | 0.160 | No |
| 5 | Teva 2026 Notes | 7/21/2016 - 5/10/2019 | 21 | 0.006 | 0.61 | 667 | 0.003 | 0.31 | 0.245 | 0.174 | No |
| 6 | Teva 2046 Notes | 7/21/2016 - 5/10/2019 | 21 | 0.010 | 1.00 | 667 | 0.005 | 0.53 | 0.377 | 0.006 | Yes |

[1]  All data sourced from Tabak Electronic Workfiles  Alleged corrective disclosure days are the days Dr  Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364)  Tabak KS tests were recomputed using Dr  Tabak's electronic files , but removing alleged disclosure dates

**APPENDIX 11**
**Tabak z-tests for Notes correcting for deviations from FDT[1]**

| | "News" Days | | | "Non-News" Days | | | Difference between Tabak Purported "News Days" and "Non-News" Days | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Difference in Percentages | z-statistic[2] | p-value (1-sided) | Significant?[3] |
| | (1) | (2) | (3) (2) / (1) | (4) | (5) | (6) (5) / (4) | (7) (3) - (6) | (8) | (9) | (10) |
| **Earnings Days** | | | | | | | | | | |
| 2018 Notes | 3 | 0 | 0 0% | 403 | 16 | 4 0% | -4 0% | -4 08 | 100 00% | No |
| 2019 Notes | 8 | 2 | 25 0% | 680 | 31 | 4 6% | 20 4% | 1 33 | 9 12% | No |
| 2021 Notes | 8 | 1 | 12 5% | 680 | 35 | 5 1% | 7 4% | 0 63 | 26 53% | No |
| 2023 Notes | 8 | 3 | 37 5% | 680 | 35 | 5 1% | 32 4% | 1 89 | 2 95% | Yes |
| 2026 Notes | 8 | 3 | 37 5% | 680 | 34 | 5 0% | 32 5% | 1 90 | 2 89% | Yes |
| 2046 Notes | 8 | 0 | 0 0% | 680 | 37 | 5 4% | -5 4% | -6 26 | 100 00% | No |
| **Dow Jones Newswires** | | | | | | | | | | |
| 2018 Notes | 226 | 14 | 6 2% | 180 | 2 | 1 1% | 5 1% | 2 85 | 0 22% | Yes |
| 2019 Notes | 345 | 21 | 6 1% | 343 | 12 | 3 5% | 2 6% | 1 59 | 5 56% | No |
| 2021 Notes | 345 | 21 | 6 1% | 343 | 15 | 4 4% | 1 7% | 1 01 | 15 61% | No |
| 2023 Notes | 345 | 21 | 6 1% | 343 | 17 | 5 0% | 1 1% | 0 65 | 25 80% | No |
| 2026 Notes | 345 | 20 | 5 8% | 343 | 17 | 5 0% | 0 8% | 0 49 | 31 24% | No |
| 2046 Notes | 345 | 20 | 5 8% | 343 | 17 | 5 0% | 0 8% | 0 49 | 31 24% | No |
| **Dow Jones Newswsires -- Top 50%** | | | | | | | | | | |
| 2018 Notes | 92 | 7 | 7 6% | 314 | 9 | 2 9% | 4 7% | 1 62 | 5 22% | No |
| 2019 Notes | 122 | 11 | 9 0% | 566 | 22 | 3 9% | 5 1% | 1 89 | 2 95% | Yes |
| 2021 Notes | 122 | 8 | 6 6% | 566 | 28 | 4 9% | 1 6% | 0 67 | 25 28% | No |
| 2023 Notes | 122 | 10 | 8 2% | 566 | 28 | 4 9% | 3 2% | 1 23 | 10 96% | No |
| 2026 Notes | 122 | 8 | 6 6% | 566 | 29 | 5 1% | 1 4% | 0 59 | 27 72% | No |
| 2046 Notes | 122 | 6 | 4 9% | 566 | 31 | 5 5% | -0 6% | -0 26 | 60 12% | No |
| **Dow Jones Newswsires -- Top 10%** | | | | | | | | | | |
| 2018 Notes | 15 | 3 | 20 0% | 391 | 13 | 3 3% | 16 7% | 1 61 | 5 39% | No |
| 2019 Notes | 21 | 4 | 19 0% | 667 | 29 | 4 3% | 14 7% | 1 71 | 4 38% | Yes |
| 2021 Notes | 21 | 4 | 19 0% | 667 | 32 | 4 8% | 14 3% | 1 66 | 4 89% | Yes |
| 2023 Notes | 21 | 3 | 14 3% | 667 | 35 | 5 2% | 9 0% | 1 18 | 11 98% | No |
| 2026 Notes | 21 | 5 | 23 8% | 667 | 32 | 4 8% | 19 0% | 2 04 | 2 08% | Yes |
| 2046 Notes | 21 | 4 | 19 0% | 667 | 33 | 4 9% | 14 1% | 1 64 | 5 07% | No |

| | |
|---|---|
| Count of "No" | 17 |
| Total Tabak Tests | 24 |
| % of Total | 71% |

**Notes and Sources:**
[1] All data sourced from Tabak Electronic Workfiles  Alleged corrective disclosure days are the days Dr  Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364)
[2] Z-statistic is computed using the "unpooled variance" as per FDT
[3] Statistical significance is determined using a threshold of 1 65, the 5% level in a one-tailed test

**APPENDIX 12**

**Tabak Dow Jones Newswires z-tests by Time Periods and correcting for deviations from FDT[1]**

**for ADS and Preferred Teva Securities at Issue**

| | Tabak Purported "News" Days | | | Tabak Purported "Non-News" Days | | | Difference between Tabak Purported "News Days" and "Non-News" Days | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns | Percent of Days with Significant Excess Returns | Difference in Percentages | z-statistic[2] | p-value (1-sided) | Significant[3] |
| | (1) | (2) | (3) (2) / (1) | (4) | (5) | (6) (5) / (4) | (7) (3) - (6) | | (9) | (10) |
| **Panel A: ADS** | | | | | | | | | | |
| Pre-Acquisition (2/6/2014 to 8/1/2016) | 325 | 23 | 7 1% | 301 | 15 | 5 0% | 2 1% | 1 10 | 13 48% | No |
| Post-Acquisition (8/2/2016 to 5/10/2019) | 341 | 81 | 23 8% | 344 | 48 | 14 0% | 9 8% | 3 30 | 0 05% | Yes |
| 2014 | 107 | 5 | 4 7% | 121 | 6 | 5 0% | -0 3% | -0 10 | 45 99% | No |
| 2015 | 150 | 12 | 8 0% | 102 | 5 | 4 9% | 3 1% | 1 01 | 15 71% | No |
| 2016 | 123 | 10 | 8 1% | 123 | 6 | 4 9% | 3 3% | 1 04 | 15 00% | No |
| 2017 | 135 | 35 | 25 9% | 111 | 14 | 12 6% | 13 3% | 2 71 | 0 34% | Yes |
| 2018 | 109 | 31 | 28 4% | 140 | 26 | 18 6% | 9 9% | 1 82 | 3 45% | Yes |
| 2019 | 42 | 11 | 26 2% | 48 | 6 | 12 5% | 13 7% | 1 65 | 4 94% | Yes |
| **Panel B: Preferred Shares** | | | | | | | | | | |
| Pre-Acquisition (12/4/2015 to 8/1/2016) | 76 | 8 | 10 5% | 89 | 4 | 4 5% | 6 0% | 1 45 | 7 30% | No |
| Post-Acquisition (8/2/2016-5/10/2019) | 293 | 81 | 27 6% | 292 | 63 | 21 6% | 6 1% | 1 71 | 4 38% | Yes |
| 2016 | 123 | 12 | 9 8% | 123 | 6 | 4 9% | 4 9% | 1 48 | 7 00% | No |
| 2017 | 135 | 38 | 28 1% | 111 | 17 | 15 3% | 12 8% | 2 49 | 0 65% | Yes |
| 2018 | 103 | 39 | 37 9% | 136 | 44 | 32 4% | 5 5% | 0 88 | 18 86% | No |

**Notes and Sources:**

[1] All data sourced from Tabak Electronic Workfiles  Alleged corrective disclosure days are the days Dr  Tabak excluded from his Notes market model as well as 8/4/2017 (see Complaint ¶16, 364)

[2] Z-statistic is computed using the "unpooled variance" as per FDT

[3] Statistical significance is determined using a threshold of 1 65, the 5% level in a one-tailed test