## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

IN RE TEVA SECURITIES LITIGATION
_____

THIS DOCUMENT RELATES TO:
_____

No. 3:17-cv-558 (SRU)

No. 3:19-cv-192 (SRU)
No. 3:19-cv-449 (SRU)
No. 3:19-cv-513 (SRU)
No. 3:19-cv-543 (SRU)
No. 3:19-cv-655 (SRU)
No. 3:19-cv-656 (SRU)
No. 3:19-cv-657 (SRU)
No. 3:19-cv-923 (SRU)
No. 3:19-cv-1167 (SRU)
No. 3:19-cv-1173 (SRU)
No. 3:20-cv-83 (SRU)
No. 3:20-cv-588 (SRU)

## <u>ORDER</u>

Numerous plaintiffs have sued Teva Pharmaceutical Industries, Ltd. ("Teva"), and several current and former employees and officers of that company. The plaintiffs allege that Teva violated federal securities laws[1] by misrepresenting the reasons for its financial success. More specifically, the plaintiffs allege that Teva publicly attributed its success to good business decisions when, in fact, Teva was thriving because it was artificially and collusively inflating the prices of certain generic drugs that it manufactured.

I have consolidated the over two-dozen cases pending before me related to the same subject matter. *See* Consolidation Ruling, Doc. No. 341;[2] Consolidation Order, Doc. No. 352.

---

[1] As discussed further below, several of the actions include ancillary claims, such as state law claims and Israeli law claims.

[2] My consolidation ruling is also available at: *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 2020 WL 1181366 (D. Conn. Mar. 10, 2020).

The consolidated case consists of four putative class actions[3] consolidated for all purposes and twenty-one "direct" actions consolidated for all pre-trial purposes (the "Direct Actions"[4]), in which the plaintiffs have indicated that they will "opt out" of any class eventually certified. Although there is substantial overlap, there is not total overlap of the defendants named and claims raised in all the actions.

Defendants in twelve of the Direct Actions have made limited motions to dismiss. More specifically, the defendants in those twelve Direct Actions ask me to dismiss two groups of claims: (1) those that fall outside applicable statutes of repose, and (2) those that assert claims under Israeli law. *See* Mot. to Dismiss on Repose Grounds, Doc. No. 449; Mot. to Dismiss Israeli Law Claims, Doc. No. 450. For the reasons that follow, I **grant** the Defendants' motion to dismiss on repose grounds and **deny** the Defendants' motion to dismiss Israeli law claims.

## I.   Standard of Review

### A.   Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

---

[3] Those are: (1) *Ontario Teachers' Pension Plan Bd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-558; (2) *Huellemeier v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-1938; (3) *Grodko v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-800; (4) *Emps.' Ret. Sys. of the City of St. Petersburg, Fla. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1768.

[4] Those are: (1) *OZ ELS Master Fund, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-1314; (2) *Nordea Investment Mgmt. AB v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-1681; (3) *Revenue, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-1721; (4) *Pacific Funds Series Tr., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-1956; (5) *Public School Teachers Pension and Ret. Sys. of Chicago v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-175; (6) *Schwab Capital Tr., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-192; (7) *Phoenix Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-449; (8) *Mivtachim The Workers Social Ins. Fund, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-513; (9) *Clal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-543; (10) *Highfields Capital I LP, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-603; (11) *Migdal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-655; (12) *Harel Pension and Provident, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-656; (13) *Oregon v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-657; (14) *Migdal Mut. Funds, Ltd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-923; (15) *Psagot Mut. Funds, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1167; (16) *Stichting PGGM Depositary, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-1173; (17) *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus., Ltd., et al.* ("*INKA*"), No. 3:20-cv-83; (18) *Boeing Co. Emp. Ret. Plans Master Tr. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-588; (19) *Fir Tree Value Master Fund, LP, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-683; (20) *Franklin Mut. Series Funds, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-1630; (21) *BH Invs. Funds, LLC, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-1635.

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (cleaned up).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (cleaned up).

"When reviewing a motion to dismiss, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  *Turner v. Boyle*, 116 F. Supp. 3d 58, 68 (D.

Conn. 2015) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))

(cleaned up).

## II.    Background

In general,[5] the plaintiffs claim that, beginning in 2013, Teva adopted a concerted and

secret strategy of raising prices on certain drugs in its generic drug portfolio.  Between July 3,

2013 and April 6, 2016, Teva raised prices for its generic drugs 76 times.  *See* Second Am.

Compl. (the "SAC"), Doc. No. 310, at ¶¶ 2, 40, 120, 128, App'x A.  The plaintiffs allege that

Teva undertook many of those price increases in tandem with competitors in the generic drug

market.  *See id.* at ¶¶ 46, 174–81, App'x A, App'x B.  As a result of those price increases, Teva's

business boomed, as reflected both in profits and in stock price.  *See id.* at Figure 1 (inflated

profit), Figure 2 (stock price).  Indeed, by July 27, 2015, Teva's stock price had soared to an all-

time high of $72 per share.  *See id.* at ¶ 277.  In August 2016, Teva was able to leverage its stock

price to help finance a $40 billion purchase of Actavis, which was Allergan's worldwide

generics business.  *Id.* at ¶¶ 8, 93.  To aid in that acquisition, Teva made a stock offering in

December 2015 and a notes offering in July 2016.  *See id.* at ¶¶ 407–08.

In the middle of 2015, the plaintiffs claim that Teva's house of cards began to come

crashing down.  *See id.* at ¶ 279.  Around that time, investigations into the generic drug industry

picked up pace and pressure grew on Teva to explain its financial success.  *See id.* at ¶¶ 101–02,

105, 117.  Teva's stock price sunk lower and lower.  *See id.* at Figure 2.  On May 10, 2019, the

Attorneys General from 47 States, the District of Columbia, and Puerto Rico filed a 524-page

antitrust complaint regarding the generic drug industry that contained detailed allegations with

---

[5]  Although there are slight differences among the complaints, I rely on the Second Amended Complaint in the consolidated putative class action for the general facts relevant to these cases.  Indeed, the complaints in many of the related actions copy verbatim large portions of that Second Amended Complaint.  For a fuller factual recitation, *see Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 432 F. Supp. 3d 131, 146–50 (D. Conn. 2019).

respect to Teva's alleged collusive conduct.  *See id.* at ¶ 374; *see also* Compl., Doc. No. 1, in

*Connecticut, et al. v. Sandoz, Inc., et al.*, No. 3:20-cv-802 (D. Conn.) (SRU).  In August 2020,

Teva Pharmaceuticals USA, Inc.—Teva's United States subsidiary—was charged in a criminal

complaint by the United States Department of Justice's Antitrust Division for conduct relating to

its alleged collusion to fix certain generic drug prices.  *See Press Release*, U.S. DEP'T OF JUSTICE

(Aug. 25, 2020), https://www.justice.gov/opa/pr/seventh-generic-drug-manufacturer-charged-

ongoing-criminal-antitrust-investigation.

      Throughout the purported class period in this case (February 6, 2014 through May 10,

2019), the plaintiffs claim that Teva publicly attributed its financial success to good business

decisions when, in fact, that success was due to artificial (and coordinated) price increases on

generic drugs.  *See* SAC, Doc. No. 310, at ¶ 1, 165.  Thus, the plaintiffs claim, in part, that Teva

violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and

Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§

77k(a), 77l(a)(2), and 77o(a).  *See id.* at ¶¶ 380–86 (Exchange Act); ¶¶ 438–64 (Securities Act).

Regarding the Exchange Act claims, the plaintiffs allege that—between February 6, 2014 and

February 19, 2019[6]—the Defendants made a series of misstatements and omissions in (1) press

releases, (2) earnings calls, (3) SEC filings, (4) guidance calls, (5) and at conferences.  *See id.* at

¶¶ 176–267.

      When I consolidated the Direct Actions into the lead action in this matter for all pre-trial

purposes, *see* Consolidation Ruling, Doc. No. 341, at 2, I ordered the plaintiffs in each Direct

---

[6] Because they filed amended complaints after the SAC had been filed, some of the plaintiffs in the Direct Actions allege misrepresentations or omissions later than February 19, 2019 (specifically, on May 2, 2019).  *See, e.g.*, Am. Compl., Doc. No. 391, at ¶ 376 (*Mivtachim*, 19-cv-513; *Migdal Ins. Co.*, 19-cv-655; *Migdal Mut. Funds*, 19-cv-923; *Psagot Mut. Funds*, 19-cv-1167).

Action (the "DAPs") to either designate their present complaint as operative or to file an amended complaint that complied with my ruling denying in substantial part the defendants' motion to dismiss in the lead action in this matter, *Ontario Teachers' Pension Plan Bd., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:17-cv-558. *See* Consolidation Order, Doc. No. 352, at ¶ 12; Ruling, Doc. No. 283 (regarding motion to dismiss). On May 28, the DAPs largely complied with my order.[7]

Also in compliance with my prior order, on July 8, 2020, the defendants in certain Direct Actions filed two limited motions to dismiss. *See* Consolidation Order, Doc. No. 352, at ¶ 13. The first, which addresses nine Direct Actions,[8] asks me to dismiss the DAPs' claims in those actions "to the extent they are based on alleged misstatements or omissions outside the five-year statutes of repose" applicable to claims brought pursuant to Section 10(b) of the Exchange Act and the analogous provision of the Pennsylvania Securities Act of 1972 (the "PSA"). *See* Mot. to Dismiss on Repose Grounds, Doc. No. 449, at 1. The second, which addresses ten Direct Actions,[9] asks me to "decline to exercise supplemental jurisdiction over claims brought under Israeli law or, in the alternative, dismiss the Israeli law claims on *forum non conveniens* grounds." Mot. to Dismiss Israeli Law Claims, Doc. No. 450, at 1. On August 7, the relevant plaintiffs filed oppositions. *See* Israeli Law Pls.' Opp'n, Doc. No. 498; Repose Pls.' Opp'n, Doc.

---

[7] The plaintiffs in one Direct Action, *OZ ELS*, 17-cv-1314, neither filed an amended complaint nor designated their current complaint as operative.

Four Direct Actions—(1) *Boeing*, 20-cv-588 (filed April 29, 2020); (2) *Fir Tree*, 20-cv-683 (filed May 15, 2020); (3) *Franklin Mut. Series*, 20-cv-1630 (filed Oct. 28, 2020); and (4) *BH Invs. Funds*, 20-cv-1635 (filed Oct. 29, 2020)—were filed after my ruling regarding consolidation. In those cases, no designation or amended complaint was required, and none was filed. The original complaints in those matters are the operative complaints.

[8] Those are: (1) *Schwab*, 19-cv-192; (2) *Mivtachim*, 19-cv-513; (3) *Migdal Ins. Co.*, 19-cv-655; (4) *Oregon*, 19-cv-657; (5) *Migdal Mut. Funds*, 19-cv-923; (6) *Psagot*, 19-cv-1167; (7) *Stichting*, 19-cv-1173; (8) *INKA*, 20-cv-83; and (9) *Boeing*, 20-cv-588.

[9] Those are: (1) *Schwab*, 19-cv-192; (2) *Phoenix*, 19-cv-449; (3) *Mivtachim*, 19-cv-513; (4) *Clal*, 19-cv-543; (5) *Migdal Ins. Co.*, 19-cv-655; (6) *Harel*, 19-cv-656; (7) *Migdal Mut. Funds*, 19-cv-923; (8) *Psagot*, 19-cv-1167; (9) *Stichting*, 19-cv-1173; and (10) *INKA*, 20-cv-83.

No. 501.  On September 7, the defendants filed replies.  *See* Israeli Law Defs.' Reply, Doc. No.

539; Repose Defs.' Reply, Doc. No. 538.  On November 12, I held a Zoom hearing regarding the

two motions and took them under advisement.  *See* Min. Entry, Doc. No. 598; Hr'g Tr., Doc. No.

647.

### III.    Motion to Dismiss on Repose Grounds (doc. no. 449)[10]

"A district court may consider timeliness arguments on a motion to dismiss when the

circumstances are 'sufficiently clear on the face of the complaint and related documents as to

make the time-bar ruling appropriate.'"  *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp.

3d 792, 802 (S.D.N.Y. 2015) (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318

F.3d 148, 157 (2d Cir. 2003)) (cleaned up).

The plaintiffs in the nine Direct Actions targeted by the Repose Defendants'[11] motion to

dismiss on repose grounds (the "Repose Plaintiffs") all filed complaints between February 7,

2019 and April 29, 2020.  The Repose Plaintiffs and the plaintiffs in the lead matter rely on

mostly the same misstatements and omissions.  The earliest misstatement or omission on which

any plaintiff relies—both in the lead matter and among the Repose Plaintiffs—occurred on

February 6, 2014.  *See* SAC, Doc. No. 310, at ¶ 183.  The Exchange Act contains a five-year

statute of repose applicable to claims brought pursuant to Section 10(b).  *See* 28 U.S.C. §

1658(b)(2); *SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos., LLC*, 829 F.3d 173, 177

(2d Cir. 2016).  At issue is whether the Repose Plaintiffs' Section 10(b) claims, to the extent that

---

[10]  Since the Motion to Dismiss on Repose Grounds was filed, two more direct actions have been
transferred to me.  Those cases are:  (1)  *Franklin Mut. Series*, 20-cv-1630 (filed Oct. 28, 2020); and (2) *BH Invs.
Funds*, 20-cv-1635 (filed Oct. 29, 2020).  In my view, both *Franklin Mut. Series* and *BH Invs. Funds* avoid any
repose issues because they do not allege misstatements and omissions more than five years before the date on which
they were filed.  *See* Compl., *Franklin Mut. Series*, Doc. No. 1, at ¶¶ 177–79 (first alleged misstatement and/or
omission occurred on Oct. 29, 2015); Compl., *BH Invs. Funds*, Doc. No. 1, at ¶¶ 180–82 (same).
[11]  "Repose Defendants" refers to the defendants in the nine Direct Actions mentioned in footnote 8.

they are based on misstatements or omissions that occurred more than five years before the

Repose Plaintiffs filed their complaints, should be dismissed.

The answer depends on when the relevant "Repose Clock" begins running.  The Repose

Defendants claim that the Repose Clock begins running from the date of *each* alleged

misstatement or omission that could give rise to liability under the Exchange Act because *each*

alleged misstatement or omission can constitute a "violation" of Section 10(b).  The Repose

Plaintiffs claim that the Repose Clock begins running only from the date of the *last* alleged

misstatement or omission that could give rise liability under the Exchange Act.  The parties agree

that, once the Repose Clock starts ticking, it cannot be stopped or stalled for any equitable

reason.

A.    Parties' Arguments

The Repose Defendants seek to dismiss the Repose Plaintiffs' claims under the Exchange

Act and the PSA "that are based on alleged misstatements or omissions outside those statutes'

five-year repose periods."  Defs.' Mem. of Law in Supp. Mot. to Dismiss on Repose Grounds

("Repose Defs.' Mem."), Doc. No. 464, at 5.[12]  The Repose Defendants argue that statutes of

repose are not subject to equitable tolling and thus "provide[] a hard and certain deadline for the

filing of claims."  *Id*.  The Repose Defendants note that both the Exchange Act and PSA include

five-year statutes of repose.  *See id.* (citing 28 U.S.C. § 1658(b) (Exchange Act); 70 Pa. Stat. § 1-

504(a) (PSA)).  The Repose Defendants also note that statutes of repose "begin[] to run from the

date of the alleged misrepresentation or omission."  *Id.* at 8.  Thus, the Repose Defendants cite

---

[12] Although they did not explain why, the Repose Defendants submitted a "corrected" memorandum of law in support of their motion to dismiss on repose grounds two days after they submitted their first memorandum. *Compare* Defs.' Mem. of Law in Supp. Mot. to Dismiss on Repose Grounds, Doc. No. 449-1 *with* Defs.' Corrected Mem. of Law in Supp. Mot. to Dismiss on Repose Grounds, Doc. No. 464.  I consider only the "corrected" memorandum of law.

numerous cases in which, they claim, district courts in this Circuit "dismiss[] Exchange Act claims based on alleged misrepresentations or omissions outside the five-year repose period." *Id.* Likewise, the Repose Defendants cite cases in which courts "dismiss or otherwise reject PSA claims that are not brought within the five-year repose period that applies to claims for civil liability under the PSA." *Id.* at 9. Given all that, the Repose Defendants request that I dismiss—as set forth in Appendix A—the Repose Plaintiffs' Exchange Act and PSA claims insofar as those claims are premised on untimely-pled misstatements or omissions. *See* Repose Defs.' Mem., Doc. No. 464, at 11–15.

The Repose Plaintiffs see things differently. The Repose Plaintiffs agree that the relevant statute of repose limits their claims to those based on Exchange Act violations that have taken place less than five years before their complaints were filed. However, the Repose Plaintiffs argue that a "violation" of the Exchange Act occurs only on the date of a defendant's "last culpable act or omission." Repose Pls.' Opp'n, Doc. No. 501, at 10. The Repose Plaintiffs thus argue that, when a plaintiff alleges that a defendant violated Section 10(b) through a series of misstatements and omissions, the Repose Clock begins running only at the *last* alleged misstatement or omission. Thus, a plaintiff can bring a Section 10(b) claim against a defendant based on misstatements and omissions that occurred more than five years before a complaint's filing date so long as the most recent misstatement or omission occurred within the repose period (*i.e.*, more recently than five years ago).

B.    Discussion

Each side claims that the other's argument is outrageous and beyond the pale.[13] In truth, though, the question of when the Repose Clock begins to tick in a Section 10(b) case is a

---

[13] *Compare* Repose Pls.' Opp'n, Doc. No. 501, at 6 ("Defendants' request is as stunning as it is unprecedented.") *with* Repose Defs.' Reply, Doc. No. 538, at 5 ("What is most notable about Plaintiffs' Opposition

relatively open issue.  Recently, a district court in Vermont remarked that "[c]ourts are divided as to whether a plaintiff can evade the five-year repose rule by alleging continuing violations," and that "[w]ithin the Second Circuit, district courts have reached diametrically opposite conclusions on the issue."  *Freihofer v. Vermont Country Foods, Inc.*, 2019 WL 2995949, at *3 (D. Vt. July 9, 2019) (cleaned up).  Although the *Freihofer* Court noted that "[r]ecently . . . district courts have been critical of using a continuing violations theory to sidestep the five-year repose period," *see id.*, the point remains:  This issue is not cut-and-dried.[14]

The statute of repose relevant to Section 10(b) claims is contained in 28 U.S.C. § 1658(b).  Section 1658(b) reads:

> **(b)** Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of –
>
> > **(1)** 2 years after the discovery of the facts constituting the violation; or
> >
> > **(2)** 5 years after such violation.

28 U.S.C. § 1658(b).  Courts uniformly treat Section 1658(b)(1) as a statute of limitations and Section 1658(b)(2) as a statute of repose.  *See, e.g.*, *In re BP PLC Sec. Litig.*, 341 F. Supp. 3d 698, 704 (S.D. Tex. 2018) (citing cases).  The parties do not dispute that characterization.  Until 2002, the repose period under Section 1658(b)(2) was three years, but the Sarbanes Oxley Act extended it to five years.  *See In re Enter. Mortg. Acceptance Co. Sec. Litig.*, 391 F.3d 401, 403 (2d Cir. 2004).

---

is that it relies upon a discredited view of the law respecting the applicable statute of repose, yet Plaintiffs fail to acknowledge that fact.").

[14]  Indeed, district courts in other circuits, too, seem to reach contrary conclusions on the issue.  *See Carlucci v. Han*, 886 F. Supp. 2d 497, 514 (E.D. Va. 2012) (explaining that "[d]istrict courts in the First Circuit have applied the continuing fraud exception to Section 10(b)'s statute of repose, while district courts in the Fifth and Ninth Circuits have rejected it," and "[d]istrict courts in the Second Circuit are split").

Statutes of limitations and statutes of repose serve different purposes.  As the Supreme

Court recently explained in the context of the statutes of limitations and repose regarding claims

brought pursuant to Section 11 of the Securities Act:

> Statutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims.  In accord with that objective, limitations periods begin to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief.  In a personal-injury or property-damage action, for example, more often than not this will be when the injury occurred or was discovered.
>
> In contrast, statutes of repose are enacted to give more explicit and certain protection to defendants.  These statutes effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.  For this reason, statutes of repose begin to run on the date of the last culpable act or omission of the defendant.

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (quoting *CTS Corp. v.*

*Waldburger*, 573 U.S. 1, 8–9 (2014)) (cleaned up).  Put differently, "The discovery rule [in

statutes of limitations] gives leeway to a plaintiff who has not yet learned of a violation, while

the rule of repose protects the defendant from an interminable threat of liability."  *Id.* at 2049–50.

Statutes of repose "grant complete peace to defendants" and "offer defendants full and final

security" after the end of the repose period.  *Id.* at 2052.  A statute of repose "mandates that there

shall be no cause of action beyond a certain point, even if no cause of action has yet accrued,"

and so it "can prohibit a cause of action from coming into existence."  *Waldburger*, 573 U.S. at

16.  "[A] statute of repose begins to run without interruption once the necessary triggering event

has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has

not yet, or could not yet have, discovered that she has a cause of action."  *P. Stolz Family P'ship*

*L.P. v. Daum*, 355 F.3d 92, 102–03 (2d Cir. 2004).

As both sides acknowledge, statutes of repose are not subject to equitable tolling.  *See*

Repose Pls.' Opp'n, Doc. No. 501, at 11; Repose Defs.' Mem., Doc. No. 464, at 10–11; *ANZ*

*Sec.*, 137 S. Ct. at 2050 ("In light of the purpose of a statute of repose, the provision is in general not subject to tolling."); *id.* at 2051 ("The purpose and effect of a statute of repose . . . is to override customary tolling rules arising from the equitable powers of courts."); *SRM Glob. Master Fund*, 829 F.3d at 176 ("[A]s a statute of repose, § 1658(b)(2) is not subject to equitable tolling."); *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) ("[A] statute of repose is subject only to legislatively created exceptions and not to equitable tolling.") (cleaned up).

To the Repose Defendants, that is the end of the story. In the Repose Defendants' view, the Repose Plaintiffs are attempting to "revitalize a 'continuing violations' argument, a dated and discredited equitable tolling theory in securities cases." Repose Defs.' Reply, Doc. No. 538, at 5. The Repose Defendants argue that the Repose Plaintiffs cannot escape that reality simply by cloaking the theory in a new name: The "last-culpable-act doctrine." *See id.* at 6, 11. The "continuing violations" doctrine "allows a plaintiff to bring an action for a violation that occurs outside the repose period when a series of misrepresentations have been made and the last misrepresentation occurred during the repose period." *Marini v. Adamo*, 995 F. Supp. 2d 155, 183 (E.D.N.Y. 2014). And courts recognize the "continuing violations doctrine . . . as an equitable tolling doctrine." *Kuwait*, 128 F. Supp. 3d at 808; *see also Freihofer*, 2019 WL 2995949, at *4. Thus, to the extent that the Repose Plaintiffs assert a "continuing violations" theory, or any other form of equitable tolling, that attempt should fail.

But the Repose Plaintiffs deny that they assert a "continuing violations" theory or that they ask me to equitably toll the repose period. Instead, the Repose Plaintiffs argue that the Supreme Court and other lower courts have repeatedly stated that the Repose Clock in analogous circumstances begins running at a defendant's "last culpable act or omission." *See ANZ Sec.*,

12

137 S. Ct. at 2049; *Waldburger*, 573 U.S. at 8; *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800,

1804 n.1 (2018); *DeKalb Cty. Pension Fund v. Transocean, Ltd.*, 817 F.3d 393, 398 (2d Cir.

2016).  The Repose Plaintiffs argue that if I accept the Repose Defendants' argument, I would

read "'last culpable act or omission' to mean '*each* culpable act or omission.'"  Repose Pls.'

Opp'n, Doc. No. 501, at 14.  The Repose Plaintiffs argue that beginning the Repose Clock at the

Repose Defendants' last culpable act or omission does not result in equitable tolling.  *See id.* at

16.

The Repose Defendants[15] and the Repose Plaintiffs[16] both cite numerous district court

cases supporting their respective interpretations regarding when the Repose Clock begins to run.

---

[15] All the Repose Defendants' cases state that the Repose Clock begins to run at the time of an alleged misstatement or omission.  *See, e.g.*, *Boudinot v. Shrader*, 2012 WL 489215, at \*4 (S.D.N.Y. Feb. 15, 2012) ("[T]he five-year period begins to run from the time that the allegedly fraudulent representations were made."); *Kuwait*, 128 F. Supp. 3d at 807 ("[T]he statute of repose runs from the date of each relevant misstatement or omission."); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) ("The statute of repose begins running from the date of each alleged statement or omission."); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013) ("[T]he five-year period begins to run from the time that the allegedly fraudulent representations were made.") (cleaned up); *Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 465 (S.D.N.Y. 2017) ("[T]he statute of repose begins running from the time that the allegedly fraudulent representations were made.") (cleaned up); *Colbert v. Rio Tinto PLC*, 392 F. Supp. 3d 329, 336 (S.D.N.Y. 2019) ("Courts in this district have consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made.") (cleaned up).

[16] All the Repose Plaintiffs' cases state that the Repose Clock begins to run from the date of the *last* alleged misrepresentation or omission.  *See, e.g.*, *Intesa Sanpaolo S.p.A. v. Credit Agricole Corporate and Inv. Bank*, 924 F. Supp. 2d 528, 536 (S.D.N.Y. 2013) ("For the purposes of 1658(b), the violation that serves as the premise for a § 10(b) claim[] is deemed to have occurred on the date upon which the last alleged misrepresentation or omission was made."); *In re Dynex Capital, Inc., Sec. Litig.*, 2009 WL 3380621, at \*18 (S.D.N.Y. Oct. 19, 2009) (explaining that when "a series of fraudulent misrepresentations is alleged, the period of repose begins when the last alleged misrepresentation was made") (cleaned up); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012) ("These continuing misrepresentations mean that Plaintiffs' claims are not untimely, given the rule, adopted by the majority of courts in this Circuit, that the statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter.") (cleaned up); *Plymouth Cty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008) ("With respect to the plaintiff's claims based on false and misleading public disclosures and financial statements, the weight of authority, including in this Circuit, dictates that the five year statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter."); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 2148919, at \*5 (S.D.N.Y. Sept. 6, 2005) ("The period of repose begins when the last alleged misrepresentation was made."); *Aronson v. Advanced Cell Tech., Inc.*, 902 F. Supp. 2d 106, 128 (D. Mass. 2012) ("Where securities fraud claims are based on affirmative misrepresentations, 'the repose period begins when the *last* alleged misrepresentation was made by any of the participants.'") (quoting *Winters v. Stemberg*, 529 F. Supp. 2d 237, 246 (D. Mass. 2008)); *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 259 (D. Me. 2011) ("Because the alleged misrepresentation in this case came from a common group of defendants in pursuit of a common scheme, the Court concludes that none of the misrepresentations is time-barred if any of them occurred within the period of repose.").

The Repose Defendants' citations are stronger:  They are more recent, and they include cases in which district courts within the Second Circuit have granted the precise relief that the Repose Defendants seek here.  *See, e.g.*, *Kuwait*, 128 F. Supp. 3d at 807–09; *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391–92 (S.D.N.Y. 2019).  The Repose Plaintiffs' cases are older—that fact lends credence to the Repose Defendants' assertion that the law on this point leans in their favor.  *See* Repose Defs.' Reply, Doc. No. 538, at 5 ("Plaintiffs do not and cannot cite a single case since 2013 that supports their argument.").[17]

To the extent that the Repose Plaintiffs claim that their position is supported by Supreme Court precedent, I disagree.  In *ANZ Securities*, the Supreme Court discussed the general purpose of statutes of repose and wrote that they "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time."  137 S. Ct. at 2049 (cleaned up).  "For this reason," the *ANZ Securities* Court wrote, "statutes of repose begin to run on 'the date of the last culpable act or omission of the defendant.'"  *Id.* (quoting *Waldburger*, 573 U.S. at 8).  In *Waldburger*, the Court again was speaking about statutes of repose generally and wrote that, in contrast to a statute of limitations, a statute of repose "puts an outer limit on the right to bring a civil action" that is "measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant."  *Id.* at 8.  Neither *ANZ*

---

[17]  At the motion to dismiss hearing, the Repose Plaintiffs brought one further case to my attention that they did not cite in their briefs:  *McCullough v. Advest, Inc.*, 2017 WL 3675787 (W.D. Pa. Aug. 25, 2017).  In *McCullough*, the district court noted that "[a]lthough the law in this area is somewhat unresolved, the majority of courts have held that the statute of repose in § 1658(b)(2) begins to run on the date of the last alleged misrepresentation regarding related subject matter."  *McCullough*, 2017 WL 3675787, at *3.  The *McCullough* Court then "[f]ollow[ed] the weight of authority" and held that "the 5-year statute of repose began to run on the date of the last alleged misrepresentation."  *Id.*

*McCullough* does not change my conclusion that the Repose Defendants' authority is stronger than the Repose Plaintiffs' because I simply disagree with the *McCullough* Court's assessment of the case law.  In my view—*see supra nn.* 15–16 and accompanying text—the weight of authority holds that the statute of repose in Section 1658(b)(2) begins to run from the date of each alleged misrepresentation or omission that could constitute a violation of Section 10(b) of the Exchange Act.

*Securities* nor *Waldburger* was an Exchange Act case.  And in both cases, the Court was simply emphasizing that a repose period begins to run at the conclusion of a Defendant's culpable behavior, rather than when a claim accrues.  The Court's language in those cases cannot be taken to mean that, in a Section 10(b) case, a "violation" for the purposes of Section 1658(b)(2) occurs only upon the last culpable act or omission, rather than with each culpable act or omission.

Importantly, a plaintiff can establish that a defendant has "violated" Section 10(b) by alleging just a single misstatement or omission.  *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant . . .") (quoting *Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013)) (cleaned up).  For that very reason, numerous district courts have held that a Repose Clock starts ticking when each alleged misstatement or omission is made.  *See, e.g.*, *Kuwait*, 128 F. Supp. 3d at 808 ("Since even one misstatement can give rise to a 'violation' for the purposes of the Exchange Act and, in turn, the operation of Section 1658(b)(2), the expansion of 'violation' to include a series of misstatements and omissions would almost certainly require the operation of equitable considerations—the kind foreclosed by the reasoning in *IndyMac* with respect to statutes of repose.").

Because the Repose Plaintiffs have filed complaints that identify numerous, interrelated misstatements and omissions by Teva and its officers over a period of years, it seems odd to isolate any one of them as independently a "violation" of Section 10(b).  But relevant law indicates that each alleged misstatement or omission can constitute an independent "violation" of Section 10(b).  Even if the time-barred misstatements and omissions cannot themselves constitute a "violation" of Section 10(b), they may still be relevant because they provide

background and context to the Repose Plaintiffs' Section 10(b) claims that rely on timely

misstatements or omissions. *See Kuwait*, 128 F. Supp. 3d at 809 n.33.

At the hearing on this pending motion to dismiss, the Repose Plaintiffs seemed to gesture

at a new theory for liability. The Repose Plaintiffs mentioned that the Repose Defendants were

involved in a years-long fraudulent "scheme" and that Rule 10b-5 "allows [for] scheme

liability." *See, e.g.*, Hr'g Tr., Doc. No. 647, at 23:3–25:12. Rule 10b-5 reads:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any national
> securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material
> > fact necessary in order to make the statements made, in the light of the
> > circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or
> > would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Rule 10b-5(b) applies to misrepresentation or omission claims, and

Rules 10b-5(a) and (c) apply to scheme liability claims." *Fischler Kapel Holdings, LLC v.*

*Flavor Producers, LLC*, 2020 WL 6939887, at *8 (C.D. Cal. Nov. 25, 2020). Claims for

"scheme liability" are "premised on deceptive conduct that is independent of misrepresentations

or omissions." *In re Mindbody, Inc. Sec. Litig.*, 2020 WL 5751173, at *19 (S.D.N.Y. Sept. 25,

2020).[18] "[T]he three subsections of Rule 10b-5 are distinct, and courts must scrutinize

pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme

---

[18] To assert a "scheme liability" claim, "a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Mindbody*, 2020 WL 5751173, at *19 (quoting *Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016)) (cleaned up).

liability rubric." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012).

"Where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the plaintiff's attempt to bypass the elements necessary to impose misstatement liability under subsection (b) by labeling the alleged misconduct a scheme rather than a misstatement." *In re Mindbody*, 2020 WL 5751173, at *19 (quoting *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)) (cleaned up); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (explaining that, where "the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement'"); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for [Rule 10b-5(a) and (c)] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").

For several reasons, I hold that the Repose Plaintiffs have not alleged a claim for "scheme liability" under Rule 10b-5(a) and (c). First, these cases are plainly misstatements and omissions cases. Although, in a way, these cases concern Teva's anti-competitive *conduct*, the Repose Plaintiffs allege that the Repose Defendants violated the federal securities laws by *lying* about the sources of their revenue and the competitiveness of the generic drug manufacturing market. *See, e.g.*, Am. Compl., Doc. No. 391, at ¶ 1 ("This action arises from misrepresentations and omissions that Defendants made to Plaintiffs . . . .") (*Mivtachim*, 19-cv-513; *Migdal Ins. Co.*, 19-cv-655; *Migdal Mut. Funds*, 19-cv-923; *Psagot Mut. Funds*, 19-cv-1167); *cf. Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 432 F. Supp. 3d 131, 158–67 (D. Conn. 2019) (holding, in the lead action, that the plaintiffs had sufficiently pled federal securities fraud claims

based on the defendants' statements and omissions regarding both (1) competition in the generic

drug market and (2) the sources of Teva's revenues and profits).

Relatedly, before the hearing on the pending motion to dismiss, the Repose Plaintiffs had

never advanced a "scheme liability" argument under Rule 10b-5(a) and (c).  For instance, the

Repose Plaintiffs' complaints do not specifically mention Rule 10b-5(a) and (c) or "scheme

liability."  Instead, each complaint states generically that the plaintiffs state a claim under Rule

10b-5.[19]  Further to the point, the Repose Plaintiffs' complaints repeatedly emphasize the Repose

Defendants' misstatements and omissions—and recount a litany of them at significant length.

Courts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both

misstatement and scheme liability must do so clearly and specifically.  *See In re Smith Barney*,

884 F. Supp. 2d at 160–61.  Indeed, it appears that such plaintiffs routinely proceed by alleging

Rule 10b-5 claims in two separate counts—one based on misstatements and one based on

scheme liability.  *See, e.g.*, *In re Mindbody*, 2020 WL 5751173, at \*6; *W. Va. Pipe Trades Health

& Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 956, 966 (D. Minn. 2014).

Put simply, the Repose Plaintiffs have not attempted to allege a scheme liability claim.

To be sure, in their complaints, briefs, and at oral argument, the Repose Plaintiffs repeatedly

refer to the Repose Defendants' conduct as a "scheme."  But the "scheme" to which the Repose

Plaintiffs refer is the Repose Defendants' alleged antitrust conspiracy covered up by many

interrelated misstatements and omissions.  *See* Hr'g Tr., Doc. No. 647, at 21:21–22:6, 23:3–15,

24:5–20; 30:13–17.  In similar circumstances, courts have held that plaintiffs have not made out

---

[19] *See* Am. Compl., Doc. No. 391, at ¶¶ 572–76 (*Mivtachim*, 19-cv-513; *Migdal Ins. Co.*, 19-cv-655; *Migdal Mut. Funds*, 19-cv-923; *Psagot Mut. Funds*, 19-cv-1167); Am. Compl., Doc. No. 393, at ¶¶ 409–13 (*Schwab*, 19-cv-192); Am. Compl., Doc. No. 394, at ¶¶ 409–13 (*Stichting*, 19-cv-1173); Am. Compl., Doc. No. 398, at ¶¶ 363–69 (*Oregon*, 19-cv-657); Compl., *INKA*, 20-cv-83, Doc. No. 1, at ¶¶ 408–12; Compl., *Boeing*, 20-cv-588, Doc. No. 1, at ¶¶ 358–62.

plausible claims for "scheme liability" under Rule 10b-5(a) and (c).  *See, e.g.*, *In re Mindbody*, 2020 WL 5751173, at *19.  Thus, I reject the Repose Plaintiffs' late and half-hearted attempt to re-fashion their Rule 10b-5 claim into a "scheme liability" claim for purposes of the relevant statute of repose.[20]

     In enacting Section 1658(b), Congress signaled its clear intent that Section 10(b) claims not be commenced later than five years after an alleged Section 10(b) violation.[21]  Equitable arguments to the contrary must fail.  That is not to say that I agree with the policy embedded in Section 1658(b)(2).  As Judge Calabresi commented in concurrence in an analogous case:[22]

---

[20]  It is also not clear that interpreting the Repose Plaintiffs' Rule 10b-5 claims under the rubric of "scheme liability" would render all the alleged misstatement and omissions timely.  To prove a scheme liability claim, a plaintiff must show, *inter alia*, a deceptive act committed "in furtherance of the alleged scheme to defraud."  *In re Mindbody*, 2020 WL 5751173, at *19 (cleaned up).  I—or a jury—would have to define "the alleged scheme."  That issue could be hotly contested.  *Cf.* Hr'g Tr., Doc. No. 647, at 23:16–24:4 (drawing an analogy to the law of criminal conspiracy).

[21]  The parties neither briefed the specific legislative history of Section 1658(b), nor did they shed much light on it at the motions to dismiss hearing in this matter.  *See* Hr'g Tr., Doc. No. 647, at 8:4–9:18; 27:2–18; 33:4–18.  I am not aware of any court that has discussed in any detail Section 1658(b)'s legislative history.  Further, my own review of Section 1658(b)'s legislative history has not revealed much helpful material.  There appear to be no at-length discussions of the repose period's enlargement.  One of the only specific mentions of the five-year repose period simply reiterates the Supreme Court's holding that "a period of repose [is] inconsistent with tolling."  *See* S. Rep. No. 107-146, at 29 (2002) (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991)).  Thus, it is difficult for me to draw specific conclusions about Congress's particular intent with respect to Section 1658(b).

     Instead, I rely on the general congressional purpose in enacting statutes of repose.  Statutes of repose are defendant-friendly and represent legislative judgments that the most important consideration at a certain point is to allow parties to put past acts behind them.  *Cf. In re ExxonMobil*, 500 F.3d 189 (3d Cir. 2007) ("[T]here is a time when allowing people to put their wrongful conduct behind them—and out of the law's reach—is more important than providing those wronged with a legal remedy, even if the victims never had the opportunity to pursue one.").  Thus, when a statute of repose operates to limit a plaintiff's remedy, it may produce an inequitable result *by design*.

[22]  In *Daum*, the plaintiffs brought, in relevant part, a claim under Section 12(a)(1) of the Securities Act and alleged that the defendant made a public offering of unregistered securities.  *See* 355 F.3d at 95.  A plaintiff must bring a Section 12(a)(1) claim not "more than three years after the security was bona fide offered to the public . . . ."  15 U.S.C. § 77m.  To determine whether the plaintiff's claims were timely, the *Daum* Court had to consider "whether the three-year repose period begins when the security is *first* bona fide offered to the public (the 'first-offered test'), or *last* bona fide offered to the public (the 'last-offered test')."  *Daum*, 355 F.3d at 100.  The *Daum* Court noted that the question was "a difficult issue because the language of [the statute of repose] provides us with little direction."  *Id.*

     The *Daum* Court held that the first-offered test applied.  In doing so, the *Daum* Court discussed the effect of its holding with respect to a hypothetical "securities offeror who, while making his ongoing bona fide offer of unregistered securities to the public, manages to avoid suit for three years, thus securing a sort of immunity to continue illicit offers without civil liability."  *Id.* at 103.  The *Daum* Court held that although that prospect— "however remote"—was undesirable, Congress still intended the first-offered test to govern, and it was up to Congress to change it if they wanted.  *Id.* at 103–04.

> Giving repose to a defendant who has ceased to do wrong may well be worthwhile even if it is "unfair" to a plaintiff whose cause of action has not yet accrued.  But it is a different thing altogether to give repose to a defendant who continued his wrongful conduct, perhaps even beyond the time specified by the repose period.

*Daum*, 355 F.3d at 106–07 (Calabresi, J., concurring).  Still, in *Daum*, Judge Calabresi agreed with the majority's decision to apply the relevant statute of repose in that potentially harsh way because he was "convinced that Congress intended that [application], however strange the result."  *Id.* at 107.  So, too, here.  The Repose Plaintiffs' equitable arguments are not enough to contravene what appears to be clear congressional intent.[23]

Although the foregoing discussion relates only to the federal statute of repose that is applicable to Exchange Act claims—Section 1658(b)(2)—it applies equally to the Repose Plaintiffs' PSA claims.  The PSA's time-bar statute reads:

> No action shall be maintained to enforce any liability created under section 501 (or section 503 in so far as it relates to that section) unless brought before the expiration of five years after the act or transaction constituting the violation or the expiration of one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting the violation, whichever shall first expire.

70 Pa. Stat. § 1-504(a).

The Repose Plaintiffs bring PSA claims pursuant to Sections 401, 402, and 501 of the PSA.  *See, e.g.*, Am. Compl., Doc. No. 391, at ¶¶ 587–600 (*Mivtachim*, 19-cv-513; *Migdal Ins.*

---

[23] Despite the possibility that statutes of repose can result in inequitable results in general, I am not so sure that the application of the statute of repose in this case results in such an inequitable result for the Repose Plaintiffs. First, the Repose Plaintiffs have intentionally opted out of a putative class action in which the complaint timely alleges (nearly) all the misstatements and omissions that the Repose Plaintiffs allege.  Second, the Repose Plaintiffs filed their actions between February 7, 2019 and April 29, 2020.  It is not clear why they waited so long to do so. Indeed, they were almost surely able to file their complaints before then.  As discussed above, by February 6, 2019, the generic drug industry had been under investigation for some time, and Teva in particular had been identified as a significant player in an alleged industry-wide conspiracy.  In addition, Teva's stock price had been falling precipitously since its mid-2015 peak.  *See* SAC, Doc. No. 310, at Figure 2.  Perhaps for those reasons, several opt-out plaintiffs filed actions well before February 6, 2019.  Five such cases are pending in this consolidated action. *See* (1) *OZ ELS*, 17-cv-1314; (2) *Revenue*, 18-cv-1721; (3) *Nordea*, 18-cv-1681; (4) *Pacific Funds*, 18-cv-1956; (5) *Public School Teachers*, 19-cv-175.  In addition, none of the Repose Plaintiffs' Exchange Act claims is entirely dismissed:  They will proceed based on the timely-pled misstatements and omissions.

*Co.*, 19-cv-655; *Migdal Mut. Funds*, 19-cv-923; *Psagot Mut. Funds*, 19-cv-1167).  Section 401 is

a near-verbatim reproduction of Rule 10b-5.  *See* 70 Pa. Stat. § 1-401; *Gilliland v. Hergert*, 2007

WL 4105223, at *2 (W.D. Pa. Nov. 15, 2007) (remarking that Section 401 "is modeled after

Rule 10b-5 of the federal securities laws, and requires virtually the same elements of proof");

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 214 (3d Cir. 2001) (noting the same).

Section 402 "is entitled 'Market Manipulation' and it defines three distinct types of unlawful

manipulation." *Fulton Bank, N.A. v. UBS Sec., LLC*, 2011 WL 5386376, at *12 (E.D. Pa. Nov.

7, 2011).  As relevant here, Section 402(c) provides that it is unlawful to "induce the purchase or

sale of any security by the circulation or dissemination of information to the effect that the price

of the security will or is likely to rise or fall . . . ."  70 Pa. Stat. § 1-402(c).  Section 501 creates a

civil cause of action for certain violations of the PSA.  *See* 70 Pa. Stat. § 1-501; *Fox Int'l*

*Relations v. Fiserv Sec., Inc.*, 490 F. Supp. 2d 590, 603–04 (E.D. Pa. 2007).

   Although Section 504(a)—the PSA's statute of repose—applies by its terms only to

Sections 501 and 503 of the PSA, courts routinely hold that Section 504(a) also applies to

Sections 401 and 402.  *See, e.g.*, *Jasin v. Kozlowski*, 2010 WL 4536973, at *4 (M.D. Pa. Nov. 3,

2010) (applying Section 504's time bar to Section 402(c)), *reconsideration granted on other*

*grounds by* 2011 WL 3627322 (M.D. Pa. Aug. 17, 2011); *Cohen v. McAllister*, 673 F. Supp. 733,

739 (W.D. Pa. 1987) ("Section 1-504(a) sets the statute of limitations for a civil action under § 1-

401 . . . ."); *Cohen v. Nw. Growth Corp.*, 385 F. Supp. 2d 935, 962–63 (D.S.D. 2005) (applying

Section 504 to, *inter alia*, Section 401); *Daniel Boone Area School Dist. v. Lehman Bros., Inc.*,

187 F. Supp. 2d 400, 405–06 (W.D. Pa. 2002) (explaining that "section[] 401 . . . must be

enforced by means of § 501").

The Repose Defendants ask me to treat the Repose Plaintiffs' PSA claims in the same way as their Exchange Act claims: I should dismiss the claims to the extent they are based on alleged misrepresentations or omissions committed more than five years before the relevant cases were filed. *See* Repose Defs.' Mem., Doc. No. 464, at 9–10. The Repose Plaintiffs do not separately address the Repose Defendants' arguments regarding the PSA and, instead, focus their arguments solely on the Exchange Act claims. Implicitly, then, the Repose Plaintiffs concede that my ruling with respect to federal law should determine the outcome of their state law claims.

Indeed, my ruling regarding federal law determines the outcome of the Repose Plaintiffs' PSA claims because both the respective claims and the applicable statutes of repose appear identical in the important respects. First, the plain language of both Section 504(a) and Section 1658(b)(2) imposes a five-year statute of repose that runs from a "violation" of the relevant securities law. *Compare* 70 Pa. Stat. § 1-504(a) (mandating that an action must be "brought before the expiration of five years after the act or transaction constituting the violation . . .") *with* 28 U.S.C. § 1658(b)(2) (mandating that an action "may be brought not later than . . . 5 years after such violation"). Second, the relevant, substantive law of the PSA is closely related to Section 10(b) of the Exchange Act and Rule 10b-5. For instance, as discussed above, numerous courts have noted the close relationship between Rule 10b-5 and Section 401 of the PSA. *See Colkitt*, 272 F.3d at 214; *Gilliland*, 2007 WL 4105223, at *2; *McAllister*, 673 F. Supp. at 739. Third, I am aware of no court that has applied the two statutes of repose in a disparate manner. Thus, my discussion of Section 1658(b)(2) with respect to the Repose Plaintiff's Section 10(b) Exchange Act claims applies equally to Section 504(a) with respect to the Repose Plaintiffs' PSA claims.

For those reasons, I **grant** the Repose Defendants' partial motion to dismiss on repose grounds, doc. no. 449.[24]  Accordingly, the Repose Plaintiffs' Exchange Act and PSA claims are limited temporally as set forth in Appendix A to this opinion.

## IV.   Motion to Dismiss Israeli Law Claims (doc. no. 450)

DAPs in ten Direct Actions[25] have brought claims under the Israeli Securities Law, 1968 (the "ISL, 1968") in addition to claims under federal securities laws (and, in some cases, Pennsylvania state laws).  I will refer to those plaintiffs as the "Israeli Law Plaintiffs."  The Defendants in those ten actions—the "Israeli Law Defendants"—have made a partial motion to dismiss the Israeli Law Plaintiffs' complaints insofar as they allege violations of Israeli law.  The Israeli Law Defendants argue that I should "decline to exercise supplemental jurisdiction over claims brought under Israeli law or, in the alternative, dismiss the Israeli law claims on *forum non conveniens* grounds."  Mem. in Supp. Israeli Law Defs.' Mot. to Dismiss ("Israeli Law Defs.' Mem. of Law"), Doc. No. 450-1, at 5.

The Israeli Law Plaintiffs include a claim under the ISL, 1968 because Teva sells its shares both as American Depositary Shares ("ADS") on the New York Stock Exchange ("NYSE") and also as common stock on the Tel Aviv Stock Exchange ("TASE").  The Israeli Law Plaintiffs bought both ADS and common stock.  Their ISL, 1968 claims are attempts to recover for the losses they endured on common stock purchased on the TASE.[26]  Initially, the putative class action complaint in the lead matter in this case contained such an Israeli law claim.

---

[24]  Because the Repose Plaintiffs' Section 10(b) claims are partially dismissed, the corresponding control person liability claims pursuant to Section 20(a) are also partially dismissed because of a lack of a primary violation. *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009).

[25]  Those are:  (1) *Schwab*, 19-cv-192; (2) *Phoenix Ins. Co.*, 19-cv-449; (3) *Mivtachim*, 19-cv-513; (4) *Clal*, 19-cv-543; (5) *Migdal Ins. Co.*, 19-cv-655; (6) *Harel*, 19-cv-656; (7) *Migdal Mut. Funds*, 19-cv-923; (8) *Psagot Mut. Funds*, 19-cv-1167; (9) *Stichting*, 19-cv-1173; (10) *INKA*, 20-cv-83.

[26]  The Israeli Law Plaintiffs claim that the same losses are recoverable pursuant to claims brought under Pennsylvania law.  *See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 44 n.11.  Some—but not all—of the Israeli Law Plaintiffs assert claims pursuant to Pennsylvania law.

*See, e.g.*, First Am. Compl., Doc. No. 141, at ¶¶ 1076–85.  In the SAC, though, the putative class

dropped the Israeli law claim.  *See* SAC, Doc. No. 310.

      A.    <u>Background</u>

      Teva is a dual-listed Israeli company.  That means that its shares are registered for trading

both on the TASE and another foreign exchange—in this case, the NYSE.[27]  Today, the

securities of over 50 companies are dual-listed on the TASE and another major foreign stock

exchange; the securities of those companies account for about half of the TASE's market

capitalization.  *See* Decl. of A. Licht in Supp. Israeli Law Pls.' Opp'n ("Licht Decl."), Doc. No.

499, at ¶ 34.

      The origins of the Israeli dual-listing regime are important to understanding the current

dispute.  In the late 1990s, the TASE had a relatively small market capitalization; as a result,

many Israeli companies eschewed listing on the TASE and, instead, listed exclusively on a

foreign market's stock exchange.  *See id.* at ¶¶ 18–21.  If they listed on the TASE, Israeli

companies would have had to "comply with two separate legal regimes, one in Israel and one in

the country of their other listing, with all the concomitant costs."  *Id.* at ¶ 22.  That was an

unattractive proposition, and Israel sought to address the situation by adopting the dual-listing

regime.

      The dual-listing regime—which is codified in an amendment to the ISL, 1968 and in

regulations enacted pursuant to the ISL, 1968 and the Companies Law, 1999—"enables issuers

listed on certain foreign markets to list their securities on the TASE based solely on disclosures

---

[27] Technically, Teva's ordinary shares are traded on the TASE, and its ADS are traded on the NYSE. Functionally, though, that is a distinction without a difference, especially because "[e]ach ADS represents one share in Teva."  Teva's Mot. to Stay, Ex. 2 to Decl. of A. Licht in Supp. Israeli Law Pls.' Opp'n, Doc. No. 499-2, at ¶ 14 (reporting as of December 31, 2016).  As of December 31, 2016, 81 percent of Teva's shares were ADS traded on the NYSE.  *See id.* at ¶ 15.

they make abroad." *Id.* at ¶ 31.  In other words, by Israeli statutory law, a dual-listed company's reporting requirements for listing on the TASE are determined entirely by the foreign market's reporting and disclosure requirements. *See id.* at ¶¶ 43–44.  Thus, Israel intentionally adopted a dual-listing regime that includes explicit "concessions on its sovereignty by subordinating its jurisdiction to prescribe, to adjudicate, and to enforce relevant securities laws and anti-fraud statutes to that of" foreign jurisdictions, including the United States. *Id.* at ¶ 16.

But the dual-listing regime left open an important question regarding what country's law applies in determining the civil liability of a dual-listed company when that company is alleged to have broken Israeli securities law.  More specifically:  Does Israeli law apply or does the foreign law apply?  The parties disagree about whether that question has been definitively answered.  *Cf. id.* at ¶ 53 ("While the Israeli Securities Law includes a statutory provision applying the foreign law with regard to reporting, the law applicable to liability has been determined by case law.").  The Israeli Law Defendants claim that it is an open and complex question and so I should decline jurisdiction and allow Israeli courts to address that issue.  The Israeli Law Plaintiffs claim that the issue is settled and clear (foreign—here, United States—law applies), and so I should retain jurisdiction over the Israeli law claims.  What follows is a summary of the relevant Israeli case law, so far as I understand it.

In 2008 in *Verifone I*,[28] an Israeli district court first shed light on the issue.  In staying a securities class action in Israel in favor of a parallel one in the United States, the *Verifone I* Court held that foreign law applies to dual-listed companies with respect "both to reporting duties and to civil liability." *Id.* at ¶ 5.  The *Verifone I* Court reasoned that the dual-listing regime enacted into Israeli law suggested that the Israeli *Knesset* intended that "the Israeli legal system shall

---

[28] *See* Ex. 4 to Licht Decl., Doc. No. 499-4, Class Action 3912-01-08 *Verifone Holdings, Inc. v. Stern* (11 Sept. 2008) (Isr.).

serve as 'a second fiddle' as opposed to the foreign legal system, primarily the American

system.'" *Id.* at ¶ 55; *Verifone I*, Ex. 4 to Licht Decl., Doc. No. 499-4, at ¶ 6(l).  The *Verifone I*

Court also reasoned that "[i]t is appropriate that the proceeding be handled, in a given case, with

respect to one forum and according to one law."  *Verifone I*, Ex. 4 to Licht Decl., Doc. No. 499-

4, at ¶ 6(n).  The *Verifone I* Court concluded:

> [I]t appears that the Israeli legislature has adopted, in the framework of the "double
> registration" arrangement, the requirements of the foreign law not only as to the
> technical aspect, which sets forth the manner for filing of the reports, but also as to
> the substantive aspect, which deals with the responsibility of the foreign company
> traded in Israel, out of a desire to concentrate all of the legal proceedings in one
> place under one law, which is the American law.

*Id.* at ¶ 6(u).

In 2010, the United States Supreme Court delivered its opinion in *Morrison v. Nat'l*

*Australia Bank, Ltd.*, 561 U.S. 247 (2010).  In *Morrison*, the Supreme Court held that Section

10(b) of the Exchange Act does not provide an extraterritorial cause of action; that is, a plaintiff

could allege a Section 10(b) violation based only on "the purchase or sale of a security listed on

an American stock exchange" or otherwise purchased or sold "in the United States."  *Id.* at 273.

Thus, *Morrison* established that Section 10(b) does not provide a cause of action to a plaintiff

who alleges a violation of the Exchange Act arising from a securities transaction on a foreign

exchange.

Several courts have analyzed *Morrison*'s effect on dual-listed companies.  For instance,

in 2011 the same Israeli district court that ruled in *Verifone I* held that *Morrison* did not change

the conclusion that, as a matter of Israeli law, foreign law "applies to civil liability with regard to

the purchase or sale in Israel of securities subject to the dual listing regime."  Licht Decl., Doc.

No. 499, at ¶¶ 59–60.  The United States district court presiding over the parallel class action

noted the same in allowing Israeli investors to be included in the class settlement in that case.

*See id.* at ¶ 61; *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 2014 WL 12646027, at *3 (N.D. Cal. Feb. 18, 2014).

In a 2011 comment letter to the SEC regarding *Morrison*'s effect, the Israel Securities Authority (the "ISA")[29] essentially adopted the *Verifone I* Court's reasoning.  *See* ISA Comment, Ex. 10 to Licht Decl., Doc. No. 499-10.  (I will refer to that letter as the "ISA Comment.") Indeed, the ISA Comment reflects the ISA's view that *Morrison*'s reasoning applies especially poorly to Israeli dual-listed companies.  *See id.* at 6 ("[T]he test suggested by the court in *Morrison* . . . results in an irrational outcome."); *id.* at 9 ("[T]he effect of *Morrison* on the regulation and orderly trading of dual listed securities is entirely negative and will lead to inequitable and irrational results.").

In the ISA's view, notwithstanding *Morrison*, "claimants who believe they have a valid claim under section 10(b)" against a dual-listed company should have a "private right of action in the US irrespective of whether they purchased the relevant securities on the US domestic exchange or on the non-US exchange."  *Id.* at 2.  The ISA opined that, in its view, "the concerns surrounding international comity do not apply in relation to dual listing."  *Id.* at 3–4, 9.  The ISA continued:  "[A]ny argument that hearing a claim in the US constitutes unreasonable interference with foreign sovereignty ignores both the essence and the practical consequences of the dual listing arrangement," and so "investors who purchase in the non-US market should at least have the option to bring an action in the US."  *Id.* at 4.  The incompatibility that the *Morrison* Court highlighted "is eliminated when the applicable law in the other country is US law."  *Id.*  In sum, the ISA believed that the dual-listing regime provided for a "[s]ingle law, [and a] single forum"

---

[29]  In Israel, "the courts remain the final arbiters of statutory interpretation questions," even though the ISA's statutory interpretation may "enjoy[] a special status."  Licht Decl., Doc. No. 499, at ¶ 67.

in Section 10(b) cases because there "is no meaningful difference between purchasing dual listed securities on a US domestic exchange or in Tel Aviv." *Id.* at 6.

In 2017, two more Israeli district courts—*Damti*[30] and *Tower*[31]—endorsed the *Verifone I* Court's holding that, as a matter of Israeli law, "U.S. law applies to civil liability" in securities law claims against dual-listed companies and reaffirmed that *Morrison* did not affect that outcome. *See* Licht Decl., Doc. No. 499, at ¶¶ 68–82.

In 2018, the Israeli Supreme Court heard an appeal[32] in the *Damti* and *Tower* cases. Apparently, the Israeli Supreme Court held two hearing sessions. According to Professor Licht, at the first, on October 4, 2018, "the Court stated its position that the Israeli district courts correctly determined that U.S. substantive law governs Israeli securities claims, and that the appellant and movant's appeal would be denied." *Id.* at ¶ 83. The same day, the Israeli Supreme Court issued the following Order:

> On reading the key written arguments and hearing the supplementary oral arguments, we opined and also stated that the District Courts were correct in the above-captioned files in their judgments as to the application of the foreign law. We additionally stated, without setting anything in stone, that there is reason to consider a legislative amendment that will explicitly clarify the position on the matter.

*Damti (Supreme Court) I*,[33] Ex. 7 to Licht Decl., Doc. No. 499-7, at 5. Subsequently, the appellant and movant withdrew their appeal to avoid losing and having to pay the winner's

---

[30]  *See* Ex. 5 to Licht Decl., Doc. No. 499-5, Class Action 28811-02-16 *Damti v. MannKind Corporation* (12 Oct. 2017) (Isr.). Confusingly, Professor Licht refers to this case as "Damti," but the appended translation appears to list the petitioner's name as "Damati." *See Damti*, Ex. 5 to Licht Decl., Doc. No. 499-5, at 3. The discrepancy is never addressed or explained, but, because Professor Licht refers to the case as "Damti," so will I.

[31]  *See* Ex. 6 to Licht Decl., Doc. No. 499-6, Class Action 44775-02-16 *Cohen v. Tower Semiconductor Ltd.* (7 Nov. 2017) (Isr.).

[32]  Technically, one case was before the Israeli Supreme Court on an appeal and the other on a motion for leave to appeal. *See* Licht Decl., Doc. No. 499, at ¶ 83.

[33]  *See* Ex. 7 to Licht Decl., Doc. No. 499-7, Civil Appeal Petition 8737/17 *Damti v. Mannkind Corporation* (4 Oct. 2018) (Isr.).

litigation costs—apparently a common occurrence in Israel—and, on October 16, 2018, the

Israeli Supreme Court issued another Order:

> As you will recall, upon the conclusion of the hearing held on October 4, 2018, we said, orally, and we repeated the main essence of the matters in our decision in writing, that, in our opinion, the District Courts were right in the judgments that are the subject of the above-captioned [appeal] . . . , when they ruled with respect to the application of the foreign law.
>
> . . .
>
> On a marginal note, we wish to reiterate, without laying down any hard and fast rules, that it would be appropriate to consider a legislative amendment that will explicitly clarify the state of affairs with respect to the issue at hand.

*Damti (Supreme Court) II*,[34] Ex. 8 to Licht Decl., Doc. No. 499-8, at 5; *see also* Licht Decl.,

Doc. No. 499, at ¶ 84.  Based on the above, the Israeli Law Plaintiffs argue that "the substantive

issue of applicable law is now resolved."  Licht Decl., Doc. No. 499, at ¶ 86.

Another important aspect of the Israeli dual-listing regime is the permissive stay

provision of the ISL, 1968.  That provision (§ 35Z) reads:

> **Stay of proceedings in an action in Israel.**  If action was brought before a court in Israel under any law, on grounds that derive from an interest in the securities of a foreign corporation, the court may, on application by a party, stay the proceedings in the action, if it learns that action was brought before a court abroad on the same cause or on a similar cause, and that until a judgment that is no longer subject to appeal is handed down in that action.

*Id.* at ¶ 87.  As several Israeli district courts have acknowledged, that provision allows Israeli

courts to stay cases involving dual-listed companies while parallel cases proceed in foreign

forums because those foreign cases might affect or resolve the cases pending in Israel.  *Id.* at ¶¶

90–92.  Indeed, two securities class action cases that parallel this litigation—*Gat*[35] and

---

[34] *See* Ex. 8 to Licht Decl., Doc. No. 499-8, Civil Appeal Petition 8737/17 *Damti v. Mannkind Corporation* (16 Oct. 2018) (Isr.).

[35] *See* DC (TA) 17017-11-16 *Gat v. Teva Pharm. Indus., Ltd.* (2016) (Isr.).  The Licht Decl. does not attach the *Gat* decision as an exhibit.

*Lightcom*[36]—are currently stayed in Israel.  *See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 16.

Those cases are stayed on Teva's motion.  *See id.* at 16–17; *Lightcom*, Ex. 3 to Licht Decl., Doc.

No. 499-3, at ¶¶ 26–41 (ordering stay).

      B.     <u>The Relevant Law</u>

      1.     Supplemental Jurisdiction

All the Israeli Law Plaintiffs allege that subject matter jurisdiction exists for their federal

securities law claims pursuant to both 15 U.S.C. § 78aa and general federal question jurisdiction,

28 U.S.C. § 1331.  The Israeli Law Plaintiffs thus ask me to exercise supplemental jurisdiction

over the Israeli law claims.[37]

When a federal district court has original jurisdiction pursuant to federal question

jurisdiction, "the district courts shall have supplemental jurisdiction over all other claims that are

so related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

Although Section 1367(a) uses the term "shall" to confer supplemental jurisdiction, a district

court has discretion in deciding whether to exercise its supplemental jurisdiction.  *See Oneida*

*Indian Nation of New York v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011).  Indeed, a district

court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if:

---

[36] *See* Ex. 3 to Licht Decl., Doc. No. 499-3, DC (TA) 5407-09-17 *Lightcom (Israel) Ltd. v. Teva Pharm. Indus., Ltd.* (2017) (Isr.).

[37] *See* Am. Compl., Doc. No. 391, at ¶ 26 (*Mivtachim*, 19-cv-513; *Clal*, 19-cv-543; *Migdal Ins. Co.*, 19-cv-655; *Migdal Mut. Funds*, 19-cv-923; *Psagot Mut. Funds*, 19-cv-1167); Am. Compl., Doc. No. 393, at ¶ 31 (*Schwab*, 19-cv-192); Am. Compl., Doc. No. 394, at ¶ 31 (*Stichti*ng, 19-cv-1173); Am. Compl., Doc. No. 397, at ¶ 45 (*Phoenix*, 19-cv-449); Am. Compl., Doc. No. 399, at ¶ 43 (*Harel*, 19-cv-656); Compl., *INKA*, 20-cv-83, Doc. No. 1, at ¶ 31.

No Israeli Law Plaintiff pleads or argues that I have subject matter jurisdiction over the Israeli law claims based on diversity of citizenship, so I do not consider that matter further.  *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *18 n.13 (S.D.N.Y. Mar. 28, 2018) (holding in similar circumstance that "the Court presumes that the only possible basis for jurisdiction over the Israeli claim is supplemental jurisdiction, as alleged in the Complaint").

(1) the claim raises a novel or complex issue of State law,[38]

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); *see also Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (noting that when Section 1367(a) is satisfied, a district court can decline to exercise supplemental jurisdiction based only on the factors in Section 1367(c)).

The Second Circuit has said that, before declining to exercise supplemental jurisdiction, a district court should consider the Section 1367(c) factors and whether declining jurisdiction will promote economy, convenience, fairness, and comity (together, the "*Gibbs* factors").  *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

2.      *Forum non conveniens*

The common law doctrine of *forum non conveniens* primarily allows a court to dismiss claims over which it has jurisdiction because a foreign forum is the best place for the claims to be heard.  *See generally Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60–61 (2013); *ICC Indus., Inc. v. Israel Disc. Bank, Ltd.*, 2005 WL 1844616, at *5 (S.D.N.Y. July 29, 2005).  In deciding whether to grant a motion to dismiss based on *forum non conveniens*,

---

[38] Courts have interpreted "State law" in Section 1367(c)(1) to encompass foreign law, too.  *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *19 n.14 (S.D.N.Y. Mar. 28, 2018); *Roman y Gordillo, S.C. v. The Bank of New York Mellon Corp.*, 2015 WL 5786460, at *21 n.29 (S.D.N.Y. Sept. 29, 2015); *Mars, Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73, 76 (D. Del. 1993) ("[T]he principles embodied in subsection (c)(1) are implicated by complex issues of foreign as well as state law.").

a court should undertake a multi-factor balancing test. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257–61 (1981) (articulating and applying the balancing test). More particularly, a court should proceed in three steps:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum, Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. Utd. Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (en banc)) (cleaned up). A court should grant a motion to dismiss based on *forum non conveniens* only when "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chemical Co., Inc.*, 942 F.2d 164, 167 (2d Cir. 1991).

At step one, the amount of deference afforded a plaintiff's choice of forum "moves on a sliding scale depending on several relevant considerations." *Iragorri*, 274 F.3d at 71. Traditionally, courts gave great deference to a plaintiff's choice of her home forum and weak deference to a foreign plaintiff's choice of a United States forum, *see Piper Aircraft*, 454 U.S. at 255–56; but the court's inquiry is more holistic than that. Indeed, a court "must consider a plaintiff's likely motivations in light of all the relevant indications." *Iragorri*, 274 F.3d at 73. In general, a court should "give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience and the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant, and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage." *Id.*

At step three (step two is not at issue here),[39] a court should consider both private-interest and public-interest factors.  Private-interest factors are a proxy for the "convenience of the litigants."  *Id.*  Those factors include:  (1) "the relative ease of access to sources of proof"; (2) "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses"; (3) "possibility of view of premises, if view would be appropriate to the action"; and (4) "all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Id.* at 73–74 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  A court "should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues."  *Id.* at 74.  "The court should consider also whether the plaintiff's damages are genuinely in dispute and where the parties will have better access to the evidence relating to those damages."  *Id.*  Regarding public-interest factors, a court should consider, among other things:

> [T]he administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 509) (cleaned up); *see also Atl. Marine*, 571 U.S. at 62 n.6.

In general, a court should grant a motion to dismiss based on *forum non conveniens* "only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly

---

[39]  The parties agree that Israel is an adequate alternative forum, and so do I.  *See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 37–47 (discussion omits any argument about Israel's not being an adequate forum); Israeli Law Defs.' Reply, Doc. No. 539, at 8 (noting that Israeli Law Plaintiffs concede that point); *Core Software Tech., Inc. v. ImageSat Int'l N.V.*, 2010 WL 21173, at *3 (S.D.N.Y. Jan. 5, 2010) (explaining that Israel is an adequate alternative forum).

preferable." *Iragorri*, 274 F.3d at 74–75.  In making such a consideration, a district court "should be mindful that, just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar forum-shopping reasons."  *Id.* at 75. Indeed, district courts should "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum."  *Id.*

> C.    *Mylan*

In March 2018, a court in the Southern District of New York declined to exercise supplemental jurisdiction in a case highly similar to this one.  *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018).  Because the parties contest whether *Mylan* was rightly decided—and whether I should follow the *Mylan* Court's lead—I include a summary of the case here.

In *Mylan*, a putative class alleged that the drug manufacturer Mylan N.V. had violated both the Exchange Act and the ISL, 1968.  *See Mylan*, 2018 WL 1595985, at *1, *3.  On the defendants' motion to dismiss, the *Mylan* Court allowed the Exchange Act claims to proceed but dismissed the Israeli law claim, which was asserted "on behalf of individuals who purchased Mylan stock on the" TASE.  *Id.* at *18.  In particular, the *Mylan* Court declined to exercise supplemental jurisdiction over the Israeli law claim.  The *Mylan* Court also noted that—although it did not reach the question—"several of the factors compelling the Court to decline supplemental jurisdiction would also weigh in favor of a dismissal" on the grounds of *forum non conveniens*.  *Id.* at *18 n.13.

The *Mylan* Court explained that considerations pursuant to both Section 1367(c)(1) and Section 1367(c)(4) led to its conclusion. *Id.* at *18–19; *see also* 28 U.S.C. § 1367.   With respect to Section 1367(c)(1)—"the claim raises a novel or complex issue of State law"—the *Mylan* Court explained that "whether Israeli courts would apply U.S. securities law or Israeli securities law to a 'dual listed' company" was an open question that had not yet been answered by the Israeli Supreme Court. *Id.* at *19.  The *Mylan* Court conceded that "three district-level decisions by Israeli courts" supported the conclusion that Israeli courts would apply United States securities law to determine a dually listed company's liability under Israeli securities law. *See id.* But, the *Mylan* Court (incorrectly)[40] noted that the Israeli Supreme Court had recently opined that that "choice-of-law issue is an open question." *Id.* (citing the 2016 *Damti* Israeli district court decision).  Thus, the *Mylan* Court thought it "better to decline to exercise supplemental jurisdiction, and to leave this novel question of Israeli law to the Israeli Supreme Court to answer in the first instance." *Id.*

With respect to Section 1367(c)(4)—"in exceptional circumstances, there are other compelling reasons for declining jurisdiction"—the *Mylan* Court explained that exceptional circumstances existed.  In particular, the *Mylan* Court focused on the fact that there were "[t]wo separate class actions [] currently pending in Israeli courts, both brought by purchasers of Mylan's stock on the TASE and both raising claims similar to those in Plaintiffs' Complaint." *Id.*  The *Mylan* Court noted that, even if those actions were soon stayed, "the remaining § 1367(c) considerations still counsel in favor of declining to exercise supplemental jurisdiction over Plaintiffs' Israeli law claims." *Id.* at *19 n.15.  The *Mylan* Court continued to explain that "Israeli courts are better equipped than this Court to offer Israeli plaintiffs an appropriate forum

---

[40]  As discussed further below, the *Mylan* Court misattributed that holding to the Israeli Supreme Court when it really came from an Israeli district court. *See* Licht Decl., Doc. No. 499, at ¶¶ 96–97.

to litigate their claims under Israeli law." *Id.* at * 19.  Citing *Morrison*, the *Mylan* Court noted

that foreign countries' securities markets can differ from the United States's securities markets in

myriad and important ways.  *See id.*  The *Mylan* Court also cited "the interests of international

comity" and "hesitate[d] to impinge on Israeli courts' ability to adjudicate the claims of their

own citizens under their own securities laws—even if Israel has chosen, as a matter of *Israeli*

*law*, to apply U.S. securities law."  *Id.*  The *Mylan* Court continued:  "Respect for foreign law

would be completely subverted if foreign claims were allowed to be piggybacked into virtually

every American securities fraud case, imposing American procedures, requirement, and

interpretations."  *Id.* (quoting *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *7

(C.D. Cal. July 7, 2011)) (cleaned up).

     The *Mylan* Court held that the Israeli plaintiffs' interest in litigating their Israeli law

claims in United States federal court was entitled to negligible deference.  The *Mylan* Court said:

> [T]he United States has only a minimal interest, if any, in providing a forum to
> litigate the claims of foreign stockholders under foreign securities laws.  *See Dar*
> *El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 388
> (S.D.N.Y. 2000); *see also Morrison*, 561 U.S. at 270 ("While there is no reason to
> believe that the United States has become the Barbary Coast for those perpetrating
> frauds on foreign securities markets, some fear that it has become the Shangri-La
> of class-action litigation for lawyers representing those allegedly cheated in foreign
> securities markets.").

*Id.* at *20.  Finally, the *Mylan* Court held that "declining jurisdiction over the Israeli Plaintiffs

avoids the risk of exposing Defendants to inconsistent or double liability."  *Id.*

     D.    Discussion

          1.    A Preliminary Issue:  Judicial Estoppel and Teva's Prior Arguments

     The Israeli Law Plaintiffs argue that the Israeli Law Defendants should be judicially

estopped from pursuing their current argument because they have already successfully argued

that the United States—and, particularly, the District of Connecticut—is a proper forum to

litigate the Israeli law claims at issue.  The Israeli Law Defendants disagree; they say that they

have not taken any contradictory positions.  Although the Israeli Law Defendants' prior positions

are relevant to aspects of my supplemental jurisdiction and *forum non conveniens* analysis

(discussed further below), I will not judicially estop the Israeli Law Defendants from arguing

their position here because the elements of judicial estoppel, in my view, have not been met.

The equitable doctrine of judicial estoppel "is designed to prevent a party who plays fast

and loose with the courts from gaining unfair advantage through the deliberate adoption of

inconsistent positions in successive suits."  *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d

Cir. 2019) (cleaned up).  "Where a party assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position, especially if it be to the prejudice of the party who has

acquiesced in the position formerly taken by him."  *New Hampshire v. Maine*, 532 U.S. 742, 749

(2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)) (cleaned up).

Three factors govern a court's application of judicial estoppel.  "First, a party's later

position must be clearly inconsistent with its earlier position."  *Id.* at 750 (cleaned up).  "[T]here

must be a true inconsistency between the statements in the two proceedings," and "[i]f the

statements can be reconciled there is no occasion to apply an estoppel."  *Ashmore*, 923 F.3d at

272 (cleaned up).  "Second, courts regularly inquire whether the party has succeeded in

persuading a court to accept that party's earlier position, so that judicial acceptance of an

inconsistent position in a later proceeding would create the perception that either the first or the

second court was misled."  *New Hampshire*, 532 U.S. at 750 (cleaned up).  Third, a court should

consider "whether the party seeking to assert an inconsistent position would derive an unfair

advantage or impose an unfair detriment on the opposing party if not estopped."  *Id.* at 751.

The application of judicial estoppel is "strong medicine," and courts do not undertake it lightly. *See Ashmore*, 923 F.3d at 274. Indeed, "[t]he application of judicial estoppel constitutes an exercise of a court's inherent power to sanction misconduct." *Montrose Med. Grp. Participating Savings Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir. 2001). "[T]he Supreme Court has made clear that courts should impose sanctions pursuant to their inherent authority only in rare circumstances." *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

The Israeli Law Plaintiffs argue that all the elements of the judicial estoppel test have been met. First, they note that the Israeli Law Defendants have previously argued on multiple occasions and in multiple forums—(1) a motion to dismiss in the lead action in this matter,[41] (2) a motion to transfer the *Phoenix* action, and (3) a motion to stay a parallel Israeli securities class action—that Israeli securities law "mirrors" United States securities law in that both reporting requirements and civil liability under the ISL, 1968 are determined by United States law. *See Israeli Law Pls.' Opp'n*, Doc. No. 498, at 18–19. Second, the Israeli Law Plaintiffs argue that the Israeli Law Defendants' positions were adopted by each relevant court because the Israeli Law Defendants prevailed on each motion. *See id.* at 20.[42] Thus, the "Defendants repeatedly sought, and successfully obtained, judicial relief based on their positions that the Israeli law claims rely on U.S. securities law principles and that U.S. courts are the appropriate forum." *Id.* Third, the Israeli Law Plaintiffs claim that they would be prejudiced if I granted the motion to

---

[41] *See* Mem. in Supp. Mot. to Dismiss, Doc. No. 189-1, at 65 n.49 (noting that "Defendants agree that Israeli law mirrors U.S. law here," and remarking that "both Israeli case law and the Israeli Securities Authority's public statements support the view that, as matter of Israeli law, Israel voluntarily applies U.S. liability standards to dual-listed companies like Teva").

[42] More specifically, the Israeli Law Plaintiffs argue that I "dismissed the Class's complaint without prejudice, and in subsequent amendments, the Class did not re-plead the Israeli law claims." Israeli Law Pls.' Opp'n, Doc. No. 498, at 20. Further, "Judge Diamond transferred the *Phoenix* plaintiffs' complaint to this Court." *Id.* "And in Israel, the Tel Aviv district court stayed the securities litigation in favor of the U.S. proceedings." *Id.*

dismiss because the Israeli Law Defendants' "end game is . . . to deprive Plaintiffs of any forum to hear their Israeli law claims." *Id.* at 21.

In articulating the Israeli Law Defendants' prior inconsistent position, the Israeli Law Plaintiffs focus heavily on Teva's motion to stay the parallel *Lightcom* case in Israel.  In that motion to stay,[43] Teva argued that United States law controls both disclosure requirements and civil liability under the ISL, 1968.  *See* Teva's Mot. to Stay, Ex. 2 to Licht Decl., Doc. No. 499-2, at ¶¶ 16–20.  Teva also argued that "courts in the United States are . . . the most natural forum for the purpose of deciding" whether Teva breached reporting duties and was liable under United States securities laws.  *See id.* at ¶¶ 8, 37.  Further, Teva argued that the questions in dispute were "similar or identical to those that were brought up in the actions in the United States." *Id.* at ¶ 56a.  The Israeli Law Plaintiffs explain that they filed their direct actions in the United States after Teva successfully obtained the stay in *Lightcom* so that they could "recover damages for all losses caused by Defendants' misconduct" as expeditiously as possible.  Israeli Law Pls.' Opp'n, Doc. No. 498, at 18.

The Israeli Law Plaintiffs also point to Teva's efforts to consolidate all the pending actions against it in the United States into one judicial district and before one judge (me).  Again, in the Israeli Law Plaintiffs' view, Teva's arguments in that posture contradict its current arguments.  The Israeli Law Plaintiffs focus particularly on Teva's motion to transfer in *Phoenix*, 19-cv-449.[44]  Filed on August 3, 2018 in the Eastern District of Pennsylvania, the complaint in

---

[43] Technically, Teva made a motion to dismiss *in limine* or, in the alternative, to stay.  *See* Teva's Mot. to Stay, Ex. 2 to Licht Decl., Doc. No. 499-2.  The *Lightcom* Court denied the motion to dismiss but granted the motion to stay.  *See Lightcom*, Ex. 3 to Licht Decl., Doc. No. 499-3.

[44] In February 2019, *Phoenix* was the first direct action that was transferred from the Eastern District of Pennsylvania to the District of Connecticut.  After *Phoenix*, several other direct actions from the Eastern District of Pennsylvania were transferred to the District of Connecticut by stipulation and without briefing.  Before *Phoenix*, the Eastern District of Pennsylvania transferred to the District of Connecticut one putative class action that asserted an Israeli law claim (*Grodko*, 18-cv-800), but there was no discussion about the Israeli law claim because, at the time, the operative complaint in the lead action before me also asserted the same claim.

*Phoenix* includes claims based on federal securities law, Pennsylvania state securities law, and Israeli securities law.  *See* Compl., *Phoenix*, 19-cv-449, Doc. No. 1.  On October 9, 2018, Teva made a motion to transfer.  *See* Mot. to Transfer, *Phoenix*, 19-cv-449, Doc. No. 30.  In that motion, Teva argued that the *Phoenix* plaintiffs' Israeli law claims were no impediment to transfer because they "add nothing significant to the federal law claims because . . . in substance they mirror the federal securities claims at the heart of all the complaints."  Mem. in Supp. Mot. to Transfer, *Phoenix*, 19-cv-449, Doc. No. 30-2, at 14 n.2; *see also id.* at 19–20 ("Both sides agree . . . that the Israeli law claim simply mirrors the federal securities law claims.").  In an order granting Teva's motion to transfer, District Judge Paul S. Diamond did not discuss the *Phoenix* plaintiffs' Israeli law claims.  *See* Order, *Phoenix*, 19-cv-449, Doc. No. 38.

        The Israeli Law Defendants submit that judicial estoppel should not apply for several reasons.  First, the Israeli Law Defendants note that judicial estoppel cannot be employed to prevent a court from considering its own subject matter jurisdiction.  *See* Israeli Law Defs.' Reply, Doc. No. 539, at 12 (citing *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000)).  Indeed, in *Da Silva*, the Second Circuit noted that the parties "prior litigating positions do not preclude either side from asserting its current position since the issue of subject matter jurisdiction is one we are required to consider, even if the parties have ignored it or, as here, have switched sides on the issue."  229 F.3d at 361.

        In any event, the Israeli Law Defendants argue that none of the factors of the judicial estoppel test is satisfied.  First, the Israeli Law Defendants state that their "position is fully consistent with what they argued previously."  Israeli Law Defs.' Reply, Doc. No. 539, at 12.  In their motion to transfer in *Phoenix*, the Israeli Law Defendants acknowledged that the Israeli and state law claims mirrored the federal securities law claims, but that "does not mean that

Defendants supported a U.S. court exercising jurisdiction over those claims." *Id.* Second, the

Israeli Law Defendants argue that even if they *had* made a contradictory statement, no court has

"adopted" such a statement. For instance, in granting Teva's motion to transfer in *Phoenix*,

Judge Diamond did not mention Israeli law in his decision. *Id.* at 13. Third, the Israeli Law

Defendants argue that their litigation tactics have not resulted in an unfair advantage. For

example, even if the *Phoenix* case had not been transferred to me, the Israeli Law Defendants

"still would have moved to dismiss in *Phoenix* (and any other cases raising Israeli law claims) on

the same grounds as" they do now. *Id.*

I will not apply judicial estoppel. I cannot apply judicial estoppel to bar the Israeli Law

Defendants' argument regarding supplemental jurisdiction because that is a question of subject

matter jurisdiction, an issue I am "required to consider." *Da Silva*, 229 F.3d at 361; *see also*

*Khodeir v. Sayyed*, 323 F.R.D. 193, 198 (S.D.N.Y. 2017) (discussing counterclaim plaintiff's

invoking "this Court's subject matter jurisdiction under 28 U.S.C. § 1367(a)").

I will also not apply judicial estoppel to bar the Israeli Law Defendants' argument

regarding *forum non conveniens*. First, applying judicial estoppel is "strong medicine," and it is

well within my discretion not to do so. Second, in my view, the Israeli Law Defendants'

arguments have not been, strictly speaking, inconsistent. Interpreting their prior positions

charitably, one could conclude that the Israeli Law Defendants have argued that (1) Israeli

securities law mirrors United States securities law but also (2) United States securities law claims

should be resolved in the United States and Israeli securities law claims should be resolved in

Israel. For instance, in their motion to stay in *Lightcom*, the Israeli Law Defendants did not

specifically argue that the United States was the most appropriate forum to hear ISL, 1968

claims. Rather, they argued that because the ISL, 1968 incorporates United States law, it made

sense for a United States court to adjudicate the United States law issues on the merits before an

Israeli court did.  *See* Teva's Mot. to Stay, Ex. 2 to Licht Decl., Doc. No. 499-2, at ¶ 57.  Thus, in

my view, the Israeli Law Defendants have not taken strictly inconsistent positions, and so I will

not apply judicial estoppel.

2.  Parties' Arguments on the Merits

a.  Supplemental Jurisdiction

The Israeli Law Defendants argue that—even if Israeli securities law closely mirrors or

incorporates United States law—I should decline to exercise supplemental jurisdiction over the

Israeli law claims because they are simply piggybacked onto an American securities fraud case.

*See* Israeli Law Defs.' Mem. of Law, Doc. No. 450-1, at 11.  The Israeli Law Defendants rely

heavily on *Mylan* and argue that I should reach the same result.  Indeed, the Israeli Law

Defendants claim that numerous courts in analogous circumstances have also declined to

exercise supplemental jurisdiction.  *See id.* at 11–12.[45]

The Israeli Law Plaintiffs claim that I should exercise supplemental jurisdiction because

no provision of Section 1367(c) counsels otherwise, and neither do the *Gibbs* factors.  *See* Israeli

---

[45] The cases the Israeli Law Defendants cite are extremely limited import.  In *In re Toyota*, plaintiffs brought Exchange Act and analogous Japanese law claims against Toyota.  *See* 2011 WL 2675395, at *1, *6.  The court declined to exercise supplemental jurisdiction over the Japanese law claims for two reasons.  First, the "Japanese law claims substantially predominate over the American law claims" because "[t]he vast majority of the members of the currently pleaded class are common stock holders who purchased their stock on foreign exchanges and, therefore, have only a Japanese law claim."  *Id.* at *6.  Second, the "exceptional circumstance of comity to the Japanese courts" counseled against exercising supplemental jurisdiction because "foreign governments have the right to decide how to regulate their own securities markets" and district courts should avoid "imposing American procedures, requirements, and interpretations likely never contemplated by the drafters of the foreign law."  *Id.* at *7.  *In re Toyota* is inapposite because (1) in *In re Toyota* predominance was the major issue whereas, here, there is a small number of Israeli Law Plaintiffs, and (2) whereas Japanese securities law apparently does not incorporate American securities law, Israeli law does through the dual-listing regime.

The other cases the Israeli Law Defendants cite—*Roman y Gordillo S.C. v. Bank of New York Mellon Corp.*, 2014 WL 3507300 (S.D.N.Y. July 14, 2014); *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214 (D. Kan. 2010); *Empagran S.A. v. F. Hoffman-La Roche, Ltd.*, 453 F. Supp. 2d 1 (D.D.C. 2006); *Mars, Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73 (D. Del. 1993)—are inapposite because they are not securities law cases and are factually distinguishable.

42

Law Pls.' Opp'n, Doc. No. 498, at 24–37.  Indeed, the Israeli Law Plaintiffs argue that two

courts in analogous instances have exercised supplemental jurisdiction over Israeli securities law

claims.  *See id.* at 24.[46]  Regarding *Mylan*, the Israeli Law Plaintiffs explain that *Mylan* was

wrongly decided and is already "out-of-date."  *See* Licht Decl., Doc. No. 499, at ¶ 95; Israeli

Law Pls.' Opp'n, Doc. No. 498, at 10.  First, the issue that *Mylan* claimed was "novel"—whether

United States securities law defined civil liability under the ISL, 1968—was not novel because,

at the time *Mylan* was issued, multiple Israeli district courts had already explained that United

States securities law did define civil liability under the ISL, 1968.  *See* Licht Decl., Doc. No.

499, at ¶ 95; Israeli Law Pls.' Opp'n, Doc. No. 498, at 10, 25–26.  Since *Mylan*, the issue is even

less "novel" because, according to the Israeli Law Plaintiffs, the Israeli Supreme Court has now

"affirmed" that view.  *See* Licht Decl., Doc. No. 499, at ¶¶ 97–98.

 The Israeli Law Defendants counter that it is not a settled, "open and shut" tenet of

Israeli law that United States securities law determines liability under the ISL, 1968.  Indeed, the

Israeli Law Defendants point out that the Israeli Law Plaintiffs' "own recounting of the recent

legal history proves the issue is more 'complex' than" they suggest.  Israeli Law Defs.' Reply,

Doc. No. 539, at 6; *see also* Hr'g Tr., Doc. No. 647, at 41:2–5 ("The submission of a 40-page

Israeli law professor's opinion hardly helps to show that all Israeli issues that may arise are open

---

[46] In *Roofer's Pension Fund v. Papa* ("*Perrigo*"), Israeli institutional plaintiffs—including Migdal Insurance Company, Ltd., which is also a plaintiff in *Migdal Ins. Co.*, 19-cv-655—purchased the Defendants' securities on both the NYSE and the TASE and so brought claims under both the Exchange Act the ISL, 1968.  2018 WL 3601229, at *1–2, *6 (D.N.J. July 27, 2018).  The *Perrigo* Court denied the defendants' motion to dismiss the Exchange Act claims and, in doing so, commented in a footnote that "the Court will not refuse to exercise supplemental jurisdiction over the Israeli law claim articulated in Count Four given the remaining federal claims." *Id.* at *24 n.24.

 Similarly, in *Costas v. Ormat Techs, Inc.*, the district court held that both the parties' agreement and its independent review of Israeli case law confirmed that "Israeli law applies United States securities law to determine liability in securities litigation regarding dual-listed corporations."  2019 WL 6700199, at *9 (D. Nev. Dec. 6, 2019). "Accordingly," the *Costas* Court concluded, "the claims under Israeli law may proceed as their resolution is dependent upon the resolution of the Rule 10b-5 and 20(a) claims." *Id.*

and shut and already resolved."). The Israeli Law Defendants argue that that legal history

reveals that "Israeli courts have repeatedly grappled with this question in recent years, and the

most relevant guidance from the Israeli Supreme Court was in an appeal that was withdrawn."

Israeli Law Defs.' Reply, Doc. No. 539, at 6.

In any event, the Israeli Law Defendants argue, even if the relevant question were settled,

that hardly matters. That is because the *Mylan* Court's reasoning went far beyond its perceived

openness of that issue. Indeed, the *Mylan* Court explicitly said that it would have reached the

same result had the question been settled just as the Israeli Law Plaintiffs argue it has been. *See*

*id.* at 5; *Mylan*, 2018 WL 1595985, at *19 (indicating that concerns of international comity

militated against exercising supplemental jurisdiction "even if Israel has chosen, as a matter of

*Israeli law*, to apply U.S. securities law").

The parties also disagree regarding whether exercising supplemental jurisdiction over the

ISL, 1968 claims would promote or erode international comity. The Israeli Law Plaintiffs claim

that *Mylan* was off the mark in its assessment that exercising supplemental jurisdiction would

erode international comity. According to the Israeli Law Plaintiffs, considerations of

international comity "are simply irrelevant," and, if they are relevant, they actually "militate *for*

exercising supplemental jurisdiction." Licht Decl., Doc. No. 499, at ¶¶ 99–101. The Israeli Law

Plaintiffs claim that "[t]he whole [dual-listing] arrangement is premised on adjudicating all

private claims in a concentrated and efficient manner in the foreign forum according to the

foreign law of liability with regard to breaches of the foreign law of disclosure." *Id.* at ¶ 101.

The Israeli Law Plaintiffs rely heavily on the ISA Comment; the Israeli Law Defendants argue

that reliance is weak because the ISA Comment was issued in 2011 and was thus already

considered in *Mylan*.  Israeli Law Defs.' Reply, Doc. No. 539, at 6–7.[47]  The Israeli Law

Defendants add:  "There is no reason to think that the ISA speaks for [] Israeli courts."  *Id.* at 7.

The parties also disagree regarding the other "exceptional circumstances" that the *Mylan*

Court highlighted, particularly:  (1) the existence of parallel litigation in Israel, and (2) the

possible difficulties that could arise from a United States court engaging with Israeli law.  The

Israeli Law Defendants argue that the pendency of two stayed parallel class actions—*Gat* and

*Lightcom*—in Israel is decisive because it indicates that the Israeli Law Plaintiffs can simply

litigate their Israeli law claims in Israel.  Further, the Israeli Law Defendants claim that allowing

the Israeli law claims to proceed here might force them "to engage in additional litigation in

Israel to ensure that the Israeli courts recognize a judgment from a U.S. court on the Israeli law

claims."  Israeli Law Defs.' Mem. of Law, Doc. No. 450-1, at 11.  That is, "[e]ven if Defendants

prevailed on or agreed to settle Israeli law claims in this Court, plaintiffs in the previously filed

Israeli cases might endeavor to relitigate the same claims in Israel."  *Id.*  An Israeli court would

then have to employ "a multi-factor test to determine the enforceability of a U.S. securities law

judgment."  *Id.*  Even if this possibility is "remote," it counsels in favor of declining to exercise

supplemental jurisdiction.  *See id.* at 11 n.7.

On the other hand, the Israeli Law Plaintiffs argue that the situation is entirely

straightforward.  First, the Israeli Law Plaintiffs focus on what they perceive to be Teva's about-

face:  Because Teva argued for *Gat* and *Lightcom* to be stayed pending the outcome in this case

(and succeeded), how can the existence of *Gat* and *Lightcom* be an extraordinary circumstance?

*See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 28.  The Israeli Law Plaintiffs also argue that the

legal reasoning in *Morrison* (and its adoption in *Mylan*) is inapplicable here because all relevant

---

[47]  That argument is difficult to credit because the *Mylan* Court did not mention the ISA Comment.

indications—the ISA Comment, Israeli case law, and Teva's own arguments in different

litigation postures—suggest that my exercising jurisdiction would *promote* international comity.

*See id.* at 29.

In addition, the Israeli Law Plaintiffs argue that declining to exercise supplemental

jurisdiction would not further any of the *Gibbs* factors:  economy, convenience, fairness, or

comity.  *See id.* at 32.  The Israeli Law Plaintiffs claim that the Israeli Law Defendants' fears are

illusory.  First, the notion that litigating Israeli law claims here may expose the Israeli Law

Defendants to inconsistent or double liability is entirely speculative.  *Id.* at 32–33.  Second, the

idea that a judgment from this court would be difficult to enforce in Israel is, as Teva itself

acknowledged in its motion to stay in *Lightcom*, "virtually inconceivable."  *Id.* at 33; Licht Decl.,

Doc. No. 499, at ¶¶ 102–08; Teva's Mot. to Stay, Ex. 2 to Licht Decl., Doc. No. 499-2, at ¶ 46.

In contrast, the Israeli Law Plaintiffs argue, declining to exercise supplemental

jurisdiction would force them to "hire separate Israeli counsel" and "institute a separate lawsuit"

in Israel for "significant losses numbering in the hundreds of millions of dollars suffered on the

TASE"—based on the same facts and misstatements already being litigated in this case.  Israeli

Law Pls.' Opp'n, Doc. No. 498, at 34.  According to the Israeli Law Plaintiffs, the lawsuits

would then "proceed in tandem with the current U.S. lawsuits," and the Israeli Law Plaintiffs

would be forced into entirely duplicative litigation.  *See id.*  Because United States law would

govern the Israeli action, confusion might be sown in the Israeli action.  *See id.* at 34–35.  If the

Israeli action were stayed, the Israeli Law Plaintiffs also claim that they "would be further

prejudiced . . . as they would be deprived of any forum in which to adjudicate claims seeking

damages for their significant losses on the TASE."  *Id.* at 35 n.10.

       b.      *Forum non conveniens*

The parties sharply disagree regarding both whether the Israeli Law Plaintiffs' choice of forum should be afforded significant deference and whether the private-interest and public-interest factors weigh in their favor.  The Israeli Law Defendants point out that nine of the ten Israeli Law Plaintiffs are foreign, and, in fact, seven of them are Israeli residents.  *See* Israeli Law Defs.' Mem. of Law, Doc. No. 450-1, at 13.  That fact "hardly supports deference to Plaintiffs' forum choice."  Israeli Law Defs.' Reply, Doc. No. 539, at 8.  Indeed, in the Israeli Law Defendants' view, the Israeli law claims regard "purchases on an Israeli stock exchange [that] have little connection to the United States" and are merely "tacked on to" the United States securities law claims; thus, the Israeli Law Plaintiffs' choice of forum is "an unavoidable acknowledgment of the secondary status of the Israeli law claims."  Israeli Law Defs.' Mem. of Law, Doc. No. 450-1, at 13.  Because the amount of deference afforded a plaintiff's choice of forum occurs on a "sliding scale," *Iragorri*, 274 F.3d at 71, it matters little on the facts of this case that the *Schwab* plaintiffs are United States residents.  *See* Israeli Law Defs.' Reply, Doc. No. 539, at 9.

The Israeli Law Plaintiffs claim that the *Schwab* plaintiffs' choice of forum is entitled to "great weight" because they are United States residents.  *See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 38.  In the Israeli Law Plaintiffs' view, *all* their choices of forum should be afforded "great weight" because this "litigation has a 'bona fide connection to the United States.'"  *Id.* (quoting *Iragorri*, 274 F.3d at 72).  Indeed, the United States is simply the common sense forum for this litigation because the Israeli Law Plaintiffs "purchased Teva securities on the NYSE ***and*** TASE and, as a result of Defendants' singular course of misconduct occurring in the U.S. generic drug market, Plaintiffs suffered significant losses on ***both*** exchanges."  *Id.*  Thus, the Israeli Law Plaintiffs' losses on the TASE trades are "directly connected to the United States and

inextricably linked to their U.S. securities claims." *Id.* at 38–39.  The Israeli Law Plaintiffs also claim that by bringing their Israeli law claims here, they are not forum shopping but are simply trying to abide by the "spirit of Israel's dual-listing regime." *Id.* at 39.  The fact that Teva sought to stay parallel litigation in Israel in favor of litigating in the United States (and succeeded) further supports the view that the United States is the proper forum to hear the Israeli Law Plaintiffs' Israeli law claims.  *See id.*  If anything, the Israeli Law Plaintiffs claim, Teva's "hypocritical and diametrically opposed posturing suggests that what they are actually seeking to do here is not find a convenient forum, but to ensure **no** forum is available to hear Plaintiffs' Israeli law claims." *Id.* at 40.

The parties also both argue that the private-interest factors relevant to the *forum non conveniens* analysis weigh in their favor.  The Israeli Law Defendants hypothesize that, if forced to defend Israeli law claims in this court, they "might have to engage in further litigation to ensure the recognition of a judgment from this Court based on an interpretation of Israeli law." Israeli Law Defs.' Mem. of Law, Doc. No. 450-1, at 14.  In contrast, the Israeli Law Defendants argue, it "can hardly be an undue inconvenience for plaintiffs who purchased stock on a[n] Israeli exchange to litigate securities claims based on those purchases in Israel—particularly when, as in many of the cases here, the plaintiffs are themselves residents of Israel." *Id.*

The Israeli Law Plaintiffs disagree.  They argue that, in general, the significant (near total) overlap between their United States securities law claims and their Israeli law claims indicate that trying the claims together will be most convenient for all parties.  The Israeli Law Plaintiffs note that the United States and Israeli law claims "will be proved through the same discovery, which is well underway in the Consolidated Action, with over one million pages of

discovery produced by Defendants thus far."  Israeli Law Pls.' Opp'n, Doc. No. 498, at 41.[48]  If

forced to file new, parallel suits in Israel, the Israeli Law Plaintiffs suggest that all parties and

both court systems would incur "significant and duplicative costs."  *Id.*  Further, the witnesses in

this case "with direct knowledge are mostly—if not all—located in the United States."  *Id.*

(Those are executives from Teva's U.S. generics division and potentially employees from third-

party generic drug manufacturing companies involved in those companies' U.S. generics

markets.  *See id.* at 42.)  The Israeli Law Plaintiffs claim that the Israeli Law Defendants "offer

no argument or evidence of how those third parties are available by compulsory process in

Israel."  *Id.*  Finally, the Israeli Law Plaintiffs submit that the Israeli Law Defendants' concern

that "they 'might' have to engage in additional litigation in Israel" to get an Israeli court to

recognize a judgment from this court is "speculative" and "unfounded."  *Id.* at 43.

The parties also view the public-interest factors differently.  The Israeli Law Defendants

note the "obvious public interest in having Israeli law claims, concerning stock on an Israeli

exchange, considered and decided by an Israeli court."  Israeli Law Defs.' Mem. of Law, Doc.

No. 450-1, at 14 (citing *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 134 (2d Cir.

2005)).  The Israeli Law Defendants point out that, in their view, courts have dismissed claims

on *forum non conveniens* grounds in similar circumstances.  *See id.* at 15.[49]

---

[48]  The Israeli Law Defendants assert that the Israeli Law Plaintiffs' focus on the volume of discovery already exchanged in this litigation is overblown because all that document discovery has been electronic; indeed, the Israeli Law Defendants themselves are "located all over the globe."  Israeli Law Defs.' Reply, Doc. No. 539, at 11–12.

[49]  The cases that the Israeli Law Defendants cite are inapposite.  In *Wilson v. Eckhaus*, the Second Circuit concluded that the public-interest factors favored dismissal on *forum non conveniens* grounds because very sensitive matters of Israeli sovereignty were implicated.  349 F. App'x 649, 652 (2d Cir. 2009) (focusing on "the relationship between defendants and the Israeli government and plaintiffs' allegations concerning the Israeli military and Israeli foreign policy" and referencing a "letter submitted by Israel's Ministry of Defense, which explains that the complaint raises claims related to Israel's national security and other governmental interests").  In contrast, this case does not concern Israel's national security, and, in fact, it seems that Israel would *prefer* that claims under its securities law be heard in United States federal courts.

In *ICC Indus., Inc. v. Israel Disc. Bank, Ltd.*, the district court focused, in large part, on the fact that the case was "really an Israeli controversy."  2005 WL 1844616, at *7 (S.D.N.Y. July 29, 2005).  That was because the

The Israeli Law Plaintiffs disagree.  They claim that, even if I dismiss their Israeli law claims, the United States securities law action proceeding before me would continue, and so the burden on this Court's congestion and the potential burden on jurors in Connecticut will not change.  *See* Israeli Law Pls.' Opp'n, Doc. No. 498, at 44.  Further, the United States has an obvious interest in ensuring that companies trading on the NYSE abide by United States securities laws; that interest is not significantly diminished by exercising supplemental jurisdiction over the Israeli law claims given that four-fifths of Teva's securities in general were traded on United States exchanges.  *See id.* at 44–45.[50]  Hearing both causes of action here will, in the Israeli Law Plaintiffs' view, minimize potential issues with conflicts of laws and/or application of foreign (U.S.) law in Israeli courts.  *See id.*

3.      Discussion

I will exercise supplemental jurisdiction over the Israeli Law Plaintiffs' Israeli law claims, and I will not dismiss them on the grounds of *forum non conveniens*.  Put simply, the Israeli Law Plaintiffs' federal securities law and Israeli securities law claims seem to me, in every important respect, identical.  The Israeli Law Defendants' concerns are, essentially, phantom concerns:  The Israeli Law Defendants have not identified a serious possibility that any significant issue might arise that would counsel against exercising supplemental jurisdiction over the Israeli law claims.

---

plaintiff—a New York corporation—had "a controlling interest in an Israeli public company and entered into an agreement to guarantee the company's financial obligations to an Israeli bank." *Id.* Thus, resolving the dispute would explicitly require the interpretation and application of Israeli law, which "[a]n Israeli court could address . . . with greater ease and expediency than this Court." *Id.* Again, that situation differs from the situation here because United States law will govern this dispute.

[50] The Israeli Law Defendants disagree and point out that the United States does not have an independent interest in ensuring that parties comply with Israel's securities laws. Instead, the United States's only interest is in ensuring that its own securities laws are not violated. *See* Israeli Law Defs.' Reply, Doc. No. 539, at 10.

Because of the slippery nature of these issues, the analytical frameworks of the supplemental jurisdiction and *forum non conveniens* tests can sometimes seem artificial and can encroach upon one another. Still, the frameworks provide a useful frame of reference, so I build my discussion upon them.

In my view, the Israeli Law Plaintiffs' ISL, 1968 claims do not "raise[] a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Take "novel" first. In my view, it is settled as a matter of Israeli law that United States securities law establishes civil liability under the ISL, 1968. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (equating "novel" under Section 1367(c)(1) with "unsettled"). At least three Israeli district courts—*Verifone I*, *Damti*, and *Tower*—have reached that conclusion. Further, the Israeli Supreme Court has now said that the *Damti* and *Tower* district courts were correct "when they ruled with respect to the application of the foreign law." *Damti (Supreme Court) II*, Ex. 8 to Licht Decl., Doc. No. 499-8, at 5. Indeed, I am not aware of any contrary decision.

Similarly, the question whether United States securities law establishes civil liability under the ISL, 1968 does not present such a "complex" issue of Israeli law that I should decline jurisdiction. To be sure, the issue is not completely straightforward. First, the Israeli *Knesset* has not resolved the question as a matter of statutory law. That is potentially significant because (1) the *Knesset* did establish that foreign markets' reporting and disclosure requirements would define those requirements under Israeli securities law, and (2) the Israeli Supreme Court has twice (somewhat cryptically) voiced its opinion that a legislative amendment would be helpful to clarify "the position" and the "state of affairs" with respect to the issue. *See Damti (Supreme Court) I*, Ex. 7 to Licht Decl., Doc. No. 499-7, at 5; *Damti (Supreme Court) II*, Ex. 8 to Licht Decl., Doc. No. 499-8, at 5. Second, the question was close enough that it went unanswered for

several years, and, when several Israeli district courts addressed the question, they published long and thoughtful analyses explaining their reasoning. Along the same lines, the Israeli Law Plaintiffs in this case submitted a lengthy and detailed affidavit from an Israeli law expert to help explain the state of the law.

On the other hand, though, the absence of any contrary precedent and the logic of Israel's dual-listing regime indicate that the issue is no longer especially "complex." In other words, the only potential complexities do not arise from existing evidence but instead regard speculations about what Israeli courts or the *Knesset* might say or do in the future. In my view, that speculation does not introduce enough potential complexity to warrant declining jurisdiction over the Israeli law claims based on Section 1367(c)(1) considerations.

I also hold that there are no "exceptional circumstances" or "compelling reasons" that favor declining supplemental jurisdiction over the ISL, 1968 claims. 28 U.S.C. § 1367(c)(4). To be sure, there are *some* reasons that support declining jurisdiction. The *Mylan* Court succinctly articulated the fundamental point: "Israeli courts are better equipped than this Court to offer Israeli plaintiffs an appropriate forum to litigate their claims under Israeli law." 2018 WL 1595985, at *19. As a general matter, that is true, and so the existence of parallel, stayed class actions in Israel—based on Israeli law—counsel slightly in favor of declining jurisdiction. The potential for differences between how I might decide the United States securities law claims in these cases and how an Israeli court might decide the Israeli law claims also counsels against exercising jurisdiction. That is the lesson of *Mylan* and *Morrison*. *See id.* ("[T]he regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, *what damages are recoverable, what discovery is available in litigation, what individual*

*actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters*.") (quoting *Morrison*, 561 U.S. at 269) (emphasis added).

However, in my view, the record does not identify any potential idiosyncrasies that legitimately might arise.  For instance, I have not been provided with an explanation why any of the italicized concerns in the above quotation from *Morrison* might arise in this case.  In fact, when I asked the Israeli Law Defendants at the hearing in this matter "what issues of Israeli law do you foresee are going to have to be decided by me if I keep the Israeli law claims," the Israeli Law Defendants admitted that they anticipated none.  *See* Hr'g Tr., Doc. No. 647, at 41:19–44:10; 57:1–3.

As described above, *see supra n.*46, two district courts recently have exercised supplemental jurisdiction over Israeli securities law claims in analogous circumstances:  (1) *Roofer's Pension Fund v. Papa* ("*Perrigo*"), 2018 WL 3601229 (D.N.J. July 27, 2018), and (2) *Costas v. Ormat Techs, Inc.*, 2019 WL 6700199 (D. Nev. Dec. 6, 2019).  The *Perrigo* and *Costas* courts did not explain their reasoning, and I do not rely on their reasoning.  However, the practical experience in those cases helps inform my view regarding the potential issues that might arise from my exercising supplemental jurisdiction over ISL, 1968 claims.

So far as I can tell, the decisions by the *Perrigo* and *Costas* courts to exercise supplemental jurisdiction over Israeli law claims have not resulted in any thorny issues in those cases.  My review of the dockets in the *Perrigo* and *Costas* cases confirms that the presence of the Israeli law claims has not (yet, at least) caused any practical difficulties for those courts.[51] The experience of the *Perrigo* and *Costas* courts does not eliminate the possibility of future

---

[51]  The parties, too, are unaware of any issues that have arisen in the *Perrigo* and *Costas* cases.  *See* Hr'g Tr., Doc. No. 647, at 44:23–24 (Israeli Law Defendants admitting they were "not aware of" any issues); *id.* at 48:6–10 (counsel for Israeli Law Plaintiffs reporting they "represent plaintiffs in the *Perrigo* action" and that the presence of Israeli law claims "has not presented any impediment whatsoever to the efficient litigation of that case.").

complications in this case, but it gives me even more confidence that complications are unlikely

to arise in this case. For all those reasons, I will not decline supplemental jurisdiction pursuant

to Section 1367(c).

I also will not dismiss the Israeli law claims based on the doctrine of *forum non

conveniens*. Regarding the level of deference to afford the Israeli Law Plaintiffs' choice of

forum, I afford it a medium amount. On the one hand, the Israeli Law Plaintiffs—except for the

*Schwab* plaintiffs—are foreign, and most are Israeli. In addition, there is no question that the

Israeli Law Plaintiffs—if they wanted to—would be able to litigate their Israeli law claims in

Israel. On the other hand, it is economical—because the Israeli law claims seem truly to mirror

the federal securities law claims—for the Israeli Law Plaintiffs to litigate their claims in one

place all at once. Clearly, the United States is the place to do that. The lion's share of evidence

and witnesses are in the United States because the case regards Teva's U.S. generic drugs

market. Because the Israeli Law Defendants have already acknowledged the secondary status of

the Israeli law claims in this case, it is difficult to see how the Israeli Law Defendants would be

so prejudiced from having to litigate the claims in the same forum.

The most important public-interest factors at play are those regarding the potential

difficulty of engaging with foreign law. *See Piper Aircraft*, 454 U.S. at 241 n.6 (listing the

following as public-interest factors: "[T]he local interest in having localized controversies

decided at home; the interest in having the trial of a diversity case in a forum that is at home with

the law that must govern the action; the avoidance of unnecessary problems in conflict of laws,

or in the application of foreign law.") (quoting *Gilbert*, 330 U.S. at 509) (cleaned up). But, as

already discussed, that is a general concern, and the Israeli Law Defendants do not substantiate

that concern with enough particularity.

The issue of comity—whether considered as a part of the public-interest factors under a *forum non conveniens* analysis or an "exceptional circumstance" under Section 1367(c)(4)—does not counsel against exercising jurisdiction over the Israeli law claims. The reasons for abstaining on the basis of comity are entirely speculative. In contrast, there are reasons to believe that exercising jurisdiction will *improve* comity between the United States and Israel—specifically, the ISA Comment, the purpose behind Israel's dual-listing regime, and the Israeli courts' treatment of parallel litigation.

Related is the concern that the United States will become an unwanted haven for opportunistic plaintiffs' lawyers. Indeed, in *Morrison*, the Supreme Court mentioned that "some fear" that the United States "has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." *Morrison*, 561 U.S. at 270. The Israeli Law Defendants reiterate that concern. *See* Hr'g Tr., Doc. No. 647, at 58:10–13 ("[I]t may be that the securities authority in Israel wants to outsource all the securities jurisprudence to America . . . , but the U.S. doesn't have an interest in that."). In my view, that concern does not carry much weight here. For one, in this case, the connection to the United States is strong: Over 80 percent of Teva's shares are traded on the NYSE. Second, Israel has apparently, as a matter of governmental policy and judicial authority, linked its securities laws to ours. Thus, although there may be a geo-political issue regarding whether Israel's doing so was appropriate, there is no latent concern that the Israeli Law Plaintiffs' lawyers are acting selfishly or improperly by attempting to bring their claims here.

Finally, the Israeli Law Defendants' prior litigating positions are informative and undercut their current argument. In a *forum non conveniens* analysis a district court "should be mindful that, just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants

also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine

concern with convenience but because of similar forum-shopping reasons." *Iragorri*, 274 F.3d at

75.  Although the Israeli Law Defendants claim that they have always planned on attempting to

litigate the United States securities claims in the United States and the Israeli securities law

claims in Israel, some of their prior arguments have been broad and purposefully attempted to

lump together the two types of claims.  For instance, in their motion to dismiss earlier in this

matter, the Defendants had no issue acknowledging that Israeli law perfectly mirrored United

States law.  *See* Mem. in Supp. Mot. to Dismiss, Doc. No. 189-1, at 64–65 & n.49.  And in their

motion to transfer in *Phoenix* and motion to stay in *Lightcom*, Teva likewise assured the courts

that Israeli law and United States law were the same in every important respect.  Now, the Israeli

Law Defendants try to make a distinction that is not quite contradictory to their prior positions,

but it is eyebrow-raising, and, in my view, too clever by half.

Courts require a strong showing of inconvenience to dismiss a claim based on the

doctrine of *forum non conveniens*.  *See R. Maganlal & Co.*, 942 F.2d at 167 (noting that courts

should grant motions to dismiss on the basis of *forum non conveniens* only when "the balance of

convenience tilts strongly in favor of trial in the foreign forum"); *Iragorri*, 274 F.3d at 74–75

(explaining that courts should grant motions to dismiss on the basis of *forum non conveniens*

"only if the chosen forum is shown to be genuinely inconvenient and the selected forum

significantly preferable").  Here, the Israeli Law Defendants have not come close to clearing that

high bar.

## V.       Conclusion

For the foregoing reasons, I **grant** the Repose Defendants' partial motion to dismiss on repose grounds, doc. no. 449, and **deny** the Israeli Law Defendants' partial motion to dismiss Israeli law claims, doc. no. 450.

As I have already ordered, the Defendants in all the Direct Actions shall "answer or otherwise respond to the operative complaints in the Direct Actions" by 120 days from today, which is May 24, 2021.  *See* Consolidation Order, Doc. No. 352, at ¶ 14.

So ordered.

Dated at Bridgeport, Connecticut, this 22d day of January 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge