UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | No. 3:17-cv-00558 (SRU) |
| | March 1, 2021 |

**DEFENDANTS' NOTICE REGARDING CASE MANAGEMENT STATUS**

Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Deborah Griffin, Kåre Shultz, Michael McClellen, Yitzhak Peterburg, and Teva Pharmaceutical Finance Netherlands III B.V. (collectively, "Defendants") respectfully submit this notice concerning several discovery and case management issues in advance of the March 3, 2021 status conference.

**I.     In Light of Newly Discovered Information, the Class Certification Decision Should Be Held in Abeyance**

Just a few weeks ago, in a parallel securities actions against a different generic drug manufacturer, Judge Michael Baylson of the Eastern District of Pennsylvania removed the Bleichmar, Fonti & Auld ("BFA") firm – the same attorneys leading this action for Plaintiffs – and the lead plaintiff in that case, for "attempt[ing] to suppress discovery," for making "representations to th[e] Court, many of which . . . were incorrect or misleading," and for "deliberately misle[ading] th[e] Court."  *Pelletier v. Endo Int'l PLC*, No. 17-CV-5114, 2021 WL 398495, at *11 (E.D. Pa. Feb. 4, 2021) ("*Endo*") (Ex. A).  In his opinion, Judge Baylson recounts his efforts to get to the truth regarding plaintiffs' trading and the involvement of a relevant third party  – which was only fully revealed through several rounds of post-hearing supplemental class certification briefing.  *See id.* at *3–10.

On February 12, 2021, Defendants wrote to Plaintiffs' counsel explaining that BFA's conduct in *Endo* raised a number of similar concerns in this case. (Ex. B). During a subsequent meet and confer, Defendants explained that because the Court may be working on its class certification decision, Defendants anticipated bringing these new issues to the Court's attention through a motion requesting a temporary stay of its decision on Plaintiffs' Class Certification Motion (ECF 419). In turn, Plaintiffs' offered to make certain disclosures and productions to address Defendants' concerns and requested that Defendants await that material before moving the Court for relief. Defendants agreed and the parties entered into a stipulation. (Ex. C).[1]

As discussed herein, despite Plaintiffs' express agreement to provide additional discovery by February 26, 2021, Plaintiffs failed to disclose all of their trades in Teva securities, failed to produce trading records in their possession to substantiate their claims, and failed to identify relevant third parties. Moreover, the partial disclosures and productions Plaintiffs have made so far raise serious concerns about not only BFA's prior representations to the Court, but also Plaintiffs' ability to satisfy the requirements of Rule 23. Indeed, much of this new information bears on the resolution of a number important issues, including materiality, loss causation, class predominance, lead counsel's appointment, and Plaintiffs' standing, knowledge, reliance, adequacy, and typicality. Accordingly, Defendants respectfully request the Court hold in abeyance its class certification decision so that Defendants can engage in additional discovery over the next two months. Once complete, Defendants request supplemental briefing in order to present the Court with a complete and accurate record so it can properly conduct its "rigorous

---

[1] On February 18, 2021, Plaintiffs responded to Defendants' letter. (Ex. D). On February 26, 2021, pursuant to the parties' stipulation, Plaintiffs provided certain additional information by letter. (Ex. E).

analysis" to determine whether Plaintiffs met their burden for each requirement of Rule 23.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).[2]

### A. Plaintiffs Failed to Produce Even the Agreed-Upon Preliminary Discovery

As noted above, in *Endo*, the Court held that BFA had made misrepresentations regarding the plaintiffs' investments in the defendant company.  As this Court will recall, in this case, BFA previously resisted discovery into its investments in Teva, arguing that it did not need to produce actual documents evidencing investment activity, but rather that its mere certification attached to the Complaint sufficed.[3]  Following the *Endo* decision, and in a good faith effort to work through Defendants' concerns without judicial intervention, Defendants accepted Plaintiffs' offer that they would produce certain fundamental documents and make basic disclosures.  In unequivocal language, Plaintiffs agreed to "fully: (i) produce **all trading records in their possession** concerning all of Plaintiffs' transactions in all Teva securities[.]"  (Ex. C ¶ 1 (emphasis added)).  Despite this express agreement, while Plaintiff Anchorage Police & Fire Retirement System ("Anchorage") produced some actual records, Plaintiff Ontario Teachers' Pension Plan

---

[2] As explained herein, Defendants agreed to forgo challenging Plaintiffs' adequacy and typicality relying on Plaintiffs' representations and disclosures – which turned out to be, at best, misleading and incomplete – and in light of newly disclosed facts, should be able to brief those critical class certification issues for the Court's benefit. Nevertheless, under the parties agreement, Defendants can still challenge Plaintiffs' standing (for claims not subject to the amendments), predominance, and lead counsel's appointment, all of which are also at issue.

[3] *See e.g.,* ECF 413 (arguing that "Plaintiffs' sworn PSLRA certifications attached to the Complaint show that they (like other Class members) transacted in Teva securities at the market price after Defendants' misstatements and before the truth was revealed."). As explained below, we now know this statement was misleading at best as ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ (*see e.g.,* Ex. E at 4).

3

("Ontario") – *again* – produced a newly-generated document that it claims is sufficient to evidence Ontario's trading history.[4] This is not what the parties agreed to, and it raises concerns as to why Ontario continues to resist this basic production.

Plaintiffs also agreed to "fully . . . (ii) disclose the existence of **any and all third parties** . . . involved in Plaintiffs' transactions in Teva securities." (Ex. C ¶ 1 (emphasis added)). As discussed below, Plaintiffs still refuse to disclose several relevant third parties. Similarly, Plaintiffs agreed that "each [would] make a representation, based on reasonable inquiry, regarding their knowledge of any ETF or fund . . . that held, tracked, or shorted Teva securities. Counsel agrees to confer thereafter regarding potential discovery related to any **named** ETF or fund." (Ex. C ¶ 1 (emphasis added)). Yet, Ontario only disclosed that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. E at 4). Although Plaintiffs agreed ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ As we explained to Plaintiffs' counsel, investments through funds are relevant. For example, Judge Stanton just recently denied class certification because a plaintiff "had something the other members did not[,] [t]hrough its investment in a [fund], which had shorted" the company it was suing. *In re Groupo Televisa Sec. Litig.,* No. 18-cv-1979 (LLS), 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020).[5]

---

[4] Notably, the same conduct led to lead plaintiff and counsel's removal in *Endo* after they "repeatedly assured the Court" regarding the nature of certain trades, but "also acted to avoid production of documents that would, eventually, contradict that assurance." 2021 WL 398495, at *2.

[5] Notably, the plaintiff there made "much of the fact that the short sales were made by a different entity" and that the short positions "were owned by" a fund that "used its own investment judgment," likening it to an "an investment in a mutual fund." *Groupo Televisa*, 2020 WL 3050550, at *7. Judge Stanton rejected this "comparison [a]s inapt" and determined that the plaintiff was not typical of the class. *Id.* As such, Plaintiffs here should immediately disclose

4

Plaintiffs should uphold their end of the agreement and make the preliminary productions and disclosures they explicitly promised to make.[6]  As explained below, however, even the information Plaintiffs selectively produced raises a host of new concerns and issues pertinent to the Court's class certification analysis, Plaintiffs' claims, and Defendants' defenses.  And until discovery into these issues is complete, this Court should stay its decision on class certification.

### B. Anchorage and Ontario Failed to Disclose ▇▇▇▇▇▇▇▇

In *Endo*, as recounted by Judge Baylson, counsel "only recently confirmed the nature of [plaintiff's] investor conduct to the Court."[7]  2021 WL 398495, at *7.  Until that point, counsel made "no mention of" an investment manager, "repeatedly referring to its client [] as the 'purchaser.'" *Id.* at 8  In fact, they "did not begin disclosing [the investment manager's] level of control directly to the Court until responding to direct questions from the Court[.]" *Id.*  Worse, they "continue[d] to represent [plaintiff] as the purchaser of the Endo shares . . . dismissing [the investment manager's] role as both factually and legally inconsequential." *Id.*  Rejecting this argument, Judge Baylson determined the investment manager's existence was "legally relevant" and that counsel "obfuscated" its role and existence. *Id.* at *11.

---

the names of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ so that Defendants can engage in the basic discovery to which they are clearly entitled in order to prepare their defense.

[6] Just a few hours ago, at 2:37 p.m., Plaintiffs advised ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. F). This only further underscores the need for a stay so that Defendants can review the forthcoming productions and disclosures, take any additional discovery, and provide the Court with briefing on any issues that arise.

[7] Plaintiff and BFA tried appealing the *Endo* decision and requested Judge Baylson's recusal. Both motions were denied. *Endo,* ECF 297.

5

Similarly here, in response to Teva's letter, Anchorage revealed for the first time that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including, for example: "***Anchorage as a purchaser*** of the Notes indisputably had Article III standing as to all the Notes underwriters." (ECF 246, at 24 n.20 (emphasis added)); "***Anchorage purchased*** Teva's U.S.-dollar denominated 3.150% fixed rate senior notes" (ECF 310, at 9); and "[n]onetheless, Ontario Teachers' and Anchorage are the quintessential institutional investor plaintiffs" because "***Anchorage purchased*** 2026 Notes." (ECF 419 at 3, 11 n.5 (emphasis added)). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. G).[8]

Since the disclosure, Defendants have discovered ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[9] Similarly, Ontario, only just days ago for the first time in this litigation revealed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. I).[10] Yet, as a result of Plaintiffs' misleading statements, as well as their failure to disclose ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ earlier, Defendants were

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[9] *See e.g.,* Ex. H (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[10] These conversations, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

deprived of the opportunity to explore relevant discovery and brief it for the Court's consideration.[11]  Furthermore, Defendants unknowingly entered into the consolidation agreement without the knowledge that Plaintiffs ▬▬▬▬▬▬▬▬▬, forgoing their ability to make common arguments related to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.[12]  Nevertheless, Plaintiffs' unique access to Teva's management and knowledge is also directly relevant to the predominance issue that Defendants raised in its opposition brief and would have further supported and expanded upon with the additional facts that are just now coming to light.  (*See, e.g.*, ECF 508 at 29 (citing *New Jersey Carpenters*, 477 F. App'x at 813)  ("Defendants' evidence of knowledge, which surely would not have sufficed to prove each knowledge defense on the merits, nonetheless indicated that individual knowledge inquiries might be necessary.")).[13]

---

[11] Defendants are in the process of preparing subpoenas to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, which Plaintiffs agreed not to object to.

[12] *See e.g., Blank v. Jacobs*, No. 03-CV2111 (JS)(MLO), 2009 WL 3233037, at *7 (E.D.N.Y. Sept. 30, 2009) ("This also threatens to become the 'focus of the litigation' and is indicative of Herpst's 'non-reliance on the market' because **Lead Plaintiffs have failed to provide any evidence that the typical class member spoke to management through private telephone calls** . . . . the Plaintiffs here have failed to offer any evidence through 'affidavits, documents, or testimony' that Herpst is typical of the other plaintiffs in this case and have not met their burden of meeting every requirement of Rule 23 by a preponderance of the evidence.") (emphasis added).

[13] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  As Plaintiffs admit, the "Price-Hike Strategy" alleged in their Second Amended Complaint ("Complaint") was simply the product of an analysis of Teva's generic drug pricing using commercially available *public* sources.  (*See, e.g.,* ECF 310 ("Second Am. Compl.") ¶¶ 4–6).  If a single expert retained for litigation could discern this information, it is not unreasonable to think ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ was conducting similar analyses during the putative class period – as many other investors and analysts were.

Like the plaintiff in *Endo*, Plaintiffs here may argue that these were not necessary disclosures. This completely misses the point that Plaintiffs actively concealed ▬▬▬▬ ▬▬ with their various representation noted above. In any event, Federal Rule of Civil Procedure 26(a)(1) requires parties to "***without awaiting a discovery request***, provide to the other parties: [] the name and, if known, the address and telephone number of ***each individual likely to have discoverable information*** – along with ***the subjects*** of that information – ***that the disclosing party may use to support its claims*** or defenses." *Id*. (emphasis added). Given the nature of this case, it goes without saying that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

In any event, if Plaintiffs' omissions are excused, no lead plaintiff would ever disclose ▬▬▬▬▬▬▬▬▬▬ in a securities class action because they would seek to obtain the benefit of the fraud-on-the-market-theory to supplant reliance. The propriety of such gamesmanship is belied by Plaintiff's initial disclosures in other cases ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ As in *Endo*, it is unclear why Plaintiffs deviated from proper and past practices in this case.

    C.    **Plaintiff Ontario Failed to Disclose Numerous** ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

A common defense and argument at class certification concerns an investor's post-disclosure trading. As Judge Engelmayer recently acknowledged, an investor "that increases his

8

holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 CIV. 4420 (PAE), 2020 WL 5548856, at *7 (S.D.N.Y. 2020).[14]

Here, Plaintiffs only recently revealed that Ontario was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[15] And yet, in response to requests for information and documents regarding Plaintiffs' transactions, on numerous occasions, Plaintiffs misleadingly referred to their PSLRA certification, claiming that it "***show[s] all of Plaintiffs' transactions in Teva securities***":

- In response to Document Request No. 4, which requested "All documents and communications concerning each and ***every purchase and sale*** by Plaintiffs of Teva securities," Ontario misleadingly "refer[red] Defendants to Plaintiffs' certifications filed with the Complaint in this Action" (ECF 412-4 at 5 (emphasis added); *see also* ECF 412-3 at 4).

- In a letter dated June 1, 2020, counsel again falsely assured Defendants "that ***all of the Plaintiffs' transactions are set forth in the PSLRA certifications*** attached to the Complaint" – as noted in the letter, similar misleading claims were used during the parties' meet and confer. (ECF 413-3 at 1 (emphasis added)). The letter went on to state that "[s]ince you seemed confused by our May 29 proposal [during a meet and confer], we repeat it here: We are willing to produce documents sufficient to show ***all of***

---

[14] Again, permitting Plaintiffs' non-disclosures would effectively destroy this common securities litigation defense.

[15] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and speaks volumes to Ontario's reliance in the middle of the class period. *See In re Terayon Commc'ns Sys., Inc.*, No. C 00-01967 MHP, 2004 WL 413277, at *9 (N.D. Cal. Feb. 23, 2004) ("The court is also greatly troubled by an apparent attempt to mislead the court as to the scope and nature of lead plaintiffs' holdings . . . As noted above, the Certifications…did not reveal [plaintiff's] "put" transactions, nor did they reveal [plaintiffs'] short sales . . . [which] gives rise to the presumption that these actions were taken intentionally to avoid closer court scrutiny of plaintiffs[.]").

9

- ***Plaintiffs' transactions in Teva securities during the Class Period***, including the nature of the trade, date, time, price per share, and number of securities bought or sold." (*Id.* (emphasis added)).

- Following the Court's suggestion that Defendants "take up the [p]laintiffs' offer" (which included "all of Plaintiffs' transactions in Teva securities"), Plaintiffs merely copied and pasted the same bare chart that appeared on their PSLRA certification onto custodian letterhead. (ECF 15 at 21:24–25).

Moreover, an earlier complaint alleged claims on behalf of investors who transacted in "Teva ordinary shares on the Tel Aviv Stock Exchange ('TASE') from February 6, 2014 through August 3, 2017." (ECF 141 at 10.) Yet Ontario's sworn certification – made under penalty of perjury – failed to disclose that ████████████████████████████████ There is no explanation for this misstatement and omission.

Here again, had Plaintiffs made the necessary disclosures concerning ████████ ████████, Defendants would not have agreed to forgo challenging Plaintiffs' adequacy and typicality. Nevertheless, Ontario's ████████ is also a predominance issue, which Defendants could have used to oppose class certification. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-CV-4209, 2013 WL 5815472, at *22 (S.D.N.Y. Oct. 29, 2013) ("Class certification is separately inappropriate . . . . ***The named plaintiffs' trading patterns defeat predominance***.") (emphasis added).

Despite these problematic ████████████████████████████████████ that Plaintiffs still refuse to explain (or provide substantiating records for). As noted above, Ontario revealed ████████████████████████████████████████████████████████████ ████████████████████████████████████. Details of these ████████ are still known only to Plaintiffs.[16] Moreover, Plaintiffs now refuse to disclose ████████████

---

[16] While Defendants are currently preparing subpoenas in order to determine this information, we suspect that the Court's assistance in ordering these records (which are in Plaintiffs' custody and

10



■■■■■■■■■■■■■■■■. Again, this was not what Plaintiffs agreed to, and so the names ■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ should be disclosed.

Potentially even more serious, it appears that Ontario has been ■■■■■■■■■■■■■ while the parties have been engaged in discovery and ■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Aside from the issues such ■■■■ would raise in this action,[18] this also raises a host of other ethical and legal questions and concerns.

### D. Ontario's Undisclosed Subsidiary Had Unique Knowledge and Interactions with Teva and its Investors

Upon counsel's own investigation, it discovered that Glass, Lewis & Co., LLC ("Glass Lewis") – a major financial research and advisory firm that, according to its website, "helps institutional investors understand and connect with the companies"[19] – is and had been during the class period, a subsidiary of Ontario. Throughout the years, Teva was a main subject of Glass

---

control) may be more efficient.

[17] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■

[18] Ontario warned of such an issue to elbow out other investors at the lead plaintiff state – "it is 'axiomatic that a movant cannot seek to represent a class of investors asserting claims for securities fraud when that movant itself is tainted by allegations of similar fraudulent or deceptive behavior . . . . This will constitute a credible, yet unnecessary, distraction and risk at the class certification stage." (ECF 33 (citations omitted).)

[19] *See* Glass, Lewis & Co., LLC , "Company Overview," *available at* www.glasslewis.com/company-overview.

Lewis's services and: (i) engaged with Teva directly; (ii) actively researched and reported on Teva; and (iii) communicated with Teva investors in order to influence and advise them. As with Plaintiffs' ███████████, Ontario's relevant subsidiary should have been disclosed long ago in its initial disclosures.[20]

Weeks ago, Defendants served a subpoena on Glass Lewis, which just started producing documents.[21] Based on information learned so far, Defendants suspect Glass Lewis's conflicts will be relevant to the Court's class certification decision. Indeed, unlike other investors, Ontario, and its subsidiary were uniquely situated and intimately involved with Teva and its shareholders in several distinctive ways:

- In one report Ontario's subsidiary warned investors that "[t]he Company is the subject of a civil complaint by twenty states, of engaging in price-fixing schemes. . . . ***In our view, although legal disputes are common to many companies, shareholders should be concerned with any type of lawsuit or regulatory investigation involving the Company, as such matters could potentially expand in scope and prove to dampen shareholder value***."[22] This information cuts directly against any extension of the class period and could have been used at class certification but for Plaintiffs' non-disclosure. *See e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008) ("A proposed class should close when 'the facts which underlie the gravamen of the plaintiff's complaint [no longer] represent a reasonable basis on which an individual purchaser or the market would rely'") (citation omitted).[23]

---

[20] Even if there was no obligation, these are new and critical facts that are commonly evaluated and considered at the class certification stage.

[21] Defendants also anticipate taking the deposition of a Glass Lewis corporate representative.

[22] Glass, Lewis & Co., LLC, "Proxy Paper – Teva Pharmaceutical Industries Ltd." at 7, *available at* https://www.glasslewis.com/wp-content/uploads/2018/04/Teva-2017.pdf (providing information from Teva's July 13, 2017 Annual Meeting) (emphasis added).

[23] Such statements also speak to Ontario's trading decisions and its reliance (or lack thereof) on Teva's market price. *See e.g. In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015 ) ("It then made a significant investment in Petrobras securities. . . after the alleged fraud had been fully revealed, stating publicly that its decision to purchase was based on. . . . ***Such statements would provide fodder for defendants to argue that [the plaintiff] relied on its own***

- As noted in Teva's SEC Form 14A: "Beginning in late 2018 and continuing through early 2019, our Board engaged in a productive shareholder outreach effort. . . .***We also engaged with the research teams at*** . . . ***Glass Lewis & Co***."[24] (emphasis added).

- Glass Lewis was a focus of numerous articles relied on by Plaintiffs' class certification expert. Unbeknownst to Defendants during briefing, Ontario was essentially a main driver behind the very news that it was presenting to the Court in support of its arguments.[25]

### E. The Court Should Allow for Additional Discovery and Stay Class Certification

As initial productions and disclosures already indicate, Defendants opposed Plaintiffs' Class Certification Motion without critical and relevant information. As such, Defendants respectfully request that they be allowed to take additional discovery over the next two months and present the Court with supplemental briefing to assist in its "rigorous analysis." *See Wal-Mart Stores, Inc.*, 564 U.S. at 351.

If the Court prefers, Defendants can submit a formal motion requesting that the Court temporarily delay its ruling on Plaintiffs' Motion for Class Certification and permit Defendants to engage in relevant discovery.

---

***valuation of Petrobras securities, and not on their market price***.") (emphasis added).

[24] Teva Pharmaceutical Industries Limited, *United States Securities and Exchange Commission Form 14A* (filed April 16, 2019), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312519107826/d689626ddef14a.htm

[25] *See e.g.,* Jonathan D. Rockoff, "Some Teva Investors to Vote Against Directors," *Wall Street Journal* (updated July 23, 2014), *available at* https://www.wsj.com/articles/some-top-teva-investors-plan-to-vote-against-re-electing-some-directors-1406145227?mod=pls_whats_news_us_business_f

## II.     Discovery Issues

In an effort to drown out their own conduct, Plaintiffs will likely make a lot of noise about various discovery issues that they clearly do not actually care about.  Indeed, it is hard reconcile any of Plaintiffs' 'serious concerns' about extraneous document issues when they insisted on (and continue to push for) a prompt deposition schedule.  The timing of these issues are also questionable as many appear to have been purposefully held – and impasses manufactured – for purposes of the upcoming status conference.

The only genuine discovery issue between the parties relates to the report of the Neutral Forensic Expert, Stroz Freidberg ("Stroz").  As the Court is aware, to resolve the dispute concerning the mobile data of certain Teva custodians, including Maureen Cavanaugh, the parties entered into an Agreed Protocol for Forensic Inspection on October 14, 2020, which the Court entered.  (ECF 574 (the "Protocol")).  At Plaintiffs' insistence, the parties retained Stroz as the neutral expert.  The Protocol is clear as to Stroz's mandate:

> 4. Forensic Inspection of Cavanaugh Device and Data (Scope of Work): The Neutral Forensic Expert shall inspect the Cavanaugh Device and Data and perform forensic analysis to (1) recover any and all data concerning Additional Text Messages, and (2) identify any evidence of the deletion, loss, or destruction of any text messages from January 1, 2013 through May 31, 2019 (inclusive).

On December 3, 2020, Stroz confirmed that it completed this analysis.  The content of the Neutral Forensic Expert's report is also clearly described:

> 5.  Report: The Neutral Forensic Expert will provide the undersigned counsel for the Parties with a written report summarizing the results of its forensic analysis described in paragraph 4 above (the "Report"), which shall be designated as "Confidential—Attorneys' Eyes Only." Any Party wishing to change this designation shall comply with the procedure set forth in the Protective Order in the Action (ECF 77).

Pursuant to these instructions and consistent with the Protocol, over the course of nearly two months, Stroz completed its analysis and provided the parties with a report on January 6, 2021.

A copy of that report is attached as Exhibit J. In its report, Stroz described in detail the analysis conducted and its findings. Among other things, Stroz unequivocally stated that "[a]fter completing its analysis, Stroz Friedberg identified only one, partially recovered text message in the Examined Data that was not within the Reviewed Messages." In other words, Stroz confirmed that there were no text messages in the Cavanaugh data to which Defendants did not have access. Defendants have reviewed that data and, consistent with the parties' agreements and the Court's guidance and orders, produced the relevant and responsive messages to Plaintiffs. Furthermore, Defendants have provided Plaintiffs with extensive information regarding the text message data in Teva's possession, which was reviewed in accordance with the parties' agreements, over the course of numerous meet and confer calls spanning more than a dozen hours.

Stroz's January 6 report was in final form, but Stroz asked whether the parties had any questions before removing the draft legend. On January 11, Plaintiffs sent Stroz a list of Plaintiffs' own conclusions relating to Stroz's analyses and requested that these conclusions be "confirmed" in Stroz's final written report. Plaintiffs insisted that Stroz reach conclusions concerning the existence of certain text messages in the examined data – regardless of whether those text messages are relevant, responsive, or were subject to production (*i.e.* either subject to Court order, the parties' agreements, or were relevant/responsive). Defendants objected to Plaintiffs improperly directing Stroz – a ***neutral*** expert – to include Plaintiffs' language in their report. These demands are improper.

Defendants objected to Plaintiffs' demands in an email to Stroz and Plaintiffs, and in a January 21 letter to Plaintiffs. Plaintiffs never substantively responded to Defendants' letter, instead dragging the dispute out for nearly a month-and-a-half to bring it before the Court. In the meantime, Stroz has billed the parties for Stroz's work, and Teva has paid its half of those fees, as

15

agreed. Teva has requested numerous times a final copy of the report for which it has paid, but Plaintiffs have refused to allow Stroz to provide that report. This dispute has been resolved and Plaintiffs' gamesmanship must end.

Defendants respectfully request that the Court find that the Neutral Expert has completed its mandate and should deliver its final report to the parties, as agreed.

Respectfully submitted,

DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; SIGURDUR OLAFSSON; DEBORAH GRIFFIN; KÅRE SCHULTZ; MICHAEL MCCLELLAN; YITZHAK PETERBURG; and TEVA PHARMACEUTICAL FINANCE NETHERLANDS III B.V.

/s/ Sheron Korpus
Sheron Korpus (admitted *pro hac vice*)
Andrew Schwartz (admitted *pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1969
Fax: (212) 500-3469
skorpus@kasowitz.com
aschwartz@kasowitz.com

Jordan D. Hershman (admitted *pro hac vice*)
Jason D. Frank (admitted *pro hac vice*)
Emily E. Renshaw (admitted *pro hac vice*)
Andrew M. Buttaro (ct30882)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
Tel: (617) 341-7700
Fax: (617) 341-7701
jordan.hershman@morganlewis.com

jason.frank@morganlewis.com
emily.renshaw@morganlewis.com
andrew.buttaro@morganlewis.com

*Counsel for Defendants*

– and –

Jill M. O'Toole (ct27116)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
jotoole@goodwin.com

*Counsel for Defendants except Kåre Schultz*