**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| IN RE TEVA SECURITIES LITIGATION | : | No. 3:17-cv-00558 (SRU) |
| | : | |
| THIS DOCUMENT RELATES TO: | : | No. 3:17-cv-00558 (SRU) |
| | : | |

**PLAINTIFFS' SUBSTITUTE SUBMISSION FOR MARCH 3, 2021 STATUS CONFERENCE**

## I. INTRODUCTION

Plaintiffs set forth below the current status and pending disputes regarding several topics: depositions, expert reports, text messages, and document production. Plaintiffs believe this case is on track to meet the deadlines set forth in Appendix A, subject to certain adjustments in light of the pending criminal matter against Teva, alleging anti-competitive conduct and price-fixing as to its generic drugs, which has required postponement of certain key fact depositions. The last topic in this report concerns the pending class certification motion, and Defendants' effort to obtain additional discovery based on a recent opinion in a similar class action involving Lead Counsel Bleichmar Fonti & Auld LLP ("BFA") against a different generic drug manufacturer (Endo International plc) in the Eastern District of Pennsylvania (Civil Action No. 2:17-cv-05114-MMB).

## II. DEPOSITIONS

Plaintiffs and Defendants agreed on twenty-five fact depositions to be completed by April 23, 2021, including former/current Teva employees, a Rule 30(b)(6) deposition of Teva, and third-party depositions under Rule 30(b)(6).

**Depositions of Teva former/current employees**: Appendix B lists the eighteen depositions of former or current Teva employees that have been scheduled or taken.

In addition, Teva and/or the Department of Justice ("DOJ") has requested a postponement of seven depositions of former or current Teva employees because these witnesses will apparently either invoke the Fifth Amendment or implicate Teva in the criminal proceeding. While Plaintiffs have agreed to postpone these depositions until after April 23, these depositions still need to be scheduled and taken in time to complete expert reports and prepare for dispositive motions. The affected witnesses are the following former and current Teva employees:

- ███████████████████████████████████████
- ███████████████████████████████
- █████████████████████████████████

- ███████████████████████████████████████
- ███████████████████████████████████████
- ███████████████████████████████████████
- ███████████████████████████████████████

Plaintiffs seek to take these seven depositions by July 30, 2021. We expect that these depositions can be timely scheduled by agreement of the parties and DOJ; thus, no Court intervention is currently required. Relatedly, Plaintiffs' expert report(s) concerning competition issues may need to incorporate this testimony. Thus, Plaintiffs will confer with the Defendants on this issue. In any event, we will apprise the Court of the status at our next scheduled conference, or sooner if necessary.

**Plaintiffs' Rule 30(b)(6) deposition of Teva**: The parties have reached agreement as to the topics. There are two issues that may persist past close of depositions: <u>First</u>, Teva has objected to two topics on grounds that the "testimony may overlap with those in the parallel criminal investigation and action" and could require Teva "to disclose critical information and preview its defenses in advance of the criminal action." Teva Response and Objections at 10. Again, while Plaintiffs have agreed to postpone testimony on the affected portions of these topics, a postponement should not continue indefinitely. <u>Second</u>, the parties have agreed to hold two topics concerning Teva's financial condition and Teva's insurance agreements in abeyance unless or until these topics become an issue in this case. The parties are also continuing to confer about the duration of time allotted for the Teva Rule 30(b)(6) deposition. At this time, Defendants have not agreed to more than seven hours of deposition time, which Plaintiffs believe is insufficient. We remain hopeful that the parties can reach agreement without the Court's intervention.

**Depositions of Third Parties:** Plaintiffs have sought Rule 30(b)(6) depositions of three of Teva's co-conspirators, Sandoz, Taro, and Apotex, but very recently obtained declarations in lieu of deposition testimony that admit their conduct set forth in their Deferred Prosecution Agreements

2

("DPAs") with the DOJ, and identify Teva as an unnamed co-conspirator in the DPAs, as well as to appear at the trial here. In light of this very recent development, Plaintiffs may seek the depositions of three additional fact witnesses to reach the agreed-upon limit of 25 depositions. We have yet to confer with Defendants on this new development.

Plaintiffs have also subpoenaed Teva's auditor (PricewaterhouseCoopers) and the lead underwriter on Teva's 2016 securities, and continue to work with their counsel to schedule Rule 30(b)(6) depositions in short order.

### III. MISSING TEXT MESSAGES

In September 2020, Plaintiffs moved to compel the text messages[1] of six key Teva employees (Cavanaugh, Baeder, Coward, Galownia, Patel, and Rekenthaler, collectively, the "Custodians"), which constitute key evidence of Teva's collusion. (*See* ECF 554-556.) Plaintiffs sought a forensic inspection and production of the Custodians' text messages with (i) competitors; (ii) any of the Custodians; and (iii) each Individual Defendant. Two issues remain outstanding.

First, the Court ordered a forensic inspection of "all data and devices pertaining to Cavanaugh in [Defendants'] possession, custody, or control that may—upon forensic examination—lead to any information regarding Cavanaugh's text messages." (ECF 569 at 4.) That forensic examination, conducted by Stroz Friedberg, has been unable to locate any of more than one thousand seemingly relevant text messages that phone records confirm Ms. Cavanaugh sent or received during this period, including those listed in Appendix C. As the Court noted on August 11, 2020: "If those text messages do not exist, the Plaintiffs want to know what happened

---

[1] Consistent with prior filings and discussions with the Court on this topic, the term "text messages" includes iMessages, MMS, SMS, WeChat, WhatsApp, Facebook Messenger, LinkedIn messages, or any other text, chat, or instant messaging that could be recoverable from a mobile device.

to them." (ECF 521 at 3.) Defendants should be ordered to state clearly and unequivocally what has happened to these text messages, including a detailed description of any preservation efforts.

Second, the Court ordered Defendants to produce (a) "full text message threads (in native format) of communications between the six relevant custodians and any individual identified by name or initial in the States AG Complaint as someone with whom those six relevant custodians communicated," "regardless of substance or relevance," as well as (b) "all relevant text messages (1) among the six relevant custodians themselves and (2) among any of the six relevant custodians and any individual defendants named in this action." (ECF 569.)

Defendants have produced some text messages in response, yet hundreds of other text messages—including known communications with executives at firms that have admitted to price-fixing with Teva—have not been produced. (*See* Appendix C.)  Defendants have refused to explain the shortfall. To resolve this issue—and potentially recover Cavanaugh's missing texts with the Custodians—Plaintiffs respectfully request that the Court order the relief sought in Plaintiffs' motion (ECF 554-556) requiring Defendants to produce the text messages identified in Appendix C, or, alternatively, explain what happened to them, including a detailed description of any preservation efforts.

## IV. DOCUMENT PRODUCTION AND PRIVILEGE CLAIMS

There are a few pending disputes regarding Teva's document production, and Plaintiffs hope that these will be resolved without the Court's intervention. Briefly, these disputes concern Teva's failure to produce:

(i) documents related to Teva's Disclosure Committee;

(ii) documents related to investor communications (such as draft earnings call transcripts and "Q&As";

(iii) financial data that ties back to Teva's publicly disclosed financial figures;

4

(iv) spreadsheets on price erosion containing all formulas; and

(v) documents from the personal files of former Teva executive Allan Oberman and from the work files of his assistant, Brandon Boyd.

## V. STATUS OF CLASS CERTIFICATION MOTION

On January 29, 2021, the Court held argument on the pending class certification motion. Since then, Defendants have sought further discovery concerning Plaintiffs' transactions in Teva securities, prompted by a recent decision in another action, *Pelletier v. Endo International plc*, Civil Action No. 2:17-cv-05114-MMB ("*Pelletier*"), criticizing BFA and its client in that case. Plaintiffs have voluntarily provided transparent disclosure to address Defendants' concerns. We respectfully submit that the *Pelletier* decision is not relevant to class certification or any other issue before the Court, and no further discovery or delay is warranted.

*Pelletier* is a securities fraud class action against another generics drug manufacturer. In 2018, BFA was appointed lead counsel on behalf of its client Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Park"). (*Pelletier* ECF 57, 58.) BFA vigorously litigated on behalf of the *Pelletier* class, including successfully opposing defendants' motion to dismiss, conducting document and deposition discovery, and filing a motion for class certification. On February 4, 2021, the presiding judge, Hon. Michael Baylson, issued an opinion criticizing BFA and Park and *sua sponte* removing both from leadership positions. (Ex. 1.) After seeking reconsideration (Ex. 2), BFA and Park filed today, March 1, 2021, a petition for a writ of mandamus (Ex. 3). As argued to the Third Circuit, the court committed multiple errors of law and fact. Among those errors, the accusation that BFA was less than candid with the court is belied by the facts and the ethical standards BFA adheres to. BFA strongly disagrees with the decision and has always acted with the highest integrity in all matters.

5

Defendants now seek to leverage *Pelletier* to obtain discovery of extensive additional records concerning Plaintiffs' transactions in Teva securities. However, this is the same discovery that Defendants have agreed not to pursue, and it remains irrelevant to class certification.

On December 13, 2019—before serving any discovery requests—Defendants agreed, and the Court later ordered, that: "Defendants will not advance at any stage of the case the arguments that Plaintiffs do not have standing to bring the claims that are the subject of the amendments, or that Plaintiffs are not adequate or typical representatives for purposes of representing the class, and Defendants shall not use the fact of the amendment itself to challenge class certification." (ECF 352 ¶7.) Nonetheless, Defendants sought a broad range of documents from Plaintiffs, arguing that they could bear on predominance or other issues. Plaintiffs objected, and Defendants moved to compel. On June 23, 2020, the Court held a status conference and stated, "I think that the defense should take up the plaintiffs' offer to produce documents sufficient to show their investments in Teva; but beyond that, this is a purported class action based upon fraud on the market, and I just don't think that the plaintiffs' actual detailed investment records are relevant." Plaintiffs then produced documents sufficient to show their transactions in the relevant Teva securities during the Class Period, and Defendants "agreed not to further pursue their Motion to Compel, reserving their rights to do so in the event that the Court denies Plaintiffs' Motion for Class Certification." (ECF 442.)

We respectfully submit that there is no basis for any further discovery or submissions as to the class certification motion, which remains ripe for decision.

First, Plaintiffs have amply established "all of" their "transactions . . . in the securit[ies] that [are] the subject of the complaint during the class period specified in the complaint." 28 U.S.C § 78u-4(a)(2)(A)(iv). Plaintiffs disclosed all of these transactions in their PSLRA Certifications,

6

which are accurate and complete, as two rounds of confirmatory discovery have shown. Most recently, on a voluntary basis, Ontario Teachers produced detailed electronic trading records, and Anchorage produced records from its external investment manager. Defendants have not argued that any of Plaintiffs' fully disclosed transactions in the securities at issue affect Class-wide predominance or any other issue (including Plaintiffs' adequacy, typicality, and standing).

Second, in a further effort to address Defendants' concerns, Plaintiffs have also voluntarily disclosed transactions in *all* Teva securities—not just the ADS, Preferred Shares, and Notes at issue—from January 1, 2013 to February 15, 2021, exceeding the Class Period (February 6, 2014 through May 10, 2019). These records show that Ontario Teachers purchased Teva corporate debentures (not the subject of the Complaint)—as disclosed years ago in Ontario Teachers' public SEC filings. Ontario Teachers also (i) insured its exposure to these debentures by purchasing CDS derivatives; (ii) acquired Teva's Israeli ordinary shares (also not at issue) before the Class Period, and sold a portion during the Class Period; and (iii) purchased other Teva bonds (some of which are the subject of the Complaint) after the Class Period. These transactions are not relevant because they are not the basis of Ontario Teachers' claims, and because they fall outside the Class Period or involve securities that are not the subject of the Complaint, their disclosure is not required under the PSLRA. 28 U.S.C § 78u-4(a)(2)(A)(iv). Nor is it surprising that a large institutional investor made additional transactions in the securities of Teva (a large issuer), and such transactions have no bearing on class certification.

Third, Defendants have strained to draw parallels with the *Pelletier* decision. Even setting aside the factual and legal errors in that decision, after several meet and confer conferences and Plaintiffs' voluntary disclosures, no issues should remain.

It appears, however, that Defendants may raise Anchorage's use of an external investment manager, Barrow, Hanley, Mewhinney & Strauss, Inc. ("Barrow Hanley"), who made the decisions to transact in the Notes on Anchorage's behalf.  Anchorage appropriately disclosed Barrow Hanley in its responses to interrogatories that Defendants served on January 27, 2021 (the deadline for written discovery).  Defendants have suggested that Anchorage's Initial Disclosures should have identified Barrow Hanley, but Rule 26(a) only requires a party to disclose persons or entities that the party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i).[2]  Anchorage has never intended to use its investment advisor to do so.  Barrow Hanley's role as Anchorage's sole fixed income manager has also been publicly disclosed in Anchorage's annual newsletter available on its website since at least 2016.[3]

Barrow Hanley's role has no impact on class certification.  Like Anchorage, the majority of institutional investors—preferred under the PSLRA—use external managers.[4]  Indeed, it is settled law that using external managers does not affect typicality or adequacy. *See, e.g.*, *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) ("Neither typicality nor adequacy are defeated when institutional investors give investment managers discretionary authority to make investment decisions."); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y.

---

[2] That has been the law for over two decades.  *See* Fed. R. Civ. P. 26(a), Advisory Committee Notes to 2000 amendments ("The scope of the disclosure obligation is narrowed to cover only information that the disclosing party may use to support its position. . . . A party is no longer obligated to disclose witnesses or documents . . . that it does not intend to use.").

[3] *Anchorage Police & Fire Retirement System Newsletter*, July 2016, at 7, https://www.muni.org/publicnotice/apfrs%20documents/july%202016%20newsletter%20website.pdf; *Anchorage Police & Fire Retirement System Newsletter*, July 2017, at 7, https://www.muni.org/publicnotice/apfrs%20documents/july%202017%20newsletter%20v2%20witout%20deceased%20retired%20members.pdf.

[4] *See also* Stephen J. Choi & Jill E. Fisch, *On Beyond Calpers: Survey Evidence on the Developing Role of Public Pension Funds in Corporate Governance*, 61 Vand. L. Rev. 315, 323 (2008) ("A large percentage of public pension fund assets are managed externally. . . . [O]n average, 84.2% of fund assets are managed externally.").

8

2012) (typicality satisfied where lead plaintiff made all investments "through accounts maintained by fourteen outside investment advisors who had full discretion"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003) (using "highly sophisticated investment managers" is "representative of methods used by many other investors" and does not defeat typicality).

In *Pelletier*, the court *sua sponte* accused Park of "obscuring [the investment manager] Lombardia's role as sole decision maker for Park's stock purchases" (Decision at 12). But, in truth, Park had expressly identified Lombardia as its investment manager in its interrogatory responses served at the very outset of discovery. Moreover, that court's views rested on the fundamental misconception that the investment manager was the actual purchaser of the securities. Notably, Endo, represented by Morgan Lewis, never made that argument. For good reason, as investment managers lack standing to bring suit on behalf of their clients. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008) (investment manager lacked title to claims and thus lacked standing).

Here, Anchorage is indisputably the actual purchaser of the Teva securities at issue. Anchorage always maintained legal ownership and legal title to those securities, and its contract with Barrow Hanley (voluntarily produced to Defendants) provides that Barrow Hanley "shall not act as Custodian of the Account assets, and shall not under any circumstances have custody or physical control of the Account assets." (ANCH_TEVA_00000277 at -278.)

Fourth, Defendants have recently expressed dissatisfaction with Plaintiffs' voluntary document production. Defendants have said they expected to receive paper "trading confirmations" and a larger volume of documents. Defendants have also argued that they are entitled to discovery concerning Ontario Teachers' investments in third-party funds that held Teva securities, despite the fact that Ontario Teachers (as a passive investor) held no title to those

9

securities and could not assert claims. While we continue to work through these issues, Defendants have not explained how any further discovery is either relevant or warranted.

*          *          *

Plaintiffs have made voluntary disclosure of their transactions in Teva securities in an effort to move past this distraction, and look forward to the Court's resolution of the pending class certification motion.

## VI.     CONCLUSION

Plaintiffs strongly believe that this case can and should be kept on track to meet all current deadlines. To that end, Plaintiffs request a further conference well before the April 23 cutoff for fact depositions.

Date: March 3, 2021

          Respectfully submitted,

          PLAINTIFFS ONTARIO TEACHERS'
          PENSION PLAN BOARD, and
          ANCHORAGE POLICE & FIRE
          RETIREMENT SYSTEM

          <u>/s/ *J. Christopher Rooney*</u>
          Joseph A. Fonti (admitted *pro hac vice*)
          Evan A. Kubota (admitted *pro hac vice*)
          Benjamin F. Burry (admitted *pro hac vice*)
          Thayne Stoddard (admitted *pro hac vice*)
          **BLEICHMAR FONTI & AULD LLP**
          7 Times Square, 27th Floor
          New York, NY 10036
          Telephone: (212) 789-1340
          Facsimile: (212) 205-3960
          jfonti@bfalaw.com
          ekubota@bfalaw.com
          bburry@bfalaw.com
          tstoddard@bfalaw.com

          *Counsel for Lead Plaintiff*
          *Ontario Teachers' Pension Plan Board, and*
          *for Named Plaintiff Anchorage Police & Fire*

*Retirement System, and Lead Counsel for the Class*

Marc J. Kurzman (ct01545)
Christopher J. Rooney (ct04027)
**CARMODY TORRANCE SANDAK & HENNESSEY LLP**
707 Summer Street, Suite 300
Stamford, CT 06901
Telephone: (203) 252-2680
Facsimile: (203) 325-8608
mkurzman@carmodylaw.com
crooney@carmodylaw.com

*Local Counsel for Lead Plaintiff Ontario Teachers' Pension Plan Board, and for Named Plaintiff Anchorage Police & Fire Retirement System*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 3, 2021, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

                                                                        */s/ J. Christopher Rooney*
                                                                          J. Christopher Rooney

## Appendix A

| Event | Deadline |
|---|---|
| **Fact Discovery** | April 23, 2021 |
| **Fact Depositions** | April 23, 2021 |
| **Designate Trial Experts and Serve Opening Reports** | May 7, 2021 |
| **Damages Analysis Provided by Any Party with a Claim or Counterclaim for Damages** | May 7, 2021 |
| **Depose Trial Experts** | June 4, 2021 |
| **Designate Rebuttal Trial Experts and Serve Rebuttal Reports** | July 2, 2021 |
| **Rebuttal Damages Analysis** | July 2, 2021 |
| **Depose Rebuttal Experts** | July 30, 2021 |
| **Reply Report of Trial Experts** | August 23, 2021 |
| **Motions for Summary Judgment** | September 13, 2021 |
| **SJ Opposition** | October 18, 2021 |
| **SJ Reply** | November 22, 2021 |
| **Joint Trial Memorandum** | 60 days after summary judgment ruling |
| **Trial Ready Date** | 60 days after filing the joint trial memorandum |

**Appendix B**

Eighteen depositions of former or current Teva employees have been scheduled or taken:

- Brian Lapp (former Senior Revenue Analyst; Revenue Manager)
- Brandon Boyd (former Strategic Associate to the President Americas Generics)
- Fred Andrush (former Associate Director, Marketing Operations)
- Mayra Avila (Director, Finance)
- Jamie Berlanska (former VP, Finance and Americas Controller)
- Brendan O'Grady (VP U.S. Market Access; President & CEO North America Generics; EVP & Head, North America Commercial)
- Andrew Boyer (former President & CEO North America Generics)
- Kobi Altman (former SVP and CFO, Global Generics Medicines)
- Gilad Shadur (former Sr. Director, Head of Financial Planning and Analysis; Interim CFO, Global Generic Medicines; VP, CFO North America Generics)
- Eti Mitrany (SVP & Head, Business Planning & Analysis)
- Yitzhak Peterburg (former Chairman; Interim President & CEO Teva)
- Kevin Mannix (SVP & Head, Global Investor Relations)
- Deborah Griffin (SVP & Chief Accounting Officer)
- Sigurdur Olafsson (former President &CEO; Global Generic Medicines)
- Michael McClellan (former SVP &CFO Global Specialty Medicines; EVP & CFO Teva)
- Eyal Desheh (former CFO Teva)
- Erez Vigodman (former President & CEO Teva)
- Kåre Schultz (current President & CEO Teva)

**Appendix C**

Cavanaugh Text Messages Confirmed Missing by Forensic Examination:

The forensic examination, conducted by Stroz Friedberg, has been unable to locate Ms. Cavanaugh's lost text messages and, as a result of Stroz's examination, we understand the following:

1. Stroz recovered *zero* text messages pre-dating March 5, 2016 and *zero* text messages between June 2016 and May 2017.

2. For Ms. Cavanaugh's phone number ending 4959, Stroz was only able to recover text messages for the period March 5, 2016 through June 2016.

3. For Ms. Cavanaugh's phone number ending 8624, Stroz was only able to recover text messages for the period May 2017 through April 2018.

4. Stroz was unable to recover well over a thousand text messages that phone records confirm Ms. Cavanaugh sent or received during this period:

    a. **Text messages listed in phone records for Cavanaugh's phone ending 4959:**
       - Christine Baeder – 5 texts between 4/4/17 and 5/16/17
       - Andrew Boyer – 45 texts, consisting of 44 texts between 1/4/16 and 2/10/16 and one text on 6/21/16
       - Theresa Coward – 26 texts between 12/23/15 and 3/3/16
       - Cavanaugh's other cell phone – 255 texts between 3/5/13 and 10/14/15
       - Marc Falkin – 337 texts between 1/17/13 and 2/26/16
       - Kevin Galownia – 709 texts between 1/19/13 and 2/22/16
       - Aaron Greenblatt – one text on 4/29/14
       - Sigurdur Olafsson – 54 texts, consisting of 48 texts between 11/14/14 and 10/02/15 and 6 texts between 2/4/16 and 2/5/16.
       - Al Paonessa – 170 texts between 2/21/2013 and 1/15/16
       - Nisha Patel – 91 texts between 2/13/13 and 3/1/16
       - Kristy Ronco – 35 texts between 8/12/13 and 10/07/15
       - Allan Slavsky – 68 texts between 10/13/15 and 2/2/16

    b. **Text messages listed in phone records for Cavanaugh's phone ending 8624:**
       - Theresa Coward – 2 texts on 8/25/15
       - Nisha Patel – 16 texts between 2/13/13 and 10/14/14

Despite repeated requests, Defendants refuse to state clearly and unequivocally what has happened to these text messages.

<u>Missing Texts between the six Teva Custodians and Competitors</u>:

The Court ordered Defendants to produce "full text message threads (in native format) of communications between [Christine Baeder, Maureen Cavanaugh, Teri Coward, Kevin Galownia, Nisha Patel, and David Rekenthaler] and any individual identified by name or initial in the States AG Complaint as someone with whom those six relevant custodians communicated." (ECF 569.) On January 14, 2021, Defendants confirmed that they had complied with the Court's Order. Yet hundreds of text messages that this Court ordered Teva to produce are missing, including:

a. **Maureen Cavanaugh**
- 45 text messages between Cavanaugh and Andrew Boyer of Actavis, consisting of 44 texts between 1/4/16 and 2/10/16, and one text on 6/21/16
- 337 text messages between Cavanaugh and Marc Falkin of Actavis between 1/17/13 and 2/26/16
- 35 text messages between Cavanaugh and Kristi Ronco of Zydus between 8/12/13 and 10/07/15
- 68 text messages between Cavanaugh and Allan Slavsky of Actavis between 10/13/15 and 2/2/16

b. **Kevin Galownia**
- 3 text messages with Kevin Green of Zydus on 7/10/13, 10/9/13, and 4/16/14
- 2 text messages with Rick Rogerson of Actavis on 3/10/16

c. **Nisha Patel**
- 37 text messages with Ara Aprahamian of Taro between 8/8/13 and 7/29/14
- 8 text messages with Victor Borelli of Dr. Reddy's between 8/25/14 and 10/10/14
- 19 text messages with Andrew Boyer of Actavis between 5/1/13 and 12/3/13
- 6 text messages with Jim Brown of Glenmark on 11/21/13
- 79 text messages with Paul Dutra of Glenmark between 1/14/13 and 12/13/13
- 3 text messages with Scott Goldy of Zydus on 5/24/16
- 1 text message with Jim Grauso of Aurobindo on 2/28/14
- 10 text messages with Kevin Green of Zydus between 8/14/14 and 3/14/16
- 2 text messages with Beth Hamilton of Apotex on 5/20/13
- 6 text messages with Jill Nailor of Greenstone on 1/22/14
- 8 text messages with Kristi Ronco of Zydus between 10/10/13 and 9/18/14
- 13 text messages with Allan Slavsky of Actavis between 9/21/15 and 10/21/15

d. **David Rekenthaler**
- A chat with Andy Boyer of Actavis on 12/18/13
- Chats with Jim Brown of Glenmark on 3/25/14 and 3/30/2015

- A chat with Mike Burton of Par on 3/26/15
- Chats with Robert Cunard of Aurobindo on 10/30/13 and 4/17/15
- Chats with Paul Dutra of Glenmark on 12/4/13 and 4/17/14
- Chats with Marc Falkin of Actavis on 3/17/14, 3/21/14, 3/25/14, 4/17/14, 3/30/15, and 4/14/15
- Chats with Scott Goldy of Zydus on 11/23/13, 5/21/14, and 3/25/15
- Chats with Kevin Green of Zydus on 10/18/13, 3/13/14, 5/21/14, 7/7/14, and 4/14/15
- Chats with Jeff Hampton of Apotex on 12/8/13, 12/24/13, 1/19/14, 3/21/14, 5/23/14, 6/5/14, 7/27/14, 8/16/14 (two chats), 10/7/14, 10/28/14, and 3/25/15
- Chats with Jon Holden of Par on 6/5/14, 3/26/15, and 3/31/15
- A chat with Jin Josway of Taro on 1/22/14
- A chat with Jill Nailor of Greenstone on 1/22/14
- A chat with Dave Nielsen of Breckenridge on 6/10/14
- A chat with Kon Ostaficiuk of Camber on 10/7/14
- A chat with Kristi Ronco of Zydus on 10/11/13
- A chat with Steve Rutledge of Amneal on 4/15/15

Again, despite repeated requests, Defendants refuse to state clearly and unequivocally what has happened to these text messages.

<u>Missing Texts among the six Teva Custodians and with the Individual Defendants</u>:

The Court ordered Defendants to produce "all relevant text messages (1) among the six relevant custodians themselves and (2) among any of the six relevant custodians and any individual defendants named in this action." (ECF 569.) As the Court explained, this must include any "potentially relevant" messages, and such production must include additional text messages "sufficient to contextualize the relevant text messages." (Oct. 1, 2020 Tr. at 41:4-5; ECF 569.) Defendants confirmed that they complied with the Court's Order. Yet, again, well over a thousand text messages remain missing from Defendants' production. These include:

- 5 text messages between Cavanaugh and Baeder during the time period 4/4/17 through 5/16/17
- 26 text messages between Cavanaugh and Coward during the time period 12/23/15 through 3/3/16
- 2 text messages between Cavanaugh and Coward on 8/25/15
- 709 text messages between Cavanaugh and Galownia during the time period 1/19/13 through 2/22/16

- 91 text messages between Cavanaugh and Patel during the time period 2/13/13 through 3/1/16
- 16 text messages between Cavanaugh and Patel during the time period 2/13/13 through 10/14/14
- 255 text messages between Cavanaugh and Cavanaugh's other cell phone during the time period 3/5/13 through 10/14/15
- 55 text messages between Cavanaugh and Sigurdur Olafsson, consisting of 48 texts during the time period 11/14/14 through 10/02/15 and 6 texts on 2/4/16 and 2/5/16
- 177 text messages between Galownia and Baeder during the time period 3/13/13 through 12/28/16
- 12 text messages between Galownia and Coward, consisting of 6 texts on 4/25/14, 4 texts on 1/20/16, and 2 texts on 11/25/16
- 8 text messages between Galownia and Patel, consisting of 6 texts during the time period 6/14/13 through 10/22/13 and 2 texts on 4/24/15
- 12 text messages between Patel and Baeder during the time period 3/2/14 through 11/4/15
  189 text messages between Patel and Rekenthaler during the time period 2/7/14 through 7/28/16

As with Ms. Cavanaugh, despite repeated requests, Defendants refuse to state clearly and unequivocally what has happened to these text messages. Moreover, Stroz Friedberg's forensic examination has already established that Ms. Cavanaugh's text messages with Baeder, Coward, Galownia, Olafsson, and/or Patel are not recoverable from Ms. Cavanaugh's own devices. Defendants have refused to answer whether those text messages can still be recovered from devices used by Baeder, Coward, Galownia, Olafsson, and Patel.