# Exhibit 3

**Petition for Writ of Mandamus,**
***In re Park Emps.' and Ret. Bd. Emps.' Annuity and Benefit Fund of Chicago and Bleichmar Fonti & Auld LLP*,**
**Misc. Dkt. No. 21-_________ (3d Cir. Mar. 1, 2021)**

**Miscellaneous Docket No. 21-________________**

# In the United States Court of Appeals for the Third Circuit

IN RE: PARK EMPLOYEES' AND RETIREMENT BOARD EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO AND BLEICHMAR FONTI & AULD LLP,

*Petitioners*

On Petition for a Writ of Mandamus from the United States District Court for the Eastern District of Pennsylvania (Baylson, J.)
Case No. 2:17-cv-05114-MMB

## PETITION FOR WRIT OF MANDAMUS

John S. Summers
Jonathan L. Cochran
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
One Logan Square – 27th Floor
Philadelphia, PA 19103
215.568.6200
jsummers@hangley.com
jcochran@hangley.com

*Counsel for Petitioner Park Employees' and Retirement Board Employees Annuity and Benefit Fund of Chicago*

Peter H. LeVan, Jr.
**LEVAN MUHIC STAPLETON LLC**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103-6933
215.561.1500
plevan@levanmuhic.com

*Counsel for Petitioners Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Bleichmar Fonti & Auld LLP*

**Dated: March 1, 2021**

**CORPORATE DISCLOSURE STATEMENT**

In accordance with Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel of record states that: (1) Petitioner Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago is a governmental entity and (2) Petitioner Bleichmar Fonti & Auld LLP has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

INTRODUCTION ........ 1

RELIEF SOUGHT ........ 4

ISSUES PRESENTED ........ 4

FACTUAL BACKGROUND ........ 5

REASONS TO GRANT THE WRIT ........ 10

A. The District Court Exceeded Its Authority by *Sua Sponte* Disqualifying Park and BFA and Failing to Apply the PSLRA's Mandatory Framework ........ 10

1. The PSLRA Confines a Court's Role to Making Specific Enumerated Determinations ........ 11

2. The PSLRA's Leadership Requirements Continue To Apply Throughout the Pendency of the Case ........ 14

3. The District Court Exceeded Its Authority by *Sua Sponte* Removing Park and BFA and Failing to Apply the PSLRA's Burden-Shifting Framework ........ 16

B. The District Court Abused its Discretion, Committed Clear Errors of Law and Inflicted Significant Reputational Harm by Stripping Petitioners of Leadership Positions Based upon Clearly Erroneous Legal and Factual Rationales ........ 21

C. The District Court Exceeded Its Authority and Committed Clear Errors of Law by Appointing Statutorily-Ineligible Lead Plaintiffs, Engaging in Inappropriate *Ex Parte* Communications, and Hand-Selecting a New Roster of Lead Counsel ........ 25

1. The District Court Exceeded Its Authority and Committed Clear Legal Errors by Conducting a "Beauty Contest" and by Appointing Bucks and the Individuals to Serve as Replacement Lead Plaintiffs ........ 25

2. The District Court Exceeded Its Authority and Committed Clear Errors of Law by Having Multiple *Ex Parte* Communications with a Former Colleague Before Elevating Him to Lead Counsel and by Appointing Multiple Sets of Attorneys to Judicially-Selected Roles ........ 28

D. The District Court Clearly Erred by Denying the Motion to Recuse ........ 31

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) ... 25

*In re Apollo*, 535 F. App'x 169 (3d Cir. 2013) ... 31

*In re Baldwin*, 700 F.3d 122 (3d Cir. 2012) ... 3

*In re BankAmerica Corp. Sec. Litig.*, 263 F.3d 795 (8th Cir. 2001) ... 2

*Bodri v. Gopro, Inc.*, No. 16-cv-00232-JST, 2016 WL 1718217 (N.D. Cal. April 28, 2016) ... 14

*Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3d Cir. 1984) ... 3

*Bowers v. NCAA*, 475 F.3d 524 (3d Cir. 2007) ... 22

*In re Briscoe*, 448 F.3d 201 (3d Cir. 2006) ... 3

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) ... 4, 20, 26, 27

*In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001) ... 13, 29

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ... *passim*

*China Agritech, Inc. v. Resh*, 584 U.S. --, 138 S. Ct. 1800 (2018) ... 10, 27

*In re Cigna Corp. Sec. Litig.*, No. Civ. A. 02-8088,
2005 WL 3952802 (E.D. Pa. Feb. 23, 2005) ....................14

*In re Cohen*,
586 F.3d 703 (9th Cir. 2009) ....................4, 28

*Endress v. Gentiva Health Services, Inc.*,
276 F.R.D. 62 (E.D.N.Y. 2011) ....................17

*EZRA Charitable Tr. v. Rent-Way, Inc.*,
136 F. Supp. 2d 435 (W.D. Pa. 2001) ....................27

*Grider v. Keystone Health Plan Cent., Inc.*,
580 F.3d 119 (3d Cir. 2009) ....................21

*Grossman v. First Pennsylvania Corp.*,
No. Civ. A. 89-9234, 1991 WL 222071 (E.D. Pa. Oct. 23, 1991) ....................2, 17

*In re Healthsouth Corp. Sec. Litig.*,
No. CV-03-BE-1500-S, 2005 WL 8161013 (N.D. Ala. July 8, 2005) ....................15

*In re Herley Indus. Inc. Sec. Litig.*,
Civil Action No. 06-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009) ....................14

*In re Herley Indus. Inc. Sec. Litig.*,
Civil Action No. 06-2596, 2010 WL 176869 (E.D. Pa. Jan. 15, 2010) ....................10, 15, 18, 26

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2009), *as amended* (Jan. 16, 2009) ....................13

*In re Initial Pub. Offering Sec. Litig.*,
214 F.R.D. 117 (S.D.N.Y. 2002) ....................10, 14, 15

*In re Karkus*,
No. 09-1500, 2010 WL 358974 (10th Cir. Jan. 27, 2010) ....................4

*In re Kensington Int'l Ltd.*,
368 F.3d 289 (3d Cir. 2004) ....................29

*Khunt v. Alibaba Grp. Holding Ltd.*,
102 F. Supp. 3d 523 (S.D.N.Y. 2015) ....................30

*Link v. Mercedes-Benz of N. Am., Inc.*,
788 F.2d 918 (3d Cir. 1986) ....................18

*Metro Services Inc. v. Wiggins*,
158 F.3d 162 (2d Cir. 1998) .................... 4

*In re New Mexico State Inv. Council*,
250 F. App'x 225 (9th Cir. 2007) ....................28

*In re NYSE Specialists Sec. Litig.*,
240 F.R.D. 128 (S.D.N.Y. 2007) .................... 14, 18

*In re Oxford Health Plans, Inc. Sec. Litig.*,
191 F.R.D. 369 (S.D.N.Y. 2000) ....................15

*Peil v. Speiser*,
806 F.2d 1154 (3d Cir. 1986) ....................27

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*,
229 F.R.D. 395 (S.D.N.Y. 2004) .................... 11, 18

*In re Prudential Ins. Co. Am. Sales Practice Litig.*,
148 F.3d 283 (3d Cir. 1998) ....................31

*In re Ruffalo*,
390 U.S. 544 (1968) ....................22

*In re SLM Corp. Sec. Litig.*,
258 F.R.D. 112 (S.D.N.Y. 2009) ....................27

*In re Snap Inc. Sec. Litig.*,
No. 2:17-cv-03679-SVW-AGR, 2019 WL 2223800 (C.D. Cal. April 1, 2019) ....................15

*In re Telxon Corp. Sec. Litig.*,
67 F. Supp. 2d 803 (N.D. Ohio 1999) ....................27

*United States v. Kennedy*,
682 F.3d 244 (3d Cir. 2012) .... 30

*United States v. Sineneng-Smith*,
590 U.S. __, 140 S. Ct. 1575 (2020) .... 18

*United States v. Washington*,
549 F.3d 905 (3d Cir. 2008) .... 21

*Walsh v. Great Atlantic & Pacific Tea Co., Inc.*,
726 F.2d 956 (3d Cir. 1983) .... 13

*Will v. United States*,
389 U.S. 90 (1967) .... 14

*Wolfington v. Reconstructive Orthopaedic Associates II PC*,
935 F.3d 187 (3d Cir. 2019) .... 21

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
231 F.3d 1215 (9th Cir. 2000) .... 4

**Statutes**

15 U.S.C. § 78u–4 .... *passim*

28 U.S.C. § 455(a) .... 31

28 U.S.C. § 1291 .... 4

28 U.S.C. § 1292(b) .... 4

28 U.S.C. § 1651(a) .... 3

Private Securities Litigation Reform Act of 1995 .... *passim*

**Other Authorities**

17 C.F.R. § 240.10b-5 .... 5

Fed. R. App. P. 21(d) .... 21

Fed. R. Civ. P. 23 ........ *passim*

Fed. R. Civ. P. 45 ........ 23

S. Rep. No. 104–98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 ........ 13

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance and complexity of the legal issues involved, which raise important and recurring issues requiring appellate guidance, Petitioners respectfully request oral argument.

## INTRODUCTION

In this securities fraud class action governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Petitioners seek a writ of mandamus to address the district court's multiple clear errors of law.[1] Contrary to the process required by the PSLRA and *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) (Becker, C.J.), the district court's February 4, 2021 Memorandum ("Op.") and Order (collectively, "Decision") improperly and *sua sponte* stripped Park of its status as Lead Plaintiff, removed BFA as Lead Counsel, appointed multiple statutorily-ineligible parties as new Lead Plaintiffs, and assembled a cadre of attorneys in leadership roles that the court unilaterally selected after two *ex parte* conversations with a former judicial colleague, whom the court appointed as Lead Counsel despite no party proposing him for that role.

This Court's immediate review is necessary to prevent prejudice to the putative Class and to enforce the PSLRA's statutory guardrails. Immediate issuance of the writ is further required because it would be enormously difficult, if not impossible, to later unravel the prejudice created by the district court's multiple errors.

---

[1] Petitioners are former Lead Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago ("Park") and Lead Counsel Bleichmar Fonti & Auld LLP ("BFA").

Throughout this unusual sequence of events, the district court repeatedly exceeded its limited authority under the Congressionally-mandated PSLRA leadership structure and persistently failed to comply with binding precedent of this Court. In *Cendant*, this Circuit confirmed that trial courts must strictly abide by the PSLRA's requirements for appointing Lead Plaintiff and Lead Counsel in securities cases. As explained below, the district court failed to comply with those strict requirements in multiple respects.

The harmful impacts of the district court's succession of errors are difficult to overstate. *First*, the Decision unlawfully strips Park of its leadership role and the "important privilege" to "control … aspects of litigation such as discovery, choice of counsel, assertion of legal theories, retention of consultants and experts, and settlement negotiations." *In re BankAmerica Corp. Sec. Litig*., 263 F.3d 795, 801 (8th Cir. 2001).

*Second*, the Decision profoundly prejudices the class by the eleventh-hour removal of Petitioners' strategic knowledge and trial preparation accumulated over nearly three years of active litigation.

*Third*, the Decision impermissibly rests on the district court's two *ex parte* conversations with a former colleague. Such a "veil of secrecy" is contrary to the PSLRA and *Cendant*. Indeed, if there were ever a time to scrupulously avoid the appearance of impropriety created by *ex parte* conversations, it

would be when purporting to replace experienced and longstanding Lead Counsel with a new lawyer who was not proposed by his client to serve as lead counsel and who has no disclosed experience in his newly appointed role.

*Fourth*, if permitted to stand, the Decision may encourage more widespread disruption within the Circuit, leading to *sua sponte* replacement of other lead plaintiffs based on arbitrary criteria in contravention of the PSLRA and *Cendant.*

Respectfully, this case presents "exceptional circumstances" warranting the extraordinary remedy of a writ of mandamus under 28 U.S.C. § 1651(a). *In re Baldwin*, 700 F.3d 122, 126 (3d Cir. 2012) (quoting *Will v. United States*, 389 U.S. 90, 95 (1967)). The statutory rights of Petitioners Park and BFA are clear and indisputable; the district court repeatedly exceeded its judicial authority under the PSLRA; and the stakes could not be greater for the thousands of members of the putative class. The Decision also raises important and recurring issues that demand appellate guidance and Petitioners have no adequate means to seek appropriate relief. *In re Briscoe*, 448 F.3d 201, 212 (3d Cir. 2006) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004)); *see also*

*Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir. 1984) (mandamus relief "available when necessary to prevent grave injustice").[2]

**RELIEF SOUGHT**

Petitioners Park and BFA respectfully request that this Court: (1) grant their petition for a writ of mandamus; (2) vacate the district court's February 4 Decision in its entirety, including the clearly erroneous statements in the Memorandum where the Court accuses Petitioners of failing to adequately represent the interests of the Class; (3) direct the district court to (a) reinstate Park as Lead Plaintiff, (b) reinstate BFA as Lead Counsel, and (c) fully comply with the PSLRA during the pendency of the matter; and (4) reassign this matter to another district court for further proceedings.

**ISSUES PRESENTED**

Whether the district court exceeded its authority, committed clear errors of law and abused its discretion when it: (1) initiated *sua sponte* proceedings to reassess and remove Petitioners as Lead Plaintiff and Lead Counsel,

[2] Lead plaintiff decisions under the PSLRA are not "final decisions" under 28 U.S.C. § 1291 (*see Metro Services Inc. v. Wiggins*, 158 F.3d 162, 165 (2d Cir. 1998); *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000)) and the district court denied certification under 28 U.S.C. § 1292(b). (ECF 297.) Thus, mandamus relief is the sole means through which Petitioners can seek review of the Decision. *See, e.g., In re Karkus*, No. 09-1500, 2010 WL 358974, *1 (10th Cir. Jan. 27, 2010); *In re Cohen*, 586 F.3d 703, 708-12 (9th Cir. 2009); *In re Cavanaugh*, 306 F.3d 726, 728-29 (9th Cir. 2002).

respectively, in violation of the court's authority under the PSLRA and *Cendant*; (2) failed to apply the PSLRA's mandatory burden-shifting framework for leadership appointments when considering Petitioners' fitness to remain in their appointed roles; (3) unlawfully removed Petitioners due to purported "specters" of potential inadequacy or atypicality premised solely upon plainly erroneous legal and factual rationales, resulting in substantial harm to Petitioners' reputations; (4) purported to appoint statutorily-ineligible parties as new lead plaintiffs and assembled a new roster of attorneys to act in leadership roles after the district judge had had multiple *ex parte* conversations with his former judicial colleague, whom the district judge appointed as new lead counsel; and (5) denied Petitioners' motion to recuse.

**FACTUAL BACKGROUND**[3]

On November 14, 2017, Alexandre Pelletier filed a class action complaint against Endo and the other Defendants alleging violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (ECF 1.) Only Park and two individuals (Wayne Wingard and Nathan Dole) timely moved for appointment as lead plaintiff under the

[3] All citations to ECF numbering refer to the underlying district court docket. Petitioners attach the most relevant documents to this Petition, including the February 4 Decision as Exhibit A and the orders leading up to the Decision collectively as Exhibit B.

PSLRA. (ECF 10-11.) The district court (Savage, J.) received extensive briefing, held a hearing and, on June 29, 2018, appointed Park as Lead Plaintiff and approved BFA as Lead Counsel. (ECF 57-58.)

Once appointed, Park and BFA methodically and diligently developed the case, investigating the facts, filing a 103-page Complaint, and defeating the majority of Defendants' motion to dismiss. (ECF 62, 93-94.) Park and BFA secured and analyzed over 1.1 million pages of documents and conducted nine depositions. In December 2020, the remaining individual defendants and Endo's CEO were scheduled to be deposed within days.

On June 26, 2020, Park moved for class certification. (ECF 116.) On August 17, 2020, Defendants filed their opposition. (ECF 133, 135.) On September 18, 2020, Park filed its reply. (ECF 153.)

On October 22, 2020, the district court issued a letter to all counsel asking for written responses to eight separate questions (with subparts) on issues potentially addressing Park's adequacy and typicality. (ECF 169.) The parties complied. (ECF 204 & 209.)

On December 9, 2020, the court conducted a hearing to address class certification and its October 22 letter. *See* Tr. (12/9/20), attached as Exhibit C, at 2-3. At the hearing, the court expressed "concerns whether Chicago Park is an appropriate class representative" and acknowledged that those concerns

were "the import of almost all my questions." *Id.* at 53. The court also expressed "surprise[] that [Park] didn't add another plaintiff" to alleviate those concerns. *Id.* At the hearing, Lead Counsel stated that, while they strongly believed Park to be adequate and typical, they expected to add a new party as an additional class representative to alleviate the court's concerns. *Id*. at 50-51. Following the hearing, the court ordered additional briefing (ECF 212); the parties again complied (ECF 216 & 222).

On December 15, 2020, the court raised additional questions at a teleconference (*see* Tr. (12/15/20), attached as Exhibit D, at 4-10) and subsequently entered an order (ECF 218) requiring written responses to four new questions, stating that it was "considering designating an actual purchaser of Endo shares as the lead plaintiff" and asking whether Pelletier, Wingard and Dole should "be considered." (*Id.* ¶4.) Notably, no class member or party had requested that extraordinary relief. Once again, however, the parties complied with the order. (ECF 233 & 234.)

On December 23, 2020, in furtherance of Lead Counsel's statements during the December 9 hearing, Park and Macomb County Employees' Retirement System ("Macomb") jointly moved for Macomb to intervene and serve as an additional class representative. (ECF 228.) Additionally, Park and

Macomb jointly moved for approval of Hangley Aronchick Segal Pudlin & Schiller LLP ("Hangley Aronchick") as co-counsel for the Class. (*Id.*)

On December 29, 2020, the court issued an order requiring Macomb to file a supplemental pleading with allegations setting forth its specific purchases. (ECF 238.) In the order, the court also expressly authorized original plaintiff Pelletier and Dole to submit a renewed lead plaintiff motion, requested briefing on two additional questions, and scheduled a hearing for January 21, 2021. (*Id.*)

Pelletier and Dole (along with previously unsuccessful applicant Wingard (collectively, the "Individuals")) moved for appointment as lead plaintiff on January 7, 2021. (ECF 243.) Meanwhile, on January 6, 2021, Bucks County Employees' Retirement Fund ("Bucks") had filed a motion for "leave to file" a lead plaintiff motion (ECF 240), proposing Robbins Geller Rudman & Dowd LLP ("RGRD") as lead counsel and Mr. Stengel as local counsel. The district court immediately granted that motion (ECF 241) and Bucks filed its lead plaintiff papers on January 11, 2021. (ECF 247.)[4]

On January 21, 2021, the court conducted another hearing. Once again, BFA and Hangley Aronchick fully answered all of the court's questions on the

---

[4] The motions of the Individuals and Bucks for appointment as lead plaintiffs are attached as Exhibits E and F, respectively.

record. *See* Tr. (1/21/21), attached as Exhibit G. Moreover, on February 3, 2021, Park and Macomb submitted a 25-page supplemental brief further addressing the court's concerns and explaining again why there was no basis to remove Park as Lead Plaintiff, why Park satisfied the Rule 23 requirements, why Macomb should be added as an additional class representative, and why Bucks and the Individuals were statutorily ineligible to be lead plaintiffs. (ECF 271, attached as Exhibit H.)

Less than 24 hours later, however, the court issued its February 4 Decision. (ECF 272-73 (Ex. A).) In addition to improperly removing Petitioners from their leadership positions, the court summarily denied Macomb's motion to intervene without analysis or discussion. The Decision also revealed—for the first time—that the court had engaged in two *ex parte* communications with Mr. Stengel in advance of his *sua sponte* appointment as new lead counsel.

Petitioners moved for reconsideration (ECF 291) and separately moved for a stay, 1292(b) certification, and recusal (ECF 295). The court promptly denied both motions, explaining as to the recusal request that it had advised Mr. Stengel "that if his client was to become lead plaintiff he should be lead counsel." (ECF 297-298, collectively attached as Exhibit I.)

## REASONS TO GRANT THE WRIT

### A. The District Court Exceeded Its Authority by *Sua Sponte* Disqualifying Park and BFA and Failing to Apply the PSLRA's Mandatory Framework

"The PSLRA imposes significant procedural requirements on securities class actions that do not apply" to other class actions. *China Agritech, Inc. v. Resh*, 584 U.S. --, 138 S. Ct. 1800, 1812-13 (2018) (Sotomayor, J., concurring) (discussing "important differences between Rule 23's general class procedures and the specific procedures imposed by the PSLRA"). Unlike other class actions, the PSLRA "establishes detailed and interrelated procedures for choosing a lead plaintiff" that impose strict limits on a court's role throughout the appointment process. *Cendant*, 264 F.3d at 254, 262-70. Importantly, the PSLRA's mandatory leadership structure is not limited to initial appointments but equally applies to subsequent leadership issues considered by the court. *See, e.g., In re Herley Indus. Inc. Sec. Litig.* ("*Herley II*"), Civil Action No. 06-2596, 2010 WL 176869, *3 (E.D. Pa. Jan. 15, 2010); *In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 214 F.R.D. 117, 120 (S.D.N.Y. 2002).

The district court exceeded its authority under the PSLRA and *Cendant*, and committed clear errors of law, by failing to consider and apply the PSLRA's mandated appointment procedures and burden-shifting framework.

**1. The PSLRA Confines a Court's Role to Making Specific Enumerated Determinations**

As *Cendant* recognizes, the PSLRA "establishes a presumption that the class member 'most capable of adequately representing the interests of class members' is the shareholder with the largest financial stake in the recovery sought by the class." 264 F.3d at 243 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(i) & (iii)(I)). By requiring courts to apply a mandatory rebuttable presumption, "Congress expressed an intention to encourage institutional investors to step forward and assume the role of lead plaintiff in an effort to prevent lawyer-driven litigation." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 417 (S.D.N.Y. 2004). The Act thus "establishes a two-step process for appointing a lead plaintiff: the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class has rebutted the presumption." *Cendant*, 264 F.3d at 262 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) & (II)).

A court first must identify the movant with "the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). It then must determine, without considering arguments raised by other members of the putative class, whether that movant "has stated a *prima facie* case of typicality and adequacy," which will be satisfied "more often than not."

*Cendant*, 264 F.3d at 264 (applying 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)).[5] Finally, a court must determine "whether the presumption has been rebutted." *Id.* at 268. Notably, "only class members may seek to rebut the presumption" and a court "should not permit or consider any arguments by defendants or non-class members." *Id*. The question "*is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff," *id*. (original emphasis); rather, the inquiry is limited to whether a class member has "*prove[d]* that the presumptive lead plaintiff will not do a fair and adequate job." *Id.* (emphasis added; internal quotations and alternations omitted). Absent such proof, the district court *must* appoint the presumptive lead plaintiff. *Id*.[6]

The court is strictly limited to this mandated structure and cannot consider any factor outside of those statutorily-required determinations—

---

[5] A *prima facie* showing of typicality and adequacy under the PSLRA requires only that the movant show its circumstances and legal claims are not "markedly different" from those of other putative class members and that it "has the ability and incentive to represent the claims of the class vigorously, has obtained adequate counsel," and has no conflict with the class. *Id.* at 265 (internal quotations and alterations omitted).

[6] If the court finds that a class member has rebutted the presumption, it must "begin the process anew," applying the same structure and burden-shifting framework to the remaining movants until a lead plaintiff is selected. *Id.*

including the court's own views on the relative typicality or adequacy of the presumptive lead plaintiff.

Importantly, the limitations on judicial authority contained in PSLRA appointment proceedings were carefully crafted. Congress intentionally sought to constrain the courts' authority in PSLRA leadership decisions. *See, e.g.,* S. Rep. No. 104–98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 ("The Committee intends to increase the likelihood that institutional investors will serve as lead plaintiffs by *requiring the court to presume* that the member of the purported class with the largest financial stake in the relief is the 'most adequate plaintiff.'") (emphasis added).[7]

[7] A district court's constrained authority under the PSLRA to assess a presumptive lead plaintiff stands in marked contrast to the "rigorous analysis" courts employ under a Rule 23 analysis. *See, e.g., In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 309 (3d Cir. 2009), *as amended* (Jan. 16, 2009). That dichotomy reflects the important doctrinal distinction between lead plaintiffs and class representatives: Courts must conduct a demanding analysis of the Rule 23 requirements because a "class representative can, as a matter of due process, bind all absent class members by a judgment." *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 963 (3d Cir. 1983). In contrast, the PSLRA's leadership structure reflects "Congress' clear intent … to transfer control of securities class actions from the attorneys to the class members (through a properly selected lead plaintiff)." *In re Cendant Corp.*, 260 F.3d 183, 197 (3d Cir. 2001). Thus, class representatives protect the due process rights of absent class members, whereas lead plaintiffs arise from Congress's efforts to prevent securities cases from being attorney-driven.

### 2. The PSLRA's Leadership Requirements Continue To Apply Throughout the Pendency of the Case

Once a court appoints a lead plaintiff, revisiting that determination is rare and requires unusual circumstances, such as where a lead plaintiff withdraws and the class would be left without representation. In fact, "[t]he PSLRA and the Federal Rules of Civil Procedure are silent as to the standard for substituting, removing, or disqualifying lead plaintiffs." *In re Herley Indus. Inc. Sec. Litig.* ("*Herley I*"), Civil Action No. 06-2596, 2009 WL 3169888, *9 (E.D. Pa. Sept. 30, 2009). As a result, "courts have created a high bar for altering a lead plaintiff's status," *id.*, and "generally restrict appointment of substitute and additional lead plaintiffs to those instances where it is *necessary* to maintain representation of the prospective class," *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) (collecting cases; emphasis added).[8]

---

[8] Of course, in the usual instance where a lead plaintiff also seeks to act as a class representative, a court *will* have a future opportunity to consider its adequacy and typicality – as well as other Rule 23 factors – when determining whether to certify the case. Analysis under Rule 23, however, is distinct from the PSLRA leadership issues, just as "being a Lead Plaintiff under the PSLRA is not the same as being a Class Representative." *IPO*, 214 F.R.D. at 123 (internal quotation omitted); *see also Bodri v. Gopro, Inc.*, No. 16-cv-00232-JST, 2016 WL 1718217, *6 (N.D. Cal. April 28, 2016) ("Being a lead plaintiff is not the same thing as being a class representative.") (internal quotation omitted); *In re Cigna Corp. Sec. Litig.*, No. Civ. A. 02-8088, 2005 WL 3952802, at *1 (E.D. Pa. Feb. 23, 2005) (given "the significance that the PSLRA has placed on the status and responsibility of the Lead Plaintiff in this type of case, … any present or potential doubts about [the lead plaintiff] being able to fulfill its role should be

Even in the rare instance where a court is required to revisit a prior appointment, "the statutory guidelines governing the initial appointment of a lead plaintiff must be satisfied." *Herley II,* 2010 WL 176869 at *3; *see also In re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2019 WL 2223800, *1 (C.D. Cal. April 1, 2019) (applying PSLRA's "sequential" selection process mandates to replacement of lead plaintiff); *In re Healthsouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S, 2005 WL 8161013, *2 (N.D. Ala. July 8, 2005) (rejecting argument that the "court need not be constrained by the PSLRA in appointing replacement lead plaintiffs" and finding "no authority to depart from the statutory factors established for selection of lead plaintiff"); *IPO*, 214 F.R.D. at 120.

In other words, a court has no greater authority in a substitution, replacement or disqualification posture than during the initial appointment. Congress' desire for institutional investors with the largest financial stake to

---

alleviated by allowing [additional] proposed class representatives"). While a lead plaintiff often chooses to do so, "[t]here is no requirement found in the plain meaning of the [PSLRA] that a Lead Plaintiff accept designation of class representative under Rule 23." *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000). Similarly, a court "has the power to designate a Class Representative under Rule 23 who is not a Lead Plaintiff." *IPO*, 214 F.R.D. at 124 (internal quotation omitted); *see also Oxford Health*, 191 F.R.D. at 378. Notably, the court here did not conduct a Rule 23 analysis and the certification motion remains pending.

lead securities cases—a goal embedded in the PSLRA and furthered by its limits on judicial authority—is no less strong *after* an initial appointment than before. Indeed, it would subvert the PSLRA if a court could unshackle itself from the constraints on judicial authority simply by waiting until after initial leadership appointments were made.

Instead, the plain language of the PSLRA, as well as the Congressional intent embodied in its provisions, mandate that courts are not entitled to revisit lead plaintiff appointments unless strictly *necessary*, such as where a lead plaintiff withdraws. And in connection with any post-appointment proceeding, courts continue to be bound by, and are required to apply, the PSLRA's mandatory structure and burden-shifting framework. *Id.* A *sua sponte* reassessment without factual or legal basis, as occurred here, clearly contravenes the statute.

### 3. The District Court Exceeded Its Authority by *Sua Sponte* Removing Park and BFA and Failing to Apply the PSLRA's Burden-Shifting Framework

In violation of these controlling requirements, the district court exceeded its authority by (1) reopening Petitioners' leadership appointments *sua sponte* and without necessity or basis and (2) failing to apply the PSLRA's burden-shifting framework when reviewing Petitioners' fitness to continue in their existing roles.

*First*, in light of the PSLRA's clear limitations on courts' authority, and the judicially-created doctrine prohibiting reconsideration of class action leadership unless strictly necessary for continued representation of the class, the district court plainly erred by reopening Petitioners' appointments *sua sponte*. No class member sought Petitioners' removal and the court lacked authority to reopen the leadership of this matter on its own.[9] *See, e.g.*, *Endress v. Gentiva Health Services, Inc.*, 276 F.R.D. 62, 64 (E.D.N.Y. 2011) (declining to reopen lead appointment, reasoning that in the absence of a motion to withdraw or disqualify "there is no reason to deviate from the letter of the PSLRA").

Nor were the court's actions necessary to maintain representation of the Class. Petitioners remain ready, willing and able to pursue the claims of the Class, and sought class certification in June 2020 (ECF 116). In December 2020, Petitioners proposed intervenor Macomb as an additional *class representative*

[9] In initiating the proceedings *sua sponte*, the court appears to have picked up and redirected certain arguments Defendants raised in opposition to class certification (*compare* ECF 135 *with* ECF 169), which would violate the PSLRA and *Cendant*. *See Cendant*, 264 F.3d at 268 (emphasizing PSLRA mandate that only class members may challenge presumption of typicality and adequacy).

to resolve concerns the court raised. (ECF 228.) The court never ruled on class certification and denied Macomb's motion without explanation.[10]

Instead, the court *sua sponte* embarked on a path unmoored from the PSLRA, Rule 23 or the facts, conducting an unauthorized review untethered to any of the statutory requirements. Tr. (2/24/21), attached as Exhibit J, at 6 ("I [the court] made a determination that a change should be made in the identity of the Lead Plaintiff and the Lead Counsel."). This is *precisely* what the PSLRA prohibits.[11]

The district court ignored the PSLRA altogether, while purporting to justify its "reconsideration" of Petitioners' leadership roles (including the

[10] In denying Macomb's motion to intervene without discussion, the court improperly conflated the roles of lead plaintiffs and class representatives, claiming that Macomb sought to act as "a new *co-lead plaintiff*" (Op. at 10 (emphasis added)) when, in fact, Macomb had moved to intervene "for the purpose of seeking appointment as additional *Class representative*" (ECF 228-1 at 5 of 19). *See Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 929 (3d Cir. 1986) ("proper remedy" to address adequacy concerns is "to amend the class certification order or to permit additional plaintiffs to intervene").

[11] While some district courts have purportedly reserved the right to revisit lead appointments in the future, *see, e.g.*, *Herley II*, 2010 WL 176869 at *2 n.2; *NYSE*, 240 F.R.D. at 132-33; *Pirelli*, 229 F.R.D. at 408, none have explained how a court's *sua sponte* reconsideration of a prior appointment is permitted under the PSLRA's mandatory burden-shifting framework and limitations on judicial authority. The better reasoning suggests a prior leadership appointment can only be reopened by motion. *Cf. United States v. Sineneng-Smith*, 590 U.S. __, 140 S. Ct. 1575, 1579 (2020) (reaffirming party presentation principle).

court's *ex parte* communications) based on its "fiduciary-like duty to the absent members of the class." Op. at 18. In so reasoning, however, the court unduly conflated the role of Rule 23 class representatives with that of PSLRA lead plaintiffs. A court's ability to reconsider a party's qualifications to act as class representative, which stems from the need to protect the due process rights of absent class members, provides no concomitant authority for a court to reconsider leadership appointments under the PSLRA. Rule 23 certifications and PSLRA appointments are distinct.

*Second*, the district court exceeded its authority, and committed additional fundamental errors of law, by failing to apply the PSLRA's rebuttable presumption framework, which limits the court to considering "proof by a member of the purported plaintiff class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II). No class member—including the substituted lead plaintiffs—offered any such proof or sought Petitioners' removal. *See, e.g.,* Exs. E-F. Notably, even the court did not find "Park/BLA" (*sic*) to be atypical or inadequate; rather, it stripped Petitioners of their leadership roles due to "concerns" and "red flags" (based on clearly erroneous legal and factual rationale) that Park "may not" be adequate, concluding that the "specter of inadequacy" justifies replacement. (Op. at 19-22.)

The district court's comparative review of Petitioners is reminiscent of the unlawful "beauty contest" struck down in *Cavanaugh*, where the Ninth Circuit granted mandamus relief and vacated the lower court's erroneous PSLRA appointment order. 306 F.3d at 739.[12] There, as here, the district court had "freed itself of the statutory presumption" and "engaged in a freewheeling comparison of the parties competing for lead plaintiff, questioning them about their business acumen [and] their knowledge of the lawsuit." *Id.* at 732. In reasoning equally applicable here, the Ninth Circuit held:

> That the district court believes another plaintiff may be 'more typical' or 'more adequate' is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job.

*Id.*

By reconsidering Petitioners' leadership appointments *sua sponte* and failing to apply the PSLRA's mandatory structure, the court exceeded its authority and committed a series of errors of law that work a grave injustice upon Petitioners and the Class. Mandamus relief is thus appropriate and

---

[12] The court's actions are also akin to the time, before passage of the PSLRA, when district courts had broad discretion to cobble together lawyers and clients to steer securities fraud actions. The PSLRA put an end to that practice. *See Cendant*, 264 F.3d at 271-73.

necessary. *See*, *e.g.*, *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008) (mandamus warranted to correct judicial "usurpation of power").

**B. The District Court Abused its Discretion, Committed Clear Errors of Law and Inflicted Significant Reputational Harm by Stripping Petitioners of Leadership Positions Based upon Clearly Erroneous Legal and Factual Rationales**

Even more troublingly, in attempting to justify its erroneous decision to revoke Petitioners' leadership roles, the court accused Petitioners of having "failed to provide" the Class with "adequate representation" (Op. at 19), based on numerous plainly erroneous determinations, which has inflicted significant harm to Petitioners' reputational interests far beyond this case.

The limitations imposed by Federal Rule of Appellate Procedure 21(d) do not allow Petitioners to address fully each of the court's erroneous accusations in detail here; however, given the need for Petitioners to clear their names and protect their professional reputations, Petitioners respectfully request leave to file to a supplemental brief responding to each of the district court's accusations in detail.[13] At a minimum, Petitioners respectfully request

[13] This Court has expressly recognized the need for a court to act with care when professional "reputations (and, therefore, [parties'] livelihood and ability to practice their chosen profession) are at stake." *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 144-45 (3d Cir. 2009); *cf. Wolfington v. Reconstructive Orthopaedic Associates II PC*, 935 F.3d 187, 206-09 (3d Cir. 2019) (reversing district court's critical findings of trial counsel where unsupported by the record). The district court failed to heed that caution here. The court

that this Court expressly vacate the lower court's unfounded accusations of wrongdoing. In the interim, Petitioners briefly respond to the court's accusations below:

> ***Petitioners' Obligation to Produce Third Parties' Documents.*** Petitioners did *not* violate any discovery "order" by failing to obtain documents from certain third parties. (Op. at 5.) The court's order stated only that the "transcript contains rulings on all open motions" (ECF 125) and the transcript is clear that Petitioners' representations and the court's ruling were confined to documents in Park's possession, which were fully produced. (Tr. (7/20/20) at 17-20 (attached as Exhibit K).) Defendants have never claimed otherwise; indeed, the motion at issue only pertained to Park's own documents.
>
> ***Moving to Quash Subpoenas in Other Jurisdictions*.** Petitioners did not act improperly by moving to quash subpoenas served by Defendants in California, Illinois and New York (Op. at 7-9, 19). Motions to quash must be filed in the districts "where compliance is required." FED. R. CIV. P. 45(d)(3)(A). Rather than attempt to evade the court's review, Petitioners repeatedly sought to file "a

---

"disqualified" both Petitioners, finding they had "failed to provide" the Class with "adequate representation," and accused them of "misleading" the court (perhaps "deliberately"), "suppress[ing] discovery," trying to "cover up the explicit ruling" of the court, "obfuscat[ing] the role" of Park's investment agent, and engaging in a "fundamental and crucial effort to mislead judges in different courthouses," among other purported failings. (Op. at 1 n.1, 19-21.) The court also suggested that Petitioners should "face consequences" for their "bad behavior," referencing "Iago's deceit about Desdemona's handkerchief and Rigoletto's bungled kidnapping" before quipping that "bad behavior can lead to tragedy." (*Id*. at 24 n.16.) Because the depth and extent of the court's errors has caused substantial damage to Petitioners' professional reputations, Petitioners respectfully request the opportunity to file a supplemental brief, to address the court's accusations in more detail and explain the copious errors underlying each unfounded conclusion. *Cf. In re Ruffalo*, 390 U.S. 544, 550 (1968); *Bowers v. NCAA*, 475 F.3d 524, 544 (3d Cir. 2007).

single motion to quash in the Eastern District of Pennsylvania" but Defendants did not consent, requiring the motions to be made in the districts where Defendants sought compliance. (Ex. H at 12 of 30; ECF 271-4 (e-mail requesting Defendants' consent)). The court nonetheless accused Petitioners of "attempt[ing] to suppress discovery in other jurisdictions," an argument it raised *sua sponte*. (Op. at 19.)[14]

***Objecting to the MissPERS Settlement.*** Petitioners' efforts to object to the settlement in *MissPERS*, a state court securities action against Defendants, were proper, protective of the Class, and well-grounded in this Court's precedent (Op. at 13-16, 20-21). There are class members here who also belong to the *MissPERS* class. Although *MissPERS* involves different claims, different conduct, and different alleged misstatements, that settlement purported to broadly release "all" claims related to the purchased shares, including the *Pelletier* claims. (ECF 174 at 2-4 of 13; ECF 174-6 at 11 of 119.) Doing so violated *Grimes v. Vitalink Communications Corp*., 17 F.3d 1553, 1564 (3d Cir. 1994), which held that a "state court class representative cannot release federal claims arising from a different factual predicate than that before the state court." Park thus moved to intervene on those grounds. The district court took issue with the merits of that argument and incorrectly found that Park failed to apprise it of the state court ruling (Op. at 20-21), even though Petitioners' class certification brief expressly disclosed that the state court "approved the settlement over Lead Plaintiff's objection, and the matter is currently on appeal." (ECF 116-1 at 16 n.5 of 30.)

***Ownership of Shares Throughout the Class Period.*** That Park did not own Endo shares throughout the entirety of the Class Period (Op. at 16-17) is legally inconsequential. *See, e.g., In re Urban Outfitters, Inc. Sec. Litig.*, No. 13–5978, 2016 WL 1043014, at *2 n.2 (E.D. Pa. Feb. 29, 2016); *Grossman v. First Pennsylvania Corp*., No. Civ. A. 89-9234, 1991 WL 222071, at *5 (E.D. Pa. Oct. 23, 1991). Regardless, any concern arising from the timing of Park's

[14] Further, Petitioners obviously should not be faulted for failing to comply with a proposed, but never adopted, amendment to Rule 45 (*id*. at 8 n.4).

ownership would have been entirely cured by allowing Macomb to intervene as an additional class representative (*see* ECF 228) but the district court denied intervention without analysis (Order at 2).

***The Role of Lombardia***. Petitioners never "obfuscated" Lombardia's role as Park's investment advisor and Park always owned the shares. (Op. at 20). In its first discovery response, Park advised Defendants that "Lombardia Capital Partners served as Plaintiff's investment manager, and had full discretion with regard to Plaintiff's investment in Endo Securities." (ECF 111-5 at 7 of 19 (Park interrogatory responses).) Additionally, Park's use of Lombardia has no impact on its typicality. *See*, *e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204-05 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011). Defendants never disputed this issue.

***Timing of Park's Purchases.*** Petitioners did *not* mislead the court concerning Park's purchases of Endo stock on November 3, 2016, and thereafter (Op. at 2, 9-11). From its first filings, Park disclosed that it purchased Endo stock on November 3 at a price of $16.60 (ECF 11-6 at 5 of 5). Park never disputed that its November 3 purchases were *completed* after the Bloomberg article but argued, based on the evidence available, that the purchases were made "starting before" the article (ECF 149 at 9-10). Based upon trade confirmations subsequently produced by a third-party broker and promptly disclosed to the court, it now appears that Park's November 3 order was completed ***97 seconds*** after publication of the *Bloomberg* article at a price of $16.595 (ECF 251-10, 251-13). Although there is no documentary evidence as to when the purchases *began*, Park's investment agent testified that he believed the purchase price "is an aggregation of all fills that have been done throughout that day." (ECF 216-1 at 189:4-6.) Park has never reversed its position and its briefing was not misleading. Moreover, the exact timing of Park's November 3 order has no legal impact on typicality considerations. *DVI*, 249 F.R.D. at 203–04; *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).

The court's conduct thus constitutes clear error warranting mandamus relief. *See*, *e.g*., *Alexander v. Primerica Holdings, Inc*., 10 F.3d 155, 164 (3d Cir.

1993) (granting mandamus to reassign case and disqualify district judge who, "despite an absence of record evidence," accused litigants of acting in "bad faith").

### C. The District Court Exceeded Its Authority and Committed Clear Errors of Law by Appointing Statutorily-Ineligible Lead Plaintiffs, Engaging in Inappropriate *Ex Parte* Communications, and Hand-Selecting a New Roster of Lead Counsel

After improperly removing Park and BFA from their leadership roles, the court made multiple additional errors by deviating from the PSLRA and *Cendant* to create its own process and criteria to appoint ineligible lead plaintiffs and counsel.

#### 1. The District Court Exceeded Its Authority and Committed Clear Legal Errors by Conducting a "Beauty Contest" and by Appointing Bucks and the Individuals to Serve as Replacement Lead Plaintiffs

As an initial matter, in appointing Bucks and the Individuals as lead plaintiff, the court did not comply with the sequential, cabined analysis mandated under the PSLRA.

To start, the court's errors are evident from what the Decision does not address. Fundamentally, the Decision offers no evaluation of the PSLRA criteria highlighted in *Cendant* (*see* Op. at 24-25). And a review of what the Decision does say demonstrates that the court conducted an improper, freewheeling "beauty contest" of candidates. *See Cendant*, 264 F.3d at 268; *Cavanaugh*, 306

F.3d at 732; *Herley II*, 2010 WL 176869 at *3. For instance, the court conducted a relative comparison of potential lead plaintiffs and considered non-statutory considerations, such as appointing the Individuals because "they were actively involved personally … [in] making decisions for the purchase or sale of Endo stock" which purportedly "would provide a broad range of testimony going to the merits of the claim." (Op. at 25.) The court's reliance on his personal views of Mr. Stengel only further confirms the inappropriateness of these appointments. *See id.* ("Knowing Mr. Stengel for many years, this Court is quite sure that his performance as Lead Counsel will be a benefit to a class, whether win, lose, or draw.").

Additionally, Bucks and the Individuals are statutorily ineligible to serve as lead plaintiffs. Bucks' appointment is time-barred. The PSLRA expressly requires lead plaintiff motions to be made within 60 days of the notice of the action, 15 U.S.C. § 78u–4 (a)(3)(A)(i)(II), which ran on January 18, 2018; yet Bucks did not move until January 11, 2021 (ECF 247), almost ***three years*** later. Numerous courts have "held that the sixty-day notice requirement is mandatory and precludes consideration of untimely filed motions for lead plaintiff appointment." MANUAL FOR COMPLEX LITIGATION (FOURTH), § 31.31 (2004). *See, e.g., In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 117 n.2 (S.D.N.Y. 2009); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999); *China Agritech*,

138 S. Ct. at 1808 ("With notice and the opportunity to participate in the first (and second) round of class litigation, there is little reason to allow plaintiffs who passed up those opportunities to enter the fray several years after class proceedings first commenced.") Thus, by appointing Bucks as lead plaintiff the district court exceeded its authority.

The Individuals are likewise ineligible because they lack the "largest financial interest" and fail to satisfy the PSLRA's preference for institutional investors, *see Cendant*, 264 F.3d at 266; instead, they are a disfavored lawyer-created "group," two members of which Judge Savage had previously declined to appoint (ECF 57). Moreover, the court's focus on the Individuals' direct involvement with trades (Op. at 25) is neither permissible under the PSLRA (*Cendant*, 264 F.3d at 268; *Cavanaugh*, 306 F.3d at 732) nor legally relevant. *See, e.g., Peil v. Speiser*, 806 F.2d 1154, 1163 (3d Cir. 1986); *EZRA Charitable Tr. v. Rent-Way, Inc*., 136 F. Supp. 2d 435, 444 (W.D. Pa. 2001).

### 2. The District Court Exceeded Its Authority and Committed Clear Errors of Law by Having Multiple *Ex Parte* Communications with a Former Colleague Before Elevating Him to Lead Counsel and by Appointing Multiple Sets of Attorneys to Judicially-Selected Roles

The district court likewise erred in its appointment of lead counsel. The PSLRA states that the *lead plaintiff* "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v); *Cendant*, 264 F.3d at 271-73. Extraordinarily, the district judge—not Bucks—proposed Mr. Stengel as lead counsel.[15] The court's unilateral appointment was thus "clearly erroneous" and a "usurpation of power." *Cohen*, 586 F.3d at 710-11 (granting mandamus to vacate district court's selection of lead counsel); *In re New Mexico State Inv. Council*, 250 F. App'x 225, 226 (9th Cir. 2007) (issuing mandamus where court wrongly "disregard[ed] the [PSLRA's] clear language in favor of its own case-management preferences").

The court compounded that error by selecting Mr. Stengel in secret and without briefing—apparently based on their prior relationship (Op. at 24-25; Ex. G at 8:14-19; ECF 297 at 1-2 (Ex. I))—which precluded any response by class members. Indeed, the court appears to have made Mr. Stengel's

[15] Bucks proposed RGRD as lead counsel and Mr. Stengel's firm, Saxton & Stump, as local counsel (ECF 247-1 at 5 of 11), a fact the district court expressly recognized at the January 21 hearing. (Tr. (1/21/21) (Ex. G) at 8.)

appointment a condition to making Bucks lead plaintiff, advising Mr. Stengel "that if his client was to become lead plaintiff he should be lead counsel." (ECF 297 (Ex. I) at 1-2.)

*Ex parte* communications "run contrary to our adversarial trial system" and threaten "bias, prejudice, coercion, and exploitation." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 310 (3d Cir. 2004). They also violate fundamental rules of judicial ethics. *See* CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 3(A)(4) (judges "should not initiate, permit, or consider *ex parte* communications … concerning a pending or impending matter").

The dangers of *ex parte* conversations are compounded in the context of leadership appointments under the PSLRA. As this Court has recognized, "[t]he only stage at which class members can exercise effective control is in the selection of class counsel. Throwing a veil of secrecy over the selection process deprives class members of that opportunity." *Cendant*, 260 F.3d at 193. Yet the court here did exactly that, admittedly relying on two *ex parte* communications with Mr. Stengel—first revealed in the Decision itself—in appointing him to the lead counsel role. (Op. at 25.) The court's justifications[16] for these inappropriate contacts cannot withstand scrutiny—whatever was discussed *ex*

[16] *See* Op. at 25; ECF 297 (Ex. I) at 2.

*parte* could presumably have been addressed at an expeditiously scheduled conference with all counsel, as the court had done on multiple other occasions.

Without doubt, these *ex parte* communications and *sua sponte* appointment of a former colleague create an appearance of bias and impropriety, tainting the Decision. A "reasonable observer, with knowledge of this case," would surely "question the impartiality and neutrality of the proceedings." *United States v. Kennedy*, 682 F.3d 244, 260 (3d Cir. 2012).

In addition, the court's decisions to appoint RGRD as "co-Lead Counsel" and Pomerantz as "assistant Lead Counsel," as well as its anticipated appointment of an unnamed "Philadelphia-based law firm as co-Lead Counsel" (Order ¶ 6) that was not "select[ed] and retain[ed]" by any lead plaintiff, 15 U.S.C. § 78u-4(a)(3)(B)(v), are additional errors of law that violate the PSLRA and *Cendant* and only further the appearance of impropriety. These actions are extremely prejudicial to the Class, which will pay the literal and figurative price of the court's multiple deviations from the statute. *See, e.g., Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015) (noting that "the mushrooming presence of ever-more attorneys in a case more often serves to

delay than to expedite the just and efficient administration of justice … [and] increase[s] costs”).[17]

**D. <u>The District Court Clearly Erred by Denying the Motion to Recuse</u>**

Finally, these events plainly create an appearance of impropriety that requires recusal and reassignment of the matter.

A judge “shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.” 28 U.S.C. § 455(a). The recusal obligation is evaluated on an objective basis considering the totality of the circumstances: “[I]f a reasonable [person], were [they] to know all the circumstances, would harbor doubts about the judge’s impartiality under the applicable standard, then the judge must recuse.” *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 343 (3d Cir. 1998) (internal quotation marks omitted). Here, the circumstances would cause an objective viewer to “harbor doubts about the judge’s impartiality” and, as a result, the court erred by denying Petitioners’ motion to recuse. *Id.*; *see also In re Apollo*, 535 F. App’x

[17] The prejudice to the Class is real and already in motion. Infighting has broken out among new counsel over responsibility for work (*see* ECF 277-1 at 4 and ECF 278) and Defendants continue to argue that the new lead plaintiffs are time-barred from pursuing class-wide relief. (ECF 292-1 at 12 of 16.) Moreover, Defendants have predictably begun to cite judicial decisions issued by Mr. Stengel in support of their own requests for relief (ECF 292-1 at 8, 11 of 16), placing Mr. Stengel in the untenable role of lead counsel for the Class and the author of decisions being used to argue against the interests of the Class.

169, 175 (3d Cir. 2013) (granting mandamus, vacating prior order and ordering reassignment where judge's impartiality could reasonably be questioned).

## CONCLUSION

This case presents "exceptional circumstances" that warrant mandamus relief. Unmoored from the facts and the parties' arguments, the district court embarked on an unauthorized process, far outside its authority under the PSLRA, to reconsider and revoke Petitioners' leadership positions without cause. This erroneous course of events, with its crippling effects on the Class, must be undone.

Accordingly, Petitioners respectfully request that the Court grant this petition and issue all mandamus relief necessary to restore order to the proceedings below.

Respectfully submitted,

Dated: March 1, 2021

**LeVAN MUHIC STAPLETON LLC**

By: */s/ Peter H. LeVan, Jr.*
Peter H. LeVan, Jr. (PA Bar No. 83456)
1650 Market Street, Suite 3600
Philadelphia, PA 19103
215.561.1500
plevan@levanmuhic.com

*Counsel for Petitioners Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago and Bleichmar Fonti & Auld LLP*

**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
John S. Summers
Jonathan L. Cochran
One Logan Square, 27th Floor
Philadelphia, PA 19103
215.568.6200
jsummers@hangley.com
jcochran@hangley.com

*Counsel for Petitioners Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*

OF COUNSEL:

**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti
Evan A. Kubota
7 Times Square, 27th Floor
New York, NY 10036
212.789.1340
jfonti@bfalaw.com
ekubota@bfalaw.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

The undersigned hereby certifies as follows:

I. This petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,570 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by Microsoft Word.

II. This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Cambria typeface.

Dated: March 1, 2021

*/s/ Peter H. LeVan, Jr.*
Peter H. LeVan, Jr.
**LeVAN MUHIC STAPLETON LLC**
*Counsel for Petitioners*

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies that he is counsel of record and is a member of the bar of the United States Court of Appeals for the Third Circuit.

Dated: March 1, 2021

*/s/ Peter H. LeVan, Jr.*
Peter H. LeVan, Jr.
**LeVAN MUHIC STAPLETON LLC**
*Counsel for Petitioners*

**CERTIFICATE OF PERFORMANCE OF VIRUS CHECK**

The undersigned hereby certifies that, on March 1, 2021, I caused a virus check to be performed on the electronically filed copy of this petition using the following virus software: Trend XG Office Scan. No virus was detected.

Dated: March 1, 2021

*/s/ Peter H. LeVan, Jr.*
Peter H. LeVan, Jr.
**LeVAN MUHIC STAPLETON LLC**
*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this day, I filed an electronic copy of the foregoing petition with exhibits via CM/ECF. The documents are available for viewing and downloading via the CM/ECF System. I also caused a copy of the petition to be served electronically on all counsel and the district court in the underlying matter in conformance with Federal Rule of Appellate Procedure 21(a)(1).

Dated: March 1, 2021

*/s/ Peter H. LeVan, Jr.*
Peter H. LeVan, Jr.
**LeVAN MUHIC STAPLETON LLC**
*Counsel for Petitioners*