<pre>
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - x
 3
     ONTARIO TEACHERS' PENSION PLAN  :  No. 3:17-cv-00558(SRU)
 4   BOARD, ET AL,                   :  915 Lafayette Boulevard
                         Plaintiffs, :  Bridgeport, Connecticut
 5                                   :
                   v.                :
 6                                   :  April 16, 2021
     TEVA PHARMACEUTICAL INDUSTRIES  :
 7   LTD., ET AL                     :
                         Defendants. :
 8
     - - - - - - - - - - - - - - - x
 9


10              TELEPHONIC STATUS CONFERENCE


11


12

     B E F O R E:
13
          THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
14


15


16


17


18


19


20


21


22


23              Sharon L. Masse, RMR, CRR
                  Official Court Reporter
24                915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
25              sharon_masse@ctd.uscourts.gov
</pre>

1   A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

          BLEICHMAR FONTI and AULD LLP
4            7 Times Square, 27th Floor
            New York, New York  10036
5        BY:  JOSEPH A. FONTI, ESQ.
            EVAN A. KUBOTA, ESQ.

6

7          LAW OFFICES OF SUSAN R. PODOLSKY
            1800 Diagonal Road
8            Suite 600
            Alexandria, Virginia  22314
9        BY:  SUSAN R. PODOLSKY, ESQ.

10

          CARMODY TORRANCE SANDAK & HENNESSEY, LLP
11           195 Church Street, 18th Floor
            P.O. Box 1950
12           New Haven, Connecticut  06510-1950
        BY:  J. CHRISTOPHER ROONEY, ESQ.
13

          BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
14           2121 Avenue of the Stars, Suite 2575
            Los Angeles, California  90067
15        BY:  JONATHAN D. USLANER, ESQ.

16          KESSLER TOPAZ MELTZER & CHECK LLP
            280 King of Prussia Road
17           Radnor, Pennsylvania  19087
        BY:  JOSHUA A. MATERESE, ESQ.
18

          GRANT & EISENHOFER P.A.
19           485 Lexington Avenue
            New York, New York  10017
20        BY:  JONATHAN PARK, ESQ.

21          ROBBINS GELLER RUDMAN & DOWD LLP
            655 West Broadway, Suite 1900
22           San Diego, California  92101
        BY:  CHAD JOHNSON, ESQ.
23

24  (Continued)

25

```
 1              HURWITZ SAGARIN SLOSSBERG & KNUFF
                    147 North Broad Street
 2                  P.O. Box 112
                    Milford, Connecticut  06460
 3            BY:  DAVID A. SLOSSBERG, ESQ.

 4               POMERANTZ
                    600 Third Avenue
 5                  Ste 20th Floor
                    New York, New York  10016
 6            BY:  MICHAEL WERNKE, ESQ.

 7            ROLNICK KRAMER SADIGHI LLP
                    1251 Avenue of the Americas FL 18
 8                  New York, New York  10020
              BY:  RICHARD BODNAR, ESQ.
 9                 JENNIFER RANDOLPH, ESQ.

10            MOTLEY RICE LLC
                    One Corporate Center, 17th Floor
11                  20 Church Street
                    Hartford, Connecticut  06103
12            BY:  WILLIAM NARWOLD, ESQ.

13            LABATON SUCHAROW, LLP
                    140 Broadway
14                  New York, New York  10005
              BY:  CORBAN S. RHODES, ESQ.

15

16  FOR THE DEFENDANTS:

17            MORGAN LEWIS & BOCKIUS LLP
                    One Federal Street
18                  Boston, Massachusetts  02110
              BY:  EMILY E. RENSHAW, ESQ.
19
              SHIPMAN & GOODWIN LLP
20                  One Constitution Plaza
                    Hartford, Connecticut  06103
21            BY:  DIANE C. POLLETTA, ESQ.

22  (Continued)

23

24

25
```

1                    KASOWITZ BENSON TORRES LLP
                        1633 Broadway
2                        New York, New York  10019
                 BY:  SHERON KORPUS, ESQ.
3                     ANDREW SCHWARTZ, ESQ.
                      SARAH LEIVICK, ESQ.
4

5    FOR THE INTERVENOR, UNITED STATES OF AMERICA:

6                    VERONICA N. ONYEMA, ESQ.
                 CATHERINE MONTEZUMA, ESQ.
7                     DOJ - Antitrust
                      450 Fifth Street, N.W.
8                     Washington, D.C.  20530

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Proceedings commenced at 4:21 p.m.)
 2               THE COURT:  Good afternoon.  This is Stefan
 3    Underhill.
 4               MR. KORPUS:  Good afternoon, Your Honor.
 5               MR. FONTI:  Good afternoon, Your Honor.
 6               MS. RENSHAW:  Good afternoon.
 7               THE COURT:  All right.  We have some issues to
 8    take up.  Why don't we start with the Department of
 9    Justice memoranda issue.
10               MS. ONYEMA:  Your Honor, this is Veronica Onyema
11    on behalf of the United States.  I'm happy to speak first
12    unless you prefer for the plaintiffs to do so.
13               THE COURT:  No, actually I'd be interested in
14    hearing from you.
15               MS. ONYEMA:  Thank you.  Yes, at the last status
16    conference you had asked the parties to let you know today
17    whether we would be able to resolve the issue of the 302s
18    without the Court's involvement.  And as you can see from
19    the parties' status reports on Wednesday, the answer to
20    that is we will not be able to resolve it on our own.  The
21    government objects to the plaintiffs' request that Teva
22    produce the government's 302 memoranda.
23               As an initial matter, it's not clear to us
24    whether the plaintiffs are intending to make a formal
25    motion of some kind; but this is, as you can imagine, an
```

1    incredibly important issue to the United States.  We think

2    that there's important policy concerns, not just for the

3    government but to the criminal process overall.  So in our

4    view, to the extent that the plaintiffs do intend to

5    pursue this issue, we would request full briefing on it

6    and a full opportunity to be heard in writing as well.

7         And I'm happy to provide a few initial reactions

8    to their status report.  But, again, we do think that full

9    briefing is appropriate as the Court is entertaining this

10   issue.

11        THE COURT:  All right.  What's the current

12   status of the criminal prosecution?

13        MS. ONYEMA:  Yes, Your Honor.  We've requested

14   trial dates in the criminal cases.  As of now, we have not

15   yet received them.  My understanding is that we requested

16   trial dates in Teva/Glenmark in November.  Originally we

17   had requested it a little sooner.  And we've asked that

18   the Aprahamian case proceed before the Teva/Glenmark

19   trial.

20        THE COURT:  All right.  And, broadly, what is

21   the concern that the Department of Justice has with

22   respect to releasing 302s under the protection of a

23   protective order in this case?

24        MS. ONYEMA:  Yes, Your Honor.  There's a number

25   of concerns.  As a threshold matter, these materials were

1    produced to Teva as part of the criminal discovery

2    process, and so the notion that plaintiffs believe that

3    they have an entitlement to these materials because they

4    were produced as part of that disclosure process we feel

5    raises serious policy concerns and also could potentially

6    have negative impacts on our investigation, both this one

7    and other investigations.

8          And the materials that were provided to Teva

9    were produced to them subject to a protective order in the

10   criminal case, and that protective order prohibits the use

11   or dissemination of those materials outside of the

12   criminal case.  And while, as plaintiffs note, there is a

13   paragraph that gives us the opportunity to object if there

14   is an attempt for disclosure of those materials and also

15   afford Teva some protection if they are compelled to

16   produce those materials, paragraph 3 explicitly states

17   that Teva cannot produce those materials and compelling

18   them to do so would be contrary to the protective order.

19   It could raise significant policy concerns as it relates

20   to our protective orders in general and to our

21   investigation.  So that's -- that's one issue with the

22   protective order.

23          Another issue that we have concerns about

24   relates to the fact that these 302s belong to the United

25   States.  You know, Teva has a copy of them, but under the

1   protective order, they're required to return those

2   materials at the end of the case, and there are potential

3   *Tooey* implications given that the division is responsible

4   for these materials that were prepared by both the FBI and

5   the Postal Service Office of the Inspector General.  So I

6   wanted to flag that issue.

7            And the other large issue would relate to the

8   law enforcement privilege.  I know that plaintiffs cited

9   to a couple of cases in their status report.  It wasn't

10  clear to me what their substantive legal argument was

11  because they just cited to them, but those cases factually

12  were very distinguishable than what we have here.  Here

13  you have a civil plaintiff seeking to gain materials

14  produced to a criminal defendant.  The case *Shanahan*, for

15  example, was a criminal defendant seeking 302s that had

16  been produced within agencies.  But ultimately the Second

17  Circuit has its own framework on law enforcement

18  privilege, and we would certainly want the opportunity to

19  brief that issue to the extent that the Court is again

20  considering granting any relief to plaintiff on this

21  issue.

22            THE COURT:  All right.  Thank you.

23            MR. KORPUS:  Your Honor, Sheron Korpus from

24  Kasowitz for Teva.

25            We agree with the Department of Justice on this

1    issue, but one other note is that we don't agree that the

2    302s necessarily paint a full picture, and the fight to be

3    fought in the criminal case is over production of the FBI

4    agent notes themselves, the handwritten notes from the

5    interviews.  So if the Court were to order production of

6    the 302s, to provide a complete picture we'd be seeking

7    that information as well, and now we'll be having a

8    disclosure fight, which really belongs in front of Judge

9    Surrick, in front of Your Honor.  So I just wanted to put

10   the placeholder in that for Your Honor, too.

11             THE COURT:  Right, but one question I have for

12   you is, you have the 302s.  Are you going to Chinese wall

13   counsel or have some internal mechanism for making sure

14   that counsel that is handling the civil case does not have

15   any access to the 302s?

16             MR. KORPUS:  Your Honor, I have not seen the

17   302s personally.  Right now there is no wall in place, but

18   that is something that we can consider.

19             THE COURT:  All right.  Because obviously if you

20   get them and use them in the civil case, you have an

21   advantage over plaintiff's counsel in terms of how the

22   case is --

23             MR. KORPUS:  Yes, I can -- I understand, I

24   understand.  I saw that concern.  I can certainly

25   represent to Your Honor that we are not using the 302s for

1    the purpose of this litigation, for the purpose of the

2    securities case.  We are sitting on the record that is

3    being made in this case.

4              THE COURT:  All right.  Thank you.

5              Mr. Fonti?

6              MR. FONTI:  Thank you, Your Honor.

7              I think the issue is what Your Honor identified,

8    that Teva and the individual defendants have access to

9    discovery and documents and information that we don't.

10    And as you know, there are witnesses in play who we are

11    not able to take depositions of at this time, whereas Teva

12    as an entity has access to it.  The same law firms on the

13    civil side in our case are also on the criminal side.  And

14    Mr. Korpus can say that he doesn't intend to use the 302s.

15    I think that's either a very broad or very narrow

16    statement in that the mental impressions created by access

17    to the 302s and, frankly, all of the discovery, including

18    the FBI notes if they get them, really presents a true

19    problem.

20              They've never -- we've raised this repeatedly

21    that that was our concern, and I don't think -- at this

22    point I think the cat is out of the bag.  You can't unring

23    the bells, as people say.  The information is out.  Morgan

24    Lewis and Kasowitz Benson have the documents.  Lawyers

25    there have the documents.  Teva has the documents.  I

1    think fairness dictates that we get them.  And also the

2    narrowing of the universe of the 302s just to Teva-related

3    people and Teva-related co-conspirators is enough of a

4    compromise, and that was flatly rejected by both DOJ and

5    Teva.

6            So I think this is a pretty straightforward

7    issue.  Fairness dictates we get them if they have them.

8            THE COURT:  All right.  Well, the protective

9    order that was negotiated presumably between the DOJ and

10   Teva, that's a stipulated protective order, it does

11   provide that Teva may not use, disclose or disseminate for

12   any purpose and cannot use them in connection with any

13   other proceeding.  So they would be in violation of the

14   protective order if they did so.

15           But I think the government's suggestion of full

16   briefing here is a good one.  I think this is an important

17   issue, and it's got some policy factors that need to be

18   weighed, and so I'd be interested in prompt briefing of

19   the issue.

20           MR. FONTI:  Certainly, Your Honor.

21           THE COURT:  So, Mr. Fonti, would you file a

22   motion to compel, and that will get the ball rolling.

23           MR. FONTI:  Your Honor, I think it might be more

24   appropriate for the DOJ to file a motion for protective

25   order on this, given that they've got something at stake.

1    We've made our points in the status report, including the

2    fact that paragraph 7 of the protective order in the

3    criminal matter expressly contemplates production pursuant

4    to compulsory discovery.  So I think, you know, they've

5    annunciated a number of factors which they have not,

6    despite our attempts to meet and confer and our efforts to

7    get their ground, we're hearing many of them for the first

8    time today.  So I think they should take the first shot,

9    and we should have a chance to oppose, and we can do that

10   quickly.

11          MS. ONYEMA:  Your Honor, this is Veronica

12   Onyema.  We would absolutely oppose that process.

13   Frankly, the plaintiffs here have sought these materials

14   from Teva.  We think a motion to compel is appropriate.

15   They, frankly, have not provided a substantive legal

16   argument.  They have buried, in their status report, a

17   couple of paragraphs with two or three case citations with

18   no legal analysis as to why they're entitled to these

19   materials.  And certainly we're happy to provide a

20   response on behalf of the United States, but we do think

21   it's appropriate for us to fully understand the legal

22   arguments that the plaintiffs are raising so that we can

23   properly respond and coordinate internally to do so.  I

24   think that that would be the most helpful, in our view.

25          THE COURT:  Well, yes, I think that's fine.

1    And, Mr. Fonti, you'll have a chance to reply, so if the

2    government raises arguments that you didn't anticipate,

3    then you'll have a chance to respond to them.

4              MR. FONTI:  Thank you, Your Honor.  That will

5    resolve the concern.

6              THE COURT:  All right.  So let's talk about

7    scheduling.

8              MR. FONTI:  Sure.

9              THE COURT:  How quickly can you file the motion?

10             MR. FONTI:  We have quite a bit going on the

11   next couple of weeks.  Can we do something like May 7?

12             THE COURT:  That's fine with me.  And the

13   government and the defendant will respond in 21 days?

14             MS. ONYEMA:  Your Honor, this is Veronica

15   Onyema.  That timing should work.  I know that there are

16   going to be a few conflicts towards the end of May on some

17   other matters that will tie us up on the civil side, so it

18   is slightly possible that we may need to reach out and

19   request an extension, but I think that timing should work

20   for us because we do also want to make sure that we can

21   coordinate internally and also given some of the

22   implications I raised with the FBI and the postal service.

23             THE COURT:  All right.  Well, do your best.

24   Hopefully we can get that opposition in 21 days, and Teva

25   won't have any problem doing that, I assume?

1          MR. KORPUS:  It's fine for Teva, Your Honor.

2          THE COURT:  All right.  Very good.

3          And then, Mr. Fonti, you'll have 14 days to

4    reply.

5          MR. FONTI:  Thank you, Your Honor.

6          THE COURT:  We'll take it up --

7          MR. FONTI:  I think -- the one thing I wanted to

8    add is given the concern about the information being

9    disseminated within the Kasowitz and Morgan Lewis firms,

10   just because that may have already happened, and there's

11   no reason to think it hasn't and no reason why it

12   shouldn't have already occurred, but understanding what

13   measures will be put in place and representations from the

14   defense on that would be important to allaying some of our

15   concerns here in the interim while this gets briefed.

16         THE COURT:  Yes, I think that's appropriate.

17         MR. KORPUS:  Yes, that's fine, Your Honor.  Your

18   Honor, I would just say the following.  Sheron Korpus

19   here.

20         First of all, Mr. Fonti has never met and

21   conferred with us on this issue.  He's never asked for any

22   representations as to protective measures or the rest or

23   we would have told him.  He only ever discussed this issue

24   with the DOJ.  So it's not true to say that this has been

25   a subject of repeated meetings.  He's never raised it with

1    us.

2              Secondly, Morgan Lewis, who does not represent,

3    at this time, Teva in the criminal case, does not have the

4    302s.  I just want the record to be clear on that.

5              MR. FONTI:  This is a process point, Your Honor.

6    We did confer with one of Mr. Korpus's colleagues on the

7    302s, but that's beside the point.  We would just like

8    confirmation that none of this is being disseminated to

9    the lawyers on the team prosecuting the case.

10             THE COURT:  Yes, why don't you meet and confer

11   further, but I do think it's a good idea not to poison the

12   well at this point.  It would be, I think, unfortunate if

13   the lawyers handling any aspect of the civil case were

14   given access to documents that the plaintiff wants access

15   to.

16             All right.  The advice of counsel,

17   attorney-client privilege, good faith defense argument is

18   one I would like to get additional briefing on.  I guess I

19   don't fully understand the intention of Teva with respect

20   to so-called good faith defense that somehow does not rely

21   upon advice of counsel.  So maybe we can start there.

22             MR. KORPUS:  Sure, Your Honor.  Sheron Korpus.

23             So I agree that there should be additional

24   briefing on the subject, but let me just explain a couple

25   of things.

1          First of all, with regard to any report by

2     Wachtell, we have explained to plaintiffs that upon

3     further investigation, we believe Mr. Vigodman was wrong,

4     there was no inquiry by Wachtell Lipton in 2016 in

5     connection with the allegations as to price fixing, etc.;

6     that on the internal investigation we're aware of and on

7     the advice that was given on the Vigodman issue is advice

8     by the same attorneys representing them in this -- in the

9     criminal matter today.

10          So when Mr. Fonti was asking witnesses as to

11    their knowledge as to whether or not there was any price

12    fixing, the witnesses, after obtaining agreement from

13    Mr. Fonti on the record that the answer would not be a

14    waiver, testified that they have understanding based on

15    advice given them by -- by counsel.  That was completely

16    appropriate, and it was not a waiver.

17          We are not relying on advice of counsel in this

18    case.  Relying on advice of counsel would mean that Teva

19    went to counsel, sought advice about whether certain

20    disclosures could be made, and is now arguing that it is

21    not violating the securities law because of the advice

22    provided by counsel.  That is not the case.  We are not

23    putting advice of counsel at issue.

24          But when the CEO and others are asked in

25    earnings calls, "Have you seen any evidence of price

1    fixing?" they say no, and their -- their statement on that

2    is partly informed by privileged information.  That does

3    not in any way, shape or form waive the privilege advice,

4    and it would be really an alarming proposition to suggest

5    that it would because I don't understand how anyone could

6    be defended in a criminal case when there is a parallel

7    civil investigation and a securities case following it.

8    The suggestion you could take Mr. Fonti's position to the

9    extreme, does he not get to depose the attorneys

10   representing Teva in the criminal case as to their views

11   and opinions and advice that they've given to the company?

12   That clearly cannot be the case.

13          So we really don't see a basis for this.  We're

14   not intending to rely on advice of counsel.  We've said

15   that to Mr. Fonti repeatedly.  And we are happy to have

16   the issue briefed in full.

17          THE COURT:  Yes, I understand that you are not

18   formally relying on the advice of counsel defense, but is

19   there an affirmative defense that you intend to plead and

20   attempt to prove at trial called a good faith defense; and

21   if so, what does that look like?

22          MR. KORPUS:  I think the defense is that the

23   people who made statements were not aware of any wrongful

24   conduct.  That is what they're going to say.  They weren't

25   aware from their own personal knowledge, and part of that

1    personal knowledge are statements made to them.  But the

2    time to deal with that would be at trial, and Your Honor

3    can make appropriate rulings at trial.  This does not open

4    the door and lead to waiver of attorney-client

5    communications given to the company by the separate

6    matter -- separate investigation, separate prosecution.

7              THE COURT:  Right, right, okay, but -- okay,

8    just bear with me for a second.  Maybe I'm slow.

9              So Teva is alleged to have engaged in securities

10   fraud.  Witness takes the stand, says I wasn't aware of X,

11   Y or Z at the time.

12             Now, if that's a true statement, then that's a

13   defense to fraud about which you don't need to insert an

14   affirmative defense.  An affirmative defense is even

15   though the plaintiff has proven all the elements of

16   securities fraud, we are not liable for securities fraud

17   because of the statute of limitations, or unclean hands,

18   or whatever it might be.

19             So what you're describing, as I am hearing it,

20   at least, is a general defense that we didn't commit fraud

21   because we didn't know the statement was untrue when we

22   made it.  So --

23             MR. KORPUS:  That is correct.  That is -- that

24   is exactly what we intend to argue.

25             THE COURT:  Okay.  But that's not an affirmative

 1    defense at all, is it?  Shouldn't --

 2            MR. KORPUS:  Well, we've told Mr. Fonti that we

 3    are not relying on the affirmative defense of advice of

 4    counsel.

 5            THE COURT:  Yes, but somehow he has the

 6    impression, it's my impression from his papers that he has

 7    the impression that you're relying on a so-called good

 8    faith defense.  If that's a defense meaning we didn't

 9    commit securities fraud, then that's just a defense.  If

10    it --

11            MR. KORPUS:  That is the defense, Your Honor.

12            THE COURT:  Okay.  All right.  So maybe we don't

13    need to brief the issue then.

14            Mr. Fonti, what's your view?

15            MR. FONTI:  Thank you, Your Honor.  There's a

16    few layers to this, and I can give you a few concrete

17    examples of how all of this ties to the core elements of

18    the claim, the falsity, the scienter of the defendants.

19            So there's a few layers.  One is they do have

20    affirmative defenses that they pled, all right?  Those are

21    in their answer.  And last time we were together, they

22    said they were going to provide us a supplemental response

23    to our Interrogatory Number 9 that would have -- and

24    that's Exhibit G, as in George, to our submission -- that

25    would give the factual basis of each of the affirmative

1    defenses.  And without privilege issues or anything else,

2    we just wanted the facts to support each of the defenses.

3    They've effectively punted on that, which I think is

4    grossly inappropriate because we are in fact discovery,

5    and we're entitled to the facts that support each

6    affirmative defense now.

7           We focused Your Honor on two of the affirmative

8    defenses, Number 4 and Number 7, which touch on the issues

9    that you raised, the good faith and compliance with the

10   law, right?  So those are what we have been focusing the

11   discussion on.  But if you look at the response to

12   Interrogatory Number 9, just about the vast majority of

13   them point -- provide no factual support and point to

14   further disclosure at expert discovery or from witness

15   testimony, presumably at trial, right?  And that's just

16   not proper, and if they don't correct it, I think they're

17   waiving these defenses because we're entitled to the facts

18   that support each defense today, not at trial or even at

19   expert discovery.  If they're facts experts are going to

20   consider to support a defense, we should be entitled to

21   them now.  So that's the first piece.

22           THE COURT:  Okay, let me just interrupt you for

23   a second.

24           MR. FONTI:  Sure.

25           THE COURT:  They don't have to plead and prove a

1  general defense, that is, we didn't commit securities

2  fraud because we believed these statements could be true.

3  So what I hear Mr. Korpus essentially saying, although not

4  in so many words, is we're not pursuing a good faith

5  affirmative defense, and maybe they're not pursuing a good

6  faith compliance with the securities law defense because

7  those are really general.

8       MR. FONTI:  Your Honor, if I -- may I say

9  something there or you're not done?

10       THE COURT:  I'm done.  I'm done.

11       MR. FONTI:  So I think that some of this is the

12  semantics of what Mr. Korpus is saying.  Specific Defense

13  Number 7 that they pled is defendants are not liable

14  because at all times, with respect to all matters

15  contained herein, acted in good faith, exercised

16  reasonable care, and did not know, and in the exercise of

17  reasonable care could not have known of the reported

18  untruth, misstatement or omission.  So that ties directly

19  to an element of the claim, knowledge or recklessness, and

20  that's their specific defense as they put it, that is, as

21  we're categorizing it.

22       If they're not going to assert it and they're

23  simply going to waive it, that's fine.  But what they did

24  is they answered it in Interrogatory Number 9 citing

25  simply five documents that are memos to the board.  Given

1    the complexity of the case and millions of documents

2    produced, I find it hard to believe that the entire

3    defense is going to be rooted on five documents, but

4    that's what they put in, and then they said we'll deal

5    with it at expert discovery.

6         So that's just not appropriate.  You know, we

7    get it now.  Whatever facts support it as an affirmative,

8    specific defense in their own words, and there are many

9    others, we get it now.  It's not -- they can't, you know,

10   sort of do the bait and switch here.

11        THE COURT:  Well, right, but it's not an

12   affirmative defense.  You're suggesting that they are

13   taking on the burden of proving the negative.  You have

14   the burden to prove the positive.

15        An affirmative defense, as I noted before, an

16   affirmative defense is notwithstanding the facts that we

17   would otherwise be liable, we are not liable because of a

18   legal concept that precludes liability.  I don't know what

19   a specific defense is, but an affirmative defense is just

20   what I said.

21        Now, if you're asking them, in effect, to give

22   you every piece of information, document, etc., that

23   supports their general denial of committing securities

24   fraud, I think that's a little broad.  We should probably

25   have Mr. Korpus tell us whether he's asserting an

1   affirmative defense or not on good faith.

2           MR. KORPUS:  Your Honor, this suddenly has

3   become a discussion on interrogatories when in fact I

4   thought we were talking about advice of counsel and legal

5   advice.  We are not relying on any legal advice.  We are

6   not relying on advice of counsel.  We haven't listed that

7   in any of the documents.  We are relying on the fact that

8   Mr. Fonti cannot prove his case and prove materiality,

9   scienter and all the other elements of the claim.

10          Now, with regard to the interrogatory request,

11   that's a separate issue, and my partner, Ms. Leivick, is

12   on the line, and she can address that she was ready to

13   address that.  But I would note that in the same --

14   Mr. Fonti took the same objection to our interrogatory to

15   him.  We asked him to set forth the documents and the

16   elements supporting his claim, and he said, I'm not going

17   to do that now.  I'll do that after expert discovery.

18          That's exactly what we said on our affirmative

19   defenses.  But we are not relying on any advice of

20   counsel.  We are not relying on an affirmative defense the

21   way that you expressed it, that even if Mr. Fonti proves

22   every element of his claim, we have some kind of -- I

23   can't remember the exact words you used, Your Honor --

24   some kind of special defense that allows us to get out of

25   it.

1          And maybe Ms. Leivick can jump in and answer --

2     and address the interrogatory responses.

3          MS. LEIVICK:  Yes.  Good afternoon, Your Honor.

4     Sarah Leivick for defendants.

5          It's absolutely correct that plaintiffs have

6     taken the same position with respect to their responses to

7     defendants' interrogatories.  They have said that this is

8     inappropriate discovery prior to expert discovery, prior

9     to the exchange of expert reports, and we have said that

10    as well.  Many of the specific defenses in this case are

11    intertwined with the expert work, and the facts that

12    support those specific defenses will become clear after

13    the time that the expert work is completed.  And that is

14    entirely proper.  Courts in this district and in other

15    districts in the Second Circuit have found that where you

16    need expert discovery to support or to respond to

17    contention interrogatories, which these are, that is an

18    appropriate time to supplement or to respond, is after --

19    after that expert discovery occurs.

20         And we don't -- we don't object to providing

21    additional information after the close of fact discovery,

22    after we see what information we are entitled to obtain

23    from plaintiffs.  As Your Honor knows, there's briefing

24    currently regarding the scope of affirmative discovery we

25    are taking from the plaintiffs, and once that is resolved

```
1     and that discovery is obtained, those facts will bear on

2     our specific defenses as well.

3             So, again, we're not -- we're not saying we

4     won't ever supplement or amend; we're just saying that

5     these are premature at this time.  We've given information

6     based on our knowledge at this time, and we will

7     supplement it later.  And we would ask that plaintiffs do

8     the same.

9             THE COURT:  Okay.  Let me just -- can I ask you,

10    what is a specific defense?

11            MR. KORPUS:  I'm not sure who that question is

12    addressed to, Your Honor, but --

13            THE COURT:  I don't care.  I just -- anybody.

14    What is a specific defense?

15            MR. KORPUS:  I don't know what Mr. Fonti means

16    by specific defense.  I'm familiar with the concept of

17    affirmative defenses.  I don't know what a specific

18    defense is.

19            MR. FONTI:  I believe that's what your answer

20    says, Sheron.

21            THE COURT:  I'm sorry?

22            MR. FONTI:  I believe that's what the answer

23    calls these, specific defenses.

24            THE COURT:  Okay.

25            MR. FONTI:  We understood them to be affirmative
```

```
 1    defenses that are being brought that defendants will try

 2    to advance at trial and plead, make their case that they

 3    acted in good faith, they acted on reliance of the legal

 4    obligations, on reliance of counsel, and I'd like to --

 5    certainly Your Honor should get the answer to the

 6    question, but there are concrete examples of misstatements

 7    and reliance on the advice of others that are presenting a

 8    barrier to us getting discovery here.  But I'll allow

 9    Mr. Korpus to answer your question.

10              MR. KORPUS:  I'm not sure what the question is.

11              THE COURT:  Well, okay.

12              MR. KORPUS:  I mean --

13              THE COURT:  Here's where I think we are.  I

14    understand Mr. Korpus to have unequivocally asserted that

15    Teva is not relying on an advice of counsel defense.  Is

16    that -- is that accurate?

17              MR. KORPUS:  That is.  That is a hundred percent

18    accurate, Your Honor.

19              THE COURT:  All right.  I think there is some

20    confusion, and I may have made it worse, about what we

21    mean by a specific defense and whether this is something

22    akin to an affirmative defense on which the defendant

23    would bear the burden of proof.  And if there were such a

24    defense asserted, it seems to me that some preliminary,

25    pre-expert discovery would be appropriate.  What are the
```

1    facts supporting this affirmative defense?  If it's a

2    statute of limitations defense, for example, the last

3    event was -- the last wrongful event was on such-and-such

4    a date, and this case was not filed until that date, and

5    you can look at it, and you can see whether there is a bar

6    to the claim.

7         I don't think these are intended to be

8    affirmative defenses from the sound of them.  A good

9    faith -- a defense that says "we acted in good faith and

10   didn't violate the law" is nothing more than a general

11   denial, as to which it's appropriate to rely on expert

12   disclosures and discovery.

13        So I think the two sides need to sort out, maybe

14   starting with Teva, need to sort out whether this specific

15   defense is a general defense that does not need to be

16   pled, does not need to be proven by the defendant, or

17   whether it's an affirmative defense on which the defendant

18   would have the burden of proof and as to which they would

19   have some obligation to set forth the factual basis.

20        So can the two of you work that out?

21        MR. FONTI:  Yes, Your Honor.

22        MR. KORPUS:  Sure, we can talk about that, Your

23   Honor.

24        Your Honor, what about the plaintiff

25   interrogatories regarding their claim?  I would think the

1  same should apply to their claim.  We are entitled to know

2  what specific statements they're asserting and they're

3  relying on.

4       MR. FONTI:  On that, Your Honor, we have a

5  complaint that is pled under Rule 9(b) under the PSLRA

6  that specifically alleges each false statement and the

7  reasons why it's false.  And as you know, there are

8  witnesses we can't get deposed, and so we had arranged

9  that we would supplement after the close of fact discovery

10  by agreement with defendants.  We're a little bit

11  surprised that they're making this an issue when their own

12  letter to us asked that we supplement a response on May 7,

13  which was the day that expert reports were previously due.

14  And as you know, we have agreement now for May 28.  So

15  this seems to be a bit of trying to level the playing

16  field, but that issue -- that is not a problem.  They're

17  on notice for years now what the false statements are, and

18  if any are supplemented, we will live up to our agreement

19  or request that we supplement when expert reports go in.

20       THE COURT:  All right.

21       MR. KORPUS:  That is not quite right, Your

22  Honor.  The complaint doesn't provide all the information

23  that we need.  I mean, what we're asking now in

24  interrogatory is for every false and misleading statement

25  that they base the claim to tell us how and when the

1   market learned the truth and tell us other information.

2   For example, on this price-hike strategy, when do you

3   allege it started, when do you allege it ended?  I mean,

4   it's their claim.  We are entitled to this basic

5   information so that we can prepare our expert reports

6   appropriately in the same way that if we were asserting

7   some kind of an affirmative defense, Your Honor believes

8   we should let them know what the facts are that support

9   that.

10          THE COURT:  Well, the first part of your

11  example, it seems to me when the market learned, that's

12  going to be publicly available to both sides, isn't it?

13  In other words, if somebody at Teva said the sky is blue,

14  and then three weeks later there's an article in the *Wall*

15  *Street Journal* that says the sky is not blue, that's

16  equally available to both sides, isn't it?

17          MR. KORPUS:  Well, it's not that clear, and I'm

18  asking them for their allegation.  They have -- they have

19  a claim that Teva had this hidden price-hike strategy.

20  When is it that they claim that truth was told to the

21  market?  Not clear to me, and I've taken a lot of

22  depositions.

23          MR. FONTI:  Your Honor, I think the complaint

24  sets out very clearly what the dates of the disclosures

25  are, and it sets a separate section entitled "Loss

```
 1    Causation," and the experts will then opine on that in the

 2    reports.  So they've been on notice for years on that.

 3    And the same goes with the price-hike strategy.  We allege

 4    that it began in early 2013.  That's in the complaint.

 5    And, again, the people who -- some of the people who were

 6    instrumental to that strategy we are not able to depose,

 7    and so we will supplement that within a reasonable amount

 8    of time after those depositions happen.  But there's no

 9    secret, we've alleged it, and we've alleged it for years

10    now.

11              MR. KORPUS:  They've alleged it as a whole.

12    They don't match up specific statements.  There's also

13    allegations arising from the Actavis deal.  When do they

14    allege that the truth concerning the Actavis deal, to the

15    extent it was a misleading statement, when was that

16    revealed to the market?  They have it as a whole, but they

17    don't break it down between these are the statements we're

18    relying on.  And this is with each one of the statements,

19    the truth of that, when it was revealed to the market.

20              If it's going to wait until expert discovery,

21    then that's fine, but then we should also deal with our

22    defenses in expert discovery so that we can respond to the

23    specific statement and specific event that they're relying

24    on.

25              THE COURT:  Right, okay.  So, look, I do think
```

1   it's a topic of expert discovery.  That level of detail is

2   going to require an opinion of an expert who is examining

3   what the market knew when and setting out in detail,

4   hopefully, the answers to the questions you're raising.

5   And the same is true the other direction.  If this is a --

6   this so-called specific defense is actually a general

7   defense, as I've described them, then that's a subject for

8   expert disclosure as well.  And if after you get the

9   expert reports out, there's a need for limited, additional

10  fact discovery to follow up on some surprising revelation

11  that was made by one of the experts, I'm sure we can find

12  a way to accommodate that.  So --

13              MR. KORPUS:  Fine with me, Your Honor.

14              THE COURT:  So, basically, I think the

15  plaintiffs are right about their disclosure.  I think the

16  defense is correct about their disclosure to the extent

17  that this is a general defense, because the specific

18  defenses have not been pled with the level of specificity

19  that the complaint has been pled, and so there's a lack of

20  equality in the nature of the disclosures made by each

21  side.

22              I don't think this is, as I said before, I don't

23  think this is an affirmative defense.  I think it's a

24  general defense.  And if that's the case, then there's no

25  harm to the plaintiff.

1          MR. FONTI:  Your Honor, if we could step back a

2    bit because I think when we started the conversation, it

3    was about the investigations and some of the other

4    assertions of privilege around things like the disclosure

5    committee.  I think it would be worth spending just a few

6    moments on that to get your guidance, and if additional

7    briefing is warranted, we'd be happy to do it.

8          So there are a couple of concrete examples where

9    the limitation on the facts being disclosed to us is

10   material and it is prejudicial because it goes to the

11   elements of the false statements -- the falsity,

12   materiality, scienter.

13         Two examples.  One is they withheld almost

14   completely any documents reflecting the considerations of

15   what they call the disclosure committee.  The disclosure

16   committee, as best we could tell from the very limited

17   discovery we've gotten, was a body comprised of senior

18   management that signed off on the disclosures.

19         So when you come to an issue like the Item 303

20   and 5, failure to disclose the impact of price, we asked

21   the fact witnesses, and they essentially have conceded

22   that there was no such disclosure, right, that the impact

23   of price was never disclosed as it related to the generic

24   segment.  Who made that decision?  The answer to that is

25   met with an assertion of privilege and that it was -- that

1    that was behind the veil of what, you know, we've loosely

2    disclosed as the disclosure committee, or as Mr. Vigodman

3    put it, the team that made decisions.  What they

4    considered, what documents they looked at, what edits they

5    made to disclosures, whether they considered the 302

6    disclosure at all, is completely behind the veil.

7          So that's a very concrete scenario where we are

8    not getting disclosure of facts that support the critical

9    misstatement in the case.

10          Likewise, we have the repeated disclosure that

11   we've done an internal or external investigation, and we

12   haven't seen any evidence of wrongdoing or any evidence of

13   facts that support liability for the company.  When we ask

14   people what's the basis for that, the sole basis for that

15   is an investigation done by counsel.  And so that's been

16   met with a complete wall of privilege.

17          There's no way for us to get to the factfinder

18   and to push back and to have a factfinder discern evidence

19   as to the truth or falsity, the mental state of people

20   making these statements, without getting the facts behind

21   it.  We're not looking to pierce the privilege; we're

22   looking to get the facts that underlie these statements.

23   And we're really at an impasse there because without any

24   disclosure, we're not able to test those assertions, and

25   they've got -- they've effectively, while they say they're

1   not relying on -- they're not asserting reliance on

2   counsel, as a practical matter that's exactly what they're

3   doing to block the discovery that we need to prove the

4   falsity of these statements.

5          MR. KORPUS:  Your Honor, it sounds to me like

6   Mr. Fonti is making the same argument all over again.  I

7   mean, let me start, first of all, with the disclosure

8   committee.  I defended Mr. Vigodman's deposition.  First

9   of all, as I recall it, there was a mischaracterization of

10  the record.  Mr. Vigodman I don't believe said that they

11  ever received any advice on whether or not to disclose

12  pricing.  So, first of all, let's just put that to one

13  side.

14         Second, there is a disclosure committee.  It has

15  attorneys on it.  And the discussions with the attorneys

16  on certain things are privileged because it's legal

17  advice, and we are not relying on that, as I said before.

18  We are not relying on legal advice that we should have --

19  that we should disclose something or shouldn't disclose

20  something even if we're wrong.  Mr. Fonti is going to have

21  to prove his case.  He's going to have to prove his case

22  that we were wrong in making certain disclosures or didn't

23  make certain disclosures appropriately.  But we are not

24  seeking to hide behind legal advice for those disclosures.

25         And same with the government investigation.

1    I've already addressed that at the beginning of this

2    argument.  I told Your Honor that there was advice given

3    by the same counsel that's representing Teva in the

4    criminal case, but we are not relying on that advice.  But

5    when Mr. Fonti asks deponents, "What's your basis for your

6    knowledge -- what's the basis for your belief that the

7    company has done nothing wrong," they say "my personal

8    knowledge and advice given to me by counsel."  But that

9    doesn't in any way waive the privilege.

10             THE COURT:  All right.  Help me understand.  I

11   don't think we're maybe talking about the same -- we're

12   passing in the night here.

13             First off, what is the disclosure committee?

14   What do they do?

15             MR. KORPUS:  The disclosure committee is a

16   committee of various high-level management at Teva,

17   including in-house counsel, to discuss the quarterly and

18   annual filing and discuss various issues relating to those

19   filings.

20             THE COURT:  Okay.  So what documents have been

21   turned over that relate to the disclosure committee during

22   the appropriate time?

23             MR. KORPUS:  Ms. Renshaw, are you on the line?

24   Is it something that you --

25             MS. RENSHAW:  I am.  I can tell Your Honor

1   nonprivileged documents that were responsive and relevant

2   have been produced.  As relates to the disclosure

3   committee, we've had many emails back and forth with

4   plaintiffs about this, but we've never formally met and

5   conferred as it relates to this issue.  It kind of morphed

6   into that advice of counsel dispute.  We discussed that.

7   But the documents that are nonprivileged have been

8   produced, we provided examples of those in an email, as

9   well as to resolve the dispute, plaintiffs asked us to run

10  additional searches and produce additional documents that

11  were outside of our original agreed-upon scope, and we did

12  that, and we made that production of additional documents

13  to them as they requested.  But then now they're raising

14  this again as if they hadn't made that offer to resolve

15  the dispute.  So we have produced many documents with

16  respect to the disclosure committee.

17          THE COURT:  Okay.  Have the withheld documents

18  been listed on a privilege log?

19          MS. RENSHAW:  They certainly have, for many,

20  many, many months.

21          THE COURT:  Okay.  So, Mr. Fonti --

22          MR. FONTI:  Yes.

23          THE COURT:  -- help me out.  What --

24          MR. FONTI:  So, Your Honor -- yes.  So we have

25  vast, overbroad redactions that they refuse to address and

1    refuse to parse out the legal communications from business

2    advice and advice around disclosures, number one.

3           We don't have a complete set and frankly don't

4    even know who all were on the disclosure committee.  We

5    don't have the drafts of the disclosures that were being

6    prepared and people's comments to those disclosures.

7           So for Ms. Renshaw to say that we have

8    documents, I mean, there might be some, but they're not

9    the documents that show how the disclosure committee was

10   operating and how they were making decisions around the

11   disclosures.

12          As to what -- go ahead.  Sorry, Your Honor.

13          MS. RENSHAW:  Oh, no, I apologize.  That was me,

14   Joe.  I thought you were done.

15          MR. FONTI:  Okay.  Thank you.

16          As to the testimony, we have not been able to

17   get any insight into the disclosure committee, its

18   considerations, what it looked at, how it did its

19   business, because privilege has been asserted.

20          And as to the investigation, we quote an example

21   of it in footnote 6 of our submission, that none of these

22   witnesses have said that -- they basically answer on their

23   personal knowledge.  And, in fact, Mr. Schultz, the

24   current CEO, was deposed this morning, and his only basis

25   for his denying any liability was the investigation done

1    by counsel.  Same goes for Mr. McClellan, one of the

2    former CFOs.  And Mr. Vigodman, while I don't have his

3    testimony right in front of me, did not rely on his

4    personal knowledge, he actually relied on the

5    investigation that he thought was conducted by Wachtell

6    Lipton, which now we learn is not the case.

7            So there's certainly a vast amount of documents

8    on the disclosure committee that we haven't gotten, and

9    the same goes with the investigation.

10           MS. RENSHAW:  And, Your Honor, this is Emily

11   Renshaw.  Just a very brief response.

12           Mr. Fonti just raised, before the testimony

13   piece of that, when he was talking about the document

14   issues, that we have not -- he's never addressed with us,

15   including redactions, these overbroad redactions that need

16   to be discussed and who was on the committee, we haven't

17   had -- there were no interrogatories, nothing to that

18   effect.  These are things that are just being raised for

19   the first time, which often is the case in these

20   prehearing submissions.  So we're obviously happy to meet

21   and confer with plaintiffs about that, but this is the

22   first we're hearing of many of these things.

23           THE COURT:  I'm going to suggest you meet and

24   confer, but everybody should be clear that -- and I'm sure

25   you are -- attorney-client privilege protects confidential

1    communications between a lawyer and a client regarding the

2    provision of legal advice.  And the fact that there may be

3    facts on which that advice is based that are included in

4    that communication does not protect the facts from

5    disclosure during discovery.  Is everybody with me on

6    that?

7              MS. RENSHAW:  Yes.  And, Your Honor, just very

8    briefly, but defendants made incredible efforts to apply

9    very minimal redactions, understand that very well, and

10   the number of communications that were produced with

11   attorneys on them, of course, is evidence of that.  But we

12   certainly understand that, and we were as narrow as we

13   possibly could in our redactions and withholding certain

14   of them.

15             THE COURT:  All right.  So why don't you meet

16   and confer about that, and if need be, we'll take it up

17   next time.

18             The other ones that I had --

19             MR. FONTI:  Your --

20             THE COURT:  Go ahead.

21             MR. FONTI:  Your Honor, I'll just say that we're

22   happy to give it one more shot, but you go look at the

23   record and this disclosure committee issue has been raised

24   repeatedly, including the last conference.  None of this

25   is new.  We'll give it one more shot, and your guidance

1   there on the scope of the privilege is helpful.  We'll try

2   to make the best use of our time.

3            THE COURT:  All right.  The other two that I

4   think you might usefully meet and confer on are the

5   internal controls and SEC certifications, and then the --

6            MR. FONTI:  Yes.

7            THE COURT:  -- Sarbanes-Oxley certifications,

8   sub-certifications, internal database, etc.  Those are

9   issues --

10           MR. FONTI:  Your Honor, we actually have a meet

11  and confer set for Monday on the Sarbanes-Oxley issue, the

12  database, so that's already there.

13           I think one issue you didn't raise was the

14  impairment memo that relates to the most recent impairment

15  charge --

16           THE COURT:  Yes.

17           MR. FONTI:  -- arising in part from the --

18           THE COURT:  Third quarter 2020.

19           MR. FONTI:  -- indictment.  Correct.

20           THE COURT:  Right.  So why is that relevant if

21  it's a third quarter 2020 document?

22           MR. FONTI:  So it goes -- part of the

23  consideration there was the impact of the indictment and

24  the company's assessment of financial impact of the

25  indictment and, you know, supposing also the merits of

1    that indictment.  So it relates in part back to the facts

2    and circumstances during our class period.  The fact the

3    charge was taken after the class period doesn't lessen

4    that it relates in part to conduct, an assessment of

5    conduct during the class period.  We don't need anything

6    beyond that, but any -- any assessment of the impairment

7    as it pertains to the indictment and the conduct alleged

8    in the indictment, the company's assessment to the

9    business is something that we think is relevant to our --

10   although it happened after the end of the class period,

11   it's still relevant to the conduct during it.

12           MR. KORPUS:  Ms. Leivick, are you going to

13   address that or would you like me to?

14           MS. LEIVICK:  Yes, yes, Your Honor.  This is

15   Sarah Leivick.  The impairment memo is absolutely not

16   relevant to plaintiffs' claims here.  We absolutely admit

17   that one of the four developments that resulted in the

18   assessment of Teva's North American reporting unit for

19   impairment was the indictment in August 2020; but, in

20   fact, as Mr. Schultz, the current CEO testified this

21   morning, he said the main driver of the impairments

22   were -- was events related to the opioid litigation and

23   not to the DOJ indictment.

24           And, further, Your Honor, the class period ends

25   in May 2019 because that is when the state attorney

1    general filed the complaint alleging Teva's participation

2    in the generic drug price-fixing conspiracy.  The

3    indictment then, more than a year later, related generally

4    to the same conduct, which the market was already aware.

5    And the fact that Teva considered the impact of that event

6    at the time compared to the company's internal projections

7    for determining whether they needed to take an impairment

8    is just irrelevant to this case and any of the alleged

9    conduct by the defendants or the damages claimed by

10   plaintiffs.

11          MR. KORPUS:  Yes, and Your Honor, if I could

12   just add one other thing as well.  The testimony actually

13   was today that the impairment gets taken as a mathematical

14   exercise based -- and it says so in the securities filing

15   that Mr. Fonti is relying on -- it's a mathematical

16   exercise based on the market cap of the company.  And then

17   it lists some of the events with respect to the market

18   cap, one of which, the third out of the fourth, is the

19   indictment.  But it's not as if it is somehow directly

20   related to the indictment.

21          THE COURT:  Okay.

22          MR. FONTI:  Again, Your Honor, we're willing to

23   limit it to the consideration of the indictment.

24   Mr. Schultz did say that opioids had some part in it, but

25   that's not disclosed, not part of the list of disclosures

```
 1    in the 10K.
 2              MR. KORPUS:  It is the first disclosure in the
 3    10K, Mr. Fonti.
 4              MR. FONTI:  We think it's in bounds to get the
 5    impact of the indictment.
 6              THE COURT:  Well, I'm not convinced that it's
 7    relevant.  If you want to pursue this, then you ought to
 8    file a more formal motion because on the basis of what
 9    I've seen so far, it does not appear to me to be worth the
10    candle.
11              MR. FONTI:  Understood.  I think we have a
12    couple other issues, Your Honor.
13              THE COURT:  Yes, we do.  Sandoz phone records.
14    How about that one?
15              MR. FONTI:  Yes.  So Teva is not agreeing to
16    produce them.  I think we're at an impasse.  They're
17    pointing to the protective order.  We've been through this
18    dance before.  The protective order in the MDL doesn't
19    prohibit them from producing phone records.  They've
20    already produced phone records to us.  All they need to do
21    is give notice.  And as Your Honor knows, Sandoz said a
22    better source for this phone record information is Teva as
23    opposed to Sandoz.  So we're neither here nor there at the
24    moment, but we'd like to get those records produced.
25              MS. RENSHAW:  And, Your Honor, this is Emily
```

1    Renshaw.  We disagree.  We think this is an improper
2    request to Teva.  You know, there's not a Rule 34 request
3    to Teva for these requests, and this has just been what
4    plaintiffs tend to do.  They seek documents long after the
5    close of fact discovery and refer back to their incredibly
6    broad request, to which we've objected, had months of meet
7    and confer, then we reached agreement on scope, and in
8    some instances there was motion practice.  And plaintiff
9    can't use their document request to support every late and
10   improper request to defendants.  In our view, this is an
11   improper request to us in the first place, and also the
12   time has passed.

13         These are records that are -- relate to a
14   nonparty to the case.  They have nothing to do with Teva.
15   They're not Teva's records.  You know, if plaintiffs
16   wanted these records, they have known about them since the
17   day they have filed their complaint, and they simply could
18   have gone and sought the records where they should have,
19   from the source.  These are, you know --

20         THE COURT:  They did, I think.

21         MS. RENSHAW:  They didn't, Your Honor, because
22   the source of these records isn't Sandoz either.  These
23   aren't Sandoz -- these aren't Sandoz business records.
24   Sandoz has produced to plaintiffs, and we know because we
25   received copies of those productions, their own business

1    records.  What plaintiffs are seeking here are records of

2    the phone carriers, so AT&T, Verizon, Sprint, for

3    instance, that were then produced to the Attorneys

4    General, who then in turn produced them in another action.

5    So they're not seeking them from the source, and that's

6    why it's even more of an improper request to Teva.

7              THE COURT:  Well, the phone company is not going

8    to have the records any longer because they typically

9    delete them after three years.  So Teva --

10             MS. RENSHAW:  Your Honor --

11             THE COURT:  -- at this point is the source, and

12   it feels appropriate that they get them from Teva, doesn't

13   it?

14             MS. RENSHAW:  I disagree, Your Honor.  I do

15   think that there is a good chance that the phone carriers

16   would likely still have the records and certainly would

17   have had plaintiffs sought them at the outset of this

18   case.  And I think the three years is only for certain

19   companies.  I know of others that keep theirs for six or

20   eight.  But they're only willing to produce them if

21   they're served with a subpoena.  And this is just an end

22   run around that process and now trying to get from Teva

23   discovery from another case where we're not at liberty to

24   just produce anything that plaintiffs want in that case.

25             The time has long since passed for them to go

1   through the proper channels to get these documents.  And

2   it's not appropriate for us.  We would be in violation of

3   protective orders in that case to even disclose what

4   documents were produced.

5          THE COURT:  Well, help me understand that.

6   Look, this is a simple matter, isn't it?  You've got them

7   set aside.  You don't have to search anywhere.  You don't

8   have to disaggregate these.  You just send them over.

9          MS. RENSHAW:  Well, that's not -- that's not

10  exactly accurate, Your Honor, because, one, we haven't

11  conferred with plaintiffs on this point, so they have just

12  named a slew of Sandoz employees, who we don't know who

13  they are, and we don't have phone numbers for those

14  people, we don't have -- we don't have any other

15  information of whether they're personal devices they're

16  seeking or business devices.  And it's not that we just

17  have them setting aside.  I mean, millions and millions

18  and millions of pages of documents have been produced in

19  the MDL.  And so I think that plaintiffs should have to

20  get -- if there's a court order that they have to be

21  produced, then we would have to provide notice, but we

22  think it's improper, and we think it's too late.

23         THE COURT:  Cite me to the portion of the MDL

24  protective order that you're relying on.

25         MS. RENSHAW:  Let me just double-check here.  I

1    had them pulled up.  There are provisions -- and I will

2    cite to you, Your Honor, the docket numbers and the

3    paragraph numbers.  I just have to pull them up.  But

4    there are provisions that prohibit the parties to the MDL

5    from disclosing what information has been produced in that

6    case and using them for any other purpose besides

7    discovery in the MDL.  And I certainly can pull that up.

8    I just don't have it right at my fingertips at this

9    moment.

10              THE COURT:  All right.  I'm looking -- I'm

11   looking at Judge Rufe's April 8, 2021 Pretrial Order

12   Number 166, which I think is the document you're talking

13   about because that's the one --

14              MS. RENSHAW:  I believe that the -- I'm sorry,

15   Your Honor.  I didn't mean to interrupt.

16              THE COURT:  That was the defense submission

17   regarding this hearing.

18              MS. RENSHAW:  So I think that related to another

19   issue that -- the pretrial orders in the MDL that -- I

20   believe it's 96 and 117, but let me just double-check.  It

21   could be what you're citing, Your Honor.  I've got a bunch

22   of them pulled out.

23              THE COURT:  I'm not sure either.

24              MR. FONTI:  Your Honor, for the record, we

25   attached as Exhibit K the protective order, Pretrial Order

```
 1   Number 53, the protective order.

 2             THE COURT:  I have that.

 3             MR. FONTI:  Is that what --

 4             THE COURT:  That's not the one I'm referring to,

 5   but I think that may be the one that applies, so...

 6             MR. FONTI:  And we cited paragraph 12 of that,

 7   if it's helpful at all.

 8             MS. RENSHAW:  And, Your Honor, I'm looking.  If

 9   in the interest of time, if it would be helpful, given

10   Your Honor's leanings on this, if the parties, if we

11   walked through and agreed on what provisions would govern

12   these issues and see if we can't work out some of the

13   details, because as I said, right now we just have a very

14   broad request, and then we have to make sure we give the

15   appropriate notice because the Attorneys General need to

16   be notified, and we can see if we can reach some

17   agreement, and we can follow up with Your Honor if it's

18   not possible.

19             THE COURT:  Yes, all right.  So consider this an

20   order that you produce the requested Sandoz phone

21   records -- or the requested phone records, I'll say it

22   more broadly because that's your position.  And so you

23   need to give notice to the designating party, after which

24   the protective order doesn't bar compliance with that

25   order, my order.
```

```
 1              MS. RENSHAW:  I appreciate that, Your Honor.  We
 2   will meet and confer with plaintiffs regarding the scope
 3   and hopefully get more specificity about their request.
 4              THE COURT:  Okay.
 5              MS. RENSHAW:  Because these are individuals we
 6   are not familiar with at all.
 7              THE COURT:  Okay.  Let's get that moving.  We've
 8   been looking for these Sandoz documents for many of these
 9   meetings.
10              MS. RENSHAW:  Your Honor, we thankfully haven't
11   been privy to those.  They just reached out to us a matter
12   of, you know, a week and a half ago about these for the
13   first time, so...
14              THE COURT:  Okay.
15              MR. FONTI:  Judge, can we put a clock on the
16   production so we all confer and get this over with sooner
17   rather than later?
18              MS. RENSHAW:  Your Honor, we're not planning to
19   delay.  We don't know even what we're looking at right now
20   in terms of trying to find records that aren't ours and
21   that we don't -- we will do this in short order, and we
22   will meet and confer with them and hopefully reach
23   agreement.  But I can't commit to a date right now, and I
24   don't know what it is that we're actually going to need to
25   do.  And, also, I think we have to provide 10 or 14 days
```

1    notice to the Attorneys General.

2              THE COURT:  Yes.  Let's move expeditiously,

3    please.

4              MS. RENSHAW:  We certainly will.

5              THE COURT:  All right.  There was an April 15

6    affidavit that was supposed to be filed.  I haven't seen

7    it.  Doesn't mean it wasn't filed.

8              MS. RENSHAW:  Your Honor, no, this is Emily

9    Renshaw, and my apologies if that was intended to be

10   filed.  We served that on plaintiff yesterday.

11             THE COURT:  Ah, okay.  Fair enough.  It doesn't

12   necessarily have to be filed.  As long as you communicated

13   it, that's fine.

14             MS. RENSHAW:  We did, Your Honor.

15             THE COURT:  Good.

16             MR. FONTI:  Your Honor, on that score, given how

17   this has worked out, I'm sure you're not surprised to hear

18   that we are not completely satisfied with what is in the

19   affidavit.  There are a number of significant gaps.  The

20   Court has put a lot of time and effort into this issue.

21   We have interrogatories, we have the RFAs, then we have

22   the affidavit.  We still don't have some critical answers

23   as to what happened to the texts, what preservation

24   applied to the texts, if any, and what steps were taken

25   even after the litigation holds were implemented here,

1    what steps were taken to ensure that nothing was

2    destroyed.

3          So rather than go through this one more time on

4    the phone, we would suggest that -- and we haven't made --

5    we just got the affidavit last night and then preparing

6    for today thought this was an appropriate proposal, the

7    defendants haven't considered it yet, but that we have the

8    30(b)(6) deposition coming up, it's gotten moved from next

9    week to May 3rd and 4th, that we use that deposition to,

10   in effect, try to close out the record on the answers to

11   the questions that we still have.

12         In negotiating the topics for the 30(b)(6), we

13   had narrowed the topic on preservation and destruction

14   because we thought we were going to get robust answers to

15   the logs and to the RFAs.  That was even before the

16   affidavit was ordered.  We'd like to expand the scope of

17   that inquiry at the deposition.  We'll get the answers we

18   get, the record will be what it will be, and then at that

19   point we can come to the Court with a complete record --

20   the affidavit, the testimony, RFAs, the logs -- and see

21   where we're at.  And hopefully we're in better position to

22   make whatever arguments we have to make on preservation,

23   destruction, adverse inferences, and so forth.  So we

24   propose that.  We appreciate that the defendants haven't

25   heard that yet, but we think it's a sensible way to go.

1          MS. RENSHAW:  And, Your Honor, this is Emily

2   Renshaw.  We're happy, of course, to meet and confer with

3   plaintiffs, and we already have a couple calls already on

4   the record -- on the calendar, so we certainly can do

5   that.

6          Just to address one quick point.  We obviously

7   disagree with Mr. Fonti's characterization of the -- of

8   the declaration that we provided.  It was robust.  It

9   walked through everything the Court asked us to address.

10  I just wanted to make the record clear there because

11  obviously we take very seriously the Court's orders.  But

12  we certainly can meet and confer about Mr. Fonti's

13  proposal and try to resolve it.

14          THE COURT:  Sounds like a good idea.  All right.

15          MR. FONTI:  Thank you, Your Honor.

16          THE COURT:  Those are the issues on my list.

17  Did either side have anything else they wanted to take up

18  today?

19          MR. FONTI:  The only remaining issue that we

20  just wanted to flag that Your Honor has is the proposed

21  schedule both sides agreed to.  I suppose that's not an

22  issue.

23          THE COURT:  It's fine with me.

24          MR. FONTI:  Very good.  And then any desire to

25  schedule another call so that we're on the calendar?

```
 1              THE COURT:  You know, after my wife gave birth,
 2    she said, "Don't even think about having another child."
 3    So...
 4              MR. FONTI:  I know what you mean.
 5              THE COURT:  It may not be the best moment to
 6    raise that at 5:30 on a Friday afternoon.
 7              MR. FONTI:  Very good.
 8              THE COURT:  I'm happy to have another call at
 9    some point.  Why don't we see how these meet and confers
10    go, and if there's some urgency, you can get ahold of my
11    clerk, and if there's not an urgency, we'll look for a
12    date, I don't know, three or four weeks out.  Does that
13    make sense?
14              MR. FONTI:  That makes sense.  Maybe the week of
15    May 10th or May 17th, whatever, sounds right to me.  Thank
16    you.
17              MR. KORPUS:  Your Honor, I will not be available
18    the week of May 17th until Friday, unfortunately, but any
19    other time.
20              THE COURT:  All right.  Well --
21              MR. KORPUS:  And I'm not suggesting we should
22    have it on Friday at 4:15 again.
23              MR. FONTI:  We appreciate that, Your Honor, for
24    moving it from Wednesday to accommodate the affidavit and
25    all that.  So thank you.
```

1             THE COURT:  Well, I could do it on Wednesday,

2    May 12 if that works for people.  I'm available any time

3    before 2:00.

4             MR. FONTI:  That works for us.

5             MR. KORPUS:  I have a hearing in the morning,

6    unfortunately.  I'm sorry, did you say before 12:00, Your

7    Honor?

8             THE COURT:  Before -- well, before 1:00.

9             I could do it most of the afternoon on the 11th,

10   or I could do it here and there on the 13th.

11            MR. FONTI:  Sheron, any of those times work, so

12   why don't you pick.

13            MR. KORPUS:  Yes, I'm just looking at the 11th.

14            The 11th looks fine, Your Honor.  Thank you.

15            THE COURT:  I'm sorry.  That is a good time?

16            MR. KORPUS:  The 11th is fine.  Anytime on the

17   11th is fine.

18            THE COURT:  Okay.  Why don't we say 2:00 p.m. on

19   the 11th.

20            MR. FONTI:  Thank you, Your Honor.

21            THE COURT:  Great.

22            All right, good luck.  Talk with you soon.

23            MR. FONTI:  Thank you, Your Honor.

24            MS. RENSHAW:  Thank you, Your Honor.  Have a

25   good weekend.

1                    MR. FONTI:  Take care.  Have a good weekend.

2     Bye.

3                    (Adjournment:  5:31 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:17-cv-00558(SRU)

Ontario Teachers' Pension Plan Board, et al v. Teva
Pharmaceutical Industries Ltd., et al

       I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

April 21, 2021

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
sharon_masse@ctd.uscourts.gov