## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | No. 3:18-cv-1681 (SRU) |
| | No. 3:18-cv-1721 (SRU) |
| | No. 3:18-cv-1956 (SRU) |
| | No. 3:19-cv-175 (SRU) |
| | No. 3:19-cv-192 (SRU) |
| | No. 3:19-cv-449 (SRU) |
| | No. 3:19-cv-513 (SRU) |
| | No. 3:19-cv-543 (SRU) |
| | No. 3:19-cv-603 (SRU) |
| | No. 3:19-cv-655 (SRU) |
| | No. 3:19-cv-656 (SRU) |
| | No. 3:19-cv-657 (SRU) |
| | No. 3:19-cv-923 (SRU) |
| | No. 3:19-cv-1167 (SRU) |
| | No. 3:19-cv-1173 (SRU) |
| | No. 3:20-cv-83 (SRU) |
| | No. 3:20-cv-588 (SRU) |
| | No. 3:20-cv-683 (SRU) |
| | No. 3:20-cv-1630 (SRU) |
| | No. 3:20-cv-1635 (SRU) |
| | May 24, 2021 |
| | Oral Argument Requested |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS ON PLEADING AND OTHER GROUNDS

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................ 4

ARGUMENT .................................................................................................................... 6

I.  SUBSTANTIVE ALLEGATIONS BASED ON OR COPIED FROM THE
    PLEADINGS IN THE *ONTARIO* AND STATE ATTORNEYS  GENERAL
    ACTIONS ARE IMMATERIAL AS A MATTER OF LAW ............................................ 7

II. THE DIRECT ACTION PLAINTIFFS' CLAIMS SUFFER FROM ONE OR
    MORE SUBSTANTIVE DEFECTS MANDATING THEIR DISMISSAL .................... 13

    A.  All Claims Based on Non-Disclosure of Subpoenas Must Be Dismissed ........... 13

    B.  The Direct Action Complaints Fail to State Plausible Claims as to
        Purchases of Teva Securities Made After August 3, 2017 ................................... 14

        1.  As a Matter Of Law, Any Losses on Purchases Made After August
            3, 2017 Cannot Have Been Caused by the Alleged Fraud ....................... 15

        2.  Plaintiffs Cannot Plausibly Plead the Elements of Materiality or
            Reasonable Reliance With Respect to Purchases After August 3,
            2017 ......................................................................................................... 17

        3.  Plaintiffs' Claims Based on Purchases of Teva Securities After
            August 3, 2017 Must Be Dismissed for Lack of Standing ...................... 19

    C.  The Direct Actions Fail to Plead Plausible Claims Based on Alleged
        Misrepresentations or Omissions Concerning Price Increases With
        Respect to Trades of Teva Securities Prior to October 29, 2015 ......................... 21

    D.  Because They Fail to Adequately Allege Purchases of Teva Securities, the
        *Clal*, *Fir Tree*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot*
        Complaints Must Be Dismissed in Their Entireties for Lack of Standing
        and Causation .................................................................................................... 23

    E.  Certain of the Direct Action Plaintiffs' Claims Under the Federal
        Securities Laws Must Be Dismissed in Whole or in Part ................................... 26

        1.  Certain Claims By Foreign Plaintiffs Are Barred Under *Morrison*
            Because They Fail to Adequately Plead Domestic Transactions .............. 26

2.      Pleading Deficiencies in The *Pacific* and *Highfields* Complaints
        Warrant Dismissal of Certain Exchange Act Claims.................................. 29

        a.      The *Pacific* Complaint Fails to State Claims Under
                Sections 10(b) and 20(a) With Respect to Teva's 2020
                Notes ....................................................................................... 29

        b.      The *Highfields* Complaint Fails to State a Section 18 Claim ....... 30

3.      The *Fir Tree*, *Harel*, and *Phoenix* Complaints Fail to State
        Plausible Claims Under Section 12(a)(2) of the Securities Act............... 32

CONCLUSION...................................................................................................... 33

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)......................................................................26, 27, 28, 29

*Abuhamdan v. Blyth*,
    9 F. Supp. 3d 175 (D. Conn. 2014)...................................................................15, 16

*In re Adelphia Comm's Secs. and Deriv. Litig.*,
    03-MDL-1529, 2010 WL 3528872 (S.D.N.Y. Aug. 30, 2010) ..............................17

*In re Am. Realty Cap. Props. Litig.*,
    15-mc-40, 2015 WL 6869337 (S.D.N.Y. Nov. 6, 2015) .......................................32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................... *passim*

*Ashland Inc. v. Morgan Stanley & Co.*,
    652 F.3d 333 (2d Cir. 2011).................................................................................25

*Banco Safra v. Samarco Mineracao*,
    __ F.App'x __, 2021 WL 825743 (2d Cir. Mar. 4, 2021) ................................28, 29

*In re Bank of America Secs., Deriv., and ERISA Litig.*,
    09-MD-2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) .................................25

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................19

*In re Bear Stearns Cos. Secs. Litig.*,
    995 F. Supp. 2d 291 (S.D.N.Y. 2014).................................................19, 30, 31, 32

*Born v. Quad/Graphics, Inc.*,
    19-cv-10376, 2021 WL 736839 (S.D.N.Y. Feb. 25, 2021) ..................................22

*Building and Const. Trades Council of Buffalo v. Downtown Development*,
    448 F.3d 138 (2d Cir. 2006)............................................................................19, 20

*Cartica Mgmt. v. Corpbanca*,
    50 F. Supp. 3d 477 (S.D.N.Y. 2014)....................................................................23

*In re Century Aluminum Co. Sec. Litig.*,
    749 F. Supp. 2d 964 (N.D. Cal. 2010) .................................................................32

*Chambers v. Time Warner*,
  282 F.3d 147 (2d Cir. 2002)...................................................................................27

*Cohen v. S.A.C. Trading*,
  711 F.3d 353 (2d Cir. 2013)......................................................................................6

*Fraiser v. Stanley Black & Decker*,
  109 F. Supp. 3d 498 (D. Conn. 2015)....................................................................19

*Francisco v. Abengoa*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020)..............................................................19, 20

*Fraser v. Fiduciary Trust Co. Int'l*,
  04-cv-6958, 2005 WL 6328596 (S.D.N.Y. June 23, 2005)....................................24

*Fulton Bank v. UBS Secs.*,
  10-cv-1093, 2011 WL 5386376 (E.D. Pa. Nov. 7, 2011) ......................................17

*Horizon Hematology-Oncology v. Blue Cross Blue Shield of So. Carolina*,
  3:07-cv-4157, 2008 WL 305347 (D.D.C. Jan. 28, 2008) .........................................8

*Jones v. Harris*,
  665 F. Supp. 2d 384 (S.D.N.Y. 2009).....................................................................23

*In re Lehman Bros. Secs. and ERISA Litig.*,
  10-cv-6637, 2013 WL 3989066 (S.D.N.Y. July 31, 2013)................................11, 12

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).....................................................................................29

*Long Miao v. Fanhua*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020).....................................................................12

*Luther v. Kia Motors America*,
  676 F. Supp. 2d 408 (W.D. Pa. 2009).....................................................................17

*Maine State Retirement Sys. v. Countrywide Fin. Corp.*,
  2:10-cv-0302, 2011 WL 4389689 (C.D. Cal. May 5, 2011).............................7, 9, 13

*In re Merrill Lynch Auction Rate Secs. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010)................................................................17, 18

*In re Millennial Media Secs. Litig.*,
  14-cv-7923, 2015 WL 3443918 (S.D.N.Y. May 29, 2015) .....................................11

*Monroe C'ty Employees' Retirement Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................16

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*,
    432 F. Supp. 3d 131 (D. Conn. Sept. 25, 2019)............................................................*passim*

*Pell v. Weinstein*,
    759 F. Supp. 1107 (M.D. Pa. 1991) ...........................................................................19

*In re Petrobras Secs. Litig.*,
    150 F. Supp. 3d 337 (S.D.N.Y. 2015)........................................................................28

*In re Petrobras Secs Litig.*,
    152 F. Supp. 3d 186 (S.D.N.Y. 2016)..................................................................32, 33

*In re Petrobras Secs. Litig.*,
    862 F.3d 250 (2d Cir. 2017)...............................................................................26, 32

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) .........................................................................7

*In re Satyam Computer Serv's Secs. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013) .......................................................................28

*Schuler v. NIVS Intellimedia Tech. Grp.*,
    11-cv-2484, 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013)....................................17, 25

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010) .......................................................................28

*Special Situations Fund III v. Deloitte Touche Tohmatsu*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014)...................................................................30, 31

*Stein v. Tangoe*,
    3:13-cv-00286, 2014 WL 12767210 (D. Conn. Sept. 30, 2014) .................................7

*Stepak v. Aetna Life & Cas.*,
    90-cv-00886, 1994 WL 858045 (D. Conn. Aug. 29, 1994)................................18, 19

*Tannenbaum v. Walco Nat'l Corp.*,
    83-cv-6815, 1984 WL 2374 (S.D.N.Y. Jan. 27, 1984) .............................................24

*Teamsters Local 455 Freight Div. Pension Fund v. Dynex Cap.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................................7

*In re Teva Secs. Litig.*,
    __ F. Supp. 3d __, 2021 WL 231130 (D. Conn. Jan. 22, 2021) .....................*passim*

*In re VNB Realty v. Bank of American Corp.*,
    11-cv-6805, 2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013) .................................7, 12

*In re Xerox Corp. Secs. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013) ..................................................................................15

*Yi Xiang v. Inovalon Holdings*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ........................................................................................32

Defendants in the above-captioned matter respectfully submit this memorandum of law in support of their motion pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), to dismiss with prejudice the Direct Actions[1] to the extent stated below. Additional bases for dismissing specific causes of action, as well as claims against specific defendants, are addressed in the two accompanying memoranda, to which defendants respectfully address the Court's attention.

## PRELIMINARY STATEMENT

Having opted out of the *Ontario* class action, plaintiffs in these Direct Actions have nevertheless chosen to pursue their claims via complaints that are patterned on – and copy many of their substantive allegations directly from – the pleadings in *Ontario*, no doubt in order to position themselves, with minimal effort, to benefit from any favorable rulings handed down by the Court in that action. Unsurprisingly, the Direct Action complaints suffer from many of the same deficiencies as did the class pleadings, including the amended consolidated class action

---

[1] The term "Direct Actions" refers to the twenty individual actions that were consolidated with the *Ontario* Action pursuant to this Court's Order Regarding Pre-Trial Consolidation of Related Actions, entered April 28, 2020 (ECF 352), and as further memorialized in this Court's Order, entered January 22, 2021 (ECF 689). These actions are: (1) *Nordea Investment Mgmt. v. Teva Pharm. Indus., et al.*, No. 3:18-cv-1681 ("*Nordea*"); (2) *Revenue, et al. v. Teva Pharm. Indus. et al.*, No. 3:18-cv-1721 ("*Alaska*"); (3) *Pacific Funds Series Tr., et al. v. Teva Pharm. Indus., et al.*, No. 3:18-cv-1956 ("*Pacific*"); (4) *Public School Teachers Pension and Ret. Sys. of Chicago v. Teva Pharm. Indus., et al.*, No. 3:19-cv-175 ("*Chicago*"); (5) *Schwab Capital Tr., et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-192 ("*Schwab*"); (6) *Phoenix Ins. Co., et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-449 ("*Phoenix*"); (7) *Mivtachim The Workers Social Ins. Fund, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-513 ("*Mivtachim*"); (8) *Clal Ins. Co., et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-543 ("*Clal*"); (9) *Highfields Capital I LP, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-603 ("*Highfields*"); (10) *Migdal Ins. Co., et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-655 ("*Migdal Ins.*"); (12) *Harel Pension and Provident, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-656 ("*Harel*"); (12) *Oregon v. Teva Pharm. Indus., et al.*, No. 3:19-cv-657 ("*Oregon*"); (13) *Migdal Mut. Funds, v. Teva Pharm. Indus., et al.*, No. 3:19-cv-923 ("*Migdal Mut.*"); (14) *Psagot Mut. Funds, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-1167 ("*Psagot*"); (15) *Stichting PGGM Depositary, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-1173 ("*Stichting*"); (16) *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus., et al.*, No. 3:20-cv-83 ("*INKA*"); (17) *Boeing Co. Emp. Ret. Plans Master Tr., et al. v. Teva Pharm. Indus., et al.*, No. 3:20-cv-588 ("*Boeing*"); (18) *Fir Tree Value Master Fund, et al. v. Teva Pharm. Indus., et al.*, No. 3:20-cv-683 ("*Fir Tree*"); (19) *Franklin Mut. Series Funds, et al. v. Teva Pharm. Indus., et al.*, No. 3:20-cv-1630 ("*Franklin*"); (20) *BH Invs. Funds, et al. v. Teva Pharm. Indus., et al.*, No. 3:20-cv-1635 ("*BH*"). *OZ ELS Master Fund, Ltd., et al. v. Teva Pharm. Indus., et al.*, 3:17-cv-01314 (D. Conn.) is excluded from the motion to dismiss and this memorandum of law, in accordance with the Joint Motion to Stay Action which was filed in that docket on February 19, 2020 and granted on February 21, 2020. *Id.* at ECF 60-61.

complaint (ECF 226) ("*Ontario* ACAC"), which defendants raised in their motions to dismiss the *Ontario* ACAC.  (*See* ECF 238, 239, 240, 254, 255, 256.)  Insofar as the Court rejected the majority of those arguments in its disposition of that motion (*see Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 171 (D. Conn. Sept. 25, 2019)), defendants do not repeat those arguments here, but instead expressly incorporate them by reference to preserve them for appeal.

Nevertheless, though the Direct Action complaints are highly derivative of the *Ontario* pleadings, they are not identical.  Plaintiffs assert additional causes of action against additional individual defendants based on additional theories of liability, all of which fail to state plausible claims for relief for the reasons set forth in the accompanying memoranda of law.[2]  Yet even where they remain closest to the *Ontario* source material, as detailed below, the Direct Action complaints suffer from numerous defects which mandate the dismissal of certain claims in whole or in part.  These deficiencies are the focus of this memorandum.

As a threshold matter, a significant portion of the substantive allegations in these complaints are not entitled to the presumption of truth usually accorded to pleadings on a motion to dismiss.  This is so because plaintiffs and their counsel have failed to comply with their non-delegable obligation under Rule 11 to conduct a reasonable, independent investigation of the facts alleged therein.  Plaintiffs lift allegations wholesale from lawsuits filed by a group of State Attorneys General and copy verbatim entire paragraphs from the *Ontario* pleadings (as well as from other Direct Action complaints purportedly drafted by separate counsel for different plaintiffs).  This problem is endemic to the Direct Action pleadings, but two instances are

---

[2] *See* Mem. L. in Supp. of Defs.' Mot. to Dismiss State And Common Law Claims; Mem. L. in Supp. of Defs.' Mot. to Dismiss New Claims and Claims Against New Defs.

particularly egregious.  Plaintiffs recycle "confidential witness" allegations based on four unnamed former Teva employees from the *Ontario* pleadings without giving any indication that their counsel made any effort to contact or interview those witnesses or to otherwise independently corroborate their accuracy.  Similarly, though the gravamen of these actions is that Teva derived "inflated profits" from its alleged pricing misconduct, plaintiffs rely uncritically on the supposed expert pricing analysis purportedly conducted in *Ontario*, copying the precise figures alleged therein, without having undertaken any independent analysis to back them up.  These failures are rendered all the more serious given that lead counsel in *Ontario* has now disclaimed any intention to rely on those confidential witness statements or the purported expert profit analysis at trial.  Without these allegations, the Direct Actions cannot plausibly plead essential elements of their claims.  These allegations should be stricken as immaterial under Rule 12(f), but in any event they cannot be credited on a motion to dismiss.

Moreover, some or all of the claims in the Direct Action complaints must be dismissed, in whole or in part, for numerous other independent reasons.  For instance, though plaintiffs allege that defendants misrepresented and concealed that Teva's profits and revenues were being driven by an alleged "price-hike strategy" and "collusion," their pleadings show – and the Court previously held in its ruling on the motion to dismiss the *Ontario* ACAC – that the "concealed truth" about this purported misconduct was revealed to the market by August 3, 2017.  As such, plaintiffs cannot establish the critical elements of reliance or causation as to any trades after that date.  And though plaintiffs allege that defendants misleadingly denied that Teva was increasing prices on generic products during the relevant period, the first such denial actually alleged in the complaints was on October 29, 2015, prior to which time Teva had repeatedly and explicitly disclosed that it was pursuing a strategy of raising prices on its generic drugs each quarter for the

foreseeable future.  As such, plaintiffs cannot state plausible claims with respect to any purchases made before that date.

Numerous other deficiencies mandate the dismissal of specific claims by specific plaintiffs as to specific securities.  For example, despite the Court's admonition to the Direct Action plaintiffs that they designate operative complaints conforming to its decision in the *Ontario* Action which dismissed claims based on Teva's purported "non-disclosure" of subpoenas, over half of the Direct Action complaints continue to assert just such a claim. Moreover, in certain Direct Actions brought by foreign plaintiffs, the complaints fail to plead facts sufficient to show that these plaintiffs' purported purchases of preferred shares, notes, and ordinary shares were effected through "domestic transactions" and are thus even subject to the United States securities laws.  In others, plaintiffs fail to plead essential elements of their claims, such as actual reliance (for claims under Section 18 of the Exchange Act) or direct purchases pursuant to a public offering (for claims under Section 12(a)(2) of the Securities Act).  A handful of Direct Action complaints fail even to concretely allege whether plaintiffs were purchasers or sellers of Teva securities during the relevant period.

For these and other reasons detailed below, substantial portions of the Direct Action complaints must be dismissed.

## BACKGROUND

Aside from some "slight differences among [their] complaints," *In re Teva Secs. Litig.*, __ F. Supp. 3d __, 2021 WL 231130, at *2 n.5 (D. Conn. Jan. 22, 2021), the Direct Action plaintiffs "claim that, beginning in 2013, Teva adopted a concerted and secret strategy of raising prices on certain drugs in its generic drug portfolio," sometimes "in tandem with competitors in the generic drug market," *id.* at *2.  It is alleged that Teva and its officers were motivated to engage in this purported "price-hike strategy" and collusive conduct in order to boost the share

price of its American Depositary Shares ("ADS"), which could then be used as "currency" to carry out the acquisition of Actavis, the generic drug division of Allergan plc.  (*See, e.g.*, *Boeing* compl., ¶ 276; *Clal* compl., ¶ 432; *Harel* compl., ¶ 764; *Schwab* compl., ¶ 279.)  "To aid in that acquisition, Teva made a stock offering in December 2015 and a notes offering in July 2016."  *In re Teva*, 2021 WL 231130, at *2.  Not long after, plaintiffs allege, "Teva's house of cards began to come crashing down…[as] investigations into the generics industry picked up pace and pressure grew on Teva to explain its financial success."  *Id.* at *3.

Plaintiffs allege that "[o]n August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of…subpoenas" from the Department of Justice and the Connecticut Attorney General.  (*Fir Tree* compl., ¶ 140; *see also*, *e.g.*, *Highfields* compl., ¶ 157; *Stichting* compl., ¶ 322.)  In mid-December 2016, a number of State Attorneys General "led by the Connecticut AG…filed [a] lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate markets for and fix the prices of generic drugs."  (*Chicago* compl., ¶ 321; *see also*, *e.g.*, *INKA* compl., ¶ 369; *Phoenix* compl., ¶ 865.)  On August 3, 2017, Teva filed a press release "announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and accelerated price erosion," as well as "a net earnings loss primarily due to a $6.1 billion goodwill impairment charge…[thus] revealing the true value of the combined [Teva and Actavis] generic[s] business" and that the company was now "facing significant and permanent generic pricing pressure."  (*Alaska* compl., ¶¶ 324-26; *see also*, *e.g.*, *Harel* compl., ¶¶ 855-57; *Oregon* compl., ¶¶ 336-38.)

"[P]laintiffs allege that [this] sequence of events between early August 2016 and early August 2017 constructively disclosed the frauds (the price-hike strategy and the price-fixing

collusion) that [defendants] had been concealing." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 174 (D. Conn. Sept. 25, 2019).[3]  "On May 10, 2019, the [State AGs] filed a 524-page antitrust complaint regarding the drug industry…[containing additional] allegations with respect to Teva's alleged collusive conduct."  *In re Teva*, 2021 WL 231130, at *3.  Plaintiffs contend that Teva's securities prices declined following each of these purported corrective disclosures and events.  (*See, e.g.*, *Boeing* compl., ¶¶ 314-49; *Nordea* compl., ¶¶ 312-59; *Pacific* compl., ¶¶ 360-401.)

Based on these allegations, the Direct Action plaintiffs bring an assortment of claims under the Securities Exchange Act of 1934 ("Exchange Act"), the Securities Act of 1933 ("Securities Act"), the Israeli Securities Law ("ISL"), the Pennsylvania Securities Act ("PSA"), and Pennsylvania common law.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter…to state a claim that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  While a court is required to credit well-pled factual allegations, that "tenet…is inapplicable to legal conclusions," "mere conclusory statements," and "[t]hreadbare recitals of the elements of a cause of action."  *Id.*  Where the well-pled facts are "merely consistent with a defendant's liability," Rule 8's minimal plausibility standard is not satisfied.  *Id.* (internal quotation marks omitted).

Further, claims that "sound in fraud are subject to the heightened pleading standards of [Rule] 9(b), which requires that averments of fraud be 'stated with particularity.'"  *Cohen v.*

---

[3] *See In re Teva*, 2021 WL 231130, at *2 n.5 ("I rely on the Second Amended Complaint in the [*Ontario*] class action for the general facts relevant to [the Direct Action] cases.  Indeed, the complaints in many of [these] actions copy verbatim large portions of that Second Amended Complaint.").

*S.A.C. Trading*, 711 F.3d 353, 359 (2d Cir. 2013).  "To satisfy this requirement the plaintiff must [not only] specify the statements that the plaintiff contends were fraudulent…[, but must also] explain why the statements were fraudulent."  *Stein v. Tangoe*, 3:13-cv-00286, 2014 WL 12767210, at *7 (D. Conn. Sept. 30, 2014) (internal quotation marks omitted).  Fraud claims brought under the federal securities laws are also subject to the PSLRA, which imposes a "stringent rule for inferences involving scienter…."  *Teamsters Local 455 Freight Div. Pension Fund v. Dynex Cap.*, 531 F.3d 190, 194 (2d Cir. 2008).

## I.  SUBSTANTIVE ALLEGATIONS BASED ON OR COPIED FROM THE PLEADINGS IN THE *ONTARIO* AND STATE ATTORNEYS GENERAL ACTIONS ARE IMMATERIAL AS A MATTER OF LAW

At oral argument on defendants' motion to dismiss the *Ontario* Class Action Complaint, the Court expressed concern that much of the substance of that pleading was improperly based on unproven allegations from the State Attorneys General ("State AGs") action in contravention of Rule 11.  (*See* ECF 218 at Tr. 25:1-5 ("[Y]ou're asking me to assume as true a fact alleged in someone else's lawsuit, and the problem I'm having with that is you don't have to go out on the line as having, under Rule 11, investigated that fact….").)  Under Rule 11, litigants and their counsel have a "non-delegable duty to make a reasonable inquiry into whether the factual contentions made in a complaint have evidentiary support."  *Maine State Retirement Sys. v. Countrywide Fin. Corp.*, 2:10-cv-0302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011); *see also In re VNB Realty v. Bank of American Corp.*, 11-cv-6805, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013) (same).  Absent independent investigation and verification by counsel, "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have…not [been resolved] are, as a matter of law, immaterial within the meaning of [Rule] 12(f)."  *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).

What was a point of concern for the Court in *Ontario* should be an even greater source of alarm here. Like the class's pleading, the Direct Action complaints source their allegations liberally from the State AGs action.[4] But that suspect, pleading-by-proxy tactic is compounded – literally – by the fact that the lion's share of the remaining substantive allegations in the Direct Actions are based on – and are frequently lifted verbatim from – the second amended consolidated class action complaint (ECF 310) ("*Ontario* SAC").[5] And the wholesale lifting does not end there. Even with respect to allegations that are not explicitly attributed to *Ontario* or the State AGs' pleadings, long passages of substantive allegations are duplicated, word-for-word, in Direct Action complaints filed (and ostensibly prepared) by separate counsel on behalf of separate clients, in what are essentially copies of copies.[6]

While allegations "in an existing complaint may serve as a useful starting point in preparing pleadings, substantially more is required to satisfy the requirements of Rule 11." *Horizon Hematology-Oncology v. Blue Cross Blue Shield of So. Carolina*, 3:07-cv-4157, 2008

---

[4] *See, e.g.*, *Alaska* compl., ¶¶ 83-84; *Boeing* compl., ¶¶ 7, 52-57, 61-63, 155, 168, 280, 282, 301; *BH* compl., ¶¶ 2, 6, 49, 50, 66, 92, 164, 243-48, 308, 328; *Chicago* compl., ¶¶ 131, 281, 283, 302, 303, 351; *Clal* compl., ¶¶ 473-74, 480-500, 503-06, 512-13; *Fir Tree* compl., ¶¶ 48-53, 57-59, 155, 168, 328, 330, 350; *Franklin* compl., ¶¶ 132-33; *Harel* compl., ¶¶ 14, 156-57, 160-65, 172-314, 455, 470-539; *Highfields* compl., ¶¶ 2, 6, 48, 49, 65, 99, 186, 289-95, 409; *INKA* compl., ¶¶ 88-89, 307, 310-12; *Migdal Ins.* compl., ¶¶ 473-74, 480-500, 503-06, 512-13; *Migdal Mut.* compl., ¶¶ 473-74, 480-500, 503-06, 512-13; *Mivtachim* compl., ¶¶ 473-74, 480-500, 503-06, 512-13; *Nordea* compl., ¶¶ 96-97; *Oregon* compl., ¶¶ 131, 281, 283, 302, 303, 351; *Pacific* compl., ¶¶ 90-91, 309, 312-14; *Phoenix* compl., ¶¶ 14, 167-72, 179-321, 462, 478-547; *Psagot* compl., ¶¶ 473-74, 480-500, 503-06, 512-13; *Schwab* compl., ¶¶ 89-90, 308, 311-13; *Stichting* compl., ¶¶ 89-90, 308, 311-13.

[5] *Compare, e.g.*, *Clal* compl., ¶¶ 68-178 (factual allegations) 428-79, 503-15 (scienter), *with Ontario* SAC ¶¶ 49-160 (factual allegations), 270-323, 326-37 (scienter); and *compare, e.g.*, *Boeing* compl., ¶¶ 171-215, 221-39, 243-74 (alleged misrepresentations and omissions), 311-49 (loss causation), *with Ontario* SAC, ¶¶ 167-211, 214-32, 234-67 (alleged misrepresentations and omissions), 338-76 (loss causation). *See also In re Teva*, 2021 WL 231130, at *2 n.5 ("[T]he complaints in many of [these] actions copy verbatim large portions of that Second Amended Complaint.").

[6] *Compare, e.g.*, *Chicago* compl., ¶¶ 52-127 (factual allegations), ¶¶ 134-79, 183-214, 221-49 (alleged misrepresentations and omissions), ¶¶ 313-14, 333-53 (loss causation), *with Nordea* compl., ¶¶ 61-137 (factual allegations), ¶¶ 143-51 (alleged misrepresentations and omissions), 312-13, 334-54 (loss causation), *and with INKA* compl., ¶¶ 54-136 (factual allegations), ¶¶ 143-53 (alleged misrepresentations and omissions), ¶¶ 358-59, 382-400 (loss causation).

WL 305347, at *2 n.4 (D.D.C. Jan. 28, 2008).  "Lifting allegations from other complaints does

not constitute reasonable investigation as required by [Rule 11]."  *Maine State*, 2011 WL

4389689, at *20.  Rather, to satisfy the Rule, plaintiffs intending to rely on allegations derived

from other complaints must, at a minimum, "speak[] directly to the sources upon which the other

complaints rely…or contact[] the attorneys whose allegations they copied to discuss the basis for

their claims."  *Id.*  Yet the proponents of the Direct Action complaints fail to offer any

assurances that either step was taken.  This deficiency is particularly significant here because it

directly undermines the allegations supporting two essential elements of plaintiffs' claims.

The central claim in the Direct Actions,[7] as in *Ontario*,[8] is that Teva realized so-called

"inflated profits" through allegedly arbitrary – and allegedly collusive – price hikes, yet failed to

disclose the true source of those profits and revenues its public filings and other public

statements by its executives.  But whereas the *Ontario* pleadings claim to have ascertained these

"inflated profit" figures by means of expert analysis commissioned by class counsel (*see Ontario*

ACAC, ¶¶ 348-353; SAC, ¶¶ 387-92), the Direct Actions make no such claim.  Rather, the

majority of those complaints simply repeat the same figures from *Ontario* and describe the

methodology employed by the *Ontario* plaintiffs' expert to derive them.[9]  Significantly, the

---

[7] *See, e.g., Chicago* compl., ¶ 1 ("In reality, however Teva's reported financial growth during the Relevant Period was the result of Defendants' strategy to raise systematically generic drug prices across a large portion of Teva's generic drug portfolio (the 'Price-Hike Strategy')"); *Clal* compl., ¶ 5 ("While Defendants loudly touted Teva's robust revenue growth, they went to great lengths to conceal the true driver of Teva's growth—the illegal Price-Hike Strategy."); *Highfields* compl., ¶ 1 ("This is an action to recover significant investment losses suffered as a result of…Teva's performance [] being driven by an illegal practice of colluding with other drug manufacturers to systematically increase the price of scores of generic drugs (the 'Price-Hike Strategy')").

[8] *See Ontario*, 432 F. Supp. 3d at 143 ("Plaintiffs basically allege that the defendants implemented a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio, which the plaintiffs refer to as the Price-Hike Strategy") (internal quotation marks omitted).

[9] *See Boeing* compl., ¶¶ 48, 353; *BH* compl., ¶¶ 4, 10, 65, 66, 76, 128, 131, 135, 138, 141; *Clal* compl., ¶¶ 615-20; *Fir Tree* compl., ¶¶ 44, 408; *Harel* compl., ¶¶ 886-91; *Highfields* compl., ¶¶ 4, 10, 64, 65, 76, 141, 144, 148, 151, 154; *Migdal Ins.* compl., ¶¶ 615-20; *Migdal Mut.* compl., ¶¶ 615-20; *Mivtachim* compl., ¶¶ 615-20; *Phoenix* compl., ¶¶ 908-13; *Psagot* compl., ¶¶ 615-20.

proponents of these complaints make no pretense of having conducted any independent analysis,

or to have taken any steps at all to corroborate these revenue and profit figures (even in cases

demanding additional scrutiny due to inconsistencies between pleadings[10]).  Plaintiffs' uncritical

adoption of the "inflated profits" analysis from *Ontario* is all the more problematic given that

class counsel has indicated it will not call on the expert who performed that analysis to testify at

trial and refused to provide any discovery associated with that alleged analysis.  (*See* ECF 218 at

Tr.  29:5-7.)

Second, in its ruling on the *Ontario* ACAC, this Court held that scienter was sufficiently

pled against defendants Eyal Desheh, Deborah Griffin, Sigurdur Olafsson, and Erez Vigodman

based on allegations that they had access to information contradicting their public statements

about the impact of Teva's purported pricing misconduct on the company's profits and revenues.

*See Ontario*, 432 F. Supp. 3d at 171 ("The complaint contains detailed allegations regarding

what [these] defendants knew on a daily, weekly, and monthly basis about the pricing and

competitive environment, while at the same time making public statements that painted a

different picture.") (internal quotation marks omitted).  Specifically, the Court credited

allegations that these specific defendants (a) personally directed or approved the alleged price

hikes, and (b) received and/or participated in the generation of various documents (*viz.*, "long

---

[10] For example, on numerous occasions the complaint in *BH* alleges that Teva made a ***different*** number of "price hikes" in a given period than is alleged in *Ontario*, yet nevertheless attributes the exact ***same*** "inflated profit" to them, which is obviously nonsensical.  (*Compare, e.g., BH* compl., ¶¶ 83 ("[Teva] implemented another **twenty-four** price increases on July 1 and August 28, 2014…[which] would generate as much as $50 million in inflated profit."), 93 ("Teva implemented another **sixteen** price increases in January 2015….  By the end of the first quarter of 2015, the sixteen price increases…would generate at least $48 million in inflated profit…."), *with Ontario* SAC, ¶¶ 67 ("[Teva] implemented another **20** price increases on July 1 and August 28, 2014…[which] would generate as much as $50 million in Inflated Profit."), 85 ("Teva implemented another **14** price increases in January 2015….  By the end of the first quarter of 2015, the 14 price increases…would generate as much as $48 million in Inflated Profit….") (emphasis added).)

range Work Plans," "weekly or daily Scorecards," and "Latest Best Estimates"[11]) that tracked or projected generic revenues and profits.  *See id.* ("Vigodman was aware of, and approved, work plans that included 71 price increases"; "Olafsson was aware of, and approved, work plans [indicating] that Teva's pricing environment had drastically declined"; "Griffin and Olafsson…circulated reports regarding the price increases and the resulting profits, which were sent to Desheh and Vigodman for approval").  These allegations, in turn, were based – in their entirety – on information purportedly obtained from four unnamed former Teva employees. (*See, e.g.*, *Ontario* ACAC, ¶¶ 36-38, 54, 56, 63, 79, 91, 98, 118, 129, 137, 241-45, 259-63, 304.)

Here, the majority of the Direct Action complaints explicitly incorporate or summarize these same "former employees" allegations in support of their background and scienter allegations, yet in none of those complaints do plaintiffs claim that their counsel independently spoke with those former employees[12] to confirm whether their statements were accurately portrayed in *Ontario*.  Yet this is precisely what is required by Rule 11.  *See, e.g.*, *In re Millennial Media Secs. Litig.*, 14-cv-7923, 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015) (under Rule 11, before filing a complaint, counsel must "attempt to confirm with the witness the statements that counsel proposes to attribute to him to assure that the Complaint is presenting these statements in fair context"); *In re Lehman Bros. Secs. and ERISA Litig.*, 10-cv-6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (same).

---

[11] *See, e.g.*, *Ontario* ACAC, ¶¶ 98, 260-62.

[12] Thirteen of the Direct Action complaints explicitly rely on these "former employee" allegations from *Ontario* without alleging any attempt to contact those witnesses.  (*See Boeing* compl., ¶ 60; *BH* compl., ¶ 249; *Chicago* compl., ¶ 282; *Clal* compl., ¶ 54; *Fir Tree* compl., ¶ 56; *Harel* compl., ¶ 763; *Highfields* compl., ¶ 296; *Migdal Ins.* compl., ¶ 54; *Migdal Mut.* compl., ¶ 54; *Mivtachim* compl., ¶ 54; *Oregon* compl., ¶ 282; *Phoenix* compl., ¶ 785; *Psagot* compl., ¶ 54.)  Three complaints allege that counsel contacted two former Teva employees, who may or may not correspond to two of the four former employees referenced in the *Ontario* pleadings.  (*See Alaska* compl., ¶¶ 72-75, 256 n.14; *Franklin* compl., ¶¶ 121-24, 268 n.14; *Nordea* compl., ¶¶ 85-88, 269 n.14.)

The Direct Action plaintiffs' failure to conduct this minimal diligence is particularly egregious given two subsequent developments in *Ontario*.  First, class counsel has now disavowed any intention of calling any of the former employees referenced in their pleadings as witnesses at trial.  (*See* ECF 423 at Tr. 29:1-3, 31:13-15.)  Moreover, the witness referred to as "FE-2" in the aforementioned fourteen Direct Action complaints (and ostensibly as FE-1 in the *Alaska*, *Franklin*, and *Nordea* complaints) has recently submitted a sworn declaration disavowing material aspects of his purported statements that were substantively mischaracterized in the *Ontario* pleadings.  (*See* Ex. A.)

Courts in this Circuit have been particularly assiduous in enforcing Rule 11's independent investigation requirement where, as here, plaintiffs in one action seek to rely on "confidential witness statements originally recounted in a separate complaint filed by separate counsel in a separate action."  *In re Lehman*, 2013 WL 3989066, at *3.  And where, as here, there is "no indication that plaintiff's counsel…tried to locate or contact a single one of the sources on which they rely, or otherwise to corroborate [their] secondhand accounts," courts have repeatedly refused to grant them any weight on a motion to dismiss.  *Long Miao v. Fanhua*, 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020); *see also In re VNB Realty v. Bank of American Corp.*, 11-cv-6805, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013) ("By drawing its factual allegations from the statements of confidential witnesses in [a separate] complaint, [plaintiff] is attempting to rely on the substance of those allegations….  Such reliance is impermissible, particularly in light of counsel's personal, non-delegable responsibility under Rule 11….") (internal quotation marks omitted); *In re Lehman*, 2013 WL 3989066, at *4 ("The unfairness of permitting a plaintiff in a separate action to rely blindly at the pleading stage…on confidential witness statements from another case to meet its pleading burden is patent.").

In sum, the Rule 11 issue that gave the Court pause in *Ontario* is exponentially exacerbated here.  If the Court was previously concerned that "for $400 anybody can allege anything" simply by citing allegations from the State AGs complaint (ECF 218 at Tr. 25:15), the question now is whether for $8,000, twenty "anybodies" can allege the <u>same</u> thing by recycling entire passages from the State AGs and *Ontario* pleadings, as well as one another's complaints, all without making any apparent effort to independently verify their accuracy.

Respectfully, the answer is no.  In light of prior proceedings in the *Ontario* action (from which these consolidated Direct Actions derive), plaintiffs were well-aware that the Court intended to hold parties to their obligations under Rule 11.  Having chosen to flout the Rule, they should bear the consequences.  Because the core, substantive allegations in the Direct Action complaints are based on uncorroborated allegations and witness statements drawn from pleadings in unresolved cases, they are immaterial and should be stricken, but in any event they cannot be credited in opposition to defendants' motion to dismiss.  *See, e.g.*, *Maine State*, 2011 WL 4389689, at *21 (striking allegations copied from other complaints without independent investigation required by Rule 11); *Merrill Lynch Research Rpts. Secs. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking paragraphs referring to or relying on unadjudicated complaints brought by the SEC and in related class actions).

## II.    THE DIRECT ACTION PLAINTIFFS' CLAIMS SUFFER FROM ONE OR MORE SUBSTANTIVE DEFECTS MANDATING THEIR DISMISSAL

### A.    All Claims Based on Non-Disclosure of Subpoenas Must Be Dismissed

In its decision on defendants' motion to dismiss the *Ontario* ACAC, the Court agreed that Teva was "not under a duty to disclose the subpoenas [it received from the DOJ and the Connecticut Attorney General] and, therefore, any claims arising from their alleged concealment [must] fail."  *Ontario*, 432 F. Supp. 3d at 167.  Further, as noted in its consolidation order at ECF

352, ¶ 12, the Court instructed the Direct Action plaintiffs to designate "operative" pleadings which were to conform with the Court's motion to dismiss rulings in *Ontario*.

Notwithstanding this clear directive, over half of the designated Direct Action complaints continue to assert Teva's purported "non-disclosure"[13] of subpoenas as a basis for liability.  (*See Alaska* compl., ¶¶ 113, 128; *Chicago* compl., ¶¶ 215-16; *Clal* compl., ¶¶ 379-80; *Harel* compl., ¶¶ 666-68, 943; *Migdal Ins.* compl., ¶¶ 379-80; *Migdal Mut.* compl., ¶¶ 379-80; *Mivtachim* compl., ¶¶ 379-80; *Nordea* compl., ¶¶ 126, 141; *Oregon* compl., ¶¶ 215-16; *Phoenix* compl., ¶¶ 681-83, 975; *Psagot* compl., ¶¶ 379-80.)  Because these complaints plead nothing substantively different from what was alleged in class action complaint (*compare, e.g.*, *Harel* compl., ¶¶ 666-68, 943, *with Ontario* ACAC, ¶¶ 238-39, 395), these "non-disclosure" claims fail for the same reasons that warranted their dismissal in *Ontario*.

### B.    The Direct Action Complaints Fail to State Plausible Claims as to Purchases of Teva Securities Made After August 3, 2017

In their opposition to defendants' motion to dismiss the *Ontario* ACAC for failure to adequately plead loss causation, "[class] plaintiffs [argued] that the sequence of events between early August 2016 and early August 2017 [*viz.*, purported corrective disclosures and events] constructively disclosed the frauds (the price-hike strategy and the price-fixing collusion) that Teva had been concealing."  *Ontario*, 432 F. Supp. 3d at 174.  The Court agreed, holding that:

> [the State AG] lawsuit and bad press, in revealing that Teva conspired with its competitors, also necessarily revealed that Teva was increasing the prices of its generic drugs.  **Investors and analysts, then, were on notice that Teva was internally raising its prices, in lockstep with its competitors**.

*Id.* (emphasis added).  Based on this ruling, the Court found that the "[class] plaintiffs' allegations regarding the investigations, the bad press, and the various departures of executives,

---

[13] As the Court correctly observed, Teva did in fact disclose those subpoenas in its next quarterly filing, "a mere two months after their receipt."  *Ontario*, 432 F. Supp. 3d at 168.

and the resultant dip in stock prices" that culminated with the filing of Teva's Form 6-K on August 3, 2017 were sufficient at the pleading stage to "adequately allege[] loss causation." *Id.*

Because the Direct Action plaintiffs allege the very same "sequence of events" in their complaints, defendants recognize that the Court's holding in *Ontario* (although they respectfully disagree with it) applies here with equal force. But by the same token, that holding requires the dismissal of the Direct Action plaintiffs' claims here to the extent they are based on purchases of Teva securities made on or after August 3, 2017. This is so for three reasons.

### 1. As a Matter Of Law, Any Losses on Purchases Made After August 3, 2017 Cannot Have Been Caused by the Alleged Fraud

"To establish loss causation, a plaintiff must allege that… [defendant's] misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Xerox Corp. Secs. Litig.*, 935 F. Supp. 2d 448, 493 (D. Conn. 2013) (internal quotation marks omitted). Whether the relevant fact is revealed by means of a corrective disclosure or through the materialization of a concealed risk "does not alter the basic loss-causation calculus." *Ontario*, 432 F. Supp. 3d at 173. In either case, the "disclosed fact must be new to the market…." *Xerox*, 935 F. Supp. 2d at 493 (internal quotation marks omitted). Thus, loss causation cannot be established based on a disclosure of facts already known to the market, *see id.*, or on the materialization of an already-known risk, *see Abuhamdan v. Blyth*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014).

Here, the Direct Action complaints[14] identify four additional putative corrective disclosures or events after August 3, 2017, but none of them provides a plausible basis for establishing loss causation. For example, plaintiffs cite Teva's November 2, 2017 Form 6-K –

---

[14] Given that all Direct Action complaints allege the same four disclosures and events, for brevity's sake citations in this subsection will for the most part be limited to the *Chicago* complaint.

which announced a decline in U.S. generics quarterly revenues for Q3 2017 as compared to the prior year due to pricing declines and increased competition (*Chicago* compl., ¶ 343) – and its February 8, 2018 Form 8-K – which announced a "staggering" goodwill impairment (*id.*, ¶ 346). Yet plaintiffs fail to explain how these filings disclosed anything new about the purported fraud or its impact on Teva's financial condition that was not previously exposed by the August 3, 2017 Form 6-K, which (in plaintiffs' telling) not only disclosed that Teva "was facing significant and permanent pricing pressure[,]" (*Harel* compl., ¶ 857), but "reveal[ed] the true value of…[Teva's legacy and Actavis] combined U.S. generics business" (*Chicago* compl., ¶ 337).

Plaintiffs also cite a December 9, 2018 Washington Post article reporting that "the State AG investigation had expanded to at least 16 companies and 300 drugs" (*Chicago* compl., ¶ 349), and the filing of an amended State AGs complaint on May 10, 2019 which contained additional allegations of price-fixing against Teva (*see id.*, ¶ 351). But here again, plaintiffs fail to explain how the filing of this amended pleading constituted "the materialization of a *concealed* risk as opposed to a *disclosed* risk." *Abuhamdan*, 9 F. Supp. 3d at 209 (emphasis in original); *see also Monroe C'ty Employees' Retirement Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (loss causation not pled where "the drop in [defendant's] share price…likely represented the materialization of a known risk, rather than the disclosure of a concealed one"). Indeed, the risk that Teva was facing potentially substantial antitrust liability based on allegations of collusive pricing had "materialized" more than eighteen months earlier when the first State AGs complaint was filed in December 2016. (*See Chicago* compl., ¶ 321.)

For the foregoing reasons, because the Direct Action complaints fail to plead facts plausibly establishing loss causation after August 3, 2017, plaintiffs' claims under the Exchange Act, the ISL, the PSA, and Pennsylvania common law – all of which require the plaintiffs to

prove causation[15] – must be dismissed as to any purchases made after that date.  Plaintiffs'

claims under the Securities Act also fail for the same reason.  Just as the affirmative defense of

"negative causation" is established where a plaintiff sells its securities <u>prior</u> to a corrective

disclosure, it must likewise be established where, as here, a plaintiff buys <u>after</u> the allegedly

concealed fact is revealed to the market.  In both circumstances, because the plaintiff's "losses

are not attributable to information that came to light in the corrective disclosures," the defendants

can "establish[] their negative causation defense."  *Schuler v. NIVS Intellimedia Tech. Grp.*, 11-

cv-2484, 2013 WL 944777, at \*10 (S.D.N.Y. Mar. 12, 2013).

### 2. Plaintiffs Cannot Plausibly Plead the Elements of Materiality or <u>Reasonable Reliance With Respect to Purchases After August 3, 2017</u>

In each of their complaints, the Direct Action plaintiffs invoke the "fraud-on-the-market"

presumption to establish the element of reliance.[16]  This presumption "can be rebutted by any

showing that severs the link between the alleged misrepresentation and either the price [paid] by

the plaintiff, or his decision to trade at a fair market price."  *In re Merrill Lynch Auction Rate*

*Secs. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (cleaned up).  "Under the 'truth on the

market' doctrine, as this rebuttal is often called, a misrepresentation is immaterial if the

---

[15] *See In re Adelphia Comm's Secs. and Deriv. Litig.*, 03-MDL-1529, 2010 WL 3528872, at \*4 (S.D.N.Y. Aug. 30, 2010) (dismissing claims under Sections 10(b) and Section 18 of the Exchange Act for failure to adequately plead loss causation); *see also Fulton Bank v. UBS Secs.*, 10-cv-1093, 2011 WL 5386376, at \*7 (E.D. Pa. Nov. 7, 2011) (PSA claims require the same elements of proof as required under Rule 10b-5), \*15 ("The elements of common law fraud are almost identical to the elements of Rule 10b-5 and claims under the PSA, and courts typically evaluate them in the same way") (internal quotation marks omitted); *Luther v. Kia Motors America*, 676 F. Supp. 2d 408, 419 (W.D. Pa. 2009) (under Pennsylvania law, "[t]he plaintiff must…establish that [defendant's] negligent misrepresentations were the proximate cause of his injuries").  As previously interpreted by this Court, plaintiffs' ISL claims also necessarily require proof of loss causation.  *See In re Teva*, 2021 WL 231130, at \*27 ("Plaintiffs' federal securities law and Israeli securities law claims seem to [be], in every important respect, identical").

[16] *See Alaska* compl., ¶¶ 347-49; *Boeing* compl., ¶¶ 350-51; *BH* compl., ¶¶ 313-16; *Chicago* compl., ¶¶ 357-58; *Clal* compl., ¶¶ 569-70; *Fir Tree* compl., ¶¶ 405-06; *Franklin* compl., ¶¶ 353-55; *Harel* compl., ¶¶ 880-82; *Highfields* compl., ¶¶ 364-67; *INKA* compl., ¶¶ 401-02; *Migdal Ins.* compl., ¶¶ 569-70; *Migdal Mut.* compl., ¶¶ 569-70; *Mivtachim* compl., ¶¶ 569-70; *Nordea* compl., ¶¶ 360-62; *Oregon* compl., ¶¶ 357-58; *Pacific* compl., ¶¶ 402-03 ; *Phoenix* compl., ¶¶ 902-04; *Psagot* compl., ¶¶ 569-70; *Schwab* compl., ¶¶ 402-03; *Stichting* compl., ¶¶ 402-03.

information is already known to the market because the misrepresentation cannot then defraud the market." *Id.* (internal quotation marks omitted).

In the Direct Action complaints, plaintiffs challenge approximately a dozen public filings and statements made after August 3, 2017 that purportedly contain additional misrepresentations and omissions. (*See, e.g.*, *Harel* compl., ¶¶ 660, 663-64, 674, 716-18, 720-25.)[17]  In each case, the challenged statements are alleged to have been misleading or incomplete because they failed to disclose "that Teva [had] engaged in collusive and anti-competitive price fixing and market allocation schemes." (*Id.* at ¶ 665(i); *see also id.*, ¶¶ 719 ("Teva failed to disclose that its revenues and profits were impacted by the Price-Hike Strategy and illegal price-fixing and market allocation schemes"), 726 (same).)  But, as noted above, this is precisely the information that the Court determined had been disclosed to the market in early August 2017, when "investors and analysts" – *i.e.*, the market – learned that Teva had allegedly "conspired with its competitors…[and] was increasing the prices of its generic drugs." *Ontario*, 432 F. Supp. 3d at 174.

"[W]hen allegedly undisclosed material information has credibly reached the market, the market is presumed to have taken the information into account." *Stepak v. Aetna Life & Cas.*, 90-cv-00886, 1994 WL 858045, at *9 (D. Conn. Aug. 29, 1994).  That is precisely the situation alleged here.  Since "the allegedly undisclosed information was available to the market," the additional statements challenged by plaintiffs "cannot provide the basis for the…fraud-on-the-market [presumption]" and thus cannot support a reasonable inference of materiality or reliance.

---

[17] For brevity's sake, citations in this subsection will be limited to the *Harel* complaint because it alleges the most extensive list of purported misrepresentations and omissions of any of the Direct Actions.  While the *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* complaints also allege misrepresentations and omissions concerning a purported "Opioid Scheme," those allegations are addressed in the accompanying Mem. L. in Supp. of Mot. To Dismiss New Claims And Claims Against New Defs.

*Id.* Because materiality is an element of all of plaintiffs' claims (and reasonable reliance is an element of all claims other than those under the Securities Act[18]), these claims must all be dismissed to the extent they are based on purchases after August 3, 2017.

### 3. Plaintiffs' Claims Based on Purchases of Teva Securities After August 3, 2017 Must Be Dismissed for Lack of Standing

"Individual standing is a prerequisite for all actions…." *Fraiser v. Stanley Black & Decker*, 109 F. Supp. 3d 498, 503 (D. Conn. 2015). "To establish individual standing, a plaintiff must show [among other things] that…it has suffered an injury in fact that is…fairly traceable to the challenged action of the defendant…." *Building and Const. Trades Council of Buffalo v. Downtown Development*, 448 F.3d 138, 144 (2d Cir. 2006) (internal quotation marks omitted).

Crediting the allegations in the Direct Actions (and accepting the Court's ruling in *Ontario*) for purposes of this motion to dismiss, it is plain that plaintiffs cannot establish individual standing for their claims based on trades made after August 3, 2017. As the Southern District recently held, "a plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information [and] the market is assumed to have processed the correction, which would be reflected in the stock price." *Francisco v. Abengoa*, 481 F. Supp. 3d 179, 206 (S.D.N.Y. 2020) (internal quotation marks omitted). That is the situation presented here.

Plaintiffs will undoubtedly try to "characterize [Teva's pre-August 2017] disclosures as 'partial disclosures,' and argue that while they raised suspicions…analysts and investors continued to rely on [defendants'] contemporaneous representations," but such an argument

---

[18] *See Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("reliance is an element of a Rule 10b-5 cause of action"); *In re Bear Stearns Cos. Secs. Litig.*, 995 F. Supp. 2d 291, 308 (S.D.N.Y. 2014) ("actual reliance" is an element of a claim under Section 18 of the Exchange Act"); *Pell v. Weinstein*, 759 F. Supp. 1107, 1115 (M.D. Pa. 1991) (reliance is an element of claims under the PSA, and for fraud and negligent misrepresentation under Pennsylvania common law).

"flies in the face of [p]laintiffs' own allegations." *Francisco*, 481 F. Supp. 3d at 206.  The Direct

Actions allege that Teva's August 3, 2017 Form 6-K revealed the "true value of [Teva's]

combined U.S. generic business" (*Chicago* compl., ¶ 337), exposed that it "was facing

significant and permanent pricing pressure" (*Harel* compl., ¶ 857), caused Teva's equities prices

to fall by as much as 40% (*see Clal* compl., ¶ 547), and prompted ratings agencies to downgrade

Teva's debt to "one step above 'junk'" (*INKA* compl., ¶ 388).  And as previously discussed, the

Court ruled in *Ontario* that the "sequence of events" (*i.e.*, government investigations and

lawsuits, bad press, etc.) in the year leading up to Teva's August 3, 2017 Form 6-K revealed to

"analysts and investors" that Teva had been "internally raising its prices, [allegedly] in lockstep

with its competitors." *Ontario*, 432 F. Supp. 3d at 174.

　　　In sum, having decided to purchase Teva securities notwithstanding these purported

corrective disclosures and events, plaintiffs simply cannot show that that they suffered any loss

that is "fairly traceable" to defendants' alleged misconduct. *Downtown Development*, 448 F.3d

at 144 (2d Cir. 2006); *see also Francisco*, 481 F. Supp. 3d at 206 ("In spite of [the] revelatory

nature of the November 2014 disclosures, Plaintiffs chose to purchase [the company's] ADSs.

Their alleged injuries, then, cannot be readily traced to [defendants'] alleged []

mischaracterization.").

*　　*　　*

　　　For the foregoing reasons, all claims in the Direct Action complaints based on trades in

Teva securities on or after August 3, 2017 must be dismissed.[19]

---

[19] Because the BH plaintiffs' earliest alleged trades occurred in December 2017 (see *BH* compl., Exs. A-G), the *BH* complaint must be dismissed in its entirety.

**C.    The Direct Actions Fail to Plead Plausible Claims Based on
Alleged Misrepresentations or Omissions Concerning Price Increases
With Respect to Trades of Teva Securities Prior to October 29, 2015**

The Direct Action plaintiffs base their claims on multiple "types" of alleged

misrepresentations and omissions made by defendants in their public filings and on conference

calls with investors and analysts, including "False and Misleading Pricing Statements."  (*See,

e.g.*, *Phoenix* compl., ¶ 585.)  In essence, plaintiffs allege that, from mid-2013 through early

2016, Teva hiked prices on its generic drugs, but rather than publicly acknowledging what it was

doing, Teva consistently denied that it was raising prices.  (*See, e.g.*, *Clal* compl., ¶ 62

("Throughout the Relevant Period…[a]t every opportunity, in Teva's financial disclosures with

the SEC and on conference calls, the Defendants denied that Teva was engaged in price

increases….").[20])

While conclusory allegations such as these "can provide the framework of a complaint,

they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  Here, upon closer

inspection, it is clear that there is a significant gap between plaintiffs' conclusory

characterization and any well-pled facts in their complaints.  The <u>first</u> statement plaintiffs

identify that can plausibly be construed as a broad "denial" that Teva was increasing prices was

made on a company earnings call on <u>October 29, 2015</u>.  (*See, e.g.*, *Boeing* compl., ¶ 9 ("'All the

improvement you see in our…margins is ***not driven by price***.  It is driven by quantities and by

mix and by efficiency measures.  ***Not by price***….'").[21])  The next such statement was made over

---

[20] *See also Alaska* compl., ¶ 128; *Boeing* compl., ¶¶ 20, 44, 75; *BH* compl., ¶¶ 12, 55; *Chicago* compl., ¶ 27; *Clal* compl., ¶¶ 62, 82; *Fir Tree* compl., ¶¶ 20, 40, 71; *Franklin* compl., ¶ 175; *Harel* compl., ¶¶ 9, 95; *Highfields* compl., ¶¶ 15, 80; *INKA* compl., ¶¶ 8, 30(a)-(b); *Migdal Ins.* compl., ¶¶ 15, 62, 82; *Migdal Mut.* compl., ¶¶ 15, 62, 82; *Mivtachim* compl., ¶¶ 15, 62, 82; *Nordea* compl., ¶ 141; *Oregon* compl., ¶ 27; *Pacific* compl., ¶¶ 8, 30(a)-(b); *Phoenix* compl., ¶¶ 9, 102; *Psagot* compl., ¶¶ 15, 62, 82; *Schwab* compl., ¶¶ 8, 30(a)-(b); *Stichting* compl., ¶¶ 8, 30(a)-(b).

[21] *See also Alaska* compl., ¶ 14; *BH* compl., ¶ 3; *Chicago* compl., ¶ 5; *Clal* compl., ¶ 121; *Fir Tree* compl., ¶ 9; *Franklin* compl., ¶ 14; *Harel* compl., ¶ 90; *Highfields* compl., ¶ 3; *INKA* compl., ¶ 12; *Migdal Ins.* compl., ¶ 121;

three months later, on <u>February 11, 2016</u>.  (*See id.* ("'This is $1 billion improvement in operating

profit over 24 months period.  So how did we do this?  ***Not by pricing*…**").)  Prior to these

statements, plaintiffs do not plead facts suggesting that defendants had misrepresented or

concealed that Teva was increasing prices.  Indeed, plaintiffs <u>cannot</u> plausibly make such an

allegation, given that defendants – on numerous occasions from the very beginning of the

putative "price-hike strategy" – <u>explicitly disclosed</u> that Teva was raising prices).

For example, in a June 6, 2013 UBS Investment Research report, following a meeting

with the President of Teva Americas Generics, Allan Oberman, the analyst reported that "Teva

has adopted a very aggressive pricing strategy since mid 2012 and expects to opportunistically

**<u>take price increases every quarter</u>.  <u>The next one is expected in early 3Q</u>**."  (*See* Ex. B, p. 2

(emphasis added).)[22]  Significantly, this report was issued less than one month before Teva began

implementing its alleged "price-hike strategy."[23]  (*See, e.g.*, *Clal* compl., ¶ 65.)

On a December 10, 2013 business outlook call, Teva's Oberman was even more explicit

about the company's "new strategy":

> So in the absence of new products, the question you are inherently asking is, why
> do we feel so bullish about our generics business in and around this year's range of
> 2013 or slightly ahead of 2013?   And the answer is really underscored by the
> **<u>execution of the new strategy</u>** that we implemented.
>
> First and foremost, [we are] **<u>looking for pricing opportunities….</u>** [W]e've offset
> that price erosion and the valley of new product years through the execution of our
> value creation based strategy.  **<u>We have been able to take pricing on a number</u>**

---

*Migdal Mut.* compl., ¶ 121; *Mivtachim* compl., ¶ 121; *Nordea* compl., ¶ 14; *Oregon* compl., ¶ 5; *Pacific* compl., ¶ 12; *Phoenix* compl., ¶ 97; *Psagot* compl., ¶ 121; *Schwab* compl., ¶ 12; *Stichting* compl., ¶ 12.

[22] The Court may properly take judicial notice of published analyst reports.  *See Born v. Quad/Graphics, Inc.*, 19-cv-10376, 2021 WL 736839, at *9 n.11 (S.D.N.Y. Feb. 25, 2021) ("The Second Circuit…has held that district courts can take judicial notice of analyst reports for the fact that they contain certain information without considering the truth of the matters asserted….") (citing *Colbert v. Rio Tinto*, 824 F.App'x 5, 10 n.5 (2d Cir. 2020)).

[23] *See also* Ex. C (8/7/13 Deutsche Bank Markets Research report, pp. 3-4) (following "day of investor meetings with Teva's CEO and CFO," reporting that Teva's management disclosed that "[i]n the US…they have been able to opportunistically increase prices for certain products").

**of products this year** and are forecasting next year to recoup some of that price erosion….

(*See* Ex. D, p. 8 (emphasis added).[24])  Similarly, slides presented during Teva's July 31, 2014 earnings call disclosed that the company "needs to capture pricing opportunities" in order to "Drive Organic Growth in Generics."  (*See* Ex. F, p. 6; *id.* at slide 34.)

In short, the Direct Action complaints are devoid of facts sufficient to show that, prior to October 29, 2015, defendants denied, concealed, or otherwise misrepresented that Teva was increasing generics prices.  Accordingly, to the extent plaintiffs purport to assert claims based on such pricing allegations with respect to trades in Teva securities prior to October 29, 2015, all such claims must be dismissed.  *See, e.g.*, *Cartica Mgmt. v. Corpbanca*, 50 F. Supp. 3d 477, 492 (S.D.N.Y. 2014) (dismissing Section 10(b) claims where plaintiff's securities purchase "occurred prior to the alleged misrepresentations or omissions").

### D.   Because They Fail to Adequately Allege Purchases of Teva Securities, the *Clal*, *Fir Tree*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* Complaints Must Be Dismissed in Their Entireties for Lack of Standing and Causation

The gravamen of the Direct Action complaints is that defendants' alleged misrepresentations and omissions caused Teva's securities to trade at artificially inflated levels. (*See, e.g.*, *Boeing* compl., ¶ 1 ("[Defendants'] misrepresentations and omissions caused investors…to purchase Teva's securities at artificially inflated prices."); *Highfields* compl., ¶ 16 ("[During the relevant period,] Defendants were making materially false and misleading statements, and failing to disclose material information, which cause the price of [Teva's] securities to be artificially inflated.").)  In four complaints, plaintiffs provide trading

---

[24] The Court may take judicial notice of this call transcript for the additional reason that it is expressly relied on and quoted in certain plaintiffs' complaints.  (*See, e.g.*, *Harel* compl., ¶ 754; *Phoenix* compl., ¶ 608.)  *See Jones v. Harris*, 665 F. Supp. 2d 384, 393 (S.D.N.Y. 2009) ("In deciding a motion to dismiss, this court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit.").

certifications identifying the specific securities they purchased, on what dates, and at what prices.[25]  In ten others, plaintiffs assert in clear and consistent terms that they purchased Teva securities, albeit without providing details about those alleged trades.[26]  Assuming that such cursory allegations satisfy Rule 9(b) (which is debatable[27]), six complaints – those in *Clal*, *Fir Tree*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* – fail to clear even this low bar.

Plaintiffs in these actions neither attach certifications to document their trades nor do they even clearly allege that they bought securities at all.  Rather, they assert that plaintiffs "purchased and/or sold" (*Clal* compl., ¶¶ 29-30, 32-35[28]) or "acquired, held, and/or sold certain Teva Securities during the Relevant Period" (*Fir Tree* compl., ¶ 24).  Plaintiffs will no doubt attempt to explain away these pleadings as inadvertent boilerplate, but this argument cannot be easily accepted for two reasons.  First, considering that these complaints lift passages wholesale from other sources, such as the *Ontario* pleadings,[29] the allegations <u>most</u> likely to be original work product (and not simply carelessly copied) are precisely those in paragraphs pertaining to the <u>plaintiffs themselves</u>.  Second, the prospect that this "purchase and/or sold" formulation is mere boilerplate is further undercut by the fact that the pleadings in *Clal*, *Migdal Ins.*, *Migdal*

---

[25] *See BH* compl., Exs. A-G; *Pacific* compl., Ex. C; *Schwab* compl., Ex. C; *Stichting* Compl., Ex. C.

[26] *See Alaska* compl., ¶¶ 28-29; *Boeing* compl., ¶¶ 24-25; *Chicago* compl., ¶ 35; *Franklin* compl., ¶¶ 29-80; *Harel* compl., ¶ 46; *Highfields* compl., ¶¶ 22-25; *INKA* compl., ¶¶ 34-35; *Nordea* compl., ¶¶ 28-43; *Oregon* compl., ¶ 35; *Phoenix* compl., ¶ 1.

[27] *See, e.g.*, *Fraser v. Fiduciary Trust Co. Int'l*, 04-cv-6958, 2005 WL 6328596, at *4 (S.D.N.Y. June 23, 2005) ("[Plaintiff] fails to allege the date(s) on which he acquired stock, the number of shares acquired, or the consideration (if any) given….  Accordingly, Plaintiff has not sufficiently pled a purchase or sale of securities with the particularity required by [Rule] 9(b)."); *Tannenbaum v. Walco Nat'l Corp.*, 83-cv-6815, 1984 WL 2374, at *2 (S.D.N.Y. Jan. 27, 1984) (dismissing Section 10(b) claim for failure to plead "specifics as to the precise dates of purchase, the number of shares acquired, and the price").

[28] The complaints in *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* contain identical allegations in identically-numbered paragraphs.

[29] *Compare*, *e.g.*, *Clal* compl., ¶¶ 450-65, and *Fir Tree* compl., ¶¶ 333-48 , *with Ontario* SAC, ¶¶ 292-307.

*Mut.*, *Mivtachim*, and *Psagot* do not employ it uniformly as to all plaintiffs, some of which are simply alleged to have "purchased Teva securities…."  (*Clal* compl., ¶¶ 31, 36-39.)

In any event, these "purchase and/or sold" allegations fail to plead a plausible claim for relief under even the lenient Rule 8(a) standard.[30]  Interpreted disjunctively, plaintiffs may have purchased Teva securities – in which case they might be able to state a claim – or they may have sold them – in which case they categorically <u>cannot</u> state a claim.  *See Schuler*, 2013 WL 944777, at *10 (granting motion to dismiss both Exchange Act and Securities Act claims, finding loss causation allegations lacking and negative causation defense established on the pleadings, where plaintiff sold stock prior to alleged corrective disclosures).  Interpreted conjunctively, plaintiffs may be "in-and-out traders," whose claims would likewise be barred for lack of causation and standing.  *See id.* ("As the Second Circuit [has] concluded…'in-and-out traders' – investors who purchased shares during the [relevant] period but sold those shares before the misrepresentation was disclosed – would not 'even conceivably be able to prove loss causation.'") (*quoting In re Flag Telecom Holdings Secs. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)); *In re Bank of America Secs., Deriv., and ERISA Litig.*, 09-MD-2058, 2011 WL 3211472, at *13-14 (S.D.N.Y. July 29, 2011) (holding that investors who bought and sold securities prior to corrective disclosure lack standing).

That these equivocal allegations could support multiple interpretations (which are equally consistent with a finding of no liability) is not enough to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a

---

[30] To the extent that the *Fir Tree* plaintiffs neither bought nor sold Teva securities during the relevant period, but merely "held" them (*see Fir Tree* compl., ¶ 24), they "lack[] standing to prosecute a claim under the federal securities laws." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, n.2 (2d Cir. 2011).

defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotation marks omitted).  Accordingly, these six complaints must be dismissed in their entirety.

      **E.**      **Certain of the Direct Action Plaintiffs' Claims Under the**
                    **Federal Securities Laws Must Be Dismissed in Whole or in Part**

          **1.**      **Certain Claims By Foreign Plaintiffs Are Barred Under *Morrison***
                         **Because They Fail to Adequately Plead Domestic Transactions**

The "reach of U.S. securities law is [] limited to (1) 'transactions in securities listed on domestic exchanges,' and (2) 'domestic transactions in other securities.'"  *In re Petrobras Secs. Litig.*, 862 F.3d 250, 262 (2d Cir. 2017) (quoting *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 267 (2010)).  In order for a securities transaction to qualify as "domestic" under the second prong of the *Morrison* test, "a plaintiff must allege facts suggesting that [i] irrevocable liability [to take and pay for the securities] was incurred…within the United States," or "[ii] title [to the securities] was transferred within the United States."  *Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).  "[T]o adequately plead the existence of domestic transactions," a complaint must allege "facts concerning the formation of contracts, the placement of purchase orders, the passing of title, or the exchange of money…."  *Id.* at 70.

All Direct Actions bring federal securities law claims with respect to their transactions in Teva's ADS, which are traded on the New York Stock Exchange.  Eight of these actions, however, are brought by foreign plaintiffs who, in addition to their ADS-based claims, also purport to assert claims with respect to transactions in Teva securities – namely, "Preferred Shares," several series of senior "Notes," Teva's "ordinary shares" – which are **not** traded on any

domestic exchange.[31]  The viability of these latter claims depends on whether these plaintiffs have alleged facts sufficient to satisfy the second prong of *Morrison*.  They have not.

In *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot*, plaintiffs – various Israeli investment firms, pension funds, and life insurance companies (*see, e.g.*, *Clal* compl., ¶¶ 29-39) – assert claims under Sections 10(b) and 20(a) of the Exchange Act with respect to their alleged transactions in "Teva Securities" (*see id.*, ¶ 575, 577), a defined term which includes "Preferred Shares, Notes, and Ordinary Shares" (*see id.*, Glossary of Terms, at vii).  These complaints fail to plead any facts whatsoever "leading to [a] plausible inference that the parties incurred irrevocable liability within the United States…to take and pay for" Teva's Preferred Shares, Notes, or ordinary shares, or that "title to the [securities] was transferred within the United States."  *Absolute Activist*, 677 F.3d at 68.

The situation is the same in *Harel* and *Phoenix*.  In both actions, plaintiffs – Israeli insurance and financial services conglomerates and their subsidiaries (*see Harel* compl., ¶ 46; *Phoenix* compl., ¶ 48) – assert Exchange Act and Securities Act claims with respect to various classes of Notes, while the *Phoenix* plaintiffs also base their Exchange Act claims on Preferred

---

[31] *See* Preferred Shares final prospectus supplement, dated December 3, 2015, pp. S-12 ("Our ordinary shares are listed on the Tel Aviv Stock Exchange."), S-49 ("The…Preferred Shares are not expected to be listed on any securities exchange.") (available at https://www.sec.gov/Archives/edgar/data/818686/000119312515394483/ d67636d424b5.htm); Notes final prospectus supplement, dated July 19, 2016, p. S-7 ("The notes will not be listed on any securities exchange or included in any automated quotation system.") (available at https://www.sec.gov/ Archives/edgar/data/0000818686/000119312516651285/d207243d424b5.htm).  The Court may take judicial notice of both documents as they are repeatedly cited and relied on in the various Direct Action complaints (*see, e.g.*, *Clal* compl., ¶¶ 263, 281, 289, 300, etc.).  *See Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (on a motion to dismiss, court may properly consider a document when the complaint "relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation marks omitted).

Shares.[32]  Again, the complaints are devoid of factual allegations suggesting that the second prong of *Morrison* is satisfied.[33]

Plaintiff in *INKA*, a German capital management company (*see INKA* compl., ¶ 34), asserts Exchange Act claims based on alleged transactions in Preferred Shares (*see id.* at pp. 145-46 (captions for Counts I and II)).  Unlike the pleadings in the other actions, which ignore the *Morrison* issue entirely, the *INKA* complaint asserts in conclusory fashion that plaintiff purchased "Preferred Shares on a United States Exchange and/or in transactions whereby Plaintiff incurred irrevocable liability for the purchases within the United States and/or title to the purchased securities passed within the United States."  (*Id.*, ¶ 35.)  But as the Supreme Court has repeatedly made clear, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" fails to satisfy the plausibility requirement necessary to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Indeed, the Second Circuit has held that *Morrison* is not satisfied where, as here, the complaint alleging "that the transactions took place in the United States only does so in conclusory fashion…."  *Absolute Activist*, 677 F.3d at 70; *see also Banco Safra v. Samarco Mineracao*, __ F.App'x __, 2021 WL 825743, at *2 (2d Cir. Mar. 4, 2021) (same); *In re*

---

[32] *See Harel* compl., pp. 375-376 (captions for Counts I and II), 388-90 (captions for Counts V and VI); *Phoenix* compl., pp. 391-93 (captions for Counts I and II), 407-10 (captions for Counts V, VI, and VII).

[33] The *Clal* and *Harel* complaints allege that the Preferred Shares and Notes, though not listed or traded on any exchange, are nonetheless still "traded in the United States" (*see Harel* compl., ¶ 49; *Clal* compl., ¶ 40 (same)), yet they fail to allege facts suggestive that these foreign plaintiffs incurred irrevocable liability to take and pay for these securities in the United States, or that legal title transferred to them in the United States.  This omission is highly significant, since courts in this Circuit have recognized that *Morrison*'s second prong cannot be satisfied even as to <u>exchange</u>-traded securities absent allegations sufficient to establish a domestic transaction.  *See In re Satyam Computer Serv's Secs. Litig.*, 915 F. Supp. 2d 450, 475 (S.D.N.Y. 2013) (dismissing Exchange Act claims where it was apparent that plaintiff acquired his exchange-traded ADS directly from company in a non-domestic transaction in India, and deeming as irrelevant the fact that ADSs were also listed on the NYSE); *see also Sgalambo v. McKenzie,* 739 F. Supp. 2d 453, 487 (S.D.N.Y. 2010) (preventing recovery by shareholders "who purchased [securities] on a foreign exchange").

*Petrobras Secs. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015) ("conclusory assertions that irrevocable liability has been incurred or that title has passed [in the United States] are insufficient").  Instead, a complaint must plead "<u>facts</u> concerning the formation of contracts, the placement of purchase orders, the passing of title, or the exchange of money…."  *Absolute Activist*, 677 F.3d at 70 (emphasis added); *see also Banco Safra*, 2021 WL 825743, at *2 ("Detailed factual allegations describing contract formation in the United States will typically satisfy the domestic transaction test.").  The *INKA* complaint fails to plead any such facts.

For the foregoing reasons, insofar as the *Clal*, *Harel*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* actions assert federal securities law claims based on transactions in Teva's Preferred Shares, Notes, or ordinary shares, those claims are barred by *Morrison* and must be dismissed.

## 2. Pleading Deficiencies in The *Pacific* and *Highfields* Complaints Warrant Dismissal of Certain Exchange Act Claims[34]

### a. The *Pacific* Complaint Fails to State Claims Under Sections 10(b) and 20(a) With Respect to Teva's 2020 Notes

In the *Pacific* action, plaintiffs seek recovery under Sections 10(b) and 20(a) of the Exchange Act in connection with their purchases of various types of Teva securities, including "2.25% Notes due March 18, 2020 ('2020 Notes')."  (*Pacific* compl., ¶ 35.)  In order to plausibly state these claims, plaintiffs must do more than simply allege that that they paid an artificially inflated price as a result of defendants' misrepresentations and omissions; rather, they must allege facts showing that the value of securities they purchased fell when the allegedly concealed truth was revealed to the market.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.

---

[34] These same deficiencies mandate dismissal of plaintiffs' derivative ISL claims which are premised on – and incorporate by reference – their U.S. federal law claims.  (*See, e.g.*, *Clal* compl., ¶ 582; *Harel* compl., ¶¶ 923, 925; *INKA* compl., ¶¶ 422, 424-25; *Phoenix* compl., ¶¶ 945, 947.)

2005) ("[T]o establish loss causation, a plaintiff must allege…that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (internal quotation marks omitted).  Over the course of forty-five paragraphs, the *Pacific* complaint cites nearly a dozen putative corrective disclosures or events and allege that the market prices of various Teva securities fell in response, yet plaintiffs fail to allege any negative impact on the 2020 Notes.  (*See Pacific* compl., ¶¶ 356-401.)  Because the sum total of allegations concerning the 2020 Notes in the complaint is the single allegation that plaintiffs purchased them (*see id.*, ¶ 35), plaintiffs' Exchange Act with respect to the 2020 Notes must be dismissed for failure to plead loss causation.

> **b.    The *Highfields* Complaint Fails to State a Section 18 Claim**

In the *Highfields* action, plaintiffs assert claims under Section 18 of the Exchange Act. (*See Highfields* compl., ¶¶ 428-38.)  To state a plausible claim under this section, plaintiffs must plead "actual reliance on specific statements in covered Exchange Act filings."  *Special Situations Fund III v. Deloitte Touche Tohmatsu*, 33 F. Supp. 3d 401, 440 (S.D.N.Y. 2014) (internal quotation marks omitted).  Unlike a claim under Section 10(b), where reliance can be established via the "fraud-on-the-market" presumption, to recover under Section 18 plaintiffs must plead – and ultimately prove – actual reliance.  *See Bear Stearns*, 995 F. Supp. 2d at 313 n.7.

In their complaint, the *Highfields* plaintiffs allege in conclusory fashion that "a Highfields investment analyst actually and justifiably read, reviewed, listed [sic] to and/or relied upon" a litany of public filings, press releases, news articles, and statements on calls and at conferences spanning a five-year period.  (*Highfields* compl., ¶ 370.)  Courts in this Circuit have repeatedly found substantively identical allegations insufficient to plead actual reliance even under Rule 8, let alone the heightened Rule 9(b) standard that applies to plaintiffs' claims here.

*See In re Bear Stearns*, 995 F. Supp. 2d at 309 ("Section 18 claims, which sound in fraud, are subject to the more stringent pleading requirements of [Rule] 9(b).").

For example, in *Int'l Fund Mgmt. v. Citigroup*, in support of their Exchange Act and common law fraud claims, plaintiffs alleged that their "investment managers read and relied upon [defendant's] 2006 [and 2007] Form 10-K[s], including the false financial statements and other statements alleged herein to be false and misleading." 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011). The court dismissed these claims, holding that plaintiffs' allegations were "conclusory" and "incredibly broad, alleging reliance on entire 10-Ks for indefinite periods of time." *Id.* And because plaintiffs failed to plead "supporting factual matter indicating how [they] relied on the alleged misrepresentations," the court concluded that the complaint had failed to meet even Rule 8's "threshold requirement that a complaint 'set forth enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2008)).

The Southern District of New York reached the same conclusion in *Special Situations Fund*, where plaintiffs alleged that before deciding to invest they "specifically read, reviewed, and relied on" defendant's audit opinions certifying four years of a company's Form 10-K filings. 33 F. Supp. 3d at 444. Yet the court dismissed plaintiffs' Section 18 claim, finding their "fail[ure] to identify any specific transactions that ensued as a result of [their] purported 'eyeball' reliance…fatal to the claim." *Id.*

Here, the conclusory "actual reliance" allegations in the *Highfields* complaint are substantively identical to those found to be fatally deficient in *Int'l Fund* and *Special Situations*. As in those cases, the complaint here fails to "link [their] review of any particular statements in [the referenced filings and calls] to any actual purchases of [Teva] securities," nor do they "identify [any] particular transaction that [plaintiffs] allegedly made in reliance on [those

statements]." *In re Bear Stearns*, 995 F. Supp. 2d at 309.  Because the *Highfields* plaintiffs fail

to plausibly allege actual reliance, their Section 18 claim must be dismissed.

   **3.     The *Fir Tree*, *Harel*, and *Phoenix* Complaints Fail to State
            Plausible Claims Under Section 12(a)(2) of the Securities Act**

   To prevail on a claim under Section 12(a)(2) of the Securities Act, a plaintiff "must

establish that it purchased the security <u>directly</u> from defendants through the public offering at

issue." *Yi Xiang v. Inovalon Holdings*, 327 F.R.D. 510, 520 (S.D.N.Y. 2018) (emphasis added;

internal quotation marks omitted).  Thus, unlike claims brought under Section 11, liability under

Section 12(a)(2) "does not extend to those who acquired a [security] 'pursuant and/or traceable

to'" a public offering.  *In re Petrobras*, 862 F.3d at 259 n.9.  For pleading purposes, therefore,

"[a]llegations that plaintiffs purchased securities 'pursuant or traceable' to a sale…are too

ambiguous to satisfy any pleading standard."  *In re Am. Realty Cap. Props. Litig.*, 15-mc-40,

2015 WL 6869337, at *3 (S.D.N.Y. Nov. 6, 2015); *see also In re Century Aluminum Co. Sec.

Litig.*, 749 F. Supp. 2d 964, 977 (N.D. Cal. 2010) (conclusory allegations that plaintiffs

purchased "'pursuant and/or traceable to' [an offering] are insufficient to establish standing

under Section 12(a)(2)").  Likewise, "barebones allegations [that plaintiffs purchased in initial

offerings] are insufficient to support [plausible] claims" under the statute.  *In re Petrobras Secs

Litig.*, 152 F. Supp. 3d 186, 194 (S.D.N.Y. 2016).

   Here, in attempting to plead Section 12(a)(2) claims, the complaints in three Direct

Actions – *Fir Tree*, *Harel*, and *Phoenix* – allege in conclusory fashion that plaintiffs purchased

Teva ADS and Notes "in, pursuant to, and/or traceable to" Teva's public offerings of those

securities during the relevant period.  (*Harel* compl., ¶¶ 957, 962; *see also Fir Tree* compl., ¶¶

433, 439; *Phoenix* compl., ¶¶ 991, 997.)  But because plaintiffs have neither "alleged specific

details of their [purported] purchases [nor] attached to their [complaints] transaction data

sufficient to support a plausible inference that they purchased [Teva securities] in an initial

offering," *In re Petrobras*, 152 F. Supp. 3d at 194, they have failed to plead facts "plausibly

suggest[ing] an entitlement to relief," *Iqbal*, 556 U.S. at 681.  The Section 12(a)(2) claims in

these complaints[35] must therefore be dismissed.

## **CONCLUSION**

For the reasons detailed above, defendants respectfully request that: (a) allegations in the

Direct Action complaints that refer to or rely on allegations from the pleadings in the State

Attorneys General action and the *Ontario* Action either be stricken or disregarded for purposes

of this motion to dismiss; and (b) the Direct Actions be dismissed, in whole or in part, as follows:

- All actions should be dismissed insofar as they assert claims based on: (1) defendants' non-disclosure of subpoenas; (2) purchases of Teva securities after August 3, 2017; and (3) purchases of Teva securities prior to October 29, 2015;

- All claims asserted in *Clal*, *Fir Tree*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* must be dismissed for lack of standing and causation;

- All federal securities law (and related ISL) claims asserted in *Clal*, *Harel*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* based on purchased of Teva's Preferred Shares, Notes, or ordinary shares must be dismissed for failure to plead facts sufficient to show that they were acquired pursuant to domestic transactions;

- Exchange Act claims asserted in *Pacific* in connection the 2020 Notes must be dismissed for lack of causation;

- Claims under Section 18 of the Exchange Act in *Highfields* must be dismissed for failure to plead actual reliance; and

- Claims under Section 12(a)(2) of the Exchange Act asserted in *Fir Tree*, *Harel*, and *Phoenix* must be dismissed for failure to plead that the securities at issue were directly acquired from defendants in a public offering.


Dated:   New York, New York
         May 24, 2021

---

[35] The derivative ISL claims in *Harel* and *Phoenix* must be dismissed for the same reasons.

Respectfully submitted,

DEFENDANTS TEVA PHARMACEUTICAL
INDUSTRIES LTD.; TEVA
PHARMACEUTICALS USA, INC.; EREZ
VIGODMAN; EYAL DESHEH; SIGURDUR
OLAFSSON; DEBORAH GRIFFIN; KÅRE
SCHULTZ; MICHAEL MCCLELLAN;
YITZHAK PETERBURG; YAACOV ALTMAN,
DIPANKAR BHATTACHARJEE; and TEVA
PHARMACEUTICAL FINANCE
NETHERLANDS III B.V.

*/s/ Sheron Korpus*

Sheron Korpus (admitted *pro hac vice*)
Cindy Caranella Kelly (admitted *pro hac vice*)
Sarah G. Leivick (admitted *pro hac vice*)
Andrew Schwartz (admitted *pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1969
Fax: (212) 500-3469
skorpus@kasowitz.com
ckelly@kasowitz.com
sleivick@kasowitz.com
aschwartz@kasowitz.com

*Counsel for Defendants except with regards to*
*Case No. 3:20-cv-588*

Jordan D. Hershman (admitted *pro hac vice*)
Jason D. Frank (admitted *pro hac vice*)
Emily E. Renshaw (admitted *pro hac vice*)
Andrew M. Buttaro (ct30882)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
Tel: (617) 341-7700
Fax: (617) 341-7701
jordan.hershman@morganlewis.com
jason.frank@morganlewis.com
emily.renshaw@morganlewis.com
andrew.buttaro@morganlewis.com

*Counsel for Defendants*

– and –

Jill M. O'Toole (ct27116)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
jotoole@goodwin.com

*Counsel for Defendants except Kåre Schultz*