# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | No. 3:18-cv-1681 (SRU) |
| | No. 3:18-cv-1721 (SRU) |
| | No. 3:18-cv-1956 (SRU) |
| | No. 3:19-cv-175 (SRU) |
| | No. 3:19-cv-192 (SRU) |
| | No. 3:19-cv-449 (SRU) |
| | No. 3:19-cv-513 (SRU) |
| | No. 3:19-cv-543 (SRU) |
| | No. 3:19-cv-603 (SRU) |
| | No. 3:19-cv-655 (SRU) |
| | No. 3:19-cv-656 (SRU) |
| | No. 3:19-cv-657 (SRU) |
| | No. 3:19-cv-923 (SRU) |
| | No. 3:19-cv-1167 (SRU) |
| | No. 3:19-cv-1173 (SRU) |
| | No. 3:20-cv-83 (SRU) |
| | No. 3:20-cv-588 (SRU) |
| | No. 3:20-cv-683 (SRU) |
| | No. 3:20-cv-1630 (SRU) |
| | No. 3:20-cv-1635 (SRU) |
| | May 24, 2021 |
| | Oral Argument Requested |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS NEW CLAIMS AND CLAIMS AGAINST NEW DEFENDANTS

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................. 3

I.  PLAINTIFFS FAIL TO PLEAD FACTS SUPPORTING A STRONG
    INFERENCE OF SCIENTER AGAINST DEFENDANTS ALTMAN *ET AL*. ............... 4

    A.  The "Former Employee" Allegations Recycled From The Ontario ACAC
        Fail To Establish A Strong Inference Of Scienter Against Altman *et al*............... 5

    B.  The Direct Actions Plead No Other Facts Supporting A Strong  Inference
        That Altman *et al.* Had The Requisite Intent To Deceive ..................................... 7

        1.  Dipankar Bhattacharjee........................................................................ 9

        2.  Yitzhak Peterburg ............................................................................... 10

        3.  Yaacov Altman ................................................................................... 11

        4.  Michael McClellan.............................................................................. 12

        5.  Kåre Schultz ....................................................................................... 14

II.  CLAIMS BASED ON ALLEGED MISREPRESENTATIONS AND
     OMISSIONS REGARDING THE OPIOID SCHEME, BRIBERY SCHEME,
     AND ACTAVIS ACQUISITION MUST BE DISMISSED ........................................... 18

    A.  Claims Based On Alleged False And Misleading Statements  About The
        Purported Opioid Scheme Must Be Dismissed.................................................... 18

        1.  Failure To Plead Actionable Misrepresentations Or Omissions.............. 19

        2.  Failure To Plead Scienter.................................................................... 22

        3.  Failure To Plead Loss Causation ......................................................... 23

        4.  The PSA Claims Are Time-Barred ....................................................... 25

    B.  Plaintiffs' "Bribery Scheme" Allegations Fail To State A Plausible Claim.......... 25

        1.  Failure To Plead Actionable Misrepresentations Or Omissions.............. 25

        2.  Failure To Plead Scienter.................................................................... 27

        3.  Plaintiffs' Securities Act and PSA Claims Are Time-Barred.................. 27

C.      Plaintiffs' Allegations Regarding The Purported "Negative Impact" Of The Actavis Acquisition On Teva Fail To State A Plausible Claim .................... 28

    1.      Failure To Plead An Actionable Misrepresentation Or Omission ............ 28

    2.      Failure To Plead Scienter .......................................................................... 31

    3.      Failure To Plead Loss Causation .............................................................. 32

CONCLUSION .................................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ............................................................................ 24-25, 34

*In re Aceto Corp. Secs. Litig.*,
  2:18-cv-02425, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) .............................. 10, 12-13, 15

*In re Adelphia Commc'ns Corp. Secs. and Deriv. Litig.*,
  03-MDL-01529, 2010 WL 3528872 (S.D.N.Y. Aug. 30, 2010) ...........................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................................3

*In re Axis Cap. Holdings Ltd. Secs. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............................................................................ 21-22

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ...............................................................................................23

*City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
  19-cv-10825, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ..................................................16

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012) ..................................................................................................33

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ................................................................................................20

*Cohen v. S.A.C. Trading Corp.*,
  711 F.3d 353 (2d Cir. 2013) ..................................................................................................3

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..............................................................................20, 21

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................................................27

*In re Elan Corp. Secs. Litig.*,
  02-cv-00865, 2004 WL 1305845 (S.D.N.Y. May 18, 2004) ....................................15, 16, 23

*Estate of Evasew*,
  526 Pa. 98 (Pa. 1990) .........................................................................................................19

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)...................................................................................33

*In re Fed. Nat'l Mortg. Ass'n Secs., Deriv. & ERISA Litig.*,
  892 F. Supp. 2d 59 (D.D.C. 2012) .........................................................................23

*Fulton Bank, N.A. v. UBS Secs., LLC*,
  10-cv-01093, 2011 WL 5386376 (E.D. Pa. Nov. 7, 2011) ........................... 19-20, 32

*Fulton Fin. Adv., Nat'l Ass'n v. NatCity Invs., Inc*,
  09-cv-04855, 2013 WL 5635977 (E.D. Pa. Oct. 15, 2013) ....................................29

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019)...................................................................................21

*In re Gen. Elec. Sec. Litig.*,
  No. 19-cv-01013, 2020 WL 2306434 (S.D.N.Y. May 7, 2020) ...............................33

*Gjidija v. U.S.*,
  18-cv-00259, 2019 WL 2615438 (S.D.N.Y. June 26, 2019)..............................14, 26

*Goonewardena v. Forster & Gabrus LLP*,
  18-cv-00029, 2019 WL 121677 (E.D.N.Y. Jan. 7, 2019)................................. 3-4, 5

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)....................................................................................5

*In re Lehman Bros. Secs. and ERISA Litig.*,
  10-cv-06637, 2013 WL 3989066 (S.D.N.Y. July 31, 2013)......................................6

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)...................................................................................32

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)............................................................ *passim*

*Loreley Fin. (Jersey) v. Wells Fargo Secs.*,
  797 F.3d 160 (2d Cir. 2015)..........................................................................5, 13, 31

*Luther v. Kia Motors Am., Inc.*,
  676 F. Supp. 2d 408 (W.D. Pa. 2009).....................................................................32

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  __ F. Supp. 3d. __, 2021 WL 517934 (S.D.N.Y. Feb. 10, 2021) ..........9, 16, 27, 31

*Michael S. Rulle Family Dynasty Trust v. AGL Life Assur. Co.*,
  459 F. App'x 79 (3d Cir. 2011) ...............................................................................4

iv

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..........................................................................4, 5, 8, 9

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*,
   432 F. Supp. 3d 131 (D. Conn. 2019), ECF 283............................................. *passim*

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
   15 F. Supp. 3d 336 (S.D.N.Y. 2014)....................................................................25, 34

*Rogers v. Gentex Corp.*,
   3:16-cv-00137, 2017 WL 889624 (M.D. Pa. Mar. 6, 2017) ..........................................5

*Salim v. Mobile Telesystems PJSC*,
   19-cv-01589, 2021 WL 796088 (E.D.N.Y. Mar. 1, 2021) ...........................7, 12, 27

*Schiro v. Cemex S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...................................................................20

*Schwab v. E*TRADE Fin. Corp.*,
   258 F. Supp. 3d 418 (S.D.N.Y. 2017).....................................................................12

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...................................................................................30

*In re Sotheby's Holdings Secs. Litig.*,
   00-cv-01041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..................................17

*South Carolina Retirement Sys. Grp. Trust v. Eaton Corp. PLC*,
   791 F. App'x 230 (2d Cir. 2019) ...........................................................................19

*Stein v. Tangoe, Inc.*,
   3:13-cv-00286, 2014 WL 12767210 (D. Conn. Sept. 30, 2014) .......................3, 29

*Sylk v. Bernsten*,
   2003 WL 1848565 (Pa. Ct. Com. Pl. Feb. 4, 2003)...............................................20

*Teamsters Local 455 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)............................................................................22, 27

*In re Teva Secs. Litig.*,
   __ F. Supp. 3d __, 2021 WL 231130 (D. Conn. Jan. 22, 2021) ...........................4-5

*U.S. v. CVS Caremark Corp.*,
   09-cv-04672, 2015 WL 5582553 (E.D. Pa. Sept. 22, 2015)...................................23

*In re Xerox Corp. Secs. Litig.*,
   935 F. Supp. 2d 448 (D. Conn. 2013) ....................................................................34

*Zecher v. Vince Holding,*
    18-cv-5072, 19-cv-05629, 2020 WL 5405663 (E.D.N.Y. Sept. 8, 2020)................................8

*Zhong Zheng v. Pingtan Marine Enter. Ltd.,*
    379 F. Supp. 3d 164 (E.D.N.Y. 2019) .............................................................................10, 11

**Statutes**

70 P.S. § 1-504(a) ...........................................................................................................25

Defendants in the above-captioned matter respectfully submit this memorandum of law in support of their motion pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), to dismiss, with prejudice and in their entirety, those claims in the Direct Actions that are: (1) asserted against individual defendants Yaacov Altman, Dipankar Bhattacharjee, Michael McClellan, Yitzhak Peterburg, and/or Kåre Schultz (collectively, "Altman *et al.*"); and/or (2) based on alleged misrepresentations and omissions of material fact concerning (a) Teva's sale and promotion of opioids ("Opioid Scheme"), (b) Teva's sale of its prescription drug Copaxone in Russia, Ukraine, and Mexico ("Bribery Scheme"), or (c) the anticipated and realized benefits of Teva's acquisition of Actavis, the generic drug division of Allergan plc ("Actavis Acquisition").[1]

## PRELIMINARY STATEMENT

In its September 25, 2019 decision (*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019), ECF 283), the Court granted in part and denied in part Defendants' motion to dismiss the Amended Consolidated Class Action Complaint in the *Ontario* class action (ECF 226, the "*Ontario* ACAC"). The Direct Action complaints hew closely to the *Ontario* ACAC, but depart from it in two significant particulars: they add five individual current and former Teva officers not previously named as defendants in the *Ontario* ACAC; and they allege several new "types" of misrepresentations and omissions beyond the four that are the subject of the *Ontario* ACAC. As explained below, these innovations were wasted effort.

---

[1] Capitalized terms not otherwise defined have the meaning given in Defendants' Motion to Dismiss the Direct Action Complaints on Pleading and Other Grounds. Additionally, *OZ ELS Master Fund, Ltd., et al. v. Teva Pharm. Indus., et al.*, 3:17-cv-01314 (D. Conn.) is excluded from the motion to dismiss and this memorandum of law, in accordance with the Joint Motion to Stay Action which was filed in that docket on February 19, 2020 and granted on February 21, 2020. *Id.* at ECF 60, 61.

The Direct Action complaints fail to state plausible claims against Altman, Bhattacharjee, McClellan, Peterburg, or Schultz because they are devoid of factual allegations supporting a strong inference that any of these individuals acted with scienter.  In the *Ontario* ACAC, the Court found scienter was sufficiently pled based on allegations derived from four unnamed former Teva employees – purportedly interviewed by class counsel – that tied certain other Teva executives to reports and decision-making contradicting their public statements regarding Teva's pricing and profits.  Though these same former-employee allegations are incorporated and summarized in the Direct Action complaints, they fail utterly to support a strong inference of scienter against the newly-added individual defendants, who are not alleged to have generated or received any of the relevant reports, nor even to have been present at Teva when the alleged pricing misconduct occurred.  Beyond those irrelevant former-employee allegations (which are in any event immaterial since plaintiffs do not claim to have independently interviewed or corroborated them, as required under Rule 11), the Direct Action complaints do little more than assert in conclusory fashion that these individual defendants "must have known" the truth based on their "high-ranking positions" and their certification of certain corporate filings.  But it is black letter law in this Circuit that allegations such as these cannot establish scienter.

Plaintiffs' attempt to premise claims on new "types" of misrepresentations and omissions is likewise unavailing.  In certain Direct Actions, plaintiffs allege that defendants misrepresented or concealed that Teva was exposed to substantial liability from the purported Opioid Scheme, a risk that supposedly materialized when Teva announced its settlement of litigation brought by the State of Oklahoma.  In others, they charge defendants with misrepresenting and concealing that Teva's success in marketing its prescription drug Copaxone in non-U.S. markets was in part due to a Bribery Scheme involving certain of its foreign subsidiaries.  In others still, plaintiffs

charge defendants with concealing the "negative impact" of the Actavis Acquisition on Teva's business prospects and results. But as detailed below, the Direct Action complaints fail to state plausible claims on any of these bases. Whether premised on the Opioid Scheme, the Bribery Scheme, or the Actavis Acquisition, in each case plaintiffs fail to plead facts establishing an actionable misrepresentation or omission, scienter, or causation. Moreover, certain of these claims are also time-barred.

For these and other reasons set out in greater detail below, the Direct Action complaints must be dismissed to the extent they assert claims that are: (1) directed against Altman *et al.*; and/or (2) based on alleged misrepresentations or omissions regarding the Opioid Scheme, the Bribery Scheme, or the Actavis Acquisition.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter…to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). While a court is required to credit well-pled factual allegations, that "tenet…is inapplicable to legal conclusions," "mere conclusory statements," and "[t]hreadbare recitals of the elements of a cause of action." *Id.* Where the well-pled facts are "merely consistent with a defendant's liability," Rule 8's minimal plausibility standard is not satisfied. *Id.* (internal quotation marks omitted).

Claims that "sound in fraud are [further] subject to the heightened pleading standards of [Rule] 9(b), which requires that averments of fraud be 'stated with particularity.'" *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013). "To satisfy this requirement, a plaintiff must [not only] specify the statements the plaintiff contends were fraudulent, [but also] explain why the statements were fraudulent." *Stein v. Tangoe, Inc.*, 3:13-cv-00286, 2014 WL 12767210, at *7 (D. Conn. Sept. 30, 2014) (internal quotation marks omitted); *see also Goonewardena v.*

*Forster & Gabrus LLP*, 18-cv-00029, 2019 WL 121677, at *7 (E.D.N.Y. Jan. 7, 2019) ("As the Second Circuit has explained…'[a]n ample factual basis must be supplied to support [plaintiff's] charges [of fraudulent intent].'") (quoting *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009)).  Claims for fraud under the federal securities laws are also subject to the PSLRA, which "effectively raised the nationwide pleading standard to that previously existing in [the Second Circuit]."  *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000).

# I.     PLAINTIFFS FAIL TO PLEAD FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER AGAINST DEFENDANTS ALTMAN *ET AL.*

The Direct Actions[2] assert claims against five individual defendants who were not previously named as defendants in the *Ontario* ACAC.  Collectively, the Direct Actions assert one or more claims arising under Sections 10(b) and 20(a) of the Exchange Act, the ISL, the PSA, common law fraud, and negligent misrepresentation against defendants Altman, Bhattacharjee, McClellan, Peterburg, and/or Schultz.[3]  Scienter is an essential element of each of these claims.  *See Michael S. Rulle Family Dynasty Trust v. AGL Life Assur. Co.*, 459 F. App'x 79, 81-82 (3d Cir. 2011) (the "Pennsylvania Securities Act[] ha[s] been interpreted to include similar scienter requirements as the Federal Securities Laws"); *Ontario Teachers' Pension Plan Bd*, 432 F. Supp. 3d at 156, 176 (Sections 10(b) and 20(a) claims); *In re Teva Secs. Litig.*, ___ F. Supp. 3d ___, 2021 WL 231130, at *27 (D. Conn. Jan. 22, 2021) ("Plaintiffs' federal securities law and Israeli securities law claims seem to [be], in every important respect,

---

[2] As used in this section of the memorandum only, the term "Direct Actions" does not include *Fir Tree*.

[3] Specifically:  *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* assert Exchange Act, ISL, PSA, and common law fraud and negligent misrepresentation claims against all five of these defendants; *Phoenix* asserts Exchange Act, ISL, and PSA claims against all five of these defendants; *Harel* asserts Exchange Act, ISL, and PSA claims against Bhattacharjee and McClellan; *Highfields* asserts Exchange Act and common law fraud and negligent misrepresentation claims against McClellan, Peterburg, and Schultz; *INKA*, *Schwab*, and *Stichting* assert Exchange Act and ISL claims against McClellan, Peterburg, and Schultz; *Boeing*, *BH*, *Chicago*, *Pacific*, and *Oregon* assert Exchange Act claims against McClellan, Peterburg, and Schultz; *Franklin* asserts Exchange Act claims against McClellan and Schultz; *Nordea* and *Alaska* assert Exchange Act claims against Altman, McClellan, and Schultz.

identical."); *Rogers v. Gentex Corp.*, 3:16-cv-00137, 2017 WL 889624, at *8 (M.D. Pa. Mar. 6,

2017) (Pennsylvania common law fraud); *id.* at *8 (claim for negligent misrepresentation

requires proof, *inter alia*, of a misrepresentation of material fact "made under circumstances in

which [defendant] ought to have known its falsity [and] with an intent to induce another to act on

it") (internal quotation marks omitted).

"To survive a Rule 12(b)(6) challenge, Plaintiffs must state facts sufficient to give rise to

a strong inference of fraudulent intent." *Loreley Fin. (Jersey) v. Wells Fargo Secs.*, 797 F.3d

160, 176 (2d Cir. 2015) (internal quotation marks omitted). "At the pleading stage, under Rule

9(b), a fraud plaintiff may establish a 'strong inference'…by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness," *id.* at 177 (internal quotation

marks omitted), or facts "showing…that Defendants had both motive and opportunity to commit

fraud," *Goonewardena*, 2019 WL 121677, at *8 (internal quotation marks omitted). The same

showing is required to plead scienter under the PSLRA.[4]

As detailed below, the allegations in the Direct Actions complaints against Altman,

Bhattacharjee, McClellan, Peterburg, and Schultz fall far short of establishing the requisite

"strong inference" of fraudulent intent under either method, taken alone or considered together.

### A.    The "Former Employee" Allegations Recycled From The *Ontario* ACAC Fail To Establish A Strong Inference Of Scienter Against Altman *et al.*

As detailed in Defendants' Memorandum of Law in Support of its Motion to Dismiss on

Pleading and Other Grounds, this Court determined that the *Ontario* ACAC sufficiently pled

scienter against defendants Eyal Desheh, Deborah Griffin, Sigurdur Olafsson, and Erez

---

[4] *See Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) ("In *Novak*, we concluded that the PSLRA 'did not change the basic pleading standard for scienter in this circuit.' Thus, both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA.") (quoting *Novak*, 216 F.3d at 310).

Vigodman (hereinafter, "Desheh *et al.*") based on allegations that they had access to information contradicting their public statements about Teva's purported pricing misconduct and related profits and revenues, which allegations were based – in their entirety – on information purportedly obtained from four unnamed former Teva employees (the "*Ontario* Former Employees").  (*See* Mem. L. in Supp. of Defs.' Mot. to Dismiss on Pleading and Other Grounds, pp. 10-11.)  By contrast, the allegations in the Direct Actions against Altman, Bhattacharjee, McClellan, Peterburg, and Schultz are far less substantial than those found sufficient to plead scienter against Desheh *et al.* in the *Ontario* ACAC.  This is so for several reasons.

In the first place, even though the majority of the Direct Actions complaints summarize, paraphrase, or incorporate by reference the *Ontario* Former Employees allegations, they do not claim that their respective counsel interviewed those employees themselves or took any other steps to independently corroborate their purported statements as required by Rule 11.  As such, "it would be inappropriate to give any weight to these alleged witness statements" here, *In re Lehman Bros. Secs. and ERISA Litig.*, 10-cv-06637, 2013 WL 3989066, at *3, *4 (S.D.N.Y. July 31, 2013), all the more so since one of those witnesses has submitted a sworn declaration stating that material aspects of his statement were misrepresented in the *Ontario* pleadings (*see* Mem. L. in Supp. of Defs.' Mot. to Dismiss on Pleading and Other Grounds, p. 12).

But even if the recycled *Ontario* Former Employees allegations could properly be credited in these Direct Actions, they would still not support a strong inference of scienter against Altman *et al.*  Critically, the Direct Actions complaints are devoid of specific allegations that any of these defendants generated or reviewed the "Scorecards," "Work Plans," or other documents that allegedly provided Desheh *et al.* with information contradicting their public statements.  Likewise, none of the Direct Actions specifically allege that Altman *et al.* had any

direct involvement in the alleged "price-hike strategy" or "collusive pricing."  Indeed, no such allegation could plausibly be made as to Bhattacharjee, McClellan, Peterburg, or Schultz, since these defendants did not assume executive roles at Teva until well **after** the alleged pricing misconduct had ceased.[5]  And though Altman's tenure as Teva's "Acting CFO from October 31, 2014 to February 11, 2014" (*Clal* compl., ¶ 45) overlapped with the initial months of the alleged "price-hike strategy," as noted above, there are **no allegations** connecting him to the reports or pricing decisions that served as the foundation to the Court's scienter finding against Desheh *et al.*

### B.    The Direct Actions Plead No Other Facts Supporting A Strong Inference That Altman *et al.* Had The Requisite Intent To Deceive

As noted above (*supra* p. 5), in the Second Circuit, a plaintiff may establish a strong inference of deceptive intent under both Rule 9(b) and the PSLRA by alleging specific facts showing either motive and opportunity or strong circumstantial evidence of conscious misbehavior or recklessness.  The Direct Actions fail to make either showing as to Altman *et al*.

Under the first standard, "[o]rdinarily a plaintiff establishes motive by alleging that 'corporate insiders…have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit.'"  *Salim v. Mobile Telesystems PJSC*, 19-cv-01589, 2021 WL 796088, at

---

[5] *Compare, e.g.*, *Clal* compl., ¶¶ 115, 123 (alleging "final round" of price increases in July 2015), *and Phoenix* compl., App'x A (listing final price increases in April 2016 and last "parallel price increase" in July 2015), *with Clal* compl., ¶ 47 (Peterburg "served as Teva's Interim President and CEO from February 6, 2017 to October 31, 2017"), ¶ 49 (Bhattacharjee "served as the President and CEO of Teva's Global Generic Medicines Group from December 5, 2016 to December 31, 2017," prior to which time his purview was the U.K. and Western Europe), ¶ 50 (Schultz "has served as Teva's President and CEO since November 1, 2017"), ¶ 51 (McClellan "was Teva's SVP and Interim CFO from July 2017 to November 2017," and "has served as EVP and CFO of Teva since November 2017"; prior to July 2017, his purview was specialty medicines).

*12 (E.D.N.Y. Mar. 1, 2021) (quoting *South Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009)).  The Direct Actions contain no such allegations.

Further, in *Ontario*, this Court recognized an alternative ground for pleading motive – *viz.*, the desire to inflate stock prices in order to fund a corporate transaction – and opined that such motive was likely established as to Desheh *et al.* because the *Ontario* ACAC "more than adequately pled that the [alleged] price-hike strategy was implemented to increase revenue and inflate the price of [Teva's] stocks to use as currency to acquire Actavis."  *Ontario Teachers' Pension Plan Bd.*, 432 F. Supp. 3d at 170.  But here, the Direct Actions do not allege any such motive as to Altman *et al.*, nor could they plausibly do so:  Altman's brief, 104-day tenure as Acting CFO ended in early February 2014, **before** Actavis was identified as a potential acquisition target around mid-2014[6] (*see, e.g.*, *Clal* compl., ¶¶ 45, 433), while Bhattacharjee, McClellan, Peterburg, and Schultz did not assume their various leadership roles until **after** the Actavis acquisition had closed (*see, e.g.*, *id.*, ¶¶ 47, 49-51, 437).

Because the Direct Actions do not and cannot allege motive against Altman *et al.*, plaintiffs' "allegations [of] conscious misbehavior or recklessness 'must be correspondingly greater.'"  *Zecher v. Vince Holding*, 18-cv-5072, 19-cv-05629, 2020 WL 5405663, at *3 (E.D.N.Y. Sept. 8, 2020) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  To survive dismissal, therefore, they "must plead behavior which is 'highly unreasonable' and 'an extreme departure from the standards of ordinary care.'"  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 805 (S.D.N.Y. 2020) (quoting *Novak*, 216 F.3d at 308).  As explained below, the

---

[6] While the Direct Actions allege that Desheh and Vigodman harbored generalized aspirations, as early as January or February 2014, to use Teva's stock as "currency" to fund some type of "transformational" acquisition (*see, e.g.*, *Clal* compl., ¶ 432), those allegations do not implicate Altman.  Notably, the Direct Actions complaints do not allege that any of the alleged price increases were implemented while Altman was Acting CFO (much less that he had any role in or awareness of those increases).  (*See, e.g.*, *Phoenix* compl., App'x A (no alleged price increases between August 9, 2013 and April 4, 2014).)

well-pled factual allegations in the Direct Actions complaints fall woefully short of satisfying this burden.

### 1.     Dipankar Bhattacharjee

Bhattacharjee – who served as President and CEO of Teva's Global Generic Medicines Group from December 2016 through December 2017 – is named as a defendant in seven complaints:  *Clal*, *Harel*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot*.[7]  Though they allege that Bhattacharjee made various statements concerning, *inter alia*, the rates and causes of generic drug price erosion that Teva was anticipating or experiencing (*see, e.g.*, *Clal* compl., ¶ 351; *Harel* compl., ¶¶ 648, 659), these complaints fail to plead any facts supporting a strong inference that Bhattacharjee made these statements with reckless (let alone conscious) disregard for their purported falsity.

To satisfy the recklessness standard, "the complaint must 'specifically allege defendants' knowledge of facts or access to information contradicting their public statements.'"  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, __ F. Supp. 3d. __, 2021 WL 517934, at *4 (S.D.N.Y. Feb. 10, 2021) (quoting *Novak*, 216 F.3d at 308).  Yet the Direct Actions at issue are entirely devoid of any such allegations.  Significantly, though each of these complaints contains a section dedicated to pleading scienter (*see, e.g.*, *Clal* compl., ¶¶ 426-72; *Harel* compl., ¶¶ 753-97), Bhattacharjee is mentioned not once – even in passing – in those sections.  At most, he is alleged to have made challenged statements while he was President and CEO of Teva's Global Generics Medicine Group.  It is "hornbook law" that allegations such as these, "which are founded on

---

[7] All seven complaints assert against Bhattacharjee claims under Sections 10(b) and 20(a) of the Exchange Act, the ISL, and the PSA.  The complaints in *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* also assert claims for common law fraud and negligent misrepresentation.

nothing more than a defendant's corporate position, are entitled to <u>no weight</u>." *Long Miao*, 442

F. Supp. 3d at 806 (emphasis added; internal quotation marks omitted).

### 2.   <u>Yitzhak Peterburg</u>

Peterburg – Teva's Interim President and CEO from February 2017 through October

2017 – is named as a defendant in fifteen Direct Actions:  *Boeing*, *BH*, *Chicago*, *Clal*,

*Highfields*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Oregon*, *Pacific*, *Phoenix*, *Psagot*,

*Schwab*, and *Stichting*.  These complaints take issue with certain statements Peterburg made

concerning the status of efforts to integrate the newly-acquired Actavis into Teva's generics

business.[8]  As was the case with Bhattacharjee, however, these complaints fail to plead facts

indicating that Peterburg knew or had access to specific facts contradicting those statements.

Additionally, these complaints also seek to hold Peterburg liable for alleged

misstatements or omissions in Teva's 2016 Form 20-F, filed on February 15, 2017, because he

signed the accompanying Sarbanes-Oxley ("SOX") certification.[9]  But "courts in this circuit

regularly hold that the signing of a SOX certification, without more, is insufficient to plead

scienter."  *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y.

2019).  Indeed, a plaintiff "cannot raise an inference of fraudulent intent based on the signing of

a certification without alleging any facts to show a concomitant awareness of or recklessness to

the materially misleading nature of the statements."  *In re Aceto Corp. Secs. Litig.*, 2:18-cv-

---

[8] *See, e.g.*, *Boeing* compl., ¶¶ 268, 273; *BH* compl., ¶¶ 233, 238; *Chicago* compl., ¶¶ 261, 266; *Clal* compl., ¶¶ 419, 424; *Highfields* compl., ¶¶ 280, 285; *INKA* compl., ¶¶ 265, 270; *Migdal Ins.* compl., ¶¶ 419, 424; *Migdal Mut.* compl., ¶¶ 419, 424; *Mivtachim* compl., ¶¶ 419, 424; *Oregon* compl., ¶¶ 261, 266; *Pacific* compl., ¶¶ 267, 272; *Phoenix* compl., ¶¶ 668, 699; *Psagot* compl., ¶¶ 419, 424; *Schwab* compl., ¶¶ 266, 271; *Stichting* compl., ¶¶ 266, 271.  The *Phoenix* complaint also challenges various statements by Peterburg on calls or in reports regarding Teva's commitment to uphold ethical standards and comply with applicable laws (*see, e.g.*, ¶¶ 670, 675).

[9] *See Boeing* compl., ¶ 270; *BH* compl., ¶ 235; *Chicago* compl., ¶ 263; *Clal* compl., ¶¶ 232, 421; *Highfields* compl., ¶ 282; *INKA* compl., ¶ 267; *Migdal Ins.* compl., ¶¶ 232, 421; *Migdal Mut.* compl., ¶¶ 232, 421; *Mivtachim* compl., ¶¶ 232, 421; *Oregon* compl., ¶ 263; *Pacific* compl., ¶ 269; *Phoenix* compl., ¶ 589; *Psagot* compl., ¶¶ 232, 421; *Schwab* compl., ¶ 268; *Stichting* compl., ¶¶ 268.

02425, 2019 WL 3606745, at *8 (E.D.N.Y. Aug. 6, 2019) (internal quotation marks omitted). Because these fifteen complaints plead no such facts, Peterburg's signing of a SOX certification adds "nothing…to the scienter calculus." *Zhong Zhen*, 379 F. Supp. 3d at 181 (internal quotation marks omitted).

### 3. Yaacov Altman

Altman is named as a defendant in eight Direct Action complaints. Six of them – *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* – fail to plead <u>any</u> specific scienter allegations as to Altman. At most, they allege that he signed one or more corporate filings and their accompanying SOX certifications. (*See Clal* compl., ¶ 232; *Migdal Ins.* compl., ¶ 232; *Migdal Mut.* compl., ¶ 232; *Mivtachim* compl., ¶ 232; *Phoenix* compl., ¶¶ 589, 746; *Psagot* compl., ¶ 232.) As was the case with Peterburg, these allegations do nothing to support an inference of scienter. *See Long Miao*, 442 F. Supp. 3d at 807-08 ("[W]here a plaintiff does not adequately alleged that defendants had actual knowledge of the alleged activity underlying the allegations of fraud, it undermines the allegations that they knew that the [SOX] certifications were false.") (internal quotation marks omitted).

The two remaining actions – *Alaska* and *Nordea* – likewise allege that Altman signed filings and certifications (*see Alaska* compl., ¶¶ 130, 283; *Nordea* compl., ¶¶ 143, 296), but seek to supplement those deficient pleadings with the boilerplate allegation that certain individual defendants, including Altman, knew or must have known that the statements in those documents were false because of their "high-level positions" at Teva. (*See Alaska* compl., ¶ 278 ("Because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the document alleged herein to be false or misleading…. Because of their positions and access to material non-public information…, the Individual Defendants knew or recklessly disregarded [the true facts, etc.]"); *Nordea* compl., ¶ 291 (same).)

The law is clear, however, that "general claims about what [] executives must have known based on their respective job titles" are insufficient, without more, to establish recklessness.  *Salim*, 2021 WL 796088, at *13; *see also Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434-35 (S.D.N.Y. 2017) ("plaintiff cannot allege scienter by merely point to [defendant CEO's] job title").  Absent "concrete allegations as to [defendants'] knowledge" of the relevant facts, a plaintiff's conclusory allegations that defendants "were privy to confidential [corporate] information and had knowledge of the details of [the company's] internal affairs because of their senior positions…are entitled to no weight."  *Long Miao*, 442 F. Supp. 3d at 806 (internal quotation marks omitted).  Here, as noted above (*supra* pp. 5-9), plaintiffs have failed to allege any specific facts giving rise to a strong inference that Altman was aware of, much less involved in, the alleged pricing misconduct during his brief tenure as Acting CFO.

### 4.   Michael McClellan

McClellan – Teva's Interim CFO from July 2017 to November 2017, and Senior VP and CFO from November 2017 to November 2019 – is named as a defendant in nineteen of the Direct Actions.  The putative scienter allegations in sixteen of these actions – *Boeing*, *BH*, *Chicago*, *Clal*, *Harel*, *Highfields*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Oregon*, *Pacific*, *Phoenix*, *Psagot*, *Schwab*, and *Stichting* – are substantively indistinguishable from those asserted against Peterburg, in that they rely __entirely__ on McClellan's signing of various corporate filings and SOX certifications.[10]  And for the same reasons, these allegations are deficient as a matter of law as against McClellan because none of these sixteen complaints pleads specific facts "show[ing] a concomitant awareness of or recklessness to the materially misleading nature" of

---

[10] *See Boeing* compl., ¶ 261; *BH* compl., ¶ 226; *Chicago* compl., ¶ 254; *Clal* compl., ¶¶ 232, 412; *Harel* compl., ¶ 581; *Highfields* compl., ¶ 273; *INKA* compl., ¶ 258; *Migdal Ins.* compl., ¶¶ 232, 412; *Migdal Mut.* compl., ¶¶ 232, 412; *Mivtachim* compl., ¶¶ 232, 412; *Oregon* compl., ¶ 254; *Pacific* compl., ¶ 260; *Phoenix* compl., ¶ 589; *Psagot* compl., ¶¶ 232, 412; *Schwab* compl., ¶ 259; *Stichting* compl., ¶ 259.

those filings or any other statements attributed to him. *In re Aceto*, 2019 WL 3606745, at *8 (internal quotation marks omitted).

The three remaining actions – *Alaska*, *Franklin*, and *Nordea* – also allege that McClellan signed public filings and certifications (*see Alaska* compl., ¶ 241; *Franklin* compl., ¶ 251; *Nordea* compl., ¶ 254), yet likewise fail to plead facts showing his actual knowledge or reckless disregard of the purported falsity of their contents. Further, in the same boilerplate terms used against Altman, these complaints allege that Teva executives, including McClellan, knew or must have known of the falsity in corporate filings because of their "high-level positions [and] access to information about [Teva's] generics business." (*See Alaska* compl., ¶ 278; *Franklin* compl., ¶ 288; *Nordea* compl., ¶ 291.) Yet as with Altman, these allegations are entitled to no weight here because plaintiffs fail to "adequately allege that [McClellan] had actual knowledge of the activity underlying the allegations of fraud." *Long Miao*, 442 F. Supp. 3d at 807-08 (internal quotation marks omitted).

These three complaints also contain an allegation not present in any of the other sixteen actions that assert claims against McClellan:

> It is implausible that Vigodman, Desheh, Olafsson…and McClellan, who directly oversaw…the 'turnaround' in Teva's generics business, were unaware of the true source of [Teva's] changed fortunes. The far more compelling inference is that these executives, whose ascension and arrival coincided with massive price increases…were well aware that the price increases were the true driving force behind [Teva's] newfound success.

(*Alaska* compl., ¶ 267; *Franklin* compl., ¶ 277; *Nordea* compl., ¶ 280.) These allegations fall far short of supporting the strong, "cogent and…compelling" inference of scienter required to survive a motion to dismiss. *Loreley*, 797 F.3d at 176-77 (internal quotation marks omitted). Indeed, as to McClellan, they are not even coherent.

13

As described in the immediately preceding paragraphs of the complaints, Teva's "striking turn around [sic]" began in 2013 and culminated in July 2015.  (*See Alaska* compl., ¶¶ 263-66; *Franklin* compl., ¶¶ 273-76; *Nordea* compl., ¶¶ 276-79.)[11]  Yet McClellan did not assume an executive position relative to Teva's generics business until July 2017,[12] long after the culmination of Teva's "turnaround" in July 2015 and the last round of its alleged price hikes in "early 2016" (*Franklin* compl., ¶ 125).  Thus, it is self-evidently <u>not</u> the case that McClellan "directly oversaw" Teva's "turnaround" or that his "ascension and arrival coincided with massive price increases."  Because these allegations are "contradicted by more specific allegations" in the complaints, they "are not entitled to a presumption of truthfulness," *Gjidija v. U.S.*, 18-cv-00259, 2019 WL 2615438, at *6 (S.D.N.Y. June 26, 2019) (internal quotation marks omitted), and thus necessarily cannot support a strong inference of fraudulent intent.

### 5.   <u>Kåre Schultz</u>

Schultz – Teva's President and CEO since November 2017 – is named as a defendant in eighteen Direct Actions:  *Alaska*, *Boeing*, *BH*, *Chicago*, *Clal*, *Franklin*, *Highfields*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Nordea*, *Oregon*, *Pacific*, *Phoenix*, *Psagot*, *Schwab*, and *Stichting*.  Each of these complaints alleges that Schultz signed SOX certifications attached to Teva's public filings.[13]  But as explained above, the fact that an officer has signed a certification

---

[11] *See also Alaska* compl., ¶ 15 ("On July 27, 2015, when Teva's stock reached an all-time high [of $72 per share], Teva's master plan came to fruition when it announced the purchase of…Actavis."); *Franklin* compl., ¶ 15 (same); *Nordea* compl., ¶ 15 (same).

[12] As alleged, McClellan became Teva's "Interim Group CFO" in July 2017, before becoming its "Executive Vice President and CFO" from November 2017 until November 8, 2019.  (*See, e.g., Alaska* compl., ¶ 37.)  Before these posts, McClellan is alleged to held the positions of "Senior Vice President and CFO" of Teva's "Global <u>Specialty</u> Medicines" (*id.* (emphasis added)), a business segment that was not involved with generics.

[13] *See Alaska* compl., ¶ 241; *Boeing* compl., ¶ 261; *BH* compl., ¶ 226; *Chicago* compl., ¶ 254; *Clal* compl., ¶¶ 232, 412; *Franklin* compl., ¶ 251; *Highfields* compl., ¶ 273; *INKA* compl., ¶ 258; *Migdal Ins.* compl., ¶¶ 232, 412; *Migdal Mut.* compl., ¶¶ 232, 412; *Mivtachim* compl., ¶¶ 232, 412; *Nordea* compl., ¶ 254; *Oregon* compl., ¶ 254; *Pacific* compl., ¶ 260; *Phoenix* compl., ¶ 589; *Psagot* compl., ¶¶ 232, 412 *Schwab* compl., ¶ 259; *Stichting* compl., ¶ 259.

adds nothing to the scienter calculus in the absence of concrete "factual allegations to show that [the officer was] aware of or reckless to any alleged misstatements contained therein." *In re Aceto*, 2019 WL 3606745, at *8.  No such allegations are pled as to Schultz.

These complaints also point to the following statements by Schultz on November 7, 2019 during an earnings call:  "'We have…shared more than 1 million documents with [the DOJ].  We have not found any evidence that we were in any way part of any structured collusion or price fixing.'"  (*See, e.g.*, *Alaska* compl., ¶ 277.)[14]  According to plaintiffs, "[t]hese statements underscore that Defendants knew Teva was a central actor in collusive conduct or, at a minimum, recklessly failed to review or check information…that would have revealed that fact." (*Id.*)  To the contrary, these allegations do nothing to support a strong inference of scienter against Schultz for two reasons.

In the first place, this statement was made <u>after</u> the end of the various "relevant periods" defined in these complaints (*i.e.*, the period spanning the first actionable misrepresentation or omission until the final corrective disclosure).[15]  As such, Schultz's statement sheds no light on what he (or any other defendant) knew or should have known at the time of his purported misstatements.  *See In re Elan Corp. Secs. Litig.*, 02-cv-00865, 2004 WL 1305845, at *23 (S.D.N.Y. May 18, 2004) ("[T]he fact that [defendant] may have denied any wrongdoing in 2002, after the relevant facts became known, does not establish that he had a motive to act in a fraudulent manner at an earlier time.").  Second, and more fundamentally, plaintiffs' attempt to construe Schultz's <u>denial</u> of alleged corporate wrongdoing as evidence of his (and other

---

[14] *See also Boeing* compl., ¶ 309; *BH* compl., ¶ 290; *Chicago* compl., ¶ 310; *Clal* compl., ¶ 469; *Franklin* compl., ¶ 287; *Highfields* compl., ¶ 340; *INKA* compl., ¶ 346; *Migdal Ins.* compl., ¶ 469; *Migdal Mut.* compl., ¶ 469; *Mivtachim* compl., ¶ 469; *Nordea* compl., ¶ 290; *Oregon* compl., ¶ 310; *Pacific* compl., ¶ 348; *Phoenix* compl., ¶ 816; *Psagot* compl., ¶ 469; *Schwab* compl., ¶ 347; and *Stichting* compl., ¶ 347.

[15] The latest "relevant period" alleged in these actions ends on May 30, 2019 (*see, e.g.*, *Clal* compl., ¶ 1); the earliest ends on December 10, 2018 (*see Boeing* compl., p. 1).

defendants') <u>knowledge</u> of such alleged wrongdoing stands logic on its head, and would effectively eviscerate the "strong inference" standard in the Second Circuit. *See id.* at *28 ("[I]f a denial of wrongdoing could serve as the factual predicate for a showing of scienter[,] this element...would become a mere formality in any action in which the individual defendants...did not concede liability.").

Next, plaintiffs in five actions – *INKA*, *Pacific*, *Phoenix*, *Schwab*, and *Stichting* – also attempt to show scienter based on Schultz's alleged statement on December 14, 2017 that "we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary." (*INKA* compl., ¶ 274; *see also Pacific* compl., ¶ 276; *Phoenix* compl., ¶ 777; *Schwab* compl., ¶ 275; and *Stichting* compl., ¶ 275.)  Plaintiffs contend that this statement – made barely six weeks after Schultz joined Teva – reveals his "self-proclaimed personal involvement" in pricing decisions and thus shows that he "possessed knowledge of the true state of affairs of the business, and thus had knowledge that [his] representations were misleading, or [was] reckless in not knowing." (*INKA* compl., ¶ 275; *see also Pacific* compl., ¶ 277; *Phoenix* compl., ¶ 778; *Schwab* compl., ¶ 276; and *Stichting* compl., ¶ 276.)  Plaintiffs are incorrect.  "[S]imply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information" contradicting their allegedly false public statements.  *Maloney*, 2021 WL 517934, at *6 (internal quotation marks omitted).[16]  As previously discussed, these complaints are devoid of concrete allegations that Schultz knew or had access to any such information.

---

[16] *See also City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 19-cv-10825, 2021 WL 212337, at *2-3, *9-10 (S.D.N.Y. Jan. 21, 2021) (allegations that CEO, who signed SOX certifications, is "involved in all aspects of [the company's] business," is "on top of what goes on," and has a "hands-on management approach" held insufficient to plead a strong inference of conscious misbehavior or recklessness, where complaint did not allege that CEO was "exposed to specific information" about company's unlawful conduct).

Finally, the complaints in three actions – *Alaska*, *Franklin*, and *Nordea* – recycle the same ineffective allegations they deployed against McClellan.  They allege that Schultz must have known about alleged pricing misconduct because of his "high-level position[]" and "access to information [and]documents" (*see Alaska* compl., ¶ 278; *Franklin* compl., ¶ 288; *Nordea* compl., ¶ 291), yet fail to specifically allege specific documents or reports contradicting his public statements.  They also allege that it is "implausible" Schultz was "unaware of the true source of [Teva's] changed fortunes" because he "directly oversaw…the 'turnaround' in Teva's generics business" and his "arrival coincided with massive price increases."  (*Alaska* compl., ¶ 267; *Franklin* compl., ¶ 277; *Nordea* compl., ¶ 280.)  But, as was the case with McClellan, this conclusory allegation cannot be credited – let alone support a strong inference of scienter – because it is contradicted by more specific allegations establishing that Schultz did not join Teva until November 1, 2017, long <u>after</u> the "turnaround" and the last of the alleged price hikes.  (*See supra* pp. 14-16 and n.5.)

*      *      *

For the foregoing reasons, because these complaints fail to plead specific facts supporting a "strong inference" that Altman, Bhattacharjee, McClellan, Peterburg, or Schultz made any challenged statement with scienter as is required under Rule 9(b) and the PSLRA, as applicable, plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act, the ISL, the PSA, and Pennsylvania common law must be dismissed as against these defendants.[17]

---

[17] The Section 20(a) claims asserted against Bhattacharjee in seven Direct Actions – *Clal*, *Harel*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* – must also be dismissed for failure to plead "actual control." Bhattacharjee is not alleged to have signed any corporate filings, but rather to have had control merely "by virtue" of being president and CEO of Teva's Global Generics Medicines Group from December 5, 2016 until December 31, 2017 (*i.e.*, <u>after</u> the alleged pricing misconduct occurred).  (*See, e.g.*, *Clal* compl., ¶¶ 49, 578; *Harel* compl., ¶¶ 51, 903.)  Under well-settled precedent, such "control-by-status" allegations are an insufficient basis for control person liability.  *See In re Sotheby's Holdings Secs. Litig.*, 00-cv-01041, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) ("[O]fficer…status alone does not constitute control.").

II.     **CLAIMS BASED ON ALLEGED MISREPRESENTATIONS AND OMISSIONS REGARDING THE OPIOID SCHEME, BRIBERY SCHEME, AND ACTAVIS ACQUISITION MUST BE DISMISSED**

In the *Ontario* ACAC, which provided the template for the Direct Actions,[18] class plaintiffs asserted claims based on "four types of false and misleading statements and omissions," namely: (1) "Item 5 non-disclosure"; (2) false statements "regarding [generics] competition"; (3) false and misleading "pricing statements" attributing the ebb and flow of Teva's generics revenues to sources other than the alleged "price-hike strategy" and collusive pricing; and (4) failure to "disclose…subpoenas from the DOJ and State Attorneys General in connection with their antitrust investigations into the generics industry." *Ontario Teachers' Pension Plan Bd.*, 432 F. Supp. 3d at 150 (quoting *Ontario* ACAC, ¶ 155). While all of the Direct Actions complaints recapitulate some or all of these same categories of purported misrepresentations[19] as predicates for their claims against defendants, a majority of them introduce entirely new theories of liability based on one or more new, distinct categories of misrepresentations and omissions. For the reasons detailed below, all claims based on these new categories must be dismissed.

A.     **Claims Based On Alleged False And Misleading Statements About The Purported Opioid Scheme Must Be Dismissed**

Five Direct Actions – *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* – allege, as a stand-alone basis for liability, that throughout the "Relevant Period [*i.e.*, February 6, 2014

---

[18] As used in this section of the memorandum, the term "Direct Actions" refers to all of the opt-out actions that were consolidated with *Ontario*, except for *OZ*, as noted earlier. (*See supra* n.1.)

[19] A majority of the Direct Actions continue to premise their claims on the same allegations from the *Ontario* ACAC regarding non-disclosure of subpoenas despite this Court's finding that defendants had no duty to disclose the subpoenas any earlier than they did. *See Ontario Teachers' Pension Plan Bd.*, 432 F. Supp. 3d at 168. As such, these eleven actions – *Alaska*, *Chicago*, *Clal*, *Harel*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Nordea*, *Phoenix*, *Psagot*, and *Oregon* – are in non-compliance with this Court's directive, in its consolidation order, that the complaints designated by the Direct Actions plaintiffs as operative "shall conform to the Court's ruling on motions to dismiss in the *Ontario* Action." (ECF 352, ¶ 12.)

through May 30, 2019], Defendants concealed Teva's illegal marketing of opioids for off-label uses, and subsequently, materially understated the material impact their marketing practices would have on [Teva]."  (*Clal* compl., ¶ 388.)[20]  All claims based on these allegations must be dismissed for multiple, independent reasons.

### 1.   Failure To Plead Actionable Misrepresentations Or Omissions

As a threshold matter, plaintiffs fail to plead with particularity that any of the challenged statements were actually false or omitted any material information that defendants had a duty to disclose.

As alleged, the challenged statements relating to opioids fall into three categories:  (1) disclosures in annual filings "concerning risks associated with the sale of [Teva's] products for non-approved purposes" (*Clal* compl., ¶ 390); (2) statements in annual and quarterly filings disclosing that Teva was the target of "numerous complaints" and investigations by State Attorneys Generals in connection with its alleged sales and marketing practices with respect to the off-label use of opioids (*see id.*, ¶¶ 392-97); and (3) denials that Teva had engaged in the alleged wrongdoing (*see id.*, ¶¶ 398-99).  According to plaintiffs, these statements were "false and/or misleading" because they "failed to disclose that [] Teva and its affiliates had purposefully promoted non-FDA approved uses of its opioid products."  (*Id.*, ¶ 391.)  This is incorrect for two reasons.

First, under the Exchange Act, the PSA, and Pennsylvania common law, "an omission is actionable as fraud only where there is an independent duty to disclose the omitted information." *Estate of Evasew*, 526 Pa. 98, 105 (Pa. 1990).[21]  The law in this Circuit is also clear that

---

[20] Because the complaints in these five actions are verbatim copies, for brevity's sake this section will cite to the *Clal* complaint only.

[21] *See also South Carolina Retirement Sys. Grp. Trust v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) ("[W]e have consistently held that an omission is actionable under the [federal] securities laws only when the

"companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation marks omitted); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018) (same).  And though a duty to disclose may arise "when, absent disclosure, a statement would be false or misleading," *Schiro v. Cemex S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019), these complaints fail to allege that any of Teva's affirmative statements were incomplete or materially misleading.

For example, plaintiffs take issue with disclosures in Teva's annual and quarterly filings regarding lawsuits and investigations into its alleged improper marketing and sale of opioids (*see Clal* compl., ¶¶ 388-400), yet they fail to explain with the requisite specificity what, if anything, about those disclosures was false or misleading.  Rather, as is clear from the face of those disclosures, Teva divulged in plain and unvarnished terms the nature of the claims against it, its potential liability, and the current procedural posture of those lawsuits.  (*See, e.g.*, *id.*, ¶ 394 ("In the 2015 20-F [Teva] disclosed that the Mississippi Attorney General filed a lawsuit…'[that] asserts claims under [] state law based upon alleged improper marketing of opioids…and seeks a variety of damages including restitution, civil penalties, disgorgement of profits, treble damages, attorneys' fees, and injunctive relief.… Teva [and co-defendants] filed joint and individual motions to dismiss.…'").)[22]

---

corporation is subject to a duty to disclose the omitted facts.") (internal quotation marks omitted); *Fulton Bank, N.A. v. UBS Secs., LLC*, 10-cv-01093, 2011 WL 5386376, at *8 (E.D. Pa. Nov. 7, 2011) (dismissing PSA claim where complaint "failed to allege that [defendant] had a duty to disclose"); *Sylk v. Bernsten*, 2003 WL 1848565, at *5 (Pa. Ct. Com. Pl. Feb. 4, 2003) (dismissing negligent representation where complaint "failed to assert…an omission along with a duty to disclose").

[22] Though plaintiffs also purport to find fault with disclosures in Teva's annual filings "concerning risks associated with the sale of its products for non-approved purposes" (*Clal* compl., ¶ 390), they again fail to identify anything in the quoted language that is false or misleading.  Nor can plaintiffs credibly argue that this language is misleadingly incomplete because it is too general, given that these same filings explicitly disclosed lawsuits and investigations concerning opioids specifically.

Second, it is well-settled in this Circuit that where, as here, "securities fraud claims are based on [defendants'] failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Das*, 332 F. Supp. 3d at 803 (internal quotation marks omitted).  Moreover, "the facts of the underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019).  Yet the plaintiffs in these five Direct Actions do not come even close to pleading particularized facts sufficient to state a plausible claim that Teva's marketing and sales of opioids was illegal.

Instead, in seven short paragraphs (*see Clal* compl., ¶¶ 213-219), plaintiffs offer up a smattering of vague, anecdotal, and internally inconsistent allegations.  For example, they allege that in 2009, Teva sponsored and paid to publish a medical journal supplement that promoted the off-label use of two branded opioid products (Actiq and Fentora) manufactured by a <u>different</u> pharmaceutical company, Cephalon, two years <u>before</u> it was acquired by Teva.  (*See id.*, ¶¶ 208, 214.)  They also allege that, at some <u>unspecified point in time</u>, Teva sponsored a consumer guide "downplay[ing] the risk of addition from opioids" (*id.*, ¶ 216), and nominated doctors "for lucrative paid speaking engagements, with the expectation that the speakers would increase their prescribing of [opioids]" (*id.*, ¶ 217).  Plaintiffs further recount that Teva sales representatives "were given sales targets which were not achievable without expanding into non-oncological practices," yet the sole source for this allegation is an unidentified witness[23] "who marketed Fentora between 2012 and 2013."  (*Id.*, ¶ 218.)  In sum, because these complaints "offer nothing more than conclusory allegations" about Teva's purported improper marketing of opioids, their

---

[23] Notably, these complaints fail to provide any indication that counsel actually spoke with (or even knows the identity of) this witness, much less that counsel took any steps to independently corroborate these allegations.  As such, this allegation is entitled to no weight.  (*See supra* p. 6.)

"[fraud] claims premised on the *nondisclosure* of [that conduct] are fatally flawed." *In re Axis Cap. Holdings Ltd. Secs. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (emphasis in original).

Having failed to plead any actionable statement or omission regarding opioids, Plaintiffs' claims based on this category of statements should be dismissed for this reason alone.

### 2.    Failure To Plead Scienter

While these five actions purport to assert claims based on the alleged Opioid Scheme against all "Defendants" generally (*see Clal* compl., ¶¶ 388-89, 391), the only defendants specifically identified as having made any challenged statements are "Teva" (in connection with the company's public filings (*see id.*, ¶¶ 390, 392-98, 400)) and Schultz (in connection with statements made during a May 2, 2019 earnings call (*see id.*, ¶ 399-400)).  Plaintiffs fail to plead facts establishing a strong inference of scienter against these (or any other) defendants.

"When the defendant is a corporate entity,…the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 455 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs' cursory allegations here fail to allege any such facts, even in conclusory terms.  As noted, aside from Schultz (and an unnamed sales representative), the complaints do not identify any corporate employee or executive who had actual knowledge or access to information contradicting the challenged statements in Teva's filings (which, as already explained, were neither false nor misleading).

Nor are any such facts pled as to Schultz.  Whereas the scienter allegations against him regarding the putative "price-hike strategy" were deficient because they were too conclusory, those regarding the purported Opioid Scheme are all but non-existent.  Plaintiffs draw attention to Schultz's May 2, 2019 statement that "from my point of view, I can't see anything which

we've done, which is wrong, given the law and the rules of pharmaceutical manufacturing sales in the U.S." (*Clal* compl., ¶ 399), yet they fail to explain how this "denial of wrongdoing [] creates the inference that Defendants knowingly committed wrongdoing." *U.S. v. CVS Caremark Corp.*, 09-cv-04672, 2015 WL 5582553, at *58 (E.D. Pa. Sept. 22, 2015).  Obviously it does not. *See Elan Corp.*, 2004 WL 1305845, at *23 ("[I]f the mere denial of a…plaintiff's accusations were sufficient to establish a defendant's scienter, the requirement of pleading the requisite mental state with particularity would frequently become a mere formality.").

Plaintiffs' attempt to bootstrap an inference of corporate scienter from the fact that Teva settled – with no admission of liability[24] – certain opioid-related lawsuits (*see Clal* compl., ¶¶ 468, 565) fails for the same reason. *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Secs., Deriv. & ERISA Litig.*, 892 F. Supp. 2d 59, 76 (D.D.C. 2012) (finding that defendant's settlement denying liability did not constitute evidence of scienter); *CVS Caremark*, 2015 WL 5582553, at *23 (rejecting argument that denial of wrongdoing constitutes evidence of scienter, otherwise "an inference of knowledge would be presumed every time a defendant maintained its innocence").

### 3.  Failure To Plead Loss Causation

As discussed above, to adequately plead loss causation, a plaintiff must allege that the price of securities fell when some previously concealed, material negative fact was revealed to the market, whether by means of a corrective disclosure or the materialization of a concealed

---

[24] *See* Santa Clara County Counsel's Office May 24, 2017 press release, p. 2 ("Teva has expressly denied any wrongdoing") (available at https://www.sccgov.org/sites/opa/nr/Documents/Teva%20settlement%20press%20release%20FINAL%2052417.pdf); Teva Q2 2019 Form 10-Q, p. 36 ("The settlement [with the Oklahoma Attorney General] did not include any admission of violation of law for any of the claims or allegations made.") (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000818686/000119312519215317/d768753d10q.htm).  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (on a motion to dismiss, court may properly consider document where the complaint "relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation marks omitted).

risk.  (*See* Mem. L. in Supp. of Defs.' Mot. to Dismiss on Pleading and Other Grounds, p. 15.)
But these five Direct Actions fail to plead either.

The sole loss causation allegation in these complaints relating to the putative Opioid
Scheme is that the price for Teva's securities fell by approximately 12.4% following the
company's May 26, 2019 announcement that it had reached an $85 million settlement with the
State of Oklahoma to resolve the state's claims relating to Teva's sales and marketing of opioids.
(*See Clal* compl., ¶¶ 565-66.)  While Plaintiffs allege that it was not until this "new negative
information" emerged that "the market began to understand the true…extent" of Teva's potential
exposure (*see id.*, ¶¶ 566-67), that bald assertion is belied by the numerous, specific disclosures
Teva made in its public filings throughout the relevant period about the very risk plaintiffs allege
was concealed (*see supra* p. 20).  Indeed, Teva repeatedly and candidly addressed the risk of
potentially substantial liability with respect to opioids, including in the Form 10-Q it filed on
May 2, 2019, three weeks before the settlement with Oklahoma was announced:

> Since May 2014, ***approximately 1,500 complaints*** have been filed with respect to
> opioid sales and distribution against various Teva affiliates…. Plaintiffs seek a
> variety of remedies, including restitution, civil penalties, disgorgement of profits,
> treble damages, attorneys' fees and injunctive relief.  Certain plaintiffs assert that
> ***the measure of damages is the entirety of the costs associated with addressing the
> abuse of opioids and opioid addiction***.  None of the complaints specify the exact
> amount of damages at issue; however, ***an adverse resolution of any of these
> lawsuits or investigations may involve large monetary penalties and could have a
> material and adverse effect on Teva's reputation, business, results of operations
> and cash flows***.[25]

In short, because these complaints fail to plead facts showing that the drop in Teva's
stock prices following announcement of the settlement "was caused by the materialization of a
*concealed* risk as opposed to a *disclosed* risk," plaintiffs' claims based on the alleged Opioid

---

[25] *See* Teva Form 10-Q filed May 2, 2019, p. 33 (emphasis added) (available at https://www.sec.gov/Archives/edgar/data/818686/000119312519134970/d724389d10q.htm).  The Court may properly consider this document because it is expressly cited and relied on in these complaints.  (*See Clal* compl., ¶¶ 376, 385, 398.)

Scheme must be dismissed for lack of causation.  *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014) (emphasis in original); *see also Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (same).

### 4.  The PSA Claims Are Time-Barred

Plaintiffs' PSA claims based on the Opioid Scheme must also be dismissed because they are time-barred.  As previously noted, plaintiffs contend that the "true and devastating extent of Teva's [opioid-related] legal liabilities" was revealed to the market on May 26, 2019.  (*Clal* compl., ¶¶ 565, 567.)  Accordingly, the one-year statute of limitations for claims under the PSA began to run on that date.  *See* 70 P.S. § 1-504(a).  To be timely, therefore, plaintiffs' PSA claims must have been brought, at the latest, by May 26, 2020.  Because these Direct Actions did not assert the Opioid Scheme as a basis for liability until they filed their amended complaints on May 28, 2020 (*see* ECF 389-400), these claims are untimely.

### B.  Plaintiffs' "Bribery Scheme" Allegations Fail To State A Plausible Claim

Two Direct Actions – *Harel* and *Phoenix* – assert as a separate basis for liability that defendants Teva, Desheh, Olafsson, and Vigodman made false and misleading statements concerning Teva's "worldwide bribery scheme…centered around its key drug Copaxone." (*Phoenix* compl., ¶ 70.)[26]  As detailed below, plaintiffs' claims based on these Bribery Scheme allegations must be dismissed for several reasons.

### 1.  Failure To Plead Actionable Misrepresentations Or Omissions

Plaintiffs challenge statements in Teva's corporate filings and on earnings calls during the approximately two-year period running from February 10, 2014 until February 11, 2016. (*See Phoenix* compl., ¶¶ 759-67.)  These fall into three categories:  statements reporting

---

[26] For brevity's sake, citations in this section will primarily be to the *Phoenix* complaint, to which the *Harel* complaint is virtually identical.

Copaxone revenues outside of the U.S. (*see id.*, ¶¶ 759, 762, 764); statements discussing contemporaneous efforts to obtain marketing approvals, registrations, and promote sales of Copaxone in Russia, Ukraine, and Mexico (*see id.*, ¶¶ 759, 761, 763, 766); and statements touting the company's ethics, integrity, and legal compliance (*see id.*, ¶¶ 760, 765.)  Plaintiffs allege that these statements were false and misleading because they failed to disclose that Teva's local subsidiaries were "bribing government officials" to improperly influence registrations, promotion, and prescription decisions relating to Copaxone.  (*Id.*, ¶ 767.)

These allegations fail to plead a plausible basis for liability, however, for one simple reason.  Whereas the challenged statements represent current facts and events (from February 2014 to February 2016), the misconduct at issue in the Bribery Scheme occurred from 2006 through 2012, and thus had come to an end **two years earlier**.  This is evident from the Deferred Prosecution Agreement that Teva entered into with the Department of Justice on December 22, 2016 ("DPA"),[27] which plaintiffs expressly incorporated by reference into their complaints.  (*See Phoenix* compl., ¶ 70 n.2.)  By assiduously omitting this crucial piece of information from their pleadings, plaintiffs give the misleading impression that the challenged statements were contradicted by contemporaneous events.  Placed into context, however, it is clear that they were not.  *See Gjidija*, 2019 WL 2615438, at *6 ("[A]llegations in a complaint that are contradicted by…documentary evidence are not entitled to a presumption of truthfulness.") (internal quotation marks omitted).

Plaintiffs' failure to allege any contemporaneous misconduct relating to the Bribery Scheme further undercuts their effort to base a claim on Teva's "Corporate Social Responsibility

---

[27] *See* Deferred Prosecution Agreement, Attachment A, ¶¶ 16-17, 52-53 (available at https://www.justice.gov/criminal-fraud/file/920436/download).

Reports," describing the company's "aim[] to build a culture of integrity and ethical behavior in every country where we do business" and its adherence "to the ethical marketing guidelines in our Code of Business Conduct in all countries" (*Phoenix* compl., ¶¶ 760, 765).  Courts in this Circuit have repeatedly recognized that general and aspirational statements, such as these, about corporate integrity, legal compliance, and codes of conduct are not actionable.  *See Salim*, 2021 WL 796088, at *11; *see also ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (same).

## 2.    Failure To Plead Scienter

Insofar as they are based on the Bribery Scheme, Plaintiffs' claims under the Exchange Act, the ISL, and the PSA must also be dismissed for failure to plead specific facts establishing a strong inference of scienter.  The complaints are devoid of allegations that the individual defendants Desheh, Olafsson, and Vigodman knew or had access to information contradicting their public statements (which were in any event not false).  *See Maloney*, 2021 WL 517934, at *4.  As a consequence, plaintiffs likewise fail to plead scienter against Teva.  *See Teamsters Local 455*, 531 F.3d at 195 (to adequately allege corporate scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

## 3.    Plaintiffs' Securities Act and PSA Claims Are Time-Barred

The sole corrective disclosure regarding the Bribery Scheme alleged in these complaints is Vigodman's statement on a November 15, 2016 earnings call that Teva had set aside $500 million in provisions in connection with settlement discussions with the Department of Justice and the Securities and Exchange Commission.  (*See Harel* compl., ¶ 831; *Phoenix* compl., ¶ 853.)  To be timely, therefore, plaintiffs' claims with one-year statutes of limitations (*i.e.*, under the Securities Act and the PSA) had to have been asserted by no later than November 15, 2017,

and those with two-year limitations periods (*i.e.*, under the Exchange Act) had to have been brought on or before November 15, 2018.  (*See supra* n.3, n.7.)

Because the *Harel* plaintiffs first asserted claims based on the Bribery Scheme in their amended pleading on April 30, 2019, all of their claims are time-barred.  And because the *Phoenix* plaintiffs' amended pleading asserting claims based on the Bribery Scheme was filed on August 3, 2018, their Securities Act and PSA claims are likewise time-barred.[28]

### C.    Plaintiffs' Allegations Regarding The Purported "Negative Impact" Of The Actavis Acquisition On Teva Fail To State A Plausible Claim

In seventeen Direct Actions – *Boeing*, *BH*, *Chicago*, *Clal*, *Fir Tree*, *Harel*, *Highfields*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Oregon*, *Pacific*, *Phoenix*, *Psagot*, *Schwab*, and *Stichting* – plaintiffs challenge defendants' "False and Misleading Statements Regarding Actavis Acquisition" as an additional basis for liability.[29]  These statements are actionable, plaintiffs contend, because they "failed to disclose and actively concealed the negative impact resulting from the acquisition and integration of Actavis on Teva's financial results and business prospects."  (*Boeing* compl., ¶ 169; *see also, e.g.*, *BH* compl., ¶ 165; *Clal* compl.; ¶ 231; *Stichting* compl., ¶ 142.)  Insofar as they are based on these allegations, plaintiffs' claims must be dismissed for several independent reasons.

#### 1.    Failure To Plead An Actionable Misrepresentation Or Omission

As a threshold matter, these plaintiffs fail to plead any actionable misrepresentation or omission of material fact regarding the putative "negative impact" of the Actavis acquisition

---

[28] The result is the same even if the announcement of Teva's entry into the DPA on December 22, 2016 were deemed to be the relevant disclosure date.

[29] *See Boeing* compl., ¶¶ 263-74; *BH* compl., ¶¶ 228-39; *Chicago* compl., ¶¶ 256-67; *Clal* compl., ¶¶ 414-25; *Fir Tree* compl., ¶¶ 311-22; *Harel* compl., ¶¶ 676-85; *Highfields* compl., ¶¶ 275-86; *INKA* compl., ¶¶ 260-71; *Migdal Ins.* compl., ¶¶ 414-25; *Migdal Mut.* compl., ¶¶ 414-25; *Mivtachim* compl., ¶¶ 414-25; *Oregon* compl., ¶¶ 256-67; *Pacific* compl., ¶¶ 262-73; *Phoenix* compl., ¶¶ 691-700; *Psagot* compl., ¶¶ 414-25; *Schwab* compl., ¶¶ 261-72; and *Stichting* compl., ¶¶ 261-72.

with the particularity required under Rule 9(b)[30] and the PSLRA, as applicable.  Among other things, this heightened pleading standard requires a plaintiff to plead, in detail, facts sufficient to "explain why the [defendants'] statements were fraudulent."  *Stein*, 2014 WL 12767210, at *7 (internal quotation marks omitted).  The statements challenged in these Direct Actions complaints fall into two categories.

The first category concerns statements regarding the <u>positive</u> impact of the Actavis acquisition on Teva in terms of its research and development activities and the reach of its operational network.  For example, on a November 15, 2016 earnings call, defendant Vigodman allegedly stated that the "completion of the Actavis acquisition strengthens and broadens our R&D capabilities, and highly complements our product pipeline, product portfolio, geographic footprint and operational network."  (*Chicago* compl., ¶ 258; *see also id.*, ¶¶ 257, 262-63.)[31]  Notably, however, plaintiffs do not allege – much less plead facts suggesting – that such statements were actually false (*e.g.*, there are no allegations that the acquisition did not in fact strengthen Teva's R&D capabilities or broaden its geographic footprint).

The second category of challenged statements concerns the source of Teva's operating profits.  (*See id.*, ¶ 261 ("The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction."), ¶ 266 (same).)  But here again, the complaints fail to explain with the requisite particularity how these statements were false.  On

---

[30] Plaintiffs' claims under the PSA and common law fraud and negligent misrepresentation "are subject to Rule 9(b)'s requirement of pleading with particularity."  *Fulton Fin. Adv., Nat'l Ass'n v. NatCity Invs., Inc*, 09-cv-04855, 2013 WL 5635977, at *12 (E.D. Pa. Oct. 15, 2013).  And like the Securities Act claims asserted in the *Ontario* ACAC, plaintiffs' Securities Act claims here (which are patterned on the *Ontario* allegations) are subject to Rule 9(b) because they sound in fraud.  *See Ontario Teachers' Pension Plan Bd.*, 432 F. Supp. 3d at 156 (rejecting plaintiffs' "attempted [] use of boilerplate language to remove their [Securities Act] claims from Rule 9(b)'s heightened pleading standards").

[31] For brevity's sake, citations will for the most part be limited to the *Chicago* complaint, since the corresponding allegations in each of the other sixteen Direct Actions are substantively identical to, and in most cases verbatim copies of, the *Chicago* allegations.

their face, these statements do not attribute the increase in operating profit mainly <u>to</u> the Actavis acquisition, but rather to the entire "generic business, <u>following</u> the closing of the Actavis transaction." (*Id.*, ¶ 261 (emphasis added).)  But even if "following" could be construed in this context as suggesting a causal relationship rather than a temporal one, this would still not support plaintiffs' claim.

The overarching theory of the case in the Direct Actions – as in the *Ontario* class action – is that Teva reaped "inflated profits" by "hiking" its generics prices while at the same time denying that those positive results were due to pricing.[32]  Thus, read generously, plaintiffs fault defendants for misattributing a <u>positive</u> impact (here, the "increase in our operating profit" due to price hikes) to the Actavis acquisition.  But even crediting this misattribution hypothesis, it does not logically follow that the Actavis acquisition had a <u>negative</u> impact on operating profit (or anything else).  Stated differently, had defendants affirmatively attributed the increase in Teva's operating profit to the alleged "price-hike strategy," plaintiffs fail to explain even in general terms, much less with the requisite specificity, what "negative impact" relating to the Actavis acquisition would have been revealed by this "accurate" attribution.[33]

---

[32] *See, e.g.*, *Chicago* compl., ¶ 1 ("Defendants consistently attributed Teva's success to fundamental business strategies…. In reality, however[,] Teva's reported financial growth during the Relevant Period was the result of…the 'Price-Hike Strategy.'"); *Clal* compl., ¶ 15 ("Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies…[but in] reality [] Teva's performance was driven by the undisclosed Price-Hike Strategy."); *Harel* compl., ¶ 9 ("Defendants were highly effective at concealing that the Price-Hike strategy was driving Teva's rapid growth.  They invariably attributed the improved profits to legitimate sources.").

[33] Plaintiffs also take issue with a May 11, 2017 statement by Peterburg.  (*See Chicago* compl., ¶ 266 ("I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017."))  This statement is non-actionable for two reasons.  In the first place, a statement projecting the anticipated dollar value of synergies and cost reduction six months into the future is plainly a forward-looking statement.  And because plaintiffs have failed to plead facts establishing that Peterburg acted with scienter (*see supra* pp. 4-8, 10-11), this statement falls squarely within the PSLRA's safe-harbor.  *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("Because the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, the scienter requirement…is stricter than for statements of current fact…. [L]iability for the former attaches only upon proof of knowing falsity.") (internal quotation marks omitted).  Second, as with the challenged statements relating to the attribution of operating profits, plaintiffs fail entirely to explain how Peterburg's statement concealed any negative impact resulting from the Actavis Acquisition.

2.      **Failure To Plead Scienter**

Not only do they fail to plead an actionable misrepresentation or omission, these Direct

Actions also fail to plead specific facts establishing a strong inference of scienter.  Plaintiffs do

not even attempt to meet their pleading burden by establishing motive, nor could they plausibly

do so.  As discussed above (*supra* p. 2,) this Court previously found that the allegations in the

*Ontario* ACAC (on which the Direct Actions complaints are patterned) were likely sufficient to

establish "motive and opportunity scienter" on the theory that defendants engaged in the alleged

pricing misconduct in order to inflate Teva's securities prices so as to fund the Actavis

acquisition.  But that motive is only coherent (or plausible) if defendants actually believed that

the acquisition would benefit the company.  It would strain credulity past the breaking point were

plaintiffs here to argue that defendants were motivated to commit a massive fraud, risking

financial ruin and potential criminal liability, in order to fund the acquisition of a company that

they believed would have a "negative impact" on Teva.  In any case, no such motive is alleged.

Nor do these complaints come even close to "alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  *Loreley*, 797 F.3d at 177

(internal quotation marks omitted).  To satisfy this standard, plaintiffs must, at a minimum,

allege concrete facts showing that defendants had "knowledge of facts or access to information

contradicting their public statements" about the actual or anticipated impact of the Actavis

Acquisition.  *Maloney*, 2021 WL 517934, at *4 (internal quotation marks omitted).  They have

failed to do so.  As shown above (*supra* pp. 5-9), the Direct Action complaints do not plead

scienter against Altman, Bhattacharjee, McClellan, Peterburg, or Schultz.  The same is true as to

Desheh *et al.*  Though the Court previously found scienter adequately pled against these

individuals in the *Ontario* ACAC based on the *Ontario* Former Employees allegations, neither

those allegations (recycled here) nor anything else asserted in these Direct Actions suggest that

Desheh *et al.* knew or had access to information about any "negative impact" from the Actavis acquisition contradicting their public statements.

For these reasons, because these complaints fail to plausibly allege a strong inference of scienter, plaintiffs' Actavis Acquisition claims under Sections 10(b) and 20(a) of the Exchange Act, the ISL, the PSA, and Pennsylvania common law must be dismissed.

### 3.   <u>Failure To Plead Loss Causation</u>

These seventeen Direct Actions also fail to plead facts sufficient to support a reasonable inference that plaintiffs suffered an injury causally linked to defendants' purported misrepresentations or omissions regarding the Actavis acquisition.  To adequately plead this element of their claims under the Exchange Act, the PSA, and Pennsylvania common law,[34] plaintiffs must allege that defendants' alleged misrepresentations or omissions "concealed something from the market that, when disclosed, negatively affected the value of [Teva's securities]."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Here, the allegedly concealed fact was the "negative impact resulting from the acquisition and integration of Actavis on [Teva's] financial results and business prospects."  (*Chicago* compl., ¶ 267.)

Nine of these actions – *Boeing*, *Chicago*, *Fir Tree*, *Highfields*, *INKA*, *Oregon*, *Pacific*, *Schwab*, and *Stichting* – allege but a single putative corrective disclosure or event that even tangentially relates to Actavis.[35]  Specifically, these plaintiffs allege that on August 3, 2017,

---

[34] *See In re Adelphia Commc'ns Corp. Secs. and Deriv. Litig.*, 03-MDL-01529, 2010 WL 3528872, at *4 (S.D.N.Y. Aug. 30, 2010) (dismissing claims under Sections 10(b) and Section 18 of the Exchange Act for failure to adequately plead loss causation); *see also Fulton Bank*, 2011 WL 5386376, at *7 (PSA claims require the same elements of proof as required under Rule 10b-5), *15 ("The elements of common law fraud are almost identical to the elements of Rule 10b-5 and claims under the PSA, and courts typically evaluate them in the same way.") (internal quotation marks omitted); *Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 419 (W.D. Pa. 2009) (under Pennsylvania law, "[t]he plaintiff must [] establish that [defendant's] negligent misrepresentations were the proximate cause of his injuries").

[35] Plaintiffs in one Direct Action – *BH* – allege no corrective disclosures or events as to the Actavis Acquisition whatsoever.

"Teva [] disclosed a net earnings loss primarily due to a $6.1 billion goodwill impairment charge in its U.S. generics unit[,] which consisted of both Teva legacy and Actavis generic business [sic]" (*Chicago* compl., ¶ 337), and that this disclosure provoked a 24% drop in Teva's ADS prices as compared to the prior day's close (*see id.*, ¶ 338).  Significantly, these complaints plead no facts as to what, if anything, this disclosure revealed about the alleged "negative impact" of the Actavis Acquisition.  (This is unsurprising since plaintiffs do not allege that the acquisition failed to provide positive benefits (*e.g.*, strengthening R&D, broadening geographic footprint) as represented (*supra* pp. 29-30.)[36]

Seven actions – *Clal*, *Harel*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* – cite one additional putative corrective disclosure that mentions Actavis.  These complaints allege that on February 8, 2018, Teva announced a "$17.1 billion goodwill impairment mainly related to its generics business for 2017" and that $3.2 billion of the impairment was "mainly related to a revaluation of generics products acquired from Actavis."  (*Harel* compl., ¶ 869; *see also, e.g.*, *Clal* compl., ¶ 553 (same).)  In order to establish loss causation by means of a corrective

---

[36] Two actions – *Harel* and *Phoenix* – separately allege, as yet another "type" of misrepresentation and omission, that Teva made false and misleading statements that "materially overstated the value of its goodwill."  (*Harel* compl., ¶¶ 577, 686-94; *Phoenix* compl., ¶¶ 585, 701-09.)  Even assuming these allegations were credible (which they are not), they would still not come close to adequately pleading causation.  As discussed, with respect to the Actavis Acquisition, the actions do not allege that defendants misrepresented the positive impact of the acquisition, but rather that they "concealed [its] negative impact."  (*Harel* compl., ¶ 577; *Phoenix* compl., ¶ 585.)  As such, even if the August 3, 2017 disclosure about the goodwill impairment charge revealed some material fact to the market, it was not a fact that the *Harel* and *Phoenix* plaintiffs allege was concealed with respect to Actavis.  Moreover, because estimates of goodwill are intrinsically subjective, courts in this Circuit routinely dismiss goodwill-based claims where, as here, plaintiffs have failed to plead concrete facts supporting a strong inference "that defendants did not believe in their statements of opinion regarding [the company's] goodwill at the time they made them."  *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012); *see also In re Gen. Elec. Sec. Litig.*, No. 19-cv-01013, 2020 WL 2306434, at *13, *15 (S.D.N.Y. May 7, 2020), *aff'd*, 844 F. App'x 385 (2d Cir. 2021) ("[G]oodwill balances are opinion statements.…The assessment of goodwill was a judgment based on other judgments and projections.  The [alleged] failures…were at worst failures in judgment.  They do not constitute conscious recklessness."); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) (holding that the statements regarding goodwill at issue were "subjective ones rather than 'objective factual matters'" and that as a result, the "allegations regarding goodwill do not involve misstatements or omissions of material fact, but rather [] misstatement[s] regarding [the defendant's] opinion").

disclosure, "the disclosed fact must be new to the market." *In re Xerox Corp. Secs. Litig.*, 935 F. Supp. 2d 448, 493 (D. Conn. 2013) (internal quotation marks omitted). But these complaints do not identify any new information in this disclosure that had not already been revealed to the market, six months earlier, in Teva's August 3, 2017 filing that purportedly laid bare Teva's "true financial condition." (*Clal* compl., ¶ 546; *see also Harel* compl., ¶ 857 (alleging that the August 3, 2017 disclosure "revealed that Teva's business was facing significant and permanent pricing pressure").) At best, therefore, these Direct Actions allege that the decline in Teva's securities prices on February 8, 2018 "represented the materialization of [an already] known risk" – *i.e.*, that the goodwill originally recorded by Teva was no longer accurate – "rather than the disclosure of a concealed one." *Monroe Cty.*, 15 F. Supp. 3d at 358; *see also Abuhamdan*, 9 F. Supp. 3d at 209 (loss causation not pled absent allegations showing that the drop in defendant's stock price "was caused by the materialization of a *concealed* risk as opposed to a [previously] *disclosed* risk") (emphasis in original).

For the foregoing reasons, plaintiffs' claims under Sections 10(b), 18, and 20(a) of the Exchange Act, the ISL, the PSA, and Pennsylvania common law must be dismissed insofar as they are based on defendants' alleged concealment of the Actavis Acquisition's "negative impact" on Teva.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss, with prejudice, those claims: (1) asserted against defendants Altman, Bhattacharjee, McClellan, Peterburg, and Schultz; and/or (2) based on alleged misrepresentations and omissions regarding the Opioid Scheme, the Bribery Scheme, or the Actavis Acquisition.

Dated:   New York, New York
         May 24, 2021

Respectfully submitted,

DEFENDANTS TEVA
PHARMACEUTICAL INDUSTRIES LTD.;
TEVA PHARMACEUTICALS USA, INC.;
EREZ VIGODMAN; EYAL DESHEH;
SIGURDUR OLAFSSON; DEBORAH
GRIFFIN; KÅRE SCHULTZ; MICHAEL
MCCLELLAN; YITZHAK PETERBURG;
YAACOV ALTMAN, DIPANKAR
BHATTACHARJEE; and TEVA
PHARMACEUTICAL FINANCE
NETHERLANDS III B.V.

*/s/ Sheron Korpus*
Sheron Korpus (admitted *pro hac vice*)
Cindy Caranella Kelly (admitted *pro hac vice*)
Sarah G. Leivick (admitted *pro hac vice*)
Andrew Schwartz (admitted *pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1969
Fax: (212) 500-3469
skorpus@kasowitz.com
ckelly@kasowitz.com
sleivick@kasowitz.com
aschwartz@kasowitz.com

*Counsel for Defendants except with regards to
Case No. 3:20-cv-588*

Jordan D. Hershman (admitted *pro hac vice*)
Jason D. Frank (admitted *pro hac vice*)
Emily E. Renshaw (admitted *pro hac vice*)
Andrew M. Buttaro (ct30882)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
Tel: (617) 341-7700
Fax: (617) 341-7701
jordan.hershman@morganlewis.com
jason.frank@morganlewis.com
emily.renshaw@morganlewis.com
andrew.buttaro@morganlewis.com

35

*Counsel for Defendants*

– and –

Jill M. O'Toole (ct27116)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
jotoole@goodwin.com

*Counsel for Defendants except Kåre Schultz*