1                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
2
   - - - - - - - - - - - - - - - - x
3
   ONTARIO TEACHERS' PENSION PLAN  :  No. 3:17-cv-00558(SRU)
4  BOARD, ET AL,                   :  915 Lafayette Boulevard
                     Plaintiffs,   :  Bridgeport, Connecticut
5                                  :
                  v.               :
6                                  :  May 25, 2021
   TEVA PHARMACEUTICAL INDUSTRIES  :
7  LTD., ET AL                     :
                     Defendants.   :
8
   - - - - - - - - - - - - - - - - x
9

10                  TELEPHONIC STATUS CONFERENCE

11

12
   B E F O R E:
13
        THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
14

15

16

17

18

19

20

21

22

23                   Sharon L. Masse, RMR, CRR
                     Official Court Reporter
24                   915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
25               sharon_masse@ctd.uscourts.gov

1    A P P E A R A N C E S:

2

3         FOR THE PLAINTIFFS:

4              BLEICHMAR FONTI and AULD LLP
                    7 Times Square, 27th Floor
                    New York, New York  10036
5              BY:  JOSEPH A. FONTI, ESQ.
                    EVAN A. KUBOTA, ESQ.

6

7              LAW OFFICES OF SUSAN R. PODOLSKY
                    1800 Diagonal Road
8                   Suite 600
                    Alexandria, Virginia  22314
9              BY:  SUSAN R. PODOLSKY, ESQ.

10

11             CARMODY TORRANCE SANDAK & HENNESSEY, LLP
                    195 Church Street, 18th Floor
12                  P.O. Box 1950
                    New Haven, Connecticut  06510-1950
13             BY:  J. CHRISTOPHER ROONEY, ESQ.

14             KESSLER TOPAZ MELTZER & CHECK LLP
                    280 King of Prussia Road
15                  Radnor, Pennsylvania  19087
               BY:  MATTHEW L. MUSTOKOFF, ESQ.
16

17             GRANT & EISENHOFER P.A.
                    485 Lexington Avenue
                    New York, New York  10017
18             BY:  JONATHAN PARK, ESQ.

19             ROBBINS GELLER RUDMAN & DOWD LLP
                    655 West Broadway, Suite 1900
20                  San Diego, California  92101
               BY:  ANGEL LAU, ESQ.
21

22

23   (Continued)

24

25

```
 1                    POMERANTZ
                          600 Third Avenue
 2                        Ste 20th Floor
                          New York, New York  10016
 3                 BY:  MICHAEL WERNKE, ESQ.

 4                 ROLNICK KRAMER SADIGHI LLP
                          1251 Avenue of the Americas FL 18
 5                        New York, New York  10020
                   BY:  JENNIFER RANDOLPH, ESQ.
 6
                   MOTLEY RICE LLC
 7                        One Corporate Center, 17th Floor
                          20 Church Street
 8                        Hartford, Connecticut  06103
                   BY:  WILLIAM NARWOLD, ESQ.
 9
                   COHEN MILSTEIN SELLERS & TOLL, PLLC
10                        190 South LaSalle Street, Suite 1705
                          Chicago, Illinois  60603
11                 BY:  JAN E. MESSERSCHMIDT, ESQ.

12                 HURWITZ SAGARIN SLOSSBERG & KNUFF
                          147 North Broad Street
13                        P.O. Box 112
                          Milford, Connecticut  06460
14                 BY:  JEFFREY P. NICHOLS, ESQ.
                        DAVID A. SLOSSBERG, ESQ.
15
                   LABATON SUCHAROW, LLP
16                        140 Broadway
                          New York, New York  10005
17                 BY:  JEFFREY R. McEACHERN, ESQ.

18
     FOR THE DEFENDANTS:
19
                   MORGAN LEWIS & BOCKIUS LLP
20                        One Federal Street
                          Boston, Massachusetts  02110
21                 BY:  EMILY E. RENSHAW, ESQ.
                        JASON FRANK, ESQ.
22
                   SHIPMAN & GOODWIN LLP
23                        One Constitution Plaza
                          Hartford, Connecticut  06103
24                 BY:  JILL O'TOOLE, ESQ.

25       (Continued)
```

```
 1                    KASOWITZ BENSON TORRES LLP
                          1633 Broadway
 2                        New York, New York  10019
                    BY:  SHERON KORPUS, ESQ.
 3                       ANDREW SCHWARTZ, ESQ.
                         SARAH LEIVICK, ESQ.
 4                       CINDY KELLY, ESQ.

 5

   FOR THE INTERVENOR, UNITED STATES OF AMERICA:
 6
                        Department of Justice - Antitrust
 7                      450 Fifth Street, N.W.
                        Washington, D.C.  20530
 8                  BY:  VERONICA N. ONYEMA, ESQ.
                        CATHERINE MONTEZUMA ESQ.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings commenced at 2:06 p.m.)

2          THE COURT:  Good afternoon.  This is Stefan

3    Underhill.  We're on the record.  Could I have the

4    appearances of those who intend to argue for each side,

5    please.

6          MR. FONTI:  Good afternoon, Your Honor.  This is

7    Joseph Fonti for the class.  And with me today are my

8    colleagues Ms. Podolsky and Mr. Kubota, who might be

9    chiming in on some of the issues.

10          THE COURT:  Thank you.

11          MR. KASOWITZ:  Good afternoon, Your Honor.

12    Sheron Korpus of Kasowitz Benson Torres for defendant.

13    With me are Sarah Leivick from my firm and Emily Renshaw

14    from Morgan Lewis, who will be addressing some issues.

15          THE COURT:  Okay.  Very good.

16          Let's start with the motion to compel, which is

17    on the docket at Number 758.  And let me start by telling

18    you that I'm inclined to bifurcate individual and class

19    discovery and trial and to postpone discovery on

20    individual issues until after class liability has been

21    resolved.  So if you have a comment about that, why don't

22    we start there.

23          MR. KASOWITZ:  Yes, Your Honor.  Sheron Korpus.

24    I understand, Your Honor.  Obviously it would be our

25    preference to take discovery first, but just one question

1    of clarification.

2              In a previous hearing you held that we can take

3    discovery now on questions of standing and the losses

4    suffered by the class.  I assume we can still continue to

5    take that discovery from the class plaintiffs at this

6    point in time?

7              THE COURT:  Yes.  The scope of that, of course,

8    may be subject to some dispute, but I have no problem with

9    you taking discovery related to standing.

10             MR. KORPUS:  And then the discovery relating to

11   the investment decisions by the class, that is for another

12   day, if I understand your inclination?

13             THE COURT:  Well, that is my inclination because

14   I don't think the individual investment decisions by class

15   representatives have any impact on the merits of the class

16   claims.  But if you want to, if you want to argue that

17   point, I'm happy to hear you.

18             MR. KORPUS:  Well, Your Honor, we briefed it in

19   full.  You asked for some authority.  We gave you

20   authority to show how discovery is generally taken on

21   those matters at the time that general discovery is taken.

22   We believe it does go to the question of materiality, it

23   does go to the question of the total mix of the market, it

24   does go to our ability to rebut the fraud-on-the-market

25   theory, but I don't have anything to add to our papers.

```
 1              THE COURT:  All right.  Mr. Fonti?

 2              MR. FONTI:  Thank you, Your Honor.  We think

 3    that's the appropriate way to proceed and are in agreement

 4    with that.  And as we said previously, we'll stand by our

 5    agreement to produce a witness on standing.

 6              THE COURT:  All right.  Very well.

 7              I should probably just note for the record that

 8    I disagree with the suggestion that individual discovery

 9    can affect materiality, reliance on the market, and so

10    forth.  In my view, that is not the holding of the

11    majority of cases, and the cases where that is the holding

12    or can be used to suggest that's the holding seems to me

13    it's where both individual and class claims were heard at

14    the same time.

15              The bifurcation issue I think makes this case

16    distinct from the cases relied upon.  It simply doesn't

17    matter, for example, in terms of reliance that a

18    particular plaintiff did or did not rely.  Fraud on the

19    market is not undercut by individual decisions, and

20    materiality being objective seems to me is not likely to

21    be affected by whatever you discover on behalf of an

22    individual and their decision-making.  So I didn't want to

23    leave a suggestion, in effect, that I am depriving the

24    defendants of all of their rights to be left unrebutted.

25              MR. KASOWITZ:  Your Honor, I assume you're going
```

1   to issue an order on this because there are certain time

2   limits that arise from this order in terms of how long we

3   have to depose class plaintiffs on standing issues, etc.

4           THE COURT:  I wasn't anticipating entering a

5   separate written order.  I mean, the conference memorandum

6   and order will set forth that we're bifurcating and

7   postponing individual discovery.

8           MR. KASOWITZ:  That will be sufficient for our

9   purposes, Your Honor.  Thank you.

10          THE COURT:  Very good.

11          MR. FONTI:  And, Sheron, I'm sure we can work

12  that out.  We'll confer on a schedule to get those

13  depositions on calendar.

14          MR. KORPUS:  That's fine.

15          THE COURT:  All right.  So do I understand that

16  the decision to bifurcate and postpone individual

17  discovery resolves, as a practical matter, the motion to

18  compel?

19          MR. FONTI:  That's our understanding, Your

20  Honor.

21          MR. KASOWITZ:  I believe that's correct as a

22  practical matter, Your Honor.

23          THE COURT:  All right, very good.  If either of

24  you want to be heard, I'm happy to hear you.

25              (No response.)

1            All right.

2            Okay.  So let's take up the issues regarding

3    case management.  I'm not sure what order makes sense to

4    take them up in.  Let's maybe start with the oldest, which

5    I think is the missing text messages.

6            MR. FONTI:  Your Honor, would you like me to

7    start?

8            THE COURT:  Sure.

9            MR. FONTI:  Okay.  So as you said, this is the

10   oldest.  I think we've been at this at least for ten

11   months, maybe longer, trying to get a handle on whether

12   the text messages exist, whether they should be produced,

13   where did they go, what happened to them.  Last time we

14   were together, I would say in March, you ordered that a

15   detailed affidavit be submitted explaining the

16   preservation efforts undertaken since 2013 forward, and we

17   got that affidavit.  Last time we met in April we

18   indicated that we didn't think that was sufficient or

19   compliant with your order and that we'd take it to the

20   30(b)(6) and see how that went.

21           The short of it, as we say in our papers, is

22   that the 30(b)(6) witness wasn't able to give anything

23   other than his own personal reading of the affidavit.  He

24   didn't speak to the affiant, he didn't know any of the

25   underlying facts, and so the record stands with this

1     affidavit that really does nothing to explain the detailed

2     facts around preservation arising from investigations,

3     litigations into Teva's generic pricing and competition.

4     And that is the measure of relevance, right?  Was there

5     anything going on in 2013, 2014, 2015 about pricing and

6     competition that would put -- would give rise, as Judge

7     Haight said in *Bagley,* give rise to notice of potential

8     preservation duty.  So that's the first question, was Teva

9     under a duty to preserve.  We think they were.  We look at

10    their privilege log.  By the fall of 2014, you have

11    multiple investigations, inquiries into Teva, and you have

12    privileged communications between key people involved in

13    this case and legal, right?  We set that out in our

14    submission.

15          The question is, what was done to preserve, and

16    we don't have the answer to that.  We still are searching

17    for that fact, what was done to preserve at that juncture.

18          Defendants take a very restricted view of what's

19    relevant, and they say that it is irrelevant, any

20    litigation hold or any preservation effort is irrelevant

21    unless the subject matter of the allegations or the legal

22    claim at issue is text messages.  Frankly, that's an

23    absurd reading of relevance.  We know relevance is

24    governed by the subject matter of the investigation, which

25    was competition and pricing.  And so we think we are

1  entitled to discovery, as the Court ordered, of the facts

2  around preservation beginning in 2013 and what steps were

3  taken, and we don't have those answers.

4        The only way to get to it, we think, or the best

5  way to get to it is to produce the litigation holds

6  themselves.  Whether holds were issued on pricing and

7  competition is one question, who they went to is another

8  question, whether they covered the missing text messages

9  is another question, but all of that is relevant to

10  determining whether Teva abided by its duty to preserve.

11  And those holds are the prima facie evidence that Teva

12  believes there was a duty and prima facie evidence of what

13  they did to enforce it.  And, again, going back to *Bagley*,

14  we're entitled to the answer to the questions of when did

15  the duty arise, what did they do once it arose, who did

16  they send the holds to, what measures were taken to

17  enforce.  And the declaration that they did put in,

18  paragraph 10, the Samb declaration, says those holds are

19  accessible to every Teva employee on their system, doesn't

20  take much to produce it, and *Bagley* also says those aren't

21  privileged because they are simply legal instructions.

22        So where this leaves us, despite hours and hours

23  of meet-and-confers and attempts to negotiate on some

24  compromised position, that the holds should be produced

25  and we get the final answer as to what was done in 2013,

1   '14 and '15 to preserve evidence relevant to pricing and

2   competition.

3        MS. RENSHAW:  Your Honor, this is Emily Renshaw

4   from Morgan Lewis.  So just to address a couple points

5   that Mr. Fonti just made.

6        First and foremost, Teva has maintained that

7   there was no duty owed to plaintiffs here before this

8   litigation was filed to preserve documents relevant to

9   these claims; but, nevertheless, we spelled out every step

10   that was taken to preserve the text messages at issue

11   here.  The problem here, and with many other discovery

12   disputes in this action, is that plaintiffs have lost

13   sight of what the dispute is about.  It's about a subset

14   of text messages from these six custodians from years

15   before this case was filed as they detailed in their March

16   preconference submission.

17        So we have spelled out every step that was taken

18   to preserve the text messages at issue here.  We have

19   provided plaintiffs with information regarding the

20   company's policies and practices relating to preservation

21   and collection generally.  We have confirmed for

22   plaintiffs that there was no obligation to preserve these

23   texts at issue until June of 2016.

24        I saw in plaintiff's submission, and as Mr.

25   Fonti just stated, that we have a restrictive review of

1   relevance, that unless a hold was about the text messages,

2   it would not be relevant, and I believe there's a

3   fundamental misunderstanding there.  We have never taken

4   that position.  We have simply informed plaintiffs that we

5   have gone back and reviewed every preservation notice that

6   went to the six custodians at issue here and have

7   confirmed there was no obligation to preserve these text

8   messages at issue until June of 2016. Again, we don't

9   concede that that obligation and duty was owed to

10  plaintiffs here, but we have confirmed that for

11  plaintiffs.

12          In addition, we have provided a detailed

13  declaration that now we have put in for Your Honor's

14  review concerning the preservation policies, practices,

15  etc. and all the steps in great detail that were taken to

16  preserve the potentially relevant text messages at issue

17  here.  We have had, as Mr. Fonti noted, hours and hours of

18  calls to discuss those efforts and address plaintiffs'

19  further questions.  We have confirmed a June 2016 hold.

20  We've discussed the prior hold.  We've reviewed every

21  single text message sent and received by these custodians,

22  produced texts consistent with our agreement with

23  plaintiffs regarding the scope of discovery as well as the

24  Court's orders.  We've provided a 30(b)(6) witness for

25  multiple days to testify on preservation issues.  We paid

1    tens of thousands of dollars to a forensic expert of

2    plaintiff's choosing, only to find there was no evidence

3    of deletion or destruction.  But that still isn't enough.

4    And in an effort to resolve this dispute before today's

5    hearing, we offered to give plaintiff the information to

6    which we don't believe they're entitled and that's totally

7    irrelevant to their claims but that would address their

8    purported concerns.  And we offered to give them

9    nonprivileged information regarding each of the irrelevant

10   holds that the six custodians at issue here were subject

11   to during this period that plaintiffs are now focused on,

12   which is January 2013 to June of 2016, but plaintiffs have

13   rejected all of our offers.

14          And as we noted in our papers, it seems as if

15   plaintiffs are now just using this dispute as a weapon

16   because they told us the only way to resolve this dispute

17   was to provide them with the deposition of a witness who

18   they know can't be deposed at this time due to the pending

19   criminal matter, producing the government's memos that are

20   in dispute, and producing copies of every single

21   privileged litigation hold that went out to any of Teva's

22   40,000 employees in a three-and-a-half-year period.

23          So these demands are unreasonable.  We've done

24   everything in a good faith effort to resolve them.  We've

25   given plaintiffs all of the information we have regarding

1    these text messages at issue, and it's our view that we

2    need the Court's intervention to stop the fishing

3    expedition.

4            THE COURT:   What is the argument that the

5    litigation holds are privileged?

6            MS. RENSHAW:   Litigation holds that went out

7    regarding these irrelevant matters have privileged

8    information in them such as the company's legal theories

9    and counsel's advice concerning the claims and defenses at

10   issue, the group of individuals whom counsel have

11   determined are relevant custodians.  And, Your Honor, just

12   to note, we have, despite the fact that these holds are

13   not relevant to plaintiff's claims, as an offer to resolve

14   this dispute before today's hearing we offered to go

15   through in detail on a call with plaintiffs the

16   nonprivileged information that Mr. Fonti is saying that's

17   what they're looking for.  They want to know when it went

18   out, and the general subject matter, and whether it

19   covered the text messages at issue.  And that's exactly

20   what we offered to discuss with plaintiff and to give them

21   that information.

22           THE COURT:   So this is unclear.  I mean, you're

23   suggesting that the litigation -- a particular litigation

24   hold that goes out says, We just received a claim or

25   notice of a claim from "X" potential plaintiff.  The

1    theories are A, B, C.  Here's our evaluation of those

2    claims.  And then please don't destroy, be sure to

3    preserve the following classes of documents.

4          So it's that third part, that you're suggesting

5    that the litigation holds describe the evaluation of the

6    litigation?

7          MS. RENSHAW:  I believe that -- it's not exactly

8    what I would say, how I would describe the privileged

9    information and the legal hold, but I think it does

10   contain -- they do contain information regarding the

11   company's legal theory generally, and counsel's advice

12   concerning the claims, and what counsel deems relevant,

13   and the types of information that would be captured by the

14   hold.  But, again, Your Honor, the nonprivileged

15   information that Mr. Fonti said that they are seeking is

16   information that we've agreed to provide to them.  So --

17         THE COURT:  Well, okay, but -- so here's what

18   I'm trying to get at.  One, it would surprise me if

19   there's an evaluation in there, frankly.  If counsel has

20   suggested that there's classes of documents that are

21   potentially relevant, that doesn't strike me as providing

22   legal advice to the recipient of the hold.  It strikes me

23   as more likely simply identifying for nonlawyers documents

24   that are subject to the hold.  But even if it has some

25   legal advice in there, why can't that be redacted out and

1    you just send -- if there are 15 litigation holds that

2    went out, that's an easy production, isn't it, just to

3    redact the advice and send it along?

4              MS. RENSHAW:  And, Your Honor, that was what we

5    were trying to get to to resolve the dispute, and if

6    providing plaintiffs with redacted versions of irrelevant

7    litigation holds that went to these six custodians will

8    resolve the dispute, we have offered to do that, and we

9    will agree to do that.  It's just plaintiffs -- plaintiffs

10   ask, they continue to evolve, and then most recently asked

11   us to review every single hold that went out to any of the

12   40,000 employees over this three-and-a-half-year period to

13   determine if any of them covered anything regarding

14   generic pricing.  And when you're talking about a large

15   manufacturer of generic pharmaceuticals, that is an

16   immense burden, and there's no justification for such a

17   request.  But if what Your Honor is suggesting would

18   resolve the dispute here, we certainly would be happy to

19   do that.

20             THE COURT:  Okay.  I think maybe I need to

21   understand better how many litigation holds went out over

22   those years.  Are you representing that it's hundreds of

23   litigation holds, thousands, or is it --

24             MS. RENSHAW:  To the six custodians at issue

25   here, there are short of -- I have to go back and double

1  check because there's duplication because some received --

2  I have an inventory of what went to the individuals, but

3  it would be fewer than a hundred, and we would be willing

4  to produce those in redacted form despite the lack of

5  relevance to these claims here and this dispute.

6  THE COURT:  All right.  And when you say those

7  are the ones that went to these six custodians, these six

8  custodians were individually identified or they were among

9  a class of employees who received the holds?  For example,

10  marketing department, or sales department, or whatever.

11  MS. RENSHAW:  No, Your Honor, we are able to

12  identify by individual, so we don't have marketing

13  department generally, and we would assume that it went to

14  a particular individual.  For these six custodians here,

15  we are able to tell which hold they received specifically.

16  So there's no question.

17  THE COURT:  Okay.

18  MS. RENSHAW:  And in every instance, Your Honor,

19  just to be clear, because I don't know if that answered

20  your question, but in every instance I don't think I've

21  seen an example of a litigation hold that went to just one

22  person, so it is that one of the custodians here was one

23  of ten, say, or twenty individuals who received it.  But,

24  again, it does have that individual name attached to it so

25  that we can confirm that they did actually -- it did go to

1    them.

2              THE COURT:  All right.  And literally every

3    litigation hold that was sent during these years in

4    question, '13 through '16, have individual recipients as

5    opposed to a department or a subset of employees that is

6    identified as a subset, in other words, everybody working

7    on the fourth floor, or everybody in the such-and-such

8    team?

9              MS. RENSHAW:  Yes, Your Honor, that's my

10   understanding.  To the extent that, for instance, it

11   was -- you know, that somebody said we should send this

12   litigation hold to everybody on the sales team, even if

13   that were the determination, we have the list of

14   individuals to whom that hold was sent.  So for these six

15   individuals for that period of January 2013 through June

16   of 2016 we have -- I have an inventory of all of the holds

17   that these six individuals received.

18             THE COURT:  Okay.  Mr. Fonti, why is that not --

19             MR. FONTI:  Thank you, Your Honor.

20             THE COURT:  If you get a redacted copy, why is

21   that unacceptable?

22             MR. FONTI:  It's partially acceptable, but there

23   is a very big missing piece of that.  So the duty here is

24   Teva's, right, and it's highly relevant because Teva

25   issued litigation holds on pricing and competition in

1    2013-'16 time period and did not send them to these six

2    custodians.  The duty attached, we think, when they got

3    letters from the Michigan AG, when they got inquiries from

4    the DOJ, when they got letters from Congress, when the

5    state AGs increased pressure, when their competitors were

6    also coming under scrutiny.  The catch -- and this has

7    been a persistent problem here -- is this microdefining

8    what is relevant and what isn't.  The fact -- and

9    Ms. Renshaw in their submission makes clear that in their

10   view the six custodians only got irrelevant hold notices.

11   We want to know did Teva invoke a hold on pricing and

12   competition at all, and did it issue it to anybody, and if

13   it didn't issue it to these six, that is very relevant to

14   whether Teva fulfilled its obligation to preserve.

15            So we'll take the holds that went to the six,

16   we'll make our own determination as to whether they

17   required preservation of relevant information, but we need

18   the holds that applied writ large on the topic that is at

19   issue, and then we can determine whether Teva fulfilled

20   its obligations or not.  Otherwise, we just can't get to

21   the final answer, which is did they -- did they destroy

22   documents or did they preserve, and that's the question we

23   need to answer.

24            THE COURT:  Okay.  So let me go back to

25   Ms. Renshaw and inquire.  We're not now talking about

1    thousands of holds, but are you willing to produce the

2    holds that were sent to anyone in connection with the

3    identified claims, that is, the claims set forth in the

4    materials that were submitted for today?

5         MS. RENSHAW:  I'm sorry, Your Honor, the

6    claims -- so just so I understand, you're saying would we

7    be willing to provide to plaintiff all of the holds that

8    went out to any employee during this three-and-a-half-year

9    period that relate to what specifically?

10        THE COURT:  So the plaintiffs have identified

11   claims or communications that they believe should have

12   triggered a litigation hold, and those are set forth, I'm

13   looking for where it is, but they're set forth --

14        MR. FONTI:  It's appended to Exhibit B, Your

15   Honor.  It's the privilege log excerpts, B to our

16   submission.

17        THE COURT:  All right.  So the holds that are --

18   that were issued in connection with these various claims

19   or inquiries, if there were holds, shouldn't they be

20   added?  In other words, you've got the hold.  It's however

21   many pages, I'm sure relatively short a submission that

22   you can redact for any advice that was included in there,

23   and then that resolves it, doesn't it, if you send the

24   ones that were sent to the six and the ones sent to anyone

25   in connection with the various claims that have been

1    identified here in Exhibit B.  What problem do you have

2    with expanding the six for those additional claims?

3            MS. RENSHAW:  Well, first and foremost, Your

4    Honor, we very much disagree that there was a duty owed to

5    these plaintiffs here in connection with any of the

6    entries on the privilege log that plaintiffs have had for

7    almost a year now.  And, again, plaintiff looking at a

8    privilege hold is not -- you know, a redacted privilege

9    hold is not sufficient for them to make a claim that there

10   was some obligation that was triggered to provide a

11   litigation hold to these six custodians.  I think just to

12   bring it back for one second --

13           THE COURT:  But they don't have the information

14   they need in order to litigate the question right now.  So

15   here, let me give you an example.  Tom Smith has a Ford

16   F-150, and the brakes fail, and he makes a claim, and a

17   litigation goes out, litigation hold goes out due to that

18   claim within Ford Motor Company.  And then Bill Jones has

19   a similar problem and brings a claim.  If the documents

20   were maintained due to the hold for Smith, isn't Jones

21   able to argue that there was a duty on behalf of Teva to

22   maintain them even if not a duty that runs to him, but a

23   duty that existed, and he is the beneficiary of the fact

24   that somebody filed a claim before he did?

25           MS. RENSHAW:  Your Honor, in that hypothetical,

1   what's missing there that we have done here is that we

2   have reviewed the communications underlying the log

3   entries that plaintiffs have identified and have confirmed

4   for plaintiffs that none of those matters gave rise to an

5   obligation to these six custodians to preserve the text

6   messages at issue here.

7        THE COURT:  But that is what's going to be

8   litigated, isn't it?  So when they see that there's a hold

9   put on because Bernie Sanders shared a letter about one

10  generic drug, can't they argue that that hold should have

11  been sent to these additional custodians?  It wasn't, I

12  agree, it wasn't, but they have the ability to check

13  whether it should have been, don't they?

14       MS. RENSHAW:  I don't believe so, Your Honor,

15  because the duty doesn't extend to these plaintiffs.  If

16  the Michigan Attorney General had an inquiry regarding the

17  pricing of one drug and Teva legal determined that a

18  litigation hold didn't need to go out, or it needed to go

19  out to individuals who weren't these folks, or went out

20  and had nothing to do with these text messages, then

21  plaintiffs would not have a claim to enforce the duty that

22  was owed to or the purported duty that was owed to the

23  Michigan Attorney General to preserve documents.

24       So, no, I don't think that issue would need to

25  be litigated here.  I don't think it's appropriate to be

1    litigated.

2         I think the matter at issue is there are text

3    messages.  And, again, plaintiffs have seen how these text

4    messages with competitors are innocuous and involve things

5    like happy hours and travel plans and birthdays.  You

6    know, we're talking about these text messages as if they

7    are relevant.  But, regardless, when the preservation

8    obligation arose and when this litigation and these claims

9    were foreseeable, and we have confirmed for plaintiffs

10   that that is the June 2016 hold that went out, and as it

11   relates to these six individuals it's the relevant holds

12   they received in the three-and-a-half years prior, you

13   know, if that would resolve the dispute to provide those

14   in redacted form, we will do that.  But to have plaintiffs

15   then get carte blanche into the legal department's

16   decision to issue litigation holds in wholly unrelated

17   matters, I don't believe that's appropriate, nor relevant.

18        We have reviewed -- counsel has reviewed those

19   communications and documents that were cited in the

20   privilege log, and none of those have anything to do with

21   the text messages at issue here, or would give rise to an

22   obligation to preserve those text messages at issue here.

23        THE COURT:  Well, I guess it's hard for the

24   plaintiffs to refute that statement because they have no

25   information about whether a particular hold should have

1    gone to these six.  You know, they can accept your

2    representation that it didn't, but how do they litigate or

3    press or contest the argument that none of the other holds

4    should have gone to these six?  That's the other aspect of

5    this problem, is they're arguing there should have been,

6    given all of these claims, there should have been a

7    broader litigation hold that would include these six, and

8    they can't make that argument if they don't have this

9    documentation.  It may be --

10         MS. RENSHAW:  Your Honor -- I apologize.

11         THE COURT:  It's all right.  It may be that

12   you're right.  When they get these documents, it may be

13   that they concede you're right, there was no involvement

14   by these six in any aspect that's called into question by

15   the litigation hold.  So --

16         MS. RENSHAW:  But, Your Honor, they do have that

17   information in that, one, they wouldn't have the right to

18   enforce the litigation hold in an action, whether it be

19   investigation or litigation, unrelated to theirs.  So they

20   can -- they can make the statement, they can make the

21   argument.  They have all of the information that Teva has

22   regarding the preservation of these -- this subset of text

23   messages.  So if they want to make the argument that these

24   text messages weren't preserved or they -- they can make

25   that argument, but they don't have -- they don't have the

1   standing to enforce a litigation hold that did or didn't

2   go to these individuals or question legal's determination

3   of whether these individuals should have received some

4   hold.  And I don't think they would be able to make that

5   determination anyway based off of a single litigation hold

6   or the fact that one did go out.  So they certainly are

7   welcome to make that argument.

8          They have the information regarding what was

9   done affirmatively, and we've given them extensive

10  information about Teva's efforts to preserve and maintain

11  the text messages at issue.  And we can't answer the

12  question about things that weren't done or what we don't

13  know is the issue.  So we've offered -- we've offered to

14  provide every single litigation hold that went to these

15  six individuals, and if there wasn't one that covered

16  these text messages, then they can argue that there wasn't

17  one.  That's their prerogative.

18          MR. FONTI:  Your Honor, can I respond briefly?

19          MS. RENSHAW:  I'm sorry.  Just very briefly,

20  Your Honor, for instance, with the 2014, you know, letter

21  from Congress, they have the letter from Congress.  We

22  have confirmed that a litigation hold, there was no

23  obligation to preserve documents that arose from that,

24  that letter.  We have confirmed for plaintiffs that the

25  six custodians here did not receive a litigation hold in

1     connection with that letter because there was no

2     preservation obligation.  There's no further inquiry that

3     needs to be done there.  They have the information about

4     what was done to preserve the text messages.

5               THE COURT:  All right.

6               MS. RENSHAW:  Even before the filing of their

7     case.

8               THE COURT:  I'm sorry, I missed that.

9               MS. RENSHAW:  Even before the time when their

10    own case was filed.  Sorry, that was my last point there.

11              THE COURT:  Okay.  So I'm looking on Exhibit B

12    at the November 12, 2014 entry, "Widening DOJ probe of

13    generic drug companies."

14              MS. RENSHAW:  Okay.  And, Your Honor, so you're

15    asking whether -- are you asking -- I guess the point with

16    the litigation -- I'm sorry, with the privilege log

17    entries, and we also have agreed to discuss in more detail

18    any nonprivileged information regarding those entries to

19    address plaintiffs' concerns, but they rejected that

20    offer.  But the fact that somebody communicated with

21    in-house lawyers regarding legal issues relating to

22    generic pricing or investigation related to generic drugs

23    is not uncommon at all.  Teva is the largest manufacturer

24    of generic drugs.  It has approximately 40,000 employees.

25    So Teva's legal department is addressing and advising its

1    employees about legal issues and questions related to

2    generic drugs every day because that is Teva's business.

3    So you can have privileged communications without

4    anticipating litigation.  You can anticipate litigation

5    relating to a certain issue without it covering the text

6    messages here.  And that's why when plaintiffs provided us

7    with examples from the entries of the privilege log, we

8    reviewed the underlying communications and the facts, and

9    we confirmed that none of those matters gave rise to an

10   obligation to preserve these text messages, or that a

11   relevant litigation hold went out to the six individuals,

12   or else it would have been provided.  We would have noted

13   that and provided it to plaintiffs.

14          By way of your example, Your Honor, if in that

15   instance there was a question regarding -- there was a

16   question regarding an investigation to a lawyer, and that

17   hit on search terms and therefore was logged, if there was

18   no litigation hold that went out, I think plaintiffs don't

19   have any right to make an argument that there was some

20   duty owed to the government to preserve documents.  And

21   plaintiffs, if a hold had gone out, plaintiffs, by giving

22   them that hold, would not have information to assess

23   whether that was sufficient given the facts in the case

24   and the lawyer's assessment of the case.  It's just --

25   it's an argument that plaintiff doesn't stand in the shoes

1    of every single individual on the other -- an entity on

2    the other side of the dispute, or investigation, or

3    inquiry, or a legal question that Teva's legal team dealt

4    with over the course of three and a half years.

5            Your Honor, again, we would like to resolve the

6    dispute.  This has been incredibly costly and

7    time-consuming.  And we again believe -- I've offered to

8    discuss with plaintiff nonprivileged information regarding

9    those matters and the entries that they flagged to put

10   their minds at ease that those matters didn't relate to

11   the text messages of the six custodians here.

12           MR. FONTI:  Your Honor, if I could respond,

13   unless you have questions for Ms. Renshaw.

14           THE COURT:  Sure.  Go ahead.

15           MR. FONTI:  I think we're going a little bit in

16   circles because I think the facts that we're talking about

17   should be disclosed now should have been disclosed in the

18   affidavit, and I think Your Honor is correct that a

19   privilege log is an anchor point for what is known at this

20   point, at least, as to relevant inquiries and

21   investigations into the subject matter, pricing and

22   competition.

23           I trust that the privilege log only contains

24   documents that are otherwise relevant to our case.

25   Otherwise, they wouldn't be on the privilege log.  So it's

1   not a far-reaching, unrelated, you know, meandering

2   exercise.  This is our privilege log from our case,

3   documents that are relevant to our case, that are being

4   withheld on privilege grounds.

5           Again, right, the law is not that we have to be

6   in privity with the litigation hold, right?  It's that

7   Teva had a duty.  And what did Teva -- did Teva have a

8   duty?  When did it arise?  What did it do about it?  If

9   the answer to the question ends up being we didn't issue

10  any litigation hold to anybody about pricing, competition

11  and these investigations, okay, that's one answer.  We

12  have our arguments.  If the answer is we did issue

13  litigation holds as a result of these inquiries and

14  investigations, that's a different answer.  And we get --

15  that is a prima facie indication, it's not an admission by

16  Teva that they had a duty to preserve this evidence.

17  Whether they sent it to the six custodians or not is

18  another question and, again, goes to the adequacy of their

19  efforts to preserve.

20          So we're going round and round a bit, but we

21  don't have the facts, as Your Honor indicated.  We need

22  the facts, and we need to get those holds in redacted

23  form.  And, you know, I think we've spent far more time on

24  this call than it's going to take Teva to collect these

25  because paragraph 10 of the Samb declaration says these

1    holds are accessible to every Teva employee on their

2    internal system.  Anybody today can go onto the internal

3    system and look at every hold that has been issued.

4    That's what the Samb declaration says.  So we're going

5    round and round, but let's get the holds that apply to

6    this subject matter, do the investigations in this time

7    period, and then go from there.

8            The next argument might be what Ms. Renshaw is

9    saying, but that's not this argument.  This argument is

10   about just getting the holds.

11           MS. RENSHAW:  And, Your Honor, if I could just

12   briefly respond to those points.  So, one, because a

13   document is logged on a privilege log does not necessarily

14   mean that that document is relevant.  There are family

15   members, there are -- we had a very broad scope of

16   discovery, so I take issue with that, but that's neither

17   here nor there at this point.

18           I think what, as a potential resolution, we

19   could agree to do, Your Honor -- oh, and just to the point

20   about all document holds are available on the company's

21   intraweb, that is true, but to the extent that for

22   something along the lines of review every single

23   litigation hold that went out to any of these 40,000

24   employees during this three-and-a-half-year period for any

25   that may potentially relate to generic pricing and would

1   cover the text messages of these custodians, that would

2   require a hold-by-hold review, and that would be -- that

3   would be burdensome.

4          But if I could make a suggestion as to a

5   proposal, a proposed resolution would be that we start

6   with providing the redacted versions of the holds that

7   went out for January 2013 to June of 2016, before the one

8   at issue where we -- where apparently a dispute lies in

9   those three-and-a-half years prior, and start with those.

10  And then to the extent that a litigation hold was issued

11  in connection with the matters that are the subject of

12  those privilege log entries that plaintiff has identified,

13  we too will produce those in redacted form to plaintiff,

14  so they will understand if a hold went out and what is the

15  nonprivileged information in those holds.

16        And to the extent that that does not resolve the

17  dispute, Your Honor, I think we would ask that we be given

18  the opportunity to brief it because we think both sides,

19  obviously, interpret the law on this differently, and I

20  think it would be a better use of our time to be able to

21  brief it.  But hopefully if we were able to do those two

22  first -- two steps that I just proposed, that could

23  resolve the dispute.

24        THE COURT:  Sounds reasonable to me.  Mr. Fonti,

25  do you have any problem with her suggestion?

1          MR. FONTI:  I just want to ask, generally

2   speaking, the contents of that makes sense, but I think

3   there's some nuance that I want to make sure we're clear,

4   that the scope of relevance is not limited by the six

5   custodians, and is not limited by whether or not these

6   holds apply explicitly to text messages or forms of

7   communication, that relevance is governed by the relevance

8   in the case, which is the subject matter, pricing and

9   competition.

10          MS. RENSHAW:  Just to make sure we're not

11   talking past each other, Joe, what I was proposing was

12   the -- all holds, whether relevant or not, that went to

13   these six individuals during that January period and

14   leading up to the subpoena, preservation notice.  And to

15   the extent holds were issued in connection with the

16   matters that were identified in the privilege log entries

17   that you put in, we will provide redacted copies of those

18   to you as well.

19          MR. FONTI:  I think that works.

20          THE COURT:  I agree.  That's fair.

21          All right, let's see how that goes.  How long

22   will it take to produce that information?

23          MS. RENSHAW:  Let me just look at the calendar,

24   Your Honor.  It shouldn't take us too long.  I guess with

25   the Memorial Day holiday we could -- and obviously we have

1   to pull and redact, pull and redact those, so if we could

2   have until like two weeks, have until June 9 to get those

3   done, and we can produce them on a rolling basis as

4   they're completed.

5         THE COURT:  That's fair.  Okay, thank you.

6   That's good.

7         MS. RENSHAW:  Thank you, Your Honor.  And just

8   one other -- one other issue before we go, and I would be

9   addressing it, so if you don't mind if we raise it now

10  just briefly.

11        In one of the issues that plaintiff had

12  identified in their filing as being still in dispute but

13  that we were meeting and conferring regarding the Sandoz

14  phone records, and we have a different understanding of

15  where we are on that.  And so we would like the Court's

16  guidance.

17        We informed plaintiffs in an email last week of

18  Teva's position that our production is complete and that

19  we've fully complied with Your Honor's order.  We're not

20  withholding anything.  We haven't heard back from

21  plaintiff responding to that correspondence but then saw

22  it in their submission.  So just to clarify, we complied

23  with the Court's order to produce the Sandoz phone records

24  that were in dispute and that have been produced to Teva

25  in the MDL.  We gave the necessary notice to the producing

1   parties.  We resolved one objection from a producing party

2   to provide the telephone records, did the work to identify

3   the telephone records for the phone numbers that

4   plaintiffs provided to us after the hearing, and we timely

5   produced the phone records to plaintiff.

6           At the hearing, as you know, we discussed the

7   carrier records and the notice that was required and the

8   protective order, and we resolved that after the hearing.

9   Plaintiffs now apparently claim that Teva needs to do

10  more, that we should be searching for actual text messages

11  that were sent or received by any of these eight Sandoz

12  custodians' phone numbers.  It's our understanding that

13  we've complied by producing exactly what Mr. Fonti

14  requested at that hearing and that we discussed with Your

15  Honor, which is the telephone carrier phone records, and

16  any request beyond that would require Teva to do a

17  relevance and responsiveness of privilege review, which

18  isn't appropriate for Teva to be doing, and it's a burden

19  that we shouldn't have to bear.

20          So if plaintiffs are seeking further documents

21  about and from nonparty Sandoz, we think they're properly

22  sought from Sandoz and not Teva, but we wanted to raise

23  that now because we don't think there's anything to meet

24  and confer further about.

25          MR. FONTI:  Your Honor, on this issue, you know,

1    we had a conference shortly before the April 16 conference

2    with Sandoz, and you had indicated -- we had asked for the

3    text messages to be produced from Teva because we were

4    having difficulty getting them from Sandoz.  As we said in

5    our status update, we thought we were still conferring

6    with Teva on that issue.  If we're at an impasse, I think

7    we can submit something in short order to tee it up.  We

8    thought we were in a different place with Teva but don't

9    want to do this on the fly.  It's probably better to put

10   in a short submission after the holiday weekend and get

11   this going.

12           MS. RENSHAW:  And, Your Honor, we don't think

13   further submissions or time or money spent on this is

14   necessary.  This is a dispute between plaintiff and

15   nonparty Sandoz.  We understand that they have a dispute

16   in their related matter with them, and we have fully

17   complied with the Court's order by producing the telephone

18   records that plaintiffs requested.  So we would

19   respectfully request your guidance on that and not put in

20   the extra time and money to put in a submission on this.

21           THE COURT:  Yes, it sounds to me like Teva has

22   done what it was obligated to do, and if there's further

23   problem, then I think the appropriate approach is to try

24   Sandoz first.

25           MR. FONTI:  Very well, Your Honor.  I do think

1   that given that these proceedings happened in parallel,

2   there might be some ambiguity as to what discovery is

3   coming from Teva and what is coming from Sandoz.  We

4   thought we were still conferring with Teva.  We didn't tee

5   this up in our status report.  But why don't you let us

6   reconvene and we'll contact the Court if there's still a

7   dispute.

8          MS. RENSHAW:  Your Honor, respectfully, we

9   really don't think there's a need to meet and confer.

10  This isn't Teva's battle to fight, and we have spent

11  considerable time and money complying with the Court's

12  prior orders, so we agree with Your Honor that we have

13  fully complied with the prior order, and to the extent

14  that plaintiff has a dispute regarding Sandoz's text

15  messages or anything else, that it's properly taken up

16  with Sandoz.

17         MR. FONTI:  I believe the issue here is that

18  Teva -- documents were produced to Teva reflecting the

19  text messages, actual text messages came to Teva, and part

20  of the argument Sandoz was making was that, well, a party

21  has the same discovery, and you should get it from the

22  party as opposed to from the nonparty.  And I believe

23  that's where this originated.

24         We have a status report due today in the Sandoz

25  matter, which we'll submit, but I don't think this is

1    properly teed up factually before the Court, and

2    Ms. Renshaw's insistence that we can't confer any more and

3    can't ask the Court for any more relief is a bit

4    perplexing, and they didn't stress this either.  So I just

5    think we need to level set and determine whether further

6    release is needed or not.  And we can make our formal

7    motions necessary or a further status report if the Court

8    wants to go that route, but trying to short-circuit it is

9    not appropriate given that we thought we were still

10   conferring with Teva.

11            THE COURT:  Well, okay.  My thought is that you

12   should confer with Sandoz because if they produced it to

13   Teva, which is the presumption you're making, then they

14   have a set they can easily send to you.

15            MR. FONTI:  Very well.  We'll take that route

16   and to the extent we can convey that in our status report

17   today to the Court, we will.  If not, we will supplement

18   in due course to keep you apprised of where that issue

19   stands.

20            THE COURT:  All right, thank you.

21            MS. RENSHAW:  Thank you, Your Honor.

22            THE COURT:  All right.  Investigation documents,

23   the next big item that I have.

24            MR. FONTI:  That's correct, Your Honor.  I

25   could -- I could take the lead on that.

1             This is a pretty unusual circumstance where

2    defendants have made affirmative statements about their

3    conclusions of an investigation and have denied the

4    existence of evidence based on an investigation done

5    internally.  Frankly, I just don't see those kinds of

6    statements made by corporate defendants or senior

7    management corporate defendants.  Through the depositions

8    we came to learn that this whole basis for the statements,

9    for the findings in these investigations, this shares a

10   common root with our prior dispute, which is we can't even

11   get off the starting block to assess what the facts are.

12   We're not asking for privileged communications.  We're not

13   asking for attorney work product, but the factual basis

14   concluding that there was no -- there is no evidence of

15   collusion, which is what has been told to the investors.

16   Defendants full stop refuse to engage in providing any

17   disclosure.

18            We think the next step is to provide a log that

19   catalogs the factual documents that underlie the

20   investigation.  Actually, we think there's two

21   investigations.  There's one by management done

22   internally, and then there's a second one that we learned

23   from the chair of the audit committee that -- who

24   personally retained the Wachtell Lipton firm to undertake

25   an investigation for the audit committee.  And facts were

1    gathered, facts were presented, and we're entitled to

2    those facts, or at least a log of those facts, so that we

3    can then take the next step if there's an appropriate

4    challenge to privilege.  And that challenge would come in

5    the form of to the extent the documents are just simply

6    factual in nature, or if they actually include some work

7    product or privilege, if they're shared with the likes of

8    the DOJ, the SEC or PWC, or any state AGs in defending

9    Teva, then any privilege would have been waived.

10           But, again, we can't get off the starting block,

11   and they won't engage with us to come up with a solution

12   so that we can at least get the factual grounds for these

13   assertions.  So we would like the Court to compel the

14   production of a log reflecting those facts.

15           MR. KORPUS:  Your Honor, Sheron Korpus.

16           THE COURT:  I understand, Mr. Fonti, that the

17   defendant's position is that those documents have already

18   been listed on the privilege log.

19           MR. FONTI:  They make this illusion that there

20   are documents on the log that reflect investigations, and

21   we know that, right?  We just spent a considerable amount

22   of time looking at some of those documents that relate to

23   investigations.  But there's not -- this was no systemic,

24   systematic attempt to collect and catalog the documents

25   related to these investigations.  As they like to say

1   repeatedly, they ran search terms on the custodial files.

2   We don't think these investigative materials would have

3   been in custodial files per se, and they necessarily

4   wouldn't have hit on the search terms.  If these are

5   investigations done by the corporation on behalf of the

6   corporation, on behalf of the audit committee, I'm sure

7   that those files are maintained in a centralized place and

8   were not custodial files that were subject to the search

9   terms.  So the happenstance that we have some

10  investigations on a log, and you saw so many of them just

11  now, isn't conclusive as to the documents that underlie

12  these representations to investors that there's no

13  evidence of wrongdoing.

14          MR. KORPUS:  If I may respond, Your Honor.

15  Sheron Korpus from Kasowiz Benson Torres.

16          Your Honor, I disagree with the statement that

17  this is an unusual circumstance.  Plaintiffs are arguing

18  that Teva's general denials of liability in securities

19  filings allow them to eventually vacate its privilege.

20  That is just not the law.  It cannot be the law that the

21  general denial of liability or awareness of texts that

22  give rise to liability would result in discovery or

23  production of such privileged communications underlying

24  the statement.  If that was the case, the company would

25  never be able to speak on any ongoing investigation or

1   litigation.

2        We talked about this at the last conference, and

3   I believe the Court said if you're not relying on the

4   advice of counsel, which I told you we were not, and

5   you're not relying on the affirmative defense of good

6   faith, which we told plaintiffs we are not, then those

7   documents are privileged.

8        And we are not relying on the affirmative

9   defense of good faith; we are relying on plaintiffs'

10  inability to prove their case, and we generally deny the

11  allegations in the case, and that's what we communicated

12  to plaintiff.  So this is a whole new pivot by plaintiff

13  to get these documents another way, after they were not

14  able to get to them through the route that the Court

15  suggested they explore.  And now they want us to do a

16  whole new collection on review for documents related to

17  internal/external investigations just so we can put them

18  on the log.  And plaintiffs want us to identify all

19  documents that form the basis for the general denials.

20  And that's just so overbroad, that it's very difficult to

21  know where to start.  In fact, at the last conference,

22  Your Honor, you said, and I'm quoting from what you said

23  in the last conference:  If you're asking them, in effect,

24  to give you every bit of information, document, etc. that

25  supports the general denial of committing securities

1   fraud, I think that's a little broad.

2          And that's exactly what I heard Mr. Fonti ask

3   for, a systematic review of every piece of paper that

4   involves an investigation.  These allegations have been

5   going on for a long time.  Given the importance of them,

6   it is not surprising that attorneys have been involved,

7   external and internal attorneys, from the beginning in

8   reviewing allegations, in reporting to the board about

9   them.  I heard Mr. Fonti say something about sharing this

10  information with the DOJ or the SEC or the AG.  There is

11  no basis for that statement.  That information has been

12  internal to Teva.  It has not been shared with anyone.  If

13  there had been any recent materials that had been shared

14  with the DOJ, they would have had them because there would

15  have been a waiver, but there isn't any such document.

16          THE COURT:  What about Pricewaterhouse Coopers?

17          MR. KASOWITZ:  There has been high-level

18  summaries in the representation letters with

19  Pricewaterhouse, and that is protected by work product

20  privilege.  That's what *Keurig*, the same case that they

21  cite, holds.  We do not lose work product privilege by

22  sharing in a high level the investigation summary with the

23  auditors.  If that's an issue that Mr. Fonti would like to

24  brief, he has everything he needs to brief that issue, and

25  he can file his motion to compel.  But for us to now go

1   back and look at new custodians, including all of legal

2   counsel, including Mr. Schultz, the current CEO, regarding

3   statements that he made after the class period in

4   November 2019 just to log them, that's a huge undertaking.

5   It's completely unnecessary.

6           We have on the log already certain entries that

7   relate to the investigation where they fell within the

8   agreed-upon search protocol.  For example, they have

9   minutes from board of directors meetings where there are

10  certain redactions that reflect advice given by attorneys.

11  They have everything that is appropriate.  There is

12  nothing more to do.  If they want to file a motion, I

13  guess they can, but there's absolutely no basis for such a

14  motion.  It would really turn upside down how management

15  and CEOs communicate with the public and would make it

16  very difficult for anyone to conduct an internal

17  investigation.

18          MR. FONTI:  Your Honor, if I could.  Just to hit

19  some of the points Mr. Korpus made.  One is I think the

20  last conference was very productive in having defendants

21  commit that they were not relying on counsel as a defense.

22  We got clarty at that conference that put that issue to

23  the side.

24          This issue, although touching on the

25  investigative materials as well, is not about general

 1    denials.  What makes this unusual is that these are very

 2    specific statements by senior management saying that there

 3    is no evidence that Teva was involved in any way in

 4    collusion.  And when we deposed these people and we asked

 5    them what was their actual basis for that, they said it

 6    was the result of these investigations.  Is there anything

 7    else?  No, it was just the investigations.

 8              This goes to their mental state.  What did these

 9    key senior executives know, what was the evidence they had

10    in hand and the facts that they knew when they made

11    statements, right?  This doesn't require an overview of

12    the entire universe of documents.  Again, the

13    investigations are discrete and are centralized.  And,

14    importantly, they're not making the argument that this

15    information is not relevant.  Relevance is not the

16    argument.  The burden is the argument.  And I think Your

17    Honor hit it straight on the head when you asked about

18    PWC.  PWC's engagement partner was deposed.  He said that

19    they received documents that their forensic auditors,

20    forensic team was involved in understanding the magnitude

21    and the reasonableness and the scope of the

22    investigations, and that was further to their auditing

23    standards and their auditing requirements, not subject to

24    privilege but part of the independent auditing function.

25    And, yeah, we'll make a motion, but we'll make a motion

1    once we have the facts.  What went to PWC?  What are the

2    documents that went to PWC?  We get to see those on a log

3    at a minimum, right?

4            And to the extent corporations undertake

5    investigations, they are routinely found not to be

6    privileged.  Audit committee investigations that are at

7    arm's length for an independent committee of the board

8    that undertakes an investigation, there is serious

9    challenges to the privilege associated with that, and

10   those are often produced in litigation because they are

11   the grounds for the company's position in the litigation.

12           So these are exactly the issues we need to be

13   able to test and get the factual basis to be able to test

14   whether we can challenge the next step.  And like the last

15   dispute, they're trying to cut us off at the pass before

16   we can even get to the facts that enable us to make a

17   motion under the appropriate standard.  They want to stop

18   us before we can even get in the door.  So we get the

19   facts, I think we get the log, and we get certainly what

20   PWC was given on a log.

21           MR. KORPUS:  Your Honor, notwithstanding the

22   fact that we told you we are not relying on advice of

23   counsel, that we told them we are not relying on the

24   affirmative defense of good faith, Mr. Fonti wants to try

25   and back us into a situation where we say we relied on

1    legal advice so that you can get at the legal advice.  I

2    don't know how many different times I can say, when you

3    look at the statements that they're citing in the

4    complaint as the basis for these statements, for example,

5    paragraph 251, Teva denies ever engaging in any conduct

6    that would give rise with respect to the above-mentioned

7    subpoenas, they are general denials.  There couldn't be

8    any more general denial.  Mr. Vigodman, paragraph 309 of

9    the complaint:  I am not aware of any fact that could give

10   rise to an exposure to Teva with respect to the

11   investigation.

12           This is what I'm talking about.  This is all

13   based on just general denials.  And, sure, some of that is

14   the internal investigation that was not done by an

15   independent committee of the board and was not done by an

16   audit committee, it was done by attorneys, as Mr. Fonti

17   said, internal and external.  It is the very height of

18   privileged information.  Some of that material is already

19   on the log, and there's no need to do anything more.

20           THE COURT:  Well, I think if we're going to

21   pursue this further, I'd like to get it briefed.  So,

22   Mr. Fonti, if you want to make a motion on this, on this

23   issue, you should do so.  My sense is that this is likely

24   either privileged or protected by the work product

25   doctrine.  But I'm happy to be convinced otherwise.

1          MR. FONTI:  Understood, Your Honor.  We will

2    take that under advisement and decide our course.

3          THE COURT:  Very good.

4          All right.  What other issues do you have today?

5          MR. FONTI:  From our end, I don't think, other

6    than maybe the housekeeping of setting another conference

7    at an appropriate time, I don't think we have any other

8    outstanding issues.

9          THE COURT:  Okay.  I should note, with respect

10   to the direct actions, that the request for extension of

11   time for briefing of the motion to dismiss will be

12   granted.

13         MR. KORPUS:  That's the only thing I have on my

14   list, Your Honor.  Thank you.

15         THE COURT:  So that's opposition by July 23 and

16   replies by September 2nd.

17         All right.  Anything else?

18         MR. FONTI:  No, Your Honor.  I mean, as we

19   noted, we have this agreement with the DOJ and defendants

20   that certain depositions wouldn't happen before the end of

21   June.  We'll obviously confer with them about that, but

22   perhaps teeing up a conference early in July, I know it's

23   vacation time for some, that we find an appropriate time

24   if that issue becomes problematic we can get that squared

25   away as well.

1          MR. KASOWITZ:  I just want to clarify the record

2     on that because I read that in Mr. Fonti's submission, and

3     as far as I know, there is no agreement with either

4     defendants or with the DOJ about a June 30 date.  This is

5     a unilateral date that Mr. Fonti came up with.

6     Nonetheless, I agree that if Mr. Fonti wants to raise it

7     at some point after the end of June, then we should have a

8     date for the next conference, sometime in July.  I would

9     ask for it to be after July 7, if possible.

10          MS. ONYEMA:  Your Honor, if I may, this is

11     Veronica Onyema.  Similarly, I'm not aware of an agreement

12     that we have with plaintiffs over June 30.  There have

13     been depositions that we have discussed with them that we

14     have concern about proceeding at this time, and as

15     Mr. Fonti noted at a prior status conference, we suspect

16     this may become an issue that requires the Court's

17     intervention in upcoming months, but there is no formal

18     agreement involving the June 30th date.

19          THE COURT:  All right.  I still think it makes

20     sense to have another conference scheduled.  Why don't we

21     try for July 15, which is a Thursday, at 2:00 p.m.

22          MR. KASOWITZ:  That is fine, Your Honor.

23          MR. FONTI:  Your Honor, just so the record is

24     clear, we have been operating under that understanding and

25     believe that it was a mutual understanding of certainly

1    DOJ, and we've indicated that much in other submissions.

2    So, in any event, whether they've agreed to it or not, I

3    think it's time to talk about whether these depositions go

4    forward or not given that summary judgment is coming down

5    the pike and experts are getting served on Friday.  So the

6    15th works for us.

7              The other issue that is out there is the

8    briefing on getting the interview memos, the FBI interview

9    memos.  I think briefing is done on June 11.  To the

10   extent the Court wants to hear argument on that, I don't

11   know if that makes sense to wait until the 15th or are you

12   just going to wait and see how you want to proceed?

13             MR. KASOWITZ:  We do think actually that

14   argument would make sense on that topic.  There are some

15   overlaps between the last topic and the topic of the

16   witnesses, so we'd be happy to take it up on the 15th if

17   that suits Your Honor.  If Your Honor needs a few more

18   days to read the completed briefing and move the

19   conference, that's fine too.

20             THE COURT:  Well, the suggestion is that the

21   briefing will be completed by June 11, is that right?

22             MR. FONTI:  That's right.

23             MR. KASOWITZ:  I'm sorry.  I thought I heard

24   July 11.  That's fine, Your Honor.

25             THE COURT:  What if we did argument at 2:00 p.m.

1    on Friday, June 25th?

2              MR. KASOWITZ:  I think that's fine, Your Honor,

3    but I do think that the issues do overlap with the witness

4    issues.  I do think it kind of makes sense to take them

5    together.  It might be more efficient to simply do it on

6    the July 15th day.

7              MR. FONTI:  We have no opposition to combining

8    the two, Your Honor, but to wait until the 15th seems a

9    bit of a stretch.  So I don't know, if there's scheduling

10   difficulties, we can move forward.  It doesn't sound like

11   we're going to make much progress with DOJ and with

12   defendants on these depositions, so maybe we can just

13   accelerate that inevitable dispute and do it before the

14   Fourth of July weekend and deal with those matters at the

15   same time.

16             THE COURT:  Well, okay.  Let's schedule a

17   conference for June 25th at 2:00 p.m.  I'm going to urge

18   you to try to work out with the DOJ what depositions, if

19   any, can go forward during the month of June, and we'll

20   take it up to the extent that it's ripe and needs to be

21   taken up on the 25th.  But I'll definitely take up the

22   question of the interview notes at that time.

23             MR. FONTI:  Very good, Your Honor.

24             MR. KASOWITZ:  Thank you, Your Honor.

25             MS. RENSHAW:  Thank you, Your Honor.

1               THE COURT:  Anything further?

2               All right.

3               MR. FONTI:  That's it for us.

4               THE COURT:  Thank you all for calling in, and

5    we'll talk to you soon.

6               MS. RENSHAW:  Thank you.

7               MR. FONTI:  Very good.  Thank you.

8               MS. RENSHAW:  Bye-bye.

9               (Adjournment:  3:17 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


No. 3:17-cv-00558(SRU)

Ontario Teachers' Pension Plan Board, et al v. Teva
Pharmaceutical Industries Ltd., et al


          I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



               June 8, 2021


                  /S/ Sharon L. Masse
               Sharon L. Masse, RMR, CRR
                Official Court Reporter
                915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
              sharon_masse@ctd.uscourts.gov