UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re TEVA SECURITIES LITIGATION | No. 3:17-cv-00558-SRU |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | No. 3:18-cv-01681 (SRU) |
| | No. 3:18-cv-1721 (SRU) |
| | No. 3:18-cv-1956 (SRU) |
| | No. 3:19-cv-175 (SRU) |
| | No. 3:19-cv-192 (SRU) |
| | No. 3:19-cv-449 (SRU) |
| | No. 3:19-cv-513 (SRU) |
| | No. 3:19-cv-543 (SRU) |
| | No. 3:19-cv-603 (SRU) |
| | No. 3:19-cv-655 (SRU) |
| | No. 3:19-cv-656 (SRU) |
| | No. 3:19-cv-657 (SRU) |
| | No. 3:19-cv-923 (SRU) |
| | No. 3:19-cv-1167 (SRU) |
| | No. 3:19-cv-1173 (SRU) |
| | No. 3:20-cv-83 (SRU) |
| | No. 3:20-cv-588 (SRU) |
| | No. 3:20-cv-683 (SRU) |
| | No. 3:20-cv-1630 (SRU) |
| | No. 3:20-cv-1635 (SRU) |
| | |
| | July 23, 2021 |
| | ORAL ARGUMENT REQUESTED |

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
NEW CLAIMS AND CLAIMS AGAINST NEW DEFENDANTS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

STANDARD OF REVIEW ...................................................................................3

ARGUMENT .......................................................................................................4

I.     PLAINTIFFS PROPERLY PLED SCIENTER FOR THE ADDITIONAL
DEFENDANTS .........................................................................................4

     A.     The Additional Defendants Had the Motive and Opportunity to Commit
Fraud ............................................................................................6

     B.     The Complaints Allege Strong Circumstantial Evidence of Conscious
Misbehavior or Recklessness ..............................................................9

          1.     Magnitude of the Fraud ...........................................................9

          2.     The Additional Defendants Made Statements Contrary to Known
or Readily Available Information ..............................................10

          3.     The Additional Defendants Made Direct Statements About Crucial
Issues, Enhancing the Evidence of Scienter ...............................12

               a.     Pricing and Competition ...............................................12

               b.     Defendants Do Not Challenge Scienter for Certain of the
Additional Defendants' Statements .................................16

                    (1)     Defendants Objectively Understated Teva's Pricing
Erosion from 2Q16 to 2Q17 ................................16

                    (2)     Denials of Collusion ........................................17

     C.     Confidential Witness Allegations Support a Finding of Scienter ............18

     D.     Defendants Mischaracterize the Scienter Allegations ...........................20

II.     PLAINTIFFS ADEQUATELY ALLEGE CLAIMS ON TEVA'S OPIOID
SCHEME ...............................................................................................21

     A.     Teva's Off-Label Marketing of Opioids ............................................21

     B.     Plaintiffs Adequately Allege a False and Misleading Statement..............23

     C.     Plaintiffs Adequately Allege Scienter................................................25

     D.     Plaintiffs Adequately Allege Loss Causation ......................................27

E.      The PSA Claims Are Timely ...................................................................28

III.    THE COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD AS TO
        THE BRIBERY SCHEME ................................................................................28

        A.      Plaintiffs Adequately Alleged that Defendants Withheld Material
                Information About the Bribery Scheme................................................28

        B.      Plaintiffs Alleged Facts to Establish a Compelling Inference of Scienter
                with Regard to the Bribery Scheme .....................................................32

        C.      The Statute of Limitations Was Tolled ................................................33

IV.     PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS
        FRAUDULENTLY MISLED INVESTORS ABOUT THE ACTAVIS
        ACQUISITION .................................................................................................34

        A.      Plaintiffs Adequately Allege that Defendants Made False and Misleading
                Statements About the Actavis Acquisition ..........................................35

        B.      Plaintiffs Adequately Allege Facts that Establish a Compelling Inference
                of Scienter as to the Actavis Acquisition.............................................39

        C.      Plaintiffs Adequately Allege Facts that Establish Loss Causation as to the
                Actavis Acquisition..............................................................................40

V.      DEFENDANTS' MISLEADING STATEMENTS CONCERNING GOODWILL
        ARE ACTIONABLE .........................................................................................42

CONCLUSION ..................................................................................................................45

## TABLE OF AUTHORITIES

**Page**

**CASES**

*380544 Can., Inc. v. Aspen Tech., Inc.,*
    544 F. Supp. 2d 199 (S.D.N.Y. 2008)...................................................................19

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974)......................................................................................34

*AP-Fonden v. Goldman Sachs Grp., Inc.,*
    2021 WL 2659797 (S.D.N.Y. June 28, 2021) ..................................................27, 28

*ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.,*
    2018 WL 1368908 (D. Conn. Mar. 16, 2018) ...........................................................4

*Bye v. Connecticut,*
    2011 WL 1271690 (D. Conn. Apr. 5, 2011) ...........................................................45

*City of Livonia Emps. Ret. Sys. v. Wyeth,*
    2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010)........................................................26

*City of Omaha v. CBS Corp.,*
    679 F.3d 64 (2d Cir. 2012)...............................................................................41

*City of Pontiac Emps.' Ret. Sys. v. Lockheed Martin Corp.,*
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)..........................................................6, 12, 20

*Commonwealth of Ky., ex rel., Andy Beshear,*
    *Att'y Gen. v. Teva Pharms., USA Inc., et al.,*
    No. 18-CI-3767 (Ky. Cir. Ct., Fayette Cnty. Oct. 25, 2018) ...................................24

*Dep't of the Treasury of the State of New Jersey*
    *& its Div. of Inv. v. Cliffs Nat. Res., Inc.,*
    2015 WL 6870110 (N.D. Ohio Nov. 6, 2015) ........................................................19

*Dobina v. Weatherford Int'l,*
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................12

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.,*
    553 F.3d 187 (2d Cir. 2009).........................................................................26, 32

*Erickson v. Corinthian Colls., Inc.,*
    2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ......................................................24

*Fait v. Regions Fin. Corp.,*
    655 F.3d 105 (2d Cir. 2011)..............................................................................41

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017)................................................................................28

*Ferrante v. Cap. Reg'l Educ. Council*,
  2015 WL 1445206 (D. Conn. Mar. 30, 2015) ...........................................10, 16, 18

*Ferry v. Mead Johnson & Co., LLC*,
  2021 WL 243119 (D. Conn. Jan. 25, 2021).............................................................4

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)...............................................................9, 12

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................20, 41

*Gammel v. Hewlett-Packard Co.*,
  2013 WL 1947525 (C.D. Cal. May 8, 2013) .........................................................39

*In re AnnTaylor Stores Sec. Litig.*,
  807 F. Supp. 990 (S.D.N.Y. 1992) ....................................................................7, 8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................................26

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015).....................................................................33

*In re CannaVest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018)...................................................................44

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) .......................................................44

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) .............................................................19

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001)......................................................................7

*In re Elan Corp.*,
  2004 WL 1305845 (S.D.N.Y. May 18, 2004) ....................................................7, 18

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)...........................................................17, 20, 30

*In re EZCorp, Inc. Sec. Litigs.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016)....................................................................11

*In re GE Sec. Litig.*,
 2020 WL 2306434 (S.D.N.Y. May 7, 2020),
 *aff'd*, 844 F. App'x 385 (2d Cir. 2021) ................................................................41

*In re GE Sec. Litig.*,
 857 F. Supp. 2d 367 (S.D.N.Y. 2012) ..................................................26, 33, 40

*In re Genworth Fin. Inc. Sec. Litig.*,
 103 F. Supp. 3d 759 (E.D. Va. 2015) ..................................................................12

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
 236 F. Supp. 3d 824 (S.D.N.Y. 2017) ..................................................................18

*In re Lehman Bros. Sec. & Erisa Litig.*,
 2013 WL 3989066 (S.D.N.Y. July 31, 2013) ......................................................19

*In re Marsh & McLennan Cos. Sec. Litig.*,
 501 F. Supp. 2d 452 (S.D.N.Y. 2006) .............................................................17, 25

*In re Massey Energy Co. Sec. Litig.*,
 883 F. Supp. 2d 597 (S.D. W. Va. 2012) ............................................................26

*In re Mercator Software, Inc.*,
 161 F. Supp. 2d 143 (D. Conn. 2001) ..................................................................40

*In re Merrill Lynch Auction Rate Sec. Litig.*,
 758 F. Supp. 2d 264 (S.D.N.Y. 2010) ..................................................................28

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
 982 F. Supp. 2d 277 (S.D.N.Y. 2013) ..................................................................10

*In re Mylan N.V. Sec. Litig.*,
 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ......................................................33

*In re Nielsen Holdings PLC Sec. Litig.*,
 2021 WL 22722 (S.D.N.Y. 2021) ........................................................................44

*In re Par Pharm. Sec. Litig.*,
 2009 WL 3234273 (D.N.J. Sept. 30, 2009) ..........................................................19

*In re ProQuest Sec. Litig.*,
 527 F. Supp. 2d 728 (E.D. Mich. 2007) ...............................................................19

*In re Salix Pharms., Ltd.*,
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................9

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) ............................................................................ *passim*

*In re Teva Sec. Litig.*,
   2021 WL 231130 (D. Conn. Jan. 22, 2021)...................................................................4

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)................................................................................................6

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).........................................................................31

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).......................................................30, 31

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) .......................................................................................24

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...........................................................................29, 36, 41

*In re Volkswagen "Clean Diesel" Mktg.,*
   *Sales Pracs. & Prods. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ....................................................................25

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014)..............................................................................7, 8

*In re WorldCom Sec. Litig.*,
   496 F.3d 245 (2d Cir. 2007)..........................................................................................34

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)............................................................................................39

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................................6

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ........................................................................................40

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) ....................................................................................44

*Matrixx Initiatives Inc. v. Siracusano*,
   563 U.S. 27 (2011)..............................................................................................3, 4, 11

*Mauss v. NuVasive, Inc.*,
   2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ...........................................................27

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)......................................................................29, 30

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ...................................................................................28

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ..........................................................................4

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ............................................................41

*Musab Abuhamdan v. Blyth, Inc.*,
    9 F. Supp. 3d 175 (D. Conn. 2014) ..............................................................41

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................11

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council*
    *Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...................................................................................44

*Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus.*,
    432 F. Supp. 3d 131 (D. Conn. 2019) ..................................................... *passim*

*Preferred Display, Inc. v. Great Am. Ins. Co. of N.Y.*,
    2017 WL 3579754 (D. Conn. Jan. 27, 2017) ...................................................2

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) .......................................................................26

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .......................................................................26

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ..........................................................30

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) .......................................................9

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) .......................................................................9, 39

*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .......................................................................26

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ........................................................................30

*Shenk v. Karmazin*,
    867 F. Supp. 2d 379 (S.D.N.Y. 2011)........................................................................12

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................................33

*Teamsters Loc. 445 Freight Div. Pension
    Fund v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................... *passim*

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ..........................................................27

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................6, 20

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................................................33, 40

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b).................................................................................................................3, 4, 33

Federal Rules of Civil Procedure
    Rule 9(b) ...............................................................................................................4, 24
    Rule 12(b)(6)................................................................................................................3
    Rule 15 .....................................................................................................................45

17 C.F.R.
    §240.10b-5 .........................................................................................................4, 33

# GLOSSARY OF TERMS[1]

| | |
|---|---|
| "Additional Defendants" | Defendants Yaacov Altman ("Altman"), Dipankar Bhattacharjee ("Bhattacharjee"), Michael McClellan ("McClellan"), Yitzhak Peterburg ("Peterburg"), and Kåre Schultz ("Schultz"). |
| "ADS(s)" | American Depository Share(s). |
| "Bribery Scheme" | Teva's engagement in an international bribery scheme, including in Russia, centered around its key drug Copaxone, as alleged in the *Ontario* SAC (defined below) and various Complaints (defined below). *See, e.g., Phoenix* compl., ¶¶759-767. |
| "Class" | The class of investors represented by Lead Plaintiff in the Class Action (defined below). |
| "Class Action" or "*Ontario*" | *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Indus. Ltd., et al.*, No. 3:17-cv-0558. |
| "Complaints" or "Direct Action Complaints" | The operative Complaints filed in the Direct Actions (defined below) and subject to Defendants' (defined below) MTD (defined below). |
| "DOJ" | U.S. Department of Justice. |
| "Defendants" | All Defendants in the Direct Actions. |
| "Direct Actions" | The term "Direct Actions" refers to the 20 individual actions that were consolidated with the *Ontario* action pursuant to this Court's Order Regarding Pre-Trial Consolidation of Related Actions, entered April 28, 2020 (ECF No. 352), and as further memorialized in this Court's Order, entered January 22, 2021 (ECF No. 689). These actions are: (1) *Nordea Investment Mgmt. AB v. Teva Pharm. Indus. Ltd., et al.*, No. 3:18-cv-01681 ("*Nordea*"); (2) *State of Alaska Department of Revenue, Treasury Division, et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:18-cv-1721 ("*Alaska*"); (3) *Pacific Funds Series Tr., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:18-cv-1956 ("*Pacific*"); (4) *Public School Teachers' Pension and Ret. Fund of Chicago v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-175 ("*Chicago*"); (5) *Schwab Capital Tr., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-192 ("*Schwab*"); (6) *Phoenix Ins. Co. Ltd., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-449 ("*Phoenix*"); (7) *Mivtachim The Workers Social Ins. Fund, et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-513 ("*Mivtachim*"); (8) *Clal Ins. Co. Ltd., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-543 ("*Clal*"); (9) *Highfields Capital I LP, et al. v. Teva Pharm. Indus., et al.*, No. 3:19-cv-603 ("*Highfields*"); (10) *Migdal Ins. Co. Ltd., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-655 ("*Migdal Ins.*"); (11) *Harel Pension and Provident Ltd., et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-656 ("*Harel*"); (12) *Oregon v. Teva Pharm. Indus.* |

---

[1] Emphasis is added and citations are omitted throughout unless otherwise indicated.

| | |
|---|---|
| | *Ltd., et al.*, No. 3:19-cv-657 ("*Oregon*"); (13) *Migdal Mut. Funds, Ltd. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-923 ("*Migdal Mut.*"); (14) *Psagot Mut. Funds, Ltd. et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-1167 ("*Psagot*"); (15) *Stichting PGGM Depositary, et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:19-cv-1173 ("*Stichting*"); (16) *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus. Ltd., et al.*, No. 3:20-cv-83 ("*INKA*"); (17) *Boeing Co. Emp. Ret. Plans Master Tr. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:20-cv-588 ("*Boeing*"); (18) *Fir Tree Value Master Fund, LP, et al. v. Teva Pharm. Indus. Ltd., et al.*, No. 3:20-cv-683 ("*Fir Tree*"); (19) *Franklin Mut. Series Funds, et al. v. Teva Pharm. Indus., et al.*, No. 3:20-cv-1630 ("*Franklin*"); and (20) *BH Invs. Funds, L.L.C., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-1635 ("*BH*").  *OZ ELS Master Fund, Ltd., et al. v. Teva Pharmaceutical Industries Ltd., et al.*, No. 3:17-cv-01314 (D. Conn.), is excluded from the motion to dismiss and this memorandum of law.  *Id.* at ECF No. 60-61. |
| "FCPA" | Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §78dd-1 *et seq.* |
| "FDA" | U.S. Food and Drug Administration. |
| "FE" | Former Employee. |
| "GAAP" | Generally Accepted Accounting Principles. |
| "MTD" | Memorandum of Law in Support of Defendants' Motion to Dismiss New Claims and Claims Against New Defendants (ECF No. 786-1). |
| "MTD Other Grounds" | Memorandum of Law in Support of Defendants' Motion to Dismiss on Pleading and Other Grounds (ECF No. 784-1). |
| "NYSE" | New York Stock Exchange. |
| "*Ontario* AC" | Amended Consolidated Class Action Complaint filed in the Class Action, dated June 22, 2018 (ECF No. 226). |
| "*Ontario* SAC" | Second Amended Class Action Complaint filed in the Class Action, dated December 13, 2019 (ECF No. 310). |
| "Opioid Scheme" | Defendants' practice of marketing opioids for off-label uses, and concealing that practice, all alleged in the consolidated complaint filed by Pomerantz LLP in *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* on May 28, 2020. ECF No. 391, ¶¶388-400. |
| "Plaintiffs" | Plaintiffs in the Direct Actions whose operative Complaints are subject to Defendants' MTD. |

| "Plea Agreement" | The Plea Agreement entered by Teva LLC (Russia) related to the Bribery Scheme, which was incorporated into various Complaints by reference. *See, e.g.*, *Phoenix* compl., ¶70 n.2.  The Plea Agreement is available at *United States v. Teva LLC (Russia)*, No. 1:16-cr-20967 (KMW) (S.D. Fla. Dec. 22, 2016) (ECF No. 2). |
| --- | --- |
| "Price-Hike Strategy" | Defendants' strategy of systematically raising prices across a large swath of its generic drug portfolio, often in tandem with other drug manufacturers, as described in the *Ontario* SAC and the Direct Action Complaints. *See, e.g.*, *Phoenix* compl., ¶7. |
| "PSA" | Pennsylvania Securities Act. |
| "PSLRA" | Private Securities Litigation Reform Act of 1995. |
| "Rule" | Federal Rule of Civil Procedure. |
| "SEC" | U.S. Securities and Exchange Commission. |
| "State AGs" | The government entities that initiated the action captioned *State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19-cv-02407 (E.D. Pa.). |
| "State AG Complaint" | Complaint in *State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19-cv-02407 (E.D. Pa.), dated May 10, 2019. |
| "Teva" or the "Company" | Defendant Teva Pharmaceutical Industries Ltd. |
| "Upheld Defendants" | Defendants Erez Vigodman ("Vigodman"), Eyal Desheh ("Desheh"), Sigurdur Olafsson ("Olafsson"), and Deborah Griffin ("Griffin"). |

Plaintiffs in the above-referenced Direct Actions submit this memorandum of law in opposition to Defendants' Motion to Dismiss New Claims and Claims Against New Defendants (ECF No. 786).[2]

## PRELIMINARY STATEMENT

The Direct Action Complaints, like the sustained *Ontario* complaint before them, describe a series of illegal schemes and distortions that Teva and its senior-most officers secretly undertook in order to inflate profits from the Company's pharmaceutical products and drive up its share price. The alleged offenses are varied, but center around the Price-Hike Strategy in which Defendants artificially inflated the price of its generic drugs, including through illegal collusion with Teva's competitors. The Complaints describe in detail how Defendants had ready access to information concerning this misconduct, knowingly or recklessly denied or failed to disclose it to investors, and instead falsely attributed the Company's soaring profits to legal and sustainable sources. Defendants then used Teva's inflated shares as a "currency" to acquire Actavis for $40.5 billion, the largest acquisition in the Company's history. When the truth was gradually revealed after the Actavis acquisition that the profits were actually due largely to illegal and unsustainable schemes, Teva's share price plummeted and investors suffered massive financial losses. These revelations similarly negatively impacted the value of Actavis itself, also a generic drug company, which Defendants publicly denied until they announced $16.5 billion in goodwill write-downs for Teva's U.S. generics business. This is the same general timeline of events that the Court already heard and considered before sustaining the bulk of the allegations in the *Ontario* AC, and that same considered analysis applies to the well-pled allegations at issue in Defendants' MTD.

Defendants use their MTD as a catch-all brief, urging the Court to dismiss a grab-bag of claims and individuals they contend are "new" "innovations" from *Ontario*. MTD at 1. But the only

---

[2] As outlined in the MTD, not all arguments apply to all Complaints. As such, arguments made herein are made only by the Direct Action Plaintiffs to which they apply.

thing "new" about the bulk of these issues is Defendants' belated attempt to challenge them. Indeed, the *Ontario* SAC includes allegations about the involvement of Defendants Schultz, McClellan, and Peterburg in the Price-Hike Strategy (*Ontario* SAC, ¶¶31-33), the Actavis acquisition (*id.*, ¶¶256-267), and the Bribery Scheme (*id.*, ¶¶37-38, 151). Defendants agreed not to challenge these claims at the Class pleading stage. *See* Order Regarding Pre-Trial Consolidation of Related Actions, ¶¶9-10 (ECF No. 352). This is a clear attempt by Defendants to secure dismissal of some of these issues here, without involvement of the Class, and then move to apply those rulings to the Class while avoiding a direct dispute. This delayed and improper collateral attack on the Class allegations should be rejected.[3]

Defendants' concession of these issues in *Ontario* is not surprising, given the mounting evidence supporting the allegations. In fact, with respect to the Price-Hike Strategy allegations, Defendants do not dispute the Court's well-reasoned analysis in *Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 171 (D. Conn. 2019), in which it sustained the Class's allegation that the Upheld Defendants knowingly or recklessly misrepresented the Company's financial condition by withholding information about the unsustainable practice of making dramatic price increases. Instead, Defendants challenge only scienter for the Additional Defendants. But the allegations in the Complaints demonstrate that the Additional Defendants held the same positions, had access to the same information, and made the same types of false and misleading statements as the Upheld Defendants.

The allegations regarding the Actavis acquisition make clear that Defendants knew no later than shortly after the deal closed – as U.S. generic pricing deteriorated – that it was a disaster for the

---

[3] If the Court wishes to prevent this tactic and address the issues when all parties can participate, it could simply deny the MTD without prejudice to raising the dispute later in the litigation. *See Preferred Display, Inc. v. Great Am. Ins. Co. of N.Y.*, 2017 WL 3579754, at *1 (D. Conn. Jan. 27, 2017) (Underhill, J.) (denying motion to dismiss "without prejudice to raising those arguments in the early summary judgment motion" in order to "avoid unnecessary duplication of effort").

Company.  They nevertheless publicly touted the deal as successful and accretive until they finally disclosed the dire financial condition of the Company and slashed goodwill value by $16.5 billion.

Regarding the Bribery Scheme, Defendants have fully admitted that the Company violated the FCPA by bribing officials to help inflate Russian Copaxone sales.  They do not dispute that they concealed the DOJ investigation into this conduct for ***four years*** while repeatedly telling the market that Teva complied with the FCPA, had an "amazing management team" in Russia, and attributed rising Copaxone sales to sources other than bribery.  They dispute the allegations only on timing, suggesting incorrectly that they cannot be liable for these statements because the bribes ended before the challenged statements, ignoring that the inflated sales and risk of exposure persisted.

The issues unique to the Direct Action Complaints are likewise properly pled.  Plaintiffs detail the multi-pronged Opioid Scheme with the requisite particularity and the only reasonable inference is that someone in Teva's management was aware of the multi-year, company-wide scheme.  Defendants barely dispute the statements about goodwill valuation, relegating their entire discussion to a footnote.  The Complaints asserting goodwill claims give great detail about how the valuations – which were ultimately slashed by 71% – depended upon unrealistic assumptions and faulty accounting.

In short, Defendants' sundry grievances against the Direct Action Complaints fare no better than their unsuccessful disputes against the Class, and their MTD should be denied.

## STANDARD OF REVIEW

For the purposes of "a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The allegations need only "'raise a reasonable expectation that discovery will reveal evidence'" from which a court can draw a "'reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matrixx Initiatives*

*Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  "[D]ismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief."  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).  SEC Rule 10b-5 makes it "unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading'" in connection with the purchase or sale of a security.  *Matrixx*, 563 U.S. at 37.  To prevail on a claim under Rule 10b-5, a plaintiff must prove: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Id.* at 37-38.[4]

## ARGUMENT

## I.   PLAINTIFFS PROPERLY PLED SCIENTER FOR THE ADDITIONAL DEFENDANTS

Defendants do not dispute that Plaintiffs here properly alleged that the Additional Defendants made materially false and misleading statements that caused financial harm to investors.  Rather, they contend only that Plaintiffs have failed to plead facts establishing a strong inference of scienter for the statements the Additional Defendants made about the Price-Hike Strategy.  MTD at 4.  But Defendants identify no salient distinction as to scienter between the Additional Defendants and the Upheld Defendants and thus the Court's well-reasoned analysis sustaining in their entirety the

---

[4] Plaintiffs also assert claims under the Israeli Securities Law, the PSA, common law fraud, and negligent misrepresentation, which are subject to similar pleading requirements for this motion.  *See, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 231130, at *12 (D. Conn. Jan. 22, 2021) ("the relevant, substantive law of the PSA is closely related to Section 10(b) of the Exchange Act and Rule 10b-5"); *id.* at *27 ("the Israeli Law Plaintiffs' federal securities law and Israeli securities law claims seem to me, in every important respect, identical").  While "[c]ourts are deeply split within this District and elsewhere about whether Rule 9(b) applies to negligent misrepresentation claims," *ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018), they generally apply the heightened fraud pleading standard where a negligent misrepresentation claim "'is couched in fraud-like terms of known falsity.'"  *Ferry v. Mead Johnson & Co., LLC*, 2021 WL 243119, at *18 (D. Conn. Jan. 25, 2021).

Class's scienter allegations against the Upheld Defendants controls.  *See Ontario*, 432 F. Supp. 3d at 168-72.

The Court found scienter properly pled in the *Ontario* AC against the Upheld Defendants because they were "corporate officers" who "represented, in conference calls and in SEC filings, that generic drug pricing was not a factor in Teva's profit growth and that they were actively involved in a competitive environment" even though they were "aware of and approved, work plans," that documented price increases and associated profits.  *Id.*

The Additional Defendants are indistinguishable from the Upheld Defendants: they are directors or high-level officers (specifically, CEOs and CFOs) with access to the work plans, who made false and misleading statements about the pricing and competition of Teva's generic drugs during the Relevant Period.[5]  Defendants ask the Court to ignore this and to instead focus on a single supposed distinction irrelevant to scienter: the time when the Additional Defendants held corporate office.  But the tenures of Altman, Peterburg, McClellan, and Bhattacharjee overlap substantially with those of the Upheld Defendants.  And Peterburg, Schultz, and McClellan rose to the highest levels of the Company (CEO, CEO, and CFO, respectively) later in the Relevant Period, which only ***strengthens*** a finding of scienter.  Indeed, besides lying about pricing and competition, they also falsely denied the Company's involvement in the Price-Hike Strategy, even after disclosure that Teva was being investigated for price fixing.

The relevant issue here is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

---

[5] The Relevant Periods from the Direct Actions span from October 30, 2013 to May 10, 2019.  ¶1.  (Unless otherwise indicated, all "¶" citations are to the *Phoenix* Complaint, ECF No. 397, which is largely representative of the other Direct Action Complaints.)

inferences.'" *Id.* at 324.  Instead, an inference of scienter is "strong" when it is as plausible as any

other inference.  *Id.*  Thus, "at the motion to dismiss stage, a tie" between an inference of scienter

and an opposing inference "goes to the plaintiff."  *City of Pontiac Emps.' Ret. Sys. v. Lockheed*

*Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).  By any measure, Plaintiffs' allegations

establish a strong inference of scienter as to the Additional Defendants.

To establish the required "strong inference" that Defendants made the alleged false

statements with scienter, Plaintiffs may plead: "(a) . . . facts demonstrating that defendants had both

the motive and an opportunity to commit fraud or (b) otherwise alleg[e] facts to show strong

circumstantial evidence of defendants' conscious misbehavior or recklessness."  *In re Scholastic*

*Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

This standard is disjunctive; allegations establishing motive or recklessness suffice.  *See In re Time*

*Warner Inc. Sec. Litig.*, 9 F.3d 259, 269-71 (2d Cir. 1993) (finding scienter based on allegations of

motive and opportunity alone); *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("'Where motive

is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious

behavior by the defendant . . . .'").

### A.     The Additional Defendants Had the Motive and Opportunity to Commit Fraud

The Complaints sufficiently allege that the Additional Defendants had the motive and

opportunity to inflate Teva's stock price.  As officers and directors of the Company who spoke on its

behalf, the Additional Defendants possessed the opportunity to mislead investors.  *Van Dongen v.*

*CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) ("'[C]ourts often assume that

corporations, corporate officers, and corporate directors would have the opportunity to commit fraud

if they so desired.'").

Motive is also readily pled.  "Motive is the stimulus that causes a person or entity to act or to

fail to act."  *Scholastic*, 252 F.3d at 74.  Motive can be established by allegations that defendants

sought "artificial inflation of a stock price in order to achieve some more specific goal," such as an acquisition. *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001); *see also Ontario*, 432 F. Supp. 3d at 169-70 (citing cases).[6]  Here, the Court has already decided that the Class "more than adequately pled that the defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency to acquire Actavis." *Ontario*, 432 F. Supp. 3d at 170.  As alleged in the Complaints, that motivation began no later than January 2014, when then-CEO Desheh announced the Company's intention "to use our share as a currency . . . to fund transactions," and continued at least until the Actavis transaction closed on August 2, 2016.  ¶¶786, 791.[7]  Thus, the Court's analysis applies equally to Altman, Peterburg, Bhattacharjee, and McClellan who held leadership positions at the time.[8]

Defendants assert that Altman lacked motive to inflate Teva's stock price because: (i) his "tenure as Acting CFO ended . . . ***before*** Actavis was identified as a potential acquisition target," and (ii) Teva did not implement any price hikes during his tenure.  MTD at 8 (emphasis in original). Both Defendants' arguments miss the point.  Defendants' motive to use Teva's high stock price as

---

[6] Defendants' cases agree.  *See In re Elan Corp.*, 2004 WL 1305845, at *22 (S.D.N.Y. May 18, 2004) ("Plaintiffs' allegation that the Elan Defendants engaged in fraud in order to increase their ability to acquire other companies adequately pleads motive and opportunity.").

[7] And after the acquisition, Defendants were motivated to maintain the prior misrepresentations, as they could not immediately unveil that they and their colleagues had lied to push the deal through.  *See In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006 (S.D.N.Y. 1992); *see also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448-49 (D. Del. 2014).

[8] Altman was VP of Finance from August 2006 until July 2013, CFO of Teva America from August 2013 until July 2014, Acting CFO from October 31, 2013 to February 11, 2014, and CFO of Generics from July 2014 to April 2015.   ¶54; https://www.sec.gov/Archives/edgar/data/818686/000119312514041871 /d649790d20f.htm at 91.  Peterburg was a director from June 2009 to July 2010, then from 2012 until February 6, 2017, acting as Chairman from January 1, 2015 to February 6, 2017.  He became Teva's Interim President and CEO from February 6, 2017 to October 31, 2017.  ¶56.  Bhattacharjee was Senior Vice President ("SVP") of Teva Western Europe from 2009 to 2013, President and CEO of Teva's Generics Europe from 2013 and 2016, and President and CEO of Teva's Global Generic Medicines Group from December 5, 2016 to December 31, 2017.  ¶57.  McClellan was CFO of the Global Specialty Medicines division from July 2015 to July 2017, SVP and Interim CFO from July 2017 to November 2017, and Executive Vice President ("EVP") and CFO of Teva since November 2017.  ¶60.

currency for acquisitions was not Actavis-specific, and remained consistent from January 2014 to August 2016, which fully encompasses Altman's time as CFO of Teva.  ¶¶786-791.  Defendants studiously omit that Altman was an officer from August 2013 through April 2015 – first as Teva America CFO, then Teva CFO, and finally, Teva Generics CFO – a time period that included 65 price hikes and the identification, in "mid 2014," of Actavis as a target.  *Phoenix* compl., Appx. A; MTD at 8.  Defendants do not explain why Altman's motivations would change depending on what particular segment of Teva he led.

Defendants also incorrectly assert that Peterburg, Bhattacharjee, and McClellan "did not assume their various leadership roles until ***after*** the Actavis Acquisition had closed."  MTD at 8 (emphasis in original).  Not so.  Each defendant had a leadership role when the deal closed and thus were motivated to maintain prior misstatements: Peterburg was Chairman of the Board, Bhattacharjee was President and CEO of Teva's Generics Europe, and McClellan was CFO of the Global Specialty Medicines.  ¶¶54-60.[9]  Although Schultz did not hold a leadership role at Teva until after the Actavis acquisition, he was motivated to keep Teva's stock price inflated "to continue and prolong the illusion of [the Company's] successful growth and management."  *AnnTaylor*, 807 F. Supp. at 1006; *see also Wilmington*, 29 F. Supp. 3d at 448-49 (finding strong inference of scienter for CEO who maintained his predecessor's misrepresentations).

---

[9] The only non-officer at the time of the transaction was Peterburg, who was Chairman of the Board.  But this did not diminish Peterburg's motivation to inflate Teva's stock price in the lead-up to the acquisition.  Indeed, as Plaintiffs alleged, an acquisition the size of Actavis cannot occur without board support and approval.  ¶788.  In fact, Peterburg participated in the July 27, 2015 investor call announcing the Actavis acquisition, and signed the offering documents for the December 2015 and August 2016 securities offerings to fund the acquisition, which falsely claimed that Teva had achieved financial success notwithstanding "intense competition," without mentioning the dramatic $2.75 billion in profit attributed solely to price increases ("Inflated Profits") from the Price-Hike Strategy.  ¶¶31, 33, 791, 956.

**B.      The Complaints Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

As for the second prong, the Court must decide whether the Complaints plead "knowledge of facts or access to information contradicting [defendants'] public statements." *Novak*, 216 F.3d at 308. "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Scholastic*, 252 F.3d at 76.

**1.      Magnitude of the Fraud**

The large magnitude of a fraudulent scheme "support[s] a strong inference of recklessness." *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ($74 million write-down); *see also Scholastic*, 252 F.3d at 77 ($24 million in charges "undermines, at the pleading stage, the argument that defendants were unaware" of the truth); *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) ($43.2 million write-down); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016) ($500 million revenue reduction); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) ("the size of the scheme" that generated "hundreds of millions of dollars" supported scienter).

Defendants' fraud here was massive. Teva earned $2.75 billion in Inflated Profits, of which over half – $1.57 billion – came from drugs where competitors raised prices at exactly the same time ("Collusive Profits").



¶7.

These figures are astronomical for any company, but especially for Teva, which earned less in total operating profits in all of 2015 ($2.68 billion), than it earned in Inflated Profits from the Price-Hike Strategy.[10]

### 2.    The Additional Defendants Made Statements Contrary to Known or Readily Available Information

Further evidencing scienter, the Additional Defendants made statements contradicting the information they had access to about pricing and competition in the generic drug market. "Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) 'failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.'" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013). Circumstantial allegations of a defendant's access to facts that undermine the truth of the alleged misstatements can

---

[10] Defendants do not dispute that the size of the fraud contributes to a finding of scienter, and have thus waived that argument. *See Ferrante v. Cap. Reg'l Educ. Council*, 2015 WL 1445206, at *6 (D. Conn. Mar. 30, 2015) ("The court does not consider this argument, as it is impermissibly raised for the first time in defendant's reply brief, and there is no reason why it could not have been raised in the initial motion to dismiss.").

alone establish scienter.  *Matrixx*, 563 U.S. at 49-50 (access to reports concerning undisclosed adverse results of drug test); *Scholastic*, 252 F.3d at 76 (access to reports that "painted a different picture" from their public statements); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13, 15 (2d Cir. 2011) (access to inventory reports contradicting statements); *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 210 (S.D.N.Y. 2016) (reports sent to CFO which refuted defendants' statements).

> This Court has already decided, as for the Upheld Defendants, that:

> > The complaint is replete with examples of those defendants making public statements about the financial status and competitive nature of Teva, all while "possess[ing] knowledge of facts, or [having] access to information [that] contradict[ed] their public statements" or, at the very least, "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."

*Ontario*, 432 F. Supp. 3d at 170-71.  The Court specifically noted their access to "work plans" that demonstrated "price increases" and later "that Teva's pricing environment had drastically declined." *Id.* at 171.  Access to work plans is critical because they "included generic revenue forecasts for three to five years and contained granular pricing details" about specific drugs.  ¶799.  Other important resources include the Latest Best Estimates ("LBEs"), which reported quarterly U.S. performance in comparison to the forecasts from the work plans.  ¶801.  All the data underlying these materials was housed in the Oracle ERP system.  ¶803.

The Complaints allege that the Additional Defendants, as "Israeli executives," had ready access to all of this information: they "reviewed and approved" the work plans (¶785), received the LBEs (¶801), and had access to the "company-wide" Oracle database (¶803).  Thus, each Additional Defendant had access to pricing and financial information showing that Teva: (a) actively increased prices to inflate profits; (b) reported inflated revenue growth based on the Inflated Profits; and (c) would not and did not sustain growth once the Inflated Profits diminished.  ¶¶798-799, 801, 803. These allegations establish that Defendants "should have known they were misrepresenting material facts with respect to the corporate business."  *Scholastic*, 252 F.3d at 76.

Moreover, Peterburg, Bhattacharjee, McClellan, and Schultz held leadership roles *after* the DOJ and State AGs subpoenas were issued in June and July 2016, respectively, and *after* Teva's co-conspirators at Heritage pled guilty to price-fixing in December 2016. ¶¶154-159. Thus, before making statements about pricing, competition, or Teva's involvement in the Price-Hike Strategy, these executives had a heightened responsibility to verify those statements using the work plans, LBEs, and Oracle database to which they had access. ¶34; *see Novak*, 216 F.3d at 308 ("'"an egregious refusal to see the obvious, or to investigate the doubtful"'" is enough for recklessness).

### 3. The Additional Defendants Made Direct Statements About Crucial Issues, Enhancing the Evidence of Scienter

#### a. Pricing and Competition

Defendants' repeated false statements directly addressing generic drug pricing and competition in the marketplace "more readily give[s] rise to the requisite strong inference of scienter." *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012); *see also Lockheed*, 875 F. Supp. 2d at 372 ("specificity" of false statements is "strong circumstantial evidence" that defendants received "specific" truthful information on the topic); *comScore*, 268 F. Supp. 3d at 552 (same). In part, that is because the repeated statements show a "self-proclaimed 'personal involvement'" in the business affairs at issue. *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015).

Like the Upheld Defendants, the Additional Defendants made "statements about the financial status and competitive nature of Teva," despite access to information showing that their statements were false or misleading. *Ontario*, 432 F. Supp. 3d at 170-71. Either Defendants knew the truth and lied or they recklessly failed to obtain "reasonably available data" that concerned "the heart of their companies' businesses." *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011). Whichever the case, scienter is properly pled.

**Altman**.  Altman signed Teva's 2013 Form 20-F, which falsely claimed the Company would overcome "intense competition" based on its "ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line."  ¶¶588-589.  He also stated during Teva's fourth quarter 2013 earnings call on February 6, 2014 that the Company's Inflated Profits came from "more profitable product mix mainly in the US generic business," without discussing the critical and illegal price-hikes.  ¶611.

**Peterburg**.  Peterburg falsely described competition in the market when he:

- Signed Teva's 2016 Form 20-F, filed February 15, 2017, which said Teva's "generic drugs face intense competition," referenced "intense competition in the generic market, with generic companies competing for advantage based on pricing," reiterated that "[i]n the United States, we are subject to intense competition in the generic drug market," and falsely claimed that Teva could overcome "intense" competitive pressure based on its "ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line." ¶¶588-589.

- Stated during Teva's first quarter 2017 earnings call on May 11, 2017, that recent "increased competition" and "net price erosion" resulted from "the ongoing consolidation of our key customers" and "increase in generic drug approval by the FDA," rather than the winding down of the Price-Hike Strategy.  ¶¶604-605.

Regarding Teva's future prospects, Peterburg:

- Stated during the fourth quarter 2016 earnings call on February 13, 2017, that "[w]e are reiterating our guidance for 2017," which he claimed the Company could achieve through "additional cost reduction if necessary."  ¶¶667-668.

- Stated during the first quarter 2017 earnings call on May 11, 2017, that "we are reaffirming our 2017 outlook."  And despite withholding information about the Company's vanishing ability to earn U.S. revenue through Inflated Profits, he told investors that "[w]e are committing to being transparent.  And therefore, we wanted to provide more clarity into our business and the moving parts of our projections, specifically regarding the challenges in the U.S. generic market."  ¶¶671-672.

- Stated during the second quarter 2017 earnings call on August 3, 2017, that Teva had finally "lowered our 2017 revenue outlook," but falsely attributed the decline in "the U.S. Generics business" to "customer consolidation, greater competition as a result of an increase in generic drug approval by the FDA and some new product launches

that were either delayed this quarter or got subjected to more competition," rather than the Company's inability to maintain Inflated Profits.  ¶¶673-674.

**Bhattacharjee**.  Bhattacharjee falsely insisted to investors that Teva's inability to maintain price after the price-fixing scheme was due exclusively to non-collusive factors.  Specifically, during a third quarter 2017 earnings call on November 2, 2017, he attributed price erosion only to "increasing FDA approvals that are happening for products, for which, already generics players exist in the market" and "consolidation . . . of the customers into 3 GPOs, which now account for more than 85% of generics."  ¶¶676-677.

**McClellan**.  McClellan falsely claimed the generic drug market was "intensely competitive," and that Teva would continue to perform well, which contradicted information from the work plans, LBEs, Oracle database, and DOJ/State AGs subpoenas that he either ignored or recklessly disregarded.  As for competition, McClellan:

- Twice signed annual Forms 6-K – for 2017 on February 12, 2018 and for 2018 on February 19, 2019 – which said Teva's "generic drugs face intense competition," referenced "intense competition in the generic market, with generic companies competing for advantage based on pricing," reiterated that "[i]n the United States, we are subject to intense competition in the generic drug market," and falsely claimed that Teva could overcome "intense" competitive pressure based on its "ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line."  ¶¶588-589.

Regarding the Company's source of revenue, he:

- Stated at the Company's second quarter 2017 earnings call on August 3, 2017, that Teva's decreased profitability was because of "the price erosion and relatively low launches in our U.S. Generics business in 2017 as well as the Venezuela currency impact," without mentioning price hikes.  He said future expectations had also decreased, but again withheld information about the scheme, specifically noting only "U.S. price erosion and lower number of product launches."  ¶¶673-674.

- Stated at the Company's third quarter 2017 earnings call on November 2, 2017, that decreased revenues and profit margins were "driven by several factors."  He did not mention price hikes or Inflated Profits, but discussed only (i) "[t]he inclusion of ANDA distribution business as well as lower margins in the generics, specifically, in our U.S. generic market"; (ii) "continued price erosion" (without discussing the true cause); (iii) "accelerated FDA approvals of additional generic versions of competitors"; (iv) "lower volumes of the Concerta-authorized generic following

additional competition"; (v) "unfavorable FX [foreign exchange rates]"; and (vi) "other variance in our costs of goods sold." ¶¶676-677.

*Schultz*.   On December 14, 2017, Schultz admitted that he personally monitored the information underlying the Price-Hike Strategy: "we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary."  ¶678. Despite this first-hand knowledge, Schultz reiterated his predecessors' false claims of "intense competition" and misleadingly focused only on innocuous sources of the Company's revenue.  As for competition, Schultz:

- Twice signed annual Forms 6-K – for 2017 on February 12, 2018 and for 2018 on February 19, 2019 – which said Teva's "generic drugs face intense competition," referenced "intense competition in the generic market, with generic companies competing for advantage based on pricing," reiterated that "[i]n the United States, we are subject to intense competition in the generic drug market," and falsely claimed that Teva could overcome "intense" competitive pressure based on its "ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line."  ¶¶588-589.

- Stated on a December 14, 2017 conference call that generic pricing in the United States was a "very dynamic situation" that deteriorated – not because of manufacturers' unsustainable and illegal Price-Hike Strategy – but because "not only Teva, but other manufacturers have ended up competing to the bottom where it's not really sustainable or profitable."  ¶678.

As to the source of Teva's profit, Schultz claimed during the JPMorgan Healthcare Conference on January 8, 2018 that "Teva used to focus on maximizing revenue in the generics business," which was a faulty strategy only because "[y]ou always need to maximize operating profit," suggesting that the Company's downfall came because it forgot to focus on earning a profit, and not because it followed an unsustainable and illegal practice of maximizing revenue by colluding with competitors to increase sales.  ¶679.

Defendants cannot distinguish the Additional Defendants' statements from the Upheld Defendants' statements.  They each repeatedly chose to speak about competition, pricing, and the source of Teva's revenue, and to simultaneously hide the Company's Price-Hike Strategy despite

- 15 -

access to work plans, LBEs, and the Oracle database, which showed the Company's reliance on price hikes for success in the past and future. As with the Upheld Defendants, this is enough to plead at least recklessness.

### b. Defendants Do Not Challenge Scienter for Certain of the Additional Defendants' Statements

Together with their false and misleading statements about competition and pricing, the Additional Defendants misrepresented Teva's financial condition as it deteriorated by making statements that falsely: (a) discussed the extent of pricing erosion and its causes; (b) denied that the Company engaged in price-fixing; and (c) attributed the Company's financial downturn to factors ostensibly unrelated to the Price-Hike Strategy. Because Defendants did not dispute the element of scienter for these statements in their opening motion, those arguments are waived. *See Ferrante*, 2015 WL 1445206, at *6.

### (1) Defendants Objectively Understated Teva's Pricing Erosion from 2Q16 to 2Q17

Defendants, including Peterburg and Bhattacharjee, repeatedly assured investors from the second quarter of 2016 to the second quarter of 2017 that the price erosion for Teva's generics business was 4%-7%. ¶130. But McClellan later admitted the falsity of these statements when he disclosed that the moving average (*i.e.*, average of the averages) during this period was 8%. ¶129. As a matter of simple arithmetic, numbers between 4% and 7% can never average out to 8%. Thus, Peterburg and Bhattacharjee's persistent assertions otherwise were false, including:

- On January 6, 2017, Bhattacharjee told investors on a business outlook conference call: "We expect to see mid single digit price erosion to continue in our base business in the United States." ¶¶662-663.

- On February 13, 2017, during a fourth quarter 2016 and full year 2016 earnings call, Bhattacharjee said that "in the US we expect net price erosion in our base business to be around 5%." ¶¶667-668.

- On May 11, 2017, Peterburg said price erosion for the first quarter of 2017 "came in at 7% versus the approximately 5% that we communicated previously." ¶¶671-672.

- On May 11, 2017, during Teva's earnings call for the first quarter of 2017, Bhattacharjee said that "we would expect and how we will track for the rest of the year, *we would expect the current levels of price erosion that we have spoken about will remain for the rest of the year. It is embedded in our forecast*. ¶¶671-672.

### (2)   Denials of Collusion

Peterburg, McClellan, and Schultz each falsely denied collusion after revelations of the State AGs' and DOJ's investigations into the Company for price-fixing. False denials of impropriety after receipt of "red flags" routinely establish scienter in this Circuit. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468-69 (S.D.N.Y. 2017); *see also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (inferring scienter where "after the investigation's announcement, [defendants] personally made misstatements and aggressively supported the Company's business practices").

The false and misleading statements alleged in the Complaints include the following:

- On February 15, 2017, Teva filed the 2016 Form 20-F, certified by Peterburg, which disclosed the State AGs' civil action and claimed "Teva has not identified any evidence that would give rise to liability with respect to the above-mentioned subpoenas and civil suits." ¶687.

- On August 3, 2017 and November 2, 2017, Teva filed the second quarter 2017 and first quarter 2017 Forms 6-K, each signed by McClellan, which stated: "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits." ¶688.

- On February 12, 2018 and February 19, 2019, Teva filed the 2017 and 2018 Forms 10-K, certified by Schultz and McClellan, which again said: "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits." ¶688.

- On May 3, 2018, August 2, 2018, November 1, 2018, and May 2, 2018, Teva filed its Forms 10-Q for first quarter 2018, second quarter 2018, third quarter 2018, and first quarter 2019, respectively, all signed by McClellan and Schultz, which all reiterated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits." ¶688.

Defendants do not address any of these statements. Instead, they discuss only a single denial Schultz made after the Relevant Period and attack it on that basis. MTD at 15. Defendants' decision to

ignore the other denials is dispositive as to those statements.  *See Ferrante*, 2015 WL 1445206, at *6.[11]

### C.     Confidential Witness Allegations Support a Finding of Scienter

Plaintiffs offer credible testimony from confidential witnesses establishing, among other things, that the Additional Defendants had access to information contradicting their representations to the market.  Confidential witness testimony supports a finding of scienter when it is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak,* 216 F.3d at 314; *see In re iDreamSky Tech. Ltd. Sec. Litig*., 236 F. Supp. 3d 824, 834 (S.D.N.Y. 2017) (allegations credited because each former employee "likely to possess the relevant information" they provided).

The confidential witnesses referenced in the Complaints meet this standard, and they provided compelling information supportive of the Additional Defendants' scienter.

- Senior Financial Analyst, CW1, worked at Teva from 2010 to 2018.  One of his primary responsibilities was to collect and analyze data on the Oracle ERP system. He stated that Teva stored prices throughout the Company on Excel spreadsheets, that the Oracle system was company-wide, and that the Oracle system was used to calculate the differences between Teva's forecasts and its actual results.  ¶782.

- Manager of Revenue, CW3, came to Teva from Actavis at the time of the merger and stayed until 2016.  He used the Oracle system as part of his central function of calculating gross to net revenues, and confirmed that the Oracle system stored sales information.  ¶784.

- Senior Product Operations Manager, FE-1, worked at Teva in its generics division for 11 years, forecasting products and managing supply chain and inventory.  FE-1

---

[11] Defendants also rely on *Elan*, 2004 WL 1305845, to contend that denials of wrongdoing can ***never*** be actionable.  But in *Elan*, the court found that the plaintiffs had not actually alleged that the defendants engaged in any wrongdoing.  *Id.* at *15, *16, *28.  Here, by contrast, Plaintiffs have more than adequately alleged that Defendants were engaging in price-fixing, based on continuing investigations by the DOJ and State AGs, evidence showing correlated and unexplained price hikes, interactions between conspirators at industry events, and a guilty plea from Teva's co-conspirators at Heritage.  Based on substantially similar allegations by the Class Action, the Court already determined that "[v]iewing the allegations in the light most favorable to the plaintiffs, the complaint has adequately pled a price-fixing scheme."  *Ontario*, 432 F. Supp. 3d at 160.

knew about work plans and LBEs, which he stated were sent to Israeli executives. ¶785(i).[12]

- Senior Director of Trade Relations, FE-2, was in charge of sales for Teva U.S.'s generics, branded, and injectable groups from 2006 through 2012. Based on his experience, FE-2 knew about the processes necessary to change drug prices. He stated that "everyone would have known" if a price increase generated significant profit, and that Teva's executives would use price increases to shore up revenues trending below expectations. ¶785(ii).[13]

- Associate Manager of Customer Marketing, FE-3, was a member of Teva U.S.'s drug pricing team from September 2014 through May 2016. In this position, FE-3 had personal knowledge that, among other things, pricing information was stored on a company-wide Excel spreadsheet, and that detailed pricing and revenue data was stored on the Oracle system, which Teva executives had access to. ¶785(iii).[14]

---

[12] In trying to differentiate the confidential witness testimony that supported the Court's finding of scienter against the Upheld Defendants, Defendants incorrectly claim "the Direct Actions complaints are devoid of specific allegations that [the Additional Defendants] generated or reviewed the 'Scorecards,' 'Work Plans,' or other documents that allegedly provided [the Upheld Defendants] with information contradicting their public statements." MTD at 6. But Defendants ignore FE-1's specific testimony that the work plans and LBEs were circulated to "Israeli executives," which includes the Additional Defendants.

[13] Defendants reference an attorney-drafted and untested declaration from someone who purports to be FE-2 that appears to disclaim some of the allegations attributed to him. MTD Other Grounds, Ex. A. Whether or not the proposed declaration is legitimate, it is "wholly improper" for Defendants to offer it at the pleading stage. *See In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 740 (E.D. Mich. 2007); *see also Dep't of the Treasury of the State of New Jersey & its Div. of Inv. v. Cliffs Nat. Res., Inc.*, 2015 WL 6870110, at *4 (N.D. Ohio Nov. 6, 2015) (refusing to strike information provided by confidential witnesses when defense counsel offered repudiating declarations); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *12 (D.N.J. Aug. 8, 2018) (same); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *12 (D.N.J. Sept. 30, 2009) ("the Court does not want to establish mechanisms whereby discovery must be conducted every time confidential informants are utilized").

[14] Defendants contest Plaintiffs' reference to the Former Employee allegations from the Class Action, seeking to draw a connection to *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066 (S.D.N.Y. July 31, 2013). But as discussed more fully in Plaintiffs' Opposition to the MTD Other Grounds, the statements at issue in *Lehman* were unsustained allegations from "a separate complaint filed by separate counsel in a separate action." *Id.* at *3. Here, the statements derive from a complaint filed in a related and coordinated action brought by counsel working on behalf of the Class in this consolidated proceeding, which this Court has already credited. *Ontario*, 432 F.3d at 171. Moreover, Defendants' own case law provides that courts in this District have "held that it is appropriate for a plaintiff at the pleading stage to rely on confidential witness statements recounted in other complaints." *Lehman*, 2013 WL 3989066, at *4 (citing *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-25 (S.D.N.Y. 2008) ("Although the confidential informants are not personally known to Plaintiffs or Plaintiffs' counsel, the fact that the informants' accounts are derived from an earlier pleading in a different case simply does not render the instant pleading inadequate.")).

These Former Employees' job duties and responsibilities "support the probability" that they "possess[ed] the information alleged." *Novak*, 216 F.3d at 314.

The corroborating nature of these allegations also bolsters the Former Employees' reliability. *See Lockheed*, 875 F. Supp. 2d at 370-71 ("corroborat[ion] by multiple confidential witnesses" supported scienter); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("The fact that this case involves '[c]orroboration from multiple sources also supports an inference of a scienter.'"). *See* ¶¶782, 785(iii) (CW1 and FE-3 corroborate that Teva stored pricing information on company-wide spreadsheets, and that Teva's executives had access to data on the Oracle system); ¶¶782-785 (CW1, CW2, FE-1, FE-2, and FE-3 corroborate that Teva stored up-to-date pricing data in the Oracle ERP system).

### D.   Defendants Mischaracterize the Scienter Allegations

Defendants make the same few arguments for each Additional Defendant, contending that one piece of circumstantial evidence or another ***by itself*** is not enough to support a compelling inference of scienter. MTD at 9-17. But as the Supreme Court has made clear, a proper scienter analysis is not disjointed. Rather, courts should consider "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original and added). Thus, while Defendants try to discredit Plaintiffs' allegations that the Additional Defendants signed Sarbanes-Oxley certifications and held high-level, executive positions at Teva during the Relevant Period, the law is unmistakably clear that these allegations contribute to a finding of scienter. *See Eletrobras*, 245 F. Supp. 3d at 468 (Sarbanes-Oxley certifications contribute to scienter analysis); *Van Dongen*, 951 F. Supp. 2d at 468 (opportunity prong of scienter analysis automatically established for officers and directors). Considering these allegations along with other detailed allegations about the Additional Defendants' motive, opportunity, access to information, and the

decision to speak on the pertinent topics creates a compelling inference of scienter.  *Tellabs*, 551 U.S. at 322-23.

Defendants insist that the Additional Defendants did not have the requisite state of mind because they "did not assume executive roles at Teva" during the alleged price hikes, and therefore did not have "direct involvement in the alleged 'price-hike strategy' or 'collusive pricing.'"  MTD at 7.  Defendants are wrong on the facts and the law.  First, as explained above, everyone but Schultz held a leadership role at Teva during some or all of the alleged price hikes.  Second, Plaintiffs need not establish Defendants' "direct involvement" in the price hikes to establish scienter.  Rather, the question is whether they "'"knew facts or had access to information suggesting that their public statements were not accurate."'"  *Ontario*, 432 F. Supp. 3d at 168.  The scheme comprised much more than the price hikes themselves; it also encompassed Teva's collusion with co-competitors before the hikes, receipt of Inflated Profits (which continued for years after the hikes (*Phoenix* compl., App'x A)), and the concerted effort throughout the Company and the industry to conceal the scheme and attribute the companies' gains and downfall to other factors.  Defendants cannot – and do not – dispute that the breadth of the multifaceted Price-Hike Strategy overlapped with each Additional Defendant's tenure.

## II.   PLAINTIFFS ADEQUATELY ALLEGE CLAIMS ON TEVA'S OPIOID SCHEME

### A.   Teva's Off-Label Marketing of Opioids

At all relevant times Teva has sold generic opioids.  Pom., ¶208.[15]  In May 2011, Teva expanded its opioid business with its acquisition of Cephalon, which sold opioids Actiq and Fentora.  Pom., ¶¶208-209.  Actiq and Fentora have been approved by the FDA ***only*** for the "management of breakthrough cancer pain in patients 16 years of age and older" ***and*** "who are already receiving and

---

[15] Citations in this section to "Pom., ¶" refer to the consolidated complaint filed by Pomerantz LLP in *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* on May 28, 2020.  ECF No. 391.

who are tolerant to opioid therapy for their underlying persistent cancer pain." Pom., ¶210. Manufacturers and distributors of pharmaceutical opioids are strictly prohibited from marketing the drugs for uses not approved by the FDA. Pom., ¶205. In 2008, Cephalon pleaded guilty to a criminal violation for its misleading off-label promotion of Actiq and agreed to pay $425 million. Pom., ¶211.

Teva engaged in its own illegal off-label marketing campaign of its opioids, including Actiq and Fentora. In December 2011, only months after its acquisition of Fentora and Actiq, Teva promoted Fentora and Actiq for "multiple causes of pain," rather than solely for cancer treatment pain to *Anesthesiology News* and *Pain Medicine News* – publications that are sent to thousands of medical professionals outside of oncologists. Pom., ¶215. Teva also paid "key opinion leaders" (or "KOLs") to deliver talks and continuing medical education programs ("CMEs") that promoted opioids, including Aciq and Fentora, for all types of pain, regardless of any cancer-related diagnosis. Pom., ¶¶213-214. Teva also sponsored a consumer guide distributed by the American Pain Foundation entitled "Treatment Options: A Guide for People Living with Pain." The guide states that physical dependence "does NOT mean you are addicted" and that "[d]espite the great benefits of opioids, they are often ***under-used***." Pom., ¶216.

Teva sales representatives also encouraged doctors who prescribed its opioids. Pom., ¶217. For example, Teva sales representatives could nominate doctors for lucrative paid speaking engagements, with the expectation that the speakers would increase their prescribing of Actiq and Fentora. *Id*. Teva sales representatives were given sales targets impossible to achieve without expanding into non-oncological practices. Pom., ¶218. When pushing opioids to non-cancer related practices, one Actiq sales representative would state that the FDA's labeling of the drug as for breakthrough cancer pain was just a "formality." *Id*. One Teva sales representative who marketed Fentora between 2012 and 2013 stated that ***it was Teva's management that instructed sales***

***representatives to target pain clinics, even though such clinics do not treat cancer patients***.  *Id.*
The sales representative stated that at least ***99% of the doctors who wrote prescriptions for Fentora
in her territory were pain specialists who wrote the prescriptions for off-label use***.  *Id.*  The doctors
told her that ***they did not treat cancer patients***.  *Id.*

### B.     Plaintiffs Adequately Allege a False and Misleading Statement

From the start of the Relevant Period, Defendants misled investors as to Teva's illegal
marketing of opioids for off-label uses and the risk associated with the resulting lawsuits.

Teva stated in each of its annual reports from 2013 to 2016 that the products Fentora and
Actiq were sold "for the treatment of breakthrough pain in opioid-tolerant adult patients with
cancer."  Pom., ¶389.  These statements were false and misleading because Teva was illegally
marketing the products for off-label purposes.

In response to many lawsuits brought by cities, counties, and states across the country as
well as private class actions asserting that Teva and its affiliates (including Cephalon) improperly
marketed opioids, including Actiq and Fentora (Pom., ¶¶392-398), Teva assured its investors that it
never engaged in such improper marketing: "Teva and its affiliates . . . deny all allegations asserted
in these complaints."  Pom., ¶¶392, 396, 398.  Defendant Schultz explicitly rejected any notion of
wrongdoing by Teva, stating that the Company always adhered to all FDA requirements on "how we
sell the products . . . So really, from my point of view, I can't see anything which we've done, which
is wrong."  Pom., ¶399.  These statements were false and misleading because Teva and its affiliates
(including Cephalon) had purposefully put in place corporate policies designed to promote off-label
uses of opioids.  As this Court recognized, "'the failure to disclose uncharged criminal conduct may
be actionable where the failure to do so would make other disclosures materially misleading.'"
*Ontario*, 432 F. Supp. 3d at 160.

Defendants assert that Plaintiffs "'offer nothing more than conclusory allegations.'" MTD at 21. They are wrong. Plaintiffs detail several aspects of Teva's multi-pronged off-label marketing scheme, even identifying specific articles and individuals employed to enact their misinformation campaign. As this Court recognized: "The purpose of the heightened pleading requirements under Rule 9(b) and the PSLRA is 'to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits.'" *Ontario*, 432 F. Supp. 3d at 154-55.

Defendants argue that the Court should reject the information from Teva's own sales representatives that detail the off-label marketing scheme because plaintiffs do not specifically identify the witness. MTD at 21. A plaintiff need not plead a "detailed evidentiary matter," *Scholastic*, 252 F.3d at 72, but simply sufficient facts "to support a reasonable belief" that the defendants' statements were materially false or misleading. *Novak*, 216 F.3d at 314 n.1. Moreover, the accounts from these sales representatives resulted from the investigation conducted by various State AGs and were relied on in those government lawsuits and described in even greater detail.[16] "[T]here is a meaningful difference between citing a government complaint that purports to quote or describe company communications and wholly relying on unproven allegations from another private lawsuit." *Erickson v. Corinthian Colls., Inc.*, 2015 WL 12732435, at *5 n.5 (C.D. Cal. Apr. 22, 2015) (crediting allegations in a class action securities complaint that were obtained from an attorney general complaint in deciding a motion to dismiss); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706-07 (9th Cir. 2012) (allowing the plaintiff to incorporate an SEC complaint's allegations into its complaint).

---

[16] *See, e.g.*, *Commonwealth of Ky., ex rel., Andy Beshear, Att'y Gen. v. Teva Pharms., USA Inc.*, *et al.*, No. 18-CI-3767, ¶¶32-50 (Ky. Cir. Ct., Fayette Cnty. Oct. 25, 2018), *available at* https://ag.ky.gov/pdf_news /20181025_Teva-Complaint.pdf.

## C.        Plaintiffs Adequately Allege Scienter

To plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant," and "'[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.'"  *Id.*  "While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."  *Marsh & McLennan*, 501 F. Supp. 2d at 481.

Plaintiffs allege a massive multi-year, multi-pronged company-wide scheme to push opioids for off-label use, including sales representatives that stated (as noted in various government complaints) that ***it was Teva's management that instructed sales representatives to target pain clinics, notwithstanding the fact that such clinics do not treat cancer patients***.  Pom., ¶218.  This nationwide scheme, which included sponsoring articles and presentations, encouraging experts and doctors, and instructing many sales representatives, would require countless employees at every level of Teva to execute.  Given the extreme importance of opioids to Teva's business and the importance of the lawsuits against the Company, there is a strong inference of individual and corporate scienter.  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017) ("[T]he 'clean diesel' vehicles were an integral part of Volkswagen's 'Strategy 2018' to become the largest automobile manufacturer in the world.  Given that, it is reasonable to infer that at least some corporate officials knew Volkswagen was falsely touting the emissions compliance . . . .  The importance and falsity of the emissions-

compliance statements gives rise to a plausible inference of VW AG's corporate scienter."). *See In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 621 (S.D. W. Va. 2012) (scienter where company misled market about its disregard for regulatory compliance, which was "an important component for investors to consider"); *see also S. Ferry LP v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008) (under the core operations doctrine, "it may be inferred that facts critical to the business's 'core operations' or important transactions are known to key company officers").

The inference of scienter is particularly strong for Shultz who affirmatively assured investors that he had investigated the issue and concluded "from my point of view, I can't see anything which we've done, which is wrong." Courts in this Circuit have repeatedly held that if executives speak about a topic of "'critical importance,'" they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *City of Livonia Emps. Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *2, *6-*7 (S.D.N.Y. Sept. 29, 2010). Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).[17] Plaintiffs adequately allege facts sufficient to establish a strong inference that someone in Teva's management either "'knew facts or had access to information suggesting that [Defendants'] public statements were not accurate'"; or (2) "'failed to check information they had a duty to monitor.'" *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d 187, 199 (2d Cir. 2009).

Further supporting an inference of scienter is Defendants' knowledge that Cephalon had pled guilty to illegally marketing the same products shortly before Teva's acquisition. *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981-83 (8th Cir. 2012) (securities fraud adequately

---

[17] *See also In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("[T]he inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement.").

alleged where company failed to disclose FDA inspection observations when it had a long history of compliance problems and failed to address the deficiencies); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *13 (C.D. Cal. Apr. 12, 2016) ("[the company's] alleged history of noncompliance further supports the inference that Defendants . . . kept a close watch on possible violations of FDA regulations").

### D. Plaintiffs Adequately Allege Loss Causation

On Sunday, May 26, 2019, less than 48 hours before the first major trial against Teva for its opioid liability was set to begin, Teva announced that it has agreed to pay the State of Oklahoma $85 million to settle the State's claims. As a result of this news, the price of Teva securities declined significantly. Teva securities' prices continued to decline over the next few days as the true extent of the Company's liabilities was exposed. Pom., ¶¶565-568.

Defendants argue that the announcement of the massive $85 million settlement with a single state was not a "materialization of the risk" concealed by the fraud because Teva had disclosed the existence of opioid-related litigations. MTD at 24. Defendants misinterpret Plaintiffs' theory of liability. Plaintiffs allege that Defendants misled investors about ***the level of risk*** associated with those litigations. Defendants falsely assured investors that the allegations were completely baseless and thus the risk was low when the allegations were true and the risk was high. The market only learned the true level of risk when the unexpected and massive settlement was announced. It was only then that analysts and investors understood that Teva's liability was a potentially crippling $4.1 billion. *See AP-Fonden v. Goldman Sachs Grp., Inc.*, 2021 WL 2659797, at *17 (S.D.N.Y. June 28, 2021) (announcement of criminal investigation with potential $2.7 billion liability was a corrective event despite the company previously disclosing that it was subject to investigations because while the company disclosed "some amount of risk" the corrective event revealed a broader risk); *Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015) ("Nor is the court persuaded

that Defendants' disclosures absolve them of liability, since Plaintiff claims that Defendants failed to disclose the true level of risk, not that they failed to disclose that there was a risk"). "Given that loss causation is a fact-based inquiry, when it is a close call as to whether 'contents of [a] disclosure had already been revealed' – as it is here – it is best 'for the jury to make' that decision." *AP-Fonden*, 2021 U.S. WL 2659797, at *17.

### E.    The PSA Claims Are Timely

Defendants incorrectly argue that the statute of limitations begins to run from the May 26, 2019 disclosure of the $85 million settlement with the State of Oklahoma. MTD at 25. "A securities-law violation is discovered when the plaintiff learns 'sufficient information about [the violation] to . . . plead it in a complaint' with enough 'detail and particularity to survive a [Federal Rule of Civil Procedure] 12(b)(6) motion to dismiss.'" *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*., 873 F.3d 85, 119 (2d Cir. 2017). This includes scienter, *Merck & Co. v. Reynolds*, 559 U.S. 633, 639 (2010), as well as loss causation, *In re Merrill Lynch Auction Rate Sec. Litig*., 758 F. Supp. 2d 264, 275 (S.D.N.Y. 2010). While the $85 million settlement was a materialization of the risk of Defendants' fraud, it did not provide Plaintiffs with any information about scienter, which Plaintiffs did not have until much later. And the settlement was disclosed on Sunday, May 26, 2019, the price of Teva securities did not decline until the next trading day, Tuesday, May 29, 2019 (Monday was Memorial Day). Thus, Plaintiffs did not suffer any economic loss until May 29, 2019.

### III.   THE COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD AS TO THE BRIBERY SCHEME

### A.    Plaintiffs Adequately Alleged that Defendants Withheld Material Information About the Bribery Scheme

In November 2016, Teva disclosed for the first time that it had received a DOJ subpoena in 2012 about the Company's FCPA compliance. ¶853. In December 2017, the Company pled guilty to violating the FCPA, including: (i) admitting "it is responsible for the acts of its officers, directors, employees, and agents" for the violations; (ii) agreeing not to "make any public statement, in

litigation or otherwise, contradicting the acceptance of responsibility"; and (iii) paying a fine of $283 million.  *See* Plea Agreement at pp. 10, 15, 18 of 40.  Teva specifically admitted that it systematically bribed officials in "Russia, certain Eastern European countries, and certain Latin American countries" to inflate sales of the Company's biggest product, Copaxone, in those countries.  ¶70.[18]  Teva also admitted that the scheme violated the FCPA and involved criminal conduct from "high-level executives" at Teva, including an executive and board member from headquarters in Israel ("Teva Executive") and a high-ranking executive in Russia.  *See* Plea Agreement at pp. 5, 29 of 40.

Before this belated disclosure, Defendants hid the scheme and the DOJ investigation, and made false and misleading statements about their conduct in foreign countries, compliance with the FCPA, and the source of the Company's revenue in those countries.  "[A] duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring."  *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).  "'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  When deciding whether a defendant must disclose an investigation, the proper consideration is "whether, in light of that Investigation, the statements [defendant] chose to make were materially misleading."  *Menaldi*, 164 F. Supp. 3d at 584.

While Teva was hiding the government's investigation into illegal bribes to foreign officials, it gave a false public façade of calm and compliance with the FCPA.  For example, at the end of 2013, the Company published its 2012 Corporate Social Responsibility Report, which falsely described how its "Anti-Corruption Policy facilitates meaningful and ***fully compliant*** collaboration

---

[18] At the time, Copaxone was an expensive multiple-sclerosis drug that accounted for "two-thirds of the Company's profits in the specialty segment," but was in the waning years of its patent.  ¶70.

or with healthcare professionals *and government officials*." ¶760.  On December 15, 2014, the

Company published the 2013 Corporate Social Responsibility Report with a letter from Defendant

Vigodman assuring investors that "*[w]e carefully monitor compliance with the [FCPA]*" and "*we*

*adhere to the ethical marketing guidelines* in our Code of Business Conduct in all countries, *even if*

*this puts us at a competitive disadvantage*." ¶765.  Vigodman also addressed bribes head-on,

denying that they do it, and claiming they "tak[e] care to ensure that such payments are not

perceived as inducement or rewards." *Id.*  These statements were false and misleading because they

failed to disclose or recklessly disregarded known FCPA violations.[19]

Defendants also falsely lauded the conduct of its Russian management personnel, without

disclosing their illegal conduct.  For example, in February 2015 – three years into the DOJ

investigation – Olafsson praised the "amazing management team" that left them "well positioned on

expanding our business in Russia." ¶766.  These statements are actionable because they materially

misled investors.  *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing

the quality of a particular management practice, a defendant declares the subject of its representation

to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

Defendants also provided financial information without listing the bribes as a source of its

financial success.  "[A] duty to disclose uncharged wrongdoing can arise when a corporation puts the

reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of

improper or illegal business practices.'"  *Menaldi*, 164 F. Supp. 3d at 581; *see also In re VEON Ltd.*

*Sec. Litig.*, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) (attributing "increased" "revenues"

to "'sales and marketing efforts,'" without disclosing that "this growth also was due to bribes" held

---

[19] Defendants claim these statements were mere "aspirational" puffery.  But statements providing specific assurances about compliance with particular laws (like the FCPA) are material and actionable.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) (finding compliance statements material and more than "mere puffery" because "[g]iven Goldman's fraudulent acts, it could not have genuinely believed that its statements about complying with the letter and spirit of the law"); *see also Eletrobras*, 245 F. Supp. 3d at 463-64 & n.6 (finding defendants' denial of bribes actionable).

actionable).  For example, on October 30, 2014, Desheh touted the Company's "very good quarter in Copaxone sales" and highlighted the positive "impact of the tender in Russia" and Olafsson noted the "good Russian business due to the Copaxone tender" without disclosing that the Russian sales had been made possible by years of bribes.  ¶764.

Defendants contend that their statements were not false for the "one simple reason" that Teva's uncontested bribes occurred **before** their contradictory statements and – according to Defendants – false statements must be "contradicted by contemporaneous events."  MTD at 26.  This argument lacks merit for at least four reasons.  **First**, Defendants provide no authority for their position, and in fact the law in this Circuit is clear that prior wrongdoing **can** render a company's statements materially false and misleading.  *See, e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (financial statements false when they failed to disclose that the "true source[]" of revenue had been illegal trading).  **Second**, Defendants remained exposed to the consequences of the Bribery Scheme long after it ended.  Indeed, as Teva admitted in the Plea Agreement, Russia is a "socialized public healthcare system" with tight restrictions on what drugs can be sold there, with a baseline disincentive to purchase foreign products.  Plea Agreement at pp. 31, 35 of 40.  Teva bribed the Russian official in exchange for his help enabling the Company to "repackage" Copaxone as a Russian product, and to "minimiz[e] the risk that a generic version of Copaxone would be approved by the Russian government."  *Id.* at pp. 35, 37 of 40.  After the bribes were paid, it would take several years (at a minimum) for the effect of these deals to be fully reversed.  **Third**, many of Defendants' statements are **backward looking**, and yet still omit material information about the bribery scheme.  For example, in the 2012 Corporate Social Responsibility Report they tout "100 years of ethical and responsible business practices," and they regularly reported on prior years' Copaxone sales, with no indication that those sales derived from a bribery scheme.  **Finally**, nothing in the Complaint or the Plea Agreement supports Defendants' suggestion

that Teva stopped bribing officials in 2012.  MTD at 26.  On the contrary, the Plea Agreement says

the bribes in Russia extended until "at least" 2012, and does not mention a time period for the bribes

to officials in Eastern Europe and Latin America.  Plea Agreement at p. 31 of 40.

      **B.**      **Plaintiffs Alleged Facts to Establish a Compelling Inference of
Scienter with Regard to the Bribery Scheme**

Plaintiffs alleged facts sufficient to show a compelling inference of scienter, by establishing

that Defendants had a motive to withhold information from investors and knew about or recklessly

disregarded material information.  *Scholastic*, 252 F.3d at 74; *Novak*, 216 F.3d at 307.

For motive, as this Court already held, the Class "more than adequately pled" that

Defendants had a motive to "inflate the price of their stocks to use as currency to acquire Actavis."

*Ontario*, 432 F. Supp. 3d at 170.  This same motivation to keep the stock price high compelled

Defendants to withhold negative information about the Bribery Scheme, disclosure of which would

cause the price to fall before the Actavis acquisition closed.  Indeed, the false and misleading

statements about Bribery Scheme span from the end of 2013 to February 2016.  ¶¶759-767.  This

time overlaps perfectly with Defendants' interest in using their stock price as a currency, which they

admitted was a strategy by January 2014 and did not end at least until the Actavis deal closed in

August 2016.  On December 22, 2016, just four months after the close of the Actavis deal, Teva

settled its criminal case with the DOJ and belatedly disclosed its bad behavior to the market.  ¶853.

Because motive has been sufficiently pled, the weight of the recklessness allegations need not be

held to a higher standard.  *ECA*, 553 F.3d at 198-99.

Besides the motive allegations, Plaintiffs also alleged that Defendants knew about or

recklessly disregarded the DOJ investigation and the Bribery Scheme.  Indeed, Defendants had

received a subpoena from the DOJ about a worldwide bribery scheme involving its largest product

and high-ranking executives (including one executive at headquarters in Israel with Defendants).

Defendants would ultimately admit wrongdoing and agree to pay a $283 million fine.  It is "'absurd

to suggest'" they did not know about the DOJ investigation when speaking about the Copaxone's performance in the same countries the DOJ was investigating. *See GE*, 857 F. Supp. 2d at 395 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)). Equipped with this knowledge, Defendants had an obligation to investigate its practices in foreign countries before speaking about them. *See Novak*, 216 F.3d at 308 ("an egregious refusal to see the obvious, or to investigate the doubtful" is enough for recklessness). And once they chose to speak about Teva's conduct and financial condition in these countries, they had an obligation to speak fully and truthfully. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015) (finding scienter where defendant "elected not to disclose the CID's [civil investigative command] existence in order to make fully clear the basis for its opinions" because the CID "identified conduct potentially implicating BioScrip in the Government's investigation" while defendants "stated publicly that they were in legal compliance"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (finding liability when "Defendants were notified of the DOJ investigation by a subpoena" but did not disclose it).[20]

### C.    The Statute of Limitations Was Tolled

Defendants miscast Plaintiffs' allegations surrounding the Bribery Scheme claims as an "innovation" from the Class Action, and suggest they are barred by applicable statutes of limitations. Defendants contend that the Securities Act of 1933 and the PSA claims "had to have been asserted by no later than November 15, 2017," and the Securities Exchange Act of 1934 claims "had to have been brought on or before November 15, 2018." MTD at 27-28. According to Defendants, certain of such claims are barred if they were not "first asserted" before these dates. *Id.* Defendants misstate the pleading history, and misapply the law.

---

[20] The Company, in particular, is liable for the knowing misconduct of the Teva Executive – an executive and board member who played a central role in the Bribery Scheme. *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of §10(b) and Rule 10b-5).

The Bribery Scheme allegations have been a central feature of the Class Action since July 2017, even before they were consolidated into the *Ontario* action.  Indeed, the original *Huellemeier* complaint, filed July 17, 2017, spends the bulk of its pages recounting the Bribery Scheme allegations in great detail.  *See Huellemeier v. Teva Pharm. Indus. Ltd.*, No. 17-cv-01938-SRU, ECF No. 1 (D. Conn. July 17, 2017), ¶¶31-101.  The *Ontario* SAC – the operative pleading in the Class Action – retains the Bribery Scheme allegations from *Huellemeier* and expressly incorporates the entire Plea Agreement, and related documents, by reference.  *Ontario* SAC, ¶¶37-38, 151.  When Defendants urged the Court to consolidate *Huellemeier* into *Ontario* on December 13, 2019, they stressed the "overlap" between the two cases, and did not mention the Bribery Scheme in its discussion of the differences between the two pleadings.  Joint Motion to Consolidate Related Actions at 12-13 (ECF No. 311).  Statutes of limitations are tolled for opt-out plaintiffs during the pendency of a class action.  *In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007) ("class members are treated as parties to the class action 'until and unless they received notice thereof and chose not to continue'") (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551 (1974)).  Defendants' decision to ignore these longstanding allegations until now does not render them untimely.

## IV.   PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS FRAUDULENTLY MISLED INVESTORS ABOUT THE ACTAVIS ACQUISITION

Defendants also contest Plaintiffs' allegations about the Actavis acquisition on three grounds, asserting that Plaintiffs failed to plead actionable misrepresentations or omissions, scienter, and loss causation.  None of these arguments have merit.

### A.    Plaintiffs Adequately Allege that Defendants Made False and Misleading Statements About the Actavis Acquisition

As described above, as early as January 2014, Defendants set out to increase Teva's stock price and "use our share *as a currency* . . . to fund transactions." *Chicago* compl., ¶277.[21] They ultimately acquired Actavis for $40.5 billion in cash, debt, and equity, the largest acquisition in Teva's 100-year operating history.[22] By the time Defendants closed the deal, they knew that the Price-Hike Strategy was beginning to fall apart. *Ontario*, 432 F. Supp. 3d at 171.

Indeed, in June and July 2016, weeks before the Actavis acquisition closed, the DOJ and the Connecticut AG served Teva with subpoenas about its drug pricing. *Chicago* compl., ¶110. Defendants were so committed to closing the deal that they responded not by disclosing the subpoenas to investors, but by *accelerating* their attempt to close before investors learned the truth. The morning after receiving the Connecticut AG's subpoena, Defendants surprised investors by moving up the debt offering – launching the $20 billion bond offering just one week later – even though Defendants had told investors just one month before that it would not occur until *after* the deal closed. *Id.*, ¶¶108-110. In other words, Defendants bought Actavis with billions of dollars in loans – funded by the Company's own investors – they *knew* they almost certainly could not repay.

Yet, after the Actavis deal closed, Defendants repeatedly made false and misleading statements about the value of Actavis and Teva's financial condition. Defendants told investors that the Actavis acquisition came "at a time when *Teva is stronger than ever*" in its generics business, *Chicago* compl., ¶111, and that it would "enhance" the Company's "leadership" in the "evolving competitive landscape" of the generics market. *Id.*, ¶¶257-258. The acquisition, Defendants told investors, would result in a "much stronger" and "more competitive" company that was "best

---

[21] General citations in this section are to the *Chicago* complaint, filed May 28, 2020 (ECF No. 400), which is representative of the Direct Action Complaints.

[22] https://www.barrons.com/articles/teva-pharmaceutical-stock-could-double-1505993839.

positioned to thrive in an evolving global generics marketplace." *Id.* Defendants made clear that the Actavis acquisition was part and parcel with its strategy to focus on its generics business, telling investors that they were "very confident" that because of the acquisition, Teva would "thrive in the long-term future as a leader in the generics industry." *Id.*, ¶266. Like their other statements about Teva's success and competition in the generics market, Defendants' statements that Actavis was making Teva even "stronger" and "more competitive" in the generics market were """"misleading in the absence of a disclosure of that anticompetitive conduct."""" *Ontario*, 432 F. Supp. 3d at 161.

In the months that followed, Defendants continued to tell investors the deal would lead to ***billions*** in "cost synergies" and "tax savings" in their generics business as early the end of 2019." *Chicago* compl., ¶257. Defendants assured investors that Teva was able to "begin capitalizing immediately on the benefits offered by the acquisition," *id.*, ¶259, providing the Company with "a matchless opportunity to add value . . . in the fast-changing global generics marketplace," *id.*, ¶260. In 2017, Defendants claimed the Actavis acquisition was a success, resulting in "significant growth" and "cash flow." *Id.*, ¶261. In February 2017, Defendants told investors that the acquisition was already "generating significant cash flow to rapidly pay down our existing debt to maintain a strong balance sheet." *Id.* And as late as May 2017 – just 2-1/2 months before Teva would announce a $6 billion impairment of its generics business – Defendants told investors that the Actavis acquisition was "***now on track*** to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017."[23] *Chicago* compl., ¶266. By that time, though, Defendants knew that

---

[23] Defendants claim, without support, that Peterburg's May 11, 2017 statement is "plainly a forward-looking statement." MTD at 30 n.33. That is incorrect. As this Court has explained, "'a statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements.'" *Ontario*, 432 F. Supp. 3d at 166 (quoting *Vivendi*, 838 F.3d at 246). "The fact that the defendants also made forward-looking statements does not change the fact that their statements about the past were misleading." *Id.* The May 11, 2017 statement included the "non-forward looking elements" that the Company could "report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified," such that the Company was "now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017." *Chicago*

the Price-Hike Strategy had begun to collapse and that Teva was losing its ability to profit from its price hikes or implement new increases in the future. *Id.*, ¶316. Thus, Defendants' continued statements that the Actavis generics business was generating "significant growth" and "cash flow" were at least misleading "because they omitted information that was necessary to make the statement[s] complete." *Ontario*, 432 F. Supp. 3d at 167.

Beginning in late 2017, investors gradually learned that Actavis was worth far less than its $40-billion price tag. On August 3, 2017 and February 8, 2018, the Company was forced to take two massive impairment charges to its U.S. generics business (which included Actavis) erasing ***$16.5 billion*** in value. *Chicago* compl., ¶¶337, 346. As investors learned the truth about Teva's generics business and its vulnerability to competition and pricing pressure, the market understood the significant negative impact the Actavis acquisition had on the Company. In December 2017, *Haaretz* reported that "[t]he acquisition of Actavis . . . is probably the ***biggest value destroyer in the history of Israeli business***," adding that the purchase "is ultimately ***the reason*** why Teva value shrank by 200 billion shekels ***($57 billion) in two-and-a-half years***."[24] It was a "***disaster[]***," *The New York Times* likewise recounted in December 2017.[25] The Actavis acquisition, the *Motley Fool* reported in May 2019, was "the worst business development move in history," adding that "[t]his singular transaction nearly forced Teva to close its doors for good."[26] "[E]ver since its mistimed and

---

compl., ¶266. Thus, "the non-forward-looking elements of those statements . . . are actionable on the basis of the failure to include pricing as a factor in Teva's financial results." *Ontario*, 432 F. Supp. 3d at 166.

[24] https://www.haaretz.com/israel-news/business/the-inside-story-how-teva-wiped-out-57-billion-in-two-years-1.5628704.

[25] https://www.nytimes.com/2017/12/27/business/teva-israel-layoffs.html ("Several of those deals are now considered disasters, none more so than the $40.5 billion acquisition of Actavis from Allergan, a rival generic-drug maker, in July 2015.").

[26] https://www.fool.com/investing/2019/05/05/why-are-investors-passing-on-teva-pharmaceutical-i.aspx.

ill-conceived acquisition of Actavis Generics," *SeekingAlpha* reported in April 2019, "Teva has struggled."[27]

Ignoring all of these facts, Defendants instead cherry-pick from their Actavis statements in an attempt to cast them in innocent terms, insisting that the statements were limited to mundane matters like the Company's "research and development activities" and the "reach of its operational network."  MTD at 29.  Other statements, Defendants claim, were merely about "the source of Teva's operating profits," such as Defendants' statement that in February 2017 that "'[t]he increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.'"  *Id.* (quoting *Chicago* compl., ¶261).  But even if that were so, those statements were similarly false and misleading because Defendants "'failed to disclose the sources of [Teva's profits]'" in its generics business generally: the Price-Hike Strategy.  *Ontario*, 432 F. Supp. 3d at 164.  Like Defendants' statements about its generics business generally, these "misstatements and omissions attributing the profit increases and decreases to things other than pricing were half-truths, ones that gave rise to a duty to disclose the whole truth."  *Id.* at 165.  But as described above, Defendants' statements about the Actavis acquisition were not merely about research and development or the Company's geographic reach.  Instead, the statements and omissions were part and parcel with statements about the Teva's success generally: the Company was succeeding and profiting in a "competitive" generics market with no worsening in the pricing environment.  Those statements were false and misleading because they withheld information about the true state of Teva's deteriorating asset.

---

[27] https://seekingalpha.com/article/4254649-teva-why-future-is-different-for-this-troubled-pharmaceutical-giant.

### B.   Plaintiffs Adequately Allege Facts that Establish a Compelling Inference of Scienter as to the Actavis Acquisition

Defendants had the motive and opportunity to overstate the value of Actavis.  This Court has already held, in ruling on the *Ontario* AC, that "plaintiffs **more than adequately pled** that the defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency to acquire Actavis."  *Ontario*, 432 F. Supp. 3d at 170.  As the Court explained, the Class "support[s] their allegations," like Plaintiffs do here, "with the representations by Desheh, and later Vigodman, that Teva stock price would increase in such a way to allow for its use as currency to fund transactions," which was alone "likely enough to sustain an allegation of motive and opportunity scienter." *Id.*  Having spent months working to close the biggest transaction in history, Defendants had the motive to convince investors that it had been the right decision. *See Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) ("It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises."); *Rothman*, 220 F.3d at 93 (explaining that "the artificial inflation of stock price in the acquisition context" may alone "be sufficient for securities fraud scienter").

Defendants argue that it "would strain credulity" that they were motivated to "commit a massive fraud, risking financial ruin and potential criminal liability" in order to fund an acquisition they believed would have a "negative impact" on Teva.  MTD at 31.  But as the Second Circuit has explained "this 'argument confuses expected with realized benefits.'" *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96-97 (2d Cir. 2016).  For it is "'cogent and at least as compelling as any opposing inference of nonfraudulent intent'" to infer that when Defendants made their statements about the Actavis acquisition, they "believed [they] had more time before prosecutors would reveal [their] role in the scheme . . . and if [Defendants] believed that [they] had more time, then 'the benefits of concealment might [have] exceed[ed] the costs'" at the time of the statements. *Id.*  After

all, "[t]he fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.).

Plaintiffs have also alleged facts demonstrating conscious misbehavior or recklessness. The Actavis acquisition was the largest transaction in Teva's history, which Defendants repeatedly promoted as a boon for the Company. Before and after the transaction, they regularly discussed on conference calls the status of the transaction and the integration of Actavis into Teva's existing business. It is "'absurd to suggest'" that Defendants did not know about the deteriorating value of the asset when they were making these statements. *See GE*, 857 F. Supp. 2d at 395 (quoting *Zucco*, 552 F.3d at 1000). Moreover, before speaking about the status of the acquisition, Defendants had an obligation to investigate its condition. *See Novak*, 216 F.3d at 308. Further indicative of scienter, in the wake of the failed acquisition, three of the Officer Defendants – Olafsson, Vigodman, and Desheh – all resigned or were terminated. *Chicago* compl., ¶300. *See In re Mercator Software, Inc.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001).

### C.   Plaintiffs Adequately Allege Facts that Establish Loss Causation as to the Actavis Acquisition

Lastly, Defendants argue that Plaintiffs fail to plead loss causation because Plaintiffs allege at most two corrective disclosures that specifically "mention[] Actavis," but that neither of these disclosures "revealed . . . the 'negative impact' of the Actavis Acquisition." MTD at 32-34. This argument is wrong on both the law and the facts.

To begin with, the two announcements of massive goodwill impairments of the U.S. generics business (which Defendants admit "mention Actavis") plainly disclose the negative impact of the

acquisition.  Indeed, these announcements collectively informed investors that **$16.5 billion** of generic assets – including assets obtained from Actavis – had been wiped away.[28]

Further, Defendants' argument is premised on their (unsupported) assertion that corrective disclosures must specifically "mention Actavis."  But as courts in this Circuit have explained, "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202.  To the contrary, in rejecting this very argument that Defendants raised as to the *Ontario* AC, this Court explained that "'it is enough that the loss caused by the alleged fraud results from the "relevant truth . . . leak[ing] out."'"  *Ontario*, 432 F. Supp. 3d at 172-73.

Nor do Plaintiffs need to allege corrective disclosures showing that the "'negative impact'" of the Actavis acquisition resulted from "strengthening R&D" or "broadening geographic footprint." MTD at 33.  As Plaintiffs have explained, Defendants' statements about the Actavis acquisition were not fraudulent because they misled investors about R&D or the Company's geographic footprint. Instead, Defendants' Actavis-related statements concealed the same "relevant truth" about Teva's vulnerability to competition and pricing pressure in the generics market.  *See Ontario*, 432 F. Supp. 3d at 148, 173.  And when investors finally learned the "relevant truth about the price-based profits

---

[28] Defendants make the puzzling claim that Teva's February 2018 announcement of a $17 billion impairment (primarily related to its generics business) somehow did not disclose any "new information" that had not been "already revealed" six months earlier when Teva announced a $6 billion impairment. MTD at 34.  But there is no better example of "new information" than Defendants' disclosure that the Company's impairment would be $11 billion **more** than it originally estimated. *See Vivendi*, 838 F.3d at 262-63 (holding that loss causation can be established by a "series of events" that materialize the concealed risk).  And none of Defendants' cited cases are to the contrary. *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (finding stock drop following announcement of company's nationalization did not establish loss causation where the risk of nationalization was extensively covered in the media for several months); *Musab Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014) (finding plaintiff failed to plead loss causation because complaint included "no factual allegations" to support plaintiff's causation theory); *In re GE Sec. Litig.*, 2020 WL 2306434, at *12 (S.D.N.Y. May 7, 2020) (holding allegations about goodwill did not establish falsity or scienter without discussion of loss causation), *aff'd*, 844 F. App'x 385 (2d Cir. 2021); *City of Omaha v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (same); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (same).

and the price-hike strategy's failure," *id.* at 173, they learned that the Actavis acquisition was nothing more than a reckless gamble that saddled Teva with $35 billion in debt and no clear source of revenue to pay it back.  In short, Defendants' statements about the Actavis acquisition are part of the same "'network of interrelated lies . . . all collectively aimed at perpetuating a broader, material lie.'"  *Id.* at 174.  Like their other statements, Defendants statements about Actavis "cannot be viewed in a vacuum."  *Id.*  And because Defendants' statements about Actavis, like their other statements, misled investors "about whether competition and their pricing scheme affected their profits, and did so with conscious misbehavior or recklessness," Plaintiffs "adequately alleged loss causation."  *Id.*

## V.   DEFENDANTS' MISLEADING STATEMENTS CONCERNING GOODWILL ARE ACTIONABLE

As discussed, in fiscal year 2017, Teva wiped out a total of $16.5 billion of goodwill relating to the U.S. generics unit, eviscerating more than 71% of the unit's goodwill balance.  ¶559.  Defendants took a massive $6.1 billion goodwill write-down on August 3, 2017, followed by another $10.4 billion write-down in February 8, 2018.  ¶¶37, 40, 580.  Due in part to these massive write-downs, Teva's securities prices plummeted, with the ADS dropping close to 24% and 10.5% on August 3, 2017 and February 8, 2018 respectively.  ¶¶877-880, 891-894.[29]

Only on February 8, 2018, when the second massive write-down was announced, did Teva reveal sufficient information about its goodwill valuation inputs and assumptions for investors to determine the cash flows growth rates used during fourth quarter 2016 to third quarter 2017

---

[29] By misreading *Harel* and *Phoenix*'s goodwill allegations and Defendants' own corrective disclosures, Defendants contend that the *Harel* and *Phoenix* plaintiffs fail to plead loss causation because Teva did not reveal "a fact that the *Harel* and *Phoenix* plaintiffs allege was concealed with respect to Actavis."  MTD at 33 n.36.  Defendants are incorrect as Peterburg stated, Teva "reduce[d] goodwill associated with our U.S. Generics business unit, which includes both the Teva legacy business and the Actavis Generics business" – not simply the Actavis business as defendants now contend.  ¶707.

impairment testing.  ¶574.  Prior to February 2018, Defendants persistently misled investors with misrepresentations such as:

- "[goodwill] [c]ash flow projections are based on management's estimates of revenue growth rates and operating margins, taking into consideration industry and market conditions" (¶¶573, 704); and

- "[t]here was no impairment for our remaining reporting units [outside of the Mexico Rimsa unit], whose fair value was estimated based on future cash flows discounted at a market participant rate" (¶¶550, 704).

In actuality, Defendants concealed Teva's use of an aggressive 20% growth rate to project cash flows as part of its goodwill impairment test.  ¶551.  The baseless 20% growth rate was close to double the growth rate Defendants conveyed to investors during their July 13, 2016 presentation, which stated that the combined Teva and Actavis generics business was projected to experience 11% cash flow growth rate and 9% revenues growth rate.  ¶¶115-117.  Between July 13, 2016 and the end of 2016 (when the goodwill impairment test took place), Teva's U.S. generics business severely deteriorated – to the point where defendant Vigodman announced on January 6, 2017 that the "2017 guidance we provided today [for revenue and cash flow] is significantly below what we provided in the July [2016] preliminary outlook."  ¶662.

Hence, Defendants' aggressive, undisclosed 20% cash flow growth rate that was used solely for their impairment test lacked any basis in reality, inflated and contradicted "management's [own] estimates of revenue growth rates and operating margins" as asserted in Teva's 2016 Form 10-K (¶704), and violated GAAP requirements.  *See* ASC 360-10-35-30; ASC 820-10-35-54A; ¶575 ("estimates [of future cash flow] shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections").  Had Teva followed GAAP requirements and used internal projections as conveyed to

investors on July 2016, an additional $7.6 billion goodwill impairment charge would have been taken as early as fourth quarter 2016.  ¶¶583-584.[30]

Accordingly, Teva's goodwill statements were materially misleading because "the excluded fact shows that [defendants] lacked the basis for making those statements that a reasonable investor would expect."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 196 (2015).  "Plaintiffs' allegations – namely, that [d]efendants failed to disclose certain accounting elements, utilized baseless assumptions, and failed to take successive write-downs during the [Relevant] Period – provide sufficiently strong circumstantial evidence of recklessness . . . to survive [d]efendants' motion."  *Nielsen Holdings*, 2021 WL 22722, at *10 (finding "[p]laintiffs adequately allege that [d]efendants' rosy valuation of . . . goodwill was based on baseless cash flow growth rates that they failed to disclose") (citing *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018)); *see also In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 239-40 (S.D.N.Y. 2018) (finding plaintiffs' goodwill allegations sufficient when "'backed by specific factual allegations, identifying each GAAP provision allegedly violated, and in what manner those provisions were violated'"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (holding that plaintiffs' allegation that "goodwill was not written down . . . despite known delays, cost overruns, growing liability disputes . . . sufficient to survive a motion to dismiss").

---

[30] Notably, as in *Nielsen Holdings*, "while the magnitude of this charge is not an independent basis for finding scienter, it can and does supplement [p]laintiffs' other allegations" and "[d]efendants do not raise any serious arguments against [p]laintiffs' allegations."  *In re Nielsen Holdings PLC Sec. Litig.*, 2021 WL 22722, at *10 (S.D.N.Y. 2021).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss in its entirety.[31]

DATED:  July 23, 2021                    Respectfully submitted,

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         LUKE O. BROOKS
                                         ANGEL P. LAU
                                         JEFFREY J. STEIN
                                         ERIKA OLIVER
                                         TING H. LIU

                                                    s/ Luke O. Brooks
                                         _____
                                                  LUKE O. BROOKS
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         lukeb@rgrdlaw.com
                                         alau@rgrdlaw.com
                                         jstein@rgrdlaw.com
                                         eoliver@rgrdlaw.com
                                         tliu@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         CHAD JOHNSON
                                         420 Lexington Avenue, Suite 1832
                                         New York, NY  10170
                                         Telephone:  212/432-5100
                                         chadj@rgrdlaw.co

---

[31] Should the Court grant any portion of Defendants' MTD, the Plaintiffs subject to that dismissal respectfully request leave to amend their Complaints. *See Bye v. Connecticut*, 2011 WL 1271690, at *2 (D. Conn. Apr. 5, 2011) (under Rule 15, "'[t]he court should freely give leave when justice so requires'").

MOTLEY RICE LLC
WILLIAM H. NARWOLD
MATTHEW P. JASINSKI
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/882-1676
860/882-1682 (fax)
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Attorneys for Plaintiffs Harel Pension and
Provident Ltd., et al. and The Phoenix Insurance
Company Ltd., et al.

*s/ Jeremy A. Lieberman* (with consent)

JEREMY A. LIEBERMAN (appearing *pro hac vice*)
MICHAEL J. WERNKE (appearing *pro hac vice*)
POMERANTZ LLP
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
mjwernke@pomlaw.com

Patrick M. Dahlstrom (appearing *pro hac vice*)
POMERANTZ LLP
10 South LaSalle, Ste 3505
Chicago, IL 60603
Tel.:  (312) 377-1181
Fax:  (312) 229-8811
pdahlstrom@pomlaw.com

Erin Green Comite (ct24886)
Margaret B. Ferron (ct28469)
SCOTT & SCOTT
ATTORNEYS AT LAW LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.:  (860) 537-5537
Fax:  (860) 537-4432
ecomite@scott-scott.com
mferron@scott-scott.com

*Counsel for Plaintiffs in Case Nos. 19-cv-00513,
19-cv-00543, 19-cv-00655, 19-cv-00923, and 19-
cv-01167*


*s/ Carol V. Gilden* (with consent)
Carol V. Gilden (pro hac vice)
COHEN MILSTEIN SELLERS
   & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL  60603
Telephone: 312/357-0370
312/357-0369(fax)
cgilden@cohenmilstein.com

COHEN MILSTEIN SELLERS
   & TOLL PLLC
Steven J. Toll (*pro hac vice*)
Julie G. Reiser
Jan E. Messerschmidt (*pro hac vice*)
1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, DC  20005-3964
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

HURWITZ, SAGARIN, SLOSSBERG
  & KNUFF LLC
David A. Slossberg (CT13116)
Jeffrey P. Nichols (CT29547)
147 Broad St.
Milford, CT 06450
Telephone: (203) 877-8000
Facsimile: (203) 878-9800
dslossberg@hssklaw.com
jnichols@hssklaw.com

*Counsel for the Public School Teachers' Pension
and Retirement Fund of Chicago, No. 3:19-cv-175,
and the State of Oregon by and through The
Oregon State Treasurer and the Oregon Public
Employee Retirement Board, on Behalf of the
Oregon Public Employee Retirement Fund, No.
3:19-cv-00657*

*/s/ Matthew L. Mustokoff* (with consent)

Matthew L. Mustokoff (*pro hac vice*)
Geoffrey C. Jarvis (*pro hac vice*)
Joshua A. Materese (*pro hac vice*)
Henry W. Longley (*pro hac vice*)
KESSLER TOPAZ MELTZER
  & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
mmustokoff@ktmc.com
gjarvis@ktmc.com
jmaterese@ktmc.com
hlongley@ktmc.com

*Liaison Counsel for the Direct Actions and Counsel
for Plaintiffs in Case Nos. 3:18-cv-01681 (Nordea),
3:18-cv-01721 (Alaska), and 3:20-cv-1630
(Franklin)*

Keith R. Dutill (*pro hac vice* forthcoming)
Joseph T. Kelleher (*pro hac vice* forthcoming)
Marissa Parker (*pro hac vice* forthcoming)
STRADLEY RONON STEVENS
   & YOUNG, LLP
2005 Market Street
Suite 2600
Philadelphia, PA  19103
Tel.:  (215) 564-8000
Fax:  (215) 564-8120
kdutill@stradley.com
jkelleher@stradley.com
mparker@stradley.com

*Counsel for Plaintiffs in Case No. 3:20-cv-1630
(Franklin)*


*/s/ William H. Clendenen, Jr.* (with consent)
William H. Clendenen, Jr. (CT04261)
CLENDENEN & SHEA, LLC
400 Orange Street
New Haven, CT 06511
Telephone:  (203) 787-1183
Facsimile:  (203) 787-2847
office@clenlaw.com

*Local Counsel for Plaintiffs in Case Nos. 3:18-cv-
01681 (Nordea), 3:18-cv-01721 (Alaska), and 3:20-
cv-1630 (Franklin)*

*s/ Lawrence M. Rolnick* (with consent)

Lawrence M. Rolnick (*pro hac vice*)
Michael Hampson (*pro hac vice*)
Matthew Peller (*pro hac vice*)
Jennifer A. Randolph (pro hac vice)
ROLNICK KRAMER SADIGHI LLP
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 597-2800

David A. Ball (ct10154)
Ari J. Hoffman (ct22516)
COHEN and WOLF, P.C.
1115 Broad St. P.O. Box 1821
Bridgeport, CT 06604
Tel: (203) 368-0211
Fax: (203) 337-5534
dball@cohenandwolf.com
ahoffman@cohenandwolf.com

*Counsel for Plaintiffs Case Nos. 3:19-cv-00603*
*(Highfields) and 3:20-cv-01635 (Brahman)*

*/s/ Daniel L. Berger* (with consent)

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Daniel L. Berger (pro hac vice)
Jonathan D. Park (pro hac vice)
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
jeisenhofer@gelaw.com
dberger@gelaw.com
jpark@gelaw.com

MOTT ZEZULA LLC
Nathan Zezula (ct27936)
750 East Main Street, 6th Floor
Stamford, CT 06902
Tel. (203) 408-6500
nzezula@lmzlegal.com

*Counsel for Plaintiffs in Case Nos. 3:18-cv-1956
(Pacific), 3:19-cv-192 (Schwab), 3:19-cv-1173
(Stichting), and 3:20-cv-83 (INKA)*


*s/ Michael P. Canty* (with consent)
LABATON SUCHAROW LLP
Michael P. Canty (pro hac vice)
Eric J. Belfi (pro hac vice)
Corban S. Rhodes (pro hac vice)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0447
mcanty@labaton.com
ebelfi@labaton.com
crhodes@labaton.com

HURWITZ, SAGARIN, SLOSSBERG
   & KNUFF, LLC
David A. Slossberg (CT13116)
Jeffrey P. Nichols (CT29547)
147 Broad St.
Milford, CT 06450
Telephone: (203) 877-8000
Fax: (203) 878-9800
dslossberg@hssklaw.com
jnichols@hssklaw.com

*Counsel for Plaintiffs in Case Nos. 3:20-cv-00588
(Boeing) and 3:20-cv-00683 (Fir Tree)*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 23, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  lukeb@rgrdlaw.com

**Mailing Information for a Case 3:17-cv-00558-SRU Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas J. Amburgy**
  tamburgy@kasowitz.com,courtnotices@kasowitz.com,autodocket@kasowitz.com

- **David A. Ball**
  dball@cohenandwolf.com

- **Eric J. Belfi**
  ebelfi@labaton.com,lpina@labaton.com,cstiene@labaton.com,4076904420@filings.docketbird.com,ElectonicCaseFiling@labaton.com

- **Daniel L. Berger**
  dberger@gelaw.com,5722178420@filings.docketbird.com,rhovsepian@gelaw.com

- **Rachel Berger**
  rberger@gelaw.com

- **James H. Bicks**
  jbicks@wiggin.com,tsuhar@wiggin.com,apetrone@wiggin.com

- **Michael D. Blanchard**
  michael.blanchard@morganlewis.com,victoria.curry@morganlewis.com,jason.frank@morganlewis.com,jordan.hershman@morganlewis.com,matthew.mcdonough@m

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Victor Brienza**
  vbrienza@kasowitz.com

- **Luke Orion Brooks**
  lbrooks@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **David Thomas Bules**
  dbules@calfee.com

- **Liam S. Burke**
  lburke@carmodylaw.com

- **Benjamin Burry**
  bburry@bfalaw.com

- **Andrew Buttaro**
  andrew.buttaro@morganlewis.com

- **California State Teachers' Retirement System**
  rorder@uks.com

- **Michael P. Canty**
  mcanty@labaton.com,lpina@labaton.com,4727379420@filings.docketbird.com,echan-lee@labaton.com,ElectonicCaseFiling@labaton.com

- **William H. Clendenen , Jr**
  office@clenlaw.com,whcj@clenlaw.com

- **Erin Green Comite**
  ecomite@scott-scott.com,scott-scott@ecf.courtdrive.com,kjager@scott-scott.com

- **Patrick M. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Christopher Davies**
  christopher.davies@wilmerhale.com

- **Seth Davis**
  sdavis@kasowitz.com,courtnotices@kasowitz.com,autodocket@kasowitz.com

- **Gregory Michael Egleston**
  egleston@gme-law.com,tjmlaw2001@yahoo.com

- **Deborah Elman**
  delman@gelaw.com,jpark@gelaw.com,2665358420@filings.docketbird.com

- **Joel Thomas Faxon**
  jfaxon@faxonlawgroup.com,sbraun@faxonlawgroup.com

- **Scott Foglietta**
  scott.foglietta@blbglaw.com,Khristine.DeLeon@blbglaw.com,ManagingClerk@blbglaw.com,Matthew.Mahady@blbglaw.com

- **Joseph A. Fonti**
  jfonti@bfalaw.com,spodolsky@podolskylaw.com,ecfnotifications@bfalaw.com

- **Jason D. Frank**
  jason.frank@morganlewis.com

- **Koji F. Fukumura**
  kfukumura@cooley.com

- **Carol V. Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com

- **Adam S. Hakki**
  adam.hakki@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Michael Hampson**
  mhampson@rksllp.com

- **Elizabeth Hays**
  liza.hays@morganlewis.com

- **Jordan D. Hershman**
  jordan.hershman@morganlewis.com,victoria.curry@morganlewis.com,emily.renshaw@morganlewis.com,brenda.kelly@morganlewis.com

- **Ari J. Hoffman**
  ahoffman@cohenandwolf.com

- **Thomas G. Hoffman , Jr**
  thoffman@labaton.com,lpina@labaton.com,echan-lee@labaton.com,5560103420@filings.docketbird.com,ElectonicCaseFiling@labaton.com

- **Adam Hollander**
  adam.hollander@blbglaw.com,JonathanU@blbglaw.com,kayem@blbglaw.com,Scott.Foglietta@blbglaw.com,Michaelb@blbglaw.com,AdamW@blbglaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Robert A. Izard , Jr**
  rizard@ikrlaw.com,ecf@ikrlaw.com

- **Mathew P. Jasinski**
  mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Christopher Chad Johnson**
  chadj@rgrdlaw.com,chadj@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **David Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com,lmix@saxenawhite.com

- **Marc Kasowitz**
  mkasowitz@kasowitz.com

- **Reed R Kathrein**
  reed@hbsslaw.com,lisal@hbsslaw.com,sf_filings@hbsslaw.com

- **Cindy Kelly**
  ckelly@kasowitz.com

- **Sheron Korpus**
  skorpus@kasowitz.com,courtnotices@kasowitz.com,autodocket@kasowitz.com

- **Evan A. Kubota**
  ekubota@bfalaw.com

- **Nancy A. Kulesa**
  nancy@nkulesa.com

- **Marc J. Kurzman**
  mkurzman@carmodylaw.com

- **Angel P. Lau**
  alau@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sarah Leivick**
  sleivick@kasowitz.com

- **Seth R. Lesser**
  seth@klafterlesser.com,nancy.velasquez@klafterlesser.com,myra.monteagudo@klafterlesser.com

- **Daniel Craig Lewis**
  daniel.lewis@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Ting Liu**
  tliu@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Ryan Llorens**
  ryanl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Henry W. Longley**
  hlongley@ktmc.com,3459377420@filings.docketbird.com

- **Joshua A. Materese**
  jmaterese@ktmc.com

- **Margaret E. Mazzeo**
  mmazzeo@ktmc.com

- **Richard D. McCune**
  rdm@mccunewright.com

- **Thomas J. McKenna**
  tjmckenna@gme-law.com,tjmlaw2001@yahoo.com,gmelawny@gmail.com

- **Jan Messerschmidt**
  jmesserschmidt@cohenmilstein.com

- **Catherine Montezuma**
  catherine.montezuma@usdoj.gov

- **Jeffrey Mueller**
  jmueller@daypitney.com,sflint@daypitney.com,kpbrooks@daypitney.com

- **Matthew L. Mustokoff**
  mmustokoff@ktmc.com,mmazzeo@ktmc.com,5558085420@filings.docketbird.com,mswift@ktmc.com,mfranek@ktmc.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,3045551720@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Gretchen M. Nelson**
  gnelson@nflawfirm.com

- **Jeffrey P. Nichols**
  jnichols@hssklaw.com,gvillella@hssklaw.com

- **Eric Ian Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill M. O'Toole**
  jotoole@goodwin.com,swestby@goodwin.com,pcotrone@goodwin.com,lgineo@goodwin.com

- **Erika Limpin Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Veronica N Onyema**
  veronica.onyema@usdoj.gov

- **Richard S. Order**
  rorder@uks.com,lvoorvaart@uks.com,pmcdonald@uks.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com

- **Jonathan Park**
  jpark@gelaw.com,tsaviano@gelaw.com

- **Ronald Richard Parry**
  rrparry@strausstroy.com

- **Matthew A. Peller**
  mpeller@rksllp.com

- **Susan R. Podolsky**
  spodolsky@podolskylaw.com

- **Diane Curran Polletta**
  dpolletta@goodwin.com

- **Sara Polychron**
  spolychron@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lesley F Portnoy**
  lfportnoy@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Thomas Henry Przybylowski**
  tprzybylowski@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Craig A. Raabe**
  craabe@ikrlaw.com,ecf@ikrlaw.com

- **Jennifer Randolph**
  jrandolph@rksllp.com,claferriere@rksllp.com

- **Emily E. Renshaw**
  emily.renshaw@morganlewis.com,victoria.curry@morganlewis.com,nathaniel.bruhn@morganlewis.com,matthew.mcdonough@morganlewis.com,liza.hays@morganle

- **Corban S. Rhodes**
  crhodes@labaton.com,lpina@labaton.com,3936743420@filings.docketbird.com,sauer@labaton.com,electroniccasefiling@labaton.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lawrence M. Rolnick**
  lrolnick@rksllp.com

- **J. Christopher Rooney**
  crooney@carmodylaw.com,ksposi@carmodylaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **David R. Roth**
  droth@wiggin.com,cmartone@wiggin.com

- **Maya Saxena**
  msaxena@saxenawhite.com

- **Andrew Schwartz**
  aschwartz@kasowitz.com,courtnotices@kasowitz.com

- **David J Schwartz**
  dschwartz@labaton.com,lpina@labaton.com,electroniccasefiling@labaton.com

- **Irwin B Schwartz**
  ischwartz@blaschwartz.com,dmacwilliam@blaschwartz.com,khutton@blaschwartz.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **David A. Slossberg**
  dslossberg@hssklaw.com,GVillella@hssklaw.com,tmontalto@hssklaw.com

- **Robert K. Smith**
  robert.smith@wilmerhale.com

- **Timothy A. Smith**
  tsmith@carmodylaw.com

- **Jeffrey Stein**
  jstein@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thayne Stoddard**
  tstoddard@bfalaw.com

- **Jessica Sutliff**
  jsutliff@kasowitz.com

- **Paul F. Thomas**
  paul@DuffyLawCT.com,stacey@duffylawct.com

- **Steven J. Toll**
  stoll@cohenmilstein.com

- **Jonathan D. Uslaner**
  jonathanu@blbglaw.com,managingclerk@blbglaw.com

- **Austin P. Van**
  avan@pomlaw.com

- **Christina Volpe**
  cvolpe@dmoc.com

- **Lesley E. Weaver**
  lweaver@bfalaw.com

- **Michael J. Wernke**
  mjwernke@pomlaw.com,abarbosa@pomlaw.com

- **Jonathan P. Whitcomb**
  jwhitcomb@dmoc.com,docket@dmoc.com

- **Nathan Craig Zezula**
  nzezula@lmzlegal.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)