1       UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT

2

3    _____
                                    )
4    ONTARIO TEACHERS' PENSION      )
     PLAN BOARD, ET AL.,            ) No. 3:17-cv-00558(SRU)
5                                   )
                     Plaintiffs,    ) September 15, 2021
6                                   )
     v.                             ) 10:08 a.m.
7                                   )
                                    ) 915 Lafayette Boulevard
8    TEVA PHARMACEUTICAL            ) Bridgeport, Connecticut
     INDUSTRIES LTD., ET AL.,       )
9                                   )
                     Defendants.    )
10   _____)

11

12

13              TELEPHONIC STATUS CONFERENCE

14

15

16   B E F O R E:

17        THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

18

19

20

21

22

23

24          Official Court Reporter:
            Melissa J. Cianciullo, RDR, CRR, CRC
25          (203) 606-1794

```
1    A P P E A R A N C E S:

2    FOR THE PLAINTIFFS:

3         BLEICHMAR FONTI & AULD LLP
              7 Times Square, 27th Floor
4             New York, New York  10036
         BY:  JOSEPH A. FONTI, ESQ.
5              EVAN A. KUBOTA, ESQ.

6         CARMODY TORRANCE SANDAK & HENNESSEY, LLP
              195 Church Street, 18th Floor
7             P.O. Box 1950
              New Haven, Connecticut  06510-1950
8         BY:  J. CHRISTOPHER ROONEY, ESQ.

9         KESSLER TOPAZ MELTZER & CHECK LLP
              280 King of Prussia Road
10            Radnor, Pennsylvania  19087
         BY:  MATTHEW L. MUSTOKOFF, ESQ.
11
          GRANT & EISENHOFER P.A.
12            485 Lexington Avenue
              New York, New York  10017
13        BY:  JONATHAN PARK, ESQ.

14        ROBBINS GELLER RUDMAN & DOWD LLP
              655 West Broadway, Suite 1900
15            San Diego, California  92101
         BY:  JEFFREY STEIN, ESQ.
16
              420 Lexington Ave, Suite 1832
17            New York, NY  10170
         BY:  CHRISTOPHER CHAD JOHNSON, ESQ.
18
          POMERANTZ LLP
19            600 Third Avenue, 20th Floor
              New York, New York  10016
20        BY:  MICHAEL J. WERNKE, ESQ.

21        MOTLEY RICE LLC
              One Corporate Center, 17th Floor
22            20 Church Street
              Hartford, Connecticut  06103
23        BY:  MATHEW P. JASINSKI, ESQ.

24   (Continued)

25
```

```
 1   A P P E A R A N C E S   C O N T ' D:

 2        LABATON SUCHAROW, LLP
               140 Broadway
 3             New York, New York  10005
          BY:  CORBAN S. RHODES, ESQ.

 4
          COHEN MISTEIN SELLERS & TOLL, PLLC
 5             190 South LaSalle Street, Suite 1705
               Chicago, IL  60603
 6        BY:  CAROL V. GILDEN, ESQ.

 7        ROLNICK KRAMER SADIGHI LLP
               1251 Avenue of the Americas FL 18
 8             New York, NY 10020
               (212) 597-2825
 9        BY:  JENNIFER RANDOLPH, ESQ.

10   FOR THE DEFENDANTS:

11        MORGAN LEWIS & BOCKIUS LLP
               One Federal Street
12             Boston, Massachusetts  02110
          BY:  EMILY E. RENSHAW, ESQ.

13
          SHIPMAN & GOODWIN LLP
14             One Constitution Plaza
               Hartford, Connecticut  06103
15        BY:  DIANE C. POLLETTA, ESQ.

16        KASOWITZ BENSON TORRES LLP
               1633 Broadway
17             New York, New York  10019
          BY:  SHERON KORPUS, ESQ.
18             CINDY CARANELLA KELLY, ESQ.
               SARAH GIBBS LEIVICK, ESQ.
19             ANDREW SCHWARTZ, ESQ.

20
     FOR THE INTERVENOR, UNITED STATES OF AMERICA:
21
          DOJ - ANTITRUST
22             450 Fifth Street, N.W.
               Washington, D.C.  20530
23        BY:  VERONICA N. ONYEMA, ESQ.

24

25
```

1          THE COURT:  Good morning.  This is Stefan

2     Underhill.  Of course, we are on the record.

3          Could I just have the appearances, please, of

4     anyone who expects to speak today.

5          MR. FONTI:  Good morning, your Honor.  Joseph

6     Fonti, class counsel for the class representatives.

7          THE COURT:  Okay.

8          MR. KORPUS:  Good morning, your Honor.

9     Sheron Korpus for the defendant.

10          MS. RENSHAW:  Good morning, your Honor.

11     Emily Renshaw for the defendants as well.

12          THE COURT:  Thank you.

13          All right.  Well, I think we have a number of

14     things to take up.  The first one on my list is the

15     nearly year-old motion to compel, Number 554, which I

16     think can be denied as moot without prejudice; that

17     is, I think we've exhausted the issue.  And there may

18     be a related issue and question, but I don't think it

19     implicates the motion to compel.

20          Does anybody think that motion still has any

21     vitality?

22          MR. KORPUS:  I'm sorry, your Honor.  Which

23     motion is that?

24          THE COURT:  This is the motion that the

25     plaintiffs made to compel for -- to compel the

1  custodian's mobile devices that are in Teva's

2  possession for forensic analysis for inspection and

3  copying of the images, backup storage media for

4  forensic analysis and for full threads of all text

5  messages of any competitors, custodians and

6  individual defendants that are identified.

7          MR. KORPUS:  Thank you for that

8  clarification.

9          THE COURT:  Sure.

10          MR. FONTI:  Your Honor, I think that was held

11  in abeyance and, just very candidly, not something

12  that we had reassessed at this juncture.  I think you

13  had ordered production of the devices around

14  Cavanaugh.

15          THE COURT:  Right.

16          MR. FONTI:  And those were forensically

17  inspected, and we understood that you had held the

18  rest of that motion in abeyance.  As you know,

19  there's -- we are pursuing the limited deposition of

20  Cavanaugh on spoliation.  We have some newly

21  developed facts around the 2015 investigation of DOJ.

22          I think we have also established that the

23  Sandoz -- any text messages involving Sandoz and Teva

24  have -- could not be recovered.  We couldn't recover

25  anything from the devices, the devices that were

1    forensically investigated.

2          We don't think there is any hope that any of

3    these other devices that are in Teva's possession

4    will result in the recovery of any additional text

5    messages.  And so we don't have a problem with the

6    denial given that Teva has made a representation that

7    they have searched those for responsive documents,

8    haven't produced any responsive information from the

9    devices as far as we know, and the text messages that

10   have been the focal point but not the exclusive

11   focus, there is other ESI at issue here, simply don't

12   exist anymore.

13         So with all that said, we don't object to the

14   denial of the motion because we don't think there's

15   anything for the motion to recover.

16         THE COURT:  Right.

17         MS. RENSHAW:  And, your Honor, this is Emily

18   Renshaw for the defendants.  I apologize.

19         Just very quickly, we obviously disagree with

20   everything that Mr. Fonti just said other than we,

21   you know, don't disagree that the Court should deny

22   the motion.

23         What Mr. Fonti said regarding Sandoz text

24   messages, conflating that with the devices in Teva's

25   possession, is unclear.  And his other

1    representations regarding the existence or lack

2    thereof of text messages and their relevance, we

3    think it goes without saying that we disagree with

4    that and don't believe any of those -- his commentary

5    there is true.  But we do agree that the motion

6    should be denied.

7        THE COURT:  Well, okay.  But just to be

8    clear, you have searched the devices and produced any

9    relevant messages that were on the devices in your

10   possession, custody or control?

11       MS. RENSHAW:  We have searched the custodial

12   data, yes, from devices in our possession, custody

13   and control and produced relevant and responsive text

14   messages.

15       THE COURT:  Great.  Okay.  All right.  So I'm

16   going to deny 544 as in effect moot without

17   prejudice.  If it turns out that there's some reason

18   that one or more of these devices or, you know,

19   threads or whatever comes to light and you want to

20   renew that motion somewhat, feel free to start again.

21   It's just been sitting there for a year, and I think

22   it's probably time to move past it.

23       All right.  Well, we have a number of issues

24   to take up.

25       Mr. Fonti, let me ask you to present your

```
1    issues first, and I'll make my comments as we go
2    along.
3          MR. FONTI:  Thank you, your Honor.
4          I believe the first issue, in our view, is
5    the limited deposition of Cavanaugh on the spoliation
6    matter.  We had fully briefed the issue besides
7    have -- I think it's fully presented.
8          But since the briefing, as of August 4th, we
9    came to learn new facts that the DOJ investigation
10   began to involve Teva in terms of words in early
11   2015.  That is a very material fact which we think
12   further supports the Cavanaugh deposition,
13   potentially other need for discovery on spoliation
14   issue but certainly as to Cavanaugh.
15         As we presented in our papers in our
16   submission for the conference, it is now undisputed
17   that that investigation by the DOJ in 2015 prompted
18   communications among the very highest levels of the
19   company, CEO of Teva Vigodman, CEO of Generics
20   Olafson, Mr. Stark who is the general counsel,
21   Mr. Phillips who is a very prominent defense lawyer
22   for the company, and Cavanaugh was involved in those
23   communications.  Those communications have been on
24   the privilege log, but there was never any indication
25   that that was related to this DOJ investigation.
```

1          We also know that this contact resulted in

2     some effort, although we don't know to what extent,

3     to preserve and to collect documents, information at

4     ESI.  We don't know anything about the scope of that.

5     We also know that no litigation hold was put into

6     place.

7          We think these facts are dramatically

8     different than the facts we've heard come out of

9     counsel over the last 18 months that this dispute has

10    been brewing.  In their May 24th submission which is

11    ECF 780, they said that the entries on the privilege

12    logs, these very entries that relate specifically to

13    the DOJ investigation of Teva were, quote, wholly

14    unrelated to this action, meaning this class action.

15    So we're disturbed by that.

16         We're disturbed by the fact the Court ordered

17    the Samb -- a declaration signed by Mr. Samb, who I

18    understand is a paralegal who joined the company in

19    2019, that is silent as to this DOJ investigation in

20    2015, silent as to the preservation efforts that were

21    undertaken in and around, you know, March or

22    thereabouts in 2015.  And we think Paragraph 19 of

23    that declaration is particularly egregious in that it

24    claims that Teva was not aware of any actual or

25    potential real claims relating, in their words, to

1    the text messages, but we think that's code for this

2    action, that no claims relating to the subject matter

3    of this action.  We think they effectively have

4    driven the truck through the truth here.

5         So the recourse we're asking for today is

6    this deposition of Ms. Cavanaugh.  She is a fact

7    witness as to the preservation efforts to the initial

8    beginnings of the investigation and certainly is a

9    fact witness to what happened to her particular text

10   messages in ESI.

11        So with all that said, we think we're at the

12   point where that deposition should be ordered; and if

13   there's further discovery warranted, we will apprise

14   the Court in due course.

15        MS. RENSHAW:  Your Honor, this is Emily

16   Renshaw for defendants.

17        This you know, is just another attempt by

18   plaintiff to distract from and broaden the scope of

19   the actual dispute here.  The dispute here, again,

20   and I know the Court is exhausted by this, but is --

21   it concerns a subset of text messages from six

22   custodians from years before the case was filed.  And

23   try as plaintiffs might, as Mr. Fonti is doing, the

24   dispute is not about Teva's preservation obligations

25   in connection with this action generally without

 1    limitation.  There is no code.  There is no

 2    deception.  It's not about Teva's preservation

 3    obligations to other parties dating back more than

 4    eight years.  It's not about whether Teva's legal

 5    department should have issued holds in a particular

 6    unrelated action many years ago.  It's about the

 7    subset of text messages that were allegedly exchanged

 8    between 2013 and mid-'16 by six particular

 9    custodians.

10          And plaintiffs -- the 2015 outreach that

11    Mr. Fonti just referenced and that was referenced in

12    their opposition briefing, we think improperly, the

13    matter is a red herring and the plaintiffs know that.

14    The dispute before the Court focuses on these text

15    messages and whether any litigation holds that were

16    sent to the six custodians in the years leading up to

17    the filing of the action other than text messages.

18          The 2015 matter does not pertain to those

19    issues.  We have confirmed to plaintiff in

20    confidential communications why that is the case,

21    among other reasons.  And I'm careful here to not run

22    afoul of the protective order that prohibits us from

23    disclosing certain information regarding the DOJ's

24    investigation.  But there was no subpoena or written

25    request for documents served on Teva in 2015 or in

1    the 14 months that followed, no mention of text

2    messages.  The first subpoena the DOJ served on Teva

3    was the subpoena in June of 2016.

4         We confirmed for plaintiffs again that the

5    first litigation hold that was issued to any of these

6    six custodians at issue that would have covered the

7    text messages at issue was in June of 2016 and a no

8    hold was issued in 2015, so it's not relevant to the

9    dispute here.  And defendants also corrected for

10   plaintiffs, although they didn't correct it in their

11   submission, their misunderstanding that Ms. Cavanaugh

12   was contacted by the DOJ at that time.  She was not.

13        So we have been transparent with plaintiffs

14   regarding this matter despite that it's irrelevant to

15   these issues.  We've only withheld from plaintiff

16   information concerning our privileged investigation

17   of it, which this Court has previously found to be

18   outside the scope of discovery here.  And, you know,

19   I think plaintiffs know that the matter is irrelevant

20   and they choose to, you know, use it to attempt to

21   expand the scope of discovery.  And it also is

22   certainly not new information.  As Mr. Fonti just

23   acknowledged and as plaintiff has cited in their

24   submission, they've had information regarding this

25   investigation, regarding internal communications,

1    regarding the DOJ's investigation, for well over a

2    year.  And they just -- that they either missed it or

3    they didn't focus on it, it's irrelevant here.  They

4    had plenty of time to inquire about it either of Teva

5    or the dozens of witnesses they deposed and that they

6    didn't doesn't justify belated discovery into this

7    now.

8               THE COURT:  So --

9               MR. FONTI:  Just --

10              THE COURT:  Go ahead.

11              MR. FONTI:  No.  It just can't be left

12   unsaid, this bizarre recitation that somehow we knew

13   about the DOJ's contact in 2015.  Your Honor has been

14   side by side with us on this.  I don't think your

15   Honor knew that the entries on this log that have

16   been the subject of numerous submissions by the

17   parties over the last many months had anything to do

18   with the DOJ contact or, in the words of Teva, that

19   those entries are reflective of when the

20   investigation began to involve Teva.  Nobody knew

21   that except for defense counsel and for Teva.  And

22   I'm -- we've got to put that to rest.

23              And it's just a continuation of the deception

24   here that -- this narrative that there's nothing that

25   has happened at all until June of 2016 when DOJ FBI

1    raised the offices and issued subpoenas that they had

2    any clue that they had an obligation to preserve.  We

3    now know that they were the subject of the

4    investigation in early 2015 and that they themselves

5    invoked a duty to preserve and to collect documents,

6    yet there are thousands of pieces of ESI that are

7    missing.

8         So I just want the record to be very clear on

9    that issue.

10        MS. RENSHAW:  Your Honor, and I'd like to

11   respond, if I may.

12        Mr. Fonti continues to do what is -- what

13   he's done and what plaintiffs have done in their

14   papers in attempting to expand the dispute beyond the

15   text messages and to suggest that there has been some

16   sort of deception or misrepresentation, when in fact

17   defendants have responded and -- to -- and complied

18   with all of the Court orders regarding, quote, to

19   produce a detailed affidavit setting forth Teva's

20   preservation efforts with respect to the missing text

21   messages from January 1, 2013, until the present.

22   And that's exactly what we did.

23        For Mr. Fonti to continue to cut off the

24   phrase "text messages" and just say "regarding Teva's

25   preservation efforts," that is not what is the

subject of this dispute, and that is not what the
Court ordered us to do.  The declaration said that
Teva was not aware of any actual or potential claims
relating to the text messages until June of 2016, and
that is true and that is responsive to the scope of
the Court's order which pertained to the text
messages that are in dispute as well.

And regardless, that doesn't change the fact
that this 2015 outreach was irrelevant to these
disputes and that Mr. Fonti now wants to do discovery
into them does not justify reopening fact discovery
into something about which they have known.

In 2015, as I mentioned, there was no
subpoena, there was no formal request for documents.
The DOJ did not mention text messages, said -- they
told us there was no subpoena coming.  There was
nothing in 2015 that would have made Teva aware of
any actual or potential legal claims relating to the
text messages at issue here which is the focus of the
parties' dispute and which the Court ordered
defendants to provide information in a detailed
affidavit concerning.

So as far as correcting the record, I want to
make sure we bring it back to what the actual dispute
is, what the Court's orders were and that Teva

1    complied with those orders.

2    THE COURT:  Well, you know, when you say

3    "relating to the text messages," a litigation hold

4    isn't going to go out that says preserve these text

5    messages that we don't anticipate today are going to

6    become relevant to a claim that hasn't been made yet.

7    But the question really is whether a

8    litigation hold did or should have gone out to

9    preserve the subject matter, all forms of

10   communication regarding the subject matter; and if

11   the subject matter would encompass some or all of

12   these text messages, then they should have been

13   preserved.

14   MS. RENSHAW:  Your Honor, we did not -- my

15   apologies.

16   THE COURT:  Go ahead.

17   MS. RENSHAW:  We did not -- defendants do not

18   read it as narrowly as possibly suggested that it was

19   like a -- only legal claims relating to these

20   specific text messages.  We, you know, complied with

21   the Court's order which was to provide the detailed

22   affidavit setting forth our preservation efforts with

23   respect to the missing text messages here and that

24   there was -- there was no obligation to preserve --

25   again, we're talking about the text messages at issue

1    here that arose in 2015.  And we confirmed with

2    plaintiffs that no litigation hold went out at that

3    time; and, therefore, it wasn't responsive to or

4    relevant for purposes of the affidavit that was

5    provided.

6          THE COURT:  All right.  Well, my thinking on

7    the Cavanaugh deposition is that there's likely to be

8    a spoliation motion filed.  That's certainly the

9    indication I'm getting, I've gotten for months now.

10   And my sense is there ought to be a full examination

11   and a full factual basis available to make that

12   motion so that we don't hear it again and again as

13   things are later developed.

14         So my thought is that the plaintiffs should

15   be allowed to take Cavanaugh's deposition limited to

16   the spoliation issue and not get into the merits of

17   the 2015 DOJ investigation but limited to the

18   spoliation issue and that it should be limited to two

19   hours.

20         So I'm happy to hear comments on that

21   suggestion.

22         MS. RENSHAW:  Your Honor, if I may, this is

23   Emily Renshaw.

24         I think there are two issues I'd just like to

25   address, understanding the Court's leaning.  The

1   first is that, you know, I do think -- and we did

2   include this in our briefing, but, you know, for the

3   very same reasons that the Court had postponed the --

4   Joe, you're not on mute -- why the Court temporarily

5   postponed the out-of-time deposition, that we think

6   this deposition is inappropriate to go forward now.

7   It's, you know, as we explained in our papers, even a

8   deposition that's limited to this can drive

9   preservation issue, is inextricably intertwined with

10  the merits here.  And it is not as easy as separating

11  merits from spoliation as it may be in some cases,

12  where here it would necessarily require testimony

13  concerning the very subject of the alleged competitor

14  communications that are at issue in the criminal

15  indictment.

16          And plaintiff's position now, as it has now

17  become, that they're entitled to all information

18  relating to any legal hold notice that went to

19  Ms. Cavanaugh dating back to 2013.  And it would be

20  impossible to ask the plaintiff to ask questions of

21  Ms. Cavanaugh's perceived obligation stemming from

22  those holds, including the holds relating to the

23  DOJ's subpoena to Teva, without first establishing or

24  understanding the claims or issues that the prompted

25  the hold.  And by doing that, that would implicate

1    the very same constitutional concerns that the Court,

2    this Court and the MDL court, sought to avoid by

3    temporarily staying the out-of-time deposition.  So

4    we think that's a very important issue.

5           And also, if the Court is inclined to -- is

6    inclined to allow a limited deposition, I would note

7    that -- and when we did in our briefing, that

8    plaintiffs never sought these nonparty depositions

9    during fact discovery, never served Ms. Cavanaugh or

10   Mr. Oberman with a deposition subpoena, and they've

11   never had the opportunity to object or move to quash.

12   So to the extent that the Court is inclined to allow

13   it, a limited deposition of Ms. Cavanaugh, we think

14   she should be afforded that opportunity.

15          And just lastly, if -- I think if the Court

16   also is inclined to allow the deposition to proceed,

17   we need the Court's guidance on scope because

18   plaintiffs stated as a basis for Ms. Cavanaugh's

19   deposition in their filing several new alleged issues

20   that they had never raised during fact discovery

21   about which the parties have never conferred, about

22   which the plaintiffs never raised in Court

23   submissions, including allegedly missing e-mails and

24   iPads and later text messages, and those issues have

25   never been -- have never been properly discussed and

```
 1    we've never conferred on those issues.  And they

 2    raised those for the first time after learning that

 3    the DOJ collected the mobile data at issue which is

 4    dispositive of their claim that certain text messages

 5    were intentionally deleted.

 6             But we would appreciate the Court's guidance

 7    concerning the appropriate topics which we think

 8    should be limited to the subset of text messages that

 9    involve Ms. Cavanaugh from the 2013 to 2016 period

10    that originally were the focus of this dispute.

11             THE COURT:  Well, I agree with a couple

12    things that you've said but not all of them.

13             I agree subpoena should issue and give her a

14    chance, should she choose, to move to quash.  I agree

15    that the parties should meet and confer regarding

16    these newer issues that have come up and also

17    regarding the scope of the deposition so that, you

18    know, there is clarity before it starts.

19             I don't agree that this limited deposition is

20    going to interfere in any way with the DOJ's

21    prosecution or Teva's defense of that prosecution,

22    and I don't really understand how questions about

23    whether Cavanaugh preserved documents or things

24    should give rise to any Fifth Amendment issue.

25             So perhaps you want to expand upon the latter
```

1     topic.

2          MS. RENSHAW:  Well, and Ms. Cavanaugh is

3     separately represented and I expect will respond to

4     plaintiff's subpoena.  So I don't necessarily want to

5     opine on her -- you know, the basis for her -- any

6     Fifth Amendment protection.

7          But as it relates to Teva's prejudice and the

8     prejudice to Teva and how the two are intertwined, I

9     think here, as I previously mentioned, I believe that

10    because the allegations in the -- that are at issue

11    in the criminal indictment and the action are

12    directly tied to these alleged competitor

13    communications that plaintiffs are asserting have

14    been either deleted or were not properly maintained.

15    Inevitably, there are going to have to be questions

16    about those communications and whether they happened

17    and the subject matter and why they happened and

18    whether they were relevant and should they have

19    been -- if they were subject to a litigation hold,

20    they were subject to a litigation hold presumably

21    only if they were relevant so were there these

22    communications.  And those are at the very heart of

23    the criminal matter.

24          THE COURT:  All right.  Well, I'll await for

25    counsel's arguments regarding the constitutional

1    concerns.  But I do think that there should be a meet

2    and confer between counsel who are on the phone

3    regarding the scope of the deposition.  If you can't

4    reach an agreement, you know, we'll take it up.  I

5    think there's plenty of time to do that because I

6    also have the view that the privileged claims with

7    respect to the litigation holds probably should be

8    resolved before that deposition goes forward.  I

9    don't want there to be a claim that there has to be a

10   second preliminary deposition of Cavanaugh.  So I

11   think we should resolve those issues.

12          And I'm prepared to move to some discussion

13   of the privilege claims if everybody else is ready to

14   talk about that now.

15          MR. FONTI:  Thank you, your Honor.  Yes.

16          THE COURT:  Okay.  So I think I need more

17   information before I resolve the privilege claims.

18   Notably absent from the privilege log is any

19   indication, at least I don't see one, of who authored

20   the documents that are claimed to be privileged.  And

21   when I say that, I mean the litigation holds

22   themselves but also who made the decision regarding

23   who would receive the holds.  So, in effect, who was

24   the author of the list of recipients.  So some of the

25   holds are -- it's obvious who the author is from the

1      holds that have been provided to me in camera.

2           But for a number of them, they're -- it's a

3      generic e-mail address as the creator or the sender

4      of the document.  And that could be a lawyer, that

5      could be a paralegal, that could be an administrative

6      person.  I don't have any idea.  And the claim of

7      privilege, it may well turn on that information.  So

8      that's the problem.

9           So let me -- Ms. Renshaw, I don't know if you

10     can speak to that at all or Mr. Korpus.

11          MS. RENSHAW:  Sure, your Honor.  This is

12     Emily Renshaw.

13          So our understanding is that each of the

14     litigation holds and legal hold notices that went out

15     were drafted and authored by in-house counsel.  And

16     it may be that a -- you know, a legal hold system or

17     a -- you know, a more generic legal hold mailbox is

18     used to send and confirm receipt of legal holds but

19     that all of the holds were drafted and -- drafted and

20     authored by in-house counsel at Teva.

21          That said, we certainly can provide clarity,

22     you know, where we can if there are specific holds

23     that don't reflect that on their faces, or we can

24     just confirm more generally for the Court that that

25     is the case with all of the holds that have been

1    provided to the Court in camera.

2         THE COURT:  Yeah.  Some sort of affidavit

3    would be helpful there.

4         And what about with respect to the list of

5    recipients?  It may well be that that was -- it would

6    not surprise me if that was a decision that didn't

7    reflect a lot of legal thinking.  In other words, the

8    product at issue is developed or marketed or whatever

9    by a particular department, send it to that

10   department.  If that was the extent of the analysis,

11   then it's not clear to me that the list of recipients

12   garners any work product or attorney-client privilege

13   protection.

14        MS. RENSHAW:  And we can confirm that as

15   well, your Honor.  My understanding is that in-house

16   legal counsel also makes the determination of who may

17   have the potentially relevant information, what --

18   you know, what information may be responsive and

19   relevant and to whom, you know, the notice should go.

20        I expect that I -- that there is certainly

21   the -- you know, a fair amount of legal opinion and

22   guidance that goes into, you know, crafting,

23   especially in a company of Teva's size where there

24   are tens of thousands of employees, who exactly needs

25   to receive the notice itself.  But we can certainly

1    address that in the follow-up submission to the

2    Court.

3          THE COURT:  All right.  Great.

4          And then finally, although it's obvious from

5    most of these, I do think that there is a potential

6    difference between actual litigation and prospective

7    litigation or proceedings.  So to the extent it's not

8    clear on the face, if you could supplement to make

9    clear which of these holds relate to pending

10   litigation and which ones relate to some other reason

11   for the hold.

12         MS. RENSHAW:  Of course.  Will do, your

13   Honor.

14         THE COURT:  All right.  Is everybody

15   satisfied with their briefing on the issue?  Is there

16   anything further I should expect to receive before --

17   I think it's necessary for me to write on that topic.

18   So if there's anybody who wants to submit further

19   beyond what we've just discussed, please let me know

20   now.

21         MR. FONTI:  Your Honor, we're okay with our

22   briefings.  I don't think there's any open items in

23   our mind.

24         MS. RENSHAW:  Your Honor, we will follow up

25   with the further submission as requested.

1          MR. FONTI:  And I just reserve the right

2    to -- obviously depending on what they submit, we may

3    want to put something in supplement.  But given our

4    briefing to date, we're comfortable with those

5    arguments.

6          THE COURT:  All right.  Very good.  All

7    right.  We had the issue of Mr. Davis's deposition.

8          MR. KORPUS:  Yes, your Honor.  I can speak to

9    that, Sheron Korpus.

10          Your Honor, it's a pretty straightforward

11    issue.  The complaint pleads that the securities were

12    purchased in domestic transactions.  And the Court

13    held that we could have a 30(b)(6) witness on

14    questions of ownership and standing.  Ontario puts

15    forward its general counsel but he had no personal

16    knowledge of the transactions and he was

17    intentionally insulated from all the trading records,

18    testified he didn't see any, insulated from

19    operations personnel by counsel, said he didn't speak

20    to any operations personnel.  All he was shown was

21    the certifications attached to the complaint and the

22    State Street letter.

23          And, therefore, the one issue with this that

24    really comes up, and we'll take his word for it that

25    Ontario is the owner of the securities and the rest.

1   But the one issue that bothers us is that he was not

2   able to testify that the transactions were domestic,

3   although he did testify that he could find out that

4   answer by speaking to the personnel in operations.

5          Now, why that is important is because of the

6   preferred shares.  The preferred shares were not

7   listed on any U.S. exchange.  So you have a Canadian

8   investor buying preferred shares in an Israeli

9   company.  And under the Supreme Court's decision in

10  *Morrison* and its progeny, unless the title actually

11  transferred in the U.S., there is just no subject

12  matter jurisdiction for this Court.  This has nothing

13  to do with adequacy or typicality.  This is subject

14  matter jurisdiction which is not waivable.  The class

15  says that we never asked for it before.  That's

16  actually not true.  We've been trying to get the

17  trading records for months.  As you know, we filed a

18  motion to compel on it.  Those trading records would

19  have told you where the stocks were purchased.  But

20  the Court denied our motion to compel and instead

21  gave us the deposition of Mr. Davis, but the class

22  gained it by hiding the information from him.

23         Now, just like Mr. Davis, Mr. Fonti could

24  have submitted something in two seconds.  We sent a

25  letter following the deposition asking for

confirmation that the transactions were domestic.  He

didn't give us the confirmation.  He didn't show us

any records.  He just said that we're not entitled to

the information.  He could have done it in his

submission for this conference but Mr. Fonti did not.

All he said was that the offering was conducted by

U.S.-based underwriters and broker-dealers, not that

the transaction actually took place and title passed

in the U.S.  His words were very carefully chosen.

So we started to clear this up, it raises

only further questions.  If the transactions were

domestic, then you should just show us the evidence

and all is good.  And if the transactions were not

domestic, then there is no subject matter

jurisdiction for the preferred shares; and that's

information that the Court should know and we should

know before we move on to summary judgement.

Thank you, your Honor.

THE COURT:  Thank you.

MR. FONTI:  Your Honor, Mr. Fonti here for

the Ontario Teachers'.

So I'd like to frame this a little bit.  It's

a bit puzzling why this argument is being raised now.

These are facts that were pled in a complaint filed

in 2017, subsequent complaints in 2018, and then the

current complaint that was filed by agreement in

2019.  I'd like to, sort of, frame this around the

two points that are made in their submission, because

the gripe with respect to the domesticity of the

transactions is a moving target.

One is Mr. Korpus says in his brief and he

says it again today that this is a matter of subject

matter jurisdiction, and that is entirely false.  The

Supreme Court in 2010 in the *Morrison* decision

reversed the Second Circuit saying that seeing this

issue as a matter of subject matter jurisdiction is,

quote, the threshold error; that instead this is a

merits issue whether a transaction happens in the

U.S.

We alleged that it happened -- these were

domestic transactions in the complaint, and that's

always been the case, right?  There's never been a

change in what the facts show in that the preferreds

were not listed, that they were part of a U.S.

offering, that the underwriters at issue are U.S.

underwriters.  Those are all facts that have been

known since the get-go, so it's a merits issue.

The second point that they make is that if

it's not resolved now, it will have serious

implications if only addressed at summary judgement.

1    And that's also a very puzzling statement because it

2    ignores the fact that the Court has bifurcated the

3    proceedings and it did so in its May 27th order, that

4    the class action, the class claims, merits claims are

5    proceeding now through trial and then individualized

6    issues would proceed after the class trial.

7          So I'd like to break it down to how does this

8    bear at all on the class claims, the merits claims

9    that are going to be subject to summary judgement in

10   the next few weeks and then individualized issues.

11         So as to the class, it has no bearing

12   whatsoever.  The Court has certified a domestic

13   class.  We have always defined our class as involving

14   only domestic transactions.  The Court went through

15   class certification with us, therefore, over 18

16   months.  We were in the midst of class certification

17   discovery.  We had a number of disputes raised to the

18   Court.  They issued document requests.  They issued

19   interrogatories to -- and issued RFAs.  They

20   submitted over a thousand pages of briefing, expert

21   reports, so forth.  Never, ever, ever any question as

22   to the domestic nature of the class's claims on the

23   preferred shares.  Never.  Not a single word.

24         Indeed, and this is something I need to

25   correct Mr. Korpus on as well, is that in February

1   when they raised their so-called concerns about

2   Ontario Teachers' transactions, we engaged in a very

3   expansive negotiation about what was to be produced.

4   The plaintiffs voluntarily produced vast amounts of

5   transactional information and trading records that --

6   and they were produced in electronic format as

7   they're maintained at Ontario Teachers'.  There's

8   literally thousands of lines of data reflecting every

9   bit of every transaction.  And indeed it was that

10  file or part of that file that was shown to Mr. Davis

11  at his deposition.  And he testified that he had seen

12  it, he had looked at it for -- in preparation and

13  testified to its authenticity, that it reflected the

14  company -- the Ontario Teachers' trading records.

15  And it was in that file where it reflected that the

16  transactions of these preferred shares were

17  consummated through Citibank which, as we know, is a

18  U.S. broker-dealer.  And that's what the complaint

19  alleges, that they were brought through the Citibank

20  entity.  Okay?

21          So these facts have been known.  They have

22  never sought them with respect to the class issues.

23  Indeed in their April submission, ECF 758, they

24  presented the Court another laundry list of

25  information that they needed in order to understand

1    the transactions.  There is no mention of domesticity

2    at all.  And so as to the class that's been

3    certified, this is a dead issue.  It's a merits issue

4    that's never been disputed.  They didn't dispute it

5    in the 23(f) that went to the circuit, and so the

6    class is certified as is and summary judgement on the

7    class goes forward.

8         With respect to Teachers' role as the class

9    rep, it's also of no moment.  In addition to the fact

10   that they waived any arguments as to Teachers'

11   adequacy and typicality, meaning that they are just

12   like every other class member, the Court has already

13   ruled in the motion to dismiss that Ontario Teachers'

14   has class standing for the entire class.  Whether or

15   not it bought the notes, whether or not it bought the

16   preferreds, it has the claim, the same injury

17   interest as the class and it has class standing.

18        So not only did the Court rule on that back

19   in -- about a year ago at this point in ECF 283, at

20   the consolidation stage in early 2020, we jointly

21   submitted a brief with Teva where Teva argued with us

22   that Teachers' had class standing.  Right?  So there

23   is no dispute and there is full agreement that they

24   are standing as the class rep.  There is no dispute

25   that the class as certified is appropriate class.

1    And as to summary judgement that's coming up on

2    November 1, this is a complete nonissue.

3            With respect to the individualized issues of

4    Teachers', as I said, the Court has already

5    bifurcated that.

6            Now, as it relates to Teachers' itself -- and

7    Mr. Korpus was not at the deposition.  I defended

8    that deposition.  And you can look at pages 108 and

9    109 in Mr. Davis's transcript, he testifies

10   specifically as to what the basis of the allegation

11   is.  He testified that he saw the trading records

12   that have been produced.  He answered every question

13   whether it was inside the scope of ownership and loss

14   or out -- and the vast majority were outside the

15   scope of ownership and loss, and he answered those to

16   the best of his knowledge and ability.  He's been at

17   Ontario Teachers' since 2004.  He is the chief legal

18   officer.  He spoke authoritatively, definitively and

19   completely as to the ownership of the securities as

20   they're owned by Ontario Teachers' Pension Plan Board

21   and as to the loss.

22           This domestic transaction nonsense, as I

23   said, it's been out there for five years, and it

24   wasn't until the deposition that we ever heard a peep

25   about it.  And so to say that as -- in response to

1  one particular question he said he wasn't certain is

2  a real mischaracterization of his testimony and the

3  documentation.  But as we stand today, whether or not

4  what he testified to and what we've produced to date

5  is enough, and we think it is enough, and whether or

6  not their agreement not to challenge adequacy and

7  typicality means they can't say that Teachers' is any

8  different than any other class member is enough.

9       This dispute doesn't need to be resolved

10  until we get past the class trial and there is

11  individualized issues to be litigated.

12       So -- and then maybe just as a point of

13  reference as to the significance of the preferred

14  shares, they -- the injury -- the loss, the trading

15  loss that Teachers' suffered on that is a mere

16  one-third of 1 percent of its overall economic

17  interest, and so it does not move the needle with

18  respect to its claim as to the ADS and the fraud that

19  occurred here.

20       So I'll stop there.

21       MR. KORPUS:  Your Honor, very quickly here.

22  Sharon Korpus here.

23       The *Morrison* decision is absolutely about

24  subject matter jurisdiction.  There is no -- if it's

25  extraterritorial, there is on subject matter.  If he

1  wants to describe it as that, that's fine.  But

2  that's the essence of the decision.

3       We -- the complaint pleads that the shares

4  were bought domestically.  Defendants were relying on

5  the complaint.  If we had known that in fact they

6  were not, then we wouldn't have entered into all the

7  stipulations that Mr. Fonti mentioned.  But that's by

8  the way anyway because we have been trying to get the

9  trading records, and Mr. Fonti has presented summary

10 letters, summary schedules, but not the actual

11 trading records.  And that's exactly why we filed the

12 motion to compel.

13      And then there was concern in the deposition

14 when the witness that the Court designated should try

15 and relieve some of our concerns testified that he

16 does not know whether they were bought in the U.S. or

17 not, he was just speculating.

18      And the one thing I did not hear from

19 Mr. Fonti's presentation in the last ten minutes is a

20 statement that these shares were bought in the U.S.

21 You know, he could just clear this up and if he

22 can't, then tell us that they were not bought in the

23 U.S. and we'll brief it.  And if the Court believes

24 that we are overreaching, that it's not a matter for

25 this day, that it's not a matter that should be

 1   addressed on summary judgement but on individual

 2   issues, the Court can rule that way.  But we just

 3   need the information so that we can file our motion.

 4   We'll include it in our summary judgement motion and

 5   the Court will do with it what it will.  But we

 6   believe it absolutely goes, it's subject matter

 7   jurisdiction, it's not waivable, and it's absolutely

 8   something that the Court should resolve as part of

 9   summary judgement here because this is the class

10   representative and they are the ones that Teva

11   trained.  So all we can tell so far, there's no

12   subject matter over them.  So we would think the

13   Court would want to know that information so the

14   Court can deal with it in its decision.

15             THE COURT:  Okay.  A couple follow-ups.

16             First off, Mr. Korpus, in the trading

17   records, do you dispute that the preferred stock was

18   purchased through Citibank in New York?

19             MR. KORPUS:  We don't know, your Honor.

20   That's what Mr. Fonti said.  We don't know that.  We

21   never received trading records.

22             THE COURT:  Well --

23             MR. FONTI:  Your Honor, that's just not true.

24             MR. KORPUS:  We received the litigation

25   schedule.  We received the made-for litigation

1    schedule that Mr. Fonti sent us at some point.  We

2    did not receive the actual documents that show where

3    it was -- that show it was purchased through

4    Citibank.

5         MR. FONTI:  Your Honor, we produced out of --

6    you know, this is 2021, nine 1995s, right, these

7    documents.  The documents we understand ESI, right,

8    is maintained in electronic databases and

9    transactions of those nature in this day and age are

10   made electronically.  Orders are put in

11   electronically.  The counterparties see them

12   electronically and so forth.

13        And so we extracted from the database the

14   trading records as they are maintained at Ontario

15   Teachers' which is exactly what Mr. Davis testified

16   is the case.  He identified the system which we had

17   identified many months back, the Charles River system

18   and -- that, and Mr. Davis was shown at his

19   deposition the file that shows that these came

20   from -- these transactions on the dates at issue were

21   made by -- through Citibank which, again, is

22   consistent with what we allege in our complaint.

23        MR. KORPUS:  The State Street matter with

24   which Mr. Fonti just referred did not mention

25   Citibank.

 1          And, look, if the records show that they were

 2    purchased with Citibank, okay.  But that doesn't tell

 3    you where they were purchased.  That's a bank that

 4    exists in Canada, Israel and other places.

 5          THE COURT:  Okay.  Look, it's not apparent to

 6    me that the issue relates to the class at all.  The

 7    class is certified and limited to purchases in

 8    domestic transactions, and so it's not apparent to me

 9    that it matters at this point.

10          Still, Mr. Fonti, I think you should provide

11    the information, documents sufficient to show, which

12    can include an affidavit if that's the best way to do

13    it, documents sufficient to show that the purchases

14    were made domestically.

15          MR. FONTI:  Your Honor, we have no issue

16    doing that, and we believe we have done that.  And we

17    have -- that's what the testimony actually speaks to.

18    But we have no issue putting this to rest.

19          What we have issue with is an attempt to

20    prolong their constant effort to get discovery out of

21    the class representatives despite the number of

22    rulings by the Court, despite their prior agreements,

23    despite the certification of the class and now the

24    bifurcation issue so we can put this to rest and put

25    that forward.

```
1              THE COURT:  Okay.  Very good.  Can you do
2    that in 14 days?
3              MR. FONTI:  We'll endeavor to do that.  I
4    don't see any reason why we can't.  If we need a few
5    more days, we'll let you know.  But 14 days should be
6    fine.
7              THE COURT:  Well, okay.  Take 21 then if you
8    need it.  That's fine.
9              MR. FONTI:  Okay.  Thank you, your Honor.
10             THE COURT:  So as a practical matter, that
11   means I'm not going to order Davis -- at this point
12   that Davis come back and testify further.  We'll see
13   what's provided and if that's satisfactory, then the
14   issue will be put to bed.  And if it hasn't been put
15   to bed, then I'm sure I'll hear about it again.
16             MR. FONTI:  Thank you, your Honor.
17             THE COURT:  All right.  What else did we have
18   to take up today?  The scheduling, but anything else?
19             MR. FONTI:  I was just going to mention the
20   schedule, but I don't think there's anything else.  I
21   know your Honor likes to look forward in scheduling
22   these conferences.  So if that's something you'd like
23   to do, we have our schedules handy.  Or if you'd
24   rather wait, that's fine with us.  We've got plenty
25   going on.
```

1          THE COURT:  Yeah.  I mean, as a practical

2     matter, I like to do this when things are coming to a

3     head.  So if you have 21 days on the Davis issue,

4     you've got to look beyond that.  I know we have

5     motions to dismiss in this case.  So that's December,

6     probably doesn't affect the schedule too much.  What

7     about -- is November 3rd too soon?

8          MR. FONTI:  Not for us, your Honor.

9          MR. KORPUS:  That's fine for us, your Honor.

10          THE COURT:  Okay.  Let's put the next

11     conference for November 3rd at 10 a.m.

12          MR. FONTI:  Your Honor, it just occurs to me,

13     it might make sense -- I don't think you gave defense

14     a deadline for their submission with respect to the

15     privilege redactions.  Should we be on the same clock

16     there and that way things are moving along still?

17          THE COURT:  Sure.  That would be helpful to

18     me in terms of getting that issued.

19          MR. KORPUS:  Your Honor, sorry.  Just about

20     the November 3rd date, our summary judgement motions

21     under the new schedule that I see your Honor is okay

22     with is due November 1.  So that would mean that the

23     preconference statement will be due the same day as

24     summary judgement and Daubert motions, which is a

25     lot.  If we could just move away from that date, that

 1    would be helpful.  Maybe a week later.

 2          THE COURT:  I've got some trial obligations.

 3    How about Monday, November 22nd?

 4          MR. KORPUS:  That's fine for me.

 5          MS. RENSHAW:  Works for me too.

 6          THE COURT:  Once again, 10 a.m.  And the

 7    usual deadlines in terms of your submissions.  And

 8    the schedule that you proposed in Document 884 looks

 9    fine to me.  Do I need to take that up at all?

10          MR. FONTI:  No.  We have agreement there.

11          THE COURT:  Great.

12          MR. KORPUS:  I do have another scheduling

13    issue for the Court, your Honor.

14          THE COURT:  Sure.

15          MR. KORPUS:  There is a new complaint that

16    was filed on the 5th by TIAA.  We have discussed this

17    with counsel, counsel for TIAA, and we think what

18    makes most sense, given that we have all these

19    motions to dismiss already fully briefed pending

20    before you, is we've agreed to a schedule whereby we

21    would answer or move to dismiss the new complaint 60

22    days after your Honor's orders on the pending

23    motions, and then they will provide an opposition 60

24    days after that if we move to dismiss, and then we

25    will reply 30 days after that, this way everybody can

1    have the benefit of whatever rulings your Honor

2    issues.

3         THE COURT:  Yeah, that's fine.  Can somebody,

4    either you or the other side, submit a motion so that

5    it's on the record?

6         MR. KORPUS:  Yes, your Honor.  We'll do that.

7         THE COURT:  That would be great.  But that

8    sounds fine to me.

9         MR. KORPUS:  Thank you, your Honor.

10        MR. FONTI:  One other matter, your Honor,

11   that might be worth airing properly is we understood

12   Morgan Lewis, Ms. Renshaw in particular, represented

13   Ms. Cavanaugh.  We don't want to get into a whole

14   service battle here.  So my question to Ms. Renshaw

15   is if she will accept service of the subpoena or do

16   we have to --

17        MS. RENSHAW:  Joe, we can certainly

18   coordinate right after this offline.  I can provide

19   you with that information.

20        MR. FONTI:  Okay.  We just don't want to get

21   into a wild goose chase here so . . .

22        MS. RENSHAW:  I understand.  That won't be a

23   problem.

24        MR. FONTI:  Thank you.

25        THE COURT:  All right.  Well, thank you very

1    much.  I think all of us have a lot of work to do,

2    and hopefully we will get it done.

3              MR. FONTI:  Thank you, your Honor.

4              MS. RENSHAW:  Thank you, your Honor.

5              THE COURT:  Talk to you next time.  Thank

6    you, take care.

7              (Proceedings concluded, 11:01 a.m.)

8

9

10

11              C E R T I F I C A T E

12

13   RE: ONTARIO TEACHERS' PENSION PLAN BOARD, ET AL.
                              v.
14      TEVA PHARMACEUTICAL INDUSTRIES LTD., ET AL.
                  No. 3:17-cv-00558(SRU)

15

16         I hereby certify that the within and

17   foregoing is a true and accurate transcript taken in

18   the aforementioned matter to the best of my skill and

19   ability.

20

21         /s/_Melissa J. Cianciullo_____

22      MELISSA J. CIANCIULLO, RDR, CRR, CRC
                 Official Court Reporter
23          United States District Court
               915 Lafayette Boulevard
24             Bridgeport, CT 06604
                  (203) 606-1794

25