## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE TEVA SECURITIES LITIGATION | No. 3:17-cv-00558 (SRU) |
| THIS DOCUMENT RELATES TO: | No. 3:18-cv-01681 (SRU) |
| | No. 3:18-cv-01721 (SRU) |
| | No. 3:18-cv-01956 (SRU) |
| | No. 3:19-cv-00192 (SRU) |
| | No. 3:19-cv-00449 (SRU) |
| | No. 3:19-cv-00513 (SRU) |
| | No. 3:19-cv-00543 (SRU) |
| | No. 3:19-cv-00603 (SRU) |
| | No. 3:19-cv-00655 (SRU) |
| | No. 3:19-cv-00656 (SRU) |
| | No. 3:19-cv-00923 (SRU) |
| | No. 3:19-cv-01167 (SRU) |
| | No. 3:19-cv-01173 (SRU) |
| | No. 3:20-cv-00083 (SRU) |
| | No. 3:20-cv-01630 (SRU) |

## ORDER ON MOTIONS TO DISMISS

Before the Court are three omnibus motions to dismiss fifteen Direct Actions by plaintiffs who opted out of the class certified in the lead action, as noted in the caption above. *See* Defs.' Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784; Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786; Defs.' Mot. to Dismiss State and Common Law Claims, Doc. No. 787. The motions have been fully briefed, and I held oral argument on the motions on January 19, 2022. *See* Min. Entry, Doc. No. 921.

For the reasons set forth below, I **grant in part and deny in part** the Defendants' motions to dismiss.

## I.        BACKGROUND

Since November 2016, Teva Pharmaceutical Industries, Ltd. ("Teva") has been embroiled in private securities fraud litigation. Amram Galmi, an Israeli investor, commenced

the first of a series of lawsuits alleging that Teva and its corporate executives misled investors about Teva's financial condition. *See generally* Compl., Doc. No. 1. That lawsuit, filed on behalf of a class of similarly-situated persons, was initially filed in the Central District of California and transferred to the District of Connecticut in April 2017.[1] *See* Order, Doc. No. 74.

Once transferred, the case proceeded through the Private Securities Litigation Reform Act ("PSLRA") process of appointing lead plaintiff and lead class counsel. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i) (requiring a court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members …."). In July 2017, Ontario Teachers' Pension Plan Board ("Ontario Teachers") was appointed as lead plaintiff and Bleichmar Fonti & Auld LLP was approved as lead counsel. *See* Order, Doc. No. 124. Shortly thereafter, Anchorage Police & Fire Retirement System ("Anchorage Police") was added to this case as a named plaintiff. *See* Am. Order, Doc. No. 137. Together, Ontario Teachers and Anchorage Police are the class representatives of the "*Ontario* Class."

The class action ("*Ontario* Action") continued to be fiercely litigated: the *Ontario* Class filed several amended complaints, while the Class Defendants fought to dismiss those complaints. Relevant here, on September 25, 2019, I granted in part and denied in substantial part the Class Defendants' motion to dismiss the Second Amended Consolidated Class Action Complaint ("SAC") in the lead action in this matter. *See* Order, Doc. No. 283; *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131 (D. Conn. 2019). Meanwhile,

---

[1]     Just a month after Amram Galmi's lawsuit was filed, a related putative class action followed. On December 27, 2016, Anthony Leone filed a similar action, *Leone v. Teva Pharm. Indus. Ltd.*, No. 16-cv-09545, Doc. No. 1 (C.D. Cal. Dec. 27, 2016), which was consolidated into the first action by Judge Terry J. Hatter Jr. of the United States District Court for the Central District of California. *See* Order, Doc. No. 74. Judge Hatter then transferred the consolidated matter to the District of Connecticut, where related antitrust litigation was underway and where a non-party witness was located. The matters arrived to the District of Connecticut with separate case numbers, 3:17-cv-00558 and 3:17-cv-00559, respectively, and I ordered the cases to be re-consolidated. Order, Doc. No. 120.

additional lawsuits kept coming. By January 2020, I consolidated over two-dozen related cases,

many transferred to me from this district and other districts. Consolidation Order, Doc. No. 341.

Of those cases, four were putative class actions[2] and seventeen were individual actions ("Direct

Actions")[3], in which those plaintiffs indicated that they would "opt out" of any class eventually

certified. Shortly thereafter, I issued a pretrial consolidation order, where I ordered, *inter alia*,

the plaintiffs in each Direct Action to designate their present complaint as operative or to file an

amended complaint that complied with my ruling denying in substantial part the Class

Defendants' motion to dismiss. *See* Pretrial Consolidation Order, Doc. No. 352, at ¶ 12; Order,

Doc. No. 283 (ruling on motion to dismiss). On May 28, 2020, the Direct Action Plaintiffs

("DAPs") largely complied with my order.[4] What followed are the Defendants' three omnibus

---

[2]       Those Putative Actions were: (1) *Ontario Teachers' Pension Plan Bd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-00558; (2) *Huellemeier v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-01938; (3) *Grodko v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-00800; (4) *Emp. Ret. Sys. of the City of St. Petersburg, Fla. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01768.

[3]       Those are: (1) *OZ ELS Master Fund, Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:17-cv-01314; (2) *Nordea Investment Mgmt. AB v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01681; (3) *State of Alaska Dept. of Revenue, et al., ("Alaska") v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01721; (4) *Pacific Funds Series Tr., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01956; (5) *Public School Teachers Pension and Ret. Sys. of Chicago v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-0175; (6) *Schwab Capital Tr., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00192; (7) *Phoenix Ins. Co., Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00449; (8) *Mivtachim The Workers Social Ins. Fund, Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00513; (9) *Clal Ins. Co., Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-543; (10) *Highfields Capital I LP, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-603; (11) *Migdal Ins. Co., Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00655; (12) *Harel Pension and Provident, Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00656; (13) *Oregon v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-657; (14) *Migdal Mut. Funds, Ltd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00923; (15) *Psagot Mut. Funds, Ltd., et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01167; (16) *Stichting PGGM Depositary, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01173; and (17) *Internationale Kapitalanlagegesellschaft mbH ("INKA") v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-00083.

[4]       The plaintiffs in one Direct Action, *OZ ELS Master Fund, Ltd., et al v. Teva Pharm. Indus., Ltd., et al.*, No. 17-cv-01314, neither filed an amended complaint nor designated their current complaint as operative.
          Six Direct Actions—(1) *Boeing Co. Emp. Ret. Plans Master Tr. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-00588 (filed on 04/29/2020); (2) *Fir Tree Value Master Fund, LP, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-00683 (filed on 05/15/2020); (3) *Franklin Mut. Series Funds, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-01630 (filed on 10/28/2020); (4) *BH Invs. Funds, LLC, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-01635 (filed on 10/29/2020); (5) *TIAA-CREF Inv. Mgmt. LLC, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:21-cv-01188 (filed on 09/05/2021); and (6) *State of Wis. Inv. Bd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:22-cv-00106 (filed on 01/20/2022)— were filed after my ruling regarding consolidation. In those cases, no designation or amended complaint was required, and none was filed.

motions to dismiss those Direct Actions. *See* Defs.' Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784; Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786; Defs.' Mot. to Dismiss State and Common Law Claims, Doc. No. 787.

Meanwhile, in the *Ontario* Action, the *Ontario* Class moved for class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. Mot. to Certify Class, Doc. No. 419. That motion was granted on March 9, 2021. Order, Doc. No. 736. The *Ontario* Action continued to be litigated for over a year until a final settlement was approved in June 2022. Order, Doc. No. 962. A final judgment was entered immediately thereafter. Doc. No. 964.

Still remaining before the Court, however, are the Direct Actions[5] that opted out of the class settlement, the subjects of the Defendants' instant motions.

## II.    FACTUAL ALLEGATIONS

The Direct Actions at issue are 15 individual lawsuits concerning the same alleged securities fraud involving the price-hike strategy and price-fixing conspiracy at issue in the *Ontario* Action, with which the Direct Actions are consolidated. The lawsuits were filed by various institutional investors that opted out of the *Ontario* Class. Pursuant to the pretrial consolidation order filed in the lead case, doc. no. 352, each of the Direct Actions are modeled

---

[5]    Only 15 of the 23 Direct Actions are the subject of the instant motions to dismiss. Of the 23 Direct Actions, three were never subject to the motion. Two Direct Actions—*TIAA-CREF* and *State of Wis. Inv. Bd*— were filed after the motions to dismiss were filed. The third Direct Action, *OZ ELS Master Fund*, was excluded from the motions to dismiss in accordance with the joint motion to stay that was filed on February 19, 2020. *See* No. 3:17-cv-01314, Doc. Nos. 60–61. *OZ ELS Master Fund* has since filed a motion of voluntary dismissal. Doc. No. 973.
Additionally, five Direct Actions were at some point the subject of the instant motions but are no longer. Since the filing of the Defendants' motions to dismiss, two Direct Actions, *Boeing* and *Fir Tree*, agreed to reenter the *Ontario* Class and partake in the class settlement. Further, three Direct Action Plaintiffs ("DAPs")—*Oregon*, *Chicago*, and *BH*— filed notices of voluntary dismissal with prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. Doc. Nos. 971, 974–75. Therefore, any arguments with respect to those five complaints are moot, and I do not consider them.

on the SAC. That said, the Direct Action complaints raise new claims and add new defendants, which I will summarize below.

    A.    <u>The Parties</u>

        1.    Direct Action Plaintiffs

            a)    *Nordea Investment Mgmt. AB v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01681

Nordea Investment Management AB is a Swedish limited liability company and licensed investment firm. *Nordea* Am. Compl., Doc. No. 390, at ¶ 28. It asserts claims on behalf multiple funds that were under its management. *Id.* at ¶¶ 28–43. Those funds are alleged to have "purchased or acquired Teva securities"[6] during the Relevant Period (February 6, 2014 to May 10, 2019) at artificially inflated prices due to the false and misleading statements alleged in the complaint. *Id.* at 1; ¶ 43.

            b)    *State of Alaska Department of Revenue, et al., v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01721

The State of Alaska Department of Revenue, Treasury Division is the "bank and trust center" for the State of Alaska. *Alaska* Am. Compl., Doc. No. 389, at ¶ 28.

Alaska Permanent Fund Corporation is a state-owned corporation based in Alaska that manages the assets of funds designated by law. *Id.* at ¶ 29.

Both entities, acting on behalf Alaskan citizens, are alleged to have purchased or acquired Teva securities during the Relevant Period (February 6, 2014 to May 10, 2019) on the New York Stock Exchange ("NYSE") at artificially inflated prices due to the false and misleading statements alleged in the complaint. *Id.* at 1; ¶¶ 28–30.

---

[6]    Although there is variation between the Direct Actions, the Teva securities referenced generally include: (1) Teva American Depositary Shares ("ADS"); (2) Teva ordinary shares; (3) Teva preferred shares; and (4) Notes. "Notes" collectively refers to certain U.S.-dollar-denominated senior notes issued by Teva in a public offering on or about July 21, 2016. *Schwab* Am. Compl., Doc. No. 393, at ii.

> c)     *Pacific Funds Series Tr., et al. v. Teva Pharm. Indus., Ltd., et al.,*
> No. 3:18-cv-01956

Pacific Funds Series Trust and Pacific Select Fund are Delaware statutory trusts,

managed by asset manager and insurance company Pacific Life Insurance Company. *Pacific* Am.

Compl., Doc. No. 392, at ¶¶ 34–36.

Both entities are suing on behalf of specific funds and portfolios. *Id.* at ¶¶ 34–35. During

the Relevant Period (February 6, 2014 to May 10, 2019), those funds and portfolios are alleged

to have purchased Teva American Depositary Shares ("ADS") and other debt securities on a

United States exchange and/or in transactions "whereby they incurred irrevocable liability for the

purchases within the United States and/or title to the purchased securities passed within the

United States." *Id.* at 1, ¶¶ 34–37. It is further alleged that those purchases were made at prices

that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 37.

> d)     *Schwab Capital Tr., et al. v. Teva Pharm. Indus., Ltd., et al.*, No.
> 3:19-cv-00192

Schwab Capital Trust is an open-end management investment company organized as a

Massachusetts business trust. *Schwab* Am. Compl., Doc. No. 393, at ¶ 34. It asserts claims on

behalf of several of its series. *Id.* During the Relevant Period (February 6, 2014 to May 10,

2019), those series are alleged to have "acquired Teva ADS in domestic transactions," with some

alleged to also have "acquired Teva ordinary shares" during the Relevant Period. *Id.* at 1; ¶ 34.

Schwab Strategic Trust, an open-end investment management company organized as a

Delaware statutory trust, asserts claim on behalf of several of its series. *Id.* at ¶ 35. It is alleged

that those series acquired Teva ordinary shares and Notes during the Relevant Period. *Id.*

It is alleged that the *Schwab* Plaintiffs paid artificially inflated prices for those securities due to the misstatements alleged in the complaint, and therefore suffered damages as a result of those violations. *Id.* at ¶ 36.

> e)    *Phoenix Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00449

The Phoenix Pension Ltd., Excellence Gemel & Hishtalmut Ltd., Excellence Kesem ETNS and Excellence Mutual Funds are subsidiaries of The Phoenix Insurance Company Ltd., which is an insurance and financial services conglomerate headquartered in Israel. *Phoenix* Am. Compl., Doc. No. 397, at 1, ¶ 48. During the Relevant Period (October 30, 2013 to May 10, 2019), it is alleged that the *Phoenix* Plaintiffs "purchased or otherwise acquired Teva [ADS], ordinary shares, preferred shares, and Notes at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged [in the complaint]." *Id.* at ¶ 1.

> f)    *Highfields Capital I LP, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00603

Highfields Capital I LP and Highfields Capital II LP are Delaware limited partnerships with their main office location in Boston, Massachusetts. *Highfields* Am. Compl., Doc. No. 396, at ¶¶ 22–23.

Highfields Capital III LP is a Cayman Islands exempted limited partnership with its main office location in Grand Cayman, Cayman Islands. *Id.* at ¶ 24.

During the Relevant Period (February 28, 2014 to May 10, 2019), the *Highfields* Plaintiffs purchased Teva ADS, Teva call options, and equity swaps with Teva as the reference entity, as well as sold put options on Teva ADS, in the United States. *Id.* at ¶¶ 16, 22–24. It is alleged that the *Highfields* Plaintiffs paid artificially inflated prices for those securities due to the

misstatements alleged in the complaint, and therefore suffered significant investment losses once the truth was gradually released. *Id.* at ¶ 16.

The *Highfields* Plaintiffs are managed by, and act via, a common investment manager, Highfields Capital Management LP, located in Boston, Massachusetts. *Id.* at ¶ 25. During the Relevant Period, that investment manager acted as investment adviser to the *Highfields* Plaintiffs in connection with their purchases and acquisitions of Teva securities. *Id.* at ¶ 25.

> g)    *Harel Pension and Provident, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00656

Harel Insurance Investments & Financial Services Ltd. ("Harel Insurance Investments") is a large Israeli insurance company. *Harel* Am. Compl., Doc. No. 399, at ¶ 46. During the Relevant Period (May 1, 2014 and May 10, 2019), Harel Insurance Investments and several of its subsidiaries—Harel Insurance Company Ltd., Israeli Shares Partnership, Ezer Mortgage Insurance Company Ltd., and Israel Credit Insurance Company Ltd.—purchased Teva ADS, ordinary shares, preferred shares and Notes at artificially inflated prices and suffered damages as a result of the securities law violations alleged in the complaint. *Id.* at 1, ¶ 46.

Harel Pension and Provident Ltd. is a long-term savings division of Harel Insurance Investments with billions of dollars in assets under management. *Id.* at ¶ 46. It is the trustee for the funds it manages and the beneficial owner of the Teva securities purchased during the Relevant Period. *Id.*

> h)    *Stichting PGGM Depositary, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01173

Stichting PGGM Depositary ("PGGM") is a foundation established and existing under the laws of the Netherlands for the purpose of holding assets of investment funds solely for the account and risk of pension funds. *Stichting* Am. Compl., Doc. No. 394, at ¶ 34. PGGM asserts

the claims on behalf of its portfolios that are alleged to have either acquired Teva ADS in domestic transactions or acquired ordinary shares during the Relevant Period (February 6, 2014 to May 10, 2019). *Id.* at 1, ¶¶ 34, 36. It is further alleged that those securities were purchased at artificially inflated prices due to the securities violations alleged in the complaint. *Id.* at ¶ 36.

Stichting Pensioenfonds Zorg en Welzijn ("PFZW") is also a foundation established and existing under the laws of the Netherlands for the purpose of holding pension fund assets. PFZW asserts the claims on behalf of its portfolios that are alleged to have acquired Teva ADS in domestic transactions during the Relevant Period at artificially inflated prices due to the securities violations alleged in the complaint. *Id.* at ¶¶ 35–36.

The *Stichting* Plaintiffs are alleged to have suffered damages because of the securities violations alleged in the complaint. *Id.* at ¶ 36.

> i) *Internationale Kapitalanlagegesellschaft mbH v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-00083

Internationale Kapitalanlagegesellschaft mbH ("INKA") is a German fund management company that functions as a "Master KAG" under German investment company law. *INKA* Am. Compl., No. 3:20-cv-0008, Doc. No. 1, at ¶ 34. INKA is acting on behalf of its (non-legal entity) investment funds based on its fiduciary duties to its clients. *Id.*

During the Relevant Period (February 6, 2014 to May 10, 2019), INKA purchased: (1) Teva ADS and preferred shares on a United States exchange and/or in transactions whereby it incurred irrevocable liability for the purchases within the United States and/or title to the purchased securities passed within the United States; and (2) Teva ordinary shares. *Id.* at 1, ¶ 35. It is further alleged that those securities were purchased at artificially inflated prices due to the securities violations alleged in the complaint. *Id.* The *INKA* Plaintiffs are alleged to have suffered damages because of the securities violations alleged in the complaint. *Id.* at ¶ 35.

j)      *Franklin Mut. Series Funds, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-01630

Franklin Mutual Series Funds is a Delaware statutory business trust and an open-end management investment company, with its principal place of business located in Short Hills, New Jersey. *Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶ 29. It asserts the claims on behalf of several of its series that are alleged to have purchased or acquired Teva securities during the Relevant Period (October 29, 2015 and May 10, 2019) at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at 2, ¶¶ 30–32.

Franklin Templeton Variable Insurance Products Trust is a Delaware statutory business trust and an open-end management investment company, with its principal place of business located in San Mateo, California. *Id.* at ¶ 33. It asserts the claims on behalf of several of its series that are alleged to have purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶¶ 34–36.

Franklin Investors Securities Trust is a Delaware statutory business trust and an open-end management investment company, with its principal place of business located in San Mateo, California. *Id.* at ¶ 37. Franklin Managed Income Fund, formerly known as Franklin Balanced Fund, a series of Franklin Investors Securities Trust, purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 40.

Templeton Funds Trust is a Delaware statutory business trust and an open-end management investment company, with its principal place of business located in Fort Lauderdale, Florida. *Id.* at ¶ 41. Templeton World Fund, a series of Templeton Funds, purchased

or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 44.

Templeton Global Investment Trust is a Delaware statutory trust and an open-end management investment company, with its principal place of business located in Fort Lauderdale, Florida. *Id.* at ¶ 45. Templeton Global Balanced Fund, a series of Templeton Global Investment Trust, purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 48.

Templeton Growth Fund, Inc. is a corporation organized under the laws of the State of Maryland, with its principal place of business located in Fort Lauderdale, Florida. *Id.* at ¶ 49. Templeton Global Opportunities Trust was a Delaware statutory trust and an open-end management investment company. *Id.* at ¶ 50. In 2018, Templeton Global Opportunities Trust reorganized into Templeton Growth Fund, Inc. *Id.* It is alleged that both entities purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 51.

Fiduciary Trust International of the South is a trust company organized under the laws of the State of Florida, with its principal place of business located in Coral Gables, Florida. *Id.* at ¶ 52. Sierra/Templeton International Equity Trust and Templeton International Equity Fund are collective investment trusts organized under the laws of the State of Florida. *Id.* at ¶ 53. Sierra/Templeton International Equity Trust and Templeton International Equity Fund, by and through Fiduciary Trust International of the South, purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 55.

Templeton Global Growth Fund Ltd. is an Australian public company listed on the Australian Securities Exchange, with its principal place of business located in Melbourne, Australia. *Id.* at ¶ 56. Templeton Global Growth Fund Ltd. purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 57.

Franklin Templeton Investments Australia Limited is an Australian public company, with a registered office in Melbourne, Australia. *Id.* at ¶ 58. It is the responsible entity for Templeton Global Trust Fund, which is an Australian managed investment scheme. *Id.* at ¶ 59. Templeton Global Trust Fund, by and through Franklin Templeton Investments Australia Limited, purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 60.

Franklin Templeton Investments Corporation is a corporation organized under the laws of the Province of Ontario, Canada, with its principal place of business located in Toronto, Canada. *Id.* at ¶ 61. It is the trustee and/or manager of several funds. *Id.* at ¶ 63. Those funds, by and through Franklin Templeton Investments Corporation, each purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 64.

Templeton Growth Fund II Limited is an exempted company with limited liability incorporated under the laws of the Cayman Islands, with a registered address in the Cayman Islands. *Id.* at ¶ 65. It is registered as a mutual fund under the mutual funds law of the Cayman Islands. *Id.* Templeton Growth Fund II purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 66.

12

Franklin Templeton Investments (Asia) Limited is a company with limited liability incorporated under the laws of Hong Kong, with its principal place of business in Hong Kong. *Id.* at ¶ 67. It is the manager, registrar, and transfer agent for Franklin Templeton Asia Fund Series, which is an open-ended unit trust established as an umbrella fund pursuant to a trust deed under the laws of Hong Kong. *Id.* at 68. Templeton Select Global Equity Fund is a sub-fund of Franklin Templeton Asia Fund Series. *Id.* at 69. Cititrust Limited, incorporated under the laws of Hong Kong, is the trustee of Franklin Templeton Asia Fund Series under its trust deed. *Id.* at ¶ 70. Templeton Select Global Equity Fund, a sub-fund of Franklin Templeton Asia Fund Series, by and through Cititrust Limited, purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶ 71.

Franklin Templeton Investment Trust Management Co., Ltd. is an investment adviser organized under the laws of the Republic of Korea, with a registered address in the Republic of Korea. *Id.* at ¶ 73. Templeton Global Equity Master Fund is an open-ended mutual fund organized under the laws of the Republic of Korea, with a registered address in the Republic of Korea. *Id.* at ¶ 74. Templeton Global Equity Master Fund, by and through Franklin Templeton Investment Trust Management Co., Ltd., purchased or acquired Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged herein. *Id.* at ¶ 76.

Franklin Templeton Investment Funds is incorporated as a société anonyme under the laws of the Grand Duchy of Luxembourg, and maintains its registered office in Luxembourg. *Id.* at ¶ 77. It is comprised of several sub-funds, which are alleged to have purchased or acquired

Teva securities during the Relevant Period at prices that were artificially inflated due to the securities violations alleged in the complaint. *Id.* at ¶¶ 78–80.

Together, the *Franklin* Plaintiffs allege that they suffered damages because of the securities violations alleged in the complaint. *Id.* at ¶¶ 29–80.

> k)   *Mivtachim The Workers Social Ins. Fund, Ltd., et al. v. Teva, Pharm Indus., Ltd., et al.*, No. 3:19-cv-00655
>      *Clal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00543
>      *Migdal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00655
>      *Migdal Mut. Funds, Ltd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00923
>      *Psagot Mut. Funds, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01167[7]

Psagot Provident and Psagot Mutual Funds are affiliates of the Psagot Investment House. *Pom* Compl., Doc. No. 391, at ¶ 29. The Psagot Investment House is an Israeli investment firm. *Id.*

Migdal Mutual Funds is an Israeli mutual fund firm that specializes in the management of mutual funds in a diverse range of asset classes and markets. *Id.* at ¶ 30.

The Amitim Funds are five related Israel-based pension funds. *Id.* at ¶ 31.

Hebrew University is the pension fund for employees of the Hebrew University of Jerusalem. *Id.* at ¶ 32.

The Migdal entities—Migdal Insurance, Migdal Makefet and Yozma—are affiliates of Migdal Group. *Id.* at ¶ 33. Migdal is an Israeli life insurance and pension manager. *Id.*

---

[7]      On May 28, 2020, the law firm Pomerantz LLP filed one consolidated complaint on behalf of the *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot* actions. For brevity's sake, I will often refer to those actions collectively as the *Pomerantz* Action, and citations to "*Pom.* Compl." will refer to the consolidated complaint.

Altshuler Mutual and Altshuler Provident are affiliates of the Altshuler Shaham

Investment House, an Israeli investment company. *Id.* at ¶ 34.

Halman Aldubi is an affiliate of the Halman Aldubi Investment House, an Israeli

investment firm. *Id.* at ¶ 35.

Canaf-Clal are Israeli investment entities affiliated with Canaf-Clal Financial

Management Ltd., the investment arm of Israel's Clal Group. *Id.* at ¶ 36.

Alumot is a subsidiary of Alumot Investment House, an Israeli investment company. *Id.*

at ¶ 37.

Menorah Pensions is the largest private pension fund in Israel. *Id.* at ¶ 38. Menorah

Pensions operates as a subsidiary of Menorah Insurance, a subsidiary of Menorah Mivtachim

Holdings Ltd. *Id.* Menorah Insurance is a large Israeli insurance company. *Id.*

Meitav is an affiliate of Meitav Dash, an Israeli investment management firm. *Id.* at ¶ 39.

Each of those entities is alleged to have purchased and/or sold Teva securities on the

NYSE and the Tel Aviv Stock Exchange ("TASE") during the Relevant Period (February 6,

2014 to May 30, 2019), and "was damaged upon the revelation of the alleged corrective

disclosures." *Id.* at 1, ¶¶ 29–39.

2. The Defendants[8]

a) *The Company*

Teva, the world's largest generic drug manufacturer, is incorporated in Israel, and has a

wholly-owned subsidiary, Teva Pharmaceuticals USA, Inc. ("Teva USA"). *Phoenix* Am.

---

[8] The Defendants, and the allegations against them, are largely consistent across the Direct Actions. Sometimes however, there are slight differences regarding which Teva officers and/or subsidiaries are omitted. Unless otherwise noted, the allegations in this subsection derive from the *Phoenix* complaint. Later, I will clarify precisely which defendants are being sued in each Direct Action.

Compl., Doc. No. 397, at ¶¶ 49–50. During the Relevant Period, Teva USA had its principal

offices in North Wales, Pennsylvania, and much of Teva's global operations were conducted

from those offices. *Id.* at ¶ 50.

Teva Finance is Dutch company that is "a shell company that is wholly-owned and

controlled special purpose finance subsidiary of Teva." *Id.* at ¶ 952.

b)      *Officer Defendants*

Defendant Erez Vigodman ("Vigodman") was Teva's President and Chief Executive

Officer ("CEO") from February 11, 2014 to February 6, 2017 and a Teva Director from June 22,

2009 to February 6, 2017. *Id.* at ¶ 52. It is alleged that Vigodman's liability stems from his

signing and certifying certain forms, notably Securities and Exchange Commission ("SEC")

Forms 20-F and 6-K, that included false and misleading statements, and making false statements

on conference calls and in Notes documents. *Id.*

Defendant Eyal Desheh ("Desheh") was Teva's Chief Financial Officer ("CFO") from

July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014 when he served

as Teva's interim CEO and Interim President. *Id.* at ¶ 53. Desheh also served as Teva's Group

Executive Vice President from 2012 to June 30, 2017. *Id.* It is alleged that Desheh's liability

stems from his signing and certifying certain forms, notably SEC Forms 20-F and 6-K, that

included false and misleading statements, and making false statements on conference calls and in

Notes documents. *Id.*

Defendant Yaacov Altman ("Altman") served as Teva's Acting CFO from October 31,

2013 to February 11, 2014. *Id.* at ¶ 54. It is alleged that Altman's liability stems from his signing

and certifying certain forms, notably SEC Forms 20-F and 6-K, that included false and

misleading statements, and making false statements on conference calls and in Notes documents. *Id.*

Defendant Sigurdur Olafsson ("Olafsson") was Teva's Global Generic Medicines Group President and CEO from July 1, 2014 to December 5, 2016. *Id.* at ¶ 55. Between 2003 and 2014, prior to joining Teva, Olafsson held various senior leadership positions at Actavis. *Id.* It is alleged that Olafsson's liability stems from his false and misleading statements. *Id.*

Defendant Yitzhak Peterburg ("Peterburg") was Teva's Interim President and CEO from February 6, 2017 to October 31, 2017. *Id.* at ¶ 56. Prior to that date, he was Chairman of Teva's Board from January 1, 2015 to February 6, 2017. *Id.* Peterburg also served as a Teva director from June 2009 to July 2010 and after a brief departure, he rejoined Teva's Board from 2012 until February 6, 2017. *Id.* It is alleged that Peterburg's liability stems from his signing and certifying certain forms, notably SEC Forms 20-F and 6-K, that included false and misleading statements, and making false statements on conference calls and in Notes documents. *Id.*

Defendant Dipankar Bhattacharjee ("Bhattacharjee") was the President and CEO of Teva's Global Generic Medicines Group from December 5, 2016 to December 31, 2017. *Id.* at ¶ 57. He previously served as President and CEO of Teva's Generics Europe from 2013 and 2016 and as CEO of Teva UK Ltd. and later as Senior Vice President ("SVP") of Teva Western Europe from 2009 to 2013. *Id.* It is alleged that Bhattacharjee's liability stems from his false and misleading statements. *Id.*

Defendant Deborah Griffin ("Griffin") is the current Teva SVP and Chief Accounting Officer and was an authorized representative of both Teva and Teva Finance. *Id.* at ¶ 58. She also was Vice President and CFO of Teva USA. *Id.* It is alleged that Griffin's liability stems from

signing the Notes and shares statements as well as her approval and control of the false and misleading SEC filings. *Id.*

Defendant Kåre Schultz ("Schultz") has served as the President and CEO of Teva since November 1, 2017. *Id.* at ¶ 59. Schultz has also served on the Company's Board of Directors since November 1, 2017. *Id.* It is alleged that Schultz's liability stems from his signing and certifying certain forms, notably SEC Forms 10-K and 10-Q, that included false and misleading statements, and making false statements on conference calls and in Notes documents. *Id.*

Defendant Michael McClellan ("McClellan") has served as the Executive Vice President and CFO of Teva since November 2017. *Id.* at ¶ 60. Prior to becoming CFO, McClellan was Teva's SVP and Interim CFO from July 2017 to November 2017, and SVP and CFO of the Global Specialty Medicines division from July 2015 to July 2017. *Id.* It is alleged that McClellan's liability stems from his signing and certifying certain forms, notably SEC Forms 10-K, 10-Q, and 6-K, that included false and misleading statements, and making false statements on conference calls and in Notes documents. *Id.*

B.   <u>Factual Allegations</u>

To avoid repetition, I begin with an overview of the factual allegations that are consistent across the 15 Direct Actions—starting with the factual allegations derived from the *Ontario* Action. Then, I will summarize the additional claims raised in the Direct Actions.

1.   Class Action Complaint

The *Ontario* Class[9] claims that, beginning in 2013, Teva adopted a concerted and secret strategy of raising prices on certain drugs in its generic drug portfolio. Between July 3, 2013 and

---

[9]   For sake of brevity, these allegations are derived from the Second Amended Consolidated Class Action Complaint ("SAC"). Many of the Direct Actions copy verbatim large portions of the SAC. Moreover, challenges to those allegations were already made and rejected in the *Ontario* Action. Thus, the Defendants preserve those arguments for the sake of appeal, but do not otherwise pursue them in these instant motions to dismiss.

April 6, 2016, Teva raised prices 76 times. *See* SAC, Doc. No. 310, at ¶¶ 2, 40, 120, 128, App. A. The *Ontario* Class alleges that Teva undertook many of those price increases in tandem with competitors in the generic drug market. *See id.* at ¶¶ 46, 174–81, App. A, App. B. As a result of those price increases, Teva's business boomed, as reflected in both profits and stock price. *See id.* at Figure 1 (inflated profit), Figure 2 (stock price). Indeed, by July 27, 2015, Teva's stock price had soared to an all-time high of $72 per share. *See id.* at ¶ 277. In August 2016, Teva was able to leverage its stock price to help finance a $40 billion purchase of Actavis, which was Allergan's worldwide generics business. *Id.* at ¶¶ 8, 93. To aid in that acquisition, Teva made a stock offering in December 2015 and a Notes offering in July 2016.[10]   *See id.* at ¶¶ 407–08.

In the middle of 2015, the *Ontario* Class claims that Teva's house of cards began to come crashing down. *See id.* at ¶ 279. Around that time, investigations into the generic drug industry picked up pace and pressure grew on Teva to explain its financial success. *See id.* at ¶¶ 101–02, 105, 117. Teva's stock price sank lower and lower. *See id.* at Figure 2. The *Ontario* Class alleges that, beginning in August 2016, a series of "negative events and disclosures" revealed the truth to the market. *See id.* at ¶¶ 338–76. On May 10, 2019, the Attorneys General from 47 States, the District of Columbia, and Puerto Rico filed a 524-page antitrust complaint regarding the generic drug industry that contained detailed allegations with respect to Teva's alleged collusive conduct. *See id.* at ¶ 374; *see also* Compl., Doc. No. 1, in *Connecticut, et al. v. Sandoz, Inc., et al.*, No. 3:20-cv-802 (SRU) (D. Conn.). In August 2020, Teva USA—Teva's United States

---

[10]     More specifically, in December 2015, Teva commenced a secondary public offering of ADS and an initial public offering of preferred shares. Each ADS represented one ordinary share of Teva, and each preferred share automatically converted into between 13.3333 and 16 ADS on December 15, 2018, subject to anti-dilution adjustments. *See* SAC, Doc. No. 310, at ¶ 417. Teva closed those two offerings on December 8, 2015. After certain underwriters exercised their options to purchase additional ADS and preferred shares "to cover overallotments," Teva's net proceeds from the two offerings were $7.24 billion. *See id.* at ¶¶ 420–21. On July 21, 2016, "Teva consummated, through Teva Finance," an offering of $15 billion in various debt securities. *Id.* at ¶ 425. Teva garnered net proceeds of $14.9 billion from the Notes offering. *See id.*

subsidiary—was charged in a criminal complaint by the United States Department of Justice's ("DOJ") Antitrust Division for conduct relating to its alleged collusion to fix certain generic drug prices. *See Press Release*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/opa/pr/seventh-generic-drug-manufacturer-charged-ongoing-criminal-antitrust-investigation (Aug. 25, 2020).

In connection with those allegations, the *Ontario* Class alleges that the Defendants made a series of misstatements and omissions with respect to Teva's price-hike and collusive strategies in (1) press releases, (2) earnings calls, (3) SEC filings, (4) guidance calls, and (5) at conferences.

### 2. Additional Misrepresentations and Omissions

Beyond the allegations raised in the *Ontario* Action, a majority of the Direct Actions introduce new theories of liability based on distinct categories of misrepresentations and omissions.

#### a) *Actavis Acquisition*

Following the $40 billion acquisition of Actavis, 12 Direct Actions[11] allege that the Defendants continued to mislead investors about the state of the company. The DAPs claim that the Defendants repeatedly touted the Actavis acquisition as a success for the company. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 691.[12] For example, in the Q1 2017 Form 6-K, Teva stated that the acquisition "significantly expanded Teva's generics product portfolio and pipeline, [research and development] capabilities and global operational network." *Id.* at ¶ 698. Moreover, the

---

[11] *See Clal* Am. Compl., Doc. No. 391, at ¶¶ 414–25; *Harel* Am. Compl., Doc. No. 399, at ¶¶ 676–85; *Highfields* Am. Compl., Doc. No. 396, at ¶¶ 275–86; *INKA* Compl., No. 3:20-cv-00083, Doc. No. 1, at ¶¶ 260–71; *Migdal Ins.* Am. Compl., Doc. No. 391, at ¶¶ 414–25; *Migdal Mut.* Am. Compl., Doc. No. 391, at ¶¶ 414–25; *Mivtachim* Am. Compl., Doc. No. 391, at ¶¶ 414–25; *Pacific* Am. Compl., Doc. No. 392, at ¶¶ 262–73; *Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 691–700; *Psagot* Am. Compl., Doc. No. 391, at ¶¶ 414–25; *Schwab* Am. Compl., Doc. No. 393, at ¶¶ 261–72; and *Stiching* Am. Compl., Doc. No. 391, at ¶¶ 261–72.

[12] For brevity's sake, citations in this section will primarily be to the *Phoenix* complaint, to which the allegations in the other complaints premised on this claim are virtually identical.

Defendants told investors that the Actavis acquisition helped to "generat[e] significant cash flow to rapidly pay down [the company's] existing debt." *Id.* at ¶ 696.

It is alleged that those statements were false and misleading because the Defendants failed to disclose and actively concealed the negative impact resulting from the acquisition and integration of Actavis on Teva's financial results and business prospects. *Id.* at ¶ 585.

b)    *Goodwill Statements and Bribery Scheme*

Two Direct Actions—*Harel* and *Phoenix*—separately allege two other types of misrepresentations and omissions: the Bribery Scheme[13] and the goodwill statements.[14]

The first category of alleged misstatements relates to the alleged Bribery Scheme. In 2012, Teva received subpoenas from the SEC and the DOJ relating to a Foreign Corrupt Practices Act ("FCPA") investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, certain Eastern European countries, and certain Latin American countries. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 70.[15] In December 2016, Teva pled guilty to violating the FCPA. *Id.* at ¶ 70 n.2. Teva specifically admitted that it systematically bribed officials in Russia, certain Eastern European countries, and certain Latin American countries to inflate sales of the company's biggest product, Copaxone, in those countries. *See id.* Before this disclosure, it is alleged that the Defendants hid the scheme and the DOJ investigation, while also making false and misleading statements about their conduct in

---

[13]    *See Harel* Am. Compl., Doc. No. 399, at ¶¶ 738–45, 945; *Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 759–767, 977.

[14]    *See Harel* Am. Compl., Doc. No. 399, at ¶¶ 577, 686–94; *Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 585, 701-09.

[15]    For brevity's sake, citations in this section will primarily be to the *Phoenix* complaint, to which the *Harel* complaint is virtually identical.

foreign countries, compliance with the FCPA, and the source of Teva's revenue in those

countries. *Id.* at ¶¶ 759–67.

The second category of alleged misstatements involves the overstatement of goodwill: (1)

during conference calls with investors and analysts; and (2) in financial statements contained in

Teva's Forms 20-F and 6-K. As of December 31, 2016, the *Harel* and *Phoenix* Plaintiffs allege

that Teva materially overstated the value of its goodwill, which inflated its balance sheet and

understated its goodwill impairment charge. *Id.* at ¶ 548. For example, in the Q2 2017 Form 6-K

filed on August 3, 2017, the Defendants allegedly reported "a goodwill impairment charge of

$6.1 billion related to [Teva's] U.S. generics reporting unit," despite knowing that generally

accepted accounting principles ("GAAP")[16] required a much larger goodwill impairment charge

of at least $8.9 billion, $2.8 billion more than the company recorded for the second quarter of

2017. *Id.* at ¶ 553.

To do so, the Defendants allegedly used "bogus inputs for the discounted cash flow

('DCF') model used to calculate the fair value and goodwill of Teva's U.S. generics unit." *Id.* at

¶ 548. Meanwhile, the Defendants told investors that its goodwill "[c]ash flow projections are

based on management's estimates of revenue growth rates and operating margins, taking into

consideration industry and market conditions." *Id.* at ¶¶ 573, 704.

It was not until February 8, 2018, when the second massive write-down was announced,

that Teva revealed sufficient information about its goodwill valuation inputs and assumptions for

---

[16]     Generally accepted accounting principles ("GAAP") are the principles recognized by the accounting
profession as the conventions, rules, and procedures defining accepted accounting practice at a particular time. SEC
Regulation SX, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the Securities and Exchange
Commission ("SEC") that are not prepared in compliance with GAAP are presumed to be misleading and
inaccurate, despite footnotes and other disclosures. *Phoenix* Am. Compl., Doc. No. 397, at 548 n.16.

investors to determine the cash flow growth rates used during fourth quarter 2016 to third quarter 2017. *Id.* at ¶ 574.

c)   *Opioid Scheme*

Separate from the alleged price-fixing scheme, five Direct Actions— *Clal*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, and *Psagot*—also allege that the Defendants concealed Teva's illegal marketing of opioids for off-label uses, and subsequently, materially understated the material impact their marketing practices would have on the company. *Pom.* Compl., Doc. No. 391, at ¶¶ 388–400.

From 2005 to 2009, Teva USA was in the business of selling generic opioids. *Id.* at ¶ 208. In May 2011, Teva expanded its opioid business with Teva USA's acquisition of Cephalon, a biopharmaceutical company that sold the opioids Actiq and Fentora. *Id.* at ¶¶ 208–09.

Per the Food and Drug Administration ("FDA"), Actiq and Fentora have only been indicated (i.e., FDA-approved use) for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." *Id.* at ¶ 210. Despite the narrow FDA-approved list of uses for its opioid drugs, Teva engaged in various campaigns to increase its sales of the products by promoting off-label (i.e., non-FDA approved) uses, including chronic pain and other non-cancer conditions. *Id.* at ¶ 213. It is alleged that Teva "incentivized doctors who prescribed its opioids," and "Teva sales representatives were given sales targets" that were not achievable without promoting off-label uses. *Id.* at ¶¶ 217–18.

This scheme eventually caught up to Teva. First, two California counties sued Teva and Cephalon, along with several other pharmaceutical companies, accusing the companies of causing the nation's prescription drug epidemic by waging a "campaign of deception" aimed at

23

boosting sales of potent painkillers such as OxyContin, Actiq, and Fentora. *Id.* at ¶ 220. Many states, counties, cities, governmental agencies, and private individuals followed suit, filing their own complaints against Teva. *Id.* at ¶¶ 221–22. In fact, there is massive multi-district litigation, comprised of approximately 1,000 cases, proceeding in the U.S. District Court for the Northern District of Ohio, in which Teva and certain of its affiliates are defendants. *Id.* at ¶ 222. On Sunday, May 26, 2019, less than 48 hours before the first major trial against Teva for its opioid liability was set to begin, Teva announced that it has agreed to pay the State of Oklahoma $85 million in order to settle claims that it fueled the opioid crisis in the State. *Id.* at ¶ 224. The market reacted negatively to that announcement, with the prices for Teva ADS falling $1.35 per share, or approximately 12.4%, from a close of $10.87 on May 24, 2019 to a close of $9.52 on May 28, 2019, on high trading volume. *Id.* at ¶ 225.

Prior to that disclosure, it is alleged that the Defendants misled investors by making false and misleading statements on earnings calls and its annual disclosures by continuing to deny liability with respect to its sales and distribution of opioids in its disclosures and on earnings calls. *Id.* at ¶¶ 388–400. For example, it is alleged that in several quarterly filings, Teva "den[ied] all allegations asserted in [numerous lawsuits]." *Id.* at ¶ 398.

C.    Legal Claims

As previously mentioned, the Direct Actions are premised on the *Ontario* Action. But the Direct Actions also name additional defendants and allege additional legal claims. Thus, I provide a summary of each Direct Action below, beginning with the *Ontario* Action as context.

1.    *Ontario* Action

The *Ontario* Class claimed that, throughout the Class Period (February 6, 2014 through May 10, 2019), Teva publicly attributed its financial success to good business decisions when, in

fact, that success was due to artificial (and collusive) price increases on generic drugs. *See* SAC, Doc. No. 310, at ¶ 1, 165. Thus, the *Ontario* Class claimed that Teva violated Section 10(b), Rule 10b-5, promulgated thereunder, and Section 20(a) of the Exchange Act of 1934 ("Exchange Act"), Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), and breached certain state common law duties and agreements. *See id.* at ¶¶ 380–86 (Exchange Act); ¶¶ 438–64 (Securities Act); ¶¶ 465–85 (state common law); and the Israel Securities Law, 1968 ("ISL").[17]

> 2. *Nordea Investment Mgmt. AB v. Teva Pharm. Indus., Ltd., et al.*, No. 3:18-cv-01681

The *Nordea* Plaintiffs assert two claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Altman, Olafsson, Schultz, and McClellen. *Nordea* Am. Compl., Doc. No. 390, at ¶¶ 368–74. The *Nordea* Plaintiffs assert, *inter alia*, that those Defendants "intended to and did … (i) deceive the investing public … (ii) artificially inflate and maintain the prices of Teva's ADS; and (iii) cause funds under [the *Nordea* Plaintiffs'] management to purchase [Teva's] ADS at artificially inflated prices." *Id.* ¶ 371.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Altman, Olafsson, Schultz and McClellen. *Id.* at ¶¶ 375–81. The *Nordea* Plaintiffs assert that those Defendants "had the power and ability to control, and did influence and control, directly or indirectly, the decision-making of [Teva]" and are therefore liable under Section 20(a). *Id.* at ¶ 379.

---

[17]     Israeli law mirrors American securities law. *See In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 341 (D. Conn. 2021), 2021 WL 1197805 (D. Conn. Mar. 30, 2021); *see generally, e.g.,* Marcus Best & Jean-Luc Soulier, Israel § 21.1, International Securities Law Handbook (4th ed. 2014).

      3.     *State of Alaska Department of Revenue, et al., v. Teva Pharm. Indus., Ltd.,*
*et al.*, No. 3:18-cv-01721

The *Alaska* Plaintiffs assert two claims in their complaint. Count One alleges a violation

of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva,

Vigodman, Desheh, Altman, Olafsson, Schultz and McClellen. *Alaska* Am. Compl., Doc. No.

389, at ¶¶ 355–61. The *Alaska* Plaintiffs assert, *inter alia*, that those Defendants "intended to and

did … (i) deceive the investing public … (ii) artificially inflate and maintain the prices of Teva's

ADS; and (iii) cause [*Alaska* Plaintiffs] to purchase [Teva's] ADS at artificially inflated prices."

*Id.* ¶ 357.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman,

Desheh, Altman, Olafsson, Schultz and McClellen. *Id.* at ¶¶ 362–68. The *Alaska* Plaintiffs assert

that those Defendants "had the power and ability to control, and did influence and control,

directly or indirectly, the decision-making of [Teva]" and are therefore liable under Section

20(a). *Id.* at ¶ 366.

      4.     *Pacific Funds Series Tr., et al. v. Teva Pharm. Indus., Ltd., et al.*, No.
3:18-cv-01956

The *Pacific* Plaintiffs assert five claims in their complaint. Count One alleges a violation

of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva,

Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellen, and Peterburg. *Pacific* Am. Compl.,

Doc. No. 392, at ¶¶ 437–41. The *Pacific* Plaintiffs assert, *inter alia*, that those Defendants

knowingly or recklessly "disseminated or approved the false and misleading statements [alleged

in the complaint]," and that those actions caused the *Pacific* Plaintiffs to pay artificially inflated

prices for Teva securities. *Id.* ¶¶ 438–40.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellen, and Peterburg. *Id.* at ¶¶ 442–45. The *Pacific* Plaintiffs assert that those Defendants "had the power to, and did, control or influence the policies and practices underlying the securities violations alleged [in the complaint]"and are therefore liable under Section 20(a). *Id.* at ¶¶ 444–45.

Count Three alleges a violation of Section 11 of the Securities Act by Teva, Vigodman, Desheh and Griffin. *Id.* at ¶¶ 446–53. The *Pacific* Plaintiffs assert that those Defendants disseminated or caused to be disseminated offering materials that contained untrue statements and omissions of material fact. *Id.* at ¶ 449. The *Pacific* Plaintiffs assert that Vigodman, Desheh, and Griffin negligently disseminated such materials, and that Teva, as the issuer of the offerings, is strictly liable for the actionable statements and omissions in the offering materials. *Id.* at ¶¶ 450–51. The *Pacific* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of Teva ADS and Notes, in, pursuant to, and/or traceable to the offerings." *Id.* at ¶ 453.

Count Four alleges a violation of Section 12(a)(2) of the Securities Act by Teva, Vigodman, Desheh, and Griffin. *Id.* at ¶¶ 454–62. The *Pacific* Plaintiffs assert that the offering materials included untrue statements and omissions of material fact. *Id.* at ¶ 458. It is alleged that those Defendants acted negligently in that none of them exercised reasonable care to ensure that the prospectuses did not include untrue or misleading statements or omissions of material fact. *Id.* at ¶ 459. The *Pacific* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of Teva ADS and Notes, in, pursuant to, and/or traceable to the offerings." *Id.* at ¶ 461.

Count Five alleges a violation of Section 15 of the Securities Act by Teva, Vigodman, Desheh, and Griffin. *Id.* at ¶¶ 463–70. The *Pacific* Plaintiffs assert those Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the offering materials were true and not misleading. *Id.* at ¶ 469. The *Pacific* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of Teva ADS and Notes, in, pursuant to, and/or traceable to the offerings." *Id.* at ¶ 470.

     5.    *Schwab Capital Tr., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00192

The *Schwab* Plaintiffs assert three claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *Schwab* Am. Compl., Doc. No. 393, at ¶¶ 409–13. The *Schwab* Plaintiffs assert, *inter alia*, that those Defendants "made, disseminated or approved the false and misleading statements [alleged in the complaint], which they knew or recklessly disregarded were false and misleading," which caused the *Schwab* Plaintiffs to pay artificially inflated prices for Teva securities *Id.* ¶¶ at 410–11.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *Id.* at ¶¶ 414–17. The *Schwab* Plaintiffs assert that those Defendants "had the power and ability to, and did, control or influence the policies and practices underlying the securities violations [alleged in the complaint]" and are therefore liable under Section 20(a). *Id.* at ¶ 416.

Count Three alleges violations of the ISL against Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg for ordinary share purchases made on the TASE. *Id.* at ¶¶ 418–26.

6.      *Phoenix Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00449

The *Phoenix* Plaintiffs assert six claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 914–22. The *Phoenix* Plaintiffs assert, *inter alia*, that those Defendants "intended to and did … (i) deceive the investing public … (ii) artificially inflate and maintain the prices of Teva's securities; and (iii) cause [the *Phoenix* Plaintiffs] to purchase [Teva's] securities at artificially inflated prices." *Id.* ¶ 918.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Id.* at ¶¶ 923–29. The *Phoenix* Plaintiffs assert that those Defendants were "controlling persons of [Teva]" and are therefore liable under Section 20(a). *Id.*

Count Three alleges violations of the Pennsylvania Securities Act ("PSA"), 70 Pa. Stat. §§ 1–402(c) and 1–501(c) against Teva, Teva USA, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Id.* at ¶¶ 930–38.

Count Four alleges violations of the ISL against Teva, Teva USA, Teva Finance, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz and McClellan for ordinary share purchases made on the TASE. *Id.* at ¶¶ 939–47.

Count Five alleges a violation of Section 11 of the Securities Act by Teva, Teva Finance, Vigodman, Desheh, Peterburg, and Griffin. *Id.* at ¶¶ 957, 978–88. The *Phoenix* Plaintiffs assert that those Defendants negligently disseminated or caused to be disseminated offering materials that contained untrue statements and omissions of material fact. *Id.* at ¶ 983. The *Phoenix* Plaintiffs assert that Vigodman, Desheh, Peterburg, and Griffin negligently disseminated such

materials, and that Teva and Teva Finance, as the issuer of the offerings, are strictly liable for the actionable statements and omissions in the offering materials. *Id.* at ¶¶ 984–86. The *Phoenix* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of the securities, in, pursuant to, and/or traceable to the Notes offerings." *Id.* at ¶ 988.

Count Six alleges a violation of Section 12(a)(2) of the Securities Act by Teva, Teva Finance, Vigodman, Desheh, Peterburg, and Griffin. *Id.* at ¶¶ 989–98. The *Phoenix* Plaintiffs assert that the offering materials included untrue statements and omissions of material fact. *Id.* at ¶ 994. It is alleged that those Defendants acted negligently in that none of them exercised reasonable care to ensure that the prospectuses did not include untrue or misleading statements or omissions of material fact. *Id.* at ¶ 995. The *Phoenix* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of the securities, in, pursuant to, and/or traceable to the offerings." *Id.* at ¶ 997.

Count Seven alleges a violation of Section 15 of the Securities Act by Vigodman, Desheh, Peterburg, and Griffin. *Id.* at ¶¶ 989–98. The *Phoenix* Plaintiffs assert that those Defendants acted negligently in that none of them exercised reasonable care to ensure that the offering materials did not include untrue or misleading statements or omissions of material fact. *Id.* at ¶ 1004. The *Phoenix* Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of the securities, in, pursuant to, and/or traceable to the offerings." *Id.* at ¶ 1005.

7.    *Highfields Capital I LP, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00603

The *Highfields* Plaintiffs assert five claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellen, and Peterburg. *Highfields* Am.

Compl., Doc. No. 396, at ¶¶ 414–19. The *Highfields* Plaintiffs allege, *inter alia*, that those Defendants knowingly or recklessly "disseminated or approved the false and misleading statements [alleged in the complaint]," and that those actions caused the *Highfields* Plaintiffs to pay artificially inflated prices for Teva securities. *Id.* ¶¶ 415, 418.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellen, and Peterburg. *Id.* at ¶¶ 420–27. The *Highfields* Plaintiffs assert that those Defendants "had the power and ability to influence and control the actions of Teva and its employees," and are therefore liable under Section 20(a). *Id.* at ¶ 422–23, 426.

Count Three alleges a violation of Section 18 of the Exchange Act against Teva, Desheh, McClellen, Schultz, and Griffin. *Id.* at ¶¶ 428–38. The *Highfields* Plaintiffs allege that those Defendants caused misleading statements and omissions of material fact to be made in Teva's SEC filings, which the *Highfields* Plaintiffs' investment team "actually and justifiably read" and relied upon. *Id.* at ¶ 431. As a result, the *Highfields* Plaintiffs allege that had they known the true facts, they would not have purchased Teva securities at inflated prices. *Id.* at ¶ 435.

Counts Four and Five assert common law fraud and common law negligence claims against Teva, Vigodman, Desheh, Olafsson, Griffin, Schultz, McClellen, and Peterburg, respectively. *Id.* at ¶¶ 439–55.

### 8. *Harel Pension and Provident, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00656

The *Harel* Plaintiffs assert six claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Teva USA, Teva Finance, Olafsson, Bhattacharjee, McClellan, and Griffin. *Harel* Am. Compl., Doc. No. 399, at ¶¶ 892–900. The *Harel* Plaintiffs assert, *inter alia*, that those Defendants "intended to

and did … (i) deceive the investing public … (ii) artificially inflate and maintain the prices of

Teva's securities; and (iii) cause [the *Harel* Plaintiffs] to purchase [Teva's] securities at

artificially inflated prices." *Id.* ¶ 896.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Olafsson,

Bhattacharjee, McClellan, and Griffin. *Id.* at ¶¶ 901–07. The *Harel* Plaintiffs assert that those

Defendants were "controlling persons of [Teva]" and are therefore liable under Section 20(a). *Id.*

at ¶ 903.

Count Three alleges violations of the PSA, 70 Pa. Stat. §§ 1–402(c) and 1–501(c) against

Teva, Teva USA, Olafsson, Bhattacharjee, McClellan, and Griffin. *Id.* at ¶¶ 908–16.

Count Four alleges violations of the ISL against Teva, Teva USA, Olafsson,

Bhattacharjee, McClellan, and Griffin for ordinary share purchases made on the TASE. *Id.* at ¶¶

917–25.

Count Five alleges a violation of Section 11 of the Securities Act by Teva and Teva

Finance. *Id.* at ¶¶ 929–30, 946–54. The *Harel* Plaintiffs assert those Defendants disseminated or

caused to be disseminated offering materials that contained untrue statements and omissions of

material fact. *Id.* at ¶ 951. The *Harel* Plaintiffs allege that they "suffered damages in connection

with the purchase or acquisition of the Notes, in, pursuant to, and/or traceable to the Notes

offerings." *Id.* at ¶ 954.

Count Six alleges a violation of Section 12(a)(2) of the Securities Act by Teva and Teva

Finance. *Id.* at ¶¶ 955–64. The *Harel* Plaintiffs assert that the offering materials included untrue

statements and omissions of material fact. *Id.* at ¶ 960. It is alleged that those Defendants acted

negligently in that none of them exercised reasonable care to ensure that the prospectuses did not

include untrue or misleading statements or omissions of material fact. *Id.* at ¶ 961. The *Harel*

Plaintiffs allege that they "suffered damages in connection with the purchase or acquisition of the Notes, in, pursuant to, and/or traceable to the Notes offerings." *Id.* at ¶ 963.

9.    *Stichting PGGM Depositary, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01173

The *Stichting* Plaintiffs assert three claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *Stichting* Am. Compl., Doc. No. 394, at ¶¶ 409–13. The *Stichting* Plaintiffs allege, *inter alia*, that those Defendants knowingly or recklessly "disseminated or approved the false and misleading statements [alleged in the complaint]," and that those actions caused the *Stichting* Plaintiffs to pay artificially inflated prices for Teva securities. *Id.* ¶¶ 410, 412.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *Id.* at ¶¶ 420–27. The *Stichting* Plaintiffs assert that those Defendants "had the power to, and did, control or influence the policies and practices underlying the securities violations alleged [in the complaint]," and are therefore liable under Section 20(a). *Id.* at ¶¶ 416–17.

Count Three alleges violations of the ISL against Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg for ordinary share purchases made on the TASE. *Id.* at ¶¶ 418–26.

10.    *INKA v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-00083

The *INKA* Plaintiffs assert five claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *INKA* Compl., No. 3:20-cv-0008, Doc. No. 1, at ¶¶ 408–12. The *INKA* Plaintiffs assert, *inter alia*, that those Defendants

knowingly or recklessly "disseminated or approved the false and misleading statements [alleged in the complaint]," and that those actions caused the *INKA* Plaintiffs to pay artificially inflated prices for Teva securities. *Id.* ¶¶ 409, 411.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg. *Id.* at ¶¶ 413–16. The *INKA* Plaintiffs assert that those Defendants "had the power and ability to control, and did influence and control, directly or indirectly, the decision-making of [Teva]" and are therefore liable under Section 20(a). *Id.* at ¶¶ 415–16.

Count Three alleges violations of the ISL against Teva, Vigodman, Desheh, Olafsson, Schultz, McClellen, and Peterburg for ordinary share purchases made on the TASE. *Id.* at ¶¶ 417–25.

11.   *Franklin Mut. Series Funds, et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:20-cv-01630

The *Franklin* Plaintiffs assert two claims in their complaint. Count One alleges a violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by Teva, Vigodman, Desheh, Olafsson, Schultz, and McClellen. *Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶¶ 361–67. The *Franklin* Plaintiffs assert, *inter alia*, that those Defendants "intended to and did … (i) deceive the investing public … (ii) artificially inflate and maintain the prices of Teva's ADS; and (iii) cause [the *Franklin* Plaintiffs] to purchase [Teva's] ADS at artificially inflated prices." *Id.* ¶ 363.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman, Desheh, Olafsson, Schultz, and McClellen. *Id.* at ¶¶ 368–74. The *Franklin* Plaintiffs assert that those Defendants "had the power to influence and control, and did influence and control, directly

34

or indirectly, the decision-making of [Teva]" and are therefore liable under Section 20(a). *Id.* at

¶¶ 372, 374.

> 12.    *Mivtachim The Workers Social Ins. Fund, Ltd., et al. v. Teva, Pharm Indus., Ltd., et al.*, No. 3:19-cv-00655
> > *Clal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00543
> > *Migdal Ins. Co., Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00655
> > *Migdal Mut. Funds, Ltd. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-00923
> > *Psagot Mut. Funds, Ltd., et al. v. Teva Pharm. Indus., Ltd., et al.*, No. 3:19-cv-01167

The *Pomerantz* Plaintiffs assert five claims in their complaint. Count One alleges a

violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by

Teva, Teva USA, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee,

Schultz, and McClellan. *Pom.* Compl., Doc. No. 391, at ¶¶ 572–76. The *Pomerantz* Plaintiffs

assert, *inter alia*, that those Defendants knowingly or recklessly "disseminated or approved the

false and misleading statements [alleged in the complaint]," and that those actions caused the

*Pomerantz* Plaintiffs to pay artificially inflated prices for Teva securities. *Id.* ¶¶ 573, 575.

Count Two alleges a violation of Section 20(a) of the Exchange Act by Vigodman,

Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Id.* at ¶¶

577–78. The *Pomerantz* Plaintiffs assert that those Defendants "had the power and ability to

control the actions of Teva and its employees," and are therefore liable under Section 20(a). *Id.*

Count Three alleges violations of the ISL against Teva, Teva USA, Vigodman, Desheh,

Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan for purchases made

on the TASE. *Id.* at ¶¶ 579–86.

Count Four alleges violations of the PSA, 70 Pa. Stat. §§ 1–402(c) and 1–501(c) against Teva, Teva USA, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Id.* at ¶¶ 587–94.

Count Five alleges violations of the PSA, 70 Pa. Stat. §§ 1–401(c) and 1–501(a)(ii) against Teva, Teva USA, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan. *Id.* at ¶¶ 595–600.

Counts Six and Seven assert common law fraud and common law negligence claims against Teva, Teva USA, Vigodman, Desheh, Altman, Olafsson, Peterburg, Griffin, Bhattacharjee, Schultz, and McClellan, respectively. *Id.* at ¶¶ 601–14.

## III.   STANDARD OF REVIEW

### A.   Motion to Dismiss Standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). "When reviewing a motion to dismiss, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Turner v. Boyle*, 116 F. Supp. 3d 58, 68 (D.

36

Conn. 2015) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))

(cleaned up).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see*

*also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint,

they must be supported by factual allegations."). The plausibility standard set forth in *Twombly*

and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through

more than "labels and conclusions, and a formulaic recitation of the elements of a cause of

action." *Twombly*, 550 U.S. at 555 (cleaned up). Plausibility at the pleading stage is nonetheless

distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of [the claims] is improbable, and … recovery is very remote and

unlikely." *Id.* at 556 (cleaned up). Federal Rule of Civil Procedure 8(a) requires only a "short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

### B.    Rule 9(b) and the PSLRA Standards

Further, plaintiffs claiming securities fraud under the Exchange Act are "subject to

heightened pleading requirements that [they] must meet to survive a motion to dismiss. First, a

complaint alleging securities fraud must satisfy Rule 9(b) … which requires that 'the

circumstances constituting fraud … shall be stated with particularity.'" *ATSI Communications,*

*Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting Fed. R. Civ. P. 9(b)).

"Securities Acts claims that 'are premised on allegations of fraud' also must satisfy Rule 9(b)'s

particularity requirement." *In re MF Global Holdings Limited Securities Litigation*, 982 F. Supp.

2d 277, 302 (S.D.N.Y. 2013) (*quoting Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

The heightened pleading standard set by Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard [its] reputation from improvident charges of wrongdoing, and protect [a defendant] against strike suits." *ATSI Communications*, 493 F.3d at 99; *Rombach*, 355 F.3d at 171.

In addition to the heightened requirements under Rule 9(b), Exchange Act complaints must also meet the pleading requirements of the PSLRA. *See ATSI Communications*, 493 F.3d at 99; *In re MF Global Holdings*, 982 F. Supp. 2d at 302. "The PSLRA requires that a complaint 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re MF Global Holdings*, 982 F. Supp. 2d at 302 (*quoting* 15 U.S.C. § 78u-4(b)(1)).

## IV.   APPLICABLE LAW

### A.   Exchange Act

#### 1.   Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), states, in pertinent part:

> It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv.*

*Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange [in connection with the purchase or sale of any security], (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

"Section 10b-5 operates as a broad prohibition against manipulation, whether in the form of false statements or market manipulation." *In re MF Global Holdings*, 982 F. Supp. 2d at 303. "To state a claim for misrepresentations or omissions, a plaintiff must allege that the defendant '(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" *Id.* (*quoting ATSI Communications*, 493 F.3d at 105).

> a)        *Misstatement or Omission*

The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why a statement is misleading, and, in an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Rule 10b-5 requires an actual *statement*, one that is either untrue outright or misleading by virtue of what it omits to state. Absent an actual statement, a complete failure to make a statement—in other words, a pure omission—is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 239 (2d Cir. 2016) (emphasis in original) (cleaned up). "And in and of themselves,

[Section] 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information…. No such duty arises merely because a reasonable investor would very much like to know that information." *Id.* (cleaned up). Half-truths, "statements that are misleading by omission", are actionable in securities law. *Id.* at 239–40.

"To determine whether a misstatement or omission is material is an inherently fact-specific inquiry." *Hutchison v. Deutshe Bank Securities Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (cleaned up). "A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]…. That is to say there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (cleaned up). Materiality is a mixed question of fact and law and, therefore, "a complaint may not properly be dismissed … on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (cleaned up). However, "materiality allegations in securities fraud complaints must nevertheless comply with the particularity requirements of [Rule 9(b)] and the PSLRA; the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).

      b)    *Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). "When pleading scienter, with respect to each act or omission alleged to violate the securities law, the complaint must state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *6 (S.D.N.Y. Aug. 31, 2000). "The requisite state of mind in a Rule 10b-5 action is an intent to deceive, manipulate, or defraud." *Speakes v. Taro Pharm. Industries, Ltd.*, 2018 WL 4572987, at *8 (S.D.N.Y. Sept. 24, 2018) (cleaned up). In order to satisfy that scienter requirement, a plaintiff must allege facts: (1) "showing that the defendants had both motive and opportunity to commit the fraud"; or (2) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications*, 493 F.3d at 99; *see also In re Sotheby's*, 2000 WL 1234601, at *6. "In evaluating whether either of [those] showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Taro Pharm.*, 2018 WL 4572987, at * 8 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

Additionally, "in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *ATSI Communications*, 493 F.3d at 99 (citing *Tellabs, Inc.*, 551 U.S. 308) (cleaned up). For an inference of scienter to be "strong," "a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis in original) (cleaned up). "[A]t a motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). "The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard." *Tellabs, Inc.*, 551 U.S. at 322–23 (cleaned up).

> c) *Loss Causation*

"Loss causation 'is the causal link between the alleged misconduct and the economic

harm ultimately suffered by the plaintiff.'" *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161,

172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003)). The PSLRA codified that requirement: "In any private action

arising under this chapter, the plaintiff shall have the burden of proving that the act or omission

of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to

recover damages." 15 U.S.C. § 78u-4(b)(4).

"[T]o establish loss causation, a plaintiff must allege … that the *subject* of the fraudulent

statement or omission was the cause of the actual loss suffered, … *i.e.*, that the misstatement or

omission concealed something from the market that, when disclosed, negatively affected the

value of the security. Otherwise, the loss in question was not foreseeable." *Lentell*, 396 F.3d at

174 (emphasis in original). Further, "a plaintiff must show that 'the loss [was a] foreseeable'

result of the defendant's conduct (*i.e.*, the fraud), '*and* that the loss [was] caused by the

materialization of the … risk' concealed by the defendant's alleged fraud." *In re Vivendi*, 838

F.3d at 261 (emphasis in original) (quoting *Lentell*, 396 F.3d at 173). "[L]oss causation has to do

with the relationship between the plaintiff's investment loss and the information misstated or

concealed by the defendant…. If that relationship is sufficiently direct, loss causation is

established … but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal

connection between the content of the alleged misstatements or omissions and the harm actually

suffered, … a fraud claim will not lie…. That is because the loss-causation requirement—as with

the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Lentell*, 396 F.3d at 174 (cleaned up).

In order to adequately plead loss causation, "[t]he complaint must simply give defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 347 (2005)). Plaintiffs need not plead that concealed risk actually "materialized into a more significant problem" in order to show loss causation. *In re Vivendi*, 838 F.3d at 261. "[I]t is enough that the loss caused by the alleged fraud results from the 'relevant truth … leak[ing] out.'" *Id.* (quoting *Dura Pharm.*, 544 U.S. at 342). The materialization of the risk principle requires a showing that a "misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security…. Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* (cleaned up) (emphasis in original). "Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by the circumstances." *Lentell*, 396 F.3d at 174.

The "burden to plead loss causation is not a heavy one, and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, the chain of causation is … not to be decided on a Rule 12(b)(6) motion to dismiss." *Gross v. GFI Grp.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016). Further, "there is a split among the circuits as to whether the loss causation element is subject to the heightened pleading requirements of Rule 9(b) or the ordinary pleading standard of Rule 8(a). The Second Circuit … has yet to weigh in on this

debate.... Under either standard, however, the securities fraud plaintiff's burden is not a heavy

one. She must only 'provide a defendant with some indication of the loss and the causal

connection that the plaintiff has in mind.'" *Taro Pharm.*, 2018 WL 4572987, at

*10 (quoting *Dura Pharm.*, 544 U.S. at 347).

> 2.      Section 20(a)

Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), states, in pertinent

part:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable ... unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must

show (1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud." *ATSI Communications*, 493 F.3d at 108; *see also S.E.C. v. First*

*Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

> B.      Securities Act

> 1.      Sections 11 and 12(a)(2)

Section 11 of the Securities Act, codified at 15 U.S.C. § 77k, "imposes liability on

issuers, directors of issuers, and other signers of a registration statement that contains an untrue

statement of a material fact or omits to state a material fact necessary to make the statements

therein not misleading." *In re MF Global Holdings*, 982 F. Supp. 2d at 308.

Section 12(a)(2) of the Securities Act, codified at 15 U.S.C. § 77*l*(a)(2), "imposes

liability for selling or offering a security by means of prospectus that includes an untrue

statement of material fact or omits a material fact necessary to make such statements not

misleading." *Id.*

"[T]he language of [S]ections 11 and 12(a)(2) creates three potential bases for liability

based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2)

an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of

information that is necessary to prevent existing disclosures from being misleading." *In re*

*Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 360 (2d Cir. 2010). When

pleading either a violation of Section 11 or of Section 12(a)(2), "a plaintiff must show that the

relevant communication either misstated or omitted a material fact." *Iowa Public Employees'*

*Retirement System v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *In re MF Global*

*Holdings*, 982 F. Supp. 2d at 308. Because the two have "roughly parallel elements," *Fait v.*

*Regions Financial Corp.*, 655 F.3d 105, 109 (2d Cir. 2011), "[a] plaintiff who fails to plead a

[Section 11] claim necessarily fails to plead a [Section] 12(a)(2) claim as well." *In re MF Global*

*Holdings*, 982 F. Supp. 2d at 308; *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525

(S.D.N.Y. 2009).

The legal standard for misstatements or omissions of material facts in a claim brought

under the Exchange Act is substantially similar to the legal standard with respect to the same in a

claim brought under the Securities Act. *See In re Morgan Stanley*, 592 F.3d at 360; *In re MF*

*Global Holdings*, 982 F. Supp. 2d at 308. The difference is that "Securities Act claims do not

need to be pled with particularity unless they sound in fraud … and do not require allegations of

scienter, reliance, or loss causation." *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (cleaned

up); *see also Rombach*, 355 F.3d at 171; *Fait*, 655 F.3d at 109. "Instead, Section 11 imposes

virtually absolute liability on issuers, and Section 11 and Section 12(a)(2) impose liability on

other parties for mere negligence." *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (cleaned up).

>    2.    Section 15

Section 15(a) of the Securities Act, codified at 15 U.S.C. § 77o(a), provides that a person who controls a person liable under Section 11 or Section 12:

> [S]hall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a). Similar to Section 20(a) of the Exchange Act, Section 15(a) of the Securities Act "requires proof of a primary violation of the statute and control of the primary violator by defendants." *In re MF Global Holdings*, 982 F. Supp. 2d at 308 (cleaned up). Additionally, "control" under Section 20(b) of the Exchange Act is the same as "control" under Section 15(a) of the Securities Act. *See id.*; *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011); *First Jersey*, 101 F.3d at 1472–73. A plaintiff can establish control by showing that the defendants were "members of the core management team." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *27 (S.D.N.Y. Dec. 2, 2013).

## V.    DEFENDANTS' MOTION TO DISMISS STATE AND COMMON LAW CLAIMS (Doc. No. 787)[18]

Eight Direct Actions[19] assert claims under the PSA and state common law. The Defendants maintain that the Securities Litigation Uniform Standards Act ("SLUSA") preempts those claims and therefore mandate dismissal. I agree.

---

[18]    Considered in this analysis: Defs.' Mem. in Supp. of Mot. to Dismiss State and Common Law Claims, Doc. No. 787-1; Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss State and Common Law Claims, Doc. No. 843; and Defs.' Reply to Resp., Doc. No. 872.
[19]    Those Direct Actions include: *Clal* Am. Compl., Doc. No. 391; *Harel* Am. Compl., Doc. No. 399; *Highfields* Am. Compl., Doc. No. 396; *Migdal Ins.* Am. Compl., Doc. No. 391; *Migdal Mut.* Am. Compl., Doc. No.

In 1998, Congress passed the SLUSA to close a loophole in the PSLRA. *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107–08 (2d Cir. 2001). Because Congress determined that class action plaintiffs were avoiding the PSLRA's heightened requirements by filing class actions in state court under more lenient state statutory or common law theories, the SLUSA mandates that federal courts be "the exclusive venue for class actions alleging fraud in the sale of certain covered securities … [and that] such class actions be governed exclusively by federal law." *Id.* at 108. In particular, the SLUSA provides that:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or <u>Federal</u> court by any private party alleging (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b) (emphasis added); *Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 380–81 (E.D.N.Y. 2002).

To dismiss an action pursuant to the SLUSA, "the defendant must show that: (1) the action is a covered class action under [the] SLUSA; (2) the action purports to be based on state law; (3) the action involves a covered security under [the] SLUSA; (4) the defendant misrepresented or omitted a material fact or employed a deceptive devise; (5) in connection with the purchase or sale of such security." *Araujo*, 206 F. Supp. 2d at 381 (cleaned up).

The only issue disputed here is whether the instant opt-out lawsuits constitute a "covered class action" for purposes of the SLUSA. A "covered class action" is defined as "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact," in which: (1) "damages are sought on behalf of more than 50 persons;" and (2) "the lawsuits are

---

391; *Mivtachim* Am. Compl., Doc. No. 391; *Phoenix* Am. Compl., Doc. No. 397; *Psagot* Am. Compl., Doc. No. 391.

joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. §

77p(f)(2)(A)(ii). It is undeniable that the eight Direct Actions fit that bill. Regarding the first

prong, the number of plaintiffs bringing the Direct Actions alone exceeds 70. It does not matter

that the Direct Actions do not seek to represent a class of plaintiffs; they meet the SLUSA

definition of a "covered class action." Regarding the second prong, the eight Direct Actions were

indisputably consolidated into the *Ontario* Action. *See* Consolidation Order, Doc. No. 341. By

definition then, those eight Direct Actions are covered class actions.

Ignoring those facts, the DAPs request an exception: opt-out actions, like theirs, should

be excluded from the "covered class action" definition. *See* Pls. Mem. in Opp'n to Defs.' Mot. to

Dismiss State and Common Law Claims ("Pls. Opp'n to Mot. to Dismiss State Claims"), Doc.

No. 843, at 8. But that argument is curious, given that there is ample authority within this Circuit

holding otherwise.[20] *See, e.g., Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 813

(S.D.N.Y. 2015) (holding that opt-out action is a covered class action, despite opt-out action not

being formally consolidated with class action); *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d

493, 517–18 (S.D.N.Y. 2009), *aff'd sub nom. Amorosa v. AOL Time Warner Inc.*, 409 F. App'x

412 (2d Cir. 2011) (same).

Still, the DAPs contend that those cases failed to consider the legislative history of the

SLUSA. *See* Pls. Opp'n to Mot. to Dismiss State Claims, Doc. No. 843, at 11 n.10. Furthermore,

the DAPs attempt to distinguish this case by drawing on the facts that: (1) they actively opposed

---

[20]     Admittedly, there is at least one case that held that an opt-out lawsuit was not "covered class action."
*Ventura v. AT & T Corp.*, 2006 WL 2627979, at *1 (S.D.N.Y. Sept. 13, 2006). There, the court stated that the action
was not joined or consolidated with the relevant class action and that the case had been on "a separate procedural
track." *Id.* Notably, the DAPs do not cite to it. And for good reason. For one, these Direct Actions have been
consolidated. *See* Consolidation Order, Doc. No. 341. Additionally, courts have routinely declined to follow the "a
separate procedural track" line of reasoning used in that case. *See Kuwait Inv. Off. v. Am. Int'l Grp.*, Inc., 128 F.
Supp. 3d 792, 813 (S.D.N.Y. 2015) ("…*Ventura*, offered little explanation or analysis and thus is of limited
persuasive value.").

consolidation with the *Ontario* Action; (2) the claims were originally brought in federal court and subject to the federal pleading standards; and (3) they exercised their Due Process rights to opt-out of the class action and pursue their individual claims. None of these arguments is availing.

It is immaterial that the DAPs filed the Direct Actions in federal court because the SLUSA's preclusive effects includes claims filed in federal court. *See* 15 U.S.C. § 77p(b). Nor does it matter that the DAPs opposed consolidation. Courts have recognized that Congress intended the clause "for any purpose," as used in the definition of "covered class action," to be broadly construed. *See In re Refco Inc. Sec. Litig.*, 859 F. Supp. 2d 644, 649 (S.D.N.Y. 2012). Actions "need not have been formally joined or consolidated with other actions to trigger [the] SLUSA, so long as they proceed as a single action for any purpose." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 479 (S.D.N.Y. 2012) (cleaned up). Finally, contrary to DAPs' arguments, it is also not clear that application of the statute "produce[s] a result demonstrably at odds with the intentions of its drafters." Pls. Opp'n to Mot. to Dismiss State Claims, Doc. No. 843, at 9 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Legislative history should only be used in determining the meaning of the statute when there is ambiguity. Assuming *arguendo* that the statutory language was not clear, the legislative history is not helpful for the DAPs, because it shows Congress' intent was that the SLUSA "be interpreted broadly to reach mass actions *and all other procedural devices that might be used to circumvent the class action definition*." S. REP. NO. 105–82, at 8 (1998) (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 242 (S.D.N.Y. 2004).

In sum, I conclude that the SLUSA applies to the eight Direct Actions' PSA and state common law claims. Accordingly, the Defendants' motion to dismiss those claims is **granted**.[21]

## VI.   DEFENDANTS' MOTION TO DISMISS ON PLEADING AND OTHER GROUNDS (Doc. No. 784)[22]

### A.   Rule 11[23]

As an initial matter, it is uncontested that each of the Direct Actions recycles several allegations raised in both the *Ontario* SAC and the State Attorneys General's complaint.[24] The Defendants argue that the Direct Actions' "wholesale lifting" of allegations does not constitute the reasonable investigation required by Rule 11 of the Federal Rules of Civil Procedure. *See* Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 8. And for that perceived violation, the Defendants ask me to strike portions of the complaints as immaterial under Rule 12(f) of the Federal Rules of Civil Procedure.[25] Having reviewed the arguments, I conclude that no such remedy is required in this case.

To begin, Rule 11(b), Fed. R. Civ. P., provides that

> [b]y presenting to the court a pleading … an attorney … certifies that to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, … the factual contentions have evidentiary support or *if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery* ….

---

[21]   I need not reach the Defendants' other bases for dismissal of the state law claims.

[22]   Considered in this analysis: Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1; Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 841; Defs.' Reply to Resp., Doc. No. 871; Defs.' Notice of Supp. Authority, Doc. No. 966; and Pls.' Resp. to Defs.' Notice of Supp. Authority, Doc. Nos. 967–70.

[23]   Initially, the Defendants posited that this argument applies to all of the Direct Actions. At oral argument, the Defendants conceded this argument does not apply to the *Franklin* and *Nordea* Direct Actions. *See* Hr'g Trans., Doc. No. 940, at 5:25-6:18. Nonetheless, for reasons described herein, this basis for dismissal is denied with respect to all of the Direct Action complaints.

[24]   *See* Compl., Doc. No. 1, in *Connecticut, et al., v. Sandoz, Inc., et al.*, No. 3:20-cv-802 (SRU) (D. Conn.).

[25]   To the extent that the Defendants are seeking relief under Rule 11, they cannot. To obtain relief under Rule 11, the Defendants had to serve a Rule 11 motion "separately from any other motion" and provide the DAPs 21 days to withdraw or otherwise correct their pleading. Fed. R. Civ. P. 11(c)(2). No such step was taken, so the Defendants are not entitled to a remedy under Rule 11. Further, the Defendants have not properly filed a Rule 12(f) motion. But as the Defendants note, Rule 12(f) permits a court to act on its own to strike "redundant, immaterial, impertinent, or scandalous matter" from a pleading. *See* Fed. R. Civ. P. 12(f); Defs.' Reply to Resp., Doc. No. 871, at 3 n.1.

(emphasis added).

Allegations that have not been independently verified, the Defendants assert, must be stricken pursuant to Rule 12(f), which permits a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The authority on which the Defendants anchor this argument derives from *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), which held that a plaintiff's pleadings could not reference a complaint that resulted in a consent decree. Of note, several courts within this Circuit have expanded *Lipsky* beyond the consent decree context.[26] Nevertheless, there is a serious question as to whether *Lipsky* mandated those subsequent results.

Importantly, the *Lipsky* court's rationale was based on the fact the consent decree was the result of a private bargain between the parties and thus inadmissible under Rule 410 of the Federal Rules of Evidence. *Id.* at 893. And because it was not a "hearing or ruling[ ] or any form of decision on the merits by the … court," the *Lipsky* court held that the decree could have no possible bearing on the dispute. *Id.* at 894. Ultimately, the *Lipsky* court reiterated the strong presumption against striking portions of the pleadings and cautioned that its holding was limited to "the facts of [the] case." *Id.* at 893.

Unsurprisingly then, other courts have chosen not to expand *Lipsky* beyond its facts. *See, e.g., City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *6 (S.D.N.Y. Jan. 21, 2021) ("Defendants are incorrect to assert that

---

[26]     *See, e.g., Low v. Robb*, 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) (noting that "[i]t is well settled under Second Circuit law that allegations in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f).") (cleaned up); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd on other grounds*, 387 F. App'x 72 (2d Cir. 2010) (striking references to complaints filed in other actions that had not been resolved on the merits).

[the plaintiffs] may not rely on facts pleaded in outside litigation."); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("[T]he weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because 'neither Circuit precedent nor logic supports … an absolute rule' against doing so.") (cleaned up). Some courts have even suggested that it would be "irresponsible" to not rely on facts adduced in government investigations and later pled in government actions. *de la Fuente v. DCI Telecommunications, Inc*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003).

Against that backdrop, I cannot conclude that the DAPs failed to comply with Rule 11. Nor do I find any basis to strike allegations in the Direct Action complaints pursuant to Rule 12(f). Beginning with the State Attorneys General's allegations, those allegations were the product of an intensive, multi-year investigation. As the *de la Fuente* court suggested, it is reasonable to rely on a governmental investigation because such information may have more "evidentiary support." *de la* Fuente, 259 F. Supp. 2d at 260. Additionally, counsel indicated that they *did* investigate the complaints upon which they relied. *See, e.g., Pacific* Am. Compl., Doc. No. 392, at 1 (noting that counsel's investigation included a review of "civil complaints alleging that Teva and its subsidiaries violated federal and state antitrust and unfair competition laws"). The DAPs were permitted to reallege allegations brought in prior complaints drafted by experienced counsel or governmental investigators and counsel. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (permitting plaintiffs to borrow allegations from the [State Attorneys General's] complaint, given that those facts "derived from a credible complaint based on facts obtained after an investigation"); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d at 472 (declining to strike allegations based on information contained in an SEC complaint where the plaintiffs had "documentary support for some of their allegations" and "publicly

available information support[ed] plaintiffs' allegations"), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) (summary order).

Regarding *Ontario* Action, the DAPs have done more than just parrot allegations from the SAC. Thus, the Defendants' reliance on *Amorosa v. General Electric Co.*, 2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022), a recently-decided case, is misplaced. *See* Defs. Notice of Supp. Authority, Doc. No. 966. In *Amorosa*, the court dismissed an opt-out plaintiff's complaint because it "copied almost verbatim from the operative complaint in the Class Action." 2022 WL 3577838, at *1. In reaching that holding, the *Amorosa* court noted that the opt-out plaintiff "verified none of what he copied," and raised barely any new factual allegations. *Id.* at *2–3.

Unlike in *Amorosa*, the Defendants themselves concede that the Direct Action complaints are not "identical" to *Ontario* SAC. *See* Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 2. And in fact, those differences, including new legal claims and defendants, are the subject of the instant motions to dismiss. Moreover, each of the Direct Action complaints identify the sources that counsel investigated, and attest in good faith that discovery will provide evidentiary support for allegations pled on information and belief. *See, e.g., Pacific* Am. Compl., Doc. No. 392, at 1 ("Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' counsel."). Rule 11 requires nothing more. *See Homeward Residential, Inc. v. Sand Canyon Corp.*, 2014 WL 2510809, at *7 (S.D.N.Y. May 28, 2014) ("Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lends credence to the borrowed allegations.").

The Defendants take specific issue with counsel failing to perform an independent investigation to confirm the adequacy of both: (1) the former employee allegations; and (2) lost profits analysis,[27] especially in light of subsequent developments: Counsel for the *Ontario* Class does not plan to call the expert who performed the inflated profits analysis to testify and one of the four former confidential employees submitted a sworn declaration disavowing a material aspect of his statement. Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 10, 12.

Starting with the lost profits calculation, I repeat my analysis from above. The DAPs were only required to conduct an independent investigation concerning the adequacy of their allegations. Put simply, there was no obligation to hire another expert to confirm the plausibility of allegations that I already sustained. That the *Ontario* Class will not call the expert is immaterial. Likewise, Rule 11 does not require counsel to certify that counsel has spoken with the confidential witnesses and knows who they are. *See Homeward Residential, Inc.*, 2014 WL 2510809, at *7. The cases relied upon by the Defendants can be easily distinguished.

In *Millennial Media*, the plaintiff's counsel relied on, and quoted from, an investigator's memo that summarized a phone interview with 11 confidential witnesses. *See In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015). No independent investigation was done by counsel. *Id.* at *11–12. Even more problematically, nearly half of the confidential witnesses repudiated various statements attributed to them. *Id.* Acting on those facts, the court stated that, although Rule 11 does not require counsel to personally conduct the

---

[27]    As context, the *Ontario* Class alleged that Teva received inflated profits resulting from its price-hike strategy. In making those allegations, counsel for the *Ontario* Class commissioned an expert to derive those figures. Regarding scienter, I previously held that the *Ontario* Class sufficiently pled scienter against the Class Defendants by relying on allegations raised by four confidential former Teva employees. Those allegations are realleged in the Direct Action complaints.

interview, it does demand that counsel attempt to confirm the accuracy of the statements that are relied upon. *Id.* What the Defendants ignore, however, is that the *Millennial Media* court took particular issue with counsel's reliance on an investigator's memo because it was possible that the "investigator may have taken notes hurriedly while conducting the interview, unaided by a tape recorder and unassisted by a colleague." *Id.* at *12.

Neither is *Lehman Brothers* on point. *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *3–4 (S.D.N.Y. July 31, 2013). There, the court held that the plaintiff failed to meet its pleading burden by relying on statements from confidential witnesses originally recounted in a "separate complaint filed by separate counsel in a separate action." *Id.* at *3. But as one court noted, the *Lehman Brothers* court:

> was concerned that the uncorroborated witness statements pled in a different matter could be mischaracterized by attorneys. But there, the confidential witnesses were employees of a non-party entity and their statements were pulled from a complaint that involved entirely different parties.

*Schwab Cap. Tr. v. Celgene Corp.*, 2021 WL 1085474, at *10 (D.N.J. Mar. 22, 2021). The concern for misuse would not be present here because the Direct Action complaints are "asserting virtually identical claims" as those in the *Ontario* Action. *Id.* Moreover, this court, as in *Schwab*, has already determined that the confidential witness statements were sufficient to support a properly pled complaint. That one witness has purportedly recanted his statement does not discredit the other three witnesses' statements.

Ultimately, the Second Circuit has observed that "courts should not tamper with the pleadings unless there is a strong reason for so doing," *Lipsky*, 551 F.2d at 893, and has emphasized that Rule 12(f) is "designed for excision of material from a pleading, not for dismissal of claims in their entirety." *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (cleaned

up). I find no basis to strike any allegations from the Direct Actions complaints, and the Defendants' motion to dismiss on that basis is **denied**.

B.   Claims Based on Non-Disclosure of Subpoenas

Next, nine Direct Actions[28] allege that Teva made material misrepresentations and omissions by failing to disclose its receipt of two government subpoenas; one from the DOJ on June 21, 2016; and the other from the Connecticut Attorney General on July 12, 2016. *See, e.g.*, *Alaska* Am. Compl., Doc. No. 389, at ¶ 128 ("Defendants failed to disclose their receipt of subpoenas from the U.S. Department of Justice and the Connecticut Attorney General."). That claim, however, has already been raised and rejected by this Court.

In the *Ontario* Action, I held that Teva was "not under a duty to disclose the subpoenas and, therefore, any claims arising from their alleged concealment fail." *Ontario*, 432 F. Supp. 3d at 167. Relying on that holding, the Defendants posit that the same result should follow here. Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 13–14. And the DAPs do not object. *See* Hr'g Trans., Doc. No. 940, at 31:1-31:5 ("[W]e didn't address that issue, your Honor. We think the Court got it right, so we do not contest it.").

Concluding as I did in *Ontario*, any claims arising out of the non-disclosure of subpoenas are **dismissed**.

C.   Purchases of Teva Securities after August 3, 2017[29]

The Defendants assert that all claims based on Teva securities purchased after August 3, 2017 ("post-August 2017 claims") must be dismissed. Defs.' Mem. in Supp. of Mot. to Dismiss

---

[28]     Those Direct Actions include: *Alaska* Am. Compl., Doc. No. 389; *Clal* Am. Compl., Doc. No. 391; *Harel* Am. Compl., Doc. No. 399; *Migdal Ins.* Am. Compl., Doc. No. 391; *Migdal Mut.* Am. Compl., Doc. No. 391; *Mivtachim* Am. Compl., Doc. No. 391; *Nordea* Am. Complaint, Doc. No. 390; *Phoenix* Am. Compl., Doc. No. 397; *Psagot* Am. Compl., Doc. No. 391.
[29]     These claims are raised in all the Direct Actions. For brevity's sake, I will only cite to the *Franklin* complaint.

on Pleading and Other Grounds, Doc. No. 784-1, at 14–15. Central to the Defendants' claims is the assumption that in *Ontario*, I concluded that by August 3, 2017, with Teva's Form 6-K, the truth about Teva's misrepresentations and omissions related to the alleged price-hike strategy and price-fixing scheme was known to the market. Relying on that presumption, the Defendants posit that, the DAPs: (1) cannot establish loss causation based on disclosure of facts already known to the market; (2) cannot rely on the fraud-on-the-market presumption for statements after August 3, 2017 because the truth had already been disclosed to the market; and (3) lack standing with respect to purchases made after August 3, 2017. *Id.* at 15–20.

Because the Defendants' arguments are premised on the *Ontario* holding, I must begin my analysis there. The Defendants are correct that I held in *Ontario* that the SAC adequately pled loss causation by alleging that "the value of Teva securities was negatively affected" by "the sequence of events [investigations, bad press, executive departures] between early August 2016 and early August 2017 [which] constructively disclosed the frauds … that Teva had been concealing." *Ontario*, 432 F. Supp. 3d at 174. Contrary to the Defendants' suggestion, however, *Ontario* never decided as a matter of law that the full scope of Teva's alleged misstatements and omissions had been disclosed by August 2017.

Practically speaking, I had no occasion to reach the question whether corrective disclosures after August 2017 were actionable. The relevant class period terminated on August 3, 2017, and no allegations concerning facts after that date were pled.

Moreover, the portion of the *Ontario* opinion relied upon the Defendants lends no support to their argument. Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds., Doc. No. 784-1, at 15. The relevant passage is as follows:

> The lawsuit and bad press, in revealing that Teva conspired with its competitors, also necessarily revealed that Teva was increasing the prices of its generic drugs.

> Investors and analysts, then, were on notice that Teva was internally raising its prices, in lockstep with its competitors.

*Ontario*, 432 F. Supp. 3d at 174. In the Defendants' view, that excerpt meant that the full extent of Teva's frauds were known to investors and analysts by the last alleged corrective disclosure on August 3, 2017. But when read in context, it is clear that the excerpt was addressing a specific argument raised in the motion to dismiss,[30] and expressed no opinion regarding disclosures made after August 2017. The Defendants seemingly recognize as much, given that they walk back their position in the Reply. *See* Defs.' Reply to Resp., Doc. No. 871, at 6.

Having held that *Ontario* does not "require dismissal" of the post-August 2017 claims, I now address whether the post-August 2017 claims should be dismissed for some other reason. Of relevance here, four revealing disclosures between November 2, 2017 and May 10, 2019 are alleged. Those disclosures, according to the DAPs, provided the market with new information about Teva's alleged frauds. The Defendants take a different view.

1.     Disclosure 1

*December 9, 2018*: A Washington Post article quoted the Connecticut Assistant Attorney General stating that the investigation into anticompetitive activity in the generics industry had expanded to 300 drugs and exposed "the largest cartel" in United States history. *Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶¶ 172, 343.

2.     Disclosure 2

---

[30]     The SAC, in pleading loss causation, alleged that the same "sequence of events [investigations, bad press, executive departures] between early August 2016 and early August 2017" constructively disclosed both the price-hike scheme and the price-fixing scheme to the market. *Ontario*, 432 F. Supp. 3d at 174; SAC, Doc. No. 310, at ¶¶ 313–37. The Class Defendants took issue with that approach, arguing that the *Ontario* Class could not rely on the same corrective events and disclosures to adequately plead loss causation for two separate frauds. *See* Defs.' Mot. to Dismiss SAC, Doc. No. 132-1, at 56. *Ontario* rejected that approach, and in doing so, held that because the two frauds were part of a "network of interrelated lies," when "[i]nvestors and analysts … were on notice" of one fraud, they were necessarily on notice of the other fraud.

*May 10, 2019*: The State Attorneys General filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the conspiracy. The State Attorneys General's complaint detailed Teva's price fixing with respect to at least 86 different generic drugs (as compared to 7 drugs in the previously-filed action). The State Attorneys General's complaint also revealed new facts relating to significant price increases Teva implemented for approximately 112 generic drugs and detailed Teva's role as a "consistent participant" and a central player in the conspiracy. *Id.* at ¶¶ 173, 345.

### 3.      Disclosure 3

*November 2, 2017*: Teva's announcement that it had experienced a 9% decline in U.S. generic quarterly revenues as compared to the third quarter of 2016. *Id.* at ¶ 337.

### 4.      Disclosure 4

*February 8, 2018*: Teva's announcement of a $10.4 billion impairment related to its U.S. generics business. *Id.* at ¶ 340.

The first two events relate to Teva's alleged participation in price collusion. Following each of those disclosures, Teva's ADS price fell $0.97 per share, or approximately 5%, and $2.13 per share, or approximately 15%, respectively. *Id.* at ¶¶ 344, 346. The Defendants contend that those disclosures did not reveal any "new" information to the market, and therefore constitute the materialization of an already disclosed risk. Defs.' Reply to Resp., Doc. No. 871, at 6.

On this issue, *In re Vivendi* is instructive. In *In re Vivendi*, the plaintiffs alleged that the company concealed the truth about its liquidity risk. *In re Vivendi*, 838 F.3d at 262. For purposes of loss causation, nine disclosures were at issue. *Id.* at 262–63. The sixth disclosure was a press release in which the company acknowledged its "short-term liquidity problems and its €1.8

billion in obligations." *Id.* at 263. The ninth disclosure, announced a month later, disclosed that the company "planned to sell €10 billion in assets over the following two years." *Id.* Applying the Defendants' logic to *In re Vivendi*, by the sixth disclosure, the market was aware that Vivendi had a liquidity problem. Yet, the Second Circuit affirmed the jury's loss-causation finding that all "nine events … revealed the truth about Vivendi's liquidity risk." *Id.* Like *In re Vivendi*, prior to the first and second disclosures at issue, it was no secret that Teva was facing antitrust liability. Nonetheless, as alleged, the market had no conception of its breadth.

The Defendants urge me to apply the rationale in *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120 (S.D.N.Y. 2021). But that case is inapposite. The *Sjunde AP-Fonden* court held that a news report describing the "ramping up" of an already-disclosed investigation was not actionable. 545 F. Supp. 3d at 148. That result is unsurprising. Such a generic, non-specific announcement could not provide the market with any new information about the culpability of those being investigated or the scope of the alleged fraud. *Id.* (noting that statements about the investigation ramping up "demonstrate the markets' awareness of the risk"). The same cannot be said here. Unlike *Sjunde AP-Fonden*, these two disclosures at issue here are far more specific, detailing the number of drugs being investigated (both significantly more than previously announced) and some of the investigations' findings. Indeed, after the May 2019 disclosure, Berstein Private Wealth Management allegedly proclaimed that "the price-fixing lawsuit is worse than [it] expected." *Franklin* compl., No. 3:20-cv-01630, Doc. No. 1, at ¶ 347. Taken together, it is plausible that, until the final disclosure in May 2019, the full extent of Teva's alleged price-collusion fraud was not known to the market.

The last two disclosures relate to Teva's alleged participation in the price-hike strategy. Following each of those disclosures, Teva's ADS price fell $2.79 per share, or approximately

20%, and $2.21, or approximately 10.6%, respectively. *Id.* at ¶¶ 338, 341. The Defendants similarly argue that these disclosures did not reveal any new information because "[a]s of August 3, 2017, the market knew that Teva's prior goodwill estimates were no longer reliable." Defs.' Reply to Resp., Doc. No. 871, at 8. That conclusion is curious because it does not account for the accompanying dip in stock price. *See, e.g., In re Mylan*, 2018 WL 1595985, at *18 (concluding that the plaintiffs adequately alleged loss causation where, *inter alia*, disclosure of suspected price-fixing scheme caused stock drop of 6.9% in September 2016 and 1.64% in November 2016).[31]

Essentially, the Defendants' arguments rest on the premise that the disclosures revealed information already known to the market (i.e., a truth-on-the-market defense)[32] and thus could not have negatively affected the market.[33] Courts routinely reject similar arguments at the motion to dismiss stage because the truth-on-the-market defense "is intensively fact-specific and is rarely an appropriate basis for dismissing a [Section] 10(b) complaint." *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018); *see also Freeland v. Iridium World Comm'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (rejecting the defendants' attempt

---

[31] The Defendants are correct that many other reasons can account for the pricing reaction. Defs.' Reply to Resp., Doc. No. 871, at 8. That is all the more reason to reject their argument. *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 149 (S.D.N.Y. 2021) ("Given that loss causation is a fact-based inquiry, when it is a close call as to whether contents of [a] disclosure had already been revealed—as it is here—it is best for the jury to make that decision.") (cleaned up); *see also Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes.").

[32] Under that theory, "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Generally, however, this defense is used to refute the materiality element. *See id.*

[33] It is worth noting that the DAPs allege several times that the Defendants continued to deny any wrongdoing. So even if the truth-on-the-market defense was applicable, such information was counteracted by Teva's alleged contemporaneous statements. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (holding that, even if the fraud had been disclosed to the market, "such information was counteracted by contemporaneous statements" by the defendants). At oral argument, the Defendants took issue with this argument, noting that a corporation should be able to deny any wrongdoing until final judgment. Hr'g Trans., Doc. No. 940, at 35:20–36:02. That point is well-taken, but it does not work to neutralize allegedly false explanations of apparent wrongdoing.

"to inject [a] truth on the market defense" into loss causation and holding that "[the truth-on-the-market defense] remains a factual determination to be decided by the jury"). I reach a similar conclusion here.

In sum, the DAPs have adequately alleged loss causation.[34] Accordingly, the Defendants' motion to dismiss any post-August 2017 claims is **denied.**

D.      Claims Based on Pre-October 29, 2015 Misrepresentations[35]

The Defendants' next challenge is centered on all claims "based on allegations, that prior to [October 29, 2015], [Teva] denied, concealed or otherwise misrepresented that Teva was increasing generic pricing." Defs.' Reply to Resp., Doc. No. 871, at 11 (cleaned up). According to the Defendants, October 29, 2015[36] is the first statement the DAPs can "identify that can plausibly be construed as a broad denial that Teva was increasing prices." Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds., Doc. No. 784-1, at 21 (cleaned up). Prior to that, the Defendants emphasize that Teva made clear that it was raising its generic drug prices.

As the Defendants note, "dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003). In other words, "[a] complaint fails to state a [Section] 10(b) claim when the alleged omission has actually been disclosed." *Debora v. WPP Group*, *P.L.C.*, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994). It is undisputed that, prior to October 2015, Teva disclosed its plans to increase pricing. And in the Defendants' view, that ends the inquiry.

---

[34]      The Defendants also argue that the DAPs did not plead reliance or standing because the four corrective disclosures and events did not reveal "new information" to the market. Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 17–20. But because I have just concluded that those corrective disclosures and events constitute new information, the Defendants' alternative arguments likewise fail.

[35]      These claims are raised in all the Direct Actions.

[36]      It is alleged that on October 29, 2015, Vigodman denied that any of Teva's margin improvements were attributable to price increases. *See, e.g., Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶ 178 ("… all the improvement you see in our [] margins is **not driven by price**. It is driven by quantities and by mix and by efficient measures. **Not by price**….").

*See* Defs.' Reply to Resp., Doc. No. 871, at 11 (arguing that, "fraud claims premised on the concealment of information which was indisputably disclosed … fail as a matter of law").

Although the Defendants' recitation of the law is correct, it is their application of the law that is flawed; the DAPs' claim is not that Teva did not disclose its intention to raise prices, but rather that it lied about why that decision was made. Said differently, the pre-October 2015 statements on pricing were allegedly false and misleading because once the Defendants spoke about Teva's pricing strategy, it had a duty to disclose the full truth behind the price-hike strategy and did not.

Take the *Phoenix* complaint as an example. One of the alleged false and misleading statements was made on a December 10, 2013 call, during which Defendant Oberman "stated that [Teva] had increased prices on a number of generic products in 2013, and Defendant Desheh affirmed that such spikes will go directly to the bottom line." *Phoenix* Am. Compl., Doc. No. 397, at ¶ 608. It is alleged that those statements were false and misleading because the Defendants, in making those statements, did not also disclose that "the price increases were part of widespread collusive activities." *Id.*

Moreover, some complaints allege that the Defendants made plainly false and misleading statements about when price increases were implemented. For example, the *Harel* complaint alleges that on October 30, 2014, Defendant Olafsson "assured investors that price increases were only taken when opportunities like shortages existed in the market." *Harel* Am. Compl., Doc. No. 399, at ¶ 603. It is alleged that those statements were false and misleading because the price-hike strategy was implemented on drugs for which no shortages had in fact occurred. *Id.* at ¶ 607.

As I held in *Ontario*, half-truths are actionable and the Defendants "cannot avoid potential liability on the basis of the technically correct portion of a half-truth." *Ontario*, 432 F. Supp. 3d at 165. Accordingly, it matters not what the Defendants disclosed (i.e., that Teva was increasing prices), but rather, what the Defendants failed to disclose (i.e., the *strategy* behind the price increase). Viewed through that lens, the DAPs have plausibly alleged that pre-2015 statements about pricing were misleading. Accordingly, the Defendants' motion to dismiss any pre-October 2015 claims is **denied**.

E.    Dismissal of Five Direct Actions

The next argument only applies to the *Pomerantz* Direct Actions. Specifically, the Defendants assert the *Pomerantz* Plaintiffs fail to "clearly allege that they bought securities," or "attach certifications to document their trades," thereby warranting dismissal on standing and loss causation grounds. *See* Defs.' Mem. in Supp. of Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 784-1, at 23–24; Defs.' Reply to Resp., Doc. No. 871, at 11–13. In support of that claim, the Defendants point to several allegations in the *Pomerantz* Complaint where it is alleged that certain plaintiffs "purchased and/or sold" certain Teva securities during the Relevant Period. That language, the Defendants posit, "could support multiple interpretations," including an inference that those plaintiffs were in-and-out traders. To put the Defendants' argument in context, it is important to discuss the constitutional Article III standing requirement, as well as the statutory loss causation requirement.

The three prongs of constitutional standing are well-established: (1) an "injury in fact"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is redressable by a favorable decision by the court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). The second and third elements are clearly established. If the *Pomerantz*

Plaintiffs' allegations are true, then their injury is "fairly traceable" to the Defendants' conduct and a favorable decision would provide their requested relief of damages. Thus, the Defendants seem to challenge only whether the *Pomerantz* Plaintiffs have suffered an injury-in-fact.

Somewhat similarly, loss causation is a required element to state a claim under the Exchange Act. The mere allegation that an individual purchases a stock at an inflated price does not, on its own, allege a loss. Rather, it is only when the misrepresented "facts … become generally known[,] and *as a result* share value depreciates," that a plaintiff suffers a loss. *See Dura Pharm.*, 544 U.S. at 344 (cleaned up). Based on that theory, selling stock before a corrective disclosure is made is generally not sufficient to show loss causation. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) ("[I]n-and-out traders"— investors who purchased shares during the class period but sold those shares before the misrepresentation was disclosed—would not "even 'conceivably' be able to prove loss causation as a matter of law.").

Applying those legal principles here, the allegations in the *Pomerantz* complaint are sufficient at the pleading stage to satisfy the constitutional requirement of a traceable injury-in-fact and the statutory loss causation requirement. Repeatedly, the *Pomerantz* Plaintiffs allege that they purchased Teva securities at an inflated price during the Relevant Period. Indeed, the first paragraph in the *Pomerantz* complaint states that the Defendants' "misrepresentations and omissions caused the market, including [the] Plaintiffs, to purchase Teva's securities at artificially inflated prices." *Pom.* Compl., Doc. No. 391, at ¶ 1. Elsewhere, the *Pomerantz* Plaintiffs allege that they "suffered damages in connection with their purchases of Teva Securities during the Relevant Period." *Id.* at ¶ 606. And again, the *Pomerantz* Plaintiffs allege

that: "the Defendants' fraudulent conduct directly and proximately caused [them] to suffer substantial losses as a result of purchasing Teva securities." *Id.* at ¶ 516.[37]

Nevertheless, the Defendants posit that those allegations are inconsistent with other pleadings alleging that certain plaintiffs "purchased and/or sold" Teva securities. The problem with the Defendants' argument is two-fold: it overstates certain allegations, while trivializing others. Admittedly, the allegations made by the various plaintiffs are not consistent. *Compare Pom.* Compl., Doc. No. 391, at ¶ 35 ("Halman Aldubi *purchased and/or sold* Teva securities … during the Relevant period") *with id.* ¶ 36 ("Each of the Canaf-Clal entities each *purchased* Teva shares during the Relevant Period and was damaged thereby."). And the *Pomerantz* Plaintiffs do not provide an explanation for the inconsistency. Contrary to the Defendants' theory, however, those inconsistencies are not fatal.

Somewhat conveniently, the Defendants ignore that the few sentences using the "purchased and/or sold" language also claim that those plaintiffs held their shares until a corrective disclosure. *See, e.g.*, *id.* at ¶ 32 ("Hebrew University purchased and/or sold Teva securities on the NYSE and TASE during the Relevant Period *and was damaged upon the revelation of the alleged corrective disclosures.*"). So even if the "purchase and/or sold" language could support "multiple interpretations" as the Defendants maintain, the remaining portion of the sentence resolves any ambiguity: the *Pomerantz* Plaintiffs allege that they <u>were</u> purchasers of Teva securities, and <u>were</u> injured following the alleged corrective disclosures. The Defendants may elect to disaggregate allegations in a way that is favorable to the outcome they seek, but I cannot.

---

[37]   The Defendants suggest that I should not credit these allegations because they were copied from the *Ontario* SAC. For reasons already articulated, I will not penalize the DAPs for following a directive that I gave.

Indeed, the *Pomerantz* Plaintiffs unambiguously allege that "[a]s the relevant truth leaked

out into the market from August 2016 to May 2019… [they] suffered losses, which were …

caused by the materialization of the risks that the Defendants' fraudulent conduct concealed from

investors." *Id.* at ¶ 518. Moreover, the *Pomerantz* Plaintiffs allege that with each corrective

disclosure or event, the stock price dropped. *Id.* at ¶¶ 516–68. As just one example, the

*Pomerantz* Plaintiffs allege that after Teva announced an $11 billion impairment related to its

U.S. generics business, "the prices for Teva securities declined," specifying that Teva's ADS

price fell by over 10.5%, and the ordinary share price fell by 6.9%. *Id.* at ¶¶ 553–56. Those

allegations are certainly enough to meet Article III's standing requirement, as well as the

statutory loss causation requirement. *See In re Barclays Liquidity Cross & High Frequency

Trading Litig.*, 390 F. Supp. 3d 432, 445 (S.D.N.Y. 2019) (quoting *John v. Whole Foods Mkt.

Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) ("'general factual allegations of injury may suffice'

to establish injury in fact because, at the [motion to dismiss stage], courts must 'presume that

general allegations embrace those specific facts that are necessary to support the claim.'").

At this stage, I am required to draw from the pleadings all reasonable inferences in the

non-movant's favor. In doing so, I conclude that the *Pomerantz* Plaintiffs have adequately pled

loss causation and standing. Thus, the Defendants' motion to dismiss the *Pomerantz* complaint

for lack of standing and failure to plead loss causation is **denied**.

F.    *Morrison*

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court held that the reach of

United States securities law is presumptively limited to (1) "transactions in securities listed on

domestic exchanges," and (2) "domestic transactions in other securities." 561 U.S. 247, 267

(2010) (discussing Section 10(b) of the Exchange Act); *see also id.* at 268 (noting that "[t]he

same focus on domestic transactions is evident in the Securities Act"); *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 55–56 (S.D.N.Y. 2013) ("Courts in this District uniformly concur that *Morrison*'s prohibition on extraterritoriality applies to Securities Act claims.").

Teva's ADS are traded on the NYSE, a domestic exchange. Teva's preferred shares, ordinary shares, and Notes (collectively, "non-ADS transactions"), however, are not listed on a domestic exchange. For "securities that are not traded on a domestic exchange," a transaction is considered domestic if "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). In other words, for a transaction to qualify as domestic, either the purchaser must have "incurred irrevocable liability within the United States to take and pay for a security, or … the seller [must have] incurred irrevocable liability within the United States to deliver a security," or legal title to the security must have transferred in the United States. *Id.* at 68.

The Defendants argue, and the DAPs do not refute, that eight Direct Actions[38] cannot meet *Morrison's* second prong with respect to their non-ADS transactions. And they are right. Those actions were brought by foreign plaintiffs and none of those complaints allege any facts that go to the second prong of *Morrison*. The DAPs, too, do not contest the Defendants' *Morrison* arguments. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss on Pleading and Other Grounds, Doc. No. 841, at 26–27. Rather, the DAPs assert that *Morrison* does not bar their non-ADS transaction claims under Israeli and/or state law. *Id.* Although that is true,[39] it is irrelevant.

---

[38]     Those Direct Actions include: *Clal* Am. Compl., Doc. No. 391; *Harel* Am. Compl., Doc. No. 399; *INKA* Compl., No. 3:20-cv-00083, Doc. No. 1; *Migdal Ins.* Am. Compl., Doc. No. 391; *Migdal Mut.* Am. Compl., Doc. No. 391; *Mivtachim* Am. Compl., Doc. No. 391; *Phoenix* Am. Compl., Doc. No. 397; and *Psagot* Am. Compl., Doc. No. 391.

[39]     But for reasons already articulated, the Securities Litigation Uniform Standards Act ("SLUSA") preempts the DAPs' state and common law claims. As for the DAPs' Israeli law claims, I previously held that I would exercise supplemental jurisdiction over those claims. *See In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 357 (D. Conn. 2021).

This argument is only limited to the DAPs' federal securities claims with respect to their non-ADS transactions. As such, the dispositive inquiry under *Morrison* is whether those Direct Actions can state a cause of action under the Exchange Act or the Securities Act with respect to their non-ADS transactions. They cannot.

In short, the *Clal*, *Harel*, *INKA*, *Migdal Ins.*, *Migdal Mut.*, *Mivtachim*, *Phoenix*, and *Psagot* Direct Actions cannot state a federal securities claim based on transactions in Teva's preferred shares, ordinary shares, or Notes. Accordingly, those claims are **dismissed**.

G.   *Pacific* Complaint: 2020 Notes

The Supreme Court, in *Dura Pharmaceuticals*, held that for a plaintiff to allege loss causation under the PSLRA based on an artificially inflated purchase price, he must also allege that the share price fell after the truth about the misrepresentation or omission became known. *See Dura Pharm.*, 544 U.S. at 347; s*ee also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed.) (cleaned up).

Here, the *Pacific* complaint does not allege, as *Dura Pharmaceuticals* requires, that the price of the 2020 Notes fell when the alleged truth was revealed to the market. Interestingly, such allegations are made with respect to other Notes. For example, the *Pacific* Plaintiffs allege that after the DOJ announced its antitrust investigation into Teva, the prices of the company's 2021 Notes, 2026 Notes, and 2046 Notes fell. *See Pacific* Am. Compl., Doc. No. 392, at ¶ 372. Nothing, however, is alleged about the price of the 2020 Notes following the DOJ announcement. *Id.* Problematically, the entire complaint is modeled on that pattern; the *Pacific*

Plaintiffs allege the loss associated with putative corrective disclosures and events for each Teva security, except the 2020 Notes.

To be fair, the *Pacific* Plaintiffs *do* allege that the collective value of the Teva Notes declined. *Id.* at ¶ 366 ("the prices of Teva securities declined") and ¶ 35 n.6 ("2020 Notes … are referred to as 'Notes.' Teva's ADS and Notes are together referred to herein as 'Teva Securities'"). But that statement is too general and conclusory to sufficiently plead loss causation, even under the more lenient Rule 8 pleading standard. The *Pacific* Plaintiffs seek recovery based, in part, on the alleged inflated price they paid for the 2020 Notes. To state a claim, therefore, the *Pacific* Plaintiffs were obligated to allege that the value of the 2020 Notes decreased following specific putative corrective disclosures and events. *See Spears v. Metro. Life Ins. Co.*, 2009 WL 2408928, at *11 (N.D. Ind. Aug. 4, 2009) (holding that, complaint did not adequately plead loss causation when plaintiff did not allege that value of shares decreased).

Taken together, I hold that the *Pacific* Plaintiffs have not adequately pled loss causation with respect to the 2020 Notes, and therefore, the Defendants' motion to dismiss those claims is **granted**. The Exchange Act claims asserted in the *Pacific* Direct Action in connection to the 2020 Notes are **dismissed**. The *Pacific* Plaintiffs, however, are granted leave to amend the complaint to correct this deficiency within 45 days of this Order.

      H.    *Highfields* Complaint: Section 18 Claim

Section 18 of the Exchange Act, 15 U.S.C. § 78r, provides an explicit private right of action to investors for damages arising from the purchase or sale of a security in actual reliance upon a false or misleading statement contained in any document or report filed with the SEC in compliance with the Exchange Act. Among other things, a plaintiff is required to plead actual reliance, which is subject to the heightened pleading standards of Rule 9(b). *See In re: Petrobras*

*Sec. Litig.*, 152 F. Supp. 3d 186, 195 (S.D.N.Y. 2016). The Defendants posit that the *Highfields* Plaintiffs have failed to adequately plead reliance.

Generally speaking, courts find actual reliance sufficiently pled where there are both allegations that a plaintiff: (1) actually read a copy of the document filed with the SEC, or relevant parts of the document reported in some other source; and (2) was induced to act upon specific misrepresentations in the document. *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 55 (D. Mass. 1995); *see also* 15 U.S.C. § 78r(a). As applied here, the *Highfields* Plaintiffs allege that a Highfields investment analyst "actually and justifiably read, reviewed, [listened] to and/or relied upon" information contained in several SEC filings and documents. *Highfields* Am. Compl., Doc. No. 396, at ¶¶ 370–72. Moreover, the *Highfields* Plaintiffs specifically identify the documents and filings that were allegedly relied upon, and allege that those documents contained misstatements concerning:

> pricing trends for generic drugs, the competitiveness of the U.S. generics market, the source of Teva's revenues and profits, [the] Defendants' denials that Teva was deriving material financial benefits from price increases, [the] Defendants' claims of limited price hikes, [the] Defendants' denials of pricing pressure, [the] Defendants' denials of participation in collusive conduct, and statements regarding the Actavis acquisition.

*Highfields* Am. Compl., Doc. No. 396, at ¶ 370.

The Defendants acknowledge those allegations, but argue that greater specificity was required. Specifically, the Defendants posit that the *Highfields* Plaintiffs were required to link the investment analyst's review of particular statements to actual Teva securities purchases. That point is well taken, and it has at least some support in this Circuit. For example, in *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd*., the court dismissed the plaintiffs' Section 18 claim because the plaintiffs failed to identify specific transactions that ensued because of their "eyeball" reliance on the company's audit opinions over two one-year

periods. 33 F. Supp. 3d 401, 444 (S.D.N.Y. 2014). Similarly, another district court dismissed a

Section 18 claim where the plaintiff failed to allege "a particular transaction that it allegedly

made in reliance on the document or any other document" alleged to be misleading. *In re Bear*

*Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 309 (S.D.N.Y.

2014).

Nevertheless, I take a different view. As another district court in this Circuit held, that

type of "specificity is not necessary for a [Section] 18 claim to survive a motion to dismiss when

the relevant period is so extensive and plaintiffs allege numerical misstatements and their

relevance with such particularity" *In re: Petrobras Sec. Litig.*, 152 F. Supp. 3d at 196; *see*

*Discovery Glob. Citizens Master Fund, Ltd. v. Valeant Pharms. Int'l, Inc.*, 2018 WL 406046, at

*4 (D.N.J. Jan. 12, 2018) ("The Court is not persuaded that [p]laintiffs must link every purchase

to a specific misstatement to meet Section 18's pleading requirement.").[40] The Relevant Period

alleged in the *Highfields* complaint is five years; the same time period alleged in some of the

individual lawsuits consolidated in *In re: Petrobras Securities Litigation. See, e.g., New York*

*City Employees' Retirement System, et al. v. Petróleo Brasileiro S.A.—Petrobras, et al.*, No. 15-

cv-2192 (S.D.N.Y. Mar. 23, 2015). The *Highfields* Plaintiffs identify nearly 50 documents and

filings that were allegedly relied upon and describe the ways in which those documents were

misleading. Further, it is alleged that the Highfields investment analyst relied upon those

misrepresentations in making each purchase and acquisition of Teva securities on behalf of the

*Highfields* Plaintiffs. Considered together, those allegations are sufficient to plead actual

reliance. *See Discovery Glob. Citizens Master Fund*, 2018 WL 406046, at *4 (holding that actual

---

[40]     Indeed, requiring the *Highfield* Plaintiffs to tie specific misstatements to specific transactions would not
"significantly improve the quality of notice" to the Defendants about the allegations against them but would
certainly "impose additional burdens" on the *Highfield* Plaintiffs. *Argent Classic Convertible Arbitrage Fund L.P. v.
Rite Aid Corp.*, 315 F. Supp. 2d 666, 678 (E.D. Pa. 2004).

reliance sufficiently pled where the plaintiffs identified the statements on which they relied and pled actual "eyeball" reliance on those documents and statements in purchasing the securities at issue.).

Therefore, the Defendants' motion to dismiss the *Highfields* Plaintiffs' Section 18 Exchange Act claims is **denied**.

### I.      Section 12(a) Claims

Section 12(a)(2) of the Securities Act does not apply to private sales of securities, or purchases made in secondary market offerings. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995); *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005). Courts have thus distinguished between allegations that a plaintiff purchased a security "pursuant or traceable to" a registration statement or similar document, and allegations that a plaintiff purchased a security "pursuant to" the document. The latter allegation is sufficient to establish standing under Section 12(a)(2), whereas the former is not. *See, e.g, Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 692 F. Supp. 2d 387, 391 (S.D.N.Y. 2010) (holding that claim based on purchase made "pursuant to" the offering documents could be brought under [Section] 12 while claim based on purchases made "pursuant or traceable to" offering likely does not give rise to standing"); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (holding that the plaintiffs lacked standing because they had merely pleaded that they had purchased the securities "pursuant and/or traceable to the offering.").

Both the *Harel* and *Phoenix* Plaintiffs allege Section 12(a) claims. Starting with the *Harel* complaint, it is alleged that the *Harel* Plaintiffs purchased Teva Notes "in, pursuant to and/or traceable to the Notes Offering." *Harel* Am. Compl., Doc. No. 399, at ¶ 957. Likewise, the *Phoenix* Plaintiffs allege that they "purchased or otherwise acquired Teva's ADSs, [p]referred

[s]hares, and Notes in or pursuant to and/or traceable to the Offerings." *Phoenix* Am. Compl.,
Doc. No. 397, at ¶¶ 948, 994.

As a preliminary manner, the *Harel* and *Phoenix* Plaintiffs cannot state a federal
securities claim with respect to their non-ADS transactions under *Morrison* for reasons already
stated. Thus, any Section 12(a) claims premised on non-ADS transactions fail. Even setting
*Morrison* aside, the allegations are still insufficient to show that the *Harel* and *Phoenix* Plaintiffs
purchased securities in a public offering as opposed to a secondary market.

"For a complaint to plausibly plead standing to raise a claim pursuant to Section 12, it
must identify a particular purchase from a particular defendant pursuant to a particular
prospectus that it contends contained a particular false or misleading statement." *In re CitiGroup
Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010). "Failing to do so fails to meet even
the lessened pleading requirements of Rule 8, because it does not put the defendant on notice as
to the claim plaintiffs seek to raise." *Id.* Put simply, neither the *Harel* nor *Phoenix* complaint
contains such allegations.

The *Harel* and *Phoenix* Plaintiffs' effort to avoid this requirement by pointing to
allegations that purportedly "make explicitly clear that [the plaintiffs] were direct purchasers" is
unavailing. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss on Pleading and Other Grounds, Doc.
No. 841, at 30–31. Relevant here, in *In re: Petrobras Securities Litigation*, the court
distinguished between: (1) complaints that "alleged specific details of [the plaintiff's] Notes
purchases and attached … transaction data sufficient to support" those purchases; and (2)
complaints that solely alleged that the plaintiffs purchased the relevant securities in an initial
offering. 152 F. Supp. 3d at 194. The former was sufficient to plead standing, whereas the

latter[41] was not. *Id.* Neither the *Harel* nor *Phoenix* complaints allege specific details about the purchases or attach transaction data. The DAPs were not required to do both. But by doing neither, the DAPs' complaints are more akin to the type identified by the *Petrobras* court as insufficient.

As plaintiffs seeking redress pursuant to Section 12(a)(2), the *Harel* and *Phoenix* Plaintiffs were "required to establish that they purchased the securities directly from [the Defendants] through the public offering at issue." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d at 585. Because they have not alleged as much, I conclude that the *Harel* and *Phoenix* Section 12(a)(2) claims must be **dismissed**. The Plaintiffs, however, are granted leave to amend their complaint within 45 days of this Order to correct this deficiency.

## VII.   DEFENDANTS' MOTION TO DISMISS NEW CLAIMS AND CLAIMS AGAINST NEW DEFENDANTS (Doc. No. 786)[42]

### A.   New Defendants

A majority of the Direct Actions name five new individuals, former and current Teva officers, as defendants: Altman, Bhattacharjee, McClellan, Peterburg, and Schultz ("New Defendants"). The Defendants argue that the Direct Actions asserting claims arising under Sections 10(b), Rule 10b-5 promulgated thereunder, and 20(a) of the Exchange Act against the New Defendants must fail because the DAPs failed to establish scienter for their statements regarding the price-hike strategy. Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and

---

[41]     The "barebones" allegation specifically identified by the court was as follows: "Plaintiffs purchased the 2013 Notes in the 2013 Offering and the 2014 Notes in the 2014 Offering, pursuant and/or traceable to the materially false and misleading 2013 Offering Documents and 2014 Offering Documents." *See* Complaint in *Transamerica Income Shares, Inc., et al., v. Petróleo Brasileiro S.A.—Petrobras, et al.*, No. 15–cv–3733 (S.D.N.Y May 13, 2015), Doc. No. 1, ¶ 406.

[42]     Considered in this analysis: Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786-1; Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844; Defs.' Reply to Resp., Doc. No. 870; Pls.' Sur Reply, Doc. No. 905; Defs.' Opp'n to Pls.' Motion for Leave to File a Sur Reply, Doc. No. 897. The Sur-Reply only addresses claims based on the Bribery Scheme.

Claims Against New Defendants, Doc. No. 786-1, at 4. I agree substantially with the

Defendants' arguments but disagree that the Direct Actions fail to sufficiently allege scienter

with respect to Defendants Altman and Schultz.

              1.      Motive and Opportunity

In pleading motive, a plaintiff must plead something more than just a motive that is

common to most corporate officers, which is insufficient to constitute motive for the purposes of

scienter. *In re MF Global Holdings*, 982 F. Supp. 2d at 304–05. "Examples of general motives

which fail to support a strong inference of scienter include: '(1) the desire for the corporation to

appear profitable; and (2) the desire to keep stock prices high to increase officer compensation.'"

*Id.* at 306 (*quoting Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). A desire to inflate stock

price, however, may at times be sufficient to support an allegation of scienter. *In re Complete*

*Management Inc. Securities Litigation*, 153 F. Supp. 2d 314, 327–28 (S.D.N.Y. 2001).

Specifically, "artificial inflation of a stock price in order to achieve some more specific goal may

satisfy the pleading requirement." *Id.* at 328.

In pleading opportunity, a plaintiff must "show that the individual defendants possessed

'the means and likely prospect of achieving concrete benefits by the means alleged.'" *In re Take-*

*Two Interactive Securities Litigation*, 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting *Shields*

*v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). "The opportunity to commit fraud

is generally assumed where the defendant is a corporation or corporate officer." *In re MF Global*

*Holdings*, 982 F. Supp. 2d at 306.

In the *Ontario* Action, I held that the *Ontario* Class adequately alleged motive and

opportunity with respect to *Ontario* Defendants by alleging that the price-hike strategy was

implemented to increase revenue and inflate the price of Teva stock to use as currency to acquire

Actavis. Relying on that holding, the DAPs try to attribute that motive to the New Defendants. But that effort is in vain because that motive simply cannot apply to Defendants Peterburg, Bhattacharjee and McClellan. Contrary to the DAPs' arguments, the time when the New Defendants held corporate office positions— including the nature of those positions—is not irrelevant. In fact, it is dispositive. At the time the Actavis deal closed: Peterburg was Chairman of the Board, a non-officer position, Bhattacharjee was President and CEO of Teva's Generics Europe, and McClellan was CFO of Global Specialty Medicines. *See, e.g., Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 56–57, 60. The presumption of opportunity that ordinarily applies to corporate officers is not readily apparent for Peterburg. Nor are there any allegations that would demonstrate that Peterburg, acting in his board member capacity, had the means to implement or effectuate the price-hike strategy. For example, there are no allegations that he was deeply involved in Teva's day-to-day operations, or that he had the ability to control the decisions made by the company. As for Bhattacharjee and McClellan, it is not alleged, nor is it apparent, how their positions are related to an alleged scheme relating to the American generics market. To be clear, Actavis is a global pharmaceutical company. Likewise, Teva is a multinational corporation with thousands of employees. Alleged fraud by persons in one division and geographic market cannot be automatically imputed to persons in another division and geographic market.

Inferring motive with respect to Defendant Schultz requires an even greater leap. Schultz did not join Teva until after the Actavis acquisition was completed. *See id.* at ¶ 59. Responding to that fact, the DAPs state "he was motivated to keep Teva's stock price inflated to continue and prolong the illusion of the Company's successful growth and management." Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 8

(cleaned up). Such a motive, however, is precisely the kind of generalized motive that would be possessed by virtually all corporate insiders, and therefore insufficient to plead scienter.

Defendant Altman is situated differently. He served as Teva's Acting CFO from October 31, 2013 to February 11, 2014. *See, e.g., Phoenix* Am. Compl., Doc. No. 397, at ¶ 54. The DAPs allege that Altman, was motivated to use Teva's stock as "currency" for a "transformational" acquisition as early as January 2014. *See id.* at ¶ 786. Based on that timeline, Altman's tenure overlapped with Teva's alleged scheme to inflate stock for a month—January 2014 to February 2014. The Defendants respond by emphasizing that there are no alleged price hikes during Altman's tenure. That may be the case, but that is not fatal to establishing motive. Certainly, raising prices was an integral part of the price-hike strategy. But also critical to the price-hike strategy were the "false statements" made to "inflate the price of Teva securities" to fund the acquisitions. *See id.* The DAPs allege that Altman made such false statements during his tenure as Acting CFO. For example, on January 14, 2014, during Teva's fourth quarter 2013 earnings call, Altman stated that Teva's inflated profits came from "more profitable product mix mainly in the US generic business." *See id.* at ¶¶ 610–11. Because that type of statement tracks directly with the motive alleged, I conclude that motive is sufficiently pled against Altman, and the statements made during his tenure as Acting CFO are potentially actionable.

2.    Recklessness

The second way a plaintiff can adequately plead scienter is by pleading facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications*, 493 F.3d at 99. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant[s], though

the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (cleaned up).

"[A] complaint sufficiently pleads scienter where it alleges defendants had 'knowledge of facts or access to information contradicting their public statements.'" *Id.* (*quoting Kalnit*, 264 F.3d at 142). "Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.*

      a)     *Bhattacharjee*

The DAPs have failed to raise a strong inference of scienter with respect to Bhattacharjee. Bhattacharjee is alleged to have made misleading statements that attributed price erosion to non-collusive factors. But it is not alleged that Bhattacharjee had "knowledge of facts or access to information contradicting [his] public statements." *Novak*, 216 F.3d at 308.

As in the *Ontario* SAC, the Direct Action complaints are replete with examples where the *Ontario* Defendants knew or had access to documents and databases that contradicted their statements. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 803 ("Teva executives, including Oberman, Cavanaugh, and defendants Griffin and Olafsson, all had access to the Oracle ERP system."). No such specificity is made with respect to Bhattacharjee. Rather, the DAPs merely allege that "Israeli executives" had access to some of those documents. The problem with that, however, is that Israeli executives is too broad a category of persons to sufficiently plead scienter against any particular person. Moreover, only Desheh and Vigodman are identified as Israeli executives in

the complaint.[43] Taken together, the allegations against Bhattacharjee do not support a recklessness indicative of conscious indifference.

b)    *Peterburg*

Next, the DAPs seek to hold Peterburg liable for alleged misstatements and omissions in Teva's 2016 Form 20-F because he signed the accompanying Sarbanes-Oxley ("SOX") certification. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 589. The signing of a SOX certification that is required by law, without more, cannot establish a strong inference of fraudulent intent. Instead, SOX certifications can only raise an inference of fraudulent intent when there are accompanying facts to "show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases). Like Bhattacharjee, there are no allegations that Peterburg had actual knowledge of underlying fraudulent activity. Where, as here, the complaint "does not adequately allege that [the defendants] had actual knowledge" of the alleged price-hike scheme and the price-fixing scheme, "it undermines the allegations that they knew that the SOX certifications were false." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017).

Additionally, Peterburg is alleged to have made several other misstatements related to Teva's pricing strategy on conference calls. During one such call, dated August 3, 2017, Peterburg allegedly stated that Teva "lowered [its] 2017 revenue outlook," but falsely attributed that decline to reasons other than the price-hike strategy collapsing, such as customer consolidation. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 674. Surely, as I have previously held, statements of this kind could be actionable as a misstatement or omission. But the DAPs needed

---

[43]      *See, e.g.*, *Pom.* Compl., Doc. No. 391, at ¶ 446; *Nordea* Am. Complaint, Doc. No. 390, at ¶¶ 88, 390; *Phoenix* Am. Compl., Doc. No. 397, at ¶ 799.

to satisfy the next step, that being, establishing scienter on the part of the speaker of that statement. Said another way, the DAPs were required to allege that Peterburg, in making that statement, knew about, or was reckless in not knowing, about the price-hike strategy. They have not done so.

                c)    *McClellan*

McClellan is a named defendant in each Direct Action. In the majority of those Direct Actions, his liability is primarily premised on his signing various corporate filings and SOX certifications. *See, e.g., Phoenix* Am. Compl., Doc. No. 397, at ¶ 589. For reasons already articulated, such allegations are insufficient to plead scienter.

In addition, several Direct Actions allege that McClellan made several misstatements on conference calls. For example, McClellan is alleged to have stated on an August 3, 2017 earnings call that Teva's reduction in profitability was mainly caused by "price erosion" and "relatively low launches" in the American generics business in 2017. *Phoenix* Am. Compl., Doc. No. 397, at ¶ 674. Nonetheless, those statements, without more, are insufficient to establish scienter. As was the case with Bhattacharjee and Peterburg, there are no allegations that McClellan possessed specific knowledge of the alleged illegal conduct. Nor are there allegations about the existence of specific documents or other information contradicting his statements that were made available to him.

Three Direct Actions, *Alaska, Franklin,* and *Nordea*, attempt to establish recklessness through additional allegations. Adding to the SOX certifications, those Direct Actions allege that McClellan "had access to various sources of information concerning Teva's U.S. generics business, including pricing," and imply that he should have known of the alleged frauds due to his "high-level position." *See, e.g., Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶ 288. It

is well-established, however, that boilerplate allegations like those are insufficient to support

scienter. *See Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (stating that,

general allegations that "defendants, due to their high-level positions in the [c]ompany, had

access to adverse undisclosed financial information through internal corporate documents,

meetings, and reports … without any further facts or details, do not adequately demonstrate …

knowledge of facts or access to information contradicting their public statements.").

The *Alaska, Franklin,* and *Nordea* Direct Actions do raise another allegation that would

not be considered boilerplate but is similarly insufficient. It is alleged that:

> It is implausible that Vigodman, Desheh, Olafsson, Schultz, and <u>McClellan</u>, who
> directly oversaw, and spoke publicly at length about, the "turnaround" [44] in Teva's
> generics business, were unaware of the true source of the Company's changed
> fortunes. The far more compelling inference is that these executives, whose
> ascension and arrival coincided with massive price increases, and whose departures
> coincided with expanding governmental probes into those same price increases,
> were well aware that the price increases were the true driving force behind the
> Company's newfound success.

*Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶ 277. Regarding McClellan, that allegation

is inconsistent with other allegations in the three complaints. Nowhere in those complaints are

there allegations about McClellan speaking "at length" about the "turnaround" in the American

generics market.[45] Moreover, it is alleged that the price-hikes and collusive pricing occurred in

the American generics market and ended in early 2016. It was not until July 2017 that McClellan

assumed his officer role in the generics department. Prior to that post, he served as the SVP and

---

[44]     In this context, the "turnaround" refers to Teva's newfound financial success following the implementation
of the price-hike strategy. *Franklin* Compl., No. 3:20-cv-01630, Doc. No. 1, at ¶¶ 274-76.
[45]     By contrast, the *Phoenix* Plaintiffs, for example, allege that McClellan made a misstatement on a
November 2, 2017 earnings call where he spoke about the revenues and profitability of the U.S. generics business.
*Phoenix* Am. Compl., Doc. No. 397, at ¶ 677. No such claims are alleged in *Alaska, Franklin,* and *Nordea*.
Nonetheless, for reasons already mentioned, those misstatements on their own are insufficient to establish scienter.

CFO of the Global Specialty Medicines division from July 2015 to July 2017, which is not "the division[] where the heart of the misconduct alleged [in the complaint] took place." *Id.* at ¶ 288.

    d)  *Schultz*

    Finally, I turn to the allegations about Schultz raised in each of the Direct Actions. In the vast majority of those Actions, Schultz's liability is premised on one statement. That single statement was made during an investor earnings conference call on November 7, 2019, where Schultz disclosed that "we have shared more than 1 million documents" with the DOJ. *See, e.g., Phoenix* Am. Compl., Doc. No. 397, at ¶ 816. Schultz continued by stating that Teva did not find "any evidence that [they] were in any way part of any structured collusion or price fixing." *Id.* Contrary to the Defendants' suggestion, that statement is not a simple denial of alleged corporate wrongdoing. Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786-1, at 15. For one, it creates a plausible inference that Schultz was aware of, and had insight into, the DOJ investigation. It further creates a strong inference that Schultz, himself, reviewed at least some of the documents because it is highly improbable that Schultz would not inquire into the status of an investigation that would have significant implications for the company he runs. Considering both the scope of the alleged fraud and the sheer number of documents sent to the DOJ, it is simply implausible that Schultz did not have knowledge of the general nature of the alleged wrongdoing. Furthermore, Schultz denied any wrongdoing after having responded to the DOJ's subpoena, further supporting that Schultz knew, or was reckless in not knowing, about the alleged frauds. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (holding that, after the announcement of New York Attorney General investigation of misconduct at subsidiary, an executive's personal comments supporting company's business practices, combined with the

rapid discovery of misconduct at subsidiary thereafter, constituted strong circumstantial evidence

of the executive's scienter). It is true that this statement was made a few months after the various

relevant periods, but the DOJ investigation commenced long before that statement, as evidenced

by Teva's receipt of a DOJ subpoena in June 2015.

Five the Direct Actions—*INKA*, *Pacific*, *Phoenix*, *Schwab*, and *Stichting*— go a step

further. In those Actions, Schultz is alleged to have made, not only the above statement, but an

additional statement in 2017 stating, "we are reviewing each and every product worldwide, and

we will make pricing adjustments to the extent … necessary." *INKA* Compl., No. 3:20-cv-0008,

Doc. No. 1, at ¶ 274. Crediting that allegation as true, Schultz made another representation that

creates a strong inference that he possessed knowledge of the true state of affairs of the business.

Other allegations support recklessness. Each of the Direct Actions alleges that Schultz

signed and certified multiple disclosures that are alleged to have contained false and misleading

statements. Furthermore, the magnitude of the fraud is significant. It is alleged that in 2016, that

the inflated and collusive profits increased Teva's profitability by at least $513 million. *Phoenix*

Am. Compl., Doc. No. 397, at ¶ 731. The stronger inference is that Schultz, as Teva's CEO,

knew the source of those profits. *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268

F. Supp. 3d 526, 553 (S.D.N.Y. 2017) ("The Court of Appeals for the Second Circuit has held

that the size of the purported fraud may contribute to an inference of scienter.") (collecting

cases).

Taken together, I hold that the Direct Actions have adequately alleged recklessness on the

part of Schultz.

B.     Alleged Misrepresentations and Omissions Regarding the Opioid Scheme,
       Bribery Scheme, and the Actavis Acquisition

Unlike the *Ontario* SAC, a majority of the Direct Actions introduce new theories of liability based on distinct categories of misrepresentations and omissions. The Defendants challenge four of those new theories. Two survive the motion to dismiss.

      1.    Opioid Scheme

The *Pomerantz* Direct Actions allege that the Defendants concealed Teva's illegal marketing of opioids for off-label uses, and subsequently, materially understated the negative impact their marketing practices would have on Teva. *Pom.* Compl., Doc. No. 391, at ¶¶ 388–400. The Defendants argue that all of those claims must be dismissed on the basis of the *Pomerantz* Plaintiffs' (1) failure to plead actionable misstatements or omissions; (2) failure to plead scienter; and (3) failure to plead loss causation.[46] *See* Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786-1, at 18–25.

      a)    *Alleged Misstatements*

As alleged in the *Pomerantz* complaint, the Defendants made several statements relating to the opioids scheme. Those statements can be summarized into three categories: (1) statements and disclosures in annual filings that "concealed Teva's illegal marketing of opioids for off-label uses," *Pom.* Compl., Doc. No. 391, at ¶¶ 388–90; (2) statements in annual and quarterly filings disclosing that Teva was named in numerous complaints and investigations by State Attorneys General in connection with the alleged scheme, *see id.* at ¶¶ 392–97; and (3) denials that Teva engaged in the alleged wrongdoing, *see id.* at ¶¶ 398–99. In making those statements, the *Pomerantz* Plaintiffs argue that the Defendants should have simultaneously announced that they were violating the law. With one exception, the *Pomerantz* Plaintiffs' position is incorrect.

---

[46]     The Defendants also move to dismiss the *Pomerantz* Plaintiffs' PSA claims based on the Opioid Scheme. Having already dismissed the DAPs' PSA claims, the Defendants' argument that the *Pomerantz* Plaintiffs' PSA claims are time barred is now moot. *See* Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786-1, at 25.

To begin, it is well established that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (cleaned up); *see also In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) ("[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations."). Nonetheless, the duty to disclose uncharged wrongdoing may arise in three scenarios: (1) "when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"; (2) "when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"; or (3) "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (cleaned up). Given that the *Pomerantz* Plaintiffs' theory is premised on the lack of disclosure about alleged misconduct, the second *Menaldi* scenario requires consideration.

According to the *Pomerantz* Plaintiffs, the first category of statements was misleading because the statements "failed to disclose material adverse facts about [Teva's] business, operational and compliance policies," including, but not limited to, Teva's alleged purposeful illegal marketing of its opioid products. *Pom.* Compl., Doc. No. 391, at ¶ 391. However, the *Pomerantz* Plaintiffs fail to support the required "direct nexus" between the alleged wrongdoing and the company's statements. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d at 588–90.

Take the two alleged misstatements for example. The first alleged misstatement is that Teva, in its 2013 Form 20-F, stated that the company's acquisition of biopharmaceutical company, Cephalon, Inc., "helped diversify [its] specialty portfolio and enhance [its] innovative

pipeline." *Pom.* Compl., Doc. No. 391, at ¶¶ 208, 389. Nothing about that statement implies that

Teva was denying its involvement in the alleged criminal conduct. The second alleged

misstatement is that Teva, in several of its annual disclosures, stated that two of its opioid

products were "indicated for the treatment of breakthrough pain in opioid-tolerant adult patients

with cancer." *Id.* at ¶¶ 389.[47] Again, that statement could not be construed as denying criminal

conduct. For one, the phrase "indicated for" is merely describing the manner in which the drug

has been approved for use by the FDA. *See* 42 U.S.C. § 1396r-8(k)(6) (a medically accepted

indication means a use that is approved by the FDA). Further, the statement is silent about

Teva's marketing practices with respect to those drugs. Nor does the statement purport to suggest

that Teva *only* intended to market its opioid products for that approved purpose.

Both of those statements are distinguishable from statements in prior cases that were held

to function as denials of illegal conduct. In *In re Banco Bradesco S.A. Securities Litigation*, the

court held that the company misled investors by representing that it had adopted an "effective"

anti-bribery policy when in fact high-level officers were participating in many illegal bribery

schemes. *See* 277 F. Supp. 3d 600, 659–60 (S.D.N.Y. 2017). Unlike in *In re Banco Bradesco*, the

statements at issue here did not strongly imply that there was no illegal conduct occurring. Said

differently, the omitted fact of the Defendants' alleged misconduct did not render the

Defendants' representations untrue. As such, there was no duty to disclose the alleged

misconduct.

---

[47]     *See also* Teva Pharmaceutical Industries Limited 2015 Form 20-F, available at
https://www.sec.gov/Archives/edgar/data/818686/000119312516459785/d120587d20f.htm (last visited May 1,
2023). Although the 2013 Form 20-F report is not attached to the *Pomerantz* complaint, I can consider it because it
is explicitly referenced in the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).
Moreover, I may also take judicial notice of public disclosure documents that must be filed with the SEC and
documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by
law." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

Likewise, the second category of statements is also inactionable. The law required Teva to disclose the investigations against it and the potential legal ramifications, which the Defendants are alleged to have done. By way of example, the *Pomerantz* Plaintiffs allege that Teva disclosed in its third quarter 2017 Form 6-K that "a number of State Attorneys General … initiated investigations into sales and marketing practices of Teva and its affiliates with respect to opioids." *Pom.* Compl., Doc. No. 391, at ¶ 397. Compare those facts to *City of Pontiac Policemen's and Firemen's Retirement System*. There, the Second Circuit held that the company complied with its duty to disclose when revealing its involvement in "multiple legal proceedings and government investigations" and that its involvement could expose the company to significant damages. *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 184. The same rationale applies here. It is clear that the Defendants repeatedly disclosed that Teva was facing legal liability and that, if charged, Teva would be facing a multitude of penalties. Asking for more would create a new obligation that does not find support in the law. *See, e.g., In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 617 (S.D.N.Y. 2017) (holding that alleged misstatements were not actionable where the plaintiffs "at most plead[] that the defendants disclosed an investigation was ongoing, but refused to provide details") (cleaned up).

The third category of statements, however, is actionable under the securities law. As discussed above, Teva affirmatively disclosed that it was subject to various lawsuits. And had the company stopped there, that would have been the end of its disclosure obligation. It did not, however. Importantly, it is alleged that Teva "continuously denied liability with respect to its sales and distribution of opioids." *Pom.* Compl., Doc. No. 391, at ¶ 398. The *Pomerantz* Plaintiffs specify precisely where such misstatements were made. *Id.* ("Specifically, in each of Q2 2017 6-K, Q3 2017 6-K, 2017 10-K, Q1 2018 10-Q, Q2 2018 10-Q, Q3 2018 10-Q, 2018 10-

K, and Q1 2019 10-Q filings Teva and its affiliates 'den[ied] all allegations asserted in these complaints[.]'"). And again, Defendant Schultz is alleged to have stated on a May 2, 2019 earnings call that the company always complied with the FDA and other relevant authorities with respect to its opioid sales. *Id.* at ¶ 399. One cannot plausibly read those statements as anything other than denials of illegal conduct. And as *Menaldi* instructs, speaking on the veracity of the allegations triggered a duty to disclose the alleged misconduct. 164 F. Supp. 3d at 581.

Moreover, the *Pomerantz* Plaintiffs state a plausible claim that such underlying conduct occurred. "When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Id.* 578. For example, the *Pomerantz* Plaintiffs allege that in 2011, Teva issued a journal supplement that "promoted Fentora for multiple causes of pain, rather than solely the FDA-approved use in connection with cancer treatment." *Pom.* Compl., Doc. No. 391, at ¶ 215 (cleaned up). Assuming that allegation to be true, the *Pomerantz* Plaintiffs have plausibly alleged that Teva illegally promoted off-label (i.e., non-FDA approved) uses for some of its opioid products.

b)      *Scienter*

Next, the Defendants contend that the *Pomerantz* Plaintiffs have failed to establish scienter with respect to Defendants Schultz and Teva. I address each Defendant in turn.

(1)      Schultz

Beginning with Schultz, only one allegedly false and misleading statement relating to the opioid scheme is attributed to Schultz—the statement made on the May 2, 2019 earnings call. On that call, when asked about potential opioid liability, Schultz stated that "from [his] point of view," Teva always complied with the FDA and other relevant authorities with respect to its opioid sales. *Pom.* Compl., Doc. No. 391, at ¶ 399. The *Pomerantz* Plaintiffs argue that scienter

is adequately pled because Schultz "affirmatively assured investors that he had investigated the issue," and in doing so, "ignore[d] crucial information at [his] fingertips" that would have contradicted his statements. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 26.

Put simply, Schultz's statement is insufficient to support scienter. Contrary to the *Pomerantz* Plaintiffs' argument, Schultz did not "affirmatively" assure investors that he investigated the issue. A less strained reading of Schultz's statement is that, based on the information he had, he did not believe that there was any wrongdoing. Had Schultz stated he investigated the issue and then denied any wrongdoing, the inference of scienter would be stronger given the alleged pervasiveness of the fraud. But as it stands, that singular statement does not suggest that Schultz investigated the issue. Nor is it alleged that he even had the duty to do so before speaking.[48]

Of significance, the complaint is devoid of any allegations that Schultz had access to information that would have contradicted his statement. That missing piece is critical because the complaint must allege equally compelling information available to the individual defendants at the time of their public statements in order to plead their scienter. *See Novak*, 216 F.3d at 304, 311 (in light of particularized allegations that the defendants had access to documents directly relevant to the subject of their misstatements, the court reasoned that the defendants knowingly made the misstatements); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) ("Given the allegedly stark contrast between [the defendant's]

---

[48]     Even if Schultz had a duty to, but did not, investigate before making that public statement, there are no allegations to support an assertion that the failure to investigate reflected the requisite intent. In establishing scienter, "simple negligence, even inexcusable negligence, is not enough." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006).

knowledge and [the defendant's] public statements, the Court is satisfied that [the plaintiff] has adequately pled [scienter.]").  No such allegations are made here.

In sum, the *Pomerantz* Plaintiffs have not adequately alleged Schultz's knowledge.[49] Accordingly, there can be no Section 10(b), Rule 10b-5, or Section 20(a) liability against him based on the Opioid Scheme. Accordingly, those claims, as well as the derivative ISL claims, must be **dismissed**.

(2)     Corporate Scienter: Teva

Notwithstanding the *Pomerantz* Plaintiffs' failure to plead a strong inference of scienter with respect to Schulz, it is still "possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "In exceedingly rare instances, a statement may be so 'dramatic' that collective corporate scienter may be inferred." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

As applied to Teva[50], the *Pomerantz* Plaintiffs allege a "massive multi-year, multi-pronged company-wide scheme to push opioids for off-label use." Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 25. The scheme is alleged to have been so central to Teva's day-to-day operations and pushed by Teva's management, thereby creating a strong inference for scienter. *See, e.g., Pom.* Compl., Doc. No. 391, at ¶¶ 213–19. In many respects, that argument is logical and has parallels to a hypothetical

---

[49]     For similar reasons, the *Pomerantz* Plaintiffs have not established "culpability" which is an essential element of a Section 20(a) claim. *See Ontario*, 432 F. Supp. 3d at 176 (To state a claim for a Section 20(a) violation, a plaintiff must plead, *inter alia*, culpability "with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind, i.e., scienter.") (cleaned up).

[50]     The *Pomerantz* Plaintiffs sue both Teva, and Teva USA. For purposes of this analysis, Teva will collectively refer to both Defendants.

scenario the Second Circuit identified as sufficient to support scienter under the "exceedingly

rare" model. The hypothetical went as follows:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and
> the actual number was zero. There would be a strong inference of corporate
> scienter, since so dramatic an announcement would have been approved by
> corporate officials sufficiently knowledgeable about the company to know that the
> announcement was false.

*Teamsters Loc. 445 Freight Div. Pension* Fund, 531 F.3d at 195. Just as one might expect

General Motors executives to have authorized such a message, the same would be true here

because the allegations set forth a claim of a widespread company strategy. To illustrate, it is

alleged that Teva's "annual promotional spending on opioids steadily climbed from under $4

million in 2000 to more than $13 million in 2014, reaching a peak budget of $27 million in

2007." *Pom.* Compl., Doc. No. 391, at ¶ 219. Further, the *Pomerantz* Plaintiffs allege that a Teva

sales representative stated that it was "*Teva's management* that instructed sales representatives to

target pain clinics, notwithstanding the fact that such clinics do not treat cancer patients." *Id.* at ¶

218. In 2014, it is alleged that two California counties sued Teva and other pharmaceutical

companies for waging "a campaign of deception aimed at boosting sales" of opioids. *Id.* at ¶ 220

(cleaned up). After the first lawsuit was filed, 1,500 additional complaints were allegedly filed

against Teva over its sales of opioids. *Id.* at ¶ 222. Given how integral this alleged scheme and

eventual fallout was to Teva's business, the statements in Teva's annual filings continuously

denying having ever engaged in any illegal off-marketing of opioid drugs were recklessly made.

Thus, corporate scienter may be inferred.

### c)  *Loss Causation*

Next, the Defendants argue that the *Pomerantz* Plaintiffs have failed to plead loss

causation with respect to the alleged opioid scheme. The *Pomerantz* Plaintiffs allege that,

following Teva's announcement that it had reached an $85 million settlement with the State of

Oklahoma to resolve the state's claims relating to Teva's sales and marketing of opioids, the

price of Teva's securities fell by approximately 12.4%. Teva argues that the settlement

announcement was not a new risk because Teva had previously disclosed that it was subject to

1500 complaints regarding its sales and marketing of opioids and stated that "an adverse

resolution of any of these lawsuits or investigations may involve large monetary penalties and

could have a material and adverse effect on Teva's reputation, business, results of operations and

cash flows." Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New

Defendants, Doc. No. 786-1, at 24.

For reasons already mentioned, however, the disclosure of potential liability does not

necessarily expose the market to the full scope of the risk, particularly if as the *Pomerantz*

Plaintiffs allege, Teva had represented to investors that it was not liable on the claims. On this

issue, *AP-Fonden v. Goldman Sachs Group, Inc.*, is on point. 545 F. Supp. 3d 120 (S.D.N.Y.

June 28, 2021). There, the court held that announcement of a criminal investigation with

potential $2.7 billion liability was a corrective event despite the company previously disclosing

that it was subject to investigations because, although the company disclosed "some amount of

risk," the corrective event revealed a broader risk. *Id.* at 148–49. The same result follows here.

In sum, the Defendants' motion to dismiss all Exchange Act claims and derivative ISL

claims based on the Opioid Scheme is **denied** with respect to Teva and Teva USA **and granted**

with respect to Schultz.

### 2.    Bribery Scheme

Another basis of potential liability is Teva's participation in the Bribery Scheme. Two

Direct Actions—*Harel* and *Phoenix*— allege that Teva admitted that it "systematically bribed

officials in Russia, certain Eastern European countries, and certain Latin American countries to

inflate sales of [Teva's] biggest product, Copaxone." Pls.' Mem. in Opp'n to Defs.' Mot. to

Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 29 (cleaned up).

The Defendants seek to dismiss all of those claims on multiple grounds, notably timeliness.

   The *Harel* and *Phoenix* Plaintiffs first asserted these claims via the filing of their

amended complaints on May 28, 2020.[51] By then, however, the DAPs' claims were time-barred.

   Beginning with the Exchange Act, the *Harel* and *Phoenix* Plaintiffs allege violations

under Section 10(b) of the Exchange Act, Rule 10b-5, promulgated thereunder, and Section

20(a). The statute of limitations for claims brought under Section 10(b) of the Exchange Act and

Rule 10b-5 provides that a claim may not be brought more than "2 years after the discovery of

the facts constituting the violation." 28 U.S.C. § 1658(b)(1). A private action under Section 20(a)

of the Exchange Act must be filed within the earlier of "(1) 2 years after the discovery of the

facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b) (2014).

   Regarding the Securities Act, the *Harel* and *Phoenix* Plaintiffs bring claims pursuant to

Sections 11, 12(a) and 15. Actions under Sections 11 and 12(a)(2) of the Securities Act, which is

in Section 13 of the Securities Act, must be "brought within one year after the discovery of the

untrue statement or the omission, or after such discovery should have been made by the exercise

of reasonable diligence." 15 U.S.C. § 77m. Section 15 of the Securities Act claims are also

subject to the one-year statute of limitations. *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.1

---

[51]     In their moving brief, the Defendants mistakenly used the dates of the original *Harel* and *Phoenix* complaints. *See* Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 786-1, at 28. Due to that error, the Defendants' initial position was that only some of the claims should be dismissed. *See id.* ("Because the *Harel* plaintiffs first asserted claims based on the Bribery Scheme in their amended pleading on April 30, 2019, all of their claims are time-barred. And because the *Phoenix* plaintiffs' amended pleading asserting claims based on the Bribery Scheme was filed on August 3, 2018, their Securities Act and PSA claims are likewise time-barred."). The amended complaints, however, were filed on May 28, 2020. The Defendants corrected this error in their Reply brief and now argue that all claims based on the Bribery Scheme should be dismissed. *See* Defs.' Reply to Resp., Doc. No. 870, at 16 n.22.

(2d Cir. 1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well.").

It is undisputed that the sole corrective disclosure occurred on November 15, 2016. As such, the DAPs' Securities Act Claims must have been asserted by November 15, 2017. And DAPs' Exchange Act claims had to have been brought on or before November 15, 2018. The *Harel* and *Phoenix* Plaintiffs did not assert these claims until May 2020, well outside the statute of limitations.

The *Harel* and *Phoenix* Plaintiffs contend, however, that the statute of limitations was tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), by the original *Huellemeier* complaint that was filed in the United States District Court for the Southern District of Ohio on July 17, 2017. Although the *Huellemeier* complaint did allege facts about the Bribery Scheme, the Plaintiffs' position is misplaced. In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe*, 414 U.S. at 554. The *Huellemeier* class was comprised of "individuals who purchased or otherwise acquired Teva [ADS] pursuant to the [Company's Employee Stock Purchase Plan for *American* Employees]."[52] *Huellemeier on behalf of Teva Pharm. Indus. Ltd. Emp. Stock Purchase Plan v. Teva Pharm. Indus. Ltd.*, 2017 WL 5523149, at *1 (S.D. Ohio Nov. 17, 2017). Therefore, the *Harel* and *Phoenix* Plaintiffs, as Israeli insurance and financial services conglomerates, could not have been part of the putative class due to their status.[53]

---

[52]    The name of the plan is: Teva Pharmaceutical Industries Limited Employee Stock Purchase Plan ("the ESPP").

[53]    Presumably, the *Harel* and *Phoenix* Plaintiffs have conceded this point because at oral argument, the DAPs changed course, and argued that this not a question of tolling, but instead one of relation back. *See* Hr'g Trans., Doc.

Because the Bribery Scheme claims against the Defendants are time-barred, I need not reach Defendants' remaining arguments. *See, e.g., Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 200 (S.D.N.Y. 2020) (declining to reach the Defendants' remaining arguments after determining the plaintiffs' Exchange Act claims were time barred). Any claims based on the Bribery Scheme are **dismissed**.

### 3.    Actavis Acquisition

Next, 12 Direct Actions[54] allege that the Defendants made several misrepresentations about the positive impact the Actavis acquisition had on Teva's business. For context, the Actavis deal closed on August 2, 2016. Immediately thereafter, the Defendants made certain statements about the Actavis acquisition that the DAPs allege are false and misleading. *See, e.g., INKA* Compl., No. 3:20-cv-00083, Doc. No. 1, at ¶¶ 260–71. An example is a statement made in one of Teva's press releases, dated August 2, 2016, where Defendant Vigodman represented that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever." *Id.* at ¶ 111. Another allegedly misleading statement was made during a November 15, 2016 earnings

---

No. 940, at 70:09-70:17. From what I can discern, the *Harel* and *Phoenix* Plaintiffs' position is that because the original consolidated class action ("FAC") complaint in the *Ontario* Action, doc. no. 141, references the Bribery Scheme, it should relate back to *Harel* and *Phoenix's* individual actions. This argument too is without merit.

Putting aside that the DAPs have provided no case law to support that position, the relation back link is far too attenuated. Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when … the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the *original pleading*." (emphasis added). The original pleadings––the *Harel* and *Phoenix* complaints—made no reference to the Bribery Scheme. Moreover, it is worth noting that the original *Harel* and *Phoenix* complaints (filed Apr. 30, 2019 and August 3, 2018 respectively) were filed *after* the FAC (filed Sept. 11, 2017) was filed. And when the *Harel* and *Phoenix* Plaintiffs filed their original complaints, they indicated that they would opt out of any certified class in *Ontario*. Thus, it is not clear to me why these DAPs should be able to avoid the statute of limitations by arguing that their claims relate back to a class they opted out of.

[54]      Those Direct Actions include: *Clal* Am. Compl., Doc. No. 391; *Harel* Am. Compl., Doc. No. 399; *Highfields* Am. Compl., Doc. No. 396; *INKA* Compl., No. 3:20-cv-00083, Doc. No. 1; *Migdal Ins.* Am. Compl., Doc. No. 391; *Migdal Mut.* Am. Compl., Doc. No. 391; *Mivtachim* Am. Compl., Doc. No. 391; *Pacific Am. Compl.*, Doc. No. 392*; Phoenix* Am. Compl., Doc. No. 397; *Psagot* Am. Compl., Doc. No. 391; *Schwab* Am. Compl., Doc. No. 393; and *Stichting* Am. Compl., Doc. No. 394.

call where Defendant Vigodman stated that the Actavis acquisition "strengthens and broadens

[Teva's research and development] capabilities, and highly complements our product pipeline,

product portfolio, geographical footprint and operational network." *See, e.g., Harel* Am. Compl.,

Doc. No. 391, at ¶ 416. Such representations, the DAPs allege:

> … misled investors by presenting a materially false and misleading picture of
> Teva's business, financial results and operations by, in addition to the reasons set
> forth above, failing to disclose and actively concealing the negative impact
> resulting from the acquisition and integration of Actavis on the Company's
> financial results and business prospects, which (among other things) exacerbated
> the risky and unsustainable nature of the price-hike strategy, which collapsed
> shortly after the closing of the Actavis acquisition in August 2016.

*Id.* ¶ 685.

The problem with the DAPs' argument, however, is that the Direct Actions fail to plead

that the Actavis acquisition actually had a negative impact on Teva. Consequently, there is

nothing in the pleadings that would suggest that the above statements were false. Recognizing

this error, the DAPs cite to several outside publications in their opposition papers to demonstrate

precisely how "Actavis was worth far less than its … price tag." *See* Pls.' Mem. in Opp'n to

Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 37.

But those publications were not cited in the complaints, and therefore cannot be used on a

motion to dismiss to remedy the defect. For similar reasons, the DAPs' argument that the

Defendants had an obligation, but failed, to disclose the "negative impact" of the Actavis

acquisition and its aftermath is simply incorrect. Again, without alleging that the Actavis

acquisition, *itself*, actually had a negative impact on the company, there can be no duty to

disclose the hypothetical "negative impact."

Great emphasis is also placed on another alleged misstatement, in which Defendant

Desheh stated: "The increase in our operating profit was driven mainly by our generic business,

following the closing of the Actavis transaction." *See, e.g., INKA* Compl., No. 3:20-cv-00083,

Doc. No. 1, at ¶ 265. That statement, too, is not actionable for reasons already articulated.

Moreover, the statement requires an even greater leap. The phrase "following the closing of the

Actavis acquisition" could be read as simply a temporal descriptor. Had the statement read: "We

increased our operating profit *because of* the Actavis transaction," there would be a stronger

argument. But the statement is ambiguous about the source of Teva's profits, and therefore,

cannot be actionable under this theory.

Accordingly, any claims based on misrepresentations and omissions regarding the

Actavis acquisition are **dismissed**.

4.      Goodwill Statements

The Defendants' final argument, initially raised in a footnote, is that two Direct Actions–

–*Harel* and *Phoenix*— fail to plead an actionable statement with respect to Teva's allegedly false

representation of its goodwill. *See, e.g., Harel* Am. Compl., Doc. No. 399, at ¶¶ 577, 686–94;

Defs.' Mem. in Supp. of Mot. to Dismiss New Claims and Claims Against New Defendants,

Doc. No. 786-1, at 33 n.36.

Specifically, those Direct Actions allege that the Defendants mislead investors with

statements such as:

> "[Goodwill] [c]ash flow projections are based on management's estimates of revenue
> growth rates and operating margins, taking into consideration industry and market
> conditions." *Phoenix* Am. Compl., Doc. No. 397, at ¶¶ 573, 704; and

> "[T]here was no impairment for our remaining reporting units, whose fair value was
> estimated based on future cash flows discounted at a market participant rate." *Harel* Am.
> Compl., Doc. No. 399, at ¶ 689.

Those statements, the *Harel* and *Phoenix* Plaintiffs allege, were misleading because the

Defendants "concealed Teva's use of an aggressive 20% growth rate to project cash flows as part

of its goodwill impairment test." *See* Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss New Claims and Claims Against New Defendants, Doc. No. 844, at 43.

The Defendants argue that those statements are not actionable because "goodwill estimates are opinion statements," and therefore inactionable absent "concrete facts to support a strong inference 'that defendants did not believe in their statements of opinion regarding [Teva's] goodwill at the time they made them.'" Defs.' Reply to Resp., Doc. No. 870, at 20 (quoting *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012)).

The Defendants are correct that "[g]oodwill estimates are opinion statements." *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016). Furthermore, the Defendants are also correct to assert that goodwill statements may become actionable when facts are pled to show that the speakers did not believe their own statements. The crux of the Defendants' arguments is that Plaintiffs failed to do so. *See* Defs.' Reply to Resp., Doc. No. 870, at 20 ("Plaintiffs have alleged no such facts; rather, they merely speculate that Teva's [discounted cash flow] model effectively applied an aggressive, biased [compounded annual growth rate] of 20%"). But not believing a goodwill statement is not the only method one can use to make an otherwise inactionable goodwill statement actionable.

Goodwill statements are actionable only if "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 233 (S.D.N.Y. 2021) (quoting *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order) (cleaned up).

99

For purposes of this argument, the third method is of significance. The *Harel* and *Phoenix* Plaintiffs have alleged that the Defendants used an "aggressive, biased 20% [cash flow growth rate]" that inflated and contradicted "management's [own] estimates of revenue growth rates and operating margins" and "violated GAAP requirements." *Harel* Am. Compl., Doc. No. 399, at ¶ 543, 545. Other courts have held similar allegations to provide sufficiently strong circumstantial evidence of recklessness to survive a motion to dismiss. *See, e.g., In re Avon Sec. Litig.*, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (scienter sufficiently alleged where the defendants failed to disclose the company's change in credit criteria and correspondingly made false and misleading GAAP calculations); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7 (S.D.N.Y. May 24, 2018) (goodwill statements are actionable when plaintiff "include[s] factual allegations from which a reader could infer [d]efendants intentionally or recklessly" failed to comply with GAAP requirement).

Even if the Defendants previously disclosed the 20% projection rate, as the Defendants point out in their Reply, the gravamen of the *Harel* and *Phoenix* Plaintiffs' allegations is that the calculation was recklessly implemented. The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts conflict with what a reasonable investor would take from the statement itself." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *17 (cleaned up). And because a reasonable investor would want to know that the "20% growth rate" contradicted management's estimates of revenue growth and operating margins, the *Harel* and *Phoenix* Plaintiffs' goodwill-related claims pass muster.

Therefore, the Defendants' motion to dismiss these claims is **denied**.

## VIII.   CONCLUSION

For the reasons set forth above, the Defendants' motions to dismiss are **granted in part, and denied in part**. Specifically:

- The Defendants' Motion to Dismiss on Pleading and Other Grounds, doc. no. 784, is **granted in part, and denied in part**.

- The Defendants' Motion to Dismiss New Claims and Claims Against New Defendants, doc. no. 786, is **granted in part, and denied in part**.

- The Defendants' Motion to Dismiss State and Common Law Claims, doc. no. 787, is **granted**.

In addition, I grant the *Pacific*, *Harel*, and *Phoenix* Plaintiffs leave to amend their complaints only to restate causes of action relating to: (1) claims based on the 2020 Notes; and (2) Section 12(a) claims. Any amended complaint shall be filed within 45 days of this Order.

So ordered.

Dated at Bridgeport, Connecticut, this 1st day of May 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

101